```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF HAWAII


                                    )
UNITED STATES OF AMERICA,           )  Case No. 19-CR-00099-DKW-1
                                    )
                      Plaintiff,    )  March 11, 2022
                                    )  9:30 a.m.
              vs.                   )
                                    )
MICHAEL J. MISKE, JR.,              )
                                    )  U.S. District Court
                      Defendant.    )  300 Ala Moana Boulevard
_____ )     Honolulu, HI 96850



    TRANSCRIPT OF HEARING ON DEFENDANT'S SECOND MOTION TO COMPEL
                           DISCOVERY
          BEFORE THE HONORABLE KENNETH J. MANSFIELD
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES: (Via Video Tele-Conference)

| | |
|---|---|
| For Plaintiff: | Mark A. Inciong, Esq. |
| | Micah W.J. Smith, Esq. |
| | Michael David Nammar, Esq. |
| | U.S. Attorney's Office |
| | 300 Ala Moana Boulevard, #6100 |
| For Defendant: | Honolulu, HI  96850 |
| | |
| | Thomas M. Otake, Esq. |
| | 851 Fort Street Mall, #400 |
| | Honolulu, HI  96813 |
| | |
| For Defendant: | Lynn E. Panagakos, Esq. |
| | 841 Bishop Street, #2201 |
| | Honolulu, HI  96813 |
| | |
| Transcription Service: | Jessica B. Cahill, CER/CET-708 |
| | Maukele Transcribers, LLC |
| | 467 Maukele Place |
| | Wailuku, Maui, HI  96793 |
| | Telephone: (808)298-8633 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1  MARCH 11, 2022                                9:30 A.M.

 2          THE CLERK:  United States District Court for the

 3  District of Hawai'i with the Honorable Kenneth J. Mansfield,

 4  United States Magistrate Judge presiding is now in session.

 5          Criminal number 19-00099-DKW-KJM, United States of

 6  America v. Defendant (01) Michael J. Miske, Jr.  This hearing has

 7  been called on a second motion to compel discovery.  Counsel,

 8  please make your appearances for the record, starting with the

 9  Government.

10          MR. SMITH:  Good morning, Your Honor.  Micah Smith,

11  Michael Nammar, and Mark Inciong for the United States.

12          THE COURT:  Good morning.

13          MS. PANAGAKOS:  Good morning, Your Honor.  Lynn

14  Panagakos and Thomas Otake on behalf of Michael J. Miske, Jr.,

15  and Mr. Miske is present from FDC on the telephone over there, I

16  believe.

17          THE COURT:  Okay.  Good morning.  May we have Michael

18  Miske on the phone, please?

19          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

20          THE DEFENDANT:  Good morning, Your Honor.

21          THE COURT:  Good morning.  Is this Michael Miske?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Good morning.  This is Judge Mansfield.

24  Ms. Panagakos and Mr. Otake are on the phone, as are Mr. Smith,

25  Mr. Nammar, Mr. Inciong from the U.S. Attorney's Office, and
```

3

1   likely some other members of the public listening in.

2          And this morning we have set for hearing your second

3   motion to compel discovery.  And before we proceed, I want to be

4   sure you agree to holding this hearing by telephone, Mr. Miske.

5          THE DEFENDANT:  Yes, Your Honor, and good morning,

6   counselors.

7          THE COURT:  Okay.  Okay.  Thank you.

8          And I have reviewed the -- excuse me -- the motion, the

9   memo in opp, and the reply.  And I would like to hear argument

10  from counsel, so Ms. Panagakos or Mr. Otake, whoever is arguing,

11  you can go first.

12         MS. PANAGAKOS:  Yes, Your Honor.  Thank you.  This is

13  Ms. Panagakos.

14         Your Honor, our motion request for production of

15  missing reports as well as the removal of redactions, which are

16  concealing exculpatory evidence, which will help undermine

17  essential aspects of the RICO charge.  What I call the RICO

18  enterprise, affairs of membership, and existence elements.  The

19  requested evidence is also relevant to help undermine the

20  Government's charge that Miske is a member of the drug conspiracy

21  charge in Count 16.

22         It appears, Your Honor, that the Government is -- has

23  intentionally -- has made an intentional decision to redact --

24  when one witness talks about another witness, who is a

25  cooperator, the Government redacts what that witness says about

1    the other cooperator.  So everything -- in this instance,

2    everything that Ashlin Akau says about Jacob Smith and Lindsey

3    Kinney are redacted.

4            That's exculpatory because she describes numerous

5    alleged offenses, which the Government contends are affairs of

6    what the Government calls the Miske Enterprise.  And what Ashlin

7    Akau describes in the context of these offenses is who committed

8    them, how they were associated with one another, the motives for

9    the crimes.  And all of it has nothing to do with Mr. Miske.  And

10   that's why the redactions are concealing exculpatory evidence.

11           For example, at Bate stamp 2-1-6-7-3-3, she describes

12   the conduct which is charged as a Hobbs Act Robbery in Count 18

13   and is alleged to be an affair of the Miske Enterprise.  And the

14   way it's in our report is that, redacted, approached CI, who was

15   Ashlin Akau, along with Norman Akau back in June 2016, about a

16   proposition to rip off dope from, and then an entire line is,

17   redacted, so it's more than just the alleged dope dealer victim's

18   name, and then while they were drinking at The Shack in Kailua.

19           That, redacted, was, redacted, source for dope.  That

20   Ashlin Akau met, redacted, through Norman Akau during the drug

21   rip of June 2016.  So, for example, I believe that in that

22   instance the, redacted, is Jacob Smith.  So she's describing how

23   she, Ashlin Akau, met Jacob Smith, through her uncle Norman Akau,

24   while they were ripping off the person whose identity is

25   concealed, but is disclosed elsewhere to be Nicholas Carignan,

1   who has nothing to do with Mr. Miske, concerning drug deals that

2   he had nothing to do with, but we can't see it because of the

3   redactions.

4           So, instead, I have been going through needles and

5   haystacks to pick out other places where I could find the

6   information, and then inserted it handwritten on my document, so

7   I can interpret these things.  I obviously can't get ready for

8   trial with such things, because I can't use them for cross-

9   examination, when it's just my handwritten notes as to what's

10  behind these redactions.

11          Anyway, going on with this Nicholas Carignan thing. She

12  says that it was done by members of the Nakipi Club.  The people

13  involved in the writ were several co-defendants, Norman Akau,

14  Lance Bermudez, and then two people who are redacted, likely one

15  of them is Jake Smith and another one who is just a mystery

16  person, and other members of the Nakipi Motorcycle Club.

17          That the members of the Nakipi Motorcycle Club are

18  Harry Kauhi, Norman Akau, and a number of redacteds.  So, here

19  again, Norman Akau and Harry Kauhi are both alleged to be members

20  of the Miske Enterprise, and she's describing them as members of

21  another group that commits crimes together with other people who

22  are redacted.

23          We need to know who all these people are that committed

24  this offense, so we can prepare our defense to it, so we can show

25  -- and it's exculpatory because it undermines the notion that

6

1    this is an affair of this fictional thing that the Government

2    calls the Miske Enterprise.  Anyway, it goes on.  She was paid

3    $2,000 for setting up redacted for the rip, and then there's

4    another entire line that's redacted.

5           So that's an example of exculpatory information on

6    Count 18, that's being redacted.  I mean, you know, if I couldn't

7    -- if I didn't compare this with other documents, which I guess

8    the Government chalks up its disclosure to human error, the way

9    they describe it in their opposition, I wouldn't even know that

10   this was Count 18.  So that's one.

11          Another one is Count 8, the conduct, which they claim

12   was attempted murder of Lindsey Kinney.  Now Lindsey Kinney is

13   also a member of Nakipi.  And she describes in the same report

14   how somebody redacted told her that Norman Akau along with Uncle

15   Zeph set up this shooting.  Uncle Zeph is also a member of

16   Nakipi.  Anyway Akau took redacted's gun away from him so that

17   Miske and some others redacted, probably Jake Smith, could shoot.

18          That redacted told Akau -- Ashlin Akau he was dealing

19   ice for redacted for a couple of weeks before the shooting.

20   During that time redacted did return money back to redacted a

21   couple of times and then stopped.  On the day of the shooting,

22   redacted called Ashlin Akau and said, he had clipped redacted,

23   meaning that he didn't pay him back for the dope.

24          So this is -- and then -- so this is describing a drug

25   related shooting that Miske had nothing to do with these drugs.

1   And, you know, and it's being -- we need -- again, the disclosure

2   of this information is exculpatory because it's going to show

3   that this incident, which the Government claims was an affair of

4   the alleged Miske Enterprise and also was committed by people for

5   the purpose of advancing their positions in the Miske Enterprise.

6           And she says that redacted told her that redacted and

7   told Akau to take care of redacted, referring to shooting

8   redacted while redacted was off island.  Ashlin Akau stated

9   redacted did this to find out if Akau, with his boys, and to

10  question Akau's loyalty being that both Akau and redacted were in

11  the Nakipi Club together and that redacted and Akau are calabash

12  brothers.

13          So, for example, who and Akau are calabash brothers?

14  Is that Jacob Smith?  I think so, but I don't know.  But again,

15  it shows that these people have separate associations, either

16  through Nakipi or being calabash brothers, and this is how Ashlin

17  Akau gets into it, through her uncle who introduces her to his

18  calabash brother and the people in Nakipi, and I can't see it

19  because of these exculpatory concealments.  So that's one.

20          Another one is -- another -- and so, Your Honor, this

21  indictment is very general.  It doesn't have a pattern of

22  racketeering activity.  I mean, I get it that there's case law

23  that says technically in a conspiracy case you don't have to

24  allege a pattern of racketeering activity, but you still have to

25  provide notice and the notice has to be in the indictment, and

1    it's not.

2            So instead what we have is what the Government calls an

3    enterprise letter. It's not on file, it doesn't bind them to

4    anything, whatever.  But there's 76 paragraphs.  Some of them

5    have more than on offense in them, and they say they may prove

6    one or more of these, whatever.

7            Anyway, one of them is an alleged attempted assault

8    against somebody that has nothing to do with Miske.  Now Ashlin

9    Akau, at page 4-5-8-9-2 says, apparently, that she was -- that it

10   was done -- that the offense was committed by a number of

11   redacted people, and that she was the get away driver for a

12   number of redacted people, after it was over.  Now who were the

13   redacted people, we don't know.  It's being concealed.

14           But, again, the Government claims this is an affair of

15   the Miske enterprise, we say it's not.  We need to know what the

16   witnesses are saying as to who was involved and why, so that we

17   can do our investigation and undermine the claim that these are

18   affairs of this alleged enterprise.

19           She says -- you know, so she says that she picked up

20   redacted at a certain location, Cinnamon's Restaurant.  Then

21   another person, who is also redacted, that's at 2-1-6-5-6-8,

22   which I believe is Lindsey Kinney, but it's redacted, he says

23   that someone else was the get away driver and that other people,

24   different from the ones Ashlin Akau identified -- I believe

25   they're different based on, you know, all of the fine print I've

1  been trying to divine here through these redactions, that they're

2  identifying different people.

3          I believe that Mr. Kinney is identifying, not Ashlin

4  Akau as the get away driver, but someone else with the initials

5  K.P.  And I believe that Mr. Kinney -- that the redactions are

6  concealing his statements about K.P., and another person who he,

7  Kinney, says was involved with the initials D.P., a male.  Ashlin

8  Akau identifies different males.

9          These are not just inconsistent statements to use on

10  cross-examination, this is stuff we need now, so we can do our

11  investigation.  I mean, in the context of Lindsey Kinney and his

12  differences between Ashlin Akau, you know, these witnesses

13  complain to the cops, and nothing happened.  You know, they

14  weren't even taken seriously because people believed Kinney, you

15  know.  And now Akau comes in and tells a different story.  Which

16  one do they believe now?

17          Kinney's version was used in wiretap applications, but

18  we can't see -- I believe they're inconsistent, but I can't see

19  because of the redactions with Ashlin Akau's.  When they got to

20  Aikahi Shopping Center, a male named redacted, picked them up.

21  You know, redacted, that could be Kinney.  Redacted, you know,

22  drove them around the corner.  I mean, it's just -- redacted

23  believed that the reason for this was the ongoing feud between

24  redacted and redacted.  Again, now motive.

25          Well, you know, I mean, Your Honor, this is not even

 1    the tip of the iceberg.  This is such a small microcosm of what

 2    we're dealing with here.

 3            Another one is there's another incident, in another

 4    report about a Chrysler that she rented for redacted to use as a

 5    safe car.  Here, it looks like the redacted again is Jake Smith,

 6    if I'm guessing correctly.  And it talks about things he did with

 7    co-defendants in the case that had nothing to do with Miske, but

 8    is alleged to be an affair of the Miske Enterprise, but I can't

 9    -- I can't -- this information would help me show that, and I

10    don't have it.

11            You know, Ashlin Akau stated that on the night of the

12    shooting blank redacted called her phone and said that, you know,

13    Dae Han Moon did something, which is redacted.  Shortly after,

14    redacted, and a co-defendant showed up at her house.

15            You know, I just -- and the Government's claim that

16    this is for witness security is just preposterous.  I mean,

17    everything that's inculpatory as to Mr. Miske is disclosed.  It's

18    the stuff about other people -- you know, how is this posing a

19    threat to her if they disclose what she said about Jake Smith and

20    Lindsey Kinney?  And how is that posing a threat to anybody?  So

21    that's some examples of the redactions.

22            Then we have the stuff that's completely missing.  So

23    Terence Chu says that in the reports prior to him intervening

24    with her father, she wasn't forthright.  Well, we don't have

25    those.  So, again, this is not just a matter of getting something

1   on the eve of trial to use in cross-examination.

2          We need to see how her story evolved from when she,

3   according to Terence Chu, was not forthright until now, so we can

4   investigate the evolution of her story.  And then what's his

5   relationship with her father?  He says he has a historical

6   relationship with her father that he used to persuade her to

7   change her story.  Well, what kind of relationship is that?  Is

8   it from a soccer game or church, or is he a criminal informant?

9   And if he's somebody who rips off drug dealers, and is that how

10  Ashlin Akau got into the trade, rather than through the alleged

11  Miske Enterprise.

12         These things are, you know, just -- I hope I'm getting

13  my point across as to how this is just preventing us from

14  investigation and, you know, conducting an effective defense.

15  The Government's claim that this is all just -- you know, the

16  302s are not discoverable is just -- I mean, I just -- I mean,

17  they cite one case that says it under certain circumstances.

18  There's plenty of cases that say 302s are discoverable.

19         The United States v. Kohring case out of the Ninth

20  Circuit is a big one.  It talks about how you can use them for

21  cross-examination.  You can use them to develop admissible

22  evidence, to pursue leads, and also, in some instances, they're

23  admissible.

24         So that's some of the examples of what we're seeking

25  here.  And I know, Your Honor, you've read everything, so

1    basically what I want.  In this motion is the stuff I've asked

2    for related to Ashlin Akau, and then more broadly for the

3    Government to be ordered to remove all discoverable redactions

4    from their work -- from the discovery.

5            They talk about human error, Your Honor.  You know,

6    it's not our problem they've committed so many errors.  I mean,

7    when I got the first set of discovery -- I mean, his name --

8    there's contracts where Mr. Miske is a party to the contract, and

9    they redact the address.  The address of whatever, if it's a real

10   property transaction.  They redact his information on his own

11   bank accounts that I can't see the account numbers, so I can't

12   even do any financial analysis.

13           And so what -- I mean, why am I supposed to correct

14   their mistakes in millions of pages?  And now we're talking about

15   close to 80 terabytes of data.  You know, they say, oh, this is

16   just a canned Giglio motion.  It's not.  You know, I mean, this

17   has taken me so much time to figure out what exists, and what's

18   missing, and how to go about getting it.

19           I mean, I talked to them -- after I got the first round

20   of discovery in August 2020, I called them, and I said, you know

21   what, you guys, I think you made some human errors in your

22   redactions.  You think you could take another look and maybe

23   correct it?  No, nothing.  I mean, and how many letters and

24   emails did I have to write before 14 months after the indictment

25   I get 60 gigabytes of unredacted financial records.  And nobody

1   else has that.  Why not?

2          So, anyway, to just pass this off as a canned Giglio

3   motion is just another example of their misconduct as far as I'm

4   concerned.  And it also ignores -- you know, Rule 5(f) wasn't in

5   play when the arraignment was -- happened in Mr. Miske's case.

6   It is now.  I mean, what is that?  Is that real?  I mean, you

7   know, the Court tells them now, you know, you've got a duty to

8   timely produce Brady material.  That's set at every initial

9   appearance now.  Have it make -- you know, tell them it means

10  something.  They're just ignoring that.

11         They ignored the entire content of my motion and just

12  said, oh, she's just asking for Giglio material.  She knows she

13  doesn't get that until later.  That's not what this is.  I don't

14  know if they just didn't read it or what.  And even if it was

15  just Giglio material, why not produce it now after the fiasco

16  they've created.  I mean, we're talking about a three month --

17  three to four month trial.  You know, this is -- what are they

18  going to flood us with in the month before trial?  It's going to

19  turn into a seven to eighth month trial.

20         And then it just boggles my mind that they use the

21  opposition to this motion to commend themselves for their

22  discovery practice, because, oh, they've worked so hard, and they

23  produced so much.  In the past two months since I filed my first

24  motion to compel, they have produced 20 times the amount of

25  discovery that everybody is talking about makes it the largest

```
 1   case ever in the District of Hawai'i and the largest case handled
 2   by the coordinating discovery attorney.
 3            I now have 20 times that amount and most of it was just
 4   seized from Mr. Miske and his businesses on the day of his
 5   arrest.  I asked them, why did it take a year-and-a-half for me
 6   to get this?  I got no answer.  I mean, that's just Rule 16 101.
 7   And they just -- I still don't have a complete extraction of the
 8   cell phone that was on him the day he was arrested.  They've
 9   given me some gray key progress reports now, which are partial
10   data.  I still don't even have the complete extraction.
11            And then what I have now -- also, you know, this
12   investigation has been going on for so long, so when I get the
13   first production, and I say, can you tell me what warrants you
14   executed on my client's accounts, oh, go look through the
15   discovery, figure it out yourself.
16            So after 700,000 pages, I now have a list of 20
17   warrants, and I'm combing through the discovery.  And I put in my
18   first motion, well, here's three examples where I know I don't
19   have everything.  I don't know about the rest, because I can't
20   figure it out.  What do I get?  I get now returns for 17 of those
21   warrants.  It wasn't in the discovery.  Why not?  I mean, again,
22   this is Rule 16 101.  And now I still don't have complete data,
23   and I got some discs.  They can't even bother to double check
24   their work.  I got empty discs with phone numbers on them and no
25   data on them.
```

1          Anyway, in addition to what they produced to Miske only

2   in the past two months, they also, in January, produced a million

3   files to the coordinating discovery attorney.  In January.  Six

4   -- a year-and-a-half after the indictment.  That's also Rule 16

5   101.  It appears, from what I can tell, to be mostly the paper

6   that was seized from the businesses.  Whereas Miske, only, has

7   now gotten 39 digital -- 39 terabytes of digital data.  There's a

8   million files to the coordinating discovery attorney.  Why did

9   that take a year-and-a-half?  Again, I asked them.  I got now

10  answer.

11         Now I -- you know, it took a while for me to figure out

12  that this was missing because of everything they do give us,

13  largely blacked out.  But when I figured it out last June, I told

14  them, hey, I don't even have what you guys seized on the day of

15  the arrest.  Do I get an answer?  No.  Instead, I get, oh, we've

16  taken death off the table, so now your discovery requests are

17  moot.  Like what the -- how is that moot?  So, no -- I respond,

18  no, it's not moot.  This is basic Rule 16 material.  Again, no

19  answer.  Not until I take the time to file my first motion to

20  compel.

21         All of this doesn't even include the 40 terabytes of

22  pole cam data.  That was produced to the coordinating discovery

23  attorney in December, just this past December.  Why did that take

24  so long?  I told them a while ago I wanted all of that.  That's

25  exculpatory, Your Honor.  They had my client under surveillance

 1   for years.  24/7 surveillance.  It's going to show he was a

 2   lawful businessman, living a normal life, going to Starbucks,

 3   going to the gym, going to work, hanging out with his girlfriend,

 4   you know, and not doing what these witnesses say he was doing.

 5         That's what this data is.  It's an extraordinary amount

 6   of exculpatory data.  The pole cam data is what's outside

 7   Kamaaina Termite.  The digital data, which they didn't give me

 8   until January is inside Kamaaina Termite.  And between the two,

 9   we're going to be able to paint a picture that totally defeats

10   this case, and they've been withholding it.  Now, why?  I don't

11   know.  I can't get any kind of straight answer.

12         Now they talk about, oh, well, the case was declared

13   complex, and nobody objected to rolling discovery.  Okay.  But

14   nobody agreed to one-and-a-half years, and still I don't even

15   have a complete extraction of his cell phone.

16         Now we, last October, moved to continue this trial.  At

17   that time, trial was in March.  And now we know that all this

18   stuff they were sitting on.  They were sitting on, yeah, 80

19   terabytes of discoverable data.  Did they join our motion to

20   continue?  No.  They didn't oppose it, but they didn't say, yeah,

21   you guys need this continuance because we're sitting on a boat

22   load of discovery that we haven't produced yet.  No, they didn't

23   say anything like that.

24         You know, I mean, how do they justify not producing it

25   until January when there was a prior trial date?  You know, and

1   now we're looking at another continuance because other co-

2   defendants don't even have what I have.  And now, how am I going

3   to get all of this to Mr. Miske?  I asked them that the other

4   day.  Would you help me get the laptop back?  I don't get help on

5   that.  I get maybe help with a hard drive.  There's no way that

6   Mr. Miske is going to be able to look at all this stuff on the

7   FDC computers, even with hard drives.  It requires applications

8   -- forensic applications to review the data.  It's not possible.

9          Now he had a laptop for a number of months while the

10  case was capital.  This stuff should have been there then.  So,

11  you know, what am I going to do?  I mean, are we going to

12  continue this for three years, and am I going to spend every

13  available visiting hour there with my own computer, so he can see

14  all this stuff?  It's just completely -- completely out of

15  control.

16         And they accuse me of overwrought rhetoric.  Your

17  Honor, I've been doing this for 34 years.  I've never ever seen a

18  case like this.  And, you know, when I brought these issues up in

19  other -- I don't bring this stuff up in every case.  Most cases I

20  don't do that.  I've had cases with Mike Nammar that have never

21  had any problems like this.  I've had plenty of cases with Mark

22  Inciong where I -- in one case we had some discovery issues.  All

23  the rest of them none.

24         When I bring issues like this it's because there's

25  merit and this case is worse than (indiscernible), which resulted

1   in sanctions.  It's worse than McCoy (phonetic), which resulted

2   in dismissal.  It's worse than Salinas (phonetic), which resulted

3   in a choice between sanctions and a continuance.  It's way worse

4   than all of them.  It just -- it boggle my mind.  And that they

5   could sit here and commend themselves for that, you know, they're

6   trying to put this man away for life.  Can't they at least follow

7   the rules?

8           That's all I have, Your Honor, unless you have any

9   questions for me.

10          THE COURT:  Okay.  Thank you, Ms. Panagakos.  And, you

11  know, I'm listening carefully.  I've read everything carefully,

12  and I've been taking notes.  I don't have any questions for you,

13  but I hear your sincerity, I hear your passion.  I don't want you

14  to take my silence as anything other than listening carefully.  I

15  don't have any questions for you right now.

16          Mr. Smith, are you arguing this morning for the

17  Government?

18          MR. SMITH:  Yes, Your Honor.  Good morning and may it

19  please the Court.

20          Ms. Panagakos has raised a number of discovery

21  arguments.  There are responses to everything she's saying, but

22  this is a hearing on the second motion to compel, so I'm going to

23  focus on that.

24          Your Honor, in support of his motion to compel, Mr.

25  Miske makes extraordinarily serious allegations against the

1    Government, and he's seeking extraordinary relief from this

2    Court.  He claims most clearly in his reply brief, and again

3    today in his argument, that we're concealing exculpatory

4    information through our redactions on discovery we produced.  He

5    claims, again most clearly in his reply brief and in today's

6    argument, that we have not yet produced some exculpatory

7    information related to an individual named Ashlin Akau.  And

8    these are some of the most serious allegations that could be made

9    against the prosecution.

10             Mr. Miske makes these accusations even though we are

11   nearly six months away from trial, and even though the Government

12   fully intends to produce much of the information he's asking for,

13   but just closer to trial.  And having made these serious --

14             THE COURT:  Okay.  Can I pause you there, Mr. Smith?

15   So I agree.  I think at its heart, as I understand the motion,

16   Mr. Miske is asserting that the Government is deliberately

17   withholding information that is discoverable under Rule 16 and

18   Brady.  I think that's a different version of what you just said.

19   Now when I read your opp, I didn't see anything disputing that

20   statement.  So how do you respond to it?

21             MR. SMITH:  Yes, Your Honor.  Our opposition -- the

22   position we take in our opposition is that there is nothing

23   exculpatory that Mr. Miske is pointing to.  What he is --

24             THE COURT:  Okay.  So let me ask the rest of it.  So

25   Mr. Miske is arguing two points.  The Government is deliberately

 1   withholding information discoverable under Rule 16, and

 2   information that is discoverable under Brady.  What is the

 3   Government's responses to both?  And I want you to be very clear.

 4   I agree these are serious allegations, and I agree these are

 5   serious issues.  And if you're going to deny those and the

 6   information turns out differently later, that's going to be

 7   important.

 8           MR. SMITH:  We understand that, Your Honor.

 9           We disagree with Mr. Miske's representations on both of

10   those counts.

11           THE COURT:  Okay.  So you're telling me -- so you're

12   telling me the Government is not withholding exculpatory

13   information.  Now let's narrow to Ms. Akau or Brady information

14   as to Ms. Akau.

15           MR. SMITH:  Yes, Your Honor.  That is the focus of Mr.

16   Miske's motion.  I would like to touch on each of the particular

17   examples that Mr. Miske points to.

18           THE COURT:  Okay.

19           MR. SMITH:  But before I get to that, Your Honor, there

20   is sort of a -- there are a couple of broader points.

21           First of all, as Mr. Miske himself acknowledges, the

22   gist of or the heart of what he's asking for is to have fewer

23   redactions on FBI 302s or HSI -- comparable HSI reports of

24   interviews with this expected witness, and it Ninth Circuit law,

25   United States v. Alvarez, a 2004 decision, 358 F.3d. 1194, 12 --

1    at page 1211.  And I, quote, "When the defense seeks evidence,

2    which qualifies as both Jencks Act and Brady material the Jencks

3    Act standards control."

4            And I think one of the reasons for that, of course,

5    Your Honor, is that if Defendant is proposing a theory of what

6    qualifies as exculpatory information, that would completely

7    undermine the protections of the Jencks Act for a witness.  That

8    is a very strong interpre -- that's a very strong indication that

9    the theory the defense counsel is proposing for interpreting

10   Brady is wrong.

11           THE COURT:  Okay.  But you just told me there is no

12   Brady information that we're talking about.  So why does that

13   apply?

14           MR. SMITH:  Your Honor, a couple of reasons.  Number

15   one, we don't think that -- we don't think that it's Brady.  We

16   don't think it's exculpatory.  We do agree that a lot of this

17   information is impeachment, which is why we are completely

18   prepared to produce it at the appropriate time.

19           Secondly, Your Honor, a couple of subsidiary points.

20   Even if it were Brady, Ms. Panagakos is incorrect that it would

21   need to be produced now.  That's what Alvarez stands for.  In

22   addition, Your Honor, I think the interpretation of what

23   qualifies as exculpatory should not be done so expansively that

24   it would have the effect of undermining the protections of the

25   Jencks Act.

 1            So all of those points, we would submit, dovetail.  The

 2   bottom line, Your Honor, is that although we do understand we

 3   have an obligation to produce this information at the appropriate

 4   time, that time is not now.

 5            And I want to be clear about exactly what Mr. Miske is

 6   complaining about in his second motion to compel, Your Honor.

 7   Why don't we just star with the information about the Hobbs Act

 8   Robbery?

 9            Mr. Miske is saying that one or more members of Nakipi

10   participated in that robbery.  He believes that that's

11   information that he can use in some way at trial.  But that

12   information, Your Honor, is not redacted.  That information is

13   unredacted in the report.  Your Honor has now copies, both of the

14   versions of the report that contain the redactions that Mr. Miske

15   has, and also has a completely unredacted copy as well.

16            The information from this witness -- this expected

17   witness to the effect that one or more members of Nakipi

18   participated in that robbery is not redacted.  That information

19   was produced.  What Mr. Miske is really complaining about there

20   is that there are two particular individuals, in addition to the

21   ones -- the many others that have been produced, whose names have

22   been redacted.  Those are individuals who have not been publicly

23   alleged or otherwise publicly identified as people who

24   participated in the offense, and their names, not the context,

25   but their names have been redacted from these reports.

1          So the question is, if there's something about the

2     names of these individuals, which is what's underneath these

3     redactions that is exculpatory, meaning that it is inconsistent

4     with Mr. Miske's factual guilt or with an element of the offense.

5          And the Court can see for itself by looking under the

6     redactions.  There's nothing underneath those redactions that

7     says, as Mr. Miske speculates, that this robbery was really the

8     affairs of Nakipi.  There's nothing under those redactions that

9     says the victim was picked out because of some beef with Nakipi.

10    Those are all speculative suggestions that Mr. Miske is

11    proposing.  And, Your Honor, can see for yourself, looking under

12    the redactions, there is nothing of that sort there.

13         And, Your Honor, I do want to take a step back and just

14    talk a little bit about what the evidence at this trial is going

15    to show, because I think there is an extent to which Mr. Miske is

16    portraying it differently from how it will actually be presented

17    at trial.

18         Your Honor, the Government's evidence at trial will

19    show that Mr. Miske recruited individuals from all parts of

20    society to carry out his criminal misdeeds.  It didn't matter

21    whether you were a member of (indiscernible), or Nakipi, or

22    anything else, as long as you did what Mr. Miske told you to do.

23    That's what the Government's evidence will show at trial.

24         And that's why, Your Honor, as co-defendant Norman Akau

25    admitted in his guilty plea allocution before Judge Watson, Mr.

1   Miske recruited him to help carry out a murder for hire contract

2   even though Norman Akau is a member of Nakipi.

3           So the mere fact, Your Honor, that individuals who

4   participated in the affairs of Mr. Miske and the Miske Enterprise

5   might have had other criminal associations, it's not exculpatory.

6   It's not inconsistent with any element the Government will be

7   proving at trial, nor is it exculpatory, as Mr. Miske suggests,

8   with respect to some drug trafficking conduct.

9           That the fact that Mr. Miske himself was not directly

10  involved in some of these crimes, nor is that exculpatory.

11  Again, Your Honor, as multiple witnesses have now admitted in

12  their guilty plea allocutions before Judge Watson, they were

13  emboldened by their association with Mr. Miske and the protection

14  he provided to them.  And that's why those crimes bear a

15  relationship to the Miske Enterprise.

16          So to the extent Ms. Panagakos' argument is that some

17  of the people Mr. Miske recruited to commit his offenses were

18  involved in, for example, a substantial amount of drug

19  trafficking activity, that's not exculpatory information.

20          Now if there were some statement or piece of

21  information that said that these individuals were not under

22  Miske's protection or that they were not emboldened by their

23  association with him and his racketeering enterprise, then Mr.

24  Miske would have a better argument that that information would be

25  inconsistent with his guilt or with an element of the offense,

1  but again there is no such statement under the redactions.  And,

2  again, the Court has the unredacted copies of all these documents

3  and will be able to see that for itself.

4        With respect to Mr. Miske's claim that the Government's

5  redactions are concealing exculpatory information about the

6  attempted murder of Victim-2, this is charged in Count 8, Your

7  Honor, that again is untrue.  The Government's evidence at trial

8  will show that there were several reasons why that attempted

9  murder took place.  One of them, that was one of the participants

10 owed a drug debt to the victim that he didn't intend to repay.

11 That fact has been produced.  Mr. Miske is aware that.

12       Another reason was that Mr. Miske was angry at the

13 victim because of social media posts the victim has made, and

14 that will also be proved at trial.  And it was for that latter

15 reason that Mr. Miske himself drove to the Kualoa Ranch to

16 participate personally in the shooting together with his half-

17 brother, John Stancil, and other members and associates of the

18 Miske Enterprise.

19       Now one or more members of Nakipi did assist Mr. Miske

20 and his associates, including Mr. Norman Akau, and including by

21 taking away the victim's firearm, which had the effect of

22 allowing Mr. Miske's associates to attack that victim without

23 repercussion.  But that information is not exculpatory.  It's not

24 inconsistent with any element the Government has to prove at

25 trial.

 1          Nor is the suggestion that Ms. Panagakos raised today

 2   that it would be of interest to her to know who Norman Akau's

 3   calabash cousin is.  There's nothing about that fact that is

 4   exculpatory, Your Honor.  And even if Ms. Panagakos would find

 5   that information interesting or even useful, that's not the

 6   question in analyzing whether the information qualifies as Brady.

 7          And again, Your Honor, the information that we're

 8   talking about here is information about what the Government's

 9   expected witnesses will testify about at trial.  A lot of this

10   information is -- I believe Mr. Miske himself acknowledges

11   finally in his reply, a lot of this information, these

12   inculpatory interviews are the sort of information that the

13   Government has no obligation to produce at all at this stage in

14   the case, and that's what the Ninth Circuit's decision in Fort

15   stands for.

16          Now Mr. Miske says that the Government -- this is page

17   8 of his reply, that the Government made a decision to disclose

18   the substance of inculpatory interviews, while he claims we

19   disagree, but he claims purposely concealing exculpatory

20   information provided during those same interviews.  But even if

21   he were correct in making that argument, the holding of the Ninth

22   Circuit's decision in Alvarez still applies.  That even if we

23   have an obligation to produce that information, which we will do,

24   we don't have to produce that information more than six months

25   before trial.

1              Mr. Miske makes -- points to a number of other things

2    to which he applies the label of exculpatory, but as we said in

3    our opposition, Your Honor, it is quite clear that these items

4    are impeachment material.  They're not exculpatory.  And simply

5    labeling them as exculpatory doesn't change their nature.

6              So, for example, Your Honor, at page 14 -- or page 12

7    of Mr. Miske's initial memorandum in support, they offer what I

8    would describe as a conclusory statement that unproduced reports

9    of interviews with Ashlin Akau's father are, quote/unquote,

10   "clearly exculpatory, as well as their relationship between a

11   case agent and Ms. Akau's father."

12             First of all, Your Honor, what Mr. Miske is suggesting

13   is he would like to use this information to contradict, or

14   dispute, or try to -- attempt to undermine, in his words, cross-

15   examine, Ms. Akau at trial to try to persuade the jury that it

16   should discredit or not believe the information that Ms. Akau

17   provides.  That is a classic example of impeachment material.

18   And it doesn't become exculpatory merely because defense counsel

19   attempts to attach that label to it.

20             On page 14, Mr. Miske's initial memorandum describes

21   what he claims is the case agent -- special agent Terence Chu's

22   efforts to create favor with Ashlin Akau.  He calls that

23   exculpatory.  And, again, that's classic impeachment material.

24   The other point there is that we actually did produce a report as

25   Ms. Panagakos knows, and which describes a lot of what she is

1   saying she doesn't have.  The Court can see that in the binders

2   that we submitted for in camera review.

3           On page 15 of Mr. Miske's initial memorandum in

4   support, Mr. Miske claims that there is a tremendous amount of

5   information going to Ashlin Akau's credibility, supposed bias,

6   and motive to cooperate.  And again, Mr. Miske applies the label

7   of exculpatory to that.  But as we said in our opposition, this

8   is impeachment material, and we agree that these are items that

9   Mr. Miske is entitled to receive.

10          And we also recognize, Your Honor, that given the

11  voluminous nature of the discovery in this case and the fact that

12  this is a very complex case, that it would make sense to have

13  conversations about how far in advance of trial we should be

14  producing even impeachment material.

15          So the limited point we're making today is that Mr.

16  Miske's suggestion that he is already entitled to this

17  information, that it's somehow Government misconduct not to have

18  provided it, that that is without merit.

19          On page 17 of Mr. Miske's initial memorandum in

20  support, he claims inconsistencies between sources.  Again, he

21  uses the label exculpatory.  But, Your Honor, as we say in our

22  memorandum in opposition that's impeachment material.  An

23  impeachment material that would be used to contradict or attempt

24  to undermine the credibility of those witnesses.

25          So, Your Honor, that is the point -- that is the main

1   point that we try to explain in our memorandum in opposition,

2   which is that we understand that we have an obligation to produce

3   a lot of this information for two independent reasons.  One is

4   because it would qualify as Jencks Act material for a lot of

5   witnesses the Government intends to call at trial.

6           The second reason is that it is true, Mr. Miske could

7   use a lot of this information to attempt to impeach the

8   credibility of the witnesses the Government calls at trial, but

9   the information doesn't become immediately producible simply

10  because Mr. Miske has attached the label of exculpatory, nor does

11  it become exculpatory simply because Mr. Miske offers a

12  conclusory statement that information that is redacted at the

13  moment would undermine essential elements of the RICO claim.  The

14  Court can see the information under those redactions and there is

15  no such information lurking underneath those redactions as we've

16  explained.

17          There is an additional point I would like to make, Your

18  Honor, with the Court's indulgence.  I think it does bear

19  pointing out that if the Government's handling of discovery were

20  as bad as Mr. Miske has been suggesting, you wouldn't expect any

21  other defense counsel in this case to be able to fully and

22  competently do their jobs, but the opposite has been true.

23          And just to take one example, we understand that

24  counsel for Defendant Michael Buntenbah has reviewed every piece

25  of evidence we've produced, and when he's had questions about

1  discovery, he hasn't file a motion with sweeping accusations and

2  assumptions about what's redacted.  Instead, he has simply

3  reached out to us with specific questions, not categorical

4  complaints.  And we have conferred with him and helped him

5  understand particular items he's asking about that were

6  appropriate.

7        Many of Mr. Miske's co-defendants have pleaded guilty

8  to the racketeering conspiracy at this point, including Kaulana

9  Freitas, Harry Kauhi, Norman Akau, and Hunter Wilson.  And it

10 cannot credibly be suggested, Your Honor, that the experience

11 defense counsel for these Defendants, who have all made their

12 professional judgment call, that they could recommend a guilty

13 plea to their clients, were unable to effectively review the

14 discovery produced to them because of the Government's

15 redactions.

16       And finally, Your Honor, I would like to address a

17 statement that Mr. Miske included in his initial memorandum in

18 support of his motion, and this is at page 3 of his memorandum.

19 Mr. Miske quotes the Supreme Court's decision in Kyles v. Whitley

20 for the proposition that there is no difference between

21 exculpatory and impeachment evidence for Brady purposes.

22        He doesn't exactly explain what he proposes that

23 quotation to mean, but I think from context it's pretty clear,

24 given that what he's seeking right now is impeachment evidence

25 that his suggestion is that the timing of disclosures for both,

 1   at least in this case ought to be the same and that's simply not

 2   correct, Your Honor.  The quotation in Mr. Miske's initial

 3   memorandum has been taken out of context.  The Supreme Court in

 4   Kyles v. Whitley was explaining that the same materiality

 5   standard applies to exculpatory and impeachment material.  And

 6   the issue of materiality typically comes up in cases in which

 7   information is never produced, and then the failure to produce is

 8   discovered only after trial.

 9          And, Your Honor, in that context, as the Supreme Court

10   explained in Kyles and in early case of United States v. Bagley,

11   the same materiality standard should apply regardless of whether

12   evidence is exculpatory or impeachment.  That's worlds apart from

13   what we're dealing with here, Your Honor.  We fully intend to

14   produce much of Miske is requesting.  And the question is simply

15   whether it all needs to be produced now, six months from trial.

16          And there is a well established difference between

17   exculpatory and impeachment evidence on that front as the Local

18   Rules recognize.  Impeachment information need not be produced

19   this far in advance of trial.

20          And, Your Honor, we think at the end of the day it's

21   Miske's initial memorandum that makes quite clear what he's

22   really after here.  He wants impeachment material.  He wants the

23   Court to say he has the right to completely unredacted copies of

24   our witness statements six months in advance of trial.  And I

25   know Your Honor asked us to focus on Ms. Akau today, but Mr.

1    Miske's motions papers, for example, on pages 23 and 24 of his

2    initial memorandum are not so limited.

3          He seeks in his motion, and I quote, "all proffers from

4    all cooperating Government witnesses and all information, which

5    reveals the negotiation process by which these witnesses'

6    received leniency in plea agreements and cooperation agreements."

7    We agree that at the appropriate time he's entitled to that

8    information, but he's not entitled to it now.

9          And for those reasons, Your Honor, we believe this

10   motion should be denied.  I'm happy to answer any questions the

11   Court might have.

12         THE COURT:  Okay.  Just a couple questions.  U.S. v.

13   Alvarez that you asked me to review, is that in your memo in opp?

14         MR. SMITH:  It's not, Your Honor.

15         THE COURT:  Okay.  Second question.  You mentioned that

16   you concede that Ms. Panagakos might find some of the redacted or

17   not produced information useful, was the word I wrote down.  How

18   is that different from being material under Rule 16?

19         MR. SMITH:  Your Honor, United State v. Fort makes it

20   very clear that if the FBI 302s don't fall within the scope of

21   Rule 16.  But, in any event, I do believe that there is the

22   question of whether these are witness statements, which they are

23   by even Ms. Panagakos' admission in her reply brief, and her

24   point is simply that within these FBI and HSI reports of

25   interviews, she thinks there's some information that she would

 1  like to have.  But in that context, it's the Jencks Act that

 2  applies and that controls.

 3          Separately, if there were Rule 16 material, and there

 4  is some of that implicated in Mr. Miske's initial motion, and

 5  that will be a discussion for another day, as I understand, but

 6  the focus of Ms. Pangakos' motion here, at least when it comes to

 7  redactions are reports that reflect interviews, and those are all

 8  materials that are covered by the Jencks Act.

 9          THE COURT:  Okay.  Thank you.  Ms. Panagakos.

10          MS. PANAGAKOS:  Your Honor, I don't know where Mr.

11  Smith has been practicing, but reports of interviews that haven't

12  been adopted or signed by the witness are not Jencks materials.

13  The Jencks Act -- I mean, I'm not seeking Jencks -- it just

14  doesn't apply.  That's not what this is.  I'm not seeking grand

15  jury transcripts.  I'm not seeking written statements of Ms. Akau

16  that she signed and adopted.  These are reports by agents as to

17  what Ms. Akau said, and they contain exculpatory information that

18  is relevant to undermine the RICO allegations itself, not just

19  the credibility of a witness.

20          You know, I mean, yeah, if we just want to sit and roll

21  over and say, okay, fine, the Government's theory is correct,

22  okay, fine.  But that's not -- I mean, we have to -- we have to

23  have what we need.  We have to have it.  Brady says you have to

24  have it in time to use it, and this stuff requires investigation.

25          The people who are redacted from the Nicholas Carignan,

1   okay, they're redacted because they haven't been publicly

2   disclosed.  Are they saying that Jacob Smith is not here?  Are

3   they saying that at page 2-1-6-7-3-3, some of these redactions

4   are not concealing Jacob Smith's involvement in the Carignan

5   robbery.  They said it's just two people.  I can't even tell it's

6   just two people.  I can't tell the number of people who they're

7   concealing.  But that's what he said, just two people who haven't

8   been disclosed.  Compare that and tell me that Jake Smith's name

9   is not there. And if it's not there, that makes it all the more

10  exculpatory because he's supposed to be one of the prime actors

11  in this thing.

12          This is not just about inconsistencies about -- it's

13  about who committed these offenses and what were their

14  relationships with one another.  It's -- oh, because they claim

15  Akau said -- Norman Akau says that Mr. Miske recruited him for

16  some other offense, therefore, this Nakipi related drug related

17  robbery it somehow has to do with Miske.  There's nowhere in here

18  that says that Miske recruited anybody for that.

19          That's why we need to know who is everyone that's

20  involved and what -- you know, he said there was no beef between

21  the drug dealer and Nakipi.  I didn't say that there was a beef.

22  I said it's a drug -- that the motive was drugs that had nothing

23  to do with Mr. Miske and the people who did it were from Nakipi.

24  And we have a right to know who the victim was, what the motive

25  was, why this person was selected, and who participated.

1          It's exculpatory.  It goes -- they're the ones who

2   chose this 20 plus RICO charge, not us.  They're the ones who

3   claim that everything that happened on this Island, by any of

4   these people, at any time, had something to do with Miske.  And,

5   oh, yeah, because of their conclusions that these people say they

6   were emboldened by their association.  What's the facts that

7   support that conclusion?  And what's the facts that don't?

8          And that's why all these reports -- these particular

9   reports need to be disclosed because there's no facts that

10  support any claims that anything -- anybody was emboldened by

11  their association with Miske to rob Nicholas Carignan.

12         That's just -- you know, they say, okay, Kyles v.

13  Whitley, it's about materiality.  Yeah, the information in that

14  case that was concealed was not some impeachment material that

15  only had to be disclosed on the eve of trial.  It was reports of

16  interviews of a witness that contained evidence to show that

17  someone else did something. That's exactly the kind of stuff

18  we're looking for here.

19         You know, I mean, it's not exculpatory, it's

20  impeachment.  What does it mean when they say impeachment is --

21  they say the same thing under Brady.  And this materiality stuff,

22  that's just not applicable here either, because we're pretrial

23  and the Ninth Circuit has repeatedly approved District Courts who

24  don't apply the materiality standard to pretrial exculpatory

25  disclosure obligations.

1          You know, I mean, they sit here and say what they --

2     what their evidence will show, what their evidence will show.

3     Well, we need the evidence that we said say helps us take down

4     this RICO allegation.  They've made a probable cause showing

5     without any challenge.  That's all they've done.

6          And then so other people have pled guilty.  Okay.

7     We're fighting.  We're fighting because they're trying to put

8     this man away life.  Just give us due process and the right to

9     compare -- present a complete defense and follow the rules.  And

10    it's just not so that these are never Rule 16.  Oh, you can just

11    produce everything except these redactions, and it's not Rule 16?

12    You know, that's just not correct.

13         I think the Fort case cites the Armstrong case, which

14    says -- I mean, there's limits to this.  I think Judge Breyer's

15    concurrence in the Armstrong case talks about how it's got to --

16    it's subject to traditional work product limitation.  Need

17    outweighs it.  Plus, I mean, they can be admissible.  So they're

18    not just strict work product privilege.  I mean, these things get

19    admitted in evidence.

20         Anyway, Your Honor, I hope I've, you know --

21         THE COURT:  I understand your position.

22         MS. PANAGAKOS:  Redacted and the unredacted, you know,

23    I hope you can see that the things that are being concealed from

24    us are helpful to us to establish our defense to negate the

25    essential elements of the RICO charge.

1          The drug conspiracy charge.  This Nicholas Carignan

2    drug robbery is part of Count 16.  It has nothing to do with

3    Miske.  Don't we have a right to see who was involved.  I mean,

4    you know.

5          The stuff with her father.  It's not just about cross-

6    examining them about what happened with the father, it's about

7    what took place.  What are the facts?  What are the exculpatory

8    facts?  There's every indication here that these things are

9    exculpatory and that they need to be produced now because they're

10   needed for pretrial investigation.

11         Thank you, Your Honor.  Do you have any questions for

12   me at this point?

13         THE COURT:  Just one last one.  So -- and you each have

14   touched on it this morning.  I would say 98 percent of the motion

15   and the reply are very narrowly focused on Ashlin Akau, but there

16   is a broad statement towards -- at least one towards the end of

17   the initial motion, and you made one this morning saying you want

18   this information as to everybody.  I need to understand exactly

19   which it is.

20         MS. PANAGAKOS:  Your Honor, this motion is about Ashlin

21   Akau.  Now one more thing, they talk about Butenbah's attorney

22   calls up with questions.  I have tried so many times to talk to

23   them, to email them.  Five times I think I asked for that -- the

24   ex parte submission in support of the search warrant for the

25   boat.  It's one of the exhibits on the other motion.  Five

```
 1   requests for that specific document.  You know, they just ignore
 2   me.  I have been trying, Your Honor, on the phone, by email, by
 3   letters.
 4          So, yes, I do have that general statement at the end,
 5   and that's just more, Your Honor, to, you know, just order them
 6   to comply with Rule 16 and Brady.  This motion is specific to
 7   Ashlin Akau.
 8          THE COURT:  Okay.
 9          MS. PANAGAKOS:  As I said in my first motion to compel,
10   which hasn't been heard yet, I can't -- you know, I can do
11   another motion like this with specifics as to exculpatory
12   evidence that's being concealed with regard to other racketeering
13   acts, other counts, and other witnesses.  So this one is about
14   Ashlin Akau with just a broad request to ask them to comply with
15   Rule 16 and Brady.
16          THE COURT:  Okay.  Thank you.  I understand.
17          All right.  I'm going to take this matter under
18   submission.  I think both sides deserve a written order on this,
19   and I'll get that out by early next week.  Thank you all.  We
20   will be in recess.
21      (Proceedings concluded)
22
23
24
25
```

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that pursuant to 28 U.S.C. §753, the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated: April 24, 2022

Jessica B. Cahill, CER/CET-708