IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. MISKE, JR.,<br><br>        Defendant. | Case No. 19-cr-00099-DKW-1<br><br>**ORDER DENYING DEFENDANT MICHAEL J. MISKE, JR.'S MOTION TO SUPPRESS CELL-SITE LOCATION INFORMATION EVIDENCE DERIVED FROM AN ORDER IN CASE NO. 17-MC-00006** |

Defendant Michael J. Miske, Jr. moves to suppress ("motion") evidence of cell-site location information ("CSLI") obtained from an order in Case No. 17-MC-00006 ("Order") on the ground that the Order was obtained without a warrant in violation of the Fourth Amendment. As Miske acknowledges, however, the lack of a warrant in this situation does not necessarily doom the evidence obtained pursuant to the Order. Specifically, suppression is not warranted if the government can establish that it satisfied the requirements of the Stored Communications Act ("SCA"). The government argues that it did by, *inter alia*, submitting a "detailed" application in support of the Order ("the Application"). In reply, Miske argues that the Application was based upon "conjecture" and "speculation."

Having reviewed the Application, the parties' written and oral arguments, the supporting documentation, and pertinent case law, the Court agrees that the Application satisfied the requirements of the SCA. Notably, the SCA required only that the Application set forth "reasonable grounds" to believe that the evidence sought was "relevant and material" to an ongoing criminal investigation. For the reasons discussed more fully below, the Application satisfied this far from onerous standard. Therefore, the motion to suppress, Dkt. No. 962, is DENIED.[1]

## RELEVANT BACKGROUND

On January 11, 2017, a U.S. Magistrate Judge signed the Order. Dkt. No. 962-1 at 23.[2] The Order required AT&T Wireless to provide records and information associated with the cellular telephone assigned number 808-476-9223 (*9223), including communications sent from or to the telephone and cell towers through which communications were sent or received, for the period July 25, 2016 to January 11, 2017. *Id*. at 24-25.

The Application stated that the records and information associated with *9223 were sought in connection with an investigation of Miske, Jacob Smith (Smith), Lance Bermudez (Bermudez), and Delia Fabro-Miske (Fabro-Miske) for allegedly,

---

[1] Miske also argues that the evidence obtained pursuant to the Order is "fruit of a poisonous tree" due to an allegedly illegal search conducted under a separate warrant in Case No. 16-MJ-00693. Dkt. No. 962 at 6. In a contemporaneously-filed order, however, the Court denied Miske's motion to suppress evidence obtained under the warrant in Case No. 16-MJ-00693. Therefore, because it is moot, the Court does not further address this argument herein.
[2] In citing to exhibits attached to the briefing on the instant motion, the Court cites to the page numbers assigned in the top-right corner of each document, *i.e.* "Page 23 of 26."

*inter alia*, using interstate commerce facilities in the commission of murder-for-hire and interference of commerce by threats or violence. *Id*. at ¶¶ 4-5. More specifically, the investigation concerned Miske allegedly hiring Smith and Bermudez to murder Johnathan Fraser (Fraser). *Id*. at ¶ 5.

The Application explained that, on November 17, 2015, Fraser and Caleb Miske (Caleb) were involved in a car accident with another vehicle. *Id*. at ¶ 6. Fraser was able to recover from the accident, but Caleb was not. Caleb died on March 12, 2016. *Id*. Although law enforcement determined that Caleb was the driver of one of the vehicles, Miske did not accept this conclusion, and believed Fraser was at fault. *Id*. at ¶¶ 6, 9-10, 14.

In July 2016, Miske and Fabro-Miske allowed Fraser and his girlfriend to stay in an apartment Miske had been renting for Fabro-Miske. *Id*. at ¶¶ 8, 11. On July 30, 2016, Fraser and a 1994 Honda Civic he used were reported missing. *Id*. at ¶ 7. Miske had purchased the Honda Civic, and one of his businesses was the registered owner. The Honda Civic used by Fraser was found secured and unattended on August 7, 2016. *Id*. at ¶ 12. As of January 11, 2017, however, the date of the Application, Fraser remained missing. *Id*.

On November 30, 2016, Confidential Source Two (CS2) provided information to investigators. *Id*. at ¶ 16. CS2 stated that he/she was an associate of Smith and Bermudez and, through said association, knew Miske was a "major drug

3

distributor" whom Smith would contact when he needed to make money. Miske would provide Smith with information about competing drug dealers who needed to be "hit", and Smith would arrange a robbery or an assault against the drug dealer after which Miske would pay Smith. *Id*. CS2 further stated that Smith and Bermudez would drive stolen vehicles. *Id*. at ¶ 17. On April 19, 2016, law enforcement recovered a stolen 2015 BMW in which Bermudez's finger prints were found, along with zip ties, duct tape, handcuffs, and a eulogy for Caleb. *Id*. at ¶ 17(B).

CS2 further stated that Smith and Bermudez lived at a house in Kalihi Valley, which CS2 later confirmed was located at 3255 Kalihi Street, Unit A (Unit A). *Id*. at ¶ 18. CS2 had visited Unit A and noticed another male in an outside bathroom underneath the stairs, whom CS2 recognized as Fraser. *Id*. at ¶ 19. Fraser was tied to a garden chair with zip ties and duct tape. According to CS2, *inter alia*, Smith and Bermudez used a gas torch to burn Fraser. CS2 also noticed a tripod-mounted phone recording Fraser. *Id*. Although CS2 could not recall the exact date of these events, CS2 believed it was in the latter part of July or early August 2016. *Id*. at ¶¶ 19(A)-(B). A few days later CS2 returned to Unit A. *Id*. at ¶ 20. Smith told CS2 that Miske wanted Fraser "tortured" as punishment for Caleb's death and showed CS2 a video of the same. According to CS2, Bermudez was in the kitchen tending to a very large pot cooking on the stove. CS2 observed a "very large bone"

sticking out of the pot, which CS2 believed was human and was from Fraser's body. *Id*. CS2 further stated that he/she was present when Smith twice received cash payments from Miske in August 2016. *Id*. at ¶ 21.

On November 20, 2016, law enforcement conducted a search of Unit A. *Id*. at ¶ 24. After testing biological samples collected during the search, no blood or interpretable DNA was detected. *Id*. On December 6, 2016, law enforcement arranged a polygraph examination of CS2, which was postponed because investigators believed CS2 was under the influence of drugs. *Id*. at ¶ 25. On December 7, 2016, a polygraph examination was attempted, but CS2 declined to participate. *Id*. at ¶ 26. Instead, investigators attempted to interview CS2. *Id*. at ¶ 27. CS2 stated that Miske had hired Smith and Bermudez to kill Fraser, but "everything else he/she told investigators was a lie." CS2 began to cry, attempted to hide in the corner of the room, and crawled into the "fetal position" under a desk. *Id*. On December 22, 2016, investigators again interviewed CS2. *Id*. at ¶ 28. CS2 stated that he/she had "lied" about observing Bermudez boil an "arm bone" in a pot, but his statement about Fraser being burned with a torch was true. *Id*.

On December 7, 2016, investigators interviewed Confidential Witness Three (CW3), who was a relative of CS2. *Id*. at ¶ 29. CW3 stated that CS2 had "confessed" his/her involvement in the abduction of Fraser. CS2 told CW3 that CS2 had visited a residence with Smith and Bermudez, abducted a male CS2

5

identified as Fraser, and transported Fraser to a house in Kalihi. CS2 further told CW3 that Fraser was bound with duct tape, and Smith and Bermudez began to beat Fraser and burn him with a torch. CS2 could not stand to watch, though, and left in Smith's car. Shortly thereafter, CS2 attempted to commit suicide. *Id*.

On December 7, 2016, law enforcement also interviewed Confidential Witness Four (CW4). *Id*. at ¶ 30. CW4 stated that he/she was "close" with Smith and contacted law enforcement to file a report as a victim of assault by Smith. *Id*. CW4 further stated that, from the start of 2016, Smith did "jobs" for Miske such that Miske paid Smith to assault people for the benefit of Miske and his business enterprises. *Id*. at ¶ 31. CW4 further stated that Smith was paid a partial payment of $14,000 in "mid-July" for a job he and two others had done for Miske. *Id*. CW4 had questioned Smith about the disappearance of Fraser, to which Smith told CW4 to "shut up" and "that they will never find him." *Id*. at ¶ 32.

A court ordered "trap and trace" of *9223 indicated that, during the three-day period spanning July 29, 2016 to July 31, 2016, *9223 had approximately 64 text message contacts and 2 voice calls with 808-479-6281 (*6281), a telephone used by Smith. *Id*. at ¶ 22. These contacts and calls "significantly exceeded" the amount of messages and calls between the same phones during other periods. *Id*. Records for *6281 showed that, from July 29, 2016 to July 30, 2016, *6281 had

6

approximately 6 call and 17 text message contacts with a telephone believed to be used by Bermudez.  *Id*. at ¶ 40.

On September 15, 2023, Miske filed the instant motion, seeking to suppress evidence of cell-site location information derived from the Order.  Dkt. No. 962.  The government filed a response in opposition to the motion, Dkt. No. 976, and Miske filed a reply, Dkt. No. 985.  On October 13 and 16, 2023, the Court held a hearing on the motion and other motions to suppress.  Dkt. Nos. 996, 998.  This Order now follows.

## LEGAL STANDARD

Miske argues that evidence obtained pursuant to the Order violates the Fourth Amendment because it was obtained without a warrant.  For its part, the government acknowledges that the evidence at issue here was obtained without a warrant.  Both parties agree, however, that the absence of a warrant is not determinative.  This is because "[e]vidence obtained by the Government, acting in objectively reasonable reliance upon a *statute*…does not require suppression." *United States v. Korte*, 918 F.3d 750, 758 (9th Cir. 2019) (quotation marks omitted, emphasis in original).  Here, the relevant statute is the SCA.  The Ninth Circuit has explained suppression will not result from the lack of a warrant "so long as the Government satisfied the SCA's then-lawful requirements…." *Id*. at 759.  In that regard, the only requirement of the SCA in dispute here is whether the government

7

"offer[ed] specific and articulable facts showing that there are reasonable grounds to believe that…the records or other information sought[] are relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).  The Supreme Court has described this standard as "fall[ing] well short of the probable cause required for a warrant[,]" as "law enforcement need only show that the cell-site evidence might be pertinent to an ongoing investigation…."  *Carpenter v. United States*, 585 U.S. __, 138 S.Ct. 2206, 2221 (2018).

## **DISCUSSION**

As set forth above, the motion presents a single issue: did the Application offer "specific and articulable facts" showing "reasonable grounds to believe" that the CSLI for *9223 was "relevant and material to an ongoing criminal investigation."  In light of the foregoing standard and the information provided in the Application, the answer is clearly in the affirmative.

First, the Application identified the "ongoing criminal investigation" as one concerning, *inter alia*, Miske, Smith, Bermudez, and Fabro-Miske's use of interstate commerce facilities, including *9223, in the commission of murder-for-hire.  Second, the Application offered the following "specific and articulable facts" related to said investigation: (1) a car accident involving Caleb and Fraser; (2) the death of Caleb following the car accident; (3) Miske blaming Fraser for the death of Caleb; (4) despite blaming Fraser for Caleb's death, Miske allowing Fraser to use a car that

one of Miske's businesses owned and to stay in an apartment Miske rented for Fabro-Miske; (5) the recovery of a stolen vehicle in April 2016 containing Bermudez's fingerprints, as well as zip ties, duct tape, handcuffs, and a eulogy to Caleb; (6) Smith and Bermudez living together; (7) Miske's relationship with Smith, which involved Miske paying Smith to "hit" competing drug dealers and assault people; (8) the disappearance of Fraser and the car Miske's business owned on July 30, 2016; (9) Smith telling CW4 that Fraser would never be found; (10) Miske's use of *9223 and Smith's use of *6281; and (11) from July 29, 2016 to July 31, 2016, the roughly 64 text message contacts and 2 voice calls between *9223 and *6281−text messages and voice calls that significantly exceeded the usual contacts between these telephone numbers.

     This information alone undoubtedly provided reasonable grounds to believe that the CSLI for *9223 was relevant and material to an ongoing criminal investigation.  Specifically, it was reasonable to believe, in light of Miske blaming Fraser for Caleb's March 2016 death, Miske's history of paying Smith to engage in violent acts, and the relatively large number of telephone contacts between Smith and Miske over the three-day period encompassing Fraser's reported July 30, 2016 disappearance, that records related to the telephone number Miske used during those exchanges−*9223—would be pertinent to the ongoing investigation of whether Miske used interstate commerce facilities in the commission of murder-for-hire.   In

fact, the Court can perhaps imagine few things *more pertinent* to any such investigation.

Miske's arguments to the contrary, raised for the first time in his reply, are unpersuasive.  Principally, Miske attacks the reliability of certain statements made by three (out of six) of law enforcement's confidential witnesses and/or sources—specifically, certain statements by CS2, CW3, and CW4.  Dkt. No. 985 at 3-6.  The information set forth above, however, does not rely on any of the statements Miske challenges from those individuals.  And, contrary to Miske's assertions, as discussed, the information set forth above provides adequate reasonable grounds to believe that records from *9223, including its CSLI, were pertinent to the murder-for-hire investigation.  Miske's attempt to argue otherwise merely takes individual, and limited, pieces of information in isolation.  *See id*. at 6.  As set forth collectively, and in totality, above, the information is more than adequate to meet the SCA's far from onerous standard of relevance and materiality.[3]

---

[3] Miske's challenges to the witness and/or source statements also largely miss the mark.  First, CS2.  Miske contends it is "absurd on its face" that CS2 provided reliable information to law enforcement, pointing to, *inter alia*, CS2's multiple recantations.  Dkt. No. 985 at 3-4.  Miske ignores, however, that every one of the deficiencies he notes with CS2's statements comes from the Application itself.  In other words, the Magistrate Judge issuing the Order was aware of the alleged deficiencies when issuing the Order, yet still did so.  Basically, therefore, in challenging CS2, Miske is in effect challenging the role of the Magistrate Judge, rather than any omission or lack of good faith by law enforcement.  This is no basis for suppressing evidence.  *See Davis v. United States*, 564 U.S. 229, 240 (2011) (explaining that, "in 27 years of practice under *Leon's* good-faith exception, we have never applied the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct.") (quotation marks omitted).  Second, CW3.  Miske argues that CW3's statements cannot be trusted because CW3 merely "related stories from CS2…."  Dkt. No. 985 at 4.  The "story" CW3 related, however, is very different to the one CS2

Miske also argues that it was not a "specific and articulable fact" for the Application to state that law enforcement believed Miske allowed Fraser to stay in an apartment as a "ruse" to facilitate his alleged murder. Dkt. No. 985 at 4-5. Miske, however, misses the point. The "belief" that this was a ruse was not intended to be a specific and articulable *fact*—that is why the statement is prefaced by it being a *belief*. The belief was *based upon* specific and articulable facts, such as Miske blaming Fraser for Caleb's death in March 2016, and, just a few months later, allowing Fraser to move into an apartment Miske rented, followed soon by Fraser's disappearance. Given that the purpose of the Application was to provide reasonable grounds to believe that *9223 was pertinent to law enforcement's investigation, it was certainly entirely consistent with that purpose for the Application to state facts and then state what law enforcement believed those facts showed. Whether a Magistrate Judge would agree with (or find reasonable) the conclusions law enforcement drew from the specific and articulable facts is another question, but it was certainly not improper for the Application to set forth law

---

told law enforcement. Specifically, CW3 stated that CS2 *confessed to participating* in the abduction of Fraser with Smith and Bermudez. In contrast, CS2 essentially told law enforcement that he accidently stumbled across Fraser's alleged abduction and torture. At the time, the fact that CW3 told law enforcement that his relative, CS2, had confessed to a crime could very well have given an officer reasonable ground to believe that CS2 was telling the truth and, thus, that Smith, Bermudez, and CS2 had been hired to commit Fraser's alleged murder. As for CW4, while Miske argues that CW4's statement−that Smith received $14,000 in mid-July 2016 as a partial payment for a job he had done for Miske−is "blatantly false", *id*. at 5-6, the Court notes that the evidence to which Miske cites to support this assertion−an FBI 302 Report−has not been submitted in connection with the briefing on the motion to suppress and, thus, it is not possible for the Court to assess whether the allegedly conflicting evidence is, in fact, inconsistent. Even if it were, though, it would not change the analysis herein.

11

enforcement's understanding of the facts. Therefore, the Court rejects this argument as a basis for suppressing any evidence.

## CONCLUSION

For the foregoing reasons, the instant motion to suppress, Dkt. No. 962, is DENIED.

IT IS SO ORDERED.

DATED: November 3, 2023 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

---

*United States v. Miske,* Case No. 19-cr-00099-DKW-1; **ORDER DENYING DEFENDANT MICHAEL J. MISKE, JR.'S MOTION TO SUPPRESS CELL-SITE LOCATION INFORMATION EVIDENCE DERIVED FROM AN ORDER IN 17-MC-00006**