IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. MISKE, JR.,<br><br>Defendant. | Case No. 19-cr-00099-DKW-1<br><br>**ORDER (1) DENYING DEFENDANT MICHAEL J. MISKE, JR.'S MOTION TO SUPPRESS EVIDENCE AND FRUITS DERIVED FROM SEARCH AND SEIZURE WARRANTS 15-01345, 15-01346, AND 15-01347, AND (2) DENYING IN PART AND REFERRING IN PART DEFENDANTS' MOTION TO COMPEL** |

Defendant Michael J. Miske, Jr. moves to suppress ("motion") all evidence obtained from three search and seizure warrants ("the Warrants") on the ground that the essentially identical affidavits accompanying the Warrants ("the Affidavits") contained recklessly and materially false statements and/or omissions, which, when corrected, negate probable cause for the searches authorized by the Warrants.   In doing so, Miske also requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).   The government opposed the motion and the *Franks* hearing on various grounds, arguing, *inter alia*, that, even if the challenged portions of the Affidavits are removed or supplemented, probable cause still exists for the authorized searches.

Reserving judgment on whether Miske had shown an entitlement to a Franks hearing, the Court held an evidentiary hearing on the instant motion.   Having observed the testimony from said hearing, the Affidavits, the parties' written and oral arguments, the supporting documentation, and pertinent case law, the Court finds that Miske has failed to show, even if the challenged portions of the Affidavits are supplemented or otherwise changed, that probable cause did not still exist. Notably, while Miske focuses on specific aspects of the Affidavits, he fails to meaningfully challenge other parts.   In particular, Miske ignores the portions of the Affidavits concerning his alleged transmission of gambling information and interference with commerce by extortion.   At the very least, these allegations contained sufficient factual material for a Magistrate Judge to find probable cause. Therefore, as more fully explained below, the motion to suppress, Dkt. No. 963, is DENIED.

## RELEVANT BACKGROUND

On November 12, 2015, a U.S. Magistrate Judge authorized the Warrants. Dkt. No. 963-4 at 1; Dkt. No. 963-5 at 1; Dkt. No. 963-6 at 1.[1]   The Warrants required the providers of four separate cellular telephone accounts to disclose, from September 1, 2014 to the then-present day, *inter alia*, all voice mail, text, and media

---

[1]In citing to exhibits attached to the briefing on the instant motion, the Court cites to the page numbers assigned in the top-right corner of each document, *i.e.* "Page 1 of 54."   In addition, for the sake of simplicity given the essentially identical nature of the Affidavits, in summarizing the same going forward, the Court cites solely to the first-filed Affidavit−in Case No. 15-MJ-01345.

messages on the respective telephones, and the cell towers and/or locations used by the phones.   Dkt. No. 963-4 at 4-5.

The Affidavits, authored by Special Agent Timothy Pent (SA Pent) of the Federal Bureau of Investigation (FBI), stated that law enforcement believed Miske and others were engaged in an enterprise that had committed violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, consisting of dealing in a controlled substance, extortion, and gambling.   *Id*. at ¶ 4.   The Affidavits provided the following information in support of the Warrants.

In November 2013, Confidential Informant One (CI#1) reported that Miske used a Fishing Vessel (FV) called *Rachel* and another called *Kraken* to transport methamphetamine into Hawai'i.   *Id*. at ¶ 19.   The registered owner of FV *Rachel* was Alfredo Cabael, who was a "good friend" of Miske and did his "dirty work." In August 2013, CI#1 reported that FV *Rachel* transported methamphetamine from California to Hawai'i by attaching the drugs to a radio frequency buoy and dropping the same into the ocean about 40 miles off the Hawai'i coast.   Later, other fishing vessels used the radio frequency transmissions to locate the drugs and transport it into Hawai'i.   In December 2013, CI#1 reported that the FV *Kraken* had been boarded by law enforcement and "fish compound" had been seized.   *Id*.

In April 2014, Confidential Informant Two (CI#2) reported that FV *Rachel* had "recently" traveled to California for the sole purpose of picking up a dog.   *Id*. at

¶ 20.   In March 2015, Confidential Informant Three (CI#3) reported that Miske asked CI#3 to assist him in registering FV *Rachel* "under a name disassociated with Miske[]" because "there was too much attention from the Coast Guard" on the boat. *Id*. at ¶ 21.   In September 2015, SA Pent obtained vessel monitoring data from the National Oceanic and Atmospheric Administration, which reflected that FV *Rachel* left Hawai'i on or about July 15, 2013, traveled to California, and returned to Hawai'i on August 26, 2013.   *Id*. at ¶ 23.

According to Confidential Witness One (CW1), Miske's primary business was Kama'aina Termite and Pest Control (KTPC).   *Id*. at ¶ 24.   Miske also owned M Nightclub, which was in an "expensive" location, and "likely" spent about $1 million on FV *Rachel*.   Based upon CW1's business experience as a bar-owner and commercial fisherman, Miske "must have" had an "illegitimate" means of income to support his "expensive" lifestyle, which included owning various properties and luxury vehicles.   *Id*.   In March 2015, Confidential Informant Five (CI#5) reported that, based upon CI#5's experience running a large pest-control business, it was "unlikely" that a fumigation business like KTPC could generate more than 10 percent profit annually.   *Id*. at ¶¶ 10, 25.   CI#5 estimated KTPC's annual gross sales to be approximately $2.5 million, which would mean a maximum profit of $250,000.   *Id*. at ¶ 25.   CI#5 reported that Miske's "apparent" profit, which CI#5 stated allowed Miske to pay his employees "significantly higher wages" and

purchase expensive company vehicles, was "impossible."   CI#5 believed,

therefore, that Miske "must have" a source of income other than KTPC.   CI#5 also

reported that, due to the poison used for fumigations, even though Miske was

required to comply with regulations related to the same, Miske "appeared" to violate

"numerous" regulations, and CI#5 was unsure how Miske was able to pass

government inspections.   *Id*.

CI#5 further reported "a time" when Miske discovered that a national pest

control company salesman (T1) showed clients negative reviews of KTPC.   *Id*. at

¶ 26.   Miske contacted T1, pretending to be interested in purchasing T1's services,

and, after T1 arrived at a residence specified by Miske, "two of Miske's guys pulled

T1 into the residence and brutally beat him."   *Id*.   In May 2015, Confidential

Witness Two (CW2) reported that he "recently" hired KTPC to fumigate his van.

*Id*. at ¶ 27.   After the fumigation, KTPC was unclear about the pesticides used,

prompting CW2 to ask for clarification on the same and to notify KTPC that he was

considering speaking to the Environmental Protection Agency about KTPC's

business practices.   Miske contacted CW2 by phone and, *inter alia*, told CW2 that

he would "beat the shit" out of CW2.   Miske called CW2 a second time and asked

him if he wanted to "disappear…."   *Id*.

In September 2015, Confidential Informant Six (CI#6) reported that Miske

used a group of guys, including Russell Mascoto, John Stancil, Cabael, Mike

Buntenbah, and Wayne Miller, to provide "muscle."   *Id*. at ¶ 29.   In October 2015, CI#6 reported that Miske previously assaulted T1.   *Id*. at ¶ 30.   Specifically, after learning about T1 providing potential clients with bad reviews of KTPC, Miske and "some of his boys" located T1 and brutally beat him.   CI#6 also recalled talking with one of Miske's employees (E1) about Miske's fishing operation, and E1 said that, when Miske heard a competitor was offering lower fish prices, Miske had his guys assault the competitor, forcing the competitor to raise his prices.   *Id*.

In October 2015, Confidential Witness 4 (CW4) reported that he visited M Nightclub in August 2012.   *Id*. at ¶ 31.   Following food and drinks, CW4 received a bill that included an "extra charge."   CW4 showed the "error" to the waitress and asked for a corrected bill.   When Miske heard about this, he sent seven or eight security personnel to CW4's table.   The security personnel "pulled" CW4 from the table and escorted him to the back of the club while "repeatedly" striking CW4 in his side.   CW4 was placed in a chair across from Miske, and Miske demanded CW4 pay the bill "or else."   CW4 asked if "or else" meant that he would be killed, to which Miske did not respond.   CW4 then took the bill and wrote "fuck security." Miske proceeded to nod at his security personnel, who began assaulting CW4 again. CW4 escaped by running outside the building, but was punched in the face by what appeared to be an employee of M Nightclub.   Bystanders helped CW4 escape, but his tooth was knocked out by the punch.   CW4 also incurred $5,000 in medical

costs.   CW4 hired an attorney to recoup his medical costs, but the attorney later explained that he would not proceed with a civil case against Miske.   *Id*.

In November 2014, CI#3 reported that Miske owed $40,000 in gambling losses to a Honolulu bookie, but Miske refused to pay.   *Id*. at ¶ 32.   In June 2015, CI#2 reported that Nathan Thorell was employed by Miske.   *Id*. at ¶ 33.[2]   In October 2015, CI#2 reported that Thorell asked if CI#2 could take an $8,000 bet on a football game the following day.   Thorell advised the bet was on behalf of the "Kama'aina guy", which CI#2 understood to mean Miske.   *Id*.   In October 2015, CI#6 reported that Miske and many of his associates were involved in gambling. *Id*. at ¶ 34.   Miske would hold a meeting each morning at KTPC, at which Miske and his employees would discuss sports bets.   Miske complained about losing a $10,000 bet on a football game.   *Id*.   Elton Santos, a KTPC salesman, once used $10,000 he collected for KTPC fumigation projects to place sports bets.   *Id*. at ¶¶ 30, 34.   Santos lost the bets, owing Miske $10,000, which Richard MacGuyer, a KTPC employee, provided to Miske in order to cover Santos' loss.   *Id*. at ¶¶ 29, 34. MacGuyer appeared to be the "house" through which Miske, Santos, and Miske's other employees placed wagers.   *Id*. at ¶ 34.   Cash pay-outs and collections were often conducted during KTPC meetings.   *Id*.

---

[2]The Affidavits also spell Thorell as Thorrell.   Dkt. No. 963-4 at ¶ 33.   The Court uses the more frequently used spelling: Thorell.   *See id*.

In September 2015, CI#6 reported that Miske always carried multiple phones and frequently changed numbers. *Id*. at ¶ 35. Miske asked CI#6 to activate new phone numbers for him, and paid employees to purchase phones under their own names and then provide the phones to Miske. *Id*. Based upon reporting from confidential informants and review of telephone records, it appeared that Miske "routinely" switched-out his use of cellular telephones. *Id*. at ¶ 36. Miske never subscribed to these phones himself; instead, the phones were subscribed to by other individuals, fictitious names, or KTPC. Toll record analysis revealed that after acquiring a phone, Miske initially generated a high volume of telephonic activity, which, after several months, would begin to decrease, with Miske obtaining a new phone number. Based upon investigation, it was determined that Miske used at least five phones between September 2014 and October 2015. *Id*. Many of Miske's most frequent telephonic contacts were with individuals identified by confidential informants as people who did Miske's "dirty work", including Mascoto, Miller, Buntenbah, and Cabael. *Id*. at ¶ 37. Miske also had frequent contact with phone numbers subscribed to by Thorell and a business owned by Ryan Teramoto. With respect to Teramoto, in an interview with law enforcement in May 2000, he stated that he had been involved in drug trafficking with Miske. *Id*.

On September 15, 2023, Miske filed the instant motion, seeking to suppress evidence and fruits derived from the Warrants. Dkt. No. 963. The government

filed a response in opposition to the motion, Dkt. No. 978, and Miske filed a reply,

Dkt. No. 987.   On October 13 and 16, 2023, the Court held, *inter alia*, an

evidentiary hearing on the instant motion, at which SA Pent, among others, testified.

Dkt. Nos. 996, 998.   This Order now follows.

## LEGAL STANDARD

Miske challenges the Warrants under the Fourth Amendment and *Franks*.

The Fourth Amendment, in relevant part, provides that search warrants may be

issued "upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized."   U.S.

Const. amend IV.   The U.S. Supreme Court has interpreted this language to require

three things for the validity of a search warrant:

> First, warrants must be issued by neutral, disinterested magistrates.
> Second, those seeking the warrant must demonstrate to the magistrate
> their probable cause to believe that the evidence sought will aid in a
> particular apprehension or conviction for a particular offense. Finally,
> warrants must particularly describe the things to be seized, as well as
> the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations and quotation marks

omitted).

Here, Miske challenges the second requirement—the demonstration of

probable cause.   Specifically, Miske argues that, although the Warrants were

approved by the Magistrate Judge, the Affidavits contain "intentional and reckless

material false statements and omissions" that, if corrected, negate probable cause.

Dkt. No. 963 at 1.   When faced with such an argument, the Supreme Court has explained that a defendant is entitled to an evidentiary hearing only if (1) the defendant alleges, with an offer of proof, that an affidavit contains "deliberate falsehood" or "reckless disregard for the truth", and (2) once the allegedly deficient information is set aside, the remaining content is insufficient to support a finding of probable cause.   *Franks*, 438 U.S. at 171-172.   It is a defendant's burden to establish "by a preponderance of the evidence" that the affidavit contains intentionally or recklessly false statements.   *Id*. at 156.   In addition, the Ninth Circuit Court of Appeals has held that a defendant may challenge an affidavit under *Franks* if it "contains deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).

## DISCUSSION

As mentioned, an evidentiary hearing was held on the instant motion to suppress.   The Court, however, has yet to address whether Miske satisfied the requirements of *Franks*.[3]   The Court now does so and finds that Miske has failed to show, even if all alleged false statements and/or misleading omissions are corrected in the manner urged by Miske, that the remaining content in the Affidavits is insufficient to show probable cause.

---

[3]This is due largely to the logistical demands of this case, which, in the undersigned's judgment, did not permit addressing the question prior to holding an *evidentiary* hearing such as the one held here.

Miske's motion challenges the following aspects of the Affidavits: (1) that law enforcement had "opened" an investigation into Miske in 2014 based upon stale information more than ten years old and without also stating that the instant investigation was the fourth one of Miske, with the three prior ones resulting in no charges being brought; (2) that KTPC's maximum profit was $250,000 and, thus, Miske had an illegitimate source of income, when KTPC's tax returns, which had been provided to the FBI, showed significantly greater profit; (3) that Miske used the FV *Rachel* to smuggle drugs, without disclosing that the boat had been surveilled and boarded by, *inter alia*, the U.S. Coast Guard after a journey to California, and no evidence of drug activity was discovered; (4) that telephone contacts between Miske and Teramoto provided evidence of drug dealing, when the alleged drug relationship, at best, had ended by 1998, and Miske had a different and legitimate reason for communicating with Teramoto between 2014 and 2015; and (5) that Miske and Stancil had frequent telephone contacts, without disclosing that they are half-brothers.   Dkt. No. 963 at 5-19.

In summary, therefore, Miske essentially challenges information related to his alleged illegitimate income and drug smuggling/dealing, along with two of the many telephone contacts described in the Affidavits.[4]   Even if the Court was willing to

---

[4]Miske's challenge to the omission of three prior investigations that did not result in charges being brought is meaningless from a probable cause standpoint.   This is because the fact that there was insufficient evidence to charge Miske with a crime *in the past* – according to Defendant, more than ten years prior -- has no bearing on whether probable cause existed *at the time of the Affidavits*.

accept that all of the information Miske identifies related to these matters needed to be corrected, excised or supplemented *and* that such changes meant none of these matters provided probable cause for the Warrants, there is still sufficient information in the Affidavits—information that Miske does not challenge—to provide the necessary probable cause.

Specifically, at a minimum, the allegations of the Affidavits provided probable cause of at least gambling and extortion.   First, gambling.   As recounted above, the Affidavits alleged the following.   Miske and his KTPC employees would hold meetings each morning during which sports bets were discussed.   One of Miske's employees was the "house" through whom Miske and his other employees placed wagers.   Miske complained about losing a $10,000 sports bet and owed $40,000 in gambling losses to a Honolulu bookie.   Thorell contacted CI#2 to place an $8,000 bet on behalf of the "Kama'aina guy", which CI#2 understood to be Miske.   Telephone numbers used by Miske and subscribed by Thorell had frequent contact between September 2014 and September 2015.   Cash pay-outs and collections were often conducted during KTPC meetings.

Miske does not factually challenge these allegations.   Instead, in one passing, solitary sentence, he asserts that the gambling allegations are too "generalized" to constitute probable cause.   Dkt. No. 963 at 20.   This conclusory statement, however, provides no explanation for why the allegations are insufficient to

establish probable cause for the offense.[5]   At the hearing on the motion to suppress,

Miske's counsel added, for the first time, that the gambling allegations do not allege

a "business of gambling" as required under the statute cited in the Affidavits, 18

U.S.C. Section 1084.   However, in light of the allegations in the Affidavits, there

was sufficient *probable cause* of prohibited gambling.   *See United States v. Cohen*,

378 F.2d 751, 758 (9th Cir. 1967) (stating that testimony from three witnesses—that

they placed wagers with the defendant "on a regular basis, settling periodically for

their losses"—was relevant to the issue of whether the defendant was engaged in the

business of betting or wagering for purposes of Section 1084).[6]

Second, extortion.   While the Affidavits contain a number of allegations of

violence and threats allegedly committed by Miske and his associates, one in

particular is sufficient here.   Specifically, the incident involving CW4 in August

2012.   CW4 reported that he visited M Nightclub and, after food and drinks, asked

for a corrected bill because the initial one showed an error.   After Miske heard

about this request, security personnel were sent to CW4's table, pulled CW4 away,

---

[5]Miske's reply provides no further specific critique of the gambling allegations, at most only stating that the "unchallenged allegations merely propped up these essential allegations [about Miske's alleged illegal source of income and drug dealing]."   Dkt. No. 987 at 3.   For the reasons discussed herein, that is not accurate.

[6]At the hearing, counsel also asserted, for the first time, that one of the gambling allegations, regarding Miske owing $40,000 to a Honolulu bookie, was based upon "undisclosed hearsay" from a person who had contact with Miske in the past.   As noted earlier, Miske did not make an evidentiary challenge to the gambling allegations in his briefing and, thus, he cannot do so in concluding arguments at the hearing.   Moreover, despite raising this tardy argument, Miske never meaningfully explained how the probable cause analysis would alter merely if the Affidavits had stated that certain allegations, such as the foregoing gambling one, were based upon hearsay—a valid foundation for probable cause.   *See Franks*, 438 U.S. at 165.

and repeatedly hit him in his side.   CW4 was then taken to the back of the club and placed across from Miske, who told CW4 to pay the bill "or else."   CW4 wrote "fuck security" on the bill, causing Miske to nod at his security, which assaulted CW4 again.   After escaping, CW4 was punched in the face by what appeared to be another Miske employee, losing a tooth in the process.

Again, Miske does not factually challenge these allegations.   Instead, in another passing, solitary sentence, he contends that "assault allegations involving disgruntled customers do not constitute extortion."   Dkt. No. 963 at 20 (citations omitted).   And again, Miske provides no explanation for this conclusory statement. Nor, at least with respect to the incident above with CW4, is it accurate.   *See* 18 U.S.C. § 1951(b)(2) (defining "extortion", in the context of a statute criminalizing, *inter alia*, attempting to interfere with commerce by extortion, as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear….").   Here, although the Affidavit does not state whether Miske was successful in having CW4 pay his bill, the allegations clearly show that Miske allegedly attempted to interfere with commerce by inducing CW4 to consent to pay the bill through the wrongful use of actual force.   Merely because CW4 was disgruntled, as Miske claims, does not mean that CW4 was not extorted—in fact, that may have very well been the reason for his disgruntlement.

14

In addition, Miske ignores the Affidavits' assertions that, consistent with individuals engaged in criminal activity, Miske used multiple telephones and frequently changed his telephone numbers.   In other words, Miske does not dispute these assertions and provides no possible explanation for why he would engage in such conduct other than being engaged in criminal activity, such as speaking to Thorell about Miske's alleged business of gambling.

Therefore, contrary to Miske's arguments, even if the allegations he actually challenges, including the ones concerning his allegedly illegitimate source of income and drug smuggling/dealing, are corrected in the manners he suggests,[7]

---

[7]With respect to these categories of information, while it is unnecessary for the Court to address whether the Affidavits intentionally or recklessly contained false or withheld material statements, the Court agrees with Miske that there was available information that would have made those allegations more complete.   For instance, with respect to Miske's alleged illegitimate source of income, the Affidavits, at a minimum, imply that Miske's businesses could not have possibly generated the income necessary for the lifestyle he lived and, thus, something allegedly illegal must have been at play.   The Affidavits, however, fail to discuss or discount any number of possible sources for Miske's alleged income that were *legitimate*, such as income from an inheritance or a generous, living family member.   In addition, in light of the evidence provided by Miske in support of the instant motion, it is clear that, at the very least, the suggestion in the Affidavits that Miske's businesses could not provide more profit than $250,000 per year is, at best, not a complete picture.   *See* Dkt. No. 963 at 9-10 (citing Defendant Miske's Exhibits M-59 at 1, M-60 at 2, M-61 at 4, M-62 at 1, M-63 at 4).   The lack of a complete picture is also true of the allegations related to Miske's use of the FV *Rachel* to smuggle drugs into Hawai'i.   The Affidavits state that Miske used the FV *Rachel* to transport drugs from California by attaching the drugs to buoys, dropping the buoys in the ocean, and then later using other vessels to locate the buoys/drugs.   According to CI#2, Miske had used the FV *Rachel* to transport a dog from California, while not unloading any fish.   However, the Affidavits omit the fact that, upon the FV *Rachel*'s return to Hawai'i, the boat was searched by numerous law enforcement agencies with no drugs being found.   The boat was also found with thousands of pounds worth of fish aboard, again with no mention of that fact in the Affidavits.   While the government contends in its briefing and at the evidentiary hearing that this information is "consistent", or at least not inconsistent, with the Affidavits, the government misses the point of the Affidavits: to provide a fair and complete picture of the facts available to the affiant and therefore to the Magistrate Judge.   Based upon the

15

there was still sufficient information contained in the Affidavits to support a finding of probable cause for the RICO offenses alleged therein.   *See* 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" as requiring "two acts of racketeering activity"); *id*. § 1961(1) (defining "racketeering activity" as including, *inter alia*, transmission of gambling information under Section 1084 and interfering with commerce by extortion under Section 1951).   As a result, Miske's challenge to the Warrants and the evidence derived therefrom must fail.[8]

## CONCLUSION

For the foregoing reasons, the instant motion to suppress, Dkt. No. 963, is DENIED.   The motion to compel, Dkt. No. 1024, is DENIED IN PART and REFERRED IN PART to the extent set forth herein.

IT IS SO ORDERED.

DATED: November 14, 2023 at Honolulu, Hawai'i.

Derrick K. Watson
Chief United States District Judge

---

evidence presented, the Court cannot say that the Affidavits painted such a fair picture on these specific issues.

[8]Nearly three weeks after the October 16, 2023 evidentiary hearing, Miske filed a motion to compel disclosure of material related to the FV *Rachel* ("motion to compel"), arguing that the material was relevant to the instant and another motion to suppress, as well as for trial purposes. Dkt. No. 1024.   Because it is beyond the scope of this Order, the Court does not address the motion to compel to the extent it argues that the government has a duty to produce information from certain agencies and seeks material for *trial* purposes, *i.e.*, Parts II, III, IV, and V(B) of the motion to compel.   Those parts of the motion are REFERRED to the assigned Magistrate Judge. To the extent the motion to compel seeks material for purposes of Miske's motions to suppress, however, the motion is DENIED.   This is because any such material would have no effect on the Court's finding that the Affidavits provided probable cause for the alleged RICO offenses *independent* of the Affidavits' use of information pertaining to the FV *Rachel* and to Miske's alleged drug smuggling/dealing.

*United States v. Miske,* Case No. 19-cr-00099-DKW-1; **ORDER (1) DENYING DEFENDANT MICHAEL J. MISKE, JR.'S MOTION TO SUPPRESS EVIDENCE AND FRUITS DERIVED FROM SEARCH AND SEIZURE WARRANTS 15-01345, 15-01346, AND 15-01347, AND (2) DENYING IN PART AND REFERRING IN PART DEFENDANTS' MOTION TO COMPEL**