1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3
      UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
4                                  )
               Plaintiff,          )    Honolulu, Hawaii
5                                  )
          vs.                      )    January 29, 2024
6                                  )
      MICHAEL J. MISKE, JR.,       )
7                                  )
               Defendant.          )
8     _____ )

9
                   TRANSCRIPT OF JURY TRIAL (DAY 13)
10             BEFORE THE HONORABLE DERRICK K. WATSON,
           CHIEF UNITED STATES DISTRICT COURT JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:          MARK INCIONG, ESQ.
                                  MICHAEL DAVID NAMMAR, ESQ
14                                WILLIAM KE AUPUNI AKINA, ESQ.
                                  Office of the United States Attorney
15                                PJKK Federal Building
                                  300 Ala Moana Boulevard, Suite 6100
16                                Honolulu, Hawaii  96850

17    For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                  841 Bishop St., Ste 2201
18                                Honolulu, HI 96813

19                                MICHAEL JEROME KENNEDY, ESQ.
                                  Law Offices of Michael Jerome
20                                Kennedy, PLLC
                                  333 Flint Street
21                                Reno, NV 89501

22
      Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                                United States District Court
                                  300 Ala Moana Boulevard
24                                Honolulu, Hawaii 96850

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).

1                              I N D E X

2    GOVERNMENT WITNESSES:                              PAGE NO.

3

     PRESTON KIMOTO (CONTINUED EXAMINATION)
4
         RESUMED CROSS-EXAMINATION BY MR. KENNEDY         8
5        REDIRECT EXAMINATION BY MR. AKINA              114

6    WAYNE MILLER

7        DIRECT EXAMINATION BY MR. INCIONG              131

8    EXHIBITS:                                         PAGE NO.

9    Exhibit 5-24 was received in evidence                8
     Exhibit 5-25 was received in evidence                9
10   Exhibit 5-27 was received in evidence               11
     Exhibit 5000-268 was received in evidence           31
11   Exhibit 5000-248 was received in evidence           33
     Exhibit 5000-257 was received in evidence           38
12   Exhibits 5000-128 through 5000-145 were received    42
     in evidence
13   Exhibit 5003-008 was received in evidence           48
     Exhibit 5003-007 was received in evidence           50
14   Exhibit 5003-9 was received in evidence             54
     Exhibit 5003-010 was received in evidence           55
15   Exhibit 5003-011 was received in evidence           56
     Exhibit 5003-012 was received in evidence           56
16   Exhibit 9010-101 was received in evidence           65
     Exhibit 9010-084 was received in evidence           67
17   Exhibit 9010-085 was received in evidence           72
     Exhibit 9010-086 was received in evidence           74
18   Exhibit 9010-087 was received in evidence           76
     Exhibit 9010-088 was received in evidence           78
19   Exhibit 9010-089 was received in evidence           80
     Exhibit 9010-090 was received in evidence           83
20   Exhibit 9010-91 was received in evidence            85
     Exhibit 9010-092 was received in evidence           89
21   Exhibit 9010-95 was received in evidence            96
     Exhibit 9010-96 was received in evidence            97
22   Exhibit 9010-097 was received in evidence           98
     Exhibit 9010-104 was received in evidence          100
23   Exhibit 9010-98 was received in evidence           101
     Exhibit 9010-099 was received in evidence          101
24   Exhibit 9010-100 was received in evidence          102
     Exhibit 1-843-A was received in evidence           126
25

```
         1   January 29, 2024                              8:28 a.m.

         2              (Open court out of the presence of the jury.)

08:28AM  3              THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

08:28AM  4   States of America versus Michael J. Miske, Jr.

08:28AM  5              Counsel, please make your appearances for the record.

08:29AM  6              MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

08:29AM  7   Michael Nammar, KeAupuni Akina for the United States.  Also

08:29AM  8   present is Kari Sherman, and FBI Special Agent Thomas Palmer.

08:29AM  9              THE COURT:  Good morning.

08:29AM 10              MR. KENNEDY:  Good morning, Your Honor.

08:29AM 11              THE COURT:  Good morning.

08:29AM 12              MR. KENNEDY:  Michael Kennedy with Lynn Panagakos,

08:29AM 13   Michael Miske, and we are here with Ms. King.

08:29AM 14              THE COURT:  All right.  Good morning to all of you as

08:29AM 15   well.  You may be seated.

08:29AM 16              Just to speak with you all just very briefly this

08:29AM 17   morning before we bring the jury in, because there is an update

08:29AM 18   with respect to Juror Number 11, the cause of us going dark on

08:29AM 19   Friday, as you may recall.

08:29AM 20              So we did receive an update from both her and her

08:29AM 21   physician.  As is typical with physician notes, it's not very

08:29AM 22   illuminating.  In fact, I'll just read it to you because it's

08:29AM 23   so short.

08:29AM 24              "This is to certify that Juror Number 11 is under my

08:29AM 25   professional care, was unable to attend jury duty due to a
```

08:30AM  1    recent motor vehicle accident which occurred on January 26th."

08:30AM  2          Things that we obviously already know, and there are

08:30AM  3    about seven more words, so you can tell how much this letter

08:30AM  4    illuminates our situation.

08:30AM  5          "She may return to jury duty on February 5th."  So

08:30AM  6    that's the entirety of the letter.

08:30AM  7          Ms. Williams did also elaborate in a separate email to

08:30AM  8    the same effect.  She provided additional details.  She was

08:30AM  9    rear-ended on the date in question.  She continues to suffer

08:30AM  10   both back and neck pain as well as headaches.  She is on

08:30AM  11   medication that makes her drowsy, and she is not able to turn

08:30AM  12   her neck or to sit for any extended period of time.  And said

08:30AM  13   she -- in fact, she said that she's been spending the majority

08:30AM  14   of her day in bed.

08:30AM  15         In light of the one-week delay that continuing on the

08:31AM  16   jury would result in -- and at that point I imagine she would

08:31AM  17   need to be reevaluated, not immediately then coming into court,

08:31AM  18   I don't think that's automatic -- my suggestion is that we

08:31AM  19   excuse her.  I don't think we can afford the one-week delay

08:31AM  20   that she is asking for at a minimum.

08:31AM  21         Thoughts?

08:31AM  22         MR. INCIONG:  We agree, Your Honor.  I think that's

08:31AM  23   really the only logical choice at this point.

08:31AM  24         MR. KENNEDY:  Agree, Your Honor.

08:31AM  25         THE COURT:  All right.  Then we'll excuse Ms. Williams

| | | |
|---|---|---|
| 08:31AM | 1 | from further participation.  All of the alternate jurors will |
| 08:31AM | 2 | then move up one spot.  Alternate Number 1, Mr. Ott, would then |
| 08:31AM | 3 | move into a deliberating and voting role, with every other |
| 08:31AM | 4 | alternate moving up one -- one slot from 2 to 1, 3 to 2, |
| 08:31AM | 5 | etcetera. |
| 08:31AM | 6 | Okay.  With that, any other issues?  Otherwise, we'll |
| 08:31AM | 7 | get the jury in and the witness to retake the stand. |
| 08:32AM | 8 | MR. INCIONG:  No, Your Honor. |
| 08:32AM | 9 | MR. KENNEDY:  None, Your Honor. |
| 08:32AM | 10 | THE COURT:  All right.  I hope everyone was able to |
| 08:32AM | 11 | take advantage of the extra day that we got. |
| 08:32AM | 12 | Let's go ahead and bring the jury in. |
| 08:32AM | 13 | And the witness may retake the stand. |
| 08:34AM | 14 | (In open court in the presence of the jury:) |
| 08:34AM | 15 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:34AM | 16 | States of America versus Michael J. Miske, Jr. |
| 08:34AM | 17 | This case has been called for jury trial, Day 13. |
| 08:35AM | 18 | Counsel, please make your appearances for the record. |
| 08:35AM | 19 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:35AM | 20 | Michael Nammar and KeAupuni Akina for the United States.  Also |
| 08:35AM | 21 | present with us again is Special Agent Thomas Palmer and Kari |
| 08:35AM | 22 | Sherman. |
| 08:35AM | 23 | THE COURT:  Good morning. |
| 08:35AM | 24 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:35AM | 25 | Kennedy with Lynn Panagakos, Michael Miske, and Ashley King is |

08:35AM    1    assisting us today.

08:35AM    2            THE COURT:  All right.  Good morning to all of you.

08:35AM    3    You may be seated.

08:35AM    4            And good morning.  I hope you all had a good weekend,

08:35AM    5    was able to enjoy the Friday bonus that we got last week.  So

08:35AM    6    you were able to turn it into a hopefully three-day weekend and

08:35AM    7    recharge a little bit.  I know last -- last week was likely a

08:35AM    8    little bit of a long one.  It's our first week of evidence.  It

08:35AM    9    tends to have that effect on most people.

08:35AM    10           So good morning to the 17 of you who have appeared

08:35AM    11   this morning.  One thing that stands out I imagine in all of

08:35AM    12   your minds is the absence of Juror Number 11.  I'll say just a

08:36AM    13   little bit about that situation without going into too much

08:36AM    14   detail.

08:36AM    15           She is okay.  It's not life-threatening or anything

08:36AM    16   along those lines, anything approximating that.  Nonetheless,

08:36AM    17   she is not able to rejoin this trial.  Her departure would have

08:36AM    18   been at least a week, if not more, and there was some

08:36AM    19   uncertainties surrounding that.

08:36AM    20           So the parties at the Court's recommendation have

08:36AM    21   agreed to excuse her from further service.  What that means,

08:36AM    22   this is why we have alternates, and this is in addition to why

08:36AM    23   we ask our alternate jurors to pay as close attention to what's

08:36AM    24   going on to the evidence, to the witnesses as anyone else on

08:36AM    25   the jury, because of moments just like this.

08:36AM    1        So what we're going to ask -- you can all remain where

08:36AM    2    you are for the time being.

08:36AM    3        But at the next break, Mr. Ott, you are the first

08:36AM    4    alternate.  You will move up -- and rather than have

08:36AM    5    Ms. Yoshiyama move over, what we'll just do is have you sit in

08:37AM    6    Juror Number 11's seat so that there is not a mass shuffling.

08:37AM    7        All of the other alternates will then move up.  Number

08:37AM    8    3 -- Number 2 will become Alternate 1, Number 3 will become

08:37AM    9    Alternate 2, etcetera.  Okay?

08:37AM    10        Hopefully that's not confusing at all.

08:37AM    11        Bottom line, continue to pay as close attention to the

08:37AM    12    proceedings as you all have been up to now, and we'll just be

08:37AM    13    fine.

08:37AM    14        Okay.  And we wish Ms. Williams of course a speedy

08:37AM    15    recovery, and I have no doubt that she will get there.  It just

08:37AM    16    won't jibe with the timetable that we have here for this

08:37AM    17    proceeding.

08:37AM    18        Okay.  So with that, I remind you where we were when

08:37AM    19    we adjourned on Thursday afternoon.  Mr. Kimoto was on the

08:37AM    20    witness stand.  Mr. Kennedy, who is just now standing up and

08:37AM    21    taking the podium, had begun his cross-examination of

08:37AM    22    Mr. Kimoto, and that is where we will resume.

08:37AM    23        Mr. Kennedy, when you're ready.

08:37AM    24        MR. KENNEDY:  Thank you, Your Honor.

08:37AM    25                        PRESTON KIMOTO,

08:38AM    1                        (Resumed the stand.)

08:38AM    2                    RESUMED CROSS-EXAMINATION

08:38AM    3    BY MR. KENNEDY:

08:38AM    4    Q    Sir, I want to pull up what's been marked as Exhibit 5-24

08:38AM    5    for you to take a look at it.

08:38AM    6            MR. KENNEDY:  Your Honor, I believe we have a

08:38AM    7    stipulation that it's admissible that was filed I believe last

08:38AM    8    evening.

08:38AM    9            THE COURT:  Yes, 5-24 pursuant to the parties' second

08:38AM    10    stipulation filed on January 28th is admitted.

08:38AM    11            (Exhibit 5-24 was received in evidence.)

08:38AM    12            MR. KENNEDY:  And it's a video clip without audio, and

08:38AM    13    if we can move to --

08:38AM    14            THE COURT:  Play it?  Yes, you may.

08:38AM    15            (Videotape was played for the jury.)

08:38AM    16    BY MR. KENNEDY:

08:38AM    17    Q    Sir, do you recognize the truck that the jury can see in

08:38AM    18    Exhibit 5-24?

08:38AM    19    A    Yes.

08:38AM    20    Q    Whose is it?

08:38AM    21    A    That is my truck.

08:38AM    22    Q    All right.  And we're on October 17, 2017, at 4:03 p.m.?

08:39AM    23    A    Yes.

08:39AM    24    Q    You've walked into the office?

08:39AM    25    A    Yes.

08:39AM   1   Q    And so I want to compare that now, and let's go to 5-24-A.

08:39AM   2   And this is a still shot of you, it looks at 4:03:35 p.m. on

08:39AM   3   October 17, 2017, correct?

08:39AM   4   A    Yes.

08:39AM   5   Q    Now, I want to compare that now to the timeline on the

08:39AM   6   phone, Mr. Miller and you.

08:39AM   7        MR. KENNEDY:  If we could pull up Exhibit 5-37, which

08:39AM   8   is in evidence, Your Honor, and publish it to the jury.

08:39AM   9        THE COURT:  You may.

08:39AM  10   BY MR. KENNEDY:

08:39AM  11   Q    If we go to the last page, since this is in reverse order,

08:40AM  12   page 6, there are no texts from Mr. Miller to you at this time

08:40AM  13   at 4:02 p.m. to 4:04 p.m., correct?

08:40AM  14   A    Yes.

08:40AM  15   Q    And so the first text from Miller to you is at 5:21:49,

08:40AM  16   correct?

08:40AM  17   A    Correct.

08:40AM  18   Q    All right.

08:40AM  19        MR. KENNEDY:  I want to move to Exhibit 5-25, which is

08:40AM  20   also a video clip that is stipulated, Your Honor.

08:40AM  21        THE COURT:  Yes, it is part of yesterday's

08:40AM  22   stipulation, and so the 5-25 is admitted.  You may publish.

08:40AM  23        (Exhibit 5-25 was received in evidence.)

08:40AM  24   BY MR. KENNEDY:

08:40AM  25   Q    All right.  And so we're at 4:13 p.m.?

08:40AM    1    A    Correct.

08:40AM    2    Q    So this is roughly ten minutes after you entered the

08:40AM    3    office?

08:40AM    4    A    Yes.

08:40AM    5    Q    And you're leaving the office in your truck.

08:40AM    6    A    Correct.

08:40AM    7    Q    And so this is on October 17, 2017?

08:41AM    8    A    Yes.

08:41AM    9    Q    All right.  And if we go to 5-25-A, and this is a

08:41AM    10   screenshot of you getting into your truck at 4:13?

08:41AM    11   A    Correct.

08:41AM    12   Q    In the afternoon and leaving the office, right?

08:41AM    13   A    Yes.

08:41AM    14   Q    All right.  If we move to Exhibit 5-37, that last page.

08:41AM    15   Once again, this is now -- there are no texts from Miller at

08:41AM    16   this point, correct?

08:41AM    17   A    Correct.

08:41AM    18   Q    The first text appears to be at 5:21:49 on that day,

08:42AM    19   October 17, 2017, correct?

08:42AM    20   A    Yes.

08:42AM    21   Q    All right.

08:42AM    22         MR. KENNEDY:  Now, I want to move to Exhibit 5-27,

08:42AM    23   which is also a video clip that is stipulated, and I would ask

08:42AM    24   that it be published.

08:42AM    25         THE COURT:  Yes, pursuant to the stipulation, the

08:42AM  1   referenced Exhibit 5-27 is admitted, and, yes, you may publish.

08:42AM  2              (Exhibit 5-27 was received in evidence.)

08:42AM  3   BY MR. KENNEDY:

08:42AM  4   Q   All right.  At this time you're gone in your truck, right?

08:42AM  5   A   Yes.

08:42AM  6   Q   All right.  Do you see an individual in the white shirt

08:42AM  7   walking away?

08:42AM  8   A   Yes.

08:42AM  9   Q   That's Mr. Miske, correct?

08:42AM  10  A   Correct.

08:42AM  11  Q   He's walking out of the office across the way, correct?

08:43AM  12  A   Yes.

08:43AM  13  Q   This is at 4:30, correct?

08:43AM  14  A   Yes.

08:43AM  15  Q   About 15 minutes after you left in your truck, correct?

08:43AM  16  A   Correct.

08:43AM  17  Q   All right.  And if we move to 5-27-A, this is a screenshot

08:43AM  18  of Mr. Miske walking out of the office across the street,

08:43AM  19  correct?

08:43AM  20  A   Yes.

08:43AM  21  Q   All right.  Once again, if we look at Exhibit 5-37,

08:43AM  22  page 6, this is almost 15 minutes before Mr. Miller sends you

08:43AM  23  his first text, correct?

08:43AM  24  A   Yes.

08:43AM  25  Q   4:30:25, he's walking across the street, and the first

08:43AM  1  text is at 5:21:49, correct?

08:43AM  2  A    Yes.

08:43AM  3  Q    All right.

08:43AM  4          MR. KENNEDY:  Let's move to Exhibit 5-28, which is a

08:43AM  5  video clip also pursuant to the stipulation, Your Honor.

08:43AM  6          THE COURT:  Yes, go ahead.

08:43AM  7  BY MR. KENNEDY:

08:43AM  8  Q    This is at 5:35:45?

08:44AM  9  A    Yes.

08:44AM  10  Q    You see Mr. Miske returning to the office, correct?

08:44AM  11  A    Correct.

08:44AM  12  Q    This is now about an hour after he left, actually an hour

08:44AM  13  and five minutes, 5:35, correct?

08:44AM  14  A    Yes.

08:44AM  15  Q    We saw him walk out at 4:30, correct?

08:44AM  16  A    Correct.

08:44AM  17  Q    So an hour and five minutes later?

08:44AM  18  A    Yes.

08:44AM  19  Q    If we move to 5-28-A, this is a screenshot of him walking

08:44AM  20  right at 5:35:43, correct, on October 17, 2017?

08:44AM  21  A    Yes.

08:44AM  22  Q    All right.  At this point I want to compare it to

08:44AM  23  Exhibit 5-37, page 6.  It's at 5:21:49 when Miller texts you,

08:44AM  24  "Yo," right?

08:44AM  25  A    Yes.

08:45AM  1  Q    At 5:33:41, he texts you, "Call me ASAP," two exclamation

08:45AM  2  points, correct?

08:45AM  3  A    Correct.

08:45AM  4  Q    The first one is 14 minutes before we see Mr. Miske

08:45AM  5  walking back into the office, correct?

08:45AM  6  A    Correct.

08:45AM  7  Q    And the "Call me ASAP," double exclamation point, is two

08:45AM  8  minutes before he walks into the office, correct?

08:45AM  9  A    Correct.

08:45AM  10  Q    Now, the government has never shown you any video showing

08:45AM  11  you arriving back at Kama'aina Termite and Pest Control after

08:45AM  12  you left on -- at 4:13 p.m. that day, correct?

08:45AM  13  A    Correct.

08:45AM  14  Q    And you have never seen any video showing you arriving

08:45AM  15  back at Kama'aina Termite and Pest Control after 4:13 p.m.,

08:45AM  16  correct?

08:45AM  17  A    Correct.

08:45AM  18       MR. KENNEDY:  Now, by stipulation, Your Honor, I would

08:46AM  19  admit Exhibit 9010-082, which is a video which is -- and before

08:46AM  20  we pull it up, it's from 5:35:36 through 5:59:48, which is

08:46AM  21  24 minutes.

08:46AM  22       To assist the jury, we have also marked

08:46AM  23  Exhibit 9010-83 that plays the video at 8-speed so we can get

08:46AM  24  through the 24 minutes in three minutes if the Court will

08:46AM  25  allow.

08:46AM    1              THE COURT:  This is pursuant to the second

08:46AM    2    stipulation?

08:46AM    3              MR. KENNEDY:  Yes, Your Honor.

08:46AM    4              THE COURT:  Yes, then go ahead.

08:46AM    5              MR. KENNEDY:  All right.  If we could pull up 9010-83.

08:46AM    6    And this will be at a quicker speed so we can get through.

08:46AM    7    BY MR. KENNEDY:

08:46AM    8    Q    Now, did you see Mr. Miske walk in?

08:46AM    9    A    Yes.

08:46AM   10    Q    All right.  Do you see Mr. Miske get out and deal with

08:47AM   11    that truck that just came in?

08:47AM   12    A    Yes.

08:47AM   13    Q    So you went back into the office with the individual that

08:47AM   14    came with the truck that parked right by the bay, correct?

08:47AM   15    A    Right in front of the shop, yes.

08:47AM   16    Q    Right in front of the shop, yes.

08:49AM   17              All right.  We're now at five -- back to the start, we

08:49AM   18    went all the way up to 5:59:48, correct?

08:50AM   19    A    Yes.

08:50AM   20    Q    Twenty-four minutes, Mr. Miske is still inside the shop.

08:50AM   21    The individual that he met is still inside the shop.  Correct?

08:50AM   22    A    Correct.

08:50AM   23    Q    The video shows that you have not returned, correct?

08:50AM   24    A    Correct.

08:50AM   25    Q    Now, if we go to Exhibit 9010-085, which is also the one I

08:50AM  1  just played that first part, since that was moving at 8-speed,

08:50AM  2  I just want to play the first part of that.

08:50AM  3          We see Mr. Miske walking into the shop, correct?

08:50AM  4  A    Correct.

08:50AM  5          MR. AKINA:  Sorry, just to be clear, this is Exhibit

08:50AM  6  08 --

08:50AM  7          MR. KENNEDY:  082, the ones at regular speed, Counsel.

08:51AM  8  BY MR. KENNEDY:

08:51AM  9  Q    Now, we're at 5:36.  There's not a lot of activity at the

08:51AM  10  shop at this time, correct?

08:51AM  11  A    Correct.

08:51AM  12  Q    In fact, we see no one else in the area working, correct?

08:52AM  13  A    Correct.

08:52AM  14  Q    Now, we see this truck pull up and stop.  A gentlemen gets

08:52AM  15  out of that truck, another gentlemen.  And it's Mr. Miske who

08:53AM  16  comes out to greet them, correct?

08:53AM  17  A    Yes.

08:53AM  18  Q    So we're at 5:37 -- 38 Mr. Miske is dealing with these two

08:53AM  19  individuals and this truck, correct?

08:53AM  20  A    Yes.

08:53AM  21  Q    And they both walk inside.

08:53AM  22  A    Yes.

08:53AM  23          MR. KENNEDY:  All right.  We can take that down since

08:53AM  24  the jury saw the rest of it.  I just wanted to slow it down

08:53AM  25  through that portion.

08:53AM    1    BY MR. KENNEDY:

08:53AM    2    Q    So we're at 5:38:22, Mr. Miske and the gentleman who came

08:53AM    3    in on the flatbed are inside the office, correct?

08:53AM    4    A    Yes.

08:53AM    5    Q    All right.  Now, I want to go back to Exhibit 5-37.  And

08:53AM    6    go to the fifth page.

08:53AM    7        So now we start out, Miller has texted you as we

08:53AM    8    pointed out at 5:21:49, "Yo," and 5:33:41, "Call me ASAP," two

08:54AM    9    exclamation points.

08:54AM    10        Here in 29 and 28 --

08:54AM    11        MR. KENNEDY:  Ms. King, if you can blow that up.

08:54AM    12    Thank you so much.

08:54AM    13    BY MR. KENNEDY:

08:54AM    14    Q    -- Miller is texting you a third time, "WTF, brah?"  WTF

08:54AM    15    being "what the fuck," right?

08:54AM    16    A    Correct.

08:54AM    17    Q    And this is at 5:37:07, correct?

08:54AM    18    A    Correct.

08:54AM    19    Q    So Miller is texting you, "What the fuck, brah?"

08:54AM    20    Mr. Miller is dealing with a guy on a flatbed going into the

08:54AM    21    office, correct?

08:54AM    22        MR. AKINA:  Objection.  That's not what the witness

08:54AM    23    testified to.

08:54AM    24        THE WITNESS:  That wasn't -- that wasn't Miller that

08:54AM    25    Mr. Miske was dealing with.

08:54AM   1   BY MR. KENNEDY:

08:54AM   2   Q    I'm sorry, not Mr. Miller.  He's dealing with someone in

08:54AM   3   the office who came on the flatbed truck.  I just misspoke.

08:54AM   4   Thank you.

08:54AM   5   A    Yes, that's correct.

08:54AM   6   Q    You were getting a text from Mr. Miller, "WTF, brah,"

08:54AM   7   correct?

08:54AM   8   A    Correct.

08:54AM   9   Q    He's texting you, correct?

08:55AM  10   A    Correct.

08:55AM  11   Q    You left in your truck at 4:13, correct?

08:55AM  12   A    Correct.

08:55AM  13   Q    And then at 5:37:36, Miller texts you, "Text me back or

08:55AM  14   something," right?

08:55AM  15   A    Correct.

08:55AM  16   Q    Okay.  Now, about -- we're now -- we see that at 6:08:48

08:55AM  17   is the first time you text him back, correct?

08:55AM  18   A    Correct.

08:55AM  19   Q    It's now about 30 minutes later, right?

08:55AM  20   A    Yes.

08:55AM  21   Q    You text him:  "I was at the house.  Left my phone in the

08:55AM  22   truck.  Hold on.  She just got home."  Correct?

08:55AM  23   A    Correct.

08:55AM  24   Q    Moving to -- up to what is marked as 26, it's another --

08:56AM  25   you text him a second time at 6:42:36, correct?

| | | | |
|---|---|---|---|
| 08:56AM | 1 | A | Correct. |
| 08:56AM | 2 | Q | So a little less than a half hour -- a little more than |
| 08:56AM | 3 | | half hour, correct, in between? |
| 08:56AM | 4 | A | Correct. |
| 08:56AM | 5 | Q | And what you text is:  "Meet."  Right? |
| 08:56AM | 6 | A | Yes. |
| 08:56AM | 7 | Q | "Give me" -- right? |
| 08:56AM | 8 | A | Yes. |
| 08:56AM | 9 | Q | -- "15 mins," M-I-N-S. |
| 08:56AM | 10 | A | Correct. |
| 08:56AM | 11 | Q | 15 minutes, right? |
| 08:56AM | 12 | A | Yes. |
| 08:56AM | 13 | Q | Miller texts back at 6:44:54, "K," for okay? |
| 08:56AM | 14 | A | Yes. |
| 08:56AM | 15 | Q | You meet him, right?  You just texted him:  "Meet, give me |
| 08:57AM | 16 | | 15 mins," correct? |
| 08:57AM | 17 | A | Correct. |
| 08:57AM | 18 | Q | You meet him and you talk, right? |
| 08:57AM | 19 | A | No, I don't remember if we met. |
| 08:57AM | 20 | Q | You meet him at Sheridan Park, don't you? |
| 08:57AM | 21 | A | I don't believe so, sir. |
| 08:57AM | 22 | Q | You're the third voice that Mr. Robert Lee hears near the |
| 08:57AM | 23 | | car, correct? |
| 08:57AM | 24 | A | No. |
| 08:57AM | 25 | Q | You just text Miller:  "Meet.  Give me 15 minutes." |

| | | |
|---|---|---|
| 08:57AM | 1 | Correct? |
| 08:57AM | 2 | MR. AKINA:  Asked and answered. |
| 08:57AM | 3 | THE COURT:  You may answer, go ahead. |
| 08:57AM | 4 | THE WITNESS:  Yes, I did text him that. |
| 08:57AM | 5 | BY MR. KENNEDY: |
| 08:57AM | 6 | Q    All right.  Now, let's move up to what is marked as Number |
| 08:58AM | 7 | 24.  There is no more texts from Mr. Miller to you between |
| 08:58AM | 8 | 6:42:36 and 7:47:48, correct? |
| 08:58AM | 9 | A    He texted "K," right, at 6:44. |
| 08:58AM | 10 | Q    At 6:42 he says -- at 6:44 he says "K," right? |
| 08:58AM | 11 | A    Yes. |
| 08:58AM | 12 | Q    And then it's all the way to 7:47:48, one hour and three |
| 08:58AM | 13 | minutes roughly later, you text him:  "Call you right back." |
| 08:58AM | 14 | Correct? |
| 08:58AM | 15 | A    Correct. |
| 08:58AM | 16 | Q    There is no text from Miller to prompt a call back, |
| 08:58AM | 17 | correct? |
| 08:58AM | 18 | A    Yes. |
| 08:58AM | 19 | Q    Miller called you, right?  That's why you said, "Call you |
| 08:59AM | 20 | right back," correct? |
| 08:59AM | 21 | A    Most likely. |
| 08:59AM | 22 | Q    Well, he wouldn't have you call him if you were with him |
| 08:59AM | 23 | physically, right? |
| 08:59AM | 24 | A    Yes. |
| 08:59AM | 25 | Q    There's no text from him, correct? |

| | | | |
|---|---|---|---|
| 08:59AM | 1 | A | Correct. |

08:59AM    2    Q    When you say, "Call you right back," he called you.  You

08:59AM    3    know that, sir.

08:59AM    4    A    He probably did, sir.

08:59AM    5    Q    And so very quickly, 12 seconds later --

08:59AM    6            MR. KENNEDY:  If we move to the next page, page 4, and

08:59AM    7    go down to the bottom, Ms. King.  So that -- it's very small.

08:59AM    8    Thank you so much.

08:59AM    9    BY MR. KENNEDY:

08:59AM    10    Q    On the earlier page it was 7:47:48 when you texted "Call

09:00AM    11    you right back."  12 seconds later at 7:48, he says "K."

09:00AM    12            And that "he" is Miller, right?

09:00AM    13    A    Yes.

09:00AM    14    Q    And then at 8:11:38, he says "Brah."

09:00AM    15    A    Correct.

09:00AM    16    Q    In a text.  Right?

09:00AM    17    A    Yes.

09:00AM    18    Q    "He" being Miller, correct?

09:00AM    19    A    Yes.

09:00AM    20    Q    And then 12 seconds later at 8:11:50, he texts you a third

09:00AM    21    time:  "No more all night."  Right?

09:00AM    22    A    Yes.

09:00AM    23    Q    Quickly within -- it looks like 11 seconds, you text back:

09:00AM    24    "I know, coming now."  Right?

09:01AM    25    A    Yes.

09:01AM  1    Q    So he's waiting on you, and now you're coming now again,
09:01AM  2    correct?
09:01AM  3    A    Yes, I'm meeting him.
09:01AM  4    Q    And he says a minute later at 8:13:11 at 19:  "How far
09:01AM  5    you?"
09:01AM  6    A    Yes.
09:01AM  7    Q    And you say at 8:14:15:  I'm at Ala's, 5 to 10 mins."
09:01AM  8    Right?
09:01AM  9    A    Correct.
09:01AM  10   Q    Ala's being Ala Moana shopping center, correct?
09:01AM  11   A    Yes.
09:01AM  12   Q    And you're about to come now to Sheridan Park to see
09:01AM  13   Miller again, correct?
09:01AM  14   A    Yes.
09:01AM  15   Q    You're meeting Sunnie Kim at Ala Moana shopping center,
09:02AM  16   correct?
09:02AM  17   A    No, I met Sunnie Kim at Sheridan Park.
09:02AM  18   Q    Oh, you met her there with Miller?
09:02AM  19   A    Not with Miller.
09:02AM  20   Q    Oh, so you're at Ala Moana shopping center shopping at
09:02AM  21   this point?
09:02AM  22   A    No.
09:02AM  23   Q    All right.  You're coming to Miller, and you know you
09:02AM  24   don't even have to ask, do you?  You know where he's at,
09:02AM  25   Sheridan Park, right?

09:02AM   1   A   Yes.

09:02AM   2   Q   Nowhere in the text does he say where he's at.  You've

09:02AM   3   been there before to see him by yourself, correct?

09:02AM   4   A   Yes, I did meet Wayne at Sheridan Park.

09:02AM   5   Q   And that's the end of the text on October 17, 2017,

09:03AM   6   correct?

09:03AM   7   A   I believe so.

09:03AM   8   Q   We can move over to the next page just to make certain.

09:03AM   9        MR. KENNEDY:  If you blow up number 17, Ms. King.

09:03AM   10  BY MR. KENNEDY:

09:03AM   11  Q   This shows 12:27:32 p.m. the next day, correct?

09:03AM   12  A   Correct.

09:03AM   13  Q   All right.

09:03AM   14       MR. KENNEDY:  Now, we can take down Government

09:03AM   15  exhibit -- or Exhibit 5-37.

09:03AM   16  BY MR. KENNEDY:

09:03AM   17  Q   So you meet with Miller after you say "I'm coming" to

09:03AM   18  Sheridan Park, right?

09:03AM   19  A   Yes.

09:03AM   20  Q   And so Miller tells you he needs money for to pay his

09:03AM   21  friend, yes?

09:03AM   22  A   Yes.

09:03AM   23  Q   Miller tells you he needs money for the cost of purchasing

09:03AM   24  the van, correct?

09:03AM   25  A   Yes.

09:04AM  1  Q    Yesterday -- oh, excuse me, on Thursday you told this jury

09:04AM  2  there was no van, correct?

09:04AM  3           MR. AKINA:  Objection mischaracterizes the witness's

09:04AM  4  testimony.

09:04AM  5           THE COURT:  You may answer.

09:04AM  6           THE WITNESS:  Yes.

09:04AM  7           THE COURT:  Overruled.

09:04AM  8           THE WITNESS:  Yes.

09:04AM  9  BY MR. KENNEDY:

09:04AM  10  Q    Yes, you did, you told him there was no van, and today now

09:04AM  11  you're telling them there is one, right?

09:04AM  12  A    Yes.

09:04AM  13  Q    So you said one thing on one day to this jury and another

09:04AM  14  thing today to this jury, correct?

09:04AM  15  A    Correct.

09:04AM  16  Q    And Miller tells you he needs money for the cost of

09:04AM  17  destroying the van, correct?

09:04AM  18  A    Yes.

09:04AM  19  Q    And you told the FBI this back in May of last -- 2023, and

09:04AM  20  on Thursday you said they got it wrong, didn't you?

09:04AM  21  A    I don't -- can you -- I don't remember that part, sir.

09:05AM  22  Q    You said there was no van.  You never said that.

09:05AM  23  A    Can you repeat that, please?

09:05AM  24  Q    You said there was no van.  You said that -- when I asked

09:05AM  25  you the question, I said, Didn't you tell the FBI that Miller

09:05AM    1    told you he needed money to pay for a van?  And you said, no,

09:05AM    2    you didn't tell him that.  Do you recall that?

09:05AM    3    A    I do recall that.

09:05AM    4    Q    All right.  Now, that's a lie because there never was a

09:05AM    5    van, was there?

09:05AM    6    A    Well, that's what Miller was asking me the money -- I

09:05AM    7    didn't know if there was a van or not there.  That's what he

09:05AM    8    was asking me.

09:05AM    9    Q    Mr. Lee was in Miller's Crown Vic the entire time.  He

09:05AM   10    never got moved out of any vehicle, sir.

09:05AM   11            MR. AKINA:  Objection.  Is there a question?

09:06AM   12    BY MR. KENNEDY:

09:06AM   13    Q    Isn't that true, you were at Sheridan Park and you saw

09:06AM   14    him?

09:06AM   15    A    I did not see Mr. Lee at Sheridan Park, nor did I see the

09:06AM   16    Crown Vic that you're talking about.

09:06AM   17    Q    Mr. Robert Lee never left the vehicle that he was

09:06AM   18    kidnapped in.  You know that, sir.

09:06AM   19    A    That's incorrect, I do not know that.  Miller -- when I

09:06AM   20    saw Miller, he was in a light color sedan, not a --

09:06AM   21    Q    A light-colored sedan.  Not a dark-colored sedan.

09:06AM   22    A    That is correct, sir.

09:06AM   23    Q    I see.  All right.  Not red or dark.

09:06AM   24    A    Not red or dark.

09:06AM   25    Q    Okay.  Now, you told the jury last Thursday that you and

09:07AM    1    Mr. Miller drove around for 30 to 60 minutes after you met him

09:07AM    2    at Sheridan Park.

09:07AM    3    A    That's correct.

09:07AM    4    Q    You drove over to meet him, right?

09:07AM    5    A    Yes.

09:07AM    6    Q    That text came in at 8:14, when you said you were coming,

09:07AM    7    right?

09:07AM    8    A    Yes.

09:07AM    9    Q    You say that you drove around, and he also asked you again

09:07AM    10   for money, right?

09:07AM    11   A    Correct.

09:07AM    12   Q    And then you said that instead of driving him back to

09:07AM    13   where you picked him up at Sheridan Park, you drove him to the

09:07AM    14   Fisherman's Wharf.

09:07AM    15   A    Correct.

09:07AM    16   Q    Back to the scene of the crime.

09:08AM    17   A    I do not know if that was the scene of the crime.

09:08AM    18   Q    And so he was at Sheridan Park and you drove him to a

09:08AM    19   different location, right?

09:08AM    20   A    Correct.

09:08AM    21   Q    And you know where it's at?

09:08AM    22   A    No, I do not, sir.

09:08AM    23   Q    So you didn't return him to his car.

09:08AM    24   A    I dropped him off where he wanted to be dropped off at.

09:08AM    25   Q    Back at the scene of a crime where he had just kidnapped

09:08AM  1  somebody, that's what you're telling the jury.

09:08AM  2          MR. AKINA:  Objection.  Mischaracterizes the witness's

09:08AM  3  testimony.

09:08AM  4          THE COURT:  You may answer.

09:08AM  5          THE WITNESS:  I just explained to you that I do not

09:08AM  6  know where the crime took place.

09:08AM  7  BY MR. KENNEDY:

09:08AM  8  Q    Now, after you were arrested by the SWAT team for

09:08AM  9  threatening Sunnie Kim, you told the FBI that Sunnie Kim asked

09:08AM  10  you when you met with her on the 17th of October how much it

09:09AM  11  cost to kill Mr. Lee.

09:09AM  12  A    Correct.

09:09AM  13  Q    And you say that she made a gesture across her throat.

09:09AM  14  A    Yes.

09:09AM  15  Q    Now, this is after you were arrested for threatening her

09:09AM  16  in December of 2022, correct?

09:09AM  17  A    No, that's not correct.

09:09AM  18  Q    Well, what I mean is the first time you told this to the

09:09AM  19  FBI was after you had been arrested for threatening her.

09:09AM  20  Correct?

09:09AM  21  A    That's correct.

09:09AM  22  Q    And so your deal with her on the first day you met her was

09:09AM  23  50/50 split, right?

09:09AM  24  A    Correct.

09:09AM  25  Q    And no monies --

09:09AM  1   A    Not 50/50 split.  It was 50 percent of whatever was
09:09AM  2   collected.
09:10AM  3   Q    Okay.  Whatever was collected, 50 percent, 50/50, right?
09:10AM  4   A    Correct.
09:10AM  5   Q    Okay.  So you're telling the jury that someone who said,
09:10AM  6   "How much does it cost to kill?" did this across their throat,
09:10AM  7   simply paid you $90,000 when they got nothing?  That's what
09:10AM  8   you're trying to sell?
09:10AM  9   A    That is the truth, sir.
09:10AM  10  Q    That's the truth.
09:10AM  11  A    Yes.
09:10AM  12  Q    Someone who went like this across their throat just gave
09:10AM  13  up $90,000.
09:10AM  14  A    That's true, sir.
09:10AM  15  Q    That too, the first time you told that was after you had
09:10AM  16  threatened Sunnie Kim and were arrested by the SWAT, correct?
09:10AM  17  A    That is not correct, because I didn't threaten Sunnie Kim
09:10AM  18  at any point.
09:10AM  19       MR. KENNEDY:  Now, if we go back to Exhibit 5-37, and
09:11AM  20  if we go to -- let's see, I believe it would be the fourth
09:11AM  21  page if I'm -- actually it would be the third.  Down at -- if
09:11AM  22  we go to the bottom of the page, Ms. King.  Thank you, Ashley.
09:11AM  23  BY MR. KENNEDY:
09:11AM  24  Q    If we look at the first text on October 18, 2017, once
09:11AM  25  again Miller is texting you, right?

| | | | |
|---|---|---|---|
| 09:11AM | 1 | A | Yes. |
| 09:11AM | 2 | Q | "Call me ASAP."  Correct? |
| 09:11AM | 3 | A | Correct. |
| 09:11AM | 4 | Q | And it's at 12:27:32 in the afternoon. |
| 09:11AM | 5 | A | Correct. |
| 09:12AM | 6 | Q | Roughly four hours later he texts you:  "Pres, I just got |
| 09:12AM | 7 | | to take care of my boys something, then I can wait till |
| 09:12AM | 8 | | tomorrow is Thursday."  Correct? |
| 09:12AM | 9 | A | Correct. |
| 09:12AM | 10 | Q | About a half an hour later you text:  "I'm doing an -- I'm |
| 09:12AM | 11 | | doing an estimate right now, braddah."  Said:  "Hold on, and |
| 09:12AM | 12 | | then I'm going to meet him at shop right after this and get |
| 09:12AM | 13 | | back to you." |
| 09:12AM | 14 | | Do you see that? |
| 09:12AM | 15 | A | Yes. |
| 09:12AM | 16 | Q | Miller texts back at 4:35:24:  "Who?"  Correct? |
| 09:12AM | 17 | A | Correct. |
| 09:12AM | 18 | Q | Not Mike, right? |
| 09:12AM | 19 | A | Not Mike. |
| 09:12AM | 20 | Q | Not Bro, right? |
| 09:12AM | 21 | A | Not Bro. |
| 09:12AM | 22 | Q | Not Mr. Miske, right? |
| 09:12AM | 23 | A | Correct. |
| 09:12AM | 24 | Q | You have to type back, "Bro."  Right? |
| 09:13AM | 25 | A | Yes. |

09:13AM   1   Q    And so if we -- he doesn't know, does he?  He asks:

09:13AM   2   "Who?"

09:13AM   3   A    Because braddah --

09:13AM   4   Q    No, sir, he asked, "Who?"  Correct?

09:13AM   5   A    Correct.

09:13AM   6   Q    All right.  Now, if we move up:  "What about your guy, he

09:13AM   7   come tru?" is what you text at 4:36, right?

09:13AM   8        Oh, outgoing:  "What about your guy, he come tru?"

09:13AM   9        MR. KENNEDY:  Thank you for correcting me.

09:13AM  10   BY MR. KENNEDY:

09:13AM  11   Q    Miller texts:  "You that."  Right?

09:13AM  12   A    Yes.

09:13AM  13   Q    "Your guy" is Mr. Kim, right?

09:14AM  14   A    Yes.

09:14AM  15   Q    Tony Kim, right?

09:14AM  16   A    Yes.

09:14AM  17   Q    He doesn't text, Not your girl, Sunnie Kim, correct?

09:14AM  18   A    Yes.

09:14AM  19        MR. KENNEDY:  We can take that down.

09:14AM  20        Now, if we can pull up Exhibit 5268, I want to

09:14AM  21   transition to another topic.

09:14AM  22        And that is not yet in evidence, Your Honor, and it

09:14AM  23   should be in the 5000 notebook.

09:14AM  24        THE COURT:  Happen to know which one?

09:14AM  25        MR. KENNEDY:  It is in 268, so it would be probably in

| | | |
|---|---|---|
| 09:14AM | 1 | the first one, Your Honor, because it would be in the first |
| 09:14AM | 2 | group, I hope. |
| 09:14AM | 3 | THE COURT:  I've got it.  It's in the second binder. |
| 09:14AM | 4 | MR. KENNEDY:  Thank you for letting me know, Your |
| 09:15AM | 5 | Honor. |
| 09:15AM | 6 | THE COURT:  You want to show this to the witness? |
| 09:15AM | 7 | MR. KENNEDY:  Yes.  Can we pull it up? |
| 09:15AM | 8 | THE COURT:  Yes, you may. |
| 09:15AM | 9 | MR. KENNEDY:  Thank you, Ms. King. |
| 09:15AM | 10 | And it is not yet in evidence. |
| 09:15AM | 11 | BY MR. KENNEDY: |
| 09:15AM | 12 | Q    Sir, do you recognize what's been marked as 5000-268? |
| 09:15AM | 13 | A    Yeah, it says Kama'aina Termite and Pest Control. |
| 09:15AM | 14 | Q    All right.  So you -- to give some -- you were working at |
| 09:15AM | 15 | O'ahu Termite and Pest Control, correct, in 2020? |
| 09:15AM | 16 | A    Yes. |
| 09:15AM | 17 | Q    And in -- from 2015 on to 2019, correct? |
| 09:15AM | 18 | A    From 2015 to 2019, I did get -- my paychecks did come from |
| 09:15AM | 19 | Kama'aina Termite and Pest Control. |
| 09:15AM | 20 | Q    And as I understood it, you had -- from your testimony |
| 09:15AM | 21 | last week, you had worked for Kama'aina and for O'ahu at |
| 09:15AM | 22 | various times during the same period, correct? |
| 09:15AM | 23 | A    Correct. |
| 09:16AM | 24 | Q    All right. |
| 09:16AM | 25 | MR. KENNEDY:  Your Honor, I would move |

09:16AM  1   Exhibit 5000-268 into evidence at this time.

09:16AM  2           THE COURT:  Any objection?

09:16AM  3           MR. AKINA:  No objection.

09:16AM  4           THE COURT:  All right.  Without objection, 5000-268 is

09:16AM  5   admitted.

09:16AM  6           (Exhibit 5000-268 was received in evidence.)

09:16AM  7           MR. KENNEDY:  May we publish it?

09:16AM  8           THE COURT:  Yes, you may.

09:16AM  9   BY MR. KENNEDY:

09:16AM  10  Q    Now, you had mentioned something about reputation.  Now it

09:16AM  11  looks like during this time period in 2013, it looks like

09:16AM  12  Kama'aina was able to get first place in Hawaii's Best, right?

09:16AM  13  A    That is correct.

09:16AM  14  Q    And also in 2019 as well?

09:16AM  15  A    Correct.

09:16AM  16  Q    And the sorts of things that they offer and -- then

09:16AM  17  there's a bit about a warm thanks and eight years in a row

09:16AM  18  being voted into Hawaii's Best, correct?

09:16AM  19  A    Correct.

09:16AM  20  Q    Structural fumigation is one of the areas that they --

09:17AM  21  that company did, Mike's company, right?

09:17AM  22  A    Correct.

09:17AM  23  Q    General pest control?

09:17AM  24  A    Correct.

09:17AM  25  Q    Ground treatment?

| 09:17AM | 1 | A | Correct. |
| 09:17AM | 2 | Q | Centricon? |
| 09:17AM | 3 | A | Correct. |
| 09:17AM | 4 | Q | Bed bugs? |
| 09:17AM | 5 | A | Correct. |
| 09:17AM | 6 | Q | Rodents? |
| 09:17AM | 7 | A | Correct. |
| 09:17AM | 8 | Q | Pest birds? |
| 09:17AM | 9 | A | Correct. |
| 09:17AM | 10 | Q | And termite inspection reports? |
| 09:17AM | 11 | A | Correct. |
| 09:17AM | 12 | | MR. KENNEDY:  All right.  Now, if we move to |
| 09:17AM | 13 | | Exhibit 5000-264, which is not yet in evidence, Your Honor. |
| 09:17AM | 14 | | THE COURT:  Go ahead. |
| 09:17AM | 15 | | BY MR. KENNEDY: |
| 09:17AM | 16 | Q | Do you recognize Exhibit 5000-264? |
| 09:17AM | 17 | A | Yes. |
| 09:17AM | 18 | Q | Do you recognize the church? |
| 09:17AM | 19 | A | I don't recognize the church, but that's what it looks |
| 09:17AM | 20 | | like. |
| 09:17AM | 21 | Q | Does Kaumakapili ring a bill? |
| 09:18AM | 22 | A | Sorry? |
| 09:18AM | 23 | Q | Does Kaumakapili run a bell -- ring a bell with you? |
| 09:18AM | 24 | A | No. |
| 09:18AM | 25 | Q | Okay.  This is 2013.  Before I ask this, let me ask you to |

| | | |
|---|---|---|
| 09:18AM | 1 | take a look at Exhibit 5000-248 before I move this into |
| 09:18AM | 2 | evidence. |
| 09:18AM | 3 | Now, you're working at Kama'aina in 2020, correct? |
| 09:18AM | 4 | A    Yes. |
| 09:18AM | 5 | Q    All right.  And if -- you're familiar with this calendar, |
| 09:18AM | 6 | right? |
| 09:18AM | 7 | A    I believe I've seen it. |
| 09:18AM | 8 | Q    All right.  Well, let's flip through the pages just for |
| 09:18AM | 9 | you to make certain that you recognize it. |
| 09:18AM | 10 | A    (Peruses document.) |
| 09:19AM | 11 | Q    Now, that you had a chance to see it, do you recognize |
| 09:19AM | 12 | what's been shown in the 2020 calendar? |
| 09:19AM | 13 | A    Yes, pictures. |
| 09:19AM | 14 | MR. KENNEDY:  All right.  At this time, Your Honor, I |
| 09:19AM | 15 | would move Exhibit 5000-248 into evidence. |
| 09:19AM | 16 | MR. AKINA:  No objection. |
| 09:19AM | 17 | THE COURT:  Without objection -- |
| 09:19AM | 18 | MR. KENNEDY:  May we publish, Your Honor? |
| 09:19AM | 19 | THE COURT:  Yes.  5000-248 is admitted. |
| 09:19AM | 20 | (Exhibit 5000-248 was received in evidence.) |
| 09:19AM | 21 | BY MR. KENNEDY: |
| 09:19AM | 22 | Q    All right.  So last week you talked to the jury about the |
| 09:19AM | 23 | fact that you were in sales, right? |
| 09:19AM | 24 | A    Correct. |
| 09:19AM | 25 | Q    And marketing, right? |

09:19AM    1    A    Yes, I did help out with that.

09:19AM    2    Q    And calendars and things like that are part of promotional

09:19AM    3    material that businesses use, right?

09:19AM    4    A    Yes.

09:19AM    5         MR. KENNEDY:  Okay.  So if we flip to the next page,

09:19AM    6    Ms. King.

09:19AM    7    BY MR. KENNEDY:

09:20AM    8    Q    Now, we move to this page, you're familiar with the

09:20AM    9    Shangri La fumigation in 2019 done by Kama'aina Termite and

09:20AM   10    Pest Control?

09:20AM   11    A    Not totally, but I do know that they -- they did this

09:20AM   12    fumigation.  I wasn't on site or I didn't -- this wasn't my

09:20AM   13    job.

09:20AM   14    Q    Okay.  Let's move -- you're familiar with it, but it

09:20AM   15    wasn't your sales job.

09:20AM   16    A    Yes.

09:20AM   17    Q    All right.  Familiar with the fumigation job at the Neal

09:20AM   18    S. Blaisdell concert hall?

09:20AM   19    A    I don't believe I was working there when they did this

09:20AM   20    fumigation.

09:20AM   21    Q    All right.  But in terms of sales and marketing, it's

09:20AM   22    something that was used that it had happened in the past before

09:20AM   23    you started working?

09:20AM   24    A    Correct.

09:20AM   25    Q    All right.  Let's move on.  Familiar with this Portlock

09:20AM    1    home fumigation that is shown here on the east side of

09:20AM    2    Honolulu?

09:20AM    3    A    I seen this picture before, but like I said, it wasn't my

09:21AM    4    particular job or I wasn't on this job site.

09:21AM    5    Q    All right.  So oftentimes in sales you would get a

09:21AM    6    customer, and then complete and follow it up whether it's a

09:21AM    7    fumigation or other services, right?

09:21AM    8    A    Correct.

09:21AM    9    Q    Okay.  And this one just wasn't your job.

09:21AM    10   A    Yeah.

09:21AM    11   Q    Okay.  Moving on.  Queen Emma Summer Palace, are you

09:21AM    12   familiar with this in 2019?

09:21AM    13   A    Not really.  I -- I know that they had performed this

09:21AM    14   fumigation, but like I said, neither was it my -- my job or I

09:21AM    15   wasn't on site.

09:21AM    16   Q    Okay.  I can do this.  All right.  You're familiar with it

09:21AM    17   because you were working at that point with O'ahu Termite and

09:21AM    18   Pest Control, right?

09:21AM    19   A    I was familiar with it because I heard that name going

09:21AM    20   around.  I mean somebody had said it in the office --

09:21AM    21   Q    Okay.

09:21AM    22   A    -- that's what the job was.

09:21AM    23   Q    All right.  Moving on to St. Louis School, Bertram Hall,

09:22AM    24   were you familiar with that in 2016 when you were working?

09:22AM    25   A    I don't remember them doing this particular job.

09:22AM  1    Q    Okay.  You were working in 2016 with Kama'aina at that
09:22AM  2    time?
09:22AM  3    A    Yes.
09:22AM  4    Q    Okay.  Moving on to May of 2020, in the materials, were
09:22AM  5    you are familiar with the bed bugs and the King Kamehameha IV
09:22AM  6    on the Big Island?
09:22AM  7    A    Yes, I did -- I did hear about this particular job.
09:22AM  8    Q    All right.  Moving on.  Poinciana Manor up in Kailua, were
09:22AM  9    you familiar with this job that was done by Kama'aina Termite
09:22AM  10   and Pest Control?
09:22AM  11   A    I'm not totally familiar with this job.
09:22AM  12   Q    Knew about it, but it wasn't a job that you were involved
09:22AM  13   with?
09:22AM  14   A    Yeah, I seen this picture before, but it wasn't something
09:22AM  15   that I was involved with.
09:23AM  16   Q    Okay.  All right.  Moving on.  The Waikiki Shell, prior to
09:23AM  17   your working, were you familiar with it when you came to work
09:23AM  18   at Kama'aina Termite and Pest Control?
09:23AM  19   A    Familiar being that I've seen this picture before.
09:23AM  20   Q    Okay.  All right.  Moving on.  Anything about the private
09:23AM  21   residence in this fumigation click a bell as to whether this
09:23AM  22   was something that you personally were involved with?
09:23AM  23   A    Not to my knowledge.
09:23AM  24   Q    Fair enough.  Let's move on to the next.  I asked you
09:23AM  25   about the church.  Anything about that now that is familiar to

09:23AM  1  you now that you see the name?

09:23AM  2  A    No, not really.  I mean I seen this -- I seen this picture

09:23AM  3  before, but I don't know where it's located or I don't know

09:23AM  4  what church this is.

09:23AM  5  Q    Okay.  All right.  Moving on.  This would be a picture of

09:24AM  6  when you're -- it's not you, but someone who is out talking

09:24AM  7  with someone about entering into a contract, correct?

09:24AM  8  A    Correct.

09:24AM  9  Q    All right.  Moving on.  Familiar with the 2019 work over

09:24AM  10  at Iolani Palace in -- in the mobile fumigation chamber?

09:24AM  11  A    Yes, I did -- I did hear about this.

09:24AM  12  Q    Okay.  Wasn't your job as well?

09:24AM  13  A    No, this wasn't my job.

09:24AM  14  Q    Okay.  But it was during your time that you're working

09:24AM  15  there in 2019, right?

09:24AM  16  A    Yes.

09:24AM  17  Q    Okay.

09:24AM  18        MR. KENNEDY:  All right.  Now, at this time, Your

09:24AM  19  Honor, I would move 5000-248 and 5000-264 -- I guess 5000-264

09:24AM  20  into evidence.

09:24AM  21        THE COURT:  248 already has been admitted.

09:24AM  22        MR. AKINA:  Lack of foundation for 264.

09:25AM  23        THE COURT:  Objection is sustained.  That's with

09:25AM  24  respect to 264.

09:25AM  25        MR. KENNEDY:  All right.  If we pull up 5000-257,

09:25AM   1   which is not yet in evidence.

09:25AM   2            THE COURT:  Yes.

09:25AM   3   BY MR. KENNEDY:

09:25AM   4   Q    Are trade shows one of the things that Kama'aina and O'ahu

09:25AM   5   Termite and Pest Control did?

09:25AM   6   A    Yes.

09:25AM   7   Q    Were you involved with any trade shows for Kama'aina?

09:25AM   8   A    No.  I -- I did say sit at one of their booths when I

09:25AM   9   first started when Mike hadn't acquired O'ahu Termite.

09:25AM  10   Q    All right.  Were you at the Blaisdell trade show in 2019?

09:26AM  11   A    I was at the Blaisdell trade show.

09:26AM  12   Q    Familiar with this booth at the Blaisdell trade show in

09:26AM  13   2019?

09:26AM  14   A    Yes, it does look familiar.

09:26AM  15            MR. KENNEDY:  At this time, Your Honor, I would move

09:26AM  16   5000-257 into evidence.

09:26AM  17            MR. AKINA:  No objection.

09:26AM  18            THE COURT:  Without objection, 5000-257 is admitted.

09:26AM  19   You may publish.

09:26AM  20            (Exhibit 5000-257 was received in evidence.)

09:26AM  21            MR. KENNEDY:  Can we publish it?

09:26AM  22            THE COURT:  Yes, you may.

09:26AM  23            MR. KENNEDY:  Thank you, sir.

09:26AM  24   BY MR. KENNEDY:

09:26AM  25   Q    So at the trade shows there are homeowners that come?

| | | | |
|---|---|---|---|
| 09:26AM | 1 | A | Yes. |
| 09:26AM | 2 | Q | Businesses that come? |
| 09:26AM | 3 | A | Correct. |
| 09:26AM | 4 | Q | And you share with them promotional materials? |
| 09:26AM | 5 | A | Correct. |
| 09:26AM | 6 | Q | And that's the purpose of it is as well, right? |
| 09:26AM | 7 | A | Yes. |
| 09:26AM | 8 | Q | Okay.  Moving on to Exhibits 5000-018.  Are you familiar |
| 09:27AM | 9 | | with the 2020 fumigation work at the Polynesian Cultural |
| 09:27AM | 10 | | Center? |
| 09:27AM | 11 | A | Yes. |
| 09:27AM | 12 | Q | Were you on site? |
| 09:27AM | 13 | A | No, I was not on site. |
| 09:27AM | 14 | Q | Were you familiar with it in meetings that were held? |
| 09:27AM | 15 | A | Yes, I did listen in on a few meetings. |
| 09:27AM | 16 | | MR. KENNEDY:  All right.  Your Honor, I would at this |
| 09:27AM | 17 | | time move 5000-018 through 5000-036, which are all photographs |
| 09:27AM | 18 | | of the Polynesian Cultural Center in 2020? |
| 09:27AM | 19 | | MR. AKINA:  Objection.  No foundation. |
| 09:27AM | 20 | | THE COURT:  Sustained. |
| 09:27AM | 21 | | BY MR. KENNEDY: |
| 09:27AM | 22 | Q | Have you seen this photograph, Polynesian Cultural Center |
| 09:27AM | 23 | | from 2020? |
| 09:27AM | 24 | A | I do not remember seeing -- I might have seen it, but I |
| 09:28AM | 25 | | don't remember seeing this particular picture. |

09:28AM   1   Q   All right.  You're not -- do you recall seeing any

09:28AM   2   photographs of that work at the Polynesian Cultural Center in

09:28AM   3   2020?

09:28AM   4   A   No, I don't -- I don't remember --

09:28AM   5   Q   Okay.

09:28AM   6   A   -- seeing pictures of it.

09:28AM   7   Q   If you don't remember, you don't remember.

09:28AM   8       Moving on to Exhibit 5000-087, which has not been put

09:28AM   9   into evidence.

09:28AM   10      Do you recognize the individuals shown in 5000-087?

09:28AM   11  A   I recognize Mike Warden.

09:28AM   12  Q   All right.

09:28AM   13  A   I do not recognize the other person.

09:28AM   14  Q   Okay.  With respect to the Queen Emma Summer Palace work

09:28AM   15  in 2019, were you involved with that at all?

09:28AM   16  A   No.

09:28AM   17  Q   All right.  Have you seen or used any of the promotional

09:28AM   18  material in your job in sales during this time regarding the

09:29AM   19  Queen Emma Summer Palace job in 2019?

09:29AM   20  A   No, I've never used the Queen Emma Summer Palace --

09:29AM   21  Q   Okay.

09:29AM   22  A   -- in any of my jobs that I did.

09:29AM   23  Q   Okay.  Moving on to 5000-093, the mobile fumigation

09:29AM   24  chamber, 2019, Iolani Palace?

09:29AM   25  A   No.

09:29AM     1     Q     Have you used any of this material in your work with

09:29AM     2     Kama'aina Termite and Pest Control or O'ahu Termite and Pest

09:29AM     3     Control?

09:29AM     4     A     No, I haven't, sir.

09:29AM     5     Q     All right.  Moving on to 5000-121.  Do you recognize

09:29AM     6     what's shown on 5000-121?

09:29AM     7     A     The Doris Duke.

09:29AM     8     Q     All right.  Were you personally involved in any of the

09:30AM     9     work in 2018 with the Doris Duke Estate, Shangri La fumigation?

09:30AM     10    A     No, I was not.

09:30AM     11    Q     All right.  Moving on to 5000-128.  Do you recognize what

09:30AM     12    is tented in 5000-128?

09:30AM     13    A     This looks like the Ala Moana boathouse -- I mean, the Ala

09:30AM     14    Moana clubhouse.

09:30AM     15    Q     Okay.  Do you recognize the Waikiki Yacht Club?

09:30AM     16    A     Correct.

09:30AM     17    Q     Were you involved in the 2020 Waikiki Yacht Club

09:30AM     18    fumigation?

09:30AM     19    A     I didn't sell this job, but I was a part of it, meaning I

09:30AM     20    gave an estimate at a way higher price than the Kama'aina

09:30AM     21    person, the Kama'aina salesperson, and so we worked together

09:31AM     22    into -- into securing this job.

09:31AM     23          MR. KENNEDY:  All right.  At this point I would move

09:31AM     24    5000-128 to 5000-145.

09:31AM     25          THE COURT:  Any objection?

| | | |
|---|---|---|
| 09:31AM | 1 | MR. AKINA:  No objection. |
| 09:31AM | 2 | THE COURT:  Okay.  Without objection, 5000-128 through |
| 09:31AM | 3 | 5000-145, so it looks like about 18 exhibits, are admitted. |
| 09:31AM | 4 | You may publish. |
| 09:31AM | 5 | (Exhibits 5000-128 through 5000-145 |
| 09:31AM | 6 | were received in evidence.) |
| 09:31AM | 7 | MR. KENNEDY:  May we publish 5000-128? |
| 09:31AM | 8 | THE COURT:  Yes. |
| 09:33AM | 9 | MR. KENNEDY:  Let's quickly go through, 5000-129, 130, |
| 09:33AM | 10 | 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, |
| 09:34AM | 11 | 143, and 144 and 145. |
| 09:34AM | 12 | BY MR. KENNEDY: |
| 09:34AM | 13 | Q    This was in May of 2020, correct? |
| 09:34AM | 14 | A    I don't know the date, but I'm assuming you're correct. |
| 09:34AM | 15 | Q    So at the same time that Kama'aina Termite and Pest |
| 09:34AM | 16 | Control is doing this job, they're also doing the Mauna Kea |
| 09:34AM | 17 | Hotel fumigation on the Big Island, correct? |
| 09:34AM | 18 | A    I'm not sure, sir. |
| 09:34AM | 19 | Q    All right.  I show you -- you're not familiar with the |
| 09:34AM | 20 | Mauna Kea Hotel fumigation? |
| 09:34AM | 21 | A    I'm familiar with it because it was a big project, but I |
| 09:34AM | 22 | don't remember when we were doing that particular job. |
| 09:34AM | 23 | Q    Okay.  I showed you this because I believe last week you |
| 09:34AM | 24 | said that, you know, O'ahu Termite and Pest Control had a |
| 09:35AM | 25 | better reputation than Kama'aina Termite and Pest Control.  Do |

09:35AM    1    you recall that?

09:35AM    2    A    Yes, I recall that.

09:35AM    3    Q    Now, O'ahu Termite and Pest Control started in the 1970s,

09:35AM    4    right?

09:35AM    5    A    I believe so.

09:35AM    6    Q    Okay.  And at a certain point in about 1999 to 2000, you

09:35AM    7    understand because you started working at Kama'aina Termite and

09:35AM    8    Pest Control, that Kama'aina did all the fumigations for O'ahu

09:35AM    9    Termite and Pest Control, correct?

09:35AM    10   A    Correct.

09:35AM    11   Q    And so O'ahu focused on other aspects of pest control

09:35AM    12   other than fumigation, correct?

09:35AM    13   A    When I worked there or --

09:35AM    14   Q    Before and when you worked there up to a certain point,

09:35AM    15   yes.

09:35AM    16   A    When -- I don't -- I can't speak before that, but when I

09:35AM    17   worked there we concentrated on everything, and fumigation was

09:36AM    18   at the top of the list.

09:36AM    19   Q    Right.  But let me stop you there.  You started working in

09:36AM    20   2015, right?

09:36AM    21   A    Correct.

09:36AM    22   Q    So you weren't aware that prior to that for about at least

09:36AM    23   15 years, Kama'aina Termite and Pest Control had done all the

09:36AM    24   fumigations for O'ahu.  Is that a fair statement?

09:36AM    25   A    Yes, that's a fair statement.

09:36AM   1   Q   Okay.  In 2015, Kama'aina Termite and Pest Control was

09:36AM   2   still doing the fumigations for O'ahu Termite and Pest Control,

09:36AM   3   correct?

09:36AM   4   A   Yes.

09:36AM   5   Q   They did it through 2015, right?

09:36AM   6   A   Correct.

09:36AM   7   Q   They did it through 2016, correct?

09:36AM   8   A   Yes.

09:36AM   9   Q   In 2017, they did it, but something changed, correct?

09:36AM   10   A   Yes.

09:36AM   11   Q   O'ahu Termite and Pest Control became an entity, right?

09:36AM   12   A   Yes.

09:36AM   13   Q   Because Mr. Miske took it over, right?  It was sold to

09:36AM   14   him, right?

09:36AM   15   A   That's what I've been told.

09:37AM   16   Q   And in the beginning Kama'aina Termite and Pest Control

09:37AM   17   did the fumigations for O'ahu Pest -- Termite and Pest Control

09:37AM   18   as they had prior in 2015 and 2016, correct?

09:37AM   19   A   Yes.

09:37AM   20   Q   Eventually when Mr. Miske had it, eventually you got blue

09:37AM   21   tarps, right?

09:37AM   22   A   Yes.

09:37AM   23   Q   And O'ahu started doing fumigations for the first time.

09:37AM   24   A   Yes, we did have -- we did have one dedicated crew too.

09:37AM   25   Q   And so that dedicated crew would go out to places which

| 09:37AM | 1 | were tented, right? |
| 09:37AM | 2 | A    They would go out and put up the tents and take them down. |
| 09:37AM | 3 | Q    Right.  And the fumigation would be done by Kama'aina |
| 09:37AM | 4 | Termite and Pest Control, correct? |
| 09:37AM | 5 | A    I'm not understanding your question, sir.  When -- |
| 09:38AM | 6 | Q    When they -- in the beginning before you got the blue |
| 09:38AM | 7 | tents -- |
| 09:38AM | 8 | A    Yes. |
| 09:38AM | 9 | Q    -- then the dedicated crew from Kama'aina Termite and Pest |
| 09:38AM | 10 | Control would go out and actually shoot the Vikane gas into the |
| 09:38AM | 11 | home, correct? |
| 09:38AM | 12 | A    Yes, the Kama'aina crew would go and do the tenting for |
| 09:38AM | 13 | O'ahu Termite. |
| 09:38AM | 14 | Q    Right.  Eventually, eventually you got a crew and you got |
| 09:38AM | 15 | blue tents, right? |
| 09:38AM | 16 | A    Correct. |
| 09:38AM | 17 | Q    Because the jury has seen the red and black for Kama'aina |
| 09:38AM | 18 | Termite, correct? |
| 09:38AM | 19 | A    Yes. |
| 09:38AM | 20 | Q    And so then now O'ahu Termite and Pest Control was doing |
| 09:38AM | 21 | something new, fumigations, right? |
| 09:38AM | 22 | A    No, I don't think that's correct. |
| 09:38AM | 23 | Q    Oh, they didn't do it in 2015, right? |
| 09:38AM | 24 | A    No, it was -- Kama'aina was doing their tent fumigations, |
| 09:38AM | 25 | correct. |

09:38AM   1   Q    Right.  So O'ahu Termite and Pest Control was doing ground

09:39AM   2   service and other things on their own, but when they needed

09:39AM   3   fumigation, they turned and had Kama'aina Termite and Pest

09:39AM   4   Control do them, correct?

09:39AM   5   A    Correct.

09:39AM   6   Q    And that good reputation came from Kama'aina's fumigation

09:39AM   7   work in addition to O'ahu Termite and Pest Control's other work

09:39AM   8   with pest control, correct?

09:39AM   9   A    I wouldn't say it was due to Kama'aina's good reputation

09:39AM   10  and good work.  There was a lot of customers that would cancel

09:39AM   11  jobs on the day of the job because Kama'aina showed up, and it

09:39AM   12  wasn't an O'ahu Termite crew.

09:39AM   13  Q    Sure.  Sure.  Because they're doing three times the amount

09:39AM   14  of fumigations as anybody on the island, right?

09:39AM   15  A    That's correct.

09:39AM   16  Q    And so if you're doing that sort of volume of time -- time

09:39AM   17  again somebody might not be happy, right?

09:39AM   18  A    Correct.

09:39AM   19  Q    Everything doesn't go perfect every time in business,

09:40AM   20  right?

09:40AM   21  A    It doesn't.

09:40AM   22  Q    Things happen, right?

09:40AM   23  A    Things happen.

09:40AM   24  Q    So if you're doing three times the volume of others,

09:40AM   25  you're probably going to have maybe a complaint or more or two,

| | | |
|---|---|---|
| 09:40AM | 1 | right? |
| 09:40AM | 2 | A    Most likely. |
| 09:40AM | 3 | Q    Okay.  But as you've seen, nobody on the island was doing |
| 09:40AM | 4 | the large jobs that I've shown you, correct? |
| 09:40AM | 5 | A    Not to my knowledge. |
| 09:40AM | 6 | Q    The one that was doing it was Kama'aina Termite and Pest |
| 09:40AM | 7 | Control, correct? |
| 09:40AM | 8 | A    Correct. |
| 09:40AM | 9 | MR. KENNEDY:  I want to move to -- and, Your Honor, I |
| 09:40AM | 10 | believe this would be in the exhibit binder for 5003. |
| 09:41AM | 11 | THE COURT:  I've got the binder. |
| 09:41AM | 12 | MR. KENNEDY:  All right.  And I would like to show the |
| 09:41AM | 13 | witness Exhibit 5003-008. |
| 09:41AM | 14 | THE COURT:  Okay. |
| 09:41AM | 15 | BY MR. KENNEDY: |
| 09:41AM | 16 | Q    Do you recognize what's been marked 5003-008, sir? |
| 09:41AM | 17 | A    Yes. |
| 09:41AM | 18 | Q    What is it? |
| 09:41AM | 19 | A    It is myself and Chaunce at a booth for Realtors, I |
| 09:41AM | 20 | believe. |
| 09:42AM | 21 | MR. KENNEDY:  All right.  At this time, Your Honor, I |
| 09:42AM | 22 | would move Exhibit 5003-008 into evidence. |
| 09:42AM | 23 | MR. AKINA:  No objection. |
| 09:42AM | 24 | THE COURT:  Without objection, Exhibit 5003-008 is |
| 09:42AM | 25 | admitted. |

09:42AM   1              (Exhibit 5003-008 was received in evidence.)

09:42AM   2              MR. KENNEDY:  May we publish, please?

09:42AM   3              THE COURT:  Yes, you may.

09:42AM   4              MR. KENNEDY:  Thank you.

09:42AM   5    BY MR. KENNEDY:

09:42AM   6    Q    So we saw a booth for Kama'aina Termite and Pest Control

09:42AM   7    earlier.  Is this a similar booth at a similar trade show?

09:42AM   8    A    Yes.

09:42AM   9    Q    Is it a different trade show?  Are you able to recognize

09:42AM   10   where you're at?

09:42AM   11   A    I believe this is a different trade show.  This is for

09:42AM   12   just Realtors.

09:42AM   13   Q    Okay.

09:42AM   14   A    Not the public.

09:42AM   15   Q    So you're talking about there are trade shows there are

09:42AM   16   for the public.  I believe you said this was just for Realtors,

09:42AM   17   right?

09:42AM   18   A    Yes.

09:42AM   19   Q    And Realtors have a real need for termite and pest control

09:42AM   20   services, right?

09:42AM   21   A    Yes.

09:42AM   22   Q    And that would involve termite inspection reports?

09:42AM   23   A    Termite inspection reports, fumigations.

09:43AM   24   Q    And so the termite inspection report would be something

09:43AM   25   that a buyer is looking for before they're going to put their

09:43AM    1    hard earned money down and buy a home, right?

09:43AM    2    A    I believe the termite inspection report is required before

09:43AM    3    a house -- a home is sold or a condo is sold.

09:43AM    4    Q    So it's now required because the problem is so great you

09:43AM    5    need it before anyone will buy or sell.

09:43AM    6    A    Yes.

09:43AM    7    Q    All right.  And so this is a specialty trade show in

09:43AM    8    addition to the other trade shows, right?

09:43AM    9    A    Yes.

09:43AM    10    Q    All right.  Moving?

09:43AM    11        MR. KENNEDY:  On to Exhibit 5003-007.  If we just pull

09:43AM    12    it up before we play it.

09:43AM    13        (Video was played for the jury.)

09:43AM    14        We can just stop it, Ms. King, for a second.

09:43AM    15    BY MR. KENNEDY:

09:44AM    16    Q    Do you recall a fumigation at King's Chapel in 2020 during

09:44AM    17    COVID?

09:44AM    18    A    No, I don't believe it was a fumigation.

09:44AM    19    Q    Or a -- I'm sorry.  Thank you for correcting me.

09:44AM    20        Do you recall work done by O'ahu Termite and Pest

09:44AM    21    Control on -- in 2020 during COVID?

09:44AM    22    A    Yes.

09:44AM    23        MR. KENNEDY:  And can we stop it?

09:44AM    24    BY MR. KENNEDY:

09:44AM    25    Q    You do recall it?

09:44AM   1   A    Yes, I do recall.

09:44AM   2   Q    Do you recall that in the footage that we're looking at

09:44AM   3   you personally spoke?

09:44AM   4   A    Yes, I did.

09:44AM   5            MR. KENNEDY:  Okay.  At this time I would offer

09:44AM   6   5003-007 into evidence.

09:44AM   7            THE COURT:  Any objection, Counsel?

09:44AM   8            MR. AKINA:  No objection, Your Honor.

09:44AM   9            THE COURT:  Without objection, 5003-7 is admitted.

09:44AM  10            (Exhibit 5003-007 was received in evidence.)

09:44AM  11            MR. KENNEDY:  May we publish and also then use the

09:44AM  12   sound?

09:44AM  13            THE COURT:  Yes, you may play the video.

09:45AM  14            MR. KENNEDY:  Thank you, Your Honor.

09:45AM  15            Oops, looks like we don't have sound.  Let's see if we

09:45AM  16   can get that worked out.

09:45AM  17            Still no sound.  Still no sound.  I apologize.

09:45AM  18   Technology sometimes.

09:45AM  19            Can we go back to the beginning.

09:45AM  20            (Video was played for the jury.)

09:45AM  21   BY MR. KENNEDY:

09:45AM  22   Q    So at this time you were with O'ahu Termite and Pest

09:47AM  23   Control, correct?

09:47AM  24   A    Yes.

09:47AM  25   Q    And you're providing a service to this church, right?

09:47AM   1   A    Yes.

09:47AM   2   Q    During COVID, correct?

09:47AM   3   A    Correct.

09:47AM   4        MR. KENNEDY:  Moving on to Exhibit 5003-009.

09:47AM   5   BY MR. KENNEDY:

09:47AM   6   Q    Before we play it, are you familiar with an individual by

09:47AM   7   the name of Wes Otani?

09:47AM   8   A    Yes, I've met Wes.

09:47AM   9   Q    Wes Otani worked for Terminix for a while.  Are you aware

09:48AM  10   of that?

09:48AM  11   A    Yes.

09:48AM  12   Q    And then he worked at Douglas Products, right?

09:48AM  13   A    Correct.

09:48AM  14   Q    And Douglas Products is the manufacturer for Vikane,

09:48AM  15   right?

09:48AM  16   A    The distributor.

09:48AM  17   Q    The distributor.

09:48AM  18   A    I don't know if they make it or not.

09:48AM  19   Q    And are you familiar with the training program that

09:48AM  20   fumigators and other authorized technicians have to go through

09:48AM  21   here in the state to do this job?

09:48AM  22   A    I'm not familiar.

09:48AM  23   Q    Did you attend the four-part training that Wes Otani did

09:48AM  24   for all the folks working for Kama'aina Termite and Pest

09:48AM  25   Control and O'ahu Termite and Pest Control regarding fumigating

09:48AM  1   a house inside, outside, everything involved?

09:48AM  2   A    I've sat in and attended Wes Otani's -- I guess he came in

09:49AM  3   and gave an education class on -- we took -- we took that

09:49AM  4   before -- I mean we saw Wes and listened to him, and did

09:49AM  5   practice tests for our own tests, but I haven't sat in on every

09:49AM  6   seminar that Wes has come and done for the companies.

09:49AM  7   Q    Understood.  Let me show you just the first one of a

09:49AM  8   four-part training and see if it looks familiar to you to be --

09:49AM  9   if you were one of the many individuals that was there, okay?

09:49AM  10  A    Yes.

09:49AM  11       MR. AKINA:  Your Honor, I would object to this being

09:49AM  12  played in the presence of the jury without the witness having

09:49AM  13  an opportunity to identify it or review it.

09:49AM  14       THE COURT:  I thought that's what we were doing.

09:49AM  15       MR. KENNEDY:  That is what I was doing.  And if we can

09:49AM  16  just do it without the sound.

09:49AM  17       THE COURT:  Yes.

09:49AM  18       MR. KENNEDY:  So that only Mr. Kimoto can view it, but

09:49AM  19  the jury -- to see if he is familiar with it, and then I'll ask

09:50AM  20  you some follow-up questions.

09:50AM  21       (Video was played without the sound for the witness.)

09:50AM  22  BY MR. KENNEDY:

09:50AM  23  Q    Sir, do you recall ever being out at a house with a group

09:50AM  24  of people, 50 or more, with a training with Mr. Wes Otani?

09:50AM  25  A    Yes, I do recall that.

09:51AM  1    Q    Okay.  Does this look like a training that you personally

09:51AM  2    attended?

09:51AM  3    A    Yes.

09:51AM  4    Q    Okay.  And as we're just looking at it, their training was

09:51AM  5    outside of the house in terms of what to look for, correct?

09:51AM  6    A    Yes.

09:51AM  7    Q    Going around the house to determine the problems and

09:51AM  8    things that come up when you're fumigating, correct?

09:51AM  9    A    That's correct.

09:51AM  10   Q    Going inside the house to talk about problems that arise

09:51AM  11   inside the house?

09:51AM  12   A    Correct.

09:51AM  13   Q    And then down in the basement making certain placement of

09:51AM  14   fans and other things, correct?

09:51AM  15   A    Correct.

09:51AM  16   Q    All right.  And so you personally believe you were at this

09:51AM  17   training?

09:51AM  18   A    Yes.

09:51AM  19        MR. KENNEDY:  Okay.  We can stop it now.

09:51AM  20        At this time, Your Honor, I would move 5003-009

09:51AM  21   through 5003-12 into evidence.

09:52AM  22        MR. AKINA:  Objection.  Hearsay.

09:52AM  23        MR. KENNEDY:  I would say that, Your Honor -- do

09:52AM  24   this -- I'm sorry, Your Honor, I didn't hear the Court's

09:52AM  25   ruling, and I started to jump the gun.  I apologize.

| | | |
|---|---|---|
| 09:52AM | 1 | THE COURT:  Yes, so 5000-9 -- 5003-9 is admitted. |
| 09:52AM | 2 | (Exhibit 5003-9 was received in evidence.) |
| 09:52AM | 3 | THE COURT:  The objection is overruled.  There is no |
| 09:52AM | 4 | foundation -- I don't know what 5003-10, 11 or 12 depict.  We |
| 09:52AM | 5 | have asked the witness not one thing about any of those three. |
| 09:52AM | 6 | MR. KENNEDY:  Let's pull up 5003-10 since -- |
| 09:52AM | 7 | THE COURT:  I know you said it was a four-part |
| 09:52AM | 8 | training. |
| 09:52AM | 9 | MR. KENNEDY:  I do. |
| 09:52AM | 10 | THE COURT:  I was listening, but I don't know if -- |
| 09:52AM | 11 | MR. KENNEDY:  I agree. |
| 09:52AM | 12 | THE COURT:  -- 10, 11, 12 are parts 2, 3 and 4 or not. |
| 09:52AM | 13 | MR. KENNEDY:  You are right.  And so I'm pulling up |
| 09:52AM | 14 | 5003-010 so that Mr. Kimoto can look at it. |
| 09:52AM | 15 | BY MR. KENNEDY: |
| 09:53AM | 16 | Q    Sir, do you see what has been previously marked as |
| 09:53AM | 17 | 5003-010? |
| 09:53AM | 18 | A    Yes. |
| 09:53AM | 19 | Q    Do you recognize Wes Otani? |
| 09:53AM | 20 | A    Yes, I do. |
| 09:53AM | 21 | Q    Is it around the house at a different location talking |
| 09:53AM | 22 | about different issues involved with fumigation? |
| 09:53AM | 23 | A    Yes. |
| 09:53AM | 24 | Q    And this is a training that you personally were at? |
| 09:53AM | 25 | A    Yes.  I'm actually in this video at the beginning. |

| | | |
|---|---|---|
| 09:53AM | 1 | Q    And I think you said you were actually in the -- in the |
| 09:53AM | 2 | picture at this point. |
| 09:53AM | 3 | A    Not at this point, but -- |
| 09:53AM | 4 | Q    But earlier. |
| 09:53AM | 5 | A    Earlier, yes. |
| 09:53AM | 6 | MR. KENNEDY:  Your Honor, I move 5003-010 into |
| 09:53AM | 7 | evidence. |
| 09:53AM | 8 | THE COURT:  Same objection, Counsel? |
| 09:53AM | 9 | MR. AKINA:  Yes, Your Honor. |
| 09:53AM | 10 | THE COURT:  All right.  Same ruling.  Overruled. |
| 09:53AM | 11 | 5003-10 is admitted. |
| 09:53AM | 12 | (Exhibit 5003-010 was received in evidence.) |
| 09:53AM | 13 | MR. KENNEDY:  Let's move on to 5003-011. |
| 09:53AM | 14 | BY MR. KENNEDY: |
| 09:53AM | 15 | Q    Do you recognize Wes Otani? |
| 09:54AM | 16 | A    Yes, I do. |
| 09:54AM | 17 | Q    Is this the same training? |
| 09:54AM | 18 | A    This is the same training. |
| 09:54AM | 19 | Q    And you are personally still at this training? |
| 09:54AM | 20 | A    Yes. |
| 09:54AM | 21 | Q    He's inside the house now? |
| 09:54AM | 22 | A    Correct. |
| 09:54AM | 23 | Q    All right.  And so we're at a different portion of it. |
| 09:54AM | 24 | MR. KENNEDY:  At this time, Your Honor, I'd move |
| 09:54AM | 25 | 5003-11 into evidence. |

09:54AM    1              MR. AKINA:  Same objection.

09:54AM    2              THE COURT:  All right.  Same ruling.  Objection is

09:54AM    3    overruled.  The exhibit is admitted, 5003-11.

09:54AM    4              (Exhibit 5003-011 was received in evidence.)

09:54AM    5              MR. KENNEDY:  Moving on to 5003-12.  If you could just

09:54AM    6    play it for Mr. Kimoto.

09:54AM    7              (Video played.)

09:54AM    8    BY MR. KENNEDY:

09:54AM    9    Q    Do you recognize Wes Otani?

09:54AM   10    A    Yes.

09:54AM   11    Q    Same training?

09:54AM   12    A    Same training.

09:54AM   13    Q    Looks like we're at a different location in the house?

09:54AM   14    A    Correct.

09:54AM   15    Q    Regarding -- are you still at the training?

09:54AM   16    A    Yes, I believe so.

09:54AM   17              MR. KENNEDY:  All right.  At this time, Your Honor, I

09:55AM   18    would move 5003-12 into evidence.

09:55AM   19              MR. AKINA:  Same objection, hearsay.

09:55AM   20              THE COURT:  All right.  Same ruling, the objection is

09:55AM   21    overruled.  5003-12 is admitted.

09:55AM   22              And now you may publish any or all of those four

09:55AM   23    exhibits, 5003-9 through 5003-12.

09:55AM   24              (Exhibit 5003-012 was received in evidence.)

09:55AM   25              MR. KENNEDY:  Thank you, Your Honor.

| | | |
|---|---|---|
| 09:55AM | 1 | Let's start with 5003-009. |
| 09:55AM | 2 | (Video played.) |
| 09:55AM | 3 | BY MR. KENNEDY: |
| 09:55AM | 4 | Q    So this training is about termite fumigation; is that |
| 09:55AM | 5 | correct, sir? |
| 09:55AM | 6 | A    Yes. |
| 09:55AM | 7 | Q    Do you see Delia Fabro-Miske in the picture? |
| 09:59AM | 8 | A    Yes. |
| 09:59AM | 9 | Q    So now the folks here are folks who are workers at |
| 10:03AM | 10 | Kama'aina Termite and Pest Control? |
| 10:04AM | 11 | A    Yes, I believe both companies. |
| 10:04AM | 12 | Q    Both companies are there, right? |
| 10:04AM | 13 | A    Yes. |
| 10:04AM | 14 | Q    Wes Otani is a distributor with Douglas, correct? |
| 10:04AM | 15 | A    Yes. |
| 10:04AM | 16 | Q    You could see Vikane on his shirt, right? |
| 10:04AM | 17 | A    Yes. |
| 10:04AM | 18 | Q    And Mr. Miske has put on this training for his workers, |
| 10:04AM | 19 | correct? |
| 10:04AM | 20 | A    Correct. |
| 10:04AM | 21 | Q    All right.  And so Mr. Otani is asking questions rather |
| 10:04AM | 22 | than just giving answers, right? |
| 10:04AM | 23 | A    Yes. |
| 10:04AM | 24 | Q    So he's opening it up so that there is a give and take, |
| 10:04AM | 25 | right? |

| | | | |
|---|---|---|---|
| 10:04AM | 1 | A | Correct. |
| 10:04AM | 2 | Q | So that everybody learns what problems can arise, right? |
| 10:04AM | 3 | A | Yes. |
| 10:04AM | 4 | Q | And that it's not so simple that it's -- if it's just a |
| 10:04AM | 5 | | bush, what do you do, right? |
| 10:04AM | 6 | A | Correct. |
| 10:04AM | 7 | Q | How far do you keep the tarp, correct? |
| 10:04AM | 8 | A | Yes. |
| 10:04AM | 9 | Q | And so this is something you needed to know in terms of |
| 10:04AM | 10 | | sales so that you could communicate to customers, right? |
| 10:04AM | 11 | A | Yes. |
| 10:04AM | 12 | Q | All right. |
| 10:05AM | 13 | | MR. KENNEDY:  Moving on to 5003-010. |
| 10:05AM | 14 | | Looks like we lost our sound. |
| 10:05AM | 15 | | (Video played.) |
| 10:05AM | 16 | | BY MR. KENNEDY: |
| 10:05AM | 17 | Q | Up on the deck, do you see Delia Fabro-Miske? |
| 10:05AM | 18 | A | Yes. |
| 10:05AM | 19 | Q | When he's mentioning George, is it George Perry? |
| 10:06AM | 20 | A | Correct. |
| 10:06AM | 21 | Q | So the cubing deals with the amount of gas that is needed |
| 10:07AM | 22 | | within the tent structure, correct? |
| 10:07AM | 23 | A | Yes, the cubing is the measurement of the home. |
| 10:07AM | 24 | Q | So what was pointed out there is you needed a ground seal |
| 10:07AM | 25 | | to make certain that the gas that's shot into the structure |

| 10:07AM | 1 | remains in the structure to kill termites and pests, right? |
| 10:08AM | 2 | A    Yes. |
| 10:08AM | 3 | Q    And that the distance the tarp would be out adds to the |
| 10:08AM | 4 | cubing when you're doing the measurements to determine how much |
| 10:08AM | 5 | gas to use, right? |
| 10:08AM | 6 | A    Correct. |
| 10:08AM | 7 | Q    And the type of pests that you're dealing with can change |
| 10:08AM | 8 | the amount of gas that is needed, correct? |
| 10:08AM | 9 | A    Correct. |
| 10:08AM | 10 | Q    So all of those factors go into, as Mr. Otani said, |
| 10:08AM | 11 | getting the kill, right? |
| 10:08AM | 12 | A    Correct. |
| 10:08AM | 13 | Q    Because what the customer wants, whether it's a business |
| 10:08AM | 14 | or whether it's a home, is the pests dead and don't come back, |
| 10:08AM | 15 | right? |
| 10:08AM | 16 | A    The pests dead.  We can't -- we can't guarantee them not |
| 10:08AM | 17 | coming back. |
| 10:08AM | 18 | Q    The only thing about the island is that at some point |
| 10:08AM | 19 | you'll have to do something to eliminate the pests.  It will |
| 10:08AM | 20 | kill them for a time, correct? |
| 10:08AM | 21 | A    Yes, correct. |
| 10:08AM | 22 | MR. KENNEDY:  Please continue, and I apologize. |
| 10:17AM | 23 | (Video played.) |
| 10:17AM | 24 | THE COURT:  Could you pause the video, please? |
| 10:17AM | 25 | MR. KENNEDY:  Please pause. |

10:17AM  1          THE COURT:  How much playing time does this exhibit

10:17AM  2  have remaining?

10:17AM  3          MR. KENNEDY:  I don't see it on the bottom, Your

10:17AM  4  Honor.  I would have to check --

10:17AM  5          THE COURT:  All right.  That's why I'm asking.

10:17AM  6          MR. KENNEDY:  Do you happen to have that, Ms. King?

10:17AM  7          MS. KING:  Two more minutes.

10:17AM  8          MR. KENNEDY:  Two more minutes.

10:17AM  9          THE COURT:  All right.  Let's go ahead and finish it

10:17AM  10  then, and then we'll take a break.  Go ahead.  Thank you.

10:17AM  11          (Video played.)

10:19AM  12          THE COURT:  All right.  So let's go ahead and -- now

10:19AM  13  that this particular exhibit has completed playing, that's -10,

10:19AM  14  we'll go ahead and take our first break of the day.

10:19AM  15          As we do so, I know all of our jurors have missed me

10:19AM  16  saying this, but please refrain from discussing the substance

10:19AM  17  of this case with anyone, including each other, until I advise

10:19AM  18  otherwise; do not access any media or other accounts of this

10:19AM  19  case that may be out there; and then finally, do not conduct

10:19AM  20  any independent investigations into the facts, circumstance or

10:19AM  21  persons involved.

10:19AM  22          Let's take about a 15-minute break, and then we will

10:19AM  23  resume with Mr. Kimoto at that time.

10:20AM  24          (Proceedings were recessed at 10:20 a.m. to 10:44

10:44AM  25  a.m.)

| | | |
|---|---|---|
| 10:44AM | 1 | THE COURT:  All right.  Back from our first morning |
| 10:44AM | 2 | break. |
| 10:44AM | 3 | Mr. Ott, got used to your new seat there? |
| 10:44AM | 4 | So we were in the middle of the series of four videos |
| 10:45AM | 5 | that Mr. Kennedy was playing. |
| 10:45AM | 6 | And so you're free to resume whenever you're ready. |
| 10:45AM | 7 | MR. KENNEDY:  Thank you, sir. |
| 10:45AM | 8 | If we could pull up 5003-011. |
| 10:45AM | 9 | And publish it to the jury? |
| 10:45AM | 10 | THE COURT:  You may.  This has been admitted. |
| 10:45AM | 11 | (Video was played for the jury.) |
| 10:45AM | 12 | BY MR. KENNEDY: |
| 10:54AM | 13 | Q    Sir, he's talking about in this introductory portion of |
| 10:55AM | 14 | 5003-011 about Vikane and the gas, and what you need to do |
| 10:55AM | 15 | inside the home, correct? |
| 10:55AM | 16 | A    Yes. |
| 10:55AM | 17 | Q    And so you were at this.  And the jury has it in evidence. |
| 10:55AM | 18 | He's going to answer questions about what to do inside the |
| 10:55AM | 19 | house in this area for close to 48 minutes, so I'm not going |
| 10:55AM | 20 | play it all for the jury. |
| 10:55AM | 21 | But this is to educate both Kama'aina's and O'ahu's |
| 10:55AM | 22 | individuals working for Mr. Miske, correct? |
| 10:55AM | 23 | A    Correct. |
| 10:55AM | 24 | Q    And so this is a give and take so everyone can understand |
| 10:55AM | 25 | the details and how someone like Wes Otani at Douglas Products |

10:55AM  1    to reach out to, to ask these technical questions and make

10:55AM  2    certain that everybody understands how to do the job right,

10:55AM  3    correct?

10:55AM  4    A    Correct.

10:55AM  5             MR. KENNEDY:  All right.  If we move on to just

10:55AM  6    5003-12.

10:56AM  7             (Continued playing of the video.)

10:59AM  8    BY MR. KENNEDY:

11:00AM  9    Q    So inside the house, the earlier one -- the jury will have

11:00AM  10    this -- that was 48 minutes, and we watched a little of it.

11:00AM  11    For this portion is another 24 minutes.  So we're spending

11:00AM  12    close to an hour and a half just talking about what to do

11:00AM  13    inside the house to make certain you have the gas right, the

11:00AM  14    aeration right, the area covered, so that in the end the

11:00AM  15    fumigation is done correct.

11:00AM  16    A    Correct.

11:00AM  17    Q    And part of this is there are -- I think you know --

11:01AM  18    Department of Agricultural folks there at this training for

11:01AM  19    watching Wes Otani teach the skills necessary for folks

11:01AM  20    involved in fumigation, correct?

11:01AM  21    A    I don't know.  I know there was one person that I didn't

11:01AM  22    recognize at this training session, but I don't know what -- I

11:01AM  23    mean where he worked or what he was there for.

11:01AM  24    Q    All right.  And did you ever get a certification or -- you

11:01AM  25    know, for that training that you attended here?

11:01AM    1    A    I -- I don't remember.

11:01AM    2    Q    Okay.  Fair enough.

11:01AM    3         All right.  So all total, we're talking over two

11:01AM    4    hours' worth of hands-on training by Mr. Miske for the folks

11:01AM    5    working for him, correct?

11:01AM    6    A    Provided by Mr. Miske --

11:01AM    7    Q    Yes.

11:01AM    8    A    -- done by Wes Otani, correct.

11:01AM    9    Q    Yes.  And Wes Otani, once again, Douglas Products,

11:02AM   10    background at Terminix, and the distributor for Vikane, right?

11:02AM   11    A    Yes.

11:02AM   12    Q    And someone that also came to the office and gave

11:02AM   13    trainings as well, correct?

11:02AM   14    A    Correct.

11:02AM   15    Q    All right.  I want to move to a different exhibit,

11:02AM   16    9010-101, which is a video and an audio.

11:02AM   17         Did you at sales meetings and other meetings inside

11:02AM   18    the office give training yourself?

11:02AM   19    A    I don't think -- I never gave training.  That wasn't my

11:02AM   20    strong point.

11:02AM   21    Q    Okay.  But just in terms of a meeting --

11:02AM   22         MR. KENNEDY:  If we pull up Exhibit 9010-101.

11:02AM   23    BY MR. KENNEDY:

11:02AM   24    Q    -- see if you recognize this before we play it.

11:02AM   25    A    Yes, that is a -- that's a sales meeting.

| | | | |
|---|---|---|---|
| 11:02AM | 1 | Q | Okay.  Now, where is this meeting at? |
| 11:02AM | 2 | A | This is in the board room at the Kama'aina Termite and |
| 11:02AM | 3 | | Pest Control office. |
| 11:03AM | 4 | Q | Okay.  And do you see yourself? |
| 11:03AM | 5 | A | Yes, I do. |
| 11:03AM | 6 | Q | And where are you? |
| 11:03AM | 7 | A | I'm standing in the front with the black shirt and I have |
| 11:03AM | 8 | | a hat on. |
| 11:03AM | 9 | Q | All right.  And is this in the board room and this is a |
| 11:03AM | 10 | | meeting that you're having? |
| 11:03AM | 11 | A | Correct. |
| 11:03AM | 12 | | MR. KENNEDY:  All right.  Your Honor, at this time I |
| 11:03AM | 13 | | would move into evidence 9010-101. |
| 11:03AM | 14 | | MR. AKINA:  Objection on hearsay.  Also to the extent |
| 11:03AM | 15 | | this is a prior statement of the witness, I don't think the |
| 11:03AM | 16 | | foundation has been laid for it to be entered into as either |
| 11:03AM | 17 | | consistent or inconsistent. |
| 11:03AM | 18 | | THE COURT:  The objection is overruled. |
| 11:03AM | 19 | | Is this on one of your exhibit lists? |
| 11:03AM | 20 | | MS. PANAGAKOS:  Yes. |
| 11:03AM | 21 | | MR. KENNEDY:  It should be. |
| 11:03AM | 22 | | THE COURT:  Which one? |
| 11:03AM | 23 | | MR. KENNEDY:  It should be I believe on the |
| 11:03AM | 24 | | supplemental. |
| 11:03AM | 25 | | THE COURT:  Which one? |

| | | |
|---|---|---|
| 11:03AM | 1 | MS. PANAGAKOS:  The third supplemental, Your Honor. |
| 11:03AM | 2 | And it's -- the exhibits on the list were added to the binder. |
| 11:04AM | 3 | THE COURT:  Well, we'll resolve it later on.  I don't |
| 11:04AM | 4 | have it. |
| 11:04AM | 5 | 9010-101 is admitted.  You may publish. |
| 11:04AM | 6 | (Exhibit 9010-101 was received in evidence.) |
| 11:04AM | 7 | MR. KENNEDY:  Looks like we have lost the sound. |
| 11:04AM | 8 | (Video was played for the jury.) |
| 11:04AM | 9 | BY MR. KENNEDY: |
| 11:05AM | 10 | Q    Sir, you're talking at this meeting about when problems |
| 11:05AM | 11 | arise, correct? |
| 11:05AM | 12 | A    Correct. |
| 11:05AM | 13 | Q    And that it's always better to, you know, have |
| 11:05AM | 14 | communication, right? |
| 11:05AM | 15 | A    Yes. |
| 11:05AM | 16 | Q    And so one of the things that happens, you have maybe at |
| 11:05AM | 17 | Kama'aina Termite and Pest Control at points close to a hundred |
| 11:05AM | 18 | people working? |
| 11:05AM | 19 | A    That's fair to say. |
| 11:05AM | 20 | Q    And so communication is key, right? |
| 11:05AM | 21 | A    Yes. |
| 11:05AM | 22 | Q    And so one of the things that was developed is a use of |
| 11:05AM | 23 | signal, correct? |
| 11:05AM | 24 | A    Correct. |
| 11:05AM | 25 | Q    And a use of slack? |

11:05AM   1   A    Correct.

11:05AM   2   Q    Can you tell the ladies and gentlemen of the jury what

11:05AM   3   signal is.

11:05AM   4   A    Signal is a texting app that we -- that we use to

11:05AM   5   communicate with everybody that's in the company.  There's

11:05AM   6   different categories for it.  I mean office, there's managers,

11:06AM   7   technicians, fumigators, sales team.

11:06AM   8   Q    What is Slack?

11:06AM   9   A    Slack is another form of communication that -- texting app

11:06AM  10   that we -- that we used for the same -- for the same things.

11:06AM  11   Q    So, sir, I want to show you what has been marked as

11:06AM  12   Exhibit 910-084 (sic).

11:06AM  13        MR. KENNEDY:  And this has not yet been admitted, Your

11:06AM  14   Honor.

11:06AM  15   BY MR. KENNEDY:

11:06AM  16   Q    Do you recognize what has been marked as 9010-084, sir?

11:06AM  17   A    Yes.  Phone numbers.

11:06AM  18   Q    All right.  And if we move to the second page.  Are you

11:06AM  19   able to read that on your screen, sir?

11:06AM  20   A    Can you enlarge it?

11:06AM  21   Q    Absolutely.

11:06AM  22        MR. KENNEDY:  Blow up the first part, Ms. King.

11:07AM  23        THE WITNESS:  (Peruses document.)  Yes, I read it.

11:07AM  24   BY MR. KENNEDY:

11:07AM  25   Q    All right.  And can you see the lower portion, sir?

11:07AM  1   A    In green?

11:07AM  2   Q    Yes.

11:07AM  3   A    Yes.

11:07AM  4   Q    All right.  And then moving to the next page.  Can you see

11:07AM  5   that as well?

11:07AM  6   A    Yes.

11:07AM  7   Q    And moving to the final page.

11:07AM  8   A    Yes.

11:07AM  9   Q    All right.  Do you recognize it as the 2019 managers

11:07AM  10  Signal group thread?

11:07AM  11  A    Yes.

11:07AM  12          MR. KENNEDY:  All right.  At this time I would move to

11:08AM  13  admit 910 -- 9010-084.  It consists of four pages, 001 through

11:08AM  14  004, Your Honor.

11:08AM  15          THE COURT:  Any objection?

11:08AM  16          MR. AKINA:  No objection.

11:08AM  17          MR. KENNEDY:  May I publish?

11:08AM  18          THE COURT:  You may.  That exhibit is admitted.

11:08AM  19  That's 9010-084.

11:08AM  20          (Exhibit 9010-084 was received in evidence.)

11:08AM  21  Q    All right.  So you just mentioned that this is the 2019

11:08AM  22  managers Signal thread, correct?

11:08AM  23  A    Yes.

11:08AM  24  Q    And so everyone who is a manager is on this thread so that

11:08AM  25  folks know what's happening at the managerial level, correct?

| | | | |
|---|---|---|---|
| 11:08AM | 1 | A | Yes. |
| 11:08AM | 2 | Q | And you are -- |
| 11:08AM | 3 | | MR. KENNEDY:  If we blow up the top portion -- |
| 11:08AM | 4 | | BY MR. KENNEDY: |
| 11:08AM | 5 | Q | -- indicated as Pres, right? |
| 11:08AM | 6 | A | Correct. |
| 11:08AM | 7 | Q | And the number is 1-808-859-2855? |
| 11:08AM | 8 | A | No. |
| 11:08AM | 9 | Q | 2822.  I'm sorry. |
| 11:08AM | 10 | A | Correct. |
| 11:08AM | 11 | Q | I need to get closer. |
| 11:09AM | 12 | | Now, that's your iPhone 6, right? |
| 11:09AM | 13 | A | I don't remember what number iPhone that was, but that is |
| 11:09AM | 14 | | my phone number, sir. |
| 11:09AM | 15 | Q | And that one is an iPhone 6, not a burner phone, right? |
| 11:09AM | 16 | A | That one was purchased initially as a phone to be used by |
| 11:09AM | 17 | | only myself and Mike. |
| 11:09AM | 18 | Q | All right.  And so it's now being used within a |
| 11:09AM | 19 | | companywide managers group thread, correct? |
| 11:09AM | 20 | A | Yes. |
| 11:09AM | 21 | Q | All right.  And MJ is Mr. Miske? |
| 11:09AM | 22 | A | Yes. |
| 11:09AM | 23 | Q | All right.  And the other managers here are listed, right? |
| 11:09AM | 24 | A | Correct. |
| 11:09AM | 25 | | MR. KENNEDY:  All right.  If we move to the second |

11:09AM   1   page.

11:09AM   2   BY MR. KENNEDY:

11:09AM   3   Q    And this is a group created, right?

11:09AM   4   A    Yes.

11:09AM   5   Q    So this is the 2019 version of who the managers are and

11:09AM   6   who is going to be in communication about what's happening with

11:10AM   7   Kama'aina Termite and Pest Control, correct?

11:10AM   8   A    Yes.

11:10AM   9   Q    And O'ahu press -- Termite and Pest Control.

11:10AM  10   A    Correct.

11:10AM  11   Q    I'll spit it out in a second.  Thank you, sir.

11:10AM  12          So if we move to -- and then this continues for the

11:10AM  13   full year, and so on this thread we just have a few pages, but

11:10AM  14   the jobs, the issues, the things that come up are all

11:10AM  15   communicated by this use of Signal, right?

11:10AM  16   A    Yes.

11:10AM  17   Q    Okay.  Now, within Signal you can use Slack as well,

11:10AM  18   right?

11:10AM  19   A    I believe Slack is a different platform.

11:10AM  20   Q    It is, but it can also then take photographs and attach it

11:10AM  21   to messages within Signal, correct?

11:10AM  22   A    Yes.

11:10AM  23   Q    Okay.  And so I'll get to that.  So in this managers

11:11AM  24   thread, from time to time something that's happening at a job

11:11AM  25   site a picture will be taken, and so the managers have the

11:11AM   1   ability to see exactly what's happening at the house, correct?

11:11AM   2   A    Correct.

11:11AM   3   Q    And it's like a checklist.  If there are ten things you

11:11AM   4   have to do, the person goes in, they do one, take a picture;

11:11AM   5   second one, take a picture; third one, take a picture, all the

11:11AM   6   way through, and then the managers can see exactly what's going

11:11AM   7   on at the house, right?

11:11AM   8   A    Correct.

11:11AM   9   Q    All right.

11:11AM  10        MR. KENNEDY:  Now, if we move to 9010-085, which is

11:11AM  11   not yet in evidence.

11:11AM  12   BY MR. KENNEDY:

11:11AM  13   Q    Do you recognize 9010-085?

11:11AM  14   A    Yes.  It's a list of phone numbers.

11:11AM  15   Q    Okay.

11:11AM  16        MR. KENNEDY:  And then if we move to the second page.

11:11AM  17   If we blow up the top portion.

11:11AM  18   BY MR. KENNEDY:

11:11AM  19   Q    And just read that to yourself.

11:11AM  20   A    The one in blue?

11:12AM  21   Q    The one in blue, and then you can read the one in green if

11:12AM  22   you can read it.

11:12AM  23   A    (Peruses document.)

11:12AM  24   Q    And just let me know when you're done.

11:12AM  25   A    I'm finished.

| | | |
|---|---|---|
| 11:12AM | 1 | Q   Okay.  Move to the third page.  Can you read that or do |
| 11:12AM | 2 | you need it blown up, sir? |
| 11:12AM | 3 | A   Just blown up a little. |
| 11:12AM | 4 | Q   Okay, will do. |
| 11:12AM | 5 |     MR. KENNEDY:  Ms. King, if you can do that.  Thank you |
| 11:12AM | 6 | so much. |
| 11:12AM | 7 | BY MR. KENNEDY: |
| 11:12AM | 8 | Q   On to the next page. |
| 11:12AM | 9 |     MR. KENNEDY:  And if you could blow up the portion. |
| 11:12AM | 10 | BY MR. KENNEDY: |
| 11:12AM | 11 | Q   And do you recognize on the fourth page a message from |
| 11:13AM | 12 | you? |
| 11:13AM | 13 | A   Yes. |
| 11:13AM | 14 | Q   Okay. |
| 11:13AM | 15 |     MR. KENNEDY:  Moving on to the fifth page. |
| 11:13AM | 16 |     And then on to the 6th page. |
| 11:13AM | 17 | BY MR. KENNEDY: |
| 11:13AM | 18 | Q   All right.  Do you recognize that as the 2020 new managers |
| 11:13AM | 19 | Signal group thread? |
| 11:13AM | 20 | A   Yes. |
| 11:13AM | 21 | Q   All right.  And so if managers change, then you create a |
| 11:13AM | 22 | new thread so that each individual who is a manager has access |
| 11:13AM | 23 | to everything that's going on in terms of that thread, correct? |
| 11:13AM | 24 | A   Correct. |
| 11:13AM | 25 | Q   All right. |

| | | |
|---|---|---|
| 11:13AM | 1 | MR. KENNEDY:  At this time, Your Honor, I'd move |
| 11:13AM | 2 | 910-085 (sic) into evidence.  It is six pages, 001 through 006. |
| 11:13AM | 3 | MR. AKINA:  No objection. |
| 11:13AM | 4 | THE COURT:  Without objection, 9010-085 is admitted. |
| 11:13AM | 5 | You may publish. |
| 11:13AM | 6 | (Exhibit 9010-085 was received in evidence.) |
| 11:13AM | 7 | BY MR. KENNEDY: |
| 11:13AM | 8 | Q   Once again, this is just six pages, but during the course |
| 11:13AM | 9 | of the year you would have all the communications that's going |
| 11:13AM | 10 | on with managers inside that thread, correct? |
| 11:14AM | 11 | A   Correct. |
| 11:14AM | 12 | MR. KENNEDY:  Moving on to 9010-086, which is not yet |
| 11:14AM | 13 | in evidence. |
| 11:14AM | 14 | BY MR. KENNEDY: |
| 11:14AM | 15 | Q   And before I do that, both yourself and Mr. Miske were on |
| 11:14AM | 16 | that thread, correct? |
| 11:14AM | 17 | A   This thread in front of me, sir? |
| 11:14AM | 18 | Q   The one from the previous one.  Do you need to see it |
| 11:14AM | 19 | again? |
| 11:14AM | 20 | A   Yes, please. |
| 11:14AM | 21 | MR. KENNEDY:  Okay.  If we could go back to 9010-085. |
| 11:14AM | 22 | THE WITNESS:  Yes. |
| 11:14AM | 23 | BY MR. KENNEDY: |
| 11:14AM | 24 | Q   All right.  And so "MJ owner" is at the top, correct? |
| 11:14AM | 25 | A   Correct. |

11:14AM   1   Q     And you are indicated as "Pres Oahu," right?

11:14AM   2   A     Yes.

11:14AM   3   Q     At the number, the last four digits being 2822.

11:14AM   4   A     Correct.

11:14AM   5   Q     All right.

11:14AM   6         MR. KENNEDY:  Let's move on to 910-086 (sic).

11:14AM   7   BY MR. KENNEDY:

11:14AM   8   Q     Now, you mentioned there were other threads.  Was there

11:15AM   9   also a sales thread for the folks who were just in the sales

11:15AM   10  area for Kama'aina Termite and Pest Control and O'ahu Termite

11:15AM   11  and Pest Control?

11:15AM   12  A     Yes.

11:15AM   13  Q     All right.  Moving to the second page of 9010-086.  Do you

11:15AM   14  need that blown up, sir?

11:15AM   15  A     Yeah.  (Peruses document.)  I read it.

11:15AM   16        MR. KENNEDY:  All right.  Moving on to the next page.

11:15AM   17        Moving on to the next page.

11:15AM   18        Moving on to the next page.

11:15AM   19        And moving on to the next page.

11:15AM   20  BY MR. KENNEDY:

11:16AM   21  Q     Do you recognize that as the 2020 new Signal sales group

11:16AM   22  thread?

11:16AM   23  A     Yes.

11:16AM   24  Q     And so that specific thread is folks like yourself who are

11:16AM   25  a manager, right?

11:16AM    1    A    Correct.

11:16AM    2    Q    Folks like Mr. Miske, who's the owner?

11:16AM    3    A    Correct.

11:16AM    4    Q    But also folks who are just sales related activities so

11:16AM    5    that everyone is on the same thread and being able to

11:16AM    6    communicate, right?

11:16AM    7    A    Correct.

11:16AM    8    Q    Using new technology, right?

11:16AM    9    A    Correct.

11:16AM    10    Q    State of the art, right?

11:16AM    11    A    I don't know if it's state of the art, but --

11:16AM    12    Q    But it works, doesn't it?

11:16AM    13    A    -- it works.

11:16AM    14         MR. KENNEDY:  I would move 9010-086 into evidence.

11:16AM    15         MR. AKINA:  No objection.

11:16AM    16         THE COURT:  Without objection, 9010-86 is admitted.

11:16AM    17         (Exhibit 9010-086 was received in evidence.)

11:16AM    18         MR. KENNEDY:  Moving on to 9010-087, which is not yet

11:17AM    19    in evidence.

11:17AM    20    BY MR. KENNEDY:

11:17AM    21    Q    Do you recognize 9010-087?

11:17AM    22    A    Yes.

11:17AM    23    Q    All right.  Do you see "MJ owner" for Mr. Miske?

11:17AM    24    A    Yes.

11:17AM    25    Q    Do you see on here yourself?

11:17AM    1    A    Yes, I do.

11:17AM    2    Q    All right.  And you are indicated as "Pres," dash,

11:17AM    3    correct?

11:17AM    4    A    Pres - Oahu.

11:17AM    5    Q    All right.

11:17AM    6            MR. KENNEDY:  And if we go through the second page.

11:17AM    7            Moving on to the third page.

11:17AM    8            Moving on to the fourth page.

11:17AM    9            Moving on to the -- I think we are at the end.  If we

11:18AM   10    go back to the front.

11:18AM   11    BY MR. KENNEDY:

11:18AM   12    Q    Do you recognize this as the 2020 new fume Signal group

11:18AM   13    thread?

11:18AM   14    A    Correct.

11:18AM   15    Q    And "fume" is short for fumigation?

11:18AM   16    A    Correct.

11:18AM   17    Q    So now this is the group thread for everyone that's doing

11:18AM   18    fumigations for Kama'aina Termite and Pest Control and O'ahu

11:18AM   19    Termite and Pest Control, correct?

11:18AM   20    A    Not everyone.  This is just for the people that drive the

11:18AM   21    trucks and -- I mean drive the trucks for the fumigation crew.

11:18AM   22    Q    Okay.

11:18AM   23    A    Not all the fumigators are on this thread.

11:18AM   24    Q    On this thread, it's the folks who are driving the trucks,

11:18AM   25    right?

11:18AM    1    A    Driving the trucks and -- and management.

11:18AM    2    Q    And management, right?

11:18AM    3    A    Correct, and the fume desk.

11:18AM    4         MR. KENNEDY:  And so at this time I'd move 910-087

11:18AM    5    (sic) into evidence.  It is four pages, 0001 through 0004.

11:19AM    6         THE COURT:  Any objection?

11:19AM    7         MR. AKINA:  No objection to this exhibit.

11:19AM    8         THE COURT:  Without objection, 9010-087 is admitted.

11:19AM    9         (Exhibit 9010-087 was received in evidence.)

11:19AM   10    BY MR. KENNEDY:

11:19AM   11    Q    If we move just to page 3, do you see a notation there?

11:19AM   12         MS. PANAGAKOS:  Counsel --

11:19AM   13         MR. KENNEDY:  Can we publish?

11:19AM   14         THE COURT:  You may.

11:19AM   15    BY MR. KENNEDY:

11:19AM   16    Q    So on 9010-087, do you see the "kill the old fume thread

11:19AM   17    and use this thread"?

11:19AM   18    A    Yes.

11:19AM   19    Q    All right.  And so what's happening is new people have

11:19AM   20    been added, maybe people have gone off.  So you're getting rid

11:19AM   21    of what was the last year's thread so that you can start anew

11:19AM   22    each year, correct?

11:19AM   23    A    No, these -- these threads could be -- it's not for

11:20AM   24    every -- like it's not annually.  It could be any -- any time.

11:20AM   25    Q    Okay.  So you started a new thread -- if we go to page 2,

11:20AM   1   it looks like in March of 2020.

11:20AM   2   A    Correct.

11:20AM   3   Q    So the top message is you created the group, right?

11:20AM   4   A    Yes.

11:20AM   5   Q    All right.  And then blow it is the individuals who are to

11:20AM   6   be added to the group, right?

11:20AM   7   A    Correct.

11:20AM   8   Q    All right.  And Delz is on there.  Is that Delia

11:20AM   9   Fabro-Miske?

11:20AM   10  A    Correct.

11:20AM   11  Q    All right.  And so those folks have been added to this

11:20AM   12  Signal thread, correct?

11:20AM   13  A    Correct.

11:20AM   14  Q    All right.  And so when we go to page 3, the old thread is

11:20AM   15  now stopped, and now you have a new thread because you've got

11:20AM   16  new members, so you're continually updating it to make it

11:20AM   17  current, correct?

11:20AM   18  A    Correct.

11:21AM   19           MR. KENNEDY:  All right.  If we look at 9010-088,

11:21AM   20  which is not yet in evidence.

11:21AM   21           Look at the first page, then let's move to the second

11:21AM   22  page.

11:21AM   23           Move to the third page.

11:21AM   24           And then we can blow up the bottom portion.

11:21AM   25  BY MR. KENNEDY:

11:21AM   1   Q    Do you recognize this as a 2020 companywide Signal group

11:21AM   2   thread?

11:21AM   3   A    Yes, that's what --

11:21AM   4        MR. KENNEDY:  Okay.  At this time, Your Honor, I would

11:21AM   5   move 9010-088 into evidence.

11:21AM   6        THE COURT:  Mr. Akina?

11:21AM   7        MR. AKINA:  No objection.

11:21AM   8        THE COURT:  Without objection, 9010-88 is admitted.

11:21AM   9        (Exhibit 9010-088 was received in evidence.)

11:22AM  10        MR. KENNEDY:  May we publish?

11:22AM  11        THE COURT:  You may.

11:22AM  12   BY MR. KENNEDY:

11:22AM  13   Q    So the participants are listed on the first page, correct?

11:22AM  14   A    Yes.

11:22AM  15   Q    And then if we move to the second page, additional

11:22AM  16   participants are listed, correct?

11:22AM  17   A    Yes.

11:22AM  18   Q    And then if we move to the third page, additional

11:22AM  19   participants are identified?

11:22AM  20   A    Correct.

11:22AM  21        MR. KENNEDY:  And then if we blow up the bottom

11:22AM  22   portion.

11:22AM  23   BY MR. KENNEDY:

11:22AM  24   Q    This is now on March 13th of 2020, this is a companywide

11:22AM  25   thread:  "We'll add remaining employees once Signal is

11:22AM   1   downloaded on their phones."  Correct?

11:22AM   2   A    Correct.

11:22AM   3   Q    So everyone is getting Signal downloaded on their phones

11:22AM   4   so that they can have messaging capabilities companywide,

11:22AM   5   correct?

11:22AM   6   A    Correct.

11:22AM   7   Q    Through manager threads, through fumigation threads,

11:23AM   8   through sales threads and companywide threads.

11:23AM   9   A    Correct.

11:23AM  10   Q    All right.  And then if we look at a portion of this

11:23AM  11   thread -- and so the companywide thread would tend to be a

11:23AM  12   longer thread since there are more participants, correct?

11:23AM  13   A    Yes, there's more -- there are definitely more

11:23AM  14   participants.

11:23AM  15   Q    All right.  So if we look at 9010-089, which is a portion

11:23AM  16   of that thread, do you recognize the first page, sir?

11:23AM  17   A    Yes.

11:23AM  18        MR. KENNEDY:  Let's move to the second page and move

11:23AM  19   to the third page.

11:23AM  20        All right.  And then if we blow up the bottom portion.

11:23AM  21   BY MR. KENNEDY:

11:24AM  22   Q    Okay.  Do you recognize this thread that you yourself are

11:24AM  23   on?

11:24AM  24   A    Yes.

11:24AM  25        MR. KENNEDY:  All right.  At this time, Your Honor, I

| | | |
|---|---|---|
| 11:24AM | 1 | would move 9010-089 into evidence, which is ten pages, 001 |
| 11:24AM | 2 | through 0010. |
| 11:24AM | 3 | THE COURT:  Any objection? |
| 11:24AM | 4 | MR. AKINA:  No objection. |
| 11:24AM | 5 | THE COURT:  9010-89 is admitted. |
| 11:24AM | 6 | (Exhibit 9010-089 was received in evidence.) |
| 11:24AM | 7 | THE COURT:  You may publish. |
| 11:24AM | 8 | MR. KENNEDY:  Can we publish, please?  Thank you. |
| 11:24AM | 9 | All right.  If we move through the first page.  Then |
| 11:24AM | 10 | to the second page.  Then to the third page. |
| 11:24AM | 11 | And then if we blow up the portion that is in green, |
| 11:24AM | 12 | please, Ms. King. |
| 11:24AM | 13 | BY MR. KENNEDY: |
| 11:24AM | 14 | Q    All right.  Do you see that sales team, "We are going to |
| 11:24AM | 15 | try and push fumigation with Coronavirus fogging treatment as |
| 11:25AM | 16 | an add-on for your information." |
| 11:25AM | 17 | Do you see that? |
| 11:25AM | 18 | A    Yes. |
| 11:25AM | 19 | Q    Okay.  And the video that we saw was an example at the |
| 11:25AM | 20 | King's Chapel of what we're talking about here in terms of |
| 11:25AM | 21 | fogging treatment, correct? |
| 11:25AM | 22 | A    Correct. |
| 11:25AM | 23 | MR. KENNEDY:  All right.  If we move to the sixth |
| 11:25AM | 24 | page. |
| 11:25AM | 25 | BY MR. KENNEDY: |

11:25AM   1   Q    Do you see -- if we blow up the top portion, do you see

11:25AM   2   that there is an attachment inside the Signal, which is a

11:25AM   3   document that is attached?

11:25AM   4   A    Yes.

11:25AM   5   Q    And then there's a thread that if this wasn't a piece of

11:25AM   6   paper with a computer or a phone, you can click on it, and then

11:25AM   7   you're able to see what is attached, right?

11:25AM   8   A    Yes.

11:25AM   9   Q    All right.  And it's very small there.  So if we move to

11:25AM  10   page 10, this would be what was shown in that attachment, just

11:26AM  11   printed out so that it can be a PDF, because we're not using

11:26AM  12   the internet to click and be able to pull it right out of the

11:26AM  13   thread like you would on your phone, correct?

11:26AM  14   A    Correct.

11:26AM  15   Q    All right.  So this is the disinfectant that was shown in

11:26AM  16   that video at King's Chapel, correct?

11:26AM  17   A    I believe so, yeah.

11:26AM  18   Q    And so the label itself indicates that this Nisus -- if

11:26AM  19   I'm pronouncing it correct, N-I-S-U-S, D-S-V -- is a broad

11:26AM  20   spectrum disinfectant sanitizer.

11:26AM  21        MR. KENNEDY:  All right.  And then if we go down a

11:26AM  22   little bit with the pullout, Ms. King.

11:26AM  23        Okay.  If we go up a little higher.

11:26AM  24   BY MR. KENNEDY:

11:26AM  25   Q    Okay.  Can be used for everyday cleanings, but then DSV is

11:26AM   1   also labeled to kill the following pathogens on hard nonporous
11:27AM   2   surfaces, and then there's an indication of human Coronavirus,
11:27AM   3   correct?
11:27AM   4   A   Correct.
11:27AM   5       MR. KENNEDY:  All right.  And if we move down on this
11:27AM   6   label.  If we keep going.  Keep going.  Okay.
11:27AM   7   BY MR. KENNEDY:
11:27AM   8   Q   So then the company N-I-S-U-S, Nisus, there's an asterisk
11:27AM   9   next to it, and EPA has determined that Nisus DSV is effective
11:27AM  10   against SARS-COVID-2, the cause of COVID-19, correct?
11:27AM  11   A   Correct.
11:27AM  12   Q   So that's what you were using in the video that we saw
11:27AM  13   when everybody was still locked down and cleaning the church,
11:27AM  14   correct?
11:27AM  15   A   Yes.
11:27AM  16   Q   And so the Signal thread allowed that to be attached so
11:27AM  17   that everyone on that thread could see that, the information
11:27AM  18   would go out companywide, right?
11:27AM  19   A   Yes.
11:28AM  20       MR. KENNEDY:  Now, if we move to 9010-090.
11:28AM  21   BY MR. KENNEDY:
11:28AM  22   Q   You recognize this?  And "this," I mean 9010-090.
11:28AM  23   A   Yes.
11:28AM  24       MR. KENNEDY:  Moving to the second page.
11:28AM  25       Moving to the third page.

11:28AM    1              And moving to the fourth page.

11:28AM    2    BY MR. KENNEDY:

11:28AM    3    Q    Is that the 2020 office Signal group thread?

11:28AM    4    A    Yes.

11:28AM    5    Q    All right.  And so this is just another thread to make

11:28AM    6    certain that other folks who are generally just in the office

11:28AM    7    helping to schedule jobs are on a thread and can communicate

11:28AM    8    with all the folks that they need to that are on this list,

11:28AM    9    correct?

11:28AM   10    A    Correct.

11:28AM   11    Q    And so Mr. Miske is listed on the first page.

11:29AM   12              MR. KENNEDY:  And at this point I would move 9010-090

11:29AM   13    into evidence, Your Honor.

11:29AM   14              MR. AKINA:  No objection.

11:29AM   15              THE COURT:  Without objection, 9010-90 is admitted.

11:29AM   16              (Exhibit 9010-090 was received in evidence.)

11:29AM   17    Q    Now, that I've published it, and the jury can see it, up

11:29AM   18    at the top "MJ owner" for Mr. Miske?

11:29AM   19    A    Correct.

11:29AM   20    Q    D-E-L-Z, Delz, is Delia Fabro-Miske?

11:29AM   21    A    Correct.

11:29AM   22    Q    All right.  Down one, two, three is yourself, Pres-Oahu?

11:29AM   23    A    Correct.

11:29AM   24    Q    All right.  And so the three of you are also on the office

11:29AM   25    group thread so that -- and everyone else here can see what's

11:29AM    1    happening inside the office to make certain we're coordinating

11:29AM    2    everything so that the business is run right, correct?

11:29AM    3    A    Correct.

11:29AM    4    Q    All right.  Now, we talked about Signal.  Inside the

11:29AM    5    office you also used WhatsApp, correct?

11:30AM    6    A    I believe so, but I don't remember using it -- I don't

11:30AM    7    remember using it for a while.

11:30AM    8    Q    Okay.

11:30AM    9         MR. KENNEDY:  If we pull up 91 -- excuse me --

11:30AM   10    9010-091.

11:30AM   11    BY MR. KENNEDY:

11:30AM   12    Q    And let's see if you recognize that.

11:30AM   13    A    Yes, I do.

11:30AM   14         MR. KENNEDY:  All right.  Moving to the second page.

11:30AM   15         And moving to the third page.

11:30AM   16         Moving to the fourth page.

11:30AM   17         Moving to the fifth page.

11:30AM   18         The sixth page.  Seventh page.  The eighth page.  The

11:31AM   19    ninth page.

11:31AM   20    BY MR. KENNEDY:

11:31AM   21    Q    Sir, is this an example of the WhatsApp 2020 companywide

11:31AM   22    group thread?

11:31AM   23    A    Yes.

11:31AM   24         MR. KENNEDY:  At this time I would move 9010-091 into

11:31AM   25    evidence.

| | | |
|---|---|---|
| 11:31AM | 1 | THE COURT:  Any objection? |
| 11:31AM | 2 | MR. AKINA:  No objection. |
| 11:31AM | 3 | THE COURT:  9010-91 is admitted without objection. |
| 11:31AM | 4 | (Exhibit 9010-91 was received in evidence.) |
| 11:31AM | 5 | MR. KENNEDY:  All right.  May we publish? |
| 11:31AM | 6 | THE COURT:  You may. |
| 11:31AM | 7 | BY MR. KENNEDY: |
| 11:31AM | 8 | Q    Okay.  And so on the first page, once again we have the |
| 11:31AM | 9 | individuals who are on the thread? |
| 11:31AM | 10 | A    Correct. |
| 11:31AM | 11 | Q    The administrator of this is Napua, right, at the top? |
| 11:31AM | 12 | A    Correct. |
| 11:31AM | 13 | Q    And then Delz is on here, Delia Fabro-Miske? |
| 11:31AM | 14 | A    Correct. |
| 11:31AM | 15 | Q    All right.  As we move down, PK is on there, correct, |
| 11:31AM | 16 | Brian Marinas? |
| 11:31AM | 17 | A    Correct. |
| 11:31AM | 18 | Q    All right.  MJ is Mr. Miske? |
| 11:31AM | 19 | A    Correct. |
| 11:31AM | 20 | Q    All right. |
| 11:31AM | 21 | MR. KENNEDY:  As we keep moving.  All right.  If we |
| 11:31AM | 22 | move to the next page. |
| 11:32AM | 23 | And if we blow up underneath what I believe was in |
| 11:32AM | 24 | blue for the jury. |
| 11:32AM | 25 | BY MR. KENNEDY: |

11:32AM   1   Q    Okay.  So Napua has created the group companywide here?

11:32AM   2   A    Yes.

11:32AM   3   Q    All right.  And then there is a system message that comes

11:32AM   4   after its created, right?

11:32AM   5   A    Yes.

11:32AM   6   Q    Okay.  So for a business, that means that no one can

11:32AM   7   obtain these communications on a competing business, right?

11:32AM   8   A    No.

11:32AM   9   Q    And so that's one reason that it is used, right, to keep

11:32AM   10  communication within the business from folks who are

11:32AM   11  competitors, right?

11:32AM   12  A    I don't know if that's true or not, but it was used to

11:33AM   13  communicate within the company.

11:33AM   14  Q    All right.

11:33AM   15  A    I don't know what the reasons were for it.

11:33AM   16  Q    Okay.  It was just used.

11:33AM   17  A    Correct.

11:33AM   18  Q    And then there is this system message that comes up that

11:33AM   19  just says:  "Message -- messages and calls are end to end

11:33AM   20  encrypted.  No one outside of this chat, not even WhatsApp" --

          21        THE COURT REPORTER:  If you are reading, you will need

          22  to slow down.

          23        MR. KENNEDY:  I can, and I apologize.

          24  BY MR. KENNEDY:

          25  Q    "Messages and calls are end to end encrypted.  No one

11:33AM   1   outside of this chat, not even WhatsApp, can read or listen to

11:33AM   2   them.  Tap to learn more."

11:33AM   3            That comes up as a system message once you create the

11:33AM   4   group, right?

11:33AM   5   A    Correct.

11:33AM   6   Q    Okay.  If we move on then to -- move through to the next

11:33AM   7   page.  There is once again the ability to provide attachments,

11:33AM   8   correct?

11:33AM   9   A    Yes.

11:33AM  10            MR. KENNEDY:  All right.  And then if we move to the

11:34AM  11   next page.

11:34AM  12            And then to the next page.  And then to 6.

11:34AM  13   BY MR. KENNEDY:

11:34AM  14   Q    There is also another attachment, right?

11:34AM  15   A    Yes.

11:34AM  16   Q    And so that means within the company, everyone that has

11:34AM  17   their phones can then click on those attachments and see

11:34AM  18   photographs, not just words and texts, right?

11:34AM  19   A    Correct.

11:34AM  20   Q    All right.  So if we move to page 7, then we can see the

11:34AM  21   progress with this tenting of this building, correct?

11:34AM  22   A    Correct.

11:34AM  23   Q    As one of the attachments that an individual can just

11:34AM  24   click on that, and then they're able to see what's happening at

11:34AM  25   a location where they're not at, right?

11:34AM    1    A    Correct.

11:34AM    2            MR. KENNEDY:  All right.  Move to the next.

11:34AM    3    BY MR. KENNEDY:

11:34AM    4    Q    And then we can see the progress on this tenting of this

11:34AM    5    building, correct?

11:34AM    6    A    Correct.

11:34AM    7    Q    And in there you can see the boom truck that is being used

11:35AM    8    that Kama'aina Termite and Pest Control had for these type of

11:35AM    9    jobs that no one else on the island was doing, correct?

11:35AM   10    A    Correct.

11:35AM   11    Q    And moving to the last, now you have another picture that

11:35AM   12    can be communicated to everyone on the thread to see where they

11:35AM   13    are at this job in real time on their phone, right?

11:35AM   14    A    Yes.

11:35AM   15            MR. KENNEDY:  Moving to 9010-092.

11:35AM   16    BY MR. KENNEDY:

11:35AM   17    Q    Do you see the first page?

11:35AM   18    A    Yes.

11:35AM   19    Q    All right.  Do you recognize that first page?

11:35AM   20    A    Yes.

11:35AM   21            MR. KENNEDY:  Moving to the second page.  And then the

11:35AM   22    third page.

11:35AM   23    BY MR. KENNEDY:

11:35AM   24    Q    Do you recognize what is 9010-092?

11:35AM   25    A    Yes, a list of numbers.

11:35AM  1   Q    Okay.  Is this the WhatsApp 2020 managers group thread?

11:36AM  2   A    Yes.

11:36AM  3            MR. KENNEDY:  Okay.  At this time I would move

11:36AM  4   9010-092 into evidence.

11:36AM  5            MR. AKINA:  No objection.

11:36AM  6            THE COURT:  9010-92 is admitted without objection.

11:36AM  7            (Exhibit 9010-092 was received in evidence.)

11:36AM  8            MR. KENNEDY:  May we publish?

11:36AM  9            THE COURT:  Yes.

11:36AM  10  BY MR. KENNEDY:

11:36AM  11  Q    So on the terms of the participants on the first page, MJ

11:36AM  12  is Mr. Miske?

11:36AM  13  A    Correct.

11:36AM  14  Q    Preston 2 is yourself?

11:36AM  15  A    The -- yes.

11:36AM  16  Q    All right.  Burton is on there?

11:36AM  17  A    Correct.

11:36AM  18  Q    Burton Kong, right?

11:36AM  19  A    Yes.

11:36AM  20  Q    Delz is on there, Delia Fabro-Miske?

11:36AM  21  A    Correct.

11:36AM  22  Q    Napua, who is the administrator of this thread, is on

11:36AM  23  there?

11:36AM  24  A    Correct.

11:36AM  25  Q    PK, Brian Marinas is on there, right?

| | | | |
|---|---|---|---|
| 11:36AM | 1 | A | Yes. |
| 11:36AM | 2 | Q | And then JRGM is on there, correct? |
| 11:37AM | 3 | A | Yes. |
| 11:37AM | 4 | Q | Okay. |
| 11:37AM | 5 | | MR. KENNEDY:  Could we move to the next page. |
| 11:37AM | 6 | | And if we blow up the top page. |
| 11:37AM | 7 | BY MR. KENNEDY: |
| 11:37AM | 8 | Q | This is a thread that Napua is creating for the managers, |
| 11:37AM | 9 | | correct? |
| 11:37AM | 10 | A | Yes. |
| 11:37AM | 11 | Q | In WhatsApp, right? |
| 11:37AM | 12 | A | Yes. |
| 11:37AM | 13 | | MR. KENNEDY:  All right.  We can take down 9010-092. |
| 11:37AM | 14 | BY MR. KENNEDY: |
| 11:37AM | 15 | Q | I want to ask you some questions about Slack, okay? |
| 11:37AM | 16 | A | Okay. |
| 11:37AM | 17 | Q | All right.  When you're using Slack, it's another |
| 11:37AM | 18 | | communication device, correct? |
| 11:37AM | 19 | A | Yes. |
| 11:37AM | 20 | Q | And it has many different channels, right? |
| 11:37AM | 21 | A | Yes. |
| 11:37AM | 22 | Q | You can program over a hundred channels, right? |
| 11:37AM | 23 | A | That sounds correct. |
| 11:37AM | 24 | Q | All right.  And so within Kama'aina Termite and Pest |
| 11:37AM | 25 | | Control and O'ahu Termite and Pest Control you had a clearance |

11:38AM    1    channel, right?

11:38AM    2    A    Um, I don't understand what that is.

11:38AM    3    Q    A clearance channel is a channel devoted to the steps that

11:38AM    4    are taken before you clear a property and turn it over to the

11:38AM    5    homeowner.  Do you remember that clearance channel?

11:38AM    6    A    Oh, yes.

11:38AM    7    Q    Okay.  So you have a specific channel that's there for

11:38AM    8    clearance, right?

11:38AM    9    A    For clearing the homes, yes.

11:38AM    10   Q    And the individual who's doing it has a series of steps,

11:38AM    11   and they take a picture to document that the steps are being

11:38AM    12   done, correct?

11:38AM    13   A    Correct.

11:38AM    14   Q    And so anyone on the channel doesn't have to just take

11:38AM    15   their word, they can click on an attachment, see step 1, done;

11:38AM    16   step 2, done; step 3, done, correct?

11:38AM    17   A    Correct.  But I don't believe that I was -- I don't

11:38AM    18   remember being on that channel and seeing all of those pictures

11:38AM    19   and what you're explaining to the jury.

11:39AM    20   Q    I remember that you might not have been, but of course, if

11:39AM    21   it was a home that you were doing, you were waiting for that

11:39AM    22   information so that you could go to the homeowner or whoever

11:39AM    23   that you were the salesperson to tell them it was now clear,

11:39AM    24   everything is ready to go, you can get back into the home,

11:39AM    25   right?

11:39AM   1    A     Not necessarily all of my homes.  But it wasn't my job to

11:39AM   2    give because I didn't know when the home got uncovered, and I

11:39AM   3    didn't know when they cleared the house.  So it wasn't -- it

11:39AM   4    was up to another person in the office to call the customer and

11:39AM   5    let them know that -- that their home was safe to return.

11:39AM   6    Q     Okay.  So it's your customer, so someone working in the

11:39AM   7    office did that for you.

11:39AM   8    A     They did that for everybody.

11:39AM   9    Q     And yourself if it was your sales.

11:39AM   10   A     Correct.

11:39AM   11   Q     Okay.  There was also a fumigation channel, right?

11:39AM   12   A     Yes.

11:39AM   13   Q     There was a fumigation shoot channel, correct?

11:39AM   14   A     I -- I don't -- I don't remember seeing a fumigation shoot

11:40AM   15   channel.

11:40AM   16   Q     Okay.  And George Perry had that fumigation truck,

11:40AM   17   correct?

11:40AM   18   A     He had one of the trucks.

11:40AM   19   Q     And on that truck they could shoot the gas, correct?

11:40AM   20   A     Yes.

11:40AM   21   Q     The Vikane, right?

11:40AM   22   A     They carried the Vikane gas.

11:40AM   23   Q     Right.  So if you have a number of trucks, trucks can go

11:40AM   24   out, tent the property, get it ready for the gas to be shot,

11:40AM   25   correct?

11:40AM   1   A    Correct.

11:40AM   2   Q    Then George Perry can bring his crew there, he has the

11:40AM   3   Vikane gas, it's ready to go, it's a team effort.  He hooks it

11:40AM   4   up, and then makes certain that the Vikane gas is then shot,

11:40AM   5   correct?

11:40AM   6   A    That would be ideal.

11:40AM   7   Q    Okay.  There were companywide Slack channels, correct?

11:40AM   8   A    Yes.

11:40AM   9   Q    Managers-wide Slack channels, right?

11:40AM  10   A    Yes.

11:40AM  11   Q    Safety compliance channels with Slack?

11:40AM  12   A    Yes.

11:40AM  13   Q    Sales, correct?

11:40AM  14   A    Correct.

11:40AM  15   Q    Marketing?

11:41AM  16   A    Correct.

11:41AM  17   Q    Open projects?

11:41AM  18   A    Um, I apologize.  I don't remember.

11:41AM  19   Q    It's okay.  If you don't remember, you don't remember.

11:41AM  20        And a technical one for technical issues, right?

11:41AM  21   A    Yes.

11:41AM  22   Q    And office, right?

11:41AM  23   A    Correct.

11:41AM  24   Q    And then within Slack there were files that could keep the

11:41AM  25   documents of the photographs so that if there's any question,

11:41AM   1   you have a visual image to show what was done inside the home,

11:41AM   2   correct?

11:41AM   3   A    That might be on the fumigation Slack, but I -- I didn't

11:41AM   4   see -- I don't remember seeing all the steps that the

11:41AM   5   fumigation crew took and the pictures that they also took.

11:41AM   6   Q    All right.  You just knew that that was a channel that was

11:41AM   7   used for that purpose.

11:41AM   8   A    There may -- yeah, there may have been a channel that was

11:41AM   9   used for that purpose.

11:42AM   10  Q    Okay.  And then Slack allowed you to have direct messaging

11:42AM   11  like you would on an any other communication platform, right?

11:42AM   12  A    Correct.

11:42AM   13  Q    And then individuals like yourself had a channel, right?

11:42AM   14  A    You mean for the company?

11:42AM   15  Q    Yeah, on Slack.

11:42AM   16  A    Correct.

11:42AM   17  Q    Mr. Miske had one, correct?

11:42AM   18  A    Correct.

11:42AM   19  Q    Delia Fabro-Miske had one?

11:42AM   20  A    Correct.

11:42AM   21  Q    Mike Warden had one?

11:42AM   22  A    Correct.

11:42AM   23  Q    George Perry had one?

11:42AM   24  A    Correct.

11:42AM   25  Q    Larry Kapu had one?

11:42AM   1   A   Correct.

11:42AM   2   Q   Individuals had their own channels as well that they could

11:42AM   3   communicate, correct?

11:42AM   4   A   Yes.

11:42AM   5       MR. KENNEDY:  So if we pull up 9010-093.

11:42AM   6   BY MR. KENNEDY:

11:42AM   7   Q   Do you recognize what is marked as 9010-093?

11:42AM   8   A   Yes.

11:42AM   9   Q   Is it a Slack image of photographs taken on a Slack

11:43AM  10   fumigation channel for Kama'aina Termite and Pest Control?

11:43AM  11   A   Yes -- well, that's what -- what's what the door tag says.

11:43AM  12       MR. KENNEDY:  At this time I would move 9010-094 (sic)

11:43AM  13   into evidence.

11:43AM  14       MR. AKINA:  Objection, lack of foundation.

11:43AM  15       THE COURT:  Sustained.

11:43AM  16       MR. KENNEDY:  Let's move to 9010-095.

11:43AM  17   BY MR. KENNEDY:

11:43AM  18   Q   Do you recognize 9010-095?

11:43AM  19   A   Yes.

11:43AM  20   Q   Is it a signal communication on the clearance channel?

11:43AM  21   A   Yes.

11:43AM  22   Q   Does it involve yourself?

11:43AM  23   A   Yes.

11:43AM  24   Q   And does it involve Cody?

11:43AM  25   A   Yes.

11:43AM   1              MR. KENNEDY:  At this time I would move 9010-095 into

11:43AM   2    evidence.

11:43AM   3              MR. AKINA:  Objection.  Hearsay.

11:44AM   4              THE COURT:  Overruled.  9010-95 is admitted.  You may

11:44AM   5    publish.

11:44AM   6              (Exhibit 9010-95 was received in evidence.)

11:44AM   7    BY MR. KENNEDY:

11:44AM   8    Q    So 9010-095 is you -- @Cody says:  "You're sending that to

11:44AM   9    Cody?  I thanks, Bro."

11:44AM   10   A    Yes.

11:44AM   11   Q    And then Cody does -- using a fist like a fist bump,

11:44AM   12   correct?

11:44AM   13   A    Correct.

11:44AM   14   Q    All right.  And down below Cody is able to indicate to

11:44AM   15   you:  "At this address, arrived at 3:30, entered home with

11:44AM   16   specters -- spectros, and checked all areas in room."

11:44AM   17        Do you see that?

11:44AM   18   A    Yes.

11:44AM   19   Q    "All gas levels reading at 0 ppms."  Do you see that?

11:44AM   20   A    Correct.

11:44AM   21   Q    "No visible damage noticed."  Right?

11:44AM   22   A    Yes.

11:44AM   23   Q    "Collected two placards and one lockbox"?

11:45AM   24   A    Yes.

11:45AM   25   Q    "Confirmed with customer regarding" -- or "re entry via

11:45AM   1   phone, customer very happy and appreciative with the services

11:45AM   2   done."

11:45AM   3   A    Yes.

11:45AM   4   Q    All right.  And in this there are photographs taken to

11:45AM   5   document what the words are in the communication, right?

11:45AM   6   A    Yes.

11:45AM   7   Q    Okay.  Moving to 9010-096.  Is this a document that you

11:45AM   8   recognize?

11:45AM   9   A    Yes.

11:45AM  10   Q    Does it involve Cody?

11:45AM  11   A    Yes.

11:45AM  12   Q    And does it involve you?

11:45AM  13   A    Correct.

11:45AM  14   Q    On the signal channel?

11:45AM  15   A    Yes.

11:45AM  16        MR. KENNEDY:  At this time I would move 9010-096 into

11:45AM  17   evidence.

11:45AM  18        THE COURT:  Mr. Akina?

11:45AM  19        MR. AKINA:  Same objection, Your Honor.  Hearsay.

11:45AM  20        THE COURT:  Objection is overruled.  9010-96 is

11:45AM  21   admitted.  You may publish.

11:45AM  22        (Exhibit 9010-96 was received in evidence.)

11:46AM  23   BY MR. KENNEDY:

11:46AM  24   Q    All right.  So now this is for different properties?

11:46AM  25   A    Correct.

11:46AM  1   Q    Once again, communicating with you by words in real time
11:46AM  2   and also with photographs documenting what was done, correct?
11:46AM  3   A    Yes.
11:46AM  4   Q    All right.  Moving down to the property down below.
11:46AM  5        So you're confirming information verbally but also
11:46AM  6   with photographs that are attached, correct?
11:46AM  7   A    Yes.
11:46AM  8        MR. KENNEDY:  All right.  Moving to 9010-097.
11:46AM  9   BY MR. KENNEDY:
11:46AM  10  Q    Do you recognize 9010-097?
11:46AM  11  A    Yeah, I recognize -- I recognize my name at the bottom.
11:46AM  12  Q    Okay.  Is it a communication from Jason to you?
11:47AM  13  A    Yes.
11:47AM  14       MR. KENNEDY:  All right.  At this time I move 9010-097
11:47AM  15  into evidence.
11:47AM  16       MR. AKINA:  Same hearsay objection, Your Honor.
11:47AM  17       THE COURT:  All right.  Same ruling, overruled.
11:47AM  18  9010-097 is admitted.
11:47AM  19       (Exhibit 9010-097 was received in evidence.)
11:47AM  20       MR. KENNEDY:  May we publish, Your Honor?
11:47AM  21       THE COURT:  Yes, you may.
11:47AM  22  BY MR. KENNEDY:
11:47AM  23  Q    All right.  Here Jason is communicating on the top
11:47AM  24  portion:  "Met with homeowner, gave her the key, all rooms and
11:47AM  25  fridge reading 0 ppm."  Correct?

11:47AM   1   A    Yes.

11:47AM   2   Q    "One clam shell, three signs, 1 lb, no visible damage."

11:47AM   3   Correct?

11:47AM   4   A    Correct.

11:47AM   5   Q    And then there are photographs underneath, correct?

11:47AM   6   A    Yes.

11:47AM   7   Q    All right.  Moving down to the -- in this one:  "Two clam

11:47AM   8   shells, three signs, 1 lb, no visible damage at 3:35."

11:48AM   9        Similar information, correct?

11:48AM   10  A    Yes.

11:48AM   11  Q    Once again, showing both communication real time, but also

11:48AM   12  photographs to make certain that there is documentation of what

11:48AM   13  is done, correct?

11:48AM   14  A    Correct.

11:48AM   15       MR. KENNEDY:  All right.  Pull this down, Ms. King.

11:48AM   16  BY MR. KENNEDY:

11:48AM   17  Q    Now, I want to show you what's been marked as 9010-104.

11:48AM   18  Do you recognize what 9010-104 is?

11:48AM   19  A    It looks like a house being fumigated with a Kama'aina

11:48AM   20  truck.

11:48AM   21  Q    All right.  Do you recognize the truck?

11:48AM   22  A    Yes.

11:48AM   23  Q    Is it George Perry's truck?

11:48AM   24  A    I've seen him driving this truck before.

11:48AM   25  Q    Okay.  Do you see anything that would look like it is

11:49AM    1    carrying gas?

11:49AM    2    A    Yes.

11:49AM    3    Q    What do you see?

11:49AM    4    A    I see on the right -- the right-hand side of the truck

11:49AM    5    there is two Vikane -- it looks like Vikane cylinders.

11:49AM    6            MR. KENNEDY:  Okay.  At this time I would move

11:49AM    7    9010-104 into evidence.

11:49AM    8            MR. AKINA:  Lack of foundation, speculation.

11:49AM    9            THE COURT:  Overruled.  The exhibit is admitted,

11:49AM    10   9010-104.

11:49AM    11           (Exhibit 9010-104 was received in evidence.)

11:49AM    12           MR. KENNEDY:  May we publish?

11:49AM    13           THE COURT:  You may.

11:49AM    14   BY MR. KENNEDY:

11:49AM    15   Q    So now you indicated that -- if you could do on the

11:49AM    16   screen, could you circle inside the truck where you see the

11:49AM    17   Vikane cylinders.

11:49AM    18   A    (Witness complies.)

11:49AM    19   Q    All right.

11:49AM    20           MR. KENNEDY:  And then if we move to Exhibit 9010-098,

11:50AM    21   which is not yet admitted.

11:50AM    22   BY MR. KENNEDY:

11:50AM    23   Q    Do you recognize the house and that truck?

11:50AM    24   A    I recognize the Kama'aina tent on that house and I

11:50AM    25   recognize the truck.

11:50AM    1                MR. KENNEDY:  Okay.  Move 9010-098 into evidence.

11:50AM    2                MR. AKINA:  No objection.

11:50AM    3                THE COURT:  9010-98 is admitted without objection.

11:50AM    4    You may publish.

11:50AM    5                (Exhibit 9010-98 was received in evidence.)

11:50AM    6    BY MR. KENNEDY:

11:50AM    7    Q    And so this once again is the truck that we were just

11:50AM    8    looking at.

11:50AM    9                MR. KENNEDY:  If we look at 9010-099, which is not yet

11:50AM   10    in evidence.

11:50AM   11    BY MR. KENNEDY:

11:50AM   12    Q    Do you recognize from the earlier photographs the house

11:50AM   13    and the truck?

11:50AM   14    A    I recognize the tents on the house and I recognize the

11:50AM   15    truck.

11:50AM   16                MR. KENNEDY:  Okay.  I would move 9010-099 into

11:51AM   17    evidence.

11:51AM   18                MR. AKINA:  No objection.

11:51AM   19                THE COURT:  9010-99 is admitted without objection.

11:51AM   20    You may publish.

11:51AM   21                (Exhibit 9010-099 was received in evidence.)

11:51AM   22                MR. KENNEDY:  May we publish?

11:51AM   23                THE COURT:  Yes.

11:51AM   24    BY MR. KENNEDY:

11:51AM   25    Q    All right.  And then you can see the cylinders with the

11:51AM  1    Vikane gas on the right side of that truck, correct?

11:51AM  2    A    Correct.

11:51AM  3    Q    Over on the tented property you can see a placard, right?

11:51AM  4    A    Correct.

11:51AM  5    Q    All right.  And so at this point it appears that the house

11:51AM  6    is fully tented, we're ready to go with shooting gas into the

11:51AM  7    house, correct?

11:51AM  8    A    That's what it appears, yes.

11:51AM  9    Q    Okay.

11:51AM  10        MR. KENNEDY:  Let's look at 9010-100.

11:51AM  11   BY MR. KENNEDY:

11:51AM  12   Q    Do you recognize what is depicted in 9010-100?

11:51AM  13   A    It looks like a home with Kama'aina fumigation tents.

11:52AM  14        MR. KENNEDY:  All right.  At this point I would move

11:52AM  15   9010-100 into evidence.

11:52AM  16        MR. AKINA:  No objection.

11:52AM  17        THE COURT:  9010-100 is admitted without objection.

11:52AM  18   You may publish.

11:52AM  19        (Exhibit 9010-100 was received in evidence.)

11:52AM  20        MR. KENNEDY:  May we publish?

11:52AM  21        THE COURT:  Yes, you may publish.

11:52AM  22        MR. KENNEDY:  And, Ms. King, can you move in on the

11:52AM  23   portion that has the white with -- it looks like red lettering

11:52AM  24   from a distance?

11:52AM  25   BY MR. KENNEDY:

11:52AM    1    Q    Hard to get it close enough, but is that a placard?

11:52AM    2    A    Yes.

11:52AM    3    Q    Does it indicate that fumigation is happening?

11:52AM    4    A    Yes.

11:52AM    5    Q    And that's part of what is to be placed on the -- whether

11:52AM    6    it's a home, a business or whatever, when it's being fumigated,

11:52AM    7    correct?

11:52AM    8    A    Yes.

11:52AM    9    Q    Okay.

11:52AM   10         MR. KENNEDY:  Now, moving to 9010-102.  This is a -- a

11:52AM   11    video.  If we just pull up the first for Mr. Kimoto.

11:52AM   12    BY MR. KENNEDY:

11:53AM   13    Q    Do you recognize what is shown in 9010-102?

11:53AM   14    A    It looks like a scale.

11:53AM   15    Q    Okay.  And in addition to the scale, do you see anything

11:53AM   16    else in the screen?

11:53AM   17    A    I see a Vikane cylinder and somebody's hand.

11:53AM   18         MR. KENNEDY:  Okay.  At this time, Your Honor, I would

11:53AM   19    move 9010-102 into evidence.

11:53AM   20         MR. AKINA:  Objection.  Lack of foundation.

11:53AM   21         THE COURT:  Sustained.

11:53AM   22    BY MR. KENNEDY:

11:53AM   23    Q    Are you familiar with how Vikane gas is then used in

11:53AM   24    fumigation?

11:53AM   25    A    Can you repeat that question, please?

11:53AM   1   Q    Are you familiar with how Vikane gas is used in

11:53AM   2   fumigation?

11:53AM   3   A    I'm familiar with what it does, but I wouldn't know how to

11:54AM   4   shoot the gas.

11:54AM   5   Q    Okay.  So you wouldn't know if this is a video of the gas

11:54AM   6   being shot or not; is that correct?

11:54AM   7   A    No.

11:54AM   8   Q    Okay.  Fair enough.  Let's move on then.

11:54AM   9         Now, the other day you talked about the fishing

11:54AM  10   vessel, the Rachel.  Do you recall that?

11:54AM  11   A    Yes.

11:54AM  12   Q    All right.  And you mentioned that there were times when

11:54AM  13   cash was paid to the crew, correct?

11:54AM  14   A    Correct.

11:54AM  15   Q    All right.  Were you aware that for every one of those

11:54AM  16   crew members, there was a check that was cut for that crew

11:54AM  17   member?

11:54AM  18   A    No, I was not.

11:54AM  19   Q    Were you aware that those crew members were not U.S.

11:54AM  20   citizens, so they had to remain on the vessel when it's in port

11:54AM  21   in Honolulu?

11:54AM  22   A    Yes, I did know that.

11:54AM  23   Q    So since they can't go to a bank, were you aware that a

11:55AM  24   check could be cut to them, cashed, and then cash would be

11:55AM  25   provided to them, but the check would be a record of the

11:55AM   1   amounts paid to them?

11:55AM   2   A    No, I was not aware of that.

11:55AM   3   Q    And I take it that you're aware that they couldn't walk

11:55AM   4   off the boat or they would be here illegally and arrested,

11:55AM   5   correct?

11:55AM   6   A    Yes, I'm aware of that.

11:55AM   7   Q    Okay.  So to pay them, one way to do that is to cut a

11:55AM   8   check, get it cashed, and provide them with the cash, right?

11:55AM   9   A    Correct.

11:55AM  10   Q    Particularly if they're from another country and they're

11:55AM  11   out at sea fishing commercially for weeks on end, correct?

11:55AM  12   A    Correct.

11:55AM  13   Q    Now, the other day you also mentioned that something about

11:55AM  14   that terrible day in November of 2015, the 17th, when Caleb and

11:56AM  15   Mr. Fraser -- Caleb Miske and Mr. Fraser, Jonathan Fraser, were

11:56AM  16   in that accident.

11:56AM  17   A    Correct.

11:56AM  18   Q    All right.  And you talked to the jury about Mr. Miske's

11:56AM  19   reaction.

11:56AM  20   A    Correct.

11:56AM  21   Q    Now, were you aware that bruising comes after a period of

11:56AM  22   time for someone, it doesn't automatically just come out?

11:56AM  23   A    Yes, I'm aware of that.

11:56AM  24   Q    Okay.  So were you aware that there was a photograph taken

11:56AM  25   which would show bruising moving from the right shoulder across

11:56AM     1    to the left hip on Mr. Miske?

11:56AM     2            MR. AKINA:  Objection.  Outside the scope.

11:56AM     3            THE COURT:  Overruled.  Go ahead.

11:56AM     4            THE WITNESS:  Yes, I was told by Mike about that.

11:56AM     5    BY MR. KENNEDY:

11:56AM     6    Q    And were you aware that in looking at that photograph,

11:57AM     7    doctors indicated it looked like a seatbelt bruising from the

11:57AM     8    right to the left?

11:57AM     9    A    I wasn't aware of that.  I was -- I mean, I wasn't aware

11:57AM    10    that the doctors had said that.  Mike had told me about the

11:57AM    11    bruise and told me what the bruise looked like was.

11:57AM    12    Q    Okay.  And were you aware that the driver of the truck who

11:57AM    13    made a left turn at 35 miles an hour was the cause of the

11:57AM    14    accident?

11:57AM    15    A    No, I was not aware of that.

11:57AM    16    Q    Were you aware that Mike sued that individual, Jared

11:57AM    17    Ishiki, and his company for the fact that that individual made

11:57AM    18    a 35-mile-an-hour left turn on a yellow?

11:57AM    19            MR. AKINA:  Objection.  This is also outside the scope

11:57AM    20    of the witness's testimony.

11:58AM    21            THE COURT:  Overruled.  Go ahead.

11:58AM    22            THE WITNESS:  No -- I mean, I was aware that Mike had

11:58AM    23    lawsuits going on with -- in connection to the accident, but I

11:58AM    24    was -- I was not aware of who the lawsuits were against.

11:58AM    25    BY MR. KENNEDY:

11:58AM    1    Q    Were you aware that an expert was retained who indicated

11:58AM    2    that that bruising could only come from the passenger's side

11:58AM    3    seatbelt, right to left?

11:58AM    4    A    I was not aware of that.

11:58AM    5    Q    Were you aware that Mr. Miske blamed himself because he

11:58AM    6    had taken away the Toyota Tacoma truck that Caleb had prior to

11:58AM    7    that accident?

11:58AM    8    A    Yes, Mike -- Mike had told me on an occasion that he does

11:58AM    9    blame himself for taking away the truck from Caleb before the

11:58AM   10    accident.

11:58AM   11    Q    And you went to the hospital from time to time, I take it,

11:58AM   12    to see Caleb?

11:58AM   13    A    Yeah, I -- I had been there on a few occasions.

11:59AM   14    Q    So in the beginning you were aware that there was a

11:59AM   15    question as to whether they needed to amputate his leg or not

11:59AM   16    due to an infection, correct?

11:59AM   17    A    Yes.

11:59AM   18    Q    And you're aware that Mike had to make that decision,

11:59AM   19    right?

11:59AM   20    A    Yes, I -- I was aware of that.

11:59AM   21    Q    And that he had one doctor telling him one thing and

11:59AM   22    another doctor telling him another.

11:59AM   23         MR. AKINA:  Your Honor, I'm going to object to this

11:59AM   24    line of questioning.  It's hearsay.  It's calling on the

11:59AM   25    defendant's statements.

11:59AM    1              THE COURT:  Overruled.  Go ahead.

11:59AM    2              THE WITNESS:  Can -- can you repeat the question, sir?

11:59AM    3    BY MR. KENNEDY:

11:59AM    4    Q    Were you aware that one doctor, the specialist was telling

11:59AM    5    him to keep the leg, when his regular doctor was saying you

11:59AM    6    should amputate?

11:59AM    7    A    I don't remember having that conversation with Mike.

11:59AM    8    Q    And do you remember after a couple of months Caleb began

12:00PM    9    to get better, and then the infection moved to his heart?

12:00PM    10   A    I do remember that.

12:00PM    11   Q    And that he was moments away from dying at that point.

12:00PM    12   A    Yeah, I -- I do remember at a point we came -- we came to

12:00PM    13   that.

12:00PM    14   Q    And then he lived and he began to go through

12:00PM    15   rehabilitation, and it looked like he was going to be able to

12:00PM    16   leave the hospital and rehabilitate.

12:00PM    17   A    Yes, I do remember that.

12:00PM    18   Q    And while this was happening, his wife Delia Fabro-Miske

12:00PM    19   had a child Nila, and he was able to hold his child in his

12:00PM    20   arms.

12:00PM    21   A    Yes, I did -- I did see a picture of that.

12:00PM    22   Q    And were you aware that Mike was making efforts to get a

12:00PM    23   one-story unit available so Caleb could rehab?

12:00PM    24              MR. AKINA:  Objection.  Hearsay.

12:00PM    25              THE COURT:  Overruled.  Go ahead.

12:01PM   1              THE WITNESS:  I -- I don't remember having that

12:01PM   2    conversation, sir.

12:01PM   3    BY MR. KENNEDY:

12:01PM   4    Q    And then the infection moved from the heart to his brain,

12:01PM   5    and he died.

12:01PM   6    A    Yes, I -- I do remember that.

12:01PM   7    Q    And you know that Mike blames himself for not amputating

12:01PM   8    that leg.

12:01PM   9    A    I do not know -- I never had a conversation with Mike

12:01PM  10    about him blaming himself about ampu- -- because he didn't

12:01PM  11    amputate the leg that Caleb passed.  The only conversation that

12:01PM  12    we had was about him blaming himself for taking the truck away

12:01PM  13    before the accident.

12:01PM  14    Q    Now, you talked about a time where Mike asked you to help

12:02PM  15    Delia if he was ever arrested, correct?

12:02PM  16    A    Yes.

12:02PM  17    Q    And if arrested, he wanted you to help her run the

12:02PM  18    business.

12:02PM  19    A    Correct.

12:02PM  20    Q    And he asked you to do this, right?

12:02PM  21    A    Yes.

12:02PM  22    Q    He didn't think you would be arrested, right?

12:02PM  23    A    No, he didn't.

12:02PM  24    Q    And he didn't think Delia would be arrested, right?

12:02PM  25    A    No, he didn't.

12:02PM   1    Q    Because there would be no reason to ask if he thought so,

12:02PM   2    correct?

12:02PM   3    A    No.

12:02PM   4    Q    Now, on the -- last week you mentioned that you saw press

12:02PM   5    regarding Mr. Fraser's disappearance on Saturday, July 30th,

12:02PM   6    2016.  Do you recall that?

12:02PM   7    A    Yes.

12:02PM   8    Q    Are you aware there was no press on that Saturday?

12:02PM   9    A    No, I'm not aware.

12:03PM   10   Q    That his disappearance had not even been reported?

12:03PM   11   A    No, sir.  I'm not aware of that.

12:03PM   12   Q    Now, sir, you've entered into a plea agreement here,

12:03PM   13   correct?

12:03PM   14   A    Correct.

12:03PM   15   Q    And originally one of the charges against you was Count 1,

12:03PM   16   a RICO conspiracy, correct?

12:03PM   17   A    Correct.

12:03PM   18   Q    And in that RICO conspiracy, you were charged with a --

12:03PM   19   what's known as a special sentencing factor.  Do you recall

12:03PM   20   that?

12:03PM   21   A    Could you -- could you repeat the question, please?

12:03PM   22   Q    Yes.  In the charge you yourself personally were charged

12:03PM   23   with something called a special sentencing factor in violation

12:04PM   24   of the drug statute, Title 21, United States Code, Sections

12:04PM   25   846, 841(a)(1) and 841(b)(1).  Do you recall that as part of

12:04PM   1   the RICO charge against you?

12:04PM   2   A    Yes.

12:04PM   3   Q    That charge carried a statutory maximum of life in prison.

12:04PM   4   A    Yes.

12:04PM   5   Q    The RICO conspiracy is to be dismissed after sentencing,

12:04PM   6   but not yet, correct?

12:04PM   7   A    Correct.

12:04PM   8   Q    Because your plea agreement means that you have to testify

12:04PM   9   for them.

12:04PM   10           MR. AKINA:  Objection as to "testify for them."

12:04PM   11           THE COURT:  Sustained.

12:04PM   12   BY MR. KENNEDY:

12:04PM   13   Q    Charge Count 16 was conspiracy to distribute and possess

12:04PM   14   with the intent to distribute controlled substances.  Do you

12:05PM   15   recall that charge?

12:05PM   16   A    Yes.

12:05PM   17   Q    And once again, that was in violation of title 21, United

12:05PM   18   States Code, Sections 846, 841(b)(1)(A, and 841(b)(1)(C) and

12:05PM   19   841(b)(1)(D).  Do you recall that charge?

12:05PM   20   A    Yes.

12:05PM   21   Q    The (b)(1)(A) portion makes that charge a statutory

12:05PM   22   maximum of life in prison, correct?

12:05PM   23   A    Correct.

12:05PM   24   Q    That too will be dismissed but only after sentencing,

12:05PM   25   correct?

| | | | |
|---|---|---|---|
| 12:05PM | 1 | A | Correct. |
| 12:05PM | 2 | Q | And we talked last week about how the witness tampering |
| 12:05PM | 3 | | charges have already been dismissed, right? |
| 12:05PM | 4 | A | Correct. |
| 12:05PM | 5 | Q | But without prejudice, which means they can be brought |
| 12:05PM | 6 | | back by the government at any time. |
| 12:05PM | 7 | A | Correct. |
| 12:05PM | 8 | Q | In your plea agreement, you agreed to certain facts. |
| 12:06PM | 9 | | Fair? |
| 12:06PM | 10 | A | Fair. |
| 12:06PM | 11 | Q | Last week you told this jury that you only learned about |
| 12:06PM | 12 | | the kidnapping that was done by Mr. Miller and Mr. Ortiz on |
| 12:06PM | 13 | | October 17, 2017, after it had already happened. |
| 12:06PM | 14 | A | Correct. |
| 12:06PM | 15 | Q | In your plea agreement you agreed that beginning no later |
| 12:06PM | 16 | | than May 2017, you agreed to willfully and unlawfully seize, |
| 12:06PM | 17 | | confine, kidnap, abduct, and carry away for money, ransom or |
| 12:06PM | 18 | | reward, Victim 3, Robert Lee, correct? |
| 12:06PM | 19 | A | Correct. |
| 12:06PM | 20 | Q | So you told this jury you didn't know about it until |
| 12:07PM | 21 | | October 17, 2017, but in this courtroom when you entered your |
| 12:07PM | 22 | | plea, you told them that you were in the conspiracy no later |
| 12:07PM | 23 | | than May of 2017, correct? |
| 12:07PM | 24 | | MR. AKINA:  Objection, Your Honor.  This |
| 12:07PM | 25 | | mischaracterizes the plea agreement. |

12:07PM    1            THE COURT:  Sustained.

12:07PM    2            MR. AKINA:  Move to strike counsel's comments, Your

12:07PM    3    Honor.

12:07PM    4            THE COURT:  Counsel's comments I'll remind the jury

12:07PM    5    are not evidence of anything, including counsel's questions.

12:07PM    6    BY MR. KENNEDY:

12:08PM    7    Q    Sir, there was no trip to the gym, was there?

12:08PM    8    A    That was -- that's false.  There was a trip to the gym.

12:08PM    9    Q    There was no trip back to the office, was there?

12:08PM   10    A    False again.

12:08PM   11    Q    And there was no erase board?

12:08PM   12    A    That is also false.

12:08PM   13    Q    And Mr. Miske didn't know a thing about this kidnapping.

12:08PM   14    It was you and Miller, correct?

12:08PM   15    A    Not correct.  Mr. Miske did know about the kidnapping.

12:08PM   16    Q    And you're looking for a better sentence by testifying

12:08PM   17    here today that way.

12:08PM   18    A    I'm hoping to get a better sentence by testifying

12:08PM   19    truthfully, sir.

12:08PM   20            MR. KENNEDY:  Nothing further.

12:08PM   21            THE COURT:  All right.  Before -- Mr. Akina, before

12:08PM   22    redirect, why don't we go ahead and take our second break of

12:08PM   23    the day.  We're about an hour and a half into this latest

12:09PM   24    session.

12:09PM   25            So I'll remind our jurors as we go to break to

12:09PM    1    refrain, please, from discussing the substance of this case

12:09PM    2    with anyone, including each another; to refrain from accessing

12:09PM    3    any media or other accounts of this case that may be out there;

12:09PM    4    and then finally, please do not conduct any independent

12:09PM    5    investigation into the facts, circumstances or persons

12:09PM    6    involved.

12:09PM    7         It's about ten after now, so let's try to get started

12:09PM    8    right around 12:30.

12:09PM    9         (Proceedings were recessed at 12:09 p.m. to 12:33

12:33PM   10    p.m.)

12:33PM   11         THE COURT:  All right.  Back from our second break.

12:33PM   12    The record should reflect the return of all 17 jurors.  The

12:33PM   13    witness Mr. Kimoto is back on the stand.  The presence of

12:33PM   14    counsel and parties.

12:33PM   15         Mr. Akina, you may begin with redirect when you're

12:33PM   16    ready.

12:33PM   17         MR. AKINA:  Thank you, Your Honor.

12:33PM   18                    REDIRECT EXAMINATION

12:33PM   19    BY MR. AKINA:

12:33PM   20    Q    Mr. Kimoto, I'm going to ask you some questions about your

12:33PM   21    plea agreement, okay?

12:33PM   22    A    Yes.

12:33PM   23    Q    As part of your plea agreement, are you testifying here at

12:33PM   24    this trial?

12:33PM   25    A    Yes.

| | | | |
|---|---|---|---|
| 12:33PM | 1 | Q | And what is your understanding pursuant to the plea |
| 12:33PM | 2 | | agreement of your obligation when you testify at this trial? |
| 12:33PM | 3 | A | My understanding is that I need to tell the truth about -- |
| 12:33PM | 4 | | I need to tell the truth with every question that is asked of |
| 12:33PM | 5 | | me. |
| 12:33PM | 6 | Q | And what happens if you don't tell the truth to your plea |
| 12:33PM | 7 | | agreement? |
| 12:33PM | 8 | A | If I do not tell the truth, and you find that I've lied |
| 12:34PM | 9 | | here on the stand, that I would be in a worse off position than |
| 12:34PM | 10 | | I am -- that I would be when we first started this. |
| 12:34PM | 11 | Q | You understand you could open yourself up to perjury |
| 12:34PM | 12 | | charges, right? |
| 12:34PM | 13 | A | Yes. |
| 12:34PM | 14 | Q | And the plea agreement that includes the dismissal of |
| 12:34PM | 15 | | certain charges after your sentencing, what could happen to |
| 12:34PM | 16 | | that if you lie to -- lie here at this trial? |
| 12:34PM | 17 | A | You guys could charge me with that. |
| 12:34PM | 18 | Q | It could come back, right? |
| 12:34PM | 19 | A | Correct. |
| 12:34PM | 20 | Q | Or it wouldn't be dismissed at all. |
| 12:34PM | 21 | A | Yes. |
| 12:34PM | 22 | Q | Now, some of the charges that may be dismissed that |
| 12:34PM | 23 | | defense counsel asked you about, you remember acknowledging |
| 12:34PM | 24 | | that the statutory maximum was life in prison for those? |
| 12:34PM | 25 | A | I remember it being said to me by my attorney, but not in |

12:34PM    1    full detail.

12:34PM    2    Q    And the charge that you did plead guilty to, the

12:34PM    3    conspiracy to commit kidnapping, do you understand that the

12:34PM    4    maximum statutory penalty for that is also life in prison?

12:35PM    5    A    Yes, I do recognize that.

12:35PM    6    Q    And that's the charge that is still -- that you could be

12:35PM    7    sentenced on -- that you will be sentenced on, correct?

12:35PM    8    A    Correct.

12:35PM    9    Q    Now, the kidnapping that you testified about, as part of

12:35PM   10    your plea agreement, did you acknowledge that you were part of

12:35PM   11    that conspiracy starting from May of 2017?

12:35PM   12    A    Yes.

12:35PM   13    Q    And what -- what event does that line up with?

12:35PM   14    A    That event lines up with when I met Sunnie for lunch that

12:35PM   15    day at the Kaka'ako restaurant.

12:35PM   16    Q    And at that lunch, she -- that's when the initial request

12:35PM   17    was made to help collect the debt?

12:35PM   18    A    Yes.

12:35PM   19    Q    And at that point did -- was a kidnapping discussed?

12:36PM   20    A    At that point, a kidnapping was not discussed.

12:36PM   21    Q    And after your next meeting with Ms. Kim where she gives

12:36PM   22    you the Post-it note, and you gave that Post-it note -- made

12:36PM   23    sure that the defendant got that Post-it note, at that point

12:36PM   24    had you discussed a kidnapping with anybody?

12:36PM   25    A    No.  I did not discuss that kidnapping.

12:36PM   1    Q    At that point, and then afterwards several months later in

12:36PM   2    October, when the defendant brought you back to Kama'aina

12:36PM   3    Termite and told you that Wayne Miller had the accountant, had

12:36PM   4    you heard anything about a kidnapping before that point in

12:36PM   5    time?

12:36PM   6    A    No, I did not.

12:36PM   7    Q    So when was the first time that you realized that a

12:36PM   8    kidnapping was going to take place or had taken place?

12:36PM   9    A    On October 17th.

12:36PM   10   Q    And who did you learn about the kidnapping from first?

12:36PM   11   A    The defendant, Mike.

12:36PM   12   Q    Not Wayne Miller?

12:36PM   13   A    Not Wayne.

12:36PM   14   Q    And so even though you didn't realize that a kidnapping

12:37PM   15   would take place, you still pled guilty to being a part of that

12:37PM   16   conspiracy all the way back in -- starting from the summer of

12:37PM   17   2017?

12:37PM   18   A    Yes.

12:37PM   19   Q    Is that because you took responsibility for your actions?

12:37PM   20   A    Because, yes, I did take responsibility for my action.

12:37PM   21   That's the only way that I could move on from this.

12:37PM   22   Q    And you acknowledge that that did play some role in the

12:37PM   23   kidnapping, right?

12:37PM   24   A    Yes.

12:37PM   25   Q    And I want to clear up a couple of things.  With the

12:37PM  1    fumigations that you did for Ms. Kim, how many total were

12:37PM  2    there?

12:37PM  3    A    There was two fumigations.

12:37PM  4    Q    And the first fumigation, when was that?

12:37PM  5    A    That was in 2017.

12:37PM  6    Q    And when did that take place in relation to the kidnapping

12:37PM  7    events?

12:37PM  8    A    That was before the kidnapping.

12:38PM  9    Q    And I think you had testified on direct that that was

12:38PM  10   when -- at around time when Ms. Kim first approached you to ask

12:38PM  11   for help with the debt?

12:38PM  12   A    Yes.

12:38PM  13   Q    Was there a prior fumigation before that?

12:38PM  14   A    No, there was not a prior fumigation before that.

12:38PM  15   Q    So -- so the second fumigation, when did that take place

12:38PM  16   with reference to the kidnapping?

12:38PM  17   A    That happened after the kidnapping.

12:38PM  18   Q    Wayne Miller, how do you know Wayne Miller?

12:38PM  19   A    I knew Wayne Miller through Mike.

12:38PM  20   Q    And back in 2017, could you describe the frequency with

12:38PM  21   which you would interact with Wayne Miller?

12:38PM  22   A    I really didn't see Wayne too often.  He would -- he would

12:38PM  23   contact me to -- if he needed to get in contact with Mike and

12:39PM  24   Mike wasn't available or answering his texts or calls, then he

12:39PM  25   would ask me -- he would -- he would contact me through text or

12:39PM  1   calling me to see if I knew where Mike was.

12:39PM  2   Q    And so for the kidnapping, do you know what vehicle, if

12:39PM  3   any, Wayne Miller used to carry out the kidnapping?

12:39PM  4   A    I do not know what vehicle Wayne used to carry out the

12:39PM  5   kidnapping.  I just know that I seen him -- when I met with

12:39PM  6   him, I seen him in a light-colored sedan.

12:39PM  7   Q    But you have no personal knowledge of which exact vehicle

12:39PM  8   was actually used by Wayne Miller?

12:39PM  9   A    No, I do not.

12:39PM  10  Q    You were asked a question by defense counsel that the

12:39PM  11  first time you mentioned Ms. Kim's request to kill the

12:40PM  12  accountant was only after your 2022 arrest, correct?

12:40PM  13  A    I'm sorry, I missed --

12:40PM  14  Q    Do you recall being -- do you remember being asked that

12:40PM  15  question by defense counsel?

12:40PM  16  A    Yes, I do.

12:40PM  17  Q    And the time in 2022 when you were arrested for the

12:40PM  18  witness tampering charge?

12:40PM  19  A    Yes.

12:40PM  20  Q    At that point in time, prior to your arrest, had you told

12:40PM  21  the government anything?

12:40PM  22  A    No.

12:40PM  23  Q    Had you entered into any type of plea agreement with the

12:40PM  24  government at that point?

12:40PM  25  A    No.

12:40PM    1    Q    Had you even come in for a proffer with the government up

12:40PM    2    to that point?

12:40PM    3    A    No.

12:40PM    4    Q    And what's your understanding of a proffer?

12:40PM    5    A    A proffer is when I come in and speak about, I guess, what

12:40PM    6    I did.

12:40PM    7    Q    With the government.

12:40PM    8    A    With the government.

12:40PM    9    Q    And there are agents there as well?

12:40PM    10    A    There are agents, yes.

12:40PM    11    Q    And so it wasn't until 2023 that you decided to enter into

12:41PM    12    a plea agreement; is that correct?

12:41PM    13    A    Yes.

12:41PM    14    Q    And as part of those discussions, did you proffer with the

12:41PM    15    government and agents?

12:41PM    16    A    Yes.

12:41PM    17    Q    And on the first -- do you remember meeting the first time

12:41PM    18    on May 24th, 2023?

12:41PM    19    A    It -- it was around that time.

12:41PM    20    Q    And the first meeting that you had, is that when you

12:41PM    21    discussed and explained your involvement in the kidnapping?

12:41PM    22    A    I believe we did go over what had -- what had happened.

12:41PM    23    Q    And at that first meeting did you also explain or reveal

12:41PM    24    to the government and agents that Ms. Kim had made the request

12:41PM    25    about killing the accountant?

12:41PM   1   A    Yes.

12:41PM   2   Q    And at that first meeting did you explain to the

12:41PM   3   government and agents about the defendant's involvement and

12:41PM   4   Wayne Miller's involvement?

12:41PM   5   A    Yes.

12:41PM   6   Q    Was that consistent with how you testified at this trial?

12:41PM   7   A    Yes.

12:42PM   8            MR. AKINA:  Could we show the witness Exhibit 5-37,

12:42PM   9   which is in evidence, page 3, please?

12:42PM  10            THE COURT:  Yes, go ahead.

12:42PM  11            MR. AKINA:  And permission to publish?

12:42PM  12            THE COURT:  Yes.

12:42PM  13   BY MR. AKINA:

12:42PM  14   Q    You were asked about some text messages on cross-

12:42PM  15   examination.  If we could focus in on messages 13, 14 and 15,

12:42PM  16   please.

12:42PM  17            Looking at message 15 where -- where you text Wayne

12:42PM  18   Miller:  "I'm doing an estimate right now.  Braddah said hold

12:42PM  19   on, and I'm going to meet him at shop right after this and get

12:42PM  20   back to you."

12:42PM  21            Do you see that?

12:43PM  22   A    Yes.

12:43PM  23   Q    And when the defense counsel asked you about "braddah,"

12:43PM  24   who that could mean to you, you were about to explain

12:43PM  25   something.  Do you recall that?

12:43PM   1   A   Yes.

12:43PM   2   Q   Can you explain to the jury what you were going to say?

12:43PM   3   A   I was going to say that that's not what Mike's nickname

12:43PM   4   was, braddah.  So that's why Wayne is probably confused and

12:43PM   5   asking me who when I say "braddah," because we never would use

12:43PM   6   names on texts or phone calls.

12:43PM   7   Q   And why wouldn't you use names on texts and phone calls?

12:43PM   8   A   In case the government or law enforcement was listening in

12:43PM   9   or tapping and viewing our texts, we didn't want to put

12:43PM  10   anybody -- anybody's name in these texts.

12:43PM  11   Q   So up to October 2017, what was the defendant's -- I guess

12:43PM  12   what name was he most commonly referred to by as a nickname?

12:44PM  13   A   I would refer to Mike as "Bro," or we would -- I would

12:44PM  14   just use initials like MM.

12:44PM  15   Q   Okay.  And so here you use "braddah" instead.  Why?

12:44PM  16   A   Because I was running this -- I was running this text

12:44PM  17   fast, and I just had said "braddah," thinking that Wayne would

12:44PM  18   understand who I was talking about because referring -- it goes

12:44PM  19   back to "Braddah said hold on, and I'm going to meet him at the

12:44PM  20   shop."  That's the only person that that could -- that could be

12:44PM  21   in relation to.

12:44PM  22   Q   And you mentioned that you didn't put names in text

12:44PM  23   messages.  Is that why you put "Bro" after Wayne Miller asked

12:44PM  24   you who you were referring to?

12:44PM  25   A   Yes.

12:45PM    1              MR. AKINA:  Now, we can take this exhibit down.

12:45PM    2    BY MR. AKINA:

12:45PM    3    Q    There was a phone number ending in 2822.  Do you remember

12:45PM    4    that phone number?

12:45PM    5    A    Yes.

12:45PM    6    Q    And that was the phone that you were using during the time

12:45PM    7    that you worked for the defendant?

12:45PM    8    A    Yes.

12:45PM    9    Q    And was this that burner phone that you were referencing

12:45PM   10    that the defendant had asked you to go and get?

12:45PM   11    A    Yes.

12:45PM   12    Q    And at the time when you got that phone, how many did you

12:45PM   13    purchase in total?

12:45PM   14    A    Sorry.  Could you repeat?

12:45PM   15    Q    How many phones did you purchase in total at that time?

12:45PM   16    A    I purchased two phones.

12:45PM   17    Q    And what were they for?

12:45PM   18    A    Those two phones were to be used for me and Mike to

12:45PM   19    communicate through.

12:45PM   20    Q    And so how did this phone number ending in 2822 go from a

12:45PM   21    burner phone dedicated to communications with the defendant to

12:45PM   22    now being a phone that was being used, you know, in other

12:46PM   23    aspects of business?

12:46PM   24    A    From what I remember, I believe that I used the number

12:46PM   25    when texting two of Mike's phones.

12:46PM   1   Q    When you say "the number," which number are you saying?

12:46PM   2   A    I used the 2822 to text two of Mike's phones.  The one --

12:46PM   3   the one that I purchased with my -- with the 2822 number and

12:46PM   4   another number associated with Mike.

12:46PM   5   Q    And so after you texted the defendant at another number

12:46PM   6   that wasn't that burner that you purchased for him, is that

12:46PM   7   when the use for 2822 changed?

12:46PM   8   A    Yes, that's when it -- that's not exactly when it changed,

12:46PM   9   but that's when it changed where we couldn't use that phone --

12:46PM  10   both those phones to communicate with, because now the phones

12:46PM  11   were dirty now, we call it, because it was -- I texted the

12:46PM  12   number that law enforcement was probably -- was most likely

12:46PM  13   viewing our texts or reviewing our phone calls on.  And now I

12:47PM  14   introduced two new numbers into -- to get their -- I mean to

12:47PM  15   get their attention now.

12:47PM  16   Q    Do you remember being shown some videos involving Wes

12:47PM  17   Otani on cross-examination?

12:47PM  18   A    Yes.

12:47PM  19   Q    And he was providing trainings to fumigation staff?

12:47PM  20   A    Yes.

12:47PM  21   Q    Do you know why that particular training was offered by

12:47PM  22   the defendant?

12:47PM  23   A    I -- I don't -- I don't know why, sir.

12:47PM  24        MR. AKINA:  Could we show the witness Exhibit 1-843,

12:47PM  25   which is not in evidence, and going to page 8 of that.

| | | |
|---|---|---|
| 12:47PM | 1 | BY MR. AKINA: |
| 12:48PM | 2 | Q    Do you recognize this photo? |
| 12:48PM | 3 | A    Yes. |
| 12:48PM | 4 | Q    What does this photo show? |
| 12:48PM | 5 | A    This photo shows -- this photo shows employees filling out |
| 12:48PM | 6 | best of -- Hawaii's Best of. |
| 12:48PM | 7 | Q    Which employees? |
| 12:48PM | 8 | A    In this picture it shows Kama'aina employees. |
| 12:48PM | 9 | Q    And are you familiar with the practice of employees |
| 12:48PM | 10 | filling out Hawaii's Best ballots? |
| 12:48PM | 11 | A    Yes, I participated in this. |
| 12:48PM | 12 | Q    And does this picture show Kama'aina employees filling out |
| 12:48PM | 13 | Hawaii Best ballots? |
| 12:49PM | 14 | A    Correct. |
| 12:49PM | 15 | MR. AKINA:  Your Honor, this particular page is part |
| 12:49PM | 16 | of a greater exhibit.  I have it separately marked as a |
| 12:49PM | 17 | separate one, which we can submit as Exhibit 1-843-A, and I can |
| 12:49PM | 18 | hand that up to the Court. |
| 12:49PM | 19 | THE COURT:  Are you offering it? |
| 12:49PM | 20 | MR. AKINA:  Yes, I'm offering it into evidence at this |
| 12:49PM | 21 | time. |
| 12:49PM | 22 | THE COURT:  Any objection? |
| 12:49PM | 23 | MR. KENNEDY:  No objection. |
| 12:49PM | 24 | THE COURT:  Without objection, Exhibit 1-843 Alpha is |
| 12:49PM | 25 | admitted. |

12:49PM   1              (Exhibit 1-843-A was received in evidence.)

12:49PM   2              MR. AKINA:  For the purposes of today, Your Honor,

12:49PM   3    could we just display this page of this exhibit for the jury?

12:49PM   4              THE COURT:  Yes.

12:49PM   5              MR. AKINA:  Thank you.

12:49PM   6              Now, if we could zoom in on the bottom half of the

12:49PM   7    picture.

12:49PM   8    BY MR. AKINA:

12:49PM   9    Q    Okay.  You see that red shirt, the long-sleeved red shirt?

12:49PM  10    A    Yes.

12:49PM  11    Q    What type of shirt is that?

12:49PM  12    A    That's an authorized technician Kama'aina shirt.

12:50PM  13    Q    And do you see these stacks of papers in front of this

12:50PM  14    individual, what is that?

12:50PM  15    A    The stacks of papers are newspaper -- newspaper ballots

12:50PM  16    for the Hawaii's Best of 2018.

12:50PM  17    Q    And do you see stacks of numerous ballots in front of the

12:50PM  18    employees?

12:50PM  19    A    Yes.

12:50PM  20    Q    And so you mentioned that you had participated in doing

12:50PM  21    this.  So what is -- what is your understanding of how Hawaii's

12:50PM  22    Best awards are -- are awarded?

12:50PM  23    A    It's a vote by the public.

12:50PM  24    Q    And what relation, if any, do these type of ballots have

12:50PM  25    to that determination, that vote?

12:50PM    1    A    The more votes you get, I guess, that's the how the best

12:50PM    2    of is awarded.

12:50PM    3    Q    And can you explain how you participated in that?

12:50PM    4    A    I participated by filling out numerous of these ballot

12:51PM    5    forms, and not turning it in, but we -- I don't know who would

12:51PM    6    turn it in, but we would just leave it -- we would just fill it

12:51PM    7    out and leave it -- leave it for somebody to turn in.

12:51PM    8    Q    And why did you do that?

12:51PM    9    A    Because I was asked by the defendant.

12:51PM   10         MR. AKINA:  If we could zoom out of this.

12:51PM   11    BY MR. AKINA:

12:51PM   12    Q    What room -- do you know what room this is taking place

12:51PM   13    in?

12:51PM   14    A    This is the Kama'aina board room.

12:51PM   15    Q    Is this that same board room where you were giving that

12:51PM   16    training in that video that you were shown on cross?

12:51PM   17    A    Yes.

12:51PM   18    Q    Did this happen on just one year, during one year?

12:51PM   19    A    No, this happened numerous years.

12:51PM   20    Q    Of the years that you worked for the defendant from 2015

12:51PM   21    to 2020, approximately how many of those years to your

12:52PM   22    knowledge did it take place?

12:52PM   23    A    I would say at least -- at least two.

12:52PM   24         MR. AKINA:  We can take this exhibit down.

12:52PM   25    BY MR. AKINA:

| | | |
|---|---|---|
| 12:52PM | 1 | Q    Do you recall being shown several manager threads on |
| 12:52PM | 2 | cross-examination? |
| 12:52PM | 3 | A    Yes. |
| 12:52PM | 4 | Q    And you were asked some questions about the individuals |
| 12:52PM | 5 | who were on those threads? |
| 12:52PM | 6 | A    Yes. |
| 12:52PM | 7 | Q    Did you see Michael Masutani's name on those -- any of |
| 12:52PM | 8 | those threads? |
| 12:52PM | 9 | A    I don't -- I don't think I saw Michael Masutani's name on |
| 12:53PM | 10 | those threads. |
| 12:53PM | 11 | Q    And did you see Devin Kimoto's name on any of those |
| 12:53PM | 12 | threads? |
| 12:53PM | 13 | A    I did not see my brother's name on those threads. |
| 12:53PM | 14 | MR. AKINA:  Could we show Exhibit 5000-129? |
| 12:53PM | 15 | And I would ask defense counsel if it's readily |
| 12:53PM | 16 | available? |
| 12:53PM | 17 | This is already in evidence. |
| 12:53PM | 18 | THE COURT:  Go ahead. |
| 12:54PM | 19 | BY MR. AKINA: |
| 12:54PM | 20 | Q    You were asked questions on cross-examination about the |
| 12:54PM | 21 | Oahu yacht club fumigation.  Do you remember that? |
| 12:54PM | 22 | A    I think this is the Waikiki one. |
| 12:54PM | 23 | Q    My mistake, sorry.  Waikiki Yacht Club. |
| 12:54PM | 24 | And then can you explain to the jury how you worked |
| 12:54PM | 25 | with another company to ensure the contract? |

12:54PM   1    A    So I got called out to this particular property for an

12:54PM   2    estimate.  I went through the estimate -- I mean I went and did

12:54PM   3    the estimate before submitting my estimated cost to fumigate

12:54PM   4    this property.

12:54PM   5         I found out that somebody else from Kama'aina -- I

12:54PM   6    mean I found out somebody from Kama'aina went as a Kama'aina

12:54PM   7    salesperson, and I went as an O'ahu sales inspector.  We both

12:55PM   8    agreed that one of us would go higher and a lot higher for the

12:55PM   9    pricing for this job, and the other one would come in at a

12:55PM  10    reasonable price.

12:55PM  11         This -- this particular fumigation isn't -- it isn't

12:55PM  12    an easy one.  It's considered a difficult fumigation.  So by --

12:55PM  13    by myself and the Kama'aina salesperson going, we -- what we

12:55PM  14    would do is we would split the sale, so we would still both

12:55PM  15    benefit.  But I -- I agreed to be the one to go higher on this

12:55PM  16    sale because I didn't want the headache of trying to manage the

12:55PM  17    expectations from the Waikiki Yacht harbor on this tent

12:55PM  18    fumigation.

12:55PM  19    Q    And was that the only time that you did something like

12:56PM  20    that while working at O'ahu Termite?

12:56PM  21    A    That -- no, it wasn't the only time.  I did it on quite a

12:56PM  22    few occasions where we would -- we would have to report at the

12:56PM  23    end of our day what estimates we did and what we sold.  We

12:56PM  24    would have to report that on -- in the -- I mean in the sales,

12:56PM  25    either the Slack or Signal.  Everybody was required to report

| | | |
|---|---|---|
| 12:56PM | 1 | how much they sold that day and what estimates they did. |
| 12:56PM | 2 | So that's how we would know where each of us went to |
| 12:56PM | 3 | so we could see if we -- so we could see if we went to the same |
| 12:56PM | 4 | customer's house.  And if we did, then we would work together |
| 12:56PM | 5 | in securing that sale and we would split -- would split that |
| 12:56PM | 6 | sale. |
| 12:56PM | 7 | MR. AKINA:  Thank you.  No further questions. |
| 12:57PM | 8 | THE COURT:  All right.  Mr. Kimoto, you may step down |
| 12:57PM | 9 | with the marshal's assistance. |
| 12:57PM | 10 | MR. KENNEDY:  Your Honor, can I have some follow-up? |
| 12:57PM | 11 | THE COURT:  No. |
| 12:57PM | 12 | MR. KENNEDY:  Just a couple of questions. |
| 12:57PM | 13 | THE COURT:  Your next witness. |
| 12:57PM | 14 | MR. INCIONG:  Wayne Miller, Your Honor. |
| 12:58PM | 15 | Did you want him brought in right now, Your Honor? |
| 12:58PM | 16 | THE COURT:  It's up to you. |
| 12:58PM | 17 | MR. INCIONG:  I think -- |
| 12:58PM | 18 | THE COURT:  You want to take a break? |
| 12:58PM | 19 | MR. INCIONG:  -- if we could take the jury out just |
| 12:58PM | 20 | briefly. |
| 12:58PM | 21 | THE COURT:  All right.  Why don't we go ahead and do |
| 12:58PM | 22 | that then. |
| 12:58PM | 23 | It's going to take a little bit of time to switch |
| 12:58PM | 24 | witnesses.  So we'll excuse the jury.  And once we have |
| 12:58PM | 25 | Mr. Miller situated, we'll call you right back in.  It |

12:58PM   1   shouldn't be more than just a few minutes.

01:10PM   2                (A recess was taken from 12:58 p.m. to 1:10 p.m.)

01:10PM   3                THE COURT:  All right.  Back from our brief break.

01:10PM   4   Has the witness -- the witness needs to be sworn.

01:10PM   5                THE CLERK:  Please raise your right hand.

01:10PM   6                                WAYNE MILLER,

01:10PM   7   called as a witness, having been first duly sworn, was examined

01:10PM   8   and testified as follows:

01:10PM   9                THE CLERK:  Please state your full name, spelling your

01:10PM   10  last name for the record.

01:10PM   11               THE WITNESS:  Wayne Miller.  Last name M-I-L-L-E-R.

01:10PM   12               THE COURT:  Mr. Inciong.

01:10PM   13               MR. INCIONG:  Thank you, Your Honor.

01:10PM   14                          DIRECT EXAMINATION

01:10PM   15  BY MR. INCIONG:

01:10PM   16  Q    Good afternoon, Mr. Miller.  How old are you, sir?

01:10PM   17  A    Forty.

01:10PM   18  Q    It looks like you are currently incarcerated; is that

01:10PM   19  correct?

01:10PM   20  A    Correct.

01:10PM   21  Q    Who are you in the custody of?

01:10PM   22  A    I'm in the custody of United States Marshals.

01:10PM   23  Q    How long have you been in custody?

01:10PM   24  A    Almost five years.

01:10PM   25  Q    Why are you in custody?

01:10PM    1    A    I pled guilty to this charge.

01:11PM    2    Q    What charge are you referring to?

01:11PM    3    A    Racketeering conspiracy.

01:11PM    4    Q    When did you plead guilty to that charge?

01:11PM    5    A    December 2020.

01:11PM    6    Q    Is that a felony charge you pled guilty to?

01:11PM    7    A    Yes.

01:11PM    8    Q    Were you represented by counsel at the time that you

01:11PM    9    entered that guilty plea?

01:11PM    10    A    Yes.

01:11PM    11    Q    Who is your attorney?

01:11PM    12    A    Max Mizono.

01:11PM    13    Q    Is Mr. Mizono an attorney here in Honolulu?

01:11PM    14    A    Yes.

01:11PM    15    Q    Has Mr. Mizono represented you throughout your -- the

01:11PM    16    proceedings?

01:11PM    17    A    Yes.

01:11PM    18    Q    Including up to today?

01:11PM    19    A    Yes.

01:11PM    20    Q    Did Mr. Mizono advise you as to the possible or applicable

01:11PM    21    guideline range that you would be facing for pleading guilty to

01:11PM    22    racketeering conspiracy?

01:11PM    23    A    Yes.

01:11PM    24    Q    What is your understanding of what you could be facing for

01:11PM    25    pleading guilty to that charge?

01:11PM   1   A     Life.

01:11PM   2   Q     Pursuant to your plea agreement, are you facing a specific

01:12PM   3   maximum penalty?

01:12PM   4   A     Yes.

01:12PM   5   Q     What is that maximum?

01:12PM   6   A     Twenty years.

01:12PM   7   Q     So that's less than the applicable guideline range you

01:12PM   8   talked about.

01:12PM   9   A     Yes.

01:12PM  10   Q     Did you pleading guilty to racketeering conspiracy

01:12PM  11   pursuant to what's called an information?

01:12PM  12   A     Yes.

01:12PM  13   Q     Did you waive your right to be indicted and instead pled

01:12PM  14   guilty to that information?

01:12PM  15   A     Yes.

01:12PM  16   Q     What is your understanding of the general terms of your

01:12PM  17   plea agreement that you entered into with the government?

01:12PM  18   A     I pled guilty to -- to a racketeering conspiracy.  I

01:12PM  19   agreed that I committed those crimes under racketeering law.

01:12PM  20   Q     Okay.  Were there any charges that were dismissed or any

01:12PM  21   other promises made to you as part of that plea agreement?

01:12PM  22   A     Yes.

01:12PM  23   Q     Could you describe what those are?

01:12PM  24   A     Drugs and firearms and kidnapping.

01:12PM  25   Q     Okay.  Did the plea agreement also cap your sentence at

01:13PM   1    20 years, as I think you testified to a moment ago?

01:13PM   2    A    Yes.

01:13PM   3    Q    Under the plea agreement do you have the right to request

01:13PM   4    a sentence even below 20 years?

01:13PM   5    A    Yes.

01:13PM   6    Q    Are you familiar with the term "acceptance of

01:13PM   7    responsibility"?

01:13PM   8    A    Yes.

01:13PM   9    Q    Did the plea agreement award you any sort of benefit for

01:13PM   10   acceptance of responsibility?

01:13PM   11   A    They -- they went down three points on me.

01:13PM   12   Q    And that's in the calculation of your guideline range?

01:13PM   13   A    Yes.

01:13PM   14   Q    Did your plea agreement include a cooperation agreement?

01:13PM   15   A    Yes.

01:13PM   16   Q    Could you explain basically the general terms of your

01:13PM   17   cooperation agreement.

01:13PM   18   A    Testify truthfully, cooperate with law enforcement, and

01:13PM   19   tell the truth.

01:13PM   20   Q    Are you testifying today freely and voluntarily?

01:13PM   21   A    Yes.

01:13PM   22   Q    Has anyone threatened or coerced you in any way in order

01:13PM   23   to get you to testify today?

01:13PM   24   A    No.

01:13PM   25   Q    What are you hoping to gain from testifying in this

01:14PM    1    matter?

01:14PM    2    A    A lower sentence.

01:14PM    3    Q    What will determine if you do in fact receive a lower

01:14PM    4    sentence?

01:14PM    5         Is there a process that will -- that determines

01:14PM    6    whether or not that happens in the end?

01:14PM    7    A    Yes.

01:14PM    8    Q    Okay.  Do you know what that -- those steps are?

01:14PM    9    A    I forgot.

01:14PM    10    Q    Okay.  We'll come back to it in a minute.

01:14PM    11         Do you recall who makes the decision -- final decision

01:14PM    12    as to whether or not you do in fact receive a lower sentence?

01:14PM    13    A    Yes.

01:14PM    14    Q    Who is that?

01:14PM    15    A    The judge.

01:14PM    16    Q    Have you been promised or guaranteed a reduced sentence by

01:14PM    17    anyone from the government in this case?

01:14PM    18    A    No.

01:14PM    19    Q    Have you been promised anything in return for your

01:14PM    20    testimony in this case?

01:14PM    21    A    No.

01:14PM    22    Q    Did you previously testify before what's called a grand

01:14PM    23    jury in this matter, sir?

01:14PM    24    A    Yes.

01:14PM    25    Q    Do you recall when you testified before the grand jury?

01:15PM   1    A    2019, about mid-2019.

01:15PM   2    Q    Okay.  Do you recall were you under oath during that

01:15PM   3    testimony?

01:15PM   4    A    Yes.

01:15PM   5    Q    Do you recall if you were also under penalty of perjury if

01:15PM   6    you testified dishonestly during that proceeding?

01:15PM   7    A    Yes.

01:15PM   8    Q    Were you represented at that time by your counsel you

01:15PM   9    referred to, Mr. Mizono?

01:15PM   10   A    Yes.

01:15PM   11   Q    Prior to coming to court today, did you have access to the

01:15PM   12   grand jury transcript of your testimony from --

01:15PM   13   A    Yes.

01:15PM   14   Q    And have you reviewed that particular grand jury

01:15PM   15   transcript?

01:15PM   16   A    Yes.

01:15PM   17   Q    Does that transcript accurately reflect your statements to

01:15PM   18   the grand jury on that day in the summer of 2019?

01:15PM   19   A    Yes.

01:15PM   20   Q    So let me go back and ask you a couple of questions about

01:15PM   21   your plea agreement.  Now, you mentioned that you pled guilty

01:15PM   22   to racketeering conspiracy, correct?

01:15PM   23   A    Yes.

01:15PM   24   Q    Did you also admit to being a member of the Miske

01:15PM   25   Enterprise?

01:15PM   1    A    Yes.

01:15PM   2    Q    Were there other members of the Miske Enterprise that you

01:16PM   3    agreed to commit the racketeering offenses you referenced

01:16PM   4    earlier?

01:16PM   5    A    Yes.

01:16PM   6    Q    Who are some of those people?

01:16PM   7    A    Myself, Mike Miske, Jake Smith, Harry Kauhi, Lance

01:16PM   8    Bermudez.

01:16PM   9    Q    Okay.  In your view, was there a leader of this

01:16PM   10   enterprise?

01:16PM   11   A    Yes.

01:16PM   12   Q    Who was that?

01:16PM   13   A    Mike Miske.

01:16PM   14   Q    Is there any doubt from your knowledge or your experience

01:16PM   15   as to who the leader of the Miske Enterprise was?

01:16PM   16   A    No.

01:16PM   17   Q    Do you see the individual you identified as the leader of

01:16PM   18   the Miske Enterprise in court today?

01:16PM   19   A    Yes.

01:16PM   20   Q    Could you identify where that person is seated and what

01:16PM   21   they're wearing for the record, please.

01:16PM   22   A    He is over there, gray long sleeve, collared shirt on.

01:16PM   23            MR. INCIONG:  Your Honor, may the record reflect that

01:16PM   24   Mr. Miller has identified Michael Miske?

01:16PM   25            THE COURT:  Yes, the record should reflect the

01:17PM   1   witness, Mr. Miller's identification of the defendant

01:17PM   2   Mr. Miske.

01:17PM   3            MR. INCIONG:  Thank you, Your Honor.

01:17PM   4   BY MR. INCIONG:

01:17PM   5   Q    How did you -- or how do you know Mr. Miske, sir?

01:17PM   6   A    We grew up in the same town.

01:17PM   7   Q    What town -- what town is that.

01:17PM   8   A    Waimanalo.

01:17PM   9   Q    That's here on the island of Oahu?

01:17PM  10   A    Yes.

01:17PM  11   Q    For members of the jury that are from our neighbor islands

01:17PM  12   who may not be familiar, could you describe where or what part

01:17PM  13   of the island that is?

01:17PM  14   A    On the east side of the island, small town, one road, one

01:17PM  15   stoplight, one blinking light.

01:17PM  16   Q    About how old were you when you met Mr. Miske?

01:17PM  17   A    I was in my teens.

01:17PM  18   Q    What year were you born?

01:17PM  19   A    '83.

01:17PM  20   Q    So this would have been in the mid to late '90s?

01:17PM  21   A    Yes.

01:17PM  22   Q    Do you recall how you first became -- knew Mr. Miske or

01:17PM  23   how you got to meet him?

01:17PM  24   A    Being from a small town, you -- you really hear about

01:18PM  25   people before you -- before you meet them.  And, yeah, we just

01:18PM   1    heard about each other.  We started meeting each other

01:18PM   2    through -- through mutual friends and created a relationship

01:18PM   3    from that.

01:18PM   4    Q    Okay.  So what was one of the first things that you

01:18PM   5    noticed or knew about Mr. Miske growing up in Waimanalo?

01:18PM   6    A    He always had -- he always had nice -- nice things, nice

01:18PM   7    cars, nice -- nice bikes, old school cars.  He always had nice

01:18PM   8    stuff.

01:18PM   9    Q    Okay.  Did that catch your attention?

01:18PM  10    A    Yes.

01:18PM  11    Q    Now, how would you -- well, before I ask you that, was

01:18PM  12    Mr. Miske your age?

01:18PM  13    A    No.

01:18PM  14    Q    Older than you, younger than you?

01:18PM  15    A    Older.

01:18PM  16    Q    How much older?

01:18PM  17    A    About ten years.

01:18PM  18    Q    So if you were in your teens when you first met him, then

01:19PM  19    he was in his 20s?

01:19PM  20    A    Yes.

01:19PM  21    Q    What were some of the kind of earliest conversations that

01:19PM  22    you recall having with Mr. Miske?

01:19PM  23    A    I used to -- when I was younger, he always used to -- he

01:19PM  24    used to school me.  You know, like I was -- I was young.  I was

01:19PM  25    doing -- I was doing a lot of little petty crimes, stealing

01:19PM  1   from tourists, robbing tourists at the beach, you know.

01:19PM  2            And when I used to talk to him, he used to be like,

01:19PM  3   "'eh, why you -- why you keep doing these little -- little

01:19PM  4   petty crimes here and there, you know.  Trying to target people

01:19PM  5   that matter, you know, like he always used to -- he used to

01:19PM  6   always like shoot -- shoot that kind of stuff to me.

01:19PM  7   Q    Okay.  So what did -- what did you understand him to mean

01:19PM  8   when he said "target people that matter"?  What are people that

01:19PM  9   matter?

01:19PM  10  A    Target people that -- that you don't gotta -- I don't

01:20PM  11  gotta -- I don't gotta rob somebody every day for a little bit

01:20PM  12  of money, you know.  Target bigger drug dealers that giving

01:20PM  13  smaller drug dealers some -- some drugs and like that, yeah.

01:20PM  14  Q    So the advice was these people had more money?

01:20PM  15  A    Yes.

01:20PM  16  Q    Okay.  Was there any other advantage to -- you said

01:20PM  17  robbing drug dealers, any other advantage to robbing that kind

01:20PM  18  of target?

01:20PM  19  A    Yes.

01:20PM  20  Q    What was that?

01:20PM  21  A    He told me like -- you know, like drug dealers, they're

01:20PM  22  not going to really call the cops, so, you know.  They cannot

01:20PM  23  really cause heat like -- like robbing tourists or robbing cars

01:20PM  24  and shit like that.

01:20PM  25  Q    So let me go back a little bit in time.  You said that you

01:20PM  1  were doing petty crimes at a young age, correct?

01:20PM  2  A     Yes.

01:20PM  3  Q     How young are we talking about?

01:20PM  4  A     Young.  I was doing it at a -- at a young age.  Elementary

01:20PM  5  school.

01:21PM  6  Q     Okay.  Tell the jury about your -- your home life and your

01:21PM  7  family life at that time.

01:21PM  8  A     Oh, family life wasn't -- wasn't great.  Wasn't -- I like

01:21PM  9  to say I raised myself.  They never -- my parents never told me

01:21PM  10  I was doing wrong or I was doing right, you know, whatever.  I

01:21PM  11  was made to make decisions on my own and -- and figure out

01:21PM  12  basically if that was right or wrong on my own.

01:21PM  13  Q     Okay.  Did the decision whether you go to school

01:21PM  14  regularly, was that left up to you?

01:21PM  15  A     Yes.

01:21PM  16  Q     And how did you decide?

01:21PM  17  A     I mean they would -- they would send me to school, but I

01:21PM  18  was -- I would go to school, and I just knew school wasn't for

01:21PM  19  me.  You know, so I -- I would constantly leave school

01:21PM  20  basically every day, you know.  And I would find out like the

01:21PM  21  only way your parents would find out is if the school calls

01:22PM  22  home, and at that time it was answering machines.  So all you

01:22PM  23  had to do was go home, erase the message from the school, and

01:22PM  24  they would never find out.

01:22PM  25  Q     So your parents were not aware you are skipping school

01:22PM    1    regularly?

01:22PM    2    A    No.

01:22PM    3    Q    What were you doing when you were supposed to be in school

01:22PM    4    and you were -- you were not there?

01:22PM    5    A    I mean, I started off innocent.  That was probably the

01:22PM    6    worst thing I was doing at the time then.  I was going to the

01:22PM    7    beach.  I was cutting school, going to the beach.  And so in my

01:22PM    8    teens started off like that.  I was going to the beach just to

01:22PM    9    go to the beach, boogie board.

01:22PM    10   Q    Okay.  But did that change?

01:22PM    11   A    Yes.

01:22PM    12   Q    What did that change to?

01:22PM    13   A    Well, I was at the beach.  I always -- I used to play

01:22PM    14   sports at that time, so I was used to -- even if I was playing

01:22PM    15   sports, I was still watching people.  Like people in my

01:22PM    16   neighborhood was stealing from cars, stealing from tourists and

01:23PM    17   everything like that.

01:23PM    18          So when I started going to the beach, even though my

01:23PM    19   attention was just to go to the beach, I started looking like,

01:23PM    20   Hey, these tourists are just leaving their bags, I can go over

01:23PM    21   and steal stuff from them, you know.  And progressed from

01:23PM    22   there.  I started going to the beach just to steal from them at

01:23PM    23   that point, you know.  And I was still young.  I'm not even --

01:23PM    24   you know, I'm not even in my teens yet, and that's what --

01:23PM    25   that's what it progressed to.

01:23PM    1    Q    Okay.  So going to the beach became not just going to the

01:23PM    2    beach, you were going there to steal from tourists.

01:23PM    3    A    Yeah.  Not even going to the beach to -- to bodysurf and

01:23PM    4    to -- you know.  At that time I never had money, you know, so I

01:23PM    5    was -- we was grabbing -- we was going to boogie board, but I

01:23PM    6    never have one boogie, so I had to steal a tray from

01:23PM    7    MacDonald's or something and use that.  So when I started

01:23PM    8    stealing from tourists, I could buy my own board, I could buy

01:23PM    9    fins, buy my friends some stuff.  I was young.

01:24PM    10   Q    Okay.  Did it stop there or did that lead to bigger

01:24PM    11   things?

01:24PM    12   A    Yeah, from there it just got worse from there.

01:24PM    13   Q    Okay.  What do you mean by "worse"?  Tell us what things

01:24PM    14   you're talking about.

01:24PM    15   A    I started stealing -- I started stealing cars from there.

01:24PM    16   I started going to -- I started traveling to different --

01:24PM    17   different beaches, stealing from houses, robbing houses.  Yeah,

01:24PM    18   just -- just got worse from there.

01:24PM    19   Q    Okay.  Now, was this about the time that -- then that you

01:24PM    20   met Mr. Miske that you referenced?

01:24PM    21   A    Yes.

01:24PM    22   Q    So how would you describe your relationship with Mr. Miske

01:24PM    23   after you had gotten to know him and he had given you this --

01:24PM    24   this advice about picking people that mattered?

01:24PM    25   A    Like I say, our relationship started off great, you know.

01:24PM   1    I was -- I was somebody.  He was somebody I looked up to.  You

01:25PM   2    know, he had -- even though it was -- was negative feedback to

01:25PM   3    you guys, to me my life revolved around that, you know.  I

01:25PM   4    mean, around committing crimes, you know.  My -- my ideal of

01:25PM   5    doing good throughout my whole life, all up until I caught this

01:25PM   6    case, was -- was just not getting caught.  You know.  So that

01:25PM   7    was my -- that was my -- that was mindset, you know, pretty

01:25PM   8    much throughout my whole life.

01:25PM   9              Meeting Mike, yeah, I mean it was great.  Our

01:25PM  10    relationship was great.  Every time I seen him, we had mutual

01:25PM  11    friends.  We had great -- I had great times with him.  Great,

01:25PM  12    great times with him, you know.  Went from talking -- we went

01:25PM  13    from just knowing mutual friends to talking, to talking more,

01:26PM  14    to talking more, hanging out more.  He would invite me to his

01:26PM  15    house.  Let me drive his cars.  Let me ride his bikes.  You

01:26PM  16    know.  Sleep on his couch.

01:26PM  17              I used to -- at his house, I used to go over there.  I

01:26PM  18    mean it was simple.  He had frozen rice balls in his freezer,

01:26PM  19    we used to pop them in the microwave, put some canned goods on

01:26PM  20    top of that.  I mean always talking, always -- always joking,

01:26PM  21    always laughing.  But our conversations started getting deeper

01:26PM  22    and deeper.

01:26PM  23    Q    Okay.  So at this point, I mean how would you describe

01:26PM  24    your relationship then?  Was he like a big brother to you, a

01:26PM  25    father figure, a close friend?  How would you describe it?

01:26PM    1    A    I would say -- I would say all of the above.  You know.

01:26PM    2    Q    Is it hard for you testifying here today?

01:27PM    3    A    Yes.  Very hard.

01:27PM    4    Q    Tell the jury why.

01:27PM    5    A    I was -- I was -- I knew this guy a long, long time.  Very

01:27PM    6    close with him, very close with -- with his son.  Yeah, it

01:27PM    7    was -- it was hard.  I never thought it was going to be this

01:27PM    8    hard, but it's even harder now that I'm actually sitting here.

01:27PM    9    Q    Okay.  You said that --

01:27PM   10    A    It's hard -- hard to testify against somebody that -- that

01:27PM   11    you was so close to for very, very long time.

01:27PM   12    Q    You're 40 now, you said, right?

01:27PM   13    A    Forty, yes.

01:27PM   14    Q    So you met him in your teens, so you've known him at least

01:27PM   15    25 years.  Is that accurate?

01:27PM   16    A    Yes.

01:27PM   17    Q    And you said one of the things that stood out to you or

01:27PM   18    made you notice Mr. Miske was he always had nice things.

01:27PM   19    A    Yes.

01:27PM   20    Q    So what do you mean by nice things?

01:28PM   21    A    Like I said earlier, he always had -- always had nice

01:28PM   22    stuff.  He always had the nicest cars, the nicest -- the nicest

01:28PM   23    trucks, the nicest bikes.  You know, I seen him with a nice

01:28PM   24    car, I wanted the same car.  I seen him with a Mercedes, I

01:28PM   25    wanted one Mercedes.  I seen him with a bike -- I am not

01:28PM   1    talking bicycle.  I'm talking like -- like choppers, you know,

01:28PM   2    like real nice bikes.

01:28PM   3    Q     Motorcycles?

01:28PM   4    A     Motorcycles, yeah.

01:28PM   5    Q     Did you ever see Mr. Miske carrying large quantities of

01:28PM   6    cash, money?

01:28PM   7    A     Yeah, on him he always had -- he always had wads of cash

01:28PM   8    on him, like at least a wad of cash on him.  He keep one wad of

01:28PM   9    cash, I would say that big.  Big bills in the middle.  He get

01:28PM   10   his license, couple of cards or whatever he was carrying,

01:28PM   11   rubber band around the -- around the stack like that.  At all

01:29PM   12   times until -- as long as I known him, I always seen him with

01:29PM   13   that till -- till the last days that I seen him.

01:29PM   14   Q     Now, would you say that when you became this -- you know,

01:29PM   15   your relationship got to this level of closeness that you

01:29PM   16   described, did your outlook on life change in any way?

01:29PM   17   A     Yes.

01:29PM   18   Q     Tell the jury how.

01:29PM   19   A     I was just -- at that time I was being -- I was -- I was

01:29PM   20   open to listening and doing more and more worse shit.  You

01:29PM   21   know.  I don't know -- I don't know how else for say 'em.  I no

01:29PM   22   like swear in front of you guys, but --

01:29PM   23   Q     Okay.  So you said before you were looking basically --

01:29PM   24   what was important to you was not to get caught, correct?

01:29PM   25   A     Yes.  That was -- that was me telling myself I'm doing

01:30PM   1   good by just not getting caught.  To me not getting caught was

01:30PM   2   actually doing good in life.  You know.  Like that was -- that

01:30PM   3   was how messed up my -- my thinking was.

01:30PM   4   Q    So when he counseled you and told you that you should pick

01:30PM   5   these people that mattered, did you view that as being good --

01:30PM   6   good advice as a way not to get caught?

01:30PM   7   A    Yes.

01:30PM   8   Q    So did you ever follow that advice and actually carry out

01:30PM   9   any crimes against drug dealers that he -- he recommended?

01:30PM  10   A    Yes.

01:30PM  11   Q    On more than one occasion?

01:30PM  12   A    Yeah, I cannot -- I cannot be specific.  It was a long

01:30PM  13   time -- long, long time ago.

01:30PM  14   Q    Okay.  So without knowing any specifics, but you did --

01:30PM  15   you did do that at that time?

01:30PM  16   A    Yeah, yeah.  But I was -- I was doing -- I was doing a lot

01:31PM  17   of stuff during that time, so...

01:31PM  18   Q    So during that period were you aware of -- was Mr. Miske

01:31PM  19   employed?  Did he have any businesses he was running at the

01:31PM  20   time?

01:31PM  21   A    Well, he was -- he was working at the -- he was working at

01:31PM  22   the movies, but he had on -- he had -- he had a few shops.  He

01:31PM  23   had a tint shop, and then after that he had -- he had Kama'aina

01:31PM  24   fumigation termite.

01:31PM  25   Q    Kama'aina Termite and Pest Control?

01:31PM    1    A    Yes.

01:31PM    2    Q    Did that come later or was that --

01:31PM    3    A    Yes.

01:31PM    4    Q    -- or did that exist at the time you met him?

01:31PM    5    A    No, no, just...

01:31PM    6    Q    Okay.  So when you say working for the movies, explain

01:31PM    7    what that means to the jury.

01:31PM    8    A    Working transportation like moving equipment to where --

01:31PM    9    to where they film at and -- yeah, stuff like that.  Transport

01:32PM   10    anything that they got to do at the -- on the movie sets.

01:32PM   11    Q    Is this a union job?

01:32PM   12    A    Yes.

01:32PM   13    Q    And the tint shop, you said he was running a tint shop?

01:32PM   14    A    Yes.

01:32PM   15    Q    You mean window tinting on vehicles?

01:32PM   16    A    Yes.

01:32PM   17    Q    Do you know where that was located?

01:32PM   18    A    Queen Street.

01:32PM   19    Q    In Honolulu?

01:32PM   20    A    Yes.

01:32PM   21    Q    So opposite side of Waimanalo where -- where you grew up.

01:32PM   22    A    Yes, Downtown area by Ward -- by that Ward area right

01:32PM   23    down -- I don't know if you guys are familiar with that, but

01:32PM   24    used to have Sports Authority, McDonald's, and that area.

01:32PM   25    Q    Okay.  All right.

01:32PM    1    A    One gas station.

01:32PM    2    Q    So after -- after you committed these robberies of the

01:32PM    3    drug dealers, did you tell Mr. Miske you had done those or was

01:32PM    4    he aware that you were -- you had followed his advice?

01:32PM    5              MR. KENNEDY:  Objection on relevance, Your Honor.

01:32PM    6              THE COURT:  Overruled.

01:32PM    7              Go ahead.

01:32PM    8              THE WITNESS:  Huh?

01:32PM    9              THE COURT:  Go ahead, you can answer the question.

01:32PM    10             THE WITNESS:  Oh.  What was the question again?

01:32PM    11   BY MR. INCIONG:

01:32PM    12   Q    Was Mr. Miske aware, either from you telling him or

01:33PM    13   otherwise, that you had been robbing drug dealers now that he

01:33PM    14   had recommended it?

01:33PM    15             MR. KENNEDY:  Objection.  Hearsay.

01:33PM    16             THE COURT:  Overruled.  Go ahead.

01:33PM    17             THE WITNESS:  Say that again now.

01:33PM    18   BY MR. INCIONG:

01:33PM    19   Q    Did Mr. Miske know that you were robbing these drug

01:33PM    20   dealers as you had discussed with him?

01:33PM    21   A    Yes.

01:33PM    22   Q    Did you have discussions with him then about more serious

01:33PM    23   crimes after that?

01:33PM    24   A    Yes.

01:33PM    25   Q    Tell us about that.

01:33PM   1   A    So I would say around -- around those times right there,

01:33PM   2   we were already -- we were already in the 2000s, right?  So I

01:33PM   3   think our relationship grew, it was at the strongest I think

01:33PM   4   has ever been.  And this is in the 2000s already.

01:33PM   5        So he's -- at that point he's fully got my -- whatever

01:33PM   6   he said was -- was right, you know, even if it was wrong,

01:33PM   7   whatever he said was right in my eyes.  So he would -- he would

01:34PM   8   shoot stuff to me like, Hey, what you think about -- what you

01:34PM   9   think hitting a home run or something like that, you know.  And

01:34PM  10   saying "home run" is referring to -- to killing somebody.  You

01:34PM  11   know.  And I would look at him, and at that time I was like,

01:34PM  12   Why not?  You know.  So...

01:34PM  13   Q    Were you surprised that he asked you that?

01:34PM  14   A    No.

01:34PM  15   Q    Did you know immediately what he meant by the term, quote,

01:34PM  16   home run?

01:34PM  17   A    Yes.

01:34PM  18   Q    How did you know what he meant by home run?

01:34PM  19   A    Like I said, I think our -- our relationship was the

01:34PM  20   strongest it has ever been at that -- at that point right

01:34PM  21   there.  You know, like he can -- he can tell me one word, and I

01:34PM  22   would -- I would figure out the terms that he was using, and

01:35PM  23   vice versa with him too.

01:35PM  24   Q    Did Mr. Miske use similar terms or analogies with you like

01:35PM  25   home run?

01:35PM  1   A     Yes, he would -- I mean he would -- in terms -- in terms

01:35PM  2   of baseball, first base.  Hey, first base somebody, knocking

01:35PM  3   somebody out.  Second base, bat somebody down.  Third base,

01:35PM  4   they just redline them, put them in the hospital, don't kill

01:35PM  5   'em.  You know, that was phrases that -- that he would use.

01:35PM  6   He -- and when he used first, second, or third or fourth

01:35PM  7   base -- I mean home run, that would be the meaning of that, of

01:35PM  8   those terms.

01:35PM  9   Q     So when you answered Mr. Miske, Yeah, why not, if you were

01:35PM  10  willing to do a home run, what was his reaction?

01:35PM  11  A     He got -- he got all excited.  He got excited.  He was --

01:35PM  12  he was happy to hear that I was -- that I was agreeing with

01:35PM  13  him.

01:36PM  14  Q     Did your relationship change after that?

01:36PM  15  A     Yes.

01:36PM  16  Q     How so?

01:36PM  17  A     Huh?

01:36PM  18  Q     How did your relationship change after that specific

01:36PM  19  question and answer?

01:36PM  20  A     It got -- just got -- continued to get stronger.

01:36PM  21  Continued to grow, continued to -- yeah, we was having deep

01:36PM  22  conversations, you know, at that -- during those times.  But...

01:36PM  23  Q     So at that point was the home run or any of the bases, was

01:36PM  24  that just conversation or did he actually ask you to carry out

01:36PM  25  anything with any specific person?

01:36PM  1  A    Oh, during the time -- this is long time ago.  So -- so

01:36PM  2  towards that point he always hated -- so I can remember this --

01:36PM  3  this really all I can remember from those times, you know, but

01:36PM  4  he always hated Joe Boy.  You know, this -- this --

01:36PM  5  Q    Who is Joe Boy?

01:36PM  6  A    This guy from our hometown, he live in the same town as

01:37PM  7  us, Joe Boy Tavares.  You know.

01:37PM  8  Q    Did you know who Joe Boy Tavares was?

01:37PM  9  A    Yes.

01:37PM  10  Q    Why did Mr. Miske say he hated Joe Boy Tavares?

01:37PM  11  A    This is -- this is a long time ago.  He just always hate

01:37PM  12  -- that's somebody that he just always hated.  Ever since I

01:37PM  13  could remember, he just hated this guy.  Might have many

01:37PM  14  reasons.  If -- if I can think of one, him saying that -- that

01:37PM  15  he was fooling around with one of his girlfriends or something

01:37PM  16  like that, you know.

01:37PM  17  Q    Did he ask you to take any action regarding Joe Boy

01:37PM  18  Tavares?

01:37PM  19  A    Yeah, he told me -- he used to tell me -- this is long

01:37PM  20  time ago, so I'm phrasing as best as I can.  But he used tell

01:37PM  21  me, 'eh, you always in Nalo.  Which is our hometown.  I'm

01:37PM  22  always there.

01:37PM  23         This guy goes chicken fights every week, he got to

01:38PM  24  come home.  There's only few roads that he can come home

01:38PM  25  through.  You know.  Keep -- keep an eye on him, you know.  Let

01:38PM    1   me know what he -- hey, he go over here, he come home this way

01:38PM    2   every time.  You know, I see him over here, let him know.

01:38PM    3   Stuff like that.

01:38PM    4   Q    So when you say "Nalo," you are referring to Waimanalo.

01:38PM    5   A    Yes.

01:38PM    6   Q    That's a nickname for Waimanalo.

01:38PM    7   A    Yeah, that's the last -- that's the last four letters

01:38PM    8   of -- of where we from.

01:38PM    9   Q    So you were basically keeping tabs on Joe Boy Tavares for

01:38PM   10   him.

01:38PM   11   A    Yes.

01:38PM   12   Q    Would you report back to him and tell him where you had

01:38PM   13   seen him or what --

01:38PM   14   A    Yeah, I would -- I would report -- I will tell him some

01:38PM   15   stuff.  I would tell him, Yeah, I seen him over here.  He

01:38PM   16   mainly take this road, you know, stuff like that.  What he was

01:38PM   17   driving.  And then he would come back to me telling me like,

01:38PM   18   Hey, this is where he works and -- yeah.

01:38PM   19   Q    Okay.  So during that period, the late '90s going up to

01:39PM   20   the early 2000s, was it anything ever more than that, than just

01:39PM   21   keeping tabs?

01:39PM   22   A    No, we just -- we just -- we close, but he just -- you

01:39PM   23   know what I mean, he just testing the waters at that time to

01:39PM   24   see how far we can go with that.

01:39PM   25   Q    Okay.

01:39PM    1                    THE COURT:  Mr. Inciong, we're about ten minutes over.
01:39PM    2    Would now be a good time?
01:39PM    3                    MR. INCIONG:  That's fine, Your Honor.
01:39PM    4                    THE COURT:  All right.  So we are about 1:40 in the
01:39PM    5    afternoon, and at this point our 17-person jury I think will
01:39PM    6    recess for the day.  Tomorrow morning we'll start at 8:30.
01:39PM    7    Mr. Miller will retake the stand on direct examination.
01:39PM    8                    So as we go to break, I'll remind each of you once
          9    again to refrain from discussing the substance of this case
         10    with anyone, including each another; to refrain from accessing
         11    any media or other accounts of this case that may be out there;
         12    and then finally, please do not conduct any independent
         13    investigation into the facts, persons involved, or
01:39PM   14    circumstances.
01:39PM   15                    We'll see you tomorrow morning at 8:30.
01:40PM   16                    (Proceedings were concluded at 1:40 p.m.)
         17
         18
         19
         20
         21
         22
         23
         24
         25

1                COURT REPORTER'S CERTIFICATE

2            I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript from the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9

10            DATED at Honolulu, Hawaii, March 28, 2024.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25