1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,     )      CRIMINAL NO. 19-00099-DKW
4                                  )
                 Plaintiff,        )      Honolulu, Hawaii
5                                  )
            vs.                    )      January 30, 2024
6                                  )
     MICHAEL J. MISKE, JR.,        )
7                                  )
                 Defendant.        )
8    _____ )

9
                    TRANSCRIPT OF JURY TRIAL (DAY 14)
10              BEFORE THE HONORABLE DERRICK K. WATSON,
            CHIEF UNITED STATES DISTRICT COURT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:          MARK INCIONG, ESQ.
                                 MICHAEL DAVID NAMMAR, ESQ
14                               WILLIAM KE AUPUNI AKINA, ESQ.
                                 Office of the United States Attorney
15                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii  96850

17   For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop St., Ste 2201
18                               Honolulu, HI 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, NV 89501

22
     Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
23                               United States District Court
                                 300 Ala Moana Boulevard
24                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1                          I N D E X

2
GOVERNMENTS WITNESSES:                                    PAGE NO.

3
    WAYNE MILLER (CONTINUED EXAMINATION)

4
        RESUMED DIRECT EXAMINATION BY MR. INCIONG        5

5

6

7    EXHIBITS:                                            PAGE NO.

8    Exhibit 1-15-C was received in evidence                7
     Exhibit 3-2 was received in evidence                  9
9    Exhibit 1-763 was received in evidence               19
     Exhibits 9-110 and 9-111 were received in evidence   37
10   Exhibit 9-112 was received in evidence               40
     Exhibit 4-60 was received in evidence                48
11   Exhibit 4-62 was received in evidence                49
     Exhibit 4-61 was received in evidence                51
12   Exhibit 1-854 was received in evidence               52
     Exhibit 9-008 was received in evidence               59
13   Exhibit 9-114 was received in evidence               78
     Exhibit 9-115 was received in evidence               81
14   Exhibit 1-59 was received in evidence                98
     Exhibit 1-1023 was received in evidence             102
15   Exhibit 1-856 was received in evidence              105
     Exhibit 1-44 was received in evidence               111
16   Exhibit 1-1079 was received in evidence             112
     Exhibit 1-1080 was received in evidence             113
17   Exhibit 1-1081 was received in evidence             114
     Exhibit 4-107 was received in evidence              127
18   Exhibit 4-110 was received in evidence              128
     Exhibit 4-108 was received in evidence              129
19   Exhibit 1-66 was received in evidence               130
     Exhibit 7-005 was received in evidence              147
20   Exhibit 7-006 was received in evidence              148
     Exhibit 7-008 was received in evidence              153
21   Exhibit 7-008-A was received in evidence            154
     Exhibit 7-010 was received in evidence              156

22

23

24

25

1                    I N D E X (CONTINUED)

2    EXHIBITS:                                        PAGE NO.

3

     Exhibit 7-010-A was received in evidence         157
4    Exhibit 7-011 was received in evidence           158
     Exhibit 7-011-A was received in evidence         159
5    Exhibit 7-014 was received in evidence           160
     Exhibit 7-014-A was received in evidence         161
6    Exhibit 7-008-C was received in evidence         163
     Exhibit 7-008-D was received in evidence         166
7    Exhibit 7-008-E was received in evidence         176
     Exhibit 7-13-D was received in evidence          180
8    Exhibit 7-14-C was received in evidence          184
     Exhibit 7-14-D was received in evidence          186
9    Exhibit 7-17 was received in evidence            199
     Exhibit 7-23 was received in evidence            201
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | January 30, 2024                                          8:30 a.m. |
| 08:30AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:30AM | 3 | States of America versus Michael J. Miske, Jr. |
| 08:30AM | 4 | This case has been called for jury trial, Day 14. |
| 08:30AM | 5 | Counsel, please make your appearances for the record. |
| 08:30AM | 6 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:30AM | 7 | Michael Nammar and KeAupuni Akina for the United States.  With |
| 08:30AM | 8 | us again are our paralegal Kari Sherman and FBI Special Agent |
| 08:30AM | 9 | Thomas Palmer. |
| 08:30AM | 10 | THE COURT:  Good morning. |
| 08:30AM | 11 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:30AM | 12 | Kennedy here with Lynn Panagakos, Michael Miske, and Ms. King |
| 08:30AM | 13 | is joining us as well this morning. |
| 08:30AM | 14 | THE COURT:  All right.  Good morning to all four of |
| 08:30AM | 15 | you.  You may be seated. |
| 08:30AM | 16 | And good morning to the 17 persons on our jury.  As we |
| 08:30AM | 17 | begin this trial day, I'll remind you where we were.  We |
| 08:30AM | 18 | adjourned yesterday, Mr. Miller had only recently taken the |
| 08:30AM | 19 | stand.  Mr. Inciong was about half an hour, I think it was, |
| 08:30AM | 20 | into his direct examination.  So that is where we will resume |
| 08:30AM | 21 | this morning. |
| 08:30AM | 22 | Mr. Inciong, when you're ready. |
| 08:31AM | 23 | MR. INCIONG:  Thank you, Your Honor. |
| 08:31AM | 24 | WAYNE MILLER, |
| 08:31AM | 25 | (Resumed the stand.) |

| | | |
|---|---|---|
| 08:31AM | 1 | RESUMED DIRECT EXAMINATION |
| 08:31AM | 2 | BY MR. INCIONG: |
| 08:31AM | 3 | Q    Good morning, Mr. Miller. |
| 08:31AM | 4 | A    Good morning. |
| 08:31AM | 5 | Q    So yesterday do you recall one of the first things we |
| 08:31AM | 6 | talked about was the plea agreement that you entered into in |
| 08:31AM | 7 | this case? |
| 08:31AM | 8 | A    Yes. |
| 08:31AM | 9 | THE COURT:  Mr. Inciong, I'm sorry, can I just |
| 08:31AM | 10 | interrupt you one second. |
| 08:31AM | 11 | Mr. Miller, I will remind you we did not ask you to |
| 08:31AM | 12 | retake the same oath that you took yesterday, but I will remind |
| 08:31AM | 13 | you that you remain subject to that oath.  Do you understand |
| 08:31AM | 14 | that? |
| 08:31AM | 15 | THE WITNESS:  Yes. |
| 08:31AM | 16 | THE COURT:  Okay.  I apologize. |
| 08:31AM | 17 | MR. INCIONG:  No problem.  Thank you. |
| 08:31AM | 18 | BY MR. INCIONG: |
| 08:31AM | 19 | Q    Do you recall discussing your plea agreement, Mr. Miller? |
| 08:31AM | 20 | A    Yes. |
| 08:31AM | 21 | Q    And what was the charge that you pled guilty to in that |
| 08:31AM | 22 | plea agreement? |
| 08:31AM | 23 | A    Racketeering conspiracy. |
| 08:31AM | 24 | Q    Were there some specific racketeering acts that you |
| 08:31AM | 25 | admitted to as part of your plea agreement? |

08:31AM  1    A    Yes.

08:31AM  2    Q    Can you tell the jury what those were?

08:31AM  3    A    Murder, murder for hire, drugs, kidnapping, obstruction --

08:31AM  4    obstruction of justice.

08:31AM  5    Q    When you say "drugs," are you referring to drug

08:31AM  6    distribution?

08:31AM  7    A    Yes.

08:32AM  8    Q    You also identified Mr. Miske as the leader of the

08:32AM  9    enterprise that you admitted to being a part of as well,

08:32AM  10   correct?

08:32AM  11   A    Yes.

08:32AM  12   Q    Did you agree with Mr. Miske to commit or attempt to

08:32AM  13   commit each of those racketeering acts you just described,

08:32AM  14   murder, murder for hire, kidnapping, drug distribution, and

08:32AM  15   obstruction of justice?

08:32AM  16   A    Yes.

08:32AM  17   Q    You also named a number of other enterprise members that

08:32AM  18   you had agreed with as well yesterday.  Do you recall that?

08:32AM  19   A    Yes.

08:32AM  20   Q    Did you agree with at least some of those members to

08:32AM  21   commit or attempt to commit those same racketeering acts as

08:32AM  22   well?

08:32AM  23   A    Yes.

08:32AM  24   Q    Now, yesterday you talked a little bit about growing up in

08:32AM  25   Waimanalo, correct?

08:32AM   1   A     Correct.

08:32AM   2   Q     So I wanted to show you a couple of maps at this point

08:32AM   3   just to kind of give us a frame of reference, okay?

08:32AM   4         MR. INCIONG:  Your Honor, if we could show to

08:32AM   5   Mr. Miller Exhibit 1-15-C.  This was added in our supplemental

08:32AM   6   exhibit list yesterday.

08:33AM   7         THE COURT:  All right.

08:33AM   8   BY MR. INCIONG:

08:33AM   9   Q     Does that image appear on the screen in front of you, sir?

08:33AM  10   A     Yes.

08:33AM  11   Q     Do you recognize what that is?

08:33AM  12   A     Yes.

08:33AM  13   Q     How do you recognize that?

08:33AM  14   A     This is Oahu, the island.

08:33AM  15   Q     Does that map -- are you also looking -- looking at that

08:33AM  16   are you able to tell where Waimanalo is located on that map?

08:33AM  17   A     Yes.

08:33AM  18         MR. INCIONG:  Your Honor, I would move to admit

08:33AM  19   Exhibit 1-15-C.

08:33AM  20         THE COURT:  Any objection?

08:33AM  21         MR. KENNEDY:  No objection.

08:33AM  22         THE COURT:  Without objection, Exhibit 1-15-C is

08:33AM  23   admitted.  You may publish.

08:33AM  24         (Exhibit 1-15-C was received in evidence.)

08:33AM  25         MR. INCIONG:  Thank you, Your Honor.

| | | |
|---|---|---|
| 08:33AM | 1 | BY MR. INCIONG: |
| 08:33AM | 2 | Q    So if you could -- you can use your finger on the touch |
| 08:33AM | 3 | screen, I believe, Mr. Miller.  If you can just circle or put |
| 08:33AM | 4 | an X on -- on the area of Waimanalo where you described |
| 08:33AM | 5 | yesterday where you grew up. |
| 08:33AM | 6 | A    (Witness complies.) |
| 08:33AM | 7 | Q    Okay.  So just off -- you're off the coast there -- |
| 08:33AM | 8 | A    Yeah. |
| 08:33AM | 9 | Q    -- on the southeast tip of the island? |
| 08:33AM | 10 | A    Yes. |
| 08:33AM | 11 | MR. INCIONG:  Could I have Exhibit 3-2, please, pulled |
| 08:33AM | 12 | up for Mr. Miller only. |
| 08:33AM | 13 | BY MR. INCIONG: |
| 08:34AM | 14 | Q    Do you recognize the map that's shown in Exhibit 3-2, sir? |
| 08:34AM | 15 | A    Yes. |
| 08:34AM | 16 | Q    How do you recognize that? |
| 08:34AM | 17 | A    That's my -- that's my hometown where I grew up. |
| 08:34AM | 18 | Q    Does that -- that map accurately show Waimanalo as you |
| 08:34AM | 19 | know it? |
| 08:34AM | 20 | A    Yes. |
| 08:34AM | 21 | MR. INCIONG:  Your Honor, I would move to admit |
| 08:34AM | 22 | Exhibit 3-2. |
| 08:34AM | 23 | THE COURT:  Any objection? |
| 08:34AM | 24 | MR. KENNEDY:  No objection. |
| 08:34AM | 25 | THE COURT:  Without objection, 3-2 is admitted, and |

08:34AM    1    you may publish.

08:34AM    2                    (Exhibit 3-2 was received in evidence.)

08:34AM    3              MR. INCIONG:  Thank you, Your Honor.

08:34AM    4    BY MR. INCIONG:

08:34AM    5    Q    Now, Mr. Miller, this is the map of Waimanalo, correct?

08:34AM    6    A    Yes.

08:34AM    7    Q    So does this show where you grew up as a boy where you --

08:34AM    8    where you testified about yesterday?

08:34AM    9    A    Yes.

08:34AM   10    Q    Could you indicate approximately, you know, where -- where

08:34AM   11    your neighborhood was on that map?

08:34AM   12    A    I grew up in this area right here (indicating).  I mean

08:34AM   13    this whole town is little, so I grew up right there.

08:34AM   14    Q    Okay.  So --

08:34AM   15    A    Right by that church right there.

08:35AM   16    Q    All right.  So that's right near Kalanianaole Highway?

08:35AM   17    A    Yes.

08:35AM   18    Q    And close to the beach, Waimanalo Beach as well?

08:35AM   19    A    Yes.

08:35AM   20    Q    Okay.  Yesterday you talked about Joe Boy Tavares.  Do you

08:35AM   21    recall that?

08:35AM   22    A    Yes.

08:35AM   23    Q    And you had said that you had kept an eye or kept tabs on

08:35AM   24    Joe Boy Tavares at some point on behalf of Mr. Miske, correct?

08:35AM   25    A    Yes.

08:35AM    1    Q    Where did Joe Boy Tavares live approximately?  If you can

08:35AM    2    show on this map as well.

08:35AM    3         Can you -- can you put a little darker X or bigger X

08:35AM    4    on that spot, just to be sure.  There we go.

08:35AM    5    A    (Witness complies.)

08:35AM    6    Q    So that green circle, that's the approximate area?

08:35AM    7    A    I think so, because no more name, but I'm pretty sure it

08:35AM    8    was right there.

08:35AM    9    Q    Okay.  Do you have -- did you have a term or what you

08:35AM    10   called that part of that area of Waimanalo?

08:35AM    11   A    Yes.

08:35AM    12   Q    What did you call that?

08:35AM    13   A    Back roads.

08:35AM    14   Q    Because is that literally the back of Waimanalo leading

08:36AM    15   right up to only the mountains are behind it?

08:36AM    16   A    Yes.

08:36AM    17   Q    What kind of property did Joe Boy Tavares live on?  Was it

08:36AM    18   home, a ranch or a farm?

08:36AM    19   A    Like one ranch farmhouse.

08:36AM    20   Q    Were there animals that were kept there that you knew

08:36AM    21   about?

08:36AM    22   A    Yes.

08:36AM    23   Q    What kind?

08:36AM    24   A    Chickens.

08:36AM    25   Q    I think when we left off yesterday you talked about you

08:36AM  1    had kind of escalated your crimes.  You had gone from stealing

08:36AM  2    from tourists to doing robberies, robbing from drug dealers.

08:36AM  3    Did any of those robberies involve firearms?  Were you armed

08:36AM  4    during that time?

08:36AM  5    A    Yes.

08:36AM  6    Q    Let me take you to the year 2021 -- actually the very end

08:36AM  7    of the year, December of 2021.  Did you rob a bank at that

08:36AM  8    time?

08:36AM  9    A    December of '21?

08:37AM  10   Q    I'm sorry, 2001.  My mistake.  December 2001.

08:37AM  11   A    Oh, yes.

08:37AM  12   Q    My apologies.  What bank did you rob?

08:37AM  13   A    Bank in Kailua.

08:37AM  14   Q    How did that come about?

08:37AM  15   A    A couple of us, we just -- it wasn't planned or anything.

08:37AM  16   We was at the -- we was at the beach kicking back, and then

08:37AM  17   just talking about 'em, and we just ended up going.  And we

08:37AM  18   just painted the whole --

08:37AM  19   Q    So who is "we," first of all?

08:37AM  20   A    Me, my friend Gavin Koa and Ikaika Garcia.

08:37AM  21   Q    Okay.  So you said it wasn't planned.

08:37AM  22   A    It wasn't planned.

08:37AM  23   Q    So you were at the beach.

08:37AM  24   A    Yeah.

08:37AM  25   Q    So how did -- how did the idea come about then?

08:37AM 1   A    We just was talking, we just -- we just bullshitting
08:37AM 2   around talking about 'em, and then -- first it was only two of
08:37AM 3   us, and then one of my friends was on his way to -- he had to
08:37AM 4   go to some type of prom or something.
08:37AM 5          And then -- so we went -- I forget where we went, but
08:38AM 6   we went somewhere and stole -- stole a car, drove through
08:38AM 7   Kaneohe, through Aikahi, through Kailua, and then just ended up
08:38AM 8   on -- on that bank right there that we -- that we ended up
08:38AM 9   robbing.
08:38AM 10  Q    Had you gotten the idea from watching any particular
08:38AM 11  movie?
08:38AM 12  A    Oh, yeah, yeah.  So first we was talking -- we was talking
08:38AM 13  about watching a movie on Point Break, and --
08:38AM 14  Q    What is the movie Point Break about?
08:38AM 15  A    About some surfers that -- that rob banks.
08:38AM 16  Q    Had you watched that movie recently at the time you were
08:38AM 17  talking about it?
08:38AM 18  A    I don't know if I watched it, but we was -- we was talking
08:38AM 19  about 'em.
08:38AM 20  Q    Okay.  Is that where you got the idea from?
08:38AM 21  A    Yes.
08:38AM 22  Q    All right.  So how did you select the particular bank that
08:38AM 23  you happened to choose?
08:38AM 24  A    Well, like I said, we was driving -- after we stole the
08:38AM 25  car, we was driving through Kaneohe, Aikahi, Kailua.  And --

08:38AM  1   and was just -- was in a secluded area, so, yeah, we just

08:39AM  2   pulled up right there.  And -- and I turned -- I turned around

08:39AM  3   looked both of them, and they was like putting their masks on,

08:39AM  4   ready to go.

08:39AM  5       We opened the door.  I kicked in the door.  I was the

08:39AM  6   only one that had a gun, you know.  And so I stood by the door.

08:39AM  7   When I kicked open the door, everybody -- before I even said

08:39AM  8   anything, everybody just immediately laid down.  The two other

08:39AM  9   guys jumped over the counter, went around to each one and

08:39AM  10  grabbed money, and then -- and then we left, drove that car,

08:39AM  11  switched cars, jumped in another car, and then -- then drove

08:39AM  12  away.

08:39AM  13  Q    How old were you at the time?

08:39AM  14  A    Eighteen years old.

08:39AM  15  Q    Had you just graduated from high school earlier that year?

08:39AM  16  A    Yes, sir.

08:39AM  17  Q    How old were the two other people with you?

08:39AM  18  A    I'm not sure.  I'm not sure.  I'm not sure.

08:39AM  19  Q    Do you know were they under 18?

08:39AM  20  A    They might have been, but we was all born in the -- in the

08:40AM  21  same year.

08:40AM  22  Q    Okay.  Now, you mentioned that you saw -- when you turned

08:40AM  23  around to look in the back seat, you saw the other two putting

08:40AM  24  masks on.

08:40AM  25  A    Yes.

| 08:40AM | 1 | Q | Were you wearing a mask as well? |

08:40AM   1   Q   Were you wearing a mask as well?

08:40AM   2   A   Yes.

08:40AM   3   Q   You said you were the only one armed?

08:40AM   4   A   Yes.

08:40AM   5   Q   Do you recall what kind of gun you had?

08:40AM   6   A   A smaller shot -- smaller shotgun, was about that big

08:40AM   7   (indicating).

08:40AM   8   Q   So you left the bank, you dropped the stolen car, got into

08:40AM   9   another car, drove away.

08:40AM   10  A   Yes.

08:40AM   11  Q   Were you apprehended that day?

08:40AM   12  A   No.

08:40AM   13  Q   Did you think you got away with it?

08:40AM   14  A   Yes.

08:40AM   15  Q   Did Mr. Miske have anything to do with that bank robbery?

08:40AM   16  A   No.

08:40AM   17  Q   Did you rob another bank after that?

08:40AM   18  A   Yes.

08:40AM   19  Q   How much longer -- how much later did that happen?

08:40AM   20  A   I don't know, maybe less than a year.

08:40AM   21  Q   Where was that bank?

08:40AM   22  A   Pearl City.

08:40AM   23  Q   How did that come about?

08:40AM   24  A   Pretty much the same thing.  Same thing, one less guy.

08:41AM   25  Same -- same -- one of the same guys but one less.

08:41AM  1   Q    And were you -- did you get arrested on the day you robbed

08:41AM  2   that second bank?

08:41AM  3   A    No.

08:41AM  4   Q    Did you think you had gotten away with that?

08:41AM  5   A    Yes.

08:41AM  6   Q    So at that time did you feel like you could get away with

08:41AM  7   these types -- sorts of crimes?

08:41AM  8   A    Yes.

08:41AM  9   Q    Did you rob any other banks after that?

08:41AM  10  A    No.

08:41AM  11  Q    Were you eventually arrested for those bank robberies?

08:41AM  12  A    Yes.

08:41AM  13  Q    When were you arrested?

08:41AM  14  A    2005.

08:41AM  15  Q    So quite a bit of time had passed, correct?

08:41AM  16  A    Right.

08:41AM  17  Q    Where were you arrested?

08:41AM  18  A    In Las Vegas.

08:41AM  19  Q    What were you doing in Las Vegas at the time.

08:41AM  20  A    My -- my girlfriend at the time was going to school at

08:41AM  21  UNLV.

08:41AM  22  Q    So were you brought back to Hawaii to face the charges?

08:41AM  23  A    Yes.

08:41AM  24  Q    Was that case handled right here in this courthouse?

08:41AM  25  A    Yes -- not this one, but --

08:42AM   1   Q     The federal courthouse?

08:42AM   2   A     Yes.

08:42AM   3   Q     It was not a state case, correct?

08:42AM   4   A     No.

08:42AM   5   Q     Did you fight the charges?

08:42AM   6   A     No.

08:42AM   7   Q     So you pled guilty?

08:42AM   8   A     Yes.

08:42AM   9   Q     What were the terms of your -- your plea agreement with

08:42AM  10   the government, if you recall?

08:42AM  11   A     They -- they dropped one, and I pled guilty to the other

08:42AM  12   one.

08:42AM  13   Q     Was there a firearm charge as well?

08:42AM  14   A     Yes.

08:42AM  15   Q     What was that?

08:42AM  16   A     Just using a gun in the commission of a crime.

08:42AM  17   Q     Okay.  Now, when you were -- that case was being handled

08:42AM  18   or being processed through the system, did you have an

08:42AM  19   attorney?

08:42AM  20   A     Yes.

08:42AM  21   Q     Did you have any communication with Mr. Miske after you

08:42AM  22   were arrested for that charge?

08:42AM  23   A     Yes.

08:42AM  24   Q     What was your -- the nature of your communication with

08:42AM  25   Mr. Miske?

08:42AM  1   A    Just we -- we was -- we was real good friends, so we used

08:42AM  2   to -- we used to talk, we used to write, we used to -- yeah.

08:43AM  3   Q    Okay.  Did he offer to help you in any way with your case?

08:43AM  4   A    Yes.

08:43AM  5   Q    How so?

08:43AM  6   A    He just asked me if -- he told me he had -- he had an

08:43AM  7   attorney, this guy named Reggie Minn, if I wanted to -- but at

08:43AM  8   that time I was pleading guilty, so...

08:43AM  9   Q    So you didn't take him up on that offer?

08:43AM  10  A    No.

08:43AM  11  Q    Did you cooperate with the government during that case?

08:43AM  12  A    No.

08:43AM  13  Q    Why not?

08:43AM  14  A    I mean that wasn't even in my -- that wasn't even in my --

08:43AM  15  in my head -- cooperating wasn't even in my head at that time.

08:43AM  16  You know, like it wasn't even part of my vocabulary.

08:43AM  17  Q    Okay.  Well, looking back --

08:43AM  18  A    My thoughts.

08:43AM  19  Q    Looking back, did you have information against Mr. Miske,

08:43AM  20  for example, that you could have provided to the government had

08:43AM  21  that been in your vocabulary?

08:43AM  22  A    Yeah.  I mean...

08:43AM  23  Q    So what -- do you remember when you actually pled guilty

08:43AM  24  approximately to the bank robbery and the firearm charge?

08:44AM  25  A    2005.

08:44AM   1   Q   So the same year you were arrested?

08:44AM   2   A   Yes.

08:44AM   3   Q   Were you sentenced shortly after that?

08:44AM   4   A   Yes.

08:44AM   5   Q   What sentence did you receive?

08:44AM   6   A   Almost ten years, hundred-something months.  Nine years

08:44AM   7   and something.

08:44AM   8   Q   So you were a convicted felon at that point?

08:44AM   9   A   Yes.

08:44AM  10   Q   Where did you serve your prison sentence, sir?

08:44AM  11   A   In a BOP on the mainland.  Multiple.

08:44AM  12   Q   All right.  As you were getting ready to be sentenced in

08:44AM  13   that case, did you have individuals write letters in support of

08:44AM  14   you that they could submit to the court?

08:44AM  15   A   Yes.

08:44AM  16   Q   Was Mr. Miske one of those?

08:44AM  17   A   Yes.

08:44AM  18          MR. INCIONG:  Your Honor, if I could have

08:44AM  19   Exhibit 1-763 pulled up for Mr. Miller?

08:44AM  20          THE COURT:  Yes, go ahead.

08:44AM  21   BY MR. INCIONG:

08:44AM  22   Q   Mr. Miller, do you recognize Exhibit 1-763?

08:44AM  23   A   Yes.

08:44AM  24   Q   How do you recognize that?

08:45AM  25   A   It's -- it's a letter from Mike Miske.

08:45AM   1   Q    Is that the letter specifically that he submitted to the

08:45AM   2   court on your behalf in the bank robbery case?

08:45AM   3   A    Yes.

08:45AM   4        MR. INCIONG:  Your Honor, I would ask the Court to

08:45AM   5   take judicial notice of this court-filed document, and move to

08:45AM   6   admit it based on Mr. Miller's foundation of this letter.

08:45AM   7        THE COURT:  Any objection?

08:45AM   8        MR. KENNEDY:  Just renewing the earlier objection,

08:45AM   9   Your Honor.

08:45AM  10        THE COURT:  All right.  That objection is overruled.

08:45AM  11   This exhibit will come into evidence.  That's 1-763.  You may

08:45AM  12   publish.

08:45AM  13        (Exhibit 1-763 was received in evidence.)

08:45AM  14        MR. INCIONG:  Thank you, Your Honor.

08:45AM  15   BY MR. INCIONG:

08:45AM  16   Q    Now, Mr. Miller, this is the letter that was submitted

08:45AM  17   it's dated March 30th of 2006, correct?

08:45AM  18   A    Correct.

08:45AM  19   Q    Prior to coming to court today, did you have a chance to

08:45AM  20   review and read the letter?

08:45AM  21   A    Yes.

08:45AM  22   Q    Are the contents of that letter accurate?

08:46AM  23   A    Yes.

08:46AM  24   Q    Does that accurately describe your relationship with

08:46AM  25   Mr. Miske at that time?

08:46AM   1   A     Yes.

08:46AM   2   Q     I'd like to focus on a couple of areas of this letter.  If

08:46AM   3   you can look at, please, the third paragraph starting with

08:46AM   4   "Miller" in quotes.

08:46AM   5          It says:  "Miller, the nickname that I've called him

08:46AM   6   for the past 11 years, and I have been really good friends for

08:46AM   7   a long time."

08:46AM   8          So that -- that's all accurate?

08:46AM   9   A     Yes.

08:46AM   10  Q     Miller is what he called you?

08:46AM   11  A     Yes.

08:46AM   12  Q     And I think -- I believe yesterday you testified how you

08:46AM   13  referred to him.  Do you remember that, testifying to that?

08:46AM   14  A     Yes.

08:46AM   15  Q     What did you call Mr. Miske typically?

08:46AM   16  A     Mikey.

08:46AM   17  Q     Anything else?

08:46AM   18  A     I can't -- I can't think of it right now.

08:46AM   19  Q     So let's read -- the next sentence says:  "I'm a little

08:46AM   20  older but only by several years."

08:47AM   21         Yesterday you testified as to how much age difference

08:47AM   22  there is, correct?

08:47AM   23  A     Yes.

08:47AM   24  Q     How -- how much older is Mr. Miske than you?

08:47AM   25  A     Almost ten years.

08:47AM   1   Q    Okay.  And then the next sentence:  "We managed to become

08:47AM   2   tight friends even with the age difference."

08:47AM   3        Is that true?

08:47AM   4   A    Yes.

08:47AM   5   Q    The next sentence:  "There are plenty of friends that I

08:47AM   6   keep in touch from my younger days, but of all -- out of all

08:47AM   7   these many acquaintances," in quotes, "there is only a select

08:47AM   8   few that I consider to be my true friends."

08:47AM   9        And then the next paragraph:  "Miller is definitely

08:47AM   10  one of those rare friends that I can always count on to be

08:47AM   11  there for me if I ever needed anything."

08:47AM   12       Is that true?

08:47AM   13  A    Yes.

08:47AM   14  Q    "That's the number one quality that I admire in Miller is

08:47AM   15  his loyalty as a friend.  Not only is he reliable, but he's got

08:47AM   16  to be one of the funniest guys around because he's constantly

08:47AM   17  making you laugh."

08:47AM   18       Does that accurately describe your relationship?

08:48AM   19  A    Yes.

08:48AM   20  Q    Okay.  Now, if we go to the next paragraph, the second to

08:48AM   21  last line of that paragraph beginning with, "I truly feel" --

08:48AM   22  do you see that portion?

08:48AM   23       I think it's highlighted now at the end of that first

08:48AM   24  line.  "I truly feel and strongly believe that deep down inside

08:48AM   25  Miller is a good person who unfortunately has made bad choices

08:48AM    1    in his short and young life."

08:48AM    2              Do you see that?

08:48AM    3    A    Yes.

08:48AM    4    Q    Do you agree with that?

08:48AM    5    A    Yes.

08:48AM    6    Q    And then the next paragraph down:  "He has a heart that is

08:48AM    7    genuine, and I sincerely value him as a friend.  I have two

08:48AM    8    brothers in my family, and I consider Miller like my third

08:48AM    9    brother."

08:48AM   10              MR. INCIONG:  Oh, looks like we lost our signal.

08:48AM   11              The third paragraph from the bottom:  "He has a heart

08:49AM   12    that is genuine," please.

08:49AM   13              Can we enlarge that?

08:49AM   14    BY MR. INCIONG:

08:49AM   15    Q    Can you see that, sir?  Can you see that okay?

08:49AM   16              Would you say that's accurate?

08:49AM   17    A    Yes.

08:49AM   18    Q    You testified yesterday I believe when I asked how you

08:49AM   19    considered this relationship, and I said brother, father

08:49AM   20    figure, friend, and I believe your answer was all of the above?

08:49AM   21    A    Yes.

08:49AM   22              MR. INCIONG:  Okay.  Thank you.  We can take that

08:49AM   23    down.

08:49AM   24    BY MR. INCIONG:

08:49AM   25    Q    So you were sent to the mainland for prison -- to prison,

| 08:49AM | 1  | correct? |
|---|---|---|
| 08:49AM | 2  | A    Correct. |
| 08:49AM | 3  | Q    Did you continue to have any contact or communications |
| 08:49AM | 4  | with Mr. Miske while you were in prison? |
| 08:49AM | 5  | A    Yes. |
| 08:49AM | 6  | Q    What kinds of communication did you have? |
| 08:49AM | 7  | A    Talking, letters.  You know, normal -- that's the only way |
| 08:50AM | 8  | you can communicate in prison at the time. |
| 08:50AM | 9  | Q    Okay.  Did you maintain your friendship with him? |
| 08:50AM | 10 | A    Yes. |
| 08:50AM | 11 | Q    Would you say it stayed the same or did it kind of fall |
| 08:50AM | 12 | off a little bit because of the distance and the time? |
| 08:50AM | 13 | A    Nah.  Stayed the -- stayed the same.  Maybe we got even |
| 08:50AM | 14 | closer.  You know, I used to talk to him a lot. |
| 08:50AM | 15 | Q    So that was a long prison sentence, right? |
| 08:50AM | 16 | A    Yes. |
| 08:50AM | 17 | Q    And you maintained that contact throughout? |
| 08:50AM | 18 | A    Yes. |
| 08:50AM | 19 | Q    As your release date started to approach, you were going |
| 08:50AM | 20 | to get out at some point obviously, correct? |
| 08:50AM | 21 | A    Correct. |
| 08:50AM | 22 | Q    Did you and Mr. Miske have conversations about life after |
| 08:50AM | 23 | you were released from prison? |
| 08:50AM | 24 | A    Well, he told me he -- at those times he was telling me he |
| 08:50AM | 25 | got -- he was growing, he was -- he did a lot of stuff.  He got |

08:50AM  1    more connections, you know.  Stuff like that.  Job connections.

08:50AM  2    Q    Okay.

08:51AM  3    A    And he told me he was doing very well.

08:51AM  4    Q    So did you talk with him about any plans for you as far as

08:51AM  5    what you were going to do when you got out?

08:51AM  6    A    Yeah, he told me when I got out, I could -- if I wanted to

08:51AM  7    work at -- if I wanted to work at the movies, he could -- he

08:51AM  8    could do that.  If I wanted to -- if I wanted to get in to on

08:51AM  9    the docks, he could do that.

08:51AM  10   Q    So these are union jobs you're referencing?

08:51AM  11   A    Yes.

08:51AM  12   Q    So this is like the stevedores at the docks?

08:51AM  13   A    Yes.

08:51AM  14   Q    Is that the Teamsters that work with the transportation

08:51AM  15   for the movies?

08:51AM  16   A    Yes.

08:51AM  17   Q    Were you interested in -- in either of those?

08:51AM  18   A    Yes.

08:51AM  19   Q    So when -- when did you actually -- when were you

08:51AM  20   scheduled to be released from prison?

08:51AM  21   A    2013.

08:51AM  22   Q    So just prior to being released from prison, did you have

08:51AM  23   some medical issues?

08:51AM  24   A    Yes.

08:51AM  25   Q    What were your medical issues?

08:51AM    1    A    I had one of my -- my aorta ripped -- my aortic valve

08:52AM    2    ripped, and I had -- they took me to the hospital.  I was in --

08:52AM    3    I was in Oregon at the time, incarcerated in Oregon.  And one

08:52AM    4    of my valves ripped, so they rushed me to the hospital, they

08:52AM    5    put in a new -- they put a new valve in there, and I stay in

08:52AM    6    the hospital for some time, and then they brought me back.

08:52AM    7    Q    So this is -- sounds like there was a surgery involved?

08:52AM    8    A    Yes.

08:52AM    9    Q    Was there -- was this a life-threatening situation?

08:52AM   10    A    Yes.

08:52AM   11    Q    Describe that.

08:52AM   12    A    Yeah, I had -- I had a slim chance of surviving that,

08:52AM   13    but -- yeah, it was open heart surgery, they cut me open, put a

08:52AM   14    whole new valve -- aortic valve in my -- in my heart.

08:52AM   15    Q    But the surgery was successful?

08:52AM   16    A    Yes.

08:52AM   17    Q    You survived that obviously?

08:52AM   18    A    Yes.

08:52AM   19    Q    How long were you in the hospital before you were released

08:53AM   20    back into the prison?

08:53AM   21    A    I was in there for some time.  Some weeks I would say.

08:53AM   22    Q    But eventually you were cleared and went back into the

08:53AM   23    facility?

08:53AM   24    A    Yes.

08:53AM   25    Q    Were there complications that happened after that?

08:53AM   1    A    Yes.  A few weeks after when I came back, I started some

08:53AM   2    new medication, some -- some blood thinners that I had to take.

08:53AM   3    So they couldn't get the -- the levels the same, and a clot --

08:53AM   4    one blood clot went into that valve, so they had to rush me

08:53AM   5    back to the hospital.

08:53AM   6    Q    Okay.  How did they treat that situation?

08:53AM   7    A    Same thing.  They had to cut 'em back open, go inside,

08:53AM   8    pull that clot out, and sew me back up.  And I stayed in the

08:53AM   9    hospital again for -- for a few weeks.

08:53AM  10    Q    So that was the second open heart surgery?

08:53AM  11    A    Yes.

08:53AM  12    Q    But you came out of that okay as well?

08:53AM  13    A    Yes.

08:53AM  14    Q    All right.  So eventually did that delay your release at

08:53AM  15    all from prison?

08:53AM  16    A    Yeah, because I was scheduled to go to the halfway house

08:54AM  17    but I was in the hospital.  So when I came back, they got all

08:54AM  18    the paperwork together and then --

08:54AM  19    Q    Okay.  So you were released from prison into a halfway

08:54AM  20    house.

08:54AM  21    A    Yes.

08:54AM  22    Q    Where was that halfway house?

08:54AM  23    A    In Honolulu.

08:54AM  24    Q    Okay.  So you came back to Hawaii for that.

08:54AM  25    A    Yes.

08:54AM   1    Q    All right.  So during this time when all of this was going

08:54AM   2    on with your surgeries and so forth, are you still in

08:54AM   3    communication with Mr. Miske?

08:54AM   4    A    Yes.

08:54AM   5    Q    Does he know when you're going to be arriving in Hawaii?

08:54AM   6    A    Yes.

08:54AM   7    Q    Okay.  So when you arrived and landed in Honolulu, was

08:54AM   8    there anybody there to greet you?

08:54AM   9    A    Yes.

08:54AM   10   Q    Who was there?

08:54AM   11   A    Miske -- Mike Miske and his brother Johnnie Stancil.

08:54AM   12   Q    Were you surprised to see them there?

08:54AM   13   A    No.

08:54AM   14   Q    You were expecting that?

08:54AM   15   A    Yes.

08:54AM   16   Q    So what did you do as soon as you were picked up by

08:54AM   17   Mr. Miske and Mr. Stancil?

08:54AM   18   A    We started talking.  We started just -- I had to get right

08:54AM   19   to the halfway house, so we only had -- only had like

08:55AM   20   20 minutes to actually get to the halfway house from getting

08:55AM   21   off the plane.  So we stopped at Zippy's.  We was talking,

08:55AM   22   stopped at Zippy's, couple Zip Pacs, and they took me to the

08:55AM   23   halfway house and dropped me off.

08:55AM   24   Q    Okay.  So was there any discussion in that, I guess,

08:55AM   25   short -- you know, short time from the airport to Zippy's to

08:55AM   1   the halfway house as to what you were going to be doing?

08:55AM   2   A    Yeah, well, he told me right there, Hey, when you get

08:55AM   3   inside there, tell them -- let them know you got one job

08:55AM   4   already.  You get one job, you already hired, they're waiting

08:55AM   5   for you, you can start tomorrow.

08:55AM   6   Q    When you say "he," who are you referring to?

08:55AM   7   A    Mike Miske.

08:55AM   8   Q    Did he say what this job was?

08:55AM   9   A    No.  Just -- was really just one job on paper, just to get

08:55AM  10   me out of the halfway house.

08:55AM  11   Q    So how did that work?  How did you -- what did you tell

08:55AM  12   the halfway house?

08:55AM  13   A    Yeah, I went in there, got all my stuff together.  The

08:56AM  14   next day -- I got there at night, so it was already night, it

08:56AM  15   was already dark.  So the next day when the -- when the staff

08:56AM  16   came in -- when the halfway house staff came in, I told them --

08:56AM  17   I told them, Hey, I already have a job waiting.  I don't

08:56AM  18   gotta -- I don't gotta go out and get -- get applications and

08:56AM  19   everything like that.  So, yeah, that -- I told them, and then

08:56AM  20   they made me fill out some paperwork.

08:56AM  21        I called up Miske, asked him what -- what I had to put

08:56AM  22   down, his name.  One other guy Alfredo Cabael, I had to put his

08:56AM  23   number down.  And -- yeah, he -- so the next day after I came,

08:56AM  24   Miske came to the halfway house, dropped me off bags of

08:56AM  25   clothes, a phone.  Everything I needed, he came to the halfway

08:57AM    1    house and dropped that off.

08:57AM    2    Q    Did he give you any money?

08:57AM    3    A    Yeah, he gave me some money.

08:57AM    4    Q    Was there anything about the money that caught your

08:57AM    5    attention?

08:57AM    6    A    I mean not really.  He always got -- he always got money,

08:57AM    7    just in -- he just peel off some -- some off his wad that he

08:57AM    8    had, and he gave me -- he gave me one stack of money like that.

08:57AM    9    Q    Okay.  Now, when you went and told the halfway house that

08:57AM    10   you -- you already had a job already, did you really believe

08:57AM    11   you actually had a job?

08:57AM    12   A    No.  It was just -- it was just -- it was just to get out

08:57AM    13   the halfway house.  It was just to leave the halfway house.

08:57AM    14   Q    So were you given instructions on how -- to indicate how

08:57AM    15   you were going paid or what your hours were?

08:57AM    16   A    Yeah, he told me that -- Miske told me that, Hey, we just

08:57AM    17   going to put down as salary so -- so these people cannot keep

08:58AM    18   track of your hours, and you're going to be on call.  You know,

08:58AM    19   like we don't gotta put down set hours when you're going to

08:58AM    20   work.  So you just call.  Most of the time I called Alfredo --

08:58AM    21   Fredo Cabael.

08:58AM    22   Q    So you mentioned his name again.  So who is Alfredo

08:58AM    23   Cabael?

08:58AM    24   A    One of Mikey's -- one of these guys that used to work for

08:58AM    25   Mikey.

08:58AM  1  Q    Worked for him at where?  At what --

08:58AM  2  A    Kama'aina.

08:58AM  3  Q    Kama'aina Termite and Pest Control?

08:58AM  4  A    Yeah, he used to work -- he used to work at all -- at

08:58AM  5  every one -- at every one of his businesses.

08:58AM  6  Q    Okay.  Had you met Mr. Cabael before you got out of

08:58AM  7  prison?

08:58AM  8  A    Yes.

08:58AM  9  Q    So did you tell the -- the folks at the halfway house that

08:58AM  10  you had this job salary and you were on call?

08:58AM  11  A    Yes.

08:58AM  12  Q    So how did you establish when you had to work?  How did

08:58AM  13  you tell them?

08:58AM  14  A    It wasn't established.  It was -- it was on call daily.

08:58AM  15  So it's like they give you -- they give you -- if you're

08:59AM  16  supposed to work down -- like I had -- I had an on-call day, so

08:59AM  17  it would be eight hours work, one hour lunch, two hours to get

08:59AM  18  there, because I was supposed to be catching a bus.  So now I'm

08:59AM  19  filling out this paperwork to where I can be gone from the

08:59AM  20  halfway house for half of the day.  You know, eight hours

08:59AM  21  working, one hour lunch, two hours to get there, two hours to

08:59AM  22  get back.

08:59AM  23          And -- and if I couldn't make it back on time, usually

08:59AM  24  Fredo used to call the halfway house and say, Hey, we working

08:59AM  25  overtime, we stay at -- we working at -- in Kahuku or Hauula or

08:59AM  1    something, and we going need about four more hours.  So now I'm

08:59AM  2    gone 18 hours a day.

08:59AM  3    Q    Okay.  So Fredo is Alfredo Cabael?

08:59AM  4    A    Yes.

08:59AM  5    Q    So you said you were supposed to be taking the bus.  Were

09:00AM  6    you taking the bus to work?

09:00AM  7    A    No.

09:00AM  8    Q    So how were you being transported?

09:00AM  9    A    Whoever was available, whoever was in the area, if Miske

09:00AM  10   was in the area, he would pick me up.  If Fredo was in the

09:00AM  11   area, he would pick me up.  Yeah.

09:00AM  12   Q    So were you working?

09:00AM  13   A    No.

09:00AM  14   Q    So what were you doing for these 12 or 14 hours a day when

09:00AM  15   you were gone?

09:00AM  16   A    I was catching up with people.  Catching up -- catching

09:00AM  17   with my family, hanging out with Miske, hanging out with Fredo.

09:00AM  18   Q    So did -- did this on-call schedule, was it required by

09:00AM  19   the halfway house that somebody had to call them every day to

09:00AM  20   tell them you were needed, or how did that work?

09:00AM  21   A    Yes.  Well, I would -- I would since I was on call, I'd go

09:00AM  22   down there every morning.  If I felt like leaving at 9:00 in

09:00AM  23   the morning, I would just go down there, fill out nine -- I

09:00AM  24   mean -- yeah, I start work at 11:00, that means I can leave at

09:00AM  25   9:00.  Eight hours plus the lunch, that's nine hours, two hours

09:01AM   1    transportation.  I would fill 'em out, they would call -- they

09:01AM   2    would call Fredo, confirm 'em, and they would let me out, let

09:01AM   3    me right out the door.

09:01AM   4    Q    So when you say "they," you mean the halfway house would

09:01AM   5    call Alfredo Cabael?

09:01AM   6    A    The halfway house.  Yes.

09:01AM   7    Q    And Alfredo Cabael knew about this arrangement.

09:01AM   8    A    Yes.

09:01AM   9    Q    So did you ever do any work for Kama'aina Termite and Pest

09:01AM   10   Control during that time?

09:01AM   11   A    During?  No.

09:01AM   12   Q    Were you paid by Mr. Miske?

09:01AM   13   A    Yes.

09:01AM   14   Q    How were you paid?

09:01AM   15   A    He would give me the -- he would give me the stubs, the

09:01AM   16   paychecks with the stub on top.

09:01AM   17   Q    Okay.  I'll ask you about that in a minute.

09:01AM   18        But how long did this go on for where you were calling

09:01AM   19   out every day and being gone for --

09:01AM   20   A    Pretty much the whole time I was in the halfway house.

09:02AM   21   Since I got there -- since couple days after I got there all

09:02AM   22   the way till -- till I found my own home apartment.

09:02AM   23   Q    How long was that approximately?

09:02AM   24   A    I'd say six -- six, eight months maybe.

09:02AM   25   Q    Okay.  Did T.J. Mahoney ever catch on or have questions

09:02AM  1  about whether this was really a legitimate job?

09:02AM  2  A    Yeah, they had -- they had questions, but -- but like

09:02AM  3  Fredo -- if they had questions, Fredo would call -- like they

09:02AM  4  would be like, Hey, you worked -- you worked -- how the hell

09:02AM  5  you work 19 hours yesterday, you come back, and you're not even

09:02AM  6  dirty.  You know, you're not even -- you're supposed to be

09:02AM  7  fumigating houses.  They would question me like that, and, you

09:02AM  8  know, I would be like, We got a shower in -- in our -- in our

09:02AM  9  shop over there.

09:02AM  10          But like I would leave and then come back, and then

09:03AM  11  tell them, Yeah, I got to go right back to work.  So Fredo

09:03AM  12  would call and say, Hey, we need him back right now or -- or he

09:03AM  13  going be fired, you know.  So...

09:03AM  14  Q    So Mr. Cabael would tell the halfway house that you would

09:03AM  15  be fired if you weren't allowed to leave again?

09:03AM  16  A    Yes.

09:03AM  17  Q    Did Mr. Miske ever do that?

09:03AM  18  A    I'm not sure if he ever did, but I know he used to call

09:03AM  19  'em for me for -- if we was going to the bay, ride jet skis or

09:03AM  20  something like on a Saturday, I would have him call.  If I

09:03AM  21  couldn't get in touch with Fredo, I would call Miske, and he

09:03AM  22  would call and tell them, Hey, we need him at work right now.

09:03AM  23  Q    Now, you mentioned some pay stubs.  Did the halfway house

09:03AM  24  require some sort of documentation or proof that you were

09:03AM  25  actually working during that time?

| | | | |
|---|---|---|---|
| 09:03AM | 1 | A | Yes. |
| 09:03AM | 2 | Q | You were also on supervised release as well, correct? |
| 09:03AM | 3 | A | Yes. |
| 09:03AM | 4 | Q | So who were you being supervised by? |
| 09:04AM | 5 | A | By the halfway house. |
| 09:04AM | 6 | Q | But was there someone from the court also that was |
| 09:04AM | 7 | | supervising you? |
| 09:04AM | 8 | A | The supervised release is after the halfway house. |
| 09:04AM | 9 | Q | Okay.  All right.  So that hadn't started yet. |
| 09:04AM | 10 | A | That hadn't -- that never start yet. |
| 09:04AM | 11 | Q | All right.  So the -- when they told you that they needed |
| 09:04AM | 12 | | to have, you know, documentation, what did you do? |
| 09:04AM | 13 | A | I gave them the -- the pay stubs. |
| 09:04AM | 14 | Q | Okay.  But how did you -- how did that come about is my |
| 09:04AM | 15 | | question?  Where did those pay stubs come from? |
| 09:04AM | 16 | A | From Miske. |
| 09:04AM | 17 | Q | So he just gave them to you?  Or explain to the jury how |
| 09:04AM | 18 | | that -- the pay stubs were even given to you. |
| 09:04AM | 19 | A | Yeah, he would just -- he would just give them to me and |
| 09:04AM | 20 | | tell me, Hey -- if I told him, Hey, I got to turn this in on |
| 09:04AM | 21 | | this day, he would have them for me on his desk.  He would tell |
| 09:04AM | 22 | | me, Hey, just pick them up -- stop by if I'm not there, grab |
| 09:04AM | 23 | | 'em off my desk, or he would hand 'em to me when he seen me. |
| 09:04AM | 24 | | Because I was -- I was -- we was together almost |
| 09:04AM | 25 | | pretty much every day at that point.  I just got out of prison. |

09:05AM   1   We were catching up a lot.  I'm together with him every day.

09:05AM   2   Q    But did you tell Mr. Miske that you needed to have -- you

09:05AM   3   needed pay stubs to show the people at the halfway house?

09:05AM   4   A    Yes.

09:05AM   5   Q    And that's why he gave them to you?

09:05AM   6   A    Yes.

09:05AM   7        MR. INCIONG:  Your Honor, could I have exhibits --

09:05AM   8   well, first, we'll start with 9-110 shown to Mr. Miller,

09:05AM   9   please?

09:05AM   10        THE COURT:  9-110?

09:05AM   11        MR. INCIONG:  Correct.

09:05AM   12        THE COURT:  Okay.  Mr. Inciong, you mentioned -- you

09:05AM   13   asked Mr. Miller if T.J. Mahoney caught on or had questions.

09:05AM   14   What is T.J. Mahoney?

09:05AM   15        MR. INCIONG:  Thank you, Your Honor.

09:05AM   16   BY MR. INCIONG:

09:05AM   17   Q    Is T.J. Mahoney the name of the halfway house you were in?

09:05AM   18   A    Yes.

09:05AM   19   Q    Okay.  That's where you were --

09:05AM   20   A    Yeah, that's where I was -- when I got out, that's --

09:05AM   21   T.J. Mahoney is where Miske and his brother dropped me off at

09:05AM   22   the day I got out.  That's the name of the halfway house.

09:05AM   23   Q    That's where you were required to go once you were

09:06AM   24   released from prison?

09:06AM   25   A    Yes.  It's a four-story building, men on one side, female

09:06AM  1    on the other side, all the staff on the bottom, a little

09:06AM  2    parking lot in the front.

09:06AM  3    Q    That's located in Honolulu?

09:06AM  4    A    Yes.

09:06AM  5    Q    Okay.  So, Mr. Miller, do you see Exhibit 9-110 in front

09:06AM  6    of you?

09:06AM  7    A    Yes.

09:06AM  8    Q    Do you recognize what's shown there?

09:06AM  9    A    Yes.

09:06AM  10   Q    How do you recognize that?

09:06AM  11   A    I mean, I recognize the Kama'aina, of course, but got my

09:06AM  12   name on 'em.

09:06AM  13   Q    Okay.  Can I have you look at 9-111 next, please.

09:06AM  14        Similar document but a different document nonetheless.

09:06AM  15   Do you recognize that?

09:06AM  16   A    Yes.

09:06AM  17   Q    How do you recognize that?

09:06AM  18   A    Same thing, got my name on the -- on the check.

09:06AM  19   Q    Now, these are -- do you see the dates that are listed on

09:06AM  20   that check --

09:06AM  21   A    Yes.

09:06AM  22   Q    -- on those two checks?

09:06AM  23        Is that after -- a little bit after the period we're

09:07AM  24   talking about when you were first released from prison into the

09:07AM  25   halfway house?

09:07AM  1   A    Oh, yes.  This is -- that date right there is like a whole

09:07AM  2   year after I got out of the halfway house.

09:07AM  3   Q    But were you continuing to receive these pay stubs from

09:07AM  4   Mr. Miske during that time?

09:07AM  5   A    Yes.

09:07AM  6   Q    Are these pay stubs similar in nature to the types that

09:07AM  7   you were receiving when you first started producing them to

09:07AM  8   T.J. Mahoney?

09:07AM  9   A    Yes.

09:07AM  10            MR. INCIONG:  Your Honor, I would move to admit

09:07AM  11  Exhibits 9-110 and 9-111.

09:07AM  12            THE COURT:  Any objection?

09:07AM  13            MR. KENNEDY:  No objection.

09:07AM  14            THE COURT:  Without objection, 9-110 and 9-111 are

09:07AM  15  each admitted.  You may publish.

09:07AM  16            (Exhibits 9-110 and 9-111 were received in evidence.)

09:07AM  17            MR. INCIONG:  Thank you, Your Honor.

09:07AM  18  BY MR. INCIONG:

09:07AM  19  Q    So starting with 9-110, so this is a pay stub that

09:07AM  20  Mr. Miske provided to you during -- in this particular case it

09:07AM  21  was 2015, correct?

09:07AM  22  A    Yes.

09:07AM  23  Q    But were these the same types of pay stubs that you gave

09:08AM  24  to T.J. Mahoney when you were first released from prison?

09:08AM  25  A    Yes.

09:08AM    1    Q    Did you actually work for any of these checks?

09:08AM    2    A    No.

09:08AM    3    Q    Now, from looking at that exhibit, is that just a pay tub

09:08AM    4    or is that the entire check, that being the check that you

09:08AM    5    would tear off to deposit and then the pay stub that is

09:08AM    6    attached?

09:08AM    7    A    Yes.  That's the whole thing right here, yeah.

09:08AM    8    Q    Okay.  So were you turning in these checks without cashing

09:08AM    9    them on some occasions?

09:08AM   10    A    Yes.  Yeah, I wasn't -- I wasn't paying attention, I was

09:08AM   11    just turning them in to him to -- because that's what you got

09:08AM   12    to do.

09:08AM   13    Q    So whether you were getting the money from these checks

09:08AM   14    and cashing them, that didn't even matter to you.

09:08AM   15    A    Yeah, I wasn't -- yeah, I guess I wasn't even thinking

09:08AM   16    about that at the time.

09:08AM   17    Q    So you were turning these checks in to T.J. Mahoney,

09:09AM   18    correct?

09:09AM   19    A    These ones are the ones that -- ones like this, yeah.

09:09AM   20    Q    Okay.  The ones that -- good question.  Let me separate

09:09AM   21    that.

09:09AM   22         So in 2013 you were turning these checks in to who?

09:09AM   23    A    To T.J. Mahoney.

09:09AM   24    Q    In 2015 you were no longer on super- -- at the halfway

09:09AM   25    house, correct?

| | | | |
|---|---|---|---|
| 09:09AM | 1 | A | No. |
| 09:09AM | 2 | Q | So who were you turning the checks in to at that time? |
| 09:09AM | 3 | A | My -- the probation officer. |
| 09:09AM | 4 | Q | Okay.  That was required as part of your supervised |
| 09:09AM | 5 | | release? |
| 09:09AM | 6 | A | Yes. |
| 09:09AM | 7 | Q | So as you explained, once you got out of the halfway |
| 09:09AM | 8 | | house, then you were on supervised release? |
| 09:09AM | 9 | A | Yes. |
| 09:09AM | 10 | Q | And U.S. Probation was supervising you? |
| 09:09AM | 11 | A | Yes. |
| 09:09AM | 12 | Q | These were the pay stubs that you produced to U.S. |
| 09:09AM | 13 | | Probation? |
| 09:09AM | 14 | A | Yes. |
| 09:09AM | 15 | Q | Were you working -- actually working for Kama'aina at that |
| 09:09AM | 16 | | time in 2015? |
| 09:09AM | 17 | A | No. |
| 09:09AM | 18 | Q | Did you ever work for Kama'aina? |
| 09:09AM | 19 | A | Like back in the days, I don't -- like back in the days, I |
| 09:09AM | 20 | | used -- I used to help him, like I used to -- I used to like -- |
| 09:10AM | 21 | | when he had like the tint and everything like that, I used |
| 09:10AM | 22 | | to -- |
| 09:10AM | 23 | Q | Okay. |
| 09:10AM | 24 | A | -- I used to detail cars and stuff like that. |
| 09:10AM | 25 | Q | Well, let me narrow my -- my question.  So after you got |

09:10AM    1    out of prison in 2013, did you ever work for Kama'aina?

09:10AM    2    A    No.

09:10AM    3         MR. INCIONG:  Could I have Exhibit 9-112 pulled up,

09:10AM    4    please, for Mr. Miller?

09:10AM    5    BY MR. INCIONG:

09:10AM    6    Q    Do you recognize that document, sir?

09:10AM    7    A    Yes.

09:10AM    8    Q    What is that?

09:10AM    9    A    Oh, that's -- that's like the report that you got to turn

09:10AM   10    in to -- to your probation officer.

09:10AM   11    Q    And does this -- do you recognize this as one of the

09:10AM   12    reports that you turned in when you were on supervised release

09:10AM   13    for the bank robbery?

09:10AM   14    A    Yes.

09:10AM   15         MR. INCIONG:  Your Honor, I would move to admit

09:10AM   16    Exhibit 9-112.

09:10AM   17         THE COURT:  Any objection?

09:11AM   18         MR. KENNEDY:  No objection.

09:11AM   19         THE COURT:  Without objection, 9-112 is admitted.  You

09:11AM   20    may publish.

09:11AM   21         (Exhibit 9-112 was received in evidence.)

09:11AM   22         MR. INCIONG:  Thank you, Your Honor.

09:11AM   23    BY MR. INCIONG:

09:11AM   24    Q    So if we look at that exhibit --

09:11AM   25         MR. INCIONG:  If we could highlight part B, that

09:11AM   1   center area, to show Mr. Miller and have the jury to look at

09:11AM   2   that.

09:11AM   3   BY MR. INCIONG:

09:11AM   4   Q    Do you see that box, sir?

09:11AM   5   A    Yes.

09:11AM   6   Q    So that lists your place of employment, correct?

09:11AM   7   A    Yes.

09:11AM   8   Q    And it's listed as Kama'aina Termite control, correct?

09:11AM   9   A    Yes.

09:11AM   10  Q    Did you actually work there?

09:11AM   11  A    No.

09:11AM   12  Q    It lists the name of your supervisor as Alfredo Cabael.

09:11AM   13  A    Yes.

09:11AM   14  Q    Was Alfredo Cabael your supervisor?

09:11AM   15  A    Yeah, that's what -- I mean that's what I had to put down

09:11AM   16  right there.

09:11AM   17  Q    But I mean was he actually supervising any real work?

09:11AM   18  A    No, no.  No.

09:11AM   19  Q    Your position held as shift, what did that mean?

09:12AM   20  A    I don't -- I don't know.  I was just filling in the --

09:12AM   21  Q    It wasn't -- it wasn't correct because you weren't

09:12AM   22  working, correct?

09:12AM   23  A    No.

09:12AM   24  Q    Okay.  So full time, that was -- was that correct?

09:12AM   25  A    No.

09:12AM   1    Q    So was this still a continuation basically of that same
09:12AM   2    disguised work that you had given to T.J. Mahoney when you
09:12AM   3    first were released from prison?
09:12AM   4    A    Yes.
09:12AM   5    Q    Now, you said when you got out you were spending a lot of
09:12AM   6    time with Mr. Miske every day catching up and so forth.
09:12AM   7         You had been in prison for several years, right?
09:12AM   8    A    Yes.
09:12AM   9    Q    So had things changed in Mr. Miske's life that you could
09:12AM   10   observe having that gap in time between when you went away to
09:12AM   11   prison and when you came back?
09:12AM   12   A    Yes.
09:12AM   13   Q    What are some of those things that you noticed that
09:12AM   14   changed?
09:12AM   15   A    He had -- he had -- he had more companies.  His companies
09:13AM   16   was way bigger.  He had -- he had new trucks.  He had -- yeah,
09:13AM   17   he had a lot of stuff going on.  He had -- he had the
09:13AM   18   nightclub, he had solar, Kama'aina -- the termite, he had
09:13AM   19   plumbing.  Yeah, he had a lot of stuff -- he had a lot of stuff
09:13AM   20   going on, you know.
09:13AM   21   Q    So that was very different from when you went off to
09:13AM   22   prison.
09:13AM   23   A    Yes.
09:13AM   24   Q    So let's start with the company Kama'aina Termite and Pest
09:13AM   25   Control.

09:13AM   1   A    Yes.

09:13AM   2   Q    You said that was -- that was way bigger?

09:13AM   3   A    Yeah.

09:13AM   4   Q    What do you mean by that specifically?

09:13AM   5   A    I mean he had -- just from -- just from the people that

09:13AM   6   was working there, he built up the office, he had both sides on

09:13AM   7   his shop now.  He had upstairs, downstairs, on both sides.  He

09:13AM   8   had built in the back above, he had built offices up there.

09:13AM   9   Q    Okay.

09:13AM   10  A    Yeah, he had one good operation, you know.  He told me

09:14AM   11  he -- he told me, Yeah, I moved up a little bit since you've

09:14AM   12  been gone, you know.

09:14AM   13            MR. INCIONG:  Can I have Exhibit 5-2 shown to

09:14AM   14  Mr. Miller, please.

09:14AM   15  BY MR. INCIONG:

09:14AM   16  Q    Mr. Miller, do you see that exhibit, that map?

09:14AM   17  A    Yes.

09:14AM   18  Q    Do you recognize what's shown there?

09:14AM   19  A    Yes.

09:14AM   20  Q    How do you recognize that?

09:14AM   21  A    That's Queen Street and Ward Avenue.  That's -- yeah, I've

09:14AM   22  been there a lot.

09:14AM   23  Q    Does that map accurately show that area?

09:14AM   24  A    Yes.

09:14AM   25  Q    Is this the general area where the business Kama'aina

09:14AM    1    Termite and Pest Control was located?

09:14AM    2    A    Yes.

09:14AM    3            MR. INCIONG:  Your Honor, I would move to admit

09:14AM    4    Exhibit 5-2, please.

09:14AM    5            THE COURT:  It's already admitted --

09:14AM    6            MR. KENNEDY:  Your Honor, I believe it's already in

09:14AM    7    evidence.

09:14AM    8            MR. INCIONG:  Oh, my -- my apologies if it is.

09:14AM    9            THE COURT:  You can publish.

09:14AM   10            MR. INCIONG:  May I publish it, Your Honor?

09:14AM   11            THE COURT:  Yes.

09:14AM   12            MR. INCIONG:  Thank you.

09:14AM   13    BY MR. INCIONG:

09:14AM   14    Q    So that's the -- the area of Queen Street and Ward, like

09:15AM   15    you said?

09:15AM   16    A    Yes.

09:15AM   17    Q    The red dot, is that generally where Kama'aina Termite and

09:15AM   18    Pest Control is located?

09:15AM   19    A    Yes, I think -- I think the -- where the red is, that's

09:15AM   20    the gun shop on the other side of -- it says --

09:15AM   21    Q    So next door is -- would be more accurate?

09:15AM   22    A    Yeah.  I think so.

09:15AM   23    Q    But generally, that's -- that's where it's located?

09:15AM   24    A    Yes.

09:15AM   25            MR. INCIONG:  Could we have Exhibit 5-2-A shown to

09:15AM    1    Mr. Miller, please?

09:15AM    2            THE COURT:  Yes.

09:15AM    3    BY MR. INCIONG:

09:15AM    4    Q    Do you recognize what's shown in this exhibit, sir?

09:15AM    5    A    Yes.

09:15AM    6    Q    And is that -- how do you recognize that?

09:15AM    7    A    That's the downtown area, Ward area.  Got the harbor right

09:15AM    8    here.  Queen Street, yeah.

09:15AM    9    Q    And is this basically just a wider, a broader view of the

09:15AM   10    slide you looked at a second ago?

09:15AM   11    A    Yes.

09:15AM   12    Q    Does that accurately show 5-2-A?

09:15AM   13    A    Yes.

09:15AM   14            MR. INCIONG:  That's previously been admitted, Your

09:16AM   15    Honor, I believe.  Can I publish that to Mr. Miller?

09:16AM   16            THE COURT:  Yes, it has been and, yes, you may.

09:16AM   17            MR. INCIONG:  Thank you.

09:16AM   18    BY MR. INCIONG:

09:16AM   19    Q    So, Mr. Miller, again, this is -- this is the Kaka'ako

09:16AM   20    area that you described?

09:16AM   21    A    Yes.

09:16AM   22    Q    And the red dot there again shows generally where the

09:16AM   23    business Kama'aina Termite and Pest Control was and is located

09:16AM   24    on Queen Street?

09:16AM   25    A    Yes.

09:16AM     1                    MR. INCIONG:  All right.  Could we show Mr. Miller

09:16AM     2     Exhibit 5-22, please.

09:16AM     3     BY MR. INCIONG:

09:16AM     4     Q    Do you recognize what's shown in this photograph, sir?

09:16AM     5     A    Yes.

09:16AM     6                    MR. INCIONG:  Your Honor, this has been previously

09:16AM     7     admitted.  May I publish that?

09:16AM     8                    THE COURT:  Yes.

09:16AM     9                    MR. INCIONG:  Thank you.

09:16AM    10     BY MR. INCIONG:

09:16AM    11     Q    So what's shown in this photo, Mr. Miller?

09:16AM    12     A    That's the -- that's the shop right there.  That's what --

09:16AM    13     that's what we used to call 'em.

09:16AM    14     Q    Is this where you were spending a lot of time with

09:16AM    15     Mr. Miske when you were released from prison in 2013?

09:17AM    16     A    Yes.

09:17AM    17     Q    And you spent -- did you spent a lot of time there in the

09:17AM    18     years going forward as well?

09:17AM    19     A    Yes.

09:17AM    20     Q    Now, you described -- I think you mentioned that one thing

09:17AM    21     that had changed about the business about it being bigger was

09:17AM    22     you mentioned trucks as well?

09:17AM    23     A    Yes.

09:17AM    24     Q    What did you notice that was different about the -- the

09:17AM    25     trucks associated with that business?

09:17AM   1   A    When I -- when I left, I used to -- I used to go with him

09:17AM   2   down to some -- when he used to buy these little Toyotas and

09:17AM   3   put the flatbeds on top.  And when I came out, he had -- he had

09:17AM   4   big Fords 450s, and -- yeah, he had a pretty good setup going.

09:17AM   5   Q    Okay.  Was this also the same location that some of the

09:17AM   6   other businesses were located that you mentioned, Kama'aina

09:17AM   7   Plumbing and solar?

09:17AM   8   A    Yes.  Solar was in -- solar was in the back upstairs,

09:18AM   9   plumbing was on the right side.

09:18AM   10  Q    And you mentioned a nightclub that was now in the picture.

09:18AM   11  A    Yes.

09:18AM   12  Q    What nightclub was that?

09:18AM   13  A    M Nightclub.

09:18AM   14  Q    Was -- Mr. Miske was owner of that nightclub?

09:18AM   15  A    Yes.

09:18AM   16  Q    Did you ever go to that nightclub?

09:18AM   17  A    Yes.

09:18AM   18       MR. INCIONG:  Could I have Exhibit 4-60 shown to

09:18AM   19  Mr. Miller, please.

09:18AM   20  BY MR. INCIONG:

09:18AM   21  Q    Do you recognize this map, Mr. Miller?

09:18AM   22  A    Yes.

09:18AM   23  Q    How do you recognize that?

09:18AM   24  A    That's the same downtown area, Punchbowl.

09:18AM   25  Q    Does this area -- this map show where the M Nightclub was

09:18AM    1    located?  Not specifically, but is this -- location-wise, is it

09:18AM    2    in this area?

09:18AM    3    A    Yeah, right there.  Well, I'd say the Waterfront Plaza, in

09:19AM    4    that area right there.  The Han's Korean barbecue right across

09:19AM    5    Subway.

09:19AM    6    Q    Okay.  So is Exhibit 4-60 an accurate map of that general

09:19AM    7    area?

09:19AM    8    A    Yes.

09:19AM    9         MR. INCIONG:  Your Honor, I would move to admit 4-60,

09:19AM   10    please.

09:19AM   11         THE COURT:  Any objection?

09:19AM   12         MR. KENNEDY:  No objection.

09:19AM   13         THE COURT:  4-60 is admitted without objection.  You

09:19AM   14    may publish.

09:19AM   15         (Exhibit 4-60 was received in evidence.)

09:19AM   16         MR. INCIONG:  Thank you, Your Honor.

09:19AM   17    BY MR. INCIONG:

09:19AM   18    Q    Sir, could you just draw a circle approximately where the

09:19AM   19    M Nightclub was located on this map, Mr. Miller?

09:19AM   20    A    About right there (indicating).

09:19AM   21    Q    So that's the area, the major streets there are Punchbowl

09:19AM   22    and Ala Moana Boulevard?

09:19AM   23    A    Yes.

09:19AM   24    Q    Are you familiar with what's known as Restaurant Row?

09:19AM   25    A    Yes.

09:19AM  1    Q    Is that area where the M Nightclub was located?

09:19AM  2    A    Yes.

09:19AM  3          MR. INCIONG:  Could we show Exhibit 4-61, please, to

09:19AM  4    Mr. Miller.

09:19AM  5          Actually let me go to 4-62, please, first.  Sorry.

09:19AM  6    BY MR. INCIONG:

09:20AM  7    Q    Do you recognize what's shown in this photo, Mr. Miller?

09:20AM  8    A    Yes.

09:20AM  9    Q    How do you recognize that?

09:20AM  10   A    I drove past 'em a lot of times.  That's the front of the

09:20AM  11   Restaurant Row.  Ruth's Chris Steakhouse right there.

09:20AM  12   Q    And is that where the M Nightclub is located

09:20AM  13   approximately?

09:20AM  14   A    Yes.

09:20AM  15         MR. INCIONG:  Your Honor, I would move to admit

09:20AM  16   Exhibit 4-62.

09:20AM  17         THE COURT:  Any objection, Counsel?

09:20AM  18         MR. KENNEDY:  No objection.

09:20AM  19         THE COURT:  Without objection, 4-62 is admitted.  You

09:20AM  20   may publish.

09:20AM  21         (Exhibit 4-62 was received in evidence.)

09:20AM  22         MR. INCIONG:  Thank you, Your Honor.

09:20AM  23   BY MR. INCIONG:

09:20AM  24   Q    So this -- as you indicated, this is the front of

09:20AM  25   Restaurant Row?

| | | | |
|---|---|---|---|
| 09:20AM | 1 | A | Yes. |
| 09:20AM | 2 | Q | So that's along Ala Moana Boulevard then? |
| 09:20AM | 3 | A | Yes. |
| 09:20AM | 4 | Q | And this is where the M Nightclub was located? |
| 09:20AM | 5 | A | Yes. |
| 09:20AM | 6 | | MR. INCIONG:  Could I show Mr. Miller Exhibit 4-62 -- |
| 09:20AM | 7 | | I'm sorry -- 4-61, please. |
| 09:20AM | 8 | | BY MR. INCIONG: |
| 09:20AM | 9 | Q | Do you recognize what's shown in that photo, Mr. Miller? |
| 09:20AM | 10 | A | Yes. |
| 09:20AM | 11 | Q | How do you recognize that? |
| 09:20AM | 12 | A | That's right outside the -- the M Nightclub.  Yeah, when |
| 09:21AM | 13 | | I -- when I came home, if I'm correct, I think he just got |
| 09:21AM | 14 | | that, because I remember him telling me he bought that place |
| 09:21AM | 15 | | too, that little -- that little thing right outside there, |
| 09:21AM | 16 | | right outside the M. |
| 09:21AM | 17 | Q | Does that accurately -- that photo accurately show that -- |
| 09:21AM | 18 | | that little bar that you just described? |
| 09:21AM | 19 | A | Yes. |
| 09:21AM | 20 | | MR. INCIONG:  Your Honor, I would move to admit |
| 09:21AM | 21 | | Exhibit 4-61 at this time. |
| 09:21AM | 22 | | THE COURT:  Any objection? |
| 09:21AM | 23 | | MR. KENNEDY:  No objection, Your Honor. |
| 09:21AM | 24 | | THE COURT:  All right.  4-61 then is admitted without |
| 09:21AM | 25 | | objection.  You may publish. |

09:21AM   1                    (Exhibit 4-61 was received in evidence.)

09:21AM   2              MR. INCIONG:  Thank you, Your Honor.

09:21AM   3    BY MR. INCIONG:

09:21AM   4    Q    So Mr. Miske owned this as well, he said?

09:21AM   5    A    Yeah.

09:21AM   6    Q    And this was located basically right outside the -- the

09:21AM   7    front door of the M Nightclub?

09:21AM   8    A    Yes.  And right there, had a little hot dog stand that

09:21AM   9    used to be right there.

09:21AM   10    Q    Now, you mentioned you've actually been to the

09:22AM   11    M Nightclub, correct?

09:22AM   12    A    Yes.

09:22AM   13    Q    How many times would you say you went to the M Nightclub?

09:22AM   14    A    Been there a lot.

09:22AM   15    Q    And this was all after you had been released from prison?

09:22AM   16    A    Yes.

09:22AM   17              MR. INCIONG:  Your Honor, I would move to -- or, I'm

09:22AM   18    sorry, can I please have Exhibit 1-854 shown just to

09:22AM   19    Mr. Miller.

09:22AM   20    BY MR. INCIONG:

09:22AM   21    Q    Do you recognize this photograph, sir?

09:22AM   22    A    Yes.

09:22AM   23    Q    How do you recognize that?

09:22AM   24    A    That's me in that -- in that picture.

09:22AM   25    Q    Okay.  And you recognize at least some of the other people

09:22AM    1    in that picture?

09:22AM    2    A    Yes.

09:22AM    3    Q    Do you recognize where that picture was taken?

09:22AM    4    A    Yes.

09:22AM    5    Q    How do you recognize that?

09:22AM    6    A    That's the inside of the -- of the M, these little --

09:22AM    7    these little pillars right here, he had 'em custom -- that was

09:22AM    8    custom made from some artist in Cali.

09:22AM    9    Q    Does that picture accurately show yourself and the other

09:22AM   10    individuals inside the M Nightclub?

09:22AM   11    A    Yes.

09:22AM   12         MR. INCIONG:  Your Honor, I would move to admit 1-854.

09:23AM   13         THE COURT:  Any objection?

09:23AM   14         MR. KENNEDY:  No objection, Your Honor.

09:23AM   15         THE COURT:  Without objection, 1-854 is admitted.  You

09:23AM   16    may publish.

09:23AM   17         (Exhibit 1-854 was received in evidence.)

09:23AM   18         MR. INCIONG:  Thank you, Your Honor.

09:23AM   19    BY MR. INCIONG:

09:23AM   20    Q    So, Mr. Miller, if you could -- I guess start from --

09:23AM   21    we'll go left to right, and tell who -- who you recognize or

09:23AM   22    who you know that are pictured in this photo.

09:23AM   23    A    So this is my -- this is my son's mom right here.

09:23AM   24    Q    Okay.  All right.

09:23AM   25    A    That's me right here.

| | | | |
|---|---|---|---|
| 09:23AM | 1 | Q | Okay. |
| 09:23AM | 2 | A | Mikey right here.  Dusky Boy.  I don't know who that -- I |
| 09:23AM | 3 | | can't figure out who this guy is right here, but -- but this is |
| 09:23AM | 4 | | Johnnie right here.  Johnnie Stancil. |
| 09:23AM | 5 | Q | Okay.  So we'll go back in reverse order, I guess.  So on |
| 09:23AM | 6 | | the far right then is John Stancil? |
| 09:23AM | 7 | A | Yes. |
| 09:23AM | 8 | Q | Okay.  You can't tell who the person next to him is? |
| 09:23AM | 9 | A | I just -- I know him, but I just cannot think of his name, |
| 09:24AM | 10 | | I don't know. |
| 09:24AM | 11 | Q | So the person then -- one person over to the left in the |
| 09:24AM | 12 | | white V-neck t-shirt you said that's Dusky Boy.  What -- do you |
| 09:24AM | 13 | | know his full name or real name? |
| 09:24AM | 14 | A | Dusky Toledo. |
| 09:24AM | 15 | Q | Okay.  And then the middle next to Mr. Toledo, who is |
| 09:24AM | 16 | | that? |
| 09:24AM | 17 | A | Right here this is -- that's Mikey -- Mike Miske right |
| 09:24AM | 18 | | there. |
| 09:24AM | 19 | Q | Okay.  And then that's you with Mr. Miske has his arm |
| 09:24AM | 20 | | around? |
| 09:24AM | 21 | A | Yes, he got his arm around -- he got is arm around Dusky |
| 09:24AM | 22 | | right here, and then me right there. |
| 09:24AM | 23 | Q | Okay.  And then next to you is you indicated your -- your |
| 09:24AM | 24 | | son's mother? |
| 09:24AM | 25 | A | That's my -- yeah, that's my baby mama right here. |

09:24AM  1    Q    Now, you said you recognized this photo, and I think the
09:24AM  2    circle is still there and I guess it's the upper left-hand
09:24AM  3    corner of the pillars.  Tell us why -- or tell the jury why you
09:24AM  4    recognize or remember those pillars.
09:24AM  5    A    At first when I -- I remember coming home and looking at
09:25AM  6    all of this -- this kind of stuff right here, and I was like --
09:25AM  7    I was like I don't believe he paying for somebody doing this
09:25AM  8    type of thing right here, you know.
09:25AM  9    Q    What do you mean by that, paying for doing what?
09:25AM  10   A    Like, I don't know, I guess they call 'em art, but to me
09:25AM  11   it look like somebody just slapping, you know, just throwing
09:25AM  12   some paint around on some -- on some paper.
09:25AM  13   Q    Did Mr. Miske explain to you how he had had that done or
09:25AM  14   how -- who did that for him?
09:25AM  15   A    He had a friend that used to -- that used to do that and
09:25AM  16   he used to do all types of art for him, making t-shirts and
09:25AM  17   stuff like that.
09:25AM  18   Q    Okay.  When you would go to the M, did you -- did you have
09:25AM  19   to pay for drinks or food or anything that you had there?
09:25AM  20   A    No.
09:25AM  21   Q    Ever?
09:25AM  22   A    No.
09:25AM  23   Q    Now, there was -- were there other businesses or business
09:26AM  24   ventures that Mr. Miske told you about that he had gotten
09:26AM  25   involved in since you had been away at prison?

09:26AM  1   A    Um, yeah, we named -- we named his businesses, right.  He

09:26AM  2   had the whole Kama'aina thing going on, he had the club going

09:26AM  3   on, and -- and, yeah, he had some fishing boats and stuff like

09:26AM  4   that.  Yeah.

09:26AM  5   Q    Okay.  So what did you know or what did he tell you about

09:26AM  6   the fishing boats?

09:26AM  7   A    He was just telling me that -- that he used to -- he

09:26AM  8   bought this boat and he was fishing and selling 'em at the

09:26AM  9   auction and stuff.  Yeah.

09:26AM  10  Q    So this is a commercial fishing boat.

09:26AM  11  A    Yeah, commercial fishing boat.  Big -- big long liner,

09:26AM  12  like long lines come off the boat to catch fish.

09:26AM  13  Q    Did you ever see that boat?

09:26AM  14  A    Yes.

09:26AM  15  Q    Do you recall the name of it?

09:26AM  16  A    I cannot -- I cannot remember the name right now.  I know

09:26AM  17  the name, but I just cannot remember right now.

09:26AM  18  Q    So that was operating still as a business when you -- you

09:27AM  19  came out of prison?

09:27AM  20  A    Yes.

09:27AM  21          MR. INCIONG:  Could I show Mr. Miller Exhibit 9-008,

09:27AM  22  please?

09:27AM  23  BY MR. INCIONG:

09:27AM  24  Q    Do you see -- I guess that's two photos there, Mr. Miller.

09:27AM  25  Do you recognize what's shown there?

| | | | |
|---|---|---|---|
| 09:27AM | 1 | A | Yes. |
| 09:27AM | 2 | Q | How do you recognize that? |
| 09:27AM | 3 | A | That's -- that's going into the bunker. |
| 09:27AM | 4 | Q | You've been there before? |
| 09:27AM | 5 | A | Yes. |
| 09:27AM | 6 | Q | Who took you there? |
| 09:27AM | 7 | A | I used to go with -- with Fredo.  And -- most of the time |
| 09:27AM | 8 | | I go there with Fredo. |
| 09:27AM | 9 | Q | And Fredo is Alfredo Cabael? |
| 09:27AM | 10 | A | Yes. |
| 09:27AM | 11 | Q | Is that picture or those two pictures, those accurately |
| 09:27AM | 12 | | depict that area outside of -- looks like the entryway to the |
| 09:27AM | 13 | | bunker you just mentioned? |
| 09:27AM | 14 | A | Yeah.  The bunker, you gotta drive on. |
| 09:27AM | 15 | | MR. INCIONG:  Your Honor, may I move to admit 9-008 or |
| 09:28AM | 16 | | 9-8 at this time, please? |
| 09:28AM | 17 | | THE COURT:  Any objection? |
| 09:28AM | 18 | | MR. KENNEDY:  Yes, Your Honor.  The objection would be |
| 09:28AM | 19 | | I'm not sure when this photograph was taken. |
| 09:28AM | 20 | | THE COURT:  All right.  Would you -- would you ask |
| 09:28AM | 21 | | Mr. Miller that? |
| 09:28AM | 22 | | MR. INCIONG:  Sure. |
| 09:28AM | 23 | | BY MR. INCIONG: |
| 09:28AM | 24 | Q | Mr. Miller, when was the -- what was the time period that |
| 09:28AM | 25 | | you went to this -- this actual bunker in person with |

| | | |
|---|---|---|
| 09:28AM | 1 | Mr. Cabael, as you just described? |
| 09:28AM | 2 | A    I used to go -- when I got out when I was in the halfway |
| 09:28AM | 3 | house, I used to be with him, and he used to be always going |
| 09:28AM | 4 | over here. |
| 09:28AM | 5 | Q    So that would be beginning in 2013 or so? |
| 09:28AM | 6 | A    Yes. |
| 09:28AM | 7 | Q    Does that -- do those photos accurately show that area as |
| 09:28AM | 8 | you saw them when you went there beginning in 2013? |
| 09:28AM | 9 | A    I mean just -- I know the road.  If that bottom road is |
| 09:29AM | 10 | down like that, because you got a drive pass 'em, yeah, like -- |
| 09:29AM | 11 | like old military housing I think on the top, you got to drive |
| 09:29AM | 12 | down and go around that bend.  So if that's that bend right |
| 09:29AM | 13 | here, that's what I -- that's what I remember more. |
| 09:29AM | 14 | Q    Okay.  And then the top picture, does that -- does that |
| 09:29AM | 15 | look like how you recall when you went to visit that -- that |
| 09:29AM | 16 | location? |
| 09:29AM | 17 | A    Yeah, kind of similar.  I not really taking in the sign, |
| 09:29AM | 18 | but like I said, if that's the same road that go around right |
| 09:29AM | 19 | here, that's what -- that's what I remember. |
| 09:29AM | 20 |              MR. INCIONG:  Okay.  Your Honor, I would move to admit |
| 09:29AM | 21 | 9-8. |
| 09:29AM | 22 |              THE COURT:  Any objection? |
| 09:29AM | 23 |              MR. KENNEDY:  Yes, Your Honor.  Could we have a |
| 09:29AM | 24 | sidebar? |
| 09:29AM | 25 |              THE COURT:  The objection was the date.  We have |

09:29AM    1    resolved the date.  Is there still -- there's a different

09:29AM    2    objection now?

09:29AM    3              MR. KENNEDY:  Yes.

09:30AM    4                      (Sidebar on the record:)

09:30AM    5              THE COURT:  All right.  What's the objection?

09:30AM    6              MR. KENNEDY:  The objection is relevance, Your Honor.

09:30AM    7    The fireworks that the government seeks to introduce was

09:30AM    8    between 2009 and 2012.  Mr. Miller was in prison, so there's no

09:30AM    9    relevance to him seeing something in 2013.  And that's why I

09:30AM    10   was asking when the picture was taken.

09:30AM    11             So I would object on relevance because he was in

09:30AM    12   either -- I think he was at Sheridan during the time period

09:30AM    13   that I understand the fireworks evidence that is being offered

09:30AM    14   I believe for Count 1 would be involved.

09:30AM    15             THE COURT:  Mr. Inciong.

09:30AM    16             MR. INCIONG:  He doesn't have to be out of prison for

09:30AM    17   it to be relevant.  The next questions are going to be whether

09:30AM    18   he was told what that bunker was used for by Mr. Miske, and

09:31AM    19   that it was used for fireworks, that he had been selling

09:31AM    20   fireworks while he was in prison.

09:31AM    21             THE COURT:  He was told that by whom?

09:31AM    22             MR. INCIONG:  Mr. Miske.

09:31AM    23             THE COURT:  All right.  Anything else?

09:31AM    24             MR. INCIONG:  No.

09:31AM    25             THE COURT:  Anything else, Mr. Kennedy?

09:31AM  1              MR. KENNEDY:  Your Honor, him visiting the fireworks

09:31AM  2    place with Mr. Cabael in 2013 would not be relevant to that.  I

09:31AM  3    don't believe that ever happened.

09:31AM  4              THE COURT:  All right.

09:31AM  5                        (End of sidebar.)

09:31AM  6              THE COURT:  The objection is overruled.  Exhibit 9-8

09:31AM  7    is admitted.  You may publish if you wish.

09:31AM  8              (Exhibit 9-008 was received in evidence.)

09:31AM  9              MR. INCIONG:  Thank you, Your Honor.

09:31AM  10             If we could enlarge just the top photo, please, at

09:31AM  11   this time.

09:31AM  12   BY MR. INCIONG:

09:31AM  13   Q    So, Mr. Miller, you mentioned that you actually visited

09:32AM  14   this place with Mr. Cabael, correct?

09:32AM  15   A    Yes.

09:32AM  16   Q    Did you actually ever go into the bunkers that you

09:32AM  17   mentioned that are -- that are contained here or --

09:32AM  18   A    Yes.

09:32AM  19   Q    What did you -- what was inside the bunker?

09:32AM  20   A    Had a bunch of extra stuff that was -- when I went in

09:32AM  21   there, it was more like a storage, you know.

09:32AM  22   Q    Did you have considerations with Mr. Miske about what he

09:32AM  23   had used that bunker for?

09:32AM  24   A    Yeah.

09:32AM  25   Q    What did he tell you?

09:32AM    1    A    Oh, he told me that that's what they used to use for

09:32AM    2    fireworks long time.

09:32AM    3    Q    What fireworks are you talking about?

09:32AM    4    A    He told me he had some -- he had some fireworks that --

09:32AM    5    that he used to -- he used to bring in.  Like -- like, you

09:32AM    6    know, like they do in Waikiki.

09:32AM    7    Q    So we're not talking about sparklers?

09:32AM    8    A    No, no, not sparklers.

09:32AM    9    Q    Commercial grade?

09:32AM    10    A    Yeah, like aerials.  Big -- big aerials.

09:33AM    11    Q    He told you he brought these in.  Where did he say from?

09:33AM    12    Brought them in from where?

09:33AM    13    A    He told me he had a company, and he used to bring those in

09:33AM    14    before.  Him and this other guy Kalani, he used to tell me

09:33AM    15    that, but --

09:33AM    16    Q    Did he tell you where the fireworks came from?

09:33AM    17    A    China.

09:33AM    18    Q    Did he tell you whether he had ever gone to China?

09:33AM    19    A    He told me he went to China.  He told me he went to China.

09:33AM    20    Q    Did he ever indicate to you the quantity of or how many --

09:33AM    21    how long that he did this for?

09:33AM    22    A    I mean he -- he just said he had a lot, but he never break

09:33AM    23    down how much the -- the quantity was that he had.

09:33AM    24    Q    Did he tell you whether he made any money off of that?

09:33AM    25    A    He told me he made -- he told me he made some -- he made a

| | | | |
|---|---|---|---|
| 09:33AM | 1 | | lot of money. |
| 09:33AM | 2 | Q | What's a lot of money? |
| 09:33AM | 3 | A | He told me he made some M's, some millions. |
| 09:33AM | 4 | Q | "M's" means -- |
| 09:33AM | 5 | A | Yeah. |
| 09:33AM | 6 | Q | -- means millions? |
| 09:33AM | 7 | A | Yes.  And he told me he was -- he was partners with this |
| 09:33AM | 8 | | guy Kalani, Kalani Nuuanu, from where we from too.  But he just |
| 09:34AM | 9 | | told me like, Hey, like, man, I feel bad, you know, but fuck |
| 09:34AM | 10 | | it, it is what it is, you know. |
| 09:34AM | 11 | Q | He felt bad about what? |
| 09:34AM | 12 | A | About -- about ripping him off. |
| 09:34AM | 13 | Q | Okay.  Well, tell us about that. |
| 09:34AM | 14 | A | I don't know much to say about that.  He was just telling |
| 09:34AM | 15 | | me that -- that he sold -- he sold -- like he was selling |
| 09:34AM | 16 | | fireworks out the back door, and then he went fake the -- the |
| 09:34AM | 17 | | break-in because there was -- the ATF was coming, and he had to |
| 09:34AM | 18 | | make like they went cut the locks and make like the thing was |
| 09:34AM | 19 | | stolen, so when they go -- when they go there and inspect the |
| 09:34AM | 20 | | containers, the bunkers, they can see the thing got stolen. |
| 09:34AM | 21 | | You know. |
| 09:34AM | 22 | Q | Okay.  So let me have -- let me ask a couple of follow-up |
| 09:34AM | 23 | | questions about that. |
| 09:34AM | 24 | | So first of all, when you say he was selling it out |
| 09:34AM | 25 | | the back door, you mean he was selling the fireworks on the |

09:34AM    1    black market?

09:34AM    2    A    Yes.

09:34AM    3    Q    He was not selling them legally?

09:35AM    4    A    No, he wasn't selling them legally.

09:35AM    5    Q    And you mentioned something about the ATF was on to him.

09:35AM    6    What do you mean by that?

09:35AM    7    A    He said like they was -- they was coming for an inspection

09:35AM    8    or something like that for see if all the fireworks was

09:35AM    9    accounted for, and the thing was gone.  So -- so he told me he

09:35AM   10    had to -- they had to -- they had to stage like when they cut

09:35AM   11    the locks, and so when they came, the ATF would look and they

09:35AM   12    would be able to say, Hey, the fireworks got stolen.  That's

09:35AM   13    why it's not there.

09:35AM   14    Q    So you mean he staged a theft of the fireworks?

09:35AM   15    A    Yes.

09:35AM   16    Q    So that was going to be the explanation to the ATF as to

09:35AM   17    why the fireworks were gone?

09:35AM   18    A    Yes.  The ATF or whoever was inspecting 'em, that was

09:35AM   19    going to be the -- whatever law was coming or people that was

09:35AM   20    coming, that was going to be the explanation why the thing was

09:35AM   21    gone.

09:35AM   22    Q    Did Mr. Miske ever tell you that he believed he was under

09:35AM   23    investigation by anyone other than the ATF during that time?

09:36AM   24    A    During that time?  Yeah, well, he would tell me the feds.

09:36AM   25    He used the feds.

09:36AM    1    Q    So what -- what did he say?

09:36AM    2    A    He told me like the feds got a hard on for him.  They

09:36AM    3    always had a hard on for him.  That's what he would tell me.

09:36AM    4    Q    Did he tell you how he knew that the ATF was investigating

09:36AM    5    him?

09:36AM    6    A    He would tell me -- like he would tell me he heard like

09:36AM    7    that.  You know, like as in I heard from somebody that -- that

09:36AM    8    knew very well what they was doing.

09:36AM    9    Q    Were there any other examples of that where he told you he

09:36AM    10    had heard things of --

09:36AM    11    A    Yeah, I cannot -- I cannot think of it right now.

09:36AM    12    Q    Do you recall any -- anything like that in regard to the

09:36AM    13    fishing boat?

09:36AM    14    A    Oh, yeah, yeah, yeah.  Yeah.

09:36AM    15    Q    Explain that.

09:36AM    16    A    Okay.  So I just still in the -- I was just getting out of

09:37AM    17    prison right there.  So -- so one day we're kicking back,

09:37AM    18    whatever, and he -- and he tells me his -- his boat got

09:37AM    19    surrounded by -- his fishing boat -- I cannot think of the

09:37AM    20    name, but the big long liner -- you know, get maybe 10, 15

09:37AM    21    people on the crew.

09:37AM    22         But he told me out there the Coast Guard surround

09:37AM    23    them, and -- and they thought he was -- they thought he was

09:37AM    24    bringing in drugs.  But he wasn't because somebody told him

09:37AM    25    that -- somebody got -- knew what was happening and told him

09:37AM   1   that -- that, Hey, they intercepted one call from me telling my
09:37AM   2   boat captain that -- that make sure you get that white dog.
09:37AM   3   And he saw he had a white dog in California, and this guy is an
09:37AM   4   animal lover, you know.
09:37AM   5         So they thought the white dog was him telling the
09:37AM   6   captain like grab white -- grab drugs or something like that,
09:37AM   7   you know, because they did a big -- they did a big Coast
09:38AM   8   Guard -- they brought in -- they brought in submarines to look
09:38AM   9   under his boat, cameras to look in every one of his fishes,
09:38AM   10  but, yeah, it was really a white dog, and, you know, he was
09:38AM   11  laughing.  You know, we was all laughing at them because they
09:38AM   12  thought that.
09:38AM   13  Q    So Mr. Miske is telling you that this is his account of
09:38AM   14  what happened with the search and the Coast Guard and so forth,
09:38AM   15  correct?
09:38AM   16  A    Yes.
09:38AM   17  Q    But it was a really -- it was a white dog, yes?
09:38AM   18  A    Yeah, it was really -- yeah, it was really -- it was
09:38AM   19  really a white dog.  He never like -- he never like the dog --
09:38AM   20  this guy loved animals, like he took in -- he took in stray
09:38AM   21  dogs, you know, dogs he never even know.  He's a -- he's an
09:38AM   22  animal lover.  So --
09:38AM   23  Q    So this white dog was his son's dog?
09:38AM   24  A    Was his son's dog, yeah.  His son was coming back from --
09:38AM   25  from -- I don't know where his son was coming back from.  I

09:38AM    1    think Alaska or something like that.  Because he was gone --

09:38AM    2    when I first came out of prison, I think he was with his mom in

09:38AM    3    Alaska, and he was coming back, but -- when you come back to

09:39AM    4    Hawaii, you got to put your dog through quarantine, and he

09:39AM    5    never like the dog go through quarantine.  So I think --

09:39AM    6    Q    So he sent the fishing boat to pick up the dog?

09:39AM    7    A    Yeah.  If the boat was in the area -- I don't know if he

09:39AM    8    just sent it there or what, but if the boat was in the area,

09:39AM    9    the thing -- it wasn't there to pick up any drugs.  It was for

09:39AM    10   grab his dog and bring 'em back.  And he told me he heard --

09:39AM    11   somebody had told him that, Hey, they told me that -- they told

09:39AM    12   me that -- the conversation was the reason why they raid my

09:39AM    13   boat was because I told the captain, Make sure you grab the

09:39AM    14   white dog.

09:39AM    15   Q    So did Mr. Miske tell you that this was someone that he

09:39AM    16   had information from or was this just hearsay that he heard the

09:39AM    17   comment from?

09:39AM    18   A    Yeah, like somebody he -- he heard information from.

09:39AM    19   That's not -- and this is going on while they -- while they

09:39AM    20   still -- while they still on the boat looking in the fishes and

09:39AM    21   stuff like that, you know.

09:39AM    22   Q    This would have been --

09:39AM    23   A    And he was like, Fuck these, fuckers.  They're going to

09:40AM    24   have to pay for the fishes now.  This is big fishes, not no

09:40AM    25   long liners they catch, like 150-, 200-pound tunas.  So they

09:40AM  1    going with the camera inside and looking at every fish and --

09:40AM  2    Q    So Mr. Miske received this information as this was

09:40AM  3    happening.

09:40AM  4    A    Yeah, like while -- while this was happening he's already

09:40AM  5    telling me about the -- about the white dog situation, and

09:40AM  6    they -- and they looking under his boat, the Coast Guard.

09:40AM  7    Q    So did you from that point on, did you refer to that term

09:40AM  8    to describe other situations, meaning the term "white dog"?

09:40AM  9    A    Yes.

09:40AM  10   Q    And what did that mean going forward then?

09:40AM  11   A    Well, I mean, from -- to me and him the term "white dog"

09:40AM  12   was like -- was like they looking for something that -- that is

09:40AM  13   not right.  They looking for something they not going to find.

09:40AM  14   They looking for the wrong -- they looking for the wrong thing.

09:40AM  15   Q    So I think you mentioned that Mr. Miske said that he

09:41AM  16   had -- he had upgraded his status since you had gotten out of

09:41AM  17   prison.  Is that what you said, something --

09:41AM  18   A    Yeah, it would be like, Hey, I'm --

09:41AM  19   Q    So he was doing well?

09:41AM  20   A    Yeah, I'm moving up, boy.

09:41AM  21   Q    You mentioned before that right when you first met

09:41AM  22   Mr. Miske that he also had nice cars, nice things.  When you

09:41AM  23   got out of prison, did you still see some of those same things?

09:41AM  24   A    I had -- came out of prison, he had nicer cars, you know.

09:41AM  25   Q    Did you -- did you recognize any cars that you had seen

09:41AM  1   from when you first met him?

09:41AM  2   A    Oh, yeah, yeah.  So -- so I remember we was sitting in his

09:41AM  3   office one day, and he was like, Hey, you remember baby girl?

09:41AM  4   And that's what he used to call his -- he had one baby window

09:41AM  5   Bug back in the days, you know, which I never remember at the

09:41AM  6   time.  But he was showing me a picture of a long time ago, and

09:41AM  7   he was like, Yeah, I got that back.  Like he bought the Bug

09:41AM  8   back, that's what -- yeah.

09:42AM  9   Q    This is a -- when you say a Bug, this is a Volkswagon Bug?

09:42AM  10  A    Yeah, old school Bug like, you know, 1950s.  Yeah, nice --

09:42AM  11  nice Bug, little baby window.

09:42AM  12  Q    So he had owned it when you first met him, and then sold

09:42AM  13  it?

09:42AM  14  A    He got rid of it and then got it back.

09:42AM  15  Q    And then bought it back.  Okay.

09:42AM  16       Was he still -- or where was Mr. Miske living to your

09:42AM  17  knowledge at this time when you first got out?

09:42AM  18  A    Huh?

09:42AM  19  Q    Where was Mr. Miske living?

09:42AM  20  A    At this time he was living -- he was living in Kailua, but

09:42AM  21  he had -- he was living in Kailua.  He had -- he had a little

09:42AM  22  apartment over there in town.

09:42AM  23  Q    The place he was living in Kailua, was that the same place

09:42AM  24  that he had lived when -- before you went to prison?

09:42AM  25  A    Yes.

09:42AM   1   Q    Had he purchased any other properties that you knew of?

09:42AM   2   A    Oh, yeah.  He had -- he wasn't living there, but he had

09:43AM   3   his -- he used to call it Lumahai.  That was this one property

09:43AM   4   at that time, wasn't -- nothing was built on it.

09:43AM   5   Q    Lumahai referenced to what?  Is that the street that it

09:43AM   6   was on?

09:43AM   7   A    That's the -- that's the street, yeah.

09:43AM   8   Q    Did you ever go to visit this property?

09:43AM   9   A    Yes.

09:43AM   10  Q    What was the state of it when you first saw it?

09:43AM   11  A    It was dirt.  Was -- was dirt.  I remember -- I remember

09:43AM   12  first -- one of the first times that I went there with him,

09:43AM   13  open the gate, it was just dirt -- it was just dirt and

09:43AM   14  equipment.  It wasn't even -- cement wasn't poured or nothing.

09:43AM   15       But I remember standing on the top looking down at the

09:43AM   16  property like that, and he was like, Hey, you see that rock out

09:43AM   17  there, I -- I own that fucking rock too.  You know.  And -- and

09:43AM   18  I was like, What you mean you own the rock?  He said, Yeah, I

09:43AM   19  own it.  That fucking rock out there, I own that rock.  But

09:43AM   20  trust me, I don't want it.  You know, if somebody get hurt on

09:43AM   21  that rock, then they going to sue me or something like that.

09:44AM   22       But, yeah, that's -- that's what I remember about that

09:44AM   23  conversation, him telling me about that -- specifically telling

09:44AM   24  me he owned that rock.

09:44AM   25  Q    And what part of the island was this property?

| | | |
|---|---|---|
| 09:44AM | 1 | A    Hawaii Kai.  Hawaii Kai, Portlock area right before |
| 09:44AM | 2 | Hanauma Bay. |
| 09:44AM | 3 | Q    Was there any like well-known landmark or attraction type |
| 09:44AM | 4 | place in that area that's close to the property that you know |
| 09:44AM | 5 | of? |
| 09:44AM | 6 | A    Yeah, Hanauma Bay was right there. |
| 09:44AM | 7 | Q    Okay.  Did Mr. Miske ever have conversations with you |
| 09:44AM | 8 | about the process of -- of building a structure or a residence |
| 09:44AM | 9 | on that property? |
| 09:44AM | 10 | A    What? |
| 09:44AM | 11 | Q    Was Mr. Miske going to build something on that property? |
| 09:44AM | 12 | A    Yeah, a house. |
| 09:44AM | 13 | Q    A house? |
| 09:44AM | 14 | A    Yeah. |
| 09:44AM | 15 | Q    Okay.  And how did he indicate to you how he was paying |
| 09:44AM | 16 | for that? |
| 09:44AM | 17 | A    He told me he was paying in cash.  He told me that -- |
| 09:44AM | 18 | yeah, he was paying the workers in cash.  He told me that |
| 09:45AM | 19 | that -- that -- he used to always tell me like, Lumahai is |
| 09:45AM | 20 | sucking up my cash. |
| 09:45AM | 21 | Q    Did you have any conversation with him about how much he |
| 09:45AM | 22 | paid for the -- just the lot or the property itself? |
| 09:45AM | 23 | A    Nah, I cannot remember that. |
| 09:45AM | 24 | Q    Okay.  So did Mr. Miske ever tell you what he was doing |
| 09:45AM | 25 | to -- to come up with the money to -- to pay for the building |

09:45AM  1    of the house since it was draining his -- his cash?

09:45AM  2    A    I mean, he had -- he had the nightclub at that time, you

09:45AM  3    know, so he used to -- he used to have this guy Jason, he used

09:45AM  4    to bring him cash from the -- from the nightclub every week.

09:45AM  5    Not every week but constantly.

09:45AM  6    Q    Okay.  Let me go back and ask you a couple of questions

09:45AM  7    about the nightclub first.  Did Mr. Miske tell you how he had

09:45AM  8    acquired the M Nightclub?

09:45AM  9    A    He told me he caught -- he caught Sammy for him.  Told me

09:46AM  10   he was supposed to buy it for Sammy -- from Sammy, I mean.

09:46AM  11   Q    So he bought the club from Sammy?

09:46AM  12   A    Yes.

09:46AM  13   Q    Who is Sammy?

09:46AM  14   A    Sammy Kuuana.

09:46AM  15   Q    Did you know Sammy Kuuana?

09:46AM  16   A    Yes.

09:46AM  17   Q    Did Mr. Miske tell you what the price or the terms of

09:46AM  18   the -- the purchase of the club were?

09:46AM  19   A    He was supposed to like -- I don't know, like he supposed

09:46AM  20   to give -- like he gave Sammy some cash, and he was supposed to

09:46AM  21   give Sammy more cash, and then they had worked out something on

09:46AM  22   the side.  But I know after he gave him the -- after he gave

09:46AM  23   him the first payment, he was telling me he just said, Fuck

09:46AM  24   this guy.

09:46AM  25   Q    So he never paid the -- the balance that was owed?

09:46AM  1    A    Yeah, I mean, not -- not that I know of.

09:46AM  2    Q    Now, you mentioned that there was a guy you referred to as

09:46AM  3    Jason.  Do you recall Jason's last name?

09:46AM  4    A    Yokoyama.

09:46AM  5         MR. INCIONG:  Could we show Mr. Miller Exhibit 1-039,

09:46AM  6    please?

09:46AM  7    BY MR. INCIONG:

09:47AM  8    Q    Do you recognize who's shown in that photo, sir?

09:47AM  9    A    Yes.

09:47AM  10   Q    How do you recognize that?

09:47AM  11   A    I know him, just Jason -- yeah, Jason Yokoyama.

09:47AM  12   Q    And that photo accurately shows him as you -- as you know

09:47AM  13   how he looks?

09:47AM  14   A    Yes.

09:47AM  15        MR. INCIONG:  Okay.  Sorry, Your Honor, I believe this

09:47AM  16   is -- this is in, so I won't move to admit it.  May we publish

09:47AM  17   it at this time?

09:47AM  18        THE COURT:  You may.

09:47AM  19   BY MR. INCIONG:

09:47AM  20   Q    So this is Jason Yokoyama?

09:47AM  21   A    Yes.

09:47AM  22   Q    Did you meet Mr. Yokoyama?

09:47AM  23   A    Yes.

09:47AM  24   Q    When did you first meet him?

09:47AM  25   A    When I -- when I came out.

09:47AM  1   Q    From your understanding, what was Mr. Yokoyama's

09:47AM  2   relationship to Mr. Miske?

09:47AM  3   A    They used to -- Jason -- the way -- the way Miske used to

09:47AM  4   explain it to me was like he was like his -- you know, he blend

09:47AM  5   right in.  He not -- like no tattoos.  He used to be in the

09:47AM  6   military.  Just a clean cut small guy, not intimidating, you

09:48AM  7   know, but he used to do different odds and ends for -- for

09:48AM  8   Miske.

09:48AM  9   Q    So he was -- he was employed by Mr. Miske in some

09:48AM  10  capacity?

09:48AM  11  A    Yes.

09:48AM  12  Q    Did he do any work for Mr. Miske at the M Nightclub that

09:48AM  13  you knew about?

09:48AM  14  A    Yes.  I -- from what I know, like he was like -- he was

09:48AM  15  like part-owner running 'em, or if not the manager, you know.

09:48AM  16  Q    So when you would go to the M Nightclub, would you see

09:48AM  17  Mr. Yokoyama there?

09:48AM  18  A    Yes.

09:48AM  19  Q    Did he appear to be working?

09:48AM  20  A    Yes.

09:48AM  21  Q    Did he appear to be the person running the place?

09:48AM  22  A    Yes.

09:48AM  23  Q    Okay.  Now, you said that he would bring Mr. Miske cash.

09:48AM  24  Did you witness --

09:48AM  25  A    Yes.

| 09:48AM | 1 | Q | Did you witness that? |

09:48AM   1   Q   Did you witness that?

09:48AM   2   A   Yes.

09:48AM   3   Q   So describe -- start with give one example that you recall

09:48AM   4   that happened.

09:48AM   5   A   We were in -- we were in his office sitting down.

09:49AM   6   Q   And when you say "in his office," you're talking about

09:49AM   7   Mr. Miske's office?

09:49AM   8   A   Mr. Miske's office on Queen Street, that little -- that

09:49AM   9   little red dot that we was at.  When you walk into his

09:49AM   10   office -- when you walk into his shop, his office is on -- is

09:49AM   11   on the left-hand side.  So we were inside there, get couches,

09:49AM   12   get seats.  We're talking -- we always talking, me and Miske.

09:49AM   13          Jason comes in and he talking going back and forth.

09:49AM   14   Miske is telling him like, Hey, this fucking -- this thing

09:49AM   15   is -- this thing is -- everything is not adding up.

09:49AM   16          And then I shot one back in, Because he's skimming

09:49AM   17   this fucking thing every -- every week with these bags Jason

09:49AM   18   bringing in, small little bags.  You know, like happy birthday

09:49AM   19   bags can fit teddy bears inside.  We all started laughing.

09:49AM   20   Jason brings the bag in, gives it to Miske, puts it in -- in a

09:50AM   21   drawer.

09:50AM   22   Q   Okay.  So let me ask you a few follow-up questions to

09:50AM   23   that.  So when Mr. Miske said, These things not adding up, what

09:50AM   24   did he -- what did he mean by that?

09:50AM   25   A   Yeah, like the -- the profits and stuff like that.

09:50AM  1    Q    That the club was not profitable?

09:50AM  2    A    Yeah.

09:50AM  3    Q    So you said you shot something back.  What did you mean by

09:50AM  4    that?

09:50AM  5    A    Yeah, I shot back at him like, Because you skimming this

09:50AM  6    -- you skimming this fucking thing every week.  And we all

09:50AM  7    started laughing because the bag was still sitting on the -- on

09:50AM  8    the counter at that time, the little -- the little bag.

09:50AM  9    Q    So how did you know there was money in the bag?

09:50AM  10   A    I -- that's not the -- okay, that's the time I remember

09:50AM  11   that's the time I saying, but many times we stay in there

09:50AM  12   he's -- he's just dropping the bags, we're not talking about

09:50AM  13   'em.  But I remember that -- that incident right there.

09:50AM  14   Q    So was this a regular occurrence that Mr. Yokoyama would

09:50AM  15   show up with these -- these gift bags?

09:50AM  16   A    Yes.

09:50AM  17   Q    And Mr. Miske said he -- he would take the bag and put it

09:50AM  18   in his drawer?

09:51AM  19   A    Yeah, he get one drawer on the side that, like every

09:51AM  20   time -- every time he need cash, he open that drawer and that's

09:51AM  21   where he kept his -- that's where he kept his cash.

09:51AM  22   Q    Did you ever see inside that drawer yourself?

09:51AM  23   A    Yes.

09:51AM  24   Q    And what did you see inside that drawer?

09:51AM  25   A    Always had money inside there.  Always had -- had stacks

09:51AM   1   of cash inside there.  Wads of cash.

09:51AM   2   Q    Could you tell from looking inside the -- the types of

09:51AM   3   bills or the amount of money?

09:51AM   4   A    Yeah, I mean you'd just see wads of cash, 100s, 20s.

09:51AM   5   Yeah.

09:51AM   6   Q    Did you ever ask Mr. Miske for money and he got it -- gave

09:51AM   7   it to you out of that drawer?

09:51AM   8   A    Yes.  That drawer, he would constantly open it at all

09:51AM   9   times of the day.

09:51AM   10   Q    Okay.  Now, so you're still in T.J. Mahoney.  You're there

09:51AM   11   for six to nine months approximately?

09:52AM   12   A    Yes.

09:52AM   13   Q    Were you actually working on obtaining any real employment

09:52AM   14   during that time?

09:52AM   15   A    Oh, during that time I was trying to get my -- trying to

09:52AM   16   get my CDL.

09:52AM   17   Q    What is your CDL?

09:52AM   18   A    Commercial driver's license.

09:52AM   19   Q    Why were you trying to get your CDL?

09:52AM   20   A    Because for work -- for work at the movies, to drive at

09:52AM   21   the movies you needed your CDL to get into the union.

09:52AM   22   Q    So you were trying to get into the Teamsters union?

09:52AM   23   A    Yes.

09:52AM   24   Q    Who set that up for you?

09:52AM   25   A    Miske.  Who set up what?  What you talking about, getting

09:52AM   1    the driver's license?

09:52AM   2    Q    The Teamsters job.

09:52AM   3    A    Oh, yeah, Miske.

09:52AM   4    Q    So were there certain steps that you had to take to get

09:52AM   5    your -- your commercial driver's license?

09:52AM   6    A    Yeah, you gotta -- you gotta go down there see this guy.

09:52AM   7    He do like side jobs on the side, but you go over there a few

09:53AM   8    weeks, drive the truck, make sure you know all the parts on the

09:53AM   9    truck, how to reverse the trucks into stalls and stuff like

09:53AM  10    that.  And you take the test on his truck.

09:53AM  11    Q    So did the fact that you were a convicted felon now at

09:53AM  12    that time, did that create any obstacles to getting into the

09:53AM  13    union or getting your commercial driver's license?

09:53AM  14    A    No.

09:53AM  15         MR. INCIONG:  Could we show Mr. Miller Exhibit 9-114,

09:53AM  16    please.

09:53AM  17    BY MR. INCIONG:

09:53AM  18    Q    Mr. Miller, do you recognize this document?

09:53AM  19    A    Hmm?

09:53AM  20    Q    Do you recognize this document?

09:54AM  21         Do you recognize that?

09:54AM  22    A    Yeah, I mean I reading 'em, yeah.

09:54AM  23    Q    Okay.  Have you seen this before?

09:54AM  24    A    Yes.

09:54AM  25    Q    How do you recognize this?

09:54AM   1   A    Get my name on top.

09:54AM   2   Q    There's a reference to a TWIC, T-W-I-C.  Do you know what

09:54AM   3   that is?

09:54AM   4   A    Yeah, that's -- that you need to -- you need that to

09:54AM   5   like -- anywhere to do like on the docks and stuff like that or

09:54AM   6   military bases.

09:54AM   7   Q    Okay.  So at the time you were trying to get your CDL and

09:54AM   8   trying to get into the -- the movies, were you also thinking

09:54AM   9   about the stevedores or getting into the docks?

09:54AM  10   A    Yeah, I was -- I was thinking about 'em.  But --

09:54AM  11   Q    Was that another option that Mr. Miske had said he could

09:54AM  12   arrange for you?

09:54AM  13   A    Yes.  Yeah, he told me --

09:54AM  14   Q    Go ahead.

09:54AM  15   A    He told me -- he was telling me if I wanted to go there,

09:54AM  16   but -- so his brother Johnnie used to -- he used to work there

09:55AM  17   at the time.  So he was telling me, he was like, 'eh, I'm

09:55AM  18   telling you, man, you don't want to -- you don't want to go out

09:55AM  19   there and work on the docks.  They gotta -- they actually doing

09:55AM  20   some hard work in the sun, they sweating, they pulling these

09:55AM  21   heavy ass rods into the containers.  He said, don't -- Don't go

09:55AM  22   work on the docks.  Work at the movies, you get paid the same,

09:55AM  23   and it's just easier, you know.

09:55AM  24   Q    Okay.  So that's partly why at least you decided to take

09:55AM  25   the -- the movies job?

| | | |
|---|---|---|
| 09:55AM | 1 | A    Yes. |
| 09:55AM | 2 | Q    But when you were still thinking about the stevedores, was |
| 09:55AM | 3 | this letter, Exhibit 9-114, was that submitted on your behalf? |
| 09:55AM | 4 | A    Yes. |
| 09:55AM | 5 | MR. INCIONG:  Your Honor, I would move to admit |
| 09:55AM | 6 | Exhibit 9-114. |
| 09:55AM | 7 | THE COURT:  Any objection? |
| 09:55AM | 8 | MR. KENNEDY:  Your Honor, could I see the -- the |
| 09:55AM | 9 | letter? |
| 09:55AM | 10 | No objection. |
| 09:55AM | 11 | THE COURT:  Without objection, 9-114 is admitted. |
| 09:56AM | 12 | (Exhibit 9-114 was received in evidence.) |
| 09:56AM | 13 | MR. INCIONG:  May I publish that, Your Honor? |
| 09:56AM | 14 | THE COURT:  Yes, you may. |
| 09:56AM | 15 | BY MR. INCIONG: |
| 09:56AM | 16 | Q    So, Mr. Miller, this is the letter that was submitted on |
| 09:56AM | 17 | behalf -- on your behalf by Pomai Bird? |
| 09:56AM | 18 | If you look at the bottom, the operations manager, did |
| 09:56AM | 19 | you know Pomai Bird? |
| 09:56AM | 20 | A    If I do, I no remember her. |
| 09:56AM | 21 | Q    Did she ever talk to you about putting this letter |
| 09:56AM | 22 | together for you? |
| 09:56AM | 23 | A    No. |
| 09:56AM | 24 | Q    If you look at -- let's start with the -- |
| 09:56AM | 25 | MR. INCIONG:  If we can enlarge the first paragraph, |

09:56AM    1    please.

09:56AM    2    BY MR. INCIONG:

09:56AM    3    Q    Starting with that, it says that earlier this year -- and

09:56AM    4    this is dated December 30, 2013, so this is when you were

09:56AM    5    released from prison to the halfway house, correct?

09:56AM    6    A    Yes.

09:56AM    7    Q    That you were hired as a full-time technician in May, and

09:56AM    8    you began your field training immediately.  Was that true?

09:56AM    9    A    No.

09:56AM    10    Q    You go down to the next paragraph, it says:  "During these

09:57AM    11    several months that Wayne has worked with us, staff members as

09:57AM    12    well as clients have commented on his pleasant, easygoing

09:57AM    13    personality.  Thus far all reviews have been very positive.  He

09:57AM    14    is always punctual, reliable, responsible, and gets along with

09:57AM    15    everyone he comes into contact with."

09:57AM    16             Was that true?

09:57AM    17    A    No.

09:57AM    18    Q    Why was that not true?

09:57AM    19    A    I mean, what you mean why?

09:57AM    20    Q    You weren't -- you weren't working there, correct?

09:57AM    21    A    Yeah, I wasn't working.

09:57AM    22    Q    But that -- so none of that paragraph is accurate.

09:57AM    23    A    No.

09:57AM    24             MR. INCIONG:  Could we go to the next paragraph,

09:57AM    25    please.

09:57AM   1   BY MR. INCIONG:

09:57AM   2   Q    It says:  "Since then," which is referencing your hiring,

09:57AM   3   "our pest control customer service base has already shown an

09:57AM   4   increase of 23 percent within our commercial sector.  These

09:57AM   5   numbers reflect the dedication and commitment from the entire

09:57AM   6   staff.  However, Wayne has proven to be an asset to the

09:57AM   7   corporation and has definitely contributed to our company's

09:58AM   8   success.  In September, Wayne was promoted to on-duty shift

09:58AM   9   supervisor because of his diligence and knowledge."

09:58AM   10           Is any of that true?

09:58AM   11  A    No.

09:58AM   12           MR. INCIONG:  Your Honor, could I have Mr. Miller look

09:58AM   13  at Exhibit 9-115 next, please?

09:58AM   14           THE COURT:  Yes.

09:58AM   15  BY MR. INCIONG:

09:58AM   16  Q    Mr. Miller, do you recognize that exhibit?

09:58AM   17  A    Yes.

09:58AM   18  Q    Have you seen that before?

09:58AM   19  A    Yes.

09:58AM   20  Q    Again, is this another similar letter to the last one that

09:58AM   21  was submitted to you on behalf of your application to be

09:58AM   22  employed by the stevedores union?

09:58AM   23  A    Yes -- no, that was for the TWIC, right?

09:58AM   24  Q    Or the -- right, the TWIC.  I'm sorry.

09:58AM   25  A    Yeah, yeah.

09:58AM   1   Q    The TWIC application.  And this was the same time period

09:58AM   2   again that -- after you had been released from the halfway

09:59AM   3   house in 2013?

09:59AM   4   A    Yes.

09:59AM   5            MR. INCIONG:  Your Honor, I would move to admit 9-115.

09:59AM   6            THE COURT:  Any objection?

09:59AM   7            MR. KENNEDY:  No objection.

09:59AM   8            THE COURT:  Without objection, 9-115 is admitted.  You

09:59AM   9   may publish.

09:59AM   10           (Exhibit 9-115 was received in evidence.)

09:59AM   11           MR. INCIONG:  Thank you, Your Honor.

09:59AM   12  BY MR. INCIONG:

09:59AM   13  Q    So again, Mr. Miller, do you know David Melton, who is

09:59AM   14  listed as the general manager, who signed this letter?

09:59AM   15  A    Yeah, I know Dave.

09:59AM   16  Q    How do you know Mr. Melton?

09:59AM   17  A    You know, I know he was big haole guy, baldheaded.

09:59AM   18  Q    How do you know him, though, from where?

09:59AM   19  A    He used to always be at -- when I got out he, used to

09:59AM   20  always be at the shop.  Like he was -- he was like the -- I

09:59AM   21  don't know what he was over there, but general manager there.

09:59AM   22  Q    The shop you're referring to is Kama'aina Termite and Pest

09:59AM   23  Control?

09:59AM   24  A    Yes.

09:59AM   25  Q    And so if we look at --

| | | |
|---|---|---|
| 09:59AM | 1 | MR. INCIONG:  If we can focus on that first paragraph |
| 09:59AM | 2 | of that letter, please. |
| 09:59AM | 3 | BY MR. INCIONG: |
| 09:59AM | 4 | Q    So Mr. Melton says, as general manager, that he supervised |
| 10:00AM | 5 | Wayne Miller since your hire in May 2013, that you initially |
| 10:00AM | 6 | started as a full-time technician, and that you are now one of |
| 10:00AM | 7 | the on-duty shift supervisors.  Is any of that true? |
| 10:00AM | 8 | A    No. |
| 10:00AM | 9 | Q    I'll have you look at the -- |
| 10:00AM | 10 | MR. INCIONG:  Highlight the next paragraph, please. |
| 10:00AM | 11 | BY MR. INCIONG: |
| 10:00AM | 12 | Q    "Our customers have enjoyed working with Wayne.  We have |
| 10:00AM | 13 | not received any complaints, nor had to reprimand him for |
| 10:00AM | 14 | anything at all.  His work ethic is remarkable as he continues |
| 10:00AM | 15 | to strive and achieve our monthly quotas.  Wayne has proven to |
| 10:00AM | 16 | be a very motivated individual and a great addition to our |
| 10:00AM | 17 | team." |
| 10:00AM | 18 | Is any of that accurate? |
| 10:00AM | 19 | A    No.  No. |
| 10:00AM | 20 | MR. INCIONG:  Okay.  Next paragraph then, please. |
| 10:00AM | 21 | BY MR. INCIONG: |
| 10:00AM | 22 | Q    It says:  "We believe Wayne does not pose any kind of |
| 10:00AM | 23 | security risk.  Therefore, we are asking that TSA withdraw its |
| 10:01AM | 24 | initial denial and grant him a TWIC," T-W-I-C. |
| 10:01AM | 25 | So this letter was sent specifically to try and get |

10:01AM    1    you this security clearance?

10:01AM    2    A    Yes.

10:01AM    3    Q    Were you told by -- or did you know from any other source

10:01AM    4    that these letters were being written on your behalf?

10:01AM    5    A    I don't know.  I no really remember that market for -- I

10:01AM    6    just -- like if I went put 'em all together and send them to

10:01AM    7    them, that's --

10:01AM    8    Q    Well, okay --

10:01AM    9    A    I never read 'em.

10:01AM   10    Q    Let me ask you this:  Did you ask Mr. Melton to write this

10:01AM   11    letter for you?

10:01AM   12    A    No.

10:01AM   13    Q    Did you ask Pomai Bird to write Exhibit 9-114 for you?

10:01AM   14    A    No, you know what.  I no remember if -- I no remember.

10:01AM   15    Q    Okay.

10:01AM   16    A    And I don't remember if I was there or what, but I no

10:01AM   17    remember asking them for the -- for the letters or if I --

10:01AM   18    Q    But the contents of these letters were not -- were not

10:01AM   19    true.

10:01AM   20    A    No.  As far as me working there and being -- being the --

10:02AM   21    what they say?  Shift supervisor, yeah, I don't know about --

10:02AM   22    yeah, none of that is true.  20 percent increase and all that.

10:02AM   23    Q    Okay.  All right.  So during this time --

10:02AM   24    A    It was just to get the TWIC, right.

10:02AM   25    Q    Pardon me?

10:02AM   1   A     I said this was all just to get the TWIC.

10:02AM   2   Q     Okay.  That was the security clearance that you needed.

10:02AM   3   A     Yes.

10:02AM   4          MR. INCIONG:  All right.  We can take that down.

10:02AM   5   BY MR. INCIONG:

10:02AM   6   Q     Now, other than the M Nightclub, the money issue that you

10:02AM   7   talked about before, did Mr. Miske ever complain to you about

10:02AM   8   other problems that he had that arose out of the M Nightclub?

10:02AM   9   A     Yeah, at that time he was -- I don't know if it arose out

10:02AM  10   of the M, though, but I know he was -- I cannot remember the

10:02AM  11   stuff, but he had some cases going on that he used to complain

10:03AM  12   about, and I know he had to go to -- he had to go to cell block

10:03AM  13   one time and like stay there overnight.  But I no remember the

10:03AM  14   details.

10:03AM  15   Q     When you say cases, what are you referring to?

10:03AM  16   A     Like -- like whatever cases he had, assault cases and

10:03AM  17   stuff like that.

10:03AM  18   Q     Did Mr. Miske ever indicate to you how he wanted to

10:03AM  19   resolve that case?

10:03AM  20   A     Yeah, I cannot remember, Mark.

10:03AM  21   Q     Okay.

10:03AM  22   A     But I remember him complaining about it.  Because the guy

10:03AM  23   Galmiche, right, I remember him always complaining about the

10:03AM  24   guy Galmiche, but I don't know if that happened at the M,

10:03AM  25   that's why.  That's one of those cases I remember him always

10:03AM    1    complaining about.

10:03AM    2    Q    All right.  Well, whether -- let's take aside whether or

10:03AM    3    not that happened at the M or not, but you remember this -- the

10:03AM    4    name Galmiche?

10:03AM    5    A    Yeah.

10:03AM    6    Q    Why do you remember that name?

10:04AM    7    A    Huh?

10:04AM    8    Q    Why do you remember that name?

10:04AM    9    A    Somebody he used to always complain about.

10:04AM   10    Q    And what --

10:04AM   11    A    This guy no like drop 'em.  He like money.  I don't like

10:04AM   12    give 'em no money, you know.  But if I do something to him,

10:04AM   13    they going know that's me.  Like he used to always say that

10:04AM   14    kind of stuff.

10:04AM   15    Q    Okay.  So when did you actually get released from the

10:04AM   16    halfway house on to supervised release where you were living on

10:04AM   17    your own?

10:04AM   18    A    I actually get released from the halfway house

10:04AM   19    January 14th.

10:04AM   20    Q    2014?

10:04AM   21    A    Yes.

10:04AM   22    Q    Where did you move to?

10:04AM   23    A    Pearl City, one condo in Pearl City.

10:04AM   24    Q    Were you living by yourself?

10:04AM   25    A    No.

10:04AM   1   Q    Who were you living with?

10:04AM   2   A    My -- my son's mom.  My --

10:04AM   3   Q    Were you working -- actually working anywhere now at this

10:04AM   4   point?

10:04AM   5   A    No, not at this point.

10:04AM   6   Q    So what are you doing at the time?

10:04AM   7   A    I still collecting -- well, I just got out of the halfway

10:04AM   8   house, I still -- I still getting the stubs from -- from Miske

10:04AM   9   to turn in to -- to turn in to my probation officer so it looks

10:05AM  10   like I'm still working.

10:05AM  11   Q    Okay.  Now, that you're at the halfway house, you can come

10:05AM  12   and go as you please, correct?

10:05AM  13   A    Yes.

10:05AM  14   Q    You don't have to get a call every day to say you're

10:05AM  15   needed for work or anything like that, right?

10:05AM  16   A    No.

10:05AM  17   Q    So does your contact or communication, does it decrease

10:05AM  18   with Mr. Miske now that you're -- you're living with your

10:05AM  19   girlfriend in Pearl City?

10:05AM  20   A    No, no, no, stayed good.  It was good.

10:05AM  21   Q    Okay.  So the times that you weren't with Mr. Miske, how

10:05AM  22   would you typically communicate with him?

10:05AM  23   A    Most of the time if we're not talking about meeting up

10:05AM  24   somewhere, but he used to always call me or send message to me

10:05AM  25   meet him at certain places and, you know, meet him at -- meet

| | | |
|---|---|---|
| 10:05AM | 1 | down the road from his shop, got a little beach by John |
| 10:05AM | 2 | Dominis, and meet me down there at the beach, meet me down |
| 10:05AM | 3 | there at the -- at the bay.  You know, meet me at certain |
| 10:06AM | 4 | places just want -- just to talk. |
| 10:06AM | 5 | Q    Why not just call you directly and talk over the phone? |
| 10:06AM | 6 | A    Yeah, sometimes we never like -- not like we was talking |
| 10:06AM | 7 | about shocker or anything, you know. |
| 10:06AM | 8 | Q    What do you mean? |
| 10:06AM | 9 | A    I mean most of the times we was just -- we never like |
| 10:06AM | 10 | be -- what's that called?  If somebody was listening, if he |
| 10:06AM | 11 | always thought the feds was on him, you know.  And he was right |
| 10:06AM | 12 | about that. |
| 10:06AM | 13 | Q    Did you ever communicate with him over the telephone? |
| 10:06AM | 14 | A    Yeah.  Yeah. |
| 10:06AM | 15 | Q    Were there specific or certain phones that you used to do |
| 10:06AM | 16 | that? |
| 10:06AM | 17 | A    Yeah, I had one regular phone or he would send message to |
| 10:06AM | 18 | me, but we always had little burners on the side. |
| 10:06AM | 19 | Q    What do you mean by "burners on the side"? |
| 10:06AM | 20 | A    Burners, like phones you can just toss away after that. |
| 10:06AM | 21 | You know, but even on those phones we never used to -- me and |
| 10:06AM | 22 | him never used -- we used to always just call, What you doing? |
| 10:07AM | 23 | We going to meet up.  Or even for just eat lunch sometimes, |
| 10:07AM | 24 | we're not talking about something, sometimes something comes |
| 10:07AM | 25 | up.  But we always had burner phones to contact each other. |

10:07AM    1    Q    Did Mr. Miske ever provide you with burner phones?

10:07AM    2    A    Yes.

10:07AM    3    Q    How many burner phones would you have at any particular

10:07AM    4    time?

10:07AM    5    A    A lot -- I had a lot.

10:07AM    6    Q    What is a lot?

10:07AM    7    A    More than five.

10:07AM    8    Q    When you were with Mr. Miske in person, were there certain

10:07AM    9    ways you would communicate at times, rather than just talking

10:07AM    10   to each other?

10:07AM    11   A    Yeah.  Most of the time -- majority of the time if -- if

10:07AM    12   I'm more than talking to him, and it's about -- it's not about

10:07AM    13   something that -- that we don't want nobody to hear, then he

10:07AM    14   would grab his phone -- one of his phones and type 'em like in

10:07AM    15   the notes, he would type what he was telling me and show 'em to

10:07AM    16   me on his phone like that.

10:08AM    17         But if we was at his office, he would -- he would --

10:08AM    18   he gotta a board on his office that he would write down

10:08AM    19   whatever -- whatever he wanted to say, he would write 'em down

10:08AM    20   on the glass board and tell me, Hey, read that, you know.  And

10:08AM    21   he would tell me, What's up?  And I would go over there and

10:08AM    22   write the response, you know, and then he would erase 'em.

10:08AM    23   Yeah, if --

10:08AM    24   Q    So is this -- are you trying to say when you had these

10:08AM    25   sorts of conversations, you're talking about criminal topics?

10:08AM    1    A    Yes.

10:08AM    2    Q    So when he would put in the notes in the phone and show

10:08AM    3    you the message, how would you respond?  Same way or would you

10:08AM    4    talk to him back?

10:08AM    5    A    Yeah.  No, I would either type 'em back to him or -- or

10:08AM    6    give 'em like one -- like one okay or something like that.

10:08AM    7    Q    Do you find that strange that that's how he wanted to

10:08AM    8    communicate with you?

10:08AM    9    A    No, it was always -- that's the -- that's the relationship

10:09AM    10   we had.  You know, wasn't -- wasn't living honest lives to

10:09AM    11   where we could just talk about anything we wanted to.  That's

10:09AM    12   the relationship we had.  That's the relationship we created.

10:09AM    13   Q    During this time Mr. Miske told you that he -- he believed

10:09AM    14   or he knew he was under investigation?

10:09AM    15   A    Yeah.  And he -- he would always -- he would tell me that

10:09AM    16   these guys, the feds get a hard on for him.  These fuckers got

10:09AM    17   one hard on for me.  You know.

10:09AM    18            MR. INCIONG:  Can I show Mr. Miller Exhibit 1-778,

10:09AM    19   please?

10:09AM    20            THE COURT:  Yes.  And we're ten minutes after 10:00,

10:09AM    21   if you would give some thought to an appropriate time to break.

10:09AM    22            MR. INCIONG:  Okay, Your Honor.  I have just a few

10:09AM    23   quick pictures, and if we can take a break after that --

10:09AM    24            THE COURT:  Sure.

10:09AM    25            MR. INCIONG:  -- if that works.

| 10:09AM | 1 | THE COURT:  Yes. |
|---------|---|------------------|

10:09AM    1                THE COURT:  Yes.

10:09AM    2                MR. INCIONG:  Thank you.

10:09AM    3                1-778 has actually been admitted, I believe, Your

10:09AM    4    Honor.  If I could publish that?

10:09AM    5                THE COURT:  Yes, go ahead.

10:09AM    6    BY MR. INCIONG:

10:09AM    7    Q    So, Mr. Miller, this has already been admitted into

10:10AM    8    evidence, but do you recognize what's shown in that picture?

10:10AM    9    A    Yes.

10:10AM   10    Q    What is that?

10:10AM   11    A    That's his office right there.  That's his -- that's his

10:10AM   12    office right there.

10:10AM   13                Earlier when I was talking about the -- the desk

10:10AM   14    that -- so this is his chair right here.  If that's the same

10:10AM   15    chair, he had that chair for a long time, like he was -- he was

10:10AM   16    attached to that chair.

10:10AM   17    Q    So you just -- you drew a circle over it, looks like a

10:10AM   18    black -- the back of a black office type chair that's on the

10:10AM   19    lower right-hand corner of the picture?

10:10AM   20    A    Yes.

10:10AM   21    Q    Okay.

10:10AM   22    A    And this is his desk -- this is where he sit right here.

10:10AM   23    This is his desk, this is his chair, and this is the -- when we

10:10AM   24    was talking about the drawer earlier.

10:10AM   25    Q    Yes.

10:10AM   1   A    Right down there.

10:10AM   2   Q    So the drawer is on the left side of the desk, if you're

10:10AM   3   sitting at the desk facing towards that window?

10:10AM   4   A    Yes.

10:10AM   5   Q    All right.  And when you say "his office," whose office

10:11AM   6   are you referring to?

10:11AM   7   A    Mike Miske.

10:11AM   8   Q    And this is the office specifically located where?

10:11AM   9   A    On Queen Street, the shop.  We call 'em the shop.  Is the

10:11AM   10  glass broken?  Go ahead.  I just noticed that.

10:11AM   11  Q    Okay.  So let me have you look at Exhibit 1-779, please.

10:11AM   12       MR. INCIONG:  This has also been previously admitted,

10:11AM   13  I believe, Your Honor.

10:11AM   14       THE COURT:  Yes, it has.  Go ahead.

10:11AM   15  BY MR. INCIONG:

10:11AM   16  Q    So this is -- this is another photo.  Do you recognize

10:11AM   17  this, Mr. Miller?

10:11AM   18  A    Yes.

10:11AM   19  Q    What does this show?

10:11AM   20  A    That's the -- when you're looking -- that's the opposite

10:11AM   21  angle in his office.

10:11AM   22  Q    Okay.  So the -- the desk that's shown there, that's the

10:11AM   23  one that you just referenced which the drawer that has the

10:11AM   24  money in would be -- from this angle on the right side, but

10:11AM   25  it's on the left side if you're sitting at the desk in that

10:11AM   1   chair?

10:11AM   2   A    Yes.

10:11AM   3   Q    That armchair, the black chair that's behind the desk,

10:11AM   4   that's the one you referenced as -- that's his chair?

10:12AM   5   A    Yes.

10:12AM   6   Q    All right.  Do you see anything behind the desk that's --

10:12AM   7   that you notice as well or recall on the wall?

10:12AM   8   A    Okay.  So -- so that's that board that I was just talking

10:12AM   9   about earlier --

10:12AM  10   Q    Yes.

10:12AM  11   A    -- where he -- where he write messages to me.  If he

10:12AM  12   writing something down, he writes it on that wall -- on that --

10:12AM  13   on that glass right there.

10:12AM  14   Q    And then that's --

10:12AM  15   A    Looks like glass, but that's like one dry erase glass

10:12AM  16   where you could write -- like if he was telling me something he

10:12AM  17   never wanted nobody to hear, he would write 'em on that board,

10:12AM  18   and then tell it to me, and then, what, or something like that,

10:12AM  19   then erase 'em.

10:12AM  20   Q    Okay.  Let me have you look at one last photo then on that

10:12AM  21   same topic, Exhibit 1-571.

10:12AM  22        MR. INCIONG:  If we could show that to Mr. Miller.  I

10:12AM  23   believe this has also been previously admitted.

10:13AM  24        THE COURT:  Yes.  Go ahead.

10:13AM  25        MR. INCIONG:  May I publish that, Your Honor?

| | | |
|---|---|---|
| 10:13AM | 1 | THE COURT:  You may. |
| 10:13AM | 2 | BY MR. INCIONG: |
| 10:13AM | 3 | Q    So, Mr. Miller, do you see what's been marked as |
| 10:13AM | 4 | Exhibit 1-571? |
| 10:13AM | 5 | A    Yes. |
| 10:13AM | 6 | Q    Is that the -- the erasable board you were just |
| 10:13AM | 7 | referencing? |
| 10:13AM | 8 | A    Yes. |
| 10:13AM | 9 | Q    How often would Mr. Miske write on this board when you |
| 10:13AM | 10 | were meeting with him at that office? |
| 10:13AM | 11 | A    A lot.  A lot.  If we talking, we talking about something, |
| 10:13AM | 12 | you know, that -- because most of the time we talk, if we talk |
| 10:13AM | 13 | about something, we talking like in code.  Like we're not |
| 10:13AM | 14 | actually saying what we saying, or if he like get one message |
| 10:13AM | 15 | to me, he would write 'em on this -- he would write 'em right |
| 10:13AM | 16 | here. |
| 10:13AM | 17 | Q    And then erase it after? |
| 10:13AM | 18 | A    And erase 'em, yeah.  This boy had many messages.  A lot |
| 10:13AM | 19 | of messages on top.  Look like cars on 'em right now, but -- |
| 10:14AM | 20 | yeah, he had a lot of messages on there. |
| 10:14AM | 21 | MR. INCIONG:  Your Honor, we could break here, I |
| 10:14AM | 22 | think, if that's -- |
| 10:14AM | 23 | THE COURT:  All right.  So we have been going for |
| 10:14AM | 24 | about an hour and 45 minutes.  Let's go ahead and take our |
| 10:14AM | 25 | first break of the morning and the day. |

| 10:14AM | 1 | As we go to break, I'll remind our jurors to, once |
|---|---|---|
| | 2 | again, refrain from discussing the substance of this case with |
| | 3 | anyone, including one another, until I advise you otherwise; to |
| | 4 | refrain from accessing any media or other accounts of this case |
| | 5 | that may be out there; and then finally, please do not conduct |
| | 6 | any independent investigation into the facts, circumstances or |
| 10:14AM | 7 | persons involved. |
| 10:14AM | 8 | Let's try to keep it to about a 15-minute break and |
| 10:14AM | 9 | resume right around 10:30. |
| 10:15AM | 10 | (Proceedings were recessed at 10:15 a.m. to 10:34 |
| 10:26AM | 11 | a.m.) |
| 10:34AM | 12 | THE COURT:  All right.  Back from our morning break. |
| 10:34AM | 13 | Mr. Inciong, you may resume your direct examination of |
| 10:34AM | 14 | Mr. Miller. |
| 10:34AM | 15 | MR. INCIONG:  Thank you, Your Honor. |
| 10:34AM | 16 | BY MR. INCIONG: |
| 10:34AM | 17 | Q   Mr. Miller, when we left off you were talking about the |
| 10:34AM | 18 | time you spent in Mr. Miske's office at Kama'aina Termite and |
| 10:34AM | 19 | Pest Control, and you were describing the clear board, correct? |
| 10:34AM | 20 | A   Yes. |
| 10:34AM | 21 | Q   You spent a lot of time in that office? |
| 10:34AM | 22 | A   Yes. |
| 10:34AM | 23 | Q   I'd like you to look at Exhibit 1-59 at this time, please. |
| 10:34AM | 24 | Do you recognize whose picture is there? |
| 10:34AM | 25 | A   Yeah, I recognize her, but I don't know her name. |

| | | |
|---|---|---|
| 10:34AM | 1 | Q    Okay.  If you didn't know her name, but -- where do you |
| 10:35AM | 2 | recognize her from? |
| 10:35AM | 3 | A    I remember seeing her at the shop. |
| 10:35AM | 4 | Q    Does this photo of her accurately show how she looked at |
| 10:35AM | 5 | that time when you were spending time at the Kama'aina Termite |
| 10:35AM | 6 | and Pest Control shop? |
| 10:35AM | 7 | A    Yes. |
| 10:35AM | 8 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:35AM | 9 | Exhibit 1-59. |
| 10:35AM | 10 | THE COURT:  Mr. Kennedy? |
| 10:35AM | 11 | MR. KENNEDY:  I would object, Your Honor.  Lack of |
| 10:35AM | 12 | foundation. |
| 10:35AM | 13 | THE COURT:  Sustained. |
| 10:35AM | 14 | BY MR. INCIONG: |
| 10:35AM | 15 | Q    Mr. Miller, you said that you recognized this person from |
| 10:35AM | 16 | when you were at the shop. |
| 10:35AM | 17 | A    Yes. |
| 10:35AM | 18 | Q    Okay.  How would -- how would you -- what contact or |
| 10:35AM | 19 | interaction, if any, did you have with this person when you |
| 10:35AM | 20 | were there? |
| 10:35AM | 21 | A    I didn't have -- I really don't have no contact with her, |
| 10:35AM | 22 | because -- the only thing I notice her, I remember her because |
| 10:35AM | 23 | every time she would come, like she would ask us -- Miske would |
| 10:35AM | 24 | ask us, Hey, let me talk to her real quick, you know.  So I |
| 10:35AM | 25 | would have to leave, and they -- he would shut the door and |

| | | |
|---|---|---|
| 10:35AM | 1 | then go -- go in there with her.  So I never -- I never |
| 10:36AM | 2 | remember have no -- I don't remember having any contact with |
| 10:36AM | 3 | her if I did. |
| 10:36AM | 4 | Q    You were never introduced to her that you recall? |
| 10:36AM | 5 | A    No. |
| 10:36AM | 6 | Q    But you recall seeing her at the shop? |
| 10:36AM | 7 | A    Yes. |
| 10:36AM | 8 | Q    On more than one occasion? |
| 10:36AM | 9 | A    Yes.  But like I said, every time we seen her, she -- if |
| 10:36AM | 10 | we was in the office, Miske would tell us, Hey, let me talk to |
| 10:36AM | 11 | her or stuff like that.  He wouldn't -- they I wouldn't -- I |
| 10:36AM | 12 | wouldn't know conversation what they was talking about or |
| 10:36AM | 13 | whatnot. |
| 10:36AM | 14 | Q    You would be asked to leave? |
| 10:36AM | 15 | A    Yes. |
| 10:36AM | 16 | Q    That's how -- that's how you remember her? |
| 10:36AM | 17 | A    I wasn't asked to leave, but I would be -- he would be |
| 10:36AM | 18 | like, Hey, let me talk to her real quick, you know.  And then |
| 10:36AM | 19 | that would be like -- yeah, I guess he ask me for leave, |
| 10:36AM | 20 | like -- but I would leave the office when he said that. |
| 10:36AM | 21 | Q    Okay.  So it's because of that that's why you remember her |
| 10:36AM | 22 | and what she looks like? |
| 10:36AM | 23 | A    Yes. |
| 10:36AM | 24 | MR. INCIONG:  Your Honor, I would move to admit 1-59. |
| 10:36AM | 25 | THE COURT:  During what time frame was this? |

10:36AM   1   BY MR. INCIONG:

10:36AM   2   Q    What -- so this is -- we're talking about the period when

10:36AM   3   you got released from the halfway house --

10:36AM   4   A    Yes.

10:37AM   5   Q    -- in 2013 onward.

10:37AM   6   A    Yes.

10:37AM   7   Q    Is that the time frame you're referencing?

10:37AM   8   A    Yes.

10:37AM   9   Q    Was this a period over months or years that you would see

10:37AM  10   her there?

10:37AM  11   A    Yeah, I would see her -- not often, you know, but I seen

10:37AM  12   her there a few times when I -- and I was there a lot, you

10:37AM  13   know.

10:37AM  14           MR. INCIONG:  Your Honor, may I move to admit at this

10:37AM  15   time?

10:37AM  16           THE COURT:  Mr. Kennedy?

10:37AM  17           MR. KENNEDY:  Objection remains, Your Honor.

10:37AM  18           THE COURT:  All right.  The objection is overruled.

10:37AM  19           You recognize this person, you just don't know her

10:37AM  20   name.  Is that fair?

10:37AM  21           THE WITNESS:  Yes.  I recognize her and the little --

10:37AM  22   the little contact that we did have was like just walking by,

10:37AM  23   though, but she would always go into the office and would

10:37AM  24   mainly just be them talking.  And I would say -- because he --

10:37AM  25   if I was there or whoever was there with me, he would ask us,

10:37AM  1   Let me talk to her.  You know, I gotta talk to her.

10:37AM  2           THE COURT:  All right.  You may publish, Mr. Inciong.

10:38AM  3           MR. INCIONG:  Thank you, Your Honor.

10:38AM  4           (Exhibit 1-59 was received in evidence.)

10:38AM  5   BY MR. INCIONG:

10:38AM  6   Q    So although I understand you don't know her name, this is

10:38AM  7   the woman that you -- you recognize from being asked to leave

10:38AM  8   or at least give Mr. Miske privacy to speak with her, correct?

10:38AM  9   A    Yes.

10:38AM  10  Q    Was that unusual for you to be asked to leave so he could

10:38AM  11  speak to anybody?

10:38AM  12  A    At that time I wasn't -- I never really asked questions.

10:38AM  13  You know, that was his -- that was his business, you know, but

10:38AM  14  this short little lady, you know.

10:38AM  15  Q    Okay.  My question is, were you regularly asked to leave

10:38AM  16  or give him privacy to talk to people, or was that a rarity?

10:38AM  17  A    Yeah, I wasn't -- wasn't usually asked to leave, but when

10:38AM  18  she was there, I was asked to leave.

10:38AM  19  Q    Okay.  All right.  Understood.

10:38AM  20  A    He wanted to talk in private without anybody there.

10:38AM  21  Q    Okay.  Now, other than the Kama'aina office, were there

10:38AM  22  any other places that you would regularly speak with Mr. Miske

10:38AM  23  so you would have privacy or you wouldn't be detected?

10:39AM  24  A    That I would speak to Miske?

10:39AM  25  Q    Yes.

| | | | |
|---|---|---|---|
| 10:39AM | 1 | A | Yeah, few places. |
| 10:39AM | 2 | Q | Okay.  Tell the jury. |
| 10:39AM | 3 | A | I think I told him before, but if you go straight down |

10:39AM    1    A    Yeah, few places.

10:39AM    2    Q    Okay.  Tell the jury.

10:39AM    3    A    I think I told him before, but if you go straight down

10:39AM    4    Ward by -- by get one restaurant called John Dominis, you know,

10:39AM    5    and park over there, and you can walk.  You know, we used -- if

10:39AM    6    the beach surfers go surf over there and get one long walkway

10:39AM    7    going all the way down in that Kaka'ako area, get like hills

10:39AM    8    that go like that (indicating), and we used to talk and walk

10:39AM    9    along the rocks and -- yeah, we used to talk over there.

10:39AM    10    Q    Okay.  Are you familiar with the Honolulu Club?

10:39AM    11    A    Yes.

10:39AM    12    Q    How do you know about the Honolulu Club?

10:39AM    13    A    That's where -- that's where Miske used to -- that's his

10:39AM    14    gym he used to work out at.

10:39AM    15    Q    Did you ever meet him there?

10:39AM    16    A    Yes.

10:39AM    17    Q    To work out?

10:39AM    18    A    No, I mean he got -- when I got out, he got us memberships

10:40AM    19    and stuff, but we never -- I never used to go there for

10:40AM    20    workout, but I used to go there for meet him too.  They get one

10:40AM    21    spiral parking that go up into Honolulu Club, underground

10:40AM    22    parking where you can drive up like one spiral, cars parked

10:40AM    23    like that.  But we used to go over there just to -- just to

10:40AM    24    talk.  We used to go in that area and just walk back and forth

10:40AM    25    and talk.

| | | | |
|---|---|---|---|
| 10:40AM | 1 | Q | So that's the parking lot of the Honolulu Club? |
| 10:40AM | 2 | A | Parking lot of the Honolulu Club, yeah. |
| 10:40AM | 3 | Q | Are you familiar with Maunalua Bay? |
| 10:40AM | 4 | A | Yes. |
| 10:40AM | 5 | Q | How do you know about Maunalua Bay? |

10:40AM   6   A   That's where we used to go ride -- ride jet skis,

10:40AM   7   barbecue, and bring our families and stuff like that.  Hawaii

10:40AM   8   Kai, it's in Hawaii Kai, that little -- that little bay over

10:40AM   9   there.

10:40AM   10   Q   Did you meet for those occasions a lot?

10:40AM   11   A   Yes.

10:40AM   12   Q   How frequently would you say?

10:40AM   13   A   At least couple times a month, you know, on the weekends

10:41AM   14   and stuff like that.

10:41AM   15   Q   Okay.  So I'm going to show you Exhibit 1-15-C, which was

10:41AM   16   previously admitted earlier today, just for reference.

10:41AM   17           MR. INCIONG:  If I could show that to the jury as

10:41AM   18   well, Your Honor, please.

10:41AM   19           THE COURT:  Yes, go ahead.

10:41AM   20   BY MR. INCIONG:

10:41AM   21   Q   So this is the -- the map of Oahu you saw earlier,

10:41AM   22   correct?

10:41AM   23   A   Yes.

10:41AM   24   Q   So if you could just draw a circle or an X approximately

10:41AM   25   where Maunalua Bay is located.

10:41AM  1   A    (Witness complies.)  We stay right around -- right in that

10:41AM  2   area right there.

10:41AM  3   Q    Okay.  So again, this is on the southeast end of Oahu,

10:41AM  4   correct?

10:41AM  5   A    Yes.

10:41AM  6            MR. INCIONG:  Could I show Mr. Miller 1-1022 at this

10:41AM  7   time, please?

10:41AM  8            Your Honor, this has been admitted I believe as well

10:42AM  9   previously.

10:42AM  10            THE COURT:  Yes, go ahead.

10:42AM  11            MR. INCIONG:  Can I publish that?

10:42AM  12            THE COURT:  Yes.

10:42AM  13   BY MR. INCIONG:

10:42AM  14   Q    Mr. Miller, do you recognize what's shown here?

10:42AM  15   A    Yes.

10:42AM  16   Q    What is this?

10:42AM  17   A    This is the -- this is the Hawaii Kai area right there.

10:42AM  18   Q    And is that showing Kalanianaole Highway where it goes --

10:42AM  19   or leads up to --

10:42AM  20   A    Yes.

10:42AM  21   Q    -- Maunalua Bay?

10:42AM  22   A    Yes.

10:42AM  23   Q    Where -- or is there a certain area or place that you

10:42AM  24   would meet at Maunalua Bay when you jet skied and barbecue like

10:42AM  25   you just described?

| | | |
|---|---|---|
| 10:42AM | 1 | A    Before -- when -- before we used to go like over here, but |
| 10:42AM | 2 | then after we started going over here. |
| 10:42AM | 3 | Q    Okay.  What do you mean -- before and after what? |
| 10:42AM | 4 | A    Like when I first came home, I don't know why we was going |
| 10:42AM | 5 | over here, but we used to just -- we used to park right there, |
| 10:42AM | 6 | park the trucks right there, dump the tail -- drop the tailgate |
| 10:42AM | 7 | down, and -- yeah, we used to go right there. |
| 10:43AM | 8 | Q    Okay.  And then you switched location for some reason? |
| 10:43AM | 9 | A    Yeah. |
| 10:43AM | 10 | Q    All right. |
| 10:43AM | 11 | A    Found a better location, I guess. |
| 10:43AM | 12 | Q    Let me have you look at 1-023. |
| 10:43AM | 13 | MR. INCIONG:  I believe that has been previously |
| 10:43AM | 14 | admitted. |
| 10:43AM | 15 | THE COURT:  Yes, it has. |
| 10:43AM | 16 | MR. INCIONG:  I'm sorry, 1-023.  I'm sorry.  I'm |
| 10:43AM | 17 | sorry.  Let me say this one more time.  1-023. |
| 10:43AM | 18 | There we go.  Thank you.  1-1023. |
| 10:43AM | 19 | THE COURT:  Yes.  1-1023 has been admitted. |
| 10:43AM | 20 | (Exhibit 1-1023 was received in evidence.) |
| 10:43AM | 21 | MR. INCIONG:  I'll say this the most confusing way I |
| 10:43AM | 22 | can. |
| 10:43AM | 23 | BY MR. INCIONG: |
| 10:43AM | 24 | Q    So do you recognize what's shown in that picture? |
| 10:43AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 10:43AM | 1 | Q | How do you recognize that? |
| 10:43AM | 2 | A | That's where we -- that's where we used to hang out right |
| 10:43AM | 3 | | here. |
| 10:43AM | 4 | Q | Okay. |
| 10:43AM | 5 | A | Right -- right in this area. |
| 10:43AM | 6 | Q | And this is the second location that you moved to later |
| 10:43AM | 7 | | on? |
| 10:43AM | 8 | A | Yeah. |
| 10:43AM | 9 | Q | Okay.  And that was the normal meeting spot? |
| 10:44AM | 10 | A | Yes. |
| 10:44AM | 11 | Q | Now, you mentioned that you would ride jet skis when you |
| 10:44AM | 12 | | went there; is that correct? |
| 10:44AM | 13 | A | Yes. |
| 10:44AM | 14 | Q | Did Mr. Miske have a special fondness for jet skis? |
| 10:44AM | 15 | A | Yes. |
| 10:44AM | 16 | Q | Would you ride jet skis with Mr. Miske? |
| 10:44AM | 17 | A | Yes. |
| 10:44AM | 18 | Q | Was it just for fun or were there other purposes of riding |
| 10:44AM | 19 | | the jet skis? |
| 10:44AM | 20 | A | Most of the times it was just was for fun, you know, but |
| 10:44AM | 21 | | sometimes like if we would talk, he would -- we would go out |
| 10:44AM | 22 | | somewhere.  We would go to the sandbar, just let the skis float |
| 10:44AM | 23 | | right there, put the -- put the life jackets on like that, and |
| 10:44AM | 24 | | just kick back over there and talk about whatever, whatever we |
| 10:44AM | 25 | | was talking about.  Yeah. |

10:44AM   1   Q     Were you just talking about casual things or was there --

10:44AM   2   A     Yeah, we was doing that.  We was never talking casual, you

10:44AM   3   know.  We not talking about what we can get from Zippy's that

10:45AM   4   night.

10:45AM   5   Q     Okay.  So you mentioned the life vests.  What were you

10:45AM   6   trying to -- I didn't understand what you were saying about the

10:45AM   7   life vests.

10:45AM   8   A     Yeah, well, he would always -- if we talking about what --

10:45AM   9   if we talking about something we don't want nobody to hear, he

10:45AM  10   would always like, Hey, I don't know who -- the skis, I don't

10:45AM  11   know what they doing.  I not by them all day.  And the life

10:45AM  12   jackets, take them off.  He don't know if they get devices for

10:45AM  13   listen to him or whatnot, you know.  But he would make me take

10:45AM  14   off the life jacket.  He would take off his, put 'em on the

10:45AM  15   skis, and get one sandbar over there that we used to just kick

10:45AM  16   back over there and talking.  And the skis used to be like a

10:45AM  17   little bit away from us.

10:45AM  18   Q     So just the two of you are speaking at that point with

10:45AM  19   nobody else around?

10:45AM  20   A     No.

10:45AM  21               MR. INCIONG:  Can I show the witness Exhibit 1-856?

10:45AM  22               This is actually a video.  If we could just show the

10:46AM  23   still frame without playing it, just to make sure the -- the

10:46AM  24   witness recognizes it first.

10:46AM  25               1-856.

10:46AM   1   BY MR. INCIONG:

10:46AM   2   Q     Mr. Miller, prior to coming to court today, did you have a

10:47AM   3   chance to view this video?

10:47AM   4   A     Yes.

10:47AM   5   Q     Did you recognize that?

10:47AM   6   A     Yes.

10:47AM   7   Q     Did you recognize who was depicted in the video?

10:47AM   8   A     Yes.

10:47AM   9   Q     Did you recognize where that is -- that video is shown?

10:47AM  10   A     Yes.

10:47AM  11   Q     Is this the -- the area generally that you were just

10:47AM  12   describing?

10:47AM  13   A     Yes.  That out in the -- that right there is out in the

10:47AM  14   bay, though.

10:47AM  15   Q     But this is the same bay that you were talking about where

10:47AM  16   you would meet and jet ski regularly and meet with Mr. Miske?

10:47AM  17   A     Yes.

10:47AM  18         MR. INCIONG:  Your Honor, I would move to admit 1-856.

10:47AM  19         MR. KENNEDY:  No objection, Your Honor.

10:47AM  20         THE COURT:  Without objection, 1-856 is admitted, and

10:47AM  21   you may play the video.

10:47AM  22         (Exhibit 1-856 was received in evidence.)

10:47AM  23         MR. INCIONG:  Thank you, Your Honor.

10:47AM  24         (Video was played for the jury.)

10:47AM  25   BY MR. INCIONG:

| 10:48AM | 1 | Q | Okay. Mr. Miller, there was no volume there, but without |
| 10:49AM | 2 | | the volume, I can still ask you what I -- what I want to. |
| 10:49AM | 3 | | First of all, who did you recognize in that video? |
| 10:49AM | 4 | A | That's me and -- me and my son's mom. |
| 10:49AM | 5 | Q | Whose jet skis were you riding? |
| 10:49AM | 6 | A | Miske's. |
| 10:49AM | 7 | Q | There was another jet ski where you couldn't see the -- |
| 10:49AM | 8 | | the driver that was in the picture too. Was that Mr. Miske's |
| 10:49AM | 9 | | jet ski as well? |
| 10:49AM | 10 | A | Yes. |
| 10:49AM | 11 | Q | This area that you were jet skiing, is that in Maunalua |
| 10:49AM | 12 | | Bay? |
| 10:49AM | 13 | A | Yes. |
| 10:49AM | 14 | Q | And is this the meeting place where you would meet |
| 10:49AM | 15 | | regularly for both socially and to meet with Mr. Miske? |
| 10:49AM | 16 | A | Yes. |
| 10:49AM | 17 | | MR. INCIONG: Okay. So we could take that down. |
| 10:49AM | 18 | | Thank you. |
| 10:49AM | 19 | | BY MR. INCIONG: |
| 10:49AM | 20 | Q | Mr. Miller, you indicated that now kind of in the |
| 10:49AM | 21 | | chronology we were going, you were released from the halfway |
| 10:49AM | 22 | | house, you were living in the apartment in Pearl City. This |
| 10:49AM | 23 | | was early 2014, correct? |
| 10:50AM | 24 | A | Yes. |
| 10:50AM | 25 | Q | You were attempting to get your commercial driver's |

10:50AM    1    license to work for the Teamsters, correct?

10:50AM    2    A    Yes.

10:50AM    3    Q    While you were waiting for that process, what were you

10:50AM    4    doing?  If you weren't working, how were you spending your

10:50AM    5    time?

10:50AM    6    A    During that time I started -- I started selling drugs.  I

10:50AM    7    started selling...

10:50AM    8    Q    How did that come about?

10:50AM    9    A    I was talking with one of my -- me and my friends, my

10:50AM   10    childhood friends that I grew up with, it was Ali'i, Mike B.,

10:50AM   11    they was already doing 'em already, you know.  And I was in the

10:50AM   12    process where I never had nothing going on, so I started -- I

10:50AM   13    started selling drugs during that time.

10:50AM   14    Q    What drugs are we talking about?

10:50AM   15    A    Ice and -- and coke.

10:50AM   16    Q    Mike B.'s full name is what?

10:50AM   17    A    Buntenbah.

10:50AM   18    Q    Ali'i's full name is what?

10:51AM   19    A    Kaanoi.

10:51AM   20    Q    What is his first name?

10:51AM   21    A    Ali'i -- or Justin.

10:51AM   22    Q    All right.  So what types of amounts were you selling?

10:51AM   23    A    I was selling large amounts.  I was selling -- I was

10:51AM   24    getting -- I was getting large amounts of ice and -- and coke.

10:51AM   25    Q    So are you talking pound quantities?

10:51AM   1    A    Yes.

10:51AM   2    Q    All right.  When you were in prison serving your bank

10:51AM   3    robbery and your gun sentence, did you make contacts for people

10:51AM   4    there that had drug -- drug network contacts?

10:51AM   5    A    Yes.

10:51AM   6    Q    Did you stay in touch with any of those people?

10:51AM   7    A    Yes.

10:51AM   8    Q    After you started selling drugs in 2014, did you reach out

10:51AM   9    to any of those people?

10:51AM  10    A    Yeah, so -- so 2014 was -- was when I started.  I started

10:51AM  11    with them was like had one period in that time, it was like

10:51AM  12    hard to get.  So Mike B. at the time was -- I was giving

10:52AM  13    Mike B. like large amounts, and he would get -- he would get

10:52AM  14    rid of 'em like that, you know, that day, and he would tell

10:52AM  15    me -- he would tell me, Man, there's a drought right now of

10:52AM  16    drugs, of coke.  And he was, If -- if we could get more, I

10:52AM  17    could sell hundred right now just like that, a hundred kilos,

10:52AM  18    he would say.  You know, so --

10:52AM  19    Q    So this is cocaine you're referring to specifically?

10:52AM  20    A    Cocaine I'm referring to.

10:52AM  21    Q    Okay.

10:52AM  22    A    We were selling ice too, but -- but more of the cocaine

10:52AM  23    was in demand at that time.

10:52AM  24    Q    Okay.

10:52AM  25    A    So -- yeah, so me and Mike B., Michael Buntenbah, we're

10:52AM   1   talking and I'm telling him, Hey, I get some -- I got some

10:52AM   2   connections that -- that I can get some contacts up there that

10:52AM   3   I was -- that I can contact and maybe we can try get something

10:52AM   4   going.  Because the -- the money amount was like -- for what

10:53AM   5   was going up there and what was going down here was like a lot.

10:53AM   6   Q    Okay.  Let me just make sure we understand.  So you're

10:53AM   7   talking -- when you say "the money up there and the money down

10:53AM   8   here," you're talk about the price for cocaine --

10:53AM   9   A    Yes.

10:53AM  10   Q    -- up there is where?

10:53AM  11   A    Yes, up there in LA, in California, on the mainland.

10:53AM  12   Q    And then the price here in Hawaii was much more?

10:53AM  13   A    Much more than that, yeah.

10:53AM  14   Q    So you could make a big profit --

10:53AM  15   A    Yeah.

10:53AM  16   Q    -- if you bought it in LA and brought it back to Hawaii?

10:53AM  17   A    Yes.

10:53AM  18   Q    Okay.  So when you say you were trying to set something

10:53AM  19   up, what do you mean -- what do you mean by that?  Is this a

10:53AM  20   one-time thing you're trying to do or --

10:53AM  21   A    No, I trying to -- I get -- I had the thing going with

10:53AM  22   Mike B., with Ali'i, with -- with Sammy and with Dusky Boy.

10:53AM  23   You know, we was kind of doing our own thing.  And all of them

10:53AM  24   wanted to -- Sammy wanted to grab -- Sammy like to grab like

10:53AM  25   over ten keys.  Dusky Boy, same thing.  Mike B. could sell --

10:54AM    1    as he told me before, if we had hundred keys, he could sell 'em

10:54AM    2    like that, one week.

10:54AM    3            And, yeah, so I started reaching out -- I started

10:54AM    4    reaching out to -- to guys up there in California.

10:54AM    5    Q    Okay.  Did you make contact with any of those people?

10:54AM    6    A    Yes.

10:54AM    7    Q    Okay.  Before we go forward and have you tell what

10:54AM    8    happened next, I want to show you a few photos first of some of

10:54AM    9    the people that you mentioned that are -- that are involved

10:54AM   10    here.

10:54AM   11            MR. INCIONG:  So could we show Mr. Miller Exhibit 1-44

10:54AM   12    at this time, please?

10:54AM   13            THE COURT:  Yes.

10:54AM   14    BY MR. INCIONG:

10:54AM   15    Q    Do you see that photo, Mr. Miller?

10:54AM   16    A    Yes.

10:54AM   17    Q    Do you recognize who that is?

10:54AM   18    A    Yes.

10:54AM   19    Q    Who is that?

10:54AM   20    A    Mike Buntenbah.

10:54AM   21    Q    Does that show how Mr. Buntenbah appears -- or appeared

10:54AM   22    when you last saw him?

10:54AM   23    A    Yes.  He had a beard, but --

10:54AM   24    Q    Other than that, that looks like him?

10:54AM   25    A    Yes.

| | | |
|---|---|---|
| 10:54AM | 1 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:55AM | 2 | Exhibit 1-44. |
| 10:55AM | 3 | THE COURT:  Any objection? |
| 10:55AM | 4 | MR. KENNEDY:  No objection. |
| 10:55AM | 5 | THE COURT:  Without objection, 1-44 is admitted.  You |
| 10:55AM | 6 | may publish. |
| 10:55AM | 7 | (Exhibit 1-44 was received in evidence.) |
| 10:55AM | 8 | MR. INCIONG:  Thank you, Your Honor. |
| 10:55AM | 9 | And, Your Honor, may I utilize the face board as |
| 10:55AM | 10 | well -- |
| 10:55AM | 11 | THE COURT:  Yes. |
| 10:55AM | 12 | MR. INCIONG:  -- for the first time? |
| 10:55AM | 13 | THE COURT:  Yes. |
| 10:55AM | 14 | MR. INCIONG:  Thank you. |
| 10:55AM | 15 | BY MR. INCIONG: |
| 10:55AM | 16 | Q    So while we are doing that, Mr. Miller, if I could have |
| 10:55AM | 17 | you look next at Exhibit 1-1079. |
| 10:55AM | 18 | THE COURT:  The face board may be used only with |
| 10:55AM | 19 | admitted exhibits and only after giving defense counsel an |
| 10:55AM | 20 | opportunity to object if they wish. |
| 10:55AM | 21 | MR. INCIONG:  Yes, Your Honor. |
| 10:55AM | 22 | BY MR. INCIONG: |
| 10:55AM | 23 | Q    Do you recognize the exhibit in 1-1079? |
| 10:55AM | 24 | A    Yes. |
| 10:55AM | 25 | Q    Who do you -- or how do you know that person? |

10:55AM    1    A    That's my friend Ali'i.

10:55AM    2    Q    Does that photo accurately show who you know as Ali'i who

10:55AM    3    is Justin Wilcox?

10:55AM    4    A    Yes.

10:56AM    5         MR. INCIONG:  Your Honor, I would move to admit

10:56AM    6    1-1079.

10:56AM    7         THE COURT:  Any objection?

10:56AM    8         MR. KENNEDY:  As soon as I flip to it.

10:56AM    9         MR. INCIONG:  It's on the first supplemental exhibit

10:56AM    10   list --

10:56AM    11        MR. KENNEDY:  I will write it in.

10:56AM    12        MR. INCIONG:  -- 1-1079.

10:56AM    13        MR. KENNEDY:  No objection, Your Honor.

10:56AM    14        THE COURT:  Without objection, 1-1079 is admitted.

10:56AM    15   You may publish.

10:56AM    16        (Exhibit 1-1079 was received in evidence.)

10:56AM    17        MR. INCIONG:  And may I place that on the face board

10:56AM    18   as well?

10:56AM    19        THE COURT, yes you may.

10:56AM    20   BY MR. INCIONG:

10:56AM    21   Q    Okay.  Mr. Miller, let me have you look next at

10:56AM    22   Exhibit 1-1080.

10:56AM    23        THE COURT:  Just for the record too, because I'm

10:56AM    24   looking at the Realtime, the admitted exhibit is 1-1079.

10:56AM    25        MR. INCIONG:  Yes.  Thank you.

| | | |
|---|---|---|
| 10:56AM | 1 | BY MR. INCIONG: |
| 10:56AM | 2 | Q    Mr. Miller, do you recognize what's shown in |
| 10:56AM | 3 | Exhibit 1-1080 or recognize the person? |
| 10:56AM | 4 | A    Yes. |
| 10:56AM | 5 | Q    How do you recognize that person? |
| 10:56AM | 6 | A    I know him, it's Sammy.  Sammy Kuuana. |
| 10:56AM | 7 | Q    Is this a photo of the Sammy Kuuana that you just |
| 10:57AM | 8 | referenced in your testimony? |
| 10:57AM | 9 | A    Yes. |
| 10:57AM | 10 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:57AM | 11 | Exhibit 1-1080. |
| 10:57AM | 12 | THE COURT:  Mr. Kennedy, any objection? |
| 10:57AM | 13 | MR. KENNEDY:  No objection, Your Honor. |
| 10:57AM | 14 | THE COURT:  Without objection, 1-1080 is admitted. |
| 10:57AM | 15 | You may publish. |
| 10:57AM | 16 | (Exhibit 1-1080 was received in evidence.) |
| 10:57AM | 17 | MR. INCIONG:  May I public that, Your Honor, and -- |
| 10:57AM | 18 | THE COURT:  Yes. |
| 10:57AM | 19 | MR. INCIONG:  -- place that on the face board as well? |
| 10:57AM | 20 | THE COURT:  Yes. |
| 10:57AM | 21 | BY MR. INCIONG: |
| 10:57AM | 22 | Q    Lastly, Mr. Miller, please look at Exhibit 1-1081. |
| 10:57AM | 23 | Do you recognize who's shown in that picture? |
| 10:57AM | 24 | A    Yes. |
| 10:57AM | 25 | Q    How do you recognize that person? |

10:57AM   1   A    I know, that's my friend Dusky Boy.

10:57AM   2   Q    And what is Dusky's full name?

10:57AM   3   A    Dusky Toledo.

10:57AM   4   Q    Does that picture accurately show Mr. Toledo?

10:57AM   5   A    Yes.

10:57AM   6        MR. INCIONG:  Your Honor, I would move to admit

10:57AM   7   Exhibit 1-1081.

10:58AM   8        THE COURT:  Any objection?

10:58AM   9        MR. KENNEDY:  No objection, Your Honor.

10:58AM  10        THE COURT:  Without objection, 1-1081 is admitted.

10:58AM  11   You may publish.

10:58AM  12        (Exhibit 1-1081 was received in evidence.)

10:58AM  13        MR. INCIONG:  May I publish that?  Thank you.

10:58AM  14        THE COURT:  Yes.

10:58AM  15   BY MR. INCIONG:

10:58AM  16   Q    So, Mr. Miller, these are the -- and we'll get all of the

10:58AM  17   pictures up in a second here, but these are the individuals

10:58AM  18   that you were speaking with regarding setting up this cocaine

10:58AM  19   network?

10:58AM  20   A    Yes.

10:58AM  21   Q    So when you made contact with the -- the individuals that

10:58AM  22   you had originally knew from your prison sentence, what sort of

10:58AM  23   meetings, if any, did you have with them?

10:58AM  24   A    Well, at first we started -- we started talking, you know,

10:58AM  25   just -- just small talk, and then towards the -- as it

| | | |
|---|---|---|
| 10:58AM | 1 | progressed, the guys that I ended up doing 'em with, couple of |
| 10:58AM | 2 | guys that -- couple guys got sent down, you know.  Like they |
| 10:59AM | 3 | got sent down for talk to me.  We would talk about -- we was |
| 10:59AM | 4 | talking about prices because the prices was -- was going up and |
| 10:59AM | 5 | down, and we was talking about quantities, you know. |
| 10:59AM | 6 | So -- they came down here, I was talking to them, and |
| 10:59AM | 7 | they told me they going report back to -- to their guys in |
| 10:59AM | 8 | the -- in the mainland and California. |
| 10:59AM | 9 | Q    Okay.  So some of these individuals actually came to |
| 10:59AM | 10 | Hawaii to meet with you in person. |
| 10:59AM | 11 | A    Yes.  Two of them. |
| 10:59AM | 12 | Q    Two people, okay.  And who -- was there anyone else |
| 10:59AM | 13 | present besides you and these -- these two people from |
| 10:59AM | 14 | California -- |
| 10:59AM | 15 | A    No. |
| 10:59AM | 16 | Q    -- at the meetings? |
| 10:59AM | 17 | A    No. |
| 10:59AM | 18 | Q    Okay?  So what was decided, if anything, at the -- at |
| 10:59AM | 19 | these meetings? |
| 10:59AM | 20 | A    I was telling them how much -- how much I can do, how |
| 10:59AM | 21 | much -- how much we wanted to do, and they was telling me |
| 10:59AM | 22 | that -- that they got told, Hey, we can get 'em to anywhere, |
| 11:00AM | 23 | just not Hawaii.  You know, like they could get 'em to anywhere |
| 11:00AM | 24 | in the mainland, any -- any states up there, just not Hawaii. |
| 11:00AM | 25 | So at that point I went back to Mike B., and I told |

11:00AM   1   Mike B. -- we was talking about 'em, and Mike B. told me that,

11:00AM   2   Hey, I can get 'em -- I get one way that I can get 'em back.

11:00AM   3   We just got to shoot 'em up to California.  You know, they went

11:00AM   4   back already.  Me and Mike B. was talking, Mike B. tells me,

11:00AM   5   Hey, get one way I can get 'em back, we can shoot 'em up to

11:00AM   6   California.

11:00AM   7   Q    Okay.

11:00AM   8   A    So -- go ahead.

11:00AM   9   Q    All right.  So that was the -- the transportation part was

11:00AM   10  one issue?

11:00AM   11  A    Yes.

11:00AM   12  Q    So did you discuss with Mike B. exactly how you were going

11:00AM   13  to get it back from California?

11:00AM   14  A    Yes.  Yes.

11:00AM   15  Q    So tell us about that.

11:00AM   16  A    So he told me all we got to do is get 'em up to -- get 'em

11:00AM   17  up to San Francisco, and he had -- he had a TSA agent up there

11:01AM   18  or he knew somebody who had a TSA agent -- I don't know the

11:01AM   19  details, that was his part of 'em -- that could actually get

11:01AM   20  'em back for us.

11:01AM   21  Q    Okay.  So where was the -- the meeting going to take place

11:01AM   22  to actually obtain the drugs?  What city?

11:01AM   23  A    In LA.

11:01AM   24  Q    All right.  How were you going to get the drugs from LA to

11:01AM   25  San Francisco?

11:01AM   1   A     I was -- we was going to drive 'em up there.  They was

11:01AM   2   going to take care of that part.

11:01AM   3   Q     Who is "they"?

11:01AM   4   A     The Mexicans, they had that part all down like they had

11:01AM   5   compartments inside cars.  They had -- they had houses where

11:01AM   6   they could keep these cars to put the drugs inside.

11:01AM   7   Q     So where did things stand then when -- after you met with

11:01AM   8   the individuals from California when they went back, what was

11:01AM   9   the agreement at that point?

11:01AM   10  A     Well, it wasn't really set yet because -- because the

11:01AM   11  transportation issue, you know.

11:01AM   12  Q     Okay.

11:01AM   13  A     So I started telling them like, Hey, we was just going to

11:01AM   14  come up there already.  I just wanted to -- at that point

11:02AM   15  Mike B. was -- like he was, Hey, we got a do this now, Bro,

11:02AM   16  and -- because the price is expensive at that time for coke.

11:02AM   17          So I was relaying back to them, I was telling them,

11:02AM   18  Hey, we going come up there, you know.  We going to come up

11:02AM   19  there, we just going get to we can going to break the ice, and

11:02AM   20  we going come up there this time and we get the -- we get one

11:02AM   21  way for bring 'em back already.

11:02AM   22  Q     Was there a quantity of cocaine that you told them you

11:02AM   23  wanted to purchase on this first -- first time?

11:02AM   24  A     The quantity wasn't really set yet, but was -- was at

11:02AM   25  least 10 -- at least 10 -- was going to be at least 10 kilos.

11:02AM    1    Q    How much were 10 kilos going to cost you?

11:02AM    2    A    I forget -- I forget the price now.  I forget the -- the

11:02AM    3    price.  Well, the actual agreement that was -- that was made.

11:02AM    4    A couple hundred -- it was in the hundreds of thousands,

11:02AM    5    though.

11:02AM    6    Q    So who was going to be the source of the money to buy the

11:03AM    7    drugs?

11:03AM    8    A    Okay.  So -- so going back now, I'm setting this all up

11:03AM    9    with -- with Sammy, with Dusky Boy, with Mike B.  So in the

11:03AM   10    midst of it, I'm -- I'm still down here selling drugs with all

11:03AM   11    of these guys.  And I'm -- the initial money was supposed to

11:03AM   12    come from them.  You know, Sammy wanted to be a part of it,

11:03AM   13    Mike B. had some money, Dusky Boy had some money.

11:03AM   14         While I'm selling drugs, I stopped at Miske's -- the

11:03AM   15    shop, and I told him, I say, Hey, Bro, I never have some money

11:03AM   16    on me.  And at that time was either -- I think it was Ali'i, I

11:03AM   17    had to give Ali'i some money.  I told Mike, Hey, just let me

11:04AM   18    borrow some money, I need like ten grand or something.  I'm not

11:04AM   19    sure of the amount.

11:04AM   20         And I grab 'em from him, took 'em to Ali'i, and like

11:04AM   21    the next day I came back and gave him his money back.  And at

11:04AM   22    that point he asked me, What the -- what you doing?  And I look

11:04AM   23    at him, because I never know he was -- he was interested.  So I

11:04AM   24    told him the plan, I told him, Hey, this is what was -- this is

11:04AM   25    what was going on.  This is who I doing 'em with.

11:04AM  1          And then he was like -- he look at me, he was like,

11:04AM  2     Why you doing it with 30?  You know, he called -- Sammy, he

11:04AM  3     called him 30.  Everybody we call him 30, but from back in when

11:04AM  4     we was younger.

11:04AM  5     Q    This is Sam Kuuana?

11:04AM  6     A    Yes.  This is Sam Kuuana.  So -- so Miske is telling me

11:04AM  7     that at that point.  And then I look at him, and I ask him, I

11:05AM  8     say, Why?  What -- you like do 'em?  He said, Yeah.  Fucking,

11:05AM  9     we go do 'em.

11:05AM  10          I was telling him about the numbers and stuff like

11:05AM  11     that.  'eh, we can get it at this price.  I think it was almost

11:05AM  12     like -- I was just giving you a number, if we buying 'em for 30

11:05AM  13     grand in LA, the price in Hawaii was in the 60s and 70s, you

11:05AM  14     know, and you had to have the cash for 'em right away.  It

11:05AM  15     wasn't handed to you and bring it back a week later.  And

11:05AM  16     that's what Mike B. was for.

11:05AM  17          So after breaking down the numbers to him, he

11:05AM  18     wanted -- he wanted to do 'em.  You know, he said, Man, this

11:05AM  19     fucking -- this fucking Lumahai is just sucking up all my cash,

11:05AM  20     you know.  And I said -- I said, Hey, whatever, but I need --

11:05AM  21     this thing was already rolling when Miske got involved.  You

11:05AM  22     know, I was already planning for do 'em with these other

11:05AM  23     people.  So when he got involved, I told him, I said, Hey, I

11:06AM  24     gotta go already.  They -- they're already waiting for us up

11:06AM  25     there.  Me and Mike B. was planning on going and everything

11:06AM    1    like that.  So --

11:06AM    2    Q    Let me interrupt you right there.  I apologize.  Let me

11:06AM    3    just ask a few follow-up questions before we get too far along.

11:06AM    4         So you said that you had asked Mr. Miske to borrow

11:06AM    5    some money initially.

11:06AM    6    A    Yes.

11:06AM    7    Q    And do you recall where you went and got the money from

11:06AM    8    him?

11:06AM    9    A    Oh, from his office.  We was in his office, yeah.

11:06AM    10   Q    From that same drawer that you referenced earlier?

11:06AM    11   A    Yes.

11:06AM    12   Q    And then you were able to pay him back, like was it the

11:06AM    13   next day, you said?

11:06AM    14   A    I brought it back -- the next time I seen him, already I

11:06AM    15   just -- I had the money.  I just never have 'em in my pocket

11:06AM    16   that day, and -- and I had to give 'em -- I had to give 'em to

11:06AM    17   Ali'i.

11:06AM    18   Q    So is that what caught his attention, the fact that you

11:06AM    19   repaid him so quickly?

11:06AM    20   A    Yes.

11:06AM    21   Q    And what's what -- how this whole conversation started?

11:06AM    22   A    Yeah, that's how the -- how the -- because I had just -- I

11:06AM    23   had just gotten out of prison, you know, so -- so he was -- and

11:06AM    24   I was -- we was together every day, but I wasn't -- I wasn't

11:07AM    25   talking to him about 'em at that point.  That was the initial

11:07AM   1    conversation that we had when -- when I gave him back that
11:07AM   2    money, he was like, Hey, what you -- what you up to, boy?
11:07AM   3         And that's when I broke down what I was doing, what I
11:07AM   4    was planning to do, and that's when -- what's when he told me
11:07AM   5    tell, Why the fuck you doing it with -- with 30?  And then
11:07AM   6    that's when -- that initial point right there is when he wanted
11:07AM   7    to be involved, you know.  And he told me he wanted to -- he
11:07AM   8    wanted to do more, but just for break the ice, he wanted to do
11:07AM   9    'em over and over.  You know what I mean, like he wanted to
11:07AM   10   leave his money in there and just give him his cut from what I
11:07AM   11   was -- from what I was making every -- every time that we did
11:07AM   12   'em.
11:07AM   13   Q    So were you looking to do it as a long-term thing as well?
11:07AM   14   A    Yes.
11:07AM   15   Q    Okay.  Did Mr. Miske indicate that at least part of the
11:07AM   16   reason for this was the -- the money he needed to build the
11:07AM   17   house?
11:07AM   18   A    Yeah, the -- the only thing he told me about that, he told
11:08AM   19   me -- he used to tell me this all the time, but he told me that
11:08AM   20   the Lumahai was just -- was just sucking up all his -- all his
11:08AM   21   cash.  The cement, the -- he was telling me like that.
11:08AM   22   Q    Okay.  So once Mr. Miske showed that he was interested and
11:08AM   23   wanted to be a partner in this, I guess, did that affect
11:08AM   24   anybody else that you had talked to originally?
11:08AM   25   A    Yeah, well, I never -- because this thing was moving, I

11:08AM    1    was just telling them be ready, but when -- when he wanted

11:08AM    2    to -- to come, I like -- I even -- I never reach out to them

11:08AM    3    after that.  I just -- he had the money.

11:08AM    4         I think that night after I wen' talk to him,

11:08AM    5    immediately I told him I said, Hey, I need the -- I need the

11:08AM    6    scripts right now because this thing -- it's already rolling,

11:08AM    7    so I need the scripts right now.  And he was like, Hey, meet me

11:08AM    8    over here in Kailua on this -- on this street, wherever it was

11:08AM    9    in Keolu, at this time 7:00 at night.

11:09AM    10   Q    Okay.  Let me stop -- let me stop you right there for a

11:09AM    11   second.  So when you say "scripts," what do you mean by

11:09AM    12   "scripts"?

11:09AM    13   A    Money.  That's what we used to call money.

11:09AM    14   Q    All right.  So you said you didn't even -- you didn't tell

11:09AM    15   the other -- I think you said "them."  Who did you mean you

11:09AM    16   didn't tell once Mr. Miske was going to give you money?

11:09AM    17   A    I never went back to Sammy and them, you know.

11:09AM    18   Q    Was Michael Buntenbah still involved?

11:09AM    19   A    Yes.

11:09AM    20   Q    Was Dusky Toledo still involved?

11:09AM    21   A    No, I never go back to them -- when I talking about I

11:09AM    22   never go back to -- Mike B. wasn't the one of the guys that was

11:09AM    23   going to give me the money.

11:09AM    24   Q    Okay.

11:09AM    25   A    It was Sammy and Dusky Boy that was going to do this.

| | | |
|---|---|---|
| 11:09AM | 1 | Q    Okay.  So those are the two you were referring to saying |
| 11:09AM | 2 | you didn't go back to them. |
| 11:09AM | 3 | A    Yes. |
| 11:09AM | 4 | Q    Because Mr. Miske was effectively taking their place as |
| 11:09AM | 5 | far as providing the money? |
| 11:09AM | 6 | A    Yes. |
| 11:09AM | 7 | Q    Did you have any of your own money that you were putting |
| 11:09AM | 8 | into this? |
| 11:09AM | 9 | A    Yes. |
| 11:09AM | 10 | Q    So I think you were about to tell us about how you got the |
| 11:09AM | 11 | money from Mr. Miske.  So you described he asked you to meet in |
| 11:10AM | 12 | Kailua? |
| 11:10AM | 13 | A    Yeah, so -- so I was leaving already at this point.  They |
| 11:10AM | 14 | was waiting for us.  Mike B. had his connection in San |
| 11:10AM | 15 | Francisco who was also waiting for us.  And even -- so when |
| 11:10AM | 16 | Mike B., when we was talking, even his connect in San Francisco |
| 11:10AM | 17 | was telling Mike like -- like, hey, they couldn't even get coke |
| 11:10AM | 18 | up there in San Francisco, you know, so he was kind of |
| 11:10AM | 19 | surprised that when Mike B. was telling them we coming up there |
| 11:10AM | 20 | and we're going to use your whatever it was. |
| 11:10AM | 21 | But, yeah, anyways, back to that -- after the |
| 11:10AM | 22 | conversation with Miske, I'm telling him, hey, I'm leaving in |
| 11:10AM | 23 | the next few days.  And if you like go, we need to go get the |
| 11:10AM | 24 | scripts.  So he told me meet me in Kailua that night at this |
| 11:10AM | 25 | time.  He was also precise when we meeting.  But anyways, later |

11:10AM   1    on that night I go to where he told me for go, and I see him

11:11AM   2    pull up in a white Lexus.  So he pull up by me in a white Lexus

11:11AM   3    in Keolu Hills in that -- so Keolu Hills is a little bluff area

11:11AM   4    in Kailua in the town, a lot of windy roads and stuff like

11:11AM   5    that, residential area.

11:11AM   6         So he pulled up next to me.  We following each other,

11:11AM   7    he's driving through these windy hills, pull over on the side

11:11AM   8    of the road, and I start talking to him and I tell him if I

11:11AM   9    don't leave -- if I don't tonight or tomorrow, I'll be gone

11:11AM   10   already, you know.  So he pops the -- he goes to his car, he

11:11AM   11   grabs out the money, like one bag, one box of money.  He grabs

11:11AM   12   out the money, gives it to me, and -- and from there I leave.

11:11AM   13        That night when I get back I open the bag -- I opened

11:12AM   14   the money that he gave me, and I'm looking at it and it's --

11:12AM   15   it's a lot of like wad -- like some small bills.  And when I

11:12AM   16   say small bills, like 20s and 50s, and just wadded up like -- I

11:12AM   17   don't know if you know how $20 in thousand dollars is like a

11:12AM   18   wad like that big (indicating).  You know, so he had -- it was

11:12AM   19   like a bunch of those, and I remember looking at 'em and I was

11:12AM   20   like, Fuck, how am I going to get this -- look like kind of

11:12AM   21   couple million dollars right here in smaller bills.

11:12AM   22        So I started grabbing 'em, I start smelling 'em.  It

11:12AM   23   was like old and -- and sticky, like the money was real sticky.

11:12AM   24   I rubber band it up, it was kind of sticky.  And I immediately

11:12AM   25   contact him, go back to meet him and tell him like, Hey, what's

| 11:13AM | 1 | up with all these -- all these smaller bills?  And he was |

11:13AM   1   up with all these -- all these smaller bills?  And he was

11:13AM   2   like -- he told me, he said, Hey, you told me you was -- you

11:13AM   3   told me you was leaving soon.

11:13AM   4           So this was at the Dent house.  The dent -- he had one

11:13AM   5   of his girlfriends he used to call her the Dent, she used to

11:13AM   6   work at a dentist office.  And at that time he told me, This is

11:13AM   7   all I had, this was at the Dent's house.  You know, you told me

11:13AM   8   you was leaving soon.  You never told me -- so he was like, Do

11:13AM   9   what you gotta do, like change 'em out or something, but that's

11:13AM   10  all I can -- that's all I have access to right now at the time.

11:13AM   11  Q     Okay.  Let me interrupt you right there and ask you a

11:13AM   12  couple of questions.  So what was the plan on how you were

11:13AM   13  going to get this money to Los Angeles to purchase the cocaine?

11:13AM   14  A     We was taking 'em up there ourselves, me and Mike B.

11:13AM   15  Q     How?

11:13AM   16  A     We was taking it on the plane, putting it on suitcases --

11:13AM   17  I was getting to that, we was putting it in suitcases and --

11:13AM   18  and taking 'em up.

11:13AM   19  Q     Okay.  In the check baggage or carry-on?

11:13AM   20  A     No, carry-on.

11:13AM   21  Q     So why was it important whether the bills were small or

11:14AM   22  large?

11:14AM   23  A     We was carry one carry-on, and we was stuffing the bills.

11:14AM   24  We wasn't -- like had clothes right here in the suitcase, and

11:14AM   25  then the bills was going stacked up all the way around like

11:14AM   1   that in the suitcase.  So if you was to stack up a bunch of
11:14AM   2   $20, $1,000 stacks that look like that, would be hard to do.
11:14AM   3   Q     So 20s would take up more space than larger bills like
11:14AM   4   100s?
11:14AM   5   A     Yes.
11:14AM   6   Q     Is that why it was important?
11:14AM   7   A     Yes.
11:14AM   8   Q     Now, let me have you look -- you described an area where
11:14AM   9   this meeting met -- where you met with Mr. Miske.  Let me have
11:14AM   10  you look at Exhibit 4-107.
11:14AM   11             MR. INCIONG:  Please, if you could slow that to
11:14AM   12  Mr. Miller.
11:14AM   13  BY MR. INCIONG:
11:14AM   14  Q     Do you recognize what's shown in that map, Mr. Miller?
11:14AM   15  A     Yes.
11:14AM   16  Q     Does this show the Keolu Hills area of Kailua that you
11:14AM   17  just described?
11:14AM   18  A     Yes.
11:14AM   19  Q     And that's where you met with Mr. Miske on this occasion
11:15AM   20  in the summer of 2014?
11:15AM   21  A     Yes.
11:15AM   22             MR. INCIONG:  Your Honor, I would move to admit
11:15AM   23  Exhibit 4-107.
11:15AM   24             THE COURT:  Mr. Kennedy, any objection?
11:15AM   25             MR. KENNEDY:  No objection.

11:15AM   1              THE COURT:  Without objection, Exhibit 4-107 is

11:15AM   2    admitted.  You may publish.

11:15AM   3              (Exhibit 4-107 was received in evidence.)

11:15AM   4              MR. INCIONG:  Thank you, Your Honor.

11:15AM   5    BY MR. INCIONG:

11:15AM   6    Q    Now, Mr. Miller, you were describing this meeting and

11:15AM   7    driving winding roads and so forth.  Is this that area?

11:15AM   8    A    Yes.

11:15AM   9    Q    Is this the area that Mr. Miske lived as well?

11:15AM   10   A    Yes.

11:15AM   11   Q    The red dot that's shown there, is that approximately

11:15AM   12   where Mr. Miske's residence was?

11:15AM   13   A    Oh, right here.  Yeah.

11:15AM   14   Q    Okay.

11:15AM   15   A    Corner lot.

11:15AM   16   Q    All right.

11:15AM   17   A    Corner lot.

11:15AM   18             MR. INCIONG:  If I could have Exhibit 4-110 shown next

11:15AM   19   to Mr. Miller.

11:15AM   20   BY MR. INCIONG:

11:15AM   21   Q    Do you recognize what's shown in that picture?

11:15AM   22   A    Yes.

11:15AM   23   Q    How do you recognize that?

11:15AM   24   A    It's the street where he lived.

11:16AM   25   Q    And when you say "he," that's Mr. Miske?

11:16AM   1   A   Mr. Miske, yeah.

11:16AM   2   Q   Does that accurately show the -- the street that he lives

11:16AM   3   on?

11:16AM   4   A   Yes.

11:16AM   5   Q   Or lived on?

11:16AM   6   A   It's the front view of his house, looking out the house.

11:16AM   7          MR. INCIONG:  Your Honor, I would move to admit

11:16AM   8   Exhibit 4-110.

11:16AM   9          THE COURT:  Mr. Kennedy?

11:16AM   10         MR. KENNEDY:  No objection.

11:16AM   11         THE COURT:  Without objection, 4-110 is admitted.  You

11:16AM   12   may publish.

11:16AM   13         (Exhibit 4-110 was received in evidence.)

11:16AM   14         MR. INCIONG:  Thank you.

11:16AM   15   BY MR. INCIONG:

11:16AM   16   Q   So this is, as you said, Mr. Miller, looking down the

11:16AM   17   street from Mr. Miske's house?

11:16AM   18   A   Yes.

11:16AM   19   Q   I'm going to show you 4-108 next, please.

11:16AM   20         Do you recognize what's shown there?

11:16AM   21   A   Yes.

11:16AM   22   Q   How do you recognize that?

11:16AM   23   A   This is his house.  This is looking at his little -- he

11:16AM   24   loved this house right here.

11:16AM   25   Q   Does that photo accurately show Mr. Miske's residence at

11:16AM   1   that time?

11:16AM   2   A    Yes.

11:16AM   3        MR. INCIONG:  Your Honor, I would move to admit

11:16AM   4   Exhibit 4-108.

11:16AM   5        THE COURT:  Any objection?

11:16AM   6        MR. KENNEDY:  No objection, Your Honor.

11:16AM   7        THE COURT:  Without objection, 4-10 -- 108 -- excuse

11:16AM   8   me, 4-108 is admitted.

11:16AM   9        (Exhibit 4-108 was received in evidence.)

11:16AM  10        MR. INCIONG:  Thank you, Your Honor.

11:16AM  11        THE COURT:  You may publish.

11:17AM  12        MR. INCIONG:  May I publish?  Thank you.

11:17AM  13   BY MR. INCIONG:

11:17AM  14   Q    So this is the front view of Mr. Miske's residence at that

11:17AM  15   time?

11:17AM  16   A    Yes.

11:17AM  17   Q    Now, you referred to one of Mr. Miske's -- Mr. Miske's

11:17AM  18   girlfriend at the time as Dent or the Dent?

11:17AM  19   A    Yes.

11:17AM  20   Q    Did you know this person's actual name?

11:17AM  21   A    Tori Clegg.

11:17AM  22   Q    I'm going to show you Exhibit 1-0066, please.  Or 1-66.

11:17AM  23        Do you recognize the picture -- or the person in that

11:17AM  24   picture?

11:17AM  25   A    Yes.

11:17AM   1   Q   How do you recognize that?

11:17AM   2   A   I know her, that's Tori.

11:17AM   3   Q   Does this photo accurately show Ms. Clegg as you knew her

11:17AM   4   about that time?

11:17AM   5   A   Yes.

11:17AM   6           MR. INCIONG:  Your Honor, I would move to admit

11:17AM   7   Exhibit 1-66 at this time.

11:17AM   8           THE COURT:  Any objection?

11:17AM   9           MR. KENNEDY:  No objection, Your Honor.

11:17AM  10           THE COURT:  Without objection, Exhibit 1-66 is

11:18AM  11   admitted.  You may publish.

11:18AM  12           (Exhibit 1-66 was received in evidence.)

11:18AM  13           MR. INCIONG:  Thank you, Your Honor.

11:18AM  14   BY MR. INCIONG:

11:18AM  15   Q   So you indicated a few minutes ago that Mr. Miske said he

11:18AM  16   got the money from the Dent's house.

11:18AM  17   A   Yes.

11:18AM  18   Q   Correct?

11:18AM  19           Did you know where that house was in relation to

11:18AM  20   Mr. Miske's house?

11:18AM  21   A   Right down the road.  I don't know exactly where, but --

11:18AM  22   Q   Same area?

11:18AM  23   A   Yeah, same area.  I think that's her grandma's house.

11:18AM  24   Q   Okay.  And that's where Mr. Miske indicated he had gotten

11:18AM  25   the -- the money that he gave to you that you described in the

| 11:18AM | 1 | small bills and sticky? |
|---|---|---|
| 11:18AM | 2 | A    Yeah.  Well, it wasn't all small bills, but had one large |
| 11:18AM | 3 | amount of small bills. |
| 11:18AM | 4 | Q    Okay. |
| 11:18AM | 5 | A    But had some 100s in there. |
| 11:18AM | 6 | Q    Okay.  And I think you stated the type of car that |
| 11:18AM | 7 | Mr. Miske had arrived in when he gave you the money in that |
| 11:18AM | 8 | area. |
| 11:18AM | 9 | A    Yes.  Yes. |
| 11:18AM | 10 | Q    What kind of car was that? |
| 11:18AM | 11 | A    A white Lexus. |
| 11:18AM | 12 | Q    Had you seen that car before? |
| 11:18AM | 13 | A    Yes. |
| 11:18AM | 14 | Q    Did you know whose car that was? |
| 11:18AM | 15 | A    That was Tori's car. |
| 11:18AM | 16 | Q    Tori Clegg? |
| 11:19AM | 17 | A    Or one that looked like Tori's car, but -- |
| 11:19AM | 18 | Q    Okay.  So what did you do, if anything, regarding the -- |
| 11:19AM | 19 | the money situation that was wet and -- or sticky, I should |
| 11:19AM | 20 | say? |
| 11:19AM | 21 | A    Yeah, so when I told him that, he was like, Yeah, |
| 11:19AM | 22 | that's -- I got that from the Dent's house.  That's how -- you |
| 11:19AM | 23 | rush 'em, you told me you need 'em, you got 'em. |
| 11:19AM | 24 |      So I went back -- at that time I was still -- I was |
| 11:19AM | 25 | still talking to Sammy at that point, and Sammy already had his |

11:19AM   1    money like kind of -- kind of ready to go.  I wasn't telling

11:19AM   2    him that I was doing 'em, but I took whatever 20s and stuff,

11:19AM   3    small bills that I had, and I told him, I said, I gotta do

11:19AM   4    something.  Just change this out for me.  So he changed out

11:19AM   5    some bills.  He gave me some -- he gave me larger.  He gave me

11:19AM   6    $100 bills for the -- for the smaller bills that I had.

11:19AM   7    Q    No questions asked?

11:19AM   8    A    No questions asked.  I was -- I had a good name at that

11:20AM   9    time, you know.  I got one good name.  I was -- I wasn't known

11:20AM   10   for doing that to people that I know.

11:20AM   11   Q    Okay.  Mr. Miller, we've got several pictures on the face

11:20AM   12   board here, but I want to show you one that's probably familiar

11:20AM   13   to you that's already been in evidence.

11:20AM   14              MR. INCIONG:  If we could show Mr. Miller

11:20AM   15   Exhibit 1-43.

11:20AM   16              This is in -- this has been admitted, I believe, Your

11:20AM   17   Honor.

11:20AM   18              THE COURT:  It has been.

11:20AM   19              MR. INCIONG:  May I publish that to the jury?

11:20AM   20              THE COURT:  Yes.

11:20AM   21   BY MR. INCIONG:

11:20AM   22   Q    Who -- who is this?

11:20AM   23   A    That's me.

11:20AM   24   Q    Does this photo show how you appeared around this time,

11:20AM   25   2014?

11:20AM   1   A     2014, I mean I was a little more slim in 2014.

11:20AM   2   Q     Okay.  But other than that, that's a photo of you?

11:20AM   3   A     Yes.

11:20AM   4   Q     Okay.  So you switched the money out for the larger bills

11:20AM   5   from Mr. Kuuana.

11:20AM   6   A     Yes.

11:20AM   7   Q     Correct?

11:20AM   8         Does Mr. Kuuana know that you're taking that money to

11:20AM   9   LA to purchase the cocaine?

11:20AM  10   A    No. I never -- I never tell him nothing.  I just was kind

11:21AM  11   of in a rush, and I was -- I was telling him and --

11:21AM  12   Q     Did you leave for LA the next day?

11:21AM  13   A     Yes.  We -- I left fast to LA.  We -- so after that all

11:21AM  14   happened, Mike B. -- Mike B., he was getting in touch with me,

11:21AM  15   like he was trying to tell me like -- he was like, We should

11:21AM  16   ship the -- we should ship up the money.  You know, I shipped

11:21AM  17   it before.

11:21AM  18         I said, I was like, Dude, this is not -- this is not

11:21AM  19   my shit, and this is the first time we're going to do 'em with

11:21AM  20   these -- with these guys.  So I gotta go, he's -- and then he

11:21AM  21   was like, All right, let's go.  Fuck it.

11:21AM  22         So we went to his -- we went to his house soon after I

11:21AM  23   got the money -- after I changed out the bills, Mike B. was

11:21AM  24   waiting for me already.  Our tickets was booked, we was ready

11:21AM  25   to go.  I went down to Mike B.'s house, and -- and me and him

| | | |
|---|---|---|
| 11:22AM | 1 | started stuffing the money inside our carry-on suitcases.  So |
| 11:22AM | 2 | we started -- we started putting 'em in bundles like that and |
| 11:22AM | 3 | then packing 'em up against the sides of the suitcase like |
| 11:22AM | 4 | that. |
| 11:22AM | 5 | Q    How much money are we talking about? |
| 11:22AM | 6 | A    Oh, hundreds of thousands, you know.  Maybe three, maybe |
| 11:22AM | 7 | more, but it was -- I cannot remember the amount, but it was a |
| 11:22AM | 8 | lot.  It was a lot money.  I mean, enough to fit -- enough to |
| 11:22AM | 9 | fit all in the walls like that, double-stacked up like that in |
| 11:22AM | 10 | two carry-on size rolling suitcases. |
| 11:22AM | 11 | Q    This is $100 bills? |
| 11:22AM | 12 | A    Yes, $100 bills. |
| 11:22AM | 13 | Q    Why did Mike B. -- Michael Buntenbah want to ship the |
| 11:22AM | 14 | money? |
| 11:22AM | 15 | A    He never like carry 'em on.  You know, at first he was |
| 11:22AM | 16 | like, Fuck, we're going carry all this money.  And then we was |
| 11:22AM | 17 | talking back and forth, you know.  And then he was like, We |
| 11:22AM | 18 | should -- we should have shipped it.  And I was like, No, we |
| 11:23AM | 19 | gotta -- we gotta go up there, Bro.  We gotta -- I gotta meet |
| 11:23AM | 20 | 'em, take them the money.  They gotta -- everything will be |
| 11:23AM | 21 | good like that.  So he just agreed with me. |
| 11:23AM | 22 | Q    So you were not concerned about having this money |
| 11:23AM | 23 | intercepted going through security at the airport? |
| 11:23AM | 24 | A    Well, we was talking, right.  And between me and Mike B., |
| 11:23AM | 25 | we was talking and we was like, Hey, these guys is more worried |

11:23AM   1   about toothpaste and shampoo, you know, than money.  That's

11:23AM   2   what we was -- that's what we was saying.

11:23AM   3   Q    And you were confident that you weren't going to get

11:23AM   4   caught with it?

11:23AM   5   A    Yeah, like I -- like if I can recall, I remember like them

11:23AM   6   stopping people that had like, You gotta take this water out.

11:23AM   7   You know what I mean.  Like it wasn't -- we never had no --

11:23AM   8   nothing that would make them stop us, no -- no toothpaste, no

11:23AM   9   nothing in the bag, so the thing was going straight through the

11:23AM   10  belt.

11:23AM   11  Q    And so you went through, no problem.

11:23AM   12  A    Straight through, no problems.

11:23AM   13  Q    All right.  Do you recall if anybody assisted you making

11:24AM   14  your travel arrangements, your flights or hotel or anything

11:24AM   15  like that?

11:24AM   16  A    What you mean?

11:24AM   17  Q    Did you book your flights yourself or did somebody else do

11:24AM   18  that for you?

11:24AM   19  A    I can't remember.  I don't remember who did 'em.

11:24AM   20  Q    So you and Mike traveled -- Mike B. traveled on the same

11:24AM   21  flight?

11:24AM   22  A    Yeah.  We was traveled on the same flight, we were

11:24AM   23  sitting -- we were sitting next to each other.

11:24AM   24  Q    So what happens when you get to LA?

11:24AM   25  A    So we get to LA, I think it's overnight flight, whatever.

11:24AM  1    But we land -- when we land it was in the morning, so a lot of

11:24AM  2    traffic in LA.  The traffic was real backed up.  So the guys

11:24AM  3    that I was in contact with was like, Hey, let's -- let's just

11:24AM  4    wait till the traffic goes down, you know.

11:24AM  5         So me and Mike B. went to a -- went to a hotel right

11:24AM  6    there.  Outside of LAX they get like whole row of hotels by the

11:24AM  7    airport.  So we call one -- we went to the hotel, checked in,

11:25AM  8    got some rest, waited -- waited for them to contact me.

11:25AM  9    Q    Did you get a call that they were ready to meet you?

11:25AM  10   A    Yeah, after -- after the traffic went down, headed to

11:25AM  11   sundown, I got the -- I got word from them that -- that it was

11:25AM  12   ready, they were sending somebody to pick me up.

11:25AM  13   Q    So someone came and picked you up?

11:25AM  14   A    Yeah, someone came and picked me up.

11:25AM  15   Q    Did you just go or did Michael Buntenbah go with you?

11:25AM  16   A    No, Mike B. stayed at -- he stayed at the hotel.  I went

11:25AM  17   by myself.

11:25AM  18   Q    Why did you go by yourself?

11:25AM  19   A    Because I was the one contacting them.  You know, Mike B.

11:25AM  20   was -- he wasn't involved in the -- Mike B.'s part wasn't to

11:25AM  21   get everything from them, set everything up.  I never told them

11:25AM  22   I was bringing anybody with me, so --

11:25AM  23   Q    Okay.

11:25AM  24   A    -- I never like to freak out if I just show up with one

11:25AM  25   white guy.

| 11:25AM | 1 | Q | Okay.  So did you know the person who came to pick you up |
| 11:25AM | 2 | | at the -- at the hotel? |
| 11:25AM | 3 | A | Well, the person that came to pick me up was one of the |
| 11:26AM | 4 | | same persons that -- that flew down and talk to me about -- |
| 11:26AM | 5 | Q | Okay.  So you knew him from that prior trip? |
| 11:26AM | 6 | A | Yeah.  Yeah, that's the only time I -- |
| 11:26AM | 7 | Q | So do you know that this person took you? |
| 11:26AM | 8 | A | Huh? |
| 11:26AM | 9 | Q | Do you know where this person took you? |
| 11:26AM | 10 | A | Yeah, they took me to one house in -- they just took me to |
| 11:26AM | 11 | | a house.  It was a nice -- it was a nice neighborhood, but |
| 11:26AM | 12 | | having a gate in front of the house.  We drove -- I not |
| 11:26AM | 13 | | familiar with the area, but we drove to a neighborhood maybe |
| 11:26AM | 14 | | half an hour away or something like that.  But we drove into a |
| 11:26AM | 15 | | neighborhood.  The front of the house had one fence, we pulled |
| 11:26AM | 16 | | up on the side, and -- and got out.  I went inside -- I don't |
| 11:26AM | 17 | | know if he stayed out or what, but I went inside and met the -- |
| 11:26AM | 18 | | the main guy that I was meeting and discussing how we going to |
| 11:26AM | 19 | | do everything after this.  You know, I went into the house -- |
| 11:26AM | 20 | Q | Let me interrupt you just for one second.  So when you |
| 11:27AM | 21 | | say, We discussed how we were going to do everything after |
| 11:27AM | 22 | | this, what do you mean by that?  What's "after this"? |
| 11:27AM | 23 | A | Yeah, well, the plan was to -- to -- we were just breaking |
| 11:27AM | 24 | | ice on that one.  You know, that's why we was only there for |
| 11:27AM | 25 | | that or whatever they was going to get at that point.  And we |

11:27AM   1    wanted to -- I wanted to keep going, and that's -- that's what

11:27AM   2    I was telling him.

11:27AM   3    Q    So was this kind of like a test run or a trial run?

11:27AM   4    A    Yeah, this was the first time, yeah.  So we was talking

11:27AM   5    about -- he was telling me, he was like, Hey, don't worry about

11:27AM   6    the -- don't worry about the transportation after this.  By the

11:27AM   7    next time we're going to have -- we're going to have everything

11:27AM   8    set up to -- to get down to Hawaii and everything like that,

11:27AM   9    you know.

11:27AM  10    Q    So you wouldn't have to worry about getting the drugs back

11:27AM  11    like you --

11:27AM  12    A    Yeah, going up to -- going up to San Francisco, and he was

11:27AM  13    telling me no worry about the -- getting 'em to San Francisco

11:27AM  14    also because we get cars, we get guys that just -- they follow

11:28AM  15    each other.  If one getting pulled over, they still get couple

11:28AM  16    cars going up to different places.

11:28AM  17    Q    So was there anyone else at this house besides you two,

11:28AM  18    you and the person that --

11:28AM  19    A    Oh, no, had more.  Had some people that was just -- that

11:28AM  20    was just there.  Like you could tell they was like Mexican gang

11:28AM  21    bangers, you know, tattoos, LA hats and stuff like that.  Yeah.

11:28AM  22    Q    Was anyone armed that you could see?

11:28AM  23    A    I seen one gun when was there, you know.  I seen one gun

11:28AM  24    when I was in the house, yeah, but I never -- I never feel -- I

11:28AM  25    wasn't -- I was kind of tripping out.  You know, I was like,

| | | |
|---|---|---|
| 11:28AM | 1 | Hey, I'm here, they could just -- they could just shoot me. |
| 11:28AM | 2 | But once I went talk to the guy and I realize like, Hey, these |
| 11:28AM | 3 | guys, they're more interested in making continuous money than |
| 11:28AM | 4 | just doing a one-time shot, you know, like they seen how |
| 11:28AM | 5 | serious keep going and everything being ready and stuff like |
| 11:28AM | 6 | that.  So -- |
| 11:29AM | 7 | Q    So did you have the money with you at that point? |
| 11:29AM | 8 | A    Yes. |
| 11:29AM | 9 | Q    So 300,000 or so? |
| 11:29AM | 10 | A    Yeah. |
| 11:29AM | 11 | Q    And you're there by yourself? |
| 11:29AM | 12 | A    Yes. |
| 11:29AM | 13 | Q    Okay.  Did they count or check the money? |
| 11:29AM | 14 | A    Yeah, so -- so I pull up, I go into the house, shake the |
| 11:29AM | 15 | guy's hand.  We talking, they got on the table -- they got |
| 11:29AM | 16 | tables and they got money counters set up on the table.  They |
| 11:29AM | 17 | putting the money -- the money is flipping through, brrrrr, |
| 11:29AM | 18 | through the machine like that, and they got -- they got stuff |
| 11:29AM | 19 | to check if any of them was counterfeit.  You know, they had |
| 11:29AM | 20 | like -- I forget what they had, but -- I remember them checking |
| 11:29AM | 21 | if any of the bills was counterfeit and coming out of the -- |
| 11:29AM | 22 | the money counting machine. |
| 11:29AM | 23 | Q    Okay.  So were they satisfied that the money was all there |
| 11:29AM | 24 | and legit? |
| 11:29AM | 25 | A    Yeah.  Everything was there, everything was good. |

11:29AM    1    Q    What about the drugs?

11:29AM    2    A    Yeah.  So, okay, so we're talking.  We're not counting.

11:30AM    3    The other guys is over there only table.  You know, me and the

11:30AM    4    guy that -- the guy is talking the whole time.  Get other guys,

11:30AM    5    all they was doing was counting the money, you know.

11:30AM    6         So after they counted the money, all the money was

11:30AM    7    good, then the guy that was doing 'em, he took the money, came

11:30AM    8    right back with the -- with the drugs, with the coke.  And so

11:30AM    9    he brought 'em in, we still talking he opened up the coke like

11:30AM   10    that, and then the guy that brought 'em in was talking to the

11:30AM   11    guy that I'm talking to.  And they talking in Spanish,

11:30AM   12    whatever, but he wanted him to check and make sure, Hey, this

11:30AM   13    thing is stamped, you know.  And he was the last guy for touch

11:30AM   14    'em, so -- so the other guy had to make me verify that -- that

11:30AM   15    everything was good.

11:30AM   16         So we tested 'em, he scoop 'em out, test 'em, cook 'em

11:31AM   17    like into one ball.  Everything was good.  We checked every

11:31AM   18    stamp that was on the -- that was on the bricks and -- and,

11:31AM   19    yeah.  So after I said everything was good, he started

11:31AM   20    packaging everything up.  His guy started packaging everything

11:31AM   21    up.

11:31AM   22    Q    Okay.  So how did you understand that the drugs were going

11:31AM   23    to get there from the house up to the -- the connection that

11:31AM   24    Mike Buntenbah had in San Francisco?

11:31AM   25    A    So after -- the guy was -- we still talking at this point.

11:31AM    1    We discussing -- you know, he -- he like do more.  His guys

11:31AM    2    like do what I'm talking about.  And I told 'em, I said, Hey, I

11:31AM    3    get guys that they got money for 'em.  Everything is good.

11:31AM    4    Just -- just bring 'em down.  We talking, the other guys

11:31AM    5    they're packaging everything up, and they had one garage car

11:31AM    6    set up to where they had compartments that -- that all this

11:31AM    7    coke, all the bricks go into.

11:32AM    8    Q    Like secret concealed compartments?

11:32AM    9    A    Yeah, concealed compartments.  It wasn't out like -- just

11:32AM   10    threw 'em in the trunk, you know.  You had to put them inside

11:32AM   11    compartments that was made just for that.  Like they had cars

11:32AM   12    that was made just for that.

11:32AM   13    Q    Okay.  So that was how they were going to get the drugs up

11:32AM   14    to San Francisco?

11:32AM   15    A    Yes.

11:32AM   16    Q    Were you going to drive with them?

11:32AM   17    A    Well, at first we wasn't, but I wanted to -- I wanted to

11:32AM   18    make sure everything that went smooth, you know.  So after all

11:32AM   19    of that is done, we come to one agreement and everything, they

11:32AM   20    send -- they send one car to pick up Mike B., who is still at

11:32AM   21    the hotel texting me like, Hey, what the fuck is going on?

11:32AM   22         So they sent one car to pick up Mike B.  He comes

11:32AM   23    back, texts me, Hey, I'm outside.  We come -- I come outside,

11:32AM   24    we shake -- I shake hands to everybody in the house.  I come

11:32AM   25    outside, Mike B. is waiting outside with the car that's

11:32AM  1   supposed to drive us up to -- they set up one car and one

11:33AM  2   driver that was supposed to drive us up to Frisco.

11:33AM  3   Q    Okay.

11:33AM  4   A    So jump in the car, everybody else -- all the cars lined

11:33AM  5   up waiting for us.  The car that's coming out the garage with

11:33AM  6   the coke inside, he come up like that and he pulls in front of

11:33AM  7   us, maybe get three cars in front of him, he pull right here,

11:33AM  8   got couple cars back, and then we're the last car.

11:33AM  9            So everybody leaves.  We go maybe 20 minutes to the

11:33AM 10   freeway, we go for jump on the freeway, and then that's when

11:33AM 11   the helicopters come.  The cars is coming from different

11:33AM 12   directions on the freeway.  They blocking off the next exit.

11:33AM 13   Q    You say "cars," you're talking about law enforcement?

11:33AM 14   A    Yeah, yeah.  Unmarked cars, that's like they just got the

11:33AM 15   lights on the inside.

11:33AM 16   Q    Okay.

11:33AM 17   A    Yeah, so they're blocking us off.  And I'm looking at

11:33AM 18   Mike B. and he's looking at me like, What the fuck, Dude?  And

11:34AM 19   I'm like, Hey, it's over.  You know, I don't know what the

11:34AM 20   fuck -- I don't know what to tell you.  I'm kind of in -- kind

11:34AM 21   of in shock right there, you know.

11:34AM 22   Q    So who was in the car that you were riding in besides you

11:34AM 23   and Mike B.?

11:34AM 24   A    Me and Mike B. and the driver.  I don't think the driver

11:34AM 25   even spoke English.

11:34AM    1    Q    Okay.

11:34AM    2    A    But --

11:34AM    3    Q    So you get pulled over?

11:34AM    4    A    Yeah, we get pulled over -- well, we get more than pulled

11:34AM    5    over.  Like they got a lot of cars, a lot of -- lot of

11:34AM    6    helicopters, like they forcing us to like drive into the wall,

11:34AM    7    you know.  They got -- they get guns out, pulling us out the

11:34AM    8    car, pulling us up against the wall.  You know.  Yeah, it was

11:34AM    9    over with.

11:34AM    10    Q    So you're taken into custody?

11:34AM    11    A    Taken into custody, yeah.  Everybody was taken, right.

11:34AM    12    That was -- I was -- they was asking everybody when they had up

11:34AM    13    against -- Hey, anybody got any medical issues and stuff like

11:34AM    14    that.  I told them I had -- I had heart surgery, I just need my

11:35AM    15    medication.

11:35AM    16         So they took everybody down to the -- to the booking

11:35AM    17    station.  When they was there, if we went walk right in, as

11:35AM    18    soon as I went in there, the guy who took me was, Hey, you got

11:35AM    19    to go to the medical, right?  You got medical -- I said, Yeah.

11:35AM    20    So he took me straight to the hospital.  And I was at the

11:35AM    21    hospital just waiting.  I was just waiting for the doctor.  It

11:35AM    22    was a long line at the hospital.  I'm waiting for the doctor.

11:35AM    23    The officers that is with me is waiting in the room for me.

11:35AM    24         And maybe a few hours after I get to the -- to the

11:35AM    25    hospital, the law comes back and he starts telling me, I'm

11:35AM  1   going to -- he took off my handcuffs, and I was kind of in

11:35AM  2   shock.  I was like, What the hell is going on?  He was telling

11:35AM  3   me -- showed me a bunch of phones, and he had one bag with

11:36AM  4   phones, all of our phones inside.  And I was -- I was still

11:36AM  5   kind of in shock.  So I grabbed my phone out the bag.  He was

11:36AM  6   like, Hey, you got anything to say?  And I was like, No.

11:36AM  7        So I told him, I'm free to go?  And he was like,

11:36AM  8   You're free to go.  I don't even got my shoes on at this point.

11:36AM  9   I just got socks.  I'm in the hospital with cuffs, and he's

11:36AM  10  uncuffing it.  And I was like, Fuck.

11:36AM  11       I jumped in the car -- I jumped in the taxi headed to

11:36AM  12  the hospital.  I got one call from Mike B., and he was like --

11:36AM  13  I was, Hey, Dude, I'm at the airport.  Where you at?  He said,

11:36AM  14  Oh, I'm headed to the airport right now.  Wait for me over

11:36AM  15  there.

11:36AM  16       So I'm kind of tripping out, like I'm looking at him

11:36AM  17  like, Hey, they let us go.  You know.  And he was like --

11:36AM  18  Mike B. said, I gotta go -- I said, I'm going home already,

11:36AM  19  fuck this.  This is too much for me, you know.  If they're

11:36AM  20  going to let me go -- they're going to let me go, I'm out of

11:37AM  21  here, I'm going home.

11:37AM  22       So Mike B. said, These guys in Frisco, they still

11:37AM  23  waiting for me.  They don't know what happened.  I gotta go up

11:37AM  24  there and let them know what the fuck is going on.  And --

11:37AM  25  yeah, that was the -- that was the whole scenario right there.

11:37AM    1    Q    So were you ever told why they released you?

11:37AM    2    A    No.  Yeah, no.

11:37AM    3    Q    So I think you said you left the hospital directly to the

11:37AM    4    airport.  Is that what you meant?

11:37AM    5    A    Yes.

11:37AM    6    Q    With no shoes?

11:37AM    7    A    Yeah, got no shoes on.  You know, I never have shoes on.

11:37AM    8    I had to -- because I remember in the hospital when you go to

11:37AM    9    the stuff, they take your shoe laces and shit like that, you

11:37AM    10   know.  So my shoes was off, I was in the hospital with socks,

11:37AM    11   with shackles and handcuffs and everything.

11:37AM    12          And when the -- when the detective came -- because I

11:37AM    13   had two regular -- whatever they was with me.  The two law guys

11:38AM    14   that was with me was just there for watch me.  So the main guy

11:38AM    15   came over there in charge of whatever case that was doing, and

11:38AM    16   he took off my cuffs and said, Hey, we letting you go.  Do you

11:38AM    17   have anything to say?  You should talk to us, you know, like

11:38AM    18   that.  And I was like, No, I can go?  I can go home?  And he

11:38AM    19   was like, Yeah, you are free to go.

11:38AM    20   Q    So you just got out of there.

11:38AM    21   A    Huh?

11:38AM    22   Q    So you just got out of there.

11:38AM    23   A    Yeah, I got -- I didn't even wait for the doctor to come.

11:38AM    24   Like the doctor, we was waiting for hours for them to come and

11:38AM    25   check me out so I could go back, but as soon as he told me I

11:38AM   1   was free, I was like -- I just left.  I never even wait for the

11:38AM   2   doctor.  I was out of there.  I was just glad to be -- you

11:38AM   3   know.

11:38AM   4   Q   Did you catch a flight back to Hawaii that same day?

11:38AM   5   A   Yeah, I came -- I came right back to Hawaii.  Mike B. shot

11:38AM   6   up to Frisco first.  Mike Buntenbah.

11:38AM   7   Q   Okay.  And you mentioned that the officer came to you and

11:38AM   8   he had a bag of phones, and you took how many phones?

11:38AM   9   A   I don't -- I remember I took my phone.  I had one

11:39AM  10   Blackberry, you know, the one you can just shoot messages with.

11:39AM  11   I took that one and I threw that one away.  But --

11:39AM  12   Q   But there were other phones that you had had in the car

11:39AM  13   that you left that you didn't claim?

11:39AM  14   A   Yeah.  Yeah, I never see those until later, you know.

11:39AM  15   Q   So you had taken a number of phones with you initially?

11:39AM  16   A   Yeah.  Yeah, like I had -- I had a number of phones, one

11:39AM  17   phone for one person.

11:39AM  18   Q   So let me have you look at Exhibit 7-005, please.

11:39AM  19       Do you recognize what's shown in that photo?

11:39AM  20   A   Yes.

11:39AM  21   Q   How do you recognize that?

11:39AM  22   A   Because I was there with that, that's how we -- that's how

11:39AM  23   we -- that's how when the thing was getting packaged up, that's

11:39AM  24   how it was getting packaged up.

11:40AM  25   Q   This is what you purchased at the meeting in LA that you

11:40AM   1   just described?

11:40AM   2   A    Yes.

11:40AM   3   Q    And this is what was seized by law enforcement after you

11:40AM   4   were stopped?

11:40AM   5   A    Yes.

11:40AM   6        MR. INCIONG:  Your Honor, I would move to admit 7-5.

11:40AM   7        THE COURT:  Any objection?

11:40AM   8        MR. KENNEDY:  No objection.

11:40AM   9        THE COURT:  Without objection, 7-5 is admitted.  You

11:40AM  10   may publish.

11:40AM  11        (Exhibit 7-005 was received in evidence.)

11:40AM  12        MR. INCIONG:  Thank you, Your Honor.

11:40AM  13   BY MR. INCIONG:

11:40AM  14   Q    So, Mr. Miller, what is shown here?

11:40AM  15   A    That's -- that's 10 kilos of cocaine.

11:40AM  16   Q    So each one of those rectangular shaped packages is a kilo

11:40AM  17   of coke?

11:40AM  18   A    Yes.

11:40AM  19   Q    That's what you purchased with Mr. Miske's money in July

11:40AM  20   of 2014?

11:40AM  21   A    Yes.  So when I say -- when I say the word "bricks,"

11:40AM  22   that's what -- that's what I was referring to.

11:40AM  23   Q    Let me have you look at one other photo, 7-006 -- or I

11:40AM  24   should say 7-6.

11:40AM  25        Do you recognize what's shown in that?

11:40AM    1    A    Yes.

11:40AM    2    Q    Is that just another -- another view, another

11:40AM    3    configuration of that same item you were just discussing?

11:41AM    4    A    Yes.

11:41AM    5    Q    Does this accurately show on the bricks as you saw them

11:41AM    6    when you purchased them in July of 2014?

11:41AM    7    A    Yes.

11:41AM    8         MR. INCIONG:  Your Honor, I would move to admit 7-6.

11:41AM    9         THE COURT:  Without objection?

11:41AM   10         MR. KENNEDY:  No objection.

11:41AM   11         THE COURT:  All right.  So without objection, 7-6 is

11:41AM   12    admitted.  You may publish.

11:41AM   13         (Exhibit 7-006 was received in evidence.)

11:41AM   14         MR. INCIONG:  Thank you, Your Honor.

11:41AM   15    BY MR. INCIONG:

11:41AM   16    Q    And, Mr. Miller, this just shows those bricks stacked in a

11:41AM   17    different manner than manner before?

11:41AM   18    A    Yes.

11:41AM   19    Q    But it's still the same 10 kilos?

11:41AM   20    A    Yes.

11:41AM   21         MR. INCIONG:  All right.  You can take that down now

11:41AM   22    for the moment.

11:41AM   23    BY MR. INCIONG:

11:41AM   24    Q    So you fly home?

11:41AM   25    A    Yes.

| | | | |
|---|---|---|---|
| 11:41AM | 1 | Q | What do you do when you get home to Hawaii? |
| 11:41AM | 2 | A | Well, first thing when -- when I got home, I was -- I was |
| 11:41AM | 3 | | tired.  I was -- I took one small -- I took one small nap.  You |
| 11:41AM | 4 | | know, I was trying to just -- I was trying to just get my head |
| 11:41AM | 5 | | together.  And that's -- after that the first person I |
| 11:41AM | 6 | | contacted -- after I went home, you know, got some rest, first |
| 11:42AM | 7 | | person I contacted was Miske, and I told him, Hey, I gotta -- I |
| 11:42AM | 8 | | gotta meet you.  It's important.  You know, so -- |
| 11:42AM | 9 | Q | And you met him in person? |
| 11:42AM | 10 | A | Met him in person. |
| 11:42AM | 11 | Q | Do you recall where? |
| 11:42AM | 12 | A | Keolu Hills, in that area where he live out.  I was |
| 11:42AM | 13 | | driving down there for meet him.  So when I met him, we did the |
| 11:42AM | 14 | | same thing, he was in -- he was in his truck -- I think he was |
| 11:42AM | 15 | | in his truck.  He had a silver Tacoma at that time.  But when I |
| 11:42AM | 16 | | met him down there, I followed him through the hills again. |
| 11:42AM | 17 | | He -- he always did that for see if anybody following us or |
| 11:42AM | 18 | | not. |
| 11:42AM | 19 | | But we went deep up into the hills, all the way to the |
| 11:42AM | 20 | | top.  Not by his house but on the other end, almost by the |
| 11:42AM | 21 | | bluffs.  And he parked.  I wen' park behind him, walked up to |
| 11:42AM | 22 | | his -- walked up to his truck, jumped into his truck.  I told |
| 11:42AM | 23 | | him, I got a talk to you. |
| 11:43AM | 24 | | And he immediately reached for the radio, he turned up |
| 11:43AM | 25 | | the radio, and -- and I started telling him like in not -- not |

11:43AM   1   loud in code, like, hey -- I explained to him what happened.  I
11:43AM   2   told him the whole deal, what wen' happened, what wen' down and
11:43AM   3   everything like that, you know.
11:43AM   4   Q    What was his reaction.
11:43AM   5   A    At first he was like -- at first he was like just -- just
11:43AM   6   staring like down, and then after that he was like, Listen,
11:43AM   7   main thing -- he told me, Main thing, you good.  Main thing,
11:43AM   8   you all right.
11:43AM   9          But I know what he was thinking because in that
11:43AM  10   conversation had a lot of time where we would stop talking and
11:43AM  11   just -- and just feel each other out.  So I know he was
11:43AM  12   thinking like I'm bullshitting him or some shit like that
11:43AM  13   because of -- because of what I just told him.  You know, it's
11:43AM  14   kind of like, Hey, he just gave me the money, and you telling
11:43AM  15   me this happened.  Sound like I full of shit, but I wasn't.
11:44AM  16   You know, I was telling him -- I was telling him what happened,
11:44AM  17   and he was like -- hey, main thing, you all right.  He was
11:44AM  18   like, Main thing, you all right.  He was grabbing me and
11:44AM  19   everything, Main thing, you good.  He was texting me showing me
11:44AM  20   things like that, and I was responding to him by typing back on
11:44AM  21   his phone.  So we're talking for a while in his truck.  We're
11:44AM  22   communicating, whether we're talking or we -- we typing
11:44AM  23   messages to each other.
11:44AM  24          We get out the car -- we get out the truck.  He said,
11:44AM  25   Let's take a walk.  We start walking, and we start walking --

11:44AM   1   that's how -- when we started walking I started -- that's when

11:44AM   2   I knew that he was kind of worried because when we was walking

11:44AM   3   up in the bluffs, he was like looking inside cars for see if

11:44AM   4   people was trying -- trying to listen to us or see us talking.

11:44AM   5   We just kept walking around cars, walking down looking in cars.

11:44AM   6            And he was feeling me out, just telling me, Listen,

11:45AM   7   everything going be all right.  You know, fuck 'em, that's only

11:45AM   8   money.  You know, trying to make me feel better, and I did for

11:45AM   9   a little bit, you know.  And yeah, that was -- that was the

11:45AM  10   initial conversation about -- about that up there in the -- in

11:45AM  11   the bluffs.

11:45AM  12   Q    Okay.  Well, we'll come back to that in a minute, but I

11:45AM  13   want to talk to you about some of the phones that were seized

11:45AM  14   in Los Angeles by law enforcement when you were arrested.

11:45AM  15   A    Okay.

11:45AM  16   Q    Okay.  You said you had taken a number of phones up there

11:45AM  17   with you, correct?

11:45AM  18   A    Yes.

11:45AM  19   Q    You didn't bring all of them back with you?

11:45AM  20   A    No.

11:45AM  21   Q    All right.  Tell the jury again why you had these

11:45AM  22   different phones.

11:45AM  23   A    I had different phones to talk to -- one phone for one

11:45AM  24   person, you know.  Like if I'm talking to Mike B., me and

11:45AM  25   Mike B. get phones just for talk to each other or he get -- he

| | | |
|---|---|---|
| 11:45AM | 1 | get one phone and he get talking to me and maybe two other guys |
| 11:45AM | 2 | on his phone. |
| 11:46AM | 3 | Q    Okay. |
| 11:46AM | 4 | MR. INCIONG:  Your Honor, may I approach with -- I |
| 11:46AM | 5 | have a couple of actual physical items of evidence that I would |
| 11:46AM | 6 | like to show Mr. Miller.  If I could approach him with 7-8, |
| 11:46AM | 7 | which is a telephone. |
| 11:46AM | 8 | THE COURT:  All right. |
| 11:46AM | 9 | You've shown that to Mr. Kennedy as well? |
| 11:46AM | 10 | MR. INCIONG:  I did, Your Honor. |
| 11:46AM | 11 | MR. KENNEDY:  He did, Your Honor. |
| 11:46AM | 12 | THE COURT:  All right.  Thank you. |
| 11:46AM | 13 | BY MR. INCIONG: |
| 11:46AM | 14 | Q    Mr. Miller, I am just showing you -- or have placed in |
| 11:46AM | 15 | front of you what's been marked as Exhibit 7-8.  Do you |
| 11:47AM | 16 | recognize that item? |
| 11:47AM | 17 | A    Yes. |
| 11:47AM | 18 | Q    How do you recognize that? |
| 11:47AM | 19 | A    This is my phone.  We went through 'em, I noticed the |
| 11:47AM | 20 | contacts that was on 'em. |
| 11:47AM | 21 | Q    Okay.  So prior to coming to court today, did you have a |
| 11:47AM | 22 | chance to look at that phone? |
| 11:47AM | 23 | A    Yes. |
| 11:47AM | 24 | Q    And as you indicated, did you power that on and look at -- |
| 11:47AM | 25 | scroll through some of the content, the contact list and so |

11:47AM   1    forth?

11:47AM   2    A    Yes.

11:47AM   3    Q    Did you recognize that as being your phone?

11:47AM   4    A    Yes.

11:47AM   5    Q    Is this one of the phones that was seized from you in Los

11:47AM   6    Angeles when you were arrested in July of 2014?

11:47AM   7    A    Yes.

11:47AM   8    Q    Does that phone look at least similar condition as it did

11:47AM   9    when you last had it in July?

11:47AM   10   A    Yes.

11:47AM   11          MR. INCIONG:  Your Honor, I would move to admit

11:47AM   12   Exhibit 7-8 at this time.

11:47AM   13          THE COURT:  Any objection?

11:47AM   14          MR. KENNEDY:  No objection.

11:47AM   15          THE COURT:  Without objection, Exhibit 7-8 is

11:47AM   16   admitted.

11:47AM   17          (Exhibit 7-008 was received in evidence.)

11:47AM   18          MR. INCIONG:  Thank you, Your Honor.

11:47AM   19          I think if we can show Mr. Miller Exhibit 7-8-A on the

11:47AM   20   screen in front of him, please.

11:47AM   21          THE COURT:  Go ahead.

11:48AM   22   BY MR. INCIONG:

11:48AM   23   Q    Mr. Miller, do you recognize what's shown in this photo?

11:48AM   24   A    Yes.

11:48AM   25   Q    Is that a photo of the phone that you have in front of you

11:48AM   1   marked Exhibit 7-8?

11:48AM   2   A    Yes.

11:48AM   3           MR. INCIONG:  Your Honor, I would move to admit 7-8-A.

11:48AM   4           THE COURT:  Any objection?

11:48AM   5           MR. KENNEDY:  No objection.

11:48AM   6           THE COURT:  Without objection, 7-8-Alpha is admitted.

11:48AM   7   You may show it to the jury if you wish.

11:48AM   8           (Exhibit 7-008-A was received in evidence.)

11:48AM   9           MR. INCIONG:  Thank you, Your Honor.

11:48AM  10   BY MR. INCIONG:

11:48AM  11   Q    So this is one of the phones that you had with you in Los

11:48AM  12   Angeles when you were arrested?

11:48AM  13   A    Yes.

11:48AM  14           MR. INCIONG:  May I show Mr. Miller Exhibit 7-10 at

11:48AM  15   this time, Your Honor?  This is another physical item.

11:48AM  16           THE COURT:  Yes.

11:48AM  17           MR. INCIONG:  A telephone.

11:48AM  18           THE COURT:  Yes.  If you would show it to

11:48AM  19   Mr. Kennedy --

11:48AM  20           MR. INCIONG:  Yes.

11:48AM  21           THE COURT:  -- before the witness.  Thank you.

11:49AM  22   BY MR. INCIONG:

11:49AM  23   Q    Mr. Miller, I'm showing you what's -- what's been marked

11:49AM  24   as Exhibit 7-10.  Do you recognize that phone?

11:49AM  25   A    Yes.

11:49AM   1   Q    How did you recognize that?

11:49AM   2   A    I went through the text messages, and I knew that -- that

11:49AM   3   was mines.

11:49AM   4   Q    Is that phone in substantially the same condition as when

11:49AM   5   you last saw it in July of 2014?

11:49AM   6   A    Yeah.

11:49AM   7   Q    And you actually powered that phone on and were you able

11:49AM   8   to look at some of the contents as well?

11:49AM   9   A    Yes.

11:49AM   10        MR. INCIONG:  Your Honor, I would move to admit

11:49AM   11   Exhibit 7-10.

11:49AM   12        THE COURT:  Any objection?

11:49AM   13        MR. KENNEDY:  Your Honor, can I just ask a question of

11:50AM   14   the witness to determine whose phone?

11:50AM   15        THE COURT:  Well, if you have an objection, you can

11:50AM   16   make an objection.

11:50AM   17        MR. KENNEDY:  I object on foundation.  We don't

11:50AM   18   know --

11:50AM   19        THE COURT:  Sustained.

11:50AM   20        MR. KENNEDY:  -- whose phone it is.

11:50AM   21   BY MR. INCIONG:

11:50AM   22   Q    Mr. Miller, when you looked at this particular phone, did

11:50AM   23   you recognize this as being your phone or someone else's phone

11:50AM   24   when you looked at the contents?

11:50AM   25   A    Yeah, we went through the -- if this is the one we went --

11:50AM   1   if this the one we went through, I noticed this phone because

11:50AM   2   the messages that was inside, I knew I sent those messages.

11:50AM   3   Q    There were certain text messages that you saw that you

11:50AM   4   knew you had sent that you saw on that phone?

11:50AM   5   A    Yes.

11:50AM   6           MR. INCIONG:  Your Honor, I would move to admit 7-10.

11:50AM   7           THE COURT:  Any objection?

11:50AM   8           MR. KENNEDY:  No objection now that I know that it's

11:50AM   9   Mr. Miller's phone and not someone else's.

11:50AM  10           THE COURT:  All right.  Without objection, 7-10 is

11:50AM  11   admitted.

11:50AM  12              (Exhibit 7-010 was received in evidence.)

11:50AM  13           MR. INCIONG:  Your Honor, may I show Exhibit 7-10-A to

11:50AM  14   Mr. Miller?

11:50AM  15           THE COURT:  Yes.

11:50AM  16   BY MR. INCIONG:

11:50AM  17   Q    Do you recognize that particular photo, Mr. Miller?

11:51AM  18   A    Yes.

11:51AM  19   Q    Is this a photo of Exhibit 7-10 which is in front of you?

11:51AM  20   A    Yes.

11:51AM  21           MR. INCIONG:  Your Honor, I would move to admit 7-10-A

11:51AM  22   and ask to publish.

11:51AM  23           THE COURT:  All right.  Any objection?

11:51AM  24           MR. KENNEDY:  No objection, Your Honor.

11:51AM  25           THE COURT:  Without objection, 7-10-Alpha is admitted.

11:51AM   1   You may publish.

11:51AM   2              (Exhibit 7-010-A was received in evidence.)

11:51AM   3              MR. INCIONG:  Thank you.

11:51AM   4   BY MR. INCIONG:

11:51AM   5   Q    So this is another phone that was seized in Los Angeles,

11:51AM   6   correct?

11:51AM   7   A    Yes.

11:51AM   8              MR. INCIONG:  Your Honor, may I approach Mr. Miller

11:51AM   9   with 7-11, another telephone?

11:51AM  10              THE COURT:  Yes, you may after showing it to

11:51AM  11   Mr. Kennedy.  Thank you.

11:52AM  12   BY MR. INCIONG:

11:52AM  13   Q    Do you recognize what's been marked as 7-11, Mr. Miller?

11:52AM  14   A    Yes.

11:52AM  15   Q    How do you recognize that?

11:52AM  16   A    So, listen, I only recognize these phones because I know

11:52AM  17   the text messages that was sent and that was mine, you know.

11:52AM  18   Q    Right.  So that's what I'm asking you, sir.  So the

11:52AM  19   question is how do you recognize that phone?

11:52AM  20   A    I mean, that's -- that's my phone.

11:52AM  21   Q    Like did you power that phone on or look at the contents?

11:52AM  22   A    Yes.

11:52AM  23   Q    Did you recognize any of the contents?

11:52AM  24   A    Yes.

11:52AM  25   Q    Did you recognize that as being one of the phones you had

11:52AM   1   in LA with you in July of 2014?

11:52AM   2   A    Yes.

11:52AM   3   Q    Is that phone in substantially the same condition as when

11:52AM   4   you last had it in 2014?

11:52AM   5   A    Yes.

11:52AM   6             MR. INCIONG:  Your Honor, I would move to admit

11:52AM   7   Exhibit 7-11.

11:52AM   8             THE COURT:  Any objection, Mr. Kennedy?

11:52AM   9             MR. KENNEDY:  No objection.

11:52AM   10            THE COURT:  Without objection, 7-11 is admitted.

11:52AM   11              (Exhibit 7-011 was received in evidence.)

11:53AM   12            MR. INCIONG:  Thank you, Your Honor.  And may I show

11:53AM   13   Mr. Miller Exhibit 7-11-A on the screen in front of him,

11:53AM   14   please?

11:53AM   15            THE COURT:  Yes, you may.

11:53AM   16   BY MR. INCIONG:

11:53AM   17   Q    Mr. Miller, do you recognize what's shown in that photo?

11:53AM   18   A    Yes.

11:53AM   19   Q    Is that a photo of the item you have in front of you

11:53AM   20   marked 7-11?

11:53AM   21   A    Yes.

11:53AM   22            MR. INCIONG:  Your Honor, I would move to admit

11:53AM   23   7-11-A.

11:53AM   24            THE COURT:  All right.  Any objection?

11:53AM   25            MR. KENNEDY:  No objection, Your Honor.

11:53AM   1                THE COURT:  Without objection, 7-11-Alpha is admitted.

11:53AM   2    You may show it to the jury.

11:53AM   3                (Exhibit 7-011-A was received in evidence.)

11:53AM   4                MR. INCIONG:  Thank you, Your Honor.

11:53AM   5    BY MR. INCIONG:

11:53AM   6    Q    So, Mr. Miller, this is another phone that you had with

11:53AM   7    you in Los Angeles in July 2014?

11:53AM   8    A    Yes.

11:53AM   9                MR. INCIONG:  All right.  Can I have 7-14, please?

11:53AM   10               May I show 7-14 to the witness, Your Honor?

11:53AM   11               THE COURT:  Yes.

11:53AM   12               MR. INCIONG:  And I'll show it to defense counsel

11:53AM   13   first.

11:54AM   14               THE COURT:  We're also getting to the point in time,

11:54AM   15   Mr. Inciong, where we should likely take our second break.  So

11:54AM   16   whenever that is right, let me know.

11:54AM   17               MR. INCIONG:  If I can just have couple more minutes,

11:54AM   18   Your Honor?

11:54AM   19               THE COURT:  Yes.

11:54AM   20               MR. INCIONG:  Thank you.

11:54AM   21   BY MR. INCIONG:

11:54AM   22   Q    Mr. Miller, do you recognize what's been marked as

11:54AM   23   Exhibit 7-14?

11:54AM   24   A    Yes.

11:54AM   25   Q    How do you recognize that?

11:54AM   1   A     From going through the phone, from the text messages that

11:54AM   2   I sent.

11:54AM   3   Q     And you were able to do that prior to testifying today?

11:54AM   4   A     Yes.

11:54AM   5   Q     And based on the content that you saw, you recognize that

11:54AM   6   as your phone?

11:54AM   7   A     Yes.

11:54AM   8   Q     Specifically one that you had with you in July of 2014?

11:54AM   9   A     Yes.

11:54AM  10   Q     And did you actually write your initials and sticker on

11:55AM  11   that phone to acknowledge that?

11:55AM  12   A     Yes.

11:55AM  13             MR. INCIONG:  Your Honor, I would move to admit 7-14.

11:55AM  14             THE COURT:  Any objection?

11:55AM  15             MR. KENNEDY:  No objection.

11:55AM  16             THE COURT:  Without objection, 7-14 is admitted.

11:55AM  17             (Exhibit 7-014 was received in evidence.)

11:55AM  18             MR. INCIONG:  And then, Your Honor, just last thing

11:55AM  19   before we break, if I could show Mr. Miller 7-14-A?

11:55AM  20             THE COURT:  Yes.

11:55AM  21   BY MR. INCIONG:

11:55AM  22   Q     Do you see that exhibit, Mr. Miller?

11:55AM  23   A     Yes.

11:55AM  24   Q     Do you recognize that?

11:55AM  25   A     Yes.

| 11:55AM | 1 | Q    Is that a photo of the phone you have in front of you |
|---------|---|--------|
| 11:55AM | 2 | marked Exhibit 7-14? |
| 11:55AM | 3 | A    Yes. |
| 11:55AM | 4 | MR. INCIONG:  Your Honor, I would move to admit |
| 11:55AM | 5 | 7-14-Alpha. |
| 11:55AM | 6 | THE COURT:  Any objection? |
| 11:55AM | 7 | MR. KENNEDY:  No objection. |
| 11:55AM | 8 | THE COURT:  Without objection, 7-14-Alpha is admitted. |
| 11:55AM | 9 | (Exhibit 7-014-A was received in evidence.) |
| 11:55AM | 10 | MR. INCIONG:  Can I publish that, Your Honor? |
| 11:55AM | 11 | THE COURT:  Yes, you may. |
| 11:55AM | 12 | BY MR. INCIONG: |
| 11:55AM | 13 | Q    And, Miller -- sorry, Mr. Miller, this is again another |
| 11:55AM | 14 | phone you had with you when you were arrested in Los Angeles in |
| 11:55AM | 15 | 2014? |
| 11:55AM | 16 | A    Yes. |
| 11:55AM | 17 | MR. INCIONG:  Your Honor, we can stop there then. |
| 11:55AM | 18 | THE COURT:  All right.  We are at the point of the |
| 11:55AM | 19 | trial day where we're going to take our second break. |
| 11:56AM | 20 | As we go to break, I'll remind the jurors to refrain |
|  | 21 | from discussing the substance of this case with anyone, |
|  | 22 | including each other, until I advise you otherwise; to refrain |
|  | 23 | from conducting any independent investigation into the facts, |
|  | 24 | circumstances or persons involved; and finally, please do not |
|  | 25 | access any media or other accounts of this case that may be out |

11:56AM    1    there.

11:56AM    2            It is just about noon, so let's try to get back here

11:56AM    3    by about 12:15.  That will leave us a little more than an hour

11:56AM    4    to finish up the trial day.

11:56AM    5            (Proceedings were recessed at 11:56 a.m. to 12:20

12:06PM    6    p.m.)

12:20PM    7            THE COURT:  The second break of the day.  The record

12:20PM    8    should reflect the return of all of our jurors, the parties and

12:20PM    9    their lawyers.

12:20PM    10           Mr. Inciong, you may resume.

12:20PM    11           MR. INCIONG:  Thank you, Your Honor.

12:20PM    12   BY MR. INCIONG:

12:20PM    13   Q    Mr. Miller, you had indicated you recognized these phones

12:20PM    14   by the contents that you had reviewed, correct?

12:20PM    15   A    Yes.

12:20PM    16   Q    So I'd like to go through some of that content in specific

12:20PM    17   with you.

12:20PM    18           MR. INCIONG:  If we could start, Your Honor, with

12:20PM    19   Exhibit 7-8-C.  This has been agreed to by stipulation as

12:20PM    20   an extraction from one of Mr. Miller's phones, the white

12:20PM    21   iPhone 4S.

12:20PM    22           THE COURT:  Well, when you say this has been agreed to

12:20PM    23   by stipulation, there are lots of exhibits that have been

12:21PM    24   agreed to for purposes of admissibility and there are other

12:21PM    25   stipulations that are less than that.  So --

12:21PM  1            MR. INCIONG:  Right.  Yeah, let me -- let me expand on

12:21PM  2    that.  This has been admitted for foundation and authenticity.

12:21PM  3    I would move to admit Exhibit 7-8-C as the contents of --

12:21PM  4    specifically the contacts list from this particular phone.

12:21PM  5            THE COURT:  All right.  Any objection?  I'll start

12:21PM  6    there.

12:21PM  7            MR. KENNEDY:  Your Honor, no objection.  However, I

12:21PM  8    believe it's not all the contacts of that phone, and with that

12:21PM  9    stipulation, I would agree that it should be admitted.

12:21PM  10           MR. INCIONG:  That's correct, Your Honor.

12:21PM  11           THE COURT:  All right.  With that stipulation,

12:21PM  12   7-8-Charlie is admitted.  You may publish.

12:21PM  13           (Exhibit 7-008-C was received in evidence.)

12:21PM  14           MR. INCIONG:  May we publish that?

12:21PM  15           THE COURT:  Yes.

12:21PM  16           MR. INCIONG:  So if we could start with box number 1,

12:21PM  17   please.  If you could enlarge that for both the jury and the

12:21PM  18   witness to see.

12:21PM  19   BY MR. INCIONG:

12:22PM  20   Q    So, Mr. Miller, this is from the contacts list from your

12:22PM  21   white iPhone 4S.  Contact number 1 there, do you see that

12:22PM  22   listed as the name as Cuzspam?

12:22PM  23   A    Yes.

12:22PM  24   Q    Who is Cuzspam?

12:22PM  25   A    Sammy Kuuana.

12:22PM    1    Q    Sammy Kuuana is one of the people you described that was

12:22PM    2    initially going to put up some of the money for the cocaine

12:22PM    3    deal?

12:22PM    4    A    Yes.

12:22PM    5    Q    Okay.  And that number is listed -- associated with him as

12:22PM    6    (808) 589-8890?

12:22PM    7    A    Yes.

12:22PM    8         MR. INCIONG:  All right.  If we could move down,

12:22PM    9    please.

12:22PM   10    BY MR. INCIONG:

12:22PM   11    Q    Number 2 and 21A, those are still Cuzspam.  Do you see

12:22PM   12    that?

12:22PM   13    A    Yes.

12:22PM   14    Q    That's the same person?

12:22PM   15    A    Yes.

12:22PM   16         MR. INCIONG:  Okay.  Could we scroll drawn.

12:22PM   17    BY MR. INCIONG:

12:22PM   18    Q    Number 3 is Cuzspam?

12:22PM   19    A    Yes.

12:22PM   20    Q    That's the same person as well?

12:22PM   21    A    Yes.

12:22PM   22    Q    All right.  We can skip 4 and 5 for now.

12:23PM   23         I wanted to ask you -- we'll go down to the second

12:23PM   24    page, the first box -- Drew is a name that we saw multiple

12:23PM   25    entries for as well.  Who is Drew?

12:23PM   1   A    That's one of my friends.

12:23PM   2   Q    Was he involved in the cocaine thing at all?

12:23PM   3   A    No.

12:23PM   4   Q    He was just a contact you had on your phone?

12:23PM   5   A    Yes.

12:23PM   6         MR. INCIONG:  Okay.  Could we scroll down.

12:23PM   7   BY MR. INCIONG:

12:23PM   8   Q    The next entry I want you to look at is number 7.  Do you

12:23PM   9   see that?

12:23PM  10   A    Yes.

12:23PM  11   Q    It's capital M, small letter b?

12:23PM  12   A    Yes.

12:23PM  13   Q    Who is that number for?

12:23PM  14   A    Mike Buntenbah.

12:23PM  15   Q    Mike Buntenbah is the person you described that

12:23PM  16   accompanied you to Los Angeles?

12:23PM  17   A    Yes.

12:23PM  18   Q    And his name is (808) 292-1555?

12:23PM  19   A    Yes.

12:23PM  20   Q    Okay.

12:23PM  21         MR. INCIONG:  All right.  If we could turn next then

12:23PM  22   to -- and show Mr. Miller Exhibit 7-8-D, as in dog.

12:24PM  23         Mr. Miller, have you seen this document before?

12:24PM  24   A    Yes.

12:24PM  25   Q    Did you review this prior to your testimony today?

12:24PM   1   A    Yes.

12:24PM   2   Q    And does this show some of the text messaging that you

12:24PM   3   were involved in before you went on this trip to Los Angeles in

12:24PM   4   2014?

12:24PM   5   A    Yes.

12:24PM   6        MR. INCIONG:  Your Honor, I would move to admit -- the

12:24PM   7   foundation and authenticity has been stipulated to as an

12:24PM   8   extraction from this phone.  I would move to admit based on the

12:24PM   9   relevance just laid by Mr. Miller.

12:24PM   10        THE COURT:  Any objection, Mr. Kennedy?

12:24PM   11        MR. KENNEDY:  Counsel, is it a -- just a one-page?

12:24PM   12        MR. INCIONG:  No, I'm sorry, it is not.  It is

12:24PM   13   multiple pages.  There are 17 pages in total, I believe.

12:24PM   14        MR. KENNEDY:  Did you say seven?

12:25PM   15        MR. INCIONG:  Seventeen, I believe.

12:25PM   16        MR. KENNEDY:  Seventeen?  Could you just go to the

12:25PM   17   end?

12:25PM   18        MR. INCIONG:  Sure.

12:25PM   19        MR. KENNEDY:  No objection, Your Honor.

12:25PM   20        THE COURT:  Without objection, Exhibit 7-8-Delta is

12:25PM   21   admitted.

12:25PM   22        (Exhibit 7-008-D was received in evidence.)

12:25PM   23        MR. INCIONG:  Thank you, Your Honor.

12:25PM   24        And if we could actually go to the very end of that

12:25PM   25   document, I believe these appear in reverse order

12:25PM    1    chronologically.

12:25PM    2              THE COURT:  Yes, you may publish.

12:25PM    3              MR. INCIONG:  Thank you.

12:25PM    4              So starting at the bottom, if we could highlight the

12:25PM    5    first couple text messages.

12:25PM    6    BY MR. INCIONG:

12:25PM    7    Q    So, Mr. Miller, do you see the message numbered 75?

12:25PM    8    A    Yes.

12:25PM    9    Q    That's an outgoing message.  Do you see that?

12:25PM   10    A    Yes.

12:25PM   11    Q    And do you see where it says:  "Yo, where you going be

12:25PM   12    today?  Gotta plan this out right so everything works out"?

12:25PM   13    A    Yes.

12:25PM   14    Q    Do you recall sending that particular text message?

12:26PM   15    A    Not -- I mean not really, yeah.

12:26PM   16    Q    Okay.  Let me have you --

12:26PM   17              MR. INCIONG:  Let's scroll up then.

12:26PM   18    BY MR. INCIONG:

12:26PM   19    Q    If we look at text message number 73 --

12:26PM   20    A    Yeah.

12:26PM   21    Q    -- do you see that -- do you see the date there, July 14

12:26PM   22    of 2014?

12:26PM   23    A    Right.

12:26PM   24    Q    Another outgoing message.  Do you see the message, "I

12:26PM   25    going under the grid"?

12:26PM   1   A    Yeah.  This is outgoing from my phone?

12:26PM   2   Q    Yes.

12:26PM   3   A    Okay.

12:26PM   4   Q    What did -- what did that text message mean?

12:26PM   5   A    Who am I texting?

12:26PM   6   Q    Well, you tell me.

12:26PM   7   A    This was a long time ago.  Mark.

12:26PM   8        MR. INCIONG:  Okay.  Let me -- let me have you scroll

12:26PM   9   up.

12:26PM  10   BY MR. INCIONG:

12:26PM  11   Q    Look at --

12:27PM  12        MR. INCIONG:  Stop there, please.

12:27PM  13   BY MR. INCIONG:

12:27PM  14   Q    -- 70 -- message 72.

12:27PM  15   A    I need to --

12:27PM  16   Q    Do you see that, the same date, July 14th, "All burners"?

12:27PM  17   A    Yes.

12:27PM  18   Q    And then the message up above that, "No phones"?

12:27PM  19   A    Yes.

12:27PM  20   Q    What does that signify?  "All burners" is --

12:27PM  21   A    Yeah, I -- I not communicating through my whole -- you

12:27PM  22   gotta read me this whole thing, though, so I can tell you

12:27PM  23   who -- who I'm going at this with.

12:27PM  24   Q    Okay.  Well, let's scroll up and we'll go through them one

12:27PM  25   by one.  Read them to yourself, and then give us the context.

| | | | |
|---|---|---|---|
| 12:27PM | 1 | | So we're up to number 70.  Do you see that one? |
| 12:27PM | 2 | A | Yes. |
| 12:27PM | 3 | Q | Okay.  69? |
| 12:27PM | 4 | A | Yeah. |
| 12:27PM | 5 | Q | 68? |
| 12:27PM | 6 | A | Yes. |
| 12:27PM | 7 | Q | 67? |
| 12:28PM | 8 | A | Yes. |
| 12:28PM | 9 | Q | 66? |
| 12:28PM | 10 | A | Yes. |
| 12:28PM | 11 | Q | What does that say? |
| 12:28PM | 12 | A | That's an incoming. |
| 12:28PM | 13 | Q | Right.  What does -- what is the message that was |
| 12:28PM | 14 | | received? |
| 12:28PM | 15 | A | Asking for Mai's full name. |
| 12:28PM | 16 | Q | Why was that question being asked of you? |
| 12:28PM | 17 | A | Well, I think I reading 'em, if that's -- I don't know. |
| 12:28PM | 18 | Q | Okay.  Well, let's continue to scroll up. |
| 12:28PM | 19 | | 65, you reply, correct? |
| 12:28PM | 20 | | MR. INCIONG:  Hold on.  Stop there. |
| 12:28PM | 21 | | BY MR. INCIONG: |
| 12:28PM | 22 | Q | You see message 65 -- |
| 12:28PM | 23 | A | Yes. |
| 12:28PM | 24 | Q | -- outgoing message on July 15th? |
| 12:28PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:28PM | 1 | Q | You respond with Sara Maile Tufele? |
| 12:29PM | 2 | A | Yes. |
| 12:29PM | 3 | Q | Who's name is that? |
| 12:29PM | 4 | A | That's my -- my son's mom. |
| 12:29PM | 5 | | MR. INCIONG:  Let's scroll up then, please. |
| 12:29PM | 6 | BY MR. INCIONG: | |
| 12:29PM | 7 | Q | Do you see that incoming message on July 17th? |
| 12:29PM | 8 | A | Yes. |
| 12:29PM | 9 | Q | Okay.  That's addressed to you? |
| 12:29PM | 10 | A | Yes.  This is all different.  This is all different people |
| 12:29PM | 11 | I'm texting.  It's not the same conversation. | |
| 12:29PM | 12 | Q | Okay.  So who were you texting? |
| 12:29PM | 13 | A | So on this one right here, I think this is Sammy's wife |
| 12:29PM | 14 | texting me. | |
| 12:29PM | 15 | Q | Okay.  Who is Sammy's wife? |
| 12:29PM | 16 | A | Star.  Star Kuuana. |
| 12:29PM | 17 | Q | Okay.  Why would you -- why were you texting her in the |
| 12:29PM | 18 | days leading up to before you left for LA? | |
| 12:29PM | 19 | A | Okay, so now -- so that day -- she worked for Hawaiian |
| 12:29PM | 20 | Airlines, so she was booking my -- she was booking my flight. | |
| 12:29PM | 21 | Q | Okay. |
| 12:29PM | 22 | A | Yeah. |
| 12:29PM | 23 | Q | And that was the flight to Los Angeles for the cocaine |
| 12:29PM | 24 | deal. | |
| 12:29PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:29PM | 1 | Q | Okay.  Is that why she needed -- why did she need your -- |
| 12:30PM | 2 | A | So -- so keep going.  I recognizing this conversation |
| 12:30PM | 3 | | right here with her. |
| 12:30PM | 4 | Q | Okay.  All right.  So we can continue to scroll up. |
| 12:30PM | 5 | A | Yeah, so see we're going backwards now.  I'm -- I'm |
| 12:30PM | 6 | | texting her this.  I'm texting her.  You started backwards. |
| 12:30PM | 7 | | You started backwards. |
| 12:30PM | 8 | Q | We're going in chronological order, Mr. Miller.  So if you |
| 12:30PM | 9 | | go up, that's the order we went, but we can continue to scroll |
| 12:30PM | 10 | | up here. |
| 12:30PM | 11 | A | Yeah. |
| 12:30PM | 12 | Q | So the next message is incoming message, correct? |
| 12:30PM | 13 | A | Yeah. |
| 12:30PM | 14 | Q | And those are times? |
| 12:30PM | 15 | A | Yeah. |
| 12:30PM | 16 | Q | "And got K fares," what did that mean? |
| 12:30PM | 17 | A | Yeah, like I'm sending that out -- no, she's sending that |
| 12:30PM | 18 | | in, she's telling me got K fares.  That's earlier the messages |
| 12:30PM | 19 | | was book me direct or whatever it was.  So at that time right |
| 12:30PM | 20 | | there, now this conversation -- so I'm meeting -- I'm |
| 12:31PM | 21 | | meeting -- this is leading up to me leaving. |
| 12:31PM | 22 | Q | Okay. |
| 12:31PM | 23 | A | So I'm trying to meet Sammy again now in this conversation |
| 12:31PM | 24 | | for -- to -- I think he's waiting for me somewhere. |
| 12:31PM | 25 | Q | Okay.  And you're arranging your flights as well? |

12:31PM   1   A    Yeah.

12:31PM   2   Q    All right.  So are those flight times that are listed that

12:31PM   3   you're choosing from?

12:31PM   4   A    Yeah.

12:31PM   5        MR. INCIONG:  Okay.  So if we can scroll up then,

12:31PM   6   please.

12:31PM   7   BY MR. INCIONG:

12:31PM   8   Q    So that's -- you send a text message on July 17th at

12:31PM   9   10:12 -- I'm sorry, 10:42?

12:31PM  10   A    Yeah.  That's why I say you going backwards, going from 62

12:31PM  11   to 61.

12:31PM  12   Q    Mr. Miller, just answer the question, please.  Is this a

12:31PM  13   text message you sent out on that day?

12:31PM  14   A    Yeah.

12:31PM  15   Q    And what are you saying there in that message?

12:31PM  16   A    "Fly out first flight Sunday morning."

12:31PM  17   Q    So that's when you want to go to LA?

12:31PM  18   A    What day is this?  Yeah.

12:32PM  19   Q    Okay.  You sent the next message a minute later, "Back to

12:32PM  20   LA"?

12:32PM  21   A    Yeah.

12:32PM  22   Q    So this again travel for your trip to and from Los

12:32PM  23   Angeles?

12:32PM  24   A    Yeah.

12:32PM  25   Q    So if we can scroll up.  This is an incoming message?

12:32PM  1    A    Yes.

12:32PM  2    Q    So you said, "Tomorrow"?

12:32PM  3    A    Yes.

12:32PM  4    Q    So you're trying to decide on the -- the date that you're

12:32PM  5    going to fly out?

12:32PM  6    A    Yes.

12:32PM  7    Q    Okay.  So this message that came into to you on July 17th

12:32PM  8    at 10:43 a.m., "Am I checking to LA tomorrow or Sunday?"

12:32PM  9         Do you recall who sent you that message?

12:32PM  10   A    Yes, it's got to be Star.

12:32PM  11   Q    And she's the one that worked for Hawaiian Airlines?

12:32PM  12   A    Yes.  If this is her, then yeah.  But this is her.  I

12:33PM  13   remember that message she sending me, I'm telling when --

12:33PM  14   Q    I think I might have said 10:43 a.m.  It was actually

12:33PM  15   10:43 p.m., my mistake.

12:33PM  16        MR. INCIONG:  Okay.  If we could scroll up to the next

12:33PM  17   messages.

12:33PM  18   BY MR. INCIONG:

12:33PM  19   Q    So this is incoming message a few minutes later.  Are you

12:33PM  20   giving -- getting your flight times at that point in message

12:33PM  21   57?

12:33PM  22   A    On the 17th?

12:33PM  23   Q    9:00 p.m. -- I'm sorry -- "6:00 p.m. LAX to Honolulu

12:33PM  24   tomorrow.  Sunday, Honolulu to LAX, 9:00 a.m."

12:33PM  25   A    See, you getting me mixed up.  This might be the 17th.  As

12:33PM  1    I read 'em, I think LAX to Honolulu, I think she's booking

12:33PM  2    the -- the guys that came down to meet me.  Because I'm reading

12:34PM  3    it, "6:00 p.m., LAX to Honolulu tomorrow."

12:34PM  4    Q    Okay.

12:34PM  5    A    You know what I mean?

12:34PM  6    Q    Okay.

12:34PM  7    A    That's why I'm getting screwed up with this.

12:34PM  8    Q    Okay.  So let me ask just a couple of questions about

12:34PM  9    that.  So there was multiple travel arrangements that were

12:34PM  10   going on at this time.  Would that be fair to say?

12:34PM  11   A    Yes.

12:34PM  12   Q    So you were preparing to fly to LA.

12:34PM  13   A    Yes.

12:34PM  14   Q    But before that happened, is that when the people from

12:34PM  15   California were coming to meet you?

12:34PM  16   A    Yes.

12:34PM  17   Q    Was Starlynn Kuuana helping you with those arrangements as

12:34PM  18   well?

12:34PM  19   A    Yeah.

12:34PM  20   Q    Okay.

12:34PM  21   A    And that's -- that's what I reading, this is a different

12:34PM  22   text.  I'm getting mixed up.

12:34PM  23   Q    Okay.  Thank you for the clarification.

12:34PM  24        MR. INCIONG:  So if we roll up -- scroll up, please.

12:34PM  25   BY MR. INCIONG:

12:34PM 1    Q    "Is there an earlier flight tomorrow," you text out that.

12:34PM 2    So that's continuing just to make arrangements at that point,

12:34PM 3    correct?

12:34PM 4    A    Yeah.

12:34PM 5    Q    Okay.  I think we can keep going up, this is just more of

12:34PM 6    the same, you're finalizing your -- either your or the

12:35PM 7    individuals coming in from LA, their flight arrangements?

12:35PM 8    A    Yeah.  Yeah.

12:35PM 9    Q    Did you handle or pay for the flights for the people

12:35PM 10   coming from LA to meet you?

12:35PM 11   A    Yeah, yeah, yeah.

12:35PM 12   Q    Was that part of the deal?

12:35PM 13   A    Well, it wasn't part of the deal, but I just told them,

12:35PM 14   Hey, come down -- you know, when I was communicating with them

12:35PM 15   I told them, Come down here, I'll pick you guys up from the

12:35PM 16   airport.  And that's what this conversation is.

12:35PM 17   Q    Okay.

12:35PM 18          MR. INCIONG:  All right.  So we can keep scrolling up.

12:35PM 19   We can just keep going up a little bit further.

12:35PM 20   BY MR. INCIONG:

12:35PM 21   Q    I want you to look at message number 50.

12:35PM 22   A    Yeah.

12:35PM 23   Q    There's an incoming message that same date, but now 11 --

12:35PM 24   I'm sorry, 11:32 p.m., and under the message is a series of

12:35PM 25   letters.  Do you see that, OTYYSC?

12:35PM    1    A    Yeah.

12:35PM    2    Q    Is that a confirmation code?

12:35PM    3    A    Oh, yeah, confirmation, yeah.

12:35PM    4    Q    All right.  So this is again more -- more travel

12:35PM    5    arrangements that you're making?

12:36PM    6    A    Yeah.

12:36PM    7    Q    Okay.  All right.  So I think we get the idea from that.

12:36PM    8         Let me have you look next at Exhibit 7-8-E, as in

12:36PM    9    Edward.

12:36PM    10         Have you reviewed these messages before --

12:36PM    11    A    Yes.

12:36PM    12    Q    -- Mr. Miller?

12:36PM    13         And did you recognize this as being a conversation or

12:36PM    14    messages you exchanged with Mike Buntenbah when you were in Los

12:36PM    15    Angeles?

12:36PM    16    A    Yes.

12:36PM    17         MR. INCIONG:  Your Honor, I would move to admit --

12:36PM    18    foundation and authenticity as stipulated to by the parties and

12:36PM    19    based on Mr. Miller's foundation for relevance, I would move to

12:36PM    20    admit the exhibit.

12:36PM    21         THE COURT:  Any objection?

12:36PM    22         MR. KENNEDY:  No objection.

12:36PM    23         THE COURT:  Without objection, 7-8-E is admitted.

12:36PM    24          (Exhibit 7-008-E was received in evidence.)

12:36PM    25         MR. INCIONG:  Thank you, Your Honor.

12:36PM    1              So I believe -- there's actually two pages.  So if we

12:37PM    2    can start up on page 1.

12:37PM    3    BY MR. INCIONG:

12:37PM    4    Q    So there's -- there's a message here that you sent to MB

12:37PM    5    on July 21st, 2014, at 7:22 p.m.  Do you see that?

12:37PM    6    A    Yes.

12:37PM    7    Q    Are you in Los Angeles at this point?

12:37PM    8    A    Yes.

12:37PM    9    Q    And your message to MB is:  "He's out front."

12:37PM    10   A    Yes.

12:37PM    11   Q    What did you mean by that?

12:37PM    12   A    So the -- they sent the car to pick him up, because

12:37PM    13   everything was done and we was just waiting.  At this point

12:37PM    14   right there we -- everything is done, the deal is done.  So we

12:37PM    15   just loading up the car and everything like that.  I told him,

12:37PM    16   I got a pick up my friend, he staying at the hotel.

12:37PM    17              So when we're talking, they send the guy, and I'm --

12:37PM    18   I'm texting -- they don't got Mike B.'s number, so I'm texting

12:37PM    19   Mike B., Hey, the guy is out front to pick you up, white

12:37PM    20   Cadillac.  That's what he's driving.

12:38PM    21   Q    Okay.  All right.  So if we go down to the next message,

12:38PM    22   that's what you text exactly, right?

12:38PM    23   A    Yeah.

12:38PM    24   Q    You text a follow-up text, "White Cadillac."

12:38PM    25   A    Yes.

12:38PM   1   Q   That was the car that Mr. Buntenbah should be looking for?

12:38PM   2   A   Yes.

12:38PM   3   Q   So he's at the hotel when you're sending him this?

12:38PM   4   A   Yes.

12:38PM   5   Q   You're at the drug house?

12:38PM   6   A   Yes.

12:38PM   7           MR. INCIONG:  All right.  Can we go down to the next

12:38PM   8   bubble.

12:38PM   9   BY MR. INCIONG:

12:38PM  10   Q   So is this Mr. B -- Mr. Buntenbah responding to you?

12:38PM  11   A   Yes.

12:38PM  12   Q   He sends you a text at 7:31 p.m. on July 21st?

12:38PM  13   A   Yes.

12:38PM  14   Q   And he says:  "I'm in."

12:38PM  15   A   Yes.

12:38PM  16   Q   What does that mean?

12:38PM  17   A   He's -- he's in the car.  He's on way.

12:38PM  18   Q   All right.

12:38PM  19   A   That was the response to me telling him they outside,

12:38PM  20   white Cadillac, he texted me back, "I'm in."

12:38PM  21   Q   Okay.

12:38PM  22           MR. INCIONG:  And if we could go to the final bubble

12:38PM  23   on that exhibit.

12:38PM  24   BY MR. INCIONG:

12:38PM  25   Q   Do you recognize this?

12:38PM    1    A    Yes.

12:38PM    2    Q    Is this your response --

12:38PM    3    A    Yes.

12:38PM    4    Q    -- to Mr. Buntenbah telling you that he's in?

12:38PM    5    A    Yes.

12:38PM    6    Q    You text him at 7:31 p.m.:  "Thank God."

12:39PM    7    A    Yes.

12:39PM    8    Q    Why did you say, "Thank God"?

12:39PM    9    A    I was kind of -- I was ready to leave the house too.  I

12:39PM   10    was done, and he was on the way with -- we was headed up to San

12:39PM   11    Francisco, I told him, Hey, we good to go.

12:39PM   12    Q    You said earlier you were kind of freaking out when you

12:39PM   13    were at that house.

12:39PM   14    A    Yeah.

12:39PM   15    Q    Were you relaxed now by this point or were you still kind

12:39PM   16    of worried?

12:39PM   17    A    Yeah, I was more relaxed because everything was done, you

12:39PM   18    know, but I just was -- I was ready to get out of there.

12:39PM   19         MR. INCIONG:  Could we go next to Exhibit 17-3-D,

12:39PM   20    please.

12:39PM   21         THE COURT:  17?

12:39PM   22         MR. INCIONG:  17 -- I'm sorry -- 7 -- sorry, Your

12:39PM   23    Honor.  7-13-D.  7-13-D.

12:39PM   24    BY MR. INCIONG:

12:40PM   25    Q    Do you recall reviewing -- and take a minute, Mr. Miller.

12:40PM  1    We can scroll down if you need to see them all, but do you

12:40PM  2    recall reviewing this series of text messages prior to court

12:40PM  3    today?

12:40PM  4    A    Yes.

12:40PM  5    Q    Okay.  Do you recognize these as text messages between

12:40PM  6    yourself and Michael Buntenbah when you were in -- getting

12:40PM  7    ready for the trip to LA?

12:40PM  8    A    Yes.

12:40PM  9              MR. INCIONG:  Your Honor, I would move to admit

12:40PM  10   Exhibit 7-13-D.  The foundation has been stipulated to, and

12:40PM  11   based on Mr. Miller's description, I believe they are relevant.

12:40PM  12             THE COURT:  Any objection?

12:40PM  13             MR. KENNEDY:  If I could see the last page and the

12:40PM  14   first page?  Is this the last page?  Okay.  And the first page,

12:40PM  15   please.

12:40PM  16             No objection.

12:40PM  17             THE COURT:  Without objection, Exhibit 7-13-D, as in

12:41PM  18   delta, is admitted.  You may publish.

12:41PM  19             (Exhibit 7-13-D was received in evidence.)

12:41PM  20             MR. INCIONG:  Thank you, Your Honor.

12:41PM  21             If we could start at the bottom, I guess it's page 6,

12:41PM  22   so we go in order chronologically.

12:41PM  23   BY MR. INCIONG:

12:41PM  24   Q    So this is a message that you received from Mr. Buntenbah

12:41PM  25   saying:  "We going Sunday."  Is that correct?

12:41PM   1   A     No, I think that's -- that's outgoing.  This is my phone

12:41PM   2   telling him "We going Sunday."

12:41PM   3   Q     Are you -- well, let me ask you this:  Are you sure this

12:41PM   4   particular phone is your phone or do you just recognize the

12:41PM   5   chats here?

12:41PM   6   A     Yeah, I recognize the chats.

12:41PM   7   Q     Okay.  So do you see under -- next to number -- number 25,

12:41PM   8   native messages, the next column over, do you see that phone

12:41PM   9   number (808) 292-1555 --

12:41PM  10   A     Yeah.

12:42PM  11   Q     -- and White is the owner?  Were you White or did you know

12:42PM  12   somebody else to be White?

12:42PM  13   A     No, that wasn't me.

12:42PM  14   Q     So the message "We going Sunday" on July 19, 2014, does

12:42PM  15   that coincide with you getting ready to go on your trip to LA?

12:42PM  16   A     Yes.

12:42PM  17         MR. INCIONG:  Can we scroll up then.

12:42PM  18   BY MR. INCIONG:

12:42PM  19   Q     There's two in particular I want you to look at.

12:42PM  20         MR. INCIONG:  We can keep going.  Keep going.

12:42PM  21         You can keep going.  Okay.  If you can roll back down.

12:42PM  22   BY MR. INCIONG:

12:42PM  23   Q     Okay.  So you see this text message right here?

12:42PM  24   A     Yes.

12:42PM  25   Q     Number 13.  This is a message sent by White, the owner of

12:43PM    1    this phone.  It says:  "Shoulda have just sent it."

12:43PM    2    A     Okay.  So this is Mike B.'s phone right here.

12:43PM    3    Q     Okay.

12:43PM    4    A     And he's telling me -- when he says "Shoulda just sent

12:43PM    5    it," he wanted to send the money to LA instead of us carrying

12:43PM    6    it up.  So we're talking in person and everything like that,

12:43PM    7    but he's -- he's telling me we should have just sent it up.

12:43PM    8    Q     This is reference to when you were explaining before the

12:43PM    9    conversation you had where he wanted to mail it and you wanted

12:43PM   10    to carry it?

12:43PM   11    A     Yes.

12:43PM   12    Q     Okay.  There's one other text message I want to have you

12:43PM   13    look at then.

12:43PM   14          MR. INCIONG:  Keep going up.  Stop right there.

12:43PM   15    BY MR. INCIONG:

12:43PM   16    Q     So this one again is sent by White, the owner of this --

12:43PM   17    this phone, saying:  "I get more den' you."

12:43PM   18          I'm sorry, this is an incoming.  My mistake.  This is

12:43PM   19    incoming message to White --

12:43PM   20    A     Yes.

12:43PM   21    Q     -- to Michael Buntenbah.

12:43PM   22    A     Yeah.

12:43PM   23    Q     Did you send that message?

12:43PM   24    A     Yes.

12:43PM   25    Q     And what did you mean by that?

12:43PM   1    A    Like I was carrying more money than him.

12:44PM   2    Q    Why did that matter?

12:44PM   3    A    Because he was -- like he was adamant about sending 'em

12:44PM   4    up, and I was telling him like I carrying more than -- more

12:44PM   5    than you.  Like he wanted to send, he never like go -- he never

12:44PM   6    like go, but I told him, I said, We gotta go because I gotta

12:44PM   7    talk -- I gotta talk to them in person, you know.

12:44PM   8    Q    Okay.

12:44PM   9              MR. INCIONG:  All right.  We can take Exhibit 13 --

12:44PM  10    7-13-D down, please.  And then the last -- second to last one,

12:44PM  11    I should say, in this series, 7-14-C, as in Charles.

12:44PM  12    BY MR. INCIONG:

12:44PM  13    Q    Do you see that exhibit, Mr. Miller?

12:44PM  14    A    Yes.

12:44PM  15    Q    Have you seen that prior to coming to court today?

12:44PM  16    A    Yes.

12:44PM  17    Q    Did you recognize this as the contacts list in one of the

12:44PM  18    phones that was seized from you in Los Angeles in July of 2014?

12:44PM  19    A    Yes.

12:44PM  20              MR. INCIONG:  Your Honor, I would move to admit

12:44PM  21    7-14-C.  This has also been stipulated to as far as foundation.

12:45PM  22              THE COURT:  All right.  Mr. Kennedy?

12:45PM  23              MR. KENNEDY:  Is it just one page, Counsel, or two?

12:45PM  24              MR. INCIONG:  It is one page.

12:45PM  25              THE COURT:  No, two pages.

12:45PM  1              MR. INCIONG:  I'm sorry.  Two pages.

12:45PM  2              MR. KENNEDY:  No objection.

12:45PM  3              THE COURT:  Without objection, 7-14-Charlie is

12:45PM  4    admitted.  You may publish.

12:45PM  5                  (Exhibit 7-14-C was received in evidence.)

12:45PM  6              MR. INCIONG:  Thank you, Your Honor.

12:45PM  7          So if we can start at box number 1.

12:45PM  8    BY MR. INCIONG:

12:45PM  9    Q    This is contact number 1 listed in your phone, Arod?

12:45PM  10   A    Yes.

12:45PM  11   Q    Is that one of the people you were communicating with in

12:45PM  12   setting up the -- the drug deal that you were going to meet

12:45PM  13   with here in Hawaii?

12:45PM  14   A    Yes.

12:45PM  15              MR. INCIONG:  Could we go down to number 2.

12:45PM  16   BY MR. INCIONG:

12:45PM  17   Q    That's the same contact name, correct?

12:45PM  18   A    Yes.

12:45PM  19              MR. INCIONG:  Okay.  Keep going down.  Keep going to

12:45PM  20   number 4, please.

12:45PM  21   BY MR. INCIONG:

12:46PM  22   Q    So this is a different contact name, that's just the

12:46PM  23   letter E.  Do you see that?

12:46PM  24   A    Yes.

12:46PM  25   Q    Is that another one of the --

12:46PM   1   A     One of the Mexicans, yeah.

12:46PM   2             MR. INCIONG:  Okay.  Keep going.  One down, please.

12:46PM   3   BY MR. INCIONG:

12:46PM   4   Q     Okay.  Number 7, do you see the name Gomez?

12:46PM   5   A     Yes.

12:46PM   6   Q     Do you recognize that as another one of the individuals

12:46PM   7   you were discussing the cocaine deal with?

12:46PM   8   A     Yes.

12:46PM   9             MR. INCIONG:  One down, please.

12:46PM   10  BY MR. INCIONG:

12:46PM   11  Q     Okay.  And Gomez, that's the same -- the same name,

12:46PM   12  correct?

12:46PM   13  A     Yes.

12:46PM   14  Q     Now, you've mentioned before that you had different phones

12:46PM   15  to talk to different people, right?

12:46PM   16  A     Yes.

12:46PM   17  Q     So what was this particular phone used for?  Who were you

12:46PM   18  talking to with this phone?

12:46PM   19  A     Just the -- just the Mexicans in this one.

12:46PM   20  Q     Only them, nobody else?

12:46PM   21  A     Yeah.

12:46PM   22  Q     So you had that phone specifically for that purpose?

12:46PM   23  A     Yes.

12:46PM   24  Q     Okay.  All right.  So the last exhibit I want you to look

12:47PM   25  at in this chain, Mr. Miller, is Exhibit 7-14-D, as in dog.

| | | |
|---|---|---|
| 12:47PM | 1 | And We can scroll down if you need to see it all, but |
| 12:47PM | 2 | have you seen this chain of text messages prior to coming to |
| 12:47PM | 3 | court today? |
| 12:47PM | 4 | A    Yes. |
| 12:47PM | 5 | Q    Do you recognize it as being your chat conversations with |
| 12:47PM | 6 | these individuals you just identified in 7-14-C in preparing |
| 12:47PM | 7 | your discussions or this LA coke deal? |
| 12:47PM | 8 | A    Yes. |
| 12:47PM | 9 | MR. INCIONG:  Your Honor, I would move to admit |
| 12:47PM | 10 | 7-14-D, which the foundation and authenticity has been |
| 12:47PM | 11 | stipulated to by the parties. |
| 12:47PM | 12 | THE COURT:  Mr. Kennedy, any objection? |
| 12:47PM | 13 | MR. KENNEDY:  If we could just go back to the first |
| 12:47PM | 14 | page, Your Honor. |
| 12:47PM | 15 | THE COURT:  Yes.  It's a 13-page document. |
| 12:47PM | 16 | MR. KENNEDY:  No objection. |
| 12:47PM | 17 | THE COURT:  Without objection, 7-14-Delta is admitted. |
| 12:48PM | 18 | You may publish. |
| 12:48PM | 19 | (Exhibit 7-14-D was received in evidence.) |
| 12:48PM | 20 | MR. INCIONG:  Thank you, Your Honor.  Thank you. |
| 12:48PM | 21 | BY MR. INCIONG: |
| 12:48PM | 22 | Q    So, Mr. Miller, this is a -- there are quite a few |
| 12:48PM | 23 | messages here.  We don't need to go through all of them, I |
| 12:48PM | 24 | don't believe, but if we can start at the bottom and again |
| 12:48PM | 25 | going in chronological order. |

12:48PM    1              So this is a message -- outgoing message that you sent

12:48PM    2    on July 17, 2014, saying:  "I'll pay everything."

12:48PM    3    A    Yes.

12:48PM    4    Q    So that was -- that was the deal you had or you offered to

12:48PM    5    the people from California?

12:48PM    6    A    Yes.

12:48PM    7              MR. INCIONG:  Okay.  So if we can just scroll up.

12:48PM    8    BY MR. INCIONG:

12:48PM    9    Q    Then you say:  "We can straighten everything out first."

12:48PM    10   A    Yes.

12:48PM    11   Q    Do you recall sending that message?

12:48PM    12   A    Yes.

12:48PM    13   Q    What did you mean by that?

12:48PM    14   A    Straighten out everything that -- that we was going do --

12:48PM    15   that we was planning on doing on the coke deal.

12:48PM    16   Q    So the negotiations basically?

12:48PM    17   A    Yeah.

12:48PM    18   Q    All right.  "Chill out and talk."

12:48PM    19   A    Yes.

12:49PM    20   Q    So that's what you meant by that, just more negotiating?

12:49PM    21   A    Yes.

12:49PM    22   Q    Okay.  This is a message that you send that same day:

12:49PM    23   "Come out tomorrow night and head back by Monday."

12:49PM    24   A    Yes.

12:49PM    25   Q    So it was going to be a quick trip for the weekend?

12:49PM   1   A     Mm-hmm.

12:49PM   2   Q     Was your plan then to follow them fairly quickly after --

12:49PM   3   A     Yeah.

12:49PM   4   Q     -- and go to LA to meet them?  Yes?

12:49PM   5   A     Yes.

12:49PM   6         MR. INCIONG:  All right.  You can keep going up.  Keep

12:49PM   7   scrolling up.  So we can stop here.

12:49PM   8   BY MR. INCIONG:

12:49PM   9   Q     So this is an incoming message that you received on

12:49PM  10   July 17th at about 9:50 in the morning, and the message is:

12:49PM  11   "Yeah, we down, Bro.  How will this work out?"

12:49PM  12   A     Yes.

12:49PM  13   Q     So are you talking about how you guys will meet or are you

12:49PM  14   talking about how the negotiation will go --

12:49PM  15   A     Yeah.

12:49PM  16   Q     -- as far as the terms?

12:49PM  17   A     Yeah, how everything will go down.

12:50PM  18         MR. INCIONG:  All right.  We can keep scrolling up

12:50PM  19   then.

12:50PM  20   BY MR. INCIONG:

12:50PM  21   Q     So you respond to that message saying:  "Set things up

12:50PM  22   right so we can come to an agreement on everything, and I'll

12:50PM  23   head back with you guys."

12:50PM  24   A     Yes.

12:50PM  25   Q     So that was the plan?

12:50PM   1    A    Yes.

12:50PM   2    Q    Is that what happened?

12:50PM   3    A    No, not -- not immediately with them.

12:50PM   4    Q    So you went back -- you went to LA a couple of days later.

12:50PM   5    A    Yes.

12:50PM   6              MR. INCIONG:  All right.  You can scroll up, please.

12:50PM   7              THE WITNESS:  But the thing was rolling, you know,

12:50PM   8    like the plan was going.  So when they came down, everything

12:50PM   9    was -- everything ready to go.

12:50PM  10    BY MR. INCIONG:

12:50PM  11    Q    Okay.  All right.  So this is -- if you look at message

12:50PM  12    54, so you're -- then are you telling them there that basically

12:50PM  13    you'll make the arrangements for their travel and so forth?

12:50PM  14    A    Yes.

12:50PM  15              MR. INCIONG:  So you can scroll up.

12:50PM  16    BY MR. INCIONG:

12:50PM  17    Q    So this is just back and forth --

12:50PM  18    A    Yes.

12:50PM  19    Q    -- finalizing the arrangements?

12:51PM  20    A    Yes.

12:51PM  21              MR. INCIONG:  Okay.  Keep going, please.  Keep going.

12:51PM  22    You can keep going.  So stop here.

12:51PM  23    BY MR. INCIONG:

12:51PM  24    Q    So this is an incoming message you received.  Still on

12:51PM  25    July 17th, now this is 10:27 p.m., with a name and a date of

12:51PM   1    birth.

12:51PM   2    A     Yeah.

12:51PM   3    Q     Do you see that, Jorge Aaron Sandoval --

12:51PM   4    A     Yes.

12:51PM   5    Q     -- and the date of birth?

12:51PM   6    A     Yes.

12:51PM   7    Q     Was that for the flight arrangements?

12:51PM   8    A     Yes.  That's one of the Mexicans that came down to meet.

12:51PM   9    Q

12:51PM   10             MR. INCIONG:  So keep going up, please.

12:51PM   11   BY MR. INCIONG:

12:51PM   12   Q     Okay.  There's another name and date of birth in message

12:51PM   13   46.

12:51PM   14   A     Yes.

12:51PM   15   Q     Same purpose?

12:51PM   16   A     Yes.

12:51PM   17             MR. INCIONG:  Okay.  Keep going up, please.  Keep

12:52PM   18   going.  Keep going.  Keep going.

12:52PM   19   BY MR. INCIONG:

12:52PM   20   Q     Oh, if you stop here, this message 37, is that another

12:52PM   21   confirmation number?

12:52PM   22   A     Yes.

12:52PM   23   Q     So this is all just flight arrangements being finalized?

12:52PM   24   A     Yes.

12:52PM   25             MR. INCIONG:  Keep going, please.

| | | |
|---|---|---|
| 12:52PM | 1 | BY MR. INCIONG: |
| 12:52PM | 2 | Q    There you're telling them on message 35 Hawaiian Airlines? |
| 12:52PM | 3 | A    Yes. |
| 12:52PM | 4 | Q    So was Starlynn Kuuana helping you with these |
| 12:52PM | 5 | reservations? |
| 12:52PM | 6 | A    Yes. |
| 12:52PM | 7 | MR. INCIONG:  Okay.  Keep going.  Keep going.  Keep |
| 12:52PM | 8 | going. |
| 12:52PM | 9 | BY MR. INCIONG: |
| 12:53PM | 10 | Q    Okay.  So message 29, you get an incoming message there |
| 12:53PM | 11 | on -- still on the 17th of July, just before midnight, and it |
| 12:53PM | 12 | says basically the name is spelled wrong, correct? |
| 12:53PM | 13 | A    Yes. |
| 12:53PM | 14 | Q    So did you have to change the reservation? |
| 12:53PM | 15 | A    I don't think needed to. |
| 12:53PM | 16 | Q    Okay.  So we go up to the next message, and do you see |
| 12:53PM | 17 | that? |
| 12:53PM | 18 | A    Yeah. |
| 12:53PM | 19 | Q    You say:  "I'll have her change it right now." |
| 12:53PM | 20 | A    Yes. |
| 12:53PM | 21 | Q    Who is "her"? |
| 12:53PM | 22 | A    Star. |
| 12:53PM | 23 | Q    Starlynn Kuuana? |
| 12:53PM | 24 | A    Yes. |
| 12:53PM | 25 | MR. INCIONG:  Okay.  Keep going up, please.  Keep |

12:53PM   1   going up.

12:53PM   2   BY MR. INCIONG:

12:53PM   3   Q    Okay.  So on message 25, you get an incoming message on

12:53PM   4   the next day, July 18th, 2014, and says:  "We about to land."

12:54PM   5        Were you meeting them at the airport?

12:54PM   6   A    Yes.

12:54PM   7        MR. INCIONG:  Okay.  You can scroll up.

12:54PM   8   BY MR. INCIONG:

12:54PM   9   Q    You reply in message 24:  "Early, Bro."

12:54PM   10  A    Yes.

12:54PM   11       MR. INCIONG:  Okay.  Keep scrolling up.

12:54PM   12  BY MR. INCIONG:

12:54PM   13  Q    So on the 18th there at 2:24 p.m., you send a message:

12:54PM   14  "I'll be there about 20 minutes."

12:54PM   15  A    Yes.

12:54PM   16  Q    So you were on your way to pick them up?

12:54PM   17  A    Yes.

12:54PM   18       MR. INCIONG:  All right.  Keep going up.

12:54PM   19  BY MR. INCIONG:

12:54PM   20  Q    And then you get a message at -- at 2:27 p.m. saying:

12:54PM   21  "Just landed in paradise."

12:54PM   22  A    Yes.

12:54PM   23  Q    So did you pick them up at the airport?

12:54PM   24  A    Yes.

12:54PM   25  Q    And then you had the meeting?

12:54PM    1    A     Yes.

12:54PM    2    Q     And that set everything in motion?

12:54PM    3    A     Everything in motion right there.

12:54PM    4    Q     Okay.

12:54PM    5          MR. INCIONG:  All right.  You can take that down.

12:54PM    6    Thank you.

12:54PM    7    BY MR. INCIONG:

12:54PM    8    Q     All right.  So before we got into the contents that were

12:54PM    9    on the phone, you described the first meeting you had with

12:55PM   10    Mr. Miske in Keolu Hills where you were out walking around, and

12:55PM   11    you said that's when you knew --

12:55PM   12    A     This was after -- after --

12:55PM   13    Q     Right, after you -- I'm fast-forwarding now to after you

12:55PM   14    had gotten released, after your arrest you flew back to Hawaii.

12:55PM   15    A     Yes.

12:55PM   16    Q     You said the first person you contacted after you got back

12:55PM   17    was Mr. Miske, right?

12:55PM   18    A     I don't know if he was the first person I contacted.  But

12:55PM   19    I contacted him as soon as I got back.

12:55PM   20    Q     Okay.  You met him in Keolu Hills?

12:55PM   21    A     Met him in Keolu Hills.

12:55PM   22    Q     You said you knew he was worried when he was looking in

12:55PM   23    cars?

12:55PM   24    A     Yes.

12:55PM   25    Q     Okay.  What -- what did you believe he was worried about?

| | | |
|---|---|---|
| 12:55PM | 1 | A    I mean, when I -- when I was telling him the story, he was |
| 12:55PM | 2 | trying to -- he was trying to register at first, you know.  I |
| 12:55PM | 3 | know he was trying -- he was thinking like, like I ripped him |
| 12:55PM | 4 | off or -- you know.  But he was -- he was trying to calm me |
| 12:55PM | 5 | down at that point, and he said, That's only money.  You know. |
| 12:55PM | 6 | Q    But at that point Mr. Miske is out a lot of money? |
| 12:56PM | 7 | A    Huh?  Yeah. |
| 12:56PM | 8 | Q    Like $300,000 or so, correct? |
| 12:56PM | 9 | A    Yep. |
| 12:56PM | 10 | Q    Okay.  Was there anything else he was concerned about that |
| 12:56PM | 11 | he relayed to you? |
| 12:56PM | 12 | A    Well, he thought I was setting him up, you know. |
| 12:56PM | 13 | Q    So what do you mean by "setting him up"? |
| 12:56PM | 14 | A    Like -- like this happened, and he thought I was trying to |
| 12:56PM | 15 | set him up, you know.  I know -- I knew that was going through |
| 12:56PM | 16 | his head because I said -- he was -- when he was -- when we was |
| 12:56PM | 17 | walking through Keolu Hills, after we got out of his truck, he |
| 12:56PM | 18 | started looking in cars and stuff like that, you know.  So I |
| 12:56PM | 19 | was -- I was looking, I was like, damn, this guy -- he thinks |
| 12:56PM | 20 | I'm trying to set him up because this just happened. |
| 12:56PM | 21 | Q    "Setting him up" meaning cooperating with law enforcement? |
| 12:56PM | 22 | A    Yes.  Yeah. |
| 12:56PM | 23 | Q    So anything else that he did to determine if you were |
| 12:56PM | 24 | cooperating with law enforcement or not? |
| 12:56PM | 25 | A    I can't -- I can't remember at the time.  It was that |

12:56PM    1    night you talking about?

12:56PM    2    Q    Okay.  Well, take us -- take me through.  You were there.

12:56PM    3    So how does that conversation go that evening?  You're walking

12:57PM    4    around, and what are you talking about?

12:57PM    5    A    We're walking around, we're talking about -- well, he

12:57PM    6    just -- he just expressing his concern, but he -- I know it was

12:57PM    7    going through his head because he -- his actions is doing other

12:57PM    8    things.  Like he going through, he looking at cars and stuff

12:57PM    9    like that, and he's doubting that this -- that this happened,

12:57PM   10    you know.  So, yeah.

12:57PM   11    Q    So did you ever meet with Mr. Miske and anyone else to

12:57PM   12    discuss this further?

12:57PM   13    A    Yes.

12:57PM   14    Q    Who?

12:57PM   15    A    I met with -- I met with Tommy Otake after within the

12:57PM   16    next -- within the next few days after that.

12:57PM   17    Q    Who is Tommy Otake?

12:57PM   18    A    That was Miske's lawyer.

12:57PM   19    Q    Who set this meeting up?

12:57PM   20    A    Miske.

12:57PM   21    Q    And how did you -- how did you find out about it?

12:57PM   22    A    Oh, I never know he was setting 'em up.  We was just -- he

12:57PM   23    told me for come meet him one day.  I forget where we met.  It

12:57PM   24    might have been at the shop or whatever.  But he told me go

12:57PM   25    check out Tommy, you know.

12:58PM   1   Q    Did you know who he meant when he said, Go check out

12:58PM   2   Tommy?

12:58PM   3   A    Yeah.

12:58PM   4   Q    Did you know what -- or why you were meeting Tommy?

12:58PM   5   A    Yeah.

12:58PM   6   Q    Why?

12:58PM   7   A    For talk about this -- this -- what just went down.

12:58PM   8   Q    Had you ever met Mr. Otake before?

12:58PM   9   A    Yes.

12:58PM   10  Q    In what context?

12:58PM   11  A    In what context?  Like he --

12:58PM   12  Q    Where had you met him before?

12:58PM   13  A    It was around.  Tommy was -- you know, Tommy used to come

12:58PM   14  around.  I don't know if I met him at his office.  Miske used

12:58PM   15  to go there -- he used to go there a lot.

12:58PM   16  Q    Okay.  So where did you meet with Mr. Otake?

12:58PM   17  A    We met at a -- at a school in Waikiki.  So when we -- by

12:58PM   18  the time we got there, Tommy was already -- he was already

12:58PM   19  parked there standing outside of his truck already.

12:58PM   20  Q    So what kind of school in Waikiki was this?

12:58PM   21  A    One school in Waikiki, it was like an elementary school or

12:58PM   22  something like that.

12:58PM   23  Q    So you didn't go to Mr. Otake's office?

12:59PM   24  A    No.

12:59PM   25  Q    Do you know why the meeting was at the school?

12:59PM  1  A    I don't know.  I don't know why it was at the school, but

12:59PM  2  I wasn't thinking nothing at the time.  But we just -- I

12:59PM  3  remember pulling up, and -- and then Miske was, Hey, we meet

12:59PM  4  Tommy, we'll talk to Tommy about this.

12:59PM  5        Then pulled up, we parked.  Tommy was parked, he was

12:59PM  6  outside of his truck already, like walking around underneath

12:59PM  7  the banyan tree.  Then we pulled up over there, and he was

12:59PM  8  like, Hey, tell him -- tell him what happened.  Miske was like,

12:59PM  9  Hey, tell him what happened.

12:59PM  10       You know, because -- because leading up to this, even

12:59PM  11 Miske was kind of doubting me, like -- like in this couple of

12:59PM  12 days from when it happened, I got back to when we met Tommy, in

12:59PM  13 those days he always -- he always used to be like, You

12:59PM  14 sure this -- you know, you sure this fucking happened?  Like he

12:59PM  15 would just throw shots at me like that.

12:59PM  16 Q    So he was asking you specifically if it really happened

12:59PM  17 how you said it?

12:59PM  18 A    Yeah, yeah.  I was kind of -- like I was like -- I was

01:00PM  19 getting offended at the time, you know, because I wasn't -- I

01:00PM  20 never have any reason for him to doubt me at that time.

01:00PM  21 Q    So what was the purpose of Mr. Otake hearing your story?

01:00PM  22 A    Oh, for see if something like that really wen' happen.

01:00PM  23 And like -- like if they would really let me go, you know.

01:00PM  24 Q    So did you tell Mr. Otake the story that -- basically what

01:00PM  25 you told this jury a little bit ago?

01:00PM  1   A    Yeah, I cannot remember the exact words that I told Tommy,

01:00PM  2   but I told him the story of what happened, you know, and mainly

01:00PM  3   why they let me go and would they let me go if this had

01:00PM  4   happened.

01:00PM  5   Q    And what was the -- what was Mr. Otake's reaction to

01:00PM  6   hearing that?

01:00PM  7   A    I mean, he took -- he was shocked too.  He was -- I would

01:00PM  8   say he was shocked when I was telling him what happened, and

01:00PM  9   the fact that they let -- that they let me go, he was -- he was

01:00PM  10  kind of shocked, you know.  He took 'em in and gave me -- we

01:01PM  11  was talking, but the clear thing that -- that the point got

01:01PM  12  across to me was -- was, Hey, if anybody come talk to you,

01:01PM  13  don't -- don't tell them nothing.  Just tell them I'm your

01:01PM  14  attorney, you know, like that.

01:01PM  15  Q    So let me have you look at Exhibit 7-17, please.

01:01PM  16       Do you see that exhibit, Mr. Miller?

01:01PM  17  A    Yes.

01:01PM  18  Q    Do you recognize what's shown in that map, that area?

01:01PM  19  A    Yes.  Monsarrat, Kapahulu.  The zoo right there.

01:01PM  20  Q    Okay.  So it's part of Waikiki area?

01:01PM  21  A    Yes.

01:01PM  22  Q    Does that accurately show that area as you know it?

01:01PM  23  A    Yes.

01:01PM  24       MR. INCIONG:  Your Honor, I would move to admit

01:01PM  25  Exhibit 7-17 at this time.

01:01PM    1                THE COURT:  Any objection?

01:01PM    2                MR. KENNEDY:  No objection.

01:01PM    3                THE COURT:  Without objection, 7-17 is admitted.  You

01:01PM    4    may publish.

01:01PM    5                    (Exhibit 7-17 was received in evidence.)

01:02PM    6                MR. INCIONG:  Thank you, Your Honor.

01:02PM    7    BY MR. INCIONG:

01:02PM    8    Q    So the -- that's the area of Waikiki.  Like you said, the

01:02PM    9    zoo.  Do you see Kapahulu Avenue there?

01:02PM   10    A    Yes.

01:02PM   11    Q    Could you just draw an X or line to indicate where that

01:02PM   12    is.

01:02PM   13    A    (Witness complies.)

01:02PM   14    Q    Okay.  Is this in the area, the vicinity of where you met

01:02PM   15    with Mr. Miske and Mr. Otake?

01:02PM   16    A    Yes.

01:02PM   17    Q    Do you see that -- the red dot there that's next to Thomas

01:02PM   18    Jefferson Elementary School?

01:02PM   19    A    Yes.

01:02PM   20    Q    Is that the elementary school that you met at?

01:02PM   21    A    I'm not sure, but I'm pretty sure it was that one, you

01:02PM   22    know, because I remember pulling into the school because it

01:02PM   23    caught me off guard, you know, when we was going over there.

01:02PM   24    He never tell me we was going to see Tommy until we was

01:02PM   25    actually seeing Tommy.  You know.

01:02PM    1    Q    And this meeting was held in the parking lot of the --

01:02PM    2    A    In the parking lot, yeah.  I remember we had one big

01:02PM    3    banyan tree, and we pulled up right there, and Tommy was

01:02PM    4    already waiting for us.

01:02PM    5    Q    Okay.  Well, let me show you Exhibit 7-23, see if you

01:03PM    6    recognize that.

01:03PM    7         Do you see that exhibit?

01:03PM    8    A    Yes.

01:03PM    9    Q    Do you recognize that?

01:03PM    10   A    Yes.

01:03PM    11   Q    Is this basically like a Google Earth view of the map that

01:03PM    12   you were just looking at but close --

01:03PM    13   A    Yes.

01:03PM    14   Q    Okay.  You mentioned a banyan tree that you recall.

01:03PM    15   A    Yes.

01:03PM    16   Q    Does that banyan tree look to be in the same location as

01:03PM    17   the one you recall?

01:03PM    18   A    Yeah.  Right.  Boom.

01:03PM    19   Q    Okay.  So does this photo accurately show that area that

01:03PM    20   you believe you met with Mr. Otake --

01:03PM    21   A    Yeah.

01:03PM    22   Q    -- when he got back you got back from LA?

01:03PM    23   A    Yeah, I'm pretty sure that's where -- that's where it was.

01:03PM    24         MR. INCIONG:  Your Honor, I'd move to admit 7-23.

01:03PM    25         THE COURT:  Any objection?

01:03PM  1             MR. KENNEDY:  No objection.

01:03PM  2             THE COURT:  7-23 is admitted without objection.  You

01:03PM  3  may publish.

01:03PM  4             (Exhibit 7-23 was received in evidence.)

01:03PM  5             MR. INCIONG:  Thank you, Your Honor.

01:03PM  6  BY MR. INCIONG:

01:03PM  7  Q    So, Mr. Miller, you circled the -- is that the banyan tree

01:04PM  8  that you recall being in the middle of the parking lot?

01:04PM  9  A    Yes.

01:04PM  10 Q    So this is the parking lot right along Kapahulu Avenue --

01:04PM  11 A    Yes.

01:04PM  12 Q    -- where you met with Mr. Otake?

01:04PM  13 A    Yes.

01:04PM  14 Q    Okay.  So how long would you say this meeting took?  How

01:04PM  15 long were you there talking to him?

01:04PM  16 A    I would give an estimate maybe -- maybe half an hour.

01:04PM  17 Q    Was Mr. Otake asking you questions about what had

01:04PM  18 happened?

01:04PM  19 A    Yeah, we was -- I mean we was talking about the -- we was

01:04PM  20 talking about 'em.  I no remember the words, but I know we was

01:04PM  21 talking about 'em, and he was asking me questions and I was

01:04PM  22 giving him the -- the feedback, but -- yeah, the main thing we

01:04PM  23 discussed at the end was -- was like when Miske told me, Hey

01:04PM  24 you heard him, right?  If anybody -- if anything happen, tell

01:04PM  25 'em Tommy is your -- you don't even got to tell them your name,

| | | |
|---|---|---|
| 01:04PM | 1 | you know.  Like he always used to tell me that kind of stuff. |
| 01:04PM | 2 | Q    So who is telling you this? |
| 01:04PM | 3 | A    Miske. |
| 01:04PM | 4 | Q    Was that the only time you met with Mr. Otake, to discuss |
| 01:05PM | 5 | this incident in Los Angeles? |
| 01:05PM | 6 | A    No, I know I met -- I know I met him more, but I cannot -- |
| 01:05PM | 7 | I don't recall.  At least one more time it was. |
| 01:05PM | 8 | Q    Was there anything different or additional discussed at |
| 01:05PM | 9 | the other meetings? |
| 01:05PM | 10 | A    I no remember. |
| 01:05PM | 11 | Q    So after that meeting, did Mr. Miske continue to be |
| 01:05PM | 12 | skeptical of your story or was he satisfied at that point? |
| 01:05PM | 13 | A    I know he was skeptical, but he wasn't -- you know, he |
| 01:05PM | 14 | wasn't -- he wasn't acting out of the ordinary.  You know, |
| 01:05PM | 15 | after that -- after that meeting we started talking about -- we |
| 01:05PM | 16 | still in the same couple days after that meeting.  So we start |
| 01:05PM | 17 | talking about -- about how we get his money back.  You know, |
| 01:05PM | 18 | they -- you know, he felt calm already.  He was -- I never got |
| 01:05PM | 19 | arrested, we went talk to Tommy.  I was -- I was still coming |
| 01:05PM | 20 | around.  I was there every day at this -- not every day, but I |
| 01:06PM | 21 | was there a lot at his shop with him.  We eating at night. |
| 01:06PM | 22 | So... |
| 01:06PM | 23 | Q    So what do you mean by you said you were talking about how |
| 01:06PM | 24 | to get his money back? |
| 01:06PM | 25 | A    We talking -- okay.  So in that time frame, in that couple |

01:06PM    1    days that we talked to Tommy or whatever, I meet him at the

01:06PM    2    Honolulu Club parking lot, and we pull up in the parking lot,

01:06PM    3    we talking.  And we talking about how I told him that -- that

01:06PM    4    Sammy was still -- was the one that was supposed to have done

01:06PM    5    the deal.  Like Sammy was a part of the deal, but he wasn't

01:06PM    6    aware -- Sammy wasn't aware that -- that the deal went bad up

01:06PM    7    there already.

01:06PM    8         So we started talking about like, Hey, fuck him, tell

01:06PM    9    him -- tell him -- just go over there like the deal was still

01:06PM   10    being set up.  You know, like the thing was still going down.

01:06PM   11    Q    Who said that?

01:06PM   12    A    Miske.

01:06PM   13    Q    Okay.  So tell him the deal was still going down?

01:07PM   14    A    Yeah, because he never know -- Sammy never know what

01:07PM   15    happened, I was freed.  All of this happened in LA.  Sammy was

01:07PM   16    down here still, he never know what was going on.

01:07PM   17    Q    Okay.  So what was the purpose of telling Sammy that

01:07PM   18    nothing happened, the deal was still going on?

01:07PM   19    A    Yeah, just for get the money back.  He was like, Hey, tell

01:07PM   20    Sammy the deal is still going down, and his deal is still going

01:07PM   21    down.  He don't know that we got arrested and let go and

01:07PM   22    everything like that.  So tell Sammy this deal is going down,

01:07PM   23    get the money, tell him, Hey, everything is still good, grab

01:07PM   24    the money from him and give 'em back to me.

01:07PM   25    Q    Give it back to Mr. Miske?

01:07PM   1    A    Yes.

01:07PM   2    Q    So what were you going to tell Mr. Kuuana then after he

01:07PM   3    didn't get any drugs in return for that money?

01:07PM   4    A    No, like Miske used to tell me, brah, fuck him.  He

01:07PM   5    used -- I like burn him on the club, you know what I mean.  He

01:07PM   6    not going do nothing.

01:07PM   7    Q    So this was basically his idea to get his money back?

01:07PM   8    A    Yeah.  That was his idea for get -- for get his money

01:08PM   9    back, yeah.  Call Sammy.

01:08PM   10   Q    Did you contact Mr. Kuuana?

01:08PM   11   A    Yes.

01:08PM   12   Q    Did you tell him, Hey, the deal is good, I need your

01:08PM   13   money?

01:08PM   14   A    Yes.

01:08PM   15   Q    Did he give you the money?

01:08PM   16   A    Yes.

01:08PM   17   Q    How much money did he give you?

01:08PM   18   A    A lot.  Over -- over 300, you know.

01:08PM   19   Q    300,000?

01:08PM   20   A    Yeah.

01:08PM   21   Q    How did you get that money?

01:08PM   22   A    He gave 'em to me.  I told him that everything was set up,

01:08PM   23   like the deal going, let me get the money.  And I was still a

01:08PM   24   trusted person at that point.  So...

01:08PM   25   Q    What did you do with the money?

01:08PM    1    A    I gave 'em to Miske.

01:08PM    2    Q    Where?

01:08PM    3    A    So I -- okay.  Going back to Sammy, I tell him, Hey, the

01:08PM    4    deal is still going on.  After I'm talking to Miske, I go see

01:08PM    5    Sammy, telling him everything is going on.  Sammy, that night

01:08PM    6    he goes and grabs the money from wherever it's at, he gives the

01:08PM    7    money to me.

01:08PM    8         So now I got to go and tell Sammy, Hey, I got ripped

01:08PM    9    off.  You know, Sammy was looking at me like, What?  You know.

01:09PM   10    So I just told him, Hey, I got ripped off, your money is gone.

01:09PM   11    And I -- I never call him back after that.  He was -- Sam was

01:09PM   12    getting ripped off all the time and he never do nothing.  So at

01:09PM   13    least he took --

01:09PM   14    Q    How much time passed after you got the money from Sammy

01:09PM   15    did you tell him you got ripped off and the money was gone?

01:09PM   16    A    Few days.  Maybe the next day.

01:09PM   17    Q    Okay.  So in the meantime, what do you do with the money?

01:09PM   18    A    I'm holding -- I'm holding the money.  At this point I got

01:09PM   19    the money now.  So I go back to Miske and I tell him, wasn't --

01:09PM   20    maybe at his club or something like that, I tell him, Hey, I

01:09PM   21    got -- I got the scripts.  You know.  So that's money.  And he

01:09PM   22    was like, You got 'em?  I was like, Yeah.  So he told me, Hey,

01:09PM   23    just hold it.  Hold 'em, and I going -- I going tell you when

01:09PM   24    for -- for bring 'em.  So...

01:09PM   25    Q    So where did you hold the money?

01:10PM  1  A    We had -- we had burner cars around, you know.  So we had

01:10PM  2  cars that -- that we used to -- that we just parked all around

01:10PM  3  the -- the island, you know, in parking spots where different

01:10PM  4  cars park every day so people not going to notice.

01:10PM  5  Q    When you say "a burner car," what do you mean by "a burner

01:10PM  6  car"?

01:10PM  7  A    Like one burner phone, a car -- a disposable car.  You

01:10PM  8  know, stuff -- to hold stuff in, stuff to follow people in.

01:10PM  9  It's not in your name, so you're not going to be able to trace

01:10PM  10  'em back to you.

01:10PM  11  Q    Who acquired these burner cars?

01:10PM  12  A    A lot of people, me, Kaulana Freitas, Jason Yokoyama.

01:10PM  13  Yeah.

01:10PM  14  Q    Who was paying for the cars?

01:10PM  15  A    Miske.

01:10PM  16  Q    Were you aware --

01:10PM  17  A    Oh, like -- I know when I would do 'em, like if I would

01:10PM  18  pay for 'em, he would give me the money back, whatever the

01:10PM  19  thing was, or he would give me the money before and I would go

01:10PM  20  grab 'em.

01:10PM  21  Q    So you had these burner cars just parked at various

01:11PM  22  places?

01:11PM  23  A    Yeah, all over the island.  You know, some in Pearl City,

01:11PM  24  some in Makiki, some downtown.

01:11PM  25  Q    How was it kept track of where these cars were?

01:11PM  1    A    I mean I already -- I knew where the thing was.  I knew

01:11PM  2    where all the cars was.

01:11PM  3    Q    Okay.

01:11PM  4    A    The ones that I wen' park, I know where the thing was.  Or

01:11PM  5    if like Jason was dropping 'em off to me, I would be the one

01:11PM  6    parking 'em.

01:11PM  7    Q    Okay.  So you were told to hold the money in one of these

01:11PM  8    burner cars?

01:11PM  9    A    Yes.

01:11PM  10   Q    That's parked on the road?

01:11PM  11   A    Yes.

01:11PM  12   Q    You weren't concerned that the money would be stolen?

01:11PM  13   A    Well, I know one of -- one of the cars was like one family

01:11PM  14   car, a family looking car, like almost like a van.  So I

01:11PM  15   remember when we got -- when we got cars like that, had like

01:11PM  16   baby seats inside and had -- had like the "Baby on Board"

01:11PM  17   sticker -- not the sticker, but the little suction thing.

01:11PM  18         And he was like, Look, if you was trying to steal cars

01:11PM  19   and you seen baby seats and the little "Baby on Board," you

01:12PM  20   would break into this car and steal 'em?  And I would be like,

01:12PM  21   That makes sense, you know.  So --

01:12PM  22   Q    You mean you would or you would not break into those cars?

01:12PM  23   A    No, you wouldn't.  You wouldn't -- you see one baby seat,

01:12PM  24   you're not going to get -- like if you're breaking into cars,

01:12PM  25   you're not going get people breaking into this car, you know, a

01:12PM    1    family looking car.

01:12PM    2    Q    Okay.

01:12PM    3    A    And -- yeah, so -- so we used to use those cars, like had

01:12PM    4    guns inside those cars and was parked all over the place.

01:12PM    5    Q    You would store -- you would store guns in those cars?

01:12PM    6    A    Yes.

01:12PM    7    Q    Okay.  So the "Baby on Board" suction cup thing, was that

01:12PM    8    something that was already in this car you're talking about?

01:12PM    9    A    Yeah, yeah, it was in the car.

01:12PM   10    Q    Did you ever place them in other cars?

01:12PM   11    A    Yes.

01:12PM   12    Q    At whose direction?

01:12PM   13    A    Yeah, Miske used to tell me that's the -- like that's --

01:12PM   14    you're not going to look at those -- you know, if you going

01:12PM   15    steal one car, you're not -- you going to look for cars with

01:12PM   16    nice rims and -- if you going to steal one car and it get one

01:12PM   17    sticker like that and baby seat inside, you not going to break

01:12PM   18    into that car and lift 'em up and find guns, you know.

01:13PM   19         So I was living in Pearl City at that time, and one of

01:13PM   20    the those cars that we had, I had 'em parked on the street

01:13PM   21    where plenty cars parked, and that's where I was holding the --

01:13PM   22    the money at that time.

01:13PM   23    Q    Okay.

01:13PM   24    A    Waiting to -- waiting for his call to tell me, Hey, bring

01:13PM   25    it -- bring it over here.

01:13PM   1   Q    Okay.  Did he eventually call you and ask for it?

01:13PM   2   A    Yes.

01:13PM   3   Q    Approximately how much -- how long did you have to hold

01:13PM   4   the money for?

01:13PM   5   A    If I got 'em that week, by that weekend I was already

01:13PM   6   meeting him to -- to pass the money on.

01:13PM   7   Q    So how did you get the money to him specifically?

01:13PM   8   A    I drove 'em down there.  I drove --

01:13PM   9   Q    Where is "down there"?

01:13PM  10   A    So he called me up and he was like, Hey, let's go -- let's

01:13PM  11   go to the bay, ride skis.  We went there often, so it wasn't

01:13PM  12   no -- wasn't no surprise.  And he was like, Hey, bring that

01:13PM  13   down.

01:13PM  14        So I went down, I parked at the bay inside the parking

01:13PM  15   lot inside where the boats -- where the boats get launched at.

01:14PM  16   And I jump in with him, we go driving around, we stop at the

01:14PM  17   library, you know, Hawaii Kai Public Library that you can go

01:14PM  18   underneath.  So we stop over there.  Again, I'm thinking that

01:14PM  19   he's -- he's double-checking if anybody following us or not.

01:14PM  20   We stop over there, we park, we start talking.  And we talking

01:14PM  21   about different shit, the thing is done, I got the money

01:14PM  22   already.  It's in -- it's in the car waiting for him to grab

01:14PM  23   it.

01:14PM  24        We talking about other stuff, fueling up the jet skis,

01:14PM  25   buying some stuff from Zippy's and whatnot.  And so in the time

01:14PM  1    that we talking, Jason Yokoyama pulls up, he communicating with

01:14PM  2    Miske.  He pulls up to the boat ramp over there in that area,

01:14PM  3    and me and Miske -- like me and Miske pulls up over there, and

01:14PM  4    Miske tells me, Hey, give the money to -- give the money to

01:15PM  5    Jason.

01:15PM  6    Q    Okay.  So did you hand it to Jason or did you put it in

01:15PM  7    his car?  Tell us how -- where the money went.

01:15PM  8    A    Yeah, so Jason -- where I was parked at, Jason pulled up

01:15PM  9    next to me like that, he popped the trunk, I grabbed the money

01:15PM  10   out of my car, gave 'em to Jason.  Jason -- him and Jason

01:15PM  11   walked away, started talking, and then Jason never stayed at

01:15PM  12   the bay with us.  He left.

01:15PM  13   Q    Okay.  So is this the same bay, the beach area that you

01:15PM  14   would always go to for barbecues, jet skis, the same place?

01:15PM  15   A    The parking lot area.

01:15PM  16   Q    Okay.  So the money was contained in what?

01:15PM  17   A    That specific money had some loose money, but those

01:15PM  18   specific money was in FoodSaver bags, stacked up neat like

01:15PM  19   that, piled up like that.

01:15PM  20   Q    Was this in a duffel bag, suitcase or --

01:16PM  21   A    No, this is a -- this is a FoodSaver bag, just stacks of

01:16PM  22   $100 bills all the way down.

01:16PM  23   Q    Okay.  And what was the -- what were the packages of money

01:16PM  24   contained in that you handed to Mr. Yokoyama?

01:16PM  25   A    It was in a bag.  I don't know what kind of bag, but I

01:16PM  1  gave it to him in a bag.  But I remember that -- that money

01:16PM  2  because the thing was nicely -- everything was neat.  Yeah.

01:16PM  3  Q    Okay.  All right.  So was there any -- was that whole

01:16PM  4  cocaine LA thing done at that point?

01:16PM  5  A    Yeah.

01:16PM  6  Q    You didn't try to get that going again after what

01:16PM  7  happened?

01:16PM  8  A    No, I was done -- I was done already.  I was done.

01:16PM  9  Q    Okay.  So this is the summer of 2014, correct?

01:16PM  10  A    Yes.

01:16PM  11  Q    Fast-forward a couple of months in that year, did you have

01:16PM  12  a child later that year?

01:16PM  13  A    Yes.

01:17PM  14  Q    When was that?

01:17PM  15  A    October 14th.

01:17PM  16  Q    Is that your first child?

01:17PM  17  A    Yes.

01:17PM  18  Q    Are you working yet at the movies or anything like that

01:17PM  19  during this time?

01:17PM  20  A    I might have -- I might have started around that time or a

01:17PM  21  little -- little bit after.

01:17PM  22  Q    All right.  Were there any other business ventures you had

01:17PM  23  gone into with Mr. Miske that you had partnered with him --

01:17PM  24  A    Yeah.

01:17PM  25  Q    -- in like legitimate business ventures?

01:17PM   1   A   Yeah.

01:17PM   2   Q   What was that?

01:17PM   3   A   We was -- we was opening up -- we was going into a food

01:17PM   4   truck that we was supposed to do.

01:17PM   5   Q   And what were you going to sell out of that food truck?

01:17PM   6   A   Poke.

01:17PM   7   Q   And whose idea was that?

01:17PM   8   A   I think that was -- that was both of ours, but -- I was

01:17PM   9   talking to him about 'em, we was looking 'em up.  My friend

01:17PM  10   that was doing 'em in the Big Island was -- he was like the

01:17PM  11   number one restaurant on -- on Yelp and stuff like that.

01:17PM  12   Q   All right.  So did that actually happen?

01:18PM  13   A   Yeah, yeah, we did for a little while.

01:18PM  14   Q   So who -- who bankrolled or funded the startup for the

01:18PM  15   business?

01:18PM  16   A   Both of us.

01:18PM  17   Q   Was it successful?

01:18PM  18   A   No.

01:18PM  19   Q   Were you involved at all really or --

01:18PM  20   A   I mean just -- as far as the money, yeah, but that's about

01:18PM  21   it.

01:18PM  22   Q   You weren't working in the -- making poke in the food

01:18PM  23   truck?

01:18PM  24   A   No, no.  No.

01:18PM  25   Q   Okay.  I want to take you -- kind of fast-forward a little

01:18PM  1    bit then to the next summer, summer of 2015.  Did you have some

01:18PM  2    recurring or flare-ups with the medical issues that you

01:18PM  3    described earlier?

01:18PM  4    A    Yes.

01:18PM  5    Q    Okay.  How did that come about or come to light?

01:18PM  6    A    I was -- I went to see my doctor, just regular routine

01:18PM  7    checkup.  They did some -- some CT scans, and the doctor said

01:18PM  8    that my -- parts of my aorta was -- was also tearing.

01:19PM  9    Q    All right.  Was the doctor able to -- or identify the

01:19PM  10   cause of this or at least have an idea?

01:19PM  11   A    Yes.

01:19PM  12   Q    And what was the diagnosis?

01:19PM  13   A    I don't know.  It sounded like it was Marfan's, you know,

01:19PM  14   but my --

01:19PM  15          THE COURT REPORTER:  I'm sorry, it sounded like what?

01:19PM  16   Did you say Marfan's?

01:19PM  17          THE WITNESS:  Yeah.

01:19PM  18   Q    Do you know how to spell Marfan's?

01:19PM  19   A    No.

01:19PM  20   Q    Okay.  Marfan's syndrome?

01:19PM  21   A    Yeah.  But she wasn't sure, though, that's why -- I never

01:19PM  22   really asked questions.

01:19PM  23   Q    All right.  Did you have follow-up testing to determine if

01:19PM  24   that was the case?

01:19PM  25   A    Yeah.

01:19PM   1    Q    Where did you go for that?

01:19PM   2    A    I went -- I went to Texas.

01:19PM   3    Q    And did it turn out that the diagnosis was accurate?

01:19PM   4    A    Yeah.

01:19PM   5    Q    What is Marfan's syndrome?

01:19PM   6    A    I don't really know, but I know for me my aorta was

01:20PM   7    ripping, if that's describing that.  I'm not a doctor.

01:20PM   8    Q    Did you learn whether that was a hereditary condition?

01:20PM   9    A    Yeah, could have been.

01:20PM  10    Q    So was there recommended action that you take once that

01:20PM  11    was discovered?

01:20PM  12    A    Yes.

01:20PM  13    Q    What was that?  What did you need to have done?

01:20PM  14    A    Yeah, well, they -- in Houston, the doctor over there told

01:20PM  15    me that, Hey, we -- we can fix that, we can put a whole new

01:20PM  16    valve inside there from top to bottom, instead of just that

01:20PM  17    arch.  Because he said in the -- it might not be right now, but

01:20PM  18    in the long run that going happen to you again, like your valve

01:20PM  19    going rip again.

01:20PM  20    Q    All right.  So did you have to make a couple of trips to

01:20PM  21    Texas for that?

01:20PM  22    A    Yes.

01:20PM  23    Q    Okay.  The first was to get the confirmation --

01:20PM  24    A    Yeah.

01:20PM  25    Q    -- that you had Marfan's syndrome?

01:20PM    1                Did you schedule a surgery?

01:20PM    2    A    Yes.

01:20PM    3    Q    When was that surgery scheduled for?

01:20PM    4    A    2015.

01:21PM    5    Q    What part of the year, do you remember?

01:21PM    6    A    Later on in the year, November, December, around there.

01:21PM    7    Q    Okay.  So before you went back to Texas for that surgery,

01:21PM    8    was there a really serious car accident that you remember

01:21PM    9    hearing about?

01:21PM   10    A    Yes.

01:21PM   11    Q    Okay.  Who was involved in that car accident?

01:21PM   12    A    Caleb -- Caleb Miske, Mike's -- Mike's son, and -- and

01:21PM   13    Caleb's friend Jonathan Fraser.

01:21PM   14    Q    How did you find out about the accident?

01:21PM   15    A    Mike B. called me that -- that night of the accident,

01:21PM   16    Mike B. called me and said, Hey, I'm trying to get in touch --

01:21PM   17    trying to get in touch with Mike.  Call him up and tell him his

01:21PM   18    son just got into an accident.

01:21PM   19    Q    So Mike B. was saying he was trying to get in touch with

01:21PM   20    Mike Miske?

01:21PM   21    A    Yeah, he's calling -- he's calling me -- I'm working at

01:21PM   22    that point, so I'm at home sleeping, and my phone just kept

01:21PM   23    ringing, ringing, ringing, so I picked it up and it was Mike B.

01:22PM   24    telling me that he was trying to get in touch with Miske

01:22PM   25    because his son just got into a big accident.

01:22PM   1   Q   All right.  Were you able to contact Mr. Miske?

01:22PM   2   A   Yes.

01:22PM   3   Q   And you told him what had happened?

01:22PM   4   A   Yes.  I told him Mike B. just called me and, you know, his

01:22PM   5   son had been taken to Queens Hospital.

01:22PM   6   Q   What did you do next?

01:22PM   7   A   I got ready, I put some clothes on, and I went down to the

01:22PM   8   hospital.

01:22PM   9   Q   Was Mr. Miske there already?

01:22PM  10   A   Yes.

01:22PM  11   Q   Who else was there?

01:22PM  12   A   Me, Miske, his brother Johnnie, and Russell Boy.

01:22PM  13   Q   Who is Russell Boy?

01:22PM  14   A   Russell Boy Moscato, that's one of Miske's good friends.

01:22PM  15   Q   So could you tell was it a serious situation?

01:22PM  16   A   Yeah.  I mean they said he was -- he was in critical

01:22PM  17   condition at that time.

01:22PM  18   Q   And when you say "he," who are you referring to?

01:22PM  19   A   Caleb.

01:22PM  20   Q   What about Jonathan Fraser?

01:22PM  21   A   I don't think -- I don't think -- I don't know if I knew

01:23PM  22   anything about him that night.

01:23PM  23   Q   Okay.  All right.  So did -- what was Mr. Miske's demeanor

01:23PM  24   during this time?  I imagine he was very worried.

01:23PM  25   A   Yeah.  I mean, he was -- he was worried.  He was worried.

01:23PM  1   He was trying to stay -- he was trying to stay positive, but I

01:23PM  2   mean, that's his only son, so he was worried, yeah.

01:23PM  3   Q    Did -- did you receive any information while you were

01:23PM  4   there with Mr. Miske as to the circumstances, like how the

01:23PM  5   accident had happened or --

01:23PM  6   A    I don't know -- I don't know if it was that night, you

01:23PM  7   know, that night that he was telling me that everything

01:23PM  8   happened or was because -- after that wen' happen, that initial

01:23PM  9   night I was there for a little while, I was there till late,

01:23PM 10   and I had to go work the next day.  So I left that night, went

01:23PM 11   home, sleep, went to work, and then came right back to the

01:24PM 12   hospital.  And pretty much did that every day until I left.

01:24PM 13   Q    Okay.  So Mr. Miske is there I'm assuming --

01:24PM 14   A    Yes.

01:24PM 15   Q    -- every time you're there?

01:24PM 16   A    Every day.

01:24PM 17   Q    Okay.  Did you have any conversation with him as to the

01:24PM 18   cause of the accident during this time?

01:24PM 19   A    Yes.  So in -- in one of those days that I'm there, first

01:24PM 20   time he tells me about the accident.  You know, he said --

01:24PM 21   Q    And what did he tell you?

01:24PM 22   A    He's telling me about the -- what the firemens told him.

01:24PM 23   He said the firemens -- he found out from a fireman or

01:24PM 24   something like that that the seatbelt was going the opposite

01:24PM 25   direction, your son wasn't the driver.

01:24PM    1    Q    Okay.

01:24PM    2    A    Yeah, so --

01:24PM    3    Q    Did Mr. Miske believe that according to what he told you?

01:24PM    4    A    Yes.  Yeah, he was --

01:24PM    5    Q    So if Mr. -- if Caleb was not the driver, then who was --

01:24PM    6    would've had to have been the driver?

01:24PM    7    A    Yeah, he said Fraser was -- was the driver, but -- so in

01:25PM    8    those conversations when he was telling me that Fraser was the

01:25PM    9    driver, I guess the kid Fraser is now -- now getting released

01:25PM    10    already.  You know, like he wasn't in bad condition.  But

01:25PM    11    they're telling Miske that the seatbelt is going in the -- in

01:25PM    12    the direction that he was the passenger.

01:25PM    13    Q    Did that seem to matter to Mr. Miske?

01:25PM    14    A    Yeah.

01:25PM    15    Q    Why?

01:25PM    16    A    He said -- I mean he said -- like at that point he was --

01:25PM    17    he brought this up like maybe one time.  Okay, like he was

01:25PM    18    like -- he was like, This kid left.  He never even come visit

01:25PM    19    my son.  You know, he's out there saying he wasn't the driver.

01:25PM    20          And that's when he brought up like, Hey, if something

01:25PM    21    happen to my son, this kid has gotta go.  That's the first time

01:25PM    22    he brought 'em up, you know.  And then when I say he gotta go,

01:25PM    23    like he wanted to kill him if something had happened to his

01:26PM    24    son.

01:26PM    25    Q    You understood that's what he meant when he said, If

01:26PM   1   something happens to my son, the kid's gotta go?

01:26PM   2   A    Yes.

01:26PM   3   Q    The "kid" being Jonathan Fraser?

01:26PM   4   A    Yes.  Yes.  Because like he's looking, like this kid is

01:26PM   5   still running around, he not even coming to visit my son.  You

01:26PM   6   know what I mean, telling everybody he is not the driver.  So

01:26PM   7   it was agitating him.

01:26PM   8        So in the beginning after those few conversations, he

01:26PM   9   never bring 'em up at all.  You know, he was trying to -- he

01:26PM   10  was trying to stay positive as to like -- like, Hey, if there

01:26PM   11  is a God, you know what I mean, if you can help him out this

01:26PM   12  time.

01:26PM   13  Q    Were you aware of whether this was a one-car accident or

01:26PM   14  whether it was a two-car accident?  Did you know any of those

01:26PM   15  circumstances?

01:26PM   16  A    Yeah, yeah, I heard about the -- like there was a car

01:26PM   17  accident, and they was going fast.

01:26PM   18  Q    So it was a collision --

01:26PM   19  A    It was a collision.

01:26PM   20  Q    -- between two cars.

01:27PM   21  A    Yeah.

01:27PM   22  Q    Did Mr. Miske ever bring up the fact that the other driver

01:27PM   23  was at fault?

01:27PM   24  A    No.

01:27PM   25  Q    Did you ever hear the name Jared Ishiki?

| 01:27PM | 1 | A | No. |

01:27PM 1 A No.

01:27PM 2 Q Do you know who that is?

01:27PM 3 A No.

01:27PM 4 Q So how long is Caleb Miske in the hospital for?

01:27PM 5 A He's in for -- he's in there for a long time, from the

01:27PM 6 accident till he's -- till he passed away.

01:27PM 7 Q Okay. We'll get to that in a minute. But -- so this is

01:27PM 8 over a period of many months, several months?

01:27PM 9 A Yeah, I would -- I would say, yeah.

01:27PM 10 Q You said you had your surgery scheduled in Texas for later

01:27PM 11 that year.

01:27PM 12 A Yes.

01:27PM 13 Q Did you go and have that surgery?

01:27PM 14 A Yes.

01:27PM 15 Q Was Caleb Miske still in the hospital?

01:27PM 16 A Yes.

01:27PM 17 Q When you left for your surgery, what was Caleb Miske's

01:27PM 18 condition?

01:27PM 19 A He was -- he was still in bad shape. He was in bad shape.

01:27PM 20 I was there every day with them.

01:27PM 21 Q What kind of conversation would you have with Mr. Miske

01:28PM 22 regarding Caleb and his progress?

01:28PM 23 A I mean, he would give me updates, but when he was -- when

01:28PM 24 Caleb was fighting, he was trying to -- he was trying to stay

01:28PM 25 positive. Like he wasn't talking about -- he wasn't -- he

01:28PM   1   wasn't trying to put like some bad vibes towards -- towards his

01:28PM   2   son.  He was like, Hey, if my son can make 'em through this.

01:28PM   3   You know, he never talk about -- after that initial

01:28PM   4   conversations about Fraser --

01:28PM   5   Q    Right.

01:28PM   6   A    -- he never talk about 'em after that, you know.  He

01:28PM   7   just -- everything was on Caleb trying to get better, making

01:28PM   8   the right decisions for him.

01:28PM   9   Q    Okay.  So do you go then and have your surgery in Houston?

01:28PM  10   A    Yes.

01:28PM  11   Q    So what kind surgery was this?

01:28PM  12   A    Oh, it was another -- it was another open -- they cut me

01:28PM  13   open again -- cut me open again for place a whole new aortic

01:28PM  14   valve inside me, mechanical valve.

01:28PM  15   Q    So this is the third then open heart surgery you've had.

01:28PM  16   A    Yes.

01:28PM  17   Q    So the first two that you had in Oregon, you said, right?

01:29PM  18   A    Yes.

01:29PM  19   Q    Did you receive pain killers for -- for that to treat the

01:29PM  20   pain after the surgery --

01:29PM  21   A    In --

01:29PM  22   Q    -- in Oregon?

01:29PM  23   A    I mean, they gave you -- I was in prison, so they no give

01:29PM  24   you like the oxys and stuff.  They give you just regular pain

01:29PM  25   killers, you know, like Percocet and stuff like that.  But

01:29PM  1    nothing to the extent of what they gave me in Houston.

01:29PM  2    Q     Okay.  So what did you get in Houston that was different?

01:29PM  3    A     Well, in Houston -- well, I was in the surgery.  When I

01:29PM  4    came out of surgery -- it was a big surgery, so they had to cut

01:29PM  5    me open, put a whole new valve inside there.  They gave me one

01:29PM  6    little button.  You know, they told me every time you're in

01:29PM  7    pain, just hit that button.  And I just kept hitting the

01:29PM  8    button.

01:29PM  9    Q     So this is pain medication that's coming through the IV

01:29PM  10   while you're in the hospital and you can self-administer?

01:29PM  11   A     Yes.  Yeah, they no tell you nothing.  Just tell you if

01:29PM  12   you in pain, just hit the button.  I just kept hitting the

01:29PM  13   button, yeah.

01:29PM  14   Q     Was the surgery successful?

01:30PM  15   A     Yes.

01:30PM  16   Q     How long did you have to recover in Texas before you came

01:30PM  17   back to Hawaii?

01:30PM  18   A     Oh, not long.  Maybe -- maybe a week or something like

01:30PM  19   that.  Maybe two weeks I flew back.

01:30PM  20   Q     Were you still -- some recuperation time was still

01:30PM  21   involved?

01:30PM  22   A     Yeah, yeah, I still couldn't -- I still couldn't move.  I

01:30PM  23   couldn't even stand up.  I had fluid just leaking out of my --

01:30PM  24   my wound and stuff like that.  So...

01:30PM  25   Q     Were you prescribed pain medication for when you got home?

01:30PM  1   A    Yeah, so when I came home, that's when -- that's when I

01:30PM  2   started getting -- I went back to my regular doctor, and she

01:30PM  3   was like, Yeah, I cannot help you with this.  You're in a major

01:30PM  4   amount of pain.  You got blood leaking out your wounds every

01:30PM  5   day.  So she sent me to a -- she said, Go see a pain management

01:30PM  6   specialist.

01:30PM  7   Q    Did you do that?

01:30PM  8   A    Yeah.

01:30PM  9   Q    Where was this pain management specialist?

01:30PM  10  A    In -- in Hawaii Kai.

01:30PM  11  Q    And what did they -- what could they do for you?

01:30PM  12  A    They would look at me, like, Hey, what are you taking now?

01:31PM  13  And I shown him what I was taking.  And he was like, No, no,

01:31PM  14  you need -- you need the top one, the highest dose, you know.

01:31PM  15  So he gave me the -- right away I went from -- I went from just

01:31PM  16  taking regular Vicodin or whatever they was giving me straight

01:31PM  17  to oxy, the highest dose that you could get.

01:31PM  18  Q    Had you ever taken oxycodone before?

01:31PM  19  A    No, that was the first time.

01:31PM  20  Q    So when you say the highest dosage, do you recall the

01:31PM  21  dosage that he prescribed for you?

01:31PM  22  A    Whatever the highest dose was, the little blue ones.  The

01:31PM  23  little -- I no remember the number, but it was a little --

01:31PM  24  little blue pills.

01:31PM  25  Q    How frequently were you advised to take the pain

01:31PM   1   medication?

01:31PM   2   A    They told me take em' every two hours.  They said just

01:31PM   3   take one every two hours, but I was already -- I started off

01:31PM   4   taking one, but after that the next -- two hours after that I

01:31PM   5   was already taking two.  You know, I just went crazy from

01:31PM   6   there.

01:31PM   7            THE COURT:  Mr. Inciong, we're at the end of the trial

01:31PM   8   day.

01:31PM   9            MR. INCIONG:  Okay.  That's fine.

01:32PM  10            THE COURT:  All right.  So we're at 1:31, 1:32, and we

01:32PM  11   will take our leave for the day.

01:32PM  12            As the jurors are excused, I will remind you again to

01:32PM  13   refrain from discussing the substance of this case with anyone,

01:32PM  14   including each other, until I advise otherwise; to refrain from

01:32PM  15   accessing any media or other accounts of this case that may be

01:32PM  16   out there; and finally, please do not conduct any independent

01:32PM  17   investigation on your own into the facts, circumstances or

01:32PM  18   persons involved.

01:32PM  19            So we will see you here tomorrow morning at 8:30,

01:32PM  20   where we will resume with Mr. Miller's direct examination.

01:32PM  21            (The jury was excused at 1:32 p.m., and the following

01:32PM  22   proceedings were held in open court:)

01:33PM  23            THE COURT:  One housekeeping issue before we leave for

01:33PM  24   the day.

01:33PM  25            Mr. Inciong, in 7-23, it's an exhibit that was

01:33PM 1   admitted, and you went over it with Mr. Miller, the photo does

01:33PM 2   not match the exhibit list description.

01:33PM 3              MR. INCIONG:  7-23?

01:33PM 4              THE COURT:  Yes.

01:33PM 5              MR. INCIONG:  Okay.

01:33PM 6              THE COURT:  So 7-23 looks to be an aerial Google view

01:33PM 7   of Jefferson Elementary --

01:33PM 8              MR. INCIONG:  Right.

01:33PM 9              THE COURT:  -- in Waikiki.  The exhibit list

01:33PM 10  description says that it is Waikiki Elementary.

01:33PM 11             MR. INCIONG:  Okay.  I think we -- we swapped it out,

01:33PM 12  but we didn't change the description.  So we'll take care of

01:33PM 13  that.  Thank you, Your Honor.

01:33PM 14             THE COURT:  There will be many amendments of the

01:33PM 15  various exhibit lists.  There already have been.  So next time

01:33PM 16  you correct it, please address it.

01:33PM 17             MR. INCIONG:  I will.

01:33PM 18             THE COURT:  Thank you.

01:33PM 19             MR. INCIONG:  Thank you for bringing it up.

01:34PM 20             (Proceedings were concluded at 1:34 p.m.)

        21

        22

        23

        24

        25

```
 1                  COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3      States District Court, District of Hawaii, do hereby certify

 4      that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5      true, and correct transcript from the stenographically reported

 6      proceedings held in the above-entitled matter and that the

 7      transcript page format is in conformance with the regulations

 8      of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, March 29, 2024.

11

12

13                                    /s/ Gloria T. Bediamol

14                                    GLORIA T. BEDIAMOL.

15                                    RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```