1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3
      UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                  )
                  Plaintiff,       )      Honolulu, Hawaii
5                                  )
            vs.                    )      January 24, 2024
6                                  )
      MICHAEL J. MISKE, JR.,       )      TESTIMONY OF PRESTON KIMOTO
7                                  )
                  Defendant.       )
8     _____ )

9
                    PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 11)
10                    BEFORE THE HONORABLE DERRICK K. WATSON,
                    CHIEF UNITED STATES DISTRICT COURT JUDGE
11
      APPEARANCES:
12
      For the Plaintiff:              MARK INCIONG, ESQ.
13                                    MICHAEL DAVID NAMMAR, ESQ
                                      WILLIAM KE AUPUNI AKINA, ESQ.
14                                    AISLINN AFFINITO, ESQ.
                                      Office of the United States Attorney
15                                    PJKK Federal Building
                                      300 Ala Moana Boulevard, Suite 6100
16                                    Honolulu, Hawaii  96850

17    For the Defendant:             LYNN E. PANAGAKOS, ESQ.
                                      841 Bishop St., Ste 2201
18                                    Honolulu, HI 96813

19                                    MICHAEL JEROME KENNEDY, ESQ.
                                      Law Offices of Michael Jerome
20                                    Kennedy, PLLC
                                      333 Flint Street
21                                    Reno, NV 89501

22    Official Court Reporter:       Gloria T. Bediamol, RPR RMR CRR FCRR
                                      United States District Court
23                                    300 Ala Moana Boulevard
                                      Honolulu, Hawaii 96850
24
        Proceedings recorded by machine shorthand, transcript produced
25      with computer-aided transcription (CAT).

1                           I N D E X

2    GOVERNMENT WITNESS:                              PAGE NO.

3

     PRESTON KIMOTO
4
         DIRECT EXAMINATION BY MR. AKINA              4
5        VOIR DIRE EXAMINATION BY MR. KENNEDY         49
         RESUMED DIRECT EXAMINATION BY MR. AKINA      51
6

7    EXHIBITS:                                        PAGE NO.

8    Exhibit 1-43 was received in evidence            24
     Exhibit 5-3 was received in evidence             27
9    Exhibit 1-42 was received in evidence            39
     Exhibit 5-2 was received in evidence             41
10   Exhibit 5-22 was received in evidence            42
     Exhibits 1-778 and 1-779 were received in evidence  45
11   Exhibit 1-571 was received in evidence           47
     Exhibit 1-41 was received in evidence            65
12   Exhibit 1-40 was received in evidence            67
     Exhibits 5-38 and 5-39 were received in evidence  73
13   Exhibit 1-765 was received in evidence           79
     Exhibit 9-478 was received in evidence           85
14   Exhibits 9-475 through 9-477 were received in    87
     evidence
15   Exhibits 9-241 through 9-245 and 9-593 were      96
     received in evidence
16   Exhibit 9-568 was received in evidence           103

17

18

19

20

21

22

23

24

25

```
 1   January 24, 2024                              10:50 a.m.
 2              THE CLERK:  Criminal Number 19-00099-DKW-KJM, United
 3   States of America versus Defendant (01) Michael J. Miske, Jr.
 4              This case has been called for jury trial, Day 11.
 5              Counsel, please make your appearances for the record.
 6              MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,
 7   Michael Nammar and KeAupuni Akina for the United States.  Kari
 8   Sherman and Special Agent Thomas Palmer are also present.
 9              THE COURT:  All right.  Good morning to all five of
10   you.
11              MR. KENNEDY:  Good morning, Your Honor.
12              THE COURT:  Good morning.
13              MR. KENNEDY:  Michael Kennedy, here with Lynn
14   Panagakos, Michael Miske and Ashley King.
15              THE COURT:  All right.  Good morning as well.  You may
16   be seated.
17                            --oo0oo--
18              THE COURT:  Please swear the witness.
19              THE CLERK:  Please raise your right hand.
20                        PRESTON KIMOTO,
21   called as a witness, having been first duly sworn, was examined
22   and testified as follows:
23              THE CLERK:  Please state your full name, spelling your
24   last name for the record.
25              THE WITNESS:  Preston Kimoto, K-I-M-O-T-O.
```

```
            1              MR. AKINA:  May I proceed, Your Honor?

            2              THE COURT:  Yes, you may.

            3              MR. AKINA:  Thank you.

            4                        DIRECT EXAMINATION

10:52AM     5   BY MR. AKINA:

            6   Q    Good morning, Mr. Kimoto.

            7   A    Good morning.

            8   Q    Could you tell the jury how old you are?

            9   A    I'm 45 years old.

10:52AM    10   Q    And can you go over your educational background?

           11   A    I graduated from Kaimuki High School and completed a few

           12   years of community college.

           13   Q    Did you graduate with a degree from college?

           14   A    No.

10:52AM    15   Q    And currently where are you housed?

           16   A    FDC Honolulu.

           17   Q    The detention center?

           18   A    Yes.

           19   Q    Is that why you're dressed the way you are?

10:52AM    20   A    Yes.

           21   Q    Do you know an individual named Michael Miske?

           22   A    Yes.

           23   Q    How long -- when did you first meet that person

           24   approximately?

10:52AM    25   A    I met Mike back in 2015.
```

1    Q    And do you know if he goes by any other nicknames?

2    A    Bro.

3    Q    Can you describe -- oh, before I go there, do you see

4    Mr. Miske here in the courtroom today?

10:53AM   5    A    Yes.

6    Q    Can you identify him by something that he's wearing?

7    A    He's wearing a gray shirt.

8         MR. AKINA:  Let the record reflect the witness has

9    identified the defendant.

10:53AM   10        THE COURT:  The record should reflect Mr. Kimoto's

11   identification of the defendant Mr. Miske.

12   BY MR. AKINA:

13   Q    Now, after meeting the defendant in 2015, what type of

14   relationship did you have with him?

10:53AM   15   A    We had a working relationship, and then it continued on to

16   being close friends.

17   Q    When you say "a working relationship," were you employed

18   by him?

19   A    Yes, I was employed at Kama'aina Termite and Pest Control.

10:53AM   20   Q    Was that the only company that you did work at with

21   regards to the defendant?

22   A    No, I -- I did work for most of the companies that Mike

23   owned.

24   Q    Okay, so let's go through this.  Can you tell us sort of

10:54AM   25   sequentially the different companies that you worked at with

```
         1    regard to the defendant?
         2    A    I started off at Kama'aina Termite and Pest Control.  Then
         3    from there I did work for Hawaii Partners buying and selling
         4    cars.  From there I went back to Kama'aina Termite and Pest
10:54AM  5    Control, and ended up after the kama- -- after that second
         6    stint at Kama'aina, I worked at Oahu Termite and Pest Control.
         7    Q    And you met the defendant in 2015.  Does that mean you
         8    started at Kama'aina Termite and Pest Control the first time in
         9    2015?
10:54AM  10   A    That's correct.
         11   Q    Now, during -- beyond Kama'aina Termite and Pest Control,
         12   Hawaii Partners and O'ahu Termite and Pest Control, did you do
         13   any work related to any other companies, businesses?
         14   A    I helped out at Makana Pacific.  I helped out at the solar
10:55AM  15   company, the plumbing company also.
         16   Q    And the solar company, what's that called?
         17   A    I don't remember.
         18   Q    And what about the plumbing company?
         19   A    Kama'aina Plumbing.
10:55AM  20   Q    And when you say that you helped out, did you receive any
         21   income related to your work at those two, the plumbing and the
         22   solar companies?
         23   A    The plumbing and solar company, I got referral checks.  So
         24   if I referred customers to them, and they sold a product, solar
10:55AM  25   or water heaters to that customer, then I would get a check --
```

         1    a referral check from the those companies.

         2    Q    Okay.  So just very generally, the type -- what was the

         3    type of work that you did at the plumbing -- relating to the

         4    plumbing and the solar companies?

10:55AM  5    A    Just referring business.

         6    Q    So sales?

         7    A    Correct.

         8    Q    And then is that different from the way that you're paid

         9    through Kama'aina Termite, Oahu Termite, and Hawaii Partners?

10:56AM  10   A    Yes.  When I -- when I started at Kama'aina Termite, I got

         11   a salary, and when I changed over to sales, I got a commission

         12   on what I sold.

         13   Q    And where were each of these businesses located, which

         14   state?

10:56AM  15   A    Hawaii.

         16   Q    And during the time that you were working there, who was

         17   the owner of each of those businesses?

         18   A    Michael Miske.

         19   Q    Did you do errands regarding any other business ventures?

10:56AM  20   A    I did errands for Hawaii Partners.  I did errands for

         21   Mike.  I did errands for the fishing boat, the Rachel.

         22   Q    When you say -- or when we're talking about errands,

         23   what's the nature of those errands that you would run?

         24   A    Picking up, dropping off things.  Just general.

10:57AM  25   Q    Can you give some examples of things that you would pick

```
 1  up and drop off?

 2  A    Supplies.  I would pick up, drop off a payment.

 3  Q    And when you first started off at Kama'aina Termite the

 4  first time, what was your role there?

 5  A    I did inside sales.  So I would call -- I would call

 6  AOAOs, townhouse and condominium associations, to inquire if

 7  they wanted pest control for their properties.

 8  Q    And over the time period that you worked for the

 9  defendant, did the nature of the responsibilities, the level of

10  responsibility that you had at any particular company change?

11  A    Yes.

12  Q    Describe that.

13  A    I would -- I would go and purchase with purchase cards

14  with Mike.  I would run -- also pay people from my pocket and

15  get reimbursed by Mike.

16  Q    And as far as level of responsibility, did you have any

17  role in running the overall companies, specifically the

18  fumigation, Kama'aina Termite and O'ahu Termite and Pest

19  Control?

20  A    Yes, I did help Mike run those companies.

21  Q    So fair to say your responsibilities increased over time?

22  A    Yes, it did increase.

23  Q    In total, after 2015, approximately how many years did you

24  work for the defendant at any of his various companies?

25  A    I worked from 2015 -- January 2015 all the way up until my
```

10:57AM (line 5)
10:57AM (line 10)
10:58AM (line 15)
10:58AM (line 20)
10:58AM (line 25)

1    arrest in July 2020.

2    Q     And for each of the companies that you worked at, was it a

3    clean break?  So, for example, did you go from Kama'aina

4    Termite, and then stop, and then go to Hawaii Partners, and

10:59AM    5    when you went to Hawaii Partners, you had nothing to do with

6    Kama'aina Termite?

7    A     No.  It was all intertwined where whatever that day called

8    for, that's what I would help out.

9    Q     So would you -- would there be instances where you would

10:59AM    10    be doing work on multiple -- for multiple different companies

11    in the same time frame?

12    A     Yes.

13    Q     Now, you mentioned that you were arrested in 2020.  Did

14    you eventually plead guilty to anything?

10:59AM    15    A     Yes, I plead -- I pled guilty to kidnapping conspiracy.

16    Q     So I'll focus -- let's focus on that.  Directing you to

17    the summer of 2017, did you know an individual by the name of

18    Annie Edwards?

19    A     Yes, but I knew her as Sunny Kim.

11:00AM    20    Q     She goes by both names as far as you know?

21    A     Yes.

22    Q     So if I refer to her as Ms. Kim, will you understand who

23    I'm referring to?

24    A     Yes.

11:00AM    25    Q     Now, in that summer of 2017, which company were you

```
     1   primarily working at?
     2   A    I was primary working at Kama'aina Termite and Pest
     3   Control.
     4   Q    And what type of company is that?
11:00AM   5   A    That's a termite and pest control company.
     6   Q    And did you have any contact with Ms. Kim in that time
     7   frame, summer of 2017?
     8   A    Yes, I did.
     9   Q    Can you describe that?
11:00AM  10   A    She had contacted me because she needed fumigation
    11   services done on her home.  So we decided to make -- meet over
    12   lunch, and we -- we could catch up because we haven't -- we
    13   didn't talk for a while.  So we met up at a restaurant in
    14   Kaka'ako to discuss fumigation and also to catch up.
11:01AM  15   Q    Did you know Ms. Kim prior to her reaching out for
    16   fumigation services?
    17   A    Yes.
    18   Q    How -- how did you know her?
    19   A    I met her through mutual friends.
11:01AM  20   Q    And during this meeting when you met with her in Kaka'ako,
    21   what was -- what are some of the things that were discussed?
    22   A    We just caught up on the years that we haven't seen each
    23   other and talked.  And then from there we talked about the
    24   fumigation for her home and asked if -- and made arrangements
11:01AM  25   for me to go to her house to do measurements so I could give
```

1    her an estimate.

2    Q    Did you -- after that meeting did you then go to her home

3    to -- for estimates on a fumigation job?

4    A    Yes, I did.

11:02AM    5    Q    And when you went to her home, what happened there?

6    A    Well, prior to that, the other thing that we discussed,

7    she had mentioned that there was an accountant that had stole

8    money from her dad, and she had asked me if I could help out

9    with that, if I knew somebody who could help out with that.

11:02AM    10    Q    So this a request from Ms. Kim that came at the first

11    meeting at Kaka'ako?

12    A    Yes.

13    Q    And explain a little bit more about what Ms. Kim told you

14    as far as the nature of why this money needed to be recovered.

11:02AM    15    A    She said that her dad's accountant had stolen a large sum

16    of money from her dad, embezzled a large sum of money from her

17    dad, and that they couldn't get -- and legally they couldn't

18    get any money back from him.

19    Q    Okay.  And you said they couldn't get money back legally

11:03AM    20    from him.  So the "they" is who?

21    A    Is Mr. Kim and Sunny and Ms. --

22    Q    Who is Mr. Kim?

23    A    Mr. Kim is Sunnie's father.

24    Q    Okay.  So Sunnie's -- so Ms. Kim and her father Mr. Kim

11:03AM    25    could not legally get money from the accountant.  Is that what

1   she told you?

2   A      Yes.

3   Q      And what did she ask after that?

4   A      She asked if I had -- if I knew somebody who could help

11:03AM   5   them out with collecting that debt that was owed to her father.

6   Q      And how did you respond?

7   A      I told her that I could, I could ask somebody.

8   Q      And was a price for the service -- you know, the cost to

9   help recover this debt, was that discussed?

11:03AM   10   A      I -- I did mention that it would be 50 percent.

11   Q      And what do you mean by 50 percent?

12   A      That she -- whatever that -- whatever was recovered, the

13   person recovering that money would take out 50 percent of

14   whatever they collected.

11:04AM   15   Q      And how did you come up with 50 percent?

16   A      Because that was the normal going rate if -- because I

17   gambled, so if somebody was going to collect money from

18   anybody, if they had to send collectors to pick it up, to

19   collect the money, they would normally take out 50 percent of

11:04AM   20   whatever they collected.

21   Q      So like you said, that was the going rate to collect a

22   debt in, I guess, nonlegal means?

23   A      Correct.

24   Q      And at this point did -- was a kidnapping discussed at

11:04AM   25   this point?

```
        1    A    No, a kidnapping was not discussed.

        2    Q    And when you said that you had a friend, who did you have

        3    in mind?

        4    A    Mike.

11:05AM 5    Q    Did you convey that to Ms. Kim at this meeting?

        6    A    No, I did not.

        7    Q    And after you told Ms. Kim that the fee would be

        8    50 percent, how did she respond?

        9    A    She said that that was fine, because they couldn't collect

11:05AM 10   anything anyway.

        11   Q    What happened next?

        12   A    Next I -- we set up an appointment for me to go over to

        13   her home to give her -- to measure her home and give her an

        14   estimate of what it was going to cost for the fumigation.  From

11:05AM 15   there she signed -- she signed the agreement, and we scheduled

        16   a date for her home to get fumigated.

        17   Q    And just to be clear, which company was providing -- was

        18   supposed to provide these fumigation services?

        19   A    Kama'aina Termite and Pest Control.

11:05AM 20   Q    What happened after that -- what happened at that meeting?

        21   A    At that meeting I let her know that my friend said, yeah,

        22   he could -- he could go talk to that person.

        23   Q    Okay.  So in between these two meetings, the one in

        24   Kaka'ako and then when you went to Ms. Kim's home, did you talk

11:06AM 25   to anyone about her proposition to help collect the debt?
```

```
        1   A     Yes.  After meeting with Sunny at the restaurant, later

        2   that day I went back to the shop and I -- I asked Mike if he

        3   could help my friend out and go talk to this person.

        4   Q     When you say "the shop," where are you referring to?

11:06AM 5   A     The shop was Kama'aina Termite and Pest Control.

        6   Q     Like the business office?

        7   A     Yes.

        8   Q     And generally where is that located?

        9   A     On Queen and Ward.

11:06AM 10  Q     So is that in Downtown Honolulu?

        11  A     Yes.

        12  Q     And when you say "Mike," who are you referring to, to be

        13  specific?

        14  A     Michael Miske.

11:06AM 15  Q     And what did you tell Michael Miske, the defendant?

        16  A     I asked him if he could help out my friend with this debt

        17  that was owed to her father, and if he can go and talk to this

        18  person.

        19  Q     And how did he respond?

11:07AM 20  A     He said yes.

        21  Q     Was anything else discussed as far as recovery of the debt

        22  at that first discussion with the defendant?

        23  A     No.

        24  Q     And then what did you do after that?

11:07AM 25  A     So Sunny got her home tented.  There was some -- there
```

```
          1   was -- I guess some stuff had needed to get fixed because the
          2   fumigation broke some of -- some of the items that she wasn't
          3   happy with.  So when we sent over a handyman to fix what needed
          4   to be fixed, and then I went back after the handyman went, I
11:07AM   5   went back and went to go check if all the fix -- everything
          6   that needed to be fixed was fixed.  And from there I let her
          7   know that -- that Mike said -- that Mike said okay to it, and
          8   then she handed me a Post-it with the information.
          9   Q    Okay.  What was on -- what information was on that Post-it
11:08AM  10   note?
         11   A    It was the person's name, his phone number, and an amount
         12   that was -- that was owed.
         13   Q    And did you keep that Post-it?
         14   A    I didn't keep that Post-it.  From -- from after leaving
11:08AM  15   Sunnie's home, I went back to the shop to Kama'aina Termite and
         16   Pest Control, and I put that Post-it on Mike's computer on his
         17   desk.
         18   Q    And do you know what happened -- did you ever see that
         19   Post-it again after that?
11:08AM  20   A    I did not see the Post-it again after that.
         21   Q    Now, do you remember the name that she wrote on the
         22   Post-it?
         23   A    I don't remember the name.  I -- I just looked -- I just
         24   glanced at it and I saw the number that was written, the amount
11:09AM  25   that was owed, and that's pretty much the only thing that I
```

```
 1   remember seeing.
 2   Q    What was the amount that was written?
 3   A    Nine -- it wasn't -- it was 900-something thousand, closer
 4   to a million dollars.
 5   Q    Was it a -- just a flat number or was it -- did it have
 6   cents involved?
 7   A    No, it was to the cent.
 8   Q    It was to the cent?
 9   A    It was to the cent.
10   Q    And you said that it was somewhere between 900,000 and
11   closer to a million dollars?
12   A    Correct.
13   Q    You don't remember the exact dollar number that was
14   written out?
15   A    I do not remember the exact dollar that was written out.
16   Q    After you left that Post-it in the defendant's office, did
17   you do anything to confirm that he got that Post-it?
18   A    Yes, later on that day when I met up with Mike at the
19   office, I asked him if he had gotten the Post-it that I left on
20   his desk, and he said yes.
21   Q    And what happened next after he confirmed that he got the
22   Post-it?  Did you discuss anything about the Post-it?
23   A    Mike just asked me if that number on the Post-it was
24   correct, and I said, That's what she -- that's what she wrote,
25   and so I'm assuming it's -- it's correct.
```

```
 1    Q    And while you were confirming this information with the
 2    defendant, did he at any point ask to speak to Ms. Kim?
 3    A    No.
 4    Q    Did he ask for any verification of the debt?
 5    A    No.
 6    Q    So as far as you knew, where was all the information that
 7    the defendant had regarding this debt, where did that come
 8    from?
 9    A    That came from Sunny and myself.
10    Q    Regarding the collection of this debt, do you know if
11    Ms. Kim had conversations directly with the defendant?
12    A    No, she did not have conversations directly with Mike.
13    Q    So the -- so information went from Ms. Kim to you to the
14    defendant?
15    A    Yes.
16    Q    After you confirmed the amount with the defendant,
17    what did he -- did he say anything else?
18    A    No.
19    Q    So what was your understanding after that point?
20    A    That he was going to go and talk to --
21    Q    Why did you think he was going to talk to this person?
22    A    Because that's what I asked him to do.
23    Q    And did the defendant agree to do that?
24    A    Yes.
25    Q    At this point had a kidnapping been discussed?
```

```
 1   A    No.
 2   Q    Did anything happen immediately after that regarding the
 3   collection of this debt?
 4   A    No.  There was a few weeks that went by, but there was
11:12AM   5   nothing that immediately happened after.
 6   Q    I'm going to direct your attention to October 17, 2017.
 7   Did you have any further discussions that day regarding this?
 8   A    Yes, in the evening.
 9   Q    Tell us what happened.
11:12AM  10   A    On that date, we -- it was a normal day, and at the end of
11   the day I would normally go back to the office and hang out and
12   talk with Mike on how the day went.  So we went -- I went back
13   to the office, me and Mike were talking about the day, how
14   it -- like how it -- how it went, and then we decided to go to
11:12AM  15   the gym.
16   Q    And before you go forward, I apologize for jumping around,
17   between these two dates from when you last spoke to the
18   defendant about and he said that -- he indicated that he would
19   go talk to this individual, the accountant --
11:13AM  20   A    Yes.
21   Q    -- and this date where the defendant is saying, Let's go
22   to the gym, did you do anything to determine the identity of
23   that individual?
24   A    Yes.
11:13AM  25   Q    What did you do?
```

1    A     One after- -- one afternoon I was -- I was in my truck in

2    the parking lot, in the Ward parking lot that I normally park

3    at, and I -- I seen the accountant -- or I thought I seen him,

4    and I took a picture of him, and I sent that picture to Sunny

11:13AM   5    to ask if this was the person that stole from her dad.

6    Q     And was that the person, according to her?

7    A     She confirmed that that was the person, and that he

8    normally frequents a restaurant in that area.

9    Q     And about how far is that restaurant from where the

11:14AM   10   Kama'aina Termite and Pest Control office is?

11   A     That restaurant is like one building away.

12   Q     Do you remember the name of that restaurant?

13   A     Asahi Grill.

14   Q     And after you got confirmation from Ms. Kim that this is

11:14AM   15   the individual, this is the accountant who you had taken a

16   picture of, what did you do, if anything?

17   A     It wasn't a good picture that I -- that I took to send to

18   her.  So I -- I went into the restaurant and I took another

19   picture of that person.

11:14AM   20   Q     So you followed the accountant into the restaurant?

21   A     Yes.

22   Q     And after you took a picture of him, what did you do?

23   A     I then went back to the office, to Kama'aina Termite and

24   Pest Control, and I showed -- I showed -- Mike was there and I

11:14AM   25   showed him the picture.

1   Q    And did you just show him the picture or did you say

2   anything?

3   A    I showed him the picture and I said, Oh, this -- I said,

4   This is the person, the accountant, what he looks like.

11:15AM   5   Q    And was anything else discussed at that point?

6   A    No.

7   Q    When's the -- what's the next thing that happened in

8   this -- relating to this debt?

9   A    The next thing that happened was -- so on October 17th, we

11:15AM  10   were at the shop like we normally are after hours and we were

11   talking.  We decided to go to the gym, so we went -- we drove

12   to the gym, the Honolulu Club, and when we got to -- after we

13   parked and we got to the elevator, Mike told me that we had to

14   go back to the shop.

11:15AM  15   Q    Okay.  So when you say, "We went to the gym," who is "we"?

16   A    Myself and Mike.

17   Q    And then the defendant said that he had to go back to the

18   shop, meaning Kama'aina Termite?

19   A    Yeah, that we had to go back to the shop now.

11:16AM  20   Q    And did you go to the shop with him?

21   A    Yes.  So we -- we left -- we left the gym parking lot, and

22   we went back to Kama'aina Termite and Pest Control.

23   Q    And what happened after you got to Kama'aina Termite and

24   Pest Control?

11:16AM  25   A    We -- I entered Mike's office, and Mike has a clear board

1    in his office in back of his desk, and he was writing on the

2    clear board and whispering saying that they have -- they have

3    the accountant, and what does your -- what does your friend

4    want to do.

11:16AM   5    Q    You said he was writing on a clear board.  Do you recall

6    the exact words that were written on the clear board?

7    A    I don't recall the exact words that were written on the

8    clear board.

9    Q    And what was the gist of what was written?

11:17AM   10   A    That the -- that they had -- that Wayne Miller had the

11   person, and he doesn't -- he doesn't -- he doesn't have the --

12   he's saying that he doesn't owe the money.  So what do we --

13   what does my friend want -- want to do now.

14   Q    And this was the defendant relaying this information to

11:17AM   15   you?

16   A    Correct.

17   Q    You mentioned that the defendant was whispering when he

18   told you that they had the accountant.  Is that normal for the

19   defendant to whisper in his office at that time period?

11:17AM   20   A    No.

21   Q    Did you know why he was whisper?

22        MR. KENNEDY:  Objection.  Speculation.

23        MR. NAMMAR:  I'm just asking if he knows.

24        THE COURT:  Overruled.

11:17AM   25        THE WITNESS:  I'm sorry?

1    BY MR. AKINA:

2    Q    Did you know why the defendant was whispering?

3    A    He was whispering because this was something that we

4    didn't -- that he didn't want to be said out loud just in case

11:18AM    5    he -- his office was bugged.

6    Q    Had you had discussions regarding that in the past up to

7    this point?

8    A    About his office being bugged?

9    Q    Being bugged.

11:18AM    10    A    Yeah, it was brought up.

11    Q    By who?

12    A    It was brought up that it might -- that the whole office

13    and --

14    Q    Well, who brought it up, before you get into the

11:18AM    15    specifics?

16    A    Mike.

17    Q    Okay.  So prior to this date, in the past the defendant

18    had brought up that the office might be bugged?

19    A    Yes.

11:18AM    20    Q    And generally, what did he tell you?

21    A    It -- it was kind of like in a joking -- a joking way

22    that he --

23    Q    And -- and when you say "bugged," what do you mean by

24    "bugged"?

11:18AM    25    A    I mean that law enforcement had put listening devices.

1   Q   So the defendant tells you that Wayne Miller has the

2   accountant.   Who is Wayne Miller?

3   A   Wayne Miller is Mike's friend.

4   Q   And had you -- did you know who Wayne Miller was at that

11:19AM   5   point?

6   A   Yes.

7   Q   And when you said that the defendant told that you Wayne

8   Miller has him and he's saying that he doesn't have the money,

9   what did that mean?

11:19AM   10   A   At that point I -- I was in shock that -- I didn't know

11   what had transpired, because my understanding was that Mike was

12   going to go and talk to him, not kidnap the person.

13   Q   And when you say "talk to him," are you referring to the

14   accountant?

11:19AM   15   A   Yes.

16   Q   And so was it your understanding that Wayne Miller had the

17   accountant, and the accountant was saying that he didn't have

18   the money?

19   A   Yes.

11:19AM   20   Q   I want to show you Exhibit 1-43.   It's not in evidence

21   yet.

22       Do you recognize who this picture is of?

23   A   Yes.

24   Q   Who is this a picture of?

11:20AM   25   A   Wayne Miller.

```
 1   Q    Is this a fair and accurate depiction of how Wayne Miller
 2   looked around the time of 2017 back then?
 3   A    Yes.
 4         MR. AKINA:  At this point I would move 1-43 into
 5   evidence.
 6         THE COURT:  Any objection?
 7         MR. KENNEDY:  No objection.
 8         THE COURT:  Without objection, 1-43 is admitted.  You
 9   may publish.
10         (Exhibit 1-43 was received in evidence.)
11         MR. AKINA:  We can publish.  Thank you.
12   BY MR. AKINA:
13   Q    So what did you do after the defendant asked you, Okay,
14   what does your friend want to do?
15   A    Wayne had actually pulled into the shop at that time.
16   Q    And then what happened?
17   A    And then Wayne -- Wayne came out and he came out of the
18   car, he greeted me and Mike, and he said -- he said that the
19   guy doesn't -- the guy doesn't have the money.  He said he
20   doesn't owe the money.
21   Q    And what happened next?
22   A    Then Mike had looked at Wayne and asked him -- oh, he said
23   that, Is the guy -- or he said, The guy better not be in the
24   fucking trunk.
25   Q    And what happened after he said that?
```

        1    A    Well, he said that because Wayne drove into the shop in a

        2    light color sedan.  So when -- when he said that, Wayne said,

        3    He's not in the trunk.  And Mike -- and Mike made him open the

        4    trunk to prove that that person wasn't in the trunk of the car.

11:21AM    5    Q    And was there anyone in the trunk of that car?

        6    A    There -- there wasn't anybody in the trunk of the car.

        7    Q    Did Wayne Miller tell you anything that he had done to try

        8    to get the money?

        9    A    Wayne said that they had assaulted the person, and that he

11:22AM   10    kept saying that he didn't have the money.  And then he made a

       11    joke and said that, If that was me or Mike, and we would

       12    have had -- I mean, and we had the money, we would have gave up

       13    the money.

       14    Q    And when you said that joke, who was he saying that to?

11:22AM   15    A    He -- he was referring to myself and Mike.

       16    Q    Okay.  And who was present when he -- when Wayne Miller

       17    made that joke?

       18    A    Myself, Mike and Wayne.

       19    Q    Can you describe what the -- sort of the general

11:22AM   20    atmosphere, the demeanor was between the three of you at this

       21    point?

       22    A    It -- it was -- it was normal, I guess.  And it wasn't --

       23    I mean I -- I was still in shock, but I -- I mean it happened.

       24    It happened.  So I had to go -- Sunny had texted me back

11:23AM   25    because I texted her prior to meet up -- once I found out, I

         1    texted her to ask her if we could meet up that evening.

         2    Q     And did you eventually meet with Ms. Kim?

         3    A     Yes, so I left Mike and Wayne at the shop, and I went to

         4    go meet Sunny.

11:23AM  5    Q     Where did you meet her?

         6    A     I met her at Sheridan Park.

         7    Q     Where is Sheridan Park located generally?

         8    A     Sheridan Park is on Sheridan Street.  Sheridan, I guess in

         9    the Ala Moana area.

11:23AM  10          MR. AKINA:  And could we show Exhibit 5-3.  This is

        11    not in evidence.

        12    BY MR. AKINA:

        13    Q     Do you recognize this?

        14    A     Yes.

11:24AM  15    Q     What is this?

        16    A     This is a map of the area.

        17    Q     And you see that red dot off to the right-hand side?

        18    A     Yes.

        19    Q     What does that depict?

11:24AM  20    A     Sheridan Park.

        21    Q     Is this a fair and accurate map showing where Sheridan

        22    Park was in relation to the Honolulu area at that time?

        23    A     Yes.

        24          MR. AKINA:  Permission to -- well, at this point I

11:24AM  25    offer 5-3 into evidence, Your Honor.

```
              1              THE COURT:  Any objection?

              2              MR. KENNEDY:  No objection.

              3              THE COURT:  Without objection, 5-3 is admitted, and

              4   yes, you may publish.

11:24AM       5              (Exhibit 5-3 was received in evidence.)

              6   BY MR. AKINA:

              7   Q    So you see I've read that.  For the benefit of the jury,

              8   that says "Sheridan Community Park" next to it.  Do you see

              9   that?

11:24AM      10   A    Yes.

             11   Q    Is that the park that you went to to meet Ms. Kim?

             12   A    Yes.

             13   Q    And about how far is that from the Kama'aina office --

             14   Kama'aina Termite and Pest Control office?

11:24AM      15   A    A few minutes.  Five -- five, ten minutes away.

             16   Q    That's if you're driving or walking?

             17   A    If I'm driving, it's -- like it's five minutes away.

             18   Q    And you see the long street going from Ala Moana Boulevard

             19   all the way up to the top of the screen that passes by Sheridan

11:25AM      20   Community Park?

             21   A    Yes.

             22   Q    Do you know the name of that street?

             23   A    Piikoi.

             24   Q    And the cross street at the bottom of Sheridan Community

11:25AM      25   Park, what is that?
```

1    A      Rycroft.

2    Q      So when you went to meet with Ms. Kim, what did you

3    discuss with her?

4    A      I told her that they had kidnapped the person and that he

11:25AM   5    got assaulted, and he's saying that he doesn't owe your father

6    the money.

7    Q      And at this point had you seen the accountant after his

8    having been kidnapped?

9    A      No.

11:25AM   10   Q      So you -- when you said -- when you told Ms. Kim that he

11   had been assaulted, that was based on information you received

12   from someone?

13   A      That was based on what Wayne and Mike said.

14   Q      And how did Ms. Kim respond?

11:26AM   15   A      She said that she had to -- she stepped away, she said

16   that she had to talk to her father.

17   Q      And what happened after that?

18   A      When -- when she took a few minutes to talk to her father,

19   she came back and she had -- she said that her father asked how

11:26AM   20   much it would be to kill the accountant.

21   Q      And how was that relayed to -- that request to kill the

22   accountant?

23   A      She made a slashing gesture to her neck.

24   Q      Okay.  So like a hand across her neck horizontally?

11:26AM   25   A      Correct.

1  Q   You took that to mean -- what did you take that to mean?

2  A   That they wanted to kill that accountant.

3  Q   How did you respond?

4  A   I told her, Absolutely not.

11:26AM  5  Q   What happened next?

6  A   Then she asked if the person who had -- had the accountant

7  could try harder because he does -- he does have the money.

8  Q   So what did you do then after she said that?

9  A   I told her, Okay.  Then I went -- I went back to the shop,

11:27AM  10  to Kama'aina Termite and Pest Control.

11  Q   So now you're back at Kama'aina Termite and Pest Control,

12  and who is there that you met with?

13  A   Mike is there.

14  Q   So just you and the defendant?

11:27AM  15  A   Yes.

16  Q   And what did you tell the defendant?

17  A   I had -- I told Mike that what she first -- what she first

18  said about how much -- I mean that they wanted to kill the

19  accountant.

11:27AM  20  Q   How did the defendant respond?

21  A   Mike said no.  And he said no because other people

22  might -- might have to follow.

23  Q   What did you take that to mean?

24  A   That other people -- the people that are witnesses to this

11:27AM  25  kidnapping, if they kill that accountant, that they would be

1    next.

2    Q    Did you understand that also included yourself and Wayne

3    Miller who would have to be killed if the accountant was

4    killed?

11:28AM   5    A    I didn't think he was referring to Wayne, but he was

6    referring to any witnesses.  So...

7    Q    What about yourself?

8    A    Even if -- even if I was trusted, nobody wants -- he

9    wouldn't want to leave anybody to be witness.

11:28AM  10    Q    Did you believe yourself to be trusted at that point by

11    the defendant?

12    A    Yes.

13    Q    And you mentioned that you didn't think he was referring

14    to Wayne who would have to be taken care of.  Why is that?

11:28AM  15    A    Because Wayne would probably be the one doing it.

16    Q    Now, what happened after you discussed that -- that

17    request to kill the accountant?

18    A    What happened next was I told Mike that what -- what Sunny

19    had said, that just to ask Wayne to try harder because the

11:29AM  20    accountant does have the money.

21    Q    And then what happened?

22    A    Mike said, Okay.  Then before leaving Kama'aina Termite

23    and Pest Control, Mike had said to not -- to not be in contact

24    with Wayne.

11:29AM  25    Q    Did he tell you why he didn't want you to contact Wayne

```
       1   Miller after that?
       2   A    He said that Wayne is dangerous.
       3   Q    Was there a decision made about what to do with the
       4   accountant?
11:29AM 5  A    Not at that -- not at that point.
       6   Q    So after you -- after this, did you leave the Kama'aina
       7   Termite and Pest Control shop?
       8   A    Yes, I left Kama'aina Termite and Pest Control.  I went
       9   home, but on my way home Wayne kept texting me and asking --
11:30AM 10 asking me -- or he texted me, and then he asked me if I could
      11   get money from my friend.
      12   Q    And what happened after -- after he started texting you --
      13   after Wayne Miller started texting you?
      14   A    Wayne wanted to meet up with me in person, but I was
11:30AM 15 already -- I was already at home, I told him.  And then he was
      16   persistent on wanting to meet up.  So I didn't want Wayne to
      17   come to my house where my family -- where my family was, so I
      18   went and I met Wayne at Sheridan Park.
      19   Q    That's the same park you met with Ms. Kim at?
11:30AM 20 A    Yes.
      21   Q    And what happened at Sheridan Park with Wayne Miller?
      22   A    He -- he jumped in my car and we rode around the Kaka'ako
      23   area, and he was asking me to ask my friend and her dad if
      24   they -- if they could pay -- pay them some money.
11:31AM 25 Q    Did Wayne Miller tell you why he was asking you for money?
```

1    A    He said that he had to take care of his friend that helped

2    him and also for the vehicle that they had used.

3    Q    Why did he need money for the vehicle?

4    A    Because they would have to get rid of the vehicle.

11:31AM   5    Q    Did he indicate to you how he planned on getting rid of

6    the vehicle?

7    A    No, he did not.

8    Q    Do you know who the friend was -- at that time did you

9    know who the friend was?

11:31AM   10   A    No.

11   Q    Okay.  And what happened after driving around with Wayne

12   Miller?

13   A    After driving around with Wayne, I -- for 30 to

14   40 minutes, I dropped him off by Fisherman's Wharf.

11:31AM   15   Q    And then what happened next?

16   A    Then I went home.  I went home, and the next -- the

17   following day Wayne kept texting me asking me if I had asked my

18   friend for -- for anything, for any money.

19   Q    Now, the defendant had told you not to talk to Wayne

11:32AM   20   Miller, right?

21   A    Correct.

22   Q    And you talked to Wayne Miller.

23   A    Yes.

24   Q    Did you tell the defendant that Wayne Miller was talking

11:32AM   25   to you?

| | | |
|---|---|---|
| | 1 | A      Yeah, the day after I notified Mike that Wayne -- that |
| | 2 | Wayne kept asking me for some kind of payment for my friend. |
| | 3 | Q      And what happened after that? |
| | 4 | A      Then Mike told me to make a -- arrange a meeting with |
| 11:32AM | 5 | Wayne and that he would accompany me to the meeting. |
| | 6 | Q      And where did this meeting take place? |
| | 7 | A      This meeting took place by Fisherman's Wharf. |
| | 8 | Q      And who was at this meeting? |
| | 9 | A      Myself, Mike, and Wayne Miller. |
| 11:33AM | 10 | Q      What was discussed at that meeting? |
| | 11 | A      Mike told Wayne to stop asking me for money, and they |
| | 12 | didn't complete -- they didn't collect anything, so why would |
| | 13 | they expect to get paid on -- I mean for the kidnapping. |
| | 14 | Q      So at this point did you know what was -- what happened to |
| 11:33AM | 15 | the accountant? |
| | 16 | A      Wayne had mentioned that he let the accountant go. |
| | 17 | Q      When did Wayne tell you that he let the accountant go? |
| | 18 | A      Wayne told me the day after that they had let the |
| | 19 | accountant go. |
| 11:33AM | 20 | Q      So was this at that meeting at -- by Fisherman's Wharf |
| | 21 | where he told you that or was that a different conversation? |
| | 22 | A      No.  No, that was a different conversation. |
| | 23 | Q      Which other conversation was that? |
| | 24 | A      That was on the day that -- the day after that it |
| 11:34AM | 25 | happened, he said that they had let the accountant go, and |

```
     1    that -- that the accountant wasn't going to go to law
     2    enforcement.
     3    Q    So you ride around, you meet Wayne Miller at Sheridan
     4    Park, right?
11:34AM  5         You have to say something so the court reporter can
     6    type it down.
     7    A    Yes.
     8    Q    And you drive around with Wayne Miller and discuss -- he
     9    asked you for payment, right?
11:34AM 10    A    Correct.
    11    Q    And did that meeting -- does he tell you that he let the
    12    accountant go?
    13    A    No, not at that meeting.
    14    Q    Was it the next day?
11:34AM 15    A    Yes, the following day.
    16    Q    The following day Wayne Miller tells you that he let the
    17    accountant go.
    18    A    Yes.
    19    Q    And is that the same day you told the defendant that Wayne
11:34AM 20    Miller was asking you for money?
    21    A    That was the same day.
    22    Q    And then this meeting at -- near Fisherman's Wharf with
    23    you, the defendant and Wayne Miller, was that that same day as
    24    well?
11:34AM 25    A    Yes, that was later that afternoon.
```

1    Q    And at this meeting with the defendant, yourself and Wayne

2    Miller, what, if anything, does the defendant indicate should

3    be done?

4    A    I'm sorry, I don't understand.

11:35AM    5    Q    So at this meeting with the defendant, yourself and Wayne

6    Miller, right --

7    A    Yes.

8    Q    -- was payment discussed?

9    A    Payment was not discussed.  He -- he told Wayne to stop

11:35AM    10    testing me and calling me and bugging me for money because they

11    don't deserve anything because they didn't collect any -- any

12    money from the accountant.

13    Q    So they didn't get any money from the accountant.

14    A    They didn't get any money from the accountant, so he said

11:35AM    15    stop bugging Pres for the money.

16    Q    And what happened after that meeting?

17    A    Then on the way back to Kama'aina Termite and Pest

18    Control, Mike said, Oh, just ask your friend if she can pay

19    10 percent.

11:35AM    20    Q    Who did the defendant say that to?

21    A    He said that to me.

22    Q    Was Wayne Miller there when he said that?

23    A    No.

24    Q    So it was just -- it was just you and the defendant?

11:36AM    25    A    Yes.

```
 1   Q    And were you in the same car going back?

 2   A    Yes.

 3   Q    And so he tells you to ask your friend, and what do you do

 4   after the defendant tells you that?

11:36AM  5   A    I agree.  And after getting dropped off at Kama'aina

 6   Termite and Pest Control, I texted Sunny and asked -- and asked

 7   if we could meet.

 8   Q    And did the defendant -- and did he indicate how much he

 9   wanted to get paid?

11:36AM 10   A    No, he -- he just said 10 percent.

11   Q    Okay.  And 10 percent means what?

12   A    10 percent of what was supposed to be collected.

13   Q    So that would be 10 percent of the somewhere between

14   900,000 and a million dollars?

11:36AM 15   A    Correct.

16   Q    So that's less -- a little bit less than $100,000,

17   somewhere between 90,000 and a hundred?

18   A    Correct.

19   Q    So you reached out to Ms. Kim after that?

11:36AM 20   A    Yes.  I texted her and asked her if we could meet.

21   Q    And did you meet with her?

22   A    Yes, I met with her at -- I mean a few days later we met

23   at the Ward Starbucks.

24   Q    And what happened at the Ward Starbucks?

11:37AM 25   A    At the Ward Starbucks, I asked her if her dad was willing
```

1    to pay the 10 percent.

2    Q    And what -- how did she respond?

3    A    And she said that she had to go and ask her father.  So we

4    left -- we left it at that.  And later, I don't remember how

11:37AM    5    long after, but a few days she said that her dad said okay.

6    Q    And then what happened after Ms. Kim told you that her dad

7    agreed to pay the 10 percent?

8    A    After they agreed to pay the 10 percent, we -- we set up a

9    meeting.  It was a few days -- a few days or a week after we

11:37AM    10    set up a meeting, and she had brought -- and we met at the same

11    Ward Starbucks, and she had a package with an envelope in it

12    that contained $50,000.

13    Q    You say "we set a meeting."  Who is "we"?

14    A    Me and Sunny.

11:38AM    15    Q    So you and Ms. Kim met again at that Starbucks, and she

16    had a package.  What was in that package?

17    A    It was an envelope and it was -- when I opened the

18    envelope, it was five bundles of bank wrapped 10,000-dollar

19    stack -- I mean, bundles.

11:38AM    20    Q    So that's $50,000?

21    A    Correct.

22    Q    What did you do with the $50,000?

23    A    I took it back to Kama'aina Termite and Pest Control, and

24    I put it in Mike's office in his bottom left drawer on his --

11:38AM    25    of his desk.

1    Q    What did you put it in that particular drawer?

2    A    That's where -- that's where we left cash or important

3    things that -- for Mike to retrieve.

4    Q    Did you confirm with the defendant that he got that

11:39AM   5    $50,000?

6    A    Yes.  Later -- later that day, again, we -- going back to

7    the office, we -- I asked him if he got the -- if he got what

8    was in the bottom left drawer.

9    Q    And what did the defendant respond?

11:39AM   10   A    He said yes.

11   Q    Do you know what happened to that $50,000?

12   A    I don't know what happened to that $50,000, but later --

13   later on during that same meeting he called Delia down -- Delia

14   Fabro-Miske down from the Kama'aina office on the top portion

11:39AM   15   of.

16   Q    And who is Delia Fabro-Miske?

17   A    That's Mike's daughter-in-law.

18   Q    And what -- after he called Delia Fabro-Miske into the

19   office, what happened?

11:39AM   20   A    He told Delia to -- he gave her the envelope and told her

21   to put it in a safe place.

22   Q    That was the envelope with the $50,000?

23   A    Correct.

24   Q    I'm going to show you 1-42.  Do you recognize this

11:40AM   25   individual?

```
 1   A      Yes.

 2   Q      Who is this?

 3   A      Delia Fabro-Miske.

 4   Q      Is this a fair and accurate picture of how Delia

 5   Fabro-Miske looked back then?

 6   A      Yes.

 7          MR. AKINA:  At this point I would offer Exhibit 1-42

 8   into evidence.

 9          THE COURT:  Any objection, Counsel?

10          MR. KENNEDY:  No objection.

11          THE COURT:  Without objection, Exhibit 1-42 is

12   admitted.

13          (Exhibit 1-42 was received in evidence.)

14          MR. AKINA:  Permission to publish?

15          THE COURT:  Yes, you may.

16   BY MR. AKINA:

17   Q      So this is a picture of Delia Fabro-Miske?

18   A      Yes.

19   Q      So after that $50,000 payment, were any other payments

20   made?

21   A      Yes.

22   Q      Tell us about that.

23   A      There were three other payments made during the following

24   months.

25   Q      And who made those payments?
```

Timestamps (left margin):
- 11:40AM (line 5)
- 11:40AM (line 10)
- 11:40AM (line 15)
- 11:40AM (line 20)
- 11:40AM (line 25)

           1   A    Sunny.

           2   Q    Where did you meet her to receive those payments?

           3   A    I met her at the same Ward Starbucks.

           4   Q    And what were the amounts that were paid at each of these

11:41AM    5   meetings?

           6   A    20,000 was the next payment, and then ten and ten.

           7   Q    So --

           8   A    10,000, 10,000 in the last two meetings.

           9   Q    So that's 20 plus 10 plus 10, that's 40,000.  Correct?

11:41AM   10   A    Correct.

          11   Q    And plus the initial 50,000, so that makes $90,000 total?

          12   A    Yes.

          13   Q    And each time you received these additional cash payments,

          14   what did you do with them?

11:41AM   15   A    I put it in Mike's office.

          16   Q    And were any other payments made after that?

          17   A    Not that -- no.

          18   Q    Did you get paid any money for your -- your role in all of

          19   this by the defendant?

11:41AM   20   A    No, I did not.

          21   Q    Did anyone else pay you anything for your role in all

          22   this?

          23   A    No.

          24   Q    Do you know if Wayne Miller was paid any money?

11:41AM   25   A    No.

1    Q    I want to show you Exhibit 5-2.  And do you recognize

2    this -- this map?

3    A    Yes.

4    Q    What does it depict?

11:42AM    5    A    Queen Street and Ward Avenue.

6    Q    And you see the red dot in the middle?

7    A    Yes.

8    Q    What's located there?

9    A    Kama'aina Termite and Pest Control.

11:42AM    10    Q    Is this a fair and accurate map showing where Kama'aina

11    Termite and Pest Control was located back in 2017?

12    A    Yes.

13         MR. AKINA:  At this point I would move Exhibit 5-2

14    into evidence.

11:42AM    15         THE COURT:  Any objection?

16         MR. KENNEDY:  No objection.

17         THE COURT:  Without objection, Exhibit 5-2 is

18    admitted.  You may publish.

19         (Exhibit 5-2 was received in evidence.)

11:42AM    20    BY MR. AKINA:

21    Q    So you said it's on the -- you said Ward and Queen.  So is

22    Ward that street on the left that's going sort of horizontally

23    from the left side to the top of the page?

24    A    Yes.

11:43AM    25    Q    And that street right in front of the red dot, what street

```
     1   is that?

     2   A     Queen.

     3   Q     And that red dot is where the Kama'aina Termite and Pest

     4   Control office is located?

11:43AM  5   A     Yes.  But I believe you guys got the wrong building.  It's

     6   the one on the right.

     7   Q     The one to the right of that red dot?

     8   A     Correct.

     9   Q     Okay.

11:43AM 10         MR. AKINA:  And could we show Exhibit 5-22.

    11   BY MR. AKINA:

    12   Q     Do you recognize this picture?

    13   A     Yes.

    14   Q     What is this a picture of?

11:43AM 15   A     Kama'aina Termite and Pest Control.

    16   Q     Is this how Kama'aina Termite and Pest Control looked back

    17   in 2017?

    18   A     Yes.

    19         MR. AKINA:  I would move Exhibit 5-22 into evidence.

11:43AM 20         THE COURT:  Any objection?

    21         MR. KENNEDY:  No objection.

    22         THE COURT:  Without objection, 5-22 is admitted.  You

    23   may publish.

    24         (Exhibit 5-22 was received in evidence.)

11:43AM 25   BY MR. AKINA:
```

```
          1   Q    So it says in the red on top, there's Kama'aina Termite

          2   and Pest Control.  The bottom is Kama'aina Plumbing Company.

          3   Was the Kama'aina Plumbing, is that the plumbing that you were

          4   referring to earlier?

11:44AM   5   A    Yes.

          6   Q    And were their offices both in that same building?

          7   A    Yes.

          8   Q    Were any other companies related to the defendant located

          9   in that building?

11:44AM  10   A    O'ahu Termite, the solar company.  Yeah, and also the

         11   construction company.

         12   Q    And what, if any, relation did Hawaii Partners have to

         13   this building?

         14   A    I don't understand what you're -- your question.

11:44AM  15   Q    I'll come back to it later.

         16        So you mentioned the defendant's office where that

         17   board was that he wrote the message to tell you that they had

         18   the accountant where he was whispering.  Where -- what floor

         19   was that located on in this building?

11:45AM  20   A    That's located on the bottom left.

         21   Q    And are you able to see it in this picture?

         22   A    Are you referring to Mike's office?

         23   Q    Yes.

         24   A    Yes.

11:45AM  25   Q    Where -- where is that?
```

```
     1   A    It's in the -- his is the picture window right in front of
     2   the white -- that white hatchback car.
     3   Q    So that's on the left side of the building?
     4   A    Correct.
11:45AM  5   Q    On the bottom floor, the first floor?
     6   A    Yes.
     7   Q    Is it this area that we zoomed in on?
     8   A    Yes.
     9        MR. AKINA:  Can we show the witness Exhibit 1-778,
11:45AM 10   please.  And 1-779.
    11   BY MR. AKINA:
    12   Q    Do you recognize what those are pictures of?
    13   A    Yes.
    14   Q    What are those pictures of?
11:45AM 15   A    Mike's office.
    16   Q    And is this generally the layout of how his office looked
    17   back then in 2017?
    18   A    Yes.
    19   Q    And is it the exact same state that it was on -- in 2017
11:46AM 20   when this was all going on?
    21   A    No, it -- it's normally kept pretty neat.
    22   Q    Okay.  But generally, this is a picture of the office?
    23   A    Yes.
    24        MR. AKINA:  Okay.  I move 1-778 and 1-779 into
11:46AM 25   evidence.
```

|      | 1  | THE COURT:  Any objection? |
|------|----|---------------------------|
|      | 2  | MR. KENNEDY:  No objection. |
|      | 3  | THE COURT:  Without objection, 1-778 and 1-779 are |
|      | 4  | each admitted.  You may publish if you wish. |
| 11:46AM | 5  | (Exhibits 1-778 and 1-779 were received in evidence.) |
|      | 6  | MR. AKINA:  Can we show 1-778 first? |
|      | 7  | BY MR. AKINA: |
|      | 8  | Q    What are we looking at? |
|      | 9  | A    You're looking at Mike's office facing Queen Street. |
| 11:46AM | 10 | Q    And this window, is that the same window that you had |
|      | 11 | indicated in 5-22? |
|      | 12 | A    Yes. |
|      | 13 | MR. AKINA:  And can we go to 1-779. |
|      | 14 | BY MR. AKINA: |
| 11:47AM | 15 | Q    What are we looking at? |
|      | 16 | A    We're looking at Mike's desk and the clear board. |
|      | 17 | Q    Can you use your finger and circle the clear board on the |
|      | 18 | screen. |
|      | 19 | A    (Witness complies.) |
| 11:47AM | 20 | Q    And is that the board you were referring to earlier that |
|      | 21 | he was writing on? |
|      | 22 | A    Yes. |
|      | 23 | Q    Do you know if it's erasable? |
|      | 24 | A    Yes. |
| 11:47AM | 25 | Q    Is it? |

```
      1    A    Yes, it's erasable.

      2              MR. AKINA:  Can we show Exhibit 1 --

      3    BY MR. AKINA:

      4    Q    And the desk that you mentioned, where is the desk where

11:47AM   5    you put the money?

      6              That's the left area where that drawer is?

      7    A    Yes.

      8    Q    And just for the record, that's the portion of the desk

      9    closest to the door; is that correct?

11:48AM  10    A    Yes.

     11              MR. AKINA:  Can we show Exhibit 1-571 to the witness,

     12    please.

     13    BY MR. AKINA:

     14    Q    What is this a picture of?

11:48AM  15    A    That's a picture of the clear board that I was referring

     16    to.

     17    Q    It's just a closer view of that board?

     18    A    Yes.

     19    Q    And is this a fair and accurate depiction -- maybe not of

11:48AM  20    the words written on the board, but the board itself as it was

     21    in the office back then in 2017?

     22    A    Yes.

     23              MR. AKINA:  I move 1-571 into evidence.

     24              THE COURT:  Mr. Kennedy, any objection?

11:48AM  25              MR. KENNEDY:  No objection, Your Honor.
```

|  | 1 | THE COURT:  Without objection, 1-571 is admitted, and |
|---|---|---|

1          THE COURT:  Without objection, 1-571 is admitted, and

2     you may publish.

3               (Exhibit 1-571 was received in evidence.)

4     BY MR. AKINA:

11:48AM   5     Q    In this board you can sort of see on the -- well, you tell

6     me.  On the bottom left-hand corner there's a reflection.  What

7     is that a reflection of?  It's kind of bright.

8     A    I'm sorry, could you repeat the question?

9     Q    If you look at the bottom left-hand corner of the screen

11:49AM  10    you see what appears to be a screen reflected.  Do you know

11    what that is?

12    A    That's a computer screen.

13    Q    Okay.  And where was that computer screen located in the

14    office?

11:49AM  15    A    That computer screen is on the left side of his office.

16    Q    Okay.  Is that on his desk?

17    A    No, his -- the computer -- the computer screen is normally

18    in the middle or on the -- a little to the right on his desk.

19    I can't -- I can't really tell from this -- this angle.

11:49AM  20    Q    You testified that Wayne Miller was texting you during

21    certain portions of this kidnapping.

22              MR. AKINA:  Can we show the witness Exhibit 5-37,

23    please.

24    BY MR. AKINA:

11:50AM  25    Q    And have you reviewed this document prior to today?

```
 1    A    Yes.

 2    Q    And what does this show, this document?

 3    A    This document is showing texting between me and Wayne

 4    Miller.

 5    Q    And are these fair and accurate messages that were sent

 6    between you and Wayne Miller during the time of the kidnapping?

 7    A    Yes.

 8              MR. AKINA:  At this point I'd move Exhibit 5-37 into

 9    evidence.

10              MR. KENNEDY:  Is 5-37 a single page?

11              MR. AKINA:  No, it's a six-page document.

12              MR. KENNEDY:  Can you --

13              MR. AKINA:  I can ask him.

14    BY MR. AKINA:

15    Q    Have you referred -- have you reviewed all six pages of

16    this document prior to today?

17    A    Yes.

18    Q    And do those pages cover messages between you and Wayne

19    Miller during the time of the kidnapping?

20    A    Yes.

21              MR. AKINA:  At this time I offer 5-37 into evidence.

22              THE COURT:  Counsel, any objection?

23              MR. KENNEDY:  If you could just blow up the first

24    page.  It's a little hard to see on the screen.

25              Can we go to the second page?  And can you blow them
```

11:50AM (line 5)
11:50AM (line 10)
11:50AM (line 15)
11:51AM (line 20)
11:51AM (line 25)

```
 1    up, please?

 2            Can we go to the third page?  Go down the -- keeping

 3    going.  Thank you.

 4            Your Honor, may I ask some questions of the witness

 5    regarding foundation?

 6            MR. AKINA:  I believe this was also covered by the

 7    party stipulation.  It's for authenticity.

 8            MR. KENNEDY:  Yes, I agree, but can I ask some

 9    questions?

10            THE COURT:  Go ahead.

11                        VOIR DIRE EXAMINATION

12    BY MR. KENNEDY:

13    Q    Sir, if you could go to the first page.  Do you see it

14    clearly there on the screen or do you need it blown up?

15    A    Can I get it blown up?

16    Q    I needed it too.  In reading it, those -- the first phone

17    message is on January 8th of 2018?

18    A    Yes.

19    Q    And if we go down to the last phone number, the second --

20    the third are also on January 18th of 2018?  January 8th, I'm

21    sorry.

22    A    Yes.

23            MR. KENNEDY:  All right.  If we keep going.  Yeah.

24    BY MR. KENNEDY:

25    Q    And then if we get to the fourth phone call on the first
```

11:52AM (line 5)
11:53AM (line 10)
11:53AM (line 15)
11:53AM (line 20)
11:53AM (line 25)

```
 1    page, I believe the question that was asked was were these
 2    phone messages during the kidnapping.  Do you recall that?
 3    A    Yes.
 4    Q    So the first three would be in January of 2018, correct?
 5    A    Yes.
 6    Q    All right.  And then when we get to message 4 and 5, that
 7    would be the day after October 18th of 2017?
 8    A    Yes.
 9         MR. KENNEDY:  All right.  If we could move to the
10    second page.
11    BY MR. KENNEDY:
12    Q    And if you can look at 6, 7, 8, 9, and 10, these are
13    messages relating to the next day on the 18th of October?
14    A    Yes.
15    Q    And including message number 11?
16    A    Yes.
17         MR. KENNEDY:  All right.  If we move to the third
18    page.
19    BY MR. KENNEDY:
20    Q    We're at 12, 13, and 14 and 15 and 16 and 17, all of those
21    messages are the day after on the 18th of 2017?
22    A    Yes.
23    Q    Okay.  And so the first three pages are not when the
24    kidnapping was happening, correct?
25    A    Yes.
```

1              MR. KENNEDY:  All right.  If we move to the fourth

2    page.

3    BY MR. KENNEDY:

4    Q    And once again, this is communications between you and

11:56AM  5    Wayne Miller?

6    A    Correct.

7    Q    And this is Wayne Miller's phone, right?

8    A    Yes.

9    Q    Okay.  So on the fourth page we begin with the last

11:56AM  10   message on 2017; is that correct?

11   A    Number 20?

12   Q    Number 18.  I apologize, bad question.

13              But it appears that what we're doing --

14              THE COURT:  All right.  Let's move on.  Let's move on.

11:56AM  15   The exhibit is not admitted.

16              You got something else, Mr. Akina?

17              MR. AKINA:  Your Honor, if I could clarify?

18              THE COURT:  You can clarify all you want.  The offer

19   is not accepted, and the exhibit shall not be admitted as of

11:56AM  20   right now.

21                    RESUMED DIRECT EXAMINATION

22   BY MR. AKINA:

23   Q    On October 17 of 2017, that's when the kidnapping

24   occurred; is that correct?

11:56AM  25   A    Yes.

1   Q    And Wayne Miller texted you on that day?

2   A    Yes.

3   Q    And you testified previously that the following day

4   related to the kidnapping, Wayne Miller texted you again

11:57AM   5   regarding trying to get payment relating to that kidnapping?

6   A    Yes.

7   Q    And did these messages depict messages sent on those days?

8   A    Yes.

9          MR. AKINA:  Your Honor, at this time I would renew my

11:57AM   10   offer of this exhibit into evidence.

11          THE COURT:  Is there an objection?

12          MR. KENNEDY:  Your Honor, with respect to the messages

13   on October 18th --

14          THE COURT:  Is there an objection, yes or no?

11:57AM   15          MR. KENNEDY:  None.  I would -- for those I do not

16   object.

17          THE COURT:  The objection is sustained.  The exhibit

18   shall not be admitted.

19          MR. AKINA:  To clarify, I believe defense counsel said

11:58AM   20   he did not object, Your Honor.

21          THE COURT:  The objection is sustained.

22          MR. AKINA:  Understood.

23          THE COURT:  The exhibit shall not in its current form

24   be admitted.

11:58AM   25          MR. AKINA:  Understood, Your Honor.

1    BY MR. AKINA:

2    Q    After this took place, this kidnapping, did you have any

3    other meetings with Ms. Kim?

4    A    I met with her to collect the payment.

11:58AM    5    Q    After those payments were collected, did you have any

6    other interactions with Ms. Kim?

7    A    Yes.  We -- Mike was looking for another storage space or

8    storage property.

9    Q    Okay.  And tell us about that.

11:58AM    10    A    So I contacted Sunny because she -- she was -- she was

11    doing that.  She was a property manager, I guess, and so she --

12    I asked her if there was any property that she knew of that we

13    could use as storage.

14    Q    And what happened after that contact or during that --

11:59AM    15    that search for storage space?

16    A    She sent over properties that were on the market, and

17    we -- we went through a few, and then we saw one -- she said

18    that her father had a property that was across the UFC gym.

19    Q    And what happened next?

11:59AM    20    A    Me, myself -- I mean myself and Mike met up with Sunny and

21    her father at that property.

22    Q    So that's you, the defendant, Ms. Kim and her father

23    Mr. Kim met at that property?

24    A    Yes.

11:59AM    25    Q    And was the property -- the rental of that property

```
         1    discussed?

         2    A    The rental -- yeah, she said that they still had a tenant

         3    in there right now, but they were looking to get rid of that --

         4    that tenant.

12:00PM  5    Q    Anything else happen after that?

         6    A    She -- she did mention that if we could help -- if Mike

         7    could help -- then help get that tenant out, that she could

         8    offer -- her father would give it to him at a discounted price.

         9    Q    And was that specified at all or was it just left like

12:00PM 10    that, if you can help get the tenant out?

        11    A    It was just -- it was just left.

        12    Q    Ultimately, to your knowledge, one, was that property

        13    rented out by the defendant?

        14    A    No.

12:00PM 15    Q    And to your knowledge, did the defendant take Ms. Kim up

        16    on that request to help get rid of the tenant?

        17    A    No.

        18    Q    After that meeting, did you -- you were subsequently

        19    arrested, you mentioned in 2020?

12:01PM 20    A    Correct.

        21    Q    After you were arrested in 2020, did you have any other

        22    meetings with Ms. Kim?

        23    A    Yes, I -- while out on pretrial, I did meet with Sunny at

        24    a downtown restaurant.

12:01PM 25    Q    And so I'm going to direct your attention to December of
```

1   2022.  Did you have any meetings with Ms. Kim?

2   A    Yes.

3   Q    And where did you have that meeting?

4   A    We met at Pig and the Lady in downtown.

12:01PM   5   Q    And what was discussed at that meeting?

6   A    We discussed -- we were caught up -- we were catching up

7   because we hadn't talked in a while since me being arrested in

8   2020.  So we chatted, we had -- we had lunch.  We -- I asked

9   her if her and her father would be interested in flipping

12:02PM   10   homes.  In a flipping home investment.  And then I told her

11   that I was going to trial and that the trial was coming up

12   shortly.  So law enforcement would probably be coming around to

13   ask her and her dad questions.

14   Q    And did you tell her anything else on that issue?

12:02PM   15   A    I told her that if she didn't feel comfortable talking to

16   law enforcement that she should ask for an attorney, and they

17   would have -- they would have to stop asking her questions

18   without her attorney there.

19   Q    Did you make any threats at this meeting?

12:02PM   20   A    I did not make any threats.

21   Q    Did you have any other meetings with Ms. Kim regarding

22   your arrest and the kidnapping?

23   A    Yes, I -- I don't -- I met with her shortly after that

24   first initial meeting at the restaurant to let her know that

12:03PM   25   there was a document that came out that had her father's name

1   in it.  So we -- I texted her if she could meet me in -- after

2   my son's football practice in the Waikiki area.

3   Q    Was this the same month, December 2022?

4   A    It was the same month, yes, correct.

12:03PM   5   Q    And so you met -- where did you meet her?

6   A    I met her near -- at a park that's near Kapiolani Park.

7   Q    At this second meeting, what did you tell her, if

8   anything?

9   A    I told her that this was a document -- I showed her the

12:03PM   10  document with her father's name in the document.  And I said --

11  and then I told her that -- that they know who her father was,

12  and they're probably going to come and ask her -- ask him

13  questions.

14  Q    When you said, "They knew who her father was," who was the

12:04PM   15  "they"?

16  A    Law enforcement.

17  Q    And did you tell Ms. Kim anything else?

18  A    And I did tell her to let her father know to ask for an

19  attorney.

12:04PM   20  Q    And at the second meeting, did you make any threats?

21  A    I did not make any threats.

22  Q    What was your hope in telling Ms. Kim at both of these

23  meetings that if law firm approached her, she should ask for an

24  attorney?

12:04PM   25  A    That it would keep her from, I guess, getting me and her

1    into more trouble.

2    Q    And why is that?

3    A    Because I did a favor for her by asking my friend to help,

4    and this is one of the -- and this is -- and I was charged

12:05PM    5    with -- I was charged with it.  So I wasn't cooperating with

6    the government or law enforcement because I was set on going to

7    trial, so I would appreciate if she extended the same courtesy

8    to me, but -- because I didn't mention her or her father's

9    name.

12:05PM    10    Q    At this point in time in December of 2022, had you pled

11    guilty yet?

12    A    No.

13    Q    And how -- did you hope that -- did you hope it would

14    benefit you in any way if she didn't talk to anyone about the

12:05PM    15    kidnapping?

16    A    Yes.

17    Q    How so?

18    A    That -- because the agreement was -- the initial agreement

19    was made between myself and Sunny, that we were both in the

12:06PM    20    same boat that could implicate both of us.

21    Q    So you mentioned that you had also worked at other

22    businesses.  Hawaii Partners, you mentioned.

23    A    Yes.

24    Q    And that was right -- that was after -- initially you

12:06PM    25    started at Kama'aina, then you went to Hawaii Partners?

```
       1   A     Yeah, but I -- I still also did work for Kama'aina at the
       2   same time that I was doing work for Hawaii Partners.
       3   Q     At Hawaii Partners, what type of company was it?  What
       4   type of business was that involved in as far as you were
12:06PM 5   concerned?
       6   A     We bought and sold cars.
       7         THE COURT:  Mr. Akina, it looks like you're headed in
       8   a different direction --
       9         MR. AKINA:  Yes.
12:06PM 10        THE COURT:  -- these last couple of questions.  I
      11   think maybe now would be a good time for us to take our second
      12   break.
      13         MR. AKINA:  Yes.
      14         THE COURT:  We're just after the noon hour, but we
12:07PM 15   have about 90 minutes left in the trial day.  As we take our
      16   second break of the day, please, I remind our jurors to refrain
      17   from discussing the substance of this case with anyone,
      18   including each other, until I advise otherwise; to refrain from
      19   conducting any independent investigation into the facts,
12:07PM 20   circumstances or persons involved; and finally, to refrain from
      21   accessing any media or other accounts of this case that may be
      22   out there.
      23         Let's try to keep it to about 15 minutes, and we will
      24   resume for the balance of the trial day.
12:07PM 25        (Proceedings were recessed at 12:07 p.m. to 12:31
```

1   p.m.)

2          THE COURT:  All right.  Back from our second and final

3   break of the day.

4          Mr. Akina, you may resume your examination of

12:31PM   5   Mr. Kimoto when you're ready.

6          MR. AKINA:  Thank you, Your Honor.

7   BY MR. AKINA:

8   Q    I want to touch back on the December 2022, those two

9   meetings that you had with Ms. Kim.  You had already been

12:32PM  10   arrested at that point, right, and I think you mentioned that

11   you were on pretrial release.  Can you explain what that means

12   as far as you understand it?

13   A    Pretrial release meant that I could be out free till the

14   trial started.

12:32PM  15   Q    And were there conditions for your pretrial release?

16   A    There were conditions.  From what I remember, it was I had

17   to be employed, I had to wear an ankle monitor.  I'm sure

18   there's more, but I --

19   Q    Do you recall any conditions regarding who you could or

12:32PM  20   could not have contact with?

21   A    Yes.

22   Q    And what do you recall of that?

23   A    There was a list of people that I couldn't communicate or

24   have contact with.

12:32PM  25   Q    What was your understanding of whether or not you were

1   supposed to have contact with Ms. Kim at that time?

2   A    She wasn't on the list that was provided to us by the

3   government.

4   Q    So we left off at Hawaii Partners.  What does Hawaii

12:33PM  5   Partners do?  What type of work does that do?

6   A    What I did for Hawaii Partners, we -- we sold -- we bought

7   and sold cars from the auction.

8   Q    And when you say "we," who is "we"?

9   A    Well, I sold it and -- I mean me and Mike.

12:33PM  10  Q    And while you were at Hawaii Partners, who was in charge

11  of Hawaii Partners ultimately?

12  A    Mike.

13  Q    Where would these cars be purchased from?

14  A    We purchased the cars from Manheim car auction in

12:33PM  15  Mapunapuna.

16  Q    Where would they -- for the most part, where would they be

17  sold?

18  A    They would be sold on Craigslist.

19  Q    Would they -- is that the only place they would be sold or

12:33PM  20  would they be sold elsewhere?

21  A    That's the only place that I normally sold it on, but

22  other -- other people had -- they would sell it on Facebook and

23  other car selling, I guess, sites.

24  Q    And in the vein of responsibilities that you had with

12:34PM  25  Hawaii Partners, are you familiar with what -- did Hawaii

1    Partners have a bank account?

2    A    Yes.

3    Q    And do you know what an authorized signer is?

4    A    Yes.

12:34PM    5    Q    And what is that?

6    A    An authorized signer is the one who can sign checks for

7    the company.

8    Q    Were you ever an authorized signer at any point for Hawaii

9    Partners?

12:34PM    10    A    Yes.

11    Q    And to be clear, did that make you an owner of Hawaii

12    Partners?

13    A    No.

14    Q    So how often were these auctions held at Manheim?

12:34PM    15    A    They were held every Wednesday.

16    Q    You said that you would buy cars.  Would anyone else buy

17    cars for Hawaii Partners?

18    A    Mike.

19    Q    At the auctions, how did they operate?  How would an

12:35PM    20    auction go generally?

21    A    Generally there would be cars that were put up for bid,

22    and they would run -- and they would run those cars through an

23    area where all the bidders would be.

24    Q    And then the actual bidding, how much would a bid raise

12:35PM    25    the auction price by?

```
          1    A      It would depend on what the price of the vehicle was, but
          2    from what I know, it would be like two -- $250 would be ...
          3    Q      Were you ever present when the defendant was bidding on
          4    cars there?
12:35PM   5    A      Yes.
          6    Q      And did you ever see people bid against the defendant?
          7    A      Not a lot.
          8    Q      And was the defendant ever outbid on occasion?
          9    A      Yes.
12:36PM  10    Q      Did you ever see the defendant's reaction when he was
         11    outbid?
         12    A      Yes.
         13    Q      Can you describe that?
         14    A      He normally was upset.
12:36PM  15    Q      What about when people just bid against him, what was his
         16    reaction?
         17    A      Yeah, he didn't like that.
         18    Q      Can you -- did the defendant do anything beyond just not
         19    liking it?
12:36PM  20    A      I don't understand what --
         21    Q      I'll rephrase it.  Can you provide some examples that like
         22    come to mind of instances when the defendant was bid against or
         23    outbid at these actions and his reaction?
         24    A      Okay.  There was one instance where I observed a person
12:36PM  25    checking in at the beginning of the auction, and while he was
```

1  waiting in line, I observed that he had marks on his face,

2  bruising, a Band-Aid, scratches.  And that's when Mike was --

3  Mike came over and he had said that -- he just mentioned that,

4  I told those two dummies to take care -- take care of this.

12:37PM   5  Q    And when he said "the dummies," did you know who -- what

6  he was referring -- who he was referring to?

7  A    Yes.

8  Q    Who was he referring to?

9  A    Jake Smith and John Stancil.

12:37PM  10  Q    And when he said, I told the dummies to take care of this,

11  what did you take that to be a reference to?

12  A    To assault that person.

13  Q    Which person?

14  A    The person that was standing in line to check in at the

12:37PM  15  auction that day.

16  Q    That's the person you said that had marks and bruises on

17  them?

18  A    Correct.

19  Q    And what was your understanding -- so did that person

12:37PM  20  appear to have been injured recently?

21  A    Yeah, he appeared to have been assaulted.

22  Q    And the defendant told you that he told the dummies to

23  take care of this?

24  A    So -- yes, so he wouldn't show up today.

12:38PM  25  Q    And when the defendant made that statement, did he -- was

```
        1   he -- was that happy?  Like was he pleased when he made that
        2   statement?
        3   A    No, he was upset.
        4   Q    So Jacob Smith, who is Jacob Smith?
12:38PM 5   A    Jacob Smith is a friend of Mike's.
        6   Q    And without going into detail, do you know -- do you know
        7   what Jacob Smith did, if anything, relating to the defendant,
        8   just yes or no?
        9        MS. PANAGAKOS:  Object to the form of the question,
12:38PM 10  Your Honor.
        11       THE COURT:  Sustained.
        12  BY MR. AKINA:
        13  Q    Just yes or no, do you know what types of things Jake
        14  Smith would do for the defendant?
12:38PM 15  A    Yes.
        16  Q    And how do you know that?
        17  A    Because I -- I seen it a few times and I -- and I've heard
        18  around.
        19  Q    And who did you hear things from?
12:39PM 20  A    Mike.
        21  Q    And what types of things -- to your understanding based on
        22  what you saw and what you heard from the defendant, what types
        23  of things did Jake Smith do?
        24  A    Jake assaulted people.
12:39PM 25       MR. AKINA:  Can we show Exhibit 1-41 to the witness,
```

1    please.

2            THE COURT:  Yes.

3    BY MR. AKINA:

4    Q    Do you recognize this person?

12:39PM    5    A    Yes.

6    Q    Who is this?

7    A    Jake Smith.

8    Q    Is this a fair and accurate picture of how Jake Smith

9    looked back around 20- -- when you were working for the

12:39PM    10    defendant?

11    A    Yes.

12            MR. AKINA:  I'd move 1-41 into evidence.

13            THE COURT:  Any objection?

14            MR. KENNEDY:  No objection.

12:39PM    15            THE COURT:  Without objection, 1-41 is admitted.  You

16    may publish.

17            (Exhibit 1-41 was received in evidence.)

18    BY MR. AKINA:

19    Q    For the jury, this is Jake Smith?

12:39PM    20            Mr. Kimoto, is this Jake Smith?

21    A    Yes.

22    Q    And you see that mark next to his left eye?

23    A    Yes.

24    Q    Do you know what that is?

12:40PM    25    A    I don't know what that is.

```
 1   Q    But did he have that marking?

 2   A    Yes.

 3   Q    And then you mentioned another individual, John Stancil.

 4   Who is John Stancil?

 5   A    John Stancil -- John Stancil is Mike's half-brother.

 6   Q    And again, just yes or no, did you know what types of

 7   things John Stancil would do?

 8   A    Yes.

 9   Q    And where -- how do you know that?

10   A    From hearing from Mike.

11   Q    And so based on what you heard from the defendant, what

12   types of things did John Stancil do?

13   A    Assaults.

14        MR. AKINA:  Could we show the witness Exhibit 1-40,

15   please.

16   BY MR. AKINA:

17   Q    Do you recognize this?

18   A    Yes.

19   Q    What is it?

20   A    That's John Stancil.

21   Q    A picture of John Stancil?

22   A    Correct.

23   Q    This is a fair and accurate picture of how he looked back

24   when you were working for the defendant?

25   A    Yeah, yes.
```

```
        1   Q    You hesitated.  Is there any difference?

        2   A    His hair was different and he was slimmer.

        3   Q    Okay.  But besides that, is this John Stancil?

        4   A    Yes.

12:41PM  5        MR. AKINA:  I would offer 1-40 into evidence.

        6        THE COURT:  Any objection?

        7        MR. KENNEDY:  No objection.

        8        THE COURT:  Without objection, 1-40 is admitted.  You

        9   may publish.

12:41PM 10        (Exhibit 1-40 was received in evidence.)

       11   BY MR. AKINA:

       12   Q    You said that his hair was different.  What do you mean?

       13   A    He had less hair.

       14   Q    He had less hair when you were working for the defendant?

12:41PM 15   A    Correct.

       16   Q    And that's the time period of 2015 up to 2020?

       17   A    Yes.

       18   Q    And you said that he was slimmer?

       19   A    Yes.

12:41PM 20   Q    Slimmer meaning in this picture or slimmer during the time

       21   that you worked for the defendant?

       22   A    Slimmer in the time that I worked for him.

       23   Q    Do you know who Stanley Ma is?

       24   A    Yes.

12:42PM 25   Q    Who is Stanley Ma?
```

```
       1   A     I -- I know Stanley Ma from the gym, from playing
       2   basketball with him at 24-hour Fitness.
       3   Q     Did you ever see Stanley Ma at these actions at Manheim?
       4   A     Yes.
12:42PM 5  Q     And did he ever bid against the defendant?
       6   A     Yes.
       7   Q     Can you tell us about that?
       8   A     Yeah, he -- he won a bid against Mike for a vehicle.
       9   Q     Do you remember what type of vehicle?
12:42PM 10 A     I believe it was a truck.
      11   Q     And after Mr. Ma won that -- that bid, what happened?
      12   A     Mike asked me if I could go over and -- Mike -- Mike knew
      13   that I knew Stan, Stanley, and he asked me if I could go over
      14   and talk to him to see if we could get that truck from him.
12:43PM 15 Q     And just for the -- okay.  And what did you do?
      16   A     I went over and I approached Stan and asked him if we
      17   could -- Mike really -- Mike really wanted that truck, and if
      18   we could work something -- something out.
      19   Q     So is that what -- is that what you told Stanley Ma?
12:43PM 20 A     Yes, I told him that Mike was bidding on -- bidding on the
      21   truck, and that he really wanted the truck, but he lost the bid
      22   to Stan.
      23   Q     Did you make -- did you threaten that anything would
      24   happen at that point?
12:43PM 25 A     No, I didn't threaten.
```

1    Q    How did Mr. Ma respond?

2    A    He -- he said, Oh, I didn't know Mike was bidding on the

3    truck, and I'll give you guys -- you guys can have the truck --

4    he can have the truck, and I'll give him 500 cash.

12:43PM    5    Q    And what did Mr. Ma do after that as far as you observed?

6    A    After that then I -- I left -- I told -- I left Stan to

7    talk to Mike.

8    Q    Did you think that you needed to do anything more than

9    mention the defendant's name such that -- in telling him that

12:44PM   10    the defendant really wanted that truck?

11    A    No.

12    Q    Why not?

13    A    Because of Mike's reputation.

14    Q    What do you mean by that?

12:44PM   15    A    I mean Mike has a reputation of getting what he wants, and

16    if not, uses violence.

17    Q    So after a car is purchased at these auctions through

18    Hawaii Partners, would any of them need work done or anything

19    like that before they're sold?

12:44PM   20    A    Yeah, most of the cars would need work done.

21    Q    And was there a place -- where would those cars be worked

22    on?

23    A    We would normally take it to O'Sung's.

24    Q    And what type of place is O'Sung's?

12:45PM   25    A    O'Sung's is a car repair, auto body shop.

```
 1   Q    And where were these vehicles stored that were purchased
 2   at auction?
 3   A    We would park it along Queen street where we had employee
 4   parking.
```

12:45PM
```
 5   Q    And where is that in relation to the Kama'aina Termite and
 6   Pest Control office?
 7   A    It's across -- across the street towards -- across the
 8   street, and there is a gravel lot that is closer to -- in
 9   between Kama'aina and Whole Foods.
```

12:45PM
```
10   Q    And you mentioned that the cars would then be sold mostly
11   on Craigslist.  Explain that process.
12   A    So once we pick the car up from the car auction, we would
13   get it -- get them fixed if they needed to get fixed.  From
14   there we would go get it detailed or at least washed, and then
```
12:45PM
```
15   I would go and take pictures of the car and post it on
16   Craigslist.
17   Q    And when you post something on Craigslist to sell, do you
18   have to indicate who is selling it?  Do you have to indicate
19   the seller's relationship to the vehicle that's being sold?
```
12:46PM
```
20   A    You have to -- there's a section -- there's a section
21   where you have to choose if it's going to be sold by a
22   dealership or a private party.
23   Q    And what type of -- which category would Hawaii Partners
24   fall under?
```
12:46PM
```
25   A    Hawaii Partners would fall under the dealership.
```

```
 1   Q     And when you sold these cars on Craigslist list, what
 2   would you mark them as?
 3   A     Private seller.
 4   Q     And who told you to do that?
 5   A     Mike.
 6   Q     What was the purpose in marking -- indicating that these
 7   were private seller instead of that they're sold by a dealer?
 8   A     There was a fee attached to sold by a dealership, a car
 9   dealer.  And if you sold it under a private seller, it was
10   free, and it would be easier to sell because people don't want
11   to deal with the dealing with a car dealership.
12   Q     Did you have any experiences with that, with people not
13   wanting to deal with a car dealership?
14   A     Yeah.  Like people just want to buy from a regular -- a
15   regular person with -- and there's no hassles.
16   Q     So did marking these cars as private seller make it easier
17   to sell more cars?
18   A     Not necessarily, but it did help.
19         MR. AKINA:  Can we show the witness Exhibit 5-38,
20   please?
21            THE COURT:  You may.
22            MR. AKINA:  And 5-39.
23   BY MR. AKINA:
24   Q     And what's depicted in these -- we'll start with 38.  What
25   does 38 show?
```

12:46PM (line 5)
12:46PM (line 10)
12:47PM (line 15)
12:47PM (line 20)
12:47PM (line 25)

1    A    38 shows a maroon-colored Lexus sedan.

2    Q    And do you know what relationship that had -- that sedan

3    had to Hawaii Partners, if any?

4    A    We purchased that car through the auction.

12:48PM  5    Q    And where is it parked in this picture?

6    A    It's parked in the Kama'aina Termite office.

7    Q    And then 5-39.  What does this show?

8    A    That shows myself next to the maroon sedan.

9    Q    And this picture, where is that taken or where are you in

12:48PM  10   -- like where is -- what location?

11   A    This is in the Ward parking lot next to Ross -- Ross's.

12   Q    And where is that in relation to Kama'aina Termite and

13   Pest Control?

14   A    That is across the street from Kama'aina Termite and Pest

12:48PM  15   Control.

16   Q    And both 5-38 and 5-39, are these fair and accurate

17   pictures of a car that was purchased through Hawaii Partners

18   that you dealt with?

19        MR. AKINA:  Sorry.

12:49PM  20   Q    Were Exhibit 5-38 and 5-39 fair accurate pictures of cars

21   that you -- of a car that you dealt with through Hawaii

22   partners?

23   A    Yes.

24        MR. AKINA:  I would offer 5-38 and 5-39 into evidence.

12:49PM  25        THE COURT:  Any objection, Counsel?

1          MR. KENNEDY:  No objection.

2          THE COURT:  Without objection, 5-38 and 5-39 are both

3     admitted.  You may publish.

4          (Exhibits 5-38 and 5-39 were received in evidence.)

12:49PM   5          MR. AKINA:  Could we show 5-38, please?

6     BY MR. AKINA:

7     Q    You said that this was parked inside the Kama'aina Termite

8     and Pest Control office?

9     A    Yes, that's inside.

12:49PM  10     Q    So to the left of the vehicle as we're looking at it, what

11     would be to the left of it on the other side of that wall?

12     A    That first door is Mike's office.

13     Q    And if we go to 5-39.  You said this was across the street

14     at the Ross parking lot; is that correct?

12:50PM  15     A    Correct.

16     Q    And would any other Hawaii Partners business be conducted

17     in that parking lot?

18     A    Yes.  I mean that's where we sold most of the cars from.

19     Q    And when you sold cars to customers, how would you dress?

12:50PM  20     A    I would normally wear plain Polo with no logo, no company

21     logo on them.

22     Q    Were there Hawaii Partners logo'd shirts that you had?

23     A    No.  It was just plain Polo golf shirts like the one that

24     you see.

12:50PM  25     Q    And why would you dress like that?

          1   A     Because we didn't want -- we wanted to look like a private

          2   seller.  We didn't want any -- I didn't want any logo -- logos

          3   on my shirt to be identified.

          4   Q     When you started at Hawaii Partners, how would you

12:51PM   5   communicate with the defendant?

          6   A     We communicated through text.

          7   Q     And were there -- was there a preferred type of way to

          8   text, a particular app to use?

          9   A     Yes, we had -- we had a few texting apps.

12:51PM  10   Q     What are some that you recall?

         11   A     Signal, WhatsApp.

         12   Q     And why were those used, if you know?

         13   A     It was -- we used them because it -- they were encrypted

         14   on both ends.

12:51PM  15   Q     And did you ever discuss that with the defendant?

         16   A     Yes.

         17   Q     What -- what was spoken about?

         18   A     That if it's encrypted that law enforcement can't read

         19   what we write.

12:51PM  20   Q     And who said that?  Was that you or the defendant who said

         21   that?

         22   A     The defendant.

         23   Q     And was that early on when you joined Hawaii Partners or

         24   at some other point in time?

12:52PM  25   A     It was early on when I joined Hawaii Partners.

```
      1   Q     Now, was everything put in writing that had to be
      2   discussed related -- with the defendant?
      3         I'll rephrase that.  So you said that you communicated
      4   with him through text.  Would you put everything into a text
12:52PM 5   message when you -- that you wanted to talk to the defendant
      6   about?
      7   A     Not everything.
      8   Q     Why not?
      9   A     To just be safe.
12:52PM 10  Q     What do you mean by that?
      11  A     We -- we didn't want to put anything that was
      12  incriminating on text just in case it wasn't encrypted.
      13  Q     And when you say "we," who are you referring to?
      14  A     Myself and Mike.
12:52PM 15  Q     And did the defendant have to explicitly tell you this,
      16  Don't put anything incriminating in here?
      17  A     There was one occasion that he had mentioned it to me.
      18  Q     And what -- what do you recall him saying?
      19  A     I had texted -- I texted two of his numbers, and one
12:53PM 20  number was -- was the burner phone.
      21  Q     And what happened after you did that?
      22  A     And then he said that now we -- now we can't use that
      23  burner phone anymore because it -- it got a text from my phone
      24  to his -- to his phone that he uses and the burner phone.  Now
12:53PM 25  that -- now that the numbers are tainted.
```

```
 1   Q   Did the defendant have multiple phones or phone numbers
 2   when -- during the time that you worked for him?
 3   A   Yes.
 4   Q   And would those change from time to time?
 5   A   Yes.
 6   Q   Can you describe some frequency or the number or numbers?
 7   A   I mean he -- he always had multiple phones on him.
 8   Q   When did you stop focusing -- when did you shift over from
 9   Hawaii Partners back to Kama'aina Termite and Pest Control?
10   A   I would say probably little over a year of doing Hawaii
11   Partners.
12   Q   Was that 2016?
13   A   Yeah, 2016.  I started sometime during 2016.
14   Q   And after you shifted your focus to Kama'aina Termite and
15   Pest Control, did you leave your responsibilities at Hawaii
16   Partners behind completely?
17   A   Not completely, but it -- it got decreased.
18   Q   You also mentioned that you eventually went from Kama'aina
19   Termite and Pest Control and focused to O'ahu Termite and Pest
20   Control, and can you explain why that happened?
21   A   Mike had -- Mike acquired O'ahu Termite and Pest Control,
22   and he wanted me to help build that company.
23   Q   And what type of -- you said Kama'aina Termite and Pest
24   Control was a fumigation pest control business.  What kind of
25   company was O'ahu Termite and Pest Control?
```

12:53PM — line 5
12:54PM — line 10
12:54PM — line 15
12:55PM — line 20
12:55PM — line 25

```
      1    A    Same business, termite and pest control.

      2    Q    Were these two companies, were they kept completely

      3    separate, meaning did they have their own set of supplies and

      4    gear to use?

12:55PM  5   A    Not at first.

      6    Q    So can you explain how that would -- how that would work?

      7    A    We -- so if I sold a job for Oahu termite, Kama'aina -- at

      8    the beginning Kama'aina would go out and do the tent

      9    fumigation.

12:55PM  10  Q    And would the customers be made aware that if they signed

     11    with O'ahu Termite, that Kama'aina Termite would come in and do

     12    the actual tenting?

     13    A    No, we did not notify the customers about that.

     14    Q    Why not?

12:56PM  15  A    Because Kama'aina Termite had a bad reputation, and O'ahu

     16    Termite had a good reputation.

     17    Q    So that was meant to sort of maintain that good reputation

     18    of O'ahu Termite?

     19    A    Correct.

12:56PM  20  Q    And when you say "bad reputation," what -- what do you

     21    mean by that?

     22    A    Bad reviews, customer complaints.

     23    Q    Did O'ahu Termite and Pest Control have a separate office

     24    from Kama'aina Termite and Pest Control?

12:56PM  25  A    It had a separate office area inside the Kama'aina
```

```
        1    Termite and -- I mean inside the Kama'aina Termite office, and

        2    then later we -- we had a storage unit in Pearl City that we

        3    used as the address for O'ahu Termite and Pest Control.

        4    Q    And after that separate storage facility was obtained for

12:57PM 5    O'ahu Termite and Pest Control, did you shift over to O'ahu

        6    Termite to that location?  Where were you physically located?

        7    A    No, we still had the O'ahu Termite phones in that same

        8    area at the Kama'aina Termite and Pest Control office.

        9    Q    So if you had to say where the headquarters were of O'ahu

12:57PM 10   Termite and Pest Control where the decisions were made, where

        11   were those decisions made?

        12   A    At the Kama'aina Termite and Pest Control office.

        13        MR. AKINA:  Could we show the witness Exhibit 1-765,

        14   please.

12:57PM 15   BY MR. AKINA:

        16   Q    Do you recognize this?

        17   A    Yes.

        18   Q    What is this a picture of?

        19   A    This is a picture of the O'ahu Termite storage.

12:57PM 20   Q    This is that storage facility that came later?

        21   A    Correct.

        22   Q    Is this a fair and accurate picture of how the -- how it

        23   looked?

        24   A    Yes.

12:58PM 25        MR. AKINA:  I would offer this into evidence at this
```

1    time, Exhibit 1-765.

2              THE COURT:  Any objection?

3              MR. KENNEDY:  No objection.

4              THE COURT:  Without objection, Exhibit 1-765 is

12:58PM   5    admitted.  You may publish.

6              (Exhibit 1-765 was received in evidence.)

7              MR. AKINA:  Could we zoom in on the logo, please.

8    BY MR. AKINA:

9    Q    Do you recognize that logo?

12:58PM   10   A    Yes.

11   Q    And what is that?

12   A    That's the O'ahu Termite and Pest Control logo.

13   Q    And where was this -- what neighborhood was this storage

14   facility located in?

12:58PM   15   A    This was in the Pearl City area.

16             MR. AKINA:  And can we show Exhibit 5-22, which is

17   already in evidence.

18   BY MR. AKINA:

19   Q    And to be clear, where was Kama'aina Termite and Pest

12:59PM   20   Control located?

21   A    Kama'aina Termite and Pest Control was located in town.

22   Q    And you said that O'ahu Termite and Pest Control had a

23   space within the Kama'aina Termite office.  Where was that

24   located?

12:59PM   25   A    That space is located on the second floor right above

       1   Mike's office.

       2   Q    So would that be around where that second window is on the

       3   left side on the top?

       4   A    Correct.

12:59PM 5   Q    For both Kama'aina Termite and Pest Control and O'ahu

       6   Termite and Pest Control, what type of work did you do?

       7   A    I did sales.

       8   Q    And focusing on the fumigation aspect of the business,

       9   specifically for Kama'aina Termite and Pest Control, what --

01:00PM 10  how does that work?  How does fumigation work?

       11        Could you explain to the jury what fumigation is?

       12  A    Fumigation is when we put a tent over your home, and we

       13  use Vikane gas to kill -- kill pests that are in your home.

       14  Q    And are -- do you know what chloropicrin is?

01:00PM 15  A    Yes.

       16  Q    What is chloropicrin?

       17  A    Chloropicrin is a tear gas agent that is used to warn

       18  people of the poisonous gas in the tent.

       19  Q    And how is it used to warn people?

01:00PM 20  A    It's a tear gas agent I believe that -- so you -- your

       21  eyes would burn and it would make it hard for you to breathe.

       22  Q    And would that keep people outside of places that are

       23  being tented?

       24  A    Yes.

01:00PM 25  Q    With Vikane, why does chloropicrin have to be used then if

1    you're using Vikane?

2    A    Chloropicrin has to be used because Vikane is odorless and

3    tasteless, so you wouldn't know that there's poisonous gas in

4    the home.

01:01PM    5    Q    And generally, what are the steps that are supposed to be

6    taken when fumigating a home as far as safety is concerned?

7    A    General steps is that we -- we fumigate the house, and

8    doing the fumigation, before we -- before we leave we're --

9    they're supposed to add chloropicrin into that process.  So to

01:01PM    10    warn people not -- to stay away because of the poisonous gas

11    that are --

12    Q    And are -- sorry.

13    A    -- inside the tent.

14    Q    And besides adding the chloropicrin, is anything else done

01:01PM    15    to keep people outside of the home?

16    A    Yes.  We're supposed to use clam shells.

17    Q    What are clam shells?

18    A    Clam shells are locks that go over your doorknob so you

19    can't use your keys to reenter the home during the fumigation

01:02PM    20    process.

21    Q    Did Kama'aina Termite and Pest Control always use

22    chloropicrin when it tented homes?

23    A    Not to my knowledge.

24    Q    How did you realize this?

01:02PM    25    A    I had a customer that purchased fumigation from me.  When

                1    we tented her home, her neighbor had called her to alert her

                2    that her tenant went inside of the tent and was back -- he

                3    hadn't -- he didn't return -- he didn't come back out of the

                4    tent yet.  So she was -- she was panicked, and she had called

01:02PM    5    me.  I answered the phone and after talking to her -- she

                6    already called the fire department -- I notified Mike about

                7    what happened, what was going on, and he -- he asked for us to

                8    meet down at the house that got broken into by the tenant.

                9    Q    And so that we have a sense of time, when did this happen?

01:03PM   10    Approximately when did this take place?

               11    A    While -- I don't -- while I was working for -- I don't

               12    know the exact date of when it happened.

               13    Q    Would -- if I showed you a document related to that, that

               14    sale, would that refresh your recollection?

01:03PM   15    A    Yes.

               16         MR. AKINA:  Could we show the witness Exhibit 9-474,

               17    please?

               18         THE COURT:  You may.

               19    BY MR. AKINA:

01:03PM   20    Q    And don't read off of this.  Just look at it, and let me

               21    know when you're done reviewing it.

               22    A    I'm done reviewing it.

               23    Q    Does this refresh your recollection as to the date that

               24    this incident took place?

01:04PM   25    A    Yes.

```
              1              MR. AKINA:  We can take this down.

              2     BY MR. AKINA:

              3     Q     And when did this take place?

              4     A     In June of 2018.

01:04PM       5     Q     And now who was the sales rep for that particular

              6     fumigation?

              7     A     Myself.

              8     Q     So this was your job?

              9     A     Yes.

01:04PM      10     Q     And as the sales rep, would you personally go and actually

             11     administer the gas and everything?

             12     A     No.

             13     Q     That would be other people?

             14     A     Yes.

01:04PM      15     Q     So after you get this call from the customer that someone

             16     had gotten in there, you told Mike about it, and Mike told you

             17     to go there?

             18     A     Yes, Mike asked for myself and him to -- to meet there.

             19     Q     And what did you do after he told you that?

01:05PM      20     A     I agreed and drove down to the house.

             21     Q     When you got to the house, what did you see?

             22     A     When I arrived at the house, I observed the fire

             23     department there, and they were entering the home.  When they

             24     exit -- when they came back out, he -- they had -- they had the

01:05PM      25     tenant and he looked to be unconscious.
```

 1   Q     And did you see what, if anything, the firefighters did?

 2   A     I wasn't up close, but from where my vantage point, it

 3   looked like they were trying to revive him.

 4   Q     And did the defendant arrive on scene at any point?

01:05PM   5   A     Yes, he -- he arrived shortly after.

 6   Q     So after the person had been pulled out of the home?

 7   A     Yes.

 8   Q     And did you talk to the defendant?

 9   A     Yeah, we -- we chatted about what -- what happened and --

01:06PM  10   I don't remember the whole conversation.

11   Q     Did the defendant leave you with any instructions?

12   A     He did say that have -- he passed on an attorney's phone

13   number for the tenant -- I mean, not the tenant, but the owner

14   to contact if anybody came asking questions after.

01:06PM  15   Q     Who did the defendant give that phone number to?

16   A     He texted it to me.

17   Q     And he wanted you to give that to the customer?

18   A     Correct.

19   Q     And did you do that?

01:06PM  20   A     Yes.

21   Q     How did you give that information to the customer?

22   A     Through text message.

23   Q     Would you commonly communicate with customers through text

24   message?

01:06PM  25   A     Yeah, I would commonly communicate through texts.

1          MR. AKINA:  Could we show the witness Exhibit 9-478,

2    please.

3          THE COURT:  Yes.

4    BY MR. AKINA:

01:07PM    5    Q    Do you recognize this?  It's a one-page document.

6    A    Yes.

7    Q    What is it?

8    A    It is a -- it's a text thread between me and the customer.

9    Q    Which customer?

01:07PM   10    A    The customer that owned that home.

11    Q    And in this particular text exchange, what are you doing?

12    A    I'm passing on the information that Mike provided for an

13    attorney named Randy.

14    Q    Is this a fair and accurate copy of that portion of the

01:07PM   15    communication you had with the customer?

16    A    Yes.

17          MR. AKINA:  I would offer 9-478 into evidence.

18          MS. PANAGAKOS:  No objection, Your Honor.

19          THE COURT:  Without objection, 9-478 is admitted.  You

01:07PM   20    may publish.

21          (Exhibit 9-478 was received in evidence.)

22          MR. AKINA:  Could we focus on the top where it says

23    "O'ahu Termite, Preston," and the phone number.

24    BY MR. AKINA:

01:08PM   25    Q    So whose phone is -- is this that we're looking at?  Whose

```
        1    phone did these come out of as far as you --

        2    A    The 859-2822 is my number.

        3    Q    So these are messages with 2822?

        4    A    Yes.

01:08PM  5    Q    Okay.  And you said that was your phone number?

        6    A    Correct.

        7         MR. AKINA:  And we can come out of this.

        8    BY MR. AKINA:

        9    Q    Focusing on the middle, so that O on the left, that

01:08PM 10    message, the second one.

       11    A    Yes.

       12    Q    What is -- who's sending this message?

       13    A    I'm sending this message to her.

       14    Q    And where it says "Randy attorney" and a phone number, is

01:08PM 15    that the attorney and the attorney's information that you got

       16    from the defendant?

       17    A    Yes.

       18         MR. AKINA:  Could we show the witness Exhibit 9-475,

       19    please?

01:09PM 20         THE COURT:  You may.

       21    BY MR. AKINA:

       22    Q    Do you recognize this?

       23    A    Yes.

       24    Q    What is this?

01:09PM 25    A    This looks like the tenant that went into the home.
```

```
 1   Q    Is this a fair and accurate --

 2             MR. AKINA:  And could we show the witness 9-476?  And

 3   477 -- 9-477?

 4   BY MR. AKINA:

 5   Q    Do you recognize 9-476 and 477 as well?

 6   A    Yes.

 7   Q    What is -- what does that depict?

 8   A    Which picture?

 9   Q    Both.  Just generally what do they both depict?

10   A    Oh, the fire department helping this person.

11   Q    So 9-475 through 9-477, those three exhibits, are these

12   fair and accurate depictions of what took place when you were

13   on scene on June of 2018?

14   A    Yes.

15             MR. AKINA:  I'd offer 9-475, 9-476 and 9-477 into

16   evidence.

17             THE COURT:  Counsel, any objection?

18             MR. KENNEDY:  No objection.

19             THE COURT:  Without objection, those three exhibits

20   are admitted.  That's 9-475 through 477.

21    ( Exhibits 9-475 through 9-477 were received in evidence.)

22             MR. AKINA:  Permission to publish?

23             THE COURT:  Yes.

24             MR. AKINA:  Could we start with 475.

25   BY MR. AKINA:
```

01:09PM (line 5)
01:09PM (line 10)
01:10PM (line 15)
01:10PM (line 20)
01:10PM (line 25)

```
      1   Q    Now, you had told us that when you arrived on scene, you
      2   observed the firefighters pulling someone who appeared to be
      3   unconscious.  Do you see that individual here?
      4   A    Yes.
01:10PM  5   Q    And at this point does that person appear to be
      6   unconscious?
      7   A    No.
      8   Q    So is this before or after that point when you first
      9   arrived?
01:10PM 10   A    This is after I arrived.
     11   Q    And who is the individual that you observed?  Which person
     12   is it in this picture?
     13   A    The person sitting down with the tattoo on his upper back.
     14   Q    The person with no shirt on?
01:11PM 15   A    Correct.
     16        MR. AKINA:  Could we go to 476, please.
     17   BY MR. AKINA:
     18   Q    Is this another picture of that same person?
     19   A    Yes.
01:11PM 20        MR. AKINA:  And 477.
     21   BY MR. AKINA:
     22   Q    Does this also show that person?
     23   A    Yes.
     24   Q    Where is that person in this picture?
01:11PM 25   A    On the bottom right.
```

    1   Q    If clam shells had been used on that property, could that
    2   person have gotten in?
    3        MR. KENNEDY:  Objection to the form of the question,
    4   Your Honor.
01:11PM  5        THE COURT:  Sustained.
    6   BY MR. AKINA:
    7   Q    Do you know if clam shells were used for that fumigation?
    8   A    I do not know if clam shells were used for this
    9   fumigation.
01:12PM  10  Q    Are you familiar with the phrase "cracking open a home"?
    11  A    Yes.
    12  Q    What does that mean?
    13  A    That means to break the seal.
    14  Q    Which seal?
01:12PM  15  A    The seal for the tent fumigation.
    16  Q    So at what point is that done?
    17  A    That's done when the fumigators arrive to undercover the
    18  home.
    19  Q    And when the -- when someone cracks the seal or opens it
01:12PM  20  up, is there any gear or equipment that are supposed to be
    21  used?
    22  A    You're supposed to use a breathing apparatus.
    23  Q    Why?
    24  A    Because of the chloropicrin.
01:12PM  25  Q    That's supposed to protect you from the chloropicrin?

```
           1   A    Yes.

           2   Q    Did you ever crack this -- crack open a home?

           3   A    Yes.

           4   Q    About how many times?

01:12PM    5   A    Fifteen -- 15, 20 times maybe.

           6   Q    And each of those times did you wear a breathing

           7   apparatus?

           8   A    No.

           9   Q    Each of those times did you feel any effects of

01:13PM   10   chloropicrin?

          11   A    No.

          12   Q    Are you aware of any rules regarding who can apply Vikane,

          13   the poison that you mentioned earlier?

          14   A    You have to have an applicator's license.

01:13PM   15   Q    And if you don't have an applicator's license, are you

          16   allowed to apply the Vikane?

          17   A    Not legally.

          18   Q    So for O'ahu Termite and Pest Control, how many fumigation

          19   crews did that one have?

01:13PM   20   A    We had one dedicated crew.

          21   Q    For Kama'aina Termite and Pest Control, how many

          22   fumigations crews did that one have?

          23   A    There was anywhere from two to four or five fumigation

          24   crews.

01:14PM   25   Q    And did every crew have its own certified applicator for
```

1    Vikane?

2    A    No.

3    Q    Did you ever see Delia Fabro-Miske applying Vikane at any

4    jobs that you were present at?

01:14PM    5    A    No.

6    Q    What -- as far as you knew, what was her role from what

7    you observed -- well, backing up, did she have any involvement

8    with Kama'aina Termite and Pest Control?

9    A    Delia came into the office Monday through Friday.

01:14PM    10    Q    Do you know if she was an employee?

11    A    I believe she was an employee -- she was an employee of

12    the company.

13    Q    And what did you -- what type of work did you see her

14    doing?

01:14PM    15    A    She would do clerical work and she would run -- she would

16    mainly run errands for Mike.

17    Q    Now, were you present at every single job that Kama'aina

18    Termite and O'ahu Termite did?

19    A    No.

01:15PM    20    Q    So just from what the ones you went to you didn't see

21    Delia Fabro-Miske at.  Is that fair?

22    A    It's fair to say that I barely went to any of my

23    fumigations unless the customer requested me to be there.

24    Q    Did you ever observe Delia Fabro-Miske operate a forklift?

01:15PM    25    A    No.

```
           1   Q     Did you ever see her operate a high lift?

           2   A     No.

           3   Q     Were there any type of formal agreements that you --

           4   what's a service agreement?

01:15PM    5   A     A service agreement is a contract between the company and

           6   the customer.

           7   Q     And as your role in sales, would you deal with service

           8   agreements for the companies?

           9   A     Yes.

01:15PM   10   Q     And would those service agreements indicate the type of

          11   chemicals that were agreed upon to be used for the home?

          12   A     Yes.

          13   Q     In your meetings with potential customers, would you ever

          14   discuss the use of chloropicrin?

01:16PM   15   A     I would check -- I would check the box and I would use it

          16   as a selling point for them to make them feel safer that we

          17   would use chloropicrin because it's a -- you know, it would

          18   deter their house getting broken into while the fumigation

          19   process was going on.

01:16PM   20   Q     And you said you would always check chloropicrin on these

          21   agreements?

          22   A     Ninety-nine percent of the time.

          23   Q     I'm sorry?

          24   A     Ninety-nine percent -- I mean, sometimes I would forget,

01:16PM   25   but most of the times I would check that box off.
```

```
 1   Q    Does it make sense to ever use Vikane without
 2   chloropicrin?
 3        MR. KENNEDY:  Your Honor, I'd object on beyond his
 4   expertise.
 5        THE COURT:  Sustained.
 6   BY MR. AKINA:
 7   Q    As far as your knowledge and dealing with sales to
 8   customers, would you ever suggest to them that you would use
 9   Vikane without chloropicrin?
10   A    No.
11   Q    Why not?
12   A    Because that's against the law.
13   Q    Did Kama'aina Termite and Pest Control and O'ahu Termite
14   and Pest Control only do fumigations?
15   A    No.  We provided general pest control services and ground
16   treatment.
17   Q    So for ground treatment were there separate chemicals
18   used?
19   A    Yeah, for liquid ground treatment we would use Termidor,
20   and for ground -- for another form of ground treatment we would
21   do Sentricon bait -- baiting stations.
22   Q    Are there cheaper alternatives to -- you mentioned
23   Termidor.  Are there cheaper alternatives to Termidor?
24   A    Yes.
25   Q    In the service agreements that you dealt with, how often
```

01:17PM  (line 5)
01:17PM  (line 10)
01:17PM  (line 15)
01:17PM  (line 20)
01:18PM  (line 25)

```
        1   would you check Termidor if -- if ground treatment was a

        2   service that was to be provided?

        3   A    If the customer wanted to do liquid ground treatment,

        4   Termidor was the only option.

01:18PM 5   Q    And Termidor versus the cheaper option, if you know, do

        6   you know why only Termidor was listed on those agreements?

        7   A    Termidor is a brand name and it's highly recognized.  So

        8   having that, that the customers would prefer that you would use

        9   Termidor.

01:18PM 10  Q    Are you aware of any rules regarding how Termidor is

        11  obtained?

        12  A    You have to purchase it through an authorized supplier.

        13  Q    So is this something that you could just walk into Long's

        14  or Home Depot, for example, and buy off the shelf?

01:19PM 15  A    No.

        16  Q    And did you ever obtain Termidor for Kama'aina Termite and

        17  Pest Control?

        18  A    Yes.

        19  Q    Would you always obtain it from an authorized seller?

01:19PM 20  A    No.

        21  Q    Why not?

        22  A    Because -- I'm sorry, I don't understand what the question

        23  is.

        24  Q    Sure.  So the times that you obtained Termidor, how did

01:19PM 25  you obtain it?  Where did you get it from?
```

1    A    I purchased it from a guy named Rob that Mike -- I met

2    through Mike.

3    Q    And would you do that on your own volition?  Did someone

4    tell you to go to Rob?

01:19PM    5    A    Yeah, Mike would instruct me to go meet Rob.

6    Q    Where would you meet Rob?

7    A    I met him up around -- around Kama'aina Termite, around

8    the parking lot area or wherever it was convenient for both of

9    us.

01:20PM    10    Q    So was this at a store?

11    A    No, it wasn't at a store.

12    Q    So how would the transaction take place?

13    A    Rob would pull up in his truck, I would pay him, and he

14    would give me -- he would give me the product.

01:20PM    15    Q    How would you pay him?

16    A    I would pay him in cash.

17    Q    Approximate -- was there a difference in price here as

18    opposed to other -- other authorized sellers?

19    A    I believe it was at least 50 percent off.

01:20PM    20    Q    Do you know if Termidor was always used when ground

21    service treatment was offered at Kama'aina Termite and Pest

22    Control?

23    A    I don't know if Termidor was always used.  I -- I

24    wasn't on -- I'm not a technician that applies Termidor.  I'm

01:21PM    25    just the person who sells -- sells the service.  And then a

1    technician would go out and do the ground treatment with

2    Termidor or without, but I didn't have knowledge that it wasn't

3    always used.

4    Q    So we've been talking about service agreements.

01:21PM    5         MR. AKINA:  I would offer into evidence at this point

6    Exhibits 9-241 through 9-245 and 9-593, and this would be

7    pursuant to the parties' stipulation number 7 that's listed.

8         MR. KENNEDY:  Counsel, can you go over those numbers a

9    little slower?

01:21PM    10        MR. AKINA:  Certainly.

11        MR. KENNEDY:  Exhibit -- it was 9 --

12        MR. AKINA:  9-241 --

13        MR. KENNEDY:  241.

14        MR. AKINA:  -- through 9-245.

01:21PM    15        MR. KENNEDY:  245.

16        MR. AKINA:  And 9-593.

17        MR. KENNEDY:  Got it.  Pursuant to the stipulation,

18    Your Honor, no objection.

19        THE COURT:  No objection, is that what you said,

01:22PM    20    Mr. Kennedy?  I didn't hear you.  No objection?

21        MR. KENNEDY:  No objection.

22        THE COURT:  All right.  Without objection,

23    Government's Exhibits 9-241 through 9-245 are each admitted

24    together with 9-593.  You may publish.

01:22PM    25        (Exhibit 9-241 through 9-245 and 9-593 were received in

```
             1                                      evidence.)

             2              MR. AKINA:  Thank you.  Could we publish 9-241?

             3    BY MR. AKINA:

             4    Q    What are we looking at, Mr. Kimoto?

01:22PM      5    A    This is a fumigation -- structural fumigation agreement.

             6    Q    For -- is this one of those service agreements you were

             7    talking about?

             8    A    Yes.

             9    Q    And which company is this particular one for?

01:23PM     10    A    This is for O'ahu Termite and Pest Control.

            11              MR. AKINA:  Can we zoom in on this area, please?

            12    BY MR. AKINA:

            13    Q    Okay.  Who is the -- who is the sales agent for this

            14    particular job?

01:23PM     15    A    Myself.

            16    Q    How do you know that?

            17    A    Because of my handwriting, and I wrote my name and my

            18    phone number down.

            19    Q    That's the same 2822 number that you texted that one

01:23PM     20    customer in 2018 where someone passed out or someone was pulled

            21    from the home?

            22    A    Yes.

            23    Q    And if you look on the left box here under "Target pests,"

            24    can you explain that?

01:23PM     25    A    The target pests are the pests that the fumigation is
```

        1   intended to -- to terminate, I guess.  So there's different

        2   amounts of Vikane gas that you have to use with -- with each

        3   target pest.  So you can't -- you can't use the same amount of

        4   Vikane for dry wood termites as you would with dead bugs or

01:24PM  5   subterranean termites.

        6           MR. AKINA:  And then if we zoom out of this, if you

        7   could focus on the two boxes -- three boxes starting with

        8   structural fumigation agreement.

        9   BY MR. AKINA:

01:24PM 10   Q    Can you explain what this is?

       11   A    This will tell -- this will tell you the type of

       12   fumigation and what the control material that -- that we're

       13   using for the fumigation.

       14   Q    And so under control material here, you checked off Vikane

01:24PM 15   and chloropicrin, right?

       16   A    Yes.

       17   Q    Is that typically how you would mark a service agreement

       18   that Vikane was being used?

       19   A    Yes.

01:25PM 20   Q    There's ProFume.  What is ProFume?

       21   A    I don't -- I don't know what ProFume is.  We -- I've never

       22   sold a job with ProFume on there.

       23   Q    Have you ever checked the box for ProFume?

       24   A    No, never.

01:25PM 25           MR. AKINA:  And on the bottom right-hand corner, if we

```
        1   could focus on the price area.

        2   BY MR. AKINA:

        3   Q    So for this particular job, is this the price that was

        4   agreed on?

01:25PM 5   A    Yes.

        6   Q    And how would payment usually be made?

        7   A    Payment would have to be made by either credit card, check

        8   or cashier's check.

        9   Q    Would payment ever be made in cash as far as you know?

01:25PM 10  A    No, we -- we weren't allowed to accept cash.

       11        MR. AKINA:  Could we go to the 9-242, please.

       12   BY MR. AKINA:

       13   Q    I'm sorry, before we move on, I was looking at the date.

       14   What year is this in?

01:26PM 15  A    2019.

       16   Q    Okay.  Moving on to the next one, 9-242.  Who is the sales

       17   rep for this one?

       18   A    Myself.

       19   Q    And what year is this agreement in?

01:26PM 20  A    2020.

       21   Q    Is this another example of a service agreement that you

       22   would do?

       23   A    Yes.

       24   Q    And 9-243.  Is this also an agreement that you worked on?

01:26PM 25  A    Yes, this is -- this is an email version of the contract.
```

1    Q    How do you know it's an email version?

2    A    Because it's typed out and -- yeah, because it's typed

3    out, and my signature is just my name spelled out.

4    Q    And how do you know that it's not someone else who just

01:27PM   5    put your name on to an agreement that they worked on?

6    A    Because I would object to it, meaning that this is how --

7    this is how I got paid.  This is how I -- I mean, this is how I

8    got paid, so you -- I would not -- I would not let anybody

9    use -- just put my name down.  I mean, if they wanted to and

01:27PM   10    give me the credit for this, then I wouldn't object to it.

11    Q    So breaking that down, when you were working in sales,

12    how -- would you get like a commission?

13    A    Yes, I would get 15 percent of the subtotal of whatever I

14    sold.

01:27PM   15    Q    And if your name is not on the service agreement, would it

16    make it harder to prove that you're entitled to that commission

17    for that job?

18    A    In your name is not on the service agreement, you would

19    not get paid for that job.

01:28PM   20    Q    So would you ever put other people's names on jobs that

21    you did?

22    A    No.

23    Q    Why not?

24    A    Because I wouldn't get paid for that job.

01:28PM   25    Q    And again, here you marked Vikane and chloropicrin in the

```
        1   control material area?

        2          MR. AKINA:  If we could focus on that.

        3          THE WITNESS:  Yes.

        4          MR. AKINA:  And could we go on to 9-245.

01:28PM 5   BY MR. AKINA:

        6   Q    Is this another job that you worked on that you were the

        7   sales rep for?

        8   A    Yes.

        9          MR. AKINA:  Go to the 9-593, please.

01:28PM 10  BY MR. AKINA:

        11  Q    This format is a little different.  Can you explain this

        12  to us, please?

        13  A    This is just a -- one of the contracts.  Like I don't know

        14  if this one is older or newer.  This is -- I'm sorry, this is

01:29PM 15  the older contract that we had.

        16  Q    So did the form sort of change over time?

        17  A    Yes.

        18  Q    And again, this is one that you worked on?

        19  A    Yes.

01:29PM 20  Q    Did Kama'aina Termite -- sorry, did O'ahu Termite and Pest

        21  Control have any advertising materials that you would use in

        22  trying to get work?

        23  A    Yes, we did have one week of the MidWeek flyers that went

        24  out.  One week out of the month we would have advertisement on

01:29PM 25  there.
```

```
        1   Q    Okay.  And explain that to us.

        2   A    So there would be a flyer in the MidWeek that would have

        3   advertising.  Three weeks was for Kama'aina, and then we would

        4   get the fourth week for advertising for O'ahu Termite.

01:30PM 5   Q    And how do you know this?

        6   A    Because I was -- because I seen it and I was involved in

        7   the decision-making.

        8   Q    Who else was involved in that decision-making?

        9   A    Mike -- Mike and Angela.

01:30PM 10  Q    Who is Angela?

        11  A    Angela is somebody who did our -- I guess you would call

        12  it like back office stuff.

        13  Q    Do you recall her last name?

        14  A    Varnadore.

01:30PM 15  Q    Angela Varnadore?

        16  A    Correct.

        17  Q    And so why -- why not run ads for Kama'aina Termite and

        18  Pest Control and O'ahu Termite and Pest Control at the same

        19  time?

01:31PM 20  A    We never -- we never discussed that, that part.

        21             MR. AKINA:  Could we show the witness 9-568, please?

        22             THE COURT:  We can.  We're just at the 1:30 hour, so

        23  please try to wrap up in the next couple of minutes.

        24             MR. AKINA:  Thank you, Your Honor.

01:31PM 25  BY MR. AKINA:
```

```
         1   Q    Do you recognize this?

         2   A    Yes.

         3   Q    What is this?

         4   A    This is a MidWeek flyer advertisement.

01:31PM  5   Q    This is an example of one of those?

         6   A    Correct.

         7   Q    Is it a fair and accurate copy of one of the ads that were

         8   run in the MidWeek?

         9   A    Yes.

01:31PM  10            MR. AKINA:  I would move 9-568 into evidence.

         11            THE COURT:  Any objection?

         12            MR. KENNEDY:  No objection.

         13            THE COURT:  Without objection, 9-568 is admitted.  You

         14   may publish.

01:31PM  15            (Exhibit 9-568 was received in evidence.)

         16            MR. AKINA:  And if we could just zoom in on this.

         17   BY MR. AKINA:

         18   Q    And this was for which company?

         19   A    This was for O'ahu Termite and Pest Control.

01:32PM  20   Q    And it offers disinfecting services here?

         21   A    Yes.

         22   Q    Do you know anything about that?

         23   A    Not the intricate details to it.  I mean, this was when

         24   COVID first started, and we would -- we would spray the

01:32PM  25   disinfectant on -- at homes, schools, churches.
```

1              MR. AKINA:  Thank you.  I think this is a good place

2     to break, Your Honor.

3              THE COURT:  All right.  Good enough.

4              As we go to break at the end of our trial day, I will

01:32PM   5     remind our jurors as you depart to please refrain from

6     discussing the substance of this case with anyone, including

7     one another, until I advise otherwise; to refrain from

8     accessing any media or other accounts of this case that may be

9     out there; and also please do not conduct any independent

01:32PM   10    investigations into the facts, circumstances or persons

11    involved.

12             We will see you here back in court at 8:30 tomorrow

13    morning where we will resume with Mr. Kimoto.

14             (Proceedings were concluded at 1:33 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10            DATED at Honolulu, Hawaii, May 28, 2024.

11

12

13                                  /s/ Gloria T. Bediamol

14                                  GLORIA T. BEDIAMOL.

15                                  RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```