1                  IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                 )
                Plaintiff,        )      Honolulu, Hawaii
5                                 )
          vs.                     )      January 25, 2024
6                                 )
     MICHAEL J. MISKE, JR.,       )      CONTINUED TESTIMONY OF
7                                 )      PRESTON KIMOTO
                Defendant.        )
8    _____ )

9
                  PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 12)
10                BEFORE THE HONORABLE DERRICK K. WATSON,
                  CHIEF UNITED STATES DISTRICT COURT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:            MARK INCIONG, ESQ.
13                                 MICHAEL DAVID NAMMAR, ESQ
                                   WILLIAM KE AUPUNI AKINA, ESQ.
14                                 AISLINN AFFINITO, ESQ.
                                   Office of the United States Attorney
15                                 PJKK Federal Building
                                   300 Ala Moana Boulevard, Suite 6100
16                                 Honolulu, Hawaii  96850

17   For the Defendant:            LYNN E. PANAGAKOS, ESQ.
                                   841 Bishop St., Ste 2201
18                                 Honolulu, HI 96813

19                                 MICHAEL JEROME KENNEDY, ESQ.
                                   Law Offices of Michael Jerome
20                                 Kennedy, PLLC
                                   333 Flint Street
21                                 Reno, NV 89501

22   Official Court Reporter:      Gloria T. Bediamol, RPR RMR CRR FCRR
                                   United States District Court
23                                 300 Ala Moana Boulevard
                                   Honolulu, Hawaii 96850
24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).

```
1                          I  N D E X

2    GOVERNMENT WITNESS:                              PAGE NO.

3     PRESTON KIMOTO (CONTINUED TESTIMONY)

4         RESUMED DIRECT EXAMINATION BY MR. AKINA          3
          CROSS-EXAMINATION BY MR. KENNEDY              107
5

6    EXHIBITS:                                        PAGE NO.

7    Exhibit 9-594 was received in evidence              6
     Exhibit 9-860 was received in evidence              7
8    Exhibit 9-570 was received in evidence             21
     Exhibit 1-570 was received in evidence             26
9    Exhibit 1-1022 was received in evidence            36
     Exhibit 1-1023 was received in evidence            36
10   Exhibit 2-48 was received in evidence              39
     Exhibit 1-39 was received in evidence              53
11   Exhibit 1-565 was received in evidence             57
     Exhibit 1-1076 was received in evidence            67
12   Exhibit 5-37 was received in evidence              86
     Exhibit 9-869 was received in evidence             96
13   Exhibit 9010-003 was received in evidence         149

14

15

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | January 25, 2024                                      8:37 a.m.        |
| 08:37AM | 2  | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United               |
| 08:37AM | 3  | States of America versus Michael J. Miske, Jr.                      |
| 08:37AM | 4  | This case has been called for jury trial, day 12.                  |
| 08:37AM | 5  | Counsel, please make your appearances for the record.              |
| 08:37AM | 6  | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,             |
| 08:37AM | 7  | Michael Nammar, and KeAupuni Akina for the United States.          |
| 08:37AM | 8  | Paralegal Kari Sherman and FBI special agent Thomas Palmer also    |
| 08:37AM | 9  | present.                                                            |
| 08:37AM | 10 | THE COURT:  Good morning.                                          |
| 08:37AM | 11 | MR. KENNEDY:  Good morning, Your Honor.  Michael                   |
| 08:37AM | 12 | Kennedy with Lynn Panagakos, Michael Miske, and Ashley King.       |
| 08:37AM | 13 | Good morning, everyone.                                            |
| 08:37AM | 14 | THE COURT:  Good morning.  You may all be seated.                  |
| 08:37AM | 15 | Good morning to the 18 persons on our jury.  Everyone is          |
| 08:37AM | 16 | looking sharp, chipper, wide awake, ready to go, just like I       |
| 08:38AM | 17 | like to see you.  So yesterday afternoon when we adjourned,        |
| 08:38AM | 18 | Mr. Kimoto was on the stand.  Mr. Akina was in the midst of his    |
| 08:38AM | 19 | direct examination, and that's where we will resume this           |
| 08:38AM | 20 | morning.  Mr. Akina, when you are ready.                           |
| 08:38AM | 21 | PRESTON KIMOTO,                                                    |
| 08:38AM | 22 | (Having previously been sworn, resumed the stand.)                |
| 08:38AM | 23 | MR. AKINA:  Thank you, Your Honor.                                 |
| 08:38AM | 24 | RESUMED DIRECT EXAMINATION                                         |
| 08:38AM | 25 | BY MR. AKINA:                                                      |

| | | |
|---|---|---|
| 08:38AM | 1 | Q    Good morning, Mr. Kimoto. |
| 08:38AM | 2 | A    Good morning. |
| 08:38AM | 3 | Q    So in your role as doing sales for Kama'aina Termite, were |
| 08:38AM | 4 | there biographical information that was provided to the |
| 08:38AM | 5 | potential customers regarding people associated with Kama'aina |
| 08:38AM | 6 | Termite? |
| 08:38AM | 7 | A    Not for Kama'aina Termite, but when I did sales for O'ahu |
| 08:38AM | 8 | Termite, there were bios when I presented to AOAOs for townhome |
| 08:38AM | 9 | pest control, ground treatment and fumigation estimates. |
| 08:38AM | 10 | Q    So for O'ahu Termite, you would use -- would you use those |
| 08:39AM | 11 | types of bios and other information with AOAOs? |
| 08:39AM | 12 | A    Yes. |
| 08:39AM | 13 | Q    And can you generally describe how that information would |
| 08:39AM | 14 | be provided to them? |
| 08:39AM | 15 | A    It was in a pamphlet form that you could -- that we could |
| 08:39AM | 16 | pass out. |
| 08:39AM | 17 | MR. AKINA:  Could we show the witness Exhibit 9-594, |
| 08:39AM | 18 | please? |
| 08:39AM | 19 | THE COURT:  Yes.  I'm sure -- Mr. Kimoto, I'm not sure |
| 08:39AM | 20 | that all of the jurors know what an AOAO is.  So would you let |
| 08:40AM | 21 | them know what that is before we continue. |
| 08:40AM | 22 | THE WITNESS:  It's an association for townhomes and |
| 08:40AM | 23 | condominiums. |
| 08:40AM | 24 | BY MR. AKINA: |
| 08:40AM | 25 | Q    So going to the -- well, first, have you seen this exhibit |

08:40AM   1   before?

08:40AM   2   A     Yes, I have.

08:40AM   3   Q     And going to the third page of the document, without

08:40AM   4   reading anything that's on here, just generally, can you tell

08:40AM   5   us what that is?

08:40AM   6   A     This is a short bio on myself.

08:40AM   7   Q     If we go to the fourth page, can you tell us what this is?

08:40AM   8   A     This is the front -- like, the front page of the proposal.

08:40AM   9   Q     And is this part of a pamphlet that you were referring to

08:40AM   10  that would be provided to the AOAO?

08:40AM   11  A     Yes.  This would be provided to the property management,

08:41AM   12  and also the board members.

08:41AM   13  Q     And this one is for Mililani Garden Homes?

08:41AM   14  A     Correct.

08:41AM   15  Q     What type of place is that?

08:41AM   16  A     That's a townhouse association.

08:41AM   17  Q     Is that similar to an AOAO?

08:41AM   18  A     Yes, it is an AOAO, I believe.

08:41AM   19  Q     And then if we could go to page six and page seven and

08:41AM   20  page eight, and then to page ten.

08:41AM   21        Generally, what types of information are contained --

08:41AM   22  well, in this pamphlet, what types of information is provided

08:41AM   23  to the AOAO?

08:41AM   24  A     It would go over services that would be provided to them,

08:42AM   25  also with an estimate on the cost of those services.

08:42AM   1   Q    And for this particular project for Exhibit 9-594, who was
08:42AM   2   the sales representative?
08:42AM   3   A    Myself.
08:42AM   4   Q    Is this a fair and accurate -- this entire document, and
08:42AM   5   it continues to page 13 -- but is this entire document we
08:42AM   6   previously looked at, is it a fair and accurate copy of a
08:42AM   7   pamphlet that was used for this particular job?
08:42AM   8   A    Yes.
08:42AM   9          MR. AKINA:  At this time, I'd offer Exhibit 9-594 into
08:42AM   10  evidence.
08:42AM   11         THE COURT:  Any objection, counsel?
08:42AM   12         MR. KENNEDY:  No objection.
08:42AM   13         THE COURT:  Without, objection, 9-594 is admitted.
08:42AM   14  You may publish.
08:42AM   15        (Exhibit 9-594 was received in evidence.)
08:42AM   16         MR. AKINA:  Before we publish this one, could we show
08:42AM   17  the witness Exhibit 9-860 as well?
08:42AM   18         THE COURT:  Yes.
08:43AM   19  BY MR. AKINA:
08:43AM   20  Q    Going to page three again, just so the witness can orient
08:43AM   21  himself, and page four.
08:43AM   22         Exhibit 9-860, what is that generally?
08:43AM   23  A    This was another proposal.
08:43AM   24  Q    Is it for that same location as the previous one you
08:43AM   25  looked at?

08:43AM   1   A    No this is for Waiau Garden Villas.

08:43AM   2   Q    Does it have similar information perspective to this

08:43AM   3   particular job as the previous exhibit you looked at?

08:43AM   4   A    Yes.  The difference -- the only difference is the name

08:43AM   5   and the price.

08:43AM   6   Q    Going to page eight.  Again, who is the sales

08:43AM   7   representative for this project?

08:43AM   8   A    Myself.

08:44AM   9   Q    Is this also a fair and accurate copy of a pamphlet that

08:44AM  10   was used for this particular project?

08:44AM  11   A    Yes.

08:44AM  12         MR. AKINA:  I'd offer 9-860 into evidence.

08:44AM  13         THE COURT:  Mr. Kennedy?

08:44AM  14         MR. KENNEDY:  No objection.

08:44AM  15         THE COURT:  Without objection, Exhibit 9-860 is

08:44AM  16   admitted.  You may publish that as well.

08:44AM  17         (Exhibit 9-860 was received in evidence.)

08:44AM  18   BY MR. AKINA:

08:44AM  19   Q    If we could publish the previous one, 9-594.  So this is

08:44AM  20   the first -- is this just the cover page for the pamphlet?

08:44AM  21   A    Yes.

08:44AM  22   Q    And going to the second page, what type of information, if

08:44AM  23   you could just very generally summarize?

08:44AM  24   A    This is giving information about the background of O'ahu

08:44AM  25   Termite and Pest Control.

08:44AM   1   Q   On page four, can you tell the jury what this shows?

08:45AM   2   A   This shows the Mililani Garden Homes II, I guess the

08:45AM   3   project for the pamphlet that we made.

08:45AM   4   Q   What was the date for this proposal?

08:45AM   5   A   September 16, 2019.

08:45AM   6   Q   And Mililani Garden Homes II, is that just one single

08:45AM   7   family home residence?

08:45AM   8   A   No, it's a townhome complex.

08:45AM   9   Q   So it's multiple townhouses?

08:45AM   10   A   Multiple building, yes, with multiple townhouses in each

08:45AM   11   building.

08:45AM   12   Q   And as part of the promotional materials, if you go back

08:45AM   13   to page three, what is this that we are looking at?

08:45AM   14   A   This is a short bio on myself.

08:45AM   15   Q   And if we could zoom in on the words at the bottom.

08:46AM   16       At the time that you were working at O'ahu Termite and

08:46AM   17   Pest Control, who generated these pamphlets?

08:46AM   18   A   Angela Varnadore.

08:46AM   19   Q   Did you submit this bio on yourself to Angela prior to it

08:46AM   20   being furnished to the customers?

08:46AM   21   A   No, I did not.

08:46AM   22   Q   And at the time that you were working at O'ahu Termite and

08:46AM   23   Pest Control, did you review these -- your bio to make sure

08:46AM   24   that it was accurate?

08:46AM   25   A   I did not.

08:46AM    1    Q    But would you provide these to customers?

08:46AM    2    A    Yes, I would.

08:46AM    3    Q    So fair to say you provide these to customers even though

08:46AM    4    you hadn't fully read the bio on yourself?

08:46AM    5    A    That's correct.

08:46AM    6    Q    And reading through this bio, we go to the second to the

08:46AM    7    last sentence right in the middle.  I think it's visible here.

08:47AM    8         Do you see that portion where it says "his

08:47AM    9    wide-ranging skill set has enabled him to successfully

08:47AM    10    contribute in a variety of roles, including project management,

08:47AM    11    business development, and product education."

08:47AM    12         Do you see that line?

08:47AM    13    A    Yes.

08:47AM    14    Q    What's the purpose -- even though you had not read this to

08:47AM    15    verify it, would you make similar representations to customers

08:47AM    16    that you had some type of background?

08:47AM    17    A    Yes.

08:47AM    18    Q    Can you explain a little bit about how you would talk to

08:47AM    19    customers about that?

08:47AM    20    A    I would let them know that this wasn't my first time

08:47AM    21    managing big projects like this -- like this one.

08:47AM    22    Q    And what's the point of telling that to a customer?

08:47AM    23    A    To gain credibility with the customer and gain trust.

08:47AM    24    Q    And was that accurate at the time?

08:47AM    25    A    Yes.

08:47AM   1   Q   And going to the next sentence below that, where it says
08:48AM   2   "Preston is a graduate of Kaimuki High School," stopping there,
08:48AM   3   was that accurate at that time?
08:48AM   4   A   That is accurate.
08:48AM   5   Q   And then continuing at the University of Hawaii at Manoa,
08:48AM   6   was that accurate at the time?
08:48AM   7   A   That is not accurate.
08:48AM   8   Q   Have you graduated from the University of Hawaii at Manoa?
08:48AM   9   A   No.
08:48AM   10   Q   Did you tell anyone at O'ahu Termite and Pest Control that
08:48AM   11   you were a graduate of University of Hawaii at Manoa?
08:48AM   12   A   No.
08:48AM   13   Q   Again, what relevance, if any, does that information have
08:48AM   14   to a pamphlet like this in a proposal?
08:48AM   15   A   I don't know.
08:48AM   16   Q   What's the point in including your educational background
08:48AM   17   in a pamphlet?
08:48AM   18   A   To build more credibility.
08:48AM   19   Q   If we go to page five.
08:49AM   20       For this particular project, what type of work was to
08:49AM   21   be done?  If we could zoom under the bottom half of scope of
08:49AM   22   work.
08:49AM   23   A   This would be for fumigation of the buildings and also
08:49AM   24   Sentricon takeover.
08:49AM   25   Q   And I don't think you've talked about Sentricon yet.

| 08:49AM | 1 | What is that generally? |
| 08:49AM | 2 | A    Sentricon is another form of ground treatment, but instead |
| 08:49AM | 3 | of using Termidor, the liquid treatment, we would install bait |
| 08:49AM | 4 | stations around the building -- buildings. |
| 08:49AM | 5 | Q    And you had testified that there was a cheaper |
| 08:49AM | 6 | alternative, sort of a generic brand to Termidor; is that |
| 08:49AM | 7 | Sentricon? |
| 08:49AM | 8 | A    No.  Sentricon is a more expensive form of ground |
| 08:49AM | 9 | treatment. |
| 08:49AM | 10 | Q    So Sentricon and Termidor are two separate things? |
| 08:49AM | 11 | A    Yes. |
| 08:49AM | 12 | Q    If we go to page ten. |
| 08:50AM | 13 | What does this show? |
| 08:50AM | 14 | A    This shows the price for the fumigation and then on the |
| 08:50AM | 15 | bottom of that, it shows the Sentricon takeover price, and also |
| 08:50AM | 16 | to monitor the Sentricon system. |
| 08:50AM | 17 | Q    If we could zoom in on the pricing. |
| 08:50AM | 18 | In this particular proposal, what was the price? |
| 08:50AM | 19 | A    For tent fumigation of the buildings, it would be 114,000. |
| 08:50AM | 20 | For the Sentricon takeover, it would be $18,760.  The annual |
| 08:51AM | 21 | monitoring of the Sentricon system would be $6,000.  If they |
| 08:51AM | 22 | decided that they wanted to do a three-year program -- |
| 08:51AM | 23 | monitoring program, it would be $29,000 upfront.  And if they |
| 08:51AM | 24 | decided to do a five-year Sentricon monitoring, it would be -- |
| 08:51AM | 25 | upfront it would be $36,960. |

08:51AM   1   Q    Going to page 12, are these just some sample reviews that

08:51AM   2   were provided?

08:51AM   3   A    Yes.

08:51AM   4   Q    Did you have any personal knowledge about these customers?

08:51AM   5   A    No.

08:51AM   6   Q    And then, going to the last page, page 13.

08:51AM   7        You see the contact information as that address out in

08:51AM   8   Pearl City?

08:51AM   9   A    Yes.

08:51AM   10  Q    What location does that refer to?

08:52AM   11  A    That is -- that's the mailing address for O'ahu Termite

08:52AM   12  and Pest Control.

08:52AM   13  Q    Is that the one you mentioned yesterday, that storage

08:52AM   14  facility?

08:52AM   15  A    Correct.

08:52AM   16  Q    And at the time in 2019, where were you actually reporting

08:52AM   17  to?

08:52AM   18  A    The office was in Kama'aina Termite and Pest Control.

08:52AM   19  Q    If we could go to Exhibit 9-860, please.  Go to page

08:52AM   20  three.

08:52AM   21        So this is for a different complex, correct?  Go to

08:52AM   22  page four.

08:52AM   23  A    Yes.

08:52AM   24  Q    And again, Waiau Garden Villas, is that one single

08:52AM   25  residence?

08:52AM   1   A    No, it's a town -- it has -- it has buildings and there is

08:53AM   2   multiple townhomes in those buildings.

08:53AM   3   Q    In this proposal, what's the date for it?

08:53AM   4   A    October 14, 2019.

08:53AM   5   Q    And then, going back to page three.  If you look at that

08:53AM   6   second to the last sentence about your educational background,

08:53AM   7   is that the same as the previous exhibit?

08:53AM   8   A    Yes.

08:53AM   9   Q    If we go to page five, what was the work to be done for

08:53AM   10  this project?

08:53AM   11  A    The work to be done would be a Termidor liquid treatment.

08:53AM   12  Q    So not fumigation for this one?

08:53AM   13  A    Not fumigation.

08:53AM   14  Q    And how many buildings?

08:53AM   15  A    22 buildings.

08:53AM   16  Q    If we go to page eight, is it similar to the previous

08:53AM   17  exhibit, this also provides the cost breakdown?

08:54AM   18  A    Yes.

08:54AM   19       MR. AKINA:  Could we show the witness Exhibit 9-477,

08:54AM   20  which is already in evidence?

08:54AM   21  BY MR. AKINA:

08:54AM   22  Q    Yesterday, you testified about an incident back in 2018

08:54AM   23  where someone had to be pulled out of a residence that was

08:54AM   24  being fumigated.

08:54AM   25       Do you recall that?

| | | | |
|---|---|---|---|
| 08:54AM | 1 | A | Yes. |
| 08:54AM | 2 | Q | And can you tell us again what this is a picture of? |
| 08:54AM | 3 | A | This was a picture of the fire department attending to the |
| 08:54AM | 4 | | victim or attending to the tenant. |
| 08:54AM | 5 | Q | Do you see two individuals in the background, one with his |
| 08:54AM | 6 | | arms crossed in a gray shirt, and then an individual to the |
| 08:54AM | 7 | | right if you are looking at the photo, in white -- in a white |
| 08:55AM | 8 | | T-shirt? |
| 08:55AM | 9 | A | Yes. |
| 08:55AM | 10 | Q | Do you recognize those individuals? |
| 08:55AM | 11 | A | Yes. |
| 08:55AM | 12 | Q | Who are they? |
| 08:55AM | 13 | A | Mike is in the white T-shirt and I'm in the gray T-shirt. |
| 08:55AM | 14 | Q | So that's you and the defendant on scene for that |
| 08:55AM | 15 | | incident? |
| 08:55AM | 16 | A | Yes. |
| 08:55AM | 17 | | THE COURT:  Do you want to display that to the jury? |
| 08:55AM | 18 | | MR. AKINA:  Oh, yes.  Sorry.  Could we publish that to |
| 08:55AM | 19 | | the jury. |
| 08:55AM | 20 | | THE COURT:  You may. |
| 08:55AM | 21 | | MR. AKINA:  Thank you, Your Honor. |
| 08:55AM | 22 | | BY MR. AKINA: |
| 08:55AM | 23 | Q | If we could zoom in on those two individuals, the one in |
| 08:55AM | 24 | | gray and the one in white. |
| 08:55AM | 25 | | Again, the one in gray was you? |

| 08:55AM | 1  | A | Yes. |
| 08:55AM | 2  | Q | And who is the individual in white? |
| 08:55AM | 3  | A | Mike. |
| 08:55AM | 4  | Q | Are you familiar with what an RME is? |

08:55AM   1   A   Yes.

08:55AM   2   Q   And who is the individual in white?

08:55AM   3   A   Mike.

08:55AM   4   Q   Are you familiar with what an RME is?

08:56AM   5   A   Yes.

08:56AM   6   Q   What is that to your understanding?

08:56AM   7   A   That's a responsible managing employee.

08:56AM   8   Q   And what is your understanding of whether or not a

08:56AM   9   responsible managing employee is needed to operate a company

08:56AM   10   like Kama'aina Termite or O'ahu Termite?

08:56AM   11           MR. KENNEDY:  Objection; relevance and speculation.

08:56AM   12           THE COURT:  I'll allow it for now.

08:56AM   13           THE WITNESS:  It's required.

08:56AM   14   BY MR. AKINA:

08:56AM   15   Q   During your time either at Kama'aina Termite or O'ahu

08:56AM   16   Termite, did you -- well, do you know an individual named Mike

08:56AM   17   Warden?

08:56AM   18   A   Yes.

08:56AM   19   Q   And while you were working at Kama'aina Termite or O'ahu

08:56AM   20   Termite and Pest Control, did you see an individual named Mike

08:56AM   21   Warden working there?

08:56AM   22   A   Yes.

08:56AM   23   Q   During which time frame?

08:56AM   24   A   Both time frames.

08:56AM   25   Q   So the entire time that you were there, you saw him there?

08:56AM   1   A   Yes.

08:56AM   2   Q   All the way up to your arrest?

08:57AM   3   A   No.  Mike Warden had left us maybe a year prior to our

08:57AM   4   arrest.

08:57AM   5   Q   So you were arrested in 2020 and he left that year

08:57AM   6   sometime in 2019?

08:57AM   7   A   Yeah.  I don't know the exact date, but it was around that

08:57AM   8   time period.

08:57AM   9   Q   Was this before or after the kidnapping had taken place?

08:57AM   10   A   This was after the kidnapping.

08:57AM   11   Q   Do you know who an individual is who is named Kerry

08:57AM   12   Kitteringham?

08:57AM   13   A   I've met him once, maybe in the office.

08:57AM   14   Q   And besides that one time that you met him at the office,

08:57AM   15   did you see him while you were working at Kama'aina Termite or

08:57AM   16   O'ahu Termite?

08:57AM   17   A   No.

08:57AM   18   Q   And are you familiar with an individual named Harry

08:57AM   19   Kansaki?

08:57AM   20   A   Yes, I've heard of Harry.

08:58AM   21   Q   And same question.

08:58AM   22       During the time that you were working at Kama'aina

08:58AM   23   Termite and O'ahu Termite, did you see Harry Kansaki working

08:58AM   24   there?

08:58AM   25   A   No.

08:58AM   1   Q   Do you know who Harry -- what Harry Kansaki's relationship
08:58AM   2   was, if any, to either of those companies?
08:58AM   3   A   I knew that Harry was the original owner of O'ahu Termite
08:58AM   4   and Pest Control.
08:58AM   5   Q   And then what happened?
08:58AM   6   A   Then Mike had purchased O'ahu Termite and Pest Control
08:58AM   7   from Harry.
08:58AM   8   Q   And after that purchase took place, where did you shift
08:58AM   9   your focus?
08:58AM   10   A   To O'ahu Termite and Pest Control.
08:58AM   11   Q   Do you have a brother?
08:58AM   12   A   Yes.
08:58AM   13   Q   What's his name?
08:58AM   14   A   Devin Kimoto.
08:58AM   15   Q   Was Devin Kimoto an employee on payroll at Kama'aina
08:59AM   16   Termite?
08:59AM   17   A   No.
08:59AM   18   Q   What -- did he do any work for that company or any other
08:59AM   19   other companies owned by the defendant?
08:59AM   20   A   Yes.  He helped run errands for Hawaii Partners.
08:59AM   21   Q   What type of errands?
08:59AM   22   A   Picking up and dropping off cars at the repair shop or
08:59AM   23   from Manheim.
08:59AM   24   Q   About how long did he work regarding Hawaii Partners?
08:59AM   25   A   He was there for a short period of time.  Not more than, I

08:59AM  1   would say, maybe three to eight months.

08:59AM  2   Q    As far as his responsibilities, was -- you said he would

08:59AM  3   pick up the cars from the auctions and drive them back and

08:59AM  4   forth.

08:59AM  5        Was he ever in charge of managing people?

08:59AM  6   A    No.

08:59AM  7   Q    Was he ever -- did he have any supervisory position in any

08:59AM  8   other companies?

08:59AM  9   A    No.

08:59AM  10  Q    How was he paid?

09:00AM  11  A    Cash.

09:00AM  12  Q    Do you know who would pay him?

09:00AM  13  A    Mike would pay him; myself or Mike.

09:00AM  14  Q    Can you explain how that would work?

09:00AM  15  A    He was paid a hundred dollars a day.  And if Mike wasn't

09:00AM  16  around when he needed to get paid, then I would pay him out of

09:00AM  17  my pocket and Mike would reimburse me.

09:00AM  18  Q    Do you know who Michael Masutani is?

09:00AM  19  A    Yes.

09:00AM  20  Q    Who is that?

09:00AM  21  A    Michael Masutani, he ran errands also for Hawaii Partners.

09:00AM  22  Q    And do you know him by any other name?

09:00AM  23  A    Koa.

09:00AM  24  Q    Is that one of his -- is that his middle name?

09:00AM  25  A    I believe so.

| | | | |
|---|---|---|---|
| 09:00AM | 1 | Q | And do you know who Tori Clegg is? |
| 09:01AM | 2 | A | Yes. |
| 09:01AM | 3 | Q | Who is Tori Clegg? |
| 09:01AM | 4 | A | Tori Clegg was, I guess, friends with Mike; one of Mike's |
| 09:01AM | 5 | | girlfriends. |
| 09:01AM | 6 | Q | What relationship if any did Michael Masutani and Tori |
| 09:01AM | 7 | | Clegg have to each other? |
| 09:01AM | 8 | A | They are siblings. |
| 09:01AM | 9 | Q | So Michael Masutani -- you mentioned that he would do |
| 09:01AM | 10 | | errands for Hawaii Partners? |
| 09:01AM | 11 | A | Yes. |
| 09:01AM | 12 | Q | What type of errands? |
| 09:01AM | 13 | A | Picking up, dropping off cars, showing cars for sale, |
| 09:01AM | 14 | | taking pictures for the Craigslist ad. |
| 09:01AM | 15 | Q | And do you know who brought him in to do those errands? |
| 09:01AM | 16 | A | Mike. |
| 09:01AM | 17 | Q | The defendant? |
| 09:01AM | 18 | A | Yes. |
| 09:01AM | 19 | Q | And how is Michael Masutani paid? |
| 09:01AM | 20 | A | In cash. |
| 09:01AM | 21 | Q | Can you explain how that worked? |
| 09:01AM | 22 | A | Koa got paid a hundred dollars a day and same -- if he |
| 09:02AM | 23 | | needed the money at the end of the week, if Mike wasn't around |
| 09:02AM | 24 | | then I would pay him out of my pocket and Mike would pay me |
| 09:02AM | 25 | | back. |

09:02AM    1    Q    Did Michael Masutani ever manage people?

09:02AM    2    A    No.

09:02AM    3    Q    Was he ever an owner of Hawaii Partners?

09:02AM    4    A    No.

09:02AM    5    Q    Was there an accountant who was used for the defendant's

09:02AM    6    businesses?

09:02AM    7    A    Yes, Trisha Castro.

09:02AM    8    Q    Did you ever have any interactions with Trisha Castro?

09:02AM    9    A    Yes.

09:02AM    10   Q    What types of interactions, broadly speaking?

09:02AM    11   A    Business interactions.  She would text me, ask questions

09:02AM    12   about what's going on, ask questions about the bank account.

09:02AM    13   Q    And did you ever -- would you communicate with her in

09:02AM    14   person or some other method?

09:02AM    15   A    We would communicate in person, text each other, and also

09:02AM    16   call each other.

09:02AM    17   Q    Did you ever have a text conversation with the accountant

09:03AM    18   Trisha Castro regarding Michael Masutani's role?

09:03AM    19   A    Yes.

09:03AM    20   Q    And generally, what did you advise her?

09:03AM    21   A    That he wasn't an official employee of Hawaii Partners and

09:03AM    22   we paid him cash.

09:03AM    23          MR. AKINA:  Could we show the witness Exhibit 9-570,

09:03AM    24   please.

09:03AM    25          THE COURT:  Yes.

| | | |
|---|---|---|
| 09:03AM | 1 | MR. AKINA:  And this is -- looking at the top, this is |
| 09:03AM | 2 | a certificate of authenticity, Your Honor. |
| 09:03AM | 3 | BY MR. AKINA: |
| 09:03AM | 4 | Q   But going to the second page, do you recognize what this |
| 09:03AM | 5 | is, Mr. Kimoto?  If we could zoom in on the bottom text, |
| 09:03AM | 6 | please. |
| 09:03AM | 7 | A   Yes. |
| 09:03AM | 8 | Q   Without reading it, just tell us what this is. |
| 09:04AM | 9 | A   This was a text thread between me and Trisha Castro. |
| 09:04AM | 10 | Q   Regarding what topic? |
| 09:04AM | 11 | A   Hawaii Partners and Koa. |
| 09:04AM | 12 | Q   If you could go to the third page, is that a continuation |
| 09:04AM | 13 | of that thread? |
| 09:04AM | 14 | A   Yes. |
| 09:04AM | 15 | MR. AKINA:  At this time, I'd offer 9-570 into |
| 09:04AM | 16 | evidence. |
| 09:04AM | 17 | THE COURT:  Any objection? |
| 09:04AM | 18 | MR. KENNEDY:  No objection, Your Honor. |
| 09:04AM | 19 | THE COURT:  Without objection, Exhibit 9-570 is |
| 09:04AM | 20 | admitted.  You may publish. |
| 09:04AM | 21 | (Exhibit 9-570 was received in evidence.) |
| 09:04AM | 22 | BY MR. AKINA: |
| 09:04AM | 23 | Q   If we could show page two and zoom in on the bottom text. |
| 09:04AM | 24 | Maybe just focus on the top three lines for now.  Okay. |
| 09:05AM | 25 | What's the date of this text exchange with Trisha |

09:05AM   1   Castro?

09:05AM   2   A     November 16, 2016.

09:05AM   3   Q     And at that time, were you working for the defendant?

09:05AM   4   A     Yes.

09:05AM   5   Q     And at that time, was Trisha Castro an accountant for his

09:05AM   6   businesses?

09:05AM   7   A     Yes.

09:05AM   8   Q     This first line that starts at 1959 and 26 seconds, who is

09:05AM   9   sending that text?

09:05AM   10   A     That is Trisha Castro.

09:05AM   11   Q     And she asks you, "What does Michael Masutani do for

09:05AM   12   Termite and Hawaii Partners?"  Correct?

09:05AM   13   A     Yes.

09:05AM   14   Q     So did Michael Masutani do anything relating to -- for

09:05AM   15   either of the termite companies?

09:05AM   16   A     If there was errands that needed to be run, he would run

09:05AM   17   errands.

09:05AM   18   Q     And what did you reply to her in the next line?

09:05AM   19   A     "He runs errands for both companies."

09:06AM   20   Q     And then her request is whether or not a 1099 needs to be

09:06AM   21   issued to him to get him on payroll, right?

09:06AM   22   A     Yes.

09:06AM   23   Q     If we could scroll down.

09:06AM   24         And do you ever respond to that?

09:06AM   25   A     Sorry.  Yes.

09:06AM  1  Q   And this is on the next day, on the 17th of November,

09:06AM  2  right?

09:06AM  3  A   Correct.

09:06AM  4  Q   And you say that you want to see, if you can -- if she can

09:06AM  5  scan checks with large amounts that were written to him?

09:06AM  6  A   Yes.

09:06AM  7  Q   And if we could go to the remaining text on that page.

09:07AM  8      Is this Trisha Castro talking about how that would

09:07AM  9  happen; generating, getting copies of checks or information

09:07AM  10  relating to checks that were written?

09:07AM  11  A   Yes.

09:07AM  12  Q   So is it fair to say back in 2016, is that when Michael

09:07AM  13  Masutani was doing errands at Hawaii Partners and for the

09:07AM  14  termite companies?

09:07AM  15  A   Yes.

09:07AM  16  Q   While at O'ahu Termite and Pest Control, did you have a

09:07AM  17  company car at any point in time?

09:07AM  18  A   Yes.

09:07AM  19  Q   And did you discuss how to get a company car with the

09:07AM  20  defendant?

09:07AM  21  A   Yes.

09:08AM  22  Q   Tell us about that discussion.

09:08AM  23  A   Mike had mentioned to me that if I wanted to get a new

09:08AM  24  truck, that I would have to sign for the lease on my own, but

09:08AM  25  he would reimburse me for the lease and the insurance of the

09:08AM   1   truck.

09:08AM   2   Q    So this would be a company car but signed in your name?

09:08AM   3   A    Correct.

09:08AM   4   Q    Then the company would make payments on your behalf?

09:08AM   5   A    Yes.

09:08AM   6   Q    Did you agree to do that?

09:08AM   7   A    I did not agree to do that.

09:08AM   8   Q    What did you tell the defendant?

09:08AM   9   A    That I wasn't going to go sign for the truck.

09:08AM  10   Q    So how did you -- you said you did have a company truck.

09:08AM  11           How did you end up with a company truck if you

09:08AM  12   declined to sign a lease?

09:08AM  13   A    Later on during the process of that, Koa had told me that

09:09AM  14   he just came back from Toyota for signing for the -- signing

09:09AM  15   for my truck.

09:09AM  16   Q    And Koa is -- who is Koa?

09:09AM  17   A    Koa is --

09:09AM  18   Q    Is that Mr. Masutani?

09:09AM  19   A    Yes.

09:09AM  20   Q    What was Mr. Masutani's demeanor when he told you that?

09:09AM  21   A    He was a little, I guess, resentful that he had to sign

09:09AM  22   for the truck.

09:09AM  23   Q    Can you describe the truck that you used?

09:09AM  24   A    It was a white Tacoma and it had O'ahu Termite logos on

09:09AM  25   it.  It had a roach in the back and a termite on the side of

09:09AM   1   both sides of the truck.

09:09AM   2            MR. AKINA:  Could we show the witness Exhibit 1-570,

09:09AM   3   please?

09:09AM   4   BY MR. AKINA:

09:09AM   5   Q    Do you recognize this?

09:10AM   6   A    Yes.

09:10AM   7   Q    What is this a picture of?

09:10AM   8   A    That's a picture of my company vehicle.

09:10AM   9   Q    How do you know it's your company vehicle as to someone

09:10AM  10   else's company vehicle?

09:10AM  11   A    Because I was the only one that had a white O'ahu Termite

09:10AM  12   truck.

09:10AM  13   Q    Were there other trucks with different colors?

09:10AM  14   A    There were two blue ones, the same Toyota Tacoma, but just

09:10AM  15   in blue.

09:10AM  16   Q    About how many company trucks were there during the time

09:10AM  17   that you worked there?

09:10AM  18   A    Three.

09:10AM  19   Q    Is this a fair and accurate picture of the truck that you

09:10AM  20   used while you were working for O'ahu Termite?

09:10AM  21   A    Yes.

09:10AM  22            MR. AKINA:  I would offer to admit Exhibit 1-570 into

09:10AM  23   evidence.

09:10AM  24            THE COURT:  Any objection?

09:10AM  25            MR. KENNEDY:  No objection.

09:10AM   1            THE COURT:  Without objection, Exhibit 1-570 is

09:10AM   2   admitted.  You may publish.

09:10AM   3            (Exhibit 1-570 was received in evidence.)

09:10AM   4   BY MR. AKINA:

09:10AM   5   Q    And do you see the logo on this truck?

09:10AM   6   A    Yes.

09:10AM   7   Q    What part of the truck is the logo on?

09:11AM   8   A    The front passenger door.

09:11AM   9   Q    And what is that on the rear, sort of the bed of the

09:11AM  10   truck?

09:11AM  11   A    A termite.

09:11AM  12   Q    Do you know a person named Mark Lapenya?

09:11AM  13   A    Yes.

09:11AM  14   Q    Who is Mark Lapenya?

09:11AM  15   A    Mark was a detailer for the company.

09:11AM  16   Q    What does a detailer do?

09:11AM  17   A    He would detail company vehicles.

09:11AM  18   Q    What kind of work does that entail, detailing?

09:11AM  19   A    Washing, polishing, vacuuming vehicles.

09:11AM  20   Q    And you said he was a detailer for the company.

09:11AM  21            Which company are you referring to?

09:11AM  22   A    He worked at Kama'aina Termite and Pest Control in the

09:11AM  23   bottom -- like the bottom bay area where the trucks were

09:12AM  24   parked.

09:12AM  25   Q    That's where he physically worked?

| | | | |
|---|---|---|---|
| 09:12AM | 1 | A | Correct. |
| 09:12AM | 2 | Q | Did he only work on Kama'aina Termite and Pest Control |
| 09:12AM | 3 | | vehicles? |
| 09:12AM | 4 | A | No, he mainly detailed Mike's vehicles. |
| 09:12AM | 5 | Q | And about when did you meet him? |
| 09:12AM | 6 | A | I met Mark when I first started in 2015. |
| 09:12AM | 7 | Q | What was -- did you ever see him work on personal |
| 09:12AM | 8 | | vehicles? |
| 09:12AM | 9 | A | Yes. |
| 09:12AM | 10 | Q | Whose vehicles were those? |
| 09:12AM | 11 | A | Mike. |
| 09:12AM | 12 | Q | The defendant? |
| 09:12AM | 13 | A | Mike's, yes. |
| 09:12AM | 14 | Q | Did you see Mr. Lapenya's work product, meaning what type |
| 09:12AM | 15 | | of job did he do, if you could tell? |
| 09:12AM | 16 | A | I don't -- |
| 09:12AM | 17 | Q | Did he do a good job? |
| 09:12AM | 18 | A | Yes. |
| 09:12AM | 19 | Q | And were there other detailers who worked around that |
| 09:12AM | 20 | | time? |
| 09:12AM | 21 | A | No. |
| 09:12AM | 22 | Q | From your observations, did you ever see Mark Lapenya and |
| 09:12AM | 23 | | the defendant interact with each other while he was working |
| 09:13AM | 24 | | there? |
| 09:13AM | 25 | A | No, not really. |

```
09:13AM   1   Q   Can you describe your relationship with Mr. Lapenya?
09:13AM   2   A   Yeah.  We joked around.  We had a good relationship.
09:13AM   3   Q   Now, at some point in 2015, did Mr. Lapenya stop working
09:13AM   4   for the defendant?
09:13AM   5   A   Yes.
09:13AM   6   Q   And how did the defendant react to that?
09:13AM   7   A   He didn't like that Mark was not working.
09:13AM   8   Q   Can you explain what happened?
09:13AM   9   A   Mike had asked -- so when Mark quit and stopped working at
09:13AM  10   Kama'aina, Mike asked me to go and talk to Mark to see if I can
09:13AM  11   get Mark to come back and work.
09:13AM  12   Q   What did you do?
09:13AM  13   A   I went to where Mark was working and I approached him and
09:14AM  14   I asked him, "What can we do?  Mike really wants you to come
09:14AM  15   back.  And what can we do to make this work?"
09:14AM  16   Q   And to be clear, is this -- where he was working was this
09:14AM  17   still at Kama'aina or a different location?
09:14AM  18   A   No, it was a different location.
09:14AM  19   Q   Was this his new job?
09:14AM  20   A   Yes.
09:14AM  21   Q   So you asked Mr. Lapenya what could be done to get him to
09:14AM  22   come back.
09:14AM  23       And so, how did that conversation go?
09:14AM  24   A   When I first approached him, he said that he didn't want
09:14AM  25   any trouble and I assured him that I wasn't here to bring
```

| | | |
|---|---|---|
| 09:14AM | 1 | trouble to him.  I was just there to talk to him and we just |
| 09:14AM | 2 | value his work and we wanted him to come back, and what does he |
| 09:14AM | 3 | need, more money?  What can we do to make him come back -- to |
| 09:14AM | 4 | have him come back and work. |
| 09:14AM | 5 | Q    Did you say anything else to sure him during that |
| 09:15AM | 6 | conversation? |
| 09:15AM | 7 | A    Yes.  I said that I wasn't here to hurt him. |
| 09:15AM | 8 | Q    And why did you feel it necessary to tell Mr. Lapenya that |
| 09:15AM | 9 | you weren't there to hurt him? |
| 09:15AM | 10 | A    When I first arrived, he was very standoffish and I -- and |
| 09:15AM | 11 | that's when I told him I wasn't here to hurt him.  I just came |
| 09:15AM | 12 | to talk to him. |
| 09:15AM | 13 | Q    You told us that you had a friendly relationship with |
| 09:15AM | 14 | Mr. Lapenya, right? |
| 09:15AM | 15 | A    Yes. |
| 09:15AM | 16 | Q    Okay, so why would that even be necessary; why would you |
| 09:15AM | 17 | even say that, that you are not here to hurt him? |
| 09:15AM | 18 | A    Because of Mike's reputation. |
| 09:15AM | 19 | Q    And what do you mean by that? |
| 09:15AM | 20 | A    I mean, I'm sure Mark -- |
| 09:15AM | 21 | Q    Well, without assuming anything from Mark Lapenya, just by |
| 09:15AM | 22 | you, what do you mean by reputation? |
| 09:15AM | 23 | A    I mean that Mike has a reputation that if he doesn't get |
| 09:16AM | 24 | what he wants, violence could follow. |
| 09:16AM | 25 | Q    And when you went to go see Mr. Lapenya, did you have any |

09:16AM    1    weapons with you?

09:16AM    2    A    I did not.

09:16AM    3    Q    Did you make any threats saying that something bad would

09:16AM    4    happen?

09:16AM    5    A    No.

09:16AM    6    Q    How did that conversation end?

09:16AM    7    A    That conversation ended with Mark deciding that he didn't

09:16AM    8    want anything to do with us.

09:16AM    9    Q    Did you have any other interaction with this topic of

09:16AM   10    trying to get Mr. Lapenya back to work for the defendant?

09:16AM   11    A    When I got back to the office, somebody had called me.  I

09:16AM   12    didn't know who that person was, but he said to leave Mark

09:16AM   13    alone; don't bother him because he works for me now.

09:16AM   14    Q    And that was a message for you?

09:16AM   15    A    Yes, that was a direct phone call from somebody, Mark's

09:17AM   16    new employer.

09:17AM   17    Q    Do you recall anything about that person's name?

09:17AM   18    A    I believe his first name was Michael.

09:17AM   19    Q    Anything about his last name?

09:17AM   20    A    It was a Caucasian last name.

09:17AM   21    Q    Do you know a person who is named Caleb Miske?

09:17AM   22    A    Yes.

09:17AM   23    Q    Who is that?

09:17AM   24    A    That's Mike's son.

09:17AM   25    Q    I'm going to direct your attention to November of 2015.

09:17AM   1           Did any events to your knowledge occur relating to

09:17AM   2   Caleb Miske?

09:17AM   3   A    Caleb had gotten into a bad accident.

09:17AM   4   Q    What type of accident?

09:17AM   5   A    Car accident.

09:17AM   6   Q    And after the car accident occurred, when did you learn

09:17AM   7   about it?

09:17AM   8   A    That evening or the following day.

09:18AM   9   Q    And did you go anywhere?

09:18AM   10  A    Yes.  I went to the hospital.

09:18AM   11  Q    At that hospital, who was there?

09:18AM   12  A    Family members.  Mike.

09:18AM   13  Q    Was Caleb there also?

09:18AM   14  A    Yes.

09:18AM   15  Q    During that time when you went to the hospital, did you

09:18AM   16  hear any conversations relating to who the driver of the

09:18AM   17  vehicle was?

09:18AM   18           MR. KENNEDY:  Objection on hearsay, Your Honor.

09:18AM   19           THE COURT:  Overruled.

09:18AM   20           MR. AKINA:  It's a yes or no question.

09:18AM   21           THE WITNESS:  Can you repeat that question?

09:18AM   22  BY MR. AKINA:

09:18AM   23  Q    Did you hear any conversations relating to who the diver

09:18AM   24  was?

09:18AM   25  A    Yes.

| | | | |
|---|---|---|---|
| 09:18AM | 1 | Q | And who was involved in that conversation? |
| 09:18AM | 2 | A | Mike and -- I'm sorry, Kaulana's brother.  I forgot his |
| 09:18AM | 3 | | name. |
| 09:18AM | 4 | Q | Who is Kaulana? |
| 09:18AM | 5 | A | Kaulana is Mike's cousin, Freitas. |
| 09:19AM | 6 | Q | This was a conversation between Kaulana's brother and the |
| 09:19AM | 7 | | defendant? |
| 09:19AM | 8 | A | Yes. |
| 09:19AM | 9 | Q | And where did that conversation take place? |
| 09:19AM | 10 | A | In the waiting room. |
| 09:19AM | 11 | Q | And what was said in that conversation? |
| 09:19AM | 12 | A | That he had said Kaulana's brother came down or came into |
| 09:19AM | 13 | | the room and had said that Caleb was driving. |
| 09:19AM | 14 | Q | And what did the defendant say? |
| 09:19AM | 15 | A | He got upset at that person, at Kaulana's brother. |
| 09:19AM | 16 | Q | Did the defendant say anything? |
| 09:19AM | 17 | A | I don't know exactly what he said, but it was along the |
| 09:19AM | 18 | | lines of like, "shut the fuck up." |
| 09:19AM | 19 | Q | Do you know who Jonathan Fraser was? |
| 09:19AM | 20 | A | Yes. |
| 09:19AM | 21 | Q | Who was that? |
| 09:20AM | 22 | A | That was Caleb's friend. |
| 09:20AM | 23 | Q | And ultimately what happened to Caleb Miske? |
| 09:20AM | 24 | A | He passed away. |
| 09:20AM | 25 | Q | Was there a funeral after he passed away, eventually? |

| | | | |
|---|---|---|---|
| 09:20AM | 1 | A | Yes. |
| 09:20AM | 2 | Q | And did you go to Caleb's funeral? |
| 09:20AM | 3 | A | I did go to Caleb's funeral. |
| 09:20AM | 4 | Q | Was anything planned after the funeral? |
| 09:20AM | 5 | A | Yes.  They were going to scatter his ashes. |
| 09:20AM | 6 | Q | Did you go to the ash-scattering ceremony? |
| 09:20AM | 7 | A | No, I did not. |
| 09:20AM | 8 | Q | Do you know if it took place? |
| 09:20AM | 9 | A | Yes. |
| 09:20AM | 10 | Q | How do you know that? |
| 09:20AM | 11 | A | Because I seen pictures of it, and then I heard from |
| 09:20AM | 12 | | people that it happened. |
| 09:20AM | 13 | Q | Did you hear from the defendant about that? |
| 09:20AM | 14 | A | Yes. |
| 09:20AM | 15 | Q | Where were the ashes scattered? |
| 09:20AM | 16 | A | Maunalua Bay. |
| 09:20AM | 17 | Q | Where is that located? |
| 09:20AM | 18 | A | In east Oahu. |
| 09:21AM | 19 | Q | Following Caleb's funeral, did you ever go to Maunalua Bay |
| 09:21AM | 20 | | later on? |
| 09:21AM | 21 | A | Yes. |
| 09:21AM | 22 | Q | Tell me about that. |
| 09:21AM | 23 | A | We went to Maunalua Bay every Friday after the passing. |
| 09:21AM | 24 | Q | When you say we, who is we? |
| 09:21AM | 25 | A | Mike, his family, myself, other friends. |

| | | | |
|---|---|---|---|
| 09:21AM | 1 | Q | And how would you characterize the relationship between |
| 09:21AM | 2 | | the defendant and those other friends who aren't family?  Were |
| 09:21AM | 3 | | they strangers? |
| 09:21AM | 4 | A | No.  They were close friends also. |
| 09:21AM | 5 | Q | Who were some of the people that you would see regularly |
| 09:21AM | 6 | | at Maunalua Bay? |
| 09:21AM | 7 | A | I would regularly see Mike's mom, John Stancil, Andy, |
| 09:22AM | 8 | | Delia, those were the ones that -- Kaulana. |
| 09:22AM | 9 | Q | Any other nonfamily members? |
| 09:22AM | 10 | A | Nonfamily -- not all the time. |
| 09:22AM | 11 | Q | Is that all the people that you've ever seen there or |
| 09:22AM | 12 | | would other people come on occasion? |
| 09:22AM | 13 | A | Yeah, there would be other people that came on other |
| 09:22AM | 14 | | occasions. |
| 09:22AM | 15 | Q | Who are some of those people? |
| 09:22AM | 16 | A | Other people would come, would be our friend Nate, Nate |
| 09:22AM | 17 | | Terelle, Russell. |
| 09:22AM | 18 | Q | Do you know his last name? |
| 09:22AM | 19 | A | Moscato and his family. |
| 09:22AM | 20 | Q | You mentioned the mom.  Who is the mom? |
| 09:22AM | 21 | A | Dina, Madine Stancil. |
| 09:22AM | 22 | Q | Madine Stancil.  And you mentioned Andy. Do you know her |
| 09:23AM | 23 | | last name? |
| 09:23AM | 24 | A | Kaneakua. |
| 09:23AM | 25 | Q | You said Delia.  Are you referring to Delia Fabro-Miske? |

09:23AM   1   A     Yes.

09:23AM   2   Q     And what would happen on Fridays when you guys went to

09:23AM   3   Maunalua Bay?

09:23AM   4   A     We would hang out, eat dinner there, and then we would

09:23AM   5   spread flowers.

09:23AM   6   Q     For what purpose?

09:23AM   7   A     We would spread flowers where Caleb's ashes were spread.

09:23AM   8   Q     And this was every Friday.

09:23AM   9         Would it be during the day, people would just take off

09:23AM   10  from work on Friday?

09:23AM   11  A     No.  It would be towards the late afternoon hours.

09:23AM   12  Q     And how frequently would people go there?

09:23AM   13  A     We would go every Friday.

09:23AM   14        MR. AKINA:  Could we show the witness Exhibit 1-1022,

09:24AM   15  please?

09:24AM   16  BY MR. AKINA:

09:24AM   17  Q     Do you recognize what this shows?

09:24AM   18  A     Yes.

09:24AM   19  Q     What does this show?

09:24AM   20  A     This shows the picture of the bay and the surrounding

09:24AM   21  areas.

09:24AM   22  Q     Is this a fair and accurate map showing that location of

09:24AM   23  the bay in relation to the island?

09:24AM   24  A     Yes.

09:24AM   25        MR. AKINA:  I would offer 1-1022 into evidence.

09:24AM    1           MR. KENNEDY:  No objection, Your Honor.

09:24AM    2           THE COURT:  Without objection, Exhibit 1-1022 is

09:24AM    3    admitted.

09:24AM    4              (Exhibit 1-1022 was received in evidence.)

09:24AM    5           MR. AKINA:  And if we could show the witness 1-1023,

09:24AM    6    please.

09:24AM    7    BY MR. AKINA:

09:24AM    8    Q     What does this show?

09:24AM    9    A     This shows the area that we went to every Friday.

09:24AM   10    Q     Do you mean the area at Maunalua Bay?

09:24AM   11    A     Yes, the area at Maunalua Bay.

09:24AM   12    Q     Is this a fair and accurate overhead view of that area?

09:25AM   13    A     Yes.

09:25AM   14           MR. AKINA:  I would offer 1-1023 into evidence.

09:25AM   15           MR. KENNEDY:  No objection, Your Honor.

09:25AM   16           THE COURT:  Again, without objection, 1-1023 is

09:25AM   17    admitted.  You may publish.

09:25AM   18              (Exhibit 1-1023 was received in evidence.)

09:25AM   19    BY MR. AKINA:

09:25AM   20    Q     If we could show 1-1022.

09:25AM   21              Do you see -- what is that long highway that's

09:25AM   22    stretching from left to right?

09:25AM   23    A     Kalaniana'ole Highway.

09:25AM   24    Q     If we could first zoom in on this first half.  What does

09:25AM   25    this show?

09:25AM   1   A    That shows the parking lot to Maunalua Bay.

09:25AM   2   Q    If we could zoom out of here.  If we could zoom in on this

09:26AM   3   area off to the right.

09:26AM   4        What area is that, that we zoomed in on?

09:26AM   5   A    That is the area that we would hang out in.

09:26AM   6   Q    That's the area next to Maunalua Bay beach, that's written

09:26AM   7   Maunalua Bay beach on this map?

09:26AM   8   A    Yes.

09:26AM   9   Q    Could we go to 1-023, please.

09:26AM   10       THE COURT:  1-1023?

09:26AM   11       MR. AKINA:  1-1023.  Thank you, Your Honor.

09:26AM   12   BY MR. AKINA:

09:26AM   13   Q    And this is that close up of the area where everyone would

09:26AM   14   hang out on Fridays?

09:26AM   15   A    Yes.

09:26AM   16   Q    You see the parking lot on the top left corner?

09:27AM   17   A    Yes.

09:27AM   18   Q    Would you guys park there?

09:27AM   19   A    Yes.

09:27AM   20   Q    And where would you actually hang out, typically?

09:27AM   21   A    Um --

09:27AM   22   Q    You can use your finger if that helps to draw it.

09:27AM   23        Okay, so the area sort of in front of between the

09:27AM   24   parking lot and the beach?

09:27AM   25   A    Yes.

| | | | |
|---|---|---|---|
| 09:27AM | 1 | Q | Do you know someone named Ashley Wong? |
| 09:27AM | 2 | A | Yes. |
| 09:27AM | 3 | Q | Who is she? |
| 09:27AM | 4 | A | That's Jonathan Fraser's girlfriend. |
| 09:27AM | 5 | Q | Have you met her before? |
| 09:27AM | 6 | A | Yes, I met her a few times. |
| 09:27AM | 7 | Q | What was the first time that you met her? |
| 09:27AM | 8 | A | The first time I met her was when Mike had asked me to |
| 09:27AM | 9 | | help someone get a safety check from O'Sungs. |
| 09:28AM | 10 | Q | And in relation to when Caleb had passed way, when did |
| 09:28AM | 11 | | that take place?  Before or after? |
| 09:28AM | 12 | A | This was after. |
| 09:28AM | 13 | Q | You mentioned O'Sung.  What is O'Sung again? |
| 09:28AM | 14 | A | That's the auto body shop that we used to take our |
| 09:28AM | 15 | | vehicles to get fixed at. |
| 09:28AM | 16 | Q | So Mike had you go down there and help Ashley Wong do |
| 09:28AM | 17 | | what? |
| 09:28AM | 18 | A | To get a safety check for her vehicle. |
| 09:28AM | 19 | Q | Do you recall what type of vehicle that was? |
| 09:28AM | 20 | A | It was a hatchback -- a dark colored hatchback. |
| 09:28AM | 21 | | MR. AKINA:  Could we show the witness Exhibit 2-48 |
| 09:28AM | 22 | | please. |
| 09:28AM | 23 | | THE COURT:  You may. |
| 09:28AM | 24 | | BY MR. AKINA: |
| 09:28AM | 25 | Q | Do you recognize what's shown here? |

| | | | |
|---|---|---|---|
| 09:28AM | 1 | A | Yes. |
| 09:28AM | 2 | Q | What is this? |
| 09:28AM | 3 | A | This is the vehicle that Ashley needed the safety check |
| 09:29AM | 4 | | for. |
| 09:29AM | 5 | Q | Is it a fair and accurate picture of the vehicle you |
| 09:29AM | 6 | | helped her with? |
| 09:29AM | 7 | A | Yes. |
| 09:29AM | 8 | | MR. AKINA:  I'd offer this Exhibit 2-48 into evidence. |
| 09:29AM | 9 | | MR. KENNEDY:  No objection. |
| 09:29AM | 10 | | THE COURT:  Without objection, Exhibit 2-48 is |
| 09:29AM | 11 | | admitted. |
| 09:29AM | 12 | | (Exhibit 2-48 was received in evidence.) |
| 09:29AM | 13 | | MR. AKINA:  Could we have permission to publish, Your |
| 09:29AM | 14 | | Honor? |
| 09:29AM | 15 | | THE COURT:  Yes. |
| 09:29AM | 16 | | BY MR. AKINA: |
| 09:29AM | 17 | Q | You said this is a two-door hatchback? |
| 09:29AM | 18 | A | Yes, I said it was a hatchback. |
| 09:29AM | 19 | Q | And it's dark in color, right? |
| 09:29AM | 20 | A | Correct. |
| 09:29AM | 21 | Q | Did you meet Ashley Wong a second time? |
| 09:29AM | 22 | A | I didn't meet her, but I was present when she was there. |
| 09:30AM | 23 | Q | Tell us about that. |
| 09:30AM | 24 | A | This was after the disappearance of Jonathan Fraser, when |
| 09:30AM | 25 | | she and her father were picking up her things from Delia's |

| | | |
|---|---|---|
| 09:30AM | 1 | townhouse. |
| 09:30AM | 2 | Q    About how long after Jonathan Fraser disappeared did this |
| 09:30AM | 3 | take place? |
| 09:30AM | 4 | A    The following week. |
| 09:30AM | 5 | Q    And why were you at this residence? |
| 09:30AM | 6 | A    Mike had asked me to accompany Delia and to make sure that |
| 09:30AM | 7 | nothing happened when Ashley and her father were cleaning out |
| 09:30AM | 8 | her belongings. |
| 09:30AM | 9 | Q    So what was the purpose of you accompanying Delia |
| 09:30AM | 10 | Fabro-Miske? |
| 09:30AM | 11 | A    To make sure that she was safe and nothing happened to |
| 09:30AM | 12 | her. |
| 09:30AM | 13 | Q    What do you mean nothing happening to her? |
| 09:31AM | 14 | A    That Ashley's father didn't say anything to upset Delia or |
| 09:31AM | 15 | things along that nature. |
| 09:31AM | 16 | Q    Were you there for protection? |
| 09:31AM | 17 | A    Yes. |
| 09:31AM | 18 | Q    And so, where was this residence? |
| 09:31AM | 19 | A    In Hawaii Kai. |
| 09:31AM | 20 | Q    I'm sorry, I spoke over you. |
| 09:31AM | 21 | A    In Hawaii Kai. |
| 09:31AM | 22 | Q    And when you got to the residence, what was happening, or |
| 09:31AM | 23 | generally what happened when you were there? |
| 09:31AM | 24 | A    When I was there, I didn't see what was happening but I |
| 09:31AM | 25 | was in the kitchen area, and the room that she was cleaning out |

09:31AM    1    was towards the front door.

09:31AM    2    Q    When you say she, who is she?

09:31AM    3    A    Ashley.

09:31AM    4    Q    Now, did you have any personal involvement with Jonathan

09:31AM    5    Fraser's disappearance?

09:31AM    6    A    No.

09:31AM    7    Q    And how did you learn about Jonathan Fraser's

09:32AM    8    disappearance?

09:32AM    9    A    From seeing it on the news.

09:32AM   10    Q    Do you remember what day of the week that was?

09:32AM   11    A    Saturday.

09:32AM   12    Q    Did you see the defendant after that?

09:32AM   13    A    I saw Mike the following Monday.

09:32AM   14    Q    And where was that?

09:32AM   15    A    That was in his office at Kama'aina Termite and Pest

09:32AM   16    Control.

09:32AM   17    Q    Did the defendant say anything relating to Jonathan

09:32AM   18    Fraser's disappearance that day to you?

09:32AM   19    A    So I was in his office that afternoon, and -- like we

09:32AM   20    normally are, and he came and stand in front of me and he said

09:32AM   21    to me that -- he said, "You didn't think anything wasn't going

09:32AM   22    to happen?"

09:33AM   23    Q    Did you ask the defendant specifically, "What are you

09:33AM   24    talking about?"

09:33AM   25    A    No, I did not ask Mike what he was talking about.

09:33AM   1   Q   Why not?

09:33AM   2   A   Because that wasn't -- I didn't want to know more and

09:33AM   3   that's not something that he would probably elaborate on.

09:33AM   4   Q   Why did you think that that was in reference to Jonathan

09:33AM   5   Fraser?

09:33AM   6   A   Because it just happened on Saturday, and I don't know

09:33AM   7   what else he would be talking about.

09:33AM   8   Q   And at the time, you had been working for the defendant

09:33AM   9   for a few years?

09:33AM   10  A   Yes.

09:33AM   11  Q   And at this time, were you pretty aware of what was going

09:33AM   12  on with the different companies that you had involvement in?

09:33AM   13  A   Yes.

09:33AM   14  Q   And did you have regular interaction with the defendant

09:33AM   15  around that time?

09:33AM   16  A   Yes.

09:34AM   17  Q   So as far as you knew, was there anything else that that

09:34AM   18  statement could have possibly referred to?

09:34AM   19  A   No.

09:34AM   20  Q   You said that you didn't want to know more.

09:34AM   21       What do you mean by that?

09:34AM   22  A   Like, I didn't want the responsibility of holding any kind

09:34AM   23  of secret.

09:34AM   24  Q   Why not?

09:34AM   25  A   Because that could be, like, that would be like a witness

09:34AM  1   to what he had said --

09:34AM  2   Q    And why did you not want to become a witness to what the

09:34AM  3   defendant said?

09:34AM  4   A    Because we all knew what would happen if it was to come

09:34AM  5   out that -- that you knew something about what happened.

09:34AM  6   Q    What do you mean by that?

09:34AM  7   A    With Jonathan.  Like, we -- like, I didn't want to be

09:34AM  8   associated with knowing what happened to Jonathan Fraser.

09:35AM  9   Q    Did you have any suspicions at the time, though, relating

09:35AM  10  to Jonathan Fraser based on that statement?  Let me ask you in

09:35AM  11  a different way.

09:35AM  12           After you heard that statement by the defendant, did

09:35AM  13  you go to the police?

09:35AM  14  A    No, I did not.

09:35AM  15  Q    Did you tell Ashley Wong?  You had met her once before.

09:35AM  16  A    No, I did not.

09:35AM  17  Q    Did you tell Jonathan Fraser's family that someone might

09:35AM  18  have information?

09:35AM  19  A    No, I did not.

09:35AM  20  Q    Why not?

09:35AM  21  A    Because I was afraid.

09:35AM  22  Q    What do you mean by that?

09:35AM  23  A    I was afraid that -- I was afraid for retaliation from

09:35AM  24  Mike if I said something.

09:35AM  25  Q    At that point in time, did you feel any loyalty to the

09:35AM    1    defendant?

09:35AM    2    A    Yes.

09:35AM    3    Q    Did that have any role in your decision not to talk to

09:35AM    4    people?

09:36AM    5    A    Yes.

09:36AM    6    Q    Explain that.

09:36AM    7    A    We were close.  We were like family at that time.

09:36AM    8    Q    Since you learned of Jonathan Fraser's disappearance, have

09:36AM    9    you seen him?

09:36AM   10    A    No, I have not seen him.

09:36AM   11    Q    Do you know an individual named Michael Char?

09:36AM   12    A    I've never met Michael Char, but I've heard his name.

09:36AM   13    Q    You've heard his name.

09:36AM   14         Who have you heard his name from?

09:36AM   15    A    I heard his name from Mike.

09:36AM   16    Q    The defendant?

09:36AM   17    A    Yes.

09:36AM   18    Q    And based on what you've heard from the defendant, are you

09:36AM   19    aware of their relationship, what type of relationship they

09:36AM   20    had?

09:36AM   21    A    No.

09:36AM   22    Q    I'm going to direct your attention to May of 2016.

09:36AM   23         Did you ever discuss Mr. Char with the defendant?

09:37AM   24    A    I don't know if that was the date that Mike had brought

09:37AM   25    his name up to me.

09:37AM   1   Q    Okay.  What do you recall of any day that it was brought
09:37AM   2   up to you?
09:37AM   3   A    I recall that Mike was leaving for a trip.  But while he
09:37AM   4   was getting ready to leave, somebody -- he told me that
09:37AM   5   somebody was calling his name from outside of his house, his
09:37AM   6   residence in Kailua.  And when he went to go see what the
09:37AM   7   person was calling him about, I guess Mike Char told Mike that
09:37AM   8   he had been robbed.
09:37AM   9   Q    So the defendant relayed to you that Mike Char had come to
09:37AM   10  his home yelling at him?
09:37AM   11  A    Not yelling at him, but calling his name.
09:37AM   12  Q    Okay, and told the defendant that Mike Char had been
09:37AM   13  robbed?
09:37AM   14  A    Yes.
09:37AM   15  Q    And did the defendant tell you anything else about this?
09:38AM   16  A    He said that Mike Char suspected that it was Kaulana
09:38AM   17  Freitas and John Stancil that robbed him at the Bay -- at
09:38AM   18  Maunalua Bay.
09:38AM   19  Q    And what did the defendant say what he did, if anything?
09:38AM   20  A    The defendant said that he met Kaulana Freitas and John
09:38AM   21  Stancil at the bay parking lot and that he had slapped him, and
09:38AM   22  I guess bent Kaulana's doors back, cracked all his windows.
09:38AM   23  Q    And was this conversation that you had with the defendant,
09:38AM   24  was that before or after Caleb Miske had passed away?
09:38AM   25  A    This was after.

09:38AM   1    Q    And what was the defendant's demeanor when he was telling
09:38AM   2    you what happened regarding all of this with Mr. Char?
09:38AM   3    A    His demeanor was -- he was animated but it wasn't -- he
09:39AM   4    was upset also that they did -- they robbed this person at the
09:39AM   5    Bay because the Bay was sacred to us.  Nothing bad was supposed
09:39AM   6    to happen over there, especially not somebody getting robbed,
09:39AM   7    because that's where our families would go and hang out.
09:39AM   8         And we didn't want -- Mike didn't want any kind of
09:39AM   9    retaliation coming back to the Bay because of what happened.
09:39AM   10   Q    Did the defendant give you any directions during this
09:39AM   11   conversation?
09:39AM   12   A    Yes.  He said to stay away from -- don't answer Kaulana
09:39AM   13   and Johnnie's texts and stay away from them.
09:39AM   14   Q    Is that the only time that he told you not to -- you know,
09:39AM   15   to stop having contact with people?
09:39AM   16   A    No, that wasn't the only time.
09:39AM   17   Q    And when the defendant tells you to do something like
09:40AM   18   that, to stop having contact with people, what was the purpose?
09:40AM   19   A    To just, I guess, punish them for what they had done.
09:40AM   20   Q    Do you know an individual named Jason Yokoyama?
09:40AM   21   A    Yes.
09:40AM   22   Q    Who is he?
09:40AM   23   A    Jason was a friend to Mike.
09:40AM   24   Q    Did he have any -- what type of relationship did he have
09:40AM   25   with the defendant?

09:40AM    1    A    I knew that he used to work for Mike, and they also had a
09:40AM    2    close relationship.
09:40AM    3    Q    What type of work did Jason Yokoyama do?
09:40AM    4    A    Jason bought and sold cars at the auction, and I think he
09:40AM    5    had a roofing company also.
09:40AM    6    Q    Are you familiar with the M Nightclub?
09:40AM    7    A    Yes.
09:40AM    8    Q    And did that name change at some point?
09:40AM    9    A    That name changed when I believe Jason purchased it from
09:41AM   10    Mike.
09:41AM   11    Q    And if there were ever disputes involving Jason Yokoyama,
09:41AM   12    are you aware of any disputes where the defendant had to
09:41AM   13    mediate involving Jason Yokoyama and others?
09:41AM   14    A    There was one that comes to mind.
09:41AM   15    Q    And how did you learn about that?
09:41AM   16    A    Because I was there.
09:41AM   17    Q    Okay.  And what happened?
09:41AM   18    A    I guess Jason -- it was New Year's -- it was after New
09:41AM   19    Year's but it was a new year.  I guess another club had posted
09:41AM   20    something on their Instagram, I guess, saying something about
09:41AM   21    Encore, and Jason took it as an insult.
09:42AM   22    Q    What happened?
09:42AM   23    A    So we -- me, Jason and Mike were in the office and we were
09:42AM   24    just talking story, joking around, and Jason had brought up
09:42AM   25    that he seen Brian Yoshida a few years earlier wearing his

09:42AM   1   watch that his ex-girlfriend -- that Jason's ex-girlfriend

09:42AM   2   stole from him.

09:42AM   3   Q    Who is Brian Yoshida?

09:42AM   4   A    Brian Yoshida is partners with -- I guess, business

09:42AM   5   partners with the people that owned the rival nightclub.

09:42AM   6   Q    Do you know the name of the rival nightclub?

09:42AM   7   A    I don't remember that name.

09:42AM   8   Q    And this particular conversation you are talking about

09:43AM   9   where Jason Yokoyama is telling -- who is he telling that

09:43AM  10   information to?

09:43AM  11   A    He was telling myself and Mike.

09:43AM  12   Q    So it's you, Jason Yokoyama, and the defendant?

09:43AM  13   A    Correct.

09:43AM  14   Q    And what year did this happen in?

09:43AM  15   A    I don't remember.

09:43AM  16   Q    Was it before or after Jonathan Fraser disappeared?

09:43AM  17   A    I don't remember.

09:43AM  18   Q    Okay, so Jason Yokoyama tells this information to the

09:43AM  19   defendant.

09:43AM  20        What happens after he tells him that information?

09:43AM  21   A    Then Mike asked him how come he didn't get the watch back,

09:43AM  22   if he saw somebody wearing his watch.

09:43AM  23   Q    What else happened during that conversation?

09:43AM  24   A    Then Mike got -- Mike got a little upset at Jason for not

09:44AM  25   getting his watch back.  So he wanted to speak to Brian

09:44AM   1   Yoshida.  So he asked if anybody had Brian's phone number.  I

09:44AM   2   had Brian's phone number, so I gave it to Mike.  And Mike

09:44AM   3   called or -- I don't remember if Mike called him or texted him.

09:44AM   4   Q    And then after you gave that number -- after you gave

09:44AM   5   Brian Yoshida's phone number to the defendant, at that point in

09:44AM   6   time, do you know what the defendant was -- did you know what

09:44AM   7   the defendant was going to do with that number?

09:44AM   8   A    Yes, he was going to get in contact with Brian.

09:44AM   9   Q    And at that point in time, did you know what the defendant

09:44AM   10  intended to do next?

09:44AM   11  A    I didn't know exactly -- I mean, I thought that he was

09:44AM   12  going to call him and go ask for Jason's watch back.

09:44AM   13  Q    So what happens next after you give Mr. Yoshida's number

09:45AM   14  to the defendant?

09:45AM   15  A    Then Brian arrives after.  I don't know how long went by

09:45AM   16  before Brian arrived; less than an hour, he came by the shop.

09:45AM   17  I let him in to the shop and he went into Mike's office.

09:45AM   18  Q    You say the shop.

09:45AM   19       This is Kama'aina Termite?

09:45AM   20  A    Yes, that's Kama'aina Termite and Pest Control.

09:45AM   21  Q    Was this during business hours?

09:45AM   22  A    This was after business hours.

09:45AM   23  Q    When you say that you let Mr. Yoshida into the shop, what

09:45AM   24  did you have to do?

09:45AM   25  A    I had to open the rollup gate for him.

| | | | |
|---|---|---|---|
| 09:45AM | 1 | Q | You open the gate, you let Mr. Yoshida in, where does |
| 09:45AM | 2 | | Mr. Yoshida go? |
| 09:45AM | 3 | A | Brian went into Mike's office. |
| 09:45AM | 4 | Q | That's the one on the first floor? |
| 09:45AM | 5 | A | Correct. |
| 09:45AM | 6 | Q | Did you go into that office? |
| 09:45AM | 7 | A | I did not go into the office. |
| 09:45AM | 8 | Q | At this point, where was the defendant? |
| 09:45AM | 9 | A | The defendant was in his office. |
| 09:45AM | 10 | Q | What happened next? |
| 09:45AM | 11 | A | Then a few minutes after Brian arrived, Jake Smith |
| 09:46AM | 12 | | arrived. |
| 09:46AM | 13 | Q | What does Jake Smith do?  Did you talk to Jake Smith? |
| 09:46AM | 14 | A | We greeted each other, and then I told him that Mike was |
| 09:46AM | 15 | | in his office. |
| 09:46AM | 16 | Q | What did Jake Smith do? |
| 09:46AM | 17 | A | He entered Mike's office. |
| 09:46AM | 18 | Q | Was anyone else present at Kama'aina Termite at this |
| 09:46AM | 19 | | point? |
| 09:46AM | 20 | A | No it was me, Jason, Jake, Mike and Brian. |
| 09:46AM | 21 | Q | So Jason Yokoyama was also present? |
| 09:46AM | 22 | A | He was present. |
| 09:46AM | 23 | Q | And did Jason Yokoyama go into that office -- the |
| 09:46AM | 24 | | defendant's office? |
| 09:46AM | 25 | A | Not initially, but he did enter the office after. |

09:46AM   1   Q    After what?

09:46AM   2   A    After about 20 minutes.

09:46AM   3   Q    Okay, so let's break this down.  So Mr. Yoshida arrives.

09:46AM   4   You let him in.  Mr. Yoshida goes to the defendant's office,

09:46AM   5   right?

09:46AM   6   A    Yes.

09:46AM   7   Q    And then Jake Smith arrives a few minutes later and he

09:47AM   8   goes to the defendant's office?

09:47AM   9   A    Yes.

09:47AM   10   Q    And at this point, the defendant, Mr. Yoshida, and Jake

09:47AM   11   Smith are in the office?

09:47AM   12   A    Yes.

09:47AM   13   Q    And you are outside the office?

09:47AM   14   A    Me, myself, and Jason Yokoyama are outside the office.

09:47AM   15   Q    Okay.  What happens next?

09:47AM   16   A    What happens next.  I don't know how long it was, but I

09:47AM   17   let -- I let Brian Yoshida out of the shop.

09:47AM   18   Q    You said you don't know how long it was.

09:47AM   19        Was it seconds, minutes, hours?

09:47AM   20   A    No, it was, like, minutes probably, about 20 to

09:47AM   21   30 minutes.

09:47AM   22   Q    And did you observe anything of Mr. Yoshida?

09:47AM   23   A    Yeah.  Brian's face looked like hamburger, like he got

09:47AM   24   beat up.

09:47AM   25   Q    Can you describe what you observed?

09:47AM   1   A    There was swelling, there was bruising, scratches, red
09:48AM   2   marks.
09:48AM   3   Q    Now, you had let Mr. Yoshida in through the rolling gate.
09:48AM   4   Did he look like that when he went in?
09:48AM   5   A    No, he did not.
09:48AM   6   Q    A few minutes later when you let him out, that's what he
09:48AM   7   looked like?
09:48AM   8   A    Yes.
09:48AM   9   Q    Did you hear anything from the defendant's office?
09:48AM   10  A    I did not hear anything.  I was in the office that was
09:48AM   11  across from Mike's office.
09:48AM   12  Q    Did you talk to the defendant after Mr. Yoshida left?
09:48AM   13  A    We -- yeah, we all -- after Brian had left, we all was in
09:48AM   14  the office after Brian left.
09:48AM   15  Q    When you say we, who is there?
09:48AM   16  A    Myself, Jason Yokoyama, Jake Smith and Mike.
09:49AM   17  Q    And what's discussed at that point?
09:49AM   18  A    That Brian will have Jason's watch back or replace it
09:49AM   19  within a week.
09:49AM   20  Q    Who said that?
09:49AM   21  A    Mike.
09:49AM   22  Q    Did you talk to Jason Yokoyama about this afterwards?
09:49AM   23  A    I did see him after, and he said that he got the exact
09:49AM   24  watch back.
09:49AM   25  Q    Was that that same day that Jason Yokoyama told you that?

| | | | |
|---|---|---|---|
| 09:49AM | 1 | A | No, I saw him a few days after. |
| 09:49AM | 2 | Q | And did he indicate who he got the watch back from? |
| 09:49AM | 3 | A | He said that Brian brought the watch back to him. |
| 09:49AM | 4 | | MR. AKINA:  Could we show the witness Exhibit 1-39 |
| 09:49AM | 5 | please? | |
| 09:49AM | 6 | | THE COURT:  You may. |
| 09:49AM | 7 | BY MR. AKINA: | |
| 09:49AM | 8 | Q | Do you recognize this individual? |
| 09:49AM | 9 | A | Yes. |
| 09:49AM | 10 | Q | Who is this? |
| 09:49AM | 11 | A | That's Jason Yokoyama. |
| 09:50AM | 12 | Q | Was this a fair and accurate picture of how Jason Yokoyama |
| 09:50AM | 13 | looked back then, during the time that you were working for the | |
| 09:50AM | 14 | defendant? | |
| 09:50AM | 15 | A | Yes. |
| 09:50AM | 16 | | MR. AKINA:  I'd offer 1-39 into evidence. |
| 09:50AM | 17 | | MR. KENNEDY:  No objection. |
| 09:50AM | 18 | | THE COURT:  Without objection, 1-39 is admitted. |
| 09:50AM | 19 | | (Exhibit 1-39 was received in evidence.) |
| 09:50AM | 20 | | MR. AKINA:  Permission to publish? |
| 09:50AM | 21 | | THE COURT:  Yes. |
| 09:50AM | 22 | BY MR. AKINA: | |
| 09:50AM | 23 | Q | Just for the jury's sake, who is this individual? |
| 09:50AM | 24 | A | Jason Yokoyama. |
| 09:50AM | 25 | Q | During the time that you are working for the defendant, |

09:50AM  1   did you become aware through the defendant of any violence or

09:50AM  2   threats that took place at Kama'aina Termite besides this

09:50AM  3   incident?

09:50AM  4   A    Could you repeat the question?

09:50AM  5   Q    Did you learn of any other violence or threats from the

09:50AM  6   defendant that took place at Kama'aina Termite?

09:50AM  7   A    There was another one involving a fumigator who had stolen

09:51AM  8   something from a customer's house.

09:51AM  9   Q    Now, how did you first become aware of this?

09:51AM  10  A    It was -- I guess the customer had called saying that they

09:51AM  11  were missing a ring from their house, and they just had gotten

09:51AM  12  their tent fumigation -- their tent taken off that day, and

09:51AM  13  when they went back into check on the ring that they had

09:51AM  14  hidden, it was gone.

09:51AM  15  Q    And did you see that person -- that employee after that?

09:51AM  16  A    The person who stole the ring, yes, I did see him come

09:51AM  17  back to the shop.

09:51AM  18  Q    And then what happened?  Tell us about the incident that

09:51AM  19  you know about.

09:51AM  20  A    Then when he came back to the shop, he went into Mike's

09:51AM  21  office alone.

09:51AM  22  Q    Did you see the defendant emerge from the office at some

09:52AM  23  point?

09:52AM  24  A    Yes.  Mike was in his office.

09:52AM  25  Q    Before that, did you see that employee emerge from the

09:52AM   1   office at some point -- the Kama'aina employee?

09:52AM   2   A    Yes, I saw him enter Mike's office.

09:52AM   3   Q    Did he ever leave?

09:52AM   4   A    Yes, he left Mike's office.

09:52AM   5   Q    Was anything different about his appearance?

09:52AM   6   A    He didn't have his shirt on.  He didn't have his company

09:52AM   7   shirt on.

09:52AM   8   Q    Did he have any shirt on?

09:52AM   9   A    No, he didn't have any shirt on.

09:52AM   10   Q    What did you do after you saw this?

09:52AM   11   A    I asked Mike what happened to his shirt.

09:52AM   12   Q    And what did the defendant tell you?

09:52AM   13   A    Mike said that he used it to blindfold the person.

09:52AM   14   Q    Did the defendant explain what happened?

09:52AM   15   A    He used it to blindfold the person so that person couldn't

09:52AM   16   say that Mike assaulted him.

09:52AM   17   Q    Did the defendant explain why he did -- generally, why did

09:52AM   18   he even have to blindfold this person?

09:53AM   19   A    So he couldn't -- so that person who got assaulted

09:53AM   20   couldn't say that, with his own eyes, that Mike was the one

09:53AM   21   that assaulted him.

09:53AM   22   Q    Did the defendant explain about any conversations that he

09:53AM   23   had with that employee at that time?

09:53AM   24   A    He had asked -- he had questioned him about the ring and

09:53AM   25   he found out what pawn shop that the person pawned the ring at.

09:53AM   1   Q     Do you know if that employee continued to work at

09:53AM   2   Kama'aina?

09:53AM   3   A     No, that was his last day of employment.

09:53AM   4   Q     He got fired?

09:53AM   5   A     Yes.

09:53AM   6   Q     You testified earlier yesterday about certain messaging

09:53AM   7   apps that would be used to communicate that were encrypted; do

09:53AM   8   you recall that?

09:53AM   9   A     Yes.

09:53AM   10   Q     And in the conversations that you had through text with

09:54AM   11   the defendant, would there sometimes be group texts as well?

09:54AM   12   A     Yes.

09:54AM   13   Q     And what, if anything, did the defendant do to sort of

09:54AM   14   control whether -- what was discussed or if -- or did he do

09:54AM   15   anything to control certain topics were continued to be

09:54AM   16   discussed through texts?

09:54AM   17   A     If Mike didn't want anything more said in the text, then

09:54AM   18   he would say "kill this text" or "kill the thread."

09:54AM   19   Q     Could we show the witness Exhibit 1-565, please.  And this

09:54AM   20   is a one-paged document.

09:54AM   21         Do you recognize this?

09:54AM   22   A     Yes.

09:54AM   23   Q     What is this?

09:54AM   24   A     This is a text thread between myself, Michael Miske, Mike

09:55AM   25   Warden, and Angela Varnadore.

09:55AM    1    Q    And did this text happen -- do you know what date this

09:55AM    2    happened on, this particular text was sent?

09:55AM    3    A    No, I do not.

09:55AM    4    Q    Did it take place during the time that you were working

09:55AM    5    for the defendant?

09:55AM    6    A    Yes.

09:55AM    7    Q    Is this a fair and accurate copy of this portion of the

09:55AM    8    text conversation?

09:55AM    9    A    Yes.

09:55AM    10             MR. AKINA:  I would offer 1-565 into evidence.

09:55AM    11             THE COURT:  Any objection?

09:55AM    12             MR. KENNEDY:  No objections.

09:55AM    13             THE COURT:  Without objection, 1-565 is admitted.

09:55AM    14               (Exhibit 1-565 was received in evidence.)

09:55AM    15             MR. AKINA:  Permission to publish?

09:55AM    16             THE COURT:  Yes.

09:55AM    17    BY MR. AKINA:

09:55AM    18    Q    Could we focus on the top three bubbles please, and

09:55AM    19    also -- yes, the people involved.

09:55AM    20             Okay, so the first person, the first name is Angela

09:55AM    21    that's -- who is Angela?

09:55AM    22    A    Angela Varnadore.

09:56AM    23    Q    The next person, Preston, that's you?

09:56AM    24    A    Yes.

09:56AM    25    Q    And Mike is?

09:56AM    1    A    Mike Warden.

09:56AM    2    Q    You see on the left there is a text from Angela.  She says

09:56AM    3    goodbye.

09:56AM    4         Who is sending the green bubbles?

09:56AM    5    A    Mike.

09:56AM    6    Q    So there is two Mikes, right?  There's Mike Warden --

09:56AM    7    A    -- I'm sorry.  Mike Miske.

09:56AM    8    Q    So the green bubbles are the defendant's?

09:56AM    9    A    Yes.

09:56AM    10   Q    So that first one, where the defendant says, Mike can you

09:56AM    11   dial in, is that referring to the other Mike, Mike Warden?

09:56AM    12   A    Yes.

09:56AM    13   Q    And the second text, who is that directed towards?

09:56AM    14   A    That's directed towards Angela.

09:56AM    15   Q    If we go down to the rest of the other messages, Mike

09:57AM    16   Warden says, "okay, I'm signing on."  And the defendant

09:57AM    17   says texts -- "kill this text.  Preston, have Curtis kill all

09:57AM    18   Angela's emails right fucking now."

09:57AM    19         What's going on here?

09:57AM    20   A    Mike is telling me to contact Curtis, who is in charge of

09:57AM    21   all the, I guess, emails.  And he is asking me -- well, he is

09:57AM    22   saying "kill this text," so stop writing in this text, and

09:57AM    23   contact Curtis to change Angela's, I guess, passwords.

09:57AM    24   Q    Do you know what was happening at that point in time

09:57AM    25   between Angela Varnadore and the defendant?

09:57AM   1   A    No, I do not know what was happening.

09:57AM   2   Q    Is this typical of how the defendant would end

09:57AM   3   conversations and control what was discussed?

09:57AM   4   A    Yes.

09:57AM   5   Q    So focusing you on 2017, did you ever assist the defendant

09:58AM   6   in making payments to workers?

09:58AM   7   A    In 2017?

09:58AM   8   Q    I'll ask it a different way.  You told us that you would,

09:58AM   9   on occasion, make cash payments to Michael Masutani and your

09:58AM   10  brother Devin Kimoto.

09:58AM   11       Did you make cash payments to anybody else on behalf

09:58AM   12  of the defendant?

09:58AM   13  A    I made cash payments to Angela Varnadore, and I observed

09:58AM   14  cash payments being made to employees at the project, the

09:58AM   15  construction project on Mike's house, and also, the fishing

09:58AM   16  boat, *The Rachel*.

09:58AM   17  Q    With Mike's house, you mentioned that.  Where was that

09:59AM   18  located?

09:59AM   19  A    In east Oahu.

09:59AM   20  Q    East Oahu?

09:59AM   21  A    Yes, correct.  In the Portlock area.

09:59AM   22  Q    Do you recall the street name?

09:59AM   23  A    Lumahai.

09:59AM   24  Q    And what involvement, if anything, did you have in cash

09:59AM   25  payments for there?

09:59AM   1   A     I dropped off the weekly payments to the workers that
09:59AM   2   worked on the project.
09:59AM   3   Q     And the project was -- what's the project?
09:59AM   4   A     That was Mike's house, 6 Lumahai.
09:59AM   5   Q     Was the house being built?
09:59AM   6   A     Yes.
09:59AM   7   Q     So weekly you would drop off these cash payments to
09:59AM   8   workers there.
09:59AM   9         Who would you give the cash payments to?
09:59AM   10  A     John Lauro.
09:59AM   11  Q     And what would John Lauro do?
09:59AM   12  A     John Lauro would pay -- I mean, pass out the envelopes to
09:59AM   13  the individual workers.
09:59AM   14  Q     Did you have any role in preparing these cash payments
09:59AM   15  before they were delivered to John Lauro?
09:59AM   16  A     Yes.  I helped Tia sometimes count it and double count it
10:00AM   17  to make sure that it was the correct payment.
10:00AM   18  Q     And when you counted it out, how was it divided, if at
10:00AM   19  all?
10:00AM   20  A     It was divided into envelopes with people's names on it
10:00AM   21  and how many hours they had worked.
10:00AM   22  Q     So for each worker, they would have a different envelope?
10:00AM   23  A     Correct.
10:00AM   24  Q     And the money would go in the envelope?
10:00AM   25  A     Yes.

| | | | |
|---|---|---|---|
| 10:00AM | 1 | Q | When you were counting out payments, were they to the |
| 10:00AM | 2 | | cents or were they nice round flat numbers? |
| 10:00AM | 3 | A | They were nice round flat numbers. |
| 10:00AM | 4 | Q | Can you give examples? |
| 10:00AM | 5 | A | Like if somebody got paid $300 a day for their work and |
| 10:00AM | 6 | | they worked five days, it would be 1500. |
| 10:00AM | 7 | Q | From what you could tell, did it appear that taxes were |
| 10:00AM | 8 | | taken into account? |
| 10:00AM | 9 | A | No. |
| 10:00AM | 10 | Q | And when you made these weekly payments, each weekly, I |
| 10:00AM | 11 | | guess, bundle of payments that you would drop off, |
| 10:01AM | 12 | | approximately how much money would that be each week? |
| 10:01AM | 13 | A | I mean, like, 20, 30,000.  I didn't do it weekly, but I |
| 10:01AM | 14 | | did it only when people couldn't make it. |
| 10:01AM | 15 | Q | The payments that you dropped off, what was your |
| 10:01AM | 16 | | understanding -- because earlier you said weekly payments. |
| 10:01AM | 17 | | So was it your understanding that the payments you |
| 10:01AM | 18 | | dropped off was for a week's worth of work? |
| 10:01AM | 19 | A | Yes, a week's worth of work for the workers that were |
| 10:01AM | 20 | | working on the project. |
| 10:01AM | 21 | Q | And when you provided the envelopes, did you just give a |
| 10:01AM | 22 | | bunch of loose envelopes to Mr. Lauro? |
| 10:01AM | 23 | A | No it was in one bag and the loose envelopes were in that |
| 10:01AM | 24 | | bag. |
| 10:01AM | 25 | Q | And you would give that bag to Mr. Lauro? |

10:01AM    1    A    Correct.

10:01AM    2    Q    You mentioned the fishing vessel *Rachel*.  Tell us about

10:01AM    3    that?

10:01AM    4    A    I accompanied Delia to drop off the payment for the deck

10:02AM    5    hands of the vessel.

10:02AM    6    Q    And was the payments, were they divided similarly to

10:02AM    7    payments for the workers at the Lumahai house?

10:02AM    8    A    Yes.

10:02AM    9    Q    Did you have any -- did you observe how those were broken

10:02AM   10    down, the cash payments?

10:02AM   11    A    They were broken down into -- it wasn't a set amount.  It

10:02AM   12    was whatever they got paid from the fishing auction.  Each deck

10:02AM   13    hand would get anywhere from half a percent to one and a half,

10:02AM   14    two percent of the total catch.  And then it got handed out

10:02AM   15    accordingly.

10:02AM   16    Q    Did you ever observe cash payments being received by the

10:02AM   17    defendant?

10:02AM   18    A    Yes.

10:03AM   19    Q    What did you observe?

10:03AM   20    A    I observed Jason dropping off cash payments to Mike.

10:03AM   21    Q    This is Jason Yokoyama?

10:03AM   22    A    Yes, Jason Yokoyama.

10:03AM   23    Q    And what were these payments for?

10:03AM   24    A    These payments were for, I guess, the remaining portion of

10:03AM   25    what he owed for the club, from purchasing the club from from

10:03AM   1   Mike.

10:03AM   2   Q    That was the Encore?

10:03AM   3   A    Yes.

10:03AM   4   Q    And when would Jason Yokoyama come to drop off these

10:03AM   5   payments?

10:03AM   6   A    Normally Fridays.

10:03AM   7   Q    Where would the payments be made at?  Where would he go

10:03AM   8   to?

10:03AM   9   A    I mean, normally, wherever was convenient for himself and

10:03AM   10  Mike, but on a few occasions when I had to pick it up, we met

10:03AM   11  at the shop.

10:03AM   12  Q    And how frequently were these payments made?

10:03AM   13  A    Weekly.

10:03AM   14  Q    Approximately how much was dropped off each week?

10:03AM   15  A    I don't know approximately how much, but from what I

10:03AM   16  picked up, it was like 10,000.

10:04AM   17  Q    And was that in cash or check or some other form?

10:04AM   18  A    In cash.

10:04AM   19  Q    And the times that you picked up payments from

10:04AM   20  Mr. Yokoyama, what did you do with that cash?

10:04AM   21  A    I gave it to Mike.

10:04AM   22  Q    How would you give it to the defendant?

10:04AM   23  A    When I met him at the bay.

10:04AM   24  Q    Familiar with an individual -- are you familiar with an

10:04AM   25  individual named Allen Lau?

10:04AM    1    A    Yes.

10:04AM    2    Q    Who is Allen Lau?

10:04AM    3    A    That's Mike's cousin.

10:04AM    4    Q    And did Allen Lau work for any of the defendant's

10:04AM    5    companies?

10:04AM    6    A    He worked for Kama'aina Plumbing.

10:04AM    7    Q    Did you do any business with Allen Lau?

10:04AM    8    A    Yeah.  I referred customers to Allen Lau.  And also, we

10:05AM    9    sold marijuana vape pens on a few occasions.

10:05AM   10    Q    What is a marijuana vape pen?

10:05AM   11    A    It's a pen that you, I guess, vape with, that has

10:05AM   12    marijuana oil in it.

10:05AM   13    Q    Did you ever talk to the defendant about you selling

10:05AM   14    marijuana vape pens?

10:05AM   15    A    Yes.

10:05AM   16    Q    And what did the defendant tell you, if anything?

10:05AM   17    A    Mike just told me to stop wasting my time doing that.

10:05AM   18    Q    Did he give you any other advice on that?

10:05AM   19    A    He didn't want -- well, I told him that the person that I

10:05AM   20    sold it to asked questions -- a lot of questions about him.  So

10:05AM   21    he didn't want me to continue to associate or sell him

10:05AM   22    anything.

10:06AM   23    Q    To your knowledge, was the defendant aware that Allen Lau

10:06AM   24    also sold marijuana vape pens?

10:06AM   25    A    Yes, he knew that Allen -- I told him that I got the vape

```
10:06AM   1    pens from Allen.  Allen made the vape pens, and I just had
10:06AM   2    somebody who bought it.
10:06AM   3    Q    Are you familiar with an individual named Chris Bourne?
10:06AM   4    A    Yes.
10:06AM   5    Q    How do you know about Chris Bourne?
10:06AM   6    A    I met Chris on one occasion at the shopping mall when me
10:06AM   7    and Mike were Christmas shopping.
10:06AM   8    Q    And tell us what happened during that interaction?
10:06AM   9    A    Mike introduced me -- well, we ran into Chris.  Mike
10:06AM   10   introduced me.  I walked away to give them privacy to talk.
10:06AM   11   And then when me and Mike met back up after he talked to Chris,
10:07AM   12   then he said that that's the person that he sent Miller to, I
10:07AM   13   guess, rob, or they wanted to tax him.
10:07AM   14   Q    What is taxing?  What does that mean?
10:07AM   15   A    Extort, rob.
10:07AM   16   Q    And he mentioned Miller.  So the defendant sent Miller?
10:07AM   17   Who is that?
10:07AM   18   A    Wayne Miller.
10:07AM   19   Q    Did the defendant say anything else on that topic?
10:07AM   20   A    No, he didn't.
10:07AM   21   Q    And when -- in relation to after Mr. Bourne left, after he
10:07AM   22   stopped talking to the defendant at the mall -- when did the
10:07AM   23   defendant tell you about what he wanted Wayne Miller to do?
10:07AM   24   A    Just a few seconds.
10:07AM   25   Q    So right after Chris Bourne had walked away?
```

| | | |
|---|---|---|
| 10:07AM | 1 | A   Yes. |
| 10:07AM | 2 | Q   Do you know who an individual is by the name of Jason |
| 10:08AM | 3 | Smith? |
| 10:08AM | 4 | A   Yes.  I've heard his name, but I've never met Jason |
| 10:08AM | 5 | before -- Jason Smith before. |
| 10:08AM | 6 | Q   How did you hear about his name? |
| 10:08AM | 7 | A   Mike had mentioned to me that that's who he was texting |
| 10:08AM | 8 | one evening when he was using my phone. |
| 10:08AM | 9 | Q   So this evening, where did that take place? |
| 10:08AM | 10 | A   It was Friday and we were at the Bay. |
| 10:08AM | 11 | Q   So Friday you are at the Bay, and the defendant was using |
| 10:08AM | 12 | your phone? |
| 10:08AM | 13 | A   Yes, he asked to use my phone. |
| 10:08AM | 14 | Q   And the defendant takes your phone. |
| 10:08AM | 15 |     Does he give it back to you? |
| 10:08AM | 16 | A   Yes, he does give it back to me. |
| 10:08AM | 17 | Q   And then what happened? |
| 10:08AM | 18 | A   I just looked down at the text thread and just asked him |
| 10:08AM | 19 | who he was -- who is this that he was texting. |
| 10:08AM | 20 | Q   And what did the defendant tell you? |
| 10:08AM | 21 | A   He said it was Jason Smith. |
| 10:08AM | 22 | BY MR. AKINA: |
| 10:09AM | 23 | Q   Could we show the witness Exhibit 1-1076, please.  And |
| 10:09AM | 24 | this is also a one paged document.  If we could focus on the |
| 10:09AM | 25 | top one, yes. |

| | | | |
|---|---|---|---|
| 10:09AM | 1 | | Do you see that phone number at the top? |
| 10:09AM | 2 | A | Yes. |
| 10:09AM | 3 | Q | Whose phone number is that? |
| 10:09AM | 4 | A | That is my phone number. |
| 10:09AM | 5 | Q | And if we could zoom out of this. |
| 10:09AM | 6 | | Do you recognize what these text messages are? |
| 10:09AM | 7 | A | Yes, I recognize these text messages. |
| 10:09AM | 8 | Q | What are these text messages? |
| 10:09AM | 9 | A | This is Mike texting Jason Smith. |
| 10:09AM | 10 | Q | This is from that night that you were telling us, at the |
| 10:09AM | 11 | | bay? |
| 10:09AM | 12 | A | Yes. |
| 10:09AM | 13 | Q | Is this a fair and accurate copy of messages that were |
| 10:09AM | 14 | | sent between the defendant using your phone and the individual |
| 10:10AM | 15 | | he identified as Jason Smith? |
| 10:10AM | 16 | A | Yes. |
| 10:10AM | 17 | | MR. AKINA:  I would offER Exhibit 1-1076 into |
| 10:10AM | 18 | | evidence. |
| 10:10AM | 19 | | MR. KENNEDY:  No objection. |
| 10:10AM | 20 | | THE COURT:  Without objection, Exhibit 1-1076 is |
| 10:10AM | 21 | | admitted. |
| 10:10AM | 22 | | (Exhibit 1-1076 was received in evidence.) |
| 10:10AM | 23 | | THE COURT:  Mr. Akina, if you would give some thought |
| 10:10AM | 24 | | to stopping at an appropriate time for our morning break. |
| 10:10AM | 25 | | MR. AKINA:  I can stop now, or I can finish with |

| | | |
|---|---|---|
| 10:10AM | 1 | this -- |
| 10:10AM | 2 | THE COURT:  Why don't you finish with this line, and |
| 10:10AM | 3 | then we will take a break. |
| 10:10AM | 4 | MR. AKINA:  Okay.  Thank you, Your Honor.  If we could |
| 10:10AM | 5 | publish.  If we could zoom in on the top box, that phone number |
| 10:10AM | 6 | at the top ending in 2822. |
| 10:10AM | 7 | BY MR. AKINA: |
| 10:10AM | 8 | Q    You said that was your phone number? |
| 10:10AM | 9 | A    Yes. |
| 10:10AM | 10 | Q    Is that the same phone number that you had used when you |
| 10:10AM | 11 | were texting with -- when you gave the attorney's information |
| 10:10AM | 12 | to that customer where someone had been pulled out of the |
| 10:10AM | 13 | residence in 2018? |
| 10:10AM | 14 | A    Yes. |
| 10:10AM | 15 | Q    So this was using your company phone? |
| 10:10AM | 16 | A    Yes. |
| 10:11AM | 17 | Q    And the date here, what's the date? |
| 10:11AM | 18 | A    It's July 6, 2018. |
| 10:11AM | 19 | Q    And that was a Friday? |
| 10:11AM | 20 | A    Yes. |
| 10:11AM | 21 | Q    And the bubbles on the left, who is sending those |
| 10:11AM | 22 | messages? |
| 10:11AM | 23 | A    Mike. |
| 10:11AM | 24 | Q    And the bubble on the right, who is sending that? |
| 10:11AM | 25 | A    Jason Smith. |

10:11AM   1   Q    So are these messages not taken out of your phone, but on

10:11AM   2   the other end from the recipient's phone?

10:11AM   3   A    Yes.

10:11AM   4   Q    And so did you send this first one, "faggot"?

10:11AM   5   A    No, I did not.

10:11AM   6   Q    Who sent that?

10:11AM   7   A    Mike.

10:11AM   8   Q    And then what about the following messages about, "We go

10:11AM   9   meet them, show me, show me slop can, fucking queer."

10:11AM   10        Did you send those messages?

10:11AM   11   A    No, I did not.

10:11AM   12   Q    Who sent those messages?

10:11AM   13   A    Mike.

10:11AM   14   Q    If we could look at the bottom box.

10:11AM   15        Is this a continuation of that same conversation?

10:12AM   16   A    Yes.

10:12AM   17   Q    So where the third bubble from the top where it says,

10:12AM   18   "let's do this, faggot.  Answer my call, faggot."

10:12AM   19        Did you sent those messages?

10:12AM   20   A    No, I did not.

10:12AM   21   Q    Who sent those messages?

10:12AM   22   A    Mike.

10:12AM   23   Q    And the message that says, "Let's meet, I like you prove

10:12AM   24   to me you not one fag."

10:12AM   25        Who sent that?

| | | |
|---|---|---|
| 10:12AM | 1 | A     Mike. |
| 10:12AM | 2 | MR. AKINA:  I think this is a good place to stop, Your |
| 10:12AM | 3 | Honor. |
| 10:12AM | 4 | THE COURT:  All right.  Let's go to our first morning |
| 10:12AM | 5 | break, then.  As we do so, I'll remind the jurors to please |
| 10:12AM | 6 | refrain from discussing the substance of this case with anyone, |
| 10:12AM | 7 | including one another, until I advise you otherwise; to refrain |
| 10:12AM | 8 | from accessing any media or other accounts of this case that |
| 10:12AM | 9 | may be out there; and then finally, please do not conduct any |
| 10:12AM | 10 | independent investigation into the facts, circumstances or |
| 10:12AM | 11 | persons involved.  So let's take about a 15-minute break.  Try |
| 10:12AM | 12 | to get back as close to 10:30 as possible. And we will resume |
| 10:13AM | 13 | at that time with Mr. Kimoto. |
| 10:13AM | 14 | (Proceedings were recessed at 10:13 a.m. to 10:35 |
| 10:14AM | 15 | a.m.) |
| 10:35AM | 16 | THE COURT:  All right.  Before the break, we were in |
| 10:35AM | 17 | the midst again of Mr. Akina's direct examination of |
| 10:35AM | 18 | Mr. Kimoto.  You may resume that now. |
| 10:35AM | 19 | MR. AKINA:  Thank you, Your Honor. |
| 10:35AM | 20 | BY MR. AKINA: |
| 10:35AM | 21 | Q     Mr. Kimoto, to your knowledge -- your personal knowledge, |
| 10:36AM | 22 | did the defendant have any weapons? |
| 10:36AM | 23 | A     Yes. |
| 10:36AM | 24 | Q     What type of weapon? |
| 10:36AM | 25 | A     A baton. |

| | | | |
|---|---|---|---|
| 10:36AM | 1 | Q | Did you see this yourself? |
| 10:36AM | 2 | A | I saw it in his truck once. |
| 10:36AM | 3 | Q | Can you describe what you saw? |
| 10:36AM | 4 | A | It was a black metal object with rubber, like X rubber |
| 10:36AM | 5 | handle on there. |
| 10:36AM | 6 | Q | And the baton, is it just long, or how does it operate? |
| 10:36AM | 7 | A | It's retractable. |
| 10:36AM | 8 | Q | Sorry, how does it operate? |
| 10:36AM | 9 | A | I'm sorry, it extends and it retracts. |
| 10:36AM | 10 | Q | And do you have any personal familiarity with batons that |
| 10:36AM | 11 | looks like that? |
| 10:36AM | 12 | A | Yes. I've ordered a few off the internet. |
| 10:36AM | 13 | MR. AKINA: Could we show the witness Exhibit 1-602, |
| 10:37AM | 14 | and then I'll follow up with the second one. This would just |
| 10:37AM | 15 | be for identification at this point. |
| 10:37AM | 16 | THE COURT: All right. |
| 10:37AM | 17 | BY MR. AKINA: |
| 10:37AM | 18 | Q | The baton that you saw in the defendant's truck, how does |
| 10:37AM | 19 | that compare to the photo that you are looking at now? |
| 10:37AM | 20 | A | It's very similar to that photo -- to the photo. |
| 10:37AM | 21 | Q | Similar in color? |
| 10:37AM | 22 | A | Similar in color and -- yeah, yes. |
| 10:37AM | 23 | Q | And what about the pattern that you described, that X |
| 10:37AM | 24 | pattern? |
| 10:37AM | 25 | A | Yes, that's also similar. |

| | | |
|---|---|---|
| 10:37AM | 1 | MR. AKINA:  And could we show the witness Exhibit |
| 10:37AM | 2 | 1-308 for identification at this time. |
| 10:37AM | 3 | BY MR. AKINA: |
| 10:37AM | 4 | Q   How does this photo compare to what -- the baton that you |
| 10:37AM | 5 | observed in the defendant's truck? |
| 10:38AM | 6 | A   Similar. |
| 10:38AM | 7 | Q   Similar color and pattern? |
| 10:38AM | 8 | A   Yes. |
| 10:38AM | 9 | Q   Did you ever discuss -- you mentioned Jake Smith |
| 10:38AM | 10 | yesterday, right? |
| 10:38AM | 11 | A   Yes. |
| 10:38AM | 12 | Q   Did you ever discuss -- and you said that you -- that the |
| 10:38AM | 13 | defendant had told you things that Jake Smith did for him, |
| 10:38AM | 14 | including assaults, right? |
| 10:38AM | 15 | A   Correct. |
| 10:38AM | 16 | Q   Did the defendant discuss particular targets to be |
| 10:38AM | 17 | assaulted that he had given to Jake Smith?  Did he discuss that |
| 10:38AM | 18 | with you? |
| 10:38AM | 19 | A   He mentioned that a few were Tori Clegg's friends. |
| 10:38AM | 20 | Q   Okay.  And which individuals? |
| 10:38AM | 21 | A   There was a dentist in the Diamond Head area, and also |
| 10:38AM | 22 | there was one of her -- Tori's friend's husband that got |
| 10:39AM | 23 | assaulted. |
| 10:39AM | 24 | Q   Do you know who Ryan Teramoto is? |
| 10:39AM | 25 | A   Yes, I know who Ryan Teramoto is. |

| | | | |
|---|---|---|---|
| 10:39AM | 1 | Q | Was he on the list of individuals? |
| 10:39AM | 2 | A | Yes. |
| 10:39AM | 3 | Q | So that's three people? |
| 10:39AM | 4 | A | Correct. |
| 10:39AM | 5 | Q | So starting with the Diamond Head -- the dentist in the |
| 10:39AM | 6 | | Diamond Head area? |
| 10:39AM | 7 | A | Yes. |
| 10:39AM | 8 | Q | What did the defendant explain? |
| 10:39AM | 9 | A | He had explained to me that Johnnie and Jake went to go |
| 10:39AM | 10 | | see the dentist, but they didn't get to do anything to him. |
| 10:39AM | 11 | Q | Anything else that was explained? |
| 10:39AM | 12 | A | For the dentist? |
| 10:39AM | 13 | Q | Yes, for the dentist. |
| 10:39AM | 14 | A | That he had provided them with all the information that |
| 10:39AM | 15 | | they needed. |
| 10:39AM | 16 | Q | And he being who? |
| 10:39AM | 17 | A | Mike. |
| 10:39AM | 18 | Q | So the defendant had provided John Stancil and Jake Smith |
| 10:40AM | 19 | | with information on the dentist? |
| 10:40AM | 20 | A | Correct. |
| 10:40AM | 21 | Q | And to your knowledge, did anything happen to the dentist? |
| 10:40AM | 22 | A | No. |
| 10:40AM | 23 | Q | And that dentist had some relationship to, some connection |
| 10:40AM | 24 | | to Tori Clegg? |
| 10:40AM | 25 | A | That's what I believe. |

| | | | |
|---|---|---|---|
| 10:40AM | 1 | Q | You mentioned a friend of Tori Clegg's husband, correct? |
| 10:40AM | 2 | A | Tori Clegg's friend, her husband. |
| 10:40AM | 3 | Q | Okay.  The husband of Tori Clegg's friend. |
| 10:40AM | 4 | | What did the defendant explain about that? |
| 10:40AM | 5 | A | That Jake had gone down to his workplace at that car |
| 10:40AM | 6 | | dealership and he got assaulted. |
| 10:40AM | 7 | Q | And was anyone else present during that conversation or |
| 10:40AM | 8 | | just you and the defendant? |
| 10:40AM | 9 | A | It was just me and Mike. |
| 10:41AM | 10 | Q | And then you also mentioned Ryan Teramoto. |
| 10:41AM | 11 | | What was explained to you about that? |
| 10:41AM | 12 | A | He said that Ryan -- that he called him Cert, because that |
| 10:41AM | 13 | | was short for his company name.  Ryan owns Certified Pest |
| 10:41AM | 14 | | Management, I believe.  So he called him Cert and he said that |
| 10:41AM | 15 | | he sent Jake to go assault Ryan. |
| 10:41AM | 16 | Q | Were you ever present for conversations with John Stancil |
| 10:41AM | 17 | | and Jake Smith regarding assaults? |
| 10:41AM | 18 | A | I was there when Jake was explaining to Mike about what |
| 10:42AM | 19 | | happened with the Diamond Head dentist. |
| 10:42AM | 20 | Q | What did Jake Smith explain to the defendant? |
| 10:42AM | 21 | A | That they almost assaulted the wrong person. |
| 10:42AM | 22 | Q | Do you know who Lindsey Kinney is? |
| 10:42AM | 23 | A | Yes. |
| 10:42AM | 24 | Q | And do you know if he has or had any type of social media |
| 10:42AM | 25 | | presence? |

10:42AM    1    A    Yes, he did.

10:42AM    2    Q    Can you explain that?

10:42AM    3    A    He would make videos about his experience with what

10:42AM    4    happened, I guess, at -- on the movie set.

10:42AM    5    Q    What -- did he have any type of relationship with the

10:42AM    6    defendant?

10:42AM    7    A    No.

10:42AM    8    Q    Did they know of each other, to your knowledge?

10:42AM    9    A    Yes, they knew of each other.

10:42AM    10    Q    How do you know that?

10:42AM    11    A    Because Lindsey was accusing Mike of trying to shoot him.

10:42AM    12    Q    Where did that -- as far as the defendant is concerned,

10:43AM    13    well, backing up.  So Lindsey Kinney would make social media

10:43AM    14    posts.

10:43AM    15        Can you describe the type of post, without getting

10:43AM    16    into details of what was said but just generally, where would

10:43AM    17    he post it?

10:43AM    18    A    Normally on Instagram.

10:43AM    19        MR. KENNEDY:  Objection on relevance and lack of

10:43AM    20    firsthand knowledge.

10:43AM    21        THE COURT:  I assume this is going somewhere?

10:43AM    22        MR. AKINA:  Yes, Your Honor.

10:43AM    23        THE COURT:  I'll allow it for now, subject to further

10:43AM    24    objection, if you don't tie it together.

10:43AM    25        THE WITNESS:  His videos were posted on Instagram and

10:43AM   1   it was just rants about discussing Mike.

10:43AM   2   BY MR. AKINA:

10:43AM   3   Q    Okay.  So Lindsey --

10:43AM   4   A    About what happened to him at Kualoa and how he wasn't

10:43AM   5   scared and stuff.  Things like that.

10:43AM   6   Q    What's your understanding of what happened at Kualoa based

10:43AM   7   on these rants?

10:44AM   8               MR. KENNEDY:  Objection; hearsay.

10:44AM   9               THE COURT:  Overruled.

10:44AM  10               MR. KENNEDY:  Lack of personal knowledge.

10:44AM  11               THE COURT:  Overruled.

10:44AM  12   BY MR. AKINA:

10:44AM  13   Q    What's your understanding of what happened at Kualoa based

10:44AM  14   on the posts that you saw?

10:44AM  15   A    He had said that Jake and Johnnie were with Mike, and they

10:44AM  16   shot at him, but they missed.

10:44AM  17   Q    Would you ever forward these types of messages to anyone?

10:44AM  18   A    I would forward it to Mike, and then I forwarded one to

10:44AM  19   Jake.

10:44AM  20   Q    Why would you forward it to the defendant?

10:44AM  21   A    Mike said that he was saving it in a file for, I guess,

10:44AM  22   when/if he ever needed it.

10:44AM  23   Q    Do you know what that means?

10:44AM  24               MR. KENNEDY:  Objection; speculation, Your Honor.

10:44AM  25               THE COURT:  Sustained.

| | | |
|---|---|---|
| 10:44AM | 1 | BY MR. AKINA: |
| 10:44AM | 2 | Q    Do you know an individual named Nate Lum? |
| 10:45AM | 3 | A    Yes. |
| 10:45AM | 4 | Q    And who is he? |
| 10:45AM | 5 | A    Nate is Mike's friend. |
| 10:45AM | 6 | Q    Do you know where Nate Lum worked? |
| 10:45AM | 7 | A    At the stevedores.  At the union. |
| 10:45AM | 8 | Q    And stevedores, what is that?  What type of industry is |
| 10:45AM | 9 | that? |
| 10:45AM | 10 | A    I don't. |
| 10:45AM | 11 | Q    You don't know what type of work that involves? |
| 10:45AM | 12 | A    I don't. |
| 10:45AM | 13 | Q    Okay.  Are you aware of whether or not the defendant -- |
| 10:45AM | 14 | based on conversations with the defendant -- are you aware of |
| 10:45AM | 15 | whether or not the defendant was able to get people jobs |
| 10:45AM | 16 | working at the docks? |
| 10:45AM | 17 | A    He did say that he got Johnnie a job before at the docks. |
| 10:45AM | 18 | Q    Johnnie being who? |
| 10:45AM | 19 | A    John Stancil. |
| 10:45AM | 20 | Q    During your time working for the defendant, about how many |
| 10:46AM | 21 | phones did you have at any given time? |
| 10:46AM | 22 | A    Multiple. |
| 10:46AM | 23 | Q    When you say multiple, about how many? |
| 10:46AM | 24 | A    Two. |
| 10:46AM | 25 | Q    And we saw a phone number in a couple of exhibits that |

10:46AM    1   ended in 2822?

10:46AM    2   A    Yes.

10:46AM    3   Q    How did you get that phone number -- that phone?

10:46AM    4   A    I got that phone because Mike had asked me to go purchase

10:46AM    5   two phones for me and him to use to just communicate with each

10:46AM    6   other.

10:46AM    7   Q    What type of phones were these?

10:46AM    8   A    iPhones.

10:46AM    9   Q    And the purpose was just to communicate between the two of

10:46AM   10   you?

10:46AM   11   A    Yes, to communicate between myself and Mike.

10:46AM   12   Q    And when did the defendant tell you to get those phones?

10:46AM   13   A    This was right around the time when Caleb got into the

10:46AM   14   accident.

10:46AM   15   Q    And what was the context for that, where the defendant

10:46AM   16   told you to go out and about two phones, one for you and one

10:47AM   17   for him?

10:47AM   18   A    It was burner phones that would be used just for myself

10:47AM   19   and him to communicate.

10:47AM   20   Q    Did the defendant indicate why he wanted you to do that?

10:47AM   21   A    No, he said that he thought that -- or he knew that law

10:47AM   22   enforcement was monitoring his phone.

10:47AM   23   Q    Did the defendant ever indicate to you what you should do

10:47AM   24   if law enforcement approached you?

10:47AM   25   A    Yeah, he just -- he said to ask for an attorney.

| | | |
|---|---|---|
| 10:47AM | 1 | Q    What's your understanding of what happens when you ask for |
| 10:47AM | 2 | an attorney? |
| 10:47AM | 3 | A    That law enforcement can't ask me anymore questions |
| 10:47AM | 4 | without my attorney present. |
| 10:47AM | 5 | Q    Are you aware of whether the defendant had an attorney |
| 10:47AM | 6 | available for other people? |
| 10:47AM | 7 | A    Yeah.  He would recommend Allen Kaneshiro if you got a DUI |
| 10:48AM | 8 | and if you asked him for a reference. |
| 10:48AM | 9 | Q    What types of people would this recommendation be for? |
| 10:48AM | 10 | A    Employees, friends. |
| 10:48AM | 11 | Q    Employees and friends of the defendant? |
| 10:48AM | 12 | A    Correct. |
| 10:48AM | 13 | Q    Do you know who would pay for Mr. Kaneshiro's fees in |
| 10:48AM | 14 | those instances? |
| 10:48AM | 15 | MR. KENNEDY:  Objection on foundation, Your Honor. |
| 10:48AM | 16 | MR. AKINA:  If you know. |
| 10:48AM | 17 | THE COURT:  Overruled.  Go ahead. |
| 10:48AM | 18 | THE WITNESS:  The person asking for the help. |
| 10:48AM | 19 | BY MR. AKINA: |
| 10:48AM | 20 | Q    Now, at some point prior to your arrest in 2020, did you |
| 10:48AM | 21 | discuss with the defendant the topic of a federal |
| 10:48AM | 22 | investigation? |
| 10:48AM | 23 | A    Yes. |
| 10:48AM | 24 | Q    Tell us about that. |
| 10:48AM | 25 | A    He had said that he was on an indictment with Kaulana and |

10:48AM   1   Johnnie; Kaulana Freitas and John Stancil.  And he had asked

10:49AM   2   them to not do stupid things and to lay low.

10:49AM   3   Q    And was this before or after Jonathan Fraser had

10:49AM   4   disappeared, this conversation?

10:49AM   5   A    This was after.

10:49AM   6   Q    Did the defendant ever discuss with you what -- any

10:49AM   7   contingency plans in the event he was arrested?

10:49AM   8   A    He asked me if I could help Delia run the companies.

10:49AM   9   Q    That's Delia Fabro-Miske?

10:49AM  10   A    Correct.

10:49AM  11   Q    And were you present for any conversations between the

10:49AM  12   defendant and other people regarding what to do in the event of

10:49AM  13   an arrest, specifically Delia Fabro-Miske?

10:49AM  14   A    Oh, yes.

10:49AM  15   Q    Tell us about that conversation.

10:49AM  16   A    We were -- well, in the same conversation that he had

10:49AM  17   asked me to help with the companies, if he was ever arrested,

10:49AM  18   he also asked her if she was indicted, if she would stand by

10:49AM  19   him or would she fold.

10:50AM  20   Q    And what was her response at that time?

10:50AM  21   A    She said that she would stand by him and -- even if she

10:50AM  22   had to take the years in prison.

10:50AM  23   Q    Have you ever heard of a grand jury?

10:50AM  24   A    Yes.

10:50AM  25   Q    And what is your understanding of what a grand jury does?

10:50AM   1   A    The grand jury decides if you are going to get indicted or

10:50AM   2   not, if there is enough evidence.

10:50AM   3   Q    What's your understanding of whether what a grand jury

10:50AM   4   does is supposed to be secret or publicly known?

10:50AM   5            MR. KENNEDY:  Objection on this grounds, Your Honor.

10:50AM   6            THE COURT:  Objection --

10:50AM   7            MR. KENNEDY:  Relevance.

10:50AM   8            THE COURT:  This grounds?

10:50AM   9            MR. KENNEDY:  Relevance; the understanding of what a

10:50AM   10   grand jury does.  I think the Court has already instructed the

10:50AM   11   jury on what --

10:50AM   12            THE COURT:  Sustained.

10:51AM   13   BY MR. AKINA:

10:51AM   14   Q    Did the defendant ever discuss what a -- grand jury

10:51AM   15   proceedings with you?

10:51AM   16            MR. KENNEDY:  Same objection, and also on relevance.

10:51AM   17            MR. AKINA:  Your Honor.

10:51AM   18            THE COURT:  Go ahead.

10:51AM   19            MR. AKINA:  This goes to the proof of an enterprise,

10:51AM   20   planning, what to do, specifically to further the purposes of

10:51AM   21   the enterprise; avoiding detection.  I think it's highly

10:51AM   22   relevant.

10:51AM   23            THE COURT:  I'll allow it.  Go ahead.

10:51AM   24            THE WITNESS:  Can you repeat the question.

10:51AM   25   BY MR. AKINA:

| | | | |
|---|---|---|---|
| 10:51AM | 1 | Q | Did the defendant ever discuss grand jury activities with |
| 10:51AM | 2 | | you? |
| 10:51AM | 3 | A | He did mention to me that people let him know when they |
| 10:51AM | 4 | | would be going in, and they would tell him after what went on. |
| 10:51AM | 5 | Q | So he would meet with people after they went to the grand |
| 10:51AM | 6 | | jury? |
| 10:51AM | 7 | A | Yes. |
| 10:51AM | 8 | Q | According to the defendant? |
| 10:51AM | 9 | A | Yes. |
| 10:51AM | 10 | Q | Did the defendant indicate how frequently the grand jury |
| 10:52AM | 11 | | met? |
| 10:52AM | 12 | A | He told me every Thursday. |
| 10:52AM | 13 | Q | Now, at some point, do you know if Wayne Miller was ever |
| 10:52AM | 14 | | arrested at some point while you were working for the |
| 10:52AM | 15 | | defendant? |
| 10:52AM | 16 | A | Yes. |
| 10:52AM | 17 | Q | Was he? |
| 10:52AM | 18 | A | Yes. |
| 10:52AM | 19 | Q | And after Wayne Miller was arrested, did you have any |
| 10:52AM | 20 | | conversations with the defendant regarding that? |
| 10:52AM | 21 | A | Yes.  I had asked him if he thought that Wayne would bring |
| 10:52AM | 22 | | up the kidnapping. |
| 10:52AM | 23 | Q | You asked the defendant if the defendant thought that |
| 10:52AM | 24 | | Wayne Miller would bring up the kidnapping? |
| 10:52AM | 25 | A | Correct. |

10:52AM  1   Q    Bring up the kidnapping to who?

10:52AM  2   A    To the accountant, Mr. Lee.

10:52AM  3   Q    Okay.  And sorry, if -- you said that you asked the

10:52AM  4   defendant if he thought Wayne Miller would bring up the

10:52AM  5   accountant, the kidnapping of the accountant.

10:52AM  6        Who were you referring to that Wayne Miller might be

10:52AM  7   talking to?

10:52AM  8   A    The government.

10:52AM  9   Q    And how did the defendant respond?

10:53AM  10  A    He said no, but then he asked me to check in with Sunny to

10:53AM  11  see if anybody came to ask her or her father any questions.

10:53AM  12  Q    That was Ms. Kim?

10:53AM  13  A    Correct.

10:53AM  14  Q    And what did you do after he directed -- after the

10:53AM  15  defendant directed you to check in on Ms. Kim?

10:53AM  16  A    I texted her and she said no.

10:53AM  17  Q    And was that conversation a different conversation from

10:53AM  18  those two in December of 2022 that you told us about yesterday

10:53AM  19  with Ms. Kim?

10:53AM  20  A    I don't recall.  Or I don't understand.

10:53AM  21  Q    Sure.  So after the defendant told you to check in on

10:53AM  22  Ms. Kim, and then you said you texted her and she indicated

10:53AM  23  that she hadn't been approached by law enforcement, right?

10:53AM  24  A    Yes.

10:53AM  25  Q    Was that text exchange, was that separate from the two

| | | |
|---|---|---|
| 10:53AM | 1 | times you met up with Ms. Kim in 2022? |
| 10:53AM | 2 | A    No.  This was previous to my arrest in July 2020. |
| 10:54AM | 3 | Q    Okay, so that text exchange with Ms. Kim, that's separate |
| 10:54AM | 4 | from the two meetings with her in 2022? |
| 10:54AM | 5 | A    Correct. |
| 10:54AM | 6 | Q    Now, on the topic of the kidnapping of Mr. Lee the |
| 10:54AM | 7 | accountant, yesterday you had mentioned that you had been in |
| 10:54AM | 8 | text communication with Wayne Miller during the time of the |
| 10:54AM | 9 | kidnapping? |
| 10:54AM | 10 | A    Yes. |
| 10:54AM | 11 | Q    And that was on the day of the kidnapping? |
| 10:54AM | 12 | A    Yes. |
| 10:54AM | 13 | Q    And the day after? |
| 10:54AM | 14 | A    Yes. |
| 10:54AM | 15 | BY MR. AKINA: |
| 10:54AM | 16 | Q    Could we show the witness Exhibit 5-37, Your Honor?  It |
| 10:54AM | 17 | has in this format. |
| 10:55AM | 18 | THE COURT:  Okay.  Go ahead. |
| 10:55AM | 19 | BY MR. AKINA: |
| 10:55AM | 20 | Q    And looking at the two lines on the bottom here, four and |
| 10:55AM | 21 | five, the dates here are October 18th? |
| 10:55AM | 22 | A    Yes. |
| 10:55AM | 23 | Q    That's the day after the kidnapping? |
| 10:55AM | 24 | A    Yes. |
| 10:55AM | 25 | Q    And I think yesterday you had told us that this exhibit |

10:55AM   1   depicts messages between Mr. Miller and yourself, correct?

10:55AM   2   A    Yes.

10:55AM   3   Q    And if we go to page two.

10:55AM   4        The dates for all these messages, is that also

10:55AM   5   October 18th of 2017?

10:55AM   6   A    Yes.

10:55AM   7   Q    And if we go to the next page.

10:55AM   8        Again, these are all on October 18, 2017?

10:55AM   9   A    Yes.

10:55AM  10   Q    And page four.  What are the dates for these?

10:56AM  11   A    That is October 17, 2017.

10:56AM  12   Q    That's the day of the kidnapping?

10:56AM  13   A    Correct.

10:56AM  14   Q    And if we could go to the next page, page five.

10:56AM  15        Is that also from the day of the kidnapping?

10:56AM  16   A    Yes.

10:56AM  17   Q    So all the messages on page five are also from that

10:56AM  18   October 17th day?

10:56AM  19   A    Yes.

10:56AM  20   Q    The last page, page six.

10:56AM  21        That's also from October 17, 2017?

10:56AM  22   A    Yes.

10:56AM  23   Q    And yesterday, you testified that these related to the

10:56AM  24   kidnapping; these messages?

10:56AM  25   A    Yes.

| | | |
|---|---|---|
| 10:56AM | 1 | MR. AKINA:  At this point, I would offer Exhibit 5-37. |
| 10:56AM | 2 | I'd renew that offer into evidence. |
| 10:57AM | 3 | MR. KENNEDY:  No objection, Your Honor. |
| 10:57AM | 4 | THE COURT:  All right.  Has this exhibit been |
| 10:57AM | 5 | modified? |
| 10:57AM | 6 | MR. AKINA:  Yes. |
| 10:57AM | 7 | THE COURT:  Yes? |
| 10:57AM | 8 | MR. AKINA:  Yes. |
| 10:57AM | 9 | THE COURT:  Without objection, Exhibit 5-37 is |
| 10:57AM | 10 | admitted. |
| 10:57AM | 11 | (Exhibit 5-37 was received in evidence.) |
| 10:57AM | 12 | MR. AKINA:  So let's start on -- permission to |
| 10:57AM | 13 | publish, Your Honor? |
| 10:57AM | 14 | THE COURT:  Yes. |
| 10:57AM | 15 | BY MR. AKINA: |
| 10:57AM | 16 | Q    And if we could start on page six.  And zoom in on these, |
| 10:57AM | 17 | the three columns showing the text, the time, and the person |
| 10:57AM | 18 | sending or receiving. |
| 10:57AM | 19 | So starting at the bottom one on October 17, 2017, at |
| 10:57AM | 20 | 5:21 p.m., this is an outgoing message and it's going to who? |
| 10:57AM | 21 | A    That's going to me. |
| 10:57AM | 22 | Q    So this is a message that Wayne Miller is sending to you? |
| 10:58AM | 23 | A    Yes. |
| 10:58AM | 24 | Q    And on the left column where it says a phone number ending |
| 10:58AM | 25 | in 4516, was that your number at that time? |

10:58AM    1    A    Yes.

10:58AM    2    Q    One of your numbers?

10:58AM    3    A    Yes.

10:58AM    4    Q    And press10, you're Preston, right?

10:58AM    5    A    Yes.

10:58AM    6    Q    In these two messages, what does Wayne Miller send to you?

10:58AM    7    A    He says, "Yo, call me ASAP."

10:58AM    8    Q    If we could go to the next page.

10:58AM    9         This next line, what does the defendant say?  Sorry,

10:58AM    10   not the defendant.  What does Wayne Miller say?

10:58AM    11   A    "WTF brah."

10:58AM    12   Q    The next, he tells you?

10:58AM    13   A    "Text me back or something."

10:58AM    14   Q    If we could scroll up, please.  So that text me back, that

10:59AM    15   was at 5:37 and then at 6:08, this is an incoming message.

10:59AM    16        So who is sending this message now?

10:59AM    17   A    This is me.

10:59AM    18   Q    This is you responding to Wayne Miller?

10:59AM    19   A    Yes.

10:59AM    20   Q    And what do you tell him?

10:59AM    21   A    "I was at a house and I left my phone in the truck.  Hold

10:59AM    22   on.  She just got home."

10:59AM    23   Q    And then you say meet me, and give me 15 minutes?

10:59AM    24   A    Yes.

10:59AM    25   Q    So stopping here, what's going on up to this point with

| | | |
|---|---|---|
| 10:59AM | 1 | these text messages? |
| 10:59AM | 2 | A    Wayne is trying to get a hold of me. |
| 10:59AM | 3 | Q    And in relation to the events that happened during the |
| 10:59AM | 4 | kidnapping, when did that take place? |
| 10:59AM | 5 | A    I'm not sure, because I don't even know why he is |
| 10:59AM | 6 | contacting -- he's trying to contact me. |
| 10:59AM | 7 | Q    So at at this point in time, you didn't know why Wayne |
| 10:59AM | 8 | Miller was trying to reach out to you? |
| 10:59AM | 9 | A    No, I didn't. |
| 10:59AM | 10 | Q    So when you told Wayne Miller that you were at the house |
| 11:00AM | 11 | and you left your phone in the truck, why did you tell him |
| 11:00AM | 12 | that? |
| 11:00AM | 13 | A    To buy more time. |
| 11:00AM | 14 | Q    For what? |
| 11:00AM | 15 | A    So I can ask Mike what Wayne was contacting -- if he knew |
| 11:00AM | 16 | what Wayne wanted to get in contact with me about. |
| 11:00AM | 17 | Q    Mike, being the defendant? |
| 11:00AM | 18 | A    Yes. |
| 11:00AM | 19 | Q    If we could scroll up, please.  So you see this message, |
| 11:00AM | 20 | Wayne Miller says "text you K."  And then you respond "Call you |
| 11:00AM | 21 | right back."  And there is a gap of about an hour.  Wayne |
| 11:00AM | 22 | Miller sends you a message at 6:44 p.m.  You respond, "Call you |
| 11:00AM | 23 | right back" at 7:47 p.m. |
| 11:00AM | 24 |              Do you see that? |
| 11:00AM | 25 | A    Yes. |

11:00AM    1    Q    And if we scroll up a little more.  Wayne Miller says, K.

11:00AM    2    And then at 8:11 p.m. he texts you, brah.

11:01AM    3        Do you see that?

11:01AM    4    A    Yes.

11:01AM    5    Q    Scroll up some more.  Wayne Miller texts you, "No more all

11:01AM    6    night," also at 11 p.m.

11:01AM    7        What is going on at that point?

11:01AM    8    A    He's getting irritated that I haven't called him or got in

11:01AM    9    contact with him.

11:01AM   10    Q    So at this point, did you know that the accountant had

11:01AM   11    been kidnapped?

11:01AM   12    A    No.

11:01AM   13    Q    Will you scroll up some more.  You text him, "I know,

11:01AM   14    coming now."  Keep scrolling up, please.  And at the top of

11:01AM   15    page four, you tell him that you're at Ala's, 5 to 10 minutes.

11:01AM   16        Ala's refers to what location?

11:01AM   17    A    Ala Moana shopping center.

11:01AM   18    Q    And how far is that from the Kama'aina Termite and Pest

11:02AM   19    Control office?

11:02AM   20    A    Like, five minutes.

11:02AM   21    Q    Keep scrolling up to page three.  The bottom of page

11:02AM   22    three.

11:02AM   23        Now, this is a different day, right, October 18th?

11:02AM   24    A    Yes.

11:02AM   25    Q    So what happens between the previous page and this next

11:02AM   1   message where Wayne Miller is telling you "call me ASAP?"  So

11:02AM   2   after you said, I'm by Ala's, 5 to 10 minutes, what happens?

11:02AM   3   A     That I believe I met up with Wayne and we had -- this is

11:02AM   4   after -- that we met after I found out at the office at the

11:02AM   5   shop that the person got kidnapped.

11:02AM   6   Q     This was the meeting at Sheridan Park with Wayne Miller

11:02AM   7   you are referring to?

11:02AM   8   A     Yes.

11:02AM   9   Q     Where you then drove around in a car with him discussing

11:02AM   10   payment?

11:02AM   11   A     Yes.

11:02AM   12   Q     So at that point, you already knew about the kidnapping?

11:02AM   13   A     Correct.

11:02AM   14   Q     So prior to that, was that other meeting where you learned

11:03AM   15   about the kidnapping through the defendant?

11:03AM   16         MR. KENNEDY:  Objection; leading.

11:03AM   17         THE COURT:  Sustained.

11:03AM   18   BY MR. AKINA:

11:03AM   19   Q     Did you learn about the kidnapping prior to that message

11:03AM   20   that you sent about you're by Ala's?

11:03AM   21   A     Yes.

11:03AM   22   Q     How did you learn about it?

11:03AM   23   A     I learned about it at the office with Mike and Wayne.

11:03AM   24   Q     So now the next day, October 18th, you see where Wayne

11:03AM   25   Miller texts you, "call me ASAP," and then he texts you,

11:03AM   1   "Press, I just gotta take care of my boys something, then I can
11:03AM   2   wait until tomorrow is Thursday."
11:03AM   3          Do you see that?
11:03AM   4   A    Yes.
11:03AM   5   Q    What is that in reference to?
11:03AM   6   A    He wants me to call him back because he has to take care
11:03AM   7   of the person -- he wants me to call him back to see if I got
11:03AM   8   any money from Sunny and her father, because he has to take
11:03AM   9   care of, I guess, the person who helped him.
11:04AM   10  Q    Could we scroll up more please.  And you tell Wayne Miller
11:04AM   11  that you're doing an estimate right now, "braddah said hold on
11:04AM   12  and I'm going to meet him at shop right after this and get back
11:04AM   13  to you."  Right?
11:04AM   14  A    Yes.
11:04AM   15  Q    And in this context, who are you referring to when you
11:04AM   16  wrote braddah?
11:04AM   17  A    Mike.
11:04AM   18  Q    And who -- where are you referring to when you put shop?
11:04AM   19  A    Kama'aina Termite.
11:04AM   20  Q    And then Wayne Miller asks you, who, right?
11:04AM   21  A    Yes.
11:04AM   22  Q    And scrolling up some more, you respond "bro"?
11:04AM   23  A    Yes.
11:04AM   24  Q    Who is bro in this context?
11:04AM   25  A    Bro is Mike.

11:04AM   1   Q   The defendant?

11:04AM   2   A   Yes.

11:04AM   3   Q   And if we could keep scrolling up.

11:05AM   4       Wayne Miller asks you, "what about your guy, he come

11:05AM   5   true"?

11:05AM   6   A   Yes.

11:05AM   7   Q   So what's happening in this exchange?

11:05AM   8   A   He is still asking me if I talked to Sunny and her father

11:05AM   9   and if they said -- I mean if they agreed to give something.

11:05AM  10   Q   If we could scroll up to page two now.  You tell Wayne

11:05AM  11   Miller, not yet.  And Wayne Miller says, "Why, I need 'em,

11:05AM  12   brah."

11:05AM  13       What is that referring to?

11:05AM  14   A   I told him not yet because I didn't talk to Sunny or her

11:05AM  15   father.

11:05AM  16   Q   So you're still talking about money?

11:05AM  17   A   Yes.

11:05AM  18   Q   Keep scrolling up please.  You tell him, "Let me finish

11:05AM  19   this estimate.  I'll get back to you."

11:06AM  20       You see that?

11:06AM  21   A   Yes.

11:06AM  22   Q   So are you working at this time?

11:06AM  23   A   Yes.  I'm working doing my normal estimates.

11:06AM  24   Q   For which company?

11:06AM  25   A   I'm not sure which company, because at the same time I

11:06AM   1   worked for both companies.  I did estimates for Kama'aina and

11:06AM   2   also O'ahu Termite.

11:06AM   3   Q    So it was one of the two termite companies?

11:06AM   4   A    Yes.

11:06AM   5   Q    If we could scroll up please.  Here at 5:39 p.m. on

11:06AM   6   October 18th, Wayne Miller reaches out again and he says,

11:06AM   7   "What, you guys left the shop?"

11:06AM   8        What did you take the shop to refer to?

11:06AM   9   A    The shop is Kama'aina Termite.

11:06AM   10  Q    Scrolling up some more, Wayne Miller texts you, "I went

11:06AM   11  stop by shop to checkout, he not there."

11:06AM   12       Who did you take "he" to be a reference to?

11:06AM   13  A    Mike.

11:07AM   14  Q    If we could scroll up to page one, please.  Here you text

11:07AM   15  Wayne Miller "WYA."

11:07AM   16       What does that mean?

11:07AM   17  A    Where you at.

11:07AM   18  Q    And you tell him the beach is closed.  What does that

11:07AM   19  mean?

11:07AM   20  A    The beach was a place that Mike told me to tell Wayne to

11:07AM   21  meet us at.  I don't know what the beach is.  I mean, the beach

11:07AM   22  was between him and Wayne.  They knew what the beach was.  I

11:07AM   23  didn't know what the beach meant but I -- Mike told me to tell

11:07AM   24  Wayne that the beach was closed.

11:07AM   25  Q    Okay.  And so what happened -- did you have a conversation

| | | |
|---|---|---|
| 11:07AM | 1 | with the defendant about meeting with Wayne Miller then? |
| 11:07AM | 2 | A    Yes. |
| 11:07AM | 3 | Q    And what took place at that conversation? |
| 11:07AM | 4 | A    He told me to set up a meeting between Wayne, because I |
| 11:07AM | 5 | told him that Wayne kept bugging me to ask my friend for money. |
| 11:08AM | 6 | Q    And was that a meeting that you told us about yesterday? |
| 11:08AM | 7 | A    Yes. |
| 11:08AM | 8 | Q    What meeting was that? |
| 11:08AM | 9 | A    That was a meeting that took place in the Fisherman's |
| 11:08AM | 10 | Wharf -- in back of Fisherman's Wharf area. |
| 11:08AM | 11 | Q    And at that meeting, what did the defendant tell Wayne |
| 11:08AM | 12 | Miller? |
| 11:08AM | 13 | A    The defendant told Wayne to stop asking me for money |
| 11:08AM | 14 | because they didn't do anything, and they didn't complete -- |
| 11:08AM | 15 | they didn't get any money from the victim.  They didn't collect |
| 11:08AM | 16 | any money from the victim. |
| 11:08AM | 17 | Q    Was that before or after the defendant asked you to try to |
| 11:08AM | 18 | get ten percent from Ms. Kim? |
| 11:08AM | 19 | A    That was before. |
| 11:08AM | 20 | Q    In 2017, did you ever receive a $17,000 cashiers check |
| 11:08AM | 21 | payment that went into your account? |
| 11:09AM | 22 | A    No. |
| 11:09AM | 23 | Q    I want to show you Exhibit 9-869.  This is a one-page |
| 11:09AM | 24 | document that I think I provided -- directed counsel to the |
| 11:09AM | 25 | certificate of authenticity previously. |

| 11:09AM | 1 | MR. KENNEDY: Yes. |
|---|---|---|

11:09AM   2   BY MR. AKINA:

11:09AM   3   Q    And what is this a picture of?

11:09AM   4   A    A cashiers check.

11:09AM   5   Q    And who is it made out to?

11:09AM   6   A    Myself.

11:09AM   7   Q    And the amount is?

11:09AM   8   A    17,000.

11:09AM   9   Q    $17,000?

11:09AM   10   A    $17,000, correct.

11:09AM   11   Q    And this is in 2017?

11:09AM   12   A    Yes.

11:09AM   13   Q    And on the the backside of the check, whose signature is

11:09AM   14   that?

11:09AM   15   A    That's my signature.

11:09AM   16   Q    And there is a letter followed by a series of numbers.

11:09AM   17   What is that?

11:10AM   18   A    My driver's license number.

11:10AM   19        MR. AKINA: Your Honor, pursuant to the party's

11:10AM   20   stipulation regarding documents that are accompanied by a

11:10AM   21   certificate of authenticity, I'd offer this into evidence at

11:10AM   22   this point.

11:10AM   23        THE COURT: Any objection, counsel?

11:10AM   24        MR. KENNEDY: No objection.

11:10AM   25        THE COURT: Without objection, Exhibit 9-869 is

| | | |
|---|---|---|
| 11:10AM | 1 | admitted.  You may publish. |
| 11:10AM | 2 | (Exhibit 9-869 was received in evidence.) |
| 11:10AM | 3 | BY MR. AKINA: |
| 11:10AM | 4 | Q    If we can focus on the top part, the front of the check, |
| 11:10AM | 5 | please. |
| 11:10AM | 6 | So the date of this cashiers check is February 16, |
| 11:10AM | 7 | 2017? |
| 11:10AM | 8 | A    Yes. |
| 11:10AM | 9 | Q    And you see your name there on the left side, "to the |
| 11:10AM | 10 | order of"? |
| 11:10AM | 11 | A    Yes. |
| 11:10AM | 12 | Q    And there is a regarding Ross Yoshioka. |
| 11:10AM | 13 | Do you know who that is? |
| 11:10AM | 14 | A    I do not know who Ross Yoshioka is. |
| 11:11AM | 15 | Q    If we could focus on the back of the check, on the top |
| 11:11AM | 16 | right corner, that's your signature? |
| 11:11AM | 17 | A    Yes. |
| 11:11AM | 18 | Q    And that letter and series of numbers that are followed by |
| 11:11AM | 19 | it, what is that again? |
| 11:11AM | 20 | A    My driver's license. |
| 11:11AM | 21 | Q    So fair to say, did you sign this check? |
| 11:11AM | 22 | A    Yes. |
| 11:11AM | 23 | Q    And -- but as you recall today, you don't recall ever |
| 11:11AM | 24 | receiving this $17,000 into your bank account? |
| 11:11AM | 25 | A    I never deposited this $17,000 into my bank account. |

11:11AM    1    Q    Would you ever run personal errands for the defendant
11:11AM    2    while you worked for him?
11:11AM    3    A    Yes.
11:11AM    4    Q    Would you ever do shopping errands for the defendant while
11:11AM    5    you worked for him?
11:11AM    6    A    No.
11:12AM    7    Q    So you never -- did you ever go to Chanel and purchase
11:12AM    8    something in all cash on behalf of the defendant?
11:12AM    9    A    No.
11:12AM   10         MR. AKINA:   Could I show the witness Exhibit 1-608 for
11:12AM   11    identification.
11:12AM   12         THE COURT:   You may.
11:12AM   13    BY MR. AKINA:
11:12AM   14    Q    If we could zoom in on the receipt portion here.
11:12AM   15         You see it says Chanel at the top?
11:12AM   16    A    Yes.
11:12AM   17    Q    And the client is a Mr. Preston Kinamoto?
11:12AM   18    A    Yes.
11:12AM   19    Q    Did you ever use that name, Preston Kinamoto, to make a
11:12AM   20    purchase?
11:12AM   21    A    No.
11:12AM   22    Q    Now, after you were arrested in 2020, you said that you
11:13AM   23    were released out on pretrial release.
11:13AM   24    A    Correct.
11:13AM   25    Q    Did that status change at some point?

11:13AM    1    A    Yes.

11:13AM    2    Q    What happened?

11:13AM    3    A    I got rearrested for witness tampering.

11:13AM    4    Q    Was that related to your 2022 meetings with Ms. Kim?

11:13AM    5    A    Yes.

11:13AM    6    Q    Relating to the kidnapping?

11:13AM    7    A    Correct.

11:13AM    8    Q    And after your status changed, where were you housed?

11:13AM    9    A    I was housed at the detention center.

11:13AM   10    Q    Was that here in Honolulu?

11:13AM   11    A    Yes.

11:13AM   12    Q    When you got there, did anyone convey messages to you on

11:13AM   13    behalf of the defendant?

11:14AM   14    A    Yes.

11:14AM   15    Q    What happened?

11:14AM   16    A    I got a job at FDC to work downstairs as a rec orderly.

11:14AM   17    So that meant you help organize games for the inmates when we

11:14AM   18    have long holiday periods.  Then from there, when I went down

11:14AM   19    the first time, they -- one inmate that was down there, he was

11:14AM   20    explaining to me what I had to do to organize these games.  But

11:14AM   21    in between explaining to me, he said that Mike wanted to know

11:14AM   22    where I stood, if I was still going to go to trial; what was my

11:14AM   23    thinking.

11:14AM   24    Q    What was the name of that inmate?

11:14AM   25    A    His last name is Javillo.  I don't know his first name.

11:14AM   1   Q   Did you respond at that point?

11:14AM   2   A   Yeah.  I told him that I didn't know what I was going to

11:15AM   3   do yet.

11:15AM   4   Q   And at this point, had you pled guilty?

11:15AM   5   A   No, I did not plead guilty yet.

11:15AM   6   Q   At this point, had you entered into any type of agreement

11:15AM   7   with the government?

11:15AM   8   A   I did not.

11:15AM   9   Q   And did you receive any other messages?

11:15AM   10   A   Yes.  During that same time that I was downstairs, then

11:15AM   11   another inmate that was down there, his name -- we just called

11:15AM   12   him NG, he showed me a note.  He said that this note came

11:15AM   13   from -- this note is from Mike.  And he doesn't care what I

11:15AM   14   have to say.  He is just passing this note to me.

11:15AM   15   Q   Did you read that note?

11:15AM   16   A   I did read part of the note.

11:15AM   17   Q   Did you keep the note?

11:15AM   18   A   No, I didn't keep the note.

11:15AM   19   Q   What did you ultimately do with the note?

11:16AM   20   A   NG took the note back.

11:16AM   21   Q   Why?

11:16AM   22   A   Because he probably didn't want any paper trail.

11:16AM   23   Q   But you gave the note back to NG?

11:16AM   24   A   Yeah, well, he took it -- he took it from me because

11:16AM   25   somebody -- one of the officers was coming and we were going to

11:16AM   1   go back upstairs.  So NG said give me the note back and then he

11:16AM   2   took it.

11:16AM   3   Q    So from the portion of that note that you read, what do

11:16AM   4   you recall?

11:16AM   5   A    Mike was asking me how my family was, and to stay strong,

11:16AM   6   and we can beat this -- we can beat this case.  And he said

11:16AM   7   that we all have families to go back to.  So we need to stay

11:16AM   8   together.

11:16AM   9   Q    What did you interpret -- how did you receive that?  What

11:16AM  10   was your response?

11:16AM  11   A    That -- I didn't respond back to NG.  But prior to this,

11:17AM  12   from the first inmate, when he was telling me verbally what

11:17AM  13   Mike was asking of me, I did tell him that I'm going to take my

11:17AM  14   family into -- like, I'm going to consider my family first

11:17AM  15   before I ever consider doing anything for Mike.

11:17AM  16   Q    And both of these inmates who came up to you, I mean, was

11:17AM  17   it threatening?

11:17AM  18   A    No, they didn't threaten me in any way.

11:17AM  19   Q    After you were detained at FDC, around that time period,

11:18AM  20   did you receive messages from guards?

11:18AM  21   A    I did receive a few messages from the guards.

11:18AM  22   Q    And what was the substance of that?

11:18AM  23   A    They had said that Mike was sending his love and to stay

11:18AM  24   strong.

11:18AM  25   Q    Now, besides the marijuana vape pens that you were

| 11:18AM | 1 | selling, were you involved in any other types of drugs? |
|---|---|---|

11:18AM   1    selling, were you involved in any other types of drugs?

11:18AM   2    A    On a few occasions, yes.

11:18AM   3    Q    Tell us about that.

11:18AM   4    A    A friend had asked me if I knew anybody who could get them

11:18AM   5    pills.  And I said, oh, I might.  Then I would ask a friend --

11:18AM   6    another friend if they could, and from there -- from there

11:18AM   7    introduced them.

11:18AM   8    Q    What type of pills were these?

11:18AM   9    A    Percs -- Percocet, Xanax.

11:19AM   10   Q    So you helped people obtain drugs, pills?

11:19AM   11   A    I helped introduce them to people.  They never met or

11:19AM   12   anything but that was only -- that was a few occasions when

11:19AM   13   somebody had asked.

11:19AM   14   Q    Okay, so it's been more than one time?

11:19AM   15   A    Yes.

11:19AM   16   Q    And earlier, you had testified that you had been involved

11:19AM   17   in gambling as well; correct?

11:19AM   18   A    Yes.

11:19AM   19   Q    What type of gambling?

11:19AM   20   A    Sports, sports betting.

11:19AM   21   Q    And to your knowledge, is that legal to do here in Hawaii?

11:19AM   22   A    No.

11:19AM   23   Q    Who would you gamble with?

11:19AM   24   A    I would gamble through a website, and I'll get the

11:19AM   25   websites from various people.

| | | | |
|---|---|---|---|
| 11:19AM | 1 | Q | Are you familiar with someone named Richard McGuire? |
| 11:19AM | 2 | A | Yes. |
| 11:20AM | 3 | Q | Who was that? |
| 11:20AM | 4 | A | Mike's cousin. |
| 11:20AM | 5 | Q | And did you have any involvement with him relating to |
| 11:20AM | 6 | | gambling? |
| 11:20AM | 7 | A | Yes.  Early on when I worked at Kama'aina in 2015, Richard |
| 11:20AM | 8 | | gave me a few sites to play on. |
| 11:20AM | 9 | Q | To your knowledge, was the defendant ever involved in |
| 11:20AM | 10 | | sports betting gambling? |
| 11:20AM | 11 | A | Yes. |
| 11:20AM | 12 | Q | How do you know that? |
| 11:20AM | 13 | A | He had asked me to meet somebody at the shop to collect. |
| 11:20AM | 14 | | That person was going to drop off the money that he won. |
| 11:20AM | 15 | Q | Did you meet with someone? |
| 11:20AM | 16 | A | Yes. |
| 11:20AM | 17 | Q | At the shop? |
| 11:20AM | 18 | A | Yes. |
| 11:20AM | 19 | Q | And the shop being Kama'aina Termite? |
| 11:20AM | 20 | A | Correct. |
| 11:20AM | 21 | Q | And what did that person provide you? |
| 11:20AM | 22 | A | He dropped off an envelope with money in it. |
| 11:20AM | 23 | Q | Cash? |
| 11:20AM | 24 | A | Cash. |
| 11:20AM | 25 | Q | And what did you do with that money? |

| 11:20AM | 1  | A | I put it in Mike's office in the bottom left drawer. |
| 11:20AM | 2  | Q | That's the same one that you put the payments that you |
| 11:20AM | 3  |   | received from Ms. Kim? |
| 11:20AM | 4  | A | Yes. |
| 11:21AM | 5  | Q | When you received this payment for gambling, was that |
| 11:21AM | 6  |   | during the time period where you worked for the defendant? |
| 11:21AM | 7  | A | Yes. |
| 11:21AM | 8  | Q | And how did you know that money was intended for the |
| 11:21AM | 9  |   | defendant? |
| 11:21AM | 10 | A | Because he told me to meet this person and the person was |
| 11:21AM | 11 |   | going to give me his money. |
| 11:21AM | 12 | Q | Now, in the context of the businesses that were owned by |
| 11:21AM | 13 |   | the defendant that you were working at over that period of 2015 |
| 11:21AM | 14 |   | to 2020, who was in charge of each of those businesses? |
| 11:21AM | 15 | A | Mike. |
| 11:21AM | 16 | Q | And for the kidnapping that you were involved in, if the |
| 11:21AM | 17 |   | defendant had told you no, I'm not going to help your friend, |
| 11:21AM | 18 |   | would you have persisted in trying to help your friend? |
| 11:21AM | 19 | A | No. |
| 11:21AM | 20 | Q | And why did you bring Ms. Kim's request to help recover |
| 11:22AM | 21 |   | the debt to the defendant? |
| 11:22AM | 22 | A | Because Mike was the only person that I knew that could go |
| 11:22AM | 23 |   | and talk to this person. |
| 11:22AM | 24 | Q | You testified about assaults carried out by Wayne Miller, |
| 11:22AM | 25 |   | Jacob Smith, and John Stancil. |

| 11:22AM | 1 | | Who was giving the orders for all those assaults? |

11:22AM   1              Who was giving the orders for all those assaults?

11:22AM   2    A    Mike.

11:22AM   3    Q    And during your time associating with the defendant, would

11:22AM   4    you have gone against any direct order that he told you?

11:22AM   5    A    No.

11:22AM   6    Q    Why not?

11:22AM   7    A    Because I was loyal to Mike and I didn't want any problems

11:22AM   8    of retaliation because I went against him.

11:22AM   9    Q    Did you ever benefit from your association with the

11:22AM   10   defendant?

11:22AM   11   A    I did.

11:22AM   12   Q    Can you provide us an example of that?

11:22AM   13   A    There was an occasion where I owed a large sum of money

11:23AM   14   for sports gambling.  And the person that was supposed to

11:23AM   15   collect that money from me knew that me and Mike were good

11:23AM   16   friends.  So he met -- he met with Mike and he told Mike that

11:23AM   17   they were just going to squash the debt.  He didn't want any

11:23AM   18   problems.

11:23AM   19   Q    Sorry for interrupting.

11:23AM   20              How did you learn this?

11:23AM   21   A    Mike told me.

11:23AM   22   Q    You said it was a substantial amount of money.  About how

11:23AM   23   much money did you owe?

11:23AM   24   A    20, $30,000.

11:23AM   25   Q    And when Mike told you that he squashed this debt for you,

| | | |
|---|---|---|
| 11:23AM | 1 | did you have have to make any payments to anyone on that debt? |
| 11:23AM | 2 | A    No, I did not. |
| 11:23AM | 3 | Q    Did that take place during the time period that you worked |
| 11:23AM | 4 | for the defendant? |
| 11:23AM | 5 | A    Yes. |
| 11:23AM | 6 | Q    Now, at the time that you pled guilty to conspiracy to |
| 11:24AM | 7 | commit kidnapping -- |
| 11:24AM | 8 | A    Yes. |
| 11:24AM | 9 | Q    -- that was in regards to the accountant? |
| 11:24AM | 10 | A    Yes. |
| 11:24AM | 11 | Q    At that time, did you enter into a plea agreement with the |
| 11:24AM | 12 | United States? |
| 11:24AM | 13 | A    Can you repeat the question? |
| 11:24AM | 14 | Q    Did you enter into a plea agreement with the government? |
| 11:24AM | 15 | A    Yes. |
| 11:24AM | 16 | Q    And as part of that plea agreement that you had with the |
| 11:24AM | 17 | government, are you testifying -- have you testified here |
| 11:24AM | 18 | yesterday and today? |
| 11:24AM | 19 | A    Yes. |
| 11:24AM | 20 | Q    And what do you hope to gain for yourself, if anything, by |
| 11:24AM | 21 | testifying in this trial? |
| 11:24AM | 22 | A    I hope to gain a favorable judgment -- I mean, a favorable |
| 11:24AM | 23 | sentence. |
| 11:24AM | 24 | Q    What do you mean by that? |
| 11:24AM | 25 | A    A more lenient sentence for my testifying today and |

11:25AM   1   yesterday.

11:25AM   2   Q    And what's your understanding of who ultimately decides

11:25AM   3   that sentence?

11:25AM   4   A    Judge Watson.

11:25AM   5   Q    And are you hoping to get anything from the government by

11:25AM   6   testifying at this trial?

11:25AM   7   A    I'm hoping to get a recommendation from the government.

11:25AM   8   Q    And has that been promised to you, that a recommendation

11:25AM   9   will be made?

11:25AM  10   A    No.

11:25AM  11        MR. AKINA:  One moment, Your Honor.

11:25AM  12        THE COURT:  Yes.

11:25AM  13        MR. AKINA:  No further questions at this time.

11:26AM  14        THE COURT:  Mr. Kennedy, cross-examination when you're

11:26AM  15   ready.

11:26AM  16        MR. KENNEDY:  Thanks, Your Honor.  Before I get

11:26AM  17   started, I do have a motion under rule 26.2.

11:26AM  18        THE COURT:  Go ahead.

11:26AM  19        MR. KENNEDY:  I would ask for any statements that

11:26AM  20   Mr. Kimoto has made, since the last one I received was in the

11:26AM  21   summer of 2023.

11:26AM  22        MR. AKINA:  I believe any 302 reports have been

11:26AM  23   furnished to defense counsel, Your Honor.

11:26AM  24        THE COURT:  Is there a reason why you think you

11:26AM  25   haven't received all the statements?

11:26AM   1              MR. KENNEDY:  Because there were topics and areas that

11:26AM   2    were discussed today that were not in those previous

11:26AM   3    statements.

11:26AM   4              THE COURT:  Mr. Akina, your representation is there is

11:26AM   5    no such statement, correct?

11:27AM   6              MR. AKINA:  Your Honor, there were multiple meetings

11:27AM   7    with the witness.  We have prepared for trial.  Not every

11:27AM   8    single word gets reduced into a 302 report.

11:27AM   9              THE COURT:  I'm not asking whether you had multiple

11:27AM  10    meetings in preparation for trial.  I'm asking whether the

11:27AM  11    statements that counsel has requested have all been produced.

11:27AM  12              MR. AKINA:  Yes, any statements we had have been

11:27AM  13    produced, Your Honor.

11:27AM  14              THE COURT:  Motion is denied.  Let's go.

11:27AM  15                       CROSS-EXAMINATION

11:27AM  16    BY MR. KENNEDY:

11:27AM  17    Q    Sir, I want to take you to July 15, 2020, when you were

11:27AM  18    originally arrested, okay?

11:27AM  19    A    Yes.

11:27AM  20    Q    At about 6:25 in the morning, you had your white Toyota

11:27AM  21    Tacoma truck, right?

11:27AM  22    A    Yes.

11:27AM  23    Q    You were able to back out of your driveway at your home,

11:27AM  24    right?

11:27AM  25    A    Yes.

11:27AM   1   Q    About three minutes later, a Honolulu police department

11:27AM   2   vehicle stopped you, right?

11:28AM   3   A    No, that's not what -- I believe I got stopped later.

11:28AM   4   Later in the morning.

11:28AM   5   Q    You didn't leave at 6:25 and get stopped at 6:28 a.m. in

11:28AM   6   the morning?

11:28AM   7   A    No.  I believe that morning I went to work out at Mike's

11:28AM   8   Portlock house.  And I returned home -- I don't know exactly

11:28AM   9   what time I left my house -- my home to go to work that day.

11:28AM   10  Q    All right.  Okay.  And at that time when you were stopped,

11:28AM   11  you handed an expired driver's license to the officer?

11:28AM   12  A    Yes.

11:28AM   13  Q    And that wasn't at 6:28 a.m.?

11:28AM   14  A    I don't know what time that was, sir.

11:29AM   15  Q    Would it help to look at that report regarding that to

11:29AM   16  refresh your recollection today?

11:29AM   17  A    Yes.

11:29AM   18       MR. KENNEDY:  Ms. King, can you pull up 9010-067 for

11:29AM   19  Mr. Kimoto and just for Mr. Kimoto.

11:29AM   20  BY MR. KENNEDY:

11:29AM   21  Q    Do you see that, sir?

11:29AM   22  A    Yes.

11:29AM   23  Q    All right.  If you can look down at the 5th paragraph and

11:29AM   24  then the 6th paragraph, just read those to yourself and then

11:29AM   25  I'll ask you some questions after you're done.

| 11:30AM | 1 | A | Okay. |

11:30AM    2    Q    Have you finished?

11:30AM    3    A    Yes.

11:30AM    4         MR. KENNEDY:  Okay.  We can pull that down, Ms. King.

11:30AM    5    And we can take it off the screen as well.

11:30AM    6    BY MR. KENNEDY:

11:30AM    7    Q    Let me ask you now.  Having read that, does that refresh

11:30AM    8    your recollection of what happened on the day you got arrested

11:30AM    9    for these charges?

11:30AM    10   A    Yes.

11:30AM    11   Q    So at 6:25, you pulled out of your driveway, backed out in

11:30AM    12   your Toyota Tacoma truck, right?

11:30AM    13   A    Yes.

11:30AM    14   Q    Three minutes later at 6:28, you were pulled over,

11:30AM    15   correct?

11:30AM    16   A    Yes.

11:30AM    17   Q    You handed them an expired driver's license, correct?

11:30AM    18   A    Yes.

11:30AM    19   Q    You were then arrested, right?

11:30AM    20   A    Yes.

11:30AM    21   Q    And you were brought to -- and you were told that you were

11:30AM    22   under arrest for things relating to conspiracy charges, right?

11:31AM    23   A    No.

11:31AM    24   Q    Okay.  You weren't told that?

11:31AM    25   A    I wasn't told that.

| 11:31AM | 1  | Q | Okay.  You were transported to the Federal Detention |
| 11:31AM | 2  |   | Center here in Honolulu? |
| 11:31AM | 3  | A | Yes. |
| 11:31AM | 4  | Q | And they put an N95 mask on your face at that time, right? |
| 11:31AM | 5  | A | Yes. |
| 11:31AM | 6  | Q | We were in the middle of COVID, right? |
| 11:31AM | 7  | A | Correct. |
| 11:31AM | 8  | Q | So then you went to the detention center, right? |
| 11:31AM | 9  | A | Yes. |
| 11:31AM | 10 | Q | Over by the airport, correct? |
| 11:31AM | 11 | A | Yes. |
| 11:31AM | 12 | Q | They put you into a cell, right? |
| 11:31AM | 13 | A | Yes. |
| 11:31AM | 14 | Q | You were in lockdown, right? |
| 11:31AM | 15 | A | Yes. |
| 11:31AM | 16 | Q | No visitors, right? |
| 11:31AM | 17 | A | Yes. |
| 11:31AM | 18 | Q | Never outdoors, right? |
| 11:31AM | 19 | A | Yes. |
| 11:31AM | 20 | Q | No attorney visits, correct? |
| 11:31AM | 21 | A | Yes. |
| 11:31AM | 22 | Q | Complete isolation, correct? |
| 11:31AM | 23 | A | Yes. |
| 11:31AM | 24 | Q | Depression set in, didn't it, sir? |
| 11:31AM | 25 | A | I've never -- I don't know if I was experiencing |

11:32AM   1   depression, but I was in shock.  This was my first time being

11:32AM   2   arrested.

11:32AM   3   Q    And you were in shock?

11:32AM   4   A    Yes.

11:32AM   5   Q    And you were in isolation?

11:32AM   6   A    Yes.

11:32AM   7   Q    And that morning you had been there with your family and

11:32AM   8   your children, and all of a sudden your life was turned upside

11:32AM   9   down, correct?

11:32AM   10          MR. AKINA: Objection, irrelevance.

11:32AM   11          MR. KENNEDY:  Bias.

11:32AM   12          THE COURT:  Overruled.  Mr. Kennedy, before you

11:32AM   13   continue, can that document on the screen be taken down.

11:32AM   14          MR. KENNEDY:  Oh, I didn't see that it came up.  I

11:32AM   15   apologize.  I was looking at Mr. Kimoto.

11:32AM   16          THE COURT:  Not a problem.

11:32AM   17   BY MR. KENNEDY:

11:32AM   18   Q    The other thing you had, as I said, your life had been

11:32AM   19   turned upside down; you have children, correct?

11:32AM   20   A    Yes.

11:32AM   21   Q    You have someone that you lived with, right?

11:32AM   22   A    Yes.

11:32AM   23   Q    And all of the sudden, that was taken away from you,

11:32AM   24   correct?

11:32AM   25   A    Correct.

11:33AM  1   Q   So you had a lot of fear at that time, didn't you?

11:33AM  2   A   A lot of uncertainty.

11:33AM  3   Q   Uncertainty?

11:33AM  4   A   Correct.

11:33AM  5   Q   And so what seemed like forever from that day, July 15th

11:33AM  6   up to July 21st, you remained in that condition, correct?

11:33AM  7   A   Correct.

11:33AM  8   Q   On the 21st of July, 2020, there was a court hearing,

11:33AM  9   right?

11:33AM  10  A   Yes.

11:33AM  11  Q   You were still at the Federal Detention Center, right?

11:33AM  12  A   Yes.

11:33AM  13  Q   Because we were in COVID and no one was coming to court,

11:33AM  14  right?

11:33AM  15  A   Correct.

11:33AM  16  Q   So you were on the telephone, right?

11:33AM  17  A   Yes.

11:33AM  18  Q   And there was a hearing, right?

11:33AM  19  A   Yes.

11:33AM  20  Q   And there were two sides, right?

11:33AM  21  A   Yes.

11:33AM  22  Q   And this side was asking a judge to keep you in custody,

11:33AM  23  right?

11:33AM  24  A   Correct.

11:34AM  25  Q   Your lawyer, who is here today, was asking for your

11:34AM   1   release, right?

11:34AM   2   A    Yes.

11:34AM   3   Q    And the judge ruled that you could be on release, right?

11:34AM   4   A    Yes.

11:34AM   5   Q    There were pretrial conditions, correct?

11:34AM   6   A    Correct.

11:34AM   7   Q    The judge told you what you had to do, right?

11:34AM   8   A    Correct.

11:34AM   9   Q    And one of those conditions was post a bond.

11:34AM   10   A    Yes.

11:34AM   11   Q    So you had to put up $5,000, right?

11:34AM   12   A    Correct.

11:34AM   13   Q    GPS monitoring, right?

11:34AM   14   A    Yes.

11:34AM   15   Q    So the authorities would know where you would go, right?

11:34AM   16   A    Yes.

11:34AM   17   Q    And the authorities being something called pretrial

11:34AM   18   services, right?

11:34AM   19   A    Yes.

11:34AM   20   Q    So that's someone who is monitoring what you are doing on

11:34AM   21   the outside to determine whether you are meeting the judge's

11:34AM   22   orders, right?

11:34AM   23   A    Yes.

11:34AM   24   Q    Later, you also had a home detention at that time,

11:34AM   25   correct?

| 11:34AM | 1  | A | Yes. |
|---------|----|---|------|

11:34AM  1  A    Yes.

11:34AM  2  Q    But you were able to get a job, right?

11:34AM  3  A    Yes.

11:34AM  4  Q    And so later, that home detention was lifted?

11:35AM  5  A    Yes.

11:35AM  6  Q    And so you had a curfew, right?

11:35AM  7  A    Correct.

11:35AM  8  Q    But other than that, as you said yesterday, you were free?

11:35AM  9  A    Yes.

11:35AM  10  Q    So you were able to go back to your children, right?

11:35AM  11  A    Yes.

11:35AM  12  Q    You were able to resume work?

11:35AM  13  A    Able to find work, yes.

11:35AM  14  Q    And you weren't in custody anymore?

11:35AM  15  A    No.

11:35AM  16  Q    And that's how it was from July 21, 2020, until April 4th

11:35AM  17  of 2023, correct?

11:35AM  18  A    Yes.

11:35AM  19  Q    Now, on April 4th, 2023, something else happened, didn't

11:35AM  20  it?

11:35AM  21  A    Yes.

11:35AM  22  Q    You were at home, right?

11:35AM  23  A    I was at home.

11:35AM  24  Q    You learned that there was a new arrest warrant, right?

11:35AM  25  A    Yes.

| | | | |
|---|---|---|---|
| 11:35AM | 1 | Q | But unlike the last time, you weren't able to back out of |
| 11:35AM | 2 | | your house, were you? |
| 11:35AM | 3 | A | No. |
| 11:35AM | 4 | Q | There was a SWAT team surrounding your house with a |
| 11:36AM | 5 | | perimeter, correct? |
| 11:36AM | 6 | A | Yes. |
| 11:36AM | 7 | Q | And at 6:01 a.m., the SWAT team announced its presence, |
| 11:36AM | 8 | | right? |
| 11:36AM | 9 | A | Yes. |
| 11:36AM | 10 | Q | They were using emergency lights, correct? |
| 11:36AM | 11 | A | I don't remember, sir. |
| 11:36AM | 12 | Q | You didn't see those emergency lights?  You heard the |
| 11:36AM | 13 | | sirens, though, right? |
| 11:36AM | 14 | A | I actually I was in my back bedroom and my -- Joyce had to |
| 11:36AM | 15 | | tell me that somebody was on the bullhorn calling my name |
| 11:36AM | 16 | | outside. |
| 11:36AM | 17 | Q | And that person could look out and see an armored vehicle, |
| 11:36AM | 18 | | right? |
| 11:36AM | 19 | A | She said that they announced themselves as the FBI. |
| 11:36AM | 20 | Q | And it was being used on the armored vehicle's |
| 11:36AM | 21 | | loudspeaker, correct? |
| 11:36AM | 22 | A | Correct. |
| 11:36AM | 23 | Q | And they had to make multiple announcements on the armored |
| 11:36AM | 24 | | vehicle SWAT team before you came out, correct? |
| 11:37AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 11:37AM | 1 | Q | And after hearing multiple times for you to leave your |
| 11:37AM | 2 | | residence, you finally walked out. |
| 11:37AM | 3 | A | Well, I walked out once I heard them call my name. |
| 11:37AM | 4 | Q | So only when you heard your name.  The earlier |
| 11:37AM | 5 | | announcements by the SWAT team, you weren't coming out of the |
| 11:37AM | 6 | | house, right? |
| 11:37AM | 7 | A | I didn't hear those earlier. |
| 11:37AM | 8 | Q | You didn't hear the sirens? |
| 11:37AM | 9 | A | I heard the sirens, but I didn't hear them calling my |
| 11:37AM | 10 | | name. |
| 11:37AM | 11 | Q | You didn't hear the loudspeaker? |
| 11:37AM | 12 | A | I didn't hear a loudspeaker, sir. |
| 11:37AM | 13 | Q | You walked out without a shirt, didn't you? |
| 11:37AM | 14 | A | Yes. |
| 11:37AM | 15 | Q | SWAT members then grabbed you? |
| 11:37AM | 16 | A | No. |
| 11:37AM | 17 | Q | Didn't the SWAT members then walk up, knock on the door, |
| 11:38AM | 18 | | and ask for a shirt, sir? |
| 11:38AM | 19 | A | That happened after I was down in custody next to the SWAT |
| 11:38AM | 20 | | vehicle. |
| 11:38AM | 21 | Q | And when you were next to the SWAT vehicle, someone put |
| 11:38AM | 22 | | the shirt on you at that time, because you weren't even trusted |
| 11:38AM | 23 | | with a shirt in that arrest, were you? |
| 11:38AM | 24 | A | I don't understand the question. |
| 11:38AM | 25 | Q | Normally you just put on your shirt.  They physically put |

11:38AM  1   the shirt on you because you were under arrest for witness

11:38AM  2   tampering with a SWAT team there making certain your every move

11:38AM  3   was under their control, correct?

11:38AM  4         MR. AKINA:  Objection as to speculation, asking the

11:38AM  5   witness to speculate as to what the SWAT team was thinking.

11:38AM  6         THE COURT:  Overruled, go ahead.

11:38AM  7         THE WITNESS:  Yes.

11:38AM  8   BY MR. KENNEDY:

11:38AM  9   Q    And at that point finally, the SWAT team members turned

11:38AM  10  you over to the FBI?

11:39AM  11  A    I was put in an unmarked -- looked like a Honolulu police

11:39AM  12  department vehicle.

11:39AM  13  Q    And then you were taken back to the Federal Detention

11:39AM  14  Center, correct?

11:39AM  15  A    Correct.

11:39AM  16  Q    You were put back into the SHU, right?

11:39AM  17  A    Yes.

11:39AM  18  Q    Special housing unit, correct?

11:39AM  19  A    Yes.

11:39AM  20  Q    Lockdown, correct?

11:39AM  21  A    Yes.

11:39AM  22  Q    Now, you were placed there because there had been a

11:39AM  23  criminal complaint for witness tampering filed against you by

11:39AM  24  the prosecutors and the FBI, correct?

11:39AM  25  A    Yes.

| | | | |
|---|---|---|---|
| 11:39AM | 1 | Q | And you'd been in meetings now with FBI special agent |
| 11:40AM | 2 | | Mr. Palmer, correct? |
| 11:40AM | 3 | A | Correct. |
| 11:40AM | 4 | Q | He was the one who signed out the affidavit for the court |
| 11:40AM | 5 | | to arrest you for witness tampering, correct? |
| 11:40AM | 6 | A | Correct. |
| 11:40AM | 7 | Q | That charged you -- that charge was that you were knowing |
| 11:40AM | 8 | | use of intimidation, threatened, and corruptly persuading Sunny |
| 11:40AM | 9 | | Kim in violation of federal law, right? |
| 11:40AM | 10 | A | Yes. |
| 11:40AM | 11 | Q | Your lawyer is here today, correct? |
| 11:40AM | 12 | A | Yes. |
| 11:40AM | 13 | Q | And so one of the things you learn about a charge is you |
| 11:40AM | 14 | | learned that you could go to jail -- prison, for up to 20 years |
| 11:40AM | 15 | | for that charge? |
| 11:40AM | 16 | A | Yes. |
| 11:40AM | 17 | Q | Now, on December 16th of 2023, you went to The Pig and the |
| 11:41AM | 18 | | Lady, correct? |
| 11:41AM | 19 | A | Correct. |
| 11:41AM | 20 | Q | The Pig and the Lady is a restaurant here in Honolulu, |
| 11:41AM | 21 | | correct? |
| 11:41AM | 22 | A | Yes. |
| 11:41AM | 23 | Q | It's in Chinatown? |
| 11:41AM | 24 | A | Correct. |
| 11:41AM | 25 | Q | There was a table in the back, right, where you sat? |

| | | | |
|---|---|---|---|
| 11:41AM | 1 | A | Yes. |

11:41AM    2    Q    There is a front bar area and a back bar area and then a

11:41AM    3    table in the back?

11:41AM    4    A    There were tables in the back, yes.

11:41AM    5         THE COURT:  Are you sure you have the date right,

11:41AM    6    counsel?

11:41AM    7         MR. KENNEDY:  I think it's December 16, 2022, if I

11:41AM    8    misspoke.

11:41AM    9         THE COURT:  Yes.

11:41AM    10        MR. KENNEDY:  I apologize.  Thank you for catching

11:41AM    11   that, Your Honor.  I didn't mean to mislead you.  Sometimes you

11:41AM    12   just can't keep all the dates in your head.  So it's not the

11:41AM    13   23rd; it's December 16, 2022.  I apologize, sir.

11:41AM    14   BY MR. KENNEDY:

11:41AM    15   Q    Now, you had reached out to Sunny to have that meeting,

11:42AM    16   right?

11:42AM    17   A    Yes.

11:42AM    18   Q    And at that meeting, you told Sunny the FBI would likely

11:42AM    19   be approaching her, right?

11:42AM    20   A    Yes.

11:42AM    21   Q    You told Sunny it would be better for her and her dad if

11:42AM    22   she told the FBI nothing about you?

11:42AM    23   A    That is not accurate, sir.

11:42AM    24   Q    You're telling the ladies and gentlemen of the jury that

11:42AM    25   you didn't tell her that?

11:42AM  1   A    I'm saying that I don't remember saying that.

11:42AM  2   Q    Okay.  That's different.  You don't remember saying that.

11:42AM  3   But if someone was told that, that the FBI -- it would be

11:42AM  4   better for her and her dad if she told the FBI nothing about

11:42AM  5   you, that's something you might remember, right?

11:42AM  6   A    Yes.

11:42AM  7   Q    But you don't even remember whether you said it, correct?

11:42AM  8   A    Yes, that's correct.

11:43AM  9   Q    Okay.  So you cannot tell these folks under oath whether

11:43AM  10  you told her that that day or not, can you?

11:43AM  11  A    No, I can't.

11:43AM  12  Q    You told her that she and her dad was the connection to

11:43AM  13  you involving the kidnapping, correct?

11:43AM  14  A    Yes.

11:43AM  15  Q    And that was the kidnapping of Mr. Lee, correct?

11:43AM  16  A    Yes.

11:43AM  17  Q    And that's why you went to talk with her; not about some

11:43AM  18  business thing, correct?

11:43AM  19  A    No, we talked about the business thing.

11:43AM  20  Q    Oh, I understand, but you hadn't reached out to her in a

11:43AM  21  long time, had you?

11:43AM  22  A    No, I hadn't.

11:43AM  23  Q    What was on your mind was that she was the connection to

11:43AM  24  what you did in the kidnapping, correct?

11:43AM  25  A    Yes.

| | | | |
|---|---|---|---|
| 11:43AM | 1 | Q | And you told Sunny Kim that you would know if she was |
| 11:44AM | 2 | | cooperating with the FBI, correct? |
| 11:44AM | 3 | A | I did not tell her that. |
| 11:44AM | 4 | Q | You didn't tell her that? |
| 11:44AM | 5 | A | I did not tell her that. |
| 11:44AM | 6 | Q | You reminded Sunny Kim that you knew where she lived and |
| 11:44AM | 7 | | where she worked, correct? |
| 11:44AM | 8 | A | That is not correct. |
| 11:44AM | 9 | Q | And you told her that you knew where her children went to |
| 11:44AM | 10 | | school, correct? |
| 11:44AM | 11 | A | That is not correct. |
| 11:44AM | 12 | Q | And you did know where she worked, right? |
| 11:44AM | 13 | A | I didn't know where she worked. |
| 11:44AM | 14 | Q | I thought you had done all this business work with her |
| 11:44AM | 15 | | prior; isn't that correct? |
| 11:44AM | 16 | A | We asked for rental properties -- leasing properties. |
| 11:44AM | 17 | Q | You had fumigated her home, right? |
| 11:44AM | 18 | A | Yes. |
| 11:44AM | 19 | Q | You had discussed business opportunities with her? |
| 11:44AM | 20 | A | Yes. |
| 11:44AM | 21 | Q | You had known her for 12 or 13 years at that time? |
| 11:45AM | 22 | A | Yes. |
| 11:45AM | 23 | Q | Between, say, 2007 and 2013 on Wednesdays, Thursdays, |
| 11:45AM | 24 | | Fridays, and Saturdays, you would go out with her, right? |
| 11:45AM | 25 | A | No, sir.  I don't remember that. |

11:45AM  1   Q   You don't remember all those times that the two of you had

11:45AM  2   spent together during that time?

11:45AM  3   A   No, I don't, sir.

11:45AM  4   Q   You just don't remember it?

11:45AM  5   A   I don't recall, or I don't remember doing that.

11:45AM  6   Q   So once again under oath, you can't tell the ladies and

11:45AM  7   gentlemen of this jury whether that's true or not, right?

11:45AM  8   A   No.

11:45AM  9   Q   So if we pull up -- just show the witness 9010-037.

11:46AM  10          Do you recognize that, sir?

11:46AM  11  A   Yes.

11:46AM  12  Q   What is it?

11:46AM  13  A   It looks to be GPS tracking on myself.

11:46AM  14  Q   And so this is GPS tracking on your cell phone on

11:46AM  15  December 16, 2022?

11:46AM  16  A   Yes.

11:46AM  17  Q   The time for the lunch was between about 11:30 and 1:30

11:46AM  18  with Sunny Kim?

11:46AM  19  A   Correct.

11:46AM  20          MR. KENNEDY:  Your Honor, at this time, I would move

11:46AM  21  9010-037 into evidence.

11:46AM  22          THE COURT:  Mr. Akina, any objection?

11:46AM  23          MR. AKINA:  Object to lack of foundation for this

11:46AM  24  particular document.

11:47AM  25          THE COURT:  Sustained.

11:47AM    1    BY MR. KENNEDY:

11:47AM    2    Q    Let me ask you this, sir:  In the context of before you

11:47AM    3    made the agreement with the government that they discussed, did

11:47AM    4    you receive information about your case?

11:47AM    5    A    I don't understand the question.

11:47AM    6    Q    Probably a bad one.  You get documents and things called

11:47AM    7    discovery when you are charged, correct?

11:47AM    8    A    Yes.

11:47AM    9    Q    And among that is, here's the evidence they have, correct?

11:47AM   10    A    Correct.

11:47AM   11    Q    And so if someone tells them, hey, I had a meeting at the

11:47AM   12    Pig and the Lady on December 16th, of 2022 with Mr. Kimoto,

11:47AM   13    it's just their word, right?

11:47AM   14    A    Yes.

11:47AM   15    Q    But if they can track GPS on a phone, right?  You are

11:47AM   16    aware of that?

11:47AM   17    A    Yes.

11:47AM   18    Q    And the phone is then pinging on towers, correct?

11:48AM   19    A    Yes.

11:48AM   20    Q    And so they can see where your phone went in the vicinity

11:48AM   21    at that same time, right?

11:48AM   22    A    Yes.

11:48AM   23    Q    And so that's some real evidence beyond what someone is

11:48AM   24    just saying that you were there, right?

11:48AM   25    A    Yes.

11:48AM   1   Q   And that's exactly what 9010-037 is, correct?

11:48AM   2   A   Yes.

11:48AM   3   Q   And so you reviewed it, and so you knew that they knew

11:48AM   4   that you had met with her on that day on December 16, 2022?

11:48AM   5   A   Yes.

11:48AM   6   Q   A credit card was used to pay at the Pig and the Lady,

11:48AM   7   correct?

11:48AM   8   A   Yes.

11:48AM   9   Q   Did you pay?

11:48AM   10   A   I did pay.

11:48AM   11   Q   Okay.  So you learned that they had gone and in this

11:48AM   12   investigation, the FBI had a copy of your credit card receipt,

11:49AM   13   correct?

11:49AM   14   A   Yes.

11:49AM   15   Q   And so you knew they had what Sunny Kim told them, the GPS

11:49AM   16   that showed you there, and your credit card receipt, right?

11:49AM   17   A   Yes.

11:49AM   18   Q   Hard evidence, right, backing her up, correct?

11:49AM   19   A   Yes.

11:49AM   20           MR. KENNEDY:  At this time, I'd move 9010-037 into

11:49AM   21   evidence.

11:49AM   22           THE COURT:  Mr. Akina.

11:49AM   23           MR. AKINA:  Same objection, Your Honor.  Still lack of

11:49AM   24   foundation.

11:49AM   25           THE COURT:  Same ruling, sustained.

| | | |
|---|---|---|
| 11:49AM | 1 | BY MR. KENNEDY: |
| 11:49AM | 2 | Q    Moving on to December 28th of 2022.  You reached out to |
| 11:49AM | 3 | Sunny Kim again prior to that time, correct? |
| 11:49AM | 4 | A    Yes. |
| 11:49AM | 5 | Q    You wanted to meet with her a second time, right? |
| 11:50AM | 6 | A    Yes. |
| 11:50AM | 7 | Q    Just less than two weeks later, correct? |
| 11:50AM | 8 | A    Yes. |
| 11:50AM | 9 | Q    Because there was something new, right? |
| 11:50AM | 10 | A    Yes. |
| 11:50AM | 11 | Q    It came from a public filing, right? |
| 11:50AM | 12 | A    Yes. |
| 11:50AM | 13 | Q    And the public filing identified you, right? |
| 11:50AM | 14 | A    I don't remember, sir. |
| 11:50AM | 15 | Q    It identified Ms. Kim, right?  Sunny? |
| 11:50AM | 16 | A    From what I received, I only recognized her father's name. |
| 11:50AM | 17 | Q    And her father, Mr. Kim? |
| 11:50AM | 18 | A    Yes. |
| 11:50AM | 19 | Q    And so you set up a meeting at a park here in Honolulu, |
| 11:50AM | 20 | right? |
| 11:50AM | 21 | A    Yes. |
| 11:50AM | 22 | Q    And at that meeting, she agreed to meet with you again, |
| 11:50AM | 23 | right? |
| 11:50AM | 24 | A    Yes. |
| 11:50AM | 25 | Q    And you told Sunny Kim she should not talk to law |

| | | |
|---|---|---|
| 11:51AM | 1 | enforcement about you? |
| 11:51AM | 2 | A    I don't remember using those exact words, but I did tell |
| 11:51AM | 3 | her that law enforcement knew who her father was so they were |
| 11:51AM | 4 | probably going to go and question him. |
| 11:51AM | 5 | Q    And you told Sunny Kim that if she did that, not talk to |
| 11:51AM | 6 | law enforcement about you, she would not have to worry about |
| 11:51AM | 7 | you, correct? |
| 11:51AM | 8 | A    That is not correct. |
| 11:51AM | 9 | Q    And you told her she didn't have to worry about you having |
| 11:51AM | 10 | someone coming to her home, correct? |
| 11:51AM | 11 | A    That is not correct. |
| 11:51AM | 12 | Q    And you told her she didn't have to worry about someone |
| 11:51AM | 13 | coming to the school that her children attended, correct? |
| 11:51AM | 14 | A    That is not correct. |
| 11:52AM | 15 | Q    And all of those things were in the sworn affidavit by the |
| 11:52AM | 16 | FBI against you? |
| 11:52AM | 17 | A    Yes. |
| 11:52AM | 18 | Q    Knowing that at a certain time, you agreed to cooperate |
| 11:52AM | 19 | with the prosecution and the FBI, correct? |
| 11:52AM | 20 | A    Yes. |
| 11:52AM | 21 | Q    And so far, in return for that cooperation, the charge of |
| 11:52AM | 22 | witness tampering, which you can do up to 20 years, has been |
| 11:53AM | 23 | dismissed without prejudice, correct? |
| 11:53AM | 24 | A    Yes. |
| 11:53AM | 25 | Q    And dismissed means gone, right? |

| | | | |
|---|---|---|---|
| 11:53AM | 1 | A | Yes. |
| 11:53AM | 2 | Q | Without prejudice means they can still bring that charge |
| 11:53AM | 3 | | back against you, right? |
| 11:53AM | 4 | A | Yes. |
| 11:53AM | 5 | Q | And so they make that determination themselves, correct? |
| 11:53AM | 6 | A | Yes. |
| 11:53AM | 7 | Q | Based upon your testimony, correct? |
| 11:53AM | 8 | A | I'm not sure, sir. |
| 11:53AM | 9 | Q | You know that. |
| 11:53AM | 10 | | MR. AKINA:  Objection, 403.  This is misleading. |
| 11:53AM | 11 | | THE COURT:  Sustained. |
| 11:54AM | 12 | | BY MR. KENNEDY: |
| 11:54AM | 13 | Q | You would understand it's a factor, wouldn't you? |
| 11:54AM | 14 | | MR. AKINA:  Same objection, Your Honor. |
| 11:54AM | 15 | | THE COURT:  Sustained. |
| 11:54AM | 16 | | BY MR. KENNEDY: |
| 11:54AM | 17 | Q | Didn't the order say that you are also cooperating, and |
| 11:54AM | 18 | | that's why it's being dismissed without prejudice? |
| 11:54AM | 19 | A | From my understanding, yes. |
| 11:54AM | 20 | Q | Now, you were charged with drug distribution, conspiracy |
| 11:54AM | 21 | | in Count 16 of the third superseding indictment, correct? |
| 11:54AM | 22 | A | Yes. |
| 11:54AM | 23 | Q | You know an individual by the name of Kevin Balatico, |
| 11:54AM | 24 | | correct? |
| 11:54AM | 25 | A | Correct. |

11:55AM   1   Q   Kevin Balatico was someone who was meeting with you

11:55AM   2   regularly, correct?

11:55AM   3   A   Yes.

11:55AM   4   Q   This began in June of 2016?

11:55AM   5   A   I've known Kevin before that.  We met at the gym playing

11:55AM   6   basketball and we had gambling in common.

11:55AM   7   Q   Okay. So you played hoop with him, right?

11:55AM   8   A   Yes.

11:55AM   9   Q   You worked out with him at the gym?

11:55AM   10  A   Not worked out.

11:55AM   11  Q   You just knew him from the gym?

11:55AM   12  A   Correct.

11:55AM   13  Q   And the two of you both gambled?

11:55AM   14  A   Yes.

11:55AM   15  Q   On sports?

11:55AM   16  A   Yes.

11:55AM   17  Q   Often?

11:55AM   18  A   For myself, yes.

11:55AM   19  Q   And that's the illegal gambling that you discussed earlier

11:55AM   20  today?

11:55AM   21  A   Correct.

11:55AM   22  Q   All right.  So this isn't like a sports book in Las Vegas

11:55AM   23  where it's legal; this is illegal gaming here?

11:56AM   24  A   Yes.

11:56AM   25  Q   Now, you, in the process of making determinations to

| | | |
|---|---|---|
| 11:56AM | 1 | cooperate with the government, you received information in your |
| 11:56AM | 2 | discovery about Kevin Balatico, correct? |
| 11:56AM | 3 | A    Yes. |
| 11:56AM | 4 | Q    That he was cooperating with the government, correct? |
| 11:56AM | 5 | A    Yes. |
| 11:56AM | 6 | Q    And that he was making phone calls to you, correct? |
| 11:56AM | 7 | A    Yes. |
| 11:56AM | 8 | Q    With the FBI listening to those phone calls and recording |
| 11:56AM | 9 | them, correct? |
| 11:56AM | 10 | A    Yes. |
| 11:56AM | 11 | Q    He would meet with you and he would wear a body camera, |
| 11:56AM | 12 | which recorded what you were saying and what you were doing, |
| 11:57AM | 13 | right? |
| 11:57AM | 14 | A    Yes. |
| 11:57AM | 15 | Q    And were you aware that there were, in the course of this |
| 11:57AM | 16 | time, that went from June of 2016 through November of 2017 -- |
| 11:57AM | 17 | A    Yes. |
| 11:57AM | 18 | Q    -- and there were upwards of maybe 40 or more times that |
| 11:57AM | 19 | he either called you or you were recorded by audio or video, |
| 11:57AM | 20 | correct? |
| 11:57AM | 21 | A    Yes. |
| 11:57AM | 22 | Q    And that's what you were facing in Count 16 for the drug |
| 11:57AM | 23 | distribution, right? |
| 11:57AM | 24 | A    Yes. |
| 11:57AM | 25 | Q    That charge carried potentially a maximum of life, right? |

| | | | |
|---|---|---|---|
| 11:57AM | 1 | A | Yes. |
| 11:57AM | 2 | Q | All right. Now, what you've told the jury about Mr. Lee |
| 11:58AM | 3 | | isn't the first time you and Sunny Kim have talked or dealt |
| 11:58AM | 4 | | with a debt owed Ms. Kim, correct? |
| 11:58AM | 5 | A | I don't remember. |
| 11:58AM | 6 | Q | Does the name Bin Lee strike a bell? |
| 11:58AM | 7 | A | Yes. |
| 11:58AM | 8 | Q | Bin Lee owed Sunny Kim and Tony Kim money, correct? |
| 11:58AM | 9 | A | That is not correct. |
| 11:58AM | 10 | Q | Owed Sunny Kim money, correct? |
| 11:58AM | 11 | A | That is not correct. |
| 11:58AM | 12 | Q | That is not correct? |
| 11:58AM | 13 | A | That is not correct, sir. |
| 11:58AM | 14 | Q | So you weren't going to collect money for Sunny Kim? |
| 11:59AM | 15 | A | No, sir. |
| 11:59AM | 16 | Q | You were going to collect money for someone else? |
| 11:59AM | 17 | A | No.  Somebody else had -- another female had asked me if I |
| 11:59AM | 18 | | could help them. |
| 11:59AM | 19 | Q | Okay.  Another female had come to you and said, someone |
| 11:59AM | 20 | | owes me money; can you get someone to go collect it, correct? |
| 11:59AM | 21 | A | Not in those particular words, sir. |
| 11:59AM | 22 | Q | And you discussed this with Mr. Balatico, correct? |
| 11:59AM | 23 | A | I didn't discuss that with -- I asked him a question, if |
| 11:59AM | 24 | | he knew that person. |
| 11:59AM | 25 | Q | If he knew that person? |

| | | |
|---|---|---|
| 11:59AM | 1 | A    Correct. |
| 11:59AM | 2 | Q    You didn't talk about the fact that you were going to do |
| 11:59AM | 3 | it even if she didn't know? |
| 11:59AM | 4 | A    I don't remember. |
| 11:59AM | 5 | Q    All right. |
| 11:59AM | 6 | MR. KENNEDY:  Your Honor, at this time I ask |
| 11:59AM | 7 | permission to play 9010-081 for state of mind in terms of |
| 12:00PM | 8 | Mr. Kimoto. |
| 12:00PM | 9 | MR. AKINA:  Objection; lack of foundation. |
| 12:00PM | 10 | THE COURT:  I'm not sure what that is right now. |
| 12:00PM | 11 | MR. KENNEDY:  Sir, it's you've seen it. |
| 12:00PM | 12 | THE COURT:  Mr. Kennedy, I'm happy to take a look at |
| 12:00PM | 13 | it.  We are right at the noon hour. |
| 12:00PM | 14 | MR. KENNEDY:  Sure, that would be fine. |
| 12:00PM | 15 | THE COURT:  Would we be able to take a break? |
| 12:00PM | 16 | MR. KENNEDY:  Absolutely. |
| 12:00PM | 17 | THE COURT:  Okay.  So let's go ahead and take our |
| 12:00PM | 18 | second afternoon break.  I try to space these in appropriate |
| 12:00PM | 19 | ways.  So as we go to break, I'll remind our jurors to refrain |
| 12:00PM | 20 | from discussing the substance of this case with anyone |
| 12:00PM | 21 | including one another; to also refrain from conducting any |
| 12:00PM | 22 | independent investigation into the facts, circumstances, or |
| 12:00PM | 23 | persons involved; and then finally, please do not access any |
| 12:00PM | 24 | media or other accounts of this case that may be out there. |
| 12:00PM | 25 | So let's try to keep it to about a 15-minute break, |

| | | |
|---|---|---|
| 12:00PM | 1 | and if I could see counsel at sidebar, please. |
| 12:00PM | 2 | (The jury was excused at 12:01 p.m. and the following |
| 12:01PM | 3 | proceedings were held in open court:) |
| 12:01PM | 4 | THE COURT:  You can take the witness.  Thank you.  If |
| 12:01PM | 5 | I could see counsel at sidebar, even though the jury is gone, I |
| 12:01PM | 6 | understand. |
| 12:01PM | 7 | (Sidebar on the record:) |
| 12:01PM | 8 | THE COURT:  Just briefly, counsel, there is a person |
| 12:01PM | 9 | in the gallery who I'm not sure who it is.  It's a female, and |
| 12:01PM | 10 | for three days now, she has had coughing fits that -- I don't |
| 12:02PM | 11 | know if you all have. |
| 12:02PM | 12 | ATTORNEY PANEL:  I've heard it. |
| 12:02PM | 13 | THE COURT:  Well, she is not wearing a mask, and so |
| 12:02PM | 14 | that's one concern.  The coughing fits, though, have also been |
| 12:02PM | 15 | disruptive, at least for me, and I assume for others, including |
| 12:02PM | 16 | the jury, in terms of listening to the testimony.  So I don't |
| 12:02PM | 17 | know if you can help me identify who this person is.  I don't |
| 12:02PM | 18 | want to embarrass her, is all I'm after.  So if she is |
| 12:02PM | 19 | affiliated with one of your sides, if you wouldn't mind asking |
| 12:02PM | 20 | her to perhaps wear a mask and to remove herself from the |
| 12:02PM | 21 | courtroom if these coughing fits arise. |
| 12:02PM | 22 | That's all I'm asking for now.  If it gets to be more |
| 12:02PM | 23 | disruptive, then we will see where we have to go with it.  I |
| 12:02PM | 24 | don't want to go crazy with it for the time being.  Do you know |
| 12:02PM | 25 | who I'm talking about. |

12:02PM   1                MR. INCIONG:  I wanted to turn to see who it was.  I

12:02PM   2      didn't, but we can ask our agent who is seated back there.

12:02PM   3                THE COURT:  Okay.  I don't know who she is.  Well, if

12:02PM   4      you notice it --

12:03PM   5                MR. KENNEDY:  She is in the courtroom now, Your Honor?

12:03PM   6                THE COURT:  I'm not a hundred percent because I don't

12:03PM   7      always look up to see.  I can hear it.

12:03PM   8                MR. KENNEDY:  If you look, everybody looks.

12:03PM   9                THE COURT:  I think the answer is yes, but I'm not a

12:03PM  10      hundred percent sure; I can't swear to it.  I don't look up

12:03PM  11      when I hear the coughing.  I've done it a couple of times but

12:03PM  12      not enough to be comfortable that I have the right person.  If

12:03PM  13      you notice it in the future, if you could perhaps help me

12:03PM  14      identify her.  And again, the main thing is I don't want to

12:03PM  15      embarrass her.  I don't want to call her out.  If there is a

12:03PM  16      professional way of handling it, that's what I'm asking.

12:03PM  17                MR. INCIONG:  Certainly.  Thank you.

12:03PM  18                          (End of side bar.)

12:25PM  19        (Proceedings were recessed at 12:03 p.m. to 12:25 a.m.)

12:25PM  20                THE COURT:  All right.  Back from our second break of

12:25PM  21      the trial day.  Mr. Kimoto is back on the stand and Mr. Kennedy

12:25PM  22      is in the midst of his cross-examination.  So where were we

12:25PM  23      when you left?  You were marking an exhibit that I think you

12:25PM  24      had identified but I have forgotten now.

12:25PM  25                MR. KENNEDY:  It's 9010-081, Your Honor, and it's an

12:25PM    1    audio and video exhibit.

12:25PM    2          THE COURT:  9010-081.

12:25PM    3          MR. KENNEDY:  I believe you probably have a place

12:25PM    4    holder.

12:25PM    5          THE COURT:  It's identified on the supplemental

12:25PM    6    exhibit list that was filed yesterday.

12:25PM    7          Okay.  And Mr. Akina, you had some thoughts on this

12:25PM    8    particular exhibit?

12:25PM    9          MR. AKINA:  Given that it's an audio/visual, one, I

12:25PM   10    believe this is improper impeachment.  The witness had been

12:25PM   11    asked the question about a prior statement and he said I do not

12:26PM   12    recall.  So if this is to refresh the witness's recollection,

12:26PM   13    that's one thing.  I have an issue of doing that since it's

12:26PM   14    audio/video, playing that in front of the jury since you can't

12:26PM   15    take that back.  If it's for some other issue, I think a little

12:26PM   16    more foundation needs to be laid to identify who is in it.

12:26PM   17          THE COURT:  I agree that some additional foundational

12:26PM   18    questions should be asked before I am able to actually rule on

12:26PM   19    this objection that the government is making.

12:26PM   20    BY MR. KENNEDY:

12:26PM   21    Q     Sir, do you recall watching a video of meeting with

12:26PM   22    Mr. Balatico and yourself, and the subject of Bin Kim came up?

12:26PM   23    A     Not Bin Kim, sir.

12:26PM   24    Q     Bin Lee?

12:26PM   25    A     Yes.

| | | | |
|---|---|---|---|
| 12:26PM | 1 | Q | All right.  And with respect to that, you had a |
| 12:26PM | 2 | | conversation with Mr. Balatico, correct? |
| 12:27PM | 3 | A | Yes. |
| 12:27PM | 4 | Q | And this individual was Bin Lee? |
| 12:27PM | 5 | A | Yes. |
| 12:27PM | 6 | Q | Not to be confused with Robert Lee, correct? |
| 12:27PM | 7 | A | Correct. |
| 12:27PM | 8 | Q | The accountant that we have been talking about? |
| 12:27PM | 9 | A | Yes. |
| 12:27PM | 10 | Q | Okay. So this is another individual with the last name of |
| 12:27PM | 11 | | Lee; first name, Bin? |
| 12:27PM | 12 | A | Correct. |
| 12:27PM | 13 | Q | And in that conversation with Mr. Balatico, he and you are |
| 12:27PM | 14 | | discussing collecting a debt, correct? |
| 12:27PM | 15 | A | I believe so. |
| 12:27PM | 16 | Q | And so this was captured by Mr. Balatico working for the |
| 12:27PM | 17 | | FBI regarding debt collection that you were discussing with |
| 12:27PM | 18 | | their informant Mr. Balatico, correct? |
| 12:27PM | 19 | A | Yes. |
| 12:27PM | 20 | | MR. KENNEDY:  And so Your Honor, at this time I'd |
| 12:27PM | 21 | | offer 9010-081. |
| 12:28PM | 22 | | MR. AKINA:  Object, improper impeachment. |
| 12:28PM | 23 | | MR. KENNEDY:  Your Honor, it's for state of mind, |
| 12:28PM | 24 | | 8033.  Mr. Kimoto testified that he was just doing a favor for |
| 12:28PM | 25 | | Ms. Sunny Kim.  And now we are talking about collecting money |

12:28PM   1   and being paid for it on a prior occasion.

12:28PM   2              THE COURT:  I'm not sure what the relevance of this

12:28PM   3   is.

12:28PM   4              MR. KENNEDY:  The relevance is, is that he is being

12:28PM   5   recorded by the FBI for a debt collection extortion prior to

12:28PM   6   the kidnapping for which he is charged with.  And that's why

12:28PM   7   they were discussing it.  It goes to his state of mind under

12:28PM   8   8033 prior to.

12:28PM   9              MR. AKINA:  Your Honor, this is extrinsic evidence of

12:28PM   10  a collateral matter.  There is nothing really that needs to be

12:29PM   11  impeached at this point.

12:29PM   12             THE COURT:  The objection is sustained.

12:29PM   13  BY MR. KENNEDY:

12:29PM   14  Q    With respect to that discussion, that's exactly what you

12:29PM   15  were trying to do, correct?

12:29PM   16  A    No, sir.

12:29PM   17  Q    You weren't trying to obtain a debt collection?

12:29PM   18  A    No.  In regards to discussing it with Mr. Balatico, it was

12:29PM   19  a question if he knew who Bin Lee was.

12:29PM   20  Q    All right.

12:29PM   21  A    We didn't go into any planning or anything like that, sir.

12:29PM   22  Q    You didn't say if she doesn't want to do it, I'm going to

12:29PM   23  do it anyway?

12:29PM   24  A    I don't recall saying that, sir.

12:29PM   25  Q    That would go beyond just planning.

12:29PM   1          You were saying you were just trying to find something

12:29PM   2   out, but -- and this was for another girlfriend, correct?

12:29PM   3   A    This was a female friend.

12:29PM   4   Q    A female friend who was owed a substantial amount of

12:30PM   5   money, correct?

12:30PM   6   A    Yes.

12:30PM   7   Q    You asked Mr. Balatico whether he knew somebody, right?

12:30PM   8   A    Yes.

12:30PM   9   Q    You were going to do it anyway, whether your friend wanted

12:30PM   10  it, to collect the money, correct?

12:30PM   11  A    Not correct.

12:30PM   12  Q    All right.  You didn't say "I'm going to do it anyway even

12:30PM   13  if she doesn't want to"?

12:30PM   14  A    I don't recall saying that.

12:30PM   15          MR. KENNEDY:  Your Honor, at this time I would offer

12:30PM   16  9010-081.

12:30PM   17          THE COURT:  Mr. Akina?

12:30PM   18          MR. AKINA:  If it's for the purpose of refreshing the

12:30PM   19  witness's recollection.  The only issue is playing it in front

12:30PM   20  of the jury.

12:30PM   21          THE COURT:  Is that what the purpose is?  It doesn't

12:30PM   22  seem like it.

12:30PM   23          MR. AKINA:  That's the only objection that I have,

12:30PM   24  Your Honor.

12:30PM   25          MR. KENNEDY:  I can refresh his recollection by doing

12:31PM   1   it.

12:31PM   2            THE COURT:  Is that the purpose, though, that this

12:31PM   3   exhibit is being offered for.

12:31PM   4            MR. KENNEDY:  It's offered, as I said, as his state of

12:31PM   5   mind prior to --

12:31PM   6            THE COURT:  Objection is sustained.

12:31PM   7   BY MR. KENNEDY:

12:31PM   8   Q    So you just don't recall right now, correct?

12:31PM   9   A    Yes.

12:31PM   10  Q    All right.  Now, did you also discuss with Mr. Balatico

12:31PM   11  investing in a game room -- in the illegal game room?

12:31PM   12  A    I did not discuss doing any business with an illegal game

12:31PM   13  room.

12:31PM   14  Q    You didn't talk about whether Sunny Kim would bankroll you

12:31PM   15  with Mr. Balatico?

12:31PM   16  A    No, sir, I don't remember that.

12:31PM   17  Q    You don't recall watching an exhibit that was video and

12:31PM   18  audio recorded where that was the case?

12:31PM   19  A    I watched that video -- I watched numerous videos, and it

12:32PM   20  was a long time ago that I had watched that, viewed it.

12:32PM   21  Q    You were talking about bankrolling a game room?

12:32PM   22  A    No, sir, I wasn't talking about bankrolling a game room.

12:32PM   23  Q    You weren't talking about knowing someone who would put up

12:32PM   24  the cash, but you wouldn't?

12:32PM   25  A    No, sir, I don't recall that.

12:32PM   1   Q   All right.

12:32PM   2           MR. KENNEDY:  At this time I would offer 9010-080

12:32PM   3   which is an audio video exhibit by the FBI informant,

12:32PM   4   Mr. Balatico.

12:32PM   5           THE COURT:  Mr. Akina.

12:32PM   6           MR. AKINA:  Same objection on relevance grounds, this

12:32PM   7   is the same topic.

12:32PM   8           THE COURT:  Same ruling.

12:32PM   9   BY MR. KENNEDY:

12:32PM  10   Q   All right.  You were charged with, in Count 16, dealing

12:33PM  11   with Mr. Balatico, correct?

12:33PM  12   A   Can you repeat the question.

12:33PM  13   Q   Yeah.  You are charged with distribution of drugs that we

12:33PM  14   discussed before, which was before the jury in Count 16,

12:33PM  15   correct?

12:33PM  16   A   Yes.

12:33PM  17   Q   A conspiracy to do so, correct?

12:33PM  18   A   Yes.

12:33PM  19   Q   All right.  And in those conversations, I take it that you

12:33PM  20   went over those with your attorney prior to deciding whether to

12:33PM  21   cooperate with the government, didn't you?

12:33PM  22   A   In all honesty, that was the least of what we thought

12:33PM  23   about.  We didn't think the drug conspiracy was a big thing.

12:33PM  24   Q   So you didn't care that the FBI had spent from June 11th

12:34PM  25   of 2016 to November of 2017, almost 16 months making recordings

12:34PM    1    of you about that; you just didn't care?

12:34PM    2    A    It was marijuana vape pens and I didn't -- well, we didn't

12:34PM    3    think that it was a big deal.

12:34PM    4    Q    Sir, I understand in some states it's legal, correct?

12:34PM    5    A    Yes.

12:34PM    6    Q    Like Nevada, right?

12:34PM    7    A    I'm not sure.

12:34PM    8    Q    But it's a federal law, right?

12:34PM    9    A    Yes.

12:34PM   10    Q    You are charged with it, right?

12:34PM   11    A    Yes.

12:34PM   12    Q    It was in the indictment, correct?

12:34PM   13    A    Correct.

12:34PM   14    Q    And so during that time, they made, as you said, more than

12:34PM   15    40 recordings of you involved with drug distribution, right?

12:34PM   16          MR. AKINA:  Objection.  That's not what the witness

12:35PM   17    said.

12:35PM   18          THE COURT:  Overruled, go ahead.

12:35PM   19          THE WITNESS:  Repeat the question, sir.

12:35PM   20    BY MR. KENNEDY:

12:35PM   21    Q    There were more than 40 occasions where Mr. Balatico, over

12:35PM   22    that year and a half time period, was making telephone calls

12:35PM   23    which were recorded; video and audio recordings of you meeting

12:35PM   24    during a year and a half, correct?

12:35PM   25    A    Correct.

12:35PM  1   Q   And you didn't care about that; that was fine?

12:35PM  2   A   We really didn't spend too much time on that subject.

12:35PM  3   Q   All right.  Let's take a listen to some of those.  So if

12:35PM  4   we move to Exhibit 9010-043, do you recall a series of phone

12:35PM  5   calls from June 11th to June 17th?

12:36PM  6   A   I don't remember, but I'm sure if you showed me something,

12:36PM  7   then I could verify.

12:36PM  8   Q   If you heard it, would you remember it?

12:36PM  9   A   I'm not sure, sir.

12:36PM  10  Q   All right.

12:36PM  11          MR. KENNEDY:  At this time, I would offer 910-043.

12:36PM  12          THE COURT:  To refresh his recollection?

12:36PM  13          MR. KENNEDY:  To refresh his recollection, and then we

12:36PM  14  can move on from there.

12:36PM  15          THE COURT:  How are we going to do that?

12:36PM  16          MR. KENNEDY:  Well, Your Honor, if the Court doesn't

12:36PM  17  want to hear the audio, I can hand to him a transcript.  He can

12:36PM  18  review it and see if that refreshes his recollection.

12:36PM  19          THE COURT:  I think that would be the preferred

12:36PM  20  alternative.

12:36PM  21          MR. KENNEDY:  May I approach, Your Honor?  I'm showing

12:36PM  22  what's been marked as 9010-043A.  May I approach?

12:36PM  23          THE COURT:  You may.

12:37PM  24  BY MR. KENNEDY:

12:37PM  25  Q   It's printed on both sides.  Would you take a look at the

12:37PM  1  paper, and look at that.

12:37PM  2          THE COURT:  Mr. Akina, I gather the government has a

12:37PM  3  copy of this 9010-43A that counsel just provided to the

12:37PM  4  witness.

12:37PM  5          MR. AKINA:  A copy was provided previously to the

12:37PM  6  government, Your Honor.

12:38PM  7          THE WITNESS:  I have read it.

12:38PM  8  BY MR. KENNEDY:

12:38PM  9  Q    Do you recall that Mr. Balatico began calling you

12:38PM  10  around -- on June 11th, 2016, and that you then were able to

12:38PM  11  review an audio of that once it was produced to you in

12:38PM  12  discovery?

12:38PM  13  A    Yes.  I'm sure it was in my -- I'm sure it was provided to

12:38PM  14  me but I don't remember the conversation.  There was numerous

12:38PM  15  conversations provided.

12:38PM  16  Q    Okay.  With respect to that same day, the conversation

12:38PM  17  begins at 6:15 in the evening.

12:38PM  18          Do you recall a second conversation at about nine that

12:39PM  19  evening where you and Mr. Balatico discussed distributing

12:39PM  20  drugs?

12:39PM  21  A    I don't recall that, sir.

12:39PM  22          MR. KENNEDY:  Your Honor, may I approach?

12:39PM  23          THE COURT:  You may.  Do you have another transcript?

12:39PM  24          MR. KENNEDY:  I do.  I'm showing you what's been

12:39PM  25  previously marked as 9010-044A.  It's printed on both sides to

| | | |
|---|---|---|
| 12:39PM | 1 | save a little paper. |
| 12:39PM | 2 | THE COURT:  Mr. Akina, I gather once again that this |
| 12:39PM | 3 | is a document that you have. |
| 12:39PM | 4 | MR. AKINA:  Yes.  It's been previously provided to the |
| 12:39PM | 5 | government, yes, Your Honor. |
| 12:42PM | 6 | THE WITNESS:  I've read through it. |
| 12:42PM | 7 | MR. KENNEDY:  May I approach, Your Honor? |
| 12:42PM | 8 | THE COURT:  Yes. |
| 12:42PM | 9 | BY MR. KENNEDY: |
| 12:42PM | 10 | Q    Sir, viewing 9010-043A and 9010-044A, did that refresh |
| 12:42PM | 11 | your recollection about Mr. Balatico and you discussing drug |
| 12:43PM | 12 | dealing? |
| 12:43PM | 13 | A    Correct. |
| 12:43PM | 14 | Q    All right. |
| 12:43PM | 15 | MR. KENNEDY:  Your Honor, at this time I would move to |
| 12:43PM | 16 | play 9010-043, the audio.  The jury can have the transcript |
| 12:43PM | 17 | which will follow on the screen, so that they can follow.  And |
| 12:43PM | 18 | 9010-044 audio. |
| 12:43PM | 19 | MR. AKINA:  Your Honor, the witness's recollection has |
| 12:43PM | 20 | been refreshed.  I believe a question would be appropriate. |
| 12:43PM | 21 | THE COURT:  I do too.  So the request is denied. |
| 12:43PM | 22 | MR. KENNEDY:  All right. |
| 12:43PM | 23 | BY MR. KENNEDY: |
| 12:43PM | 24 | Q    So you're discussing selling drugs, right? |
| 12:43PM | 25 | A    We are discussing selling marijuana vape pens. |

12:43PM   1   Q   All right.  Selling marijuana vape pens, correct?

12:43PM   2   A   Yes.

12:43PM   3   Q   You're going to get some for yourself, right?

12:43PM   4   A   Am I going to get some for myself for use?

12:43PM   5   Q   Yes.

12:43PM   6   A   No.

12:43PM   7   Q   Okay.  So you're getting them to sell them to other people

12:44PM   8   for money?

12:44PM   9   A   I'm getting it from Allen Lau and selling it to Kevin

12:44PM  10   Balatico.

12:44PM  11   Q   Right.  And you're discussing the fact that pretty soon

12:44PM  12   you're going to be doing ten units, right?

12:44PM  13   A   That means ten vape pens.

12:44PM  14   Q   And you're going to be making, maybe the first one was

12:44PM  15   just for a couple, and that was for around $3,000, right?

12:44PM  16   A   Right.

12:44PM  17   Q   And so if you are doing ten, doing that times five, that's

12:44PM  18   around $15,000 every week monies that would go to you and

12:44PM  19   Kevin, right?

12:44PM  20   A   No, that is not correct, sir.

12:44PM  21   Q   And so what you are discussing with him is that they have

12:44PM  22   already had a sample that you've given to them, correct?

12:44PM  23   A   What we are discussing is I gave him two samples, and now

12:44PM  24   he is asking me -- I believe he is asking me for a few more

12:44PM  25   samples --

| | | | |
|---|---|---|---|
| 12:44PM | 1 | Q | And pretty soon he says, "I have someone.  I have somebody |
| 12:45PM | 2 | | that will get ten a week every week, and we can be making that |
| 12:45PM | 3 | | money during the week," right? |
| 12:45PM | 4 | A | Ten vape pens, yes, sir. |
| 12:45PM | 5 | Q | Right.  So what this was about is you establishing a |
| 12:45PM | 6 | | business relationship selling ten or so a week for about |
| 12:45PM | 7 | | $15,000 and banking that cash, right? |
| 12:45PM | 8 | A | No, that is not correct, sir. |
| 12:45PM | 9 | Q | Sharing it with Allen Lau, right? |
| 12:45PM | 10 | A | The price for the vape pens were between 40 and $50 so I |
| 12:45PM | 11 | | don't know how you came up with ten vape pens for $15,000.  But |
| 12:45PM | 12 | | that is inaccurate. |
| 12:45PM | 13 | Q | Didn't you say it would be 29 in the recording? |
| 12:45PM | 14 | A | I believe I did, yes. |
| 12:45PM | 15 | Q | Right which was for two, right? |
| 12:45PM | 16 | A | Well, I'm trying to think of the math right now, but there |
| 12:46PM | 17 | | was no time when I sold those vape pens to Mr. Balatico that it |
| 12:46PM | 18 | | came close to $15,000. |
| 12:46PM | 19 | Q | Because he wasn't buying that much, was he? |
| 12:46PM | 20 | A | No, he picked up more than 29 at a time but it didn't come |
| 12:46PM | 21 | | out to anywhere close to $15,000. |
| 12:46PM | 22 | Q | And you did this over the period of time of close to |
| 12:46PM | 23 | | 18 months, correct? |
| 12:46PM | 24 | A | I met with Mr. Balatico a handful of times. |
| 12:46PM | 25 | Q | And you sold to him about a half dozen times? |

12:46PM    1    A    About, a little less than a half dozen times.

12:46PM    2    Q    I'm sorry?

12:46PM    3    A    Less than a half dozen times.

12:46PM    4    Q    You sold to him on several occasions, right?

12:46PM    5    A    Correct.

12:46PM    6    Q    You then were recorded on those occasions, right?

12:46PM    7    A    Yes.

12:46PM    8    Q    And so you knew that, once again, it wasn't just your word

12:46PM    9    or someone's word against you, right?

12:47PM   10    A    Yes.

12:47PM   11    Q    They had audio recordings of you doing it, right?

12:47PM   12    A    Correct.

12:47PM   13    Q    Video recordings of you doing it, right?

12:47PM   14    A    Yes.

12:47PM   15    Q    Once again, just like the situation with GPS and a receipt

12:47PM   16    regarding Sunny Lee and your threatening her on December 16th

12:47PM   17    of 2022?

12:47PM   18    A    No.  Not Sunny Lee, sir.

12:47PM   19    Q    Sunny Kim.  I apologize, Sunny Kim.

12:47PM   20    A    Yes.

12:47PM   21    Q    They also had text messages between you and Sunny Kim,

12:47PM   22    correct?

12:47PM   23    A    Correct.

12:47PM   24    Q    And you reviewed those, right?

12:47PM   25    A    Yes.

12:47PM   1   Q   And so they had GPS, text messages, all of that against

12:47PM   2   you?

12:47PM   3   A   Yes.

12:47PM   4   Q   All right.  And so now at this point, you know you are

12:48PM   5   guilty of Count 16, the drug distribution count, right?

12:48PM   6   A   Yes, we never denied that.

12:48PM   7   Q   And you know they can prove it, right?

12:48PM   8   A   Correct.

12:48PM   9   Q   You went to Sunny Lee -- excuse me, Sunny Kim, and you

12:48PM   10   threatened her because you knew they could prove that too,

12:48PM   11   right?

12:48PM   12   A   No, I did not, sir.

12:48PM   13   Q   So let's talk about what you have told the jury.  I think

12:49PM   14   you said that as far as count -- excuse me, the kidnapping

12:49PM   15   charge, the conspiracy on Count 11, that that began sometime in

12:49PM   16   May or the summer of 2017?

12:49PM   17   A   Yes.

12:49PM   18   Q   It actually began on April 3, 2017, did it not?

12:49PM   19   A   I don't remember, sir.

12:49PM   20   Q   Do you recall getting on your pres10k Instagram a message

12:49PM   21   from Sunny Kim saying, "hey, what's your number, you guys do

12:49PM   22   termite tenting?"

12:49PM   23   A   I --  yeah, maybe she did.  I'm not sure, sir.

12:49PM   24   Q   Let's take a look at 9010-003, second page, just for the

12:50PM   25   witness.  If we go to the first page.

12:50PM   1          Do you recognize on the bottom portion of the screen

12:50PM   2   an Instagram account?

12:50PM   3   A    Yes, sir.

12:50PM   4   Q    Whose is it?

12:50PM   5   A    That is my Instagram account.

12:50PM   6   Q    If we move to -- from 9010-003-001 to the second page.

12:51PM   7          Is there something on April 4th of 2017?

12:51PM   8   A    There is something on April 4th, 2017.

12:51PM   9   Q    Is it regarding a termite tenting?

12:51PM   10  A    Yes.

12:51PM   11  Q    Is it from Sunny Kim?

12:51PM   12  A    I can't see who sent me this message, sir.

12:51PM   13  Q    If we go back to the first page and we blow up the first

12:51PM   14  part.  If you'd just read that to yourself, and then I'm going

12:51PM   15  to ask you some questions.  Just let me know when you are done.

12:52PM   16  A    I'm finished.

12:52PM   17  Q    All right.  Is that a message from Sunny Kim?

12:52PM   18  A    Yes.

12:52PM   19  Q    All right.  Going back to the second page.

12:52PM   20          In the blue, is that a message from Sunny Kim?

12:52PM   21  A    Yes.

12:52PM   22          MR. KENNEDY:  All right.  At this time I'd move to

12:52PM   23  admit 9010-003-001 and 2 and if there is a third page, Ashley.

12:52PM   24          THE COURT:  So the entirety of the exhibit.

12:52PM   25          MR. KENNEDY:  The entirety of this exhibit, Your

12:52PM   1   Honor.

12:52PM   2              THE COURT:  Any objection?

12:52PM   3              MR. AKINA:  Yes, to the portion of the first page that

12:52PM   4   is not the Instagram message itself.  I'd object to all of that

12:52PM   5   on hearsay.

12:52PM   6              MR. KENNEDY:  Your Honor, the Instagram portion is on

12:53PM   7   the -- how it was delivered to us.  If the Court wants us to

12:53PM   8   black out the top portion, we did not get it in a fashion that

12:53PM   9   doesn't have the top portion.

12:53PM   10              THE COURT:  All right.  So we can clean this up and

12:53PM   11   not spend jury time on it.  So there is no objection to the

12:53PM   12   Instagram portion of this particular exhibit from the

12:53PM   13   government; is that correct, Mr. Akina?

12:53PM   14              MR. AKINA:  Correct, Your Honor.

12:53PM   15              THE COURT:  So let's get this cleaned up offline after

12:53PM   16   the trial day is over.  But subject to that cleanup that the

12:53PM   17   government has objected to, and which Mr. Kennedy appears to be

12:53PM   18   okay with, this exhibit is admitted that's 9010-003.  It's

12:53PM   19   three pages long.

12:53PM   20              (Exhibit 9010-003 was received in evidence.)

12:53PM   21              MR. AKINA:  Your Honor, my request would be that if

12:53PM   22   any portion is blown up and shown to the jury, that it would

12:53PM   23   not include the hearsay portions.

12:53PM   24              THE COURT:  Yes, because that's not part of what I

12:53PM   25   just admitted.

12:54PM   1          MR. KENNEDY:  If we move to page two with the

12:54PM   2    understanding this is your Instagram account.  I would ask that

12:54PM   3    just this page be published to the jury.

12:54PM   4          THE COURT:  Go ahead.

12:54PM   5    BY MR. KENNEDY:

12:54PM   6    Q    So it's on April 4th, it looks like 2017 when Sunny Kim

12:54PM   7    says "Hey, what's your number, you guys do termite tenting?"

12:54PM   8    Then, "or text me," and then gives a number, correct?

12:54PM   9    A    Correct.

12:54PM   10   Q    And it looks like the number is cut off on what we

12:54PM   11   received.

12:54PM   12          So the initial conversation, then, about tenting Sunny

12:54PM   13   Kim's residence occurs on April 4th, 2017, correct?

12:54PM   14   A    Yes.

12:54PM   15   Q    All right.  So did she also call you?

12:55PM   16   A    I might have called her.

12:55PM   17   Q    As I understand what you've said previously, she either

12:55PM   18   texted you or called you, asked you to meet for lunch, and you

12:55PM   19   agreed to meet for lunch; is that fair?

12:55PM   20   A    That's fair.

12:55PM   21   Q    That's what you testified to.  So now we can take that

12:55PM   22   down.

12:55PM   23          So you understood that Sunny Kim was selling her home,

12:55PM   24   right?

12:55PM   25   A    No, I don't think -- when we did the tenting the first

| | | |
|---|---|---|
| 12:55PM | 1 | time, she was selling -- she was selling her home. |
| 12:55PM | 2 | Q   All right.  Let me see.  Can we pull up -- |
| 12:56PM | 3 |     Well, let me ask you this:  Did you meet with the FBI |
| 12:56PM | 4 | in May of 2023? |
| 12:56PM | 5 | A   I may have.  I don't recall. |
| 12:56PM | 6 | Q   Would seeing a document help you remember that meeting? |
| 12:56PM | 7 | A   Yes. |
| 12:56PM | 8 |     MR. KENNEDY:  Can we pull up 9010-042 first page just |
| 12:56PM | 9 | for Mr. Kimoto? |
| 12:56PM | 10 | BY MR. KENNEDY: |
| 12:56PM | 11 | Q   Sir, if you look at the bottom, does it appear that you |
| 12:56PM | 12 | were interviewed by the FBI on May 24th of 2023? |
| 12:56PM | 13 | A   Yes. |
| 12:56PM | 14 | Q   If you take a look at the second full paragraph, just read |
| 12:56PM | 15 | that to yourself and then I'm going to ask you some questions |
| 12:57PM | 16 | about it. |
| 12:57PM | 17 | A   Okay. |
| 12:57PM | 18 | Q   All right.  We can take that down now. |
| 12:57PM | 19 |     Does that refresh your recollection about that lunch |
| 12:57PM | 20 | after the April 4th text that we saw? |
| 12:57PM | 21 | A   That wasn't accurate of what I said -- |
| 12:58PM | 22 | Q   Okay. |
| 12:58PM | 23 | A   -- that day.  I think they might have gotten mixed up. |
| 12:58PM | 24 | Q   Okay, so let me get this straight. |
| 12:58PM | 25 |     You're sitting in a room with a couple FBI agents, |

12:58PM    1    right?

12:58PM    2    A    Yes.

12:58PM    3    Q    A Mr. Parker -- Special Agent Parker, right?

12:58PM    4    A    Correct.

12:58PM    5    Q    And Special Agent Palmer who is here, correct?

12:58PM    6    A    Yes.

12:58PM    7    Q    And they are listening to you and asking you questions,

12:58PM    8    right?

12:58PM    9    A    Yes.

12:58PM    10   Q    And they are taking down notes, correct?

12:58PM    11   A    Yes.

12:58PM    12   Q    And at a certain point, then you were provided with this

12:58PM    13   document, right?

12:58PM    14   A    No.

12:58PM    15   Q    You've never reviewed this document?

12:58PM    16   A    I've never seen that document.

12:58PM    17   Q    You never received it in discovery?

12:58PM    18   A    I never seen that document, sir.

12:58PM    19   Q    You've never went over their FBI report?

12:58PM    20   A    I never went over their FBI report.

12:59PM    21   Q    So this is the very first time you received this; you

12:59PM    22   never got it in discovery from your attorney?

12:59PM    23   A    I never got it in discovery from my attorney.

12:59PM    24   Q    You never got anything in terms of discovery, or just this

12:59PM    25   document?

| | | | |
|---|---|---|---|
| 12:59PM | 1 | A | I've never seen this document, sir, before. |
| 12:59PM | 2 | Q | Okay.  So did you ask to take a look at the interview at |
| 12:59PM | 3 | | any point in time to see if it was correct, what they put down? |
| 12:59PM | 4 | A | No, I did not ask to review it. |
| 12:59PM | 5 | Q | All right.  So if they said that Sunny Kim was selling her |
| 12:59PM | 6 | | home, they got it wrong? |
| 12:59PM | 7 | A | Yeah, because the first time we tented her home, she |
| 12:59PM | 8 | | wasn't selling her house.  But when -- I don't know how long |
| 12:59PM | 9 | | went by, a year or two, she decided to sell her house after |
| 12:59PM | 10 | | that.  And we actually re-tented her house at no cost. |
| 12:59PM | 11 | Q | Okay.  So was it right that there was a home inspection? |
| 01:00PM | 12 | A | From what Sunny had said, yes. |
| 01:00PM | 13 | Q | Okay.  And termites were discovered? |
| 01:00PM | 14 | A | Correct. |
| 01:00PM | 15 | Q | Sunny knew you worked for O'ahu Termite? |
| 01:00PM | 16 | A | Yes. |
| 01:00PM | 17 | Q | She asked if you could tent and fumigate the home? |
| 01:00PM | 18 | A | She asked if we could do it at no cost or a discounted |
| 01:00PM | 19 | | rate because she had tented her house previously with us and |
| 01:00PM | 20 | | she was inquiring about the five-year guarantee that we gave to |
| 01:00PM | 21 | | her. |
| 01:00PM | 22 | Q | So you had previously done it for O'ahu Termite? |
| 01:00PM | 23 | A | I don't know which company, but I believe it was either -- |
| 01:00PM | 24 | | I mean, it was either Kama'aina or O'ahu Termite. |
| 01:00PM | 25 | Q | And so she was inquiring about tenting and fumigating her |

| | | |
|---|---|---|
| 01:00PM | 1 | home. |
| 01:00PM | 2 | Did you ever tell the agents that there was a previous |
| 01:00PM | 3 | one? |
| 01:01PM | 4 | A   I believe I disclosed that. |
| 01:01PM | 5 | Q   Okay.  You disclosed it but have you reviewed any |
| 01:01PM | 6 | interview notes that you -- any interview report that they |
| 01:01PM | 7 | made? |
| 01:01PM | 8 | A   Again, I've never seen any of the interview reports that |
| 01:01PM | 9 | they have made. |
| 01:01PM | 10 | Q   Okay.  All right.  Now, during this lunch, you told -- |
| 01:01PM | 11 | apparently, Sunny Kim also then said that her father's |
| 01:01PM | 12 | accountant Robert Lee had embezzled money? |
| 01:01PM | 13 | A   Correct. |
| 01:01PM | 14 | Q   Stole money from her father? |
| 01:01PM | 15 | A   Correct. |
| 01:01PM | 16 | Q   And that Mr. Lee had forged his signature on documents -- |
| 01:01PM | 17 | A   Correct. |
| 01:01PM | 18 | Q   -- and these forged documents that allowed Robert Lee to |
| 01:01PM | 19 | steal a million dollars from Tony Kim? |
| 01:01PM | 20 | A   Yes. |
| 01:01PM | 21 | Q   All right.  Did you check into any of that? |
| 01:02PM | 22 | A   No, I did not. |
| 01:02PM | 23 | Q   When you went on the internet later, did you check into |
| 01:02PM | 24 | any of this? |
| 01:02PM | 25 | A   I may have looked up Robert Lee's name. |

01:02PM   1   Q    And did you see that actually, Mr. Lee had done a

01:02PM   2   bankruptcy?

01:02PM   3   A    No, I did not see that.

01:02PM   4   Q    Did you see that it didn't have anything to do with

01:02PM   5   embezzlement or stealing money?

01:02PM   6   A    No, I did not.

01:02PM   7   Q    Okay.  All right.  Now, you mentioned that Sunny Kim asked

01:02PM   8   you during this lunch if you knew anyone who could assist in

01:02PM   9   collecting her father's money, correct?

01:02PM  10   A    Correct.

01:02PM  11   Q    Now, you answered that it would be one half, right?

01:02PM  12   A    Yes.  50 percent.

01:02PM  13   Q    50 percent, right?

01:02PM  14   A    Yes.

01:02PM  15   Q    You didn't need to talk to anybody, right?

01:02PM  16   A    No, sir.

01:02PM  17   Q    You set the terms:  It would be 50 percent, right?

01:03PM  18   A    Yes, sir.

01:03PM  19   Q    You made the call before you talked to anybody else,

01:03PM  20   right?

01:03PM  21   A    Yes, sir.

01:03PM  22   Q    You decided that it would be 50/50, right?

01:03PM  23   A    Yes.

01:03PM  24   Q    And she already told you that her father would be okay

01:03PM  25   with this fee over a lunch meeting that was about tenting her

01:03PM   1    house?

01:03PM   2    A    Yes.

01:03PM   3    Q    So it was decided in one meeting what the terms were by

01:03PM   4    you and her, right?

01:03PM   5    A    Yes.

01:03PM   6    Q    You didn't have to ask anybody, did you?

01:03PM   7    A    No.  I said I had to ask my friend if he could go and talk

01:03PM   8    to that person.

01:03PM   9    Q    No, but you already decided the terms would be 50/50,

01:03PM   10   right?

01:03PM   11   A    I said 50/50, yes.

01:03PM   12   Q    Right.  50 for them, 50 for you, right?

01:04PM   13   A    Not for myself, sir.

01:04PM   14   Q    Okay.  Now, you told the jury the other day that you went

01:04PM   15   back to measure the house for fumigation, correct?

01:04PM   16   A    After this previous meeting at the restaurant, yes.

01:04PM   17   Q    Right.  And you told her that you had found someone,

01:04PM   18   correct?

01:04PM   19   A    Correct.

01:04PM   20   Q    What you didn't tell the jury is that you told the FBI on

01:04PM   21   May 24th that you did not tell her who you had found?

01:05PM   22   A    I don't understand your question, sir.

01:05PM   23   Q    I'll be plain.  You said you found someone, right?

01:05PM   24   A    Yes, I said that I had asked my friend, and he said okay.

01:05PM   25   Q    You didn't tell her who?

| | | | |
|---|---|---|---|
| 01:05PM | 1 | A | No. |
| 01:05PM | 2 | Q | Okay.  Because the other day, you told us that you said it |
| 01:05PM | 3 | | was Michael Miske. |
| 01:05PM | 4 | | MR. AKINA:  Objection; vague. |
| 01:05PM | 5 | | THE COURT:  Overruled. |
| 01:05PM | 6 | | BY MR. KENNEDY: |
| 01:05PM | 7 | Q | So the truth is you told her that you had found someone, |
| 01:05PM | 8 | | but you didn't tell them who, correct? |
| 01:05PM | 9 | A | Yes. |
| 01:05PM | 10 | Q | Now, at a certain point you received what you said was a |
| 01:06PM | 11 | | call or text again from Sunny Kim after this meeting, correct? |
| 01:06PM | 12 | A | Yes. |
| 01:06PM | 13 | Q | And so -- between that time you went on the internet about |
| 01:06PM | 14 | | Mr. Robert Lee, correct? |
| 01:06PM | 15 | A | Yes. |
| 01:06PM | 16 | Q | In connection with you setting the 50/50 terms, correct? |
| 01:06PM | 17 | A | I don't understand your question, sir. |
| 01:06PM | 18 | Q | Well,  Ms. Kim -- Sunny Kim told you that once a week, |
| 01:07PM | 19 | | Robert Kim goes to a restaurant next to the Central Pacific |
| 01:07PM | 20 | | Bank on the corner of Ward and Queen, correct? |
| 01:07PM | 21 | A | Robert Lee. |
| 01:07PM | 22 | Q | Robert Lee, yes. |
| 01:07PM | 23 | A | Yes. |
| 01:07PM | 24 | Q | And so you told us the other day that what you did with |
| 01:07PM | 25 | | that information is you went and you took a photograph of |

01:07PM   1   Mr. Robert Lee when he was outside the restaurant, correct?

01:07PM   2   A   Correct.

01:07PM   3   Q   In addition to that, you followed Mr. Lee into the

01:07PM   4   restaurant to eat, right?

01:07PM   5   A   Yes.

01:07PM   6   Q   And while in the restaurant, you were able to photograph

01:07PM   7   Mr. Lee again without him knowing it, right?

01:07PM   8   A   Yes.

01:07PM   9   Q   Because you were surveilling with respect to your 50/50

01:08PM  10   split terms, correct?

01:08PM  11   A   I don't understand the question, sir.

01:08PM  12   Q   You met with Sunny Kim.  You told her "I know someone but

01:08PM  13   it will be 50/50 split," right?

01:08PM  14   A   Yes.

01:08PM  15   Q   You set the terms, right?

01:08PM  16   A   Yes.

01:08PM  17   Q   You took surveillance of Mr. Robert Lee in connection of

01:08PM  18   that, correct?

01:08PM  19   A   Yes.

01:08PM  20   Q   You took a photograph of him outside the restaurant,

01:08PM  21   correct?

01:08PM  22   A   Correct.

01:08PM  23   Q   You followed him into the restaurant, correct?

01:08PM  24   A   Correct.

01:08PM  25   Q   You acted like you were eating, but you ordered a meal so

| | | | |
|---|---|---|---|
| 01:08PM | 1 | | that you could take a better photograph of him, right? |
| 01:08PM | 2 | A | No, I actually ate, but -- |
| 01:08PM | 3 | Q | Oh, I understand. |
| 01:08PM | 4 | A | -- I did take a picture of him in the restaurant. |
| 01:08PM | 5 | Q | What's that? |
| 01:08PM | 6 | A | You're correct.  I did take a picture of him in the |
| 01:09PM | 7 | | restaurant. |
| 01:09PM | 8 | Q | You didn't ask him his permission, did you? |
| 01:09PM | 9 | A | No, I did not. |
| 01:09PM | 10 | Q | You did it because you were surveilling him, right? |
| 01:09PM | 11 | A | Yes. |
| 01:09PM | 12 | Q | And then you texted the photograph of Mr. Lee back to |
| 01:09PM | 13 | | Sunny Kim, right? |
| 01:09PM | 14 | A | Correct. |
| 01:09PM | 15 | Q | Now, you told this jury the other day something about a |
| 01:09PM | 16 | | Post-It note. |
| 01:09PM | 17 | | Do you recall that? |
| 01:09PM | 18 | A | Yes. |
| 01:09PM | 19 | Q | A name, right? |
| 01:09PM | 20 | A | Correct. |
| 01:09PM | 21 | Q | A telephone number, right? |
| 01:09PM | 22 | A | Yes. |
| 01:09PM | 23 | Q | And you said there was an amount? |
| 01:09PM | 24 | A | Yes. |
| 01:09PM | 25 | Q | And you told the jury that you gave it to Michael Miske? |

01:09PM  1   A    I told the jury that I put it on Mike's computer in his

01:09PM  2   office.

01:09PM  3   Q    Right.  And you said to them repeatedly you thought he was

01:09PM  4   just going to make a call, right?

01:10PM  5   A    Not necessarily make a call.

01:10PM  6   Q    What you said was he would make a call?

01:10PM  7   A    No, I said that he will talk to him.

01:10PM  8   Q    Oh, talk to him; make a call, talk to him?

01:10PM  9   A    No, he could talk in person.

01:10PM  10  Q    You could, but you could also pick up the telephone if you

01:10PM  11  got a number, right?

01:10PM  12  A    You could.

01:10PM  13  Q    And you could call him?

01:10PM  14  A    Correct.

01:10PM  15  Q    Okay. And this is before this surveillance, right?

01:10PM  16  A    Yes.

01:10PM  17  Q    So then after that, you do this surveillance on your own,

01:10PM  18  right, even though it's only going to be what you told the

01:10PM  19  jury, a call or a meet, right?

01:10PM  20  A    I took the picture so Mike would know what he looks like

01:10PM  21  when he visits the person.

01:10PM  22  Q    You took the picture, sir, because you sent it to Sunny

01:10PM  23  Kim, correct?

01:10PM  24  A    Yes, to verify.

01:10PM  25  Q    Now, you told the jury that on October 17, 2017, that you

01:11PM  1   and Mike went to the Honolulu Club gym to work out together.

01:11PM  2           Do you recall that?

01:11PM  3   A   I said that we headed to the gym.  We parked but we didn't

01:11PM  4   enter the actual gym.

01:11PM  5   Q   You said it was later in the day, right?

01:11PM  6   A   Correct.

01:11PM  7   Q   But the sun was still out, right?

01:11PM  8   A   From what I believe.

01:11PM  9   Q   You were in the car, right?

01:11PM  10  A   Yes.

01:11PM  11  Q   You said you were "talk story" on the way over?

01:11PM  12  A   No, I said that we were talking story at the office before

01:11PM  13  we headed over to the gym.  That's when we decided to go to the

01:12PM  14  gym.

01:12PM  15  Q   All right.  And then you arrived there.  You say that Mike

01:12PM  16  says we have to go back to the office.

01:12PM  17  A   Correct.

01:12PM  18  Q   All right.  Sir, you have grown up here your whole life,

01:12PM  19  right?

01:12PM  20  A   Yes.

01:12PM  21  Q   You know then that the sun goes down about 6:05 on

01:12PM  22  October 17th here in Honolulu?

01:12PM  23  A   I don't know the exact time, sir, when it goes down.

01:12PM  24  Q   And what you told the jury was that it was dark when you

01:12PM  25  got back to the office.

| | | | |
|---|---|---|---|
| 01:12PM | 1 | A | Yes. |

01:12PM  2  Q   Now, if we look -- first of all, you've never given your

01:13PM  3  phone to the prosecution, correct?

01:13PM  4  A   No.

01:13PM  5  Q   You've never offered up your phone to them, right?

01:13PM  6  A   No.

01:13PM  7  Q   You didn't give them your phone for what was happening on

01:13PM  8  the 17th of October, 2017, correct?

01:13PM  9  A   No.  But actually, I did offer up the phone when I got

01:13PM  10  arrested back in 2020.

01:13PM  11  Q   Did they take it?

01:13PM  12  A   They did not take it.  They said to leave it in the

01:13PM  13  vehicle.

01:13PM  14  Q   All right.  And so you offered it.

01:13PM  15      Is that the same phone you were using on October 17th?

01:13PM  16  A   Yes.

01:13PM  17  Q   Still have it?

01:13PM  18  A   Not in my possession, sir.

01:13PM  19  Q   Do you know where it is?

01:13PM  20  A   I believe my attorney has it.

01:13PM  21  Q   All right.  Now, at 5:21 and 49 seconds, Wayne Miller --

01:14PM  22  we looked at Government's Exhibit 5-37.

01:14PM  23      Do you remember that today?

01:14PM  24  A   Yes.

01:14PM  25  Q   If we could pull up Government's Exhibit 5-37 and go to

01:14PM   1   the back of the document, page six.  It's in reverse order when

01:14PM   2   you were going through it.

01:14PM   3          Do you recall that?

01:14PM   4   A   Yes.

01:14PM   5   Q   Okay.  So, to, like, do it in real time, we have to start

01:14PM   6   at page six and go forward.  So at 5:21:49 on October 17th,

01:14PM   7   Wayne Miller is texting you and says, "yo."

01:14PM   8   A   Yes.

01:14PM   9   Q   Next at 5:33:41 --

01:15PM   10          MR. KENNEDY:  And is this published, Your Honor?

01:15PM   11          THE COURT:  It is.

01:15PM   12          MR. KENNEDY:  Can you folks see it?  Can we pull up

01:15PM   13   5-37 so the jury --

01:15PM   14          THE COURT:  I meant it was admitted.  It was admitted

01:15PM   15   and you may publish.

01:15PM   16          MR. KENNEDY:  Oh, thank you, Your Honor.  I apologize.

01:15PM   17   BY MR. KENNEDY:

01:15PM   18   Q   So at 5:21:49, there is a text from Wayne Miller to you,

01:15PM   19   right?

01:15PM   20   A   Yes.

01:15PM   21   Q   Not to Michael Miske, right?

01:15PM   22   A   No.

01:15PM   23   Q   And it says, "yo," right?

01:15PM   24   A   Yes.

01:15PM   25   Q   Then roughly 12 minutes later, at 5:33:41, Wayne Miller

01:15PM   1   says to you, "Call me ASAP," two exclamation points, correct?

01:15PM   2   A   Correct.

01:15PM   3   Q   Not to Michael Miske, correct?

01:15PM   4   A   No, sir.

01:15PM   5   Q   All right.  And (808) 584 -- excuse me, (808) 542-4516 is

01:16PM   6   the phone that is coming to you, right?

01:16PM   7   A   Yes.

01:16PM   8   Q   Wayne Miller's phone, correct?

01:16PM   9   A   No.  The 542-4516 is my number.

01:16PM   10  Q   Oh, is your phone.  Okay.

01:16PM   11       So that's how you recognize that you are receiving it?

01:16PM   12  A   Yes.

01:16PM   13  Q   Okay.  So let's move forward.  If we go to the page five

01:16PM   14  and blow up the portion down below.

01:16PM   15       Four minutes later, 5:37:07, it's "WTF brah"; WTF

01:16PM   16  being what the fuck, brah?

01:17PM   17  A   Yes.

01:17PM   18  Q   That's Wayne Miller to you, right?

01:17PM   19  A   Yes.

01:17PM   20  Q   And then you -- at 5:37:36 say, "text me back or

01:17PM   21  something."  It's Wayne Miller, yes.  "Text me back or

01:17PM   22  something," right?

01:17PM   23  A   Yes.

01:17PM   24  Q   So now, this is, in a span of less than a half hour, four

01:17PM   25  texts from Wayne Miller to you, right?

| | | | |
|---|---|---|---|
| 01:17PM | 1 | A | Yes. |
| 01:17PM | 2 | Q | Not to Mike Miske, correct? |
| 01:17PM | 3 | A | Correct. |
| 01:17PM | 4 | Q | And one of them said ASAP with two exclamation points, |
| 01:17PM | 5 | | correct? |
| 01:17PM | 6 | A | Correct. |
| 01:17PM | 7 | Q | At 6:08:48, you text back for the first time, right? |
| 01:17PM | 8 | A | Yes. |
| 01:17PM | 9 | Q | "I was at the house." |
| 01:18PM | 10 | A | Yes. |
| 01:18PM | 11 | Q | You're not with Mike Miske, are you? |
| 01:18PM | 12 | A | No.  This is a lie that I was telling Miller for the |
| 01:18PM | 13 | | excuse of not getting back to him. |
| 01:18PM | 14 | Q | Oh, this is a lie.  That's what you're saying now? |
| 01:18PM | 15 | A | Yes.  This text was sent to Miller so he would stop |
| 01:18PM | 16 | | texting me. |
| 01:18PM | 17 | Q | Oh, because I thought we were going through earlier when |
| 01:18PM | 18 | | the first time you found something out about this, and you said |
| 01:18PM | 19 | | you didn't know anything about the fact at this time. |
| 01:18PM | 20 | | Isn't that correct?  Isn't that what you just told the |
| 01:18PM | 21 | | jury? |
| 01:18PM | 22 | A | Could you repeat the question? |
| 01:18PM | 23 | Q | Yeah.  You told them you learned about the kidnapping in a |
| 01:18PM | 24 | | meeting with Mike and Wayne. |
| 01:18PM | 25 | | You just told them that today, correct? |

| 01:18PM | 1 | A | Yes. |

01:18PM  2  Q   Wayne is texting you.  He's not in a meeting with you,
01:19PM  3  sir.

01:19PM  4  A   I don't understand what -- yeah, he's not in a meeting
01:19PM  5  with us.

01:19PM  6  Q   No, because you're at the house and "I left my phone in
01:19PM  7  the truck.  Hold, on she just got home."  Correct?

01:19PM  8  A   Yes.

01:19PM  9  Q   All right.  Let's move forward.
01:19PM  10      At 6:42:36, you say, meet -- "give me 15 minutes,"
01:19PM  11  right?

01:19PM  12  A   Yes.

01:19PM  13  Q   Okay. At 6:44:54, you say, "K."  Right?
01:20PM  14      You received "K" from Wayne Miller?
01:20PM  15      MR. AKINA:  Objection; I think this is outgoing.

01:20PM  16  BY MR. KENNEDY:

01:20PM  17  Q   Okay.  So you say "K."  All right?

01:20PM  18  A   Yes.

01:20PM  19  Q   Then it's "call you right back," incoming to Mr. Miller.

01:20PM  20  A   Yes.

01:20PM  21  Q   This is now almost more than an hour later, right?

01:20PM  22  A   Yes.

01:20PM  23  Q   No discussion of any meeting at all with Michael Miske,
01:20PM  24  you, and Wayne Miller, correct?

01:20PM  25  A   Yes.

01:20PM   1   Q    You're just exchanging text messages with Wayne Miller,
01:21PM   2   right?

01:21PM   3   A    Yes.

01:21PM   4   Q    Moving forward.  8:11, "brah," right?

01:21PM   5   A    Yes.

01:21PM   6   Q    And then at 8:11, "no more all night"?

01:21PM   7   A    Yes.

01:21PM   8   Q    Moving forward.  "I know.  Coming now at 8:12."

01:21PM   9   A    Yes.

01:21PM   10  Q    "How far you"?  And then you go back, "I'm at Ala's, five
01:21PM   11  to ten minutes," right?

01:22PM   12  A    Yes.

01:22PM   13  Q    You're meeting with Wayne Miller, correct?

01:22PM   14  A    Yes.

01:22PM   15  Q    No reference to any meeting in this text between you,
01:22PM   16  Wayne Miller, and Michael Miske, correct?

01:22PM   17  A    No.

01:22PM   18  Q    No phone call to Mike Miske to turn around at the Honolulu
01:22PM   19  Club and come back, right?

01:22PM   20  A    He told me in person, sir.

01:22PM   21  Q    No.  What I'm saying, sir, is there is no phone call from
01:22PM   22  Wayne Miller that he needs to turn around and come back,
01:22PM   23  Mr. Miske.

01:22PM   24        That didn't happen, did it?

01:22PM   25  A    I don't understand what you are asking, sir.

01:22PM   1   Q   What I'm saying is you went to the Honolulu Club, right?

01:22PM   2   A   Yes.

01:22PM   3   Q   You said you had to turn around and go back to the office,

01:22PM   4   right?

01:22PM   5   A   Correct.

01:22PM   6   Q   This involved Wayne Miller, right?

01:22PM   7   A   No.  Wayne wasn't -- only myself and Mike went to the

01:22PM   8   Honolulu club.

01:22PM   9   Q   But you said you had to come back to the office, right?

01:22PM  10   A   Yeah.

01:22PM  11   Q   Right.  And then you said that Mike wrote something up on

01:23PM  12   the board, right?

01:23PM  13   A   That's correct.

01:23PM  14   Q   And then you said that Wayne Miller came there, right?

01:23PM  15   A   Yes.

01:23PM  16   Q   And all of that happened.  But what we see in the phone

01:23PM  17   calls is that between 5:21 all the way up to 8:14, all we have

01:23PM  18   is Wayne Miller trying to get in touch with you, right?

01:23PM  19   A   Correct.

01:23PM  20   Q   Because Wayne Miller is the guy you're splitting the 50/50

01:23PM  21   with; not Michael Miske, right?

01:23PM  22   A   That is not correct.

01:23PM  23   Q   There is not a single phone call from Wayne Miller to

01:23PM  24   Michael Miske on October 17, 2017.

01:23PM  25            MR. AKINA:  Objection; speculation.

| | | |
|---|---|---|
| 01:23PM | 1 | THE COURT:  Sustained. |
| 01:23PM | 2 | BY MR. KENNEDY: |
| 01:23PM | 3 | Q    No mention in this of any meeting that had occurred during |
| 01:23PM | 4 | this time period, correct? |
| 01:23PM | 5 | A    There is no mention of any meeting.  You are correct. |
| 01:24PM | 6 | Q    The first time that there is any connection that you and |
| 01:24PM | 7 | Wayne Miller are going to meet is at 8:14:15 when you are at |
| 01:24PM | 8 | Ala Moana mall, right? |
| 01:24PM | 9 | A    Yes. |
| 01:24PM | 10 | Q    All right.  Now, Wayne Miller has a black Crown Vic, |
| 01:24PM | 11 | right? |
| 01:24PM | 12 | THE COURT REPORTER:  Excuse me, black crown... |
| 01:24PM | 13 | BY MR. KENNEDY: |
| 01:24PM | 14 | Q    Vic.  It's like a police car, right? |
| 01:24PM | 15 | A    Yes. |
| 01:24PM | 16 | Q    You told the FBI on May 24th of 2023 that Miller said in |
| 01:25PM | 17 | this supposed meeting that Mr. Lee was in a van when Miller |
| 01:25PM | 18 | came to the shop. |
| 01:25PM | 19 | Do you recall that? |
| 01:25PM | 20 | A    No, I don't recall. |
| 01:25PM | 21 | Q    You don't recall telling the FBI that Miller said, he's in |
| 01:25PM | 22 | a -- that Jonah Ortiz has him in a van. |
| 01:25PM | 23 | You don't recall saying that? |
| 01:25PM | 24 | A    I don't recall.  From what I recall, I said that Miller |
| 01:25PM | 25 | came to the shop in a light colored sedan. |

01:25PM   1   Q    Sir, let's take a look at what's been marked as 9010-042.

01:26PM   2   See if this refreshes your recollection about what you told the

01:26PM   3   FBI.  If we go to the 0004 page in there, and this is just for

01:26PM   4   you, Mr. Kimoto, if you go down to the paragraph one, two,

01:26PM   5   three, four and read that entire fourth paragraph to yourself.

01:27PM   6        Let me know when you are finished reading that

01:27PM   7   paragraph, sir.

01:27PM   8        THE COURT:  Mr. Kennedy, as Mr. Kimoto is finishing

01:27PM   9   reading up the section you asked him to read, it's getting

01:27PM  10   close to 1:30, so please give some thought to asking your final

01:27PM  11   questions for the day.

01:27PM  12        MR. KENNEDY:  I will, Your Honor, as soon as he lets

01:28PM  13   me know that he has read that paragraph.

01:28PM  14        THE COURT:  Thank you.

01:28PM  15        THE WITNESS:  I'm finished.

01:28PM  16   BY MR. KENNEDY:

01:28PM  17   Q    All right.  Can we take a down please?  On May 24, two FBI

01:28PM  18   agents were in the room listening to what you said, correct?

01:28PM  19   A    Correct.

01:28PM  20   Q    You told them that Miller said Lee was in a van with Jonah

01:28PM  21   Ortiz.

01:28PM  22   A    I did not say that.

01:28PM  23   Q    And then you told them that Miller wanted to know how he

01:28PM  24   was going to get paid for purchasing the van.

01:28PM  25   A    I did not say that.  I said that Wayne was asking for

| | | |
|---|---|---|
| 01:28PM | 1 | reimbursement for the van. |
| 01:28PM | 2 | Q    Asking for a van that you told them Jonah Ortiz had Robert |
| 01:29PM | 3 | Lee in it? |
| 01:29PM | 4 | A    That's not what I said, sir. |
| 01:29PM | 5 | Q    Asking for money for disposing of the van by burning it, |
| 01:29PM | 6 | is what you told the FBI on May of 2023? |
| 01:29PM | 7 | A    That is not what I said.  I didn't know how they would |
| 01:29PM | 8 | dispose of the van. |
| 01:29PM | 9 | Q    You didn't know because it's a lie, and there was no van, |
| 01:29PM | 10 | and Mr. Lee was never in a van; you just made it up, didn't |
| 01:29PM | 11 | you? |
| 01:29PM | 12 | A    No, sir. |
| 01:29PM | 13 | Q    And you told the FBI that in May of 2023. |
| 01:29PM | 14 | A    I did not know what Mr. Lee was held in. |
| 01:29PM | 15 | Q    I have nothing further for today. |
| 01:29PM | 16 | THE COURT:  All right, so we are right at 1:30.  As we |
| 01:30PM | 17 | go to break for the trial day I'll remind our jurors to refrain |
| 01:30PM | 18 | from discussing the substance of this case with anyone, |
| 01:30PM | 19 | including each other.  Also, do not access any media or other |
| 01:30PM | 20 | accounts of this case that maybe out there; and finally, please |
| 01:30PM | 21 | do not conduct any of your own independent investigations into |
| 01:30PM | 22 | the facts, circumstances or persons involved.  So we will see |
| 01:30PM | 23 | you at 8:30 tomorrow and we will resume at that time with |
| 01:30PM | 24 | Mr. Kennedy's cross-examination of Mr. Kimoto. |
| | 25 | --oo0oo-- |

```
 1                  COURT REPORTER'S CERTIFICATE

 2          I , Gloria T. Bediamol, Official Court Reporter,

 3   United States District Court, District of Hawaii, do hereby

 4   certify that pursuant to 28 U.S.C. §753 the foregoing is a

 5   complete, true, and correct transcript from the

 6   stenographically reported proceedings held in the

 7   above-entitled matter and that the transcript page format is in

 8   conformance with the regulations of the Judicial Conference of

 9   the United States.

10

11          DATED at Honolulu, Hawaii, May 28, 2024.

12

13

14                             /s/ Gloria T. Bediamol

15                             GLORIA T. BEDIAMOL.

16                             RMR, CRR, FCRR

17

18

19

20

21

22

23

24

25
```