1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3
       UNITED STATES OF AMERICA,     )     CRIMINAL NO. 19-00099-DKW
4                                    )
                  Plaintiff,         )     Honolulu, Hawaii
5                                    )
             vs.                     )     February 13, 2024
6                                    )
       MICHAEL J. MISKE, JR.,        )     CONTINUED TESTIMONY OF SARA
7                                    )     TUFELE
                  Defendant.         )
8      _____)     TESTIMONY OF JONAH ORTIZ

9
                  PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 19)
10                BEFORE THE HONORABLE DERRICK K. WATSON,
               CHIEF UNITED STATES DISTRICT COURT JUDGE
11
      APPEARANCES:
12
      For the Plaintiff:          MARK INCIONG, ESQ.
13                                MICHAEL DAVID NAMMAR, ESQ
                                  WILLIAM KE AUPUNI AKINA, ESQ.
14                                AISLINN AFFINITO, ESQ.
                                  Office of the United States Attorney
15                                PJKK Federal Building
                                  300 Ala Moana Boulevard, Suite 6100
16                                Honolulu, Hawaii  96850

17    For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                  841 Bishop St., Ste 2201
18                                Honolulu, HI 96813

19                                MICHAEL JEROME KENNEDY, ESQ.
                                  Law Offices of Michael Jerome
20                                Kennedy, PLLC
                                  333 Flint Street
21                                Reno, NV 89501

22    Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                  United States District Court
23                                300 Ala Moana Boulevard
                                  Honolulu, Hawaii 96850
24
        Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).

1                           I N D E X

2    GOVERNMENT WITNESSES:                                PAGE NO.

3    SARA TUFELE (CONTINUED TESTIMONY)

4         RESUMED CROSS-EXAMINATION BY MS. PANAGAKOS        3
          REDIRECT EXAMINATION BY MR. NAMMAR               39
5         RECROSS-EXAMINATION BY MS. PANAGAKOS             46

6    JONAH ORTIZ

7         DIRECT EXAMINATION BY MR. AKINA                  48
          CROSS-EXAMINATION BY MR. KENNEDY                 84
8

9    EXHIBITS:                                            PAGE NO.

10   Exhibit 9051-39 was received in evidence             12
     Exhibit 9051-31 was received in evidence             17
11   Exhibit 9051-32A was received in evidence            21
     Exhibit 9011-95 was received in evidence             31
12   Exhibit 9012-014-001 was received in evidence        92
     Exhibit 9012-014-0002 was received in evidence      112
13   Exhibit 9012-16-001 was received in evidence        113
     Exhibit 9012-017 was received in evidence           119
14   Exhibit 9012-015-002 was received in evidence       122
     Exhibit 9012-018 was received in evidence           124
15   Exhibit 9012-012 was received in evidence           143
     Exhibit 9012-012B was received in evidence          144
16   Exhibit 9012-012C was received in evidence          146
     Exhibit 9012-012E was received in evidence          147
17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | February 13, 2024                                        8:31 a.m. |
| 08:31AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:31AM | 3 | States of America versus Michael J. Miske, Jr. |
| 08:31AM | 4 | This case has been called for jury trial, day 19. |
| 08:32AM | 5 | Counsel, please make your appearances for the record. |
| 08:32AM | 6 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:32AM | 7 | Michael Nammar, and KeAupuni Akina for the United States.  Kari |
| 08:32AM | 8 | Sherman and FBI Special Agent Thomas Palmer are present. |
| 08:32AM | 9 | THE COURT:  Good morning. |
| 08:32AM | 10 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:32AM | 11 | Kennedy here with Lynn Panagakos, Michael Miske, Ashley King, |
| 08:32AM | 12 | and Josh Barry.  Good morning. |
| 08:32AM | 13 | THE COURT:  Good morning to all of you as well.  You |
| 08:32AM | 14 | may be seated. |
| 08:32AM | 15 | Good morning to our 17-person jury.  February 13th. |
| 08:32AM | 16 | Yesterday when we adjourned, Ms. Tufele was on the stand. |
| 08:32AM | 17 | Ms. Panagakos was in the midst of her cross-examination.  So we |
| 08:32AM | 18 | will resume where we left off. |
| 08:32AM | 19 | Ms. Panagakos, when you are ready. |
| 08:32AM | 20 | MS. PANAGAKOS:  Thank you, Your Honor. |
| 08:32AM | 21 | SARA TUFELE, |
| 08:32AM | 22 | (Having been previously sworn, resumed the stand.) |
| 08:32AM | 23 | RESUMED CROSS-EXAMINATION |
| 08:32AM | 24 | BY MS. PANAGAKOS: |
| 08:32AM | 25 | Q    Good morning, Ms. Tufele. |

08:32AM   1   A     Good morning.

08:32AM   2            MS. PANAGAKOS:  I'd like to start by showing you

08:32AM   3   Exhibit 1-860, which was admitted during your direct testimony

08:33AM   4   yesterday, and I'd like to publish that to the jury.

08:33AM   5            THE COURT:  Go ahead.

08:33AM   6            MR. KENNEDY:  It appears, Your Honor, that our network

08:33AM   7   is down.

08:33AM   8            THE COURT:  There you go.

08:33AM   9   BY MS. PANAGAKOS:

08:33AM   10  Q     And Ms. Tufele, I believe you testified that this is a

08:33AM   11  photograph of a GPS that you found in your trunk after

08:33AM   12  Mr. Miller was arrested?

08:33AM   13  A     Yes.

08:33AM   14  Q     And you gave that to the FBI?

08:33AM   15  A     Yes.

08:33AM   16            MS. PANAGAKOS:  I'd now like to show you Exhibit 1-2.

08:33AM   17  I'd like to display those side by side.  1-2 has also been

08:33AM   18  admitted and I would like to publish these side by side.

08:33AM   19            THE COURT:  All right.  Go ahead.

08:33AM   20  BY MS. PANAGAKOS:

08:33AM   21  Q     Ms. Tufele, can you look at those two photographs, 1-2 and

08:34AM   22  1-860?

08:34AM   23            Can we -- are you able to enlarge them both at the

08:34AM   24  same time?

08:34AM   25            Can you see that these are photographs of the same

08:34AM   1   GPS?

08:34AM   2   A    Yes.

08:34AM   3   Q    The same model number?

08:34AM   4   A    Yes.

08:34AM   5   Q    The same IMEI number, 860599001851450?

08:34AM   6   A    Yes.

08:34AM   7   Q    The same FCC ID number?

08:34AM   8   A    Yes.

08:34AM   9   Q    So if Mr. Miller testified about Exhibit 1-2 during his

08:34AM   10  testimony, he would have been testifying about the GPS that had

08:34AM   11  been in your trunk?

08:34AM   12           MR. NAMMAR:  Objection; calls for speculation.

08:34AM   13           THE COURT:  Sustained.

08:34AM   14  BY MS. PANAGAKOS:

08:35AM   15  Q    Since Exhibit 1-2 is a photograph of the same GPS as 1-60,

08:35AM   16  can you identify Exhibit 1-2 as a photograph of the GPS that

08:35AM   17  you found in the trunk of your car?

08:35AM   18  A    Yes.

08:35AM   19  Q    I'd now like to display -- take down 1-60 and display 1-10

08:35AM   20  side by side.

08:35AM   21           MS. PANAGAKOS:  1-10 has also been admitted, and I

08:35AM   22  would like to publish.

08:35AM   23           THE COURT:  Go ahead.

08:35AM   24  BY MS. PANAGAKOS:

08:35AM   25  Q    And you see, Ms. Tufele, this is an email from GPS track

| | | |
|---|---|---|
| 08:35AM | 1 | support identifying the user as sleanio@yahoo.com? |
| 08:35AM | 2 | A    Yes. |
| 08:35AM | 3 | Q    Are you aware that SLeanio is Sheena, Mr. Miller's cousin? |
| 08:35AM | 4 | A    No. |
| 08:35AM | 5 | Q    I would like to move on to Exhibit 9051-036, which was |
| 08:36AM | 6 | admitted yesterday and published.  And can we enlarge the |
| 08:36AM | 7 | body -- thank you, Ms. King. |
| 08:36AM | 8 | So this is a text between you, Mai, and Mr. Miller, |
| 08:36AM | 9 | correct? |
| 08:36AM | 10 | A    Yes. |
| 08:36AM | 11 | Q    And these texts show that on October 6, 2017, you're |
| 08:36AM | 12 | telling Mr. Miller that Sheena needs to get a hold of him? |
| 08:36AM | 13 | A    Yes. |
| 08:36AM | 14 | Q    And Sheena, that's Mr. Miller's cousin? |
| 08:36AM | 15 | A    Yes. |
| 08:36AM | 16 | Q    And she worked at Kama'aina Termite? |
| 08:36AM | 17 | A    Yes. |
| 08:36AM | 18 | Q    And you do know -- I mean, you were friends with Mr. Miske |
| 08:36AM | 19 | and others, and you testified yesterday about different people |
| 08:36AM | 20 | that worked at Kama'aina Termite. |
| 08:36AM | 21 | A    Yes. |
| 08:36AM | 22 | Q    So you're familiar with the number of people who worked |
| 08:36AM | 23 | there? |
| 08:36AM | 24 | A    Correct. |
| 08:36AM | 25 | Q    And you are aware that Mr. Miller worked there in 2013 and |

08:36AM     1    2014?

08:36AM     2    A     Yes.

08:36AM     3              MR. KENNEDY:  Counsel, did you want to publish this?

08:36AM     4              MS. PANAGAKOS:  Yes.  May I publish?

08:37AM     5              THE COURT:  You may.  It's been admitted.

08:37AM     6    BY MS. PANAGAKOS:

08:37AM     7    Q     Thank you.

08:37AM     8              So you're telling him, Mr. Miller, on October 6th,

08:37AM     9    that Sheena needs to get a hold of him.  And you see he sent --

08:37AM    10    he responds first to your first text by saying, K?

08:37AM    11    A     Yes.

08:37AM    12    Q     And then you text him again three hours later and you tell

08:37AM    13    him again, Sheena needs to get a hold of you?

08:37AM    14    A     Yes.

08:37AM    15    Q     And you are telling him again because he had not responded

08:37AM    16    by getting a hold of Sheena in response to your first text,

08:37AM    17    right?

08:37AM    18    A     Yes.

08:37AM    19    Q     Okay.  And then a couple of weeks go by and it's now

08:37AM    20    October 29th, and you say, "Why haven't you paid Sheena back

08:37AM    21    yet $250?"

08:37AM    22    A     Yes.

08:37AM    23    Q     So he owed Sheena money during the month of October 2017?

08:37AM    24    A     I can't remember this exact, but it appears that he did.

08:37AM    25    Q     And you acknowledge -- you are telling him that -- you're

08:37AM   1   asking him why he hasn't paid her back?

08:37AM   2   A   Yes.

08:38AM   3   Q   And then again on October 30th, you say, "Did you pay

08:38AM   4   Sheens yet?"

08:38AM   5   A   Yes.

08:38AM   6   Q   And then he tells you he is going to stop by the shop and

08:38AM   7   give it to her on Wednesday.  He says that on October 30th.

08:38AM   8           Do you see that?

08:38AM   9   A   Yes.

08:38AM   10   Q   And then on November 1st, you respond -- you remind him

08:38AM   11   again, "Make sure you pay Sheena today.  She needs the money."

08:38AM   12   A   Yes.

08:38AM   13   Q   Do you know if this was for a GPS?

08:38AM   14   A   I don't recall what it was for.

08:38AM   15   Q   But she was reaching out to you to get a hold of him to

08:38AM   16   get paid?

08:38AM   17   A   Yes, correct.

08:38AM   18   Q   Because that's what was going on with Mr. Miller at that

08:38AM   19   time, right?  He was ducking people?

08:38AM   20   A   Yes.  A lot of people reached out to me to communicate to

08:38AM   21   Wayne for whatever reason.

08:38AM   22   Q   Because he was on drugs and not easy to reach and talk to

08:38AM   23   about money.

08:38AM   24           You testified that -- yesterday that Mr. Miller and

08:38AM   25   Mr. Miske were close friends?

08:38AM   1   A      Yes.

08:38AM   2   Q      And you are aware that Mr. Miller's drug addiction put a
08:39AM   3   strain on that relationship?

08:39AM   4   A      Yes.

08:39AM   5   Q      And he started ducking Mike about matters of money as
08:39AM   6   well?

08:39AM   7   A      Yes.

08:39AM   8   Q      And you are aware by the end of September, Mr. Miske was
08:39AM   9   basically done with Mr. Miller, right?

08:39AM   10   A      I can't make certain of that, but their relationship was
08:39AM   11   strained.

08:39AM   12   Q      And on September 30, 2017, you actually texted Mr. Miller
08:39AM   13   about being past due on some loans, and among other things, you
08:39AM   14   told him M was done with him, right?

08:39AM   15   A      Yes.

08:39AM   16   Q      And I'd like to show the witness Exhibit 9051-39, which is
08:39AM   17   on our eighth supplemental list.

08:39AM   18          THE COURT:  All right.

08:39AM   19   BY MS. PANAGAKOS:

08:39AM   20   Q      And can we enlarge for Ms. Tufele the bottom portion of
08:40AM   21   this page one.

08:40AM   22          You see there, Ms. Tufele, that you're telling
08:40AM   23   Mr. Miller that he is past due on his loans?

08:40AM   24   A      Yes.

08:40AM   25   Q      And --

| | | |
|---|---|---|
| 08:40AM | 1 | MR. NAMMAR:  Objection to her reading from the |
| 08:40AM | 2 | exhibit. |
| 08:40AM | 3 | THE COURT:  I'm not sure what this exhibit is.  Get |
| 08:40AM | 4 | some foundation please. |
| 08:40AM | 5 | BY MS. PANAGAKOS: |
| 08:40AM | 6 | Q    It's by stipulation.  It comes from the -- one of the |
| 08:40AM | 7 | phones seized from Mr. Miller.  And Ms. Tufele, if you could |
| 08:40AM | 8 | see the whole -- can we scroll through the entire document for |
| 08:40AM | 9 | Ms. Tufele, please. |
| 08:40AM | 10 | Do you see at the top from -- and you recognize your |
| 08:40AM | 11 | phone number and your name, Mai? |
| 08:40AM | 12 | A    Yes. |
| 08:40AM | 13 | Q    That was how he identified you in his phone, right? |
| 08:40AM | 14 | A    Yes. |
| 08:40AM | 15 | Q    And so you see that this is a text from you on |
| 08:40AM | 16 | September 30, 2017? |
| 08:40AM | 17 | A    Yes. |
| 08:40AM | 18 | Q    And then can we go to next bubble. |
| 08:40AM | 19 | Do you see also that that's another text from you on |
| 08:40AM | 20 | September 30, 2017? |
| 08:40AM | 21 | A    Yes. |
| 08:40AM | 22 | Q    And you're telling him he is past due on his loans, right? |
| 08:41AM | 23 | MR. NAMMAR:  Objection to her reading from the |
| 08:41AM | 24 | exhibit. |
| 08:41AM | 25 | THE COURT:  Sustained. |

08:41AM   1   BY MS. PANAGAKOS:

08:41AM   2   Q     And can you identify the next page page two of this

08:41AM   3   document.

08:41AM   4         Are these more messages from you to Mr. Miller?

08:41AM   5   A     Yes.

08:41AM   6   Q     And then can we look page three of this document.

08:41AM   7         And is this a copy of a loan that Mr. Miller was past

08:41AM   8   due on?

08:41AM   9   A     Yes.

08:41AM   10  Q     And you had received a copy of this because the mail was

08:41AM   11  coming to the place where you both had lived together?

08:41AM   12  A     Yes.

08:41AM   13  Q     And then can we look at page four of this document.

08:41AM   14        And do you recognize this as a copy of a bank

08:41AM   15  statement where he had a negative balance?

08:41AM   16  A     Yes.

08:41AM   17  Q     And so this is an example of something you testified about

08:42AM   18  yesterday, about you were experiencing his addiction, his

08:42AM   19  symptoms of addiction through being past due on his loans?

08:42AM   20  A     Yes.

08:42AM   21  Q     Delinquent.  And does this refresh your recollection as to

08:42AM   22  whether on September 30th you told Mr. Miller M is done with

08:42AM   23  you?

08:42AM   24  A     I don't recall the exact time or conversation, but it

08:42AM   25  sounds like something that could have been said.

08:42AM  1    Q    Can we turn to page one and show the witness the first

08:42AM  2    bubble.  And can we highlight the third line from the bottom.

08:42AM  3    A    Okay.  I see what you're --

08:42AM  4    Q    You see that?  And M -- you see, you wrote to Mr. Miller

08:42AM  5    on September --

08:42AM  6              MR. NAMMAR:  Objection to her reading from the

08:42AM  7    exhibit.

08:42AM  8              THE COURT:  Are you going to offer this?

08:42AM  9              MS. PANAGAKOS:  I would move to admit this into

08:42AM  10   evidence, Your Honor.

08:42AM  11             THE COURT:  Mr. Nammar, any objection?

08:42AM  12             MR. NAMMAR:  It's hearsay and it's improper

08:43AM  13   impeachment on a collateral matter.  She's admitted as much to

08:43AM  14   the substance of this case.

08:43AM  15             MS. PANAGAKOS:  The loan statements are business

08:43AM  16   records.

08:43AM  17             THE COURT:  The objection is overruled.  9051-39 is

08:43AM  18   admitted and you may publish.

08:43AM  19             (Exhibit 9051-39 was received in evidence.)

08:43AM  20   BY MS. PANAGAKOS:

08:43AM  21   Q    Thank you.  I would like to publish to the jury.

08:43AM  22             So you do remember -- this refreshes your

08:43AM  23   recollection, right, Ms. Tufele, that on September 30th, you

08:43AM  24   informed Mr. Miller that M was done with him?

08:43AM  25   A    Yes.

08:43AM   1   Q   And M is Michael Miske?

08:43AM   2   A   Yes.

08:43AM   3   Q   And you remained friends with him, right?

08:43AM   4   A   Yes.

08:43AM   5   Q   And that's why he reached out to you to contact -- to get

08:43AM   6   messages to Mr. Miller?

08:43AM   7   A   Yes.

08:43AM   8   Q   Particularly about things -- well, in this instance,

08:43AM   9   you're just telling Wayne he is delinquent on his bills.

08:43AM   10       But you do recall that the bill on page three of this

08:43AM   11   document, that's -- that $927.63 that's past due, that's for a

08:44AM   12   payment on a Dually truck, right?

08:44AM   13   A   Yes.

08:44AM   14   Q   And that was a truck that Mr. Miller had first bought from

08:44AM   15   Mr. Miske?

08:44AM   16   A   My understanding is Wayne purchased it and then was unable

08:44AM   17   to pay for it, and then turned it over to Mike.

08:44AM   18   Q   And then Mike was making the loan payments?

08:44AM   19   A   Yes.

08:44AM   20   Q   Mike got the truck and he was making the loan payments?

08:44AM   21   A   Yes.

08:44AM   22   Q   And Mr. Miller at some point stopped using the money that

08:44AM   23   Mike was providing to make the loan payments for that purpose,

08:44AM   24   right?

08:44AM   25   A   I don't know what their transactions were.

08:44AM   1   Q   Okay.  Can we go back to page one of this exhibit and

08:44AM   2   enlarge the first bubble.

08:44AM   3           And so on September 30, 2017, this is how you felt?

08:45AM   4   A   Yes.

08:45AM   5   Q   You were having a hard time sleeping, thinking about what

08:45AM   6   your lives had come to.

08:45AM   7           Your lives had been good before Mr. Miller's oxycodone

08:45AM   8   addiction, right?  You had planned to marry him actually,

08:45AM   9   right?

08:45AM   10  A   Yes.

08:45AM   11  Q   And you had good relationships -- very good friendship

08:45AM   12  with Mr. Miske and Heather, right, and Delia and Nila and the

08:45AM   13  rest of their family.  You did before this time have a good

08:45AM   14  relationship --

08:45AM   15  A   I answered yes to all of these questions.  Why are you

08:45AM   16  continuing on the same message?

08:45AM   17  Q   So at this point you had no money?

08:45AM   18  A   Yes, he was on drugs.  Yes, I told him Mike was done with

08:45AM   19  him.  Yes, Mike was paying the loan.  Can we move on, please?

08:45AM   20  This is not a time in my life that I want to remember.

08:45AM   21  Q   So Mr. Miller had a gambling problem at the time?

08:46AM   22  A   Everything in the statement I wrote and I meant at the

08:46AM   23  time, yes.

08:46AM   24  Q   And so this was on September 30, 2017, and you had not

08:46AM   25  even -- didn't even known where he had been for a couple of

08:46AM   1   weeks, right?

08:46AM   2   A     Yes.

08:46AM   3   Q     And you weren't even able to have a simple conversation

08:46AM   4   with him at this point in time?

08:46AM   5   A     Yes.

08:46AM   6   Q     Okay.  We can take that exhibit down, Ms. King.

08:46AM   7         Also during this time, he wasn't only not paying his

08:46AM   8   bills -- Wayne, that is, he was also draining your bank

08:46AM   9   account, right?

08:46AM   10  A     Not necessarily.  I had my own money as I worked myself.

08:47AM   11  And he just couldn't pay for the things he said he was going to

08:47AM   12  pay for.

08:47AM   13  Q     So you kept your money separate?

08:47AM   14  A     Yes.

08:47AM   15  Q     But he just was supposed to be making contributions to

08:47AM   16  bills?

08:47AM   17  A     Upbringing, yes.

08:47AM   18  Q     Mortgage and contribute to the home?

08:47AM   19  A     Yes.

08:47AM   20  Q     And he failed?

08:47AM   21  A     Yes.

08:47AM   22  Q     I'd like to show Ms. Tufele Exhibit 9051-31.  Can you read

08:47AM   23  the first page and then let us know when you are done and we

08:47AM   24  can move on to the second page.

08:48AM   25  A     Okay.

| | | |
|---|---|---|
| 08:48AM | 1 | Q    Okay.  So can we go back to the first page now. |
| 08:48AM | 2 | And you recognize this as a text between you and |
| 08:48AM | 3 | Mr. Miller? |
| 08:48AM | 4 | A    Yes. |
| 08:48AM | 5 | Q    And the image in the first item on this report -- |
| 08:48AM | 6 | extraction report of text messages, you are forwarding him a |
| 08:48AM | 7 | screenshot of what appears on the second page of this exhibit, |
| 08:48AM | 8 | right? |
| 08:48AM | 9 | A    Yes. |
| 08:48AM | 10 | Q    And so the second page of this exhibit is a text you |
| 08:48AM | 11 | received from Mike Miske, right? |
| 08:48AM | 12 | A    Yes. |
| 08:48AM | 13 | Q    And is this about the same thing, the car payments? |
| 08:49AM | 14 | A    Yes. |
| 08:49AM | 15 | Q    And he is asking you to get access? |
| 08:49AM | 16 | MR. NAMMAR:  Objection to her saying what the |
| 08:49AM | 17 | defendant says.  As enumerated in our trial brief on page ten, |
| 08:49AM | 18 | this is hearsay. |
| 08:49AM | 19 | MS. PANAGAKOS:  Your Honor, I would move to admit |
| 08:49AM | 20 | Exhibit 9051-31. |
| 08:49AM | 21 | MR. NAMMAR:  Objection, Your Honor.  These are hearsay |
| 08:49AM | 22 | statements of the defendant, and as enumerated on page ten of |
| 08:49AM | 23 | our trial brief, they should not be admitted pursuant to *United* |
| 08:49AM | 24 | *States v. Fernandez*.  They are not state of mind.  There is no |
| 08:49AM | 25 | reason under the hearsay rules to admit them. |

08:49AM   1            THE COURT:  The objection is overruled.  9051-31 is

08:49AM   2   admitted.

08:49AM   3            (Exhibit 9051-31 was received in evidence.)

08:49AM   4            MS. PANAGAKOS:  Thank you.  And may I publish to the

08:49AM   5   jury?

08:49AM   6            THE COURT:  You may.

08:49AM   7   BY MS. PANAGAKOS:

08:49AM   8   Q    Thank you, Your Honor.  So do you see on page two, which

08:49AM   9   is on the screen at the bottom in white, Mr. Miske is asking if

08:49AM   10  you could get from Wayne access to his truck account so that

08:50AM   11  Delia could set up auto pay to make these payments.  And you're

08:50AM   12  telling Mike that you don't have access to his Navy Fed stuff

08:50AM   13  anymore, but you gave him an account number where the payment

08:50AM   14  comes out of?

08:50AM   15  A    Yes.

08:50AM   16  Q    And then can we go back to page one.

08:50AM   17           And so in the first item you're texting Mr. Miske's

08:50AM   18  text to you; you are forwarding that to Wayne, right?

08:50AM   19  A    Yes.

08:50AM   20  Q    And then in the second text, Wayne is giving you a

08:50AM   21  response, telling you that he's tried to give the information

08:50AM   22  to Delia?

08:50AM   23  A    Yes.

08:50AM   24  Q    And you don't believe him, right?

08:50AM   25  A    Yes.

08:50AM   1   Q     And you are saying "You can't even access this shit
08:50AM   2   anymore," right?
08:51AM   3   A     Yes.
08:51AM   4   Q     And then you're telling him, "You're probably hiding so
08:51AM   5   you can take the money and buy pills."
08:51AM   6   A     Yes.
08:51AM   7   Q     And so that's what you thought at this time, was that you
08:51AM   8   suspected Wayne Miller of hiding money from Mike in order to
08:51AM   9   use the money that Mike was using for the car payments to get
08:51AM   10  pills?
08:51AM   11  A     Yes.
08:51AM   12  Q     And this is October 1, 2017?
08:51AM   13  A     November 1.
08:51AM   14  Q     I'm sorry.  Correct, thank you.  So the earlier one where
08:51AM   15  you told Mr. Miller that Mike was done with Wayne was
08:51AM   16  September 30th.  And now a month later, you're telling him you
08:51AM   17  suspect -- you are telling Wayne you suspect him of hiding from
08:51AM   18  Mike because he is taking Mike's money?
08:51AM   19  A     Yes.
08:51AM   20  Q     And eventually, you did learn that that in fact occurred,
08:51AM   21  right?
08:51AM   22  A     If you bring up additional paperwork, it will refresh my
08:51AM   23  memory.
08:52AM   24         MS. PANAGAKOS:  Your Honor, Exhibit 9051-032, pages
08:52AM   25  one and two -- oh, that is on the 8th supplemental list.  It's

08:52AM   1   not been admitted, but what I'd like to show Ms. Tufele is page

08:52AM   2   one, and then through item 18 on page two.  So we have a

08:52AM   3   redacted copy digitally.  I just haven't gotten it into your

08:52AM   4   binder yet, but that's what I'd like to --  what I would like

08:52AM   5   to present to Ms. Tufele.

08:52AM   6        THE COURT:  Sure.  You can show it to her.

08:52AM   7   BY MS. PANAGAKOS:

08:52AM   8   Q    Can we enlarge item number one.

08:52AM   9        And that's your phone number, right?

08:52AM  10   A    Yes.

08:52AM  11   Q    And this is another text from you to Wayne on a different

08:52AM  12   one of his phones?

08:52AM  13   A    Yes.

08:52AM  14   Q    And this is April 18th, 2018, right?

08:53AM  15   A    Yes.

08:53AM  16   Q    And so does this refresh your recollection about

08:53AM  17   eventually someone coming to repossess the Dually?

08:53AM  18   A    Yes.

08:53AM  19   Q    And then if we can go down to items -- on the bottom of

08:53AM  20   this page, items 14 and 15.

08:53AM  21        And you see on item 14, does that refresh your

08:53AM  22   recollection as to Mike Miske finding out about the Dually

08:53AM  23   being repossessed?

08:53AM  24   A    Yes.

08:53AM  25   Q    And then that image in item 15, if we could turn to page

08:53AM   1   four of this exhibit.

08:53AM   2          Is that what's in that image?  It's a screenshot of

08:53AM   3   texts between you and Mr. Miske, right?

08:53AM   4   A     Yes.

08:53AM   5   Q   And can we enlarge the bottom.  And this is a text showing

08:54AM   6   that the payments on the -- for the Dually had been delinquent,

08:54AM   7   right?

08:54AM   8   A     Yes.

08:54AM   9          MS. PANAGAKOS:  Your Honor, I would move to admit

08:54AM  10   9051-32 as redacted.  I could supply a redacted copy for the

08:54AM  11   court later under this number, or as an A, but I'm not going to

08:54AM  12   move to admit the entire 9051-32.

08:54AM  13          THE COURT:  So what are you offering?  1 through 18?

08:54AM  14          MS. PANAGAKOS:  Yes.  And then the last page, which is

08:54AM  15   the thumbnail from item 15 on page one, the second text from

08:54AM  16   the bottom.

08:54AM  17          THE COURT:  Any objection, counsel?

08:54AM  18          MR. NAMMAR:  Same objection.

08:54AM  19          THE COURT:  Same ruling.  My suggestion is that you

08:54AM  20   mark it as a separate or new exhibit.  That will be the cleaner

08:54AM  21   way to do it.  If you wish, maybe, if I could suggest 9051-32A

08:54AM  22   might be the best way to approach it.  Is that acceptable?

08:55AM  23          MS. PANAGAKOS:  Thank you, Your Honor.

08:55AM  24          THE COURT:  We will go ahead and with that

08:55AM  25   explanation, we will admit 9051-32A.  And please provide that

08:55AM   1    to my courtroom manager during the next break.

08:55AM   2              (Exhibit 9051-32A was received in evidence.)

08:55AM   3              MS. PANAGAKOS:  Thank you, Your Honor.  So can we

08:55AM   4    highlight and publish for the jury now page one, and can we

08:55AM   5    highlight the first three items.

08:55AM   6              THE COURT:  Yes.

08:55AM   7    BY MS. PANAGAKOS:

08:55AM   8    Q    So this is April 18, 2018, and you're telling Wayne that

08:55AM   9    someone came to possess the Dually -- repossess the Dually?

08:55AM   10   A    Yes.

08:55AM   11   Q    And you are saying this is getting out of control, right?

08:55AM   12   A    Yes.

08:55AM   13   Q    And you are telling him he blows his money on dumb shit?

08:56AM   14   A    I tell him that he should start giving me his paycheck so

08:56AM   15   I can pay his things off.

08:56AM   16   Q    And can we enlarge item six, please.  You are telling him

08:56AM   17   on April 18, 2018 that he can't make responsible decisions,

08:56AM   18   right?

08:56AM   19   A    Yes.

08:56AM   20   Q    And then can we go to item 14, please.  You can see there

08:56AM   21   that on the next day, you are telling him that "M also texted

08:56AM   22   me today.  He found out about the repo people."

08:56AM   23   A    Yes.

08:56AM   24   Q    And then you see the thumbnail in item 15, right?

08:56AM   25   A    Yes.

| 08:56AM | 1 | Q | Okay. Can we turn to page four and publish. |
| 08:56AM | 2 | | And that's a text between you and Mr. Miske that you |
| 08:57AM | 3 | | are forwarding to Mr. Miller in that thumbnail, right? |
| 08:57AM | 4 | A | Yes. |
| 08:57AM | 5 | Q | And this is Mr. Miske saying, "Brah, we have been paying |
| 08:57AM | 6 | | the truck each month and the repo guys went to your house last |
| 08:57AM | 7 | | night"? |
| 08:57AM | 8 | A | Yes. |
| 08:57AM | 9 | Q | And the bottom item, if we could enlarge that, that's the |
| 08:57AM | 10 | | statement showing that the loan is delinquent? |
| 08:57AM | 11 | A | Yes. |
| 08:57AM | 12 | Q | And this is happening at the time of Caleb's birthday? |
| 08:57AM | 13 | A | Yes. |
| 08:57AM | 14 | Q | And you're still friends with Mike, and that's why you are |
| 08:57AM | 15 | | sharing birthday wishes? |
| 08:57AM | 16 | A | Yes. |
| 08:57AM | 17 | Q | And then if we can go to page two as redacted, and |
| 08:57AM | 18 | | highlight item 17 and 18. You're telling him he is $4,000 |
| 08:58AM | 19 | | behind on the truck. |
| 08:58AM | 20 | | And the truck is the one that Mike is making the |
| 08:58AM | 21 | | payments on, right? |
| 08:58AM | 22 | A | Yes. |
| 08:58AM | 23 | Q | So $4,000 -- it was $923 a month was the payment, right? |
| 08:58AM | 24 | A | Yes. |
| 08:58AM | 25 | Q | On the page before, if we can go back to page one on the |

08:58AM    1    bottom, item 16, that's Wayne.

08:58AM    2              He is ducking you again, saying this is all crazy,

08:58AM    3    right?

08:58AM    4    A    Yes.

08:58AM    5    Q    And then could we go back to page two and highlight item

08:58AM    6    18.  And your answer is, "It's not crazy.  For four months, you

08:58AM    7    were swiping the money that he was putting into your account

08:58AM    8    for the truck."

08:58AM    9    A    Yes.

08:58AM    10    Q    So yesterday you testified that Wayne went to rehab?

08:58AM    11    A    Yes.

08:58AM    12    Q    How many times?

08:58AM    13    A    I don't remember exactly, but a few times.

08:58AM    14    Q    How many?

08:58AM    15    A    A few, like, more than two at least.

08:58AM    16    Q    And one was in Las Vegas?

08:59AM    17    A    Yes.

08:59AM    18    Q    And where was the other one?

08:59AM    19    A    Here in Honolulu.

08:59AM    20    Q    Where?

08:59AM    21    A    I think Sand Island.

08:59AM    22    Q    How long did he stay?

08:59AM    23    A    Like, maybe a week.

08:59AM    24    Q    So you realize that's a year program, right?

08:59AM    25    A    I don't know how long it is.

08:59AM   1   Q   So he went for a week and he just checked out; he didn't
08:59AM   2   succeed?
08:59AM   3   A   Correct.
08:59AM   4   Q   And clearly at this time in April of 2018, you don't
08:59AM   5   believe he is clean and sober?
08:59AM   6   A   Correct.
08:59AM   7   Q   And in the end of September 2017, when M was done with
08:59AM   8   him, you didn't believe he was clean and sober?
08:59AM   9   A   Correct.
08:59AM   10  Q   And in October and November, when he was ducking Sheena,
08:59AM   11  you didn't believe he was clean and sober?
08:59AM   12  A   Correct.
08:59AM   13  Q   And you testified yesterday that Wayne's drug addiction
09:00AM   14  affected his ability to pay his bills and made him tired, but
09:00AM   15  didn't affect much anything else?
09:00AM   16  A   Not that I can recall.
09:00AM   17  Q   It actually ruined your family, right?
09:00AM   18  A   Yes.
09:00AM   19  Q   So that's something else?
09:00AM   20  A   Yes.
09:00AM   21  Q   And it ruined his friendships?
09:00AM   22  A   Yes.
09:00AM   23  Q   He burned his bridge with Mike?
09:00AM   24  A   Yes.
09:00AM   25  Q   And that was in September and October of 2017?

09:00AM   1    A    Yes.

09:00AM   2    Q    He had actually told Mike he was going to go to rehab

09:00AM   3    after JD's birthday that year, right?

09:00AM   4    A    I don't know about that conversation.

09:00AM   5         MS. PANAGAKOS:  I'd like to show Ms. Tufele 91-92.

09:00AM   6         THE COURT:  91-92 I don't find --

09:00AM   7         MS. PANAGAKOS:  That is on the 6th supplemental

09:00AM   8    exhibit list.  And it has not been admitted; I'd just like to

09:00AM   9    show Ms. Tufele.  9011, did I say?  I'm sorry.

09:01AM   10        THE COURT:  Yeah, that's what I'm saying.  That's not

09:01AM   11   a numbering scheme I'm familiar with.

09:01AM   12        MS. PANAGAKOS:  Okay, I'm sorry, I meant 9011-092.

09:01AM   13   No?  I believe it's on the 6th supplemental exhibit list.

09:01AM   14        MR. KENNEDY:  It is, Counsel.

09:01AM   15        THE COURT:  Okay.  Go ahead.

09:01AM   16   BY MS. PANAGAKOS:

09:01AM   17   Q    Ms. Tufele, do you see that this is another excerpt of

09:01AM   18   text messages between you and Mr. Miller?

09:01AM   19   A    Yes.

09:01AM   20   Q    And this is in the time frame -- if you scroll, you can

09:02AM   21   see at the beginning of this report it begins on October 2,

09:02AM   22   2017, right?

09:02AM   23   A    Yes.

09:02AM   24   Q    And then if we go to page three.

09:02AM   25        At the end of this report, it goes to October 17th,

09:02AM    1    2017, right?

09:02AM    2    A    Yes.

09:02AM    3    Q    And so this is a text between you and Mr. Miller during

09:02AM    4    that two-week time period?

09:02AM    5    A    Yes.

09:02AM    6    Q    And I'd like to direct your attention to item number 13.

09:02AM    7         Does this refresh your recollection as to the state of

09:02AM    8    your relationship at this time?

09:02AM    9    A    Yes.

09:02AM   10    Q    By this time, he had ruined your family?

09:02AM   11    A    Yes.

09:02AM   12    Q    And if we could go -- can we see number 12.

09:03AM   13         And by this time, he had burned his bridges with his

09:03AM   14    friends?

09:03AM   15    A    Yes.

09:03AM   16    Q    And if we can go to page three now, item 49.

09:03AM   17         And does this refresh your recollection as to Wayne

09:03AM   18    having told Mike Miske that after JD's birthday, that Wayne was

09:03AM   19    going to go to rehab?

09:03AM   20    A    Yes.

09:03AM   21    Q    And he didn't go at this time, right?

09:03AM   22    A    I don't remember when he went.

09:03AM   23    Q    But he had not gone by now?

09:03AM   24    A    Yes.

09:03AM   25    Q    And no one believed him that he was going to go?

| | | | |
|---|---|---|---|
| 09:03AM | 1 | A | Yes. |
| 09:03AM | 2 | Q | And everyone thought his word was shit? |
| 09:03AM | 3 | A | Yes. |
| 09:03AM | 4 | Q | And you actually were calling him over and over again a |
| 09:03AM | 5 | | fraud on this very day, October 16, 2017? |
| 09:03AM | 6 | A | Yes. |
| 09:03AM | 7 | Q | And you talked throughout this text about him lying, |
| 09:04AM | 8 | | right, if we go back to page one item number three. |
| 09:04AM | 9 | | You told him he was lying, right? |
| 09:04AM | 10 | A | Yes. |
| 09:04AM | 11 | Q | And then item number four, "you keep lying," right.  And |
| 09:04AM | 12 | | then if we could go to page three, item 32.  At this point in |
| 09:04AM | 13 | | time you told him you couldn't fucking stand -- |
| 09:04AM | 14 | | MR. NAMMAR:  Objection to her reading from the |
| 09:04AM | 15 | | exhibit. |
| 09:04AM | 16 | | THE COURT:  Sustained. |
| 09:04AM | 17 | | MS. PANAGAKOS:  Your Honor, I would move to admit |
| 09:04AM | 18 | | 9011-92. |
| 09:04AM | 19 | | MR. NAMMAR:  401, 403 hearsay. |
| 09:04AM | 20 | | THE COURT:  Sustained. |
| 09:05AM | 21 | | MS. PANAGAKOS:  I'd like to show Ms. Tufele |
| 09:05AM | 22 | | Exhibit 8010-20, which has been admitted and is on the first |
| 09:05AM | 23 | | supplemental list.  And I'll ask to publish this to the jury. |
| 09:05AM | 24 | | THE COURT:  Go ahead.  It's been admitted. |
| 09:05AM | 25 | | BY MS. PANAGAKOS: |

| | | | |
|---|---|---|---|
| 09:05AM | 1 | Q | And Ms. Tufele, you recognize this as another series of |
| 09:05AM | 2 | | text messages between you and Mr. Miller? |
| 09:05AM | 3 | A | Yes. |
| 09:05AM | 4 | Q | And this is on October 17th, 18th, and October 31st, 2017, |
| 09:05AM | 5 | | right? |
| 09:05AM | 6 | A | Yes. |
| 09:05AM | 7 | Q | And if we can go to -- you see again in item six there is |
| 09:06AM | 8 | | an image of a thumbnail, right? |
| 09:06AM | 9 | A | Yes. |
| 09:06AM | 10 | Q | And if we turn to the next page of this exhibit, that's a |
| 09:06AM | 11 | | text between you and Mr. Miske -- |
| 09:06AM | 12 | A | Yes. |
| 09:06AM | 13 | Q | -- that you forwarded to Wayne? |
| 09:06AM | 14 | A | Yes. |
| 09:06AM | 15 | Q | And Mr. Miske again, now, October 31st, upset with Wayne, |
| 09:06AM | 16 | | right? |
| 09:06AM | 17 | A | Yes. |
| 09:06AM | 18 | Q | Threatening to go to his PO? |
| 09:06AM | 19 | A | Yes. |
| 09:06AM | 20 | Q | That's his probation officer? |
| 09:06AM | 21 | A | Yes. |
| 09:06AM | 22 | Q | Because he was on supervised release? |
| 09:06AM | 23 | A | Yes. |
| 09:06AM | 24 | Q | And there were a number of times you threatened to go to |
| 09:06AM | 25 | | his PO too, right? |

| | | |
|---|---|---|
| 09:06AM | 1 | A    Yes. |
| 09:06AM | 2 | Q    And then if we go back to page one of this exhibit, and |
| 09:06AM | 3 | items seven and eight, you say, "You're lying to me, I know it. |
| 09:06AM | 4 | You wanted me to tell him you came home yesterday when you came |
| 09:06AM | 5 | home Friday night."  That was Mr. Miller asking you to lie to |
| 09:07AM | 6 | Mr. Miske, right, about when he came home? |
| 09:07AM | 7 | A    Yes. |
| 09:07AM | 8 | Q    And then again in item three of this text, your view of |
| 09:07AM | 9 | Mr. Miller on October 17, 2017, was that he was a lying, |
| 09:07AM | 10 | selfish loser? |
| 09:07AM | 11 | A    Yes. |
| 09:07AM | 12 | Q    Who you didn't even know anymore? |
| 09:07AM | 13 | A    Yes. |
| 09:07AM | 14 | Q    And neither did Mr. Miske? |
| 09:07AM | 15 | A    Um-hm. |
| 09:07AM | 16 | Q    Okay.  We could take that down.  Yesterday, you testified |
| 09:07AM | 17 | that you thought that Wayne had gotten clean for the month |
| 09:07AM | 18 | before his arrest? |
| 09:07AM | 19 | A    Yes. |
| 09:07AM | 20 | MS. PANAGAKOS:  I'd like to show Ms. Tufele |
| 09:08AM | 21 | Exhibit 9011-95, which has not been admitted and is on the |
| 09:08AM | 22 | sixth supplemental list. |
| 09:08AM | 23 | THE COURT:  Go ahead. |
| 09:08AM | 24 | BY MS. PANAGAKOS: |
| 09:08AM | 25 | Q    Ms. Tufele, do you see that this is -- can we enlarge the |

| 09:08AM | 1 | first four items. |
|---|---|---|
| 09:08AM | 2 | Can you see that this is a -- you remember that |
| 09:08AM | 3 | Mr. Miller got arrested on July 1st, 2018, right? |
| 09:08AM | 4 | A    No. |
| 09:08AM | 5 | Q    I mean August 1st, 2018? |
| 09:08AM | 6 | A    Yes. |
| 09:08AM | 7 | Q    And so these texts are between you and Mr. Miller -- |
| 09:08AM | 8 | A    Yes. |
| 09:08AM | 9 | Q    -- July 6th, July 9th, 2018? |
| 09:08AM | 10 | A    Yes. |
| 09:08AM | 11 | Q    This is the month before his arrest? |
| 09:08AM | 12 | A    Yes. |
| 09:08AM | 13 | Q    And at that time -- does this refresh your recollection as |
| 09:08AM | 14 | to what -- your view of Mr. Miller in the month before his |
| 09:08AM | 15 | arrest? |
| 09:09AM | 16 | A    Yes. |
| 09:09AM | 17 | Q    You didn't think he was sober at that time; you thought he |
| 09:09AM | 18 | was up to no good again, right? |
| 09:09AM | 19 | A    Right.  I don't recall, but I think like a week or two |
| 09:09AM | 20 | maybe before he went away, he was a little bit better. |
| 09:09AM | 21 | Q    Could we go down to the bottom on this, starting with |
| 09:09AM | 22 | items 11 and highlight items 11 through item 19. |
| 09:09AM | 23 | And so this is now July 13th, 2018, two and a half |
| 09:09AM | 24 | weeks before his arrest, right? |
| 09:09AM | 25 | A    Okay, yes. |

09:09AM   1   Q    At this point in time you did not think he was --

09:09AM   2   A    Correct.

09:09AM   3   Q    -- you hoped he'd died?

09:09AM   4   A    Yes.

09:09AM   5   Q    And he threatened to take one of your dads with him and

09:09AM   6   your mom, too, if she was in the way?

09:09AM   7   A    Okay, yes.

09:09AM   8   Q    So you didn't think he was sober a month before he was

09:09AM   9   arrested?

09:09AM   10   A    Yes.

09:10AM   11        MS. PANAGAKOS:  Your Honor, I would move this exhibit

09:10AM   12   into evidence.  It's impeachment by contradiction; not

09:10AM   13   contradictory statements, but contradiction.  It shows the

09:10AM   14   state of the relationship is diametrically opposed to what this

09:10AM   15   witness testified to.

09:10AM   16        THE COURT:  Mr. Nammar?

09:10AM   17        MR. NAMMAR:  It's hearsay and she acknowledged that

09:10AM   18   it's not impeachment by contradiction.

09:10AM   19        THE COURT:  The objection is overruled.  9011-95 is

09:10AM   20   admitted.

09:10AM   21        (Exhibit 9011-95 was received in evidence.)

09:10AM   22        MS. PANAGAKOS:  So I'd like to publish it to the jury

09:10AM   23   now.

09:10AM   24        THE COURT:  Go ahead.

09:10AM   25   BY MS. PANAGAKOS:

| | | |
|---|---|---|
| 09:10AM | 1 | Q    And let's start up at the top, item two.  Well, let's |
| 09:11AM | 2 | start with one. |
| 09:11AM | 3 | On July 6th, you're asking Mr. Miller what he is doing |
| 09:11AM | 4 | that he can't talk? |
| 09:11AM | 5 | A    Yes. |
| 09:11AM | 6 | Q    And then in item two on July 9th, you tell Mr. Miller: |
| 09:11AM | 7 | "You are up to no good again.  Don't ever say you're doing it |
| 09:11AM | 8 | for your family.  That's all lies.  You're doing it for |
| 09:11AM | 9 | yourself"? |
| 09:11AM | 10 | A    Yes. |
| 09:11AM | 11 | Q    And there were times like this where he would do whatever |
| 09:11AM | 12 | it is that he would do that you disagreed with, and he would |
| 09:11AM | 13 | tell you that he was doing it for you? |
| 09:11AM | 14 | A    I don't understand what that -- what your statement is. |
| 09:11AM | 15 | Q    You told him, "Don't ever say you're doing it for your |
| 09:11AM | 16 | family"? |
| 09:11AM | 17 | A    Yeah, like going to rehab and things like that, because he |
| 09:11AM | 18 | needs to do things for himself. |
| 09:11AM | 19 | Q    And he is lying about it? |
| 09:11AM | 20 | A    Yes. |
| 09:11AM | 21 | Q    Okay.  And then if we can look at item four.  The bottom |
| 09:12AM | 22 | paragraph, all I needed.  "All I needed you to do was go to |
| 09:12AM | 23 | work and come home and spend time with us.  But that's not |
| 09:12AM | 24 | enough for you.  So you'll see that in the end, you wish you |
| 09:12AM | 25 | did just that." |

09:12AM   1            And those are the kinds of opportunities Mr. Miske

09:12AM   2   was trying to provide for him, right?  He offered him a job at

09:12AM   3   the Kama'aina Termite?

09:12AM   4   A    Yes.

09:12AM   5   Q    And he invested in the poke truck for you guys?

09:12AM   6   A    Yes.

09:12AM   7   Q    And he also helped him get a job at the movies?

09:12AM   8   A    Yes.

09:12AM   9   Q    That was a good job, right?

09:12AM   10  A    Yes.

09:12AM   11  Q    And he tried to help him -- get him a job as a

09:12AM   12  longshoreman, too?

09:12AM   13  A    Yes.

09:12AM   14  Q    If we could keep reading down on this text.  And then you

09:12AM   15  tell him -- you said yesterday you expressed anger, and I guess

09:13AM   16  that's one instance here on July 13th, item 11 where you say,

09:13AM   17  "I hope you die."

09:13AM   18  A    Yes.

09:13AM   19  Q    And then in item 13, Wayne responds, "I'm going to take

09:13AM   20  one of your dads with me.  Trust me.  Maybe both."

09:13AM   21            That's because you had a biological dad.  Is that

09:13AM   22  Lenny?

09:13AM   23  A    Yes.

09:13AM   24  Q    And then another dad?

09:13AM   25  A    Yes.

| | | | |
|---|---|---|---|
| 09:13AM | 1 | Q | And he threatened Lenny more than once, right? |
| 09:13AM | 2 | A | No. |
| 09:13AM | 3 | Q | And then in item 17 he says, "If your mom's in the way, |
| 09:13AM | 4 | | her too." |
| 09:13AM | 5 | A | Yes. |
| 09:13AM | 6 | Q | And then in item 19, "You don't learn your mouth is going |
| 09:13AM | 7 | | to get you into shit you cannot handle.  I promise you I'm |
| 09:13AM | 8 | | going to go on a spree and your parents will be on that list, |
| 09:13AM | 9 | | and I'm going to wipe them out all along the way." |
| 09:13AM | 10 | A | Yes. |
| 09:13AM | 11 | Q | Are you aware that Wayne was a confidential informant for |
| 09:14AM | 12 | | the FBI when he was making these threats to you? |
| 09:14AM | 13 | A | No.  I just found out yesterday when you told me. |
| 09:14AM | 14 | Q | So you say he never threatened Lenny before? |
| 09:14AM | 15 | A | Not that I can recall.  I mean, maybe to me, but not to my |
| 09:14AM | 16 | | dad. |
| 09:14AM | 17 | Q | But to you, he did? |
| 09:14AM | 18 | A | Yes. |
| 09:14AM | 19 | Q | He threatened Lenny more than once? |
| 09:14AM | 20 | A | In this text message, yes. |
| 09:14AM | 21 | Q | And in other text messages earlier in time? |
| 09:14AM | 22 | A | Maybe.  I don't remember. |
| 09:14AM | 23 | | MS. PANAGAKOS:  I'd like to show Ms. Tufele |
| 09:15AM | 24 | | Exhibit 9051-33, which is on the 8th supplemental list and has |
| 09:15AM | 25 | | not been admitted into evidence. |

09:15AM    1    BY MS. PANAGAKOS:

09:15AM    2    Q    Ms. Tufele, do you recognize this as more text messages

09:15AM    3    between you and Mr. Miller?

09:15AM    4    A    Yes.

09:15AM    5    Q    And the context of this is -- what did you have, like, a

09:15AM    6    family plan where you had the ability to turn his phone off?

09:15AM    7    A    Yes.

09:15AM    8    Q    And you did that because of all of his texting with drug

09:15AM    9    dealers, right?

09:15AM   10    A    And answer his phone.

09:15AM   11    Q    If you look at item four in this exhibit, if we could

09:15AM   12    highlight items one through four.  You are telling -- let's

09:15AM   13    see.

09:15AM   14    A    Yes, okay, now I recall.

09:15AM   15    Q    You turned off his phone because of all his texting with

09:15AM   16    drug dealers?

09:15AM   17    A    Yes.

09:15AM   18    Q    And he got mad at you?

09:15AM   19    A    Yes.

09:15AM   20    Q    And you told him you can have the phone number but you're

09:16AM   21    not going to use one of my phones that's on my plan to text

09:16AM   22    drug dealers?

09:16AM   23    A    Yes.

09:16AM   24    Q    And Mike Miske was not one of those drug dealers?

09:16AM   25    A    I don't know.

09:16AM    1    Q    You never saw his phone number --

09:16AM    2    A    I don't know.

09:16AM    3    Q    You don't know?

09:16AM    4    A    No.  Just to clarify, it's for him to buy pills for

09:16AM    5    himself.

09:16AM    6    Q    You never saw him buy pills from Mr. Miske?

09:16AM    7    A    No.

09:16AM    8    Q    You are aware that he -- you're now aware that he was in

09:16AM    9    the drug business with Ali'i, right?

09:16AM   10    A    From what you told me yesterday, yes.

09:16AM   11    Q    And from the fact that Ali'i has been -- was arrested in

09:16AM   12    September of 2017 for dealing drugs?

09:16AM   13            MR. NAMMAR:  Objection; calls for speculation.

09:16AM   14            THE COURT:  Sustained.

09:16AM   15    BY MS. PANAGAKOS:

09:16AM   16    Q    You recall Ali'i Lee getting arrested for drug

09:16AM   17    distribution, right?

09:16AM   18    A    Yes.

09:16AM   19    Q    You recall telling Mr. Miller the times when you were

09:16AM   20    angry that you hoped he rotted in jail like Mr. Ali'i Wilcox?

09:17AM   21    A    Sure.

09:17AM   22    Q    You know they were friends?

09:17AM   23    A    Yes.

09:17AM   24    Q    And they both dealt drugs?

09:17AM   25    A    I don't know at the time.

09:17AM  1   Q   You do now?

09:17AM  2   A   Now I know.

09:17AM  3   Q   And you know that he dealt drugs with Jonah Ortiz?

09:17AM  4   A   Yes.

09:17AM  5   Q   And back to 9051-33, on page two, if we could highlight

09:17AM  6   items 14 and 15.

09:17AM  7       You see that these texts are April 15th, 2018?

09:17AM  8   A   Yes.

09:17AM  9   Q   And you see that he's threatening Lenny in item 15?

09:17AM  10  A   Okay.

09:17AM  11  Q   And then if we can go to page three and look at items 35

09:18AM  12  and 36.

09:18AM  13      And do you see again, he is threatening your dads on

09:18AM  14  April 17th, 2018?

09:18AM  15  A   Yes.

09:18AM  16  Q   And you tell him he is evil.

09:18AM  17  A   Yes.

09:18AM  18  Q   They've never been anything good -- your dads, both of

09:18AM  19  them, have never been anything but good to Mr. Miller?

09:18AM  20  A   Yes.

09:18AM  21  Q   And this is how he treated them?

09:18AM  22  A   Um-hm.

09:18AM  23  Q   And you personally have seen Mr. Miske be good to

09:18AM  24  Mr. Miller?

09:18AM  25  A   Yes.

09:18AM   1              MS. PANAGAKOS:  I move to admit this exhibit, Your
09:18AM   2    Honor.
09:18AM   3              MR. NAMMAR:   401, 403 hearsay.  And there is only
09:18AM   4    three messages that could be construed by defense counsel as
09:18AM   5    impeachment by contradiction.
09:18AM   6              MS. PANAGAKOS:  Your Honor, the entire text is
09:19AM   7    impeachment by contradiction.  She said yesterday that her
09:19AM   8    relationship with Mr. Miller was not impacted by drug use other
09:19AM   9    than than through sleepiness and delinquent bills.
09:19AM  10              THE COURT:  The objection is sustained.
09:19AM  11    BY MS. PANAGAKOS:
09:19AM  12    Q    Yesterday, you testified about a photograph of you and
09:19AM  13    Mr. Miske at a memorial service for Hansen Apo?
09:19AM  14    A    Yes.
09:19AM  15    Q    You were still friends with Mr. Miske at that time, right?
09:19AM  16    A    Yes.
09:19AM  17    Q    You had actually reached out to him when you learned that
09:19AM  18    Mr. Apo had died, right?
09:19AM  19    A    Yes.
09:19AM  20    Q    And that was in April of 2019?
09:20AM  21    A    Sounds about right.
09:20AM  22    Q    And I'd like to -- let me see.  I'd like to show
09:20AM  23    Ms. Tufele Exhibit 9051-51.
09:20AM  24              Do you recognize this photograph?
09:20AM  25    A    Yes.

09:20AM   1   Q    That's a photograph of Hansen Apo and your son?

09:20AM   2   A    Yes.

09:20AM   3   Q    JD in April of 2019, right?

09:20AM   4   A    Yes.

09:20AM   5   Q    And you texted that to Mr. Miske, right?

09:20AM   6   A    Yes.

09:20AM   7   Q    Do you remember when Wayne tried to get a job as a

09:20AM   8   longshoreman?

09:20AM   9   A    I don't remember when.

09:20AM   10   Q    Do you remember writing a letter for him?

09:20AM   11   A    Yes.  Actually I recall one in probably 2014, 2015.

09:21AM   12   Q    And you know it was an issue with that job because he had

09:21AM   13   a felony conviction, right?

09:21AM   14   A    Yes.

09:21AM   15   Q    And you tried to help him get a waiver so he could get

09:21AM   16   that job?

09:21AM   17           MR. NAMMAR:  Objection to beyond the scope.

09:21AM   18           THE COURT:  Sustained.

09:21AM   19           MS. PANAGAKOS:  I have nothing further, Your Honor.

09:21AM   20           THE COURT:  Any redirect?

09:21AM   21           MR. NAMMAR:  Yes, Your Honor.

09:21AM   22                        REDIRECT EXAMINATION

09:21AM   23   BY MR. NAMMAR:

09:21AM   24   Q    Ms. Tufele, you were asked about a number of text messages

09:22AM   25   where they essentially said that Michael Miske was done with

| | | |
|---|---|---|
| 09:22AM | 1 | Wayne Miller around 2017. |
| 09:22AM | 2 | Do you recall that? |
| 09:22AM | 3 | A    Yes. |
| 09:22AM | 4 | Q    Fast forwarding to 2018 now, from the messages that we |
| 09:22AM | 5 | looked at yesterday, did Mr. Miske to you seem very interested |
| 09:22AM | 6 | as to whether Wayne Miller was cooperating? |
| 09:22AM | 7 | A    Yes. |
| 09:22AM | 8 | Q    You were shown a lot of messages with you and Mr. Miller, |
| 09:22AM | 9 | and it seemed like in some of those messages, you were calling |
| 09:22AM | 10 | Mr. Miller a liar. |
| 09:22AM | 11 | A    Yes. |
| 09:22AM | 12 | Q    You were upset with him at the time? |
| 09:22AM | 13 | A    Yes. |
| 09:23AM | 14 | Q    And this is the same time that Mr. Miller was on drugs? |
| 09:23AM | 15 | A    Yes. |
| 09:23AM | 16 | Q    Would you agree that Mr. Miller was different when he was |
| 09:23AM | 17 | not on drugs? |
| 09:23AM | 18 | A    Yes. |
| 09:23AM | 19 | Q    If we could bring up -- if the defense could bring up |
| 09:23AM | 20 | 8010-20, please, which is in evidence.  If you could go to page |
| 09:23AM | 21 | two. |
| 09:23AM | 22 | Do you recall being shown this message, Ms. Tufele? |
| 09:23AM | 23 | A    Yes. |
| 09:23AM | 24 | Q    This is a screenshot of a communication between you and |
| 09:24AM | 25 | Mr. Miske; is that right? |

09:24AM   1   A   Yes.

09:24AM   2   Q   Do you know what this message is about?

09:24AM   3   A   No.

09:24AM   4   Q   Do you know what the golf shop reference is?

09:24AM   5   A   No.

09:24AM   6   Q   When Mr. Miske references "deeper shit" at the bottom

09:24AM   7   there, do you know what he was in deep shit about, Mr. Miske at

09:24AM   8   this point?

09:24AM   9   A   No.

09:24AM   10   Q   Do you know if Mr. Miske is telling the truth in this

09:24AM   11   message?

09:24AM   12   A   Yes.

09:24AM   13   Q   You know he is telling the truth in this message?

09:24AM   14   A   Wait.  Do I know if Mike Miske is telling the truth in

09:24AM   15   this message?

09:24AM   16   Q   Yes.  Do you know if Mr. Miller went to a golf shop or

09:24AM   17   sent somebody to a golf shop?

09:24AM   18   A   No, I don't know.

09:24AM   19   Q   Do you know if Mr. Miske is trying to cover something up

09:24AM   20   in this message?

09:24AM   21   A   I don't know, but probably.

09:24AM   22   Q   So defense counsel asked you a number of times if --

09:25AM   23       MR. NAMMAR:  Sorry.  Could we publish 8010-20?  My

09:25AM   24   mistake.

09:25AM   25       THE COURT:  Go ahead.  It's been admitted.

09:25AM  1    BY MR. NAMMAR:

09:25AM  2    Q    Was this the message at the bottom that I was just asking

09:25AM  3    you about with the golf shop?

09:25AM  4    A    Yes.

09:25AM  5    Q    You can take it down.  You were shown some messages in

09:25AM  6    2018 and you were asked by defense counsel if Mr. Miske was

09:25AM  7    your friend at that point?

09:25AM  8    A    Yes.

09:25AM  9    Q    Sounds like, though, at a certain point, you began to be

09:25AM  10   afraid of Mr. Miske?

09:25AM  11   A    Yes.

09:25AM  12   Q    You began to be concerned for your safety?

09:25AM  13   A    Yes.

09:25AM  14   Q    At that point, did you still consider Mr. Miske your

09:26AM  15   friend?

09:26AM  16   A    No.

09:26AM  17   Q    Do you consider him your friend today?

09:26AM  18   A    No.

09:26AM  19   Q    Why not?

09:26AM  20   A    After learning all the things that him and Wayne have been

09:26AM  21   involved in.

09:26AM  22   Q    You were asked about whether Mr. Miske worked at Kama'aina

09:26AM  23   Termite and Pest Control; do you recall that?

09:26AM  24   A    If Wayne worked at Kama'aina?

09:26AM  25   Q    I'm sorry, yes; if Mr. Miller worked there, were you asked

09:26AM   1   about that?

09:26AM   2   A    Yes.

09:26AM   3   Q    Did you ever actually see Mr. Miller doing work at

09:26AM   4   Kama'aina Termite and Pest Control?

09:26AM   5   A    Not fumigating, but at the shop on Queen Street.

09:26AM   6   Q    Was he doing any work when you saw him there?

09:26AM   7   A    No.

09:26AM   8   Q    Did you ever actually see him run any errands for

09:26AM   9   Kama'aina Termite and Pest Control?

09:26AM  10   A    I would see him leave the shop.

09:26AM  11   Q    Okay.

09:26AM  12   A    But I didn't see what errands he was doing.

09:27AM  13   Q    Did you ever see him supervise anyone over there?

09:27AM  14   A    No.

09:27AM  15   Q    Did you ever hear about him doing any fumigations?

09:27AM  16   A    No.

09:27AM  17   Q    Did you ever hear about him doing any pest control

09:27AM  18   services?

09:27AM  19   A    No.

09:27AM  20   Q    You were asked some questions about the Poke Shack by

09:27AM  21   defense counsel.  When you testified yesterday, you understood

09:27AM  22   Mr. Miske and Mr. Miller were the actual owners?

09:27AM  23   A    Yes.

09:27AM  24   Q    And you told us that you filed a tax return in 2018

09:27AM  25   because no one had filed a tax return yet for the Poke Shack;

09:28AM   1    is that right?

09:28AM   2    A    Yes.

09:28AM   3    Q    I think you said it was the right thing to do, you

09:28AM   4    thought?

09:28AM   5    A    Yes.

09:28AM   6    Q    And I think you also told us yesterday that you had

09:28AM   7    checked with Michael Miske and Trisha Castro, but nobody ever

09:28AM   8    got back to you; is that right?

09:28AM   9    A    Yes.

09:28AM   10            MR. NAMMAR:  Your Honor, at this time I would move to

09:28AM   11   admit Exhibit 9-572, which is from our first exhibit list.

09:28AM   12   It's a two-page exhibit that's related to the Poke Shack.  It's

09:28AM   13   accompanied by business records certification and it's also

09:28AM   14   pursuant to our stipulation that applies to business records

09:28AM   15   certifications which was filed at Document 1266.

09:28AM   16            THE COURT:  Which exhibit list is it on?

09:28AM   17            MR. NAMMAR:  It is 9-572.

09:28AM   18            THE COURT:  Right.  But which exhibit list is it on?

09:28AM   19            MR. NAMMAR:  Oh, the first one.  I'm sorry, Your

09:28AM   20   Honor.

09:28AM   21            THE COURT:  The original?

09:28AM   22            MR. NAMMAR:  Yes.  If we can bring that up for the

09:29AM   23   witness only.

09:29AM   24            THE COURT:  You may show it to the witness.

09:29AM   25            MR. NAMMAR:  Can you go to page two.  Was there -- I'm

09:30AM   1   sorry, Your Honor, was it admitted?  I apologize.

09:30AM   2          THE COURT:  No.  I thought you were going to ask

09:30AM   3   foundational questions.

09:30AM   4          MR. NAMMAR:  I'm not, just because on page one of the

09:30AM   5   exhibit, it's accompanied by a certification under 902 and it

09:30AM   6   also -- the parties have stipulated that business records can

09:30AM   7   come in.

09:30AM   8          THE COURT:  Okay.  Any objection, Ms. Panagakos?

09:30AM   9          MS. PANAGAKOS:  Your Honor, there is a stipulation as

09:30AM   10  to authenticity.  But -- because these are text messages, I

09:30AM   11  think there is a hearsay issue as to this particular case.

09:30AM   12         MR. NAMMAR:  There is no hearsay issue when they're

09:30AM   13  accompanied by a business record certification.  That's the

09:31AM   14  whole reason for one under 803(6) and 902.

09:31AM   15         THE COURT:  Is this witness involved in this email

09:31AM   16  exchange somehow?

09:31AM   17         MR. NAMMAR:  No, but it's regarding something that she

09:31AM   18  has already testified to.

09:31AM   19         THE COURT:  So Ms. Panagakos, I assume, is that an

09:31AM   20  objection that you made?

09:31AM   21         MS. PANAGAKOS:  Objection as to using it with this

09:31AM   22  witness.  Yes, Your Honor.

09:31AM   23         THE COURT:  The objection is sustained.

09:31AM   24         MR. NAMMAR:  So is it not admitted right now, Your

09:31AM   25  Honor?

09:31AM   1            THE COURT:  That's generally what objection sustained

09:31AM   2   means, counsel.

09:31AM   3   BY MR. NAMMAR:

09:31AM   4   Q    Regarding the Poke Shack that we have talked about, did

09:31AM   5   Mr. Miske ever tell you why he didn't want to be the owner on

09:31AM   6   paper?

09:31AM   7   A    No.

09:31AM   8   Q    Did he ever tell you -- did he ever mention that it was

09:31AM   9   going to be difficult for him to qualify for a mortgage if he

09:32AM   10  was the owner of the Poke Shack?

09:32AM   11  A    No.

09:32AM   12           MR. NAMMAR:  Nothing further, Your Honor.

09:32AM   13           THE COURT:  Anything further, Ms. Panagakos?

09:32AM   14                     RECROSS-EXAMINATION

09:32AM   15  BY MS. PANAGAKOS:

09:32AM   16  Q    Exhibit 8010-20, page two.

09:32AM   17           You testified that you don't know what this is about,

09:32AM   18  right?

09:32AM   19  A    Correct.

09:32AM   20  Q    So you don't know whether -- you have no knowledge what

09:32AM   21  Mr. Miske's motive was?

09:32AM   22  A    Yes.

09:32AM   23           MS. PANAGAKOS:  Could we publish it, please?

09:32AM   24           THE COURT:  Yes.  It's an admitted exhibit.

09:32AM   25  BY MR. NAMMAR:

09:32AM   1   Q   And can we -- so when you said probably, that's just
09:32AM   2   speculation?
09:32AM   3   A   Sorry, I'm not understanding your question.
09:33AM   4   Q   You don't know what Mr. Miske's motive was in this text?
09:33AM   5   A   No.
09:33AM   6   Q   Okay.  Can we turn to page one, please.  And if we can
09:33AM   7   highlight items seven and eight.
09:33AM   8        But what you did know was that Mr. Miller was lying to
09:33AM   9   you, right?
09:33AM   10   A   I'm reading the text message.  Yes.
09:33AM   11   Q   And that he asked you to lie to Mr. Miske?
09:33AM   12   A   Yes.
09:33AM   13        MS. PANAGAKOS:  Thank you.
09:33AM   14        THE COURT:  Anything further?
09:33AM   15        MS. PANAGAKOS:  Nothing further.
09:33AM   16        THE COURT:  Ms. Tufele, you may step down.
09:33AM   17        The government may call its next witness.
09:43AM   18                    --oo0oo--
09:43AM   19        MR. AKINA:  Government calls Jonah Ortiz.  Your Honor,
09:43AM   20   I'm told it might take a minute or two to bring him up.
09:43AM   21        THE COURT:  All right.
09:48AM   22        MR. AKINA:  I realize I was not fully clear of the
09:48AM   23   reason it might take a few minutes, because this is one of our
09:48AM   24   cooperating witnesses.
09:49AM   25        THE CLERK:  Please raise your right hand.

09:49AM   1                          JONAH ORTIZ,

09:49AM   2   called as a witness, having been first duly sworn, was examined

09:49AM   3   and testified as follows:

09:49AM   4          THE CLERK:  Please state your full name, spelling your

09:49AM   5   last name for the record.

09:49AM   6          THE WITNESS:  Jonah Ortiz, O-R-T-I-Z.

09:49AM   7          MR. AKINA: May I proceed, Your Honor?

09:49AM   8          THE COURT:  Yes.  Go ahead.

09:49AM   9                       DIRECT EXAMINATION

09:49AM  10   BY MR. AKINA:

09:49AM  11   Q    Good morning, Mr. Ortiz.

09:49AM  12   A    Good morning.

09:49AM  13   Q    How old are you?

09:49AM  14   A    45.

09:49AM  15   Q    And are you currently incarcerated?

09:49AM  16   A    Yeah.  I'm at FDC.

09:49AM  17   Q    And have you pled guilty to certain crimes?

09:49AM  18   A    I have.

09:49AM  19   Q    What are those specifically?

09:49AM  20   A    Distribution of meth and kidnapping.

09:49AM  21   Q    Did you enter into a plea agreement with the government

09:50AM  22   prior to pleading guilty?

09:50AM  23   A    I did.

09:50AM  24   Q    And are you testifying here today as part of that plea

09:50AM  25   agreement?

| | | | |
|---|---|---|---|
| 09:50AM | 1 | A | I am. |
| 09:50AM | 2 | Q | I want to focus on the drug crime.  That was conspiracy to |
| 09:50AM | 3 | | distribute and possess with the intent to distribute |
| 09:50AM | 4 | | methamphetamine?  You have to answer for the court reporter. |
| 09:50AM | 5 | A | What was the question? |
| 09:50AM | 6 | Q | The crime that you pled guilty to, the drug one, that was |
| 09:50AM | 7 | | conspiracy to distribute and possess with intent to distribute |
| 09:50AM | 8 | | methamphetamine? |
| 09:50AM | 9 | A | Correct. |
| 09:50AM | 10 | Q | And prior to that conviction, have you had prior drug |
| 09:50AM | 11 | | related convictions? |
| 09:50AM | 12 | A | I have. |
| 09:50AM | 13 | Q | In 2004, you had another federal drug conviction; is that |
| 09:50AM | 14 | | correct? |
| 09:50AM | 15 | A | That's correct. |
| 09:50AM | 16 | Q | And that was also for methamphetamine? |
| 09:50AM | 17 | A | It was. |
| 09:50AM | 18 | Q | And have you sold drugs in the past? |
| 09:51AM | 19 | A | I have. |
| 09:51AM | 20 | Q | What types of drugs? |
| 09:51AM | 21 | A | Pretty much everything.  Weed, heroin, coke, meth. |
| 09:51AM | 22 | Q | Have you ever used drugs in the past? |
| 09:51AM | 23 | A | I have. |
| 09:51AM | 24 | Q | Have you ever had a substance abuse problem? |
| 09:51AM | 25 | A | I have. |

| | | | |
|---|---|---|---|
| 09:51AM | 1 | Q | When did you first start using drugs? |
| 09:51AM | 2 | A | I'd say probably around 15.  I started smoking weed and |
| 09:51AM | 3 | | then when I was 18, I think I smoked meth for the first time. |
| 09:51AM | 4 | | And then I started using OxyContin and opiates and stuff. |
| 09:51AM | 5 | Q | Did one of those opiates include heroin? |
| 09:51AM | 6 | A | Correct. |
| 09:51AM | 7 | Q | Fair to say you struggled with drugs for a significant |
| 09:51AM | 8 | | portion of your life? |
| 09:51AM | 9 | A | That's true. |
| 09:51AM | 10 | Q | And after that previous federal conviction in 2004, were |
| 09:52AM | 11 | | you released around 2014? |
| 09:52AM | 12 | A | I was. |
| 09:52AM | 13 | Q | Where did you go to, after leaving prison? |
| 09:52AM | 14 | A | After I got out immediately went to T.J. Mahoney's, which |
| 09:52AM | 15 | | is a halfway house. |
| 09:52AM | 16 | Q | Is that here in Hawaii? |
| 09:52AM | 17 | A | Yeah. |
| 09:52AM | 18 | Q | Were you on any type of supervised release at this point? |
| 09:52AM | 19 | A | Yeah.  I was on a five-year probation supervised release. |
| 09:52AM | 20 | Q | So for those five years after 2014? |
| 09:52AM | 21 | A | Correct. |
| 09:52AM | 22 | Q | When you went to T.J. Mahoney, what type of place was |
| 09:52AM | 23 | | that? |
| 09:52AM | 24 | A | T.J. Mahoney was like -- I don't know, like -- maybe, like |
| 09:52AM | 25 | | a low income housing, kind of secured.  It was -- I think it |

09:53AM   1   was like two-bedroom small apartments, like two beds to each

09:53AM   2   room.

09:53AM   3   Q    And while you were staying at T.J. Mahoney's, what were

09:53AM   4   you supposed to be doing?

09:53AM   5   A    Well, everybody kind of has different -- what I was doing,

09:53AM   6   I was trying to get my -- I didn't have my license, I didn't

09:53AM   7   have my identification, I didn't have my birth certificate.

09:53AM   8   You know, so you have to get all of that and get a job and, you

09:53AM   9   know, start life over.

09:53AM   10   Q    At this point in your life, were you sober?

09:53AM   11   A    I was.

09:53AM   12   Q    And for a period of time, were you able to maintain that

09:53AM   13   sobriety?

09:53AM   14   A    I was.

09:53AM   15   Q    While you were at T.J. Mahoney, were you able to -- or

09:53AM   16   after leaving it at some point, were you able to find some

09:54AM   17   employment?

09:54AM   18   A    I did.

09:54AM   19   Q    What type of employment did you do?

09:54AM   20   A    My first job, I think I got a Speedy Shuttle.  And then I

09:54AM   21   had another job at the Waikiki.  It was a beach boy.

09:54AM   22   Q    While you were at T.J. Mahoney, did you meet an individual

09:54AM   23   named Wayne Miller?

09:54AM   24   A    I did.

09:54AM   25   Q    And while you were at T.J. Mahoney, were you and Wayne

09:54AM   1   Miller particularly close at that point in time?

09:54AM   2   A    At that point in time, no, we weren't.  But that's when I

09:54AM   3   first became aware of him, I guess.

09:54AM   4   Q    And as far as you could tell, what sort of things was

09:54AM   5   Wayne Miller doing at T.J. Mahoney?

09:54AM   6   A    At that time, he was gone most of the time.  He was out on

09:54AM   7   passes.  I think he was trying to get his CDL.

09:54AM   8   Q    Can you explain that, "being out on passes"?

09:54AM   9   A    Yeah.  Every day everybody gets approved to either go out

09:55AM  10   on pass to go to a class, or go look for work, or medical, or

09:55AM  11   whatever reason.

09:55AM  12   Q    After leaving T.J. Mahoney, did you run into Wayne Miller

09:55AM  13   again at some point in time?

09:55AM  14   A    I did.

09:55AM  15   Q    How did that happen?

09:55AM  16   A    I think it was through a mutual friend.  It was just a

09:55AM  17   friend that I grew up with and he knew me real well.  And I

09:55AM  18   believe it was someone that he did time with at another spot.

09:55AM  19   And you know, it was just a friendly introduction.  It was not

09:55AM  20   like for any criminal purposes or anything like that.  It was

09:56AM  21   just, you know, he thought we should meet.

09:56AM  22   Q    And was this your formal introduction to Wayne Miller?

09:56AM  23   A    Yeah.

09:56AM  24   Q    And at this point when you first met up with him formally,

09:56AM  25   what types of things did you guys do together?

| | | | |
|---|---|---|---|
| 09:56AM | 1 | A | In the beginning, we just kind of like hung out.  I guess |
| 09:56AM | 2 | | we had a few things in common.  You know I was raising bull |
| 09:56AM | 3 | | dogs.  He was telling me he had some dogs.  He would come over |
| 09:56AM | 4 | | to my house.  I had a nice place.  He was like, you know, he |
| 09:56AM | 5 | | told me he bought a house, and he was doing good.  And it was |
| 09:56AM | 6 | | kind of like kicking back, not really doing much. |
| 09:57AM | 7 | Q | And at some point in time, did you start using drugs |
| 09:57AM | 8 | | again? |
| 09:57AM | 9 | A | I did. |
| 09:57AM | 10 | Q | And what about Wayne Miller?  Could you tell if he was |
| 09:57AM | 11 | | using drugs at some point? |
| 09:57AM | 12 | A | He was also, so that's kind of like, I guess, we were |
| 09:57AM | 13 | | both, like, doing good at the same time, and then I think we |
| 09:57AM | 14 | | both started doing bad at the same time.  So we had that in |
| 09:57AM | 15 | | common too. |
| 09:57AM | 16 | Q | And when you were doing bad, were the two of you doing |
| 09:57AM | 17 | | drugs? |
| 09:57AM | 18 | A | Yeah. |
| 09:57AM | 19 | Q | You mentioned that in the past you've supplied drugs to |
| 09:57AM | 20 | | others. |
| 09:57AM | 21 | | Did you ever supply drugs to Wayne Miller? |
| 09:57AM | 22 | A | Yeah, I did. |
| 09:57AM | 23 | Q | What types? |
| 09:57AM | 24 | A | At first, it was just weed and I think OxyContin. |
| 09:58AM | 25 | Q | Anything else? |

09:58AM   1   A    A few times I gave him some meth.

09:58AM   2   Q    Would you two ever do drugs together?

09:58AM   3   A    Yeah, we did quite a bit.

09:58AM   4   Q    Now, you pled guilty to a drug related charge and a

09:58AM   5   kidnapping charge, correct?

09:58AM   6   A    That's correct.

09:58AM   7   Q    That kidnapping, do you remember that taking place in

09:58AM   8   2017?

09:58AM   9   A    I do.

09:58AM   10  Q    Now, prior to that kidnapping in 2017, were you doing

09:58AM   11  drugs with Wayne Miller?

09:58AM   12  A    I was.

09:58AM   13  Q    And had you had conversations with Wayne Miller prior to

09:58AM   14  that kidnapping?

09:58AM   15  A    I did.

09:58AM   16  Q    Did Wayne Miller ever mention an individual to you named

09:58AM   17  Michael Miske?

09:58AM   18  A    He did.

09:58AM   19  Q    And in that time prior to the kidnapping, did Wayne Miller

09:59AM   20  tell you what types of things he did for Michael Miske?

09:59AM   21           MR. KENNEDY:  Objection; hearsay.

09:59AM   22           MR. AKINA:  It's a prior consistent statement.

09:59AM   23           THE COURT:  Overruled.

09:59AM   24           THE WITNESS:  He didn't go into, like, detail, but

09:59AM   25  just basically similar crimes, I guess.  You know, like he

09:59AM  1    mentioned he was kind of like a go-to guy.  He did what needed

09:59AM  2    to be done, I guess.

09:59AM  3    BY MR. AKINA:

09:59AM  4    Q    You said similar crimes.  What did you mean by that?

09:59AM  5    A    Well, relating to the kidnapping.

09:59AM  6    Q    Was it your understanding that Wayne Miller did crimes on

09:59AM  7    behalf of Michael Miske?

09:59AM  8              MR. KENNEDY:  Objection; hearsay.

09:59AM  9              THE COURT:  Overruled.  Go ahead.

09:59AM  10             THE WITNESS:  Yes.

09:59AM  11   BY MR. AKINA:

09:59AM  12   Q    And during these conversations, did you learn from Wayne

10:00AM  13   Miller whether or not he gained anything from Michael Miske?

10:00AM  14             MR. KENNEDY:  Same objection, Your Honor.

10:00AM  15             THE COURT:  Same ruling.  Go ahead.

10:00AM  16             THE WITNESS:  You know, over time, there is a few

10:00AM  17   times, like, he kind of bragged about some stuff that he had

10:00AM  18   gotten.  One of them, I don't know, it was like a poke truck or

10:00AM  19   a food truck he loved.  Another one, I think, was he used to

10:00AM  20   pull up to my house in like a four-door Dually truck.  He

10:00AM  21   mentioned something about a Rolex.  It was items that I

10:00AM  22   remember.

10:00AM  23   BY MR. AKINA:

10:00AM  24   Q    Around this time, do you know what Wayne Miller did for

10:00AM  25   work?

| | | |
|---|---|---|
| 10:00AM | 1 | A     Yeah, he also -- at the time he was driving, I believe it |
| 10:01AM | 2 | was for the Teamsters.  He was driving A-list movie stars |
| 10:01AM | 3 | around. |
| 10:01AM | 4 | Q     Do you know how he got that job? |
| 10:01AM | 5 | A     He told me that his friend Mike got him that job. |
| 10:01AM | 6 | Q     Again, prior to the kidnapping in 2017, did Wayne Miller |
| 10:01AM | 7 | ever discuss with you whether he fell out of favor with |
| 10:01AM | 8 | Michael Miske? |
| 10:01AM | 9 | A     Yeah, he did. |
| 10:01AM | 10 | Q     Tell us about that. |
| 10:01AM | 11 | MR. KENNEDY:  Objection; hearsay, Your Honor. |
| 10:01AM | 12 | THE COURT:  Overruled.  Go ahead, sir. |
| 10:01AM | 13 | THE WITNESS:  I think it was, like, for two reasons, |
| 10:01AM | 14 | mainly.  Of what I gathered was, I don't know -- there was a |
| 10:01AM | 15 | conversation we had one time.  He was telling me about when he |
| 10:01AM | 16 | got offered like $250,000 to get rid of this kid, and I don't |
| 10:02AM | 17 | think he did it, or, you know, that's what I gathered.  And I |
| 10:02AM | 18 | think another reason you say he fell out of favor was because |
| 10:02AM | 19 | he had a drug problem, and people who he associated with didn't |
| 10:02AM | 20 | fuck with drugs. |
| 10:02AM | 21 | Q     You mentioned that $250,000 to get rid of a kid? |
| 10:02AM | 22 | A     Yeah. |
| 10:02AM | 23 | Q     What kid? |
| 10:02AM | 24 | A     It was -- |
| 10:02AM | 25 | MR. KENNEDY:  Objection; hearsay, past narrative. |

10:02AM   1          THE COURT:  I didn't hear what the last thing was,
10:02AM   2   objection, hearsay what?
10:02AM   3          MR. KENNEDY:  It's a past narrative.
10:02AM   4          THE COURT:  Overruled.  Go ahead.
10:02AM   5          THE WITNESS:  He mentioned something about his
10:03AM   6   friend's son got into a car accident, and I guess the kid had
10:03AM   7   something to do with it or whatever, and he just wanted him
10:03AM   8   gone.
10:03AM   9   Q    When you say his friend's son, are you talking about Wayne
10:03AM  10   Miller's friend's son or someone else's friend's son?
10:03AM  11   A    Mike's friend's son.
10:03AM  12   Q    Did Wayne Miller ever tell you where he had that
10:03AM  13   conversation with Michael Miske?
10:03AM  14   A    Yeah, he said something about a hospital.
10:03AM  15   Q    Now, have you ever met Michael Miske?
10:03AM  16   A    I have not.
10:03AM  17   Q    Have you ever had any direct interactions with him?
10:03AM  18   A    No, sir.
10:03AM  19   Q    So this kidnapping in 2017, how did that first come to
10:04AM  20   your attention?
10:04AM  21   A    Wayne had brought it up on multiple occasions.  I don't
10:04AM  22   remember exactly how it got brought up, but basically, you
10:04AM  23   know, we were both doing pretty bad at the time.  And you know,
10:04AM  24   I was broke, he was broke; we had -- obviously we were addicted
10:04AM  25   to heroin.  So, like, he just came and told me, he was like,

10:05AM   1   hey, I got this job we can do.  I got this accountant that

10:05AM   2   supposedly, he is dirty and he stole some money.  But it

10:05AM   3   wasn't -- it was just like a quick conversation, you know.  It

10:05AM   4   was -- he just brought it up as an idea, and, you know, it

10:05AM   5   wasn't like anything that I took seriously at first.

10:05AM   6   Q    So when at first it was brought up by Wayne Miller, did

10:05AM   7   you immediately agree?

10:05AM   8   A    No, because I mean, like I said, it was just something

10:05AM   9   that came up and it was kind of like, it's just not my sort of

10:05AM  10   thing.  Honestly, I didn't think too much about it.

10:05AM  11   Q    And it it sounds like there was more than one conversation

10:05AM  12   with Wayne Miller about this?

10:06AM  13   A    Yeah, you know, he just kept on bringing it up, like

10:06AM  14   that's a possibility.  And then I think at one point, I'm like,

10:06AM  15   screw it.  Let's do it.  And then I would be like, so now, the

10:06AM  16   time would pass and I would be like, so, you know, what's up

10:06AM  17   with that job?  And he would be like, I'll let you know.  At

10:06AM  18   one point he just -- I think we were at my friend's house in

10:06AM  19   the apartment, and all of a sudden, it became kind of like

10:06AM  20   urgent, like we had to do it soon.

10:06AM  21   Q    Who was urgent about it?  You or Wayne Miller?

10:06AM  22   A    Wayne.

10:06AM  23   Q    So in these discussions, did Wayne Miller tell you whether

10:07AM  24   or not you would get paid anything for helping him?

10:07AM  25   A    He mentioned that he took a hundred thousand, so that we

10:07AM    1    would split the money.

10:07AM    2    Q    Who took a hundred thousand?

10:07AM    3    A    He said that the accountant took a hundred thousand.

10:07AM    4    Q    And so when you split the money, that would be -- how

10:07AM    5    would that be split?

10:07AM    6    A    I guess 50, 50.

10:07AM    7    Q    That's 50,000 for you and 50,000 for Wayne Miller?

10:07AM    8    A    Correct.

10:07AM    9    Q    You mentioned that Wayne Miller said that he had gotten

10:07AM   10    this job referring to this -- getting this money from this

10:07AM   11    accountant?

10:07AM   12    A    Yeah.

10:07AM   13    Q    Did he ever mention to you who he was doing this for?

10:07AM   14    A    Yeah, he told me a lawyer.  He was like, I got a lawyer

10:07AM   15    friend.

10:07AM   16    Q    Did you believe him when he said it was a lawyer?

10:07AM   17    A    No, I didn't.

10:07AM   18    Q    Why not?

10:07AM   19    A    Well, that's just his style.  Like, you know, if I'm going

10:08AM   20    to give him -- like, he is not going to tell me who he is going

10:08AM   21    to sell the drugs to or who he is going to buy the drugs from.

10:08AM   22    He is going to usually keep that person, you know, from being

10:08AM   23    known.

10:08AM   24    Q    So he wouldn't always give you all the details on

10:08AM   25    different things; is that fair?

10:08AM    1    A    Correct.

10:08AM    2    Q    So sounds like you knew that you were not getting the

10:08AM    3    whole truth from Wayne Miller about this particular job?

10:08AM    4    A    Yes, that's correct.

10:08AM    5    Q    Were you still comfortable going forward knowing that?

10:08AM    6    A    Yeah.  I mean, at the time, I was -- you know, I was

10:08AM    7    pretty desperate.  And you know, I knew who he associated with,

10:09AM    8    so I felt it was credible.

10:09AM    9    Q    What do you mean by that, who he associated with?

10:09AM   10    A    I mean, you know, I know who his friends are, and it was

10:09AM   11    just that I didn't think that it was a made-up story.

10:09AM   12    Q    So after you agreed to do this, to get this money back

10:09AM   13    from the accountant with Wayne Miller, did Wayne Miller tell

10:09AM   14    you any steps he had taken in preparation for this?

10:09AM   15    A    He told me that he has already done, like, surveillance on

10:09AM   16    the guy.  Pretty much knew, I guess, where his office was.  He

10:10AM   17    explained where his home was.  I don't remember the exact

10:10AM   18    details, but it was just basically that, you know, that he has

10:10AM   19    already done, like, prior surveillance on the guy.

10:10AM   20    Q    And had you ever kidnapped anyone prior to this?

10:10AM   21    A    I have not.

10:10AM   22    Q    What did you do with Wayne Miller, if anything, to

10:10AM   23    prepare?

10:10AM   24    A    There was times when we just sat outside of his office, on

10:11AM   25    the street that I believed to be his office.

10:11AM   1   Q   When you say "his office," who are you referring to?

10:11AM   2   A   The accountant.

10:11AM   3   Q   Was that one time or multiple times?

10:11AM   4   A   No, there was multiple times.  There was another time when

10:11AM   5   we sat across on the opposite side of the street in a covered

10:11AM   6   parking garage, like, on the -- I think the top floor.  So it

10:11AM   7   was, like, higher up so you can kind of see the whole building

10:11AM   8   and the road and everything.

10:11AM   9   Q   Do you recall anything about the accountant's -- the

10:11AM  10   building where his office was located in?

10:12AM  11   A   Yeah.  It was above -- I think it's above a candy store or

10:12AM  12   some kind of store.  I remember that building because, like I

10:12AM  13   said, a long time ago, I went in there one time because I think

10:12AM  14   I was trying to drive for Uber or something like that.  I think

10:12AM  15   Uber used to have an office in there.

10:12AM  16   Q   Besides staking out the accountant's place of work, did

10:12AM  17   you do anything else to prepare?

10:12AM  18   A   I did see Wayne -- I'm very sure he put a tracker on his

10:12AM  19   car.  I don't remember exactly when, but before we did the

10:12AM  20   kidnapping, he went into -- I guess he went into a meeting with

10:13AM  21   somebody at Mike's business, and I mean, after he had that

10:13AM  22   meeting, that's when the tracking devices appeared.  So I just

10:13AM  23   assumed it probably came from there, but I was just guessing.

10:13AM  24   Q   You told us you never met Mr. Miske before and you

10:13AM  25   mentioned Mike's business.

| | | |
|---|---|---|
| 10:13AM | 1 | Did you have some understanding of what Michael Miske |
| 10:13AM | 2 | did work-wise or what he was involved in? |
| 10:13AM | 3 | A    I mean, he is a pretty known guy.  Even before I knew |
| 10:13AM | 4 | Wayne, I went to the M Nightclub and, you know, everybody kind |
| 10:14AM | 5 | of knows who he is. |
| 10:14AM | 6 | Q    And this particular business where you said Wayne Miller |
| 10:14AM | 7 | went to, what business was that? |
| 10:14AM | 8 | A    The pest control. |
| 10:14AM | 9 | Q    That Kama'aina Termite and Pest Control? |
| 10:14AM | 10 | A    Correct. |
| 10:14AM | 11 | Q    Now, did you go into Kama'aina Termite and Pest Control |
| 10:14AM | 12 | with Wayne Miller? |
| 10:14AM | 13 | A    I did not. |
| 10:14AM | 14 | Q    So you stayed outside? |
| 10:14AM | 15 | A    Correct. |
| 10:14AM | 16 | Q    And you said that he went in there to meet somebody? |
| 10:14AM | 17 | A    Yes. |
| 10:14AM | 18 | Q    At that point in time, did you know -- who were you aware |
| 10:14AM | 19 | of that Wayne Miller knew that was associated with Kama'aina |
| 10:14AM | 20 | Termite and Pest Control? |
| 10:14AM | 21 | A    At that time and still, only Mike.  I knew that was his |
| 10:14AM | 22 | buddy.  He had mentioned that he even had a baby shower at his |
| 10:14AM | 23 | club one time.  I knew they were friends. |
| 10:14AM | 24 | Q    You said a baby shower? |
| 10:15AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 10:15AM | 1 | Q | So Wayne Miller goes into Kama'aina Termite and Pest |
| 10:15AM | 2 | | Control, and he comes out. |
| 10:15AM | 3 | | About how long was he in there for? |
| 10:15AM | 4 | A | He wasn't in there for that long. |
| 10:15AM | 5 | Q | Minutes, hours? |
| 10:15AM | 6 | A | I would say less than 30 minutes. |
| 10:15AM | 7 | Q | And after Wayne Miller came back from Kama'aina Termite |
| 10:15AM | 8 | | and Pest Control, what, if anything, did you observe? |
| 10:15AM | 9 | A | That's when I observed what I believed to be tracking |
| 10:15AM | 10 | | devices.  It's like a black egg.  It had -- magnetized tracking |
| 10:15AM | 11 | | devices. |
| 10:15AM | 12 | Q | Did you ever use a tracking device before? |
| 10:15AM | 13 | A | I have not. |
| 10:15AM | 14 | Q | How did you know what a tracking device looked like? |
| 10:15AM | 15 | A | I've seen them on, like, Amazon. |
| 10:16AM | 16 | Q | You previously looked up tracking devices on Amazon? |
| 10:16AM | 17 | A | Yeah. |
| 10:16AM | 18 | Q | So anything else that you did to prepare for this |
| 10:16AM | 19 | | kidnapping? |
| 10:16AM | 20 | A | That's pretty much it. |
| 10:16AM | 21 | Q | How were you going to get in touch with this accountant? |
| 10:16AM | 22 | A | So Wayne had his phone number, and I remember him -- he |
| 10:16AM | 23 | | called him a couple of times.  Ultimately he set an appointment |
| 10:17AM | 24 | | to meet him at Fisherman's Wharf. |
| 10:17AM | 25 | Q | At Fisherman's Wharf, what was your guys's plan? |

10:17AM   1   A    Oh, yeah.  Also prior to the kidnapping, I was at an
10:17AM   2   antique store and I noticed, you know, I think they were like
10:17AM   3   expired police badges.  One was an old fireman's badge.  But I
10:17AM   4   think -- we went back, I told Wayne about it and he ended up
10:17AM   5   buying the badges.  So I guess the plan was when the accountant
10:18AM   6   pulled up, we were going to act like we were police officers.
10:18AM   7   Q    You mentioned that Wayne Miller had called the accountant.
10:18AM   8        Did you ever call the accountant?
10:18AM   9   A    Not that I remember.  I may have, because, I mean, there
10:18AM  10   was more than one call, you know.  I honestly don't remember
10:18AM  11   speaking to him.
10:18AM  12   Q    Did you go by any other names besides Jonah?
10:18AM  13   A    Yeah, James.
10:18AM  14   Q    Do you remember ever calling up the accountant posing as
10:18AM  15   James, or using that name James?
10:18AM  16   A    Honestly, I don't remember.
10:19AM  17        THE COURT:  Mr. Akina, is now a good time?
10:19AM  18        MR. AKINA:  Yes.  We can break here, Your Honor.
10:19AM  19        THE COURT:  We are at 10:20.  We have been going for
10:19AM  20   about an hour an 45 minutes.  Let's go ahead and take our first
10:19AM  21   break of the day.  As we go to break, I remind our jurors to
10:19AM  22   please refrain from discussing the substance of this case with
10:19AM  23   anyone, including each other; to refrain from accessing any
10:19AM  24   media or other accounts of this case that may be out there; and
10:19AM  25   finally, please do not conduct any independent investigation

10:19AM    1    into the facts, circumstances, or persons involved.

10:19AM    2         Let's take about a 15-minute break and we will resume

10:19AM    3    with the direct of Mr. Ortiz.

10:20AM    4         (Proceedings were recessed at 10:20 a.m. to 10:42

10:42AM    5    a.m.)

10:42AM    6         THE COURT:  Mr. Akina, you may resume your direct.

10:42AM    7    BY MR. AKINA:

10:42AM    8    Q    Thank you, Your Honor.

10:42AM    9         Mr. Ortiz, you told us that the plan was to meet with

10:42AM   10    the accountant at Fisherman's Wharf.

10:42AM   11         Why did you and Wayne Miller pick Fisherman's Wharf?

10:42AM   12    A    It was a spot where we believed to be pretty secluded,

10:42AM   13    like, no cameras.

10:42AM   14    Q    You mentioned that the plan when the accountant arrived

10:43AM   15    was to pose as police officers.

10:43AM   16         How were you and Wayne Miller dressed?

10:43AM   17    A    Pretty much all black.

10:43AM   18    Q    So not in police uniforms, but you wore all black?

10:43AM   19    A    Yes, correct.  Wayne had a Crown Vic, which was an old

10:43AM   20    police vehicle or something that he had picked up from the

10:43AM   21    auction.  So, you know, it looked like a cop car.

10:43AM   22    Q    Do you remember what color it was?

10:43AM   23    A    Yeah, it was a black Crown Vic.

10:43AM   24    Q    And what was the plan -- how did that play into the plan?

10:43AM   25    A    The plan was when the accountant pulled up, just pretend

10:44AM   1   to be cops and just arrest him.

10:44AM   2   Q    And would you try to put him into the Crown Vic if you had

10:44AM   3   to?

10:44AM   4   A    Yeah.  That was the plan.

10:44AM   5   Q    So about what time of day was this -- well, eventually did

10:44AM   6   you two meet up with the accountant?

10:44AM   7   A    We did.

10:44AM   8   Q    And that's at Fisherman's Wharf?

10:44AM   9   A    It is.

10:44AM   10   Q    And about what time of day was this?

10:44AM   11   A    It was still daylight.  I don't know exactly what time.

10:44AM   12   Q    Can you describe the vehicle the victim was driving?

10:44AM   13   A    It was a gray -- it wasn't a car; it wasn't a big SUV.  It

10:44AM   14   was a mid sized four-door.

10:44AM   15   Q    A mid sized SUV?

10:44AM   16   A    Correct.

10:44AM   17   Q    So when the victim parked -- the accountant parked, where

10:44AM   18   were you in relation to his car?

10:45AM   19   A    I'm on the passenger -- I'm on the driver side of his car,

10:45AM   20   the passenger side of the Crown Vic.  He pulled up on the

10:45AM   21   passenger side of the Crown Vic.

10:45AM   22   Q    So the accountant pulled up on your side?

10:45AM   23   A    Um-hm.

10:45AM   24   Q    So were you closest to him between you and Wayne Miller?

10:45AM   25   A    I was.

| | | | |
|---|---|---|---|
| 10:45AM | 1 | Q | And can you describe the accountant, how he looked? |
| 10:45AM | 2 | A | He was like an older Asian; kind of salt and pepper, black |
| 10:45AM | 3 | | hair, stocky, healthy looking. |
| 10:45AM | 4 | Q | About how tall? |
| 10:45AM | 5 | A | A few feet shorter than me.  I'm six feet. |
| 10:45AM | 6 | Q | Few feet? |
| 10:45AM | 7 | A | I mean, you know, a foot shorter. |
| 10:45AM | 8 | Q | So he was about five feet? |
| 10:46AM | 9 | A | Yeah. |
| 10:46AM | 10 | Q | And so what happens after the accountant arrives? |
| 10:46AM | 11 | A | When he got out of the vehicle, both said, you know, |
| 10:46AM | 12 | | like -- or I said, "Freeze, police, you are under arrest," |
| 10:46AM | 13 | | hoping that he would just kind of like go along with it, but he |
| 10:46AM | 14 | | didn't.  He kind of -- I don't think he was fooled that we |
| 10:46AM | 15 | | weren't police because he was definitely -- he was resisting. |
| 10:46AM | 16 | Q | Did you do anything physically to try to -- |
| 10:47AM | 17 | A | Yeah.  I grabbed him and I tried, you know, I tried |
| 10:47AM | 18 | | pinning him down.  And I think ultimately, like, it took the |
| 10:47AM | 19 | | both of us to get him in the vehicle. |
| 10:47AM | 20 | Q | And was he restrained in any way? |
| 10:47AM | 21 | A | After we got him in the vehicle, again, he's -- you know, |
| 10:47AM | 22 | | he's definitely fighting the whole way.  So after we got him in |
| 10:47AM | 23 | | there and we got him pinned down, we handcuffed him.  And after |
| 10:47AM | 24 | | we handcuffed him, we stuck a black bag over his head and duct |
| 10:48AM | 25 | | taped it to stay on. |

10:48AM   1   Q   And who duct taped it?

10:48AM   2   A   Wayne had the duct tape.  I mean, we were both doing it,

10:48AM   3   you know.

10:48AM   4   Q   And how did you duct tape it to get it secured on?

10:48AM   5   A   Just around his neck area.

10:48AM   6   Q   Did anyone strike the accountant?

10:48AM   7   A   Yeah.  Wayne struck him.  He elbowed him at first.  I

10:48AM   8   don't remember how it went or who was driving first, because at

10:49AM   9   some point, I was driving and at some point, he was driving.  I

10:49AM   10  do remember at one point I think when I was driving, Wayne had

10:49AM   11  a gun.  And I believe he was striking the accountant, you know,

10:49AM   12  and threatening to shoot him.  We were basically trying to get

10:49AM   13  him to tell us where the money was, or come up with the money,

10:49AM   14  or, you know, just, that was like the repeat comment, you know.

10:49AM   15  "Tell us where the money is."

10:50AM   16          He just refused to admit to even knowing what we were

10:50AM   17  talking about.  You know, he was like, what money?  And Wayne

10:50AM   18  was telling him, "you know the money.  Just tell us where the

10:50AM   19  money is."

10:50AM   20  Q   So sounds like you two were driving him around after

10:50AM   21  initially handcuffing him and putting him into the vehicle?

10:50AM   22  A   Correct.

10:50AM   23  Q   And you mentioned that Wayne Miller used a gun to strike

10:50AM   24  the accountant.

10:50AM   25          Did he do anything else with the gun that you

| | | |
|---|---|---|
| 10:50AM | 1 | observed? |
| 10:50AM | 2 | A    He just pointed it at him, and threatened to shoot him. |
| 10:50AM | 3 | Q    Did anyone threaten to kill the accountant when trying to |
| 10:50AM | 4 | get this money? |
| 10:50AM | 5 | A    I mean, yeah, that's pretty much -- when he was |
| 10:51AM | 6 | threatening to shoot him, he was threatening to kill him. |
| 10:51AM | 7 | Q    While you two were driving the accountant around, were you |
| 10:51AM | 8 | continuously driving the entire time that you had him? |
| 10:51AM | 9 | A    No.  We pulled over a few -- I remember -- I know we had |
| 10:51AM | 10 | him for -- I don't know exactly how long, I know it was, I |
| 10:51AM | 11 | think, up to, like, five or six hours.  So I honestly don't -- |
| 10:51AM | 12 | I remember a few stops.  One of the stops stuck out to me |
| 10:51AM | 13 | because that was where we were staying at the time.  It was at |
| 10:51AM | 14 | a friend's house on one of those little side streets.  I think |
| 10:52AM | 15 | off of Piikoi. |
| 10:52AM | 16 | Q    Did you go into the house? |
| 10:52AM | 17 | A    No. |
| 10:52AM | 18 | Q    Stayed out in the street in the car? |
| 10:52AM | 19 | A    Yeah, we were just out on the street and pulled over.  I |
| 10:52AM | 20 | mean, when we pulled over, we were using drugs as well or |
| 10:52AM | 21 | smoking heroin. |
| 10:52AM | 22 | Q    You were smoking? |
| 10:52AM | 23 | A    I was shooting heroin.  Wayne was smoking heroin. |
| 10:52AM | 24 | Q    What about any other stops? |
| 10:52AM | 25 | A    The other one I remember was at the top of Ward.  I just |

| | | |
|---|---|---|
| 10:52AM | 1 | remember Wayne saying something about going to meet his lawyer |
| 10:53AM | 2 | friend or something, but anyway he disappeared for a little |
| 10:53AM | 3 | bit. |
| 10:53AM | 4 | Q    You said at the top of Ward. |
| 10:53AM | 5 |      Is that closer to the mountains or the ocean? |
| 10:53AM | 6 | A    What do you mean? |
| 10:53AM | 7 | Q    You said that you stopped at the top of Ward Avenue.  Is |
| 10:53AM | 8 | that in the direction of the mountains or the ocean? |
| 10:53AM | 9 | A    Yeah, mountains. |
| 10:53AM | 10 | Q    And any other stops? |
| 10:53AM | 11 | A    At this park. |
| 10:53AM | 12 | Q    Which park? |
| 10:53AM | 13 | A    I think it's Sheridan Park. |
| 10:53AM | 14 | Q    Did you go to Sheridan Park just one time? |
| 10:53AM | 15 | A    No, there was a few times. |
| 10:53AM | 16 | Q    A few stops at Sheridan Park? |
| 10:53AM | 17 | A    Yeah. |
| 10:53AM | 18 | Q    Thinking of the final stop during this several-hour |
| 10:53AM | 19 | period, where was that, that you recall? |
| 10:53AM | 20 | A    So the last would have been on the Piikoi.  If you are |
| 10:54AM | 21 | looking up towards the mountain, Piikoi being on the left, |
| 10:54AM | 22 | Walmart being on the right, we were on the other side. |
| 10:54AM | 23 | Q    Other side of what? |
| 10:54AM | 24 | A    Of Piikoi.  The park. |
| 10:54AM | 25 | Q    Is that Sheridan Park? |

| | | | |
|---|---|---|---|
| 10:54AM | 1 | A | Correct. |
| 10:54AM | 2 | Q | And what, if anything, happened there? |
| 10:54AM | 3 | A | This was what I believed to be towards the end.  And we |
| 10:54AM | 4 | | were just like, you know, after hours of nothing -- of him not |
| 10:55AM | 5 | | admitting to having any money, you know, it was kind of going |
| 10:55AM | 6 | | nowhere, so it was just -- you know, like, what are we going to |
| 10:55AM | 7 | | do?  Like, what's the plan?  And then that's when he was like, |
| 10:55AM | 8 | | fuck 'em.  I'm going to go call Bro and find out.  And he kind |
| 10:55AM | 9 | | of like caught himself a little bit and he was like oh, no, I'm |
| 10:55AM | 10 | | going to call my lawyer friend, and see what we are going to |
| 10:55AM | 11 | | do. |
| 10:55AM | 12 | Q | And when Wayne Miller said he was going to call Bro, did |
| 10:55AM | 13 | | you know who that was a reference to? |
| 10:55AM | 14 | A | I just know in past conversations, like, he told me, like, |
| 10:56AM | 15 | | that's what they called him. |
| 10:56AM | 16 | Q | Called who? |
| 10:56AM | 17 | A | Mike. |
| 10:56AM | 18 | Q | Previous conversations, Wayne Miller had referred to |
| 10:56AM | 19 | | Michael Miske as Bro? |
| 10:56AM | 20 | A | Yeah.  I guess that was like their code name or something, |
| 10:56AM | 21 | | I don't know. |
| 10:56AM | 22 | Q | You said that Wayne Miller caught himself after he said |
| 10:56AM | 23 | | Bro. |
| 10:56AM | 24 | | What did you mean by that? |
| 10:56AM | 25 | A | Well, I just know that he -- it felt like he kind of |

| | | |
|---|---|---|
| 10:56AM | 1 | slipped up or, you know, it was like he caught himself.  It |
| 10:56AM | 2 | wasn't like, I don't know, like he wasn't supposed to say that |
| 10:56AM | 3 | or something, you know. |
| 10:56AM | 4 | Q    And then he followed up by correcting himself and saying |
| 10:56AM | 5 | lawyer friend? |
| 10:56AM | 6 | A    Correct. |
| 10:56AM | 7 | Q    Did you think he was being truthful about the lawyer |
| 10:57AM | 8 | friend reference? |
| 10:57AM | 9 | A    I mean, I never did buy that whole story the whole time, |
| 10:57AM | 10 | you know, but I wasn't, like, really concerned about that.  It |
| 10:57AM | 11 | wasn't really important to me at the time. |
| 10:57AM | 12 | Q    So after Wayne Miller said he was going to step out and |
| 10:57AM | 13 | call Bro, what did he do? |
| 10:57AM | 14 | A    He was gone for a little while.  I don't remember how long |
| 10:57AM | 15 | he was gone, but ultimately he came back, and I guess the |
| 10:57AM | 16 | decision was take him back to his car. |
| 10:57AM | 17 | Q    Did the two of you discuss doing anything else with the |
| 10:57AM | 18 | accountant besides taking him back? |
| 10:57AM | 19 | A    I mean, yeah, of course.  The conversation came up of |
| 10:58AM | 20 | getting rid of him.  Killing him.  Thank God that didn't |
| 10:58AM | 21 | happen.  Yeah, so that's what happened. |
| 10:58AM | 22 | Q    Now, during these multiple stops that you described, at |
| 10:58AM | 23 | any of these stops, did a third person ever join you and Wayne |
| 10:58AM | 24 | Miller? |
| 10:58AM | 25 | A    Not that I recall. |

10:58AM   1    Q    Did you ever see or hear a third person approach the Crown

10:58AM   2    Vic during those stops?

10:58AM   3    A    I didn't, no.

10:58AM   4    Q    Do you know someone named Preston Kimoto?

10:58AM   5    A    I don't.

10:58AM   6    Q    So after the two of you decided to return the accountant,

10:59AM   7    where did you take him?

10:59AM   8    A    So after the park we just -- we left.  And before we

10:59AM   9    reached his car at Fisherman's Wharf, I think we took his

10:59AM   10   wallet.  We might have taken his wallet at first, I don't know,

10:59AM   11   but I remember basically all he had was -- like, I think it was

10:59AM   12   under a hundred dollars.  It was, like, 40 bucks, I think, and

10:59AM   13   a credit card or debit card.  And either me or Wayne told him,

10:59AM   14   you know, make sure that he waits a while before he calls in

11:00AM   15   the car and obviously, don't contact police.

11:00AM   16   Q    What about the handcuffs?

11:00AM   17   A    I think we put them -- at some point, I want to say, ended

11:00AM   18   up having zip ties on him, I think.  But anyway, at the end, we

11:00AM   19   took everything off and we left him at his car.

11:00AM   20   Q    Do you ever get paid for this?

11:00AM   21   A    I did not.

11:01AM   22   Q    You mentioned that leading up to this, when you agreed to

11:01AM   23   do this kidnapping, I might be paraphrasing, you were at a low

11:01AM   24   point.

11:01AM   25        Why did you agree to do this?

11:01AM   1   A    Like I said, you know, I just went from, like, nice little

11:01AM   2   three bedroom house, trying to open up a couple of businesses,

11:01AM   3   wife, I was going to start a family, to ultimately homeless,

11:01AM   4   which I had never been in my life.  It just happened so fast.

11:01AM   5   Q    Did any of those circumstances excuse what you did?

11:02AM   6   A    Absolutely not.  I mean, it was inexcusable.

11:02AM   7   Q    You mentioned that you and Wayne Miller were -- that you

11:02AM   8   were shooting up heroin during this kidnapping.

11:02AM   9        You said Wayne Miller was also smoking heroin as well?

11:02AM  10   A    Yeah.  He didn't inject.  I did.

11:02AM  11   Q    And for you personally, how does heroin affect you?

11:02AM  12   A    You know, there is times when you inject it, there would

11:02AM  13   be moments where like -- usually at the initial moments, you

11:02AM  14   would be kind of like you're sedated, almost.  You know, you

11:02AM  15   just kind of like nod out and maybe fall asleep a little bit.

11:02AM  16   And then -- there is times that it wears off.  Then you're up

11:03AM  17   and you can focus.

11:03AM  18   Q    So the time -- did that happen to you during this -- the

11:03AM  19   kidnapping?  Did you --

11:03AM  20   A    Yeah.  I mean, that's the thing with heroin.  It's like

11:03AM  21   you got to have it every so often, or you, like, you physically

11:03AM  22   get ill, like you have -- like, it's painful.  So yeah,

11:03AM  23   throughout the kidnapping there was times it did that.

11:03AM  24   Q    Meaning you felt ill so you needed to use it?

11:03AM  25   A    Correct.

11:03AM   1   Q   And after you used it, you mentioned that sometimes you

11:03AM   2   would nod off.

11:03AM   3        So fair to say there are times you nodded off during

11:03AM   4   the kidnapping?

11:03AM   5   A   Yeah, absolutely.

11:03AM   6   Q   But during the periods of time when you are awake and not

11:03AM   7   nodding off, did heroin affect your ability to remember?

11:04AM   8   A   You got a buzz, but you're able to do things.

11:04AM   9   Q   So your memories are pretty accurate for the periods of

11:04AM   10   time that you are awake?

11:04AM   11   A   Correct.

11:04AM   12   Q   Did Wayne Miller -- you mentioned that you sold Wayne

11:04AM   13   Miller oxy as well, right?

11:04AM   14   A   Yes.

11:04AM   15   Q   Did he primarily use that with you or heroin with you?

11:04AM   16   A   No, in the beginning it was all oxys.  But then it

11:04AM   17   switched over to strictly heroin.

11:04AM   18   Q   And you don't know what he did when he wasn't with you,

11:04AM   19   right?

11:04AM   20   A   Right.

11:04AM   21        MR. AKINA:  Could we show the witness Exhibit 5-1

11:04AM   22   which is in evidence, and this is from our initial exhibit

11:04AM   23   list, Your Honor.  Permission to publish.

11:05AM   24        THE COURT:  Yes, go ahead.

11:05AM   25   BY MR. AKINA:

11:05AM   1   Q    Do you see the area on this map where Fisherman's Wharf

11:05AM   2   was where you met with the accountant?

11:05AM   3   A    I do.

11:05AM   4   Q    Can you circle that with your finger?  Just use your

11:05AM   5   finger on the screen.

11:05AM   6   A    Somewhere over here.

11:05AM   7        MR. AKINA:  Could we go to Exhibit 5-2A please, which

11:05AM   8   is also in evidence and from that same exhibit list.

11:05AM   9        THE COURT:  Yes, go ahead.

11:05AM   10        MR. AKINA:  Permission to publish this.

11:05AM   11        THE COURT:  Yes.

11:05AM   12   BY MR. AKINA:

11:05AM   13   Q    Do you see this red dot towards the top of the screen by

11:05AM   14   Queen Street?

11:05AM   15   A    Uh-huh.

11:05AM   16   Q    What business is in that general area?

11:06AM   17   A    That's the termite pest control.

11:06AM   18   Q    And is that where Wayne Miller went to before he came out

11:06AM   19   with the trackers?

11:06AM   20   A    He did.

11:06AM   21   Q    Do you mind leaning in towards the mic?

11:06AM   22   A    Yeah, it is.

11:06AM   23   Q    And do you see the area where the accountant's office was

11:06AM   24   that you staked out with Wayne Miller?

11:06AM   25   A    Yes, I do.  It says Herbox Spa.  And then right across the

| | | |
|---|---|---|
| 11:06AM | 1 | street is that parking. |
| 11:06AM | 2 | Q    So it's in the bottom right-hand corner of the map? |
| 11:06AM | 3 | A    Correct, yes. |
| 11:06AM | 4 | MR. AKINA:  And then -- we can take this down.  Can we |
| 11:06AM | 5 | show the witness Exhibit 5-3, which is also in evidence. |
| 11:06AM | 6 | THE COURT:  Yes.  Go ahead. |
| 11:06AM | 7 | BY MR. AKINA: |
| 11:06AM | 8 | Q    Do you see Sheridan Park here? |
| 11:06AM | 9 | A    Yeah.  It's got the red dot on my right. |
| 11:07AM | 10 | Q    If we could zoom in on that area of the map, please.  You |
| 11:07AM | 11 | mentioned that there was at one point you stopped near a house |
| 11:07AM | 12 | that you were staying at. |
| 11:07AM | 13 | Did you see where that is? |
| 11:07AM | 14 | A    Yeah.  I think it's right there. |
| 11:07AM | 15 | Q    On Hoolai Street? |
| 11:07AM | 16 | A    Yes. |
| 11:07AM | 17 | Q    And then that stop that you are describing where Wayne |
| 11:07AM | 18 | Miller stepped out and made a call to Bro, what part of |
| 11:07AM | 19 | Sheridan Park was that? |
| 11:07AM | 20 | A    Like, the bottom right-hand corner. |
| 11:07AM | 21 | Q    Bottom right-hand corner? |
| 11:07AM | 22 | A    Of Sheridan Community Park. |
| 11:07AM | 23 | MR. AKINA:  We can take this exhibit down.  Could we |
| 11:07AM | 24 | show the witness Exhibit 5-13, also in evidence. |
| 11:07AM | 25 | THE COURT:  Yes, go ahead. |

| | | |
|---|---|---|
| 11:07AM | 1 | BY MR. AKINA: |
| 11:07AM | 2 | Q    Do you recognize this? |
| 11:08AM | 3 | A    I do.  This is where we told the accountant to meet us. |
| 11:08AM | 4 | Q    This is Fisherman's Wharf? |
| 11:08AM | 5 | A    It is. |
| 11:08AM | 6 | Q    And the area where you met up with the accountant, is it |
| 11:08AM | 7 | more to the left or the right or the front? |
| 11:08AM | 8 | A    I remember the fence line more on the right because the |
| 11:08AM | 9 | water was on the left.  I remember when we first went in there, |
| 11:08AM | 10 | we kind of pulled up towards the water area and we moved a |
| 11:08AM | 11 | couple of times.  And we ended up settling somewhere on the |
| 11:08AM | 12 | right towards the fence. |
| 11:08AM | 13 | Q    Will you go to Exhibit 5-15, also in evidence. |
| 11:08AM | 14 | Do you see that fence line area? |
| 11:08AM | 15 | A    Yeah.  It's right there to the right. |
| 11:09AM | 16 | Q    Could we zoom in on this right corner of the screen, |
| 11:09AM | 17 | please. |
| 11:09AM | 18 | So this is the fence line you are talking about? |
| 11:09AM | 19 | A    Correct. |
| 11:09AM | 20 | Q    We can take this exhibit down. |
| 11:09AM | 21 | After the kidnapping, did you continue to hang out |
| 11:09AM | 22 | with Wayne Miller? |
| 11:09AM | 23 | A    Immediately, like, for a time. |
| 11:09AM | 24 | Q    For a time you did or did not? |
| 11:09AM | 25 | A    For a time I did, and then I think ultimately, I went off |

11:10AM   1    on my own.  I saw that hanging out with him really wasn't going

11:10AM   2    anywhere.  So I just went and did my own thing.

11:10AM   3    Q    At some point after -- I'm going to go forward in time to

11:10AM   4    2018.  And leading up to that, did you deal any drugs with

11:10AM   5    Wayne Miller?

11:10AM   6    A    I did.

11:10AM   7    Q    Also in 2018?

11:10AM   8    A    Correct.

11:10AM   9    Q    Did that include methamphetamine?

11:10AM   10   A    It did.

11:10AM   11   Q    On August 8th of 2018, were you arrested?

11:10AM   12   A    I was.

11:10AM   13   Q    And what was that for?

11:10AM   14   A    It was for conspiracy to sell meth.

11:11AM   15   Q    That's the kidnapping and the drug charge that you pled

11:11AM   16   guilty to, are you referring to the drug charge?

11:11AM   17   A    Correct.

11:11AM   18   Q    And can you tell the jury what you did in relation to

11:11AM   19   that?

11:11AM   20   A    Well, I immediately -- I didn't want to go to prison, so I

11:11AM   21   immediately cooperated with the government.

11:11AM   22   Q    And so the day you were arrested, did you make a statement

11:11AM   23   to law enforcement?

11:11AM   24   A    I did.

11:11AM   25   Q    And you told them you were selling drugs, essentially?

| | | | |
|---|---|---|---|
| 11:12AM | 1 | A | Yeah, I did. |
| 11:12AM | 2 | Q | You didn't mention the kidnapping at that point, right? |
| 11:12AM | 3 | A | No, I didn't. |
| 11:12AM | 4 | Q | That same day you were arrested, did you let the law |
| 11:12AM | 5 | | enforcement search your car? |
| 11:12AM | 6 | A | I did. |
| 11:12AM | 7 | Q | And what are some things that were inside your car that |
| 11:12AM | 8 | | day? |
| 11:12AM | 9 | A | A gun, some oxy, some pills, and some heroin, some ice. |
| 11:12AM | 10 | Q | You had about a half pound of methamphetamine? |
| 11:12AM | 11 | A | Sounds right. |
| 11:12AM | 12 | Q | You mentioned you had a gun? |
| 11:12AM | 13 | A | Um-hm. |
| 11:12AM | 14 | Q | The gun had ammunition? |
| 11:12AM | 15 | A | It did. |
| 11:12AM | 16 | Q | Were you aware that because you were -- you had that prior |
| 11:12AM | 17 | | felony conviction, you weren't allowed to possess a gun or |
| 11:12AM | 18 | | ammunition? |
| 11:12AM | 19 | A | Um-hm, yes, that's true. |
| 11:12AM | 20 | Q | And this all happened -- the kidnapping, the drug dealing, |
| 11:13AM | 21 | | and possessing the gun and drugs, that all happened while you |
| 11:13AM | 22 | | were on supervised release, right? |
| 11:13AM | 23 | A | Yeah, it did. |
| 11:13AM | 24 | Q | Now, specifically the drug count that you pled guilty to, |
| 11:13AM | 25 | | did that involve you getting drugs and sending them to Hawaii? |

| 11:13AM | 1 | A | Yeah, it did. |

11:13AM  1  A    Yeah, it did.

11:13AM  2  Q    Tell us a little bit about that.  I'll rephrase the

11:13AM  3  question.

11:13AM  4        How did you do that?

11:13AM  5  A    Used an address -- one of the places -- I used the address

11:13AM  6  at the methadone clinic because they offered an address for, I

11:14AM  7  guess, their clients, because a majority of their clients, they

11:14AM  8  probably don't have an address.  So I used that address to send

11:14AM  9  boxes, and that's where I would receive it.

11:14AM  10  Q    So you mailed boxes of drugs to Hawaii?

11:14AM  11  A    Correct.

11:14AM  12  Q    And you'd mail ten ounces of meth on one occasion?

11:14AM  13  A    Correct.

11:14AM  14  Q    And about a pound of meth on another occasion?

11:14AM  15  A    Correct.

11:14AM  16  Q    With the -- so you told us that you entered into a

11:14AM  17  cooperation agreement eventually, right?

11:14AM  18  A    Um-hm.

11:14AM  19  Q    And as part of that cooperation, did you provide testimony

11:15AM  20  in the grand jury?

11:15AM  21  A    I did.

11:15AM  22  Q    Have you already been sentenced for the kidnapping and the

11:15AM  23  drug count that you pled guilty to?

11:15AM  24  A    I have.

11:15AM  25  Q    And some counts were dismissed against you as part of that

| | | |
|---|---|---|
| 11:15AM | 1 | plea agreement? |
| 11:15AM | 2 | A    Correct. |
| 11:15AM | 3 | Q    Were you also separately -- were you given any punishment |
| 11:15AM | 4 | because you committed crimes while you were out on supervised |
| 11:15AM | 5 | release? |
| 11:15AM | 6 | A    I have, yeah. |
| 11:15AM | 7 | Q    That was a separate sentence? |
| 11:15AM | 8 | A    It was, yeah. |
| 11:15AM | 9 | Q    Did you receive any type of benefit for your cooperation |
| 11:15AM | 10 | when it came time for sentencing? |
| 11:15AM | 11 | A    I got a two point reduction. |
| 11:15AM | 12 | Q    And explain how you understood that worked. |
| 11:15AM | 13 | A    So I guess sentencing is based off of guidelines which is |
| 11:16AM | 14 | criminal history, which is one category that goes left or |
| 11:16AM | 15 | right, and then the offense level, which goes from 1 to 40 or |
| 11:16AM | 16 | whatever.  So you get a couple of points for acceptance, and |
| 11:16AM | 17 | typically, I guess if you cooperate and it's legitimate, they |
| 11:16AM | 18 | tend to give you a couple more points. |
| 11:16AM | 19 | Q    So was it your understanding that the government had to |
| 11:16AM | 20 | make a motion first for that reduction in points? |
| 11:16AM | 21 | A    Correct. |
| 11:16AM | 22 | Q    And ultimately, who was the person who decided whether or |
| 11:16AM | 23 | not you get any credit for that? |
| 11:16AM | 24 | A    It would be the judge. |
| 11:16AM | 25 | Q    That was the judge who sentenced you? |

| | | | |
|---|---|---|---|
| 11:16AM | 1 | A | Correct. |
| 11:16AM | 2 | Q | So are you hoping to gain anything by testifying here |
| 11:16AM | 3 | | today since you've already been sentenced? |
| 11:16AM | 4 | A | Yeah, that would be great. |
| 11:17AM | 5 | Q | What are you hoping to gain? |
| 11:17AM | 6 | A | I'm hoping to get a reduced sentence. |
| 11:17AM | 7 | Q | You're hoping to get an additional benefit? |
| 11:17AM | 8 | A | Correct. |
| 11:17AM | 9 | Q | Have any promises been made to you? |
| 11:17AM | 10 | A | None. |
| 11:17AM | 11 | Q | Do you recall what you were sentenced to as far as time? |
| 11:17AM | 12 | A | I think I got -- I'm not quite sure.  I think I got |
| 11:17AM | 13 | | 15 years, eight months.  And then an additional 12 months for |
| 11:17AM | 14 | | violation probation. |
| 11:17AM | 15 | Q | Earlier you told us that prior to the kidnapping, Wayne |
| 11:18AM | 16 | | Miller had described how he had fallen out of Michael Miske's |
| 11:18AM | 17 | | good graces. |
| 11:18AM | 18 | A | Um-hm. |
| 11:18AM | 19 | Q | Did Wayne Miller indicate to you anything he was trying to |
| 11:18AM | 20 | | do to sort of get back into those good graces? |
| 11:18AM | 21 | | MR. KENNEDY:  Objection; hearsay, Your Honor. |
| 11:18AM | 22 | | THE COURT:  Overruled.  Go ahead. |
| 11:18AM | 23 | | THE WITNESS:  Not specifically that I remember. |
| 11:18AM | 24 | | BY MR. AKINA: |
| 11:18AM | 25 | Q | You're not aware of anything? |

| | | |
|---|---|---|
| 11:18AM | 1 | A    Yeah. |
| 11:18AM | 2 | MR. AKINA:  Thank you.  I have no further questions. |
| 11:18AM | 3 | THE COURT:  Mr. Kennedy. |
| 11:18AM | 4 | CROSS-EXAMINATION |
| 11:18AM | 5 | BY MR. KENNEDY: |
| 11:18AM | 6 | Q    Sir, this kidnapping happened in October 17th of 2017, |
| 11:18AM | 7 | correct? |
| 11:18AM | 8 | A    I believe so. |
| 11:18AM | 9 | Q    And it's 2024 now, right? |
| 11:19AM | 10 | A    Correct. |
| 11:19AM | 11 | Q    And you mentioned that you gave grand jury testimony, |
| 11:19AM | 12 | right? |
| 11:19AM | 13 | A    Correct. |
| 11:19AM | 14 | Q    And you gave that grand jury testimony not too long after |
| 11:19AM | 15 | you were arrested, correct? |
| 11:19AM | 16 | A    Correct. |
| 11:19AM | 17 | Q    So I believe the government just indicated that on |
| 11:19AM | 18 | August 8th of 2018, you were arrested, right? |
| 11:19AM | 19 | A    Sounds right. |
| 11:19AM | 20 | Q    And then within two months, on October 10th of 2018, you |
| 11:19AM | 21 | were in front of a grand jury, correct? |
| 11:19AM | 22 | A    Correct. |
| 11:19AM | 23 | Q    You would agree with me that the events that happened on |
| 11:19AM | 24 | October 17, 2017 were a little fresher in your mind back then |
| 11:19AM | 25 | than they are today, more than five years later, correct? |

| | | | |
|---|---|---|---|
| 11:19AM | 1 | A | Can you repeat that. |
| 11:19AM | 2 | Q | Sure.  When you testified in front of the grand jury, you |
| 11:19AM | 3 | | raised your hand and you said you would tell them the truth, |
| 11:19AM | 4 | | right? |
| 11:19AM | 5 | A | Correct. |
| 11:19AM | 6 | Q | And you were under penalty of perjury, right? |
| 11:19AM | 7 | A | Correct. |
| 11:19AM | 8 | Q | Just like you are today, right? |
| 11:20AM | 9 | A | Correct. |
| 11:20AM | 10 | Q | You were raising your hand and describing those events |
| 11:20AM | 11 | | less than a year after they happened, right? |
| 11:20AM | 12 | A | I believe so, yeah. |
| 11:20AM | 13 | Q | Now, we are close to six years afterwards, right? |
| 11:20AM | 14 | A | Correct. |
| 11:20AM | 15 | Q | So when you were giving your testimony under oath, you |
| 11:20AM | 16 | | would agree, in front of a grand jury, that those events were a |
| 11:20AM | 17 | | little fresher in your mind than they are today, correct? |
| 11:20AM | 18 | A | Correct. |
| 11:20AM | 19 | Q | Okay.  So I want to ask you some questions. |
| 11:20AM | 20 | | The meeting with the CPA, Wayne Miller had his phone |
| 11:20AM | 21 | | number, right? |
| 11:20AM | 22 | A | I believe so. |
| 11:20AM | 23 | Q | And you observed him calling him, right? |
| 11:20AM | 24 | A | I believe so. |
| 11:20AM | 25 | Q | All right.  So would it help to refresh your recollection |

11:20AM   1   about that to take a look at your sworn testimony to the grand

11:21AM   2   jury on October 10th of 2018?

11:21AM   3   A   Sure.

11:21AM   4   Q   All right.  Just for the witness, Mr. Ortiz, Ms. King,

11:21AM   5   could you put up 7350, go to page 16 and lines one through

11:21AM   6   eight.  And then, sir, just read that to yourself and once

11:21AM   7   you've done so, I'll ask you some questions.  I think -- is it

11:21AM   8   on the defense table?  May we please have it on the defense

11:21AM   9   table?

11:22AM   10           Have you had time to review that, sir?

11:22AM   11   A   Yes.

11:23AM   12   Q   All right.  So let me ask you some questions about that.

11:23AM   13   A   Sure.

11:23AM   14   Q   Wayne Miller had his phone number, correct?

11:23AM   15   A   Correct.

11:23AM   16   Q   You observed him calling the accountant, right?

11:23AM   17   A   Correct.

11:23AM   18   Q   By him, I mean Wayne Miller?

11:23AM   19   A   Yes.

11:23AM   20   Q   Wayne Miller called him a couple of times before you

11:23AM   21   actually met, correct?

11:23AM   22   A   Like I said, that's what I believed.

11:23AM   23   Q   And Wayne Miller set up the appointment to meet the

11:23AM   24   accountant at the Fisherman's Wharf at a certain time, correct?

11:23AM   25   A   Um.

11:23AM   1   Q    Let me ask you this:  Is that your sworn testimony on
11:23AM   2   October 10, 2018?
11:23AM   3   A    It is.
11:23AM   4   Q    All right.  Now, the government asked you a question
11:24AM   5   about, okay, do you remember the time of day, and you said you
11:24AM   6   weren't sure, correct?
11:24AM   7   A    Um-hm.
11:24AM   8   Q    Do you recall that it was -- do you recall your sworn
11:24AM   9   testimony on October 10, 2018?
11:24AM   10  A    This right here?
11:24AM   11  Q    No.  We can remove this from the screen for a second and
11:24AM   12  just keep page 16 up.
11:24AM   13       Do you recall the time that Wayne Miller set up the
11:24AM   14  appointment with the accountant?
11:24AM   15  A    No.
11:24AM   16  Q    All right.  Would looking at your sworn testimony on
11:24AM   17  October 10th of 2018 help you remember?
11:24AM   18  A    Sure.
11:24AM   19  Q    All right.  Ms. King, if you could pull up 7350, page 16,
11:24AM   20  lines 19 through 24, just for Mr. Ortiz.  Lines 19 through 24.
11:25AM   21  If I said 1 through 8, I apologize.  Looks to be frozen.  If we
11:25AM   22  could blow up lines 19 through 24 so it's a little easier for
11:25AM   23  Mr. Ortiz to read it.
11:25AM   24       Take a chance to read those lines, sir, and when you
11:25AM   25  are done, just let me know and I'll ask you a question.

| | | | |
|---|---|---|---|
| 11:25AM | 1 | A | Go ahead. |
| 11:25AM | 2 | Q | Does reading that help refresh your recollection? |
| 11:25AM | 3 | A | Sure. |

11:25AM   4   Q   So on October 10, 2018, you were asked, Do you remember

11:26AM   5   what time a day more or less it was you met?  And your answer

11:26AM   6   was, Before I was still -- I know it was later in the evening

11:26AM   7   but still very light outside.  Correct?

11:26AM   8   A   Correct.

11:26AM   9   Q   So it was evening but still light.  That's what you told

11:26AM   10   the grand jury on October 10th of 2018, correct?

11:26AM   11       MR. AKINA:  Could we let the witness answer the

11:26AM   12   question, please.

11:26AM   13       MR. KENNEDY:  I asked a follow-up question.

11:26AM   14       THE COURT:  Go ahead and answer the question.

11:26AM   15       THE WITNESS:  So you are asking the exact time that we

11:26AM   16   called or are you asking like -- I mean, that's what I told the

11:26AM   17   grand jury.

11:26AM   18   BY MR. KENNEDY:

11:26AM   19   Q   Let me ask you this way, sir.  Did you tell the grand jury

11:26AM   20   on October 10, 2018 under oath that you knew it was later in

11:27AM   21   the evening but it was still light outside?

11:27AM   22   A   Yeah, but define evening.  I mean --

11:27AM   23   Q   Those were your words, right, to a grand jury under oath,

11:27AM   24   right?

11:27AM   25   A   Yes.

11:27AM   1   Q   So as I take it, it's the evening but still light, right?

11:27AM   2   A   Yeah.

11:27AM   3   Q   As opposed to the evening and dark?

11:27AM   4   A   Yeah.  So evening is like after lunch, before dinner,

11:27AM   5   around dinner.

11:27AM   6   Q   Around dinner?

11:27AM   7   A   After lunch.

11:27AM   8   Q   After lunch.  Okay.

11:27AM   9   A   Fair to say.

11:27AM   10   Q   Now, when you talked to the FBI on September 28th of 2018,

11:27AM   11   you said that you met them around five p.m., correct?

11:27AM   12   A   I don't remember.

11:28AM   13   Q   If we could pull up Exhibit 9012-005, the fourth page to

11:28AM   14   see if that refreshes your recollection, sir.  And if you could

11:28AM   15   blow up the last paragraph on 9012-05-004.  Read that to

11:28AM   16   yourself, please.

11:28AM   17   A   Okay.

11:29AM   18   Q   Have you had a chance to review that?

11:29AM   19   A   I have.

11:29AM   20   Q   So question is, when you spoke with the FBI on

11:29AM   21   September 28, 2018, that was part of your proffer agreement,

11:29AM   22   correct?

11:29AM   23   A   Correct.

11:29AM   24   Q   You told them that Mr. Miller called the accountant a

11:29AM   25   couple of days prior to the kidnapping, correct?

| | | | |
|---|---|---|---|
| 11:30AM | 1 | A | Um-hm. |
| 11:30AM | 2 | Q | Once on the day of the kidnapping, right? |
| 11:30AM | 3 | A | I believe so. |
| 11:30AM | 4 | Q | That's consistent with what you told the grand jury, |
| 11:30AM | 5 | | correct? |
| 11:30AM | 6 | A | I believe so. |
| 11:30AM | 7 | Q | And it's consistent with what you told these folks today, |
| 11:30AM | 8 | | that Mr. Miller made the call? |
| 11:30AM | 9 | A | I believe so. |
| 11:30AM | 10 | Q | All right.  Mr. Miller was able to get the accountant to |
| 11:30AM | 11 | | agree to a meeting, correct? |
| 11:30AM | 12 | A | Correct. |
| 11:30AM | 13 | Q | You told them on September 28th, they agreed to meet in |
| 11:30AM | 14 | | the evening? |
| 11:30AM | 15 | A | I don't remember the exact time, but I mean, at some |
| 11:30AM | 16 | | point, yeah. |
| 11:30AM | 17 | Q | And you told the FBI that you and Miller drove to the area |
| 11:30AM | 18 | | around five p.m. approximately one hour before the proposed |
| 11:30AM | 19 | | meeting time? |
| 11:30AM | 20 | A | Yeah, again, like the exact time isn't -- again, these are |
| 11:30AM | 21 | | just guesses.  Like, I couldn't honestly tell you, you know, |
| 11:31AM | 22 | | the exact time.  I mean, when I was saying this, I was just |
| 11:31AM | 23 | | kind of like giving the best recollection. |
| 11:31AM | 24 | Q | Okay.  So the best recollection was you agreed to meet in |
| 11:31AM | 25 | | the evening around 5:00, right? |

11:31AM   1   A      Um-hm.

11:31AM   2   Q      Is that what you told the FBI on the 28th of September,

11:31AM   3   2018?

11:31AM   4   A      That's what it looks like.

11:31AM   5   Q      Now, sir, during that meeting, they were asking you about

11:31AM   6   locations, so I'm going to show you what has been marked as

11:31AM   7   9012-014-001.  I'm sorry, I misspoke.  That was my mistake.

11:31AM   8   9010-014-001.

11:32AM   9          Do you recall that the FBI was working with you with

11:32AM  10   Google and dropping a pin right near where you said you met the

11:32AM  11   accountant, correct?

11:32AM  12   A      Repeat that.

11:32AM  13   Q      Yes.  You were describing where you went, correct?

11:32AM  14   A      Correct.

11:32AM  15   Q      The FBI was using Google Maps to show you a location,

11:32AM  16   correct?

11:32AM  17   A      When?  The FBI?

11:32AM  18   Q      When you were meeting with them on September 28th, sir.

11:32AM  19   A      I think I told them where we met.

11:32AM  20   Q      Right.  And then they showed you a location and you

11:32AM  21   dropped a pin to show them exactly where the meeting occurred

11:32AM  22   during that interview; do you recall that?

11:32AM  23   A      I believe so.

11:32AM  24   Q      All right.  Looking at 9012-014, does that look like the

11:33AM  25   location of where you described the kidnapping of the

11:33AM    1    accountant?

11:33AM    2    A    That's what it looks like.

11:33AM    3           MR. KENNEDY:  At this time, I would move 9012-014 into

11:33AM    4    evidence.

11:33AM    5           MR. AKINA:  No objection.

11:33AM    6           THE COURT:  I want to be clear, because you just gave

11:33AM    7    two different numbers, Mr. Kennedy.

11:33AM    8           MR. KENNEDY:  I'm sorry.  It's 9012-014 and that is my

11:33AM    9    mistake, Your Honor.  I did give two numbers.

11:33AM    10           THE COURT:  So it's 9012-014-001?

11:33AM    11           MR. KENNEDY:  Yes.

11:33AM    12           THE COURT:  So without objection, that document is

11:33AM    13    admitted and you may publish.

11:33AM    14           (Exhibit 9012-014-001 was received in evidence.)

11:33AM    15    BY MR. KENNEDY:

11:33AM    16    Q    So now, this is the location of where the kidnapping

11:33AM    17    happened, correct?

11:33AM    18    A    I believe so.

11:33AM    19    Q    And you were helping the FBI see exactly where it was the

11:34AM    20    at, right?

11:34AM    21    A    I believe so.

11:34AM    22    Q    Now, previous to that, you had met with the ATF, right?

11:34AM    23    A    When?

11:34AM    24    Q    Or was it the DEA?  You were talking to a lot of folks.

11:34AM    25           Do you recall that?

11:34AM   1   A   I don't know which time you're talking about.

11:34AM   2   Q   All right.  I think it was the DEA.  Do you recall meeting

11:34AM   3   with them on both the 21st of September and the 28th of

11:34AM   4   September?

11:34AM   5   A   I honestly -- I don't know any dates.  I do remember

11:34AM   6   meeting with them.

11:34AM   7   Q   Okay, and they asked you questions.

11:34AM   8       So the way this progressed was you had a meeting first

11:34AM   9   with the DEA, right?

11:34AM   10   A   I honestly don't remember.

11:34AM   11   Q   Because the DEA was who was arrested you?

11:34AM   12   A   Are you talking about the day of my arrest?

11:34AM   13   Q   No.  I'm talking about in September of 2018 after you were

11:34AM   14   cooperating.

11:35AM   15   A   At what point, though?

11:35AM   16   Q   Would it help refresh your recollection if you saw a

11:35AM   17   report?

11:35AM   18   A   Sure.

11:35AM   19   Q   All right.  Let's pull up 9012-008.

11:35AM   20       Now you said you had a proffer agreement pursuant to

11:35AM   21   your plea agreement, right?

11:35AM   22       MR. AKINA:  Objection.  It's not exactly what the

11:35AM   23   witness said.

11:35AM   24   BY MR. KENNEDY:

11:35AM   25   Q   You had a proffer agreement, right?

11:35AM    1    A    I did.

11:35AM    2    Q    And you know what a proffer agreement is; it's an

11:35AM    3    agreement that you get to talk and they can't use that against

11:35AM    4    you, right?

11:35AM    5    A    Correct.

11:35AM    6    Q    All right.  And so this was an interview that you see on

11:35AM    7    the 21st and the 28th of September pursuant to your proffer

11:35AM    8    agreement, right?  Do you see that your attorney was there?

11:36AM    9    A    Where does it say that?

11:36AM   10    Q    Up in the first paragraph, sir.

11:36AM   11    A    Okay.

11:36AM   12    Q    All right.  And do you see someone from the

11:36AM   13    U.S. Attorney's office was there?

11:36AM   14    A    Um-hm.

11:36AM   15    Q    And there were agents from the DEA there?

11:36AM   16    A    Um-hm.

11:36AM   17    Q    Okay.  So now, if we go to page three of that, and if we

11:37AM   18    go down to the bottom portion of that document and just blow

11:37AM   19    that up, if you begin with the first line, just read that first

11:37AM   20    sentence.  And then if you read the second sentence as well,

11:37AM   21    let me know when you are finished.

11:37AM   22    A    You want me to read it?

11:37AM   23    Q    Just to yourself, yes.  Have you finished that, sir?

11:38AM   24    A    I'm on the last one.  Okay.

11:38AM   25         THE COURT:  Mr. Kennedy, just a second.  Just one

11:38AM   1   second, Tammy.  Just a second.

11:38AM   2              MR. KENNEDY:  You got it.

11:39AM   3              THE COURT:  As soon as Ms. Kimura is back, you may

11:39AM   4   resume, Mr. Kennedy.

11:40AM   5              Go ahead.

11:40AM   6   BY MR. KENNEDY:

11:40AM   7   Q    So sir, during those proffer sessions, you said at dusk

11:40AM   8   the accountant pulled up in an a small black sports utility

11:40AM   9   vehicle, correct?

11:40AM   10   A    After reading this, it's like, you know, obviously at the

11:40AM   11   time of saying this, that's, you know, what I believed to be

11:40AM   12   true.  And then we are here six years later, and obviously some

11:41AM   13   things aren't as clear and some things are a little more clear.

11:41AM   14   So.

11:41AM   15   Q    The question is, sir, did you tell him --

11:41AM   16   A    What is the exact question?

11:41AM   17   Q    Did you tell the DEA on September 21st and/or 28th of 2018

11:41AM   18   that the accountant pulled up at dusk in a small black sports

11:41AM   19   utility vehicle?

11:41AM   20   A    Yeah.  I don't actually remember saying that exactly, but

11:41AM   21   I mean, that's what's written.

11:41AM   22   Q    You can pull that down.  That would be consistent with

11:41AM   23   sometime around five p.m., right?

11:41AM   24   A    Sure.

11:41AM   25   Q    And it would be consistent with your sworn testimony on

| | | |
|---|---|---|
| 11:41AM | 1 | October 10th of 2018 that it was in the evening, but it was |
| 11:42AM | 2 | still light outside, correct? |
| 11:42AM | 3 | A    Yeah.  Again, I don't remember exactly what I said, but... |
| 11:42AM | 4 | Q    Well, I'm not asking you exactly.  You saw it, you said it |
| 11:42AM | 5 | under oath; the same oath you took today, right? |
| 11:42AM | 6 | A    Um-hm. |
| 11:42AM | 7 | Q    Now, Mr. Miller -- Wayne Miller drove his black Crown Vic |
| 11:42AM | 8 | during that kidnapping, didn't he? |
| 11:42AM | 9 | A    Yeah.  We both did. |
| 11:42AM | 10 | Q    Yeah.  It wasn't being painted.  It was used during the |
| 11:43AM | 11 | kidnapping, wasn't it? |
| 11:43AM | 12 | A    His Crown Vic? |
| 11:43AM | 13 | Q    Yes. |
| 11:43AM | 14 | A    Yes. |
| 11:43AM | 15 | Q    And you drove it because it reassembled a cop car? |
| 11:43AM | 16 | A    I mean, that was his car as well, but yeah. |
| 11:43AM | 17 | Q    And he got it from an auction and it was an old police |
| 11:43AM | 18 | vehicle, right? |
| 11:43AM | 19 | A    Correct. |
| 11:43AM | 20 | Q    And so the plan was for you to impersonate police |
| 11:43AM | 21 | officers, so driving in a car that looked like a police car |
| 11:43AM | 22 | because it had been part of the plan? |
| 11:43AM | 23 | A    Yeah, I believe so. |
| 11:43AM | 24 | Q    Now, you told the jury that Mr. Miller beat the accountant |
| 11:43AM | 25 | with his fist? |

11:43AM  1   A   You're asking me if I said that?

11:44AM  2   Q   Yes.

11:44AM  3   A   I believe so.

11:44AM  4   Q   He used a pistol and he pistol whipped him, right?

11:44AM  5   A   Correct.

11:44AM  6   Q   He also had a silencer and he put it against his head and

11:44AM  7   told him he was going to kill him if he didn't give him money,

11:44AM  8   correct?

11:44AM  9   A   I believe so at one point.

11:44AM 10   Q   You don't think so; you've given sworn testimony to that

11:44AM 11   fact, haven't you, sir?

11:44AM 12   A   I have.

11:44AM 13   Q   And so your words were, I'm not sure at that point if

11:44AM 14   that's when he pistol whipped him or if it was another point,

11:44AM 15   you know, he threatened to kill him if he didn't give the

11:44AM 16   money.

11:44AM 17       He had a gun with a silencer, right?

11:44AM 18   A   Correct.

11:44AM 19   Q   So he had a chrome 357 that day, right?

11:44AM 20   A   I don't know exactly what a 357 is.

11:44AM 21   Q   Okay.  And he had a smaller pistol with a silencer, right?

11:44AM 22   A   That's the one I remember.

11:44AM 23   Q   And he had access to another black pistol with a silencer

11:45AM 24   that day.

11:45AM 25       That's what you told the FBI, right?

| | | | |
|---|---|---|---|
| 11:45AM | 1 | A | Correct. |
| 11:45AM | 2 | Q | Now, with respect to this silencer, you remember that |
| 11:45AM | 3 | | Wayne Miller got it from somebody's house, one of his buddies. |
| 11:45AM | 4 | | Do you recall that? |
| 11:45AM | 5 | A | I do. |
| 11:45AM | 6 | Q | And then that person did the milling of it? |
| 11:45AM | 7 | A | I believe so, yeah. |
| 11:45AM | 8 | Q | And that person is Norm Akau, isn't it? |
| 11:45AM | 9 | A | Honestly, I don't know who. |
| 11:45AM | 10 | Q | Now, in using that silencer with a pistol, he literally |
| 11:45AM | 11 | | put it to the guy's temple demanding money, correct? |
| 11:45AM | 12 | A | I don't know if he, like, actually pressed it against his |
| 11:46AM | 13 | | head.  Again, I was driving, so it was being in the rear view |
| 11:46AM | 14 | | mirror. |
| 11:46AM | 15 | Q | Didn't you tell the FBI under a proffer agreement that |
| 11:46AM | 16 | | Miller placed the pistol with the silencer against the |
| 11:46AM | 17 | | accountant's head at one point, demanding money? |
| 11:46AM | 18 | A | Yeah, but like I said, I don't know if it was actually, |
| 11:46AM | 19 | | like, pressed, you know what I mean.  I just know it was, like, |
| 11:46AM | 20 | | pointed. |
| 11:46AM | 21 | Q | Pointed at his head threatening to kill him? |
| 11:46AM | 22 | A | Correct. |
| 11:46AM | 23 | Q | All right.  Now, I'd like to pull up some photographs at |
| 11:46AM | 24 | | this point that are in evidence.  Exhibits 6015-0001. |
| 11:46AM | 25 | | And can we publish 6015-0001? |

11:47AM   1           THE COURT:  This is on the original list?

11:47AM   2           MR. KENNEDY:  Yes, Your Honor.

11:47AM   3           MS. PANAGAKOS:  No, it's --

11:47AM   4           MR. KENNEDY:  Oh, no?  Let me grab this and I'll tell

11:47AM   5   you.  First supplemental, Your Honor.

11:47AM   6           THE COURT:  Yes.  Go ahead.

11:47AM   7   BY MR. KENNEDY:

11:47AM   8   Q    All right.  If we move to Exhibit 6015-0011.

11:47AM   9           Do you recognize what is shown by the placard number

11:47AM   10  nine?

11:47AM   11  A    Um-hm.

11:47AM   12  Q    How is it that you recognize it?

11:47AM   13  A    I mean, it looks like the handcuffs that we used.

11:47AM   14  Q    Now, if we move to placard eight and blow that up.  You

11:48AM   15  mentioned going to an antique store.

11:48AM   16  A    Um-hm.

11:48AM   17  Q    Does that look like one of the items that you saw, told

11:48AM   18  Wayne Miller about, and he purchased?

11:48AM   19  A    I mean, I don't know if it's the exact one, but it looks

11:48AM   20  like it.

11:48AM   21  Q    All right.  Looking at item seven, if we blow that one up.

11:48AM   22           Similar to your last testimony, sir?

11:48AM   23  A    Correct.

11:48AM   24  Q    All right.  Looking at item six.  I take it you had at

11:48AM   25  least two that day.

11:48AM   1               Did you buy three?

11:48AM   2   A   I honestly -- I don't remember.  Very well could have.

11:48AM   3   Q   All right.  Let's --

11:48AM   4   A   I know, like I said, there was more.  There was another

11:48AM   5   one that we didn't get obviously.  There was an old fire

11:49AM   6   marshal badge or something, a fireman or something.

11:49AM   7   Q   Okay.  All right.  Let's look at Exhibit 6015-0053.

11:49AM   8               Do you recognize that gun?

11:49AM   9   A   Um-hm.

11:49AM   10  Q   That's because that's a 22 magazine and a silencer,

11:49AM   11  correct?

11:49AM   12  A   I believe so.

11:49AM   13  Q   And that's what Wayne Miller had with him that day, wasn't

11:49AM   14  it?

11:49AM   15  A   I believe so.

11:49AM   16  Q   Let's go to 6015-0057.  That's the silencer portion?

11:49AM   17  A   Looks like it.

11:49AM   18  Q   All right.  Let's go to Exhibit 6015-0060.  The other end

11:50AM   19  of the silencer, correct?

11:50AM   20  A   Uh --

11:50AM   21  Q   You can see it's got some threads on it so it fits on to

11:50AM   22  the threaded end of the 22?

11:50AM   23  A   Um-hm.

11:50AM   24  Q   Let's move to 6015-0061.  6015-0063.

11:50AM   25               Now you said that he was pistol whipping the

11:50AM   1   accountant?

11:50AM   2   A     Yeah.  He struck him.

11:50AM   3   Q     6015-0067.  6015-0075.  And that's the pistol you

11:50AM   4   recognized, correct?

11:50AM   5   A     I believe so.

11:50AM   6   Q     6015-0077.  Close up view, correct?  6015-0085.

11:51AM   7   6015-0089.  6015-0094.  All right.

11:51AM   8         Now, you saw the badges at the antique store, but

11:51AM   9   Wayne Miller is the one who purchased them, right?

11:51AM   10  A     Correct.

11:51AM   11  Q     So I want to show you some photos that are in evidence.

11:51AM   12  6015-0011.  If we could just pull up -- there we go.  So

11:52AM   13  orienting you to these nine different tabs, I'm going to show

11:52AM   14  you some close ups of some of the items, all right, sir.

11:52AM   15  Exhibit 6015-0099.

11:52AM   16        Now that you have a close up, does that look like the

11:52AM   17  badge that you saw that Wayne Miller purchased?

11:52AM   18  A     It is.  It does look like it.

11:52AM   19  Q     6015-0104.  Does that look like another badge that you saw

11:52AM   20  that Wayne Miller purchased?

11:52AM   21  A     It does.

11:52AM   22  Q     6015-0107.  Does that look like another badge that you saw

11:52AM   23  that Wayne Miller purchased?

11:52AM   24  A     Possibly.  More so, the other ones for sure.

11:53AM   25  Q     Okay.  This might just be one that you don't recognize; is

11:53AM   1   that right?

11:53AM   2   A   I mean, all badges kind of look the same.

11:53AM   3   Q   Let's look at 6015-0112.

11:53AM   4       These reassemble the handcuffs that you used that day?

11:53AM   5   A   I would say, yeah.

11:53AM   6   Q   Do they look like the ones that you did use?

11:53AM   7   A   Excuse me?

11:53AM   8   Q   Does it look like they are the ones you did use?

11:53AM   9   A   Yeah, it does.

11:53AM   10   Q   Let's look at 6015-0170.  Now, do you recognize this TUMI

11:53AM   11   Global Locater?

11:54AM   12   A   I don't.

11:54AM   13   Q   All right.  Let's look at 6015-0174.

11:54AM   14   A   That might be --

11:54AM   15   Q   All right.  That would be the backside.  6015-0176.

11:54AM   16       Have you seen this global locater TUMI opened up?

11:54AM   17   A   Um...

11:54AM   18   Q   Is that a yes or no, sir?

11:54AM   19   A   Yes.  It looks like one that I actually bought before.

11:54AM   20   Q   Okay.  6015-0178.  If we can go in on the TUMI receipt

11:55AM   21   that's shown in it 6015-0178.

11:55AM   22       Is that blown up enough for you to see that, sir?

11:55AM   23   Perhaps we can highlight the top portion of that receipt.

11:55AM   24   A   Yeah, I remember that.

11:55AM   25   Q   Okay.  This is one you bought, correct?

| | | | |
|---|---|---|---|
| 11:55AM | 1 | A | Yes. |
| 11:55AM | 2 | Q | In Palm Springs -- Palm Desert, California? |
| 11:55AM | 3 | A | Correct. |
| 11:55AM | 4 | Q | This is part of what you were there for when you were |
| 11:55AM | 5 | | setting up the drug dealing? |
| 11:55AM | 6 | A | Correct. |
| 11:55AM | 7 | Q | Because the supply was coming from California to Hawaii, |
| 11:55AM | 8 | | correct? |
| 11:55AM | 9 | A | Um-hm. |
| 11:55AM | 10 | Q | And that Wayne Miller was with you, right? |
| 11:55AM | 11 | A | I'm not sure. |
| 11:55AM | 12 | Q | And the two of you were doing this together, right? |
| 11:55AM | 13 | A | Yeah.  I mean, obviously, we didn't go to every store |
| 11:56AM | 14 | | together, but. |
| 11:56AM | 15 | Q | I meant you were together on the trip. |
| 11:56AM | 16 | | You were together in these drug dealing of ice at this |
| 11:56AM | 17 | | time? |
| 11:56AM | 18 | A | Correct. |
| 11:56AM | 19 | Q | And so this was a tracker that Mr. Miller and you |
| 11:56AM | 20 | | purchased, right? |
| 11:56AM | 21 | A | I think I purchased it. |
| 11:56AM | 22 | Q | All right.  Now, when you were arrested, you didn't have |
| 11:56AM | 23 | | it, did you? |
| 11:56AM | 24 | A | I don't think so. |
| 11:56AM | 25 | Q | You knew that Wayne Miller had it, right? |

11:56AM    1    A    No, actually, I don't know what happened to it.

11:56AM    2    Q    Okay.  So it could be that Wayne Miller stole it from you?

11:56AM    3           MR. AKINA:  Objection; speculation.

11:56AM    4           THE COURT:  You can answer.  Go ahead.

11:56AM    5           THE WITNESS:  I honestly don't know what happened to

11:56AM    6    it.  I remember buying it, yeah.

11:56AM    7    BY MR. KENNEDY:

11:56AM    8    Q    All right.  If we can go down from that and look at

11:56AM    9    6015-0181 and 605-0184 (verbatim).

11:57AM    10          Now, this 1515 South King Street, that's where you

11:57AM    11   were staying at, right?

11:57AM    12   A    With Wayne, or...

11:57AM    13   Q    With Wayne.

11:57AM    14   A    No.  I think I was staying here on my own.

11:57AM    15   Q    All right.  Eventually you and Wayne were staying together

11:57AM    16   though, right?

11:57AM    17   A    Yeah.  This is -- this was an older one.  This was, like,

11:57AM    18   way before we did the kidnapping and stuff.  It used to have

11:57AM    19   packages sent there as well.

11:57AM    20   Q    Okay.  So this was another location where you were having

11:57AM    21   packages of ice sent to distribute drugs, right?

11:57AM    22   A    Correct.

11:57AM    23   Q    And this involved Wayne Miller as well, right?

11:58AM    24   A    These ones, I don't know if they did because there was a

11:58AM    25   time when I was working with him and there was a time when I

11:58AM  1   wasn't.

11:58AM  2   Q    So there was a time you were working with him, right?

11:58AM  3   A    Right.

11:58AM  4   Q    There was a time you weren't, right?

11:58AM  5   A    Yeah.  I think this was the time that I wasn't, because

11:58AM  6   like I said, when I wasn't around him, things were getting

11:58AM  7   done.  So I honestly -- I couldn't tell you.

11:58AM  8   Q    Okay.  Fair enough.  When you were working with him, what

11:58AM  9   that meant was you were receiving drugs and the two of you were

11:58AM  10  selling it and keeping the money, right?

11:58AM  11  A    Yes.

11:58AM  12  Q    Okay.  Now, you mentioned with respect to the accountant

11:58AM  13  that Mr. Miller had been tracking the CPA for some time, right?

11:58AM  14  A    Repeat that.

11:58AM  15  Q    Yeah.  You mentioned that Wayne Miller told you that he

11:58AM  16  had been tracking the CPA, the accountant for some time?

11:59AM  17  A    Correct.

11:59AM  18  Q    And you knew that he had been watching the guy, right?

11:59AM  19  A    Yes.

11:59AM  20  Q    Observing him, yes?

11:59AM  21  A    Um-hm.

11:59AM  22  Q    Knew his hours, right?

11:59AM  23  A    Um-hm.

11:59AM  24  Q    Knew where he lived, right?

11:59AM  25  A    Um-hm.

| | | | |
|---|---|---|---|
| 11:59AM | 1 | Q | And knew his routine, right? |
| 11:59AM | 2 | A | Correct. |
| 11:59AM | 3 | Q | And so he had been spending a fair amount of time on this, |
| 11:59AM | 4 | | right? |
| 11:59AM | 5 | A | Yeah. |
| 11:59AM | 6 | Q | Okay.  And so the deal was that you were to make 50,000? |
| 11:59AM | 7 | A | Correct. |
| 11:59AM | 8 | Q | He was to make 50,000? |
| 11:59AM | 9 | A | Um-hm. |
| 11:59AM | 10 | Q | Because the CPA was dirty and had stolen money? |
| 11:59AM | 11 | A | Correct. |
| 11:59AM | 12 | Q | And so there was a hundred thousand in it? |
| 11:59AM | 13 | A | Um-hm. |
| 11:59AM | 14 | Q | Okay.  Now, you mentioned that you were homeless, right? |
| 11:59AM | 15 | A | Correct. |
| 11:59AM | 16 | Q | You didn't have a place to stay? |
| 12:00PM | 17 | A | Um-hm. |
| 12:00PM | 18 | Q | You were staying at your friend's house. |
| 12:00PM | 19 | | And this was right around the time when the kidnapping |
| 12:00PM | 20 | | happened, correct? |
| 12:00PM | 21 | A | Sorry, repeat that. |
| 12:00PM | 22 | Q | You were staying at your friend's house at the time the |
| 12:00PM | 23 | | kidnapping happened? |
| 12:00PM | 24 | A | Yes, correct. |
| 12:00PM | 25 | Q | Before that, you and Wayne Miller -- let me step back. |

12:00PM    1              You and Wayne Miller were staying at your friend's

12:00PM    2    house together, correct?

12:00PM    3    A    Correct.

12:00PM    4    Q    Before that, you and Wayne Miller were staying at a vacant

12:00PM    5    apartment, right?

12:00PM    6    A    Correct.

12:00PM    7    Q    So you were basically just slumming it there, right?

12:00PM    8    A    Yes, correct.

12:00PM    9    Q    You didn't have any money, right?

12:00PM   10    A    Um-hm.

12:00PM   11    Q    You didn't have a source of income?

12:00PM   12    A    Um-hm.

12:00PM   13    Q    You are addicted to heroin?

12:00PM   14    A    Um-hm.

12:00PM   15    Q    Sounds like he has now become addicted to heroin?

12:00PM   16    A    Um-hm.

12:00PM   17    Q    You are saying um-hm.  Is that a yes?

12:01PM   18    A    That's a yes.

12:01PM   19    Q    Okay, because the court reporter has to write down your

12:01PM   20    answer.

12:01PM   21    A    No problem.  You got it.

12:01PM   22    Q    So that's a yes to you were addicted to heroin?

12:01PM   23    A    Yes.

12:01PM   24    Q    Wayne Miller was addicted to heroin?

12:01PM   25    A    Yes.

12:01PM   1   Q    And I believe you just told us, I think for the first

12:01PM   2   time, that you actually shot up heroin while you were

12:01PM   3   kidnapping this accountant?

12:01PM   4   A    Is that a question?

12:01PM   5   Q    Yes.

12:01PM   6   A    Yeah, I would shoot up heroin.

12:01PM   7   Q    Right.  Because you didn't tell the grand jury back that

12:01PM   8   in October 2018, did you?

12:01PM   9            MR. AKINA:  Objection, Your Honor; 403.

12:01PM   10           THE COURT:  Sustained.

12:01PM   11           THE WITNESS:  Is that a question?

12:01PM   12  BY MR. KENNEDY:

12:01PM   13  Q    It was sustained so you don't need to answer it, sir.

12:01PM   14           Now, you mentioned that a couple days before the

12:02PM   15  kidnapping, Wayne Miller went to Kama'aina Termite and Pest

12:02PM   16  Control.

12:02PM   17  A    Correct.

12:02PM   18  Q    Were you aware that his relative works there?

12:02PM   19  A    I was not.

12:02PM   20  Q    Were you aware that she purchased the tracking device?

12:02PM   21  A    I was not.

12:02PM   22  Q    Were you aware that he was paying her money for that

12:02PM   23  tracking device?

12:02PM   24  A    I was not.

12:02PM   25  Q    Because when you answered previously earlier to the jury,

| | | |
|---|---|---|
| 12:02PM | 1 | you said that you guessed that it came from there, right? |
| 12:02PM | 2 | A    Correct. |
| 12:02PM | 3 | Q    And you guessed because what happened was Wayne came back, |
| 12:02PM | 4 | right, got in the car. |
| 12:02PM | 5 |         You drove a short distance and then the two of you |
| 12:02PM | 6 | smoked heroin, right? |
| 12:03PM | 7 | A    Correct. |
| 12:03PM | 8 | Q    So it was after you smoked heroin in the car that later he |
| 12:03PM | 9 | showed you the tracking device, right? |
| 12:03PM | 10 | A    That is correct. |
| 12:03PM | 11 | Q    And then he said I've been surveilling, right, and using |
| 12:03PM | 12 | it, right? |
| 12:03PM | 13 | A    Correct. |
| 12:03PM | 14 | Q    So it was only after you had smoked heroin and sometime |
| 12:03PM | 15 | later did he show it to you, correct? |
| 12:03PM | 16 | A    That is correct. |
| 12:03PM | 17 | Q    Now, you mentioned that Mr. Wayne Miller had spent |
| 12:03PM | 18 | multiple times observing this accountant, right? |
| 12:03PM | 19 | A    That's what he said. |
| 12:03PM | 20 | Q    And I believe that while Mr. Wayne Miller was beating the |
| 12:04PM | 21 | accountant, saying "Give us the money or we will kill you," he |
| 12:04PM | 22 | was pleading to let him go? |
| 12:04PM | 23 | A    The accountant? |
| 12:04PM | 24 | Q    Yes. |
| 12:04PM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 12:04PM | 1 | Q | Directed at Wayne Miller, right? |
| 12:04PM | 2 | A | I mean, I'm pretty sure just in general he wanted -- |
| 12:04PM | 3 | Q | He was the one with the gun, right? |
| 12:04PM | 4 | A | Correct. |
| 12:04PM | 5 | Q | You didn't have one, did you? |
| 12:04PM | 6 | A | No, sir. |
| 12:04PM | 7 | Q | All right.  Now, the government asked you about some stops |
| 12:04PM | 8 | | along the way that you had been, so I want to go over that with |
| 12:04PM | 9 | | you. |
| 12:04PM | 10 | A | Sure. |
| 12:04PM | 11 | Q | You indicated several stops and you've given some |
| 12:04PM | 12 | | testimony about it. |
| 12:04PM | 13 | A | Um-hm. |
| 12:04PM | 14 | Q | So do you recall the first stop that you made? |
| 12:05PM | 15 | A | The one on my friend's street. |
| 12:05PM | 16 | Q | Yes.  So let's take a look at 7350 page 21, lines seven |
| 12:05PM | 17 | | through 22.  Just read that to yourself, sir, and I want to ask |
| 12:05PM | 18 | | you some questions about it. |
| 12:06PM | 19 | A | Okay. |
| 12:06PM | 20 | Q | All right.  Now, I'd like to pull up at this point Exhibit |
| 12:06PM | 21 | | 9012-005, which is not in evidence. |
| 12:06PM | 22 | | Now, you testified about your first stop to the grand |
| 12:06PM | 23 | | jury on October 10th of 2018, right?  You just saw that, |
| 12:06PM | 24 | | correct? |
| 12:06PM | 25 | A | Correct. |

12:06PM   1   Q    And you also told the FBI about it on September 28th of

12:06PM   2   2018 as well, correct?

12:06PM   3   A    I believe so.

12:06PM   4   Q    All right.  So I want to show you what has been marked as

12:06PM   5   9012-014-0002, which is not in evidence yet.  And I believe it

12:06PM   6   would be in the first supplemental, correct, or is it -- yeah,

12:07PM   7   that one should be in the first, I believe.

12:07PM   8            MS. PANAGAKOS:  It's in the original list.

12:07PM   9            MR. KENNEDY:  It's in the original list.  I apologize,

12:07PM   10   Your Honor.

12:07PM   11            MS. PANAGAKOS:  I'm sorry.  It's the first

12:07PM   12   supplemental.  I'm sorry, Your Honor.

12:08PM   13            THE COURT:  Go ahead.

12:08PM   14   BY MR. KENNEDY:

12:08PM   15   Q    Sir, I'm showing you 9012-014-0002.

12:08PM   16            You recognize that as the location where you made the

12:08PM   17   first stop when you discussed this with the FBI?

12:08PM   18   A    Yeah, I'm not sure if this was the first stop.  I just

12:08PM   19   know it was one of the stops that stuck out to me because I'm

12:08PM   20   familiar with the surroundings.  I have a friend that lives

12:08PM   21   around there.  So when we stopped there, it kind of stuck out

12:08PM   22   to me.

12:08PM   23            MR. KENNEDY:  At this time, Your Honor, I would move

12:08PM   24   9012-014-0002 into evidence.

12:08PM   25            THE COURT:  Any objection?

12:08PM    1               MR. AKINA:  No objection.

12:08PM    2               THE COURT:  Without objection --

12:08PM    3               MR. KENNEDY:  May we publish.

12:08PM    4               THE COURT:  You may.  Without objection, that document

12:09PM    5     is admitted, 9012-014-0002.

12:09PM    6               (Exhibit 9012-014-0002 was received in evidence.)

12:09PM    7     BY MR. KENNEDY:

12:09PM    8     Q    So this is at the near Prospect and Alapai, right?

12:09PM    9     A    Correct.

12:09PM   10     Q    Okay.  And this isn't the Sheridan Park area, right?

12:09PM   11     A    No, sir.

12:09PM   12     Q    Okay.  So I pull up 9012-16-1 which is in the supplemental

12:09PM   13     exhibit list eight, Your Honor.

12:09PM   14               Do you recognize the area 940 Queen Street?

12:09PM   15     A    Was that the --

12:10PM   16     Q    You recognized it earlier when you were pointing out --

12:10PM   17     A    Yeah, but I'm saying it's a different.

12:10PM   18     Q    Yeah.

12:10PM   19     A    Is that the fumigation?

12:10PM   20     Q    Correct.

12:10PM   21     A    Okay.

12:10PM   22     Q    And so up at the top, you recognize where the pin is at

12:10PM   23     Prospect Street and Alapai?

12:10PM   24     A    Correct.

12:10PM   25               MR. KENNEDY:  At this time, Your Honor, I would move

| | | |
|---|---|---|
| 12:10PM | 1 | 9012-016-001 into evidence. |
| 12:10PM | 2 | THE COURT:  Any objection? |
| 12:10PM | 3 | MR. AKINA:  No objection. |
| 12:10PM | 4 | MR. KENNEDY:  May we publish? |
| 12:10PM | 5 | THE COURT:  You may.  Without objection, that document |
| 12:10PM | 6 | is admitted, 9012-16-1. |
| 12:10PM | 7 | (Exhibit 9012-16-001 was received in evidence.) |
| 12:10PM | 8 | BY MR. KENNEDY: |
| 12:10PM | 9 | Q    So on this document, you will see that it's -- by the |
| 12:10PM | 10 | Google, it's a 26-minute walk from the location on Prospect |
| 12:10PM | 11 | Street to Alapai down to 940 Queen Street, correct? |
| 12:10PM | 12 | A    Um-hm. |
| 12:11PM | 13 | Q    That's the quickest way.  You could take another route, |
| 12:11PM | 14 | which would be 1.3 miles. |
| 12:11PM | 15 | And that's a 32-minute walk down and if you were to go |
| 12:11PM | 16 | back up, another 32 minutes; over an hour to walk down and |
| 12:11PM | 17 | back, correct? |
| 12:11PM | 18 | A    Looks like that's what Google says, yeah. |
| 12:11PM | 19 | Q    So a little quicker way is just under an hour, right? |
| 12:11PM | 20 | A    Yeah.  I'm going off of what you are saying. |
| 12:11PM | 21 | Q    Okay.  So if we move to the second stop that you told them |
| 12:11PM | 22 | about, let's take a look at 9012-015-001. |
| 12:11PM | 23 | When you met with the FBI, do you recall telling them |
| 12:11PM | 24 | that this was the second stop that you made? |
| 12:11PM | 25 | A    I do.  I remember saying that we stopped at this park a |

12:12PM   1   few times.  I just remember that the red dot was ultimately the

12:12PM   2   last stop that I recall.

12:12PM   3             MR. KENNEDY:  Okay.  I would move 9012-015-0001 into

12:12PM   4   evidence.

12:12PM   5             MR. AKINA:  I just want to confirm this is a one-page

12:12PM   6   document.

12:12PM   7             MR. KENNEDY:  This is a one-page document.

12:12PM   8             MR. AKINA:  No objection.

12:12PM   9             MS. PANAGAKOS:  That's on the first supplemental list.

12:12PM   10             MR. KENNEDY:  Actually, no, it is a two-page document.

12:12PM   11             MR. AKINA:  Could we see the second page, please?

12:12PM   12             MR. KENNEDY:  Sure.

12:12PM   13             MR. AKINA:  No objection to the first page.  No

12:12PM   14   foundation to the second at this point.

12:12PM   15             THE COURT:  You're offering --

12:12PM   16             MR. KENNEDY:  Just the first page, because I don't

12:12PM   17   have foundation for the second page.  But I intend to.

12:13PM   18             THE COURT:  Without objection, 9012-15-1 only is

12:13PM   19   admitted, and you may publish.  But before you ask any

12:13PM   20   questions about that, let's go ahead and take a break.  We are

12:13PM   21   at 12:15.

12:13PM   22             As we go to our second break of the trial day, I'll

12:13PM   23   remind our jurors to please refrain from discussing the

            24   substance of this case with anyone, including one another,

            25   until I advise you otherwise; to refrain from accessing any

1    media or other accounts of this case that may be out there; and

2    then finally, please do not conduct any independent

3    investigation into the facts, circumstances, or persons

12:13PM    4    involved.

12:13PM    5         If the lawyers would please remain.

12:14PM    6         All right just briefly, the jury has departed.  You

12:14PM    7    may be seated.  If Ms. Kimura is mirroring myself, we are

12:14PM    8    getting -- it's becoming very, very difficult to manage the

12:14PM    9    defense exhibits in particular.  You guys are now on exhibit

12:14PM    10   list 10 or 11.  Not only is it difficult because of that, but

12:14PM    11   you are taking individual exhibits, breaking them up, offering

12:14PM    12   some -- it's going to be an absolute mess when it comes to

12:14PM    13   pulling these exhibits for jury deliberation.

12:15PM    14        So I'm not sure what the solution is at this point,

12:15PM    15   but you guys need to break up these exhibits into smaller

12:15PM    16   pieces.  You can't be taking a ten-page document offering the

12:15PM    17   first 18 text messages and then another page later on in the

12:15PM    18   exhibit and expect us to figure that out.  It's a mess.  I've

12:15PM    19   got notes here.  I assume you guys have notes there.  It's

12:15PM    20   getting very complicated.

12:15PM    21        And mistakes are going to get made.  That's my

12:15PM    22   concern.  So you guys need to break this stuff up in smaller

12:15PM    23   pieces.  And right now, I think the best way to do it is to use

12:15PM    24   alpha, beta, etcetera to accomplish that.  So that's just my

12:15PM    25   suggestion.  We are whatever, 20 some-odd days, I've lost track

12:15PM    1    now, into this trial.  We've got many more to go, so there is

12:16PM    2    still time to try to simplify and clarify an otherwise

12:16PM    3    challenging effort on our part.  So I appreciate whatever help

12:16PM    4    you guys can give.

12:16PM    5        MS. PANAGAKOS:  Your Honor, we are doing our best

12:16PM    6    every day to get the exhibits in as things like this arise.  I

12:16PM    7    have the one from this morning to put into the binder as 32A,

12:16PM    8    and I'll deal with that this afternoon.  But one thing I wanted

12:16PM    9    to ask is could we file a combined list now that combines

12:16PM    10   everything that we have up to this point and then -- we're

12:16PM    11   going to have more supplements with more crosses of witness.

12:16PM    12       THE COURT:  Let me give that some thought, because

12:16PM    13   there is some advantages to doing what you suggest, but there

12:16PM    14   is also some disadvantage.  The main disadvantage is we have

12:16PM    15   got to go back, and once we get your combined document, pull

12:16PM    16   notes from all of the other exhibit lists and transfer them.

12:16PM    17   So there is some advantage to doing that now, but I'm not

12:16PM    18   sure -- thus far, I think you guys have been amending or adding

12:17PM    19   exhibits practically every day.

12:17PM    20       MS. PANAGAKOS:  Right.  And part of the problem is

12:17PM    21   with the number of witnesses, and we had no narrowing of the 80

12:17PM    22   terabytes as to what would be exhibits, and it's just

12:17PM    23   impossible to get -- which is why our exhibits is large, is

12:17PM    24   because we tried to make sure we had everything somewhere that

12:17PM    25   we will need, and now we are pulling out from there.  So that's

12:17PM   1   how it came to be the way it is, and that's why we are going to

12:17PM   2   need to supplement as we -- we are still getting discovery.  We

12:17PM   3   just got production 42 this week.

12:17PM   4        THE COURT:  If you guys amended and combined all of

12:17PM   5   your exhibit lists into one, ten days from now.

12:17PM   6        MS. PANAGAKOS:  We would have more.  That's why I have

12:17PM   7   not done it and waited for a time to talk about it.  I know

12:17PM   8   there is drawbacks too.  We will do our best in calling out

12:17PM   9   what list it's on.  And.

12:17PM  10        THE COURT:  Let me give that some thought and I'll get

12:17PM  11   back to you.

12:17PM  12        MR. KENNEDY:  And Your Honor, I believe with some of

12:17PM  13   the witnesses we will go through this afternoon -- I noticed

12:18PM  14   that last night -- so I pulled them out and given them an A on

12:18PM  15   those pages so that we do have that.  Because they are part of

12:18PM  16   a larger group of, say, an arrest where, say, photographs are

12:18PM  17   just on a page and there is no JPEG or anything else to pull so

12:18PM  18   we tried to do that last night with supp eight.  So I think

12:18PM  19   that's a good suggestion.

12:18PM  20        THE COURT:  I think that's where we are.  Rather than

12:18PM  21   having to redo everything again, which I'm sure you don't want

12:18PM  22   to do.

12:18PM  23        MR. KENNEDY:  Then Tammy has to sit down with us and

12:18PM  24   go through the admitted ones again, and we do that daily.

12:18PM  25        THE COURT:  And we are doing that as well.  It's just

| | | |
|---|---|---|
| 12:18PM | 1 | very time-consuming.  Thank you. |
| 12:18PM | 2 | (Proceedings were recessed at 12:18 p.m. to 12:46 |
| 12:28PM | 3 | p.m.) |
| 12:46PM | 4 | THE COURT:  We're back from our second trial break. |
| 12:46PM | 5 | Mr. Kennedy, you may resume. |
| 12:46PM | 6 | MR. KENNEDY:  May we publish 9012-015-001 that I |
| 12:46PM | 7 | believe was admitted? |
| 12:46PM | 8 | THE COURT:  Yes. |
| 12:46PM | 9 | BY MR. KENNEDY: |
| 12:46PM | 10 | Q    Now, this is the pin where you placed the second stop. |
| 12:46PM | 11 | And this is Sheridan Park, right? |
| 12:46PM | 12 | A    Correct. |
| 12:46PM | 13 | Q    And you said you stopped there on multiple times? |
| 12:46PM | 14 | A    I believe so. |
| 12:46PM | 15 | Q    All right.  And you see on the Exhibit 9012-015-001 if we |
| 12:47PM | 16 | just circle, there is the Sheridan basketball courts? |
| 12:47PM | 17 | A    Um-hm. |
| 12:47PM | 18 | Q    The Sheridan Community Park? |
| 12:47PM | 19 | A    Um-hm. |
| 12:47PM | 20 | Q    And so, this is where you indicated that you had stopped |
| 12:47PM | 21 | multiple times, right? |
| 12:47PM | 22 | A    Correct. |
| 12:47PM | 23 | MR. KENNEDY:  All right.  Now I want to pull up |
| 12:47PM | 24 | 9012-017-0001.  It's in exhibit list eight, Your Honor. |
| 12:47PM | 25 | THE COURT:  Okay.  Go ahead. |

| | | |
|---|---|---|
| 12:47PM | 1 | BY MR. KENNEDY: |
| 12:47PM | 2 | Q    Now, sir, do you see where the Sheridan Community Park is? |
| 12:47PM | 3 | A    Um-hm. |
| 12:47PM | 4 | Q    All right.  And do you see where 940 Queen Street is? |
| 12:48PM | 5 | A    I do. |
| 12:48PM | 6 | MR. KENNEDY:  All right.  At this time, Your Honor, |
| 12:48PM | 7 | I'd move 9012-017 into evidence. |
| 12:48PM | 8 | MR. AKINA:  I'd object on relevance and lack of |
| 12:48PM | 9 | foundation, specifically with regards to the time estimates for |
| 12:48PM | 10 | walking. |
| 12:48PM | 11 | THE COURT:  Where is this from?  Is this from his |
| 12:48PM | 12 | statement or report? |
| 12:48PM | 13 | MR. KENNEDY:  This is just showing where he marked it |
| 12:48PM | 14 | at Sheridan going to 940 Queen Street.  It's showing distance. |
| 12:48PM | 15 | THE COURT:  I'm not sure of the relevance of it, but |
| 12:48PM | 16 | go ahead. |
| 12:48PM | 17 | MR. KENNEDY:  All right. |
| 12:48PM | 18 | THE COURT:  It's admitted. |
| 12:48PM | 19 | (Exhibit 9012-017 was received in evidence.) |
| 12:48PM | 20 | MR. KENNEDY:  So -- if we can publish it. |
| 12:48PM | 21 | THE COURT:  Yes.  Go ahead. |
| 12:48PM | 22 | BY MR. KENNEDY: |
| 12:48PM | 23 | Q    All right.  Between the two areas that we have circled, |
| 12:48PM | 24 | you can see that the distance there is estimated to be |
| 12:48PM | 25 | 21 minutes, but it's basically a mile walk each way. |

| | | |
|---|---|---|
| 12:48PM | 1 | MR. AKINA:  Objection, speculation. |
| 12:49PM | 2 | MR. KENNEDY:  It's on the exhibit .09 miles. |
| 12:49PM | 3 | THE COURT:  The objection is sustained. |
| 12:49PM | 4 | BY MR. KENNEDY: |
| 12:49PM | 5 | Q    Does the exhibit show a route which would be 0.9 miles, |
| 12:49PM | 6 | and I'm referring to right here, sir? |
| 12:49PM | 7 | A    That's what it says. |
| 12:49PM | 8 | Q    Okay.  And then there is a different route that is longer? |
| 12:49PM | 9 | A    Yes. |
| 12:49PM | 10 | Q    So essentially, a mile down and a mile back; is that a |
| 12:49PM | 11 | fair statement? |
| 12:49PM | 12 | A    That's what it says. |
| 12:49PM | 13 | Q    All right.  Now, let's go -- and this was the location |
| 12:49PM | 14 | that you marked for multiple stops that evening, right? |
| 12:49PM | 15 | A    Correct. |
| 12:49PM | 16 | Q    Moving on to -- we can pull this down at this point.  Now, |
| 12:49PM | 17 | there was a third location that you marked when you were |
| 12:50PM | 18 | speaking with the FBI on September 28th of 2018.  Correct? |
| 12:50PM | 19 | A    Yes. |
| 12:50PM | 20 | MR. KENNEDY:  All right.  And if we could pull up |
| 12:50PM | 21 | 9012-015-0002, which is not yet in evidence.  It's in the first |
| 12:50PM | 22 | supplement, Your Honor. |
| 12:50PM | 23 | THE COURT:  Go ahead. |
| 12:50PM | 24 | BY MR. KENNEDY: |
| 12:50PM | 25 | Q    Is this the area sir that's near your friend's place? |

12:50PM    1    A    Yes.

12:50PM    2    Q    Okay.  And you indicated that you stopped there, correct?

12:50PM    3    A    Yes.

12:50PM    4           MR. KENNEDY:  All right.  At this time, I would move

12:50PM    5    9012-015-002 into evidence and I would move for simplicity

12:50PM    6    9012-015 into evidence.  There is a page three we can show the

12:50PM    7    government and a page four.  They are just smaller versions of

12:50PM    8    these two.

12:50PM    9           THE COURT:  So you are offering three pages into

12:51PM   10    evidence?

12:51PM   11           MR. KENNEDY:  I'm sorry.

12:51PM   12           THE COURT:  You're offering three pages.

12:51PM   13           MR. KENNEDY:  Four pages, sir.  And it would be the

12:51PM   14    entirety of the exhibit.

12:51PM   15           MR. AKINA:  Could I confirm what the other two pages

12:51PM   16    are?

12:51PM   17           MR. KENNEDY:  Sure.  Oh, it's only two?  No, I don't

12:51PM   18    think so.  I think there are two smaller ones.  I don't want to

12:51PM   19    misrepresent.  Are there not?  Okay, then if there is only two,

12:51PM   20    there is only two.  It was produced with a smaller one you

12:51PM   21    couldn't see.  So I would move 9012-015-002 into evidence, Your

12:51PM   22    Honor.

12:51PM   23           THE COURT:  Just that one page?

12:51PM   24           MR. KENNEDY:  Yes.

12:51PM   25           MR. AKINA:  No objection.

12:51PM   1            THE COURT:  Without objection, that one page is

12:51PM   2   admitted, 9012-15-2.

12:51PM   3            (Exhibit 9012-015-002 was received in evidence.)

12:51PM   4            MR. KENNEDY:  Can we publish it at this time.

12:51PM   5            THE COURT:  Yes, you may.

12:51PM   6   BY MR. KENNEDY:

12:51PM   7   Q    So this is the third location that you indicated that you

12:52PM   8   stopped at that evening, correct?

12:52PM   9   A    Correct.

12:52PM  10   Q    All right.  And so in relation to that, if we pull up

12:52PM  11   9012-018-001 which is not in evidence, and it's in exhibit list

12:52PM  12   8, Your Honor.

12:52PM  13            Does this show where you stopped in relation to 940

12:52PM  14   Queen Street?

12:52PM  15   A    Yeah, it does.

12:52PM  16   Q    All right.  And this was one of the locations you stopped.

12:52PM  17            And I believe in front of the grand jury you indicated

12:52PM  18   this was the last place you stopped, correct?

12:52PM  19   A    I think the last place was the park.

12:53PM  20   Q    You're not sure?

12:53PM  21   A    I believe the last place was the park.

12:53PM  22            MR. KENNEDY:  Okay.  Last place was the park, all

12:53PM  23   right.  At this time, I move 9012-018 into evidence.

12:53PM  24            THE COURT:  Any objection?

12:53PM  25            MR. AKINA:  To foundation as to the two paths that are

12:53PM   1   marked.

12:53PM   2         THE COURT:  I don't see two paths.

12:53PM   3         MR. AKINA:  There is a dotted path and then a light

12:53PM   4   blue path and they overlap slightly.

12:53PM   5         MR. KENNEDY:  Let me remove the circles, Your Honor.

12:53PM   6   It might be easier to see.

12:53PM   7         THE COURT:  What is the relevance of this?

12:53PM   8         MR. KENNEDY:  Time.

12:54PM   9         THE COURT:  Did somebody walk this distance?

12:54PM   10        MR. KENNEDY:  No, they didn't, and that's what I'm

12:54PM   11  trying to show.

12:54PM   12        THE COURT:  I don't know what you are trying to show

12:54PM   13  quite honestly, Counsel.

12:54PM   14        MR. KENNEDY:  I'm trying to show that none of these

12:54PM   15  stops --

12:54PM   16        THE COURT:  I still don't see --

12:54PM   17        MR. KENNEDY:  No one went to 940 Queen Street.  That's

12:54PM   18  what I'm showing.

12:54PM   19        THE COURT:  I'm talking, am I not?

12:54PM   20        MR. KENNEDY:  You are, Your Honor.

12:54PM   21        THE COURT:  I do not see two paths, Mr. Akina.  I see

12:54PM   22  a blue path.  Where is the second one?

12:54PM   23        MR. AKINA:  Your Honor, the first path is comprised of

12:54PM   24  dark blue dots.  The second path is comprised of a light blue

12:54PM   25  solid line.  They overlap starting from the right-hand side and

12:54PM  1   then going towards the left, they diverge halfway.

12:54PM  2          THE COURT:  I see them, thank you.  The objection is

12:54PM  3   overruled.  The exhibit may be admitted.  You may publish.

12:54PM  4          (Exhibit 9012-018 was received in evidence.)

12:54PM  5   BY MR. KENNEDY:

12:54PM  6   Q    And so on 9012-018, we can see the distance between this

12:55PM  7   location and Queen Street, correct?

12:55PM  8   A    I'm sorry.

12:55PM  9   Q    Specifically 940 Queen Street, correct?

12:55PM  10  A    What about it?

12:55PM  11  Q    I'm sorry?

12:55PM  12  A    What was the question?

12:55PM  13  Q    On this, you can see the distance between the two

12:55PM  14  locations, correct?

12:55PM  15  A    I believe so.

12:55PM  16  Q    All right.  And so you were asked where this was in

12:55PM  17  relation to earlier.

12:55PM  18          The Fisherman's Wharf is quite a distance away, isn't

12:55PM  19  it?

12:55PM  20  A    I'm not sure.

12:55PM  21  Q    I thought you said it was towards the mountain side as

12:55PM  22  opposed to towards the water?

12:55PM  23  A    I said quite a far distance.  I don't know what you mean.

12:55PM  24  Q    Numerous, numerous blocks, correct?

12:55PM  25  A    From where --

| 12:55PM | 1 | Q | From this location? |
| 12:56PM | 2 | A | Right. |

12:56PM  3  Q  Down this street across, across, across --

12:56PM  4  A  Okay.

12:56PM  5  Q  -- it's roughly a half hour walk one way?

12:56PM  6  A  I'll take your word for it.

12:56PM  7  Q  All right.  Now, you mentioned something about Mr. Miller.

12:56PM  8      You said it's just his style, right?

12:56PM  9  A  Uh --

12:56PM  10  Q  Wasn't that your words earlier today, it's just his style?

12:56PM  11  A  At what part?

12:56PM  12  Q  The government was asking you whether you believed him

12:56PM  13  about the lawyer?

12:56PM  14  A  Okay.

12:56PM  15  Q  And you said it's just his style; you didn't really

12:56PM  16  believe anything that this man was telling you, right?

12:56PM  17  A  Yeah.  There is a lot that I didn't believe.

12:56PM  18  Q  Okay.  So were you aware you were asked about an

12:56PM  19  individual by the name of Preston Kimoto.

12:57PM  20      Do you recall the government asking you that?

12:57PM  21  A  Yes, I do.

12:57PM  22  Q  Were you aware that Mr. Miller was texting Preston Kimoto

12:57PM  23  at 5:37:07, "WTF, what the fuck, brah.  Text me back or

12:57PM  24  something," while you were kidnapping.

12:57PM  25      Were you aware of that?

12:57PM    1    A    I was not.

12:57PM    2    Q    Were you aware that Kimoto got back to Miller and said, "I

12:57PM    3    was at the house.  Left my phone in the truck.  Hold on.  She

12:57PM    4    just got home."

12:57PM    5           THE REPORTER:  Sir, you're reading too fast.

12:57PM    6    BY MR. KENNEDY:

12:57PM    7    Q    You're right.  I apologize.  Were you aware that

12:57PM    8    Mr. Kimoto was texting Miller back at 6:08:48:  "I was at the

12:57PM    9    house and left my phone in the truck.  Hold on.  And she just

12:57PM   10    got home."

12:57PM   11           Were you aware of that?

12:57PM   12    A    No, sir.

12:57PM   13    Q    Were you aware that at 6:42:36, Kimoto texted Miller and

12:57PM   14    said, "Meet, give me 15 minutes."

12:58PM   15           Were you aware of that?

12:58PM   16    A    I was not.

12:58PM   17    Q    Were you aware that Miller then texted Kimoto back and

12:58PM   18    said, "K," for okay?

12:58PM   19           MR. AKINA:  Objection as to cumulative.  The witness

12:58PM   20    has already stated that he doesn't know Preston Kimoto.

12:58PM   21    BY MR. KENNEDY:

12:58PM   22    Q    You were doing a kidnapping with this individual, right?

12:58PM   23           THE COURT:  Sustained.

12:58PM   24    BY MR. KENNEDY:

12:58PM   25    Q    Correct?

| | | | |
|---|---|---|---|
| 12:58PM | 1 | | THE COURT:  With Kimoto? |
| 12:58PM | 2 | BY MR. KENNEDY: | |
| 12:58PM | 3 | Q | You were doing a kidnapping with Mr. Miller, right? |
| 12:58PM | 4 | A | Yes. |
| 12:58PM | 5 | Q | You were doing this together, right? |
| 12:58PM | 6 | A | Yes. |
| 12:58PM | 7 | Q | Did you see him texting Mr. Kimoto? |
| 12:58PM | 8 | A | I don't know who he was texting. |
| 12:58PM | 9 | Q | You don't know.  Did you see him meeting with Mr. Kimoto? |
| 12:58PM | 10 | A | I did not. |
| 12:58PM | 11 | Q | Did you see him calling Mr. Kimoto? |
| 12:58PM | 12 | A | I did not. |
| 12:58PM | 13 | Q | Did you see Mr. Kimoto arrive at Sheridan Park and speak |
| 12:58PM | 14 | | with Mr. Miller? |
| 12:58PM | 15 | A | I never seen Kimoto.  I don't even know who that is. |
| 12:59PM | 16 | Q | But there was a period of time where you didn't see |
| 12:59PM | 17 | | Mr. Miller? |
| 12:59PM | 18 | A | But I don't know who Kimoto is.  I couldn't pick him out |
| 12:59PM | 19 | | of a lineup. |
| 12:59PM | 20 | Q | So what I'm saying, sir, is there were periods of time |
| 12:59PM | 21 | | that you didn't see Mr. Miller, right? |
| 12:59PM | 22 | A | Yes. |
| 12:59PM | 23 | Q | You were shooting up heroin, right? |
| 12:59PM | 24 | A | Yes. |
| 12:59PM | 25 | Q | And you were shooting up heroin while the kidnapping was |

12:59PM   1   happening, right?

12:59PM   2   A    Yes.

12:59PM   3   Q    Takes a little time to wrap it, put the needle in, right?

12:59PM   4   A    Correct.

12:59PM   5   Q    You're busy doing that, right?

12:59PM   6   A    Yeah, at times.

12:59PM   7   Q    You also have someone in the car that you got a hood over

12:59PM   8   and put duct tape, right?

12:59PM   9   A    Correct.

12:59PM   10   Q    And you have kidnapped him, right?

12:59PM   11   A    Yes.

12:59PM   12   Q    Okay, so Mr. Miller is also smoking heroin, right?

12:59PM   13   A    At times.

12:59PM   14   Q    At times throughout that, right?

12:59PM   15   A    Correct.

12:59PM   16   Q    You saw that, right?

12:59PM   17   A    I did.

12:59PM   18   Q    Okay.  And so there were other times where he moved away,

12:59PM   19   right, where you didn't see him?

12:59PM   20   A    Correct.

12:59PM   21   Q    So you don't know if he was meeting with Mr. Kimoto,

01:00PM   22   right?

01:00PM   23   A    No, I don't.

01:00PM   24   Q    You don't know whether he was texting Mr. Kimoto, right?

01:00PM   25   A    I don't know.

| 01:00PM | 1  | Q | You don't know if he was calling Mr. Kimoto, right? |
| 01:00PM | 2  | A | No idea.  He was gone. |
| 01:00PM | 3  | Q | So you just don't know is your testimony, right? |
| 01:00PM | 4  | A | That's correct. |
| 01:00PM | 5  | Q | You don't know who he called, right? |
| 01:00PM | 6  | A | I do not. |
| 01:00PM | 7  | Q | You don't know who he texted with, right? |
| 01:00PM | 8  | A | Yeah, I already said that. |
| 01:00PM | 9  | Q | And you don't know who he met with? |
| 01:00PM | 10 | A | I said that also. |

01:00PM    11    Q    So you don't know that later, by about 8:00, 8:14,

01:00PM    12    Mr. Kimoto and Mr. Miller are agreeing to meet at Sheridan

01:00PM    13    Park, do you?

01:00PM    14              MR. AKINA:  Objection; cumulative.

01:00PM    15              THE COURT:  Sustained.

01:00PM    16    BY MR. KENNEDY:

01:00PM    17    Q    You don't know any of this, do you?

01:01PM    18              MR. AKINA:  Objection; vague.

01:01PM    19              THE COURT:  Sustained.

01:01PM    20    BY MR. KENNEDY:

01:01PM    21    Q    So I want to talk to you a little bit about your plea

01:01PM    22    agreement and the government touched on that.  Now, you were

01:01PM    23    charged with nine separate counts, correct?

01:01PM    24    A    Sounds about right.  I'm not sure.

01:01PM    25    Q    Okay.  And the counts that were dismissed were Count 1,

01:01PM   1   Count 5, Count 6, Count 7, Count 8, and Count 9, correct?

01:01PM   2   A    Could be.  I don't have it in front of me.

01:01PM   3   Q    All right.  In the plea agreement, it has some things that

01:02PM   4   the government agrees to do and -- if you would like to take a

01:02PM   5   look at it, I can show it to you.

01:02PM   6            Would that be helpful?

01:02PM   7   A    What's the question.

01:02PM   8   Q    Would it be helpful for you to see your plea agreement to

01:02PM   9   remember its details?

01:02PM   10  A    Sure.

01:02PM   11  Q    Can we pull up just for the witness what's been marked as

01:02PM   12  9012-004.

01:02PM   13           Does this look like a memorandum of your plea

01:02PM   14  agreement, sir?

01:02PM   15  A    It does.

01:02PM   16           MR. KENNEDY:  All right.  I believe that would be in

01:02PM   17  the original one, Your Honor.

01:02PM   18           THE COURT:  Got it, thanks.

01:03PM   19  BY MR. KENNEDY:

01:03PM   20  Q    And I apologize for not telling you that.  Okay.  If we

01:03PM   21  move to page two of that agreement, you've told the jury that

01:03PM   22  you pled guilty to kidnapping and conspiracy to distribute and

01:03PM   23  possess with the intent to distribute methamphetamine, correct?

01:03PM   24  A    Correct.

01:03PM   25  Q    It looks like they are going to dismiss Counts 1, 5, 6, 7,

| | | |
|---|---|---|
| 01:03PM | 1 | 8, and 9 of that indictment, right? |
| 01:03PM | 2 | A    Correct. |
| 01:03PM | 3 | Q    And with respect to those charges, those would be |
| 01:03PM | 4 | additional drug and gun charges, correct? |
| 01:03PM | 5 | A    Correct. |
| 01:03PM | 6 | Q    Now, before that happened, there was something that |
| 01:04PM | 7 | happened in your case, and so the government filed with respect |
| 01:04PM | 8 | to your drug charges. |
| 01:04PM | 9 | You knew that the minimum penalty would be ten years |
| 01:04PM | 10 | and the maximum would be life, correct? |
| 01:04PM | 11 | A    851? |
| 01:04PM | 12 | Q    Before I get to the 851, the amount of drugs that you were |
| 01:04PM | 13 | doing, the minimum is ten years and the maximum is life, right? |
| 01:04PM | 14 | A    I believe so. |
| 01:04PM | 15 | Q    Okay.  They filed this thing called an 851, correct? |
| 01:04PM | 16 | A    Correct. |
| 01:04PM | 17 | Q    It's Title 21 United States Code 851.  And what that does |
| 01:04PM | 18 | is it takes the minimum from 10 years all the way up to 20, |
| 01:04PM | 19 | correct? |
| 01:04PM | 20 | A    Around there.  I'm not sure. |
| 01:04PM | 21 | Q    All right.  And the government asked you about a |
| 01:04PM | 22 | conviction that you had in this courthouse in 2004 regarding |
| 01:05PM | 23 | drugs, correct? |
| 01:05PM | 24 | A    Yes. |
| 01:05PM | 25 | Q    And that's what they filed, right? |

01:05PM   1   A   Yes.

01:05PM   2   Q   And in your agreement, if we go to the third page, you can

01:05PM   3   see that they are agreeing not to use that enhanced sentence

01:05PM   4   against you, correct?

01:05PM   5   A   Yes.

01:05PM   6   Q   So that was dismissed, right?

01:05PM   7   A   I believe so.

01:05PM   8   Q   And you didn't have to do 20?

01:05PM   9   A   No.

01:05PM  10   Q   Okay.  But there is a last line that says the government

01:05PM  11   also agrees not to file a second special information pursuant

01:05PM  12   to 21 U.S.C. 851 which would result in an enhanced sentencing

01:05PM  13   based on a prior conviction on June 14, 2005 for promoting a

01:06PM  14   dangerous drug in the first degree, correct?

01:06PM  15   A   Correct.

01:06PM  16   Q   That's part of your agreement here as well, right?

01:06PM  17   A   What do you mean?

01:06PM  18   Q   Well, they are doing this for you, right?

01:06PM  19   A   I signed this -- I don't know.

01:06PM  20   Q   Well, if we go back to the second page, doesn't the

01:06PM  21   beginning of it begin with the agreement, right?

01:06PM  22   A   Correct.

01:06PM  23   Q   And it says what you're going to do, right?

01:06PM  24   A   It says I'm entering into a plea.

01:06PM  25   Q   You pled guilty to Count 1 and Count 2 of an information,

01:06PM    1    right?

01:06PM    2    A    Um-hm.

01:06PM    3    Q    Then it says what they are going to do, correct?

01:06PM    4    A    Correct.

01:06PM    5    Q    So the first thing was dismissed, Counts 1, 5, 6, 7, 8,

01:06PM    6    and 9, right?

01:06PM    7    A    Correct.

01:06PM    8    Q    If we move to the third page, they had filed this 851 that

01:07PM    9    took the minimum from 10 years to 20 years, right?

01:07PM   10    A    I believe so.

01:07PM   11    Q    Well, didn't it say that the government agrees to dismiss

01:07PM   12    and they did dismiss that, correct?

01:07PM   13    A    Correct.

01:07PM   14    Q    All right.  Now, I'm going down to the last thing that

01:07PM   15    they agree.

01:07PM   16    A    Okay.

01:07PM   17    Q    They agreed not to file a second enhanced sentencing under

01:07PM   18    851 regarding your Hawaii state drug conviction on June 14th of

01:07PM   19    2005, correct?

01:07PM   20    A    Correct.

01:07PM   21    Q    That makes it mandatory life, no floor, no ability to do

01:07PM   22    anything other than life without, correct?

01:07PM   23    A    Sounds pretty fair.

01:08PM   24    Q    So that was your situation.  You were going to do life

01:08PM   25    without; correct?

01:08PM    1    A    Yeah, I don't know.

01:08PM    2              MR. AKINA:  Objection, Your Honor.  That misrepresents

01:08PM    3    what the plea agreement and the filings in that case were.

01:08PM    4              THE COURT:  Sustained.

01:08PM    5    BY MR. KENNEDY:

01:08PM    6    Q    If they had filed the second one, which they agreed not to

01:08PM    7    do, you were going to do life without.

01:08PM    8              That's part of their agreement, correct?

01:08PM    9              MR. AKINA:  Objection, speculation.

01:08PM   10              THE COURT:  Sustained.

01:08PM   11    BY MR. KENNEDY:

01:08PM   12    Q    Didn't they promise you, the government also agrees not to

01:08PM   13    file a second special information, correct?

01:08PM   14    A    Yeah, I don't know what I would have gotten.  I'm sure

01:08PM   15    there is minimums -- there is mandatory minimums, and there is

01:08PM   16    the PSI.  I think even the attorney general sent out a memo

01:08PM   17    saying that they are not even supposed to file an 851, but they

01:08PM   18    did it anyway.

01:09PM   19    Q    So that's what you were facing, whether there is a memo

01:09PM   20    about it or not.

01:09PM   21              You know that's what you were looking at, weren't you?

01:09PM   22    A    It's all right there.

01:09PM   23              MR. AKINA:  Objection, speculation and vague.

01:09PM   24    BY MR. KENNEDY:

01:09PM   25    Q    Now with respect to the guidelines --

01:09PM   1                THE COURT REPORTER:  I didn't hear the ruling.

01:09PM   2                THE COURT:  Are you asking me?

01:09PM   3                THE COURT REPORTER:  Yes, Judge.  I didn't hearing the

01:09PM   4    ruling on the objection.

01:09PM   5                THE COURT:  The question was withdrawn.  I take it as

01:09PM   6    the question was withdrawn.  Counsel moved on.

01:09PM   7    BY MR. KENNEDY:

01:09PM   8    Q    You mentioned these guidelines that are advisory on the

01:09PM   9    court, right?

01:09PM   10   A    Yes.

01:09PM   11   Q    You talked about getting, like, two points off, right?

01:09PM   12   A    Yeah.  I also got two points enhanced for the gun.

01:09PM   13   Q    And so --

01:10PM   14   A    So that's kind of broke even.

01:10PM   15   Q    Weren't you looking at 292 to 365 months?

01:10PM   16   A    I'm saying they dropped the gun, but I still got two

01:10PM   17   points enhancement for that.

01:10PM   18   Q    So if you take a look at what's just marked for

01:10PM   19   identification purposes only, 9012-013, and if we go to page

01:10PM   20   34.

01:10PM   21                The guideline provisions was 292 to 365 months,

01:10PM   22   correct?

01:10PM   23   A    Correct.

01:10PM   24   Q    So 365 months is a little more than 30 years, right?

01:10PM   25   A    I believe so.

01:10PM   1   Q   And 292 months is a little less than 25 years, got it?

01:11PM   2   A   I believe so.

01:11PM   3   Q   What you ended up with was 188 months, right?

01:11PM   4   A   That's correct.

01:11PM   5   Q   And by testifying here today, you want to do a little

01:11PM   6   better, right?

01:11PM   7   A   I hope so.

01:11PM   8   Q   And so you're hoping to do from life to a little better,

01:11PM   9   right?

01:11PM   10              MR. AKINA:  Objection; that's not his sentence.

01:11PM   11              MR. KENNEDY:  I understand that.

01:11PM   12              THE COURT:  Overruled.  Go ahead.

01:11PM   13              THE WITNESS:  Do a little better, yes.

01:11PM   14   BY MR. KENNEDY:

01:11PM   15   Q   So.

01:11PM   16   A   I agreed to, I think, testify truthful.  That's part of my

01:11PM   17   plea agreement.

01:11PM   18   Q   Now, I believe that you mentioned to the jury that there

01:12PM   19   was -- Mr. Miller came back after a conversation with someone

01:12PM   20   that you don't know -- don't know who he was talking to, and

01:12PM   21   said Mr. Miller said we should get rid of him.

01:12PM   22              Do you recall that?

01:12PM   23   A   That's not exactly how it went.

01:12PM   24   Q   Well, didn't you, on October 10th of 2018, testify under

01:12PM   25   oath to the grand jury?

01:12PM   1   A    Yes, getting rid of him was a discussion.  And then he --

01:12PM   2   we were trying to figure out what we are going to do, and then,

01:12PM   3   like I said, he went numb, made a phone call.  That's when he

01:12PM   4   came back with the understanding that we are going to just take

01:13PM   5   him back.

01:13PM   6   Q    Didn't you testify in the grand jury that that happened

01:13PM   7   after the phone call, sir?

01:13PM   8   A    I'm not sure.

01:13PM   9   Q    Take a look at page 2305 and 2319 of 7350.

01:13PM   10  A    Because it wouldn't even make any sense.

01:13PM   11  Q    Take a look at line 2 and then read down to line 24, just

01:13PM   12  to yourself.

01:13PM   13        THE COURT:  What's page 2305?

01:13PM   14        MR. KENNEDY:  I'm sorry, 7350, page 23, Your Honor.

01:13PM   15  Exhibit 7350, and it's page 23 line 02 to line 19.

01:13PM   16        THE WITNESS:  Yeah, it says a discussion before --

01:13PM   17  BY MR. KENNEDY:

01:13PM   18  Q    Before you -- just read it to yourself, sir, and then I'll

01:14PM   19  ask you some questions.

01:14PM   20  A    Okay.

01:14PM   21  Q    So there was a discussion after he came back, right?

01:14PM   22  A    No.  It says it was before.

01:14PM   23  Q    Okay.  So there was a discussion before he came back,

01:14PM   24  right?

01:14PM   25  A    Yeah.  There was discussion, and then he went and used the

01:14PM   1   phone, and then that's when he came back and we decided we were

01:14PM   2   going to take him back.

01:14PM   3   Q    Okay.  So when -- the discussion was whether you were

01:14PM   4   going to get rid of him, right?

01:14PM   5   A    Yes.

01:14PM   6   Q    And so you mentioned you don't know a Preston Kimoto,

01:14PM   7   right?

01:14PM   8   A    Yes.

01:14PM   9   Q    And you don't know of any meeting with a Preston Kimoto,

01:14PM  10   right?

01:15PM  11   A    Correct.

01:15PM  12   Q    So before that, you had a discussion about getting rid of

01:15PM  13   him and you were asked what getting rid of him meant, right?

01:15PM  14   A    Correct.

01:15PM  15   Q    And that was, you were pretty sure it meant to kill him

01:15PM  16   and get rid of him, right?

01:15PM  17   A    Correct.

01:15PM  18   Q    But then you chose to take him back, right?

01:15PM  19   A    Yeah, because he went and made the phone call and came

01:15PM  20   back, and that's when we decided to take him back.

01:15PM  21   Q    Okay.  Did you see him make a phone call?

01:15PM  22   A    No.  I think he said he was going to go call.  He told me

01:15PM  23   he was going to go call.

01:15PM  24   Q    Did you see him make a phone call?

01:15PM  25   A    No.

01:15PM   1   Q    So you don't know if he met with someone who met up with

01:15PM   2   him there?

01:15PM   3   A    Yeah, I'm not sure.

01:15PM   4   Q    Okay.  So now, at that point, you bring him back, correct?

01:15PM   5   A    Correct.

01:15PM   6   Q    All right.  Now I want to move to an exhibit that is in

01:15PM   7   the first supplement, 8010-008.

01:16PM   8        Do you recognize the phone number 808 -- up at the

01:16PM   9   top, sir?

01:16PM  10   A    I don't.

01:16PM  11   Q    Do you recognize it as your phone?

01:16PM  12   A    Honestly, I couldn't tell you what it was.

01:16PM  13   Q    Okay.  Why don't we blow up the first page.

01:16PM  14        Do you recognize the number as your phone?

01:16PM  15   A    I don't.

01:16PM  16   Q    You don't recognize the 808?

01:16PM  17   A    Because it's not like you ever really give out your

01:16PM  18   phone -- you know what I mean?  You just call somebody and they

01:16PM  19   get your number.  I don't think I even had that phone for too

01:16PM  20   long, if it was mine.

01:16PM  21   Q    Let's take a look at the -- if you go -- if we scroll

01:17PM  22   through the messages.

01:17PM  23        Do you recognize it as the phone that was seized when

01:17PM  24   you were arrested?

01:17PM  25   A    I don't know.

| | | | |
|---|---|---|---|
| 01:17PM | 1 | Q | Okay.  Well, let's keep scrolling through. |
| 01:17PM | 2 | | Do you recognize it as messages that you were sending? |
| 01:18PM | 3 | A | No. |
| 01:18PM | 4 | Q | Okay.  Let's keep scrolling through. |
| 01:18PM | 5 | | Do you recognize any of the messages from this phone? |
| 01:18PM | 6 | A | Not yet. |
| 01:18PM | 7 | Q | Okay.  Tell you what, sir, since you don't recognize them, |
| 01:18PM | 8 | | and I don't want to take the jury's time, I'll find the |
| 01:18PM | 9 | | document that might help you. |
| 01:18PM | 10 | | Let's move on to a different chapter since we're |
| 01:18PM | 11 | | getting close to 1:20 and I don't want to sit here and scroll |
| 01:18PM | 12 | | through here. |
| 01:18PM | 13 | | Let me ask you this:  You don't remember the phone |
| 01:18PM | 14 | | that you had when you were arrested, right? |
| 01:18PM | 15 | A | That is correct. |
| 01:19PM | 16 | Q | Okay.  And if there is a document that shows the number, |
| 01:19PM | 17 | | that might help you remember? |
| 01:19PM | 18 | A | As I said I couldn't tell you.  If you could release me |
| 01:19PM | 19 | | today, I couldn't tell you.  I don't know the number. |
| 01:19PM | 20 | Q | Well, we will take a look if we can find that for you and |
| 01:19PM | 21 | | help you. |
| 01:19PM | 22 | | So now on August 8, 2018, you were arrested, right? |
| 01:19PM | 23 | A | Yes. |
| 01:19PM | 24 | Q | Now, you got a phone call from Wayne Miller on August 1st, |
| 01:19PM | 25 | | correct? |

| | | | |
|---|---|---|---|
| 01:19PM | 1 | A | Correct. |
| 01:19PM | 2 | Q | And so he called you about a drug transaction, right? |
| 01:19PM | 3 | A | I'm not sure what it was about. |
| 01:19PM | 4 | Q | And you learned that was when he had been arrested himself |
| 01:19PM | 5 | | and he made a phone call to you? |
| 01:19PM | 6 | A | Yeah.  I wasn't aware that he got arrested. |
| 01:19PM | 7 | Q | Right, because he was calling you with agents there |
| 01:20PM | 8 | | listening, right? |
| 01:20PM | 9 | A | Yeah.  I found that out afterwards. |
| 01:20PM | 10 | Q | Right.  And then there was a series of text messages and |
| 01:20PM | 11 | | then you were arrested eight days later? |
| 01:20PM | 12 | A | Correct. |
| 01:20PM | 13 | Q | So there was a traffic stop, right? |
| 01:20PM | 14 | A | Correct. |
| 01:20PM | 15 | Q | It was over on the Nimitz Highway? |
| 01:20PM | 16 | A | Yes. |
| 01:20PM | 17 | Q | And you were arrested for possession of methamphetamine to |
| 01:20PM | 18 | | sell, right? |
| 01:20PM | 19 | A | Yes. |
| 01:20PM | 20 | Q | And you had in the glove compartment a 40 caliber Smith & |
| 01:20PM | 21 | | Wesson handgun, right? |
| 01:20PM | 22 | A | Yes. |
| 01:20PM | 23 | Q | Loaded with nine rounds, right? |
| 01:20PM | 24 | A | I believe so. |
| 01:20PM | 25 | Q | No ammunition in the chamber, but loaded? |

01:20PM    1    A    Sounds fair to say, yeah.

01:20PM    2    Q    And you had a little decorative strip on each side of that

01:20PM    3    40, right?

01:20PM    4    A    Yes.

01:20PM    5    Q    And if you peel away that strip, then you could see that

01:20PM    6    the serial number had been taken off the gun, right?

01:21PM    7    A    Yes.

01:21PM    8    Q    But the decorative strip helped, hid that, didn't it?

01:21PM    9    A    Sure.

01:21PM   10    Q    On both sides, right.  And so on the left side of the

01:21PM   11    pistol slide, the serial number was obliterated, right?

01:21PM   12    A    Yeah.

01:21PM   13    Q    Okay.  If we could look at 9012-012-0038A, which is in the

01:21PM   14    8th supplement.

01:21PM   15         Do you recognize what's shown?

01:21PM   16    A    Yes.

01:21PM   17    Q    I'm sorry.  Looks like it's -- can we go back to -- okay.

01:21PM   18         Do you see what's marked as 9012-012A?

01:21PM   19    A    Me?

01:21PM   20    Q    Yes.

01:21PM   21    A    Yes.

01:21PM   22         MR. KENNEDY:  And Your Honor, it would be 34 pages

01:22PM   23    into 9012, but you we marked it separately to just admit this

01:22PM   24    single page.

01:22PM   25         THE COURT:  I'll let you know when I find it because

| | | |
|---|---|---|
| 01:22PM | 1 | it's not on the 8th supplemental list. |
| 01:22PM | 2 | MR. KENNEDY:  Oh, it's not?  My apologies, Your Honor, |
| 01:22PM | 3 | it's on the 9th.  That's on me. |
| 01:22PM | 4 | THE COURT:  I've got it now.  And you're offering |
| 01:22PM | 5 | what? |
| 01:22PM | 6 | BY MR. KENNEDY: |
| 01:22PM | 7 | Q    Do you recognize it, sir? |
| 01:22PM | 8 | A    Yes. |
| 01:22PM | 9 | Q    Is that the gun that was seized? |
| 01:22PM | 10 | A    Yes. |
| 01:22PM | 11 | MR. KENNEDY:  All right.  I'd offer 9012-012A into |
| 01:22PM | 12 | evidence. |
| 01:22PM | 13 | MR. AKINA:  No objection. |
| 01:22PM | 14 | THE COURT:  Is this a one-page document? |
| 01:22PM | 15 | MR. KENNEDY:  Yes.  We pulled it out to make it |
| 01:22PM | 16 | 9012-012A. |
| 01:22PM | 17 | THE COURT:  I see.  I think I understand here. |
| 01:23PM | 18 | Without objection, 9012-012 Alpha is admitted. |
| 01:23PM | 19 | (Exhibit 9012-012 was received in evidence.) |
| 01:23PM | 20 | MR. KENNEDY:  Can we pull up 9012-012-0038A. |
| 01:23PM | 21 | THE COURT:  I'm sorry.  Where would I find this one? |
| 01:23PM | 22 | MR. KENNEDY:  It should be in supplemental number |
| 01:23PM | 23 | nine. |
| 01:23PM | 24 | THE COURT:  You would think, but it's not. |
| 01:23PM | 25 | MR. KENNEDY:  I'm going to check and make certain, |

01:23PM    1    Your Honor.  I have them here.  Oh, it's a B.  It's 9012-012B.

01:24PM    2              THE COURT:  I've got it now.

01:24PM    3    BY MR. KENNEDY:

01:24PM    4    Q    All right.  Do you recognize what's shown in 9012-012B,

01:24PM    5    sir?

01:24PM    6    A    Yes, I do.

01:24PM    7              MR. KENNEDY:  I would move 9012-012B into evidence.

01:24PM    8              MR. AKINA:  I think he's going to get there, but there

01:24PM    9    is no foundation.

01:24PM   10              THE COURT:  There isn't.

01:24PM   11    BY MR. KENNEDY:

01:24PM   12    Q    Sir, what is it?

01:24PM   13    A    A gun and drugs.

01:24PM   14    Q    Is it inside the glove compartment?

01:24PM   15    A    It is.

01:24PM   16    Q    Of the car you were driving when you were arrested?

01:24PM   17    A    It is.

01:24PM   18              MR. KENNEDY:  At this time, I'd move 9012-012B into

01:24PM   19    evidence.

01:24PM   20              MR. AKINA:  No objection.

01:24PM   21              THE COURT:  Without objection, that document is

01:24PM   22    admitted, 9012-012B.

01:24PM   23              (Exhibit 9012-012B was received in evidence.)

01:24PM   24              MR. KENNEDY:  May we publish.

01:24PM   25              THE COURT:  Yes.

01:24PM   1    BY MR. KENNEDY:

01:24PM   2    Q    So when you were arrested, this is where this particular

01:25PM   3    40-caliber Smith & Wesson was in the glove compartment of the

01:25PM   4    car, correct?

01:25PM   5    A    Yes.

01:25PM   6    Q    You were a passenger?

01:25PM   7    A    Yes.

01:25PM   8    Q    And so it was right in front of you, right?

01:25PM   9    A    Correct.

01:25PM  10    Q    If we'd publish 9012-012A, this is then that firearm and a

01:25PM  11    series of photographs?

01:25PM  12    A    Yes.

01:25PM  13    Q    The decorative strip that I was referring to is in that

01:25PM  14    circle.

01:25PM  15         You can see it, correct?

01:25PM  16    A    Yes.

01:25PM  17    Q    And so it was on each side of the firearm, correct?

01:25PM  18    A    Correct.

01:25PM  19    Q    And that would hide the fact that the serial number was

01:25PM  20    obliterated, correct?

01:25PM  21    A    It appears so.  I don't think that was the reason, but...

01:25PM  22    Q    All right.  If we could pull up 9012-012, I believe it

01:26PM  23    would be C.

01:26PM  24         Do you recognize the ammunition being photographed

01:26PM  25    from your firearm?

01:26PM   1   A     Yes.

01:26PM   2            MR. KENNEDY:  At this time, I'd move 9012-012C into

01:26PM   3   evidence.

01:26PM   4            THE COURT:  Any objection, counsel?

01:26PM   5            MR. AKINA:  No objection.

01:26PM   6            THE COURT:  9012-012C is admitted without objection.

01:26PM   7            (Exhibit 9012-012C was received in evidence.)

01:26PM   8            MR. KENNEDY:  May I publish.

01:26PM   9            THE COURT:  Yes, you may.

01:26PM   10  BY MR. KENNEDY:

01:26PM   11  Q     So this was the ammunition which was inside the 40-caliber

01:26PM   12  Smith & Wesson, right?

01:26PM   13  A     I believe so.

01:26PM   14  Q     In the magazine.  If we moved to 9012-012D, and this was

01:27PM   15  the magazine which held the nine rounds that we just saw?

01:27PM   16  A     Looks like it.

01:27PM   17  Q     Now, there was also a search of your house done that day,

01:27PM   18  correct?

01:27PM   19  A     Yes.

01:27PM   20  Q     Or soon thereafter, right?

01:27PM   21  A     Correct.

01:27PM   22  Q     And what was the location of that place which you were

01:27PM   23  staying?

01:27PM   24  A     I'm not quite sure.

01:27PM   25  Q     You're not sure.  Okay.  If we pull up Exhibit 9012-012E.

01:27PM   1           Do you recognize what is depicted in 9012-012E?

01:27PM   2   A   I do.

01:27PM   3   Q   Is it ammunition, 40-caliber located at the house that you

01:27PM   4   were staying at when you were arrested and during the traffic

01:28PM   5   stop?

01:28PM   6   A   Yes, it is.

01:28PM   7           MR. KENNEDY:  At this time, I'd move 9012-012E into

01:28PM   8   evidence.

01:28PM   9           THE COURT:  Any objection?

01:28PM   10           MR. AKINA:  No objection.

01:28PM   11           THE COURT:  9012-012E is admitted without objection.

01:28PM   12           (Exhibit 9012-012E was received in evidence.)

01:28PM   13           MR. KENNEDY:  May I publish?

01:28PM   14           THE COURT:  You may.

01:28PM   15   BY MR. KENNEDY:

01:28PM   16   Q   This was the ammunition that you had at the home, correct?

01:28PM   17   A   Correct.

01:28PM   18   Q   It's Winchester, correct, 40-caliber?

01:28PM   19   A   Correct.

01:28PM   20   Q   And American Eagle, right?

01:28PM   21   A   Sure.

01:28PM   22   Q   And these are photographs of it, right?

01:28PM   23   A   Yes.

01:28PM   24   Q   Now, we talked about the fact that you received a

01:28PM   25   hundred -- back in 2005 when you were convicted, back then in

01:29PM   1   federal court, you received 188 months sentence, right?

01:29PM   2   A   Correct.

01:29PM   3   Q   And then it was reduced down to 144 months during that

01:29PM   4   term, which allowed you to get out in 2013 to the halfway

01:29PM   5   house, correct?

01:29PM   6   A   Correct.

01:29PM   7   Q   So right now, you are doing 188 months, right?

01:29PM   8   A   Correct.

01:29PM   9   Q   And in between, you were on supervised release, right?

01:29PM  10   A   Yes, it was.

01:29PM  11   Q   And all this drug dealing, drug use, and criminal activity

01:29PM  12   was while you were under supervised release of the court,

01:29PM  13   right?

01:29PM  14   A   Yes, it was.

01:29PM  15   Q   So you were getting away with committing crimes while you

01:29PM  16   were under the supervision of the court, right?

01:29PM  17   A   Well, I got caught.

01:29PM  18   Q   You didn't get caught until --

01:29PM  19   A   I didn't get away, I don't think.

01:29PM  20   Q   -- until August 8th of 2018, right?

01:30PM  21   A   Correct.

01:30PM  22   Q   And prior to that, with Mr. Wayne Miller, you were flying

01:30PM  23   back to Las Vegas to get drugs from a guy by the name of Rusty

01:30PM  24   Largo, (phonetic) weren't you?

01:30PM  25   A   Something like that.

01:30PM  1    Q    Yeah.  And so that was going on in 2018 as well, correct?

01:30PM  2    A    I don't know the exact dates, but yeah.

01:30PM  3              MR. KENNEDY:  Your Honor, before we move to another

01:30PM  4    spot, is this a good spot to stop for the day?

01:30PM  5              THE COURT:  It is.  It is.  Thank you.  So let's go

01:30PM  6    ahead and break for the trial day then at that point.  And we

01:30PM  7    will resume with Mr. Kennedy's cross of Mr. Ortiz tomorrow

01:30PM  8    morning.  As we go to break, I'm reminding our jurors to please

01:30PM  9    once again to please refrain from discussing the substance of

01:30PM  10   this case with anyone, including each other, until I advise you

01:30PM  11   otherwise; do not access any media or other accounts of this

01:30PM  12   case that may be out there; and then finally, please do not

01:30PM  13   conduct any independent investigation into the facts,

01:31PM  14   circumstances, or persons involved.

01:31PM  15              So we will start just as we did this morning at 8:30

01:31PM  16   tomorrow.

01:31PM  17              (Proceedings were concluded at 1:31 p.m.)

         18

         19

         20

         21

         22

         23

         24

         25

1                    COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript from the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9

10         DATED at Honolulu, Hawaii, June 3, 2024.

11

12

13                               /s/ Gloria T. Bediamol

14                               GLORIA T. BEDIAMOL.

15                               RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25