```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,    )     CRIMINAL NO. 19-00099-DKW
 4                                 )
                   Plaintiff,      )     Honolulu, Hawaii
 5                                 )
            vs.                    )     April 1, 2024
 6                                 )
      MICHAEL J. MISKE, JR.,       )     TESTIMONY OF THERESA
 7                                 )     SCHUBERT AND LAURENCE
                   Defendant.      )     MILLER
 8     _____)

 9
                  PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 40)
10                BEFORE THE HONORABLE DERRICK K. WATSON,
                  CHIEF UNITED STATES DISTRICT COURT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:            MARK INCIONG, ESQ.
13                                 MICHAEL DAVID NAMMAR, ESQ
                                   WILLIAM KE AUPUNI AKINA, ESQ.
14                                 AISLINN AFFINITO, ESQ.
                                   Office of the United States Attorney
15                                 PJKK Federal Building
                                   300 Ala Moana Boulevard, Suite 6100
16                                 Honolulu, Hawaii  96850

17   For the Defendant:           LYNN E. PANAGAKOS, ESQ.
                                   841 Bishop St., Ste 2201
18                                 Honolulu, HI 96813

19                                 MICHAEL JEROME KENNEDY, ESQ.
                                   Law Offices of Michael Jerome
20                                 Kennedy, PLLC
                                   333 Flint Street
21                                 Reno, NV 89501

22   Official Court Reporter:     Gloria T. Bediamol, RPR RMR CRR FCRR
                                   United States District Court
23                                 300 Ala Moana Boulevard
                                   Honolulu, Hawaii 96850
24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).
```

 1                          I N D E X

 2    GOVERNMENT WITNESSES:                              PAGE NO.

 3     THERESA SCHUBERT

 4          DIRECT EXAMINATION BY MR. INCIONG                  5
            CROSS-EXAMINATION BY MR. KENNEDY                  57
 5          REDIRECT EXAMINATION BY MR. INCIONG              65

 6     LAURENCE MILLER

 7          DIRECT EXAMINATION BY MR. AKINA                  70
            CROSS-EXAMINATION BY MS. PANAGAKOS               97
 8          REDIRECT EXAMINATION BY MR. AKINA               113
            RECROSS-EXAMINATION BY MS. PANAGAKOS            115
 9

10    EXHIBITS:                                          PAGE NO.

11
       Exhibit 4-93 was received in evidence              48
12     Exhibit 4-95 was received in evidence              50
       Exhibit 4-143 was received in evidence             53
13     Exhibit 1-1110 and 1-1111 were received in         80
       evidence
14     Exhibit 1-449 was received in evidence             82
       Exhibit 1-447 was received in evidence             83
15     Exhibit 1-448 was received in evidence             84
       Exhibit 1-450 and 1-451 were received in evidence  86
16     Exhibit 9115-009 was received in evidence         101
       Exhibit 1-1112 was received in evidence           112
17

18

19

20

21

22

23

24

25

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
|          | 1  | April 1, 2024                                8:39 a.m.     |
| 08:39AM  | 2  | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United      |
| 08:39AM  | 3  | States of America versus Michael J. Miske, Jr.            |
| 08:39AM  | 4  | This case has been called for jury trial, day 40.        |
| 08:39AM  | 5  | Counsel, please make your appearances for the record.    |
| 08:39AM  | 6  | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,    |
| 08:39AM  | 7  | Michael Nammar and KeAupuni Akina for the United States along |
| 08:39AM  | 8  | with FBI Special Agent Thomas Palmer and Kari Sherman.  Good |
| 08:39AM  | 9  | morning.                                                  |
| 08:39AM  | 10 | THE COURT:  Good morning.                                 |
| 08:39AM  | 11 | MR. KENNEDY:  Good morning, Your Honor.  Michael          |
| 08:39AM  | 12 | Kennedy here with Lynn Panagakos, Michael Miske, Ashley King |
| 08:39AM  | 13 | and Josh Barry.  And good morning to everyone.            |
| 08:39AM  | 14 | THE COURT:  Good morning.  The entire team is here.       |
| 08:39AM  | 15 | MR. KENNEDY:  We are.                                      |
| 08:39AM  | 16 | THE COURT:  16 jurors good morning to you.  You may be    |
| 08:39AM  | 17 | seated by the way, Counsel.  Welcome back.  Hopefully everyone |
| 08:40AM  | 18 | did what I asked you to do on the two weeks ago Friday, which |
| 08:40AM  | 19 | was to recharge the batteries.  Hopefully you all have had a |
| 08:40AM  | 20 | chance to do that.  We've got a few extra days in fact more |
| 08:40AM  | 21 | than what we had all contemplated.  So we have had even more of |
| 08:40AM  | 22 | an opportunity to do what I just suggested.               |
| 08:40AM  | 23 | We are ready to go hopefully this morning.  The          |
| 08:40AM  | 24 | government is prepared, I assume, to continue its case in |
| 08:40AM  | 25 | chief.                                                    |

| | | |
|---|---|---|
| 08:40AM | 1 | Mr. Inciong, your next witness please. |
| 08:40AM | 2 | MR. INCIONG:  We are, Your Honor.  Before we call our |
| 08:40AM | 3 | witness, Your Honor, could we please publish an exhibit Your |
| 08:40AM | 4 | Honor ruled on after the jury left us? |
| 08:40AM | 5 | THE COURT:  Those two pages from the grand jury |
| 08:40AM | 6 | transcript? |
| 08:40AM | 7 | MR. INCIONG:  Correct. |
| 08:40AM | 8 | THE COURT:  Yes, you may. |
| 08:40AM | 9 | MR. INCIONG:  4-138A. |
| 08:40AM | 10 | THE COURT:  You may.  And since we're on the subject |
| 08:40AM | 11 | of just kind of clean-up here and housekeeping, there were some |
| 08:40AM | 12 | objections filed to some of the witnesses that I gather the |
| 08:40AM | 13 | government intends to call this morning, since we have not yet |
| 08:40AM | 14 | heard argument on that, I asked the government to hold off on |
| 08:41AM | 15 | calling any of those individuals until after our first morning |
| 08:41AM | 16 | break, and I will take argument, if there is any, at that time. |
| 08:41AM | 17 | Mr. Inciong, go ahead.  You may publish. |
| 08:41AM | 18 | MR. INCIONG:  Thank you, Your Honor. We would like to |
| 08:41AM | 19 | publish 4-138A which is an excerpt of the January 3, 2013, HPD |
| 08:41AM | 20 | interview of Michael Galmiche.  If we could enlarge the first |
| 08:41AM | 21 | top half to allow the jury to read that.  Thank you. |
| 08:42AM | 22 | Could we show the second half, the bottom half of that |
| 08:42AM | 23 | page please, then could we go to to the second page all the way |
| 08:42AM | 24 | from the top please?  Thank you. |
| 08:43AM | 25 | Finally, could we show the bottom half of the second |

08:43AM   1   page please?

08:43AM   2          Thank you, Your Honor.  The United States calls

08:43AM   3   Theresa Schubert.

08:44AM   4          THE CLERK:  Please raise your right hand.

08:44AM   5                       THERESA SCHUBERT,

08:44AM   6   called as a witness, having been first duly sworn, was examined

08:44AM   7   and testified as follows:

08:44AM   8          THE CLERK:  Please state your full name for the record

08:44AM   9   spelling your last name for the record.

08:44AM   10         THE WITNESS:  Theresa Schubert, T-H-E-R-E-S-A,

08:44AM   11  S-C-H-U-B-E-R-T.

08:44AM   12                    DIRECT EXAMINATION

08:44AM   13  BY MR. INCIONG:

08:44AM   14  Q    Good morning, Ms. Schubert.

08:44AM   15  A    Good morning.

08:44AM   16  Q    How old are you, ma'am?

08:44AM   17  A    I'm 52 years old.

08:44AM   18  Q    Did you grow up here on the island of Oahu?

08:44AM   19  A    Yes, I did.

08:45AM   20  Q    What high school did you go to?

08:45AM   21  A    I attended Radford High School.

08:45AM   22  Q    What do you for employment currently?

08:45AM   23  A    I am a high school teacher for over now 29 years.

08:45AM   24  Q    Which high school do you teach at?

08:45AM   25  A    I teach at Farrington High School.

| 08:45AM | 1  | Q   Is there a certain subject that you cover? |
|---------|----|--------------------------------------------------|
| 08:45AM | 2  | A   I am the student activities coordinator, so I oversee |
| 08:45AM | 3  | student government, all the counsels, the clubs on campus as |
| 08:45AM | 4  | well as I teach leadership training two classes a day. |
| 08:45AM | 5  | Q   So are you employed then by the department of education |
| 08:45AM | 6  | technically? |
| 08:45AM | 7  | A   That is correct. |
| 08:45AM | 8  | Q   Have you had other employment with the Department of |
| 08:45AM | 9  | Education prior to becoming a teacher at Farrington? |
| 08:45AM | 10 | A   No. |
| 08:45AM | 11 | Q   And you're still doing that currently today, correct? |
| 08:45AM | 12 | A   Yes.  I've been there for 25 years. |
| 08:45AM | 13 | Q   Are you one of the so many teachers that we hear about |
| 08:45AM | 14 | that have second jobs to supplement their income? |
| 08:46AM | 15 | A   Yes. |
| 08:46AM | 16 | Q   What is your -- what is your side hustle so to speak? |
| 08:46AM | 17 | A   I do event coordination for different promoters who hire |
| 08:46AM | 18 | me to run their event operations which includes ticketing, |
| 08:46AM | 19 | cashiering, muscle and maintenance.  Any I -- actually, |
| 08:46AM | 20 | anything I could do, anything that's even related. |
| 08:46AM | 21 | Q   What do you mean by muscle and maintenance? |
| 08:46AM | 22 | A   If they need a crew to that needs the help carry ice for |
| 08:46AM | 23 | the venders or help build out a stage or truss and lighting or |
| 08:46AM | 24 | platforms or tents.  And then maintenance they become the same |
| 08:46AM | 25 | crew to make sure that the event is safe of debris or any |

08:46AM   1    hazardous materials they'll dispose it throughout the night.

08:46AM   2    Q    Are you employed by a certain company in that regard or

08:46AM   3    are you an independent contractor?

08:46AM   4    A    I'm independent.

08:46AM   5    Q    How long have you been doing that -- that sort of work on

08:46AM   6    the side for?

08:46AM   7    A    17 years now.

08:47AM   8    Q    Are you involved with any other organizations, nonprofit

08:47AM   9    organizations?

08:47AM   10   A    Yes.  I am the current president of Women Speaking Out

08:47AM   11   Hawaii which is a nonprofit.  We're a platform as to educate

08:47AM   12   our youth of Hawaii against domestic violence and so we teach

08:47AM   13   free workshops twice a year for high school, middle school and

08:47AM   14   young college students.

08:47AM   15   Q    So you work with children a lot or at least high school

08:47AM   16   students a lot it sounds like?

08:47AM   17   A    Yes.

08:47AM   18   Q    Do you have children of your own?

08:47AM   19   A    I do.

08:47AM   20   Q    How many?

08:47AM   21   A    I have five children.

08:47AM   22   Q    So I want to take you back to December of 2012,

08:47AM   23   Ms. Schubert.  Were you working as a teacher at Farrington High

08:47AM   24   School at any time?

08:47AM   25   A    Yes, I was.

08:47AM   1    Q    Were you also involved in the -- your side job of the

08:47AM   2    promotional activities support?

08:47AM   3    A    Yes, I was.

08:47AM   4    Q    Do you know a person by the name of Michael Galmiche?

08:48AM   5    A    Yes, I do.

08:48AM   6    Q    How do you know Michael Galmiche?

08:48AM   7    A    Because he was the lead producer for that particular event

08:48AM   8    that we were promoting for at the time.

08:48AM   9    Q    So this is an event that you're referencing on December of

08:48AM   10   2012?

08:48AM   11   A    Correct.

08:48AM   12   Q    How long had you known or worked with Mr. Galmiche?

08:48AM   13   A    Up until that time?

08:48AM   14   Q    Well, let's start with as of today?

08:48AM   15   A    15 years.

08:48AM   16   Q    Okay.  So as of 2012, had you worked previously with

08:48AM   17   Mr. Galmiche on promotional type of activities?

08:48AM   18   A    Yes.

08:48AM   19   Q    What types of support or help did you provide to him

08:48AM   20   specifically?

08:48AM   21   A    Well, there is another event that we were doing prior to

08:48AM   22   that.  It was our high school block party where we would have

08:48AM   23   an event at the wet and wild -- the Wet'n'Wild park, and so it

08:48AM   24   was for high schoolers only and so it was a lot of promotions

08:49AM   25   and seeking sponsorships.  But I would run the door with my

08:49AM    1    team ticketing, responding, cashiering and then I would have

08:49AM    2    about 60 volunteers come on board to just make sure that they

08:49AM    3    would chaperone throughout the water park to make sure it was a

08:49AM    4    safe event.

08:49AM    5    Q    Okay.  So as of 2012, approximately how long had you known

08:49AM    6    Mr. Galmiche?

08:49AM    7    A    Four years.

08:49AM    8    Q    Had you been working with him exclusively on this sort of

08:49AM    9    promotional support or did you have multiple promoters that you

08:49AM   10    worked with?

08:49AM   11    A    At that time, it was just himself and his -- his partners.

08:49AM   12    He had partners.

08:49AM   13    Q    Okay.  So I want to take you then specifically to

08:49AM   14    December 15th of 2012.  Do you recall helping Mr. Galmiche

08:49AM   15    promote an event that was coming up for New Year's of 2013?

08:49AM   16    A    Yes, I do.

08:49AM   17    Q    What was that event?

08:49AM   18    A    It was the New Year's Eve party of the year a Kaka'ako

08:50AM   19    event.

08:50AM   20    Q    Had you worked on that event previously or was that the

08:50AM   21    first year you worked on that with him?

08:50AM   22    A    No.  We -- we did that event a few years prior to.

08:50AM   23    Q    On December 15th of 2012, do you recall what you were

08:50AM   24    doing specifically to promote that event?

08:50AM   25    A    Yes.  I was partnered with another person to hold the

08:50AM   1   screen that was projecting a still image of the event itself.

08:50AM   2   It was like a -- it was like seeing a big banner but digitally.

08:50AM   3   Q    Okay.  I'll show you a picture of that in -- in a moment,

08:50AM   4   but do you recall where you were promoting this particular

08:50AM   5   event, where you were holding the screen as you described?

08:50AM   6   A    Yes.  We were across the street from the opening of the

08:50AM   7   Restaurant Row parking lot that faces mauka of -- on Pohukaina

08:50AM   8   Street.

08:50AM   9   Q    Why had you chosen that location to promote the New Year's

08:51AM   10  Eve party?

08:51AM   11  A    Because like -- like anything else, we always want to

08:51AM   12  catch the let out.  Those who are coming out of the -- who are

08:51AM   13  exiting the venue, we want to hit them.

08:51AM   14  Q    So just so the jury understands some of the -- some of

08:51AM   15  your industry lingo.

08:51AM   16  A    Sorry.

08:51AM   17  Q    When you say you want to hit the let out, what does that

08:51AM   18  mean?

08:51AM   19  A    We want those who are exiting one venue to see -- be the

08:51AM   20  eyes upon the advertisement that we're projecting.

08:51AM   21  Q    Was there a certain venue or venues at the location

08:51AM   22  described that you wanted to try and target the -- the patrons

08:51AM   23  leaving from?

08:51AM   24  A    Yes.  We knew that the M was one of the few clubs where

08:51AM   25  they end very late, so that was our last stop in promoting.

| | | | |
|---|---|---|---|
| 08:51AM | 1 | Q | This is the M Nightclub you're -- you're referencing? |
| 08:51AM | 2 | A | Correct. |
| 08:51AM | 3 | Q | And when you say they're one of the few clubs that were |
| 08:51AM | 4 | | able to stay open late, is -- is there a specific or special |
| 08:52AM | 5 | | license that you're aware of that allows those clubs to stay |
| 08:52AM | 6 | | open later and serve alcohol later? |
| 08:52AM | 7 | A | I -- I do not. |
| 08:52AM | 8 | Q | Okay. |
| 08:52AM | 9 | A | I just know that's what is said. |
| 08:52AM | 10 | Q | Okay.  So what time do you recall arriving at the M |
| 08:52AM | 11 | | Nightclub or thereabouts to set up your -- your screen? |
| 08:52AM | 12 | A | If I recall correctly, I believe the M let out about 3 |
| 08:52AM | 13 | | a.m. and so we were sure to be set up around between 2 and 3 I |
| 08:52AM | 14 | | believe. |
| 08:52AM | 15 | Q | Okay.  So, Ms. Schubert, I'd like to show you as well as |
| 08:52AM | 16 | | the jury a few exhibits that have been previously admitted |
| 08:52AM | 17 | | already in this matter starting with Exhibit 4-63. |
| 08:52AM | 18 | | MR. INCIONG:  Could we publish that, Your Honor? |
| 08:52AM | 19 | | That's been previously admitted from the government's original |
| 08:52AM | 20 | | list. |
| 08:52AM | 21 | | THE COURT:  You may, go ahead. |
| 08:52AM | 22 | | MR. INCIONG: |
| 08:52AM | 23 | Q | Ms. Schubert, do you see the photo marked as 4-63? |
| 08:52AM | 24 | A | Yes, I do. |
| 08:52AM | 25 | Q | Is this the parking garage that you referenced a few |

08:53AM   1   minutes ago where you were set up with the display to promote

08:53AM   2   the block party?

08:53AM   3   A    Yes.

08:53AM   4   Q    Where were you situated in reference to this particular

08:53AM   5   parking entry and exit?

08:53AM   6   A    I was directly across the street on the right-hand side of

08:53AM   7   this photo.

08:53AM   8            MR. INCIONG:  All right.  Could we publish

08:53AM   9   Exhibit 4-64 previously admitted, Your Honor, at this time?

08:53AM   10            THE COURT:  Yes, yes.

08:53AM   11            MR. INCIONG:  Thank you.

08:53AM   12   BY MR. INCIONG:

08:53AM   13   Q    Ms. Schubert, do you see Exhibit 4-64?

08:53AM   14   A    Yes.

08:53AM   15   Q    Does this photo show where you were situated across from

08:53AM   16   that parking garage exit and entrance?

08:53AM   17   A    That is correct.

08:53AM   18   Q    The screen in front of you is a touch screen.  If you

08:53AM   19   wouldn't mind, could you just mark an X or a circle to show

08:53AM   20   approximately where you were situated on that night?  So the

08:53AM   21   record shows -- should show you've drawn a circle right about

08:54AM   22   at the driveway to the small parking lot that's shown in that

08:54AM   23   photo.  Is that true?

08:54AM   24   A    Yes.

08:54AM   25            MR. INCIONG:  Could we show the witness and the jury

08:54AM    1    Exhibit 4-135 previously admitted from the government's 10th

08:54AM    2    supplemental list, Your Honor?

08:54AM    3           THE COURT:  Do you recall, Counsel, which supplemental

08:54AM    4    list?

08:54AM    5           MR. INCIONG:  Tenth, I believe.

08:54AM    6           THE COURT:  Tenth.  Okay, go ahead.

08:54AM    7           MR. INCIONG:  Thank you, Your Honor.

08:54AM    8    BY MR. INCIONG:

08:54AM    9    Q    Ms. Schubert, this is just a different angle it looks like

08:54AM   10    across the street from the previous exhibit.  Does this show

08:54AM   11    that same driveway entrance or to the parking lot where you

08:54AM   12    were set up across from the parking garage?

08:54AM   13    A    Yes, it does.

08:54AM   14    Q    Could you again, if you would, just write an X or a circle

08:54AM   15    to where you were situated that night.  Again, the record

08:55AM   16    should show you've just drawn an X on the left edge of that

08:55AM   17    photo right in the driveway area to that small parking lot?

08:55AM   18    A    Yes.

08:55AM   19           MR. INCIONG:  Could we publish, Your Honor,

08:55AM   20    Exhibit 4-66 previously admitted from the government's original

08:55AM   21    list?

08:55AM   22           THE COURT:  You may.

08:55AM   23           MR. INCIONG:  Thank you, Your Honor.

08:55AM   24    BY MR. INCIONG:

08:55AM   25    Q    Ms. Schubert, do you see this sketch or diagram showing

08:55AM   1   the -- the area you've just described?

08:55AM   2   A    Yes.

08:55AM   3   Q    Do you see the -- a small parking lot referenced in that

08:55AM   4   exhibit on 4-66?

08:55AM   5   A    Yes, I do.

08:55AM   6   Q    Is that directly across from the parking garage exit that

08:55AM   7   you previously identified?

08:55AM   8   A    Yes, it is.

08:55AM   9   Q    Other than maybe not being exactly to scale, does this

08:55AM  10   diagram accurately show that area where you were that evening?

08:56AM  11   A    Yes.

08:56AM  12        MR. INCIONG:  Could we publish, Your Honor, Exhibit

08:56AM  13   4-67 previously admitted from the government's original list?

08:56AM  14        THE COURT:  Yes.

08:56AM  15   BY MR. INCIONG:

08:56AM  16   Q    Ms. Schubert, do you recognize this photograph?

08:56AM  17   A    Yes, I do.

08:56AM  18   Q    How do you recognize that?

08:56AM  19   A    I took that photo.

08:56AM  20   Q    Is this the -- the display or the banner that you were

08:56AM  21   describing that you were holding across from the parking exit?

08:56AM  22   A    That's correct.

08:56AM  23   Q    So the cars coming out of that, they can -- they can read

08:56AM  24   that.  It's -- it reads backwards here because you're behind

08:56AM  25   it?

| 08:56AM | 1 | A | Yes, that's correct. |

08:56AM   1   A   Yes, that's correct.

08:56AM   2   Q   What does the display say or what did it say?

08:56AM   3   A   New Year's Eve block party Kaka'ako park.

08:56AM   4   Q   So you mentioned earlier that you were one of two people

08:56AM   5   that was holding this sign?

08:56AM   6   A   Yes.

08:56AM   7   Q   Why did it -- why did it require people to hold this

08:56AM   8   particular sign?  There's no one there in this photo, right?

08:56AM   9   A   Right.  Yeah, we just set it up, but it was windy.  There

08:57AM   10   are occasional big gusts of wind, and these are fastfold

08:57AM   11   screens.  And if you know anything about a fastfold screen, it

08:57AM   12   becomes like a parachute.  And so it's -- it's light enough to

08:57AM   13   where it will fly.

08:57AM   14   Q   Okay.  So when you were holding this screen, which side of

08:57AM   15   the screen were you on, the right or the left, as we're looking

08:57AM   16   at it in this photo?

08:57AM   17   A   It would be to your right as we are looking at the --

08:57AM   18   Q   Was there a second individual then on the left side?

08:57AM   19   A   Yes, there was.

08:57AM   20   Q   Approximately how many people were working with you that

08:57AM   21   evening as part of the promotional group including

08:57AM   22   Mr. Galmiche?

08:57AM   23   A   I believe there were about six of us.

08:57AM   24   Q   Where was Mr. Galmiche located in reference to the display

08:57AM   25   on this -- on this exhibit?

08:57AM   1   A      He would be across the street on the side of the parking
08:57AM   2   structure.
08:57AM   3            MR. INCIONG:  Okay.  Could we go back for a moment to
08:57AM   4   Exhibit 4-63, please?
08:58AM   5            THE COURT:  Go ahead.
08:58AM   6   BY MR. INCIONG:
08:58AM   7   Q      So when you say "across the street," this is where
08:58AM   8   Mr. Galmiche was?  Is it -- is that what's shown here in 4-63?
08:58AM   9   A      That's correct.
08:58AM   10  Q      Was he over there by himself or with anyone else?
08:58AM   11  A      There were two other team people on our team with him.
08:58AM   12  Q      What was Mr. Galmiche and the other team members doing
08:58AM   13  over on the other side of the street?
08:58AM   14  A      Handing out flyers to those in their cars.
08:58AM   15  Q      As they were exiting?
08:58AM   16  A      Yes.
08:58AM   17  Q      This was part of the plan along as how -- how you were
08:58AM   18  going to help promote the -- the New Year's Eve party?
08:58AM   19  A      Yes.
08:58AM   20           MR. INCIONG:  Okay.  So can we go back to 4-67?
08:58AM   21           THE COURT:  Go ahead, you may publish.
08:58AM   22           MR. INCIONG:  Thank you, Your Honor.
08:58AM   23  BY MR. INCIONG:
08:58AM   24  Q      So, Ms. Schubert, as -- as you look at 4-67, do you see in
08:58AM   25  the bottom there below the actual display screen it looks like

08:59AM   1   there's some equipment.  I can see the illuminated rectangle,

08:59AM   2   for example, on the bottom right.  Do you recognize those

08:59AM   3   items?

08:59AM   4   A     Yes, I do.

08:59AM   5   Q     What are those items?

08:59AM   6   A     The illuminated item, that would be the -- the laptop.

08:59AM   7   It's a small laptop.

08:59AM   8   Q     Okay.  And is there something just to the left of that?

08:59AM   9   A     Yes.  It's connected to a LCD projector.

08:59AM  10   Q     These two pieces of equipment were used to actually

08:59AM  11   project the display that's on the screen right there?

08:59AM  12   A     That is correct.

08:59AM  13   Q     Did you assist at all in setting this up or were you in

08:59AM  14   charge of setting this up?

08:59AM  15   A     Yes, I was in charge of setting that up.

08:59AM  16   Q     How were these two items powered?

08:59AM  17   A     By generator.

08:59AM  18   Q     Can you see the generator in this photo or does it -- is

08:59AM  19   it not shown?

08:59AM  20   A     You can't see it but it would be to the far left where --

08:59AM  21   perhaps where that it looks like it's a pole that's bent.

09:00AM  22   Q     Okay, all right.

09:00AM  23   A     Yeah.

09:00AM  24   Q     So did everything go as you -- as you expected as far as

09:00AM  25   setting up the screen and passing out the flyers and so forth?

09:00AM   1   A   Yes.

09:00AM   2   Q   At any point --

09:00AM   3   A   I've -- I've done it before so, yeah, it was just like

09:00AM   4   clockwork.

09:00AM   5   Q   Okay.  At any point, was the promotion disrupted or

09:00AM   6   interrupted?

09:00AM   7   A   Yes, it was.

09:00AM   8   Q   What happened?  How did that happen?

09:00AM   9   A   So while I was standing on the -- the right of the screen

09:00AM   10   and cars were coming out, there -- there was a car, a black car

09:00AM   11   that pulled up right parallel to our screen, and it stopped

09:00AM   12   where I was holding the screen, like the front of the car

09:00AM   13   stopped like where I was.

09:00AM   14   Q   Okay.

09:00AM   15   A   And -- I'm sorry.

09:00AM   16   Q   No.  Go ahead.

09:01AM   17   A   And -- and I remember first thing I thought was, wow, this

09:01AM   18   is a really nice car.

09:01AM   19   Q   Do you recall what kind of car it was that made you think

09:01AM   20   that?

09:01AM   21   A   Yeah, it was a black Porsche.  And -- and I joked with my

09:01AM   22   partner who was holding the other side, I -- I told him, wow,

09:01AM   23   look at this.  This is a really nice car.  But then I -- I

09:01AM   24   said, why is it stopped right here?  Like I didn't understand

09:01AM   25   why it stopped when we were watching cars come out and go to

09:01AM    1    the left or the right.  But this car just came and just

09:01AM    2    stopped.

09:01AM    3    Q    So if I understand correctly, it was stopped directly in

09:01AM    4    front of the display screen?

09:01AM    5    A    Yes.

09:01AM    6    Q    Okay.  You said it was a black Porsche.  Was this a sports

09:01AM    7    car, SUV, sedan?

09:01AM    8    A    It was a sedan.  I remember it having four -- four doors.

09:01AM    9    Q    So what happened after the black Porsche stopped in front

09:01AM   10    of the -- the display screen?

09:01AM   11    A    As I was speaking to Ryan, I noticed that the person who

09:01AM   12    was in the car was like -- can I turn?

09:02AM   13    Q    Sure.

09:02AM   14    A    Okay.  So I'm -- I'm looking this way, and that person is

09:02AM   15    in his car and he's like talking.  I can tell he's talking but

09:02AM   16    there's no one else in the car so I assumed he's like on the

09:02AM   17    phone.

09:02AM   18    Q    Okay.

09:02AM   19    A    And then he jumps out and then he yells at us to take this

09:02AM   20    fucking thing down.  And -- and I -- I just looked at him like

09:02AM   21    why is he so angry?  Like who is this guy?  Like I didn't -- I

09:02AM   22    didn't understand why he was parked in -- like why he stopped

09:02AM   23    in the -- just on the road, number one.  And then I didn't

09:02AM   24    understand why he was yelling at us for.  Like I had no idea

09:02AM   25    who he was.

09:02AM   1   Q    You've never seen this person or met this person before?

09:02AM   2   A    No, never.

09:02AM   3   Q    Did you respond to him in any way when he yelled to take

09:02AM   4   the -- the screen down?

09:02AM   5   A    Yeah, the -- the teacher mommy brain in me said, Why you

09:02AM   6   gotta swear for?  Like, I didn't understand.  Yeah.

09:02AM   7   Q    So what happened then?

09:03AM   8   A    Well, he -- he start -- he continued yelling at us to take

09:03AM   9   this fucking thing down, and then he walked over to the other

09:03AM  10   side of the -- the street which was on the parking structure

09:03AM  11   side.  And then he started yelling loudly at our other partners

09:03AM  12   Romeo, Valentine and Kanoe who had flyers in their hands.

09:03AM  13   Q    Was there any sort of discussion that happened between any

09:03AM  14   of the individuals on that side of the street with this

09:03AM  15   individual?

09:03AM  16   A    Yeah, I mean, he just basically kept yelling the same

09:03AM  17   thing, like -- like, you know, Why you guys fucking doing this,

09:03AM  18   and I told you guys not to fucking do this.  Or, you know, I

09:03AM  19   let you -- I let you into my club and you guys turn around and

09:03AM  20   do this fucking kind of shit.

09:03AM  21        And just -- it was -- just he was just yelling the

09:04AM  22   same things over and over again and trying to take the flyers

09:04AM  23   away from the partners who had flyers in their hands.

09:04AM  24   Q    While that was happening, had you made any attempts to

09:04AM  25   take the display down or -- or anything of that nature?

| | | | |
|---|---|---|---|
| 09:04AM | 1 | A | Well, I stood there because I didn't understand why |
| 09:04AM | 2 | | somebody would be so angry and I -- I kept trying to ask my -- |
| 09:04AM | 3 | | the partner who was holding the other side of the screen. |
| 09:04AM | 4 | Q | What was his name again? |
| 09:04AM | 5 | A | His name was Ryan. |
| 09:04AM | 6 | Q | Ryan last name? |
| 09:04AM | 7 | A | Sorry.  It escapes me right now. |
| 09:04AM | 8 | Q | Okay.  No problem. |
| 09:04AM | 9 | A | You know, just like, yeah. |
| 09:04AM | 10 | Q | So at -- at any point, did this individual who had pulled |
| 09:04AM | 11 | | up in the Porsche come back over to your side of the street? |
| 09:04AM | 12 | A | Yeah, he came back again.  He was -- it seemed like he was |
| 09:04AM | 13 | | pacing like yelling there and yelling there and he would come |
| 09:04AM | 14 | | out but not all the way to us but still yelling to take it |
| 09:04AM | 15 | | down.  And so that's when I noticed my partner was gone.  And |
| 09:05AM | 16 | | then again, I didn't understand like where he went.  And I |
| 09:05AM | 17 | | noticed the whole street got kind of quiet when it was so |
| 09:05AM | 18 | | noisy.  It was so busy.  It went from being super busy to |
| 09:05AM | 19 | | eerily quiet, and so that's when I -- I started walking to the |
| 09:05AM | 20 | | back to slowly power things down.  Because at that point, |
| 09:05AM | 21 | | that's when Mike -- Mike would come across and tell me, you |
| 09:05AM | 22 | | know what, let's just shut this down. |
| 09:05AM | 23 | Q | So when you say Mike, you're referring to Michael |
| 09:05AM | 24 | | Galmiche? |
| 09:05AM | 25 | A | I'm sorry, yes.  Mike Galmiche. |

09:05AM   1   Q    So when Mr. Galmiche came across and he told you to shut
09:05AM   2   this down, you started to -- to do so?
09:05AM   3   A    Well, I was -- I was still watching what is going on
09:05AM   4   because I didn't -- I still couldn't wrap my head around what
09:05AM   5   was happening.  I didn't know who he was.  I didn't understand
09:05AM   6   why my partner all of the sudden disappeared and why the street
09:05AM   7   got so quiet.
09:05AM   8         And then when Mike did tell us to -- Mike Galmiche,
09:06AM   9   excuse me, when he told us to shut it down, that's when Mike
09:06AM  10   Miske came quickly.  And then it looked like he was heading
09:06AM  11   towards the -- the laptop, so I beat him to it and I told him,
09:06AM  12   "Oh, I got it.  I got it."  So then I -- I shut -- because once
09:06AM  13   you close the laptop, it stops the image from projecting.  So I
09:06AM  14   just shut the laptop.
09:06AM  15   Q    Okay.  So you -- you've referenced the individual by name
09:06AM  16   but --
09:06AM  17   A    I'm sorry, yes.
09:06AM  18   Q    -- but you -- you didn't know who this person was at that
09:06AM  19   time; is that correct?
09:06AM  20   A    I did not.
09:06AM  21   Q    Do you see the person in court today that pulled up in the
09:06AM  22   Porsche and was yelling at you and telling you to take the
09:06AM  23   display down?
09:06AM  24   A    I do.
09:06AM  25   Q    Could you indicate where that person is seated and what

09:06AM   1   they're wearing for the record, please?

09:06AM   2   A    He's seated right there in a white suit.

09:06AM   3        MR. INCIONG:  Your Honor, may the record reflect that

09:06AM   4   Ms. Schubert has identified the defendant.

09:06AM   5        THE COURT:  Yes, excuse me.  Yes, the record should

09:06AM   6   reflect the witness, Ms. Schubert's, identification of the

09:06AM   7   defendant, Mr. Miske.

09:06AM   8   BY MR. INCIONG:

09:06AM   9   Q    So you said you beat him to it, so you closed the laptop.

09:07AM   10  So at that point, the display is -- is no longer visible,

09:07AM   11  correct?

09:07AM   12  A    Yes.  It -- it would just be a -- a blue -- a blue light,

09:07AM   13  a blue screen.

09:07AM   14  Q    I see.  What happened then?

09:07AM   15  A    I started to slowly -- like what I always do.  I started

09:07AM   16  to disconnect the cables and there is a way to wrap it so I was

09:07AM   17  wrapping the cables slowly and unhooking everything.  And the

09:07AM   18  projector can't be powered off right away, because it'll kill

09:07AM   19  the projector.  So I didn't want to unhook that right away I --

09:07AM   20  instead I attended to the -- the laptop itself.

09:07AM   21  Q    Okay.  Where was Mr. -- the person -- well let me ask you

09:07AM   22  this:  So you -- you reference his name.  How did you later

09:07AM   23  learn who this person was or who -- what his name was?

09:07AM   24  A    Because when Mike Galmiche was being taken away in the

09:07AM   25  ambulance, a police officer asked him if he knew who assaulted

09:08AM    1    him.  And then he -- he said, "Mike Miske."

09:08AM    2           And then I repeated it to the officer because he could

09:08AM    3    barely speak at that point, like I was near him, excuse me, and

09:08AM    4    then I related to the officer.

09:08AM    5    Q    Okay.  So when you were trying to take down the equipment

09:08AM    6    and wrap up the cords, where were Mr. Galmiche and Mr. Miske in

09:08AM    7    relation to you at that point?

09:08AM    8    A    So they were arguing and they -- they would move from

09:08AM    9    where -- where I was which is if you're looking at the screen

09:08AM   10    to the right of the -- the fastfold screen and then they would

09:08AM   11    end up somewhere like -- like the movement to me was slow

09:08AM   12    because I was wrapping cords and looking up and I just heard

09:08AM   13    them arguing and arguing which I still didn't -- I didn't know

09:08AM   14    why someone would get so upset at us promoting this way because

09:08AM   15    we've done it before.  And -- and then it was just he -- it was

09:09AM   16    two Mikes, Mike Galmiche and Michael Miske, just yelling

09:09AM   17    like not -- not yelling at each other but having words and then

09:09AM   18    they ended up to the left of the screen.

09:09AM   19    Q    Okay.  So as we're looking at this exhibit that's on

09:09AM   20    display right now so that's from the back as you're looking to

09:09AM   21    the left?

09:09AM   22    A    Yes, that's correct.

09:09AM   23    Q    Okay.  And you're -- you're still behind that screen and

09:09AM   24    packing up the equipment?

09:09AM   25    A    Yes.  So where you see the equipment in the picture,

09:09AM   1   that's where I am.  I am back there because I'm waiting for the

09:09AM   2   projector to quiet.  That's how I know when it's cooled off.

09:09AM   3   Q    Okay.

09:09AM   4   A    Then I can successfully unplug it but...

09:09AM   5   Q    Okay.  So Mr. Galmiche and Mr. Miske then are to the left

09:09AM   6   of the screen as we are looking at it here?

09:09AM   7   A    Yes.

09:09AM   8   Q    What did you observe next?

09:09AM   9   A    That's when I noticed to the right of the screen I saw a

09:10AM   10   group of gentlemen coming out of the -- the parking structure

09:10AM   11   that was now very, like I said, weirdly quiet, and they were

09:10AM   12   all dressed in black which for me I felt relieved.  I thought

09:10AM   13   okay here come the bouncers.  You know, everything is going to

09:10AM   14   like go away.  Like I thought they were -- they were here to

09:10AM   15   help us --

09:10AM   16   Q    Okay.

09:10AM   17   A    -- with this gentlemen who was yelling at us.

09:10AM   18   Q    So you -- you used the word "bouncer," what made you

09:10AM   19   believe that they were bouncers?

09:10AM   20   A    Because I've been to the M before and just being in this

09:10AM   21   industry and line of work, bouncers tend to have that same

09:10AM   22   overall look of -- especially the M very classy all in black.

09:10AM   23   Q    So they were all dressed the same?

09:10AM   24   A    Correct.

09:10AM   25   Q    Okay.  So where did this group of bouncers proceed after

09:10AM   1   you first saw them come out of the parking garage?

09:10AM   2   A    They beelined straight for where Mr. Galmiche and Mike

09:11AM   3   Miske were having their -- sharing words.

09:11AM   4   Q    Did they intercede?

09:11AM   5   A    They actually started to be a part of I guess helping Mike

09:11AM   6   Miske deal with Mike Galmiche.

09:11AM   7   Q    Describe what you saw.

09:11AM   8   A    So up until that point, it was just a lot of yelling, and

09:11AM   9   like -- like I said, it didn't really concern me.  But once

09:11AM   10   those gentlemen in black came to the -- to the scene then I saw

09:11AM   11   them punching and kicking Mike Galmiche.

09:12AM   12   Q    Did you know any of these bouncers by chance or --

09:12AM   13   A    I did not.

09:12AM   14   Q     -- did you recognize any of them at the time?

09:12AM   15   A    I did not.

09:12AM   16   Q    Did you see Mr. Miske involved in this assault?

09:12AM   17   A    Yes, I did.

09:12AM   18   Q    What did you see Mr. Miske specifically do?

09:12AM   19   A    I saw him throw a couple blows at Mike Galmiche only after

09:12AM   20   he was being held by other men in black.

09:12AM   21   Q    When you say "he was being held," what do you mean

09:12AM   22   exactly?

09:12AM   23   A    They were trying to hold him up like this, like one on one

09:12AM   24   side and one on the other side so that his body was like open

09:12AM   25   to blows.

09:13AM   1   Q   Did you see -- see specifically where Mr. Miske was

09:13AM   2   punching Mr. Galmiche?

09:13AM   3   A   Yeah, I know it was up here.

09:13AM   4   Q   So you're motioning upper body?

09:13AM   5   A   Yes.

09:13AM   6   Q   Head or face?

09:13AM   7   A   Yes.

09:13AM   8   Q   What was your reaction once you saw that?

09:13AM   9   A   That's when I was shocked.  I -- I -- as a high school

09:13AM   10   teacher of 29 years, 25 years at Farrington, I've seen -- I've

09:13AM   11   seen many lunchtime fights because I throw all the events

09:13AM   12   during lunchtime.  And I've seen fights and I -- and I -- I

09:13AM   13   feel like I'm clued into when a fight is going to happen, but

09:13AM   14   I -- not once did I think that there'd be an assault on someone

09:13AM   15   because of a projection that we're doing.  And so I -- I

09:13AM   16   panicked.  I mean, I -- I -- honestly I don't know what I felt.

09:13AM   17   I just know that that's when I knew it was serious and I -- I

09:13AM   18   abandoned my mission of wrapping cords and I walked -- I

09:14AM   19   started walking towards where the assault was happening.

09:14AM   20   Q   Did you have any interaction or any conversation with any

09:14AM   21   of the bouncers as you walked over to where the assault was

09:14AM   22   happening?

09:14AM   23   A   Yeah.  There was a -- there was a bouncer who was standing

09:14AM   24   if you look at the screen to the left but more back.  And I

09:14AM   25   walked right past him and he grabbed me on my left shoulder and

09:14AM  1  he said, "Oh, sister.  It's too late."

09:14AM  2          Like it was almost like he was surprised that I came

09:14AM  3  out of the -- the dark.  I guess they didn't see me.  And he

09:14AM  4  grabbed me and said, "Sister, it's too late."

09:14AM  5          And I -- I -- I just remember being so focused on

09:14AM  6  watching Mike getting assaulted, Mike Galmiche getting

09:14AM  7  assaulted that I -- I shrugged him off but I -- I kept

09:14AM  8  beelining, walking towards where they were assaulting Mike

09:14AM  9  Galmiche.

09:14AM  10  Q    Why did you keep walking towards the -- the location of

09:14AM  11  the assault?

09:15AM  12  A    Because I couldn't believe they were beat -- beating on

09:15AM  13  him and I started yelling, "He has four daughters.  He has four

09:15AM  14  daughters.  He just lost his fiancee."

09:15AM  15          And then to which the guys were scream -- yelling

09:15AM  16  like, we don't fucking care.

09:15AM  17          And even -- even that I couldn't -- I couldn't believe

09:15AM  18  it like that they would still -- it was like unfair.  You know,

09:15AM  19  it was -- they were holding him.  He couldn't get away.

09:15AM  20  Q    Did you eventually get right to -- right next to where all

09:15AM  21  this was happening?

09:15AM  22  A    I did.  I did.

09:15AM  23  Q    What -- what did you do?

09:15AM  24  A    I -- I -- I was hoping that as a female that they would

09:15AM  25  just stop.  But it didn't.  And I -- I -- I just remember going

09:15AM   1   to where Mike Galmiche was and I just put myself around him

09:15AM   2   like tried to bear hug him.  And then eventually successfully

09:16AM   3   got him down to the ground and then I tried to put my -- I put

09:16AM   4   my weight around him because I could hear his shallow

09:16AM   5   breathing.  And so I put my body like I can't -- I don't know

09:16AM   6   how to show it but -- so his body but I was -- my -- my elbow's

09:16AM   7   on my -- my legs were positioned over him and he was curled

09:16AM   8   under me.

09:16AM   9   Q    So you're basically trying to cover him and protect him?

09:16AM   10  A    Yeah, I -- I -- really thought they would stop.

09:16AM   11  Q    So the assault did not stop when you did that?

09:16AM   12  A    No.

09:16AM   13  Q    What happened?

09:16AM   14  A    I got kicked in my -- in my head here and then my elbows

09:16AM   15  on the -- my -- my arm -- my forearm here and here when I was

09:16AM   16  like this over him.  And I kept yelling, like, I'm a chick.

09:16AM   17  Like, I'm a woman.  I'm a girl.  And that's when I looked up to

09:16AM   18  the person who -- who was on the right-hand side who seemed to

09:17AM   19  like be doing more like kicking and kicking on this side versus

09:17AM   20  this side.  And it was because I got -- I was up against the

09:17AM   21  curb.  There was a curb -- street and the curb, so we were like

09:17AM   22  butt up there, so it's harder to get to him this way versus his

09:17AM   23  body being this side where the -- the street is.

09:17AM   24  Q    So when you looked up at the -- you said the person that

09:17AM   25  seemed to be doing most of the kicking, did you have a -- a

09:17AM     1     clear view of that person's face?

09:17AM     2     A     Yes.

09:17AM     3     Q     Was there anything about that person that stood out to you

09:17AM     4     that you recall?

09:17AM     5     A     Yeah, that there was like a big tattoo and he had a very

09:17AM     6     broad -- very broad, big forehead.  Yeah, because he was

09:17AM     7     looking down.

09:17AM     8             MR. INCIONG:  Your Honor, could we publish

09:17AM     9     Exhibit 1-58 previously admitted from our original list?

09:17AM     10            THE COURT:  Go ahead.

09:17AM     11    BY MR. INCIONG:

09:17AM     12    Q     Ms. Schubert, do you recognize the individual in 1-58?

09:18AM     13    A     Yes.

09:18AM     14    Q     How do you recognize that person?

09:18AM     15    A     The tattoos and the broad forehead.

09:18AM     16    Q     Is this the person that was kicking you as you were trying

09:18AM     17    to protect and cover Mr. Galmiche's body?

09:18AM     18    A     Yes.

09:18AM     19    Q     How long did the assault continue after you had kind of

09:18AM     20    enveloped Mr. -- Mr. Galmiche with your own body?

09:18AM     21    A     I don't know.  I -- I -- it felt like forever but I don't

09:18AM     22    know.

09:18AM     23    Q     Did it stop at some point?

09:18AM     24    A     It did.

09:18AM     25    Q     Do you know why it stopped?

09:18AM   1   A     I only noticed it stopped when I heard sirens coming near

09:18AM   2   us.

09:18AM   3   Q     Did the police respond shortly after?

09:18AM   4   A     Yes.

09:18AM   5           MR. INCIONG:  We can take Exhibit 1-58 down for the

09:18AM   6   moment.

09:18AM   7   BY MR. INCIONG:

09:18AM   8   Q     So once the police sirens or -- I shouldn't say police

09:19AM   9   sirens.  Sirens were heard, did -- that -- that's the point you

09:19AM   10   believe the assault stopped?

09:19AM   11   A     Yes.  I -- I noticed that it got quiet and so I looked up

09:19AM   12   and I saw like the police cars were coming this way on

09:19AM   13   Pohukaina.  And when I looked to my right, I also saw another

09:19AM   14   group of men dressed the same as the first set of bouncers that

09:19AM   15   I saw.  I saw a second set of bouncers come out same -- same

09:19AM   16   dress.

09:19AM   17   Q     They came out of the same area, the parking garage exit

09:19AM   18   entry?

09:19AM   19   A     Yes.

09:19AM   20   Q     So as far as the -- the group of bouncers that was

09:19AM   21   involved in the assault, did you see where they went?

09:19AM   22   A     I did not.

09:19AM   23   Q     Did you see where Mr. Miske went?

09:19AM   24   A     I did not.

09:19AM   25   Q     Did you see the black Porsche leave the area?

| | | | |
|---|---|---|---|
| 09:20AM | 1 | A | I did not. |
| 09:20AM | 2 | Q | So the second group of bouncers that you described, did |
| 09:20AM | 3 | | they come over and -- to where you were? |
| 09:20AM | 4 | A | They did. |
| 09:20AM | 5 | Q | Did you have any interaction with them? |
| 09:20AM | 6 | A | Yes, I did. |
| 09:20AM | 7 | Q | How was your interaction with them different from the |
| 09:20AM | 8 | | first set? |
| 09:20AM | 9 | A | They actually asked me if I was okay.  And I said, "Where |
| 09:20AM | 10 | | were you guys?"  Because they looked different too. |
| 09:20AM | 11 | Q | What do you mean by "they looked different"? |
| 09:20AM | 12 | A | I'm Samoan, so they all looked some Polynesian like they |
| 09:20AM | 13 | | did not look like the first set of bouncers that I saw. |
| 09:20AM | 14 | Q | When the police arrived, did they ask you to speak with |
| 09:20AM | 15 | | them? |
| 09:20AM | 16 | A | I'm sorry? |
| 09:20AM | 17 | Q | Did the police ask you to speak with them after they |
| 09:20AM | 18 | | arrived? |
| 09:20AM | 19 | A | They did not.  And I was surprised with everything that |
| 09:21AM | 20 | | just happened.  There were a bunch of police watching |
| 09:21AM | 21 | | Mr. Galmiche being taken away by the ambulance.  And I had to |
| 09:21AM | 22 | | tell them, "Aren't any of you going to take my statement?" |
| 09:21AM | 23 | | To which they all started looking at each other and |
| 09:21AM | 24 | | then one cop said, "Okay." |
| 09:21AM | 25 | Q | Did you have any discussions with Mr. Galmiche before he |

| | | |
|---|---|---|
| 09:21AM | 1 | was taken away in the ambulance that you referenced? |
| 09:21AM | 2 | A     The only -- the only thing that he said was Mike Miske's |
| 09:21AM | 3 | name when the police officer asked him if he knew who did that |
| 09:21AM | 4 | to him, who assaulted him. |
| 09:21AM | 5 | Q     So you eventually made a statement then to the Honolulu |
| 09:21AM | 6 | police? |
| 09:21AM | 7 | A     Yes, I did. |
| 09:21AM | 8 | Q     Was that a verbal statement or a written statement or |
| 09:21AM | 9 | both? |
| 09:21AM | 10 | A     No.  It was a written statement. |
| 09:21AM | 11 | Q     Was it on a form that you -- that you filled out that you |
| 09:21AM | 12 | were provided? |
| 09:21AM | 13 | A     Yes.  And I'm very familiar with those forms |
| 09:21AM | 14 | unfortunately.  Because, like I said, at Farrington I -- |
| 09:22AM | 15 | because I'm out during lunchtime, I'm always -- it's our group |
| 09:22AM | 16 | that -- that throws lunchtime events.  Whenever there's -- |
| 09:22AM | 17 | unfortunately our students choose to fight when there's a crowd |
| 09:22AM | 18 | which is lunchtime.  I've -- I've had to fill out those forms |
| 09:22AM | 19 | many, many times. |
| 09:22AM | 20 | Q     So the police coming to Farrington is not unusual in your |
| 09:22AM | 21 | experience? |
| 09:22AM | 22 | A     No.  No.  They're -- they're there daily almost |
| 09:22AM | 23 | unfortunately. |
| 09:22AM | 24 | Q     So you filled out this type of form statement on a number |
| 09:22AM | 25 | of previous occasions as well? |

| | | |
|---|---|---|
| 09:22AM | 1 | A    That's correct. |
| 09:22AM | 2 | Q    All right.  Were there any other individuals or -- or |
| 09:22AM | 3 | potential witnesses that you saw that were filling out forms as |
| 09:22AM | 4 | well? |
| 09:22AM | 5 | A    Yes.  There were two other young women who -- when -- when |
| 09:22AM | 6 | I noticed it got quiet and I could hear sirens, I recall two |
| 09:22AM | 7 | women screaming like, no worry, sister.  Like we saw |
| 09:23AM | 8 | everything.  We -- we saw everything.  We're going to -- we got |
| 09:23AM | 9 | you or something like that.  And then so they were next to me |
| 09:23AM | 10 | filling out the -- their statements, so it was myself, a police |
| 09:23AM | 11 | officer and the two other young ladies. |
| 09:23AM | 12 | Q    So after you completed that statement, where did you go |
| 09:23AM | 13 | next? |
| 09:23AM | 14 | A    I went to -- well, first I had to -- I had to get all the |
| 09:23AM | 15 | equipment into the van by myself because nobody was around. |
| 09:23AM | 16 | All our partners -- like I said, I still didn't understand |
| 09:23AM | 17 | where everybody went.  I didn't understand why I was by myself |
| 09:23AM | 18 | and what just happened, so I had to load everything into the |
| 09:23AM | 19 | van and then I made my way to the -- the emergency room. |
| 09:23AM | 20 | Q    Which hospital was that do you recall? |
| 09:23AM | 21 | A    It was at Queens. |
| 09:23AM | 22 | Q    That's where Mr. Galmiche was being treated? |
| 09:23AM | 23 | A    That's correct. |
| 09:23AM | 24 | Q    Were you able to see him there? |
| 09:23AM | 25 | A    Not -- not for -- for maybe four more hours or three more |

09:24AM  1   hours.

09:24AM  2   Q    Okay.  When you were finally able to see him, what was his

09:24AM  3   state?

09:24AM  4   A    He was -- he was not in good shape.  He told me that he

09:24AM  5   had two broken ribs and he had bruises.  He had swollen --

09:24AM  6   swelling on his head.

09:24AM  7   Q    While you were seeing Mr. Galmiche at Queens Hospital, did

09:24AM  8   the Honolulu police show up there?

09:24AM  9   A    Yes.  There was a detective in his room.

09:24AM  10  Q    Did you speak with that detective?

09:24AM  11  A    I did.

09:24AM  12  Q    Did he ask you to provide a statement?

09:24AM  13  A    He did to which I told him I already completed a statement

09:24AM  14  hours ago on the scene.

09:24AM  15  Q    So did you prepare a -- a second statement?

09:24AM  16  A    I did.

09:24AM  17  Q    Was this using the same form that you were familiar with

09:24AM  18  that you filled out previously in your capacity as a teacher at

09:25AM  19  Farrington?

09:25AM  20  A    That is correct.

09:25AM  21       MR. INCIONG:  Your Honor, could we show just for the

09:25AM  22  witness please Exhibit 4-139 from our 10th supplemental exhibit

09:25AM  23  list?

09:25AM  24       THE COURT:  Yes, go ahead.

09:25AM  25  BY MR. INCIONG:

| | | | |
|---|---|---|---|
| 09:25AM | 1 | Q | Ms. Schubert, do you see the document that's been marked |
| 09:25AM | 2 | | on the screen in front of you as 4-139? |
| 09:25AM | 3 | A | I do. |
| 09:25AM | 4 | Q | Do you recognize this? |
| 09:25AM | 5 | A | Yes, I do. |
| 09:25AM | 6 | Q | How do you recognize that? |
| 09:25AM | 7 | A | That's my handwriting.  That's my statement. |
| 09:25AM | 8 | Q | Now, is this the statement that you made at Queens |
| 09:25AM | 9 | | Hospital or the statement that you made across from the |
| 09:25AM | 10 | | Restaurant Row parking exit? |
| 09:25AM | 11 | A | This is the Queens Hospital statement. |
| 09:25AM | 12 | Q | Have you ever seen your written statement that you made |
| 09:25AM | 13 | | across from Restaurant Row? |
| 09:25AM | 14 | A | I did not, but I did ask for it many times and they said |
| 09:26AM | 15 | | it -- there was no statement. |
| 09:26AM | 16 | Q | HPD was never able to provide you with a copy of your |
| 09:26AM | 17 | | statement? |
| 09:26AM | 18 | A | No. |
| 09:26AM | 19 | Q | Of -- of the first statement? |
| 09:26AM | 20 | A | Correct. |
| 09:26AM | 21 | Q | This one you've seen before today? |
| 09:26AM | 22 | A | Yes. |
| 09:26AM | 23 | Q | Were you present when the detective or other HPD personnel |
| 09:26AM | 24 | | was taking any photos of Mr. Galmiche's injuries? |
| 09:26AM | 25 | A | I was not. |

09:26AM   1   Q    But you saw -- you were able to see the injuries that you

09:26AM   2   described just a minute ago?

09:26AM   3   A    I did, yes.

09:26AM   4   Q    Okay.  I'd like you to look at a couple of photos that

09:26AM   5   have been previously admitted into evidence.

09:26AM   6           MR. INCIONG:  If we could start, Your Honor, with

09:26AM   7   Exhibit 4-76 from our original list?

09:26AM   8           THE COURT:  Go ahead.

09:26AM   9           MR. INCIONG:  If we could publish that for the jury as

09:27AM  10   well.

09:27AM  11           THE COURT:  You may.

09:27AM  12           MR. INCIONG:  Thank you.

09:27AM  13   BY MR. INCIONG:

09:27AM  14   Q    Ms. Schubert, do you recognize these two photos?

09:27AM  15   A    Yes, I do.

09:27AM  16   Q    Do they accurately show Mr. Galmiche's injuries as you saw

09:27AM  17   them at Queens Hospital in the early morning of December 15,

09:27AM  18   2012?

09:27AM  19   A    Yes.  Although the pictures don't --

09:27AM  20   Q    Well, you hesitate so explain -- explain why you hesitate,

09:27AM  21   if you could?

09:27AM  22   A    It looked worse than what the pictures show.

09:27AM  23           MR. INCIONG:  Okay.  Could we show Ms. Schubert and

09:27AM  24   the -- the jury 4-77 also please previously admitted?

09:27AM  25           THE COURT:  You may, go ahead.

| | | |
|---|---|---|
| 09:27AM | 1 | MR. INCIONG:  Thank you, Your Honor. |
| 09:27AM | 2 | BY MR. INCIONG: |
| 09:27AM | 3 | Q    Do you see those two photos, Ms. Schubert? |
| 09:27AM | 4 | A    Yes, I do. |
| 09:27AM | 5 | Q    Do you recognize those as being photos depicting the |
| 09:27AM | 6 | injuries that Mr. Galmiche suffered on that night? |
| 09:27AM | 7 | A    Yes. |
| 09:27AM | 8 | Q    Do those accurately show his injuries? |
| 09:28AM | 9 | A    Again, it doesn't -- it doesn't show -- it doesn't do it |
| 09:28AM | 10 | justice but that is where he was injured. |
| 09:28AM | 11 | Q    Okay.  Do you recall whether Mr. Galmiche stayed overnight |
| 09:28AM | 12 | at the following night or was he discharged the next day? |
| 09:28AM | 13 | A    I cannot recall. |
| 09:28AM | 14 | Q    Do you recall going to see Mr. Galmiche the following day? |
| 09:28AM | 15 | A    Yes. |
| 09:28AM | 16 | Q    Did you, in fact, take some photos yourself of his |
| 09:28AM | 17 | injuries the next day? |
| 09:28AM | 18 | A    Yes. |
| 09:28AM | 19 | MR. INCIONG:  Your Honor, could I show Ms. Schubert as |
| 09:28AM | 20 | well as the jury a series of photos beginning with Exhibit 4-68 |
| 09:28AM | 21 | going through 4-75 all of which have been previously admitted |
| 09:28AM | 22 | from our original exhibit list? |
| 09:28AM | 23 | THE COURT:  Yes, you may. |
| 09:28AM | 24 | MR. INCIONG:  Thank you. |
| 09:28AM | 25 | BY MR. INCIONG: |

09:28AM   1   Q    So starting with 4-68.  Is this one of the photos you took

09:29AM   2   the day after the assault, Ms. Schubert?

09:29AM   3   A    Yes.

09:29AM   4   Q    Why did you take this particular shot?

09:29AM   5   A    Because he had bruising and swelling here.

09:29AM   6   Q    You're motioning to your forehead?

09:29AM   7   A    Forehead, excuse me, yes.

09:29AM   8   Q    All right.  Any other spots on his face that you wanted

09:29AM   9   to -- to document as well?

09:29AM  10   A    His left black eye.

09:29AM  11   Q    Okay.  Could we go to Exhibit 4-69?  Did you take this

09:29AM  12   photo?

09:29AM  13   A    Yes, I did.

09:29AM  14   Q    Why did you take this particular shot?

09:29AM  15   A    Because of the -- I wanted to make sure that if we ever

09:29AM  16   had to, you know, document or have our day in court just to

09:29AM  17   show the -- the injuries that he had.

09:29AM  18   Q    Okay.  Could we go to 4-70, please?  And are those

09:30AM  19   injuries to his left ear area that you were documenting as

09:30AM  20   well?

09:30AM  21   A    Yes.

09:30AM  22   Q    So this photo accurately shows it as it appeared the next

09:30AM  23   day?

09:30AM  24   A    Correct.

09:30AM  25   Q    Could we go to 4-71?  Is this the -- the area on his

09:30AM   1   forehead that you were describing a minute ago that you

09:30AM   2   documented in this photo?

09:30AM   3   A     Correct, yes.

09:30AM   4   Q     Could we go to 4-72?  Do you recognize this as one of the

09:30AM   5   photos you took?

09:30AM   6   A     Yes.

09:30AM   7   Q     Did these or does this photo show injuries behind his

09:30AM   8   right ear?

09:30AM   9   A     Yes.

09:30AM   10   Q     Could we display 4-73?  What is shown in this photo that

09:31AM   11   you took, Ms. Schubert?

09:31AM   12   A     That's the -- the area of -- of redness was where he

09:31AM   13   claimed like he was -- it was sensitive for him.  So I took a

09:31AM   14   photo of it.

09:31AM   15   Q     You mentioned when you were at the hospital you learned he

09:31AM   16   had a couple of broken ribs, correct?

09:31AM   17   A     Yes.

09:31AM   18   Q     Could we go to 4-75, please?  What were you trying to

09:31AM   19   capture in this photo?

09:31AM   20   A     Just the scratches and the -- the areas in which he was --

09:31AM   21   the injuries that he sustained from the assault.

09:31AM   22   Q     Now, you said when you saw Mr. Galmiche at Queens he was

09:31AM   23   in bad shape.  Okay.  So a day later, how would you describe

09:31AM   24   his -- his condition at that point?

09:31AM   25   A     He was still weak.  He could speak in a -- in a very soft

09:32AM   1   tone.  We couldn't make him laugh because it would hurt.  Even

09:32AM   2   coughing or sneezing was hard for him.

09:32AM   3   Q    All right.  Now, you mentioned before you went to the

09:32AM   4   hospital since everyone on your team had left the area

09:32AM   5   except for you, and you were -- you were the one left to

09:32AM   6   collect the equipment?

09:32AM   7   A    Yes.

09:32AM   8   Q    I'd like to show you a number of photos that were taken of

09:32AM   9   the equipment that evening.

09:32AM   10        MR. INCIONG:  Your Honor, could I publish for the jury

09:32AM   11   the exhibits previously admitted starting at 4-79 through 4-88

09:32AM   12   from our original list?

09:32AM   13        THE COURT:  You may, go ahead.

09:32AM   14        MR. INCIONG:  Thank you.

09:32AM   15   BY MR. INCIONG:

09:32AM   16   Q    Starting with 4-79.  Ms. Schubert, do you recognize what

09:32AM   17   that is?

09:32AM   18   A    Yes.  That is the projector that we used.

09:32AM   19   Q    So the bottom half of that projector looks like it's

09:33AM   20   broken open.  That is not how it appeared I take it before this

09:33AM   21   incident happened?

09:33AM   22   A    Correct.  It was -- it was intact prior to.

09:33AM   23   Q    Was this -- was this item destroyed?

09:33AM   24   A    Yes, it was.

09:33AM   25   Q    Did you see who destroyed any of this equipment?

09:33AM   1   A   Yes, I did.

09:33AM   2   Q   Who did you see destroying the equipment?

09:33AM   3   A   It was Mike Miske.

09:33AM   4   Q   How do you see him actually destroying this equipment?

09:33AM   5   A   Because like I said, I -- I was in the back.  I closed the

09:33AM   6   laptop.  And then after he and Mike exchanged a few words and

09:33AM   7   it was like happening all at the same time when I saw the --

09:33AM   8   the bouncers, the men in black, coming up the parking

09:33AM   9   structure.  I noticed as soon as they came that's when he

09:33AM   10   started to like, you know, like throw, pick up our -- like he

09:33AM   11   picked this up and threw it down and same with the laptop.  And

09:34AM   12   then he tried the same with the generator but it's kind of

09:34AM   13   heavy, so he just kind of like kicked it over.

09:34AM   14   Q   So this driveway area you were in --

09:34AM   15   A   Yes.

09:34AM   16   Q   -- that you were set up in, that's cement I take it?

09:34AM   17   A   Right.

09:34AM   18   Q   So when you say he was throwing it down on the ground, he

09:34AM   19   was throwing it on the cement?

09:34AM   20   A   Yeah.  Well, he only did it like picked it up and threw it

09:34AM   21   down one time.  He just kind of went through our items and then

09:34AM   22   went back to where the assault would -- would happen.

09:34AM   23   Q   So when he threw the items down on the ground, that's when

09:34AM   24   you -- it was smashed?

09:34AM   25   A   Yes.

09:34AM   1   Q   Could we show 4-80 next, please?  Do you recognize what's

09:34AM   2   shown there?

09:34AM   3   A   Yes.

09:34AM   4   Q   What is that?

09:34AM   5   A   That is the laptop that we used that night.

09:34AM   6   Q   Was that destroyed that night?

09:34AM   7   A   Yes.

09:34AM   8        MR. INCIONG:  Could we go to 4-81?  If we can zoom in

09:34AM   9   on the -- that top photo?

09:34AM   10   BY MR. INCIONG:

09:34AM   11   Q   It's a little bit hard to see but do you -- do you

09:35AM   12   recognize what's shown in this shot?

09:35AM   13   A   That's our generator that was powering the projector.

09:35AM   14   Q   Is the generator, it looks like it's the orange or red

09:35AM   15   object on the left lower corner?

09:35AM   16   A   Yes.  It's the lower left.  It's -- it's a Honda

09:35AM   17   generator.

09:35AM   18        MR. INCIONG:  Could we show 4-82 next, please?  Thank

09:35AM   19   you.

09:35AM   20   BY MR. INCIONG:

09:35AM   21   Q   Do you know what that is, Ms. Schubert?

09:35AM   22   A   That is the lens from our projector.

09:35AM   23   Q   Does it normally -- is it normally separate from the rest

09:35AM   24   of the -- the unit?

09:35AM   25   A   No, it is not.  It's built in.

09:35AM   1   Q   So this was broken after Mr. Miske threw it on the ground?

09:35AM   2   A   Yes.

09:35AM   3   Q   Could we go to 4-83, please?  Is this another a little bit

09:35AM   4   better shot I think of the generator and the laptop?

09:36AM   5   A   That is correct.

09:36AM   6   Q   The laptop here is on the -- shown on the ground, correct?

09:36AM   7   A   Yes.

09:36AM   8   Q   When you were operating the -- the laptop to show the

09:36AM   9   display, was it -- was it on the ground or was it somewhere

09:36AM   10   else?

09:36AM   11   A   No.  It was elevated on a crate.  We used like a milk

09:36AM   12   crate.

09:36AM   13           MR. INCIONG:  Could we show the witness 4-84 as well

09:36AM   14   as to the jury please next?

09:36AM   15   BY MR. INCIONG:

09:36AM   16   Q   Is this another shot of the projector that now is broken?

09:36AM   17   A   That is correct.

09:36AM   18   Q   Could we display 4-85, please?  Same generator again?  Or

09:36AM   19   I'm sorry, same projector?

09:36AM   20   A   Yes, same projector.

09:36AM   21   Q   All right.  Could we display 4-86, please?  What is this,

09:36AM   22   Ms. Schubert?

09:36AM   23   A   That is our fastfold screen that is broken.

09:36AM   24   Q   So normally it would be flat and smooth when it's set up?

09:36AM   25   A   Yes.

09:37AM   1   Q     Was this -- how was this broken?  Was it the screen, the

09:37AM   2   frame, both?

09:37AM   3   A     It's the frame is not standing anymore and the screen is

09:37AM   4   sagging as well.

09:37AM   5   Q     So you were left trying to salvage this, pack it up before

09:37AM   6   you went to the hospital?

09:37AM   7   A     Yes, um-hm.

09:37AM   8           MR. INCIONG:  Could we show the witness 4-87 as well

09:37AM   9   the jury, please?

09:37AM  10   BY MR. INCIONG:

09:37AM  11   Q     Do you recognize this as the laptop that you were using

09:37AM  12   that night?

09:37AM  13   A     That is correct.

09:37AM  14   Q     Is that in a different state than when you saw it when you

09:37AM  15   were originally setting up to promote that -- that night?

09:37AM  16   A     Yes.

09:37AM  17   Q     It's broken now?

09:37AM  18   A     Yes.

09:37AM  19   Q     Could we go to 4-88 next?  Do you recognize this,

09:37AM  20   Ms. Schubert?

09:37AM  21   A     Yes.  That is the laptop that we used that night.

09:38AM  22   Q     It looks like the -- the screen on the monitor is

09:38AM  23   shattered there?

09:38AM  24   A     Correct.

09:38AM  25   Q     Was that shattered before Mr. Miske arrived?

09:38AM   1   A    No, it was not.

09:38AM   2              MR. INCIONG:  Okay.  We can take that down for the

09:38AM   3   moment.  Thank you.

09:38AM   4   BY MR. INCIONG:

09:38AM   5   Q    So you made a couple of written statements you indicated

09:38AM   6   basically the -- the early morning of the event, this is in the

09:38AM   7   early morning hours, correct?

09:38AM   8   A    Um-hm, yes.

09:38AM   9   Q    Did you have contact with the Honolulu Police Department

09:38AM  10   subsequent to that in -- in regard to their investigation of

09:38AM  11   the case?

09:38AM  12   A    After -- after the incident, yes.

09:38AM  13   Q    Do you recall making a number of recorded statements to

09:38AM  14   HPD after that?

09:38AM  15   A    Yes.

09:38AM  16   Q    How many times do you recall going to HPD to be

09:38AM  17   interviewed after the incident?

09:38AM  18   A    At least three and I didn't understand why.

09:39AM  19   Q    Do you recall on the first of those also being shown a

09:39AM  20   couple of -- a number of photo line ups?

09:39AM  21   A    Yes, I do.

09:39AM  22              MR. INCIONG:  Your Honor, could we show to the witness

09:39AM  23   only please Exhibit 4-93 from our original exhibit list?

09:39AM  24              THE COURT:  Go ahead.

09:39AM  25   BY MR. INCIONG:

09:39AM    1    Q    Ms. Schubert, do you see Exhibit 4-93 on the screen in

09:39AM    2    front of you?

09:39AM    3    A    I -- I do.

09:39AM    4    Q    Do you recognize this exhibit?

09:39AM    5    A    Yes, I do.

09:39AM    6    Q    How do you recognize it?

09:39AM    7    A    It was the photo lineup that was shown to me, and they

09:39AM    8    asked if I could identify someone in the photo lineup.

09:39AM    9    Q    Did you recognize anybody in that particular photo lineup?

09:39AM   10    A    I did.

09:39AM   11    Q    And did you mark this particular exhibit to show who you

09:39AM   12    recognized?

09:39AM   13    A    I did.

09:39AM   14    Q    How did you mark that?

09:39AM   15    A    I circled it and then I initialed.

09:39AM   16    Q    Did you also put a date on there as well?

09:40AM   17    A    Yes.  The date and -- date and time.

09:40AM   18    Q    Do you recognize this as the -- at least a -- a copy of

09:40AM   19    the photo lineup that you marked on January 3rd of 2013 at the

09:40AM   20    Honolulu Police Department?

09:40AM   21    A    Yes.

09:40AM   22         MR. INCIONG:  Your Honor, I would move to admit

09:40AM   23    Exhibit 4-93.

09:40AM   24         THE COURT:  Any objection?

09:40AM   25         MR. KENNEDY:  No objection.

| | | |
|---|---|---|
| 09:40AM | 1 | THE COURT:  Without objection 4-93 then is admitted |
| 09:40AM | 2 | and you may publish. |
| 09:40AM | 3 | MR. INCIONG:  Thank you, Your Honor. |
| 09:40AM | 4 | (Exhibit 4-93 was received in evidence.) |
| 09:40AM | 5 | BY MR. INCIONG: |
| 09:40AM | 6 | Q    So, Ms. Schubert, this is the photo lineup or one of the |
| 09:40AM | 7 | photo lineups you were shown on January 3rd of 2013? |
| 09:40AM | 8 | A    Yes. |
| 09:40AM | 9 | Q    You said you circled the individual you -- that you |
| 09:40AM | 10 | recognized? |
| 09:40AM | 11 | A    Yes. |
| 09:40AM | 12 | Q    So that was the individual in the upper right-hand corner |
| 09:40AM | 13 | of the six shots? |
| 09:40AM | 14 | A    Correct. |
| 09:40AM | 15 | Q    Who did you recognize that as? |
| 09:40AM | 16 | A    Mike Miske. |
| 09:40AM | 17 | Q    To the left of that, is that your handwriting that you |
| 09:40AM | 18 | indicated that shows the -- the date and your initials? |
| 09:40AM | 19 | A    Correct. |
| 09:41AM | 20 | MR. INCIONG:  Could we show the witness only, Your |
| 09:41AM | 21 | Honor, Exhibit 4-95 from our original exhibit list as well? |
| 09:41AM | 22 | THE COURT:  Go ahead. |
| 09:41AM | 23 | BY MR. INCIONG: |
| 09:41AM | 24 | Q    Ms. Schubert, do you recognize Exhibit 4-95? |
| 09:41AM | 25 | A    Yes, I do. |

09:41AM  1   Q    Was this another photo lineup that you were shown on
09:41AM  2   January 3, 2013?
09:41AM  3   A    Yes.
09:41AM  4   Q    So this was about just over a -- a couple weeks after the
09:41AM  5   incident?
09:41AM  6   A    Yes.
09:41AM  7   Q    Did you recognize anybody in this particular lineup?
09:41AM  8   A    I did.
09:41AM  9   Q    And did you mark it and -- and date and initial it as you
09:41AM  10  did with the previous?
09:41AM  11  A    Yes, I did.
09:41AM  12  Q    Is this an accurate copy of the photo lineup that you
09:41AM  13  observed and marked on January 3rd of 2013?
09:41AM  14  A    Yes.
09:41AM  15       MR. INCIONG:  Your Honor, I would move to admit 4-95.
09:41AM  16       THE COURT:  Denied.
09:41AM  17  BY MR. INCIONG:
09:41AM  18  Q    Ms. Schubert, do you recognize your handwriting on the --
09:42AM  19  on this particular photo or photo lineup?
09:42AM  20  A    Yes, that is my handwriting.
09:42AM  21  Q    Where is that located?
09:42AM  22  A    In the lower right-hand corner of the -- the photo that I
09:42AM  23  circled with my -- with the date and the time.
09:42AM  24       MR. INCIONG:  Your Honor, I would move to admit 4-95.
09:42AM  25       THE COURT:  Counsel, Mr. Kennedy?

| | | |
|---|---|---|
| 09:42AM | 1 | MR. KENNEDY:  I believe we need a little more |
| 09:42AM | 2 | foundation, Your Honor. |
| 09:42AM | 3 | THE COURT:  There -- there's an issue, Counsel. |
| 09:42AM | 4 | MR. KENNEDY:  Yes. |
| 09:42AM | 5 | MR. INCIONG:  Thank you, Your Honor.  I'm sorry. |
| 09:42AM | 6 | BY MR. INCIONG: |
| 09:42AM | 7 | Q    Ms. Schubert, I misspoke with the -- the date.  The date |
| 09:42AM | 8 | rather -- I believe I said January 3rd of 2013.  Actually, what |
| 09:42AM | 9 | was the date that you wrote in your handwriting on this |
| 09:43AM | 10 | particular exhibit? |
| 09:43AM | 11 | A    That is February 6th. |
| 09:43AM | 12 | Q    2013? |
| 09:43AM | 13 | A    2013, correct. |
| 09:43AM | 14 | Q    So does this -- is this Exhibit 4-95 an accurate copy of |
| 09:43AM | 15 | the photo lineup you viewed and marked on that date February 6, |
| 09:43AM | 16 | 2013? |
| 09:43AM | 17 | A    Correct. |
| 09:43AM | 18 | MR. INCIONG:  Thank you, Your Honor.  I move to admit |
| 09:43AM | 19 | Exhibit 4-95. |
| 09:43AM | 20 | THE COURT:  Any objection? |
| 09:43AM | 21 | MR. KENNEDY:  No objection at this time, Your Honor. |
| 09:43AM | 22 | THE COURT:  Without objection 4-95 is admitted then |
| 09:43AM | 23 | and you may publish. |
| 09:43AM | 24 | MR. INCIONG:  Thank you, Your Honor. |
| 09:43AM | 25 | (Exhibit 4-95 was received in evidence.) |

09:43AM   1   BY MR. INCIONG:

09:43AM   2   Q    So, Ms. Schubert, this is the photo lineup you viewed in

09:43AM   3   February, February 6th of 2013?

09:43AM   4   A    Yes.

09:43AM   5   Q    And you circled the middle individual on the bottom row?

09:43AM   6   A    Correct.

09:43AM   7   Q    Did you -- this is the individual that you recognized from

09:43AM   8   the incident, correct?

09:43AM   9   A    Yes.

09:43AM   10  Q    And specifically what -- how did you recognize this

09:43AM   11  individual?  What did he do that you saw that day?

09:43AM   12  A    Well, because he's the one that wouldn't stop kicking me

09:43AM   13  on my right side by my head.

09:44AM   14  Q    This was the person you -- you noticed the tattoo on their

09:44AM   15  neck you said and the -- the forehead?

09:44AM   16  A    Yeah, because I was looking up at him, yelling at him to,

09:44AM   17  like, I'm a fricking chick, like, I'm a woman.  Like, What are

09:44AM   18  you doing, you know.

09:44AM   19  Q    So when you initially met with HPD, did you know this

09:44AM   20  individual's name?

09:44AM   21  A    I did not.

09:44AM   22        MR. INCIONG:  You can take that down.  Thank you.

09:44AM   23  BY MR. INCIONG:

09:44AM   24  Q    Did you later learn his name?

09:44AM   25  A    I did.

| | | | |
|---|---|---|---|
| 09:44AM | 1 | Q | How did you come about his name? |
| 09:44AM | 2 | A | I saw something on the news or something. |
| 09:44AM | 3 | Q | Okay.  And you recognized the individual at that point? |
| 09:44AM | 4 | A | Yes. |
| 09:44AM | 5 | Q | Did you make that information known to the Honolulu Police |
| 09:44AM | 6 | | Department? |
| 09:44AM | 7 | A | I did. |
| 09:44AM | 8 | Q | Was it then that they had you come back and showed you the |
| 09:44AM | 9 | | second lineup? |
| 09:44AM | 10 | A | Yes. |
| 09:44AM | 11 | | MR. INCIONG:  Could we show for the witness only |
| 09:44AM | 12 | | Exhibit 4-143?  This is from our 11th supplemental exhibit |
| 09:45AM | 13 | | list, Your Honor. |
| 09:45AM | 14 | | THE COURT:  Go ahead.  I've got it now.  Thank you. |
| 09:45AM | 15 | | BY MR. INCIONG: |
| 09:45AM | 16 | Q | Ms. Schubert, do you see Exhibit 4-143? |
| 09:45AM | 17 | A | I do. |
| 09:45AM | 18 | Q | Did you have a chance to review that document prior to |
| 09:45AM | 19 | | coming to court today? |
| 09:45AM | 20 | A | I did. |
| 09:45AM | 21 | Q | Do you see the -- notice the -- the make and type of |
| 09:45AM | 22 | | vehicle that is shown in this document? |
| 09:45AM | 23 | A | Yes, I do. |
| 09:45AM | 24 | Q | Was that consistent with the type of vehicle that you |
| 09:45AM | 25 | | observed parked in front of the display on the night of this |

09:45AM   1    incident or -- or early morning December 15, 2012?

09:45AM   2    A    Yes.

09:45AM   3          MR. INCIONG:  Your Honor, I would move to admit

09:45AM   4    Exhibit 4-143 as a certified public document.  Additionally,

09:45AM   5    the parties have stipulated to certified business records being

09:46AM   6    admitted as well.  The certification is contained on the bottom

09:46AM   7    half of that exhibit.

09:46AM   8          THE COURT:  Any objection to 4-143?

09:46AM   9          MR. KENNEDY:  No objection to the document, Your

09:46AM  10    Honor.

09:46AM  11          THE COURT:  All right.  Without objection then that

09:46AM  12    exhibit is admitted and you pay may I publish it.

09:46AM  13          MR. INCIONG:  Thank you, Your Honor.

09:46AM  14          (Exhibit 4-143 was received in evidence.)

09:46AM  15    BY MR. INCIONG:

09:46AM  16    Q    So, Ms. Schubert, if we look at this document that's just

09:46AM  17    been exhibit -- just been admitted, do you recognize this as a

09:46AM  18    registration for a -- a particular vehicle?

09:46AM  19    A    Yes, I do.

09:46AM  20    Q    And do you see -- or actually, let's do it this way.  If

09:46AM  21    you could use the touch screen, could you circle the make and

09:46AM  22    type of the -- the vehicle that you recognized when you

09:46AM  23    reviewed this previously?  So you circled under make it says

09:46AM  24    P-O-R-S, correct?

09:47AM  25    A    Correct.

09:47AM  1  Q    And then under type, that's F 4-DSD, four-door sedan?

09:47AM  2  A    Correct.

09:47AM  3  Q    Do you see who that registered owner of that vehicle is

09:47AM  4  listed in the -- the lower left box?

09:47AM  5  A    Yes, I do.

09:47AM  6  Q    Who is the registered owner?

09:47AM  7  A    Kama'aina Termite and Pest Control and Miske M.

09:47AM  8          MR. INCIONG:  Okay.  We can take that down.

09:47AM  9  BY MR. INCIONG:

09:47AM  10  Q    So, Ms. Schubert, at -- at any point, did yourself and/or

09:47AM  11  Mr. Galmiche to your knowledge take any sort of legal action,

09:47AM  12  civil legal action against Mr. Miske or any of the other

09:47AM  13  individuals that were involved in the assault?

09:47AM  14  A    Yes, we did.

09:47AM  15  Q    Do you recall what was that?

09:48AM  16  A    We got a lawyer for -- to seek damages.

09:48AM  17  Q    What happened with that legal proceeding?

09:48AM  18  A    Nothing.  It just -- we kept getting calls that it was --

09:48AM  19  I don't know what the legal verbiage is, but basically it's

09:48AM  20  just drawn out to the point where we just didn't know -- we

09:48AM  21  just felt like it was going nowhere.

09:48AM  22  Q    Was that civil action ultimately dismissed?

09:48AM  23  A    Yes.

09:48AM  24  Q    Do you know when it was dismissed?

09:48AM  25  A    I'm not sure.  Sometime in 2016 I think.

09:48AM   1    Q    Okay.  Did you ever attempt to pursue any additional or

09:48AM   2    new legal action civilly since then?

09:48AM   3    A    No.  We were just tired of going nowhere, getting --

09:48AM   4    getting nowhere, excuse me.

09:49AM   5    Q    So after this incident had happened, did this affect

09:49AM   6    your -- your side business with any of the work you did with

09:49AM   7    promoters after that?

09:49AM   8    A    It did.

09:49AM   9    Q    Did it change the way you did business?

09:49AM   10   A    Oh, absolutely.

09:49AM   11   Q    How -- how so?

09:49AM   12   A    Many of our team members especially those who were there,

09:49AM   13   they did not want to do any nighttime promotions.  It was that

09:49AM   14   fear of being out and being vulnerable to something like this

09:49AM   15   happening again.

09:49AM   16   Q    Now, I've been remiss to ask you we talked about

09:49AM   17   Mr. Galmiche's injuries.  You said you were -- you were kicked

09:49AM   18   and struck.  Did you have injuries as a result of this?

09:49AM   19   A    I did.  Very minor compared to his.

09:49AM   20   Q    Did you need to seek any sort of medical treatment for

09:49AM   21   those?

09:49AM   22   A    No.  The detective recommended that I perhaps seek medical

09:50AM   23   attention.  But at the time, I was just, like I said, I still

09:50AM   24   couldn't believe what happened and I'm a single mother, so I

09:50AM   25   had to think about -- I was more fearful for my children the

09:50AM  1   more I learned about what other people said about Mike Miske.
09:50AM  2   It then made me --
09:50AM  3              MR. KENNEDY:  Objection, Your Honor, hearsay.
09:50AM  4              THE COURT REPORTER:  I'm sorry.  I didn't hear the
09:50AM  5   ruling on the objection, Your Honor.
09:50AM  6              THE COURT:  Sustained.
09:50AM  7   BY MR. INCIONG:
09:50AM  8   Q    Did you make any changes in -- in your daily lifestyle or
09:50AM  9   habits as a result of this?
09:50AM  10  A    I did for that month.  The remaining month of December, I
09:50AM  11  had my children stay with their father.  I felt it was safer
09:50AM  12  for them.
09:50AM  13  Q    So there were no lasting physical effects then I under --
09:50AM  14  as I understand it?
09:50AM  15  A    No.
09:51AM  16  Q    What about on you personally mentally?
09:51AM  17  A    Yeah, I -- just talking about this again is -- I was just
09:51AM  18  hoping we'd -- I'd never have to revisit this again because
09:51AM  19  it makes -- I find myself just always glancing over my shoulder
09:51AM  20  or being hypervigilant ever since the incident.
09:51AM  21  Q    So this is almost 12 years ago now.  So even then, it
09:51AM  22  still has had an lasting impact on you?
09:51AM  23  A    Yes.
09:51AM  24  Q    Is it still fresh to this day when -- when you're forced
09:51AM  25  to come in and -- and talk about this today?

| | | |
|---|---|---|
| 09:51AM | 1 | A    Yes. |
| 09:51AM | 2 | MR. INCIONG:  Thank you, Ms. Schubert. |
| 09:51AM | 3 | I have nothing further, Your Honor. |
| 09:51AM | 4 | THE COURT:  Mr. Kennedy? |
| 09:52AM | 5 | CROSS-EXAMINATION |
| 09:52AM | 6 | BY MR. KENNEDY: |
| 09:52AM | 7 | Q    So if I understand your testimony, after the event, you -- |
| 09:52AM | 8 | both you and Michael Galmiche retained a lawyer; is that |
| 09:52AM | 9 | correct? |
| 09:52AM | 10 | A    Yes. |
| 09:52AM | 11 | Q    And then you filed a civil complaint, correct? |
| 09:52AM | 12 | A    Correct. |
| 09:52AM | 13 | Q    And the civil complaint was to seek damages I believe, |
| 09:52AM | 14 | right? |
| 09:52AM | 15 | A    Correct. |
| 09:52AM | 16 | Q    And in that civil complaint, the process would involve |
| 09:52AM | 17 | discovery, right? |
| 09:52AM | 18 | A    Yes. |
| 09:52AM | 19 | Q    And so discovery means that, you know, questions are posed |
| 09:52AM | 20 | to you; questions are posed to the other side, right? |
| 09:52AM | 21 | A    Yes. |
| 09:52AM | 22 | Q    And that eventually the court may have arbitration, right? |
| 09:53AM | 23 | You were aware of that? |
| 09:53AM | 24 | A    Yes. |
| 09:53AM | 25 | Q    And eventually then a judge is sort of a referee to the |

09:53AM   1   complaint, correct?

09:53AM   2   A   Yes.

09:53AM   3   Q   And what happened in the end is the judge dismissed the

09:53AM   4   complaint, correct?

09:53AM   5   A   Yes.

09:53AM   6   Q   All right.  And that happened over a couple of years I

09:53AM   7   believe you said, correct?

09:53AM   8   A   Yes.

09:53AM   9   Q   All right.  And so that was the end of that matter in

09:53AM   10   terms of that civil case that you brought regarding the events

09:53AM   11   that we've talked about, correct?

09:53AM   12   A   Yes.

09:53AM   13   Q   All right.  Now, I want to shift attention a little bit.

09:53AM   14   You mentioned that you were -- I believe your words you still

09:53AM   15   didn't understand where everyone was going that evening, and I

09:53AM   16   want to ask you some questions about that, okay?

09:53AM   17   A   Yes.

09:53AM   18   Q   All right.  So you mentioned that your -- the screen could

09:54AM   19   become like a -- a kite and fly, right?

09:54AM   20   A   Yes.

09:54AM   21   Q   So on one side you were holding it, right?

09:54AM   22   A   Yes.

09:54AM   23   Q   And then another person I believe his first name was Ryan,

09:54AM   24   if I remember correctly, was holding it?

09:54AM   25   A   Yes.

09:54AM  1   Q   Okay.  And at some point early on, while there was arguing

09:54AM  2   between Mr. Galmiche and Mr. Miske, Ryan just left, right?

09:54AM  3   A   I guess so, yes.

09:54AM  4   Q   Okay.  You -- you looked around and he was gone?

09:54AM  5   A   Correct.

09:54AM  6   Q   And that was when they were simply arguing, right?

09:54AM  7   A   Yes.

09:54AM  8   Q   Okay.  Now, eventually you said that everyone else left,

09:54AM  9   right?

09:54AM  10  A   Yes.

09:54AM  11  Q   All right.  Now, in promoting the event, you used a -- a

09:54AM  12  phrase I think I heard the words correctly, although I'm a

09:54AM  13  little under the weather so I'll try to make certain that I do.

09:54AM  14  But I think you said catch the let out.  Is that -- were those

09:55AM  15  your words?

09:55AM  16  A   Yes.

09:55AM  17  Q   All right.  And so it's you're -- the -- the purpose of

09:55AM  18  this was to set up at a location where patrons of the M were

09:55AM  19  leaving that evening, right?

09:55AM  20  A   Yes.

09:55AM  21  Q   Okay.  Now, were you aware -- you said that you had done

09:55AM  22  the Kaka'ako event previously, right?

09:55AM  23  A   Yes.

09:55AM  24  Q   Okay.  Were you aware that or were you part of -- that's

09:55AM  25  just simply bad question.

09:55AM    1          Let me ask you this:  Were you aware of efforts made
09:55AM    2    by folks on behalf of your event to go inside the M and hand
09:55AM    3    out the same materials regarding that event weeks prior?
09:55AM    4    A    I am not.
09:55AM    5    Q    Okay.  So you were not aware of whether individuals that
09:55AM    6    come in once, twice, three times and had been distributing the
09:56AM    7    information and asked to leave but kept coming back?
09:56AM    8    A    I am not aware of that.
09:56AM    9    Q    Okay.  So you're not aware of the others that may have
09:56AM   10    been there that were leaving when they saw Mr. Miske, correct?
09:56AM   11    A    Correct.
09:56AM   12    Q    All right.  Now, with respect to some of what happened,
09:56AM   13    you said that for a period of time the initial thing after the
09:56AM   14    black Porsche showed up and the individual that you've
09:56AM   15    identified as Mr. Miske came out of the car, there were some
09:56AM   16    words about basically using F bombs but, What are you doing?
09:56AM   17    I've let you into my club.  You keep doing this, right?
09:56AM   18    A    Yes.
09:56AM   19    Q    And at the time, you didn't understand what he was talking
09:56AM   20    about, right?
09:56AM   21    A    I did not.
09:57AM   22    Q    Because you didn't even know who he was, right?
09:57AM   23    A    Correct.
09:57AM   24    Q    You didn't know that he was associated with the M?
09:57AM   25    A    I did not.

09:57AM   1   Q   Didn't have any idea of whether some of the same

09:57AM   2   individuals had been in there, asked to leave and kept coming

09:57AM   3   back and doing this?

09:57AM   4   A   Correct.

09:57AM   5   Q   And didn't understand whether they may have an event on

09:57AM   6   New Year's Eve as well?

09:57AM   7   A   Correct.

09:57AM   8   Q   And so the purpose of showing up again and again, you

09:57AM   9   weren't aware of that, right?

09:57AM   10   A   Correct.

09:57AM   11   Q   Okay.  Then there was a period of time where you said that

09:57AM   12   the person you identified as Mr. Miske was going towards the

09:57AM   13   laptop very early, right?  Did you shut off the projector,

09:57AM   14   correct?

09:57AM   15   A   Could you say that, again?

09:57AM   16   Q   Yeah, it was just a terrible question.

09:57AM   17        There was a period of time where you -- the person you

09:57AM   18   identified as Mr. Miske was going towards the laptop that we

09:57AM   19   saw in the picture, and I think it's Government's

09:58AM   20   Exhibit 4-1437 (verbatim) I believe?

09:58AM   21   A   Yes.

09:58AM   22   Q   Okay.  And that you went over and you closed the laptop

09:58AM   23   down, right?

09:58AM   24   A   Correct.

09:58AM   25   Q   And that shut down the projection, right?

| | | | |
|---|---|---|---|
| 09:58AM | 1 | A | It just shut down the image going to the projector. |
| 09:58AM | 2 | Q | Because the projector needs some time to cool down before |
| 09:58AM | 3 | | you can shut it down completely? |
| 09:58AM | 4 | A | Correct. |
| 09:58AM | 5 | Q | Okay.  So at that point, the -- what was being projected |
| 09:58AM | 6 | | on the screen no longer was up there, right? |
| 09:58AM | 7 | A | Yes. |
| 09:58AM | 8 | Q | Then there was a period of time where you said that |
| 09:58AM | 9 | | Mr. Miske and Mr. Galmiche were exchanging words, right? |
| 09:58AM | 10 | A | Yes. |
| 09:58AM | 11 | Q | And the two of them were arguing, right? |
| 09:58AM | 12 | A | Yes. |
| 09:58AM | 13 | Q | And you couldn't hear what they were arguing about, right? |
| 09:58AM | 14 | A | Yes. |
| 09:58AM | 15 | Q | You don't know what the substance of it was, right? |
| 09:58AM | 16 | A | At that -- at that time when you're talking about, yes. |
| 09:58AM | 17 | Q | Okay.  And so at a certain point then that continues for |
| 09:58AM | 18 | | some time and I believe you said the they were sort of moving |
| 09:59AM | 19 | | from left to right by the screen? |
| 09:59AM | 20 | A | That's correct. |
| 09:59AM | 21 | Q | And so moving back and forth and arguing for a period of |
| 09:59AM | 22 | | time, correct? |
| 09:59AM | 23 | A | (Inaudible response.) |
| 09:59AM | 24 | Q | All right.  At a certain point, you saw some men come out |
| 09:59AM | 25 | | of the garage area that you recognized due to their classy |

| | | |
|---|---|---|
| 09:59AM | 1 | outfits as bouncers, right? |
| 09:59AM | 2 | A    Yes. |
| 09:59AM | 3 | Q    All right.  And there were roughly about four of them? |
| 09:59AM | 4 | A    Four to -- four to six of them. |
| 09:59AM | 5 | Q    Four to six of them, okay.  And they were all dressed in |
| 09:59AM | 6 | black long pants and in long black sleeved tops? |
| 09:59AM | 7 | A    Black tops, correct. |
| 09:59AM | 8 | Q    Okay.  And the -- so they were coming and they ran up and |
| 09:59AM | 9 | they surrounded Michael Galmiche, correct? |
| 09:59AM | 10 | A    They approached him. |
| 10:00AM | 11 | Q    All right.  They approached him, right.  At a certain |
| 10:00AM | 12 | point they had him surrounded, correct? |
| 10:00AM | 13 | A    I wouldn't say surrounded but they were near him. |
| 10:00AM | 14 | Q    Okay.  All right.  And there was a -- and at that point, |
| 10:00AM | 15 | Mr. Miske and a guy who had a clear-colored ear piece were |
| 10:00AM | 16 | standing off to the side.  Do you recall that? |
| 10:00AM | 17 | A    I recall the gentlemen with the clear-colored ear piece to |
| 10:00AM | 18 | the side, yes. |
| 10:00AM | 19 | Q    Okay.  And you also recall in the -- that Mr. Miske was |
| 10:00AM | 20 | standing by the side with him as well, correct? |
| 10:00AM | 21 | A    No.  He was -- he was further ahead in front of the |
| 10:00AM | 22 | gentleman. |
| 10:00AM | 23 | Q    All right.  All right.  And then what happened is one of |
| 10:00AM | 24 | the four men who approached began punching Michael, correct? |
| 10:00AM | 25 | A    No. |

10:00AM   1   Q    And you said while another was trying to hold Michael up,
10:01AM   2   right?
10:01AM   3   A    Someone was holding Michael.
10:01AM   4   Q    And he was near the grill on the hood of the parked truck,
10:01AM   5   correct?
10:01AM   6   A    At that point when I started walking forward, yes.
10:01AM   7   Q    Okay.  All right.  Now, you indicated that at that point
10:01AM   8   you originally weren't concerned when the bouncers came up,
10:01AM   9   correct?  If I understood your testimony earlier, you indicated
10:01AM   10  that when you saw the first folks come up, you were happy to
10:01AM   11  see them, right?
10:02AM   12  A    Yes.  Because I thought they were coming to help with the
10:02AM   13  gentleman who was yelling.
10:02AM   14  Q    Okay.  All right.  And then at a certain point, a second
10:02AM   15  group of folks came up as well, right?
10:02AM   16  A    That was not until everything was done.
10:02AM   17  Q    All right.
10:02AM   18  A    Like Mike was -- Michael -- Mike Galmiche was already
10:02AM   19  taken away -- being taken away by the ambulance.
10:02AM   20  Q    All right.  So if I understood your testimony the -- this
10:02AM   21  morning, you -- you indicated that the actual equipment you saw
10:02AM   22  Mr. Miske throw one of the items to the ground, correct?
10:02AM   23  A    Two of the items.
10:02AM   24  Q    Two of the items, correct?
10:02AM   25  A    Yes.

10:02AM  1   Q    Okay.  And that was while you were over by the screen,

10:02AM  2   right?

10:02AM  3   A    Yes.

10:02AM  4   Q    And then after that occurred is when you went over to try

10:02AM  5   to protect Mr. Galmiche, right?

10:02AM  6   A    Correct.

10:02AM  7   Q    And that the -- Mr. Miske was over with you with those

10:03AM  8   items, correct?

10:03AM  9   A    No.

10:03AM  10   Q    You were over by the screen, right, correct?

10:03AM  11   A    Yes.

10:03AM  12   Q    And that you indicated that you saw Mr. Miske throw two of

10:03AM  13   the items down, right?

10:03AM  14   A    Yes.

10:03AM  15   Q    And then you went over to protect Mr. Galmiche?

10:03AM  16   A    Yes.

10:03AM  17        MR. KENNEDY:  I have nothing further.

10:03AM  18        Thank you, Your Honor.

10:03AM  19        THE COURT:  Mr. Inciong, anything further?

10:03AM  20        MR. INCIONG:  Thank you, Your Honor.

10:03AM  21                    REDIRECT EXAMINATION

10:03AM  22   BY MR. INCIONG:

10:03AM  23   Q    Ms. Schubert, just so we're -- we're clear on exactly what

10:03AM  24   happened, walk us through what you observed from the point

10:03AM  25   where you observed Mr. Miske smashing the equipment and then

| | | |
|---|---|---|
| 10:03AM | 1 | you walking over to protect Mr. Galmiche and -- and where all |
| 10:03AM | 2 | the people that you knew or recognized were in that -- that |
| 10:03AM | 3 | kind of -- that sequence? |
| 10:04AM | 4 | A    So close the laptop, letting it -- the projector cool |
| 10:04AM | 5 | down.  There's other cables that are running to and from each |
| 10:04AM | 6 | other because they interface with one another, the projector |
| 10:04AM | 7 | and the -- the laptop with the -- the generator.  And there's |
| 10:04AM | 8 | bags that we have where everything goes back into.  So I'm |
| 10:04AM | 9 | preparing everything to go backwards.  It's the reverse of the |
| 10:04AM | 10 | materials. |
| 10:04AM | 11 | Q    Okay. |
| 10:04AM | 12 | A    And as it was happening, when I saw the gentlemen coming |
| 10:04AM | 13 | up, I started wrapping one set of cables from the -- for the |
| 10:04AM | 14 | laptop that went to the projector.  And when I saw the -- the |
| 10:04AM | 15 | men in black coming out through the structure, I felt relieved |
| 10:04AM | 16 | like okay, like okay.  They're going to deal with this angry |
| 10:04AM | 17 | person who's yelling at us. |
| 10:04AM | 18 | Q    Right. |
| 10:04AM | 19 | A    And then everything just happened so fast, like that's |
| 10:05AM | 20 | when I went from just like okay I'm just going to do my mission |
| 10:05AM | 21 | of wrapping up like I always do to the -- the yelling, to |
| 10:05AM | 22 | the -- the breaking of the things, to the men going towards |
| 10:05AM | 23 | Mike and then Mike Miske doing like jumping in with the assault |
| 10:05AM | 24 | that's happening, the man -- me -- then I realized because to |
| 10:05AM | 25 | the left of the screen that's when I could see everything |

10:05AM   1   taking place, that's when I started to walk quickly towards

10:05AM   2   the -- the assault that was taking place.  I dropped the cords.

10:05AM   3        The gentleman told me, "Sister, it's too late," on my

10:05AM   4   left side.  But I kept going, bear hugged him, got him down to

10:05AM   5   the ground.

10:05AM   6   Q    Okay.  So at which point did you see Mr. Miske smash the

10:05AM   7   equipment in that sequence?

10:05AM   8   A    It was -- according to what I remember, it was when he

10:06AM   9   already assaulted Mike.

10:06AM   10  Q    Okay.

10:06AM   11  A    And he came back and then I went and that's when the other

10:06AM   12  gentlemen were -- were like grabbing him.  And the reason why I

10:06AM   13  said I remember the grill of that car so vividly is because

10:06AM   14  Mike Galmiche was trying to get under it and they were pulling

10:06AM   15  him out as he was trying to seek shelter under the vehicle.

10:06AM   16  Q    So when you were bear hugging or -- or trying to protect

10:06AM   17  Mr. Galmiche, did you see where Mr. Miske was at that point?

10:06AM   18  A    No, I did not.

10:06AM   19  Q    Okay.  Now, you were asked about whether you were aware

10:06AM   20  that people from your team had passed out promotional flyers

10:06AM   21  inside the club previously?

10:06AM   22  A    Right.

10:06AM   23  Q    Is that a practice that sometimes you would do?

10:06AM   24  A    Not me.

10:06AM   25  Q    But your group?

10:06AM   1   A    The group, yes, but not me.  Yeah, I don't do that.

10:06AM   2   Q    Did you have any understanding or knowledge as to, you

10:06AM   3   know, how that was decided if -- if people would go into the

10:07AM   4   club to pass out flyers as opposed to staying outside like they

10:07AM   5   were on that night?

10:07AM   6   A    No.  Our team -- our team is a team of 12 at the time, so

10:07AM   7   I don't know.  I didn't -- I can't -- I don't keep track of

10:07AM   8   what everybody is doing.

10:07AM   9   Q    So in -- you've done this for an extended period of time,

10:07AM  10   correct?

10:07AM  11   A    Correct.

10:07AM  12   Q    Did this outside of multiple different clubs and nighttime

10:07AM  13   venues, correct?

10:07AM  14   A    Yes, yes.

10:07AM  15   Q    All right.  If flyers had been passed out against the

10:07AM  16   owner's permission, in your knowledge of how the industry

10:07AM  17   works, would it have been justifiable that people get beat up

10:07AM  18   for doing that?

10:07AM  19   A    No.

10:07AM  20           MR. KENNEDY:  Objection, argumentative.

10:07AM  21           THE COURT:  Sustained.

10:07AM  22   BY MR. INCIONG:

10:07AM  23   Q    Now, the civil complaint that was dismissed, was there

10:07AM  24   anything to prevent you from refiling that complaint?

10:07AM  25   A    No.

```
10:08AM   1   Q    Why did you choose not to?
10:08AM   2   A    Because we were -- well, I can't speak for Mike Galmiche,
10:08AM   3   but I was personally tired of nothing happening.  We weren't
10:08AM   4   getting answers.  I was just -- I've never been through
10:08AM   5   something like this before, so I -- I couldn't believe that
10:08AM   6   with all the evidence that I felt we had that nothing --
10:08AM   7   nothing came of it.
10:08AM   8             MR. INCIONG:  Thank you.
10:08AM   9             I have nothing further, Your Honor.
10:08AM  10             THE COURT:  Mr. Kennedy, anything else?
10:08AM  11             MR. KENNEDY:  Nothing further, Your Honor.
10:08AM  12             THE COURT:  All right.  Ms. Schubert, you may step
10:08AM  13   down.  Thank you.
10:08AM  14             THE WITNESS:  Thank you.
11:04AM  15                        --oo0oo--
11:04AM  16             MR. AKINA:  Government calls Laurence Miller.
11:05AM  17             THE CLERK:  Please raise your right hand.
11:05AM  18                        LAURENCE MILLER,
11:05AM  19   called as a witness, having been first duly sworn, was examined
11:05AM  20   and testified as follows:
11:05AM  21             THE CLERK:  Please state your full name for the
11:05AM  22   record.
11:05AM  23             THE WITNESS:  Laurence Miller.
11:05AM  24             THE CLERK:  Spell your first and last name.
11:05AM  25             THE WITNESS:  L-A-U-R-E-N-C-E, M-I-L-L-E-R.
```

| | | |
|---|---|---|
| 11:05AM | 1 | DIRECT EXAMINATION |
| 11:05AM | 2 | BY MR. AKINA: |
| 11:05AM | 3 | Q    Good morning, Mr. Miller. |
| 11:05AM | 4 | A    Hello. |
| 11:05AM | 5 | Q    Do you currently reside in Hawaii? |
| 11:05AM | 6 | A    No.  In Austin, Texas. |
| 11:05AM | 7 | Q    And have you ever lived in Hawaii? |
| 11:05AM | 8 | A    Yes. |
| 11:05AM | 9 | Q    About what years did you live here? |
| 11:05AM | 10 | A    2006 to maybe 2017. |
| 11:05AM | 11 | Q    And during the time that you were living here in Hawaii, |
| 11:05AM | 12 | what sorts of things did you do for work? |
| 11:05AM | 13 | A    I had a juice bar.  I did magic, kind of like a freelance |
| 11:06AM | 14 | entrepreneur. |
| 11:06AM | 15 | Q    Did you have a surfboard miniatures business? |
| 11:06AM | 16 | A    Yeah, a little -- yeah, a little -- I made souvenir |
| 11:06AM | 17 | surfboards. |
| 11:06AM | 18 | Q    In May of 2015, that's during that period you were still |
| 11:06AM | 19 | in Hawaii, right? |
| 11:06AM | 20 | A    Yes. |
| 11:06AM | 21 | Q    At that time, did you own a van? |
| 11:06AM | 22 | A    Yes. |
| 11:06AM | 23 | Q    What type of van was it? |
| 11:06AM | 24 | A    It was like a blue Chevy van. |
| 11:06AM | 25 | Q    And did that van have any pest problems? |

11:06AM    1    A    Yeah, it was infested with cockroaches.

11:06AM    2    Q    So back in 2015, what did you do about that?

11:06AM    3    A    I reached out to Kama'aina Termite because I thought that

11:06AM    4    they could fumigate it and eliminate the -- the cockroach

11:06AM    5    infestation.

11:06AM    6    Q    Was there a particular reason -- well, backing up.  Did

11:06AM    7    you do any research prior to reaching out to Kama'aina Termite

11:06AM    8    and Pest Control?

11:06AM    9    A    Yeah, yeah, I knew what service I wanted.  I wanted to

11:06AM   10    have it fumigated.

11:06AM   11    Q    And why did you reach out to Kama'aina Termite and Pest

11:06AM   12    Control?

11:06AM   13    A    Because they offer that service, and I had seen that

11:07AM   14    they'd been tenting houses like in the community.

11:07AM   15    Q    You said that you wanted your van fumigated.  Why -- what

11:07AM   16    were other options that you were aware of?

11:07AM   17    A    I think you can treat -- you can treat insects with

11:07AM   18    sprays, insecticides and fumigants, and I guess there's a

11:07AM   19    difference between them in regards to -- well, this was

11:07AM   20    important to me.  Fumigants don't leave any -- or yeah, they

11:07AM   21    don't leave any residue because they're gases and I guess they

11:07AM   22    dissipate so they -- once the fumigant goes in, there's nothing

11:07AM   23    on the surface.  So if you're allergic to that type of

11:07AM   24    insecticide, you -- it wouldn't affect you because it's not

11:07AM   25    there after they treat your vehicle or your home.

11:07AM   1   Q   And this is opposed to spraying it with some type of
11:07AM   2   chemical?
11:07AM   3   A   Yeah, if you spray it with a chemical, there might be a
11:07AM   4   residue that lasts for some time.  And then if you have contact
11:07AM   5   it and you're allergic to it, you could have a reaction.
11:07AM   6   Q   And why was it important to you to use the fumigant as
11:07AM   7   opposed to a spray that left some residue behind?
11:07AM   8   A   Well, like I said, yeah, so I didn't want to have a
11:08AM   9   residue.  My dad, he's really old.  He has like respiratory
11:08AM  10   problems.  I also just don't like to be around these types of
11:08AM  11   chemicals either especially if you're in a car or you're
11:08AM  12   handling the steering wheel, things like that.
11:08AM  13           THE COURT REPORTER:  I need you to slow down.
11:08AM  14           THE WITNESS:  Oh, okay, sorry.
11:08AM  15           MR. AKINA:  Continue.
11:08AM  16           THE COURT REPORTER:  Start your answer again.
11:08AM  17           THE WITNESS:  Yeah, no problems.
11:08AM  18           Yeah, my dad, he has respiratory problems and I didn't
11:08AM  19   want him to be affected by any residues that would be left in
11:08AM  20   the vehicle from a pesticide.
11:08AM  21   BY MR. AKINA:
11:08AM  22   Q   So on or about May 25th of 2015, did you end up taking
11:08AM  23   your van to Kama'aina Termite and Pest Control?
11:08AM  24   A   Yes.
11:08AM  25   Q   And when you brought it in for service, did you explain

11:08AM   1   what you wanted and what you didn't want to happen?

11:08AM   2   A    Yeah, absolutely.

11:08AM   3   Q    Was that agreed upon as far as you understood it?

11:08AM   4   A    Yeah, it was very clear.

11:08AM   5   Q    What part of the island was Kama'aina Termite and Pest

11:08AM   6   Control located where you took your van?

11:08AM   7   A    Well, that location, I don't know if they have multiple,

11:08AM   8   but it was located in Ward kind of near the theater and

11:08AM   9   sports -- the old Sports Authority.

11:09AM   10        MR. AKINA:  Could we publish Exhibit 5-22 which is

11:09AM   11   already in evidence from the government's original list?

11:09AM   12        THE COURT:  Go ahead.

11:09AM   13   By MR. AKINA:

11:09AM   14   Q    Do you recognize this location?

11:09AM   15   A    Yes.

11:09AM   16   Q    What is this?

11:09AM   17   A    This is the location where I dropped off my van.

11:09AM   18   Q    So you dropped off your van, and what was your

11:09AM   19   understanding of what happens when a van is fumigated?

11:09AM   20   A    So when anything is, I think, fumigated, they have to

11:09AM   21   encapsulate it in a tent so that they can introduce the gas so

11:09AM   22   the gas can maintain in an environment for some period of time

11:09AM   23   so that it kills all the insects.

11:09AM   24   Q    After you dropped off your van, did you see it the

11:09AM   25   following day?

11:09AM    1    A    Yes.  I saw it that evening and I saw it the next day as

11:10AM    2    well.

11:10AM    3    Q    Okay.  So later that same day you saw it initially?

11:10AM    4    A    Yes.  So I dropped off the van then I went to see a movie

11:10AM    5    with my dad which got out late maybe 11, and then I walked back

11:10AM    6    past where I had left the van at Kama'aina Termite and so I saw

11:10AM    7    my van again.

11:10AM    8    Q    When you saw your van that evening the day you dropped it

11:10AM    9    off, did it appear to be encapsulated or tented?

11:10AM   10    A    No.  It was in the same place where I left it.

11:10AM   11    Q    Okay.  Nothing covering it?

11:10AM   12    A    Yeah, nothing covering it.  It was just sitting there.

11:10AM   13    Q    The next morning, did you see your van again?

11:10AM   14    A    Yes.

11:10AM   15    Q    About what time?

11:10AM   16    A    Maybe 5 in the morning.  I went to the gym and then that

11:10AM   17    happens to be -- there's a UFC gym which is close or it's in

11:10AM   18    proximity to Kama'aina.  And I don't know why, I just drove by

11:10AM   19    and I saw my van again.

11:10AM   20    Q    And what was the condition at that time?

11:10AM   21    A    It was in the same location just sitting there.

11:10AM   22    Q    Was it tented at that time?

11:10AM   23    A    No.

11:10AM   24    Q    Did it -- what was your understanding of how long it

11:11AM   25    should be tented for?

11:11AM   1   A    I did some research and I think that I found that it

11:11AM   2   needed -- anything needs to be tented I think for approximately

11:11AM   3   24 hours.  And then after the tent's removed, there needs to be

11:11AM   4   some period of time that's -- that needs to elapse just to

11:11AM   5   allow all of those gases to exit like the -- the enclosure just

11:11AM   6   so that it's safe.

11:11AM   7   Q    At this point, did it bother you that the tenting had not

11:11AM   8   commenced yet?

11:11AM   9   A    Not really.

11:11AM   10   Q    You weren't in a particular rush at that time?

11:11AM   11   A    No, not at all.

11:11AM   12   Q    When's the next you heard about your van?

11:11AM   13   A    So that was 5 in the morning I saw it.  After the gym, I

11:11AM   14   went back to Hawaii Kai.  That's where I was and maybe like I

11:11AM   15   think about 9.  It was pretty early.  I think I received a

11:11AM   16   phone call around that time and they said your -- your vehicle

11:11AM   17   has been fumigated and it's done.

11:11AM   18   Q    And just to be clear, where did this call come from?

11:11AM   19   A    Kama'aina Termite.

11:11AM   20   Q    And how did you react when they told you that it's done?

11:12AM   21   A    Well, I was surprised and I also didn't believe them.  And

11:12AM   22   I wasn't exactly sure, so --

11:12AM   23   Q    Okay.  So what did you do?

11:12AM   24   A    I asked a series of questions.  I said, "I had seen the

11:12AM   25   car.  I don't really think that it's possible that you guys

| | | |
|---|---|---|
| 11:12AM | 1 | could have fumigated it between 5 and 9.  And if you did, you |
| 11:12AM | 2 | didn't leave it in the tent long enough, so what's happening?" |
| 11:12AM | 3 | And the person I was speaking with wasn't really |
| 11:12AM | 4 | familiar I don't think with the different ways of treating a |
| 11:12AM | 5 | vehicle for -- for an insect infestation.  So they followed up |
| 11:12AM | 6 | with a manager I believe and they said, let me contact you back |
| 11:12AM | 7 | and figure out what's happening. |
| 11:12AM | 8 | Q    Did you speak with a manager later on? |
| 11:12AM | 9 | A    Yeah, I spoke to a manager.  And then that manager, they |
| 11:12AM | 10 | said that they had sprayed it with the insecticide that I asked |
| 11:12AM | 11 | them not to use instead of fumigating it.  And that's why it |
| 11:13AM | 12 | was done because it would take maybe like, I don't know, a |
| 11:13AM | 13 | minute or -- not a couple of minutes.  I have no idea how long |
| 11:13AM | 14 | it takes but it doesn't take that long. |
| 11:13AM | 15 | Q    And you explained why you didn't want it sprayed with a |
| 11:13AM | 16 | chemical.  What sorts of things would you had to have done if |
| 11:13AM | 17 | that was the case if it had actually been sprayed with a |
| 11:13AM | 18 | chemical? |
| 11:13AM | 19 | A    Yeah, I mean, I hadn't thought about the consequences.  I |
| 11:13AM | 20 | just didn't want to have that have -- or didn't want to have |
| 11:13AM | 21 | those insecticides in the vehicle.  But when I discovered |
| 11:13AM | 22 | that's what they had done or could have done, then I started |
| 11:13AM | 23 | exploring what would need to be done to the vehicle to have it |
| 11:13AM | 24 | cleaned or -- or have all those things removed so that it would |
| 11:13AM | 25 | be safe for my dad or myself or anybody else to be in the |

| | | |
|---|---|---|
| 11:13AM | 1 | vehicle.  You know. |
| 11:13AM | 2 | Q    And would that cost some money to get it cleaned? |
| 11:13AM | 3 | A    Yeah, and I have no idea how much so... |
| 11:13AM | 4 | Q    Did you escalate this issue? |
| 11:13AM | 5 | A    Yes. |
| 11:13AM | 6 | Q    Describe that. |
| 11:13AM | 7 | A    So I talked to the manager.  Actually, I went down.  This |
| 11:14AM | 8 | is important.  So when I got that phone call, I went down and |
| 11:14AM | 9 | spoke to the manager, and that manager then walked me to the |
| 11:14AM | 10 | car and said that he had sprayed it so it was very clear. |
| 11:14AM | 11 | And then after that, I think I reached back to him and |
| 11:14AM | 12 | I said, "So what are we going to do?" |
| 11:14AM | 13 | He said, "I don't really know what the solution is.  I |
| 11:14AM | 14 | can't really do anything for you."  So we're going to need |
| 11:14AM | 15 | to -- I need to talk to like maybe his manager or his owner. |
| 11:14AM | 16 | Q    And did you eventually speak to the owner? |
| 11:14AM | 17 | A    Yes. |
| 11:14AM | 18 | Q    Was that in person or over the phone initially? |
| 11:14AM | 19 | A    No.  Over the phone. |
| 11:14AM | 20 | Q    And who was that person that you spoke with? |
| 11:14AM | 21 | A    That was Mike Miske. |
| 11:14AM | 22 | Q    How did this first conversation with him go? |
| 11:14AM | 23 | A    Well, I think I discussed like what I wanted and what had |
| 11:14AM | 24 | happened, and then I was starting to already think about how I |
| 11:14AM | 25 | was going to treat the vehicle or clean the vehicle out. |

11:14AM   1          So I said, "Hey, your manager told me he sprayed it.
11:14AM   2   You guys didn't do what I asked and now I'm probably going to
11:14AM   3   have to clean the car.  It's not a very expensive car.  It's
11:15AM   4   kind of an old car but, I mean, maybe it might cost a couple
11:15AM   5   hundred dollars.  I -- I just don't know.  But once I figure
11:15AM   6   out what you guys used, what chemicals, I think it's your
11:15AM   7   responsibility to cover the cleaning fees."
11:15AM   8   Q    And did Mr. Miske agree to that?
11:15AM   9   A    No.  He said, "The services -- it was the wrong service.
11:15AM   10  It was sprayed, and just come pick up your car and get out of
11:15AM   11  here.  Like I'm not going to charge you for it."
11:15AM   12  Q    Did you ask for some confirmation of what type of chemical
11:15AM   13  was used on your van?
11:15AM   14  A    Yes.
11:15AM   15  Q    And initially did you get a response on that?
11:15AM   16  A    Well, yeah, okay.  So, yes.  So during that -- that phone
11:15AM   17  call with him, he said -- at the very end, he said, "Let me
11:15AM   18  call you back."
11:15AM   19  Q    And when he said, "Let me call you back," what was -- what
11:15AM   20  part of the conversation was that referencing?
11:15AM   21  A    Yeah, yeah, yeah, yeah.  I just got to remember.  It's
11:15AM   22  been such a long time ago.  So he said, "Yeah, just come pick
11:16AM   23  up your van.  I'm not going to clean it.  You know, let me call
11:16AM   24  you back in a minute."
11:16AM   25          And then he called me back and then he said, "You know

11:16AM   1    what, actually, it was not sprayed.  It was fumigated."

11:16AM   2    Q    So --

11:16AM   3    A    And then -- okay.

11:16AM   4    Q    So is that different from what you previously been told?

11:16AM   5    A    That is correct.

11:16AM   6    Q    I'm sorry I cut you off.  What were you about to say?

11:16AM   7    A    And then I requested -- when I heard this, I -- I then was

11:16AM   8    so suspicious that maybe this company is lying to me.  I said,

11:16AM   9    "Can you write a letter, like an official letter, stating what

11:16AM   10   you have done to my van and what you haven't done?  Because I'm

11:16AM   11   getting mixed information right now from your manager and now

11:16AM   12   from you."

11:16AM   13   Q    And eventually, did you get a written letter from Michael

11:16AM   14   Miske?

11:16AM   15   A    Yes.

11:16AM   16   Q    And how was that letter provided to you?

11:16AM   17   A    Via email.

11:16AM   18        MR. INCIONG:  If we could show the witness only

11:16AM   19   Exhibit 1-1110 from the government's 12th supplemental?

11:17AM   20        THE COURT:  Go ahead.

11:17AM   21        MR. AKINA:  If we could go to the second page and back

11:17AM   22   to the first.  And then if we could also show Exhibit 1-1111

11:17AM   23   also from the 12th supplemental?

11:17AM   24        THE COURT:  Yes.

11:17AM   25   By MR. AKINA:

11:17AM   1   Q    These two exhibits, do you recognize them?

11:17AM   2   A    Yes.

11:17AM   3   Q    The first one, 1-1110, what is that?

11:17AM   4   A    This is the letter that -- that I had requested or part of

11:17AM   5   the letter I requested.  Letting me know that he used the

11:17AM   6   Vikane gas.

11:17AM   7   Q    And to be -- I meant 1-1110 which is now in front of you,

11:17AM   8   what is that exhibit?

11:17AM   9   A    Oh, okay.  So this is an email I got from I believe the

11:17AM   10  manager with the attachment of the letter.

11:18AM   11  Q    And is the next Exhibit 1-1111 the attachment?

11:18AM   12  A    That's correct.

11:18AM   13       MR. AKINA:  At this time, I'd offer 1-1110 and 1-1111

11:18AM   14  into evidence.

11:18AM   15       THE COURT:  Any objection, Counsel?

11:18AM   16       MS. PANAGAKOS:  No objection.

11:18AM   17       THE COURT:  Without objection those two exhibits are

11:18AM   18  admitted 1-1110 and 1-1111.  You may publish.

11:18AM   19  (Exhibit 1-1110 and 1-1111 were received in evidence.)

11:18AM   20       MR. AKINA:  Thank you, Your Honor.

11:18AM   21       If we could publish 1-1110 and zoom in on the date and

11:18AM   22  the body of the letter -- email I mean.

11:18AM   23  BY MR. AKINA:

11:18AM   24  Q    Okay.  So this is dated June 3, 2015, correct?

11:18AM   25  A    Yes.

11:18AM   1   Q   So that's a few days after you dropped it off from
11:18AM   2   May 25th?
11:18AM   3   A   Yes, correct.
11:18AM   4   Q   And here this is Kama'aina telling you here's the
11:18AM   5   clearance letter?
11:18AM   6   A   That's correct.
11:18AM   7   Q   Okay.  And if we go to the next Exhibit 1-1111, this is
11:19AM   8   that attachment to that email?
11:19AM   9   A   Yes, that's correct.
11:19AM   10   Q   Okay.  And so if we focus on the top portion the date and
11:19AM   11   who it's dressed to.  So date is June 2, 2015?
11:19AM   12   A   Yes.
11:19AM   13   Q   And it's addressed to you, correct?
11:19AM   14   A   Yes, that's correct.
11:19AM   15   Q   And it's for a blue Chevrolet van license plate PRU635?
11:19AM   16   A   Yes.
11:19AM   17   Q   And if we scroll down to the body of this letter.  Looking
11:19AM   18   at the bottom, who is it signed by?
11:19AM   19   A   Mike Miske.
11:19AM   20   Q   And does this letter essentially tell you that on May 26,
11:19AM   21   2015, Kama'aina had fumigated your van with Vikane?
11:19AM   22   A   Yes.
11:19AM   23   Q   Did that address your concerns?
11:19AM   24   A   Not -- no, because it was -- it gave me some information.
11:19AM   25   I mean, it's confirming what he says that he's done but it also

11:19AM   1   excluded the information I had asked which was that he states

11:20AM   2   that he didn't use a sprayed insecticide.  Because that's --

11:20AM   3   there's a question of whether or not that he used that or not

11:20AM   4   because of his manager.

11:20AM   5   Q    And referencing -- it describes a particular vehicle.

11:20AM   6            MR. AKINA:  If we could show the witness 1-449 from

11:20AM   7   the original list?

11:20AM   8            THE COURT:  Go ahead.

11:20AM   9   By MR. AKINA:

11:20AM  10   Q    What is this a picture of?

11:20AM  11   A    My old junky van.

11:20AM  12   Q    And with that license plate PRU653 (sic)?

11:20AM  13   A    Yes, yes, that's my van.

11:20AM  14            MR. AKINA:  I'd offer this into evidence.

11:20AM  15            THE COURT:  Any objection?

11:20AM  16            MS. PANAGAKOS:  No objection, Your Honor.

11:20AM  17            THE COURT:  1-449 is admitted without objection.  You

11:20AM  18   may publish.

11:20AM  19            (Exhibit 1-449 was received in evidence.)

11:20AM  20   BY MR. AKINA:

11:20AM  21   Q    If we could focus on the van.  That's your blue Chevrolet

11:20AM  22   with the license plate number, correct?

11:20AM  23   A    Yes.

11:20AM  24   Q    All right.  So after you got that letter, that first

11:21AM  25   letter from Michael Miske, did you respond by email?

11:21AM   1    A     Yeah, I believe so and I may have also called them over

11:21AM   2    the phone as well.

11:21AM   3              MR. AKINA:  So if we could show the witness

11:21AM   4    Exhibit 1-447 from the original list?

11:21AM   5    BY MR. AKINA:

11:21AM   6    Q     Is this one of your responses to that first letter?

11:21AM   7    A     Yes, I remember this, yes.

11:21AM   8              MR. AKINA:  If we could go to the second page, okay,

11:21AM   9    and back for the first.

11:21AM   10             I offer 1-447 into evidence.

11:21AM   11             THE COURT:  Any objection?

11:21AM   12             MS. PANAGAKOS:  No objection.

11:21AM   13             THE COURT:  1-447 is admitted without objection.  You

11:21AM   14   may publish.

11:21AM   15             (Exhibit 1-447 was received in evidence.)

11:21AM   16   BY MR. AKINA:

11:21AM   17   Q     If we could focus on just from forwarded message down to

11:21AM   18   the body of that.  So the first email you got was on June 3rd.

11:22AM   19   This is dated June 4th, so this is the next day?

11:22AM   20   A     Yeah, after the letter.

11:22AM   21   Q     Okay.  And what did you tell them?

11:22AM   22   A     In this I'm asking him to -- well, I'm asking whoever to

11:22AM   23   forward this to Mike and to have him address my concerns that

11:22AM   24   weren't addressed in the previous letter.

11:22AM   25   Q     And that's whether or not insecticides other than Vikane

11:22AM   1   gas had been used to the van, correct?

11:22AM   2   A    Yes.  So I'm asking for an additional letter.  I'm

11:22AM   3   saying -- I'm asking him to send me another letter but include

11:22AM   4   that it was treated with the fumigant if that's what you say

11:22AM   5   you've done and then also include that you didn't use the

11:22AM   6   insecticide -- the sprayed insecticide.

11:22AM   7          MR. AKINA:  If we could go and show the witness 1-448.

11:22AM   8   BY MR. AKINA:

11:22AM   9   Q    And did you have to follow up with Kama'aina Termite to

11:22AM  10   get a response?

11:22AM  11   A    Yes.

11:22AM  12   Q    Is this one of those follow-up emails?

11:23AM  13   A    Yes, this is correct.

11:23AM  14          MR. AKINA:  I'd offer 1-448 into evidence.

11:23AM  15          MS. PANAGAKOS:  No objection.

11:23AM  16          THE COURT:  1-448 then is admitted without objection.

11:23AM  17   Thank you, Ms. Panagakos.

11:23AM  18          You may publish.

11:23AM  19          (Exhibit 1-448 was received in evidence.)

11:23AM  20   BY MR. AKINA:

11:23AM  21   Q    If we could zoom in on the body.  This is a few days later

11:23AM  22   on June 8th.  Is this a follow-up email that you sent to

11:23AM  23   Kama'aina?

11:23AM  24   A    Yes.

11:23AM  25   Q    And so up to this point, you hadn't gotten a clarification

| | | |
|---|---|---|
| 11:23AM | 1 | I take it? |
| 11:23AM | 2 | A    Yeah, I think that's why I sent this, just to get them |
| 11:23AM | 3 | moving. |
| 11:23AM | 4 | Q    Ultimately, did you get a second letter from Kama'aina |
| 11:23AM | 5 | signed by Michael Miske? |
| 11:23AM | 6 | A    Yes. |
| 11:23AM | 7 | MR. AKINA:  And if we could show the witness |
| 11:23AM | 8 | Exhibit 1-450 first? |
| 11:23AM | 9 | BY MR. AKINA: |
| 11:23AM | 10 | Q    Okay.  Is this that email? |
| 11:23AM | 11 | A    Yes. |
| 11:24AM | 12 | Q    And if we go to 1-451, is this that second letter? |
| 11:24AM | 13 | A    Yes. |
| 11:24AM | 14 | Q    Okay.  Was this second letter attached to that email you |
| 11:24AM | 15 | got? |
| 11:24AM | 16 | A    Yes. |
| 11:24AM | 17 | Q    And the email is dated -- if we go back to 1-450, it's |
| 11:24AM | 18 | dated June 10, 2015? |
| 11:24AM | 19 | A    Correct. |
| 11:24AM | 20 | MR. AKINA:  I'd offer 1-450 and 1-451 into evidence. |
| 11:24AM | 21 | THE COURT:  Any objection? |
| 11:24AM | 22 | MS. PANAGAKOS:  No objection. |
| 11:24AM | 23 | THE COURT:  Those two exhibits then are admitted |
| 11:24AM | 24 | without objection.  That's 1-450 and 451.  Thank you.  You may |
| 11:24AM | 25 | publish. |

11:24AM   1          (Exhibit 1-450 and 1-451 were received in evidence.)

11:24AM   2    BY MR. AKINA:

11:24AM   3    Q    And if we could focus on the date and the body.  So this

11:24AM   4    is a June 10th email that you get, right?

11:24AM   5    A    That's correct.

11:24AM   6    Q    And it references another clearance letter.  So if we

11:24AM   7    could go to Exhibit 4 -- 1-451.  Was this that letter that was

11:25AM   8    attached to the email?

11:25AM   9    A    That's correct.

11:25AM   10   Q    Okay.  So this is dated June 9th, the day before, right?

11:25AM   11   A    Yeah.  So he must have written it a day prior to the

11:25AM   12   email.

11:25AM   13   Q    And if we could focus on the body and the signature.  It's

11:25AM   14   signed by Michael Miske?

11:25AM   15   A    That's correct.

11:25AM   16   Q    And did this second letter address your initial concern

11:25AM   17   about whether or not anything else besides Vikane had been

11:25AM   18   used?

11:25AM   19   A    No.  It was just this is just like more information about

11:25AM   20   the treatment of a vehicle with a fumigant, so he just

11:25AM   21   completely ignored the request.  In fact, I had spoken to him

11:25AM   22   prior to this -- this letter because I'm trying to get this

11:25AM   23   letter which this isn't the letter that had the information

11:25AM   24   that I wanted.  I reached out to I think their employees and I

11:25AM   25   explained trying to push them to give me this letter.  I had

11:26AM    1    said, "Maybe I need to do an investigation or, you know,
11:26AM    2    contact the EPA."
11:26AM    3            And then when I called them, I had spoke to Mike
11:26AM    4    again.  And during that conversation, I think I had said, You
11:26AM    5    need to give me this letter with the information that I'm
11:26AM    6    requesting or I -- I don't know what else to do other than I
11:26AM    7    have to -- I have to figure out -- I'm going to have to figure
11:26AM    8    out what this is.  I don't even know how I'm going to do that
11:26AM    9    yet but -- so why don't you send me the letter and -- so I can
11:26AM   10    avoid this problem?
11:26AM   11            And then he said, "Okay."
11:26AM   12            And then this is the letter I got.
11:26AM   13    Q    Okay.  And then after you got this letter, did you -- what
11:26AM   14    did you do after?
11:26AM   15    A    I -- then I reached back out them -- out to them again,
11:26AM   16    and I tell them, "Okay, well, you know, I'm -- you're just
11:26AM   17    not -- you're not cooperating.  You're not giving the
11:26AM   18    information and honestly I feel like you guys aren't being
11:26AM   19    honest right now at this point.  You're being evasive.  You're
11:26AM   20    giving me letters that like aren't stating what we agreed upon
11:26AM   21    over the phone."  So --
11:27AM   22    Q    And did you get a call from Michael Miske that same day,
11:27AM   23    June 10th about?
11:27AM   24    A    Yes.
11:27AM   25    Q    And describe that conversation.

11:27AM   1    A    So I think, yeah, maybe after I spoke to one of their --

11:27AM   2    the employees about this letter not having the information and

11:27AM   3    then kind of continuing down that path of letting them know

11:27AM   4    that I might have to contact the EPA.  He called me and reached

11:27AM   5    out to me.  And...

11:27AM   6    Q    How would you characterize that call?

11:27AM   7    A    Insanity.  Like just crazy nonsense.

11:27AM   8    Q    Were there any threats involved in that call?

11:27AM   9    A    Yeah, it was a surprising.  The guy, he changed from being

11:27AM   10   somewhat professional a little bit being evasive and hard to

11:27AM   11   work with to suddenly threatening me, insinuating that I was

11:27AM   12   involved in like a crime that had been committed in Hawaii

11:27AM   13   based on the description of my vehicle.

11:27AM   14   Q    Did he threaten to contact, to turn you in based on that

11:27AM   15   insinuation?

11:27AM   16   A    Yeah, that he was connected to some authorities and that,

11:28AM   17   you know, he could make my life really complicated.

11:28AM   18        And I was, like, this is such a surprise.  This was

11:28AM   19   like the first thing that he's saying when he calls me.  I'm

11:28AM   20   like, Okay, hey dude, this is like way like outside of the

11:28AM   21   scope.  I can't even -- I -- I really wasn't prepared for these

11:28AM   22   kinds of like accusations and threats.  So yeah, that was --

11:28AM   23   that was strange.

11:28AM   24        And I said, "Hey, why don't you just calm down?  All

11:28AM   25   I'm asking for is this information."

11:28AM   1          And he said, "You know what, you're not from Hawaii.
11:28AM   2    You don't know how things work here.  You can just disappear
11:28AM   3    like that."
11:28AM   4          And I'm, like, "Wait, wait.  Now, I'm going to
11:28AM   5    disappear over my van, like in this insecticide, like 300 bucks
11:28AM   6    and an old van?  Like, it sounds like you're threatening me."
11:28AM   7    Q    Did he mention your skin color or reference it?
11:28AM   8    A    Yeah, yeah.  He said, like, you know, "You're from the
11:28AM   9    mainland.  You're a haole.  You don't know what it's like here,
11:28AM   10   brah.  Like, you know, you can just disappear."
11:28AM   11         I'm, like, "I'm going to disappear over my van? I'm
11:28AM   12   like, Dude, I think you're like -- you're losing it a little
11:28AM   13   bit.  But, I mean, if you're serious about this, you know what,
11:28AM   14   maybe I should just head down to Kama'aina and I'll just call
11:29AM   15   the police and we'll just, like, I can show up and we can all
11:29AM   16   just discuss this.  Because I don't like this open threat,
11:29AM   17   these threats that you're making over the phone over this van.
11:29AM   18   And you sound pretty serious about it and these accusations
11:29AM   19   of -- like insinuating though a part of a crime and you're
11:29AM   20   connected to something, whatever, and you're going to get me
11:29AM   21   involved in some nonsense.  I'm like, I'm -- it's a little too
11:29AM   22   much."
11:29AM   23   Q    And on that note about being kind of connected, did he
11:29AM   24   mention that he could make your life really miserable?
11:29AM   25   A    Yes, that's correct, yeah.

| | | |
|---|---|---|
| 11:29AM | 1 | Q    Did he tell you to come get your van at any point? |
| 11:29AM | 2 | A    Oh, yeah, yeah.  During that conversation, so as he's |
| 11:29AM | 3 | saying these things, I said, "You know, I'm going to come |
| 11:29AM | 4 | down." |
| 11:29AM | 5 | And he's, like, "Yeah, come down."  And then he -- I |
| 11:29AM | 6 | think he said other things like, you know, come down.  And I'm |
| 11:29AM | 7 | also just -- sorry. |
| 11:29AM | 8 | THE COURT REPORTER:  Can you slow down? |
| 11:29AM | 9 | THE WITNESS:  Sorry.  I speak really fast. |
| 11:29AM | 10 | He said, "Come down.  I'll beat your ass."  Like, you |
| 11:29AM | 11 | know, "Just get down here, get your van."  Like, "Come down |
| 11:29AM | 12 | right now." And I agreed. |
| 11:29AM | 13 | BY MR. AKINA: |
| 11:29AM | 14 | Q    So he threatened -- so he threatened to beat you up? |
| 11:29AM | 15 | A    Yeah. |
| 11:29AM | 16 | Q    During this conversation, did you mention the EPA to |
| 11:30AM | 17 | Michael Miske? |
| 11:30AM | 18 | A    I -- maybe.  No, I don't -- I don't know if it was in |
| 11:30AM | 19 | the -- in that conversation.  It may -- it may have been in -- |
| 11:30AM | 20 | in like the beginning or something but, like, he was starting |
| 11:30AM | 21 | off with the allegations right away like being upset with me. |
| 11:30AM | 22 | Like, Why are you telling my employees that you're going to, |
| 11:30AM | 23 | you know, contact the EPA? |
| 11:30AM | 24 | Because the first conversation I had with him, I said, |
| 11:30AM | 25 | "Maybe I need to do an investigation."  I don't know what I |

11:30AM    1    need to do.  And then thinking about that more, I thought maybe

11:30AM    2    the EPA would be the -- the organization that I should call.

11:30AM    3    Q    So after this phone call --

11:30AM    4         MR. AKINA:  We can take this exhibit down.

11:30AM    5    BY MR. AKINA:

11:30AM    6    Q    -- did you contact the police?

11:30AM    7    A    Yes.

11:30AM    8    Q    For what purpose?

11:30AM    9    A    So right after the phone call, I called HPD, and I let

11:30AM   10    them know what had just happened.  I said, "I feel like I just

11:30AM   11    got threatened over my vehicle," and I explained the -- the

11:30AM   12    story.  I said, "I think I need to go down there and address

11:30AM   13    this.  So can you send some officers down there because I

11:30AM   14    don't -- he sounds pretty serious over this." Like, I don't

11:31AM   15    know, but the tone of his voice, it didn't sound like an empty

11:31AM   16    threat.

11:31AM   17         So I asked them to come down and meet me at Kama'aina

11:31AM   18    so we could address the situation.

11:31AM   19    Q    Did you go down to Kama'aina Termite later that day?

11:31AM   20    A    Yes.

11:31AM   21    Q    And when you got there, did you see any police there?

11:31AM   22    A    Yeah, the police were already there so there were already

11:31AM   23    squad cars outside of Kama'aina Termite.

11:31AM   24    Q    And what did you observe about the police that were there?

11:31AM   25    A    Yeah.  So when I get there, like I said, there are cop

11:31AM  1   cars outside and so I'm thinking this is great.  You know, we

11:31AM  2   can -- we can get to the bottom of this.

11:31AM  3       And Kama'aina has like a -- like a hangar, sorry.  It

11:31AM  4   was like a hangar and I walked past this little hangar kind of

11:31AM  5   getting oriented.  I didn't really know like where I was going

11:31AM  6   to go or approach or where the officers may have been.  And as

11:31AM  7   I walk by the hangar, I'm on the street, and then deep within

11:31AM  8   the building, I see officers standing and high-fiving and kind

11:31AM  9   of like getting along with somebody.  And I didn't know who

11:32AM  10  that was, I mean, at that time but it's Mike Miske.

11:32AM  11  Q    And do -- would you recognize him if you saw Mike Miske

11:32AM  12  again today?

11:32AM  13  A    Yeah, I think so.

11:32AM  14  Q    Do you see him here in the courtroom?

11:32AM  15  A    Yeah, over there in the white jacket.

11:32AM  16       MR. AKINA:  Let the record reflect the witness has

11:32AM  17  identified the defendant.

11:32AM  18       THE COURT:  Yes, the record should reflect the

11:32AM  19  witness, Mr. Miller's, identification of the defendant,

11:32AM  20  Mr. Miske.

11:32AM  21  BY MR. AKINA:

11:32AM  22  Q    So you see Mike Miske high-fiving with the police officer

11:32AM  23  and what do you do?

11:32AM  24  A    So, yeah, when I see it, I just like -- I see it quickly.

11:32AM  25  I see this kind of this interaction they're getting along.  I

11:32AM   1   think maybe aborting.  I don't know.  I just really didn't feel
11:32AM   2   comfortable.  I've never seen officers interact with somebody
11:32AM   3   like that like friends.  But the moment I -- I peeked -- peeked
11:32AM   4   around the corner, they -- they had seen me, too.
11:32AM   5         So the officer called me back, he said, "Hey, you.
11:33AM   6   You're the guy with the van?  Come back here."
11:33AM   7         So I had to walk all the way down to the corridor to
11:33AM   8   where they were.
11:33AM   9   Q    Did you enter the building?
11:33AM  10   A    Well, I mean, it's -- like I said, it's a hangar so, yeah,
11:33AM  11   I'm on the property now like deep inside of their -- their
11:33AM  12   hangar.
11:33AM  13   Q    And what happened after you entered?
11:33AM  14   A    The officer says, "What's going on?"  He kind of starts
11:33AM  15   kind of asking me.
11:33AM  16         And then I begin to tell him why I'm there, and he
11:33AM  17   just cuts me off, and he says, "No, wait.  Why are you giving
11:33AM  18   this business man a hard time?"
11:33AM  19         And I said, "Well" --
11:33AM  20         "No, no, no, no, well.  No nothing.  He -- he treated
11:33AM  21   your car, right?"
11:33AM  22         I'm like, "Yeah, but" --
11:33AM  23         "No, no, but.  So he did everything that he was
11:33AM  24   supposed to do.  Why you giving this -- this business man a
11:33AM  25   hard time?"

| | | |
|---|---|---|
| 11:33AM | 1 | And I said, "Okay."  You know what, clearly this guy |
| 11:33AM | 2 | doesn't want to listen to my explanation.  And I already felt |
| 11:33AM | 3 | uncomfortable, so I said, "Okay." |
| 11:33AM | 4 | He says, "So get your car and get out of here." |
| 11:33AM | 5 | Q   What did you do? |
| 11:34AM | 6 | A   I just -- I turned around and started walking away. |
| 11:34AM | 7 | Q   Did that get that police officer's name? |
| 11:34AM | 8 | A   No. |
| 11:34AM | 9 | Q   What happened as you walked away? |
| 11:34AM | 10 | A   Maybe about three quarters of the way, I kind of was like |
| 11:34AM | 11 | that's so messed up like I just didn't feel good so I kind of |
| 11:34AM | 12 | looked -- looked behind me with a kind of smirk maybe just like |
| 11:34AM | 13 | what.  And the officer was like, "Don't turn around again." |
| 11:34AM | 14 | Like, with this like authority, like, if you turn |
| 11:34AM | 15 | around, it feels like I -- I might get shot.  Like, do not turn |
| 11:34AM | 16 | around again.  Keep going.  Get your van. |
| 11:34AM | 17 | I was like, "Okay."  Well, that's -- that's it.  So I |
| 11:34AM | 18 | just left. |
| 11:34AM | 19 | Q   Can you describe the tone that the officer used? |
| 11:34AM | 20 | A   Yeah, very threatening like -- like on top of it, like I |
| 11:34AM | 21 | said, like almost like an execution style like voice.  Do not |
| 11:34AM | 22 | turn around.  Get your van, and like whoa. |
| 11:34AM | 23 | Q   Do you think that had -- that interaction had anything to |
| 11:35AM | 24 | do with when the defendant mentioned that he was kind of |
| 11:35AM | 25 | connected? |

| | | | |
|---|---|---|---|
| 11:35AM | 1 | A | I don't think I thought about it too much but I mean |
| 11:35AM | 2 | | afterwards, yes.  And then -- |
| 11:35AM | 3 | Q | Ultimately, did you take your van away from Kama'aina? |
| 11:35AM | 4 | A | Correct, yes. |
| 11:35AM | 5 | Q | And did you end up trying to speak to the EPA? |
| 11:35AM | 6 | A | Yes. |
| 11:35AM | 7 | Q | And was that to figure out what type of chemical was |
| 11:35AM | 8 | | actually used, if any? |
| 11:35AM | 9 | A | Yeah, it was like definitely -- I was -- well, I was |
| 11:35AM | 10 | | shooken up over the entire situation.  And then when I left, I |
| 11:35AM | 11 | | don't know how relevant this is, but when I left immediately -- |
| 11:35AM | 12 | | well, go ahead. |
| 11:35AM | 13 | Q | Yeah, let me jump in right here. |
| 11:35AM | 14 | A | Okay. |
| 11:35AM | 15 | Q | Focusing on the EPA, ultimately did you speak to someone |
| 11:35AM | 16 | | from some government agency? |
| 11:35AM | 17 | A | Yes. |
| 11:35AM | 18 | Q | And what agency was that? |
| 11:35AM | 19 | A | I think it was -- I -- I got handed off to the |
| 11:36AM | 20 | | agricultural department. |
| 11:36AM | 21 | Q | The -- the Hawaii State Department of Agriculture? |
| 11:36AM | 22 | A | Yeah, yeah, yeah. |
| 11:36AM | 23 | Q | And do you remember the name of that person? |
| 11:36AM | 24 | A | I'd have to see it to remember it. |
| 11:36AM | 25 | | MR. AKINA:  If we could show the witness |

11:36AM  1   Exhibit 1-1112 from the government's 12th supplemental?

11:36AM  2           THE COURT:  Go ahead.

11:36AM  3   By MR. AKINA:

11:36AM  4   Q    Does this refresh your recollection of who you spoke with?

11:36AM  5   A    Yeah, I -- I remember him, and, yeah, it looks like his

11:36AM  6   name is Steve Ogata.

11:36AM  7           MR. AKINA:  You can take this down.

11:36AM  8           THE WITNESS:  Or Steven Ogata.

11:36AM  9   BY MR. AKINA:

11:36AM  10  Q    So you spoke to Steven Ogata from the Hawaii Department of

11:36AM  11  Agriculture?

11:36AM  12  A    Yeah, that's correct.

11:36AM  13  Q    And ultimately, did you ever find out what was used on

11:36AM  14  your van, if anything?

11:36AM  15  A    No.  I -- I contacted them.  I had a conversation with

11:36AM  16  them about this in person and he kind of let me know that he

11:37AM  17  was like kind of familiar with.

11:37AM  18  Q    And without going into conversation --

11:37AM  19  A    I'm sorry.  Yes.

11:37AM  20  Q    -- that you had with third parties, just ultimately did

11:37AM  21  you find out what was used on your van, if anything?

11:37AM  22  A    He said that he would swab it, but he didn't know whether

11:37AM  23  or not he could definitely let me know what had been used on

11:37AM  24  the vehicle.

11:37AM  25  Q    So you never found out?

| | | | |
|---|---|---|---|
| 11:37AM | 1 | A | Yeah. |
| 11:37AM | 2 | | MR. AKINA:  No other questions at this time. |
| 11:37AM | 3 | | THE COURT:  Ms. Panagakos, when you're ready. |
| 11:37AM | 4 | | CROSS-EXAMINATION |
| 11:37AM | 5 | BY MS. PANAGAKOS: | |
| 11:37AM | 6 | Q | Hello, Mr. Miller. |
| 11:37AM | 7 | A | Hello. |
| 11:37AM | 8 | Q | So when you went to Kama'aina Termite after you called the |
| 11:38AM | 9 | | police, you encountered Mr. Miske and the police officers? |
| 11:38AM | 10 | A | Yes. |
| 11:38AM | 11 | Q | And is that the first time you met Mr. Miske in person? |
| 11:38AM | 12 | A | Yes. |
| 11:38AM | 13 | Q | So Mr. Miske had not seen you prior to speaking you -- |
| 11:38AM | 14 | | speaking with you on the telephone according to your testimony? |
| 11:38AM | 15 | A | I'm assuming that, yeah. |
| 11:38AM | 16 | Q | But yet you say he called you a fucking haole? |
| 11:38AM | 17 | A | That's correct. |
| 11:38AM | 18 | Q | Not having seen you? |
| 11:38AM | 19 | A | That's correct. |
| 11:38AM | 20 | Q | And the person that you spoke with at -- that you met with |
| 11:38AM | 21 | | at -- at Kama'aina Termite who you believe was the manager, do |
| 11:38AM | 22 | | you remember his name? |
| 11:38AM | 23 | A | No. |
| 11:38AM | 24 | Q | Do you remember what he looked like? |
| 11:38AM | 25 | A | Vaguely.  I feel like he was a little heavysetish maybe |

| | | |
|---|---|---|
| 11:39AM | 1 | possibly. |
| 11:39AM | 2 | Q    Haole? |
| 11:39AM | 3 | A    I don't believe so. |
| 11:39AM | 4 | Q    So you recall testifying in the grand jury about four |
| 11:39AM | 5 | years ago, right? |
| 11:39AM | 6 | A    Yeah. |
| 11:39AM | 7 | Q    And you recall speaking with the FBI a number of times, |
| 11:39AM | 8 | right? |
| 11:39AM | 9 | A    Correct. |
| 11:39AM | 10 | Q    And with the prosecutors to get ready for your testimony |
| 11:39AM | 11 | today? |
| 11:39AM | 12 | A    Correct. |
| 11:39AM | 13 | Q    And in the grand jury, you discussed your employment.  You |
| 11:39AM | 14 | said you had been -- you were a magician, right? |
| 11:39AM | 15 | A    Correct. |
| 11:39AM | 16 | Q    And you made miniature model surfboards? |
| 11:39AM | 17 | A    Um-hm. |
| 11:39AM | 18 | Q    You didn't say anything about a juice bar at that time? |
| 11:39AM | 19 | MR. AKINA:  Objection, improper impeachment, |
| 11:39AM | 20 | relevance. |
| 11:39AM | 21 | THE COURT:  Overruled.  Go ahead. |
| 11:39AM | 22 | THE WITNESS:  Okay to answer it? |
| 11:40AM | 23 | THE COURT:  Yes, please. |
| 11:40AM | 24 | THE WITNESS:  Okay.  Yeah, yeah, I -- maybe at that |
| 11:40AM | 25 | time.  Like I said, I do a lot of -- a lot of things, like I |

11:40AM  1   was an entrepreneur so I was in and out of a juice bar that I

11:40AM  2   had started.  But at that time maybe when I was testifying

11:40AM  3   during that period I may not have been actively working on it,

11:40AM  4   so maybe it was just something that I had done.  I had a juice

11:40AM  5   bar.  I had partners.  I had left.  I had come back so -- I

11:40AM  6   don't know how it's relevant.

11:40AM  7   By MS. PANAGAKOS:

11:40AM  8   Q    You never worked in the fumigation industry?

11:40AM  9   A    No.

11:40AM  10  Q    And yet you seemed to think you know more than the manager

11:40AM  11  at Kama'aina Termite about pesticides?

11:40AM  12  A    Why do you say that?

11:40AM  13  Q    You testified that he didn't seem to know what he was

11:40AM  14  talking about?

11:40AM  15  A    What do you mean?

11:40AM  16  Q    I thought I heard you testify on direct that the manager

11:40AM  17  didn't seem knowledgeable about the process of fumigating your

11:40AM  18  van?

11:40AM  19  A    I don't think I said that.  I think I said that he wasn't

11:40AM  20  sure how I should clean it.  And I -- and then he told me he

11:41AM  21  sprayed it.  He didn't know what should be done to remediate

11:41AM  22  that problem if I wanted it cleaned.

11:41AM  23  Q    And you testified that in order to fumigate a van it has

11:41AM  24  to be tented for 24 hours?

11:41AM  25  A    That's the information that I found online.

11:41AM   1   Q    You were provided a Vikane fact sheet by Kama'aina

11:41AM   2   Termite, correct?

11:41AM   3   A    Correct.

11:41AM   4        MS. PANAGAKOS:  And I'd like to show -- publish 1-40

11:41AM   5   which has been admitted just during the direct testimony.  I --

11:42AM   6   I'm sorry.  I misspoke.  1-450.

11:42AM   7        THE COURT:  Go ahead.

11:42AM   8   BY MS. PANAGAKOS:

11:42AM   9   Q    And you testified that this is an email you received from

11:42AM  10   Kama'aina Termite on June 10th, correct?

11:42AM  11   A    Yes.

11:42AM  12   Q    And in addition to the clearance letter, this email also

11:42AM  13   attached a Vikane fact sheet, correct?

11:42AM  14   A    That's what it says.

11:42AM  15        MS. PANAGAKOS:  And I'd like to show Mr. Miller now

11:42AM  16   Exhibit 9115-009 which is on the 27th supplemental list.

11:42AM  17        THE COURT:  I'll have to take your word for it.  I do

11:42AM  18   not have a 27th supplemental list.  Do you have a copy?  Thank

11:43AM  19   you.  All right.  Go ahead.

11:43AM  20   By MS. PANAGAKOS:

11:43AM  21   Q    And you see this is the same email, right?

11:43AM  22   A    Okay.

11:43AM  23   Q    That was -- okay.  And then the next page, page two is the

11:43AM  24   same June 9th letter which is also marked 1-451?

11:43AM  25   A    Okay.

| | | |
|---|---|---|
| 11:43AM | 1 | Q    And then page three of this exhibit has the attached |
| 11:43AM | 2 | Vikane fact sheet that accompanied this email and this letter, |
| 11:43AM | 3 | correct? |
| 11:43AM | 4 | A    Okay.  Correct. |
| 11:43AM | 5 | MS. PANAGAKOS:  So I'd move to admit 9115-009. |
| 11:43AM | 6 | THE COURT:  Any objection? |
| 11:43AM | 7 | MR. AKINA:  I just want to confirm if there's another |
| 11:43AM | 8 | page to the fact sheet.  Okay.  No objection. |
| 11:43AM | 9 | THE COURT:  Okay.  Without objection that exhibit is |
| 11:44AM | 10 | admitted 9115-9.  You may publish. |
| 11:44AM | 11 | MS. PANAGAKOS:  Thank you. |
| 11:44AM | 12 | (Exhibit 9115-009 was received in evidence.) |
| 11:44AM | 13 | MS. PANAGAKOS:  And if we could highlight this |
| 11:44AM | 14 | paragraph here, Ms. King. |
| 11:44AM | 15 | BY MS. PANAGAKOS: |
| 11:44AM | 16 | Q    And this is for buildings, structures way bigger than |
| 11:44AM | 17 | vans, right? |
| 11:44AM | 18 | A    I don't know.  I haven't read this. |
| 11:44AM | 19 | Q    How buildings are fumigated? |
| 11:44AM | 20 | A    Okay. |
| 11:44AM | 21 | Q    And it says, "The building will remain sealed for two to |
| 11:44AM | 22 | 72 hours depending on the specifics of the job." |
| 11:44AM | 23 | Do you see that? |
| 11:44AM | 24 | A    Yeah, I see that. |
| 11:44AM | 25 | Q    And this is the Vikane fact sheet produced by Dow |

11:44AM   1   AgroSciences the manufacturer of Vikane.

11:44AM   2            MS. PANAGAKOS:  Can we go scroll out to the top?  Can

11:44AM   3   we show the entire page, please?

11:44AM   4   BY MS. PANAGAKOS:

11:44AM   5   Q    Do you see that?

11:44AM   6   A    Yeah, yeah, I see that.  I'm looking at the entire

11:44AM   7   document.  I just want to read the part that you had enlarged.

11:45AM   8   Q    Okay.

11:45AM   9            MS. PANAGAKOS:  So we can enlarge that paragraph

11:45AM  10   again, please.

11:45AM  11   BY MS. PANAGAKOS:

11:45AM  12   Q    So you see at the time of the duration of sealing ranges

11:45AM  13   from two to 72 hours according to the manufacturer of Vikane?

11:45AM  14   A    Yes, that's correct.

11:45AM  15   Q    And tenting is not the only way to seal a structure.  It

11:45AM  16   can also be done with tape and a plastic sheet, correct?

11:45AM  17   A    When it's accomplishing the same thing, right.

11:45AM  18   Q    Right.

11:45AM  19   A    So --

11:45AM  20   Q    So the fact that you didn't -- so you dropped your car

11:45AM  21   off -- your van off at 3 or 4:00 in the afternoon, right?

11:45AM  22   A    Correct.

11:45AM  23   Q    And then you saw it again eight or nine hours later after

11:45AM  24   the movies, right?

11:45AM  25   A    Correct.

| 11:45AM | 1 | Q | And so it wasn't tented at that time? |

11:45AM    1    Q    And so it wasn't tented at that time?

11:45AM    2    A    Correct.

11:45AM    3    Q    You have no idea whether it was tented for any portion of

11:46AM    4    the time between 3 or 4 and 11 or 12 when you got out of the

11:46AM    5    movies?

11:46AM    6    A    I think when I dropped it off it was close to their

11:46AM    7    closing time.

11:46AM    8    Q    You testified in the grand jury that you dropped it off

11:46AM    9    between 3 and 4 p.m.?

11:46AM   10    A    Yeah, I feel like I don't know when -- when they stop

11:46AM   11    doing business but around that time it seems like near the end

11:46AM   12    of the day.

11:46AM   13    Q    And then the movie got out around 11 or 12?

11:46AM   14    A    That's correct.

11:46AM   15    Q    Right?  So there was a seven or eight or nine-hour period

11:46AM   16    from when you dropped it off and you saw it without a tent,

11:46AM   17    right?

11:46AM   18    A    That's correct.

11:46AM   19    Q    And so you have no idea whether it had been tented during

11:46AM   20    that time?

11:46AM   21    A    Yeah, that's possible.

11:46AM   22    Q    And then the next time you saw it was at 5 or 6 in the

11:46AM   23    morning?

11:46AM   24    A    That's correct.

11:46AM   25    Q    And then you had a call and it wasn't tented at that time?

11:46AM   1   A   That's correct.

11:46AM   2   Q   And then you had a call several hours later that it was

11:46AM   3   ready?

11:46AM   4   A   Yes.

11:46AM   5   Q   And you don't know whether it was tented in between the

11:46AM   6   time you saw it when you went to the gym and the time you went

11:46AM   7   back to pick it up?

11:46AM   8   A   That's correct.

11:47AM   9           MS. PANAGAKOS:   Okay.   We can take that down.

11:47AM   10          And can we show Mr. Miller Exhibit 1-1111?

11:47AM   11          THE COURT:   Yes, go ahead.

11:47AM   12  By MS. PANAGAKOS:

11:48AM   13  Q   This is the first letter you received from Mr. Miske,

11:48AM   14  correct?

11:48AM   15  A   Yes, correct.

11:48AM   16  Q   And you spoke with him after you received this letter,

11:48AM   17  right?

11:48AM   18  A   Before and after.

11:48AM   19  Q   And in the phone call after this, he told you that they

11:48AM   20  did not use any other insecticides other than Vikane, right?

11:48AM   21  A   Yes, that's what he said.

11:48AM   22  Q   And then you asked for a second letter, correct?

11:48AM   23  A   Yes.

11:48AM   24  Q   And you received a second letter again saying that the

11:49AM   25  fumigant used was Vikane, right?

| | | | |
|---|---|---|---|
| 11:49AM | 1 | A | Yes. |

11:49AM   2   Q   So he told you in writing what he used -- he told you in

11:49AM   3   writing what Kama'aina Termite had used to fumigate your van,

11:49AM   4   right?

11:49AM   5   A   That's correct.

11:49AM   6   Q   And he told you on the phone that no other insecticide had

11:49AM   7   been used?

11:49AM   8   A   Well, he told me that he had -- that's not true.  He told

11:49AM   9   me that it had been treated with insecticide sprayed and then

11:49AM   10   hold on a second.  Let me call you back.  Which is confirming

11:49AM   11   the information that his manager had told me because he said

11:49AM   12   that he personally had sprayed it and he didn't fumigate it.

11:49AM   13   Q   So --

11:49AM   14   A   So then he called me back and said, "Oh, wait, now it's

11:49AM   15   been fumigated."

11:49AM   16   Q   The first letter said it had been fumigated.  In the first

11:49AM   17   letter he sent you, it -- he said it had been fumigated,

11:50AM   18   correct?

11:50AM   19   A   So what I just discussed was before the first letter,

11:50AM   20   the -- before the first letter, we spoke.  He said, "It's been

11:50AM   21   sprayed.  Wrong service.  Come pick up your car.  Got it?

11:50AM   22   Okay."

11:50AM   23   Q   And that came from the manager or Mr. Miske?

11:50AM   24   A   Mr. Miske.

11:50AM   25   Q   Okay.

| | | | |
|---|---|---|---|
| 11:50AM | 1 | A | Then he called back and said, "Wait.  Actually, it's |
| 11:50AM | 2 | | been -- it was fumigated." |
| 11:50AM | 3 | Q | Okay.  You had asked for it to be -- |
| 11:50AM | 4 | A | I can give you the letter -- |
| 11:50AM | 5 | Q | You had asked for it to be fumigated? |
| 11:50AM | 6 | A | That's correct. |
| 11:50AM | 7 | Q | He told you it was fumigated? |
| 11:50AM | 8 | A | I didn't ask for it to be fumigated again. |
| 11:50AM | 9 | Q | No, you asked -- you -- you -- the service you requested |
| 11:50AM | 10 | | was fumigation? |
| 11:50AM | 11 | A | That's correct. |
| 11:50AM | 12 | Q | And he told you that service had been rendered? |
| 11:50AM | 13 | A | After flip flopping. |
| 11:50AM | 14 | Q | And then he told you again? |
| 11:50AM | 15 | A | That's correct. |
| 11:50AM | 16 | Q | And this is a multimillion dollar business, you're aware |
| 11:50AM | 17 | | of that, right? |
| 11:50AM | 18 | | MR. AKINA:  Objection to relevance. |
| 11:50AM | 19 | | THE COURT:  Sustained. |
| 11:50AM | 20 | | BY MS. PANAGAKOS: |
| 11:50AM | 21 | Q | Others worked on the project? |
| 11:50AM | 22 | A | I don't know that so okay. |
| 11:50AM | 23 | Q | Others -- other employees handled the services that are |
| 11:51AM | 24 | | rendered and -- |
| 11:51AM | 25 | A | I spoke to one of them. |

11:51AM   1   Q    And your claim is that the manager of the business handled

11:51AM   2   this fumigation?

11:51AM   3   A    That's what he said.  I said, yeah, manager.  He just was

11:51AM   4   a higher authority the person I was talking to.  So what his

11:51AM   5   position there is, he could be manager.  I think that's what

11:51AM   6   they said.  They said I'm going to have to give it to my

11:51AM   7   manager and then I spoke to that person.

11:51AM   8   Q    You've testified in the grand jury that he was a manager?

11:51AM   9   A    That's what I was told.

11:51AM   10  Q    And so they also mentioned that there had been

11:51AM   11  miscommunication, right?

11:51AM   12  A    With whom?  Within the company or between --

11:51AM   13  Q    Whether within the company or with you, the lady you spoke

11:52AM   14  with initially said there had been a miscommunication, right?

11:52AM   15  A    She said that she needed -- I -- yeah, possibly, I don't

11:52AM   16  remember the specific language.

11:52AM   17  Q    Okay.  And Mr. Miske cleared it up by telling you the

11:52AM   18  service that his company rendered?

11:52AM   19  A    At the very end, yes, after saying that it had been

11:52AM   20  sprayed, pick up the car, wrong service.  And then after that,

11:52AM   21  yes, wait.  Actually it's been treated with the fumigant.

11:52AM   22  Q    And this van was a really old van, right?

11:52AM   23  A    Yeah.

11:52AM   24  Q    And it was in bad shape?

11:52AM   25  A    I mean, I don't know.  It ran but, yeah.

| | | |
|---|---|---|
| 11:52AM | 1 | Q   But it was worth about 500 bucks I think you said -- you |
| 11:52AM | 2 | testified? |
| 11:52AM | 3 | A   Yeah, probably. |
| 11:52AM | 4 | Q   And you had left it unattended for some period of time? |
| 11:52AM | 5 | A   Yes. |
| 11:52AM | 6 | MR. AKINA:  Objection, relevance. |
| 11:52AM | 7 | MS. PANAGAKOS:  I'm sorry, Your Honor.  I didn't hear |
| 11:52AM | 8 | the ruling. |
| 11:52AM | 9 | THE COURT:  Let's move on. |
| 11:52AM | 10 | By MS. PANAGAKOS: |
| 11:52AM | 11 | Q   Okay.  And you had gone camping in your van? |
| 11:53AM | 12 | MR. AKINA:  Objection, relevance, beyond the scope. |
| 11:53AM | 13 | THE COURT:  Side bar. |
| 11:53AM | 14 | MS. PANAGAKOS:  Okay.  Can we -- |
| 11:53AM | 15 | THE COURT:  Side bar now. |
| 11:53AM | 16 | (Sidebar on the record:) |
| 11:53AM | 17 | THE COURT:  How much time are you going to waste? |
| 11:53AM | 18 | MS. PANAGAKOS:  I'm moving on. |
| 11:53AM | 19 | THE COURT:  How much time are you going to waste? |
| 11:53AM | 20 | Let's get through this or we're going to be in trial in |
| 11:53AM | 21 | October. |
| 11:53AM | 22 | (End of side bar.) |
| 11:53AM | 23 | BY MS. PANAGAKOS: |
| 11:53AM | 24 | Q   So you called the police officers?  You called the police |
| 11:53AM | 25 | department? |

11:53AM    1    A    Yes.

11:53AM    2    Q    And you told them you wanted to make a police report?

11:53AM    3    A    Well, I don't know.  I just told them that this person had

11:54AM    4    threatened me and that I needed to go down to manage the

11:54AM    5    situation if they could bring officers because I had been

11:54AM    6    threatened.

11:54AM    7    Q    And when you got to Kama'aina Termite --

11:54AM    8         MS. PANAGAKOS:  Let's see.  Can we show Mr. Miller

11:54AM    9    Exhibit 5-22?

11:54AM    10        THE COURT:  Go ahead.

11:54AM    11   BY MS. PANAGAKOS:

11:54AM    12   Q    And when you arrived, where did you see -- where were the

11:54AM    13   officers?

11:54AM    14   A    I believe in the -- yeah, it's the hangar, so that's the

11:54AM    15   kind of garage I was talking about.  There might have been

11:55AM    16   something on the right of this.  I actually can't remember if

11:55AM    17   this building might extend more to the right a little bit but

11:55AM    18   it -- or there's some vehicles but this is a long hallway and

11:55AM    19   they were down in that little -- yeah, that dark area.

11:55AM    20   Q    And you saw the them -- you saw the officers high-fiving

11:55AM    21   with Mr. Miske?

11:55AM    22   A    Yeah.

11:55AM    23   Q    And you testified in the grand jury they were actually --

11:55AM    24   one of the officers was actually giving him a hug?

11:55AM    25   A    Yeah, I mean, they were just interacting like friends.  So

11:55AM   1   maybe like a close, like kind of, you know, like a homie hug.

11:55AM   2   Q    And so they wouldn't take a report from you?

11:55AM   3   A    No.  Well, I mean they didn't even offer that.

11:55AM   4   Q    And do you recall seeing another officer when you left?

11:55AM   5   A    Yes.

11:55AM   6   Q    And where was that?

11:56AM   7   A    After I had left?

11:56AM   8   Q    Yeah.

11:56AM   9   A    Okay, yeah.  So after that, I went across the street to --

11:56AM  10   well, actually I just -- I just left and I just walked away

11:56AM  11   from that whole situation, walked across the street where the

11:56AM  12   old Sports Authority was.  And in that parking lot, there was a

11:56AM  13   squad car with an officer in it.

11:56AM  14   Q    And you told that officer what had happened?

11:56AM  15   A    Yeah, I -- I kind of like I -- well, it wasn't -- I

11:56AM  16   introduced him to like -- I just started -- yeah, a little bit

11:56AM  17   I started to just talk to him because I wasn't exactly sure

11:56AM  18   whether or not he had arrived with those other officers or not.

11:56AM  19   So at first I was kind of delicate as to how I brought that up.

11:56AM  20   And when I did, he opened up to me.  And, yeah, he said that

11:56AM  21   I -- I didn't know who that really was.  This person is Mike

11:56AM  22   Miske.

11:56AM  23   Q    This officer told you according to your grand jury

11:56AM  24   testimony that he had also experienced situations where

11:57AM  25   officers showed favoritism towards locals and --

11:57AM   1   A      Yeah, I think I -- yeah, that's when I -- okay, so when

11:57AM   2   I -- when I met him, I asked him if he was from Hawaii right

11:57AM   3   away and he said he wasn't.  And then -- then I told him --

11:57AM   4   okay, so I felt a little more comfortable maybe because he was

11:57AM   5   from the mainland maybe he wouldn't be like as affiliated as

11:57AM   6   these guys seemed to be, so I told him the story.  And then he

11:57AM   7   said, yeah.  He's like, I totally understand like probably what

11:57AM   8   you just went through and you should probably like report that.

11:57AM   9   Q      And he told you that -- according to your grand jury

11:57AM   10  testimony that he'd been in positions where he was unable to do

11:57AM   11  his job because of officers, local officers' connections to

11:57AM   12  local people, right?

11:57AM   13  A      Yeah, he felt stifled, he said, yeah.

11:57AM   14  Q      And he said you should make a report?

11:57AM   15  A      Yeah, he said, you should definitely probably pursue that

11:57AM   16  if you want.

11:57AM   17  Q      But yet you didn't -- he didn't take your report.  He

11:57AM   18  didn't -- you couldn't file a police report with him?

11:57AM   19  A      I don't even -- I think in the conversation it didn't

11:58AM   20  really come up.  He didn't offer that as a solution.  I

11:58AM   21  remember at that point also I just kind of had a huge

11:58AM   22  adrenaline dump from that situation, and so, you know, I wasn't

11:58AM   23  really clear minded and thinking too clearly about what I

11:58AM   24  should do next.  It was just kind of just get away from that

11:58AM   25  situation.

11:58AM   1   Q    And then when you talked to the department of agriculture

11:58AM   2   Mr. Ogata, he sent you an email confirming what you had

11:58AM   3   discussed with him, right?

11:58AM   4   A    I don't know what email you're talking about so maybe if

11:58AM   5   you could show me then I can.

11:58AM   6   Q    1-1112 which Mr. Akina showed you but did not move to

11:58AM   7   admit.

11:59AM   8   A    Okay.  Yes, I remember this email.

11:59AM   9   Q    And you provided this to the government, right?

11:59AM  10   A    Yes.

11:59AM  11        MS. PANAGAKOS:  I would move to admit 1-1112.

11:59AM  12        THE COURT:  Any objection?

11:59AM  13        MR. AKINA:  No objection.

11:59AM  14        THE COURT:  1-1112 is admitted without objection.  You

11:59AM  15   may publish.

11:59AM  16            (Exhibit 1-1112 was received in evidence.)

11:59AM  17   BY MS. PANAGAKOS:

11:59AM  18   Q    And Mr. Ogata said since we don't know if Kama'aina

11:59AM  19   Termite applied a pesticide liquid spray to your van and if

11:59AM  20   they did what pesticide, he can't tell you what you need to do

11:59AM  21   to clean it, right?

11:59AM  22   A    Yes.

11:59AM  23   Q    So from his perspective, it was still unknown based on

11:59AM  24   what you had reported whether a pesticide liquid spray had been

11:59AM  25   used?

| | | | |
|---|---|---|---|
| 11:59AM | 1 | A | Yes. |
| 11:59AM | 2 | Q | And you never had any further contact with Mr. Miske? |
| 11:59AM | 3 | A | No. |
| 12:00PM | 4 | | MS. PANAGAKOS:  Nothing further. |
| 12:00PM | 5 | | Thank you, Your Honor. |
| 12:00PM | 6 | | Thank you, Mr. Miller. |
| 12:00PM | 7 | | THE COURT:  Redirect? |
| 12:00PM | 8 | | REDIRECT EXAMINATION |
| 12:00PM | 9 | | BY MR. AKINA: |
| 12:00PM | 10 | Q | You're not an expert in Vikane, right? |
| 12:00PM | 11 | A | No. |
| 12:00PM | 12 | Q | But you did some research? |
| 12:00PM | 13 | A | Yes. |
| 12:00PM | 14 | Q | And what happened was you were a customer trying to get |
| 12:00PM | 15 | | more information; is that fair to say? |
| 12:00PM | 16 | A | Yes. |
| 12:00PM | 17 | Q | And as a result of that, you got threatened? |
| 12:00PM | 18 | A | That's correct. |
| 12:00PM | 19 | Q | And the person who threatened you, Mr. Miske, prior to you |
| 12:00PM | 20 | | meeting him in person -- you only met him one time, right? |
| 12:00PM | 21 | A | That's correct. |
| 12:00PM | 22 | Q | Okay.  But prior to that day, you had met with other |
| 12:00PM | 23 | | employees at Kama'aina? |
| 12:00PM | 24 | A | That's correct. |
| 12:00PM | 25 | Q | And had you -- and when you -- and you'd spoken to |

| | | |
|---|---|---|
| 12:00PM | 1 | Mr. Miske on the phone? |
| 12:00PM | 2 | A    Yes. |
| 12:00PM | 3 | Q    Do you speak with a local pidgin accent? |
| 12:01PM | 4 | A    Actually, I was just thinking about that when she had |
| 12:01PM | 5 | asked that question, how would he know I was haole?  That's |
| 12:01PM | 6 | because probably the way I speak. |
| 12:01PM | 7 | Q    And your name, Laurence Miller, is that a Hawaiian name to |
| 12:01PM | 8 | your knowledge? |
| 12:01PM | 9 | A    No. |
| 12:01PM | 10 | Q    You were asked some questions about an officer who you |
| 12:01PM | 11 | spoke to after you left Kama'aina Termite and Pest Control? |
| 12:01PM | 12 | A    Yes. |
| 12:01PM | 13 | Q    That officer, did you tell him -- did you mention Michael |
| 12:01PM | 14 | Miske to that officer? |
| 12:01PM | 15 | A    Yes. |
| 12:01PM | 16 | Q    Did that officer share things with you about his knowledge |
| 12:01PM | 17 | of Michael Miske? |
| 12:01PM | 18 | A    Yeah, kind of a lot of stuff. |
| 12:01PM | 19 | Q    And without going into specifics, was it good or bad? |
| 12:01PM | 20 | A    Very bad. |
| 12:01PM | 21 |         MS. PANAGAKOS:  Objection. |
| 12:01PM | 22 |         THE COURT:  Overruled.  Go ahead. |
| 12:01PM | 23 |         THE WITNESS:  Yeah, very bad. |
| 12:01PM | 24 | BY MR. AKINA: |
| 12:01PM | 25 | Q    And was that along the lines of him not being able to do |

| | | |
|---|---|---|
| 12:01PM | 1 | his job? |
| 12:01PM | 2 | A    That was the gist of the entire conversation. |
| 12:01PM | 3 | Q    And -- |
| 12:01PM | 4 | A    He was impeded in his investigations he felt like because |
| 12:01PM | 5 | of the way that things worked in Hawaii and specifically with |
| 12:02PM | 6 | him like that -- that person. |
| 12:02PM | 7 | MR. AKINA:  No other questions. |
| 12:02PM | 8 | THE COURT:  Anything else? |
| 12:02PM | 9 | MS. PANAGAKOS:  Yes, Your Honor. |
| 12:02PM | 10 | THE COURT:  Go ahead. |
| 12:02PM | 11 | RECROSS-EXAMINATION |
| 12:02PM | 12 | BY MS. PANAGAKOS: |
| 12:02PM | 13 | Q    Mr. Akina asked you about the threats you say Mr. Miske |
| 12:02PM | 14 | made.  When you testified in the grand jury, you testified that |
| 12:02PM | 15 | the first threat that you say Mr. Miske made was that he |
| 12:02PM | 16 | insinuated that he was going to report you for using your van |
| 12:02PM | 17 | to abduct missing children? |
| 12:02PM | 18 | A    That is correct. |
| 12:02PM | 19 | Q    And that was what you described as insanity, right? |
| 12:02PM | 20 | A    Yeah, I mean, it's -- I mean an allegation like that is |
| 12:03PM | 21 | like pretty serious and also, you know, that's -- I don't know. |
| 12:03PM | 22 | It's outside of like normal -- |
| 12:03PM | 23 | Q    Yes, it is kind of. |
| 12:03PM | 24 | A    Yeah. |
| 12:03PM | 25 | Q    And then I'd like to show you a portion of your grand jury |

12:03PM   1   testimony.

12:03PM   2            MS. PANAGAKOS:  It's on the first supplemental list

12:03PM   3   seven -- it's Exhibit 7344 at page 0019.  And I'd like to have

12:03PM   4   the witness read lines 18 through 25 on that page.

12:03PM   5            THE COURT:  Okay.  Go ahead.

12:03PM   6            MR. AKINA:  Just to be clear, the witness should be

12:03PM   7   reading it to himself.

12:03PM   8            MS. PANAGAKOS:  Correct, yes.

12:03PM   9            MR. AKINA:  Okay.

12:03PM   10           MS. PANAGAKOS:  Thank you, Mr. Akina.

12:03PM   11           Oh, wait, I'm sorry.  I have the wrong page.  I have

12:04PM   12   the wrong page.  I meant page 27.

12:04PM   13           THE COURT:  And the line numbers?

12:04PM   14   By MS. PANAGAKOS:

12:04PM   15   Q    Line 13 to the bottom.  And then let me know when you're

12:04PM   16   done, Mr. Miller.

12:04PM   17   A    Yeah, I read it.

12:04PM   18   Q    Okay.  And can you just read the top half of the next page

12:05PM   19   where you continue testifying about this subject up through

12:05PM   20   line 15.

12:05PM   21   A    Okay.

12:06PM   22   Q    So when you describe before the grand jury your

12:06PM   23   interaction with the mainland officer and situations that that

12:06PM   24   officer described to you, he described in general his

12:06PM   25   interactions with other officers in situations having not to do

12:06PM   1    with Mr. Miske, correct?

12:06PM   2    A    I have to just think about this because it's been such a

12:06PM   3    long time so I'm like rereading this for a minute, please.  Can

12:06PM   4    you ask the question again, please?

12:06PM   5    Q    The police officer from the mainland according to your

12:06PM   6    testimony told you that he'd had experiences where he felt his

12:06PM   7    hands were tied because of local officers connections with

12:06PM   8    local people?

12:06PM   9    A    Yes.

12:06PM   10   Q    And he did not in describing that make reference to any

12:07PM   11   instance with Mr. Miske?

12:07PM   12   A    I don't -- yeah, I don't -- I don't believe -- I can't

12:07PM   13   recall.  I don't -- I don't know.  I think he had said

12:07PM   14   afterwards because he had said, "Oh, Mike Miske.  Do you know

12:07PM   15   who that is?"

12:07PM   16        Like he was the one who was kind informing me because

12:07PM   17   before I didn't --

12:07PM   18   Q    And that's not what's in your grand jury testimony --

12:07PM   19        MR. AKINA:  Objection.  That is referenced in the

12:07PM   20   testimony.

12:07PM   21        THE COURT:  Overruled.  Go ahead.

12:07PM   22   By MS. PANAGAKOS:

12:07PM   23   Q    Your testimony about this officer's descriptions of his

12:07PM   24   hand being tied was a general description of other officers'

12:07PM   25   interactions with other local people, correct?

12:07PM    1    A    Just give me a minute before -- I just want to read this

12:07PM    2    again because I -- I have to recall like what I had said here.

12:08PM    3    Honestly, I don't really how to, like, comprehend actually kind

12:08PM    4    of like the writing here.  Like what this -- what question was

12:08PM    5    being asked.  So --

12:08PM    6    Q    All right.

12:08PM    7    A    I'm sorry.  I just don't really -- it's kind of like a

12:08PM    8    back and forth between me and the officer.  We could be talking

12:08PM    9    slightly about Miske and then about his feelings with other

12:08PM   10    officers of the police department in general so...

12:08PM   11             MS. PANAGAKOS:  All right.  Thank you.

12:08PM   12             THE WITNESS:  Yeah.

12:08PM   13             THE COURT:  I assume you're done?

12:08PM   14             MS. PANAGAKOS:  Oh, yes, Your Honor.  I'm sorry.

12:08PM   15             THE COURT:  All right.  Mr. Miller you may step down.

12:08PM   16    Thank you, sir.

          17                          --oo0oo--

          18

          19

          20

          21

          22

          23

          24

          25

1                    COURT REPORTER'S CERTIFICATE

2          I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript from the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9

10         DATED at Honolulu, Hawaii, June 4, 2024.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25