1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3
    UNITED STATES OF AMERICA,    )     CRIMINAL NO. 19-00099-DKW
4                                )
              Plaintiff,         )     Honolulu, Hawaii
5                                )
          vs.                    )     April 10, 2024
6                                )
    MICHAEL J. MISKE, JR.,       )     TESTIMONY OF RYAN TERAMOTO
7                                )
              Defendant.         )
8   _____ )

9
              PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 47)
10            BEFORE THE HONORABLE DERRICK K. WATSON,
           CHIEF UNITED STATES DISTRICT COURT JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:          MARK INCIONG, ESQ.
13                              MICHAEL DAVID NAMMAR, ESQ
                                WILLIAM KE AUPUNI AKINA, ESQ.
14                              AISLINN AFFINITO, ESQ.
                                Office of the United States Attorney
15                              PJKK Federal Building
                                300 Ala Moana Boulevard, Suite 6100
16                              Honolulu, Hawaii  96850

17  For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                841 Bishop St., Ste 2201
18                              Honolulu, HI 96813

19                              MICHAEL JEROME KENNEDY, ESQ.
                                Law Offices of Michael Jerome
20                              Kennedy, PLLC
                                333 Flint Street
21                              Reno, NV 89501

22  Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                United States District Court
23                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
24
      Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).

1                              I N D E X

2    GOVERNMENT WITNESS:                                    PAGE NO.

3     RYAN TERAMOTO

4         DIRECT EXAMINATION BY MR. INCIONG                     4
          CROSS-EXAMINATION BY MR. KENNEDY                     33
5         REDIRECT EXAMINATION BY MR. INCIONG                  44
          RECROSS-EXAMINATION BY MR. KENNEDY                   44

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | April 10, 2024                                      11:39 a.m. |
| 08:42AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:42AM | 3 | States of America versus Michael J. Miske, Jr. |
| 08:42AM | 4 | This case has been called for jury trial, day 47. |
| 08:43AM | 5 | Counsel, please make your appearances for the record. |
| 08:43AM | 6 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:43AM | 7 | KeAupuni Akina and Michael Nammar for the United States.  Also |
| 08:43AM | 8 | with us are Kari Sherman and FBI Special Agent Thomas Palmer. |
| 08:43AM | 9 | Good morning. |
| 08:43AM | 10 | THE COURT:  Good morning. |
| 08:43AM | 11 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:43AM | 12 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King and |
| 08:43AM | 13 | Josh Barry.  Good morning to all of you. |
| 08:43AM | 14 | THE COURT:  Good morning to the 16 persons on our jury |
| 08:43AM | 15 | you may be seated.  Good morning to our jury. |
| 11:37AM | 16 | --oo0oo-- |
| 11:37AM | 17 | MR. INCIONG:  The United States calls Ryan Teramoto. |
| 11:39AM | 18 | THE CLERK:  Please raise your right hand. |
| 11:39AM | 19 | RYAN TERAMOTO, |
| 11:39AM | 20 | called as a witness, having been first duly sworn, was examined |
| 11:39AM | 21 | and testified as follows: |
| 11:39AM | 22 | THE CLERK:  Please state your full name spelling your |
| 11:39AM | 23 | last name for the record. |
| 11:39AM | 24 | THE WITNESS:  Ryan Teramoto, T-E-R-A-M-O-T-O. |
| | 25 | |

| | | |
|---|---|---|
| 11:39AM | 1 | DIRECT EXAMINATION |
| 11:39AM | 2 | BY MR. INCIONG: |
| 11:39AM | 3 | Q    Good morning, Mr. Teramoto. |
| 11:39AM | 4 | A    Good morning. |
| 11:39AM | 5 | Q    Are you appearing today pursuant to a subpoena, sir? |
| 11:39AM | 6 | A    Excuse me? |
| 11:39AM | 7 | Q    Are you appearing today pursuant to a subpoena? |
| 11:39AM | 8 | A    Yes. |
| 11:39AM | 9 | Q    If you were not compelled to testify in this case, would |
| 11:39AM | 10 | you have done so? |
| 11:39AM | 11 | A    No. |
| 11:39AM | 12 | Q    Is it difficult for you to testify in this trial? |
| 11:39AM | 13 | A    Yes. |
| 11:39AM | 14 | Q    Can you explain to the jury why that is? |
| 11:39AM | 15 | A    Because Mike is a friend of mine, and this goes way back. |
| 11:40AM | 16 | Part of my life I'm trying to forget. |
| 11:40AM | 17 | Q    When you refer to "Mike," who is Mike that you referenced |
| 11:40AM | 18 | just a minute ago? |
| 11:40AM | 19 | A    Mike Miske. |
| 11:40AM | 20 | Q    Do you see the person you know as Mike Miske in the |
| 11:40AM | 21 | courtroom today? |
| 11:40AM | 22 | A    Yes. |
| 11:40AM | 23 | Q    Could you indicate where he's seated and what he is |
| 11:40AM | 24 | wearing for the record, please? |
| 11:40AM | 25 | A    Nice suit in the middle. |

| | | | |
|---|---|---|---|
| 11:40AM | 1 | Q | What color is the suit? |
| 11:40AM | 2 | A | Brown. |
| 11:40AM | 3 | | MR. INCIONG:  Your Honor, may the record reflect |
| 11:40AM | 4 | | Mr. Teramoto as identified the defendant? |
| 11:40AM | 5 | | THE COURT:  Yes.  The record should reflect the |
| 11:40AM | 6 | | witness, Mr. Teramoto's, identification of the defendant |
| 11:40AM | 7 | | Mr. Miske. |
| 11:40AM | 8 | | BY MR. INCIONG: |
| 11:40AM | 9 | Q | Mr. Teramoto, how old are you? |
| 11:40AM | 10 | A | 51. |
| 11:40AM | 11 | Q | Did you grow up in Hawaii? |
| 11:40AM | 12 | A | Yes. |
| 11:40AM | 13 | Q | What part of Hawaii did you grow up? |
| 11:40AM | 14 | A | Waimanalo. |
| 11:40AM | 15 | Q | Where did you go to high school? |
| 11:40AM | 16 | A | Kailua High School. |
| 11:40AM | 17 | Q | What year did you graduate? |
| 11:40AM | 18 | A | 1990. |
| 11:40AM | 19 | Q | Do you have a family, sir? |
| 11:40AM | 20 | A | Yes. |
| 11:40AM | 21 | Q | Tell us about that. |
| 11:40AM | 22 | A | I have three daughters. |
| 11:41AM | 23 | Q | How did you meet Mr. Miske? |
| 11:41AM | 24 | A | Growing up in Waimanalo. |
| 11:41AM | 25 | Q | So you've known him since you were approximately how old? |

| | | | |
|---|---|---|---|
| 11:41AM | 1 | A | Teenager. |
| 11:41AM | 2 | Q | Would it be accurate to say you've known him over 30 years |
| 11:41AM | 3 | | at this point? |
| 11:41AM | 4 | A | Yes. |
| 11:41AM | 5 | Q | What do you currently do for a living, sir? |
| 11:41AM | 6 | A | I run a termite and pest control company. |
| 11:41AM | 7 | Q | How long have you run that company? |
| 11:41AM | 8 | A | Fifteen years. |
| 11:41AM | 9 | Q | Do you have a number of employees? |
| 11:41AM | 10 | A | Yes. |
| 11:41AM | 11 | Q | How many employees do you have? |
| 11:41AM | 12 | A | Two. |
| 11:41AM | 13 | Q | Did you have prior experience in the pest control industry |
| 11:41AM | 14 | | before you started that company? |
| 11:41AM | 15 | A | Yes. |
| 11:41AM | 16 | Q | What was that from? |
| 11:41AM | 17 | A | Kama'aina Termite and Pest Control. |
| 11:41AM | 18 | Q | When did you work for Kama'aina Termite and Pest Control? |
| 11:41AM | 19 | A | Approximately 2001 through 2009. |
| 11:42AM | 20 | Q | Did you know Mr. Miske before working there? |
| 11:42AM | 21 | A | Yes. |
| 11:42AM | 22 | Q | Was it through your connection with Mr. Miske that you |
| 11:42AM | 23 | | began employment there? |
| 11:42AM | 24 | A | Yes. |
| 11:42AM | 25 | Q | What did you do specifically for Kama'aina Termite and |

11:42AM   1   Pest Control?

11:42AM   2   A     Mainly sales.

11:42AM   3   Q     Were you paid on a salary or commission basis?

11:42AM   4   A     Salary.

11:42AM   5          MR. INCIONG:  Your Honor, could we show the witness

11:42AM   6   and publish please Exhibit 5-22 previously admitted from our

11:42AM   7   original exhibit list?

11:42AM   8          THE COURT:  Go ahead.

11:42AM   9   BY MR. INCIONG:

11:42AM  10   Q     Mr. Teramoto, do you recognize what's shown in 5-22?

11:42AM  11   A     Yes.

11:42AM  12   Q     Is that the business location of Kama'aina Termite and

11:42AM  13   Pest Control?

11:42AM  14   A     Yes.

11:42AM  15   Q     Is that the location that you worked out of when you were

11:42AM  16   employed there?

11:42AM  17   A     Yes.

11:42AM  18   Q     After high school, when you graduated in 1990, what did

11:43AM  19   you do for work?

11:43AM  20   A     Started a few small businesses.

11:43AM  21   Q     What kinds of businesses or services did those businesses

11:43AM  22   involve?

11:43AM  23   A     An auto detailing business and a janitorial cleaning

11:43AM  24   business.

11:43AM  25   Q     Were those basically kind of one-man businesses or did you

| | | |
|---|---|---|
| 11:43AM | 1 | have employees? |
| 11:43AM | 2 | A    One-man businesses. |
| 11:43AM | 3 | Q    You were the one man? |
| 11:43AM | 4 | A    Yes. |
| 11:43AM | 5 | Q    How long did you run those businesses for about? |
| 11:43AM | 6 | A    Eight to ten years. |
| 11:43AM | 7 | Q    In that approximate time period, did you ever begin |
| 11:43AM | 8 | selling or distributing illegal drugs? |
| 11:43AM | 9 | A    Yes. |
| 11:43AM | 10 | Q    Was there a certain drug that you distributed? |
| 11:43AM | 11 | A    Yes. |
| 11:43AM | 12 | Q    What drug was that? |
| 11:43AM | 13 | A    Cocaine. |
| 11:43AM | 14 | Q    How did that begin? |
| 11:43AM | 15 | A    Through friends that were doing it. |
| 11:43AM | 16 | Q    Why did you decide to begin joining them in selling drugs? |
| 11:44AM | 17 | A    Trying to make money. |
| 11:44AM | 18 | Q    What kinds of amounts were you selling initially when you |
| 11:44AM | 19 | started doing that? |
| 11:44AM | 20 | A    Very small amounts. |
| 11:44AM | 21 | Q    Would grams be an accurate description? |
| 11:44AM | 22 | A    Yes. |
| 11:44AM | 23 | Q    Over time did that amount increase? |
| 11:44AM | 24 | A    Yes. |
| 11:44AM | 25 | Q    What types of -- what were the larger or largest, I should |

| | | |
|---|---|---|
| 11:44AM | 1 | say, types of amounts you were dealing with at any point? |
| 11:44AM | 2 | A    Kilograms. |
| 11:44AM | 3 | Q    Did you have a primary source of cocaine that you were |
| 11:44AM | 4 | selling for? |
| 11:44AM | 5 | A    Yes. |
| 11:44AM | 6 | Q    How long did that primary source supply for you |
| 11:44AM | 7 | approximately? |
| 11:44AM | 8 | A    Four or five years. |
| 11:44AM | 9 | Q    Over that time period, can you estimate the amount of |
| 11:44AM | 10 | cocaine that you received and then further distributed? |
| 11:44AM | 11 | A    I can't remember. |
| 11:44AM | 12 | Q    Would it be fair to say it was multiple kilos? |
| 11:45AM | 13 | A    Yes. |
| 11:45AM | 14 | Q    Were you aware of where your source was obtaining the |
| 11:45AM | 15 | cocaine from? |
| 11:45AM | 16 | A    No, not initially. |
| 11:45AM | 17 | Q    Location-wise did you become aware? |
| 11:45AM | 18 | A    Yes. |
| 11:45AM | 19 | Q    Where was that? |
| 11:45AM | 20 | A    California. |
| 11:45AM | 21 | Q    Did you ever accompany your source to California on any |
| 11:45AM | 22 | trips to obtain cocaine? |
| 11:45AM | 23 | A    Yes. |
| 11:45AM | 24 | Q    How many times? |
| 11:45AM | 25 | A    Once. |

| | | | |
|---|---|---|---|
| 11:45AM | 1 | Q | Do you recall when you made that trip? |
| 11:45AM | 2 | A | In October of 1998. |
| 11:45AM | 3 | Q | Do you recall whether you took cash to purchase the |
| 11:45AM | 4 | | cocaine when you accompanied your source on that trip? |
| 11:45AM | 5 | A | Yes, I did. |
| 11:45AM | 6 | Q | Do you recall how much collectively you took? |
| 11:45AM | 7 | A | I think it was probably close to a hundred thousand |
| 11:45AM | 8 | | dollars total. |
| 11:45AM | 9 | Q | Do you recall the amount of cocaine that you were hoping |
| 11:45AM | 10 | | to purchase at that time? |
| 11:45AM | 11 | A | Approximately five. |
| 11:46AM | 12 | Q | Kilograms? |
| 11:46AM | 13 | A | Yes -- yeah. |
| 11:46AM | 14 | Q | Was a portion of that going to come to you or was that all |
| 11:46AM | 15 | | coming to you? |
| 11:46AM | 16 | A | A portion of it. |
| 11:46AM | 17 | Q | Did you return with your source or did you return in |
| 11:46AM | 18 | | advance of your source? |
| 11:46AM | 19 | A | I came back alone before. |
| 11:46AM | 20 | Q | At some point, did your source come back with the cocaine? |
| 11:46AM | 21 | A | Yes. |
| 11:46AM | 22 | Q | Did he give your two kilograms share to you? |
| 11:46AM | 23 | A | Yes. |
| 11:46AM | 24 | Q | Shortly after that, in October of 1998, did you suspect |
| 11:46AM | 25 | | that your source had been arrested by law enforcement? |

| 11:46AM | 1 | A | Yes. |
| 11:46AM | 2 | Q | What did you do in response to that? |
| 11:46AM | 3 | A | I hired an attorney. |
| 11:46AM | 4 | Q | Did you have a chance to consult with your attorney about |
| 11:46AM | 5 | | what was going on at that time? |
| 11:46AM | 6 | A | Yes. |
| 11:46AM | 7 | Q | What did you decide to do after consulting your attorney? |
| 11:46AM | 8 | A | We reached out to the FBI. |
| 11:47AM | 9 | Q | Did you meet with the FBI? |
| 11:47AM | 10 | A | Yes. |
| 11:47AM | 11 | Q | Did you in fact agree to cooperate with the FBI? |
| 11:47AM | 12 | A | Yes. |
| 11:47AM | 13 | Q | Did you enter into a proffer agreement shortly after that |
| 11:47AM | 14 | | in January of 1999? |
| 11:47AM | 15 | A | Yes. |
| 11:47AM | 16 | Q | Did that proffer agreement require you to meet with the |
| 11:47AM | 17 | | FBI and give them truthful information? |
| 11:47AM | 18 | A | Yes. |
| 11:47AM | 19 | Q | Did you do that? |
| 11:47AM | 20 | A | Yes. |
| 11:47AM | 21 | Q | Did you proactively turn into the FBI any contraband as |
| 11:47AM | 22 | | part of your cooperation? |
| 11:47AM | 23 | A | Yes, I did. |
| 11:47AM | 24 | Q | What did you turn over to the FBI? |
| 11:47AM | 25 | A | Two kilos and some money. |

11:47AM  1   Q    So two kilograms of cocaine?

11:47AM  2   A    Yes.

11:47AM  3   Q    Was that the cocaine that had just come back from LA?

11:47AM  4   A    Yes.

11:47AM  5   Q    You referenced some money.  Do you recall that being about

11:47AM  6   $6,000?

11:47AM  7   A    I can't remember.

11:47AM  8   Q    Was the source of that money prior of cocaine sales?

11:47AM  9   A    Yes.

11:47AM  10  Q    Why did you turn over those drugs and the money to the

11:48AM  11  FBI?

11:48AM  12  A    To start a new chapter in my life.

11:48AM  13  Q    From 1999, when you first entered the proffer agreement

11:48AM  14  with the FBI, did you proffer or meet with them on a number of

11:48AM  15  occasions that year and carrying over into the following year?

11:48AM  16  A    I met with them that year.  I don't remember meeting with

11:48AM  17  them after that year.

11:48AM  18  Q    Okay.  During the meetings, were you asked questions as to

11:48AM  19  who your sources or source of cocaine was, who your customers

11:48AM  20  were, things of that nature?

11:48AM  21  A    Yes.

11:48AM  22  Q    Did you identify your source of cocaine to them?

11:48AM  23  A    Yes.

11:48AM  24  Q    Did you identify your customers?

11:48AM  25  A    Yes.

| | | | |
|---|---|---|---|
| 11:48AM | 1 | Q | Did you have a number of main or primary customers that |
| 11:49AM | 2 | | you sold cocaine to? |
| 11:49AM | 3 | A | Yes. |
| 11:49AM | 4 | Q | Was Mr. Miske one of the customers you identified to the |
| 11:49AM | 5 | | FBI? |
| 11:49AM | 6 | A | Yes. |
| 11:49AM | 7 | Q | What types of amounts were you selling to Mr. Miske? |
| 11:49AM | 8 | A | Ounces. |
| 11:49AM | 9 | Q | Were you selling up to ten ounces at a time to Mr. Miske? |
| 11:49AM | 10 | A | Yes. |
| 11:49AM | 11 | Q | Approximately how many times did you sell cocaine to |
| 11:49AM | 12 | | Mr. Miske? |
| 11:49AM | 13 | A | A handful. |
| 11:49AM | 14 | Q | Over what time period did that take place? |
| 11:49AM | 15 | A | Several months prior to that -- the incident in October. |
| 11:49AM | 16 | Q | So would this have been 1998? |
| 11:49AM | 17 | A | Yes. |
| 11:49AM | 18 | Q | Were you eventually charged in federal court for your |
| 11:49AM | 19 | | cocaine involvement? |
| 11:49AM | 20 | A | Yes. |
| 11:49AM | 21 | Q | What were you charged with? |
| 11:49AM | 22 | A | Possession with the intent to distribute. |
| 11:50AM | 23 | Q | Do you recall specifically being charged with possession |
| 11:50AM | 24 | | with intent to distribute over 500 grams of cocaine? |
| 11:50AM | 25 | A | Yes. |

11:50AM   1   Q   Do you recall that charge coming down in May of 2002?

11:50AM   2   A   Yes.

11:50AM   3   Q   Did you resolve that case?

11:50AM   4   A   Yes.

11:50AM   5   Q   How did you resolve your case?

11:50AM   6   A   I was sentenced to a year in federal prison.

11:50AM   7   Q   Prior to that, did you enter into a plea agreement?

11:50AM   8   A   Yes.

11:50AM   9   Q   So you pled guilty to the charge?

11:50AM   10   A   Yes.

11:50AM   11   Q   Did you understand that was a federal drug felony

11:50AM   12   conviction then?

11:50AM   13   A   Yes.

11:50AM   14   Q   You indicated just a minute ago you were sentenced,

11:50AM   15   correct?

11:50AM   16   A   Yes.

11:50AM   17   Q   What did you say the sentence was again?

11:50AM   18   A   One year.

11:50AM   19   Q   Where did you serve that sentence?

11:50AM   20   A   At the FDC Honolulu.

11:50AM   21   Q   When did you serve that sentence, what years?

11:50AM   22   A   2003.

11:50AM   23   Q   Were you sentenced in the later part of 2002 for that

11:51AM   24   charge?

11:51AM   25   A   Yes.

11:51AM   1   Q   As part of your sentencing, did you receive a motion for a
11:51AM   2   downward departure for substantial assistance?
11:51AM   3   A   Yes.
11:51AM   4   Q   Did you receive an award for that or was that granted?
11:51AM   5   A   Yes.
11:51AM   6   Q   Was that for your cooperation with the FBI?
11:51AM   7   A   Yes.
11:51AM   8   Q   Was there a term of supervised release that was instituted
11:51AM   9   as part of your sentence?
11:51AM   10   A   Yes.
11:51AM   11   Q   How long was that?
11:51AM   12   A   Three years.
11:51AM   13   Q   Did you have any violations of your supervised release
11:51AM   14   after you were released from prison?
11:51AM   15   A   No.
11:51AM   16   Q   Have you been arrested since this incident back in 1998?
11:51AM   17   A   No.
11:51AM   18   Q   Now, while this cooperation was happening did you tell
11:51AM   19   anyone you were cooperating with the FBI?
11:51AM   20   A   No.
11:51AM   21   Q   After you were charged in May of 2002, did you tell anyone
11:51AM   22   you had been charged in federal court with a drug trafficking
11:51AM   23   crime?
11:51AM   24   A   No.
11:52AM   25   Q   When was the first time that you shared with anybody what

| | | |
|---|---|---|
| 11:52AM | 1 | was going on in the court system? |
| 11:52AM | 2 | A    After I was sentenced and shortly before I turned myself |
| 11:52AM | 3 | in. |
| 11:52AM | 4 | Q    When you were sentenced, were you given a date later to |
| 11:52AM | 5 | turn yourself in? |
| 11:52AM | 6 | A    Yes. |
| 11:52AM | 7 | Q    Is that called a self-surrender date? |
| 11:52AM | 8 | A    Yes. |
| 11:52AM | 9 | Q    So that was just before you were turning yourself into the |
| 11:52AM | 10 | FDC that you told anyone? |
| 11:52AM | 11 | A    Yes. |
| 11:52AM | 12 | Q    Who did you tell that you were going to serve a federal |
| 11:52AM | 13 | drug sentence? |
| 11:52AM | 14 | A    My immediate family, and that's pretty much it, and my |
| 11:52AM | 15 | boss of course. |
| 11:52AM | 16 | Q    Who was your boss at the time? |
| 11:52AM | 17 | A    Mike Miske. |
| 11:52AM | 18 | Q    When you told Mr. Miske, what was his reaction? |
| 11:52AM | 19 | A    Shock. |
| 11:52AM | 20 | Q    Did you tell Mr. Miske that your conviction was for |
| 11:52AM | 21 | cocaine distribution? |
| 11:52AM | 22 | A    Yes. |
| 11:52AM | 23 | Q    Did Mr. Miske indicate whether he was worried about that? |
| 11:53AM | 24 | A    No.  I mean, he was concerned, but it was many years past |
| 11:53AM | 25 | everything we had gone through. |

| | | | |
|---|---|---|---|
| 11:53AM | 1 | Q | You had sold him cocaine previously, correct? |
| 11:53AM | 2 | A | Yes. |
| 11:53AM | 3 | Q | Did you say anything or tell Mr. Miske anything to assure |
| 11:53AM | 4 | | him that he didn't have to worry? |
| 11:53AM | 5 | A | Yes. |
| 11:53AM | 6 | Q | What did you tell him? |
| 11:53AM | 7 | A | That my case was done, done and over it, and I was going |
| 11:53AM | 8 | | to get locked up. |
| 11:53AM | 9 | Q | Did you ever tell Mr. Miske that you had identified him as |
| 11:53AM | 10 | | one of your customers? |
| 11:53AM | 11 | A | No. |
| 11:53AM | 12 | Q | To your knowledge, did he ever know that you had |
| 11:53AM | 13 | | identified him? |
| 11:53AM | 14 | A | No. |
| 11:53AM | 15 | Q | So you were working at Kama'aina Termite and Pest Control |
| 11:53AM | 16 | | when you entered your guilty plea, correct? |
| 11:54AM | 17 | A | Yes. |
| 11:54AM | 18 | Q | When you told Mr. Miske that you were going to serve this |
| 11:54AM | 19 | | sentence, did you have a discussion about your job status? |
| 11:54AM | 20 | A | Yes. |
| 11:54AM | 21 | Q | What was that discussion about? |
| 11:54AM | 22 | A | That I would be able to continue working until my |
| 11:54AM | 23 | | surrender date and that I would have a job waiting for me when |
| 11:54AM | 24 | | I got home. |
| 11:54AM | 25 | Q | After you served your sentence, did you go back to |

11:54AM   1   Kama'aina Termite and Pest Control?

11:54AM   2   A    Yes.

11:54AM   3   Q    Was your job waiting for you as Mr. Miske had promised?

11:54AM   4   A    Yes.

11:54AM   5   Q    Was it the same job you had as before you went in to serve

11:54AM   6   your sentence?

11:54AM   7   A    Yes.

11:54AM   8   Q    That was doing sales still?

11:54AM   9   A    Yes.

11:54AM   10   Q    Now, prior to serving your prison sentence, you referred

11:54AM   11   to Mr. Miske is both your friend and your boss.  Before you

11:54AM   12   went and served your sentence, how would you describe your

11:54AM   13   friendship?  Was it a work friendship, a casual friendship,

11:55AM   14   close friendship?  How would you characterize it?

11:55AM   15   A    Close friendship.

11:55AM   16   Q    After you came back and began working for the second stint

11:55AM   17   at Kama'aina Termite, did your friendship stay the same, was it

11:55AM   18   more distant, or did you become closer?

11:55AM   19   A    It became closer.

11:55AM   20   Q    Would you consider Mr. Miske a close friend at that time?

11:55AM   21   A    Yes.

11:55AM   22   Q    Do you consider that today?

11:55AM   23   A    Yes.

11:55AM   24   Q    So when you came back you started up again, started

11:55AM   25   working at Kama'aina, you worked there for another several

11:55AM   1   years?

11:55AM   2   A    Yes.

11:55AM   3   Q    During that time, did you have regular contact with

11:55AM   4   Mr. Miske?

11:55AM   5   A    Yes.

11:55AM   6   Q    Did you develop a trust between each other?

11:55AM   7   A    Yes.

11:55AM   8   Q    You feel like he trusted you?

11:55AM   9   A    Yes.

11:55AM   10   Q    Did you trust him?

11:55AM   11   A    Yes.

11:55AM   12   Q    Do you recall in about 2009 Mr. Miske asking you to serve

11:56AM   13   in a certain capacity in regard to a revocable living trust

11:56AM   14   that he had established?

11:56AM   15   A    Yes.

11:56AM   16   Q    What was that?  What did he ask you to do?

11:56AM   17   A    To be a backup trustee on his revocable living trust.

11:56AM   18   Q    A successor trustee is that another term?

11:56AM   19   A    Yes.

11:56AM   20   Q    So basically if the original trustee or trustees couldn't

11:56AM   21   perform their duties you would step in?

11:56AM   22   A    Yes.

11:56AM   23   Q    Did you agree to do that?

11:56AM   24   A    Yes.

11:56AM   25   Q    What was your understanding as to what would be your

11:56AM    1    primary obligation or duties as trustee?

11:56AM    2    A    To look after his son.

11:56AM    3    Q    Did you know his son?

11:56AM    4    A    Yes.

11:56AM    5    Q    That was Caleb Miske?

11:56AM    6    A    Yes.

11:56AM    7    Q    Did you have a relationship with Caleb Miske?

11:56AM    8    A    Yes.

11:56AM    9    Q    How would you describe your relationship with Caleb?

11:56AM   10    A    Uncle/nephew.

11:57AM   11    Q    So that same year, 2009, was that a time you left

11:57AM   12    Kama'aina Termite to form your own company?

11:57AM   13    A    Yes.

11:57AM   14    Q    What was Mr. Miske's reaction when you informed him you

11:57AM   15    were going to leave and start your own business?

11:57AM   16    A    He wanted me to stay.

11:57AM   17    Q    You were a valuable employee?

11:57AM   18    A    I think so.

11:57AM   19    Q    In the end, did he support your leaving to begin your own

11:57AM   20    business?

11:57AM   21    A    Yes.

11:57AM   22    Q    Like to begin a pest control business, do you need an

11:57AM   23    endorsement of other pest control companies as part of that

11:57AM   24    process?

11:57AM   25    A    Yes.

| | | | |
|---|---|---|---|
| 11:57AM | 1 | Q | Did Mr. Miske endorse you to allow you to begin that |
| 11:57AM | 2 | | company? |
| 11:57AM | 3 | A | Yes, he did. |
| 11:57AM | 4 | Q | You said that you trusted Mr. Miske.  Is that why you |
| 11:57AM | 5 | | asked him to act in a certain role for one of your children? |
| 11:57AM | 6 | A | Yes. |
| 11:58AM | 7 | Q | Do you recall what you asked him to serve as as to one of |
| 11:58AM | 8 | | your daughters? |
| 11:58AM | 9 | A | Yes.  As the godfather to my one of my daughters. |
| 11:58AM | 10 | Q | So in 2009, you left to begin your own business, right? |
| 11:58AM | 11 | A | Yes. |
| 11:58AM | 12 | Q | Did you maintain contact with Mr. Miske from that point |
| 11:58AM | 13 | | on? |
| 11:58AM | 14 | A | Yes. |
| 11:58AM | 15 | Q | What kind of -- how regular was your contact would you |
| 11:58AM | 16 | | say? |
| 11:58AM | 17 | A | Weekly, sometimes monthly. |
| 11:58AM | 18 | Q | Would you socialize with him? |
| 11:58AM | 19 | A | Yes. |
| 11:58AM | 20 | Q | Did you discuss work issues with him as well? |
| 11:58AM | 21 | A | Yes. |
| 11:58AM | 22 | Q | Do you recall an incident in 2012 where Mr. Miske asked |
| 11:58AM | 23 | | you to hold something for him? |
| 11:58AM | 24 | A | Yes. |
| 11:58AM | 25 | Q | Do you recall what that was? |

| | | | |
|---|---|---|---|
| 11:58AM | 1 | A | Money. |
| 11:58AM | 2 | Q | How did Mr. Miske ask you to do that?  How did that come |
| 11:59AM | 3 | | about? |
| 11:59AM | 4 | A | I can't remember how it came about.  He just asked me if I |
| 11:59AM | 5 | | would hold some money for him. |
| 11:59AM | 6 | Q | Did he tell you what the source of that money was? |
| 11:59AM | 7 | A | No. |
| 11:59AM | 8 | Q | Did you ask? |
| 11:59AM | 9 | A | No. |
| 11:59AM | 10 | Q | Did he tell you how much money it was? |
| 11:59AM | 11 | A | No. |
| 11:59AM | 12 | Q | Did you ask? |
| 11:59AM | 13 | A | No. |
| 11:59AM | 14 | Q | Did he tell you how long he was going to ask you to hold |
| 11:59AM | 15 | | the money for? |
| 11:59AM | 16 | A | No. |
| 11:59AM | 17 | Q | Did you ask? |
| 11:59AM | 18 | A | No. |
| 11:59AM | 19 | Q | Did you in fact receive some cash from him for that |
| 11:59AM | 20 | | purpose? |
| 11:59AM | 21 | A | Yes. |
| 11:59AM | 22 | Q | How was that cash given to you?  What was it contained in? |
| 11:59AM | 23 | A | In a bag. |
| 11:59AM | 24 | Q | Do you recall the type of bag? |
| 11:59AM | 25 | A | No. |

| | | | |
|---|---|---|---|
| 11:59AM | 1 | Q | Could you describe or give an example? |
| 11:59AM | 2 | A | A duffel bag or backpack. |
| 11:59AM | 3 | Q | Did you have the opportunity to look inside and see the |
| 11:59AM | 4 | | contents? |
| 11:59AM | 5 | A | Yes. |
| 11:59AM | 6 | Q | Did you see cash? |
| 11:59AM | 7 | A | Yes. |
| 11:59AM | 8 | Q | Do you recall how the cash was packaged? |
| 11:59AM | 9 | A | In bundles. |
| 11:59AM | 10 | Q | It wasn't loose? |
| 12:00PM | 11 | A | No. |
| 12:00PM | 12 | Q | It was stacks of cash? |
| 12:00PM | 13 | A | Yes. |
| 12:00PM | 14 | Q | Do you recall seeing the types of denominations? |
| 12:00PM | 15 | A | Small and large. |
| 12:00PM | 16 | Q | So when you say "large," what are we talking about? |
| 12:00PM | 17 | A | Hundred dollar bills. |
| 12:00PM | 18 | Q | Are there other smaller denominations as well? |
| 12:00PM | 19 | A | Yes. |
| 12:00PM | 20 | Q | What did you do with the money? |
| 12:00PM | 21 | A | Put it in the attic of my house. |
| 12:00PM | 22 | Q | How long did it stay there? |
| 12:00PM | 23 | A | Couple of years, maybe. |
| 12:00PM | 24 | Q | Mr. Teramoto, do you know an individual by the name of |
| 12:00PM | 25 | | Tori Clegg? |

| | | | |
|---|---|---|---|
| 12:00PM | 1 | A | Yes. |
| 12:00PM | 2 | Q | How do you know Tori Clegg? |
| 12:00PM | 3 | A | From Mike. |
| 12:00PM | 4 | Q | Were you aware of any relationship between Ms. Clegg and |
| 12:00PM | 5 | | Mr. Miske? |
| 12:00PM | 6 | A | Yes. |
| 12:00PM | 7 | Q | What was that relationship? |
| 12:00PM | 8 | A | Boyfriend/girlfriend. |
| 12:00PM | 9 | Q | Did you have any relationship with Ms. Clegg other than |
| 12:01PM | 10 | | knowing her through Mike, were you friends, in other words? |
| 12:01PM | 11 | A | Yes. |
| 12:01PM | 12 | | MR. INCIONG:  Could we show the witness, Your Honor, |
| 12:01PM | 13 | | Exhibit 1-66 previously admitted from our original list? |
| 12:01PM | 14 | | THE COURT:  Yes. |
| 12:01PM | 15 | | MR. INCIONG:  Could we publish that as well? |
| 12:01PM | 16 | | THE COURT:  Go ahead. |
| 12:01PM | 17 | | BY MR. INCIONG: |
| 12:01PM | 18 | Q | Mr. Teramoto, do you recognize who is show in Exhibit |
| 12:01PM | 19 | | 1-66? |
| 12:01PM | 20 | A | Yes. |
| 12:01PM | 21 | Q | Is that Tori Clegg? |
| 12:01PM | 22 | A | Yes. |
| 12:01PM | 23 | Q | So you had a friendship with Ms. Clegg yourself? |
| 12:01PM | 24 | A | Yes. |
| 12:01PM | 25 | Q | Would you have discussions with her about things going on |

| | | | |
|---|---|---|---|
| 12:01PM | 1 | | in your personal lives? |
| 12:01PM | 2 | A | Yes. |
| 12:01PM | 3 | Q | Did Ms. Clegg confide in you with relationship issues she |
| 12:01PM | 4 | | was having with Mr. Miske? |
| 12:01PM | 5 | A | Yes. |
| 12:01PM | 6 | Q | Would you talk to her about those things? |
| 12:01PM | 7 | A | Yes. |
| 12:01PM | 8 | Q | Were some of those conversations long conversations? |
| 12:01PM | 9 | A | Yes. |
| 12:01PM | 10 | Q | Were those conversations in person or over the phone? |
| 12:01PM | 11 | A | Over the phone. |
| 12:01PM | 12 | Q | At some point, did Mr. Miske ever confront or accuse you |
| 12:01PM | 13 | | of speaking with Ms. Clegg? |
| 12:02PM | 14 | A | Yes. |
| 12:02PM | 15 | Q | How -- if you know, how did Mr. Miske know that you had |
| 12:02PM | 16 | | been speaking with her? |
| 12:02PM | 17 | A | He saw my phone number on her phone. |
| 12:02PM | 18 | Q | Did he accuse you of any sort of inappropriate conduct or |
| 12:02PM | 19 | | contact with her? |
| 12:02PM | 20 | A | Questioned me about it. |
| 12:02PM | 21 | Q | What did you tell him? |
| 12:02PM | 22 | A | That we were just talking. |
| 12:02PM | 23 | Q | Was that true? |
| 12:02PM | 24 | A | No. |
| 12:02PM | 25 | Q | Did you in fact have a romantic relationship with her at |

12:02PM 1    some point?

12:02PM 2    A    Yes.

12:02PM 3    Q    What was the time frame as to when that happened as

12:02PM 4    opposed to when Mr. Miske confronted you about it?

12:02PM 5    A    It happened prior.  Like, almost a year prior.

12:02PM 6    Q    Did you share that part with Mr. Miske?

12:02PM 7    A    No.

12:02PM 8    Q    You just told him you were having a friendly conversation?

12:03PM 9    A    Yes.

12:03PM 10   Q    Did he seem to accept that answer?

12:03PM 11   A    Yes.

12:03PM 12   Q    Just to give some time reference to this, you mentioned

12:03PM 13   that you considered yourself kind of to be an uncle to Caleb

12:03PM 14   Miske, correct?

12:03PM 15   A    Yes.

12:03PM 16   Q    Did you become aware of a very serious car accident that

12:03PM 17   Caleb was involved in?

12:03PM 18   A    Yes.

12:03PM 19   Q    Do you recall when that happened?

12:03PM 20   A    November 2015.

12:03PM 21   Q    So this incident where Mr. Miske confronted you about

12:03PM 22   talking to Ms. Clegg, did that happen before or after the car

12:03PM 23   accident?

12:03PM 24   A    Before.

12:03PM 25   Q    Now, at some point after Mr. Miske confronted you about

| | | |
|---|---|---|
| 12:03PM | 1 | speaking with Tori Clegg, did he ask you to return the money |
| 12:03PM | 2 | that he had asked you to hold? |
| 12:03PM | 3 | A    Yes. |
| 12:03PM | 4 | Q    Did you in fact return it to him? |
| 12:03PM | 5 | A    Yes. |
| 12:04PM | 6 | Q    How did you give him the money back? |
| 12:04PM | 7 | A    I gave it to his brother. |
| 12:04PM | 8 | Q    Which brother is that? |
| 12:04PM | 9 | A    John Stancil. |
| 12:04PM | 10 | Q    Did you know John Stancil prior to that? |
| 12:04PM | 11 | A    Yes. |
| 12:04PM | 12 | Q    Was he a person that you knew from growing up in Waimanalo |
| 12:04PM | 13 | as well? |
| 12:04PM | 14 | A    Yes. |
| 12:04PM | 15 |         MR. INCIONG:  Your Honor, could we show the witness |
| 12:04PM | 16 | and publish Exhibit 1-58 previously admitted from our original |
| 12:04PM | 17 | list? |
| 12:04PM | 18 |         THE COURT:  Yes, go ahead. |
| 12:04PM | 19 | BY MR. INCIONG: |
| 12:04PM | 20 | Q    Do you recognize the individual in 1-58, sir? |
| 12:04PM | 21 | A    Yes. |
| 12:04PM | 22 | Q    Who is that? |
| 12:04PM | 23 | A    John Stancil. |
| 12:04PM | 24 | Q    Was there anyone else present with Mr. Stancil when you |
| 12:04PM | 25 | gave him the money that Mr. Miske had asked you to hold? |

12:04PM   1   A   Yes, Kaulana Freitas.

12:04PM   2   Q   How did you know -- or did you know Kaulana Freitas?

12:04PM   3   A   Yes.

12:04PM   4   Q   How did you know him?

12:04PM   5   A   From his dad.

12:04PM   6   Q   Who was his dad?

12:04PM   7   A   Denny Freitas.

12:04PM   8   Q   Denny Freitas is someone that you knew that he had an

12:04PM   9   affiliation with Kama'aina Termite and Pest Control?

12:05PM   10   A   No, he had an affiliation with the plumbing company.

12:05PM   11   Q   Okay, the plumbing company?

12:05PM   12   A   Yes.

12:05PM   13   Q   Kama'aina Plumbing Company?

12:05PM   14   A   Yes.

12:05PM   15       MR. INCIONG:  Could we publish Exhibit 1-57 previously

12:05PM   16   admitted from our original list, Your Honor?

12:05PM   17       THE COURT:  Go ahead.

12:05PM   18   BY MR. INCIONG:

12:05PM   19   Q   Does Exhibit 1-57 show Kaulana Freitas?

12:05PM   20   A   Yes.

12:05PM   21   Q   Do you recall where you gave Kaulana Freitas and John

12:05PM   22   Stancil the money Mr. Miske asked you to hold?

12:05PM   23   A   Yes, at Kaulana's house.

12:05PM   24   Q   Is it in Kailua?

12:05PM   25   A   Yes.

| | | | |
|---|---|---|---|
| 12:05PM | 1 | Q | Did this also happen before Caleb's auto accident? |
| 12:05PM | 2 | A | Yes. |
| 12:05PM | 3 | Q | You went on to operate your own company, correct? |
| 12:05PM | 4 | A | Yes. |
| 12:05PM | 5 | Q | Has that been a successful viable company since then? |
| 12:05PM | 6 | A | Yes. |
| 12:05PM | 7 | Q | Has it grown in any size since you started it until today? |
| 12:05PM | 8 | A | Yes. |
| 12:05PM | 9 | Q | Do you have a number of employees now? |
| 12:06PM | 10 | A | Yes. |
| 12:06PM | 11 | Q | Do you have a number of trucks as part of your work fleet? |
| 12:06PM | 12 | A | Yes. |
| 12:06PM | 13 | Q | Do you ever have any of those trucks serviced at Jiffy |
| 12:06PM | 14 | | Lube? |
| 12:06PM | 15 | A | Yes. |
| 12:06PM | 16 | Q | Specifically, the Kaneohe location of Jiffy Lube? |
| 12:06PM | 17 | A | I don't know about locations, but we do use Jiffy Lube. |
| 12:06PM | 18 | Q | Have you also served on the Hawaii Pest Control Board as |
| 12:06PM | 19 | | part of your -- in relation to your being owner of this pest |
| 12:06PM | 20 | | control company? |
| 12:06PM | 21 | A | Yes. |
| 12:06PM | 22 | Q | When did you serve on that board? |
| 12:06PM | 23 | A | From about 2017 or '18.  I'm actually still on the board. |
| 12:06PM | 24 | Q | Mr. Teramoto, are you a big golfer? |
| 12:06PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:06PM | 1 | Q | You golf frequently? |
| 12:06PM | 2 | A | Yes. |
| 12:07PM | 3 | Q | Do you golf at Olomana golf course frequently? |
| 12:07PM | 4 | A | Yes. |
| 12:07PM | 5 | Q | Do you recall an incident, an unusual incident that |
| 12:07PM | 6 | | occurred there when you were attending a holiday function in |
| 12:07PM | 7 | | approximately 2015? |
| 12:07PM | 8 | A | Yes. |
| 12:07PM | 9 | Q | What happened that day that stood out to you? |
| 12:07PM | 10 | A | After my golf, I put my clubs into my car and noticed a |
| 12:07PM | 11 | | van parked across from me with a couple of guys sitting in it. |
| 12:07PM | 12 | Q | Is there anything about that van that stood out to you or |
| 12:07PM | 13 | | that you recall? |
| 12:07PM | 14 | A | No, it was just odd that two guys were sitting there. |
| 12:07PM | 15 | Q | Did you leave at that time or did you remain at the golf |
| 12:07PM | 16 | | course? |
| 12:07PM | 17 | A | I stayed at the golf course. |
| 12:07PM | 18 | Q | Did you eventually leave at some point later? |
| 12:07PM | 19 | A | Yes. |
| 12:07PM | 20 | Q | Did you go home from there? |
| 12:07PM | 21 | A | Yes. |
| 12:07PM | 22 | Q | When you got home, did you see that van again? |
| 12:08PM | 23 | A | Yes. |
| 12:08PM | 24 | Q | Where did you see the van? |
| 12:08PM | 25 | A | It pulled up across the street from my house. |

| | | | |
|---|---|---|---|
| 12:08PM | 1 | Q | Did that alarm you in any way? |
| 12:08PM | 2 | A | Not initially, but yes. |
| 12:08PM | 3 | Q | So what happened from that point? |
| 12:08PM | 4 | A | Someone got out and called my name. |
| 12:08PM | 5 | Q | Did you see the person who called out your name? |
| 12:08PM | 6 | A | Yeah. |
| 12:08PM | 7 | Q | Did you recognize that person? |
| 12:08PM | 8 | A | No. |
| 12:08PM | 9 | Q | Do you think you'd ever seen him before? |
| 12:08PM | 10 | A | No. |
| 12:08PM | 11 | Q | So at that point after they called your name out, what did |
| 12:08PM | 12 | | you do? |
| 12:08PM | 13 | A | I was walking into my house, I just yelled to hold on, and |
| 12:08PM | 14 | | I went in the house and used the bathroom and came back out and |
| 12:08PM | 15 | | the car was gone.  The van was gone. |
| 12:08PM | 16 | Q | Did that van ever come back later that day? |
| 12:08PM | 17 | A | No. |
| 12:08PM | 18 | Q | Or any other time? |
| 12:08PM | 19 | A | No. |
| 12:08PM | 20 | Q | Since you've been in the business -- the pest control |
| 12:08PM | 21 | | business as an employee both of Kama'aina Termite and as the |
| 12:08PM | 22 | | owner of your own business, in your experience is that a cash |
| 12:09PM | 23 | | business? |
| 12:09PM | 24 | A | No. |
| 12:09PM | 25 | Q | Do you ever carry large amounts of cash for any purpose |

12:09PM   1   related to your business?

12:09PM   2   A    No.

12:09PM   3           MR. INCIONG:  I have nothing further for Mr. Teramoto.

12:09PM   4   Thank you, Your Honor.

12:09PM   5           THE COURT:  I'm not sure who is doing the cross.  Is

12:09PM   6   that you, Mr. Kennedy?

12:09PM   7           MR. KENNEDY:  Yes, Your Honor.

12:09PM   8           THE COURT:  Would you have any issue with taking a

12:09PM   9   second afternoon break?

12:09PM  10           MR. KENNEDY:  No, Your Honor.

12:09PM  11           THE COURT:  Okay.  I think if we just plowed through

12:09PM  12   we would end up breaking in about ten or 15 minutes anyway; so

12:09PM  13   it probably makes sense to do that right now.

12:09PM  14           As we go to break, the second trial break of our day,

12:09PM  15   I will remind our jurors to please refrain from discussing the

         16   substance of this case with anyone, including each other, until

         17   I advise otherwise; do not access also any media or other

         18   accounts of this case that may be out there; and finally,

         19   please do not conduct any independent investigation of your own

         20   into the facts, circumstances or persons involved.

12:10PM  21           So we will try to keep it to about a 15-minute break

12:10PM  22   and we will begin the cross of Mr. Teramoto at the time.

12:12PM  23           (Proceedings were recessed at 12:12 p.m. to 12:39

12:39PM  24   p.m.)

12:39PM  25           THE COURT:  Okay.  We have brought our jury back in,

| | | |
|---|---|---|
| 12:39PM | 1 | all 16 members. |
| 12:39PM | 2 | Mr. Kennedy, you may begin with your cross of |
| 12:39PM | 3 | Mr. Teramoto when you are ready. |
| 12:39PM | 4 | CROSS-EXAMINATION |
| 12:39PM | 5 | BY MR. KENNEDY: |
| 12:39PM | 6 | Q    Good afternoon, sir. |
| 12:39PM | 7 | A    Good afternoon. |
| 12:39PM | 8 | Q    You told the jury this morning that you began working in |
| 12:39PM | 9 | roughly 2001 for Kama'aina Termite and Pest Control, correct? |
| 12:39PM | 10 | A    Yes. |
| 12:39PM | 11 | Q    And that was Mike Miske's company, right? |
| 12:39PM | 12 | A    Yes. |
| 12:39PM | 13 | Q    He had started it from scratch, right? |
| 12:39PM | 14 | A    Yes. |
| 12:39PM | 15 | Q    And that he offered you a position, correct? |
| 12:39PM | 16 | A    Yes. |
| 12:39PM | 17 | Q    And you told the jury that in 1998, when this source was |
| 12:40PM | 18 | arrested, you went to the FBI to turn your life around, |
| 12:40PM | 19 | correct? |
| 12:40PM | 20 | A    Yes. |
| 12:40PM | 21 | Q    And you did that, didn't you? |
| 12:40PM | 22 | A    Yes. |
| 12:40PM | 23 | Q    All right.  And now Mr. Miske had started Kama'aina |
| 12:40PM | 24 | Termite and Pest Control, correct? |
| 12:40PM | 25 | A    Yes. |

12:40PM   1   Q   And that business was growing, right?

12:40PM   2   A   Yes.

12:40PM   3   Q   And you wanted to be a part of it, right?

12:40PM   4   A   Yes.

12:40PM   5   Q   And when your life sort of changed a little bit when

12:40PM   6   formal charges came around 2002, correct?

12:40PM   7   A   Yes.

12:40PM   8   Q   You were working at Kama'aina Termite and Pest Control at

12:40PM   9   that time, correct?

12:40PM   10   A   Yes.

12:40PM   11   Q   You then were released on bond while the case was

12:40PM   12   progressing, correct?

12:40PM   13   A   I was already -- I was never formally arrested.

12:41PM   14   Q   You were allowed to come to court, enter your appearance,

12:41PM   15   right?

12:41PM   16   A   Yes.

12:41PM   17   Q   And you had some conditions of release, correct?

12:41PM   18   A   Yes, sir.

12:41PM   19   Q   And so you continued to work at Kama'aina Termite and Pest

12:41PM   20   Control while you were under the supervision of your case,

12:41PM   21   correct?

12:41PM   22   A   Yes.

12:41PM   23   Q   All right.  And in fact while you were doing that, you

12:41PM   24   obtained some course work at the University of Hawaii in terms

12:41PM   25   of the pest control industry, correct?

12:41PM   1   A   Yes.

12:41PM   2   Q   And you were able to get certifications in terms of use of

12:41PM   3   restricted chemicals, right?

12:41PM   4   A   Yes.

12:41PM   5   Q   And so you had to go away for one year, right?

12:41PM   6   A   Yes.

12:41PM   7   Q   And Mike told you -- you said that he was shocked that you

12:41PM   8   had to go away, correct?

12:41PM   9   A   Yes.

12:41PM   10   Q   But he told you your job would be there when you got back?

12:41PM   11   A   Yes.

12:41PM   12   Q   So you went and did your time?

12:41PM   13   A   Yes.

12:41PM   14   Q   You came back, correct?

12:41PM   15   A   Yes.

12:41PM   16   Q   And you started working at Kama'aina Termite and Pest

12:42PM   17   Control, correct?

12:42PM   18   A   Yes.

12:42PM   19   Q   And you did that almost up to 2009, right?

12:42PM   20   A   Yes.

12:42PM   21   Q   All right.  And during that time you were primarily in

12:42PM   22   sales, right?

12:42PM   23   A   Yes.

12:42PM   24   Q   And you learned the pest control business at Kama'aina

12:42PM   25   Termite and Pest Control, correct?

12:42PM    1    A    Yes.

12:42PM    2    Q    And so what they were about -- well, what Mike's company

12:42PM    3    was about, they took on some of the most difficult jobs on the

12:42PM    4    island, didn't they?

12:42PM    5                MR. INCIONG:  Objection, beyond the scope.  Relevance.

12:42PM    6                THE COURT:  You can answer that question.  Go ahead.

12:42PM    7    Overruled.

12:42PM    8                THE WITNESS:  Yes.

12:42PM    9    BY MR. KENNEDY:

12:42PM   10    Q    They dealt with a lot of iconic places that are important

12:42PM   11    to the state?

12:42PM   12                MR. INCIONG:  Objection, beyond the scope.  Relevance.

12:42PM   13                THE COURT:  Sustained.

12:42PM   14    BY MR. KENNEDY:

12:42PM   15    Q    And so during that time you became proficient in the pest

12:42PM   16    control industry, correct?

12:42PM   17    A    Yes.

12:42PM   18    Q    All right.  And then in 2009 you started your own company,

12:43PM   19    right?

12:43PM   20    A    Yes.

12:43PM   21    Q    Mike endorsed you, right?

12:43PM   22    A    Yes.

12:43PM   23    Q    At that time, he had his RME, correct?

12:43PM   24    A    Yes.

12:43PM   25    Q    And he helped you start that company until you got your

12:43PM    1    RME, correct?

12:43PM    2    A    Yes.

12:43PM    3    Q    And so you've run that company since that time, correct?

12:43PM    4    A    Yes.

12:43PM    5    Q    Providing for your family, right?

12:43PM    6    A    Yes.

12:43PM    7    Q    Servicing the island, correct?

12:43PM    8    A    Yes.

12:43PM    9    Q    Being on the board, right?

12:43PM   10    A    Yes.

12:43PM   11    Q    And you are still doing that today?

12:43PM   12    A    Yes.

12:43PM   13    Q    And folks that have your services they have had you for a

12:43PM   14    long time, right?

12:43PM   15    A    Yes.

12:43PM   16    Q    Now, you were asked some questions about the 1990s, do you

12:43PM   17    recall that?

12:43PM   18    A    Yes.

12:43PM   19    Q    You were in your 20s, right?

12:43PM   20    A    Yes.

12:43PM   21    Q    Mike was in his 20s, right?

12:43PM   22    A    Yes.

12:43PM   23    Q    And you left drugs behind in the late 1990s, correct?

12:43PM   24    A    Yes.

12:43PM   25    Q    And you've observed Mike since that time?

12:44PM   1    A    Yes.

12:44PM   2    Q    He's been your boss?

12:44PM   3    A    Yes.

12:44PM   4    Q    He got you started in your company?

12:44PM   5    A    Yes.

12:44PM   6    Q    And you said that during the course of your cooperation

12:44PM   7    with the FBI you told them that Mike was a customer, right?

12:44PM   8    A    Yes.

12:44PM   9    Q    And what you observed is he left that life behind as well,

12:44PM  10    correct?

12:44PM  11    A    Yes.

12:44PM  12    Q    And so he went on, like you did, to Kama'aina Termite and

12:44PM  13    Pest Control, correct?

12:44PM  14    A    Yes.

12:44PM  15    Q    And then to Certified Pest Management, your company,

12:44PM  16    right?

12:44PM  17    A    Yes.

12:44PM  18    Q    And the mistakes that you made were mistakes that you made

12:44PM  19    in your 20s, right?

12:44PM  20    A    Yes.

12:44PM  21    Q    Now, you grew up in Waimanalo, right?

12:44PM  22    A    Yes.

12:44PM  23    Q    And Mike grew up for a time in Waimanalo, correct?

12:44PM  24    A    Yes.

12:44PM  25    Q    Mike came from pretty humble beginnings, didn't he?

| | | |
|---|---|---|
| 12:44PM | 1 | A    Yes. |
| 12:44PM | 2 | Q    Lost his dad at six? |
| 12:44PM | 3 | MR. INCIONG:  Objection, relevance. |
| 12:45PM | 4 | THE COURT:  Sustained. |
| 12:45PM | 5 | BY MR. KENNEDY: |
| 12:45PM | 6 | Q    And so it's not often that someone who grows up that |
| 12:45PM | 7 | humbly can start the business that he started and succeeded, |
| 12:45PM | 8 | right? |
| 12:45PM | 9 | MR. INCIONG:  Objection, calls for speculation. |
| 12:45PM | 10 | THE COURT:  Sustained. |
| 12:45PM | 11 | BY MR. KENNEDY: |
| 12:45PM | 12 | Q    You are a business owner, right? |
| 12:45PM | 13 | A    Yes. |
| 12:45PM | 14 | Q    You know how hard it is to run your own business? |
| 12:45PM | 15 | A    Yes. |
| 12:45PM | 16 | Q    You know how hard it is to be the person that always is |
| 12:45PM | 17 | responsible? |
| 12:45PM | 18 | A    Yes. |
| 12:45PM | 19 | Q    Now, you mentioned that one of the reasons you were on the |
| 12:45PM | 20 | revocable trust was to be there for Caleb in case something |
| 12:45PM | 21 | happened to Mike, correct? |
| 12:45PM | 22 | A    Yes. |
| 12:45PM | 23 | Q    And you became close with Caleb, correct? |
| 12:45PM | 24 | A    Yes. |
| 12:45PM | 25 | Q    And the government asked you about the accident, correct? |

| | | | |
|---|---|---|---|
| 12:46PM | 1 | A | Yes. |
| 12:46PM | 2 | Q | And at that time you went to the hospital? |
| 12:46PM | 3 | A | Yes. |
| 12:46PM | 4 | Q | When you heard about it, correct? |
| 12:46PM | 5 | A | Yes. |
| 12:46PM | 6 | Q | And you were there throughout that time, correct? |
| 12:46PM | 7 | A | Yes. |
| 12:46PM | 8 | Q | And during that time never did you ever hear Mike blame |
| 12:46PM | 9 | | anyone for that accident? |
| 12:46PM | 10 | | MR. INCIONG: Objection, beyond the scope. Relevance. |
| 12:46PM | 11 | | THE COURT: Sustained. |
| 12:46PM | 12 | | BY MR. KENNEDY: |
| 12:46PM | 13 | Q | And you were there at the hospital many, many times, |
| 12:46PM | 14 | | right? |
| 12:46PM | 15 | A | Yes. |
| 12:46PM | 16 | Q | And it looked like for a time Caleb was going to recover, |
| 12:46PM | 17 | | right? |
| 12:46PM | 18 | A | Yes. |
| 12:46PM | 19 | Q | But he didn't and he died? |
| 12:46PM | 20 | A | Yes. |
| 12:46PM | 21 | Q | And so in terms of your -- and this was right around -- |
| 12:46PM | 22 | | the accident occurred in 2015, right? |
| 12:46PM | 23 | A | Yes. |
| 12:46PM | 24 | Q | And he died in March of 2016, correct? |
| 12:47PM | 25 | A | Yes. |

12:47PM   1   Q   All right.  Now, Mike and you -- in the past you had

12:47PM   2   purchased the first home that you flipped, correct?

12:47PM   3           MR. INCIONG:  Objection, beyond the scope.  Relevance.

12:47PM   4           MR. KENNEDY:  We went over a great deal of time.

12:47PM   5           THE COURT:  That was discussed during direct?

12:47PM   6           MR. INCIONG:  No.

12:47PM   7           THE COURT:  I don't recall that.  I think it is beyond

12:47PM   8   the scope.  The objection is sustained.

12:47PM   9   BY MR. KENNEDY:

12:47PM   10  Q   All right.  Then with respect to Mike you've been in

12:47PM   11  business with him together, correct?

12:47PM   12  A   Yes.

12:47PM   13  Q   All right.  And this continued in terms of business

12:47PM   14  opportunities almost days before he was arrested, correct?

12:47PM   15  A   Yes.

12:47PM   16  Q   All right.  Now, the government asked you about an

12:48PM   17  incident when you were at a local golf course, correct?

12:48PM   18  A   Yes.

12:48PM   19  Q   And it was a van, right?

12:48PM   20  A   Yes.

12:48PM   21  Q   Couple of guys in the van?

12:48PM   22  A   Yes.

12:48PM   23  Q   Around Christmastime, correct?

12:48PM   24  A   Yes.

12:48PM   25  Q   Came back to your house?

| | | | |
|---|---|---|---|
| 12:48PM | 1 | A | Yes. |
| 12:48PM | 2 | Q | Mentioned your name? |
| 12:48PM | 3 | A | Yes. |
| 12:48PM | 4 | Q | You went inside? |
| 12:48PM | 5 | A | Yes. |
| 12:48PM | 6 | Q | Nothing else happened beyond that? |
| 12:48PM | 7 | A | No. |
| 12:48PM | 8 | Q | All right.  That was the entire matter, correct? |
| 12:48PM | 9 | A | Yes. |
| 12:48PM | 10 | Q | All right.  You knew that Mike at a certain point -- |
| 12:48PM | 11 | | excuse me, I think you mentioned that in around 2012 Mike asked |
| 12:48PM | 12 | | you to hold some cash for him, correct? |
| 12:49PM | 13 | A | Yes. |
| 12:49PM | 14 | Q | You knew at the time that he was operating the M |
| 12:49PM | 15 | | Nightclub, correct? |
| 12:49PM | 16 | A | Yes. |
| 12:49PM | 17 | Q | So he asked you to just keep it, correct? |
| 12:49PM | 18 | A | Yes. |
| 12:49PM | 19 | Q | And then a few years later he asked you to give it back to |
| 12:49PM | 20 | | him? |
| 12:49PM | 21 | A | Yes. |
| 12:49PM | 22 | Q | You gave it back to his brother John? |
| 12:49PM | 23 | A | Yes. |
| 12:49PM | 24 | Q | And Kaulana his cousin? |
| 12:49PM | 25 | A | Yes. |

12:49PM  1   Q    And you know Denny Freitas because you grew up together,

12:49PM  2   correct?

12:49PM  3   A    Yes.

12:49PM  4   Q    It was hard for you to lie to Mike about Tori Clegg,

12:49PM  5   wasn't it?

12:49PM  6   A    Yes.

12:49PM  7   Q    And you said that he took it, what you told him, and took

12:49PM  8   it well, correct?

12:49PM  9   A    Yes.

12:49PM  10   Q    And that the two of you have remained -- you said earlier

12:50PM  11   you were a close friend of him growing up, correct?

12:50PM  12   A    Yes.

12:50PM  13   Q    That it remained a close friendship when you were even in

12:50PM  14   a boss/employee relationship, correct?

12:50PM  15   A    Yes.

12:50PM  16   Q    After you got back from prison, it's pretty hard sometimes

12:50PM  17   for folks to get a job after they have to go in and do federal

12:50PM  18   time, right?

12:50PM  19   A    Yes.

12:50PM  20   Q    And you walked back into this that job that you had while

12:50PM  21   you were on supervision, correct?

12:50PM  22   A    Yes.

12:50PM  23   Q    And then you learned that trade and you went off and you

12:50PM  24   started your own business?

12:50PM  25   A    Yes.

| | | | |
|---|---|---|---|
| 12:50PM | 1 | Q | Providing for your daughters, right? |

12:50PM   1   Q    Providing for your daughters, right?

12:50PM   2   A    Yes.

12:50PM   3   Q    And that was because of Mike?

12:50PM   4   A    Yes.

12:50PM   5         MR. KENNEDY:  I have nothing further.

12:50PM   6         Thank you, Your Honor.

12:50PM   7         THE COURT:  Redirect?

12:50PM   8                    REDIRECT EXAMINATION

12:50PM   9   BY MR. INCIONG:

12:50PM  10   Q    Thank you, Your Honor.

12:50PM  11         Mr. Teramoto, you can't really say definitively that

12:50PM  12   Mr. Miske left drugs behind like you did, can you?

12:50PM  13   A    No.

12:50PM  14         MR. INCIONG:  Nothing further, Your Honor.

12:50PM  15         THE COURT:  Mr. Kennedy, anything else.

12:50PM  16                    RECROSS-EXAMINATION

12:50PM  17   BY MR. KENNEDY:

12:51PM  18   Q    You were asked definitively.  You never saw any evidence

12:51PM  19   of Mike and drugs after 1998, correct?

12:51PM  20   A    Yes, correct.

12:51PM  21         MR. KENNEDY:  Nothing further.

12:51PM  22         THE COURT:  Mr. Teramoto, you may step down.  Thank

12:51PM  23   you, sir.

12:51PM  24         THE WITNESS:  Thank God.

12:51PM  25         THE COURT:  Ladies and gentlemen, as we did yesterday,

| | | |
|---|---|---|
| 12:51PM | 1 | we are done for the trial day a little bit early.  Everyone is |
| 12:51PM | 2 | doing the best they can.  It's not the defense's fault, it's |
| 12:51PM | 3 | not the government's fault.  Everyone is doing the best they |
| 12:51PM | 4 | can to fill our trial days as best we can.  But you know that |
| 12:51PM | 5 | this is not an exact science.  Sometimes we have more witnesses |
| 12:51PM | 6 | than we can fit within a trial day and other times, like today |
| 12:51PM | 7 | and yesterday, we don't. |
| 12:52PM | 8 | So take it while you can.  I do that same thing and |
| 12:52PM | 9 | try to make use of the time as best I can.  So I'm sure and |
| 12:52PM | 10 | confident that you will do the same.  So we are going to excuse |
| 12:52PM | 11 | you about 30 minutes, a little bit more than 30 minutes early |
| 12:52PM | 12 | today.  We will resume tomorrow morning, as we did today, at |
| 12:52PM | 13 | 8:30. |
| 12:52PM | 14 | As we go to break I'll remind you once again to |
| 12:52PM | 15 | refrain please from discussing the substance of this case with |
| 12:52PM | 16 | anyone, including each other; to also refrain from conducting |
| 12:52PM | 17 | any independent investigation into this case; and finally, do |
| 12:52PM | 18 | not access any media or other accounts of this case that may be |
| 12:52PM | 19 | out there.  We will see you tomorrow morning. |
| 12:53PM | 20 | (Proceedings were concluded at 12:53 p.m.) |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                    COURT REPORTER'S CERTIFICATE

 2          I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10          DATED at Honolulu, Hawaii, May 28, 2024.

11

12

13                                  /s/ Gloria T. Bediamol

14                                  GLORIA T. BEDIAMOL.

15                                  RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```