1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

   UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
4                               )
              Plaintiff,        )    Honolulu, Hawaii
5                               )
          vs.                   )    April 15, 2024
6                               )
   MICHAEL J. MISKE, JR.,       )
7                               )
              Defendant.        )
8    _____)

9
                 TRANSCRIPT OF JURY TRIAL (DAY 50)
10          BEFORE THE HONORABLE DERRICK K. WATSON,
          CHIEF UNITED STATES DISTRICT COURT JUDGE
11
   APPEARANCES:
12
   For the Plaintiff:          MARK INCIONG, ESQ.
13                             MICHAEL DAVID NAMMAR, ESQ
                               WILLIAM KE AUPUNI AKINA, ESQ.
14                             AISLINN AFFINITO, ESQ.
                               Office of the United States Attorney
15                             PJKK Federal Building
                               300 Ala Moana Boulevard, Suite 6100
16                             Honolulu, Hawaii  96850

17 For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                               841 Bishop St., Ste 2201
18                             Honolulu, HI 96813

19                             MICHAEL JEROME KENNEDY, ESQ.
                               Law Offices of Michael Jerome
20                             Kennedy, PLLC
                               333 Flint Street
21                             Reno, NV 89501

22 Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24
    Proceedings recorded by machine shorthand, transcript produced
25  with computer-aided transcription (CAT).

```
 1                        I N D E X
       GOVERNMENT WITNESS:                      PAGE NO.
 2

 3     JACOB SMITH (CONTINUED TESTIMONY)

 4          DIRECT EXAMINATION BY MR. NAMMAR          3
            CROSS-EXAMINATION BY MR. KENNEDY         88
 5

 6     EXHIBITS:                                PAGE NO.
```

```
 7     Exhibit 1-957E was received in evidence         4
       Exhibit 1-957G was received in evidence         5
 8     Exhibit 1-957J was received in evidence         5
       Exhibit 1-957 was received in evidence          8
 9     Exhibit 1-484 was received in evidence         18
       Exhibit 1-1116 was received in evidence        75
10     Exhibit 1-1117 was received in evidence        79
       Exhibit 6023-0055 was received in evidence     96
11     Exhibits 6023-56, 6023-58, 6023-0059, and      97
       6023-0060 were received in evidence
12     Exhibit 6023-0067 was received in evidence     99
       Exhibit 6023-0081 was received in evidence    101
13     Exhibit 6023-0095 was received in evidence    102
       Exhibit 6023-102 was received in evidence     103
14     Exhibit 6023-149 was received in evidence     105
       Exhibit 1-905M was received in evidence       107
15     Exhibit 1-905F was received in evidence       113
       Exhibit 1-905G was received in evidence       114
16     Exhibit 1-905H was received in evidence       116
       Exhibit 1-905I was received in evidence       117
17     Exhibit 1-905N was received in evidence       118
       Exhibit 1-938D was received in evidence       119
18     Exhibit 1-938E was received in evidence       120
       Exhibit 1-956L was received in evidence       123
19     Exhibit 1-956Q was received in evidence       125
```

```
20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | April 15, 2024                                        8:38 a.m. |
| 08:38AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 08:38AM | 3 | States of America versus Michael J. Miske, Jr. |
| 08:38AM | 4 | This case has been called for jury trial, day 50. |
| 08:38AM | 5 | Counsel, please make your appearances for the record. |
| 08:38AM | 6 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 08:38AM | 7 | Michael Nammar, KeAupuni, Akina and Aislinn Affinito with |
| 08:38AM | 8 | Thomas Palmer and Kari Sherman.  Good morning. |
| 08:38AM | 9 | THE COURT:  Good morning. |
| 08:38AM | 10 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 08:38AM | 11 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and |
| 08:38AM | 12 | Josh Barry.  Good morning to you all.  Good morning to you. |
| 08:38AM | 13 | THE COURT:  Good morning.  You may be seated.  Good |
| 08:38AM | 14 | morning to our 16 jurors.  Mr. Smith, good morning.  You're |
| 08:38AM | 15 | back on the stand and I will remind you as I did on Friday that |
| 08:38AM | 16 | although we won't swear you again, you still remain subject to |
| 08:38AM | 17 | the same oath that you took at the first start of your |
| 08:38AM | 18 | testimony.  Do you understand that?  All right.  Mr. Nammar, |
| 08:38AM | 19 | you may resume.  We are at half a hundred, by the way. |
| 08:38AM | 20 | JACOB SMITH, |
| 08:38AM | 21 | (Having been previously sworn, resumed the stand.) |
| 08:38AM | 22 | RESUMED DIRECT EXAMINATION |
| 08:38AM | 23 | BY MR. NAMMAR: |
| 08:38AM | 24 | Q    Good morning, Mr. Smith. |
| 08:38AM | 25 | A    Good morning, Mr. Nammar. |

08:39AM    1                    MR. NAMMAR:  Your Honor, can we show the witness only

08:39AM    2    1-957E as in echo from our 13th supplemental list?  Can we play

08:40AM    3    it one more time?

08:40AM    4           (Video played.)

08:40AM    5    BY MR. NAMMAR:

08:40AM    6    Q    Mr. Smith, do you recognize what's just been shown to you,

08:40AM    7    1-957E?

08:40AM    8    A    Yes.

08:40AM    9    Q    What is it?

08:40AM   10    A    It was a picture of Chris Bourne.

08:40AM   11    Q    Is it a video or a picture?

08:40AM   12    A    It was a video.

08:40AM   13    Q    Are you taking a video of someone else's phone here?

08:40AM   14    A    Yes.

08:40AM   15                    MR. NAMMAR:  Your Honor, move to admit 1-957E as in

08:40AM   16    echo.

08:40AM   17                    THE COURT:  Any objection, counsel?

08:40AM   18                    MR. KENNEDY:  No objection.

08:40AM   19                    THE COURT:  1-957E is admitted then.  You may publish.

08:40AM   20            (Exhibit 1-957E was received in evidence.)

08:40AM   21                    MR. NAMMAR:  Thank you.  Your Honor, can we also show

08:40AM   22    the witness -- before we publish this one, show the witness

08:40AM   23    1-957G as in golf from the 13th supplemental list.

08:40AM   24            (Video was played.)

08:40AM   25    BY MR. NAMMAR:

| | | | |
|---|---|---|---|
| 08:41AM | 1 | Q | Mr. Smith do you recognize 1-957G? |
| 08:41AM | 2 | A | Yes. |
| 08:41AM | 3 | Q | What is it of? |
| 08:41AM | 4 | A | It's another video of Chris Bourne. |

08:41AM    5              MR. NAMMAR:  Your Honor, move to admit 1-957G.

08:41AM    6              THE COURT:  Any objection to that one?

08:41AM    7              MR. KENNEDY:  No objection.

08:41AM    8              THE COURT:  1-957G is then admitted without objection,

08:41AM    9    and you may put it up when you are ready.

08:41AM   10              (Exhibit 1-957G was received in evidence.)

08:41AM   11              MR. NAMMAR:  Thank you.  Could we also show the

08:41AM   12    witness only 1-957J from the 13th supplemental list.

08:41AM   13              (Video was played.)

08:41AM   14    BY MR. NAMMAR:

08:41AM   15    Q    Mr. Smith do you recognize 1-957J?

08:41AM   16    A    Yes.

08:41AM   17    Q    What is it?

08:41AM   18    A    It's a video of the gas truck outside of Chris Bourne's

08:41AM   19    house.

08:41AM   20              MR. NAMMAR:  Your Honor, I move to admit 1-957J.

08:41AM   21              THE COURT:  Any objection?

08:42AM   22              MR. KENNEDY:  No objection.

08:42AM   23              THE COURT:  1-957J is admitted without objection, and

08:42AM   24    you may play it.

08:42AM   25              (Exhibit 1-957J was received in evidence.)

| | | |
|---|---|---|
| 08:42AM | 1 | (Video was played.) |
| 08:42AM | 2 | MR. NAMMAR:  If we can publish now 1-957E, it has |
| 08:42AM | 3 | sound.  If we can publish with the sound. |
| 08:42AM | 4 | (Video was played.) |
| 08:42AM | 5 | BY MR. NAMMAR: |
| 08:42AM | 6 | Q    If we can play that one more time. |
| 08:42AM | 7 | (Video was played.) |
| 08:42AM | 8 | Can you tell the jury what is shown here? |
| 08:42AM | 9 | A    It's a video of me taking a video off Mike's phone of |
| 08:42AM | 10 | Chris Bourne. |
| 08:42AM | 11 | Q    Do you recognize the person that's speaking on the video? |
| 08:42AM | 12 | Do you recognize that voice? |
| 08:42AM | 13 | A    I'm not sure.  I think it's me. |
| 08:42AM | 14 | MR. NAMMAR:  Can we publish 1-957G as in golf now. |
| 08:42AM | 15 | THE COURT:  Yes. |
| 08:43AM | 16 | (Video was played.) |
| 08:43AM | 17 | MR. NAMMAR:  Play that one more time. |
| 08:43AM | 18 | (Video was played.) |
| 08:43AM | 19 | BY MR. NAMMAR: |
| 08:43AM | 20 | Q    What is shown here, Mr. Smith? |
| 08:43AM | 21 | A    It's another video taken of Chris Bourne. |
| 08:43AM | 22 | Q    Did you take this video? |
| 08:43AM | 23 | A    Yes. |
| 08:43AM | 24 | Q    Do you know whose phone is shown in this video that |
| 08:43AM | 25 | you're -- |

08:43AM   1   A     It's Mike's phone.

08:43AM   2               MR. NAMMAR:  May we publish 1-957J?

08:43AM   3               THE COURT:  Yes.

08:43AM   4               (Video was played.)

08:43AM   5               MR. NAMMAR:  Could we play that one more time?  Can we

08:43AM   6   rotate that?

08:44AM   7               (Video was played.)

08:44AM   8   BY MR. NAMMAR:

08:44AM   9   Q     What is shown in 1-957J?

08:44AM   10  A     That's another video of the gas truck outside Chris

08:44AM   11  Bourne's house.

08:44AM   12  Q     And are you recording a phone again?

08:44AM   13  A     Yes.

08:44AM   14  Q     Do you know whose phone you are recording?

08:44AM   15  A     Mike's phone.

08:44AM   16              MR. NAMMAR:  Could we show the witness now only 1-957

08:44AM   17  from the original list.

08:44AM   18              THE COURT:  Go ahead.

08:44AM   19              (Video was played.)

08:44AM   20  BY MR. NAMMAR:

08:44AM   21  Q     We can scroll through.  Do you recognize this as a video

08:45AM   22  report from your phone?

08:45AM   23  A     Yes.

08:45AM   24  Q     Does it have the same three videos that we just looked at?

08:45AM   25  A     Yes.

| | | |
|---|---|---|
| 08:45AM | 1 | MR. NAMMAR:  Your Honor, I'd move to admit 1-957. |
| 08:45AM | 2 | THE COURT:  Any objection to that? |
| 08:45AM | 3 | MR. KENNEDY:  No objection. |
| 08:45AM | 4 | THE COURT:  1-957 is admitted then without objection. |
| 08:45AM | 5 | You may publish. |
| 08:45AM | 6 | (Exhibit 1-957 was received in evidence.) |
| 08:45AM | 7 | BY MR. NAMMAR: |
| 08:45AM | 8 | Q    If we could start with box 5 and zoom in on box 5. |
| 08:45AM | 9 | Do you recognize the tiny thumbnail on the right-hand |
| 08:45AM | 10 | side, Mr. Smith? |
| 08:45AM | 11 | A    Yes. |
| 08:45AM | 12 | Q    What is it? |
| 08:45AM | 13 | A    It's the video we just watched of Chris Bourne. |
| 08:45AM | 14 | Q    The creation date is at the bottom here, created on May 6, |
| 08:45AM | 15 | 2018; do you see that? |
| 08:45AM | 16 | A    Yes. |
| 08:45AM | 17 | Q    At around 6:43 p.m.; do you see that? |
| 08:45AM | 18 | A    Yes. |
| 08:46AM | 19 | Q    If we can go to box 7 now. |
| 08:46AM | 20 | And the tiny thumbnail on the right-hand side, do you |
| 08:46AM | 21 | recognize that? |
| 08:46AM | 22 | A    Yes. |
| 08:46AM | 23 | Q    What is that? |
| 08:46AM | 24 | A    That's the other video of Chris Bourne that we just |
| 08:46AM | 25 | watched. |

08:46AM    1    Q    If we see the creation date, is it the same date -- around

08:46AM    2    the same date and time on May 6, 2018, as the one we just

08:46AM    3    looked at?

08:46AM    4    A    Yes.

08:46AM    5          MR. NAMMAR:  Your Honor, can we now publish 1-953

08:46AM    6    which is admitted yesterday from our original.

08:46AM    7          THE COURT:  Go ahead.

08:46AM    8    BY MR. NAMMAR:

08:46AM    9    Q    Page -- if we can go to page 409, and if we could zoom in

08:46AM   10    on the bottom message.

08:47AM   11          Do you see the date at the -- delivered date here?

08:47AM   12    A    Yes.

08:47AM   13    Q    May 6, 2018, at 8:31 p.m.?

08:47AM   14    A    Yes.

08:47AM   15    Q    Is that the same day from the videos we were just looking

08:47AM   16    at?

08:47AM   17    A    Yes.

08:47AM   18    Q    So is this "Bro, you guys still at the Bay?"  Is this the

08:47AM   19    message you sent to Mr. Miske?

08:47AM   20    A    Yes.

08:47AM   21    Q    You told us before you commonly refer to him as bro?

08:47AM   22    A    Yes.

08:47AM   23    Q    And the Bay is what?

08:47AM   24    A    The area where we used to hang out in Hawaii Kai.

08:47AM   25    Q    If we go to the next message.  Down.  Sorry, page 410.

08:47AM    1    Response is from Mr. Miske is, "Yes, at the ramp now."

08:47AM    2         Do you see that?

08:47AM    3    A    Yes.

08:47AM    4    Q    Do you know what the ramp refers to?

08:47AM    5    A    The boat ramp at the Bay.

08:47AM    6    Q    Is that right by where you guys would hang out?

08:47AM    7    A    Yes.

08:47AM    8    Q    And then Mr. Miske says, "What's up?"  Your response is,

08:48AM    9    "Can you tell Migo I left my keys in the back of their car?"

08:48AM   10    A    Yes.

08:48AM   11    Q    Who is Migo?

08:48AM   12    A    Johnnie.

08:48AM   13    Q    And response, "okay."  And then you say, "Ask him for text

08:48AM   14    me if can, bro," and the response is "okay."

08:48AM   15         Do you see that?

08:48AM   16    A    Yes.

08:48AM   17    Q    This is a couple hours before the video that we just

08:48AM   18    looked at, correct?

08:48AM   19    A    Yes.

08:48AM   20    Q    Do you think you were at the Bay on May 6, 2018?

08:48AM   21    A    Yes.

08:48AM   22    Q    Hanging out with John Stancil and Mike Miske?

08:48AM   23    A    Yes.

08:48AM   24         MR. NAMMAR:  We can go back now, Your Honor, to 1-957.

08:49AM   25         THE COURT:  Go ahead.

08:49AM  1   BY MR. NAMMAR:

08:49AM  2   Q    Focus on box 11.

08:49AM  3        Do you recognize, Mr. Smith, the thumbnail on the

08:49AM  4   right-hand side?

08:49AM  5   A    Yes.

08:49AM  6   Q    Is that the from the video of the gas truck that we looked

08:49AM  7   at?

08:49AM  8   A    Yes.

08:49AM  9   Q    It has a creation date a little bit later in time now,

08:49AM  10  May 27, 2018.

08:49AM  11       Do you see that?

08:49AM  12  A    Yes.

08:49AM  13  Q    With the time of 4:41 p.m.; is that right?

08:49AM  14  A    Yes.

08:49AM  15  Q    And we talked about this last week, but do you recognize

08:49AM  16  the article of clothing that's in that video?

08:49AM  17  A    Yes.

08:49AM  18  Q    What is it?

08:49AM  19  A    It was camouflage shorts I was wearing.

08:49AM  20  Q    You recognize those as your shorts?

08:50AM  21  A    Yes.

08:50AM  22       MR. NAMMAR:  So if we can now go to 1-953 again, which

08:50AM  23  is from the original list.

08:50AM  24       THE COURT:  Yes, go ahead.

08:50AM  25  BY MR. NAMMAR:

| | | | |
|---|---|---|---|
| 08:50AM | 1 | Q | Thank you.  Page 472.  And start with the first message. |
| 08:50AM | 2 | | This is you in green.  "Can you take me look at that thing |
| 08:50AM | 3 | | again?" |
| 08:50AM | 4 | | Do you see that? |
| 08:50AM | 5 | A | Yes. |
| 08:50AM | 6 | Q | And if we scroll down, Mr. Miske has a question mark.  And |
| 08:50AM | 7 | | you say "member" as in remember? |
| 08:50AM | 8 | A | Yes. |
| 08:50AM | 9 | Q | Keep going down.  Sorry, this is the wrong exchange that I |
| 08:51AM | 10 | | wanted to show.  My apologies.  If we can go to page 425. |
| 08:51AM | 11 | | Start with the second message. |
| 08:51AM | 12 | | Is this 5/27?  Do you see the date there? |
| 08:51AM | 13 | A | Yes. |
| 08:51AM | 14 | Q | Is that the same date and time for the video that we just |
| 08:51AM | 15 | | looked at a couple of hours before? |
| 08:51AM | 16 | A | Yes. |
| 08:51AM | 17 | Q | And Mr. Miske says WYA.  What does that stand for? |
| 08:51AM | 18 | A | "Where you at." |
| 08:51AM | 19 | Q | And if we scroll down, you tell him "home."  Go to the |
| 08:51AM | 20 | | next page.  Keep going down.  "You all G."  "All G," what does |
| 08:52AM | 21 | | all G mean? |
| 08:52AM | 22 | A | "All good." |
| 08:52AM | 23 | Q | Keep going down.  "LMK," is that "let me know"? |
| 08:52AM | 24 | A | Yes. |
| 08:52AM | 25 | Q | "Let me know when you are around," Mr. Miske says.  Keep |

08:52AM   1   going down.  "I stay town."  What does that mean?

08:52AM   2   A   I'm in town.

08:52AM   3   Q   Keep going down.  "HK" he responds.  What does that mean?

08:52AM   4   A   Hawaii Kai.

08:52AM   5   Q   "What, come check me out."

08:52AM   6         Do you see that?

08:52AM   7   A   Yes.

08:52AM   8   Q   Keep going down.  "If not too busy" is what you say.  Keep

08:52AM   9   going down.  "Call you if I come that way.  Nothing important;

08:52AM   10   just update on a friend."

08:52AM   11         Do you see that?

08:52AM   12   A   Yes.

08:52AM   13   Q   Keep going down.  You ask if it's good or bad and

08:53AM   14   Mr. Miske responds "not our friend.  The one we drove around."

08:53AM   15   "Good."

08:53AM   16         Do you see that?

08:53AM   17   A   Yes.

08:53AM   18   Q   Who do you think he is referring to there?

08:53AM   19   A   Chris Bourne.

08:53AM   20   Q   Chris Bourne?

08:53AM   21   A   Yes.

08:53AM   22   Q   If we keep going, "Roger, bro."  When you say -- when

08:53AM   23   Mr. Miske said in that last message "the one we drove around,"

08:53AM   24   why do you think that refers to Mr. Bourne?

08:53AM   25   A   Because that's the one he drove me by his house.

08:53AM   1   Q    Keep going down.  You say "When is good to go see?"

08:53AM   2       Do you see that?

08:53AM   3   A    Yes.

08:53AM   4   Q    Keep going down.  And Mr. Miske responds -- keep going

08:53AM   5   down -- "any time."  And then "now."

08:53AM   6       Do you see that?

08:53AM   7   A    Yes.

08:53AM   8   Q    If we keep going down.  He says "ramp."  Do you see that?

08:54AM   9   A    Yes.

08:54AM  10   Q    What does that refer to?

08:54AM  11   A    The boat ramp at the Bay.

08:54AM  12   Q    The one you just talked about?

08:54AM  13   A    Yes.

08:54AM  14   Q    Keep going down.  Keep going down.  Keep going down.

08:54AM  15       You let him know you are coming from town here in this

08:54AM  16   message?

08:54AM  17   A    Yes.

08:54AM  18   Q    Keep going down.  Keep going down.  Okay, stop here.

08:54AM  19   Mr. Miske says, "K, meet you at the ramp."  That's what you

08:54AM  20   told us is the ramp in Hawaii Kai?

08:54AM  21   A    Yes.

08:54AM  22   Q    And he says, "I'm in a piece of shit truck, silver."

08:54AM  23       What do you think that's referring to?

08:54AM  24   A    That was the car he was in that day I met him.

08:55AM  25   Q    Keep going down.  Keep going down.  Mr. Miske says, "Ramp

08:55AM  1   not Bay parking lot."

08:55AM  2          Do you see that?

08:55AM  3   A    Yes.

08:55AM  4   Q    What is that referring to?

08:55AM  5   A    The boat ramp in the parking lot next to it, not the Bay

08:55AM  6   parking lot.

08:55AM  7   Q    Keep going down.  Telling him you're on your way here.

08:55AM  8   Telling him you are passing Kahala.

08:55AM  9          What does that refer to?

08:55AM  10  A    Outside of Hawaii Kai area.

08:55AM  11  Q    You're on your way here?

08:55AM  12  A    Yes.

08:55AM  13  Q    And keep going down.  We can stop here.  "Pulling up."

08:55AM  14          What do you think that refers to?

08:55AM  15  A    That I just pulled into the parking lot.

08:55AM  16  Q    And if we look at the time that this message was

08:56AM  17  delivered, it's May 27, 2018, at 4:26 p.m.

08:56AM  18          Do you see that?

08:56AM  19  A    Yes.

08:56AM  20          MR. NAMMAR:  If we can go back to, Your Honor, 1-957.

08:56AM  21          THE COURT:  Go ahead.

08:56AM  22  BY MR. NAMMAR:

08:56AM  23  Q    And go to box 11.  On that same date, is the creation date

08:56AM  24  for this video about 15 minutes later?

08:56AM  25  A    Yes.

08:56AM   1    Q    So about 15 minutes after you are texting "I'm pulling
08:56AM   2    up," you're making this video?
08:56AM   3    A    Yes.
08:56AM   4    Q    Do you believe that was in the silver truck that Mr. Miske
08:56AM   5    references in the video?
08:56AM   6    A    Yes.
08:56AM   7    Q    In the text message, excuse me.
08:56AM   8    A    Yes.
08:56AM   9         MR. NAMMAR:  If we can now go, Your Honor, back to
08:57AM  10    1-953, page 472.  Okay.  Just to zoom in on the first message.
08:57AM  11    BY MR. NAMMAR:
08:57AM  12    Q    Just to orient us on time, this is you texting Miske on
08:57AM  13    July 12th a little bit later in time.
08:57AM  14         Do you see that?
08:57AM  15    A    Yes.
08:57AM  16    Q    If we can scroll down now.  Scroll down.  If we can stop
08:58AM  17    here.  You tell Mr. Miske "I can't find it."
08:58AM  18         Do you see that?
08:58AM  19    A    Yes.
08:58AM  20    Q    What are you referring to here?
08:58AM  21    A    We were trying to drive around and look for the house --
08:58AM  22    Chris Bourne's house.
08:58AM  23    Q    When you say "we," who is that?
08:58AM  24    A    Me and Frankie Silva.
08:58AM  25    Q    That's the Frankie that you talked about last week that

08:58AM  1    you said you guys were scouting out Chris Bourne's house,

08:58AM  2    parking in front of it?

08:58AM  3    A    Yes.

08:58AM  4    Q    In his vehicle?

08:58AM  5    A    Yes.

08:58AM  6    Q    Which you described as a black sedan?

08:58AM  7    A    Yes.

08:58AM  8    Q    Keep going down.  Mr. Miske says, "I'll be that side

08:58AM  9    tomorrow."

08:58AM  10        What does that refer to?

08:58AM  11   A    That he'll be around in that area tomorrow.

08:58AM  12   Q    If we go back down a little further, if we could stop

08:58AM  13   there.  "Okay, thank you, bro."

08:58AM  14        Do you see that?

08:58AM  15   A    Yes.

08:58AM  16   Q    Do you think you later got in touch with him and he showed

08:59AM  17   you where Mr. Bourne lived?

08:59AM  18   A    Yes.

08:59AM  19        MR. NAMMAR:  Your Honor, if we can now show the

08:59AM  20   witness only Exhibit 1-484 from the original list.

08:59AM  21        THE COURT:  Go ahead.

08:59AM  22   BY MR. NAMMAR:

08:59AM  23   Q    Thank you.  Do you see the first couple of messages here?

08:59AM  24   A    Yes.

08:59AM  25   Q    Do you recognize the one in blue as being sent by you?

| | | | |
|---|---|---|---|
| 08:59AM | 1 | A | Yes. |
| 08:59AM | 2 | Q | And if we keep going down. |
| 09:00AM | 3 | | Who is the one in green, if you know? |
| 09:00AM | 4 | A | Lance. |
| 09:00AM | 5 | Q | Are these messages with you and Lance about Mr. Salas that |
| 09:00AM | 6 | | you talked about last week? |
| 09:00AM | 7 | A | Yes. |
| 09:00AM | 8 | | MR. NAMMAR:  Your Honor, I move to admit 1-484. |
| 09:00AM | 9 | | THE COURT:  Any objection? |
| 09:00AM | 10 | | MR. KENNEDY:  No objection. |
| 09:00AM | 11 | | THE COURT:  1-484 then is admitted.  You may publish. |
| 09:00AM | 12 | | (Exhibit 1-484 was received in evidence.) |
| 09:00AM | 13 | | BY MR. NAMMAR: |
| 09:00AM | 14 | Q | Thank you.  We can start with page one, the first message. |
| 09:00AM | 15 | | This is one of the messages we looked just from your |
| 09:00AM | 16 | | phone last week, right? |
| 09:00AM | 17 | A | Yes. |
| 09:00AM | 18 | Q | And this is in reference to James Salas, right? |
| 09:00AM | 19 | A | Yes. |
| 09:00AM | 20 | Q | That you were concerned that he may be cooperating? |
| 09:00AM | 21 | A | Yes. |
| 09:00AM | 22 | Q | If we go to page six, and zoom in on the last message. |
| 09:01AM | 23 | | Why don't you take some time and review it.  Let me know when |
| 09:01AM | 24 | | you are done. |
| 09:01AM | 25 | A | I'm done. |

| | | | |
|---|---|---|---|
| 09:01AM | 1 | Q | Is this a message from you to Lance? |
| 09:01AM | 2 | A | Yes. |
| 09:01AM | 3 | Q | Were you in a dispute with Lance at this time? |
| 09:01AM | 4 | A | Yes. |
| 09:01AM | 5 | Q | About what? |
| 09:01AM | 6 | A | I robbed Dae Han after him and Lance did a game room. |
| 09:02AM | 7 | Q | Did you make up with Lance at some point after this? |
| 09:02AM | 8 | A | Yes. |
| 09:02AM | 9 | Q | And was Lance mad at you that you robbed Dae Han? |
| 09:02AM | 10 | A | Yes. |
| 09:02AM | 11 | Q | And in this message, you say, "But JB here too and bro is |
| 09:02AM | 12 | | going to get INVVED, so I ain't scared." |
| 09:02AM | 13 | A | Yes. |
| 09:02AM | 14 | Q | Who is JB? |
| 09:02AM | 15 | A | Johnnie was with us. |
| 09:02AM | 16 | Q | So you are referring to John Stancil? |
| 09:02AM | 17 | A | Yes. |
| 09:02AM | 18 | Q | And you say "bro."  Who are you referring to there? |
| 09:02AM | 19 | A | Mike. |
| 09:02AM | 20 | Q | And when you say "INVVED," what does that mean? |
| 09:02AM | 21 | A | I'm not sure.  I spelled it wrong. |
| 09:02AM | 22 | Q | Does that refer to involved possibly? |
| 09:02AM | 23 | A | Maybe. |
| 09:02AM | 24 | Q | So, "Bro going to get involved, so I ain't scared." |
| 09:02AM | 25 | | What are you referring to there? |

09:03AM   1            MR. KENNEDY:  Objection to the form of the question,

09:03AM   2    Your Honor, based on the answer that he wasn't sure.

09:03AM   3            THE COURT:  Sustained.

09:03AM   4    BY MR. NAMMAR:

09:03AM   5    Q    Bro, who do you believe that's a reference to?

09:03AM   6    A    Mike.

09:03AM   7    Q    And if we go to page seven.  If we could zoom in there.

09:03AM   8         Are you telling Lance that you love him here the same

09:03AM   9    day?

09:03AM  10    A    Yes.

09:03AM  11    Q    When you say "Gimme three days, I'll return the ten."

09:03AM  12    What does that refer to?

09:03AM  13    A    The money that we took.

09:03AM  14    Q    So you are telling him you are going to pay the money

09:03AM  15    back?

09:03AM  16    A    Yes.

09:03AM  17    Q    And if we now go to the last message, if you could take

09:03AM  18    some time to review it and let me know when you are done.

09:04AM  19    A    I'm done.

09:04AM  20    Q    Dae -- who are you referring to here?

09:04AM  21    A    Dae Han.

09:04AM  22    Q    "Dae can almost kiss his attorney bye, LOL, because Mike

09:04AM  23    going to hear everything."

09:04AM  24         Do you see that?

09:04AM  25    A    Yes.

09:04AM   1    Q    What are you referring to here?

09:04AM   2    A    The lawyer that we were using from Mike.

09:04AM   3    Q    The lawyer that you talked about last week that was

09:04AM   4    representing Dae Han; is that right?

09:04AM   5    A    Yes.

09:04AM   6    Q    And the Mike, who is the Mike that's referred to here?

09:04AM   7    A    Mike Miske.

09:05AM   8         MR. NAMMAR:  Your Honor, if we could now go to 1-952,

09:05AM   9    which was admitted last week from the original list.

09:05AM   10        THE COURT:  Go ahead.

09:05AM   11   BY MR. NAMMAR:

09:05AM   12   Q    If we could start with -- well, if we could just zoom in

09:05AM   13   on participants.  Let's zoom out real quick.  Can we zoom out

09:05AM   14   real quick.  Zoom in on the first message.

09:05AM   15        Is this an automated message?

09:05AM   16   A    Yes.

09:05AM   17   Q    So is this a message that is sent by WhatsApp, to your

09:05AM   18   knowledge?

09:05AM   19   A    Yes.

09:05AM   20   Q    And based on that, did you think that the message was

09:06AM   21   encrypted?

09:06AM   22   A    Yes.

09:06AM   23   Q    We can go to page 15.  Zoom in on the first message.

09:06AM   24        So just to orient us in time, this is a message -- is

09:06AM   25   this a message you sent?

09:06AM    1    A    Yes.

09:06AM    2    Q    On December 12th, 2017?

09:06AM    3    A    Yes.

09:06AM    4    Q    And if we scroll down now.

09:06AM    5         Who do you think you are referring to here when you

09:06AM    6    say, "Bro, he writing all this bullshit.  WTF"?

09:06AM    7         THE COURT:  December 12th?

09:06AM    8    BY MR. NAMMAR:

09:06AM    9    Q    I meant December 2nd, sorry, Your Honor.

09:06AM   10         Is this a December 2nd, 2017, delivered message?

09:07AM   11    A    Yes.

09:07AM   12    Q    Who do you think you are referring to when you say bro, he

09:07AM   13    writing all this bullshit.  WTF?

09:07AM   14    A    Probably Lindsey.

09:07AM   15    Q    When you say writing all this bullshit, what do you think

09:07AM   16    you are referring to?

09:07AM   17    A    He is posting videos of us on Instagram all the time.

09:07AM   18    Q    Scroll down.  Stop here.  You reference a Dallas.

09:07AM   19         Who do you believe that to be?

09:07AM   20    A    I didn't know who he was.  I just heard his name.  He was

09:07AM   21    talking to Lindsey about us.

09:07AM   22    Q    Scroll down.  We can go up to the one above that.

09:07AM   23         You're saying WTF?

09:07AM   24    A    Yes.

09:07AM   25    Q    "I don't know WTF for to do what happening."

09:07AM    1          Do you see that?

09:07AM    2    A    Yes.

09:08AM    3    Q    And Mr. Miske's response is, "I'm thinking."

09:08AM    4          Is that his response in blue?

09:08AM    5    A    Yes.

09:08AM    6    Q    Keep going down.  Keep going down.  And you are saying,

09:08AM    7    "IDK, what for do we go his house."

09:08AM    8          What are you referring to there?

09:08AM    9    A    We should pull up to Lindsey's house.

09:08AM   10    Q    Keep going down.  And the response, Mr. Miske says, "I'm

09:08AM   11    not happy about it."

09:08AM   12          Do you see that?

09:08AM   13    A    Yes.

09:08AM   14    Q    Would Mr. Miske frequently tell you he was not happy about

09:08AM   15    Lindsey Kinney's posts?

09:08AM   16    A    Yes.

09:08AM   17    Q    Mr. Miske tells you "not his house."

09:08AM   18          What is he referring to there?

09:08AM   19    A    For us not to pull up at his house.

09:08AM   20    Q    Go to page 20 now.  And start at the last message, it's

09:09AM   21    the same day, December 2, 2017.  You talk about "where are the

09:09AM   22    mitts."

09:09AM   23          Do you see that?

09:09AM   24    A    Yes.

09:09AM   25    Q    If you scroll down, you correct yourself and say mutts; is

09:09AM   1    that right?

09:09AM   2    A     Yes.

09:09AM   3    Q     And then scroll down.  Mr. Miske responds, "They stay at

09:09AM   4    an H."  We can stop there.

09:09AM   5          What's being discussed here?

09:09AM   6    A     That they are at a hotel.

09:09AM   7    Q     Who is at a hotel?

09:09AM   8    A     I think the boys that was with us the day of the -- that

09:09AM   9    Dayson got killed.

09:09AM   10   Q     The Aloha Tattoo incident?

09:09AM   11   A     Yes.

09:09AM   12   Q     Is that Cash and Jayward that you are talking about?

09:09AM   13   A     Yes.

09:09AM   14   Q     And you are referring to them as mutts?

09:10AM   15   A     Yes.

09:10AM   16   Q     Keep going down.  "At an H."  And then Mr. Miske says,

09:10AM   17   "Don't make more enemies that can testify."

09:10AM   18         Do you see that?

09:10AM   19   A     Yes.

09:10AM   20   Q     Who do you think he is referring to here?

09:10AM   21   A     To Cash and Jayward.

09:10AM   22   Q     Going down.  You say, "I like chill with them."  Who are

09:10AM   23   you referring to there?

09:10AM   24   A     Cash and Jayward, Johnnie.

09:10AM   25   Q     Why bring up Johnnie?

09:10AM   1   A   Because they are at the hotel with Johnnie.

09:10AM   2   Q   Please scroll down.  Stop here.  "He's the only problem at

09:10AM   3   thus point."

09:10AM   4       Do you see that?

09:10AM   5   A   Yes.

09:10AM   6   Q   Who do you think the "he" was that's being referred to

09:10AM   7   here?

09:10AM   8   A   Lindsey.

09:10AM   9   Q   Lindsey Kinney?

09:10AM   10   A   Yes.

09:10AM   11   Q   If we can go to page 35 now.  And start with the last

09:11AM   12   message.  Mr. Miske texts you here, same day, 12/02/2017,

09:11AM   13   "Dallas causing this problems."

09:11AM   14       Do you see that?

09:11AM   15   A   Yes.

09:11AM   16   Q   Who is that referring to?

09:11AM   17   A   The kid Dallas we were talking about in the last message.

09:11AM   18   Q   Is that the same person that you told us last week that

09:11AM   19   John Stancil had a confrontation with?

09:11AM   20   A   Yes.

09:11AM   21   Q   Keep scrolling down.  And you respond, "Dallas looks like

09:11AM   22   he's starting all of our shit."

09:11AM   23       Do you see that?

09:11AM   24   A   Yes.

09:11AM   25   Q   Keep going down.  Are you talking about his phone number

```
09:11AM   1   here?  Keep going down.  Are you talking about his phone number
09:12AM   2   here?
09:12AM   3   A    I think so.
09:12AM   4   Q    Keep going down.  Keep going down.  Keep going down.  Keep
09:12AM   5   going down.  Stop here.  Mr. Miske says, "The problem is the
09:12AM   6   faggot, period."
09:12AM   7            Do you see that?
09:12AM   8   A    Yes.
09:12AM   9   Q    Who do you believe he is referring to here?
09:12AM  10   A    Lindsey.
09:12AM  11   Q    Keep going down.  So you text Mr. Miske here, same chain,
09:12AM  12   "What are we going to do to make him take down these posts and
09:12AM  13   stop talking all about?"
09:12AM  14            Do you see that?
09:12AM  15   A    Yes.
09:12AM  16   Q    Who are you referring to here?
09:12AM  17   A    To Lindsey.
09:12AM  18   Q    Going down.  Stop here.  Mr. Miske tells you, "Don't be
09:12AM  19   unraveling now."
09:12AM  20            Do you see that?
09:12AM  21   A    Yes.
09:12AM  22   Q    "Got to think."  Would Mr. Miske commonly give you
09:13AM  23   instructions like that when discussing things about Lindsey
09:13AM  24   Kinney and what to do?
09:13AM  25   A    Yes.
```

09:13AM   1   Q   We can stop there.  And now if we can go to page 41.  Also
09:13AM   2   if we can zoom in on the first message.  Also on the same day,
09:13AM   3   12/2.
09:13AM   4         Do you see that?
09:13AM   5   A   Yes.
09:13AM   6   Q   You are texting here, "Where you stay, can not meet up?"
09:13AM   7   What are you asking?
09:13AM   8   A   If we can meet up.
09:13AM   9   Q   And scroll down.  Mr. Miske says, "I can, one hour."
09:13AM  10         Do you see that?
09:13AM  11   A   Yes.
09:13AM  12   Q   And go down.  He asks about his daughter.
09:14AM  13         Do you see that?
09:14AM  14   A   Yes.
09:14AM  15   Q   And one more down.  "No more pics."
09:14AM  16         Do you see that?
09:14AM  17   A   Yes.
09:14AM  18   Q   Who is that referring to?
09:14AM  19   A   I think he is talking about Lindsey's daughter.
09:14AM  20   Q   What is he asking for with no more pics?
09:14AM  21   A   I don't know.  He is asking who she fools around with and
09:14AM  22   stuff like that.
09:14AM  23   Q   Scrolling down.  Scrolling down.  "Of her naked."
09:14AM  24         Do you see that?
09:14AM  25   A   Yes.

09:14AM   1    Q    Who is he referring to there?

09:14AM   2    A    To Lindsey's daughter.

09:14AM   3    Q    Will you scroll down.  Is he telling you to get some

09:14AM   4    there?

09:14AM   5    A    Yes.

09:14AM   6    Q    What is he referring to there?

09:14AM   7    A    To try and get pictures of her, whoever she fools around

09:14AM   8    with.

09:14AM   9    Q    Naked pictures?

09:14AM  10    A    Yes.

09:14AM  11    Q    Did he tell you what he wanted to do with those naked

09:14AM  12    pictures?

09:14AM  13    A    He said he was going to post them.

09:14AM  14    Q    To get back at Lindsey Kinney?

09:14AM  15    A    Yes.

09:14AM  16    Q    We can go to page 47 now.  Start at the last message.

09:15AM  17    "Talk in lerson."

09:15AM  18         Do you see that?

09:15AM  19    A    Yes.

09:15AM  20    Q    Do you think that's a typo?

09:15AM  21    A    Yes.

09:15AM  22    Q    What do you think it's meant to say?

09:15AM  23    A    Talk in person.

09:15AM  24    Q    Would you commonly meet with Mr. Miske in person?

09:15AM  25    A    Yes.

09:15AM    1    Q    To discuss various criminal activity?

09:15AM    2    A    Yes.

09:15AM    3    Q    Go down.  Mr. Miske says, "I headed to town."  Keep going

09:15AM    4    down.  You reply, "Yeah, when?"  Going down.  "Bro, WYA?"

09:15AM    5         What is WYA?

09:15AM    6    A    Where you at.

09:15AM    7    Q    Response is "freeway."  Keep going down.  Keep going down.

09:16AM    8    WYA, where you at.  Mr. Miske says, "Leaving gym in ten

09:16AM    9    minutes."  Your response, "Town driving around."  And then stop

09:16AM    10   here.  "Come in loop, park in loop, and elevator to four."

09:16AM    11        Do you know what that refers to?

09:16AM    12   A    Yes.

09:16AM    13   Q    What?

09:16AM    14   A    He wanted me to meet him at the gym that he works out at

09:16AM    15   in the Honolulu Club.

09:16AM    16   Q    Is that one of the places that you would commonly meet

09:16AM    17   him?

09:16AM    18   A    Not commonly, but every now and then we met up over there.

09:16AM    19   Q    Keep going down.  Gym.  Keep going down.  "I'm on two."

09:16AM    20        Do you know what that refers to?

09:16AM    21   A    Yes.

09:16AM    22   Q    What?

09:16AM    23   A    He is on the second floor.

09:16AM    24   Q    Keep going down.  Keep going down.  "Coming down Ward."

09:17AM    25        Does that refer to the street?

```
09:17AM    1    A    Yes.
09:17AM    2    Q    One more message.  Stop there.  "Park in loop and come up
09:17AM    3    to two."
09:17AM    4         Do you see that?
09:17AM    5    A    Yes.
09:17AM    6    Q    What's being discussed here?
09:17AM    7    A    To park in the loop and come to the second floor.
09:17AM    8    Q    And at these in-person meetings, would you sometimes
09:17AM    9    discuss assaults?
09:17AM   10    A    Yes.
09:17AM   11    Q    Sometimes discuss Lindsey Kinney?
09:17AM   12    A    Yes.
09:17AM   13    Q    Sometimes discuss the robberies that you you've talked
09:17AM   14    about?
09:17AM   15    A    Yes.
09:17AM   16    Q    We can go now to page 56.  And start on the second
09:17AM   17    message.
09:17AM   18         Same day, right?  We are still on December 2nd, right?
09:17AM   19    A    Yes.
09:17AM   20    Q    You're saying, "Promise over everything if I see him, I'm
09:18AM   21    going to turn his jaw."
09:18AM   22    A    Yes.
09:18AM   23    Q    Keep going down.  And you say, "I'm going to knock him out
09:18AM   24    cold."
09:18AM   25         Do you see that?
```

09:18AM   1   A   Yes.

09:18AM   2   Q   Who are you referring to here?

09:18AM   3   A   To Lindsey.

09:18AM   4   Q   Lindsey Kinney?

09:18AM   5   A   Yes.

09:18AM   6   Q   And Mr. Miske's response -- keep going down.  "And not

09:18AM   7   stop."

09:18AM   8       Do you see that?

09:18AM   9   A   Yes.

09:18AM   10  Q   And then you say, "Yep, going to knock out his teeth out

09:18AM   11  of his mouth."

09:18AM   12      Do you see that?

09:18AM   13  A   Yes.

09:18AM   14  Q   And then Mr. Miske's response is "not enough," right?

09:18AM   15  A   Yes.

09:18AM   16  Q   And then you say, "I know."  We can stop here.  "I'm not

09:18AM   17  going to stop swinging until I can't swing no more."

09:18AM   18      You are talking about what you are going to do to

09:18AM   19  Lindsey Kinney?

09:18AM   20  A   Yes.

09:18AM   21  Q   Go to page 65.  Zoom in on this message.  So this is a

09:19AM   22  couple of days later on December 4th.

09:19AM   23      Do you see that?

09:19AM   24  A   Yes.

09:19AM   25  Q   Mr. Miske says, "I almost had LK kicked off IG."

| | | | |
|---|---|---|---|
| 09:19AM | 1 | A | Yes. |
| 09:19AM | 2 | Q | What does that refer to? |
| 09:19AM | 3 | A | Lindsey Kinney and Instagram. |
| 09:19AM | 4 | Q | The kicked off part, what does that refer to? |
| 09:19AM | 5 | A | He was trying to get his account shut down. |
| 09:19AM | 6 | Q | Lindsey Kinney's account? |
| 09:19AM | 7 | A | Yes. |
| 09:19AM | 8 | Q | He would tell you that? |
| 09:19AM | 9 | A | Yes. |
| 09:19AM | 10 | Q | If we can go to page 75.  So this is three days later now, |
| 09:20AM | 11 | | December 7th. |
| 09:20AM | 12 | | Do you see that? |
| 09:20AM | 13 | A | Yes. |
| 09:20AM | 14 | Q | You are asking -- you are referencing the shop. |
| 09:20AM | 15 | | What does that refer to? |
| 09:20AM | 16 | A | To Kama'aina. |
| 09:20AM | 17 | Q | Keep going down.  "Can come see." |
| 09:20AM | 18 | | What does that refer to? |
| 09:20AM | 19 | A | I'm not sure.  Probably can I come see him. |
| 09:20AM | 20 | Q | Is that one of the places you would sometimes meet |
| 09:20AM | 21 | | Mr. Miske? |
| 09:20AM | 22 | A | Yes. |
| 09:20AM | 23 | Q | Keep going down.  Keep going down.  Mr. Miske's response |
| 09:21AM | 24 | | is, "Yo," and then, "I'll come.  WYA?" |
| 09:21AM | 25 | | What does that mean? |

09:21AM   1    A    Where you at.

09:21AM   2    Q    You tell him "eggs and things."  Keep going down.  Keep

09:21AM   3    going down.  Telling him "by Payless Ala Moana."  Keep going

09:21AM   4    down.  Keep going down.  "Seen his last post."

09:21AM   5         Do you see that?

09:21AM   6    A    Yes.

09:21AM   7    Q    If we go up to the one before.  "K coming."

09:21AM   8         Do you see that?

09:21AM   9    A    Yes.

09:21AM  10    Q    Is this another example of you and Mr. Miske coordinating

09:21AM  11    a meet-up?

09:21AM  12    A    Yes.

09:21AM  13    Q    Keep going down.  Keep going down.  Keep going down.  Stop

09:22AM  14    here.  Mr. Miske says "two minutes away."

09:22AM  15         Another example of you guys coordinating a meet-up?

09:22AM  16    A    Yes.

09:22AM  17    Q    We can go to page 81.  Start on the last message.

09:22AM  18    Mr. Miske says, "CRU looking for Bubu."

09:22AM  19         Do you see that?

09:22AM  20    A    Yes.

09:22AM  21    Q    Who is Bubu, if you know?

09:22AM  22    A    Johnnie.

09:22AM  23    Q    John Stancil?

09:22AM  24    A    Yes.

09:22AM  25    Q    It's another one of his nicknames?

| | | | |
|---|---|---|---|
| 09:22AM | 1 | A | Yes. |
| 09:22AM | 2 | Q | CRU, what does that refer to? |
| 09:22AM | 3 | A | Undercover police officers, crime reduction. |
| 09:22AM | 4 | Q | With the Honolulu Police Department? |
| 09:22AM | 5 | A | Yes. |
| 09:22AM | 6 | Q | If we can keep going down.  You say, "How you know?"  And |
| 09:22AM | 7 | | then go down.  Mr. Miske says, "CRU grabbed Cody.  Drilling him |
| 09:23AM | 8 | | for Bubu location." |
| 09:23AM | 9 | | Do you see that? |
| 09:23AM | 10 | A | Yes. |
| 09:23AM | 11 | Q | Who is Cody? |
| 09:23AM | 12 | A | Their other brother. |
| 09:23AM | 13 | Q | Mr. Miske's other brother and Mr. Stancil's other brother? |
| 09:23AM | 14 | A | Yes. |
| 09:23AM | 15 | Q | And then you -- keep going down -- you ask for question |
| 09:23AM | 16 | | mark.  And then the response is, "TAT." |
| 09:23AM | 17 | | Do you see that? |
| 09:23AM | 18 | A | Yes. |
| 09:23AM | 19 | Q | Does this refer to Aloha Tattoo? |
| 09:23AM | 20 | A | Yes. |
| 09:23AM | 21 | Q | And this is on December 8, 2017; do you see that? |
| 09:23AM | 22 | A | Yes. |
| 09:23AM | 23 | Q | We can go to page 84 now.  Zoom out on this message. |
| 09:23AM | 24 | | This is from you? |
| 09:23AM | 25 | A | Yes. |

09:23AM   1   Q    You're saying you haven't heard from him in a while.

09:24AM   2        This is now on December 12, 2017, a few days later?

09:24AM   3   A    Yes.

09:24AM   4   Q    And if we go down.  Mr. Miske says, "D-I-S number was in

09:24AM   5   car.  Delz was driving."

09:24AM   6        Do you see that?

09:24AM   7   A    Yes.

09:24AM   8   Q    What's that referring to?

09:24AM   9   A    That phone was in the car Delia was driving.

09:24AM  10        THE COURT REPORTER:  I'm sorry, the what?

09:24AM  11        THE WITNESS:  The phone, that number was in the car

09:24AM  12   that Delia was driving.

09:24AM  13   Q    So the Delz is referring to Delia?

09:24AM  14   A    I think so.

09:24AM  15   Q    If we go down.  Stop there.  Mr. Miske says, "I still get

09:24AM  16   the 228 if emerg."

09:24AM  17        Do you see that?

09:24AM  18   A    It's the regular number if it's an emergency.

09:24AM  19   Q    The 228 is referring to his other number?

09:24AM  20   A    Yes.

09:25AM  21        MR. NAMMAR:  Your Honor, if we could now go to 1-953,

09:25AM  22   which was admitted last week.

09:25AM  23        THE COURT:  Go ahead.

09:25AM  24   BY MR. NAMMAR:

09:25AM  25   Q    Thank you.  Page 15.  Last message.  So this is just a

| | | |
|---|---|---|
| 09:25AM | 1 | couple days later, another text from Mr. Miske? |
| 09:25AM | 2 | A    Yes. |
| 09:25AM | 3 | Q    On December 14, 2017.  Mr. Miske writes -- well, the |
| 09:25AM | 4 | number, 228-7500. |
| 09:25AM | 5 | A    Yes. |
| 09:25AM | 6 | Q    Is that the number Mr. Miske was referring to in the last |
| 09:25AM | 7 | text? |
| 09:25AM | 8 | A    Yes. |
| 09:25AM | 9 | Q    And the message, he says, "Try high kick that dummy.  Make |
| 09:25AM | 10 | sure on film." |
| 09:25AM | 11 |      Do you see that? |
| 09:25AM | 12 | A    Yes. |
| 09:25AM | 13 | Q    Who is that referring to? |
| 09:25AM | 14 | A    Lindsey Kinney. |
| 09:25AM | 15 | Q    Is dummy a phrase you would commonly refer to Lindsey |
| 09:26AM | 16 | Kinney as? |
| 09:26AM | 17 | A    Yes. |
| 09:26AM | 18 | Q    Make sure on film.  Would you commonly get requests from |
| 09:26AM | 19 | Miske to film things? |
| 09:26AM | 20 | A    Yes. |
| 09:26AM | 21 | Q    High kick, is that something you were known for? |
| 09:26AM | 22 | A    Yes. |
| 09:26AM | 23 | Q    What does that refer to? |
| 09:26AM | 24 | A    Kicking him in the face. |
| 09:26AM | 25 | Q    And if we scroll down.  You're saying, "I never go see |

| | | |
|---|---|---|
| 09:26AM | 1 | him.  He runs." |
| 09:26AM | 2 | A    Yes. |
| 09:26AM | 3 | Q    What does that refer to? |
| 09:26AM | 4 | A    When I would see him, he would run. |
| 09:26AM | 5 | Q    Lindsey Kinney? |
| 09:26AM | 6 | A    Yes. |
| 09:26AM | 7 | Q    He would run away from you? |
| 09:26AM | 8 | A    Yes. |
| 09:26AM | 9 | Q    Go down.  Mr. Miske says, "That video would go viral." |
| 09:26AM | 10 | Going down.  "He only make videos."  We can stop there. |
| 09:26AM | 11 |        Who is that referring to? |
| 09:26AM | 12 | A    Lindsey Kinney. |
| 09:26AM | 13 | Q    You can go to page 30 now.  Zoom in on the second message. |
| 09:27AM | 14 | This is a couple days later.  December 16th -- excuse me, yeah, |
| 09:27AM | 15 | December 16, 2017.  Mr. Miske texts, "I may not be with you |
| 09:27AM | 16 | every day running around but I promise you this:  When you need |
| 09:27AM | 17 | me, I'll be there." |
| 09:27AM | 18 |        Do you see that? |
| 09:27AM | 19 | A    Yes. |
| 09:27AM | 20 | Q    And if you text him back, if you look below you text him |
| 09:27AM | 21 | back, "I know, bro, love you." |
| 09:27AM | 22 |        As I believe you testified to last week, you felt like |
| 09:27AM | 23 | you had protection from Mr. Miske? |
| 09:27AM | 24 | A    Yes. |
| 09:27AM | 25 | Q    Is this an example -- one of the examples of why you |

| | | |
|---|---|---|
| 09:27AM | 1 | thought you had Mr. Miske's protection? |
| 09:27AM | 2 | A   Yes. |
| 09:27AM | 3 | Q   When he says -- if we go back up, "I may not be with you |
| 09:28AM | 4 | every day running around," do you see that? |
| 09:28AM | 5 | A   Yes. |
| 09:28AM | 6 | Q   I think you testified last week you were committing a |
| 09:28AM | 7 | bunch of robberies which Mr. Miske was not a part of for the |
| 09:28AM | 8 | majority of those robberies, right? |
| 09:28AM | 9 | A   Yes. |
| 09:28AM | 10 | Q   But you would inform Mr. Miske about those robberies; is |
| 09:28AM | 11 | that right? |
| 09:28AM | 12 | A   Yes. |
| 09:28AM | 13 | Q   We can go to page 37 now.  Start with the second message. |
| 09:28AM | 14 | This is a day later on December 17th.  Mr. Miske says, "Try get |
| 09:28AM | 15 | me a pic of that dummy's daughter."  Scroll down.  "One nude |
| 09:29AM | 16 | one if get." |
| 09:29AM | 17 | What do you think that's referring to? |
| 09:29AM | 18 | A   To Lindsey's daughter. |
| 09:29AM | 19 | Q   Naked pictures of her like you just testified to? |
| 09:29AM | 20 | A   Yes. |
| 09:29AM | 21 | Q   Going down.  And then he says, "And if anyone knows the |
| 09:29AM | 22 | ex-wife's IG." |
| 09:29AM | 23 | What is that referring to? |
| 09:29AM | 24 | A   If anyone knows Lindsey's ex-wife's IG Instagram. |
| 09:29AM | 25 | Q   If we go to page 39.  Zoom in on the last message.  The |

| | | |
|---|---|---|
| 09:29AM | 1 | next day December 18th, 2017, you're texting with Mr. Miske, |
| 09:29AM | 2 | "Bro, how come all these guys saying I was the one there at the |
| 09:30AM | 3 | tattoo shop." |
| 09:30AM | 4 | Do you see that? |
| 09:30AM | 5 | A    Yes. |
| 09:30AM | 6 | Q    What are you saying there?  What's that referring to? |
| 09:30AM | 7 | A    I'm asking him why the story is everybody is saying I was |
| 09:30AM | 8 | the one that was there, because I wasn't the one that went in. |
| 09:30AM | 9 | It was Daes. |
| 09:30AM | 10 | Q    Who was the one that went in with Daes? |
| 09:30AM | 11 | A    Johnnie. |
| 09:30AM | 12 | Q    If you go down, Mr. Miske says, "Who is saying?" |
| 09:30AM | 13 | Do you see that? |
| 09:30AM | 14 | A    Yes. |
| 09:30AM | 15 | Q    Going down.  And then it says, "Tim telling all kind |
| 09:30AM | 16 | people was me." |
| 09:30AM | 17 | Do you see that? |
| 09:30AM | 18 | A    Yes. |
| 09:30AM | 19 | Q    Who do you believe Tim is referring to? |
| 09:30AM | 20 | A    The owner of the tattoo shop. |
| 09:30AM | 21 | Q    Going down.  And then Mr. Miske says "Get to Tim." |
| 09:30AM | 22 | Do you see that? |
| 09:30AM | 23 | A    Yes. |
| 09:30AM | 24 | Q    Tell him, "Why the fuck he saying that."  Going down. |
| 09:30AM | 25 | "Who did he tell that to?"  Go on down.  "Guarantee it's LK |

| | | |
|---|---|---|
| 09:30AM | 1 | telling Tim that." |
| 09:31AM | 2 | Who is LK referring to? |
| 09:31AM | 3 | A   Lindsey Kinney. |
| 09:31AM | 4 | Q   Going down, "A bunch of people telling me it's coming from |
| 09:31AM | 5 | Tim," is your response.  Going down.  "You have any pics of his |
| 09:31AM | 6 | daughter?" |
| 09:31AM | 7 | Do you see that? |
| 09:31AM | 8 | A   Yes. |
| 09:31AM | 9 | Q   Keep going down.  The response is, "LK," do you see that? |
| 09:31AM | 10 | A   Yes. |
| 09:31AM | 11 | Q   That's Lindsey Kinney? |
| 09:31AM | 12 | A   Yes. |
| 09:31AM | 13 | Q   Keep going down.  You say, "Nope, I don't got."  Keep |
| 09:31AM | 14 | going down.  "I no even think she got social media." |
| 09:31AM | 15 | Are you referring to Lindsey's daughter? |
| 09:31AM | 16 | A   Yes. |
| 09:31AM | 17 | Q   Keep going down.  He is saying, "I thought one of the boys |
| 09:31AM | 18 | was cranking her." |
| 09:31AM | 19 | Who is that referring to? |
| 09:31AM | 20 | A   I'm not sure. |
| 09:31AM | 21 | Q   Keep going down.  "He no more." |
| 09:32AM | 22 | Were these about Lindsey Kinney's daughter? |
| 09:32AM | 23 | A   Yes. |
| 09:32AM | 24 | Q   If we go to page 52.  Start at the top.  Mr. Miske says -- |
| 09:32AM | 25 | this is a couple of days later now on December 19th.  "Somebody |

| 09:32AM | 1 | been hammering nonstop."  If we scroll down.  You say, "huh?" |
|---|---|---|
| 09:32AM | 2 | The response is "I crack up."  And then you say, "on IG?" |
| 09:32AM | 3 | What does IG refer to? |
| 09:32AM | 4 | A   Instagram. |
| 09:32AM | 5 | Q   Keep going down.  "Who."  Keep going down.  "No front in |
| 09:33AM | 6 | 808."  Keep going down.  "Something like that."  You say, |
| 09:33AM | 7 | "Who's that, do we know him?"  Keep going down.  "IDK," does |
| 09:33AM | 8 | that mean I don't know? |
| 09:33AM | 9 | A   Yes. |
| 09:33AM | 10 | Q   Keep going down.  Stop there.  "Sound like Migo but I |
| 09:33AM | 11 | never ask." |
| 09:33AM | 12 | Do you see that? |
| 09:33AM | 13 | A   Yes. |
| 09:33AM | 14 | Q   Who is Migo? |
| 09:33AM | 15 | A   Johnnie. |
| 09:33AM | 16 | Q   Did John Stancil ever make fake pages on Instagram? |
| 09:33AM | 17 | A   Yes. |
| 09:33AM | 18 | Q   What would he post on those fake pages? |
| 09:33AM | 19 | A   They would argue with Lindsey on the fake pages. |
| 09:33AM | 20 | Q   We go to page 64 now.  Start on the bottom message.  So |
| 09:34AM | 21 | couple of days later now, December 21, 2017.  You say, "I just |
| 09:34AM | 22 | saw Dallas." |
| 09:34AM | 23 | You see that? |
| 09:34AM | 24 | A   Yes. |
| 09:34AM | 25 | Q   Is this the Dallas that you've been discussing in the last |

```
09:34AM    1    messages we looked at?
09:34AM    2    A    Yes.
09:34AM    3    Q    The one that you testified you thought was spreading
09:34AM    4    information about you guys?
09:34AM    5    A    Yes.
09:34AM    6    Q    Keep going down.  Mr. Miske asks where.  The response,
09:34AM    7    "and what happened?"  You say, "I driving.  Text you when I
09:34AM    8    stop."  You say, "I just smiled at him and told him I heard you
09:34AM    9    going to die soon, boy."
09:34AM   10         Are you referring to Dallas there?
09:34AM   11    A    Yes.
09:34AM   12    Q    You say "he ran out of the spot.  He ran out the spot."
09:35AM   13    "He ran?"  Question mark.  Your response is, "Yep."  He said,
09:35AM   14    "hurry, we gotta go."  Mr. Miske asks "who was he with?"  Keep
09:35AM   15    going down.  Keep going down.  He tells you here, "Should have
09:35AM   16    slapped that person."
09:35AM   17         Do you see that?
09:35AM   18    A    Yes.
09:35AM   19    Q    That's referring to Dallas?
09:35AM   20    A    Yes.
09:35AM   21    Q    What does to slap mean?
09:35AM   22    A    To slap him.
09:35AM   23    Q    "He the one giving info."
09:35AM   24         Do you see that?
09:35AM   25    A    Yes.
```

| | | | |
|---|---|---|---|
| 09:35AM | 1 | Q | Is that referring to Dallas? |
| 09:35AM | 2 | A | Yes. |
| 09:35AM | 3 | Q | We can go to page 77.  Zoom in on the first message.  It |
| 09:36AM | 4 | | says the next day, December 22nd, "What gotta do for get 'em |
| 09:36AM | 5 | | taken down." |
| 09:36AM | 6 | | Do you see that? |
| 09:36AM | 7 | A | Yes. |
| 09:36AM | 8 | Q | "I been trying," is Mr. Miske's response.  Keep going |
| 09:36AM | 9 | | down.  "Enough PPL complaining." |
| 09:36AM | 10 | | Do you see that? |
| 09:36AM | 11 | A | Yes. |
| 09:36AM | 12 | Q | What is that referring to? |
| 09:36AM | 13 | A | People. |
| 09:36AM | 14 | Q | What are you asking Mr. Miske here? |
| 09:36AM | 15 | A | How we are going to get Lindsey's Instagram taken down. |
| 09:36AM | 16 | Q | You were trying to get his IG removed from Instagram? |
| 09:36AM | 17 | A | Yes. |
| 09:36AM | 18 | Q | We can go to page 80 now.  Top message.  You're saying |
| 09:37AM | 19 | | here that this person is driving you nuts.  Keep going down. |
| 09:37AM | 20 | | Response is, "how you think I feel."  Keep going down.  Stop |
| 09:37AM | 21 | | here.  "He's a problem." |
| 09:37AM | 22 | | Do you see that? |
| 09:37AM | 23 | A | Yes. |
| 09:37AM | 24 | Q | Who is that referring to? |
| 09:37AM | 25 | A | Lindsey Kinney. |

09:37AM   1   Q    We can go to page 85.  Zoom in on the top message.  Couple

09:37AM   2   days later now on December 24th, Mr. Miske tells you, "Don't

09:38AM   3   drive.  Tell Oni I said hi."

09:38AM   4        Who is Oni referred to?

09:38AM   5   A    Keoni Adric.

09:38AM   6   Q    Is that the person that you testified to last week that

09:38AM   7   assaulted Shaden?

09:38AM   8   A    Yes.

09:38AM   9   Q    For Mr. Miske?

09:38AM   10  A    Yes.

09:38AM   11  Q    Go to page 92.  Zoom in on the last -- the second message.

09:38AM   12  You're typing here, "LOL, he is a dummy."  Scrolling down.

09:38AM   13  "Bro, I, like, knock him out so bad."

09:38AM   14       Are you talking about Lindsey Kinney again?

09:38AM   15  A    Yes.

09:38AM   16  Q    Keep going down.  Mr. Miske says, "I wish you did already.

09:39AM   17  Should a long time ago.  And film it so we can shoot it so

09:39AM   18  people can see the truth."

09:39AM   19       Do you see that?

09:39AM   20  A    Yes.

09:39AM   21  Q    Would he commonly ask you to record things like this?

09:39AM   22  A    Yes.

09:39AM   23  Q    Keep going down.  Keep going down.  Keep going down.  "He

09:39AM   24  was at the corner last night."

09:39AM   25       Do you see that?

09:39AM    1    A    Yes.

09:39AM    2    Q    What is that referring to?

09:39AM    3    A    The bar in Kaneohe.

09:39AM    4    Q    Is that the same bar that we looked at a video from last

09:39AM    5    week of you fighting?

09:39AM    6    A    Yes.

09:39AM    7    Q    Is that a bar that Mr. Kinney would hang out at?

09:39AM    8    A    Yes.

09:39AM    9    Q    Keep going down.  You were asked, "How we know."  And the

09:39AM   10    response -- stop here.  "Andi seen him."

09:40AM   11         Do you see that?

09:40AM   12    A    Yes.

09:40AM   13    Q    Who is this referring to?

09:40AM   14    A    One of Mike's girlfriends.

09:40AM   15    Q    That was Andi?

09:40AM   16    A    Yes.

09:40AM   17    Q    Go to page 98.  Last message, Mr. Miske tells you on

09:40AM   18    December 24th, "Gonna camp at the Bay overnight, hang out all

09:40AM   19    day tomorrow.  You always invited."  Your response is on the

09:40AM   20    next page.  Stop there.  "Roger, bro, I see you there."

09:40AM   21         What's that referring to?

09:40AM   22    A    The Bay.

09:40AM   23    Q    Where you guys would hang out in Hawaii Kai?

09:40AM   24    A    Yes.

09:40AM   25    Q    If we go to page 112.  Start on the second message.  Two

| | | | |
|---|---|---|---|
| 09:41AM | 1 | | days later you're asking him, "Did Alen say anything?" |
| 09:41AM | 2 | | Who is that referring to? |
| 09:41AM | 3 | A | Alen Kaneshiro. |
| 09:41AM | 4 | Q | The lawyer that you've been telling us about? |
| 09:41AM | 5 | A | Yes. |
| 09:41AM | 6 | Q | Keep going down.  He says, "Alen going call me in an |
| 09:41AM | 7 | | hour."  Keep going down.  Keep going down.  Stop here. |
| 09:41AM | 8 | | What's being discussed here? |
| 09:41AM | 9 | A | Turning myself in for a violation. |
| 09:41AM | 10 | Q | Is Mr. Miske discussing advice that he received from Alen |
| 09:41AM | 11 | | for you? |
| 09:41AM | 12 | A | Yes. |
| 09:41AM | 13 | Q | Go to page 127.  First message. |
| 09:42AM | 14 | | You're asking Mr. Miske where he is here? |
| 09:42AM | 15 | A | Yes. |
| 09:42AM | 16 | Q | The second message down.  Stop here.  "Auction." |
| 09:42AM | 17 | | Do you see that? |
| 09:42AM | 18 | A | Yes. |
| 09:42AM | 19 | Q | What does that refer to? |
| 09:42AM | 20 | A | The car auction. |
| 09:42AM | 21 | Q | Would you ever go to the auction with Mr. Miske? |
| 09:42AM | 22 | A | I have. |
| 09:42AM | 23 | Q | Where was it located, if you remember? |
| 09:42AM | 24 | A | In Mapunapuna Industrial. |
| 09:42AM | 25 | Q | If we can go to page 182 now, and start at the top.  So |

09:42AM   1    now we are in February of 2018.

09:42AM   2            Do you see that on the bottom?

09:42AM   3    A    Yes.

09:42AM   4    Q    And he is asking you about a person named Kalani.  Scroll

09:43AM   5    down.  He is saying -- scroll down, "I had to grab him."

09:43AM   6    Scroll down.  "He went and jump bail."  Scroll down.  "My

09:43AM   7    friend the bondsman."  Scroll down.  "I just dropped him off at

09:43AM   8    the police station cell block."  HPD caught him on Kuhio.  And

09:43AM   9    you say, "He stay Ebb Tides."

09:43AM   10           What are you talking about here?

09:43AM   11   A    I knew who he was and he stayed at an apartment in

09:43AM   12   Waikiki.

09:43AM   13   Q    And this is about this person Kalani?

09:43AM   14   A    Yes.

09:43AM   15   Q    Keep going down.  Keep going down.  Keep going down.  Keep

09:44AM   16   going down.  Stop here.  Mr. Miske says, "Yeah, those people

09:44AM   17   are taking pics of me."

09:44AM   18           Do you see that?

09:44AM   19   A    Yes.

09:44AM   20   Q    Who is he referring to?

09:44AM   21   A    The police that were there with him.

09:44AM   22   Q    Keep going down.  Keep going down.  Keep going down.  Stop

09:44AM   23   here.  "One of the pics got back to me."

09:44AM   24           Do you see that?

09:44AM   25   A    Yes.

| | | | |
|---|---|---|---|
| 09:44AM | 1 | Q | What is he saying here? |
| 09:44AM | 2 | A | Pics the police took over there got back to him. |
| 09:44AM | 3 | | (Reporter interruption for clarification.) |
| 09:44AM | 4 | A | One of the pictures the police took got back to him. |
| 09:44AM | 5 | Q | So he was explaining that a police officer took pictures |
| 09:44AM | 6 | | of him when was arresting Kalani? |
| 09:44AM | 7 | A | Yes. |
| 09:44AM | 8 | Q | And that one of the pictures was reported back to him? |
| 09:44AM | 9 | A | Yes. |
| 09:44AM | 10 | Q | Keep going down.  Keep going down.  Keep going down. |
| 09:45AM | 11 | | Mr. Miske says, "The CRU guys was taking pictures of me." |
| 09:45AM | 12 | | What does CRU refer to? |
| 09:45AM | 13 | A | Undercovers. |
| 09:45AM | 14 | Q | Keep going down.  Keep going down.  You're saying, "Was |
| 09:45AM | 15 | | the CRU named Tanuvasa?" |
| 09:45AM | 16 | | Do you see that? |
| 09:45AM | 17 | A | Yes. |
| 09:45AM | 18 | Q | Who is Tanuvasa? |
| 09:45AM | 19 | A | The CRU that didn't like me and Lance. |
| 09:45AM | 20 | Q | A police officer? |
| 09:45AM | 21 | A | Yes. |
| 09:45AM | 22 | Q | Keep going down.  And here -- keep going down.  He is |
| 09:45AM | 23 | | telling you he is providing you with a name.  Keep going down. |
| 09:45AM | 24 | | "Micah Apo." |
| 09:45AM | 25 | | Do you see that? |

| | | | |
|---|---|---|---|
| 09:45AM | 1 | A | Yes. |
| 09:45AM | 2 | Q | Is that a police officer? |
| 09:45AM | 3 | A | Yes. |
| 09:45AM | 4 | Q | Keep going down.  Keep going down.  Keep going down.  He |
| 09:46AM | 5 | | is saying, "HPD is security guards." |
| 09:46AM | 6 | | Do you see that? |
| 09:46AM | 7 | A | Yes. |
| 09:46AM | 8 | Q | Keep going down.  Stop here.  "I call them mailmen." |
| 09:46AM | 9 | | Do you see that? |
| 09:46AM | 10 | A | Yes. |
| 09:46AM | 11 | Q | Is that how you would commonly refer to Honolulu police |
| 09:46AM | 12 | | officers around you? |
| 09:46AM | 13 | A | I think he was teasing them. |
| 09:46AM | 14 | Q | If we go now to page 200.  First message.  So around the |
| 09:46AM | 15 | | same time also in February, Mr. Miske says, "Dave should shoot |
| 09:46AM | 16 | | that person now.  At least he would have a valid reason." |
| 09:46AM | 17 | | Do you know what that's referring to? |
| 09:46AM | 18 | A | Yes. |
| 09:46AM | 19 | Q | What is it referring to? |
| 09:46AM | 20 | A | One of my friends got beat up from Lindsey Kinney and he |
| 09:46AM | 21 | | is saying they should shoot him. |
| 09:47AM | 22 | Q | Who was your friend? |
| 09:47AM | 23 | A | David Pedro (phonetic). |
| 09:47AM | 24 | Q | Could we go to page 207 now.  If we go to the second |
| 09:47AM | 25 | | message.  Four days later.  Mr. Miske says, "I wish you would |

| | | |
|---|---|---|
| 09:47AM | 1 | smash that person to pieces." |
| 09:47AM | 2 | Do you see that? |
| 09:47AM | 3 | A   Yes. |
| 09:47AM | 4 | Q   Keep going down.  You're responding here, "He not going to |
| 09:47AM | 5 | meet." |
| 09:47AM | 6 | Who are you referring to? |
| 09:47AM | 7 | A   Lindsey. |
| 09:48AM | 8 | Q   Keep going down.  "Who his friends?"  Question mark.  And |
| 09:48AM | 9 | then you say Abe. |
| 09:48AM | 10 | Who are you referring to there? |
| 09:48AM | 11 | A   Abe Sakama. |
| 09:48AM | 12 | Q   You are discussing one of the Lindsey Kinney's friends? |
| 09:48AM | 13 | A   Yes. |
| 09:48AM | 14 | Q   If we go to page 217.  Last message.  Couple days later, |
| 09:48AM | 15 | February 23, 2018.  Mr. Miske says, "Catch him walking to his |
| 09:48AM | 16 | truck."  If we could scroll down.  Scroll down.  L-I-K, what |
| 09:49AM | 17 | does that refer to? |
| 09:49AM | 18 | A   Beat him up, lick him. |
| 09:49AM | 19 | Q   Scroll down.  Mr. Miske says bad.  Who are you guys |
| 09:49AM | 20 | referring to here? |
| 09:49AM | 21 | A   Lindsey. |
| 09:49AM | 22 | Q   More Lindsey Kinney text messages? |
| 09:49AM | 23 | A   Yes. |
| 09:49AM | 24 | Q   We go to page 224, last message.  "Please shut this person |
| 09:49AM | 25 | up."  Keep going, next page.  Keep going down.  Keep going |

| | | | |
|---|---|---|---|
| 09:49AM | 1 | | down.  Stop there. |
| 09:49AM | 2 | | What does smash refer to? |
| 09:49AM | 3 | A | Beat him up badly. |
| 09:49AM | 4 | Q | Is this more Lindsey Kinney text messages? |
| 09:49AM | 5 | A | Yes. |
| 09:49AM | 6 | Q | We go to page 248.  Start with last message.  We are a |
| 09:50AM | 7 | | couple of days later now. |
| 09:50AM | 8 | | February 26, 2018, do you see that? |
| 09:50AM | 9 | A | Yes. |
| 09:50AM | 10 | Q | "I see Certification right now." |
| 09:50AM | 11 | | Do you see that? |
| 09:50AM | 12 | A | Yes. |
| 09:50AM | 13 | Q | Who are you talking about here? |
| 09:50AM | 14 | A | Ryan Teramoto. |
| 09:50AM | 15 | Q | Why do you use the name Certification? |
| 09:50AM | 16 | A | Because that was the name of his pest control business. |
| 09:50AM | 17 | Q | If we go to the next message, "Certi squirty." |
| 09:50AM | 18 | | Do you see that? |
| 09:50AM | 19 | A | Yes. |
| 09:50AM | 20 | Q | Who is that referring to? |
| 09:50AM | 21 | A | Ryan Teramoto. |
| 09:50AM | 22 | Q | Going down.  Mr. Miske's response is, "Do it." |
| 09:50AM | 23 | | Do you see that? |
| 09:50AM | 24 | A | Yes. |
| 09:50AM | 25 | Q | What is he referring to? |

| | | | |
|---|---|---|---|
| 09:50AM | 1 | A | To assault him. |
| 09:51AM | 2 | Q | And then there is a Q and then there is a Quin. |
| 09:51AM | 3 | | Do you see that? |
| 09:51AM | 4 | A | Yes. |
| 09:51AM | 5 | Q | Who is that referring to? |
| 09:51AM | 6 | A | My friend Quinton that was cruising with me. |
| 09:51AM | 7 | Q | Keep going down.  "With me, LOL.  That's why I told you." |
| 09:51AM | 8 | | What's that referring to? |
| 09:51AM | 9 | A | That Quinton is with me. |
| 09:51AM | 10 | Q | Keep going down.  And then you say -- Mr. Miske says, |
| 09:51AM | 11 | | "Yeah, doggy." |
| 09:51AM | 12 | | What is he referring to here? |
| 09:51AM | 13 | A | He is excited. |
| 09:51AM | 14 | Q | About you assaulting Teramoto with Quinton? |
| 09:51AM | 15 | A | Yes. |
| 09:51AM | 16 | Q | How big of a person is Quinton? |
| 09:51AM | 17 | A | He is a big boy. |
| 09:51AM | 18 | Q | And then keep going down.  Response is, "I like see." |
| 09:51AM | 19 | | What is he saying there? |
| 09:51AM | 20 | A | That he wants to see us do it. |
| 09:52AM | 21 | Q | Keep going down.  You say, "I don't know if he even here, |
| 09:52AM | 22 | | just his car in there and it's closing soon." |
| 09:52AM | 23 | | What are you referring to? |
| 09:52AM | 24 | A | That the store we see the truck outside is about to close. |
| 09:52AM | 25 | Q | Do you remember what kind of store that was? |

09:52AM   1   A   Jiffy Lube.

09:52AM   2   Q   Where?

09:52AM   3   A   In Kaneohe Windward Mall.

09:52AM   4   Q   Jiffy Lube Kaneohe Windward Mall?

09:52AM   5   A   Yes.

09:52AM   6   Q   Keep going down.  Mr. Miske says, "Discipline."

09:52AM   7       Is he saying wait him out here?

09:52AM   8   A   Yes.

09:52AM   9   Q   Keep going down.  "Wait him out."

09:52AM   10      He is giving you advice on how to do the assault?

09:52AM   11  A   Yes.

09:52AM   12  Q   And then your response is, "We been, the shop closing and

09:53AM   13  his car in the shop."

09:53AM   14      What does that mean?

09:53AM   15  A   That we was waiting there but the shop was closing and the

09:53AM   16  truck was still there.

09:53AM   17  Q   Then he says, "Oh, next time."  And then Mr. Miske says,

09:53AM   18  "What shop?"  Keep going down.  You saying, "We walked in

09:53AM   19  everything, he not even there."

09:53AM   20      What are you referring to there?

09:53AM   21  A   That we walked in looking for him and he wasn't there.

09:53AM   22  Q   And then keep going down.  Jiffy.  Do you see that?

09:53AM   23  A   Yes.

09:53AM   24  Q   What does that mean?

09:53AM   25  A   The Kaneohe Jiffy Lube.

09:53AM    1    Q    Keep going down.  Keep going down.  You're saying here

09:53AM    2    that they closed and they just brought his truck back?

09:53AM    3    A    Yes.

09:53AM    4    Q    Referring Jiffy Lube?

09:53AM    5    A    Yes.

09:53AM    6    Q    And then his response, stop here, "They leaving it."

09:54AM    7         Is this referring to Teramoto's truck?

09:54AM    8    A    Yes.

09:54AM    9    Q    If we go down to page 292.  Zoom in here.  Now we are in

09:54AM   10    March, March 2, 2018.  Last week you were shown a video of you

09:54AM   11    fighting someone outside the corner bar.

09:54AM   12         Could you remind us what that one was of?

09:54AM   13    A    That was one of Lindsey's friends.

09:54AM   14    Q    What are you doing here in this WhatsApp message?

09:54AM   15    A    I sent it to Mike.

09:54AM   16    Q    You're sending the video of you assaulting one of

09:55AM   17    Lindsey's friends?

09:55AM   18    A    Yes.

09:55AM   19    Q    Keep going down.  Keep going down.

09:55AM   20         Did you send him three videos here?

09:55AM   21    A    Yes.

09:55AM   22    Q    Were they all you assaulting Lindsey Kinney's friend?

09:55AM   23    A    Yes.

09:55AM   24    Q    Keep going down.  Miske says, "Who is that?  Who is

09:55AM   25    Lindsey's boy?"  "His nephew."  You say, "I caught him at the

09:55AM   1    bar and split one cup on his head."

09:55AM   2            What are you referring to there?

09:55AM   3    A    I hit him with a cup inside the bar.

09:55AM   4    Q    Keep going down.  Mr. Miske is asking, "Dummy LK?"  Is he

09:55AM   5    asking if it's Lindsey Kinney?

09:55AM   6    A    Yes.

09:55AM   7    Q    And keep going down.  You say, "No.  No, his boy."  You

09:56AM   8    tell him, "I told him, call Lindsey."  Keep going down.  Stop

09:56AM   9    here.  You say "Taylor."

09:56AM   10           Who is that?

09:56AM   11   A    Lindsey's friend.

09:56AM   12   Q    Keep going down.  Keep going down.  Keep going down.  You

09:56AM   13   say, "He stay in the videos with him."

09:56AM   14           What do you mean by that?

09:56AM   15   A    That he was making videos with Lindsey Kinney.

09:56AM   16   Q    Keep going down.  Keep going down.  Keep going down.  Keep

09:56AM   17   going down.  Quinton, that's referred to here, who is that?

09:56AM   18   A    My friend.

09:56AM   19   Q    Is that the same friend that you were outside of Jiffy

09:57AM   20   Lube with?

09:57AM   21   A    Yes.

09:57AM   22   Q    Keep going down.  Keep going down.  We can stop there.

09:57AM   23   Can we go now to page 311 and focus on the last message.  This

09:57AM   24   is sent to you around the same time, March 4, 2018.

09:57AM   25           Is this from Mr. Miske?

09:57AM    1    A    Yes.

09:57AM    2    Q    And now if we go to page 516 and zoom in.

09:57AM    3         Does this appear to be the same message that -- just

09:58AM    4    blown up that we just looked at?

09:58AM    5    A    Yes.

09:58AM    6    Q    It says, "Report an impersonation account on Instagram."

09:58AM    7    And then it reads that, "Thanks for bringing this account to

09:58AM    8    our attention.  We have removed the account or disabled access

09:58AM    9    to it on Instagram."

09:58AM   10         Do you see that?

09:58AM   11    A    Yes.

09:58AM   12    Q    Who is this referring to?

09:58AM   13    A    To Lindsey Kinney.

09:58AM   14    Q    So Mr. Miske made an impersonation complaint on

09:58AM   15    Mr. Kinney's account?

09:58AM   16    A    Yes.

09:58AM   17    Q    Could we go to page 312.  Actually, go back to 311.

09:58AM   18         So this is the message we just looked at, just blown

09:58AM   19    up, correct?

09:58AM   20    A    Yes.

09:58AM   21    Q    If we go to page 312 now.  And then Mr. Miske says, "Don't

09:59AM   22    tell anyone though.  Just play dumb.  I don't want it to get

09:59AM   23    back to him."

09:59AM   24         Is he referring to the impersonation complaint?

09:59AM   25    A    Yes.

09:59AM  1   Q    You tell him he is an idol for taking Lindsey Kinney's
09:59AM  2   Instagram off?
09:59AM  3   A    Yes.
09:59AM  4   Q    Did it in fact get shut down?
09:59AM  5   A    I think so.
09:59AM  6   Q    And then Mr. Miske said, "I had to write a compelling
09:59AM  7   story and told IG, and I'm going to sue."  Going down.  And
09:59AM  8   then your response is, "LOL, you're bad."
09:59AM  9        This is all referring to getting Lindsey Kinney's
09:59AM  10  Instagram account taken down?
09:59AM  11  A    Yes.
09:59AM  12  Q    If we can go now to page 345.  Zoom in on the second
10:00AM  13  message.  Mr. Miske says, "One charge can be beatable, but they
10:00AM  14  going to go for 50 charges and offer to drop 25 and pleas to
10:00AM  15  25."  What is Mr. Miske discussing here?
10:00AM  16  A    I think about coming to jail.
10:00AM  17  Q    The pending case against him?
10:00AM  18  A    Yes.
10:00AM  19  Q    Keep going down.  And you say -- keep going down.  They're
10:00AM  20  talking about ice head who sells pounds of ice over yours who
10:00AM  21  is someone who run a business.  Keep going down.  And then you
10:00AM  22  ask, "What 25 do they have?  There is no way they can put 25
10:01AM  23  charges on us."
10:01AM  24       Do you see that?
10:01AM  25  A    Yes.

10:01AM    1    Q    You're discussing the pending investigation?

10:01AM    2    A    Yes.

10:01AM    3    Q    Keep going down.  You say, "He just said he shot your ear

10:01AM    4    and my nose.  The guy's obviously delusional here."

10:01AM    5         Who are you referring to here?

10:01AM    6    A    To Lindsey.

10:01AM    7    Q    Keep going down.  Keep going down.  Stop here.  Mr. Miske

10:01AM    8    says, "I'm just saying it's not over."

10:01AM    9         This is all discussing the pending criminal

10:01AM   10    investigation against you?

10:01AM   11    A    Yes.

10:01AM   12    Q    Keep going down.  Keep going down.  Keep going down.  Stop

10:02AM   13    here.  Mr. Miske says, "That's why I tell you don't get into

10:02AM   14    trouble."

10:02AM   15         Do you see that?

10:02AM   16    A    Yes.

10:02AM   17    Q    "Because when they do, they quietly pull in your victims

10:02AM   18    and have them testify to assaults, robberies, etcetera.  And

10:02AM   19    that's where the 50 comes into play."

10:02AM   20         Last week you testified to a number of assaults,

10:02AM   21    correct?

10:02AM   22    A    Yes.

10:02AM   23    Q    And those assaults that you talked about, who was paying

10:02AM   24    you to do those assaults?

10:02AM   25    A    Mike.

| | | | |
|---|---|---|---|
| 10:02AM | 1 | Q | Who was directing you to do those assaults? |
| 10:02AM | 2 | A | Mike. |
| 10:02AM | 3 | Q | Did you know any of the people that you were assaulting? |
| 10:02AM | 4 | A | No. |
| 10:02AM | 5 | Q | If we go now to page 370, zoom in on the bottom message. |
| 10:03AM | 6 | | Is this message from you? |
| 10:03AM | 7 | A | Yes. |
| 10:03AM | 8 | Q | "Bro, do you have a whip I can use for now?  I can't drive |
| 10:03AM | 9 | | my car.  Got to take it to the shop." |
| 10:03AM | 10 | | What are you talking about here? |
| 10:03AM | 11 | A | If there was one of the auction cars I can use.  I'm |
| 10:03AM | 12 | | taking my regular car to the shop. |
| 10:03AM | 13 | Q | A whip is a car? |
| 10:03AM | 14 | A | Yes. |
| 10:03AM | 15 | Q | Scroll on down.  Stop here.  He says, "I'll ask Koa." |
| 10:03AM | 16 | | Do you know who Koa was? |
| 10:03AM | 17 | A | One of the boys that worked at the shop. |
| 10:03AM | 18 | Q | Would you on occasion borrow auction cars from him? |
| 10:03AM | 19 | A | Yes. |
| 10:03AM | 20 | Q | We can go to page 376.  We zoom in on the first one.  You |
| 10:04AM | 21 | | say, "Come watch me and Q lick the person at the fights." |
| 10:04AM | 22 | | Who are you referring to here? |
| 10:04AM | 23 | A | To Lindsey. |
| 10:04AM | 24 | Q | And when you say Q, who is that? |
| 10:04AM | 25 | A | Quinton. |

10:04AM  1   Q   Going down.  You say, "Which one."  Keep going down.  Keep

10:04AM  2   going down.  Keep going down.  "Which location?"  Mr. Miske

10:04AM  3   asks.  Keep going down.  And you say "Abe's."

10:05AM  4          What does that refer to?

10:05AM  5   A   The chicken fights that are held at Abe's.

10:05AM  6   Q   Is that where they would be located?

10:05AM  7   A   Yes.

10:05AM  8   Q   Keep going down.  Mr. Miske says, "Okay, well let me know

10:05AM  9   what time."  Keep going down.  Keep going down.  You say,

10:05AM  10  "Waiting for H and we out."

10:05AM  11         Who is H?

10:05AM  12  A   I think that's Harry Boy, Harry Kauhi.

10:05AM  13  Q   Keep going down.  Then you say, "You like watch."

10:05AM  14         What does that refer to?

10:05AM  15  A   I asked him if he wants to watch.

10:05AM  16  Q   Watch the assault?

10:05AM  17  A   Yes.

10:05AM  18  Q   Keep going down.  Stop here.  Mr. Miske's response is,

10:05AM  19  "Have somebody FaceTime me.  I'm eating brunch at the Four

10:05AM  20  Seasons right now.  I forgot, it's Daniel's birthday."  So he

10:05AM  21  wanted you to FaceTime.

10:05AM  22         Can you tell the jury what FaceTime is?

10:05AM  23  A   It's a video chat.

10:06AM  24  Q   So he could see it live?

10:06AM  25  A   Yes.

10:06AM  1   Q    Do you know who the Daniel is that's being referred to?

10:06AM  2   A    I'm not sure.

10:06AM  3   Q    Keep going down.  You say, "shoots."  Keep going down.  He

10:06AM  4   says, "I don't think he is going to be there."  Keep going

10:06AM  5   down.  You say why?  Keep going down.  "He wasn't there the

10:06AM  6   last two weeks."

10:06AM  7        Who are you discussing there?

10:06AM  8   A    Lindsey Kinney.

10:06AM  9   Q    Keep going down.  Keep going down.  Keep going down.  Keep

10:06AM  10  going down.  Keep going down.  So Mr. Miske is saying, "Can you

10:06AM  11  text me before anything happens?  Text me if he is there."

10:06AM  12       What is he talking about?

10:06AM  13  A    To let him know if Lindsey is there.

10:06AM  14  Q    Keep going down.  You say, yep.  Keep going down.  I will.

10:07AM  15  Keep going down.  Stop here.  "Make sure you strapping in case

10:07AM  16  they get plenty guys."

10:07AM  17       What does that refer to?

10:07AM  18  A    I should have my gun on me in case there's a lot of guys.

10:07AM  19  Q    Strapping is guns?

10:07AM  20  A    Yes.

10:07AM  21  Q    Keep going down.  Keep going down.  Keep going down.  Keep

10:07AM  22  going down.  "Did you guys film it?"

10:07AM  23       What is he asking here?

10:07AM  24  A    If there was film of whatever happened at the fights.

10:07AM  25  Q    Keep going down.  Keep going down.  Keep going down.  Keep

| | | |
|---|---|---|
| 10:07AM | 1 | going down.  Keep going down.  Keep going down.  Stop here. |
| 10:08AM | 2 | "He ran behind, like, 12 guys." |
| 10:08AM | 3 | What are you talking about here? |
| 10:08AM | 4 | A    Lindsey ran behind a bunch of people when we pulled up on |
| 10:08AM | 5 | him at the fights. |
| 10:08AM | 6 | Q    And you weren't able to assault him? |
| 10:08AM | 7 | A    No. |
| 10:08AM | 8 | Q    Keep going down.  Keep going down.  Keep going down.  Keep |
| 10:08AM | 9 | going down.  Keep going down.  Keep going down.  Stop here. |
| 10:08AM | 10 | This says "missed voice call"? |
| 10:08AM | 11 | A    Yes. |
| 10:08AM | 12 | Q    Would you also have voice calls with him over WhatsApp? |
| 10:08AM | 13 | A    Sometimes. |
| 10:08AM | 14 | Q    So you would text, like the ones we are seeing here, but |
| 10:08AM | 15 | you would also have voice calls over WhatsApp? |
| 10:08AM | 16 | A    Sometimes. |
| 10:08AM | 17 | Q    Keep going down.  Stop here.  "Bro, two cops just went to |
| 10:09AM | 18 | my chick's house asking who lives there, and they came, two |
| 10:09AM | 19 | blue and whites.  No one in uniform." |
| 10:09AM | 20 | What are you discussing here? |
| 10:09AM | 21 | A    I said two cops came to the girl's house. |
| 10:09AM | 22 | Q    Are you concerned? |
| 10:09AM | 23 | A    Yes. |
| 10:09AM | 24 | Q    Keep going down.  "Did your PO call?" |
| 10:09AM | 25 | What does that refer to? |

| | | | |
|---|---|---|---|
| 10:09AM | 1 | A | My probation officer call me. |
| 10:09AM | 2 | Q | Keep going down.  Keep going down.  And Mr. Miske says, |
| 10:09AM | 3 | | "No worry about HPD."  Keep going down.  "They mailmen with |
| 10:09AM | 4 | | guns."  Stop here.  "FBI is the one." |
| 10:09AM | 5 | | Do you see that? |
| 10:09AM | 6 | A | Yes. |
| 10:09AM | 7 | Q | Would Mr. Miske tell you on this occasion and on others |
| 10:10AM | 8 | | that he was worried about the FBI? |
| 10:10AM | 9 | A | Yes. |
| 10:10AM | 10 | Q | If we go to page 394 now.  Middle one.  April 21, 2018, |
| 10:10AM | 11 | | Mr. Miske texts you, "Always be careful what you snap.  Just |
| 10:10AM | 12 | | because it disappears from your screen doesn't mean a fed |
| 10:10AM | 13 | | subpoena won't make it reappear FYI." |
| 10:10AM | 14 | | Do you see that? |
| 10:10AM | 15 | A | Yes. |
| 10:10AM | 16 | Q | What is being discussed here? |
| 10:10AM | 17 | A | Be careful when posting Snapchat. |
| 10:10AM | 18 | Q | Did you have a Snapchat account? |
| 10:10AM | 19 | A | Yes. |
| 10:10AM | 20 | Q | What sorts of things would you post on Snapchat? |
| 10:10AM | 21 | A | Money, guns. |
| 10:10AM | 22 | Q | How does Snapchat work, to your knowledge? |
| 10:10AM | 23 | A | Your post goes on for a few second and it goes off. |
| 10:11AM | 24 | Q | When you posted those, was it your understanding that they |
| 10:11AM | 25 | | disappeared? |

10:11AM    1    A    Yes.

10:11AM    2    Q    But Mr. Miske here is telling you to be careful of a fed

10:11AM    3    subpoena.

10:11AM    4         What did that refer to?

10:11AM    5    A    That the feds can make it come back; bring it back up.

10:11AM    6    Q    We can go now to page 395.  First message.  A couple of

10:11AM    7    days later, you are texting Mr. Miske, "Alen just went Fri,

10:11AM    8    Spiked in court today.  LOL.  We was supposed to go to trial.

10:11AM    9    Never even made 'em to trial."

10:11AM    10        What are you talking about here?

10:11AM    11   A    The cop Spiker, we were in trial with him for the DUI and

10:11AM    12   we didn't make it to trial.  Alen made him look dumb.

10:12AM    13   Q    Is this the police officer you talked about last week that

10:12AM    14   Miske wanted you to assault?

10:12AM    15   A    Yes.

10:12AM    16   Q    Keep going down.  Keep going down.  Keep going down.  Stop

10:12AM    17   here.

10:12AM    18        Here, you're telling him the name Spiker as in the

10:12AM    19   officer?

10:12AM    20   A    Yes.

10:12AM    21   Q    Keep going down.  Keep going down.  Keep going down.  You

10:12AM    22   say, "He made him look dumb today on the stand."

10:12AM    23        What is this referring to?

10:12AM    24   A    While we were in court, he made him look dumb while he was

10:12AM    25   on the stand.

10:12AM    1    Q    Alen Kaneshiro did?

10:12AM    2    A    Yes.

10:12AM    3    Q    We now go to page 400.  Start with the second message.

10:13AM    4    Miske says, "A guy by the name of Max Kim was apprehended.  Two

10:13AM    5    of his friends got away but in his car had pictures of my

10:13AM    6    Portlock house.  And my" -- scroll down -- "company trucks."

10:13AM    7    Scroll down.  Scroll down.  "Two of his friends get away."

10:13AM    8         Do you see that?

10:13AM    9    A    Yes.

10:13AM   10    Q    What's the reference to the Portlock house, if you know?

10:13AM   11    A    The Hawaii Kai house that was being built.

10:13AM   12    Q    Keep going down.  You say, "You like me come meet you?"

10:13AM   13    Keep going down.  "No, I got to find out who this is first."

10:13AM   14    Keep going down.  "I'm going to be at the Bay this afternoon."

10:13AM   15    Keep going down.  Mr. Miske says, "I went to the station to

10:14AM   16    bail out Max Kim but he wasn't there."  Keep going down.

10:14AM   17    "Christmas come early."

10:14AM   18         What is he referring to there, if you know?

10:14AM   19    A    I'm not sure.  He tried to bail out Max Kim.

10:14AM   20    Q    Keep going down.  You say, "Who is he and what he did."

10:14AM   21    Keep going down.  Mr. Miske explains, "In his car were pictures

10:14AM   22    of my house, pictures of my company, pictures of the shop.  He

10:14AM   23    was stalking to do something.  I don't know what yet but I will

10:14AM   24    find out."  Keep going down.  Keep going down.  "LOL," you say.

10:14AM   25         Is LMK let me know?

| | | | |
|---|---|---|---|
| 10:14AM | 1 | A | Let me know. |
| 10:14AM | 2 | Q | Keep going down.  "I got that."  Keep going down.  Keep |
| 10:14AM | 3 | | going down.  Keep going down.  "Let me know for real.  I'll |
| 10:15AM | 4 | | handle." |
| 10:15AM | 5 | | What are you referring to here? |
| 10:15AM | 6 | A | That I'll handle Max Kim. |
| 10:15AM | 7 | Q | What are you offering to do here? |
| 10:15AM | 8 | A | To assault him. |
| 10:15AM | 9 | Q | As you told us before, you were on call to do those sorts |
| 10:15AM | 10 | | of things? |
| 10:15AM | 11 | A | Yes. |
| 10:15AM | 12 | Q | Keep going down.  He says, "I gotta find out where he |
| 10:15AM | 13 | | stay."  Keep going down.  Keep going down.  Keep going down. |
| 10:15AM | 14 | | Are you still talking about Max Kim here? |
| 10:15AM | 15 | A | Yes. |
| 10:15AM | 16 | Q | Keep going down.  Who is the Alen referred to here? |
| 10:15AM | 17 | A | Kaneshiro. |
| 10:15AM | 18 | Q | Keep going down.  Keep going down.  Keep going down.  Keep |
| 10:15AM | 19 | | going down.  Stop here. |
| 10:16AM | 20 | | Did you ever end up assaulting Max Kim? |
| 10:16AM | 21 | A | No. |
| 10:16AM | 22 | Q | We can go to page 417 now.  Start on the second one. |
| 10:16AM | 23 | | Mr. Miske says, "I just left.  Heading to doctor." |
| 10:16AM | 24 | | What would you guys refer to doctors as? |
| 10:16AM | 25 | A | Lawyers. |

| | | |
|---|---|---|
| 10:16AM | 1 | Q   Keep going down.  You ask, "All good?"  Keep going down. |
| 10:16AM | 2 | "LK better hope so." |
| 10:16AM | 3 |     Who is LK? |
| 10:16AM | 4 | A   Lindsey Kinney. |
| 10:16AM | 5 | Q   Keep going down.  "Going to read some results now." |
| 10:17AM | 6 |     What did you take that to mean? |
| 10:17AM | 7 | A   He was going to meet with the lawyer about some stuff. |
| 10:17AM | 8 | Q   Keep going down.  Keep going down.  Keep going down.  Keep |
| 10:17AM | 9 | going down.  Stop here.  "Some good, some bad." |
| 10:17AM | 10 |     What did you take that to mean? |
| 10:17AM | 11 | A   He had some good information and some bad. |
| 10:17AM | 12 | Q   From his meeting with his attorneys? |
| 10:17AM | 13 | A   Yes. |
| 10:17AM | 14 | Q   Page 440.  If we could start at the second to the last. |
| 10:18AM | 15 |     WYA, is that where you at? |
| 10:18AM | 16 | A   Yes. |
| 10:18AM | 17 | Q   Keep going down.  It says, "Boy you always cruise with." |
| 10:18AM | 18 |     Do you know who that was referring to? |
| 10:18AM | 19 | A   No. |
| 10:18AM | 20 | Q   Keep going down.  He says, "Got one fast one." |
| 10:18AM | 21 |     Do you know what that's referring to? |
| 10:18AM | 22 | A   I think an assault. |
| 10:18AM | 23 | Q   Keep going down.  Keep going down.  And then you say, |
| 10:18AM | 24 | "Here with me." |
| 10:18AM | 25 |     Are you referring to the boy you cruise with? |

10:18AM   1   A   Yes.

10:18AM   2   Q   Keep going down.  He says, "Try bring him by the shop but
10:19AM   3   park underneath at the bank."

10:19AM   4       Do you see that?

10:19AM   5   A   Yes.

10:19AM   6   Q   What's that referring to?

10:19AM   7   A   There was a bank next door.  He was telling me to park
10:19AM   8   under the bank and walk to the shop.

10:19AM   9   Q   Keep going down.  Keep going down.  Keep going down.  Keep
10:19AM   10  going down.  He is saying, "Haole cracks here."

10:19AM   11      What do cracks refer to?

10:19AM   12  A   To assault someone.

10:19AM   13  Q   Keep going down.  "How far you?"  Keep going down.  You
10:19AM   14  say, "ten minutes."

10:19AM   15      Are you letting him know how far you are from the
10:19AM   16  shop?

10:19AM   17  A   Yes.

10:19AM   18  Q   His response is "try five.  He about to dig."
10:20AM   19      Do you see that?

10:20AM   20  A   Yes.

10:20AM   21  Q   What is that referring to?

10:20AM   22  A   He is about to leave.

10:20AM   23  Q   The assault target?

10:20AM   24  A   Yes.

10:20AM   25  Q   Keep going down.  Keep going down.  Keep going down.  "He

| | | | |
|---|---|---|---|
| 10:20AM | 1 | | is on the move." |
| 10:20AM | 2 | | What is that referring to? |
| 10:20AM | 3 | A | That he's moving. |
| 10:20AM | 4 | Q | The assault target? |
| 10:20AM | 5 | A | Yes. |
| 10:20AM | 6 | Q | You're telling him you're here? |
| 10:20AM | 7 | A | Yes. |
| 10:20AM | 8 | Q | Keep going down.  "We are in the bank."  Keep going down. |
| 10:20AM | 9 | | Is this the bank next to the shop? |
| 10:20AM | 10 | A | Yes. |
| 10:20AM | 11 | Q | Keep going down.  Scroll back up.  "Like us walk to you?" |
| 10:20AM | 12 | | What are you saying there? |
| 10:20AM | 13 | A | If he wants us to meet him. |
| 10:20AM | 14 | Q | Keep going down.  He says, "Nah, cameras." |
| 10:21AM | 15 | | Do you see that? |
| 10:21AM | 16 | A | Yes. |
| 10:21AM | 17 | Q | Do you know what he is referring to here? |
| 10:21AM | 18 | A | That there was cameras around. |
| 10:21AM | 19 | Q | Cameras around the shop? |
| 10:21AM | 20 | A | Some were from the bank, the walk to the shop. |
| 10:21AM | 21 | Q | Keep going down.  So he tells you to hold? |
| 10:21AM | 22 | A | Yes. |
| 10:21AM | 23 | Q | Keep going down.  "Be right there."  Keep going down. |
| 10:21AM | 24 | | Stop here.  "K.  We are right there." |
| 10:21AM | 25 | | Do you think you ever assaulted the person that you |

| | | |
|---|---|---|
| 10:21AM | 1 | were tasked with on that day? |
| 10:21AM | 2 | A    No. |
| 10:21AM | 3 | Q    If we can now go to page 487.  Zoom in on the last |
| 10:22AM | 4 | message.  This is now in August of 2018 -- this is now in 2018. |
| 10:22AM | 5 |      Is this right before you were arrested? |
| 10:22AM | 6 | A    Yes. |
| 10:22AM | 7 | Q    Mr. Miske says, "You know dummy got swooped up."  Keep |
| 10:22AM | 8 | going down.  "Who dat bro."  Keep going down.  Keep going down. |
| 10:22AM | 9 | Stop here.  "Mills." |
| 10:22AM | 10 |      Who is that referring to? |
| 10:22AM | 11 | A    Wayne Miller. |
| 10:22AM | 12 | Q    What is this referring to, swooped up? |
| 10:22AM | 13 | A    He got picked up. |
| 10:22AM | 14 | Q    Arrested? |
| 10:22AM | 15 | A    Yes. |
| 10:22AM | 16 | Q    You asked, "for what."  Keep going down.  Keep going down. |
| 10:23AM | 17 | It says "trafficking."  Keep going down.  Keep going down.  You |
| 10:23AM | 18 | ask, "What kind trafficking?"  The response is "windows." |
| 10:23AM | 19 |      Did you know what that referred to? |
| 10:23AM | 20 | A    Yes. |
| 10:23AM | 21 | Q    What? |
| 10:23AM | 22 | A    Meth. |
| 10:23AM | 23 | Q    Keep going down.  Keep going down.  Keep going down.  Keep |
| 10:23AM | 24 | going down.  Go up real quick.  Sorry.  It says "slam dunk |
| 10:23AM | 25 | case." |

| | | | |
|---|---|---|---|
| 10:23AM | 1 | | What is that referring to? |
| 10:23AM | 2 | A | That he got caught red-handed and it was going to be an |
| 10:23AM | 3 | | easy case. |
| 10:23AM | 4 | Q | Wayne Miller? |
| 10:23AM | 5 | A | Yes. |
| 10:23AM | 6 | Q | Keep going down.  And then you say "Who said."  Keep going |
| 10:24AM | 7 | | down.  And his response is "his girl." |
| 10:24AM | 8 | | Who is that referring to? |
| 10:24AM | 9 | A | To Miller's girl. |
| 10:24AM | 10 | Q | Keep going down.  "He sold to them is what I heard." |
| 10:24AM | 11 | | What is that referring to? |
| 10:24AM | 12 | A | That he got control-buyed. (Phonetic) He sold to one of |
| 10:24AM | 13 | | the feds. |
| 10:24AM | 14 | Q | Keep going down.  Keep going down.  Keep going down. |
| 10:24AM | 15 | | "Can't believe he would do that."  Keep going down.  Keep going |
| 10:24AM | 16 | | down.  Keep going down.  Stop here.  "His G said he got set up |
| 10:25AM | 17 | | 7/13." |
| 10:25AM | 18 | | Do you know what that's referring to? |
| 10:25AM | 19 | A | No. |
| 10:25AM | 20 | Q | Keep going down.  Stop here.  "Does he have a doctor?" |
| 10:25AM | 21 | | Do you see that? |
| 10:25AM | 22 | A | Yes. |
| 10:25AM | 23 | Q | What are you referring to when you say doctor? |
| 10:25AM | 24 | A | A lawyer. |
| 10:25AM | 25 | Q | Keep going down.  Stop here.  "Yeah.  Public fed, but the |

| | | |
|---|---|---|
| 10:25AM | 1 | guy is a hammer." |
| 10:25AM | 2 | Do you know what that's referring to? |
| 10:25AM | 3 | A    That he had a good federal defense lawyer, public |
| 10:25AM | 4 | defender. |
| 10:25AM | 5 | Q    Keep going down.  "My guy said if he was in trouble, he |
| 10:25AM | 6 | would be happy with that office." |
| 10:25AM | 7 | Do you know what he is referring to here when he says |
| 10:25AM | 8 | "my guy"? |
| 10:25AM | 9 | A    No. |
| 10:25AM | 10 | Q    Keep going down.  Keep going down. |
| 10:25AM | 11 | Public defender, do you know what that is? |
| 10:25AM | 12 | A    Yes. |
| 10:25AM | 13 | Q    What is that? |
| 10:26AM | 14 | A    That's who was representing Miller. |
| 10:26AM | 15 | Q    Keep going down.  Stop here.  Mr. Miske tells you to keep |
| 10:26AM | 16 | your eyes open and your head down. |
| 10:26AM | 17 | Is he giving you instructions here? |
| 10:26AM | 18 | A    Yes. |
| 10:26AM | 19 | Q    To be careful? |
| 10:26AM | 20 | A    Yes. |
| 10:26AM | 21 | Q    Could we go down to page 502.  Do you recognize -- if we |
| 10:26AM | 22 | could zoom in. |
| 10:26AM | 23 | Do you recognize what is shown in this photo? |
| 10:26AM | 24 | A    Yes. |
| 10:26AM | 25 | Q    What is shown in this photo? |

| | | | |
|---|---|---|---|
| 10:26AM | 1 | A | The Bay. |
| 10:26AM | 2 | Q | Is this where you and Mr. Miske would often hang out? |
| 10:26AM | 3 | A | Yes. |
| 10:26AM | 4 | Q | Switch gears now -- we can take that down. |

10:27AM   5         THE COURT:  If we are going to switch gears, then now

10:27AM   6   would probably be a good time to take a break.  Then let's go

10:27AM   7   ahead and take our first break of the trial week, and as we do

10:27AM   8   so, I'll remind our jurors to please refrain from discussing

10:27AM   9   the substance of this case with anyone, including each other;

10:27AM   10   to refrain from accessing any media or other accounts of this

10:27AM   11   case that may be out there; and finally, please do not conduct

10:27AM   12   any independent investigation of your own into the facts,

10:27AM   13   circumstances, or persons involved.

10:27AM   14         Before we go to break and before I forget, we also

10:27AM   15   will be adjourning today a little bit early.  At 1:00 there is

10:27AM   16   a juror that has a medical appointment that can not be easily

10:28AM   17   rescheduled, so we will adjourn at that time.  So it's about

10:28AM   18   30 minutes before normal.

10:28AM   19         (Proceedings were recessed at 10:28 a.m. to 11:04

11:04AM   20   a.m.)

11:04AM   21         THE COURT:  All right.  Back from our first morning

11:04AM   22   break.  Mr. Nammar, you may continue with your direct of

11:04AM   23   Mr. Smith when you are ready.

11:04AM   24         MR. NAMMAR:  Thank you, Your Honor.  Can we show the

11:04AM   25   witness only 1-1116 from our 13th supplemental list?

| | | |
|---|---|---|
| 11:05AM | 1 | THE COURT:  All right.  Go ahead. |
| 11:05AM | 2 | BY MR. NAMMAR: |
| 11:05AM | 3 | Q    Thank you.  Mr. Smith, the name at the top, gingerbreadjr, |
| 11:05AM | 4 | do you recognize that name? |
| 11:05AM | 5 | A    Yes. |
| 11:05AM | 6 | Q    What is that name? |
| 11:05AM | 7 | A    That's Lance Bermudez's Instagram account. |
| 11:05AM | 8 | Q    And if we can zoom in on the picture.  Starting from left |
| 11:05AM | 9 | to right, is there a person that has, like, their face half cut |
| 11:05AM | 10 | off? |
| 11:05AM | 11 | A    Yes. |
| 11:05AM | 12 | Q    Do you recognize this person? |
| 11:05AM | 13 | A    Johnnie. |
| 11:05AM | 14 | Q    And then the person with the right with their hand up in |
| 11:05AM | 15 | the back row, do you recognize that person? |
| 11:05AM | 16 | A    Frankie. |
| 11:05AM | 17 | Q    And then the other person in the back, do you recognize |
| 11:06AM | 18 | that person? |
| 11:06AM | 19 | A    Looks like Keali'i. |
| 11:06AM | 20 | Q    And then the person here? |
| 11:06AM | 21 | A    Mike B. |
| 11:06AM | 22 | Q    And then the person here? |
| 11:06AM | 23 | A    Mike Miske. |
| 11:06AM | 24 | MR. NAMMAR:  Your Honor, I move to admit 1-1116. |
| 11:06AM | 25 | THE COURT:  Any objection? |

11:06AM   1            MR. KENNEDY:  No objection.

11:06AM   2            THE COURT:  Exhibit 1-1116 then is admitted without

11:06AM   3    objection and you may show the jury.

11:06AM   4            (Exhibit 1-1116 was received in evidence.)

11:06AM   5    BY MR. NAMMAR:

11:06AM   6    Q    If we can zoom out real quick.  And zoom in on the

11:06AM   7    gingerbread.  The jury can see it now.

11:06AM   8            Mr. Smith, can you tell us what gingerbreadjr2412 is?

11:06AM   9    A    That's Lance Bermudez's Instagram account.

11:06AM   10   Q    Okay.  And then, can zoom out.  If we can zoom in on the

11:06AM   11   text real quick.

11:06AM   12           So is this a post by Lance gingerbreadjr2412?

11:07AM   13   A    Yes.

11:07AM   14   Q    "When you got the top pics of every aspect in the streets

11:07AM   15   it's a valuable and dangerous asset.  We're like AT&T.  We

11:07AM   16   reach out."  And then it does look like it's cut off.

11:07AM   17   A    Yes.

11:07AM   18   Q    If we can zoom out now.  Zoom in on the picture.  Walk

11:07AM   19   through the people that you can identify.  This person on the

11:07AM   20   far left looks like their face is partly cut off.  Who is that?

11:07AM   21   A    Johnnie.

11:07AM   22   Q    And then the person right next to him, it looks like they

11:07AM   23   are wearing a hat.

11:07AM   24           Who is that person?

11:07AM   25   A    Kaulana.

| | | | |
|---|---|---|---|
| 11:07AM | 1 | Q | And then the person in the front throwing the shaka? |
| 11:07AM | 2 | A | Isaiah. |
| 11:07AM | 3 | Q | Is that the Isaiah Bush you've talked about? |
| 11:07AM | 4 | A | Yes. |
| 11:07AM | 5 | Q | And then, going back up to the top row, third to the left, |
| 11:07AM | 6 | | who is that? |
| 11:07AM | 7 | A | Frankie. |
| 11:07AM | 8 | Q | The person right to the right of him? |
| 11:07AM | 9 | A | Lance. |
| 11:07AM | 10 | Q | Lance Bermudez? |
| 11:07AM | 11 | A | Yes. |
| 11:07AM | 12 | Q | And then the person to the right of him? |
| 11:07AM | 13 | A | Keali'i. |
| 11:08AM | 14 | Q | Keali'i Young? |
| 11:08AM | 15 | A | Yes. |
| 11:08AM | 16 | Q | And then the -- looks like the person without any hair to |
| 11:08AM | 17 | | the right of him? |
| 11:08AM | 18 | A | Mike B. |
| 11:08AM | 19 | Q | And then the person to the right of him? |
| 11:08AM | 20 | A | Mike Miske. |
| 11:08AM | 21 | Q | Do you recognize this person to the right of Mike Miske? |
| 11:08AM | 22 | A | No. |
| 11:08AM | 23 | Q | And then this other person on the end, do you recognize |
| 11:08AM | 24 | | that person? |
| 11:08AM | 25 | A | J Dog. |

| 11:08AM | 1 | Q | Did you say J Dog? |

11:08AM   1   Q   Did you say J Dog?

11:08AM   2   A   Yes.

11:08AM   3   Q   Is that Jason Medeiros?

11:08AM   4   A   Yes.

11:08AM   5   Q   That's the person on the far right with their face half

11:08AM   6   cut off?

11:08AM   7   A   Yes.

11:08AM   8   Q   Do you know where this picture is taken?

11:08AM   9   A   I'm not sure.

11:08AM   10   Q   We can take this down.  You talked some last week about

11:08AM   11   the La Familia prison gang?

11:08AM   12   A   Yes.

11:08AM   13   Q   And I think you told us last week that you covered up your

11:08AM   14   tattoos.  You no longer have them?

11:08AM   15   A   Yes.

11:08AM   16   Q   What does it mean to cover up a tattoo?

11:09AM   17   A   That you are out of the gang.

11:09AM   18   Q   When did you join La Familia?

11:09AM   19   A   Sometime while I was in jail.

11:09AM   20   Q   Why did you join La Familia in jail?

11:09AM   21   A   The jail gang.

11:09AM   22   Q   Does it offer you protection while you are in jail?

11:09AM   23   A   Yes.

11:09AM   24   Q   Any other crimes that you've testified to today or last

11:09AM   25   week, did any of them were any of them done for the benefit of

11:09AM    1    La Familia?

11:09AM    2    A    No.

11:09AM    3    Q    And have you heard of a gang called USO?

11:09AM    4    A    Yes.

11:09AM    5    Q    Is that another prison gang?

11:09AM    6    A    Yes.

11:09AM    7    Q    Were you ever associated or a member or prospect for that

11:09AM    8    gang?

11:09AM    9    A    In the beginning, yes.

11:09AM    10   Q    For how long?

11:09AM    11   A    Not long at all.

11:09AM    12   Q    Like, weeks?

11:09AM    13   A    Yes.

11:09AM    14   Q    Are you no longer affiliated with them either?

11:09AM    15   A    No.

11:09AM    16   Q    Any of the crimes that you've talked about today or last

11:09AM    17   week, were they ever done for the benefit of the USO gang?

11:09AM    18   A    No.

11:10AM    19   Q    Ever heard of a gang called the Shooter gang?

11:10AM    20   A    My friend Lance used to say it all the time, but it's not

11:10AM    21   a real gang.

11:10AM    22   Q    It's not a real gang?

11:10AM    23   A    No.

11:10AM    24   Q    You were not a part of it?

11:10AM    25   A    No.

11:10AM    1              MR. NAMMAR:  Can we show the witness only now, Your

11:10AM    2    Honor, Exhibit 1-1117 from the 13th supplemental?

11:10AM    3              THE COURT:  Go ahead.

11:10AM    4    BY MR. NAMMAR:

11:10AM    5    Q    Thank you.  Mr. Smith, do you recognize what's shown in

11:10AM    6    this photo?

11:10AM    7    A    Yes.

11:10AM    8    Q    What is it?

11:10AM    9    A    It was paperwork Mike was trying to send out to my pod to

11:10AM   10    stir up an incident in my pod.  He was trying to show people I

11:10AM   11    was cooperating against him.

11:10AM   12    Q    Did you receive this paperwork?

11:10AM   13    A    Yes.

11:10AM   14    Q    What did you do with it after you received it?

11:10AM   15    A    I gave it to the lawyer.

11:11AM   16              MR. NAMMAR:  Your Honor, move to admit 1-1117.

11:11AM   17              THE COURT:  Any objection?

11:11AM   18              MR. KENNEDY:  Lack of foundation, Your Honor.

11:11AM   19              THE COURT:  Overruled.  1-1117 will be received into

11:11AM   20    evidence and you may publish it.

11:11AM   21              (Exhibit 1-1117 was received in evidence.)

11:11AM   22    BY MR. NAMMAR:

11:11AM   23    Q    Thank you.  Go ahead and publish it.  Mr. Smith, the jury

11:11AM   24    can see it.  There is a bunch of huge chunks of blacked-out

11:11AM   25    texts.

11:11AM   1              Were those blacked-out texts -- was that present when
11:11AM   2    you received this document?
11:11AM   3    A     There was some -- there was words behind it.
11:11AM   4    Q     Okay.   There was words behind this document?   What did the
11:11AM   5    words document?
11:11AM   6    A     They were just talking about me proffering -- making a --
11:11AM   7    cooperating on Mike.
11:11AM   8    Q     You making a statement to the FBI?
11:11AM   9    A     Yes.
11:11AM   10   Q     And you said when you received this document, you turned
11:12AM   11   it over to your lawyer?
11:12AM   12   A     Yes.
11:12AM   13   Q     Is that your name that appears here, Jacob Smith?
11:12AM   14   A     Yes.
11:12AM   15   Q     And does this report document an interview of you by the
11:12AM   16   FBI?
11:12AM   17   A     Yes.
11:12AM   18   Q     You testified that you thought that this was delivered to
11:12AM   19   you by Michael Miske.
11:12AM   20              Why did you think that?
11:12AM   21   A     Because he gave it to somebody from his pod that was
11:12AM   22   moving up to our pod to spread around my pod.
11:12AM   23   Q     Did you feel this was an attempt to intimidate you?
11:12AM   24   A     Yes.
11:12AM   25   Q     Now, this is a photograph of the document, right?

| 11:12AM | 1 | A | Yes. |

11:12AM   2   Q   And it has -- is it ripped on the top left and top right?

11:12AM   3   A   Yes.

11:12AM   4   Q   Does it appear to be ripped across the entire top?

11:12AM   5   A   Yes.

11:13AM   6   Q   And if you look at the bottom, is it also ripped on the

11:13AM   7   bottom right and left?

11:13AM   8   A   Yes.

11:13AM   9   Q   What do you understand to be placed on those documents in

11:13AM   10   the bottom right and top?

11:13AM   11   A   I think that anything that -- with his identification on

11:13AM   12   it is probably ripped off.

11:13AM   13   Q   What do you mean by identification?

11:13AM   14   A   Like his register number, or any of the numbers that are

11:13AM   15   affiliated to his paperwork.

11:13AM   16        MR. NAMMAR:  Can we show the witness only now Your

11:13AM   17   Honor 1-1118 from the 13th supplemental?

11:13AM   18        THE COURT:  Go ahead.

11:13AM   19   BY MR. NAMMAR:

11:13AM   20   Q   Does this appear to be similar to what we just looked at

11:14AM   21   in 1-1117?

11:14AM   22   A   Yes.

11:14AM   23   Q   Does it have some additional markings that are at the top?

11:14AM   24   A   Yes.

11:14AM   25   Q   What do those markings say?

11:14AM   1   A    For attorney custody only.  Subject to protective order.

11:14AM   2   Q    And in the bottom right, do you see some additional

11:14AM   3   markings?

11:14AM   4   A    Yes.

11:14AM   5   Q    What do those say?

11:14AM   6   A    Says USA versus Mike Miske.

11:14AM   7   Q    Does it have a number associated with it?

11:14AM   8   A    Yes.

11:14AM   9   Q    Going back now to 1-1117, if we can publish it, thank you.

11:14AM   10        Do you see those markings anywhere on this document?

11:14AM   11   A    No.

11:14AM   12   Q    Where did you first find this document?

11:14AM   13   A    Somebody brought it up to our pod.

11:14AM   14   Q    And gave it to you?

11:14AM   15   A    Yes.

11:14AM   16   Q    We can take that down.  So we talked some about it, but I

11:15AM   17   want to switch gears now and ask you about some things you

11:15AM   18   received from Mr. Miske.

11:15AM   19        Would he let you borrow cars on occasion when you

11:15AM   20   needed them?

11:15AM   21   A    Yes.

11:15AM   22   Q    Were these the auction cars you referred to?

11:15AM   23   A    Yes.

11:15AM   24   Q    Would he sometimes let you borrow money?

11:15AM   25   A    Yes.

| 11:15AM | 1 | Q | Did he hire a lawyer for you? |
| 11:15AM | 2 | A | Yes. |
| 11:15AM | 3 | Q | Did he let you drink for free at his nightclub? |
| 11:15AM | 4 | A | Yes. |
| 11:15AM | 5 | Q | And did you do that a long time? |
| 11:15AM | 6 | A | While it was open, yes. |

11:15AM   7   Q   As you've talked about before, you received protection
11:15AM   8   from Mr. Miske?

11:15AM   9   A   Yes.

11:15AM   10   Q   Protection in the form of lawyers?

11:15AM   11   A   Yes.

11:15AM   12   Q   And protection from people you robbed because of
11:15AM   13   Mr. Miske's reputation?

11:15AM   14   A   Yes.

11:15AM   15   Q   Protection from drug traffickers you didn't pay because of
11:15AM   16   Mr. Miske's reputation?

11:16AM   17   A   Yes.

11:16AM   18   Q   Mr. Miske, did he let you borrow money for a deposit on an
11:16AM   19   apartment?

11:16AM   20   A   Yes.

11:16AM   21   Q   Were you aware that he also paid for Lance Bermudez's
11:16AM   22   attorney?

11:16AM   23       MR. KENNEDY:  Objection on foundation, Your Honor.

11:16AM   24       THE COURT:  The form of the question is fine.

11:16AM   25   Overruled.  Go ahead.

11:16AM    1              THE WITNESS:  Yes.

11:16AM    2    BY MR. NAMMAR:

11:16AM    3    Q    Were you also aware that he paid for Dae Han Moon's

11:16AM    4    attorney?

11:16AM    5    A    Yes.

11:16AM    6    Q    And as you've testified to, he paid you for a number of

11:16AM    7    assaults?

11:16AM    8    A    Yes.

11:16AM    9    Q    And for all these things that you've talked about, you

11:16AM   10    were on call for him?

11:16AM   11    A    Yes.

11:16AM   12    Q    You were expected to break the law for him?

11:16AM   13    A    Yes.

11:16AM   14    Q    Expected to assault people?

11:16AM   15    A    Yes.

11:16AM   16    Q    Expected to commit other crimes for him?

11:16AM   17    A    Yes.

11:16AM   18    Q    Like the tear gas that you told us that you assisted in

11:16AM   19    with the nightclubs?

11:16AM   20    A    Yes.

11:16AM   21    Q    And like some of the robberies that you've talked about

11:16AM   22    with Teramoto and Chris Bourne?

11:16AM   23    A    Yes.

11:17AM   24    Q    Did you also -- besides the text messages we looked at,

11:17AM   25    did you have a number of in-person meetings with Mr. Miske?

11:17AM   1   A     Yes.

11:17AM   2   Q     And would Mr. Miske sometimes coordinate those meetings

11:17AM   3   with burner phones?

11:17AM   4   A     Yes.

11:17AM   5   Q     Would he sometimes coordinate those meetings over

11:17AM   6   WhatsApp?

11:17AM   7   A     Yes.

11:17AM   8   Q     And regarding burner phones, did he sometimes provide

11:17AM   9   those to you for free?

11:17AM   10   A     Yes.

11:17AM   11   Q     Did he appear to you to be paranoid about law enforcement

11:17AM   12   detection?

11:17AM   13   A     Yes.

11:17AM   14   Q     Were you one of Miske's trusted associates?

11:17AM   15   A     Yes.

11:17AM   16   Q     Who do you believe were some of his other most trusted

11:17AM   17   associates?

11:17AM   18   A     Me, Miller, Lance, Johnnie, Kaulana.

11:17AM   19   Q     Because you were part of his trusted circle, were certain

11:17AM   20   things expected of you?

11:17AM   21   A     Yes.

11:17AM   22   Q     Were you expected to assault people?

11:18AM   23   A     Yes.

11:18AM   24   Q     Were you expected to commit crime when asked for?

11:18AM   25   A     Yes.

| | | | |
|---|---|---|---|
| 11:18AM | 1 | Q | Were you expected to lie to law enforcement if needed? |
| 11:18AM | 2 | A | Yes. |
| 11:18AM | 3 | Q | Were you expected not to cooperate with law enforcement? |
| 11:18AM | 4 | A | Yes. |
| 11:18AM | 5 | Q | Were you expected not to question Mr. Miske? |
| 11:18AM | 6 | A | Yes. |
| 11:18AM | 7 | Q | And did you get some of the perks that we have talked |
| 11:18AM | 8 | | about for being in his trusted circle? |
| 11:18AM | 9 | A | Yes. |
| 11:18AM | 10 | Q | What was Mr. Miske's reputation? |
| 11:18AM | 11 | A | People were scared of him. |
| 11:18AM | 12 | Q | When you did not commit crime that Mr. Miske asked you to |
| 11:18AM | 13 | | do, do you feel like it hurt your status with him? |
| 11:18AM | 14 | A | Yes. |
| 11:18AM | 15 | Q | Can you give us an example of that? |
| 11:18AM | 16 | A | If I didn't do it, I wouldn't be able to make money.  I |
| 11:18AM | 17 | | wouldn't do anymore jobs for him. |
| 11:18AM | 18 | Q | Did he ever tell you he was disappointed in you if you did |
| 11:18AM | 19 | | not commit a particular crime? |
| 11:18AM | 20 | A | Yes. |
| 11:18AM | 21 | Q | Did Mr. Miske appear to care about his reputation? |
| 11:18AM | 22 | A | Yes. |
| 11:18AM | 23 | Q | Did he appear to be the type of person that did not |
| 11:19AM | 24 | | forget? |
| 11:19AM | 25 | A | Yes. |

11:19AM   1   Q    Did you ever question who was the leader of the circle of
11:19AM   2   people that were surrounding Mr. Miske?
11:19AM   3   A    No.
11:19AM   4   Q    Who was the leader?
11:19AM   5   A    Mike.
11:19AM   6   Q    Anybody else have the power to direct people like
11:19AM   7   Mr. Miske did?
11:19AM   8   A    No.
11:19AM   9   Q    On law enforcement, did Mr. Miske ever give you any
11:19AM   10  instructions if law enforcement ever approached you?
11:19AM   11  A    Yes.
11:19AM   12  Q    What instructions did he give you?
11:19AM   13  A    To call Alen.
11:19AM   14  Q    And on the day you were arrested in August of 2018, did
11:19AM   15  you initially call Alen?
11:19AM   16  A    Yes.
11:19AM   17  Q    Did you later change your mind?
11:19AM   18  A    Yes.
11:19AM   19  Q    And reach out to a different attorney?
11:19AM   20  A    Yes.
11:19AM   21  Q    And on that day in August of 2018, did you immediately
11:19AM   22  begin cooperating?
11:19AM   23  A    Yes.
11:19AM   24  Q    And did you start the process of telling law enforcement
11:19AM   25  all the things that you did for Mr. Miske?

| 11:19AM | 1 | A | Yes. |

11:19AM 1 A Yes.

11:19AM 2 Q And in 2018, did you testify in the grand jury?

11:20AM 3 A Yes.

11:20AM 4 Q And in 2020, did you plead guilty?

11:20AM 5 A Yes.

11:20AM 6 Q And as we mentioned, your plea agreement requires you to

11:20AM 7 testify here today?

11:20AM 8 A Yes.

11:20AM 9 Q And you're testifying pursuant to that plea agreement?

11:20AM 10 A Yes.

11:20AM 11         MR. NAMMAR:  Pass the witness, Your Honor.

11:20AM 12         THE COURT:  Mr. Kennedy, cross-examination when you

11:20AM 13 are ready.  As far as the schedule for today, since we are

11:20AM 14 going to go to break at 1:00, and we did not resume this

11:20AM 15 session until just after 11, I thought we would go from now

11:20AM 16 until 1:00.  It's a little bit longer than what we are used to.

11:20AM 17 Ms. Bediamol, if that becomes an issue for you, please let me

11:20AM 18 know that.  But otherwise, let's try to capture some of the

11:21AM 19 time that we are going to lose back from not taking a second

11:21AM 20 break in the trial day.

11:21AM 21                 CROSS-EXAMINATION

11:21AM 22 BY MR. KENNEDY:

11:21AM 23 Q So I want to start by asking you some questions about

11:22AM 24 Kualoa Ranch, okay?

11:22AM 25 A Yes.

| | | | |
|---|---|---|---|
| 11:22AM | 1 | Q | I want to take you right to that scene.  You testified |
| 11:22AM | 2 | | about it. |
| 11:22AM | 3 | | You've been up here for three days, right? |
| 11:22AM | 4 | A | Yes. |
| 11:22AM | 5 | Q | And I heard you say to the jury that on the day that you |
| 11:22AM | 6 | | fired a round up into the air, Lindsey Kinney was closer to you |
| 11:22AM | 7 | | than I am right now, correct? |
| 11:22AM | 8 | A | He was about the same. |
| 11:22AM | 9 | Q | About the same.  All right. |
| 11:22AM | 10 | | And so at that distance, I take it you fired a shot |
| 11:22AM | 11 | | into the air, right? |
| 11:22AM | 12 | A | Yes. |
| 11:22AM | 13 | Q | You didn't aim at him, right? |
| 11:22AM | 14 | A | We said the gun was pointed towards his direction but we |
| 11:22AM | 15 | | missed on purpose. |
| 11:22AM | 16 | Q | You missed him on purpose, correct? |
| 11:22AM | 17 | A | Yes. |
| 11:22AM | 18 | Q | You didn't shoot to hit him? |
| 11:22AM | 19 | A | No. |
| 11:22AM | 20 | Q | You fired a warning shot into the air? |
| 11:22AM | 21 | A | Yes. |
| 11:22AM | 22 | Q | Everybody got back into the cars? |
| 11:23AM | 23 | A | We waited for Johnnie. |
| 11:23AM | 24 | Q | And then you left? |
| 11:23AM | 25 | A | Yes. |

11:23AM   1   Q    And so the -- you've seen a picture on the other day of a
11:23AM   2   40 casing, right?
11:23AM   3   A    No.
11:23AM   4   Q    They didn't show you the casing?
11:23AM   5   A    No.
11:23AM   6   Q    You had a 40 that day, right?
11:23AM   7   A    Yes.
11:23AM   8   Q    You shot it up in the air?
11:23AM   9   A    Yes.
11:23AM   10  Q    You didn't shoot at him?
11:23AM   11  A    No.
11:23AM   12  Q    And that's what happened?
11:23AM   13  A    Yes.
11:23AM   14  Q    All right.  No intent to kill, right?
11:23AM   15  A    No.
11:23AM   16  Q    No intent to even harm?
11:23AM   17  A    No.
11:23AM   18  Q    Talked about Counts 8 and 9 now.  I want to take you to
11:23AM   19  August 14th of 2018, okay?
11:23AM   20       You were at a restaurant, right?
11:23AM   21  A    I think so.
11:23AM   22  Q    You don't remember the day you were arrested?
11:23AM   23  A    The day I was arrested?
11:23AM   24  Q    Yeah.  You were dining at a restaurant with someone at
11:24AM   25  around 1:00 that afternoon, right?

| | | | |
|---|---|---|---|
| 11:24AM | 1 | A | Yes. |
| 11:24AM | 2 | Q | And unbeknownst to you, the SWAT team had surrounded the |
| 11:24AM | 3 | | restaurant, right? |
| 11:24AM | 4 | A | Yes. |
| 11:24AM | 5 | Q | And so about 45 minutes later, you left the restaurant, |
| 11:24AM | 6 | | right? |
| 11:24AM | 7 | A | Yes. |
| 11:24AM | 8 | Q | You were walking to your vehicle, right? |
| 11:24AM | 9 | A | I was leaving the restaurant. |
| 11:24AM | 10 | Q | And you had a backpack, right? |
| 11:24AM | 11 | A | Yes. |
| 11:24AM | 12 | Q | A brown multi-colored backpack, right? |
| 11:24AM | 13 | A | Yes. |
| 11:24AM | 14 | Q | In your left hand as you walked there, correct? |
| 11:24AM | 15 | A | I don't recall. |
| 11:24AM | 16 | Q | And then the SWAT team moved in to arrest you right at |
| 11:24AM | 17 | | that vehicle, right? |
| 11:24AM | 18 | A | Yes. |
| 11:24AM | 19 | Q | And they told you to drop the backpack, drop the phones, |
| 11:24AM | 20 | | right? |
| 11:24AM | 21 | A | Yes. |
| 11:24AM | 22 | Q | And you did it, right? |
| 11:24AM | 23 | A | Yes. |
| 11:24AM | 24 | Q | Then they said, "Is that backpack yours?"  And you said |
| 11:24AM | 25 | | no, right? |

| | | | |
|---|---|---|---|
| 11:25AM | 1 | A | I don't remember. |
| 11:25AM | 2 | Q | And that was a lie? |
| 11:25AM | 3 | A | I don't remember if I said it or not. |
| 11:25AM | 4 | Q | And you dropped the phones, right? |
| 11:25AM | 5 | A | I remember dropping the bag. |
| 11:25AM | 6 | Q | And that was a lie when you told them the phones weren't |
| 11:25AM | 7 | | yours as well, right? |
| 11:25AM | 8 | A | I don't know if I told them that or not. |
| 11:25AM | 9 | Q | Okay.  Would it help refresh your recollection to take a |
| 11:25AM | 10 | | look at a report that you received in discovery? |
| 11:25AM | 11 | A | Sure. |
| 11:25AM | 12 | Q | All right. |
| 11:25AM | 13 | | MR. KENNEDY:  If we can just pull up Exhibit 9013-063 |
| 11:25AM | 14 | | which is in the original exhibit list, Your Honor. |
| 11:25AM | 15 | | THE COURT:  Go ahead. |
| 11:25AM | 16 | | By MR. KENNEDY: |
| 11:26AM | 17 | Q | If we move to page two, paragraph three, just read that to |
| 11:26AM | 18 | | yourself.  And when you are done let me know. |
| 11:26AM | 19 | A | I'm done. |
| 11:26AM | 20 | Q | All right.  We can take that down.  SWAT officer asked |
| 11:26AM | 21 | | you, "Is that your backpack?"  And you said no, right? |
| 11:26AM | 22 | A | That's what it says. |
| 11:26AM | 23 | Q | They asked you if that was your phones and you said no, |
| 11:26AM | 24 | | right? |
| 11:26AM | 25 | A | That's what it says. |

11:26AM   1   Q     And both of those things were a lie when you said it,

11:26AM   2   right?

11:26AM   3   A     If I said it.  I don't remember saying it.

11:26AM   4   Q     All right.  So you know that inside the backpack --

11:26AM   5   eventually, they got a search warrant, right?

11:26AM   6   A     Yes.

11:26AM   7   Q     And inside that backpack you had a Glock 26 9-millimeter,

11:27AM   8   right?

11:27AM   9   A     Yes.

11:27AM   10  Q     And $6,000 worth of cash, right?

11:27AM   11  A     Yes.

11:27AM   12  Q     You were a felon, right?

11:27AM   13  A     Yes.

11:27AM   14  Q     You were carrying a Glock?

11:27AM   15  A     Yes.

11:27AM   16  Q     When you were arrested?

11:27AM   17  A     Yes.

11:27AM   18  Q     A slam dunk case, right?

11:27AM   19  A     I don't know.  We never went -- we never went through with

11:27AM   20  it.

11:27AM   21  Q     Never was charged with that, were you?

11:27AM   22  A     What was that?

11:27AM   23  Q     Never charged with that, were you?

11:27AM   24  A     No.

11:27AM   25  Q     All right.  So at that very day on August 14th, they also

| | | |
|---|---|---|
| 11:27AM | 1 | searched your apartment, right? |
| 11:27AM | 2 | A    Yes. |
| 11:27AM | 3 | Q    And that was over at 1088 Bishop Street? |
| 11:27AM | 4 | A    Yes. |
| 11:27AM | 5 | Q    Apartment 1502, right? |
| 11:27AM | 6 | A    I believe so. |
| 11:27AM | 7 | Q    And inside the apartment, you had an AK-47 with a drum |
| 11:27AM | 8 | magazine, right? |
| 11:27AM | 9 | A    I had an extended magazine on it. |
| 11:28AM | 10 | Q    You had an extended and also a drum, right? |
| 11:28AM | 11 | A    Maybe.  I don't remember. |
| 11:28AM | 12 | Q    You don't remember.  Okay.  Was that AK fully automatic? |
| 11:28AM | 13 | A    No. |
| 11:28AM | 14 | Q    Semiautomatic, right? |
| 11:28AM | 15 | A    Yes. |
| 11:28AM | 16 | Q    Assault rifle semiautomatic, right? |
| 11:28AM | 17 | A    Yes. |
| 11:28AM | 18 | Q    All right.  And you had a number of loose rounds of 762 |
| 11:28AM | 19 | ammunition, didn't you? |
| 11:28AM | 20 | A    Yes. |
| 11:28AM | 21 | Q    All right.  Now, moving to -- and that search was done, |
| 11:28AM | 22 | correct?  You saw the results of it, right, in your paperwork? |
| 11:28AM | 23 | A    No. |
| 11:28AM | 24 | Q    All right.  Well let's take a look. |
| 11:28AM | 25 |         MR. KENNEDY:  Let pull up 6023-0055 for the witness. |

| | | |
|---|---|---|
| 11:28AM | 1 | That should be in the original exhibit list as well, Your |
| 11:29AM | 2 | Honor. |
| 11:29AM | 3 | THE COURT:  6023? |
| 11:29AM | 4 | MR. KENNEDY:  Yes. |
| 11:29AM | 5 | THE COURT:  It's definitely not in the original. |
| 11:29AM | 6 | MR. KENNEDY:  My apologies.  It's in the 12th, Your |
| 11:29AM | 7 | Honor. |
| 11:29AM | 8 | THE COURT:  12th? |
| 11:29AM | 9 | MR. KENNEDY:  Yes.  My mistake.  I thought it was in |
| 11:29AM | 10 | the original. |
| 11:29AM | 11 | THE COURT:  Okay.  Got it now, thank you. |
| 11:29AM | 12 | By MR. KENNEDY: |
| 11:29AM | 13 | Q    If we can pull up 6023 and just go to 0055 for the |
| 11:29AM | 14 | witness. |
| 11:29AM | 15 | Sir, do you recognize what's shown in 6023-0055? |
| 11:29AM | 16 | A    Yes. |
| 11:29AM | 17 | Q    It's an AK47, right? |
| 11:30AM | 18 | A    Yes. |
| 11:30AM | 19 | Q    That was inside your apartment, right? |
| 11:30AM | 20 | A    Yes. |
| 11:30AM | 21 | Q    On August 14, 2018? |
| 11:30AM | 22 | A    Yes. |
| 11:30AM | 23 | Q    All right. |
| 11:30AM | 24 | MR. KENNEDY:  Can we publish 6023-0055, Your Honor?  I |
| 11:30AM | 25 | would move to admit it at this time. |

| | | |
|---|---|---|
| 11:30AM | 1 | THE COURT:  That one page? |
| 11:30AM | 2 | MR. KENNEDY:  Yes.  I have a series of them that I'm |
| 11:30AM | 3 | going to go through. |
| 11:30AM | 4 | THE COURT:  Any objection to that one page? |
| 11:30AM | 5 | MR. NAMMAR:  No objection. |
| 11:30AM | 6 | THE COURT:  6023-0055 is admitted. |
| 11:30AM | 7 | (Exhibit 6023-0055 was received in evidence.) |
| 11:30AM | 8 | MR. KENNEDY:  May we publish it? |
| 11:30AM | 9 | THE COURT:  You may.  We will figure out how to handle |
| 11:30AM | 10 | this when you are done with the series. |
| 11:30AM | 11 | MR. KENNEDY:  And Your Honor, we can easily add an A |
| 11:30AM | 12 | on to each one and then reconfigure it, if that would be |
| 11:30AM | 13 | acceptable. |
| 11:30AM | 14 | BY MR. KENNEDY: |
| 11:30AM | 15 | Q    So this is the AK-47 that you had, right? |
| 11:31AM | 16 | A    Yes. |
| 11:31AM | 17 | Q    And at the time, you are being arrested -- and we will get |
| 11:31AM | 18 | to that -- for dealing drugs, right? |
| 11:31AM | 19 | A    Yes. |
| 11:31AM | 20 | Q    The AK-47 is part of what you possessed while you were |
| 11:31AM | 21 | dealing drugs? |
| 11:31AM | 22 | A    Yes. |
| 11:31AM | 23 | Q    And it was part of what you possessed when you had been |
| 11:31AM | 24 | robbing people, correct? |
| 11:31AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 11:31AM | 1 | Q | All right.  If we go to 6023-0056. |
| 11:31AM | 2 | | What are we looking at here, sir? |
| 11:31AM | 3 | A | The same gun. |
| 11:31AM | 4 | Q | All right.  Let's go to 6023-0058. |
| 11:31AM | 5 | | What are we looking at here? |
| 11:31AM | 6 | A | The same gun. |
| 11:31AM | 7 | Q | Let's go to 6023-0059. |
| 11:31AM | 8 | | What are we looking at here, sir? |
| 11:32AM | 9 | A | Same gun. |
| 11:32AM | 10 | Q | Go to 6023-0060. |
| 11:32AM | 11 | | What are we looking at here? |
| 11:32AM | 12 | A | Another picture of the gun. |
| 11:32AM | 13 | | MR. KENNEDY:  At this time, Your Honor, I would move |
| 11:32AM | 14 | | 6023-0056, 6023-0058, 6023-0059, and 6023-0060 into evidence. |
| 11:32AM | 15 | | THE COURT:  Any objection to those four pages? |
| 11:32AM | 16 | | MR. NAMMAR:  No, Your Honor. |
| 11:32AM | 17 | | THE COURT:  All four pages of 6023 are admitted |
| 11:32AM | 18 | | without objection.  That's dash 56, 58, 59, and 60.  You may |
| 11:32AM | 19 | | publish. |
| 11:32AM | 20 | | (Exhibits 6023-56, 6023-58, 6023-0059, and 6023-0060 were |
| 11:32AM | 21 | | received in evidence.) |
| 11:32AM | 22 | | BY MR. KENNEDY: |
| 11:32AM | 23 | Q | If we start with 6023-0060, which is published. |
| 11:32AM | 24 | | Now, when we saw it before, this is the banana clip, |
| 11:32AM | 25 | | correct? |

| | | | |
|---|---|---|---|
| 11:32AM | 1 | A | Yes. |
| 11:33AM | 2 | Q | Which was in the gun when it was found, correct? |
| 11:33AM | 3 | A | Yes. |
| 11:33AM | 4 | Q | It appears to be fully loaded in the magazine? |
| 11:33AM | 5 | A | I don't know if it's fully loaded or not. |
| 11:33AM | 6 | Q | All right.  Let's go to 6023-0059.  This shows the AK-47 |
| 11:33AM | 7 | | with a banana clip. |
| 11:33AM | 8 | A | Yes. |
| 11:33AM | 9 | Q | After its removal from the assault rifle? |
| 11:33AM | 10 | A | Yes. |
| 11:33AM | 11 | Q | 6023-0058 and 6023-0056.  After you were arrested, you |
| 11:33AM | 12 | | learned that having this during and in relation to drug |
| 11:33AM | 13 | | trafficking is a federal crime, which is punishable by ten |
| 11:33AM | 14 | | years consecutive to any other sentence, didn't you? |
| 11:34AM | 15 | A | Didn't know that at all. |
| 11:34AM | 16 | Q | You never charged with that, were you, either? |
| 11:34AM | 17 | A | No. |
| 11:34AM | 18 | Q | So not charged with the Glock that you had in the backpack |
| 11:34AM | 19 | | at the restaurant that you were arrested with, correct? |
| 11:34AM | 20 | A | I'm not even sure. |
| 11:34AM | 21 | Q | Not charged with the AK-47 assault rifle, correct? |
| 11:34AM | 22 | A | I'm not sure. |
| 11:34AM | 23 | Q | You're not sure? |
| 11:34AM | 24 | A | No. |
| 11:34AM | 25 | Q | Never been charged with it, have you? |

11:34AM    1                    MR. NAMMAR:  Asked and answered, Your Honor.

11:34AM    2                    THE COURT:  Go ahead.  You may answer.

11:34AM    3    By MR. KENNEDY:

11:34AM    4    Q    You're just not sure?

11:34AM    5    A    Not sure.

11:34AM    6    Q    We will take a look then.  Okay.  Let's go to 6023-0067.

11:34AM    7         Do you recognize this?

11:34AM    8    A    Kind of, yeah.

11:34AM    9    Q    It's a drum magazine, right?

11:34AM   10    A    A drum.

11:34AM   11    Q    Seized from your apartment, correct?

11:34AM   12    A    Yes.

11:34AM   13    Q    In your possession, right?

11:35AM   14    A    In my apartment.

11:35AM   15    Q    On August 14, 2018, with a federal search warrant, right?

11:35AM   16    A    Yes.

11:35AM   17                    MR. KENNEDY:  All right.  At this time I would move

11:35AM   18    6023-0067 into evidence.

11:35AM   19                    THE COURT:  Any objection?

11:35AM   20                    MR. NAMMAR:  No objection.

11:35AM   21                    THE COURT:  6023-0067 is admitted without objection.

11:35AM   22    You may publish.

11:35AM   23                    (Exhibit 6023-0067 was received in evidence.)

11:35AM   24    BY MR. KENNEDY:

11:35AM   25    Q    So this is a drum magazine that goes along with it,

11:35AM    1    correct?

11:35AM    2    A    I don't know if it goes along with it.  It wasn't plugged

11:35AM    3    into the gun.

11:35AM    4    Q    No, because the banana clip was in it, right?

11:35AM    5    A    It could have been an extra piece.

11:35AM    6    Q    All right.  Let's take a look at 6023-0069.  Do you

11:35AM    7    recognize that as a black magazine seized from your apartment

11:35AM    8    on August 14, 2018?

11:35AM    9    A    I don't recognize it, but if it was there, it was there.

11:35AM   10           MR. KENNEDY:  All right.  At this time, I would move

11:36AM   11    6023-0069 into evidence.

11:36AM   12           MR. NAMMAR:  Lack of foundation.

11:36AM   13           THE COURT:  Sustained.

11:36AM   14    By MR. KENNEDY:

11:36AM   15    Q    All right.  Move to 6023-0081.

11:36AM   16           Do you recognize what's shown there?

11:36AM   17    A    A gun case.

11:36AM   18    Q    Was it a gun case for the nine-millimeter Glock that you

11:36AM   19    had?

11:36AM   20    A    Maybe.

11:36AM   21    Q    All right.  Do you recognize you had that gun case inside

11:36AM   22    your apartment, correct?

11:36AM   23    A    Yes.

11:36AM   24           MR. KENNEDY:  I'd move 6023-0081 into evidence.

11:36AM   25           THE COURT:  Any objection?

11:36AM   1          MR. NAMMAR:  No objection.

11:36AM   2          THE COURT:  6023-81 is admitted.  Yes, you may

11:36AM   3   publish.

11:36AM   4          (Exhibit 6023-0081 was received in evidence.)

11:36AM   5   BY MR. KENNEDY:

11:36AM   6   Q    Could we pull up 6023-092.

11:37AM   7          Do you recognize what's shown in 6023-0092?

11:37AM   8   A    Yes.

11:37AM   9   Q    What is it?

11:37AM   10   A    Rounds.

11:37AM   11   Q    Seized from your apartment?

11:37AM   12   A    I'm guessing.

11:37AM   13   Q    You know you had ammunition in there.

11:37AM   14          Do you recognize it?

11:37AM   15   A    I don't recognize it; it's been a while.

11:37AM   16   Q    You haven't looked at this for a while?

11:37AM   17   A    I haven't seen it.

11:37AM   18   Q    As a felon, you weren't supposed to have ammunition,

11:37AM   19   correct?

11:37AM   20   A    No.

11:37AM   21   Q    All right.  Are you aware that there were 30 rounds of

11:37AM   22   7.62 ammunition seized from your apartment during that search?

11:37AM   23   A    I wasn't aware.

11:37AM   24   Q    Let's move on to 6023-0095.

11:37AM   25          Do you recognize this?

| | | | |
|---|---|---|---|
| 11:37AM | 1 | A | Yes. |
| 11:37AM | 2 | Q | It's from your apartment? |
| 11:37AM | 3 | A | I think so. |
| 11:37AM | 4 | Q | It's a scale, isn't it? |
| 11:37AM | 5 | A | Yes. |
| 11:37AM | 6 | Q | You used it with respect to your drug trade, did you not? |
| 11:38AM | 7 | A | Yes. |
| 11:38AM | 8 | | MR. KENNEDY:  I move 6023-0095 into evidence. |
| 11:38AM | 9 | | THE COURT:  Any objection? |
| 11:38AM | 10 | | MR. NAMMAR:  No objection. |
| 11:38AM | 11 | | THE COURT:  6023-95 is admitted.  You may publish. |
| 11:38AM | 12 | | (Exhibit 6023-0095 was received in evidence.) |
| 11:38AM | 13 | | BY MR. KENNEDY: |
| 11:38AM | 14 | Q | Moving on to 6023-0102. |
| 11:38AM | 15 | | Do you recognize what's shown in 6023-0102? |
| 11:38AM | 16 | A | A dollar bill. |
| 11:38AM | 17 | Q | All right.  Do you see what's on the dollar bill? |
| 11:38AM | 18 | A | I don't see anything on the dollar bill. |
| 11:38AM | 19 | Q | Were you aware that the dollar bill had a white powder |
| 11:38AM | 20 | | residue on it? |
| 11:38AM | 21 | A | I'm aware of it now. |
| 11:38AM | 22 | Q | All right.  And do you see what is shown in an item nine |
| 11:39AM | 23 | | there next to the dollar bill with the white powder residue? |
| 11:39AM | 24 | A | Yes. |
| 11:39AM | 25 | Q | There is a baggy, there's a straw, correct? |

| | | | |
|---|---|---|---|
| 11:39AM | 1 | A | Yes. |

11:39AM   2   Q    Do you recognize that as being inside your apartment when

11:39AM   3   it was seized on August 14, 2018?

11:39AM   4   A    Yes.

11:39AM   5        MR. KENNEDY:  I'd move 6023-0102 into evidence at this

11:39AM   6   time, Your Honor.

11:39AM   7        THE COURT:  Any objection?

11:39AM   8        MR. NAMMAR:  No objection.

11:39AM   9        THE COURT:  6023-102 is admitted.  You may publish.

11:39AM   10       (Exhibit 6023-102 was received in evidence.)

11:39AM   11   BY MR. KENNEDY:

11:39AM   12   Q    I think you gave some testimony that during 2018 you

11:39AM   13   became addicted to oxy, right?

11:39AM   14   A    Yes.

11:39AM   15   Q    Prior to that, going back to 2015 and getting out of high

11:39AM   16   school, I think you mentioned that you were a user of ice?

11:40AM   17   A    Not really.  Every now and then.

11:40AM   18   Q    Cocaine?

11:40AM   19   A    Not really.  Every now and then.

11:40AM   20   Q    Marijuana?

11:40AM   21   A    Yes.

11:40AM   22   Q    And other drugs?

11:40AM   23   A    Yes.

11:40AM   24   Q    Moving on to 6023-0136.

11:40AM   25        Do you recognize what's shown in 6023-0136?

| 11:40AM | 1  | A | More rounds. |
| 11:40AM | 2  | Q | Do you recognize that from -- seized from your apartment? |
| 11:40AM | 3  | A | No, I don't remember. |
| 11:40AM | 4  | Q | Oh, you don't remember? |
| 11:40AM | 5  | A | No. |
| 11:40AM | 6  | Q | Do you remember having ammunition in your apartment? |
| 11:40AM | 7  | A | I remember I had guns. |
| 11:40AM | 8  | Q | Okay.  All right.  But you don't remember what's shown in |
| 11:40AM | 9  |   | 6023-0136? |
| 11:40AM | 10 | A | I can see it, but I don't remember it. |
| 11:41AM | 11 | Q | Okay.  All right.  Let's see if -- let's just move through |
| 11:41AM | 12 |   | these and I'll ask some follow up.  6023-0149. |
| 11:41AM | 13 |   | Do you recognize what's shown in 6023-0149? |
| 11:41AM | 14 | A | Yes. |
| 11:41AM | 15 | Q | What is it? |
| 11:41AM | 16 | A | A type of steroid. |
| 11:41AM | 17 | Q | All right.  Do you recognize that as being in your |
| 11:41AM | 18 |   | apartment and seized on August 14th? |
| 11:41AM | 19 | A | Yes. |
| 11:41AM | 20 | Q | 2018? |
| 11:41AM | 21 | A | Yes. |
| 11:41AM | 22 |   | MR. KENNEDY:  At this time I would move 6023-0149 into |
| 11:41AM | 23 |   | evidence. |
| 11:41AM | 24 |   | THE COURT:  Any objection? |
| 11:41AM | 25 |   | MR. NAMMAR:  No objection. |

11:41AM   1            THE COURT:  6023-149 is admitted.  You may publish.

11:41AM   2            (Exhibit 6023-149 was received in evidence.)

11:41AM   3   BY MR. KENNEDY:

11:41AM   4   Q    Moving on to 6023-0151.

11:42AM   5            Do you recognize what's shown in 6023-0151?

11:42AM   6   A    Syringes for the steroids.

11:42AM   7   Q    Do you recognize that photograph showing the syringes that

11:42AM   8   you had inside your apartment on August 14, 2018?

11:42AM   9   A    No, I don't recognize it.  I was not using the steroids.

11:42AM  10   There was a bunch of people at my house.

11:42AM  11   Q    So you don't recognize this?

11:42AM  12   A    No.

11:42AM  13   Q    All right.

11:43AM  14            MR. KENNEDY:  Now, let's pull up 9013-064 just for the

11:43AM  15   witness.  Which should be in -- is it the 12th -- that should

11:43AM  16   be in the original one, Your Honor.

11:43AM  17            THE COURT:  Go ahead.

11:43AM  18   By MR. KENNEDY:

11:43AM  19   Q    Just take a moment and review the first page, and then let

11:43AM  20   me know when you are done.

11:43AM  21   A    I'm done.

11:43AM  22   Q    All right.  If we move to the second page.  And let me

11:44AM  23   know when you are done.

11:44AM  24   A    Done.

11:44AM  25   Q    All right.  We can take that down now.

11:44AM   1          Does that refresh your recollection about the

11:44AM   2   ammunition that was seized from your apartment on August 14,

11:44AM   3   2018?

11:44AM   4   A    Yes.

11:44AM   5   Q    All right.  Let me show you 6023-0092 then, which is not

11:44AM   6   yet in evidence.

11:44AM   7          Do you recognize that as Exhibit 7B in terms of the

11:44AM   8   evidence list of the ammunition seized from your apartment?

11:44AM   9   A    I don't really recognize it.  You said there was rounds in

11:45AM   10  the backpack.  I didn't use the rounds.  I don't recognize

11:45AM   11  them.

11:45AM   12  Q    And if we go to 6023-0136.

11:45AM   13         Do you recognize that as some of the ammunition seized

11:45AM   14  from your apartment on August 14, 2018?

11:45AM   15  A    I don't recognize it, but I could have had it.

11:45AM   16         MR. KENNEDY:  Yeah.  All right.  Let's pull up just

11:45AM   17  for the witness, I think the government marked it 1-905M.  And

11:45AM   18  I believe that's in the 13th government exhibit list.

11:45AM   19         THE COURT:  Go ahead.  I've got it.

11:45AM   20  By MR. KENNEDY:

11:46AM   21  Q    I apologize, 1-905M as in Mary.

11:46AM   22         Do you recognize what's shown in 1-905M?

11:46AM   23  A    Yes.

11:46AM   24  Q    Do you recognize yourself?

11:46AM   25  A    Yes.

11:46AM   1   Q   Do you recognize the person next to you?

11:46AM   2   A   Yes.

11:46AM   3   Q   It's Lovelyn Duarte?

11:46AM   4   A   Yes.

11:46AM   5   Q   This was your girlfriend, right?

11:46AM   6   A   Yes.

11:46AM   7   Q   Do you recognize the firearm that you are pointing?

11:46AM   8   A   Yes.

11:46AM   9   Q   Is it a mini AR-15?

11:46AM   10  A   Yes.

11:46AM   11          MR. KENNEDY:  At this time, Your Honor, I would move

11:46AM   12  1-905M into evidence.

11:46AM   13          THE COURT:  Any objection?

11:46AM   14          MR. NAMMAR:  No objection.

11:46AM   15          THE COURT:  1-905M as in Mary is admitted, then

11:47AM   16  without objection you may publish it.

11:47AM   17          (Exhibit 1-905M was received in evidence.)

11:47AM   18  BY MR. KENNEDY:

11:47AM   19  Q   Now, this was posted on social media, right?

11:47AM   20  A   I don't know.

11:47AM   21  Q   Now, this mini AR-15, you've given some testimony about

11:47AM   22  over the last three days, correct?

11:47AM   23  A   It could be the AR-15; it could not be.  It could be the

11:47AM   24  same one; it couldn't be.

11:47AM   25  Q   So you had multiple ones?

| | | | |
|---|---|---|---|
| 11:47AM | 1 | A | My friend did. |
| 11:47AM | 2 | Q | So you're pointing a mini AR-15 at a selfie? |
| 11:47AM | 3 | A | At a phone, yeah. |
| 11:47AM | 4 | Q | With Ms. Duarte, right? |
| 11:47AM | 5 | A | She is not pointing it.  I'm pointing it, yeah. |
| 11:47AM | 6 | Q | Yes, you are, right?  And she is with you during the |
| 11:47AM | 7 | | photograph, right? |
| 11:47AM | 8 | A | Yes. |
| 11:47AM | 9 | Q | All right.  Now this was taken in 2016, right? |
| 11:47AM | 10 | A | I don't even know. |
| 11:47AM | 11 | Q | The jury will have the date on the 1-905.  I want to ask |
| 11:48AM | 12 | | you about this.  We see the mini AR-15.  So in the Brandon Ota |
| 11:48AM | 13 | | robbery that you gave testimony about, you had the mini AR-15 |
| 11:48AM | 14 | | that day, correct? |
| 11:48AM | 15 | A | We had a mini AR-15. |
| 11:48AM | 16 | Q | That's what you told the jury, right? |
| 11:48AM | 17 | A | Yes. |
| 11:48AM | 18 | Q | Okay.  And so that's a robbery, right? |
| 11:48AM | 19 | A | Yes. |
| 11:48AM | 20 | Q | Federal robbery, right? |
| 11:48AM | 21 | A | I don't know if it's a federal robbery, but yes, it was a |
| 11:48AM | 22 | | robbery. |
| 11:48AM | 23 | Q | You are using a firearm during the robbery, right? |
| 11:48AM | 24 | A | Yes. |
| 11:48AM | 25 | Q | And so you became aware that that use of that firearm is |

| | | |
|---|---|---|
| 11:48AM | 1 | another ten-year consecutive sentence, correct? |
| 11:48AM | 2 | A    I did not become aware of that. |
| 11:48AM | 3 | Q    Never got charged with that either, did you? |
| 11:49AM | 4 | A    I'm not sure.  No, I don't think so. |
| 11:49AM | 5 | Q    You've never had a charge which comes under 18 U.S.C. 924, |
| 11:49AM | 6 | have you? |
| 11:49AM | 7 | A    I'm not sure. |
| 11:49AM | 8 | Q    Well, we will look as we go through.  You're not sure. |
| 11:49AM | 9 | A    No. |
| 11:49AM | 10 | Q    All right.  So this is now a second one.  Ten plus ten, we |
| 11:49AM | 11 | are at 20. |
| 11:49AM | 12 |       Now, I remember you giving testimony about a game room |
| 11:49AM | 13 | robbery in Mapunapuna, correct? |
| 11:49AM | 14 | A    Yes. |
| 11:49AM | 15 | Q    You had the mini AR-15 during that robbery as well, |
| 11:49AM | 16 | correct? |
| 11:49AM | 17 | A    Yes. |
| 11:49AM | 18 | Q    That was another robbery that you've talked about, right? |
| 11:49AM | 19 | A    Yes. |
| 11:49AM | 20 | Q    That, then, is a third 924C, ten years consecutive to any |
| 11:49AM | 21 | other sentence you would receive, correct? |
| 11:50AM | 22 | A    I don't know. |
| 11:50AM | 23 | Q    Never been charged with that either, have you? |
| 11:50AM | 24 | A    No. |
| 11:50AM | 25 | Q    All right.  Now, another Brandon -- Brandon Torres was a |

| 11:50AM | 1 | robbery as well, right? |
|---|---|---|
| 11:50AM | 2 | A    Yes. |
| 11:50AM | 3 | Q    You were there, right? |
| 11:50AM | 4 | A    I was there. |
| 11:50AM | 5 | Q    Frankie Silva was there? |
| 11:50AM | 6 | A    Frank Silva was there. |
| 11:50AM | 7 | Q    And someone by the name of Mim was there as well, right? |
| 11:50AM | 8 | A    Yes. |
| 11:50AM | 9 | Q    During that robbery, there was the use of the AK-47? |
| 11:50AM | 10 | A    Yes. |
| 11:50AM | 11 | Q    So there was a use of the assault weapon during the |
| 11:50AM | 12 | robbery that you participated in, correct? |
| 11:50AM | 13 | A    Yes. |
| 11:50AM | 14 | Q    The assault weapon you said is not fully automatic, right? |
| 11:50AM | 15 | A    No. |
| 11:50AM | 16 | Q    It's semiautomatic, right? |
| 11:50AM | 17 | A    Yes. |
| 11:50AM | 18 | Q    So that's another ten years.  So now we are at ten plus |
| 11:50AM | 19 | ten plus ten plus ten to 40, right? |
| 11:50AM | 20 | MR. NAMMAR:  Objection to counsel testifying.  There |
| 11:50AM | 21 | is no foundation for this. |
| 11:50AM | 22 | THE COURT:  Sustained. |
| 11:51AM | 23 | By MR. KENNEDY: |
| 11:51AM | 24 | Q    You understand that you can be charged for these crimes, |
| 11:51AM | 25 | right? |

| | | |
|---|---|---|
| 11:51AM | 1 | A    Yes. |
| 11:51AM | 2 | MR. NAMMAR:  Objection to asked and answered. |
| 11:51AM | 3 | By MR. KENNEDY: |
| 11:51AM | 4 | Q    And you have not? |
| 11:51AM | 5 | A    I don't know. |
| 11:51AM | 6 | Q    Sir, you would know whether you you've been charged with |
| 11:51AM | 7 | crimes that require the judge to sentence you to 40 years |
| 11:51AM | 8 | consecutive to any other charge? |
| 11:51AM | 9 | MR. NAMMAR:  Objection; lack of foundation. |
| 11:51AM | 10 | THE COURT:  Overruled.  Go ahead. |
| 11:51AM | 11 | THE WITNESS:  Yeah. |
| 11:51AM | 12 | By MR. KENNEDY: |
| 11:51AM | 13 | Q    Now, I heard about a robbery of Nico Carignan, right? |
| 11:51AM | 14 | A    Yeah. |
| 11:51AM | 15 | Q    And during that robbery, you said that yourself and Lance |
| 11:51AM | 16 | and I believe you said John Stancil and others were armed. |
| 11:52AM | 17 | A    Yes. |
| 11:52AM | 18 | Q    During that robbery, are you aware that because you |
| 11:52AM | 19 | brandished that weapon, you would be looking at seven years |
| 11:52AM | 20 | consecutive to the 40.  We are now up to 47 years? |
| 11:52AM | 21 | MR. NAMMAR:  Objection to counsel testifying.  There |
| 11:52AM | 22 | is no foundation for this. |
| 11:52AM | 23 | THE COURT:  Sustained. |
| 11:52AM | 24 | By MR. KENNEDY: |
| 11:52AM | 25 | Q    Are you aware that in the robbery of Palani Mitchell, you |

11:52AM   1   were also armed, correct?

11:52AM   2   A    Yes.

11:52AM   3   Q    And in that robbery, you brandished a weapon as well,

11:52AM   4   correct?

11:52AM   5   A    I had a weapon, yes.

11:52AM   6   Q    Because the object of it was to steal dope, right?

11:52AM   7   A    Yes.  I didn't have the gun pointed at nobody.  I hit the

11:52AM   8   guy with my feet.  I didn't use the gun to rob anybody.

11:53AM   9   Q    Sir, you are aware that at least you had another five

11:53AM  10   years, maybe seven on top of that total, are you not?

11:53AM  11            MR. NAMMAR:  Objection; no foundation.

11:53AM  12            THE COURT:  Sustained.

11:53AM  13   By MR. KENNEDY:

11:53AM  14   Q    In the other game room robbery, you provided a gun to

11:53AM  15   someone else, correct?

11:53AM  16   A    Yes.

11:53AM  17   Q    So you aided that person, correct?

11:53AM  18   A    Yes.

11:53AM  19   Q    Are you aware that that's another consecutive sentence?

11:53AM  20   A    I was not aware.

11:53AM  21   Q    What you were aware of is that you were facing charges

11:53AM  22   which we will get to that would put you away for the rest of

11:54AM  23   your natural life, correct?

11:54AM  24   A    I wasn't aware of that either.

11:54AM  25   Q    You became aware of it later, right?

11:54AM   1   A    Not really.  I thought we had a lawyer to fix that.

11:54AM   2   Q    All right.  Let's take a look at 1-905F.

11:54AM   3        Do you recognize what's shown in 1-905F?

11:54AM   4   A    Yes.

11:54AM   5   Q    What is it?

11:54AM   6   A    Looks like ice.

11:54AM   7        MR. KENNEDY:  At this time, Your Honor, I would move

11:54AM   8   1-905F into evidence.

11:54AM   9        THE COURT:  Any objection, counsel?

11:54AM   10        MR. NAMMAR:  No objection.

11:54AM   11        THE COURT:  905F -- that's 1-905F as in frank is

11:54AM   12   admitted.  You may publish.

11:54AM   13        (Exhibit 1-905F was received in evidence.)

11:54AM   14   BY MR. KENNEDY:

11:54AM   15   Q    So this is ice?

11:55AM   16   A    Looks like it.

11:55AM   17   Q    Meth?

11:55AM   18   A    Looks like it.

11:55AM   19   Q    905 is an exhibit that comes from a phone that Lovelyn

11:55AM   20   Duarte gave the authorities in December of 2016, correct?

11:55AM   21   A    I don't know.

11:55AM   22   Q    You've been testifying about photographs and other things

11:55AM   23   from 905, right?

11:55AM   24   A    Yes.

11:55AM   25   Q    You remember that you were arrested in December of 2016,

| | | |
|---|---|---|
| 11:55AM | 1 | and you remember that Ms. Duarte gave them a phone that you |
| 11:55AM | 2 | used, correct? |
| 11:55AM | 3 | A    I think so. |
| 11:55AM | 4 | Q    And so on this phone is ice that you had to sell, right? |
| 11:55AM | 5 | A    That was from somebody who we probably robbed. |
| 11:55AM | 6 | Q    So you robbed them to get ice to give it to someone to |
| 11:55AM | 7 | sell to make money? |
| 11:55AM | 8 | A    Yes. |
| 11:55AM | 9 | Q    Moving on to 1-905G. |
| 11:56AM | 10 | Do you recognize what's shown in 1-905G? |
| 11:56AM | 11 | A    Yes. |
| 11:56AM | 12 | Q    What is it? |
| 11:56AM | 13 | A    Money. |
| 11:56AM | 14 | MR. KENNEDY:  I'd move 1-905G into evidence, Your |
| 11:56AM | 15 | Honor. |
| 11:56AM | 16 | THE COURT:  Any objection? |
| 11:56AM | 17 | MR. NAMMAR:  No objection. |
| 11:56AM | 18 | THE COURT:  1-905G is admitted.  You may show it to |
| 11:56AM | 19 | the jury. |
| 11:56AM | 20 | (Exhibit 1-905G was received in evidence.) |
| 11:56AM | 21 | By MR. KENNEDY: |
| 11:56AM | 22 | Q    So this is money, right? |
| 11:56AM | 23 | A    Um-hm. |
| 11:56AM | 24 | Q    That you made, right? |
| 11:56AM | 25 | A    Um-hm. |

| | | | |
|---|---|---|---|
| 11:56AM | 1 | Q | Either stealing it, right? |
| 11:56AM | 2 | A | Yeah. |
| 11:56AM | 3 | Q | Stealing drugs and selling it? |
| 11:56AM | 4 | A | Assaults. |
| 11:56AM | 5 | Q | Assaults? |
| 11:56AM | 6 | A | Um-hm. |
| 11:56AM | 7 | Q | We will get to that.  We will get to that, sir. |
| 11:57AM | 8 | | But I understood listening over the past few days that |
| 11:57AM | 9 | | you purchased a lot of drugs during that time from numerous |
| 11:57AM | 10 | | sources, right? |
| 11:57AM | 11 | A | Sometimes. |
| 11:57AM | 12 | Q | And trafficking, right? |
| 11:57AM | 13 | A | Yes. |
| 11:57AM | 14 | Q | Stole a lot of drugs when you didn't have money to |
| 11:57AM | 15 | | purchase it, right? |
| 11:57AM | 16 | A | Yes. |
| 11:57AM | 17 | Q | And sold it? |
| 11:57AM | 18 | A | Yes. |
| 11:57AM | 19 | Q | And that's how you made your money? |
| 11:57AM | 20 | A | Yes. |
| 11:57AM | 21 | Q | And so this is how you made your money, and you are |
| 11:57AM | 22 | | showing it in a photograph that was posted, right? |
| 11:57AM | 23 | A | Yes. |
| 11:57AM | 24 | Q | To build your reputation, right? |
| 11:57AM | 25 | A | I don't know if it was posted on social media or not.  I |

| | | | |
|---|---|---|---|
| 11:57AM | 1 | | just know it was on the phone. |
| 11:57AM | 2 | Q | In the phone that Ms. Duarte gave the authorities? |
| 11:57AM | 3 | A | That's what you are telling me. |
| 11:57AM | 4 | Q | In 2016? |
| 11:57AM | 5 | A | That's what you said. |
| 11:57AM | 6 | Q | Let's move to 1-905H. |
| 11:58AM | 7 | | Do you recognize 1-905H? |
| 11:58AM | 8 | A | Yes. |
| 11:58AM | 9 | Q | What is it? |
| 11:58AM | 10 | A | It looks like cocaine and money. |
| 11:58AM | 11 | | MR. KENNEDY:  All right.  I move 1-905H into evidence. |
| 11:58AM | 12 | | THE COURT:  Mr. Nammar, any objection? |
| 11:58AM | 13 | | MR. NAMMAR:  No objection. |
| 11:58AM | 14 | | THE COURT:  1-905H is admitted.  You may publish. |
| 11:58AM | 15 | | (Exhibit 1-905H was received in evidence.) |
| 11:58AM | 16 | | BY MR. KENNEDY: |
| 11:58AM | 17 | Q | So now, this is cocaine? |
| 11:58AM | 18 | A | That's what it looks like. |
| 11:58AM | 19 | Q | Another drug that you were trafficking in? |
| 11:58AM | 20 | A | I wasn't trafficking in it.  That's just what we got. |
| 11:58AM | 21 | Q | And this is some money from your drug trafficking, right? |
| 11:58AM | 22 | A | That is some money from the robbery. |
| 11:59AM | 23 | Q | So it's a robbery of which you obtained money? |
| 11:59AM | 24 | A | Yes. |
| 11:59AM | 25 | Q | Moving on to 1-905I.  What are we looking at here, sir? |

| | | | |
|---|---|---|---|
| 11:59AM | 1 | A | Looks like more coke. |
| 11:59AM | 2 | Q | What's that? |
| 11:59AM | 3 | A | Looks like cocaine. |
| 11:59AM | 4 | | MR. KENNEDY:  All right.  Move 1-905I into evidence. |
| 11:59AM | 5 | | THE COURT:  Any objection? |
| 11:59AM | 6 | | MR. NAMMAR:  No objection. |
| 11:59AM | 7 | | THE COURT:  1-905I is admitted.  You may publish. |
| 11:59AM | 8 | | (Exhibit 1-905I was received in evidence.) |
| 11:59AM | 9 | BY MR. KENNEDY: | |
| 11:59AM | 10 | Q | So this is additional cocaine, correct? |
| 11:59AM | 11 | A | That's the same cocaine. |
| 11:59AM | 12 | Q | It's the same? |
| 11:59AM | 13 | A | It's the same one. |
| 11:59AM | 14 | Q | To be sold, correct? |
| 11:59AM | 15 | A | I didn't know what we was going to do with it yet.  We |
| 11:59AM | 16 | | just got it and we were splitting it. |
| 11:59AM | 17 | Q | So this is the proceeds of robbery, right? |
| 11:59AM | 18 | A | Yes. |
| 11:59AM | 19 | Q | You are robbing the people to obtain drugs, right? |
| 12:00PM | 20 | A | Yes. |
| 12:00PM | 21 | Q | Then to sell it, right? |
| 12:00PM | 22 | A | Yes. |
| 12:00PM | 23 | Q | To make money, right? |
| 12:00PM | 24 | A | Yes. |
| 12:00PM | 25 | Q | Let's move on to 1-905N. |

| | | | |
|---|---|---|---|
| 12:00PM | 1 | | What are we looking at here, sir? |
| 12:00PM | 2 | A | Two guns. |
| 12:00PM | 3 | Q | Do you recognize the guns? |
| 12:00PM | 4 | A | Not really, but I know we could have had them. |
| 12:00PM | 5 | Q | Do you recognize the guns from the Mocheese (phonetic) or |
| 12:00PM | 6 | | Mocheesie robbery you discussed to the jury? |
| 12:00PM | 7 | A | Yes, maybe. |
| 12:00PM | 8 | | MR. KENNEDY:  At this time, I would move 1-905N into |
| 12:00PM | 9 | | evidence. |
| 12:00PM | 10 | | THE COURT:  Any objection? |
| 12:00PM | 11 | | MR. NAMMAR:  No objection. |
| 12:00PM | 12 | | THE COURT:  1-905N as in Nancy is admitted.  You may |
| 12:00PM | 13 | | publish. |
| 12:00PM | 14 | | (Exhibit 1-905N was received in evidence.) |
| 12:00PM | 15 | | BY MR. KENNEDY: |
| 12:00PM | 16 | Q | So in addition to robbing for guns, robbing for drugs, and |
| 12:00PM | 17 | | robbing for chains, and robbing for cash, this is an example of |
| 12:01PM | 18 | | taking a gun, correct? |
| 12:01PM | 19 | A | Yes. |
| 12:01PM | 20 | Q | And so you got -- I remember you telling us that you got |
| 12:01PM | 21 | | guns from Mocheesie (phonetic), correct? |
| 12:01PM | 22 | A | Yes. |
| 12:01PM | 23 | Q | And so you're posting this on social media afterwards to |
| 12:01PM | 24 | | boost your reputation, right? |
| 12:01PM | 25 | A | I don't know if I posted it on social media. |

12:01PM   1   Q   But these are guns that you acquired by robbing?

12:01PM   2   A   One of them is, I think.

12:01PM   3   Q   Let's look at 1-938D.

12:01PM   4       Do you recognize what's shown in 1-938D?

12:01PM   5   A   Yes.

12:01PM   6   Q   What is it?

12:01PM   7   A   Marijuana.

12:01PM   8   Q   Is this also proceeds of a robbery?

12:02PM   9   A   It could be.

12:02PM  10   Q   Or proceeds as something you purchased to sell?

12:02PM  11   A   Could be.

12:02PM  12       MR. KENNEDY:  At this time, I would move 1-938D into

12:02PM  13   evidence.

12:02PM  14       THE COURT:  Any objection?

12:02PM  15       MR. NAMMAR:  No objection.

12:02PM  16       THE COURT:  1-938D as in delta is admitted.  You may

12:02PM  17   publish.

12:02PM  18       (Exhibit 1-938D was received in evidence.)

12:02PM  19   BY MR. KENNEDY:

12:02PM  20   Q   So now we have seen meth or ice, we have seen cocaine, and

12:02PM  21   we have seen marijuana, which is all you have to sell, right?

12:02PM  22   A   Some of it, yeah.

12:02PM  23   Q   1-938E.  Do you recognize 1-938E?

12:02PM  24   A   Yes.

12:02PM  25   Q   Who is on the far left?

| | | | |
|---|---|---|---|
| 12:03PM | 1 | A | Keoni Adric. |
| 12:03PM | 2 | Q | Who is next to Keoni Adric? |
| 12:03PM | 3 | A | Dane. |
| 12:03PM | 4 | Q | I'm sorry? |
| 12:03PM | 5 | A | Dane. |
| 12:03PM | 6 | Q | Do you see yourself? |
| 12:03PM | 7 | A | Yes. |
| 12:03PM | 8 | Q | Who is next to you? |
| 12:03PM | 9 | A | Rocky. |
| 12:03PM | 10 | Q | Who is next to -- did you say Rocky? |
| 12:03PM | 11 | A | Rocky. |
| 12:03PM | 12 | Q | Who is next to him? |
| 12:03PM | 13 | A | Johnnie. |
| 12:03PM | 14 | Q | And who's next to Johnnie? |
| 12:03PM | 15 | A | Keali'i. |
| 12:03PM | 16 | Q | Who is next to Keali'i? |
| 12:03PM | 17 | A | I don't know. |
| 12:03PM | 18 | | MR. KENNEDY:  At this time I move 1-938E into |
| 12:03PM | 19 | | evidence. |
| 12:03PM | 20 | | THE COURT:  Mr. Nammar, any objection? |
| 12:03PM | 21 | | MR. NAMMAR:  No objection. |
| 12:03PM | 22 | | THE COURT:  1-938E as in echo is admitted. |
| 12:03PM | 23 | | (Exhibit 1-938E was received in evidence.) |
| 12:03PM | 24 | | MR. KENNEDY:  May we publish? |
| 12:03PM | 25 | | THE COURT:  Yes. |

12:03PM    1    By MR. KENNEDY:

12:03PM    2    Q    All right.  So these are for the jury.  On the far left if

12:03PM    3    I just put a checkmark there, and then I'll take it away.

12:03PM    4         Who is that, sir?

12:03PM    5    A    Keoni Adric.

12:04PM    6    Q    This is the Keoni Adric that you have discussed, right?

12:04PM    7    A    Yes.

12:04PM    8    Q    I think we saw a text today about Keoni Adric from Mike

12:04PM    9    Miske about you be safe, don't drive, right?

12:04PM   10    A    I'm not sure.

12:04PM   11    Q    And that was because at that time, you didn't have your

12:04PM   12    license, and so Keoni Adric did.  So he was telling you, let

12:04PM   13    him drive.

12:04PM   14         Do you recall that?

12:04PM   15    A    I don't know what he was telling me.

12:04PM   16    Q    All right.  Who is next to Keoni Adric then?

12:04PM   17    A    Dane.

12:04PM   18    Q    And so this would be Dane; is that correct?

12:04PM   19    A    Yes.

12:04PM   20    Q    All right.  And here?

12:04PM   21    A    That's me.

12:04PM   22    Q    And next to you is this Rocky?

12:04PM   23    A    Rocky.

12:04PM   24    Q    Okay.  And the jury will recognize, this is Mr. Stancil.

12:04PM   25    Johnnie?

| | | | |
|---|---|---|---|
| 12:04PM | 1 | A | Yes. |
| 12:04PM | 2 | Q | All right.  And who is next to Johnnie right here? |
| 12:05PM | 3 | A | Keali'i. |
| 12:05PM | 4 | Q | Keali'i Young? |
| 12:05PM | 5 | A | Yes. |
| 12:05PM | 6 | Q | And sometimes also referred to as Keali'i Foster, right? |
| 12:05PM | 7 | A | Yes. |
| 12:05PM | 8 | Q | You knew him as Keali'i Young, right? |
| 12:05PM | 9 | A | Keali'i Young. |
| 12:05PM | 10 | Q | And I believe this individual here, you said you didn't |
| 12:05PM | 11 | | recognize? |
| 12:05PM | 12 | A | I don't know who that is. |
| 12:05PM | 13 | Q | We can take that down. |
| 12:05PM | 14 | | MR. KENNEDY:  Move on to 1-956L, which I believe is |
| 12:05PM | 15 | | also in the 13th.  I can check, Your Honor, but I believe it |
| 12:05PM | 16 | | is. |
| 12:05PM | 17 | | THE COURT:  It is.  Go ahead. |
| 12:05PM | 18 | | By MR. KENNEDY: |
| 12:05PM | 19 | Q | Do you recognize what's shown in 1-956L, sir? |
| 12:05PM | 20 | A | A gun. |
| 12:05PM | 21 | Q | What type of gun? |
| 12:05PM | 22 | A | I don't know what type of gun it was.  It was a gun I got |
| 12:05PM | 23 | | from a friend of mine. |
| 12:05PM | 24 | Q | So this is a gun that you got from a friend of yours, |
| 12:06PM | 25 | | right? |

| | | |
|---|---|---|
| 12:06PM | 1 | A    Yes. |
| 12:06PM | 2 | MR. KENNEDY:  All right.  I'd move 1-956L into |
| 12:06PM | 3 | evidence. |
| 12:06PM | 4 | THE COURT:  Any objection? |
| 12:06PM | 5 | MR. NAMMAR:  No objection. |
| 12:06PM | 6 | THE COURT:  1-956L is admitted.  You may publish. |
| 12:06PM | 7 | (Exhibit 1-956L was received in evidence.) |
| 12:06PM | 8 | BY MR. KENNEDY: |
| 12:06PM | 9 | Q    Thank you.  So now, this is another gun that you received |
| 12:06PM | 10 | from a friend of yours, right? |
| 12:06PM | 11 | A    Yes. |
| 12:06PM | 12 | Q    And have you fired this gun? |
| 12:06PM | 13 | A    No. |
| 12:06PM | 14 | Q    I understand you used to go out and fire the assault |
| 12:06PM | 15 | rifles with Keali'i Young, right? |
| 12:06PM | 16 | A    What assault rifles? |
| 12:06PM | 17 | Q    I'm sorry? |
| 12:06PM | 18 | A    What assault rifles? |
| 12:06PM | 19 | Q    Say, the AK-47? |
| 12:06PM | 20 | A    I never did go shoot anything with Keali'i Young.  I fired |
| 12:06PM | 21 | the AK-47 maybe one time. |
| 12:06PM | 22 | Q    One time?  Okay.  You never shot anything with Keali'i |
| 12:06PM | 23 | Young? |
| 12:06PM | 24 | A    Not much, I don't remember shooting anything with Keali'i |
| 12:06PM | 25 | Young. |

| | | | |
|---|---|---|---|
| 12:06PM | 1 | Q | Did you tell the authorities that you did? |
| 12:06PM | 2 | A | We seen Keali'i shoot.  I wasn't shooting with him. |
| 12:06PM | 3 | Q | So this is a gun that you had in your possession while you |
| 12:07PM | 4 | | were dealing the drugs that we have seen and the robberies you |
| 12:07PM | 5 | | were doing? |
| 12:07PM | 6 | A | I had the gun, yeah. |
| 12:07PM | 7 | | MR. KENNEDY:  Let's move on to 1-956Q. |
| 12:07PM | 8 | | THE COURT:  Go ahead. |
| 12:07PM | 9 | | MR. KENNEDY:  Also in the 13th. |
| 12:07PM | 10 | | THE COURT:  Yes, thanks. |
| 12:07PM | 11 | | By MR. KENNEDY: |
| 12:07PM | 12 | Q | All right.  Do you recognize the three individuals in this |
| 12:07PM | 13 | | photograph? |
| 12:07PM | 14 | A | Yes. |
| 12:07PM | 15 | Q | Do you recognize yourself? |
| 12:07PM | 16 | A | Yes. |
| 12:07PM | 17 | Q | Do you recognize John Stancil? |
| 12:07PM | 18 | A | Yes. |
| 12:07PM | 19 | Q | And do you recognize the person to your right? |
| 12:07PM | 20 | A | Yes. |
| 12:07PM | 21 | Q | Who is that? |
| 12:07PM | 22 | A | Cody. |
| 12:07PM | 23 | Q | Cody who? |
| 12:07PM | 24 | A | Stancil. |
| 12:07PM | 25 | | MR. KENNEDY:  Okay.  I move 1-956Q into evidence. |

| | | |
|---|---|---|
| 12:07PM | 1 | THE COURT:  Any objection? |
| 12:07PM | 2 | MR. NAMMAR:  No objection. |
| 12:07PM | 3 | THE COURT:  1-956Q is admitted.  You may publish. |
| 12:07PM | 4 | (Exhibit 1-956Q was received in evidence.) |
| 12:07PM | 5 | BY MR. KENNEDY: |
| 12:07PM | 6 | Q    Okay.  So you are here, sir? |
| 12:08PM | 7 | A    Yes. |
| 12:08PM | 8 | Q    Mr. Stancil, Johnnie Stancil to your left? |
| 12:08PM | 9 | A    Yes. |
| 12:08PM | 10 | Q    And Cody Stancil to your right? |
| 12:08PM | 11 | A    Yes. |
| 12:08PM | 12 | Q    All right.  We can take that down.  Now, on August 14th of |
| 12:08PM | 13 | 2018 when you were arrested, you were charged in a criminal |
| 12:08PM | 14 | complaint; do you recall that? |
| 12:08PM | 15 | A    I'm not too sure what I was charged with. |
| 12:08PM | 16 | Q    Okay.  You were charged, right?  You were arrested and |
| 12:08PM | 17 | charged, correct? |
| 12:08PM | 18 | A    I was arrested. |
| 12:08PM | 19 | Q    Okay.  You were arrested with someone that you -- in |
| 12:09PM | 20 | related to this charge, you've talked about, correct? |
| 12:09PM | 21 | A    I was arrested with who? |
| 12:09PM | 22 | Q    Have you discussed somebody by the name of Timmy or Timmy |
| 12:09PM | 23 | Taboada? |
| 12:09PM | 24 | A    We discussed him but I didn't even know he was arrested |
| 12:09PM | 25 | that morning. |

| | | | |
|---|---|---|---|
| 12:09PM | 1 | Q | So you were charged with Timmy or Timothy Taboada as your |
| 12:09PM | 2 | | codefendant, right? |
| 12:09PM | 3 | A | Yes. |
| 12:09PM | 4 | Q | And Nicole or Nicky Zapata, right? |
| 12:09PM | 5 | A | I think so. |
| 12:09PM | 6 | Q | All right.  We will look at the documents, but the three |
| 12:09PM | 7 | | of you were charged originally, right? |
| 12:09PM | 8 | A | I think so, yeah. |
| 12:09PM | 9 | Q | And you know you were charged because you came to court. |
| 12:09PM | 10 | | They gave you the document and at a certain point, you |
| 12:09PM | 11 | | read it, right? |
| 12:09PM | 12 | A | I think so. |
| 12:09PM | 13 | Q | So what that charge dealt with is you talked about today, |
| 12:10PM | 14 | | that we saw some text messages between yourself and Mr. Miske; |
| 12:10PM | 15 | | do you recall that? |
| 12:10PM | 16 | A | Yes. |
| 12:10PM | 17 | Q | And we saw a lot of them today, right? |
| 12:10PM | 18 | A | Yes. |
| 12:10PM | 19 | Q | Some of them were 500 pages long, right? |
| 12:10PM | 20 | A | They were long. |
| 12:10PM | 21 | Q | And we were scrolling through them fast, right? |
| 12:10PM | 22 | A | Yes. |
| 12:10PM | 23 | Q | So near the end, there was a charge -- there was some text |
| 12:10PM | 24 | | messages about how Wayne Miller had been charged for drug |
| 12:10PM | 25 | | trafficking, right? |

| | | | |
|---|---|---|---|
| 12:10PM | 1 | A | Um-hm. |
| 12:10PM | 2 | Q | And that he had sold to an undercover, correct? |
| 12:10PM | 3 | A | Yes. |
| 12:10PM | 4 | Q | And that it was a slam dunk case, right? |
| 12:10PM | 5 | A | Yes. |
| 12:10PM | 6 | Q | And you were talking about that and Mr. Miske was |
| 12:10PM | 7 | | surprised in those text messages that that had happened; did |
| 12:10PM | 8 | | you see that? |
| 12:10PM | 9 | A | I don't know if he was surprised or he wasn't. |
| 12:10PM | 10 | Q | All right.  So with respect to you, you were charged |
| 12:10PM | 11 | | with -- on February 9th of 2018, selling to a person working |
| 12:11PM | 12 | | for the government, right?  A confidential informant, right? |
| 12:11PM | 13 | A | Not me myself, no.  And I didn't see any of that. |
| 12:11PM | 14 | Q | So you -- so on February 9th, what happened was, you've |
| 12:11PM | 15 | | told the jury that all these drugs that you were robbing and |
| 12:11PM | 16 | | getting, you gave to Timmy Tabouada to sell, right? |
| 12:11PM | 17 | A | Um-hm. |
| 12:11PM | 18 | Q | So on that day, both you and he go to make a sale, right? |
| 12:11PM | 19 | A | Yes. |
| 12:11PM | 20 | Q | He goes over to talk to the person who is going to buy, |
| 12:11PM | 21 | | right? |
| 12:11PM | 22 | A | I don't know. |
| 12:11PM | 23 | Q | Unbeknownst to you, that person is working for the |
| 12:11PM | 24 | | government, right? |
| 12:11PM | 25 | A | I guess, that's what you are saying. |

| | | | |
|---|---|---|---|
| 12:11PM | 1 | Q | Taboada comes back to you to get the drugs to sell to him, |
| 12:11PM | 2 | | right? |
| 12:11PM | 3 | A | I don't know.  I don't even remember the exact day. |
| 12:12PM | 4 | Q | Then he goes over there and sells those drugs, right? |
| 12:12PM | 5 | A | I'm guessing that's what you are saying. |
| 12:12PM | 6 | Q | And those drugs included an amount that will get you ten |
| 12:12PM | 7 | | years in prison at a minimum, right? |
| 12:12PM | 8 | A | I don't know what the amount was. |
| 12:12PM | 9 | Q | And then it could go up to life, right? |
| 12:12PM | 10 | A | I don't know what the amount was. |
| 12:12PM | 11 | Q | Well, let's take a look at Exhibit 9013-037, which is in |
| 12:12PM | 12 | | the original exhibit list. |
| 12:12PM | 13 | | THE COURT:  Okay.  Go ahead. |
| 12:13PM | 14 | | By MR. KENNEDY: |
| 12:13PM | 15 | Q | Sir, do you see Exhibit 9013-037? |
| 12:13PM | 16 | A | Yes. |
| 12:13PM | 17 | Q | Do you see that it's a criminal complaint against you? |
| 12:13PM | 18 | A | Yes. |
| 12:13PM | 19 | Q | Timothy Taboada? |
| 12:13PM | 20 | A | Yes. |
| 12:13PM | 21 | Q | And a Catherine Nicole Zapata, correct? |
| 12:13PM | 22 | A | Yes. |
| 12:13PM | 23 | Q | Let's move to the second page.  Take a look at count one. |
| 12:13PM | 24 | | Just read that to yourself. |
| 12:13PM | 25 | | Have you done so? |

| | | | |
|---|---|---|---|
| 12:13PM | 1 | A | I did it. |
| 12:13PM | 2 | Q | All right.  And take a look at count two. |
| 12:13PM | 3 | | Have you read that as well? |
| 12:14PM | 4 | A | I've read it. |
| 12:14PM | 5 | Q | Okay.  We can take that down for the time being.  So you |
| 12:14PM | 6 | | are aware that what you were charged with was a sale by you and |
| 12:14PM | 7 | | Mr. Taboada of drugs on February 9th of 2018, correct? |
| 12:14PM | 8 | A | I'm aware that we were on a conspiracy right there. |
| 12:14PM | 9 | Q | Well, let's just pull up 9013-037 up again.  Go to page |
| 12:14PM | 10 | | two. |
| 12:14PM | 11 | | Does it say that you are charged with knowingly and |
| 12:14PM | 12 | | intentionally distributing and possessing with intent to |
| 12:14PM | 13 | | distribute methamphetamine? |
| 12:14PM | 14 | A | Yes. |
| 12:14PM | 15 | Q | Doesn't say anything about conspiracy, does it? |
| 12:14PM | 16 | A | No. |
| 12:14PM | 17 | Q | All right.  Now, let's move on to the third page.  I'd |
| 12:15PM | 18 | | like to -- if you just focus your attention on paragraph two. |
| 12:15PM | 19 | | And when you are done, just let me know when you are finished |
| 12:15PM | 20 | | with that. |
| 12:15PM | 21 | A | I'm done. |
| 12:15PM | 22 | Q | All right.  Sir, you are aware that your charge was a drug |
| 12:15PM | 23 | | sale that you made on February 9th of 2018, correct? |
| 12:16PM | 24 | A | I'm aware now. |
| 12:16PM | 25 | Q | And at that time, on August 14, 2018, that's what you were |

12:16PM    1    arrested for, correct?

12:16PM    2    A    Yes.

12:16PM    3    Q    And so at that point, you knew that one drug sale on

12:16PM    4    February 9th of 2018 could get you ten years to life?

12:16PM    5    A    I figured it out.

12:16PM    6    Q    If we move to near the bottom, you also were then aware

12:16PM    7    that federal wiretaps had been on your phones from March 2018

12:16PM    8    to June 2018, correct?

12:16PM    9    A    I'm aware of it now.

12:16PM   10    Q    And they had been listening to you on your telephone with

12:17PM   11    all of your drug dealing, right?

12:17PM   12    A    I'm aware of it now.

12:17PM   13    Q    And so in addition to what we discussed earlier here, you

12:17PM   14    are looking at federal wiretap.  They have your conversations

12:17PM   15    dealing drugs for several months, right?

12:17PM   16         MR. NAMMAR:  Objection; no foundation for this.

12:17PM   17         THE COURT:  There isn't.

12:17PM   18    By MR. KENNEDY:

12:17PM   19    Q    You became aware when you received discovery that the

12:17PM   20    wiretaps were your phones, right?

12:17PM   21    A    Yes.

12:17PM   22    Q    And that in processing what you are going to do, you

12:17PM   23    signed a proffer agreement on August 14th of 2018, correct?

12:17PM   24    A    I signed the agreement the day I got arrested.

12:17PM   25    Q    Which was the day you got arrested, right?

12:18PM    1    A    Yes.

12:18PM    2    Q    You didn't enter your plea to any charge until 2020, more

12:18PM    3    than two years later, correct?

12:18PM    4    A    Yes.

12:18PM    5    Q    In between that time period, it was more than a year later

12:18PM    6    that you went in front of the grand jury, right?

12:18PM    7    A    I think so.

12:18PM    8    Q    And so the proffer agreement that you signed isn't a plea

12:18PM    9    agreement, correct?

12:18PM   10    A    No.

12:18PM   11    Q    What it is, is you can speak to the government and nothing

12:18PM   12    that you say during those meetings can be used against you,

12:18PM   13    right?

12:18PM   14    A    Yes.

12:18PM   15    Q    And so none of that can be used against you, right?

12:19PM   16         MR. NAMMAR:  Objection; asked and answered.

12:19PM   17         THE COURT:  Overruled, go ahead.

12:19PM   18         THE WITNESS:  None of what?

12:19PM   19    By MR. KENNEDY:

12:19PM   20    Q    What you say to them during the proffer agreement?

12:19PM   21    A    That's what I'm told.

12:19PM   22    Q    It can only be used against others?

12:19PM   23         MR. NAMMAR:  Objection; misstates the agreement.

12:19PM   24    By MR. KENNEDY:

12:19PM   25    Q    With one exception:  You understood that it couldn't be

12:19PM   1   used against you, correct?

12:19PM   2   A    I was told.

12:19PM   3   Q    You understood it could be used against others, though,

12:19PM   4   right?

12:19PM   5   A    I didn't understand it.

12:19PM   6   Q    And the only way it could be used against you is if the

12:19PM   7   government deemed what you say to be untruthful?

12:19PM   8            MR. NAMMAR:  Objection; misstates the agreement.

12:20PM   9            THE COURT:  Overruled.  You can answer.

12:20PM  10            THE WITNESS:  What was the question?

12:20PM  11   By MR. KENNEDY:

12:20PM  12   Q    You understood that it could be -- what you were saying

12:20PM  13   could be used against others, correct?

12:20PM  14   A    Yes.

12:20PM  15   Q    The only way it could be used against you is if the

12:20PM  16   government deems what you say to be untruthful?

12:20PM  17   A    Yes.

12:20PM  18   Q    Okay.

12:20PM  19            MR. KENNEDY:  If we could pull up 9013-002 just for

12:20PM  20   the witness.  It's also in the original exhibit list.

12:21PM  21            THE COURT:  Okay, go ahead.  I've got it.

12:21PM  22   By MR. KENNEDY:

12:21PM  23   Q    Sir, do you recognize what is shown on the first page of

12:21PM  24   9013-002?

12:21PM  25   A    Yes.

12:21PM   1   Q   If we move to the second page.  And the third page.  And

12:21PM   2   the fourth page.

12:21PM   3        Do you recognize your signature?

12:21PM   4   A   Yes.

12:21PM   5   Q   And do you recognize the signatures as being done that day

12:21PM   6   when you signed?

12:21PM   7   A   Yes.

12:21PM   8   Q   All right.  So now it is August 14, 2018 when you entered

12:22PM   9   into your proffer agreement, correct?

12:22PM   10  A   Yes.

12:22PM   11  Q   All right.  So we can take that down.

12:22PM   12       Nico Carignan is somebody that we heard about in terms

12:22PM   13  of a robbery that you participated in, correct?

12:22PM   14  A   Yes.

12:22PM   15  Q   He also was one of your largest drug suppliers, right?

12:22PM   16  A   Yes.

12:22PM   17  Q   And he was your largest drug supplier at this time,

12:22PM   18  correct?

12:22PM   19  A   Yes.

12:22PM   20  Q   And so you robbed him, right?

12:22PM   21  A   We robbed him.

12:22PM   22  Q   Of his drugs?

12:22PM   23  A   Yes.

12:22PM   24  Q   In what you discussed to the jury, right?

12:22PM   25  A   Yes.

12:22PM   1   Q   Where cars came up, Norm Akau came out with a badge,

12:22PM   2   right?

12:22PM   3   A   Um-hm.

12:22PM   4   Q   He thought he was under arrest, and you got somewhere

12:23PM   5   between five to six pounds of ice?

12:23PM   6   A   Yes.

12:23PM   7   Q   Which Ashlin Akau set up, right?

12:23PM   8   A   Yes.

12:23PM   9   Q   Through Kurt Kipapa, right?

12:23PM   10   A   Yes.

12:23PM   11   Q   And the jury has heard all about that, right?

12:23PM   12   A   I guess.

12:23PM   13   Q   Heard it from you?

12:23PM   14   A   Yes.

12:23PM   15   Q   After you do that, then you start buying drugs from him as

12:23PM   16   well, right?

12:23PM   17   A   Yes.

12:23PM   18   Q   And so he becomes your main supplier, right?

12:23PM   19   A   Yes.

12:23PM   20   Q   And so on the 14th of August at that time, he is supplying

12:23PM   21   you drugs.

12:23PM   22       You're giving those drugs to Timmy Taboada for sale,

12:23PM   23   right?

12:23PM   24   A   Yes.

12:23PM   25   Q   You are getting the money back, right?

| 12:23PM | 1 | A | Yes. |
| 12:23PM | 2 | Q | And you're making the profit, right? |
| 12:23PM | 3 | A | Yes. |
| 12:23PM | 4 | Q | And so at that time, you set up Nico Carignan, right? |
| 12:24PM | 5 | A | No. |
| 12:24PM | 6 | Q | Don't you make a bunch of phone calls to him? |
| 12:24PM | 7 | A | Well, yes, we do. |
| 12:24PM | 8 | Q | Don't you set up a drug deal with the FBI? |
| 12:24PM | 9 | A | Yes. |
| 12:24PM | 10 | Q | Don't you end up the next day having him arrested? |
| 12:24PM | 11 | A | I don't know if he got arrested or not, but yes. |
| 12:24PM | 12 | Q | You set up the drug deal, right? |
| 12:24PM | 13 | A | Yes. |
| 12:24PM | 14 | Q | So that's what you did to Nico Carignan, right? |
| 12:24PM | 15 | A | Yes. |
| 12:24PM | 16 | Q | You robbed him, right? |
| 12:24PM | 17 | A | Yes. |
| 12:24PM | 18 | Q | You bought from him, right? |
| 12:24PM | 19 | A | He fronted me. |
| 12:24PM | 20 | Q | And then you set him up to be arrested, correct? |
| 12:24PM | 21 | A | Correct. |
| 12:24PM | 22 | Q | Now, during that proffer interview that you did on |
| 12:24PM | 23 | | August 14th of 2018, you would agree with me that your memory |
| 12:25PM | 24 | | of events that had happened was sharper then than it is now, |
| 12:25PM | 25 | | six years later? |

| | | | |
|---|---|---|---|
| 12:25PM | 1 | A | Would I agree with you with what? |
| 12:25PM | 2 | Q | That your memory was better then of things that had just |
| 12:25PM | 3 | | happened than it is now? |
| 12:25PM | 4 | A | I mean, it's my memory then better of things -- |
| 12:25PM | 5 | Q | That had just happened as opposed to six years later? |
| 12:25PM | 6 | A | Probably.  I'm not sure. |
| 12:25PM | 7 | Q | So back to that sitting down with -- ATF was in the room, |
| 12:25PM | 8 | | right? |
| 12:25PM | 9 | A | I think so. |
| 12:25PM | 10 | Q | FBI was in the room, right? |
| 12:25PM | 11 | A | Yes. |
| 12:25PM | 12 | Q | Okay.  And we established that when I started questioning |
| 12:25PM | 13 | | you, that basically Lindsey Kinney was about this distance from |
| 12:25PM | 14 | | you and that you fired a shot directly up in the air, right? |
| 12:26PM | 15 | A | I fired a shot. |
| 12:26PM | 16 | Q | You said in the air? |
| 12:26PM | 17 | A | I fired a warning shot in the air.  In the air. |
| 12:26PM | 18 | Q | Okay.  So what you told the FBI and the ATF on that |
| 12:26PM | 19 | | August 14, 2018, interview is that Mike Miske told you, told |
| 12:26PM | 20 | | John Stancil, and told Harry Kauhi to stay in their vehicles. |
| 12:26PM | 21 | | That's what you told them. |
| 12:26PM | 22 | A | Are you asking me a question? |
| 12:26PM | 23 | Q | Yes.  That's what you said? |
| 12:26PM | 24 | A | I don't know if that's what I said. |
| 12:26PM | 25 | | MR. KENNEDY:  Okay.  Let's take a look at 9013-018, |

12:26PM   1   which is in the original exhibit list as well.

12:26PM   2         THE COURT:  Go ahead.

12:26PM   3   By MR. KENNEDY:

12:26PM   4   Q    If we turn to page six, and we go down to the fourth

12:27PM   5   paragraph.  And if you take a look at the second sentence.

12:27PM   6         Have you read that, sir?

12:27PM   7   A    Yes.

12:27PM   8   Q    All right.  We can take it down.  So what you told them is

12:27PM   9   that Mr. Miske told you, told John Stancil, and told Harry

12:27PM  10   Kauhi to stay in their vehicles?

12:27PM  11   A    That's what it looks like but that's not what I said.  He

12:27PM  12   could have got it wrong.

12:27PM  13   Q    We will go through this.

12:27PM  14         You remember that this interview was audio recorded,

12:27PM  15   don't you?

12:27PM  16   A    I don't remember.

12:27PM  17   Q    Okay.  All right.  You told them, during that first

12:28PM  18   interview on August 14, 2018, that Mr. Miske and Lindsey Kinney

12:28PM  19   began squaring off as if they were about to fight.

12:28PM  20         Do you recall telling them that?

12:28PM  21   A    That was the plan when we got there.

12:28PM  22   Q    Okay.  So you told them that, right?

12:28PM  23   A    I told them what the plan was when we got there.

12:28PM  24   Q    No.  What I'm asking you, sir, is you -- your words were

12:28PM  25   that Mr. Miske and Mr. Kinney began squaring off as if they

12:28PM    1    were to fight.

12:28PM    2    A    I said they were walking up to each other like they wanted

12:28PM    3    to fight.

12:28PM    4    Q    But you were not sure if Miske was a good fighter; that's

12:28PM    5    what you told them?

12:28PM    6    A    Yes.

12:28PM    7    Q    You told them that you shot a round in the air as you

12:28PM    8    exited the vehicle, correct?

12:28PM    9    A    Yes.

12:28PM   10    Q    All right.  And you shot it in the air just like you've

12:29PM   11    told the jury that, correct?

12:29PM   12    A    Yes.

12:29PM   13    Q    And so from August 14th of 2018, it's always been a shot

12:29PM   14    in the air, right?

12:29PM   15    A    Yes.

12:29PM   16    Q    Never any intent to hit Mr. Kinney; never any intent to

12:29PM   17    murder him, correct?

12:29PM   18    A    No.

12:29PM   19    Q    Never any intent to assault him with a gun?

12:29PM   20    A    No.

12:29PM   21    Q    And that Stancil, you, and Miske all ran to the vehicles

12:29PM   22    after your shot.  That's what you told them.

12:29PM   23    A    Yes.

12:29PM   24    Q    And that all three vehicles then left the scene.

12:29PM   25    A    Yes.

12:29PM   1   Q     And you said that the firearm that you used is -- you got

12:29PM   2   from Wayne Miller, right?

12:29PM   3   A     Yes.

12:29PM   4   Q     It was a 40-caliber, right?

12:29PM   5   A     Yes.

12:29PM   6   Q     And that afterwards, you gave that firearm to Harry Kauhi,

12:30PM   7   right?

12:30PM   8   A     Yes.

12:30PM   9   Q     And did you eventually get it back?

12:30PM  10   A     I believe I did, yes.

12:30PM  11   Q     Okay.  All right.  Now, sticking with that incident, there

12:30PM  12   was a meeting that you had when I believe you and Harry Kauhi

12:30PM  13   were having lunch, right?

12:30PM  14   A     Yes.

12:30PM  15   Q     Prior to what we just discussed, right?

12:30PM  16   A     Yes.

12:30PM  17   Q     All right.  And you ended up meeting with two individuals

12:30PM  18   with Harry, right?

12:30PM  19   A     Yes.

12:30PM  20   Q     Zeph Salas?

12:30PM  21   A     Yeah, he was there.

12:30PM  22   Q     And Norman Akau?

12:31PM  23   A     Yes, I met with Norm.

12:31PM  24   Q     Right.  And when you met with Norm, you understood that

12:31PM  25   Zeph Salas was a member of Nakipi Motorcycle Club, right?

12:31PM   1    A    Yes.

12:31PM   2    Q    That Norm Akau was a member of Nakipi Motorcycle Club,

12:31PM   3    correct?

12:31PM   4    A    Yes.

12:31PM   5    Q    That the president was Norm Akau, right?

12:31PM   6    A    Yes.

12:31PM   7    Q    And Zeph Salas was a founder of that motorcycle club,

12:31PM   8    correct?

12:31PM   9    A    I just knew Zeph was up there in the club.  I didn't know

12:31PM   10   all the spots and stuff.

12:31PM   11   Q    And you knew that Norm Akau was a USO family member,

12:31PM   12   correct?

12:31PM   13   A    I heard about it.  I didn't pay much attention to it.

12:31PM   14   Q    And you knew he remained an USO family member when he left

12:31PM   15   prison, correct?

12:31PM   16   A    I knew he was a USO.  I heard he was an USO.

12:32PM   17   Q    Right.  It isn't just a prison gang, is it?

12:32PM   18   A    It isn't just a prison gang?

12:32PM   19   Q    Right.  It exists on the outside as well, and you know

12:32PM   20   that, correct?

12:32PM   21   A    No.  To me it was.

12:32PM   22   Q    So you've mentioned La Familia being just a prison gang,

12:32PM   23   right?

12:32PM   24   A    Yes.

12:32PM   25   Q    But it's hard to have a website in prison, isn't it?

12:32PM   1   A   Yeah, it's hard to have a website.

12:32PM   2   Q   And so there is a La Familia website on the outside,

12:32PM   3   right?

12:32PM   4   A   Was there a La Familia website.

12:32PM   5   Q   Yeah.

12:32PM   6   A   I don't know if there was a La Familia website.

12:32PM   7   Q   Oh, so you didn't post messages on La Familia website?

12:32PM   8   A   On a La Familia website?

12:32PM   9   Q   Yes?

12:32PM   10   A   No.

12:32PM   11   Q   You didn't?

12:32PM   12   A   There is no La Familia website.

12:32PM   13   Q   All right.  So now, when -- are you aware that when the

12:33PM   14   wiretaps against you were brought, that the international gang

12:33PM   15   was identified to be La Familia of which you were a part?

12:33PM   16   A   You got to repeat the question.

12:33PM   17   Q   Were you aware that when the -- were you aware that when

12:33PM   18   the wiretaps were obtained, the organization listed, which

12:33PM   19   included you, was La Familia?

12:33PM   20        MR. NAMMAR:  Objection; vague.

12:33PM   21        THE COURT:  Sustained.

12:33PM   22   By MR. KENNEDY:

12:33PM   23   Q   You weren't aware that they were targeting La Familia,

12:33PM   24   including you?

12:33PM   25   A   No, I wasn't aware of that.

12:33PM    1    Q    All right.  Now, at that meeting with Zeph Salas and Norm

12:33PM    2    Akau, you were given an order to deal with Lindsey Kinney,

12:34PM    3    weren't you?

12:34PM    4    A    At the meeting I was given an order to deal with Lindsey

12:34PM    5    Kinney?

12:34PM    6    Q    Yes.  By Zeph Salas?

12:34PM    7    A    No, not from Zeph Salas, no.

12:34PM    8    Q    He gave you an order to take care of him, right?

12:34PM    9    A    No, he didn't.

12:34PM   10    Q    Because Lindsey Kinney had been kicked out of Nakipi

12:34PM   11    Motorcycle Club?

12:34PM   12    A    Why would Zeph give me an order?  I'm not in Nakipi.

12:34PM   13    Q    Because he is in USO and so were you.

12:34PM   14    A    No, that's not even close to being true.

12:34PM   15    Q    And so you were in a position to carry it out, right?

12:34PM   16    A    No, I was in a position to carry it out because of Mike.

12:34PM   17    Q    We will go through it, but other than a shot in the air as

12:34PM   18    a warning shot, that's the only thing that's ever happened to

12:34PM   19    Lindsey Kinney, correct?

12:34PM   20    A    I don't know.  I don't know what else has happened to

12:35PM   21    Lindsey Kinney.

12:35PM   22    Q    Well, let's talk about it.  What triggered it, you know,

12:35PM   23    was Lindsey Kinney was posting on social media that Mike Miske

12:35PM   24    was responsible for killing his own son?

12:35PM   25    A    Lindsey was posting a lot of stuff on social media.

| | | |
|---|---|---|
| 12:35PM | 1 | Q    That was one of it, right? |
| 12:35PM | 2 | A    I don't got social media.  I don't got Instagram. |
| 12:35PM | 3 | Q    Well, you sure knew -- if we took a look at the one, I |
| 12:35PM | 4 | guess it's -- let's see.  I think I wrote the number down.  The |
| 12:35PM | 5 | jury has page 387 of that long-winded text messages. |
| 12:35PM | 6 |      Lindsey Kinney was posting messages about you killing |
| 12:35PM | 7 | someone in an apartment, which was crazy, right? |
| 12:35PM | 8 | A    I don't know exactly whatever he was posting, but he |
| 12:36PM | 9 | posted a lot of crazy stuff. |
| 12:36PM | 10 | Q    Okay, well, let's take a look.  I think this was 1-953. |
| 12:36PM | 11 | And if we go to page 387, kind of reading it as we went along. |
| 12:36PM | 12 | If we pull up the bottom one and make that larger. |
| 12:36PM | 13 |      MR. KENNEDY:  And can we publish it now since it's in |
| 12:36PM | 14 | evidence. |
| 12:36PM | 15 |      THE COURT:  All right. |
| 12:36PM | 16 | By MR. KENNEDY: |
| 12:36PM | 17 | Q    Now that we have certainly found the right one. |
| 12:36PM | 18 |      This is a message from you, correct? |
| 12:37PM | 19 | A    Yes. |
| 12:37PM | 20 | Q    To Mike Miske, right? |
| 12:37PM | 21 | A    Yes. |
| 12:37PM | 22 | Q    "Brah, this dumb ass saying I killed this boy at the |
| 12:37PM | 23 | apartments last night, this fucking idiot.  And that boy was my |
| 12:37PM | 24 | friend.  His sister, them all my friend," right? |
| 12:37PM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 12:37PM | 1 | Q | This is an example of what Lindsey Kinney was posting, |
| 12:37PM | 2 | | right? |
| 12:37PM | 3 | A | An example, yeah. |
| 12:37PM | 4 | Q | And you said he was crazy, right? |
| 12:37PM | 5 | A | Yes. |
| 12:37PM | 6 | Q | He was posting stuff about beheading people, right? |
| 12:37PM | 7 | A | Yes. |
| 12:37PM | 8 | Q | He was posting things about attacking our governor, right? |
| 12:37PM | 9 | A | Yes. |
| 12:37PM | 10 | Q | He was posting all kinds of crazy stuff, right? |
| 12:37PM | 11 | A | Yes. |
| 12:37PM | 12 | Q | And included in that, he was just bombing Mike Miske with |
| 12:37PM | 13 | | things about being responsible for his son's death at that |
| 12:37PM | 14 | | time, right? |
| 12:37PM | 15 | A | I think so -- |
| 12:37PM | 16 | Q | And that's when Mike snapped, right? |
| 12:37PM | 17 | | THE COURT:  I didn't hear the witness's response. |
| 12:37PM | 18 | | MR. KENNEDY:  And that is my mistake, Your Honor. |
| 12:38PM | 19 | | THE COURT:  I think the record caught part of it. |
| 12:38PM | 20 | | Mr. Smith, the question was:  "And included in that, he was |
| 12:38PM | 21 | | just bombing Mike Miske with things about being responsible for |
| 12:38PM | 22 | | his son's death at that time, right?"  And your response was: |
| 12:38PM | 23 | | "I think so."  And there were more words after that that we did |
| 12:38PM | 24 | | not capture. |
| 12:38PM | 25 | | THE WITNESS:  I think so.  He was talking a lot and |

145

12:38PM   1    posting a lot of crazy stuff.

12:38PM   2    By MR. KENNEDY:

12:38PM   3    Q    And so if we go to page 28 and 29 of what is this exhibit,

12:38PM   4    which is, I believe it's 1-593.

12:38PM   5         THE COURT:  953?

12:38PM   6    By MR. KENNEDY:

12:38PM   7    Q    If we go and we just blow up the first one, "You seen what

12:38PM   8    he was saying about me killing my own son."

12:38PM   9    A    Yes.

12:38PM   10   Q    Do you see that?

12:38PM   11   A    Yes.

12:39PM   12        MR. KENNEDY:  Okay.  Why don't we publish it now that

12:39PM   13   we have got the right --

12:39PM   14        THE COURT:  You're speaking of 1-953, correct?

12:39PM   15        MR. KENNEDY:  Yes, yes.

12:39PM   16        THE COURT:  Go ahead.

12:39PM   17   By MR. KENNEDY:

12:39PM   18   Q    Just dealing with what we have looked at today, and this

12:39PM   19   continued on.

12:39PM   20        We are now in December 16th of 2017, correct?

12:39PM   21   A    Yes.

12:39PM   22   Q    The incident at Kualoa Ranch was in March -- May, excuse

12:39PM   23   me, I misspoke; May of 2017, May 23rd, if I recall.

12:39PM   24        And he's still posting, correct?

12:39PM   25   A    Yes.

| | | | |
|---|---|---|---|
| 12:39PM | 1 | Q | And if we move to page 29 of this document, then there is |
| 12:39PM | 2 | | an attachment, right? |
| 12:40PM | 3 | A | Yes. |
| 12:40PM | 4 | Q | And so he's still posting images at this point, right? |
| 12:40PM | 5 | A | Yes. |
| 12:40PM | 6 | Q | So that's what was going on back in May of 2017, correct? |
| 12:40PM | 7 | A | I don't know what was going on in May 2017. |
| 12:40PM | 8 | Q | Well, you knew that Mike snapped over this, correct? |
| 12:40PM | 9 | A | Yes. |
| 12:40PM | 10 | Q | All right.  Now, we can take that down.  You and Lindsey |
| 12:40PM | 11 | | had a relationship, right? |
| 12:40PM | 12 | A | I knew Lindsey. |
| 12:40PM | 13 | Q | You knew Lindsey because he had fronted you drugs, right? |
| 12:40PM | 14 | A | Yes. |
| 12:40PM | 15 | Q | Lindsey was one of your suppliers, right? |
| 12:40PM | 16 | A | He gave me drugs for a little while. |
| 12:40PM | 17 | Q | So he gave you drugs on two or three occasions, right? |
| 12:40PM | 18 | A | Yes. |
| 12:40PM | 19 | Q | Pound quantities, right? |
| 12:40PM | 20 | A | Yes. |
| 12:40PM | 21 | Q | And he fronted them to you, right? |
| 12:41PM | 22 | A | Yes. |
| 12:41PM | 23 | Q | And you discussed that over the last three days; that |
| 12:41PM | 24 | | means you didn't have to pay, right? |
| 12:41PM | 25 | A | Yes. |

12:41PM    1    Q    So you got the drugs, right?

12:41PM    2    A    Yes.

12:41PM    3    Q    You gave it to someone to sell or did you sell it

12:41PM    4    yourself?

12:41PM    5    A    I gave it to somebody to sell.

12:41PM    6    Q    You gave it to Mr. Taboada?

12:41PM    7    A    Yes.

12:41PM    8    Q    And then he sold it, right?

12:41PM    9    A    Um-hm.

12:41PM    10   Q    And you get the money, right?

12:41PM    11   A    Yes.

12:41PM    12   Q    And normally what you have to do is you have to pay the

12:41PM    13   person who you bought them from, right?

12:41PM    14   A    Yes.

12:41PM    15   Q    But what you were doing at the time was robbing people

12:41PM    16   rather than paying them, right?

12:41PM    17   A    No.  I'm not robbing people every day.  Sometimes I was

12:41PM    18   paying them.

12:41PM    19   Q    Sometimes you were paying them but you hadn't paid Lindsey

12:41PM    20   Kinney, right?

12:41PM    21   A    Yes.

12:41PM    22   Q    Because he was in Las Vegas, right?

12:41PM    23   A    Yes.

12:41PM    24   Q    And you knew him to have a really good supplier in Las

12:41PM    25   Vegas, right?

| | | | |
|---|---|---|---|
| 12:41PM | 1 | A | I knew he was in Vegas grabbing dope. |
| 12:41PM | 2 | Q | And so you weren't going to pay him, right? |
| 12:41PM | 3 | A | I was going to pay him, but he started talking crazy to |
| 12:42PM | 4 | | me. |
| 12:42PM | 5 | Q | Right.  And so then he started talking crazy about you, |
| 12:42PM | 6 | | right? |
| 12:42PM | 7 | A | Yeah. |
| 12:42PM | 8 | Q | And that was your motivation that day, correct? |
| 12:42PM | 9 | A | That wasn't my motivation.  I was eating lunch. |
| 12:42PM | 10 | Q | And that's when you spoke with Zeph and you spoke with |
| 12:42PM | 11 | | Norm, correct?  After you got done eating lunch? |
| 12:42PM | 12 | A | Yeah, I think so. |
| 12:42PM | 13 | Q | Okay.  And so just to deal with what we saw today, at no |
| 12:42PM | 14 | | point did you ever assault Lindsey Kinney? |
| 12:42PM | 15 | A | No. |
| 12:42PM | 16 | Q | At no point did that ever happen, right? |
| 12:42PM | 17 | | MR. NAMMAR:  Objection; asked and answered. |
| 12:42PM | 18 | | THE COURT:  Go ahead.  Overruled; go ahead. |
| 12:42PM | 19 | | By MR. KENNEDY: |
| 12:42PM | 20 | Q | Correct? |
| 12:42PM | 21 | A | Correct. |
| 12:43PM | 22 | Q | The closest it ever got was there was a text message that |
| 12:43PM | 23 | | said you wanted to square up with him, and he ran away, right? |
| 12:43PM | 24 | A | Yes. |
| 12:43PM | 25 | Q | And in those text messages, what's being communicated, |

```
12:43PM    1    there was some conversation about getting it on camera, right?

12:43PM    2    A    Yes.

12:43PM    3    Q    Because Lindsey was talking about how he was going to kill

12:43PM    4    you, kill Mike, do all this damage, right?

12:43PM    5    A    Yes.

12:43PM    6    Q    So he was talking big on social media, right?

12:43PM    7    A    Yes.

12:43PM    8    Q    And at the same time he was talking about how Mike's

12:43PM    9    responsible for the death of his son, right?

12:43PM   10    A    Yes.

12:43PM   11    Q    And what you wanted to do, which is let's go straight up,

12:43PM   12    you and me, right, and have a fight, right?

12:43PM   13    A    I wanted to do it however Mike wanted us to do it.

12:43PM   14    Q    You wanted to do it for your own sake?

12:43PM   15    A    I wanted to do it however Mike wanted us to do it.  If I

12:43PM   16    wanted to do it for my own sake, I would have did it already.

12:43PM   17    Q    And so what it was, you saw efforts to take down his IG

12:44PM   18    account, right?

12:44PM   19    A    Did I see efforts to take it down?

12:44PM   20    Q    Yes.

12:44PM   21    A    Yeah.

12:44PM   22    Q    And so what it was going to be was, if you can get it on

12:44PM   23    film, right?

12:44PM   24    A    Yes.

12:44PM   25    Q    Then -- what he is boasting about can be shown not to be
```

12:44PM   1   true, right?

12:44PM   2   A      Yeah.

12:44PM   3   Q      And so that way, you could take down the social media

12:44PM   4   bully, right?

12:44PM   5   A      I don't know how we were taking down anything.  That's all

12:44PM   6   up to Mike.

12:44PM   7   Q      All you needed to do is if you had a camera, somebody

12:44PM   8   would film it, you're squaring up with him, he runs away.  You

12:44PM   9   post it, then his words don't have any meaning anymore, right?

12:44PM  10   A      I'm not sure.  I don't know.

12:44PM  11   Q      Okay.  Now, you gave some testimony over the last few days

12:45PM  12   about the District and Ginza, correct?

12:45PM  13   A      Yes.

12:45PM  14   Q      And I believe you mentioned your testimony was something

12:45PM  15   about going to John Stancil's house to obtain it on the first

12:45PM  16   night, correct?

12:45PM  17   A      Whatever night we went there.  We went there one of the

12:45PM  18   nights.

12:45PM  19   Q      And going there on the second night, correct?

12:45PM  20   A      We went there on one of the nights.

12:45PM  21   Q      All right.  And that's what you told the jury over these

12:45PM  22   days, correct?

12:45PM  23   A      Yes.

12:45PM  24   Q      Now, on August 14th of 2018, you said that Kaulana Freitas

12:45PM  25   approached you regarding a plan to drop fume chemicals,

12:45PM   1    correct?

12:45PM   2    A    Yes.

12:45PM   3    Q    The chemical was contained in a clear, squeezable

12:46PM   4    ketchup-style bottle, correct?

12:46PM   5    A    Yes.

12:46PM   6    Q    After Kaulana went into the club, a large portion of the

12:46PM   7    chemical still remained in the bottle; only a small amount of

12:46PM   8    the chemical was used.

12:46PM   9         That's what you told them, right?

12:46PM   10   A    I think so.

12:46PM   11   Q    And that Kaulana Freitas then gave you the bottle for the

12:46PM   12   use the following evening, correct?

12:46PM   13   A    Yes.

12:46PM   14   Q    You stored the bottle in your vehicle for the following

12:46PM   15   night at Ginza, correct; that's what you told them?

12:46PM   16   A    I don't know.

12:46PM   17        MR. KENNEDY:  Let's take a look at 9013-018.

12:46PM   18        THE COURT:  Go ahead.

12:47PM   19   By MR. KENNEDY:

12:47PM   20   Q    Go to page eight.  Paragraph two.  Take that one down.

12:47PM   21   Okay.  Let me see.  Okay.  We can bring that back up.  Just

12:47PM   22   that one paragraph.

12:47PM   23        Do you see the third line?  Just read that to

12:47PM   24   yourself.

12:47PM   25   A    Yes.

12:47PM  1    Q    We can take that down.  And that you stored the bottle

12:47PM  2    containing the chemical in your vehicle for the following

12:47PM  3    night, correct; that's what you told them?

12:47PM  4    A    That's what it says.

12:48PM  5    Q    And then you identified the Jagermeister bottle that was

12:48PM  6    obtained about three weeks later as what you had left from what

12:48PM  7    Kaulana Freitas gave you, correct?

12:48PM  8    A    The Jagermeister bottle was dumped in a -- whatever was

12:48PM  9    left, it got dumped in a Jagermeister bottle.

12:48PM  10   Q    At no point did you tell them anything about going to John

12:48PM  11   Stancil's house either on the first night or the second night,

12:48PM  12   correct?

12:48PM  13   A    I did tell them about going to John Stancil house the

12:48PM  14   first or second night.

12:48PM  15   Q    Not during that interview?

12:48PM  16   A    That's a summary.

12:48PM  17   Q    As I said, you recall that; that was audio recorded?

12:48PM  18   A    I don't recall if it was or if it wasn't.

12:48PM  19   Q    All right.  Now, I want to talk to you a little bit

12:49PM  20   about -- because we have got about ten minutes left to today.

12:49PM  21        You've talking about an individual by the name of

12:49PM  22   Wayne Miller, correct?

12:49PM  23   A    Yes.

12:49PM  24   Q    All right.  And to back up, in 2013 is when this

12:49PM  25   first-degree burglary incident happened, right?

12:49PM    1    A    What first-degree burglary incident?

12:49PM    2    Q    The one that you became a felon in, in 2015?

12:49PM    3    A    Yes.

12:49PM    4    Q    And so with respect to that, you began cooperating right

12:49PM    5    away, right?

12:49PM    6    A    I think so.

12:49PM    7    Q    Yeah.  And you were allowed the opportunity to do a

12:50PM    8    deferred plea, right?

12:50PM    9    A    Yes.

12:50PM   10    Q    So you were given a chance to cooperate, do a deferred

12:50PM   11    plea, and you wouldn't have a felony, right?

12:50PM   12    A    I think so.  I don't know how it worked exactly.

12:50PM   13    Q    But then I think you told the authorities that you, at the

12:50PM   14    age of 19, started obtaining methamphetamine from Harry Kauhi,

12:50PM   15    right?

12:50PM   16    A    Sometimes.

12:50PM   17    Q    And so by 2015, you entered your plea of guilty to the

12:50PM   18    first degree burglary of a dwelling, correct?

12:50PM   19    A    I think so.

12:50PM   20    Q    All right.  Now, then I believe you had to do about six

12:50PM   21    months of time locally at -- was it at OCCC?

12:50PM   22    A    Yes.

12:50PM   23    Q    All right.  And then you were released in 2015; is that

12:51PM   24    correct?

12:51PM   25    A    Yes.

12:51PM   1   Q   All right.  When you got out, you went to Wayne Miller to

12:51PM   2   get a car, right?

12:51PM   3   A   Yes.

12:51PM   4   Q   And Wayne Miller is the one who really introduced you to

12:51PM   5   John Stancil, right?

12:51PM   6   A   Kind of.

12:51PM   7   Q   Okay.  And then when you started, you were with Wayne

12:51PM   8   Miller and you were with John Stancil, correct?

12:51PM   9   A   When I started what?

12:51PM   10  Q   When you were released in 2015 in the fall?

12:51PM   11  A   Was I with them when I was released?  I was with them

12:51PM   12  sometimes.

12:51PM   13  Q   Yeah.  And so you remember that the accident involving

12:51PM   14  Caleb Miske happened in November of 2015, right?

12:51PM   15  A   I don't remember when the accident happened.

12:51PM   16  Q   All right.

12:51PM   17  A   I wasn't close enough to the group at the time.  I don't

12:51PM   18  remember the date of the accident.

12:51PM   19  Q   And Wayne Miller then was someone that, during this time

12:52PM   20  period, 2015, '16, '17, and '18, you were obtaining firearms

12:52PM   21  from, right?

12:52PM   22  A   Sometimes.

12:52PM   23  Q   And Wayne Miller is the person you were with when the two

12:52PM   24  of you were doing surveillance that time on the union guy,

12:52PM   25  correct?

| | | |
|---|---|---|
| 12:52PM | 1 | A    Yes. |
| 12:52PM | 2 | Q    And it was Wayne Miller's GPS egg that we saw during your |
| 12:52PM | 3 | testimony here, correct? |
| 12:52PM | 4 | A    I don't know.  I don't know whose GPS it was. |
| 12:52PM | 5 | Q    And it was Wayne Miller who, when you were there with him, |
| 12:52PM | 6 | he called you off on doing anything with Mr. Calles, correct? |
| 12:52PM | 7 | A    Yes. |
| 12:52PM | 8 | Q    Now, with respect to Wayne Miller, it was Wayne Miller who |
| 12:52PM | 9 | was there with you, with Mr. Ryan Teramoto at the golf course |
| 12:52PM | 10 | outside of -- between Kailua and Waimanalo, correct? |
| 12:53PM | 11 | A    Yes. |
| 12:53PM | 12 | Q    And it was Wayne Miller who was there when you went over |
| 12:53PM | 13 | to Mr. Teramoto's house, right? |
| 12:53PM | 14 | A    Yes. |
| 12:53PM | 15 | Q    And with respect to Mr. Teramoto, during this entire time, |
| 12:53PM | 16 | there has never been an assault with Mr. Teramoto, correct? |
| 12:53PM | 17 | A    No. |
| 12:53PM | 18 | Q    Nothing ever happened with that, right? |
| 12:53PM | 19 | A    No. |
| 12:53PM | 20 | Q    Now, with respect to Wayne Miller, you mentioned a meeting |
| 12:53PM | 21 | that you had with -- you were hanging out over at Norm Akau's |
| 12:53PM | 22 | house, right? |
| 12:53PM | 23 | A    Yes. |
| 12:53PM | 24 | Q    And I believe Norm Akau was someone who was pretty |
| 12:53PM | 25 | proficient with making additions to firearms, right? |

| | | | |
|---|---|---|---|
| 12:53PM | 1 | A | Yes. |
| 12:53PM | 2 | Q | And so the silencer that Norm had with him when you and he |
| 12:54PM | 3 | | and others robbed Nico Carignan came from Norm Akau, right? |
| 12:54PM | 4 | A | I would think so. |
| 12:54PM | 5 | Q | I think you said he had with him that day a 22 with a |
| 12:54PM | 6 | | silencer, right? |
| 12:54PM | 7 | A | Yes. |
| 12:54PM | 8 | Q | And the government lawyer asked you questions and you said |
| 12:54PM | 9 | | that he demonstrated it by shooting it in Waimanalo, right? |
| 12:54PM | 10 | A | Yes. |
| 12:54PM | 11 | Q | Okay.  Now, and it was Wayne Miller who, in August 1, |
| 12:54PM | 12 | | 2018, we heard about getting arrested for that drug sale, |
| 12:54PM | 13 | | correct? |
| 12:54PM | 14 | A | Yes. |
| 12:54PM | 15 | Q | Now, were you aware that Wayne Miller, when you were at |
| 12:54PM | 16 | | Norm Akau's house, was an FBI informant? |
| 12:54PM | 17 | A | I was not. |
| 12:54PM | 18 | Q | All right.  But you were aware that when you got to the |
| 12:54PM | 19 | | federal detention center, he was there, right? |
| 12:54PM | 20 | A | Yes. |
| 12:54PM | 21 | Q | You were there, right? |
| 12:55PM | 22 | A | Yes. |
| 12:55PM | 23 | Q | And you had an opportunity to talk with him, didn't you? |
| 12:55PM | 24 | A | We were in the SHU.  We were separated but we talked. |
| 12:55PM | 25 | Q | Right.  And in fact I believe -- and so when you were in |

12:55PM   1    the SHU together, you and Mr. Miller discussed how you were on

12:55PM   2    the same side of the fence right now, and that you were going

12:56PM   3    to sink Mike Miske?

12:56PM   4    A    You telling me or are you asking me?

12:56PM   5    Q    I asked you the question.

12:56PM   6    A    I don't recall what we talked about at that time.

12:56PM   7    Q    You didn't say to the -- under oath that we are all right,

12:56PM   8    he is -- I mean -- I guess -- I'm guessing he is on the same

12:56PM   9    side of the fence as me right now because he is telling me to

12:56PM  10    sink Mike?

12:56PM  11    A    I could have.

12:56PM  12    Q    You could have given that testimony under oath, correct?

12:56PM  13    A    Yes.

12:56PM  14         MR. KENNEDY:  Your Honor, I've got nothing more for

12:56PM  15    today.

12:56PM  16         THE COURT:  Nothing more for today?  We have got a few

12:56PM  17    more minutes.

12:56PM  18         MR. KENNEDY:  Okay.  You want me to continue, I'll do

12:56PM  19    it for a couple more minutes for today.

12:56PM  20    By MR. KENNEDY:

12:56PM  21    Q    Now, the jury has seen the street sweeper.

12:57PM  22         Do you know what I'm referring to?

12:57PM  23    A    Yes.

12:57PM  24    Q    Okay.  So they have seen it enough times.  On that

12:57PM  25    August 14, 2018 interview, you and Dayson Kaae received that

| | | |
|---|---|---|
| 12:57PM | 1 | street sweeper shotgun with the drum magazine from Kaae's |
| 12:57PM | 2 | brother's friend, right? |
| 12:57PM | 3 | A    Yes. |
| 12:57PM | 4 | Q    And it's sort of like a collector's item, right?  You |
| 12:57PM | 5 | didn't shoot it, did you? |
| 12:57PM | 6 | A    No. |
| 12:57PM | 7 | Q    And your plan was that you and Kaae intended to sell the |
| 12:57PM | 8 | street sweeper shotgun and split the profits, right? |
| 12:57PM | 9 | A    Yes. |
| 12:57PM | 10 | Q    And that's how you acquired it, right? |
| 12:57PM | 11 | A    Yes.  It was from Dayson's brother and Dusky Boy's |
| 12:57PM | 12 | friends. |
| 12:57PM | 13 | Q    And so it was given to Dayson, right? |
| 12:58PM | 14 | A    It was given to me and Dayson over there.  It was given to |
| 12:58PM | 15 | me. |
| 12:58PM | 16 | Q    What you wanted to do with it was to sell it, make money, |
| 12:58PM | 17 | right? |
| 12:58PM | 18 | A    Yes. |
| 12:58PM | 19 | Q    And we have seen that, the jury has seen it, and we went |
| 12:58PM | 20 | over this during the days that you were in a stolen car, right? |
| 12:58PM | 21 | A    Yes. |
| 12:58PM | 22 | Q    You went into the barber shop, right? |
| 12:58PM | 23 | A    Yes. |
| 12:58PM | 24 | Q    Dayson Kaae went in there with you, right? |
| 12:58PM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 12:58PM | 1 | Q | Unbeknownst to you, the person who owned the car spotted |
| 12:58PM | 2 | | it, and so HPD came, correct? |
| 12:58PM | 3 | A | Yes. |
| 12:58PM | 4 | Q | You had taken a bag in that had your drugs there, correct? |
| 12:58PM | 5 | A | Yes. |
| 12:58PM | 6 | Q | So you took the drugs in to the barber shop, right? |
| 12:58PM | 7 | A | Yes. |
| 12:58PM | 8 | Q | When you came out without the drugs is when you were |
| 12:58PM | 9 | | arrested and placed on the curb, right? |
| 12:58PM | 10 | A | Yes. |
| 12:58PM | 11 | Q | And we saw that photograph, right? |
| 12:58PM | 12 | A | Yes. |
| 12:58PM | 13 | Q | Dayson was also questioned, right? |
| 12:58PM | 14 | A | Yes. |
| 12:58PM | 15 | Q | The end result was the two of you were let go, right? |
| 12:59PM | 16 | A | Yes. |
| 12:59PM | 17 | Q | And then you were able to go back in the barber shop and |
| 12:59PM | 18 | | obtain the drugs? |
| 12:59PM | 19 | A | Yes. |
| 12:59PM | 20 | Q | Now, during that August 14, 2018 proffer interview, some |
| 12:59PM | 21 | | questions were asked about Alen Kaneshiro, the lawyer. |
| 12:59PM | 22 | | Do you recall that? |
| 12:59PM | 23 | A | Yes. |
| 12:59PM | 24 | Q | All right.  And you told them that Mr. Miske told you that |
| 12:59PM | 25 | | Alen Kaneshiro was a good friend of his, right? |

12:59PM    1    A    Yes.

12:59PM    2    Q    And if you were ever to have legal trouble, you should

12:59PM    3    contact him.

12:59PM    4    A    Yes.

12:59PM    5    Q    That's what you told them.

12:59PM    6    A    Yes.

12:59PM    7    Q    You were not sure if Mr. Miske ever paid Mr. Kaneshiro to

12:59PM    8    represent you; that's what you told them.

12:59PM    9    A    So I didn't see him pay him.

12:59PM   10    Q    Okay.  But you paid for his services?

01:00PM   11    A    Towards the end.

01:00PM   12    Q    All right.  Do you realize you were on an installment

01:00PM   13    payment plan with him?

01:00PM   14    A    I don't know what kind of payment plan I was on with him.

01:00PM   15    I would pay him sometimes at the end; that was it.

01:00PM   16    Q    So you weren't sure, on August 14, 2018, when he was

01:00PM   17    representing you, whether Mr. Miske had ever paid him, correct?

01:00PM   18    A    I know he paid him.  I didn't see him pay him, but I know

01:00PM   19    he paid him in the beginning.

01:00PM   20    Q    And on the day you were arrested, both Mr. Alen Kaneshiro

01:00PM   21    and Mr. Collins came to you, right?

01:00PM   22    A    Mr. Kaneshiro didn't.

01:00PM   23    Q    He wasn't there on the 14th?  He didn't meet with the two

01:00PM   24    of you?

01:00PM   25    A    No.

01:00PM    1    Q    Mr. Collins and Mr. Kaneshiro?

01:00PM    2    A    He didn't meet with me.

01:00PM    3    Q    He didn't then leave?

01:00PM    4    A    I didn't see him.  He didn't come see me.

01:00PM    5    Q    Okay.

01:01PM    6         THE COURT:  Is this a good stopping point?

01:01PM    7         MR. KENNEDY:  It is, Your Honor.

01:01PM    8         THE COURT:  All right.  So we will go ahead and take

01:01PM    9    our leave for the trial day.  As I said, we would finish up a

01:01PM   10    few minutes early.  As we go to break for the trial day, I'll

01:01PM   11    remind our jurors to please refrain from discussing the

01:01PM   12    substance of this case with anyone, including each other; to

01:01PM   13    refrain from accessing any media or other accounts of this case

01:01PM   14    that may be out there; and finally, please do not conduct any

01:01PM   15    investigation of your own into the facts, circumstances, or

01:01PM   16    persons involved.  We will start tomorrow morning at 8:30.

01:01PM   17         There is just one housekeeping thing I want to discuss

01:01PM   18    with counsel.  So please remain, just for a couple of minutes.

01:01PM   19         (At 1:01 p.m., the jury was excused, and the following

01:01PM   20    proceedings were held:)

01:02PM   21         THE COURT:  Mr. Smith, you may step down.  You may be

01:02PM   22    seated.  Thank you.

01:02PM   23         Just one housekeeping issue.  So we were talking about

01:02PM   24    6023-55.  That's an exhibit that Mr. Kennedy excerpted from.

01:02PM   25    There are a number of pages, many more than we discussed during

01:02PM   1   Mr. Smith's examination.  Several of those pages were admitted,

01:02PM   2   I think largely without objection if not exclusively without

01:02PM   3   objection.

01:02PM   4          Those pages being -- let me make sure I have got this

01:03PM   5   right:  55, 56, 58, 59, 60, 67, 81, 95, 102, and 149.  This is

01:03PM   6   again of 6023 -- Defendant's Exhibit 6023.  So those pages need

01:03PM   7   to be dealt with in terms of placing them in a new exhibit

01:03PM   8   number.

01:03PM   9          Mr. Kennedy, I think you suggested that you could mark

01:03PM  10   them as 6023A, B, C, etcetera.  The only issue with that is

01:03PM  11   there is already a 6023A.  So that wouldn't work.  You could

01:03PM  12   start with B and proceed from there.  You could mark them, all

01:03PM  13   of the numbers I just mentioned as a single Exhibit 6023B.

01:03PM  14   That might be the easiest thing.

01:03PM  15          Whatever you choose to do, let's get that cleaned up

01:04PM  16   by tomorrow before Ms. Kimura so we can get that updated in the

01:04PM  17   binders.  Any issues?

01:04PM  18          MR. NAMMAR:  No, Your Honor.

01:04PM  19          MR. KENNEDY:  Your Honor, I think 58 may also, and 60.

01:04PM  20          THE COURT:  If I didn't mention that.

01:04PM  21          MR. KENNEDY:  60 was mentioned.

01:04PM  22          THE COURT:  Let me try that again.  6023, it would be

01:04PM  23   55, 56, 58, 59, 60, 67, 81, and 95, 102, and 149.

01:04PM  24          MR. KENNEDY:  Oh, 68.  Okay.  Let me look at my notes.

01:04PM  25   Your Honor.

01:04PM   1                    MR. NAMMAR:  68 is not in.

01:05PM   2                    THE COURT:  I don't recall it being offered.

01:05PM   3                    MR. KENNEDY:  Without looking at the picture, I have a

01:05PM   4     hard time looking at the number.  But we will get it

01:05PM   5     straightened out.  We will take up the 6023B suggestion.

01:05PM   6                    THE COURT:  Good enough.  We will see you tomorrow.

01:05PM   7                    (Proceedings were concluded at 1:05 p.m.)

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                       COURT REPORTER'S CERTIFICATE

2               I, Gloria T. Bediamol, Official Court Reporter, United

3       States District Court, District of Hawaii, do hereby certify

4       that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5       true, and correct transcript from the stenographically reported

6       proceedings held in the above-entitled matter and that the

7       transcript page format is in conformance with the regulations

8       of the Judicial Conference of the United States.

9

10              DATED at Honolulu, Hawaii, May 28, 2024.

11

12

13                                     /s/ Gloria T. Bediamol

14                                     GLORIA T. BEDIAMOL.

15                                     RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25