1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF HAWAII

3

    UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                )
                Plaintiff,       )      Honolulu, Hawaii
5                                )
         vs.                     )      April 16, 2024
6                                )
    MICHAEL J. MISKE, JR.,       )      CONTINUED TESTIMONY OF
7                                )      JACOB SMITH
                Defendant.       )
8    _____)

9

                PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 51)
10              BEFORE THE HONORABLE DERRICK K. WATSON,
                CHIEF UNITED STATES DISTRICT COURT JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:          MARK INCIONG, ESQ.
13                              MICHAEL DAVID NAMMAR, ESQ
                                WILLIAM KE AUPUNI AKINA, ESQ.
14                              AISLINN AFFINITO, ESQ.
                                Office of the United States Attorney
15                              PJKK Federal Building
                                300 Ala Moana Boulevard, Suite 6100
16                              Honolulu, Hawaii  96850

17   For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                841 Bishop St., Ste 2201
18                              Honolulu, HI 96813

19                              MICHAEL JEROME KENNEDY, ESQ.
                                Law Offices of Michael Jerome
20                              Kennedy, PLLC
                                333 Flint Street
21                              Reno, NV 89501

22   Official Court Reporter:   Gloria T. Bediamol, RPR RMR CRR FCRR
                                United States District Court
23                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
24
      Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

1                          I N D E X

2    <u>GOVERNMENT WITNESS:</u>                           <u>PAGE NO.</u>

3
      JACOB SMITH (CONTINUED TESTIMONY)
4
          RESUMED CROSS-EXAMINATION BY MR. KENNEDY      4
5         REDIRECT EXAMINATION BY MR. NAMMAR            73
          RECROSS-EXAMINATION BY MR. KENNEDY           109
6

7    <u>EXHIBITS:</u>                                      <u>PAGE NO.</u>

8     Exhibit 8013-036 was received in evidence        34
      Exhibit 8013-037 was received in evidence        36
9     Exhibit 8013-038 was received in evidence        37
      Exhibit 8013-039 was received in evidence        39
10    Exhibit 8012-026 was received in evidence        43
      Exhibit 8012-027 was received in evidence        48
11    Exhibit 9013-147A was received in evidence       67
      Exhibit 9001-020 was received in evidence        68
12    Exhibit 1-956R was received in evidence          70

13

14

15

16

17

18

19

20

21

22

23

24

25

|          |     |                                                          |
|----------|-----|----------------------------------------------------------|
|          | 1   | April 16, 2024                              8:35 a.m.    |
| 08:35AM  | 2   | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United     |
| 08:35AM  | 3   | States of America versus Michael J. Miske, Jr.           |
| 08:35AM  | 4   | This case has been called for jury trial, day 51.        |
| 08:35AM  | 5   | Counsel, please make your appearances for the record.    |
| 08:35AM  | 6   | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,   |
| 08:35AM  | 7   | Michael Nammar, KeAupuni Akina, and Aislinn Affinito for the |
| 08:35AM  | 8   | United States.  Also with us again are special agent Thomas |
| 08:35AM  | 9   | Palmer and Kari Sherman.  Good morning.                  |
| 08:36AM  | 10  | THE COURT:  Good morning.                                |
| 08:36AM  | 11  | MR. KENNEDY:  Good morning, Your Honor.  Michael         |
| 08:36AM  | 12  | Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and |
| 08:36AM  | 13  | Josh Barry.  Good morning.                               |
| 08:36AM  | 14  | THE COURT:  Good morning.  You may be seated.  Good      |
| 08:36AM  | 15  | morning to our 16-person jury.  Mr. Smith, good morning to you, |
| 08:36AM  | 16  | sir.  I'll remind you before you resume your testimony this |
| 08:36AM  | 17  | morning that, as in the last couple of days, that you remain |
| 08:36AM  | 18  | subject to the same oath that you took at the inception of your |
| 08:36AM  | 19  | testimony, although we won't take the time to re-swear you. |
| 08:36AM  | 20  | Do you understand?                                       |
| 08:36AM  | 21  | THE WITNESS:  Yes.                                       |
| 08:36AM  | 22  | THE COURT:  Mr. Kennedy was in the midst of his          |
| 08:36AM  | 23  | cross-examination, and you may continue, sir, when you are |
| 08:36AM  | 24  | ready.                                                   |
| 08:36AM  | 25  | MR. KENNEDY:  Thank you, sir.                            |

| | | |
|---|---|---|
| 08:36AM | 1 | JACOB SMITH, |
| 08:36AM | 2 | (Having been previously sworn, resumed the stand.) |
| 08:36AM | 3 | RESUMED CROSS-EXAMINATION |
| 08:36AM | 4 | BY MR. KENNEDY: |
| 08:36AM | 5 | Q   Jorge Cano testified about that robbery, correct? |
| 08:36AM | 6 | A   Yes. |
| 08:36AM | 7 | Q   Frankie Silva and Lance Bermudez were already doing |
| 08:36AM | 8 | robberies, right? |
| 08:36AM | 9 | A   Yes. |
| 08:36AM | 10 | Q   You knew Jorge Cano was a drug dealer, right? |
| 08:36AM | 11 | A   Yes. |
| 08:36AM | 12 | Q   You suggested the robbery, correct? |
| 08:36AM | 13 | A   Yes. |
| 08:36AM | 14 | Q   You suggested it because you knew he was a drug dealer, |
| 08:36AM | 15 | right? |
| 08:36AM | 16 | A   Yes. |
| 08:36AM | 17 | Q   Drug dealers then don't report that they have their drugs |
| 08:37AM | 18 | stolen, correct? |
| 08:37AM | 19 | A   Yes. |
| 08:37AM | 20 | Q   You came up with that plan with Frank Silva and with Lance |
| 08:37AM | 21 | Bermudez, correct? |
| 08:37AM | 22 | A   Yes. |
| 08:37AM | 23 | Q   Nico Carignan was a drug dealer, correct? |
| 08:37AM | 24 | A   Yes. |
| 08:37AM | 25 | Q   You came up with that plan, right? |

| | | | |
|---|---|---|---|
| 08:37AM | 1 | A | No, I did not come up with the plan. |
| 08:37AM | 2 | Q | Wayne Miller suggested to you that you have someone |
| 08:37AM | 3 | | impersonate a police officer, correct? |
| 08:37AM | 4 | A | Somebody did.  I don't know who did. |
| 08:37AM | 5 | Q | And then Ashlin Akau and Kurt Kipapa, that was an inside |
| 08:37AM | 6 | | job between the two of them, right? |
| 08:37AM | 7 | A | Yeah. |
| 08:37AM | 8 | Q | Nico Carignan was a drug dealer, right? |
| 08:37AM | 9 | A | Yes. |
| 08:37AM | 10 | Q | You robbed him of drugs, correct? |
| 08:37AM | 11 | A | Yes. |
| 08:37AM | 12 | Q | You had firearms there, correct? |
| 08:37AM | 13 | A | Yes. |
| 08:37AM | 14 | Q | That was your plan, right? |
| 08:37AM | 15 | A | No. |
| 08:37AM | 16 | Q | And you had protection, right? |
| 08:37AM | 17 | A | Did I have protection? |
| 08:37AM | 18 | Q | The three firearms that you had there plus a silencer and |
| 08:38AM | 19 | | a -- |
| 08:38AM | 20 | A | I didn't have three firearms on me. |
| 08:38AM | 21 | Q | Lance had a firearm, right? |
| 08:38AM | 22 | A | Lance had a firearm. |
| 08:38AM | 23 | Q | You had a firearm, correct? |
| 08:38AM | 24 | A | I had one firearm. |
| 08:38AM | 25 | Q | You said Johnnie had a firearm, right? |

| | | | |
|---|---|---|---|
| 08:38AM | 1 | A | Johnnie had a firearm. |
| 08:38AM | 2 | Q | Norm Akau had a firearm with a silencer, right? |
| 08:38AM | 3 | A | Yes. |
| 08:38AM | 4 | Q | And you robbed him of those drugs, right? |
| 08:38AM | 5 | A | Yes. |
| 08:38AM | 6 | Q | You guys came up with that plan, right? |
| 08:38AM | 7 | A | No, I didn't come up with the plan.  I was just there to |
| 08:38AM | 8 | | do it.  The plan was made already. |
| 08:38AM | 9 | Q | You joined their plan, right? |
| 08:38AM | 10 | A | Yes. |
| 08:38AM | 11 | Q | And that was Nico Carignan, right? |
| 08:38AM | 12 | A | Yes. |
| 08:38AM | 13 | Q | Palani Mitchell, another drug dealer, right? |
| 08:38AM | 14 | A | Yes. |
| 08:38AM | 15 | Q | Targeted because he was a drug dealer, right? |
| 08:38AM | 16 | A | Yes. |
| 08:38AM | 17 | Q | Not to report to the cops, right? |
| 08:38AM | 18 | A | Yes. |
| 08:38AM | 19 | Q | Keali'i Young and his mom set that one up with you, right? |
| 08:38AM | 20 | A | It was just set up already. |
| 08:38AM | 21 | Q | They participated, right? |
| 08:38AM | 22 | A | Yes. |
| 08:38AM | 23 | Q | Ashlin Akau participated, right? |
| 08:39AM | 24 | A | She watched. |
| 08:39AM | 25 | Q | Lance Bermudez and you had firearms, right? |

| 08:39AM | 1 | A | Yes. |
|---|---|---|---|
| 08:39AM | 2 | Q | The folks I just mentioned came up with the plan, right? |
| 08:39AM | 3 | A | Yes. |
| 08:39AM | 4 | Q | And you were robbing them of drugs, right? |
| 08:39AM | 5 | A | Yes. |
| 08:39AM | 6 | Q | Drugs that you would turn into money, right? |
| 08:39AM | 7 | A | Yes. |
| 08:39AM | 8 | Q | Drugs that you would turn into money that you would keep, |
| 08:39AM | 9 | | right? |
| 08:39AM | 10 | A | Yes. |
| 08:39AM | 11 | Q | Just like Nico Carignan, right? |
| 08:39AM | 12 | A | Yes. |
| 08:39AM | 13 | Q | Brandon Ota, he was a drug dealer, right? |
| 08:39AM | 14 | A | He was a drug dealer. |
| 08:39AM | 15 | Q | Hunter Wilson had lived at that house, right? |
| 08:39AM | 16 | A | Yes. |
| 08:39AM | 17 | Q | Hunter Wilson was a drug dealer, right? |
| 08:39AM | 18 | A | Yes. |
| 08:39AM | 19 | Q | He knew Brandon Ota was a drug dealer, right? |
| 08:39AM | 20 | A | Yes. |
| 08:39AM | 21 | Q | You came up with that plan, right? |
| 08:39AM | 22 | A | No.  We just did it. |
| 08:39AM | 23 | Q | With Hunter Wilson, right? |
| 08:39AM | 24 | A | Hunter Wilson told us how to do it and we did it. |
| 08:39AM | 25 | Q | So was Lance Bermudez, right? |

| | | | |
|---|---|---|---|
| 08:39AM | 1 | A | Yes. |
| 08:39AM | 2 | Q | You, correct? |
| 08:39AM | 3 | A | Yes. |
| 08:39AM | 4 | Q | James Salas, right? |
| 08:39AM | 5 | A | Yes. |
| 08:39AM | 6 | Q | You had the mini AR-15, right? |
| 08:40AM | 7 | A | Yes. |
| 08:40AM | 8 | Q | So each of you was armed, right? |
| 08:40AM | 9 | A | Yes. |
| 08:40AM | 10 | Q | That was the protection that you needed, right? |
| 08:40AM | 11 | A | At the time. |
| 08:40AM | 12 | Q | You stole drugs, right? |
| 08:40AM | 13 | A | Yes. |
| 08:40AM | 14 | Q | A chain, right? |
| 08:40AM | 15 | A | Yes. |
| 08:40AM | 16 | Q | You took the drugs and the chain and produced money, |
| 08:40AM | 17 | | right? |
| 08:40AM | 18 | A | Yes. |
| 08:40AM | 19 | Q | Which you kept, right? |
| 08:40AM | 20 | A | Yes. |
| 08:40AM | 21 | Q | Another time where a drug dealer is targeted pursuant to |
| 08:40AM | 22 | | your plan, right? |
| 08:40AM | 23 | A | You keep saying my plan.  It wasn't my plan.  We did it |
| 08:40AM | 24 | | but it wasn't my plan. |
| 08:40AM | 25 | Q | Your participation, right? |

08:40AM   1   A    I'm participating in it.

08:40AM   2   Q    Your perfection of the robbery, right?

08:40AM   3   A    Am I a perfection of the robbery?

08:40AM   4   Q    Yes.

08:40AM   5   A    I wasn't a perfection of the robbery.

08:40AM   6   Q    You had an AR-15 that you stuck in a man's face --

08:40AM   7   A    I had a gun, yes --

08:40AM   8        THE COURT REPORTER:  Wait.  You're talking over each

08:40AM   9   other now.

08:40AM   10  BY MR. KENNEDY:

08:40AM   11  Q    You had an AR-15 that you stuck in the man's face, right?

08:40AM   12  A    Yes.

08:40AM   13  Q    And you saw how he looked after his face, correct?

08:40AM   14  A    Did I see how he looked after his face was --

08:41AM   15  Q    Yeah, because he was all beat up, right?

08:41AM   16  A    I was downstairs.

08:41AM   17  Q    Oh, you were downstairs; you weren't the person that stuck

08:41AM   18  the AR-15 --

08:41AM   19        (Overlapping of voices.)

08:41AM   20        THE COURT REPORTER:  You're talking over each other.

08:41AM   21  You are losing me.

08:41AM   22  BY MR. KENNEDY:

08:41AM   23  Q    I understand.  I apologize.

08:41AM   24        You weren't the person that hit him with the AR-15?

08:41AM   25  A    No, I wasn't the person that hit him with the AR.

08:41AM    1    Q    All right.  You stole that and produced money for

08:41AM    2    yourself, right?

08:41AM    3    A    Yes.

08:41AM    4    Q    Game room robberies.

08:41AM    5         You talked about three of them, right?

08:41AM    6    A    We talked about a few of them.

08:41AM    7    Q    All right.  The first one, you did with Timmy Zapata,

08:41AM    8    right?  I'm sorry, Timmy Taboada?

08:41AM    9    A    Yes.

08:41AM    10   Q    My mistake, sir.

08:41AM    11   A    Yes.

08:41AM    12   Q    Also with Lance Bermudez, right?

08:41AM    13   A    Yes.

08:41AM    14   Q    Once again with the AR-15?

08:41AM    15   A    With an AR-15, yes.

08:41AM    16   Q    Timmy Taboada went in there and was communicating with

08:41AM    17   you, right?

08:41AM    18   A    Yes.

08:41AM    19   Q    So this is a little different.

08:41AM    20         It's a game room, right?

08:42AM    21   A    Yes.

08:42AM    22   Q    They have a fair amount of money in there, right?

08:42AM    23   A    There's supposed to be.

08:42AM    24   Q    This was Mr. White's game room where he had quite a few of

08:42AM    25   them, right?

08:42AM   1   A    Yes.

08:42AM   2   Q    And so you were successful in stealing money for yourself,

08:42AM   3   right?

08:42AM   4   A    Yes.

08:42AM   5   Q    And that was the plan that you came up with Lance Bermudez

08:42AM   6   and Timmy Taboada, correct?

08:42AM   7   A    Yes.

08:42AM   8   Q    Once again, stealing for yourself, right?

08:42AM   9   A    Yes.

08:42AM   10  Q    Now, you talk about protection.  The protection that you

08:42AM   11  had was the firearms that you used in these robberies, isn't

08:42AM   12  it?

08:42AM   13  A    At the time.

08:42AM   14  Q    And you always had a firearm on you, didn't you?

08:42AM   15  A    Most of the time.

08:42AM   16  Q    Even when you went to the restaurant on August 14th, you

08:42AM   17  took your backpack with that Glock into the restaurant just to

08:42AM   18  have lunch with the woman that you were with, correct?

08:42AM   19  A    Yes.

08:42AM   20  Q    That was your protection, correct?

08:43AM   21  A    That's my protection at the time.

08:43AM   22  Q    All right.  Now, with respect to the game room robbery, at

08:43AM   23  no point has the government showed anything about that game

08:43AM   24  room communicating with Mike Miske after it was done, right?

08:43AM   25  A    We didn't communicate with Mike.

| | | | |
|---|---|---|---|
| 08:43AM | 1 | Q | No, because he had nothing to do with it.  The second game |
| 08:43AM | 2 | | robbery was the one with, I believe, Jarrin Young, right? |
| 08:43AM | 3 | A | Yes. |
| 08:43AM | 4 | Q | Once again, firearms, right? |
| 08:43AM | 5 | A | We had a gun. |
| 08:43AM | 6 | Q | Stealing money, right? |
| 08:43AM | 7 | A | Yes. |
| 08:43AM | 8 | Q | Keeping it for yourself, correct? |
| 08:43AM | 9 | A | Yes. |
| 08:43AM | 10 | Q | That's how you were earning your money, right? |
| 08:43AM | 11 | A | Some of it. |
| 08:43AM | 12 | Q | Stealing money, right? |
| 08:43AM | 13 | A | Some of it. |
| 08:43AM | 14 | Q | Stealing chains, right? |
| 08:43AM | 15 | A | Sometimes. |
| 08:43AM | 16 | Q | Selling chains, correct? |
| 08:43AM | 17 | A | Sometimes. |
| 08:43AM | 18 | Q | Stealing drugs, right? |
| 08:43AM | 19 | A | Sometimes. |
| 08:43AM | 20 | Q | Selling the drugs that you stole, right? |
| 08:43AM | 21 | A | Sometimes. |
| 08:43AM | 22 | Q | When you were flushed with cash buying drugs, right? |
| 08:44AM | 23 | A | Sometimes. |
| 08:44AM | 24 | Q | Turning those drugs into more money, right? |
| 08:44AM | 25 | A | Sometimes. |

| | | | |
|---|---|---|---|
| 08:44AM | 1 | Q | And all that money was yours? |
| 08:44AM | 2 | A | I owed people money, too. |
| 08:44AM | 3 | Q | And you paid people with that money, right? |
| 08:44AM | 4 | A | Yes. |
| 08:44AM | 5 | Q | All right.  Now, third game robbery was the one that |
| 08:44AM | 6 | | Dayson Kaae participated in, correct? |
| 08:44AM | 7 | A | I don't know if it happened before or after. |
| 08:44AM | 8 | Q | We will just say that one. |
| 08:44AM | 9 | | He participated in one, right? |
| 08:44AM | 10 | A | Yes, he did. |
| 08:44AM | 11 | Q | And at the time, you had fronted him drugs, right? |
| 08:44AM | 12 | A | Yes. |
| 08:44AM | 13 | Q | And he hadn't paid you, right? |
| 08:44AM | 14 | A | Yes. |
| 08:44AM | 15 | Q | And so his -- you made a decision that he should go in |
| 08:44AM | 16 | | there to steal money to pay you, correct? |
| 08:44AM | 17 | A | I told him that he needed to find a way to pay me. |
| 08:44AM | 18 | Q | You told him he needed to find a way to pay you, right? |
| 08:44AM | 19 | A | That's what I just said. |
| 08:44AM | 20 | Q | Because you were calling the shots with him in paying you, |
| 08:45AM | 21 | | right? |
| 08:45AM | 22 | A | He owed me money at the time. |
| 08:45AM | 23 | Q | Of course, when you were fronted drugs and you didn't want |
| 08:45AM | 24 | | to pay, you had the protection of your guns, right? |
| 08:45AM | 25 | A | I didn't need guns to not pay. |

08:45AM   1   Q    And you had the protection of your ability to fight,

08:45AM   2   right?

08:45AM   3   A    Didn't even know it was like that.

08:45AM   4   Q    And you had the protection of your reputation as a

08:45AM   5   fighter, correct?

08:45AM   6   A    I didn't even know it was like that.  Like, I was from the

08:45AM   7   mainland.

08:45AM   8   Q    And Dayson went in there and the security -- the security

08:45AM   9   beat him up, right?

08:45AM   10   A    I wasn't in there but I'm guessing by the picture.

08:45AM   11   Q    You knew he was arrested and you saw what -- the picture,

08:45AM   12   right?

08:45AM   13   A    I saw the picture, no, that's what I just said.

08:45AM   14   Q    And so he was arrested and then released, right?

08:45AM   15   A    Yes.

08:45AM   16   Q    All right.  All the other robberies that you talked about

08:45AM   17   involved firearms; you obtaining drugs, cash, chains for money

08:46AM   18   for you, right?

08:46AM   19   A    Some of it.

08:46AM   20   Q    Not one dime from those robberies went to Mike Miske?

08:46AM   21   A    They didn't need to go to Mike.  Mike is well off.

08:46AM   22   Q    Exactly.

08:46AM   23   A    Exactly.

08:46AM   24   Q    And so Lovelyn Duarte knew you were robbing, right?

08:46AM   25   A    She knew we did stuff but she wasn't involved in it.

08:46AM  1    Q    She knew about it, right?

08:46AM  2    A    Not really.

08:46AM  3    Q    She wasn't involved in it, right?

08:46AM  4    A    No.

08:46AM  5    Q    But just knowing about it didn't make her guilty, did it?

08:46AM  6    A    She didn't even really know about it.  We'd be out and she

08:46AM  7    thought I was doing other stuff.

08:46AM  8    Q    Except when you would, by mistake, send a text to

08:46AM  9    her which said --

08:46AM  10   A    I wasn't --

08:46AM  11   Q    I need to finish my question, first, sir.  Except when you

08:46AM  12   would send a text to her by mistake it's time to go, and that

08:46AM  13   would be a mistake, right?

08:46AM  14   A    It's time to go where?

08:46AM  15   Q    Time to go to the robbery.  It was clear.

08:46AM  16        You did that a time or two, correct?

08:46AM  17   A    She doesn't know what we're doing.  She don't know if

08:47AM  18   we're robbing people or what we doing.  She knows I was

08:47AM  19   assaulting people.

08:47AM  20   Q    She knows you also were robbing people when you are coming

08:47AM  21   home with that kind of money, right?

08:47AM  22   A    She doesn't really know what the thing is from.  Some days

08:47AM  23   she does, some days she doesn't.

08:47AM  24   Q    She knew you didn't have a job, right?

08:47AM  25   A    Sometimes I did have a job.

08:47AM    1    Q    Sometimes you did, but not for that kind of money, right?

08:47AM    2    A    Depends.

08:47AM    3    Q    When you were walking around flush with $30,000 in a

08:47AM    4    backpack, you weren't getting that from a legal occupation,

08:47AM    5    were you?

08:47AM    6    A    No, I wasn't getting $30,000 from a legal.

08:47AM    7    Q    That was when you were thinking about getting a car

08:47AM    8    because Johnnie Stancil was there at the auction calling you

08:47AM    9    and saying, "hey, you want to buy this car?"  Because he was

08:47AM   10    buying cars at the auction.

08:47AM   11         You recall that?

08:47AM   12    A    Kind of, not really.

08:47AM   13    Q    All right.  I asked you a question yesterday regarding

08:48AM   14    whether you testified under oath that with respect to Wayne

08:48AM   15    Miller, you said, "I'm guessing he is on the same side of the

08:48AM   16    fence as me right now because he is telling me to sink Mike."

08:48AM   17         Those were your words, right?

08:48AM   18    A    I think so.

08:48AM   19    Q    Would you like to take a look at 7357-0175, which I

08:48AM   20    believe, Your Honor, is in the first supplemental exhibit list.

08:48AM   21    7357 dash -- and then inside it, page 175.

08:49AM   22         THE COURT:  Okay.  I have it.

08:49AM   23    BY MR. KENNEDY:

08:49AM   24    Q    And sir, I'll direct your attention to lines 16, 17, and

08:49AM   25    18.  Just read that to yourself.

08:49AM   1   A   Go ahead.

08:49AM   2   Q   We can take that down.  Those were your words under oath:

08:49AM   3   "I'm guessing he is on the same side of the fence as me right

08:49AM   4   now because he is telling me to sink Mike."

08:49AM   5       Those were your words, right?

08:49AM   6   A   Yes.

08:49AM   7   Q   All right.  Your words were also:  "Me and Mills weren't

08:49AM   8   really talking until we came back to jail -- until we went to

08:50AM   9   jail again."

08:50AM   10      Those were your words, right?

08:50AM   11  A   If it's there.

08:50AM   12  Q   Would you like to see 7357?

08:50AM   13  A   That's up to you.

08:50AM   14  Q   All right.  Let's pull up 7357 page 175.  Direct your

08:50AM   15  attention to lines eight, nine and ten.  You can take that

08:50AM   16  down.

08:50AM   17      Those were your words:  "Me and Mills weren't really

08:51AM   18  talking until we came back to jail -- until we met in jail

08:51AM   19  again," correct?

08:51AM   20  A   Yes.

08:51AM   21  Q   Those were your words under oath, right?

08:51AM   22  A   Yes.

08:51AM   23  Q   Now, I'm going to ask you some questions about Lance

08:51AM   24  Bermudez and Jason Yokoyama, okay.

08:51AM   25      You told the government that Jason Yokoyama had a

08:51AM  1   close relationship with Bermudez, correct?

08:51AM  2   A    Yes.

08:51AM  3   Q    You told him that Bermudez can call Yokoyama for money at

08:51AM  4   any time and he would get it, correct?

08:51AM  5   A    Yes.

08:51AM  6   Q    You told him that around 2016, Bermudez called Yokoyama

08:51AM  7   for money and he met you and Lance Bermudez at Frankie Silva's

08:51AM  8   girlfriend's house, and Yokoyama gave Bermudez 3,500 to $4,000?

08:52AM  9   A    Yes.

08:52AM  10  Q    You told the government that Jason Yokoyama would pay

08:52AM  11  Bermudez to burn cars for him, correct?

08:52AM  12  A    Yes.

08:52AM  13  Q    You told the government that Bermudez had burned vehicles

08:52AM  14  on previous occasions for Yokoyama, correct?

08:52AM  15  A    Yes.

08:52AM  16  Q    Now, I want to ask you some questions about Lance Bermudez

08:52AM  17  and Mike Miske.

08:52AM  18       You told the government that Mike Miske did not like

08:52AM  19  Lance Bermudez because he was a chronic user of drugs?

08:52AM  20  A    Yes.

08:52AM  21  Q    You told the government that Lance Bermudez was not

08:52AM  22  allowed to come to Kama'aina Termite and Pest Control, correct?

08:52AM  23  A    I said yeah, he didn't like him coming to the shop.

08:52AM  24  Q    You told the government that Bermudez had shot and stabbed

08:53AM  25  people in the past because he could not fight, right?

| 08:53AM | 1 | A | Yes. |

08:53AM   1   A   Yes.

08:53AM   2   Q   And you demonstrated the other day to the jury how he

08:53AM   3   would throw a punch, right?

08:53AM   4   A   Yes.

08:53AM   5   Q   And you told the government on August 21, 2018, a week

08:53AM   6   later during your second interview, that Bermudez never told

08:53AM   7   you about any jobs he did for Mike Miske?

08:53AM   8   A   Yes.

08:53AM   9   Q   Only later did you tell them something different, correct?

08:53AM   10   A   I don't know.

08:53AM   11   Q   Now, Joe Boy Tavares is a big player in the chicken

08:53AM   12   fighting scheme, correct?

08:53AM   13   A   Yes.

08:53AM   14   Q   And chicken fights involve a lot of betting, right?

08:53AM   15   A   Yes.

08:53AM   16   Q   On the outcome of battles, right?

08:54AM   17   A   Yes.

08:54AM   18   Q   Where folks are gambling, correct?

08:54AM   19   A   Yes.

08:54AM   20   Q   Sometimes thousands of dollars are riding on each fight,

08:54AM   21   correct?

08:54AM   22   A   Yes.

08:54AM   23   Q   And you and Keoni Adric had been at those fights with

08:54AM   24   firearms, right?

08:54AM   25   A   What fights?

08:54AM   1   Q   Chicken fights.

08:54AM   2   A   No.  Not all of them.

08:54AM   3   Q   And you were looking for people to rob as we went through

08:54AM   4   this morning, correct?

08:54AM   5   A   Sometimes.

08:54AM   6   Q   It sounded like you went over maybe ten or more robberies

08:54AM   7   with this jury over the past four days that you participated

08:54AM   8   in, right?

08:54AM   9   A   Maybe.

08:54AM   10   Q   All right.  Now, you told the jury that -- something about

08:54AM   11   a lawyer representing Joe Boy Tavares, and that was something

08:55AM   12   connected to a job for Lance Bermudez for Mike Miske.

08:55AM   13        Do you recall that?

08:55AM   14   A   Yes.

08:55AM   15   Q   That lawyer was Tommy, you told the grand jury, right?

08:55AM   16   A   That's what I was told.

08:55AM   17   Q   Otake, right?

08:55AM   18   A   Yes.

08:55AM   19   Q   Are you aware that Tommy Otake has never represented Joe

08:55AM   20   Boy Tavares?

08:55AM   21   A   That's what I was told.

08:55AM   22   Q   That's what you've told us.

08:55AM   23        Are you aware that he never represented him?

08:55AM   24   A   I'm repeating what I was told.

08:55AM   25   Q   And so Miller wanted to rob Joe Boy Tavares, correct?

08:55AM   1   A   I don't know if Miller wanted to rob him.

08:55AM   2   Q   Lance Bermudez wanted to rob Joe Boy Tavares, correct?

08:55AM   3   A   I've never heard that they wanted to rob him.

08:55AM   4   Q   Harry Kauhi wanted to rob Joe Boy Tavares, correct?

08:55AM   5   A   I don't know.

08:55AM   6   Q   Frankie Silva wanted to rob Joe Boy Tavares, correct?

08:56AM   7   A   Nobody ever said they wanted to rob Joe Boy.

08:56AM   8   Q   And you wanted to rob Joe Boy Tavares?

08:56AM   9   A   -- answering the question --

08:56AM   10          THE COURT REPORTER:  Sorry.  He is speaking over the

08:56AM   11   question.

08:56AM   12          THE COURT:  The witness said, "I keep answering your

08:56AM   13   question."

08:56AM   14   BY MR. KENNEDY:

08:56AM   15   Q   And so the chicken fight scene is also something like drug

08:56AM   16   deal dealing that would not be reported often if there is a

08:56AM   17   robbery, correct?

08:56AM   18   A   I don't know.

08:56AM   19   Q   "I had a hundred thousand on me that I did in an illegal

08:56AM   20   gaming operation and it was stolen from me," not the sort of

08:56AM   21   thing that gets reported, just like stealing drug money, right?

08:56AM   22   A   I don't know.  It does get reported sometimes.

08:56AM   23   Q   Now, we looked at the WhatsApp conversations yesterday,

08:57AM   24   correct?

08:57AM   25   A   Yes.

08:57AM   1   Q    And you told the government as early as October 3, 2018
08:57AM   2   that you didn't act on any of those requests regarding anything
08:57AM   3   that was discussed in the WhatsApp, correct?
08:57AM   4   A    Some of them we might have saw when we did it.
08:57AM   5   Q    In fact, you said -- your words were you did not act on
08:57AM   6   any of Miske's requests to assault the males discussed in the
08:57AM   7   WhatsApp conversations.
08:57AM   8        Those were your words, right?
08:57AM   9   A    I think so.
08:57AM   10  Q    You didn't receive any payments from Mike Miske up front,
08:57AM   11  right?
08:57AM   12  A    Nothing up front.
08:57AM   13  Q    And the first time you talked to the government back on
08:57AM   14  October 3rd of 2018, the story with Chris Bourne was that Mike
08:58AM   15  wanted to assault Chris Bourne.
08:58AM   16       That's what you told the government in 2018, right?
08:58AM   17  A    He wanted us to do a lot to Chris Bourne.
08:58AM   18  Q    I'm asking you a question about you told the government --
08:58AM   19  A    I'm telling you he wanted us to do a lot to Chris Bourne.
08:58AM   20  Q    You told the government on October 3, 2018, in now your
08:58AM   21  4th meeting with them, that Mike Miske wanted to assault Chris
08:58AM   22  Bourne.
08:58AM   23       That's what you told them, right?
08:58AM   24  A    I'm telling you there was a lot that he wanted to happen
08:58AM   25  to Chris Bourne.

08:58AM   1          MR. KENNEDY:  Let's take a look at Exhibit 9013-020,
08:58AM   2   which is in the original exhibit list, Your Honor.
08:58AM   3          THE COURT:  Okay, go ahead.
08:59AM   4   BY MR. KENNEDY:
08:59AM   5   Q    If we move to -- we can take that down.
08:59AM   6          Have you had a chance to read that now, sir?
08:59AM   7   A    Yes.
08:59AM   8   Q    You told them on October 3, 2018 that it was an assault,
08:59AM   9   right?
08:59AM  10   A    That was the first thing I remember.  It was an assault
09:00AM  11   because that's what I do.
09:00AM  12   Q    So only later did you add a robbery, correct?
09:00AM  13   A    Maybe.  I don't know.
09:00AM  14   Q    And that you had done surveillance with Frankie Silva
09:00AM  15   related to an assault that never happened, right?
09:00AM  16   A    Yes.
09:00AM  17   Q    All right.  Now, Wayne Miller was the person who, when you
09:00AM  18   got out of OCCC, got you that first car, right?
09:00AM  19   A    Miller gave me a car, yeah.
09:00AM  20   Q    And up until the time he had heart surgery, he was giving
09:00AM  21   you money for hotels and food and other things, you told the
09:00AM  22   federal government, correct?
09:00AM  23   A    Yes.
09:00AM  24   Q    And he purchased automobiles at Advantage Auto, correct?
09:00AM  25   A    I don't know.

09:00AM   1   Q    And you told the government that on October 3, 2018,

09:00AM   2   right?

09:00AM   3   A    I didn't say he purchased vehicles at Advantage Auto.   I

09:00AM   4   don't even know what Advantage Auto is.

09:01AM   5   Q    If we can pull 9013-020, which is also in the original,

09:01AM   6   and if we go to page nine, and if you could just read to

09:01AM   7   yourself the last paragraph.

09:01AM   8            Have you done so, sir?

09:01AM   9   A    Yes.

09:01AM   10  Q    You told them on October 3, 2018, that Advantage Auto was

09:01AM   11  the place that Miller used to purchase a lot of his vehicles,

09:02AM   12  right?

09:02AM   13  A    I never did say Advantage Auto.   I didn't know what it was

09:02AM   14  called.

09:02AM   15  Q    You pointed it out while you were driving by the spot,

09:02AM   16  correct?

09:02AM   17  A    Yes.

09:02AM   18  Q    And so they put in Advantage Auto, even though you didn't

09:02AM   19  know the name, right?

09:02AM   20  A    That's what it looks like.

09:02AM   21  Q    And it was near the Four Wheels Auto, correct?

09:02AM   22  A    I don't know.

09:02AM   23  Q    Because that's what you were doing that day; you were

09:02AM   24  taken out of FDC and you went over to a location.

09:02AM   25            You were driving back and you pointed out the place

09:02AM   1   where Miller purchased automobiles, right?

09:02AM   2   A    I said Miller got some cars from over there.

09:02AM   3   Q    All right.  They are a competitor of Four Wheels, right?

09:02AM   4   A    I don't know who is competitors.

09:02AM   5   Q    All right.  Now, you gave testimony that -- with respect

09:03AM   6   to an incident inside Mike's office; an owner of a nightclub

09:03AM   7   was assaulted, correct?

09:03AM   8   A    Yes.

09:03AM   9   Q    By you, right?

09:03AM   10  A    Yes.

09:03AM   11  Q    And you told the jury that you went up and you kicked him

09:03AM   12  in the face.

09:03AM   13       That's what you testified to, right?

09:03AM   14  A    Yes.

09:03AM   15  Q    You told the federal government on your second interview

09:03AM   16  that you slapped and punched the individual; not kicked him in

09:03AM   17  the face, right?

09:04AM   18  A    I don't know what I told them.  I slapped, punched him a

09:04AM   19  bunch of time after I kicked him.

09:04AM   20  Q    And you did that on your own without any direction from

09:04AM   21  Mr. Miske, didn't you?

09:04AM   22  A    No.

09:04AM   23  Q    You just went up and did it, didn't you?

09:04AM   24  A    Why would I be in Mike's office and hit somebody in the

09:04AM   25  office?

| | | | |
|---|---|---|---|
| 09:04AM | 1 | Q | Because you hit people; that's what you do.  And he told |
| 09:04AM | 2 | | you to stop? |
| 09:04AM | 3 | A | No, he told me when to stop. |
| 09:04AM | 4 | Q | He told you to stop right after you did it? |
| 09:04AM | 5 | A | No, he told me when to stop. |
| 09:04AM | 6 | Q | Now, you testified about another incident at Kama'aina |
| 09:04AM | 7 | | Termite and Pest Control, correct? |
| 09:04AM | 8 | A | Yes. |
| 09:04AM | 9 | Q | And you told the jury that you used a baton, correct? |
| 09:04AM | 10 | A | Yes. |
| 09:04AM | 11 | Q | On August 21st of 2018 in your second interview, you told |
| 09:04AM | 12 | | them that you punched and kicked the employee in the face as |
| 09:04AM | 13 | | punishment for the theft; nothing about a baton, correct? |
| 09:05AM | 14 | A | Probably.  Like I said, we hit him a bunch of times. |
| 09:05AM | 15 | Q | So the story changed over time? |
| 09:05AM | 16 | A | No, the story is not changing.  I'm just remembering |
| 09:05AM | 17 | | things as we are going. |
| 09:05AM | 18 | Q | You had a hard time remembering a kick, a punch, a slap? |
| 09:05AM | 19 | | You said you slapped him and punched him, right?  That's what |
| 09:05AM | 20 | | you told the government on August 21st. |
| 09:05AM | 21 | A | I said we did that to the first guy, yeah. |
| 09:05AM | 22 | Q | And then it became a baton later, right? |
| 09:05AM | 23 | A | He got batoned after. |
| 09:05AM | 24 | Q | Oh, now it's both, correct? |
| 09:05AM | 25 | A | I'm telling you he got hit by everything.  I just said |

| 09:05AM | 1 | that. |
|---|---|---|
| 09:05AM | 2 | Q   Now it's both? |
| 09:05AM | 3 | A   I just said that. |
| 09:05AM | 4 | Q   Actually, it just never happened, did it? |
| 09:05AM | 5 | A   I don't know.  It happened. |
| 09:05AM | 6 | Q   Now, over this time period, you've testified that in |
| 09:05AM | 7 | January of 2016 with Kawika Dahlin, you received $2,000, |
| 09:06AM | 8 | correct? |
| 09:06AM | 9 | A   That's what it says. |
| 09:06AM | 10 | Q   And you shared some of that with Johnnie Stancil; that's |
| 09:06AM | 11 | your testimony, right? |
| 09:06AM | 12 | A   That's what it says. |
| 09:06AM | 13 | Q   With respect to the used car dealer, you testified that |
| 09:06AM | 14 | you received $1,500, correct? |
| 09:06AM | 15 | A   That's what it says. |
| 09:06AM | 16 | Q   All right.  And then you talked about a third incident |
| 09:06AM | 17 | involving Denver Freitas; do you recall that? |
| 09:06AM | 18 | A   Yes. |
| 09:06AM | 19 | Q   Okay.  So Mike's nephew had someone rip and rob him of a |
| 09:06AM | 20 | chain, right? |
| 09:06AM | 21 | A   That's what he told me. |
| 09:06AM | 22 | Q   And so you and Keoni Adric found the individual that did |
| 09:06AM | 23 | it, correct? |
| 09:06AM | 24 | A   I was told where he lived by Mike.  We went over there and |
| 09:06AM | 25 | handled it. |

09:06AM   1   Q    And you testified that Keoni Adric got the chain back and
09:06AM   2   punched him, and he was a boxer, correct?
09:07AM   3   A    I said Keoni Adric did it, yeah.
09:07AM   4   Q    And that, you said you got a thousand dollars for; that's
09:07AM   5   your testimony?
09:07AM   6   A    Yes.
09:07AM   7   Q    All right.  Was that in 2016 or 2017?
09:07AM   8   A    I don't know.
09:07AM   9   Q    In 2017, you testified about the individual who was the
09:07AM  10   manager of the nightclub, correct?
09:07AM  11   A    I think so.
09:07AM  12   Q    And you said you got a thousand dollars, right?
09:07AM  13   A    I think so.
09:07AM  14   Q    And from February 2017 all the way until your arrest, you
09:07AM  15   testified about receiving no more money from any other assault,
09:07AM  16   correct?
09:07AM  17   A    There was assaults I wasn't getting paid for.
09:07AM  18   Q    So the sum total of what you received in 2016, '17 and
09:07AM  19   '18, your testimony is $5,500?
09:07AM  20   A    Are you asking me a question or are you telling me?
09:08AM  21   Q    I'm asking you a question.
09:08AM  22   A    I don't know.  I never did the math.
09:08AM  23   Q    2,000, right; 1,000 more, right?  We are up to 3000,
09:08AM  24   correct?  Another thousand, 4,000; and then 1,500 would be
09:08AM  25   5500, correct?

09:08AM   1   A     That's what it sounds like.

09:08AM   2   Q     All right.  And you did a lot of math in terms of we got

09:08AM   3   to see your phone.  You had all those drug debts in your phone

09:08AM   4   in dollar amounts.

09:08AM   5         You were keeping track of that, right?

09:08AM   6   A     Sometimes.

09:08AM   7   Q     When you were asked a question about whether Mike was

09:09AM   8   taking care of you, what did you mean, you said, "I mean, he

09:09AM   9   just liked being at Johnnie's and stuff.  I mean, he's always

09:09AM   10  made sure I could go over there and stuff.  And just made me

09:09AM   11  feel like I always had a place to go.  So I mean, yeah, that

09:09AM   12  was -- so, I mean, I used to be over there a lot."

09:09AM   13        That's how you described it, correct?

09:09AM   14  A     In the beginning, yeah.

09:09AM   15  Q     And then you were asked, "Was he somewhat of a father

09:09AM   16  figure to you?"  And you said, "I wouldn't say a father figure,

09:09AM   17  but he was like an older brother," correct?

09:09AM   18  A     Yes.

09:09AM   19  Q     You were asked whether you were getting tight with Mike.

09:09AM   20        Do you recall that?

09:09AM   21  A     Yes.

09:09AM   22  Q     And you said, "I was always more tight with John, but Mike

09:09AM   23  is like the older brother, so, I mean."  And then you were

09:09AM   24  asked how long had you known him.  "Not that long.  I was only

09:09AM   25  cruising with Johnnie, really.  I was only cruising with

09:10AM    1    Johnnie.  Like, he would go see bro and stuff, Mike -- we would

09:10AM    2    talk to him and stuff but it wasn't like, yeah, like, fuck, I

09:10AM    3    don't know."

09:10AM    4          That's what you said, right?

09:10AM    5    A    I don't cruise with Mike every day.  I cruised more with

09:10AM    6    Johnnie.

09:10AM    7    Q    You were with Johnnie.

09:10AM    8          That's what you were doing, because Mike was working,

09:10AM    9    right?

09:10AM   10    A    We was at the shop.  Mike's working, but we are chilling

09:10AM   11    with Mike too sometimes.

09:10AM   12    Q    Now, you were asked in August 14th of 2018 whether

09:10AM   13    anything had come out of Mike's mouth with respect to Fraser.

09:10AM   14          Do you recall that?

09:10AM   15    A    Briefly.

09:10AM   16    Q    And you said has Mike said -- you were asked, "Has Mike

09:10AM   17    said anything to you?"  And you said, "Mike doesn't say

09:10AM   18    anything about it."

09:10AM   19          That's what you told them?

09:10AM   20    A    Mike didn't talk to me too much about it.  There was only

09:11AM   21    a few times we even talked about it.

09:11AM   22    Q    Your answer on August 14th of 2018 was, "Mike doesn't say

09:11AM   23    anything about it," correct?

09:11AM   24    A    That's what you are saying, yeah.

09:11AM   25    Q    And then what you said is, "If you'll just let me out, if

09:11AM   1   I can just go back out there, maybe I can gain some

09:11AM   2   information."

09:11AM   3        That's what you said, right?

09:11AM   4   A    Yes.

09:11AM   5   Q    Because you didn't have any.  But yet, you told the jury

09:11AM   6   about some comment saying that Mike told you that he was gone.

09:11AM   7   But you didn't tell them that at all, because when you were

09:11AM   8   first asked about it, what you said was, "Mike doesn't say

09:11AM   9   anything about it," correct?

09:11AM   10       MR. NAMMAR:  Objection; argumentative.  Asked and

09:11AM   11   answered.

09:11AM   12       THE COURT:  The objection is sustained.

09:11AM   13   BY MR. KENNEDY:

09:11AM   14   Q    And you wouldn't have to be released to go gain

09:12AM   15   information if you had it at that time, would you?

09:12AM   16   A    I didn't know exactly what happened to him.

09:12AM   17   Q    And the reason is, as you know, you too had been falsely

09:12AM   18   accused, haven't you?

09:12AM   19   A    I have been falsely accused.

09:12AM   20   Q    And we will get to that.  Yesterday I asked you about

09:12AM   21   whether La Familia had a presence on the web.

09:12AM   22       Do you recall that?

09:12AM   23   A    You asked if there was a La Familia website.

09:12AM   24   Q    Yes, and you said no, right?

09:12AM   25   A    There is no La Familia.com.  There is no La Familia

| | | |
|---|---|---|
| 09:12AM | 1 | website. |
| 09:12AM | 2 | Q   But there is a La Familia Facebook page, isn't there? |
| 09:13AM | 3 | A   There was a friend page, yeah. |
| 09:13AM | 4 | Q   Right.  And so when -- I want to talk to you about the |
| 09:13AM | 5 | events around September of 2016, okay. |
| 09:13AM | 6 | In 2016, September, you had given some testimony that |
| 09:13AM | 7 | James Salas was one of the three robbers with you on the |
| 09:13AM | 8 | Brandon Ota robbery, correct? |
| 09:13AM | 9 | A   Yes. |
| 09:13AM | 10 | Q   And I take it that you were living in Kalihi at that time, |
| 09:13AM | 11 | correct? |
| 09:13AM | 12 | A   Yes. |
| 09:13AM | 13 | Q   I think it was at 3255, was the address? |
| 09:13AM | 14 | A   I think so. |
| 09:13AM | 15 | Q   And it had came to your attention that Turtle -- James |
| 09:13AM | 16 | Salas -- was stealing things from you, right? |
| 09:13AM | 17 | A   Yes. |
| 09:13AM | 18 | Q   Stealing a car, right? |
| 09:14AM | 19 | A   After, yeah. |
| 09:14AM | 20 | Q   Stealing things out of the house, right? |
| 09:14AM | 21 | A   Yes. |
| 09:14AM | 22 | MR. KENNEDY:  Okay, so if we could pull up 8013-036, |
| 09:14AM | 23 | Your Honor, which I believe is in the 34th supplemental.  I can |
| 09:14AM | 24 | check. |
| 09:14AM | 25 | THE COURT:  It's not that one. |

09:14AM   1   BY MR. KENNEDY:

09:14AM   2   Q    Do you have it, sir?

09:14AM   3            THE COURT:  It's not that one.

09:14AM   4            MR. KENNEDY:  Oh, it's not that one?  Oh, it's the

09:14AM   5   first?  Thank you.  Oh, the 35th.  I'm sorry.  I apologize,

09:14AM   6   Your Honor.  I had to find it here.

09:14AM   7            THE COURT:  All right.  I have it now, thank you.

09:14AM   8   BY MR. KENNEDY:

09:14AM   9   Q    My apologies.  If we could pull it up just for the

09:15AM  10   witness.  8013-036.  I apologize.

09:15AM  11            THE COURT:  That's what I had.

09:15AM  12            MR. KENNEDY:  Looks like we are at 8013-016, Your

09:15AM  13   Honor.  That's why I repeated it.  If we could go to the second

09:15AM  14   page.  The two page.

09:15AM  15   BY MR. KENNEDY:

09:15AM  16   Q    Do you recognize the individuals shown in 8013-036, second

09:15AM  17   page?

09:15AM  18   A    Yes.

09:15AM  19   Q    Who is the person on the left?

09:15AM  20   A    That's me.

09:15AM  21   Q    Who is the person on the right?

09:15AM  22   A    David Pedro.

09:15AM  23   Q    Is this an image from the La Familia Facebook page?

09:16AM  24   A    Yes.

09:16AM  25            MR. KENNEDY:  At this time, I would move to introduce

09:16AM   1   and move to admit 8013-036.

09:16AM   2            THE COURT:  Any objection?

09:16AM   3            MR. NAMMAR:  No objection.

09:16AM   4            THE COURT:  That exhibit then is admitted without

09:16AM   5   objection, 8013-36.  You may publish.

09:16AM   6            (Exhibit 8013-036 was received in evidence.)

09:16AM   7            MR. KENNEDY:  Can we publish, Your Honor?

09:16AM   8            THE COURT:  Yes, you may.

09:16AM   9   BY MR. KENNEDY:

09:16AM   10  Q    Now, you were asked some questions about La Familia,

09:16AM   11  right?

09:16AM   12  A    Yes.

09:16AM   13  Q    You were asked some questions about USO, correct?

09:16AM   14  A    Yes.

09:16AM   15  Q    You were asked some questions about whether this was done

09:16AM   16  for the benefit of them, correct?

09:16AM   17  A    Yes.

09:16AM   18  Q    Let me ask you some questions.

09:16AM   19            In 2016, La Familia has a Facebook page, right?

09:16AM   20  A    Yes.

09:16AM   21  Q    La Familia's Facebook page isn't being posted in prison,

09:16AM   22  is it?

09:17AM   23  A    No.

09:17AM   24  Q    All right.  And so in 8013-036, we see you making a hand

09:17AM   25  sign, right?

09:17AM   1   A   Yes.

09:17AM   2   Q   La Familia, right?

09:17AM   3   A   No.  We were both from the east.

09:17AM   4   Q   Oh, this is the east side again, right?

09:17AM   5   A   It looks like an E to me.

09:17AM   6   Q   And you've got an assault rifle in your right hand holding

09:17AM   7   it down?

09:17AM   8   A   Yes.

09:17AM   9   Q   All right.  And so Keali'i Young, we've talked about him.

09:17AM   10      He is a North Shore boy, correct?

09:17AM   11  A   Yes.

09:17AM   12  Q   We talked about you.  You've been USO family, right?

09:17AM   13  A   Not really, but yeah.

09:17AM   14  Q   La Familia, right?

09:17AM   15  A   I have been.

09:17AM   16  Q   Jake -- excuse me, Salas, James Salas was La Familia,

09:17AM   17  correct?

09:17AM   18  A   Yes.

09:17AM   19  Q   Lance Bermudez, La Familia, right?

09:17AM   20  A   I don't know what Lance is.

09:17AM   21  Q   And Royalty, right?

09:17AM   22  A   I don't know what Lance is.

09:17AM   23  Q   All of these, everybody that I mentioned, they are just

09:18AM   24  gang members, right?

09:18AM   25  A   We were in jail, not really.  When we are outside, we are

09:18AM   1   just -- was regular.

09:18AM   2   Q    When you are outside -- because clearly you are outside on

09:18AM   3   this point -- you have an assault rifle in a picture on a La

09:18AM   4   Familia Facebook page, right?

09:18AM   5   A    Yes.

09:18AM   6           MR. KENNEDY:  Now, if we could pull up 8013-037, which

09:18AM   7   is not in evidence.

09:18AM   8           THE COURT:  Go ahead.

09:18AM   9           MR. KENNEDY:  And it's also, I believe, in the 35th.

09:18AM   10   Let me make certain Your Honor before I -- yes.

09:18AM   11           THE COURT:  Okay.  Go ahead.

09:18AM   12   BY MR. KENNEDY:

09:18AM   13   Q    Who is the person on the left of 803 --

09:18AM   14   A    James.

09:18AM   15   Q    -- 8013-037.  I apologize, sir, I had to complete the

09:18AM   16   question.

09:19AM   17   A    James.

09:19AM   18   Q    And who is the person on the right?

09:19AM   19   A    That's me.

09:19AM   20           MR. KENNEDY:  I'd move to introduce 8013-037.

09:19AM   21           THE COURT:  Any objection?

09:19AM   22           MR. NAMMAR:  No objection.

09:19AM   23           THE COURT:  8013-037 is admitted.  You may publish.

09:19AM   24           (Exhibit 8013-037 was received in evidence.)

09:19AM   25   BY MR. KENNEDY:

09:19AM   1   Q   So now that the jury can see it on the -- it looks like

09:19AM   2   for them, let me see.  The individual here, since the screens

09:19AM   3   are shown different ways, that's James Salas, right?

09:19AM   4   A   Yes.

09:19AM   5   Q   And this is you here, right?

09:19AM   6   A   Yes.

09:19AM   7       MR. KENNEDY:  Okay.  Now, if we could pull up 8013-038

09:19AM   8   which is also in the 35th supp.

09:19AM   9       THE COURT:  Go ahead if we could.

09:20AM  10   BY MR. KENNEDY:

09:20AM  11   Q   If we could go to the second page and just do -- do you

09:20AM  12   know the individual in the top portion of 8013-038?

09:20AM  13   A   Yes.

09:20AM  14   Q   And is the second message from you?

09:20AM  15   A   Yes.

09:20AM  16   Q   And is the third message in response to your message?

09:20AM  17   A   No.

09:20AM  18       MR. KENNEDY:  At this time, I'd move 8013-038 into

09:20AM  19   evidence.

09:20AM  20       THE COURT:  Any objection?

09:20AM  21       MR. NAMMAR:  Hearsay, no foundation for the last

09:20AM  22   message.

09:20AM  23       THE COURT:  The objection is overruled.  That exhibit

09:20AM  24   is admitted, 8013-38.  You may publish.

09:20AM  25       (Exhibit 8013-038 was received in evidence.)

09:21AM    1    BY MR. KENNEDY:

09:21AM    2    Q    All right.  So this is in September.  And the person that

09:21AM    3    you know is Shane, right?

09:21AM    4    A    Yes.

09:21AM    5    Q    He is saying, "Anybody see or knows the whereabouts of

09:21AM    6    James Salas, contact me ASAP or Jacob Smith.  Hold him if you

09:21AM    7    can.  I'll be there as soon as you call."

09:21AM    8            Do you see that?

09:21AM    9    A    Yes.

09:21AM   10    Q    And then you say, "You thanks, braddah, Shane, and Theo,

09:21AM   11    love you guys," right?

09:21AM   12    A    Yes.

09:21AM   13    Q    So at this point, your La Familia guys and yourself are

09:21AM   14    looking for James Turtle Salas, correct?

09:21AM   15    A    We are not looking for him as a gang thing.  James is

09:21AM   16    still part of La Familia.  Some of these guys trained with me.

09:21AM   17    Q    You are looking for James Salas, right?

09:21AM   18    A    I just said these guys are helping me find him.  Some of

09:21AM   19    them have trained with me.  It's not a gang thing.

09:21AM   20    Q    And then the person down below -- and this is on the La

09:21AM   21    Familia Facebook page, right?

09:22AM   22    A    It looks like it.

09:22AM   23    Q    And then down below, "Aloha, my braddahs," and then -- of

09:22AM   24    La Familia, "love you, my family," right?

09:22AM   25    A    That's what it says.

09:22AM    1    Q    Okay.  So this is -- if we go back to the first page.  We
09:22AM    2    have September 13th and September 14th.  Now let's move to
09:22AM    3    8013-039.
09:22AM    4            And if we move to the second page, do you recognize
09:22AM    5    your message on October 2nd at 9:25 on the La Familia Facebook
09:22AM    6    page?
09:22AM    7    A    Yes.
09:22AM    8    Q    Do you recognize the second message that you sent?
09:22AM    9    A    Yes.
09:22AM   10    Q    All right.
09:22AM   11            MR. KENNEDY:  At this time I would move 8013-039 into
09:23AM   12    evidence.
09:23AM   13            THE COURT:  Any objection, Counsel?
09:23AM   14            MR. NAMMAR:  No objection.
09:23AM   15            THE COURT:  8013-039 is admitted.  You may publish.
09:23AM   16            (Exhibit 8013-039 was received in evidence.)
09:23AM   17    BY MR. KENNEDY:
09:23AM   18    Q    All right.  So at this point on October 2nd, you're still
09:23AM   19    trying to locate Mr. Salas, right?
09:23AM   20    A    Yes.
09:23AM   21    Q    And we talked about the fact that he had stolen rims, TVs,
09:23AM   22    a lot; there was a car, right?
09:23AM   23    A    Yes.
09:23AM   24    Q    And even some of your kid's toys are missing?
09:23AM   25    A    Yes.

09:23AM    1    Q    And you are indicating that he had -- that he was on the
09:23AM    2    run, right?
09:23AM    3    A    I am indicating I was on the run that year.
09:23AM    4    Q    You were on the run at that point?
09:23AM    5    A    Yes, I was.
09:23AM    6    Q    And you were on the run due to the robberies that we had
09:24AM    7    talked about?
09:24AM    8    A    I was on the run due to missing a urine test.
09:24AM    9    Q    You were on the run because you missed a urine test
09:24AM   10    because you would have not given a clean sample?
09:24AM   11    A    No, because my kid's mom was giving birth, and I made the
09:24AM   12    choice to make sure I got her to the hospital instead.
09:24AM   13    Q    And you didn't think that a child being born would be a
09:24AM   14    good reason to tell someone that it's something you had to be
09:24AM   15    at rather than a drug test?
09:24AM   16    A    I told them that.
09:24AM   17    Q    But then you were on the run for that?
09:24AM   18    A    Yeah.  I'm not going to turn myself in if she is giving
09:24AM   19    birth.
09:24AM   20    Q    Of course not.
09:24AM   21    A    Of course.
09:24AM   22    Q    All right.  But you didn't tell them that?
09:24AM   23    A    I did tell them that.
09:24AM   24    Q    And you were still on the run from it?
09:24AM   25    A    I was still on the run.  The law is the law, I guess.

| | | |
|---|---|---|
| 09:24AM | 1 | MR. KENNEDY:  All right.  Now, if we go to 8012-026, |
| 09:24AM | 2 | which is also in the 35th. |
| 09:25AM | 3 | THE COURT:  Go ahead. |
| 09:25AM | 4 | BY MR. KENNEDY: |
| 09:25AM | 5 | Q    Do you recognize the 5896 number?  Would it help to blow |
| 09:25AM | 6 | that up, sir? |
| 09:25AM | 7 | A    I see a 5895 number. |
| 09:25AM | 8 | Q    5895.  My apologies.  It helps when it's blown up for me. |
| 09:25AM | 9 | Do you recognize the 5895 number? |
| 09:25AM | 10 | A    Yes. |
| 09:25AM | 11 | Q    That's your phone number, right? |
| 09:25AM | 12 | A    That's my other half's number. |
| 09:25AM | 13 | Q    And if we go back to a full view.  And if we just flip |
| 09:26AM | 14 | through.  And if we go back to the first page. |
| 09:26AM | 15 | Do you recognize these are messages that you are |
| 09:26AM | 16 | sending on November 20th and November 21st of 2016? |
| 09:26AM | 17 | A    Yes. |
| 09:26AM | 18 | Q    Sending and receiving? |
| 09:26AM | 19 | A    Yes. |
| 09:26AM | 20 | MR. KENNEDY:  At this time, I would offer 8012-026 |
| 09:26AM | 21 | into evidence. |
| 09:26AM | 22 | MR. NAMMAR:  Hearsay, relevance. |
| 09:26AM | 23 | THE COURT:  I'm not sure -- certain what's going on |
| 09:26AM | 24 | here.  He said this is his girlfriend's phone? |
| 09:26AM | 25 | MR. KENNEDY:  No.  It's his phone.  It's an outgoing |

| | | |
|---|---|---|
| 09:26AM | 1 | message to -- from 5896. |
| 09:27AM | 2 | THE COURT:  Could you establish that? |
| 09:27AM | 3 | BY MR. KENNEDY: |
| 09:27AM | 4 | Q    Sir, the (808) 304-5895 if -- it's so small, that's an |
| 09:27AM | 5 | outgoing message to Hunny My, right? |
| 09:27AM | 6 | A    I don't know. |
| 09:27AM | 7 | Q    That's your phone calling Lovelyn Duarte, correct? |
| 09:27AM | 8 | A    I'm not calling her.  I'm messaging. |
| 09:27AM | 9 | Q    Excuse me, texting her.  You're absolutely right.  Do you |
| 09:27AM | 10 | see -- well let's go down the document, then. |
| 09:27AM | 11 | Do you recognize the number for Timmy? |
| 09:27AM | 12 | A    Yes. |
| 09:27AM | 13 | Q    That's Timmy Taboada, correct? |
| 09:27AM | 14 | A    Yes. |
| 09:27AM | 15 | Q    And that's an outgoing message from you to Timmy Taboada, |
| 09:28AM | 16 | correct? |
| 09:28AM | 17 | A    Yes. |
| 09:28AM | 18 | Q    If we move down, number ten, that's an outgoing message |
| 09:28AM | 19 | from you to Norm uncle, correct? |
| 09:28AM | 20 | A    Yes. |
| 09:28AM | 21 | Q    That's Norm Akau, correct? |
| 09:28AM | 22 | A    I think so. |
| 09:28AM | 23 | Q    If we move to the second page, 8799, that was an outgoing |
| 09:28AM | 24 | messages to Lance Bermudez, correct? |
| 09:28AM | 25 | A    I think so.  I don't know. |

09:28AM   1   Q   And these are the same -- this is the same numbers that we

09:28AM   2   looked at in terms of when you saw the government exhibit

09:28AM   3   yesterday or the day before, and where you say about James

09:28AM   4   Salas, "I want him dead," correct?

09:28AM   5   A   Yes.

09:28AM   6   Q   Because that happened on, I believe, either the 22nd or

09:28AM   7   the 23rd of November, and these are text messages from you on

09:28AM   8   the 20th and the 21st, up to that point where you text "I want

09:29AM   9   him dead," correct?

09:29AM   10  A   Yes.

09:29AM   11          MR. KENNEDY:  At this time, I would move 8012-026 into

09:29AM   12  evidence.

09:29AM   13          THE COURT:  Any objection?

09:29AM   14          MR. NAMMAR:  Same objection.

09:29AM   15          THE COURT:  The objection is overruled.  8012-026 is

09:29AM   16  admitted.  You may publish.

09:29AM   17          (Exhibit 8012-026 was received in evidence.)

09:29AM   18  BY MR. KENNEDY:

09:29AM   19  Q   All right.  If we can blow up the first top page so it's

09:29AM   20  easier to read.

09:29AM   21          The first outgoing message is you need to call me

09:29AM   22  ASAP, right?

09:29AM   23  A   Yes.

09:29AM   24  Q   The second message, 8799, is to Lance Bermudez, right?

09:29AM   25  A   I think so.  I'm not sure.

09:29AM  1    Q    And it's, "Hey, I know you don't give a fuck because you

09:29AM  2    such a G.  But they just raided my Kalihi house.  Figure I give

09:29AM  3    you a heads-up.  Thanks."  Right?

09:30AM  4    A    That's what it says.

09:30AM  5    Q    And if we move through, then another message and the third

09:30AM  6    one to Hunny My, "call me ASAP," right?

09:30AM  7    A    Yes.

09:30AM  8    Q    Another message to Lance Bermudez.

09:30AM  9         "And even though you are not talking to me, maybe let

09:30AM  10   me know so at least we are on the same page if one of us gets

09:30AM  11   picked up, if you've been there or haven't, 'cause the house is

09:30AM  12   literally filled with cops.  The fucking load inside and out,"

09:30AM  13   right?

09:30AM  14   A    Yes.

09:30AM  15   Q    So that's your house in Kalihi, 3255, right?

09:30AM  16   A    That is.

09:30AM  17   Q    And you're not talking to Lance at that time because you

09:30AM  18   told the jury the other day that Lance and Dae Han Moon were

09:30AM  19   close, right?

09:30AM  20   A    Yes.

09:30AM  21   Q    And you had ripped off Dae Han Moon by selling him four

09:30AM  22   ounces of bunk, right?

09:30AM  23   A    No.  That was only towards the end.  This is a whole

09:30AM  24   different incident.

09:31AM  25   Q    So this was just another time that you and Lance were at

09:31AM    1    odds, right?

09:31AM    2    A    Another time.

09:31AM    3    Q    And so as we go down, you're asking Timmy three times to

09:31AM    4    call you, right?

09:31AM    5    A    Yes.

09:31AM    6    Q    Okay.  You're back to Lovelyn Duarte and saying, "Okay,

09:31AM    7    well this is an emergency and again, you are not answering,"

09:31AM    8    right?

09:31AM    9    A    Yes.

09:31AM    10    Q    Then you're reaching out to Norm Akau, right?

09:31AM    11    A    Yes.

09:31AM    12    Q    Saying, "Bro, call me," right?

09:31AM    13    A    Yes.

09:31AM    14    Q    And you are on the run, right?

09:31AM    15    A    Yes.

09:31AM    16    Q    And your house is being raided and cops are all inside and

09:31AM    17    out, right?

09:31AM    18    A    Yes.

09:31AM    19    Q    And you are getting information about it, right?

09:31AM    20    A    Somebody drove by my house and told me.

09:31AM    21    Q    And there is, like, crime scene people inside, right?

09:31AM    22    A    Yes.

09:31AM    23    Q    And they're pulling stuff out of the house, like wall

09:31AM    24    boards and things, right?

09:32AM    25    A    Yes.

09:32AM  1   Q    And so you're getting this information in real time,
09:32AM  2   right?
09:32AM  3   A    Somebody is just telling me that there is cops at the
09:32AM  4   house.  I'm not getting all of that information.
09:32AM  5   Q    Because they are all there doing this because they think
09:32AM  6   you are a killer, right?
09:32AM  7   A    That's what we were told after.
09:32AM  8   Q    All right.  And so as we go down the page, we are talking
09:32AM  9   about the fact, "With Lance is not squatters, because none of
09:32AM  10  us have a note.  They've been there with guns drawn.  All I do
09:32AM  11  know, they might have kicked the door open," right?
09:32AM  12  A    Yes.
09:32AM  13  Q    All right.  And if we move to the second page, 8799, the
09:32AM  14  jury now knows that's Lance Bermudez, right?  Your outgoing and
09:32AM  15  incoming calls from him, right?
09:32AM  16  A    Yes.
09:33AM  17  Q    If we move down more outgoing and incoming, it looks like
09:33AM  18  from Hunny Me, Lovelyn Duarte, right?
09:33AM  19  A    Yes.
09:33AM  20  Q    And then Lance Bermudez in 30 is saying, "If they went to
09:33AM  21  the house, probably they get something on me," right?
09:33AM  22  A    Yes.
09:33AM  23  Q    And if we go down.
09:33AM  24       And those are all the people you are reaching out to,
09:33AM  25  right?

09:33AM   1   A     That's the people I talk to every day.

09:33AM   2   Q     There is not a single text message to Mike Miske, is

09:33AM   3   there?

09:33AM   4   A     Probably after, not on this page.

09:33AM   5   Q     You are having an emergency.  Your house is being raided.

09:33AM   6   They are taking things out of that.  You think they are looking

09:33AM   7   at you for something that is a killing, and there is not a

09:33AM   8   single message to Mike Miske, is there?

09:33AM   9   A     And he is not going to want -- he is not going to want us

09:34AM   10  around if we have that much heat on us.

09:34AM   11  Q     The question I asked you, is there is a single text

09:34AM   12  message --

09:34AM   13  A     I just told you he's not going to want us around if

09:34AM   14  there's that much heat on us.

09:34AM   15  Q     So the answer is no, there's not a single text message,

09:34AM   16  correct?

09:34AM   17  A     The answer is whatever you want to say.

09:34AM   18          MR. KENNEDY:  The jury will have it.  8012-027, if we

09:34AM   19  just pull that up for the witness.  It's not yet in evidence

09:34AM   20  and I believe it is also in the 35th supp, Your Honor.

09:34AM   21          THE COURT:  Yes, I have it.  Go ahead.

09:34AM   22  BY MR. KENNEDY:

09:34AM   23  Q     If we move to -- I believe this is now the 22nd, correct,

09:34AM   24  of November, in terms of the first message, sir?

09:35AM   25  A     Yes.

09:35AM  1   Q    And if we move to the second page.  If we move to the
09:35AM  2   third page.
09:35AM  3         This is more messages between yourself and Lance
09:35AM  4   Bermudez, correct?  And others?
09:35AM  5   A    Yes.
09:35AM  6         MR. KENNEDY:  At this time, I'd move 8012-027 into
09:35AM  7   evidence.
09:35AM  8         MR. NAMMAR:  Hearsay, relevance.
09:35AM  9         THE COURT:  What was the objection?  Relevance?
09:35AM  10        MR. NAMMAR:  Yes.
09:35AM  11        THE COURT:  The objection is overruled.  8012-027 is
09:35AM  12   admitted.  You may publish.
09:35AM  13        (Exhibit 8012-027 was received in evidence.)
09:35AM  14   BY MR. KENNEDY:
09:35AM  15   Q    All right.  If we go to the first page, where now, we
09:35AM  16   looked at text messages on the 20th and the 21st.
09:35AM  17        We are now at the 22, correct?
09:35AM  18   A    Yes.
09:36AM  19   Q    And if we move down the page and just stop right there.
09:36AM  20   If we go up just a little bit, I apologize.  "Squirrel-cho,
09:36AM  21   Johnnie," right?
09:36AM  22        I think that was a nickname that you said for John
09:36AM  23   Stancil, correct?
09:36AM  24   A    Yes.
09:36AM  25   Q    So "I need you to call me ASAP.  You need to talk to" --

09:36AM   1   Keali'i is above that.  And for Johnnie, your message is, "Bro,
09:36AM   2   need you to call me ASAP.  This is an emergency," correct?
09:36AM   3   A    Yes.
09:36AM   4   Q    All right.  And in five, you say the same thing,
09:36AM   5   "Emergency, bro, please call me," for Norm uncle, right?
09:36AM   6   A    Yes.
09:36AM   7   Q    And that's Norm Akau, right?
09:36AM   8   A    Yes.
09:36AM   9   Q    If we keep going down the page.  At ten you are also
09:37AM  10   texting Johnnie again, "Come on, bro, I need you right now,"
09:37AM  11   right?
09:37AM  12   A    Yes.
09:37AM  13   Q    Okay.  And then on 14, "Bro, fuck, please wake up.  I need
09:37AM  14   you fucking -- I need your fucking help," right?
09:37AM  15   A    Yes.
09:37AM  16   Q    All right.  If we keep going.  Let's keep going -- and
09:37AM  17   finally, at the bottom of the page, you have on the 22nd, "Hey,
09:37AM  18   Alen, I'm a friend of Mike and Johnnie's.  Mike told me to call
09:37AM  19   you.  Can you call me back as soon as you can?  Thank you,"
09:37AM  20   right?
09:37AM  21   A    Yes.
09:37AM  22   Q    So at that time, all these people are in your house and
09:37AM  23   you're trying to find a lawyer, right?
09:37AM  24   A    I'm just trying to figure out what's going on.
09:38AM  25   Q    Right.  "Hey Alen, I'm a friend of Mike and Johnnie's,"

09:38AM   1   right?  So this is the first time you're reaching out to Alen,
09:38AM   2   right?
09:38AM   3   A    I'm not sure if it was the first time or not.
09:38AM   4   Q    Well,  if you had known him, you wouldn't say that you are
09:38AM   5   a friend of somebody else's right?
09:38AM   6   A    It depends.  I'm calling them on my own.  If I was there
09:38AM   7   with Mike, then he doesn't need to know that.  He knows I'm a
09:38AM   8   friend of Mike's.
09:38AM   9   Q    Okay.  So let's go on to the third page.  And if we go
09:38AM   10  to -- Cakes (phonetic) is somebody that you are talking to,
09:38AM   11  right?  K-I-K-S in 40?
09:38AM   12  A    Yes.
09:38AM   13  Q    All right.  And you have an outgoing message to him that
09:38AM   14  says, "You talk to him yet?"  Right?  Correct?
09:39AM   15  A    Yes.
09:39AM   16  Q    And Cakes (phonetic) is the one who tells you, "all he
09:39AM   17  told me was robbery assault and parole violation," correct?
09:39AM   18  A    Yes.
09:39AM   19  Q    So this is Cakes, (phonetic) the person that you are
09:39AM   20  reaching out to, right?
09:39AM   21  A    That's Kiks, yes.
09:39AM   22  Q    Kiks?  All right.  And then as we go down, you have an
09:39AM   23  outgoing message to Kiks, "Can you ask to dig a little bit
09:39AM   24  please, bro," and let you know what robbery, what assault,
09:39AM   25  right?

09:39AM   1   A   Yes.

09:39AM   2   Q   Okay.  And then you have an outgoing message to Lance

09:40AM   3   Bermudez, "James still in jail.  You think he went fold about

09:40AM   4   that one?"  Right?

09:40AM   5   A   Yes.

09:40AM   6   Q   And then incoming from Lance, "Fuck him or fuk (phonetic)

09:40AM   7   him," correct?

09:40AM   8   A   Yes.

09:40AM   9   Q   And then if we go to the next one, "Yup.  Fuck him.  I

09:40AM   10   like him dead."

09:40AM   11        That's from you?

09:40AM   12   A   Yes.

09:40AM   13   Q   Three months earlier, James, you, and Lance were involved

09:40AM   14   in the Brandon Ota robbery, correct?

09:40AM   15   A   Yes.

09:40AM   16   Q   The one with the mini AR-15, right?

09:40AM   17   A   Yes.

09:41AM   18        MR. KENNEDY:  And if we move to 8039-001.  And I

09:41AM   19   believe that one is in; the first supp.

09:41AM   20        THE COURT:  I have it.

09:41AM   21        MR. KENNEDY:  Thank you, Your Honor. I needed a little

09:41AM   22   help with that.

09:41AM   23   BY MR. KENNEDY:

09:41AM   24   Q   This is an exchange between yourself and James Salas in

09:41AM   25   messages, correct?

09:41AM   1   A    Yes.

09:42AM   2   Q    And if we flip to the second page.  And if we flip to the

09:42AM   3   third page.  And if we flip to the -- I think the last page.

09:42AM   4        Do you recognize that as text messages between

09:42AM   5   yourself and James Salas?

09:42AM   6   A    I see my name and James's name at the top.

09:42AM   7   Q    Do you recognize the photo at the end of Mr. Salas?

09:42AM   8   A    Yes.

09:42AM   9        MR. KENNEDY:  All right.  I'd move to admit 8039-001.

09:43AM  10        THE COURT:  Any objection?

09:43AM  11        MR. NAMMAR:  Hearsay, relevance, improper impeachment,

09:43AM  12   and no foundation.

09:43AM  13        THE COURT:  Sustained.

09:43AM  14   BY MR. KENNEDY:

09:43AM  15   Q    During this conversation with James Salas, did he show to

09:43AM  16   you that he was going to have his La Familia tattoo on the back

09:43AM  17   of his neck covered?

09:43AM  18   A    I'm not sure.  He just told me he wanted to be out

09:43AM  19   already.

09:43AM  20   Q    Let's just move to the last page of 8039-001 to refresh

09:43AM  21   your recollection.  We can take that down now.

09:43AM  22        Is it your memory that, due to this incident, he told

09:43AM  23   you that he would cover up; no longer be part of La Familia,

09:43AM  24   correct?

09:43AM  25   A    He told me that the guys didn't want him to be La Familia.

| | | | |
|---|---|---|---|
| 09:43AM | 1 | Q | All right.  Now, you mentioned that in that text message, |
| 09:44AM | 2 | | you said you want him dead, right? |
| 09:44AM | 3 | A | Yes. |
| 09:44AM | 4 | Q | You gave testimony that you didn't really mean it, right? |
| 09:44AM | 5 | A | No. |
| 09:44AM | 6 | Q | You've told the government later -- and as you know, James |
| 09:44AM | 7 | | Salas was murdered at OCCC, correct? |
| 09:44AM | 8 | A | Yes. |
| 09:44AM | 9 | Q | You told the government that that was a gang hit, right? |
| 09:44AM | 10 | A | I told them that's what we heard was going on.  They asked |
| 09:44AM | 11 | | me what I thought happened and I told them. |
| 09:44AM | 12 | Q | You told the government that he had changed gangs too many |
| 09:44AM | 13 | | times, right? |
| 09:44AM | 14 | A | Yes. |
| 09:44AM | 15 | Q | And that he was murdered because of that, right? |
| 09:44AM | 16 | A | Probably. |
| 09:44AM | 17 | Q | Now, you also have been the subject of false accusations, |
| 09:45AM | 18 | | right? |
| 09:45AM | 19 | A | Yes. |
| 09:45AM | 20 | Q | So you know how it feels when you are accused of something |
| 09:45AM | 21 | | and everybody thinks you did it, but you didn't; correct? |
| 09:45AM | 22 | A | Yes. |
| 09:45AM | 23 | Q | So you knew that both law enforcement and others were |
| 09:45AM | 24 | | saying that you killed Jonathan Fraser, right? |
| 09:45AM | 25 | A | I know Lindsey Kinney spread the rumor. |

09:45AM   1   Q    And you also know because you read search warrant

09:45AM   2   affidavits that said the same thing, correct?

09:45AM   3   A    I didn't read search warrant affidavits.  Somebody told me

09:45AM   4   while I was in jail.  That's why it happened.

09:45AM   5   Q    In October 25, 2022, in what was then the 11th time you

09:46AM   6   were interviewed in this course of this case, you said that you

09:46AM   7   were concerned about the recent media attention you had been

09:46AM   8   receiving in regards to the case, right?

09:46AM   9   A    I was concerned because there is constant lies being put

09:46AM  10   out.

09:46AM  11   Q    And you were being accused of terrible actions and the

09:46AM  12   media was reporting that information as the truth, right?

09:46AM  13   A    They were reporting it.

09:46AM  14   Q    And so you were telling them you were being falsely

09:46AM  15   accused, right?

09:46AM  16   A    I'm telling that some of the stuff that they were saying

09:46AM  17   was just crazy already.

09:46AM  18   Q    And you were feeling what it feels like to have that,

09:47AM  19   right?

09:47AM  20   A    It depends what I was being falsely accused of.

09:47AM  21   Q    Murder.

09:47AM  22   A    I didn't have anything to do with Fraser, so yeah.

09:47AM  23   Q    Kidnapping?

09:47AM  24   A    What?

09:47AM  25   Q    Kidnapping.

09:47AM   1   A    They didn't say anything about kidnapping.

09:47AM   2   Q    Torture?

09:47AM   3   A    Yeah.  That was crazy.

09:47AM   4   Q    And when people just say those things and they are not

09:47AM   5   true, they hurt, don't they?

09:47AM   6            MR. NAMMAR:  Objection; relevance.

09:47AM   7            THE COURT:  Sustained.

09:47AM   8   BY MR. KENNEDY:

09:47AM   9   Q    And in fact, during that time, you told Ashley Wong on the

09:47AM  10   night that Jonathan Fraser went missing, you were in custody,

09:47AM  11   right?

09:47AM  12   A    Yes, that's what I believed.

09:47AM  13   Q    And you weren't, correct?

09:47AM  14   A    I don't know.  You are going to get into specific dates

09:47AM  15   with me.  I told you, I don't know dates already.  The

09:47AM  16   prosecution read what happened.  They seen that -- the first

09:47AM  17   time I seen it, I was in jail.

09:48AM  18            So to my understanding, yes, I was incarcerated at the

09:48AM  19   time.

09:48AM  20   Q    So if the jury sees evidence of you using your phone on

09:48AM  21   July 30th, July 31st, and later, you're trying to tell them

09:48AM  22   that's not you?

09:48AM  23   A    I just told you that the first time I was made aware of

09:48AM  24   it, I was incarcerated.  That's why I told her that.  I'm not

09:48AM  25   saying anything is not true.  I'm saying I wasn't close enough

09:48AM   1   to Mike Miske to know when it happened; to know any dates.

09:48AM   2   Q   I just asked you a question about --

09:48AM   3   A   You keep bringing up specific dates.  I don't know

09:48AM   4   specific dates.

09:48AM   5   Q   All right.  You do know your birthday is July 29th, right?

09:48AM   6   A   I do.

09:48AM   7   Q   You do know you went to -- you gave testimony about going

09:48AM   8   to the M, right?

09:48AM   9   A   Yes.

09:48AM   10   Q   We saw a picture of you all together, right?

09:48AM   11   A   Yes.

09:48AM   12   Q   You went on to a different nightclub, right?

09:48AM   13   A   Yes.

09:48AM   14   Q   You gave testimony that at the M, you got into a fight

09:48AM   15   outside with a bunch of guys, right?

09:48AM   16   A   Yes, we did.

09:48AM   17   Q   That was the evening of the 29th and the morning of the

09:49AM   18   30th, right?

09:49AM   19   A   Yes.

09:49AM   20   Q   You know that the nightclubs stay open late, right?

09:49AM   21   A   Yes.

09:49AM   22   Q   Almost to 4:00, right?

09:49AM   23   A   Yes.

09:49AM   24   Q   So then you went to a different nightclub, right?

09:49AM   25   A   Yes.

09:49AM   1   Q   It may have been Limelight?

09:49AM   2   A   It was -- we weren't there.  We were in the parking lot.

09:49AM   3   Q   So you were in the parking lot and that's what you told

09:49AM   4   the jury, that Frankie Silva -- there was a big fight and he

09:49AM   5   stabbed somebody, right?

09:49AM   6   A   Yes.

09:49AM   7   Q   And then you were out on the 30th, right?

09:49AM   8   A   I was out on the 30th.

09:49AM   9   Q   Right.  And that was the day that Jonathan Fraser went

09:49AM   10  missing?

09:49AM   11  A   I wasn't involved in the thing.  I'm not going to know the

09:49AM   12  date.

09:49AM   13  Q   And so Ashley Wong is his -- Jonathan Fraser's girlfriend,

09:49AM   14  right?

09:49AM   15  A   That's what I've --

09:49AM   16  Q   And you made it a point to go up to her and tell her that

09:49AM   17  you were incarcerated on the 30th, on the day that he went

09:49AM   18  missing.

09:49AM   19      And that was a lie?

09:49AM   20  A   I let her know that I had nothing to do with it.

09:49AM   21      THE COURT:  Hold on, hold on, Mr. Smith.  The question

09:50AM   22  was, "So Ashley Wong is Jonathan Fraser's girlfriend, right?"

09:50AM   23  And you started to provide your answer and did not complete it

09:50AM   24  before counsel asked the next question.  So can you back up and

09:50AM   25  answer that question, and counsel may ask whatever he wishes

09:50AM    1    thereafter.

09:50AM    2            THE WITNESS:  I heard that Ashley Wong was the

09:50AM    3    girlfriend.  I wasn't sure.

09:50AM    4    BY MR. KENNEDY:

09:50AM    5    Q    And you went up to her and you told her that you were in

09:50AM    6    custody on the day that Jonathan Fraser went missing on

09:50AM    7    July 30th, and that was a lie?

09:50AM    8            MR. NAMMAR:  Objection; this is asked and answered.

09:50AM    9            THE COURT:  Sustained.

09:50AM   10    BY MR. KENNEDY:

09:50AM   11    Q    On April 26th -- excuse me, on the May 3rd, 2023

09:50AM   12    interview, you told the government that Mike Miske gave you

09:50AM   13    money on a few occasions but you always paid him back, correct?

09:51AM   14    A    I paid him back a few times, yeah.

09:51AM   15    Q    And on that same May 3rd, 2023 interview, you said Mike

09:51AM   16    Miske paid Kaneshiro's legal fees, but there was no agreement

09:51AM   17    to include you.

09:51AM   18            That's what you told the federal authorities on

09:51AM   19    May 3rd of 2023?

09:51AM   20    A    There was multiple meetings.  Alen was paid for in the

09:51AM   21    beginning because he wasn't just representing me for nothing.

09:51AM   22    Q    All you had, sir, was a probation violation, which we saw

09:51AM   23    the text, correct?

09:51AM   24    A    That's not all I had.  I had stress because I was doing

09:51AM   25    assaults and working too.  So that would be the use for a

09:51AM 1   lawyer.

09:51AM 2   Q    And then you got a DUI charge and you paid Alen yourself?

09:51AM 3   A    That was towards the end, and I did pay Alen myself

09:51AM 4   because it didn't involve Mike.

09:52AM 5   Q    And so what Mr. Miske told you, simply, was if you need a

09:52AM 6   lawyer, call Alen, right, because he was a friend of

09:52AM 7   Mr. Miske's?

09:52AM 8   A    For what occasion?

09:52AM 9   Q    And that's what he does for a living, right?

09:52AM 10  A    I don't know.  So what occasion, I just said.  You're not

09:52AM 11  answering the question.

09:52AM 12  Q    Okay.  Now, you said that you told the government on

09:52AM 13  May 3rd of 2023 that nothing was planned on the day of the

09:52AM 14  Aloha Tattoo incident, correct?

09:52AM 15  A    You being brief.  Nothing was planned as in what?  We went

09:52AM 16  there for a reason.

09:52AM 17  Q    Your words were nothing was planned on the day of the

09:52AM 18  Aloha Tattoo?

09:52AM 19  A    We also had multiple meetings, and I told them what we

09:53AM 20  were supposed to do at Aloha Tattoo.

09:53AM 21  Q    Right.  And so what you told the jury is that Tim Goodrich

09:53AM 22  assaulted Billy Whitney in front of his family, correct?  You

09:53AM 23  told the jury that Tim Goodrich assaulted Billy Whitney in

09:53AM 24  front of his family.

09:53AM 25           That was the reason, right?

09:53AM   1   A    I didn't say Billy Whitney, and I didn't say Tim Goodrich.

09:53AM   2   I said that it was a friend of Mike's named Bill that got

09:53AM   3   assaulted, and that's why we were sent there.

09:53AM   4   Q    You said that the owner of Aloha Tattoo assaulted the

09:53AM   5   owner of 808 Tattoo in front of his family.

09:53AM   6        That's what you told the jury, right?

09:53AM   7   A    That's what I was told.

09:53AM   8   Q    And so you're telling the jury that Tim Goodrich assaulted

09:54AM   9   him?

09:54AM  10   A    I'm telling the jury that's what I was told.

09:54AM  11   Q    And so on that day, Dayson Kaae still owed you that money,

09:54AM  12   right?

09:54AM  13   A    No.

09:54AM  14   Q    You sent him in, right?

09:54AM  15   A    No.

09:54AM  16   Q    You started out your testimony several days ago by talking

09:54AM  17   about your plea agreement.

09:54AM  18        Do you recall that?

09:54AM  19   A    Yes.

09:54AM  20   Q    And that you pled guilty to a conspiracy to trafficking

09:54AM  21   drugs, right?

09:54AM  22   A    Yes.

09:54AM  23   Q    And the mandatory minimum for that is ten years, right?

09:55AM  24   A    Yes.

09:55AM  25   Q    And the maximum is life, correct?

| | | | |
|---|---|---|---|
| 09:55AM | 1 | A | Yes. |
| 09:55AM | 2 | Q | And that you pled guilty to a new charge in 2020 that you |
| 09:55AM | 3 | | faced for the first time; a RICO charge, correct? |
| 09:55AM | 4 | A | Yes. |
| 09:55AM | 5 | Q | And that that maximum is 20 years, correct? |
| 09:55AM | 6 | A | Yes. |
| 09:55AM | 7 | Q | Now, in the agreement is something called substantial |
| 09:55AM | 8 | | assistance, right? |
| 09:55AM | 9 | A | I'm not sure. |
| 09:55AM | 10 | Q | Well, it's a fancy way of saying you know you have to come |
| 09:55AM | 11 | | and testify, right? |
| 09:55AM | 12 | A | If you say.  You are a lawyer. |
| 09:55AM | 13 | Q | Isn't that part of your agreement? |
| 09:55AM | 14 | A | Yes. |
| 09:55AM | 15 | Q | All right.  Don't need to be a lawyer to know that, right? |
| 09:55AM | 16 | A | I don't know.  I just told you I didn't know what it |
| 09:55AM | 17 | | meant. |
| 09:55AM | 18 | Q | Okay.  So you know that if -- the government will make the |
| 09:56AM | 19 | | decision to ask for a sentence that involves whether you've |
| 09:56AM | 20 | | given substantial assistance, right? |
| 09:56AM | 21 | A | Yes. |
| 09:56AM | 22 | Q | They can make that motion, right? |
| 09:56AM | 23 | A | Yes. |
| 09:56AM | 24 | Q | The agreement does not require them to make that motion, |
| 09:56AM | 25 | | right? |

| | | | |
|---|---|---|---|
| 09:56AM | 1 | A | Yes. |
| 09:56AM | 2 | Q | No remedy exists for you if they fail to make that motion, |
| 09:56AM | 3 | | right? |
| 09:56AM | 4 | A | Yes. |
| 09:56AM | 5 | Q | But if they do, that ten-year, four, goes away, right? |
| 09:56AM | 6 | A | Yes. |
| 09:56AM | 7 | Q | And you can ask for any sentence that you wish, right? |
| 09:56AM | 8 | A | I didn't know that. |
| 09:56AM | 9 | Q | And you can ask for time served. |
| 09:56AM | 10 | | You've been down for six years, right? |
| 09:56AM | 11 | A | Yes. |
| 09:56AM | 12 | Q | Now, in that decision -- you made that decision because |
| 09:58AM | 13 | | your lawyer presented the plea to you as your only hope to |
| 09:58AM | 14 | | avoid what could have been a sentence that you could have been |
| 09:58AM | 15 | | incarcerated for the most of the rest of your natural life, |
| 09:58AM | 16 | | right? |
| 09:58AM | 17 | | MR. NAMMAR:  Objection. |
| 09:58AM | 18 | | THE COURT:  Sustained. |
| 09:58AM | 19 | BY MR. KENNEDY: | |
| 09:58AM | 20 | Q | Those were your words, right? |
| 09:58AM | 21 | | MR. NAMMAR:  Objection; beyond the scope. |
| 09:58AM | 22 | | THE COURT:  Overruled.  Go ahead. |
| 09:58AM | 23 | BY MR. KENNEDY: | |
| 09:58AM | 24 | Q | Those were your words.  The defendant's attorney presented |
| 09:58AM | 25 | | this plea as the defendant's only hope to avoid what could have |

09:58AM 1  been a sentence that could have incarcerated the defendant for

09:58AM 2  most of the rest of his natural life.

09:58AM 3       Those were your words, correct?

09:58AM 4       MR. KENNEDY:  If we could pull up 9013-004, which I

09:58AM 5  believe is in the initial.

09:59AM 6       THE COURT:  Go ahead.

09:59AM 7  BY MR. KENNEDY:

09:59AM 8  Q   Directing your attention to the third paragraph.  If you

09:59AM 9  can just read the first three sentences to yourself.  Let me

09:59AM 10 know when you are finished.

09:59AM 11 A   I'm done.

09:59AM 12 Q   Are you done, sir?

09:59AM 13 A   I'm done.

10:00AM 14 Q   All right.  We can take it down now.  You wrote that your

10:00AM 15 primary concern was to avoid a prison sentence that would take

10:00AM 16 you away from your children for decades, right?

10:00AM 17 A   My lawyer wrote that at the time.

10:00AM 18 Q   And you presented it as an in-camera communication, right?

10:00AM 19 A   Yes.

10:00AM 20 Q   Signed by you, correct?

10:00AM 21 A   Yes.

10:00AM 22 Q   All right.  And you presented that you entered this plea

10:00AM 23 as your only hope to avoid what could have been a sentence that

10:00AM 24 could have incarcerated you for the most of the rest of your

10:00AM 25 natural life, right?

10:00AM   1   A    Um --

10:00AM   2   Q    Is that what you wrote?

10:00AM   3   A    This in-camera thing was --

10:00AM   4   Q    Sir, the question is --

10:00AM   5   A    -- this in-camera thing was a jail house lawyer, and I

10:00AM   6   didn't write that.

10:00AM   7   Q    But you signed it, correct?

10:01AM   8   A    I signed it at the bottom.

10:01AM   9   Q    All right.  And so you adopted it by your signature,

10:01AM   10  right, and you mailed it, correct?

10:01AM   11  A    I had him mail it.  He mailed it for me.

10:01AM   12  Q    And so you adopted that, if your words on your signature

10:01AM   13  were that you were threatened with prosecution to the point of

10:01AM   14  natural life behind bars, and you pled -- chose to plead to a

10:01AM   15  conspiracy of a crime you neither committed nor was involved

10:01AM   16  in, those were your words, correct?

10:01AM   17  A    Those are the guy that wrote the letter's words.  I didn't

10:01AM   18  really read it.  I trusted he knew what he was doing and he

10:01AM   19  didn't.

10:01AM   20  Q    And you had him send that in to the court, correct?

10:01AM   21  A    I wasn't able to get a hold of my lawyer at the time he

10:01AM   22  sent it in.

10:01AM   23  Q    All right.  And that's what you said, that you chose --

10:02AM   24  A    No, that's not what I said.  That's what he said.

10:02AM   25  Q    -- to plea to the conspiracy of a crime that you neither

| | | |
|---|---|---|
| 10:02AM | 1 | committed nor was involved in? |
| 10:02AM | 2 | MR. NAMMAR:  Objection; relevance, Your Honor, at this |
| 10:02AM | 3 | point. |
| 10:02AM | 4 | THE COURT:  The objection is sustained. |
| 10:02AM | 5 | MR. KENNEDY:  If we could pull up 9013-147 just for |
| 10:02AM | 6 | the witness.  And I believe, Your Honor, that one is in the, I |
| 10:02AM | 7 | think it's either the -- the 35th, Your Honor. |
| 10:02AM | 8 | THE COURT:  Okay, go ahead. |
| 10:02AM | 9 | BY MR. KENNEDY: |
| 10:03AM | 10 | Q    If we could go to the second page. |
| 10:03AM | 11 | Do you recognize the -- what is shown on the second |
| 10:03AM | 12 | page of 9013-147? |
| 10:03AM | 13 | A    Yes. |
| 10:03AM | 14 | Q    What is it? |
| 10:03AM | 15 | A    A tattoo of a robber with a gun. |
| 10:03AM | 16 | Q    And does it have SG-100 with two slash marks underneath? |
| 10:03AM | 17 | A    It does. |
| 10:03AM | 18 | Q    And is that a tattoo that you received? |
| 10:03AM | 19 | A    That is a tattoo on my leg, yes. |
| 10:03AM | 20 | Q    And if we move back to the first page, it is attached to |
| 10:03AM | 21 | an outgoing message at number eight on 9013-147, correct? |
| 10:03AM | 22 | A    Yes. |
| 10:03AM | 23 | Q    Identified as I am G0010 dot PNG, correct? |
| 10:03AM | 24 | A    Yes. |
| 10:03AM | 25 | MR. KENNEDY:  At this time, I move 9013-147 into |

10:04AM  1   evidence, Your Honor.

10:04AM  2          MR. NAMMAR:  There is no foundation, Your Honor, at

10:04AM  3   this point, for the messages.  I object.

10:04AM  4          THE COURT:  Sustained.

10:04AM  5   BY MR. KENNEDY:

10:04AM  6   Q    Sir, if we go to the second page.  This is the tattoo that

10:04AM  7   you received, right?

10:04AM  8   A    That's what I just said.

10:04AM  9   Q    SG stands for shooter gang?

10:04AM  10  A    That was what me and Hammah were running around saying for

10:04AM  11  a little bit.

10:04AM  12  Q    Right.  So SG stands for shooter gang, correct?

10:04AM  13  A    It stood for it at the time, yeah.

10:04AM  14  Q    All right.  And this is what you got tattooed on your leg?

10:04AM  15  A    That is the picture I got tattooed on my leg.

10:04AM  16  Q    And that was an outgoing message that was sent off of 9856

10:04AM  17  on April 2nd of 2018, correct?

10:04AM  18  A    Yes.

10:05AM  19         MR. KENNEDY:  At this time, I'd move 9013-147 into

10:05AM  20  evidence, Your Honor.

10:05AM  21         THE COURT:  Any objection, counsel?

10:05AM  22         MR. NAMMAR:  Same objection.  No objection to photo,

10:05AM  23  though, on page two.

10:05AM  24         THE COURT:  Yeah, same ruling.  Objection is

10:05AM  25  sustained.

10:05AM  1              MR. KENNEDY:  I would move the second page that has

10:05AM  2       been identified, since the government has said they have no

10:05AM  3       objection to the second page.  And we can mark that as

10:05AM  4       9013-147A if that hasn't been used.

10:05AM  5              THE COURT:  Mr. Nammar, is that acceptable to the

10:05AM  6       government?

10:05AM  7              MR. NAMMAR:  Yes, Your Honor.

10:05AM  8              THE COURT:  All right.  Proceeding that way, Counsel,

10:05AM  9       is fine.  9013-147A, then there is none at the moment, will be

10:05AM  10      occupied by this photograph on page two of what is now

10:05AM  11      9013-147.  It is admitted without objection.  You may publish

10:05AM  12      the photograph only.

10:05AM  13              (Exhibit 9013-147A was received in evidence.)

10:05AM  14      BY MR. KENNEDY:

10:05AM  15      Q    So this is the tattoo for the -- you put on your leg

10:06AM  16      regarding shooter gang, correct?

10:06AM  17      A    No.  It's not a tattoo I put on my leg regarding shooter

10:06AM  18      gang.  Shooter gang is just something Lance would say, just

10:06AM  19      like anybody else says outside.  They put gang behind it.  It's

10:06AM  20      not a gang.

10:06AM  21      Q    And you have an SG-100, and the SG on this photograph

10:06AM  22      stands for Shooter Gang, correct?

10:06AM  23      A    Yes.

10:06AM  24              MR. KENNEDY:  Pull up 9001-020 which is not yet in

10:06AM  25      evidence.  9001-020.  And do you have which supplement?  The

10:07AM   1   32nd, Your Honor.

10:07AM   2          THE COURT:  Okay, go ahead.

10:07AM   3   BY MR. KENNEDY:

10:07AM   4   Q    Sir, do you recognize this as incoming and outgoing

10:07AM   5   messages between you and Norm Akau?

10:07AM   6   A    Yes.

10:07AM   7   Q    And this is on 11/17/2016, correct?

10:07AM   8   A    Yes.

10:07AM   9          MR. KENNEDY:  At this time I move 9001-020 into

10:07AM  10   evidence.

10:07AM  11          THE COURT:  Any objection?

10:07AM  12          MR. NAMMAR:  No objection.

10:07AM  13          THE COURT:  That exhibit then is admitted without

10:07AM  14   objection, 9001-020.  You may publish.

10:07AM  15          (Exhibit 9001-020 was received in evidence.)

10:07AM  16   BY MR. KENNEDY:

10:07AM  17   Q    Sir, the second message to Norm is, "I'm on my way.  Let

10:08AM  18   me know when you like cut Hammah's cord.  We go look for um

10:08AM  19   together.  I just went beat his ass at a few days ago."

10:08AM  20          Do you see that?

10:08AM  21   A    Yes.

10:08AM  22   Q    That's referring to Lance Bermudez, correct?

10:08AM  23   A    I think so, yes.

10:08AM  24   Q    And you and Norm Akau are communicating here, right?

10:08AM  25   A    Yes.

| | | |
|---|---|---|
| 10:08AM | 1 | Q    And about beating his ass, right? |
| 10:08AM | 2 | A    Yes. |
| 10:08AM | 3 | MR. KENNEDY:  If we could pull up 1-956-EE, which is |
| 10:08AM | 4 | in evidence.  I think it was on the government's 13th |
| 10:08AM | 5 | supplemental, Your Honor. |
| 10:08AM | 6 | THE COURT:  Go ahead. |
| 10:09AM | 7 | BY MR. KENNEDY: |
| 10:09AM | 8 | Q    We looked at this yesterday. |
| 10:09AM | 9 | Do you recognize what is 1-956EE? |
| 10:09AM | 10 | A    Yes. |
| 10:09AM | 11 | Q    All right. |
| 10:09AM | 12 | MR. KENNEDY:  I'd like to show you what is not yet in |
| 10:09AM | 13 | evidence as 1-956R that was also, I believe, marked by the |
| 10:09AM | 14 | government as 13th supplemental, Your Honor. |
| 10:09AM | 15 | THE COURT:  Go ahead. |
| 10:09AM | 16 | BY MR. KENNEDY: |
| 10:09AM | 17 | Q    All right.  Do you recognize the folks in the photograph |
| 10:09AM | 18 | which is 1-956R? |
| 10:09AM | 19 | A    Yes. |
| 10:09AM | 20 | Q    All right.  Who is this on the left? |
| 10:09AM | 21 | A    I'm not sure. |
| 10:09AM | 22 | Q    Okay.  Who is this next to the person on the left that you |
| 10:09AM | 23 | are not sure about? |
| 10:09AM | 24 | A    Johnnie. |
| 10:09AM | 25 | Q    Who is this next to Johnnie, to his left? |

10:09AM   1   A   Me.

10:09AM   2   Q   And who is this to your left?

10:09AM   3   A   Frankie.

10:09AM   4        MR. KENNEDY:  At this time, Your Honor, I'd move

10:09AM   5   1-956R into evidence.

10:10AM   6        THE COURT:  Any objection?

10:10AM   7        MR. NAMMAR:  No objection.

10:10AM   8        THE COURT:  1-956R is admitted.  You may publish.

10:10AM   9        (Exhibit 1-956R was received in evidence.)

10:10AM   10  BY MR. KENNEDY:

10:10AM   11  Q   This is Frankie Silva?

10:10AM   12  A   Yes.

10:10AM   13  Q   All right.  And you can see his shorts, correct?

10:10AM   14  A   Yes.

10:10AM   15  Q   All right.  If we go back to the photograph, which is

10:10AM   16  1-956EE, do you see the pattern down here, sir?

10:10AM   17  A   I see it.

10:10AM   18  Q   All right.  If we could just do a split screen with

10:10AM   19  1-956EE and 1-956R, Frankie Silva and you were surveilling the

10:11AM   20  individual over in Hawaii Kai; Mr. Bourne, correct?

10:11AM   21  A   We did.

10:11AM   22  Q   What is shown is Frankie Silva and you, correct?

10:11AM   23  A   On the right, yeah.

10:11AM   24  Q   And what's shown in 1-956E, is, this is Frankie Silva,

10:11AM   25  correct?

10:11AM   1    A    Those are cheap shorts from Champs that everybody bought
10:11AM   2    at the time.  I'm sure Johnnie had the same shorts too.  So
10:11AM   3    yeah, we all had those kind of shorts.
10:11AM   4    Q    So that's Frankie Silva, correct?
10:11AM   5    A    No, that's not Frankie Silva.  That's me.
10:11AM   6    Q    On your legs you have SG tattooed for Shooter Gang,
10:11AM   7    correct?
10:11AM   8    A    On my legs, I have a lot of tattoos on my legs.  This
10:11AM   9    picture right here with no tattoos on it is because I didn't
10:11AM  10    have tattoos yet.
10:11AM  11    Q    Correct.  I'm just asking you a question about -- we can
10:12AM  12    take that down.
10:12AM  13    A    Yes.
10:12AM  14    Q    You have a tattoo of S and G on your legs at this time?
10:12AM  15    A    Yes.
10:12AM  16    Q    Sir, you mentioned that you pled guilty so you wouldn't
10:12AM  17    spend the rest -- or almost the rest of your natural life in
10:12AM  18    prison, correct?
10:12AM  19         MR. NAMMAR:  Objection.
10:12AM  20         THE COURT:  Sustained.
10:12AM  21    BY MR. KENNEDY:
10:12AM  22    Q    You don't want to spend one more day there if you don't,
10:12AM  23    correct?
10:12AM  24    A    Nobody does.
10:12AM  25         MR. KENNEDY:  No further questions.

| | | |
|---|---|---|
| 10:12AM | 1 | THE COURT:  All right.  Before we start your redirect, |
| 10:13AM | 2 | Mr. Nammar, I think we should take a break because we are at |
| 10:13AM | 3 | 10:15 already.  As we go to break, I'll remind our jurors to |
| 10:13AM | 4 | refrain, please, from discussing the substance of this case |
| 10:13AM | 5 | with anyone, including each other, until I advise otherwise; to |
| 10:13AM | 6 | refrain from accessing any media or other accounts of this case |
| 10:13AM | 7 | that may be out there; and finally, please do not conduct any |
| 10:13AM | 8 | investigation of your own into the facts, circumstances, or |
| 10:13AM | 9 | persons involved. |
| 10:13AM | 10 | Before we go to break, I thought we might do this |
| 10:13AM | 11 | outside the jury's presence, but this is a housekeeping matter |
| 10:13AM | 12 | that -- in case the jury is taking notes, we might as well do |
| 10:13AM | 13 | this while you are still here.  And that is with respect to an |
| 10:13AM | 14 | exhibit yesterday that we provisionally admitted.  It was |
| 10:13AM | 15 | Defense Exhibit 6023, and if the jury recalls, there were ten |
| 10:13AM | 16 | pages from a very voluminous exhibit that were excerpted and |
| 10:13AM | 17 | admitted, and those were pages 55, 56, 58, 59, 60, 67, 81, 95, |
| 10:14AM | 18 | 102 and 149. |
| 10:14AM | 19 | Only those pages from what was Defense Exhibit 6023 |
| 10:14AM | 20 | were admitted yesterday.  Those ten photographs have since been |
| 10:14AM | 21 | marked as a new Exhibit 6023B as in boy and admitted under that |
| 10:14AM | 22 | marking.  Okay, so that's been done.  That should be reflected |
| 10:14AM | 23 | in the record.  And in case any of the jurors were taking |
| 10:14AM | 24 | notes, I wanted you to know that as well. |
| 10:14AM | 25 | All right.  Let's take our break. |

10:15AM   1          (Proceedings were recessed at 10:15 a.m. to
10:16AM   2   10:43 a.m.)
10:43AM   3          THE COURT:  Okay.  Back from our first break of the
10:43AM   4   trial day.
10:43AM   5          Mr. Nammar, you may begin your redirect.
10:43AM   6                    REDIRECT EXAMINATION
10:43AM   7   BY MR. NAMMAR:
10:43AM   8   Q    Thank you.  Mr. Smith, you were asked some questions about
10:43AM   9   an assault related to Shaden Wolf.
10:43AM   10         Do you recall that by defense counsel?
10:43AM   11  A    Yes, Mr. Nammar.
10:43AM   12  Q    And that's the one that, when you testified on direct, you
10:44AM   13  said that you went with Keoni Adric?
10:44AM   14  A    Yes.
10:44AM   15  Q    The one you said had a reputation of a boxer?
10:44AM   16  A    Yes.
10:44AM   17  Q    And that Keoni was the one who did the assault, correct?
10:44AM   18  A    Yes.
10:44AM   19  Q    And that was the one that you said were ordered to do by
10:44AM   20  Mr. Miske, right?
10:44AM   21  A    Yes.
10:44AM   22         MR. NAMMAR:  Your Honor, if we could publish 9-919,
10:44AM   23  which is from the original list.
10:44AM   24         THE COURT:  Go ahead.
10:44AM   25  By MR. NAMMAR:

10:44AM   1   Q   Thank you.  If we can zoom in on the first -- well, zoom

10:44AM   2   in on the participants first.

10:44AM   3           Is this between and Mr. Miske?

10:44AM   4   A   Yes.

10:44AM   5   Q   You had him saved in your phone as M2?

10:44AM   6   A   Yes.

10:44AM   7   Q   Zoom out.  Zoom in on the first message.

10:44AM   8           MR. KENNEDY:  Your Honor, I don't know that this has

10:44AM   9   been published.

10:44AM   10           THE COURT:  It has been.  It's an admitted exhibit.

10:44AM   11   Go ahead.

10:44AM   12   By MR. NAMMAR:

10:45AM   13   Q   Thank you.  And if we look at the first -- well, if we

10:45AM   14   look at the date, this is October 19th, 2016?

10:45AM   15   A   Yes.

10:45AM   16   Q   And this is you sending a message to Mr. Miske?

10:45AM   17   A   Yes.

10:45AM   18   Q   "Bro, this is J."  Did you mean Jacob Smith when you said

10:45AM   19   J?

10:45AM   20   A   Yes.

10:45AM   21   Q   "This is my new number.  We just went and light up the boy

10:45AM   22   that took Denver's chain right outside his house.  Call me."

10:45AM   23           What are you talking about here?

10:45AM   24   A   He told us that his nephew Denver got his chain taken, and

10:45AM   25   he wanted us to go and handle the kid that pulled his chain.

10:45AM  1   Q   This is for Shaden Wolf?

10:45AM  2   A   Yes.

10:45AM  3   Q   So you are confirming to him here that you've done it?

10:45AM  4   A   Yes.

10:45AM  5   Q   And this is the one with Keoni Adric?

10:45AM  6   A   Yes.

10:45AM  7   Q   And if we scroll down, Mr. Miske's response is, "Fly up to

10:45AM  8   Starbucks Ward."

10:45AM  9       Do you see that?

10:45AM  10  A   Yes.

10:45AM  11  Q   Did you end up going to meet him at Starbucks Ward with

10:46AM  12  Adric?

10:46AM  13  A   Yes.

10:46AM  14  Q   And is that where you got paid for this assault?

10:46AM  15  A   Yes.

10:46AM  16  Q   As I think you testified to on direct, that was a place

10:46AM  17  that you would commonly see Mr. Miske or hear that he was

10:46AM  18  there?

10:46AM  19  A   Yes.

10:46AM  20  Q   He would hang out there a lot?

10:46AM  21  A   Yes.

10:46AM  22  Q   We can take that down.  You were also asked by Mr. Kennedy

10:46AM  23  today about -- you were shown some text messages about the

10:46AM  24  Kalihi house being raided?

10:46AM  25  A   Yes.

10:46AM   1   Q   Do you recall that?

10:46AM   2   A   Yes.

10:46AM   3   Q   And you were shown some messages where you were contacting

10:46AM   4   people saying it was an emergency?

10:46AM   5   A   Yes.

10:46AM   6   Q   And you were asking for details from Tim Taboada.

10:47AM   7       Do you recall seeing those messages?

10:47AM   8   A   Yes.

10:47AM   9       MR. NAMMAR:  Your Honor, if we could publish now

10:47AM   10   1-936, which is from the original list.

10:47AM   11       THE COURT:  Go ahead.

10:47AM   12   By MR. NAMMAR:

10:47AM   13   Q   And do you recall those messages that he were looking at

10:47AM   14   about the Kalihi house were on November 21, 2016, many of them?

10:47AM   15   A   Yes.

10:47AM   16   Q   And so, if we look at the first message here, a day later,

10:47AM   17   are you texting Alen Kaneshiro?

10:47AM   18   A   Yes.

10:47AM   19   Q   Is this in reference to the Kalihi house?

10:47AM   20   A   Yes.

10:47AM   21   Q   And at the beginning, you tell him you are a friend of

10:47AM   22   Mike and Johnnie's.

10:47AM   23       Do you see that?

10:47AM   24   A   Yes.

10:47AM   25   Q   You told him, "Mike told me to call you."

| | | | |
|---|---|---|---|
| 10:47AM | 1 | A | Yes. |
| 10:47AM | 2 | Q | Is that Michael Miske? |
| 10:47AM | 3 | A | Yes. |
| 10:47AM | 4 | Q | Do you think you had met with Michael Miske when you found |
| 10:47AM | 5 | | out that the Kalihi house had been searched? |
| 10:47AM | 6 | A | Yes. |
| 10:48AM | 7 | Q | And do you believe that he told you to reach out to |
| 10:48AM | 8 | | Mr. Alen Kaneshiro? |
| 10:48AM | 9 | A | Yes. |
| 10:48AM | 10 | Q | You're following Miske's direction here? |
| 10:48AM | 11 | A | Yes. |
| 10:48AM | 12 | Q | You were asked some questions about Lovelyn. |
| 10:48AM | 13 | | Did she ever encourage you to do any assaults? |
| 10:48AM | 14 | A | No. |
| 10:48AM | 15 | Q | Did Lovelyn ever provide you with an attorney? |
| 10:48AM | 16 | A | No. |
| 10:48AM | 17 | Q | Who provided you with an attorney? |
| 10:48AM | 18 | A | Mike. |
| 10:48AM | 19 | Q | And you told us that you would tell Mike Miske about the |
| 10:48AM | 20 | | robberies that you were committing. |
| 10:48AM | 21 | | Did he approve of those robberies? |
| 10:48AM | 22 | A | Yes. |
| 10:48AM | 23 | Q | And were you telling Mr. Miske about those robberies to |
| 10:48AM | 24 | | raise your status with Mr. Miske? |
| 10:48AM | 25 | A | Yes. |

10:48AM   1   Q   As I think you told us on direct, he liked hearing that

10:48AM   2   you guys were doing plenty of robberies?

10:48AM   3   A   Yes.

10:48AM   4   Q   Who was giving you orders?

10:49AM   5   A   Mike was giving us orders to do assaults and other things.

10:49AM   6   Q   Mr. Miske was giving you orders?

10:49AM   7   A   Yes.

10:49AM   8   Q   You were shown yesterday pictures of a number of firearms.

10:49AM   9   And as we talked about, too, on direct, you had a lot of

10:49AM   10   firearms in 2016, '17, and '18?

10:49AM   11   A   Yes.

10:49AM   12   Q   Where did you get the majority of those firearms from?

10:49AM   13   A   I got a lot of them from Miller.

10:49AM   14   Q   Wayne Miller?

10:49AM   15   A   Yes.

10:49AM   16   Q   And did you on occasion speak to Mr. Miske about

10:49AM   17   particular firearms that Mr. Miske wanted to purchase?

10:49AM   18   A   Yes.

10:49AM   19   Q   Which firearm did Mr. Miske want?

10:49AM   20   A   He wanted to buy --

10:49AM   21         MR. KENNEDY:  Objection; beyond the scope, Your Honor.

10:49AM   22         THE COURT:  Overruled.  Go ahead.

10:49AM   23         THE WITNESS:  He wanted to buy that mini AK-47 they

10:49AM   24   showed yesterday.

10:49AM   25   By MR. NAMMAR:

| | | |
|---|---|---|
| 10:49AM | 1 | Q    On cross-examination, you were also asked some questions |
| 10:50AM | 2 | about Ryan Teramoto. |
| 10:50AM | 3 | Miske asked you to assault him first; is that correct? |
| 10:50AM | 4 | A    Yes. |
| 10:50AM | 5 | Q    And on one occasion, you and Mr. Miller went out to the |
| 10:50AM | 6 | Olomana golf course? |
| 10:50AM | 7 | A    Yes. |
| 10:50AM | 8 | Q    But you didn't go through with it because you were scared? |
| 10:50AM | 9 | A    Yes. |
| 10:50AM | 10 | Q    Because there were a lot of people around? |
| 10:50AM | 11 | A    Yes. |
| 10:50AM | 12 | Q    And then as I understand what you testified to later, |
| 10:50AM | 13 | Mr. Miske asked you to do a home invasion robbery of |
| 10:50AM | 14 | Mr. Teramoto? |
| 10:50AM | 15 | A    Yes. |
| 10:50AM | 16 | Q    And you went with Mr. Miller to Teramoto's house? |
| 10:50AM | 17 | A    Yes. |
| 10:50AM | 18 | Q    But you didn't go through with it because Teramoto saw you |
| 10:50AM | 19 | and ran inside? |
| 10:50AM | 20 | A    Yes. |
| 10:50AM | 21 | Q    It was Miske that gave you the order to assault |
| 10:50AM | 22 | Mr. Teramoto? |
| 10:50AM | 23 | A    Yes. |
| 10:50AM | 24 | Q    It was Miske that gave you the order to do the home |
| 10:50AM | 25 | invasion robbery of Mr. Teramoto? |

| | | | |
|---|---|---|---|
| 10:50AM | 1 | A | Yes. |
| 10:50AM | 2 | Q | And we also talked about on direct how Mr. Miske wanted |
| 10:50AM | 3 | | you to assault him outside of Jiffy Lube, right? |
| 10:50AM | 4 | A | Yes. |
| 10:50AM | 5 | Q | The one in Kaneohe? |
| 10:50AM | 6 | A | Yes. |
| 10:51AM | 7 | | MR. NAMMAR:  If we can pull up, Your Honor, |
| 10:51AM | 8 | | Exhibit 1-953. |
| 10:51AM | 9 | | THE COURT:  Go ahead. |
| 10:51AM | 10 | | By MR. NAMMAR: |
| 10:51AM | 11 | Q | Page 248.  If we can zoom in on the last message. |
| 10:51AM | 12 | | So this is a message from you sent in February of 2018 |
| 10:51AM | 13 | | to Mr. Miske? |
| 10:51AM | 14 | A | Yes. |
| 10:51AM | 15 | Q | And you are telling him, "I see Certification right now"? |
| 10:51AM | 16 | A | Yes. |
| 10:51AM | 17 | Q | Who was Certification? |
| 10:51AM | 18 | A | That was Ryan Teramoto. |
| 10:51AM | 19 | Q | What did it refer to? |
| 10:51AM | 20 | A | The name of his business. |
| 10:51AM | 21 | Q | And if we go to the next page.  You say "Certi Squirty." |
| 10:51AM | 22 | | Is that referring to Ryan? |
| 10:51AM | 23 | A | Yes. |
| 10:51AM | 24 | Q | Mr. Miske says "do it." |
| 10:52AM | 25 | | What is he talking about? |

| | | | |
|---|---|---|---|
| 10:52AM | 1 | A | He is telling us to get it done -- to assault him. |
| 10:52AM | 2 | Q | Keep going down.  And then he is asking if you are with |
| 10:52AM | 3 | | WEAQ. |
| 10:52AM | 4 | | What did you take that to mean? |
| 10:52AM | 5 | A | He was asking where my friend Quinton is. |
| 10:52AM | 6 | Q | Keep going down.  "With me, LOL.  That's why I told you." |
| 10:52AM | 7 | | Are you talking about Quinton? |
| 10:52AM | 8 | A | Yes. |
| 10:52AM | 9 | Q | Keep going down.  And Mr. Miske's response is, "yeah |
| 10:52AM | 10 | | doggy." |
| 10:52AM | 11 | | You see that? |
| 10:52AM | 12 | A | Yes. |
| 10:52AM | 13 | Q | Is he getting excited here? |
| 10:52AM | 14 | A | Yes. |
| 10:52AM | 15 | Q | And then he tells you "I like see"? |
| 10:52AM | 16 | A | Yes. |
| 10:52AM | 17 | Q | What did you take that to mean? |
| 10:52AM | 18 | A | To see if we can get it on camera. |
| 10:52AM | 19 | Q | Keep going down.  Keep going down.  And he says "wait |
| 10:52AM | 20 | | 'em." |
| 10:52AM | 21 | | Do you see that? |
| 10:52AM | 22 | A | Yes. |
| 10:52AM | 23 | Q | "Discipline."  Keep going down.  "Wait 'em out." |
| 10:53AM | 24 | | Is he giving you instructions here? |
| 10:53AM | 25 | A | Yes. |

10:53AM   1   Q   And then later, if we go to page 255, you're confirming

10:53AM   2   that it is Jiffy Lube by saying "Jiffy"; is that right?

10:53AM   3   A   Yes.

10:53AM   4   Q   So this is you and Mr. Miske talking about assaulting Ryan

10:53AM   5   Teramoto in real time?

10:53AM   6   A   Yes.

10:53AM   7   Q   You guys are planning it out?

10:53AM   8   A   Yes.

10:53AM   9   Q   And he is giving you instruction?

10:53AM   10   A   Yes.

10:53AM   11   Q   Like he has given you instruction on many other assaults

10:53AM   12   you did?

10:53AM   13   A   Yes.

10:53AM   14   Q   Now, you were asked some questions about Alen Kaneshiro.

10:53AM   15       And as I understand your testimony, Mr. Miske paid for

10:53AM   16   Alen Kaneshiro for you?

10:53AM   17   A   Yes.

10:53AM   18   Q   You didn't see an exchange of cash, but you knew he paid

10:53AM   19   him?

10:53AM   20   A   Yes.

10:53AM   21   Q   And only later, when you got a DUI, did you have to pay

10:54AM   22   him yourself?

10:54AM   23   A   Yes.

10:54AM   24   Q   Miske also paid for Lance Bermudez's attorney?

10:54AM   25   A   Yes.

| | | |
|---|---|---|
| 10:54AM | 1 | Q   And we looked at certain messages where Miske seems to |
| 10:54AM | 2 | know a lot about Lance Bermudez's case? |
| 10:54AM | 3 | A   Yes. |
| 10:54AM | 4 | MR. NAMMAR:  We can, for the same exhibit, Your |
| 10:54AM | 5 | Honor -- one second. |
| 10:54AM | 6 | BY MR. NAMMAR: |
| 10:55AM | 7 | Q   Do you recall looking at a message on direct where |
| 10:55AM | 8 | Mr. Miske was talking about how Lance's attorney cracked the |
| 10:55AM | 9 | case open? |
| 10:55AM | 10 | A   Yes. |
| 10:55AM | 11 | Q   And how he got the witnesses lying. |
| 10:55AM | 12 | Do you recall that? |
| 10:55AM | 13 | A   Yes. |
| 10:55AM | 14 | Q   Did it appear to you that Miske knew a lot about the |
| 10:55AM | 15 | status of Lance Bermudez's case? |
| 10:55AM | 16 | A   Yes. |
| 10:55AM | 17 | Q   If we can go to page 275. |
| 10:55AM | 18 | THE COURT:  This is in 1-953? |
| 10:55AM | 19 | MR. NAMMAR:  Yes, Your Honor. |
| 10:56AM | 20 | THE COURT:  Thank you. |
| 10:56AM | 21 | By MR. NAMMAR: |
| 10:56AM | 22 | Q   If we go to page 280.  Zoom in on the message.  Keep going |
| 10:56AM | 23 | down.  Mr. Miske is saying here, "Jason cracked the case open." |
| 10:56AM | 24 | Do you see that? |
| 10:56AM | 25 | A   Yes. |

10:56AM   1   Q    Is that referring to the attorney that Mr. Miske hired for

10:56AM   2   Lance?

10:56AM   3   A    Yes.

10:56AM   4   Q    Keep going down.

10:56AM   5        Is he going on to say that he got the witnesses lying;

10:56AM   6   do you see that?

10:56AM   7   A    Yes.

10:56AM   8   Q    And so did he appear to you, based on this, to know a lot

10:56AM   9   about the status of Lance Bermudez's case?

10:56AM   10  A    Yes.

10:56AM   11  Q    And I believe you also said that Mr. Miske paid for Dae

10:56AM   12  Han Moon's attorney?

10:57AM   13  A    Yes.

10:57AM   14       MR. NAMMAR:  And if we could publish 1-484, which is

10:57AM   15  from the original list.

10:57AM   16       THE COURT:  Go ahead.

10:57AM   17  BY MR. NAMMAR:

10:57AM   18  Q    And if we could go to page seven.  And if we could zoom in

10:57AM   19  on the last message.  This is you -- we looked at this earlier

10:57AM   20  this week, I think.

10:57AM   21       And this is you discussing with Lance Bermudez when

10:57AM   22  you guys were in a disagreement?

10:57AM   23  A    Yes.

10:57AM   24  Q    About the $10,000?

10:57AM   25  A    Yes.

| | | |
|---|---|---|
| 10:57AM | 1 | Q   You're saying, "Dae can almost kiss his attorney bye, LOL, |
| 10:57AM | 2 | because Mike is going to hear everything." |
| 10:57AM | 3 |     What are you referring to here? |
| 10:57AM | 4 | A   About the lawyer Mike had for him.  I let Mike know what |
| 10:57AM | 5 | happened between us. |
| 10:57AM | 6 | Q   The lawyer that you understood Mr. Miske to have paid for, |
| 10:58AM | 7 | for Dae Han Moon? |
| 10:58AM | 8 | A   Yes. |
| 10:58AM | 9 | Q   Did paying for lawyers appear to be a way that Mr. Miske |
| 10:58AM | 10 | kept tabs on whether you, Lance Bermudez, and Dae Han Moon were |
| 10:58AM | 11 | cooperating? |
| 10:58AM | 12 | A   Yes. |
| 10:58AM | 13 | Q   You can take that down.  Now you told us during your -- |
| 10:58AM | 14 | you were asked some questions about Elgin Calles. |
| 10:58AM | 15 |     Do you recall that? |
| 10:58AM | 16 | A   Yes. |
| 10:58AM | 17 | Q   And you told us during your direct testimony that you were |
| 10:58AM | 18 | tasked with assaulting Elgin by Wayne Miller. |
| 10:58AM | 19 |     Do you remember that? |
| 10:58AM | 20 | A   Yes. |
| 10:58AM | 21 | Q   But you also told us that while you were tracking Elgin |
| 10:58AM | 22 | and with Wayne Miller, you overheard a phone conversation? |
| 10:58AM | 23 | A   Yes. |
| 10:58AM | 24 | Q   Where Mr. Miske was talking with Mr. Miller. |
| 10:58AM | 25 |     Do you recall that? |

| | | | |
|---|---|---|---|
| 10:58AM | 1 | A | Yes. |
| 10:58AM | 2 | Q | And during that phone conversation, Mr. Miske was getting |
| 10:59AM | 3 | | updates on the Elgin Calles job? |
| 10:59AM | 4 | A | Yes. |
| 10:59AM | 5 | Q | Asking if Miller had got it done yet? |
| 10:59AM | 6 | A | Yes. |
| 10:59AM | 7 | Q | And you told us at one point, you were following Elgin |
| 10:59AM | 8 | | with Mr. Miller and you were about to assault him; is that |
| 10:59AM | 9 | | right? |
| 10:59AM | 10 | A | Yes. |
| 10:59AM | 11 | Q | Is that near the Kapahulu area? |
| 10:59AM | 12 | A | Yes. |
| 10:59AM | 13 | Q | But then you were called off by by Mr. Miller at the last |
| 10:59AM | 14 | | minute? |
| 10:59AM | 15 | A | Yes. |
| 10:59AM | 16 | Q | Did you also testify on direct that you knew that in the |
| 10:59AM | 17 | | past, Mr. Miske had gotten people jobs at the docks? |
| 10:59AM | 18 | A | Yes. |
| 10:59AM | 19 | Q | And regarding Wayne Miller, on cross-examination you were |
| 10:59AM | 20 | | asked some questions about sinking Mr. Miske. |
| 10:59AM | 21 | | Do you recall that? |
| 10:59AM | 22 | A | Yes. |
| 10:59AM | 23 | Q | Did you plan to sink Mr. Miske by telling the truth when |
| 10:59AM | 24 | | you are testifying here today and in the grand jury? |
| 10:59AM | 25 | A | Yes. |

| 10:59AM | 1 | Q | Did you plan to sink Mr. Miske by testifying truthfully |
| 11:00AM | 2 | | about all the criminal acts you did for Mr. Miske? |
| 11:00AM | 3 | A | Yes. |
| 11:00AM | 4 | Q | By testifying truthfully about how Mr. Miske was your |
| 11:00AM | 5 | | crime boss? |
| 11:00AM | 6 | A | Yes. |
| 11:00AM | 7 | Q | By testifying truthfully about how you did things for |
| 11:00AM | 8 | | Mr. Miske in exchange for money? |
| 11:00AM | 9 | A | Yes. |
| 11:00AM | 10 | Q | By testifying truthfully about how you did criminal acts |
| 11:00AM | 11 | | to maintain or increase your status with Mr. Miske? |
| 11:00AM | 12 | A | Yes. |
| 11:00AM | 13 | Q | And as you told us yesterday, Mr. Miller was in the |
| 11:00AM | 14 | | trusted circle with Mr. Miske? |
| 11:00AM | 15 | A | Yes. |
| 11:00AM | 16 | Q | And when it came to that trusted circle with Mr. Miske, |
| 11:00AM | 17 | | was there any question about who the leader was? |
| 11:00AM | 18 | A | No. |
| 11:00AM | 19 | Q | Who was the leader? |
| 11:00AM | 20 | A | Mike. |
| 11:00AM | 21 | Q | You were asked a number of questions on cross-examination |
| 11:01AM | 22 | | about the day you were arrested? |
| 11:01AM | 23 | A | Yes. |
| 11:01AM | 24 | Q | And how you were interviewed after you were arrested? |
| 11:01AM | 25 | A | Yes. |

11:01AM   1   Q    And one of the things you were asked about is, you said
11:01AM   2   you were asked about Jonathan Fraser; do you recall that?
11:01AM   3   A    Yes.
11:01AM   4   Q    And a conversation with Mr. Miske; do you recall that?
11:01AM   5   A    Yes.
11:01AM   6   Q    And you were asked if you said Mike -- essentially that
11:01AM   7   Mike didn't talk about Jonathan Fraser; do you remember that?
11:01AM   8   A    Yes.
11:01AM   9          MR. NAMMAR:  If we can pull up Exhibit 9013-009 alpha
11:01AM  10   only for the witness.  Sorry, Judge, I don't know which one
11:02AM  11   this is from.  I just want to show him one little part on the
11:02AM  12   screen.
11:02AM  13          THE COURT:  Okay, go ahead.  I'll try to find it in
11:02AM  14   the meantime.
11:02AM  15   BY MR. NAMMAR:
11:02AM  16   Q    Page 24.
11:02AM  17          MR. KENNEDY:  Your Honor, I believe it's the original.
11:02AM  18          MR. NAMMAR:  Thank you, Mr. Kennedy.
11:02AM  19          MR. KENNEDY:  That's my recollection.
11:02AM  20          THE COURT:  009 is in the original, but I don't see
11:02AM  21   009 alpha.  Is that what you asked?
11:02AM  22          MR. KENNEDY:  That is -- I believe alpha is the
11:02AM  23   recording, Your Honor --  alpha is the -- I guess I was
11:03AM  24   confused as to A as the audio.  My apologies, Your Honor.
11:03AM  25   BY MR. NAMMAR:

11:03AM   1   Q   If we can go to page 24 and if you could zoom in this part
11:03AM   2   and read it to yourself and look up when you are done.

11:03AM   3   A   I'm done.

11:03AM   4   Q   Okay.  We can take that down.

11:03AM   5       So when you were arrested, you told the agents that
11:03AM   6   Mr. Miske won't say much about Jonathan Fraser.

11:03AM   7       Do you recall that?

11:03AM   8   A   Yes.

11:03AM   9   Q   And in fact, as you testified to on direct, you had asked
11:03AM   10  Mr. Miske for details about what happened to Jonathan Fraser?

11:03AM   11  A   Yes.

11:03AM   12  Q   And he wouldn't give you details?

11:03AM   13  A   No.

11:03AM   14  Q   You wanted to know how he did it and where he disposed of
11:04AM   15  the body, but he wouldn't tell you that?

11:04AM   16  A   Yes.

11:04AM   17  Q   But what he did tell you on that day that you were at the
11:04AM   18  Bay and away from everybody was that Fraser was gone?

11:04AM   19  A   Yes.

11:04AM   20  Q   And is there any doubt in your mind he told you that?

11:04AM   21  A   No.

11:04AM   22  Q   And on the day that you were arrested, you were also asked
11:04AM   23  about Miske taking care of you and letting you stay at
11:04AM   24  Johnnie's.

11:04AM   25      Do you recall that?

11:04AM   1   A    Yes.

11:04AM   2   Q    But when you were arrested and you were talking to the

11:04AM   3   agents, you also told them about how Miske would pay for you to

11:04AM   4   assault people?

11:04AM   5   A    Yes.

11:04AM   6   Q    And how you would get paid by Mr. Miske at the shop?

11:04AM   7   A    Yes.

11:04AM   8   Q    And over the course of your testimony in this trial, over

11:04AM   9   a number of days, you've told us about the perks that Mr. Miske

11:04AM   10  gave you?

11:04AM   11  A    Yes.

11:04AM   12  Q    How he let you borrow cars from the auction?

11:04AM   13  A    Yes.

11:04AM   14  Q    How he let you borrow money?

11:05AM   15  A    Yes.

11:05AM   16  Q    How he paid you money for assaults?

11:05AM   17  A    Yes.

11:05AM   18  Q    How you drank free at the club?

11:05AM   19  A    Yes.

11:05AM   20  Q    How he loaned you money for a deposit on your apartment?

11:05AM   21  A    Yes.

11:05AM   22  Q    In that interview, when you were initially arrested back

11:05AM   23  in August of 2018, that was about 90 minutes long?

11:05AM   24  A    Yes.

11:05AM   25  Q    You clearly can't tell them everything you know about

11:05AM   1   Mr. Miske in that 90 minutes, can you?

11:05AM   2   A    No.

11:05AM   3   Q    You've been here on your fourth day testifying, and you've

11:05AM   4   told us about three years of committing crime with Mr. Miske;

11:05AM   5   is that right?

11:05AM   6   A    Yes.

11:05AM   7   Q    And the interview in August of 2018 was just a snippet of

11:05AM   8   time where you talked about some of the things that you did for

11:05AM   9   Mr. Miske?

11:05AM   10  A    Yes.

11:05AM   11  Q    You didn't talk about all of the things?

11:05AM   12  A    No.

11:05AM   13  Q    You've been asked on cross-examination about a number of

11:05AM   14  robberies.

11:05AM   15        In your plea agreement, did you admit to committing

11:05AM   16  robberies as part of your racketeering conspiracy charge?

11:06AM   17  A    Yes.

11:06AM   18  Q    You admitted in that plea agreement to robbing Jorge Cano?

11:06AM   19  A    Yes.

11:06AM   20  Q    Nicholas Carignan?

11:06AM   21  A    Yes.

11:06AM   22  Q    Palani Mitchell?

11:06AM   23  A    Yes.

11:06AM   24  Q    To agreeing to rob Chris Bourne?

11:06AM   25  A    Yes.

| 11:06AM | 1 | Q | The Mapunapuna game room? |
| 11:06AM | 2 | A | Yes. |
| 11:06AM | 3 | Q | The Palama game room? |
| 11:06AM | 4 | A | Yes. |
| 11:06AM | 5 | Q | Brandon Torres? |
| 11:06AM | 6 | A | Yes. |

11:06AM 7 Q And on cross, you were asked a number of questions about
11:06AM 8 protection with respect to these robberies?

11:06AM 9 A Yes.

11:06AM 10 Q As I understand your testimony on direct, you were
11:06AM 11 protected by Mr. Miske from retaliation?

11:06AM 12 A Yes.

11:06AM 13 Q Retaliation that could come after the fact?

11:06AM 14 A Yes.

11:06AM 15 Q Retaliation from drug dealers?

11:06AM 16 A Yes.

11:06AM 17 Q Or game room owners?

11:06AM 18 A Yes.

11:06AM 19 Q Because, as you told us, what was Mr. Miske's reputation
11:06AM 20 in the community?

11:06AM 21 A People were scared of him.

11:06AM 22 Q And people knew you were affiliated with Mr. Miske?

11:06AM 23 A Yes.

11:06AM 24 Q You were asked a number of questions about gangs, and I
11:07AM 25 want to talk to you briefly about that.

11:07AM    1                    Just so we are clear, the crimes that you talked about

11:07AM    2    during this trial were not committed for the benefit of La

11:07AM    3    Familia?

11:07AM    4    A    No.

11:07AM    5    Q    Or the USO gang?

11:07AM    6    A    No.

11:07AM    7    Q    Or the Shooter Gang?

11:07AM    8    A    No.

11:07AM    9    Q    And as I understand it, the Shooter Gang does not exist?

11:07AM    10   A    No.

11:07AM    11   Q    And as for La Familia, you got out of that gang well

11:07AM    12   before you went into federal custody?

11:07AM    13   A    Yes.

11:07AM    14   Q    And as you said, it was a prison thing?

11:07AM    15   A    Yes.

11:07AM    16   Q    Focused on protection in prison?

11:07AM    17   A    Yes.

11:07AM    18   Q    Over the last four days, you've talk about a number of

11:07AM    19   crimes that you have committed for Mr. Miske because you wanted

11:07AM    20   to stay in his good standing; is that right?

11:07AM    21   A    Yes.

11:07AM    22   Q    And get money?

11:07AM    23   A    Yes.

11:07AM    24   Q    And all the other perks you've talked about?

11:07AM    25   A    Yes.

11:07AM   1   Q   Was Johnnie a part of La Familia?

11:07AM   2   A   No.

11:07AM   3   Q   Was Miller a part of La Familia?

11:08AM   4   A   No.

11:08AM   5   Q   Was Jason Yokoyama a part of La Familia?

11:08AM   6   A   No.

11:08AM   7   Q   Was Kaulana Freitas ever a part of La Familia?

11:08AM   8   A   No.

11:08AM   9       MR. NAMMAR:  Your Honor, if we could publish now

11:08AM  10   8013-39, which is from the 35th supp for the defense.

11:08AM  11       THE COURT:  Go ahead.

11:08AM  12   BY MR. NAMMAR:

11:08AM  13   Q   Go to page two.  Zoom in on the top message.

11:08AM  14       You were asked about this message by Mr. Kennedy; do

11:08AM  15   you recall that?

11:08AM  16   A   Yes.

11:08AM  17   Q   And in this message, do you mention that it's personal?

11:08AM  18   A   Yes.

11:08AM  19   Q   That he took your son's toys?

11:08AM  20   A   Yes.

11:08AM  21   Q   Do you see that?

11:08AM  22   A   Yes.

11:08AM  23   Q   What was personal about what Mr. Salas did?

11:09AM  24   A   He was staying with us and he took things that belonged to

11:09AM  25   my kids.

| | | | |
|---|---|---|---|
| 11:09AM | 1 | Q | You say, "I don't like anybody to even touch him." |
| 11:09AM | 2 | | Do you see that? |
| 11:09AM | 3 | A | Yes. |
| 11:09AM | 4 | Q | It was personal and you wanted to handle it yourself; is |
| 11:09AM | 5 | | that right? |
| 11:09AM | 6 | A | Yes. |
| 11:09AM | 7 | Q | Didn't have anything to do with La Familia? |
| 11:09AM | 8 | A | No. |
| 11:09AM | 9 | Q | We can take that down. |
| 11:09AM | 10 | | And after this message, as you testified, you made up |
| 11:09AM | 11 | | with Mr. Salas? |
| 11:09AM | 12 | A | Yes. |
| 11:09AM | 13 | Q | And you two were cruising together again? |
| 11:09AM | 14 | A | Yes, he was hanging out with us again. |
| 11:09AM | 15 | Q | Well before you went into custody on your federal charge |
| 11:09AM | 16 | | in 2018? |
| 11:09AM | 17 | A | Yes. |
| 11:09AM | 18 | Q | Now, moving now to August of 2019, you testified on |
| 11:09AM | 19 | | August 1, 2019 in the grand jury? |
| 11:09AM | 20 | A | Yes. |
| 11:09AM | 21 | Q | That was about a year after you were arrested? |
| 11:09AM | 22 | A | Yes. |
| 11:09AM | 23 | Q | And did you review that transcript in preparation for your |
| 11:10AM | 24 | | trial testimony here today? |
| 11:10AM | 25 | A | Yes. |

11:10AM   1   Q   Many of the things you testified to in this trial you also
11:10AM   2   told the grand jury, right?
11:10AM   3   A   Yes.
11:10AM   4   Q   So you are not testifying to these things under oath for
11:10AM   5   the first time, are you?
11:10AM   6   A   No.
11:10AM   7   Q   Let's walk through some of the things you told the grand
11:10AM   8   jury.
11:10AM   9        You told them about assaults you did for Mr. Miske?
11:10AM  10   A   Yes.
11:10AM  11   Q   Did you tell them how Mr. Miske hired you in January of
11:10AM  12   2016 to assault the car dealer -- excuse me, let me strike
11:10AM  13   that.  Let me rephrase.
11:10AM  14        Did you tell them how in January of 2016, Mr. Miske
11:10AM  15   hired you to assault Kawika?
11:10AM  16   A   Yes.
11:10AM  17   Q   How you did that at the Cutter Chevrolet with the help of
11:10AM  18   Johnnie Stancil?
11:10AM  19   A   Yes.
11:10AM  20   Q   And did you tell the grand jury that after that assault,
11:10AM  21   you were paid $2,000 by Michael Miske?
11:10AM  22   A   Yes.
11:10AM  23   Q   Did you also tell the grand jury that Mr. Miske ordered
11:10AM  24   you to assault the car dealer off of Nimitz Highway?
11:11AM  25   A   Yes.

11:11AM   1   Q   The one near the Eagle Cafe?

11:11AM   2   A   Yes.

11:11AM   3   Q   And did you tell the grand jury that this was the one

11:11AM   4   where Mr. Miske was mad at you after the fact?

11:11AM   5   A   Yes.

11:11AM   6   Q   Because you had not hospitalized the target of that

11:11AM   7   assault enough?

11:11AM   8   A   Yes.

11:11AM   9   Q   And did you also tell the grand jury how you were tasked

11:11AM   10  with an assault of a dentist in the Diamond Head area of town?

11:11AM   11  A   Yes.

11:11AM   12  Q   And did you also tell the grand jury how Mr. Miske had

11:11AM   13  tasked you with the assault of Ryan Teramoto?

11:11AM   14  A   Yes.

11:11AM   15  Q   And later, the home invasion of Ryan Teramoto?

11:11AM   16  A   Yes.

11:11AM   17  Q   Did you also tell the grand jury about -- excuse me,

11:11AM   18  strike that.

11:11AM   19       Did you also tell the grand jury about assaults at the

11:11AM   20  M Nightclub as directed by Jason Yokoyama?

11:11AM   21  A   Yes.

11:11AM   22  Q   Did you tell them that Miske said you should be ready to

11:12AM   23  assault people if Jason asks?

11:12AM   24  A   Yes.

11:12AM   25  Q   Did you tell the grand jury that you committed two

11:12AM    1    assaults at Jason's direction at the nightclub?

11:12AM    2    A    Yes.

11:12AM    3    Q    Did you also tell the grand jury about how Mr. Miske

11:12AM    4    tasked you with assaulting the owner of the Ginza nightclub?

11:12AM    5    A    Yes.

11:12AM    6    Q    And did you tell them that during that assault, Miske was

11:12AM    7    yelling at that owner to give the Rolex watch back?

11:12AM    8    A    Yes.

11:12AM    9    Q    And that Miske was telling the owner of Ginza that Jason

11:12AM    10   was family?

11:12AM    11   A    Yes.

11:12AM    12   Q    Did you also tell the grand jury that at Miske's

11:12AM    13   direction, you assaulted a Kama'aina Termite employee with a

11:12AM    14   baton?

11:12AM    15   A    Yes.

11:12AM    16   Q    And that you did that in Mr. Miske's office?

11:12AM    17   A    Yes.

11:12AM    18   Q    Did you tell the grand jury how Mr. Miske tasked you with

11:12AM    19   assaulting somebody by the name of Jason Smith at a chicken

11:12AM    20   fight?

11:12AM    21   A    Yes.

11:12AM    22   Q    Did you also tell the grand jury about Joe Boy Tavares?

11:12AM    23   A    Yes.

11:12AM    24   Q    Did you tell them about the murder for contract that

11:12AM    25   Mr. Miske had put on Joe Boy Tavares?

| | | | |
|---|---|---|---|
| 11:13AM | 1 | A | Yes. |
| 11:13AM | 2 | Q | Did you tell them about how Mr. Miske summons you and |
| 11:13AM | 3 | | Lance Bermudez to the Kam shopping center? |
| 11:13AM | 4 | A | Yes. |
| 11:13AM | 5 | Q | Did you tell them that, at that time, Mr. Miske knew that |
| 11:13AM | 6 | | you were cruising with Lance Bermudez and that you were doing |
| 11:13AM | 7 | | lots of shootings and robberies? |
| 11:13AM | 8 | A | Yes. |
| 11:13AM | 9 | Q | And did you tell the grand jury that at that meeting, |
| 11:13AM | 10 | | Mr. Miske said he wanted Joe Boy dead? |
| 11:13AM | 11 | A | Yes. |
| 11:13AM | 12 | Q | And that after that meeting, Lance told you that he went |
| 11:13AM | 13 | | to Joe Boy's house with Dae Han Moon to kill Joe Boy Tavares? |
| 11:13AM | 14 | A | Yes. |
| 11:13AM | 15 | Q | And did you tell the grand jury that Lance Bermudez |
| 11:13AM | 16 | | accepted the murder for hire contract? |
| 11:13AM | 17 | A | Yes. |
| 11:13AM | 18 | Q | And that after it was accepted, that Mr. Miske would ask |
| 11:13AM | 19 | | for updates on the status of the murder through Johnnie |
| 11:13AM | 20 | | Stancil? |
| 11:13AM | 21 | A | Yes. |
| 11:13AM | 22 | Q | That he would ask you for those updates? |
| 11:13AM | 23 | A | Yes. |
| 11:13AM | 24 | Q | Regarding Jonathan Fraser, did you tell the grand jury |
| 11:13AM | 25 | | that Miske told you that he was frustrated with Wayne Miller? |

11:14AM   1   A   Yes.

11:14AM   2   Q   Frustrated because Wayne Miller had not killed Jonathan

11:14AM   3   Fraser?

11:14AM   4   A   Yes.

11:14AM   5   Q   And did you tell the grand jury about how one day, you

11:14AM   6   were with Mr. Miske at the Bay?

11:14AM   7   A   Yes.

11:14AM   8   Q   And he told you that Fraser was gone?

11:14AM   9   A   Yes.

11:14AM   10   Q   Did you also tell the grand jury about how you talked to

11:14AM   11   Lance Bermudez after he got out of OCCC?

11:14AM   12   A   Yes.

11:14AM   13   Q   And how Lance told you that he had grabbed a van for

11:14AM   14   Jason?

11:14AM   15   A   Yes.

11:14AM   16   Q   And Jason -- when Jason was talking to him, he had tears

11:14AM   17   in the eyes?

11:14AM   18   A   Yes.

11:14AM   19   Q   And that Lance told you that he picked up the van from

11:14AM   20   Hawaii Kai and burned it?

11:14AM   21   A   Yes.

11:14AM   22   Q   And that Lance told you he believed the van was related to

11:14AM   23   Jonathan Fraser?

11:14AM   24   A   Yes.

11:14AM   25   Q   And that Lance told you he did it with Dae Han Moon?

11:14AM   1   A    Yes.

11:14AM   2   Q    Did you also tell the grand jury that Mr. Miske recruited

11:14AM   3   you to participate in a chemical weapons attack?

11:15AM   4   A    Yes.

11:15AM   5   Q    And did you tell the grand jury that you participated in

11:15AM   6   both attacks as the driver?

11:15AM   7   A    Yes.

11:15AM   8   Q    Did you tell the grand jury that Kaulana did the first

11:15AM   9   night at the District?

11:15AM   10  A    Yes.

11:15AM   11  Q    And did you tell the grand jury that after the District,

11:15AM   12  you called Mr. Miske and he was laughing about it?

11:15AM   13  A    Yes.

11:15AM   14  Q    Did you tell the grand jury that for the second night,

11:15AM   15  Mr. Miske tasked you with recruiting a female?

11:15AM   16  A    Yes.

11:15AM   17  Q    And that you recruited Ashlin Akau?

11:15AM   18  A    Yes.

11:15AM   19  Q    Did you tell the grand jury that you had talked to Johnnie

11:15AM   20  Stancil in advance of the chemical attacks, and he had told you

11:15AM   21  about Addiction?

11:15AM   22  A    Yes.

11:15AM   23  Q    About how you previously poured out a chemical in

11:15AM   24  Addiction by the booth?

11:15AM   25  A    Yes.

11:15AM   1   Q    Did you also tell the grand jury that you went to Johnnie

11:15AM   2   Stancil's house in Waimanalo with Ashlin Akau before the Ginza

11:15AM   3   incident?

11:15AM   4   A    Yes.

11:15AM   5   Q    Did you talk to the grand jury about Officer Spiker?

11:16AM   6   A    I believe so.

11:16AM   7   Q    Did you tell the grand jury about how Mr. Miske wanted you

11:16AM   8   to assault Officer Spiker?

11:16AM   9   A    Yes.

11:16AM   10  Q    Did you also talk to the grand jury about Kualoa Ranch?

11:16AM   11  A    Yes.

11:16AM   12  Q    And how, before the Kualoa Ranch shooting, Mr. Miske asked

11:16AM   13  you if you had a gun?

11:16AM   14  A    Yes.

11:16AM   15  Q    How, before the Kualoa shooting, Johnnie had a mask and a

11:16AM   16  gun?

11:16AM   17  A    Yes.

11:16AM   18  Q    And how, at the ranch, Johnnie came out of the car with

11:16AM   19  his mask on and his gun drawn?

11:16AM   20  A    Yes.

11:16AM   21  Q    And how Johnnie was running after Lindsey Kinney with his

11:16AM   22  gun drawn?

11:16AM   23  A    Yes.

11:16AM   24  Q    And how you shot off in the air in the direction of

11:16AM   25  Lindsey Kinney, but intending to miss?

11:16AM   1   A    Yes.

11:16AM   2   Q    And that you were not sure whether Johnnie Stancil fired

11:16AM   3   his gun?

11:16AM   4   A    Yes.

11:16AM   5   Q    And how, after that incident, Lindsey Kinney kept posting

11:16AM   6   videos?

11:16AM   7   A    Yes.

11:16AM   8   Q    Did you tell the grand jury that Mr. Miske was pissed

11:17AM   9   because of the videos that Lindsey Kinney was posting?

11:17AM   10  A    Yes.

11:17AM   11  Q    Did you tell the grand jury that Mr. Miske then asked you

11:17AM   12  to kill or find someone to kill Lindsey Kinney?

11:17AM   13  A    Yes.

11:17AM   14  Q    Did you tell the grand jury how Mr. Miske gave you and

11:17AM   15  Johnnie a van to commit that murder?

11:17AM   16  A    Yes.

11:17AM   17  Q    And how he told you to tape everything up when you

11:17AM   18  committed the murder of Lindsey Kinney with duct tape?

11:17AM   19  A    Yes.

11:17AM   20  Q    Did you also tell the grand jury about the street sweeper

11:17AM   21  shotgun that you testified to on direct?

11:17AM   22  A    Yes.

11:17AM   23  Q    That was recovered by the police in a stolen Mercedes?

11:17AM   24  A    Yes.

11:17AM   25  Q    Did you tell the grand jury that you got it from Dusky Boy

| | | |
|---|---|---|
| 11:17AM | 1 | and Dayson's brother's friend? |
| 11:17AM | 2 | A    Yes. |
| 11:17AM | 3 | Q    Did you also tell the grand jury about Aloha Tattoo? |
| 11:17AM | 4 | A    Yes. |
| 11:17AM | 5 | Q    How Mr. Miske met you at Roy's before the Aloha Tattoo |
| 11:17AM | 6 | incident and asked you to assault the owner of Aloha Tattoo? |
| 11:17AM | 7 | A    Yes. |
| 11:17AM | 8 | Q    That Mr. Miske told you that it was because his friend |
| 11:17AM | 9 | Billy was mobbed by the owner of Aloha Tattoo? |
| 11:18AM | 10 | A    Yes. |
| 11:18AM | 11 | Q    Did you also tell the grand jury about how after the Aloha |
| 11:18AM | 12 | Tattoo, Mr. Miske sent you to the Safeway in Kailua? |
| 11:18AM | 13 | A    Yes. |
| 11:18AM | 14 | Q    And told you to bring Cash and Jayward, the two boys, in |
| 11:18AM | 15 | the back? |
| 11:18AM | 16 | A    Yes. |
| 11:18AM | 17 | Q    And how you talked to Cash and Jayward afterward, and they |
| 11:18AM | 18 | said that Mr. Miske had a mask on? |
| 11:18AM | 19 | A    Yes. |
| 11:18AM | 20 | Q    And that Mr. Miske told them not to tell? |
| 11:18AM | 21 | A    Yes. |
| 11:18AM | 22 | Q    Did you tell the grand jury that Mr. Miske gave you money |
| 11:18AM | 23 | for a hotel? |
| 11:18AM | 24 | A    Yes. |
| 11:18AM | 25 | Q    And that you then took Cash and Jayward at his direction |

11:18AM   1   to the DoubleTree hotel after the Aloha Tattoo incident?

11:18AM   2   A    Yes.

11:18AM   3   Q    Did you tell the grand jury that Mr. Miske tasked you with

11:18AM   4   burning down the house of Daniel Miller?

11:18AM   5   A    Yes.

11:18AM   6   Q    And how you and Lance Bermudez went out to Daniel Miller's

11:18AM   7   house to scout it out?

11:18AM   8   A    Yes.

11:18AM   9   Q    Did you tell the grand jury about how Mr. Miske tasked you

11:19AM   10   with robbing Chris Bourne?

11:19AM   11   A    Yes.

11:19AM   12   Q    And how Mr. Miske took you by Mr. Bourne's house in Hawaii

11:19AM   13   Kai?

11:19AM   14   A    Yes.

11:19AM   15   Q    And did you tell the grand jury that you and Frankie Silva

11:19AM   16   waited outside of Chris Bourne's house to scope out the job?

11:19AM   17   A    Yes.

11:19AM   18   Q    Did you tell the grand jury that Mr. Miske was paying for

11:19AM   19   Alen Kaneshiro to represent you?

11:19AM   20   A    Yes.

11:19AM   21   Q    And did you tell the grand jury that once you got a DUI,

11:19AM   22   you had to pay for Alen yourself?

11:19AM   23   A    Yes.

11:19AM   24   Q    Did you tell the grand jury that Miske paid for Lance

11:19AM   25   Bermudez's attorney?

11:19AM   1   A    Yes.

11:19AM   2   Q    And did you tell the grand jury that Mr. Miske had passed

11:19AM   3   a message to Lance Bermudez, while he was incarcerated, through

11:19AM   4   a prison guard named Scott?

11:19AM   5   A    Yes.

11:19AM   6   Q    Now, you were asked on cross about a number of law

11:20AM   7   enforcement reports that documented meetings with you and the

11:20AM   8   FBI?

11:20AM   9   A    Yes.

11:20AM   10  Q    Was there a court reporter at those meetings taking down

11:20AM   11  every word you said?

11:20AM   12  A    I think there was somebody taking notes.

11:20AM   13  Q    Was there a court reporter like here in this trial taking

11:20AM   14  down word for word, like, what you said?

11:20AM   15  A    No.

11:20AM   16  Q    But when you testified in the grand jury, there was a

11:20AM   17  court reporter taking down what you said?

11:20AM   18  A    Yes.

11:20AM   19  Q    And it was word for word what you said?

11:20AM   20  A    Yes.

11:20AM   21  Q    Have you told the truth during your testimony?

11:20AM   22  A    Yes.

11:20AM   23  Q    Does the plea agreement say anything about giving

11:20AM   24  testimony?

11:20AM   25  A    Yes.

| | | | |
|---|---|---|---|
| 11:20AM | 1 | Q | Does it say you must testify truthfully? |
| 11:20AM | 2 | A | Yes. |
| 11:20AM | 3 | Q | Do you know what discovery is? |
| 11:20AM | 4 | A | Yes. |
| 11:20AM | 5 | Q | Have you received a lot of discovery related to your case? |
| 11:20AM | 6 | A | No. |
| 11:20AM | 7 | Q | Do you have any idea, for example, what Ashlin Akau has |
| 11:20AM | 8 | | said about the chemical weapons attack? |
| 11:20AM | 9 | A | No. |
| 11:20AM | 10 | Q | Do you have any idea, for example, what Jayward has said |
| 11:21AM | 11 | | about the Aloha Tattoo incident? |
| 11:21AM | 12 | A | No. |
| 11:21AM | 13 | Q | What is your understanding of what will happen if you |
| 11:21AM | 14 | | don't tell the truth during your testimony here today? |
| 11:21AM | 15 | A | There is new charges. |
| 11:21AM | 16 | Q | Have any promises been made to you? |
| 11:21AM | 17 | A | No. |
| 11:21AM | 18 | Q | About what sentence you'll get? |
| 11:21AM | 19 | A | No. |
| 11:21AM | 20 | Q | What is the maximum penalty you understand you are facing |
| 11:21AM | 21 | | for the crimes you have pled guilty to? |
| 11:21AM | 22 | A | Life. |
| 11:21AM | 23 | Q | What do you understand is the most important thing to |
| 11:21AM | 24 | | remember about your testimony here today? |
| 11:21AM | 25 | A | That it needs to be honest. |

11:21AM   1                MR. NAMMAR:  Nothing further, Your Honor.

11:21AM   2                THE COURT:  Mr. Kennedy.

11:21AM   3                MR. KENNEDY:  Your Honor, may we approach for one

11:21AM   4      question?

11:21AM   5                THE COURT:  Yes.

11:22AM   6                     (Sidebar on the record:)

11:22AM   7                MR. KENNEDY:  I don't anticipate a lengthy recross.

11:22AM   8      It would be very short.  The government asked a number of

11:22AM   9      questions about did you tell the grand jury, did you tell the

11:22AM   10     grand jury.  The court ruled on the evidence related to

11:22AM   11     polygraphs.  And the only reason I bring it up is that the

11:22AM   12     government in the grand jury questioned Mr. Smith about the

11:22AM   13     fact that they had him take a polygraph and that he failed the

11:22AM   14     polygraph, and they asked him if he had anything to do with it.

11:22AM   15     So I'm not offering it for the purpose of that.

11:22AM   16          That is normally offered, but before I ask the

11:22AM   17     question, I obviously want to say that, did you tell the grand

11:22AM   18     jury, I think it was pertinent to the credibility of Mr. Smith.

11:23AM   19     And that's why I raised it at side bar.

11:23AM   20                THE COURT:  Okay.  Mr. Nammar.

11:23AM   21                MR. NAMMAR:  Your Honor, the Court has already ruled,

11:23AM   22     and the only reason I went into the grand jury testimony, which

11:23AM   23     is what we do in every case where someone tries to discredit

11:23AM   24     the credibility of our witness, which he did for hours and

11:23AM   25     hours and hours.  There is no reason to go into that.  I didn't

11:23AM   1   touch that part about the polygraph.  And the Court has ruled

11:23AM   2   for good reason that that should not be brought up.

11:23AM   3        THE COURT:  So if you intend -- I'm not exactly sure

11:23AM   4   of what question regarding the polygraph you intend to ask or

11:23AM   5   what series of questions, but going into the polygraph

11:23AM   6   questioning that he may have been asked, and I don't even have

11:23AM   7   that all in front of me in terms of what specifically he was

11:23AM   8   asked in the grand jury with regard to the polygraph, but

11:23AM   9   that's an area that I have ruled on in limine.

11:23AM   10       I understand why you're bringing it up precisely

11:23AM   11  because of that reason, but that won't be permitted to go into

11:24AM   12  on recross.

11:24AM   13       MR. KENNEDY:  I only brought it up because normally,

11:24AM   14  it is not a question that's posed to the grand jury.  And the

11:24AM   15  purpose of it wasn't to say that the polygraph proved

11:24AM   16  something.  It was, we did this to you and now I'm going to ask

11:24AM   17  you again under oath.  So that's why I brought it up, that it

11:24AM   18  was the asking of the question in front of the grand jury goes

11:24AM   19  to credibility; it's one of those other factors.  So I

11:24AM   20  understand the court's ruling.

11:24AM   21                 (End of side bar.)

11:24AM   22       THE COURT:  Mr. Kennedy, you may begin recross when

11:24AM   23  you are ready.

11:24AM   24                 RECROSS-EXAMINATION

11:24AM   25  BY MR. KENNEDY:

11:24AM  1   Q    Sir, the government just asked you a number of questions

11:24AM  2   about your grand jury testimony, correct?

11:24AM  3   A    Yes.

11:24AM  4   Q    And you've been testifying for, now on your fourth day,

11:25AM  5   right?

11:25AM  6   A    Yes.

11:25AM  7   Q    And the grand jury testimony, as we pointed out at times

11:25AM  8   on cross, was different than the tape recorded interview that

11:25AM  9   you gave on August 14, 2018, correct?

11:25AM  10  A    Some of it.

11:25AM  11  Q    Now, I'm going to -- I'm not going to redo the entire

11:25AM  12  direct and cross.  I have a question for you with respect to

11:25AM  13  that interview on August 14th of 2018.  You were asked a

11:25AM  14  specific question related to Jonathan Fraser and you were asked

11:25AM  15  has Mike said anything to you, and your answer was Mike doesn't

11:25AM  16  say anything about it.  Correct?

11:25AM  17  A    I said Mike doesn't talk to me about it.  We would have to

11:25AM  18  talk at the Bay about it.

11:25AM  19  Q    Yes.

11:25AM  20  A    That's not something we would talk about every day.

11:26AM  21  Q    Right.  And so what you said was that you -- "but you

11:26AM  22  know, like, if I brought it up or something, like, oh, fuck,

11:26AM  23  you just, like, he'd be, like, he doesn't say much.  I mean, he

11:26AM  24  won't say much.  The time I would have to, like, talk to him

11:26AM  25  and shit, I would be able to talk to him at the Bay.  He likes

| 11:26AM | 1 | talk at the Bay. |
| 11:26AM | 2 | At that time, on the -- August 14, 2018, he hadn't |
| 11:26AM | 3 | said a word to you, and that's what you told them, right? |
| 11:26AM | 4 | Mike doesn't say anything about it, correct? |
| 11:26AM | 5 | A   I'm saying it's not something we talk about every day, |
| 11:26AM | 6 | correct. |
| 11:26AM | 7 | Q   So you were saying you would have to get out to hear |
| 11:26AM | 8 | something that never happened, right? |
| 11:26AM | 9 | A   I'm saying that I would have to get out to hear exact |
| 11:26AM | 10 | details, because I don't know details. |
| 11:26AM | 11 | Q   That wasn't the question that was asked. |
| 11:26AM | 12 | The question was:  Has Mike said anything to you? |
| 11:26AM | 13 | And your answer was, Mike doesn't say anything about |
| 11:27AM | 14 | it, period, correct? |
| 11:27AM | 15 | A   I'm saying me and Mike don't talk about it, yes.  But I'm |
| 11:27AM | 16 | saying that I would have to get out to get details. |
| 11:27AM | 17 | Q   Sir.  Sir, it's a very simple question.  The question is |
| 11:27AM | 18 | has Mike said anything to you?  And your answer was Mike |
| 11:27AM | 19 | doesn't say anything about it, correct? |
| 11:27AM | 20 | A   Correct. |
| 11:27AM | 21 | Q   Nothing further. |
| 11:27AM | 22 | THE COURT:  All right, Mr. Smith.  You may step down. |
| 11:27AM | 23 | Thank you. |
| 11:27AM | 24 | THE WITNESS:  Thank you. |
| | 25 | --oo0oo-- |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, May 28, 2024.

11

12

13                             /s/ Gloria T. Bediamol

14                             GLORIA T. BEDIAMOL.

15                             RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```