```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,   )     CRIMINAL NO. 19-00099-DKW
 4                                )
                 Plaintiff,       )     Honolulu, Hawaii
 5                                )
            vs.                   )     February 15, 2024
 6                                )
      MICHAEL J. MISKE, JR.,      )
 7                                )
                 Defendant.       )
 8    _____ )

 9
                    TRANSCRIPT OF JURY TRIAL (DAY 21)
10            BEFORE THE HONORABLE DERRICK K. WATSON,
             CHIEF UNITED STATES DISTRICT COURT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:          MARK INCIONG, ESQ.
13                               MICHAEL DAVID NAMMAR, ESQ
                                 WILLIAM KE AUPUNI AKINA, ESQ.
14                               AISLINN AFFINITO, ESQ.
                                 Office of the United States Attorney
15                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii  96850

17   For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop St., Ste 2201
18                               Honolulu, HI 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, NV 89501

22   Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                 United States District Court
23                               300 Ala Moana Boulevard
                                 Honolulu, Hawaii 96850
24
        Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

<pre>
 1                        I N D E X

 2   GOVERNMENT WITNESSES:                        PAGE NO.

 3    ASHLIN AKAU

 4         DIRECT EXAMINATION BY MR. NAMMAR            4
           CROSS-EXAMINATION BY MS. PANAGAKOS         80
 5         REDIRECT EXAMINATION BY MR. NAMMAR        124
           RECROSS-EXAMINATION BY MS. PANAGAKOS      132
 6
      KAULANA FREITAS
 7
           DIRECT EXAMINATION BY MR. INCIONG         137
 8


 9   EXHIBITS:                                    PAGE NO.

10
      Exhibit 1-57 was received in evidence         16
11    Exhibit 6-44 was received in evidence         18
      Exhibit 6-79 was received in evidence         20
12    Exhibit 6-26 was received in evidence         22
      Exhibit 1-880 was received in evidence        32
13    Exhibit 6-29 was received in evidence         35
      Exhibit 1-58 was received in evidence         38
14    Exhibit 8-1 was received in evidence          46
      Exhibit 8-7 was received in evidence          47
15    Exhibit 8-5 was received in evidence          51
      Exhibit 1-706 was received in evidence        56
16    Exhibit 1-702 was received in evidence        59
      Exhibit 1-38 was received in evidence         61
17    Exhibits 1-862 and 1-863 were received in evidence  73
      Exhibit 9000-043A was received in evidence   114
18    Exhibit 6-37 was received in evidence        194
      Exhibit 6-32 was received in evidence        195
19    Exhibit 2-1 was received in evidence         205
      Exhibit 2-11 was received in evidence        206
20    Exhibit 2-12 was received in evidence        207
      Exhibit 2-13 was received in evidence        209
21    Exhibit 2-16 was received in evidence        210
      Exhibit 4-19 was received in evidence        217
22    Exhibit 4-22 was received in evidence        219
      Exhibits 4-28, 4-29 and 4-30 were received in  222
23    evidence

24

25
</pre>

|  |  |  |  |
|---|---|---|---|

1   February 15, 2024                                8:37 a.m.

08:37AM   2        THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

08:37AM   3   States of America versus Defendant (01) Michael J. Miske, Jr.

08:37AM   4        This case has been called for jury trial, day 21.

08:37AM   5        Counsel, please make your appearances for the record.

08:37AM   6        MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

08:37AM   7   Michael Nammar and KeAupuni Akina for the United States.  Also

08:37AM   8   present is our paralegal Kari Sherman and FBI Special Agent Tom

08:37AM   9   Palmer.  Good morning.

08:37AM   10       THE COURT:  Good morning.

08:37AM   11       MR. KENNEDY:  Good morning, Your Honor.  Michael

08:37AM   12   Kennedy with Lynn Panagakos, Michael Miske, Ashley King and

08:37AM   13   Josh Barry.  Good morning.

08:37AM   14       THE COURT:  Good morning to all of you as well.  You

08:37AM   15   may be seated.

08:37AM   16       Good morning to the 17 persons on our jury.

08:37AM   17   February 15 is where we're at, the middle of the month.  Is

08:37AM   18   that the ides -- does that make it the Ides of February?  I

08:37AM   19   think so.

08:38AM   20       In any event, Mr. Inciong, the government should call

08:38AM   21   its next witness when you are ready.

08:38AM   22       MR. INCIONG:  Thank you, Your Honor.

08:38AM   23       MR. NAMMAR:  United States calls Ashlin Akau.

08:38AM   24       THE CLERK:  Please raise your right hand.

08:38AM   25                      ASHLIN AKAU,

08:38AM   1   called as a witness, having been first duly sworn, was examined

08:38AM   2   and testified as follows:

08:38AM   3             THE CLERK:  Please state your full name, spelling your

08:38AM   4   last name for the record.

08:38AM   5             THE WITNESS:  Ashlin Akau.  A-S-H-L-I-N, A-K-A-U.

08:38AM   6                         DIRECT EXAMINATION

08:38AM   7   BY MR. NAMMAR:

08:38AM   8   Q    Good morning, Ms. Akau.

08:38AM   9   A    Good morning.

08:38AM   10   Q    Can you tell the jury how old you are?

08:38AM   11   A    I'm 33.

08:38AM   12   Q    And where did you grow up?

08:38AM   13   A    In Kailua.

08:38AM   14   Q    Are you married?

08:38AM   15   A    No.

08:38AM   16   Q    Are you divorced?

08:38AM   17   A    Yes.

08:38AM   18   Q    Who are you divorced from?

08:38AM   19   A    Ramsey Scanlan.

08:39AM   20   Q    Did you and Mr. Scanlan have any children together?

08:39AM   21   A    Yes, we have one son.

08:39AM   22   Q    And how old is that child now?

08:39AM   23   A    He's eight now.

08:39AM   24   Q    Is Mr. Scanlan in your child's life?

08:39AM   25   A    No, he's not.

| | | | |
|---|---|---|---|
| 08:39AM | 1 | Q | How far did you go in school? |
| 08:39AM | 2 | A | Some college. |
| 08:39AM | 3 | Q | Where did you go to some college? |
| 08:39AM | 4 | A | Windward Community College. |
| 08:39AM | 5 | Q | Did you graduate from high school? |
| 08:39AM | 6 | A | Yes, I did. |
| 08:39AM | 7 | Q | From where? |
| 08:39AM | 8 | A | Kailua High School. |
| 08:39AM | 9 | Q | What are you currently doing for work? |
| 08:39AM | 10 | A | I'm a certified laser specialist. |
| 08:39AM | 11 | Q | And what does it mean to be a certified laser specialist? |
| 08:39AM | 12 | A | I work in the aesthetic industry, so tattoo removal, hair |
| 08:39AM | 13 | | removal, skin resurfacing, things like that. |
| 08:39AM | 14 | Q | If you could remove the mic -- if you could move the mic |
| 08:39AM | 15 | | just a little bit closer to you. |
| 08:39AM | 16 | A | Okay. |
| 08:39AM | 17 | Q | Thank you.  So what sorts of thing do you do on patients? |
| 08:39AM | 18 | A | Tattoo removal, hair removal, skin resurfacing, those |
| 08:39AM | 19 | | kinds of things. |
| 08:39AM | 20 | Q | Was there a process involved to become certified? |
| 08:40AM | 21 | A | Yes, I had to go to Rocky Mountain Laser College. |
| 08:40AM | 22 | Q | And where is that? |
| 08:40AM | 23 | A | In Colorado. |
| 08:40AM | 24 | Q | And how long have you had -- or where do you currently |
| 08:40AM | 25 | | work? |

08:40AM  1   A   At Asia Pacific Plastic Surgery.

08:40AM  2   Q   How long have you been with that company?

08:40AM  3   A   About five years.

08:40AM  4   Q   How long have you been a certified laser specialist?

08:40AM  5   A   About six years.

08:40AM  6   Q   Have you had any other jobs in your career?

08:40AM  7   A   Yes.

08:40AM  8   Q   Tell us about those.

08:40AM  9   A   I worked at Macy's in Kailua after high school, and I

08:40AM  10  worked for Elite Parking after high school.

08:40AM  11  Q   Now, in 2021 did you plead guilty to a federal offense?

08:40AM  12  A   Yes.

08:40AM  13  Q   What was the offense you pled guilty to?

08:40AM  14  A   The use of a chemical weapon.

08:40AM  15  Q   Are you represented by attorneys in that case?

08:40AM  16  A   Yes.

08:40AM  17  Q   Who are you represented by?

08:40AM  18  A   Michael Green and Lani Nakamura.

08:40AM  19  Q   And as it relates to that particular case, are you

08:40AM  20  cooperating with the government?

08:41AM  21  A   Yes.

08:41AM  22  Q   Why are you cooperating?

08:41AM  23  A   Because it's the right thing to do, and I feel like I

08:41AM  24  could get -- with the plea deal, I can lessen my sentence.

08:41AM  25  Q   Have you been sentenced yet in that case?

08:41AM    1    A    No.  No, I have not.

08:41AM    2    Q    Have you been promised what sentence you will receive?

08:41AM    3    A    No, I have not.

08:41AM    4    Q    What is your understanding about who will be sentencing

08:41AM    5    you in your criminal case?

08:41AM    6    A    The judge.

08:41AM    7    Q    Did you enter a plea agreement with the United States?

08:41AM    8    A    Yes, I did.

08:41AM    9    Q    Does that plea agreement say anything about robberies?

08:41AM   10    Robberies.

08:41AM   11    A    Yes.

08:41AM   12    Q    What does the plea agreement say about robberies?

08:41AM   13    A    That I was involved in robberies.

08:41AM   14    Q    Okay.  Did that plea agreement require you to plead guilty

08:41AM   15    to robberies?

08:41AM   16    A    Yes.

08:41AM   17    Q    Okay.  Have you in fact assisted others in committing

08:41AM   18    robberies?

08:41AM   19    A    Yes, I have.

08:41AM   20    Q    What kind of robberies?

08:41AM   21    A    Robberies of drug dealers.

08:42AM   22    Q    Now, you said that the plea agreement required you to

08:42AM   23    plead guilty due to robberies.  Do you recall that the plea

08:42AM   24    agreement mentioned dismissing certain -- or not filing certain

08:42AM   25    charges against you?

08:42AM  1   A    The robberies, I believe.

08:42AM  2   Q    Okay.  Would it refresh your recollection to look at a

08:42AM  3   particular provision of the plea agreement?

08:42AM  4   A    Yeah.  Yes.

08:42AM  5        MR. NAMMAR:  Could we show the witness only 1-864,

08:43AM  6   which is from the original list, and go to page 3.  Actually

08:43AM  7   start on page 2.

08:43AM  8   BY MR. NAMMAR:

08:43AM  9   Q    If you could read the bottom part there starting with "In

08:43AM  10  return"?

08:43AM  11  A    "In return" -- okay.

08:43AM  12  Q    And then if you could go to the next page.  Just look up

08:43AM  13  when you are done reading paragraph 4.

08:43AM  14       Okay.  Did that refresh your memory about whether

08:43AM  15  charges of robberies weren't going to be filed against you

08:43AM  16  pursuant to the plea agreement?

08:43AM  17  A    No, they weren't.

08:43AM  18  Q    Okay.  The plea agreement that -- the crime you pled

08:44AM  19  guilty to, what was that?

08:44AM  20  A    The use of a chemical weapon.

08:44AM  21  Q    Do you understand what the maximum penalty for that crime

08:44AM  22  is?

08:44AM  23  A    Yes.

08:44AM  24  Q    What is it?

08:44AM  25  A    A life sentence.

08:44AM   1   Q   And does the plea agreement provide -- require you to give

08:44AM   2   testimony?

08:44AM   3   A   Yes.

08:44AM   4   Q   And does it say anything about telling the truth?

08:44AM   5   A   Yes, I should be truthful.

08:44AM   6   Q   Switch gears now and I ask you about someone by the name

08:44AM   7   of Jacob Smith.  Do you know who that is?

08:44AM   8   A   Yes, I do.

08:44AM   9   Q   How did you meet Mr. Smith?

08:44AM   10   A   I met him through a mutual friend, Norman Akau.

08:44AM   11   Q   Okay.  And do you recall around when you first met him?

08:44AM   12   A   I would say the beginning of June.

08:44AM   13   Q   Of what year?

08:44AM   14   A   2016.

08:44AM   15   Q   Okay.  Did you become friends with Mr. Smith?

08:44AM   16   A   Yes, I did.

08:44AM   17   Q   Did you become romantically involved with him as well?

08:44AM   18   A   Yes.

08:45AM   19   Q   Now, these robberies that you have said you were a part

08:45AM   20   of, did Mr. Smith have anything to do with them?

08:45AM   21   A   Yes.

08:45AM   22   Q   How many robberies were you a part of with Mr. Smith?

08:45AM   23   A   Two.

08:45AM   24   Q   In what year did those occur?

08:45AM   25   A   2016 was the first one.

08:45AM   1   Q    Okay.  Why did you agree to help Mr. Smith?

08:45AM   2   A    Because they were offering me basically protection and

08:45AM   3   money.

08:45AM   4   Q    What was going on in your life then?

08:45AM   5   A    I was going through a nasty divorce with my abusive

08:45AM   6   ex-husband.

08:45AM   7   Q    Are you in a different place now?

08:45AM   8   A    Very much so.

08:45AM   9   Q    How so?

08:45AM  10   A    I have a career.  I live for my son.  And, yeah, I'm doing

08:45AM  11   great.

08:45AM  12   Q    Now, you said you were in a relationship with Mr. Smith.

08:45AM  13   Would you spend a fair amount of time with him in the years of

08:45AM  14   2016 and 2017?

08:45AM  15   A    A little bit, yes.

08:45AM  16   Q    Did you get to know the people that he would associate

08:46AM  17   with?

08:46AM  18   A    Yes.

08:46AM  19   Q    Who would you see him with the most?

08:46AM  20   A    Lance Bermudez, Johnnie Stancil, Dae Han.

08:46AM  21   Q    Do you know Dae Han's last name?

08:46AM  22   A    Moon.

08:46AM  23   Q    What was that?  Sorry.

08:46AM  24   A    Dae Han Moon.

08:46AM  25   Q    Lance Bermudez, do you know whether he went by a nickname?

08:46AM   1   A   Yes, they call him Hammah.

08:46AM   2   Q   Do you know why he was called Hammah?

08:46AM   3   A   No.

08:46AM   4   Q   I want to direct your attention now to March of 2017.

08:46AM   5   Were you recruited to do something at a nightclub?

08:46AM   6   A   Yes.

08:46AM   7   Q   What nightclub?

08:46AM   8   A   Ginza.

08:46AM   9   Q   And what were recruited to do?

08:46AM   10  A   To pour out pepper spray into the club.

08:46AM   11  Q   What you thought was pepper spray?

08:46AM   12  A   Yes.

08:46AM   13  Q   Do actually know what the substance was that you poured

08:46AM   14  out?

08:46AM   15  A   Now I do, yes.

08:47AM   16  Q   Okay.  Is that related to the crime that you pled guilty

08:47AM   17  to the chemical weapon charge?

08:47AM   18  A   Yes.

08:47AM   19  Q   Who recruited you to do this?

08:47AM   20  A   Jake Smith.

08:47AM   21  Q   Do you -- do you recall when this occurred?

08:47AM   22  A   The beginning of March of 20- --

08:47AM   23  Q   2017?

08:47AM   24  A   2017, yeah.

08:47AM   25  Q   Okay.  Who asked you to do this?

| | | | |
|---|---|---|---|
| 08:47AM | 1 | A | Jacob Smith. |
| 08:47AM | 2 | Q | Okay.  What does he say when he asked you to do this? |
| 08:47AM | 3 | A | He said that Bro asked him to find a girl to help him pour |
| 08:47AM | 4 | | out the mace on the -- on the floor because of Ginza, because |
| 08:47AM | 5 | | the boys did it the night before. |
| 08:47AM | 6 | Q | Okay.  You mentioned the word "Bro."  Who is that? |
| 08:47AM | 7 | A | Mike Miske. |
| 08:47AM | 8 | Q | And how did you know he was referring to Mike Miske when |
| 08:47AM | 9 | | he said Bro? |
| 08:47AM | 10 | A | Because he told me. |
| 08:47AM | 11 | Q | Okay.  And they said that he mentioned that he needed a |
| 08:48AM | 12 | | girl? |
| 08:48AM | 13 | A | Yes. |
| 08:48AM | 14 | Q | Did Mr. Smith explain why they needed a girl? |
| 08:48AM | 15 | A | Because he said the boys were getting stopped because they |
| 08:48AM | 16 | | did District the night before. |
| 08:48AM | 17 | Q | Okay.  Did he say -- did you know what District was? |
| 08:48AM | 18 | A | A club. |
| 08:48AM | 19 | Q | Okay.  And do you know what Ginza was? |
| 08:48AM | 20 | A | A club as well. |
| 08:48AM | 21 | Q | Okay.  When they said the boys did District the night |
| 08:48AM | 22 | | before, did he mention which boys did it? |
| 08:48AM | 23 | A | He said Kaulana. |
| 08:48AM | 24 | Q | Did you know who Kaulana was? |
| 08:48AM | 25 | A | At the time, no. |

08:48AM   1   Q   Do you know who Kaulana is now?

08:48AM   2   A   Yes.

08:48AM   3   Q   Who is Kaulana?

08:48AM   4   A   Kaulana Freitas.  I believe that's Mike's cousin.

08:48AM   5   Q   Now, you mentioned Michael Miske.  Had you met him before?

08:48AM   6   A   Yes.

08:48AM   7   Q   Okay.  If you saw Mr. Miske in the courtroom, could you

08:48AM   8   pick him out?

08:48AM   9   A   Yes.

08:48AM   10   Q   Do you see him in the courtroom?

08:48AM   11   A   Yes.

08:48AM   12   Q   Can you pick him out and describe an article of clothing

08:49AM   13   he's wearing?

08:49AM   14   A   He's right behind you in the brown and black suit.

08:49AM   15        MR. NAMMAR:  May the record reflect that the witness

08:49AM   16   identified the defendant Michael Miske?

08:49AM   17        THE COURT:  Yes, the record should reflect the witness

08:49AM   18   Ms. Akau's identification of the defendant Mr. Miske.

08:49AM   19   BY MR. NAMMAR:

08:49AM   20   Q   What, if anything, did you know about Mr. Smith's

08:49AM   21   relationship to Michael Miske?

08:49AM   22   A   I knew that they were really close and Jake would

08:49AM   23   basically do whatever he said.

08:49AM   24   Q   Did you know whether Mr. Smith worked for Mr. Miske?

08:49AM   25   A   He told me he did, yes.

08:49AM  1  Q    What kind of work would he tell you he did?

08:49AM  2  A    Beat up people for money.  Basically anything he asked him

08:49AM  3  to do.

08:49AM  4  Q    Okay.  Now, you mentioned beat people up.  Mr. Smith, did

08:49AM  5  you know anything about his background in martial arts?

08:49AM  6  A    Yes.

08:49AM  7  Q    What did you know?

08:49AM  8  A    His dad owned a martial arts facility that he grew up in.

08:50AM  9  Q    Did you know where that was?

08:50AM  10  A    In Kaneohe.

08:50AM  11  Q    And do you know if Mr. Smith competed at all in martial

08:50AM  12  arts?

08:50AM  13  A    I believe he did.

08:50AM  14  Q    So you said you were recruited by Jacob Smith --

08:50AM  15  A    Yes.

08:50AM  16  Q    -- to pour out a chemical, you mentioned it was mace?

08:50AM  17  A    Yes.

08:50AM  18  Q    Did you know in fact it was mace?

08:50AM  19  A    No, I did not.

08:50AM  20  Q    Okay.  Was an amount of money ever discussed?

08:50AM  21  A    Yes.

08:50AM  22  Q    What was the amount of money discussed?

08:50AM  23  A    Jake said that Mike was going to giving him $3,000 and

08:50AM  24  that he would split it with me.

08:50AM  25  Q    And what were you supposed to do for that money?

08:50AM   1   A   Just go into the club at a certain time and pour out the
08:50AM   2   mace.
08:50AM   3   Q   Did you agree to do that?
08:50AM   4   A   Yes.
08:50AM   5   Q   Did you do that?
08:50AM   6   A   Yes.
08:50AM   7   Q   Did you ever get paid?
08:51AM   8   A   No.
08:51AM   9   Q   You mentioned it was Ginza.  Can you tell the jury where
08:51AM   10  Ginza is?
08:51AM   11  A   Ginza is near Ala Moana.
08:51AM   12  Q   Did Mr. Smith ever say anything about why they wanted to
08:51AM   13  do this job --
08:51AM   14  A   He said --
08:51AM   15  Q   -- what the reason was?
08:51AM   16  A   Yes, he said that he wanted everybody to go to a different
08:51AM   17  club at Restaurant Row, which was Mike's club.
08:51AM   18  Q   Okay.  And when you say "he," who did you believe that
08:51AM   19  was?
08:51AM   20  A   Jake told me.
08:51AM   21  Q   And you said Restaurant Row?
08:51AM   22  A   Yes.
08:51AM   23  Q   And you said Mike's club?
08:51AM   24  A   Yes.
08:51AM   25  Q   Did you know what Jake was referring to?

08:51AM   1   A    Encore I believe the name of the club was.

08:51AM   2   Q    Okay.  Have you ever been there?

08:51AM   3   A    No.

08:51AM   4   Q    Do you know what Mike's relationship to that club was?

08:52AM   5   A    I believe he was the owner.

08:52AM   6            MR. NAMMAR:  Can we show the witness only

08:52AM   7   Exhibit 1-57, which is from the original list.  I don't believe

08:52AM   8   it's in evidence.

08:52AM   9            THE COURT:  Okay, go ahead.

08:52AM   10  BY MR. NAMMAR:

08:52AM   11  Q    Do you recognize what's on the screen in front of you,

08:52AM   12  Ms. Akau?

08:52AM   13  A    Yes.

08:52AM   14  Q    What is it?

08:52AM   15  A    It's a picture of Kaulana.

08:52AM   16  Q    And is this an accurate picture of Kaulana?

08:52AM   17  A    Yes.

08:52AM   18            MR. NAMMAR:  Your Honor, I'd move to admit 1-57.

08:52AM   19            THE COURT:  Any objection, Counsel?

08:52AM   20            MS. PANAGAKOS:  No objection, Your Honor.

08:52AM   21            THE COURT:  Without objection, Exhibit 1-57 is

08:52AM   22  admitted.  And you may publish.

08:52AM   23            (Exhibit 1-57 was received in evidence.)

08:52AM   24  BY MR. NAMMAR:

08:52AM   25  Q    1-57 is up on the screen.  Can you tell the jury what

08:52AM   1   we're looking at here?  What are we looking at here?

08:53AM   2   A    A picture of Kaulana.

08:53AM   3   Q    Okay.  And what was the relationship, if any, that you

08:53AM   4   were aware of to Michael Miske?

08:53AM   5   A    I believe that they were cousins.

08:53AM   6   Q    And is this the person that you had talked about doing

08:53AM   7   District on Friday night?

08:53AM   8   A    Yes.

08:53AM   9   Q    So you agreed to do it, and I want to talk to you about

08:53AM   10  what happens before you pour out the substance.

08:53AM   11  A    Okay.

08:53AM   12  Q    Did you meet up with Jake Smith?

08:53AM   13  A    Yes, he picked me up.

08:53AM   14  Q    Where did he pick you up?

08:53AM   15  A    From my house.

08:53AM   16  Q    And where was your house?

08:53AM   17  A    In Kailua.

08:53AM   18  Q    And where did you all go?

08:53AM   19  A    We drove to Waimanalo.

08:53AM   20  Q    Okay.  If you recall, what was Mr. Smith driving?

08:53AM   21  A    I'm honestly not too sure.  I don't remember.

08:54AM   22  Q    Okay.  You said you went to Waimanalo?

08:54AM   23  A    Yes.

08:54AM   24  Q    For the members of the jury that are not from this island,

08:54AM   25  can you tell them where that is on this island?

08:54AM   1   A   On the east side of Oahu.

08:54AM   2   Q   And where did you go in Waimanalo?

08:54AM   3   A   We went to Johnnie Stancil's house.

08:54AM   4   Q   Who is Johnnie Stancil?

08:54AM   5   A   Mike Miske's half-brother.

08:54AM   6          MR. NAMMAR:  Can we show the witness now -- or can we

08:54AM   7   publish now 6-44, which is -- actually let's not publish it.  I

08:54AM   8   don't think this is in, Your Honor.  My apologies.

08:54AM   9          Can we show the witness 6-44, which is from the

08:54AM  10   original list?

08:54AM  11          THE COURT:  Yes, you can.  Go ahead.

08:54AM  12   BY MR. NAMMAR:

08:54AM  13   Q   Do you recognize this map, Ms. Akau?

08:54AM  14   A   Yes.

08:54AM  15   Q   What is this map of?

08:54AM  16   A   This map is of Waimanalo.

08:54AM  17   Q   And does this map accurately reflect the area around

08:55AM  18   Mr. Stancil's house?

08:55AM  19   A   Yes.

08:55AM  20          MR. NAMMAR:  Your Honor, I would move to admit 6-44.

08:55AM  21          THE COURT:  Any objection?

08:55AM  22          MS. PANAGAKOS:  No objection.

08:55AM  23          THE COURT:  Without objection, 6-44 is admitted.  And,

08:55AM  24   yes, you may publish to the witness and to the jury.

08:55AM  25          (Exhibit 6-44 was received in evidence.)

| | | |
|---|---|---|
| 08:55AM | 1 | BY MR. NAMMAR: |
| 08:55AM | 2 | Q    Okay.  6-44, now the jury can see it, Ms. Akau.  This is |
| 08:55AM | 3 | of Waimanalo? |
| 08:55AM | 4 | A    Yes. |
| 08:55AM | 5 | Q    Do you see Mr. Stancil's house on this map? |
| 08:55AM | 6 | A    Yes. |
| 08:55AM | 7 | Q    Where is it? |
| 08:55AM | 8 | So you're circling where the red dot is? |
| 08:55AM | 9 | A    Yes. |
| 08:55AM | 10 | Q    Can you tell the jury what happened when you got to |
| 08:55AM | 11 | Mr. Stancil's house with Mr. Smith? |
| 08:55AM | 12 | A    Mr. Smith got out of the car and went in the house, and I |
| 08:55AM | 13 | stayed inside the car. |
| 08:55AM | 14 | Q    And how long was he in the house for? |
| 08:55AM | 15 | A    I would say about ten minutes. |
| 08:55AM | 16 | Q    Around what time of day was this, if you recall? |
| 08:55AM | 17 | A    It was evening time, I would say probably around 8:30, |
| 08:56AM | 18 | 9:00. |
| 08:56AM | 19 | Q    And does Mr. Smith eventually come out? |
| 08:56AM | 20 | A    Yes. |
| 08:56AM | 21 | Q    And what do you recall he had with him, if anything, when |
| 08:56AM | 22 | he came out? |
| 08:56AM | 23 | A    He had a bag and in the bag was a McDonald's cup, an empty |
| 08:56AM | 24 | McDonald's cup, and in the McDonald's cup was a little |
| 08:56AM | 25 | Jagermeister bottle. |

08:56AM   1   Q   How many little Jagermeister bottles were in the

08:56AM   2   McDonald's cup, if you recall?

08:56AM   3   A   There was two.

08:56AM   4   Q   And when you say "little Jagermeister bottles," could you

08:56AM   5   maybe describe the size for people in the jury that they may

08:56AM   6   have seen elsewhere?

08:56AM   7   A   Probably at the airplane -- on the airplane, those little

08:56AM   8   bottles that they give out there.

08:56AM   9        MR. NAMMAR:  Can we show the witness now 6-79, which

08:56AM   10  is from the original list?

08:56AM   11  BY MR. NAMMAR:

08:57AM   12  Q   Ms. Akau, do you recognize this photo?

08:57AM   13  A   Yes.

08:57AM   14  Q   And what is it of?

08:57AM   15  A   The house that we stopped at before we went to town.

08:57AM   16  Q   Mr. Stancil's house?

08:57AM   17  A   Yes.

08:57AM   18  Q   Is this an accurate picture of his house?

08:57AM   19  A   Yes.

08:57AM   20        MR. NAMMAR:  Your Honor, we move to admit 6-79.

08:57AM   21        THE COURT:  Ms. Panagakos, any issue?

08:57AM   22        MS. PANAGAKOS:  No objection.

08:57AM   23        THE COURT:  All right.  Without objection, 6-79 is

08:57AM   24  admitted.  You may publish.

08:57AM   25        (Exhibit 6-79 was received in evidence.)

08:57AM    1    BY MR. NAMMAR:

08:57AM    2    Q    So the jury can see 6-79.  Tell them what's shown in this

08:57AM    3    photo.

08:57AM    4    A    What's shown is Jonathan Stancil's house in Waimanalo.

08:57AM    5    Q    And this is where Mr. Smith went in for around ten

08:57AM    6    minutes, I think you said, and came out with the two little

08:57AM    7    Jagermeister bottles; is that right?

08:57AM    8    A    Correct.

08:57AM    9    Q    What did you understand was in the Jagermeister bottles?

08:57AM   10    A    I believe there was like mace or pepper spray.

08:57AM   11    Q    Okay.  And what form was it in?  Was it in a liquid form?

08:58AM   12    A    Yes, it was.

08:58AM   13         MR. NAMMAR:  Can we show the witness now 6-26, which

08:58AM   14    is from our original list as well?

08:58AM   15    BY MR. NAMMAR:

08:58AM   16    Q    Do you recognize, Ms. Akau, what's shown in this photo?

08:58AM   17    A    Yes, I do.  That's the Jagermeister bottle.

08:58AM   18    Q    The one that Mr. Smith came out of the house with?

08:58AM   19    A    Yes.

08:58AM   20         MS. PANAGAKOS:  Objection.  Lack of foundation.

08:58AM   21         THE COURT:  Sustained.

08:58AM   22    BY MR. NAMMAR:

08:58AM   23    Q    Does this look like the bottle that Mr. Smith came out of

08:58AM   24    the house with?

08:58AM   25    A    Yes.

08:58AM   1          MS. PANAGAKOS:  Objection.  Lack of foundation.

08:58AM   2          THE COURT:  Overruled.  Go ahead.

08:58AM   3   BY MR. NAMMAR:

08:58AM   4   Q    You can answer.

08:58AM   5   A    Yes.

08:58AM   6          MR. NAMMAR:  Move to admit 6-26, Your Honor.

08:58AM   7          THE COURT:  Any objection?

08:58AM   8          MS. PANAGAKOS:  Yes, Your Honor.  Same objection.

08:58AM   9          THE COURT:  All right.  Same ruling.  Objection is

08:59AM  10   overruled.

08:59AM  11          You may publish.  The exhibit is admitted, that's

08:59AM  12   6-26.

08:59AM  13          (Exhibit 6-26 was received in evidence.)

08:59AM  14   BY MR. NAMMAR:

08:59AM  15   Q    Okay.  6-26 is up on the screen.  Can you tell the jury

08:59AM  16   what we're looking at here?

08:59AM  17   A    That's the Jagermeister bottle that the mace or pepper

08:59AM  18   spray I thought was inside.

08:59AM  19   Q    And is this the same bottle that you -- or same or similar

08:59AM  20   bottle -- well, how many did you say Mr. Smith came out with?

08:59AM  21   A    Two.

08:59AM  22   Q    Okay.  And did you take one of those bottles into the

08:59AM  23   Ginza Nightclub?

08:59AM  24   A    Yes.

08:59AM  25   Q    And then poured that substance out that's in the bottle in

08:59AM    1    the Ginza Nightclub?

08:59AM    2    A    Yes.

08:59AM    3    Q    So once Mr. Smith comes back with the bottles in the

08:59AM    4    McDonald's cup, do you all leave Mr. Stancil's house?

08:59AM    5    A    Yes.

08:59AM    6    Q    And you're with Mr. Smith at this time?

09:00AM    7    A    Yes, I am.

09:00AM    8    Q    And where do you go?

09:00AM    9    A    We drive to town.

09:00AM   10    Q    And what do you do in town?

09:00AM   11    A    We drive around, and then at one point we stopped and

09:00AM   12    parked in Ala Moana.

09:00AM   13    Q    Okay.  Before you get to Ala Moana, were you guys driving

09:00AM   14    around killing time?

09:00AM   15    A    Yes.

09:00AM   16    Q    Do you remember at that point when you were killing time

09:00AM   17    whether Jake was on the phone?

09:00AM   18    A    Yes.

09:00AM   19    Q    Do you remember what he was talking about?

09:00AM   20    A    He basically told me that we had to do it at a certain

09:00AM   21    time.

09:00AM   22    Q    Okay.  When he was on the phone, could you hear the other

09:00AM   23    end of the conversation?

09:00AM   24    A    No.

09:00AM   25    Q    Even though you couldn't hear the other end of the

09:00AM   1   conversation, did you hear what Mr. Smith was talking about?

09:00AM   2   A    Yes.

09:00AM   3   Q    And could you ascertain from the other end of the

09:00AM   4   conversation, Mr. Smith's end, who Mr. Smith was talking to?

09:00AM   5   A    Yes.

09:00AM   6   Q    Who did you think he was talking to?

09:00AM   7   A    To Mike.

09:00AM   8   Q    Why did you think that?

09:00AM   9   A    Because he told me that he's the one who ordered us to do

09:01AM   10   that.

09:01AM   11   Q    And were there any details about the job being discussed

09:01AM   12   during this phone conversation that Jacob Smith had with

09:01AM   13   Michael Miske?

09:01AM   14   A    That he wanted us to do it at a certain time, like around

09:01AM   15   12:00 or 12:30 when the club was busy.

09:01AM   16   Q    You said -- you told us that you eventually ended up in

09:01AM   17   Ala Moana Center?

09:01AM   18   A    Yes.

09:01AM   19   Q    Do you recall where you went in Ala Moana Center?

09:01AM   20   A    We parked kind of near the bus stop across District.

09:01AM   21   Q    Okay.  And for the folks that are not from this island,

09:01AM   22   what is Ala Moana Center?

09:01AM   23   A    It's the shopping mall.

09:01AM   24   Q    Okay.  What happened when you parked kind of across from

09:01AM   25   the District?

09:01AM    1    A    Jake got out of the car and jumped into a blue Lexus.

09:01AM    2    Q    Okay.  Did you see who the other person was in the blue

09:01AM    3    Lexus?

09:01AM    4    A    It was Mike.

09:01AM    5    Q    Okay.  And -- Michael Miske?

09:01AM    6    A    Yes.

09:01AM    7    Q    And the blue Lexus, was it an SUV or sedan?

09:01AM    8    A    Sedan, I believe.

09:02AM    9    Q    You stayed in Mr. Smith's car?

09:02AM   10    A    Yes.

09:02AM   11    Q    And Mr. Smith leaves with Mr. Miske?

09:02AM   12    A    Yes.

09:02AM   13    Q    How long are they gone for?

09:02AM   14    A    I would probably say about ten minutes.

09:02AM   15         MR. NAMMAR:  May we publish 6-46, which is already in

09:02AM   16    evidence?  6-46.

09:02AM   17         THE COURT:  Go ahead.

09:02AM   18    BY MR. NAMMAR:

09:02AM   19    Q    Do you recognize this map, Ms. Akau?

09:02AM   20    A    Yes.

09:02AM   21    Q    Okay.  Could you put an X by the place that you recall

09:02AM   22    parking at the Ala Moana Center.

09:02AM   23         So for the record, that is the mauka side or the

09:02AM   24    mountain side of the mall.

09:02AM   25         And you mentioned District.  Do you see where that is

09:03AM   1   on this map?

09:03AM   2   A     Yes, I do.

09:03AM   3   Q     Okay.  Ginza, was it in close proximity of where you were

09:03AM   4   parked, if you know?

09:03AM   5   A     It was right down the road.

09:03AM   6   Q     Can you put an X on where you believed Ginza was?

09:03AM   7   A     (Complying.)

09:03AM   8   Q     Okay.  So you told us that Mr. Smith and Mr. Miske were

09:03AM   9   gone for about ten minutes; is that right?

09:03AM   10  A     Correct.

09:03AM   11  Q     Do you see them return?

09:03AM   12  A     Yes.

09:03AM   13  Q     Do you see Mr. Miske return?

09:03AM   14  A     Yes.

09:03AM   15  Q     And what does Mr. Smith do when he returns?

09:03AM   16  A     He just jumps out of the car and comes back in the car.

09:03AM   17  Q     And when he comes back in the car, does he say anything to

09:03AM   18  you?

09:03AM   19  A     Yes.  He said that Mike Miske just wanted to make sure I

09:04AM   20  was good and that we were going to do it.

09:04AM   21  Q     And what did you interpret "I was good" to mean?

09:04AM   22  A     That I was going to do it and that I wasn't

09:04AM   23  second-guessing it basically.

09:04AM   24  Q     Where do you all go?  Where do you and Mr. Smith go from

09:04AM   25  there?

| | | | |
|---|---|---|---|
| 09:04AM | 1 | A | I believe we still killed time until about 12:00. |
| 09:04AM | 2 | Q | And what happens at about 12:00 or midnight? |
| 09:04AM | 3 | A | He drops me off by Ginza. |
| 09:04AM | 4 | Q | And do you go inside Ginza? |
| 09:04AM | 5 | A | Yes. |
| 09:04AM | 6 | Q | The Jager bottle that we talked about, did you take that |
| 09:04AM | 7 | | with you? |
| 09:04AM | 8 | A | Yes, I did. |
| 09:04AM | 9 | Q | How many bottles? |
| 09:04AM | 10 | A | Just one. |
| 09:04AM | 11 | Q | And where, if anything, did you put -- where did you put |
| 09:04AM | 12 | | that bottle when you went -- |
| 09:04AM | 13 | A | I put it in my top, so kind of like my bra area. |
| 09:04AM | 14 | Q | Why did you do that? |
| 09:04AM | 15 | A | Because that's the only place I felt like I could hide it. |
| 09:04AM | 16 | Q | Okay.  And what did you do when you got into the club? |
| 09:04AM | 17 | A | Well, it wasn't exactly 12:30 and it wasn't too packed |
| 09:05AM | 18 | | yet, so I was instructed to wait. |
| 09:05AM | 19 | Q | Okay.  When you were inside the club, did you communicate |
| 09:05AM | 20 | | with anybody outside the club? |
| 09:05AM | 21 | A | Yes. |
| 09:05AM | 22 | Q | Who did you communicate with? |
| 09:05AM | 23 | A | Jake. |
| 09:05AM | 24 | Q | Jacob Smith? |
| 09:05AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:05AM | 1 | Q | And what were you communicating about? |
| 09:05AM | 2 | A | He was just telling me when to do it and just wait till it |
| 09:05AM | 3 | | was busy, the club was busy. |
| 09:05AM | 4 | Q | And did you wait till it was busy? |
| 09:05AM | 5 | A | Yes, I did. |
| 09:05AM | 6 | Q | Now, you told us that you had poured it out.  When you |
| 09:05AM | 7 | | poured it out, was the club -- poured out the substance that |
| 09:05AM | 8 | | you thought was mace, was the club full of people? |
| 09:05AM | 9 | A | There was a decent amount of people, yes. |
| 09:05AM | 10 | Q | Where did you pour it out? |
| 09:05AM | 11 | A | On the dance floor. |
| 09:05AM | 12 | Q | Okay.  Right before you poured it out, where were you, if |
| 09:05AM | 13 | | you recall? |
| 09:05AM | 14 | A | I went to the bathroom. |
| 09:05AM | 15 | Q | Okay.  And if you recall, in the club Ginza where was the |
| 09:06AM | 16 | | bathroom located, near the entrance or in the back? |
| 09:06AM | 17 | A | I believe it was in the middle of the entrance and the |
| 09:06AM | 18 | | dance floor. |
| 09:06AM | 19 | Q | Okay.  So you come out of the bathroom and you pour it |
| 09:06AM | 20 | | out? |
| 09:06AM | 21 | A | Yes. |
| 09:06AM | 22 | Q | Where do you pour it out? |
| 09:06AM | 23 | A | On the dance floor. |
| 09:06AM | 24 | Q | Did you pour everything out in the bottle? |
| 09:06AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:06AM | 1 | Q | And what did you do with the bottle after you poured it |
| 09:06AM | 2 | | out? |
| 09:06AM | 3 | A | I put it back in my top. |
| 09:06AM | 4 | Q | Okay.  What, if anything, did you notice after you poured |
| 09:06AM | 5 | | out the substance in the Jager bottle? |
| 09:06AM | 6 | A | While I was walking out people were coming out as well, |
| 09:06AM | 7 | | rushing out. |
| 09:06AM | 8 | Q | Rushing out? |
| 09:06AM | 9 | A | Yes. |
| 09:06AM | 10 | Q | And did you notice any effects after you had poured out |
| 09:06AM | 11 | | the substance in the Jager bottle? |
| 09:06AM | 12 | A | Yes.  My eyes were watering.  My skin was irritated and |
| 09:06AM | 13 | | burnt a little bit.  I was coughing. |
| 09:07AM | 14 | Q | Was it difficult to breathe? |
| 09:07AM | 15 | A | Yes. |
| 09:07AM | 16 | Q | Did you notice anything where you had put the bottle back |
| 09:07AM | 17 | | into your shirt? |
| 09:07AM | 18 | A | Yes, that it was burnt. |
| 09:07AM | 19 | Q | Did you stick around to see the aftermath from what you |
| 09:07AM | 20 | | poured out at Ginza? |
| 09:07AM | 21 | A | No. |
| 09:07AM | 22 | Q | How -- where did you go? |
| 09:07AM | 23 | A | Jake picked me up and then we drove to Restaurant Row. |
| 09:07AM | 24 | Q | What, if anything, were you feeling when you got in |
| 09:07AM | 25 | | Mr. Smith's car?  Were you feeling any effects? |

| | | |
|---|---|---|
| 09:07AM | 1 | A    Yes.  My -- my eyes were watering.  I was coughing.  I |
| 09:07AM | 2 | didn't feel good at all. |
| 09:07AM | 3 | Q    Did Mr. Smith, did he appear to you to have any of the |
| 09:07AM | 4 | same effects? |
| 09:07AM | 5 | A    Yes, he did.  He was coughing as well as soon as I got in |
| 09:07AM | 6 | the car. |
| 09:07AM | 7 | Q    What did -- what did you do with the bottle? |
| 09:07AM | 8 | A    I threw it out the window. |
| 09:08AM | 9 |        MR. NAMMAR:  Your Honor, could we publish 6-48A, which |
| 09:08AM | 10 | was admitted I believe yesterday? |
| 09:08AM | 11 |        THE COURT:  Yes. |
| 09:08AM | 12 | BY MR. NAMMAR: |
| 09:08AM | 13 | Q    Ms. Akau, 6-48A is up on the screen.  Do you recognize |
| 09:08AM | 14 | this photo? |
| 09:08AM | 15 | A    Yes. |
| 09:08AM | 16 | Q    What is shown here? |
| 09:08AM | 17 | A    That's where Ginza was. |
| 09:08AM | 18 | Q    And do you recall where Mr. Smith picked you up in the |
| 09:08AM | 19 | vicinity to the Ginza Nightclub? |
| 09:08AM | 20 | A    Right on the side of the Ginza Nightclub. |
| 09:08AM | 21 | Q    So after Ms. Smith -- after Mr. Smith picks you up, you |
| 09:08AM | 22 | say you were experiencing the symptoms in the car, you throw |
| 09:08AM | 23 | out the bottle, where do you guys go? |
| 09:08AM | 24 | A    We went to Restaurant Row. |
| 09:08AM | 25 | Q    And why did you go there? |

09:08AM   1    A    Because Jake wanted to make sure there was no retaliation

09:08AM   2    from Ginza.

09:08AM   3    Q    What happens when you get to Restaurant Row?

09:09AM   4    A    We parked the car.

09:09AM   5    Q    Where did you park the car?

09:09AM   6    A    Kind of like a side parking area.

09:09AM   7    Q    And where does Mr. Smith go, if anywhere, when you park

09:09AM   8    the car?

09:09AM   9    A    He went inside to the club.

09:09AM   10   Q    And where -- what did you do?

09:09AM   11   A    Just stayed in the car.

09:09AM   12   Q    Okay.  When you say he went inside to the club, where did

09:09AM   13   he go?

09:09AM   14   A    He did.

09:09AM   15   Q    At which club?

09:09AM   16   A    Encore.

09:09AM   17   Q    Okay.

09:09AM   18          MR. NAMMAR:  And can we show the witness 1-880, which

09:09AM   19   is from the original list?

09:09AM   20   BY MR. NAMMAR:

09:09AM   21   Q    Do you recognize this photo, Ms. Akau?

09:09AM   22   A    Yes.

09:09AM   23   Q    What is it?

09:09AM   24   A    That's the area that we parked.

09:09AM   25   Q    The area you parked near the Encore club?

| | | | |
|---|---|---|---|
| 09:09AM | 1 | A | Yes. |
| 09:09AM | 2 | Q | Is this an accurate picture of that area? |
| 09:09AM | 3 | A | Yes. |
| 09:10AM | 4 | | MR. NAMMAR:  Your Honor, I'd move to admit 1-880. |
| 09:10AM | 5 | | THE COURT:  Any issue, Ms. Panagakos? |
| 09:10AM | 6 | | MS. PANAGAKOS:  No, no objection. |
| 09:10AM | 7 | | THE COURT:  All right.  Without objection, |
| 09:10AM | 8 | | Exhibit 1-880 is admitted.  You may publish. |
| 09:10AM | 9 | | (Exhibit 1-880 was received in evidence.) |
| 09:10AM | 10 | | BY MR. NAMMAR: |
| 09:10AM | 11 | Q | Okay, Ms. Akau, the jury can see 1-880.  Is this the area |
| 09:10AM | 12 | | where you recall Mr. Smith parking after the Ginza Nightclub? |
| 09:10AM | 13 | A | Yes. |
| 09:10AM | 14 | Q | Where he left you and went inside the club? |
| 09:10AM | 15 | A | Yes. |
| 09:10AM | 16 | Q | Were you still feeling any effects when Mr. Smith was in |
| 09:10AM | 17 | | the Encore Nightclub? |
| 09:10AM | 18 | A | Yes, I was. |
| 09:10AM | 19 | Q | What kind of effects? |
| 09:10AM | 20 | A | Same as I described previous, so coughing, the inside of |
| 09:10AM | 21 | | my top was burning, my eyes were watering. |
| 09:10AM | 22 | Q | How long is Mr. Smith gone for? |
| 09:10AM | 23 | A | I'd say at least 15 minutes. |
| 09:10AM | 24 | Q | And does he eventually return? |
| 09:10AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:10AM | 1 | Q | And when he returns, is there a discussion about any more |
| 09:11AM | 2 | | crime? |
| 09:11AM | 3 | A | Yes. |
| 09:11AM | 4 | Q | By who? |
| 09:11AM | 5 | A | By Jake. |
| 09:11AM | 6 | Q | What does he say? |
| 09:11AM | 7 | A | He asks if we wanted to do another one. |
| 09:11AM | 8 | Q | Another what? |
| 09:11AM | 9 | A | To go hit the other club the same as we did Ginza, so |
| 09:11AM | 10 | | District. |
| 09:11AM | 11 | Q | And what was your response? |
| 09:11AM | 12 | A | No. |
| 09:11AM | 13 | Q | If you know, what -- the second bottle, you mentioned |
| 09:11AM | 14 | | there was two that were picked up, right? |
| 09:11AM | 15 | A | Yes. |
| 09:11AM | 16 | Q | Okay.  So you took one into Ginza? |
| 09:11AM | 17 | A | Right. |
| 09:11AM | 18 | Q | If you know, did Mr. Smith still have the second bottle? |
| 09:11AM | 19 | A | I believe he did. |
| 09:11AM | 20 | Q | When Mr. Smith came back, did the subject of a traffic |
| 09:11AM | 21 | | stop come up? |
| 09:11AM | 22 | A | Yes. |
| 09:11AM | 23 | Q | What did Mr. Smith say? |
| 09:11AM | 24 | A | He said that Mike Miske got stopped driving past Ginza. |
| 09:11AM | 25 | Q | And did he say anything about a search? |

| | | | |
|---|---|---|---|
| 09:11AM | 1 | A | He said that they searched his car and they didn't find |
| 09:11AM | 2 | | anything. |
| 09:11AM | 3 | Q | They searched Mr. Miske's car? |
| 09:11AM | 4 | A | Yes, correct. |
| 09:11AM | 5 | Q | And didn't find anything? |
| 09:11AM | 6 | A | Yes. |
| 09:12AM | 7 | Q | You mentioned you had burns.  Did those -- where were |
| 09:12AM | 8 | | those burns? |
| 09:12AM | 9 | A | In like on the side of my chest. |
| 09:12AM | 10 | Q | And how long did they last? |
| 09:12AM | 11 | A | I would say a few months. |
| 09:12AM | 12 | Q | Were they painful? |
| 09:12AM | 13 | A | Yes. |
| 09:12AM | 14 | Q | And was -- where you had the burns, was that the area |
| 09:12AM | 15 | | where you had put the bottle? |
| 09:12AM | 16 | A | Yes. |
| 09:12AM | 17 | Q | After you poured it out? |
| 09:12AM | 18 | A | Yes. |
| 09:12AM | 19 | Q | Now, before you poured out the substance in the club that |
| 09:12AM | 20 | | you thought was mace, you told us you didn't know exactly what |
| 09:12AM | 21 | | it was. |
| 09:12AM | 22 | A | Correct. |
| 09:12AM | 23 | Q | Were you ever told at any time that the substance you |
| 09:12AM | 24 | | poured out was meant to be used for termite fumigations? |
| 09:12AM | 25 | A | No. |

09:12AM  1   Q    If you were told that, would you have poured it out in the

09:12AM  2   Ginza?

09:12AM  3   A    Absolutely not.

09:12AM  4          MS. PANAGAKOS:  Objection.

09:12AM  5          THE COURT:  Sustained.

09:12AM  6          MR. NAMMAR:  Can we show the witness 6-29?  Which is

09:13AM  7   from the original list and not in evidence yet.

09:13AM  8          THE COURT:  Go ahead.

09:13AM  9   BY MR. NAMMAR:

09:13AM  10  Q    Do you recognize what's shown here, Ms. Akau?

09:13AM  11  A    Yes, that's Jacob Smith's bag.

09:13AM  12  Q    And how can you recognize it as Mr. Smith's bag?

09:13AM  13  A    Because he always had it with him.

09:13AM  14  Q    Is this an accurate depiction of you -- of what you recall

09:13AM  15  the bag that Mr. Smith always had with him?

09:13AM  16  A    Yes.

09:13AM  17         MR. NAMMAR:  Your Honor, I'd move to admit 6-29.

09:13AM  18         THE COURT:  Any objection?

09:13AM  19         MS. PANAGAKOS:  No objection.

09:13AM  20         THE COURT:  Without objection, 6-29 is admitted.  You

09:13AM  21  may show it to the jury.

09:13AM  22         (Exhibit 6-29 was received in evidence.)

09:13AM  23  BY MR. NAMMAR:

09:13AM  24  Q    6-29 is on the screen.  What are we looking at here?

09:13AM  25  A    That's Jacob Smith's Gucci bag.

| | | | |
|---|---|---|---|
| 09:13AM | 1 | Q | Okay.  And you said Mr. Smith would always have it with |
| 09:13AM | 2 | | him? |
| 09:13AM | 3 | A | Yes. |
| 09:13AM | 4 | Q | Did you ever see what kind of things he kept in his bag? |
| 09:13AM | 5 | A | Sometimes. |
| 09:13AM | 6 | Q | What would you see? |
| 09:14AM | 7 | A | Money.  Occasionally a gun. |
| 09:14AM | 8 | Q | What brand was this? |
| 09:14AM | 9 | A | Gucci. |
| 09:14AM | 10 | Q | Okay.  I want to switch gears now -- |
| 09:14AM | 11 | | MR. NAMMAR:  You can take that down. |
| 09:14AM | 12 | | BY MR. NAMMAR: |
| 09:14AM | 13 | Q | -- and ask you if you heard of someone named Nico? |
| 09:14AM | 14 | A | Yes. |
| 09:14AM | 15 | Q | How so? |
| 09:14AM | 16 | A | He was supplying drugs to my ex-husband. |
| 09:14AM | 17 | Q | And who was your ex-husband again? |
| 09:14AM | 18 | A | Ramsey Scanlan. |
| 09:14AM | 19 | Q | Did you know Nico's last name? |
| 09:14AM | 20 | A | No. |
| 09:14AM | 21 | Q | Did you help rob -- help others rob Nico? |
| 09:14AM | 22 | A | Yes. |
| 09:14AM | 23 | | MS. PANAGAKOS:  Your Honor, I have a relevance |
| 09:14AM | 24 | | objection.  I believe that this line of questioning is relevant |
| 09:14AM | 25 | | for impeachment, but not as a racketeering act for the alleged |

09:14AM   1   enterprise charge in the indictment or -- and that it's
09:15AM   2   irrelevant to the alleged enterprise's affairs.
09:15AM   3           MR. NAMMAR:  This is a racketeering act.
09:15AM   4           THE COURT:  The objection -- this is the same
09:15AM   5   objection I think that has been voiced pretrial.  The objection
09:15AM   6   is overruled.
09:15AM   7           Go ahead.
09:15AM   8   BY MR. NAMMAR:
09:15AM   9   Q    So, Ms. Akau, you were saying -- I think the last question
09:15AM   10  was did you assist in robbing Nico?
09:15AM   11  A    Yes, I did.
09:15AM   12  Q    And how did you assist?
09:15AM   13  A    I at least set him up.
09:15AM   14  Q    And what was -- what was the purpose of the robbery?  What
09:15AM   15  were you trying with others to obtain?
09:15AM   16  A    His drugs.
09:15AM   17  Q    What kind of drugs, if you know?
09:15AM   18  A    Ice.
09:15AM   19  Q    Who also took part in the robbery of Nico?
09:15AM   20  A    Norman Akau, Harry Kauhi, Jonathan Santos, Jake Smith,
09:15AM   21  Lance Bermudez, Kurt Kipapa.
09:15AM   22  Q    Could you recognize those -- all those folks you just
09:15AM   23  named off if you saw their photos again?
09:15AM   24  A    Yes.
09:16AM   25          MR. NAMMAR:  Your Honor, can we show the witness now

| | | |
|---|---|---|
| 09:16AM | 1 | 1-58, which is from our original list which is not in evidence? |
| 09:16AM | 2 | THE COURT:  Go ahead. |
| 09:16AM | 3 | BY MR. NAMMAR: |
| 09:16AM | 4 | Q    Do you recognize 1-58? |
| 09:16AM | 5 | A    Yes, that's Johnnie Stancil. |
| 09:16AM | 6 | Q    And is it an accurate depiction -- accurate picture of |
| 09:16AM | 7 | Johnnie Stancil as you remember him? |
| 09:16AM | 8 | A    Yes. |
| 09:16AM | 9 | MR. NAMMAR:  Your Honor, I'd move to admit 1-58. |
| 09:16AM | 10 | THE COURT:  Any objection? |
| 09:16AM | 11 | MS. PANAGAKOS:  No objection, Your Honor. |
| 09:16AM | 12 | THE COURT:  1-58 is admitted without objection.  You |
| 09:16AM | 13 | may publish. |
| 09:16AM | 14 | (Exhibit 1-58 was received in evidence.) |
| 09:16AM | 15 | BY MR. NAMMAR: |
| 09:16AM | 16 | Q    The jury can see 1-58.  Who is shown here? |
| 09:16AM | 17 | A    Jonathan Stancil. |
| 09:16AM | 18 | Q    And is that a tattoo on his neck? |
| 09:16AM | 19 | A    Yes. |
| 09:16AM | 20 | Q    Do you recall seeing Mr. Stancil with that same tattoo? |
| 09:16AM | 21 | A    Yes. |
| 09:16AM | 22 | MR. NAMMAR:  Can we show the witness now, Your Honor, |
| 09:16AM | 23 | 1-41, which is already in evidence? |
| 09:17AM | 24 | THE COURT:  Yes. |
| 09:17AM | 25 | BY MR. NAMMAR: |

| | | |
|---|---|---|
| 09:17AM | 1 | Q    And before we get to 1-41, Mr. Stancil, do you know |
| 09:17AM | 2 | whether -- was he one of the people you told us that Mr. Smith |
| 09:17AM | 3 | frequently associated with? |
| 09:17AM | 4 | A    Yes. |
| 09:17AM | 5 | MR. NAMMAR:  Can we publish 1-41, Your Honor? |
| 09:17AM | 6 | THE COURT:  You may. |
| 09:17AM | 7 | BY MR. NAMMAR: |
| 09:17AM | 8 | Q    1-41 is up on the screen.  Who is this a photo of? |
| 09:17AM | 9 | A    Jacob Smith. |
| 09:17AM | 10 | MR. NAMMAR:  Can we publish now 1-34, Your Honor, |
| 09:17AM | 11 | which is are already in evidence? |
| 09:17AM | 12 | THE COURT:  Yes. |
| 09:17AM | 13 | BY MR. NAMMAR: |
| 09:17AM | 14 | Q    1-34 is on the screen, Ms. Akau.  What is this -- who is |
| 09:17AM | 15 | this a picture of? |
| 09:17AM | 16 | A    Lance Bermudez. |
| 09:17AM | 17 | Q    And what was his nickname? |
| 09:17AM | 18 | A    Hammah. |
| 09:17AM | 19 | Q    And was Lance Bermudez one of the people that you told us |
| 09:17AM | 20 | that Mr. Smith was one of his close associates? |
| 09:17AM | 21 | A    Yes. |
| 09:18AM | 22 | MR. NAMMAR:  Can we publish 1-61, which is already in |
| 09:18AM | 23 | evidence? |
| 09:18AM | 24 | THE COURT:  Yes. |
| 09:18AM | 25 | BY MR. NAMMAR: |

| | | | |
|---|---|---|---|
| 09:18AM | 1 | Q | Do you recognize who is shown in this photo? |
| 09:18AM | 2 | A | Yes, that's Harry Kauhi. |
| 09:18AM | 3 | | MR. NAMMAR:  And can we also publish, Your Honor, |
| 09:18AM | 4 | 1-33, which is already in evidence? |
| 09:18AM | 5 | | THE COURT:  Yes. |
| 09:18AM | 6 | BY MR. NAMMAR: |
| 09:18AM | 7 | Q | Do you recognize who's shown in this photo? |
| 09:18AM | 8 | A | Yes, that's Norman Akau. |
| 09:18AM | 9 | Q | And you have the same last name as Mr. Akau? |
| 09:18AM | 10 | A | Yes. |
| 09:18AM | 11 | Q | Do you know if you're related to him? |
| 09:18AM | 12 | A | We are. |
| 09:18AM | 13 | Q | How so? |
| 09:18AM | 14 | A | My dad and him are cousins. |
| 09:18AM | 15 | | MR. NAMMAR:  Your Honor, can we use the face board and |
| 09:18AM | 16 | put those same photos on the face board? |
| 09:18AM | 17 | | THE COURT:  Yes. |
| 09:19AM | 18 | | MS. PANAGAKOS:  No objection. |
| 09:19AM | 19 | BY MR. NAMMAR: |
| 09:19AM | 20 | Q | So you mentioned Nico.  You knew Nico through your husband |
| 09:19AM | 21 | Ramsey Scanlan? |
| 09:19AM | 22 | A | Yes. |
| 09:19AM | 23 | Q | What was the connection between the two? |
| 09:19AM | 24 | A | They were friends, and Nico was supplying Ramsey with ice. |
| 09:19AM | 25 | Q | Do you recall who spoke to you first about the Nico |

09:19AM   1   robbery?

09:19AM   2   A   Yes.

09:19AM   3   Q   Who?

09:19AM   4   A   Norman Akau.

09:19AM   5   Q   And do you recall where that conversation happened?

09:19AM   6   A   Yes, outside of The Shack in Kailua, which is a bar.

09:19AM   7   Q   Was there anything about your appearance that was

09:20AM   8   referenced during that conversation?

09:20AM   9   A   Yes, I had a black eye from my ex-husband.

09:20AM   10  Q   And did that have anything to do with why they approached

09:20AM   11  you?

09:20AM   12  A   I believe so.

09:20AM   13  Q   Why?

09:20AM   14  A   They offered me protection.  They offered me money because

09:20AM   15  they knew I was in a bad spot.

09:20AM   16  Q   Okay.  Norman Akau, what did he -- what did he offer you

09:20AM   17  to do with respect to Nico?

09:20AM   18  A   Money and protection.

09:20AM   19  Q   And did you all discuss a plan?

09:20AM   20  A   Yes.

09:20AM   21  Q   What was the plan?

09:20AM   22  A   That I was going to get Nico to grab the drugs, and that

09:20AM   23  they were going to rob him.

09:20AM   24  Q   Okay.  Did you agree to do that?

09:20AM   25  A   Yes.

| | | | |
|---|---|---|---|
| 09:20AM | 1 | Q | And how were you going to get Nico to grab the drugs? |
| 09:20AM | 2 | A | Ask him. |
| 09:20AM | 3 | Q | And what were you supposed to do once -- if you recall, |
| 09:20AM | 4 | | once Nico had the drugs? |
| 09:20AM | 5 | A | Call them. |
| 09:20AM | 6 | Q | Call who? |
| 09:20AM | 7 | A | Norman. |
| 09:20AM | 8 | Q | Okay.  And did you know what the plan was going to be at |
| 09:20AM | 9 | | that point? |
| 09:20AM | 10 | A | No. |
| 09:21AM | 11 | Q | Okay.  So in furtherance of that agreement and that plan, |
| 09:21AM | 12 | | did you end up reaching out to Nico? |
| 09:21AM | 13 | A | Yes. |
| 09:21AM | 14 | Q | And what -- tell us what you told Nico. |
| 09:21AM | 15 | A | That I had somebody that wanted to buy 5 pounds of ice. |
| 09:21AM | 16 | Q | Okay.  And did you end up meeting up with Nico? |
| 09:21AM | 17 | A | Yes. |
| 09:21AM | 18 | Q | Where did you meet up -- meet up with him? |
| 09:21AM | 19 | A | I picked him up at The Shack Kailua, which is a bar. |
| 09:21AM | 20 | Q | And do you recall where you went? |
| 09:21AM | 21 | A | We went -- we drove to town to his apartment building. |
| 09:21AM | 22 | Q | What area of town was that in? |
| 09:21AM | 23 | A | Kind of like Kalihi by the 21 Mart. |
| 09:21AM | 24 | Q | Okay.  Did you know why you were going to his apartment? |
| 09:21AM | 25 | A | To go grab the drugs. |

| | | | |
|---|---|---|---|
| 09:21AM | 1 | Q | And did Nico go up and grab drugs? |
| 09:21AM | 2 | A | Yes. |
| 09:21AM | 3 | Q | And when he came back, did you believe he had drugs? |
| 09:21AM | 4 | A | Yes, he did. |
| 09:21AM | 5 | Q | And what, if anything, did you do when you believed he had |
| 09:21AM | 6 | | drugs? |
| 09:21AM | 7 | A | I told him to put it in the trunk. |
| 09:21AM | 8 | Q | What happened next? |
| 09:21AM | 9 | A | As we were leaving his apartment parking lot area, we got |
| 09:22AM | 10 | | blocked off by two cars. |
| 09:22AM | 11 | Q | Okay.  And what do you recall happening after you got |
| 09:22AM | 12 | | blocked off by -- well, first of all, do you remember the |
| 09:22AM | 13 | | description of the cars? |
| 09:22AM | 14 | A | I remember one was a black Altima.  The other one I -- I |
| 09:22AM | 15 | | don't recall. |
| 09:22AM | 16 | Q | And what are you remembering -- what do you remember after |
| 09:22AM | 17 | | you were blocked off by those two vehicles? |
| 09:22AM | 18 | A | Norman Akau jumped out of the front car, the Altima, came |
| 09:22AM | 19 | | towards the passenger side of my car, and he had a police badge |
| 09:22AM | 20 | | and a walkie talkie. |
| 09:22AM | 21 | Q | What time frame do you remember this was? |
| 09:22AM | 22 | A | It was afternoon, I believe. |
| 09:22AM | 23 | Q | And what about what -- was this in 2016? |
| 09:22AM | 24 | A | Yes. |
| 09:22AM | 25 | Q | Around what time of year? |

09:22AM  1   A    The beginning of June.

09:22AM  2   Q    Okay.  What's the first thing that you recall -- you

09:22AM  3   mentioned a walkie talkie.  What's the first thing you recall

09:22AM  4   during the robbery?

09:22AM  5   A    That Norman had a police badge and he was trying to get

09:22AM  6   him out of the car.

09:22AM  7   Q    Do you know if that was part of the plan?

09:23AM  8   A    No.

09:23AM  9   Q    So was Norman -- this is Norman Akau?

09:23AM  10  A    Yes.

09:23AM  11  Q    Was he -- did he appear to be to you to be impersonating a

09:23AM  12  police officer?

09:23AM  13  A    Yes.

09:23AM  14  Q    And does he say anything, if you recall, to Nico?

09:23AM  15  A    Yes, he tells him to get out of the car.

09:23AM  16  Q    Similar to what a police officer may do?

09:23AM  17  A    Correct.

09:23AM  18  Q    Does Nico comply?

09:23AM  19  A    He hesitated at first, but yes, he did.

09:23AM  20  Q    And what happens after Nico gets out of the car?

09:23AM  21  A    When Nico gets out of the car, the second car that blocked

09:23AM  22  us in, they grabbed the purse out of my back seat.

09:23AM  23  Q    Okay.  Did you see how many people came out of that second

09:23AM  24  car?

09:23AM  25  A    Only one came out, but there was about three people in the

09:23AM    1    car.

09:23AM    2    Q    Okay.  Did you see whether they had any disguise on?

09:23AM    3    A    Yes, they had masks on.

09:23AM    4    Q    Do you recall seeing any firearms?

09:23AM    5    A    Yes.

09:23AM    6    Q    What do you recall was taken from the car?

09:24AM    7    A    My purse, and then Norman ended up taking the 5 pounds of

09:24AM    8    ice.

09:24AM    9    Q    Okay.  Despite the fact that they were -- the other people

09:24AM   10    in the car were wearing masks, did you -- did you know who

09:24AM   11    those other occupants were?

09:24AM   12    A    Not at the time.

09:24AM   13    Q    Did you later figure out who they were?

09:24AM   14    A    Yes, I did.

09:24AM   15    Q    And is it the individuals that you pointed out before and

09:24AM   16    that are on the -- that you pointed out the photos from?

09:24AM   17    A    Yes.

09:24AM   18    Q    What happens -- so they get the drugs?

09:24AM   19    A    Right.

09:24AM   20    Q    They take your purse.  Did you know that was going to be

09:24AM   21    part of the plan?

09:24AM   22    A    No, I did not.

09:24AM   23         MR. NAMMAR:  Can we show the witness Exhibit 8-1,

09:24AM   24    which is not in evidence at this time?  It's from the original

09:24AM   25    list.

| | | |
|---|---|---|
| 09:24AM | 1 | THE COURT:  8-1? |
| 09:25AM | 2 | MR. NAMMAR:  8-1. |
| 09:25AM | 3 | THE COURT:  Go ahead. |
| 09:25AM | 4 | BY MR. NAMMAR: |
| 09:25AM | 5 | Q    Do you recognize what's shown in 8-1? |
| 09:25AM | 6 | A    Yes, I do. |
| 09:25AM | 7 | Q    What is it? |
| 09:25AM | 8 | A    It's near 21 Mart where they robbed Nico. |
| 09:25AM | 9 | Q    Okay.  Is this an accurate map of the vicinity of where |
| 09:25AM | 10 | Nico was robbed? |
| 09:25AM | 11 | A    Yes. |
| 09:25AM | 12 | MR. NAMMAR:  Your Honor, I'd move to admit 8-1. |
| 09:25AM | 13 | THE COURT:  Any objection, Counsel? |
| 09:25AM | 14 | MS. PANAGAKOS:  No objection, Your Honor. |
| 09:25AM | 15 | THE COURT:  Without objection, 8-1 is admitted.  You |
| 09:25AM | 16 | may publish. |
| 09:25AM | 17 | (Exhibit 8-1 was received in evidence.) |
| 09:25AM | 18 | BY MR. NAMMAR: |
| 09:25AM | 19 | Q    8-1 is up on the screen.  What part of town is this in, |
| 09:25AM | 20 | Ms. Akau? |
| 09:25AM | 21 | A    Like Kalihi area. |
| 09:25AM | 22 | Q    Okay.  And the red dot, do you recognize that being in the |
| 09:25AM | 23 | vicinity of where the robbery occurred? |
| 09:25AM | 24 | A    Yes. |
| 09:25AM | 25 | Q    Can you put an X on where you recall the robbery |

09:25AM   1   occurring.

09:25AM   2   A    (Complying.)

09:26AM   3   Q    And for the record, you're marking very close proximity to

09:26AM   4   the 21 Mart; is that right?

09:26AM   5   A    Yes.

09:26AM   6             MR. NAMMAR:  May we show the witness 8-7, which is

09:26AM   7   from the original list and not in evidence yet?

09:26AM   8             THE COURT:  Go ahead.

09:26AM   9   BY MR. NAMMAR:

09:26AM  10   Q    Ms. Akau, do you recognize 8-7?

09:26AM  11   A    Yes.

09:26AM  12   Q    What is it?

09:26AM  13   A    That's the 21 Mart.

09:26AM  14   Q    And is it an accurate photo of the 21 Mart where the

09:26AM  15   robbery occurred?

09:26AM  16   A    Yes.

09:26AM  17             MR. NAMMAR:  Your Honor, I'd move to admit 8-7.

09:26AM  18             THE COURT:  Any objection?

09:26AM  19             MS. PANAGAKOS:  No objection.

09:26AM  20             THE COURT:  Without objection, 8-7 is admitted.  You

09:26AM  21   may publish.

09:26AM  22             (Exhibit 8-7 was received in evidence.)

09:26AM  23   BY MR. NAMMAR:

09:26AM  24   Q    Okay, Ms. Akau, the jury can see 8-7.  Tell the jury what

09:26AM  25   we're looking at here.

09:26AM   1   A    We're looking at the place where they robbed Nico, Jake

09:26AM   2   Smith and the boys.

09:26AM   3   Q    And on this photo can you see the area where the robbery

09:26AM   4   occurred?

09:26AM   5   A    Yes.

09:27AM   6   Q    Can you put an X by that area where you believe that

09:27AM   7   occurred.

09:27AM   8   A    (Complying.)

09:27AM   9   Q    So what happens --

09:27AM   10       MR. NAMMAR:  You can take that down.

09:27AM   11   BY MR. NAMMAR:

09:27AM   12   Q    What happened after the robbery of Nico?

09:27AM   13   A    I take Nico back to The Shack in Kailua.

09:27AM   14   Q    Okay.  And then where did you go?

09:27AM   15   A    To Waimanalo.

09:27AM   16   Q    Why do you go there?

09:27AM   17   A    Because that's where they were all meeting.

09:27AM   18   Q    Okay.  And when you say -- well, did you end up going to

09:27AM   19   Waimanalo?

09:27AM   20   A    Yes.

09:27AM   21   Q    Where do you go?

09:27AM   22   A    By the Waimanalo gym.

09:27AM   23   Q    Okay.  And who do you see there?

09:27AM   24   A    Everyone that I listed earlier.

09:27AM   25   Q    Okay.  And when you get to the gym, what is the mood like,

09:27AM   1    if you recall?

09:27AM   2    A    They were happy.

09:27AM   3    Q    Why were they happy?

09:27AM   4    A    Because they just robbed Nico.

09:27AM   5    Q    Of what?

09:27AM   6    A    The 5 pounds of ice.

09:27AM   7    Q    Did you see the drugs at the gym?

09:28AM   8    A    No.

09:28AM   9    Q    Were you given any of those drugs?

09:28AM   10   A    No.

09:28AM   11   Q    Were you given any money?

09:28AM   12   A    Later, yes.

09:28AM   13   Q    How much?

09:28AM   14   A    I would say less than a thousand.

09:28AM   15   Q    From who?

09:28AM   16   A    Norman.

09:28AM   17        MS. PANAGAKOS:  I'm sorry, Your Honor, I didn't hear

09:28AM   18   the amount.

09:28AM   19        THE WITNESS:  Sorry.  Less than a thousand.

09:28AM   20        MS. PANAGAKOS:  Thank you.

09:28AM   21   BY MR. NAMMAR:

09:28AM   22   Q    From whom were you given money?

09:28AM   23   A    Norman.

09:28AM   24        MR. NAMMAR:  Your Honor, may we publish 6-44, which is

09:28AM   25   already in evidence?  It's a map of the Waimanalo area.

| | | |
|---|---|---|
| 09:28AM | 1 | THE COURT:  Yes, go ahead. |
| 09:28AM | 2 | BY MR. NAMMAR: |
| 09:28AM | 3 | Q    Ms. Akau, 6-44 is on the screen.  Do you see where you |
| 09:28AM | 4 | went to the -- to the Waimanalo gym -- |
| 09:28AM | 5 | A    Yes. |
| 09:28AM | 6 | Q    -- after the robbery? |
| 09:28AM | 7 | Can you put an X on the map? |
| 09:28AM | 8 | A    (Complying.) |
| 09:29AM | 9 | Q    And for the record, you're marking very close to the |
| 09:29AM | 10 | baseball field in the Waimanalo District Park? |
| 09:29AM | 11 | A    Yes. |
| 09:29AM | 12 | Q    And when we talked earlier today you mentioned |
| 09:29AM | 13 | Mr. Stancil's house.  Is this area in close proximity to |
| 09:29AM | 14 | Mr. Stancil's house? |
| 09:29AM | 15 | A    Yes. |
| 09:29AM | 16 | Q    Where is Mr. Stancil's house? |
| 09:29AM | 17 | A    (Indicating.) |
| 09:29AM | 18 | Q    Okay.  And when you were back at the park, was everyone |
| 09:29AM | 19 | discussing what took place at the robbery? |
| 09:29AM | 20 | A    No. |
| 09:29AM | 21 | Q    Okay.  What was the purpose of meeting back at the park? |
| 09:29AM | 22 | A    Just to get back together. |
| 09:30AM | 23 | MR. NAMMAR:  Can we show the witness now 8-5, which is |
| 09:30AM | 24 | not in evidence? |
| 09:30AM | 25 | THE COURT:  Go ahead. |

09:30AM   1   BY MR. NAMMAR:

09:30AM   2   Q    Do you recognize what's shown in 8-5?

09:30AM   3   A    Yes, that's Waimanalo gym.

09:30AM   4   Q    Is this where you met up with the individuals that were

09:30AM   5   involved in the robbery?

09:30AM   6   A    In that area, yes.

09:30AM   7   Q    Okay.  Is this an accurate photo of the Waimanalo gym?

09:30AM   8   A    Yes.

09:30AM   9        MR. NAMMAR:  Your Honor, I'd move to admit 8-5.

09:30AM   10       THE COURT:  Any objection?

09:30AM   11       MS. PANAGAKOS:  No objection.

09:30AM   12       THE COURT:  Without objection, 8-5 is admitted.  You

09:30AM   13   may publish.

09:30AM   14            (Exhibit 8-5 was received in evidence.)

09:30AM   15   BY MR. NAMMAR:

09:30AM   16   Q    Okay.  8-5 is up on the screen.  What are we looking at

09:30AM   17   here?

09:30AM   18   A    The Waimanalo gym.

09:30AM   19   Q    So you said this was in June -- around June 2016?

09:31AM   20   A    Yes, the beginning of June.

09:31AM   21   Q    Did you start to see Mr. Smith more after this particular

09:31AM   22   robbery?

09:31AM   23   A    Yes.

09:31AM   24   Q    And were you spending time with him after this robbery?

09:31AM   25   A    A little bit, yes.

| | | | |
|---|---|---|---|
| 09:31AM | 1 | Q | Did you get to learn what Mr. Smith did for work? |
| 09:31AM | 2 | A | Yes. |
| 09:31AM | 3 | Q | Did you know how he made money? |
| 09:31AM | 4 | A | Yes. |
| 09:31AM | 5 | Q | How? |
| 09:31AM | 6 | A | By robbing people. |
| 09:31AM | 7 | Q | You earlier mentioned that he did work for Mr. Miske. |
| 09:31AM | 8 | A | Correct. |
| 09:31AM | 9 | Q | And the kind of work -- what was the kind of work that you |
| 09:31AM | 10 | | were told he did for Mr. Miske? |
| 09:31AM | 11 | A | Beat up people and did basically whatever he asked. |
| 09:31AM | 12 | Q | Okay.  Would he tell you he was paid for that work? |
| 09:32AM | 13 | A | Yes. |
| 09:32AM | 14 | Q | You mentioned robberies, that he did robberies.  Would you |
| 09:32AM | 15 | | hear about Mr. Smith's involvement in robberies from other |
| 09:32AM | 16 | | people in the community besides Mr. Smith? |
| 09:32AM | 17 | A | Yes. |
| 09:32AM | 18 | Q | Was he known for that on the east side? |
| 09:32AM | 19 | A | Yes. |
| 09:32AM | 20 | Q | Did you participate in a second robbery with Mr. Smith? |
| 09:32AM | 21 | A | Yes. |
| 09:32AM | 22 | Q | Who was this robbery of? |
| 09:32AM | 23 | A | Palani Mitchell. |
| 09:32AM | 24 | Q | And around when was this? |
| 09:32AM | 25 | A | I don't recall the date. |

| 09:32AM | 1 | Q | Okay.  Was it close in time to the Nico robbery? |

09:32AM   1   Q   Okay.  Was it close in time to the Nico robbery?

09:32AM   2   A   Yes.

09:32AM   3   Q   Was it in 2016?

09:32AM   4   A   Yes.

09:32AM   5   Q   Okay.  Who was Palani Mitchell?

09:32AM   6        MS. PANAGAKOS:  Your Honor, I object.  Same objection

09:32AM   7   as the motions in limine.

09:32AM   8        THE COURT:  All right.  Same ruling.  Overruled.

09:32AM   9        Go ahead.

09:32AM   10  BY MR. NAMMAR:

09:32AM   11  Q   Who was Palani Mitchell?

09:32AM   12  A   He was another drug dealer on our side.

09:32AM   13  Q   Okay.  And what was the purpose of targeting Mr. Mitchell?

09:32AM   14  A   To grab 2 pounds of ice.

09:33AM   15  Q   What, if anything, did you do in that robbery?

09:33AM   16  A   I just drove my car past where they were going to rob him

09:33AM   17  to make sure there wasn't any cops going that way.

09:33AM   18  Q   And you say you were going to be a lookout essentially?

09:33AM   19  A   Basically.

09:33AM   20  Q   Who were the other people -- and what were you supposed to

09:33AM   21  do if you saw police?

09:33AM   22  A   Just let them know.

09:33AM   23  Q   And how would you let them know?

09:33AM   24  A   Call them.

09:33AM   25  Q   Who were the people that were actually going to do the

| 09:33AM | 1 | | robbery of Mr. Mitchell? |
|---|---|---|---|
| 09:33AM | 2 | A | Jacob Smith, Lance Bermudez and Keli'i Young. |
| 09:33AM | 3 | Q | Who is Keli'i Young? |
| 09:33AM | 4 | A | One of their friends. |
| 09:33AM | 5 | Q | Did this robbery occur? |
| 09:33AM | 6 | A | Yes. |
| 09:33AM | 7 | Q | What part of town? |
| 09:33AM | 8 | A | In Kalihi. |
| 09:33AM | 9 | Q | Do you recall whether it occurred near any businesses or |
| 09:33AM | 10 | | schools? |
| 09:33AM | 11 | A | I don't recall. |
| 09:33AM | 12 | Q | And did you serve as a lookout during that robbery? |
| 09:33AM | 13 | A | Yes, I did. |
| 09:33AM | 14 | Q | What happened after the robbery? |
| 09:33AM | 15 | A | We all went to Jake's house in Kalihi. |
| 09:34AM | 16 | Q | And how do you know the robbery occurred? |
| 09:34AM | 17 | A | Because they had the ice with them. |
| 09:34AM | 18 | Q | And did you see the ice? |
| 09:34AM | 19 | A | Yes. |
| 09:34AM | 20 | Q | And had you seen methamphetamine before? |
| 09:34AM | 21 | A | No. |
| 09:34AM | 22 | Q | What did the ice look like? |
| 09:34AM | 23 | A | Well, I basically saw Hammah smoking it.  So... |
| 09:34AM | 24 | Q | Do you know whether during that robbery if Mr. Smith, |
| 09:34AM | 25 | | Mr. Bermudez and Mr. Young had firearms with them? |

09:34AM    1    A    Yes, they did.

09:34AM    2    Q    How do you know that?

09:34AM    3    A    They always had firearms with them, especially during a

09:34AM    4    robbery.

09:34AM    5    Q    Do you recall whether you got anything for serving as a

09:34AM    6    lookout of the robbery of Palani Mitchell?

09:34AM    7    A    No, I don't recall.

09:34AM    8    Q    You don't recall if you got any money?

09:34AM    9    A    Yeah.

09:35AM   10         MR. NAMMAR:  Could we show the witness now

09:35AM   11    Exhibit 1-706, which is from our original list and not in

09:35AM   12    evidence?

09:35AM   13         THE COURT:  Go ahead.

09:35AM   14    BY MR. NAMMAR:

09:35AM   15    Q    Do you recognize what is shown here, Ms. Akau?

09:35AM   16    A    Yes.

09:35AM   17    Q    What is shown here?

09:35AM   18    A    A rental car.

09:35AM   19    Q    Is this a car that you rented?

09:35AM   20    A    Yes.

09:35AM   21    Q    For who?

09:35AM   22    A    For Jake.

09:35AM   23    Q    Is this an accurate picture of the car you rented for

09:35AM   24    Jake?

09:35AM   25    A    Yes.

| | | |
|---|---|---|
| 09:35AM | 1 | MR. NAMMAR:  Your Honor, I move to admit 1-706. |
| 09:35AM | 2 | THE COURT:  Any objection, Counsel? |
| 09:35AM | 3 | MS. PANAGAKOS:  No objection. |
| 09:35AM | 4 | THE COURT:  Without objection, 1-706 -- I assume |
| 09:35AM | 5 | you're going to tie this to something? |
| 09:35AM | 6 | MR. NAMMAR:  Yes. |
| 09:35AM | 7 | THE COURT:  All right. |
| 09:35AM | 8 | (Exhibit 1-706 was received in evidence.) |
| 09:35AM | 9 | BY MR. NAMMAR: |
| 09:35AM | 10 | Q   1-706 is up on the screen.  You said you rented this car. |
| 09:35AM | 11 | A   Correct. |
| 09:35AM | 12 | Q   Why did you rent this car for Mr. Smith? |
| 09:35AM | 13 | A   Because Norman Akau and Jake asked me to. |
| 09:35AM | 14 | Q   And what did they say was the purpose of renting this car? |
| 09:35AM | 15 | A   To basically be a safe car. |
| 09:36AM | 16 | Q   Did you know what they meant when they said "safe car"? |
| 09:36AM | 17 | A   Well, a legal car. |
| 09:36AM | 18 | Q   Did you get anything in return for renting this car? |
| 09:36AM | 19 | A   No. |
| 09:36AM | 20 | Q   Where did you rent it, if you recall? |
| 09:36AM | 21 | A   Enterprise, I believe. |
| 09:36AM | 22 | Q   What did you do after you rented the car? |
| 09:36AM | 23 | A   Gave it to them and drove away. |
| 09:36AM | 24 | Q   Okay.  When you picked up the car, what condition was |
| 09:36AM | 25 | it -- was it in? |

09:36AM   1   A   Good condition.

09:36AM   2   Q   Did you notice any damage on the car?

09:36AM   3   A   No, I did not.

09:36AM   4   Q   When you picked up the car, do you recall how long of a

09:36AM   5   rental this was supposed to be for?

09:36AM   6   A   Two days.

09:36AM   7   Q   And did it end up going for much longer?

09:36AM   8   A   Yes.

09:36AM   9   Q   For how long?

09:36AM   10   A   A few months.

09:36AM   11   Q   And during that few month period, would you on occasion

09:36AM   12   see Mr. Smith driving the car?

09:36AM   13   A   Yes.

09:36AM   14   Q   Would you see anybody else driving the car?

09:36AM   15   A   No.

09:37AM   16   Q   Were you concerned when the rental was going on for

09:37AM   17   months?

09:37AM   18   A   Yes.

09:37AM   19   Q   Why were you concerned?

09:37AM   20   A   Because it was only supposed to be rented out for a couple

09:37AM   21   of days.

09:37AM   22           MR. NAMMAR:  Can we show the witness 1-702,

09:37AM   23   specifically page 19?

09:37AM   24   BY MR. NAMMAR:

09:37AM   25   Q   Do you recognize what is shown here?

| | | | |
|---|---|---|---|
| 09:37AM | 1 | A | Yes. |
| 09:37AM | 2 | Q | What is this? |
| 09:37AM | 3 | A | The Enterprise agreement basically. |
| 09:37AM | 4 | Q | Is this what you filled out when you picked up the rental |
| 09:37AM | 5 | | car? |
| 09:37AM | 6 | A | Yes. |
| 09:37AM | 7 | Q | The one that you told us you rented as a safe car? |
| 09:37AM | 8 | A | Correct. |
| 09:37AM | 9 | Q | Did you later learn that a crime had been committed in |
| 09:37AM | 10 | | this car? |
| 09:37AM | 11 | A | Yes. |

09:37AM   12        MR. NAMMAR:  Your Honor, I move to admit 1-702 at this

09:37AM   13   time.  This document on page 1 is accompanied by a business

09:38AM   14   record declaration and certification of authenticity which

09:38AM   15   complies with 902(11) and 803(6).

09:38AM   16        THE COURT:  So this exhibit consists of more -- far

09:38AM   17   more than just the first page that you described as well as

09:38AM   18   page 19, to which the witness just testified to.  Are you

09:38AM   19   seeking to admit only those two pages or the entirety of the

09:38AM   20   exhibit?

09:38AM   21        MR. NAMMAR:  The entirety of the exhibit is a business

09:38AM   22   record that was furnished pursuant to 1-702.  It's also

09:38AM   23   pursuant to the parties' stipulation, which is 12 -- document

09:38AM   24   number 1296, which is relevant to business records.

09:38AM   25        THE COURT:  So again, the question is are you seeking

09:38AM   1   to admit the entirety of the exhibit or just those two pages?

09:38AM   2            MR. NAMMAR:  I'm sorry, Your Honor, the entire

09:38AM   3   exhibit.

09:38AM   4            THE COURT:  All right.  Counsel?

09:38AM   5            MS. PANAGAKOS:  Your Honor, we do have a stipulation

09:38AM   6   that it is a business record.  However, this line of

09:39AM   7   questioning was the subject of Motion in Limine Number 5, and

09:39AM   8   so I would object to the question regarding the -- the crime

09:39AM   9   that was allegedly committed with it on the grounds of

09:39AM   10   relevance -- irrelevance to any element of Count 1 and only

09:39AM   11   relevant to impeachment.

09:39AM   12            THE COURT:  All right.  So the objection is overruled.

09:39AM   13   Exhibit 1-702 is admitted.

09:39AM   14            (Exhibit 1-702 was received in evidence.)

09:39AM   15            MR. NAMMAR:  May we publish, Your Honor?

09:39AM   16            THE COURT:  You may.

09:39AM   17            MR. NAMMAR:  Okay.  Can we bring up page 19?  And can

09:39AM   18   you zoom in on the top left side.  Perfect.

09:39AM   19   BY MR. NAMMAR:

09:39AM   20   Q    So, Ms. Akau, the renter on the top left side is shown as

09:40AM   21   Ashlin Scanlan.  Do you recognize that name?

09:40AM   22   A    Yes.

09:40AM   23   Q    How so?

09:40AM   24   A    That was my name when I was married.

09:40AM   25   Q    And the date -- the first date is August 31, 2016.  Do you

09:40AM    1    see that?

09:40AM    2    A    Yes.

09:40AM    3    Q    Is that around the time when you recall picking up this

09:40AM    4    rental car?

09:40AM    5    A    Yes.

09:40AM    6    Q    And then the second date is September 3rd, just a few days

09:40AM    7    later, 2016.  Do you see that?

09:40AM    8    A    Yes.

09:40AM    9    Q    Was this car actually returned on September 3rd?

09:40AM    10    A    It was not.

09:40AM    11    Q    Was it returned much later?

09:40AM    12    A    Yes.

09:40AM    13    Q    The description below that is a 300C four-door white

09:40AM    14    Chrysler.  Do you see that?

09:40AM    15    A    Yes.

09:40AM    16    Q    Is that the car that you recall renting?

09:40AM    17    A    Yes.

09:40AM    18    Q    And the license plate is X -- SXD816.  Do you see that?

09:40AM    19    A    Yes.

09:41AM    20    Q    Moving forward to October 2016, so about a month and a

09:41AM    21    half after you rented this car, were you contacted by Mr. Smith

09:41AM    22    about this particular rental car?

09:41AM    23    A    Yes.

09:41AM    24    Q    What did he tell you?

09:41AM    25    A    He said that his friend shot a gun out of it.

```
09:41AM    1   Q    Sorry, I don't know if I heard that.

09:41AM    2   A    Sorry.  He said his friend Dae Han Moon shot -- tried to

09:41AM    3   shoot out of the car.

09:41AM    4   Q    Were you concerned when you heard that?

09:41AM    5   A    Yes.

09:41AM    6   Q    Okay.  Dae Han Moon, who is that?

09:41AM    7   A    His friend.

09:41AM    8        MR. NAMMAR:  If we can show the witness 1-38, which is

09:41AM    9   on the original list and not in evidence yet?

09:41AM   10        THE COURT:  Go ahead.

09:41AM   11   BY MR. NAMMAR:

09:41AM   12   Q    Do you recognize what is shown in 1-38?

09:42AM   13   A    Yes.

09:42AM   14   Q    What is it?

09:42AM   15   A    A picture of Dae Han.

09:42AM   16   Q    Is this an accurate photo of Dae Han Moon?

09:42AM   17   A    Yes.

09:42AM   18        MR. NAMMAR:  Your Honor, I move to admit 1-38.

09:42AM   19        THE COURT:  Any objection, Counsel?

09:42AM   20        MS. PANAGAKOS:  No objection.

09:42AM   21        THE COURT:  Without objection, 1-38 is admitted.  You

09:42AM   22   may publish.

09:42AM   23        (Exhibit 1-38 was received in evidence.)

09:42AM   24   BY MR. NAMMAR:

09:42AM   25   Q    Okay, Ms. Akau, the jury can see 1-38.  Who are we looking
```

09:42AM  1   at here?

09:42AM  2   A    That is Dae Han Moon.

09:42AM  3   Q    And is this the individual that Mr. Smith was talking

09:42AM  4   about shooting out of the car?

09:42AM  5   A    Yes.

09:42AM  6   Q    The rental car that you had rented?

09:42AM  7   A    Yes.

09:42AM  8   Q    So after you get that call from Mr. Smith about the

09:42AM  9   shooting, what, if anything, do you do about getting the rental

09:42AM  10  car back?

09:42AM  11  A    I told him I needed it back.

09:42AM  12  Q    And were you contacted by anybody next?

09:42AM  13  A    Yes.

09:42AM  14  Q    Did you have a follow-up conversation with people about

09:42AM  15  getting the car back?

09:42AM  16  A    Yes.

09:42AM  17  Q    Do you recall who you had a conversation with?

09:43AM  18  A    Well, I talked to Jake about getting the car back.

09:43AM  19  Q    Okay.  Did you eventually get the car back?

09:43AM  20  A    Yes.

09:43AM  21  Q    From who?

09:43AM  22  A    We went -- me and my ex-sister-in-law went to go get it.

09:43AM  23  Q    Okay.  Is who is your ex-sister-in-law?

09:43AM  24  A    Teiti Scanlan.

09:43AM  25  Q    How was she related to Ramsey Scanlan, your ex-husband?

| | | | |
|---|---|---|---|
| 09:43AM | 1 | A | That was his sister. |
| 09:43AM | 2 | Q | Okay.  And what do you do when you retrieve the car? |
| 09:43AM | 3 | A | We grabbed the car, stopped at the gas station to throw |
| 09:43AM | 4 | | out whatever was in the car, and then we went to return it. |
| 09:43AM | 5 | Q | At Enterprise? |
| 09:43AM | 6 | A | Yes. |
| 09:43AM | 7 | Q | Okay.  So you returned the car.  You heard about from |
| 09:43AM | 8 | | Mr. Smith that it was involved in a shooting.  Are you |
| 09:43AM | 9 | | approached by law enforcement and asked about the same rental |
| 09:43AM | 10 | | car? |
| 09:43AM | 11 | A | Yes. |
| 09:43AM | 12 | Q | Who approaches you? |
| 09:43AM | 13 | A | ATF agents. |
| 09:43AM | 14 | Q | Okay.  Is this shortly after you returned the car? |
| 09:43AM | 15 | A | Yes. |
| 09:43AM | 16 | Q | Were you asked about the rental car? |
| 09:44AM | 17 | A | Yes. |
| 09:44AM | 18 | Q | What, if anything, did you tell them about the rental car? |
| 09:44AM | 19 | A | I said that I rented it for a friend. |
| 09:44AM | 20 | Q | Did you tell them anything else about the rental car? |
| 09:44AM | 21 | A | No, I did not. |
| 09:44AM | 22 | Q | Why not? |
| 09:44AM | 23 | A | Because I was scared. |
| 09:44AM | 24 | Q | You didn't tell them about the shooting? |
| 09:44AM | 25 | A | No. |

09:44AM   1   Q   So you're approached by law enforcement, and you said you

09:44AM   2   don't -- you tell them about the car, but you don't tell them

09:44AM   3   about the shooting.  Did you speak to anybody after that about

09:44AM   4   being approached by law enforcement?

09:44AM   5   A   Yes.

09:44AM   6   Q   Who did you speak to?

09:44AM   7   A   My ex-sister-in-law, Teiti.

09:44AM   8   Q   And what happened after you spoke to Teiti about being

09:44AM   9   approached by law enforcement?

09:44AM   10   A   Teiti said she went to Starbucks and randomly met Mike

09:44AM   11   Miske.

09:44AM   12   Q   Okay.  And what happened after that?

09:45AM   13   A   She said that he had a lawyer for me and that he wanted to

09:45AM   14   meet up.

09:45AM   15   Q   Okay.  And did you end up meeting with Michael Miske?

09:45AM   16   A   Yes, I did.

09:45AM   17   Q   Where did you meet with him?

09:45AM   18   A   Outside Keolu liquor store in Kailua.

09:45AM   19   Q   And who was present at that meeting?

09:45AM   20   A   Myself, Mike Miske, and then Teiti was with our kids in

09:45AM   21   the car.

09:45AM   22   Q   Okay.  So could Teiti hear what you two were talking

09:45AM   23   about?

09:45AM   24   A   No.

09:45AM   25   Q   And where do you talk, you and Mr. Miske?

09:45AM   1   A   Right outside in the parking lot.

09:45AM   2   Q   Okay.  What do you talk about?

09:45AM   3   A   Basically that he had a lawyer and not to say anything and

09:45AM   4   that to stay away from Jake.

09:45AM   5   Q   Okay.  So he tells you don't say anything and he has a

09:45AM   6   lawyer for you?

09:45AM   7   A   Correct.

09:45AM   8   Q   Stay away from Jake?

09:45AM   9   A   Yes.

09:45AM   10  Q   Did you recall the lawyer that he mentioned, the name?

09:45AM   11  A   No, I do not.

09:45AM   12  Q   Do you recall whether the name Gary came up during this

09:46AM   13  conversation?

09:46AM   14  A   I don't recall.

09:46AM   15  Q   Okay.  What were your thoughts about being offered a

09:46AM   16  lawyer by Mr. Miske?

09:46AM   17  A   It kind of made me feel better because honestly his

09:46AM   18  approach was seemed like he was trying to be concerned about me

09:46AM   19  and the cops coming.

09:46AM   20  Q   Do you still think that today?

09:46AM   21  A   No.

09:46AM   22  Q   Why not?

09:46AM   23  A   Because I believe he was just trying to save himself.

09:46AM   24  Q   So Mr. Miske told you to stay away from Jacob Smith?

09:46AM   25  A   Correct.

| | | | |
|---|---|---|---|
| 09:46AM | 1 | Q | Did you do that? |
| 09:46AM | 2 | A | No. |
| 09:46AM | 3 | Q | You told us about Ginza, right? |
| 09:46AM | 4 | A | Correct. |
| 09:46AM | 5 | Q | You did that with Jacob Smith in March of 2017? |
| 09:46AM | 6 | A | Correct. |
| 09:46AM | 7 | Q | Okay.  So after Ginza, which was in March of 2017, right, |
| 09:46AM | 8 | | which you've already told us about, the next month in April, |
| 09:46AM | 9 | | April of 2017, were you visited again by law enforcement? |
| 09:47AM | 10 | A | Yes. |
| 09:47AM | 11 | Q | And did you speak with them at this time? |
| 09:47AM | 12 | A | Yes. |
| 09:47AM | 13 | Q | And was that meeting recorded? |
| 09:47AM | 14 | A | Yes. |
| 09:47AM | 15 | Q | And without going into detail, during that recorded |
| 09:47AM | 16 | | meeting with law enforcement, did you speak with them about |
| 09:47AM | 17 | | Ginza? |
| 09:47AM | 18 | A | Yes. |
| 09:47AM | 19 | Q | Were you asked, though, during that meeting if you had |
| 09:47AM | 20 | | committed any robberies with Jacob Smith? |
| 09:47AM | 21 | A | Yes. |
| 09:47AM | 22 | Q | Were you truthful about that? |
| 09:47AM | 23 | A | No, I was not. |
| 09:47AM | 24 | Q | Why not? |
| 09:47AM | 25 | A | Because for one, I was scared.  For two, my dad was with |

| | | |
|---|---|---|
| 09:47AM | 1 | me. |
| 09:47AM | 2 | Q    So your dad was with you at this meeting? |
| 09:47AM | 3 | A    Correct. |
| 09:47AM | 4 | Q    What were you scared about? |
| 09:47AM | 5 | A    Retaliation, getting in trouble, just everything. |
| 09:47AM | 6 | Q    Okay.  Later on, though, did you tell law enforcement |
| 09:47AM | 7 | about those robberies? |
| 09:47AM | 8 | A    Yes, I did. |
| 09:47AM | 9 | Q    And those are the same robberies that you've testified to |
| 09:47AM | 10 | here today? |
| 09:47AM | 11 | A    Correct. |
| 09:47AM | 12 | Q    Have you recently reviewed a recording of that interview |
| 09:48AM | 13 | that you had with law enforcement in April of 2018? |
| 09:48AM | 14 | A    Yes. |
| 09:48AM | 15 | Q    Do you recall during that interview if you were asked |
| 09:48AM | 16 | about a specific phone number that Jacob Smith utilized? |
| 09:48AM | 17 | A    I believe so. |
| 09:48AM | 18 | Q    What -- did you provide them with the number? |
| 09:48AM | 19 | A    Yes. |
| 09:48AM | 20 | Q    And what number did you provide them with? |
| 09:48AM | 21 | A    I believe the last four might have been like 5854, |
| 09:48AM | 22 | something like that. |
| 09:48AM | 23 |       THE COURT:  Is this the April 2017 interview that you |
| 09:48AM | 24 | asked her about or is this -- |
| 09:48AM | 25 |       MR. NAMMAR:  Yes. |

09:48AM   1                  THE COURT:  -- another interview a year later?

09:48AM   2                  MR. NAMMAR:  I'm sorry, in the April 2017 interview.

09:48AM   3                  THE WITNESS:  Yes.

09:48AM   4   BY MR. NAMMAR:

09:48AM   5   Q    And the number was 5854 ending, you said?

09:48AM   6   A    I believe so, yes.

09:48AM   7   Q    Okay.  So that was April.  Moving forward now to the next

09:48AM   8   month, May of 2017, do you hear about a shooting that took

09:48AM   9   place at Kualoa Ranch?

09:48AM  10   A    Yes, I did.

09:49AM  11   Q    How did you hear about it?

09:49AM  12   A    It was all over Instagram.

09:49AM  13   Q    And do you recall who were the people that were posting

09:49AM  14   about it on Instagram?

09:49AM  15   A    Lindsey Kinney.

09:49AM  16   Q    And did you know who Lindsey Kinney was?

09:49AM  17   A    Yes, I did.

09:49AM  18   Q    How did you know Lindsey Kinney?

09:49AM  19   A    He was dating my ex-sister-in-law.

09:49AM  20   Q    Who -- who was that?

09:49AM  21   A    Teiti Scanlan.

09:49AM  22   Q    That's the person you talked about before?

09:49AM  23   A    Correct.

09:49AM  24   Q    Now, have you had any interaction with Mr. Kinney?

09:49AM  25   A    Yes.

09:49AM  1  Q    So after you were -- after you hear about the shooting in

09:49AM  2  Kualoa Ranch, do you see the postings by Mr. Kinney on

09:49AM  3  Instagram?

09:49AM  4  A    I do.

09:49AM  5  Q    Is he -- without going into details, is he posting about

09:49AM  6  this shooting?

09:49AM  7  A    Yes.

09:49AM  8  Q    Okay.  After that shooting, are you approached by Johnnie

09:49AM  9  Stancil?

09:49AM  10  A    Yes.

09:49AM  11  Q    And where -- where or how are you approached by Johnnie

09:49AM  12  Stancil?

09:49AM  13  A    He reached out to me on Instagram saying he wanted to

09:49AM  14  meet, and not too long after that he came to the house, to my

09:50AM  15  house in Kailua.

09:50AM  16  Q    Okay.  And who was present for that meeting?

09:50AM  17  A    Just him and I.

09:50AM  18  Q    What did Mr. Stancil say to you during that meeting?

09:50AM  19          MS. PANAGAKOS:  Objection.  Hearsay.

09:50AM  20          THE COURT:  Overruled.  Go ahead.

09:50AM  21          THE WITNESS:  He said that he wanted me to see if

09:50AM  22  Lindsey was going to talk to the grand jury.

09:50AM  23  BY MR. NAMMAR:

09:50AM  24  Q    Okay.  Did he say anything else about charges?

09:50AM  25  A    Yeah, he said he was looking at a lot of charges.

| 09:50AM | 1 | Q | Did you know what the grand jury was? |
| 09:50AM | 2 | A | I had no idea. |
| 09:50AM | 3 | Q | Do you know what the grand jury is now? |
| 09:50AM | 4 | A | Yes, I do. |
| 09:50AM | 5 | Q | How do you know what the grand jury is? |
| 09:50AM | 6 | A | Because I testified at the grand jury. |
| 09:50AM | 7 | Q | Can you tell the jury what the grand jury does? |
| 09:50AM | 8 | A | Basically sees if somebody can be prosecuted or not. |
| 09:50AM | 9 | Q | You said you testified before them.  Was it in relation to |
| 09:50AM | 10 | | this case? |
| 09:50AM | 11 | A | Yes. |
| 09:50AM | 12 | Q | Now, around that same time, this is May of 2017, did you |
| 09:51AM | 13 | | also agree to become an informant with the ATF? |
| 09:51AM | 14 | A | Yes, I did. |
| 09:51AM | 15 | Q | And as part of being an informant, were you required to |
| 09:51AM | 16 | | sign an agreement? |
| 09:51AM | 17 | A | Yes. |
| 09:51AM | 18 | Q | Did that agreement set forth essentially the rules of your |
| 09:51AM | 19 | | cooperation? |
| 09:51AM | 20 | A | Yes. |
| 09:51AM | 21 | Q | And was one of those rules that you were not supposed to |
| 09:51AM | 22 | | break any laws? |
| 09:51AM | 23 | A | Yes. |
| 09:51AM | 24 | Q | So after you signed that agreement, I want to fast-forward |
| 09:51AM | 25 | | now to November of 2017, do you recall Mr. Smith contacting you |

09:51AM     1    and asking for help?

09:51AM     2    A    Yes.

09:51AM     3    Q    Tell us about that.

09:51AM     4    A    He called me and said that one of our friends got stabbed

09:51AM     5    and that they needed a ride.

09:51AM     6    Q    Okay.  Did you agree to help him?

09:51AM     7    A    Yes.

09:51AM     8    Q    Why?

09:51AM     9    A    Because I wasn't going to let one of our friends go

09:51AM    10    without taking him to the hospital.

09:51AM    11    Q    Did you think Mr. Smith had committed a crime?

09:51AM    12    A    No.

09:51AM    13    Q    So did you contact law enforcement about -- did you give

09:52AM    14    Mr. Smith a ride?

09:52AM    15    A    Yes, I did.

09:52AM    16    Q    Did you tell law enforcement about that after the fact?

09:52AM    17    A    Not right after.

09:52AM    18    Q    Eventually did you tell law enforcement about giving

09:52AM    19    Mr. Smith a ride?

09:52AM    20    A    Yes.

09:52AM    21    Q    Where did you pick him up?

09:52AM    22    A    In Kailua.

09:52AM    23    Q    And do you recall where?

09:52AM    24    A    I believe it was by Checkers, now it's O'Reilly's.

09:52AM    25    Q    And who -- who, if anybody, was Mr. Smith with when you

09:52AM   1   picked him up?

09:52AM   2   A     He was with two younger kids.

09:52AM   3   Q     Do you know their names?

09:52AM   4   A     I believe they go by Cash and Jayword.

09:52AM   5   Q     One is named is Cash and one is named Jayword?

09:52AM   6   A     Correct.

09:52AM   7             MR. NAMMAR:  Can we show the witness --

09:52AM   8   BY MR. NAMMAR:

09:52AM   9   Q     Oh, Cash and Jayword, if you saw their photos, do you

09:52AM   10  think you could recognize them?

09:52AM   11  A     Yes.

09:52AM   12            MR. NAMMAR:  Can we show the witness 1-862, which is

09:52AM   13  from the original list?

09:53AM   14            THE COURT:  All right.

09:53AM   15  BY MR. NAMMAR:

09:53AM   16  Q     Do you recognize what's shown here?

09:53AM   17  A     Yes.

09:53AM   18            MR. NAMMAR:  Can we show the witness now 1-863, which

09:53AM   19  is from the original list?

09:53AM   20            THE COURT:  Yes, go ahead.

09:53AM   21  BY MR. NAMMAR:

09:53AM   22  Q     Do you recognize what is shown here?

09:53AM   23  A     Yes.

09:53AM   24  Q     These two photos, what do they depict?

09:53AM   25  A     The two boys, Cash and Jayword.

| | | |
|---|---|---|
| 09:53AM | 1 | Q    Okay.  Do you know which one is Cash and which one is |
| 09:53AM | 2 | Jayword? |
| 09:53AM | 3 | A    I believe this one is Cash. |
| 09:53AM | 4 | Q    Okay.  And the previous one we looked at you think was |
| 09:53AM | 5 | Jayword? |
| 09:53AM | 6 | A    Yes, correct. |
| 09:53AM | 7 | Q    Okay.  Are these accurate photos of Cash and Jayword? |
| 09:53AM | 8 | A    Yes. |
| 09:53AM | 9 | MR. NAMMAR:  Your Honor, I move to admit 1-862 and |
| 09:53AM | 10 | 1-863. |
| 09:53AM | 11 | THE COURT:  Any objection? |
| 09:53AM | 12 | MS. PANAGAKOS:  No objection. |
| 09:53AM | 13 | THE COURT:  Without objection, those two exhibits, |
| 09:53AM | 14 | 1-862 and 1-863, are each admitted.  You may publish. |
| 09:53AM | 15 | (Exhibits 1-862 and 1-863 were received in evidence.) |
| 09:54AM | 16 | MR. NAMMAR:  Can you publish 1-863. |
| 09:54AM | 17 | BY MR. NAMMAR: |
| 09:54AM | 18 | Q    The jury can see 1-863.  Who do you think this is? |
| 09:54AM | 19 | A    Cash. |
| 09:54AM | 20 | Q    And this is one of the boys that you picked up? |
| 09:54AM | 21 | A    Correct. |
| 09:54AM | 22 | Q    With Jake Smith? |
| 09:54AM | 23 | A    Correct. |
| 09:54AM | 24 | Q    And can you go to 1-862 now.  What is shown here? |
| 09:54AM | 25 | A    Jayword. |

| | | | |
|---|---|---|---|
| 09:54AM | 1 | Q | And is this another one of the boys that you picked up |
| 09:54AM | 2 | | with Jake Smith? |
| 09:54AM | 3 | A | Correct. |
| 09:54AM | 4 | Q | When you -- when you picked Jake Smith, Cash and Jayword |
| 09:54AM | 5 | | up, where did you take them? |
| 09:54AM | 6 | A | To right down the street in Kailua to Aikahi to meet with |
| 09:54AM | 7 | | their other friend. |
| 09:54AM | 8 | Q | Who did they meet with there? |
| 09:54AM | 9 | A | I believe his name was Frankie. |
| 09:54AM | 10 | Q | Did you know Frankie's last name? |
| 09:54AM | 11 | A | No. |
| 09:54AM | 12 | Q | Was there discussion in the car about what happened? |
| 09:54AM | 13 | A | No, not really. |
| 09:54AM | 14 | Q | What was the mood like in the car? |
| 09:54AM | 15 | A | They were all sad. |
| 09:54AM | 16 | Q | Did they say why they were sad? |
| 09:54AM | 17 | A | Well, because they believed that he -- that Dayson was -- |
| 09:55AM | 18 | | died.  Died. |
| 09:55AM | 19 | Q | Who is Dayson? |
| 09:55AM | 20 | A | The person that the got stabbed. |
| 09:55AM | 21 | Q | Did you know Dayson's last name? |
| 09:55AM | 22 | A | No. |
| 09:55AM | 23 | Q | In the car after you dropped them off, did you notice |
| 09:55AM | 24 | | whether they leave -- they left anything behind? |
| 09:55AM | 25 | A | Yes, they left two bags. |

09:55AM    1    Q    Did you look through those bags?

09:55AM    2    A    Yes.

09:55AM    3    Q    Did you notice anything of significance?

09:55AM    4    A    No.

09:55AM    5    Q    Did you later discover who owned those bags?

09:55AM    6    A    Yes.

09:55AM    7    Q    What did you discover?

09:55AM    8    A    Jake -- Jacob Smith owned one, and then Johnnie Stancil

09:55AM    9    owned the other.

09:55AM    10    Q    The one that was Johnnie Stancil's, how would you describe

09:55AM    11    that one?

09:55AM    12    A    It was a red Supreme kind of like designer backpack.

09:55AM    13    Q    Okay.  And what ended up happening with those two bags

09:55AM    14    that were left in your car?

09:55AM    15    A    Jake came to get his, and then Johnnie and his girlfriend

09:55AM    16    came to get his bag.

09:56AM    17    Q    And about how -- how far in time after this ride that you

09:56AM    18    had given him did Johnnie come pick up his bag?

09:56AM    19    A    I don't recall.  At least a week.

09:56AM    20    Q    About a week?

09:56AM    21    A    At least, yeah.

09:56AM    22    Q    You mentioned Chloe.  He came with Chloe.  Who is Chloe?

09:56AM    23    A    It was his girlfriend at the time.

09:56AM    24    Q    Did you know her last name?

09:56AM    25    A    Chang, I believe.

| | | | |
|---|---|---|---|
| 09:56AM | 1 | Q | Do you know what kind of car they arrived in? |
| 09:56AM | 2 | A | In a Jaguar. |
| 09:56AM | 3 | Q | Did you know whose car that was? |
| 09:56AM | 4 | A | It was Chloe's. |
| 09:56AM | 5 | Q | Did you -- when Mr. Stancil picked up the bag, did you |
| 09:56AM | 6 | | speak with Mr. Stancil? |
| 09:56AM | 7 | A | Not really. |
| 09:56AM | 8 | Q | Did he tell you anything about the bag? |
| 09:56AM | 9 | A | No. |
| 09:56AM | 10 | Q | Did he say anything about speaking to law enforcement? |
| 09:56AM | 11 | A | I don't recall. |
| 09:56AM | 12 | Q | Now, moving forward into 2018, did you continue to have |
| 09:57AM | 13 | | contact with Jacob Smith? |
| 09:57AM | 14 | A | Yes. |
| 09:57AM | 15 | Q | Would you speak with him over the telephone? |
| 09:57AM | 16 | A | Yes. |
| 09:57AM | 17 | Q | Would you text message with him? |
| 09:57AM | 18 | A | Yes. |
| 09:57AM | 19 | Q | Among other things, did you talk to him about a BMW? |
| 09:57AM | 20 | A | Yes. |
| 09:57AM | 21 | Q | What was that about? |
| 09:57AM | 22 | A | He needed a car, another safe car basically for him and |
| 09:57AM | 23 | | his kids. |
| 09:57AM | 24 | Q | Okay.  And was that car affiliated with you somehow? |
| 09:57AM | 25 | A | Yes. |

| 09:57AM | 1 | Q | How so? |
|---|---|---|---|

09:57AM   1   Q   How so?

09:57AM   2   A   I went with him to go get it.

09:57AM   3   Q   Okay.  And did you have discussions with him about selling

09:57AM   4   that car?

09:57AM   5   A   Yes.

09:57AM   6   Q   Why?

09:57AM   7   A   Because I wanted nothing to do with him.

09:57AM   8   Q   Okay.  And how was that car affiliated with you?

09:57AM   9   A   Because I owned -- basically owned the car.  It was

09:57AM   10   registered under me.

09:57AM   11   Q   So the title would have had your name on it?

09:57AM   12   A   Correct.

09:57AM   13   Q   Moving forward now to the summer of 2020, couple of years

09:57AM   14   later, did you learn that Michael Miske, John Stancil and

09:58AM   15   others were arrested and charged?

09:58AM   16   A   Yes.

09:58AM   17   Q   And after they were charged, did you get a phone call from

09:58AM   18   Mr. Smith?

09:58AM   19   A   Yes.

09:58AM   20   Q   And where was Mr. Smith at the time?

09:58AM   21   A   I believe he was in jail.

09:58AM   22   Q   How did you know that?

09:58AM   23   A   From the phone call.

09:58AM   24   Q   Okay.  And what, if anything, did you and Mr. Smith

09:58AM   25   discuss?

| | | |
|---|---|---|
| 09:58AM | 1 | A    He basically just told me that to tell on him because I |
| 09:58AM | 2 | had a lot to lose.  So if the cops come for me, to tell on him. |
| 09:58AM | 3 | Q    Okay.  What did you understand to tell on you to mean? |
| 09:58AM | 4 | A    To tell them everything I knew. |
| 09:58AM | 5 | Q    Okay.  Did you know -- did Mr. Smith know that you were |
| 09:58AM | 6 | cooperating at the time? |
| 09:58AM | 7 | A    No, he did not. |
| 09:58AM | 8 | Q    During this conversation, did Mr. Smith say anything about |
| 09:58AM | 9 | what you shouldn't say? |
| 09:59AM | 10 | A    I just -- I don't recall. |
| 09:59AM | 11 | Q    Okay.  Did he tell you to make anything up? |
| 09:59AM | 12 | A    No, he did not. |
| 09:59AM | 13 | Q    Did he encourage you in any way? |
| 09:59AM | 14 | A    He basically said to tell on him. |
| 09:59AM | 15 | Q    Okay.  At the time you had this phone call with Mr. Smith, |
| 09:59AM | 16 | were you still giving information to the ATF? |
| 09:59AM | 17 | A    Yes. |
| 09:59AM | 18 | Q    And after you had this conversation, did you tell the ATF |
| 09:59AM | 19 | about it? |
| 09:59AM | 20 | A    Yes. |
| 09:59AM | 21 | Q    Okay.  Ms. Akau, do you recall the -- you talked to us |
| 09:59AM | 22 | about the Keolu liquor store meeting with Mr. Miske? |
| 10:00AM | 23 | A    Correct. |
| 10:00AM | 24 | Q    And you also -- you talked about Ginza which happened in |
| 10:00AM | 25 | March of 2017? |

10:00AM   1   A    Correct.

10:00AM   2   Q    That meeting with Mr. Miske at the liquor store, do you

10:00AM   3   recall if that happened before Keolu liquor or after -- excuse

10:00AM   4   me, before Ginza or after?

10:00AM   5   A    That happened before Ginza.

10:00AM   6   Q    Okay.  So Ginza was March 2017, and you're meeting with

10:00AM   7   Mr. Miske you believe was before then?

10:00AM   8   A    I believe so.

10:00AM   9        MR. NAMMAR:  Okay.  Pass the witness, Your Honor.

10:00AM   10        THE COURT:  It's a little earlier than we typically

10:00AM   11   take breaks, but given where we are with the examination, why

10:00AM   12   don't we go ahead and do that a little bit early this morning

10:00AM   13   before we begin the cross-examination of Ms. Akau.

10:00AM   14        As we go to break, we're just after the 10:00 hour,

10:00AM   15   I'll remind our jurors to refrain from discussing the substance

          16   of this case with anyone, including each other, until I advise

          17   you otherwise; to refrain from accessing any media or other

          18   accounts of this case that may be out there; and finally, do

          19   not conduct any independent investigation into the facts,

          20   circumstances or persons involved.

10:01AM   21        Try to take it -- about 20 minutes I think is what

10:01AM   22   we've been averaging, so let's try to keep it to that, and then

10:01AM   23   we will begin again with Ms. Akau.

10:01AM   24        (Proceedings were recessed at 10:01 a.m. to 10:20

10:02AM   25   a.m.)

| | | |
|---|---|---|
| 10:20AM | 1 | THE COURT:  Okay.  Back from our first trial break of |
| 10:26AM | 2 | the day. |
| 10:26AM | 3 | Ms. Panagakos, you were about to begin your cross of |
| 10:26AM | 4 | Ms. Akau.  You may begin when you are ready. |
| 10:26AM | 5 | MS. PANAGAKOS:  Thank you, Your Honor. |
| 10:26AM | 6 | CROSS-EXAMINATION |
| 10:26AM | 7 | BY MS. PANAGAKOS: |
| 10:26AM | 8 | Q    Ms. Akau, you at a time were married to Ramsey Scanlan? |
| 10:26AM | 9 | A    Correct. |
| 10:26AM | 10 | Q    When was that? |
| 10:26AM | 11 | A    I was married to him in 2012 -- 2014. |
| 10:26AM | 12 | Q    And you were still in touch with him in 2016? |
| 10:26AM | 13 | A    Yes. |
| 10:26AM | 14 | Q    And he was a drug dealer? |
| 10:26AM | 15 | A    More so a user than a drug dealer. |
| 10:26AM | 16 | Q    Did he get drugs from Nico Carignan that he supplied to |
| 10:26AM | 17 | others? |
| 10:26AM | 18 | A    Yes. |
| 10:26AM | 19 | Q    And when was that? |
| 10:26AM | 20 | A    About 2016. |
| 10:27AM | 21 | Q    And so was he living with you at that time? |
| 10:27AM | 22 | A    No. |
| 10:27AM | 23 | Q    So how did you get to know Nico Carignan? |
| 10:27AM | 24 | A    He was his friend previous before he started giving him |
| 10:27AM | 25 | drugs. |

| | | | |
|---|---|---|---|
| 10:27AM | 1 | Q | And what was the nature of your friendship with him? |
| 10:27AM | 2 | A | Well, that was his friend so he would always hang out with |
| 10:27AM | 3 | | him, so I would be around. |
| 10:27AM | 4 | Q | And you were -- what was the nature -- what was the state |
| 10:27AM | 5 | | of your relationship with Mr. Carignan in 2016 when you set him |
| 10:27AM | 6 | | up? |
| 10:27AM | 7 | A | Before or after? |
| 10:27AM | 8 | Q | Before. |
| 10:27AM | 9 | A | Before we were friend -- we were friends. |
| 10:27AM | 10 | Q | You were friends? |
| 10:27AM | 11 | A | Yeah. |
| 10:27AM | 12 | Q | And you knew him to be a drug dealer? |
| 10:27AM | 13 | A | Yes. |
| 10:27AM | 14 | Q | And had you ever had prior drug related conversations with |
| 10:27AM | 15 | | him? |
| 10:27AM | 16 | A | Never. |
| 10:27AM | 17 | Q | And you just went up to him one day and said, I have |
| 10:28AM | 18 | | friends who want to buy 5 pounds and -- |
| 10:28AM | 19 | A | Yes. |
| 10:28AM | 20 | Q | -- a deal was set up just like that for 5 pounds? |
| 10:28AM | 21 | A | Yes. |
| 10:28AM | 22 | Q | With you never having any history of drug dealing? |
| 10:28AM | 23 | A | Because he knew my -- my ex-husband was missing.  He |
| 10:28AM | 24 | | just -- he wasn't living in the house, so I would talk to him |
| 10:28AM | 25 | | to try and get ahold of my ex-husband, and he'd tell me what he |

10:28AM   1   would do with him, give him the drugs.  So that's how it kind

10:28AM   2   of opened up that conversation.

10:28AM   3   Q    So in 2016 you were in touch with him about your husband

10:28AM   4   being missing?

10:28AM   5   A    Yes.

10:28AM   6   Q    And how frequently were you in touch with him about that?

10:28AM   7   A    I don't recall.  Probably at least once a week.

10:28AM   8   Q    But you were no longer married to him?

10:28AM   9   A    We were divorced in 2018.

10:28AM   10   Q    Okay.  So I'm sorry, I misunderstood.  I thought you said

10:28AM   11   you were married from 2012 to 2014?

10:28AM   12   A    No, I was thinking -- 2012 was when we got together.  We

10:28AM   13   were married 2014.

10:28AM   14   Q    Okay.  Until -- until 2018?

10:28AM   15   A    Yes, correct.

10:28AM   16   Q    Okay.  All right.  So during the 2016 time frame your

10:28AM   17   husband was dealing drugs for Nicholas Carignan?

10:29AM   18   A    Correct.

10:29AM   19   Q    You would contact Nicholas Carignan to discuss your

10:29AM   20   husband's whereabouts in relation to his drug activity?

10:29AM   21   A    Correct.

10:29AM   22   Q    And it was Kurt Kipapa, Jr., who initially brought the

10:29AM   23   idea to you and Norman Akau, right?

10:29AM   24   A    Well, it was Norman Akau.

10:29AM   25   Q    And was Kurt Kipapa, Jr., present for that?

10:29AM   1   A   They were there.

10:29AM   2   Q   So it was something -- the initial discussion then was

10:29AM   3   between you and Norman Akau and Kurt Kipapa, Jr.?

10:29AM   4   A   For the most part, but it was Norman who started the

10:29AM   5   conversation.

10:29AM   6   Q   And you became an informant in May 2017, right?

10:29AM   7   A   I believe so.

10:29AM   8   Q   You had meetings with the ATF, the first one I guess was

10:29AM   9   in October 2016?

10:29AM   10   A   Mmm, I believe so.

10:29AM   11   Q   After the car rental?

10:29AM   12   A   Right.

10:29AM   13   Q   And then about a month and a half after the Ginza

10:29AM   14   situation you met with them again?

10:29AM   15   A   Correct.

10:29AM   16   Q   And then about a month after that you became -- signed an

10:30AM   17   informant agreement?

10:30AM   18   A   I believe so.

10:30AM   19   Q   And then after you signed your informant agreement, you

10:30AM   20   met with them periodically?

10:30AM   21   A   Occasionally, yes.

10:30AM   22   Q   To provide information?

10:30AM   23   A   Correct.

10:30AM   24   Q   Because you were an informant?

10:30AM   25   A   Correct.

10:30AM    1    Q    And you -- well, let's see.

10:30AM    2         MS. PANAGAKOS:  Can we show Ms. Akau Exhibit 9000-033.

10:30AM    3    It's not in evidence, just for the Court and the parties and

10:30AM    4    the witness.

10:30AM    5    BY MS. PANAGAKOS:

10:31AM    6    Q    Ms. Akau, is this the informant agreement you signed?

10:31AM    7    A    Yes, it is.

10:31AM    8    Q    And it's dated May 15, 2017?

10:31AM    9    A    Correct.

10:31AM    10        MS. PANAGAKOS:  Let me see.  Your Honor, I apologize,

10:31AM    11   this is on the tenth supplemental exhibit list.

10:31AM    12        THE COURT:  Go ahead.

10:31AM    13        MS. PANAGAKOS:  Can we highlight paragraph 1, please?

10:31AM    14   BY MS. PANAGAKOS:

10:31AM    15   Q    So in this agreement you voluntarily agree to provide

10:31AM    16   information regarding Jacob Smith and his associates and their

10:32AM    17   involvement in criminal enterprise?

10:32AM    18   A    Correct.

10:32AM    19   Q    And Mr. Smith's and his associates criminal enterprise?

10:32AM    20   A    Correct.

10:32AM    21        MS. PANAGAKOS:  And then can we highlight paragraph 2,

10:32AM    22   please?

10:32AM    23   BY MS. PANAGAKOS:

10:32AM    24   Q    And Special Agent Gary Graham, he was your controlling

10:32AM    25   agent, right?

10:32AM   1   A   Correct.

10:32AM   2   Q   And then you also in this agreement agreed not to commit

10:32AM   3   any illegal activity, right?

10:32AM   4   A   Correct.

10:32AM   5   Q   And not to engage in any destruction of evidence?

10:32AM   6   A   Correct.

10:32AM   7   Q   And to notify ATF of any acts of violence?

10:32AM   8   A   Correct.

10:32AM   9   Q   And your motivation for becoming an informant was

10:33AM   10   initially to get -- seek consideration from the government with

10:33AM   11   regard to your involvement in the Kalihi post office shooting,

10:33AM   12   correct?

10:33AM   13   A   Sorry, say that again?

10:33AM   14   Q   Your initial motivation to become an informant was to seek

10:33AM   15   consideration from the government regarding your involvement in

10:33AM   16   the shooting that occurred near the Kalihi post office on

10:33AM   17   October 13, 2016?

10:33AM   18   A   Correct.

10:33AM   19   Q   And then ultimately --

10:33AM   20        MS. PANAGAKOS:   We can take that down.

10:33AM   21   BY MS. PANAGAKOS:

10:33AM   22   Q   Ultimately you did receive favorable consideration.   You

10:33AM   23   received an agreement from the government not to charge you

10:33AM   24   with that offense?

10:33AM   25   A   Correct.

10:33AM   1                MR. NAMMAR:  Objection.  Misstates the plea agreement.

10:33AM   2                THE COURT:  You can cross on that --

10:33AM   3                MS. PANAGAKOS:  Thank you, Your Honor.

10:33AM   4                MR. NAMMAR:  -- when you do your redirect.

10:33AM   5                Go ahead.

10:34AM   6                MS. PANAGAKOS:  Can we turn, Ms. King, to

10:34AM   7     Exhibit 9000-020, and show this to Ms. Akau.  It's not in

10:34AM   8     evidence.

10:34AM   9     BY MS. PANAGAKOS:

10:34AM   10    Q     This is a copy of your memorandum of plea agreement.  Do

10:34AM   11    you see that?

10:34AM   12    A     Yes.

10:34AM   13               MS. PANAGAKOS:  And can we turn to page 2 and

10:34AM   14    highlight paragraph 4 and the heading, the agreement.

10:34AM   15    BY MS. PANAGAKOS:

10:34AM   16    Q     So the agreement -- this is your agreement, right?

10:34AM   17    A     Correct.

10:34AM   18    Q     And it says that you agree to plead guilty to the release

10:34AM   19    of what you believed to be mace or pepper spray at Ginza

10:34AM   20    Nightclub, right?

10:34AM   21    A     Correct.

10:34AM   22               MS. PANAGAKOS:  And then can we look at the bottom --

10:34AM   23    the sentence that begins on the bottom of page 4 and then

10:34AM   24    continues on to page 5?

10:35AM   25               I'm sorry, I'm sorry.  I mean the bottom of page 2,

10:35AM   1   paragraph 4.

10:35AM   2   BY MS. PANAGAKOS:

10:35AM   3   Q    And in exchange for your guilty plea, the government

10:35AM   4   agrees not to charge you with any additional offenses --

10:35AM   5        MS. PANAGAKOS:  Can we turn to page 3?

10:35AM   6   BY MS. PANAGAKOS:

10:35AM   7   Q    -- with regard to the release of chemicals in the Ginza

10:35AM   8   Nightclub, and also not to charge you with any offenses related

10:35AM   9   to robberies in which you participated to the extent you

10:35AM   10  disclosed those robberies -- okay.  I guess it doesn't have

10:35AM   11  that.

10:35AM   12        But ultimately you weren't charged with anything

10:35AM   13  related to the -- the Kalihi post office shooting?

10:35AM   14  A    Right, because I had nothing to do with that.

10:35AM   15  Q    You were not charged with that.

10:35AM   16  A    No.

10:35AM   17  Q    And you were not charged -- that car was also used with --

10:35AM   18  in Jarrin Young's robbery of Eric Lum, right?

10:36AM   19  A    So I've heard, yes.

10:36AM   20  Q    And that was done by Jarrin Young and Jake Smith?

10:36AM   21        THE COURT REPORTER:  I need you to slow down,

10:36AM   22  Ms. Panagakos.

10:36AM   23        MS. PANAGAKOS:  Yes, Ms. Bediamol.  I apologize.

10:36AM   24  BY MS. PANAGAKOS:

10:36AM   25  Q    The Chrysler you rented was also used by Jarrin Young in

10:36AM   1   the robbery of Eric Lum, correct?

10:36AM   2   A   I believe so.

10:36AM   3   Q   And do you know who participated in that with Jarrin

10:36AM   4   Young?

10:36AM   5   A   I believe it might have been Jake Smith.  I don't recall.

10:36AM   6   Q   And so the government in its plea agreement agreed not to

10:36AM   7   charge you with that robbery either.

10:36AM   8   A   Well, I had nothing to do with that robbery.

10:36AM   9   Q   You rented a car and provided it to Jake Smith, and it was

10:36AM  10   used in the commission of crimes, correct?

10:36AM  11   A   Correct.

10:36AM  12   Q   Now, it was your cousin Norman Akau who asked you to rent

10:36AM  13   the car for Jake Smith, right?

10:36AM  14   A   Correct.

10:36AM  15   Q   And when you spoke to the ATF on April 28, 2017, you lied

10:37AM  16   about that and said it was not your cousin, right?

10:37AM  17   A   Well, at that time I didn't know if he was my cousin or

10:37AM  18   not.  Later I found out he was.

10:37AM  19   Q   But you didn't -- you lied and said it was not -- well,

10:37AM  20   your father was there during your interview on April 28, 2017,

10:37AM  21   right?

10:37AM  22   A   Correct.

10:37AM  23   Q   And he knew that Norman Akau was his cousin, correct?

10:37AM  24   A   I'm not so sure if he knew at that time.  You have to do

10:37AM  25   some digging.  All of us are related.

10:37AM   1   Q   On April 28, 2017, when you were interviewed you were

10:37AM   2   asked about the circumstances of the rental car, correct?

10:37AM   3   A   Correct.

10:37AM   4   Q   And that interview was recorded?

10:38AM   5   A   Correct.

10:38AM   6           MS. PANAGAKOS:  So I'd like to show Ms. Akau

10:38AM   7   Exhibit 9000-31.

10:38AM   8   BY MS. PANAGAKOS:

10:38AM   9   Q   And this is a transcript of your recorded interview.

10:38AM   10          MS. PANAGAKOS:  And I would like to direct Ms. Akau's

10:38AM   11  attention to page 26, line 22 through 25.

10:38AM   12          And this is on the sixth supplemental exhibit list.

10:39AM   13          THE COURT:  Yes, I have it now.

10:39AM   14  BY MS. PANAGAKOS:

10:39AM   15  Q   And so when you were asked about this on April 28, 2017,

10:39AM   16  Ms. Akau, your answer was:  "Well, my cousin -- well, this guy

10:39AM   17  called me to rent the car, he is not our cousin, and then I

10:39AM   18  rented the car and then it was Jake's use."

10:39AM   19          Do you see that?

10:39AM   20  A   Yes, I do.

10:39AM   21  Q   And that's what you told the -- the agents that day?

10:39AM   22  A   That day I did.

10:39AM   23  Q   And you didn't say it was Norman Akau?

10:39AM   24  A   Not in this -- I'm not too sure if it says it in this when

10:39AM   25  I talked to them, but in this particular part, it does not.

| | | | |
|---|---|---|---|
| 10:39AM | 1 | Q | And you said, "My cousin -- well, not my cousin -- well, a |
| 10:39AM | 2 | | guy" in front of your father? |
| 10:39AM | 3 | A | Right. |
| 10:39AM | 4 | Q | And failed to disclose who it was? |
| 10:39AM | 5 | A | At the time, yes. |
| 10:39AM | 6 | Q | Now, when you were interviewed in October 2016, Agent |
| 10:40AM | 7 | | Graham contacted you? |
| 10:40AM | 8 | A | Okay. |
| 10:40AM | 9 | Q | Well, he -- I mean you got to know him, he was your |
| 10:40AM | 10 | | handler, right? |
| 10:40AM | 11 | A | Right. |
| 10:40AM | 12 | Q | And so he was the guy who came the first time to talk with |
| 10:40AM | 13 | | you, right? |
| 10:40AM | 14 | A | Correct. |
| 10:40AM | 15 | Q | And others were there as well? |
| 10:40AM | 16 | A | Correct. |
| 10:40AM | 17 | Q | Do you remember who any of the other agents were? |
| 10:40AM | 18 | A | I don't remember.  There was two others. |
| 10:40AM | 19 | Q | One was Ty Torco? |
| 10:40AM | 20 | A | Sorry? |
| 10:40AM | 21 | Q | Was one of them Ty Torco? |
| 10:40AM | 22 | A | I'm -- if you're telling me it is, then yes.  I don't |
| 10:40AM | 23 | | recall their names. |
| 10:40AM | 24 | Q | And they asked you who you rented the car for? |
| 10:40AM | 25 | A | Correct. |

| | | | |
|---|---|---|---|
| 10:40AM | 1 | Q | And they asked you if you were aware that it had been used |
| 10:40AM | 2 | | in a shooting? |
| 10:40AM | 3 | A | Correct. |
| 10:40AM | 4 | Q | And you told them -- you did not disclose who you rented |
| 10:40AM | 5 | | the car for? |
| 10:40AM | 6 | A | Right. |
| 10:40AM | 7 | Q | And you denied knowledge that it had been used in a |
| 10:40AM | 8 | | shooting? |
| 10:40AM | 9 | A | Correct. |
| 10:40AM | 10 | Q | But -- but Mr. Smith had called you minutes after the |
| 10:40AM | 11 | | shooting to inform you that it was in fact used in a shooting? |
| 10:41AM | 12 | A | Correct. |
| 10:41AM | 13 | Q | So you lied to the agents that day. |
| 10:41AM | 14 | A | I did. |
| 10:41AM | 15 | Q | And then after you became -- well, before becoming an |
| 10:41AM | 16 | | informant, your father, you spoke with him about it, right? |
| 10:41AM | 17 | A | Spoke with him about? |
| 10:41AM | 18 | Q | Becoming an informant. |
| 10:41AM | 19 | A | I don't recall. |
| 10:41AM | 20 | Q | You recall that your father came with you to the |
| 10:41AM | 21 | | meeting -- |
| 10:41AM | 22 | A | Oh, yes, I did talk to him about it. |
| 10:41AM | 23 | Q | Right.  And your father is the one who told you about a |
| 10:41AM | 24 | | traffic stop where a bottle of Jagermeister had -- |
| 10:41AM | 25 | | MR. NAMMAR:  Objection.  Hearsay. |

10:41AM   1              THE COURT:  Overruled.  Go ahead.

10:41AM   2              THE WITNESS:  Sorry, can you repeat that?

10:41AM   3    BY MS. PANAGAKOS:

10:41AM   4    Q    Your father is the one who told you about Jake Smith

10:41AM   5    having been involved in a traffic stop and his backpack being

10:42AM   6    seized, the Gucci bag that you recognized?

10:42AM   7    A    Okay.  I believe so.

10:42AM   8    Q    And did your father tell you that he learned that

10:42AM   9    information from Terrence Chu?

10:42AM   10   A    I don't recall.

10:42AM   11   Q    You don't recall -- you're aware that your father was

10:42AM   12   acquainted with Homeland Security Investigations Special Agent

10:42AM   13   Terrence Chu prior to your April 28, 2017, meeting with the

10:42AM   14   agents, right?

10:42AM   15   A    I don't recall, but if you're telling me, then I'm sure.

10:42AM   16   Q    Well, it was your father who got you to go to that

10:42AM   17   meeting, right?

10:42AM   18   A    Right.

10:42AM   19   Q    So how did this come to the attention of your father?

10:42AM   20   A    How did what -- how did the backpack?

10:42AM   21   Q    The -- well, yes, for one the backpack.

10:42AM   22   A    I'm not sure.  He has a lot of friends.

10:42AM   23   Q    And your father -- I mean you're aware that Terrence Chu

10:42AM   24   contacted your father and told him that law enforcement wanted

10:42AM   25   to speak with you?

10:42AM   1   A    Well, I don't recall if it was Terrence Chu, but I know

10:42AM   2   they were talking to me about it, yes.

10:43AM   3   Q    You're -- you're aware law enforcement contacted your

10:43AM   4   father.

10:43AM   5   A    I don't recall if they contacted him through me or

10:43AM   6   whatnot.  It was a long time ago.  I don't recall.

10:43AM   7   Q    You know that your father has been an informant in the

10:43AM   8   past?

10:43AM   9   A    Correct.

10:43AM   10   Q    And so did he talk with you about the benefits of becoming

10:43AM   11   an informant?

10:43AM   12   A    Yes.

10:43AM   13   Q    And he had gotten huge breaks on his sentences by being an

10:43AM   14   informant?

10:43AM   15         MR. NAMMAR:  Objection.  Relevance.

10:43AM   16         THE COURT:  Sustained.

10:43AM   17   BY MS. PANAGAKOS:

10:43AM   18   Q    So are you aware of who your father had relationships with

10:43AM   19   in law enforcement as a result of being an informant?

10:43AM   20   A    No, I was not aware.

10:43AM   21   Q    Is your father the one who arranged for you to meet with

10:43AM   22   law enforcement on April 28, 2017?

10:43AM   23   A    I don't recall.  I don't recall if it was him or I.

10:43AM   24   Q    Did you ask him to go with you?

10:43AM   25   A    Yes, I did.

| | | |
|---|---|---|
| 10:43AM | 1 | Q    And you know that your father had robbed drug dealers |
| 10:44AM | 2 | before. |
| 10:44AM | 3 |              MR. NAMMAR:  Objection.  Relevance. |
| 10:44AM | 4 |              THE COURT:  Sustained. |
| 10:44AM | 5 | BY MS. PANAGAKOS: |
| 10:44AM | 6 | Q    And so during your April 28, 2017, interview, you were |
| 10:44AM | 7 | asked if you committed any robberies with Jacob Smith. |
| 10:44AM | 8 | A    Correct. |
| 10:44AM | 9 | Q    And you said no. |
| 10:44AM | 10 | A    Correct. |
| 10:44AM | 11 | Q    And that was a lie. |
| 10:44AM | 12 | A    Correct. |
| 10:44AM | 13 | Q    And you asked them if you had -- they asked you if you had |
| 10:44AM | 14 | provided all disclosure of your knowledge of all of Jacob |
| 10:44AM | 15 | Smith's activities. |
| 10:44AM | 16 | A    Correct. |
| 10:44AM | 17 | Q    And you said you had. |
| 10:44AM | 18 | A    Correct. |
| 10:44AM | 19 | Q    And that was a lie. |
| 10:44AM | 20 | A    Correct. |
| 10:44AM | 21 | Q    So these Jagermeister bottles, I mean it's just like a |
| 10:44AM | 22 | Diet Coke, I mean, you know, any one looks like the other, |
| 10:45AM | 23 | right?  I mean if you see a picture of a Jagermeister bottle, a |
| 10:45AM | 24 | month and a half after you testified you used a Jagermeister |
| 10:45AM | 25 | bottle in a club, I mean how can -- the picture is just of a |

10:45AM    1    Jagermeister bottle that you saw a month and a half later?

10:45AM    2              MR. NAMMAR:  Objection.  Confusing.

10:45AM    3              THE COURT:  I'm not sure I understand the question.

10:45AM    4    If the witness does, she may answer.

10:45AM    5              THE WITNESS:  I don't understand the question as well.

10:45AM    6              MS. PANAGAKOS:  I believe it's 6-26, the photo of the

10:45AM    7    Jagermeister bottle that was in -- that is in evidence is what

10:45AM    8    I'm --

10:45AM    9              THE COURT:  It is.

10:45AM    10             MS. PANAGAKOS:  May I publish that?

10:45AM    11             THE COURT:  Yes.

10:45AM    12   BY MS. PANAGAKOS:

10:45AM    13   Q    So this is a photo of a Jagermeister bottle.

10:45AM    14   A    Correct.

10:45AM    15   Q    And your father told you about the circumstances of seeing

10:46AM    16   this photograph.

10:46AM    17             MR. NAMMAR:  Objection.  Asked and answered.

10:46AM    18             THE COURT:  Overruled.  Go ahead.  You may answer that

10:46AM    19   question.

10:46AM    20             THE WITNESS:  Sorry, repeat your question again.

10:46AM    21   BY MS. PANAGAKOS:

10:46AM    22   Q    Your father told you about the circumstances of this

10:46AM    23   photograph that you saw on April 28, 2017, right?

10:46AM    24   A    Can you rephrase that?

10:46AM    25   Q    Sometime -- so the Ginza incident occurred on March 5th.

10:46AM   1   A    Correct.

10:46AM   2   Q    And then sometime in April you got a call from Jacob

10:46AM   3   Smith.

10:46AM   4   A    Correct.

10:46AM   5   Q    And he asked you if you had talked to anyone.

10:46AM   6   A    Okay.

10:46AM   7   Q    And he said he -- he thought he could trust you not to

10:46AM   8   talk, right?

10:46AM   9   A    Okay.

10:46AM   10   Q    And then he indicated that he was going to follow up on

10:46AM   11   this conversation in person.

10:46AM   12   A    I don't recall.

10:47AM   13        MS. PANAGAKOS:  Can we please show Ms. Akau

10:47AM   14   Exhibit 9000-31, page 5?

10:47AM   15        THE COURT:  Go ahead.

10:47AM   16        MS. PANAGAKOS:  I'm sorry, if we could go to page 4,

10:47AM   17   at the bottom, line 24.

10:47AM   18   BY MS. PANAGAKOS:

10:47AM   19   Q    And, Ms. Akau, if you could read from line 24, and then on

10:47AM   20   to the next page, line 14.

10:47AM   21   A    (Peruses document.)

10:48AM   22   Q    And have you read -- let me know when you've read that,

10:48AM   23   please.

10:48AM   24   A    Yes.

10:48AM   25   Q    So it was your dad who told you what had happened with

10:48AM   1   regard to Jake Smith's traffic stop.

10:48AM   2   A    Correct, that's what it says there.

10:48AM   3   Q    And then at this meeting you were then shown photographs

10:48AM   4   of items that your father had told you had been seized from the

10:48AM   5   traffic stop.

10:48AM   6   A    Correct.

10:48AM   7   Q    Okay.  And you recognize the Gucci bag because that is

10:48AM   8   distinctive?

10:48AM   9   A    Correct.

10:48AM   10  Q    But a Jagermeister bottle -- I mean a Jagermeister

10:48AM   11  miniature bottle is -- I mean any one looks just like another,

10:48AM   12  they're mass produced, right?

10:48AM   13  A    Correct.

10:48AM   14  Q    So you don't know anything about the -- where the

10:48AM   15  Jagermeister bottle in the photograph that you saw on

10:48AM   16  April 27 -- on April 28, 2017, had actually been.  You have no

10:49AM   17  personal knowledge of that.  You just saw a photograph that

10:49AM   18  day.

10:49AM   19  A    Correct.

10:49AM   20  Q    Now, with regard to the April 28, 2007 -- I'm sorry, the

10:49AM   21  incident at Ginza, you and Jacob Smith drove to a house in

10:49AM   22  Waimanalo?

10:49AM   23  A    Correct.

10:49AM   24  Q    And then in your first recorded statement you said he came

10:49AM   25  out with a McDonald's cup with two things wrapped in paper

10:49AM    1    towels inside the cup.

10:49AM    2    A    Right.

10:49AM    3    Q    And so then you took one of them because you went into the

10:49AM    4    club with it.

10:49AM    5    A    Correct.  It was the Jagermeister bottle.

10:49AM    6    Q    Correct.

10:49AM    7    A    Correct.

10:49AM    8    Q    Did you actually even unwrap the other item?  It was

10:49AM    9    wrapped in a paper towel inside a cup, did you --

10:49AM   10    A    Yeah, I looked at both of them.

10:49AM   11    Q    You did?

10:49AM   12    A    Correct.

10:49AM   13    Q    Okay.  And then you weren't ordered to do anything by

10:49AM   14    Mike.  Jake Smith asked you to do this and you agreed, right?

10:49AM   15    A    Correct.

10:49AM   16    Q    And you understood the purpose of this to be to cause

10:50AM   17    people to leave the club?

10:50AM   18    A    Correct.

10:50AM   19    Q    And that's what you agreed to do, pour some chemical on

10:50AM   20    the floor that you believed to be pepper spray or mace that

10:50AM   21    would cause people to get irritated eyes and cough and have

10:50AM   22    enough difficulty breathing to move away from the substance.

10:50AM   23    A    Correct.

10:50AM   24    Q    You did not intend to ever put that bottle on anybody

10:50AM   25    else's body other than your own.

10:50AM    1    A    Correct.

10:50AM    2    Q    And the only lasting period of time issue you had was as a

10:50AM    3    result of your choice to put it on your body.

10:50AM    4    A    Correct.

10:50AM    5    Q    You did not intend to physically hurt anybody by pouring

10:50AM    6    some chemical on the floor that day.

10:50AM    7    A    Correct.

10:50AM    8    Q    You just intended for people to leave.

10:50AM    9    A    Correct.

10:50AM    10   Q    You certainly didn't intend to cause severe harm to many

10:50AM    11   people.

10:50AM    12   A    Correct.

10:50AM    13   Q    You would never have done something like that.

10:51AM    14   A    Correct.

10:51AM    15   Q    And the -- you never spoke to Michael Miske that day?

10:51AM    16   A    No, I did not.

10:51AM    17   Q    The only person you spoke to about this was Jake Smith.

10:51AM    18   A    Correct.

10:51AM    19   Q    And in fact, even Jake Smith was kind of jealous, right?

10:51AM    20   He kept you away, he didn't want you to talk to other people

10:51AM    21   outside of him.

10:51AM    22   A    Correct.

10:51AM    23   Q    So your knowledge of Mr. Smith's relationship with Mike

10:51AM    24   Miske comes exclusively from Jake Smith.

10:51AM    25   A    Correct.

10:51AM   1   Q   And the only thing that Jake Smith ever told you -- of the

10:51AM   2   things that Jake Smith asked you to do, the only one that he

10:51AM   3   ever said was something that Mike asked him to do was the

10:51AM   4   incident at the Ginza.

10:51AM   5   A   Sorry, can you say that one more time?

10:51AM   6   Q   Jake Smith didn't tell you that the robbery of Palani

10:51AM   7   Mitchell was something that Mike -- Mike Miske asked him to do.

10:52AM   8   A   Correct.

10:52AM   9   Q   Jake Smith didn't tell you that renting the Chrysler was

10:52AM   10   something that Mike Miske asked you to do.

10:52AM   11   A   Correct.

10:52AM   12   Q   Jake Smith didn't tell you that Mike Miske had asked Dae

10:52AM   13   Han Moon to shoot out of the car.

10:52AM   14   A   Correct.

10:52AM   15   Q   Jake Smith never told you that Mike Miske asked him to

10:52AM   16   have Jarrin Young use the car to rob Eric Lum.

10:52AM   17   A   Correct.

10:52AM   18   Q   And to your knowledge, Mike Miske had absolutely nothing

10:52AM   19   to do with any of those things.

10:52AM   20   A   To my knowledge.

10:52AM   21   Q   So what is your relationship with Kurt Kipapa, Jr.?

10:52AM   22   A   We're -- we're friends.

10:52AM   23   Q   And did you know him prior to the day when he and Norm

10:52AM   24   approached you about the robbery of Nicolas Carignan?

10:52AM   25   A   I didn't know him personally, but I knew of him.

| | | | |
|---|---|---|---|
| 10:52AM | 1 | Q | Well, which one were you better acquainted with when the |
| 10:52AM | 2 | | two approached you? |
| 10:52AM | 3 | A | I didn't meet any of them in person before they approached |
| 10:52AM | 4 | | me. |
| 10:52AM | 5 | Q | So you're at The Shack Kailua -- |
| 10:52AM | 6 | A | Yes. |
| 10:52AM | 7 | Q | -- drinking? |
| 10:52AM | 8 | A | I was outside in the parking lot. |
| 10:53AM | 9 | Q | Had you been drinking inside? |
| 10:53AM | 10 | A | I believe we just got there not too long -- |
| 10:53AM | 11 | Q | "We" who? |
| 10:53AM | 12 | A | Me and my sister-in-law. |
| 10:53AM | 13 | Q | And did your sister-in-law know these people? |
| 10:53AM | 14 | A | I don't believe so.  Maybe she knew Kurt, but we didn't |
| 10:53AM | 15 | | really talk about it. |
| 10:53AM | 16 | Q | So people you don't know just walked up to you and asked |
| 10:53AM | 17 | | you if you could set up Nicholas Carignan for 5-pound bags? |
| 10:53AM | 18 | A | Yes. |
| 10:53AM | 19 | Q | And you -- when did you come to know him as Kurty Boy? |
| 10:53AM | 20 | A | Not far after.  I don't recall. |
| 10:53AM | 21 | Q | So do you recall, you know, you were seeking favorable |
| 10:53AM | 22 | | consideration?  That's why you became an informant. |
| 10:53AM | 23 | A | Yes. |
| 10:53AM | 24 | Q | And do you recall that shortly after -- like about a month |
| 10:53AM | 25 | | after becoming an informant, you actually met with not only |

10:53AM   1    agents but a prosecutor, Chris Thomas?  Not one of these guys

10:53AM   2    but a different prosecutor.

10:53AM   3    A    I believe so.

10:53AM   4    Q    And you know that agents write reports about, you know, to

10:54AM   5    document what you say --

10:54AM   6    A    Yes.

10:54AM   7    Q    -- and what your work is as an informant?

10:54AM   8          MS. PANAGAKOS:  I'd like to show Ms. Akau

10:54AM   9    Exhibit 9000-003, which is on the original list.

10:54AM   10         If we could go to page -- the second page of this

10:54AM   11   exhibit, please.

10:54AM   12   BY MS. PANAGAKOS:

10:54AM   13   Q    And this is a memorandum of their contact with you, Chris

10:54AM   14   Thomas, Gary Graham and Ty Torco, on June 16, 2017.

10:54AM   15         MS. PANAGAKOS:  And then if we can turn to the third

10:54AM   16   page.  And if we could highlight from the top of this page all

10:54AM   17   the way down to the -- yeah, let me see.

10:54AM   18   BY MS. PANAGAKOS:

10:55AM   19   Q    So if you could read the first paragraph.

10:55AM   20   A    (Peruses document.)  Okay.

10:55AM   21   Q    And does this remind you that Kurty Boy is actually the

10:55AM   22   one who approached you and Norman Akau?

10:55AM   23   A    Well, it was both of them --

10:55AM   24   Q    Both of them.

10:55AM   25   A    -- as previously stated.

| | | | |
|---|---|---|---|
| 10:55AM | 1 | Q | Okay.  Both of them of them together approached you? |
| 10:55AM | 2 | A | Well, Norman talked to me first. |
| 10:55AM | 3 | Q | Okay.  And you knew Kurt Kipapa, Jr., to be a member of |
| 10:55AM | 4 | | Nakipi? |
| 10:55AM | 5 | A | I don't recall if at that time I knew.  I understood -- I |
| 10:55AM | 6 | | don't recall if they were part of a motorcycle gang. |
| 10:55AM | 7 | Q | All right.  But by the time of this interview you were |
| 10:55AM | 8 | | aware of this, right? |
| 10:55AM | 9 | A | Yes. |
| 10:55AM | 10 | Q | And you were -- it was your understanding that the robbery |
| 10:55AM | 11 | | of Nicholas Carignan had been done by members of the Nakipi |
| 10:56AM | 12 | | Motorcycle Club? |
| 10:56AM | 13 | A | Correct. |
| 10:56AM | 14 | Q | Kurt Kipapa, Jr., you understood to be a member of the |
| 10:56AM | 15 | | Nakipi Motorcycle Club. |
| 10:56AM | 16 | A | Correct. |
| 10:56AM | 17 | Q | Norman Akau, your cousin, you understood to be a member of |
| 10:56AM | 18 | | Nakipi Motorcycle Club. |
| 10:56AM | 19 | A | Correct. |
| 10:56AM | 20 | Q | Harry Kauhi you understood to be a member of the Nakipi |
| 10:56AM | 21 | | Motorcycle Club. |
| 10:56AM | 22 | A | Correct. |
| 10:56AM | 23 | Q | Did you at the time that you met with Chris Thomas |
| 10:56AM | 24 | | understand that to be the case? |
| 10:56AM | 25 | A | I don't recall. |

| | | | |
|---|---|---|---|
| 10:56AM | 1 | Q | Does this report of your interview help refresh your |
| 10:56AM | 2 | | recollection? |
| 10:56AM | 3 | A | Yes. |
| 10:56AM | 4 | Q | Yes? |
| 10:56AM | 5 | A | Yes. |
| 10:56AM | 6 | Q | So how did you come to learn about Nakipi Motorcycle Club? |
| 10:56AM | 7 | A | I think they were always around.  After this I realized |
| 10:56AM | 8 | | that they were part -- that Norman was the president of some |
| 10:56AM | 9 | | kind of motorcycle club. |
| 10:56AM | 10 | Q | And did you understand Norman to have a relationship with |
| 10:57AM | 11 | | Jacob Smith? |
| 10:57AM | 12 | A | Yes. |
| 10:57AM | 13 | Q | What was that? |
| 10:57AM | 14 | A | Honestly, I'm not too sure.  I don't remember what their |
| 10:57AM | 15 | | relationship was, but I knew that they were close. |
| 10:57AM | 16 | Q | And are you aware that Norman knows Jacob Smith's father? |
| 10:57AM | 17 | A | I believe so. |
| 10:57AM | 18 | Q | So their relationship is independent of Mr. Miske. |
| 10:57AM | 19 | A | Correct. |
| 10:57AM | 20 | Q | And it was when you -- so you set up Nicholas Carignan. |
| 10:57AM | 21 | A | Correct. |
| 10:57AM | 22 | Q | And this -- you know, he brings the 5 pounds, puts it in |
| 10:57AM | 23 | | the trunk, and you pop the trunk when you get there so that the |
| 10:57AM | 24 | | guys can steal it, right? |
| 10:57AM | 25 | A | After awhile, yes. |

| | | | |
|---|---|---|---|
| 10:57AM | 1 | Q | And it was Norman Akau who brought Jacob Smith to this? |
| 10:57AM | 2 | A | I believe so, yes. |
| 10:57AM | 3 | Q | Because of their relationship? |
| 10:57AM | 4 | A | I believe so. |
| 10:57AM | 5 | | MS. PANAGAKOS:  We can take this down, Ms. King. |
| 10:57AM | 6 | | BY MS. PANAGAKOS: |
| 10:58AM | 7 | Q | So you are aware that Jacob Smith got arrested and held in |
| 10:58AM | 8 | | custody at the Federal Detention Center in about August of |
| 10:58AM | 9 | | 2018, right? |
| 10:58AM | 10 | A | I believe so, yes. |
| 10:58AM | 11 | Q | And Mr. Miske's arrest wasn't until two years later. |
| 10:58AM | 12 | A | Okay. |
| 10:58AM | 13 | Q | You were aware before Mr. Miske's arrest that Mr. Smith |
| 10:58AM | 14 | | was cooperating. |
| 10:58AM | 15 | A | I don't recall if he told me he was cooperating or not. |
| 10:58AM | 16 | Q | You don't recall email communications, telephone |
| 10:58AM | 17 | | communications where he told you he was cooperating, and you |
| 10:58AM | 18 | | relayed that information to the agents? |
| 10:58AM | 19 | A | I don't recall. |
| 10:59AM | 20 | | MS. PANAGAKOS:  Can we show Ms. Akau Exhibit 9000-013, |
| 10:59AM | 21 | | which is on the original list. |
| 10:59AM | 22 | | BY MS. PANAGAKOS: |
| 10:59AM | 23 | Q | You became an actual numbered CI because you had -- you |
| 10:59AM | 24 | | know, you had an informant agreement that went through the |
| 10:59AM | 25 | | approval process and you got a number.  You were an informant |

10:59AM   1   for about five years, right?

10:59AM   2   A    Correct.

10:59AM   3   Q    And this is a memorandum of your contact with -- with your

10:59AM   4   handler Gary Graham on May 3rd, 2019.  And does this refresh

10:59AM   5   your recollection that Smith had told you he was cooperating?

10:59AM   6   A    Yes.

10:59AM   7   Q    And it was at this time -- and he also told you, Do what

10:59AM   8   you have to do.  They will probably come talk to you, do what

10:59AM   9   you have to do.

11:00AM   10           MR. NAMMAR:  Objection to her reading from the report.

11:00AM   11           THE COURT:  Sustained.

11:00AM   12   BY MS. PANAGAKOS:

11:00AM   13   Q    Does this refresh your recollection as to communications

11:00AM   14   you had with Mr. Smith while he was in FDC in the April, May

11:00AM   15   2019 time frame?

11:00AM   16   A    Yes.

11:00AM   17           MS. PANAGAKOS:  And then can we show Ms. Akau

11:00AM   18   Exhibit 9000-014?

11:00AM   19   BY MS. PANAGAKOS:

11:00AM   20   Q    This is a memorandum of a June 18, 2019, contact between

11:00AM   21   you and your handler Special Agent Gary Graham.  And here, if

11:00AM   22   you would read this to yourself paragraph -- read the entire

11:00AM   23   thing to yourself.  And let me know when you are done.

11:01AM   24   A    (Peruses document.)  Okay.  I'm finished.

11:01AM   25   Q    Okay.  So now do you recall that for at least the

| | | |
|---|---|---|
| 11:01AM | 1 | two-month period of April through June of 2019, you were having |
| 11:02AM | 2 | conversations with Mr. Smith about his cooperation? |
| 11:02AM | 3 | A    Correct. |
| 11:02AM | 4 | Q    So you were aware by the time of Mr. Miske's arrest in |
| 11:02AM | 5 | 2020 that Mr. Smith was a cooperating witness. |
| 11:02AM | 6 | A    Correct. |
| 11:02AM | 7 | Q    And you were aware of Mr. Smith's agenda to "fuck Mike"? |
| 11:02AM | 8 | A    Well, that's what it states here. |
| 11:02AM | 9 | Q    And that's what you told the agents on June 18, 2019, |
| 11:02AM | 10 | correct? |
| 11:02AM | 11 | A    Correct. |
| 11:02AM | 12 | Q    And so what Mr. Smith actually told you after Mike had |
| 11:02AM | 13 | been arrested is that he was blaming everything on Mike and |
| 11:02AM | 14 | Johnnie.  Not for you to tell on him.  He didn't need -- I mean |
| 11:02AM | 15 | they already had him, he was already cooperating. |
| 11:02AM | 16 | A    I don't recall. |
| 11:03AM | 17 | MS. PANAGAKOS:  I'd like to show Ms. Akau |
| 11:03AM | 18 | Exhibit 9000-016. |
| 11:03AM | 19 | BY MS. PANAGAKOS: |
| 11:03AM | 20 | Q    Please read that to yourself and let -- let us know when |
| 11:03AM | 21 | you're finished. |
| 11:03AM | 22 | MS. PANAGAKOS:  This is not the correct -- oh, yes, it |
| 11:03AM | 23 | is. |
| 11:03AM | 24 | BY MS. PANAGAKOS: |
| 11:03AM | 25 | Q    Direct your attention specifically to paragraph 2. |

11:03AM   1   A     (Peruses document.)  Okay.

11:03AM   2   Q     And so after Mr. Miske was arrested, what Smith told you

11:03AM   3   was that he was blaming everything on Mike and Johnnie, right?

11:04AM   4   A     That's what it says.

11:04AM   5   Q     And it was in that context that he was coaching you on

11:04AM   6   what to say to the feds, right?

11:04AM   7   A     That's what it says, yes.

11:04AM   8   Q     And this is a report of what you told the agents on

11:04AM   9   August 6, 2020, right?

11:04AM  10   A     Okay.

11:04AM  11         MS. PANAGAKOS:  So can we take that down, please?

11:04AM  12   BY MS. PANAGAKOS:

11:04AM  13   Q     And so you signed informant agreements over the course of

11:04AM  14   your work as an informant.  Pretty much like every year you

11:04AM  15   would sign a new agreement, right?

11:04AM  16   A     Correct.

11:04AM  17   Q     So the first one we saw was in May of 2017, and the

11:04AM  18   purpose was to provide information regarding Jacob Smith along

11:05AM  19   with his associates and their involvement in their criminal

11:05AM  20   enterprise, right?

11:05AM  21   A     Yes.

11:05AM  22         MS. PANAGAKOS:  And then if we could show Ms. Akau

11:05AM  23   Exhibit 9000-038, which is on the tenth supplemental exhibit

11:05AM  24   list.

11:05AM  25   BY MS. PANAGAKOS:

11:05AM   1   Q   This is now you're being renewed, I guess, as a continued

11:05AM   2   confidential informant, and you sign -- this agreement is

11:05AM   3   signed on January 5th by you and 8th by the agents of 2018,

11:05AM   4   right?

11:05AM   5   A   Correct.

11:05AM   6   Q   And again, the purpose is to provide information regarding

11:05AM   7   Jacob Smith along with his associates and their involvement in

11:05AM   8   their criminal enterprise.

11:05AM   9   A   Correct.

11:05AM   10   Q   And so it was on -- in November of 2017 that Mr. Smith

11:06AM   11   called you and asked you to come pick him up after someone had

11:06AM   12   been stabbed.

11:06AM   13   A   Correct.

11:06AM   14   Q   And your testimony is you went because you wanted to

11:06AM   15   render aid to the person who had been stabbed.

11:06AM   16   A   Correct.

11:06AM   17   Q   And you didn't do so.

11:06AM   18   A   Correct.

11:06AM   19   Q   You learned from Mr. Smith that that person had died?

11:06AM   20   A   When they jumped in the car, yes.

11:06AM   21   Q   And you didn't call the cops to report a stabbing.

11:06AM   22   A   The cops were already there.

11:06AM   23   Q   And you didn't tell the agents about Mr. Smith's

11:06AM   24   involvement in this stabbing.

11:06AM   25   A   Well, at that point I had no idea what his involvement

| | | |
|---|---|---|
| 11:06AM | 1 | was. |
| 11:06AM | 2 | Q    But you had an agreement to voluntarily provide |
| 11:06AM | 3 | information to the agents about Mr. Smith. |
| 11:06AM | 4 | A    Correct. |
| 11:06AM | 5 | Q    And you chose not to provide this information. |
| 11:06AM | 6 | MR. NAMMAR:  Objection.  Misstates the testimony. |
| 11:06AM | 7 | THE COURT:  Overruled.  Go ahead. |
| 11:06AM | 8 | BY MS. PANAGAKOS: |
| 11:06AM | 9 | Q    You choose not to provide this information to your ATF |
| 11:06AM | 10 | handler for 11 months. |
| 11:06AM | 11 | A    That I didn't -- that I picked him up, yes, I didn't tell |
| 11:07AM | 12 | him I picked him up. |
| 11:07AM | 13 | Q    You didn't tell him you picked him up after a stabbing. |
| 11:07AM | 14 | A    Correct. |
| 11:07AM | 15 | Q    That he had been involved in a stabbing and didn't make |
| 11:07AM | 16 | statements to the police. |
| 11:07AM | 17 | A    Well, I didn't know his involvement. |
| 11:07AM | 18 | Q    You didn't make a statement to the police -- |
| 11:07AM | 19 | A    Correct. |
| 11:07AM | 20 | Q    -- about your involvement in picking people up in the |
| 11:07AM | 21 | aftermath of it. |
| 11:07AM | 22 | A    Correct. |
| 11:07AM | 23 | Q    You didn't make a statement to the police about taking |
| 11:07AM | 24 | custody of bags that were at the scene of the stabbing. |
| 11:07AM | 25 | A    Correct. |

11:07AM   1   Q    And you didn't tell your ATF handler about any of this

11:07AM   2   until October 2018.

11:07AM   3   A    Okay.

11:07AM   4   Q    And then after you told them, they did not -- no agent

11:07AM   5   reported a violation of your agreement.

11:08AM   6   A    Okay.

11:08AM   7   Q    And in fact, they renewed your agreement again in 2019.

11:08AM   8   A    Okay.

11:08AM   9   Q    Well, you do recall that they renewed your agreement,

11:08AM   10  right?

11:08AM   11  A    Okay, yeah.

11:08AM   12       MS. PANAGAKOS:  Can we show Ms. Akau Exhibit 9000-19,

11:08AM   13  page 0005?

11:08AM   14  BY MS. PANAGAKOS:

11:08AM   15  Q    And you see that's an agreement dated March 8 -- March 13,

11:08AM   16  2019?

11:08AM   17  A    Yes.

11:08AM   18  Q    So your agreement was renewed with no consequence despite

11:08AM   19  your failure to report Mr. Smith's presence at a stabbing.

11:08AM   20  A    Correct.

11:08AM   21  Q    And his request that you keep custody of his bag and

11:08AM   22  someone else's bag for a period of time following the stabbing.

11:08AM   23  A    Correct.

11:08AM   24  Q    And you're giving aid in helping people leave the scene of

11:09AM   25  a crime when they were present during the stabbing.

11:09AM   1   A     At the time I didn't realize, but yes.

11:09AM   2   Q     You didn't realize when Mr. Smith called you and asked you

11:09AM   3   to come pick him up because your friend had been stabbed that

11:09AM   4   he had not -- didn't have personal knowledge of the fact that

11:09AM   5   this just happened?

11:09AM   6   A     Well, I knew he had personal knowledge of it, but I didn't

11:09AM   7   know where he was at the time, what happened, if he was there

11:09AM   8   or what.  I just knew that somebody was hurt and I wanted to go

11:09AM   9   help.

11:09AM   10   Q     Okay.  And then you failed to inform --

11:09AM   11         MR. NAMMAR:  Objection.  Asked and answered.

11:09AM   12   BY MS. PANAGAKOS:

11:09AM   13   Q     -- police at the ATF.

11:09AM   14         THE COURT:  Sustained.

11:09AM   15   BY MS. PANAGAKOS:

11:09AM   16   Q     You testified about -- so even after the rental of the

11:09AM   17   Chrysler and its use in criminal activity, while you were an

11:10AM   18   informant you allowed Mr. Smith use of another car owned by

11:10AM   19   you.

11:10AM   20   A     Correct.

11:10AM   21   Q     And you didn't tell the ATF about that.

11:10AM   22   A     Correct.

11:10AM   23   Q     And you say on your direct testimony that you just wanted

11:10AM   24   to -- you wanted nothing more to do with him, that's why you

11:10AM   25   wanted the title?

11:10AM   1   A      Eventually, yes.

11:10AM   2             MS. PANAGAKOS:  Your Honor, we have on our tenth

11:10AM   3   supplemental exhibit list a long chat between Ms. Akau and

11:10AM   4   Mr. Smith, and that's 9000-043.  I have marked an excerpt -- a

11:10AM   5   small excerpt of this chat 9000-043A.  I've provided the Court

11:10AM   6   with an 11th supplemental list that lists this and copies of

11:10AM   7   the exhibit, and I have provided both documents to the

11:10AM   8   government.

11:11AM   9             THE COURT:  Okay.

11:11AM   10            MS. PANAGAKOS:  And so I would like to show Ms. Akau

11:11AM   11  Exhibit 9000-043A.

11:11AM   12            THE COURT:  Okay, go ahead.

11:11AM   13            MS. PANAGAKOS:  And can we highlight -- okay.

11:11AM   14  BY MS. PANAGAKOS:

11:11AM   15  Q    And so, Ms. Akau, these are text messages.  You recognize

11:11AM   16  your phone number, right, 358-1387?

11:11AM   17  A    Correct.

11:11AM   18  Q    And this is from Jake Smith's phone and you're identified

11:11AM   19  as Ash.  This is an extraction from a phone that was seized

11:11AM   20  from Jake Smith when he was arrested.  You didn't provide text

11:11AM   21  messages between you and Jake Smith while you were an informant

11:11AM   22  to the government, right?

11:11AM   23  A    I don't believe so.

11:11AM   24  Q    Okay.  And so this one is related to the car title that

11:12AM   25  you had testified about on your direct examination, right?

11:12AM   1   A      Correct.

11:12AM   2            MS. PANAGAKOS:  Your Honor, I would move to admit this

11:12AM   3   exhibit.

11:12AM   4            MR. NAMMAR:  No objection.

11:12AM   5            THE COURT:  All right.  Without objection -- and

11:12AM   6   you're going to file, I assume, the defense eleventh

11:12AM   7   supplemental exhibit list?

11:12AM   8            MS. PANAGAKOS:  Yes, Your Honor.

11:12AM   9            THE COURT:  Okay.  And that's the one that contains

11:12AM   10   this particular exhibit?

11:12AM   11            MS. PANAGAKOS:  Yes, Your Honor.

11:12AM   12            THE COURT:  All right.  Then without objection,

11:12AM   13   9000-43 alpha is admitted.  You may publish.

11:12AM   14            (Exhibit 9000-043A was received in evidence.)

11:12AM   15            MS. PANAGAKOS:  Is it on the screen?

11:12AM   16            THE COURT:  It is.

11:12AM   17            MS. PANAGAKOS:  Okay.  Thank you, Your Honor.

11:12AM   18   BY MS. PANAGAKOS:

11:12AM   19   Q    And so you're discussing the -- item number 1 is a text

11:12AM   20   from you to Mr. Smith, and you're saying here:  "I'm going to

11:12AM   21   sign it over to Melissa because we need to cover our tracks, be

11:12AM   22   smarter about shit.  Don't question my loyalty because IDK how

11:13AM   23   you expect me to have your back if I go down for some shit too.

11:13AM   24   And you want to put it in someone else's name."

11:13AM   25            You see that?

11:13AM  1   A    Yes, I do.

11:13AM  2   Q    And then in item 6, you're telling him:  "It's just

11:13AM  3   smarter because that's a link to me.  You don't want to have a

11:13AM  4   link between you and Smith while you're an informant."

11:13AM  5   A    Right.  I was basically trying to say anything to get the

11:13AM  6   car so I could cut ties with him.

11:13AM  7   Q    And you say:  "I'm trying to look out for us two and us

11:13AM  8   two only."

11:13AM  9   A    Yeah, if that meant trying to convince him of that, then I

11:13AM  10  was trying to get the car back.

11:13AM  11  Q    Okay.  But you have an agreement with the FD -- with the

11:14AM  12  ATF to voluntarily provide information regarding Smith and you

11:14AM  13  didn't share this information.

11:14AM  14  A    Correct.

11:14AM  15  Q    And you actually didn't -- weren't trying to get away from

11:14AM  16  him after this or you changed your mind or something, right?

11:14AM  17  A    Are you asking me?

11:14AM  18  Q    I mean, you continued to be romantically involved with him

11:14AM  19  for months after this.

11:14AM  20  A    After I got the car back?

11:14AM  21  Q    Yes.

11:14AM  22  A    I don't recall.

11:14AM  23       MS. PANAGAKOS:  We can -- can we take down this

11:14AM  24  exhibit.  And then if we can show the witness only 9000-043,

11:14AM  25  which is on the tenth supplemental exhibit list.  And turn to

11:14AM   1   page 20.

11:14AM   2           And if we could begin highlighting from item 13 -- 313

11:15AM   3   for the witness to review.

11:15AM   4           And then let me know, please, when -- okay.

11:15AM   5           And then can we continue on down to 324.  Highlighting

11:15AM   6   it.  Thank you.

11:15AM   7   BY MS. PANAGAKOS:

11:15AM   8   Q    And so you see these are texts between you and Mr. Smith

11:15AM   9   in April 2018, correct?

11:15AM  10   A    Correct.  I didn't get the car back.

11:15AM  11   Q    Hmm?

11:15AM  12   A    I still didn't get the car back.

11:15AM  13   Q    Okay.  So you're sleeping over in order to get the car

11:16AM  14   back?

11:16AM  15   A    I'm trying to do anything I can to get the car back.

11:16AM  16   Q    Okay.  And that includes sleeping over and telling him you

11:16AM  17   miss him and complaining about other girls being there?

11:16AM  18   A    If I had to put on a front, then yes.

11:16AM  19   Q    And you chose not to disclose to the ATF that you were

11:16AM  20   having some difficulty -- that you had done the same thing

11:16AM  21   basically that you had done with the Chrysler was get a car for

11:16AM  22   someone you know to be a criminal, and let him have access to

11:16AM  23   it for months now.  So it's been four months that he has access

11:16AM  24   to your car.

11:16AM  25   A    Correct.

11:16AM   1   Q   Even after he misused another car you gave him.

11:16AM   2   A   Correct.

11:16AM   3   Q   And you have an agreement to provide information regarding

11:16AM   4   Jake Smith to the ATF.

11:16AM   5           MR. NAMMAR:  Objection.  Asked and answered.

11:16AM   6           THE COURT:  Go ahead.  You can answer.

11:16AM   7           THE WITNESS:  Correct.

11:16AM   8   BY MS. PANAGAKOS:

11:16AM   9   Q   And you didn't share your difficulties with regard to him

11:16AM   10  using a car you owned while he's engaged in criminal activity.

11:17AM   11  A   Correct.

11:17AM   12  Q   So during the time while you were an informant, this

11:17AM   13  Exhibit 9000-43 contains --

11:17AM   14          MS. PANAGAKOS:  If we can show page 1 to Ms. Akau,

11:17AM   15  please.

11:17AM   16  BY MS. PANAGAKOS:

11:18AM   17  Q   This is a timeline of communications between you and Jake

11:18AM   18  Smith from December 6, 2017, through April 2018.  And it's got

11:18AM   19  335 text messages back and forth.

11:18AM   20          You never gave your -- you had -- I mean so you

11:18AM   21  were -- you had the ability to collect information from Jacob

11:18AM   22  Smith, text messages --

11:18AM   23  A   Correct.

11:18AM   24  Q   -- emails, CorrLink emails --

11:18AM   25  A   Correct.

11:18AM   1   Q   -- telephone calls, voicemails.  You could have provided

11:18AM   2   them with a lot of stuff.

11:18AM   3   A   Okay.

11:18AM   4   Q   But you were romantically involved with him and you did

11:18AM   5   not do so.

11:18AM   6   A   Correct.

11:18AM   7   Q   And you have a plea agreement that doesn't charge you with

11:18AM   8   the robbery of Nicholas Carignan.  Agrees not to charge you

11:18AM   9   with the robbery of Nicholas Carignan.

11:19AM   10  A   Correct.

11:19AM   11  Q   Agrees not to charge you with the robbery of Palani

11:19AM   12  Mitchell.

11:19AM   13  A   Correct.

11:19AM   14  Q   Agrees not to charge you for your role in providing a car

11:19AM   15  to criminals that was used to shoot an entirely innocent person

11:19AM   16  during Dae Han Moon's road rage --

11:19AM   17              MR. NAMMAR:  Objection.  Counsel is testifying.

11:19AM   18              THE COURT:  Overruled.  Go ahead.

11:19AM   19              THE WITNESS:  Sorry, can you repeat the last --

11:19AM   20  BY MS. PANAGAKOS:

11:19AM   21  Q   You're not being charged with any offense resulting from

11:19AM   22  Dae Han Moon using the vehicle that you rented and provided to

11:19AM   23  Jacob Smith to take shots at an innocent person who Dae Han

11:19AM   24  Moon got mad at as a result of a road rage incident, you're not

11:19AM   25  being charged with anything as a result of that.

| | | | |
|---|---|---|---|
| 11:19AM | 1 | A | Correct. |
| 11:19AM | 2 | Q | And you are not being charged with anything as a result of |
| 11:19AM | 3 | | the robbery of Eric Lum. |
| 11:19AM | 4 | A | Correct. |
| 11:19AM | 5 | Q | And you were aware that there were firearms used at the |
| 11:19AM | 6 | | robbery of Nicholas Carignan. |
| 11:19AM | 7 | A | Correct. |
| 11:19AM | 8 | Q | And you're aware that -- that you were involved in? |
| 11:20AM | 9 | A | Okay. |
| 11:20AM | 10 | Q | And you're aware that there were firearms present at the |
| 11:20AM | 11 | | robbery of Palani Mitchell that you were involved -- a robbery |
| 11:20AM | 12 | | that you were involved in. |
| 11:20AM | 13 | A | Correct. |
| 11:20AM | 14 | Q | And those two robberies resulted in the people who |
| 11:20AM | 15 | | participated in those robberies stealing a total of |
| 11:20AM | 16 | | approximately 7 pounds of methamphetamine. |
| 11:20AM | 17 | A | Correct. |
| 11:20AM | 18 | Q | And you're aware that a charge of conspiracy to rob that |
| 11:20AM | 19 | | quantity of drugs has a mandatory minimum sentence of at least |
| 11:20AM | 20 | | ten years. |
| 11:20AM | 21 | A | Well, now I'm aware, yes. |
| 11:20AM | 22 | Q | And you're aware that use of a firearm in furtherance of |
| 11:20AM | 23 | | such a conspiracy carries a consecutive seven-year mandatory |
| 11:20AM | 24 | | penalty. |
| 11:20AM | 25 | A | Okay. |

| 11:20AM | 1 | Q | And the Palani Mitchell, since the firearm was present, |
| 11:20AM | 2 | | carries a five-year mandatory consecutive penalty. |
| 11:21AM | 3 | A | Okay. |
| 11:21AM | 4 | Q | And the government has agreed not to charge you with any |
| 11:21AM | 5 | | of those offenses as part of your plea agreement. |
| 11:21AM | 6 | A | Correct. |
| 11:21AM | 7 | Q | And you have no mandatory minimum in the connection with |
| 11:21AM | 8 | | what the -- what you believed to be mace or pepper spray that |
| 11:21AM | 9 | | you released in the nightclub. |
| 11:21AM | 10 | A | Correct. |
| 11:21AM | 11 | Q | So Teiti Scanlan, she was your sister-in-law. |
| 11:21AM | 12 | A | Teiti. |
| 11:21AM | 13 | Q | Teiti.  I'm sorry. |
| 11:21AM | 14 | A | No. |
| 11:21AM | 15 | Q | And you guys were close for a time. |
| 11:21AM | 16 | A | Yes. |
| 11:21AM | 17 | Q | And she is the one who told you that she, Teiti, had told |
| 11:21AM | 18 | | Mr. Miske about you being approached by law enforcement. |
| 11:21AM | 19 | A | Correct. |
| 11:21AM | 20 | Q | And to your knowledge, Mr. Miske was friends with Teiti? |
| 11:21AM | 21 | A | I wasn't too sure.  She said she saw him at Starbucks. |
| 11:22AM | 22 | Q | So she saw him at Starbucks and she told Mr. Miske of what |
| 11:22AM | 23 | | had happened with you. |
| 11:22AM | 24 | A | I guess, yes. |
| 11:22AM | 25 | Q | You didn't tell him. |

| | | | |
|---|---|---|---|
| 11:22AM | 1 | A | No. |
| 11:22AM | 2 | Q | And then Teiti asked you if you wanted to meet with Mike. |
| 11:22AM | 3 | A | Right. |
| 11:22AM | 4 | Q | So it was Teiti who set this up. |
| 11:22AM | 5 | A | Teiti and Mike, yes. |
| 11:22AM | 6 | Q | Well, your contact was Teiti. |
| 11:22AM | 7 | A | Correct. |
| 11:22AM | 8 | Q | She's the one who asked you if you wanted to meet with |
| 11:22AM | 9 | | Mike. |
| 11:22AM | 10 | A | I don't recall if she asked me if I wanted to meet up with |
| 11:22AM | 11 | | him or vice versa.  I don't recall. |
| 11:22AM | 12 | Q | And he was very nice to you during that meeting. |
| 11:22AM | 13 | A | He was. |
| 11:22AM | 14 | Q | Can I direct your attention to -- |
| 11:22AM | 15 | | MS. PANAGAKOS:  If we can show Ms. Akau |
| 11:22AM | 16 | | Exhibit 9000-31, which is not in evidence, page 51. |
| 11:22AM | 17 | | MR. NAMMAR:  Are you trying to refresh recollection? |
| 11:23AM | 18 | | MS. PANAGAKOS:  Yes, she said -- yes, I am, Your |
| 11:23AM | 19 | | Honor, as with regard to who set up the meeting. |
| 11:23AM | 20 | | BY MS. PANAGAKOS: |
| 11:23AM | 21 | Q | So, Ms. Akau, I would direct your attention to lines 2 |
| 11:23AM | 22 | | through 6.  And this is a transcript of your April 28, 2017, |
| 11:23AM | 23 | | statement which was obviously much closer in time.  And you see |
| 11:23AM | 24 | | you told the agents that Teiti was the one who set it up? |
| 11:23AM | 25 | A | That's what it says, yes. |

11:23AM  1   Q   And it says Teiti asked you if you wanted to talk to Mike.

11:23AM  2   A   That's what it says, correct.

11:23AM  3   Q   And Mike gave you the name of a lawyer?

11:23AM  4   A   Correct.

11:23AM  5   Q   And was nice to you?

11:23AM  6   A   Right.

11:23AM  7   Q   And Teiti had a screenshot of the name of the lawyer?

11:23AM  8   A   I believe so.

11:23AM  9   Q   And so what Mr. Miske did was provide you information so

11:24AM  10  that you could contact a lawyer in the event you were contacted

11:24AM  11  by law enforcement again.

11:24AM  12  A   Correct.

11:24AM  13  Q   And he was very nice to you while he did it.

11:24AM  14  A   He was.

11:24AM  15  Q   He did not threaten?

11:24AM  16  A   No.

11:24AM  17  Q   He did not intimidate?

11:24AM  18  A   No.

11:24AM  19  Q   He was real -- honestly real nice is what you told the

11:24AM  20  agents.

11:24AM  21  A   Right.

11:24AM  22  Q   And there was absolutely nothing wrong with providing --

11:24AM  23       MR. NAMMAR:  Objection.  Speculation.

11:24AM  24  BY MS. PANAGAKOS:

11:24AM  25  Q   -- a friend of a friend the name of a lawyer.

| | | |
|---|---|---|
| 11:24AM | 1 | MR. NAMMAR:  Argument. |
| 11:24AM | 2 | THE COURT:  What was the question? |
| 11:24AM | 3 | BY MS. PANAGAKOS: |
| 11:24AM | 4 | Q    You were appreciative that a friend of your -- of your |
| 11:24AM | 5 | sister-in-law gave you the name of a lawyer so you could |
| 11:24AM | 6 | perhaps exercise your right to counsel the next time you were |
| 11:24AM | 7 | contacted by law enforcement. |
| 11:24AM | 8 | A    Correct. |
| 11:24AM | 9 | MS. PANAGAKOS:  Your Honor, may I have a moment? |
| 11:24AM | 10 | THE COURT:  Sure. |
| 11:25AM | 11 | BY MS. PANAGAKOS: |
| 11:25AM | 12 | Q    Ms. Akau, when you did the Nicholas Carignan robbery -- |
| 11:25AM | 13 | A    Okay. |
| 11:25AM | 14 | Q    -- that was again the original people with Kurt Kipapa and |
| 11:25AM | 15 | Norman Akau, both members of Nakipi? |
| 11:25AM | 16 | A    Correct. |
| 11:25AM | 17 | Q    And you only got paid about $700 for that? |
| 11:25AM | 18 | A    About so. |
| 11:25AM | 19 | Q    And it came from Kurt Kipapa? |
| 11:25AM | 20 | A    Kurt or Norman.  I don't recall. |
| 11:25AM | 21 | Q    And so -- I mean the other guys got 5 pounds.  You got |
| 11:25AM | 22 | $700.  So really what you were interested was the protection |
| 11:25AM | 23 | they could provide, right? |
| 11:25AM | 24 | A    Of course. |
| 11:25AM | 25 | Q    And that was the protection at that time from Nakipi? |

11:25AM    1    A    Protection of them against my ex-husband, yes.

11:25AM    2    Q    Right, the protection of Nakipi against your ex-husband.

11:25AM    3    A    Well, I wouldn't say it was just Nakipi, but --

11:26AM    4    Q    Well, you didn't know Jake Smith yet, right?

11:26AM    5    A    From after the Nico thing, yes.

11:26AM    6    Q    After.  So in this instance the first people who were

11:26AM    7    providing protection were Norman Akau and Kurt Kipapa, Jr.

11:26AM    8    A    Correct.

11:26AM    9    Q    And then Norm, through his relationship with Jacob Smith

11:26AM   10    and Jacob Smith's father, introduced you to Jacob Smith.

11:26AM   11    A    Correct.

11:26AM   12    Q    And then through your relationship with Jacob Smith, a

11:26AM   13    friend and romantic relationship, you then benefitted from his

11:26AM   14    protection.

11:26AM   15    A    Correct.

11:26AM   16    Q    It had nothing to do with Mr. Miske.

11:26AM   17    A    Correct.

11:26AM   18         MS. PANAGAKOS:  May I have a moment, Your Honor?

11:26AM   19         THE COURT:  Yes.

11:26AM   20         MS. PANAGAKOS:  I have nothing further.  Thank you,

11:26AM   21    Ms. Akau.

11:26AM   22         THE COURT:  Mr. Nammar.

11:26AM   23                    REDIRECT EXAMINATION

11:26AM   24    BY MR. NAMMAR:

11:26AM   25    Q    Ms. Akau, you were asked about -- on cross about the

| | | |
|---|---|---|
| 11:27AM | 1 | meeting with Mr. Miske outside the Keolu liquor store. |
| 11:27AM | 2 | A    Correct. |
| 11:27AM | 3 | Q    As you sit here today, what do you think the purpose of |
| 11:27AM | 4 | that meeting was? |
| 11:27AM | 5 | A    To save himself -- |
| 11:27AM | 6 | Q    To save his -- |
| 11:27AM | 7 | A    Sorry, to save himself so I wouldn't say anything. |
| 11:27AM | 8 | Q    Who is "he"? |
| 11:27AM | 9 | A    Mike. |
| 11:27AM | 10 | Q    You were asked questions about the Chrysler 300, quite a |
| 11:27AM | 11 | number of questions.  Did you have any reason to believe when |
| 11:27AM | 12 | you rented it that it would be used in a crime? |
| 11:27AM | 13 | A    No, I did not. |
| 11:27AM | 14 | Q    And I think you told us the term was "safe car." |
| 11:27AM | 15 | A    Correct. |
| 11:27AM | 16 | Q    That's what Norman and Jacob Smith told you about the car? |
| 11:27AM | 17 | A    Correct. |
| 11:27AM | 18 | Q    What did you understand a safe car to be? |
| 11:27AM | 19 | A    A car that they could drive and not do any illegal |
| 11:27AM | 20 | activity out of. |
| 11:27AM | 21 | Q    Okay.  Did you have any idea that that car would be used |
| 11:27AM | 22 | by Dae Han Moon in a shooting? |
| 11:27AM | 23 | A    No, I did not. |
| 11:28AM | 24 | Q    Did you have any idea that it would be used in the robbery |
| 11:28AM | 25 | of Eric Lum? |

| | | | |
|---|---|---|---|
| 11:28AM | 1 | A | No, I did not. |
| 11:28AM | 2 | Q | The BMW that we've talked about and the text messages that |
| 11:28AM | 3 | | we saw, did you have any idea that that car was used in a |
| 11:28AM | 4 | | crime? |
| 11:28AM | 5 | A | No, I did not. |
| 11:28AM | 6 | Q | We talked about Ginza and you were asked about who the |
| 11:28AM | 7 | | direction to do that came from. |
| 11:28AM | 8 | A | Correct. |
| 11:28AM | 9 | Q | You saw Mr. Miske meeting with Jacob Smith that day, |
| 11:28AM | 10 | | right? |
| 11:28AM | 11 | A | I did. |
| 11:28AM | 12 | Q | That was at the Ala Moana shopping center, right? |
| 11:28AM | 13 | A | Correct. |
| 11:28AM | 14 | Q | And you also heard from Mr. Smith after it happened that |
| 11:28AM | 15 | | Michael Miske was pulled over near Ginza Nightclub, right? |
| 11:28AM | 16 | A | Correct. |
| 11:28AM | 17 | Q | And the instructions you were getting from Jacob Smith, |
| 11:28AM | 18 | | were they clear who those instructions were originating from? |
| 11:28AM | 19 | A | Yes. |
| 11:28AM | 20 | Q | Who? |
| 11:28AM | 21 | A | Michael Miske. |
| 11:28AM | 22 | Q | Now, Nakipi, you were asked some questions about Nakipi. |
| 11:29AM | 23 | | Do you know if Jacob Smith was ever a member of Nakipi? |
| 11:29AM | 24 | A | I don't believe so. |
| 11:29AM | 25 | Q | Do you know if Lance Bermudez was ever a member of Nakipi? |

11:29AM   1   A    I don't believe so.

11:29AM   2   Q    Do you know if John Stancil was ever a member of Nakipi?

11:29AM   3   A    Also, I'm not --

11:29AM   4   Q    And those three people that I just named, they were all

11:29AM   5   involved in the robbery of Nico, right?

11:29AM   6   A    Correct.

11:29AM   7        THE COURT:  I'm not sure we caught the answer to

11:29AM   8   Mr. Nammar's penultimate question:  Do you know if John Stancil

11:29AM   9   was ever a member of Nakipi?  What was your response?

11:29AM   10       THE WITNESS:  I don't believe so.  Sorry.

11:29AM   11       THE COURT:  Thank you.

11:29AM   12  BY MR. NAMMAR:

11:29AM   13  Q    You were asked some questions about a meeting in April of

11:29AM   14  2017 with law enforcement that was recorded, right?

11:30AM   15  A    Correct.

11:30AM   16  Q    That was the one where your dad was present, right?

11:30AM   17  A    Correct.

11:30AM   18  Q    And I believe you testified that that particular meeting,

11:30AM   19  that you have reviewed a recording of it recently; is that

11:30AM   20  right?

11:30AM   21  A    Correct.

11:30AM   22  Q    Now, during that recording were you asked questions by law

11:30AM   23  enforcement about Ginza?

11:30AM   24  A    No.

11:30AM   25  Q    The Ginza Nightclub, where you poured --

| | | |
|---|---|---|
| 11:30AM | 1 | A    Yes, yes. |
| 11:30AM | 2 | Q    Did you tell them about pouring out a substance in Ginza |
| 11:30AM | 3 | during that meeting on April 28, 2017? |
| 11:30AM | 4 | A    Yes. |
| 11:30AM | 5 | Q    And did you tell them, consistent with what you've |
| 11:30AM | 6 | testified to here today, that you poured that substance out at |
| 11:30AM | 7 | the direction of Jacob Smith and Michael Miske? |
| 11:30AM | 8 | A    Yes. |
| 11:30AM | 9 | Q    In the recording with law enforcement in April of 2017, |
| 11:30AM | 10 | did you also tell them that you were offered $3,000 to commit |
| 11:31AM | 11 | that crime? |
| 11:31AM | 12 | A    Yes. |
| 11:31AM | 13 | Q    In the recording in April of 2017, did you also tell law |
| 11:31AM | 14 | enforcement that before the crime occurred that you went to |
| 11:31AM | 15 | John Stancil's house in Waimanalo to pick up what you thought |
| 11:31AM | 16 | was mace? |
| 11:31AM | 17 | A    Yes. |
| 11:31AM | 18 | Q    Did you also tell them in the recording in April 2017 that |
| 11:31AM | 19 | they wanted you to do it because you -- you were a girl? |
| 11:31AM | 20 | A    Yes. |
| 11:31AM | 21 | Q    And because they had used Kaulana to do it the night |
| 11:31AM | 22 | before at the District? |
| 11:31AM | 23 | A    Correct. |
| 11:31AM | 24 | Q    Did you also tell law enforcement in April 2017 in the |
| 11:31AM | 25 | recording that Jacob Smith had met with Michael Miske at the |

11:31AM   1   Ala Moana mall before the chemical attack took place?

11:31AM   2   A    Yes.

11:31AM   3   Q    And did you also tell them in that recorded meeting that

11:32AM   4   you had learned after the fact, after you released the

11:32AM   5   chemicals in the nightclub in Ginza, that Michael Miske had

11:32AM   6   been pulled over?

11:32AM   7   A    Yes, correct.

11:32AM   8   Q    And that his car had been searched?

11:32AM   9   A    Correct.

11:32AM   10  Q    Did you also tell them in that meeting that was recorded

11:32AM   11  about your meeting with Mr. Miske at Keolu liquor store?

11:32AM   12  A    Correct, yes.

11:32AM   13  Q    Now, moving forward from there to October 2018, did you

11:32AM   14  also testify before the grand jury?

11:32AM   15  A    Yes.

11:32AM   16  Q    And have you recently reviewed a transcript from that

11:32AM   17  proceeding?

11:32AM   18  A    Yes.

11:32AM   19  Q    And in the grand jury, did you tell the grand jury about

11:32AM   20  those same robberies that you talked about here today, the

11:32AM   21  Palani Mitchell robbery and the Nico robbery?

11:32AM   22  A    Yes.

11:32AM   23  Q    Did you tell them about your involvement?

11:32AM   24  A    Yes.

11:32AM   25  Q    Did you also tell them about pouring an unknown substance

11:32AM   1   in the Ginza Nightclub consistent with what you testified to

11:32AM   2   here today?

11:33AM   3   A    Yes.

11:33AM   4   Q    And in the grand jury, did you also tell them about the

11:33AM   5   Chrysler 300 that we talked about here today, how you rented

11:33AM   6   it?

11:33AM   7   A    Yes.

11:33AM   8   Q    Now, during cross-examination you were asked about a

11:33AM   9   number of law enforcement reports.  When you met with law

11:33AM   10   enforcement, were they -- besides the April 2017 meeting, were

11:33AM   11   they recording your meetings with them?

11:33AM   12   A    I don't believe so.

11:33AM   13   Q    And when you testified in grand jury, was there a court

11:33AM   14   reporter taking down what you said?

11:33AM   15   A    Yes.

11:33AM   16   Q    So we have -- from the grand jury we have word for word

11:33AM   17   what you were saying, right?

11:33AM   18   A    Correct.

11:33AM   19   Q    Those reports that you looked at, those aren't word-for-

11:33AM   20   word verbatim what you had told the agents, is it?

11:33AM   21   A    No.

11:33AM   22   Q    Now, you were asked about -- you were shown a report and

11:33AM   23   you were asked about a conversation and you testified to on

11:34AM   24   direct a conversation in the summertime of 2020 with Jacob

11:34AM   25   Smith.

| 11:34AM | 1 | A | Yes. |

11:34AM   2   Q   This is the one where you had told us that after Mr. Miske

11:34AM   3   had been arrested, Jacob Smith called you from prison, right?

11:34AM   4   A   Correct.

11:34AM   5   Q   Okay.  You were asked about whether Mr. Smith ever told

11:34AM   6   you -- ever coached you, do you recall that?

11:34AM   7   A   I recall.

11:34AM   8   Q   Do you remember him every using those words "coaching"?

11:34AM   9   A   No.

11:34AM   10   Q   Do you remember him during that conversation ever saying

11:34AM   11   he was going to blame everything on Mike?

11:34AM   12   A   I don't recall.

11:34AM   13   Q   Have you told the truth here today?

11:34AM   14   A   Yes, I have.

11:34AM   15   Q   Does your plea agreement say anything about giving

11:34AM   16   testimony truthfully?

11:34AM   17   A   Yes.

11:34AM   18   Q   What does it say?

11:34AM   19   A   It says that I should be truthful.

11:34AM   20   Q   Did you get together with any other witnesses to shape or

11:34AM   21   alter the way you would testify here today?

11:34AM   22   A   No, I did not.

11:34AM   23   Q   Do you know what discovery is?

11:35AM   24   A   Yes.

11:35AM   25   Q   Have you reviewed any discovery in your case?

| 11:35AM | 1  | A      No. |
|---------|----|------------|

11:35AM    1    A      No.

11:35AM    2    Q      Do you have any idea what Jacob Smith has said about the

11:35AM    3    chemical weapons attack on Ginza?

11:35AM    4    A      No.

11:35AM    5    Q      Do you have any idea what Kaulana Freitas has said about

11:35AM    6    the chemical weapons attack at District?

11:35AM    7    A      No.

11:35AM    8    Q      What's your understanding of what will happen if you don't

11:35AM    9    tell the truth during your testimony?

11:35AM    10   A      That my plea deal would be void.

11:35AM    11   Q      What's your understanding about the maximum penalty you're

11:35AM    12   facing?

11:35AM    13   A      A life sentence.

11:35AM    14   Q      Have any promises been made to you about what sentence you

11:35AM    15   will get?

11:35AM    16   A      No.

11:35AM    17   Q      What do you understand is the most important thing to

11:35AM    18   remember about your testimony here today?

11:35AM    19   A      To be truthful.

11:35AM    20          MR. NAMMAR:  Nothing further.

11:35AM    21          THE COURT:  Ms. Panagakos, anything else?

11:35AM    22          MS. PANAGAKOS:  Yes, Your Honor, briefly.

11:35AM    23                    RECROSS-EXAMINATION

11:35AM    24   BY MS. PANAGAKOS:

11:35AM    25   Q      Ms. Akau, in your recorded April 28th, 2017 statement that

11:36AM   1   Mr. Nammar just asked you about, you also said with regard to

11:36AM   2   Jake Smith and Mike Miske on the evening of the Ginza Nightclub

11:36AM   3   incident:  "I never seen him talk to Mike, nothing."  Right?

11:36AM   4   A    That says that.

11:36AM   5   Q    And with regard to going to the Encore afterwards, you sat

11:36AM   6   in the car outside of Restaurant Row.

11:36AM   7   A    Correct.

11:36AM   8   Q    And you told the agents you don't know where Mr. Smith

11:36AM   9   went, you didn't see him go in anywhere, you don't know.

11:36AM   10  A    Just from what he told me, yes.

11:36AM   11       MS. PANAGAKOS:  Can we show Ms. Akau 9000-31, page 23,

11:37AM   12  lines 21 through 22.

11:37AM   13  BY MS. PANAGAKOS:

11:37AM   14  Q    Do you see he said:  "I don't know where he went"?

11:37AM   15  A    Okay.

11:37AM   16  Q    And some of these reports that I showed you, I can show

11:37AM   17  them to you again if you don't remember, but the June 16, 2017,

11:37AM   18  report of the agents and Assistant United States Attorney Chris

11:37AM   19  Thomas's meeting with you had some language in quotations which

11:37AM   20  would be attributing statements to you, right?

11:37AM   21  A    If it's in quotations, yes.

11:37AM   22  Q    So "rip off" in quotes, "Nico" in quotes, "rip" in quotes,

11:37AM   23  "Nakipi" in quotes, that's because they were quoting you,

11:37AM   24  right?

11:37AM   25  A    Correct.

| | | |
|---|---|---|
| 11:37AM | 1 | Q    And in the -- your report of -- their report of what -- |
| 11:37AM | 2 | the agents report of what you told the agents on August 6, |
| 11:38AM | 3 | 2020, reports that you said Smith was blaming everything on, |
| 11:38AM | 4 | quote -- |
| 11:38AM | 5 | MR. NAMMAR:  Objection, Your Honor, reading from the |
| 11:38AM | 6 | report. |
| 11:38AM | 7 | MS. PANAGAKOS:  All right.  Then I'll take the time, |
| 11:38AM | 8 | if we could show Ms. Akau the report, 9000-016.  Paragraph 2. |
| 11:38AM | 9 | BY MS. PANAGAKOS: |
| 11:38AM | 10 | Q    And do you see quotations around "Mike and Johnnie"? |
| 11:38AM | 11 | A    I see quotation. |
| 11:38AM | 12 | Q    Quotations around "feel out"? |
| 11:38AM | 13 | A    Yes. |
| 11:38AM | 14 | Q    Quotations around "fish"? |
| 11:38AM | 15 | A    Yes. |
| 11:38AM | 16 | Q    So these reports at times quote what the agents understood |
| 11:38AM | 17 | you to be saying. |
| 11:38AM | 18 | A    I believe so. |
| 11:38AM | 19 | Q    Mr. Smith's relationship with Nakipi, while he's not a |
| 11:38AM | 20 | member, he has a close relationship with Norm Akau through his |
| 11:38AM | 21 | own personal connection. |
| 11:38AM | 22 | A    Correct. |
| 11:38AM | 23 | Q    And he also has a relationship with Lindsey Kinney, right? |
| 11:38AM | 24 | A    Correct. |
| 11:38AM | 25 | Q    And Lindsey Kinney was a high ranking member of Nakipi, |

11:39AM   1   right?

11:39AM   2   A    Correct.

11:39AM   3   Q    And Mr. Smith purchased drugs from Lindsey Kinney.

11:39AM   4   A    Correct.

11:39AM   5   Q    And sometimes he stiffed him.

11:39AM   6   A    Correct.

11:39AM   7   Q    And he dealt drugs for him.

11:39AM   8   A    Correct.

11:39AM   9   Q    And they got in fights sometimes.

11:39AM   10   A    Correct.

11:39AM   11   Q    And sometimes Norm Akau sided with Mr. Smith.

11:39AM   12   A    I guess.

11:39AM   13        MR. NAMMAR:  Objection.  This is beyond the scope of

11:39AM   14   redirect.

11:39AM   15        THE COURT:  Sustained.

11:39AM   16   BY MS. PANAGAKOS:

11:39AM   17   Q    And as far as Mr. Smith's -- the people that Mr. Nammar

11:39AM   18   asked you about and their associations with Nakipi, are you

11:39AM   19   aware of Mr. Smith's association with La Familia?

11:39AM   20   A    I know that he's a member.

11:39AM   21   Q    A member of --

11:39AM   22        MR. NAMMAR:  Objection.  This is beyond the scope of

11:39AM   23   redirect.

11:39AM   24        THE COURT:  Sustained.

11:39AM   25   BY MS. PANAGAKOS:

11:39AM  1   Q    Are you aware of the connection between Nakipi and La

11:39AM  2   Familia?

11:39AM  3   A    No, I'm not.

11:39AM  4   Q    And Nakipi and USO?

11:39AM  5   A    No, I'm not.

11:40AM  6   Q    And La Familia and Shooter Gang?

11:40AM  7            MR. NAMMAR:  Objection.  It's beyond the scope of

11:40AM  8   redirect.

11:40AM  9            THE COURT:  Sustained.

11:40AM 10            MS. PANAGAKOS:  Nothing further.

11:40AM 11            THE COURT:  You may step down, ma'am.

11:40AM 12            THE WITNESS:  Thank you.

11:40AM 13            THE COURT:  The government may call its next witness.

11:40AM 14            MR. INCIONG:  Thank you, Your Honor.  The United

11:40AM 15   States calls Kaulana Freitas.

11:42AM 16            THE CLERK:  Please raise your right hand.

11:42AM 17                    KAULANA FREITAS,

11:42AM 18   called as a witness, having been first duly sworn, was examined

11:42AM 19   and testified as follows:

11:42AM 20            THE CLERK:  Please be seated.  Please state your full

11:42AM 21   name, spelling your last name for the record.

11:42AM 22            THE WITNESS:  Kaulana Freitas.  Last name is

11:42AM 23   F-R-E-I-T-A-S.

        24

        25

| | | |
|---|---|---|
| 11:42AM | 1 | DIRECT EXAMINATION |
| 11:42AM | 2 | BY MR. INCIONG: |
| 11:42AM | 3 | Q    Good morning, Mr. Freitas. |
| 11:42AM | 4 | A    Good morning. |
| 11:42AM | 5 | Q    How old are you, sir? |
| 11:42AM | 6 | A    Thirty-five. |
| 11:42AM | 7 | Q    Where were you born? |
| 11:42AM | 8 | A    Honolulu, Hawaii. |
| 11:42AM | 9 | Q    Did you grow up here on Oahu? |
| 11:42AM | 10 | A    Yes, I moved here -- I left here when I was ten years old. |
| 11:42AM | 11 | Q    Where did you move to? |
| 11:42AM | 12 | A    Las Vegas, Nevada. |
| 11:42AM | 13 | Q    For the ten years or so that you were here, what part of |
| 11:42AM | 14 | the island did you grow up on? |
| 11:42AM | 15 | A    Honolulu. |
| 11:42AM | 16 | Q    Did you have family on other parts of the island? |
| 11:43AM | 17 | A    Yes. |
| 11:43AM | 18 | Q    What parts? |
| 11:43AM | 19 | A    Waimanalo and Kailua. |
| 11:43AM | 20 | Q    When you moved to the Mainland when you were about ten, |
| 11:43AM | 21 | how long did you stay there? |
| 11:43AM | 22 | A    About eight years, nine years. |
| 11:43AM | 23 | Q    Did you live in more than one location on the Mainland? |
| 11:43AM | 24 | A    Yes. |
| 11:43AM | 25 | Q    Where did you live? |

| | | | |
|---|---|---|---|
| 11:43AM | 1 | A | California and Las Vegas. |
| 11:43AM | 2 | Q | Did you eventually move back to Hawaii? |
| 11:43AM | 3 | A | Yes. |
| 11:43AM | 4 | Q | About how old were you when you moved back? |
| 11:43AM | 5 | A | About 26. |
| 11:43AM | 6 | Q | Did you have family or anything at that time? |
| 11:43AM | 7 | A | Yes. |
| 11:43AM | 8 | Q | Tell us about that. |
| 11:43AM | 9 | A | I have two boys. |
| 11:43AM | 10 | Q | So they -- they were born at that time? |
| 11:43AM | 11 | A | Yes. |
| 11:43AM | 12 | Q | Was that part of the reason why you moved back to Hawaii? |
| 11:43AM | 13 | A | Yes. |
| 11:43AM | 14 | Q | Any other reasons why you moved back? |
| 11:43AM | 15 | A | To start a new fresh start for my family. |
| 11:43AM | 16 | Q | What were you doing for work at that time? |
| 11:43AM | 17 | A | I was working at Home Depot. |
| 11:43AM | 18 | Q | When you came back to Hawaii, did you continue to work for |
| 11:44AM | 19 | | Home Depot or did you have new employment? |
| 11:44AM | 20 | A | I had a new job. |
| 11:44AM | 21 | Q | And what was that? |
| 11:44AM | 22 | A | Working at Halawa at a warehouse. |
| 11:44AM | 23 | Q | How long did you work at that place? |
| 11:44AM | 24 | A | About nine months. |
| 11:44AM | 25 | Q | What did you do then, for work? |

| | | | |
|---|---|---|---|
| 11:44AM | 1 | A | For work, just from medical supplies, packing and stuff. |
| 11:44AM | 2 | Q | Okay.  Sorry, I meant the next job after -- after the nine |
| 11:44AM | 3 | | months there. |
| 11:44AM | 4 | A | Oh, I was -- I was working with my dad at Kama'aina |
| 11:44AM | 5 | | Plumbing. |
| 11:44AM | 6 | Q | That's obviously a plumbing company? |
| 11:44AM | 7 | A | Yes. |
| 11:44AM | 8 | Q | What were doing for the plumbing company? |
| 11:44AM | 9 | A | I was a helper. |
| 11:44AM | 10 | Q | And you said you were working for your dad.  Was that his |
| 11:44AM | 11 | | company? |
| 11:44AM | 12 | A | Yes, his company and Mike's company. |
| 11:44AM | 13 | Q | When you say "Mike's company," who are you referring to? |
| 11:44AM | 14 | A | Mike Miske. |
| 11:44AM | 15 | Q | Who is Mike Miske? |
| 11:44AM | 16 | A | My cousin. |
| 11:44AM | 17 | Q | How are you related to Mr. Miske? |
| 11:44AM | 18 | A | My mom and him is first cousins. |
| 11:45AM | 19 | Q | So this company Kama'aina Plumbing was co-owned, is that |
| 11:45AM | 20 | | accurate to say by Mr. Miske and your dad? |
| 11:45AM | 21 | A | Yes. |
| 11:45AM | 22 | Q | Now, do you see the person in court today that you know to |
| 11:45AM | 23 | | be your cousin Mike Miske? |
| 11:45AM | 24 | A | Yes. |
| 11:45AM | 25 | Q | Could you indicate where he's seated and what he's wearing |

11:45AM   1   for the record, please?

11:45AM   2   A    He's sitting on the left with a brown jacket.

11:45AM   3           MR. INCIONG:  Your Honor, may the record reflect

11:45AM   4   Mr. Freitas has identified the defendant?

11:45AM   5           THE COURT:  Yes, the record should reflect the witness

11:45AM   6   Mr. Freitas's identification of the defendant Mr. Miske.

11:45AM   7   BY MR. INCIONG:

11:45AM   8   Q    Now, when you moved to the Mainland, you were just a kid,

11:45AM   9   right, you said about ten?

11:45AM   10  A    Yes.

11:45AM   11  Q    Did you have any sort of relationship with Mr. Miske when

11:45AM   12  you were ten or under that you recall?

11:45AM   13  A    No, not that I recall.

11:45AM   14  Q    So when you came back to Hawaii, did you know him well at

11:45AM   15  that point?

11:45AM   16  A    No.  I seen him around here and there.

11:46AM   17  Q    What is the approximate age difference between yourself

11:46AM   18  and Mr. Miske?

11:46AM   19  A    About 15 years.

11:46AM   20  Q    So when you started working at the company that was

11:46AM   21  co-owned by Mr. Miske and your father, did you have more

11:46AM   22  contact with Mr. Miske at that point?

11:46AM   23  A    I would see him in the office here and there.

11:46AM   24  Q    Was Mr. Miske an active member of Kama'aina Plumbing or

11:46AM   25  was he more like a silent partner?

11:46AM   1   A   A silent partner.

11:46AM   2   Q   Was your dad kind of the more hands-on part of the

11:46AM   3   partnership?

11:46AM   4   A   Yes.

11:46AM   5   Q   How long did you work at Kama'aina Plumbing for?

11:46AM   6   A   About nine months.

11:46AM   7   Q   So not very long?

11:46AM   8   A   Not long.

11:46AM   9   Q   Why -- why such a short period?

11:46AM   10   A   Me and my dad got into it, so I parted ways.

11:46AM   11   Q   All right.  Did you seek new employment from there?

11:46AM   12   A   Yes.

11:46AM   13   Q   Where did you go to work from there?

11:46AM   14   A   I worked at Victoria's Secret.

11:46AM   15   Q   How long did you work there?

11:46AM   16   A   About a year.

11:46AM   17   Q   So at this point you've been back to Hawaii now for not

11:47AM   18   quite two years; is that accurate?

11:47AM   19   A   Yes.

11:47AM   20   Q   Did you get reacquainted with any of the family you

11:47AM   21   referred to that -- that you knew after you had moved away?

11:47AM   22   A   Yes.

11:47AM   23   Q   Any specific family members you were spending a lot of

11:47AM   24   time with during that period?

11:47AM   25   A   My cousin John and Cody.

11:47AM   1   Q   What are John and Cody's last names?

11:47AM   2   A   Stancil.

11:47AM   3            MR. INCIONG:  Could I show Mr. Freitas Exhibit 1-40,

11:47AM   4   which has been previously admitted from the government's first

11:47AM   5   witness list, please?

11:47AM   6            THE COURT:  You may.

11:47AM   7            MR. INCIONG:  Thank you, Your Honor.

11:47AM   8            And if the jury could be shown that as well.

11:47AM   9            THE COURT:  Yes.

11:47AM  10            MR. INCIONG:  Thank you.

11:47AM  11   BY MR. INCIONG:

11:47AM  12   Q   Who do you recognize this to be, Mr. Freitas?

11:47AM  13   A   John Stancil.

11:47AM  14   Q   And how much time were you spending with Mr. Stancil

11:47AM  15   during this year or two after you moved back to Hawaii?

11:47AM  16   A   Quite a bit of time.

11:48AM  17   Q   What kinds of things were you doing with Mr. Stancil?

11:48AM  18   A   All kinds of stuff.  Hanging out, cruising, going to the

11:48AM  19   beach and stuff like that.

11:48AM  20   Q   After you were working at Victoria's Secret for a while,

11:48AM  21   were you offered any new employment by Mr. Miske?

11:48AM  22   A   Yes.

11:48AM  23   Q   What was that?

11:48AM  24   A   His personal assistant.

11:48AM  25   Q   What did that mean to be his personal assistant?

11:48AM   1    A    Run errands for his businesses.

11:48AM   2              MR. INCIONG:  If we could take that exhibit down,

11:48AM   3    please.  Thank you.

11:48AM   4    BY MR. INCIONG:

11:48AM   5    Q    You said businesses.  Were there a number of businesses

11:48AM   6    that you were aware of that Mr. Miske owned or was involved

11:48AM   7    with?

11:48AM   8    A    Yes.

11:48AM   9    Q    What are those?

11:48AM   10   A    M Nightclub, Hawaii Partners, Kama'aina Termite and Pest

11:48AM   11   Control, Kama'aina Plumbing, and the Rachel fishing boat.

11:48AM   12   Q    All right.  So as his personal assistant, did you

11:48AM   13   understand that your services could be for any one of those

11:48AM   14   companies at any time?

11:48AM   15   A    Yes.

11:48AM   16   Q    Did you in fact do different things for each of those

11:49AM   17   companies at certain points?

11:49AM   18   A    Yes.

11:49AM   19   Q    Did you ever go back and do any work for Kama'aina

11:49AM   20   Plumbing?

11:49AM   21   A    Any work for Kama'aina Plumbing?  No, just run errands.

11:49AM   22   Q    Okay.  And when you say "run errands," what -- give us

11:49AM   23   some examples.  What kinds of things were you doing that were

11:49AM   24   errands?

11:49AM   25   A    Getting office supplies, paying for the -- the people in

11:49AM   1   the boat, paychecks and stuff like that.

11:49AM   2   Q    Okay.  And the boat you're referring to is the Rachel?

11:49AM   3   A    Yes.

11:49AM   4   Q    I'll ask you a little bit about that later.  But how much

11:49AM   5   were you being paid by Mr. Miske to be his personal assistant?

11:49AM   6   A    Five to $600 a week.

11:49AM   7   Q    You say five to six.  Why -- why was there a range there,

11:49AM   8   did you know?

11:49AM   9   A    No, I don't know.  It was just 500, 550, just roughly

11:49AM  10   around there.

11:49AM  11   Q    Okay.  You were paid that weekly?

11:50AM  12   A    Yes.

11:50AM  13   Q    How were you paid that money?

11:50AM  14   A    In cash.

11:50AM  15   Q    Was it always in cash?

11:50AM  16   A    Yes.

11:50AM  17   Q    Did you report any taxes on that cash?

11:50AM  18   A    No.

11:50AM  19   Q    Do you recall approximately when you started as

11:50AM  20   Mr. Miske's personal assistant, what year?

11:50AM  21   A    I would say about 2015, I believe.

11:50AM  22   Q    And would it be fair to say then based on that, that you

11:50AM  23   came back to Hawaii in around 2013?

11:50AM  24   A    Yes.

11:50AM  25   Q    Now, when you were offered the job to be Mr. Miske's

| | | |
|---|---|---|
| 11:50AM | 1 | personal assistant, are you aware of whether Mr. Stancil was |
| 11:50AM | 2 | offered any employment at that same time by Mr. Miske? |
| 11:50AM | 3 | A    Yes. |
| 11:50AM | 4 | Q    What employment was he offered? |
| 11:50AM | 5 | A    To work back in the movies. |
| 11:50AM | 6 | Q    When you say the movies, is that a union job? |
| 11:50AM | 7 | A    Yes. |
| 11:50AM | 8 | Q    Did Mr. Stancil accept that employment? |
| 11:50AM | 9 | A    Yes. |
| 11:50AM | 10 | Q    Were you offered to work -- have that same job? |
| 11:50AM | 11 | A    No. |
| 11:50AM | 12 | Q    Where did you report to work when you were working for |
| 11:51AM | 13 | Mr. Miske as his personal assistant? |
| 11:51AM | 14 | A    940B Queen Street. |
| 11:51AM | 15 | Q    What is located at that address? |
| 11:51AM | 16 | A    Kama'aina Termite and Pest Control and Kama'aina Plumbing. |
| 11:51AM | 17 | Q    Did you refer to that location as the shop? |
| 11:51AM | 18 | A    Yes. |
| 11:51AM | 19 | MR. INCIONG:  Could we show Mr. Freitas Exhibit 5-22, |
| 11:51AM | 20 | please, which has been previously admitted, as well as the |
| 11:51AM | 21 | jury, please. |
| 11:51AM | 22 | BY MR. INCIONG: |
| 11:51AM | 23 | Q    Do you recognize what's shown in Exhibit 5-22, sir? |
| 11:51AM | 24 | A    Yes. |
| 11:51AM | 25 | Q    What do you see there? |

11:51AM   1    A    The shop, the company.

11:51AM   2    Q    Is this where you would report to work when you were

11:51AM   3    Mr. Miske's personal assistant?

11:51AM   4    A    Yes.

11:51AM   5    Q    What were your typical hours during the day?

11:51AM   6    A    About 8:00 a.m. to 5:00 p.m.

11:51AM   7    Q    Monday through Friday?

11:51AM   8    A    Monday through Fridays.

11:51AM   9    Q    Did you ever have to work on the weekends?

11:52AM   10   A    If need to be.

11:52AM   11   Q    But that was not your typical work schedule?

11:52AM   12   A    No.

11:52AM   13   Q    Okay.  When you reported to work, was there a certain --

11:52AM   14   did you have your own office, for example, or where did you

11:52AM   15   report within that particular building?

11:52AM   16   A    No, I didn't have my own office.  I would just report to

11:52AM   17   that building.

11:52AM   18   Q    Where in the building then would you work out of?

11:52AM   19   A    Upstairs or Mike's office.

11:52AM   20   Q    All right.

11:52AM   21          MR. INCIONG:  Could I show Mr. Freitas and the jury

11:52AM   22   Exhibit 1-777, which has previously been admitted, please?

11:52AM   23   BY MR. INCIONG:

11:52AM   24   Q    Do you recognize that photo, Mr. Freitas?

11:52AM   25   A    Yes.

| 11:52AM | 1 | Q   How do you recognize that? |

11:52AM    1    Q    How do you recognize that?

11:52AM    2    A    It's Mike's office.

11:52AM    3    Q    That is where you would meet with him when you were

11:52AM    4    working as his personal assistant?

11:52AM    5    A    Yes.

11:52AM    6          MR. INCIONG:  May we show the witness and the jury

11:52AM    7    1-778, which was also previously admitted, please?

11:52AM    8          THE COURT:  Yes.

11:53AM    9    BY MR. INCIONG:

11:53AM    10   Q    What is shown in that picture, Mr. Freitas?

11:53AM    11   A    Mike's office.

11:53AM    12   Q    Do you recognize that from working at the 940B location?

11:53AM    13   A    Yes.

11:53AM    14          MR. INCIONG:  Finally, could we show the witness and

11:53AM    15   the jury 1-779, which was previously admitted?

11:53AM    16   BY MR. INCIONG:

11:53AM    17   Q    What do you see here, Mr. Freitas?

11:53AM    18   A    Mike's office.

11:53AM    19   Q    That's the same office that you've referenced where you

11:53AM    20   would meet with him when you were working as his personal

11:53AM    21   assistant?

11:53AM    22   A    Yes.

11:53AM    23   Q    Now, you mentioned one of the companies that you helped

11:53AM    24   him with was called Hawaii Partners; is that -- is that

11:53AM    25   correct?

| | | | |
|---|---|---|---|
| 11:53AM | 1 | A | Yes. |
| 11:53AM | 2 | Q | What kind of business was Hawaii Partners? |
| 11:53AM | 3 | A | A car dealership. |
| 11:53AM | 4 | Q | What was your involvement or what were you asked to do as |
| 11:53AM | 5 | | part of your assistant duties for that particular company? |
| 11:53AM | 6 | A | I would go to the auctions, check on the vehicles, see if |
| 11:53AM | 7 | | they was running correctly, the windows roll up, the AC works, |
| 11:54AM | 8 | | register the vehicle, do safety inspections. |
| 11:54AM | 9 | Q | So Hawaii Partners was a car dealership, you said? |
| 11:54AM | 10 | A | Yes. |
| 11:54AM | 11 | Q | How did Hawaii Partners obtain its inventory, its vehicles |
| 11:54AM | 12 | | to sell?  Where -- where did they get the cars from? |
| 11:54AM | 13 | A | Manheim or Copart. |
| 11:54AM | 14 | Q | What is Manheim or Copart? |
| 11:54AM | 15 | A | Manheim is the auto auctions where we purchased the |
| 11:54AM | 16 | | vehicles every Wednesdays at. |
| 11:54AM | 17 | Q | I see.  Where was that located? |
| 11:54AM | 18 | A | Mapunapuna was Manheim.  Copart was located at Campbell |
| 11:54AM | 19 | | Industrial. |
| 11:54AM | 20 | Q | Maybe you could just raise your voice just a little bit so |
| 11:54AM | 21 | | everybody can hear you. |
| 11:54AM | 22 | A | It was Manheim, and it was located in Mapunapuna.  And |
| 11:54AM | 23 | | Copart was located in Campbell Industrial. |
| 11:54AM | 24 | Q | I see.  And I think you said that Manheim, that auction |
| 11:54AM | 25 | | took place every Wednesday? |

| 11:54AM | 1 | A | Yes, correct. |

11:54AM    1    A    Yes, correct.

11:54AM    2    Q    What about the other one?

11:54AM    3    A    I'm not too sure.  Maybe it was on Mondays.

11:54AM    4    Q    Did you go to any of these auctions?

11:54AM    5    A    Yes.

11:54AM    6    Q    Would you go regularly?

11:54AM    7    A    Yes.

11:55AM    8    Q    Both or one more than the other?

11:55AM    9    A    Mostly Manheim.

11:55AM   10    Q    That was the one every Wednesday?

11:55AM   11    A    Yes.

11:55AM   12    Q    When you went to these auctions, would you go by yourself

11:55AM   13    or did you go with anyone?

11:55AM   14    A    I would go with Mike or I would go with my cousin John

11:55AM   15    Stancil.

11:55AM   16    Q    And again, when you say "Mike," you're referring to

11:55AM   17    Mr. Miske?

11:55AM   18    A    Yes.

11:55AM   19    Q    Was he there more often than not or were you there by

11:55AM   20    yourself more often than not?

11:55AM   21    A    He was there mostly.

11:55AM   22    Q    Now, you said Mr. Stancil was there as well sometimes.

11:55AM   23    A    Yes.

11:55AM   24    Q    Was he an employee or helping with the actual business of

11:55AM   25    Hawaii Partners?

11:55AM  1   A    Sometimes he would help out with Hawaii Partners.

11:55AM  2   Q    Okay.  So describe if you could just briefly the auction

11:55AM  3   process.  I mean, how does that work?  If someone goes to

11:55AM  4   Manheim auctions and is interested in a car, how does the

11:55AM  5   process work?

11:55AM  6   A    We bid on the cars.  There's multiple people there, so

11:55AM  7   you're going against other people bidding.

11:55AM  8   Q    Are the cars displayed in person there or beforehand,

11:56AM  9   online, or how did that work?

11:56AM  10  A    It's online and also in person.  So you can walk around

11:56AM  11  the vehicle at the Manheim auction, and then they run through

11:56AM  12  these two lanes.

11:56AM  13  Q    All right.

11:56AM  14  A    And then we bid on the vehicles.

11:56AM  15  Q    And is there like an auctioneer there calling out bids

11:56AM  16  like you see on -- at a normal auction type situation?

11:56AM  17  A    Yes.

11:56AM  18  Q    Did you bid on cars?

11:56AM  19  A    I bid on cars.

11:56AM  20  Q    Did Mr. Miske bid on cars?

11:56AM  21  A    Yes.

11:56AM  22  Q    Did Mr. Stancil bid on cars?

11:56AM  23  A    Yes.

11:56AM  24  Q    Was there any rhyme or reason as to who bid on the car if

11:56AM  25  there were multiple people present, or how did that work?

11:56AM   1   A   Sometimes we will bid on the cars if Mike wasn't there.

11:56AM   2   If he's there, he would be bidding on the cars as well.

11:56AM   3   Q   Who determined -- I'm sorry, were you going to say

11:56AM   4   something?

11:56AM   5   A   No.

11:56AM   6   Q   Okay.  Who determined how much the bids were going to be

11:56AM   7   for these cars?

11:56AM   8   A   The auctioneers.

11:56AM   9   Q   I mean from Hawaii Partners, who -- were you given free --

11:57AM   10  free rein to bid as much as you thought was appropriate or was

11:57AM   11  it --

11:57AM   12  A   No, not me, no.

11:57AM   13  Q   Okay.  So who set the prices?

11:57AM   14  A   Mike did.

11:57AM   15  Q   So if you were successful in purchasing a car through the

11:57AM   16  auction, what would you do with the car?

11:57AM   17  A   We'd pick up the vehicle, take it back to the shop, or

11:57AM   18  Pearl City is another storage area over there that we keep the

11:57AM   19  cars.

11:57AM   20  Q   What was in Pearl City?

11:57AM   21  A   Storage.

11:57AM   22  Q   Okay.  That was one place that the cars would be stored?

11:57AM   23  A   Yes.

11:57AM   24  Q   Where else were the cars stored?

11:57AM   25  A   At the 940B Queen Street.

11:57AM  1   Q   You mentioned that part of your duties were to obtain

11:57AM  2   title and safety checks for the cars?

11:57AM  3   A   Yes.

11:57AM  4   Q   When would that be done typically after you had purchased

11:57AM  5   them?

11:57AM  6   A   Most likely the next day.  If possible, that same day.

11:57AM  7   Q   Did any of these cars need repairs?

11:57AM  8   A   Yes, some vehicles would need repairs.

11:57AM  9   Q   How were those repairs handled?

11:58AM  10  A   We'd take it to a body shop, a mechanic shop, and we'd fix

11:58AM  11  the cars there.

11:58AM  12  Q   Was there any particular body shop or mechanic that Hawaii

11:58AM  13  Partners used?

11:58AM  14  A   We used O'Sung's.

11:58AM  15  Q   That's O, apostrophe, S-U-N-G, apostrophe, S?

11:58AM  16  A   Yes.

11:58AM  17  Q   Where was the O'Sung's shop located?

11:58AM  18  A   King Street.

11:58AM  19  Q   Okay.  So when you started as Mr. Miske's personal

11:58AM  20  assistant, Hawaii Partners was already established and had been

11:58AM  21  in business?

11:58AM  22  A   No.

11:58AM  23  Q   So it was brand new when you started?

11:58AM  24  A   Yes.

11:58AM  25  Q   I see.  At any time how many cars would you have on hand

| | | |
|---|---|---|
| 11:58AM | 1 | that you would purchase for resale? |
| 11:58AM | 2 | A    Quite a bit.  So when we first started we started off, we |
| 11:58AM | 3 | started off with a lower bid, then later on it was maybe like |
| 11:58AM | 4 | 50 -- 30 to 50 cars. |
| 11:58AM | 5 | Q    So you would have 30 to 50 on hand at any time? |
| 11:58AM | 6 | A    Yes. |
| 11:58AM | 7 | Q    And these were then intended to be resold? |
| 11:59AM | 8 | A    Yes. |
| 11:59AM | 9 | Q    How did Hawaii Partners resell these cars?  What was the |
| 11:59AM | 10 | means? |
| 11:59AM | 11 | A    Craigslist, OfferUp, Facebook. |
| 11:59AM | 12 | Q    All online? |
| 11:59AM | 13 | A    Yes. |
| 11:59AM | 14 | Q    There was no, like, dealership lot or anything like that |
| 11:59AM | 15 | that resold the cars, was there? |
| 11:59AM | 16 | A    No, we would be meeting the persons, like in person.  They |
| 11:59AM | 17 | wouldn't come to the shop and sign papers like a normal |
| 11:59AM | 18 | dealership would. |
| 11:59AM | 19 | Q    Okay.  So who directed that these sales be done all online |
| 11:59AM | 20 | on Craigslist and the places you mentioned? |
| 11:59AM | 21 | A    Mike did. |
| 11:59AM | 22 | Q    So these are online ads that were placed? |
| 11:59AM | 23 | A    Yes. |
| 11:59AM | 24 | Q    Who determined the -- what comprised the ads, the language |
| 11:59AM | 25 | in the ads and the photos, etcetera? |

| 11:59AM | 1 | A | Mike did. |
|---|---|---|---|

11:59AM   1   A   Mike did.

11:59AM   2   Q   Were you involved in that at all?

11:59AM   3   A   Yes.

11:59AM   4   Q   So what was -- what was your involvement then?

11:59AM   5   A   To take pictures of the vehicle and to post it online.

11:59AM   6   Q   So were you ever posting those online with -- without

12:00PM   7   consulting with Mr. Miske?

12:00PM   8   A   No, it has to go through him first.

12:00PM   9   Q   Then once he approved it, you could post it?

12:00PM   10   A   Yes.

12:00PM   11   Q   All right.  So was there any sort of guidelines that you

12:00PM   12   used in posting these various cars online?

12:00PM   13   A   The cars -- yes, the cars was posted like it was not from

12:00PM   14   a dealership.

12:00PM   15   Q   Why was that?

12:00PM   16   A   We was selling it as a private seller.

12:00PM   17   Q   Who directed you to do that?

12:00PM   18   A   Mike did.

12:00PM   19   Q   Was there a reason why that you were aware of?

12:00PM   20   A   No, not that I was aware of.

12:00PM   21   Q   Did you ever include in any of these ads that these

12:00PM   22   vehicles had been purchased at auction?

12:00PM   23   A   No.

12:00PM   24   Q   Was that intentional?

12:00PM   25   A   I don't think so.

12:00PM  1  Q   So when you got a prospective buyer who responded to any

12:01PM  2  of these various online ads, how did the actual sale or

12:01PM  3  potential sale go from there?

12:01PM  4  A   Usually meet up with the customer and it would be a cash

12:01PM  5  transaction.

12:01PM  6  Q   Okay.  So you would show them the car at that point,

12:01PM  7  right?

12:01PM  8  A   Mm-hmm.

12:01PM  9  Q   If they were interested, then it was the cash transaction?

12:01PM  10  A   Yes.

12:01PM  11  Q   Did you ever accept anything other than cash?

12:01PM  12  A   No.

12:01PM  13  Q   Were there any guarantee or warranty ever given on any of

12:01PM  14  the cars?

12:01PM  15  A   No.

12:01PM  16  Q   How were the cars sold?

12:01PM  17  A   How was it sold?

12:01PM  18  Q   Right.  What was -- what was the condition that was --

12:01PM  19  that was --

12:01PM  20  A   As is.

12:01PM  21  Q   What did "as is" mean?

12:01PM  22  A   Once you purchased the vehicle, it is -- that's it.

12:01PM  23  There's no return or anything like that.

12:01PM  24  Q   All right.  Did you ever have any complaints from cars

12:01PM  25  that were sold, even though they had been sold as is?

| 12:01PM | 1  | A | Yes. |
| 12:02PM | 2  | Q | What was your response to complaints of if the car turned |
| 12:02PM | 3  |   | out to be not working as -- as they thought it should be, |
| 12:02PM | 4  |   | perhaps? |
| 12:02PM | 5  | A | This car was sold as is. |
| 12:02PM | 6  | Q | So no refunds were ever given? |
| 12:02PM | 7  | A | No. |
| 12:02PM | 8  | Q | No repairs were ever offered to be made? |
| 12:02PM | 9  | A | No. |
| 12:02PM | 10 | Q | Did anyone ever seek legal action against Hawaii Partners |
| 12:02PM | 11 |   | or yourself based on any of the sales of these cars? |
| 12:02PM | 12 | A | Yes, it was me. |
| 12:02PM | 13 | Q | You were sued? |
| 12:02PM | 14 | A | Yes. |
| 12:02PM | 15 | Q | Individually? |
| 12:02PM | 16 | A | Yes. |
| 12:02PM | 17 | Q | Not as an agent of Hawaii Partners? |
| 12:02PM | 18 | A | No. |
| 12:02PM | 19 | Q | And why was the -- what was the basis for that lawsuit? |
| 12:02PM | 20 | A | We went to small claims, and I got sued for $5,000. |
| 12:02PM | 21 | Q | Was that the sale price of the vehicle? |
| 12:02PM | 22 | A | Yes. |
| 12:02PM | 23 | Q | Do you recall what kind of vehicle this was? |
| 12:02PM | 24 | A | A Toyota Prius. |
| 12:02PM | 25 | Q | Was there a judgment or decision rendered -- |

12:02PM    1    A    Yes.

12:02PM    2    Q    -- by the court?

12:02PM    3    A    Yes.

12:02PM    4    Q    What was the decision?

12:03PM    5    A    That I got sued for 5,000.

12:03PM    6    Q    So the judgment was against you?

12:03PM    7    A    Yes.

12:03PM    8    Q    So there was a $5,000 judgment against you?

12:03PM    9    A    Yes.

12:03PM   10    Q    All right.  Did you report to Mr. Miske initially that

12:03PM   11    this lawsuit had been filed against you?

12:03PM   12    A    Yes.

12:03PM   13    Q    What was his response?

12:03PM   14    A    His response was pretty much nothing.  It wasn't --

12:03PM   15    Q    Did he offer to -- to provide you with a lawyer for

12:03PM   16    this -- for this court hearing?

12:03PM   17    A    No.

12:03PM   18    Q    Did he provide to offer to come with you for the court

12:03PM   19    hearing?

12:03PM   20    A    No.

12:03PM   21    Q    So once you told him that there was a $5,000 judgment

12:03PM   22    rendered against you, what did he say about that?

12:03PM   23    A    Nothing.  He just -- I just got caught with the 5,000.

12:03PM   24    Q    But he didn't offer to -- to cover that judgment?

12:03PM   25    A    No.

| | | | |
|---|---|---|---|
| 12:03PM | 1 | Q | That car was sold as a Hawaii Partners car? |
| 12:04PM | 2 | A | No. |
| 12:04PM | 3 | Q | It was not? |
| 12:04PM | 4 | A | It wasn't sold as a Hawaii Partners car.  It was sold as |
| 12:04PM | 5 | | -- it was my -- it was in my personal name. |
| 12:04PM | 6 | Q | Okay.  Let me rephrase that.  So when you sold these cars |
| 12:04PM | 7 | | as Mr. Miske's personal assistant working for Hawaii Partners, |
| 12:04PM | 8 | | were those all sold in your name? |
| 12:04PM | 9 | A | Yes. |
| 12:04PM | 10 | Q | On Craigslist? |
| 12:04PM | 11 | A | Mm-hmm. |
| 12:04PM | 12 | Q | And this was part of the selling it as a private owner |
| 12:04PM | 13 | | rather than as from a dealer? |
| 12:04PM | 14 | A | Yes. |
| 12:04PM | 15 | Q | Okay.  So when you told Mr. Miske that you had this $5,000 |
| 12:04PM | 16 | | judgment against you, did he offer any explanation as to why he |
| 12:04PM | 17 | | wasn't going to help you with that $5,000 obligation? |
| 12:04PM | 18 | A | He said that we went half on it. |
| 12:04PM | 19 | Q | What did he mean by you went half on it? |
| 12:04PM | 20 | A | That we went half on the Toyota Prius from the car |
| 12:04PM | 21 | | auction. |
| 12:04PM | 22 | Q | Had you gone half on it? |
| 12:04PM | 23 | A | No. |
| 12:04PM | 24 | Q | Had you ever gone half on any car that you purchased at |
| 12:04PM | 25 | | the auction for Hawaii Partners? |

| | | | |
|---|---|---|---|
| 12:04PM | 1 | A | Never. |
| 12:04PM | 2 | Q | Is that $5,000 judgment still outstanding against you? |
| 12:05PM | 3 | A | Yes. |
| 12:05PM | 4 | | MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-571, |
| 12:05PM | 5 | | please, as well as the jury?  This has been previously been |
| 12:05PM | 6 | | admitted, Your Honor. |
| 12:05PM | 7 | | THE COURT:  Go ahead. |
| 12:05PM | 8 | | BY MR. INCIONG: |
| 12:05PM | 9 | Q | Mr. Freitas, do you see what's shown there in 1-571? |
| 12:05PM | 10 | A | Yes. |
| 12:05PM | 11 | Q | Do you recognize that? |
| 12:05PM | 12 | A | Yes. |
| 12:05PM | 13 | Q | What is that? |
| 12:05PM | 14 | A | Some of the vehicles Mike -- Hawaii Partners owned. |
| 12:05PM | 15 | Q | Mr. Freitas, I'm sorry, I may have to ask you to -- |
| 12:05PM | 16 | A | Some of the vehicles Mike and Hawaii Partners owned. |
| 12:05PM | 17 | Q | Where is this particular writing board located? |
| 12:05PM | 18 | A | Mike's office. |
| 12:05PM | 19 | Q | This is the office you looked at photos before located at |
| 12:05PM | 20 | | 940B Queen Street? |
| 12:05PM | 21 | A | Yes. |
| 12:05PM | 22 | Q | Do you recognize any of that handwriting? |
| 12:05PM | 23 | A | Yes. |
| 12:05PM | 24 | Q | Whose handwriting do you recognize? |
| 12:06PM | 25 | A | It's my handwriting and Mike's handwriting. |

12:06PM   1   Q   Starting -- could you circle first the handwriting you

12:06PM   2   recognize as your own?

12:06PM   3   A   (Complying.)

12:06PM   4   Q   And then could you now -- so you circled the word "Copart"

12:06PM   5   up in the upper right-hand corner, correct?

12:06PM   6   A   Yes.

12:06PM   7   Q   That's the second auction that you made reference to

12:06PM   8   earlier?

12:06PM   9   A   Yes.

12:06PM   10  Q   All right.  Could you circle examples of Mr. Miske's

12:06PM   11  writing that you recognize?

12:06PM   12  A   (Complying.)

12:06PM   13  Q   So that's -- does that say "Step van" --

12:06PM   14  A   Yes.

12:06PM   15  Q   -- that you circled in the upper left-hand corner?

12:06PM   16  A   Mm-hmm.

12:06PM   17  Q   So is this board, did you use that regularly to record and

12:06PM   18  keep track of the various vehicles that Hawaii Partners was

12:06PM   19  purchasing and selling?

12:06PM   20  A   We used this board and another board in his office.

12:06PM   21  Q   Okay.  Now, after you had successfully sold a vehicle and

12:06PM   22  accepted the cash, what did you do with the cash?

12:07PM   23  A   I gave it to Mike.

12:07PM   24  Q   Directly to him in person?

12:07PM   25  A   Directly.  If he wasn't there, I would leave it in his

12:07PM   1   office.

12:07PM   2   Q    If he wasn't there and you left it in his office, was

12:07PM   3   there a specific particular place you were supposed to leave

12:07PM   4   the money?

12:07PM   5   A    Using his first drawer.

12:07PM   6        MR. INCIONG:  Can we go back to Exhibit 1-777, please?

12:07PM   7   BY MR. INCIONG:

12:07PM   8   Q    Do you see the drawer that you're referring to in the desk

12:07PM   9   in this particular shot?

12:07PM   10  A    Yes.

12:07PM   11  Q    Could you circle on Exhibit 1-777 the drawer that you

12:07PM   12  would leave the cash.

12:07PM   13  A    (Complying.)

12:07PM   14  Q    So that's the top drawer on the left-hand side of the

12:07PM   15  desk; is that correct?

12:07PM   16  A    Yes.

12:07PM   17       MR. INCIONG:  Okay, thank you.  We can take that down.

12:07PM   18  BY MR. INCIONG:

12:07PM   19  Q    So how long did you work as Mr. Miske's personal assistant

12:08PM   20  for?

12:08PM   21  A    On and off for about five years.

12:08PM   22  Q    So did you see him every day?

12:08PM   23  A    Every day.

12:08PM   24  Q    Did you get close to him during that time?

12:08PM   25  A    Yes, very close.

12:08PM    1    Q    Did you get to know him well?

12:08PM    2    A    Yes.

12:08PM    3    Q    I think you said before you -- you were just a young kid

12:08PM    4    when you moved away.  You didn't really know him at all prior

12:08PM    5    to moving back?

12:08PM    6    A    Yes, correct.

12:08PM    7    Q    How would you describe your relationship with Mr. Miske

12:08PM    8    after you became close, as you said?

12:08PM    9    A    It was a good relationship.

12:08PM   10    Q    Would you describe it as -- was he a mentor of sorts, a

12:08PM   11    father figure, big brother?

12:08PM   12    A    Yes, I looked up to Mike.

12:08PM   13    Q    Why did you look up to him?

12:08PM   14    A    He's my older cousin.  He's very smart.  Owned multiple

12:08PM   15    businesses.

12:08PM   16    Q    And you said you worked for him for about five years,

12:08PM   17    correct?

12:08PM   18    A    Yes.

12:08PM   19    Q    Was that straight through -- a straight-through period of

12:08PM   20    five years?

12:09PM   21    A    It just was on and off.

12:09PM   22    Q    Why on and off?

12:09PM   23    A    Sometimes I'd get fired.

12:09PM   24    Q    By Mr. Miske?

12:09PM   25    A    Yes, and then rehired.

12:09PM   1   Q    About how many times were you fired and rehired in that
12:09PM   2   five years would you say?
12:09PM   3   A    More than a few times.
12:09PM   4   Q    Why were you fired?
12:09PM   5   A    If I didn't do something right or if I didn't show up to
12:09PM   6   work, he would fire me.
12:09PM   7   Q    Not showing up to work sounds like a reasonable reason.
12:09PM   8   Wouldn't you agree?
12:09PM   9   A    Yes.
12:09PM  10   Q    Were there other reasons you were fired that you didn't
12:09PM  11   agree with?
12:09PM  12   A    Mmm, yes.
12:09PM  13   Q    Okay.  Can you give an example?
12:09PM  14   A    Just for not doing my research and stuff like that.  I
12:09PM  15   think it was too serious -- like it wasn't that serious to get
12:09PM  16   fired.
12:09PM  17   Q    Doing your research, what are you -- what are you
12:09PM  18   referring to?
12:09PM  19   A    Research on the vehicles of Hawaii Partners.
12:09PM  20   Q    Okay.  So he would ask you to do research on cars that the
12:09PM  21   company was maybe interested in buying?
12:10PM  22   A    Yes.
12:10PM  23   Q    Were there any like long gaps during this time?  So for
12:10PM  24   example, if you were fired, would you be rehired in days,
12:10PM  25   weeks, months, or did it vary?  I mean how did that work?

12:10PM   1   A   It just varied.

12:10PM   2   Q   But you were -- you were rehired each time eventually?

12:10PM   3   A   Yes.

12:10PM   4   Q   All right.  Did you remain as Mr. Miske's personal

12:10PM   5   assistant during that whole roughly five-year period or did you

12:10PM   6   move into other positions?

12:10PM   7   A   I moved into sales for Kama'aina Termite and Pest Control.

12:10PM   8   Q   Approximately what year did you begin doing sales for

12:10PM   9   Kama'aina Termite and Pest Control?

12:10PM   10   A   I believe August 2019.

12:10PM   11   Q   Okay.  Was that at your request or Mr. Miske's request?

12:10PM   12   A   He thought I would be great in sales, so I went to the

12:10PM   13   sales department.

12:10PM   14   Q   Did you agree with that?

12:10PM   15   A   Yes.

12:10PM   16   Q   Is that something you were interested in doing?

12:10PM   17   A   Yes.

12:10PM   18   Q   Was the pay going to be better?

12:11PM   19   A   The pay was going to be better.

12:11PM   20   Q   What was the pay going to be?

12:11PM   21   A   It was actually based on commission, so it depends on your

12:11PM   22   sales.

12:11PM   23   Q   What were you selling exactly?

12:11PM   24   A   Sentricon fumigations.

12:11PM   25   Q   So various pest control services?

12:11PM    1    A    Yes.

12:11PM    2    Q    How were you -- how were you able -- or how were you

12:11PM    3    supposed to initiate contact with potential customers?

12:11PM    4    A    We have -- the office gave us leads.

12:11PM    5    Q    Gave you what?

12:11PM    6    A    Leads.

12:11PM    7    Q    Okay.  What was the commission that you were expected to

12:11PM    8    get if you successfully obtained a sale or a contract?

12:11PM    9    A    15 percent.

12:11PM   10    Q    Was there any salary or anything on top of it or was it

12:11PM   11    pure commission?

12:11PM   12    A    Pure commission.

12:11PM   13    Q    So you started that, you said, in the latter part of 2019?

12:11PM   14    A    Yes.

12:11PM   15    Q    All right.  So I want to fast-forward then to the

12:11PM   16    following year, July of 2020.  Do you recall anything of

12:12PM   17    significance happening in July of 2020 in your life?

12:12PM   18    A    I got arrested at my apartment in Hawaii Kai.

12:12PM   19    Q    Who were you arrested by?

12:12PM   20    A    The FBI.

12:12PM   21    Q    Were you advised of your Miranda rights at that time?

12:12PM   22    A    Yes.

12:12PM   23    Q    Were you aware what you were being arrested for at that

12:12PM   24    time?

12:12PM   25    A    At that time, no.

12:12PM   1   Q   You said that that was at your apartment in Hawaii Kai?

12:12PM   2   A   Yes.

12:12PM   3   Q   Was your apartment searched?

12:12PM   4   A   No.

12:12PM   5   Q   Was your person searched at that time?

12:12PM   6   A   Yes, I was searched.

12:12PM   7   Q   Was there anything of your personal property that was

12:12PM   8   seized from you at that time?

12:12PM   9   A   Yes.

12:12PM   10   Q   What was seized?

12:12PM   11   A   My cell phone.

12:12PM   12   Q   Were you booked and taken into custody?

12:12PM   13   A   Yes.

12:12PM   14   Q   Where were you taken into custody?

12:12PM   15   A   FDC Honolulu.

12:12PM   16   Q   That's the Federal Detention Center Honolulu?

12:12PM   17   A   Yes.

12:12PM   18   Q   Were you appointed an attorney?

12:13PM   19   A   Yes.

12:13PM   20   Q   Did you make an initial appearance on -- on the charges?

12:13PM   21   A   Yes.

12:13PM   22   Q   Did you understand then what you were being charged with?

12:13PM   23   A   Yes.

12:13PM   24   Q   What was your understanding you were being charged with?

12:13PM   25   A   My understanding I was getting charged with conspiracy to

12:13PM   1   racketeering.  That was Count 1.  Count 12, conspiracy to

12:13PM   2   chemical weapon.  Count 13 was conspiracy to -- not conspiracy

12:13PM   3   but chemical weapon charge.

12:13PM   4   Q    Okay.

12:13PM   5   A    And 16, conspiracy to sell drugs.

12:13PM   6   Q    Okay.

12:13PM   7        THE COURT:  Mr. Inciong, would now be an appropriate

12:13PM   8   time to take a break?  It sounds like you're getting into

12:13PM   9   another area.

12:13PM   10       MR. INCIONG:  Yeah, that's fine, Your Honor.

12:13PM   11       THE COURT:  All right.  It's now 12 -- just about

12:13PM   12   12:15.  We have been going for about an hour and 45 minutes

12:13PM   13   since our last break.

12:13PM   14       So as we take our second and final break of the trial

12:13PM   15   day, I'll remind our jurors to please refrain from discussing

12:13PM   16   the substance of this case with anyone, including each other,

12:13PM   17   until I advise you otherwise; to refrain from accessing any

12:13PM   18   media or other accounts of this case that may be out there; and

12:13PM   19   finally, please do not conduct any independent investigation of

12:14PM   20   your own into the facts, circumstances or persons involved.

12:14PM   21       (Proceedings were recessed at 12:14 p.m. to 12:37

12:37PM   22   p.m.)

12:37PM   23       THE COURT:  All right.  Back from our second and final

12:37PM   24   break of the trial day.

12:37PM   25       Mr. Inciong, you may resume your direct examination of

12:37PM    1    Mr. Freitas when you are ready.

12:38PM    2              MR. INCIONG:  Thank you, Your Honor.

12:38PM    3    BY MR. INCIONG:

12:38PM    4    Q    Mr. Freitas, when we left off you had just testified that

12:38PM    5    you had been arrested in July of 2020 on the racketeering

12:38PM    6    conspiracy, chemical weapon charges, as well as the drug

12:38PM    7    distribution charges, correct?

12:38PM    8    A    Yes.

12:38PM    9    Q    Were you detained without bond initially on those charges?

12:38PM   10    A    Yes.

12:38PM   11    Q    So you remained at the Federal Detention Center Honolulu?

12:38PM   12    A    Yes.

12:38PM   13    Q    At some point did you decide to cooperate with law

12:38PM   14    enforcement and the government in this case?

12:38PM   15    A    Yes.

12:38PM   16    Q    When did you decide to cooperate?

12:38PM   17    A    March 2021.

12:38PM   18    Q    Would you tell the jury why you decided to cooperate?

12:38PM   19    A    I have two kids that I have to support and be there and

12:38PM   20    raise them.

12:38PM   21    Q    Did you enter into a proffer agreement with the government

12:38PM   22    at that time?

12:38PM   23    A    Yes.

12:38PM   24    Q    What are the primary terms of that proffer agreement as

12:38PM   25    you understand them?

12:38PM     1     A     To tell the truth.

12:38PM     2     Q     Did you also understand that you had some protections in

12:38PM     3     that proffer agreement as well?

12:38PM     4     A     Yes.

12:39PM     5     Q     What were those?

12:39PM     6     A     Anything I say can't be used against me.

12:39PM     7     Q     Did you meet then with agents of the government and the

12:39PM     8     FBI after that agreement was reached?

12:39PM     9     A     Yes.

12:39PM    10     Q     Were you at any point released on pretrial release from

12:39PM    11     the FDC while this case was pending?

12:39PM    12     A     Yes.

12:39PM    13     Q     When was that?

12:39PM    14     A     January 12th, 2021 -- '22, I believe.  Sorry, '22.

12:39PM    15     Q     2022?

12:39PM    16     A     Yes.

12:39PM    17     Q     So you were incarcerated for about a year and a half

12:39PM    18     before then?

12:39PM    19     A     Yes.

12:39PM    20     Q     Your attorney, did they file a motion for you to be

12:39PM    21     released?

12:39PM    22     A     Yes.

12:39PM    23     Q     That was granted?

12:39PM    24     A     Yes.

12:39PM    25     Q     Were there conditions that were part of that release?

| | | | |
|---|---|---|---|
| 12:39PM | 1 | A | Yes. |
| 12:39PM | 2 | Q | Could you tell the jury what those conditions were? |
| 12:39PM | 3 | A | To find a job, to live at my dad's house, and to not get |
| 12:40PM | 4 | | into any trouble. |
| 12:40PM | 5 | Q | All right.  Was there any sort of electronic monitoring |
| 12:40PM | 6 | | that was required? |
| 12:40PM | 7 | A | Yes, I have a GPS tracking device on my leg. |
| 12:40PM | 8 | Q | Was there any sort of money or surety that was required to |
| 12:40PM | 9 | | be placed? |
| 12:40PM | 10 | A | Yes. |
| 12:40PM | 11 | Q | What was that for? |
| 12:40PM | 12 | A | It was for my bond. |
| 12:40PM | 13 | Q | Who put up the money for the bond? |
| 12:40PM | 14 | A | My mom put up her house and I put up 5,000 cash. |
| 12:40PM | 15 | Q | Was there a regular drug testing as part of that as well? |
| 12:40PM | 16 | A | Yes. |
| 12:40PM | 17 | Q | Have you had any violations of your pretrial -- pretrial |
| 12:40PM | 18 | | release during that time? |
| 12:40PM | 19 | A | No, sir. |
| 12:40PM | 20 | Q | After you made the decision to cooperate, did you tell |
| 12:40PM | 21 | | anyone that you were cooperating with the government? |
| 12:40PM | 22 | A | No. |
| 12:40PM | 23 | Q | No one at all? |
| 12:40PM | 24 | A | I just told my mom. |
| 12:40PM | 25 | Q | So other than your mom, anyone? |

| | | | |
|---|---|---|---|
| 12:40PM | 1 | A | Other than my mom and my dad, that's it. |
| 12:40PM | 2 | Q | Okay.  Your mom and your dad.  Anyone else? |
| 12:40PM | 3 | A | No. |
| 12:40PM | 4 | Q | Did you later decide to resolve your case? |
| 12:41PM | 5 | A | Yes. |
| 12:41PM | 6 | Q | How did you decide to resolve your case? |
| 12:41PM | 7 | A | I pled guilty. |
| 12:41PM | 8 | Q | When did you plead guilty? |
| 12:41PM | 9 | A | March 2022. |
| 12:41PM | 10 | Q | Did you plead guilty pursuant to a plea agreement? |
| 12:41PM | 11 | A | Yes. |
| 12:41PM | 12 | Q | What did you plead guilty to? |
| 12:41PM | 13 | A | Conspiracy to racketeering and chemical weapon charge. |
| 12:41PM | 14 | Q | Why did you decide to plead guilty? |
| 12:41PM | 15 | A | To own up to what I did and -- that's pretty much it. |
| 12:41PM | 16 | Q | What was the last part? |
| 12:41PM | 17 | A | That's it. |
| 12:41PM | 18 | Q | Okay.  Were there any benefits that you were hoping to |
| 12:41PM | 19 | | obtain from your plea agreement? |
| 12:41PM | 20 | A | Any benefits, yes. |
| 12:41PM | 21 | Q | Okay.  So let's talk about some of the terms of your plea |
| 12:41PM | 22 | | agreement.  You said you pled guilty to those two counts, |
| 12:41PM | 23 | | right? |
| 12:41PM | 24 | A | Yes. |
| 12:41PM | 25 | Q | Racketeering conspiracy and chemical weapons.  So were |

12:41PM   1   there a number of counts that were dismissed?

12:41PM   2   A    Count 16 and Count 12, conspiracy to chemical weapon

12:42PM   3   attack and the drug conspiracy.

12:42PM   4   Q    Were you aware of the maximum statutory penalties that

12:42PM   5   each of those dismissed counts carried?

12:42PM   6   A    Yes.

12:42PM   7   Q    What were those?

12:42PM   8   A    Count 1, conspiracy to racketeering is zero to 20 years,

12:42PM   9   and the chemical and drugs was going to be up to life in

12:42PM  10   prison.

12:42PM  11   Q    Okay.  So did that drug charge carry a mandatory minimum

12:42PM  12   that you were aware of?

12:42PM  13   A    Yes, ten years.

12:42PM  14   Q    So those were dismissed as part of the plea agreement,

12:42PM  15   correct?

12:42PM  16   A    Correct.

12:42PM  17   Q    What about the charges that you pled guilty to?  Starting

12:42PM  18   with the racketeering conspiracy, what is the maximum you're

12:42PM  19   facing for that?

12:42PM  20   A    Zero to 20.

12:42PM  21   Q    What is the maximum you're facing for the chemical weapons

12:42PM  22   count?

12:42PM  23   A    Up to life in prison.

12:42PM  24   Q    Were there any stipulations between yourself and the

12:42PM  25   government contained in the plea agreement other than those

12:43PM    1    dismissed counts?

12:43PM    2    A    Yes.

12:43PM    3    Q    Was there -- are you familiar with what is called the base

12:43PM    4    offense level?

12:43PM    5    A    Yes.

12:43PM    6    Q    What is that?

12:43PM    7    A    Base offense level is where I want to be at, I want to

12:43PM    8    start at.

12:43PM    9    Q    Did the plea agreement agree to place you at a base

12:43PM   10    offense level of 28?

12:43PM   11    A    Yes.

12:43PM   12    Q    Was there any agreement for any upward adjustment in that

12:43PM   13    base offense level because of the chemical that was used?

12:43PM   14    A    It wouldn't be four-level increase because of a business

12:43PM   15    function.

12:43PM   16    Q    Okay.  Let me get to that in a second.

12:43PM   17         In regard to the type of chemical --

12:43PM   18    A    It's a toxic chemical, yes --

12:43PM   19    Q    So was there an upward adjustment --

12:43PM   20    A    -- upward adjustment --

12:43PM   21    Q    Was there an upward adjustment that you agreed to?

12:43PM   22    A    Yes.

12:43PM   23    Q    And I think you just referred to there was an agreement

12:43PM   24    not to have any adjustment based on any loss of business

12:43PM   25    basically, correct?

| | | | |
|---|---|---|---|
| 12:43PM | 1 | A | Correct. |
| 12:43PM | 2 | Q | What about acceptance of responsibility? |
| 12:43PM | 3 | A | Two -- two levels down for early acceptance and |
| 12:44PM | 4 | | responsibility and one for early. |
| 12:44PM | 5 | Q | So based on all those adjustments then, did your attorney |
| 12:44PM | 6 | | give you an estimate as to what the possible guideline range |
| 12:44PM | 7 | | might be as to the sentence you're facing? |
| 12:44PM | 8 | A | Yes.  I believe it was 70 to 81 months. |
| 12:44PM | 9 | Q | Did your plea agreement have a cooperation agreement as |
| 12:44PM | 10 | | part of it? |
| 12:44PM | 11 | A | Yes. |
| 12:44PM | 12 | Q | What did your cooperation agreement require of you? |
| 12:44PM | 13 | A | To tell the truth. |
| 12:44PM | 14 | Q | What are you hoping to gain from testifying here today? |
| 12:44PM | 15 | A | Leniency on my sentence. |
| 12:44PM | 16 | Q | Have you been promised any sort of reduction or leniency |
| 12:44PM | 17 | | in your sentence? |
| 12:44PM | 18 | A | No. |
| 12:44PM | 19 | Q | To your understanding, who will make the decision as to |
| 12:44PM | 20 | | whether you receive a reduced sentence? |
| 12:44PM | 21 | A | Yes. |
| 12:44PM | 22 | Q | Who will make that decision? |
| 12:44PM | 23 | A | The judge will. |
| 12:44PM | 24 | Q | Are you testifying today freely and voluntarily? |
| 12:44PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:44PM | 1 | Q | Have you been promised any benefit in all -- at all for |
| 12:44PM | 2 | | your testimony today? |
| 12:44PM | 3 | A | No. |
| 12:44PM | 4 | Q | Have you been threatened or coerced in any way? |
| 12:45PM | 5 | A | No. |
| 12:45PM | 6 | Q | Is it difficult for you to be here today? |
| 12:45PM | 7 | A | Very difficult. |
| 12:45PM | 8 | Q | Could you explain to the jury why it's hard for you to |
| 12:45PM | 9 | | testify in this matter. |
| 12:45PM | 10 | A | Mike's my cousin, and we -- we're very close. |
| 12:45PM | 11 | Q | Since you've pled guilty and have been out on pretrial |
| 12:45PM | 12 | | release, have you seen family members of yourself or |
| 12:45PM | 13 | | Mr. Miske's in the community? |
| 12:45PM | 14 | A | Yes. |
| 12:45PM | 15 | Q | Have you been to any family gatherings such as funerals, |
| 12:45PM | 16 | | birthday parties, things of that nature, where people were |
| 12:45PM | 17 | | present? |
| 12:45PM | 18 | A | Yes. |
| 12:45PM | 19 | Q | How were you treated at those -- at those gatherings? |
| 12:45PM | 20 | A | Nobody spoke with me. |
| 12:45PM | 21 | Q | How did that make you feel? |
| 12:45PM | 22 | A | It sucks. |
| 12:45PM | 23 | Q | Why? |
| 12:45PM | 24 | A | Because it's family.  We are supposed to be loyal to |
| 12:45PM | 25 | | family. |

12:45PM   1   Q   Do you feel you're part of that family anymore?

12:45PM   2   A   No.

12:45PM   3   Q   Let's get back to your plea agreement for a second.  You

12:45PM   4   mentioned that the first count you pled to is racketeering

12:46PM   5   conspiracy, correct?

12:46PM   6   A   Yes.

12:46PM   7   Q   So what did you do to make you guilty of conspiring to

12:46PM   8   violate the racketeering laws?

12:46PM   9   A   Robberies and drugs.

12:46PM   10   Q   Anything else?

12:46PM   11   A   And the chemical weapon charge.

12:46PM   12   Q   In your plea agreement did you admit to being a member of

12:46PM   13   the Miske Enterprise?

12:46PM   14   A   Yes.

12:46PM   15   Q   Who were some other members or associates of the Miske

12:46PM   16   Enterprise that you agreed to violate the racketeering laws

12:46PM   17   with?

12:46PM   18   A   Jake Smith, Lance Bermudez, John Stancil.

12:46PM   19   Q   Is John Stancil -- are you also related to him?

12:46PM   20   A   Yes.

12:46PM   21   Q   He is a cousin of yours as well?

12:46PM   22   A   Yes.

12:46PM   23   Q   What about Mr. Miske, was he part of the enterprise that

12:46PM   24   you were a part of?

12:46PM   25   A   Yes.

12:46PM   1   Q   Who was the leader of the Miske Enterprise?

12:47PM   2   A   Mike.

12:47PM   3   Q   Is there any doubt in your mind as to who was running that

12:47PM   4   organization?

12:47PM   5   A   No.

12:47PM   6   Q   In your plea agreement did you admit to committing certain

12:47PM   7   or specific what's known as racketeering acts?

12:47PM   8   A   Yes.

12:47PM   9   Q   Was chemical -- the chemical weapons offense you

12:47PM  10   referenced to, was that one of those chemical -- sorry, was

12:47PM  11   that one of those racketeering acts?

12:47PM  12   A   Yes.

12:47PM  13   Q   Were robberies another of those racketeering acts?

12:47PM  14   A   Yes.

12:47PM  15   Q   Was drug trafficking also one of those racketeering acts?

12:47PM  16   A   Yes.

12:47PM  17   Q   You mentioned assaults.  Did you also engage in assaults

12:47PM  18   on the part of the enterprise?

12:47PM  19   A   Yes.

12:47PM  20   Q   Did you agree with Mr. Miske himself personally to commit

12:47PM  21   any of these racketeering acts?

12:47PM  22   A   Yes.

12:47PM  23   Q   Which ones?

12:47PM  24       MR. KENNEDY:  Objection to the form of the question,

12:47PM  25   Your Honor.

| | | |
|---|---|---|
| 12:47PM | 1 | THE COURT:  Overruled. |
| 12:47PM | 2 | MR. KENNEDY:  It's also not racketeering acts. |
| 12:47PM | 3 | THE COURT:  Overruled.  You may answer. |
| 12:48PM | 4 | BY MR. INCIONG: |
| 12:48PM | 5 | Q    Did you agree with Mr. Miske to commit any of these |
| 12:48PM | 6 | specific racketeering acts? |
| 12:48PM | 7 | A    Yes. |
| 12:48PM | 8 | Q    Which ones? |
| 12:48PM | 9 | A    Assaults.  Chemical weapon charge. |
| 12:48PM | 10 | Q    Okay.  So let's start with the chemical weapons charge. |
| 12:48PM | 11 | MR. KENNEDY:  Your Honor, at this time I would ask an |
| 12:48PM | 12 | instruction that assaults are not racketeering acts. |
| 12:48PM | 13 | THE COURT:  Denied.  Proceed. |
| 12:48PM | 14 | MR. KENNEDY:  Under the code. |
| 12:48PM | 15 | THE COURT:  Denied.  Proceed. |
| 12:48PM | 16 | BY MR. INCIONG: |
| 12:48PM | 17 | Q    Mr. Freitas, are you familiar with a nightclub by the name |
| 12:48PM | 18 | of the District? |
| 12:48PM | 19 | A    Yes. |
| 12:48PM | 20 | Q    How are you familiar with the District Nightclub? |
| 12:48PM | 21 | A    It was one of the nightclubs here in Honolulu. |
| 12:48PM | 22 | Q    Had you frequented that nightclub ever? |
| 12:48PM | 23 | A    I've been to that nightclub before. |
| 12:48PM | 24 | Q    Okay.  So in March of 2017, do you recall going to that |
| 12:48PM | 25 | nightclub for a different reason? |

| | | | |
|---|---|---|---|
| 12:48PM | 1 | A | Yes. |
| 12:48PM | 2 | Q | How did that come about? |
| 12:48PM | 3 | A | Mike asked me to -- to release a toxic chemical at that |
| 12:49PM | 4 | | nightclub in March. |
| 12:49PM | 5 | Q | So was there -- had there been any conversation about this |
| 12:49PM | 6 | | before or did this just come up out of the blue? |
| 12:49PM | 7 | A | It came up out of the blue. |
| 12:49PM | 8 | Q | Mr. Miske asked you this personally? |
| 12:49PM | 9 | A | Yes. |
| 12:49PM | 10 | Q | In person, not over the phone or via text or anything like |
| 12:49PM | 11 | | that? |
| 12:49PM | 12 | A | No, personally. |
| 12:49PM | 13 | Q | Do you recall where this meeting took place? |
| 12:49PM | 14 | A | M Nightclub. |
| 12:49PM | 15 | Q | The M Nightclub, that was one of the businesses you |
| 12:49PM | 16 | | mentioned earlier that he owned, correct? |
| 12:49PM | 17 | A | Yes. |
| 12:49PM | 18 | Q | Did you spend time at the M Nightclub? |
| 12:49PM | 19 | A | Yes. |
| 12:49PM | 20 | Q | So were you just there socializing on that particular |
| 12:49PM | 21 | | night or were you there for any other reason? |
| 12:49PM | 22 | A | Just socializing that night. |
| 12:49PM | 23 | Q | Tell us how Mr. Miske approached you about this chemical |
| 12:49PM | 24 | | idea. |
| 12:49PM | 25 | A | He asked me to -- to go over there to that nightclub to |

12:49PM   1    release what I thought was going to be tear gas at District

12:50PM   2    Nightclub.

12:50PM   3    Q    Why did you think it was tear gas?

12:50PM   4    A    Because he told me it was tear gas.

12:50PM   5    Q    Did you have any idea or know why he wanted you to do it?

12:50PM   6    A    They made a comment on social media about a post.

12:50PM   7    Q    Were you aware of that or did Mr. Miske tell you that?

12:50PM   8    A    He told me this.

12:50PM   9    Q    Had you seen that post before or was it just information

12:50PM   10   that he relayed to you?

12:50PM   11   A    No, I seen that post before.

12:50PM   12   Q    So let me first ask you, you said you were familiar with

12:50PM   13   the District Nightclub.  Let me show you first Exhibit 6-47.

12:50PM   14         MR. INCIONG:  If we could show the jury as well,

12:50PM   15   please.  This has been previously admitted.

12:50PM   16         THE COURT:  Go ahead.

12:50PM   17   BY MR. INCIONG:

12:50PM   18   Q    Do you recognize what's shown in that photograph?

12:50PM   19   A    Yes.

12:50PM   20   Q    How do you recognize that?

12:50PM   21   A    It's the -- the side of the building is District

12:51PM   22   Nightclub.

12:51PM   23   Q    Does that -- does that particular shot show the entrance

12:51PM   24   to the District Nightclub?

12:51PM   25   A    No, it's the other side.

| | | |
|---|---|---|
| 12:51PM | 1 | MR. INCIONG:  Okay.  Could we show the witness and the |
| 12:51PM | 2 | jury Exhibit 6-74, please? |
| 12:51PM | 3 | THE COURT:  6-47, has that been admitted, Counsel? |
| 12:51PM | 4 | MR. INCIONG:  6-47.  You know, I'm sorry, Your Honor, |
| 12:51PM | 5 | it's a different angle, I believe, now that I -- |
| 12:51PM | 6 | MR. KENNEDY:  I'll check as well, Your Honor. |
| 12:51PM | 7 | I don't believe it has, Your Honor. |
| 12:51PM | 8 | MR. INCIONG:  One moment, Your Honor.  My apologies. |
| 12:52PM | 9 | I'm sorry, Your Honor, could we show 6-73?  That's the |
| 12:52PM | 10 | one I meant.  My apologies. |
| 12:52PM | 11 | THE COURT:  Yes, 6-73 has been admitted. |
| 12:52PM | 12 | MR. INCIONG:  Thank you. |
| 12:52PM | 13 | BY MR. INCIONG: |
| 12:52PM | 14 | Q   Same question, Mr. Freitas, do you recognize this as being |
| 12:52PM | 15 | the District Nightclub? |
| 12:52PM | 16 | A   Yes. |
| 12:52PM | 17 | Q   So you mentioned that the entrance was on the other side. |
| 12:52PM | 18 | MR. INCIONG:  Could we show the witness and the jury |
| 12:52PM | 19 | 6-74, please? |
| 12:52PM | 20 | BY MR. INCIONG: |
| 12:52PM | 21 | Q   Do you recognize that? |
| 12:52PM | 22 | A   Yes. |
| 12:52PM | 23 | Q   Is that the entry to the District Nightclub? |
| 12:52PM | 24 | A   Yes. |
| 12:52PM | 25 | Q   So when you're at the M Nightclub and Mr. Miske asks you |

12:53PM   1   to drop what he called tear gas, did you agree to do so?

12:53PM   2   A   At first I didn't want to do it.

12:53PM   3   Q   Why?

12:53PM   4   A   Because I didn't want to do it.

12:53PM   5   Q   Did you -- did you tell him that?

12:53PM   6   A   Yes, I did.

12:53PM   7   Q   What was his response?

12:53PM   8   A   "Stop being a faggot."

12:53PM   9   Q   Is that how he would talk to you frequently?

12:53PM   10   A   Not frequently.

12:53PM   11   Q   When would he talk to you like that?

12:53PM   12   A   When he was upset.

12:53PM   13   Q   After he said that to you, did you agree to do it?

12:53PM   14   A   Yes.

12:53PM   15   Q   Did you feel pressured?

12:53PM   16   A   Yes.

12:53PM   17   Q   Why?

12:53PM   18   A   Because he's my older cousin, and I look up to him and I

12:53PM   19   do what he says.

12:53PM   20   Q   So after you had agreed, what was the plan?

12:53PM   21   A   I left, and we drove in my Mercedes with Jake -- with Jake

12:53PM   22   Smith over to the nightclub, and I seen them wanding people in

12:54PM   23   the front door.  And what I had it in was a Jagermeister bottle

12:54PM   24   with a metal cap.

12:54PM   25   Q   Okay.  Let me -- sorry to interrupt you, but let me -- let

| | | |
|---|---|---|
| 12:54PM | 1 | me go back just a step or two first.  So you're at the club and |
| 12:54PM | 2 | you agreed to do it.  How did you get this bottle that you |
| 12:54PM | 3 | referenced? |
| 12:54PM | 4 | A    Jake Smith had it. |
| 12:54PM | 5 | Q    So who is Jake Smith? |
| 12:54PM | 6 | A    Jake Smith is a friend. |
| 12:54PM | 7 | Q    How did you know Jake Smith? |
| 12:54PM | 8 | A    I met him through John Stancil. |
| 12:54PM | 9 | Q    So were you with Jake Smith at the M Nightclub that night? |
| 12:54PM | 10 | A    Yes. |
| 12:54PM | 11 | Q    And let me ask you about that too.  So was -- when you |
| 12:54PM | 12 | were hanging out at the M Nightclub, did you know it to always |
| 12:54PM | 13 | be the M Nightclub or did it change to a different name at some |
| 12:54PM | 14 | point? |
| 12:54PM | 15 | A    It changed to a different name to Encore. |
| 12:54PM | 16 | Q    Do you recall when that occurred? |
| 12:54PM | 17 | A    No, I don't remember or recollect that day. |
| 12:54PM | 18 | Q    Did you always -- did you continue to refer to it as the |
| 12:55PM | 19 | M -- |
| 12:55PM | 20 | A    Yes. |
| 12:55PM | 21 | Q    -- or it was the M to you? |
| 12:55PM | 22 | A    Yes. |
| 12:55PM | 23 | Q    Okay.  Other than the name change, were you aware that |
| 12:55PM | 24 | whether or not the ownership had changed? |
| 12:55PM | 25 | A    The ownership had changed. |

12:55PM    1    Q    Who -- who would become the owner?

12:55PM    2    A    Jason Yokoyama.

12:55PM    3    Q    What was Mr. Yokoyama's relationship, if any, to

12:55PM    4    Mr. Miske?

12:55PM    5    A    They was friends.

12:55PM    6    Q    So was Mr. Miske still involved with the now Encore

12:55PM    7    Nightclub to your knowledge?

12:55PM    8    A    I believe so.

12:55PM    9    Q    So you're at the club with Jake Smith, correct?

12:55PM   10    A    Mm-hmm.

12:55PM   11    Q    So tell us now how you got this particular bottle after

12:55PM   12    you had agreed to -- to drop the tear gas.

12:55PM   13    A    Jake had the bottle, and we went in my Mercedes, drove

12:55PM   14    over to the District Nightclub, and they was wanding people in

12:55PM   15    the front door with a metal detector wand.  So I left -- I

12:56PM   16    didn't want to get busted with the bottle, so I went to Walmart

12:56PM   17    and purchased like a little ketchup bottle, I poured the

12:56PM   18    Jagermeister bottle into this ketchup bottle, and I went inside

12:56PM   19    to the District Nightclub, and I poured the tear gas at the

12:56PM   20    time into a trash can, and then I left.  And when I returned

12:56PM   21    back to the nightclub --

12:56PM   22    Q    Let me stop you there.  So the reason you saw -- or the

12:56PM   23    reason you went to Walmart was because you saw the metal

12:56PM   24    detectors?

12:56PM   25    A    Yes.

12:56PM   1   Q   Why did the metal detectors concern you?

12:56PM   2   A   Because the bottle would be going off because it had a

12:56PM   3   metal cap.

12:56PM   4   Q   All right.

12:56PM   5         MR. INCIONG:  Could we show Mr. Freitas and the jury

12:56PM   6   Exhibit 6-26, please, which has been previously admitted into

12:56PM   7   evidence?

12:56PM   8         THE COURT:  Go ahead.

12:56PM   9   BY MR. INCIONG:

12:56PM   10   Q   Mr. Freitas, does this look like the bottle that you were

12:56PM   11   given by Jake Smith?

12:57PM   12   A   Yes.

12:57PM   13   Q   And approximately what -- what size is this?  It may be

12:57PM   14   hard to tell from this photo.  Could you describe the size of

12:57PM   15   the bottle?

12:57PM   16   A   It was maybe like a shot glass size.

12:57PM   17   Q   All right.  Is this one of the -- like the types of

12:57PM   18   bottles you find like in a hotel minibar, on the airplane,

12:57PM   19   something like that?

12:57PM   20   A   Yes.

12:57PM   21   Q   All right.  So because of that cap you thought that might

12:57PM   22   go off on the metal detector?

12:57PM   23   A   Yes.

12:57PM   24         MR. INCIONG:  Could we show Exhibit 6-46, which has

12:57PM   25   been previously admitted into evidence, please, to the jury and

12:57PM    1    Mr. Freitas?

12:57PM    2              THE COURT:  Yes.

12:57PM    3    BY MR. INCIONG:

12:57PM    4    Q    Do you see this map, Mr. Freitas?

12:57PM    5    A    Yes.

12:57PM    6    Q    Do you see where the District Nightclub is located on that

12:57PM    7    map with that red pin?

12:57PM    8    A    Yes.

12:57PM    9    Q    Does that accurately show its location in reference to Ala

12:57PM   10    Moana mall, for example?

12:57PM   11    A    Yes.

12:57PM   12    Q    Now, you referenced a Walmart that you went to after you

12:57PM   13    saw the metal detecters.  Do you see that on this map?

12:58PM   14    A    Yes.

12:58PM   15    Q    Could you circle that on the touch screen?  You can use

12:58PM   16    your finger if you want.

12:58PM   17    A    The Walmart?

12:58PM   18    Q    Yes, please.

12:58PM   19    A    (Complying.)

12:58PM   20    Q    So is that relatively close to the District?

12:58PM   21    A    Yes.

12:58PM   22    Q    Okay.  So you drove over there, and what -- what did you

12:58PM   23    obtain there?

12:58PM   24    A    It was a little squeeze bottle, like a ketchup bottle.

12:58PM   25    Q    What was the bottle made out of?

12:58PM   1   A   Plastic.

12:58PM   2   Q   All right.  So what did you do with it?

12:58PM   3   A   I bought it, and I returned back to the District and I

12:58PM   4   poured the Jagermeister tear gas into a clear ketchup bottle.

12:58PM   5   Q   Where were you located when you did that?

12:58PM   6   A   Across the street from District in Ala Moana parking lot.

12:58PM   7   Q   Okay.  So in the -- in the parking lot of the Ala Moana

12:58PM   8   mall?

12:58PM   9   A   Yes.

12:58PM   10   Q   Who was present with you at that time?

12:58PM   11   A   Jake Smith.

12:58PM   12   Q   Now, were you given any instructions as to how you should

12:59PM   13   pour out this particular substance or where you should pour it

12:59PM   14   or anything like that?

12:59PM   15   A   No.

12:59PM   16   Q   Were you told how much you should pour out?

12:59PM   17   A   No.

12:59PM   18   Q   That was just left to you to decide?

12:59PM   19   A   Yes.

12:59PM   20   Q   So you said you went and you poured it into a trash can?

12:59PM   21   A   Yes.

12:59PM   22   Q   Where did you -- where were you concealing this plastic

12:59PM   23   squeeze bottle when you went into the club?

12:59PM   24   A   In my pants.

12:59PM   25   Q   Did you empty the entire bottle in the club?

12:59PM    1    A    No.  I did like a squirt into a trash can.

12:59PM    2    Q    Where was that trash can located?

12:59PM    3    A    By the dance floor.

12:59PM    4    Q    Did you stay for any period of time or did you leave

12:59PM    5    immediately?

12:59PM    6    A    I left immediately.

12:59PM    7    Q    At this point as you're leaving the club, did you see any

12:59PM    8    signs of any effect of this substance in the club?

12:59PM    9    A    No.

12:59PM   10    Q    Did you yourself experience any signs or symptoms from

12:59PM   11    having any contact with this -- with this chemical?

12:59PM   12    A    Yes.

12:59PM   13    Q    What was that?

01:00PM   14    A    Eyes was burning, like cut onions or something.

01:00PM   15    Q    All right.  Where did you go from there?

01:00PM   16    A    I went back to the -- to the nightclub.

01:00PM   17    Q    Did you go to your car first?

01:00PM   18    A    Yeah, I went back to the car, we drove over to the

01:00PM   19    nightclub.

01:00PM   20    Q    So this was your car?

01:00PM   21    A    Yes.

01:00PM   22    Q    What were you driving that night?

01:00PM   23    A    A Mercedes, a black Mercedes-Benz.

01:00PM   24    Q    And Jake Smith was your passenger?

01:00PM   25    A    Yes.

| | | | |
|---|---|---|---|
| 01:00PM | 1 | Q | On the way back to the club were you experiencing any |
| 01:00PM | 2 | | symptoms? |
| 01:00PM | 3 | A | Yes. |
| 01:00PM | 4 | Q | Describe what those are for the jury. |
| 01:00PM | 5 | A | Burning in the eyes. |
| 01:00PM | 6 | Q | Anything else? |
| 01:00PM | 7 | A | No. |
| 01:00PM | 8 | Q | Was Mr. Smith experiencing the same symptoms? |
| 01:00PM | 9 | A | Yes. |
| 01:00PM | 10 | Q | So why did you go back to the M Nightclub? |
| 01:00PM | 11 | A | To report back to Mike. |
| 01:00PM | 12 | Q | Was Mr. Miske there? |
| 01:00PM | 13 | A | Yes. |
| 01:00PM | 14 | Q | Did you tell him what you had done? |
| 01:00PM | 15 | A | Yes. |
| 01:00PM | 16 | Q | What was his response? |
| 01:00PM | 17 | A | How was their reaction on what happened? |
| 01:00PM | 18 | Q | What did you tell him? |
| 01:00PM | 19 | A | I told him what happened, and he asked me if anybody left |
| 01:01PM | 20 | | the nightclub. |
| 01:01PM | 21 | Q | Did you know if they had or not? |
| 01:01PM | 22 | A | No, I didn't -- at that time I didn't. |
| 01:01PM | 23 | Q | Did you tell him that? |
| 01:01PM | 24 | A | Yes. |
| 01:01PM | 25 | Q | And what did he say? |

01:01PM   1   A    Go back there.

01:01PM   2   Q    Why?

01:01PM   3   A    To see the reaction.

01:01PM   4   Q    Did he want you to just look yourself or did he want you

01:01PM   5   to obtain any sort of evidence of it?

01:01PM   6   A    He wanted me to take photos.

01:01PM   7   Q    So did you agree to drive back?

01:01PM   8   A    Yes.

01:01PM   9   Q    Who did you drive back with, if anyone?

01:01PM   10  A    Keoni --

01:01PM   11  Q    Who is Keoni?

01:01PM   12  A    Keoni Adric.

01:01PM   13  Q    Keoni Adric did not go with you the first time, correct?

01:01PM   14  A    No.

01:01PM   15  Q    That was just Mr. Smith?

01:01PM   16  A    Yes.

01:01PM   17  Q    Why did Keoni Adric go with you?

01:01PM   18  A    Because I didn't want to go back with the same vehicle, so

01:01PM   19  I asked him if he can drive.

01:01PM   20  Q    So you took his car?

01:01PM   21  A    Yes.

01:01PM   22  Q    What kind of car was that?

01:01PM   23  A    Also a white Mercedes.

01:01PM   24  Q    Different --

01:01PM   25  A    Different white --

01:01PM    1    Q    -- color?

01:01PM    2    A    -- same type.

01:02PM    3    Q    What did you see when you went back to the District

01:02PM    4    Nightclub with Mr. Adric?

01:02PM    5    A    I seen HPD and I seen fire trucks.

01:02PM    6    Q    What else?

01:02PM    7    A    And people scrambling out from the District.

01:02PM    8    Q    Did you stop or did you just drive by slowly or how did

01:02PM    9    you see?

01:02PM   10    A    I drove by slowly.

01:02PM   11    Q    Did you stick around?

01:02PM   12    A    No.

01:02PM   13    Q    Did you take pictures?

01:02PM   14    A    I don't recall if I took pictures or not.

01:02PM   15    Q    Where did you go from there?

01:02PM   16    A    I went back to the nightclub.

01:02PM   17    Q    Did you report what you had seen to Mr. Miske at that

01:02PM   18    time?

01:02PM   19    A    Yes.

01:02PM   20    Q    What did he say?

01:02PM   21    A    No reaction.

01:02PM   22    Q    Now, on the way back, are you -- had the symptoms that you

01:02PM   23    were experiencing earlier subsided or the same or stronger?

01:02PM   24    What were -- what were you feeling at that point?

01:02PM   25    A    When I returned back?

| | | | |
|---|---|---|---|
| 01:02PM | 1 | Q | Yes. |
| 01:02PM | 2 | A | Nothing. |
| 01:02PM | 3 | Q | Now, the bottle that you used, the squeeze bottle, what |
| 01:02PM | 4 | | happened to that? |
| 01:03PM | 5 | A | I believe Jake Smith had it.  There was still some |
| 01:03PM | 6 | | remaining inside that bottle. |
| 01:03PM | 7 | Q | What about the original Jagermeister bottle that you |
| 01:03PM | 8 | | poured that into, what happened to that? |
| 01:03PM | 9 | A | I don't know if I threw it away or if Jake had it. |
| 01:03PM | 10 | Q | Now, the very next night in March of 2017, were you |
| 01:03PM | 11 | | involved in any other chemical attacks? |
| 01:03PM | 12 | A | No. |
| 01:03PM | 13 | Q | Were you involved in any other chemical attacks at any |
| 01:03PM | 14 | | time after that? |
| 01:03PM | 15 | A | No. |
| 01:03PM | 16 | Q | Were you in the area of that District Nightclub the |
| 01:03PM | 17 | | following night? |
| 01:03PM | 18 | A | I might have been at District -- Addiction Nightclub. |
| 01:03PM | 19 | Q | What is Addiction? |
| 01:03PM | 20 | A | It's in the Modern -- located at the Modern hotel. |
| 01:03PM | 21 | Q | That's a club as well? |
| 01:03PM | 22 | A | Yes. |
| 01:03PM | 23 | Q | Okay.  What were you doing there? |
| 01:03PM | 24 | A | Having a few drinks, hanging out with some friends. |
| 01:04PM | 25 | Q | Same friends as the night before or a different group? |

01:04PM   1   A     A different group.

01:04PM   2   Q     Not Mr. Smith?

01:04PM   3   A     No.

01:04PM   4   Q     Not Mr. Stancil?

01:04PM   5   A     No.

01:04PM   6   Q     Not Mr. Miske?

01:04PM   7   A     No.

01:04PM   8   Q     Let me fast-forward about a month or so after you released

01:04PM   9   the -- what you believed to be tear gas at the District.  Were

01:04PM   10   you stopped by Honolulu police for a traffic stop in Kailua?

01:04PM   11   A     Yes.

01:04PM   12   Q     Who was with you at the time of the traffic stop?

01:04PM   13   A     Jake Smith and his two friends.

01:04PM   14   Q     Did you know who those two friends were?

01:04PM   15   A     No -- at that time, no.

01:04PM   16   Q     What was the reason for the traffic stop?

01:04PM   17   A     No front license plates.

01:04PM   18          MR. INCIONG:  Could we show the witness only, please,

01:04PM   19   Exhibit 6-37?

01:04PM   20   BY MR. INCIONG:

01:04PM   21   Q     Mr. Freitas, do you recognize what's shown in the

01:04PM   22   photograph in Exhibit 6-37?

01:05PM   23   A     Yes.

01:05PM   24   Q     How do you recognize that?

01:05PM   25   A     That's my Mercedes.

01:05PM   1   Q     And is this the car that you were driving in when you were

01:05PM   2   stopped by Honolulu police in Kailua in April of 2017?

01:05PM   3   A     Yes.

01:05PM   4   Q     Does that photo accurately show your vehicle at that time?

01:05PM   5   A     Yes.

01:05PM   6             MR. INCIONG:  Your Honor, I would move to admit 6-37.

01:05PM   7             THE COURT:  Any objection?

01:05PM   8             MR. KENNEDY:  No objection.

01:05PM   9             THE COURT:  Without objection, 6-37 is admitted.  You

01:05PM  10   may publish.

01:05PM  11             (Exhibit 6-37 was received in evidence.)

01:05PM  12             MR. INCIONG:  Thank you, Your Honor.

01:05PM  13   BY MR. INCIONG:

01:05PM  14   Q     Mr. Freitas, this is the car that you drove from the M or

01:05PM  15   Encore Nightclub to the District Nightclub to release the tear

01:05PM  16   gas?

01:05PM  17   A     Yes.

01:05PM  18   Q     This is the same car that you were stopped by Honolulu

01:05PM  19   police in Kailua about a month later?

01:05PM  20   A     Yes.

01:05PM  21             MR. INCIONG:  Could we show the witness only, please,

01:05PM  22   Exhibit 6-32?

01:05PM  23   BY MR. INCIONG:

01:05PM  24   Q     Do you recognize that, sir?

01:05PM  25   A     Yes.

01:05PM   1   Q   How do you recognize that?

01:05PM   2   A   That's me and Jake Smith.

01:05PM   3   Q   Is that photo taken when you were pulled over by Honolulu

01:06PM   4   police in Kailua in April of 2017?

01:06PM   5   A   Yes.

01:06PM   6   Q   Does that accurately show yourself and Mr. Smith at that

01:06PM   7   time?

01:06PM   8   A   Yes.

01:06PM   9        MR. INCIONG:  Your Honor, I would move to admit 6-32.

01:06PM   10        THE COURT:  Mr. Kennedy, any objection?

01:06PM   11        MR. KENNEDY:  No objection.

01:06PM   12        THE COURT:  Without objection, 6-32 is admitted.  You

01:06PM   13   may publish that as well.

01:06PM   14        (Exhibit 6-32 was received in evidence.)

01:06PM   15        MR. INCIONG:  Thank you, Your Honor.

01:06PM   16   BY MR. INCIONG,

01:06PM   17   Q   So, Mr. Freitas, you're in the driver's seat; is that

01:06PM   18   correct?

01:06PM   19   A   Yes.

01:06PM   20   Q   And who is that seated in the passenger seat?

01:06PM   21   A   Jake Smith.

01:06PM   22   Q   And Jake Smith is the person who gave you the Jagermeister

01:06PM   23   bottle on the night that you emptied its contents into the

01:06PM   24   squeeze bottle and then dispersed it at the District Nightclub?

01:06PM   25   A   Yes.

01:06PM   1                    MR. INCIONG:  Could we show the witness Exhibit 6-29,

01:06PM   2   please, which has been previously admitted earlier today?

01:06PM   3                    THE COURT:  Yes.

01:06PM   4                    MR. INCIONG:  Thank you, Your Honor.

01:06PM   5   BY MR. INCIONG:

01:07PM   6   Q    Do you recognize that backpack, Mr. Freitas?

01:07PM   7   A    Yes.

01:07PM   8   Q    How do you know that backpack?

01:07PM   9   A    That's Jake's backpack.

01:07PM  10   Q    Have you seen him with that?

01:07PM  11   A    Yes.

01:07PM  12   Q    Did he have that with him on the day you were stopped by

01:07PM  13   the Kailua police at the traffic stop in the pictures we just

01:07PM  14   looked at?

01:07PM  15   A    Yes.

01:07PM  16   Q    Did you know what was inside that particular backpack?

01:07PM  17   A    I knew Jake carried a backpack and it has guns inside.

01:07PM  18   Q    You had that knowledge, right?

01:07PM  19   A    Mm-hmm.

01:07PM  20   Q    On that particular day did you look inside that backpack?

01:07PM  21   A    No.

01:07PM  22   Q    Did you -- so did you know specifically what was inside

01:07PM  23   there?

01:07PM  24   A    No.

01:07PM  25                    MR. INCIONG:  Could I show again 6-26 to Mr. Freitas,

01:07PM   1    which was previously admitted today?

01:07PM   2              THE COURT:  Go ahead.

01:07PM   3    BY MR. INCIONG:

01:07PM   4    Q    And you recognize this as being the same type of

01:07PM   5    Jagermeister bottle that you were given to disperse at the

01:08PM   6    District Nightclub?

01:08PM   7    A    Yes.

01:08PM   8    Q    Did you know that a similar or same Jagermeister bottle

01:08PM   9    was in that backpack?

01:08PM  10    A    No, I didn't know.

01:08PM  11    Q    So when you were stopped by the police, were you asked

01:08PM  12    about this backpack?

01:08PM  13    A    Yes.

01:08PM  14    Q    And what was asked, whose -- who it belonged to?

01:08PM  15    A    Yes.

01:08PM  16    Q    Was that asked of you or of Mr. Smith?

01:08PM  17    A    It was asked by HPD whose backpack it was.

01:08PM  18    Q    And whose -- what did you answer?

01:08PM  19    A    It wasn't my backpack.

01:08PM  20    Q    Did you tell HPD that?

01:08PM  21    A    Yes.

01:08PM  22    Q    And were you present when Mr. Smith was asked that?

01:08PM  23    A    No.

01:08PM  24    Q    Were you allowed to leave the scene that day?

01:08PM  25    A    Yes.

01:08PM   1   Q   Was Mr. Smith allowed to leave the scene?

01:08PM   2   A   Yes.

01:08PM   3   Q   Was the backpack with you or left behind?

01:08PM   4   A   Left behind.

01:08PM   5   Q   Who took custody of that backpack?

01:09PM   6   A   HPD.

01:09PM   7   Q   Okay.  So let me shift gears with you a little bit here.

01:09PM   8   You mentioned that to further the enterprise you had committed

01:09PM   9   a number of assaults you admitted to in part of your plea

01:09PM   10   agreement, correct?

01:09PM   11   A   Yes.

01:09PM   12   Q   Who directed you to commit these assaults?

01:09PM   13   A   Mike did.

01:09PM   14   Q   That's Mike Miske?

01:09PM   15   A   Mm-hmm.

01:09PM   16   Q   So did you know an individual by the name of Jonathan

01:09PM   17   Fraser?

01:09PM   18   A   Yes.

01:09PM   19   Q   How did you know of Jonathan Fraser?

01:09PM   20   A   He was Caleb's friend.

01:09PM   21   Q   Who is Caleb?

01:09PM   22   A   My cousin.

01:09PM   23   Q   Do you know his last name?

01:09PM   24   A   Miske.

01:09PM   25   Q   Is that Mike Miske's son?

| | | | |
|---|---|---|---|
| 01:09PM | 1 | A | Yes. |
| 01:09PM | 2 | Q | So when you moved back from the Mainland in approximately |
| 01:10PM | 3 | | 2013, did you get to know Caleb Miske at that time? |
| 01:10PM | 4 | A | Yes. |
| 01:10PM | 5 | Q | How would you describe your relationship with Caleb? |
| 01:10PM | 6 | A | Very close. |
| 01:10PM | 7 | Q | You're closer -- closer in age to Caleb than you were to |
| 01:10PM | 8 | | Mr. Miske? |
| 01:10PM | 9 | A | Yes. |
| 01:10PM | 10 | Q | Did you get to know Mr. Frasure as a result of that? |
| 01:10PM | 11 | A | Yes. |
| 01:10PM | 12 | Q | So when you first came back in 2013, did you know of |
| 01:10PM | 13 | | Mr. Frasure at that point? |
| 01:10PM | 14 | A | 2013, no. |
| 01:10PM | 15 | Q | Moving forward into 2014 after you had been back for a |
| 01:10PM | 16 | | little while, do you recall if you met Mr. Frasure by that |
| 01:10PM | 17 | | time? |
| 01:10PM | 18 | A | Yes. |
| 01:10PM | 19 | Q | How had you met him, through Caleb? |
| 01:10PM | 20 | A | Through Caleb. |
| 01:10PM | 21 | Q | Do you recall Mr. Miske speaking with you about a watch |
| 01:10PM | 22 | | and mentioning Mr. Frasure in regard to that watch? |
| 01:10PM | 23 | A | Yes. |
| 01:10PM | 24 | Q | Tell the jury what -- how that came up. |
| 01:10PM | 25 | A | Jonathan Fraser stole a Rolex watch from Mike's office. |

01:11PM    1    Q    Mr. Miske told you that or you knew that independently?

01:11PM    2    A    He told me that.

01:11PM    3    Q    Mike told you that?

01:11PM    4    A    Yes.

01:11PM    5    Q    Was he upset about that?

01:11PM    6    A    Yes.

01:11PM    7    Q    Were you asked to do anything in that regard?

01:11PM    8    A    To see if Jonathan Fraser pawned the watch at any pawn

01:11PM    9    shops.

01:11PM   10    Q    That was the direction you were given by Mr. Miske?

01:11PM   11    A    Yes.

01:11PM   12    Q    So any pawn shop?

01:11PM   13    A    Yes.  All pawn shops in the area.

01:11PM   14    Q    Did you learn that there were quite a few pawn shops in

01:11PM   15    the area?

01:11PM   16    A    There -- yes, there's a lot.

01:11PM   17    Q    Did you go to every single pawn shop to see if this watch

01:11PM   18    was pawned there?

01:11PM   19    A    To a lot of pawn shops to look.

01:11PM   20    Q    Physically going into the shops or calling or a

01:11PM   21    combination?

01:11PM   22    A    No, I actually went just went into every single shop to

01:11PM   23    see if they did.

01:11PM   24    Q    How long did that take you?

01:11PM   25    A    A long time.

01:12PM   1   Q   Were you able to locate the watch?

01:12PM   2   A   No.

01:12PM   3   Q   Did you report that back to Mr. Miske?

01:12PM   4   A   Yes.

01:12PM   5   Q   Did he ask you to do anything else after that?

01:12PM   6   A   Yes.

01:12PM   7   Q   What did he ask you to do?

01:12PM   8   A   We found out Jonathan Fraser was at the District Park.

01:12PM   9   Q   Which District Park?

01:12PM  10   A   In Kaneohe.

01:12PM  11   Q   Were you familiar with that District Park?

01:12PM  12   A   Yes.

01:12PM  13   Q   So what was the significance of Mr. Frasure being at that

01:12PM  14   park?

01:12PM  15   A   I don't know what he was doing at that park, but he was at

01:12PM  16   that park.

01:12PM  17   Q   Okay.  But what did Mr. Miske want you to do, if anything?

01:12PM  18   A   To locate the watch and get it back from Jonathan.

01:12PM  19   Q   So he wanted you to go to that park to see if you could

01:12PM  20   get it back there?

01:12PM  21   A   Yes.

01:12PM  22   Q   Did you go there?

01:12PM  23   A   Yes.

01:12PM  24   Q   Who did you go there with?

01:12PM  25   A   John Stancil.

| | | | |
|---|---|---|---|
| 01:12PM | 1 | Q | This is your cousin that you referenced earlier? |
| 01:12PM | 2 | A | Yes. |
| 01:12PM | 3 | | MR. INCIONG:  Could we show the witness what I believe |
| 01:12PM | 4 | | is marked as Exhibit 1-40, which has been previously admitted? |
| 01:13PM | 5 | | THE COURT:  Go ahead. |
| 01:13PM | 6 | | MR. INCIONG:  And if we could show the jury as well, |
| 01:13PM | 7 | | please. |
| 01:13PM | 8 | | BY MR. INCIONG: |
| 01:13PM | 9 | Q | That's Mr. Stancil that you went with? |
| 01:13PM | 10 | A | Yes. |
| 01:13PM | 11 | Q | Anyone else go with you? |
| 01:13PM | 12 | A | No. |
| 01:13PM | 13 | Q | So when you arrived at the Kaneohe District Park, were you |
| 01:13PM | 14 | | able to locate Mr. Frasure? |
| 01:13PM | 15 | A | Yes, I seen him inside the van with his girlfriend. |
| 01:13PM | 16 | Q | What did you do? |
| 01:13PM | 17 | A | I tried to take the keys out of the van. |
| 01:13PM | 18 | Q | Why? |
| 01:13PM | 19 | A | So he wouldn't be able to go anywhere. |
| 01:13PM | 20 | Q | Were you able to do that? |
| 01:13PM | 21 | A | No. |
| 01:13PM | 22 | Q | What happened? |
| 01:13PM | 23 | A | He took off. |
| 01:13PM | 24 | Q | Was he driving? |
| 01:13PM | 25 | A | No, I believe it was his girlfriend. |

| | | | |
|---|---|---|---|
| 01:13PM | 1 | Q | They took off in the vehicle that they were in? |
| 01:13PM | 2 | A | Yes. |
| 01:13PM | 3 | Q | Did you follow? |
| 01:13PM | 4 | A | Yes. |
| 01:13PM | 5 | Q | On foot or a vehicle or -- |
| 01:13PM | 6 | A | In a vehicle. |
| 01:13PM | 7 | Q | Who was driving the vehicle you were in? |
| 01:13PM | 8 | A | John was. |
| 01:13PM | 9 | Q | How would you describe this following?  Was it a following |
| 01:13PM | 10 | | or was it a chase? |
| 01:13PM | 11 | A | It was kind of like a chase. |
| 01:13PM | 12 | Q | Where did this chase take place? |
| 01:14PM | 13 | A | Kaneohe District Park. |
| 01:14PM | 14 | Q | Where did you go from there? |
| 01:14PM | 15 | A | I think by the freeway. |
| 01:14PM | 16 | Q | The chase continued out onto the freeway? |
| 01:14PM | 17 | A | Yeah, to the main street and then it stopped by the |
| 01:14PM | 18 | | freeway. |
| 01:14PM | 19 | Q | Were you able to catch them? |
| 01:14PM | 20 | A | No. |
| 01:14PM | 21 | Q | Why did you stop the chase? |
| 01:14PM | 22 | A | We just stopped the chase. |
| 01:14PM | 23 | Q | Were you able -- ever able to catch up with and find |
| 01:14PM | 24 | | Mr. Frasure later that day? |
| 01:14PM | 25 | A | No. |

01:14PM   1          MR. INCIONG:  If I could show Mr. Freitas Exhibit 2-1,
01:14PM   2    please, just to the witness only.
01:14PM   3    BY MR. INCIONG:
01:14PM   4    Q    Mr. Freitas, do you recognize who is shown in this
01:14PM   5    photograph?
01:14PM   6    A    Yes.
01:14PM   7    Q    Who is that?
01:14PM   8    A    Jonathan Fraser.
01:14PM   9    Q    And does that photo show Mr. Frasure how he appeared when
01:15PM  10    you saw him at the Kaneohe District Park in November of 2014?
01:15PM  11    A    No.  I didn't see him.  It was dark and I couldn't see
01:15PM  12    him.  He was inside the van.
01:15PM  13    Q    Okay.  You say -- when you say you couldn't -- then how
01:15PM  14    did you know it was him?
01:15PM  15    A    Because it was his girlfriend by this -- by his -- how he
01:15PM  16    looked.
01:15PM  17    Q    Okay.
01:15PM  18    A    It was dark, so I couldn't really like see, but he was
01:15PM  19    inside the car with his girlfriend Ashley.
01:15PM  20    Q    Okay.  Let me -- let me focus then.
01:15PM  21          MR. INCIONG:  And if we can zoom in on from the
01:15PM  22    shoulders up to see if that would help of this particular
01:15PM  23    photo.
01:15PM  24    BY MR. INCIONG:
01:15PM  25    Q    Are you able to recognize there?

01:15PM   1   A    Yes.

01:15PM   2   Q    Okay.  Is this the person that you saw in the vehicle that

01:15PM   3   you described that you ended up chasing at the Kaneohe District

01:15PM   4   Park?

01:15PM   5   A    Yes.

01:15PM   6          MR. INCIONG:  Your Honor, I would move to admit

01:15PM   7   Exhibit 2-1.

01:15PM   8          THE COURT:  Any objection?

01:15PM   9          MR. KENNEDY:  No objection, Your Honor.

01:15PM   10          THE COURT:  Without objection, 2-1 is admitted.

01:15PM   11          (Exhibit 2-1 was received in evidence.)

01:15PM   12          MR. INCIONG:  Could I publish that, Your Honor?

01:15PM   13          THE COURT:  Yes.

01:16PM   14   BY MR. INCIONG:

01:16PM   15   Q    Did you have any -- was there any conversation or

01:16PM   16   interaction with Mr. Frasure or the -- who you described as the

01:16PM   17   girlfriend when you were trying to take the keys out of the

01:16PM   18   car?

01:16PM   19   A    No, she was just screaming.

01:16PM   20          MR. INCIONG:  Could we show Mr. Freitas Exhibit 2-11

01:16PM   21   next, please, the witness only.  Thank you.

01:16PM   22   BY MR. INCIONG:

01:16PM   23   Q    Do you recognize the map in 2-11, sir?

01:16PM   24   A    Yes.

01:16PM   25   Q    What part of the island does that map show?

01:16PM    1    A    Kaneohe side.

01:16PM    2    Q    Are you familiar with that side?

01:16PM    3    A    Yes.

01:16PM    4    Q    Does that accurately show Kaneohe, which includes the

01:16PM    5    Kaneohe District Park?

01:16PM    6    A    Yes.

01:16PM    7              MR. INCIONG:  Your Honor, I would move to admit 2-11,

01:16PM    8    please.

01:16PM    9              THE COURT:  Any objection?

01:16PM   10              MR. KENNEDY:  No objection.

01:16PM   11              THE COURT:  2-11 is admitted without objection.  You

01:16PM   12    may publish.

01:16PM   13              (Exhibit 2-11 was received in evidence.)

01:16PM   14              MR. INCIONG:  Thank you, Your Honor.

01:16PM   15    BY MR. INCIONG:

01:16PM   16    Q    So this is Kaneohe in general, correct, Mr. Freitas?

01:17PM   17    A    Yes.

01:17PM   18    Q    Is there a tag anywhere that shows correctly where the

01:17PM   19    Kaneohe District Park is located?

01:17PM   20    A    Yes.

01:17PM   21    Q    Could you circle that on the screen, please.

01:17PM   22    A    (Complying.)

01:17PM   23    Q    So that's where you went at Mr. Miske's request on that

01:17PM   24    day?

01:17PM   25    A    Yes.

01:17PM    1    Q    And you came from the town side?

01:17PM    2    A    Yes.

01:17PM    3              MR. INCIONG:  Could we show Mr. Freitas only

01:17PM    4    Exhibit 2-12 next, please.

01:17PM    5              And these are all from the government's first original

01:17PM    6    witness list, Your Honor.

01:17PM    7    BY MR. INCIONG:

01:17PM    8    Q    Mr. Freitas, do you recognize this map?

01:17PM    9    A    Yes.

01:17PM   10    Q    What's shown there?

01:17PM   11    A    The Kaneohe District Park.

01:17PM   12    Q    Does that accurately show the map in the immediate

01:17PM   13    surrounding areas as you're familiar with it?

01:17PM   14    A    Yes.

01:17PM   15              MR. INCIONG:  Your Honor, I would move to admit 2-12.

01:17PM   16              THE COURT:  Any objection?

01:17PM   17              MR. KENNEDY:  No objection.

01:17PM   18              THE COURT:  2-12 is admitted without objection.  You

01:18PM   19    may publish that as well.

01:18PM   20              (Exhibit 2-12 was received in evidence.)

01:18PM   21              MR. INCIONG:  Thank you, Your Honor.

01:18PM   22    BY MR. INCIONG:

01:18PM   23    Q    So, Mr. Freitas, this is -- is that green, you know,

01:18PM   24    roughly rectangle shape right in the middle of that the Kaneohe

01:18PM   25    District Park?

| | | | |
|---|---|---|---|
| 01:18PM | 1 | A | Yes. |
| 01:18PM | 2 | Q | And does it show the freeway that you referred to that the |
| 01:18PM | 3 | | chase led on to out from the District Park? |
| 01:18PM | 4 | A | Yes. |
| 01:18PM | 5 | Q | Could you just draw a line along that what you -- that |
| 01:18PM | 6 | | freeway where the chase occurred. |
| 01:18PM | 7 | A | (Complying.) |
| 01:18PM | 8 | Q | Okay.  So your -- that's the Kahekili Highway; is that |
| 01:18PM | 9 | | correct? |
| 01:18PM | 10 | A | Yes. |
| 01:18PM | 11 | | MR. INCIONG:  Could we show Mr. Freitas only |
| 01:18PM | 12 | | Exhibit 2-13 next, please? |
| 01:18PM | 13 | | BY MR. INCIONG: |
| 01:18PM | 14 | Q | Do you recognize that, Mr. Freitas? |
| 01:18PM | 15 | A | Yes. |
| 01:18PM | 16 | Q | How do you recognize that? |
| 01:18PM | 17 | A | This is where Jonathan was. |
| 01:18PM | 18 | Q | Is that the entryway into the Kaneohe District Park? |
| 01:18PM | 19 | A | Yes. |
| 01:18PM | 20 | Q | Does that accurately show that entryway as it appeared |
| 01:18PM | 21 | | when you were there in November of 2014? |
| 01:19PM | 22 | A | Yes. |
| 01:19PM | 23 | | MR. INCIONG:  Your Honor, I would move to admit 2-13. |
| 01:19PM | 24 | | THE COURT:  Counsel, any objection? |
| 01:19PM | 25 | | MR. KENNEDY:  No objection, Your Honor. |

01:19PM   1              THE COURT:  Without objection, 2-13 is admitted.  You
01:19PM   2     may publish.
01:19PM   3              (Exhibit 2-13 was received in evidence.)
01:19PM   4              MR. INCIONG:  Thank you, Your Honor.
01:19PM   5     BY MR. INCIONG:
01:19PM   6     Q    So that's the entry or exit from the District Park,
01:19PM   7     Mr. Freitas?
01:19PM   8     A    Yes.
01:19PM   9     Q    And is that where you entered in to, first of all?
01:19PM  10     A    Around that area, yes.
01:19PM  11     Q    Okay.  And then is this where basically you ended up
01:19PM  12     leaving and following the car that Mr. Frasure was in out on to
01:19PM  13     the Kahekili Highway?
01:19PM  14     A    Yes.
01:19PM  15              MR. INCIONG:  Finally, could we show to Mr. Freitas
01:19PM  16     only Exhibit 2-16?
01:19PM  17     BY MR. INCIONG:
01:19PM  18     Q    Do you recognize that particular view, Mr. Freitas?
01:19PM  19     A    Yes.
01:19PM  20     Q    Does this accurately show another section of the Kaneohe
01:19PM  21     surroundings on the Windward side?
01:20PM  22     A    Yes.
01:20PM  23              MR. INCIONG:  Your Honor, I would move to admit 2-16.
01:20PM  24              THE COURT:  Any objection?
01:20PM  25              MR. KENNEDY:  No objection.

01:20PM   1          THE COURT:  2-16 is admitted without objection.  You

01:20PM   2   may publish.

01:20PM   3          (Exhibit 2-16 was received in evidence.)

01:20PM   4          MR. INCIONG:  Thank you, Your Honor.

01:20PM   5   BY MR. INCIONG:

01:20PM   6   Q    And once again, Mr. Freitas, you recognize this as showing

01:20PM   7   the Kaneohe surroundings?

01:20PM   8   A    Yes.

01:20PM   9   Q    You see where the Kaneohe District Park is on this

01:20PM  10   particular map?

01:20PM  11   A    Yes.

01:20PM  12   Q    Could you circle that, please.

01:20PM  13   A    (Complying.)

01:20PM  14   Q    So you've circled the green, again, sort of rectangle just

01:20PM  15   left of center on that particular exhibit?

01:20PM  16   A    Yes.

01:20PM  17   Q    So again using the touch screen, could you draw a line to

01:20PM  18   show where that chase went and approximately where you ended

01:20PM  19   the chase on the Kahekili Highway.

01:20PM  20   A    (Complying.)

01:20PM  21   Q    So you stopped short of the intersection with the Pali

01:20PM  22   Highway, 63 Highway, correct?

01:21PM  23   A    Yes.

01:21PM  24   Q    The interchange there.  Okay.

01:21PM  25          THE COURT:  Is that the Pali Highway?

01:21PM   1                    MR. INCIONG:  I'm sorry.

01:21PM   2                    THE WITNESS:  The Likelike.

01:21PM   3                    MR. INCIONG:  Likelike.  I'm sorry, Your Honor, 63,

01:21PM   4    not the 61.

01:21PM   5    BY MR. INCIONG:

01:21PM   6    Q    So where did you go from that point when -- when you

01:21PM   7    stopped the chase?

01:21PM   8    A    We just stopped and went back to -- I believe we went to

01:21PM   9    John's house.

01:21PM   10   Q    In Waimanalo?

01:21PM   11   A    Yes.

01:21PM   12   Q    Did you report back to Mr. Miske that you had not been

01:21PM   13   able to contact Mr. Frasure?

01:21PM   14   A    Yes.

01:21PM   15   Q    Do you recall if he had any response to that?

01:21PM   16   A    No, I don't recall any response.

01:21PM   17   Q    All right.  I want to fast-forward then, not quite a year

01:21PM   18   later, to September of 2015.  Do you recall Mr. Miske summoning

01:21PM   19   you to the Wendy's parking lot -- Wendy's restaurant parking

01:22PM   20   lot near the airport?

01:22PM   21   A    Yes.

01:22PM   22   Q    Why were you summoned there?

01:22PM   23   A    Because Mike bought a car from a guy from the auction.

01:22PM   24   Q    Do you recall which auction it was?

01:22PM   25   A    The Manheim auction.

01:22PM   1   Q   Do you recall what kind of car it was?

01:22PM   2   A   I believe it was a Cadillac.  It was --

01:22PM   3   Q   So Mr. Miske bought a car at the auction, and what -- what

01:22PM   4   happened?

01:22PM   5   A   He bought a car from another guy that bought it at the

01:22PM   6   auction.

01:22PM   7   Q   I see.  So was there any issue with that car?

01:22PM   8   A   It was a lemon.

01:22PM   9   Q   Meaning it didn't run?

01:22PM   10   A   Yes.

01:22PM   11   Q   So what was Mr. Miske's response to that?

01:22PM   12   A   He was upset.

01:22PM   13   Q   Was that car sold as is as you had sold your cars?

01:22PM   14   A   Yeah, sold it as is.

01:22PM   15   Q   But he -- he wanted something done?

01:22PM   16   A   Yes.

01:22PM   17   Q   Okay.  What did he want?

01:22PM   18   A   We met him at the Wendy's parking lot and he wanted us to

01:23PM   19   assault them.

01:23PM   20   Q   Why?

01:23PM   21   A   Because he got sold -- he bought a lemon from this guy.

01:23PM   22   Q   When you say "we," who is -- who is "we"?

01:23PM   23   A   Me and John Stancil.

01:23PM   24   Q   You were with Mr. Stancil at the time?

01:23PM   25   A   Yes.

01:23PM   1   Q   How were you contacted by Mr. Miske, if you recall?

01:23PM   2   A   Telephone or text.

01:23PM   3   Q   Asking you to come to that location?

01:23PM   4   A   Yes.

01:23PM   5   Q   Prior to coming to the location, did you know why you were

01:23PM   6   going?

01:23PM   7   A   Yes.

01:23PM   8   Q   Okay, you did.  All right.  And so once you got there, who

01:23PM   9   was there?

01:23PM   10   A   The guy that Mike bought the car from.

01:23PM   11   Q   Was Mr. Miske there?

01:23PM   12   A   Yes.

01:23PM   13   Q   Did you speak with Mr. Miske once you got there?

01:23PM   14   A   Yes.

01:23PM   15   Q   Was there anything discussed?

01:23PM   16   A   Yes.

01:23PM   17   Q   What was discussed?

01:23PM   18   A   That he would signal us to assault him.

01:23PM   19   Q   What was the signal going to be?

01:23PM   20   A   I believe it was twitch his nose.

01:23PM   21   Q   So you said the guy was there who had sold the car?

01:24PM   22   A   Mm-hmm.

01:24PM   23   Q   How did you know who he was?

01:24PM   24   A   I didn't know who the guy was.  Never met him before.

01:24PM   25   Q   Did Mr. Miske point him out?

01:24PM   1   A   Yes.

01:24PM   2   Q   What happened once -- once the seller had arrived?

01:24PM   3   A   They was talking and they was getting in an argument.

01:24PM   4   Q   And when you say "they," who do you mean?

01:24PM   5   A   Mike and the -- the person that bought the car.

01:24PM   6   Q   The person that sold the car?

01:24PM   7   A   Sold the car, bought the car.

01:24PM   8   Q   Okay, got it.  How far away from them were you when this

01:24PM   9   argument was taking place?

01:24PM  10   A   I was right next to Mike.

01:24PM  11   Q   So did -- was the signal ever made?

01:24PM  12   A   Yes.

01:24PM  13   Q   What happened?

01:24PM  14   A   Actually the signal wasn't made.  What happened was John

01:24PM  15   got a mixed signal, and then John assaulted and I assaulted him

01:24PM  16   by punching him and kicking him.

01:24PM  17   Q   Okay.  So who assaulted him first?

01:24PM  18   A   John did.

01:24PM  19   Q   And what did he do exactly?

01:25PM  20   A   Punched him in the face.

01:25PM  21   Q   What did you do when you began assaulting him?

01:25PM  22   A   Punching him and kicking him.

01:25PM  23   Q   How many times did you punch him and kick him?

01:25PM  24   A   Three or four times.

01:25PM  25   Q   How many times did Mr. Stancil punch him and kick him?

| | | | |
|---|---|---|---|
| 01:25PM | 1 | A | Around the same. |
| 01:25PM | 2 | Q | Did this person ever go to the ground as a result, |
| 01:25PM | 3 | | anything like that? |
| 01:25PM | 4 | A | Yes. |
| 01:25PM | 5 | Q | So they fell down? |
| 01:25PM | 6 | A | Yes. |
| 01:25PM | 7 | Q | Did either of you continue to assault them after they were |
| 01:25PM | 8 | | done? |
| 01:25PM | 9 | A | I assaulted him. |
| 01:25PM | 10 | Q | What was Mr. Miske doing while this assault was taking |
| 01:25PM | 11 | | place? |
| 01:25PM | 12 | A | He was in the back.  He didn't do anything. |
| 01:25PM | 13 | Q | Did he ever tell you to stop? |
| 01:25PM | 14 | A | Yes. |
| 01:25PM | 15 | Q | At what point? |
| 01:25PM | 16 | A | When he fell on the ground. |
| 01:25PM | 17 | Q | After he fell on the ground, then what -- did Mr. Miske |
| 01:25PM | 18 | | have any conversation with the -- the person who was being |
| 01:25PM | 19 | | assaulted? |
| 01:25PM | 20 | A | He wanted his money back. |
| 01:25PM | 21 | Q | That's what he told him? |
| 01:25PM | 22 | A | Yes. |
| 01:25PM | 23 | Q | And what -- what words, if you remember? |
| 01:25PM | 24 | A | I don't know word by word.  He just said that he wanted |
| 01:25PM | 25 | | his money back. |

| | | | |
|---|---|---|---|
| 01:25PM | 1 | Q | Was he asking or demanding? |
| 01:26PM | 2 | A | Demanding. |
| 01:26PM | 3 | Q | Was he saying it nicely or was it an order? |
| 01:26PM | 4 | A | It was an order. |
| 01:26PM | 5 | Q | Was he yelling? |
| 01:26PM | 6 | A | Yes. |
| 01:26PM | 7 | Q | What did the victim say, if any? |
| 01:26PM | 8 | A | "Okay." |
| 01:26PM | 9 | Q | Pardon? |
| 01:26PM | 10 | A | The victim said, "Okay." |
| 01:26PM | 11 | Q | Okay.  So what happened then? |
| 01:26PM | 12 | A | Then we left. |
| 01:26PM | 13 | Q | Were there any arrangements made or directions given as to |
| 01:26PM | 14 | | when or how the money should be paid back? |
| 01:26PM | 15 | A | Yes, there was an arrangement to get the money and the car |
| 01:26PM | 16 | | back.  But I was in prison at that time when he received the |
| 01:26PM | 17 | | money or picked up the vehicle. |
| 01:26PM | 18 | Q | Did you find out later that Mr. Miske had received the |
| 01:26PM | 19 | | money? |
| 01:26PM | 20 | A | Yes. |
| 01:26PM | 21 | Q | Who did you find that out from? |
| 01:26PM | 22 | A | From Mike. |
| 01:26PM | 23 | Q | He told you the guy had paid him? |
| 01:26PM | 24 | A | Yes. |
| 01:26PM | 25 | | MR. INCIONG:  Could we show Mr. Freitas only |

01:26PM    1    Exhibit 4-19, please?

01:26PM    2    BY MR. INCIONG:

01:27PM    3    Q    Mr. Freitas, do you recognize the individual shown in

01:27PM    4    these two photographs in 4-19?

01:27PM    5    A    Yes.

01:27PM    6    Q    How do you recognize that person?

01:27PM    7    A    The guy -- this was the guy that was at the Wendy's

01:27PM    8    parking lot.

01:27PM    9    Q    This is the person that you assaulted --

01:27PM   10    A    Yes.

01:27PM   11    Q    -- along with Mr. Stancil?

01:27PM   12    A    Yes.

01:27PM   13    Q    Do these two photos show him as -- as you recall him on

01:27PM   14    that day?

01:27PM   15    A    Yes.

01:27PM   16            MR. INCIONG:  Your Honor, I would move to admit 4-19.

01:27PM   17            THE COURT:  Any objection, Counsel?

01:27PM   18            MR. KENNEDY:  No objection.

01:27PM   19            THE COURT:  4-19 is admitted.  You may publish.

01:27PM   20            (Exhibit 4-19 was received in evidence.)

01:27PM   21            MR. INCIONG:  Thank you, Your Honor.

01:27PM   22            If we could zoom in first on the top photograph,

01:27PM   23    please.

01:27PM   24    BY MR. INCIONG:

01:27PM   25    Q    So this is the individual that you and Mr. Stancil

01:27PM    1    assaulted at Mr. Miske's direction?

01:27PM    2    A    Yes.

01:27PM    3    Q    This was in the Wendy's parking lot?

01:27PM    4    A    Yes.

01:27PM    5    Q    You said Mr. Stancil punched him in the face, correct?

01:27PM    6    A    Yes.

01:27PM    7    Q    Did you punch him in the face as well?

01:27PM    8    A    Yes.

01:27PM    9         MR. INCIONG:  Could we show the lower half of that?

01:27PM   10    BY MR. INCIONG:

01:28PM   11    Q    Did you or Mr. Stancil punch him in the mouth or area

01:28PM   12    where he could have sustained injuries to his lips or teeth?

01:28PM   13    A    Yes.

01:28PM   14    Q    After the assault of this individual --

01:28PM   15         MR. INCIONG:  You can take that down.  Thank you.

01:28PM   16    BY MR. INCIONG:

01:28PM   17    Q    -- were you given anything by Mr. Miske?

01:28PM   18    A    No.

01:28PM   19    Q    Were you paid any money?

01:28PM   20    A    No.

01:28PM   21    Q    What was said to you after?

01:28PM   22    A    Nothing.

01:28PM   23    Q    Thank you?

01:28PM   24    A    No.

01:28PM   25    Q    Was this unusual, out of the ordinary?

| | | | |
|---|---|---|---|
| 01:28PM | 1 | A | No. |
| 01:28PM | 2 | Q | That's the way Mr. Miske did business? |
| 01:28PM | 3 | A | If he was upset. |
| 01:28PM | 4 | | MR. INCIONG:  Let me show Exhibit 4-22 to the witness |
| 01:29PM | 5 | only, please. |

01:29PM   6   BY MR. INCIONG:

01:29PM   7   Q   Just to give reference, Mr. Freitas, first of all, do you

01:29PM   8   recognize this part of Honolulu that's shown on the map here?

01:29PM   9   A   Yes.

01:29PM   10   Q   Does this show -- encompass the area where you assaulted

01:29PM   11   the individual at the Wendy's parking lot?

01:29PM   12   A   Yes.

01:29PM   13   MR. INCIONG:  Your Honor, I would move to admit 4-22,

01:29PM   14   please.

01:29PM   15   THE COURT:  Any objection?

01:29PM   16   MR. KENNEDY:  No objection.

01:29PM   17   THE COURT:  4-22 is admitted without objection.  You

01:29PM   18   may publish.

01:29PM   19   (Exhibit 4-22 was received in evidence.)

01:29PM   20   MR. INCIONG:  Thank you, Your Honor.

01:29PM   21   BY MR. INCIONG:

01:29PM   22   Q   So does -- does this show the area near the airport,

01:29PM   23   Mr. Freitas?

01:29PM   24   A   Yes.

01:29PM   25   Q   Could you circle where the Wendy's restaurant is that you

01:29PM    1    assaulted the victim.

01:29PM    2    A    (Complying.)

01:29PM    3    Q    Okay, great.  Thank you.

01:29PM    4         MR. INCIONG:  Could we show Mr. Freitas 4-27, please?

01:29PM    5    BY MR. INCIONG:

01:29PM    6    Q    Do you recognize that photo, Mr. Freitas?

01:29PM    7    A    Yes.

01:29PM    8    Q    Does that show the Wendy's restaurant that you were at

01:30PM    9    where that assault was committed?

01:30PM   10    A    Yes.

01:30PM   11    Q    Does that accurately show it as -- as you recall it on

01:30PM   12    that day?

01:30PM   13    A    Yes.

01:30PM   14         MR. INCIONG:  Your Honor, I would move to admit 4-27.

01:30PM   15         THE COURT:  Mr. Kennedy, any objection?

01:30PM   16         MR. KENNEDY:  No objection.

01:30PM   17         THE COURT:  Without objection, 4-267 is admitted.

01:30PM   18         And we're getting to the end of the trial day,

01:30PM   19    Mr. Inciong, so please keep that in mind as you finish up.

01:30PM   20         MR. INCIONG:  Your Honor, I just have three quick

01:30PM   21    photos that I will introduce, and we can end there, if that's

01:30PM   22    okay.

01:30PM   23         THE COURT:  That's fine.

01:30PM   24    BY MR. INCIONG:

01:30PM   25    Q    So this is the Wendy's restaurant, correct, Mr. Freitas?

01:30PM    1    A    Yes.

01:30PM    2              MR. INCIONG:  All right.  So if we could show

01:30PM    3    Mr. Freitas only three photos beginning with Exhibit 4-28.

01:30PM    4    BY MR. INCIONG:

01:30PM    5    Q    Do you recognize what's shown in that photograph,

01:30PM    6    Mr. Freitas?

01:30PM    7    A    Yes.

01:30PM    8    Q    How do you recognize that?

01:30PM    9    A    This is where we assaulted him.

01:30PM   10    Q    Is that the parking lot of the Wendy's?

01:30PM   11    A    Yes.

01:30PM   12    Q    Does that photo accurately show that area where the

01:30PM   13    assault occurred?

01:30PM   14    A    Yes.

01:30PM   15              MR. INCIONG:  Okay.  Could we show Mr. Freitas now

01:30PM   16    4-29, please?

01:30PM   17    BY MR. INCIONG:

01:31PM   18    Q    Do you recognize that photo?

01:31PM   19    A    Yes.

01:31PM   20    Q    Is that that same area?

01:31PM   21    A    Yes.

01:31PM   22    Q    Do you recognize that as accurately showing that area, the

01:31PM   23    parking lot of the Wendy's restaurant?

01:31PM   24    A    Yes.

01:31PM   25              MR. INCIONG:  And then finally, 4-30, please.

01:31PM    1    BY MR. INCIONG:

01:31PM    2    Q    Is this just another angle of that same part of the

01:31PM    3    parking lot?

01:31PM    4    A    Yes.

01:31PM    5    Q    Does that accurately show the area where the assault

01:31PM    6    occurred?

01:31PM    7    A    Yes.

01:31PM    8         MR. INCIONG:  Your Honor, I would move to admit

01:31PM    9    Exhibits 4-28, 4-29 and 4-30.

01:31PM   10         THE COURT:  Mr. Kennedy, any objection to any of these

01:31PM   11    three exhibits?

01:31PM   12         MR. KENNEDY:  No objection to 4-28, 4-29 and 4-30,

01:31PM   13    Your Honor.

01:31PM   14         THE COURT:  All right.  Then all three should come in

01:31PM   15    without objection, 4-28, 4-29 and 4-30.  You may publish all of

01:31PM   16    them.

01:31PM   17      (Exhibits 4-28, 4-29 and 4-30 were received in evidence.)

01:31PM   18         MR. INCIONG:  Thank you, Your Honor.

01:31PM   19    BY MR. INCIONG:

01:31PM   20    Q    So starting with 4-30, this shows the parking lot where

01:31PM   21    the -- the meeting took place?

01:31PM   22    A    Yes.

01:31PM   23    Q    And where you and Mr. Stancil assaulted the victim at

01:31PM   24    Mr. Miske's direction?

01:31PM   25    A    Yes.

01:32PM   1   Q    4-29, please.  That's just another angle of that same

01:32PM   2   area, correct --

01:32PM   3   A    Yes.

01:32PM   4   Q    -- where the assault occurred?

01:32PM   5        And then finally 4-28.  Again, this is a wider view or

01:32PM   6   different angle of that same part of the parking lot?

01:32PM   7   A    Yes.

01:32PM   8   Q    After the assault was finished, the victim left the area?

01:32PM   9   A    Yes.

01:32PM  10   Q    Where did you go, if you recall?

01:32PM  11   A    I don't recall where we went.  Went back into town.

01:32PM  12        MR. INCIONG:  All right.  Your Honor, I can conclude

01:32PM  13   at that point.

01:32PM  14        THE COURT:  All right.  As we break for the trial day

01:32PM  15   then, I'll remind our jurors as I always do to please refrain

         16   from discussing the substance of this case with anyone,

         17   including each other, until I advise you otherwise; to refrain

         18   from accessing any media or other accounts of this case that

         19   may be out there; and finally, please do not conduct any

         20   independent investigation into the facts, circumstances or

         21   persons involved.

01:32PM  22        We will see you tomorrow at 8:30 where we will resume

01:33PM  23   the examination of Mr. Freitas.

01:33PM  24        (Proceedings were concluded at 1:33 p.m.)

         25

```
 1                COURT REPORTER'S CERTIFICATE
 2          I, Gloria T. Bediamol, Official Court Reporter, United
 3   States District Court, District of Hawaii, do hereby certify
 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,
 5   true, and correct transcript from the stenographically reported
 6   proceedings held in the above-entitled matter and that the
 7   transcript page format is in conformance with the regulations
 8   of the Judicial Conference of the United States.
 9
10          DATED at Honolulu, Hawaii, June 3, 2024.
11
12
13                              /s/ Gloria T. Bediamol
14                              GLORIA T. BEDIAMOL.
15                              RMR, CRR, FCRR
16
17
18
19
20
21
22
23
24
25
```