1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3
    UNITED STATES OF AMERICA,     )     CRIMINAL NO. 19-00099-DKW
4                                 )
                Plaintiff,        )     Honolulu, Hawaii
5                                 )
         vs.                      )     February 16, 2024
6                                 )
    MICHAEL J. MISKE, JR.,        )
7                                 )
                Defendant.        )
8    _____ )

9
                    TRANSCRIPT OF JURY TRIAL (DAY 22)
10            BEFORE THE HONORABLE DERRICK K. WATSON,
            CHIEF UNITED STATES DISTRICT COURT JUDGE
11
    APPEARANCES:
12
    For the Plaintiff:           MARK INCIONG, ESQ.
13                               MICHAEL DAVID NAMMAR, ESQ
                                 WILLIAM KE AUPUNI AKINA, ESQ.
14                               AISLINN AFFINITO, ESQ.
                                 Office of the United States Attorney
15                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii  96850

17  For the Defendant:           LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop St., Ste 2201
18                               Honolulu, HI 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, NV 89501

22  Official Court Reporter:     Gloria T. Bediamol, RPR RMR CRR FCRR
                                 United States District Court
23                               300 Ala Moana Boulevard
                                 Honolulu, Hawaii 96850
24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

<pre>
 1                        I N D E X

 2   GOVERNMENT WITNESS:                         PAGE NO.

 3
     KAULANA FREITAS (CONTINUED EXAMINATION)
 4
         RESUMED DIRECT EXAMINATION BY MR. INCIONG       4
 5       CROSS-EXAMINATION BY MR. KENNEDY             166

 6

 7   EXHIBITS:                                     PAGE NO.

 8   Exhibit 1-632 was received in evidence          15
     Exhibit 1-639 was received in evidence          17
 9   Exhibit 1-640 was received in evidence          18
     Exhibits 1-641 and 1-642 were received in evidence   21
10   Exhibit 1-636 was received in evidence          25
     Exhibit 1-637 was received in evidence          34
11   Exhibit 1-65 was received in evidence           36
     Exhibit 1-144 was received in evidence          82
12   Exhibit 1-643B was received in evidence         86
     Exhibit 1-31 was received in evidence           90
13   Exhibit 1-896 was received in evidence          91
     Exhibits 1-153, 1-154 and 1-155 were received in   98
14   evidence
     Exhibits 1-643 through 1-647 and 1-649 were     108
15   received in evidence
     Exhibit 1-997 was received in evidence         118
16   Exhibits 1-614, 1-615 and 1-616 were received in  121
     evidence
17   Exhibit 1-627 was received in evidence         124
     Exhibit 1-631 was received in evidence         125
18   Exhibit 1-1097 was received in evidence        131
     Exhibit 1-891 was received in evidence         133
19   Exhibits 9-1190 through 9-1194 were received in  141
     evidence
20   Exhibit 1-630 was received in evidence         147
     Exhibits 1-638 was received in evidence        162
21   Exhibit 9008-012 was received in evidence      195
     Exhibit 9008-015 was received in evidence      197
22   Exhibit 9008-016 was received in evidence      200
     Exhibit 9008-008 was received in evidence      204
23

24

25
</pre>

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | February 16, 2024                                    8:44 a.m.      |
| 08:44AM  | 2  | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United               |
| 08:44AM  | 3  | States of America versus Michael J. Miske, Jr.                     |
| 08:44AM  | 4  | This case has been called for jury trial, day 22.                  |
| 08:44AM  | 5  | Counsel please make your appearances for the record.               |
| 08:44AM  | 6  | MR. INCIONG:  Good morning, Your Honor, Mark Inciong,              |
| 08:44AM  | 7  | Michael Nammar and KeAupuni Akina for the United States.  Also     |
| 08:44AM  | 8  | present with us again is our paralegal Kari Sherman and FBI        |
| 08:44AM  | 9  | Special Agent Thomas Palmer.                                       |
| 08:44AM  | 10 | THE COURT:  Good morning.                                          |
| 08:44AM  | 11 | MR. KENNEDY:  Good morning, Your Honor, Michael                   |
| 08:44AM  | 12 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King and        |
| 08:44AM  | 13 | Josh Barry.  Good morning to you and good morning to you.          |
| 08:44AM  | 14 | THE COURT:  Good morning to your group as well,                    |
| 08:44AM  | 15 | Mr. Kennedy.  You may be seated.                                   |
| 08:44AM  | 16 | Good morning to the 17 persons on our jury.  Happy as             |
| 08:44AM  | 17 | they say aloha Friday and good morning to you, Mr. Freitas, as     |
| 08:44AM  | 18 | well.                                                              |
| 08:44AM  | 19 | Mr. Freitas, although we will not ask you to retake               |
| 08:44AM  | 20 | the oath that you started your testimony with, I will remind       |
| 08:44AM  | 21 | you that you remain subject to that oath.  Do you understand       |
| 08:45AM  | 22 | that.                                                              |
| 08:45AM  | 23 | THE WITNESS:  I understand.                                         |
| 08:45AM  | 24 | THE COURT:  All right.  Mr. Inciong, you may continue             |
| 08:45AM  | 25 | with your direct examination of Mr. Freitas when you're ready.     |

| | | |
|---|---|---|
| 08:45AM | 1 | MR. INCIONG:  Thank you, Your Honor. |
| 08:45AM | 2 | KAULANA FREITAS, |
| 08:45AM | 3 | (Having been previously sworn, resumed the stand.) |
| 08:45AM | 4 | RESUMED DIRECT EXAMINATION |
| 08:45AM | 5 | BY MR. INCIONG: |
| 08:45AM | 6 | Q    Good morning, Mr. Freitas. |
| 08:45AM | 7 | A    Good morning. |
| 08:45AM | 8 | Q    When we left off yesterday, you had described two |
| 08:45AM | 9 | incidents in which Mr. Miske had directed you to act.  Do you |
| 08:45AM | 10 | recall that? |
| 08:45AM | 11 | A    Yes. |
| 08:45AM | 12 | Q    The first of those was the chemical weapon attack, |
| 08:45AM | 13 | correct? |
| 08:45AM | 14 | A    Yes. |
| 08:45AM | 15 | Q    Was that one of the racketeering acts that you admitted to |
| 08:45AM | 16 | in your plea agreement? |
| 08:45AM | 17 | A    Yes. |
| 08:45AM | 18 | Q    Did I understand you correctly that that was something you |
| 08:45AM | 19 | did not want to do?  You did not want to drop the -- what was |
| 08:45AM | 20 | called the tear gas to you in the club? |
| 08:45AM | 21 | A    Yes, that's correct. |
| 08:45AM | 22 | Q    Did you ever receive any payment or other benefit from |
| 08:45AM | 23 | Mr. Miske or anyone else for doing that? |
| 08:45AM | 24 | A    No payment. |
| 08:45AM | 25 | Q    Second incident you described was the assault that |

| | | |
|---|---|---|
| 08:45AM | 1 | occurred at the Wendy's parking lot? |
| 08:45AM | 2 | A    Yes. |
| 08:45AM | 3 | Q    You also said that you were not paid or compensated in any |
| 08:45AM | 4 | way for that, correct? |
| 08:45AM | 5 | A    No. |
| 08:45AM | 6 | Q    Did you want to commit that assault? |
| 08:45AM | 7 | A    No. |
| 08:46AM | 8 | Q    Why not? |
| 08:46AM | 9 | A    Because I don't think that's right. |
| 08:46AM | 10 | Q    So my question -- |
| 08:46AM | 11 | MR. KENNEDY:  Your Honor, I would renew my request for |
| 08:46AM | 12 | a limiting instruction since -- |
| 08:46AM | 13 | THE COURT:  And I renew my same ruling.  Overruled. |
| 08:46AM | 14 | Go ahead. |
| 08:46AM | 15 | Q    Mr. Freitas, so my question is:  Why were you doing these |
| 08:46AM | 16 | things if you didn't want to? |
| 08:46AM | 17 | A    Because he was my cousin, I was doing what I was told. |
| 08:46AM | 18 | Q    Was it simply that he was your cousin and that you were |
| 08:46AM | 19 | doing what you were told or was there more to it than that? |
| 08:46AM | 20 | A    It was a little more to that. |
| 08:46AM | 21 | Q    Was it important for you to keep Mr. Miske happy? |
| 08:46AM | 22 | A    Yes. |
| 08:46AM | 23 | Q    Why was that? |
| 08:46AM | 24 | A    Because there was benefits to making him happy. |
| 08:47AM | 25 | Q    What kinds of benefits are you referring to? |

08:47AM   1   A   More job opportunities.

08:47AM   2   Q   Okay.  Anything else?

08:47AM   3   A   No.

08:47AM   4   Q   Was there any sort of financial benefit to you?

08:47AM   5   A   Yes.

08:47AM   6   Q   Describe how you received any financial benefit.

08:47AM   7   A   Would be more jobs, more -- more opportunities to make

08:47AM   8   more money.

08:47AM   9   Q   What about any sort of I guess what you referred to as

08:47AM   10   perks or things you would get for free that you might not

08:47AM   11   otherwise get?

08:47AM   12   A   Yes.

08:47AM   13   Q   What were those?

08:47AM   14   A   He said, "An incident is going to the night club.  We'll

08:47AM   15   have free drinks and stuff" --

08:47AM   16       THE COURT REPORTER:  Sir, can I -- can I get you to

08:47AM   17   speak up a little more, please?

08:47AM   18       THE WITNESS:  Yes.  There would be -- there would be

08:47AM   19   more benefits of going to a nightclub not having to pay for

08:48AM   20   anything like that.

08:48AM   21   BY MR. INCIONG:

08:48AM   22   Q   Which nightclub are you referring to?

08:48AM   23   A   M Nightclub.

08:48AM   24   Q   Did you frequent the M Nightclub regularly?

08:48AM   25   A   Yes.

| | | | |
|---|---|---|---|
| 08:48AM | 1 | Q | How often would you go? |
| 08:48AM | 2 | A | Every weekend. |
| 08:48AM | 3 | Q | Who would you go to the M Nightclub with? |
| 08:48AM | 4 | A | My cousin John Stancil. |
| 08:48AM | 5 | Q | Over what period of time would you go every weekend? |
| 08:48AM | 6 | A | Since 2015, '14. |
| 08:48AM | 7 | Q | More than a year? |
| 08:48AM | 8 | A | More than a year. |
| 08:48AM | 9 | Q | Two years? |
| 08:48AM | 10 | A | Yes. |
| 08:48AM | 11 | Q | Every weekend for two years?  Is that a yes? |
| 08:48AM | 12 | A | Yes. |
| 08:48AM | 13 | Q | Did you ever have to pay for anything when you were at the |
| 08:48AM | 14 | | club? |
| 08:48AM | 15 | A | No, I didn't. |
| 08:48AM | 16 | Q | No cover charge? |
| 08:48AM | 17 | A | No cover charge. |
| 08:48AM | 18 | Q | No -- no drinks that were charged to you? |
| 08:48AM | 19 | A | No. |
| 08:48AM | 20 | Q | Did you ever eat there? |
| 08:48AM | 21 | A | Yes. |
| 08:48AM | 22 | Q | Ever charged for food? |
| 08:48AM | 23 | A | No. |
| 08:48AM | 24 | Q | Why do you think you were allowed to eat and drink for |
| 08:49AM | 25 | | free at the M Nightclub? |

| | | | |
|---|---|---|---|
| 08:49AM | 1 | A | Because I was family. |
| 08:49AM | 2 | Q | Was that part of the reason you were doing these things |
| 08:49AM | 3 | | like dropping the tear gas and -- and committing the assaults |
| 08:49AM | 4 | | because you wanted to keep those benefits? |
| 08:49AM | 5 | A | Yes. |
| 08:49AM | 6 | Q | You worked with Mr. Miske closely for an extended period |
| 08:49AM | 7 | | of time, correct? |
| 08:49AM | 8 | A | Yes. |
| 08:49AM | 9 | Q | Did you become aware from your dealings with him and the |
| 08:49AM | 10 | | dealings with the various businesses you had whether he had any |
| 08:49AM | 11 | | reputation in the community? |
| 08:49AM | 12 | A | Yes. |
| 08:49AM | 13 | Q | What was his reputation? |
| 08:49AM | 14 | A | He was known as a business man and -- and he was feared. |
| 08:49AM | 15 | Q | Did you benefit in any way from either of those |
| 08:49AM | 16 | | reputations? |
| 08:49AM | 17 | A | Yes. |
| 08:49AM | 18 | Q | Starting with his reputation as a business man, how did |
| 08:49AM | 19 | | you benefit from that? |
| 08:49AM | 20 | A | Getting more job opportunities. |
| 08:49AM | 21 | Q | His reputation for being feared, how did you benefit from |
| 08:49AM | 22 | | that? |
| 08:49AM | 23 | A | His protection. |
| 08:49AM | 24 | Q | Did you take advantage of that? |
| 08:50AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 08:50AM | 1 | Q | How so? |
| 08:50AM | 2 | A | By doing other acts. |
| 08:50AM | 3 | Q | Such as? |
| 08:50AM | 4 | A | Robberies. |
| 08:50AM | 5 | Q | Anything else? |
| 08:50AM | 6 | A | And drug dealings. |
| 08:50AM | 7 | Q | Okay.  So let's start with the robberies first.  You were |
| 08:50AM | 8 | | committing robberies of just random individuals or who were you |
| 08:50AM | 9 | | targeting, if anyone? |
| 08:50AM | 10 | A | Some was going to be random and some I knew. |
| 08:50AM | 11 | Q | Who were you committing these robberies with, if anyone? |
| 08:50AM | 12 | A | Once was with John Stancil. |
| 08:50AM | 13 | Q | Was Mr. Miske aware of these robberies in advance? |
| 08:50AM | 14 | A | No. |
| 08:50AM | 15 | Q | Did he become aware of any of them after the fact? |
| 08:50AM | 16 | A | Yes. |
| 08:50AM | 17 | Q | We'll talk more about that in a moment.  But as far as |
| 08:51AM | 18 | | drug distribution, what kind of drugs were you distributing? |
| 08:51AM | 19 | A | Oxycodone. |
| 08:51AM | 20 | Q | Was Mr. Miske aware of that? |
| 08:51AM | 21 | A | No. |
| 08:51AM | 22 | Q | How did you benefit from his protection, as you said, when |
| 08:51AM | 23 | | you were dealing drugs? |
| 08:51AM | 24 | A | Everybody knew that I was Mike Miske's little cousin. |
| 08:51AM | 25 | Q | Did you feel like that meant you -- they -- people would |

08:51AM   1    not cause retribution on you that they might otherwise have?

08:51AM   2    A    Yes.

08:51AM   3    Q    Was it -- was it important for you to maintain all of

08:51AM   4    those various benefits and protections you described?

08:51AM   5    A    Yes.

08:51AM   6    Q    Is that why in -- at least in part you were committing

08:51AM   7    these acts that you've told us about so far today -- or

08:51AM   8    yesterday?

08:51AM   9    A    Yes.

08:51AM   10   Q    Okay.  And then you mentioned that you had committed at

08:52AM   11   least one --

08:52AM   12              THE COURT REPORTER:  I didn't hear the answer.

08:52AM   13              THE WITNESS:  Yes.

08:52AM   14   BY MR. INCIONG:

08:52AM   15   Q    You mentioned you had -- you had committed at least one of

08:52AM   16   the robberies with John Stancil?

08:52AM   17   A    Yes.

08:52AM   18   Q    All right.  Anyone else that you at least discussed

08:52AM   19   robberies with?

08:52AM   20   A    Jake Smith and Chad Duncan.

08:52AM   21   Q    And you've mentioned Jake Smith a few time before.  Did --

08:52AM   22   were you aware did Mr. Smith ever work for Mr. Miske?

08:52AM   23   A    Not on paycheck, pay roll.

08:52AM   24   Q    What do you mean by that?

08:52AM   25   A    He never worked for any of the companies.

08:52AM    1    Q    Was he paid by Mr. Miske, if you're aware, for any other
08:52AM    2    reason?
08:52AM    3    A    Yes.
08:52AM    4    Q    What was he paid for?
08:52AM    5    A    Assaults.
08:52AM    6    Q    How did you know about that?
08:52AM    7    A    Because I was close with Jake Smith and he would tell me.
08:52AM    8    Q    Okay.  Jake Smith would -- would commit assaults for money
08:52AM    9    for Mr. Miske?
08:52AM   10    A    Yes.
08:52AM   11    Q    Who was involved, if anyone, with your oxycodone
08:53AM   12    distribution?
08:53AM   13    A    Jake Smith.
08:53AM   14    Q    Same Jake Smith?
08:53AM   15    A    Yes.
08:53AM   16    Q    So you mentioned the M Nightclub that you were hanging out
08:53AM   17    there for quite a bit for about two years, correct?
08:53AM   18    A    Yes.
08:53AM   19    Q    Was it shortly after you had returned, moved back to
08:53AM   20    Hawaii from the mainland?
08:53AM   21    A    Yes.
08:53AM   22    Q    Is that when you were kind of reacquainting yourself with
08:53AM   23    your cousin John Stancil and other family?
08:53AM   24    A    Yes.
08:53AM   25    Q    Was there anyone else that you went to the M club

08:53AM    1    regularly with other than Mr. Stancil?

08:53AM    2    A    Isaiah.

08:53AM    3    Q    Who is Isaiah?

08:53AM    4    A    Isaiah Bush.

08:53AM    5    Q    Was he just a friend, family, co-worker?  Who is he?

08:53AM    6    A    He's a friend.

08:53AM    7         MR. INCIONG:  Could I show Mr. Freitas as well as the

08:53AM    8    jury, please, Exhibit 4-60, 6-0, which has been previously

08:53AM    9    admitted?

08:54AM   10         THE COURT:  Go ahead, yes.

08:54AM   11         MR. INCIONG:  Thank you, Your Honor.

08:54AM   12    BY MR. INCIONG:

08:54AM   13    Q    Do you see that map that's shown in Exhibit 4-60,

08:54AM   14    Mr. Freitas?

08:54AM   15    A    Yes.

08:54AM   16    Q    Can you see on that map where the -- the M or also known

08:54AM   17    as Encore Nightclub was -- is located or was located I should

08:54AM   18    say?

08:54AM   19    A    Yes.

08:54AM   20    Q    Could you just draw an X or circle approximately where you

08:54AM   21    recall it being located?  Okay.  So you've drawn a circle or a

08:54AM   22    mark there that's approximately the intersection of Punchbowl

08:54AM   23    and Ala Moana Boulevard?

08:55AM   24    A    Yes.

08:55AM   25    Q    Is that also known as Restaurant Row, that area in

| | | |
|---|---|---|
| 08:55AM | 1 | general? |
| 08:55AM | 2 | A     Yes. |
| 08:55AM | 3 | Q     All right.  That's where the -- the club was where you |
| 08:55AM | 4 | were going? |
| 08:55AM | 5 | A     Yes. |
| 08:55AM | 6 | Q     All right. |
| 08:55AM | 7 | MR. INCIONG:  Could we show Mr. Freitas and the jury |
| 08:55AM | 8 | Exhibit 4-61 next, please? |
| 08:55AM | 9 | THE COURT:  You may. |
| 08:55AM | 10 | MR. INCIONG:  Thank you, Your Honor. |
| 08:55AM | 11 | BY MR. INCIONG: |
| 08:55AM | 12 | Q     Do you recognize what's shown in this photo? |
| 08:55AM | 13 | A     Yes. |
| 08:55AM | 14 | Q     How do you recognize that? |
| 08:55AM | 15 | A     That's the row bar. |
| 08:55AM | 16 | Q     Where is that located in -- in proximity to the M or |
| 08:55AM | 17 | Encore Nightclub? |
| 08:55AM | 18 | A     In front of the main entrance. |
| 08:55AM | 19 | Q     Okay. |
| 08:55AM | 20 | MR. INCIONG:  Could we show Mr. Freitas and the jury |
| 08:55AM | 21 | 4-62 also previously admitted, please? |
| 08:55AM | 22 | THE COURT:  Yes. |
| 08:55AM | 23 | BY MR. INCIONG: |
| 08:55AM | 24 | Q     Do you recognize what's shown here, Mr. Freitas? |
| 08:55AM | 25 | A     Yes. |

08:55AM    1    Q    What does that show?

08:55AM    2    A    The outside of the M Nightclub.

08:55AM    3         MR. INCIONG:  Okay.  Your Honor, may I approach

08:55AM    4    Mr. Freitas with a physical exhibit?  It's Exhibit 1-632.

08:56AM    5         THE COURT:  Yes.

08:56AM    6         MR. INCIONG:  Thank you, Your Honor.

08:56AM    7    BY MR. INCIONG:

08:56AM    8    Q    Mr. Freitas, I just placed in front of you what's been

08:56AM    9    marked as Exhibit 1-632.  Have you seen that item before?

08:56AM   10    A    Yes.

08:56AM   11    Q    How do you recognize that?

08:56AM   12    A    It's my old phone that I thought I lost.

08:56AM   13    Q    Okay.  Did you have a chance to examine the -- the

08:56AM   14    contents of that phone as well?

08:56AM   15    A    Yes.

08:56AM   16    Q    Did you recognize the contents of that phone?

08:57AM   17    A    Yes.

08:57AM   18    Q    Does that -- did that match up with the -- your

08:57AM   19    recollection of the phone that you thought you lost?

08:57AM   20    A    Yes.

08:57AM   21         MR. INCIONG:  Your Honor, I would move to admit

08:57AM   22    Exhibit 1-632.

08:57AM   23         THE COURT:  Any objection or issues, Counsel?

08:57AM   24         MR. KENNEDY:  On the exhibit -- it looks like it shows

08:57AM   25    a photo here.  It's the actual phone is there.

08:57AM   1              MR. INCIONG:  It's -- yeah, sorry about that.

08:57AM   2              MR. KENNEDY:  Okay.

08:57AM   3              MR. INCIONG:  I think on the -- the earlier list I

08:57AM   4    thought we were going to replace that today but it says photo.

08:57AM   5    It's supposed to be the actual phone itself.

08:57AM   6              MR. KENNEDY:  No objection, Your Honor.  I'm just

08:57AM   7    making certain we don't have a duplicate.

08:57AM   8              THE COURT:  Yes.  So without objection, 1-632 is

08:57AM   9    admitted.  It is the phone.  I know the exhibit list says photo

08:57AM   10   but I understand that that is not accurate.

08:57AM   11             (Exhibit 1-632 was received in evidence.)

08:57AM   12             MR. INCIONG:  Thank you, Your Honor.

08:57AM   13   BY MR. INCIONG:

08:57AM   14   Q   Mr. Freitas, I should also have asked did you actually

08:57AM   15   mark or initial that phone anywhere to show that you identified

08:57AM   16   it when you previously viewed it before coming to court today?

08:58AM   17   A   Yes.

08:58AM   18   Q   What date did you initial that phone?

08:58AM   19   A   2/7/24.

08:58AM   20   Q   Do you recognize your handwriting and your initials as

08:58AM   21   well?

08:58AM   22   A   Yes.

08:58AM   23   Q   Okay.  Now, in that phone, were there a number of photos

08:58AM   24   that you recognized as well?

08:58AM   25   A   Yes.

| | | |
|---|---|---|
| 08:58AM | 1 | MR. INCIONG:  Could we pull up for Mr. Freitas only |
| 08:58AM | 2 | Exhibit 1-638 at this time, please? |
| 08:58AM | 3 | BY MR. INCIONG: |
| 08:58AM | 4 | Q    Mr. Freitas, do you recall going through this list of -- |
| 08:58AM | 5 | I'll refer to them as thumbnails of different photographs that |
| 08:58AM | 6 | were found on that phone? |
| 08:58AM | 7 | A    Yes. |
| 08:58AM | 8 | Q    Did you recognize those various photographs? |
| 08:58AM | 9 | A    Yes. |
| 08:58AM | 10 | MR. INCIONG:  Can we show Mr. Freitas only please |
| 08:58AM | 11 | Exhibit 1-639? |
| 08:58AM | 12 | BY MR. INCIONG: |
| 08:58AM | 13 | Q    Do you recognize this photograph, Mr. Freitas? |
| 08:59AM | 14 | A    Yes. |
| 08:59AM | 15 | Q    Is that one of the photos that you identified and |
| 08:59AM | 16 | recognized on your old cell phone? |
| 08:59AM | 17 | A    Yes. |
| 08:59AM | 18 | Q    Do you recognize the individuals that are in this photo? |
| 08:59AM | 19 | A    Yes. |
| 08:59AM | 20 | Q    Does this photo accurately show each of those individuals? |
| 08:59AM | 21 | A    Yes. |
| 08:59AM | 22 | Q    Do you recall where this photo was taken? |
| 08:59AM | 23 | A    M Nightclub. |
| 08:59AM | 24 | Q    Does this photo accurately show the -- the setting being |
| 08:59AM | 25 | at the M Nightclub as well? |

| | | |
|---|---|---|
| 08:59AM | 1 | A    Yes. |
| 08:59AM | 2 | MR. INCIONG:  Your Honor, I would move to admit |
| 08:59AM | 3 | Exhibit 1-639. |
| 08:59AM | 4 | THE COURT:  Any objection? |
| 08:59AM | 5 | MR. KENNEDY:  No objection. |
| 08:59AM | 6 | THE COURT:  Without objection 1-639 is admitted.  You |
| 08:59AM | 7 | may publish. |
| 08:59AM | 8 | MR. INCIONG:  Thank you, Your Honor. |
| 08:59AM | 9 | (Exhibit 1-639 was received in evidence.) |
| 08:59AM | 10 | BY MR. INCIONG: |
| 08:59AM | 11 | Q    So, Mr. Freitas, the jury can now see Exhibit 1-639 |
| 08:59AM | 12 | starting from the left and moving to the right, could you |
| 08:59AM | 13 | identify everybody in the photo, please? |
| 08:59AM | 14 | A    John Stancil, me, Caleb Miske and Isaiah Bush. |
| 08:59AM | 15 | Q    John Stancil is your cousin that you said was the one you |
| 08:59AM | 16 | were primarily going to the M Nightclub with during this time? |
| 09:00AM | 17 | A    Yes. |
| 09:00AM | 18 | Q    Did you see or socialize with Caleb Miske there |
| 09:00AM | 19 | frequently? |
| 09:00AM | 20 | A    He would come here and there. |
| 09:00AM | 21 | Q    What about Mr. Bush? |
| 09:00AM | 22 | A    Yes. |
| 09:00AM | 23 | MR. INCIONG:  All right.  Could we next show |
| 09:00AM | 24 | Mr. Freitas Exhibit 1-640, please? |
| 09:00AM | 25 | BY MR. INCIONG: |

| | | | |
|---|---|---|---|
| 09:00AM | 1 | Q | Mr. Freitas, do you recognize what's shown in this photo? |
| 09:00AM | 2 | A | Yes. |
| 09:00AM | 3 | Q | Do you recognize the individuals shown in that photo? |
| 09:00AM | 4 | A | Yes. |
| 09:00AM | 5 | Q | And do you recognize where that photo was taken? |
| 09:00AM | 6 | A | Yes. |
| 09:00AM | 7 | Q | Was this another photo from the phone that you just |
| 09:00AM | 8 | | identified a few moments ago? |
| 09:00AM | 9 | A | Yes. |
| 09:00AM | 10 | Q | Does this accurately show each of those individuals and |
| 09:00AM | 11 | | the location as you recall? |
| 09:00AM | 12 | A | Yes. |
| 09:00AM | 13 | | MR. INCIONG:  Your Honor, I would move to admit 6, |
| 09:00AM | 14 | | dash -- I'm sorry, 1-640. |
| 09:00AM | 15 | | THE COURT:  Mr. Kennedy, any objection? |
| 09:00AM | 16 | | MR. KENNEDY:  No objection, Your Honor. |
| 09:00AM | 17 | | THE COURT:  Without objection 1-640 is admitted.  You |
| 09:00AM | 18 | | may publish. |
| 09:00AM | 19 | | MR. INCIONG:  Thank you, Your Honor. |
| 09:00AM | 20 | | (Exhibit 1-640 was received in evidence.) |
| 09:01AM | 21 | | BY MR. INCIONG: |
| 09:01AM | 22 | Q | And again, if you could, Mr. Freitas, starting from the |
| 09:01AM | 23 | | left and moving to right, could you identify whoever you |
| 09:01AM | 24 | | recognize in this photo? |
| 09:01AM | 25 | A | John Stancil, Jason Yokoyama, Mike Miske, Isaiah Bush, me |

09:01AM    1    and Wayne Miller.

09:01AM    2    Q    So Mr. Stancil you've already talked about.  Jason

09:01AM    3    Yokoyama, how did you know him?

09:01AM    4    A    He worked for the M Nightclub.

09:01AM    5    Q    What was his position there as far as you knew?

09:01AM    6    A    Manager.

09:01AM    7    Q    You talked about Mr. Miske obviously, Mr. Bush, Mr. Miller

09:01AM    8    who's on the far right side.  How did you know Mr. Miller?

09:01AM    9    A    From Mike and John.

09:01AM   10    Q    Did you ever socialize with Mr. Miller?

09:01AM   11    A    Yes.

09:01AM   12    Q    How would you describe your friendship or relationship

09:01AM   13    with him?

09:01AM   14    A    We was -- we was good.

09:01AM   15    Q    Did you socialize with him regularly or on an off?

09:01AM   16    A    On an off.

09:02AM   17         MR. INCIONG:  Okay.  Could I show Mr. Freitas

09:02AM   18    Exhibit 1-641 next?

09:02AM   19    BY MR. INCIONG:

09:02AM   20    Q    Mr. Freitas, do you recognize what's shown in this photo?

09:02AM   21    A    Yes.

09:02AM   22    Q    Do you recognize each of the individuals in the photo?

09:02AM   23    A    Yes.

09:02AM   24    Q    Do you recognize where the photo is taken?

09:02AM   25    A    Yes.

| | | | |
|---|---|---|---|
| 09:02AM | 1 | Q | Was this another photo taken off the phone that you just |
| 09:02AM | 2 | | identified? |
| 09:02AM | 3 | A | Yes. |
| 09:02AM | 4 | Q | Does this photo accurately show the setting and the -- the |
| 09:02AM | 5 | | individuals in it? |
| 09:02AM | 6 | A | Yes. |
| 09:02AM | 7 | | MR. INCIONG:  Before I move to admit and publish that, |
| 09:02AM | 8 | | Your Honor, can we show Mr. Freitas 1-642? |
| 09:02AM | 9 | | THE COURT:  Go ahead. |
| 09:02AM | 10 | | BY MR. INCIONG: |
| 09:02AM | 11 | Q | Same questions, Mr. Freitas, do you recognize the |
| 09:02AM | 12 | | individuals in this photo? |
| 09:02AM | 13 | A | Yes. |
| 09:02AM | 14 | Q | Do you recognize where that photo was taken? |
| 09:02AM | 15 | A | Yes. |
| 09:02AM | 16 | Q | Is this a photo that was on your old phone? |
| 09:02AM | 17 | A | Yes. |
| 09:02AM | 18 | Q | And does this photo accurately show those people and |
| 09:02AM | 19 | | the -- the location? |
| 09:02AM | 20 | A | Yes. |
| 09:02AM | 21 | | MR. NAMMAR:  Your Honor, I would move to admit |
| 09:02AM | 22 | | Exhibits 1-641 and 1-642 at this time. |
| 09:02AM | 23 | | THE COURT:  Any -- and objection, counsel, To either? |
| 09:03AM | 24 | | MR. KENNEDY:  No objection to either 64 -- 1-641 or |
| 09:03AM | 25 | | 1-642, Your Honor. |

09:03AM  1          THE COURT:  All right.  Without objection those two
09:03AM  2    exhibits then are admitted 1-641 and 1-642.
09:03AM  3          MR. INCIONG:  Thank you, Your Honor.
09:03AM  4          THE COURT:  You may publish either or both.
09:03AM  5          MR. INCIONG:  Thank you.  So we can start with 642.
09:03AM  6          (Exhibits 1-641 and 1-642 were received in evidence.)
09:03AM  7    BY MR. INCIONG:
09:03AM  8    Q    Mr. Freitas, could you identify everyone that you
09:03AM  9    recognize in this particular shot?
09:03AM  10   A    Mike Miske, Michael Buntenbah, Allen Lau, Caleb Miske and
09:03AM  11   me.
09:03AM  12   Q    So I think a name you haven't mentioned so far is Mike
09:03AM  13   Buntenbah, correct?
09:03AM  14   A    Yes.
09:03AM  15   Q    That's the person -- second person from the left next to
09:03AM  16   Mr. Miske?
09:03AM  17   A    Yes.
09:03AM  18   Q    How did you know Mr. Buntenbah?
09:03AM  19   A    From Mike and John.
09:03AM  20   Q    What was your relationship with him?
09:03AM  21   A    On an off.
09:03AM  22   Q    Did he work at the M or Encore Nightclub as far as you
09:03AM  23   knew?
09:03AM  24   A    No.
09:03AM  25   Q    Did he socialize there?

09:04AM    1    A    Yes.

09:04AM    2    Q    As much as you did?

09:04AM    3    A    No.

09:04AM    4    Q    And you said this is your uncle you mentioned or cousin

09:04AM    5    Mr. Lau?

09:04AM    6    A    He's my cousin.

09:04AM    7    Q    Okay.  That's the person that's basically behind you to

09:04AM    8    the right?

09:04AM    9    A    Yes.

09:04AM   10    Q    Did you ever socialize with Mr. Lau at the M Nightclub?

09:04AM   11    A    No.  He doesn't really go out.

09:04AM   12    Q    So this was a rare occasion that he was there?

09:04AM   13    A    Yes.

09:04AM   14    Q    All right.

09:04AM   15         MR. INCIONG:  Okay.  We can take that down for -- at

09:04AM   16    this time.

09:04AM   17    BY MR. INCIONG:

09:04AM   18    Q    So on that same phone that you just identified a few

09:04AM   19    moments ago, did you also review a number of text exchanges

09:04AM   20    that were on that particular phone?

09:04AM   21    A    Yes.

09:04AM   22         MR. INCIONG:  Could we show Mr. -- could we show Mr.

09:04AM   23    Freitas Exhibit 1-636, please?  I'm sorry, Your Honor, could we

09:05AM   24    go back.  I -- I was just reminded I -- I failed to ask to have

09:05AM   25    1-641 published.  We just looked at 1-642.

| | | |
|---|---|---|
| 09:05AM | 1 | THE COURT:  Yes, go ahead. |
| 09:05AM | 2 | MR. INCIONG:  Thank you. |
| 09:05AM | 3 | BY MR. INCIONG: |
| 09:05AM | 4 | Q    So, Mr. Freitas, could you identify everybody that you can |
| 09:05AM | 5 | in Exhibit 1-641? |
| 09:05AM | 6 | A    Jason, Dusky Toledo, Isaiah Bush, Mike Miske, John Stancil |
| 09:05AM | 7 | and me. |
| 09:05AM | 8 | Q    Okay.  Do you know the woman in the photo? |
| 09:05AM | 9 | A    No. |
| 09:05AM | 10 | Q    The person on the -- the first person you mentioned on the |
| 09:05AM | 11 | left, what did you say his name was? |
| 09:05AM | 12 | A    Jason. |
| 09:05AM | 13 | Q    Did you know his last name? |
| 09:05AM | 14 | A    No. |
| 09:05AM | 15 | Q    The person next to him, Dusky? |
| 09:05AM | 16 | A    Yes. |
| 09:05AM | 17 | Q    What was his -- Dusky's last name? |
| 09:06AM | 18 | A    Toledo. |
| 09:06AM | 19 | Q    How did you know Dusky Toledo? |
| 09:06AM | 20 | A    From Jason. |
| 09:06AM | 21 | Q    The Jason that's in this photo? |
| 09:06AM | 22 | A    Yes. |
| 09:06AM | 23 | Q    Did you know Mr. Toledo well? |
| 09:06AM | 24 | A    No, not well. |
| 09:06AM | 25 | Q    Did you have any sort of relationship with him? |

09:06AM  1    A    No.

09:06AM  2    Q    He just happened to be there that night when you were at

09:06AM  3    the M?

09:06AM  4    A    Yes.

09:06AM  5    Q    Okay.  Thank you.

09:06AM  6         MR. INCIONG:  We can go back to Exhibit 1-636 to show

09:06AM  7    Mr. Freitas, please.

09:06AM  8    BY MR. INCIONG:

09:06AM  9    Q    Mr. Freitas, we can scroll through this document if -- if

09:06AM  10   you need to, but do you recall reviewing this text chat

09:06AM  11   exchange from your old phone that you just identified a few

09:06AM  12   minutes ago?

09:06AM  13   A    Yes.

09:06AM  14   Q    Did you recognize those as being text messages that you

09:06AM  15   had sent and received?

09:06AM  16   A    Yes.

09:06AM  17        MR. INCIONG:  Your Honor, I would move to admit

09:07AM  18   Exhibit 1-636.  The parties have stipulated to the foundation

09:07AM  19   and authenticity and Mr. Freitas has recognized the texts as

09:07AM  20   being those he received and sent from the phone that's been

09:07AM  21   previously admitted.

09:07AM  22        THE COURT:  Any objection?

09:07AM  23        MR. KENNEDY:  No objection.

09:07AM  24        THE COURT:  1-636 is admitted without objection.  You

09:07AM  25   may publish it.

09:07AM   1          MR. INCIONG:  Thank you, Your Honor.

09:07AM   2          (Exhibit 1-636 was received in evidence.)

09:07AM   3   BY MR. INCIONG:

09:07AM   4   Q    So, Mr. Freitas, I'd like to go through a number of these

09:07AM   5   chats or messages with you just to kind of have you explain the

09:07AM   6   context of these chats.  So if we could go to page two starting

09:07AM   7   with the first bubble on the top.  Do you see that that starts

09:07AM   8   with, hey Bro?

09:07AM   9   A    Yes.

09:07AM   10  Q    So it reads, hey Bro, JS got arrested and we was moving

09:07AM   11  his car to park it at the shop and stay a friend's house

09:08AM   12  because guest parking only can park there at a certain time.

09:08AM   13          What was going on on this date which was April 21st of

09:08AM   14  2015?

09:08AM   15  A    Me and John was sleeping inside the -- his car his Nissan

09:08AM   16  Maxima this night.

09:08AM   17  Q    And you're -- and you're saying this is John Stancil?

09:08AM   18  A    Yes.

09:08AM   19  Q    Who were you sending this text to?

09:08AM   20  A    To Mike.

09:08AM   21  Q    And is that reflected in the -- the MM?

09:08AM   22  A    Yes.

09:08AM   23  Q    That's above that?

09:08AM   24  A    Yes.

09:08AM   25  Q    And the phone number associated with that is

09:08AM    1    (808) 439-5220?

09:08AM    2    A    Yes.

09:08AM    3    Q    That was a number that you would communicate with

09:08AM    4    Mr. Miske on?

09:08AM    5    A    Yes.

09:08AM    6    Q    Okay.  Where were you sleeping in your -- in the car

09:08AM    7    exactly, if you recall?

09:08AM    8    A    I was by the storage by Queen Street.

09:08AM    9    Q    Is this near the Kama'aina Termite shop?

09:08AM   10    A    Yes.

09:08AM   11    Q    Why were you and Mr. Stancil sleeping in your car?

09:09AM   12    A    Because we had nowhere else to stay.

09:09AM   13    Q    This was April of 2015?

09:09AM   14    A    Yes.

09:09AM   15    Q    How long had you been back in Hawaii at that point

09:09AM   16    approximately?

09:09AM   17    A    Probably a few years.

09:09AM   18    Q    So why did you or Mr. Stancil not have a place to stay at

09:09AM   19    that time?

09:09AM   20    A    We just didn't have a place to stay.

09:09AM   21    Q    So you were sleeping in -- in a parking lot in -- in the

09:09AM   22    car?

09:09AM   23    A    Yes.

09:09AM   24    Q    Okay.  What happened that caused you to send this text

09:09AM   25    message?

| | | | |
|---|---|---|---|
| 09:09AM | 1 | A | John got arrested. |
| 09:09AM | 2 | Q | What was he arrested for? |
| 09:09AM | 3 | A | Outstanding warrants. |
| 09:09AM | 4 | Q | Do you recall -- did you know of the officer who arrested |
| 09:09AM | 5 | | him? |
| 09:09AM | 6 | A | Yes. |
| 09:09AM | 7 | Q | How did you know the officer who arrested him? |
| 09:09AM | 8 | A | It was Spiker.  He pretty much did that area.  That was |
| 09:09AM | 9 | | his district. |
| 09:09AM | 10 | Q | Had you had interactions with Officer Spiker before? |
| 09:10AM | 11 | A | Yes. |
| 09:10AM | 12 | Q | What kinds of interactions? |
| 09:10AM | 13 | A | I got pulled over twice by him. |
| 09:10AM | 14 | Q | You knew who he was? |
| 09:10AM | 15 | A | Yes. |
| 09:10AM | 16 | Q | Did you know him through any other means? |
| 09:10AM | 17 | A | No. |
| 09:10AM | 18 | Q | So when you told Mr. Miske in this text that he was |
| 09:10AM | 19 | | arrested, did you ever relay to him later that it was |
| 09:10AM | 20 | | specifically Officer Spiker who had made the arrest? |
| 09:10AM | 21 | A | I think I mentioned it to him. |
| 09:10AM | 22 | Q | So your next text message says, he got taken in for |
| 09:10AM | 23 | | warrants and -- and told me to tell you if Alen can be there in |
| 09:10AM | 24 | | the morning. |
| 09:10AM | 25 | | So was that where you were explaining why Mr. Stancil |

| | | | |
|---|---|---|---|
| 09:10AM | 1 | | had been arrested? |
| 09:10AM | 2 | A | Yes. |
| 09:10AM | 3 | Q | You referenced Alen there.  Who is Alen? |
| 09:10AM | 4 | A | Alen Kaneshiro. |
| 09:10AM | 5 | Q | Who was Alen Kaneshiro? |
| 09:10AM | 6 | A | An attorney. |
| 09:10AM | 7 | Q | How did you know of Alen Kaneshiro? |
| 09:10AM | 8 | A | From Mike. |
| 09:10AM | 9 | Q | Have you ever dealt with or used Mr. Kaneshiro's services |
| 09:10AM | 10 | | before? |
| 09:10AM | 11 | A | Yes. |
| 09:10AM | 12 | Q | How did that come about? |
| 09:11AM | 13 | A | I had some seven bench warrants for tickets for speeding, |
| 09:11AM | 14 | | driving without a license. |
| 09:11AM | 15 | Q | How did you end up having Mr. Kaneshiro represent you for |
| 09:11AM | 16 | | those? |
| 09:11AM | 17 | A | I'm sorry.  Can you say that again? |
| 09:11AM | 18 | Q | Were you recommended to be -- to use Mr. Kaneshiro?  How |
| 09:11AM | 19 | | did you choose to retain him for those tickets? |
| 09:11AM | 20 | A | It was recommended. |
| 09:11AM | 21 | Q | By whom? |
| 09:11AM | 22 | A | By Mike. |
| 09:11AM | 23 | Q | That's Mike Miske? |
| 09:11AM | 24 | A | Yes. |
| 09:11AM | 25 | Q | So do you see the responses that Mr. Miske sent to you |

09:11AM   1   later that evening on that same page?  What time are you going
09:11AM   2   to be done.  And then the following text, meet me as soon as
09:11AM   3   you're F'ing done.  I need to talk with you once and for all.
09:11AM   4   A   Yes.
09:11AM   5   Q   Okay.  Before I ask you about that, can we go to next
09:11AM   6   page, page three, in the top bubble there.  This is a text that
09:11AM   7   Mr. Miske sent to you then also at the same time?
09:11AM   8   A   Yes.
09:11AM   9   Q   Tired of you three idiots always getting into shit?
09:12AM   10   A   Yes.
09:12AM   11   Q   So what did you believe Mr. Miske's attitude to be with
09:12AM   12   you at that time?
09:12AM   13          MR. KENNEDY:  Objection, speculation, Your Honor.
09:12AM   14          THE COURT:  Sustained.
09:12AM   15   BY MR. INCIONG:
09:12AM   16   Q   From looking at his texts and knowing Mr. Miske from
09:12AM   17   working with him, did you believe you were in trouble with him?
09:12AM   18   A   Yes.
09:12AM   19   Q   And on the text we're looking at right now, it says, tired
09:12AM   20   of you three idiots.
09:12AM   21          Did you know who he was referring to?
09:12AM   22   A   Yes.
09:12AM   23   Q   Who was he referring to?
09:12AM   24   A   Me, John Stancil and Jake Smith.
09:12AM   25   Q   Were you aware of another of name that Mr. Miske would

09:12AM    1    refer to you three as?

09:12AM    2    A    Three amigos.

09:12AM    3    Q    The three amigos?

09:12AM    4    A    Yes.

09:12AM    5    Q    Do you know why he gave you that name?

09:12AM    6    A    No.

09:12AM    7    Q    All right.  So then the next text you respond, okay, going

09:13AM    8    to see if I can just go.

09:13AM    9         And then Mr. Miske responds to you saying, Alen is

09:13AM   10    going to go this afternoon at 1:30.  She gets in front of

09:13AM   11    judge.

09:13AM   12         What did you understand that to mean?

09:13AM   13    A    That Alen was going to show up for John.

09:13AM   14    Q    Okay.  All right.  So if you could go down to the last

09:13AM   15    blue bubble on the page three, do you see this text that

09:13AM   16    Mr. Miske sent you on May 6th of 2015?

09:13AM   17    A    Yes.

09:13AM   18    Q    What was this text about?

09:13AM   19         Split the side view and the back view evenly where

09:13AM   20    you're talking a picture of a corner, the corner of the vehicle

09:13AM   21    would be the midpoint?

09:13AM   22    A    It was vehicles for Hawai'i Partners vehicles.

09:13AM   23    Q    So were these -- is this a reference to what you were

09:13AM   24    describing yesterday where Mr. Miske would direct you what

09:14AM   25    photos to take and what -- what verbiage to use on the ads to

09:14AM   1   sell the cars?

09:14AM   2   A   Yes.

09:14AM   3   Q   So you would -- there was legitimate business that you

09:14AM   4   were doing with Mr. Miske during the time you were working for

09:14AM   5   him, correct?

09:14AM   6   A   Yes.

09:14AM   7   Q   So the following page, if you go to page four.  Those are

09:14AM   8   a number of -- of texts that Mr. Miske sent you, correct?

09:14AM   9   A   Yes.

09:14AM  10   Q   And those are all in regard to posting ads to sell Hawai'i

09:14AM  11   Partner vehicles?

09:14AM  12   A   Yes.

09:14AM  13   Q   Okay.  So could we go to page five then?  And do you see

09:14AM  14   your responses to that?

09:14AM  15        Yep, doing that now.

09:14AM  16   A   Yes.

09:14AM  17   Q   So this is just again more exchanges listing those

09:14AM  18   vehicles, correct?

09:14AM  19   A   Yes.

09:14AM  20   Q   All right.  Let's go down now to page six, if we could, to

09:15AM  21   the first blue bubble on page six.  Do you see this text that

09:15AM  22   Mr. Miske sent to you on May 9th of 2015?

09:15AM  23   A   Yes.

09:15AM  24   Q   Did he send it to anyone else besides you?

09:15AM  25   A   Yes.

09:15AM    1    Q    Who else did he send it to?

09:15AM    2    A    John Stancil.

09:15AM    3    Q    And that is the reference to John Blane in the two at the

09:15AM    4    top of that?

09:15AM    5    A    Yes.

09:15AM    6    Q    Okay.  So what is this text message about?

09:15AM    7    A    Going to MLZ Wayne's birthday party at the Shore Bird.

09:15AM    8    Q    The capital letters MLZ, that's the MLZ you referred to?

09:15AM    9    A    Yes.

09:15AM   10    Q    Who is MLZ?

09:15AM   11    A    Wayne Miller.

09:15AM   12    Q    The Wayne Miller is -- there was a birthday party for him

09:15AM   13    at the Shore Bird that -- that evening?

09:15AM   14    A    Yes.

09:15AM   15    Q    Okay.  What does -- what did this no social media part

09:15AM   16    what did that mean to you?

09:15AM   17    A    No social media, no posting pictures or anything on

09:15AM   18    Instagram or any social media network.

09:16AM   19    Q    Was that unusual or typical of Mr. Miske to say that?

09:16AM   20    A    We just don't post none of that stuff on social media.

09:16AM   21    Q    Why was that?

09:16AM   22    A    Just no -- no social media.

09:16AM   23    Q    Who directed that?

09:16AM   24    A    Mike did.

09:16AM   25    Q    The next text below that, he then texts both you and

| | | |
|---|---|---|
| 09:16AM | 1 | Mr. Stancil again.  Did you guys text MLZHBD? |
| 09:16AM | 2 | What did that mean? |
| 09:16AM | 3 | A    Did you guys text Miller happy birthday? |
| 09:16AM | 4 | Q    Okay.  So -- so reminding you to -- to text Miller happy |
| 09:16AM | 5 | birthday basically? |
| 09:16AM | 6 | A    Yes. |
| 09:16AM | 7 | Q    Okay. |
| 09:16AM | 8 | MR. INCIONG:  All right.  Could we show Mr. Freitas |
| 09:16AM | 9 | Exhibit 1-637 next, please? |
| 09:16AM | 10 | BY MR. INCIONG: |
| 09:16AM | 11 | Q    Mr. Freitas, this is another set of chats that were found |
| 09:16AM | 12 | on the -- the phone you identified earlier today.  This -- |
| 09:17AM | 13 | these are fairly lengthy, so take your time, if you need to, |
| 09:17AM | 14 | but if you go through these chat bubbles, are you able to |
| 09:17AM | 15 | recognize these various texts? |
| 09:17AM | 16 | A    Yes. |
| 09:17AM | 17 | Q    Did you review this entire text chain prior to coming to |
| 09:17AM | 18 | court today? |
| 09:17AM | 19 | A    Yes. |
| 09:17AM | 20 | Q    Did you recognize those as text messages that you sent and |
| 09:17AM | 21 | received from Mr. Miske that were on your old phone? |
| 09:17AM | 22 | A    Yes. |
| 09:17AM | 23 | MR. INCIONG:  Your Honor, I would move to admit |
| 09:17AM | 24 | Exhibit 1-637 at this time. |
| 09:17AM | 25 | THE COURT:  Mr. Kennedy, any issue? |

09:17AM  1              MR. KENNEDY:  No objection, Your Honor.

09:17AM  2              THE COURT:  Okay.  Without objection 1-637 is admitted

09:17AM  3   and you may publish.

09:17AM  4              MR. INCIONG:  Thank you, Your Honor.

09:17AM  5              (Exhibit 1-637 was received in evidence.)

09:17AM  6   BY MR. INCIONG:

09:17AM  7   Q    So if we can start with the very first chat bubble.  Is

09:17AM  8   this a text message that you received from Mr. Miske back on

09:17AM  9   June 1st of 2015?

09:17AM  10  A    Yes.

09:17AM  11  Q    And -- and -- was this an attachment or a -- a screenshot

09:18AM  12  that was sent as a text?

09:18AM  13  A    Yes.

09:18AM  14             MR. INCIONG:  Could we go to that particular

09:18AM  15  attachment, please, to show Mr. Freitas?

09:18AM  16  BY MR. INCIONG:

09:18AM  17  Q    Is that the -- do you recognize that as the screenshot

09:18AM  18  that was attached to that text message on June 1st of 2015?

09:18AM  19  A    Yes.

09:18AM  20  Q    Did you recognize what that is of?

09:18AM  21  A    Yes.

09:18AM  22  Q    Where do you recognize that as -- as being located?

09:18AM  23  A    It was at a salon.

09:18AM  24  Q    In Honolulu?

09:18AM  25  A    No.  In Kaimuki area.

| | | | |
|---|---|---|---|
| 09:19AM | 1 | Q | Okay.  What was the significance of this salon in Kaimuki? |
| 09:19AM | 2 | A | One of his girlfriends worked there. |
| 09:19AM | 3 | Q | Which girlfriend? |
| 09:19AM | 4 | A | Heather Freeman. |

09:19AM   5       MR. INCIONG:  Could we go off of this exhibit for a
09:19AM   6   moment and show Mr. Freitas Exhibit 1-65, please?

09:19AM   7   BY MR. INCIONG:
09:19AM   8   Q   Mr. Freitas, do you recognize the individual shown in
09:19AM   9   Exhibit 1-65?
09:19AM  10   A   Yes.
09:19AM  11   Q   Who do you recognize that as?
09:19AM  12   A   Heather Freeman.
09:19AM  13   Q   Is this the girlfriend of Mr. Miske that you just
09:19AM  14   referenced?
09:19AM  15   A   Yes.
09:19AM  16   Q   Does this photo accurately show her?
09:19AM  17   A   Yes.

09:19AM  18       MR. INCIONG:  Your Honor, I would move to admit 1-65,
09:19AM  19   please.
09:19AM  20       THE COURT:  Any issue?
09:19AM  21       MR. KENNEDY:  No objection, Your Honor.
09:19AM  22       THE COURT:  Without objection 1-65 is admitted --
09:19AM  23       MR. KENNEDY:  Your Honor, I -- I do have a question
09:19AM  24   about the last exhibit.  When we went off screen, is that part
09:19AM  25   of the exhibit or are we --

09:19AM  1          THE COURT:  It is.

09:19AM  2          MR. KENNEDY:  Thank you.

09:19AM  3          THE COURT:  There are no page numbers that I observed,

09:20AM  4   but it is part of it.

09:20AM  5          MR. KENNEDY:  That's fine, Your Honor.  That -- that

09:20AM  6   was the only thing I wanted to check on.

09:20AM  7              (Exhibit 1-65 was received in evidence.)

09:20AM  8          MR. INCIONG:  Could we publish 1-65, please?

09:20AM  9          THE COURT:  Yes.

09:20AM  10  BY MR. INCIONG:

09:20AM  11  Q    This is a photo of Heather Freeman, Mr. Freitas?

09:20AM  12  A    Yes.

09:20AM  13         MR. INCIONG:  Okay.  All right.  So could we go back,

09:20AM  14  please, to Exhibit 1-637 to the top there?  All right.  Can we

09:20AM  15  focus on the -- the second and third bubbles, please?

09:20AM  16  BY MR. INCIONG:

09:20AM  17  Q    So you received these texts from Mr. Miske after he'd sent

09:20AM  18  you that screenshot, Mr. Freitas; is that true?

09:20AM  19  A    Yes.

09:20AM  20  Q    That say go drive to this parking lot.  Where is

09:20AM  21  Genevieve?

09:20AM  22         And then let's go down to the next page, page two, the

09:20AM  23  first bubble, don't do it in front of her.

09:20AM  24         What was happening here when Mr. Miske was sending you

09:20AM  25  these three text messages in -- after the screenshot?

09:21AM   1    A    I was putting in a cell phone into Heather Freeman's

09:21AM   2    vehicle.

09:21AM   3    Q    What was the purpose of putting a cell phone in her

09:21AM   4    vehicle?

09:21AM   5    A    To see where she goes.

09:21AM   6    Q    How was the cell phone going to tell you where she was

09:21AM   7    going?

09:21AM   8    A    Find My iPhone.

09:21AM   9    Q    That's a tracking app that you were using on that phone?

09:21AM   10   A    Yes.

09:21AM   11   Q    Who directed you to do that?

09:21AM   12   A    Mike.

09:21AM   13   Q    Why did he want Ms. Freeman tracked?

09:21AM   14   A    He just wanted to know where her location was.

09:21AM   15   Q    Now, in one of the texts, he asked you, Where is

09:21AM   16   Genevieve?  Who is Genevieve?

09:21AM   17   A    It was an old girlfriend.

09:21AM   18   Q    Is that your girlfriend at that time?

09:21AM   19   A    Yes.

09:21AM   20   Q    As of June of 2015?

09:21AM   21   A    Yes.

09:21AM   22          MR. INCIONG:  Okay.  So let's go to page two then and

09:21AM   23   see your responses, the two green bubbles on page two, please.

09:21AM   24   Thank you.

09:21AM   25   BY MR. INCIONG:

| | | | |
|---|---|---|---|
| 09:21AM | 1 | Q | So you -- you answer, with me and okay. |
| 09:21AM | 2 | | So with me were you referring to Genevieve there? |
| 09:22AM | 3 | A | Yes. |
| 09:22AM | 4 | Q | So she was with you in your vehicle at that time? |
| 09:22AM | 5 | A | Yes. |
| 09:22AM | 6 | Q | Okay.  And okay, you were just acknowledging his text? |
| 09:22AM | 7 | A | Yes. |
| 09:22AM | 8 | Q | All right.  Can we look at the final text bubble on page |
| 09:22AM | 9 | | two then?  Mr. Miske then texts you, grab the phone out.  Need |
| 09:22AM | 10 | | to charge in my office then put back in car. |
| 09:22AM | 11 | | If we go to page three, the next text says, this the |
| 09:22AM | 12 | | parking lot in back of Big City Diner. |
| 09:22AM | 13 | | Then Mr. Miske texts you, what you think.  Then he |
| 09:22AM | 14 | | texts you, can, question mark, question mark.  Then he texts |
| 09:22AM | 15 | | you, gotta be stealth and not get caught. |
| 09:22AM | 16 | | Do you recall that? |
| 09:22AM | 17 | A | Yes. |
| 09:22AM | 18 | Q | Again, what was he referring to?  What was happening |
| 09:22AM | 19 | | there? |
| 09:22AM | 20 | A | To put the cell phone inside Heather's car. |
| 09:23AM | 21 | Q | And not get caught? |
| 09:23AM | 22 | A | Yes. |
| 09:23AM | 23 | Q | So if you look at page four then, the green -- top two |
| 09:23AM | 24 | | green bubbles, are those your answers to Mr. Miske? |
| 09:23AM | 25 | A | Yes. |

09:23AM   1   Q    And you say, okay and can?

09:23AM   2   A    Yes.

09:23AM   3   Q    If we go down then to the bottom half of page four.  Were

09:23AM   4   those Mr. Miske's responses to you then on June 1, 2015?

09:23AM   5   A    Yes.

09:23AM   6   Q    He texts you, don't let Genevieve know?

09:23AM   7   A    Yes.

09:23AM   8   Q    And IDC how much you trust her?

09:23AM   9   A    Yes.

09:23AM   10   Q    IDC is what?

09:23AM   11   A    I don't care.

09:23AM   12   Q    So if we could go to page five, please.  And then do you

09:23AM   13   respond to him in the top text bubble there saying, K?

09:23AM   14   A    Yes.

09:23AM   15   Q    So you're acknowledging?

09:23AM   16   A    Yes.

09:23AM   17   Q    All right.  So could I have you look now at the two blue

09:24AM   18   bubbles on that page, page five.  Mr. Miske then texts you, if

09:24AM   19   the windows are looking at you, then don't do it.  We can

09:24AM   20   always wait until the car is easier parks.

09:24AM   21        What did you understand that to mean?

09:24AM   22   A    The salon was upstairs and it had windows, so he didn't

09:24AM   23   want me to get caught if she was looking out the window.

09:24AM   24   Q    All right.  So do you see your response there at the

09:24AM   25   bottom of page five?

09:24AM   1   A   Yes.

09:24AM   2   Q   You told Mr. Miske at that point done?

09:24AM   3   A   Yes.

09:24AM   4   Q   What did that mean?

09:24AM   5   A   That I put the cell phone in the vehicle.

09:24AM   6   Q   Okay.  How did you get into Ms. Freeman's vehicle to put

09:24AM   7   the cell phone in there?

09:24AM   8   A   I didn't get inside her vehicle.  I put it underneath the

09:24AM   9   backside bumper.

09:24AM   10   Q   How did you secure it or keep it in place?

09:24AM   11   A   I put it in a bag, a waterproof bag so it wouldn't get

09:24AM   12   wet.

09:25AM   13   Q   Okay.  So could I have you look at your text to Mr. Miske

09:25AM   14   at the top of page six on that same day?  You tell him, got it.

09:25AM   15   A   Yes.

09:25AM   16   Q   And then your next text right below that says charging in

09:25AM   17   the car -- in -- the my car now.

09:25AM   18       What did that mean?

09:25AM   19   A   We had to charge the cell phone because it was dying.

09:25AM   20   Q   So Mr. Miske then responds to you that same day.  If we

09:25AM   21   look at the bottom of page six, he says, nice.  And how dead

09:25AM   22   was it?

09:25AM   23       Do you recall that?

09:25AM   24   A   Yes.

09:25AM   25   Q   And could we go to page seven?  Then he did -- did he ask

09:25AM    1    you by text what percent?

09:25AM    2    A    Yes.

09:25AM    3    Q    And do you see your response below that?

09:26AM    4    A    Yes.

09:26AM    5    Q    What did you tell him?

09:26AM    6    A    32 percent.

09:26AM    7    Q    His response to you to that on the bottom of page 7 was,

09:26AM    8    good way to gauge.  How long has it been?  And then below that,

09:26AM    9    now, we know we can wait a few more days.

09:26AM    10          And do you respond to him on the following page, on

09:26AM    11   page eight?

09:26AM    12   A    Yes.

09:26AM    13   Q    What do you say?

09:26AM    14   A    Yep.

09:26AM    15   Q    So do you see his response to that message then the

09:26AM    16   following bubble probably been over a week?

09:26AM    17   A    Yes.

09:26AM    18   Q    And that was referring to what?

09:26AM    19   A    The cell phone.

09:26AM    20   Q    How long the charge had lasted?

09:26AM    21   A    Yes.

09:26AM    22   Q    And then you respond you acknowledge that there, correct?

09:26AM    23   Yeah, it's been?

09:26AM    24   A    Yes.

09:26AM    25   Q    And then you ask -- is that a question you're asking

| | | |
|---|---|---|
| 09:26AM | 1 | there, when we putting it back? |
| 09:26AM | 2 | A    Yes. |
| 09:26AM | 3 | Q    Did he respond? |
| 09:26AM | 4 | A    Yes, he did respond. |
| 09:26AM | 5 | Q    Do you see his response at the top of page nine? |
| 09:27AM | 6 | A    Yes. |
| 09:27AM | 7 | Q    And that was, once it's charged? |
| 09:27AM | 8 | A    Yes. |
| 09:27AM | 9 | Q    Did you acknowledge that? |
| 09:27AM | 10 | A    Yes. |
| 09:27AM | 11 | Q    And that's in the next message where you say, K? |
| 09:27AM | 12 | A    Yes. |
| 09:27AM | 13 | Q    And then if we look at the bottom of page nine, how does |
| 09:27AM | 14 | he answer that? |
| 09:27AM | 15 | A    She'll be there for another two hours.  Was it hard to |
| 09:27AM | 16 | grab? |
| 09:27AM | 17 | Q    Okay.  So starting with the she'll be there for another |
| 09:27AM | 18 | two hours, where was the there that he was referring to? |
| 09:27AM | 19 | A    Her salon that she was working at. |
| 09:27AM | 20 | Q    All right.  So then when he asks you was it hard to grab, |
| 09:27AM | 21 | he sends you another text before you could answer, correct? |
| 09:27AM | 22 | A    Yes. |
| 09:27AM | 23 | Q    Do you see that at the top of page ten? |
| 09:27AM | 24 | A    Yes. |
| 09:27AM | 25 | Q    I'm here at auto customs waiting for the Jeep. |

| | | | |
|---|---|---|---|
| 09:27AM | 1 | | Was that something totally separate related to what |
| 09:27AM | 2 | | you were texting about here? |
| 09:27AM | 3 | A | Yes. |
| 09:27AM | 4 | Q | Did you know what he was referring to? |
| 09:27AM | 5 | A | Yes. |
| 09:27AM | 6 | Q | What was -- what was he referring to there? |
| 09:27AM | 7 | A | He was putting rims and tires on his new Jeep. |
| 09:28AM | 8 | Q | So in the next text, do you respond to his previous |
| 09:28AM | 9 | | question which was was it hard to grab? |
| 09:28AM | 10 | A | It was easy to grab. |
| 09:28AM | 11 | Q | Did he then ask you -- below that do you see that?  Is it |
| 09:28AM | 12 | | charged yet? |
| 09:28AM | 13 | A | Yes. |
| 09:28AM | 14 | Q | And do you see your response? |
| 09:28AM | 15 | A | Yes. |
| 09:28AM | 16 | Q | That was what? |
| 09:28AM | 17 | A | No at 50 percent. |
| 09:28AM | 18 | Q | Was there another text you sent right after that on that |
| 09:28AM | 19 | | subject? |
| 09:28AM | 20 | A | Yes. |
| 09:28AM | 21 | Q | Do you see that where it says on the 2.1 amp? |
| 09:28AM | 22 | A | Yes. |
| 09:28AM | 23 | Q | What does that mean? |
| 09:28AM | 24 | A | It's on the faster charger. |
| 09:28AM | 25 | Q | How did he respond via text to that message? |

| | | | |
|---|---|---|---|
| 09:28AM | 1 | A | That thing is going to take two fucking hours. |
| 09:28AM | 2 | Q | So do you see your two responses to that below that on |
| 09:28AM | 3 | | page 11?  What you think about the GPS? |
| 09:29AM | 4 | A | Yes. |
| 09:29AM | 5 | Q | And then I sent you. |
| 09:29AM | 6 | | What were you referring to there? |
| 09:29AM | 7 | A | GPS device that I found online. |
| 09:29AM | 8 | Q | So you were thinking about using that instead of the cell |
| 09:29AM | 9 | | phone? |
| 09:29AM | 10 | A | Yes. |
| 09:29AM | 11 | Q | Why? |
| 09:29AM | 12 | A | It's going to last longer. |
| 09:29AM | 13 | Q | Did you do that on your own or were you directed to do |
| 09:29AM | 14 | | research on that? |
| 09:29AM | 15 | A | I was directed to do research on it. |
| 09:29AM | 16 | Q | Who directed you? |
| 09:29AM | 17 | A | Mike. |
| 09:29AM | 18 | Q | Could we look at page 12 then, please?  So Mr. Miske's |
| 09:29AM | 19 | | first text there to you says, it doesn't say how long the |
| 09:29AM | 20 | | battery last. |
| 09:29AM | 21 | | Do you remember that? |
| 09:29AM | 22 | A | Yes. |
| 09:29AM | 23 | Q | How did you respond to him? |
| 09:29AM | 24 | A | Depends how much you use it. |
| 09:29AM | 25 | Q | Okay.  Did -- and what does your next text say? |

09:29AM     1     A     But it costs too.

09:29AM     2     Q     And then what did you say in the last message on that

09:29AM     3     page?

09:29AM     4     A     I think the best is iPhone 6 plus.  That shit works good.

09:30AM     5     Q     What were you expressing to Mr. Miske at that time?

09:30AM     6     A     That the iPhone 6 was better.

09:30AM     7     Q     Better than the GPS device he'd asked you to look at?

09:30AM     8     A     Yes.

09:30AM     9     Q     So do you recall the messages on the top of page 13 from

09:30AM    10     Mr. Miske in response to this discussion?

09:30AM    11     A     Yes.

09:30AM    12     Q     So he texted you, like how we're using it, how long would

09:30AM    13     it last?  Need to ask them battery life.

09:30AM    14            So this was all -- why was it important how long the

09:30AM    15     battery would last for these trackers or this -- or the phone?

09:30AM    16     A     So we don't have to go back too often.

09:30AM    17     Q     So every time it would -- the battery would be running

09:30AM    18     out, you'd have to retrieve it, charge it, and then put back

09:30AM    19     again?

09:30AM    20     A     Yes.

09:30AM    21     Q     Did you do that a number of times that you recall?

09:30AM    22     A     Yes.

09:30AM    23     Q     All right.  Let's go to page 14, if we could.  So this is

09:31AM    24     now on June 4th of 2015.  If we can look at those two top text

09:31AM    25     messages.  Do you recognize those as messages coming again from

| | | |
|---|---|---|
| 09:31AM | 1 | MM, Mr. Miske? |
| 09:31AM | 2 | A    Yes. |
| 09:31AM | 3 | Q    So do you recall where he texted you there, go buy a Boost |
| 09:31AM | 4 | Mobile that can text? |
| 09:31AM | 5 | A    Yes. |
| 09:31AM | 6 | Q    Did you know what he was referring to? |
| 09:31AM | 7 | A    Yes. |
| 09:31AM | 8 | Q    What was he referring to? |
| 09:31AM | 9 | A    A burner phone. |
| 09:31AM | 10 | Q    What is a burner phone? |
| 09:31AM | 11 | A    A phone that doesn't link back to us. |
| 09:31AM | 12 | Q    Had you bought burner phones for Mr. Miske in the past? |
| 09:31AM | 13 | A    Yes. |
| 09:31AM | 14 | Q    Do you recall approximately how many occasions you |
| 09:31AM | 15 | purchased burner phones at his direction? |
| 09:31AM | 16 | A    Two or three times. |
| 09:31AM | 17 | Q    Was there any specific place that you went to buy the |
| 09:31AM | 18 | burner phones? |
| 09:31AM | 19 | A    No. |
| 09:31AM | 20 | Q    Who would those phones be subscribed to or whose name? |
| 09:32AM | 21 | A    Anonymous name. |
| 09:32AM | 22 | Q    While we're on that subject, were there other certain |
| 09:32AM | 23 | types of ways of communication that you were directed to use |
| 09:32AM | 24 | with Mr. Miske? |
| 09:32AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 09:32AM | 1 | Q | Can you give a couple of examples? |
| 09:32AM | 2 | A | Signal and WhatsApp. |
| 09:32AM | 3 | Q | What are Signal and what -- what is WhatsApp? |
| 09:32AM | 4 | A | It's an encryption that's not linked to the iPhone.  It's |
| 09:32AM | 5 | | another app we use. |
| 09:32AM | 6 | Q | Did you communicate with Mr. Miske on either of those apps |
| 09:32AM | 7 | | regularly? |
| 09:32AM | 8 | A | Yes. |
| 09:32AM | 9 | Q | Were you directed to use those with him? |
| 09:32AM | 10 | A | Yes. |
| 09:32AM | 11 | Q | Did you ever communicate with him outside of those apps? |
| 09:32AM | 12 | A | No. |
| 09:32AM | 13 | Q | So going back to the page 14, so he asked you to get |
| 09:32AM | 14 | | the -- to buy a Boost Mobile.  Do you see your response there |
| 09:32AM | 15 | | at the bottom of page 14? |
| 09:32AM | 16 | A | Yes. |
| 09:32AM | 17 | Q | You responded to him the same -- I'm sorry.  This is |
| 09:33AM | 18 | | June 4th of 2015, the same day, K, and phone in office? |
| 09:33AM | 19 | A | Yes. |
| 09:33AM | 20 | Q | What did that mean? |
| 09:33AM | 21 | A | The phone was in the office that I picked it up already. |
| 09:33AM | 22 | Q | Okay.  So you left it there for Mr. Miske? |
| 09:33AM | 23 | A | Yes. |
| 09:33AM | 24 | Q | All right.  Could we then turn to page 15 of this |
| 09:33AM | 25 | | particular exhibit, please?  Starting with the top blue bubble, |

| | | | |
|---|---|---|---|
| 09:33AM | 1 | | that's a text from Mr. Miske, correct? |
| 09:33AM | 2 | A | Yes. |
| 09:33AM | 3 | Q | And he's asking you on June 11, 2015, where you at? |
| 09:33AM | 4 | | And do you see your response? |
| 09:33AM | 5 | A | Yes. |
| 09:33AM | 6 | Q | You said, shop. |
| 09:33AM | 7 | | Where did that mean? |
| 09:33AM | 8 | A | Kama'aina Termite and Pest Control. |
| 09:33AM | 9 | Q | At 940B Queen Street? |
| 09:33AM | 10 | A | Yes. |
| 09:33AM | 11 | Q | So the next text message Mr. Miske sends you is, Go |
| 09:34AM | 12 | | recharge the iPhone Plus.  You have two hours before she leaves |
| 09:34AM | 13 | | work.  Take a two amp charger. |
| 09:34AM | 14 | | What was happening here? |
| 09:34AM | 15 | A | To recharge the phone that was in Heather's car. |
| 09:34AM | 16 | Q | So is this the same work location, the salon in Kaimuki? |
| 09:34AM | 17 | A | Yes. |
| 09:34AM | 18 | Q | You respond to him, about to get some office supplies? |
| 09:34AM | 19 | A | Yes. |
| 09:34AM | 20 | Q | So you were doing legitimate work at that time, correct? |
| 09:34AM | 21 | A | Yes. |
| 09:34AM | 22 | Q | But he wanted you to stop that and go recharge the -- the |
| 09:34AM | 23 | | phone? |
| 09:34AM | 24 | A | Yes. |
| 09:34AM | 25 | Q | So if we look at the next page, page 16, do you recall |

| | | |
|---|---|---|
| 09:34AM | 1 | where he asks you how many days has it been? |
| 09:34AM | 2 | A    Yes. |
| 09:34AM | 3 | Q    And then your reply, you -- you sent two messages back to |
| 09:34AM | 4 | back.  Do you recall that? |
| 09:34AM | 5 | A    Yes. |
| 09:34AM | 6 | Q    Phone cases came in and where she at same place.  Is |
| 09:34AM | 7 | Kaimuki misspelled there? |
| 09:35AM | 8 | A    Yes. |
| 09:35AM | 9 | Q    So what were you referring to when you say phone cases |
| 09:35AM | 10 | came in? |
| 09:35AM | 11 | A    The cases for the phone came in. |
| 09:35AM | 12 | Q    Which phone? |
| 09:35AM | 13 | A    For the iPhone. |
| 09:35AM | 14 | Q    The phone that was being used to track Heather Freeman? |
| 09:35AM | 15 | A    Yes. |
| 09:35AM | 16 | Q    Why had you ordered those? |
| 09:35AM | 17 | A    So it would be waterproof so when we put it in the bag. |
| 09:35AM | 18 | Q    You used the plastic bag the first time? |
| 09:35AM | 19 | A    Yes. |
| 09:35AM | 20 | Q    So now you had bought waterproof cases for it? |
| 09:35AM | 21 | A    Yes. |
| 09:35AM | 22 | Q    Who directed you to buy those? |
| 09:35AM | 23 | A    He did, Mike. |
| 09:35AM | 24 | Q    Then you asked, where she at the same place Kaimuki? |
| 09:35AM | 25 |      You are referring to the salon? |

09:35AM    1    A    Yes.

09:35AM    2    Q    And then he responds to you, yes, in the next message?

09:35AM    3    A    Yes.

09:35AM    4    Q    Okay.  So if we go to page 17, you acknowledge, okay,

09:35AM    5    correct?

09:35AM    6    A    Yes.

09:35AM    7    Q    So then he responds with three text messages on that page.

09:35AM    8    Do you see those?

09:35AM    9    A    Yes.

09:35AM   10    Q    How many days he asks first?

09:35AM   11    A    Yes.

09:36AM   12    Q    Did you know what he was referring to there?

09:36AM   13    A    How many days did it last?

09:36AM   14    Q    The charge on the phone?

09:36AM   15    A    Yes.

09:36AM   16    Q    All right.  Then the next one he says, go charge iPhone

09:36AM   17    Plus.

09:36AM   18         That's the iPhone Plus you were using to track Heather

09:36AM   19    Freeman?

09:36AM   20    A    Yes.

09:36AM   21    Q    And then the next message, she gets off at 6.

09:36AM   22         What did that mean?

09:36AM   23    A    That she is leaving work at 6:00.

09:36AM   24    Q    Leaving the salon in Kaimuki?

09:36AM   25    A    Yes.

| | | | |
|---|---|---|---|
| 09:36AM | 1 | Q | Okay.  Do you see your response on the top of page 18 to |
| 09:36AM | 2 | | that? |
| 09:36AM | 3 | A | Yes. |
| 09:36AM | 4 | Q | You say, okay? |
| 09:36AM | 5 | A | Yes. |
| 09:36AM | 6 | Q | Did you go and do as he instructed you? |
| 09:36AM | 7 | A | Yes. |
| 09:36AM | 8 | Q | Okay.  Let me now -- let's look at the next text message |
| 09:36AM | 9 | | on that same page, page 18, but this is a new exchange that |
| 09:36AM | 10 | | begins on 6/16, June 16, 2015.  So Mr. Miske sends you this |
| 09:37AM | 11 | | text message that says that the GPS in Tacoma, question mark, |
| 09:37AM | 12 | | question mark, question mark? |
| 09:37AM | 13 | A | Yes. |
| 09:37AM | 14 | Q | Did you know what he was referring to there? |
| 09:37AM | 15 | A | Yes. |
| 09:37AM | 16 | Q | What was he referring to? |
| 09:37AM | 17 | A | The GPS in the Tacoma. |
| 09:37AM | 18 | Q | Whose Tacoma? |
| 09:37AM | 19 | A | I believe it was Caleb's. |
| 09:37AM | 20 | Q | And what GPS system is this that -- that's being |
| 09:37AM | 21 | | referenced? |
| 09:37AM | 22 | A | To put inside the -- the vehicle, a professional shop has |
| 09:37AM | 23 | | to do it. |
| 09:37AM | 24 | Q | Was this a new GPS that you had acquired? |
| 09:37AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:37AM | 1 | Q | When had you acquired this in relation to this text?  Had |
| 09:37AM | 2 | | it been just recently or had you had it for a while?  Do you |
| 09:37AM | 3 | | recall? |
| 09:37AM | 4 | A | I don't recall. |
| 09:37AM | 5 | Q | Who instructed you to get this GPS that was in the Tacoma? |
| 09:37AM | 6 | A | Mike did. |
| 09:37AM | 7 | Q | What was this GPS going to be used for? |
| 09:37AM | 8 | A | Just to track the vehicle. |
| 09:37AM | 9 | Q | Whose vehicle? |
| 09:37AM | 10 | A | I believe it was Caleb's. |
| 09:37AM | 11 | Q | Caleb owned or drove a Toyota Tacoma? |
| 09:38AM | 12 | A | Yes. |
| 09:38AM | 13 | Q | Was that Toyota Tacoma given to him by Mr. Miske? |
| 09:38AM | 14 | A | Yes. |
| 09:38AM | 15 | Q | So Mr. Miske's next text is, today is Tuesday, correct? |
| 09:38AM | 16 | A | Yes. |
| 09:38AM | 17 | Q | And you respond there, yes, GPS is ready for pick up? |
| 09:38AM | 18 | A | Yes. |
| 09:38AM | 19 | Q | If we could go to page 19.  Then Mr. Miske sends you four |
| 09:38AM | 20 | | consecutive text messages on this page.  Do you see those? |
| 09:38AM | 21 | A | Yes. |
| 09:38AM | 22 | Q | So those say, wait for it to be done.  Make sure it works |
| 09:38AM | 23 | | before you leave.  Tell them to hide this unit good and place |
| 09:38AM | 24 | | it opposite of existing unit.  This is unit number two.  And |
| 09:38AM | 25 | | then the next message is, let her find and take out the other |

09:38AM   1   one.  Make sure they didn't find this one.

09:38AM   2              Do you see those?

09:38AM   3   A    Yes.

09:38AM   4   Q    So these are all -- were all sent on June 18th of 2015,

09:39AM   5   correct?

09:39AM   6   A    Yes.

09:39AM   7   Q    So this is a new and a different conversation than the one

09:39AM   8   with the Tacoma?

09:39AM   9   A    Yes.

09:39AM   10   Q    So what is being discussed by Mr. Miske here?

09:39AM   11   A    Putting a GPS tracking device on Tori Clegg's car.

09:39AM   12   Q    Who is Tori Clegg?

09:39AM   13   A    His other girlfriend.

09:39AM   14   Q    Mr. Miske's -- another of Mr. Miske's girlfriends?

09:39AM   15   A    Yes.

09:39AM   16   Q    Do you know who Tori Clegg was?

09:39AM   17   A    Yes.

09:39AM   18              MR. INCIONG:  Could we leave this exhibit for a

09:39AM   19   moment, please, and show Mr. Freitas Exhibit 1-66, please?

09:39AM   20              THE COURT:  Yes.

09:39AM   21              MR. INCIONG:  Thank you.

09:39AM   22   BY MR. INCIONG:

09:39AM   23   Q    Mr. Freitas, do you recognize the individual in 1-66?

09:39AM   24   A    Yes.

09:39AM   25   Q    Who do you recognize that as?

09:39AM   1   A   Tori Clegg.

09:39AM   2   Q   Does that photo accurately show her as you know Ms. Clegg

09:39AM   3   to look?

09:39AM   4   A   Yes.

09:39AM   5         MR. INCIONG:  Your Honor, I would move to admit 1-66.

09:39AM   6         THE COURT:  It's been admitted.

09:40AM   7         MR. INCIONG:  Oh, thank you.  Could we publish that at

09:40AM   8   this time?

09:40AM   9         THE COURT:  Yes.

09:40AM   10   BY MR. INCIONG:

09:40AM   11   Q   So that is the Tori Clegg that you know?

09:40AM   12   A   Yes.

09:40AM   13   Q   So these texts that we were just referring to were going

09:40AM   14   to be in reference to tracking Ms. Clegg?

09:40AM   15   A   Yes.

09:40AM   16         MR. INCIONG:  Could we go back then, please, to

09:40AM   17   Exhibit 1-637 at page 19?

09:40AM   18   BY MR. INCIONG:

09:40AM   19   Q   Now, I want to ask you specifically in regard to the --

09:40AM   20   the third and fourth messages in this -- on this page.

09:40AM   21         So on the third message, he says, tell them to hide

09:40AM   22   this unit good and place it in opposite of existing unit.  This

09:40AM   23   is unit number two.

09:40AM   24         What is happening there?

09:40AM   25   A   She had a GPS already inside the vehicle and he wanted to

| | | |
|---|---|---|
| 09:40AM | 1 | put another one because she found out where the first one was. |
| 09:40AM | 2 | Q    How did she find the first one? |
| 09:40AM | 3 | A    It was inside the engine part. |
| 09:40AM | 4 | Q    Had you placed that tracker there? |
| 09:41AM | 5 | A    No. |
| 09:41AM | 6 | Q    So the next message says, let her find and take out the |
| 09:41AM | 7 | other one.  Make sure they don't find this one. |
| 09:41AM | 8 | So basically, he was -- he was asking you to replace |
| 09:41AM | 9 | the one that she had found? |
| 09:41AM | 10 | A    No.  Leave that one inside and put another one inside. |
| 09:41AM | 11 | Q    I see.  Did you do that? |
| 09:41AM | 12 | A    Yes. |
| 09:41AM | 13 | Q    Could we go to next page, please?  Page 20.  He sends you |
| 09:41AM | 14 | some additional texts that same day June 18th of 2015.  Do you |
| 09:41AM | 15 | see the first one, The app is in my phone? |
| 09:41AM | 16 | A    Yes. |
| 09:41AM | 17 | Q    What is he talking about there? |
| 09:41AM | 18 | A    He has an app for that tracking device in his phone. |
| 09:41AM | 19 | Q    So he could track the -- the location of the person from |
| 09:41AM | 20 | your cell phone? |
| 09:41AM | 21 | A    Yes. |
| 09:41AM | 22 | Q    Remotely? |
| 09:41AM | 23 | A    Yes. |
| 09:41AM | 24 | Q    Then below that he says, so I can check if it's working? |
| 09:42AM | 25 | A    Yes. |

09:42AM  1   Q    That's reference to the -- the app that you just talked

09:42AM  2   about?

09:42AM  3   A    Yes.

09:42AM  4   Q    Then the third message says, going to need you to recharge

09:42AM  5   that iPhone Plus after 2 today same work location.

09:42AM  6            So this is a -- a new date.  Let me make that clear.

09:42AM  7   So do you see the date there?  This is June 26th of 2015?

09:42AM  8   A    Yes.

09:42AM  9   Q    Now, is he talking about going back to a different

09:42AM  10  tracker?

09:42AM  11  A    Yes.

09:42AM  12  Q    And which tracker is this in reference to?

09:42AM  13  A    The charger for the phone is going to be Heather's.

09:42AM  14  Q    And so this is the same work location?  Is that the -- the

09:42AM  15  salon in Kaimuki?

09:42AM  16  A    Yes.

09:42AM  17  Q    All right.  Let me skip forward then to page 24 of this

09:42AM  18  exhibit, please.  Starting with the -- the first blue bubble.

09:43AM  19            MR. INCIONG:  Oh, I'm sorry.  Could we have this

09:43AM  20  published, Your Honor?  I don't think it's showing -- showing

09:43AM  21  on the -- on the screen.  There we go, thank you.

09:43AM  22            THE COURT:  This is a page from the same exhibit we've

09:43AM  23  been talking about.

09:43AM  24            MR. INCIONG:  Yes.  Page 24 of Exhibit 1-637.

09:43AM  25            THE COURT:  Go ahead.

09:43AM  1   BY MR. INCIONG:

09:43AM  2   Q    So in this text, do you see that was sent on August 28th

09:43AM  3   of 2015?

09:43AM  4   A    Yes.

09:43AM  5   Q    Was this sent to you or someone else as well?

09:43AM  6   A    It was sent to John Blane.  John Stancil.

09:43AM  7   Q    As well as yourself?

09:43AM  8   A    Yes.

09:43AM  9   Q    And this text says, Kaulana, just to let you know, I got a

09:43AM 10   call inquiring about your whereabouts from someone who called

09:43AM 11   someone that I wouldn't personally take lightly.  He said you

09:43AM 12   ripped him for 10K and is now looking for you.  I'm not sure

09:43AM 13   what the truth is but wanted to give you a heads up.  Let me

09:43AM 14   know if you need that type of help.  Although I want to

09:44AM 15   personally slap you, I won't let anyone else.

09:44AM 16        Did you know what Mr. Miske was referring to when --

09:44AM 17   when you read that text?

09:44AM 18   A    Yes.

09:44AM 19   Q    What was he referring to?

09:44AM 20   A    I ripped off Eric Lum of three pounds of marijuana.

09:44AM 21   Q    Who is Eric Lum?

09:44AM 22   A    A friend.

09:44AM 23   Q    Did you do that by yourself or with someone else?

09:44AM 24   A    I did it with John.

09:44AM 25   Q    John Stancil?

09:44AM   1   A   Yes.

09:44AM   2   Q   How did you guys set up this robbery?

09:44AM   3   A   I set it up.

09:44AM   4   Q   What was the -- what was the plan that you put in place?

09:44AM   5   A   To purchase three pounds of marijuana.

09:44AM   6   Q   And did you set up a meeting with Mr. Lum to -- to get

09:44AM   7   that marijuana?

09:44AM   8   A   Yes.

09:44AM   9   Q   Were you falsely telling him that you were going to buy

09:44AM   10   the marijuana?

09:44AM   11   A   Yes.

09:44AM   12   Q   Where was that meeting?

09:44AM   13   A   24 hours in Kaneohe.

09:44AM   14   Q   24 hours?

09:45AM   15   A   24 Hour Fitness.

09:45AM   16   Q   Did Mr. Lum show up at the meeting?

09:45AM   17   A   Yes.

09:45AM   18   Q   Were you there with Mr. Stancil?

09:45AM   19   A   Yes.

09:45AM   20   Q   What happened when you folks all met?

09:45AM   21   A   I went to Eric.  I met Eric.  I went into his vehicle,

09:45AM   22   told him I'll be back, and we took off.

09:45AM   23   Q   You never intended to pay him?

09:45AM   24   A   No.

09:45AM   25   Q   Did he object or chase you or what happened?

| | | | |
|---|---|---|---|
| 09:45AM | 1 | A | Nothing happened.  He didn't chase me. |
| 09:45AM | 2 | Q | Okay.  But later now you're finding out he did have a |
| 09:45AM | 3 | | problem? |
| 09:45AM | 4 | A | Yes. |
| 09:45AM | 5 | Q | Okay.  Did your association with Mr. Miske play any part |
| 09:45AM | 6 | | in your decision to do that robbery? |
| 09:45AM | 7 | A | No. |
| 09:45AM | 8 | Q | Did Mr. Miske have a problem with you doing that robbery? |
| 09:45AM | 9 | A | Yes. |
| 09:45AM | 10 | Q | And that's what he is showing in here in the first text |
| 09:45AM | 11 | | message? |
| 09:45AM | 12 | A | Yes. |
| 09:45AM | 13 | Q | Okay.  So let's look at the second text message.  What |
| 09:45AM | 14 | | about this 10K rip? |
| 09:45AM | 15 | | So the rip is referring to robbery? |
| 09:45AM | 16 | A | Yes. |
| 09:45AM | 17 | Q | What is the 10K referring to? |
| 09:46AM | 18 | A | It was worth about 10,000. |
| 09:46AM | 19 | Q | That was the three pounds of marijuana? |
| 09:46AM | 20 | A | Yes. |
| 09:46AM | 21 | Q | He then sends the next text, you evading the question? |
| 09:46AM | 22 | | You see that? |
| 09:46AM | 23 | A | Yes. |
| 09:46AM | 24 | Q | Then if we could go to page 25.  He sends two more texts |
| 09:46AM | 25 | | to you.  All within that same time frame.  The 10K? |

| | | | |
|---|---|---|---|
| 09:46AM | 1 | A | Yes. |
| 09:46AM | 2 | Q | And true, question mark? |
| 09:46AM | 3 | A | Yes. |
| 09:46AM | 4 | Q | So do you see your first response to him at the bottom of |
| 09:46AM | 5 | | page 25? |
| 09:46AM | 6 | A | Yes. |
| 09:46AM | 7 | Q | You say for anybody else, no, but for you, you already |
| 09:46AM | 8 | | know. |
| 09:46AM | 9 | | What did you mean by that? |
| 09:46AM | 10 | A | That I did the robbery. |
| 09:46AM | 11 | Q | And so what did you mean for -- what did you mean by for |
| 09:46AM | 12 | | anybody else, no? |
| 09:46AM | 13 | A | If anybody asks questions. |
| 09:46AM | 14 | Q | Did you see his response then on the next page, page 26? |
| 09:47AM | 15 | | Starting with the top text message.  They're actually |
| 09:47AM | 16 | | duplicates so -- oh, I take that back.  If we can just look at |
| 09:47AM | 17 | | the top one there, thank you. |
| 09:47AM | 18 | | Mr. Miske texts you.  Kaulana, you knew that was my |
| 09:47AM | 19 | | F'ing friend's nephew beforehand and you still F'ing did it, |
| 09:47AM | 20 | | question mark, question mark, question mark.  What about my |
| 09:47AM | 21 | | relationship with his uncle?  Now, his uncle calling me for |
| 09:47AM | 22 | | help, exclamation point, exclamation point, exclamation point. |
| 09:47AM | 23 | | What if his uncle call Sudee?  You two dumb fukas.  The |
| 09:47AM | 24 | | position you two dumb fucks put me in, exclamation, |
| 09:47AM | 25 | | exclamation.  You know how close Nate is to Bruce, question |

09:47AM   1   mark, question mark, question mark.  You know that's my circle

09:47AM   2   and you still do it.  Now what, question mark, question mark,

09:47AM   3   question mark.  I going have to pay back your guys F'ing rip

09:47AM   4   just because you affiliated with me.

09:47AM   5         You remember that?

09:47AM   6   A    Yes.

09:47AM   7   Q    Did you understand everything that was going on there?

09:48AM   8   A    Yes.

09:48AM   9   Q    So in the first line, he says, that was my F'ing friend's

09:48AM  10   nephew.

09:48AM  11         Did you know what friend he was referring to?

09:48AM  12   A    Yes.

09:48AM  13   Q    Who was the friend he was referring to?

09:48AM  14   A    Nate Lum.

09:48AM  15   Q    So when he says, what about my relationship with his

09:48AM  16   uncle, Nate Lum is the uncle?

09:48AM  17   A    Yes.

09:48AM  18   Q    Did you know Nate Lum?

09:48AM  19   A    No.

09:48AM  20   Q    Did you know what Mr. Lum's relationship was with Mike

09:48AM  21   Miske?

09:48AM  22   A    It was friends.

09:48AM  23   Q    This next sentence is, now his uncle calling me for help.

09:48AM  24         So that's Nate Lum?

09:48AM  25   A    Uh-hm.

09:48AM    1    Q    So the next sentence then is, what if his uncle call

09:48AM    2    Sudee?

09:48AM    3         Who is Sudee?

09:48AM    4    A    Mike's friend.

09:48AM    5    Q    Did you know Sudee?

09:48AM    6    A    Yes.

09:48AM    7    Q    What's Sudee's last name?

09:48AM    8    A    I don't know.

09:48AM    9    Q    Did you know why there might be the possibility that Nate

09:48AM    10   Lum would call Sudee?

09:48AM    11        MR. KENNEDY:  Objection, speculation, Your Honor.

09:48AM    12        THE COURT:  Overruled.  Go ahead, if you know.

09:48AM    13        THE WITNESS:  No, I don't know.

09:49AM    14   BY MR. INCIONG:

09:49AM    15   Q    Was Sudee somebody that you feared?

09:49AM    16   A    No.

09:49AM    17   Q    Did you know if Mr. Miske feared him?

09:49AM    18   A    No.

09:49AM    19   Q    So then the two sentences down the question is asked, you

09:49AM    20   know how close Nate is to Bruce.

09:49AM    21        Did you know who Bruce was?

09:49AM    22   A    Yes.

09:49AM    23   Q    Who is Bruce?

09:49AM    24   A    Bruce Perry.

09:49AM    25   Q    How do you know Bruce Perry?

| | | | |
|---|---|---|---|
| 09:49AM | 1 | A | From Mike. |
| 09:49AM | 2 | Q | What is -- what do you know of Bruce Perry? |
| 09:49AM | 3 | A | Nothing. |
| 09:49AM | 4 | Q | Okay.  Do you know what their relationship was? |
| 09:49AM | 5 | A | No. |
| 09:49AM | 6 | Q | He said, you know that's my circle and you still do it. |
| 09:49AM | 7 | | Now what I'm going to have to pay back your guys just because |
| 09:49AM | 8 | | you affiliated with me. |
| 09:49AM | 9 | | Affiliated with you, what did you understand that to |
| 09:49AM | 10 | | mean? |
| 09:49AM | 11 | A | That was -- John was Mike's half brother and I was his |
| 09:49AM | 12 | | cousin. |
| 09:49AM | 13 | Q | Okay.  Let's go to page 27, please.  At the top of that, |
| 09:50AM | 14 | | the first text messages, is that an attachment, a screenshot? |
| 09:50AM | 15 | A | Yes. |
| 09:50AM | 16 | Q | That Mr. Miske sent you? |
| 09:50AM | 17 | A | Yes. |
| 09:50AM | 18 | | MR. INCIONG:  Could we go to -- and I apologize.  It |
| 09:50AM | 19 | | is not numbered as you indicated, Your Honor, but it's the |
| 09:50AM | 20 | | second to the last page of this document.  Exhibit 1-637. |
| 09:50AM | 21 | | Second to the last page.  There we go. |
| 09:50AM | 22 | | BY MR. INCIONG: |
| 09:50AM | 23 | Q | Is -- is this the attachment that you saw there attached |
| 09:50AM | 24 | | to that text? |
| 09:50AM | 25 | A | Yes. |

09:50AM   1   Q   Can you see who that message is from to Mr. Miske?

09:50AM   2   A   Yes.

09:50AM   3   Q   Or -- or who it's to, I should say.  What name is there?

09:50AM   4   A   Nate Lum.

09:50AM   5   Q   And that message says, or the bottom half says, braddah, I

09:50AM   6   need to ask you for help.

09:51AM   7       And the response, yeah, what's up?

09:51AM   8   A   Yes.

09:51AM   9   Q   So you responded to that, correct, on page 27, if you can

09:51AM  10   go back there.  In the green bubble, that's your response,

09:51AM  11   correct?

09:51AM  12   A   Yes.

09:51AM  13   Q   And you tell him I never know that was your friend's

09:51AM  14   nephew?

09:51AM  15   A   Yes.

09:51AM  16   Q   Is that true?

09:51AM  17   A   Yes.

09:51AM  18   Q   What was Mr. Miske's response to that at the bottom of

09:51AM  19   page 27?

09:51AM  20   A   Fuck you.

09:51AM  21   Q   And if we go to next page, top of page 28, what was the

09:51AM  22   next text that Mr. Miske sent you?

09:51AM  23   A   You fucking knew you lying fuck.

09:51AM  24   Q   You respond to him following that, I promise I didn't?

09:51AM  25   A   Yes.

| | | |
|---|---|---|
| 09:51AM | 1 | Q    So what did Mr. Miske respond to you at the bottom of that |
| 09:51AM | 2 | page in those next two texts? |
| 09:51AM | 3 | A    Doesn't matter now.  You better figure it out how the fuck |
| 09:52AM | 4 | you going to pay it back. |
| 09:52AM | 5 | Q    And the next text says what? |
| 09:52AM | 6 | A    Fuck you.  Don't show your face around the fucking club |
| 09:52AM | 7 | both of you. |
| 09:52AM | 8 | Q    So the -- the club is -- what did you understand that to |
| 09:52AM | 9 | mean? |
| 09:52AM | 10 | A    M Nightclub. |
| 09:52AM | 11 | Q    And both of you is who? |
| 09:52AM | 12 | A    John Stancil and me. |
| 09:52AM | 13 | Q    So did you understand that basically you were being banned |
| 09:52AM | 14 | from the club at that point? |
| 09:52AM | 15 | A    Yes. |
| 09:52AM | 16 | Q    The place where you had had free drinks, free entry, free |
| 09:52AM | 17 | food for -- for two years? |
| 09:52AM | 18 | A    Yes. |
| 09:52AM | 19 | Q    Could we go and look at the next two texts from Mr. Miske |
| 09:52AM | 20 | on the top of page 29?  Well, just the first one, I'm sorry, to |
| 09:52AM | 21 | start. |
| 09:52AM | 22 |       So the last text in this chain on August 29th of 2015 |
| 09:52AM | 23 | is, these guys don't play.  And you put me and Miller in a bad |
| 09:53AM | 24 | spot because you a dumb fuck. |
| 09:53AM | 25 |       What do you understand that to mean? |

| | | | |
|---|---|---|---|
| 09:53AM | 1 | A | That he's in a bad spot. |
| 09:53AM | 2 | Q | Meaning what did he have to do? |
| 09:53AM | 3 | A | Pay back the 10,000. |
| 09:53AM | 4 | Q | You put me and Miller.  Who is Miller? |
| 09:53AM | 5 | A | Wayne Miller. |
| 09:53AM | 6 | Q | Why was Wayne Miller in a bad spot, if you know? |
| 09:53AM | 7 | A | I don't know. |
| 09:53AM | 8 | Q | So did Mr. Miske protect you on this deal? |
| 09:53AM | 9 | A | Yes. |
| 09:53AM | 10 | Q | Did you later learn that other people had come looking for |
| 09:53AM | 11 | | you for pay back of some sort on the same deal? |
| 09:53AM | 12 | A | Yes. |
| 09:53AM | 13 | Q | How did you learn about that? |
| 09:53AM | 14 | A | They came to the shop. |
| 09:53AM | 15 | Q | Did you know who the person was that came to the shop? |
| 09:53AM | 16 | A | No. |
| 09:53AM | 17 | Q | How would you describe that person? |
| 09:53AM | 18 | A | That person was a few guys and some of them was big. |
| 09:53AM | 19 | Q | You were there at the time? |
| 09:53AM | 20 | A | No. |
| 09:53AM | 21 | Q | How did you find out they came? |
| 09:54AM | 22 | A | Mike told me. |
| 09:54AM | 23 | Q | They came looking for you? |
| 09:54AM | 24 | A | Yes. |
| 09:54AM | 25 | Q | Not to have a friendly conversation, I take it? |

| | | | |
|---|---|---|---|
| 09:54AM | 1 | A | No. |
| 09:54AM | 2 | Q | Did Mr. Miske take care of that? |
| 09:54AM | 3 | A | Yes. |
| 09:54AM | 4 | Q | So he protected you? |
| 09:54AM | 5 | A | Yes. |
| 09:54AM | 6 | Q | And that was some of the benefits that you talked about |
| 09:54AM | 7 | | earlier? |
| 09:54AM | 8 | A | Yes. |
| 09:54AM | 9 | Q | You knew you could get away with doing this kind of stuff? |
| 09:54AM | 10 | A | Yes. |
| 09:54AM | 11 | Q | Okay.  Let me go then to the next message on that page, |
| 09:54AM | 12 | | which is a different now chat, different date on September 6th |
| 09:54AM | 13 | | of 2015.  Mr. Miske sends you a text, "Where did you put box |
| 09:54AM | 14 | | exactly on Lex?"? |
| 09:54AM | 15 | | Do you recall that? |
| 09:54AM | 16 | A | Yes. |
| 09:54AM | 17 | Q | Did you know what he meant by that? |
| 09:54AM | 18 | A | Yes. |
| 09:54AM | 19 | Q | What did he mean? |
| 09:54AM | 20 | A | The GPS device. |
| 09:54AM | 21 | Q | And Lex, what was that? |
| 09:54AM | 22 | A | The Lexus. |
| 09:54AM | 23 | Q | Whose vehicle? |
| 09:54AM | 24 | A | It was Heather's. |
| 09:54AM | 25 | Q | Do you see a response to that message? |

| | | | |
|---|---|---|---|
| 09:55AM | 1 | A | Yes. |
| 09:55AM | 2 | Q | So you offer to change it if he wants you to? |
| 09:55AM | 3 | A | Yes. |
| 09:55AM | 4 | Q | And then the next message, you say, "On both, Bro." |
| 09:55AM | 5 | | So what did that mean "on both"? |
| 09:55AM | 6 | A | I'm not too sure.  I don't recall or recollect on both. |
| 09:55AM | 7 | Q | All right.  Go to the next message then maybe that will |
| 09:55AM | 8 | | refresh your memory.  If you look at this text you sent on |
| 09:55AM | 9 | | September 6th, you see that where you said, "Passenger back |
| 09:55AM | 10 | | tire on the frame." |
| 09:55AM | 11 | A | Yes. |
| 09:55AM | 12 | Q | Then his response is, "Grab them both.  I'll let you know |
| 09:55AM | 13 | | where they are at some point soon." |
| 09:55AM | 14 | | And then you say, "Okay, let us know." |
| 09:55AM | 15 | A | Okay. |
| 09:55AM | 16 | Q | Do you recall now? |
| 09:55AM | 17 | A | Yes. |
| 09:55AM | 18 | Q | So what was happening here? |
| 09:55AM | 19 | A | I was switching out the GPS devices on the Lexus. |
| 09:55AM | 20 | Q | Was it more than one? |
| 09:55AM | 21 | A | I believe it was two. |
| 09:55AM | 22 | Q | Okay.  So Mr. Miske responds to you, I searched under the |
| 09:56AM | 23 | | Lexus and can't find it. |
| 09:56AM | 24 | | Do you see that on the bottom of page 30? |
| 09:56AM | 25 | A | Yes. |

09:56AM     1    Q    And if we go to page 31, do you see your response?

09:56AM     2    A    Yes.

09:56AM     3    Q    You tell him FaceTime me; I can show you?

09:56AM     4    A    Yes.

09:56AM     5    Q    And then do you describe -- is that what you're doing in

09:56AM     6    the next message you're describing specifically where it is?

09:56AM     7    A    Yes.

09:56AM     8    Q    The passenger back tire -- the frame behind it.  If you're

09:56AM     9    looking at the tire, it's on the right top side of frame.

09:56AM     10         Is that where you had put that tracker?

09:56AM     11   A    Yes.

09:56AM     12   Q    Do you see Mr. Miske's response to that at the bottom of

09:56AM     13   page 31?

09:56AM     14   A    Yes.

09:56AM     15   Q    I can't now.  She works tomorrow at 10:30.  Grab it there.

09:56AM     16         So where was that -- where was "there"?

09:56AM     17   A    At the salon where she works.

09:56AM     18   Q    The same salon in Kaimuki?

09:56AM     19   A    Yes.

09:56AM     20   Q    Where Heather Freeman worked?

09:56AM     21   A    Yes.

09:56AM     22   Q    Then you respond on the top of page 32, you say, okay?

09:57AM     23   A    Yes.

09:57AM     24   Q    All right.  So if we go now to the -- this is a new chat

09:57AM     25   now, a new date on that same page, the middle bubble on page

09:57AM   1   32.   Mr. Miske sends you this text on November 7, 2015,

09:57AM   2   correct?

09:57AM   3   A    Yes.

09:57AM   4   Q    Does he send it to you and to John Stancil again, John

09:57AM   5   Blane shown on this text?

09:57AM   6   A    Yes.

09:57AM   7   Q    Was this a flier of some sort that was attached to the --

09:57AM   8   to the text message?

09:57AM   9   A    Yes.

09:57AM   10  Q    Okay.  If we could go to very last page of this document,

09:57AM   11  Exhibit 6-137, do you see that?

09:57AM   12  A    Yes.

09:57AM   13  Q    Is that the flier that was attached to the text message

09:57AM   14  sent on November 7th?

09:57AM   15  A    Yes.

09:57AM   16  Q    What was this flier for?

09:57AM   17  A    Wayne Miller's son's first birthday.

09:57AM   18  Q    Okay.  So this is John Duke's first birthday barbecue at

09:58AM   19  Makaha Valley Riding Stables?

09:58AM   20  A    Yes.

09:58AM   21  Q    Okay.  All right.  We go back to page 32.

09:58AM   22       THE COURT:  This is the last page of Exhibit 1-637,

09:58AM   23  right?

09:58AM   24       MR. INCIONG:  Correct, Your Honor, thank you.

09:58AM   25  BY MR. INCIONG:

| | | | |
|---|---|---|---|
| 09:58AM | 1 | Q | So we're going to go back to number page 32 of that same |
| 09:58AM | 2 | | exhibit.  After he -- after Mr. Miske sent you the flier, he |
| 09:58AM | 3 | | sends you a text, correct? |
| 09:58AM | 4 | A | Yes. |
| 09:58AM | 5 | Q | Don't forget this? |
| 09:58AM | 6 | A | Yes. |
| 09:58AM | 7 | Q | Okay.  Can we go to next page, page 33?  He sends three |
| 09:58AM | 8 | | more texts within it's important? |
| 09:58AM | 9 | A | Yes. |
| 09:58AM | 10 | Q | Next text says 11:30. |
| 09:58AM | 11 | | That was the time that it was being held? |
| 09:58AM | 12 | A | Yes. |
| 09:58AM | 13 | Q | The next text is, Makaha? |
| 09:58AM | 14 | A | Yes. |
| 09:58AM | 15 | Q | That's the location.  And then if we go to page 34, the |
| 09:58AM | 16 | | next text says, don't be late, correct? |
| 09:58AM | 17 | A | Yes. |
| 09:58AM | 18 | Q | And then if we look at the final text message sent on that |
| 09:59AM | 19 | | page on November 7, 2015, what does Mr. Miske text you and John |
| 09:59AM | 20 | | Stancil? |
| 09:59AM | 21 | A | If you two fucking idiots don't reply and don't show for |
| 09:59AM | 22 | | Miller's baby party, you're going to lose every fucking |
| 09:59AM | 23 | | privilege within my circle.  Understand that dummies. |
| 09:59AM | 24 | Q | What did you understand that to mean? |
| 09:59AM | 25 | A | That me and John Stancil will lose all the privilege in |

09:59AM    1    his circle.

09:59AM    2    Q    So these are some of the privileges that you talked about

09:59AM    3    before that you would get the job opportunities?

09:59AM    4    A    Yes.

09:59AM    5    Q    Money?

09:59AM    6    A    Yes.

09:59AM    7    Q    Drinking for free, etcetera, at the M?

09:59AM    8    A    Yes.

09:59AM    9    Q    Protection.  And you -- and he was threatening to take

09:59AM   10    those away from you?

09:59AM   11    A    Yes.

09:59AM   12    Q    Was it these reasons at least part of why you committed

09:59AM   13    the things like the assault and the chemical weapon attack?

09:59AM   14    A    Yes.

10:00AM   15             MS. PANAGAKOS:  Your Honor, if we're going change

10:00AM   16    subjects, could we take a recess now?  Our team has an urgent

10:00AM   17    need for a recess.

10:00AM   18             THE COURT:  You have a -- I'm sorry, I missed the last

10:00AM   19    part.

10:00AM   20             MS. PANAGAKOS:  Our team has an urgent need for a

10:00AM   21    recess.

10:00AM   22             THE COURT:  All right.  Any objection, Mr. Inciong?

10:00AM   23             MR. INCIONG:  That's all right.

10:00AM   24             THE COURT:  We're a little bit early on the break but

10:00AM   25    that's fine.  We're at 10:00.  As we go to break, I'll remind

10:00AM    1    our jurors to please refrain from discussing the substance of

10:00AM    2    this case with anyone, including one another, until I advise

10:00AM    3    otherwise; refrain from accessing, please, any media or other

10:00AM    4    accounts of this case that may be out there; and finally,

10:00AM    5    please do not conduct any independent investigation into the

10:00AM    6    facts, circumstances or persons involved.

10:00AM    7          Ms. Panagakos, just let Ms. Kimura know when you're

10:00AM    8    ready to resume.

10:00AM    9          (Proceedings were recessed at 10:00 a.m. to 10:23

10:23AM   10    a.m.)

10:23AM   11          THE COURT:  All right.  Back from our first morning

10:23AM   12    break of the trial day.

10:23AM   13          Mr. Inciong, you may resume with your examination of

10:23AM   14    Mr. Freitas.

10:23AM   15          MR. INCIONG:  Thank you, Your Honor.

10:23AM   16    BY MR. INCIONG:

10:23AM   17    Q    Mr. Freitas, when we had left off, we had discussed the

10:23AM   18    birthday party for Wayne Miller's son that was going to occur

10:23AM   19    in November of 2015.  Do you recall that?

10:23AM   20    A    Yes.

10:23AM   21    Q    Shortly after that birthday party, did you learn that

10:23AM   22    there'd been a serious car accident involving Caleb Miske and

10:23AM   23    Jonathan Fraser?

10:23AM   24    A    Yes.

10:23AM   25    Q    How did you learn about that?

| | | | |
|---|---|---|---|
| 10:23AM | 1 | A | From my family. |
| 10:23AM | 2 | Q | Did you respond to the hospital and -- once you got that |
| 10:23AM | 3 | | news? |
| 10:23AM | 4 | A | Yes. |
| 10:23AM | 5 | Q | Do you recall where Mr. Fraser and Mr. Miske were being |
| 10:23AM | 6 | | treated? |
| 10:23AM | 7 | A | Yes. |
| 10:23AM | 8 | Q | Where was that? |
| 10:23AM | 9 | A | Queens. |
| 10:24AM | 10 | Q | So what did you observe or see when you got to Queens |
| 10:24AM | 11 | | Hospital? |
| 10:24AM | 12 | A | Caleb in the hospital bed. |
| 10:24AM | 13 | Q | This was a serious car accident, correct? |
| 10:24AM | 14 | A | Yes. |
| 10:24AM | 15 | Q | Both -- both Mr. Fraser and Mr. Miske were in bad shape? |
| 10:24AM | 16 | A | Yes. |
| 10:24AM | 17 | Q | You indicated that you had gotten to know Caleb fairly |
| 10:24AM | 18 | | well, true? |
| 10:24AM | 19 | A | Yes. |
| 10:24AM | 20 | Q | Now, you mentioned that you knew Mr. Fraser and described |
| 10:24AM | 21 | | the incident about a year before where he had tried to retrieve |
| 10:24AM | 22 | | the watch from him at Kaneohe district park? |
| 10:24AM | 23 | A | Yes. |
| 10:24AM | 24 | Q | Had you had any other contact with Mr. Fraser since then? |
| 10:24AM | 25 | A | I seen him here and there. |

10:24AM    1    Q    What were your impressions of Jonathan Fraser?

10:24AM    2    A    Good kid.

10:24AM    3    Q    He had never held a grudge or anything against you despite

10:24AM    4    what had happened at the Kaneohe district park?

10:25AM    5    A    No, sir.

10:25AM    6         MR. INCIONG:  So could I show Mr. Freitas only

10:25AM    7    Exhibit 1-32, please?

10:25AM    8         THE COURT:  Go ahead.

10:25AM    9    BY MR. INCIONG:

10:25AM   10    Q    Do you recognize who's shown in this photograph, sir?

10:25AM   11    A    Yes.

10:25AM   12    Q    Who do you recognize that as?

10:25AM   13    A    Jonathan Fraser.

10:25AM   14    Q    And does that show Mr. Fraser's appearance about the time

10:25AM   15    of the accident or shortly thereof?

10:25AM   16    A    Yes.

10:25AM   17    Q    Okay.  Now, you previously identified a -- a picture of

10:25AM   18    Mr. Fraser in this trial, correct?

10:25AM   19    A    Yes.

10:25AM   20    Q    Does he look significantly different in these two photos?

10:25AM   21    A    Yes.

10:25AM   22    Q    What is the -- the main difference that you see?

10:25AM   23    A    His hair.

10:25AM   24    Q    Besides the hair though, do you recognize this as being a

10:25AM   25    photo of Mr. Fraser showing him as he appeared in 2015?

10:25AM   1   A    Yes.

10:25AM   2           MR. INCIONG:  Your Honor, I believe this has been

10:25AM   3   admitted into evidence, so I -- I would ask to publish it.

10:25AM   4           THE COURT:  It has and you may.

10:25AM   5           MR. INCIONG:  Thank you.

10:25AM   6   BY MR. INCIONG:

10:25AM   7   Q    So this is Mr. Fraser with his -- just hair much longer

10:26AM   8   than the -- the other photo that you were shown yesterday?

10:26AM   9   A    Yes.

10:26AM   10          MR. INCIONG:  Okay.  We can take that down.

10:26AM   11  BY MR. INCIONG:

10:26AM   12  Q    So what was the mood like at the hospital would you say

10:26AM   13  when you got there?

10:26AM   14  A    Everybody was sad.

10:26AM   15  Q    Okay.  There were lots of family there?

10:26AM   16  A    Yes.

10:26AM   17  Q    Was Mr. Miske there?

10:26AM   18  A    Yes.

10:26AM   19  Q    Did you have any interaction with him?

10:26AM   20  A    A brief.

10:26AM   21  Q    So it was -- it was a tough time for everyone in the

10:26AM   22  family?

10:26AM   23  A    Yes.

10:26AM   24  Q    Did you visit the hospital on a number of occasions after

10:26AM   25  that?

10:26AM  1   A   Two -- two times maybe three times.

10:26AM  2   Q   Did you stop visiting the hospital?

10:26AM  3   A   Yes.

10:26AM  4   Q   Was there a reason why you stopped?

10:26AM  5   A   Mike kicked me out.

10:26AM  6   Q   Mike Miske kicked you out?

10:26AM  7   A   Yes.

10:26AM  8   Q   Why?

10:26AM  9   A   One night I was in town and my car ran out of gas and I

10:26AM  10  put gas at the Shell gas station.  It was like $20.  He was

10:27AM  11  upset that I stole from him.

10:27AM  12  Q   Had you used a -- a company credit card or something?

10:27AM  13  A   No.

10:27AM  14  Q   What do you mean by he thought you stole from him?

10:27AM  15  A   So when I fill up gas, the gas station people at Shell

10:27AM  16  knows me as working for Mike and the businesses.

10:27AM  17  Q   Okay.

10:27AM  18  A   So they just -- I tell them what pump number and I can

10:27AM  19  fill up gas.

10:27AM  20  Q   Okay.

10:27AM  21  A   At that time, I wasn't working for Mike.

10:27AM  22  Q   Okay.  So this is one of the times you'd been fired?

10:27AM  23  A   Yes.

10:27AM  24  Q   All right.  So you just didn't have money to pay at that

10:27AM  25  time?

| | | | |
|---|---|---|---|
| 10:27AM | 1 | A | Yes. |
| 10:27AM | 2 | Q | All right.  So you filled up with $20 you said? |
| 10:27AM | 3 | A | Yes, I believe $20. |
| 10:27AM | 4 | Q | Did Mr. Miske find out about that? |
| 10:27AM | 5 | A | Yes. |
| 10:27AM | 6 | Q | Did he bring that to your attention? |
| 10:27AM | 7 | A | Yes. |
| 10:27AM | 8 | Q | Where was that? |
| 10:27AM | 9 | A | At the hospital. |
| 10:27AM | 10 | Q | So what did he tell you when he saw you at the hospital? |
| 10:27AM | 11 | A | Stay the fuck away from my family.  You're no longer |
| 10:28AM | 12 | | welcome. |
| 10:28AM | 13 | Q | Did that -- |
| 10:28AM | 14 | A | He grabbed me by my next and escorted me out the hospital. |
| 10:28AM | 15 | Q | Was there any other reason that you know of other than |
| 10:28AM | 16 | | the -- this gas thing that made him so angry? |
| 10:28AM | 17 | A | Probably not me showing up for Caleb but it was hard for |
| 10:28AM | 18 | | me to show up. |
| 10:28AM | 19 | Q | So you weren't not visiting him regularly? |
| 10:28AM | 20 | A | No. |
| 10:28AM | 21 | Q | Explain why it was hard for you to -- to go there? |
| 10:28AM | 22 | A | Because that day I was supposed to be with him and I |
| 10:28AM | 23 | | didn't go with him. |
| 10:28AM | 24 | Q | The day of the accident you're referring to? |
| 10:28AM | 25 | A | Yes. |

| 10:28AM | 1 | Q | But did you for some reason feel guilty about that? |
| 10:28AM | 2 | A | Yes, I did. |
| 10:28AM | 3 | Q | Even though it was a random car accident? |
| 10:28AM | 4 | A | No. |
| 10:28AM | 5 | Q | Did you explain that to Mr. Miske? |
| 10:29AM | 6 | A | No, I never did. |
| 10:29AM | 7 | Q | Did you ever go back to the hospital after that date? |
| 10:29AM | 8 | A | No. |
| 10:29AM | 9 | Q | Did you, in fact, leave town at some point after that? |
| 10:29AM | 10 | A | Yes.  I moved back to Vegas. |
| 10:29AM | 11 | | THE COURT REPORTER:  You said you moved back to? |
| 10:29AM | 12 | | THE WITNESS:  Vegas. |
| 10:29AM | 13 | BY MR. INCIONG: | |
| 10:29AM | 14 | Q | Why did you move back to Vegas? |
| 10:29AM | 15 | A | To -- for employment. |
| 10:29AM | 16 | Q | Did you find employment there? |
| 10:29AM | 17 | A | Yes. |
| 10:29AM | 18 | Q | What were you doing there? |
| 10:29AM | 19 | A | I did tile.  I worked for the union. |
| 10:29AM | 20 | Q | So if we fast forward then to the following year of March |
| 10:29AM | 21 | | of 2016, did you find out that Caleb had passed away? |
| 10:29AM | 22 | A | Yes. |
| 10:29AM | 23 | Q | How did you find out about that? |
| 10:29AM | 24 | A | I got a call from my dad saying that Caleb passed away. |
| 10:29AM | 25 | Q | You were still in Las Vegas at the time? |

| | | | |
|---|---|---|---|
| 10:29AM | 1 | A | Yes. |
| 10:29AM | 2 | Q | Did you come back to Hawaii relatively soon after that? |
| 10:30AM | 3 | A | Yes.  I came back for the funeral. |
| 10:30AM | 4 | Q | Did you attend the funeral? |
| 10:30AM | 5 | A | Yes. |
| 10:30AM | 6 | Q | While you were in Las Vegas, did you stay in touch with |
| 10:30AM | 7 | | any of your cousins or family? |
| 10:30AM | 8 | A | I stayed in touch with my cousin John. |
| 10:30AM | 9 | Q | John Stancil? |
| 10:30AM | 10 | A | Yes. |
| 10:30AM | 11 | Q | Okay.  Your relationship was good? |
| 10:30AM | 12 | A | Yes. |
| 10:30AM | 13 | Q | It was not unchanged by what had happened? |
| 10:30AM | 14 | A | No. |
| 10:30AM | 15 | Q | When you came back to Hawaii, were things eventually |
| 10:30AM | 16 | | patched up at least a bit with you and Mr. Miske? |
| 10:30AM | 17 | A | Yes. |
| 10:30AM | 18 | Q | How did that happen? |
| 10:30AM | 19 | A | We was at the bay, Maunalua Bay.  I met him over there. |
| 10:30AM | 20 | Q | What -- what took place at that time?  Did you have a |
| 10:30AM | 21 | | conversation? |
| 10:30AM | 22 | A | Yeah, we had a conversation.  He asked me if I wanted to |
| 10:30AM | 23 | | come back and help sell some vehicles for him at -- for Hawai'i |
| 10:31AM | 24 | | Partners. |
| 10:31AM | 25 | Q | Similar to what you'd been doing before? |

10:31AM    1    A    Yes.

10:31AM    2    Q    Did you agree to do that?

10:31AM    3    A    Yes.

10:31AM    4    Q    Now, I want to show you Exhibit 1-11 -- I'm sorry.  1-144.

10:31AM    5    That's 1-144 which has been previously admitted, so we can

10:31AM    6    publish that as well.

10:31AM    7            THE COURT:  This has not been admitted to my

10:31AM    8    knowledge.

10:31AM    9            MR. KENNEDY:  I agree, Your Honor.

10:31AM   10            MR. INCIONG:  Okay.  My mistake.  Let me lay some

10:31AM   11    foundation then.

10:31AM   12    BY MR. INCIONG:

10:31AM   13    Q    Mr. Freitas, do you recognize what's been shown in --

10:31AM   14            MR. INCIONG:  And if we could just show Mr. Freitas,

10:31AM   15    thank you.  Could we --

10:31AM   16    BY MR. INCIONG:

10:31AM   17    Q    Could you describe -- do you recognize what's shown in

10:31AM   18    Exhibit 1-144?

10:31AM   19    A    Yes.

10:31AM   20    Q    How do you recognize that?

10:31AM   21    A    It's the Maunalua beach park, where we launch our skis.

10:31AM   22    Q    Is this the area you refer to as the bay when you were

10:31AM   23    met -- met at the bay?

10:31AM   24    A    No.  It's a little bit down at another park, same area.

10:32AM   25    Q    Okay.  Same general area?

10:32AM   1   A    Um-hm.

10:32AM   2   Q    Is this where you would meet for gatherings on various

10:32AM   3   occasions?

10:32AM   4   A    Yes.

10:32AM   5   Q    Does this overhead photo accurately show that area as you

10:32AM   6   know it?

10:32AM   7   A    Yes.

10:32AM   8          MR. INCIONG:  Your Honor, I would admit -- move to

10:32AM   9   admit 1-144.

10:32AM   10         THE COURT:  Any objection?

10:32AM   11         MR. KENNEDY:  No objection.

10:32AM   12         THE COURT:  Without objection 1-144 is admitted.  You

10:32AM   13   may publish.

10:32AM   14         MR. INCIONG:  Thank you, Your Honor.

10:32AM   15         (Exhibit 1-144 was received in evidence.)

10:32AM   16   BY MR. INCIONG:

10:32AM   17   Q    So is this the area where you describe where Mr. Miske

10:32AM   18   offered you to come back and work for Hawai'i Partners?

10:32AM   19   A    Around that area, yes.

10:32AM   20   Q    Okay.  Let me show you another exhibit.  I'm pretty sure

10:32AM   21   these have been admitted so let me start with 1-1023.  Do you

10:32AM   22   recognize that?

10:32AM   23   A    Yes.

10:32AM   24   Q    Is that just another view of that same general area?

10:32AM   25   A    Yes.

```
10:33AM   1   Q    Is that where you would gather to jet ski as you
10:33AM   2   indicated?
10:33AM   3   A    Yes.
10:33AM   4        MR. INCIONG:  Okay.  And if we could show
10:33AM   5   Exhibit 1-1022 which has also been admitted, please.
10:33AM   6        THE COURT:  Yes.
10:33AM   7   BY MR. INCIONG:
10:33AM   8   Q    Do you recognize that?
10:33AM   9   A    Yes.
10:33AM  10   Q    Does that show the -- the area around the bay in Hawaii
10:33AM  11   Kai?
10:33AM  12   A    Yes.
10:33AM  13        MR. INCIONG:  Your Honor, could we publish 1-022 at
10:33AM  14   this time?
10:33AM  15        THE COURT:  Yes.  Both of those exhibits have been
10:33AM  16   admitted.  That's 1-1022 and 1-1023.
10:33AM  17        MR. INCIONG:  Okay, great.  I think we can just show
10:33AM  18   him 1022 would be fine.
10:33AM  19   BY MR. INCIONG:
10:33AM  20   Q    So, Mr. Freitas, could you just show with like an X or
10:33AM  21   mark where you would gather for these outings where you would
10:33AM  22   jet ski and so forth in that area that's shown on this
10:33AM  23   particular shot?  Okay.  All right.  All right.
10:34AM  24        So you came back to Hawaii then, correct?
10:34AM  25   A    Yes.
```

10:34AM  1   Q    All right.  You were working at Hawai'i Partners for

10:34AM  2   Mr. Miske again?

10:34AM  3   A    Yes.

10:34AM  4   Q    Were you hanging out with the -- the -- the same people as

10:34AM  5   before John Stancil, Jake Smith and so forth?

10:34AM  6   A    Yes.

10:34AM  7   Q    Did you know an individual by the name of Mike Char?

10:34AM  8   A    Yes.

10:34AM  9   Q    How did you know Mike Char?

10:34AM  10  A    He lived in Waimanalo.

10:34AM  11  Q    That was where you had a lot of family?

10:34AM  12  A    Yes.

10:34AM  13  Q    Did you know if Mike Char was involved in any sort of

10:34AM  14  criminal activity?

10:34AM  15  A    Yes.  He was a drug dealer in Waimanalo.

10:34AM  16  Q    Would you ever hang out with Mike Char?

10:34AM  17  A    Here and there.

10:34AM  18  Q    After you had come back from Hawaii and after Caleb's

10:35AM  19  funeral, did you plan a robbery of Mike Char?

10:35AM  20  A    Yes.

10:35AM  21  Q    Tell the jury how that came about.

10:35AM  22  A    We found out that Mike Char had a large sum of money.  And

10:35AM  23  we robbed him.

10:35AM  24  Q    So once you found that out, you wanted to rob him?

10:35AM  25  A    Yes.

10:35AM   1   Q    Was it just you or were there others involved?

10:35AM   2   A    There was others involves.

10:35AM   3         MR. INCIONG:  Before I ask you about who those people

10:35AM   4   were, could we show Mr. Freitas only please Exhibit 1-634A?

10:35AM   5   And this is on the third government supplemental list, Your

10:35AM   6   Honor.  643.  If I said 634, this trial is causing me dyslexia

10:36AM   7   I think.  Sorry.

10:36AM   8         THE COURT:  1-643A.

10:36AM   9         MR. INCIONG:  Yes.

10:36AM  10         THE COURT:  I have it.

10:36AM  11   BY MR. INCIONG:

10:36AM  12   Q    1-643A is now on the screen in front of you, Mr. Freitas.

10:36AM  13   Do you see that exhibit?

10:36AM  14   A    Yes.

10:36AM  15   Q    Have you seen that before?

10:36AM  16   A    Yes.

10:36AM  17   Q    Do you see the -- the thumbnail on there?

10:36AM  18   A    Yes.

10:36AM  19   Q    Did you watch the video that's attached to that thumbnail

10:36AM  20   prior to testifying in this matter?

10:36AM  21   A    Yes.

10:36AM  22   Q    Did you recognize that particular video?

10:36AM  23   A    Yes.

10:36AM  24   Q    Do you recall recording that video on the phone that you

10:36AM  25   thought you lost?

10:36AM   1    A    Yes.

10:36AM   2    Q    Are you in that video?

10:36AM   3    A    Yes.

10:36AM   4    Q    Did you recognize who else is in that video?

10:36AM   5    A    Yes.

10:36AM   6    Q    Okay.  Is that an accurate -- the -- the video you showed,

10:36AM   7    does it accurately -- an accurate copy or version of the video

10:36AM   8    that you took of yourself?

10:36AM   9    A    Yes.

10:36AM   10        MR. INCIONG:  Your Honor, I would move to admit

10:37AM   11   Exhibit 1-643B which is the actual video.  And this is for the

10:37AM   12   foundation and authenticity the parties have stipulated this is

10:37AM   13   an extracted material from the cell phone.

10:37AM   14        THE COURT:  So 643B is the actual video that is shown

10:37AM   15   in the thumbnail on 643A?

10:37AM   16        MR. INCIONG:  Yes.  Yes.

10:37AM   17        THE COURT:  Any objection, Counsel?

10:37AM   18        MR. KENNEDY:  No objection.

10:37AM   19        THE COURT:  Without objection 1-643 Bravo is admitted

10:37AM   20   and you may play it.

10:37AM   21        MR. INCIONG:  Thank you, Your Honor.

10:37AM   22        (Exhibit 1-643B was received in evidence.)

10:37AM   23             (Video was played.)

10:38AM   24   BY MR. INCIONG:

10:38AM   25   Q    So did you recognize whose voice that is?

| | | | |
|---|---|---|---|
| 10:38AM | 1 | A | Yes. |
| 10:38AM | 2 | Q | Whose voice was that? |
| 10:38AM | 3 | A | Mine. |
| 10:38AM | 4 | Q | And the face that was shown wearing the hat, who was that? |
| 10:38AM | 5 | A | Mike Char. |
| 10:38AM | 6 | Q | He's the person driving the vehicle? |
| 10:38AM | 7 | A | Yes. |
| 10:38AM | 8 | Q | Okay.  You were in the front passenger seat? |
| 10:38AM | 9 | A | Yes. |
| 10:38AM | 10 | Q | Was that you holding the money? |
| 10:38AM | 11 | A | Yes. |
| 10:38AM | 12 | Q | Is that the money that you were referencing? |
| 10:38AM | 13 | A | Yes. |
| 10:38AM | 14 | Q | You said, we stack in Hawaii? |
| 10:38AM | 15 | A | Um-hm. |
| 10:38AM | 16 | Q | What does that mean? |
| 10:38AM | 17 | A | Large amount of money. |
| 10:38AM | 18 | Q | So that looked like -- it was a couple large stacks or |
| 10:38AM | 19 | | bundles of -- of bills.  Were you aware of the -- the |
| 10:38AM | 20 | | denomination of -- of what was in all of those stacks? |
| 10:38AM | 21 | A | At the time, no. |
| 10:38AM | 22 | Q | What did you believe it to be? |
| 10:38AM | 23 | A | A hundred thousand. |
| 10:38AM | 24 | Q | Were the -- at least the bills you could see on the top or |
| 10:38AM | 25 | | bottom of those stacks, could you see what those were? |

10:38AM  1  A    Yes.

10:38AM  2  Q    What -- what denomination were those?

10:38AM  3  A    Hundred dollar bills.

10:39AM  4  Q    So this -- let me ask you about this particular phone.

10:39AM  5  Earlier you testified that you thought you had lost this phone,

10:39AM  6  correct?

10:39AM  7  A    Yes.

10:39AM  8  Q    Why did you think you'd lost the phone?

10:39AM  9  A    Because I thought Mike threw it in the ocean.

10:39AM  10  Q    When did he throw it in the ocean?

10:39AM  11  A    The next day after the robbery at Maunalua Bay.

10:39AM  12  Q    So we'll get to that in a second.  But -- so this video,

10:39AM  13  did you share this video with anyone else after you took it?

10:39AM  14  A    No, I don't believe so, maybe Snapchat but...

10:39AM  15  Q    Did you share the information you had with anyone else

10:39AM  16  that you believe Mike Char had what -- what you thought could

10:39AM  17  be a hundred thousand dollars?

10:39AM  18  A    Yes.

10:39AM  19  Q    Who did you share that information with?

10:39AM  20  A    John Stancil.

10:39AM  21  Q    Anyone else?

10:39AM  22  A    Yes.  Keoni Adric, Lance Bermudez, Frankie and Keli'i

10:40AM  23  Foster.

10:40AM  24  Q    Why did you share that information with those people?

10:40AM  25  A    Because we wanted to set up a robbery.

10:40AM    1    Q    Did you, in fact, set up a robbery?

10:40AM    2    A    Yes.

10:40AM    3    Q    Before I get to that, let me ask you:  You've identified

10:40AM    4    Mr. Stancil before.

10:40AM    5              MR. INCIONG:  If we could show Mr. Freitas

10:40AM    6    Exhibit 1-40, please.  And if we could publish that.

10:40AM    7              THE COURT:  Yes.

10:40AM    8              MR. INCIONG:  And could we next show Mr. Freitas 1-58

10:40AM    9    which is another photo of Mr. Stancil.  And which has also been

10:40AM   10    admitted if we could publish that.

10:40AM   11              THE COURT:  Yes.

10:40AM   12    BY MR. INCIONG:

10:40AM   13    Q    Do you recognize those both being Mr. Stancil, correct?

10:40AM   14    A    Yes.

10:40AM   15              MR. INCIONG:  Okay.  If we could show Mr. Freitas only

10:40AM   16    Exhibit 1-31 now.

10:40AM   17    BY MR. INCIONG:

10:40AM   18    Q    Do you recognize this photo?

10:40AM   19    A    Yes.

10:40AM   20    Q    Who do you recognize that as?

10:40AM   21    A    Keli'i.

10:40AM   22    Q    Keli'i, do you know his last name?

10:41AM   23    A    Foster.

10:41AM   24    Q    How do you know Keli'i Foster?

10:41AM   25    A    I met him here and there from the nightclub and partying.

10:41AM   1   Q    Why was he someone that you chose to share the information

10:41AM   2   about the money Mike Char had?

10:41AM   3   A    He was just one of our friends.

10:41AM   4   Q    All right.  Does this photo accurately show Keli'i Foster?

10:41AM   5   A    Yes.

10:41AM   6            MR. INCIONG:  Your Honor, I would move to admit

10:41AM   7   Exhibit 1-31.

10:41AM   8            THE COURT:  Any objection?

10:41AM   9            MR. KENNEDY:  No objection.

10:41AM  10            THE COURT:  1-31 is admitted without objection.  You

10:41AM  11   may publish.

10:41AM  12            (Exhibit 1-31 was received in evidence.)

10:41AM  13            MR. INCIONG:  Thank you, Your Honor.  Next I'd like

10:41AM  14   Mr. Freitas to look at Exhibit 1-896.  I believe this is on --

10:41AM  15   was one of our supplemental exhibit lists, second I believe.

10:41AM  16            THE COURT:  I've got this on the original.  Go ahead.

10:41AM  17            MR. INCIONG:  Okay.  Thank you.

10:41AM  18   BY MR. INCIONG:

10:41AM  19   Q    Do you recognize, Mr. Freitas, Exhibit 1-896?

10:42AM  20            MR. KENNEDY:  Your Honor, just before we go too far, I

10:42AM  21   also have it on the third supplemental, so I don't know which

10:42AM  22   one it is, but I wanted to clear that up first.  It looks like

10:42AM  23   there's a -- is there a 1.8?  Was it -- maybe I'm mistaken.  It

10:42AM  24   was my mistake, Your Honor.  I thought I saw an eight there.

10:42AM  25            Go ahead, Counsel, sorry to interrupt.

| | | |
|---|---|---|
| 10:42AM | 1 | MR. INCIONG:  No problem, thank you. |
| 10:42AM | 2 | BY MR. INCIONG: |
| 10:42AM | 3 | Q    Mr. Freitas, do you recognize the individual shown in |
| 10:42AM | 4 | 1-896? |
| 10:42AM | 5 | A    Yes. |
| 10:42AM | 6 | Q    Who do you recognize that as? |
| 10:42AM | 7 | A    Frank Silva. |
| 10:42AM | 8 | Q    How do you know Frank Silva? |
| 10:42AM | 9 | A    That's an associate, a friend. |
| 10:42AM | 10 | Q    And does this photo accurately show Mr. Silva? |
| 10:42AM | 11 | A    Yes. |
| 10:42AM | 12 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:42AM | 13 | Exhibit 1-896. |
| 10:42AM | 14 | THE COURT:  Any objection, Mr. Kennedy? |
| 10:42AM | 15 | MR. KENNEDY:  No, no objection, Your Honor. |
| 10:42AM | 16 | THE COURT:  Without objection 1-896 is admitted and |
| 10:42AM | 17 | you may show the jury. |
| 10:42AM | 18 | MR. INCIONG:  Thank you, Your Honor. |
| 10:42AM | 19 | (Exhibit 1-896 was received in evidence.) |
| 10:42AM | 20 | BY MR. INCIONG: |
| 10:42AM | 21 | Q    So the jury can now see that's Frank Silva? |
| 10:43AM | 22 | A    Yes. |
| 10:43AM | 23 | Q    Does he also go by Frankie Silva? |
| 10:43AM | 24 | A    Yes. |
| 10:43AM | 25 | Q    Finally, Mr. Freitas, can I have you look at Exhibit 1-34 |

10:43AM    1    which has been previously admitted?  Do you recognize the

10:43AM    2    individual in that photo?

10:43AM    3    A    Yes.

10:43AM    4    Q    Who is that?

10:43AM    5    A    Lance Bermudez.

10:43AM    6    Q    And this is another one of the individuals you told about

10:43AM    7    Mr. Char's cash?

10:43AM    8    A    Yes.

10:43AM    9              MR. INCIONG:  Your Honor, could we publish 1-34?

10:43AM    10             THE COURT:  You may.

10:43AM    11             MR. INCIONG:  And, Your Honor, may we utilize the face

10:43AM    12   board to display the photos of those four individuals?

10:43AM    13             THE COURT:  Yes, you may.

10:43AM    14   BY MR. INCIONG:

10:43AM    15   Q    So, Mr. Freitas, so what was the -- what was the plan that

10:43AM    16   was discussed as to how you were going to set up Mr. Char?

10:44AM    17   A    We was going to lure him to Maunalua Bay and act like me

10:44AM    18   and John got robbed.

10:44AM    19   Q    So who was going to actually commit the robbery then?

10:44AM    20   A    Lance Bermudez, Keoni Adric, Keli'i Foster and Frankie.

10:44AM    21   Q    So you and John Stancil were going to be decoys basically?

10:44AM    22   A    Yes.

10:44AM    23   Q    Were you with Mr. Char at the time?

10:44AM    24   A    Yes.

10:44AM    25   Q    How did you, in fact, lure him to Maunalua Bay?

| | | | |
|---|---|---|---|
| 10:44AM | 1 | A | We drove -- we were hanging out earlier on the beach in |
| 10:44AM | 2 | | that video, and we drove back to Waimanalo and then we drove |
| 10:44AM | 3 | | back to Maunalua Bay. |
| 10:44AM | 4 | Q | Was there a reason you gave to Mr. Char why you had to go |
| 10:44AM | 5 | | all the way back to Maunalua Bay? |
| 10:44AM | 6 | A | I think he forgot something maybe at his house.  He had to |
| 10:44AM | 7 | | grab it and come back. |
| 10:44AM | 8 | Q | So is it the same area at Maunalua Bay that you just |
| 10:44AM | 9 | | identified a few moments ago where you would have the |
| 10:44AM | 10 | | gatherings? |
| 10:44AM | 11 | A | Yes. |
| 10:44AM | 12 | Q | So did you, in fact, end up arriving at Maunalua Bay with |
| 10:45AM | 13 | | Mr. Char? |
| 10:45AM | 14 | A | Yes. |
| 10:45AM | 15 | Q | What happened when you got there? |
| 10:45AM | 16 | A | We sat down, hanged out for a little bit and those four |
| 10:45AM | 17 | | guys came. |
| 10:45AM | 18 | Q | And the four you're talking about are Keli'i Foster, |
| 10:45AM | 19 | | Frankie Silva, Lance Bermudez and Keoni Adric? |
| 10:45AM | 20 | A | Yes. |
| 10:45AM | 21 | Q | Did they all come in one vehicle? |
| 10:45AM | 22 | A | Yes. |
| 10:45AM | 23 | Q | Were they armed? |
| 10:45AM | 24 | A | I believe one or two of them was armed. |
| 10:45AM | 25 | Q | Were any of them wearing disguises of any sort? |

10:45AM   1   A   Black masks, all black.

10:45AM   2   Q   All four of them?

10:45AM   3   A   Yes.

10:45AM   4   Q   Where were you when first saw this -- the car arrive with

10:45AM   5   these four?

10:45AM   6   A   I was underneath the tent.

10:45AM   7   Q   With Mr. Char?

10:45AM   8   A   Yes.  And John.

10:45AM   9   Q   What happened then?

10:45AM   10   A   They came up to us and they grabbed Mike Char and started

10:45AM   11   beating him and taking his clothes off.

10:45AM   12   Q   Why did they do that?

10:45AM   13   A   To find the keys to his car.

10:46AM   14   Q   He had driven there?

10:46AM   15   A   Yes.

10:46AM   16   Q   What were you and Mr. Stancil doing at the time?

10:46AM   17   A   We was in the area laid down.

10:46AM   18   Q   Were you acting as if you were being robbed as well?

10:46AM   19   A   Yes.

10:46AM   20   Q   But you were not?

10:46AM   21   A   No.

10:46AM   22   Q   That was part of the plan?

10:46AM   23   A   Yes.

10:46AM   24   Q   So when you say they were beating Mr. Char, what -- can

10:46AM   25   you be more specific as to what was happening?

| 10:46AM | 1 | A | They was punching him and kicking him. |
| 10:46AM | 2 | Q | Was he pistol whipped at any point? |
| 10:46AM | 3 | A | I'm not too sure.  I didn't see.  My face was down. |
| 10:46AM | 4 | Q | Could -- could you see whether Mr. Char ever fell to the |
| 10:46AM | 5 | | ground or was taken to the ground? |
| 10:46AM | 6 | A | Yes. |
| 10:46AM | 7 | Q | When you say his clothes were taken off completely? |
| 10:46AM | 8 | A | He was left in his boxers. |
| 10:46AM | 9 | Q | Was anything else taken from Mr. Char? |
| 10:46AM | 10 | A | His vehicle -- |
| 10:46AM | 11 | Q | Did -- |
| 10:46AM | 12 | A | And his keys. |
| 10:46AM | 13 | Q | This money that we saw in the video, was that in |
| 10:46AM | 14 | | Mr. Char's possession at the time? |
| 10:46AM | 15 | A | Not in his possession.  It was inside his vehicle. |
| 10:47AM | 16 | Q | The vehicle was taken? |
| 10:47AM | 17 | A | Yes. |
| 10:47AM | 18 | Q | The money inside? |
| 10:47AM | 19 | A | Yes. |
| 10:47AM | 20 | Q | Who took the vehicle? |
| 10:47AM | 21 | A | One of the guys.  I'm not too sure who took it. |
| 10:47AM | 22 | Q | Was that vehicle driven away? |
| 10:47AM | 23 | A | Yes. |
| 10:47AM | 24 | Q | Mr. Char's vehicle? |
| 10:47AM | 25 | A | Yes. |

10:47AM  1   Q    So did those -- the four individuals that you named, did

10:47AM  2   they leave?

10:47AM  3   A    Yes.

10:47AM  4   Q    Did you and Mr. Stancil remain behind?

10:47AM  5   A    Yes.

10:47AM  6   Q    What happened then?

10:47AM  7   A    Mike Char called the cops.

10:47AM  8   Q    Did the police come?

10:47AM  9   A    Yes, they came across the street.  They didn't come to the

10:47AM  10  bay.

10:47AM  11  Q    Why did they not come to the bay?  Do you know?

10:47AM  12  A    No, I don't know why they came to the bay.  It was -- he

10:47AM  13  was across the street talking with them.

10:47AM  14  Q    I see.  So Mr. Char went across the street?

10:47AM  15  A    Yes.

10:47AM  16  Q    That's where he made contact with Honolulu police?

10:47AM  17  A    Yes.

10:47AM  18  Q    Did the police ever come and talk to you or Mr. Stancil?

10:47AM  19  A    No.

10:47AM  20  Q    Before I ask you what happened next, I want to show you a

10:47AM  21  series of photos.

10:47AM  22          MR. INCIONG:  Could we show Mr. Freitas only

10:47AM  23  Exhibit 1-153 to start, please?

10:47AM  24  BY MR. INCIONG:

10:48AM  25  Q    Do you see 1-153, Mr. Freitas?

| | | | |
|---|---|---|---|
| 10:48AM | 1 | A | Yes. |
| 10:48AM | 2 | Q | Do you know who's shown in that photograph? |
| 10:48AM | 3 | A | Yes. |
| 10:48AM | 4 | Q | Who do you recognize that as? |
| 10:48AM | 5 | A | Mike Char. |
| 10:48AM | 6 | Q | Does that show Mike Char as he appeared after the robbery |
| 10:48AM | 7 | | at Maunalua Bay? |
| 10:48AM | 8 | A | Yes. |
| 10:48AM | 9 | | MR. INCIONG:  Could we show Mr. Freitas 1-154 next? |
| 10:48AM | 10 | | BY MR. INCIONG: |
| 10:48AM | 11 | Q | Do you recognize that photo? |
| 10:48AM | 12 | A | Yes. |
| 10:48AM | 13 | Q | Who do you recognize there? |
| 10:48AM | 14 | A | Mike Char. |
| 10:48AM | 15 | Q | Does it show Mr. Char after the robbery at Maunalua Bay on |
| 10:48AM | 16 | | that day? |
| 10:48AM | 17 | A | Yes. |
| 10:48AM | 18 | | MR. INCIONG:  Could we go next to 1-155?  I'm sorry, |
| 10:48AM | 19 | | 1-155.  I said it wrong again.  155.  Okay.  Thank you. |
| 10:48AM | 20 | | BY MR. INCIONG: |
| 10:48AM | 21 | Q | Is that somebody that you recognize? |
| 10:48AM | 22 | A | Yes. |
| 10:48AM | 23 | Q | Does that accurately show the person you recognized on -- |
| 10:49AM | 24 | | on that day? |
| 10:49AM | 25 | A | Yes. |

10:49AM   1   Q    Who do you recognize that as?

10:49AM   2   A    Mike Char.

10:49AM   3        MR. INCIONG:  Your Honor, I would move to admit

10:49AM   4   Exhibits 1-153, 1-154 and 1-155.

10:49AM   5        THE COURT:  Mr. Kennedy, any objection?

10:49AM   6        MR. KENNEDY:  No objection.

10:49AM   7        THE COURT:  Without objection those three exhibits are

10:49AM   8   admitted and you may publish.  That's 1-153, 154, 155.

10:49AM   9   (Exhibits 1-153, 1-154 and 1-155 were received in evidence.)

10:49AM  10        MR. INCIONG:  Thank you.

10:49AM  11   BY MR. INCIONG:

10:49AM  12   Q    So let's start with 1-154, please.  So this is Mike Char?

10:49AM  13   A    Yes.

10:49AM  14   Q    So the -- the area around his forehead and above his both

10:49AM  15   eyes, do you see that area?

10:49AM  16   A    Yes.

10:49AM  17   Q    Did he look like that before the four individuals you

10:49AM  18   named arrived at Maunalua Bay?

10:49AM  19   A    No.

10:49AM  20   Q    Were those injuries he received in the -- the beating that

10:49AM  21   you referenced?

10:49AM  22   A    Yes.

10:49AM  23        MR. INCIONG:  Could we show next 1-153?  And if we

10:50AM  24   could focus on the head portion.

10:50AM  25   BY MR. INCIONG:

10:50AM   1   Q   So that's Mr. Char again?

10:50AM   2   A   Yes.

10:50AM   3   Q   Do you see the red marks on -- on his head and forehead

10:50AM   4   and neck as well?

10:50AM   5   A   Yes.

10:50AM   6   Q   Did he have those earlier in the day before you went with

10:50AM   7   him to Maunalua Bay?

10:50AM   8   A   No.

10:50AM   9       MR. INCIONG:  Finally, could we look at 1-155?

10:50AM  10   BY MR. INCIONG:

10:50AM  11   Q   Is this just a view of the other side of Mr. Char's head

10:50AM  12   and face?

10:50AM  13   A   Yes.

10:50AM  14   Q   And do you see redness along the -- the side of his head

10:50AM  15   and -- and jaw area?

10:50AM  16   A   Yes.

10:50AM  17   Q   Was that there when you saw him earlier in the day?

10:50AM  18   A   No.

10:50AM  19       MR. INCIONG:  Okay.  We can take those down.

10:50AM  20   BY MR. INCIONG:

10:50AM  21   Q   So when you saw Mr. Char speaking with the police across

10:50AM  22   the street from you at Maunalua Bay, what did you do?

10:50AM  23   A   Me and John started packing up the bed, putting everything

10:51AM  24   inside the van and then leave.

10:51AM  25   Q   So you're talking about the beach -- beach gear and things

10:51AM    1    of that nature?

10:51AM    2    A    Yes.

10:51AM    3    Q    Why were you leaving at that point?

10:51AM    4    A    Because we didn't want to Mike -- let Mike know that we

10:51AM    5    did it at the bay.

10:51AM    6    Q    When you're referring to Mike, who's Mike?

10:51AM    7    A    Miske.

10:51AM    8    Q    When you say you did -- when you say did it, you're

10:51AM    9    talking about the robbery?

10:51AM   10    A    The robbery.

10:51AM   11    Q    Why did you not want Mr. Miske to know that you'd done

10:51AM   12    this robbery at the bay?

10:51AM   13    A    Because that's his place that he goes to put flowers out

10:51AM   14    for his son.

10:51AM   15    Q    You're -- you're speaking of Caleb?

10:51AM   16    A    Yes.

10:51AM   17    Q    After Caleb passed away, was that a place that carried

10:51AM   18    some extra special meaning to the family?

10:51AM   19    A    Yes.

10:51AM   20    Q    Why?

10:51AM   21    A    Because that's where we spread his ashes.

10:51AM   22    Q    So you didn't think about that beforehand?

10:51AM   23    A    No.

10:51AM   24    Q    So you were leaving hoping then not to have to speak with

10:52AM   25    the police?

| | | | |
|---|---|---|---|
| 10:52AM | 1 | A | Yes. |
| 10:52AM | 2 | Q | What happened as you left Maunalua Bay? |
| 10:52AM | 3 | A | I left and I got pulled over by the Portlock entry by the |
| 10:52AM | 4 | | elementary school by HPD. |
| 10:52AM | 5 | Q | Why were you pulled over? |
| 10:52AM | 6 | A | Because I had a Honda Accord that looks -- fit the |
| 10:52AM | 7 | | description of what the vehicle was stolen from -- from Mike |
| 10:52AM | 8 | | Char. |
| 10:52AM | 9 | Q | So Honolulu police mistakenly thought that the vehicle you |
| 10:52AM | 10 | | were driving was Mike Char's vehicle? |
| 10:52AM | 11 | A | Yes. |
| 10:52AM | 12 | Q | You had -- it -- it was not? |
| 10:52AM | 13 | A | No. |
| 10:52AM | 14 | Q | You just happened to have a similar make and model of car? |
| 10:52AM | 15 | A | Yes. |
| 10:52AM | 16 | Q | What make and model was it? |
| 10:52AM | 17 | A | My make and model was a Honda Accord. |
| 10:52AM | 18 | Q | Is that the same as Mr. Char's? |
| 10:52AM | 19 | A | His one was a Honda Civic. |
| 10:52AM | 20 | Q | Were the colors -- |
| 10:52AM | 21 | A | Same color silver. |
| 10:52AM | 22 | Q | So did Honolulu police realize that your vehicle wasn't -- |
| 10:52AM | 23 | | was, in fact, not the one they were looking for? |
| 10:53AM | 24 | A | Yes. |
| 10:53AM | 25 | Q | Were you released? |

| | | | |
|---|---|---|---|
| 10:53AM | 1 | A | Yes. |
| 10:53AM | 2 | Q | Not cited or anything like that? |
| 10:53AM | 3 | A | No. |
| 10:53AM | 4 | Q | So after you were stopped by the police, what did you do? |
| 10:53AM | 5 | A | We went back to the bay. |
| 10:53AM | 6 | Q | Why? |
| 10:53AM | 7 | A | To set up everything so it looks like nothing happened |
| 10:53AM | 8 | | there. |
| 10:53AM | 9 | Q | Right.  So was this again a further attempt to try and not |
| 10:53AM | 10 | | let Mr. Miske find out what had happened? |
| 10:53AM | 11 | A | Yes. |
| 10:53AM | 12 | Q | Did he find out what had happened? |
| 10:53AM | 13 | A | Yes. |
| 10:53AM | 14 | Q | How did he find out? |
| 10:53AM | 15 | A | Mike Char went to his house and told him what happened. |
| 10:53AM | 16 | Q | Why did Mike Char go to his -- to Mr. Miske's house? |
| 10:53AM | 17 | | MR. KENNEDY:  Objection, speculation, Your Honor. |
| 10:53AM | 18 | | THE COURT:  Sustained. |
| 10:53AM | 19 | | BY MR. INCIONG: |
| 10:53AM | 20 | Q | Did you later find out from Mr. Char or Mr. Miske why Mike |
| 10:53AM | 21 | | Char went there? |
| 10:53AM | 22 | A | To tell them -- |
| 10:53AM | 23 | | MR. KENNEDY:  Objection, compound. |
| 10:53AM | 24 | | THE COURT:  Overruled.  Go ahead. |
| 10:53AM | 25 | | THE WITNESS:  Mike Char went to the house to tell Mike |

10:53AM   1    that we robbed him at the bay.

10:53AM   2    BY MR. INCIONG:

10:53AM   3    Q    What was Mr. Miske's reaction to that?

10:54AM   4    A    He was upset that we did it over there at the bay.

10:54AM   5    Q    How did you know he was upset?

10:54AM   6    A    When we was at the bay, he came back in the morning, and

10:54AM   7    he came to the morning.  My car was outside, my cell phone was

10:54AM   8    on the car, and he bent all my four doors back and some lights.

10:54AM   9    Q    You say he bent your four doors back.  What does that

10:54AM   10   mean?

10:54AM   11   A    He bent it the opposite way.

10:54AM   12   Q    He pulled the doors open and pushed them the -- past where

10:54AM   13   they're supposed to go?

10:54AM   14   A    Yes.

10:54AM   15   Q    Were the doors stuck in that position?

10:54AM   16   A    Yes.

10:54AM   17   Q    All four doors?

10:54AM   18   A    All four doors.

10:54AM   19   Q    Was your car operable at that point?

10:54AM   20   A    No.  I got it towed.

10:54AM   21   Q    Did you watch him do this?

10:54AM   22   A    Yes.

10:54AM   23   Q    What was his demeanor during the time he was doing this?

10:54AM   24   A    He was upset.

10:54AM   25   Q    Upset or more than upset?

| | | | |
|---|---|---|---|
| 10:54AM | 1 | A | Pissed off. |
| 10:54AM | 2 | Q | Was there any other damage to the vehicle? |
| 10:54AM | 3 | A | Just some lights was broken. |
| 10:55AM | 4 | Q | Did Mr. Miske say anything to you? |
| 10:55AM | 5 | A | He was screaming at us that we were fucking idiots. |
| 10:55AM | 6 | Q | Did you know why he was upset? |
| 10:55AM | 7 | A | Because we did the robbery at the bay. |
| 10:55AM | 8 | Q | Was it because you did the robbery or where you did the |
| 10:55AM | 9 | | robbery? |
| 10:55AM | 10 | | MR. KENNEDY:  Objection on speculation, Your Honor. |
| 10:55AM | 11 | | THE COURT:  Sustained. |
| 10:55AM | 12 | | BY MR. INCIONG: |
| 10:55AM | 13 | Q | Did Mr. Miske ever say anything to you about the location |
| 10:55AM | 14 | | when he was damaging your car? |
| 10:55AM | 15 | A | No, he didn't say nothing about the location.  We know he |
| 10:55AM | 16 | | was upset because it was at the bay. |
| 10:55AM | 17 | Q | Okay.  Now, you mentioned that your car -- your cell phone |
| 10:55AM | 18 | | was on the car? |
| 10:55AM | 19 | A | Yes. |
| 10:55AM | 20 | Q | And you testified a little bit ago that you thought Mike |
| 10:55AM | 21 | | threw that in the ocean? |
| 10:55AM | 22 | A | Yes. |
| 10:55AM | 23 | Q | Why did you think that? |
| 10:55AM | 24 | A | Because I never seen that phone since that day. |
| 10:55AM | 25 | Q | Okay.  When did you next see the phone again? |

| | | | |
|---|---|---|---|
| 10:55AM | 1 | A | On 2/7/24. |
| 10:55AM | 2 | Q | February 7th? |
| 10:55AM | 3 | A | Yes. |
| 10:55AM | 4 | Q | Earlier this month? |
| 10:55AM | 5 | A | Yes. |
| 10:55AM | 6 | Q | You hadn't seen it before until -- so years? |
| 10:56AM | 7 | A | Years, yes. |

10:56AM   8        MR. INCIONG:  Okay.  Could we show Mr. Freitas
10:56AM   9   Exhibit 1-638, please?
10:56AM  10   BY MR. INCIONG:
10:56AM  11   Q    Mr. Freitas, this was -- do you recognize looking at this
10:56AM  12   particular exhibit before?
10:56AM  13   A    Yes.
10:56AM  14   Q    Before testifying today?
10:56AM  15   A    Yes.
10:56AM  16   Q    You recognize some of those photos that we showed you
10:56AM  17   earlier today from the M Nightclub, correct?
10:56AM  18   A    Yes.
10:56AM  19   Q    Were there also some other photos that you recognized that
10:56AM  20   were on your phone that had to do with your duties as working
10:56AM  21   for Hawai'i Partners?
10:56AM  22   A    Yes.
10:57AM  23        MR. INCIONG:  So if we could show Mr. Freitas
10:57AM  24   Exhibit 1-643 please to Mr. Freitas only.
10:57AM  25   BY MR. INCIONG:

10:57AM   1   Q    Do you recognize that as being one of the photos you saw

10:57AM   2   on this what you described as your old phone?

10:57AM   3   A    Yes.

10:57AM   4            MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-644?

10:57AM   5   BY MR. INCIONG:

10:57AM   6   Q    Do you recognize that as another photo that you saw on

10:57AM   7   your old phone?

10:57AM   8   A    Yes.

10:57AM   9            MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-645?

10:57AM   10  BY MR. INCIONG:

10:57AM   11  Q    Do you recognize that photo?

10:57AM   12  A    Yes.

10:57AM   13  Q    Did you see that photo as one that was stored on your old

10:57AM   14  phone as well?

10:57AM   15  A    Yes.

10:57AM   16            MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-646?

10:57AM   17  BY MR. INCIONG:

10:57AM   18  Q    Do you recognize this shot or screenshot it looks like?

10:58AM   19  A    Yes.

10:58AM   20  Q    Do you recognize that as being on your old phone as well?

10:58AM   21  A    Yes.

10:58AM   22            MR. INCIONG:  And then 1-647.

10:58AM   23  BY MR. INCIONG:

10:58AM   24  Q    Do you recognize that as another ad that was on --

10:58AM   25  preserved on your phone, your old phone?

| | | |
|---|---|---|
| 10:58AM | 1 | A    Yes. |
| 10:58AM | 2 | MR. INCIONG:  And finally, can we show Mr. Freitas |
| 10:58AM | 3 | 1-649? |
| 10:58AM | 4 | BY MR. INCIONG: |
| 10:58AM | 5 | Q    Do you recognize that? |
| 10:58AM | 6 | A    Yes. |
| 10:58AM | 7 | Q    Is that also a photo that was on your old phone? |
| 10:58AM | 8 | A    Yes. |
| 10:58AM | 9 | Q    Do all of those photos marked as exhibits accurately show |
| 10:58AM | 10 | them as you reviewed them on your old cell phone? |
| 10:58AM | 11 | A    Yes. |
| 10:58AM | 12 | MR. INCIONG:  Your Honor, I would move to admit |
| 10:58AM | 13 | Exhibits 1-643, 644, 645, 646, 647 and 649. |
| 10:58AM | 14 | THE COURT:  Any objection, Counsel? |
| 10:59AM | 15 | MR. KENNEDY:  No objection, Your Honor, to 1-643 |
| 10:59AM | 16 | through 647 and then was it 649? |
| 10:59AM | 17 | MR. INCIONG:  Correct.  I skipped 648.  There's no |
| 10:59AM | 18 | 648. |
| 10:59AM | 19 | MR. KENNEDY:  Making sure, Counsel, thank you. |
| 10:59AM | 20 | THE COURT:  And did you have a view, Mr. Kennedy, on |
| 10:59AM | 21 | 649? |
| 10:59AM | 22 | MR. KENNEDY:  I'm sorry? |
| 10:59AM | 23 | THE COURT:  Did you have a view on 649? |
| 10:59AM | 24 | MR. KENNEDY:  No. |
| 10:59AM | 25 | THE COURT:  No objection? |

10:59AM    1                MR. KENNEDY:  No objection, Your Honor, for 649.

10:59AM    2                THE COURT:  Sorry, sorry, I wasn't clear on that.

10:59AM    3           All right, without objection then, the exhibits

10:59AM    4     identified by Mr. Kennedy are each admitted.  That's 1-643

10:59AM    5     through 647 and 1-649.

10:59AM    6           (Exhibits 1-643 through 1-647 and 1-649 were received in

10:59AM    7                              evidence.)

10:59AM    8                MR. INCIONG:  Thank you, Your Honor.  May I publish

10:59AM    9     those one at a time?

10:59AM   10                THE COURT:  Yes, you may.

10:59AM   11     BY MR. INCIONG:

10:59AM   12     Q     So, Mr. Freitas, starting with Exhibit 1-164, can you tell

10:59AM   13     the jury what that is?

10:59AM   14     A     It's a Honda Prelude 2003.

10:59AM   15     Q     And the -- the entire content of that, is that an example

10:59AM   16     of an ad that would be placed by yourself or others on Hawai'i

11:00AM   17     Partners -- by Hawai'i Partners to sell the vehicles that you

11:00AM   18     purchased?

11:00AM   19     A     Yes.

11:00AM   20     Q     Can I have you look at 1-644?  Same thing.  Is that

11:00AM   21     another example of a listing you would put on Craigslist or

11:00AM   22     some of those other online --

11:00AM   23     A     Yes.

11:00AM   24                MR. INCIONG:  Okay.  1-645, if we can show that to the

11:00AM   25     jury, please.

11:00AM    1    BY MR. INCIONG:

11:00AM    2    Q    This is another example that you recall?

11:00AM    3    A    Yes.

11:00AM    4              MR. INCIONG:  Could we show 1-646, please?

11:00AM    5    BY MR. INCIONG:

11:00AM    6    Q    This another ad for Hawai'i Partners?

11:00AM    7    A    Yes.

11:00AM    8    Q    All right.  1-647.  Another Hawai'i Partners ad?

11:00AM    9    A    Yes.

11:00AM   10    Q    Then finally, I want to you look at 1-649.  I don't know

11:01AM   11    if we can show that to the jury.  What is that?

11:01AM   12    A    This is one of the vehicles at Manheim auction.

11:01AM   13    Q    Okay.  So let me ask you about this -- this sticker in

11:01AM   14    particular.  It says Manheim Hawaii and there's a number, a bar

11:01AM   15    code and some other information.  Is that the -- the stickers

11:01AM   16    that you would -- that would be -- be placed on the auction

11:01AM   17    vehicles?

11:01AM   18    A    Yes.

11:01AM   19    Q    Was that part of the bidding process?

11:01AM   20    A    Yeah, you can scan that bar code on your Manheim app to

11:01AM   21    find out details about this vehicle.

11:01AM   22    Q    Okay.  That's how you typically keep track and -- and bid

11:01AM   23    on these vehicles?

11:01AM   24    A    Yes.

11:01AM   25    Q    All right.  So the -- as your duties as Mr. Miske's

11:01AM   1   personal assistant when you were doing that, let me just -- I

11:01AM   2   want to make clear.  So when you were working for him the first

11:02AM   3   time, you said you were working for all the various businesses,

11:02AM   4   correct?

11:02AM   5   A    Yes.

11:02AM   6   Q    When you came back after Las Vegas and you had the meeting

11:02AM   7   at the bay and patched things up after what had happened at the

11:02AM   8   hospital, were you working only for Hawai'i Partners at that

11:02AM   9   point?

11:02AM   10   A    Yes.  Hawai'i Partners and maybe some errands.

11:02AM   11   Q    Okay.  And then later on you transitioned to where you

11:02AM   12   were working only for Kama'aina in sales?

11:02AM   13   A    Yes.

11:02AM   14   Q    Okay.  Did you have other duties as his personal assistant

11:02AM   15   that were related to the businesses?

11:02AM   16   A    Yes.

11:02AM   17   Q    That you were asked to do?

11:02AM   18   A    Yes.

11:02AM   19   Q    So let me give you an example.  If I could show you

11:02AM   20   Exhibit 1-843A as an apple.

11:02AM   21          MR. INCIONG:  That's been previously admitted into

11:02AM   22   evidence.  If we could publish that, Your Honor.

11:02AM   23          THE COURT:  Yes, you may.

11:03AM   24   BY MR. INCIONG:

11:03AM   25   Q    Do you recognize that photo?

| | | | |
|---|---|---|---|
| 11:03AM | 1 | A | Yes. |
| 11:03AM | 2 | Q | Does that look familiar to you? |
| 11:03AM | 3 | A | Yes. |
| 11:03AM | 4 | Q | Why does it look familiar to you? |
| 11:03AM | 5 | A | It's the office upstairs at the shop 940B Queen Street. |
| 11:03AM | 6 | Q | Do you see what's happening in that -- in that particular |
| 11:03AM | 7 | | photo? |
| 11:03AM | 8 | A | They were filling out Hawaii's Best 2018. |
| 11:03AM | 9 | Q | Did you ever fill out Hawaii's Best ballots? |
| 11:03AM | 10 | A | Yes. |
| 11:03AM | 11 | Q | Do you recall when you did that? |
| 11:03AM | 12 | A | No.  Not exact date. |
| 11:03AM | 13 | Q | Do you recall where you did that? |
| 11:03AM | 14 | A | Yes. |
| 11:03AM | 15 | Q | Where did you do that? |
| 11:03AM | 16 | A | One time was at the Outback Steakhouse in Hawaii Kai. |
| 11:03AM | 17 | Q | Is this the -- the Outback Steakhouse that's located |
| 11:03AM | 18 | | anywhere near the -- the gathering place at the bay where you |
| 11:03AM | 19 | | would jet ski? |
| 11:03AM | 20 | A | Yes. |
| 11:03AM | 21 | | MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-1022 |
| 11:03AM | 22 | | please which has been previously admitted? |
| 11:04AM | 23 | | THE COURT:  Go ahead. |
| 11:04AM | 24 | | BY MR. INCIONG: |
| 11:04AM | 25 | Q | Mr. Freitas, do you see on this overhead where the Outback |

11:04AM   1   Steakhouse is located?

11:04AM   2   A    Yes.

11:04AM   3   Q    Could you circle that with your finger on the touch

11:04AM   4   screen, please?  So that's very close in proximity to the --

11:04AM   5   the beach where you would gather?

11:04AM   6   A    Yes.

11:04AM   7   Q    So why -- do you know why this place was chosen to fill

11:04AM   8   out the ballots on that day?

11:04AM   9   A    No.

11:04AM  10   Q    Do you recall how many people were there that day filling

11:04AM  11   out the ballots?

11:04AM  12   A    No, I don't recall how many people.

11:04AM  13   Q    Can you give a rough estimate?  It is more than two?

11:04AM  14   A    Yes, more than two.

11:04AM  15   Q    Less than ten?

11:04AM  16   A    Less than ten.

11:04AM  17   Q    Who provided the ballots to you?

11:04AM  18   A    Mike did.

11:04AM  19   Q    That's Mike Miske?

11:04AM  20   A    Yes.

11:04AM  21   Q    Were you instructed as to how to fill the ballots?

11:04AM  22   A    How to fill out anonymous names or people from the

11:04AM  23   newspaper.

11:04AM  24   Q    What did you do with those ballots once you were finished

11:05AM  25   completing them?

| | | | |
|---|---|---|---|
| 11:05AM | 1 | A | Just turned it in. |
| 11:05AM | 2 | Q | Can you estimate how many ballots you filled out that day? |
| 11:05AM | 3 | A | Me personally? |
| 11:05AM | 4 | Q | Yeah. |
| 11:05AM | 5 | A | About ten, 15 of them. |
| 11:05AM | 6 | Q | All right.  So going back to when you were working for |
| 11:05AM | 7 | | Mr. Miske for all the various businesses, one of the businesses |
| 11:05AM | 8 | | you mentioned was the Rachel, correct? |
| 11:05AM | 9 | A | Yes. |
| 11:05AM | 10 | Q | This was the fishing boat? |
| 11:05AM | 11 | A | Yes. |
| 11:05AM | 12 | Q | What was your involvement in any tasks that you were asked |
| 11:05AM | 13 | | to do regarding the Rachel? |
| 11:05AM | 14 | A | To pay the -- the people that worked on the boat. |
| 11:05AM | 15 | Q | The crew? |
| 11:05AM | 16 | A | Yes, the crew. |
| 11:05AM | 17 | Q | How did you go about doing that? |
| 11:05AM | 18 | A | Going to the bank and pulling out some money to pay these |
| 11:05AM | 19 | | guys. |
| 11:05AM | 20 | Q | Who would send you to the bank? |
| 11:05AM | 21 | A | Mike would send me to the bank. |
| 11:05AM | 22 | Q | When you say "pulling out money," how were -- how were |
| 11:06AM | 23 | | these withdrawals being made? |
| 11:06AM | 24 | A | Mike would write me a personal check in his name written |
| 11:06AM | 25 | | into my name and I would go to the bank and cash the checks. |

11:06AM    1    Q    Why was it done this way, if you know?

11:06AM    2    A    I don't know why it was done this way.

11:06AM    3    Q    You were just being told --

11:06AM    4    A    Told what to do, yes.

11:06AM    5    Q    So were you given any instructions about certain amounts

11:06AM    6    that you should withdraw at a -- at a certain time or limits?

11:06AM    7    A    Yes.  To stay under 10,000.

11:06AM    8    Q    Who told you that?

11:06AM    9    A    Mike did.

11:06AM    10   Q    Why did he tell you that?

11:06AM    11   A    Because it will actually throw red flags out for the IRS.

11:06AM    12   Q    So you were told not to withdraw more than $10,000?

11:06AM    13   A    Yes.

11:06AM    14   Q    At a time?

11:06AM    15   A    Yes.

11:06AM    16   Q    So once you withdrew the cash, what would you do with it?

11:06AM    17   A    I'd go back to the office and we have some names written

11:06AM    18   down from the Rachel crew, and we will put the money in the

11:06AM    19   envelope and drop it off.

11:07AM    20   Q    Who provided the names for the crew?

11:07AM    21   A    Mike did.

11:07AM    22   Q    Was there a reason why the -- the crew couldn't get off

11:07AM    23   the boat and -- and cash checks, for example, themselves?

11:07AM    24   A    They wasn't U.S. citizens.

11:07AM    25   Q    But they were -- they could not deboard?

| | | | |
|---|---|---|---|
| 11:07AM | 1 | A | No. |
| 11:07AM | 2 | Q | How many occasions did you take cash payments over to the |
| 11:07AM | 3 | | crew? |
| 11:07AM | 4 | A | Quite a bit. |
| 11:07AM | 5 | Q | Did you make similar payments to any construction workers |
| 11:07AM | 6 | | on Mr. Miske's behalf? |
| 11:07AM | 7 | A | Yes. |
| 11:07AM | 8 | Q | Where were those construction workers working? |
| 11:07AM | 9 | A | Lumahai house in part. |
| 11:07AM | 10 | Q | What was the Lumahai house? |
| 11:07AM | 11 | A | It was Mike's house. |
| 11:07AM | 12 | Q | Okay.  What was -- do you recall when he was building that |
| 11:07AM | 13 | | house? |
| 11:07AM | 14 | A | Yes. |
| 11:07AM | 15 | Q | Approximately what years was that? |
| 11:07AM | 16 | A | I seen the house be built from ground up -- |
| 11:07AM | 17 | Q | Okay. |
| 11:07AM | 18 | A | -- so there was nothing there.  I don't know exactly what |
| 11:08AM | 19 | | year. |
| 11:08AM | 20 | Q | Okay.  Was there a certain day of the week that |
| 11:08AM | 21 | | the construction workers would be paid? |
| 11:08AM | 22 | A | Every Fridays. |
| 11:08AM | 23 | Q | How many times would you make these payments on Fridays do |
| 11:08AM | 24 | | you -- that you recall? |
| 11:08AM | 25 | A | Quite a bit. |

11:08AM    1    Q    Describe how the payments were made to the construction

11:08AM    2    workers, if you know?

11:08AM    3    A    Same way.  Personal checks into my name, I'll cash them,

11:08AM    4    go back to the office and count it out individually for each

11:08AM    5    worker.

11:08AM    6    Q    Okay.  Was that -- was the cash then put into envelopes

11:08AM    7    with -- for each worker as well?

11:08AM    8    A    Yes.

11:08AM    9    Q    Approximately how many construction workers were working

11:08AM    10   at a time, any given time when you were delivering the money on

11:08AM    11   Fridays?

11:08AM    12   A    I'd say more than five people.

11:08AM    13   Q    Do you recall approximately how much money in cash total

11:08AM    14   you were taking to the Lumahai house to pay the workers?

11:08AM    15   A    Yes.  It was about less than 10,000.

11:08AM    16   Q    Were you getting -- avoiding that $10,000 limit?

11:09AM    17   A    Yes.

11:09AM    18   Q    Did this occur over weeks, months, years?  How long did

11:09AM    19   you go to make these payments?

11:09AM    20   A    Months.

11:09AM    21   Q    As part of your duties as Mr. Miske's personal assistant,

11:09AM    22   did you order supplies for the businesses?

11:09AM    23   A    Yes.

11:09AM    24   Q    Did you order uniforms or clothing for the businesses?

11:09AM    25   A    Yes.

11:09AM   1          MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-997,

11:09AM   2   please?

11:09AM   3   BY MR. INCIONG:

11:09AM   4   Q    Mr. Freitas, do you see the document that's been marked

11:09AM   5   1-997?

11:09AM   6   A    Yes.

11:09AM   7   Q    Did you have a chance to review that before coming to

11:09AM   8   court today?

11:09AM   9   A    Yes.

11:09AM   10  Q    Did you recognize this particular invoice?

11:09AM   11  A    Yes.

11:09AM   12  Q    How do you recognize that?

11:09AM   13  A    By the JR.'s Caps & Embroidery.  The company.

11:10AM   14  Q    Does that have your name as a contract as well on it?

11:10AM   15  A    Yes.

11:10AM   16  Q    And do you recall what you were ordering from this

11:10AM   17  particular business?

11:10AM   18  A    T-shirts.  Polo t-shirts.

11:10AM   19  Q    Does this exhibit accurately show the -- the invoice that

11:10AM   20  you received from this particular business?

11:10AM   21  A    Yes.

11:10AM   22         MR. INCIONG:  Your Honor, I would move to admit

11:10AM   23  Exhibit 1-997.

11:10AM   24         THE COURT:  Any objection?

11:10AM   25         MR. KENNEDY:  No objection, Your Honor.

| | | |
|---|---|---|
| 11:10AM | 1 | THE COURT: Without objection 1-997 is admitted. You |
| 11:10AM | 2 | may publish. |
| 11:10AM | 3 | MR. INCIONG: Thank you, Your Honor. |
| 11:10AM | 4 | (Exhibit 1-997 was received in evidence.) |
| 11:10AM | 5 | BY MR. INCIONG: |
| 11:10AM | 6 | Q    So this is the receipt or invoice you received after |
| 11:10AM | 7 | ordering you said they were shirts? |
| 11:10AM | 8 | A    Yes. |
| 11:10AM | 9 | MR. INCIONG: Okay. Could we enlarge just the top |
| 11:10AM | 10 | third of that document or so? Perfect. Thank you. |
| 11:10AM | 11 | BY MR. INCIONG: |
| 11:10AM | 12 | Q    So this is J.R.'s Caps & Embroidery. That's the name of |
| 11:10AM | 13 | the business? |
| 11:10AM | 14 | A    Yes. |
| 11:10AM | 15 | Q    Do you see there where it to Kaulana Kama'aina? |
| 11:10AM | 16 | A    Yes. |
| 11:10AM | 17 | Q    That's you Kaulana? |
| 11:11AM | 18 | A    Yes. |
| 11:11AM | 19 | Q    The phone number that's underneath that that 585-1944, is |
| 11:11AM | 20 | that your phone number? |
| 11:11AM | 21 | A    Yes. |
| 11:11AM | 22 | Q    Okay. Was this the phone number you were using at the |
| 11:11AM | 23 | time of your arrest in July of 2020? |
| 11:11AM | 24 | A    Yes. |
| 11:11AM | 25 | Q    Now, when you were around the businesses working for |

| 11:11AM | 1 | Mr. Miske, you said you reported to the shop at -- on Queen |
| 11:11AM | 2 | Street pretty much every weekday, correct? |
| 11:11AM | 3 | A   Yes. |
| 11:11AM | 4 | Q   So did you get to know some of the other individuals that |
| 11:11AM | 5 | were working there? |
| 11:11AM | 6 | A   Yes. |
| 11:11AM | 7 | Q   Did you understand or get to know what their various jobs |
| 11:11AM | 8 | and responsibilities were? |
| 11:11AM | 9 | A   Yes. |
| 11:11AM | 10 | Q   Did you know anyone by the name of Koa Masutani? |
| 11:11AM | 11 | A   Yes. |
| 11:11AM | 12 | Q   How did you know Koa Masutani? |
| 11:11AM | 13 | A   He replaced me after I got fired. |
| 11:11AM | 14 | Q   He replaced you as Mr. Miske's personal assistant? |
| 11:11AM | 15 | A   Yes. |
| 11:11AM | 16 | Q   So after you got fired, you came back in a different |
| 11:12AM | 17 | capacity? |
| 11:12AM | 18 | A   Yes. |
| 11:12AM | 19 | Q   So was Mr. Masutani still acting as Mr. Miske's personal |
| 11:12AM | 20 | assistant? |
| 11:12AM | 21 | A   Yes. |
| 11:12AM | 22 | Q   From your time being around the businesses and -- and |
| 11:12AM | 23 | knowing who worked there, did you ever believe that |
| 11:12AM | 24 | Mr. Masutani was a manager or supervisor of any level there? |
| 11:12AM | 25 | A   On my knowledge, no. |

| | | |
|---|---|---|
| 11:12AM | 1 | Q    To your knowledge, he had replaced you as -- as personal |
| 11:12AM | 2 | assistant? |
| 11:12AM | 3 | A    Yes. |
| 11:12AM | 4 |      MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-641 |
| 11:12AM | 5 | next, please?  I'm sorry, 1-614.  My mistake, 1-614. |
| 11:12AM | 6 | BY MR. INCIONG: |
| 11:12AM | 7 | Q    Do you recognize 1-614, Mr. Freitas? |
| 11:13AM | 8 | A    Yes. |
| 11:13AM | 9 | Q    Do you see anything that catches your attention in that |
| 11:13AM | 10 | particular photo? |
| 11:13AM | 11 | A    My ID. |
| 11:13AM | 12 | Q    Okay.  Could we have you now look at Exhibit 1-615?  Do |
| 11:13AM | 13 | you recognize that? |
| 11:13AM | 14 | A    Yes. |
| 11:13AM | 15 | Q    Is that the ID you saw in the -- the previous photograph? |
| 11:13AM | 16 | A    Yes. |
| 11:13AM | 17 | Q    Is that your Hawaii driver's license? |
| 11:13AM | 18 | A    Identification card, yes. |
| 11:13AM | 19 | Q    Or identification card, yes. |
| 11:13AM | 20 |      MR. INCIONG:  Can we show Mr. Freitas 1-616 next? |
| 11:13AM | 21 | BY MR. INCIONG: |
| 11:13AM | 22 | Q    Do you recognize that? |
| 11:13AM | 23 | A    Yes.  My bank card. |
| 11:13AM | 24 | Q    That's a Bank of Hawaii debit card? |
| 11:13AM | 25 | A    Yes. |

11:13AM  1   Q    Do you recognize that as being one that you used in the

11:13AM  2   past?

11:13AM  3   A    Yes.

11:13AM  4   Q    These photos that you just saw, those three photos, do

11:13AM  5   those all three accurately show either your Hawaii

11:13AM  6   identification card and/or your Bank of Hawaii debit card?

11:13AM  7   A    Yes.

11:13AM  8        MR. INCIONG:  Your Honor, I would move to admit

11:14AM  9   Exhibits 1-614, 1-615 and 1-616.

11:14AM  10       THE COURT:  Any objection, Mr. Kennedy?

11:14AM  11       MR. KENNEDY:  No objection to 614, 615, and 616 of the

11:14AM  12  one series, Your Honor.

11:14AM  13       THE COURT:  All right.  Then all three exhibits are

11:14AM  14  admitted without objection 1-614 through 1-616.

11:14AM  15       MR. INCIONG:  Thank you, Your Honor.

11:14AM  16  (Exhibits 1-614, 1-615 and 1-616 were received in evidence.)

11:14AM  17  BY MR. INCIONG:

11:14AM  18  Q    So starting with the Exhibit 1-615, Mr. Freitas, do you

11:14AM  19  have any recollections as to when the last time you had this in

11:14AM  20  your possession?

11:14AM  21  A    No, I don't recollect.

11:14AM  22  Q    Okay.  Same question as -- as to 1-616.  Any recollection

11:14AM  23  as to when you last had that debit card in your possession?

11:14AM  24  A    No.

11:14AM  25       MR. INCIONG:  Okay.  We can take that down.

11:14AM    1    BY MR. INCIONG:

11:14AM    2    Q    So, Mr. Freitas, I want to direct you to July of 2016.  Do

11:15AM    3    you recall where you were living at that time?

11:15AM    4    A    2016?

11:15AM    5    Q    Yes.

11:15AM    6    A    Here in Hawaii.

11:15AM    7    Q    Okay.  Did you become aware that Jonathan Fraser had gone

11:15AM    8    missing at the end of that month?

11:15AM    9    A    No.

11:15AM   10    Q    When did you become aware of that, if ever?

11:15AM   11    A    I seen it on the news.

11:15AM   12    Q    Do you recall when that was approximately?

11:15AM   13    A    No, I don't.

11:15AM   14    Q    Do you know what happened to Mr. Fraser?

11:15AM   15    A    No, I don't know what happened.

11:15AM   16    Q    Did you ever see Mr. Fraser again after you'd heard that

11:15AM   17    he had been reported as missing?

11:15AM   18    A    No.

11:15AM   19    Q    Did you find that strange?

11:15AM   20    A    A little strange but...

11:15AM   21    Q    Did you ever have any conversation with Mr. Miske about

11:15AM   22    that?

11:15AM   23    A    No.

11:15AM   24    Q    Now, I want to ask you about you mentioned previously that

11:15AM   25    you had been dealing in oxycodone with Jake Smith, correct?

11:16AM   1   A    Yes.

11:16AM   2   Q    Is that one of the racketeering acts that you admitted to

11:16AM   3   as part of your plea agreement?

11:16AM   4   A    Yes.

11:16AM   5        MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-631,

11:16AM   6   please?

11:16AM   7   BY MR. INCIONG:

11:16AM   8   Q    And if we need to scroll down to refresh your memory, let

11:16AM   9   us know, Mr. Fraser.  I mean Mr. Freitas, but do you recognize

11:16AM  10   Exhibit 1-631?

11:16AM  11   A    Yes.

11:16AM  12   Q    Did you review those particular text messages before you

11:16AM  13   testified today?

11:16AM  14   A    Yes.

11:16AM  15   Q    Do -- do you recognize these texts as being texts that you

11:16AM  16   received and sent from this particular phone?

11:16AM  17   A    Yes.

11:16AM  18   Q    And this phone was the phone that you were -- you had in

11:16AM  19   your possession at the time of your arrest; is that correct?

11:16AM  20   A    Yes.

11:16AM  21        MR. INCIONG:  Your Honor, may I approach the witness

11:17AM  22   with a physical exhibit at this time, Exhibit 1-627, please.

11:17AM  23        THE COURT:  Go ahead.  Defense counsel I assume has

11:17AM  24   seen that.

11:17AM  25        MR. INCIONG:  I'm showing it right now.

11:17AM   1            THE COURT:  All right.

11:17AM   2    BY MR. INCIONG:

11:17AM   3    Q    Mr. Freitas, do you recognize that phone?

11:17AM   4    A    Yes.

11:17AM   5    Q    Prior to coming to court today, did you have an

11:17AM   6    opportunity to -- to look at that phone and review that phone?

11:17AM   7    A    Yes.

11:17AM   8    Q    Did you, in fact, remember the password to that phone?

11:17AM   9    A    Yes.

11:17AM   10   Q    Did the password activate the phone?

11:17AM   11   A    Yes.

11:17AM   12   Q    Were you able to get into the contacts and view things

11:17AM   13   such as the contacts, text messages such as the one on the

11:18AM   14   screen in front of you?

11:18AM   15   A    Yes.

11:18AM   16   Q    Is that the phone that you had in your possession when you

11:18AM   17   were arrested in July of 2020?

11:18AM   18   A    Yes.

11:18AM   19            MR. INCIONG:  Your Honor, I would move to admit

11:18AM   20   Exhibit 1-627 at this time.

11:18AM   21            THE COURT:  Any objection?

11:18AM   22            MR. KENNEDY:  No objection.

11:18AM   23            THE COURT:  1-627 is admitted without objection.

11:18AM   24            MR. INCIONG:  Thank you, Your Honor.

11:18AM   25            (Exhibit 1-627 was received in evidence.)

| | | |
|---|---|---|
| 11:18AM | 1 | BY MR. INCIONG: |
| 11:18AM | 2 | Q    So, Mr. Freitas, going back to Exhibit 1-631, these are a |
| 11:18AM | 3 | set of text messages that were taken off of this phone that you |
| 11:18AM | 4 | just identified, correct? |
| 11:18AM | 5 | A    Yes. |
| 11:18AM | 6 | Q    And do these messages accurately show the -- the messages |
| 11:18AM | 7 | as you saw them in your review either on this document itself |
| 11:18AM | 8 | or on the phone itself? |
| 11:18AM | 9 | A    Yes. |
| 11:18AM | 10 | MR. INCIONG:  Your Honor, I would move to admit |
| 11:18AM | 11 | Exhibit 1-631.  This is an extraction that the foundation and |
| 11:18AM | 12 | authenticity has been stipulated to by the parties and based on |
| 11:19AM | 13 | Mr. Freitas's identification.  I would move to admit it as an |
| 11:19AM | 14 | exhibit. |
| 11:19AM | 15 | THE COURT:  All right.  Mr. Kennedy? |
| 11:19AM | 16 | MR. KENNEDY:  No objection, Your Honor. |
| 11:19AM | 17 | THE COURT:  Without objection 1-631 is admitted and |
| 11:19AM | 18 | you may publish any part of the 17-page document. |
| 11:19AM | 19 | MR. INCIONG:  Thank you, Your Honor. |
| 11:19AM | 20 | If we can begin with page one to show the -- the jury. |
| 11:19AM | 21 | (Exhibit 1-631 was received in evidence.) |
| 11:19AM | 22 | BY MR. INCIONG: |
| 11:19AM | 23 | Q    So this -- these -- this particular -- |
| 11:19AM | 24 | MR. INCIONG:  Could we go back to what you just had, |
| 11:19AM | 25 | please? |

11:19AM   1   BY MR. INCIONG:

11:19AM   2   Q    You can see this text exchange is between two phone

11:19AM   3   numbers.  Do you recognize one of those as your own?

11:19AM   4   A    Yes.

11:19AM   5   Q    And that's the one ending in 1944?

11:19AM   6   A    Yes.

11:19AM   7   Q    It says Kaulana as owner?

11:19AM   8   A    Yes.

11:19AM   9   Q    Okay.  So the phone above that, there's a number ending in

11:19AM   10  7913; is that correct?

11:19AM   11  A    Yes.

11:19AM   12  Q    It says Kama'aina Plumbing?

11:19AM   13  A    Yes.

11:19AM   14  Q    Who was using this phone, if you recall, at the time?

11:20AM   15  A    I don't recall who was using that phone.

11:20AM   16  Q    So let me have you look down at some of the text bubbles

11:20AM   17  and see if that refreshes your memory.  So starting with this

11:20AM   18  one, this is not a message that was exchanged but this is a

11:20AM   19  message generated from the app; is that correct?

11:20AM   20  A    Yes.

11:20AM   21  Q    Was this WhatsApp you were using at that time?

11:20AM   22  A    Yes.

11:20AM   23  Q    And as you testified before, is this message confirming

11:20AM   24  that this text exchange is being secured with end-to-end

11:20AM   25  encryption?

| | | | |
|---|---|---|---|
| 11:20AM | 1 | A | Yes. |
| 11:20AM | 2 | Q | Let me have you look at the -- the next two bubbles there. |
| 11:20AM | 3 | | So these are dated May 15th of 2018, correct? |
| 11:20AM | 4 | A | Yes. |
| 11:20AM | 5 | Q | And do you recall are these message that -- messages that |
| 11:20AM | 6 | | you sent or that you were receiving at that time? |
| 11:20AM | 7 | A | I believe it's receiving. |
| 11:20AM | 8 | Q | And do you see what those two messages say? |
| 11:21AM | 9 | A | Yes. |
| 11:21AM | 10 | Q | 30MG yellow ones and 25 of them.  Did you know what that |
| 11:21AM | 11 | | referred to? |
| 11:21AM | 12 | A | Oxies. |
| 11:21AM | 13 | Q | Oxycodone tablets? |
| 11:21AM | 14 | A | Yes. |
| 11:21AM | 15 | Q | So 30 milligrams, that represents the -- the dosage? |
| 11:21AM | 16 | A | Yes. |
| 11:21AM | 17 | Q | 25 of them was saying 25of those pills? |
| 11:21AM | 18 | A | Yes. |
| 11:21AM | 19 | Q | Could we go to next page, please? |
| 11:21AM | 20 | | So do you see the top message in green that says, |
| 11:21AM | 21 | | what's the ticket? |
| 11:21AM | 22 | A | Yes. |
| 11:21AM | 23 | Q | What did that mean? |
| 11:21AM | 24 | A | What's the price? |
| 11:21AM | 25 | Q | And then the next message down says, you tell me then we |

11:21AM    1    can both make something.

11:21AM    2              What is being referred to there?

11:21AM    3    A    Discussing what it's going to be sold and bought for.

11:21AM    4    Q    Does the next message answer that?

11:21AM    5    A    Ten to 12.

11:21AM    6    Q    What does ten to 12 mean?

11:22AM    7    A    I believe it's how -- how much each one will be.

11:22AM    8    Q    Okay.  Ten to $12?

11:22AM    9    A    Yes.

11:22AM   10    Q    Per tablet?

11:22AM   11    A    Yes.

11:22AM   12    Q    Okay.  So did you have these sorts of discussions over --

11:22AM   13    over your -- your phone that you had on -- on your possession

11:22AM   14    in July of 2020?

11:22AM   15    A    I'm sorry.  Say that again.

11:22AM   16    Q    So this -- did you have other types of these conversations

11:22AM   17    discussing distribution of oxycodone on this phone?

11:22AM   18    A    Yes.

11:22AM   19    Q    The same phone that you had in your possession when you

11:22AM   20    were arrested?

11:22AM   21    A    Yes.

11:22AM   22    Q    Okay.  Do you recall who you were discussing the oxycodone

11:22AM   23    sales with during this particular text chain?

11:22AM   24    A    Not this text chain, no.

11:22AM   25    Q    Okay.  But from your knowledge and recollection, do you

| | | |
|---|---|---|
| 11:22AM | 1 | recall who you engaged in oxycodone distribution with? |
| 11:22AM | 2 | A    Jake Smith. |
| 11:22AM | 3 | Q    Okay.  Anyone else? |
| 11:22AM | 4 | A    I don't know. |
| 11:22AM | 5 | Q    Were you engaging in any -- any other kinds of drug |
| 11:23AM | 6 | distribution? |
| 11:23AM | 7 | A    Yes. |
| 11:23AM | 8 | Q    Which drugs? |
| 11:23AM | 9 | A    Vicodin. |
| 11:23AM | 10 | Q    Where were you obtaining the -- the Vicodin or oxycodone |
| 11:23AM | 11 | from? |
| 11:23AM | 12 | A    I was getting them prescribed to me. |
| 11:23AM | 13 | Q    And then you were sell them for profit? |
| 11:23AM | 14 | A    Yes. |
| 11:23AM | 15 | Q    Now, was Mr. Miske aware that you were distributing |
| 11:23AM | 16 | oxycodone and -- and the prescription drug? |
| 11:23AM | 17 | A    No. |
| 11:23AM | 18 | Q    Did you do that with any acknowledgement of his protection |
| 11:23AM | 19 | as you indicated previously? |
| 11:23AM | 20 | A    I'm sorry.  Say that again. |
| 11:23AM | 21 | Q    Did you engage in any of this drug distribution knowing |
| 11:23AM | 22 | you would be protected if something happens, went wrong? |
| 11:23AM | 23 | A    Yes. |
| 11:23AM | 24 |      MR. INCIONG:  Could we show Mr. Freitas Exhibit 1-1097 |
| 11:24AM | 25 | which is on the government's third supplemental exhibit list, |

| | | |
|---|---|---|
| 11:24AM | 1 | please? |
| 11:24AM | 2 | THE COURT:  Go ahead. |
| 11:24AM | 3 | BY MR. INCIONG: |
| 11:24AM | 4 | Q    Mr. Freitas, do you recognize what's shown in this photo? |
| 11:24AM | 5 | A    Yes. |
| 11:24AM | 6 | Q    Do you know where that is? |
| 11:24AM | 7 | A    Yes. |
| 11:24AM | 8 | Q    And the items that are, I guess, parked behind there, do |
| 11:24AM | 9 | you recognize what those are? |
| 11:24AM | 10 | A    Yes. |
| 11:24AM | 11 | Q    Have you seen those items in that location previously? |
| 11:24AM | 12 | A    Yes. |
| 11:24AM | 13 | Q    Does this photo accurately show the items parked there at |
| 11:24AM | 14 | the location that you recognize? |
| 11:24AM | 15 | A    Yes. |
| 11:24AM | 16 | Q    What is the location that you recognize? |
| 11:24AM | 17 | A    Mike's house on Kuuna. |
| 11:24AM | 18 | Q    That's in Kailua? |
| 11:24AM | 19 | A    Yes. |
| 11:24AM | 20 | MR. INCIONG:  Your Honor, I would move to admit 1-1097 |
| 11:24AM | 21 | at this time. |
| 11:24AM | 22 | THE COURT:  Any objection? |
| 11:24AM | 23 | MR. KENNEDY:  Is it on the original one, Counsel? |
| 11:24AM | 24 | MR. INCIONG:  Third supplemental list. |
| 11:24AM | 25 | MR. KENNEDY:  Third supplemental.  No objection. |

11:24AM   1            THE COURT:  Without objection 1-1097 is admitted.  You

11:24AM   2    may publish.

11:24AM   3            MR. INCIONG:  Thank you, Your Honor.

11:24AM   4            (Exhibit 1-1097 was received in evidence.)

11:25AM   5    BY MR. INCIONG:

11:25AM   6    Q    So what is shown in this photograph, Mr. Freitas?

11:25AM   7    A    Two Yamaha jet skis and a Kama'aina Termite vehicle truck.

11:25AM   8    Q    You mentioned these are parked at Mr. Miske's house on

11:25AM   9    Kuuna Street in Kailua?

11:25AM  10    A    Yes.

11:25AM  11    Q    Are -- are those jet skis of -- of the type that you would

11:25AM  12    ride at Maunalua Bay when you had the gatherings?

11:25AM  13    A    Yes.

11:25AM  14            MR. INCIONG:  Could we show Mr. Freitas next Exhibit

11:25AM  15    1-891 which has been previously admitted?  Could we publish

11:25AM  16    that, Your Honor?

11:25AM  17            THE COURT:  I don't have that as an admitted exhibit.

11:25AM  18            MR. INCIONG:  It is not?  Okay.  Let me lay -- My

11:25AM  19    apologies.  Let me lay some foundation for that then.

11:25AM  20    BY MR. INCIONG:

11:25AM  21    Q    Mr. Freitas, do you recognize what's shown in 1-891?

11:25AM  22    A    I don't have anything on my screen.

11:26AM  23    Q    You can't see it on your screen?

11:26AM  24    A    No.

11:26AM  25            THE COURT:  Still not coming up?

11:26AM   1            THE WITNESS:  No, sir.

11:26AM   2            MR. INCIONG:  I can move on while we work on that,

11:26AM   3   Your Honor.

11:26AM   4            THE COURT:  His screen is not working, his monitor.

11:26AM   5            THE CLERK:  No.

11:26AM   6            THE WITNESS:  The screen just popped up.

11:26AM   7            THE CLERK:  Is it on?

11:26AM   8            THE WITNESS:  Yes.

11:26AM   9            THE CLERK:  Okay.

11:26AM   10           MR. INCIONG:  Okay.  Thank you.

11:26AM   11   BY MR. INCIONG:

11:26AM   12   Q    Do you recognize what's shown in Exhibit 1-891, Mr.

11:26AM   13   Freitas?

11:26AM   14   A    Yes.

11:26AM   15   Q    How do you recognize that?

11:26AM   16   A    That's Mike's house.

11:26AM   17   Q    That's the house on Kuuna Street?

11:26AM   18   A    Yes.

11:26AM   19   Q    Does this photo accurately show Mr. Miske's house on Kuuna

11:26AM   20   Street?

11:26AM   21   A    Yes.

11:26AM   22           MR. INCIONG:  Your Honor, I would move to admit

11:26AM   23   Exhibit 1-891.

11:26AM   24           THE COURT:  Okay.  Any objection?

11:26AM   25           MR. KENNEDY:  No objection.

11:26AM  1                THE COURT:  Without objection 1-891 is admitted.  You

11:27AM  2   may publish.

11:27AM  3                MR. INCIONG:  Can we publish that?  Thank you.

11:27AM  4                (Exhibit 1-891 was received in evidence.)

11:27AM  5   BY MR. INCIONG:

11:27AM  6   Q    Mr. Freitas, is this the house just from a different view

11:27AM  7   that showed the jet skis parked in the previous exhibit?

11:27AM  8   A    Yes.

11:27AM  9   Q    With the jet skis parked in the -- the rear of that

11:27AM  10  property?

11:27AM  11  A    Yes.

11:27AM  12  Q    Now, you mentioned you went to the bay on many occasions,

11:27AM  13  correct?

11:27AM  14  A    Yes.

11:27AM  15  Q    For gatherings and rode jet skis there?

11:27AM  16  A    Yes.

11:27AM  17  Q    Do you recall an incident there in the year 2019, so the

11:27AM  18  year prior to your arrest, where Mr. Miske spoke to you and

11:27AM  19  Mr. Stancil about potentially being charged with -- with

11:27AM  20  criminal charges?

11:27AM  21  A    Yes.

11:27AM  22  Q    What do you recall about that?

11:27AM  23  A    It was our paper like in -- with our names.  It wasn't

11:27AM  24  handwritten.  It was typed out.

11:27AM  25  Q    Okay.  Well, let me back you up.  So where are you at this

| | | |
|---|---|---|
| 11:28AM | 1 | time, Maunalua Bay? |
| 11:28AM | 2 | A    Yes. |
| 11:28AM | 3 | Q    All right.  Who was with you? |
| 11:28AM | 4 | A    Me and Mike and John. |
| 11:28AM | 5 | Q    That's John Stancil? |
| 11:28AM | 6 | A    Yes. |
| 11:28AM | 7 | Q    And Michael Miske? |
| 11:28AM | 8 | A    Yes. |
| 11:28AM | 9 | Q    How did this subject come up? |
| 11:28AM | 10 | A    We just got a piece of paper from somebody that said our |
| 11:28AM | 11 | name was on it. |
| 11:28AM | 12 | Q    Who -- who -- who produced the piece of paper initially? |
| 11:28AM | 13 | When you first saw it, who had it? |
| 11:28AM | 14 | A    Mike had the paper. |
| 11:28AM | 15 | Q    Say this is a paper.  Was it like one single piece of |
| 11:28AM | 16 | paper or a -- a set of documents? |
| 11:28AM | 17 | A    It was one single paper. |
| 11:28AM | 18 | Q    Did it look like a handwritten piece of paper like on a |
| 11:28AM | 19 | piece of writing paper or something? |
| 11:28AM | 20 | A    No.  It was typed. |
| 11:28AM | 21 | Q    Did it look like an official court document? |
| 11:28AM | 22 | A    Yes. |
| 11:28AM | 23 | Q    Could you -- could you tell what that court document was? |
| 11:28AM | 24 | A    No, I couldn't tell.  It just had our -- all our names on |
| 11:28AM | 25 | it. |

| | | | |
|---|---|---|---|
| 11:28AM | 1 | Q | Who is all our names? |
| 11:28AM | 2 | A | Everybody on top our indictment except Delia and Jason. |
| 11:29AM | 3 | Q | So that included Mike Miske? |
| 11:29AM | 4 | A | Uh-huh. |
| 11:29AM | 5 | Q | John Stancil? |
| 11:29AM | 6 | A | Yes. |
| 11:29AM | 7 | Q | Yourself? |
| 11:29AM | 8 | A | Yes. |
| 11:29AM | 9 | Q | Harry Kauhi? |
| 11:29AM | 10 | A | Yes. |
| 11:29AM | 11 | Q | Jake Smith? |
| 11:29AM | 12 | A | Yes. |
| 11:29AM | 13 | Q | Lance Bermudez? |
| 11:29AM | 14 | A | Yes. |
| 11:29AM | 15 | Q | Norman Akau? |
| 11:29AM | 16 | A | Yes. |
| 11:29AM | 17 | Q | You saw all those names on this document? |
| 11:29AM | 18 | A | Yes. |
| 11:29AM | 19 | Q | Mr. Miske showed you this? |
| 11:29AM | 20 | A | Yes. |
| 11:29AM | 21 | Q | Where did he get this document, did he say? |
| 11:29AM | 22 | A | No, I didn't know where he got it. |
| 11:29AM | 23 | Q | What did he say when he showed you this document? |
| 11:29AM | 24 | A | That our names is on the paper. |
| 11:29AM | 25 | Q | What did that mean? |

| | | | |
|---|---|---|---|
| 11:29AM | 1 | A | I don't know. |
| 11:29AM | 2 | Q | What did he tell you he thought it meant? |
| 11:29AM | 3 | A | That they was probably looking at us. |
| 11:29AM | 4 | Q | As far as what?  Who is "they"? |
| 11:29AM | 5 | A | The FBI. |
| 11:29AM | 6 | Q | They were looking at you as criminal subjects? |
| 11:29AM | 7 | A | Yes. |
| 11:29AM | 8 | Q | Did he give you any instructions after that -- at -- at |
| 11:30AM | 9 | | that point? |
| 11:30AM | 10 | A | To stay low. |
| 11:30AM | 11 | Q | What did that mean by "stay low"? |
| 11:30AM | 12 | A | Don't go out and party. |
| 11:30AM | 13 | Q | How long did this incident take place before you were |
| 11:30AM | 14 | | actually arrested in July of 2020? |
| 11:30AM | 15 | A | One year. |
| 11:30AM | 16 | Q | Did you stay low and out of sight? |
| 11:30AM | 17 | A | We tried to. |
| 11:30AM | 18 | Q | Did Mr. Miske agree you were staying low and out of sight? |
| 11:30AM | 19 | A | On one occasion, no. |
| 11:30AM | 20 | Q | What happened on that one occasion? |
| 11:30AM | 21 | A | It was around Christmastime and me and John Stancil was |
| 11:30AM | 22 | | out shopping, and we ended up at Rockza at a strip club.  So |
| 11:30AM | 23 | | his girlfriend at the time -- John's girlfriend at the time |
| 11:30AM | 24 | | busted John at this nightclub, so she contacted Mike and Mike |
| 11:31AM | 25 | | texted us. |

11:31AM    1    Q    Was he upset?

11:31AM    2    A    He was upset that we was out and we shouldn't be out

11:31AM    3    partying.

11:31AM    4    Q    Because of what he told you at the -- at the bay?

11:31AM    5    A    Yes.

11:31AM    6    Q    What did you do?

11:31AM    7    A    We left.  Went home.

11:31AM    8    Q    Did you ever receive any other information along those

11:31AM    9    lines from Mr. Miske prior to your arrest?

11:31AM   10    A    No.

11:31AM   11    Q    Do you believe you were going to be arrested eventually?

11:31AM   12    A    I never believed it.

11:31AM   13    Q    When the FBI came to your Hawaii Kai apartment, that

11:31AM   14    was -- did you believe it then?

11:31AM   15    A    Yes.

11:31AM   16    Q    So in 2020, in the months before you were arrested, you

11:31AM   17    were working strictly as a salesperson for Kama'aina Termite

11:31AM   18    and Pest Control, correct?

11:31AM   19    A    Yes.

11:31AM   20    Q    Selling the various pest services?

11:32AM   21    A    Yes.

11:32AM   22    Q    Were you involved at all in procuring the contract to

11:32AM   23    fumigate the Maunakoa -- Maunakea -- I'm sorry -- hotel on the

11:32AM   24    Big Island?

11:32AM   25    A    Yes.

11:32AM   1   Q   What was your involvement with that?

11:32AM   2   A   I got the lead and I worked on it for six months.

11:32AM   3   Q   How did you get the lead?

11:32AM   4   A   I got that lead from Jody (phonetic) that worked at

11:32AM   5   Kama'aina Termite and Pest Control.

11:32AM   6   Q   Okay.  So this was a big project?

11:32AM   7   A   This was a big project.

11:32AM   8   Q   Were there others involved with you in trying to land that

11:32AM   9   contract?

11:32AM  10   A   Yes.

11:32AM  11   Q   Who were some of the other people from Kama'aina that were

11:32AM  12   working with you on that?

11:32AM  13   A   Jake Matthews.

11:32AM  14   Q   Was Mr. Miske involved?

11:32AM  15   A   Yes.

11:32AM  16   Q   Was Delia Fabro-Miske involved?

11:32AM  17   A   Yes.

11:32AM  18   Q   Was the company Kama'aina Termite and Pest Control

11:32AM  19   successful in landing that contract?

11:32AM  20   A   Yes.

11:32AM  21   Q   Do you recall how much that contract was for?

11:32AM  22   A   I believe it was 2.5 million.

11:33AM  23   Q   You'd indicated before that as a salesperson you were

11:33AM  24   working on a commission?

11:33AM  25   A   Yes.

11:33AM Q Correct? Was that -- was that in place still when you were working on the Maunakea job?
11:33AM A We never discussed the percentage on that -- that job.
11:33AM Q Were you paid any commission?
11:33AM A No.
11:33AM Q Why not?
11:33AM A Because he left me out of that job.
11:33AM Q Who is "he"?
11:33AM A Mike Miske.
11:33AM Q What do you mean by he left you out of that job?
11:33AM A Later on he was working on it, he went -- flew to the Big Island. He fumigated the whole thing and I wasn't part of it.
11:33AM Q Did you feel like you'd been cut out?
11:33AM A Yes.
11:33AM Q Why?
11:33AM A I have no idea why.
11:33AM Q After the Maunakea job was completed, did you notice Mr. -- whether Mr. Miske had acquired any new possessions?
11:33AM A Yes.
11:33AM Q What did you notice?
11:34AM A He bought a brand new Ferrari.
11:34AM Q Did you see that Ferrari?
11:34AM A Yes.
11:34AM MR. INCIONG: Could we show Mr. Freitas Exhibit dash -- 9-1190 from the government's third supplemental exhibit

11:34AM   1    list?

11:34AM   2              THE COURT:  Okay.  Go ahead.

11:34AM   3    BY MR. INCIONG:

11:34AM   4    Q    Do you recognize what's shown in that photo, Mr. Freitas?

11:34AM   5    A    Yes.

11:34AM   6    Q    Is that the Ferrari you're referencing?

11:34AM   7    A    Yes.

11:34AM   8    Q    Does that accurately show the -- the car as you recall

11:34AM   9    seeing -- seeing it?

11:34AM   10   A    Yes.

11:34AM   11   Q    The car itself.

11:34AM   12             MR. INCIONG:  Could we show Mr. Freitas 9-1191 next,

11:34AM   13   please?

11:34AM   14   BY MR. INCIONG:

11:34AM   15   Q    Is that the same car, Mr. Freitas?

11:34AM   16   A    Yes.

11:34AM   17   Q    Does that accurately show it as you recall how it looked?

11:34AM   18   A    Yes.

11:34AM   19   Q    This is in 2020?

11:34AM   20   A    Yes.

11:34AM   21   Q    After the Maunakea job?

11:34AM   22   A    Yes.

11:35AM   23             MR. INCIONG:  Could we show Mr. Freitas 9-1192?

11:35AM   24   BY MR. INCIONG:

11:35AM   25   Q    Is this another angle of that same car?

| | | | |
|---|---|---|---|
| 11:35AM | 1 | A | Yes. |
| 11:35AM | 2 | Q | Does that accurately show it as you recall seeing it? |
| 11:35AM | 3 | A | Yes. |
| 11:35AM | 4 | | MR. INCIONG:  Could we show Mr. Freitas 9-1193? |
| 11:35AM | 5 | BY MR. INCIONG: |
| 11:35AM | 6 | Q | Is this a rear view of the same car? |
| 11:35AM | 7 | A | Yes. |
| 11:35AM | 8 | Q | Does that accurately show the Ferrari as you saw it? |
| 11:35AM | 9 | A | Yes. |
| 11:35AM | 10 | | MR. INCIONG:  And then finally could we show 9-1194? |
| 11:35AM | 11 | | THE WITNESS:  Yes. |
| 11:35AM | 12 | BY MR. INCIONG: |
| 11:35AM | 13 | Q | Is that just another angle of that same vehicle? |
| 11:35AM | 14 | A | Yes. |
| 11:35AM | 15 | Q | Is that an accurate depiction as well? |
| 11:35AM | 16 | A | Yes. |
| 11:35AM | 17 | | MR. INCIONG:  Your Honor, I would move to admit |
| 11:35AM | 18 | Exhibits 9-1190 through 1194 at this time. |
| 11:35AM | 19 | | THE COURT:  Any objection? |
| 11:35AM | 20 | | MR. KENNEDY:  No objection, Your Honor. |
| 11:35AM | 21 | | THE COURT:  All right.  Without objection, those five |
| 11:35AM | 22 | exhibits are admitted, 9-1190 through 9-1194.  You may publish. |
| 11:35AM | 23 | | MR. INCIONG:  Thank you. |
| 11:35AM | 24 | (Exhibits 9-1190 through 9-1194 were received in evidence.) |
| 11:35AM | 25 | BY MR. INCIONG: |

11:35AM   1   Q    So beginning with 1194 and we'll go backwards.  Is that

11:36AM   2   the -- the new Ferrari you were referencing?

11:36AM   3   A    Yes.

11:36AM   4            MR. INCIONG:  Can we show 9-1193?

11:36AM   5   BY MR. INCIONG:

11:36AM   6   Q    That's the rear view of that?

11:36AM   7   A    Yes.

11:36AM   8            MR. INCIONG:  Can we show 9-1192?

11:36AM   9   BY MR. INCIONG:

11:36AM   10  Q    That's the other side, the driver's side, correct?

11:36AM   11  A    Yes.

11:36AM   12            MR. INCIONG:  Could we go to 9-1191?

11:36AM   13  BY MR. INCIONG:

11:36AM   14  Q    This is an angle from the front of that car in a different

11:36AM   15  location?

11:36AM   16  A    Yes.

11:36AM   17  Q    And finally 9-1190, is that the head-on view of that car?

11:36AM   18  A    Yes.

11:36AM   19  Q    Mr. Freitas how much commission were you -- well, I'll ask

11:36AM   20  expecting first.  What were you expecting to -- to earn from

11:36AM   21  the Maunakea work that you did?

11:36AM   22  A    Ten to 15 percent.

11:36AM   23  Q    Ten to 15 percent of a 2.5 million job --

11:36AM   24  A    Yes.

11:37AM   25  Q    -- would be a lot of money?

| | | | |
|---|---|---|---|
| 11:37AM | 1 | A | Yes. |
| 11:37AM | 2 | Q | Over 200,000 potentially? |
| 11:37AM | 3 | A | Yes. |
| 11:37AM | 4 | Q | How much did you get? |
| 11:37AM | 5 | A | Nothing. |
| 11:37AM | 6 | Q | Do you know how much this Ferrari cost? |
| 11:37AM | 7 | A | Probably as much as I would have got for my commission. |
| 11:37AM | 8 | | MR. INCIONG:  Okay.  We can take that down. |
| 11:37AM | 9 | | BY MR. INCIONG: |
| 11:37AM | 10 | Q | Now, Mr. Freitas, you also admitted to -- in your plea |
| 11:37AM | 11 | | agreement to committing assaults, correct? |
| 11:37AM | 12 | A | Yes. |
| 11:37AM | 13 | Q | Those are not racketeering acts by themselves, but you |
| 11:37AM | 14 | | testified that you committed those to further the enterprise? |
| 11:37AM | 15 | A | Yes. |
| 11:37AM | 16 | Q | Who did you commit some of these assaults with again? |
| 11:37AM | 17 | A | Jake Smith and John Stancil. |
| 11:37AM | 18 | Q | And in your mind, how did committing these assaults on |
| 11:37AM | 19 | | behalf of Mr. Miske further or help the enterprise? |
| 11:37AM | 20 | A | Being feared. |
| 11:38AM | 21 | Q | Were there any other assaults that you planned to commit |
| 11:38AM | 22 | | with Mr. Miske that didn't happen for -- for whatever reason? |
| 11:38AM | 23 | A | It was one time that we was just -- I had some issues.  We |
| 11:38AM | 24 | | masked up with batons but nothing happened. |
| 11:38AM | 25 | Q | So when you say "we," who is we to begin with? |

11:38AM   1   A   John Stancil and Mike.

11:38AM   2   Q   So you all masked up, you wore -- put on masks?

11:38AM   3   A   Yes.

11:38AM   4   Q   And you say "baton," what does that mean?

11:38AM   5   A   It was metal batons.

11:38AM   6   Q   That -- that's like a weapon that sometimes law

11:38AM   7   enforcement will use?

11:38AM   8   A   Yes.

11:38AM   9   Q   Does that -- did those retract and they can be extended to

11:38AM   10   be longer?

11:38AM   11   A   Yes.

11:38AM   12   Q   Are those typically made out of metal?

11:38AM   13   A   Yes.

11:38AM   14   Q   When do you recall that took place?

11:38AM   15   A   I had an issue with my ex-girlfriend, and we went there.

11:39AM   16   We went there and we seen HPD.  I had some problems with her.

11:39AM   17   My girlfriend's cousin.

11:39AM   18   Q   HPD was there when you got there?

11:39AM   19   A   HPD was there, so we left.

11:39AM   20   Q   So it was called off?

11:39AM   21   A   Yes.

11:39AM   22   Q   And it never happened?

11:39AM   23   A   Yes.

11:39AM   24   Q   Had HPD not been there, you planned to carry through with

11:39AM   25   it?

| | | | |
|---|---|---|---|
| 11:39AM | 1 | A | Yes. |
| 11:39AM | 2 | Q | So I want to ask you a little bit more about this phone |
| 11:39AM | 3 | | that you had in your possession at the time of your arrest.  Do |
| 11:39AM | 4 | | you recall the phone number for that phone? |
| 11:39AM | 5 | A | Yes. |
| 11:39AM | 6 | Q | What was the phone number? |
| 11:39AM | 7 | A | 585-1944, 808 area code. |
| 11:39AM | 8 | Q | So did you typically carry more than one phone at a time? |
| 11:39AM | 9 | A | No, not really. |
| 11:39AM | 10 | Q | So was this the -- the only phone that you were using at |
| 11:40AM | 11 | | the time you were arrested in 2020? |
| 11:40AM | 12 | A | Mainly, yes. |
| 11:40AM | 13 | Q | When you say "mainly," what do you mean by that? |
| 11:40AM | 14 | A | I had another one as well.  At that time, it was buy one |
| 11:40AM | 15 | | get one so I bought this one and another phone. |
| 11:40AM | 16 | Q | Were you actively using that phone or was it a backup? |
| 11:40AM | 17 | A | It was just a backup. |
| 11:40AM | 18 | Q | So this -- the phone that you -- the phone number you just |
| 11:40AM | 19 | | indicated, that's the phone that you identified just a few |
| 11:40AM | 20 | | minutes ago? |
| 11:40AM | 21 | A | Yes. |
| 11:40AM | 22 | Q | That was the one that you used primarily? |
| 11:40AM | 23 | A | Yes. |
| 11:40AM | 24 | Q | Did you have a number of contacts that you stored in that |
| 11:40AM | 25 | | particular phone? |

11:40AM   1   A    In this phone?

11:40AM   2   Q    Yes.

11:40AM   3   A    Yes.

11:40AM   4         MR. INCIONG:  Your Honor, could we show for Mr.

11:40AM   5   Freitas only Exhibit 1-630 at this time?

11:40AM   6         THE COURT:  Go ahead.

11:40AM   7   BY MR. INCIONG:

11:40AM   8   Q    Mr. Freitas, do you recognize what's been marked as 1-630?

11:41AM   9   A    Yes.

11:41AM  10   Q    Is this your contacts list that was in the phone with the

11:41AM  11   phone number ending 1944?

11:41AM  12   A    Yes.

11:41AM  13   Q    Is it fair to say that you had quite a few contacts in

11:41AM  14   your contacts list?

11:41AM  15   A    Yes.

11:41AM  16   Q    Prior to coming to court today, did you review and go

11:41AM  17   through that entire contacts list?

11:41AM  18   A    Yes.

11:41AM  19   Q    Did you recognize that as being the contacts you had

11:41AM  20   stored in this phone?

11:41AM  21   A    Yes.

11:41AM  22   Q    If we need to scroll through this to make sure for you,

11:41AM  23   let us know.  But in looking at this first page and scrolling

11:41AM  24   down at least for the next couple to give you an idea, is this

11:41AM  25   the -- the contact list that you reviewed prior to coming to

11:41AM    1    court today that was taken from your phone with the phone

11:41AM    2    number ending in 1944?

11:41AM    3    A    Yes.

11:41AM    4          MR. INCIONG:  Your Honor, I would move to admit

11:41AM    5    Exhibit 1-630.  This is an extraction again foundation and

11:42AM    6    authenticity has been stipulated to by the parties.  This is 23

11:42AM    7    pages long.  Mr. Freitas has identified it as the contact list

11:42AM    8    from the phone he had in his possession at the time of his

11:42AM    9    arrest.

11:42AM   10          THE COURT:  Mr. Kennedy any, objection?

11:42AM   11          MR. KENNEDY:  Your Honor, if I could just see the

11:42AM   12    pages?  I don't think I do but...

11:42AM   13          THE COURT:  Of course.  I think he's scrolling through

11:42AM   14    it as we speak.

11:42AM   15          MR. KENNEDY:  He is, thank you, sir.  No objection,

11:44AM   16    Your Honor.

11:44AM   17          THE COURT:  Without objection Exhibit 1-630 is

11:44AM   18    admitted and you may publish.

11:44AM   19          MR. INCIONG:  Thank you, Your Honor.

11:44AM   20          (Exhibit 1-630 was received in evidence.)

11:44AM   21    BY MR. INCIONG:

11:44AM   22    Q    So, Mr. Freitas, starting on page one of Exhibit 1-630,

11:44AM   23    I'm not going to go through every one of these with you but I

11:44AM   24    do want to ask you about a number of them.  So starting with

11:44AM   25    contact number one, that contact is Allen Lau, correct?

11:44AM   1   A    Yes.

11:44AM   2   Q    That was the same gentlemen that you identified in one of

11:44AM   3   the pictures at the M club earlier today?

11:44AM   4   A    Yes.

11:44AM   5   Q    That's your cousin, correct?

11:44AM   6   A    Yes.

11:44AM   7   Q    Okay.  Could we go down to contact number five, please?

11:44AM   8   Do you recognize that name?

11:44AM   9   A    Yes.

11:44AM  10   Q    Andi, A-N-D-I?

11:45AM  11   A    Yes.

11:45AM  12   Q    Who is Andi?

11:45AM  13   A    One of Mike's girlfriends.

11:45AM  14   Q    Do you know Andi's full name?

11:45AM  15   A    I believe the last name starts with a K.

11:45AM  16   Q    Does the name Kaneakua sound familiar?

11:45AM  17   A    Yes.

11:45AM  18   Q    That's listed on -- see the source under Andi's name?  It

11:45AM  19   says WhatsApp, correct?

11:45AM  20   A    Yes.

11:45AM  21   Q    So that's the -- the encrypted app that you would use

11:45AM  22   sometimes?

11:45AM  23   A    Yes.

11:45AM  24   Q    And Andi's number is listed as (808) 724-8697?

11:45AM  25   A    Yes.

11:45AM   1   Q   Did Andi work at Kama'aina Termite and Pest Control?

11:45AM   2   A   Yes.

11:45AM   3   Q   What was her position there?

11:45AM   4   A   I believe she was a manager.

11:45AM   5   Q   When you were working there reporting to the shop every

11:45AM   6   day, was she always there?

11:45AM   7   A   Yes.

11:45AM   8   Q   Where was her office in relation to Mr. Miske's office?

11:45AM   9   A   Right above Mike's office, second floor.

11:45AM  10   Q   Did you see her frequently in Mike's office when you were

11:45AM  11   there?

11:45AM  12   A   Yes.

11:45AM  13   Q   Could we go next to page two to contact number ten?  Do

11:46AM  14   you recognize that contact?

11:46AM  15   A   Yes.

11:46AM  16   Q   Who is Angela Varnadore?

11:46AM  17   A   One of Mike's girlfriends.

11:46AM  18   Q   Where did Angela Varnadore work, if you know?

11:46AM  19   A   She did the advertisement.

11:46AM  20   Q   For which company?

11:46AM  21   A   Kama'aina Termite and Pest Control.

11:46AM  22   Q   And again that's another -- that's a WhatsApp source

11:46AM  23   contact there?

11:46AM  24   A   Yes.

11:46AM  25   Q   Angela Varnadore's number is (808) 778-8776?

11:46AM    1    A    Yes.

11:46AM    2    Q    All right.  Can I have you turn then to page three and

11:46AM    3    look at contact 13?  That's Caleb Miske?

11:46AM    4    A    Yes.

11:46AM    5    Q    That was his phone number?

11:46AM    6    A    Yes.

11:46AM    7    Q    Also on WhatsApp?

11:47AM    8    A    Yes.

11:47AM    9    Q    All right.  Let me next have you turn to page four,

11:47AM   10    please.  Contact number 24.  Do you see that name?

11:47AM   11    A    Yes.

11:47AM   12    Q    Who is Jake Cook?

11:47AM   13    A    Family friend.

11:47AM   14    Q    Do you know where Jake Cook grew up?

11:47AM   15    A    Waimanalo.

11:47AM   16    Q    Were you friends with Jake -- Jake Cook?

11:47AM   17    A    Yes.

11:47AM   18    Q    Was John Stancil friends with Jake Cook?

11:47AM   19    A    Yes.

11:47AM   20    Q    Was Mr. Miske friends with Jake Cook?

11:47AM   21    A    Yes.

11:47AM   22    Q    Did you know Jake Cook from growing up as kids?

11:47AM   23    A    Yes.

11:47AM   24    Q    So there this is not a phone number but this is -- the

11:47AM   25    source is Snapchat, correct?

| | | | |
|---|---|---|---|
| 11:47AM | 1 | A | Yes. |
| 11:47AM | 2 | Q | You used Snapchat on occasion? |
| 11:47AM | 3 | A | Yes. |
| 11:47AM | 4 | Q | So if we go to page five, please.  Contact number 26. |
| 11:48AM | 5 | | Jake Cook's name is there again, correct? |
| 11:48AM | 6 | A | Yes. |
| 11:48AM | 7 | Q | And is that a phone number on WhatsApp for him? |
| 11:48AM | 8 | A | Yes. |
| 11:48AM | 9 | Q | And that's (808) 864-1897? |
| 11:48AM | 10 | A | Yes. |
| 11:48AM | 11 | Q | Could I have you look at contract number 28 next?  Who is |
| 11:48AM | 12 | | Craig Ivester? |
| 11:48AM | 13 | A | My uncle. |
| 11:48AM | 14 | Q | Where did Craig Ivester grow up? |
| 11:48AM | 15 | A | Waimanalo. |
| 11:48AM | 16 | Q | And this is a WhatsApp source number as well? |
| 11:48AM | 17 | A | Yes. |
| 11:48AM | 18 | Q | And that's area code (702) 409-9940? |
| 11:48AM | 19 | A | Yes. |
| 11:48AM | 20 | Q | Do you recognize the 702 area code? |
| 11:48AM | 21 | A | Yes. |
| 11:48AM | 22 | Q | What area code is that attributed to? |
| 11:48AM | 23 | A | Las Vegas. |
| 11:48AM | 24 | Q | Did Craig Ivester in Las Vegas? |
| 11:48AM | 25 | A | Yes. |

11:48AM   1   Q   Let me have you next look at contact 34 which is on page

11:48AM   2   six.  Who is David Melton?

11:49AM   3   A   He worked for Kama'aina Termite and Pest Control.

11:49AM   4   Q   What was David Melton's position there?

11:49AM   5   A   He was a manager.

11:49AM   6   Q   And then contact 35, that's below that, is there a

11:49AM   7   WhatsApp listed for David Melton?

11:49AM   8   A   Yes.

11:49AM   9   Q   237-9969?

11:49AM   10   A   Yes.

11:49AM   11   Q   All right.  Could we next go down to contact number 38 on

11:49AM   12   that same page?  Who is Dealz, D-E-A-L-Z?

11:49AM   13   A   Delia.

11:49AM   14   Q   Delia Fabro-Miske?

11:49AM   15   A   Yes.

11:49AM   16   Q   Is there a phone number for her there?

11:49AM   17   A   Yes.

11:49AM   18   Q   On WhatsApp as well?

11:49AM   19   A   Yes.

11:49AM   20   Q   That's (808) 726-4429?

11:49AM   21   A   Yes.

11:49AM   22   Q   Let's go to page seven next please and contact number 43,

11:50AM   23   Eric Lum.  This is the same Eric Lum that -- that you robbed of

11:50AM   24   the marijuana?

11:50AM   25   A   Yes.

11:50AM   1   Q    That Mr. Miske had to come and protect you from being --

11:50AM   2   from the retribution from that?

11:50AM   3   A    Yes.

11:50AM   4   Q    And his phone number is (808) 445-0964?

11:50AM   5   A    Yes.

11:50AM   6   Q    Could we go next to page eight?  The top contact there 46,

11:50AM   7   that's Jay Ivester.  Who is Jay Ivester?

11:50AM   8   A    My uncle.

11:50AM   9   Q    Contact 46.  Next.  Do you see that?

11:50AM   10   A    Yes.

11:50AM   11   Q    Rich Ivester?

11:50AM   12   A    Yes.

11:50AM   13   Q    Is that another uncle?

11:50AM   14   A    Yes.

11:50AM   15        THE COURT:  Is that contact 46?

11:50AM   16        MR. INCIONG:  I'm sorry.  Contact 48.  I'm sorry.  We

11:51AM   17   went to -- from 46 to 48.  Thank you.

11:51AM   18   BY MR. INCIONG:

11:51AM   19   Q    All right.  Could we go please next to page nine, contact

11:51AM   20   56.  Jake Smith, correct?

11:51AM   21   A    Yes.

11:51AM   22   Q    This is the Jake Smith that you said that you discussed

11:51AM   23   robberies with?

11:51AM   24   A    Yes.

11:51AM   25   Q    That you were dealing oxycodone with?

| | | | |
|---|---|---|---|
| 11:51AM | 1 | A | Yes. |
| 11:51AM | 2 | Q | And this is a Snapchat contact you had for Jake Smith? |
| 11:51AM | 3 | A | Yes. |
| 11:51AM | 4 | Q | Could we go next to page ten, contact number 62?  Jason |
| 11:51AM | 5 | | Yokoyama? |
| 11:51AM | 6 | A | Yes. |
| 11:51AM | 7 | Q | That was the person you identified as the manager of |
| 11:51AM | 8 | | Mr. Miske's nightclub? |
| 11:52AM | 9 | A | Yes. |
| 11:52AM | 10 | Q | Could we go please to page 11, contact 69.  Who is JB? |
| 11:52AM | 11 | A | John Blane. |
| 11:52AM | 12 | Q | John Blane Stancil? |
| 11:52AM | 13 | A | Yes. |
| 11:52AM | 14 | Q | And there's a WhatsApp number there for him, correct? |
| 11:52AM | 15 | A | Yes. |
| 11:52AM | 16 | Q | That's (808) 469-5665? |
| 11:52AM | 17 | A | Yes. |
| 11:52AM | 18 | Q | Can we go to page 12?  Contact number 78.  I'm sorry, 76. |
| 11:52AM | 19 | | Is that another contact for John Stancil? |
| 11:52AM | 20 | A | Yes. |
| 11:52AM | 21 | Q | And that's a WhatsApp source as well? |
| 11:52AM | 22 | A | Yes. |
| 11:52AM | 23 | Q | But -- but that is a different number than the other |
| 11:52AM | 24 | | contact, correct? |
| 11:52AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 11:53AM | 1 | Q | So this one is (808) 799-3229? |
| 11:53AM | 2 | A | Yes. |
| 11:53AM | 3 | Q | Did you know Mr. Stancil to use multiple phone numbers or |
| 11:53AM | 4 | | multiple phones? |
| 11:53AM | 5 | A | Here and there. |
| 11:53AM | 6 | Q | Okay.  You have two different contact numbers for him in |
| 11:53AM | 7 | | your -- your contacts, correct? |
| 11:53AM | 8 | A | Yes. |
| 11:53AM | 9 | Q | If we could go to page 15, contact number 89.  You see the |
| 11:53AM | 10 | | contact for Manheim Hawaii? |
| 11:53AM | 11 | A | Yes. |
| 11:53AM | 12 | Q | That's the auto auction you referenced before, correct? |
| 11:53AM | 13 | A | Yes. |
| 11:53AM | 14 | Q | And that's their phone number? |
| 11:53AM | 15 | A | Yes. |
| 11:53AM | 16 | Q | All right.  Could we look at phone number -- I'm sorry, |
| 11:53AM | 17 | | phone contact 91?  Do you see that one? |
| 11:53AM | 18 | A | Yes. |
| 11:53AM | 19 | Q | Who is Maydeen? |
| 11:54AM | 20 | A | My auntie. |
| 11:54AM | 21 | Q | That's Maydeen Stancil? |
| 11:54AM | 22 | A | Yes. |
| 11:54AM | 23 | Q | That's John Stancil and Mike Miske's mother? |
| 11:54AM | 24 | A | Yes. |
| 11:54AM | 25 | Q | And that phone number is (808) 216-6795? |

| | | | |
|---|---|---|---|
| 11:54AM | 1 | A | Yes. |
| 11:54AM | 2 | Q | Let me have you look next at page 16 starting with |
| 11:54AM | 3 | | contract number 96.  Mike M, who is that? |
| 11:54AM | 4 | A | Mike Miske. |
| 11:54AM | 5 | Q | That's a WhatsApp number, correct? |
| 11:54AM | 6 | A | Yes. |
| 11:54AM | 7 | Q | That's (808) 341-4299? |
| 11:54AM | 8 | A | Yes. |
| 11:54AM | 9 | Q | Could I have you look at contact number one -- I'm sorry, |
| 11:54AM | 10 | | 99, the one above that.  That's a gmail contact for Mike Miske? |
| 11:54AM | 11 | A | Yes. |
| 11:55AM | 12 | Q | And the email is mike@kama'aina.com? |
| 11:55AM | 13 | A | Yes. |
| 11:55AM | 14 | Q | We look at contact number 100.  That's another gmail |
| 11:55AM | 15 | | contact for Mr. Miske, correct? |
| 11:55AM | 16 | A | Yes. |
| 11:55AM | 17 | Q | And that email is mike@mnlhnl.com? |
| 11:55AM | 18 | A | Yes. |
| 11:55AM | 19 | Q | Okay.  Let's turn next to page 17, please.  Contact number |
| 11:55AM | 20 | | 105.  Mikey Miske.  That's Mike Miske, the defendant, correct? |
| 11:55AM | 21 | A | Yes. |
| 11:55AM | 22 | Q | That's a WhatsApp number? |
| 11:55AM | 23 | A | Yes. |
| 11:55AM | 24 | Q | And this is a second number that you had for him in your |
| 11:55AM | 25 | | contacts list? |

| | | | |
|---|---|---|---|
| 11:55AM | 1 | A | Yes. |
| 11:55AM | 2 | Q | (808) 729-3034? |
| 11:55AM | 3 | A | Yes. |
| 11:55AM | 4 | Q | Could I have you look at exhibit -- I'm sorry, contact |
| 11:55AM | 5 | | number 107, please, Mr. Freitas?  Do you see that one? |
| 11:55AM | 6 | A | Yes. |
| 11:55AM | 7 | Q | That contact says my Miley, M-I-L-E-Y, M.  Is that correct |
| 11:56AM | 8 | | or is that a typo? |
| 11:56AM | 9 | A | Say that again. |
| 11:56AM | 10 | Q | Is Miley, is that -- is that correct or is that a typo? |
| 11:56AM | 11 | A | No, that's Miley. |
| 11:56AM | 12 | Q | Okay.  So that's someone different than Mikey M? |
| 11:56AM | 13 | A | Yes. |
| 11:56AM | 14 | Q | Okay.  All right.  Let me have you look next at page 18, |
| 11:56AM | 15 | | contact number 110, the first one at the top of the page.  Who |
| 11:56AM | 16 | | is Mills W? |
| 11:56AM | 17 | A | Wayne Mills, Wayne Miller. |
| 11:56AM | 18 | Q | And that's a WhatsApp number for him? |
| 11:56AM | 19 | A | Yes. |
| 11:56AM | 20 | Q | (808) 321-8464? |
| 11:56AM | 21 | A | Yes. |
| 11:56AM | 22 | Q | If we look at contact number 112, that's capital M, small |
| 11:56AM | 23 | | M.  Who is that? |
| 11:56AM | 24 | A | Mike Miske. |
| 11:56AM | 25 | Q | And there's a phone number there of (808) 321-8464? |

| | | | |
|---|---|---|---|
| 11:57AM | 1 | A | No.  It's 439-5220.  That's on my screen at 112. |
| 11:57AM | 2 | Q | My mistake, sorry.  (808) 439-5220, thank you.  That's the |
| 11:57AM | 3 | | number you had for Mr. Miske? |
| 11:57AM | 4 | A | Yes. |
| 11:57AM | 5 | Q | Okay.  Could you look at number 114, contact number 114, |
| 11:57AM | 6 | | two capital Ms here, MM.  Who is that? |
| 11:57AM | 7 | A | Mike Miske. |
| 11:57AM | 8 | Q | There is yet another number here for Mr. Miske, correct? |
| 11:57AM | 9 | A | Yes. |
| 11:57AM | 10 | Q | That's (808) 376-6481? |
| 11:57AM | 11 | A | Yes. |
| 11:57AM | 12 | Q | And that's a WhatsApp source number? |
| 11:57AM | 13 | A | Yes. |
| 11:57AM | 14 | Q | Can I -- you look at contact number 115, please?  That's |
| 11:57AM | 15 | | another two capital Ms, correct? |
| 11:57AM | 16 | A | Yes. |
| 11:57AM | 17 | Q | Who is that? |
| 11:57AM | 18 | A | Mike Miske. |
| 11:57AM | 19 | Q | And that's a WhatsApp number? |
| 11:57AM | 20 | A | Yes. |
| 11:57AM | 21 | Q | And that's another number (808) 228-7500? |
| 11:58AM | 22 | A | Yes. |
| 11:58AM | 23 | Q | Was it customary for Mr. Miske to have several different |
| 11:58AM | 24 | | phone numbers like this? |
| 11:58AM | 25 | A | I don't know about several.  Usually a couple phones he'll |

| | | | |
|---|---|---|---|
| 11:58AM | 1 | | have. |
| 11:58AM | 2 | Q | Okay.  But you had multiple phone numbers in your contacts |
| 11:58AM | 3 | | list for him, correct? |
| 11:58AM | 4 | A | Yes. |
| 11:58AM | 5 | Q | Could we go next to page 20, please, contact number 124. |
| 11:58AM | 6 | | Who is Preston? |
| 11:58AM | 7 | A | Preston Kimoto. |
| 11:58AM | 8 | Q | Preston Kimoto worked where? |
| 11:58AM | 9 | A | O'ahu Termite and Pest Control. |
| 11:58AM | 10 | Q | Did you -- were you friends with Mr. Kimoto? |
| 11:58AM | 11 | A | Yes. |
| 11:58AM | 12 | Q | Work friends or did you socialize with him as well? |
| 11:58AM | 13 | A | Work and socialized. |
| 11:58AM | 14 | Q | Was Mr. Kimoto friends with Mr. Miske? |
| 11:58AM | 15 | A | Yes. |
| 11:58AM | 16 | Q | How would you describe their relationship? |
| 11:58AM | 17 | A | Close. |
| 11:58AM | 18 | Q | Mr. Kimoto had a WhatsApp number here as well, correct? |
| 11:59AM | 19 | A | Yes. |
| 11:59AM | 20 | Q | (808) 859-2822? |
| 11:59AM | 21 | A | Yes. |
| 11:59AM | 22 | Q | Could we go to page 21 next, please?  Contact number 134. |
| 11:59AM | 23 | | Who is Richard McGuyer? |
| 11:59AM | 24 | A | My other cousin. |
| 11:59AM | 25 | Q | Did Mr. McGuyer work at Kama'aina Termite and Pest |

| | | |
|---|---|---|
| 11:59AM | 1 | Control? |
| 11:59AM | 2 | A    He did before. |
| 11:59AM | 3 | Q    Before what? |
| 11:59AM | 4 | A    He left. |
| 11:59AM | 5 | Q    Do you know why he left? |
| 11:59AM | 6 | A    Just started a new business. |
| 11:59AM | 7 | Q    Do you know what that business was? |
| 11:59AM | 8 | A    It was staging houses. |
| 11:59AM | 9 | Q    Can I have you look at the contact right below that number |
| 11:59AM | 10 | 135, Tia P.  Do you know who Tia P is? |
| 11:59AM | 11 | A    Tia Paoa. |
| 11:59AM | 12 | Q    Who is Tia Paoa? |
| 11:59AM | 13 | A    Another worker for the businesses. |
| 12:00PM | 14 | Q    What did she do for the business? |
| 12:00PM | 15 | A    She did the solar side. |
| 12:00PM | 16 | Q    And that's a WhatsApp number for Tia Paoa as well? |
| 12:00PM | 17 | A    Yes. |
| 12:00PM | 18 | Q    227-3707? |
| 12:00PM | 19 | A    Yes. |
| 12:00PM | 20 | MR. INCIONG:  Okay.  Okay.  I have no further |
| 12:00PM | 21 | questions regarding Exhibit 1-630. |
| 12:00PM | 22 | THE COURT:  This might be a good time then, |
| 12:00PM | 23 | Mr. Inciong. |
| 12:00PM | 24 | MR. INCIONG:  That's fine. |
| 12:00PM | 25 | THE COURT:  All right.  We're at -- just at the noon |

| | | |
|---|---|---|
| 12:00PM | 1 | hour.  And we've been going for about 90 minutes.  We'll go |
| 12:00PM | 2 | into our second break of the trial day then at this point. |
| 12:00PM | 3 | I'll remind our jurors to please refrain from discussing the |
| | 4 | substance of this case with anyone, including each another, |
| | 5 | until I advise you otherwise; to refrain from accessing any |
| | 6 | media or other accounts of this case that may be out there; and |
| | 7 | finally, please do not conduct any independent investigation |
| | 8 | into the facts, circumstances or persons involved. |
| 12:00PM | 9 | So let's try to keep it to about a 15 or 20-minute |
| 12:01PM | 10 | break and we will resume with a little more than an hour left |
| 12:01PM | 11 | in the trial week. |
| 12:01PM | 12 | (Proceedings were recessed at 12:01 p.m. to 12:26 |
| 12:02PM | 13 | p.m.) |
| 12:26PM | 14 | THE COURT:  All right.  We've returned from our second |
| 12:26PM | 15 | and final break of the trial day. |
| 12:26PM | 16 | And, Mr. Inciong, you may resume your direct |
| 12:26PM | 17 | examination of Mr. Freitas when you're ready. |
| 12:26PM | 18 | MR. INCIONG:  Thank you, Your Honor.  Before I |
| 12:26PM | 19 | proceed, I had neglected to move to admit Exhibit 1-638.  This |
| 12:26PM | 20 | was an extraction from the phone that is marked as Exhibit |
| 12:26PM | 21 | 1-632.  Mr. Freitas identified and we admitted the actual |
| 12:26PM | 22 | photographs that were captured in that extraction but I wanted |
| 12:26PM | 23 | to also move to admit the extraction report. |
| 12:26PM | 24 | THE COURT:  All right.  Any objection to that? |
| 12:26PM | 25 | MR. KENNEDY:  No objection, Your Honor. |

12:26PM  1          THE COURT:  All right.  Without objection 1-638 is

12:26PM  2   admitted.  And you are correct that the subsequent Exhibits

12:26PM  3   639, etcetera, were part of 638 and have been admitted.

12:26PM  4          MR. INCIONG:  Thank you, Your Honor.

12:26PM  5          (Exhibits 1-638 was received in evidence.)

12:26PM  6   BY MR. INCIONG:

12:26PM  7   Q    Mr. Freitas, just a few more requests for you, sir.  Could

12:26PM  8   I start with having you look at Exhibit 2-24, please?

12:27PM  9          MR. INCIONG:  This has been previously admitted, Your

12:27PM  10  Honor, if I could publish that.

12:27PM  11         THE COURT:  Yes, you may.  It has been.

12:27PM  12         MR. INCIONG:  Thank you, Your Honor.

12:27PM  13  BY MR. INCIONG:

12:27PM  14  Q    Mr. Freitas, do you recognize what's shown in this

12:27PM  15  particular photograph?

12:27PM  16  A    Yes.

12:27PM  17  Q    How do you recognize that?

12:27PM  18  A    This is the apartment in Hawaii Kai.

12:27PM  19  Q    Okay.  Can I have you look at Exhibit 2-101 which has also

12:27PM  20  previously been admitted.  Is that a different angle of that --

12:27PM  21  that same apartment you referenced?

12:27PM  22  A    Yes.

12:27PM  23  Q    How do you know of this apartment?

12:27PM  24  A    This is where Delia and Mike used to stay.

12:27PM  25  Q    Had you been to that apartment yourself?

| | | |
|---|---|---|
| 12:27PM | 1 | A     Yes. |
| 12:27PM | 2 | Q     Do you recall the time frame of when you believed |
| 12:27PM | 3 | Mr. Miske and Delia resided there? |
| 12:27PM | 4 | A     The time frame, no. |
| 12:27PM | 5 | MR. INCIONG:  I'm sorry.  May I publish this, too, |
| 12:27PM | 6 | Your Honor, 2-101? |
| 12:27PM | 7 | THE COURT:  Yes, you may.  It's been admitted. |
| 12:28PM | 8 | MR. INCIONG:  Thank you. |
| 12:28PM | 9 | BY MR. INCIONG: |
| 12:28PM | 10 | Q     In regard to if -- if we give you a -- a reference as |
| 12:28PM | 11 | to -- you recall the Caleb Miske passed away in March of 2016, |
| 12:28PM | 12 | correct? |
| 12:28PM | 13 | A     Yes. |
| 12:28PM | 14 | Q     Do you recall whether Mr. Miske and Delia stayed at this |
| 12:28PM | 15 | apartment after or before Caleb passed away? |
| 12:28PM | 16 | A     After. |
| 12:28PM | 17 | MR. INCIONG:  Could we show Mr. Freitas Exhibit 2-23, |
| 12:28PM | 18 | please, and if we could publish that?  That's been previously |
| 12:28PM | 19 | been admitted as well I believe. |
| 12:28PM | 20 | THE COURT:  Yes. |
| 12:28PM | 21 | MR. INCIONG:  Thank you, Your Honor. |
| 12:28PM | 22 | BY MR. INCIONG: |
| 12:28PM | 23 | Q     Mr. Freitas, does this map of Hawaii Kai? |
| 12:28PM | 24 | A     Yes. |
| 12:28PM | 25 | Q     Does this show the location of the apartment that you just |

12:28PM  1   recognized in the previous two photos on this map?

12:28PM  2   A    Yes.

12:28PM  3   Q    Could you indicate -- if -- if there's a marking area, you

12:29PM  4   can make your own marking as to approximately where that

12:29PM  5   apartment was located.  You -- you circled the red tag that's

12:29PM  6   on Keokea Place; is that correct?

12:29PM  7   A    Um-hm.

12:29PM  8        MR. INCIONG:  Okay.  All right.  We can take that

12:29PM  9   down.

12:29PM 10   BY MR. INCIONG:

12:29PM 11   Q    So, Mr. Freitas, you indicated that when you were

12:29PM 12   initially arrested you spent about 18 months almost in custody

12:29PM 13   before you were released?

12:29PM 14   A    Yes.

12:29PM 15   Q    You were released in January of 2022?

12:29PM 16   A    Yes.

12:29PM 17   Q    So when you were in custody for those first 18 months,

12:29PM 18   were you housed in the FDC Honolulu with any of your

12:29PM 19   codefendants?

12:29PM 20   A    Yes.

12:29PM 21   Q    Do you recall which codefendants you were housed with?

12:29PM 22   A    Dae Han Moon, Lance Bermudez, Norman Akau and John Stancil

12:29PM 23   and Jarrin Young.

12:29PM 24   Q    Okay.  You said you began cooperating in May of 2021 so

12:29PM 25   almost a year after you were arrested, correct?

12:29PM   1   A   Yes.

12:29PM   2   Q   In the period before you began cooperating, did you

12:30PM   3   discuss your case with any of those individuals?

12:30PM   4   A   No.

12:30PM   5   Q   At any point, did you have access to any of those

12:30PM   6   individuals' discovery or -- or reports?

12:30PM   7   A   No.

12:30PM   8   Q   You said earlier that you only told your mother and father

12:30PM   9   you were cooperating, correct?

12:30PM   10  A   Yes.

12:30PM   11  Q   After you were released in January of 2022, did you have

12:30PM   12  any contact whatsoever with any of your codefendants?

12:30PM   13  A   No.

12:30PM   14  Q   Did you ever speak with Jake Smith about agreeing to try

12:30PM   15  and blame everything on Mr. Miske?

12:30PM   16  A   No.

12:30PM   17  Q   Did you ever speak with Lance Bermudez about trying to

12:30PM   18  frame Mr. Miske?

12:30PM   19  A   No.

12:30PM   20  Q   Did you ever speak with Norman Akau about trying to blame

12:30PM   21  Mr. Miske?

12:30PM   22  A   No.

12:30PM   23  Q   Harry Kauhi?

12:30PM   24  A   No.

12:30PM   25  Q   Dae Han Moon?

| | | | |
|---|---|---|---|
| 12:30PM | 1 | A | No. |

12:30PM   1    A    No.

12:30PM   2    Q    Did you speak with anyone about trying to blame anyone

12:30PM   3    else other than yourself in this case?

12:30PM   4    A    No.

12:30PM   5         MR. INCIONG:  I have no further questions for

12:31PM   6    Mr. Freitas, Your Honor.

12:31PM   7         THE COURT:  Mr. Kennedy, cross-examination when you're

12:31PM   8    ready.

12:31PM   9                    CROSS-EXAMINATION

12:31PM  10    BY MR. KENNEDY:

12:31PM  11    Q    Sir, let's start with the Mike Char robbery, okay?

12:31PM  12    A    Yes.

12:31PM  13    Q    We saw you in the car with Mike Char?

12:31PM  14    A    Yes.

12:31PM  15    Q    He had stacks of bills?

12:31PM  16    A    Yes.

12:31PM  17    Q    Hundred dollar bills you believed?

12:31PM  18    A    Yes.

12:31PM  19    Q    Was going to be about a hundred thousand dollars, right?

12:31PM  20    A    Yes.

12:31PM  21    Q    So you knew that, right?

12:31PM  22    A    Yes.

12:31PM  23    Q    And then you and it appears John Stancil were in on the

12:31PM  24    plan?

12:31PM  25    A    Yes.

```
12:31PM    1    Q    And then you brought in Keoni Adric, right?

12:31PM    2    A    Yes.

12:31PM    3    Q    And Keli'i Young?

12:31PM    4    A    Keli'i Foster.

12:31PM    5    Q    Foster also known sometimes as Keli'i Young as well?

12:31PM    6    A    Yes.

12:31PM    7    Q    Lance Bermudez?

12:32PM    8    A    Yes.

12:32PM    9    Q    And Frankie Silva?

12:32PM   10    A    Yes.

12:32PM   11    Q    Okay.  So the plan was there was six of you, right?

12:32PM   12    A    Yes.

12:32PM   13    Q    And you were going to split what you thought was a hundred

12:32PM   14    thousand dollars, right?

12:32PM   15    A    Yes.

12:32PM   16    Q    So you came up with a plan to trick Mike Char to get to

12:32PM   17    the bay, right?

12:32PM   18    A    Yes.

12:32PM   19    Q    And so you got him at the bay and then you and John

12:32PM   20    Stancil were going to fool him and act like you were being

12:32PM   21    robbed, right?

12:32PM   22    A    Yes.

12:32PM   23    Q    So Keoni Adric came up with a mask, right?

12:32PM   24    A    Yes.

12:32PM   25    Q    Frankie Silva came up with a mask, right?
```

12:32PM   1   A   Yes.

12:32PM   2   Q   Lance Bermudez came up with a mask, right?

12:32PM   3   A   Yes.

12:32PM   4   Q   And Mr. Foster came up with a mask, right?

12:32PM   5   A   Yes.

12:32PM   6   Q   And they didn't just come up with a mask, they had guns,

12:32PM   7   right?

12:32PM   8   A   Two of them did have guns.

12:32PM   9   Q   Two of them, right?

12:32PM   10   A   Yes.

12:32PM   11   Q   And so what happened was then you jumped down to the

12:32PM   12   ground, right?

12:32PM   13   A   Yes.

12:32PM   14   Q   John did as well, right?

12:32PM   15   A   Yes.

12:32PM   16   Q   As part of this plan, right?

12:32PM   17   A   Yes.

12:32PM   18   Q   That the six of you kicked up, right?

12:32PM   19   A   Yes.

12:32PM   20   Q   Then two guys with a gun were there pointing it at Mike

12:33PM   21   Char, right?

12:33PM   22   A   Yes.

12:33PM   23   Q   And then you said a couple of guys started beating him,

12:33PM   24   right?

12:33PM   25   A   Yes.

12:33PM    1    Q    And then you were kicking him to the ground?

12:33PM    2    A    Yes.

12:33PM    3    Q    And then all of sudden, he got stripped of his shirt and

12:33PM    4    his pants?

12:33PM    5    A    Yes.

12:33PM    6    Q    Took his keys, right?

12:33PM    7    A    Yes.

12:33PM    8    Q    And you needed the keys because that was the key to get

12:33PM    9    that hundred thousand dollars, right?

12:33PM   10    A    Yes.

12:33PM   11    Q    That the six of you were going to split between

12:33PM   12    yourselves, right?

12:33PM   13    A    Correct.

12:33PM   14    Q    And so then someone takes the car away, right?

12:33PM   15    A    Yes.

12:33PM   16    Q    With the money, right?

12:33PM   17    A    Yes.

12:33PM   18    Q    Okay.  And Mike Char goes across the street I understand

12:33PM   19    it and calls the police, right?

12:33PM   20    A    Yes.

12:33PM   21    Q    So he reached out to the police, right?

12:33PM   22    A    Yes.

12:33PM   23    Q    And you saw him do that, correct?

12:33PM   24    A    Correct.

12:33PM   25    Q    So then you and John Stancil got away, right?

| | | | |
|---|---|---|---|
| 12:33PM | 1 | A | Yes. |
| 12:33PM | 2 | Q | And then you didn't want to be there during that time, |
| 12:34PM | 3 | | right? |
| 12:34PM | 4 | A | Correct. |
| 12:34PM | 5 | Q | But then you figured maybe you'd go back and act like you |
| 12:34PM | 6 | | had just been there, right? |
| 12:34PM | 7 | A | Yes. |
| 12:34PM | 8 | Q | So that no one would interview you about what happened, |
| 12:34PM | 9 | | right? |
| 12:34PM | 10 | A | Not interview. |
| 12:34PM | 11 | Q | Well, you got HPD.  He is calling the cops.  You figured |
| 12:34PM | 12 | | he was calling somebody, right? |
| 12:34PM | 13 | A | Nobody showed up.  We was with him the whole time. |
| 12:34PM | 14 | Q | Okay. |
| 12:34PM | 15 | A | He was across the street. |
| 12:34PM | 16 | Q | He was across the street? |
| 12:34PM | 17 | A | Yes. |
| 12:34PM | 18 | Q | Okay.  And so eventually then what happened was Mike Char |
| 12:34PM | 19 | | you said reached out to the police? |
| 12:34PM | 20 | A | Yes. |
| 12:34PM | 21 | Q | And he reached out to Mike Miske, didn't he? |
| 12:34PM | 22 | A | Yes. |
| 12:34PM | 23 | Q | Came to his house, right? |
| 12:34PM | 24 | A | Yes. |
| 12:34PM | 25 | Q | Told him what had happened, right? |

12:34PM    1    A    Correct.

12:34PM    2    Q    Asked for help in getting his car back, right?

12:34PM    3    A    Yes.

12:34PM    4    Q    Mike got him his car back, right?

12:34PM    5    A    Yes.

12:34PM    6    Q    And you said, he was mad because you committed the robbery

12:34PM    7    at the bay, right?

12:34PM    8    A    Yes.

12:34PM    9    Q    But he was mad because you committed the robbery, right?

12:34PM   10    A    Part of it.

12:34PM   11    Q    Yes.  Because he didn't know a thing about it, did he?

12:34PM   12    A    No.

12:34PM   13    Q    He didn't know anything about your robbing, correct?

12:35PM   14    A    No.

12:35PM   15    Q    He didn't know anything about these robberies that you

12:35PM   16    were doing, right?

12:35PM   17    A    No.

12:35PM   18    Q    With Chad Duncan, right?

12:35PM   19    A    No.

12:35PM   20    Q    Jake Smith?

12:35PM   21    A    No.

12:35PM   22    Q    John Stancil maybe?

12:35PM   23    A    No.

12:35PM   24    Q    Did this one -- didn't know a thing about it, did he?

12:35PM   25    A    No.

12:35PM   1   Q   So the idea wasn't that it happened at the bay, that just
12:35PM   2   made it that much worse because this was in April of 2016,
12:35PM   3   wasn't it?
12:35PM   4   A   Yes.
12:35PM   5   Q   It was right after Caleb's ashes were put in that water,
12:35PM   6   weren't they?
12:35PM   7   A   Yes.
12:35PM   8   Q   And so what do you do with these men but turn around and
12:35PM   9   try to rob a man of a hundred thousand dollars, right?
12:35PM  10   A   What was the question?
12:35PM  11   Q   What do you do but turn around within weeks of being at a
12:35PM  12   celebration of life and a funeral but rob a man where his ashes
12:35PM  13   are spread?
12:35PM  14   A   What do I do or what does he do?
12:36PM  15   Q   What did you do?  You robbed him, didn't you?
12:36PM  16   A   Yes.
12:36PM  17   Q   At that location?
12:36PM  18   A   Yes.
12:36PM  19   Q   After you jumped in the water, right?
12:36PM  20   A   Yes.
12:36PM  21   Q   And the ashes were spread within weeks of it, right?
12:36PM  22   A   I don't know of the exact dates, if it's weeks or months
12:36PM  23   or anything.
12:36PM  24   Q   There has been that phone, what you saw, wasn't that
12:36PM  25   April 20th on that video that we saw today on your phone?

| | | | |
|---|---|---|---|
| 12:36PM | 1 | A | Yes. |
| 12:36PM | 2 | Q | Of 2016? |
| 12:36PM | 3 | A | Yes. |
| 12:36PM | 4 | Q | Caleb died on March 12, 2016? |
| 12:36PM | 5 | A | Correct. |
| 12:36PM | 6 | Q | Celebration of life was March 20th of 2016? |
| 12:36PM | 7 | A | About a month ago.  A month later. |

12:36PM   8   Q   Okay.  Not a dime from one of these robberies ever went to

12:36PM   9   Mike Miske, correct?

12:36PM   10   A   Yes.

12:36PM   11   Q   Now, you talked about that his -- a racketeering activity.

12:37PM   12   He did not know about it, right?

12:37PM   13   A   No, he didn't know about it till later.

12:37PM   14   Q   He didn't have any money from it?

12:37PM   15   A   No.

12:37PM   16   Q   He didn't even know it happened until afterwards, right?

12:37PM   17   A   Yes.

12:37PM   18   Q   And with Mike Char after he helped find Mike Char's car

12:37PM   19   and got it back to him, he went to the bay and found you and

12:37PM   20   Johnnie, right?

12:37PM   21   A   Yes.

12:37PM   22   Q   And what he did was he took out his anger on your car,

12:37PM   23   right?

12:37PM   24   A   Yes.  And then he came after us.

12:37PM   25   Q   He came after you too because he was pissed, wasn't he?

| | | | |
|---|---|---|---|
| 12:37PM | 1 | A | Yes. |
| 12:37PM | 2 | Q | Because of what you had done, right? |
| 12:37PM | 3 | A | Yes. |
| 12:37PM | 4 | Q | And so that car was totaled, right? |
| 12:37PM | 5 | A | Yes. |
| 12:37PM | 6 | Q | And you thought he'd thrown that phone into the ocean, |
| 12:37PM | 7 | | right? |
| 12:37PM | 8 | A | Correct. |
| 12:37PM | 9 | Q | And that was his response to you robbing, right? |
| 12:38PM | 10 | A | Yes. |
| 12:38PM | 11 | Q | Now, you talked about protection.  Keoni Adric had |
| 12:38PM | 12 | | protection that night.  He had one of those guns, didn't he? |
| 12:38PM | 13 | A | Yes. |
| 12:38PM | 14 | Q | And Keoni Adric knows how to use one of those guns because |
| 12:38PM | 15 | | he killed two men as an FBI informant, didn't he? |
| 12:38PM | 16 | A | That's what I know on top the news. |
| 12:38PM | 17 | Q | And so does Lance Bermudez, right?  He knows how to use |
| 12:38PM | 18 | | those guns, right, you know that? |
| 12:38PM | 19 | A | Yes. |
| 12:38PM | 20 | Q | All right.  That was their protection, right? |
| 12:38PM | 21 | A | You can say so, yes. |
| 12:38PM | 22 | Q | They protected themselves with AR15s with 45s and 40s, |
| 12:38PM | 23 | | correct? |
| 12:38PM | 24 | A | Yes. |
| 12:38PM | 25 | Q | So now, let move on to the drug charge count 16 that was |

| | | | |
|---|---|---|---|
| 12:38PM | 1 | | dismissed against you? |
| 12:38PM | 2 | A | Yes. |
| 12:38PM | 3 | Q | Oxycodone, right? |
| 12:39PM | 4 | A | Yes. |
| 12:39PM | 5 | Q | You were selling it, right? |
| 12:39PM | 6 | A | Yes. |
| 12:39PM | 7 | Q | For a number of years, right? |
| 12:39PM | 8 | A | Yes. |
| 12:39PM | 9 | Q | All right.  You already told this jury Mike Miske he |
| 12:39PM | 10 | | didn't have any idea that you were doing that, did he? |
| 12:39PM | 11 | A | No. |
| 12:39PM | 12 | Q | He didn't profit one dime from it? |
| 12:39PM | 13 | A | No. |
| 12:39PM | 14 | Q | You were able to sell and it was your decision to do that, |
| 12:39PM | 15 | | right? |
| 12:39PM | 16 | A | Yes. |
| 12:39PM | 17 | Q | It was your money, right? |
| 12:39PM | 18 | A | Yes. |
| 12:39PM | 19 | Q | You didn't have to split it with anyone, right? |
| 12:39PM | 20 | A | Yes. |
| 12:39PM | 21 | Q | And so for that you didn't need any protection, did you? |
| 12:39PM | 22 | A | I had protection. |
| 12:39PM | 23 | Q | You had protection.  You were family, weren't you? |
| 12:39PM | 24 | A | Yes. |
| 12:39PM | 25 | Q | Okay.  And so you said, "Family should be loyal," right? |

| | | | |
|---|---|---|---|
| 12:40PM | 1 | A | Yes. |
| 12:40PM | 2 | Q | And family means something, doesn't it? |
| 12:40PM | 3 | A | Yes. |
| 12:40PM | 4 | Q | Now, with respect to the Eric Lum incident, that was |
| 12:40PM | 5 | | another one that you discussed? |
| 12:40PM | 6 | A | Yes. |
| 12:40PM | 7 | Q | That was trickery to get away with a bunch of drugs to |
| 12:40PM | 8 | | sell, right? |
| 12:40PM | 9 | A | Yes. |
| 12:40PM | 10 | Q | And so we saw the text messages and when Eric Lum must |
| 12:40PM | 11 | | have talked to his uncle Nate Lum, right? |
| 12:40PM | 12 | A | It wasn't technically his uncle. |
| 12:40PM | 13 | Q | Must have talk to him because he reached out to Mike |
| 12:40PM | 14 | | Miske, right? |
| 12:40PM | 15 | A | Yes. |
| 12:40PM | 16 | Q | And said that he'd been robbed by you, right? |
| 12:40PM | 17 | A | Eric Lum, yes. |
| 12:40PM | 18 | Q | Because we saw his contact in your phone, right? |
| 12:40PM | 19 | A | Yes. |
| 12:40PM | 20 | Q | So someone that you knew, someone that you had a contact |
| 12:41PM | 21 | | with, you treated him by robbing him of drugs, right? |
| 12:41PM | 22 | A | Yes. |
| 12:41PM | 23 | Q | All right.  And so you saw the text messages that came |
| 12:41PM | 24 | | between you and Mike, right? |
| 12:41PM | 25 | A | Yes. |

12:41PM    1    Q    And he referred to the fact of the -- the fact that you

12:41PM    2    had done this, right?

12:41PM    3    A    Yes.

12:41PM    4    Q    And that now you needed to make it right, didn't you?

12:41PM    5    A    Yes.

12:41PM    6    Q    But you didn't?

12:41PM    7    A    No.

12:41PM    8    Q    You never paid him back the 10,000, did you?

12:41PM    9    A    I did not pay Eric Lum back the 10,000, no.

12:41PM   10    Q    You didn't give him anything back, right?

12:41PM   11    A    No.

12:41PM   12    Q    Now, you mentioned something about protection, so some

12:41PM   13    guys show up at the shop, right?

12:41PM   14    A    Yes.

12:41PM   15    Q    And so these guys want to do something to you, right?

12:41PM   16    A    Yes.

12:41PM   17    Q    And you have an idea it has to do with Mr. Eric Lum,

12:41PM   18    right?

12:41PM   19    A    Yes.

12:41PM   20    Q    And that these guys look pretty threatening, right?

12:41PM   21    A    Yes.

12:41PM   22    Q    But you're not there.  You hear about it later, right?

12:41PM   23    A    Yes.

12:41PM   24    Q    And you're not there so they can't do anything to you, can

12:42PM   25    they?

12:42PM    1    A    No.

12:42PM    2    Q    And so for whatever reason, that didn't happen again,

12:42PM    3    right?

12:42PM    4    A    Yes.

12:42PM    5    Q    And so once again you were family, right?

12:42PM    6    A    Yes.

12:42PM    7    Q    Even though you had screwed up, right?

12:42PM    8    A    Yes.

12:42PM    9    Q    Just like when you got kicked out and you couldn't go to

12:42PM   10    the M anymore, right?

12:42PM   11    A    Yes.

12:42PM   12    Q    That wasn't the only time you'd been kicked out of the M,

12:42PM   13    right?

12:42PM   14    A    No.

12:42PM   15    Q    You were doing cocaine in the bathroom and it was captured

12:42PM   16    on the cameras, right?

12:42PM   17    A    Yes.

12:42PM   18    Q    So when you did something like that, you were kicked out

12:42PM   19    as well, weren't you?

12:42PM   20    A    Yes.

12:42PM   21    Q    And so you were removed from the club and couldn't come,

12:42PM   22    right?

12:42PM   23    A    For one weekend, yes.

12:42PM   24    Q    But once again, you were given another chance, right, by

12:42PM   25    Mike?

12:42PM   1   A     Yes.

12:42PM   2   Q     And so you said you'd been hired many times, right?

12:42PM   3   A     Yes.

12:42PM   4   Q     Fired many times right?

12:42PM   5   A     Yes.

12:42PM   6   Q     But each time he gave you another chance, right?

12:42PM   7   A     Yes.

12:42PM   8   Q     Maybe something that was lacking when you were growing up,

12:43PM   9   right?

12:43PM  10   A     "Lacking" meaning?

12:43PM  11   Q     People with -- a lot of time when people screw up then

12:43PM  12   they don't get another chance but part of being there for

12:43PM  13   someone is when they screw up?

12:43PM  14   A     Yes.

12:43PM  15   Q     You give them another chance and you say, there's a right

12:43PM  16   way to do it and a wrong way, right?

12:43PM  17   A     Yes.

12:43PM  18   Q     And you were given that many, many times by Mike Miske,

12:43PM  19   weren't you?

12:43PM  20   A     Yes.

12:43PM  21   Q     So in 2015, you came back from Las Vegas as I understand

12:43PM  22   it?

12:43PM  23   A     2015, 2016, yes.

12:43PM  24   Q     Okay.  All right.  Now, I want to talk to you a little bit

12:43PM  25   about the Maunakea job, okay?

| | | | |
|---|---|---|---|
| 12:43PM | 1 | A | Yes. |
| 12:43PM | 2 | Q | All right.  You knew Mike had started a company probably |
| 12:43PM | 3 | | even before you left to go to Las Vegas, right? |
| 12:43PM | 4 | A | Started what company? |
| 12:43PM | 5 | Q | Kama'aina Termite and Pest Control? |
| 12:44PM | 6 | A | Yes. |
| 12:44PM | 7 | Q | And you knew they were involved with big projects, right? |
| 12:44PM | 8 | A | Yes. |
| 12:44PM | 9 | Q | Waikiki Shell? |
| 12:44PM | 10 | A | Yes. |
| 12:44PM | 11 | Q | You can -- King Kam IV over on the Big Island, right? |
| 12:44PM | 12 | A | Yes. |
| 12:44PM | 13 | Q | Huge jobs that no one else was doing? |
| 12:44PM | 14 | A | Yes. |
| 12:44PM | 15 | Q | All right.  Now, you came back in 2015 and you were |
| 12:44PM | 16 | | running errands, right? |
| 12:44PM | 17 | A | Yes. |
| 12:44PM | 18 | Q | You -- we saw in your phone Dave Melton, right? |
| 12:44PM | 19 | A | Yes. |
| 12:44PM | 20 | Q | David Melton was the general manager, right? |
| 12:44PM | 21 | A | Yes. |
| 12:44PM | 22 | Q | Do you have any idea that Dave Melton was working on the |
| 12:44PM | 23 | | Maunakea job in 2015? |
| 12:44PM | 24 | A | No.  I think it was earlier than 2015. |
| 12:44PM | 25 | Q | Even -- exactly.  It might have been a little bit earlier. |

12:44PM    1    That was a project that had been in the works for years, right?

12:44PM    2    A    Yes.

12:44PM    3    Q    Okay.  So then even when Mike Worden was there, you know

12:44PM    4    who he is, right?

12:44PM    5    A    Yes.

12:44PM    6    Q    Then later he's working on that project, right?

12:44PM    7    A    I didn't know at that time he was working on that project,

12:45PM    8    no.

12:45PM    9    Q    Because you may not have been working there at that time,

12:45PM   10    you might have been in Las Vegas, right?

12:45PM   11    A    Las Vegas in and out and being hired and fired.

12:45PM   12    Q    And being hired and hired, right?

12:45PM   13    A    Yes.

12:45PM   14    Q    And so these guys knew along with Mike how to do these big

12:45PM   15    jobs, right?

12:45PM   16    A    Yes.

12:45PM   17    Q    Okay.  Now, we get to around 2019 August, right?

12:45PM   18    A    Yes.

12:45PM   19    Q    And that's the first time that you are given a chance to

12:45PM   20    become a rookie in sales for fumigation, right?

12:45PM   21    A    Correct.

12:45PM   22    Q    And so you're learning the ins and outs beginning in

12:45PM   23    August of 2019, correct?

12:45PM   24    A    Yes.

12:45PM   25    Q    All right.  The Maunakea job was in March of 2020.  Mike

12:45PM    1    flew over to the Big Island with the crew and prepped that job.

12:45PM    2    You knew that, right?

12:45PM    3    A    Yes.

12:46PM    4    Q    He flew over with probably 50 to 75 guys to do that job,

12:46PM    5    correct?

12:46PM    6    A    Yes.

12:46PM    7    Q    That job had been in the works for years, right?

12:46PM    8    A    No.

12:46PM    9    Q    Yes.  What you're saying is all of a sudden Maunakea after

12:46PM    10    years of doing this now that it's COVID decided to do a

12:46PM    11    $2.5 million job?

12:46PM    12    A    I'm sorry, what was your question?

12:46PM    13    Q    The question is:  Sir, you had no experience at that time

12:46PM    14    with fumigation.  You were just learning the ropes?

12:46PM    15    A    I had -- I had experience with fumigations.  I did

12:46PM    16    multiple fumigations but not that big of a job.

12:46PM    17    Q    Correct.  And so the 15 percent was for leads coming in

12:46PM    18    not something that had been in the works for years, correct?

12:46PM    19    A    No.  Not technically.

12:46PM    20    Q    At least how you understood it, right?

12:47PM    21    A    I understood it if you sell it by cubes over the price

12:47PM    22    that he was asking, it would be a 15 percent.  So if you sold

12:47PM    23    the big job, you would still get the 15 percent if you made it

12:47PM    24    more than the mark.

12:47PM    25    Q    And you don't think that all those years Maunakea was

12:47PM   1   dealing with Mike Miske throughout this?

12:47PM   2   A    It was new people that was involved so it wasn't the same

12:47PM   3   people.  It was in the works.  They did put in a quote but it

12:47PM   4   never happened.

12:47PM   5   Q    Exactly.  They had already.  Before you ever went into

12:47PM   6   fumigation, there was a quote so they had been in negotiations

12:47PM   7   for years over that job, correct?

12:47PM   8   A    2014 to 2019.

12:47PM   9   Q    Correct.  And then it finally was done in 2020, right?

12:47PM  10   A    Yes, that's what time was good because COVID.

12:47PM  11   Q    Right.  Because COVID was there, they didn't have any

12:47PM  12   occupants.  So at that time they could -- the place was shut

12:48PM  13   down.  It was the perfect time to do that large-scale

12:48PM  14   fumigation of that entire property, right?

12:48PM  15   A    Correct.

12:48PM  16   Q    All right.  And now you said that you believed from the

12:48PM  17   time you got there in 2019 in August to March '20 that you were

12:48PM  18   entitled to 200 to $250,000?

12:48PM  19   A    We never discussed what I was going to get paid.

12:48PM  20   Q    While you were learning the ropes?

12:48PM  21   A    I'm sorry?

12:48PM  22   Q    While you were learning the ropes, right?  Because you

12:48PM  23   were following Preston around, right?

12:48PM  24   A    In the beginning for training for one week and a half, I

12:48PM  25   trained.  I made my first sale after two weeks.

12:48PM    1    Q    Okay.

12:48PM    2    A    And I did pretty big jobs.

12:48PM    3    Q    Okay.

12:48PM    4    A    Apartment, condos.

12:48PM    5    Q    Right.

12:48PM    6    A    Tough fumigations.

12:48PM    7    Q    Okay.  Yeah, you were learning it.

12:48PM    8    A    Yes.

12:48PM    9    Q    You were figuring it out.  But the Maunakea job was

12:49PM   10    completely different than a house or a few condos, you would

12:49PM   11    agree with me, wouldn't you?

12:49PM   12    A    Yes.  That's why we had Jake Matthews trying to assist me

12:49PM   13    on the job.

12:49PM   14    Q    Well, in terms of the actual job, what it was you had zero

12:49PM   15    experience in prepping it anything of that size, correct?

12:49PM   16    A    Correct.

12:49PM   17    Q    You had zero experience in terms of how you would even

12:49PM   18    begin to tent it, to fumigate it and to do that job?

12:49PM   19    A    Correct.

12:49PM   20    Q    But you wanted to be paid like you did, right?

12:49PM   21    A    I made the sale, yes.

12:49PM   22    Q    Okay.  And it was your view that you made the sale?

12:49PM   23    A    I worked with that guy Jason.  That was at beach Maunakea

12:49PM   24    the hotel for a while.  Mike told me that I was kicking the can

12:49PM   25    on the street and I wasn't going to have that sale.  They were

12:49PM   1   just pulling my chain, exact words.

12:50PM   2   Q    Okay.  And you believed you were out 200, $200,000, right?

12:50PM   3   A    Roughly ten at 15 percent.

12:50PM   4   Q    Right.  And the only time you were looking at any kind of

12:50PM   5   money like that is when you were robbing people, right?

12:50PM   6   A    Not necessarily, no.

12:50PM   7   Q    Yeah.  And so that's how you had been making your money up

12:50PM   8   to that point, right?

12:50PM   9   A    Making my money how?

12:50PM   10  Q    Robbing people, selling drugs, and doing those things

12:50PM   11  along with working, right?

12:50PM   12  A    No.  That wasn't my main income.

12:50PM   13  Q    And that's why the minute you saw a guy who you thought

12:50PM   14  you had a hundred thousand dollars in the car, you took a video

12:50PM   15  of it, took it to a bunch of people and set up a robbery,

12:50PM   16  right?

12:50PM   17  A    Yes.

12:50PM   18  Q    Now, we talked a little bit about Signal.  Do you recall

12:51PM   19  that conversation?  Signal was a business communication used

12:51PM   20  within the business, correct?

12:51PM   21  A    I'm not too sure.  I can't recollect if it was or not.

12:51PM   22  Q    All right.  You don't recall that you were sending videos

12:51PM   23  by way of like when you were looking at a house and trying to

12:51PM   24  figure out how you would even begin to make a bid, you don't

12:51PM   25  recall doing videos and then sending them to Mike and asking

12:51PM   1   for help?

12:51PM   2   A    Yes.

12:51PM   3   Q    Okay.  You do recall that?

12:51PM   4   A    I do, yes.

12:51PM   5   Q    Okay.  So Signal was used in the business, right?

12:51PM   6   A    No.  To communicate with Mike.

12:51PM   7   Q    Right.  In the business, you had Signal channels within

12:52PM   8   the business, correct?

12:52PM   9   A    Yes.

12:52PM  10   Q    Right.  And so the reason for that is that that allows

12:52PM  11   communication where you can attach videos and the person that

12:52PM  12   you're talking to can see what you see, right?

12:52PM  13   A    Yes.

12:52PM  14   Q    All right.  And so that was used throughout, so there was

12:52PM  15   a Signal manager's thread, right?

12:52PM  16   A    I don't recollect a Signal manager thread.

12:52PM  17   Q    You don't recall that?

12:52PM  18   A    No.

12:52PM  19   Q    So if others more experience, there may have been one,

12:52PM  20   right?  You just don't recall it?

12:52PM  21   A    Yeah, I don't remember.

12:52PM  22   Q    Okay.  Did you know that there was a Signal sales

12:52PM  23   thread -- thread since you were in Signal?

12:52PM  24   A    For all of us at the company of Kama'aina?

12:52PM  25   Q    Yes.

| | | | |
|---|---|---|---|
| 12:52PM | 1 | A | Yes. |
| 12:52PM | 2 | Q | Okay.  There was a fumigation Signal thread, right? |
| 12:52PM | 3 | A | Yes. |
| 12:52PM | 4 | Q | There was a company-wide thread using Signal, right? |
| 12:52PM | 5 | A | Yes. |
| 12:52PM | 6 | Q | There was an office Signal thread for the folks who were |
| 12:53PM | 7 | | within the office, right? |
| 12:53PM | 8 | A | Yes. |
| 12:53PM | 9 | Q | So that's why you could keep teamwork within the business, |
| 12:53PM | 10 | | right? |
| 12:53PM | 11 | A | Yes. |
| 12:53PM | 12 | Q | Okay.  Slack was used for that as well, right? |
| 12:53PM | 13 | A | Yes. |
| 12:53PM | 14 | Q | We're moving into an area where paper is replaced by this |
| 12:53PM | 15 | | kind of communication device, right? |
| 12:53PM | 16 | A | Correct. |
| 12:53PM | 17 | Q | So you're digitally using Slack channels to show photos, |
| 12:53PM | 18 | | correct? |
| 12:53PM | 19 | A | Yes. |
| 12:53PM | 20 | Q | And in the fumigation process, what Slack or Signal could |
| 12:53PM | 21 | | do is if you had a ten checklist of things that had to be done, |
| 12:53PM | 22 | | you could visually show that check, did one check, did two |
| 12:53PM | 23 | | check, did three, so there was a visual record of what was done |
| 12:53PM | 24 | | in the business, right? |
| 12:53PM | 25 | A | Yes. |

| | | |
|---|---|---|
| 12:53PM | 1 | Q    And so you didn't have to rely on somebody's word or if |
| 12:53PM | 2 | somebody comes back and says something's broken, you had a |
| 12:53PM | 3 | visual image of when you started and when you left and you |
| 12:53PM | 4 | recorded it so that the person could see exactly what was done, |
| 12:54PM | 5 | right? |
| 12:54PM | 6 | A    Yes. |
| 12:54PM | 7 | Q    Just like when there's a video, these folks can see the |
| 12:54PM | 8 | video and see it like they were there for themselves, right? |
| 12:54PM | 9 | A    Yes. |
| 12:54PM | 10 | Q    And that was the whole point of it, correct? |
| 12:54PM | 11 | A    Correct. |
| 12:54PM | 12 | Q    And this was pretty advanced for companies at that time, |
| 12:54PM | 13 | wasn't it? |
| 12:54PM | 14 | A    Yes. |
| 12:54PM | 15 | Q    Now, you also had WhatsApp channel within the business, |
| 12:54PM | 16 | right? |
| 12:54PM | 17 | A    Within what business? |
| 12:54PM | 18 | Q    Within Kama'aina Termite and Pest Control? |
| 12:54PM | 19 | A    Yes. |
| 12:54PM | 20 | Q    Yes.  And so we saw a number of WhatsApps on those |
| 12:54PM | 21 | contents, correct? |
| 12:54PM | 22 | A    Yes. |
| 12:54PM | 23 | Q    And so that was a communication device used within the |
| 12:54PM | 24 | business, right? |
| 12:54PM | 25 | A    Yes. |

12:54PM   1   Q    And so then you could use that device to communicate as

12:54PM   2   well, correct?

12:54PM   3   A    Yes.

12:54PM   4   Q    And there were WhatsApp channels that were part of that

12:54PM   5   process as well, right?

12:54PM   6   A    Correct.

12:54PM   7   Q    So WhatsApp is just another app that you can use to

12:54PM   8   communicate within the business, right?

12:55PM   9   A    Yes.

12:55PM  10   Q    And if you have a business, your communication is kind of

12:55PM  11   important that it's not stolen, right?

12:55PM  12   A    What you mean "not stolen"?

12:55PM  13   Q    Well, if somebody gets your business plan, they can figure

12:55PM  14   out how to bid on something if they didn't have that

12:55PM  15   information, right?

12:55PM  16   A    I don't know.

12:55PM  17   Q    So you've got internal communications that you want to

12:55PM  18   keep separate from the rest of the world, right?  Competitors?

12:55PM  19   Excuse me.  You've got competitors out there that you're

12:55PM  20   competing against, right?

12:55PM  21   A    Yes.

12:55PM  22   Q    So all WhatsApp is is it has an encryption, right?

12:55PM  23   A    Yes.

12:55PM  24   Q    Okay.  And that was used within the business as well?

12:55PM  25   A    By certain people, yes.

| | | | |
|---|---|---|---|
| 12:55PM | 1 | Q | Yeah, and so we saw a number of people that you identified |
| 12:55PM | 2 | | in the business WhatsApp and that was their business phone, |
| 12:56PM | 3 | | right? |
| 12:56PM | 4 | A | One of theirs. |
| 12:56PM | 5 | Q | Okay.  All right.  Now, was that an old number for Eric |
| 12:56PM | 6 | | Lum or a new number? |
| 12:56PM | 7 | A | I'm not too sure if it's old or new. |
| 12:56PM | 8 | Q | Okay.  After you robbed him, did you remain a contact and |
| 12:56PM | 9 | | a friend? |
| 12:56PM | 10 | A | No. |
| 12:56PM | 11 | Q | Okay.  That kind of severed your relationship, right? |
| 12:56PM | 12 | A | Yes. |
| 12:56PM | 13 | Q | So that $10,000 was worth severing a relationship with a |
| 12:56PM | 14 | | friend? |
| 12:56PM | 15 | A | It wasn't really a friend.  It was an associate. |
| 12:56PM | 16 | Q | Oh, he was an associate so it was okay? |
| 12:56PM | 17 | A | No.  It wasn't okay. |
| 12:56PM | 18 | Q | Okay.  Now, we took a look at a number of photographs of |
| 12:56PM | 19 | | ads from Hawai'i Partners.  Do you recall those? |
| 12:56PM | 20 | A | Ads from Hawai'i Partners. |
| 12:56PM | 21 | Q | They were identified as ads from Hawai'i Partners that the |
| 12:56PM | 22 | | jury just saw.  Do you recall? |
| 12:56PM | 23 | A | Some of them, yes. |
| 12:56PM | 24 | Q | All right.  Did you recognize those were vehicles that you |
| 12:57PM | 25 | | wanted to buy? |

| | | | |
|---|---|---|---|
| 12:57PM | 1 | A | No.  It wasn't vehicles to buy. |
| 12:57PM | 2 | Q | So it's your testimony that you weren't buying those |
| 12:57PM | 3 | | vehicles? |
| 12:57PM | 4 | A | Those vehicles, I wasn't buying those vehicles. |
| 12:57PM | 5 | Q | Those were ads of vehicles that were for sale, were they |
| 12:57PM | 6 | | not? |
| 12:57PM | 7 | A | Yes. |
| 12:57PM | 8 | Q | And they were for sale and there was intent to perhaps |
| 12:57PM | 9 | | purchase them, not sell them by Hawai'i Partners, correct? |
| 12:57PM | 10 | A | Hawai'i Partners didn't buy any cars prior from private |
| 12:57PM | 11 | | sellers. |
| 12:57PM | 12 | Q | Are you sure? |
| 12:57PM | 13 | A | That I know of. |
| 12:57PM | 14 | Q | Okay.  That you know of, right? |
| 12:57PM | 15 | A | Yes. |
| 12:57PM | 16 | Q | So you just assumed because you think that you didn't know |
| 12:57PM | 17 | | that that that's what those ads were, right? |
| 12:57PM | 18 | A | I don't know what those ads was. |
| 12:57PM | 19 | Q | Okay.  You didn't know what the ads were? |
| 12:57PM | 20 | A | Some of them, yes. |
| 12:57PM | 21 | Q | Okay.  All right.  Now, I want talk to you a little bit |
| 12:58PM | 22 | | about what you did at Hawai'i Partners in terms of documenting |
| 12:58PM | 23 | | what was done.  So we saw the white board that the jury saw, |
| 12:58PM | 24 | | correct? |
| 12:58PM | 25 | A | The cleared board in Mike's office, yes. |

| | | | |
|---|---|---|---|
| 12:58PM | 1 | Q | Right.  And there was another board in there that you said |
| 12:58PM | 2 | | was similar material was written on, correct? |
| 12:58PM | 3 | A | Yes. |
| 12:58PM | 4 | Q | Okay.  So you would log those cars on those white boards, |
| 12:58PM | 5 | | correct? |
| 12:58PM | 6 | A | Yes. |
| 12:58PM | 7 | Q | Then the information from the boards would get on a |
| 12:58PM | 8 | | spreadsheet, correct? |
| 12:58PM | 9 | A | Maybe after six, seven months, we put it on the seven -- |
| 12:58PM | 10 | | on the spreadsheet.  We had a lot of vehicles, so it couldn't |
| 12:58PM | 11 | | fit on top of that white board. |
| 12:58PM | 12 | Q | And then all of a sudden, the info on the spreadsheet |
| 12:58PM | 13 | | included make and model of the vehicle, right? |
| 12:58PM | 14 | A | Yes. |
| 12:58PM | 15 | Q | The price purchased, right? |
| 12:58PM | 16 | A | Yes. |
| 12:58PM | 17 | Q | The price sold, right? |
| 12:58PM | 18 | A | Yes. |
| 12:58PM | 19 | Q | The license plate, right? |
| 12:59PM | 20 | A | Yes. |
| 12:59PM | 21 | Q | The VIN number, right? |
| 12:59PM | 22 | A | Yes. |
| 12:59PM | 23 | Q | And the sales were either cash or cashier's checks mostly. |
| 12:59PM | 24 | | Those were your words, right? |
| 12:59PM | 25 | A | Mostly cash. |

12:59PM    1    Q    And cashier's checks as well?

12:59PM    2    A    I never seen a cashier's check maybe -- yeah, I never seen

12:59PM    3    a cashier check.  The only cashier check I got was from the

12:59PM    4    Lunchwagon.

12:59PM    5    Q    So when you told the FBI that the sales were cash or

12:59PM    6    cashier's checks mostly, that wasn't accurate?

12:59PM    7    A    It was accurate.

12:59PM    8    Q    Okay.  The spreadsheets kept track of the information for

12:59PM    9    tax purposes, right?

12:59PM   10    A    Yes.

12:59PM   11    Q    Which was then given to an accountant, right?

12:59PM   12    A    Yes.

12:59PM   13    Q    And what you said is, "Mike Miske just loved cars," right?

12:59PM   14    A    Yes.

12:59PM   15    Q    And it was as much a hobby for him as a business?

12:59PM   16    A    Yes, it was like a hobby.

01:00PM   17    Q    And so it was because of his love of cars that he was

01:00PM   18    involved with this, this wasn't a big money maker, was it?

01:00PM   19    A    No, it wasn't.

01:00PM   20    Q    In fact, on a lot of these cars, you lost money?

01:00PM   21    A    Yes.

01:00PM   22    Q    But as you said, "It was more a of hobby than a business"?

01:00PM   23    A    Yes.

01:00PM   24    Q    Okay.  Now, in August of 2019, you became a sales

01:00PM   25    representative as we've talked about, right?

| | | | |
|---|---|---|---|
| 01:00PM | 1 | A | Yes. |
| 01:00PM | 2 | Q | And that was for Kama'aina Termite and Pest Control, |
| 01:00PM | 3 | | correct? |
| 01:00PM | 4 | A | Yes. |
| 01:00PM | 5 | Q | You were encouraged by Mike Miske to do that, right? |
| 01:00PM | 6 | A | Yes. |
| 01:00PM | 7 | Q | He encouraged you to be customer oriented, correct? |
| 01:00PM | 8 | A | Yes.  Yes. |
| 01:00PM | 9 | Q | You learned how to do customer property walks, right? |
| 01:01PM | 10 | A | Yes. |
| 01:01PM | 11 | Q | Mike Miske gave you sound advice on that? |
| 01:01PM | 12 | A | Yes. |
| 01:01PM | 13 | Q | When bidding a job, right? |
| 01:01PM | 14 | A | Yes. |
| 01:01PM | 15 | Q | And if we can -- you learned how to do walk-throughs with |
| 01:01PM | 16 | | a customer bid, right? |
| 01:01PM | 17 | A | Yes. |
| 01:01PM | 18 | Q | And you worked with him on how to bid? |
| 01:01PM | 19 | A | Yes. |
| 01:01PM | 20 | | MR. KENNEDY:  All right.  If we can pull up |
| 01:01PM | 21 | | Exhibit 9008-012 just for the witness at this time, Your Honor, |
| 01:01PM | 22 | | and this would be on the 9th supplemental exhibit list, Your |
| 01:01PM | 23 | | Honor.  I apologize. |
| 01:01PM | 24 | | THE COURT:  Okay. |
| 01:02PM | 25 | | BY MR. KENNEDY: |

01:02PM  1   Q   Do you recognize what's shown in the video which has been

01:02PM  2   marked as 9008-012?

01:02PM  3   A   Yes.

01:02PM  4   Q   Is it something that you videoed?

01:02PM  5   A   Yes.

01:02PM  6   Q   And was this working as a sales representative for

01:02PM  7   Kama'aina Termite and Pest Control?

01:02PM  8   A   Yes.

01:02PM  9        MR. KENNEDY:  All right.  At this time, Your Honor,

01:02PM  10  I'd offer 9008-012 into evidence.

01:02PM  11        THE COURT:  This is a video?

01:02PM  12        MR. KENNEDY:  Yes.

01:02PM  13        THE COURT:  All right.  Any objection?

01:02PM  14        MR. INCIONG:  No objection.

01:02PM  15        THE COURT:  Okay.  Without objection 9008-12 is

01:02PM  16  admitted.  You may play it.

01:02PM  17        (Exhibit 9008-012 was received in evidence.)

01:02PM  18        MR. KENNEDY:  And can we publish it?

01:02PM  19        THE COURT:  Yes, you may play it.

01:02PM  20        (Video was played.)

01:02PM  21        THE WITNESS:  Should be sound.

01:02PM  22        MR. KENNEDY:  I believe there is sound.  If we could

01:02PM  23  go back.

01:02PM  24  BY MR. KENNEDY:

01:03PM  25  Q   Now, sir, while we're doing that, part of it is there is

01:03PM   1   you're shooting the video but you're also communicating

01:03PM   2   sometimes at the same time about what you're seeing?

01:03PM   3   A    Yes.

01:03PM   4            MR. KENNEDY:  Okay.  Let's start it again.  Looks like

01:03PM   5   we lost it.

01:04PM   6            THE COURT:  Doesn't look like it's playing properly,

01:04PM   7   Mr. Kennedy.

01:04PM   8            MR. KENNEDY:  Technology is always great when works

01:04PM   9   and a pain when it doesn't.

01:04PM   10            THE COURT:  We'll try to get our IT folks here, if you

01:04PM   11   wouldn't mind going on to another subject.

01:04PM   12            MR. KENNEDY:  Oh, no problem.

01:04PM   13   BY MR. KENNEDY:

01:04PM   14   Q    So also with respect to that, you know, this is part of

01:04PM   15   learning how to inspect the job, right?

01:04PM   16   A    Yes.

01:04PM   17   Q    And so during that, you learned to do estimates, send

01:04PM   18   photos and videos to Mike Miske to coordinate the bid, right?

01:04PM   19   A    Yes.

01:04PM   20   Q    All right.  Why don't we try 9008-015 which is in the

01:04PM   21   ninth supplemental exhibit list.  And is this, sir, an example

01:04PM   22   of a communication involving what I'm describing here as a

01:05PM   23   estimate on a job while you were working for Kama'aina Termite

01:05PM   24   and Pest Control?

01:05PM   25   A    Yes.

01:05PM    1                MR. KENNEDY:  All right.  At this time, Your Honor, I

01:05PM    2    would move 9008-015 into evidence.

01:05PM    3                THE COURT:  This is a multiple-paged exhibit.

01:05PM    4                MR. KENNEDY:  Let's see.

01:05PM    5                THE COURT:  Looks like it.  Any objection?

01:05PM    6                MR. KENNEDY:  I think it is just -- yes, it is.  Okay.

01:05PM    7    It is five pages in total or six.

01:05PM    8                THE COURT:  Yes.

01:05PM    9                MR. KENNEDY:  It looks like -- is it -- all right,

01:05PM   10    six.

01:05PM   11                THE COURT:  Any objection, Counsel?

01:05PM   12                MR. INCIONG:  No objection.

01:05PM   13                THE COURT:  Without objection 9008-015 is admitted.

01:05PM   14                (Exhibit 9008-015 was received in evidence.)

01:06PM   15                MR. KENNEDY:  All right.  If we can just blow up the

01:06PM   16    first one that is in blue.

01:06PM   17    BY MR. KENNEDY:

01:06PM   18    Q    Okay.  Missed voice call.  Do you recognize MJ owner?

01:06PM   19    A    Yes.

01:06PM   20    Q    Who is that?

01:06PM   21    A    Mike Miske.

01:06PM   22    Q    Okay.  And if we go up a little further.  Do you recognize

01:06PM   23    (808) 585-1944?

01:06PM   24    A    Yes.

01:06PM   25    Q    How do you recognize that?

01:06PM    1    A    That's my phone number at the time.

01:06PM    2              MR. KENNEDY:  Okay.  Let's move on to the second page.

01:06PM    3    If we can blow up in the green.  Is that coming in -- okay.

01:06PM    4    All right.  Move down.

01:06PM    5              MS. KING:  Is it published?

01:06PM    6              MR. KENNEDY:  I will publish it in a second.

01:06PM    7    BY MR. KENNEDY:

01:06PM    8    Q    Did you call me; is that correct?

01:07PM    9    A    Yes.

01:07PM   10    Q    All right.  So let's publish this on the first page, sir.

01:07PM   11    Make certain that the jury can now see it and let's move up to

01:07PM   12    the -- the blue there.  So this is just a missed voice call to

01:07PM   13    you?

01:07PM   14    A    Yes.

01:07PM   15              MR. KENNEDY:  Okay.  If we move to the second page.

01:07PM   16    And if we blow up the green.

01:07PM   17    BY MR. KENNEDY:

01:07PM   18    Q    And then, Yo?

01:07PM   19    A    Yes.

01:07PM   20    Q    Did you call me, correct?

01:07PM   21    A    Yes.

01:07PM   22    Q    So you've called Mike and he is responding to you, right?

01:07PM   23    A    Yes.

01:07PM   24    Q    Okay.  If we move down to the blue.  Okay.  Can you read

01:07PM   25    what you were asking at this time, sir?

01:07PM  1   A   "Yes.  Doing an estimate for Kamalani in Kailua.  I wanted
01:07PM  2   to ask you how we can reach the top of the roof gutter for bird
01:08PM  3   exclusions, but Larry has a job out here and going to meet me."
01:08PM  4   Q   All right.  If we can go on to see if -- what the answer
01:08PM  5   is?  Then you've got a few more, okay, right, and then do you
01:08PM  6   attach something to this communication?
01:08PM  7   A   Yes.
01:08PM  8   Q   And do you see that this is Signal, right?
01:08PM  9   A   I'm sorry?
01:08PM  10  Q   The communication device you're using is Signal, right?
01:08PM  11  A   Yes.
01:08PM  12  Q   So this is an example of what we were talking about where
01:08PM  13  Signal was used within the business, correct?
01:08PM  14  A   Yes.
01:08PM  15  Q   And Signal allowed you to attach something so that they --
01:08PM  16  a person can see what you're seeing, right?
01:08PM  17  A   Yes.
01:08PM  18  Q   Okay.  We can move on.  All right.  Okay.  We keep going
01:08PM  19  through to the next response.  Okay.  These are some other.
01:08PM  20  And then the answer is, WYA, where you at?
01:09PM  21  A   Yes.
01:09PM  22  Q   All right.  We go down to the bottom.  We keep going.
01:09PM  23  Continue.  Outgoing voicemail at that time, right?
01:09PM  24  A   Yes.
01:09PM  25  Q   Okay.  And then through page six.  And then this is --

01:09PM   1   this is a photograph that is attached, right?

01:09PM   2   A   Correct.

01:09PM   3   Q   And so we saw the attachment in there so that when you're

01:09PM   4   asking about how you can reach the roof, the individual can see

01:09PM   5   what you're seeing, right?

01:09PM   6   A   Yes.

01:09PM   7   Q   Okay.  If we move to -- did you also take videos of these

01:09PM   8   events?

01:09PM   9   A   Yes.

01:09PM   10   Q   All right.  Now, if we go back to the first page.

01:09PM   11          MR. KENNEDY:  If we can pull up 9008-016.

01:09PM   12   BY MR. KENNEDY:

01:09PM   13   Q   Do you recognize this as a video of that job site, sir,

01:10PM   14   there was Exhibit 908-015?

01:10PM   15   A   Yes.

01:10PM   16          MR. KENNEDY:  Okay.  At this time, Your Honor, I would

01:10PM   17   move 9008-016 and seek to admit that.

01:10PM   18          THE COURT:  Any objection?

01:10PM   19          MR. INCIONG:  No objection.

01:10PM   20          THE COURT:  Without objection, 9008-16 is admitted.

01:10PM   21          (Exhibit 9008-016 was received in evidence.)

01:10PM   22          MR. KENNEDY:  All right.  Well, let's see if we can

01:10PM   23   get this to play.

01:10PM   24          THE COURT:  Give it a shot.

01:10PM   25          (Video was played.)

01:12PM   1                    MR. KENNEDY:  All right.  If we can take a look at

01:12PM   2    9008-017.  Just for Mr. Freitas.

01:12PM   3                    (Video was played.)

01:13PM   4    BY MR. KENNEDY:

01:13PM   5    Q    All right.  So we've seen those two videos.  Those are

01:13PM   6    part of the Signal thread when you're trying to figure out how

01:13PM   7    you're going to estimate and figure out that job, correct?

01:13PM   8    A    Yes.

01:13PM   9    Q    And these were in January of 2020, right?

01:13PM   10   A    I believe so.

01:13PM   11   Q    And so you're reaching out to Mike for his advice, right?

01:13PM   12   A    Yes.

01:13PM   13   Q    Okay.  Now, one of -- some of that advice in the context

01:13PM   14   of how you're doing your business is he wanted you to step up

01:13PM   15   your game, right?

01:13PM   16   A    Yes.

01:13PM   17   Q    He wanted you to show up early, right?

01:13PM   18   A    Yes.

01:13PM   19   Q    Look sharp, right?

01:13PM   20   A    Correct.

01:13PM   21   Q    Because these were some of the problems in the past when

01:13PM   22   he would hire you and then fire you for times where that wasn't

01:14PM   23   going on, right?

01:14PM   24   A    Yes.

01:14PM   25   Q    But he believed you had it in it -- but he believed you

01:14PM    1    had it in yourself?

01:14PM    2    A    Correct.

01:14PM    3    Q    Because a lot of times where you got into trouble was you

01:14PM    4    learned that staying out too late and partying might get you

01:14PM    5    fired, right?

01:14PM    6    A    Yes.

01:14PM    7    Q    Because if you're a no show and you can't carry your

01:14PM    8    weight then everybody else suffers, right?

01:14PM    9    A    Yes.

01:14PM   10    Q    Okay.  So when you were Mike's personal assistant back in

01:14PM   11    2015, you told the jury the other day that that started roughly

01:14PM   12    around 2015, correct?

01:14PM   13    A    Yes.

01:14PM   14    Q    When you came back from Las Vegas.  Do you recall that

01:14PM   15    Mike was interested in buying a boat back at that time not the

01:14PM   16    Rachel, right?  Do you recall that?

01:15PM   17    A    What kind of boat was he purchasing?

01:15PM   18    Q    A personal boat, something that was different.  The Rachel

01:15PM   19    is a commercial fishing vessel, right?

01:15PM   20    A    Right.

01:15PM   21    Q    It sails in the Samoan waters.  It's got a permit there.

01:15PM   22    It sails in the Hawaiian waters.  It does commercial fishing,

01:15PM   23    right?

01:15PM   24    A    Yes.

01:15PM   25    Q    Okay.  Do you recall that prior to Caleb's -- the accident

01:15PM    1    that Caleb Miske was in Mike was asking you to look for boats

01:15PM    2    to buy?

01:15PM    3    A     Yes.

01:15PM    4    Q     Okay.  And so you found boats that Mike Miske was

01:15PM    5    considering buying, right?

01:15PM    6    A     Yes.

01:15PM    7    Q     And so you would reach out to folks to see if he could

01:15PM    8    test drive those boats, right?

01:15PM    9    A     Yes.

01:15PM   10           MR. KENNEDY:  All right.  And if we can pull up

01:15PM   11    9008-008 which, Your Honor, is in the seventh supp exhibit

01:15PM   12    list.

01:16PM   13           THE COURT:  What was the number again?  I'm sorry.

01:16PM   14           MR. KENNEDY:  9008-008 in the seventh supplemental

01:16PM   15    exhibit list I believe, Your Honor.  I can check it back here

01:16PM   16    in another -- at least that's what my note has.

01:16PM   17           THE COURT:  Okay.  Go ahead.

01:16PM   18    BY MR. KENNEDY:

01:16PM   19    Q     Sir, can you -- would you like us to blow that up so you

01:16PM   20    can read it a little better because it's somewhat small?

01:16PM   21    A     Yes.

01:16PM   22           MR. KENNEDY:  So if we could blow up the top part.

01:16PM   23    Thank you, Ms. King.  And then if we move through it so it can

01:16PM   24    be read.

01:16PM   25    BY MR. KENNEDY:

01:17PM  1  Q    Does that help you refresh when Mike was interested in

01:17PM  2  purchasing a boat and you making efforts to do so?

01:17PM  3  A    Yes.

01:17PM  4         MR. KENNEDY:  Okay.  If we could go back just to the

01:17PM  5  first page without it blown up.  And this would be -- is it

01:17PM  6  October 15th of 2015?

01:17PM  7         Your Honor, at this time I move 9008-008 into

01:17PM  8  evidence.

01:17PM  9         THE COURT:  Any objection?

01:17PM  10        MR. INCIONG:  No objection.

01:17PM  11        MR. KENNEDY:  All right.  Can we publish that, please?

01:17PM  12        THE COURT:  You may.  This exhibit is admitted.

01:17PM  13  That's 9008-8 and, yes, you may publish.

01:17PM  14        (Exhibit 9008-008 was received in evidence.)

01:17PM  15        MR. KENNEDY:  Can we blow up the -- the -- just the

01:17PM  16  participants down to the blue please, Ms. King.

01:17PM  17  BY MR. KENNEDY:

01:17PM  18  Q    So is this you reaching out, supp Bro, interested in the

01:17PM  19  boat, right?

01:17PM  20  A    It was me personally?

01:17PM  21  Q    No.  Are you asking Mike Miske if he's interested in the

01:18PM  22  boat?

01:18PM  23  A    Yes.

01:18PM  24  Q    Okay.  If we move down.  And so is it, yeah, where is it

01:18PM  25  located?  When can I see it?

| | | | |
|---|---|---|---|
| 01:18PM | 1 | A | Yes. |

01:18PM   2   Q   And that's Mr. Miske responding to you about this boat,

01:18PM   3   right?

01:18PM   4   A   Yes.

01:18PM   5       MR. KENNEDY:  Okay.  If we go to the second page.  We

01:18PM   6   can blow up just the top portion.  Okay.  If we can move down.

01:18PM   7   BY MR. KENNEDY:

01:18PM   8   Q   Okay.  You're saying if you're serious you can meet up at

01:18PM   9   Kaneohe pier and you can test them out, right?

01:18PM   10   A   Yes.

01:18PM   11   Q   The weekend though because I work during the week, right?

01:18PM   12   A   Yes.

01:18PM   13   Q   All right.  If we keep going.  Boat is bad, right?

01:18PM   14   A   Yes.

01:18PM   15   Q   Bad ass, right?

01:18PM   16   A   Yes.

01:18PM   17   Q   And so as we move through and see.  Okay.  Asking about

01:19PM   18   price.

01:19PM   19   A   Um-hm.

01:19PM   20   Q   Sounds good, right?

01:19PM   21   A   Yes.

01:19PM   22   Q   Let me know tomorrow.  What's your name, right?

01:19PM   23   A   Yes.

01:19PM   24   Q   Okay.  So this is you're looking for a boat for Mr. Miske,

01:19PM   25   right?

01:19PM     1     A     Yes.

01:19PM     2     Q     Okay.  And so this was in -- on October 15th of 2015, and

01:19PM     3     the accident didn't even happen until the next month on

01:19PM     4     November 17th of 2015, correct?

01:19PM     5     A     Yes.

01:19PM     6            MR. KENNEDY:  All right.  Now, we can take that down.

01:19PM     7     BY MR. KENNEDY:

01:19PM     8     Q     We talked about Slack.  We talked about the business

01:19PM     9     advice.  We talked about, you know, what you were doing during

01:19PM    10     that time, but when you were talking to the government, you

01:19PM    11     were talking about some individuals like Chad Duncan.  Do you

01:20PM    12     recall that?

01:20PM    13     A     Yes.

01:20PM    14     Q     So with Chad Duncan, the conversations that you would have

01:20PM    15     were about whether there was somebody that he and you could

01:20PM    16     tax, right?

01:20PM    17     A     Yes.

01:20PM    18     Q     And tax means steal?

01:20PM    19     A     Correct.

01:20PM    20     Q     Take money from, right?

01:20PM    21     A     Yes.

01:20PM    22     Q     And whether there were targets, right?

01:20PM    23     A     Yes.

01:20PM    24     Q     Whether there's a big project somebody who's got a lot of

01:20PM    25     money, right?

01:20PM   1   A    Yes.

01:20PM   2   Q    They called this kid Tommy.  He's somebody you're looking

01:20PM   3   at, right?

01:20PM   4   A    Tommy...

01:20PM   5   Q    Just somebody that might owe money and then you could tax

01:20PM   6   him, right?

01:20PM   7   A    Yes.

01:20PM   8   Q    And so the kind of communications there is I got one big

01:20PM   9   job and I need a soldier like you, right?

01:20PM  10   A    Yes.

01:20PM  11   Q    So that was kind of the dual life which you were doing

01:20PM  12   robbing, right?

01:21PM  13   A    Yes.

01:21PM  14   Q    And you were doing that for yourself, right?

01:21PM  15   A    Yes.

01:21PM  16   Q    But you were also working back sometimes getting fired but

01:21PM  17   working with Mike, right?

01:21PM  18   A    Correct.

01:21PM  19   Q    So with Mike you were doing jobs both for all of his

01:21PM  20   businesses, right?

01:21PM  21   A    Yes.

01:21PM  22   Q    When you were a personal assistant, right?

01:21PM  23   A    Correct.

01:21PM  24   Q    But also working with the termite company and getting a

01:21PM  25   start with sales, right?

01:21PM    1    A    Yes.

01:21PM    2    Q    And you got a knack for sales.  You were good at it?

01:21PM    3    A    Yes.

01:21PM    4    Q    You had worked at Victoria's Secret, right?

01:21PM    5    A    Yes.

01:21PM    6    Q    And you had some sales experience, right?

01:21PM    7    A    No, I never really had experience, sales experience until

01:21PM    8    I came work for Mike.

01:21PM    9    Q    Okay.  So you were just starting out in sales there --

01:21PM   10    A    Yes.

01:21PM   11    Q    -- but it was something naturally you can present to

01:21PM   12    people and you're comfortable talking to people?

01:21PM   13    A    Yes.

01:21PM   14    Q    And so he saw that in you?

01:21PM   15    A    Yes.

01:21PM   16    Q    But these communications with Chad Duncan are about

01:21PM   17    robbing people and stealing stuff, right?

01:21PM   18    A    Yes.

01:21PM   19    Q    Jake Smith is another one that's out robbing people,

01:22PM   20    right?

01:22PM   21    A    Correct.

01:22PM   22    Q    And Jake Smith is robbing folks, right?

01:22PM   23    A    Yes.

01:22PM   24    Q    Of drugs, right?

01:22PM   25    A    Yes.

| | | | |
|---|---|---|---|
| 01:22PM | 1 | Q | Large quantities, right? |
| 01:22PM | 2 | A | Yes. |
| 01:22PM | 3 | Q | And he is keeping the money for himself, isn't he? |
| 01:22PM | 4 | A | Yes. |
| 01:22PM | 5 | Q | He's doing that on his own, right? |
| 01:22PM | 6 | A | Yes. |
| 01:22PM | 7 | Q | It's him.  He's doing it for himself alone, right? |
| 01:22PM | 8 | A | Yes. |
| 01:22PM | 9 | Q | Lance Bermudez same thing, right? |
| 01:22PM | 10 | A | Yes. |
| 01:22PM | 11 | Q | All the other folks so everybody that we had up on this |
| 01:22PM | 12 | | board over here John Stancil, Lance Bermudez, Keli'i Young, |
| 01:22PM | 13 | | Frankie Silva, all of those folks were robbing people of drugs |
| 01:22PM | 14 | | for themselves, right? |
| 01:22PM | 15 | A | Right. |
| 01:22PM | 16 | | MR. INCIONG:  Objection, calls for speculation. |
| 01:22PM | 17 | | THE COURT:  Sustained. |
| 01:22PM | 18 | | BY MR. KENNEDY: |
| 01:22PM | 19 | Q | That's what you knew, right? |
| 01:22PM | 20 | A | Yes. |
| 01:22PM | 21 | Q | And that's a yes is it not? |
| 01:22PM | 22 | A | Yes. |
| 01:22PM | 23 | Q | And you knew that from your own knowledge, didn't you? |
| 01:22PM | 24 | A | Yes. |
| 01:22PM | 25 | Q | Because you had been with them doing it yourself, right? |

01:23PM    1    A    Yes.

01:23PM    2    Q    Now, I want to ask you looks like we got a few minutes

01:23PM    3    left so I'll cover a chapter with you that was covered by the

01:23PM    4    government over the last couple of days.  They asked you about

01:23PM    5    Jonathan Fraser and a watch.  Do you recall that?

01:23PM    6    A    Yes.

01:23PM    7    Q    Now, at that time, you understood that Jonathan Fraser and

01:23PM    8    his girlfriend were -- they -- they were between places to

01:23PM    9    live, right?

01:23PM   10    A    Correct.

01:23PM   11    Q    And Caleb Miske and Delia Fabro-Miske were living with

01:23PM   12    them, right?

01:23PM   13    A    Yes.

01:23PM   14    Q    And they were sleeping in Mike's office at night after the

01:23PM   15    end of the workday, right?

01:23PM   16    A    Yes.

01:24PM   17    Q    So the four of them were there?

01:24PM   18    A    Yes.

01:24PM   19    Q    So he turned over his office not only to his son and his

01:24PM   20    girlfriend at the time who he then married or -- and Jonathan

01:24PM   21    and his girlfriend, right?

01:24PM   22    A    Yes.

01:24PM   23    Q    So he gave up his office at night for them to be there,

01:24PM   24    correct?

01:24PM   25    A    Correct.

01:24PM   1   Q   Now, Caleb had graduated a few years before in 2012?

01:24PM   2   A   I believe so.

01:24PM   3   Q   And you may have been gone in Las Vegas then, right?

01:24PM   4   A   No.  I was down here in Hawaii.

01:24PM   5   Q   I'm sorry?

01:24PM   6   A   I was here in Hawaii.

01:24PM   7   Q   Okay.  And so were you at his graduation?

01:24PM   8   A   No, I wasn't at Caleb's graduation.

01:24PM   9   Q   Okay.  Did you understand that the watch that Jonathan

01:24PM  10   Fraser stole was a gift from Mike Miske to -- to his son Caleb

01:24PM  11   Miske?

01:24PM  12   A   I know it was very sentimental to Mike.

01:24PM  13   Q   And so what happened was one morning Caleb and Delia get

01:25PM  14   up and Jonathan and his girlfriend are gone, right?

01:25PM  15   A   Yes.

01:25PM  16   Q   And the watch is gone, right?

01:25PM  17   A   Yes.

01:25PM  18   Q   And it's been stolen, right?

01:25PM  19   A   Correct.

01:25PM  20   Q   And so you were asked by Mike Miske to go to the pawn

01:25PM  21   shops to see if it was being pawned, right?

01:25PM  22   A   Yes.

01:25PM  23   Q   And you said you went to a lot of them, right?

01:25PM  24   A   Yes.

01:25PM  25   Q   And you found out that Honolulu has maybe as many pawn

01:25PM   1   shops as Las Vegas which has a whole lot of them as we both

01:25PM   2   know?

01:25PM   3   A    Yes.

01:25PM   4   Q    So you weren't successful in that, correct?

01:25PM   5   A    Yes.

01:25PM   6   Q    But you then were asked to see if you could find Jonathan

01:25PM   7   Fraser, right?

01:25PM   8   A    Yes.

01:25PM   9   Q    And if he still had the watch get the watch back, right?

01:25PM   10  A    Yes.

01:25PM   11  Q    And so you indicated that you went to the Kaneohe district

01:26PM   12  park, if I recall?

01:26PM   13  A    Yes.

01:26PM   14  Q    And that you tried to grab the keys before they could

01:26PM   15  drive away, right?

01:26PM   16  A    Yes.

01:26PM   17  Q    You were unsuccessful, right?

01:26PM   18  A    Yes.

01:26PM   19  Q    You saw Jonathan Fraser's girlfriend.  Did you know who

01:26PM   20  she was?

01:26PM   21  A    Yes.

01:26PM   22  Q    Did you know her by name?

01:26PM   23  A    Yes.

01:26PM   24  Q    Ashley Wong?

01:26PM   25  A    Yes.

01:26PM  1   Q    And so she was driving, right?

01:26PM  2   A    Yes.

01:26PM  3   Q    But you could see Jonathan in the car, right?

01:26PM  4   A    Correct.

01:26PM  5   Q    I think it was dark so you could only see a portion of

01:26PM  6   him, right?

01:26PM  7   A    Yes.

01:26PM  8   Q    So you tried to follow him, right?

01:26PM  9   A    Yes.

01:26PM 10   Q    And you gave up chase?

01:26PM 11   A    Yes.

01:26PM 12   Q    And that's the only thing that came about with that

01:26PM 13   incident, right?

01:26PM 14   A    Correct.

01:26PM 15   Q    All right.  And now before we go, I think that what I'd

01:27PM 16   like to do is just play for you the 911 call on Saturday

01:27PM 17   March 4th, okay?  It's already in evidence and this 911 call

01:27PM 18   relates to the District, okay?

01:27PM 19   A    Okay.

01:27PM 20        MR. KENNEDY:  So at this time, could we play 6-65?

01:27PM 21        (Video was played.)

01:27PM 22        THE COURT:  All right.  We just have a few more

01:27PM 23   minutes, Mr. Kennedy.

01:27PM 24        MR. KENNEDY:  And that's why I figured we'd just get

01:27PM 25   this in, Your Honor, and then stop for the day.

01:27PM    1              THE COURT:  That's fine.  Sure.

01:27PM    2              MR. KENNEDY:  I'd figure I'd just use up the time

01:27PM    3    until we get there.

01:27PM    4              THE COURT:  Go ahead.  You may play it.

01:27PM    5              MR. KENNEDY:  All right.

01:27PM    6              (Recording was played.)

01:28PM    7              MR. KENNEDY:  6-65, I believe that's the -- Counsel,

01:28PM    8    isn't that the number?  I missed the -- the start of it when

01:28PM    9    they give the time.

01:28PM   10              (Recording was played.)

01:30PM   11    BY MR. KENNEDY:

01:30PM   12    Q    All right.  So this call was at 1:41:42 a.m.  Did you hear

01:30PM   13    that, sir?

01:30PM   14    A    Yes.

01:30PM   15    Q    And that the entire club had been cleared out?

01:30PM   16    A    Correct.

01:30PM   17    Q    And that the manager was making the call?

01:30PM   18    A    Yes.

01:30PM   19    Q    And that Honolulu Police Department was on its way?

01:30PM   20    A    Yes.

01:30PM   21    Q    All right.  When we get back, I'll ask you some questions

01:30PM   22    about that, okay?

01:30PM   23    A    Okay.

01:30PM   24              THE COURT:  All right.  Thank you for stopping on

01:30PM   25    time.  As we go to break for the trial day and, in fact, the

01:30PM  1   trial week, I will remind our jurors to please refrain from

2   discussing the substance of this case with anyone, including

3   one another, until I advise you otherwise.  I know you're all

4   headed home some to the neighbor islands so please keep that in

5   mind.  Please also refrain from accessing any media or other

6   accounts of this case that may be out there; and finally, do

7   not conduct any independent investigation into the facts,

01:31PM  8   circumstances or persons involved.

01:31PM  9           Please enjoy the three-day weekend so be mindful of

01:31PM  10  that.  We are not convening on Monday.  It is a holiday.  We

01:31PM  11  will resume on Tuesday morning at 8:30.  Okay.  We'll see you

01:31PM  12  then.

01:31PM  13           (Proceedings were concluded at 1:31 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I, Gloria T. Bediamol, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5    true, and correct transcript from the stenographically reported

6    proceedings held in the above-entitled matter and that the

7    transcript page format is in conformance with the regulations

8    of the Judicial Conference of the United States.

9

10           DATED at Honolulu, Hawaii, May 29, 2024.

11

12

13                                    /s/ Gloria T. Bediamol

14                                    GLORIA T. BEDIAMOL.

15                                    RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25