```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
 4                                 )
                 Plaintiff,        )    Honolulu, Hawaii
 5                                 )
            vs.                    )    February 20, 2024
 6                                 )
      MICHAEL J. MISKE, JR.,       )    TESTIMONY OF KAULANA
 7                                 )    FREITAS
                 Defendant.        )
 8    _____ )

 9
                  PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 23)
10                BEFORE THE HONORABLE DERRICK K. WATSON,
                  CHIEF UNITED STATES DISTRICT COURT JUDGE
11
      APPEARANCES:
12
      For the Plaintiff:           MARK INCIONG, ESQ.
13                                 MICHAEL DAVID NAMMAR, ESQ
                                   WILLIAM KE AUPUNI AKINA, ESQ.
14                                 AISLINN AFFINITO, ESQ.
                                   Office of the United States Attorney
15                                 PJKK Federal Building
                                   300 Ala Moana Boulevard, Suite 6100
16                                 Honolulu, Hawaii  96850

17    For the Defendant:           LYNN E. PANAGAKOS, ESQ.
                                   841 Bishop St., Ste 2201
18                                 Honolulu, HI 96813

19                                 MICHAEL JEROME KENNEDY, ESQ.
                                   Law Offices of Michael Jerome
20                                 Kennedy, PLLC
                                   333 Flint Street
21                                 Reno, NV 89501

22    Official Court Reporter:     Gloria T. Bediamol, RPR RMR CRR FCRR
                                   United States District Court
23                                 300 Ala Moana Boulevard
                                   Honolulu, Hawaii 96850
24
        Proceedings recorded by machine shorthand, transcript produced
25      with computer-aided transcription (CAT).
```

```
 1                        I N D E X

 2   GOVERNMENT WITNESS:                          PAGE NO.

 3    KAULANA FREITAS (CONTINUED TESTIMONY)

 4        RESUMED CROSS-EXAMINATION BY MR. KENNEDY      4
          REDIRECT EXAMINATION BY MR. INCIONG         103
 5        RECROSS-EXAMINATION BY MR. KENNEDY          135

 6   EXHIBITS:                                    PAGE NO.

 7   Exhibit 5004-22 was received in evidence       10
     Exhibit 5004-023 was received in evidence      10
 8   Exhibit 5004-024 was received in evidence      11
     Exhibits 5004-020 and 5004-021 were received in  12
 9   evidence
     Exhibit 5004-0294 was received in evidence     13
10   Exhibit 5004-34 was received in evidence       15
     Exhibit 5004-43 was received in evidence       17
11   Exhibit 9008-078 was received in evidence      26
     Exhibit 9008-80 was received in evidence       29
12   Exhibit 9008-81 was received in evidence       33
     Exhibit 9008-82 was received in evidence       35
13   Exhibit 9008-009 was received in evidence      41
     Exhibit 9008-083 was received in evidence      44
14   Exhibit 9008-72 was received in evidence       49
     Exhibit 9008-86 was received in evidence       51
15   Exhibit 9008-087 was received in evidence      54
     Exhibit 9008-088 was received in evidence      56
16   Exhibit 9008-085 was received in evidence      63
     Exhibit as 9008-89A received in evidence       67
17   Exhibits 9372-003, 9372-004 and 9372-005 were   72
     received in evidence
18   Exhibit 9008-073 was received in evidence      98

19

20

21

22

23

24

25
```

1  February 20, 2024                                    8:38 a.m.

08:38AM  2          THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

08:38AM  3  States of America versus Michael J. Miske, Jr.

08:38AM  4          This case has been called for jury trial, day 23.

08:38AM  5          Counsel please make your appearances for the record.

08:38AM  6          MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

08:38AM  7  Michael Nammar and KeAupuni Akina for the United States.  Also

08:38AM  8  present are Kari Sherman and FBI Special Agent Thomas Palmer.

08:38AM  9          THE COURT:  Good morning.

08:38AM  10         MR. KENNEDY:  Good morning, Your Honor.  Michael

08:38AM  11  Kennedy here with Lynn Panagakos, Michael Miske, and Ashley

08:38AM  12  King and Josh Barry, and good morning to you.

08:38AM  13         THE COURT:  Good morning to your group as well,

08:38AM  14  Mr. Kennedy.  You may seated.

08:38AM  15         Good morning to the 17 persons on our jury.  Hopefully

08:38AM  16  everyone got a chance to recharge the batteries a little bit

08:38AM  17  over this three-day weekend and are raring to go this Tuesday

08:38AM  18  morning.  Whether you're raring to go or not, we're going.

08:38AM  19         So we're at the point of the cross-examination of

08:39AM  20  Mr. Freitas, and Mr. Kennedy was conducting that

08:39AM  21  cross-examination when we adjourned on Friday afternoon.

08:39AM  22         Mr. Kennedy, you may resume when you're ready.

23         MR. KENNEDY:  Thank you, sir.

24                     KAULANA FREITAS,

25         (Having been previously sworn, resumed the stand.)

```
          1                       RESUMED CROSS-EXAMINATION

          2     BY MR. KENNEDY:

08:39AM   3     Q    Sir, last week the government asked you some questions

08:39AM   4     about some exhibits and I want to bring those up for you, okay?

08:39AM   5     A    Okay.

08:39AM   6              MR. KENNEDY:  If we could took a look at Government

08:39AM   7     Exhibit 1-643.

08:39AM   8     BY MR. KENNEDY:

08:39AM   9     Q    Do you recall some questions about 1-643?

08:39AM   10    A    Yes.

08:39AM   11    Q    Can we bring up Exhibit 1-644?

08:39AM   12             Do you recall some questions about 1-644?

08:39AM   13    A    Yes.

08:39AM   14    Q    Bring up Exhibit 1-646.

08:39AM   15             Do you recall some questions about 1-646?

08:39AM   16    A    Yes.

08:40AM   17    Q    And if we could bring up Exhibit 1-647.

08:40AM   18             Do you recall some questions about that?

08:40AM   19    A    Yes.

08:40AM   20             MR. KENNEDY:  All right.  If we can publish

08:40AM   21    Exhibit 1-643 for the jury?

08:40AM   22             THE COURT:  Go ahead.

08:40AM   23             MR. KENNEDY:  And then Exhibit 1-644, and then

08:40AM   24    Exhibit 1-646, and then Exhibit 1-647.

08:40AM   25    BY MR. KENNEDY:
```

08:40AM   1   Q     All right.  Now as to each of these exhibits,

08:40AM   2   Exhibit 1-643, 1-644, 1-646 and 1-647, you testified that these

08:40AM   3   were Hawai'i Partners' Craigslist ads last week?

08:40AM   4   A     I don't believe so.  This is Hawai'i Partners.  I never

08:40AM   5   posted these personally.

08:41AM   6   Q     Correct.  These -- last week I asked you some questions

08:41AM   7   and I think the government asked you some questions, and I

08:41AM   8   think the answer was that these were Hawai'i Partners' cars

08:41AM   9   that were to sell, but they're at the auction right?

08:41AM   10  A     Yes.

08:41AM   11  Q     And they made some comments about they're listed as

08:41AM   12  private sellers, correct?

08:41AM   13  A     Yes.

08:41AM   14        MR. KENNEDY:  If we can, Your Honor, if we move to the

08:41AM   15  12th supplemental exhibit list, Exhibit 9008-073, just for the

08:41AM   16  witness?

08:41AM   17        THE COURT:  All right.

08:41AM   18        MR. KENNEDY:  Can we blow up this for Mr. Freitas so

08:41AM   19  he can see a little bit?

08:41AM   20  BY MR. KENNEDY:

08:41AM   21  Q     Do you see the attachments that are in that conversation?

08:41AM   22  A     Yes.

08:41AM   23        MR. KENNEDY:  If we move to the second page, and if we

08:42AM   24  could blow it up so that it's a little easier to read, both in

08:42AM   25  the top, middle and bottom.  If we can move to the third page.

08:42AM   1   Keep moving through.  Continue on to the next page so

08:42AM   2   Mr. Freitas can read it, and then continue on to the next page.

08:43AM   3   And then if we could just flip through the last pages.

08:43AM   4   BY MR. KENNEDY:

08:43AM   5   Q    Sir, do you recognize that text communication between

08:43AM   6   yourself and Mr. Miske?

08:44AM   7   A    I don't recognize that phone number as being mine.

08:44AM   8   Q    If you can pull it up.

08:44AM   9        If we look through and compare, if we move to

08:44AM   10  Exhibit 9008-073-001, do you recognize that these cars are to

08:44AM   11  buy, not sell?

08:44AM   12  A    Yes.

08:44AM   13  Q    All right.  So last week I was asking you some questions

08:44AM   14  about those transactions.  These were cars that were listed on

08:44AM   15  Craigslist, right?

08:44AM   16  A    Yes.

08:44AM   17  Q    The ads were by someone who was selling the car, right?

08:44AM   18  A    Correct.

08:44AM   19  Q    Mr. Miske was interested in buying those cars, right?

08:44AM   20  A    Yes.

08:44AM   21  Q    And in fact with respect to each car, it was make an

08:44AM   22  offer, right?

08:44AM   23  A    Yes.

08:44AM   24  Q    Or buy the car?

08:44AM   25  A    Yes.

| | | | |
|---|---|---|---|
| 08:45AM | 1 | Q | So these were cars that he was buying at the auction |
| 08:45AM | 2 | | potentially, right? |
| 08:45AM | 3 | A | Yes. |
| 08:45AM | 4 | Q | And the actual exhibits were written by someone else, |
| 08:45AM | 5 | | correct, not Hawai'i Partners, right? |
| 08:45AM | 6 | A | Yes. |
| 08:45AM | 7 | Q | And so the testimony last week was that Hawai'i Partners |
| 08:45AM | 8 | | had written those ads for sale. |
| 08:45AM | 9 | | Do you recall that? |
| 08:45AM | 10 | A | I believe so, yes. |
| 08:45AM | 11 | Q | So I just want to clear it up for the jury, those ads were |
| 08:45AM | 12 | | written by private sellers that Mr. Miske wanted to buy those |
| 08:45AM | 13 | | cars, right? |
| 08:45AM | 14 | A | Yes. |
| 08:45AM | 15 | Q | So there was nothing deceptive about the ads.  They were |
| 08:45AM | 16 | | written by someone else instead of Hawai'i Partners, right? |
| 08:45AM | 17 | A | I believe so. |
| 08:45AM | 18 | Q | Would you like to take a look at that again? |
| 08:45AM | 19 | A | Yes. |
| 08:45AM | 20 | Q | All right.  So there were -- these were ads written by |
| 08:45AM | 21 | | third parties that Mr. Miske was looking to buy those cars at |
| 08:46AM | 22 | | the auction rather than ads written by Hawai'i Partners, by |
| 08:46AM | 23 | | yourself or others, correct? |
| 08:46AM | 24 | A | Correct. |
| 08:46AM | 25 | Q | All right.  And so in that -- |

08:46AM    1              MR. KENNEDY:  At this time, Your Honor, I would move
08:46AM    2    9008-073 into evidence.
08:46AM    3              THE COURT:  Any objection, Counsel?
08:46AM    4              MR. INCIONG:  I don't believe there's been foundation
08:46AM    5    laid, Your Honor.  Objection.
08:46AM    6              THE COURT:  Sustained.
08:46AM    7    BY MR. KENNEDY:
08:46AM    8    Q    With respect to --
08:46AM    9              Let me see if we can pull up just the second page and
08:46AM   10    then the third page, and then just the bottom portion.
08:47AM   11              On May 13th of 2015, were you working with Mr. Miske
08:47AM   12    with Hawai'i Partners?
08:47AM   13    A    I believe so, yes.
08:47AM   14    Q    And do you recall setting up these appointments looking at
08:47AM   15    these cars?
08:47AM   16    A    I don't recall or recollect this conversation with these
08:47AM   17    cars.
08:47AM   18    Q    Do you recall looking at the cars themselves?
08:47AM   19    A    No.
08:47AM   20    Q    All right.  We'll move on.
08:47AM   21              The one thing that is certain is that it wasn't ads
08:47AM   22    produced by Hawai'i Partners.  There are third-party cars
08:47AM   23    looking to buy at the auction, right?
08:47AM   24    A    Correct.
08:47AM   25    Q    Okay.  Now, you're familiar with the fishing vessel the

```
08:47AM    1    Rachel?

08:47AM    2    A    Yes.

08:47AM    3    Q    And the Rachel was a commercial fishing vessel?

08:47AM    4    A    Yes.

08:47AM    5    Q    That Mr. Miske owned, right?

08:47AM    6    A    Correct.

08:47AM    7    Q    When you began working as his personal assistant, right?

08:48AM    8    And you may have understood that he had it for years, right?

08:48AM    9    A    Yes.

08:48AM   10    Q    When it was in port, it was here in Honolulu?

08:48AM   11    A    Yes.

08:48AM   12    Q    And you in fact worked on the Rachel fixing rust spots,

08:48AM   13    right?

08:48AM   14    A    Correct.

08:48AM   15    Q    As part of your work, correct?

08:48AM   16    A    Yes.

08:48AM   17    Q    All right.  I'd like to show you a series of photographs?

08:48AM   18         MR. KENNEDY:  If we could pull up Exhibit 5004-022.

08:48AM   19         Your Honor, it's in the original exhibit list.

08:48AM   20         THE COURT:  Thank you.

08:48AM   21    BY MR. KENNEDY:

08:48AM   22    Q    Do you recognize what's shown in Exhibit 5004-022?

08:48AM   23    A    Yes.

08:48AM   24    Q    What is this?

08:48AM   25    A    It's the Rachel, Mike's boat.
```

| | | |
|---|---|---|
| 08:48AM | 1 | MR. KENNEDY:  At this time, Your Honor, I'd move to |
| 08:48AM | 2 | admit 5004-022. |
| 08:48AM | 3 | THE COURT:  Any objection? |
| 08:48AM | 4 | MR. INCIONG:  No objection. |
| 08:48AM | 5 | THE COURT:  Without objection, that document, 5004-22, |
| 08:48AM | 6 | is admitted. |
| 08:48AM | 7 | (Exhibit 5004-22 was received in evidence.) |
| 08:49AM | 8 | BY MR. KENNEDY: |
| 08:49AM | 9 | Q    At this time I'd like to show you Exhibit 5004-023. |
| 08:49AM | 10 | Do you recognize 5004-023? |
| 08:49AM | 11 | A    Yes. |
| 08:49AM | 12 | Q    What is it? |
| 08:49AM | 13 | A    The Rachel. |
| 08:49AM | 14 | MR. KENNEDY:  At this time I'd move to admit 5004-023. |
| 08:49AM | 15 | MR. INCIONG:  No objection. |
| 08:49AM | 16 | THE COURT:  Without objection, 5004-23 is admitted. |
| 08:49AM | 17 | You may publish. |
| 08:49AM | 18 | (Exhibit 5004-023 was received in evidence.) |
| 08:49AM | 19 | BY MR. KENNEDY: |
| 08:49AM | 20 | Q    At this time I'd like to show you 5004-024. |
| 08:49AM | 21 | Do you recognize 5004-024? |
| 08:49AM | 22 | A    Yes. |
| 08:49AM | 23 | Q    What is it? |
| 08:49AM | 24 | A    The Rachel. |
| 08:49AM | 25 | MR. KENNEDY:  At this time I'd move 5004-024 into |

08:49AM    1    evidence.

08:49AM    2            MR. INCIONG:  No objection.

08:49AM    3            THE COURT:  Without objection, 5004-024 is admitted.

08:49AM    4            (Exhibit 5004-024 was received in evidence.)

08:49AM    5    BY MR. KENNEDY:

08:49AM    6    Q    I'd like to show you 5004-025, 5004-029.

08:49AM    7            Do you recognize 5004-029?

08:50AM    8    A    Yes.

08:50AM    9    Q    What is it?

08:50AM   10    A    The Rachel.

08:50AM   11    Q    I'd like to show you 5004-021.

08:50AM   12            Do you recognize that?

08:50AM   13    A    Yes.

08:50AM   14    Q    What is it?

08:50AM   15    A    The Rachel.

08:50AM   16    Q    And 5004-020.

08:50AM   17            Do you recognize what's shown in 5004-029 (verbatim)?

08:50AM   18    A    Yes.

08:50AM   19            MR. KENNEDY:  I'd move to admit 5004-021 and 5004-020.

08:50AM   20            THE COURT:  Okay.  Can you ask him your questions

08:51AM   21    again with respect to those two documents?  I think you got the

08:51AM   22    numbering wrong in a number of your questions.  You jumped all

08:51AM   23    over the place.

08:51AM   24    BY MR. KENNEDY:

08:51AM   25    Q    The last one that is up on the screen is 5004-020.

| | | |
|---|---|---|
| 08:51AM | 1 | Do you recognize that? |
| 08:51AM | 2 | A    Yes. |
| 08:51AM | 3 | MR. KENNEDY:  If we move back to 5004-021. |
| 08:51AM | 4 | THE WITNESS:  Yes. |
| 08:51AM | 5 | BY MR. KENNEDY: |
| 08:51AM | 6 | Q    Do you recognize that document? |
| 08:51AM | 7 | A    Yes. |
| 08:51AM | 8 | MR. KENNEDY:  And if we can pull up the exhibit |
| 08:51AM | 9 | sticker and make it a little larger. |
| 08:51AM | 10 | BY MR. KENNEDY: |
| 08:51AM | 11 | Q    Does that look like 5004-021? |
| 08:51AM | 12 | A    Yes. |
| 08:51AM | 13 | MR. KENNEDY:  All right.  At this time I'd move |
| 08:51AM | 14 | 5004-020 and 5004-021. |
| 08:51AM | 15 | THE COURT:  Any objection, Counsel? |
| 08:51AM | 16 | MR. INCIONG:  No objection. |
| 08:51AM | 17 | THE COURT:  Thank you for clarifying, Mr. Kennedy. |
| 08:51AM | 18 | Those two exhibits are admitted without objection, |
| 08:52AM | 19 | 5004-20 and 21. |
| 08:51AM | 20 | (Exhibits 5004-020 and 5004-021 were received in |
| 08:51AM | 21 | evidence.) |
| 08:52AM | 22 | MR. KENNEDY:  Now, if we could publish 5004-022 for |
| 08:52AM | 23 | the jury, now that we've got them into evidence. |
| 08:52AM | 24 | (Government Exhibit 5004-022 was published to the |
| 08:52AM | 25 | jury.) |

08:52AM   1   BY MR. KENNEDY:

08:52AM   2   Q    So this is a picture of the Rachel; is that correct?

08:52AM   3   A    Yes.

08:52AM   4          MR. KENNEDY:  All right.  5004-023, if we could

08:52AM   5   publish it.  5004-024, 5004-029.

08:52AM   6          (Government Exhibits 5004-023 and 5004-024 were

08:52AM   7   published to the jury.)

08:52AM   8          THE COURT:  I don't think 29 has been admitted.

08:52AM   9          MR. KENNEDY:  If we can pull up that very small

08:52AM  10   exhibit.

08:52AM  11   BY MR. KENNEDY:

08:52AM  12   Q    Do you recognize 5004-029?

08:52AM  13   A    Yes.

08:52AM  14   Q    What is it?

08:52AM  15   A    The Rachel.

08:52AM  16          MR. KENNEDY:  All right.  I'd move to admit 5004-029.

08:53AM  17          THE COURT:  Any objection, Mr. Inciong?

08:53AM  18          MR. INCIONG:  No objection.

08:53AM  19          THE COURT:  The exhibit is admitted, that's 5004-029,

08:53AM  20   and yes, you may publish.

08:53AM  21          (Exhibit 5004-0294 was received in evidence.)

08:53AM  22   BY MR. KENNEDY:

08:53AM  23   Q    And this is a picture of it in port here in Honolulu?

08:53AM  24   A    I believe so, yes.

08:53AM  25          MR. KENNEDY:  All right.  5004-021 and 5004-020.

| | | |
|---|---|---|
| 08:53AM | 1 | BY MR. KENNEDY: |
| 08:53AM | 2 | Q    So now are you familiar with the fishing auction where the |
| 08:53AM | 3 | commercial catch from the Rachel would happen in Honolulu? |
| 08:53AM | 4 | A    Yes. |
| 08:53AM | 5 | Q    Where each fish is bid on individually, correct? |
| 08:53AM | 6 | A    Correct. |
| 08:53AM | 7 | Q    And so from the commercial catch, then bids are made on |
| 08:53AM | 8 | each fish.  Just like at an auction for a car, bids are made on |
| 08:53AM | 9 | each car, right? |
| 08:53AM | 10 | A    Yes. |
| 08:53AM | 11 | MR. KENNEDY:  So I'd like to pull that down for the |
| 08:54AM | 12 | moment and if we could go to 5004-034, which was in the |
| 08:54AM | 13 | original exhibit list, Your Honor. |
| 08:54AM | 14 | BY MR. KENNEDY: |
| 08:54AM | 15 | Q    Do you recognize this area sir? |
| 08:54AM | 16 | A    It's the fish auction. |
| 08:54AM | 17 | Q    Okay.  And it's the fish auction here in Honolulu? |
| 08:54AM | 18 | A    I believe so. |
| 08:54AM | 19 | MR. KENNEDY:  All right.  At this time I would move |
| 08:54AM | 20 | 5004-034 into evidence. |
| 08:54AM | 21 | THE COURT:  Any objection? |
| 08:54AM | 22 | MR. INCIONG:  No, Your Honor. |
| 08:54AM | 23 | MR. KENNEDY:  May it be published? |
| 08:54AM | 24 | THE COURT:  Without objection, 5004-34 is admitted and |
| 08:54AM | 25 | yes, you may publish. |

08:54AM   1              (Exhibit 5004-34 was received in evidence.)

08:54AM   2    BY MR. KENNEDY:

08:54AM   3    Q    All right.  So the fish -- commercial fishing was another

08:54AM   4    one of the businesses that Mike Miske got involved in, right?

08:54AM   5    A    Yes.

08:54AM   6    Q    All right.  And you were asked some questions about checks

08:54AM   7    for Rachel fishing vessel crew members last week.

08:54AM   8              Do you recall that?

08:54AM   9    A    Yes.

08:54AM  10         MR. KENNEDY:  All right.  So if we could pull up

08:55AM  11    9008-084, which is in the 12th supplemental exhibit list, Your

08:55AM  12    Honor.

08:55AM  13    BY MR. KENNEDY:

08:55AM  14    Q    You've been asked questions about that in the past,

08:55AM  15    correct?

08:55AM  16    A    Yes.

08:55AM  17         MR. KENNEDY:  All right.  We can just pull that down.

08:55AM  18    BY MR. KENNEDY:

08:55AM  19    Q    So as Mr. Miske's assistant, you cashed checks for the

08:55AM  20    Rachel fishing vessel crew members, correct?

08:55AM  21    A    Yes.

08:55AM  22    Q    And the Rachel fishing vessel crew members were paid a

08:55AM  23    percentage of the total boat take, right?

08:55AM  24    A    Yes.

08:55AM  25    Q    So each crew member had a percentage assigned to himself

| | | |
|---|---|---|
| 08:55AM | 1 | or herself if that was ever the case, right? |
| 08:55AM | 2 | A    Yes. |
| 08:55AM | 3 | Q    And that was paid by the United Fishing Agency down at the |
| 08:55AM | 4 | docks, right? |
| 08:55AM | 5 | A    I believe so. |
| 08:55AM | 6 | Q    And so they then -- there were checks that then would be |
| 08:55AM | 7 | deposited from the United Fishing Agency, right? |
| 08:55AM | 8 | A    Yes. |
| 08:55AM | 9 | Q    Which would add up to the total boat share, right? |
| 08:56AM | 10 | A    Yes. |
| 08:56AM | 11 | Q    Okay.  And you had signature authority on Kama'aina |
| 08:56AM | 12 | Holdings' account, right? |
| 08:56AM | 13 | A    Yes. |
| 08:56AM | 14 | Q    And Kama'aina Holdings was a limited -- it was an LTD that |
| 08:56AM | 15 | had the Rachel as its business, right? |
| 08:56AM | 16 | A    Yes. |
| 08:56AM | 17 | Q    Okay.  And so one of those accounts was at Central Pacific |
| 08:56AM | 18 | Bank, right? |
| 08:56AM | 19 | A    Yes. |
| 08:56AM | 20 | Q    And one of them was at Bank of Hawaii, right? |
| 08:56AM | 21 | A    Yes. |
| 08:56AM | 22 | MR. KENNEDY:  All right.  So I'd like to pull up |
| 08:56AM | 23 | 5004-043, which is in the 12th supplemental exhibit list, Your |
| 08:56AM | 24 | Honor. |
| 08:56AM | 25 | THE COURT:  Go ahead. |

| | | |
|---|---|---|
| 08:56AM | 1 | MR. KENNEDY:  We can take that down. |
| 08:56AM | 2 | So could we pull up 500 -- oh, there we go. |
| 08:56AM | 3 | BY MR. KENNEDY: |
| 08:57AM | 4 | Q    All right.  Sir, take a look at 5004-043. |
| 08:57AM | 5 | MR. KENNEDY:  And then if you move through the pages. |
| 08:57AM | 6 | BY MR. KENNEDY: |
| 08:57AM | 7 | Q    Sir, do you recognize that document? |
| 08:57AM | 8 | A    Yes. |
| 08:57AM | 9 | Q    And on a couple of the pages were you authorized as a |
| 08:57AM | 10 | signer ar Central Pacific Bank for Kama'aina Holdings' account |
| 08:57AM | 11 | regarding the Rachel? |
| 08:57AM | 12 | A    Yes. |
| 08:57AM | 13 | MR. KENNEDY:  I'd move 5004-043 into evidence, Your |
| 08:57AM | 14 | Honor. |
| 08:57AM | 15 | THE COURT:  Any objection, Mr. Inciong? |
| 08:58AM | 16 | MR. INCIONG:  No, Your Honor. |
| 08:58AM | 17 | THE COURT:  Without objection, 5004-43 is admitted. |
| 08:58AM | 18 | You may publish. |
| 08:58AM | 19 | (Exhibit 5004-43 was received in evidence.) |
| 08:58AM | 20 | MR. KENNEDY:  May we publish? |
| 08:58AM | 21 | THE COURT:  Yes. |
| 08:58AM | 22 | (Government Exhibit 5004-43 was published to the |
| 08:58AM | 23 | jury.) |
| 08:58AM | 24 | MR. KENNEDY:  So if we move to pages 6 and 7 and if we |
| 08:58AM | 25 | blow up around the member authorized signature, the authorized |

08:58AM   1   signer.

08:58AM   2   BY MR. KENNEDY:

08:58AM   3   Q    So you're an authorized signer on the account correct?

08:58AM   4   A    Yes.

08:58AM   5        MR. KENNEDY:  All right.  We can pull that down.

08:58AM   6   BY MR. KENNEDY:

08:58AM   7   Q    And this is in the 2015 time period that you talked about

08:58AM   8   last week, to the jury, right?

08:58AM   9   A    I believe so, yes.

08:58AM   10  Q    Okay.  If we move to page 7, it looks like, if I'm

08:58AM   11  correct, January 15th of 2015, right?

08:58AM   12  A    Yes.

08:58AM   13       MR. KENNEDY:  All right.  So now we can take that down

08:58AM   14  and I'd like to pull up 9008-074, which is also in the 12th

08:59AM   15  supplemental, Your Honor?

08:59AM   16       THE COURT:  Yes.  Go ahead.

08:59AM   17       MR. KENNEDY:  And if we can spin that to the side.

08:59AM   18  BY MR. KENNEDY:

08:59AM   19  Q    Sir, do you recognize that check?

08:59AM   20  A    No, recognize it, but I know what it is.

08:59AM   21  Q    What is it?

08:59AM   22  A    It's an invoice for Kama'aina Holdings.

08:59AM   23  Q    Okay.  And do you see a check that is associated with

08:59AM   24  that?

08:59AM   25  A    Yes.

08:59AM   1   Q    And do you recognize the check from -- a check that would

08:59AM   2   come from United Fishing Agency?

08:59AM   3   A    Yes.

08:59AM   4        MR. KENNEDY:  All right.  At this time I'd move

08:59AM   5   9008-074 into evidence, Your Honor.

08:59AM   6        MR. INCIONG:  Objection, lack of foundation of this

08:59AM   7   specific check.

08:59AM   8        THE COURT:  Sustained.

08:59AM   9        MR. KENNEDY:  All right.

08:59AM  10   BY MR. KENNEDY:

08:59AM  11   Q    Now, you're familiar with the process that each month when

09:00AM  12   the commercial catch would come in, fish would be sold, a check

09:00AM  13   would be cut for the total boat share, correct?

09:00AM  14   A    Yes.

09:00AM  15   Q    All right.  Let's move on to -- if we take a look at --

09:00AM  16   and in part, from time to time you would send wire transfers,

09:00AM  17   correct?

09:00AM  18   A    Yes.

09:00AM  19   Q    And the wire transfers from either Central Pacific Bank or

09:00AM  20   Bank of Hawaii would go to the boat captain, right?

09:00AM  21   A    Yes.

09:00AM  22   Q    And that was Alejandro Bueno or Alex?

09:00AM  23   A    One of them was Alex, yes.

09:00AM  24   Q    All right.  Another one is Frank Crivello, right?

09:00AM  25   A    Yes.

| | | | |
|---|---|---|---|
| 09:00AM | 1 | Q | And so the boat captain would have a percentage and you |
| 09:00AM | 2 | | would wire that money to that individual, correct? |
| 09:00AM | 3 | A | Yes. |
| 09:01AM | 4 | Q | Through either Central Pacific Bank, right? |
| 09:01AM | 5 | A | Yes. |
| 09:01AM | 6 | Q | Or Bank of Hawaii. |
| 09:01AM | 7 | A | Yes. |
| 09:01AM | 8 | Q | All right.  Now the Rachel fishing vessel crew members you |
| 09:01AM | 9 | | said were paid a percentage, right? |
| 09:01AM | 10 | A | Yes. |
| 09:01AM | 11 | Q | And so they were fishing in either the Hawaiian waters, |
| 09:01AM | 12 | | right? |
| 09:01AM | 13 | A | Yes. |
| 09:01AM | 14 | Q | Or the Samoan waters, correct? |
| 09:01AM | 15 | A | Correct. |
| 09:01AM | 16 | Q | And with those individuals, checks would be issued to each |
| 09:01AM | 17 | | of those individuals, right? |
| 09:01AM | 18 | A | Yes. |
| 09:01AM | 19 | Q | And then those checks would be endorsed, turned into cash, |
| 09:01AM | 20 | | and then they would be paid, right? |
| 09:01AM | 21 | A | Yes. |
| 09:01AM | 22 | Q | Because they were foreign citizens, right? |
| 09:01AM | 23 | A | Yes. |
| 09:01AM | 24 | Q | And so they couldn't get off the boat, right? |
| 09:01AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:01AM | 1 | Q | And a check wasn't going to do them much good in an a |
| 09:01AM | 2 | | foreign country? |
| 09:01AM | 3 | A | Correct. |
| 09:01AM | 4 | Q | But there was a check that was issued to each of them in |
| 09:01AM | 5 | | their name, right? |
| 09:01AM | 6 | A | Yes. |
| 09:01AM | 7 | Q | So you would take the checks to the bank, right? |
| 09:01AM | 8 | A | Yes. |
| 09:01AM | 9 | Q | Endorse them, right? |
| 09:01AM | 10 | A | Yes. |
| 09:01AM | 11 | Q | They would be cashed, correct? |
| 09:02AM | 12 | A | Yes. |
| 09:02AM | 13 | Q | And then each individual's check would be then turned into |
| 09:02AM | 14 | | cash, and the cash would be given to them on the boat, right? |
| 09:02AM | 15 | A | Yes. |
| 09:02AM | 16 | Q | And so for the crew members, their percentages were fairly |
| 09:02AM | 17 | | low on the total boat share, correct? |
| 09:02AM | 18 | A | Yes, I believe so. |
| 09:02AM | 19 | Q | And so each of those checks for that individual was under |
| 09:02AM | 20 | | $10,000, right? |
| 09:02AM | 21 | A | Yes. |
| 09:02AM | 22 | Q | And so you're acting as their agent, just cashing those |
| 09:02AM | 23 | | checks for that individual, right? |
| 09:02AM | 24 | A | Yes. |
| 09:02AM | 25 | Q | And so each time there may be six crew members, you're |

| | | |
|---|---|---|
| 09:02AM | 1 | bringing six checks, all under $10,000, to cash for that |
| 09:02AM | 2 | individual, right? |
| 09:02AM | 3 | A    Yes. |
| 09:02AM | 4 | MR. KENNEDY:  All right.  And if we can take a look at |
| 09:02AM | 5 | Exhibit 5004-005, which is in the original exhibit list, Your |
| 09:02AM | 6 | Honor. |
| 09:02AM | 7 | BY MR. KENNEDY: |
| 09:03AM | 8 | Q    Are you familiar with this document regarding the payout |
| 09:03AM | 9 | and profit sharing in the -- are you familiar with this |
| 09:03AM | 10 | document, sir? |
| 09:03AM | 11 | A    Yes. |
| 09:03AM | 12 | Q    All right.  And what is it? |
| 09:03AM | 13 | A    It's United Fishing Agency Ltd. |
| 09:03AM | 14 | Q    And is the date January 9th of 2015? |
| 09:03AM | 15 | A    Yes. |
| 09:03AM | 16 | Q    And I saw earlier your signature authority was on |
| 09:03AM | 17 | January 15th of 2015? |
| 09:03AM | 18 | A    Yes. |
| 09:03AM | 19 | MR. KENNEDY:  At this time, Your Honor, I would move |
| 09:03AM | 20 | 5004-005 into evidence. |
| 09:03AM | 21 | THE COURT:  Any objection? |
| 09:03AM | 22 | MR. INCIONG:  Objection, lack of foundation. |
| 09:03AM | 23 | THE COURT:  Sustained. |
| 09:03AM | 24 | BY MR. KENNEDY: |
| 09:03AM | 25 | Q    Did you use this document yourself, sir, to determine the |

09:04AM    1    percentages for the crew member from the total boat share?

09:04AM    2    A    I didn't do the percentages.

09:04AM    3    Q    All right.  Did you know the percentages?

09:04AM    4    A    No.

09:04AM    5    Q    Did you ask?

09:04AM    6    A    I never asked.

09:04AM    7    Q    Did you know what the total boat share was when you were

09:04AM    8    doing it?

09:04AM    9    A    No.

09:04AM   10    Q    All right.  I'll move on.

09:04AM   11          MR. KENNEDY:  9008-075, which is in the 12th

09:04AM   12    supplemental, Your Honor.

09:04AM   13          THE COURT:  Okay.

09:04AM   14    BY MR. KENNEDY:

09:04AM   15    Q    Were you familiar, setting aside the document, that the

09:04AM   16    Rachel pulled in over $1 million during 2015?

09:04AM   17    A    No.

09:04AM   18    Q    All right.  Let's look at 9008-075.  Can you take a look

09:04AM   19    at the first page, and the second page, third page, fourth

09:04AM   20    page, fifth page, sixth page and seventh page.

09:05AM   21          Do you recognize those checks and the deposit that

09:05AM   22    I've just shown you?

09:05AM   23    A    Yeah, I know the checks.

09:05AM   24    Q    I'm sorry?

09:05AM   25    A    I do know the checks.

| | | |
|---|---|---|
| 09:05AM | 1 | MR. KENNEDY:  At this time, Your Honor, I would move |
| 09:05AM | 2 | 9008-075 into evidence. |
| 09:05AM | 3 | MR. INCIONG:  Objection, lack of foundation. |
| 09:05AM | 4 | THE COURT:  Sustained. |
| 09:05AM | 5 | BY MR. KENNEDY: |
| 09:05AM | 6 | Q    Sir, did you cash these checks for the foreign crew? |
| 09:05AM | 7 | A    Not these specific ones. |
| 09:05AM | 8 | Q    Are you familiar with the process? |
| 09:05AM | 9 | A    Yes. |
| 09:05AM | 10 | Q    Did you do it on other checks? |
| 09:05AM | 11 | A    Yes. |
| 09:05AM | 12 | Q    All right.  But you don't think you did these specific |
| 09:05AM | 13 | checks. |
| 09:05AM | 14 | A    No. |
| 09:05AM | 15 | Q    For this specific month. |
| 09:05AM | 16 | A    Yes. |
| 09:05AM | 17 | Q    All right. |
| 09:05AM | 18 | MR. KENNEDY:  Okay.  Let's move on to |
| 09:06AM | 19 | Exhibit 9008-076. |
| 09:06AM | 20 | THE COURT:  Go ahead. |
| 09:06AM | 21 | MR. KENNEDY:  And if we could look through this |
| 09:06AM | 22 | document. |
| 09:06AM | 23 | BY MR. KENNEDY: |
| 09:06AM | 24 | Q    Do you recognize what has been shown in 9008-076? |
| 09:06AM | 25 | A    Yes. |

09:06AM  1   Q    Is it checks for the month of February, plus a deposit for
09:06AM  2   the total boat share?
09:06AM  3   A    Yes.
09:06AM  4        MR. KENNEDY:  All right.  At this time I'd move
09:06AM  5   9008-076 into evidence.
09:06AM  6        MR. INCIONG:  Same objection.
09:06AM  7        THE COURT:  Same ruling.
09:06AM  8        MR. KENNEDY:  All right.  Let's move on to 9008-078.
09:06AM  9   If we can flip through this document, it's four pages.
09:06AM  10  BY MR. KENNEDY:
09:07AM  11  Q    Do you recognize what's been shown as 9008-078?
09:07AM  12  A    Yes.
09:07AM  13  Q    Is it checks to crew members, plus a deposit?
09:07AM  14  A    Correct.
09:07AM  15       MR. KENNEDY:  I would move 9008-078 into evidence,
09:07AM  16  Your Honor?
09:07AM  17       MR. INCIONG:  Objection, no foundation.
09:07AM  18       THE COURT:  The objection is still sustained.
09:07AM  19  BY MR. KENNEDY:
09:07AM  20  Q    Sir, do you recognize the endorsement on the checks in
09:07AM  21  your handwriting?
09:07AM  22  A    Yes.
09:07AM  23  Q    And the endorsement was to pay to you, correct?
09:07AM  24  A    Yes.
09:07AM  25  Q    And so you are taking the checks to the bank for the crew

09:07AM    1    members, right?

09:07AM    2    A    Yes.

09:07AM    3    Q    You're writing an endorsement on there on their behalf as

09:07AM    4    an agent, right?

09:07AM    5    A    Yes.

09:07AM    6    Q    The checks are then cashed, right?

09:07AM    7    A    Yes.

09:07AM    8    Q    The checks are a written record of their pay, right?

09:07AM    9    A    Yes.

09:07AM   10    Q    Then it's turned into the cash, the cash is brought to the

09:07AM   11    boat to pay the folks who earned it, right?

09:08AM   12    A    Yes.

09:08AM   13         MR. KENNEDY:  At this time I'd move 9008-078 into

09:08AM   14    evidence.

09:08AM   15         THE COURT:  Any objection?

09:08AM   16         MR. INCIONG:  No objection.

09:08AM   17         THE COURT:  Without objection, 9008-078 is admitted

09:08AM   18    and you may publish.

09:08AM   19         MR. KENNEDY:  Thank you.

09:08AM   20         (Exhibit 9008-078 was received in evidence.)

09:08AM   21         MR. KENNEDY:  If we can pull up 9008-78.

09:08AM   22    BY MR. KENNEDY:

09:08AM   23    Q    So this is the check that would come from United Fishing

09:08AM   24    Agency to Kama'aina Holdings LLC, right?

09:08AM   25    A    Yes.

| | | | |
|---|---|---|---|
| 09:08AM | 1 | Q | And then it would be deposited in the bank, correct? |
| 09:08AM | 2 | A | Yes. |
| 09:08AM | 3 | Q | It looks like this was deposited on April 10th of 2015? |
| 09:08AM | 4 | A | Yes. |
| 09:08AM | 5 | Q | And a check date was cut on April 9 of 2015. |
| 09:08AM | 6 | A | Yes. |
| 09:08AM | 7 | Q | All right. |
| 09:08AM | 8 | | MR. KENNEDY:  If we move to the second page. |
| 09:08AM | 9 | | BY MR. KENNEDY: |
| 09:08AM | 10 | Q | This is a check in the amount of $1,300 to a crew member, |
| 09:08AM | 11 | | right? |
| 09:08AM | 12 | A | Yes. |
| 09:08AM | 13 | | MR. KENNEDY:  And if we pull up the second page. |
| 09:08AM | 14 | | BY MR. KENNEDY: |
| 09:08AM | 15 | Q | For crew expense, right? |
| 09:08AM | 16 | A | Yes. |
| 09:08AM | 17 | | MR. KENNEDY:  And then if we move down to the bottom |
| 09:08AM | 18 | | portion of this second page and blow that up. |
| 09:08AM | 19 | | BY MR. KENNEDY: |
| 09:09AM | 20 | Q | So "Pay to the Order of" and then it's your signature, |
| 09:09AM | 21 | | right? |
| 09:09AM | 22 | A | Correct. |
| 09:09AM | 23 | Q | All right.  So you're endorsing this check so that it can |
| 09:09AM | 24 | | be cashed, the cash can then go to the person who earned it, |
| 09:09AM | 25 | | right? |

09:09AM   1   A    Yes.

09:09AM   2          MR. KENNEDY:  If we move to the third page.

09:09AM   3   BY MR. KENNEDY:

09:09AM   4   Q    With respect to the third page, this is the same process

09:09AM   5   for this crew member, right?

09:09AM   6   A    Yes.

09:09AM   7          MR. KENNEDY:  And then if we move to the fourth page.

09:09AM   8   BY MR. KENNEDY:

09:09AM   9   Q    Right?

09:09AM  10   A    Yes.

09:09AM  11   Q    Same process for this crew member, right?

09:09AM  12   A    Yes.

09:09AM  13          MR. KENNEDY:  All right.  We can take that down.

09:09AM  14   BY MR. KENNEDY:

09:09AM  15   Q    And this was the process that was followed by Mr. Miske

09:09AM  16   and Kama'aina Holdings, right?

09:09AM  17   A    Yes.

09:09AM  18          MR. KENNEDY:  Now, we move to 9008-080, and if we go

09:09AM  19   through the first page and the second page, please, and the

09:10AM  20   third page and the fourth page.

09:10AM  21   BY MR. KENNEDY:

09:10AM  22   Q    Is that blown up enough for you, sir, or can we...

09:10AM  23   A    No, it's good.

09:10AM  24   Q    Okay.  You recognize this as the month of June checks,

09:10AM  25   plus a deposit from Central Pacific Bank to the individual crew

09:10AM   1   members, right?

09:10AM   2   A    Yes.

09:10AM   3   Q    In which you are doing the endorsing, right?

09:10AM   4   A    Yes.

09:10AM   5        MR. KENNEDY:  At this time I'd move 9008-080, which is

09:10AM   6   in the 12th supplemental as well, Your Honor.

09:10AM   7        THE COURT:  Any objection?

09:10AM   8        MR. INCIONG:  No objection.

09:10AM   9        THE COURT:  Without objection, 9008-80 is admitted.

09:10AM   10  You may publish.

09:10AM   11       (Exhibit 9008-80 was received in evidence.)

09:10AM   12       MR. KENNEDY:  All right.  If we go to the first page.

09:10AM   13  The first page, if we blow up the top portion.

09:10AM   14  BY MR. KENNEDY:

09:10AM   15  Q    It looks like a deposit of $65,280 is made on the 4th of

09:11AM   16  June, 2015?

09:11AM   17  A    Yes.

09:11AM   18  Q    And then the next day there is a, it appears to be --

09:11AM   19       MR. KENNEDY:  If we go to the second page and blow up

09:11AM   20  just the top portion.

09:11AM   21  BY MR. KENNEDY:

09:11AM   22  Q    The next day on the 5th is a second deposit of $50,014.66,

09:11AM   23  right?

09:11AM   24  A    Yes.

09:11AM   25  Q    And the two together would be the total boat share from

| | | |
|---|---|---|
| 09:11AM | 1 | that fishing venture during that month? |
| 09:11AM | 2 | A    Yes. |
| 09:11AM | 3 | MR. KENNEDY:  All right.  If we move to the third |
| 09:11AM | 4 | page.  Then we have one, two -- we have a number of checks, so, |
| 09:11AM | 5 | for instance, the first check, if we blow up the second one |
| 09:11AM | 6 | right there. |
| 09:11AM | 7 | BY MR. KENNEDY: |
| 09:11AM | 8 | Q    That's a check cut to an, it looks like IPFS Corporation, |
| 09:12AM | 9 | right? |
| 09:12AM | 10 | A    Yes. |
| 09:12AM | 11 | Q    So that is just a check that's sent to a corporation in |
| 09:12AM | 12 | the normal course of business, and the check can be cashed by |
| 09:12AM | 13 | them, right? |
| 09:12AM | 14 | A    Yes. |
| 09:12AM | 15 | Q    All right.  If we move down to the other -- with respect |
| 09:12AM | 16 | to crew members, you're once again just endorsing the check |
| 09:12AM | 17 | right? |
| 09:12AM | 18 | A    Yes. |
| 09:12AM | 19 | Q    There's a record of the payment of what the wages were, |
| 09:12AM | 20 | $1,941.30, right? |
| 09:12AM | 21 | A    Yes. |
| 09:12AM | 22 | Q    It's just a percentage of what the total boat took, right? |
| 09:12AM | 23 | A    Yes. |
| 09:12AM | 24 | Q    You endorse it over here to the pay to the order of you, |
| 09:12AM | 25 | right? |

| | | | |
|---|---|---|---|
| 09:12AM | 1 | A | Yes. |
| 09:12AM | 2 | Q | So then you can turn the check into cash, get it to the |
| 09:12AM | 3 | | person who earned it. |
| 09:12AM | 4 | A | Yes. |
| 09:12AM | 5 | | MR. KENNEDY:  And if we scroll down. |
| 09:12AM | 6 | | BY MR. KENNEDY: |
| 09:12AM | 7 | Q | That's the same with this individual as well, correct? |
| 09:12AM | 8 | A | Correct. |
| 09:12AM | 9 | | MR. KENNEDY:  If we move down. |
| 09:12AM | 10 | | BY MR. KENNEDY: |
| 09:12AM | 11 | Q | Same as to this individual, correct? |
| 09:12AM | 12 | A | Yes. |
| 09:12AM | 13 | | MR. KENNEDY:  And if we move down to the last part of |
| 09:12AM | 14 | | the page and blow up just the last two. |
| 09:13AM | 15 | | All right.  And if we move to the last page. |
| 09:13AM | 16 | | BY MR. KENNEDY: |
| 09:13AM | 17 | Q | We have -- as you can see, for this individual it's |
| 09:13AM | 18 | | $3,382.16, right? |
| 09:13AM | 19 | A | Yes. |
| 09:13AM | 20 | Q | The percentage was different for the crew depending on |
| 09:13AM | 21 | | what their jobs were on the boat, their experience and other |
| 09:13AM | 22 | | things, right? |
| 09:13AM | 23 | A | Yes. |
| 09:13AM | 24 | Q | All right.  But their pay is down to the cents, right? |
| 09:13AM | 25 | A | Yes. |

| | | |
|---|---|---|
| 09:13AM | 1 | Q    On a record a check, right? |
| 09:13AM | 2 | A    Yes. |
| 09:13AM | 3 | Q    Endorsed by you. |
| 09:13AM | 4 | MR. KENNEDY:  And if we keep going down. |
| 09:13AM | 5 | BY MR. KENNEDY: |
| 09:13AM | 6 | Q    Similar to this individual, correct? |
| 09:13AM | 7 | A    Yes. |
| 09:13AM | 8 | MR. KENNEDY:  Keep moving down. |
| 09:13AM | 9 | BY MR. KENNEDY: |
| 09:13AM | 10 | Q    Now we're back to a different rate for this individual, |
| 09:13AM | 11 | right? |
| 09:13AM | 12 | A    Yes. |
| 09:13AM | 13 | Q    Okay. |
| 09:13AM | 14 | MR. KENNEDY:  And then moving down. |
| 09:13AM | 15 | BY MR. KENNEDY: |
| 09:14AM | 16 | Q    This one is to pay Cardinal, right?  But no endorsement is |
| 09:14AM | 17 | necessary, right? |
| 09:14AM | 18 | A    No. |
| 09:14AM | 19 | Q    All right.  And if we move down, State of Hawaii DOT |
| 09:14AM | 20 | Harbors, there's a payment to them and it's just a check that |
| 09:14AM | 21 | they can cash, and there's no endorsement needed, right? |
| 09:14AM | 22 | A    Yes. |
| 09:14AM | 23 | MR. KENNEDY:  All right.  We can take that down. |
| 09:14AM | 24 | Now, if we pull up 9008-081, which is also in the 12th |
| 09:14AM | 25 | supplemental, Your Honor. |

| | | |
|---|---|---|
| 09:14AM | 1 | THE COURT:  Go ahead. |
| 09:14AM | 2 | BY MR. KENNEDY: |
| 09:14AM | 3 | Q    Sir, just take a look at this page.  It's a one-page |
| 09:14AM | 4 | document. |
| 09:14AM | 5 | Do you recognize the document? |
| 09:14AM | 6 | A    Yes. |
| 09:14AM | 7 | Q    All right.  What is it? |
| 09:14AM | 8 | A    This is Central Pacific Bank. |
| 09:14AM | 9 | Q    Is it a wire transfer request form? |
| 09:14AM | 10 | A    Yes. |
| 09:14AM | 11 | Q    That was done on your authority. |
| 09:14AM | 12 | A    Yes. |
| 09:14AM | 13 | MR. KENNEDY:  At this time I'd move 9008-081 into |
| 09:15AM | 14 | evidence. |
| 09:15AM | 15 | THE COURT:  Any objection? |
| 09:15AM | 16 | MR. INCIONG:  No objection. |
| 09:15AM | 17 | MR. KENNEDY:  If we can publish. |
| 09:15AM | 18 | THE COURT:  Without objection, 9008-81 is admitted. |
| 09:15AM | 19 | You may publish. |
| 09:15AM | 20 | (Exhibit 9008-81 was received in evidence.) |
| 09:15AM | 21 | MR. KENNEDY:  Now, if we can blow up just the top |
| 09:15AM | 22 | part. |
| 09:15AM | 23 | BY MR. KENNEDY: |
| 09:15AM | 24 | Q    So this is a wire transfer in the amount of $14,628.46? |
| 09:15AM | 25 | A    Yes. |

09:15AM   1   Q   And then it's going to, depending on who the captain was

09:15AM   2   at this time, you indicated you knew Alejandro Bueno, right?

09:15AM   3   A   Yes.

09:15AM   4   Q   He was the Rachel captain in 2015, right?

09:15AM   5   A   Yes.

09:15AM   6   Q   So you're sending him his percentage of the total boat

09:15AM   7   catch by wire, correct?

09:15AM   8   A   Yes.

09:15AM   9        MR. KENNEDY:  If we move down.

09:15AM  10   BY MR. KENNEDY:

09:15AM  11   Q   The bank beneficiary, the Bank of America, right?

09:16AM  12   A   Yes.

09:16AM  13   Q   And so this was an example of how he received his pay, by

09:16AM  14   a wire transfer, right?

09:16AM  15   A   Yes.

09:16AM  16   Q   With a written record, right?

09:16AM  17   A   Yes.

09:16AM  18        MR. KENNEDY:  Now, if we go to page 2, if we pull up

09:16AM  19   9008-082 and if we go through these particular documents.

09:16AM  20   BY MR. KENNEDY:

09:16AM  21   Q   All right.  Do you recognize 9008-082?

09:16AM  22   A   Yes.

09:16AM  23   Q   What is it?

09:16AM  24   A   Fishing Ltd, the United Fishing Agency.

09:17AM  25   Q   Do you see your endorsements on those checks?

| | | |
|---|---|---|
| 09:17AM | 1 | A    No. |
| 09:17AM | 2 |          MR. KENNEDY:  If we move to the second page. |
| 09:17AM | 3 | BY MR. KENNEDY: |
| 09:17AM | 4 | Q    Do you recognize those? |
| 09:17AM | 5 | A    Yes. |
| 09:17AM | 6 |          MR. KENNEDY:  Okay.  At this time, Your Honor, I'd |
| 09:17AM | 7 | move 9008-082. |
| 09:17AM | 8 |          THE COURT:  Any objection? |
| 09:17AM | 9 |          MR. INCIONG:  No objection. |
| 09:17AM | 10 |          THE COURT:  Without objection, 9008-82 is admitted. |
| 09:17AM | 11 | You may publish. |
| 09:15AM | 12 |          (Exhibit 9008-82 was received in evidence.) |
| 09:17AM | 13 |          MR. KENNEDY:  All right.  So if we pull up the first |
| 09:17AM | 14 | page and blow up the portion that has -- |
| 09:17AM | 15 | BY MR. KENNEDY: |
| 09:17AM | 16 | Q    This is the deposit for that month of $88,776.52, right? |
| 09:17AM | 17 | A    Yes. |
| 09:17AM | 18 | Q    So this is deposited at Central Pacific Bank, right? |
| 09:17AM | 19 | A    Yes. |
| 09:17AM | 20 | Q    On August 6, 2015. |
| 09:17AM | 21 | A    Correct. |
| 09:17AM | 22 |          MR. KENNEDY:  All right.  And so if we move to page 3 |
| 09:18AM | 23 | of this document. |
| 09:18AM | 24 | BY MR. KENNEDY: |
| 09:18AM | 25 | Q    This is another wire transfer, right? |

| | | |
|---|---|---|
| 09:18AM | 1 | A    Yes. |
| 09:18AM | 2 | Q    So this wire transfer would be the amounts that would be |
| 09:18AM | 3 | sent, $15,091.97, to Alejandro Bueno, the captain, right? |
| 09:18AM | 4 | A    Yes. |
| 09:18AM | 5 |      MR. KENNEDY:  Then if we move to page 2, these would |
| 09:18AM | 6 | be -- if we can blow up some of those. |
| 09:18AM | 7 | BY MR. KENNEDY: |
| 09:18AM | 8 | Q    Once again, these are the individual crew member checks, |
| 09:18AM | 9 | right? |
| 09:18AM | 10 | A    Yes. |
| 09:18AM | 11 | Q    Endorsed by you. |
| 09:18AM | 12 | A    Yes. |
| 09:18AM | 13 | Q    There's a check showing a record of what was paid to them, |
| 09:18AM | 14 | right? |
| 09:18AM | 15 | A    Yes. |
| 09:18AM | 16 | Q    You're just turning it into cash, right? |
| 09:18AM | 17 | A    Correct. |
| 09:18AM | 18 | Q    Because a check doesn't do them any good in a foreign |
| 09:18AM | 19 | country, right? |
| 09:18AM | 20 | A    Yes. |
| 09:18AM | 21 | Q    All right.  And each one of these checks, each one of |
| 09:18AM | 22 | them, is under $10,000, right? |
| 09:18AM | 23 | A    Yes. |
| 09:18AM | 24 | Q    And so you're acting as a representative of different |
| 09:18AM | 25 | individuals simply to cash their check. |

| | | |
|---|---|---|
| 09:18AM | 1 | A    Yes. |
| 09:18AM | 2 | MR. KENNEDY:  All right.  We can take that down. |
| 09:18AM | 3 | BY MR. KENNEDY: |
| 09:19AM | 4 | Q    Now, you -- last week you looked at an exhibit, which is |
| 09:19AM | 5 | Government Exhibit 1-637, which was admitted into evidence. |
| 09:19AM | 6 | MR. KENNEDY:  If we could pull that up.  I think it's |
| 09:19AM | 7 | in the government's original exhibit list, Your Honor. |
| 09:19AM | 8 | THE COURT:  Yes.  I got it. |
| 09:19AM | 9 | MR. KENNEDY:  And I believe it's admitted, my memory |
| 09:19AM | 10 | is. |
| 09:19AM | 11 | THE COURT:  Yes, it's been admitted. |
| 09:19AM | 12 | MR. KENNEDY:  All right.  I would publish it then. |
| 09:19AM | 13 | THE COURT:  Go ahead. |
| 09:19AM | 14 | (Government Exhibit 1-637 was published to the jury.) |
| 09:19AM | 15 | BY MR. KENNEDY: |
| 09:19AM | 16 | Q    So you were asked some questions about WhatsApp and you |
| 09:19AM | 17 | were asked some questions about Signal, right? |
| 09:19AM | 18 | A    Yes. |
| 09:19AM | 19 | Q    And those questions involved whether there were |
| 09:19AM | 20 | communications which were encrypted, right? |
| 09:19AM | 21 | A    Yes. |
| 09:19AM | 22 | Q    All right.  WhatsApp has an encryption, right? |
| 09:19AM | 23 | A    Yes. |
| 09:19AM | 24 | Q    And Signal does as well. |
| 09:19AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 09:19AM | 1 | Q | And you were asked some questions about that, right? |
| 09:19AM | 2 | A | Yes. |
| 09:19AM | 3 | Q | I think you said that your communications were on phones |
| 09:20AM | 4 | | that were encrypted, right? |
| 09:20AM | 5 | A | Yes. |
| 09:20AM | 6 | Q | But 1-637 is just a regular chat, isn't it? |
| 09:20AM | 7 | A | I believe so. |
| 09:20AM | 8 | Q | It's not a WhatsApp, right? |
| 09:20AM | 9 | A | No. |
| 09:20AM | 10 | Q | It's not a Signal, right? |
| 09:20AM | 11 | A | No. |
| 09:20AM | 12 | Q | It's just an iMessage, right? |
| 09:20AM | 13 | A | Yes. |
| 09:20AM | 14 | Q | Between you and Mike Miske, right? |
| 09:20AM | 15 | A | Yes. |
| 09:20AM | 16 | Q | And so the 38 pages that we went through last week, this |
| 09:20AM | 17 | | is a nonencrypted message just on -- it's just an iMessage, |
| 09:20AM | 18 | | right? |
| 09:20AM | 19 | A | Yes. |
| 09:20AM | 20 | | MR. KENNEDY:  And so if we move to Exhibit 1-636, |
| 09:20AM | 21 | | which I believe is also in evidence. |
| 09:20AM | 22 | | THE COURT:  Go ahead.  It has. |
| 09:20AM | 23 | | BY MR. KENNEDY: |
| 09:20AM | 24 | Q | This, too, is just a regular chat, right? |
| 09:20AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 09:20AM | 1 | Q | It's not on WhatsApp, right? |
| 09:20AM | 2 | A | No. |
| 09:20AM | 3 | Q | It's not on Signal, right? |
| 09:20AM | 4 | A | No. |
| 09:20AM | 5 | Q | It's just an iMessage, right? |
| 09:21AM | 6 | A | Yes. |
| 09:21AM | 7 | Q | Between you and Mike Miske, right? |
| 09:21AM | 8 | A | Yes. |

09:21AM     9          MR. KENNEDY:  All right.  Could we publish 1-637?

09:21AM    10          THE COURT:  Yes.

09:21AM    11          (Government Exhibit 1-637 was published to the jury.)

09:21AM    12          MR. KENNEDY:  And let's just flip through the 38

09:21AM    13   pages.

09:21AM    14          If we move to Exhibit 1-636, which is only six pages,

09:21AM    15   and just flip through those.

09:21AM    16   BY MR. KENNEDY:

09:22AM    17   Q   Those two were on a -- simply just iMessages, right?

09:22AM    18   A   Yes.

09:22AM    19   Q   Nothing encrypted, not WhatsApp or not Signal, right?

09:22AM    20   A   No.

09:22AM    21          MR. KENNEDY:  Now, we can take that down.

09:22AM    22   BY MR. KENNEDY:

09:22AM    23   Q   Last week I asked you some questions about the fact that

09:22AM    24   in October of 2015, Mr. Miske was looking to buy a boat, right?

09:22AM    25   A   Yes.

09:22AM   1   Q    And that was prior to the accident on November 17th of
09:22AM   2   2015, right?
09:22AM   3   A    Yes.
09:22AM   4          MR. KENNEDY:  And if we pull up Exhibit 9008-008,
09:22AM   5   which I believe was admitted, Your Honor, and if we could
09:22AM   6   publish it.
09:22AM   7          THE COURT:  Which exhibit list is it on?
09:22AM   8          MR. KENNEDY:  Oh, I'm sorry, Your Honor.  It's on the
09:22AM   9   seventh supplemental exhibit list.  My apologies.
09:23AM  10          THE COURT:  Go ahead.
09:22AM  11          (Government Exhibit 9008-008 was published to the
09:22AM  12   jury.)
09:23AM  13   BY MR. KENNEDY:
09:23AM  14   Q    All right.  This was an inquiry that you were making to a
09:23AM  15   seller of a boat on behalf of Mike Miske, right?
09:23AM  16   A    Yes.
09:23AM  17   Q    And we went through it last week, so this was one
09:23AM  18   potential boat and seller that you were looking at, right?
09:23AM  19   A    Yes.
09:23AM  20   Q    Okay.  We went through it last week.  The jury heard about
09:23AM  21   it.  I'd like to show you 9008-009?
09:23AM  22          MR. KENNEDY:  Which is also on the 7th supplemental
09:23AM  23   list, Your Honor.
09:23AM  24   BY MR. KENNEDY:
09:23AM  25   Q    And just take a moment to go through this, sir.

| | | |
|---|---|---|
| 09:23AM | 1 | THE COURT:  Go ahead. |
| 09:24AM | 2 | MR. KENNEDY:  And if you can keep scrolling through. |
| 09:24AM | 3 | BY MR. KENNEDY: |
| 09:24AM | 4 | Q   Do you recognize what's been marked as 9008-009, sir? |
| 09:24AM | 5 | A   Yes. |
| 09:24AM | 6 | Q   All right.  And is it a conversation regarding a different |
| 09:24AM | 7 | boat that Mike Miske was interested in purchasing? |
| 09:24AM | 8 | A   Yes. |
| 09:24AM | 9 | MR. KENNEDY:  All right.  At this time I would offer |
| 09:24AM | 10 | to admit, move to admit, 9008-009. |
| 09:24AM | 11 | THE COURT:  Any objection? |
| 09:24AM | 12 | MR. INCIONG:  No objection. |
| 09:24AM | 13 | THE COURT:  Without objection, 9008-009 is admitted. |
| 09:24AM | 14 | (Exhibit 9008-009 was received in evidence.) |
| 09:24AM | 15 | MR. KENNEDY:  So can we publish that? |
| 09:24AM | 16 | THE COURT:  Yes, you may. |
| 09:24AM | 17 | (Government Exhibit 9008-009 was published to the |
| 09:24AM | 18 | jury.) |
| 09:24AM | 19 | BY MR. KENNEDY: |
| 09:24AM | 20 | Q   So the first one we talked about last week was on |
| 09:24AM | 21 | October 15th. |
| 09:24AM | 22 | I believe this one is on October 5th, right? |
| 09:24AM | 23 | A   Yes. |
| 09:24AM | 24 | Q   And so this is a second conversation about a different |
| 09:25AM | 25 | boat, because he's looking for a boat to purchase in October of |

09:25AM   1   2015, right?

09:25AM   2   A    Yes.

09:25AM   3   Q    So if we move through it, and the inquiry is, "Can we meet

09:25AM   4   at Sand Island, drop it in the water for a test drive," right?

09:25AM   5   A    Yes.

09:25AM   6   Q    And the response back, "For your information, if we agree

09:25AM   7   on a price and you give me a deposit, then we can do a test

09:25AM   8   ride.  That's standard procedure.  I would do it here on the

09:25AM   9   bay," right?

09:25AM   10   A    Yes.

09:25AM   11   Q    So this is a second boat that Mike Miske is looking at

09:25AM   12   during this time period to purchase, right?

09:25AM   13   A    Yes.

09:25AM   14         MR. KENNEDY:  We can take that down.

09:25AM   15   BY MR. KENNEDY:

09:25AM   16   Q    Now, last week you talked about the fact that you logged

09:25AM   17   the cars that were purchased at the auction on the white board,

09:25AM   18   right?

09:25AM   19   A    Yes.

09:25AM   20   Q    And that eventually the information would be transferred a

09:26AM   21   spreadsheet?

09:26AM   22   A    Yes.

09:26AM   23   Q    The info on the spreadsheet would have make and model of

09:26AM   24   the vehicle, right?

09:26AM   25   A    Yes.

| 09:26AM | 1  | Q | Price purchased? |
| 09:26AM | 2  | A | Yes. |
| 09:26AM | 3  | Q | Price sold? |
| 09:26AM | 4  | A | Yes. |
| 09:26AM | 5  | Q | License plate? |
| 09:26AM | 6  | A | Yes. |
| 09:26AM | 7  | Q | VIN number? |
| 09:26AM | 8  | A | Yes. |
| 09:26AM | 9  | Q | Sales were cash, right? |
| 09:26AM | 10 | A | Yes. |
| 09:26AM | 11 | Q | Or cashier's check? |
| 09:26AM | 12 | A | Yes. |
| 09:26AM | 13 | Q | The spreadsheet kept track of the information for the tax |
| 09:26AM | 14 |   | purposes? |
| 09:26AM | 15 | A | Yes. |
| 09:26AM | 16 | Q | Which was given to the accountant, right? |
| 09:26AM | 17 | A | Yes. |
| 09:26AM | 18 | Q | And I think you said Mike Miske loved cars and it was as |
| 09:26AM | 19 |   | much a hobby as it was a business, unlike some of the other |
| 09:26AM | 20 |   | ventures. |
| 09:26AM | 21 | A | Yes. |
| 09:26AM | 22 | Q | All right.  I'd like to show you what's marked as |
| 09:26AM | 23 |   | 9008-083. |
| 09:26AM | 24 |   | MR. KENNEDY:  Which is in the 12th supplemental |
| 09:26AM | 25 |   | exhibit list, Your Honor. |

09:26AM   1             THE COURT:  Go ahead.

09:26AM   2   BY MR. KENNEDY:

09:26AM   3   Q    Do you recognize 9008-083 for the year 2018?

09:26AM   4   A    Yes.

09:26AM   5             MR. KENNEDY:  If we move through to the second page

09:26AM   6   and then the third page.

09:26AM   7   BY MR. KENNEDY:

09:26AM   8   Q    Is this a spreadsheet which you just described for 2018?

09:27AM   9   A    Yes, sir.

09:27AM   10            MR. KENNEDY:  At this time, Your Honor, I'd move

09:27AM   11  9008-083 into evidence.

09:27AM   12            THE COURT:  Any objection?

09:27AM   13            MR. INCIONG:  No objection.

09:27AM   14            THE COURT:  Without objection, 9008-083 is admitted.

09:27AM   15            (Exhibit 9008-083 was received in evidence.)

09:27AM   16            MR. KENNEDY:  May we publish?

09:27AM   17            THE COURT:  Yes, you may.

09:27AM   18            (Government Exhibit 9008-083 was published to the

09:27AM   19  jury.)

09:27AM   20            MR. KENNEDY:  On the left-hand corner if we just blow

09:27AM   21  up the top part so that it's a little larger.

09:27AM   22  BY MR. KENNEDY:

09:27AM   23  Q    The purchase dates for each of the vehicles is shown,

09:27AM   24  right?

09:27AM   25  A    Yes.

| 09:27AM | 1 | Q | The VIN number for each vehicle is shown, right? |

| 09:27AM | 2 | A | Yes. |

| 09:27AM | 3 | Q | The year of the car is shown. |

| 09:27AM | 4 | A | Yes. |

| 09:27AM | 5 | Q | The make of the car is shown. |

| 09:27AM | 6 | A | Yes. |

| 09:27AM | 7 | Q | The model is shown. |

| 09:27AM | 8 | A | Yes. |

| 09:27AM | 9 | Q | The color is shown. |

| 09:27AM | 10 | A | Yes. |

| 09:27AM | 11 | Q | The seller is shown. |

| 09:27AM | 12 | A | Yes. |

| 09:27AM | 13 | Q | The purchase amount is shown. |

| 09:27AM | 14 | A | Yes. |

| 09:27AM | 15 | Q | If there's a cashier's check involved, that's shown. |

| 09:27AM | 16 | A | Yes. |

| 09:27AM | 17 | Q | The sale date is shown. |

| 09:27AM | 18 | A | Yes. |

| 09:27AM | 19 | Q | The sold amount is shown. |

| 09:27AM | 20 | A | Yes. |

09:27AM   21   Q   And so off this spreadsheet you can see whether a profit
09:28AM   22   was made or not, right?

09:28AM   23   A   Yes.

09:28AM   24   Q   And so you have all the information that is presented to
09:28AM   25   the accountant for tax purposes, right?

| | | | |
|---|---|---|---|
| 09:28AM | 1 | A | Yes. |

09:28AM    2         MR. KENNEDY:  And so if we just move back from this

09:28AM    3    and just go back.

09:28AM    4    BY MR. KENNEDY:

09:28AM    5    Q    Then this is beginning on February 7th of 2018, correct?

09:28AM    6    A    Yes.

09:28AM    7    Q    Moving to the last -- on the first page we get to May 23rd

09:28AM    8    of 2018?

09:28AM    9    A    Yes.

09:28AM   10    Q    And then it's current if we go to the last page into

09:28AM   11    October of 2018.

09:28AM   12    A    Yes.

09:28AM   13    Q    All right.  And this was what would happen from the white

09:28AM   14    board to the spreadsheet, to the accountant, right?

09:28AM   15    A    Yes.

09:28AM   16         MR. KENNEDY:  Now, we can take that down.

09:28AM   17    BY MR. KENNEDY:

09:28AM   18    Q    We talked a little bit about the Mauna Kea hotel project,

09:29AM   19    right?

09:29AM   20    A    Yes.

09:29AM   21    Q    And you gave some testimony about what you did on that in

09:29AM   22    the year 2019 after you started working in August of 2019?

09:29AM   23    A    Yes.

09:29AM   24    Q    And into 2020, right?

09:29AM   25    A    Yes.

09:29AM   1          MR. KENNEDY:  I want to pull up 9008-072, which is in

09:29AM   2    the 12th supplemental exhibit list, and just flip through this

09:29AM   3    document for Mr. Freitas.

09:29AM   4    BY MR. KENNEDY:

09:30AM   5    Q    Sir, does that refresh your recollection about this

09:30AM   6    proposal?

09:30AM   7    A    2013, yes.

09:30AM   8    Q    So there was a proposal in 2013, right?

09:30AM   9    A    Yes.

09:30AM   10   Q    That was for a structural tent fumigation?

09:30AM   11   A    Yes.

09:30AM   12   Q    The main tower, right?

09:30AM   13   A    Yes.

09:30AM   14   Q    Beach cottage?

09:30AM   15   A    Yes.

09:30AM   16   Q    Breezeways?

09:30AM   17   A    Yes.

09:30AM   18   Q    Restaurants?

09:30AM   19   A    Yes.

09:30AM   20   Q    Spa?

09:30AM   21   A    Yes.

09:30AM   22   Q    Gym?

09:30AM   23   A    Yes.

09:30AM   24   Q    Retail stores?

09:30AM   25   A    Yes.

| 09:30AM | 1  | Q | Loading areas, right? |
|---------|----|----|----------------------|
| 09:30AM | 2  | A | Yes. |
| 09:30AM | 3  | Q | The proposal included references? |
| 09:30AM | 4  | A | Yes. |
| 09:30AM | 5  | Q | Certificate of liability insurance? |
| 09:30AM | 6  | A | Yes. |
| 09:30AM | 7  | Q | Floor plans, right? |
| 09:30AM | 8  | A | Yes. |
| 09:31AM | 9  | Q | Information about the difference between Vikane and orange |
| 09:31AM | 10 |   | oil in terms of how you kill the termites? |
| 09:31AM | 11 | A | Yes. |
| 09:31AM | 12 | Q | And information of the difference between a tent |
| 09:31AM | 13 |   | fumigation with Vikane versus spot treatment, right? |
| 09:31AM | 14 | A | Yes. |
| 09:31AM | 15 | Q | Spot treatment is simply if you have a problem right here, |
| 09:31AM | 16 |   | treating this spot, right? |
| 09:31AM | 17 | A | Yes. |
| 09:31AM | 18 | Q | Tent fumigation would be treating this whole place, right? |
| 09:31AM | 19 | A | Correct. |
| 09:31AM | 20 | Q | And that this continued on to 2014 with this proposal, |
| 09:31AM | 21 |   | right? |
| 09:31AM | 22 | A | I believe so. |
| 09:31AM | 23 | Q | And Dave Melton was someone that you knew? |
| 09:31AM | 24 | A | Yes. |
| 09:31AM | 25 | Q | He was the project manager? |

| | | |
|---|---|---|
| 09:31AM | 1 | A    Yes. |
| 09:31AM | 2 | Q    And it was submitted to Lloyd Leong at Mauna Kea hotel. |
| 09:31AM | 3 | A    Yes. |
| 09:31AM | 4 | MR. KENNEDY:  At this time, Your Honor, I'd move |
| 09:31AM | 5 | 9008-072 into evidence. |
| 09:31AM | 6 | MR. INCIONG:  Objection, lack of foundation. |
| 09:31AM | 7 | THE COURT:  The objection is overruled.  The document |
| 09:31AM | 8 | will be received and admitted, 9008-72. |
| 09:32AM | 9 | (Exhibit 9008-72 was received in evidence.) |
| 09:32AM | 10 | MR. KENNEDY:  So if we can publish that. |
| 09:32AM | 11 | (Government Exhibit 9008-72 was published to the |
| 09:32AM | 12 | jury.) |
| 09:32AM | 13 | BY MR. KENNEDY: |
| 09:32AM | 14 | Q    So this is a folder that has that particular proposal in |
| 09:32AM | 15 | it, right? |
| 09:32AM | 16 | A    Yes. |
| 09:32AM | 17 | MR. KENNEDY:  All right.  If we move to the second |
| 09:32AM | 18 | page. |
| 09:32AM | 19 | BY MR. KENNEDY: |
| 09:32AM | 20 | Q    So this is a proposal for what I just described in terms |
| 09:32AM | 21 | of a structural tent fumigation, right? |
| 09:32AM | 22 | A    Yes. |
| 09:32AM | 23 | MR. KENNEDY:  And if we just blow up the top portion, |
| 09:32AM | 24 | and if we just kind of slide through. |
| 09:32AM | 25 | BY MR. KENNEDY: |

09:32AM   1   Q    There's the job scope that we just discussed, right?

09:32AM   2   A    Yes.

09:32AM   3          MR. KENNEDY:  All right.  And then if we keep

09:32AM   4   scrolling through.

09:32AM   5   BY MR. KENNEDY:

09:32AM   6   Q    If you saw, this is a six-day job, right?

09:32AM   7   A    Yes.

09:32AM   8   Q    All right.  If we move to page 7, 8 and 9 in 90872 --

09:33AM   9   908-072, these are the references, right?

09:33AM   10  A    Yes.

09:33AM   11  Q    So references are given to them about prior jobs which

09:33AM   12  have been done, correct?

09:33AM   13  A    Correct.

09:33AM   14  Q    All right.  If we move to page 10, this is a certificate

09:33AM   15  of liability insurance, right?

09:33AM   16  A    Yes.

09:33AM   17  Q    And there's a warranty that comes with this, which would

09:33AM   18  be a five-year warranty for spot treatment, correct?

09:33AM   19  A    Yes.

09:33AM   20  Q    All right.  If we move to page 37 to 38, there's a

09:33AM   21  detailed correspondence in June of 2014, right?

09:33AM   22  A    Yes.

09:33AM   23  Q    Setting forth what is attached, right?

09:33AM   24  A    Yes.

09:33AM   25  Q    Okay.  And if we move to page 39 and 40, we have the

09:34AM  1   proposal, and if we move back a page, looks like Dave Melton is

09:34AM  2   the project manager then, correct?

09:34AM  3   A    Yes.

09:34AM  4   Q    And so the Mauna Kea Beach Hotel, as early as 2013, is a

09:34AM  5   job that is internal within Kama'aina Termite and Pest Control,

09:34AM  6   right?

09:34AM  7   A    Yes.

09:34AM  8        MR. KENNEDY:  All right.  If we move on and we can

09:34AM  9   take that down, it looks like if we pull up 9008-086, just take

09:34AM 10   a moment to go through these pages, and this is also in the

09:35AM 11   12th supplemental exhibit list, Your Honor.

09:35AM 12   BY MR. KENNEDY:

09:35AM 13   Q    Do you recognize 9008-086?

09:35AM 14   A    Yes.

09:35AM 15   Q    Is it a proposal in 2018 for the Mauna Kea hotel?

09:35AM 16   A    Yes.

09:35AM 17        MR. KENNEDY:  At this time I'd move 9008-086 into

09:35AM 18   evidence.

09:35AM 19        THE COURT:  Any objection?

09:35AM 20        MR. INCIONG:  No objection.

09:35AM 21        THE COURT:  Without objection, 9008-86 is admitted and

09:35AM 22   you may publish.

09:35AM 23        (Exhibit 9008-86 was received in evidence.)

09:35AM 24        MR. KENNEDY:  May we publish?

09:35AM 25        THE COURT:  Yes.

| | | |
|---|---|---|
| 09:35AM | 1 | MR. KENNEDY:  All right. |
| 09:35AM | 2 | (Government Exhibit 9008-86 was published to the |
| 09:35AM | 3 | jury.) |
| 09:35AM | 4 | MR. KENNEDY:  So this is the first page.  If we move |
| 09:35AM | 5 | to the second page.  Move to the third page. |
| 09:35AM | 6 | BY MR. KENNEDY: |
| 09:35AM | 7 | Q    Okay.  Do you recognize the individual here? |
| 09:35AM | 8 | A    Yes. |
| 09:35AM | 9 | Q    Is it Mike Worden? |
| 09:35AM | 10 | A    Yes. |
| 09:35AM | 11 | Q    And he's the project manager at this time, correct? |
| 09:36AM | 12 | I believe we asked questions yesterday about that. |
| 09:36AM | 13 | A    Yes. |
| 09:36AM | 14 | Q    All right.  And on page 4 you can see Michael Worden as |
| 09:36AM | 15 | the project manager on the proposal in 2018; is that correct? |
| 09:36AM | 16 | A    Yes. |
| 09:36AM | 17 | Q    All right.  Moving on to page 6, it's a structural tent |
| 09:36AM | 18 | fumigation again. |
| 09:36AM | 19 | A    Yes. |
| 09:36AM | 20 | Q    A proposal that is being made again to the main tower, |
| 09:36AM | 21 | right? |
| 09:36AM | 22 | A    Yes. |
| 09:36AM | 23 | Q    Beach cottage? |
| 09:36AM | 24 | A    Yes. |
| 09:36AM | 25 | Q    Breezeway? |

09:36AM   1   A    Yes.

09:36AM   2   Q    The restaurants?

09:36AM   3   A    Yes.

09:36AM   4   Q    Retail stores?

09:36AM   5   A    Yes.

09:36AM   6   Q    Gym and spa area, right?

09:36AM   7   A    Correct.

09:36AM   8   Q    And then the warranty that I asked you about, it's a

09:36AM   9   five-year spot treatment warranty?

09:36AM   10  A    Yes.

09:36AM   11  Q    All right.  And then if we look at page 16 through 19,

09:36AM   12  once again we have references on projects that Kama'aina

09:37AM   13  Termite and Pest Control has done which are similar in scale,

09:37AM   14  right?

09:37AM   15  A    Yes.

09:37AM   16         MR. KENNEDY:  If we just move through.  So now moving

09:37AM   17  to --

09:37AM   18  BY MR. KENNEDY:

09:37AM   19  Q    This is a continuing negotiations with Mauna Kea which

09:37AM   20  began in 2013, right?

09:37AM   21  A    Yes.

09:37AM   22  Q    And now we're into 2018, correct?

09:37AM   23  A    Um-hm.

09:37AM   24  Q    If it's six days, the place has to be shut down, right?

09:37AM   25  A    Yes.

| | | |
|---|---|---|
| 09:37AM | 1 | Q    No guests can come, right? |
| 09:37AM | 2 | A    No. |
| 09:37AM | 3 | Q    So it's a fairly big deal to do a fumigation that lasts |
| 09:37AM | 4 | close to a week, right? |
| 09:37AM | 5 | A    Yes. |
| 09:37AM | 6 | MR. KENNEDY:  So now if we move to 9008-087, which is |
| 09:37AM | 7 | also in the 12th supplemental exhibit list, Your Honor. |
| 09:37AM | 8 | BY MR. KENNEDY: |
| 09:38AM | 9 | Q    Do you recognize 9008-087? |
| 09:38AM | 10 | A    Yes. |
| 09:38AM | 11 | MR. KENNEDY:  And if we could move through those |
| 09:38AM | 12 | pages. |
| 09:38AM | 13 | BY MR. KENNEDY: |
| 09:38AM | 14 | Q    This is a structural fumigation agreement? |
| 09:38AM | 15 | A    Yes. |
| 09:38AM | 16 | Q    Continuing with the Mauna Kea Beach Hotel, correct? |
| 09:38AM | 17 | A    Yes. |
| 09:38AM | 18 | MR. KENNEDY:  I'd move 9008-087 into evidence.  It's |
| 09:38AM | 19 | also in the 12th supplemental, Your Honor. |
| 09:38AM | 20 | THE COURT:  Any objection? |
| 09:38AM | 21 | MR. INCIONG:  No objection. |
| 09:38AM | 22 | THE COURT:  Without objection, 9008-87 is admitted. |
| 09:38AM | 23 | You may publish. |
| 09:38AM | 24 | (Exhibit 9008-087 was received in evidence.) |
| 09:38AM | 25 | MR. KENNEDY:  If we could publish, please. |

09:38AM    1    BY MR. KENNEDY:

09:38AM    2    Q    So this is a continuing -- this is now a third attempt,

09:38AM    3    right?

09:39AM    4    A    Yes.

09:39AM    5    Q    All right.  If we move through.

09:39AM    6         Okay.  And Jake Matthews is now the project manager,

09:39AM    7    right?

09:39AM    8    A    Yes.

09:39AM    9         MR. KENNEDY:  If we move to 9008-088, which is also in

09:39AM   10    the 12th supplemental exhibit list, Your Honor.

09:39AM   11         THE COURT:  Go ahead.

09:39AM   12         MR. KENNEDY:  And if we can blow up the top portion.

09:39AM   13    Then if we can scroll down.

09:39AM   14    BY MR. KENNEDY:

09:39AM   15    Q    And then there is a, it looks like an attachment, correct?

09:40AM   16    A    Yes.

09:40AM   17    Q    All right.  So now this is a letter in March, or excuse

09:40AM   18    me, an email in March of 2020 that also references

09:40AM   19    communications back in, I believe it's July of 2019, correct?

09:40AM   20    A    Yes.

09:40AM   21         MR. KENNEDY:  All right.  So at this time I would move

09:40AM   22    9008-088 into evidence.

09:40AM   23         THE COURT:  Any objection, Mr. Inciong?

09:40AM   24         MR. INCIONG:  Yes.  Objection, lack of foundation.

09:40AM   25         THE COURT:  Sustained.

09:40AM   1   BY MR. KENNEDY:

09:40AM   2   Q    Sir, are you familiar with this communication?

09:40AM   3   A    Yes.

09:40AM   4   Q    Is it -- the project has already now been a walk-through

09:40AM   5   in the first part of March, right, of 2020?

09:40AM   6   A    Yes.

09:40AM   7   Q    And so this is part of the business records of Kama'aina

09:40AM   8   Termite and Pest Control, right?

09:40AM   9   A    Yes.

09:41AM  10   Q    Made at a time and is accurate in detail, correct?

09:41AM  11   A    Yes.

09:41AM  12        MR. KENNEDY:  At this time I'd move 9008-088 into

09:41AM  13   evidence.

09:41AM  14        MR. INCIONG:  Same objection.

09:41AM  15        THE COURT:  The objection is overruled.  The document

09:41AM  16   is received and admitted that's 9008-88.  You may publish.

09:41AM  17        (Exhibit 9008-088 was received in evidence.)

09:41AM  18   BY MR. KENNEDY:

09:41AM  19   Q    If we blow up the first part.

09:41AM  20        Now, the individual who had been the engineer, I

09:41AM  21   believe you testified, at Mauna Kea left and a new person took

09:41AM  22   over, right?

09:41AM  23   A    Yes.

09:41AM  24   Q    And so Mr. Miske is sending the proposal after he flew

09:41AM  25   with a crew and took a look at the facility with individuals to

09:41AM   1   finalize actually doing the tent fumigation, right?

09:41AM   2   A    Yes.  I was there.

09:41AM   3   Q    And so you were with him on that trip, right?

09:42AM   4   A    Yes.

09:42AM   5   Q    Okay.  And so that was a trip to make certain that you

09:42AM   6   viewed the property, right?

09:42AM   7   A    Yes.

09:42AM   8   Q    And so we saw some videos yesterday of -- excuse me, not

09:42AM   9   yesterday, but last week on Friday of you looking at a rooftop

09:42AM   10   trying to figure out how those things could be tented, right?

09:42AM   11   A    No, we didn't see those pictures.

09:42AM   12   Q    You were looking at a property that you were looking at

09:42AM   13   what to bid and asking questions?

09:42AM   14   A    Yes, yes, correct.

09:42AM   15   Q    All right.  So part of the walk-through was to take a look

09:42AM   16   at what's the vegetation, what's the height, how are we going

09:42AM   17   to tent this, all of these buildings do all this, right?

09:42AM   18   A    Yes.

09:42AM   19   Q    So this is part of that project, right?

09:42AM   20   A    Correct.

09:42AM   21   Q    All right.  And if we go down on this document, Mike

09:42AM   22   Worden, back in July of 2019, is still communicating with Lloyd

09:42AM   23   Leong, right?

09:42AM   24   A    Yes.

09:42AM   25   Q    And Lloyd Leong was the director of engineering at Mauna

09:43AM    1    Kea, correct?

09:43AM    2    A    Yes.

09:43AM    3    Q    And so he's indicating that he'll be leaving, he doesn't

09:43AM    4    know who's gonna take over, so he's telling Mr. Worden that

09:43AM    5    fact at that time, right?

09:43AM    6    A    Yes.

09:43AM    7    Q    Mr. Worden, in 2020, is no longer with Kama'aina Termite

09:43AM    8    and Pest Control, right?

09:43AM    9    A    Correct.

09:43AM   10    Q    And so Mike Miske is communicating directly with him in

09:43AM   11    this document, right?

09:43AM   12    A    Yes.

09:43AM   13    Q    And "him" I mean the new director of engineering, right?

09:43AM   14    A    Yes.

09:43AM   15    Q    We can take that down.

09:43AM   16         And so the Mauna Kea hotel project had been in the

09:43AM   17    works for seven years, right?

09:43AM   18    A    Yes.

09:43AM   19    Q    Proposals had been made twice before you were even brought

09:43AM   20    in to do sales, right?

09:43AM   21    A    Yes.

09:43AM   22    Q    Now, and this was an internal project, not someone calling

09:43AM   23    in and asking for a -- to communicate with someone in sales and

09:44AM   24    following up with that lead, right?

09:44AM   25    A    Can you repeat that?

| | | | |
|---|---|---|---|
| 09:44AM | 1 | Q | This wasn't the same as someone calling up and saying, |
| 09:44AM | 2 | | hey, I'd like to have my house fumigated, can someone follow up |
| 09:44AM | 3 | | and get back in touch with me.  That would happen in the |
| 09:44AM | 4 | | office, right? |
| 09:44AM | 5 | A | It was a call-in. |
| 09:44AM | 6 | Q | What's that? |
| 09:44AM | 7 | A | It was a call-in.  Jason did call in to the office. |
| 09:44AM | 8 | Q | Communicating on a basis of five years of two prior |
| 09:44AM | 9 | | proposals, right? |
| 09:44AM | 10 | A | Yes. |
| 09:44AM | 11 | Q | As opposed to someone who had never contacted the business |
| 09:44AM | 12 | | before. |
| 09:44AM | 13 | A | Yes. |
| 09:44AM | 14 | Q | Now, I want to talk to you a little bit about the M |
| 09:44AM | 15 | | Nightclub, right? |
| 09:44AM | 16 | A | Yes. |
| 09:44AM | 17 | Q | All right.  You were shown a number of pictures last week? |
| 09:44AM | 18 | A | Yes. |
| 09:44AM | 19 | Q | Okay.  Now, the M Nightclub for you was party central, |
| 09:44AM | 20 | | right? |
| 09:45AM | 21 | A | Yes. |
| 09:45AM | 22 | Q | I think you said you tried to get there every weekend? |
| 09:45AM | 23 | A | Yes. |
| 09:45AM | 24 | Q | You weren't paying for drinks, right? |
| 09:45AM | 25 | A | No. |

```
09:45AM   1    Q    You got 86'd one day, right?

09:45AM   2    A    Yes.

09:45AM   3    Q    Let back in the next?

09:45AM   4    A    Yes.

09:45AM   5    Q    And that happened more than once, right?

09:45AM   6    A    Correct.

09:45AM   7    Q    And you were family, right?

09:45AM   8    A    Yes.

09:45AM   9    Q    And that's what you do for family, right?

09:45AM  10    A    Yes.

09:45AM  11    Q    And that's how Mike Miske saw it, didn't he?

09:45AM  12    A    Yes.

09:45AM  13    Q    And you know, there's a Bruce Springsteen song that says,

09:45AM  14    "A man who turns his back on his family, he ain't no good," and

09:45AM  15    that's kind of the way this worked, didn't it?

09:45AM  16    A    Yes.

09:45AM  17    Q    Now, we've seen some photos in the exhibits of the

09:45AM  18    M Nightclub, right?

09:45AM  19    A    Yes.

09:45AM  20    Q    And some of those photos include Mike Miske in them,

09:45AM  21    right?

09:45AM  22    A    Yes.

09:45AM  23    Q    And he was during that time with the M Nightclub, the

09:45AM  24    owner, right?

09:45AM  25    A    Yes.
```

| | | | |
|---|---|---|---|
| 09:45AM | 1 | Q | And folks want to have their picture taken with him, |
| 09:46AM | 2 | | right? |
| 09:46AM | 3 | A | Yes. |
| 09:46AM | 4 | Q | And that happened numerous times, didn't it? |
| 09:46AM | 5 | A | Yes. |
| 09:46AM | 6 | Q | And you saw it, right? |
| 09:46AM | 7 | A | Yes. |
| 09:46AM | 8 | Q | So someone has a picture, hey, I know the owner, they come |
| 09:46AM | 9 | | back -- this is business, right? |
| 09:46AM | 10 | A | Yes. |
| 09:46AM | 11 | Q | So when you were at the M, it was a party; for Mike, it |
| 09:46AM | 12 | | was a business, right? |
| 09:46AM | 13 | A | No.  He was teaching me about the business. |
| 09:46AM | 14 | Q | Yeah.  He was also teaching you about the business, right? |
| 09:46AM | 15 | A | Correct. |
| 09:46AM | 16 | Q | What I'm saying, he was at the M Nightclub because he |
| 09:46AM | 17 | | owned it and that was his business, right? |
| 09:46AM | 18 | A | Yes. |
| 09:46AM | 19 | Q | When you were there to party, you were there to party, |
| 09:46AM | 20 | | right? |
| 09:46AM | 21 | A | Yeah. |
| 09:46AM | 22 | Q | But when -- he was also teaching you about the business, |
| 09:46AM | 23 | | right? |
| 09:46AM | 24 | A | Yes. |
| 09:46AM | 25 | Q | Okay.  And so when he's standing in these photos with |

09:46AM   1   other people, that's just what you do when you're in business,
09:46AM   2   right?
09:46AM   3   A    Yes.
09:46AM   4   Q    So now that all ended on March 12th of 2016 for Mike
09:46AM   5   Miske, didn't it?
09:46AM   6   A    Yeah.  He didn't show up anymore.
09:47AM   7   Q    He didn't show up anymore, did he?
09:47AM   8   A    No.
09:47AM   9   Q    When Caleb died, that part of his life went with him.
09:47AM  10   Showing up at the M, dealing with the M, that was over, right?
09:47AM  11   A    Yes.
09:47AM  12   Q    He had lost his son and you had lost someone that you were
09:47AM  13   very close to, his son, as well?
09:47AM  14   A    Yes.
09:47AM  15   Q    So now there was a celebration of life for Caleb, right?
09:47AM  16   A    Yes.
09:47AM  17   Q    And then there was a celebration that went out to the bay,
09:47AM  18   right?
09:47AM  19   A    Yes.
09:47AM  20   Q    And so I'd like to show you 9008-085.
09:47AM  21        MR. KENNEDY:  Which is in the 12th supplemental as
09:47AM  22   well, Your Honor.
09:47AM  23        THE COURT:  Go ahead.
09:47AM  24   BY MR. KENNEDY:
09:47AM  25   Q    Do you recognize that photo?

09:47AM   1   A      Yes.

09:47AM   2   Q      How is it that you recognize it?

09:47AM   3   A      That's family there and friends.

09:47AM   4   Q      All right.  And was this taken during the celebration of

09:47AM   5   life component that was at the bay?

09:48AM   6   A      Yes.

09:48AM   7          MR. KENNEDY:  At this time I'd move 9008-085 into

09:48AM   8   evidence.

09:48AM   9          THE COURT:  Any objection?

09:48AM   10         MR. INCIONG:  No objection.

09:48AM   11         THE COURT:  Without objection, 9008-85 is admitted.

09:48AM   12   You may publish.

09:48AM   13         MR. KENNEDY:  Thank you, sir.

09:48AM   14         (Exhibit 9008-085 was received in evidence.)

09:48AM   15   BY MR. KENNEDY:

09:48AM   16   Q      Do you see yourself in there, sir?

09:48AM   17   A      Yes.

09:48AM   18   Q      Are you grabbing a hand of another?

09:48AM   19   A      Yes.

09:48AM   20   Q      And this was the day that after the celebration of Caleb's

09:48AM   21   life, his ashes were taken there and spread in the bay, right?

09:48AM   22   A      Yes.

09:48AM   23   Q      All right.  And so I'd like to show you, sir -- do you

09:48AM   24   recall, before I get to that, do you recall that there were a

09:48AM   25   number of jet skis involved?

09:48AM    1    A    Yes.

09:48AM    2    Q    And that there was at the bay where every Friday after

09:48AM    3    that you got together, there was a tent set up for individuals?

09:48AM    4    A    Yes.

09:48AM    5    Q    And then there was a boat for people to go out into the

09:48AM    6    bay to see the spreading of the ashes, right?

09:49AM    7    A    Yes.

09:49AM    8    Q    And so you were there for that, right?

09:49AM    9    A    Yes.

09:49AM   10    Q    Were you on one of the jet skis?

09:49AM   11    A    I believe so.

09:49AM   12         MR. KENNEDY:  All right.  Your Honor, I'd like to pull

09:49AM   13    up 9008-086.  It's a 15-minute video.  I don't intend to play

09:49AM   14    the whole thing, but I want to just show the jury portions of

09:49AM   15    it since Mr. Freitas was there.

09:49AM   16         THE COURT:  Do you mean 9008-89?

09:49AM   17         MR. KENNEDY:  Is it 9008-89?  Let me check with -- I

09:49AM   18    do.

09:49AM   19         THE COURT:  All right.

09:49AM   20    BY MR. KENNEDY:

09:49AM   21    Q    And if we could begin to play -- what are we looking at

09:49AM   22    here, sir?

09:49AM   23    A    This is the bay.

09:49AM   24         MR. KENNEDY:  All right. I move to admit 9008-89 and

09:49AM   25    ask that it be published.

| | | |
|---|---|---|
| 09:49AM | 1 | THE COURT:  Any objection, Mr. Inciong? |
| 09:49AM | 2 | MR. INCIONG:  This is the video, this particular |
| 09:49AM | 3 | exhibit? |
| 09:50AM | 4 | MR. KENNEDY:  Yes. |
| 09:50AM | 5 | MR. INCIONG:  Objection, lack of foundation. |
| 09:50AM | 6 | MR. KENNEDY:  We can play it through a little way. |
| 09:50AM | 7 | THE COURT:  Yes.  You may need to lay more foundation. |
| 09:50AM | 8 | MR. KENNEDY:  Let's just play it through for |
| 09:50AM | 9 | Mr. Freitas. |
| 09:50AM | 10 | (Video was played for the witness.) |
| 09:51AM | 11 | MR. KENNEDY:  And we can stop it right there. |
| 09:51AM | 12 | BY MR. KENNEDY: |
| 09:51AM | 13 | Q    Sir, in seeing that video, do you recognize it as the |
| 09:51AM | 14 | celebration of life on the water for Caleb? |
| 09:51AM | 15 | A    Yes. |
| 09:51AM | 16 | Q    And did you see the area that at the bay, a tent set up |
| 09:52AM | 17 | for individuals to be there later in the celebration? |
| 09:52AM | 18 | A    Yes. |
| 09:52AM | 19 | Q    And there's a boat that you can see where individuals |
| 09:52AM | 20 | could go out on a flat boat and watch the actual spreading of |
| 09:52AM | 21 | the ashes. |
| 09:52AM | 22 | A    Yes. |
| 09:52AM | 23 | MR. KENNEDY:  At this time, Your Honor, I would move |
| 09:52AM | 24 | 9008-089, which is on the 12th supplemental, into evidence, |
| 09:52AM | 25 | Your Honor. |

| | | |
|---|---|---|
| 09:52AM | 1 | THE COURT:  Any objection? |
| 09:52AM | 2 | MR. INCIONG:  No objection to the portion that the |
| 09:52AM | 3 | witness has seen and authenticated. |
| 09:52AM | 4 | Beyond that, the objection remains. |
| 09:52AM | 5 | THE COURT:  Do you intend to show him portions of this |
| 09:52AM | 6 | exhibit, Mr. Kennedy, that extend beyond what we just saw or |
| 09:52AM | 7 | what the witness just saw? |
| 09:52AM | 8 | You said you didn't intend to show -- |
| 09:52AM | 9 | MR. KENNEDY:  I did not. |
| 09:52AM | 10 | THE COURT:  I wasn't sure which portion of it. |
| 09:52AM | 11 | MR. KENNEDY:  We can go through the entire video. |
| 09:52AM | 12 | Does the government want me to splice it at this |
| 09:52AM | 13 | point? |
| 09:52AM | 14 | MR. INCIONG:  Like I said, I have no objection up to |
| 09:52AM | 15 | the point that the witness has seen and authenticated. |
| 09:53AM | 16 | MR. KENNEDY:  Okay.  Your Honor, I think I can live |
| 09:53AM | 17 | with that.  We will splice it and make it 9008-089.  I don't |
| 09:53AM | 18 | want to take the jury's time to go through 15 minutes and then |
| 09:53AM | 19 | show it to them again. |
| 09:53AM | 20 | THE COURT:  So you will stop it at this point and that |
| 09:53AM | 21 | portion -- |
| 09:53AM | 22 | MR. KENNEDY:  And do we have a timing on there since I |
| 09:53AM | 23 | can't see it on my screen? |
| 09:53AM | 24 | THE COURT:  I can't either on mine.  So one minute and |
| 09:53AM | 25 | 35 seconds.  That sounds about right of what we just saw, and |

09:53AM   1   that will then be spliced into 9008-89 alpha; is that correct?

09:53AM   2        MR. KENNEDY:  That is correct, Your Honor.

09:53AM   3        THE COURT:  Okay.  And then that, the alpha exhibit,

09:53AM   4   will be admitted without objection.  Go ahead.

09:53AM   5        (Exhibit as 9008-89A received in evidence.)

09:53AM   6        MR. KENNEDY:  If we can go back to the front,

09:53AM   7   Ms. King, and then publish it for the jury.

09:53AM   8   BY MR. KENNEDY:

09:53AM   9   Q    And before we start it, sir, what area of Honolulu are we

09:53AM   10  looking at here?

09:53AM   11  A    Hawaii Kai.

09:53AM   12  Q    All right.  And the jet skis and the boats are going in an

09:53AM   13  easterly direction?

09:54AM   14  A    Yes.

09:54AM   15  Q    All right.  And off to the left here, we'll get closer to

09:54AM   16  that, but is this area right here near to a boat ramp?

09:54AM   17  A    Yes, it's near a boat ramp.

09:54AM   18  Q    Okay.  And then this area down here is the grassy area

09:54AM   19  that you mentioned last week where folks would get together,

09:54AM   20  right?

09:54AM   21  A    Yes.

09:54AM   22  Q    All right.  And as we get closer, we will see that in that

09:54AM   23  area right here there is a tent set up for folks for the

09:54AM   24  celebration of life, correct?

09:54AM   25  A    Correct.

09:54AM   1   Q    And then eventually out in the open area water here there

09:54AM   2   will be a flatbed boat that has individuals on it who

09:54AM   3   eventually see the spreading of the ashes, right?

09:54AM   4   A    Yes.

09:54AM   5   Q    And the jet skis are going in that direction, correct?

09:55AM   6   A    Correct.

09:55AM   7        MR. KENNEDY:  All right.  We can play the video now.

09:55AM   8        (Video was played for the jury.)

09:55AM   9   BY MR. KENNEDY:

09:55AM  10   Q    And you are one of the members on the jet skis

09:55AM  11   participating in this, correct?

09:55AM  12   A    I believe so.

09:55AM  13        MR. KENNEDY:  And, Ms. King, if we stop it just right

09:55AM  14   there.

09:55AM  15   BY MR. KENNEDY:

09:55AM  16   Q    Is this the tent that I was circling before that now we're

09:55AM  17   close enough to see the chairs and other things that are set up

09:55AM  18   after the ashes are spread, correct?

09:55AM  19   A    Yes.

09:55AM  20        MR. KENNEDY:  We can continue, Ms. King.  Thank you.

09:55AM  21        (Video was played for the jury.)

09:56AM  22        MR. KENNEDY:  If we stop it right there.

09:56AM  23   BY MR. KENNEDY:

09:57AM  24   Q    We have a boat right here, correct?

09:57AM  25   A    Yes.

| | | |
|---|---|---|
| 09:57AM | 1 | Q    All right.  And then if we continue a little bit longer, |
| 09:57AM | 2 | jet skis are getting near this particular flatbed boat, |
| 09:57AM | 3 | correct? |
| 09:57AM | 4 | A    Yes. |
| 09:57AM | 5 | Q    And there are individuals out there who aren't on jet |
| 09:57AM | 6 | skis, but they want to see the spreading of the ashes and so |
| 09:57AM | 7 | they have been ferried out there in that boat, correct? |
| 09:57AM | 8 | A    Yes. |
| 09:57AM | 9 | MR. KENNEDY:  And is this right near the end, |
| 09:57AM | 10 | Ms. King? |
| 09:57AM | 11 | MS. KING:  Yes. |
| 09:57AM | 12 | MR. KENNEDY:  All right.  We can take it down then. |
| 09:57AM | 13 | BY MR. KENNEDY: |
| 09:57AM | 14 | Q    So what transpired, what happened is spreading of the |
| 09:57AM | 15 | ashes, folks that were on the jet skis went back over and |
| 09:57AM | 16 | continued with the celebration of life, correct? |
| 09:57AM | 17 | A    Yes. |
| 09:57AM | 18 | Q    So now after that it became a family tradition to go to |
| 09:58AM | 19 | that area where we saw the tent, every Friday as honoring |
| 09:58AM | 20 | Caleb, right? |
| 09:58AM | 21 | A    Yes. |
| 09:58AM | 22 | Q    Because one of the things he loved to do was jet ski? |
| 09:58AM | 23 | A    Yes. |
| 09:58AM | 24 | Q    And he was a street racer, right? |
| 09:58AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 09:58AM | 1 | Q | He liked speed, correct? |
| 09:58AM | 2 | A | Yes. |
| 09:58AM | 3 | Q | Like a lot of us; fast cars, fast skis, fast jet skis. |
| 09:58AM | 4 | A | Yes. |
| 09:58AM | 5 | Q | And so every Friday the family would go there and get |
| 09:58AM | 6 | | together to keep his memory alive, right? |
| 09:58AM | 7 | A | Yes. |
| 09:58AM | 8 | Q | And you participated in some of those as well, correct? |
| 09:58AM | 9 | A | Yes. |
| 09:58AM | 10 | Q | So you mentioned Mike Miske didn't set foot back in the |
| 09:58AM | 11 | | club after that, right? |
| 09:58AM | 12 | A | Yeah.  He wasn't showing up at all. |
| 09:58AM | 13 | Q | He didn't show up at all, right? |
| 09:58AM | 14 | | And so eventually M Nightclub closed, right? |
| 09:59AM | 15 | A | Yes. |
| 09:59AM | 16 | Q | And Jason Yokoyama, who had been the general manager, |
| 09:59AM | 17 | | purchased the club, right? |
| 09:59AM | 18 | A | Yes. |
| 09:59AM | 19 | Q | And he remodeled the club, right? |
| 09:59AM | 20 | A | Yes. |
| 09:59AM | 21 | Q | And the look of the club changed, right? |
| 09:59AM | 22 | A | Yes. |
| 09:59AM | 23 | Q | And the name of the club changed, right? |
| 09:59AM | 24 | A | Yes. |
| 09:59AM | 25 | Q | Because it was no longer the M, right? |

| | | | |
|---|---|---|---|
| 09:59AM | 1 | A | Yes. |
| 09:59AM | 2 | Q | That was done and it became Encore at the Row, right? |
| 09:59AM | 3 | A | Yes. |
| 09:59AM | 4 | Q | I want to show you some pictures, 9372-003, 004 and 005? |
| 09:59AM | 5 | | MR. KENNEDY:  Which are in the 9th supplement exhibit |
| 09:59AM | 6 | | list, Your Honor.  You probably don't have that one in front of |
| 09:59AM | 7 | | you so... |
| 09:59AM | 8 | | BY MR. KENNEDY: |
| 09:59AM | 9 | Q | Sir, do you recognize what's shown in 9372-003? |
| 09:59AM | 10 | A | Yes. |
| 09:59AM | 11 | Q | And then if we can show you 9372-004 and 9372-005. |
| 10:00AM | 12 | | Do you recognize those three photographs, 9372-003, |
| 10:00AM | 13 | | 9372-004 and 9372-005, to be photographs of the Encore at the |
| 10:00AM | 14 | | Row? |
| 10:00AM | 15 | A | Yes. |
| 10:00AM | 16 | Q | And this was after the remodel, right? |
| 10:00AM | 17 | A | Yes. |
| 10:00AM | 18 | | MR. KENNEDY:  Your Honor, at this time I'd move |
| 10:00AM | 19 | | 9372-003, 004 and 005. |
| 10:00AM | 20 | | THE COURT:  Any objection? |
| 10:00AM | 21 | | MR. INCIONG:  No objection.  My only issue is that it |
| 10:00AM | 22 | | looks like there are two different exhibit numbers, at least on |
| 10:00AM | 23 | | this exhibit we're looking at right here. |
| 10:00AM | 24 | | MR. KENNEDY:  Let's see. |
| 10:00AM | 25 | | MR. INCIONG:  There are maybe multiple pages.  I'm not |

| | | |
|---|---|---|
| 10:00AM | 1 | sure. |
| 10:00AM | 2 | MR. KENNEDY:  I think on those exhibits they should |
| 10:01AM | 3 | just be one-page photographs.  I have a copy.  I think those |
| 10:01AM | 4 | are the same as what is shown on the screen, but let's see if |
| 10:01AM | 5 | we can get it right if there's something messed up. |
| 10:01AM | 6 | MR. INCIONG:  I think there's just a 001 that's added |
| 10:01AM | 7 | on the lower left-hand corner, but it's the same three |
| 10:01AM | 8 | exhibits, so no objection. |
| 10:01AM | 9 | THE COURT:  All right. |
| 10:01AM | 10 | MR. KENNEDY:  Yes, there is that, Your Honor, because |
| 10:01AM | 11 | just to explain that, once it's in the computer, each page has |
| 10:01AM | 12 | an individual number in it and so if it's a 20-page document, |
| 10:01AM | 13 | it would be 9372-005 and then it would be dash 0001 through |
| 10:02AM | 14 | dash 00020 so you can call it out. |
| 10:02AM | 15 | When it's a one-page document, it's -- for the |
| 10:02AM | 16 | computer it still has the four digits at the end. |
| 10:02AM | 17 | THE COURT:  Without objection, 9372-003, 004, 005, |
| 10:02AM | 18 | each of which is a one-page photograph, is admitted.  You may |
| 10:02AM | 19 | publish. |
| 10:02AM | 20 | (Exhibits 9372-003, 9372-004 and 9372-005 were |
| 10:02AM | 21 | received in evidence.) |
| 10:02AM | 22 | BY MR. KENNEDY: |
| 10:02AM | 23 | Q    If we can start with 9372-003. |
| 10:02AM | 24 | So now this changed the look of what had been the M, |
| 10:02AM | 25 | which had closed and was now Encore at the Row, correct? |

10:02AM    1    A    Yes.

10:02AM    2    Q    And then if we move to 9372-004.

10:02AM    3         This was an area at the Encore at the Row, right?

10:02AM    4    A    Yes.

10:02AM    5    Q    And then 9372-005.

10:03AM    6         Another area inside Encore at the Row, right?

10:03AM    7    A    Yes.

10:03AM    8    Q    Which completely remodeled because it was a new club under

10:03AM    9    new ownership, right?

10:03AM   10    A    Yes.

10:03AM   11    Q    So now Jason Yokoyama is the owner, right?

10:03AM   12    A    Yes.

10:03AM   13    Q    Jason Yokoyama is now the boss and it's his club, right?

10:03AM   14    A    Yes.

10:03AM   15    Q    All right.  Now, did you have knowledge of a post that was

10:03AM   16    made that referenced Jason Yokoyama's club, the Encore?

10:03AM   17    A    Yes.

10:03AM   18    Q    I believe you testified about it last week.

10:03AM   19         Were you aware that The District, one of The District

10:03AM   20    owners set up a meeting to apologize directly to Mr. Yokoyama?

10:04AM   21    A    No, I don't recall that.

10:04AM   22    Q    So you weren't aware that an apology was made at the front

10:04AM   23    door, and there was interplay between Mr. Yokoyama and one of

10:04AM   24    the owners at The District where Mr. Yokoyama was not accepting

10:04AM   25    the apology.  You didn't know about that.

| | | | |
|---|---|---|---|
| 10:04AM | 1 | A | No. |
| 10:04AM | 2 | Q | Now, I want to ask you some questions about inside The |
| 10:04AM | 3 | | District on March 4th of 2015, okay? |
| 10:04AM | 4 | A | Okay. |
| 10:04AM | 5 | Q | When you were in there, you just wanted people to leave, |
| 10:04AM | 6 | | right? |
| 10:04AM | 7 | A | Yes. |
| 10:04AM | 8 | Q | You didn't want to cause anyone any harm, right? |
| 10:04AM | 9 | A | Yes. |
| 10:04AM | 10 | Q | From the chemical release, right? |
| 10:04AM | 11 | A | Yes. |
| 10:05AM | 12 | Q | And you sure didn't want to give any severe harm to |
| 10:05AM | 13 | | anyone, right? |
| 10:05AM | 14 | A | Yes. |
| 10:05AM | 15 | Q | So let me ask you some questions about that. |
| 10:05AM | 16 | | When we left off on Friday, I played the 911 call for |
| 10:05AM | 17 | | you because we had a few minutes of time. |
| 10:05AM | 18 | | Do you recall that 911 call? |
| 10:05AM | 19 | A | Yes. |
| 10:05AM | 20 | Q | All right.  Do you recall that that time that call was |
| 10:05AM | 21 | | made was at 1:41:42 a.m. on Saturday, March 4th? |
| 10:05AM | 22 | A | Yes. |
| 10:05AM | 23 | Q | Okay.  So the call is made and it's in evidence.  So the |
| 10:05AM | 24 | | caller says, "I want to make a police report."  You heard that, |
| 10:05AM | 25 | | right? |

| | | | |
|---|---|---|---|
| 10:05AM | 1 | A | Yes. |
| 10:05AM | 2 | Q | Someone released pepper spray, right? |
| 10:05AM | 3 | A | Yes. |
| 10:05AM | 4 | Q | Cleared out the entire club, right? |
| 10:05AM | 5 | A | Yes. |
| 10:05AM | 6 | Q | Wants to make a report about it? |
| 10:05AM | 7 | A | Yes. |
| 10:05AM | 8 | Q | It's The District nightclub.  He identifies where he's |
| 10:06AM | 9 | | calling from and what he's associated with, right? |
| 10:06AM | 10 | A | Yes. |
| 10:06AM | 11 | Q | He's the manager, right? |
| 10:06AM | 12 | A | Yes. |
| 10:06AM | 13 | Q | They ask about an ambulance and he says, "There's one |
| 10:06AM | 14 | | coming for something that's totally different." |
| 10:06AM | 15 | | Do you recall that? |
| 10:06AM | 16 | A | Yes. |
| 10:06AM | 17 | Q | And he says his name is Reid and he has no idea who |
| 10:06AM | 18 | | released the pepper spray. |
| 10:06AM | 19 | A | Yes. |
| 10:06AM | 20 | Q | So the club is clear at 1:41:42 that night, or excuse me, |
| 10:06AM | 21 | | that morning, correct? |
| 10:06AM | 22 | A | Yes. |
| 10:06AM | 23 | Q | All right.  Now, shortly before that 911 call, you and |
| 10:06AM | 24 | | Jake Smith drive to the District Nightclub, right? |
| 10:06AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 10:06AM | 1 | Q | You're in your black Mercedes right? |
| 10:06AM | 2 | A | Yes. |
| 10:06AM | 3 | Q | You entered the club, right? |
| 10:06AM | 4 | A | Yes. |
| 10:06AM | 5 | Q | You squirted the liquid chemical, right? |
| 10:06AM | 6 | A | Yes. |
| 10:06AM | 7 | Q | Into a trash can. |
| 10:06AM | 8 | A | Yes. |
| 10:06AM | 9 | Q | Near the dance floor. |
| 10:06AM | 10 | A | Correct. |
| 10:06AM | 11 | Q | You walked out of the club. |
| 10:06AM | 12 | A | Yes. |
| 10:06AM | 13 | Q | Into your black Mercedes. |
| 10:07AM | 14 | A | Yes. |
| 10:07AM | 15 | Q | You and Jake Smith departed the club. |
| 10:07AM | 16 | A | Yes. |
| 10:07AM | 17 | Q | And drove to Encore Nightclub, right? |
| 10:07AM | 18 | A | Yes. |
| 10:07AM | 19 | Q | And you went inside Encore Nightclub, right? |
| 10:07AM | 20 | A | Yes. |
| 10:07AM | 21 | Q | Earlier that evening you and Jake Smith again, right? |
| 10:07AM | 22 | A | Yes. |
| 10:07AM | 23 | Q | Drove to the District Nightclub, right? |
| 10:07AM | 24 | A | Yes. |
| 10:07AM | 25 | Q | And once you arrived, you saw that security was wanding |

| | | |
|---|---|---|
| 10:07AM | 1 | folks, right? |
| 10:07AM | 2 | A    Yes. |
| 10:07AM | 3 | Q    So you decided that the metal cap on the Jägermeister |
| 10:07AM | 4 | bottle would be detected by a wand, right? |
| 10:07AM | 5 | A    Yes. |
| 10:07AM | 6 | Q    So you decided that a plastic bottle would be better, |
| 10:07AM | 7 | right? |
| 10:07AM | 8 | A    Yes. |
| 10:07AM | 9 | Q    And you made that decision right? |
| 10:07AM | 10 | A    Yes. |
| 10:07AM | 11 | Q    And Jake Smith made that decision, right? |
| 10:07AM | 12 | A    Yes. |
| 10:07AM | 13 | Q    And so you and Jake Smith drove in your black Mercedes, |
| 10:08AM | 14 | right, to Walmart, right? |
| 10:08AM | 15 | A    Yes. |
| 10:08AM | 16 | Q    Near the Ala Moana shopping area, right? |
| 10:08AM | 17 | A    Yes. |
| 10:08AM | 18 | Q    Which is open 24 hours, right? |
| 10:08AM | 19 | A    Yes. |
| 10:08AM | 20 | Q    To purchase a plastic, ketchup-style bottle, right? |
| 10:08AM | 21 | A    Yes. |
| 10:08AM | 22 | Q    Because there was a metal detector in operation, right? |
| 10:08AM | 23 | A    Yes. |
| 10:08AM | 24 | Q    And you made that determination, right? |
| 10:08AM | 25 | A    Yes. |

10:08AM   1   Q   And since you decided it would not detect the plastic
10:08AM   2   bottle, right?
10:08AM   3   A   Yes.
10:08AM   4   Q   Before that happened, you were given the chemical, right?
10:08AM   5   A   Yes.
10:08AM   6   Q   In a mini Jägermeister bottle, right?
10:08AM   7   A   Yes.
10:08AM   8   Q   By Jake Smith, right?
10:08AM   9   A   Yes.
10:08AM  10   Q   At Encore Nightclub, right?
10:08AM  11   A   I believe so, yes.
10:08AM  12   Q   And Jake Smith had the chemicals in a metal container,
10:08AM  13   right?
10:08AM  14   A   Yes.
10:08AM  15   Q   Jake Smith never told you what was in the bottle, right?
10:08AM  16   A   No.
10:08AM  17   Q   You never asked Jake Smith what was in the bottle, right?
10:09AM  18   A   No.
10:09AM  19   Q   And it was Jake Smith who gave you the Jägermeister
10:09AM  20   bottle, right?
10:09AM  21   A   Yes.
10:09AM  22   Q   So then at that point you drive to the District Nightclub,
10:09AM  23   right?
10:09AM  24   A   Yes.
10:09AM  25   Q   And you stopped, right?

10:09AM   1   A   Yes.

10:09AM   2   Q   And at the Ala Moana parking structure you transfer the

10:09AM   3   Jägermeister chemical into the plastic bottle, right?

10:09AM   4   A   Yes.

10:09AM   5   Q   I believe you told at that point you threw the

10:09AM   6   Jägermeister bottle away.

10:09AM   7   A   I believe so, yes.

10:09AM   8   Q   Okay.  Then you drove to the nightclub, right?

10:09AM   9   A   Yes.

10:09AM   10   Q   The chemical was released and you went back to Encore,

10:09AM   11   right?

10:09AM   12   A   Yes.

10:09AM   13   Q   Now, after that at Encore, you returned to Encore after

10:10AM   14   the 911 call, right?

10:10AM   15   A   I'm not sure.  I don't think so.

10:10AM   16   Q   And you and Keoni Adric drive back, right?

10:10AM   17   A   Yes.

10:10AM   18   Q   You say in his white Mercedes, right?

10:10AM   19   A   Yes.

10:10AM   20   Q   Not in your black Mercedes.

10:10AM   21   A   No.

10:10AM   22   Q   And you saw fire trucks, right?

10:10AM   23   A   Yes.

10:10AM   24   Q   You saw ambulances, right?

10:10AM   25   A   Yes.

| | | | |
|---|---|---|---|
| 10:10AM | 1 | Q | You don't remember if you took any pictures -- |
| 10:10AM | 2 | A | No. |
| 10:10AM | 3 | Q | -- of what you saw and you were with Keoni Adric, right? |
| 10:10AM | 4 | A | Yes. |
| 10:10AM | 5 | Q | Now Keoni Adric is the same Keoni Adric who was with |
| 10:10AM | 6 | | Keli'i Young, Frankie Silva, Lance Bermudez and you when you |
| 10:10AM | 7 | | robbed Mike Char, right? |
| 10:10AM | 8 | A | Yes. |
| 10:10AM | 9 | Q | When you were trying to rob him of that what you thought |
| 10:11AM | 10 | | was $100,000, right? |
| 10:11AM | 11 | A | Yes. |
| 10:11AM | 12 | Q | And they had masks and guns, right? |
| 10:11AM | 13 | A | Yes. |
| 10:11AM | 14 | Q | At the bay, right? |
| 10:11AM | 15 | A | Yes. |
| 10:11AM | 16 | Q | And that's when Mike Miske got angry that he destroyed |
| 10:11AM | 17 | | your car, right? |
| 10:11AM | 18 | A | Yes. |
| 10:11AM | 19 | Q | And that's when Mike Char went to Mike Miske and said, "I |
| 10:11AM | 20 | | was robbed.  Can you help me?"  He returned his -- figured out |
| 10:11AM | 21 | | how to get the car back to him, right? |
| 10:11AM | 22 | A | Yes. |
| 10:11AM | 23 | Q | And that car was returned by making phone calls, right? |
| 10:11AM | 24 | A | Yes. |
| 10:11AM | 25 | Q | And then Mike Miske decided to wreck your car because you |

10:11AM   1   had robbed someone, right?

10:11AM   2   A    Yes.

10:11AM   3   Q    And as you said, he never knew about any of these

10:11AM   4   robberies, right?

10:11AM   5   A    Yes.

10:11AM   6   Q    Now, at the Encore Nightclub, are you aware that on -- let

10:12AM   7   me ask you some questions.

10:12AM   8        You talked about GPS last week, right?

10:12AM   9   A    Yes.

10:12AM   10  Q    So you know about GPS, right?

10:12AM   11  A    Yes.

10:12AM   12  Q    Both in devices, right?

10:12AM   13  A    Yes.

10:12AM   14  Q    And you were wearing a monitor at one point, an ankle

10:12AM   15  monitor, that is GPS-related, right?

10:12AM   16  A    Yes.

10:12AM   17  Q    That gives locations, correct?

10:12AM   18  A    Yes.

10:12AM   19  Q    And so you're familiar that with respect to, say, cellular

10:12AM   20  phones, they operate by connecting to cell towers, right?

10:12AM   21  A    Yes.

10:12AM   22  Q    And the cell towers are among the cell towers that are

10:12AM   23  nearby, right?

10:12AM   24  A    Yes.

10:12AM   25  Q    And they're going for a signal which is the strongest

| | | |
|---|---|---|
| 10:12AM | 1 | signal, right? |
| 10:12AM | 2 | A    Um-hm. |
| 10:12AM | 3 | Q    So it could be a different cell tower, right? |
| 10:12AM | 4 | A    Yes. |
| 10:12AM | 5 | Q    But it's in a general area, correct? |
| 10:12AM | 6 | A    Yes. |
| 10:12AM | 7 | Q    Now, last week you told us that after you released the |
| 10:13AM | 8 | chemical inside the District, right? |
| 10:13AM | 9 | A    Yes. |
| 10:13AM | 10 | Q    You drove back to the Encore Nightclub, right? |
| 10:13AM | 11 | A    Yes. |
| 10:13AM | 12 | Q    And you met with Mike Miske in person, right? |
| 10:13AM | 13 | A    Yes. |
| 10:13AM | 14 | Q    He's never been inside the Encore Nightclub, sir. |
| 10:13AM | 15 | A    He was there that night. |
| 10:13AM | 16 | Q    He stopped going to the M and never went to the Encore. |
| 10:13AM | 17 | You're familiar with that, right?  And so this was after the |
| 10:13AM | 18 | chemical was released, correct? |
| 10:13AM | 19 | A    Yes. |
| 10:13AM | 20 | Q    You say that Mike Miske was at the Encore, right? |
| 10:13AM | 21 | A    Yes. |
| 10:13AM | 22 | Q    Are you familiar with the fact that -- do you know about |
| 10:13AM | 23 | cell phone location information? |
| 10:13AM | 24 | A    Yes. |
| 10:13AM | 25 | Q    That there are towers where the cell phones that you're |

10:13AM   1   carrying are pinging off of?

10:13AM   2   A    Yes.

10:13AM   3   Q    Are you aware that from 11:30 that evening all the way up

10:14AM   4   to -- from 11:49 all the way up to 1:24, Mike Miske is in

10:14AM   5   Hawaii Kai?

10:14AM   6         MR. INCIONG:  Objection, facts not in evidence.

10:14AM   7         THE COURT:  Sustained.

10:14AM   8   BY MR. KENNEDY:

10:14AM   9   Q    Are you aware, sir?  Because you've told this jury that

10:14AM  10   Mike Miske was at the Encore, right?

10:14AM  11   A    Yes.

10:14AM  12   Q    And you said that he never stepped back into the M,

10:14AM  13   correct?

10:14AM  14         That was your testimony today, right?

10:14AM  15   A    Yeah, he never was there.

10:14AM  16   Q    And he's never stepped foot in the Encore, has he?

10:14AM  17   A    Yes, he has.

10:14AM  18   Q    Were you aware that he was in Hawaii Kai during that time

10:14AM  19   between 11:30, 11:49 and 1:24 on Saturday, March 4th?

10:14AM  20   A    I wasn't aware.

10:14AM  21   Q    Are you aware that from 1:30 to 1:32 he's in the Portlock

10:15AM  22   area?  Are you aware of that?

10:15AM  23   A    No.

10:15AM  24   Q    For the outer island folks, that would be going east on

10:15AM  25   the far east side of Oahu, correct, Portlock area?

| | | | |
|---|---|---|---|
| 10:15AM | 1 | A | Yes. |
| 10:15AM | 2 | Q | Would be east of Hawaii Kai, right? |
| 10:15AM | 3 | A | Yes. |
| 10:15AM | 4 | Q | Are you aware that between 1:33 and 1:35 in the morning |
| 10:15AM | 5 | | he's in Waimanalo? |
| 10:15AM | 6 | A | At what time? |
| 10:15AM | 7 | Q | He's in Waimanalo between 1:33 and 1:35. |
| 10:15AM | 8 | A | No, I wasn't aware. |
| 10:15AM | 9 | Q | Moving around the windward side of the island, are you |
| 10:15AM | 10 | | aware that from 1:51 to 4:35 in the morning he's in Kailua, |
| 10:15AM | 11 | | correct, where you live, correct? |
| 10:15AM | 12 | A | Yes. |
| 10:15AM | 13 | Q | We're in Honolulu, right? |
| 10:15AM | 14 | A | Yes. |
| 10:15AM | 15 | Q | The District Nightclub is in downtown Honolulu, right? |
| 10:15AM | 16 | A | Yes. |
| 10:15AM | 17 | Q | To get to Kailua you're taking the Pali all the way from |
| 10:16AM | 18 | | south to north, right? |
| 10:16AM | 19 | A | Yes. |
| 10:16AM | 20 | Q | Across the mountains, right? |
| 10:16AM | 21 | A | Yes. |
| 10:16AM | 22 | Q | So from 1:51 to 4:35, he's in Kailua, correct? |
| 10:16AM | 23 | A | I'm not sure.  I know he was there that night. |
| 10:16AM | 24 | Q | And so the 911 call was at 1:41:42, right? |
| 10:16AM | 25 | A | Yes. |

10:16AM   1   Q   You went back to Encore, right?

10:16AM   2   A   Yes.

10:16AM   3   Q   Now, you were on the windward side of Oahu almost that

10:16AM   4   entire day, weren't you?

10:16AM   5   A   I'm not sure where I was that day.

10:16AM   6   Q   Never went to the office that day, did you?

10:16AM   7   A   No.

10:16AM   8   Q   Because you too have a cell phone, right?

10:16AM   9   A   Yes.

10:16AM   10   Q   And we looked at the number and it's (808) 585-1944,

10:17AM   11   correct?

10:17AM   12   A   Yes.

10:17AM   13   Q   That cell phone is connecting to towers, right?

10:17AM   14   A   Yes.

10:17AM   15   Q   And so it wasn't until 11:35 p.m. that you came down the

10:17AM   16   Pali with Jake Smith, right?

10:17AM   17   A   At what time.

10:17AM   18   Q   11:35 p.m. on Friday, March 3rd.

10:17AM   19   A   Yes.

10:17AM   20   Q   When Mike Miske was in Hawaii Kai.

10:17AM   21        MR. INCIONG:  Objection, misstates the evidence.

10:17AM   22        THE COURT:  Objection is sustained.

10:17AM   23   BY MR. KENNEDY:

10:17AM   24   Q   Now, you also told the jury that this event was out of the

10:17AM   25   blue.

10:17AM    1            Do you recall that?

10:17AM    2    A    Yes.

10:17AM    3    Q    And that it was Mike Miske who asked you to release tear

10:17AM    4    gas, right?

10:17AM    5    A    Correct.

10:18AM    6    Q    And that this happened at the M Nightclub is what you

10:18AM    7    said, right?

10:18AM    8    A    Refers the M Nightclub.

10:18AM    9    Q    Which he stopped going into and was closed at the time of

10:18AM   10    this event, right?

10:18AM   11    A    It was Encore.

10:18AM   12    Q    Encore Nightclub owned by Jason Yokoyama, right?

10:18AM   13    A    Yes.

10:18AM   14    Q    Are you aware that your phone and Michael Miske's cell

10:18AM   15    phone are never together that entire day?

10:18AM   16            MR. INCIONG:  Objection, assumes facts not in

10:18AM   17    evidence.

10:18AM   18            THE COURT:  Sustained.

10:18AM   19    BY MR. KENNEDY:

10:18AM   20    Q    But you had your cell phone with you that day, didn't you?

10:18AM   21    A    Yes.

10:18AM   22    Q    Now, you gave some testimony last week that you sold oxy

10:18AM   23    pills for yourself, right?

10:18AM   24    A    Yes.

10:18AM   25    Q    And you sold cocaine for yourself, right?

| | | | |
|---|---|---|---|
| 10:18AM | 1 | A | Yes. |
| 10:18AM | 2 | Q | And not one dime went to Mike Miske, right? |
| 10:18AM | 3 | A | Yes. |
| 10:18AM | 4 | Q | You robbed Mike Char and others, right? |
| 10:19AM | 5 | A | Yes. |
| 10:19AM | 6 | Q | And not one dime went to Mike Miske, right? |
| 10:19AM | 7 | A | Yes. |
| 10:19AM | 8 | Q | You taxed people for yourself, right? |
| 10:19AM | 9 | A | Yes. |
| 10:19AM | 10 | Q | And not one dime went to Mike Miske? |
| 10:19AM | 11 | A | No. |
| 10:19AM | 12 | Q | Jake Smith, Lance Bermudez, Keoni Adric, they all rob |
| 10:19AM | 13 | | people and not one dime, you testified, went to Mike Miske? |
| 10:19AM | 14 | | MR. INCIONG:  Objection, calls for speculation. |
| 10:19AM | 15 | | THE COURT:  Sustained. |
| 10:19AM | 16 | | BY MR. KENNEDY: |
| 10:19AM | 17 | Q | Based on your knowledge, correct? |
| 10:19AM | 18 | A | Yes. |
| 10:19AM | 19 | Q | Now, the government asked you some questions about your |
| 10:19AM | 20 | | plea agreement and I want to ask you some follow-up questions |
| 10:19AM | 21 | | about that, okay? |
| 10:19AM | 22 | | You told the jury last week that you pled guilty to |
| 10:19AM | 23 | | the chemical weapon count, right? |
| 10:19AM | 24 | A | Yes. |
| 10:19AM | 25 | Q | And it carried a maximum sentence of life in prison, |

| | | |
|---|---|---|
| 10:19AM | 1 | right? |
| 10:19AM | 2 | A    Yes. |
| 10:19AM | 3 | Q    And you pled to a RICO conspiracy count that carried a |
| 10:19AM | 4 | maximum of 20 years in prison, correct? |
| 10:20AM | 5 | A    Yes. |
| 10:20AM | 6 | Q    And they were dismissing the drug count that had a maximum |
| 10:20AM | 7 | of life imprisonment, right? |
| 10:20AM | 8 | A    Yes. |
| 10:20AM | 9 | Q    And government counsel asked you about your understanding |
| 10:20AM | 10 | as to your Advisory Sentencing Guideline range, correct? |
| 10:20AM | 11 | A    Yes. |
| 10:20AM | 12 | Q    And that's a body of law that's advisory, right? |
| 10:20AM | 13 | A    Yes. |
| 10:20AM | 14 | Q    So it can inform the judge, but the judge gets to use his |
| 10:20AM | 15 | or her discretion based on other law as to what the sentence |
| 10:20AM | 16 | will be, right? |
| 10:20AM | 17 | A    Yes. |
| 10:20AM | 18 | Q    Okay.  And I believe you said that you understood, I think |
| 10:20AM | 19 | from your lawyer, if I'm incorrect you can correct me, that the |
| 10:20AM | 20 | range that you believe you're at is 72 to 81 months, right? |
| 10:20AM | 21 | A    Yes. |
| 10:20AM | 22 | Q    And so somewhere around six to seven years. |
| 10:20AM | 23 | A    Yes. |
| 10:20AM | 24 | Q    That's before cooperation, right? |
| 10:20AM | 25 | A    Yes. |

```
10:20AM    1   Q    And if the government makes a motion that you have
10:21AM    2   cooperated, then what you said you were looking for was
10:21AM    3   leniency, right?
10:21AM    4   A    Yes.
10:21AM    5   Q    That motion can factor into what the sentence ultimately
10:21AM    6   is going to be, correct?
10:21AM    7   A    Yes.
10:21AM    8   Q    Now, as part of your plea agreement there was no
10:21AM    9   adjustment up on the numbers for substantial disruption of
10:21AM   10   business function or services.
10:21AM   11        Do you recall that?
10:21AM   12   A    Yes.
10:21AM   13   Q    And just to help the members of the jury out, for all
10:21AM   14   offenses there's a 1 to a 43, right?
10:21AM   15   A    Yes.
10:21AM   16   Q    And 43 is for the -- is life, right?
10:21AM   17   A    Yes.
10:21AM   18   Q    They have a one, but I've never seen it, but there's a
10:21AM   19   number that goes into various offenses and there's adjustments
10:21AM   20   up, there's adjustments down, correct?
10:21AM   21   A    Yes.
10:21AM   22   Q    So this was an adjustment up that the government agreed
10:22AM   23   would not be pursued in your case, right?
10:22AM   24   A    Yes.
10:22AM   25   Q    For any substantial disruption of business function or
```

```
10:22AM    1    services, right?

10:22AM    2    A     Yes.

10:22AM    3    Q     So you have no mandatory minimum sentence, right?

10:22AM    4    A     No.

10:22AM    5    Q     And you're looking for leniency in your sentence now,

10:22AM    6    right?

10:22AM    7    A     Yes.

10:22AM    8    Q     So you were detained at the Federal Detention Center here

10:22AM    9    in Honolulu for, if I'm correct, somewhere around 18 months,

10:22AM   10    right?

10:22AM   11    A     Yes.

10:22AM   12    Q     And you told us you had two kids to support, right?

10:22AM   13    A     Yes.

10:22AM   14    Q     And so you decided in March of, I believe, 2021 to

10:22AM   15    cooperate, right?

10:22AM   16    A     Yes.

10:22AM   17    Q     In a proffer, right?

10:22AM   18    A     Yes.

10:22AM   19    Q     And a proffer is you sit down with the prosecutors and the

10:22AM   20    agents, they ask you questions, right?

10:23AM   21    A     Yes.

10:23AM   22    Q     You answer them, right?

10:23AM   23    A     Yes.

10:23AM   24    Q     And none of what your answers are can be used against you,

10:23AM   25    correct?
```

```
10:23AM    1   A    Yes.

10:23AM    2   Q    And then in 2022, you entered into a formal plea agreement

10:23AM    3   that we just went over, right?

10:23AM    4   A    Yes.

10:23AM    5   Q    And you're awaiting sentencing at some point after this

10:23AM    6   trial is over.

10:23AM    7   A    Yes.

10:23AM    8   Q    Now, is it fair to say that you hope never to walk back

10:23AM    9   inside a prison?

10:23AM   10   A    Yes.

10:23AM   11   Q    You can ask for time served, can't you?

10:23AM   12   A    That's mainly up to the judge.

10:23AM   13   Q    Of course it's up to the judge, but you can ask for time

10:23AM   14   served, right?

10:23AM   15   A    Yes.

10:23AM   16   Q    So you can continue to support your two kids, right?

10:23AM   17   A    Yes.

10:23AM   18   Q    You don't want to do another day in prison, do you?

10:23AM   19   A    I don't think anybody wants to.

10:23AM   20   Q    No one does, correct?

10:23AM   21   A    Correct.

10:24AM   22   Q    That's why you're here, right?

10:24AM   23   A    Yes.

10:24AM   24   Q    Now, let me ask you a question.  The video that we

10:24AM   25   watched, do you see the ashes being spread in that video?
```

10:24AM   1   A   In this video, no.

10:24AM   2   Q   Okay.  If we played it on, have you seen that particular

10:24AM   3   video before?

10:24AM   4   A   I think so.  I believe so.

10:24AM   5   Q   And your memory is we don't get to that point where the

10:24AM   6   ashes are spread, right?

10:24AM   7   A   Yes.

10:24AM   8   Q   I will check it when we have a break.

10:25AM   9       Now --

10:25AM   10       THE COURT:  In fact if you're going to a different or

10:25AM   11   new area, Mr. Kennedy, a break might be where --

10:25AM   12       MR. KENNEDY:  That would be fine and it will -- just

10:25AM   13   to let the Court and the government know, I don't have that

10:25AM   14   much left, so if we take a break now, I'll finish up fairly

10:25AM   15   quickly after that.

10:25AM   16       THE COURT:  Let's go ahead and do that then and it

10:25AM   17   will give you a chance to check your notes as well.

10:25AM   18       As we go to our first break of the trial day and trial

10:25AM   19   week, I'll remind our jurors to please refrain from discussing

10:25AM   20   the substance of this case with anyone, including each other,

10:25AM   21   till I advise you otherwise; please also refrain from accessing

10:25AM   22   any media or other accounts of this case that may be out there,

10:25AM   23   and finally, do not conduct any independent investigation into

10:25AM   24   the facts, circumstances or persons involved.

10:25AM   25       We will try to keep it to 15 or 20 minutes and then we

| | | |
|---|---|---|
| 10:25AM | 1 | will resume with Mr. Kennedy's cross of the witness, |
| 10:25AM | 2 | Mr. Freitas. |
| 10:25AM | 3 | (Proceedings were recessed at 10:25 a.m. to 10:57 |
| 10:37AM | 4 | a.m.) |
| 10:57AM | 5 | THE COURT:  All right.  Back from our first morning |
| 10:57AM | 6 | break.  Mr. Freitas is back on the stand and Mr. Kennedy was |
| 10:57AM | 7 | going to continue with his cross. |
| 10:57AM | 8 | BY MR. KENNEDY: |
| 10:57AM | 9 | Q   Sir, I want to just circle back to something.  Sometimes |
| 10:57AM | 10 | in trials there's rules and I just want to try to get through |
| 10:57AM | 11 | this. |
| 10:57AM | 12 | MR. KENNEDY:  If we could pull up 1-636, which was |
| 10:57AM | 13 | admitted. |
| 10:57AM | 14 | THE COURT:  Yes.  Go ahead. |
| 10:57AM | 15 | BY MR. KENNEDY: |
| 10:57AM | 16 | Q   Do you see the -- that particular exhibit and that |
| 10:57AM | 17 | communication exchange? |
| 10:57AM | 18 | A   Yes. |
| 10:57AM | 19 | Q   All right.  And you can see that MM is up at the top |
| 10:57AM | 20 | portion. |
| 10:57AM | 21 | A   Yes, see that. |
| 10:57AM | 22 | Q   All right.  And if we move to 1.637, that also has been |
| 10:58AM | 23 | admitted. |
| 10:58AM | 24 | And if we go to the top portion, can you see MM is at |
| 10:58AM | 25 | the top portion? |

| | | |
|---|---|---|
| 10:58AM | 1 | A    Yes. |
| 10:58AM | 2 | Q    You gave some testimony last week about the fact that |
| 10:58AM | 3 | these particular conversations occurred and that they were |
| 10:58AM | 4 | taken from an iPhone 6 that you didn't have, but the government |
| 10:58AM | 5 | showed you and actually introduced it into evidence last week. |
| 10:58AM | 6 | Do you recall that? |
| 10:58AM | 7 | A    Yes. |
| 10:58AM | 8 | Q    All right.  Now, if we go to the Exhibit 1-643, that was |
| 10:58AM | 9 | admitted and that's coming from your same iPhone 6, correct, |
| 10:59AM | 10 | and you testified about that last week? |
| 10:59AM | 11 | A    Yes. |
| 10:59AM | 12 | Q    All right.  And if we move to 1.644, which has also been |
| 10:59AM | 13 | admitted, that too came from your iPhone 6, right? |
| 10:59AM | 14 | A    Yes. |
| 10:59AM | 15 | Q    And you testified about it last week. |
| 10:59AM | 16 | A    Yes. |
| 10:59AM | 17 | Q    All right.  And then 1-646, that also came from your |
| 10:59AM | 18 | iPhone 6 and it was admitted last week, right? |
| 10:59AM | 19 | A    Yes. |
| 10:59AM | 20 | Q    And just to close this down, 1.647, which was -- you |
| 10:59AM | 21 | testified about it last week, this also came from your iPhone |
| 10:59AM | 22 | 6, right? |
| 10:59AM | 23 | A    Yes. |
| 10:59AM | 24 | MR. KENNEDY:  Now, if we pull up just for the witness, |
| 10:59AM | 25 | 9008-073, which is in the 12th supplement, Your Honor. |

```
10:59AM    1    BY MR. KENNEDY:

10:59AM    2    Q    And if we go to -- you can see on the first page there is

10:59AM    3    attachments, correct?

10:59AM    4    A    Correct.

10:59AM    5    Q    So if we move, Ms. King, to, I believe it might start at

11:00AM    6    about page 6 or 7.  When there -- and if we move to page 7.

11:00AM    7    Keep going.  Okay.

11:00AM    8         Now, do you see that in 9008-073 that -- a photograph

11:00AM    9    of the same Honda, 2003 Honda Prelude?

11:00AM   10    A    Yes.

11:00AM   11    Q    Okay.  And let's just flip through the photographs.  Keep

11:00AM   12    going.  All right.  Keep going.  Keep going.  Keep going.  Keep

11:01AM   13    going.

11:01AM   14         Now, do you see the 2000 Honda Accord?

11:01AM   15    A    Yes.

11:01AM   16    Q    And that particular picture is identical to the one that

11:01AM   17    was admitted last week, right?

11:01AM   18    A    Yes.

11:01AM   19    Q    All right.  If we keep going.  Keep going.

11:01AM   20         All right.  And then we see a 2001 Honda Accord,

11:01AM   21    correct?

11:01AM   22    A    Yes.

11:01AM   23    Q    And it's identical to one that you gave testimony about

11:01AM   24    last week, correct?

11:01AM   25    A    Yes.
```

| | | |
|---|---|---|
| 11:01AM | 1 | MR. KENNEDY:  All right.  If we keep going. |
| 11:01AM | 2 | THE COURT:  This is the last page? |
| 11:01AM | 3 | MR. KENNEDY:  There's no pages up here, so let's go |
| 11:01AM | 4 | back to the first page. |
| 11:01AM | 5 | BY MR. KENNEDY: |
| 11:01AM | 6 | Q    Now, in your phone, these are attachments and they have |
| 11:01AM | 7 | PNG files, right? |
| 11:01AM | 8 | A    Yes. |
| 11:01AM | 9 | Q    And a PNG file, you can just click on and the image will |
| 11:01AM | 10 | come up, right? |
| 11:01AM | 11 | A    Yes. |
| 11:01AM | 12 | Q    But to make it into paper, you have to print it out and |
| 11:02AM | 13 | then attach it, right? |
| 11:02AM | 14 | A    Yes. |
| 11:02AM | 15 | Q    So in looking at this, do you see that the MM, if we blow |
| 11:02AM | 16 | up the top part, this is the identical number for the Exhibits |
| 11:02AM | 17 | 636 and 637 that you gave testimony about, correct? |
| 11:02AM | 18 | A    Yes. |
| 11:02AM | 19 | Q    And so these particular cars that are shown in 1-643, |
| 11:02AM | 20 | 1-644, 1-646 and 1-647 are simply attachments in this instant |
| 11:02AM | 21 | message between you and Mr. Miske, correct? |
| 11:02AM | 22 | A    I believe so. |
| 11:02AM | 23 | Q    Okay. |
| 11:02AM | 24 | A    I don't see my phone number with it. |
| 11:02AM | 25 | Q    That's because your phone isn't being shown. |

| | | |
|---|---|---|
| 11:02AM | 1 | If we can go back to Exhibit 01-0636 and let's go to |
| 11:03AM | 2 | the second page. |
| 11:03AM | 3 | Do you see it's the same phone number in the way that |
| 11:03AM | 4 | it's presented, it's just not showing your phone?  Do you see |
| 11:03AM | 5 | that? |
| 11:03AM | 6 | A    Yes. |
| 11:03AM | 7 | Q    Okay.  And so Exhibit 908-073 is simply an extraction from |
| 11:03AM | 8 | your iPhone 6. |
| 11:03AM | 9 | A    Yes. |
| 11:03AM | 10 | MR. KENNEDY:  Okay.  At this time, Your Honor, I would |
| 11:03AM | 11 | move Exhibit 9008-073 as an extraction from Mr. Freitas's |
| 11:03AM | 12 | iPhone 6. |
| 11:03AM | 13 | THE COURT:  Any objection? |
| 11:03AM | 14 | MR. INCIONG:  No objection. |
| 11:03AM | 15 | MR. KENNEDY:  Okay. |
| 11:03AM | 16 | THE COURT:  Without objection -- |
| 11:03AM | 17 | MR. KENNEDY:  So now going back to -- |
| 11:03AM | 18 | THE COURT:  Do you want this document admitted? |
| 11:03AM | 19 | MR. KENNEDY:  I would move to admit it. |
| 11:03AM | 20 | THE COURT:  So when they say no objection, if you |
| 11:03AM | 21 | would give me a minute, because this is about the fifth time |
| 11:04AM | 22 | you've done it. |
| 11:04AM | 23 | MR. KENNEDY:  That is on me, Your Honor, and I |
| 11:04AM | 24 | apologize. |
| 11:04AM | 25 | THE COURT:  All right.  So without objection, |

| | | |
|---|---|---|
| 11:04AM | 1 | Exhibit 9008-073 is admitted and you may publish. |
| 11:04AM | 2 | (Exhibit 9008-073 was received in evidence.) |
| 11:04AM | 3 | BY MR. KENNEDY: |
| 11:04AM | 4 | Q   So if we can blow up the first page there on the first |
| 11:04AM | 5 | attachment, it gives an img_0052.png message, right? |
| 11:04AM | 6 | A   Yes. |
| 11:04AM | 7 | Q   Now, if we move to the second page.  And there are three |
| 11:04AM | 8 | more attachments, correct? |
| 11:04AM | 9 | A   Yes. |
| 11:04AM | 10 | Q   Okay.  So what we have are six cars, right? |
| 11:04AM | 11 | A   Yes. |
| 11:04AM | 12 | Q   All right.  And then I believe if we can pull that down? |
| 11:04AM | 13 | What Mr. Miske says is, "Call each of these and set up |
| 11:05AM | 14 | viewings," right. |
| 11:05AM | 15 | A   Yes. |
| 11:05AM | 16 | Q   Okay.  And that's the identical car that was in the |
| 11:05AM | 17 | Government Exhibit 1-643, right? |
| 11:05AM | 18 | A   Yes. |
| 11:05AM | 19 | Q   Okay.  If we move through, the next message is, "For |
| 11:05AM | 20 | Delia, unless you like one of them, we will give the Acura to |
| 11:05AM | 21 | Delz." |
| 11:05AM | 22 | Do you see that? |
| 11:05AM | 23 | A   Yes. |
| 11:05AM | 24 | Q   This is a message from Mike to you about the Acura that is |
| 11:05AM | 25 | one of the six vehicles there, correct? |

11:05AM   1   A    Yes.

11:05AM   2   Q    And then if we go to the third page, if we blow up the

11:05AM   3   first two.

11:05AM   4           "Got to get at least 1 to 1,500 off asking price."

11:05AM   5           Do you see that?

11:05AM   6   A    Yes.

11:05AM   7   Q    And then copy, right?

11:05AM   8   A    Yes.

11:05AM   9   Q    So he's telling you, "Hey, view 'em, see if you can get

11:06AM  10   'em down by at least 1,000 or 1,500," right?

11:06AM  11   A    Yes.

11:06AM  12   Q    And we're referring to the ones that the government

11:06AM  13   admitted through you last week, right?

11:06AM  14   A    Yes.

11:06AM  15   Q    If we move to the green, you say, "Got it.  Going to meet

11:06AM  16   them this afternoon," right?

11:06AM  17   A    Yes.

11:06AM  18   Q    Okay.  Now, if we move to -- and this is back, as we said,

11:06AM  19   to buying these rather than selling them, right?

11:06AM  20   A    Yes.

11:06AM  21   Q    Okay.  If we move to page 4, there is a seventh car shown

11:06AM  22   in the top attachment, right?

11:06AM  23   A    Yes.

11:06AM  24   Q    Okay.  And then if we move to page 14, this is identical

11:06AM  25   to Government's Exhibit 1-644, right?

| | | |
|---|---|---|
| 11:06AM | 1 | A    Yes. |
| 11:06AM | 2 | Q    Okay.  And that -- if we go back to page 4, if we blow up |
| 11:07AM | 3 | the second blue bubble. |
| 11:07AM | 4 |      This is, "Call this one and find out miles.  Make them |
| 11:07AM | 5 | an offer," right? |
| 11:07AM | 6 | A    Yes. |
| 11:07AM | 7 | Q    So these are just what you're doing in terms of buying |
| 11:07AM | 8 | cars and Mr. Miske is communicating to you, right? |
| 11:07AM | 9 | A    Yes. |
| 11:07AM | 10 | Q    All right.  If we go back to, then, page 4 of the second |
| 11:07AM | 11 | attachment, this is now the eighth car that he's looking at, |
| 11:07AM | 12 | right, and you are -- he is sending these to you so that you |
| 11:07AM | 13 | can view them, right? |
| 11:07AM | 14 | A    Yes. |
| 11:07AM | 15 | Q    Okay.  And then if we go to page 15, that's the identical |
| 11:07AM | 16 | car with 1., looks like 646, right? |
| 11:08AM | 17 | A    Yes. |
| 11:08AM | 18 | Q    And so this is just a conversation about those things that |
| 11:08AM | 19 | were just introduced with the pictures of the cars last week, |
| 11:08AM | 20 | right? |
| 11:08AM | 21 | A    Yes. |
| 11:08AM | 22 | Q    All right.  And so if we go back to page 4, the |
| 11:08AM | 23 | instructions with that one are "Buy this," right? |
| 11:08AM | 24 | A    Yes. |
| 11:08AM | 25 | Q    And then if we move to the last one, 1-647, if we go to |

11:08AM   1   page 6 again.  Do you see there's two more cars that are

11:08AM   2   listed, correct?

11:08AM   3   A    Yes.

11:08AM   4   Q    All right.  And for this one you've already seen it,

11:08AM   5   right?

11:09AM   6   A    This car?

11:09AM   7   Q    Yeah.

11:09AM   8   A    If I seen it?

11:09AM   9   Q    Yeah.  You've already taken a look at it, correct?

11:09AM  10   A    No.

11:09AM  11   Q    Okay.  Because if we go to the next green message, it

11:09AM  12   says -- if we blow that up -- "The green Honda is a no.  Inside

11:09AM  13   is dirty and brakes make noise," right?

11:09AM  14   A    Yes.

11:09AM  15   Q    So this is like we're going to stay away from this car,

11:09AM  16   right?

11:09AM  17   A    Um-hm.

11:09AM  18   Q    So once again this is just clearing up that this doesn't

11:09AM  19   have anything to do with Hawai'i Partners' Craigslist ads.

11:09AM  20   These are ads by other people that Hawai'i Partners is thinking

11:09AM  21   of buying cars, right?

11:09AM  22   A    Yes.

11:09AM  23   Q    Now, between about 2005 and 2010, are you aware that your

11:09AM  24   dad lived with Mike at Kuuna Street in Kailua?

11:09AM  25   A    Yes.

| 11:09AM | 1 | Q | They're close, right? |
| 11:09AM | 2 | A | Yes. |
| 11:09AM | 3 | Q | And you're his son, right? |
| 11:10AM | 4 | A | Yes. |
| 11:10AM | 5 | Q | And you're family, right? |
| 11:10AM | 6 | A | Yes. |

11:10AM   7   Q   And during that time he was going through a rough time and
11:10AM   8   Mike --
11:10AM   9         MR. INCIONG:  Objection, beyond the scope.
11:10AM  10         THE COURT:  Overruled.  Go ahead.
11:10AM  11   BY MR. KENNEDY:
11:10AM  12   Q   And Mike opened up his home and your dad was able to live
11:10AM  13   there during those years.
11:10AM  14   A   Yes.
11:10AM  15   Q   And that's what families do, right?
11:10AM  16   A   Yes.
11:10AM  17   Q   Now, in the discussion, you know, the agreement, the
11:10AM  18   proffer agreement, it talks about testify truthfully, right?
11:10AM  19   A   Yes.
11:10AM  20   Q   And you testified about to tell the truth, right?
11:10AM  21   A   Yes.
11:10AM  22   Q   And you understand that it's the government that decides
11:10AM  23   whether to make that cooperation motion for you, right?
11:10AM  24   A   Correct.
11:10AM  25   Q   That they wait until you've testified, right?

| Time | Line | Text |
|---|---|---|
| 11:10AM | 1 | A    Yes. |
| 11:10AM | 2 | Q    And they are the sole ones who decide whether you will be |
| 11:10AM | 3 | requested leniency for that reason, right? |
| 11:10AM | 4 | A    Yes. |
| 11:10AM | 5 | Q    But inside this courtroom, it's not the government that |
| 11:11AM | 6 | decides truth, is it? |
| 11:11AM | 7 | A    No. |
| 11:11AM | 8 | Q    It's not even the judge, correct? |
| 11:11AM | 9 | A    Yes. |
| 11:11AM | 10 | Q    It's the jury, right? |
| 11:11AM | 11 | A    Correct. |
| 11:11AM | 12 | MR. KENNEDY:  I've got nothing further, Your Honor. |
| 11:11AM | 13 | THE COURT:  Mr. Inciong, redirect? |
| 11:11AM | 14 | MR. INCIONG:  Thank you, Your Honor. |
| 11:11AM | 15 | REDIRECT EXAMINATION |
| 11:11AM | 16 | BY MR. INCIONG: |
| 11:11AM | 17 | Q    Good morning, Mr. Freitas. |
| 11:11AM | 18 | A    Good morning. |
| 11:11AM | 19 | Q    Whether you were buying or selling cars for Mr. Miske, was |
| 11:11AM | 20 | this all part of your duties as his personal assistant? |
| 11:11AM | 21 | A    Yes. |
| 11:11AM | 22 | Q    Did he direct you as to what cars to purchase? |
| 11:11AM | 23 | A    Yes. |
| 11:11AM | 24 | Q    Did he direct you as to how much to offer for them? |
| 11:11AM | 25 | A    Yes. |

11:11AM   1   Q   Did he direct you for certain things to look at for those

11:11AM   2   cars?

11:11AM   3   A   Yes.

11:11AM   4   Q   When you were selling the cars, you sold those cars

11:11AM   5   online, correct?

11:11AM   6   A   Correct.

11:11AM   7   Q   Who directed you to sell them online?

11:11AM   8   A   Mike did.

11:11AM   9   Q   Did Mr. Miske direct you as to what to say in those ads?

11:12AM   10   A   Yes.

11:12AM   11   Q   Did he direct you what pictures to take?

11:12AM   12   A   Yes, certain angles of the vehicle.

11:12AM   13         MR. INCIONG:  So on that point, if we could show

11:12AM   14   Mr. Freitas and the jury Exhibit 1-636, which has previously

11:12AM   15   been admitted, Your Honor?

11:12AM   16         THE COURT:  Yes.  Go ahead.

11:12AM   17   Q   If we could go to page 3 to begin with on the very bottom.

11:12AM   18   Your Honor -- there we go.  Thank you.

11:12AM   19         If we could look at the bottom bubble, the very last

11:12AM   20   one.  Do you recall seeing this text message when you testified

11:12AM   21   earlier?

11:12AM   22   A   Yes.

11:12AM   23   Q   Is this an example of where Mr. Miske would direct you as

11:12AM   24   to what pictures to take?

11:12AM   25   A   Yes.

| 11:12AM | 1 | Q | And how to post it? |

11:12AM   1   Q   And how to post it?

11:12AM   2   A   Yes.

11:12AM   3   Q   So if we could look at page 4, then, of that same exhibit

11:12AM   4   next, and starting at the top bubble.

11:13AM   5         Do you see that text Mr. Miske sent you, "Take a

11:13AM   6   close-up of the window sticker so we can post that as an image

11:13AM   7   on Craigslist"?

11:13AM   8   A   Yes.

11:13AM   9   Q   He was directing you as to what to do for this particular

11:13AM   10  ad?

11:13AM   11  A   Yes.

11:13AM   12  Q   And the next text, "Post the jeep."

11:13AM   13        So was he directing you as to which car to put for

11:13AM   14  sale?

11:13AM   15  A   Yes.

11:13AM   16  Q   And then the next text, "Tell me what verbiage you're

11:13AM   17  going to write"?

11:13AM   18  A   Yes.

11:13AM   19  Q   So you had to run by what you were going to post as far as

11:13AM   20  the language in the ad for his approval?

11:13AM   21  A   Correct.

11:13AM   22  Q   And then in the last text he says, "Put your number and

11:13AM   23  email"?

11:13AM   24  A   Yes.

11:13AM   25  Q   You were the contact person when any interested buyer

11:13AM   1   would respond?

11:13AM   2   A    Yes.

11:13AM   3   Q    When you were selling the cars, were you directed as to

11:13AM   4   whether to list them as private seller or as an auction car?

11:13AM   5   A    The cars was registered in my name, so it would be a

11:13AM   6   private seller.

11:13AM   7   Q    Who directed you to do that?

11:13AM   8   A    Mike did.

11:14AM   9   Q    Now, you were asked a lot of questions about the cashing

11:14AM   10  of the checks for the Rachel crew earlier today.

11:14AM   11       Do you recall that?

11:14AM   12  A    Yes.

11:14AM   13  Q    Now, Mr. Miske had given you some instructions about when

11:14AM   14  you cashed, or made withdrawals or cashed checks at the bank,

11:14AM   15  correct?

11:14AM   16  A    Yes.

11:14AM   17  Q    What was that direction?

11:14AM   18  A    Not to exceed $10,000.

11:14AM   19  Q    Why did he explain, if he did, as to why you should avoid

11:14AM   20  that particular limit?

11:14AM   21       MR. KENNEDY:  Objection, speculation.

11:14AM   22       THE COURT:  Overruled.  Go ahead.

11:14AM   23       THE WITNESS:  It would throw up red flags for the IRS.

11:14AM   24  BY MR. INCIONG:

11:14AM   25  Q    He told you that?

| | | | |
|---|---|---|---|
| 11:14AM | 1 | A | Yes. |
| 11:14AM | 2 | Q | So were you just following his instructions? |
| 11:14AM | 3 | A | Yes. |
| 11:14AM | 4 | Q | So you remember testifying about making similar cash |
| 11:14AM | 5 | | payments to the construction workers at the Lumahai house? |
| 11:14AM | 6 | A | Yes. |
| 11:14AM | 7 | Q | They were not illegal immigrants or aliens who couldn't |
| 11:14AM | 8 | | get off the boat, right? |
| 11:14AM | 9 | A | No. |
| 11:14AM | 10 | Q | They were workers doing the construction work at that |
| 11:15AM | 11 | | particular house? |
| 11:15AM | 12 | A | Yes. |
| 11:15AM | 13 | Q | How often did you pay cash to them? |
| 11:15AM | 14 | A | Every week. |
| 11:15AM | 15 | Q | Was that every Friday? |
| 11:15AM | 16 | A | Every Friday. |
| 11:15AM | 17 | Q | Did you make those payments more frequently than you did |
| 11:15AM | 18 | | to the Rachel crew? |
| 11:15AM | 19 | A | Yes. |
| 11:15AM | 20 | Q | Did you pay much more money in cash than you did to the |
| 11:15AM | 21 | | Rachel crew? |
| 11:15AM | 22 | A | It was still in the $10,000. |
| 11:15AM | 23 | Q | On each occasion I understand, but in total? |
| 11:15AM | 24 | A | Yes. |
| 11:15AM | 25 | Q | In total you paid much more to the construction workers |

11:15AM   1   than you did to the Rachel crew?

11:15AM   2   A    Besides the captain, yes.

11:15AM   3   Q    You were asked earlier today about some of the messages

11:15AM   4   that we went through and we'll go through them in a minute here

11:15AM   5   for a different reason, but some of the messages you exchanged

11:15AM   6   were not on WhatsApp or Signal, messages with Mr. Miske,

11:15AM   7   correct?

11:15AM   8   A    Yes.

11:15AM   9   Q    When you first started working for Mr. Miske, you said it

11:16AM  10   was about 2015, right?

11:16AM  11   A    Yes.

11:16AM  12   Q    Was encryption such as Signal, WhatsApp used right away

11:16AM  13   when you started working with him at that time, or did that

11:16AM  14   come later?

11:16AM  15   A    It came later.

11:16AM  16   Q    Now, the Hawai'i Partners, that was the car business,

11:16AM  17   correct?

11:16AM  18   A    Yes.

11:16AM  19   Q    Do you recall when Mr. Kennedy asked you, so that was

11:16AM  20   really more of a hobby for Mr. Miske than a business?

11:16AM  21   A    Yes.

11:16AM  22   Q    What was your answer to that?

11:16AM  23   A    He likes vehicles.  He likes cars.

11:16AM  24   Q    So some of the cars you lost money on, true?

11:16AM  25   A    Yes.

11:16AM  1   Q   Some of them you made money on, true?

11:16AM  2   A   Yes.

11:16AM  3   Q   Would you say it was hit or miss as to whether you would

11:16AM  4   make a profit on that?

11:16AM  5   A   Yes.

11:16AM  6   Q   But did the profit matter to Mr. Miske?

11:16AM  7   A   Just depends.  If we was in the hole with some money on

11:17AM  8   some vehicles, we would try to make it back on some of the

11:17AM  9   other vehicles.

11:17AM  10  Q   Did it matter in the instance of the person who wouldn't

11:17AM  11  repay him the money that he asked you to assault at the Wendy's

11:17AM  12  restaurant?

11:17AM  13  A   Yes.

11:17AM  14  Q   So you were shown some -- a couple different proposals in

11:17AM  15  regard to the Mauna Kea hotel termite job earlier today.

11:17AM  16      Do you recall that?

11:17AM  17  A   Yes.

11:17AM  18  Q   The first one was from 2013, right?

11:17AM  19  A   Yes.

11:17AM  20  Q   Were you working even for Mr. Miske at that time?

11:17AM  21  A   No.

11:17AM  22  Q   Did you become aware of that later?

11:17AM  23  A   That the bid was in, but it never went through.

11:17AM  24  Q   So that bid was not accepted.

11:17AM  25  A   No.

11:17AM   1   Q   That job was not obtained in 2013, correct?

11:17AM   2   A   No.

11:17AM   3   Q   And then in 2018 you were shown a second bid, right?

11:17AM   4   A   Yes.

11:17AM   5   Q   Was that bid accepted?

11:17AM   6   A   No.

11:17AM   7   Q   So there was no contract obtained from the 2018 proposal.

11:17AM   8   A   No.

11:17AM   9   Q   So 2020 after you were involved, that bid was accepted?

11:18AM  10   A   Yes.

11:18AM  11   Q   Those proposals, in your experience working as a

11:18AM  12   salesperson, in particular for Kama'aina at the later part of

11:18AM  13   your time working there, they came with a warranty?

11:18AM  14   A   For that job?

11:18AM  15   Q   Yes.

11:18AM  16   A   Yeah, it's a spot treatment warranty.

11:18AM  17   Q   What does that mean exactly, a spot treatment warranty?

11:18AM  18   A   If anything, if any sightings of termites or anything like

11:18AM  19   that, that we will come by and spot treat those areas.

11:18AM  20   Q   That means you won't come and re-tent the entire property

11:18AM  21   again, right?

11:18AM  22   A   No.  The warranty --

11:18AM  23   Q   The area that was affected?

11:18AM  24   A   Yes.  That's spot treatment.

11:18AM  25   Q   How long did those warranties typically were they good

| | | |
|---|---|---|
| 11:18AM | 1 | for? |
| 11:18AM | 2 | A     Five years. |
| 11:18AM | 3 | Q     So when you came on in 2020, did you recognize the name |
| 11:18AM | 4 | Jason Okazaki? |
| 11:18AM | 5 | A     Yes.  That was my contact. |
| 11:18AM | 6 | Q     You had dealt with Mr. Okazaki in some fashion? |
| 11:19AM | 7 | A     Yes. |
| 11:19AM | 8 | Q     What was the nature of your communications with |
| 11:19AM | 9 | Mr. Okazaki? |
| 11:19AM | 10 | A     About fumigation at Beach Mauna Kea. |
| 11:19AM | 11 | Q     You indicated that you were present on at least one of the |
| 11:19AM | 12 | trips that Mr. Miske took over to make a presentation of some |
| 11:19AM | 13 | sort? |
| 11:19AM | 14 | A     Yes.  I mentioned the whole facility.  It was about 6 |
| 11:19AM | 15 | million cubes. |
| 11:19AM | 16 | Q     Did you make any other trips other than that one? |
| 11:19AM | 17 | A     No.  I was kicked out of there by then.  I was left out, |
| 11:19AM | 18 | not kicked out. |
| 11:19AM | 19 | Q     So you indicated you were not paid any commission for that |
| 11:19AM | 20 | job. |
| 11:19AM | 21 | A     No. |
| 11:19AM | 22 | Q     Were you paid anything at all? |
| 11:19AM | 23 | A     No. |
| 11:19AM | 24 | Q     When you were asked about whether Mr. Miske stopped going |
| 11:19AM | 25 | to the club after March of 2016, the M Nightclub after Caleb |

11:19AM   1   passed away, did you mean that literally, that he never ever

11:19AM   2   had set foot in there again, or that he just went there much

11:19AM   3   less?

11:19AM   4   A    He went there much less.  He was in and out.  He was

11:20AM   5   mostly not there.

11:20AM   6   Q    So it wasn't a case where he never set foot in the club

11:20AM   7   again, was it?

11:20AM   8   A    No.

11:20AM   9   Q    Did you have any knowledge as to the particulars of the

11:20AM   10  change in ownership from Mr. Miske to Mr. Yokoyama?

11:20AM   11  A    Yes.

11:20AM   12  Q    What did you know about that?

11:20AM   13  A    That Jason took over the nightclub.

11:20AM   14  Q    Did you know that Jason had basically purchased the club

11:20AM   15  over time?

11:20AM   16  A    Yes.

11:20AM   17  Q    He hadn't bought it with one lump sum amount of money.

11:20AM   18  A    No.

11:20AM   19  Q    Were you aware that Mr. Yokoyama was paying Mr. Miske

11:20AM   20  weekly in cash to pay off that debt?

11:20AM   21  A    Yes.

11:20AM   22  Q    Just to clarify, so when you refer to it as the M

11:20AM   23  Nightclub, even after it became the Encore, did you still in

11:21AM   24  your mind, did you refer to it as the M?

11:21AM   25  A    Yes.

| | | |
|---|---|---|
| 11:21AM | 1 | Q    Although it might have changed ownership, it might have |
| 11:21AM | 2 | been redecorated, was it still the M to you? |
| 11:21AM | 3 | A    To me, yes. |
| 11:21AM | 4 | Q    You were asked earlier today by Mr. Kennedy about your |
| 11:21AM | 5 | intentions when you dispersed the, what you believed to be tear |
| 11:21AM | 6 | gas at the District Nightclub. |
| 11:21AM | 7 | Do you recall that? |
| 11:21AM | 8 | A    Yes. |
| 11:21AM | 9 | Q    And he asked you, it wasn't your intention to harm anyone. |
| 11:21AM | 10 | A    Yes. |
| 11:21AM | 11 | Q    Correct? |
| 11:21AM | 12 | What did Mr. Miske tell you what that subject was -- |
| 11:21AM | 13 | substance was? |
| 11:21AM | 14 | A    Tear gas. |
| 11:21AM | 15 | Q    So did you have any way to know one way or the other |
| 11:21AM | 16 | whether or not it was tear gas? |
| 11:21AM | 17 | A    No. |
| 11:21AM | 18 | Q    Did he tell you it was in fact a chemical called |
| 11:21AM | 19 | chloropicrin? |
| 11:21AM | 20 | A    No. |
| 11:21AM | 21 | Q    Did he tell you that chloropicrin can cause human death? |
| 11:21AM | 22 | A    No. |
| 11:21AM | 23 | Q    Did he tell you that chloropicrin, the warning is if |
| 11:21AM | 24 | you're exposed to it, you should seek medical attention |
| 11:21AM | 25 | immediately? |

| | | | |
|---|---|---|---|
| 11:21AM | 1 | A | No. |
| 11:21AM | 2 | Q | Do you have any doubt in your mind that you met Mr. Miske |
| 11:22AM | 3 | | at the Encore, which you refer to as the M Nightclub, earlier |
| 11:22AM | 4 | | that night when he asked you to drop the chemical? |
| 11:22AM | 5 | A | No. |
| 11:22AM | 6 | Q | Do you have any doubt that you went back to the nightclub |
| 11:22AM | 7 | | the, M/Encore Nightclub, after to report back to him what you |
| 11:22AM | 8 | | had done? |
| 11:22AM | 9 | A | No. |
| 11:22AM | 10 | Q | Was it at the M/Encore Nightclub where he told you to go |
| 11:22AM | 11 | | back and take pictures to see what the effect of the dropping |
| 11:22AM | 12 | | the chemical had been? |
| 11:22AM | 13 | A | Yes. |
| 11:22AM | 14 | Q | Now, you testified earlier that you had purchased what |
| 11:22AM | 15 | | were called burner cell phones from Mr. Miske previously, |
| 11:22AM | 16 | | correct? |
| 11:22AM | 17 | A | Yes. |
| 11:22AM | 18 | Q | Did you know him to carry more than one cell phone as |
| 11:22AM | 19 | | well? |
| 11:22AM | 20 | A | Yes. |
| 11:22AM | 21 | Q | You were asked a lot of questions about cell towers and |
| 11:22AM | 22 | | things of that nature.  Sounds like you know something about |
| 11:22AM | 23 | | that, right? |
| 11:22AM | 24 | A | Yes. |
| 11:22AM | 25 | Q | But to your knowledge, do you have to be actually carrying |

```
11:22AM    1    a particular cell phone in order to be able to track that?
11:23AM    2    A    No.
11:23AM    3    Q    If I'm not -- if I have two cell phones, for example, I
11:23AM    4    leave one at home and I'm carrying the other one, the one at
11:23AM    5    home isn't going to give any information about my whereabouts
11:23AM    6    that day, is it?
11:23AM    7    A    No.
11:23AM    8    Q    So let me have you focus a minute on the robbery of Eric
11:23AM    9    Lum.
11:23AM   10         You testified, this was last week now, that Mr. Miske
11:23AM   11    was not happy when he found out about that, correct?
11:23AM   12    A    No.
11:23AM   13    Q    Do you recall we went over a number of text messages that
11:23AM   14    he had sent you after he had learned about that incident?
11:23AM   15    A    Yes.
11:23AM   16         MR. INCIONG:  Could we show Mr. Freitas and the jury
11:23AM   17    Exhibit 1-637, Your Honor, which has previously been admitted
11:23AM   18    into evidence?
11:23AM   19         THE COURT:  Yes, you may.
11:23AM   20         MR. INCIONG:  Could we go to page 24 specifically,
11:24AM   21    please, of that exhibit.
11:24AM   22    BY MR. INCIONG:
11:24AM   23    Q    Do you see page 24 in front of you, Mr. Freitas?
11:24AM   24    A    Yes.
11:24AM   25    Q    So starting with the second bubble, the first blue bubble
```

11:24AM   1   on that page if you could -- thank you -- enlarge that.

11:24AM   2          Do you recall this is the first text message you got

11:24AM   3   from Mr. Miske after he had learned about the robbery of Eric

11:24AM   4   Lum?

11:24AM   5   A    Yes.

11:24AM   6   Q    Now, do you see the last sentence of that particular text

11:24AM   7   message?

11:24AM   8   A    Yes.

11:24AM   9   Q    Does that read, "Although I want to personally slap you, I

11:24AM   10  won't let anyone else"?  What did that mean to you?

11:24AM   11  A    That he wouldn't let nothing happen to me.

11:24AM   12  Q    Meaning he was going to protect you, right?

11:25AM   13  A    Yes.

11:25AM   14  Q    Could we go to page 26 of that exhibit, please.  If we

11:25AM   15  could enlarge the first -- the top bubble.

11:25AM   16         Do you recall him sending you this message on

11:25AM   17  August 29th of 2015 in regard to the Eric Lum robbery?

11:25AM   18  A    Yes.

11:25AM   19  Q    Do you see the last sentence of that particular bubble?

11:25AM   20  A    Yes.

11:25AM   21  Q    Does that read, "I going have to pay back your guys f'ing

11:25AM   22  rip just because you affiliated with me," exclamation point

11:25AM   23  times three.

11:25AM   24         Do you see that?

11:25AM   25  A    Yes.

11:25AM   1    Q    What do you believe Mr. Miske meant by saying "affiliated

11:25AM   2    with me"?

11:25AM   3             MR. KENNEDY:  Objection as speculation, Your Honor.

11:25AM   4             THE COURT:  Overruled.  Go ahead.

11:25AM   5             THE WITNESS:  Just being part of being with Mike,

11:26AM   6    being affiliated with Mike.

11:26AM   7    Q    All right.  Could we go to page 28 of that exhibit,

11:26AM   8    please, and if we could enlarge the very last bubble, the

11:26AM   9    bottom one on that page.

11:26AM   10             Do you see that text?

11:26AM   11   A    Yes.

11:26AM   12   Q    Was this another text he sent to you after the Eric Lum

11:26AM   13   robbery had occurred?

11:26AM   14   A    Yes.

11:26AM   15   Q    Do you see the last part of that, the last full sentence

11:26AM   16   starting with "Don't"?

11:26AM   17   A    Yes.

11:26AM   18   Q    Does that say, "Don't show your face around the f'ing

11:26AM   19   club, both of you"?

11:26AM   20   A    Yes.

11:26AM   21   Q    What did you understand that to mean?

11:26AM   22   A    Not to go to that nightclub.

11:26AM   23   Q    Why would that matter to you?

11:26AM   24   A    Because we used to go there and party.

11:26AM   25   Q    You went there a lot, right?

| | | | |
|---|---|---|---|
| 11:26AM | 1 | A | Yes. |
| 11:26AM | 2 | Q | Drank for free, ate for free, no cover charge, right? |
| 11:27AM | 3 | A | Yes. |
| 11:27AM | 4 | Q | When you were there, did people know who you were? |
| 11:27AM | 5 | A | Yes. |
| 11:27AM | 6 | Q | Did they know you were affiliated with Mike? |
| 11:27AM | 7 | A | Yes. |
| 11:27AM | 8 | Q | Did you feel like you were a big shot or a celebrity of |
| 11:27AM | 9 | | some sort almost? |
| 11:27AM | 10 | A | Not really like a celebrity, just the owner's cousin, |
| 11:27AM | 11 | | family of the nightclub. |
| 11:27AM | 12 | Q | Someone who was known. |
| 11:27AM | 13 | A | Yes. |
| 11:27AM | 14 | Q | If we could go to page 29 and the top bubble.  If we could |
| 11:27AM | 15 | | enlarge that, please. |
| 11:27AM | 16 | | Do you see that, Mr. Freitas? |
| 11:27AM | 17 | A | Yes. |
| 11:27AM | 18 | Q | Was this another text message Mr. Miske sent to you after |
| 11:27AM | 19 | | the Lum robbery? |
| 11:27AM | 20 | A | Yes. |
| 11:27AM | 21 | Q | Do you see the second sentence there? |
| 11:27AM | 22 | A | Yes. |
| 11:27AM | 23 | Q | It says, "And you put me in and Miller in a bad spot |
| 11:27AM | 24 | | because you a dumb fuck." |
| 11:27AM | 25 | A | Yes. |

11:27AM   1   Q   What did you understand that to mean?

11:27AM   2   A   That him and Miller was in a bad spot because of the

11:27AM   3   robbery.

11:27AM   4   Q   What does that mean, "in a bad spot"?

11:28AM   5   A   In a bad position.

11:28AM   6   Q   You also mentioned that after the Lum robbery, Mr. Miske

11:28AM   7   told you that people came looking for you at the shop, right?

11:28AM   8   A   Yes.

11:28AM   9   Q   But nothing ever happened.

11:28AM   10   A   No.

11:28AM   11   Q   So from looking at those text messages, do you recall that

11:28AM   12   happened in August of 2015?

11:28AM   13   A   Yes.

11:28AM   14   Q   We can take that down now for the moment.  Thank you.

11:28AM   15       So then going forward, then, to the following year,

11:28AM   16   May of 2016, you made the plan to rob Mike Char?

11:28AM   17   A   Yes.

11:28AM   18   Q   Correct?

11:28AM   19       So you did that despite all of the texts we saw that

11:28AM   20   Mr. Miske had sent you after he found out about Eric Lum?

11:28AM   21   A   Yes.

11:28AM   22   Q   Why?

11:28AM   23   A   There's no reason.  I just did.

11:29AM   24   Q   Were you afraid of any retaliation if you did the Mike

11:29AM   25   Char robbery?  Were you worried about that coming back to you

| | | |
|---|---|---|
| 11:29AM | 1 | in any way? |
| 11:29AM | 2 | A     No. |
| 11:29AM | 3 | Q     Is that because nothing had happened to you from the Eric |
| 11:29AM | 4 | Lum robbery? |
| 11:29AM | 5 | A     Yes. |
| 11:29AM | 6 | Q     Who protected you in the Eric Lum robbery? |
| 11:29AM | 7 | A     Mike did. |
| 11:29AM | 8 | Q     Did you expect him to protect you again if something |
| 11:29AM | 9 | happened like that in the Mike Char robbery? |
| 11:29AM | 10 | A     Yes. |
| 11:29AM | 11 | Q     So did the fact that you did the Lum robbery and nothing |
| 11:29AM | 12 | happened, you never even had to pay back the money, right? |
| 11:29AM | 13 | A     No. |
| 11:29AM | 14 | Q     So were you emboldened by Mr. Miske's protection of you |
| 11:29AM | 15 | from that incident? |
| 11:29AM | 16 | A     I wouldn't say more. |
| 11:29AM | 17 | Q     Pardon me? |
| 11:29AM | 18 | A     I wouldn't say that exactly. |
| 11:29AM | 19 | Q     Well, what would you say? |
| 11:29AM | 20 | A     I just knew that Mike would always protect me. |
| 11:29AM | 21 | Q     Were you thinking about the meaning of that area, the bay, |
| 11:29AM | 22 | to Mr. Miske when you planned to have that robbery there? |
| 11:30AM | 23 | A     No. |
| 11:30AM | 24 | Q     So after the Mike Char robbery, we know Mr. Miske destroys |
| 11:30AM | 25 | your car, right? |

11:30AM    1    A    Yes.

11:30AM    2    Q    Did he send you any of the texts or say anything to you

11:30AM    3    like he did after the Eric Lum robbery?

11:30AM    4    A    No.

11:30AM    5    Q    Did he text you or tell you, I want to slap you, but I

11:30AM    6    won't let anybody else do it?

11:30AM    7    A    No.

11:30AM    8    Q    Did he say, Now I'm going to have to pay Mike Char back

11:30AM    9    because you're affiliated with me?

11:30AM   10    A    No.

11:30AM   11    Q    Did he tell you, You can't come around, you're banned from

11:30AM   12    the M Nightclub?

11:30AM   13    A    No.

11:30AM   14    Q    So was it the fact that you robbed Mike Char or was it the

11:30AM   15    fact of where you robbed Mike Char that made Mr. Miske so

11:30AM   16    angry?

11:30AM   17            MR. KENNEDY:  Objection, asked and answered, both on

11:30AM   18    direct and --

11:30AM   19            THE COURT:  Sustained.

11:31AM   20    BY MR. INCIONG:

11:31AM   21    Q    Now, on direct exam you had indicated that you did not

11:31AM   22    want to drop the tear gas at the District Nightclub, correct?

11:31AM   23    A    Yes.

11:31AM   24    Q    Do you recall saying that I -- me asking well, why did you

11:31AM   25    do it then?

| | | | |
|---|---|---|---|
| 11:31AM | 1 | A | Yes. |
| 11:31AM | 2 | Q | Remind us what your answer was. |
| 11:31AM | 3 | A | I didn't want to do it in the first place, but Mike made |
| 11:31AM | 4 | | me do it. |
| 11:31AM | 5 | Q | Did you feel like you were obligated to him in some way? |
| 11:31AM | 6 | A | Yes. |
| 11:31AM | 7 | Q | Did you feel like there would be repercussions or |
| 11:31AM | 8 | | consequences that you didn't want to happen if you didn't do |
| 11:31AM | 9 | | it? |
| 11:31AM | 10 | A | Yes. |
| 11:31AM | 11 | Q | What were those? |
| 11:31AM | 12 | A | The privileges that I had. |
| 11:31AM | 13 | Q | So was it important to you to maintain your standing with |
| 11:31AM | 14 | | Mr. Miske? |
| 11:31AM | 15 | A | Yes. |
| 11:31AM | 16 | Q | Now, you were asked a number of times by defense counsel |
| 11:32AM | 17 | | that well, this is all about family, this is because you and |
| 11:32AM | 18 | | Mr. Miske were family, it was family because you did this, it |
| 11:32AM | 19 | | was family because Mr. Miske did that.  I want to have you look |
| 11:32AM | 20 | | again at Exhibit 1-637. |
| 11:32AM | 21 | | MR. INCIONG:  If we could go back to that again and |
| 11:32AM | 22 | | publish that, Your Honor. |
| 11:32AM | 23 | | THE COURT:  Yes. |
| 11:32AM | 24 | Q | So back to page 26, if we could enlarge that top bubble |
| 11:32AM | 25 | | again. |

| | | |
|---|---|---|
| 11:32AM | 1 | So can you show me where in that text Mr. Miske sent |
| 11:32AM | 2 | to you he says anything about family, he mentions the word |
| 11:32AM | 3 | "family"? |
| 11:32AM | 4 | A    No. |
| 11:32AM | 5 | Q    The word "family" is not in there, correct? |
| 11:32AM | 6 | A    No, it's not. |
| 11:32AM | 7 | Q    But as you indicated just a little bit ago, in the last |
| 11:32AM | 8 | sentence it says, "...because you affiliated with me," correct? |
| 11:33AM | 9 | A    Yes. |
| 11:33AM | 10 | Q    Could we go to pages -- page 32, please, of that same |
| 11:33AM | 11 | exhibit?  Could we focus on the last two bubbles, please? |
| 11:33AM | 12 | So do you recall what was happening here in these |
| 11:33AM | 13 | texts that Mr. Miske sent you? |
| 11:33AM | 14 | A    Yes. |
| 11:33AM | 15 | Q    What was this about? |
| 11:33AM | 16 | A    Miller's son's birthday, Wayne Miller. |
| 11:33AM | 17 | Q    And Mr. Miske is telling you in the last text, "Don't |
| 11:33AM | 18 | forget this," right? |
| 11:33AM | 19 | A    Yes. |
| 11:33AM | 20 | Q    If we could go to page 33.  This is still on that same |
| 11:33AM | 21 | subject, correct? |
| 11:33AM | 22 | A    Yes. |
| 11:33AM | 23 | Q    And he's telling you it's important, and then he gives you |
| 11:33AM | 24 | the time, 11:30, and the place, Makaha? |
| 11:33AM | 25 | A    Yes. |

| | | | |
|---|---|---|---|
| 11:33AM | 1 | Q | Could we go to page 34? |
| 11:34AM | 2 | | It says, "Don't be late," on the top message, correct? |
| 11:34AM | 3 | A | Yes. |
| 11:34AM | 4 | Q | And then the last message, do you see that one? |
| 11:34AM | 5 | A | Yes. |
| 11:34AM | 6 | Q | So where in the last text does Mr. Miske say anything |
| 11:34AM | 7 | | about you being family? |
| 11:34AM | 8 | A | It doesn't. |
| 11:34AM | 9 | Q | It doesn't, right? |
| 11:34AM | 10 | A | No. |
| 11:34AM | 11 | Q | But how does he refer to you in that message? |
| 11:34AM | 12 | A | As us two idiots. |
| 11:34AM | 13 | Q | And after that he says, "You're going to lose every |
| 11:34AM | 14 | | privilege within my circle," correct? |
| 11:34AM | 15 | A | Yes. |
| 11:34AM | 16 | Q | Mr. Freitas, when you talk about family, is that how you |
| 11:34AM | 17 | | refer to family?  Do you talk about people being affiliated |
| 11:34AM | 18 | | with you? |
| 11:34AM | 19 | A | No. |
| 11:34AM | 20 | Q | Do you say people being within my circle? |
| 11:34AM | 21 | A | No. |
| 11:34AM | 22 | Q | When they're family, you say family, right? |
| 11:34AM | 23 | A | Yes. |
| 11:35AM | 24 | Q | Now, on cross-examination, do you remember Mr. Kennedy |
| 11:35AM | 25 | | asking you about Mr. Miske being angry that you were committing |

11:35AM   1   crimes?  Do you recall that?

11:35AM   2   A     Yes.

11:35AM   3   Q     And you talked about the Mike Char and Eric Lum robberies?

11:35AM   4   A     Yes.

11:35AM   5   Q     You talked about, I believe there was one example about

11:35AM   6   you doing drugs or doing cocaine in the bathroom at the M

11:35AM   7   Nightclub?

11:35AM   8   A     Yes.

11:35AM   9   Q     So in regard to the Eric Lum and Mike Char robberies, did

11:35AM   10  Mr. Miske find out about those because the person who was

11:35AM   11  robbed complained to him, or somebody on their behalf

11:35AM   12  complained to him?

11:35AM   13  A     Yes.

11:35AM   14  Q     Is that how he got involved?

11:35AM   15  A     Yes.

11:35AM   16  Q     And then M Nightclub, that was his business, correct?

11:35AM   17  A     Yes.

11:35AM   18  Q     He was running it as a business?

11:35AM   19  A     Correct.

11:35AM   20  Q     So if the police or somebody found out that you or anybody

11:35AM   21  else was doing drugs in the bathroom there, that wouldn't be

11:36AM   22  good for business, would it?

11:36AM   23  A     No.

11:36AM   24  Q     But did he care about any of those things when he asked

11:36AM   25  you to drop the tear gas at the District Nightclub?

| | | |
|---|---|---|
| 11:36AM | 1 | MR. KENNEDY:  Objection on speculation. |
| 11:36AM | 2 | THE COURT:  Sustained. |
| 11:36AM | 3 | THE WITNESS:  No. |
| 11:36AM | 4 | THE COURT:  The objection was sustained.  The last |
| 11:36AM | 5 | answer from the witness shall be stricken and not considered by |
| 11:36AM | 6 | the jury. |
| 11:36AM | 7 | BY MR. INCIONG: |
| 11:36AM | 8 | Q    When Mr. Miske asked you to commit the assault at the |
| 11:36AM | 9 | Wendy's, do you recall that? |
| 11:36AM | 10 | A    Yes. |
| 11:36AM | 11 | Q    Did he tell you, Make sure you don't get caught by police |
| 11:36AM | 12 | or Make sure this doesn't show up on the surveillance camera? |
| 11:36AM | 13 | A    No. |
| 11:36AM | 14 | Q    When he was asking you to place the trackers on his |
| 11:36AM | 15 | girlfriend's cars, did he warn you, don't get caught? |
| 11:36AM | 16 | MR. KENNEDY:  Objection, beyond the scope of cross. |
| 11:37AM | 17 | THE COURT:  Sustained. |
| 11:37AM | 18 | BY MR. INCIONG: |
| 11:37AM | 19 | Q    Did Mr. Miske seem to have any problems when he was |
| 11:37AM | 20 | directing you to commit crimes that would benefit him? |
| 11:37AM | 21 | A    No. |
| 11:37AM | 22 | MR. KENNEDY:  Objection to the form of the question. |
| 11:37AM | 23 | THE COURT:  Overruled. |
| 11:37AM | 24 | BY MR. INCIONG: |
| 11:37AM | 25 | Q    You were asked about looking for boats for Mr. Miske to |

| 11:37AM | 1 | purchase. |
| 11:37AM | 2 | Do you recall that? |
| 11:37AM | 3 | A | Yes. |
| 11:37AM | 4 | Q | Did you or Mr. Miske ever actually go and look at any of |
| 11:37AM | 5 | those boats? |
| 11:37AM | 6 | A | Yes. |
| 11:37AM | 7 | Q | Was an offer ever made on any of those boats? |
| 11:37AM | 8 | A | I believe so. |
| 11:37AM | 9 | Q | But no boat was ever purchased? |
| 11:37AM | 10 | A | No. |
| 11:37AM | 11 | Q | I think you mentioned that when you were going to be paid, |
| 11:37AM | 12 | whether it was as Mr. Miske's personal assistant when you were |
| 11:38AM | 13 | being paid in cash weekly, or when you were working as a sales |
| 11:38AM | 14 | rep for Kama'aina Termite, that Mr. Miske determined how much |
| 11:38AM | 15 | you were going to be paid, correct? |
| 11:38AM | 16 | A | Yes. |
| 11:38AM | 17 | Q | Did you ever question how much he was paying you? |
| 11:38AM | 18 | A | No. |
| 11:38AM | 19 | Q | Why not? |
| 11:38AM | 20 | A | I was just thankful for a job and to learn his business. |
| 11:38AM | 21 | Q | So when you were not paid a commission for the Mauna Kea |
| 11:38AM | 22 | job, did you harbor any resentment towards Mr. Miske about |
| 11:38AM | 23 | that? |
| 11:38AM | 24 | A | No. |
| 11:38AM | 25 | Q | Did you have a vendetta against him about that? |

11:38AM   1   A    No.

11:38AM   2   Q    Was your decision to cooperate and testify in this case,

11:38AM   3   did that have anything to do with you not getting paid a

11:38AM   4   commission by Mr. Miske?

11:38AM   5   A    No.

11:38AM   6   Q    You were asked a couple of questions about your plea

11:39AM   7   agreement today and I want to go back to that.

11:39AM   8        You pled guilty to racketeering conspiracy, correct?

11:39AM   9   A    Yes.

11:39AM   10  Q    Do you recall what the elements or what the things that

11:39AM   11  have to be present to make you guilty of that crime?

11:39AM   12  A    Yes.

11:39AM   13  Q    Do you recall that you have to have agreed with at least

11:39AM   14  one other person to violate the racketeering laws?

11:39AM   15  A    Yes.

11:39AM   16  Q    Do you understand that you had to become a member of this

11:39AM   17  enterprise or conspiracy, knowing of its goals and intending to

11:39AM   18  help accomplish it?

11:39AM   19  A    Yes.

11:39AM   20  Q    Do you understand that at least one member of that

11:39AM   21  conspiracy had to perform an act that was in furtherance of the

11:39AM   22  conspiracy?

11:39AM   23  A    Yes.

11:39AM   24  Q    Did you understand that the agreement is the crime when it

11:39AM   25  comes to conspiracy?

| | | |
|---|---|---|
| 11:39AM | 1 | A    Yes. |
| 11:39AM | 2 | Q    Did your attorney -- you've had multiple attorneys that |
| 11:39AM | 3 | have represented you in this case, correct? |
| 11:39AM | 4 | A    Correct. |
| 11:39AM | 5 | Q    But you've been represented by counsel throughout the |
| 11:40AM | 6 | entire stage of -- from the time you were charged up until the |
| 11:40AM | 7 | present day? |
| 11:40AM | 8 | A    Yes. |
| 11:40AM | 9 | Q    Did your attorneys explain to you that any coconspirator |
| 11:40AM | 10 | such as yourself is liable for the acts of other coconspirators |
| 11:40AM | 11 | that are performed in furtherance of the conspiracy? |
| 11:40AM | 12 | MR. KENNEDY:  Objection to the form of the question. |
| 11:40AM | 13 | The Court will instruct the jury at the end. |
| 11:40AM | 14 | THE COURT:  I'm sorry.  I couldn't hear what you said. |
| 11:40AM | 15 | MR. KENNEDY:  I'm sorry, Your Honor.  Objection to the |
| 11:40AM | 16 | form of the question.  Legal question.  The Court will give |
| 11:40AM | 17 | instructions at the end. |
| 11:40AM | 18 | THE COURT:  Overruled.  Go ahead. |
| 11:40AM | 19 | BY MR. INCIONG: |
| 11:40AM | 20 | Q    Let me repeat the question if I can, Mr. Freitas. |
| 11:40AM | 21 | Did your attorney explain to you that any |
| 11:40AM | 22 | coconspirator like yourself is liable for other coconspirators' |
| 11:40AM | 23 | acts that are done in furtherance of this conspiracy as long as |
| 11:40AM | 24 | they're reasonably foreseeable? |
| 11:40AM | 25 | A    Yes. |

11:40AM   1              MR. KENNEDY:  Objection to the form of the question,

11:40AM   2    Your Honor.

11:40AM   3              THE COURT:  Overruled again.

11:40AM   4              You may answer.

11:40AM   5              THE WITNESS:  Yes.

11:40AM   6    BY MR. INCIONG:

11:40AM   7    Q     And did your attorneys explain to you that that's true

11:40AM   8    even if you were not personally involved in that act that was

11:41AM   9    committed by the other coconspirator?

11:41AM   10   A     Yes.

11:41AM   11             MR. KENNEDY:  Once again, objection to the form of the

11:41AM   12   question, calls for a legal conclusion.

11:41AM   13             THE COURT:  Overruled.

11:41AM   14             You may answer.

11:41AM   15             THE WITNESS:  Yes.

11:41AM   16   BY MR. INCIONG:

11:41AM   17   Q     Did you also understand that that holds true even if you

11:41AM   18   had no knowledge of that other act as long as it was reasonably

11:41AM   19   foreseeable?

11:41AM   20   A     Yes.

11:41AM   21             MR. KENNEDY:  Same objection.

11:41AM   22             THE COURT:  That one is sustained.

11:41AM   23   BY MR. INCIONG:

11:41AM   24   Q     So there was -- you were certainly doing legitimate work

11:41AM   25   for Mr. Miske at times, correct?

11:41AM   1   A   Yes.

11:41AM   2   Q   You were not committing crimes for him seven days a week,

11:41AM   3   24 hours a day, right?

11:41AM   4   A   No.

11:41AM   5   Q   But you were committing crimes for him, right?

11:41AM   6   A   Yes.

11:41AM   7   Q   When I asked you about the Wendy's assault and I asked you

11:41AM   8   is that how Mr. Miske did business, do you recall what your

11:41AM   9   answer was?

11:41AM   10         MR. KENNEDY:  Objection, beyond the scope of cross.

11:41AM   11         THE COURT:  Sustained.

11:41AM   12   BY MR. INCIONG:

11:41AM   13   Q   Was Mr. Miske a different person when he was upset?

11:42AM   14         MR. KENNEDY:  Objection, vague.

11:42AM   15         THE COURT:  Overruled.

11:42AM   16         Go ahead.

11:42AM   17         THE WITNESS:  Yes.

11:42AM   18   BY MR. INCIONG:

11:42AM   19   Q   Explain so.  How so?

11:42AM   20   A   When he's upset he doesn't really think everything

11:42AM   21   through.

11:42AM   22   Q   He doesn't think everything through?  Is that what you

11:42AM   23   said?

11:42AM   24   A   Yes.

11:42AM   25   Q   So Jake Smith and yourself, we saw those text messages

11:42AM    1    where you discussed drugs, oxycodone distribution, right?

11:42AM    2    A    Yes.

11:42AM    3    Q    Did you discuss also potential robberies with Jake Smith?

11:42AM    4    A    Yes.

11:42AM    5    Q    Did you ever actually rob anybody with Jake Smith?

11:42AM    6    A    No.

11:42AM    7    Q    What about Chad Duncan?  Did you discuss robberies with

11:42AM    8    Chad Duncan?

11:42AM    9    A    Yes.

11:42AM   10    Q    Did you rob anybody with Chad Duncan?

11:43AM   11    A    One time.

11:43AM   12    Q    What about John Stancil?

11:43AM   13    A    Yes.

11:43AM   14    Q    How many robberies did you do with John Stancil?

11:43AM   15    A    Two.

11:43AM   16    Q    Those were the Eric Lum and Mike Char?

11:43AM   17    A    Yes.

11:43AM   18    Q    Now, in your plea agreement there was a cooperation

11:43AM   19    agreement, correct?

11:43AM   20    A    Yes.

11:43AM   21    Q    Did that require your full cooperation?

11:43AM   22    A    Yes.

11:43AM   23    Q    What did you understand full cooperation to mean?

11:43AM   24    A    To tell the truth.

11:43AM   25    Q    Did you understand that meant that you had to testify

| | | |
|---|---|---|
| 11:43AM | 1 | truthfully at any trial or proceeding that the government asks |
| 11:43AM | 2 | you to? |
| 11:43AM | 3 | A    Yes. |
| 11:43AM | 4 | Q    Did you understand that that meant you had to meet with |
| 11:43AM | 5 | government agents at any time and give truthful information? |
| 11:43AM | 6 | A    Yes. |
| 11:43AM | 7 | Q    Did you understand that that cooperation provided that if |
| 11:43AM | 8 | you did that and you provided substantial assistance, then the |
| 11:43AM | 9 | government may make a motion for a reduced sentence? |
| 11:43AM | 10 | A    Yes. |
| 11:43AM | 11 | Q    Was that motion promised in any way? |
| 11:44AM | 12 | A    No. |
| 11:44AM | 13 | Q    Guaranteed in any way? |
| 11:44AM | 14 | A    No. |
| 11:44AM | 15 | Q    You recall the proffer agreement that you entered into, |
| 11:44AM | 16 | right? |
| 11:44AM | 17 | A    Yes. |
| 11:44AM | 18 | Q    Did that also have a truthful component as well? |
| 11:44AM | 19 | A    Yes. |
| 11:44AM | 20 | Q    What was the number one requirement, as you understood, of |
| 11:44AM | 21 | both your proffer agreement and the cooperation agreement in |
| 11:44AM | 22 | your plea agreement? |
| 11:44AM | 23 | A    To tell the truth. |
| 11:44AM | 24 | Q    Have you told the truth to this jury over the last several |
| 11:44AM | 25 | days? |

11:44AM   1   A   Yes.

11:44AM   2   Q   Has anyone associated with the government told you to tell

11:44AM   3   anything but the truth in this case?

11:44AM   4   A   No.

11:44AM   5   Q   Have you provided truthful information to the government

11:44AM   6   since you began proffering in 2021?

11:44AM   7   A   Yes.

11:44AM   8   Q   At any time have you embellished or exaggerated the

11:44AM   9   information that you provided to the government in order to

11:44AM   10  help yourself?

11:44AM   11  A   No.

11:44AM   12  Q   Who in the end will decide whether you get a reduced

11:44AM   13  sentence or not?

11:44AM   14  A   The judge.

11:44AM   15  Q   Is that what you're hoping for in this case?

11:44AM   16  A   Yes.

11:44AM   17  Q   What happens if you don't get a downward departure and

11:45AM   18  don't get a reduced sentence?

11:45AM   19  A   What was the question?

11:45AM   20  Q   Do you have any recourse if you do not get a reduced

11:45AM   21  sentence?

11:45AM   22  A   No.

11:45AM   23  Q   Can you withdraw from your plea agreement?

11:45AM   24  A   No.

11:45AM   25  Q   And on the other hand, if you are not truthful, would

| | | |
|---|---|---|
| 11:45AM | 1 | there be consequences? |
| 11:45AM | 2 | A    Yes. |
| 11:45AM | 3 | Q    What would those be? |
| 11:45AM | 4 | A    It would be a void of the plea agreement and there would |
| 11:45AM | 5 | be more charges brought to me. |
| 11:45AM | 6 | Q    You could be facing the original charges that were agreed |
| 11:45AM | 7 | to be dismissed. |
| 11:45AM | 8 | A    Yes. |
| 11:45AM | 9 | MR. INCIONG:  Thank you, Your Honor.  No further |
| 11:45AM | 10 | questions for Mr. Freitas. |
| 11:45AM | 11 | THE COURT:  Mr. Kennedy, anything further? |
| 11:45AM | 12 | RECROSS-EXAMINATION |
| 11:45AM | 13 | BY MR. KENNEDY: |
| 11:45AM | 14 | Q    Sir, your dad lived with Mike for five years? |
| 11:46AM | 15 | A    I'm sorry? |
| 11:46AM | 16 | Q    Your dad lived with Mike Miske for five years? |
| 11:46AM | 17 | MR. INCIONG:  Objection, beyond the scope. |
| 11:46AM | 18 | THE COURT:  Sustained. |
| 11:46AM | 19 | BY MR. KENNEDY: |
| 11:46AM | 20 | Q    Let me ask you this:  You knew you were family, right? |
| 11:46AM | 21 | A    Yes. |
| 11:46AM | 22 | Q    Nobody had to tell you in a text message, did they? |
| 11:46AM | 23 | A    No. |
| 11:46AM | 24 | Q    Nobody has to tell a family member they're family, they're |
| 11:46AM | 25 | just family, right? |

| | | | |
|---|---|---|---|
| 11:46AM | 1 | A | Yes. |
| 11:46AM | 2 | Q | And so when Pat from Waianae came to do harm to you and |
| 11:46AM | 3 | | that was somebody that Miller knew, that's what that text |
| 11:46AM | 4 | | message was about? |
| 11:46AM | 5 | | MR. INCIONG:  Objection, states facts not in evidence. |
| 11:46AM | 6 | | THE COURT:  Sustained. |
| 11:46AM | 7 | BY MR. KENNEDY: | |
| 11:46AM | 8 | Q | Did you know that that was Miller's friend? |
| 11:46AM | 9 | A | No. |
| 11:46AM | 10 | Q | And the text message was you had robbed someone, right? |
| 11:46AM | 11 | A | Yes. |
| 11:46AM | 12 | Q | It had cost them money, right?  Right? |
| 11:46AM | 13 | A | Yes. |
| 11:46AM | 14 | Q | And Mike was saying because you had robbed someone who was |
| 11:47AM | 15 | | family of a friend, he would have to make what you did wrong |
| 11:47AM | 16 | | right? |
| 11:47AM | 17 | | MR. INCIONG:  Objection, misstates the testimony and |
| 11:47AM | 18 | | the evidence. |
| 11:47AM | 19 | | THE COURT:  Sustained. |
| 11:47AM | 20 | BY MR. KENNEDY: | |
| 11:47AM | 21 | Q | Didn't he say that he would now have to pay the debt? |
| 11:47AM | 22 | A | Yes. |
| 11:47AM | 23 | Q | Now, at Mauna Kea are you aware that you were asked some |
| 11:47AM | 24 | | questions about a warranty and spot treatment, right? |
| 11:47AM | 25 | A | Yes. |

| | | |
|---|---|---|
| 11:47AM | 1 | Q   Were you aware that there was a tent fumigation involving |
| 11:47AM | 2 | tenting the entire property, running gas over a number of days? |
| 11:47AM | 3 | A   Yes. |
| 11:47AM | 4 | Q   And there were close to 50 mile an hour winds during that |
| 11:47AM | 5 | time? |
| 11:47AM | 6 | A   Yeah.  They didn't cover with the tent.  They gas |
| 11:47AM | 7 | chambered it. |
| 11:47AM | 8 | Q   So in addition to that job, they did a chamber seal from |
| 11:47AM | 9 | the inside and did it again, right? |
| 11:48AM | 10 | A   Yes. |
| 11:48AM | 11 | Q   And so they did two different jobs to make certain that |
| 11:48AM | 12 | they did it right, correct? |
| 11:48AM | 13 | A   Correct. |
| 11:48AM | 14 | Q   Now, with respect to one of the questions that you were |
| 11:48AM | 15 | asked at the end, you don't want to do any more time, do you? |
| 11:48AM | 16 | A   No. |
| 11:48AM | 17 | Q   Your kids depend on you. |
| 11:48AM | 18 | A   Yes. |
| 11:48AM | 19 | Q   And that's why you're here, right? |
| 11:48AM | 20 | A   To testify truthfully, yes. |
| 11:48AM | 21 | Q   And the jury will decide that, right? |
| 11:48AM | 22 | A   Yes. |
| 11:48AM | 23 | Q   Now, the government asked you some questions about if you |
| 11:48AM | 24 | leave your cell phone at home, right?  Do you recall those |
| 11:48AM | 25 | questions? |

11:48AM   1   A   Yes.

11:48AM   2   Q   Okay.  So the cell phone is at home, right, and it's -- in

11:48AM   3   this question it's pinging on places that are nearby, right?

11:48AM   4   A   Yes.

11:48AM   5   Q   Okay.  It wouldn't be that situation if it shows movement,

11:49AM   6   now would it?

11:49AM   7   A   No.

11:49AM   8   Q   The phone would be moving, right?

11:49AM   9   A   Yes.

11:49AM   10   Q   So if the phone shows movement into the city and movement

11:49AM   11   back, it wouldn't be like when someone is at their home, right?

11:49AM   12   A   Yes.

11:49AM   13   Q   So if it shows leaving Hawaii Kai, going downtown before

11:49AM   14   you're ever there, that would be movement, right?

11:49AM   15   A   Yes.

11:49AM   16   Q   And if it shows driving back to Hawaii Kai before you and

11:49AM   17   Jake Smith ever get to town, that would be movement right?

11:49AM   18         MR. INCIONG:  Objection facts not in evidence.

11:49AM   19         THE COURT:  Overruled.  Go ahead.

11:49AM   20   BY MR. KENNEDY:

11:49AM   21   Q   Correct?

11:49AM   22   A   Yes.

11:49AM   23   Q   So the movement would show that the phone was not just

11:49AM   24   sitting at home, wouldn't it?

11:49AM   25   A   No.

11:49AM     1    Q     And then if the phone shows movement around the windward

11:49AM     2    side of the island, it wouldn't just be sitting at home, now

11:49AM     3    would it?

11:49AM     4    A     No.

11:49AM     5           MR. KENNEDY:  Nothing further.

11:49AM     6           THE COURT:  Mr. Freitas, you may step down.  Thank

11:49AM     7    you, sir.

            8                        --oo0oo--

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

```
 1                    COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, May 28, 2024.

11

12

13                             /s/ Gloria T. Bediamol

14                             GLORIA T. BEDIAMOL.

15                             RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```