1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3
UNITED STATES OF AMERICA,      ) CR 19-00099 DKW-KJM
4                              )
             Plaintiff,        ) Honolulu, Hawaii
5       vs.                    ) June 13, 2024
                               )
6                              ) JURY TRIAL – DAY 85
   MICHAEL J. MISKE, JR., (01) ) TESTIMONY OF GEORGE PERRY
7     aka "Bro,"               )
                               )
8          Defendant.          )
    _____)
9

10        PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 85)
             BEFORE THE HONORABLE DERRICK K. WATSON
11            CHIEF UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:        MARK A. INCIONG
                                MICHAEL DAVID NAMMAR
14                              AISLINN AFFINITO
                                Assistant United States Attorneys
15                              Office of the United States Attorney
                                PJKK Federal Building
16                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
17
     Also Present:             THOMAS PALMER, FBI Special Agent
18                             KARI SHERMAN, Paralegal

19   For the Defendant (1)     MICHAEL JEROME KENNEDY, ESQ.
     Michael J. Miske, Jr.:    Law Offices of Michael Jerome Kennedy,
20                             PLLC
                               333 Flint Street
21                             Reno, Nevada 89501
                               *Pro Hac Vice*

22
                               LYNN E. PANAGAKOS, ESQ.
23                             841 Bishop Street, Suite 2201
                               Honolulu, Hawaii 96813
24

25

                     UNITED STATES DISTRICT COURT

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant (1)
     Michael J. Miske, Jr.:
 3
     Also Present:               ASHLEY KING, Paralegal
 4                               JOSH BARRY, Technician

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Official Court Reporter:  Debra Read, RDR
                               United States District Court
22                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
23                             readit3949@gmail.com

24
     Proceedings recorded by machine shorthand; transcript
25   produced with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

1                                I N D E X

2                    CHRONOLOGICAL INDEX OF WITNESSES

3

4    DEFENDANT'S WITNESS                                      PAGE

5

6    **GEORGE KAILIPONO PERRY**
     Direct Examination By Mr. Kennedy                          5
7    Cross-Examination By Mr. Nammar                           35
     Redirect Examination By Mr. Kennedy                       54
8    Recross-Examination By Mr. Nammar                         62

9

10                               I N D E X

11                           E X H I B I T S

12
                                                              FOR
13                                                         EVIDENCE
     NO.                                                      PG.
14   ─────────────────────────────────────────────────────────────

15      9-1351                                                47
        9-1352                                                49
16      9-1353                                                52
     9538-001                                                 31
17   9538-002                                                 15
     9538-003                                                 33
18

19

20

21

22

23

24

25

```
 1    THURSDAY, JUNE 13, 2024                        8:40 A.M.

 2              THE COURTROOM MANAGER:  Criminal Number

 3    19-00099-DKW-KJM, United States of America versus Michael

 4    J. Miske, Jr.

 5         This case has been called for jury trial, day 85.

 6         Counsel, please make your appearances for the record.

 7              MR. INCIONG:  Good morning, Your Honor.

 8         Mark Inciong, Michael Nammar and Aislinn Affinito for the

 9    United States.  Special Agent Tom Palmer and Kari Sherman are

10    also present.  Good morning.

11              THE COURT:  Good morning.

12              MR. KENNEDY:  Good morning, Your Honor.

13         Michael Kennedy with Lynn Panagakos, Michael Miske,

14    Ashley King, and Josh Barry.

15         Good morning to each of you.

16              THE COURT:  Good morning.  You may all be seated.

17         Good morning to our 16-person jury.  You're ready for the

18    second day of the defense case.

19         Mr. Kennedy or Ms. Panagakos, you may call your next

20    witness.

21              MR. KENNEDY:  Your Honor, we would call George

22    Perry.

23         **GEORGE KAILIPONO PERRY, DEFENDANT'S WITNESS, WAS SWORN**

24              THE COURTROOM MANAGER:  Thank you.  You may be

25    seated.
```

UNITED STATES DISTRICT COURT

1          Please state your full name, spelling your last name for

2    the record.

3              THE WITNESS:  George Kailipono Perry, P-e-r-r-y.

4                        DIRECT EXAMINATION

5    BY MR. KENNEDY:

6          Q    Good morning, sir.

7          A    Good morning.

8          Q    What are you currently doing for work?

9          A    Fumigation.

10         Q    And who do you do fumigation for currently?

11         A    The Pest Group.

12         Q    All right, sir.  And how long have you been with The

13   Pest Group?

14         A    A little over a year.

15         Q    All right.  And when did you start doing fumigation

16   for pest control companies?

17         A    Back in about 2014-15.

18         Q    All right.  And who did you start with?

19         A    Terminix.

20         Q    All right.  And at Terminix, what did you start

21   doing?

22         A    I started off as a laborer.

23         Q    Okay.  And did that change within a matter of a few

24   months?

25         A    Yes.

1     Q    Tell us about that.

2     A    So I found out that the way to get a raise is by

3 gaining licenses, so I asserted myself to get the training

4 needed to get my licenses so I could move ahead.

5     Q    All right.  Are you familiar with a 7A license?

6     A    Yes, sir.

7     Q    What is that?

8     A    It is applicator's license to introduce a fumigant.

9     Q    All right.  And what does it allow you to do?

10    A    It allows us to introduce the gas fumigant Vikane to

11 effectively fumigate a house.

12    Q    All right.  And with respect to the transportation

13 of Vikane, chloropicrin, did you also obtain anything with

14 respect to that?

15    A    So with -- with the fumigation, you need to

16 introduce the warning agent, which is called chloropicrin,

17 prior to introducing the fumigant.

18    Q    All right.  And as far as the transportation of

19 Vikane and chloropicrin, did you apply for anything that allows

20 you to do that?

21    A    I also carry a CDL with a HAZMAT endorsement.

22    Q    And what's a CDL, sir?

23    A    It's a commercial driver's license.  It's just a

24 Class 3.

25    Q    Okay.  And what's the HAZMAT allow you to do?

1          A      So the HAZMAT endorsement allows me to carry

2    hazardous materials like Vikane and chloropicrin.

3          Q      All right.  And so you were able to obtain those

4    while you were at Terminix?

5          A      Correct.

6          Q      And how long did it take you to obtain those?

7          A      About three months.

8          Q      I take it that you were interested in increasing

9    your pay?

10         A      Correct.

11         Q      All right.  How long did you work at Terminix?

12         A      I worked there for about a year-and-a-half.

13         Q      All right.  And then did there come a time where you

14   were employed at Kama'aina Termite & Pest Control?

15         A      Yes, sir.

16         Q      And when was that?

17         A      I left Terminix after about a year-and-a-half.  I

18   got into a vehicle accident and they decided to release me.

19         Q      All right.  And was that like on a Friday?

20         A      Yeah, I was released on a Friday.  I did an

21   interview with the manager at Kama'aina, and they hired me on a

22   Monday.

23         Q      And who was that that you interviewed with?

24         A      Matt Febry.

25         Q      And were you familiar with him from Terminix?

UNITED STATES DISTRICT COURT

```
 1      A     I had heard his name before, but I did not meet him

 2  before that.

 3      Q     All right.  So you did the interview and you were

 4  hired on Monday?

 5      A     Yes.

 6      Q     The following Monday, correct?

 7      A     Correct.

 8      Q     All right.  Now, what did you do for Kama'aina

 9  Termite & Pest Control?

10      A     Kama'aina I came on as a crew lead.

11      Q     All right.  Can you explain what a crew lead is?

12      A     It's -- basically it entails supervising between

13  four or more people to cover a house correctly, make sure

14  there's no damages, and fumigate a house.

15      Q     All right.  And with respect to a crew leader, what

16  are the roles that folks have and what did you have as a role?

17      A     So my role mainly is to make sure that all -- safety

18  of my workers, for one.  I follow all instructions as required

19  by the label of the gas, making sure that they correctly cover

20  the house without damages, making sure that insides of the

21  houses are correctly prepped, and answer any questions the

22  customers may have.

23      Q     All right.  And so with respect to that, what would

24  be a typical fumigation with a house?  Does it occur on one

25  day?  Does it occur over a couple days?  Or can you explain how
```

1   that works to our jury?

2        A    Typically it's a 2-day process on a normal.  On day

3   one, you would go there, introduce yourself, do a walk-through

4   with the customer, make sure the house is correctly prepped,

5   put whatever equipment that we need on the inside of the house,

6   collect the key from them, lock the doors, put their key in a

7   lockbox, put a secondary lock on top of the doors so that they

8   can't even get in even with their keys, and proceed to covering

9   the house.

10       Q    All right.  And after you're done with covering the

11  house, what's the next step, sir?

12       A    The next step would be to introduce the Vikane -- I

13  mean, not the Vikane -- the chloropicrin 15 minutes prior to

14  introducing Vikane.

15       Q    All right.  And so 15 minutes prior to introducing

16  the Vikane, let me ask you some questions about that.

17       A    Uh-huh.

18       Q    If it's a -- how do you determine how much

19  chloropicrin to introduce into the house before you shoot the

20  gas?

21       A    We do a calculation.  There's a app on top of the

22  phones or there's a fume calculator, fumigant calculator that

23  we put the total volume of the house, or cubing, and it gives

24  us -- spits us back numbers.  Basically we're letting it know

25  what the temperature is, the size of the house is, humidity,

UNITED STATES DISTRICT COURT

1    wind speed, quality of the tents, type of ground, quality of

2    the ground seal, and then it gives us back numbers on how

3    much -- what is a half-loss time, or how much it'll lose over

4    half the time that it's going to be up there, how much actual

5    Vikane to put in pound-wise, and it gives us a range of how

6    much chloropicrin we need to use.

7         Q    All right.  So I understand it gives you a specific

8    number for Vikane, correct?

9         A    Correct.

10        Q    And it gives you a range for chloropicrin?

11        A    Correct.

12        Q    What do you understand the range to be and how do

13   you use your experience and professionalism to determine within

14   that range how much chloropicrin --

15        A    So with the range it's going to give you a minimum

16   requirement and a maximum that you can put.

17        Q    All right.

18        A    So you would -- every house is different.  A

19   two-story house you would need to put more than one -- you need

20   to put more than one place.  If the volume is bigger than so

21   much, you need to put multiple 'cause you have to put more pans

22   in there, 'cause each pan can only hold so much of the

23   chloropicrin.

24        Q    All right.  And then how -- how do you go about the

25   steps of putting the chloropicrin in the house 15 minutes

```
 1    before you administer the gas?
 2         A     So you would pre-prep the chloropicrin pans and the
 3    measuring cups.  You pour how much you need in each cup for
 4    each pan, you take it in the house, you put it in the path of
 5    the fan, you pour it, you drop the cup in the pan, and you walk
 6    out, lock the doors, and reseal.
 7         Q     All right.  And with respect to the -- I've asked
 8    you when you began, did you work at Kama'aina Termite & Pest
 9    Control all the way up to July 15th of 2020?
10         A     Yes.
11         Q     Roughly about five years?
12         A     Correct.
13         Q     And during that time, did you always use
14    chloropicrin under the label is the law?
15         A     Yes.
16         Q     Why did you use it?
17         A     That's the requirement per the label.
18         Q     All right.  With respect to -- did you have a
19    manager at Kama'aina Termite & Pest Control during your time?
20         A     Yes.
21         Q     Who was that?
22         A     PK.
23         Q     PK?  Is that Brian Morenas?
24         A     Yes.
25         Q     And he goes by PK?
```

UNITED STATES DISTRICT COURT

1      A      Yes.

2      Q      Was he also someone who was strict with compliance

3    during the time that he was the manager?

4      A      Yes.

5      Q      Tell us about that.

6      A      He was there every morning with us making sure that

7    trucks are prepped.  He come out and ran spot checks on us on

8    the job sites.  If it's big or heavier jobs or whatever, it's

9    more complicated, he's going to be there to make sure that

10   everything is done correctly and safely.

11     Q      All right.  And you were aware, I take it, that

12   Mr. Miske owned Kama'aina Termite & Pest Control?

13     A      Yes.

14     Q      Do you -- do you recognize him in the courtroom,

15   sir?

16     A      Yes.

17     Q      Can you point out where he's sitting and what he

18   might be wearing?

19     A      He's wearing a suit, a blue shirt.

20            MR. KENNEDY:  Can you see, Your Honor?

21            THE COURT:  I can.

22            MR. KENNEDY:  All right.

23            THE COURT:  Thank you.

24            MR. KENNEDY:  Would the record reflect that

25   Mr. Perry has identified Mr. Miske, please?

 1            THE COURT:  Yes, the record should reflect the

 2   witness, Mr. Perry's identification of the defendant,

 3   Mr. Miske.

 4       Q     (BY MR. KENNEDY:)  Now, in terms of Mr. Miske, was

 5   he also someone who was interested in compliance with the label

 6   is the law?

 7       A     Very much so.

 8       Q     Tell us about that.

 9       A     He was another person that would always be always

10   making sure that we're up to date with our -- how do I

11   say -- our classes to keep our licenses.  He quarterly had

12   someone come in to us to give us trainings.

13       Q     And do you know was Wes Otani one of those

14   individuals?

15       A     Wes Otani was the individual that gave us the

16   training.

17       Q     And what was his background and what could he offer

18   in terms of training in your profession?

19       A     I actually worked for Wes at Terminix.  He was a

20   regional manager there before he moved to the -- I believe it

21   was Douglas, the makers of the gas, and he became a

22   representative and a trainer there.

23       Q     Okay.  And were there other folks that were also

24   brought periodically?

25       A     Excuse me?

1      Q      Were there other trainers that came that would train

2   you as well?

3      A      Yes.

4      Q      All right.  Now, with respect to a typical day for

5   you, what -- when would that start for you?

6      A      Our day -- my day normally started about 6:30 in the

7   morning.

8      Q      All right.

9      A      I get there, we open up shop, we check over the

10   trucks, make sure we had all the equipment that we're going to

11   need, everything is safe, do our daily checks, we pull up -- we

12   pull out our route schedules and we set up, get ready to go.

13      Q      All right.  And with respect to the setup in terms

14   of routes and equipment, how would you know where you were

15   going to go?

16      A      Every day the office would set up the night before

17   our routes for the following day.  They put each route in a

18   different folder.  On top of the folder there's a route sheet;

19   there's all your appointments for the day.  Inside there,

20   there's fume logs for every house.

21      Q      All right.  And what's a fume log, sir?

22      A      Our fume logs are the paperwork that we're required

23   to fill out for every structure that we do.

24         MR. KENNEDY:  All right.  And so if we can take a

25   look at -- just for the witness -- it's so small -- 9538-002

UNITED STATES DISTRICT COURT

1   which is in the -- I believe it's the 68th supplemental, Your

2   Honor -- or the -- yes, I believe that's correct.

3           THE COURT:  Go ahead.

4       Q   (BY MR. KENNEDY:)  Sir, do you recognize what's

5   shown in 93- -- it's so small; I got to go back to the exhibit.

6           THE COURT:  9538-2.

7       Q   (BY MR. KENNEDY:) -- 9538-002?

8       A   That's me holding the daily -- one of the daily

9   schedules.

10      Q   All right.  So that would be a daily occurrence that

11  you would do?

12      A   Correct.

13          MR. KENNEDY:  At this time I'd move 9538-002.

14          THE COURT:  Any objection?

15          MR. NAMMAR:  No objection.

16          MR. KENNEDY:  And could we publish?

17          THE COURT:  It is admitted then without objection.

18  Yes, you may publish.  That's 9538-2.

19          (Exhibit 9538-002 received into evidence.)

20      Q   (BY MR. KENNEDY:)  All right.  So you would have the

21  route there and you would also have the fume logs for each of

22  the places that you were going to go to for the day; is that

23  correct?

24      A   Correct.

25      Q   All right.  We can take that down now.

1          Now, with respect to we kind of hit the first day and we

2    were talking about introducing chloropicrin.  What happens when

3    you move 15 minutes later to the Vikane introduction at a house

4    and how do you -- how do you do that in terms of having the gas

5    go in?  And could you describe it in a way that if the jury was

6    there, they could see you doing it.

7          A    So basically once I do a walk-through with the

8    customers, I walk out -- I walk them out of the structure, make

9    sure there's no one left in the structure.

10          Depending on the size, I may have to put a fan or

11   multiple fans.  On each fan we're going to put a high pressure

12   shooting line which is how we introduce the gas Vikane.

13          We run that out of the structure to where the truck is.

14   Upon completion of sealing everything up, introducing the

15   chloropicrin, we hang the Vikane cylinder, which can be

16   anywhere from a full cylinder, 200-plus pounds off of a scale,

17   don our PPE, connect the shooting lines to the cylinder, and

18   basically you crack the valve open to make sure that it's

19   flowing and the tip is holding, and then you give it one full

20   turn, and we just watch the numbers drop until you reach the

21   amount of weight that needs to be put into the house.

22          Q    All right.  And then when the amount of weight that

23   is to be put into the house, what do you do at that point?

24          A    Once we hit the target number of the amount of

25   weight that we need to go in the house, we turn the valve off,

1  leave it -- just let it sit for a little bit 'cause the

2  pressure has to bleed off into the house.

3         Once the pressure bleeds off into the house, we can

4  release the line, roll it up, stick it under the tent.  Once

5  the gas exits the lines into the house, it's not going to come

6  back out.

7         Q     All right.  What happens after that?

8         A     We roll everything up, hang danger signs on the

9  outside of the tent from any angles anybody can see, gives our

10  name, the date, and all the phone numbers in case of emergency.

11        Q     And what happens after that?

12        A     We leave and go to the next job site.

13        Q     All right.  And then in this process with this

14  house, I take it that the gas remains in the house that day?

15        A     Correct.

16        Q     What happens on day two?

17        A     On day two, we come back, don our SCBAs, break the

18  seam.  That's when we initially start active aeration, which is

19  an hour, and then you just continue unseaming, taking all the

20  tents down.

21        Once everything is down, either the crew lead or somebody

22  else qualified to use the SCBA will go in, open up the house,

23  all the windows and doors, remove the equipment, and load up

24  the truck.

25        Q     All right.  And then where do you go from there?

UNITED STATES DISTRICT COURT

 1      A     From there we relock the house, make sure all the

 2   signs are up on all the doors, return the key back into the

 3   lockbox, make sure all the doors are locked up with our

 4   secondary locks, and we leave.  We have to wait six hours for

 5   aeration time.

 6         After that 6-hour period, someone else will come back out

 7   with a -- the meter to read the gas.  For us to let anybody

 8   back in, the meter has to read zero.

 9      Q     All right.  Now, did you have a number of different

10   crews while you were there at Kama'aina Termite & Pest Control

11   for the five years that you were there?

12      A     Yes.

13      Q     And so there are other crew leaders, correct?

14      A     Yes.

15      Q     And all of those folks, like you, are licensed,

16   right?

17      A     Yes.

18      Q     And during that time, were you aware of anyone

19   transporting Vikane or chloropicrin without a CDL endorsement?

20      A     No.

21      Q     All right.  And were you aware of anyone else that

22   was shooting gas who had a 7A license where the individual who

23   was shooting the gas was outside of their sight?

24      A     No.

25      Q     And so so long -- you understand that as long as

1    you're in their sight, someone can --

2        A     Anybody can shoot the gas.

3        Q     -- can shoot the gas, and that's how someone goes

4    through the process of obtaining a license?

5        A     As part of the learning process, correct.

6        Q     All right.  And I take it that when you were at

7    Terminix, that was something that you did along the way,

8    correct?

9        A     Correct.

10       Q     All right.  Now, would you describe fumigation as a

11   really physical work?

12       A     Yes, I would.

13       Q     Why?

14       A     There's a lot of long, hot days and the equipment is

15   heavy.  Not every house is on perfect flat ground.  You could

16   be working on the side of hills, could be a rocky area.  It's

17   just -- it's hard work, but somebody's got to do it.

18       Q     And so can you describe how heavy the tents are?

19       A     Tents can range anywhere from a hundred pounds to

20   close to 300 pounds depending if they're dry or wet.

21       Q     All right.  And so those 100- to 300-pound tents

22   have to get up on structures that are high, correct?

23       A     Correct.

24       Q     And so are there individuals who are primarily in

25   the crew responsible for the roof?

1      A      Yes.

2      Q      Tell us about that.

3      A      So your roofers are not going to be basically guys

4  that look like me -- not going to want a big guy like me up on

5  top of the roof, 'cause now you're looking at a 200-plus-pound

6  piece of equipment you're carrying up on the roof, walking on

7  somebody's roof.  It's not meant for that kind of square

8  footage.  The footprint on that is small.

9       So you're going to have smaller guys that are strong that

10  know what they're doing.  They're going to go up there, lay the

11  tents down, and maybe somebody else go up there and help them

12  move it.

13      Q      All right.  Now, on days -- are there some days

14  where someone doesn't show up, people are sick, there aren't

15  the number of crews to handle the jobs that are for that day?

16      A      Correct.

17      Q      All right.  And that happens from time to time?

18      A      Yeah.

19      Q      Okay.  Are you -- when I say a shoot truck, do you

20  know what I mean?

21      A      Yes.

22      Q      Tell us about that.

23      A      So a lot of times I'd run a shoot truck because I

24  carry the HAZMAT, which I can carry the gas; I'm a certified

25  applicator.  I can train somebody else who doesn't have a

1   license to do a walk-through.  If they're a trustworthy person,

2   they can be in training trying to get their certification, they

3   can do a walk-through; they know what they're supposed to be

4   looking for.  They can set up the house, they can cover the

5   house, they just can't shoot the gas or anything like that.

6        So they can have a crew of four or five guys out there,

7   they can cover the house, and I can come by later, reenter the

8   house, make sure everything is done correctly, set up, run my

9   lines out, reseal, and apply the gas.

10       Q     And so when you were at Kama'aina Termite & Pest

11  Control, were you the fallback person on those days?

12       A     Correct.

13       Q     Where you would need the shoot truck?

14       A     Yes, sir.

15       Q     And did you do that on a number of occasions?

16       A     Yes, sir.

17       Q     All right.  Now, you mentioned inside the folders --

18  you know, you have your route on the top and inside the folders

19  would be these fume logs?

20       A     Uh-huh.

21       Q     What would be -- what's the essential things that

22  you need to have after the job is done to document what was

23  done?

24       A     The essential thing to have is that fume log and the

25  calculation correctly written out.


UNITED STATES DISTRICT COURT

 1      Q     All right.  And then -- go ahead, sir.  If we --

 2      A     Huh?  No, basically the fume log needs to be filled

 3  out for every structure that we cover.

 4            MR. KENNEDY:  All right.  Your Honor, I believe

 5  9528-020 has been admitted into evidence?

 6            THE COURT:  You're going to have to help me find it.

 7            MR. KENNEDY:  Do you have an idea in terms of

 8  where -- when it was admitted or the -- which supplement?

 9        Apologize, Your Honor.

10            THE COURT:  Is that question directed to me?

11            MR. KENNEDY:  No, it was directed to Ms. King to

12  help the Court.

13        59, Your Honor, is the -- I believe it's 9528-020.

14            THE COURT:  Yes.  Go ahead.

15            MR. KENNEDY:  Thank you, Your Honor.  Apologize for

16  that, I just didn't know that one.

17        If we can pull it up and publish it.

18      Q     (BY MR. KENNEDY:)  Sir, do you recognize what's

19  shown as 9528-020?

20      A     Yes.

21      Q     How is it that you recognize it?

22      A     That's something that I did.

23      Q     Okay.

24      A     That's one of my jobs.

25      Q     All right.  And can you explain to the jury what the

1   check marks, what the -- well, let me ask you this first.

2       There's a typewritten portion of it right here --

3       A      Yes.

4       Q      -- at the top.  When you receive the fume log, is

5   that on there?

6       A      So that top portion is always already filled out.

7   It's -- basically it's just address and where I'm going.

8       Q      Okay.  And then when we get to the fumigation

9   information, can you explain the form, what you're checking and

10  what you're doing?

11      A      So the fumigation information, the first check mark

12  that's there is marked as an original fume, which means that

13  it's never -- it hasn't been done; it's original for me to do

14  it.  It's not something that we tried to do and failed, which

15  that would be a check mark on the refume side.

16      Q      Okay.  And then --

17      A      The type of structure is basically what we were

18  doing.  It was just a pile of wood.

19      Q      Okay.

20      A      It could have been anything from wood planking, to

21  pallets, to maybe somebody's a woodworker and they have like

22  tree stumps or whatever that they carve.  Could have been

23  anything to that.  I'm not sure what it was.  I don't remember.

24  That was a long time ago.

25          And --

1      Q      And then when we have the target pest, can you

2   explain that?

3      A      The target pest over there the check mark is under

4   powderpost beetles which is the highest dosage that it would be

5   'cause they're hard.

6      Q      I understand it to require ten times the amount?

7      A      Ten times the actual dose.

8      Q      Can you explain why it takes ten times the amount?

9      A      It's just that's what it requires to get the correct

10   amount of ounce-hours to kill a beetle, that specific type of

11   beetle.

12      Q      All right.  So when we're saying ten times, that

13   would be the amount of Vikane that would be used?

14      A      Correct.

15      Q      All right.  And I see Soil.  We have sand, loam,

16   clay, sandy loam, and slab?

17      A      Correct.

18      Q      Can you explain why it's important to know the

19   condition of the soil?

20      A      So what the soil basically -- the best type of soil

21   or the best ground seal -- that is basically your ground

22   seal -- the best thing that you would have is -- would be slab,

23   which is just cement, 'cause nothing's going to leak through

24   the cement if it's flat or not.

25         Then would be clay.  Clay is a mixture of dirt, but it

UNITED STATES DISTRICT COURT

1   gets hard and wet, basically like Play-Doh, so it's a good

2   seal.

3          Then you have other things.  Like sand is one of the

4   worst things 'cause it's porous.  Gas will just leak through

5   that.  This job you would not want to do on sand at all.

6          Q     With respect to the Vikane calculation by the

7   calculator, was that a business phone that you would pick up

8   during the day and then leave at the work at the end of the

9   day?

10         A     Yes.

11         Q     All right.  Tell me about that.

12         A     So it's one -- it's our phones that we use to

13   contact customers to keep in contact with the shop if something

14   -- we needed something or whatnot.  And also it had the app on

15   top of there to do the calculations for this.

16         Q     Okay.  And then there are a number of written-in

17   things here.  Can you walk us through, since this is your

18   profession --

19         A     So basically --

20         Q     -- what you're indicating there?

21         A     -- on the writing-in part where it says Tarp

22   Condition, that's Good, so the tarps were -- in my opinion were

23   good.  They're of good quality.  They're still within -- you

24   know, they're not all filled with holes, they're not tattered

25   and torn.

1          The ground seal was good, meaning that it was flat for

2     the most part; it's not where leaks coming out of the ground.

3          The wind speed, it's 5 miles an hour at the time.

4          The MCF is the actual size or the volume of it.

5          The underseal is clay again.

6          The temperature on the soil at the coldest point was

7     75 degrees.

8          The weather was clear.

9          And then the next line underneath was the dosage.  It's

10    check marked as 10X which is for powderpost beetles.

11         Q     And then I take it --

12         A     Then all the numbers there after that is all what --

13    we put all that other information that I was just talking about

14    into the calculator and it spits these numbers back at us,

15    where the ounces per MCF would be.  So for each cube basically

16    that the number -- the MCF is considered a cubing, so each

17    number is one cube.  So it'd be 70.8 ounces for each cube.

18         Q     All right.  And what would be a cube, sir?

19         A     One cubic foot.

20         Q     All right.  Now, if we just flip through the

21    document here since you've explained it with this, I believe

22    there are maybe -- if we just go to the second page, third

23    page, the fourth page, the fifth page, the sixth page, seventh

24    page, the eighth page, the ninth page, and the tenth page,

25    those all are your fume logs, a representative sample of the

1    work over five years?

2         A    Correct.

3         Q    And this was something that was stressed by Mr. --

4    PK, Brian Morenas, to --

5         A    Correct.

6         Q    And was it also stressed by Mr. Miske to be

7    completed?

8         A    Correct.  Everybody, all managers, they make sure

9    that we get this stuff in on time.

10        Q    All right.  Now, was there -- this -- we can take

11   that down.

12         Was there a movement towards doing what I would say what

13   the fume log is there for by having a digital at a point in

14   time?

15        A    There -- towards the ending of my career there, they

16   were trying to move towards digital.

17        Q    All right.  And was this something that both PK

18   Morenas and Mr. Miske were encouraging and implementing?

19        A    Yeah, they were trying to implement.  I was doing

20   like a -- I started to try to do it, but we still would do the

21   paperwork side of it.  But we were trying to implement and

22   input it onto an iPad.

23        Q    All right.  And was -- were you familiar with an

24   application called Slack?

25        A    Yes.

UNITED STATES DISTRICT COURT

1     Q     And how did that work?

2     A     So Slack was basically a -- basically an information

3  transfer to let all managers know where we're at, what we're

4  doing.  When we do a house, when we're prepping, we're showing

5  the preview of the house, basically if there's any damages,

6  prior to us working so that it can all be documented.

7        Upon completion of covering the house, we take a picture

8  of all areas around the house, make sure that everything is

9  sealed correctly, all our signs are up, everything looks

10  correctly before we -- before we leave, excuse me.

11     Q     And were there -- in terms of photographs and were

12  there also videos that were used?

13     A     Correct.

14     Q     And so this was simultaneous so that managers and

15  others could --

16     A     Correct.

17     Q     -- see it as if they were there?

18     A     Yeah.  Before we leave any job site, we send all

19  that in, make sure that a manager looks over it, they satisfied

20  with everything that's correct before we leave.

21     Q     All right.  Now, with respect to your time, was

22  there -- you said you would often get there at 6:30 or perhaps

23  even earlier.  Was there like a clock-in/clock-out, and how did

24  that work?

25     A     There was a -- like a iPad up in the office that we

UNITED STATES DISTRICT COURT

1    clock in and out on.

2        Q    All right.  And you would -- arrival time and then

3    exit time, right?

4        A    Correct.

5        Q    All right.  Let's talk about pay.

6         Were you paid by the hour?

7        A    Yes.

8        Q    And when you had overtime, were you paid for that?

9        A    Yes.

10       Q    How did you receive your pay?

11       A    By check.

12       Q    All right.  And was that every two weeks?

13       A    Yes.

14       Q    Okay.  And so your work time and your overtime was

15   paid by check, correct?

16       A    Yes.

17       Q    And you never received cash, correct?

18       A    No.

19       Q    All right.  Now, you described a 2-day process with

20   respect to the -- how it works, correct?

21       A    Yes.

22       Q    All right.  I take it that not using chloropicrin

23   wouldn't change that amount of time that it would take to do

24   that 2-day process, correct?

25       A    No.

UNITED STATES DISTRICT COURT

```
 1      Q      And I take it that you had your 7A license and it

 2   was your obligation to follow the label of the law, correct?

 3      A      Correct.

 4      Q      All right.  And you did so for those five years at

 5   Kama'aina Termite & Pest Control?

 6      A      Correct.

 7      Q      Now, you've talked about training folks.  Did you

 8   have a particular crew that you worked with that -- in terms of

 9   training folks that became a close-knit group?

10      A      Uhm, I kind of worked with everybody because I was a

11   shooter; I ran a shoot truck.  But I got close with a couple of

12   guys who I actually trusted.  I don't mind training people as

13   long as you listen.  I just don't like to keep telling you do

14   the same thing over and over and over.

15             MR. KENNEDY:  Understand.

16        If we could pull up Exhibit 9538-001 just for the

17   witness?

18             THE COURT:  This is on the 68th?

19             MR. KENNEDY:  It's on the 68th.  I apologize, Your

20   Honor.

21      Q      (BY MR. KENNEDY:)  Do you recognize what's shown in

22   9538-001?

23      A      Yes.

24      Q      And how is it that you recognize it?

25      A      That's me.
```

1        Q       And what is it related to?

2        A       It's related to setting up the shoot.

3                MR. KENNEDY:  All right.  At this time, Your Honor,

4        I would offer to admit 9538-001.

5                THE COURT:  Any objection?

6                MR. NAMMAR:  No objection.

7                THE COURT:  9538-1 is admitted.  You may publish it.

8                (Exhibit 9538-001 received into evidence.)

9        Q       (BY MR. KENNEDY:)  All right.  Can you describe

10       what's happening in the photo?

11       A       This is my process where I'm setting up -- the tank

12       is already set up.  It's hanging off of a scale.

13              This looks like a slot picture to me showing that I have

14       weighed the tank, whether it be pre-shoot or post-shoot, to let

15       them know how much weight was in there, how much weight is

16       actually gone.

17       Q       All right.  And with respect to this device right

18       here, can you explain how that works to help you get the

19       correct amount of Vikane into a home or a business?

20       A       So when I get the calculation, it tells me how much

21       pounds actually need to go in.  The digital readout is the

22       actual weight of the cylinder itself.

23              When the gas releases, the weight drops.  Once I reach

24       the point of how much weight I need to put in that house, I

25       just turn the wrench back to the left and shut it off.

1       Q     All right.  We can take that down.

2            Now, for larger jobs where, you know -- say, did you work

3    at the Polynesian Cultural Center in the job that was done

4    around 2020?

5       A     Yes.

6       Q     All right.  When I say an RDA, do you recognize

7    that?

8       A     Yes.

9       Q     What is an RDA?

10      A     It is a machine that reads over time how much ounces

11   of the Vikane fumigant are present, how much coverage is

12   actually happened.

13      Q     All right.

14      A     And how much you actually lose over time.

15      Q     Okay.  So I take it it allows you to monitor over

16   time the Vikane gas and its levels?

17      A     Yes.

18           MR. KENNEDY:  All right.  If we can pull up

19   9538-003, just for the witness?  It's in the 68th, Your Honor.

20           THE COURT:  Go ahead.

21      Q     (BY MR. KENNEDY:)  Do you recognize what's shown in

22   9538-003?

23      A     Yes.

24      Q     What is it, sir?

25      A     It's me setting up the RDA.

```
 1      Q     Okay.  And do you recognize the location?

 2      A     Yes.  That's Polynesian Cultural Center.

 3            MR. KENNEDY:  All right.  At this time I would offer

 4   9538-003.

 5            THE COURT:  Any objection?

 6            MR. NAMMAR:  No objection.

 7            THE COURT:  9538-3 is admitted.  You may publish.

 8            (Exhibit 9538-003 received into evidence.)

 9      Q     (BY MR. KENNEDY:)  So I take it that this is the RDA

10   unit, sir?

11      A     Correct.

12      Q     And how do you -- how do you operate it?

13      A     Basically we plug it in.  It's connected through

14   internet.  Those orange hoses that are on the ground, we run

15   them to various areas of the structure that's being fumigated

16   where it takes samples of air to see how much saturation there

17   is in the air basically.  And there's a fifth line that we run

18   out of the structure away from it to open air so it can read

19   the difference in actual clean air to what is the actual

20   reading on the inside.

21      Q     And so you mentioned that it was connected to the

22   internet?

23      A     Yes.

24      Q     And so are there devices remotely that on the

25   communication channels folks can also monitor that?
```

UNITED STATES DISTRICT COURT

```
 1        A      Correct.

 2        Q      And so managers and other folks can be seeing what

 3   you're seeing at site while it's happening remotely, correct?

 4        A      Yeah.  That's -- they watch it overnight to make

 5   sure it collected enough ounce-hours to get the correct

 6   coverage to kill.

 7        Q      All right.  Now we can take that down now.

 8         In the five years that -- or so you worked at Kama'aina

 9   Termite & Pest Control, was there ever a time where you didn't

10   have enough Vikane?

11        A      There was times when our delivery was short or

12   whatever, where I'd have to call in, or because my truck can

13   only carry so much cylinders.  If I'm shooting for multiple

14   crews, I may need to go back out and go get some more gas or

15   I'd have to call back the shop, Hey, I need X amount more gas;

16   can you call in an order?

17         And then I would go to the -- so what is it called

18   now? -- Veseris or Douglas Products, their warehouse, and drop

19   off one of our empty cylinders and sign for a new one.

20        Q      All right.  And then with respect to chloropicrin,

21   you said on every job that you did that you used it, correct?

22        A      Correct.

23        Q      Was there ever a time where you didn't have enough

24   chloropicrin?

25        A      No.
```

1        Q       So every time during those five years you had

2   chloropicrin?

3        A       Always.

4        Q       To follow the label as the law, correct?

5        A       Always.

6        Q       Now, while you worked at Kama'aina Termite & Pest

7   Control, were they known for taking on really difficult jobs?

8        A       They took on all jobs.

9        Q       Took on all jobs?

10       A       We had -- we had a good crew when we were there.

11  Everybody was highly experienced and motivated.

12       Q       And so with respect to those five years, I take it

13  you're still in the industry, correct?

14       A       Yes.

15       Q       And so you look back on those years with a good crew

16  and a good company that took on all jobs, correct?

17       A       Oh, yeah.

18               MR. KENNEDY:  Nothing further.  Thank you.

19               THE COURT:  Mr. Nammar, cross-examination?

20                           CROSS-EXAMINATION

21  BY MR. NAMMAR:

22       Q       Good morning, Mr. Perry.

23       A       Morning.

24               MR. NAMMAR:  If we can publish, Your Honor, 9538-003

25  from the 38th list?

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  Yes.  Go ahead.

 2                    MR. NAMMAR:  Excuse me, 68th list.

 3           Q     (BY MR. NAMMAR:)  Mr. Perry, you were just shown

 4      this photo.  You identified yourself in this photo, correct?

 5           A     Correct.

 6           Q     And you said the device in the bottom left was an

 7      RDA?

 8           A     Yes.

 9           Q     Now, you only use these RDAs on commercial jobs,

10      right?

11           A     No.

12           Q     You would use them on every single-family home you

13      did?

14           A     Not every single-family home, but there was some

15      jobs, depending on the size of it, or if a customer asked for

16      it.

17           Q     Okay.  But the majority of single-family -- majority

18      of the jobs you did were single-family homes, right?

19           A     Yeah.

20           Q     And on the majority of the jobs you did not use

21      RDAs, right?

22           A     No.

23           Q     And as far as you knew, did they have to rent these

24      devices if they needed them?

25           A     No.
```

UNITED STATES DISTRICT COURT

```
 1        Q      How many of these devices at Kama'aina Termite &
 2   Pest Control?
 3        A      I remember seeing at least two of them.
 4        Q      Two of them.  And on -- if there was a shiny
 5   brochure that was given out to customers that represented that
 6   a RDA would be used on every single-family home, that would not
 7   be accurate, correct?
 8        A      I've never seen that brochure, but, yeah, no.
 9        Q      Because he didn't use one of these on every
10   single-family home?
11        A      No.
12        Q      In fact, not on the majority of them, right?
13        A      No.
14        Q      Now, you mentioned chloropicrin.  When that is put
15   into a house, that can sometimes attach itself to things,
16   right?
17        A      To soft spaces if it's real crowded, yeah.
18        Q      Okay.  So like furniture, for example?
19        A      Yeah, if there's not good ventilation in the house,
20   yes.
21        Q      And sometimes can linger, right?
22        A      Sometimes.
23        Q      And so if a company -- I'm not saying you did
24   this -- but if somebody at a company wanted to give the house
25   back quicker to the customer after uncovering, one way to do
```

```
 1    that would be to not use chloropicrin, correct?

 2         A     I guess you could, but I wouldn't -- why would you

 3    do that?  It's not -- you're not following what you're supposed

 4    to do.

 5         Q     And it's not safe --

 6         A     It's not on the company; it's on the applicator

 7    himself.  The company would have nothing to do with that.  The

 8    company has nothing to do with your license.

 9         Q     Well, it's not safe to do, right?

10         A     No, it's not, 'cause then there's no way to tell

11    that there's gas in the house.

12         Q     Right.  And you told us that chloropicrin can

13    sometimes linger when houses are crowded, right?

14         A     They can.

15         Q     They can attach itself to furniture?

16         A     If you over -- if you overdo it, yes.

17         Q     They can attach itself to curtains, things like

18    that, right?

19         A     Yes.

20         Q     And so not saying you did it, but if another

21    certified applicator wanted to give a house back quicker to the

22    customer, one way to do that would be not use chloropicrin?

23         A     I guess.

24         Q     Now, just so we're clear on time frame, you worked

25    there from around 2015 to 2020; is that right?
```

```
 1        A      Yes.

 2        Q      And you mention that Mr. Miske was concerned with

 3   compliance, right?

 4        A      Yes.

 5        Q      Now, when you were working there, did you know that

 6   Mr. Miske was under investigation by the EPA?

 7        A      No.

 8        Q      Did you know he was under investigation by the FBI?

 9        A      Nope.

10        Q      You talked about Slack, the use of Slack to send

11   pictures.  Do you remember that?

12        A      Yes.

13        Q      That only came at the very end, correct?

14        A      Towards the end, correctly, yes.

15        Q      And you also mention these trainings with Wes Otani,

16   right?

17        A      Uh-huh.

18        Q      Those were required trainings, right?

19        A      Yeah.

20        Q      To keep your license, you had to do those trainings?

21        A      To keep my license, I'd have to do certain

22   trainings.

23        Q      And one of the ways that you fulfilled that was

24   these trainings with Wes Otani?

25        A      Yeah.
```

```
 1       Q     So it wasn't like they were optional; you needed to

 2  do a training like that to keep your license, right?

 3       A     Yeah.

 4       Q     Now, you said you worked at Terminix, correct?

 5       A     Yes.

 6       Q     And now you're with Pest Group, right?

 7       A     Yes.

 8       Q     So having worked at three different companies,

 9  you -- you can see how maybe one company was a little bit

10  different than the other company, right?

11       A     Not necessarily.

12       Q     Okay.  Well, one way that Kama'aina Termite & Pest

13  Control differed from Pest Group and Terminix was that at

14  Terminix and Pest Group each crew leader as the driver has a

15  CDL, right?

16       A     Yes.

17       Q     Okay.  But at Kama'aina Termite & Pest Control, each

18  crew did not have a CDL attached to it?

19       A     Correct.

20       Q     'Cause there was a shortage of CDLs, right?

21       A     Not necessarily a shortage of CDLs, is they weren't

22  carrying gas.

23       Q     Well, one way that your job was different at

24  Kama'aina Termite & Pest Control is you spent a lot of time

25  running around shooting gas because there weren't enough CDLs,
```

1    right?

2         A     Yes.

3         Q     And as far as you could remember, you were a

4    licensed CDL and so was Shane Martin, correct?

5         A     Yes.

6         Q     You had four or five crews but only two CDLs, right?

7         A     Yeah.

8         Q     Now, Delia Fabro-Miske, she didn't have a CDL,

9    correct?

10        A     Not that I know of.

11        Q     And she wasn't driving a truck, to your knowledge,

12   right?

13        A     Not that I know of.

14        Q     And when you would see her, she would be in the

15   office, correct?

16        A     Yeah.

17        Q     You wouldn't see her shooting gas, right?

18        A     She came out maybe a handful of times to learn how

19   to do it when she was trying to get her licensing.

20        Q     But other than that, after that you wouldn't see her

21   shooting gas?

22        A     No.

23        Q     And would -- would you be surprised to learn that

24   she claimed to the Department of Ag that she told them she did

25   over 300 jobs in the year 2019?

UNITED STATES DISTRICT COURT

```
 1      A      I don't know.

 2      Q      Would that surprise you?

 3      A      Yeah, I guess.

 4      Q      Now, you were asked about your supervisory chain.

 5  Do you recall that?

 6      A      What was that?

 7      Q      You were asked about your supervisor.  Do you recall

 8  that?

 9      A      Okay.

10      Q      Brian was your -- PK Marinas was your supervisor?

11      A      Yes.

12      Q      And he reported to someone above him, right?

13      A      As far as I know.

14      Q      At some times he reported to somebody named Matt

15  Fabry.  You recall that?

16      A      I don't know exactly who he reported to.  That's

17  above my side of the chain of command.

18      Q      Okay.  So but Matt Fabry --

19      A      He was there, yeah.

20      Q      -- he was one of the managers, right?  He was a

21  manager, right?

22      A      Yes.

23      Q      And at some point he just left without a lot of

24  notice, right?

25      A      I don't know the specifics of that.
```

UNITED STATES DISTRICT COURT

1      Q      But --

2      A      He did -- last I heard, he left and he had another

3    opportunity in the mainland or something.

4      Q      He got another job on the mainland?

5      A      Yeah.

6      Q      And same goes for Michael Worden; he left too for

7    the mainland, right?

8      A      Yeah.

9      Q      He moved to Texas, correct?

10     A      I am not sure.

11     Q      Okay.  But you knew he went to the mainland?

12     A      Yes.

13     Q      And after he went to the mainland, he was not

14   supervising, as far as your knowledge, the work going on?

15     A      Not that I know of.

16     Q      Not that you're aware of?

17       And you said you started in 2015.  Have you ever heard of

18   somebody by the name of Harry Kansaki?

19     A      I heard the name before, but I'm not sure who that

20   is.

21     Q      Okay.  He certainly wasn't supervising your work

22   when you started in 2015?

23     A      No.

24     Q      You talked a little bit about fumigation logs.  You

25   kept those on the jobs that you personally worked on, right?

UNITED STATES DISTRICT COURT

 1      A      Yes.

 2      Q      And your practice was to fill those out by hand on

 3  your job?

 4      A      Yes.

 5      Q      You would do that in your handwriting?

 6      A      Yes.

 7      Q      Now, at one point the company tried to switch to

 8  doing that electronically as well as paper logs, right?

 9      A      Yes.

10      Q      But that practice didn't really catch on, did it?

11      A      No.

12      Q      And you stopped -- you stopped doing electronically

13  'cause it was too time consuming; is that right?

14      A      Part of it, and I was having a hard time with -- I'm

15  not tech savvy.

16      Q      And so you continued to just do it the paper way,

17  right?

18      A      The required way.

19      Q      The end of the day you would turn them into the

20  office; is that right?

21      A      Yes.

22             MR. NAMMAR:  Your Honor, can we publish 9528-19 from

23  the 59th supp?  It's a defense exhibit.

24             THE COURT:  Go ahead.

25      Q      (BY MR. NAMMAR:)  If we could zoom in on the top

UNITED STATES DISTRICT COURT

1    right here.  Include this part, yep.  Great.

2         Mr. Perry, the font is small, but do you see your name on

3    the top left corner here?

4         A    Yep.

5         Q    And do you see your applicator number to the right

6    of that?

7         A    Yeah.

8         Q    That's your license number, right?

9         A    My license number is different now.  I'm not sure

10   what it was.  That changes with every company that you work at.

11        Q    Okay.  And do you see that this is reporting for the

12   year 2019?

13        A    Okay.

14        Q    And it's entitled Estimated Annual Restricted Use

15   Pesticide Recording?

16        A    Uh-huh.

17        Q    Do you know how this was prepared?

18        A    I'm guessing through the fume logs and somebody in

19   the office has to fill that out.

20        Q    Okay.  You didn't personally prepare this?

21        A    No.

22        Q    But do you understand this to be capturing your jobs

23   for the year 2019?

24        A    Yes.

25        Q    Do you recall how in 2019 the law changed that you

1    had to start reporting all the jobs that you did?

2          A     I didn't know.

3          Q     Okay.  If we can go to page 15 of this exhibit, I

4    want to focus on some jobs on a certain date, November 14th,

5    2019.

6          You think you were still working at Kama'aina Termite &

7    Pest Control on November of 2019?

8          A     Yeah.

9          Q     Okay.  If we can start with on the right-hand side,

10   Ms. Sherman, it's about halfway up, I want to focus on Kahena

11   Street, 980 Kahena Street which is right here, and go to here.

12         So, Mr. Perry, you see that this log lists a job on 980

13   Kahena Street?  Do you see that?

14         A     Uh-huh.

15         Q     And then it lists a date of November 14th, 2019?

16         A     Uh-huh.

17               MR. NAMMAR:  And if we can now go to, Your Honor --

18   show the witness only 9-1351 from 38th supp, the government's

19   list?

20               THE COURT:  Go ahead.

21         Q     (BY MR. NAMMAR:)  Mr. Perry, do you recognize this

22   as a fume log you did?

23         A     Yes.

24         Q     So it's got your name here at the top right?

25         A     Yep.

1      Q      And it's for the same job, 980 Kahena Street that we

2  were just looking at?

3      A      Yeah.

4              MR. NAMMAR:  Your Honor, I move to admit 9-1351.

5              THE COURT:  Any objection?

6              MR. KENNEDY:  No objection.

7              THE COURT:  That exhibit is admitted then and you

8  may publish 9-1351.

9              (Exhibit 9-1351 received into evidence.)

10     Q      (BY MR. NAMMAR:)  Mr. Perry, the jury can see it.

11 Is this another example of a fume log that you would have

12 created?

13     A      Yes.

14     Q      In your handwriting, right?

15     A      Yes.

16     Q      And your practice you said you would fill these out

17 after you did every single job, right?

18     A      Yep.

19     Q      And it's for 980 Kahena Street which is what we just

20 looked at the annual log which was submitted to the Department

21 of Agriculture, correct?

22     A      Yes.

23             MR. NAMMAR:  Okay.  If we can go back now, Your

24 Honor, to 9528-19.

25             THE COURT:  Yes.  Go ahead.

UNITED STATES DISTRICT COURT

1    Q    (BY MR. NAMMAR:)  And if we can zoom in on Kumukoa

2    Drive which is right here.

3        Mr. Perry, do you see that now we have highlighted a job

4    on 3554 Kumukoa Drive?

5    A    Uh-huh.

6    Q    Or Kumukoa Street?

7    A    Uh-huh.

8    Q    And it has that same date on the left-hand side --

9    A    Uh-huh.

10   Q    -- 11-14-2019.  Do you see that?

11   A    Yep.

12        MR. NAMMAR:  Your Honor, if we can show the witness

13   only 9-1352 from the 38th supplemental list?

14        THE COURT:  Yes.  Go ahead.

15   Q    (BY MR. NAMMAR:)  Do you see, Mr. Perry, that this

16   exhibit is for the same address?

17   A    Yes.

18   Q    And it's tough to read, but it appears to be the

19   same date, 11-14-2019?

20   A    Uh-huh.

21   Q    It's entitled Structural Fume Log.  Do you see that?

22   A    Yes.

23        MR. NAMMAR:  Your Honor, I move to admit 9-1352.

24        THE COURT:  Any objection?

25        MR. KENNEDY:  No objection.


UNITED STATES DISTRICT COURT

```
 1                THE COURT:  9-1352 is admitted.  You may publish it.

 2                (Exhibit 9-1352 received into evidence.)

 3        Q     (BY MR. NAMMAR:)  Okay.  The jury can see it now.

 4         This is for the same address that we just looked at,

 5    right, 3554 Kumukoa Street?

 6        A     Yes.

 7        Q     This is not your handwriting, right?

 8        A     No.

 9        Q     And your practice, you would not have left the

10    certified applicator blank, would you?

11        A     No.

12        Q     Okay.  So if we go to the second page of this, it

13    lists somebody by the name of Marshall.  Who's that?

14        A     One of the other workers.

15        Q     He's a laborer, right?

16        A     Yeah.

17        Q     He's not certified, is he?

18        A     No.

19        Q     So if this was listed -- so this is listed

20    this -- if we go back to the first page -- so this job is

21    listed under you as the certified applicator on the annual log,

22    but the fume log was not filled out by you?

23        A     But the other fume log was filled out by me.

24        Q     The one we looked at before, right?

25        A     Yeah.  That's the correct fume.  Just because the
```

UNITED STATES DISTRICT COURT

 1   fume log is there doesn't mean that's the one that was actually

 2   used.  It could have been somebody, he was there, he did the

 3   cover on the house or whatever it was, and I came out there

 4   with the shoot truck later and shot it.

 5        Q    But your practice was to fill these out as you went,

 6   correct?

 7        A    Yeah.  The person that is notated on top of there as

 8   a -- he was a laborer, but he was also a skilled laborer; he

 9   knew what he was doing.  He just wasn't certified to apply or

10   to carry gas.

11        Q    Okay.

12        A    So he may have just done this and sent me this, and

13   I already had another fume log, 'cause you do have the correct

14   fume log on the other side that I did fill out.

15        Q    Right.  But --

16        A    This fume log means nothing.

17        Q    That was for a different job, right?

18        A    It has the same address, correct?

19        Q    It has a different address, the one we just looked

20   at.

21        A    Oh.

22        Q    So this is for 3554 Kumukoa Street, right?

23        A    Yes.

24        Q    And there's no certified applicator filled out,

25   right?

UNITED STATES DISTRICT COURT

1      A      No.

2      Q      On the log we looked at, it was under your name,

3   right?  The annual log we looked at had it listed under you,

4   correct?

5      A      Yes.

6             MR. NAMMAR:  Okay.  If we can now go back to

7   9528-19, Your Honor?

8             THE COURT:  Yep.

9             MR. NAMMAR:  Page 15?

10      Q      (BY MR. NAMMAR:)  And if we can zoom in on Waimakua

11   Drive.  Perfect.

12         Do you see also on this annual log there's a job listed

13   at 95-259 Waimakua Drive?

14      A      Yes.

15      Q      And it has the same date, 11-14-2019.  Do you see

16   that?

17      A      Uh-huh.

18             MR. NAMMAR:  Can we show the witness only now 9-1353

19   from the 38th list, Your Honor?

20             THE COURT:  Yes.

21      Q      (BY MR. NAMMAR:)  Mr. Perry, do you see this as the

22   fume log for the same exact address?

23      A      Yes.

24      Q      And it lists the same exact date?

25      A      Yes.

 1               MR. NAMMAR:  Your Honor, I move to admit 9-1353.

 2               THE COURT:  Any objection?

 3               MR. KENNEDY:  No objection.

 4               THE COURT:  9-1353 then is admitted without

 5    objection.  You may publish.

 6               (Exhibit 9-1353 received into evidence.)

 7          Q    (BY MR. NAMMAR:)  Okay.  So, Mr. Perry, the jury can

 8    see it now.  We just looked at the annual fume log where you

 9    were listed as the certified applicator with the Department of

10    Ag.  You see that?

11          A    Yes.

12          Q    Now we're looking at the structural fume log for the

13    same address, right?

14          A    Yes.

15          Q    Same date, right?

16          A    Yes.

17          Q    And it's got the name Marshall.  Do you see that?

18          A    Yep.

19          Q    And the certified applicator is blank.  Do you see

20    that?

21          A    Yes.

22          Q    And if we zoom out, the chloropicrin amount is

23    blank.  Do you see that?

24          A    Yes.

25          Q    You wouldn't do that, right?

UNITED STATES DISTRICT COURT

 1      A      No.

 2      Q      Your standard practice was to always fill that in,

 3  correct?

 4      A      Correct.

 5      Q      And you would also fill that in at the same time

 6  that you filled in the amount of Vikane, correct?

 7      A      Yes.

 8      Q      Okay.  And this isn't your handwriting, correct?

 9      A      Nope.

10      Q      Now, you were asked about -- we can take that down.

11       You were asked about chloropicrin, correct?

12      A      Yes.

13      Q      And from what you saw, there was never a large

14  stockpile of chloropicrin sitting around the office, right?

15      A      No.

16      Q      To your knowledge, there was not enough storage for

17  a large stockpile at the office, correct?

18      A      Yes.

19      Q      And when you saw chloropicrin stored, it was stored

20  in the chemical closet on the bottom floor, correct?

21      A      Correct.

22      Q      And that closet wasn't very large, right?

23      A      No.

24      Q      Now, your testimony that you testified to is about

25  what you personally did on your jobs, right?

```
 1          A     Correct.

 2          Q     And on that note, Kama'aina Termite & Pest Control

 3  had multiple fumigation crews, right?

 4          A     Yes.

 5          Q     And for the jobs on the other crews that you weren't

 6  working on, you don't know what was going on on those jobs,

 7  right?

 8          A     No.

 9          Q     'Cause you weren't on those jobs, right?

10          A     No.

11                MR. NAMMAR:  Nothing further.

12                THE COURT:  Mr. Kennedy?

13                          REDIRECT EXAMINATION

14  BY MR. KENNEDY:

15          Q     You were asked some questions by counsel about

16  chloropicrin.  I'll follow up with that.

17          A     Uh-huh.

18          Q     I believe you said that in the five years you were

19  doing it, you always used chloropicrin, correct?

20          A     Correct.

21          Q     You were the person that when other crews did not

22  have a full crew, you worked on the shoot truck, correct?

23          A     Correct.

24          Q     And that would be -- the number of houses would

25  increase and you would always use chloropicrin, correct?
```

1        A      Correct.

2        Q      And you said that in that 5-year period, there was

3   never a time where you didn't have it so that you couldn't use

4   it, right?

5        A      Correct.

6        Q      And you said, "It's my license," correct?

7        A      Correct.

8        Q      And you said, "Every applicator has that license,"

9   right?

10       A      Correct.

11       Q      And it's not the company's license; it's the

12   applicator's license, correct?

13       A      Correct.

14       Q      And so with respect to the fume logs, you were shown

15   a couple of examples, correct?

16       A      Uh-huh.

17       Q      Those were prepared later in the office, right?

18       A      Yes.

19       Q      And so on those -- some of them looked like a cover

20   crew, correct?

21       A      Correct.

22       Q      And so with respect to your fume logs, you always

23   documented it?

24       A      Yes.

25       Q      And you were always in compliance?

UNITED STATES DISTRICT COURT

```
 1      A      Yes.

 2      Q      All right.  And one of the reasons that Mr. Morenas

 3   and Mr. Miske moved to Slack was that on Slack on the

 4   fumigation channel you could see what other crews were doing,

 5   correct?

 6      A      Correct.

 7             MR. NAMMAR:  Objection.  Speculation.

 8             THE COURT:  Overruled.  Go ahead.

 9      Q      (BY MR. KENNEDY:)  You could see it on Slack,

10   correct?

11      A      Correct.

12      Q      And the managers could see exactly what was

13   happening at numerous locations, correct?

14      A      Correct.

15      Q      And you could as well at that time?

16      A      Correct.

17      Q      And so that was a movement to make certain that the

18   company was moving in the direction for anybody that wasn't

19   following the label is the law, correct?

20      A      Correct.

21      Q      And that was the sole purpose to take photographs so

22   you could document what was done, correct?

23      A      Yes.

24      Q      And take videos, right?

25      A      Yes.
```

1       Q     And the technology was new, right?

2       A     Yes.

3       Q     Okay.  Other companies certainly weren't using it,

4   right?

5       A     No.

6       Q     And there was also walkie-talkies that were in

7   communication with Kama'aina Termite?

8       A     Yes.

9       Q     And so you could communicate between crews, right?

10      A     Yes.

11      Q     That was essential for you when you were the shoot

12  truck, right?

13      A     Correct.

14      Q     So that way you could be in communication with other

15  crews and you could fulfill for the customer that day the jobs,

16  even though other people might be sick or they didn't show up?

17      A     Yes.

18      Q     Now, with respect to HAZMAT, were you aware -- I

19  think you said Shane Martin was also someone who had a CDL and

20  a HAZMAT, correct?

21      A     Yes.

22      Q     And William Joseph had a HAZMAT as well?

23      A     Correct.

24      Q     And Clint Lefcort had a HAZMAT and a CDL?

25      A     Oh, yeah.

UNITED STATES DISTRICT COURT

```
 1        Q      And so you had enough folks for the crews that would
 2   go out on any day who could transport Vikane and chloropicrin,
 3   correct?
 4        A      Yes.
 5        Q      And on days where crews were going out that
 6   couldn't, that's when you used the shoot truck, correct?
 7        A      Yes.
 8        Q      And so you couldn't -- everybody can't show up every
 9   day; you had a backup plan so that you were in compliance with
10   the law, correct?
11        A      Always.
12        Q      All right.  You were asked some questions about
13   Mr. Miske.  He was active on Slack during the time period?
14        A      Yes.
15        Q      He was on those channels monitoring it, correct?
16        A      Yes.
17        Q      He was an active owner in terms of compliance,
18   correct?
19        A      Yes.
20        Q      And it was a fairly large company, right?
21        A      Yes.
22        Q      And so there's a lot of individuals to herd, right?
23        A      Yes.
24        Q      Now, PK Morenas was really good with people, right?
25        A      Yes.
```

UNITED STATES DISTRICT COURT

```
1        Q      He knew how to put people together that worked,

2   right?

3        A      Correct.

4        Q      And to this day, he's still in the industry, right?

5        A      Correct.

6        Q      You were asked about chloropicrin, right?

7        A      Yes.

8        Q      You were asked about its -- the storage on site,

9   correct?

10       A      Yes.

11       Q      There was a storage center in Pearl City, correct?

12       A      Yes.

13       Q      And chloropicrin could be stored there and brought

14  at the times you needed it, right?

15       A      Could be, but I don't -- I don't remember.

16       Q      What you were doing was simply when you needed

17  chloropicrin over those five years, you always got it, right?

18       A      Yes.

19       Q      And there was a storage unit downtown as well?

20       A      I don't know.  I'm not sure.  I don't remember.

21       Q      That was somebody else's job when you needed

22  chloropicrin to get it to you, correct?

23       A      Yes.

24       Q      And that always occurred, correct?

25       A      Yes.
```

UNITED STATES DISTRICT COURT

```
 1        Q      And that was the same with Vikane, right?

 2        A      Yes.

 3        Q      And if you ran out of Vikane, I believe you said

 4    that an order could be put in, correct?

 5        A      Correct.

 6        Q      The order form would allow someone like you who had

 7    a CDL and HAZMAT to pick it up and transport it, correct?

 8        A      Correct.

 9        Q      And Clint Lefcourt, William Joseph, Shane Martin,

10    anyone with a CDL and HAZMAT could do the same, correct?

11        A      Correct.

12        Q      Now, it was -- you mentioned that when you moved

13    from company to company, you -- the license changes, correct?

14        A      Yes.

15        Q      And so when you moved and the license changed, you

16    got a new license, right?

17        A      New license number.

18        Q      The number, uh-huh.

19            And so you mentioned that Kama'aina Termite & Pest

20    Control in terms of their compliance with Slack and

21    walkie-talkies and other things they were doing, they were

22    ahead of the game with respect to fumigation?

23        A      Yeah.

24        Q      They did the really large jobs, right?

25        A      Yep.
```

UNITED STATES DISTRICT COURT

1     Q     They did all the jobs, you said?

2     A     Yep.

3     Q     They took on some of the most difficult jobs, right?

4     A     Yeah.

5     Q     And you were proud to do that there?

6     A     Yeah.

7     Q     And you earned a living?

8     A     What was that?

9     Q     You earned a living?

10    A     Yes, sir.

11    Q     You got a check?

12    A     Yes, sir.

13    Q     You got paid for overtime?

14    A     Yes, sir.

15    Q     And the reason that you moved was when the -- you

16   were asked if you had understood that Mr. Miske was under

17   investigation and you said you didn't, correct?

18    A     Uh-huh.

19    Q     You worked up to the day that the FBI came and other

20   agencies and came to the office and shut the business down?

21    A     Correct.

22    Q     Otherwise, you would have kept working there,

23   wouldn't you?

24    A     Correct.

25          MR. KENNEDY:  Nothing further.


UNITED STATES DISTRICT COURT

```
 1                THE COURT:  Mr. Nammar, anything else?
 2                          RECROSS-EXAMINATION
 3   BY MR. NAMMAR:
 4        Q     Mr. Perry, you were not aware of any large stockpile
 5   of chloropicrin?
 6        A     No.
 7        Q     And you weren't aware of it being stored anywhere
 8   other than Kama'aina Termite & Pest Control?
 9        A     Correct.
10                MR. NAMMAR:  Nothing further.
11                THE COURT:  Mr. Perry, you may step down.  Thank
12   you, sir.
13                THE WITNESS:  Thank you.
14                (This concludes the partial transcript.)
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10                  DATED at Honolulu, Hawaii, June 13, 2024.

11

12

13                        /s/ Debra Read

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```