1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,      ) CR 19-00099 DKW-KJM
4                              )
           Plaintiff,          ) Honolulu, Hawaii
5                              ) June 14, 2024
    vs.                        )
6                              ) JURY TRIAL – DAY 86
MICHAEL J. MISKE, JR., (01)    )
7    aka "Bro,"                ) TESTIMONIES OF TIA NAKANELUA
                               ) AND ALLEN LAU
8            Defendant.        )
_____    )
9

10          PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 86)
               BEFORE THE HONORABLE DERRICK K. WATSON
11             CHIEF UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Government:        MARK A. INCIONG
                                MICHAEL DAVID NAMMAR
14                              AISLINN AFFINITO
                                Assistant United States Attorneys
15                              Office of the United States Attorney
                                PJKK Federal Building
16                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
17
     Also Present:              THOMAS PALMER, FBI Special Agent
18                              KARI SHERMAN, Paralegal

19   For the Defendant (1)      MICHAEL JEROME KENNEDY, ESQ.
     Michael J. Miske, Jr.:     Law Offices of Michael Jerome Kennedy,
20                              PLLC
                                333 Flint Street
21                              Reno, Nevada 89501
                                *Pro Hac Vice*
22
                                LYNN E. PANAGAKOS, ESQ.
23                              841 Bishop Street, Suite 2201
                                Honolulu, Hawaii 96813
24

25

                        UNITED STATES DISTRICT COURT

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant (1)
      Michael J. Miske, Jr.:
 3
      Also Present:            ASHLEY KING, Paralegal
 4                             JOSH BARRY, Technician

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21    Official Court Reporter:  Debra Read, RDR
                                United States District Court
22                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
23                              readit3949@gmail.com

24
      Proceedings recorded by machine shorthand; transcript
25    produced with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

1                          I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3

4   DEFENDANT'S WITNESSES                            PAGE

5

6   **TIA NAKANELUA**
     Direct Examination By Mr. Kennedy              4
7    Cross-Examination By Mr. Inciong               9
     Redirect Examination By Mr. Kennedy           21
8    Recross-Examination By Mr. Inciong            23

9   **ALLEN LAU**
     Direct Examination By Mr. Kennedy             24
10   Cross-Examination By Mr. Nammar               36
     Redirect Examination By Mr. Kennedy           68
11   Recross-Examination By Mr. Nammar             73

12

13                          I N D E X

14                      E X H I B I T S

15

16                                              FOR
                                             EVIDENCE
17   NO.                                        PG.

18   _____

     2-21                                        12
19   9-1356                                       45
     9-1360                                       68
20   9-1366                                       50

21

22

23

24

25

```
 1  FRIDAY, JUNE 14, 2024                          9:46 A.M.

 2           (Testimony of Tia Nakanelua:)

 3           THE COURT:  The next defense witness.

 4           MR. KENNEDY:  Defense would call Tia Nakanelua.

 5       Thank you, Mike.

 6       TIA NAKANELUA, DEFENDANT'S WITNESS, WAS SWORN

 7           THE COURTROOM MANAGER:  Thank you.  You may be

 8  seated.  Please state your full name, spelling your last name

 9  for the record.

10           THE WITNESS:  Tia Nakanelua, N-a-k-a-n-e-l-u-a.

11                     DIRECT EXAMINATION

12  BY MR. KENNEDY:

13       Q    Good morning.  Where do you live?

14       A    I live in Hawaii Kai, 7489 Makaa Street.

15       Q    And what do you do for work?

16       A    I'm a real estate broker.

17       Q    All right.  And is there a property that you would

18  manage there?

19       A    I'm sorry.  I'm having difficulty hearing you.

20       Q    I apologize.  Are you familiar with the property

21  6233 Keokea Place?

22       A    Yes.

23       Q    And how is it that you're familiar with it?

24       A    I'm the property manager.

25           MR. KENNEDY:  All right.  If we could pull up
```

UNITED STATES DISTRICT COURT

 1    Exhibit 2-25 which I believe has been admitted, Your Honor.

 2    Let me check.  I don't think it's in the original.

 3              THE COURT:  It has been.  Go ahead.

 4              MR. KENNEDY:  Oh, thank you.

 5              THE COURT:  It is in the original.

 6              MR. KENNEDY:  Oh, is it?

 7              THE COURT:  Yes.

 8              MR. KENNEDY:  And could we --

 9              THE COURT:  You may publish.

10              MR. KENNEDY:  All right.  Oh, I apologize.

11    Exhibit 2-24, which I don't believe is in the original.  I

12    wrote down the wrong number.

13              THE COURT:  2-24 is in the original.  It also has

14    been admitted and you may publish.

15              MR. KENNEDY:  Thank you.

16         Q    (BY MR. KENNEDY:)  Do you recognize what is shown as

17    Exhibit 2-24?

18         A    Yes.

19         Q    All right.  And then are you familiar with a

20    particular apartment number 101?

21         A    Yes.

22              MR. KENNEDY:  All right.  And if we could go to

23    2-26, which has been admitted and is in the government's

24    original?

25              THE COURT:  Yes.  Go ahead.

UNITED STATES DISTRICT COURT

```
 1       Q      (BY MR. KENNEDY:)  Is this the front door and the
 2  entry way into Apartment 101 --
 3       A      Yes, sir.
 4       Q      All right.  And then if we move in to Exhibit 2-27,
 5  is this a hallway entering into Apartment 101 down to the
 6  bedrooms in that unit?
 7       A      Yes, sir.
 8              MR. KENNEDY:  All right.  And if we move to 2-28?
 9              THE COURT:  Yes.
10       Q      (BY MR. KENNEDY:)  Is this looking into one of the
11  bedrooms there?
12       A      Yes.
13              MR. KENNEDY:  All right.  And if we move to
14  Exhibit 2-29?
15              THE COURT:  Go ahead.
16              (Someone sneezed.)
17       Q      (BY MR. KENNEDY:)  Bless you.
18        Is this a picture of the door that we had just seen in
19  2-28?
20       A      Yes.
21       Q      All right.  I want to ask you some questions about
22  this area here.  Doesn't seem to be working today, in terms of
23  it, but I'll just describe it to you.
24        I see three -- looks like three holes there.  Are you
25  familiar with those doors?
```

UNITED STATES DISTRICT COURT

1      A      Yes, I am.

2      Q      And how is it that you're familiar with them?

3      A      Well, when the owner first bought this complex, it

4    had been renovated previously by the previous owner, and they

5    brought fixtures in from out of the country.  And we had a lot

6    of problems with these doors because the inside of the locking

7    mechanism would malfunction, and we had people trapped inside,

8    couldn't get inside.  Every door, including the front door, had

9    this configuration when you took the lock off and you tried to

10   put a new one on, a normal American doorknob won't fit.

11        So we had to have someone fabricate a plate and then

12   drill holes.  And so almost immediately after they purchased

13   the unit in 2015, we started having these problems with the

14   door knobs.

15        So in the bedrooms, especially, if they had had a

16   problem, we just took it off and left it off rather than having

17   someone be trapped inside while we were fabricating and

18   changing.

19        To this day we still have some of the old door knobs and

20   we're changing them as they fail.

21      Q      So I take it that occasionally they will fail, and

22   when they fail, individuals are locked inside if they happen to

23   be in the bedroom?

24      A      Yes, that would have happened, yeah.

25      Q      And they can't get out?

UNITED STATES DISTRICT COURT

1          A      True.

2          Q      And so this -- at the Apartment 101 was an occasion

3    where the -- that had been the reason why we're seeing it

4    without a handle at that time?

5          A      I don't recall if someone actually got trapped in

6    there or not, but once the doorknob started giving a problem,

7    we removed them.

8          Q      All right.  And you said that the problem for

9    various units persist to this day in other units in the

10   complex?

11         A      Yes.

12         Q      And when they begin to have problems with the

13   old-style doorknob is when you're replacing them in those

14   units?

15         A      Yes.

16         Q      All right.  And I take it this something special has

17   to be done to remedy the -- with the plate and a new door to

18   make it work?

19         A      Yeah, it's not just the plate, but that entire

20   section out to the tongue of the doorknob is empty on the

21   inside, so we have to bundle it and do quite a bit of

22   remediation in order to have it facilitate a regular doorknob.

23         Q      Okay.  Now, in July 2016 and August of 2016, did you

24   have a no dogs could reside in the apartments at that time?

25         A      To my knowledge, I didn't know about a dog in that

    1    unit.

    2         Q    Correct.  I'm asking you if whether, you know, dogs

    3    were allowed to live inside those units at that time?

    4         A    While I don't recall the exact date that we started

    5    allowing dogs, at that time I'm quite sure that there were no

    6    dogs allowed in the building.

    7         Q    All right.  And so if someone had a dog there, they

    8    would not be able to do so when it was discovered, correct?

    9         A    Correct.

   10              MR. KENNEDY:  I have nothing further.  Thank you.

   11              THE COURT:  Cross-examination?

   12              MR. INCIONG:  Thank you, Your Honor.

   13                         CROSS-EXAMINATION

   14    BY MR. INCIONG:

   15         Q    Good morning, Mrs. Nakanelua.  How are you?

   16         A    Good morning.

   17         Q    So this doorknob issue basically started as soon as

   18    the owner had purchased the condominium unit?

   19         A    Soon after, yes.  They purchased it in, if I recall,

   20    July of '15, and we almost -- I'm not sure exactly when, but

   21    almost immediately we started having problems.

   22         Q    And it continues to this day, you said?

   23         A    I'm sorry?

   24         Q    The problem has continued to this day?

   25         A    Yes.

                      UNITED STATES DISTRICT COURT

```
 1        Q      How many units are in this complex?

 2        A      There are eight units.

 3        Q      Okay.  But you -- you are not -- you cannot say

 4    whether the door knobs in Unit Number 101 were giving any

 5    particular problems in July of 2016, can you?

 6        A      No.  I don't know.

 7        Q      That's a no?

 8        A      I'm sorry.  I'm having difficulty hearing you.

 9        Q      Let me speak up.

10          You can't say whether any of the door knobs in Unit

11    Number 101 were having those problems in July of 2016

12    specifically, can you?

13        A      I can't say specifically, but it doesn't surprise me

14    at all because we did take door knobs off almost immediately

15    after.  So even when someone moved in as a new tenant, there

16    have been times when the doorknob was not there when they moved

17    in.

18        Q      Sure.  But you don't recall that specifically as to

19    Unit 101?  You can't say that --

20        A      I do not.

21        Q      Okay.  Now, you were the property manager of the

22    entire complex --

23        A      Yes.

24        Q      -- correct?  So you handled the leases for

25    individual tenants that were renting in that complex?
```

UNITED STATES DISTRICT COURT

1      A      Yes.

2      Q      Do you recall leasing one of those units,

3   specifically 101, to Delia Miske in 2016?

4      A      Yes.

5             MR. INCIONG:  Your Honor, could we show the witness

6   Exhibit 2-21 from our original list, please?

7             THE COURT:  Yes.  Go ahead.

8      Q      (BY MR. INCIONG:)  And could we go specifically to

9   page 7 of that exhibit?

10       Ms. Nakanelua, do you see the document in front of you?

11      A      Yes.

12      Q      Do you recognize that as the lease that's -- you

13   entered into with Delia Fabro-Miske for Unit 101 at 633 Keokea

14   Place?

15      A      Yes.

16      Q      Could you just scroll through and go through the

17   next several pages?  Okay.  We can stop and go back, please.

18   Yeah.

19       So that's the last page.  Do you see your signature or at

20   least your digital signature --

21      A      It's done through Docusign, looks like.

22      Q      Is this a copy of the lease that you entered into

23   with Ms. Miske for that unit?

24      A      Yes.

25             MR. INCIONG:  Your Honor, I would move to admit

UNITED STATES DISTRICT COURT

1    Exhibit 2-22.  There is a 902(11) certification -- I'm sorry --

2    2-21.  There is a 902(11) certification at Exhibit 2-22.

3              THE COURT:  Any objection 2-21?

4              MR. KENNEDY:  No objection.

5              THE COURT:  That exhibit then is admitted and yes,

6    you may publish.

7              MR. INCIONG:  Thank you, Your Honor.

8              (Exhibit 2-21 received into evidence.)

9         Q    (BY MR. INCIONG:)  So, if we can publish now, if we

10   can go back to page 7, which is the first page of the lease.

11        So this is the first page of the lease agreement you

12   entered into with Ms. Miske, correct?

13        A    Yeah.

14        Q    And if we look at paragraph number 2 of that under

15   Tenant, you see where it lists Delia Fabro-Miske?

16        A    Yes.

17        Q    She was the only tenant --

18        A    Yes.

19        Q    -- pursuant to this lease agreement?

20        A    Yes, she was the only person on the lease, yes.

21        Q    If we go up above that to paragraph 1, the date that

22   this was entered into was June 30th of 2016?

23        A    Yes, sir.

24        Q    Does that accurately show the address and the unit

25   number as well, 6233 Keokea, Unit 101?

 1       A     Yes.

 2       Q     Okay.  Then could we go to page 11 which is the last

 3  page of the lease, please.

 4       If we -- under the Tenant Signatures section, is that

 5  where Delia Miske signed the lease and the date on July 19th of

 6  2016.

 7       A     If this is a Docusign document --

 8       Q     Okay.

 9       A     -- yes.

10       Q     Digital signature then?

11       A     Uh-huh.

12       Q     You were accepting those at that time, correct?

13       A     Yeah.

14       Q     Okay.  And then if we can go to the Landlord

15  Signature.  Did you sign that there, the same way with the --

16       A     With Docusign, yes.

17       Q     -- the Docusign?

18       Okay.  Could then we go back to page 9 of this document

19  and show the -- these are the terms, some of the different

20  terms of the lease, correct, Mrs. Nakanelua?

21       A     It's a standard form used by the Realtors.

22       Q     Okay.  Could we focus on paragraph 9.  So this

23  covers pets, correct?

24       A     Yeah.

25       Q     And it says, "Except as otherwise provided by law in

UNITED STATES DISTRICT COURT

1   connection with service animals or other classification of

2   animals, pets are not allowed to occupy or to visit the unit

3   unless landlord gives tenant prior written approval.  If tenant

4   brings pets into the unit without any landlord's prior written

5   approval, landlord may terminate this rental agreement."

6       So that's just one of the standard terms, right?

7   A   Standard.

8   Q   But Ms. Miske had no pets that she asked to bring

9   into the unit, correct?

10  A   No.

11  Q   Did Ms. Miske at any time ask you if she could bring

12  a pet into the unit?

13  A   I don't recall that ever being asked of me.

14  Q   Okay.  Did you -- how much interaction did you have

15  with Ms. Miske during the time she was a tenant?

16  A   I actually had very little interaction with her

17  personally.

18  Q   Okay.  Was there someone else that you had more

19  interaction with concerning payments of the monthly rent, for

20  example?

21  A   Yes.  Usually I spoke with Mike or with Andy.

22  Q   When you say Mike, who are you referring to?

23  A   Mike Miske.

24  Q   Did you know Mike prior to entering into this lease

25  with Delia Miske?

```
 1        A      I knew of him.  Personally we weren't friends.  I

 2   had used the company as a Realtor before and I knew of him.

 3        Q      So you'd used his fumigation services before in the

 4   past?

 5        A      I'm sorry?

 6        Q      You'd used his fumigation services before in the

 7   past?

 8        A      Yes.

 9        Q      And some solar services as well?

10        A      Yes.

11        Q      Okay.  Who was paying the rent for this unit?

12        A      Mike was.

13        Q      By check?

14        A      Yes.

15        Q      Did one of the checks that he paid to you bounce

16   during the time Ms. Miske was living there?

17        A      One time.  I believe it was one time.

18        Q      Did Ms. Miske ever ask you or inform you that there

19   were other people living in that unit?

20        A      I believe there was going to be a caregiver for the

21   child.

22        Q      Okay.

23        A      I don't recall any additional people.

24        Q      Did you become aware that an individual by the name

25   of Johnathan Fraser may have been living there at some point?
```

```
 1       A       I never met him.  I don't know him.

 2       Q       Did you become aware, though, that he may have been

 3   living in --

 4       A       No.

 5       Q       Did you become aware that there had been -- there

 6   was a young couple that was possibly living there?

 7       A       No.

 8       Q       So as far as you knew, it was just Ms. Miske and

 9   possibly a caregiver, correct?

10       A       Yes.

11       Q       The caregiver was --

12       A       And I know that Andy and Mike -- I don't know if

13   they spend -- I don't think they stayed there, but they were

14   there.

15       Q       They visited?

16       A       Yeah.

17       Q       But they weren't living there, correct?

18       A       Not to my knowledge.

19       Q       And if they had been, that would have been in

20   violation of the lease, correct?

21       A       Technically, yes.  I'm pretty loose on that sort of

22   thing.  You know, if someone had family or someone else moving

23   in, you know, we may or may not have amended the lease

24   immediately.

25            But if another couple or there were roommates and that
```

     1    sort of thing, then they would have been added to the lease.

     2         Q    So you would have tried to work with them if someone

     3    else wanted to be added, correct?

     4         A    Right.

     5         Q    But as the way the lease was signed, Delia was the

     6    only --

     7         A    Yes.

     8         Q    -- the only registered tenant, correct?

     9         A    Yes, sir.

    10              MR. INCIONG:  All right.  Your Honor, can we pull up

    11    for the witness only initially Exhibit 2-129A admitted from our

    12    original witness list?

    13              THE COURT:  Where might I find that exhibit,

    14    counsel?  I don't see it on the original.

    15              MR. INCIONG:  Oh, I'm sorry, Your Honor, 14th -- my

    16    mistake -- 14th supplemental list.

    17              THE COURT:  Yes, you may.  It's an admitted exhibit.

    18              MR. INCIONG:  Yes.  If we could just pull it up just

    19    so the witness can see it initially, I have a couple questions

    20    to ask before I publish it?

    21              THE COURT:  Go ahead.

    22         Q    (BY MR. INCIONG:)  Ms. Nakanelua, do you recall

    23    meeting with myself and an FBI agent in my office earlier this

    24    year?

    25         A    Yeah.

                          UNITED STATES DISTRICT COURT

```
 1      Q      Do you recall listening to a recorded phone call?

 2      A      Yeah.

 3      Q      Between Delia and another young lady?

 4      A      Yes.

 5      Q      Do you recall -- and it's hard to say just looking

 6   at this; we might have to have you listen to it -- but do you

 7   recall the nature of the conversation?

 8      A      I do.

 9      Q      So were you ever -- first of all, were you ever

10   asked for permission to have a dog brought into Unit Number

11   101?

12      A      I don't recall being asked that.

13      Q      Once you found out -- so -- well, let me ask this.

14        Did you ever find out if there was a dog that was

15   being --

16      A      No.

17      Q      You never found out there was a dog in that unit?

18      A      No.

19      Q      Did you ever tell Delia that unless the dog was

20   removed, she would be evicted?

21      A      No.

22      Q      Did you ever tell Delia that if other people were

23   living there, unless they left, she would be evicted?

24      A      No.

25             MR. INCIONG:  Your Honor, I would move to publish
```

UNITED STATES DISTRICT COURT

 1    and play Exhibit 2-129A at this time.

 2               THE COURT:  Go ahead.

 3               MR. KENNEDY:  Your Honor, it seems beyond the scope

 4    at this point.

 5               THE COURT:  Overruled.  Go ahead.

 6         (Audio played, not reported.)

 7               MR. INCIONG:  Could we stop for a moment until we

 8    can get the sound rectified?

 9               THE COURT:  Yes.

10               MR. INCIONG:  Can we play from the beginning

11    since --

12         (Audio played, not reported.)

13         Q    (BY MR. INCIONG:)  Did you ever lecture Delia about

14    having a pet in the unit without your knowledge?

15         A    No, I did not.

16         Q    Did you ever threaten her with eviction if -- unless

17    she told this other young lady to move out?

18         A    No.

19         Q    Did you ever threaten to raise her rent until she

20    told this person to move out?

21         A    No.

22         Q    If she had asked if this other person could stay,

23    you would have tried to work something out, right?

24         A    Yes.

25         Q    That was more your style?

                   UNITED STATES DISTRICT COURT

```
 1       A      Yes.

 2       Q      Your style was to try and find a solution rather

 3  than to threaten eviction?

 4       A      Yes.

 5       Q      Delia eventually moved out from Unit 101, right?

 6       A      Yes.

 7       Q      She moved right next door to Unit Number 102?

 8       A      Correct.

 9       Q      She lived there with Andy who you'd mentioned?

10       A      I'm sorry?

11       Q      She was living there with Andy, the Andy that you

12  mentioned?

13       A      I think -- I'm not sure how much time Andy was

14  there, but she was there and stayed over sometimes.

15       Q      And at one point you had to talk to them and say

16  they couldn't stay anymore 'cause they weren't paying rent,

17  correct?

18       A      No, no, that's not why.  We had a plumbing issue

19  that leaked from upstairs.

20       Q      Okay.

21       A      And it was -- it was black water.  I mean, we had a

22  nasty -- and this was right at the beginning of COVID.  And so

23  we had things tested, and we found that they needed remediation

24  in the unit, and so they needed to move out.  They needed to

25  leave the unit for a while while we did remediation.
```

UNITED STATES DISTRICT COURT

1        And then while they were gone is when -- I'm not sure the

2    actual chronology, but they were not in the unit at the time we

3    did remediation and they never actually moved back in fully.

4        Q    There was a period of time they were living there

5    that they were not paying rent, correct?

6        A    Yes.

7        Q    And you allowed that just out of being a nice

8    person?

9        A    Yes, because I felt that it was coming.  And then

10   once Mike was arrested, there just -- you know, we were just in

11   the process of having them take the rest of the stuff out, move

12   their things, and rent wasn't paid during that time.

13            MR. INCIONG:  Okay.  Thank you for the

14   clarification.

15        I have nothing further, Your Honor.

16            THE COURT:  Redirect?

17                         REDIRECT EXAMINATION

18   BY MR. KENNEDY:

19       Q    So the government asked you some questions about

20   checks.  At the time that you had the checks, but they just

21   weren't signed when --

22       A    I'm so sorry, I'm having difficulty hearing you.

23       Q    It's my problem, not yours.  I apologize.

24        At the time that Mike was arrested, you had the checks,

25   but they just weren't signed, correct?

```
 1        A     Yes.

 2        Q     And so when he was arrested, that was during COVID,

 3   right?

 4        A     Right after, right around that time, yeah, I think

 5   it was --

 6        Q     July of 2020?

 7        A     Pardon me?

 8        Q     July of 2020?

 9        A     Yeah.

10        Q     All right.  And so you were in the process of

11   working that out when that occurred, right?

12        A     Yes.

13        Q     All right.  And so back to -- we heard Delia's

14   words, right, on the tape?

15        A     I'm sorry?

16        Q     We heard Delia's words on the tape, right?

17        A     Yes.

18        Q     And at this time you don't recall that you had that

19   conversation, right?

20        A     Correct.

21        Q     And so at the time, were you aware that -- it

22   appears that the other person that was living there had left

23   and was no longer living there at the time she had the

24   conversation?

25              MR. INCIONG:  Objection.  Misstates the evidence.
```

UNITED STATES DISTRICT COURT

1          THE WITNESS:  I --

2          THE COURT:  Overruled.  Go ahead.

3          THE WITNESS:  I didn't know of that other person at

4    all, so I didn't know they were there or if they left 'cause I

5    didn't know them.

6          Q    (BY MR. KENNEDY:)  All right.  And so you have no

7    idea what the relationship was between those two individuals at

8    the time that that tape was made, right?

9          A    Correct.

10          MR. KENNEDY:  Okay.  I have nothing further.

11       Thank you, Your Honor.

12          THE COURT:  Mr. Inciong?

13          MR. INCIONG:  Yes.

14                     RECROSS-EXAMINATION

15   BY MR. INCIONG:

16          Q    Mrs. Nakanelua, did you hear toward the end of that

17   recording where the woman that Delia was talking to said she

18   was going to have to call her dad to try and figure out how to

19   get all her stuff out?  Do you recall that part?

20          A    I don't recall that part.  I'm sorry.

21          Q    Would it help if you heard it again?

22          A    I'm happy to listen again.

23          MR. INCIONG:  Your Honor, could we replay

24   2-29 -- 2-129A?

25          THE COURT:  Yes.  Go ahead.

UNITED STATES DISTRICT COURT

```
 1            (Audio played, not reported.)

 2      Q     (BY MR. INCIONG:)  So did you hear that part where

 3  she said --

 4      A     Yes.

 5      Q     -- "I'll have to call my dad to get my stuff"?

 6      A     Uh-huh.

 7      Q     Did you also hear her when she said, "So when do we

 8  have to be out?"  Did you hear that part at the very end?

 9      A     Yeah.

10      Q     Okay.  You never told Delia that anybody had to be

11  out of that unit, correct?

12      A     No.

13            MR. INCIONG:  Thank you, Your Honor.  No further

14  questions.

15            THE COURT:  Ma'am, you may step down.  Thank you.

16         (Testimony of Tia Nakanelea concluded at 10:16 A.M.)

17          (Testimony of Allen Lau begins at 12:04 P.M.)

18            THE COURT:  The next defense witness, please.

19            MR. KENNEDY:  At this time we would call Allen Lau.

20      ALLEN LAU, DEFENDANT'S WITNESS, WAS SWORN

21            THE COURTROOM MANAGER:  Thank you.  You may be

22  seated.  Please state your full name, spelling your last name

23  for the record.

24            THE WITNESS:  Allen Lau, L-a-u.

25                        DIRECT EXAMINATION
```

UNITED STATES DISTRICT COURT

1    BY MR. KENNEDY:

2        Q    Good afternoon, sir.  What do you presently do for

3    work?

4        A    I'm a pipe fitter mechanic at a shipyard, Pearl

5    Harbor Shipyard, Naval Shipyard.

6        Q    Are you familiar with the company called Kama'aina

7    Plumbing?

8        A    I was hired there as a helper, ended up leaving as a

9    general manager.

10        Q    All right.  So take you a step back, when you were

11    hired as a helper, was that shortly after the business began?

12        A    About six months or so after they started it.

13        Q    All right.  And what would you do as a helper to

14    begin?

15        A    Like the first three years were like an absolute

16    nightmare for me.  I felt like I was going to get fired every

17    day, pretty much, just an apprentice learning the plumbing

18    trade.

19        Q    And who were you working under as a helper?

20        A    Denny.

21        Q    And who is Denny?

22        A    He was a owner of the company, married to my cousin.

23        Q    All right.  And so after you got through those first

24    three years, did your role change?

25        A    Yeah.  I mean, after that, I ended up I think

UNITED STATES DISTRICT COURT

1    becoming a journeyman I think at about five years.  And then

2    after that, I think I was -- it was like just a lot of

3    different -- it's a small company.  It's not like a big union

4    shop.  There was a lot of roles to fill, so I did a bunch of

5    everything.

6           Q     So when you're a journeyman, what would you do?

7           A     I would -- I would -- sometimes I would do -- go on

8    estimates, sometimes I would do site walks for projects,

9    sometimes I would do service work or commercial work.

10          Q     All right.  And so what time period are we involved

11   with here, sir?  What year are we speaking?

12          A     For that period?

13          Q     Yes.

14          A     I mean, so I think if I'm not mistaken, I started

15   shortly after 2006 or '7, yeah.  About five years after that,

16   2011, 2012, I was probably a journeyman and then general

17   manager.  I mean, it wasn't -- it was just like a role that I

18   had to fill.

19          Q     And when did that become a role that you had to

20   fill?

21          A     I'm not -- I'm not a hundred percent sure on the

22   dates, but it was towards the ending portion of it, like maybe

23   '15, maybe, '16, something like that.

24          Q     All right.  And were you doing residential jobs?

25          A     Residential, commercial, we did some federal, some

```
 1    state jobs.

 2        Q    All right.  And so can you describe a typical

 3    residential job and then a typical federal job?

 4        A    So we had some commercial accounts, like with Home

 5    Depot, and with Lowes, American Home Shield.  Home Depot was

 6    mainly like people going and buying a water heater and then

 7    we'd install it.  And then we pretty much -- I think we're the

 8    only plumbing company for Home Depot, I think, so we did -- we

 9    serviced all three stores.

10        And we did pretty -- pretty good for Home Depot.  And it

11    would be just like you go to somebody's house and interact with

12    the customer, see what the issues are.

13        Then, I mean, it kind of varies.  There's -- plumbing

14    covers a pretty broad spectrum of stuff that we did.

15        Q    Describe some of the broadness of what it covered so

16    that the jury gets an idea of what the work was of Kama'aina

17    Plumbing.

18        A    So we did, like, service and repair, which is kind

19    of like the bread and butter of your company.  That's kind of

20    like what you do, like, for like somebody has a leak or

21    somebody has an issue, a plumbing issue, you would go and kind

22    of diagnose it, figure it out, if necessary give them an

23    estimate.

24        We did some commercial work where we'd, like -- I think

25    one, like, we did like the satellite communications building
```

1   for Wheeler.  We did some condominium buildings.  I mean, we

2   pretty much did everything to do with plumbing from water,

3   waste, vents, gas, pretty much the full spectrum of what

4   plumbing entails.

5        Q     All right.  And so did it -- this was a family

6   business?

7        A     Yep.

8        Q     And do you know an individual by the name of Michael

9   Miske?

10       A     Yes.

11       Q     Do you see him in the courtroom?

12       A     He's right there.

13       Q     Can you point out an item of clothing that he's

14   wearing?

15       A     Gray suit.

16             MR. KENNEDY:  Your Honor, can the record reflect

17   that Mr. Lau has identified Mr. Miske?

18             THE COURT:  Yes.  The record should reflect the

19   witness, Mr. Lau's, identification of the defendant, Mr. Miske.

20       Q     (BY MR. KENNEDY:)  If we took, you know, when you're

21   in the general manager time period, what kind of size in terms

22   of volume of business were you doing at Kama'aina Plumbing?

23       A     As much as we could.

24       Q     Okay.  And --

25       A     Yeah.

UNITED STATES DISTRICT COURT

1       Q     -- tell us about that.

2       A     We pretty much ran I would like to say at least

3  12-hour days, 7 days a week, and we did as much work as we

4  could possibly get.

5       Q     All right.  And so tell us what your duties were

6  when you were a general manager.  What did that involve?

7       A     My main job was limiting liability for the company.

8  And you can make a lot -- you can make a lot of money as a

9  contractor, but you can also lose a lot of money if you mess

10  things up.

11      So my -- my main focus, aside from, like, building

12  relationships with contractors or vendors, was basically to

13  limit the liabilities that we were exposed to.

14      Q     When you say limit liabilities, what do you mean?

15      A     Like there were certain work, even though it was

16  covered under plumbing license, we would not do, like because

17  of liabilities.  Like, for instance, fire sprinklers, we

18  wouldn't -- we wouldn't do fire sprinkler jobs because it's

19  like lifetime warranty; something goes wrong, you can -- you

20  can pretty much submarine your whole company on one event that

21  has nothing to do with you.  It could be like a manufacturer

22  defect in the system.

23      And there's certain jobs that were like too big, like too

24  risky to do.  We wouldn't -- I wouldn't go after those jobs, or

25  stuff like that.

UNITED STATES DISTRICT COURT

1       Q     Let me ask you about a specific job in Maui, the

2  Maui Marriott project.  Do you recall that project?

3       A     So, we -- we -- we went out to do an estimate.  We

4  didn't actually -- I don't think we actually got to the part

5  where we were awarded the job.  But we -- we went out, we flew

6  up to do an emergency site visit for one of their boiler rooms

7  and we met with the owners of that Maui Marriott and some of

8  their staff.  It was a pretty -- pretty technical job.  It was

9  on the larger size of the jobs we could handle, I would say.

10      Q     All right.  And with respect to that job, did you

11 end up doing any work on that job?

12      A     We actually got selected -- so when we went to do

13 the job, it was a maintenance guy, like an older maintenance

14 guy was showing us around and basically talking story with us,

15 and it was a couple of contractors with us doing the site walk.

16      And he -- we surveyed the property.  He kind of told the

17 issues that they were having and it was a pretty complex

18 situation.  I believe it was a 500-unit hotel and the work

19 was -- the emergency work had to do with one of their three

20 boilers going down and not providing hot water to pretty much

21 the upper floors of the building.

22      And it -- they wanted to do a swap-out of their boiler

23 without losing service for hot water, like, and it's kind

24 of -- it's kind of sort of like pretty much a impossible

25 solution to -- 'cause if they want -- we want to work on the

1     water, we have to shut it down.

2         And like the guy who was giving the tour that we met

3     there was like just casually asking our ideas and how we would

4     do it, how our company would attack that type of job.

5         Q     And did you give him your ideas?

6         A     Yeah, I came up with a pretty good idea to replace

7     the existing boiler and then to bypass the existing -- the

8     existing second-stage boiler into a battery of basically 10,000

9     gallons of collection tanks that they had on site that they

10    weren't using, the buffer, the system to be able to run both

11    sides off of the boiler.  And that was the only way that I

12    could think to do it because the ultimate pretty much

13    regulation for them was -- or the thing that they wanted most

14    was to not lose service to the building, and that's the only

15    way I could figure to do it.  And I guess it was a pretty

16    unique idea.  It was a pretty good idea, I guess.

17        Q     And so with respect to these difficult problems, was

18    that part of what Kama'aina Plumbing was doing?

19        A     Yeah.  In fact, the person who was giving us a tour

20    wasn't a maintenance worker.  Like, he kind of deceived us, the

21    group, a little bit.  He was the lead engineer for the building

22    for like the past 40 years and --

23        Q     Well, I ask you this because this person was kind of

24    acting like he was a maintenance worker and he was checking you

25    out to see --

UNITED STATES DISTRICT COURT

1      A      Yeah.

2      Q      -- could you come up with unique solutions?

3      A      So the owner of the building trusted that guy

4  because it's basically his plan, it's his hot water plan, it's

5  his mechanical room, and I believe that engineer's the one who

6  helped design it.

7          So he -- he went -- and we found out because when we went

8  up to go do like the official site walk, we were going to meet

9  the owner, and the guy who was just giving us the tour was

10  walking out, and, like, he -- the owner kind of told us the

11  story, but like pretty much We're going to select you guys

12  'cause this is actually a bigger job than just emergency

13  repair.

14          But I guess they liked our pricing and they liked our

15  acumen for plumbing, and they basically wanted us to compete

16  for the -- like to replace all the boilers and the whole

17  mechanical room which is like an even bigger job than the

18  smaller emergency job.

19      Q      So other than about a 6-month time period where you

20  left and then you came back after that, you worked as the

21  general manager there, correct?

22      A      Yeah.

23      Q      And so during that time, let me ask you this:  Were

24  you proud of the work that Kama'aina Plumbing was doing?

25      A      Well, I believe the stuff that we were putting in

UNITED STATES DISTRICT COURT

```
 1   was going to last 50 years.  We weren't the type of company
 2   that was going to make a quick buck off a quick job.  We're not
 3   trying to retire off of one job.  We were in it for the long
 4   term.  And we routinely, even if it wasn't our fault, we
 5   warranty customers out of the warranty period just because,
 6   like, we were the only ones that they trusted to do their
 7   plumbing.
 8        Q     So now Kama'aina Plumbing was also owned by
 9   Mr. Miske, correct?
10        A     Yeah.
11        Q     All right.  And he had a number of businesses,
12   right?
13        A     Yeah.
14        Q     Plumbing was not really his area of expertise,
15   correct?
16        A     Nope.
17        Q     What did you learn about business from Mr. Miske?
18        A     He taught me a lot --
19              MR. NAMMAR:  Objection.  Relevance.
20              THE COURT:  Overruled.  Go ahead.
21              THE WITNESS:  What?
22              THE COURT:  Go ahead.
23              THE WITNESS:  Oh, yeah.  He -- I think he taught me
24   a lot about -- about business, about how to conduct myself as a
25   manager, a lot about loyalty.
```

 1      Like, when -- it's a different story when you're

 2  responsible for everybody's families, and you have to be able

 3  to provide enough work for your guys to pay their bills, and

 4  it's a pretty heavy burden.

 5      And I remember one time when I was looking at some

 6  expenses that we had, I wanted to swap our insurance agent,

 7  and -- because, like, I got some online quotes and these guys

 8  were much cheaper.  And I thought it was a no-brainer decision,

 9  like, to save more money, you have more money you can use to

10  build a business.

11      And one of the first lessons he taught me was about

12  loyalty and about how that insurance agent that I'm trying to

13  fire was with them from the beginning, and that it doesn't

14  matter so much what the price is, but what the value is that

15  they bring to the table.

16      And I thought the cheapest price was the best price,

17  'cause it's just insurance, but I didn't value at the time or

18  know enough to know how important these types of relationships

19  are and how maintaining them is important; similar to how it's

20  important to maintain a good reputation and good rapport with

21  your customers even though they're out of the warranty period,

22  you still show up and you still do the best you can for them.

23      Q     (BY MR. KENNEDY:)  So now how long have you known

24  Mr. Miske?

25      A     He's my cousin.  I know him my whole life.

```
 1        Q     All right.  And in your personal relationship with
 2   Mr. Miske, are the things that have been landmarks in your
 3   personal life that he's been involved with?
 4        A     Yeah.  So for me, he's -- pretty much every major
 5   milestone in my life I think he's been a part of.  He -- like
 6   my senior prom, he let me borrow his Maxima, which was like I
 7   was terrified to drive 'cause it was so nice.
 8          He introduced me to my wife, who I been married coming up
 9   25 years, five daughters and a son, and I would have never met
10   her if it wasn't for him.
11          He let me run a multimillion dollar company.  Like, he
12   gave me -- pretty much trusted me to take -- to safeguard that
13   company for him.  And, like, there's probably a lot more that
14   I'm not thinking of at the moment, but, like, it was a lot of
15   the positive events in my life he was there for.
16        Q     I want to switch gears to something that is not
17   positive at all.
18          You knew Caleb Miske, correct?
19        A     Yeah.
20        Q     And you were aware when he got into an accident,
21   correct?
22        A     Yeah.
23        Q     And were you at the hospital with Caleb from time to
24   time until he died in March of 2016?
25        A     Yeah.
```

UNITED STATES DISTRICT COURT

1    Q    You were around Mr. Miske during that time, were you

2  not?

3    A    Yeah.

4    Q    Who did he blame for the accident?

5    A    He blamed himself.  He -- he blamed himself.

6    Q    And why was that?

7    A    I don't think he thought that Caleb would have been

8  driving that car if he didn't take away his truck.  And I

9  remember him taking away the truck because I guess Caleb, like,

10  wasn't showing up to work and he was -- like a form of

11  discipline, he just took his truck away.

12      But Caleb, being the kid that he was, he ended up buying

13  another car, it was a little CRX, or a small little tin can of

14  a car that Mike would have never let him buy.  And I think he

15  was in that car and he was in that position, and I feel that

16  Mike blames himself.  I mean, he said as much in the hospital

17  when Caleb was still in a coma, and I don't know if he forgave

18  himself to this day.

19           MR. KENNEDY:  I have nothing further.

20           THE COURT:  Mr. Nammar?

21                    CROSS-EXAMINATION

22  BY MR. NAMMAR:

23    Q    Mr. Lau, you were -- you talked some about the

24  plumbing company.  You recall when Mr. Miske was arrested in

25  the summertime, July of 2020?

UNITED STATES DISTRICT COURT

1      A      Yeah.

2      Q      But before then in 2020, you had already parted ways

3  with Kama'aina Plumbing; is that right?

4      A      Before 2020?

5      Q      Before July 2020?

6      A      I mean, I left when I was -- I got an opportunity to

7  work at Pearl Harbor.  That's the only time I left.

8      Q      And -- but I guess what I'm asking is the company

9  was shut down before July 2020; is that right?

10      A      I'm not sure.

11      Q      You're not sure?

12      A      Huh-uh.

13      Q      Could be the case that it was shut down; is that

14  right?

15      A      Well, I mean, when -- I believe when the arrest or

16  they raided the shops, it must have been on a Wednesday,

17  because I believe payroll was supposed to come out on a

18  Friday -- I mean, Friday or a Thursday, and our banks were

19  frozen.  So I don't think -- I don't think it was technically

20  shut down; more so we couldn't receive payments or we couldn't

21  pay any bills out.

22      Q      Was it your testimony that you were working there in

23  July of 2020 before the -- Mr. Miske was arrested?

24      A      Yeah, I was working there.

25      Q      Okay.  So the company was in operation then?

```
 1        A      It was in operation until our bank accounts were

 2   frozen, and I think the status of that is still frozen.

 3   There's a -- nobody cashed their last checks.  Like, we

 4   couldn't accept money from people who owed us money.  We

 5   couldn't pay out vendors, supplier, like we was just in limbo,

 6   and it all -- we were told it was pending an investigation.

 7             MR. NAMMAR:  Your Honor, can we publish 9-210 at

 8   this time, from the original list?

 9             THE COURT:  Go ahead.

10        Q      (BY MR. NAMMAR:)  Can we go to page 50?

11         Mr. Lau, this form is entitled Application for

12   Contractors License.  Do you see that?

13        A      Yep.

14        Q      And it's dated in the top right August 4th, '25.  Do

15   you see that?

16        A      Uh-huh.

17        Q      And it has -- is that around the time when you

18   started working as a helper?

19        A      No, I don't think so.

20        Q      After that?

21        A      In 2006, maybe.

22        Q      Okay.  It has Edward Freitas.  Do you see that

23   listed on this form?

24        A      Yeah, yeah.

25        Q      He is listed as the president and RME, do you see
```

UNITED STATES DISTRICT COURT

1    that?

2         A    Yeah.

3         Q    And that's what you understood Mr. Freitas's role

4    was when you were there, RME, right?

5         A    No.  He -- he was -- he was just my boss.  Like, he

6    hired me and we -- like, he's always in the family.  He's --

7    like if you had a plumbing issue growing up, you would call

8    Uncle Benny to come and fix the plumbing.  He was always --

9         Q    Let me make sure you understand my question.

10        So he was running the show when you worked there, at

11   least from 20- -- when you started till around 2014.

12        A    Yeah, very much so, very much so.

13        Q    He was supervising the work, right?

14        A    Yeah.  He was -- he was the boss.  Like, he

15   taught -- I was his helper.  He taught me how to do plumbing,

16   to do plumbing in the field.  He criticized the way I breathe,

17   like, for the first three years.

18        Q    He was making sure the work was done correctly,

19   right?

20        A    He was doing the work.

21        Q    But --

22        A    He was doing the, like, rough-ins and stuff.  He

23   would be doing the work.

24        Q    Just so we're clear, after 2014 he was gone?

25        A    20- -- what was it?

```
 1       Q       2014 and after he was gone?

 2       A       I'm not a hundred percent sure on that.

 3       Q       At some point he left and he was gone?

 4       A       At some point I think he wanted to do his own thing.

 5       Q       And he was no longer affiliated with Kama'aina

 6  Plumbing from there on out?

 7       A       No.

 8       Q       He was not regularly on job sites?

 9       A       He was -- Benny was always available any time, like,

10  as plumbers and as, like, he was my journeyman.

11       Q       Sure.

12       A       He was always -- like, if I had a issue with

13  anything, he was the first person I'd think to call.  But

14  I -- same thing like with Mike.  If I had a issue with the

15  company or funding, I would go to him.  But I would feel

16  embarrassed if I did have to do that, and I feel like for the

17  most part, like, I don't remember having to seek either of

18  their counsel --

19       Q       Okay.

20       A       -- while I was there.

21       Q       So he parted ways, just so we're clear, with

22  Kama'aina Termite & Pest Control?

23       A       I think he was allowed to do his own business that

24  had plumbing.

25       Q       Okay.
```

UNITED STATES DISTRICT COURT

 1        A     So that's kind of a conflict of interest because

 2   most of our plumbing customers came from Denny.

 3        Q     Okay.  So --

 4        A     So I --

 5        Q     -- he parted ways -- excuse me -- with Kama'aina

 6   Plumbing at a certain point, correct?

 7        A     Yeah.  He was -- he was for the most part, like, not

 8   there every morning, I would say, you know.  But --

 9        Q     He really wasn't there at all, right?  He really

10   wasn't there at all, right?  He was doing his own thing?

11        A     He was doing plumbing, but not -- not for us anymore

12   but --

13        Q     And you were running the show at that point, right?

14        A     I was doing a lot of things at the time.  One of

15   them would be running the show, I guess.

16        Q     And you talked about limiting liability.  I mean,

17   you guys were still -- you knew you were still operating under

18   Denny's RME license, didn't you?

19        A     I was not aware how they set that up.

20        Q     You didn't know that?

21        A     This is the first time I'm seeing the organization

22   of the company.  I've never seen this before.  President/RME or

23   whatever Mike is, I've never seen that organization.

24         Like I say, I wasn't there when they made it, but the

25   same -- the same -- the same way I jumped at being one out of

1    6,000 candidates selected at Pearl Harbor, I jumped at being

2    able to work for Denny.

3        Q    So your testimony is that you didn't know you were

4    running under Denny's license when you were the manager for

5    Kama'aina --

6        A    I wasn't sure how they organized it.

7        Q    You left it up to Mr. Miske?

8        A    It was up and running when I got there, and my job

9    was to make sure it kept running.

10       Q    Okay.  And so when you were there --

11       A    But like, so Denny --

12       Q    There's not a question pending.  There's not a

13   question pending.

14       So when you were there, just so we're clear, you were

15   never on paper as the principal RME with the DCCA, right?

16       A    Not that I know of, no.

17       Q    Okay.  And if we can go to page 52, and if we could

18   zoom in on this language.

19       It says that, "The principal RME will be held equally

20   responsible, along with the licensed entity, for any violation

21   of the contractors license law or any of the board's rules."

22       Do you see that?

23       A    Yep.

24       Q    That wasn't you because you weren't the principal

25   RME, right?

1      A      That's probably why Denny taught me that my job was

2  limiting liability for the company.

3      Q      But you don't know that, right?

4      A      Don't know -- I'm sorry.  What was the question?

5      Q      And just so we're clear, you were never an owner of

6  Kama'aina Plumbing, correct?

7      A      No.

8      Q      Mr. Miske was the owner, right?

9      A      I'm not -- I'm not sure about how they organized the

10  shares or what his percentage was.  I'm not -- I don't know

11  about that, that side of it.

12      Q      Okay.  But after Denny Freitas parted ways, you

13  understood that Mr. Miske was the owner of the Kama'aina

14  Plumbing?

15      A      I wasn't sure about that either.

16      Q      So who was signing all the contracts after Denny

17  Freitas left?

18      A      I'm not sure.

19      Q      Okay.  Let me show you and let's see if we can talk

20  about that.

21      If we could publish, Your Honor, 9-1268 from the 25th

22  supp?

23              THE COURT:  Go ahead.

24      Q      (BY MR. NAMMAR:)  Mr. Lau, do you recognize the

25  Atlas Construction at the top?

UNITED STATES DISTRICT COURT

1    A    Yeah.

2    Q    Were they one of your big customers?

3    A    Yeah.

4    Q    And did you see some subcontract agreements that

5  looked similar to this one?

6    A    Yeah.  I mean, it looks like a standard

7  subcontracting agreement.

8    Q    Were a number of these executed with Atlas

9  Construction?

10    A    Uh-huh.  I would assume so, yeah.

11    Q    Okay.  If we go to page 3, that's not your signature

12  under Kama'aina Plumbing, is it?

13    A    No.

14    Q    Do you know who signed that?

15    A    I believe my wife signed that.

16    Q    Did she work there?

17    A    She was volunteering there.

18    Q    Okay.

19    A    She -- I don't think she got paid.

20    Q    It certainly wasn't Denny Freitas's signature?

21    A    Huh-uh.

22        MR. NAMMAR:  Okay.  And if we can show the witness

23  now only, Your Honor, 9-1356 from the 25th supp -- excuse me --

24  from the 39th supp that was filed last night?  9-1356?

25        THE COURT:  Yes.  Go ahead.


UNITED STATES DISTRICT COURT

1      Q      (BY MR. NAMMAR:)  Mr. Lau, do you recognize the 4005

2  Black Point residence?

3      A      Yeah.

4      Q      Is that a big job that you guys had?

5      A      That was a super high-end builder, and I

6  remember -- not sure how they got in touch with us -- but I

7  remember taking the contractor and the architect to Mike's

8  Portlock residence to convince them of the quality of work that

9  we did.

10     Q      Okay.  And this was one of the jobs that you

11 personally worked on, I take it?

12     A      Yeah.

13     Q      And this was one of the jobs that Kama'aina Plumbing

14 obtained, correct?

15     A      Yeah.

16     Q      And if we can just scroll through this.

17        Does this look like a subcontract agreement that was

18 executed in furtherance of this?

19     A      Yep.

20            MR. NAMMAR:  Your Honor, I move to admit 9-1356.

21            THE COURT:  Any objection?

22            MR. KENNEDY:  No objection.

23            THE COURT:  That exhibit is admitted then without

24 objection.  9-1356 may be published.

25            (Exhibit 9-1356 received into evidence.)


                      UNITED STATES DISTRICT COURT

1    Q    (BY MR. NAMMAR:)  Okay.  Mr. Lau, the jury can see

2  it.  CRX Hawaii the company that hired you?

3    A    Yeah.

4    Q    And then you were the sub on this job; is that

5  right?

6    A    Yeah.

7    Q    And Black Point is in the Diamond Head area of Oahu?

8    A    Yeah.

9    Q    And if we go to the last page, if we can zoom in

10  here, so it has got Mr. Freitas's name, but it's dated in May

11  of 2017.  Do you see that?

12    A    Yeah.

13    Q    He's long gone at this point, right?

14    A    I -- I'm not sure if he was on the site walk for

15  this job or not.  But like I just said, my wife was working

16  there, but she wasn't getting paid.

17        Denny would routinely call me if there was an issue where

18  I had more expertise than him.  I would assume that for this

19  job he was at one of the site walks, either at Mike's house

20  or -- because like you got to understand how high-end this

21  customer was, and it mirrored, like, Portlock residence which

22  is kind of like one of a kind.  There's no comps in the area

23  that's like it.

24        And I think what won us the job was we worked through

25  some of the same issues that they were trying to figure out,

UNITED STATES DISTRICT COURT

 1   and I believe it was like the hose bibs and the stainless steel

 2   wire they were using.

 3           THE COURT:  Do you remember what the question was?

 4           THE WITNESS:  Yeah.  What was that?

 5           THE COURT:  You understand what the question was?

 6           THE WITNESS:  I think so.

 7           THE COURT:  I don't think so.

 8           THE WITNESS:  Oh, I'm sorry.

 9           THE COURT:  The question was, "Mr. Freitas was long

10   gone by this date" --

11           THE WITNESS:  No.

12           THE COURT:  -- "you were looking at?"  That was the

13   question.

14           THE WITNESS:  Long gone, I don't know about long

15   gone.  He's my uncle.  Like, I can call him any time I needed

16   him.

17       Q     (BY MR. NAMMAR:)  All right.  He was long gone from

18   Kama'aina Plumbing at this time, right?

19       A     He worked on Mike's house, that was after the date

20   he was long gone.  I've worked with him --

21       Q     He wasn't an owner anymore at Kama'aina Plumbing,

22   was he?

23       A     I don't know if he was an owner.  I'm not sure how

24   they arranged the ownership for the company.  I'm not -- I

25   wasn't there for that part of it.

1       Q       You took --

2       A       I know he's my uncle and he's my cousin.

3       Q       You took his place as basically managing the

4    operations, right?

5       A       I filled multiple holes that was created in his

6    absence, but I -- I don't know if I was able to fill his shoes

7    or to take his place at all.

8       Q       Whose signature is that on this contract?

9       A       It looks like my signature, but --

10      Q       So you're signing for Mr. Freitas?

11      A       I'm not signing for Mr. Freitas.  If -- I'm --

12              MR. NAMMAR:  Can we show the witness now 9-1366 from

13   the 39th supp?

14              THE COURT:  You may.  But before we do that, how

15   much longer?

16              MR. NAMMAR:  I have a little bit, Your Honor, if we

17   can -- probably good time to take a break.

18              THE COURT:  All right.  We're getting a little bit

19   late in the trial day is the reason I asked.  So we're at

20   12:40; we only got 15 more minutes.  Let's go ahead and take a

21   short second break in the trial day.

22          As we go to break, I'll remind our jurors to refrain,

23   please, from discussing the substance of the case with anyone,

24   including each other, to refrain from accessing any media or

25   other accounts of this case that may be out there.  Finally,

UNITED STATES DISTRICT COURT

1    please do not conduct your own investigation relating to this

2    case.

3           If the lawyers would please remain just for a minute.

4                (Open court without the jury:)

5                THE COURT:  All right.  You may be seated.  The jury

6    has left.

7           Mr. Lau, you may step down, if you wish.

8           With regard to the witness, Ms. Clegg, who we addressed

9    briefly before -- during the last break, I have had now a

10   chance to take a look at Government Exhibits 1-1128 through

11   1-1131.  I also have taken a look at 608 and of course 403, do

12   not see any reason to restrict the government's

13   cross-examination of Ms. Clegg in the manner described earlier,

14   specifically with regard to the veracity of the representations

15   that she made to the Hawaii State Family Court in 2015 with

16   regard to a number of incidences that she appears to have

17   described and written in her TRO application.

18          I'm mindful, among other things, the FBI 302 that -- of

19   an interview that they conducted with Ms. Clegg very recently

20   or earlier this year in 2024, in which she states, among other

21   things, that not all of the facts that she set forth in that

22   TRO application were, in fact, true.

23          So if the government wishes to inquire into those

24   representations to the Court, regardless of whether she intends

25   to take the Fifth or not, the government may do so.

UNITED STATES DISTRICT COURT

```
 1                    (A recess was taken.)

 2                    THE COURT:  All right.  Mr. Nammar, you may resume

 3    with your cross.

 4                    MR. NAMMAR:  Thank you, Your Honor.

 5              Your Honor, can we show the witness only 9-1366 from the

 6    39th supp?

 7                    THE COURT:  Go ahead.

 8        Q    (BY MR. NAMMAR:)  Mr. Lau, do you see that this is

 9    from the same company that we just looked at, CRX Hawaii?

10        A    Uh-huh.

11        Q    And that this is a release of mechanic's lien for

12    Kama'aina Plumbing Company --

13        A    Uh-huh.

14        Q    -- which is related to the Black Point project that

15    we just looked at?

16        A    Yes.

17                    MR. NAMMAR:  Your Honor, I move to admit 9-1366.

18                    THE COURT:  Any objection?

19                    MR. KENNEDY:  No objection.

20                    THE COURT:  9-1366 is admitted.  You may publish.

21                    (Exhibit 9-1366 received into evidence.)

22        Q    (BY MR. NAMMAR:)  Mr. Lau, the jury can see this.

23    We're looking at a Waiver and Release of Lien.  These are

24    usually filled out when liens -- mechanic's liens are being

25    released?
```

```
 1        A      Yep.

 2        Q      Okay.  And if we zoom out, this is the same company

 3   that we just looked at for the high-end project on Black Point,

 4   correct, CRX Hawaii?

 5        A      Yep.

 6        Q      And if we go to the bottom and we zoom in on the

 7   signature, it's dated May of 2018.  Do you see that?

 8        A      Yeah.

 9        Q      It's got Mr. Freitas's name again --

10        A      Yep.

11        Q      -- lists his title as Member.  Whose signature is

12   that?

13        A      Looks like Denny's signature.

14        Q      You think that's Denny's signature?

15        A      Yeah, looks like it.

16        Q      Okay.  But at that point he was long gone, right?

17        A      No.

18        Q      I mean, certainly by 2018 he wasn't affiliated with

19   Kama'aina Plumbing anymore?

20        A      I'm -- I -- I want to make it clear, 'cause maybe I

21   wasn't earlier.  Like, he -- Denny was always around.

22        Q      Okay.  Well, let's talk about that.

23          Was he showing up there on a daily basis?

24        A      No.

25        Q      Was he signing contracts?
```

1        A       He might have been.

2        Q       Okay.  You're not sure?

3        A       Not sure.

4        Q       Was he approving the estimates that you would send

5    out?

6        A       No.

7        Q       Was he making sure that for all the contracts that

8    all the provisions were complied with?

9        A       It --

10       Q       Was he getting any money from that company?

11       A       I'm not sure.

12       Q       Okay.  Do you believe --

13       A       I'm not sure on the ownership shares if he was still

14   an owner.  I'm not sure.

15       Q       He was doing his own separate thing, though?  He had

16   his own separate business, right?

17       A       Yeah.  Mike had his own separate businesses as well,

18   and I believe that was the issue why Denny left.  He felt it

19   was unfair that his time, labor, and money into that one

20   company was all he could do.  And it's limiting, I guess,

21   so --

22       Q       So --

23       A       Denny -- Denny is also a master tilesmith as well,

24   so he -- he -- he has more avenues than just plumbing.  He, by

25   far, is the most expert tradesperson I know.

UNITED STATES DISTRICT COURT

1       Q       So you were the general manager, right?

2       A       Yes.

3       Q       For a five-year period of time; is that fair to say?

4       A       Yeah, I'm -- I'm agreeing with that.

5       Q       2015 to 2020, does that sound right?

6       A       Yep, yep.

7       Q       And you don't know who the owner of the Kama'aina

8    Plumbing was during that time?

9       A       I wasn't -- I wasn't there when they formed it, and

10   there was a period of time where they were bringing other

11   people on and I'm not sure of the deals between ownership,

12   shares, or pay.  That wasn't part of my scope.

13      Q       You don't know the organizational structure of the

14   company when you were general manager?

15      A       I wasn't there for that part, and there were a

16   couple -- we changed our name, too, and I wasn't a part of that

17   either.  They changed the -- so Kama'aina Plumbing changed its

18   name, its logo, and so like this -- I'm not even sure this is

19   the correct company name 'cause it was Kama'aina Plumbing &

20   Renovation.

21      Q       Whose idea was it to change the name?

22      A       It was most likely Mike's idea.

23      Q       Not yours, right?

24      A       Not my idea.

25      Q       Okay.

UNITED STATES DISTRICT COURT

```
 1      A      We -- we -- I mean, I -- I --

 2      Q      There's no question pending.

 3      A      I'm sorry.  Sorry about that.

 4             MR. NAMMAR:  If we can, Your Honor, publish 9-210

 5   again?

 6             THE COURT:  Yes.  Go ahead.

 7      Q      (BY MR. NAMMAR:)  And if we can go to page 2.

 8        Josiah Akau, are you related to him?

 9      A      Nope.

10      Q      Do you know who that is?

11      A      Yeah.  I think he's related to Mike on his dad's

12   side.

13      Q      He wasn't working for Kama'aina Plumbing, was he?

14      A      There was -- there was a time when we were

15   collaborating on some jobs, 'cause he was more, like,

16   commercial.  He was doing a bunch of restaurants, and I

17   think -- I went to a couple of his -- I'm not -- I don't recall

18   if we did any work for him or not.  But he had his own

19   construction business.

20      Q      Diversified, right?

21      A      I'm -- I'm not sure.

22      Q      Okay.  But --

23      A      He was general contractor.

24      Q      Okay.  He wasn't doing any showing up on a

25   day-to-day basis for Kama'aina Plumbing, was he?
```

UNITED STATES DISTRICT COURT

          1          A      This is a BC license.  We didn't really do BC work.

          2  We're a subcontractor.  So BC is more like structural building.

          3  We didn't really do none of that type of work.

          4          Q      That wasn't my question.  My question was Mr. Akau

          5  wasn't showing up on a daily basis, was he?

          6          A      For what would he be showing up for?

          7          Q      For Kama'aina Plumbing.

          8          A      No.

          9          Q      He wasn't supervising your work for Kama'aina

         10  Plumbing?

         11          A      No.

         12          Q      And to your knowledge, he wasn't an owner of

         13  Kama'aina Plumbing?

         14          A      I have no knowledge of how they structured the

         15  business.

         16          Q      Okay.  This document right here, that's your company

         17  name, right?  Kama'aina Plumbing Company?

         18          A      Kama'aina Plumbing Renovation.

         19          Q      Okay.  And it lists a Class B.  Do you see that at

         20  the top right?

         21          A      Yeah.

         22          Q      And that allowed -- would allow you to do more than

         23  a C-37 work -- right? -- more than plumbing work?

         24          A      We never -- I -- I don't recall that permit license

         25  number or ever pulling any B-class permits ever.  I don't

UNITED STATES DISTRICT COURT

1    remember doing any B-class work.

2        Q    Well, you were certainly doing -- you changed your

3    name after you guys got this, right?  To Renovations, right?

4        A    So Kama'aina Plumbing Company, LLC was -- I believe

5    was the original name, and then it was changed to Kama'aina

6    Plumbing & Renovation for search engine optimization reasons,

7    from what I remember.

8        Q    But you were doing renovation work as well besides

9    just plumbing work, right?

10       A    Yeah.

11       Q    Okay.  And so the name changed after you guys got a

12   B license, correct?

13       A    No.  I don't think that it was -- I -- I distinctly

14   remember sitting in meetings, learning about this new thing

15   called search engine optimization, and they changed the name

16   for the key words, so when people look for plumbers in our

17   area, and they were looking for renovations, it would ping us

18   is the reason why, to my understanding, why they changed the

19   name.

20       Q    But as far as in time, it happened after 2015,

21   correct?

22       A    I'm -- I'm not sure on the -- like, I'm not really

23   good with the dates.

24       Q    Okay.  And this page lists Josiah Akau as the RME.

25   But to your knowledge, he was not --

1      A      Yeah, to my knowledge, I'm not sure how they

2  structured that.

3      Q      But he was not supervising any work?

4      A      Maybe -- maybe he could have signed on, like I could

5  conceivably see that maybe we were going to take on more

6  construction-type jobs.  But I don't think that ever

7  materialized.  Like, I don't remember -- I remember going on a

8  couple of site walks of his jobs and stuff, but I don't really

9  remember doing any work with him.

10     Q      But would a plumbing work -- would a plumbing

11  license, a C-37 license -- that doesn't allow you do extensive

12  renovations and tile work?

13     A      That might be a mistake, I think, on the

14  application.  C-37 is for a plumbing license, that's a --

15     Q      Right.

16     A      -- C license.

17     Q      That's for rough-in and changing fixtures and things

18  like that, correct?

19     A      261517 was the entity --

20     Q      You didn't answer the question.

21     A      Oh, I'm sorry.

22     Q      C-37 license is for doing rough-ins and plumbing

23  work and changing fixtures and things like that?

24     A      Plumbing -- yeah, plumbing work.

25     Q      It didn't lie to do tile work and other renovation

UNITED STATES DISTRICT COURT

1   work, correct?

2       A     Repairs, you can do -- you can do light

3   repairs -- structures -- BC license is for structural, to my

4   understanding.

5       Q     But you weren't allowed to do full-on remodels with

6   your C-37 license, correct?

7       A     Why not?

8       Q     Did you think that you were with your C-37 license?

9   Okay.

10      A     Yeah.  I mean, so we did a lot of investigation for

11  leaks.  To investigate the leak you have to compromise the

12  waterproofing, take off the tile, get to the plumbing, and then

13  you have to put it back to how you got it before you

14  investigated it.  So absolutely it's part of plumbing.

15      Q     I'm asking you about like a full bathroom gut and

16  reno.

17      A     Yeah, that's not structurals, if -- you're only

18  required to pull the permit because you're over a thousand

19  dollars.

20      Q     I'm not asking about permits.  I'm asking you about

21  what a C-37 license allows you to do.  You can't lay tile --

22      A     Plumbing's for plumbing.

23      Q     You can't lay tile, right?

24      A     That's not to my understanding.

25            MR. NAMMAR:  Okay.  Your Honor, can we show -- can I

UNITED STATES DISTRICT COURT

 1    use the ELMO for a second?

 2                THE COURT:  Sure.

 3                MR. NAMMAR:  To the witness only.

 4        Q     (BY MR. NAMMAR:)  Mr. Lau, do you see that this

 5    document is entitled Description of Contractor License

 6    Classification?

 7        A     Correct.

 8        Q     And I want you to just read to yourself what is

 9    under C-37.

10        A     Okay.

11        Q     And then look up when you're done.

12        A     Yeah.

13        Q     And read for yourself C-51 and look up when you're

14    done.

15        A     Okay.

16        Q     So under the C-37 license, you're not allowed to do

17    full remodel guts of bathrooms?

18        A     Could you bring the C-37 back up?

19        Q     Sure.  In other words, nowhere in this description

20    does it say anything about being able to lay tile or do full

21    remodels?

22        A     So my interpretation of this statute, in the last

23    section where it says, "and the trenching, back filling,

24    patching, and surface restoration, in connection there within"

25    falls under the purview of a repair.  So when you cut open a

                    UNITED STATES DISTRICT COURT

1    wall and it's a tile wall, you're allowed to patch it.  That's

2    called a repair.

3         Q    Sure.  But --

4         A    That's industry --

5         Q    -- you guys were doing full-on full remodel guts of

6    bathrooms, you guys were ripping out vanities, replacing

7    vanities, you guys were ripping out tile to put new floor tile

8    in, for example?

9         A    And we would patch it back.  That's the nature of

10   our duties.

11        Q    That's your interpretation of it?

12        A    That's the nature of all plumbing companies here,

13   that's what they do.  Everybody does renovation.

14        Q    So during your time when you were at Kama'aina

15   Plumbing, besides working on plumbing work, were you also in

16   discussions with Mr. Miske about starting a marijuana business?

17             MR. KENNEDY:  Objection on relevance, Your Honor.

18             MR. NAMMAR:  Relevance to the Fraser issue.

19             THE COURT:  Overruled.

20             THE WITNESS:  There was a point in time -- like,

21   there was a lot of ideas that we would have, and I believe

22   there might have been during the time when legalization was on

23   the table.  But obviously that hasn't happened, so...

24        Q    (BY MR. NAMMAR:)  Sure.  But back in 2016 there was

25   a lot of talk about legalization, correct?

UNITED STATES DISTRICT COURT

```
 1      A       Yeah.

 2      Q       And during -- it was during that time period that

 3   you were in discussions with Mr. Miske about starting up a

 4   business that would sell dabs, correct?

 5      A       I don't recall that.

 6      Q       Liquid marijuana, right?

 7      A       I don't -- I don't recall that.

 8      Q       Do you recall at one point giving a sample of dabs

 9   to Mr. Miske so he could see whether the product was going to

10   be any good or not?

11      A       I don't recall -- I don't recall that at all.

12      Q       That --

13      A       That sounds highly unlikely, 'cause Mike doesn't

14   smoke weed, so why would I give him weed?

15      Q       Maybe to give to somebody else to test?

16      A       I -- I don't recall that.  It sounds highly

17   unlikely.

18      Q       Do you recall discussions with Mr. Miske about

19   purchasing equipment to make dabs or liquid marijuana?

20      A       No.

21      Q       Were you on a number of occasions selling dabs or

22   liquid marijuana to Preston Kimoto?

23      A       No.

24              MR. KENNEDY:  Objection on relevance, Your Honor.

25              MR. NAMMAR:  Goes to credibility.
```

```
 1              THE COURT:  Where is this going?

 2              MR. NAMMAR:  Goes to credibility.

 3              MR. KENNEDY:  608.

 4              THE COURT:  Sustained.

 5              THE WITNESS:  No.

 6              THE COURT:  The objection was sustained.  There's no

 7   need to answer.

 8              THE WITNESS:  Oh, sorry.

 9       Q     (BY MR. NAMMAR:)  Can we show the witness -- well,

10   let me ask you at this point.  At some point was there a

11   problem with delinquent tax issues with Kama'aina Termite &

12   Pest Control?

13       A     Uhm, yeah, there could have been.  I'm not -- not

14   off the top of my head.  I don't recall.

15              MR. NAMMAR:  Can we show the witness, Your Honor,

16   9-1365 from the 39th supp?

17              THE COURT:  Yes.

18              MR. NAMMAR:  Can you take it off ELMO?

19              THE COURTROOM MANAGER:  Oh, sorry.

20              MR. NAMMAR:  Thank you.

21       Q     (BY MR. NAMMAR:)  Can we go to the second page, and

22   then can we zoom in for Mr. Lau?

23          So do you see here in this text message there's a

24   reference to delinquent federal Hawaii and GET taxes?

25       A     Yeah.
```

UNITED STATES DISTRICT COURT

1    Q    And then do you see there's a reference to having

2    Allen sign for the taxes?

3    A    Yes.

4    Q    Do you now recall that --

5         MR. KENNEDY:  That's hearsay, Your Honor.  We're

6    just reading from the document.

7    Q    (BY MR. NAMMAR:)  Do you recall that there was an

8    issue having looked at this with the Kama'aina Plumbing taxes?

9    A    I don't know what this is, yeah.  I've never seen

10   this before.

11   Q    Okay.  But do you recall that you stopped

12   essentially paying taxes?

13   A    If this is the time frame when I left and came back,

14   like, there was -- the company was in absolute shambles when I

15   came back.

16   Q    Okay.

17   A    So there -- there was issues with managers,

18   deferring -- 'cause your GET is basically you're paying an

19   estimate.  So there's an option to defer, and to pay your

20   actual taxes, so it could have been something like that.

21   Q    Do you recall deferring some taxes during this time

22   period?

23   A    I don't defer.  I pay my bills.  I don't defer.

24   Q    For Kama'aina Plumbing?

25   A    Yeah, I wouldn't -- I wouldn't want to defer.

```
 1          Q      Who is Trisha Castro?

 2          A      She was our accountant.

 3          Q      Okay.  And do you -- did Mr. Miske ever accuse you

 4   of running the business, Kama'aina Plumbing, into the ground?

 5          A      Into the ground?

 6          Q      Yes.

 7          A      No.  I don't think it was ran into the ground.

 8          Q      Okay.

 9          A      I think when I left, maybe.

10          Q      Did he ever call you derogatory names, like an

11   idiot?

12          A      Probably.  I would -- I don't know if that's

13   derogatory.  Sometimes I'm -- I do act like an idiot.

14          Q      So is it your testimony that you don't have any

15   recollection about trying to get a loan from a company called

16   Reliant to pay off a delinquent tax set for Kama'aina Plumbing?

17          A      Not to pay off -- we did some financing options to

18   grow the business, and one of the ideas -- 'cause

19   we -- we -- like I said, we pay our bills up front, so we

20   didn't do net 30s or anything for our materials.  We paid up

21   front.

22              So, like, we were trying to limit owing anybody any

23   money, but to do bigger federal jobs, you would need like what

24   is called like a bridge loan.

25          Q      Okay.
```

UNITED STATES DISTRICT COURT

1       A       So it might have been for that.

2       Q       Okay.  Do you remember exploring to get a bridge

3    loan with a company called Reliant?

4       A       Yeah.

5               MR. NAMMAR:  Okay.  If we can show the witness only

6    now, Your Honor, 9-1364?

7               THE COURT:  Yes.

8               MR. NAMMAR:  From the 39th supp?

9               THE COURT:  Yes.

10      Q       (BY MR. NAMMAR:)  Go to the second page and zoom in

11   for Mr. Lau.

12          Mr. Lau, did you believe this is in reference to the

13   bridge loan, the Reliant loan that you were talking about?

14      A       Yeah, I'm not sure.  I don't --

15      Q       Well, that's an Allen that references you, right?

16      A       Yeah.

17      Q       And you just mentioned Reliant loan, correct?

18      A       I -- I wouldn't want to take on a Reliant bridge

19   loan for purposes of paying off debt for taxes.  That's a very

20   bad idea.

21      Q       So you don't ever remember any conversations with --

22      A       I wouldn't -- I wouldn't -- I wouldn't get a bridge

23   loan for that purpose.  Bridge loan is to tide you over for

24   materials in between large payments from the government.

25      Q       So is it --

UNITED STATES DISTRICT COURT

1      A     The purpose and the reason you wouldn't do that for

2    a tax debt is specifically because the interest rate is

3    prorated and it's extremely high.

4      Q     So --

5      A     But it's only supposed to be able to get you between

6    payments for federal jobs, not -- definitely not for taxes.

7      Q     If we can go to the second page?  Why don't you

8    review that.

9         This is again referencing the Reliant loan that you

10   mentioned that you guys were exploring?

11        Your Honor, I move to admit 9-1364.  It's accompanied by

12   a cert on page one.

13            THE COURT:  Any objection?

14            MR. KENNEDY:  Lack of personal knowledge for this

15   witness, Your Honor.

16            MR. NAMMAR:  That's what the cert is for.

17            THE COURT:  Sustained.  It's not relevant.

18      Q     (BY MR. NAMMAR:)  Did you ever -- were you ever

19   asked by Mr. Miske to fill out some documents related to the

20   Reliant loan?

21      A     I don't recall.  I -- I thought the Reliant loan was

22   my thing that I -- maybe I'm misunderstanding the Reliant loan

23   'cause I remember, like, finding an online -- might have even

24   been spam -- like where there were options for bridge loans.

25   And I believe it was in a period of time where we were looking

1    to take on more federal work.  So maybe the Reliant loan

2    is -- seems like this is something different.

3         Q     Did you ever fill out an operating agreement stating

4    that you were an owner of Kama'aina Plumbing for a loan with

5    Reliant?

6         A     I don't recall that.

7         Q     Would you have ever done anything like that?

8         A     I've never been an owner of Kama'aina Plumbing, so I

9    don't think so.

10        Q     So you wouldn't have filled out an operating

11   agreement claiming that you were an owner, correct?

12        A     I mean, if I was a -- if I was given ownership in a

13   company, maybe I would.  But I don't -- I have never been an

14   owner of Kama'aina Plumbing.

15        Q     But absent that, you wouldn't have done it 'cause

16   that would be false, correct?

17        A     That would be false.

18              MR. NAMMAR:  Can we show the witness only, Your

19   Honor, 9-1360 from the 39th supp?

20              THE COURT:  Go ahead.

21        Q     (BY MR. NAMMAR:)  Do you recognize this as one of

22   the invoices that routinely went out for your company?

23        A     Yep.

24        Q     Did you work on this project, the O'Mally's project?

25        A     I don't recall.

```
 1              MR. NAMMAR:  Your Honor, I move to admit 9-1360.

 2              THE COURT:  Any objection?

 3              MR. KENNEDY:  No objection.

 4              THE COURT:  Exhibit is admitted then.  Go ahead and

 5   publish.

 6              (Exhibit 9-1360 received into evidence.)

 7        Q     (BY MR. NAMMAR:)  If we can zoom in right here on

 8   the scope of work, looking at the bottom -- actually, zooming

 9   out a little bit -- this is under Renovation.  Do you see that?

10        A     Yeah.

11        Q     And then the scope of work is listed, among other

12   things, as "installing travertine bathroom walls and shower

13   walls."  Do you see that?

14        A     Yep.

15        Q     "Installing hardwood vanity," do you see that?

16        A     Yeah.

17        Q     "Installing mirror and light fixtures," do you see

18   that?

19        A     Yeah.

20        Q     This is consistent with the time period after which

21   you guys got the B license; is that right?

22        A     I'm not sure.

23              MR. NAMMAR:  Nothing further.

24              THE COURT:  Redirect?

25                        REDIRECT EXAMINATION
```

 1    BY MR. KENNEDY:

 2        Q    If we could pull up 9-1360 just briefly again?

 3          So these invoices relate to a plumbing issue that

 4    homeowners and other folks have, correct?

 5        A    Yeah.

 6        Q    And so in that situation, it -- the problem can be

 7    in the walls, in the pipes, in other areas of the home,

 8    correct?

 9        A    Yeah.

10        Q    And so to remedy the problem, you have to bring

11    those problems under control, correct?

12        A    Yes.

13        Q    And then after you do it, you repair it and you put

14    it back to the way it is, correct?

15        A    As close -- yeah.

16        Q    And in this one, there's a discount because the

17    homeowner is to install the tile themselves, way down on the

18    bottom, correct?  If we can blow up just the --

19        A    Yeah, I see that.

20        Q    All right.  So with respect to --

21        A    What's the date of this?

22        Q    Let's see.  Looks like April 4th of 2016.

23        A    This -- this might have been when I wasn't there.

24        Q    All right.

25        A    I think it was around that time.

UNITED STATES DISTRICT COURT

1      Q      So let me ask you that.

2        Around that time, you were gone for a 6- to 9-month

3   period, correct?

4      A      Correct.

5      Q      Someone else --

6      A      This does actually look like an estimate that I

7   would -- this actually is consistent with standard estimates

8   that were there when I was there.

9      Q      All right.  We can take that down.

10       I just want to ask you some general questions about that.

11   You were gone for a period of time, correct?

12      A      Yeah.

13      Q      When you left, Kama'aina Plumbing was in solid

14   financial condition, correct?

15      A      Absolutely.

16      Q      When you got back, it wasn't, correct?

17      A      It was -- yeah.  It was --

18      Q      'Cause the person who came in was embezzling money,

19   right?

20      A      Absolutely.

21      Q      And he stole money from the company, right?

22      A      Yeah.

23      Q      And so during this time period when we're talking

24   about taxes, there were issues that could have come up during

25   that time, correct?

UNITED STATES DISTRICT COURT

```
 1       A     If there was a deferral, they would probably be from
 2  him.
 3       Q     Because you, as a practice, didn't defer, correct?
 4       A     No.
 5       Q     And so then you built it back up after you got back
 6  there, correct?
 7       A     Absolutely.
 8       Q     And you kept doing that, correct?
 9        Now, with respect to Denny Freitas, he's family, right?
10       A     Family.
11       Q     And you said that he was around for the entire time
12  that you were there as a general manager, correct?
13       A     Yep.
14       Q     And were you aware that he had given his
15  authorization to use his license during that time?
16       A     I'm not sure how that portion of it was.  But I know
17  with a hundred percent certainty an RME can remove his name
18  from the company at any time.
19       Q     All right.
20       A     And --
21       Q     Go ahead, sir.
22       A     -- I didn't get any cease and desist or there was no
23  issues with our license to operate.
24       Q     Okay.  So during that time, that license is going to
25  the individual, right?  The individual -- the license is the
```

UNITED STATES DISTRICT COURT

```
 1   individual's license, correct?

 2       A    Correct.

 3       Q    And so during that time, you didn't get any notice

 4   that he had removed it, correct?

 5       A    Correct.

 6       Q    And that is the individual's responsibility because

 7   it's their license, correct?

 8       A    Yeah.

 9       Q    And that's how the company was operated during that

10   time, correct?

11       A    Yeah.

12       Q    And that's how you built it back up to the company

13   that you continued to manage during that time?

14       A    Yeah.

15       Q    And did the quality of work that you did?

16       A    Yes.

17       Q    Now, you were asked about some questions about when

18   the bank froze the loans -- excuse me -- froze the accounts.

19       A    Right.

20       Q    You were there, right?

21       A    Yeah.

22       Q    And you couldn't pay the people that were there,

23   correct?

24       A    Correct.

25       Q    You couldn't finish the jobs that were out there,
```

1    correct?

2       A    Yeah.

3       Q    And you and Denny Freitas took it upon yourself to

4    start a company and do those jobs and finish every one of those

5    jobs --

6       A    Yeah.

7       Q    -- that you couldn't finish at Kama'aina Plumbing

8    because that's the way you do work when you're loyal to your

9    customers, right?

10      A    I -- I took money out of my own pocket to finish a

11   lot of those jobs.

12      Q    And you started a company, Axis, right?

13      A    Yeah.

14      Q    With Denny, right?

15      A    Yeah.

16      Q    And you finished every one of those jobs that you

17   couldn't even finish at that time, correct?

18      A    Yeah.

19           MR. KENNEDY:  Nothing further.

20           THE COURT:  Anything else?

21                       RECROSS-EXAMINATION

22   BY MR. NAMMAR:

23      Q    Mr. Lau, did you do a lot of work at Pauahi Gardens,

24   the condo?

25      A    Yes.

UNITED STATES DISTRICT COURT

1          Q      They lost out on over a hundred grand because you

2    didn't finish the work, right?

3          A      No.

4                 MR. NAMMAR:  Nothing further.

5                 THE COURT:  You may step down, sir.

6                 THE WITNESS:  Thank you.

7                 THE COURT:  Thank you.

8          All right.  We've reached the end of the trial week.  As

9    we go to break and for the weekend, I will remind our jurors to

10   please refrain from discussing the substance of this case with

11   anyone, to also refrain from conducting your own investigation,

12   and from accessing any media or other accounts of this case

13   that may be out there.

14         So we will see you on, let's see, Monday the 17th at

15   8:30.  Remember as well that Wednesday is a federal holiday, so

16   we will certainly observe that and we will have a break in our

17   kind of mid week, I guess it would be.  So we'll have Monday,

18   Tuesday, and then Thursday, Friday of next week.  We'll see you

19   then.

20                (Proceedings adjourned at 1:33 P.M.)

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                COURT REPORTER'S CERTIFICATE

 2

 3          I, DEBRA READ, Official Court Reporter, United

 4    States District Court, District of Hawaii, do hereby certify

 5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6    true, and correct transcript of the stenographically reported

 7    proceedings held in the above-entitled matter and that the

 8    transcript page format is in conformance with the regulations

 9    of the Judicial Conference of the United States.

10                DATED at Honolulu, Hawaii, June 14, 2024.

11

12

13                     /s/ Debra Read

14                DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```