1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4    UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
5              Plaintiff,           )  Honolulu, Hawaii
                                    )
6         vs.                       )  March 4, 2024
                                    )
7    MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 31
                                    )
8              Defendant.           )  (TESTIMONY OF GOVERNMENT'S
     _____)  WITNESS AHMED CHERGUI)
9

10

                 PARTIAL TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE DERRICK K. WATSON
            CHIEF UNITED STATES DISTRICT COURT JUDGE
12

     APPEARANCES:
13

     For the Government:        MARK A. INCIONG, AUSA
14                              MICHAEL DAVID NAMMAR, AUSA
                                WILLIAM KEAUPUNI AKINA, AUSA
15                              Office of the United States Attorney
                                Prince Kuhio Federal Building
16                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
17
     For the Defendant:         LYNN E. PANAGAKOS, ESQ.
18                              841 Bishop Street, Suite 2201
                                Honolulu, Hawaii 96813
19
                                MICHAEL JEROME KENNEDY, ESQ.
20                              Law Offices of Michael Jerome
                                Kennedy, PLLC
21                              333 Flint Street
                                Reno, Nevada 89501
22
     Official Court             ANN B. MATSUMOTO, RPR
23   Reporter:                  United States District Court
                                300 Ala Moana Boulevard, Room C-338
24                              Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

```
 1                    I N D E X

 2   WITNESS:                                    PAGE NO.

 3   FOR THE GOVERNMENT:

 4    AHMED CHERGUI

 5     DIRECT EXAMINATION BY MR. NAMMAR              3

 6     CROSS-EXAMINATION BY MR. KENNEDY             59

 7     REDIRECT EXAMINATION BY MR. NAMMAR           88

 8     RECROSS-EXAMINATION BY MR. KENNEDY          101

 9

10                    E X H I B I T S

11   Exhibits 4-17 and 4-18 received in evidence     17

12   Exhibit 4-16 received in evidence               22

13   Exhibits 4-20 and 4-21 received in evidence     52

14   Exhibit 4-124 received in evidence              89

15   Exhibit 4-125 received in evidence              93

16   Exhibit 7310 pages 1, 15, 16, 17, 23, and 24    99
     received in evidence
17   (Excerpted exhibit to be renamed Exhibit 7310A)

18

19

20

21

22

23

24

25
```

```
 1   MONDAY, MARCH 4, 2024                        9:54 A.M. O'CLOCK

 2                                * * * * *

 3              (Start of partial transcript:)

 4              (Open court in the presence of the jury.)

 5              THE COURT:  The government may call its next witness.

 6              MR. NAMMAR:  United States calls Ahmed Chergui.

 7              COURTROOM MANAGER:  Please raise your right hand.

 8              AHMED CHERGUI, GOVERNMENT'S WITNESS, SWORN.

 9              THE WITNESS:  I do.

10              COURTROOM MANAGER:  Thank you.  You may be seated.

11              Please state your full name, spelling your last name

12   for the record.

13              THE WITNESS:  Last name is Chergui, C-H-E-R-G-U-I.

14   First name is Ahmed, A-H-M-E-D.

15                            DIRECT EXAMINATION

16   BY MR. NAMMAR:

17   Q    Mr. Chergui, good morning.

18   A    Good morning.

19   Q    Can you tell the jury how old you are?

20   A    45 year old.

21   Q    And are you married?

22   A    Yes, sir.

23   Q    Who are you married to?

24   A    Dorota Strugala.

25   Q    Can you spell Dorota?
```

```
 1   A    D-O-R-O-T-A.

 2   Q    And can you spell Strugala?

 3   A    S-T-R-U-G-A-L-A.

 4   Q    That's your wife?

 5   A    Yes, sir.

 6   Q    Where do you -- do you live part-time in Hawaii?

 7   A    Yes, I'm in training in Hawaii -- I mean California.

 8   Q    Okay.  But do you also live part time in Hawaii?

 9   A    Yes, sir.

10   Q    What part of the island do you live on?

11   A    East side.

12   Q    Okay.  You said you're in training.  Are you also living

13   part-time in California?

14   A    Yes, sir.

15   Q    What are you doing in California?

16   A    Pardon?

17   Q    What are you doing in California?

18   A    I'm a police officer trainer right now, in training.

19   Q    Okay.  Are you in a --

20   A    (Inaudible.)

21   Q    You need to pull the microphone just a little bit closer.

22   A    Yes, sir.

23   Q    Are you in a police academy right now?

24   A    Yes, sir.

25   Q    Where is that academy?
```

```
 1   A     It's in L.A., Los Angeles.

 2   Q     And what's the name of the academy?

 3   A     Rio Hondo Police Academy.

 4   Q     And do you aspire to be a police officer?

 5   A     Yes.  I'm in the process.

 6   Q     Do you have -- aside from this academy, do you have a

 7   college degree?

 8   A     Yes.  I have two of them.

 9   Q     From where?

10   A     Hassan University and I-CAR University.

11   Q     And where is Hassan University?

12   A     It's in Casablanca, Africa.

13   Q     Okay.  Is that where you're originally from?

14   A     Yes, sir.

15   Q     Can you tell the jury where Casablanca is?

16   A     Casablanca, it's in Morocco, North Africa.

17   Q     When did you first -- is this where you grew up?

18   A     Yes, sir.

19   Q     When did you first come to the United States?

20   A     August 5th, 1998.

21   Q     And how long have you lived in Hawaii?

22   A     Since July 1st, 2015.

23   Q     When you came to the United States, where did you first

24   settle?

25   A     I arrived in New York, spent three days, didn't like it
```

1  and settled in Chicago for 18 years.  Then moved the wife and

2  kids to Hawaii.

3  Q    What were you doing for work in Chicago?

4  A    I owned a small auto repair shop and a car dealership.

5  Q    And when you came to Hawaii, what did you do for work?

6  A    So when I moved in to Hawaii, I applied with HPD.  And

7  while I was in the process of HPD, I was buying and selling

8  cars.

9  Q    Okay.  And that was something you had done previously in

10  Chicago?

11  A    Correct.

12  Q    Do you own a business right now?

13  A    Yes.

14  Q    What does your business do?

15  A    It's a collision center.

16  Q    A collision center?

17  A    Correct.

18  Q    And so do you repair cars that have been in accidents?

19  A    Correct.

20  Q    Before Pacific Collision, what were you doing?

21  A    Used to be Lincoln Auto Sales, buying and selling cars.

22  Q    Okay.  So the name of your company was Lincoln Auto Sales?

23  A    The legal name is Lincoln Auto, LLC, and typically it's

24  doing a d/b/a, which is doing business as Lincoln Auto Sales

25  and Pacific Auto Sales.

1    Q    Okay.  Was Lincoln Auto the same company that you had in

2    Chicago?

3    A    Correct, yes.

4    Q    Lincoln Auto, who would you primarily sell cars to?

5    A    So I operated -- when I moved in to Hawaii, I operated in

6    my residence in Kailua.  And most of my clientele was military.

7    Q    Okay.  If you had to put a percentage on your clientele,

8    how many would you say were military?

9    A    95 percent.

10   Q    And when you sold a car to those military members, would

11   you look at their IDs?

12   A    Yes.  Part of the test drive, you needed to make sure they

13   have a driver's license.  So I checked their ID.  They're out

14   of state.  They come in uniform.  Sometimes they have a

15   government ID also.

16   Q    Were the majority of your customers at Lincoln Auto Sales

17   from out of state?

18   A    Yes.

19   Q    Did the majority of your customers finance vehicles that

20   you sold them?

21   A    No.  They mostly were cash and carry.  Occasionally when

22   you got something over 10,000, people tend to get a loan for

23   that.

24   Q    Okay.  And was there a lender that you typically saw when

25   you would finance cars?

```
 1  A     Yes.  Most of them were Navy Federal Credit Union and
 2  USAA.
 3  Q     Do you know where those two banks are based?
 4  A     They're based on the East Coast, somewhere in Virginia.
 5  Q     Where would you acquire the cars that you sold at Lincoln
 6  Auto?
 7  A     Here in Hawaii, it's only one place.  It's called Manheim
 8  Auto Auction.  It's by the airport area.
 9  Q     Is that -- that's where you would primarily get your
10  inventory from?
11  A     Yes, sir.
12  Q     Okay.  And then you would -- how would you sell them to
13  customers?  How would you market them to customers?
14  A     Basically we don't use an online.  And based on the pages,
15  it's called the lemon lot.  It's for military members, and
16  that's why I advertise them on that website for military
17  members.
18  Q     Okay.  Were you pretty accomplished in fixing up vehicles?
19  A     Yes.  When you get cars, you're going to have to have them
20  reconditioned, cleaned up, serviced up to standard, safety
21  inspection, license plate registration before you can give them
22  to people to drive.
23  Q     And do you hold any certifications in fixing vehicles?
24  A     Yes.  I'm a master technician mechanic, and I do have
25  multiple certifications with I-CAR also, which qualifies me to
```

1    service and maintain and fix cars.

2    Q    When you were operating Lincoln Auto Sales in the

3    beginning and buying cars, did you have to ship some cars back

4    to the mainland that you bought here in Hawaii?

5    A    Yes.  Some vehicles, American cars, I had them shipped to

6    mainland for resale due to market demand over there.

7    Q    What do you mean by that?

8    A    Mostly American cars are not much demanded here.  So I

9    shipped them there because they have low mileage, newer models.

10   They sell for more money than here.

11   Q    Okay.  So you had bought some cars here in Hawaii, but

12   they weren't that popular so you shipped them to the mainland?

13   A    Correct.

14   Q    So you mentioned the auction where you buy 'em.  What was

15   the name of the auction?

16   A    Manheim Auto Auction.

17   Q    And how would the auction work?

18   A    So they have multiple lanes and the cars run.  And

19   dealers, they had paddles, and they just bid on them.

20   Q    Okay.  Were there different sorts of cars that were

21   offered as far as their condition at the auction?

22   A    Yes.  So before the auction starts with a run and drive,

23   they have the inoperable vehicles, which is usually a vehicle

24   that's donated, non-runners, no keys or possession, accidents.

25   They're not in running condition so they had to go to a

1    different line first before they go to the running cars.

2    Q    Okay.  So the non-runners were in a special line?

3    A    Correct.

4    Q    And then later on they had the running cars that were up

5    for auction?

6    A    Correct.

7    Q    So how would somebody, if they showed up to the auction,

8    bid on a car?

9    A    They had to go to the office, register.  They got a paddle

10   number assigned to them, and they just put it on their left

11   side.  It's a sticker.  You peel it, and you put it in here.

12   Q    And is there somebody that's conducting the auction,

13   asking for bids in the crowd?

14   A    Yes.  There's the auctioneer who calls the numbers.  And

15   then when the number settles on you, they see your number.  And

16   number is actually your first name, last name, and company you

17   represent.

18   Q    And does the highest bid win?

19   A    Correct.

20   Q    Can anyone from the public come to the Manheim auction?

21   A    No.  You have to be a licensed registered car dealer.

22   Q    And did you have a license when you came here in 2015 to

23   be at Manheim?

24   A    Yes, sir.

25   Q    Is that under Lincoln Auto?

 1   A     Correct.

 2   Q     Okay.  So I want to take you back to September 2015.  Were

 3   you living in Hawaii then?

 4   A     Yes, sir.

 5   Q     About how long had you been in Hawaii?

 6   A     Two months, two months and a half from July 1st.

 7   Q     And were you buying and selling cars under Lincoln Auto?

 8   A     Yes, sir.

 9   Q     Were you buying those cars that you would sell at the

10   Manheim auction?

11   A     Yes.

12   Q     Back in September 16th, 2015, do you recall bidding on a

13   particular car at the Manheim auction?

14   A     Yes, sir.

15   Q     What kind of vehicle?

16   A     It was a white Cadillac DTS.

17   Q     And you told us a little bit about the auction.  Was this

18   an operable vehicle or an inoperable vehicle?

19   A     Inoperable.

20   Q     Okay.  So it didn't run?

21   A     No, sir.

22   Q     Do you remember, are people allowed to inspect the

23   vehicles before they bid on them?

24   A     Yes.  So you're allowed to inspect it the day before the

25   auction, which is Tuesday.  And then you're allowed to inspect

1    it before the auction starts.

2    Q    Do you remember inspecting this particular Cadillac?

3    A    Yes, sir.

4    Q    And what did you find out from your inspection?

5    A    You know, the car does turn on but doesn't start.  It

6    would not crank.  So probably is the starter is bad or

7    electrical, because Cadillacs are known for having a lot of

8    electronic failures.

9         And as a buyer you need to make sure that the mechanical

10   condition is not seized or hydraulic locked.  Hydraulic lock,

11   make sure the engine is not locked.  And by doing so you can

12   actually get a wrench, because they had a mechanic onsite

13   belongs to the auction, and I asked him to give me a wrench.

14   He gave me the wrench.  And I put it on the engine and I was

15   able to crank it manually.  So the engine wasn't seized.

16   Q    Why was that important to you?

17   A    The engine is the most expensive part in the vehicle.  So

18   I can deal with the electronics.  I can deal with the head

19   gasket.  I can deal with anything.  I cannot deal with a seized

20   engine.

21   Q    And when you say it wasn't seized, how could you tell for

22   this Cadillac it wasn't seized?

23   A    With the wrench.  I put it on the main flywheel, the front

24   one.  It hooks on it, and you manually turn it.  So it turns,

25   meaning it's not locked.

1    Q    Okay.  And then after you inspected this Cadillac, did you

2    end up bidding on it?

3    A    Yes, sir.

4    Q    And when you were bidding on it, were other people bidding

5    against you?

6    A    Yes, sir.

7    Q    After you -- did you win the auction for this car?

8    A    Yes.  So literally as soon as they say "sold" and I show

9    my patch, my paddle number, someone came from the back and tap

10   on my hand.  He said:  Hey, I wanted this car.  I just missed

11   it.

12   Q    Okay.

13   A    And I said:  Sure.

14   Q    Who was the person that tapped on your back?

15   A    At that time I did not know him by first name.  I only

16   looked at his patch.  Paddle number, it says Hawaii Partners,

17   LLC, at that time.

18   Q    Were you able to later identify who that person was?

19   A    Yes, sir.

20   Q    Who was that person?

21   A    Michael Miske.

22   Q    So Mr. Miske taps on your shoulder.  Do you guys have a

23   conversation?

24   A    Yes, sir.

25   Q    What do you guys talk about?

1    A    So as a car dealer, you know, sometime car dealers can't
2    make it on time.  They call their buddy:  Hey, I wanted that
3    Lot Number 215.  Can you bid up to 5,000 for it on my behalf?
4          Sure.  I bid.  They come in.  They get the car, and they
5    give me my commission, 250, 300, it depends.
6          If I'm running late, I called someone and I said:  Hey,
7    John, I want that lot number.  I can't make it.  I'm running
8    late.  Bid for me.
9          Because at that time they didn't do online bidding at that
10   time, so you had to be in person.
11         So I'd say:  Sure.  I'll take 500.  It's a good price we
12   got it for.  It's under $2,000 with the option fee.  Comes to
13   like 24, 25 hundred.
14   Q    Okay.
15   A    The car is worth 14 retail.  So even if you spend three,
16   four, five, six Gs, you're still going to make a profit on it.
17   Q    Okay.  So if you could bring the microphone just a little
18   closer to you.
19   A    Sure.
20   Q    So you said you'll take 500.  Can you tell the jury what
21   you meant by 500?
22   A    The $500 commission.  So whatever the price is, I collect
23   500 on top of it.
24   Q    So you and Mr. Miske negotiated a deal?
25   A    Correct, onsite.

1   Q     And he was going to pay the price of the vehicle at -- for

2   the auction?

3   A     Correct.

4   Q     Plus what?

5   A     My commission of $500.

6   Q     Okay.  And did you agree?

7   A     Yes, sir.

8   Q     And what happened after that?

9   A     We went into the office for the auction, and they transfer

10  the sales receipt from my name to his company's name.

11  Q     Okay.  And why did you do that?

12  A     Well, to transfer the ownership.  So now the ownership

13  transferred from me to him.

14  Q     Okay.  And when you buy a car, do you have a couple of

15  days with the auction house to pay for it?

16  A     Correct.  So the auction is on Wednesdays and they allow

17  you at that time to Friday afternoon to pay for it.

18  Q     Okay.  Was your meeting that day with Mr. Miske cordial?

19  A     Pardon me?

20  Q     Was your meeting with Mr. Miske that day cordial?  Did you

21  guys get along?

22  A     Yes.

23  Q     Okay.  Following that meeting with Mr. Miske did you guys

24  exchange some text messages the day after and the day after

25  that?

```
 1   A    Yes, sir.

 2   Q    And what did you guys text about?

 3   A    We text about making sure he pays for the vehicle on time

 4   because they will charge you late fees if you don't pay on

 5   time.  And we discussed the detail for my commission.  Because

 6   I didn't collect it on time.  I said I will collect it later.

 7   Q    And at some point later on did you provide those text

 8   messages to the FBI?

 9   A    Yes, sir.

10             MR. NAMMAR:  Your Honor, can we show the witness only

11   4-17?

12             THE COURT:  Go ahead.

13             MR. NAMMAR:  And can we also show the witness only

14   4-18?

15             THE COURT:  Yes.

16   BY MR. NAMMAR:

17   Q    Do you recognize these two exhibits, these two text

18   messages, 4-17 and 4-18?

19   A    Yes, sir.

20   Q    And what are they?

21   A    It's my communications with Michael Miske regarding the

22   transaction.

23   Q    Of the Cadillac in question that we've been talking about?

24   A    Yes, sir.

25   Q    And are they accurate copies of those text messages with
```

1   Mr. Miske?

2   A    Yes, sir.

3          MR. NAMMAR:  Your Honor, I'd move to admit 4-17 and

4   4-18.

5          THE COURT:  Any objection?

6          MR. KENNEDY:  No objection.

7          THE COURT:  Without objection, those two exhibits are

8   each admitted.  That's 4-17 and 4-18.

9          (Exhibits 4-17 and 418 received in evidence.)

10         THE COURT:  You may publish.

11         MR. NAMMAR:  Thank you.

12         If we can start with 4-17.

13  BY MR. NAMMAR:

14  Q    And if we could focus on the very, very top first, is this

15  a photograph taken from your phone?

16  A    Yes, sir.

17  Q    Okay.  And in these messages, are you communicating with

18  Mr. Miske?

19  A    Yes, sir.

20  Q    And is Mr. Miske using the phone number at the top,

21  439-5220?

22  A    Yes, sir.

23  Q    And was the first message on September 17th, 2015?

24  A    Correct.

25         MR. NAMMAR:  So if you could zoom in on the first

 1   message.

 2   BY MR. NAMMAR:

 3   Q    Is the person in the light gray, is that Mr. Miske?

 4   A    Yes, sir.

 5   Q    And then the person in the green bubbles, is that you?

 6   A    Yes, sir.

 7   Q    Okay.  So this first one is Mr. Miske?

 8   A    Yes, sir.

 9   Q    So he tells you:  It's Mike from Hawaii Partners for the

10   Cadillac?

11   A    Yes, sir.

12   Q    Did you understand that to mean the Cadillac that you have

13   testified previously about?

14   A    Yes, sir.

15   Q    And then the message says:  Please let me know what the

16   counter is so I can handle payment and get the car towed.

17        Did you know what that referred to?

18   A    Yes, sir.

19   Q    What is the counter?

20   A    I mean in -- they get the price of the car and they charge

21   you their auction fees, their taxes, and their running line

22   fees, all of that.

23   Q    Okay.  If we can zoom out now and zoom in on the rest of

24   the messages.

25        And then you respond:  2308.  Do you see that?

1   A    Yes, sir.

2   Q    What is that figure?

3   A    So the price of the vehicle was $2,000 even and the $308,

4   that's the auction fee and half percent resale tax.

5   Q    Okay.  And then in the light gray, does Mr. Miske respond?

6   A    Yes, sir.

7   Q    And this carries on to the next day, September 18th, 2005?

8   A    Yes, sir.

9   Q    Past the 2,000, can we split the buyer fees?  I have a

10  cashier's check made to Manheim ready to go and a tow truck.

11       Did you know what that referred to?

12  A    It refers to the -- please -- like he's going to be paying

13  for the vehicle and he's going to have the vehicle relocated

14  from the auction site.

15  Q    Okay.

16  A    To wherever he want to take it to.

17  Q    So split the buyer's fees, is that $308 that you told us

18  about?

19  A    Yes.  So that's what he's referring to, and I -- yeah.

20            MR. NAMMAR:  Okay.  If we can go to the -- publish

21  the 4-18 now.

22  BY MR. NAMMAR:

23  Q    Is this a continuation of the -- this same conversation?

24  A    Yes, sir.

25  Q    Okay.

```
 1              MR. NAMMAR:  If you could zoom in on all of it.
 2    Thanks.
 3    BY MR. NAMMAR:
 4    Q    In response, is that you in green?
 5    A    Yes, sir.
 6    Q    You say:  I will eat $100 and I will take $400.
 7         What is that referring to?
 8    A    Referring to like I'm willing to give him discount on my
 9    commission from 500, as we agreed on, to 400 to help him with
10    the fees from the auction, even if I didn't have to.
11    Q    Okay.  And then in response Mr. Miske says:  That's 2700
12    back to me.  Still need to tow and repair.  Let's split the
13    buyer's cost.
14         Do you see that?
15    A    Correct.
16    Q    So is he referencing the $308 and the buyer's cost that
17    you talked about before?
18    A    Yeah.  He's adding the commission on the pricing of the
19    car also.
20    Q    Okay.  And in green you say:  That is not the deal?
21    A    Correct.
22    Q    And Mr. Miske says he needs the license plate number.  Do
23    you see that?
24    A    Correct.
25    Q    And then on the right you send him a really long number.
```

1    What is that really long number that starts with 1G?

2    A    So that vehicle was a repossessed vehicle.  And the

3    previous owner already kept the license plate, so the car

4    didn't have license plate at the auction.

5         So I gave him the VIN number, which is the vehicle

6    identification number for the vehicle.

7    Q    Okay.  And then in light gray at the bottom Mr. Miske

8    says:  I'm at Wendy's restaurant waiting for you.

9         Do you see that?

10   A    Yes, sir.

11   Q    At any point in time did you discuss the condition of the

12   Cadillac with Mr. Miske?

13   A    Yes.

14   Q    Where did you do that?

15   A    At the auction site he asked me:  What do you think is

16   wrong with it?  I said I had it inspected.  I cranked it

17   manually.  And it's not the engine.  It's going to be something

18   else related.

19   Q    This is at the -- on the day of the auction?

20   A    Correct.

21   Q    Okay.  So the number shown on 4-18 is (808) 439-5220.  Do

22   you see that?

23   A    Yes, sir.

24   Q    That's the number that Miske was communicating with you

25   on, right?

1    A    Yes, sir.

2    Q    Okay.

3              MR. NAMMAR:  Your Honor, if we could show the witness

4    only now 4-16, and from the original list?

5              THE COURT:  Go ahead.

6              MR. NAMMAR:  And go to page 2.

7              Under -- if we could zoom in on the middle part.

8    BY MR. NAMMAR:

9    Q    Do you see the name Michael Miske on this record?

10   A    I see that now, yeah.

11   Q    And do you also see a business telephone for Mr. Miske on

12   the right?

13   A    Yes, sir.

14   Q    Is that the same telephone number that you were

15   communicating with Mr. Miske in -- back in 2015?

16   A    Yes, sir.

17             MR. NAMMAR:  Your Honor, I would move to admit 4-16,

18   which is accompanied with a certification on page 1 of the

19   exhibit, and it complies with 803(6) and 902(11).

20             THE COURT:  Any objection to 4-16?

21             MR. KENNEDY:  No objection.

22             THE COURT:  Without objection, that exhibit then is

23   admitted.

24             (Exhibit 4-16 received in evidence.)

25             THE COURT:  You may publish.

1           MR. NAMMAR:  Thank you.

2    BY MR. NAMMAR:

3    Q    4-16 is up on the screen.  Do you see in the left-hand

4    side the customer's name listed as Michael J. Miske?

5    A    Yes, sir.

6    Q    With an address of 940 Queen Street, do you see that?

7    A    Yes, sir.

8    Q    And on the right-hand side, do you see the telephone as

9    (808) 439-5220?

10   A    Yes, sir.

11   Q    And if we can go back to 4-17 at this time, is that the

12   same number that appears on 4-17 at the top?

13   A    Yes, sir.

14   Q    If we can go to 4-18 now, there's a reference in the last

15   message to the Wendy's restaurant.  Do you see that?

16   A    Yes, sir.

17   Q    After this text message exchange, did you meet Mr. Miske

18   at the Wendy's restaurant?

19   A    Yes, sir.

20   Q    Why?

21   A    To collect my commission.

22   Q    Okay.  And where was that Wendy's restaurant?

23   A    It's located Nimitz, along H-1 with Pualei [phonetic],

24   right behind the Harley-Davidson dealership.

25   Q    Is it near the Honolulu airport?

 1  A    Yes.

 2  Q    And tell us how that meeting went with Mr. Miske at the

 3  Wendy's.

 4  A    It went good.  I went there and collected my commission,

 5  and that's it.

 6  Q    Did you expect to hear from Mr. Miske about this

 7  transaction in the future?

 8  A    No.

 9  Q    Did you hear from Mr. Miske again?

10  A    Yes.

11  Q    How did Mr. Miske contact you?

12  A    He called me at night a couple days later, all mad, pissed

13  off, cussing, hostile, on the phone.

14  Q    This was on the phone?

15  A    Yes, sir.

16  Q    You said he was cussing, mad.  Was Mr. Miske yelling at

17  you?

18  A    Yes.

19  Q    What was he yelling at you?

20  A    That I sold him a bad car.

21  Q    Did he elaborate?

22  A    Yeah.  He said I sold him a bad car.  The engine is no

23  good.  His mechanic told him this car is worthless, la, la, la,

24  la, all that stuff.

25  Q    Okay.  What was your response to that?

 1   A    I told him:  Are you sure your mechanic told you it's a
 2   bad engine?  Because I checked that car myself.  It is not the
 3   engine is seized.  It's something related to the engine, but
 4   it's not the engine seized.  So I was trying to rationalize
 5   with him.
 6   Q    Okay.  So did you explain to him about how you had checked
 7   the engine yourself?
 8   A    Yes.
 9   Q    And what was your response -- what was his response to
10   this?
11   A    Well, he was still cussing and screaming, didn't give me a
12   chance to explain to him how diagnostic works when you check in
13   the engine failures.
14   Q    Okay.
15   A    And a lot of mechanics, they're not really total when it
16   comes to internal failures.  And I'm very certified to deal
17   with that.  And I was trying to walk him through.  But he was
18   so upset and cussing and the whole thing.
19        So he said, well, you meet me.  So I said sure.  I'll meet
20   you.
21   Q    Okay.  Did you make plans to meet?
22   A    Yes.  He said you better meet me now.  So I said sure.
23   Q    And was this on September 21, 2015?
24   A    Yes, sir.
25   Q    Where did you guys make plans to meet?

1   A    He recommended the Wendy's parking lot again.

2   Q    Okay.

3   A    Which is a public place.  I said sure.

4   Q    Is this the same Wendy's that you had talked about --

5   A    Yes.

6   Q    -- where you met him before?

7   A    Yes, sir.

8   Q    This is the Wendy's by the airport?

9   A    Yes, sir.

10  Q    Before you went, did you talk to your wife about going out

11  to Wendy's?

12  A    Yes.  When I was talking to him, I had him on the speaker

13  because I talk a lot on the phone.  I try not to have the phone

14  in my ear, so I have it always on the speaker when I'm talking.

15  So she heard the conversation.

16  Q    Okay.  Without telling us what your wife said, did she not

17  want you to go to the Wendy's?

18  A    Yes.

19  Q    Why you did end up going to the Wendy's?

20  A    The way how he sounded, she was frightened.  She was not

21  comfortable that I go over there by myself or meet him late at

22  night.  And I said, hey, I'm just going to go meet him and

23  explain to him and rationalize with him, maybe walk him through

24  the process.

25       You know, as a customer service, you know, you sell a car

1    to somebody and somebody calls you pissed off, you need to meet

2    them, see what's the problem and help them through it, even I'm

3    not related to the problem, but just trying to use my expertise

4    into the matter and help them.

5    Q    Did you think you had done anything wrong at that point?

6    A    No.

7    Q    Did you go alone to the Wendy's?

8    A    Yes.

9    Q    Around what time did you get there?

10   A    I believe it was under 45 minutes from the time I finished

11   the conversation with him.

12   Q    Okay.  Was this the evening time on September 21, 2015?

13   A    Yes, sir.

14   Q    What do you see when you show up to the Wendy's?

15   A    So I pull in, was in first.  So I didn't know what car he

16   drives.  The last time I saw him, he was driving a pickup

17   truck, a Ford F-150.  So I was looking out for a Ford.  So he

18   showed up in some Chevy sedan car.  And I didn't know it was

19   him.  It was all tinted windows.  The car just pulled next to

20   my car on the right side, and another car pulled into my --

21   there's a car.  The other car parked the other side, next to

22   the other car.

23        I didn't pay attention.  It's a parking lot.  It's full of

24   cars.

25   Q    What was the other car that you saw?

1   A    It was a Lexus LS 430, black color, funky wheels, dark

2   tinted windows, lowered suspension.

3   Q    Okay.  And do you get out?

4   A    Pardon?

5   Q    Do you get out of the car?

6   A    Did I get out from the car?

7   Q    Yes.

8   A    I was already out of the car.

9   Q    Okay.

10  A    Looking out when he's going to come in.

11  Q    Does Mr. Miske get out of the tinted windows car?

12  A    Yes.  He got out from the right side and walked in towards

13  me.

14  Q    What about the individuals in the Lexus that you

15  described?

16  A    Yeah, the two guys got up -- so I'm not looking at them.

17  I'm just looking with my peripheral vision.  And they're

18  walking.  I'm expecting them to go to the Wendy's, and they

19  just pulled in right behind him, like a diamond shape.  So he's

20  here, and the two guys right behind him like this.

21  Q    So Miske's in front of you, and the other two gentlemen

22  are flanked on either side behind.

23  A    Correct.

24  Q    How would you describe the other two gentlemen's build?

25  A    Asians, in early 30s or late 20s.  One is very heavyset.

```
1    I would say 5-6, 300 pounds.  The other one is 5-4, 5-5, 150,

2    170 pounds.  Bald, have no hair.

3    Q    No hair.  One is much bigger than the other?

4    A    Correct.  The heavyset one has shorter hair.

5    Q    Okay.  And Mr. Miske's in front of you?

6    A    Yes.

7    Q    What takes place?

8    A    He comes in mad, cussing, pointing his fingers that I

9    fucked him.  Can I cuss?

10   Q    Yes.

11   A    Good.  He starts cussing, using vulgar language, all that

12   towards me.  And I'm just standing my grounds.

13        And having that technique, let people vent, that would

14   help them to calm down and then explain to them when they're

15   done talking what was the process, what's wrong, and then talk.

16   I'm talking -- I'm thinking I'm talking to a normal person.  So

17   you let them talk and then explain with them.  I did not know

18   at that time what I'm dealing with.

19        And he kept just with the threaten, threatening,

20   threatening.  I'm just waiting, and I'm trying to tell him what

21   did I do wrong, what he's saying, it doesn't make sense.  And

22   he's just cussing.  As he's cussing, he's getting closer and

23   closer and closer.

24        And I didn't step back.  I stood my ground to the point he

25   was literally a half inch from my nose, like came to my face
```

1    and face, and his nose was like almost touching my nose.

2    Q    Did he ever at any point say:  You don't know who you're

3    fucking with?

4    A    Yes.

5    Q    What was your response to his yelling?

6    A    It -- it was irrelevant.  I wasn't scared.  You know,

7    people when they're angry, they say stuff they don't mean.  I

8    was just hoping that maybe he's going to calm down and

9    rationalize, especially if he doesn't see I'm upset or I'm

10   cussing also.  I'm just going to aggravate the situation.  So

11   my technique is let him vent and then we can talk as

12   gentlemens.

13   Q    Did Mr. Miske demand money?

14   A    Yes.

15   Q    What was your response to the money?

16   A    I said no, but what did I do wrong.  Explain to me.

17        I kept asking him that:  What did I do wrong, explain to

18   me.  But I don't think he heard that because he was -- his

19   voice was louder than my voice.

20   Q    Okay.  At some point was a signal given?

21   A    So at the point when he cames too close to me and I'm

22   looking with my peripheral vision, his right shoulder went up

23   like this twice, and at that time it didn't make sense why he

24   did that.  And at that point I'm keeping my eye contact with

25   him and I'm looking at something traveling, something's coming

1   from his right ear.  Later I realize that's a punch coming.

2       And when I realize, I say what's that.  That's impossible.

3   He's not punching me.  He's right in front of me.  And

4   something came and just punched me back.

5   Q   Okay.  Was the punch from Mr. Miske or somebody else?

6   A   The person was behind him.

7   Q   Of the two people, the bigger person or the smaller

8   person?

9   A   The bigger person because he was on his right.  So the

10  punch came from his right ear to my left cheek.

11  Q   And what happened when you were punched?

12  A   Well, I was in shock.  I wasn't expecting that.  And when

13  I got punched, I fell backward and I tripped on my left foot,

14  and I fell down on my butt.  And I was in a sitting position

15  and -- because, you know, I'm just seeing stars.  And then

16  suddenly when I realize what's going on, I'm getting kicked and

17  punched, kicked and punched, and kicked and punched on the

18  front.

19      I'm down with my feet.  I'm just trying to protect my head

20  while I'm sitting position between the cars.

21      So people couldn't see that because there's a car here and

22  there's a car here, and I'm between the cars, fallen backward

23  in the parking lot.

24  Q   And who is punching and kicking you?

25  A   Well, I didn't see the faces.  There's only three people

1  at that time.  And I'm sitting on the ground.  'Cause if I
2  look, I'm going to get punched in the face.  So ducking down,
3  protecting my head.  But I only can see two black shoes and a
4  white shoe.  Michael Miske when he came in, he was wearing
5  aloha shirt, blue jeans, and white tennis -- gym shoes.  And
6  the white tennis was coming and punches -- I mean the kicks,
7  and I'm seeing the kicks on the side.
8  Q    Okay.  So based on seeing the white shoe, do you believe
9  that Mr. Miske was one of the people that was kicking you?
10  A    Yeah.  That's the only three people were between the cars
11  at that time.
12  Q    Do you fight back or do you remain on the ground?
13  A    Oh, I remain on the ground.
14  Q    And what are you doing when you're getting hit?
15  A    Trying to process staying awake, not to pass out.
16  Q    Okay.  How long did the beating go on for?
17  A    Well, for me, it seems took forever.  But I believe it was
18  like end of 15 seconds.
19  Q    Okay.  And what are you doing with your arms when you're
20  getting beat?
21  A    Well, I'm just covering my head and my ears, not -- not
22  much you can do.  You protect your head.  You're getting hit on
23  all sides from three people at the same time.
24  Q    Did the beating eventually stop?
25  A    Yes.

1    Q    Do you know why it stopped?

2    A    Michael Miske told them to stop.

3    Q    Okay.

4    A    And then he said:  Look at me.  And I raised my head and

5    he was cussing.  I couldn't hear because my ears were ringing

6    at that time and I'm seeing stars flying.

7    Q    Okay.  He's yelling at you?

8    A    Yes.  I -- I couldn't comprehend 100 percent because again

9    my ears were like still ringing from the -- the hits.

10   Q    Does the subject of money come up?

11   A    Yes.

12   Q    What did Mr. Miske say, if anything, about money?

13   A    Yes.  He said:  You'd better get me my money or you're

14   going to see more of this, motherfucker, all that stuff.  And

15   he called me also a fagot.  It didn't make sense at that time

16   why he's calling that and you're going to see more of it.

17   Q    So you're going to see more of what happened to you?

18   A    Yes.

19   Q    You'd better give me my money?

20   A    Correct.  So I said yes, because I just want him out of my

21   face at that time.

22   Q    And he called you a fagot?

23   A    Of course, yeah.

24   Q    Was anything done with the title at that point?

25   A    Yes.  He was holding the blue piece of paper, which is the

```
1    title, and throw it in my face.  And he said:  You'd better get

2    my money.  Calling names, calling names and threats.

3    Q    The title, did you later take the title?

4    A    Yeah.

5    Q    What was the title for?

6    A    It's for the Cadillac.

7    Q    Okay.  So it's the Cadillac in question that we've been

8    talking about?

9    A    Yes, sir.

10   Q    Okay.  Does Mr. Miske and the two other males leave at

11   that point?

12   A    I'm sorry.  What's the last question?

13   Q    Did Mr. Miske and the two other males leave at that point?

14   A    Yes.

15   Q    Okay.  So are you still on the ground at this point?

16   A    I'm slowly trying to recover and assess myself and my

17   condition because I lost one tooth and I was looking for the

18   tooth, where is the tooth, and I found it.

19   Q    Okay.  The tooth was out of your mouth?

20   A    Completely out.

21   Q    Okay.  You're pointing to your mouth.

22   A    Yeah.

23   Q    Which tooth?

24   A    Right one.  The bottom one.

25   Q    In the front?
```

 1    A      Yeah.

 2    Q      Okay.  So it's on the ground?

 3    A      Yes, sir.

 4    Q      Do you collect your tooth?

 5    A      I collect it.

 6    Q      Are you bleeding from anywhere?

 7    A      Yes.

 8    Q      Where?

 9    A      Mouth, I believe little bit by the ear, little bit by the

10    nose.

11    Q      Okay.

12    A      Some contusions on the neck area.

13    Q      Are you in pain at that point?

14    A      Not much because the adrenaline stayed high.  It didn't --

15    I didn't get to the pain until later on and got to the

16    hospital.  You know, calmed down and then I feel the swelling

17    at that time.

18    Q      Did you have any other noticeable injuries that you could

19    notice at that time?

20    A      I noticed my nose little bit engulfed, swollen.  The jaws,

21    the face, all red.

22    Q      Did you call the police?

23    A      I didn't call the police at that time, no.

24    Q      Why not?

25    A      I was more concerned in saving my tooth, so I had to make

 1    it to the hospital first.

 2            MR. NAMMAR:  If we could show the witness only

 3    Exhibit 4-22 from the first list?

 4            THE COURT:  Go ahead.

 5            THE WITNESS:  Yes, sir.

 6    BY MR. NAMMAR:

 7    Q    Do you recognize 4-22?

 8    A    Yes, sir.

 9    Q    What is this?

10    A    This is the map of the area.

11            THE COURT:  It's been admitted, Mr. Nammar.  If you

12    wish to show the jury, you may do so.

13            MR. NAMMAR:  My apologies, Your Honor.

14            Can we publish?

15            THE COURT:  Yes.

16    BY MR. NAMMAR:

17    Q    Is this a map of the area where you were assaulted --

18    A    Yes.

19    Q    -- by Mr. Miske and others?  Okay.

20    A    Yes, sir.

21    Q    Can you circle for the jury the area where you were

22    assaulted?

23    A    (Complies.)

24    Q    So you circled the Wendy's restaurant?

25    A    Yes, sir.

1    Q    And in the bottom left over here, is this the airport?

2    A    Yes, sir.

3    Q    Okay.

4         THE COURT:  Do you have much more for this witness?

5    It sounds like you might.

6         MR. NAMMAR:  Yeah, I do, Your Honor.

7         THE COURT:  All right.  Maybe we can take a break

8    now.  We've been going for almost two hours.

9         MR. NAMMAR:  Sounds great.

10         THE COURT:  All right.  Why don't we go ahead then

11   and take our first break for the trial week.  As we do so, I'll

12   remind our jurors to please refrain from discussing the

13   substance of this case with anyone, including each other, until

14   I advise you otherwise.  Please also refrain from accessing any

15   media or other accounts in this case that may be out there.

16   And then, finally, please do not conduct any independent

17   investigation into the facts, circumstances, or persons

18   involved.

19         So let's take about a 20-minute break, and then we

20   will resume with Mr. Chergui.

21         COURTROOM MANAGER:  All rise for the jury.

22         (The jury was excused at 10:34 a.m.)

23         (The proceedings recessed at 10:34 a.m. until

24   10:52 a.m.)

25         (Open court in the presence of the jury.)

1          THE COURT:  All right.  Back from our morning break,
2     at least the first one.
3          Mr. Nammar, you may continue with your direct
4     examination.
5          MR. NAMMAR:  Thank you.
6     BY MR. NAMMAR:
7     Q    So at the auction the inoperable vehicles, are those sold
8     as-is?
9     A    Yes.
10    Q    Can you tell -- can you tell the jury what as-is means?
11    A    As-is condition means there's no warranty has been
12    amplified [verbatim].  There's no guarantees of any kind or any
13    promises.  It means you're buying it as is.  You're buying it
14    at your own risk.
15    Q    And would that be something that's common knowledge to all
16    the dealers at the auction?
17    A    Yes.  That's -- that line for inoperable vehicles, there
18    is no promises.  So the running cars, the sellers do make
19    promises.  They give you a limited warranty or a full warranty
20    before you bid on it, and it's to say that in applying means
21    there's no guarantees.  There's no running condition, so you're
22    not going to get any guarantee.
23         MR. NAMMAR:  Your Honor, can we publish right now
24    4-27, 4-28, and 4-30, which I believe are already in?
25         THE COURT:  You may.

```
 1   BY MR. NAMMAR:

 2   Q    Do you recognize what's shown in 4-27, which is up on the

 3   screen?

 4   A    Yes, sir.

 5   Q    What's shown here?

 6   A    That's the Wendy's facility.

 7   Q    Okay.  Is this where you were assaulted by Mr. Miske and

 8   the two others?

 9   A    Yes, sir.

10        MR. NAMMAR:  Can you show 4-28.

11   BY MR. NAMMAR:

12   Q    Do you recognize this photo?

13   A    Yes, sir.

14   Q    What is shown in 4-28?

15   A    The area where I was assaulted, right where that white

16   pickup truck.

17   Q    Okay.  There's a bunch of water in this photo in the

18   parking lot.  Was the water there when you were assaulted?

19   A    No, no.  The stalls is another four stalls to the right of

20   that white pickup truck.

21   Q    Okay.  Is this photo taken after the fact?

22   A    Yes.  This photo was taken years after the fact.

23   Q    Can you put an X or mark where the assault took place on

24   4-28?

25   A    (Complies.)
```

1    Q    So right where the right front wheel of the Nissan pickup

2    truck is?

3    A    Towards the back, 'cause when I got punched, I fell

4    backwards so I -- this area (indicates) where I was standing,

5    the circle, that's when I fell down backward.

6    Q    And you said you were between two cars when the assault

7    happened?

8    A    Correct.

9            MR. NAMMAR:  Can we put up 4-30.

10   BY MR. NAMMAR:

11   Q    What is shown here?

12   A    That's me next to that white pickup truck.

13   Q    And can you -- on this particular photo, where did the

14   assault take place?

15   A    To the right of the pickup truck.

16   Q    Okay.  Can you put an X at that spot?

17   A    (Complies.)

18           MR. NAMMAR:  Okay.  You can take that down.

19   BY MR. NAMMAR:

20   Q    So you said that Mr. Miske and the two others left.  You

21   were on the ground.  You found your tooth.

22           Were you able to get up at some point?

23   A    Yes.

24   Q    And when you got up, you told us you didn't call police;

25   is that right?

1    A    Pardon?

2    Q    You did not call the police, right?

3    A    No, sir.

4    Q    Okay.  Did you contact anybody else right after the

5    assault?

6    A    I called my wife.  She's a nurse.  I asked her what to do.

7    Q    Okay.

8    A    That's my first time getting assaulted.

9    Q    Okay.

10   A    And how to handle the tooth.

11   Q    Is your wife someone that you would rely on for medical

12   advice because she is a nurse?

13   A    Yes.  She's an operation nurse.

14   Q    Without telling us what she told you, what did you do

15   after speaking with your wife?

16   A    She advised me to get to the hospital as soon as possible.

17   Q    Okay.

18   A    So I drove myself to Castle Hospital.

19   Q    Okay.  Why did you go to Castle?

20   A    It's the nearest one next to my house.

21   Q    Okay.  You lived in Kailua --

22   A    Yes, sir.

23   Q    -- at that time?

24        What happened at Castle Hospital?

25   A    They did X-rays.  They checked my jaws because they were

1    in pain.  They were hair fractured, both of them.  Hair

2    fracture in the nose.  I just wanted to make sure nothing is

3    seriously broken.

4    Q    Okay.  Could they help your tooth?

5    A    No.  They didn't have a surgeon on duty at that time.

6    Q    So --

7    A    But they recommended me to get to the Queen's Hospital.

8    Q    What did you have -- so you had to go to Queen's to get

9    help with your tooth?

10   A    Correct.

11   Q    Do you recall whether your tooth was put in something?

12   A    Yeah.  They gave me some milk so to preserve it.  And

13   drove myself.  They offered me an ambulance, but I wanted to

14   get there quicker.

15   Q    So you drove yourself?

16   A    Correct.

17   Q    When you were at Castle, were you asked what happened to

18   you by the doctors?

19   A    Yes.

20   Q    Okay.  What did you tell the doctors?

21   A    At that time I told them I slipped.  I was running and I

22   slipped and fell.

23   Q    Okay.  Was that true?

24   A    That was not true, no.

25   Q    Why did you tell them you were running and you slipped and

1   fell?

2   A    Well, they're going to be calling the police, trying to

3   make a report, so report an incident, and at that time my main

4   concern is to save my tooth.

5   Q    Okay.

6   A    If they had surgeons onsite, I would have said what

7   happened because I'm getting help.  I don't want technicality

8   to delay my urgent care.

9   Q    Were you also scared at that time?

10  A    Yes, sir.

11  Q    Is that one of the reasons why you said you slipped and

12  fell while running?

13  A    Correct.

14  Q    So you said you drove to Queen's.  What assistance did you

15  get at Queen's from --

16  A    They did a surgery on my teeth to replant the tooth and

17  fix other issues because the front ones were loose also.

18  Q    Okay.  And following that surgery, did you have anything

19  over your mouth?

20  A    Yes.  They installed braces because the other tooth were

21  loose and they were afraid they were going to fall off too, so

22  they had to retain the upper jaw.

23  Q    How long were those on?

24  A    They recommended six months.  But I went almost a year

25  with them.

```
1   Q    Okay.  Were you restricted to a certain diet after that?

2   A    Yes.  I was -- in the first weeks I was restricted

3   strictly to wet -- soft diet.  I couldn't chew anything.  So I

4   had to really go easy on it.

5   Q    In the weeks that followed the assault, were you in pain?

6   A    Yes.  I was prescribed ibuprofen four months to deal with

7   the pain with the jaw.

8   Q    And did you have pain anywhere else?

9   A    I had pain in the first few days but it wasn't serious.

10  But the main pain was on the upper nose bone and the jaws and

11  upper gum area.

12  Q    Okay.  Was your nose broken?

13  A    No.  It was swollen -- it was a hair fracture, they call

14  it.

15  Q    Those problems that you talked about, had you had any

16  other problems like that before the assault?

17  A    No.  Health condition, no.  I didn't have any condition

18  like that, no.

19  Q    Did you have issues with your jaw following the assault?

20  A    Yes.

21  Q    What kind of issues?

22  A    Pain.  When you get in the cold, it gets -- because I flew

23  a lot to the mainland, so it gets really cold.  I got a lot of

24  pain.  And every time I open my jaw, it keeps clicking and

25  cracking.  So when I open my mouth, it cracks both.  Right now,
```

1    this one's still doing it as we speak.  This one, two years ago

2    it stopped doing that.

3    Q    Okay.  Did you have any of that cracking in your jaw

4    before the assault?

5    A    No, sir.

6    Q    Is the jaw one of the areas that you were hit?

7    A    Yes.

8    Q    You said your tooth was re -- reimplanted.  Did that

9    reimplantation work?

10   A    Well, cosmetically only worked.  So they were able to

11   replant it back in, but they said the nerve is dead.  So they

12   told me that eventually the tooth is going to become black and

13   I'm going to lose it.

14        So right now it's really dark orange color.  It's slowly

15   dying.

16   Q    In that tooth, can you no longer feel hot or cold on that

17   tooth?

18   A    No.  The nerve is dead, so I can't have any sensitivity to

19   the tooth.

20   Q    Did you have any issues like that before with that tooth,

21   before the assault?

22   A    No, sir.

23   Q    Okay.  After you were assaulted, the day after, did you go

24   to the Honolulu Police Department and make a report?

25   A    Yes, I did.

1   Q    Which station did you go to?

2   A    I believe I went to the Kailua location.

3   Q    Okay.

4   A    Next to my house.

5   Q    And at the station, do you recall that they took a picture

6   of you and your injuries?

7   A    Yes, sir.

8   Q    And around what time of the day did you initially walk

9   into the station?

10  A    I don't recall.

11  Q    Okay.

12       MR. NAMMAR:  Your Honor, can we publish 4-19, which I

13  believe is in?  I'm not sure, though.

14       THE COURT:  It is.  Go ahead.

15       MR. NAMMAR:  Okay.

16  BY MR. NAMMAR:

17  Q    Do you recognize these photos?

18  A    Yes, sir.

19  Q    Were these two photos that were taken of you by a police

20  officer at the station?

21  A    Yes, sir.

22  Q    And do they show some of your injuries?

23  A    Yeah.  It shows on the lower photo, it shows a swollen

24  nose right there, really swollen, and cuts under the lips,

25  upper, lower.  And I have the braces on.  They were mounted by

1     the dentist surgeon.

2     Q    Okay.  And the nose, you said, was swollen.  Is that one

3     of the areas that you were hit as well?

4     A    Yes.  It's super swollen.

5             MR. NAMMAR:  If we could show the witness only now

6     4-124, which is from the original list?

7             Oh, no, it's not, Your Honor.  It's not from the

8     original list.  I think it's -- (Confers off the record.)

9             Your Honor, it's from the third supplement.

10            THE COURT:  Okay.  Go ahead.

11            MR. NAMMAR:  Thank you.

12    BY MR. NAMMAR:

13    Q    Do you recognize what's shown here in 4-124?

14    A    Yes, sir.

15    Q    Is this the written statement that you made to the police

16    that morning?

17    A    Yes, sir.

18    Q    And does it reflect a time of 11:15 a.m. on

19    September 22nd, 2015?

20    A    Yes, sir.

21    Q    Is that around the time you remembered making the initial

22    report to the police?

23    A    Yes, sir.

24            MR. NAMMAR:  You can take that down.

25    BY MR. NAMMAR:

1  Q    So you go into the police department.  You give a written

2  statement.  Some photos are taken of you.

3        Do you recall anything memorable happening when you left

4  the police department?

5  A    Yes.  When I left the police department, I received a

6  phone call from an unknown number, and it was Mr. Miske talking

7  again about when he's going to get his money back.

8  Q    Okay.  Was he yelling again?

9  A    Yeah, yelling and -- wasn't as much yelling the first

10 time, but it was all threatening.

11 Q    Threatening?

12 A    Threatenings, yes.

13 Q    What was he threatening?

14 A    Like I'm going to get more beat up.  You really don't know

15 who you're fucking with, and eventually we're going to come for

16 you if you want more of it.

17 Q    Did you let him know anything about the police?

18 A    Yes.  I told him:  I'm at the police station parking lot

19 as we speak.  I was surprised that -- I don't know how he knows

20 at the police station at that time.

21 Q    And what was his response when you told Mr. Miske you were

22 at the police station?

23 A    He hanged up.

24 Q    Okay.  At any point in that conversation, did he talk

25 about coming for you or your family?

```
 1   A    Yes.

 2   Q    What do you recall about that?

 3   A    I'm going to come your place -- because I buy and sell

 4   cars in my house, in my garage, because I'm a wholesaler.  And

 5   at that time I did not know he lives literally two blocks from

 6   my house.

 7   Q    Okay.

 8   A    So I did not know the whole condition, but the idea that

 9   he was going to come and beat me up.  That's how --

10   Q    So he mentioned he was going to come to your place?

11   A    Yes.  Which is my house.

12   Q    Did he ever mention your family?

13   A    Yes.

14   Q    What did he say?

15   A    "In front of your family."

16   Q    Okay.  Do you recall at all whether the auction was

17   mentioned in this particular conversation or any other?

18   A    Yes.  He stated to me that he doesn't want to see me at

19   the auction anymore to buy and sell cars.

20   Q    When Miske brought up your family and your house --

21   A    Yeah.

22   Q    -- were you concerned?

23   A    Very.

24   Q    What did you do about your concerns?

25   A    I had to take proactive actions.  I have a German dog I
```

1    always keep in the back, a German Shepherd.  So now I let the

2    dog run in the front.  I have my loaded gun ready.  I talk to

3    my wife and kids to keep an eye around and --

4    Q    Did you reach out to Manheim at all?

5    A    Yes, I did.

6    Q    Why did you reach out to Manheim?

7    A    I was trying to get his information, who I'm dealing with,

8    because in the police report I did not know his last name.  I

9    only know his name Mike with Hawaii Partners, LLC.

10   Q    And were you able to find out some information from

11   Manheim?

12   A    Yes.

13   Q    And did you do some of your own research online?

14   A    Yes, sir.

15   Q    What did you do?

16   A    I got his after the name and cross-referenced it with his

17   first name and went online, tried to figure out who is this

18   person I'm dealing with because --

19   Q    And let me stop you there.  Did you end up printing up

20   some pictures?

21   A    Yes.

22   Q    And when you had those pictures, did you go back to the

23   police station?

24   A    Yes.

25   Q    Why did you do that?

1   A   Because I need to give them the complete information of
2   the person who assaulted me.
3   Q   Okay.  And was that the same day that you'd gotten the
4   threatening phone call from Mr. Miske?
5   A   Yes, sir.
6   Q   And did you make a second report?
7   A   Yes, sir.
8   Q   Okay.
9            MR. NAMMAR:  Your Honor, can we show the witness
10  only, now, 4-125 from the third supplemental?
11            THE COURT:  Okay.
12  BY MR. NAMMAR:
13  Q   Do you recognize what's shown here?
14  A   Yes, sir.
15  Q   Is this the second written statement that you gave to the
16  police?
17  A   Yes, sir.
18  Q   And is it also on the same date, September 22nd, 2015?
19  A   Yes, sir.
20  Q   And is it at around 3:30 in the afternoon?
21  A   Yes, sir.
22            MR. NAMMAR:  Can we show the witness only 4-20 from
23  our first list and 4-21?
24            THE COURT:  Yes.
25            MR. NAMMAR:  If we could go to 4-21 now.

1   BY MR. NAMMAR:

2   Q    Do you recognize 4-20 and 4-21?

3   A    Yes, sir.

4   Q    What is it?

5   A    This one is showing the -- Michael Miske with the two

6   other suspects.

7   Q    Okay.  And are these photos that you printed up and gave

8   to the police during your second visit?

9   A    Yes, sir.

10  Q    Are these accurate -- is 4-20 and 4-21, are these accurate

11  copies of the photos that you brought to the police?

12  A    Yes, sir.

13          MR. NAMMAR:  Your Honor, I move to admit 4-20 and

14  4-21.

15          THE COURT:  Any objection?

16          MR. KENNEDY:  No objection.

17          THE COURT:  Without objection, those two exhibits are

18  admitted, 4-20 and 4-21.

19          (Exhibits 4-20 and 4-21 received in evidence.)

20          THE COURT:  You may publish.

21          MR. NAMMAR:  Thank you.

22  BY MR. NAMMAR:

23  Q    Okay.  4-20 is up on the screen.  If we could zoom in on

24  the photo.

25          Is this a photo that you provided to the police on

1    September 22nd, 2015?

2    A    Yes, sir.

3    Q    Who is shown in this photo?

4    A    Michael Miske.

5    Q    Do you see Mr. Miske in the courtroom today?

6    A    Yes, sir.

7    Q    Can you point him out and describe an article of clothing

8    he's wearing?

9    A    He's sitting right behind you.  He's wearing a green shirt

10   and black suit.

11            MR. NAMMAR:  May the record reflect that the witness

12   has identified the defendant?

13            THE COURT:  Yes.  The record should reflect the

14   witness Mr. Chergui's identification of the defendant,

15   Mr. Miske.

16            MR. NAMMAR:  If we could zoom out now.

17   BY MR. NAMMAR:

18   Q    "Suspect Number 1" and "Michael Miske," is that your

19   handwriting?

20   A    Yes, sir.

21            MR. NAMMAR:  Okay.  Zoom -- if we could go to 4-21

22   now.  Zoom in on the photo.

23   BY MR. NAMMAR:

24   Q    Do you recognize this photo?

25   A    Yes, sir.

1    Q     Who is depicted in this photo?

2    A     Suspect Number 2 is on the left side, the heavyset guy

3    with the short hair.

4    Q     In the black shirt?

5    A     Yes, sir.

6    Q     Okay.  Was he one of the people that was in the Wendy's

7    parking lot that day?

8    A     Yes, sir.

9    Q     And when you mentioned there were two males -- and I think

10   you said, that were behind Mr. Miske; is that right?

11   A     Correct.

12   Q     You said one was a lot bigger than the other?

13   A     Yes.

14   Q     Which one is this?

15   A     The heavyset, the 300-pound guy.

16   Q     Okay.

17   A     That's the one with the black shirt and the tattoo on his

18   left hand.

19   Q     The individual that's on the far right, that I've just

20   circled, that's wearing the pink tie, when you walked into the

21   police department on September 22nd, 2015, did you identify

22   that particular individual as a suspect?

23   A     Yes, sir.

24   Q     Do you no longer believe that?

25   A     Yeah.  I made a mistake.  I realized he's taller than

1  Miske and -- but he's the same exact -- look exact like him,

2  but was shorter than Miske.  So I realized I made a mistake

3  when identifying Suspect Number 3.

4  Q    Okay.  Do you still, though, believe that the person on

5  the left is one of the people that assaulted you in the Wendy's

6  parking lot that I --

7  A    Yes, sir.

8          MR. NAMMAR:  If we could zoom out.  If we could --

9  thanks.

10  BY MR. NAMMAR:

11  Q    So is this a copy of the photo and your handwriting that

12  you provided to the police on September 22nd, 2015?

13  A    Yes, sir.

14  Q    And this is where you indicate that the person in the pink

15  tie is Suspect Number 2, correct?

16  A    Correct.

17  Q    But you've explained that you don't believe that anymore

18  because in part based on the height?

19  A    Correct, based on the height.

20  Q    And where you also described the heavier-set guy as

21  Suspect 3?

22  A    Correct.

23  Q    And that's your handwriting there?

24          MR. NAMMAR:  Your Honor, may we publish 1-58, which

25  is from the original list and in evidence?

 1              THE COURT:  Yes.  Go ahead.

 2   BY MR. NAMMAR:

 3   Q    Do you recognize what is shown in 1-58?

 4   A    Yes, sir.

 5   Q    What's shown there?

 6   A    Suspect Number 2.

 7   Q    This is the heavier-set person?

 8   A    Yes, sir.

 9   Q    This is the person that, I think you described, was the

10   first to assault you in the parking lot?

11   A    Correct.

12              MR. NAMMAR:  We can take that down.

13   BY MR. NAMMAR:

14   Q    You made several police reports to HPD.  Do you know what

15   happened with that investigation?

16   A    It gets nowhere, and so I had to reach out to the Senator.

17   Q    You reached out to the Senator?

18   A    Yes.

19   Q    Okay.  And did you get any response when that happened?

20   A    Yeah.  Surprisingly, I got a phone call from HPD

21   headquarter by Detective Cruz that he wants to make an

22   interview with me.

23   Q    Okay.  Did anything ever happen with that investigation?

24   A    No.

25   Q    Okay.

1   A    I met up with him, and it was not an interview.  It was an
2   interrogation.
3   Q    You felt that it was an interrogation of you?
4   A    Yeah, it was using interrogation techniques with me.  I
5   was the victim and I was being processed as the -- the suspect.
6   Q    Regarding Mr. Miske's demands to repay you money, did you
7   ever make any payments to Mr. Miske?
8   A    No, sir.
9   Q    After you were assaulted by Mr. Miske and two others, did
10  you change the way you did business?
11  A    Yes, sir.
12  Q    How so?
13  A    I -- luckily the auctions started doing online auctions.
14  So -- because what happened, I tried to keep my lifestyle the
15  same way.
16       I went to the auction a couple times, and Michael Miske
17  went to the auction and he was following me everywhere and
18  literally tapping his shoulder against his shoulder.  So he was
19  harassing me.
20  Q    Did you think that was intentional?
21  A    Yes, sir.
22  Q    So did you go to online auctions?
23  A    Yeah.  Started buying the cars online.  I changed my way.
24  I stopped going to the auction, but I was inspecting the cars
25  on Tuesday and buying them on Wednesday from my computer.

1   Q    Did you do anything about your business hours?

2   A    Yes.  I started avoiding local phone calls because I don't

3   know if he's going to have him or any one of his buddies.  So I

4   dealt only with military and out-of-states because it's safer

5   to deal with those.

6   Q    And were you constantly looking over your shoulder?

7   A    Yes.  Make sure I'm not being followed.

8   Q    Did you --

9   A    Both eyes in the back of my head.

10  Q    Did you change your business hours to close earlier?

11  A    Yes.

12  Q    And this was a result of being assaulted?

13  A    Correct.

14  Q    Were you eventually -- did you eventually speak with the

15  FBI?

16  A    Yes, sir.

17  Q    And when you met with them, did you tell them about what

18  happened to you?

19  A    Yes, sir.

20  Q    Okay.

21          MR. NAMMAR:  Pass the witness, Your Honor.

22          THE COURT:  Mr. Kennedy, cross when you're ready.

23          MR. KENNEDY:  Thank you, Your Honor.

24  ///

25  ///

1              CROSS-EXAMINATION

2    BY MR. KENNEDY:

3    Q    Sir, when you started your testimony today, you took an

4    oath, correct?

5    A    Yes, sir.

6    Q    You took an oath to tell the truth, correct?

7    A    Yes, sir.

8    Q    Now, you've taken oaths before, correct?

9    A    Yes, sir.

10   Q    During immigration-related interviews, correct?

11   A    Yes, sir.

12   Q    One being held in 2017?

13   A    Yes, sir.

14   Q    One being held in 2023?

15   A    Yes, sir.

16   Q    And in both of those cases, those interviews were under

17   oath, correct?

18   A    Yes, sir.

19   Q    You were asked a question, correct?

20   A    Yes, sir.

21   Q    And you lied.

22   A    No.

23   Q    In fact, you were asked how many children you have,

24   correct?

25   A    Yes.

1   Q    And you lied under oath.

2   A    How?

3   Q    By failing to disclose the existence of a child that you

4   fathered.

5   A    What was the number I gave when I was asked the question?

6   Q    I'm sorry, sir?

7   A    What was the question?

8   Q    The question was how many children you have, and you lied

9   under oath --

10  A    What was my answer?

11  Q    -- during an official proceeding, correct?

12  A    No, sir.

13  Q    Now, in two separate applications for naturalization, one

14  in 2016 and one in 2020, you failed to disclose that as well,

15  correct?

16  A    No.

17  Q    That was not under oath, but it's an official proceeding,

18  correct?

19  A    Official proceeding, yes.

20  Q    You failed to expose the existence of your youngest

21  biological child, correct?

22  A    No.

23  Q    When you answered those questions, correct?

24  A    No.

25  Q    And you lied in that official proceeding, correct?

1   A     No.

2   Q     Relating to your status in this country, correct?

3   A     No.

4   Q     You testified in front of the grand jury on September 26

5   of 2018, correct?

6   A     Yes.

7   Q     You were asked a question, correct?

8   A     Yes.

9   Q     You were asked:  Question:  How many, do you have

10  children?

11        And your answer was:  Three kids.

12        And where do they live?  Kailua.

13        Correct?

14  A     Yes.

15  Q     Once again under oath, that was untrue?

16  A     That was true.

17  Q     That was true?

18  A     Yeah.  I have three kids.

19  Q     And you have four children, so you lied to the grand jury.

20  A     I had three kids.

21  Q     All right.  So you have lied under oath on those

22  occasions?

23  A     That's not correct.  No.

24  Q     And there was an investigation by the Department of

25  Homeland Security, correct?

1    A    Yes.

2    Q    And the Homeland Security made a conclusion that you had

3    lied under oath, correct?

4    A    No.

5    Q    All right.  Now, you've been in Hawaii since 2015, right?

6    A    Yes.

7    Q    And I believe since that time you have a small car

8    business, right?

9    A    Yes, sir.

10   Q    Doing auto sales in the beginning, right?

11   A    Yes, sir.

12   Q    And then some auto repair, correct?

13   A    Correct.

14   Q    And I believe you said that you were involved from the

15   time you got here in July of 2015, you were in the process of

16   becoming a policeman with the Honolulu Police Department,

17   correct?

18   A    Yes, sir.

19   Q    And so on February 17th of this year, 2020 -- excuse me --

20   it's my mistake and I apologize.

21        On February 17th of 2023, you spoke with some special

22   agents from the Department of Homeland Security, correct?

23   A    February 17, 2023?

24   Q    Yes.

25   A    Yes, not --

1    Q    And a member of the prosecution team was there as well,

2    correct?

3    A    Yes.

4    Q    And in that interview you said that you were incorrect

5    when you had said that you had failed the police psychological

6    exam one time, correct?

7    A    Well, which department?

8    Q    For the Honolulu Police Department.

9    A    Yes.

10   Q    When in fact you had failed it three times?

11   A    We were talking about the last application.  We were not

12   talking about the whole process.

13   Q    We're talking about the police psychological exam.

14   A    Every time --

15   Q    You failed it three times, you told them, and you had

16   incorrectly said previously that you had only failed it once?

17   A    Yeah.  Only one time.

18   Q    So --

19   A    I failed the process three times.

20   Q    In your interview with the FBI that was just mentioned, on

21   February 1st of 2016, when you first -- you spoke with them and

22   you said you were involved in the hiring process at that time

23   with the Honolulu Police Department, correct?

24   A    Yes, sir.

25   Q    At the time you spoke with the FBI in February 2016?

1   A    Yes, sir.

2   Q    And you told them that you had failed the psychological

3   examination three times, correct?

4   A    Failed the process three times.  The process has 12 steps.

5   If you fail one step, you have to re-do the whole thing all

6   over.

7   Q    Did you not tell the FBI that it was the psychological

8   examination --

9   A    Yeah.

10  Q    -- that you had failed three times?

11  A    One of the -- one of examinations is the psychological.  I

12  failed three times.  I did not fail the same subject three

13  times.

14  Q    So you were asked in front of the grand jury a question

15  regarding that.  The question began with:  So did you ever pay

16  Mike Miske his money back?  And you said:  No, sir.

17       Correct?

18  A    Correct.

19  Q    For the vehicle?

20       Has he requested and threatened you?  And you said no.

21  A    They asked me if I gave him his money back, and I said no.

22  Q    And then the -- the question was:  So did you ever pay

23  Mike Miske his money back?  And you answered:  No, sir.

24       Then the question was completed "for the vehicle."

25  A    Correct.  I did not give him the money back.

1   Q    Then you were asked:  Has he requested and threatened you?
2   And you had said no.

3        Then you were asked:  How has this affected you?

4        Well, at the time, I was actually in the selection process
5   for HPD.  I passed my physical, passed the psychological, the
6   exam, the evaluation, everything.  I was only two steps from
7   becoming an HPD police officer myself.  I lost my faith in the
8   Honolulu police, all corrupted.

9        Was that the answer that you gave?

10  A    Yes, sir.

11  Q    But you had failed the psychological exam three times.

12  A    No, we'll have -- again, you keep insisting psychological.
13  I failed the process three times, and there is no restriction.
14  You can apply as many time as you want.

15  Q    So you told the grand jury --

16  A    Mm-hmm.

17  Q    -- made up of individuals like this, something that wasn't
18  true when you said you passed the psychological exam?

19  A    I passed the psychological before that.  I failed the
20  background on the second time.

21  Q    The truth is, you failed the psychological exam three
22  times, never told the grand jury that fact while you were under
23  oath, correct?

24  A    That's not true.  No.

25  Q    Now, when you went to the Castle Hospital in Kailua, you

1    told them that you were -- your complaints were that you had

2    taken a fall, right?  While you were walking down the steps?

3    A    Yeah.

4    Q    And that you had twisted your ankle, right?

5    A    I slipped.

6    Q    Falling on your face?

7    A    Hit my face on the rails.

8    Q    And knocking out your tooth?

9    A    Correct.

10    Q    And that's what you told them at the Castle Hospital,

11    correct?

12    A    Correct.

13    Q    Then you said that they didn't have a dentist to do

14    surgery, so you were able to drive yourself to Queen's Hospital

15    in downtown Honolulu, correct?

16    A    Correct.

17    Q    And there you told them that you were running?

18    A    Mm-hmm.

19    Q    Not walking down steps, correct?

20    A    Yes.  I was in my sportwear.  I had shorts and short

21    sleeves and I was wearing gym shoes.

22    Q    So the first thing, at the Castle Hospital you said you

23    were walking down some steps, correct?

24    A    Mm-hmm.

25    Q    And then you twisted your ankle, right?

1    A    Slipped, hit my face.

2    Q    Slipped?

3    A    Twisted my ankles as you're rolling down the steps.

4    Q    So then when you got to the Queen's Hospital, you weren't

5    walking down steps.  Now you told them that you were running

6    and it was in the rain?

7    A    I just got hit and I got concussions.  I don't know

8    exactly how bad I was.  So having some small details in my

9    statement, you will not be accurate when you get beat up with

10    three people in the head and in the face.  So excuse my

11    inconsistency making my statements to medical staff versus a

12    court.

13    Q    All right.  And that you slipped and fell, right?

14    A    Yes, sir.

15    Q    Injured your ankle?

16    A    Sure.

17    Q    Your nose?

18    A    Mm-hmm.

19    Q    And lost your tooth during the fall?

20    A    Yeah.

21    Q    That's what you told the folks at the Queen's Hospital,

22    right?

23    A    No.  I told it to the people on Castle.

24    Q    I --

25    A    Queen's never asked me.

 1              MR. KENNEDY:  If we can go to Exhibit 4-14, which I

 2    don't believe has been admitted yet, Your Honor?

 3              THE COURT:  Go ahead.

 4              MR. KENNEDY:  If we can just pull it up for the

 5    witness.

 6    BY MR. KENNEDY:

 7    Q    Do you recognize the first page, sir?

 8    A    Yes, sir.

 9    Q    Okay.  If we move to --

10              MR. KENNEDY:  And I believe it's in the government's

11    original, Your Honor.

12    BY MR. KENNEDY:

13    Q    If we move to page 6, do you see on page -- first off, on

14    page 6, do you see your name, your age, and that these records

15    relate to you at the Queen's Hospital?

16    A    Yes, sir.

17    Q    All right.  And on page 6 -- all right.

18         And what is on page 6 deals with an SP, a slip and fall,

19    with blunt face trauma, correct?

20    A    Yes, sir.

21    Q    All right.  If we move to page 14 of this document, do you

22    see that the history is that you were running in the rain,

23    slipped and fell?

24    A    Yes, sir.

25    Q    So you did tell the Queen's Hospital that, correct?

1    A    No, sir.  If you go back to page 6, you're going to read

2    on the bottom it says "referred."  They transferred my

3    statement and they transferred the filed [verbatim] from Castle

4    Hospital to Queen.  So when I get to Queen, they already had

5    the referral from Dr. Curtis and they transferred my statement

6    from him to Queen.

7         So when I got there, they already had the whole story --

8    Q    Okay.

9    A    -- transferred.

10   Q    All right.

11   A    So it wasn't a statement.  It was transferred.

12   Q    All right.  And so you mentioned a doctor's name from

13   Castle Hospital, correct?

14   A    Page 6.

15   Q    All right.  Let's go to 4-13, which I believe is in the

16   government's original.

17        Sir, do you recognize that as the hospital that we

18   commonly refer to as Castle Hospital in Kailua?

19   A    Yes, sir.

20   Q    All right.  And if we move -- does it -- by looking at

21   4-13, do you see that these medical records deal with yourself?

22   A    I'm reading it.  One moment.

23   Q    Sure.  Take your time.

24   A    Yes, sir.

25   Q    All right.  Do you see that the medical records refer to

1    yourself?

2    A    Yes, sir.

3    Q    And it appears that the date of service of these records

4    is between September 21st of 2015 all the way up to April 3rd

5    of 2022?

6    A    Yes, sir.

7    Q    Okay.  Sir, I want to draw your attention -- and if we

8    could just go to page 106 within this document.

9              MR. KENNEDY:  One, zero, six.

10             THE COURT:  Are we looking at 4-13?

11             MR. KENNEDY:  We are, I believe, Your Honor.  I think

12   there are over a hundred pages there.

13             THE COURT:  Not in my version.  It's 47 pages in

14   mine.

15             MR. KENNEDY:  Well, let's see.

16             (Counsel confer off the record.)

17             MR. KENNEDY:  Your Honor, I've just shown counsel

18   what is at the bottom of the page shown as 106.  I'm just

19   trying to confirm that that is the records that relate to the

20   incident.  I believe earlier in this production, as the Court

21   could see, I believe that it goes all the way to 2022.  So it

22   may be that what is now in Exhibit 4, dash -- if I go back to,

23   I think it was --

24             MR. NAMMAR:  I'm not -- the only pages I have are 47,

25   counsel.

 1          THE COURT:  If you look at the footer on the bottom

 2   left corner, Mr. Kennedy, it says:  Adventist Health Castle,

 3   page 45 of 45.

 4          MR. KENNEDY:  All right.

 5          THE COURT:  So it does seem like it's complete as I

 6   have it.

 7          MR. KENNEDY:  Could be complete as you have it then,

 8   Your Honor.  May -- I've shown it to counsel.  I thought that

 9   they had more when I pulled it up last night, with the

10   four-one-six number.

11          May I approach and hand this up to the Court before I

12   approach the witness?

13          THE COURT:  Yes, you may.

14          MR. KENNEDY:  I just have one copy of it.  I thought

15   it was electronically.

16          May I approach, Your Honor?

17          THE COURT:  Yes, you may.

18          MR. KENNEDY:  (Hands document to the Court.)

19          Your Honor, my cocounsel, who knows these documents

20   better -- I believe what I was looking at was an earlier

21   version of 4, dash, 13.

22          THE COURT:  This looks to be page 6 of this very same

23   exhibit.

24          MR. KENNEDY:  Oh, did I not pull up the right one?  I

25   apologize.

1           THE COURT:  So again, the bottom left-hand corner,
2    page blank of 45.
3           MR. KENNEDY:  Oh, okay.
4           THE COURT:  Your -- the copy of the document you just
5    handed me says page 4 of 45, which is page 6 of Exhibit 4-13.
6           MR. KENNEDY:  All right.  Then whatever I was looking
7    at -- let's see.  May I see that?
8           COURTROOM MANAGER:  (Returns document to counsel.)
9           MR. KENNEDY:  Oh, I'm sorry, Your Honor.  What I was
10   looking at was, it's page 106, down here.  I apologize.
11          May I approach the witness?
12          THE COURT:  This is page 6.  This is what I'm
13   saying -- I'm telling you.
14          MR. KENNEDY:  Yes.
15          THE COURT:  This is -- the numbering is off.  But
16   this is page 6 of this exhibit.
17          MR. KENNEDY:  Okay.
18          THE COURT:  I don't think you need to approach him
19   with anything.  We have that electronic --
20          MR. KENNEDY:  Okay, great.  Let's scroll it up.  I
21   was confused by the 106 at the bottom in the earlier
22   production.
23          THE COURT:  I can't explain why that's on there,
24   but --
25          MR. KENNEDY:  But if we've got it up, that's perfect.

1   BY MR. KENNEDY:

2   Q    Sir, can you take a look at what is shown on page 6 of

3   4-13?

4   A    Yes, sir.

5   Q    And we will -- just want you to blow up that portion and

6   read it to yourself, sir.

7   A    (Reviews document.)

8        Yes, sir.

9        MR. KENNEDY:  All right.  We can take that down now.

10  BY MR. KENNEDY:

11  Q    So at Castle Hospital what you told them was that you were

12  walking down the steps, correct?

13  A    Can't recall exactly.  But whatever I said there, it's

14  there, on record.

15  Q    And twisted your ankle, correct?

16  A    Slipped then twisted ankle.

17  Q    And that was not what was then just taken to Queen's

18  Hospital because there you were running, correct?

19  A    If you see the timestamp, 20:58, the meeting I had with

20  Michael Miske was 8:00 o'clock.  From that meeting, for me to

21  drive to Honolulu from Queen's Hospital, it took 35 minutes.

22  The meeting was less than five minutes.  The timestamp from the

23  time I met up with him to the time I made it from Wendy's over

24  there, it's consistent with the time frame I have over there.

25       So running or jogging or walking, it's irrelevant how the

 1   injury happened.

 2   Q    Well, at the locations you're describing how it happened

 3   to the medical professionals, correct?

 4   A    Yeah.

 5   Q    And in one version you're walking down some stairs, right?

 6   A    Yeah.  It's a verbal statement.  I did not write it.

 7   Q    Which is very different than running, correct?

 8   A    And when my tooth is missing and it's swollen and with my

 9   English and my accent, if they misunderstood me, that's on

10   them.  But my mouth was swollen, I'm missing a tooth.  I have

11   cloth over it, and I'm talking.  So running or walking, it's

12   irrelevant.  I understand where you're trying to get to,

13   counsel.

14   Q    Now, you mentioned that there was an HPD officer by the

15   name of Cruz, right?

16   A    Detective Cruz.

17   Q    Detective, correct?

18   A    Yes, sir.

19   Q    And I believe you said that you had contacted a senator?

20   A    Correct.

21   Q    All right.  Now, the detective gave you a form, right?

22   A    I don't recall.  It has been eight years now.

23   Q    And so the detective said:  Please go back to the

24   hospital, use this form and change the medical records to be

25   consistent with what you've told the police.  Correct?

1   A    I don't remember that.

2   Q    And -- because what you told the medical folks was that it

3   was an accident, a fall, right?

4   A    At that time, just trying to seek medical care.

5   Q    Right.  And what the detective was saying is just fill out

6   the form and go to the hospital and just change it to an

7   assault, right?

8        That's what you were instructed to do, correct?

9   A    No, sir.  Can you repeat the question?

10  Q    Yes.  You told the FBI on February 1st of 2016 that the

11  detective gave you a form, correct?

12  A    Again, I don't recall what happened 2016, when 2024 --

13  Q    All right.

14  A    -- it's been eight years, sir.

15  Q    All right.

16  A    Is there something in writing you can show me so we can go

17  over it?

18  Q    I will.

19  A    Please.

20       MR. KENNEDY:  If we can pull up 9042-01, just for the

21  witness.

22  BY MR. KENNEDY:

23  Q    Do you recall a interview with members of the FBI, which

24  looks like it occurred on February 1st of 2016?

25  A    You can give me a moment to read this form, please?

1    Q    Yes.

2    A    Thank you.

3         (Reviews document.)

4         Yes, sir.  Go ahead.

5    Q    All right.  And if we could then -- do you recognize it as

6    an interview that was done by the FBI with you on February 1st

7    of 2016?

8    A    Yes, sir.

9    Q    All right.  If we can move then to page 3.  And if we look

10   at the -- the second full paragraph on that page and just blow

11   that up for you, sir, so it's easier to read.  Let me get rid

12   of that.

13        Can you just read that to your --

14   A    Can I read the whole paragraph before it too?

15   Q    Absolutely.

16        MR. KENNEDY:  Can we pull it back?

17        And then let me get that out of the way.

18   A    (Reviews document.)

19   BY MR. KENNEDY:

20   Q    And when you're done with that paragraph, let me know, and

21   we'll move to the next one.

22   A    Yes, sir.  Go ahead.

23   Q    All right.  Let's move to the next one.

24   A    (Reviews document.)

25        Yes, sir.  Go ahead.

1   Q    All right.

2        MR. KENNEDY:  If we can pull that down, and then pull

3   that down.

4   BY MR. KENNEDY:

5   Q    So you told the FBI that the detective, Mr. Cruz, gave you

6   a form, correct?

7   A    Yes, sir.

8   Q    To change your discharge paperwork, right?

9   A    No.

10  Q    For the hospitals, right?

11  A    No.  He gave me that paper so they can release all the

12  records to him.  He did not say to change the records.

13  Q    Didn't the form that was given you would reflect the cause

14  of injury as an assault, as you've told them, rather than an

15  accidental fall, correct?

16  A    No.

17  Q    And didn't you tell the FBI that you refused to complete

18  the task because you believed it was just a way for HPD to slow

19  the process with red tape and bureaucracy, right?

20  A    No.

21  Q    You didn't tell them that?

22  A    No.  I said I'm tired of the bureaucracy of HPD not doing

23  their job and giving me update about the case.

24       I did not say that HPD gave me the documents to change my

25  record.  They wanted all the record.  Like the FBI, they want

1   and get all my medical record.  The detective wanted the full

2   record of what happened on my discharge paper.  He wanted the

3   discharge paper to have a condition of what happened.

4   Q    Correct.

5   A    He did not ask me to change my statements --

6   Q    All right.

7   A    -- in any way or shape.

8   Q    Okay.  Then on May 10th of 2016, you met with the FBI

9   again, correct?

10  A    Yes, sir.

11  Q    And at this time I believe it may have been a phone call,

12  and the FBI asked you to go to the hospital to complete the

13  form to reflect the cause of injury as an assault, not an

14  accidental fall, correct?

15  A    I don't remember that phone call, sir.

16       MR. KENNEDY:  If we can take a look at 9042-005,

17  which I believe is also in the original exhibit list.

18  BY MR. KENNEDY:

19  Q    And it would be the fourth paragraph down, if you just

20  want to read that paragraph to yourself, sir.

21  A    (Reviews document.)

22       Okay.  I read that.  Yes.

23  Q    All right.  So you were -- you told the FBI that you had

24  been instructed to take the form to the hospital to change the

25  discharge to show an assault rather than an accidental fall?

1    A       Mm-hmm.

2    Q       Correct?

3    A       Based on the statement here, yes.

4    Q       And you never did complete that form and change it to this

5    day, have you?

6    A       I didn't know who to address to because when I was

7    supposed to go and change my braces, the dentist who was

8    processing me the whole time and doing the regular visit, she

9    wasn't there anymore.

10   Q       All right.  So despite being directed by both the Honolulu

11   Police Department and the FBI --

12           MR. NAMMAR:  Objection, misstates the report.

13   BY MR. KENNEDY:

14   Q       You have not done that, correct?

15           MR. NAMMAR:  Objection, misstates the report.

16           THE COURT:  Go ahead.

17           THE WITNESS:  Answer, sir?

18           THE COURT:  Yes.

19           THE WITNESS:  Okay.  Repeat your question, sir.

20   BY MR. KENNEDY:

21   Q       Despite being directed by the Honolulu Police Department

22   and then telling the FBI that you had been directed to do it,

23   and them encouraging you to do it, to change the discharge to

24   show what you've said on the police forms versus what you told

25   the hospital, you still haven't done that?

1    A    No, sir.

2    Q    You didn't take either the HPD or the FBI's direction?

3         MR. NAMMAR:  Objection.  Facts not in evidence,

4    misstates the report, hearsay.

5         THE COURT:  You may answer.  The objections are all

6    overruled.

7    A    No.

8    BY MR. KENNEDY:

9    Q    Now, the HPD interviewer, you told the special agents from

10   the Department of Homeland Security, who you met with, you had

11   said that you were earning money from your car dealership in

12   Illinois, which was still active, right?

13   A    Correct.

14   Q    Yet when you told the HPD interviewer in 2015, you told

15   him that you were in Hawaii to work in the security consulting

16   business for Alliance Security, right?

17   A    Yes, sir.

18   Q    And that wasn't true?

19   A    No.  I am.  I am a licensed armed security guard in the

20   State of Illinois all the way to 2018.

21   Q    But this was in 2015, sir?

22   A    Correct.  I had my license from 2013, sir.

23   Q    From 2013?

24   A    Yes, sir.

25   Q    So were you in Hawaii doing work for the security

1   consulting business?

2   A     So the consulting work --

3   Q     Were you?

4   A     Yes, sir.

5   Q     All right.  I thought you told the interviewer that that

6   wasn't true.  You're saying it's now true?

7   A     Sir, I came here.  I applied with HPD, and I was flipping

8   cars.  And I had the security company, called Olai [phonetic]

9   Security, which I am licensed with in the State of Illinois,

10  doing part-time work for them.  They wanted to see if they can

11  expand their branches to Hawaii.  So I was doing an assessment

12  how the process go, and I was making consulting work without

13  being paid for.  Therefore, if I had been asked by any

14  jurisdiction if I am getting any compensation for work I do, I

15  wasn't collecting any compensation, therefore I am not

16  officially working.

17  Q     All right.

18  A     Consulting, it's not to mean you are employed, counsel.

19  Q     Now, you're aware that the Manheim auction is not the only

20  auction in the state of Hawaii, correct?

21  A     It's the only licensed dealer auction for operated

22  vehicles in the state of Hawaii.

23  Q     All right.  You don't know of any other auction in the

24  state?

25  A     There is other auctions for insurance, salvaged, rebuild

1    vehicles.

2    Q    Okay.

3    A    Not for dealers auction.

4    Q    All right.

5    A    There's only one auction in state of Hawaii and it's to

6    this date.

7    Q    Now, with respect to --

8         You were shown some pictures, and I believe 4-20 is one of

9    them, correct?

10   A    I don't recall 4-20, sir.

11        MR. KENNEDY:  If we could just pull up 4-20, which I

12   believe was just introduced in evidence?

13        THE COURT:  Yes.  Go ahead.

14   BY MR. KENNEDY:

15   Q    And you said this was Suspect 1, Mr. Miske, correct?

16   A    Correct.  Yes, sir.

17   Q    All right.  If we move to 4-21, you have Suspect 3 and

18   Suspect 2.  Correct?

19   A    Yes, sir.

20   Q    Now, I was here this morning.  You described the suspect,

21   the larger one, as Asian, right?

22   A    Mm-hmm.

23   Q    Five foot six?

24   A    Mm-hmm.

25   Q    And 300 pounds?

 1    A    Approximately.

 2    Q    All right.  And you described the other individual as five

 3    foot four?

 4    A    Mm-hmm.

 5    Q    Asian and 175 pounds, correct?

 6    A    160 pounds, I stated earlier.

 7    Q    160 pounds.

 8    A    No hair.

 9    Q    And so Suspect 3 in this picture is the five foot six,

10    300-pound person that you described?

11    A    Yes, sir.

12    Q    And I believe with Suspect 2 you identified that

13    individual as the suspect on that day, correct?

14    A    Yes, sir.

15    Q    But you now say that's not the case?

16    A    The height.  You see that photo for Suspect Number 3 is

17    exactly as Suspect 3.  The only one is when I identified him I

18    was told that actually he's an attorney, but still looks

19    exactly like him.

20    Q    Now, sir, in -- when you clarified that and you realized

21    that you were wrong, you said that that person was Asian,

22    right?

23    A    Mm-hmm.

24    Q    But they had a long beard coming from the chin?

25    A    He had a goatee, not a long beard.

 1              MR. KENNEDY:  If we can go to 40 -- excuse me --

 2    9042-001, which is not in evidence.

 3    BY MR. KENNEDY:

 4    Q    If you'll look at page 4.

 5         And if you go to the second full paragraph.  And let me

 6    get rid of that.  And just read that to yourself, sir.

 7    A    (Complies.)

 8         Yes, sir.

 9              MR. KENNEDY:  All right.  We can take that down.

10    BY MR. KENNEDY:

11    Q    Did you not describe that someone as having a long beard

12    coming down from his chin, not a goatee?

13    A    I meant a goatee.  I never read this report.  So if I read

14    it, I would have corrected it.  This the first time I see this

15    report.

16    Q    All right.  Now, you brought a car to an individual by the

17    name of Richard Carvalho.  Do you know him?  At Global Auto

18    Body?

19              MR. NAMMAR:  Objection and beyond the scope.

20              THE COURT:  Let's see where this goes for now.

21              Go ahead.

22    A    Richard, yes.

23    BY MR. KENNEDY:

24    Q    And Mr. Miske was there, right?

25    A    I saw a vehicle leaving.  I was doing my -- doing safety

1  inspection over there.

2  Q    And Mr. Miske was physically there at that location?

3  A    I was pulling in and he was pulling out.

4  Q    And you were there for a safety check and it failed,

5  right?

6  A    I don't remember.  I went there like probably 50 times.  I

7  don't know which one you're referring to, counsel.

8  Q    And Richard, who owns Global Auto Body, asked you to leave

9  the property, didn't he?

10  A    He doesn't own --

11          MR. NAMMAR:  Objection and beyond the scope.

12          THE COURT:  And where is this headed?

13  BY MR. KENNEDY:

14  Q    And then you called the police, right?

15          THE COURT:  I asked you:  Where is this headed?

16          MR. KENNEDY:  To an incident where he called the

17  police on this individual for asking him to leave his business

18  property.

19          THE COURT:  The objection is sustained.

20          When I ask a question, I expect it to be answered,

21  not to be ignored.

22          MR. KENNEDY:  All right.  I apologize, Your Honor.

23  BY MR. KENNEDY:

24  Q    Now, I want to go back to that interview with Detective

25  Cruz, right?

```
 1  A    Yes, sir.

 2  Q    You said that it wasn't an interview, it was more like an

 3  interrogation, right?

 4  A    Yes.

 5  Q    And they were asking you questions, correct?

 6  A    Yes, sir.

 7  Q    And at that time, and it persists to this day, you still

 8  haven't brought the paperwork to change the hospital records to

 9  show that it was an assault rather than an accidental --

10          MR. NAMMAR:  Objection, asked and -- sorry, counsel.

11          MR. KENNEDY:  -- fall, correct?

12          MR. NAMMAR:  Objection, asked and answered.

13          THE COURT:  Sustained.

14  BY MR. KENNEDY:

15  Q    Now, in that interview it was an interrogation-like,

16  right?

17  A    Yeah.

18  Q    Because on the day that you described to the jury, you've

19  left out that you went and grabbed your firearm and attempted

20  to do so, correct?

21  A    Repeat the question slowly.

22  Q    On September --

23  A    I apologize.

24  Q    -- in a parking lot --

25  A    We talked about the detective and you jumped to firearm.
```

1    I didn't make it -- sorry.

2  Q    I'm talking to the day that you described to the jury.

3       You went to grab a firearm prior to the assault, correct?

4  A    From where?

5  Q    Your trunk.  Which you had with you, correct?

6  A    No, sir.

7  Q    And you said you had a loaded firearm and you were ready

8  to use after that, right?

9  A    I said to the jury that my wife told me:  Don't go, should

10  take the dog with you.  And I was thinking about taking a

11  firearm, and I told myself you can't carry the firearm in the

12  state of Hawaii.  That's illegal.  So I had to leave my firearm

13  at home.

14  Q    And so when you went to pull that firearm is when it

15  happened, correct?

16  A    What's the question again?

17  Q    When you went to pull the firearm, that's when it

18  happened, right?

19  A    What did happen?  Doesn't make sense, your question.

20  Q    The assault.  You were grabbing a gun, sir.

21  A    No.

22       I live in Kailua.  The meeting was in Honolulu.  So how I

23  do have a gun into the meeting if my weapon was stored at home?

24  It don't make sense, counsel.

25  Q    You took it with you, sir.

1   A    No, I did not.  It's illegal.

2              MR. KENNEDY:  Nothing further.

3              THE COURT:  Mr. Nammar, redirect.

4                      REDIRECT EXAMINATION

5   BY MR. NAMMAR:

6   Q    You were just asked about the Wendy's parking lot.  The

7   assault, that's where it took place, right?

8   A    Yes, sir.

9   Q    Did you have your gun with you on that day?

10  A    No, sir.

11  Q    Did you leave your gun at home?

12  A    Yes, sir.

13             MR. NAMMAR:  Your Honor, can we bring up 4-124, which

14  is not in evidence?

15  BY MR. NAMMAR:

16  Q    Mr. Chergui, is this your initial statement that you wrote

17  out to HPD?

18  A    Yes, sir.

19  Q    And is this the statement where you outlined to the police

20  on the day after the assault what happened to you in the

21  Wendy's parking lot with Mr. Miske?

22  A    Yes, sir.

23  Q    And do you go into detail about exactly what happened?

24  A    Yes, sir.

25             MR. NAMMAR:  Your Honor, I move into evidence at this

1   time 4-124 as a prior consistent statement.

2              THE COURT:  Any objection?

3              MR. KENNEDY:  I believe he can read it, but it

4   shouldn't go into evidence, Your Honor.

5              MR. NAMMAR:  Should come into evidence, Your Honor.

6              THE COURT:  The objection's overruled.

7              4-124 is admitted.

8              (Exhibit 4-124 received in evidence.)

9              THE COURT:  This is on your third supplemental list?

10             MR. NAMMAR:  Yes, Your Honor.

11             THE COURT:  All right.  Thank you.

12             MR. NAMMAR:  If you could zoom in on the top box.

13  BY MR. NAMMAR:

14  Q    Is that your name right there, Mr. Chergui?

15  A    Yes, sir.

16  Q    And is that in your handwriting?

17  A    Yes, sir.

18  Q    And did you write that your occupation was security

19  specialist, Alliance?

20  A    Yes, sir.

21  Q    Why did you do that?

22  A    Because I have credentials from them.

23             MR. NAMMAR:  Can you zoom out?  Can you zoom in on

24  the body?

25  BY MR. NAMMAR:

1    Q    First of all, at the bottom left-hand side, is that your

2    signature?

3    A    Yes, sir.

4    Q    And did you sign it after you had reviewed this statement?

5    A    Yes, sir.

6    Q    Is this in your handwriting?

7    A    Yes, sir.

8    Q    Okay.  The first line, does it read:  On Monday,

9    September 21, 2015, at around 8:00 p.m., at the Wendy's parking

10   lot next to Harley-Davidson on Nimitz Highway, I met Mike, used

11   car dealer from Hawaii Auto Partners, LLC, to discuss a problem

12   and he showed up with two extra unknown males.

13        Is that what it says?

14   A    Yes, sir.

15   Q    As the meeting went from bad to worse verbally, out of

16   nowhere, with no warning, I got punched on my face, falling to

17   the ground, and all three of them started punching me and

18   kicking me all over my body.

19        Is that what it says?

20   A    Yes, sir.

21   Q    Mike told me if I do not refund his money paid for the

22   car, I will see more of it.

23        Did I read that right?

24   A    Yes, sir.

25   Q    And asked me, quote, when I get my money back, end quote.

1         Did I read that right?

2    A    Yes, sir.

3    Q    I told them tomorrow.  And he -- I told him tomorrow

4    and -- can you read that next line?

5    A    He told -- he told -- he told the title on me.

6         He threw the title on me.

7    Q    "He threw the title on me"?

8    A    Yes, sir.

9    Q    Does it go on to say:  I picked up my broken tooth and

10   checked myself into Castle Hospital ER?

11   A    Yes, sir.

12   Q    Did I read that right?

13   A    Yes, sir.

14   Q    I had 30 minutes to reimplant my tooth before it was too

15   late.

16        Did I read that right?

17   A    Yes, sir.

18   Q    And I could not take the plate number of his car, but it

19   was a late-model Chevy Cruze black sedan.

20   A    Yes, sir.

21   Q    Is that the kind of car you remember him --

22   A    Yes, sir.

23   Q    -- driving?

24        If you could go to the next page now.

25        It goes on to say:  I am willing to prosecute.  I will be

 1    able to identify them.

 2         And then there's a phone number listed.  Do you see that?

 3    A    Yes, sir.

 4    Q    Is that the same phone number from the text messages that

 5    we looked at before?

 6    A    Yes, sir.

 7              MR. NAMMAR:  Can we show the witness only now 4-125?

 8              THE COURT:  You may.  Go ahead.

 9    BY MR. NAMMAR:

10    Q    Mr. Chergui, is this your second statement that you made

11    later that day after receiving a threatening phone call?

12    A    Yes, sir.

13    Q    And this is another written statement that you submitted

14    to the police on that same day?

15    A    Yes, sir.

16              MR. NAMMAR:  Your Honor, I move to admit 4-125.

17              THE COURT:  Any objection?

18              MR. KENNEDY:  Same objection, Your Honor.

19              THE COURT:  This is admitted as a prior consistent

20    statement?

21              MR. NAMMAR:  Yes, Your Honor.

22              THE COURT:  Why is it necessary to do that?

23              MR. NAMMAR:  'Cause he's called into his credibility

24    about the threat.  He specifically read a portion of the grand

25    jury, which is about this particular threat in particular,

1    which is covered by this statement.

2          THE COURT:  Hold on.  Let me finish reading it,

3    please.

4          The objection's overruled.  4-125 is admitted.

5          (Exhibit 4-125 received in evidence.)

6          THE COURT:  You may publish.

7    BY MR. NAMMAR:

8    Q    Mr. Chergui, is this the second statement that you made to

9    the police after you received the threatening phone call that

10   you've told the jury about in the parking lot?

11   A    Yes, sir.

12         MR. NAMMAR:  And if we could zoom in on the body.

13   BY MR. NAMMAR:

14   Q    Is this your handwriting here?

15   A    Yes, sir.

16   Q    On Tuesday, September 22nd, 2015, at 12:55 p.m., I

17   received a phone call from Michael Miske making threats that he

18   will hurt me and my family if I do not return him his car

19   refund.

20         Did I read that right?

21   A    Yes, sir.

22   Q    I recognized his voice as we talked more.  Exact words

23   used were that, quote, I will fuck you up.  And next time I

24   will fuck you up with your family at your house, end quote.

25         Did I read that right?

```
 1   A     Yes, sir.

 2   Q     He called me from an unknown phone number, no caller ID.

 3   I did not give him permission to make threats.  He hung up the

 4   phone after the threats.  I want to prosecute.  I will identify

 5   the defendant.

 6         Did I read that right?

 7   A     Yes, sir.

 8   Q     So following these statements, the next year, were you

 9   contacted by the FBI?

10   A     Yes, sir.

11   Q     And then did you eventually end up testifying before the

12   grand jury in this courthouse in 2018?

13   A     Yes, sir.

14            MR. NAMMAR:  Your Honor, can we bring up 7310, which

15   is a defense exhibit?  From their first supplemental, I

16   believe.  For the witness only.

17            THE COURT:  Go ahead.

18            MR. NAMMAR:  7310.

19   BY MR. NAMMAR:

20   Q     Mr. Chergui, is this a copy of your grand jury testimony?

21   A     First time I'm looking at it.

22   Q     Okay.  Can we go to -- is it dated September 26, 2018?

23   A     Yes, sir.

24   Q     And is that your name at the top:  Testimony of Ahmed

25   Chergui?  Do you see that?
```

1   A    On top center?

2   Q    Yes.

3   A    Oh, yes.  I see that.  Yeah.

4   Q    Okay.  Can we go to page 14.

5        At 14, were you asked about what led up to the assault at

6   the Wendy's parking lot?

7   A    Yes, sir.

8   Q    And did you say to the grand jury that Mr. Miske pulled up

9   in a gray Chevy Cruze?  Do you see that?

10  A    Which line is it?

11  Q    Lines --

12  A    Oh, yes.  Okay.

13  Q    Line --

14  A    Line number 19.

15  Q    You see that on line 19?

16  A    Yes, sir.

17  Q    And were you asked that -- about another vehicle that

18  showed up with two other vehicles?

19  A    Yes, sir.

20  Q    With two other individuals, sorry.

21       And if we go to page 15, were you then asked about your

22  interaction with Mr. Miske in the parking lot?

23  A    Yes, sir.

24  Q    And before you answer that, did you describe the second

25  vehicle as a dark old-model Lexus with big rims and tinted

1    windows?

2    A    Yes, sir.

3    Q    And regarding your interaction with Mr. Miske, did you say

4    to the grand jury that he started -- started talking very bad

5    language to me?

6    A    Correct.

7    Q    Literally swearing every other word?

8    A    Correct.

9    Q    Saying that I screwed him and I F'd him up, and I did and

10   I did?

11   A    Correct, yeah.  I did not know if I should use bad

12   language in front of the jury, so I was trying to be as clean

13   language as possible.

14   Q    And did you also say that Mr. Miske said:  You'd better

15   give me the money now?

16   A    Yes, sir.

17   Q    And he came to my face and was very hostile?

18   A    Yes, sir.

19   Q    Did you also tell the grand jury you realized there were

20   two people behind him?

21   A    Yes, sir.

22   Q    And did you also tell the grand jury that you later

23   realized that Mr. Miske had given a signal to two other

24   individuals?

25   A    Correct.

1  Q    And then that you were then punched from behind?

2  A    From -- from behind Miske forward, in front of my face.

3  The punch came from behind his head traveling towards me.

4  Q    Can we go to page 16 now?

5  A    Yes, sir.

6  Q    And then did you go on and explain to the grand jury in

7  detail how you were assaulted?

8  A    Correct.

9  Q    Did you tell them you had to shield your head, and they

10 were punching you and kicking you when you were on the ground?

11 A    Yes, sir.

12 Q    And did you describe that you were being punched and

13 kicked when you were on the ground by three individuals?

14 A    Correct.

15 Q    And did you tell the grand jury that one of those

16 individuals you believe was Mike Miske?

17 A    Correct.

18 Q    Did you tell them that because you had seen Mike Miske

19 wearing white shoes?

20 A    Correct.

21 Q    You can go to page 17.

22      Did you tell the grand jury that the two other individuals

23 that were assaulting you were from the Lexus, the one that you

24 had described earlier?

25 A    Yes, I did.

1  Q    Did you also tell them that the assault had happened for

2  ten seconds?

3  A    Under 15 seconds, yes.

4  Q    And did you also tell the grand jury that Mr. Miske

5  ordered the two other men in the Lexus to stop?

6  A    Yes, sir.

7  Q    And that he threw the title at you and demanded money?

8  A    Yes.

9       MR. NAMMAR:  If we go now to page 19.  Excuse me, 20.

10      Sorry, page 23.

11  BY MR. NAMMAR:

12  Q    And at page 23, did you talk about when you were in the

13  parking lot of the police station that you got a phone call

14  from Mr. Miske?

15  A    Yes, sir.

16  Q    And does that continue on to page 24?  If we can go to the

17  next page.

18  A    Yes, sir.

19  Q    And do you describe that phone call to the grand jury?

20  A    Yes, sir.

21  Q    And did you tell the grand jury that he, Mr. Miske, was

22  using vulgar language?

23  A    Yes, sir.

24  Q    And then he said:  Give me the money?

25  A    Correct.

1  Q    And that you told him that you were at the police station

2  and that in response Mr. Miske said:  I'm going to F you up

3  again at your house with your family; is that right?

4  A    Correct.

5            MR. NAMMAR:  Your Honor, at this time I move to admit

6  pages 1, 15, 16, 17 of the grand jury, as well as page 24, and

7  23.

8            THE COURT:  These are the pages that you just covered

9  in his redirect?

10            MR. NAMMAR:  Yes, Your Honor, as prior consistent

11  statements.

12            THE COURT:  Any objection?

13            MR. KENNEDY:  No objection, Your Honor.

14            THE COURT:  Without objection, those pages -- you're

15  going to have to move these out into a separate exhibit.

16            MR. NAMMAR:  I will, Your Honor.

17            THE COURT:  With that caveat, this exhibit is

18  admitted then.

19            The excerpts from these exhibits -- from this

20  exhibit, rather.

21            (Exhibit 7310 pages 1, 15, 16, 17, 23 and 24,

22  received in evidence.)

23            MR. NAMMAR:  Thank you.

24            We can take that down.

25  BY MR. NAMMAR:

1    Q    Mr. Chergui, when you went to the hospital, were you

2    concerned for your safety?

3    A    Yes.

4    Q    Is that one of the reasons why you told them that you

5    tripped and fell when you were jogging?

6    A    Yes, sir.

7    Q    Have you told the truth here today?

8    A    Yes.

9    Q    Are you making up the fact that you were assaulted by

10   three men in the Wendy's parking lot?

11   A    No.

12   Q    Have you also told the FBI these same things about the

13   assault?

14   A    Yes, sir.

15   Q    Did you tell the FBI that you were assaulted by Miske and

16   two men in the parking lot?

17   A    Yes, sir.

18   Q    And that Miske assaulted you after giving you -- giving a

19   signal?

20   A    Yes.

21   Q    Did you tell the FBI that you fell to the ground and were

22   continually assaulted by three people?

23   A    Correct.

24   Q    And that afterwards Miske demanded money and threw the

25   title in your face?

1   A      Yes, sir.

2   Q      Has dealing with this event been hard on you personally?

3   A      Yes, sir.

4   Q      Has it been hard on your family?

5   A      Yes, sir.

6   Q      Has it been hard on your business?

7   A      Yes, sir.

8   Q      Is there any doubt in your mind that you were assaulted by

9   Miske and two other men in the Wendy's parking lot on

10  September 2015?

11  A      No.

12  Q      Is there any doubt in your mind that when you walked out

13  of the police station you received a phone call from Miske

14  where he was threatening you and your family?

15  A      No.

16  Q      Is there any doubt in your mind that Miske told you during

17  that phone call that he would fuck you up in front of your

18  family if you didn't pay?

19  A      No.

20          MR. NAMMAR:  Nothing further.

21          THE COURT:  Mr. Kennedy, go ahead.

22                      RECROSS-EXAMINATION

23  BY MR. KENNEDY:

24  Q      Sir, following that phone call, nothing ever happened to

25  you, correct?

1   A     Correct.

2   Q     Nothing ever happened to your family, correct?

3   A     Correct.

4   Q     You never paid any money back?

5   A     Correct.

6   Q     None of that ever came to pass, correct?

7   A     What's the last question?

8   Q     None of that ever came to pass, correct?

9   A     What do you mean, none of it came to fact?  Can you

10  clarify?

11  Q     Sure.  Didn't pay any money back, right?

12  A     Correct.

13  Q     Received no more phone calls, if you received one that

14  day, correct?

15  A     Correct.

16  Q     None of that ever happened, right?

17  A     Well, I was intimidated and harassed at the auction

18  following that incident two times.

19  Q     And there are video cameras at the auction, right?

20  A     Yes.

21  Q     And you did not obtain any of that, correct?

22  A     No.

23  Q     Just like you didn't screen shot the phone call that you

24  say happened at the police station like you did the others that

25  the government showed, correct?

1   A    To correct you, sir, those screen shots --

2   Q    Yeah.

3   A    -- I did not screen shot them that day because I never

4   erased my text messages.  I still have them for 12 years.  I

5   have an iPhone, so I have all my message from 2012.

6   Q    All right.

7   A    When the FBI came, I went to my history and it was still

8   there.  So I never screen shot them with that, and they're

9   still there.

10  Q    Sir, you testified about your grand jury testimony.  I'd

11  like to show you Exhibit 9042-007.

12       And that also --

13       MR. NAMMAR:  This is improper refreshing the

14  recollection.  This is not how it's done pursuant to the rules.

15       THE COURT:  Well, let's see what he intends to do

16  with this document.  All he's asked is to turn to this --

17       MR. KENNEDY:  All right.

18       THE COURT:  -- exhibit.  Go ahead.

19  BY MR. KENNEDY:

20  Q    And, sir, if you can go to 9042, page 007, just the third

21  page, and read that to yourself.

22       MR. NAMMAR:  This is beyond the scope, Your Honor.

23       THE COURT:  Sustained.

24       MR. KENNEDY:  We're talking about, Your Honor, the

25  truthfulness in front of the grand jury, and I'm going to go to

1   the grand jury pages where this pertains to.

2           MR. NAMMAR:  This is beyond the scope.

3           THE COURT:  Sustained.

4   BY MR. KENNEDY:

5   Q    Have you had a chance to review that, sir?

6           THE WITNESS:  Can I answer him, Your Honor?

7           THE COURT:  You can ask -- you can answer the

8   question if you had a chance to review it.

9           It's a "yes" or "no" question.  Have you had a chance

10  to review this exhibit?

11          THE WITNESS:  Yes, sir.

12          MR. KENNEDY:  All right.

13  BY MR. KENNEDY:

14  Q    Do you stand by the answer that you gave earlier to this

15  jury?

16  A    Yes, sir.

17          MR. NAMMAR:  Objection, beyond the scope.

18          MR. KENNEDY:  Your Honor, at this time I would ask to

19  move what is 9042-007, dash, 003 as a separate exhibit under

20  Federal Rule 803(8), as a factual finding in a criminal case by

21  the government.

22          MR. NAMMAR:  803(8)?

23          MR. KENNEDY:  Yes.  Subpart (C).

24          MR. NAMMAR:  I don't know of any reason to admit

25  this, Your Honor, under 803(8).

1          THE COURT:  Is it public record?

2          MR. KENNEDY:  I believe it is, from the Department of

3    Homeland Security.

4          THE COURT:  803(8), subpart (C), doesn't exist.

5          MR. KENNEDY:  In the 808 --

6          THE COURT:  I know how to look up the Federal Rules

7    of Evidence, so --

8          MR. KENNEDY:  803, subpart -- let me get to the right

9    one, Your Honor.

10         803, subpart (8)(A) -- I'm sorry -- it's the

11   underlined, the third.  So it's (8)(A), the third.

12         THE COURT:  803(8)(A)(iii)?

13         MR. KENNEDY:  Yes.  Record or statement of a public

14   office, against the government in a criminal case, of a factual

15   finding from a legally authorized investigation.

16         MR. NAMMAR:  I don't think there's any foundation

17   this is a civil case, Your Honor, or any certification that's

18   accompanying this email.

19         MR. KENNEDY:  And, Your Honor, it's attached to

20   Exhibit 9042-002, which is titled, current case title, Jacob

21   Smith, et al., in a criminal investigation by the Department of

22   Homeland Security, Homeland Security Investigations.

23         THE COURT:  The objection, Mr. Nammar, is what?

24         MR. NAMMAR:  That it doesn't fall within 803(8).

25   It's not accompanied by a certification, and it doesn't fall

1   within three, which is a civil case.

2           MR. KENNEDY:  No, Your Honor.  It says in a criminal

3   case.

4           THE COURT:  Right.  It says in a civil or --

5           MR. NAMMAR:  My apologies.

6           THE COURT:  It says civil or criminal.

7           MR. NAMMAR:  It doesn't give any factual findings

8   from a legally authorized investigation either.  There's

9   nothing before the record on that.

10          THE COURT:  Yeah.  The objection's sustained.

11          MR. KENNEDY:  All right.  No further questions.

12          THE COURT:  All right.  At this point -- I'm sorry.

13  Mr. Chergui, you may step down.

14                                        (Witness excused.)

15          (End of partial transcript.)

16                  * * * * *

17

18

19

20

21

22

23

24

25

 1                      COURT REPORTER CERTIFICATE

 2             I, Ann B. Matsumoto, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5    complete, true, and correct transcript of the stenographically

 6    recorded proceedings held in the above-entitled matter and that

 7    the transcript page format is in conformance with the

 8    regulations of the Judicial Conference of the United States.

 9             DATED at Honolulu, Hawaii, June 25, 2024.

10

11

12
                              /s/ Ann B. Matsumoto
13                            ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25