```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
 5                 Plaintiff,       )  Honolulu, Hawaii
                                    )
 6        vs.                       )  March 5, 2024
                                    )
 7   MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 32
                                    )
 8                 Defendant.       )  (TESTIMONY OF GOVERNMENT'S
     _____)   WITNESS MICHAEL BOTHA)
 9

10

                     PARTIAL TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE DERRICK K. WATSON
                CHIEF UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
     For the Government:        MARK A. INCIONG, AUSA
14                              MICHAEL DAVID NAMMAR, AUSA
                                WILLIAM KEAUPUNI AKINA, AUSA
15                              Office of the United States Attorney
                                Prince Kuhio Federal Building
16                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
17
     For the Defendant:         LYNN E. PANAGAKOS, ESQ.
18                              841 Bishop Street, Suite 2201
                                Honolulu, Hawaii 96813
19
                                MICHAEL JEROME KENNEDY, ESQ.
20                              Law Offices of Michael Jerome
                                Kennedy, PLLC
21                              333 Flint Street
                                Reno, Nevada 89501
22
     Official Court             ANN B. MATSUMOTO, RPR
23   Reporter:                  United States District Court
                                300 Ala Moana Boulevard, Room C-338
24                              Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1                          I N D E X

2    WITNESS:                                    PAGE NO.

3    FOR THE GOVERNMENT:

4     MICHAEL BOTHA

5      DIRECT EXAMINATION BY MR. INCIONG              3

6      CROSS-EXAMINATION BY MR. KENNEDY              61

7

8                        E X H I B I T S

9     Exhibit 1-443 received in evidence             34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TUESDAY, MARCH 5, 2024                        11:08 A.M. O'CLOCK

 2                              *  *  *  *  *

 3                (Start of partial transcript:)

 4                (Open court in the presence of the jury.)

 5                THE COURT:  Mr. Inciong.

 6                MR. INCIONG:  Thank you, Your Honor.

 7                The United States calls Michael Botha.

 8                COURTROOM MANAGER:  Good morning.

 9                THE WITNESS:  Good morning.

10                COURTROOM MANAGER:  Right up here.

11                Please raise your right hand.

12                MICHAEL BOTHA, GOVERNMENT'S WITNESS, SWORN.

13                THE WITNESS:  Yes.

14                COURTROOM MANAGER:  Thank you.  You may be seated.

15                Please state your full name, spelling your last name

16   for the record.

17                THE WITNESS:  Michael Botha, B-O-T-H-A.

18                              DIRECT EXAMINATION

19   BY MR. INCIONG:

20   Q    Good morning, Mr. Botha.  How old are you, sir?

21   A    56.

22   Q    Where are you from originally?

23   A    The Republic of South Africa.

24   Q    Were you born in South Africa?

25   A    Yes.
```

1    Q    Did you grow up there as well?

2    A    Yes.

3    Q    Did you serve in the South African military at any point

4    in your life?

5    A    Yes.

6    Q    Could you tell the jury what that was?

7    A    The South African Defense Force was -- we were fighting a

8    16-year bush war.  It was at the end of the Cold War, and all

9    white males who didn't go to college had to go and fight in the

10   war.

11   Q    How long did you serve in that conflict?

12   A    A little over two years.

13   Q    What was your specific duty or position in the South

14   African Defense at that time?

15   A    I was a PT instructor, physical training instructor, and

16   then I went up to fight on the border.

17   Q    Okay.  Were you involved in combat in that -- in that war?

18   A    Yes.

19   Q    After you served your time in the South African army, what

20   did you do then?

21   A    I left South Africa and sailed around the world for

22   three -- about three years and then ended up in -- going to

23   college in Florida.

24   Q    Were you studying anything in particular?

25   A    Yes.  Entomology, which is the science of insects, and

1  pest control technology.

2  Q    Did you have a plan as to what you wanted to do with that

3  education and knowledge once you had obtained it?

4  A    Yes.  My grandfather had started one of the biggest

5  fumigation companies in South Africa.  My dad ran that for 40

6  years.  He took it over, and the plan was for me to go back and

7  grow that business.

8  Q    Okay.  So before we go on, just so we're clear, can you

9  explain to the jury what a fumigation business is?

10  A    Fumigation is typically the term used when you enclose a

11  structure with a tarpaulin, introduce a gas and kill whatever

12  the target species is you're trying to kill.  So that's what a

13  tent fumigation is.

14  Q    Okay.  We'll talk about that in a little bit, but -- so it

15  sounds like the plan was to go back and take over the family

16  business?

17  A    Yes, that's correct.

18  Q    Did you end up receiving your education and completing

19  that in Florida?

20  A    Yes.  I completed it and was going to go on to study -- it

21  was a two-years social sciences degree.  And then I was going

22  to go on to complete it in entomology, but at the same time in

23  South Africa it was the end of the apartheid regime, and

24  everything started going south in the country, and decided that

25  I would not go back and my dad was going to sell his business.

1    So I went -- I went and got a job.

2    Q    Okay.  Where did you get a job?

3    A    With Terminix International in California.

4    Q    What was your position you were hired with by Terminix

5    International?

6    A    I was hired as a training manager and shortly became a --

7    a regional technical specialist.

8    Q    Okay.  Let's start with the training manager.  What were

9    your duties and responsibilities in that position?

10   A    It -- basically to run a branch or a region of branches.

11   Q    Was Terminix a large company at that time?

12   A    At the time it was the largest in the world.

13   Q    Then you became, you said, their regional technical

14   specialist.  Did I get that right?

15   A    Yes.  They -- it -- it's a technical position where you're

16   responsible for training, compliance, participating with

17   Department of Agriculture, participating with the state pest

18   control boards, that type of thing, and involved in government

19   affairs.  And they had begun buying companies in Hawaii and had

20   decided to build a region in Hawaii, and that's why they were

21   starting to hire for positions like that.

22   Q    So this is Terminix was acquiring companies?

23   A    Yes.

24   Q    Okay.  Did you relocate to Hawaii as part of your job

25   responsibilities with Terminix then?

1    A    Yes.

2    Q    Were you still acting as the regional technical specialist

3    at that time?

4    A    Yes.

5    Q    So were you part of the initial Terminix presence in

6    Hawaii then?

7    A    I was the first corporate officer they had in -- in

8    Hawaii.

9    Q    Okay.

10    A    Or regional person.

11    Q    So how did Terminix's presence compare with any other pest

12    control companies that might have been already present in the

13    state?

14    A    In those days the industry within Hawaii was mostly made

15    up of one- to three-man companies.

16    Q    Okay.

17    A    And I believe there were over a hundred of those companies

18    in Hawaii.  Terminix was the largest, and Orkin and Ecola were

19    close behind.

20    Q    So were these smaller companies some of the outfits that

21    Terminix starting acquiring as you described a minute ago?

22    A    Yes.  That was their strategy.

23    Q    How long did you remain in the position as regional

24    technical specialist here in Hawaii for Terminix?

25    A    Just over three years, I believe.

1    Q    During those three years did you obtain what's known as

2    your RME?

3    A    Yes.

4    Q    Could you explain to the jury what an RME is?

5    A    An RME is the term used for responsible managing employee.

6    And an RME over pest control company is someone who's involved

7    with the direct oversight of all operations and is required to

8    sign all contracts that come -- well, review and sign all

9    contracts.

10   Q    Okay.  So you said you did that for about three years?

11   A    Yes.

12   Q    Was Terminix growing during that time?

13   A    Oh, yes.

14   Q    Approximately how many employees did Terminix have in

15   Hawaii specifically at that time?

16   A    If I can remember correctly, it must have been between 70

17   and a hundred, and they were adding new -- they -- there was

18   always a new company in the pipeline.

19   Q    And by that you mean a new company they were --

20   A    They were buying, which would increase the number of

21   employees --

22   Q    Okay.

23   A    -- in the region.

24   Q    So did that business model give you ideas for your own

25   future in particular?

1   A    Yes.  I'd always planned to go back and take over our

2   family business, which is a successful business.  And when that

3   opportunity ended, I realized I would not be able to reach my

4   financial goals working for another company and decided I loved

5   Hawaii, I wanted to live here, and started plans to start my

6   own business in Hawaii.

7   Q    Did you in fact start your own pest control company?

8   A    Yes.

9   Q    What was the name of that company?

10  A    Sandwich Isle Pest Solutions.

11  Q    What year did you incorporate that company?

12  A    I believe it was 1997.

13  Q    So when you began in 1997, what sorts of pest control

14  services were you offering?

15  A    There's three primary types of pest control services

16  categories --

17  Q    Okay.

18  A    -- in Hawaii pest control:  General pest control, termite

19  control, and fumigation.  And we were licensed for all three.

20  Q    All right.  Could you briefly explain the differences

21  between those three areas to the jury?

22  A    If we used a single term as an example, general pest

23  control might be the rodent control, centipede, ants and

24  roaches, where a technician might come out every month or every

25  other month.  That would be general pest control.

1      Termite control would typically be that same house might

2      discover that they have subterranean termites that have come up

3      in the garage or in a cabinet or something.  In that case the

4      company would come out and do a termite service, which is

5      basically putting in a chemical barrier under -- between the

6      earth and the house to keep the ground termites from coming up

7      or some type of baiting system.

8      Q    Okay.

9      A    And then let's assume they had drywood termites where they

10     saw little black granules of sand dropping down.  That would be

11     an indication of drywood termites, and then in that case it

12     would be tent fumigated, where it's enveloped and gas

13     introduced.

14     Q    Okay.  How do those three compare as far as profitability

15     to a company like yours or -- or any other pest control

16     company?

17     A    General pest control --

18           MR. KENNEDY:  Your Honor, I --

19     A    -- is --

20           MR. KENNEDY:  Your Honor, I would object.  I believe

21     he can speak to his own company.  But as to others, it would be

22     speculation.

23           THE COURT:  Sustained.

24     BY MR. INCIONG:

25     Q    In your own company's experience which -- how do those

1    compare as far as profitability?

2    A    It's the same with most companies around the country and

3    around the world.  General pest control is by far the most

4    valuable pest control, where you might get 10, up to 20 percent

5    net profit.  Termite control, which is ground termite control,

6    is about 10 percent on average.  Tent fumigation nationwide is

7    about 7 percent net profit.

8    Q    Okay.

9              MR. KENNEDY:  Your Honor, I'd ask the witness to

10   limit his answers to his own company.

11             THE COURT:  You may cross.

12   BY MR. INCIONG:

13   Q    Mr. Botha, did you grow that company?

14   A    Yes.

15   Q    Was it successful?

16   A    Yes.

17   Q    When you started, how many employees did you have?

18   A    Myself.  Just one.

19   Q    At its peak, how many employees did Sandwich Isles Pest

20   Control have?

21   A    It wasn't full-time employees, but at one point when we

22   had a big contract out at Midway Atoll, we had about -- I think

23   it was about 112 employees total.

24   Q    All right.  Did your company pioneer any sort of new or

25   innovative techniques in pest control while you were running

1    that company?

2    A    Yes.

3    Q    Could you tell the jury -- tell the jury what those are,

4    please?

5    A    When there was the bedbug epidemic, we were on the front

6    edge of that, and we trained K-9s, beagles, and had a K-9 scent

7    detection business where we had trained beagles that could

8    identify the difference between a viable bedbug egg and a dead

9    bedbug egg or -- or bug itself.  So there was -- the entomology

10   dogs was one.  And then we started a heat business where,

11   instead of fumigation or pest control, we would heat a

12   structure for either drywood termites or whatever the pest

13   might be, bedbugs, and use lethal heat temperature over an

14   exposure period to kill an inspect species and its eggs.

15        We also started the coffee berry borer treatment center

16   when that became on the Big Island.  Kona coffee could not be

17   shipped because they had discovered this coffee berry borer

18   beetle, and within about three days of that coming out we had

19   established a coffee berry borer treatment center on the Big

20   Island where we started fumigating coffee so it could get

21   exported.

22   Q    Okay.  So in regard to this heat treatment solution that

23   you explained, what was that primarily used as an alternative

24   for, which of the three areas that you described previously?

25   A    Well, it could be any one of them, really.

1   Q    Okay.

2   A    But the target species were drywood termites, powder post

3   beetles and bedbugs, typically.

4   Q    Okay.  At some point when you were running that company,

5   did the future -- was the future of fumigation, tent fumigation

6   in question at any point?

7   A    Yes.

8   Q    How did that become a question?

9   A    At the time I was the chair of the National Pest

10  Management Association fumigation committee, and we were

11  dealing with nationwide problems with the misuse or

12  misapplication of fumigants.  There had been a number of deaths

13  in the Caribbean and on the East Coast.  And there was a high

14  degree of risk that structural fumigation might -- the labels

15  might prohibit the use of fumigants for structural fumigation

16  because of the risks associated with it.

17  Q    All right.  Based on that, did you make any adjustments in

18  your -- your business model or business focus?

19  A    Yes.  We -- we did.

20  Q    What was that?

21  A    We actually scaled back our fumigation.  We were running

22  up to four crews at one time.  And we scaled it back to one

23  crew so we could get a better handle on the quality of every

24  single job.

25  Q    Are you still currently running Sandwich Isle Pest

 1   Solutions?

 2   A    No, I sold that business.

 3   Q    When did you sell it?

 4   A    2016.

 5   Q    Did you sell it to Terminix?

 6   A    Yes, I did.

 7   Q    That was your original employer?

 8   A    Yes.

 9   Q    Was that kind of the plan all along?

10   A    Yes.  I designed a business that could -- I could sell.

11   Q    Do you mind if we ask -- if I ask you to tell the jury how

12   much you sold that company for?

13   A    Sure.

14   Q    What did you sell the company for?

15   A    I think it was 13.5 million.

16   Q    Now, you'd mentioned that you were on the board of one --

17   of a certain pest association.  Did you have a history of being

18   involved with both local and national pest control

19   associations?

20   A    Yes.

21   Q    Could you tell the jury how you began in that regard?

22   A    When I was studying pest control technology in Florida, I

23   attended the first National Pest Management Association and

24   continued to attend the annual convention, which is the biggest

25   of its type in the world, every year until I left the industry.

```
 1    I was also -- when I first came to Hawaii, I immediately became
 2    a director on the Hawaii Pest Control Association.  And within
 3    the National Pest Management Association, which is actually the
 4    largest association in the world and represents the world, I
 5    was a director and a chair in -- in that organization too.
 6    Q    Okay.  Are you familiar with the Hawaii Department of
 7    Agriculture advisory committee?
 8    A    Yes.  I was a member.
 9    Q    Approximately how long were you a member on that board?
10    A    I think the period was three years.
11    Q    Are you familiar with the -- the DCCA Hawaii Pest Control
12    Board?
13    A    Yes.
14    Q    What is the DCCA, first of all?
15    A    Department of Commerce and -- and -- Customer Affairs, I
16    think it is.
17    Q    Okay.  What does the Hawaii Pest Control Board do?
18    A    The pest control board is -- is part of the DCCA, and it
19    enforces the licensing of the pest management industry in
20    Hawaii.
21    Q    All right.  Are there several members that make up that
22    board?
23    A    I believe there's between seven and nine members.  I can't
24    remember the exact number.
25    Q    Do they come from different parts of the industry or --
```

1  A    Yes.

2  Q    Okay.

3  A    They were -- if I remember correctly, there were three

4  company representatives.  So pest -- PCOs.  And then there was

5  the head of the entomology department, University of Hawaii,

6  the head of the Department of Agriculture, and I think someone

7  from RICO.  And I can't remember.  There are others.

8  Q    Do you recall approximately when you joined the Hawaii

9  Pest Control Board?

10  A    I became -- I began attending the meetings as soon as I

11  arrived working for Terminix.  And I think maybe the third year

12  I was in Hawaii I was elected to the board as a director.

13  Q    Did you ever serve as the chairman of that board?

14  A    Yes.

15  Q    How long did you serve as the chairman?

16  A    I -- I think I was a director for four years and a chair

17  for -- for two, or a chair for four and director for two.  I

18  can't remember which way around it was.

19  Q    Okay.  Is one of the functions of the Hawaii Pest Control

20  Board to review and either grant or deny licensing applications

21  for individuals or companies that are seeking to provide pest

22  control services?

23  A    Yes.  There's a -- it's called an applicant review

24  committee, which meets before every board meeting that -- that

25  reviews all applicants.

1   Q     As the -- a member of the board, as the chairman of the

2   board, how are individuals who are seeking those licenses

3   notified whether or not their license was granted or denied?

4   A     If they attend in person, they would be informed in person

5   at the meeting.  If they did not attend in person, they would

6   be informed by mail.

7   Q     Okay.  Do you recall while you were serving on that board,

8   specifically in the capacity as president of that board, that

9   an individual by the name of Michael Miske had submitted an

10  application to be licensed by the board?

11  A     Yes.

12  Q     Do you recall what the outcome or decision on that

13  application was?

14  A     It was declined.

15  Q     Do you recall the basis or reason why it was declined?

16  A     Insufficient experience.

17  Q     Did you -- were you aware of a specific company or the

18  company that Mr. Miske was associated with when he applied for

19  that license?

20  A     Yes.

21  Q     What was the name of that company?

22  A     Kama'aina Pest Control.

23  Q     Did you later learn whether Kama'aina Pest Control had in

24  fact obtained a license through your board?

25  A     Yes, they did obtain a license.

1    Q     How?  How did that happen?

2    A     I believe they hired a gentleman by the name of Harry

3    Kansaki, who was an RME, I think for Oahu Termite, and he was

4    apparently the new RME for Kama'aina.

5    Q     In your time on the board or -- and -- as well as your

6    experience in the industry in Hawaii, had you encountered a

7    situation where one individual worked as the RME for two

8    separate companies?

9    A     That would be called a dual RME, and, no, I was not aware

10   of one.

11   Q     But it's permitted, though, right?

12   A     Under the circumstances it was presented, I believe it was

13   permitted, which is why the license was granted.

14   Q     Now, when you were at the peak of -- I guess your business

15   was Sandwich Isles.  Who was your main competitor?

16   A     Terminix.

17   Q     Okay.  Did you consider Kama'aina Termite and Pest Control

18   to be one your main competitors?

19   A     They -- yes, they were.  They were a good competitor of

20   ours.  We had slightly different markets that we went after.

21   Q     So how did those markets differ?

22   A     Kama'aina was very strong in the real estate market.  When

23   houses sold, they'd get an inspection and then usually get

24   tent-fumigated or ground-termite-treated, and we could not

25   compete with Kama'aina's prices, and they pretty much took over

1    that entire market.

2    Q    Okay.  Now, you mentioned before that the tent fumigation,

3    that was the lowest profit margin of the three types of

4    services that your company offered?

5    A    Yes.

6    Q    Now, you served on a number of different boards here in

7    Hawaii, and some of those boards are also international in

8    nature as well?

9    A    Yes.

10   Q    In your experience in sitting on those boards, is your

11   experience with Sandwich Isles consistent with those other

12   companies as far as profit margins and so forth?

13   A    Yes.

14   Q    Why are some of the reasons that tent fumigation has such

15   a small profit margin?

16   A    There's a lot of expense and a lot of -- to do fumigation

17   properly, tent fumigation properly requires adhering to a

18   number of different types of rules and regulations that you

19   wouldn't otherwise need.  For example, in Hawaii, there was

20   the -- at that time there was something called the Hawaii four

21   protection program which required that you had a minimum of

22   four people on a -- on a tent fumigation crew to comply with

23   the four protection standard.  So that immediately, even if it

24   was a tiny one-man job that one man could do, you would need

25   four people on it just as an example of how it was more

1    expensive.  The fumigants were very expensive.  In those days I

2    think, depending on the volume you purchased, Vikane, which was

3    the gas used, it was, you know, nine or ten dollars to 16

4    dollars a pound for the gas, and you might need 40, 50 pounds

5    in a fumigation.

6        And then it was a very tedious process.  It wasn't like

7    you just show up, do the work and leave.  You show up.  You

8    cover the structure.  You calculate the gas, shoot the gas.

9    You monitor the fumigation.  There's a -- a procedure for

10   untenting where you have to -- to follow the rules properly you

11   have to have a certified applicator on the site.  You have to

12   have a CDL driver drive the Vehicle and shoot the gas and --

13   and then you follow the untenting procedure:  Take the tent

14   off, keep the structure secured with secondary locks and

15   warning signs, and then come back again six or eight hours

16   later with a gas analyzing device, measure the interior to make

17   sure that the gas is lower than five parts per million, and

18   then you can release the structure back to the homeowner.  So

19   that -- that entire process takes multiple steps, multiple

20   people, and it's a very expensive process.

21   Q    Okay.  Now, you mentioned Vikane.

22   A    Yes.

23   Q    That's the poison that actually kills the termites or

24   other pests, right?

25   A    That's the common name for the -- for sulfuryl fluoride

1    that is labeled for use of structural fumigation in Hawaii.

2    Q    Are there other chemicals that are mandatory as part of

3    the tenting fumigation process?

4    A    Yes.

5    Q    What are those?

6    A    Chloropicrin is the other one.  And it is a -- it's tear

7    gas basically, in a liquid form.  And it's a warning agent.

8    Vikane, or sulfuryl fluoride, is colorless, odorless, and

9    tasteless.  And so if there were someone exposed to that or if

10   there was a leak, you would never know you were even getting

11   exposed to it because it has no warning agent in it.  So you

12   have to separately mix chloropicrin inside the fumigation --

13   well, it was actually not a mix.  You just pour it into a

14   little tray in front of a fan, let it blow out --

15              THE WITNESS:  Oh, sorry.  Sorry.

16   BY MR. INCIONG:

17   Q    Go ahead.

18   A    So the way you use chloropicrin is you would pour it into

19   a little tray, put it in front of a fan inside the structure,

20   and it would blow throughout the structure.  It was like one

21   ounce per 15,000 cubic feet.  And once it reached a state of

22   equilibrium, no living animal could sustain being exposed to

23   that because it's very strong tear gas.

24   Q    When you say no living animal, does that include humans?

25   A    Yes.

1    Q    Is there a specialized equipment also that is required for

2    the fumigation process that you don't need for the other two

3    areas that you mentioned?

4    A    Yes.  Everything from calculators to calculate the dosage

5    for the gas, to scales to weigh the dosage, to measure out the

6    dosage, and then gas-analyzing instruments to analyze the gas

7    concentration during the course of the fumigation, and a

8    different type of gas-analyzing device to clear the structure

9    for re-entry at the end of the fumigation.

10   Q    All right.  What about the tents themselves?  Are those

11   expensive?

12   A    They can be.  They -- in those days we used to pay between

13   1200 and probably 1500 dollars per 40-foot by 60-foot tent, and

14   you might use seven on an average-size house.

15   Q    Was there any way to distinguish between the various pest

16   control companies, yours, Terminix, Kama'aina, for example, to

17   distinguish whose tents were whose for these various fumigation

18   jobs?

19   A    Yes.  There was no official rule, but most companies

20   preferred to have their own color tents as kind of their own

21   marketing identification.  And so most companies had their own

22   one- or two-color tent panels.  Kama'aina's was black and red,

23   if I remember correctly.  Ours was blue.  Terminix was orange

24   and -- and green.

25   Q    Okay.

1          Now, you'd mentioned that when you were on the board of

2     the Hawaii Pest Control, the -- or the chairman of the Hawaii

3     Pest Control Board, I should say, Mr. Miske's application was

4     denied, correct?

5     A     Initially, yes.

6     Q     Did you know Mr. Miske personally --

7     A     No.

8     Q     -- when that application was made?

9     A     No.

10    Q     Had you ever met him during -- during or around that time?

11    A     I may have met him at a -- at industry events because we

12    attended all of them, but outside of that, I can't remember

13    any.

14    Q     Okay.  So during the, I guess it was, approximately 20

15    years that you owned Sandwich Isles, was it a successful

16    company?

17    A     Yes.

18    Q     Was it profitable?

19    A     Yes.

20    Q     How did you compare size-wise to other pest control

21    companies in Hawaii, as far as numbers of employees and so

22    forth?

23    A     Well, as for locally owned companies we were maybe the

24    largest.

25    Q     All right.  Were you capable of doing big commercial jobs

1    in addition to, you know, residential, single-family homes, as

2    you've talked about in some examples?

3    A    Yes.  And we did.  We had a naval contract for five years.

4    We did giant naval shipyard buildings.  We had the contract for

5    Midway Atoll for many, many years and treated every single

6    building, including Air Force hangars and that type of thing.

7    So, yes, it doesn't matter the size or difficulty of

8    fumigation.  We could accomplish any of it.

9    Q    Okay.  So Mr. Botha, I want to take you to December 24th

10   of 2003.  This would be the day before Christmas.

11        Do you recall shopping at the Waipio Costco on that

12   afternoon?

13   A    Yes.

14   Q    Did something out of the ordinary, unexpected happen while

15   you were there?

16   A    Yes.

17   Q    Could you describe to the jury what happened?

18   A    I was on the phone with my wife, getting some last-minute

19   supplies for a dinner we were having that night, and I noticed

20   someone kind of staring at me.  And didn't really recognize the

21   person, to be honest.  And I told my wife:  Hold on a second.

22   I'll call you back.

23        And then Miske approached me and said that he had a

24   problem with our company saying negative things about his --

25   his company and he wanted to meet outside.

1   Q     Did you realize who he was at that point?

2   A     At that point, I did.  Yes.

3   Q     What was Mr. Miske's demeanor as he approached you?

4   A     Confrontational.

5   Q     When he said he wanted to go outside, what did you

6   understand that to mean?

7   A     I expected that we were getting into a fistfight.

8   Q     Did you go outside with Mr. Miske?

9   A     Yes.

10  Q     Before I ask you what happened next, do you see the person

11  in the courtroom today that approached you in the Waipio Costco

12  on December 24th of 2003?

13  A     It's been a long time but I -- I think that's Mike right

14  there.

15  Q     Could you indicate where he's seated and where -- what

16  he's wearing, the person you believe is Mr. Miske?

17  A     Seated next to the gentleman with the blue suit and purple

18  tie.  And Mike is wearing a yellowish shirt and a gray sport

19  coat.

20  Q     Thank you.

21        MR. INCIONG:  Your Honor, may the record reflect that

22  Mr. Botha has identified the defendant?

23        THE COURT:  Yes.  The record should reflect the

24  witness Mr. Botha's identification of the defendant, Mr. Miske.

25  BY MR. INCIONG:

1    Q     Now, did you have any indication or any idea what

2    Mr. Miske was referring to when he initially approached you?

3    A     He had said that we had -- I believe he'd said we had said

4    negative things about his -- we were talking trash about his

5    company, I think that's what he said.

6    Q     Was that something you had been doing?

7    A     No.

8    Q     So what happens when the two of you then step outside the

9    Costco?

10   A     When Mike was -- was stretching and -- and kind of warming

11   up as if he was about to get into a fight.  And we ended up

12   getting into an argument.  And some passers -- passersby, I

13   think, first interjected and then they called security.

14   Security showed up.  It was right outside in the parking lot in

15   Costco.  And we con -- I guess continued to argue, and they

16   called the police, and then the police showed up and separated

17   us.

18   Q     Do you still recall any specific things that Mr. Miske

19   might have said to you during that argument?

20   A     Yes.  He said he knew where I lived.  He said that a

21   number of times, that I didn't really know who he really was

22   and that he would take matters into his own hands.  He said

23   things were done differently in Hawaii.  He basically said that

24   he was going to slash my tents if he saw any of my tents up and

25   a bunch -- basically trying to get into a fight and

1   threatening.

2   Q    Did you feel threatened by any of these comments?

3   A    Not really at the time.  But then afterwards, I -- when it

4   sunk in what he was saying, I did.

5   Q    So let me ask you about a few of those.

6        So you mentioned that he said he knew where you lived.

7   A    Yes.

8   Q    Did that alarm you?

9   A    Yes.

10  Q    Why?

11  A    At the time we had young children and it -- it worried me

12  that my wife would be at home with our young kids and someone

13  might show up and, you know, do something silly.

14  Q    You said that he had told you he would slash your tents if

15  he saw them up.  What did you take to mean?

16  A    That he would cut our tents and let the gas out.

17  Q    So these are your company fumigation tents you're

18  referring to?

19  A    Yes.

20  Q    So what sorts of issues and problems would someone

21  slashing your tents cause you?

22  A    In the fumigation industry, that's one of the things

23  that's most likely to happen to a fumigation once it's put up

24  and you've injected the gas.  If it's super windy, for example,

25  a tent could rip.  And that was -- one of our biggest banes as

1  a tent fumigator was that you would have to then go back, shoot

2  more gas, fix it up.  The customer would have to be out of the

3  house for another night.  The dog would have to go to a dog

4  sitter for another night.  So it was a big nightmare.

5       And so there was a common thing with fumigation companies

6  that you would endure that type of problem with a -- with a

7  fumigation owing to wind, usually.

8       When someone would slash your tents, there'd been some

9  instances where, you know, tents were slashed by a competitor,

10 and that causes the same amount of pain, basically.

11 Q    All right.  What about any public safety issues as a

12 result of tents being cut or slashed?

13 A    Well, so sulfuryl fluoride, like I said before, is a

14 colorless, odorless, deadly, poisonous gas with no antidote.

15 So if that got out, it could kill someone without them knowing

16 about it.  So that -- so we use chloropicrin, which is tear

17 gas, which is highly repellant.  So if those two were at

18 equilibrium and they're mixed together, the gas that was

19 leaking out, anyone who would encounter that would have a

20 severe reaction to it.

21 Q    So how did this argument with Mr. Miske end on

22 December 24th of 2003?

23 A    It ended when the police separated us.  And as I remember,

24 we both walked back into Costco to continue our shopping.

25 Q    While the police were there, did they ask you to make a

1    statement?

2    A    I think they did.  Yes.

3    Q    Do you recall giving a -- actually making a -- a written

4    statement on a form --

5    A    Oh, yes.

6    Q    -- that was provided to you?

7    A    Yes.

8    Q    All right.  So you went home that night, enjoyed Christmas

9    Eve?

10   A    Yes.

11   Q    After thinking about what had happened, did you decide to

12   take any further action?

13   A    Yes.  I -- I think I remember the guy, a policeman coming

14   on the -- a couple days after Christmas or the next day and

15   giving a more detailed account of what had happened.

16   Q    I see.  So there was a follow-up visit?

17   A    Yes.

18   Q    From HPD?

19   A    Yes.

20   Q    So you spoke to them at the Costco and then a day or two

21   later?

22   A    Yes.

23   Q    Did you seek any sort of other legal action to try and

24   protect yourself or address the threats that had been made?

25   A    We -- we -- I believe we applied for a temporary

 1   restraining order.

 2   Q    And when did you apply for that, do you recall?

 3   A    I don't remember the date, but it was shortly thereafter.

 4   Q    All right.  In that temporary restraining order you were

 5   seeking that Mr. Miske could not come near you or your family?

 6   A    Or my business.

 7   Q    Or your business?

 8   A    Because I didn't want my tents slashed.

 9   Q    Okay.  Was that temporary restraining order ever put into

10   effect, to your knowledge?

11   A    I don't believe it was served.

12   Q    All right.  So after you had applied for the TRO, spoken

13   with Honolulu Police Department, did you encounter anything out

14   of the ordinary around your home after that?

15   A    At -- I don't remember the -- how soon it was after, but

16   we did see a Kama'aina sign written truck parked in our

17   cul-de-sac.  And where my house is on the North Shore, it's up

18   on Kuwo'o [phonetic] Place and it's a private road.  There's

19   only six houses on the road.  Everyone knows everyone.  It's

20   not a through road.  So anyone who parks at the end of the

21   cul-de-sac is visiting us, usually.  And I saw one of their

22   trucks parked there one morning.

23   Q    How close was it parked to your home?

24   A    Ten, 15 feet from our gate.

25   Q    Did that alarm you?

1   A     It came in at night and I saw it in the morning.

2   Q     What did you understand the -- the fact that that car or

3   truck being parked at the end of your driveway to mean?

4   A     Intim -- an attempt to intimidate me, to show me that he

5   knew where I lived and that he could send someone up to my

6   house.

7   Q     After that, were there any incidents that affected any of

8   your jobs or your business?

9   A     Yes.  We almost immediately started having our tents

10  slashed.

11  Q     Now, when you say tents slashed, being deliberately cut?

12  A     Yes.  So that -- that's correct.

13  Q     Is tent slashing or tent slitting, is that something that

14  is encountered from time to time in your industry?

15  A     There's three types of tent damage that -- that a

16  fumigator might incur.  The first one was there was a ring

17  of -- we think they were fumigators who were burglars, who

18  understand sufficient about the process of fumigation that they

19  would actually open up the seams where two tents joined, on

20  fumigations, and they would aerate the structure before

21  breaking into it.  But they would make inconspicuous openings

22  so that no one was alarmed, and then they would go in without

23  lights at night and, you know, break in.  That was one.

24      The other one was, of course, like I mentioned, with a

25  high wind might come up at night so you might have a tent that

1    ripped because of the wind.  And then the third one, which is

2    what we're talking about, the slashing the tents, is where

3    somebody deliberately cuts a hole or square or slices down the

4    length of the tent to allow the gas to come out and nothing is

5    broken into.  Your house isn't burgled; it's just vandalism,

6    basically.

7    Q    So did you receive a call in April of 2004, so about, you

8    know, four months or so after the Costco incident?

9    A    Yes.

10   Q    In regards to a -- an issue with one of your fumigation

11   tents in Kailua?

12   A    Yes.

13   Q    How did you receive that information?

14   A    I got a call from a neighbor saying that one of our tents

15   was opened and was leaking gas into his house.

16   Q    Where did you -- what did you do to -- in response?

17   A    Went down there immediately and found that we had a

18   roughly eight-foot by eight-foot square cut out of our tent,

19   and inside that tented structure was deadly poisonous gas with

20   chloropicrin, the warning agent, tear gas; and the gas had

21   leaked through that open gap across a very narrow area, like a

22   zero lot line.  And the person who had called, his daughter was

23   asthmatic and she had had a reaction to the tear gas coming

24   through her window while she was sleeping.

25   Q    Now, this cut that you described, was this emblematic of

1    an intentional act or one of the other two categories that you

2    described, whether it was the wind or someone trying to be

3    inconspicuous?

4    A    No.  This was an intentional cut.  Literally someone had

5    cut out a square eight-foot by eight-foot on the side of a

6    tent.

7    Q    In your experience from seeing these different categories,

8    is it easy to distinguish between the three?

9    A    Absolutely.

10   Q    Was there any doubt in your mind that this was an

11   intentional act in Kailua that you saw on April of 2004?

12   A    It was no doubt that it was intentional.

13             MR. INCIONG:  Your Honor, could we show the witness

14   Exhibit 1-443 at this time, please?

15             THE COURT:  Go ahead.

16   BY MR. INCIONG:

17   Q    Mr. Botha, do you recognize the photo that's shown in

18   Exhibit 1-443?

19   A    Yes.

20   Q    How do you recognize that?

21   A    That's the square that I was talking about that was cut

22   out of that tent.

23   Q    Does this photo accurately show your Sandwich Isle Pest

24   Solutions tent as it appeared on that date in April 2004 when

25   you responded to the call from the neighbor?

 1  A     Yes.

 2            MR. INCIONG:  Your Honor, I would move to admit

 3  1-443.

 4            THE COURT:  Any objection?

 5            MR. KENNEDY:  No objection.

 6            THE COURT:  Without objection, Exhibit 1-443 is

 7  admitted.

 8            (Exhibit 1-443 received in evidence.)

 9            THE COURT:  You may publish.

10            MR. INCIONG:  Thank you, Your Honor.

11  BY MR. INCIONG:

12  Q     So Mr. Botha, could you explain what is shown here in this

13  photograph for the jury, please?

14  A     So the -- the shape outside is the roofline of the

15  structure, and the blue tarpaulins envelope and are over the

16  top of the roof.  And the hole that you see is where it's been

17  sliced up, across the top and then back down again.  And that

18  patch that was cut out is actually missing.

19  Q     So the screen in front of you is actually a touch screen.

20  So just to be sure that the jury can see where we're talking

21  about, can you circle the cutout area?

22  A     (Complies.)

23  Q     Great.  Thank you.

24            So I think you just mentioned.  So this piece that was cut

25  out -- that you said that was approximately eight feet high?

 1   A     I'm guessing the eaves on that house looked to be eight

 2   feet.  And -- and I think that's why -- how we came up with

 3   that measurement.

 4   Q     So this piece that was cut out, was that still at the

 5   scene or was it -- was it missing from the tent completely?

 6   A     I don't remember seeing it.  I think it was missing.

 7   Q     Did you call the police?

 8   A     Yes.

 9   Q     Did they respond?

10   A     Yes.

11   Q     Did you give the police a written statement at that time?

12   A     Yes.

13   Q     Was there any success in trying to identify who might have

14   done this?

15   A     No.

16   Q     Was this an isolated incident in the months that followed

17   after your confrontation with Mr. Miske at the Costco?

18   A     No.  We had many incidents.

19   Q     Were these all incidents in which you were confident they

20   were intentional slitting of your tents?

21   A     Yes.

22   Q     Had you had any such incidents in that number or anywhere

23   close to that number prior to your confrontation with

24   Mr. Miske?

25   A     No.  We had occasional, like in downtown or something,

1   where a drunk person might do something stupid.  Or we had had

2   burglaries where -- typically we had a number of burglaries

3   over the years where these folks would come in and actually

4   knew enough about the fumigation process to open the seam on

5   one side, on the windward side, and then open another seam on

6   the leeward side and allow the gas to get blown off.  And then

7   they would come in and burgle.  But that was, like I said, they

8   tried to do it inconspicuously because they didn't want people

9   calling in an open tent.

10  Q    This incident on the photo that we're looking at that

11  happened in Kailua, was there any sign that anyone had actually

12  entered that house or taken anything from the house?

13  A    No.

14  Q    Was that consistent with the other slittings that you

15  encountered in the months that followed?

16  A    Yes.

17  Q    Did you report every single one of these to the police

18  once you would find out about them?

19  A    No.  We pretty much gave up after -- the police, through

20  no fault of their own, could do nothing because there was never

21  evidence.  We couldn't prove anything, and there typically

22  wasn't ever a burglary.  So there was no real crime to report

23  except for the fact that the tent had been slashed.  And so we

24  gave up calling the police because there was nothing they could

25  do.

1    Q    Were there instances where you would find out like days

2    after the fact from your crew that there had been slittings

3    that they just took care of and repaired on their own?

4    A    Yes, that's true.  I wasn't on the fumigation truck with

5    them.  And we had multiple crews and so sometimes I wouldn't

6    see them for a few days and they would just -- you know, they

7    would tell me when they saw me.

8    Q    So you mentioned that these tents were -- sounds like

9    they're fairly expensive, correct?

10   A    Twelve to 15 hundred, on average, for a small tent.

11   Q    So when a tent is slit like this, is it repairable, or do

12   you have to replace the entire tent?

13   A    If it was a straight slice, you could take it back.  And

14   most of us had commercial sewing machines.  And on a rainy day

15   or a windy day we would take them in and try and repair

16   ourselves by stitching down that seam.  In a case like this

17   where there's a patch cut out of it and it's missing, the tent

18   is destroyed.  So we -- in fact, we estimated we lost about

19   $70,000, seven-zero thousand dollars worth of tents that were

20   damaged.

21   Q    So how long did this go on for, approximately?

22   A    I don't remember exactly how long it went on for, but it

23   seemed like it went on for quite a long time.  And so Mr. Miske

24   and I met and -- came to met [verbatim].

25   Q    So let me ask you about that.  So did you -- it sounded

1    like the police were doing what they could, but you hadn't been

2    able to apprehend anybody, or they hadn't been able to

3    apprehend anybody, correct?

4    A    They were not able to help us.

5    Q    Were there any steps that you took within the industry to

6    try and resolve what was going on?

7    A    I tried everything.  I had spoken to the -- Dow

8    AgroSciences was the company that -- that owned the Vikane

9    label at that time.  I spoke to them and asked them to get

10   involved, because if there was a death they may lose the use of

11   their gas.  I spoke to them at the highest levels, from the

12   local representative all the way to the national.

13        I -- I spoke to the National Pest Management Association

14   to see if there's anyone in there that could help me.  I spoke

15   to the Hawaii Pest Control Association.  Tim Lyons was the

16   executive director at the time.  He had -- he wanted nothing to

17   do with it.  I wanted to see if he would set up a meeting with

18   myself and Mr. Miske.  He -- he wouldn't do it.

19        Kurt Nosal with Univar, who was a distributor for Vikane,

20   he wanted nothing to do with it.  Everyone was -- did not want

21   to get into a confrontation.

22   Q    Why was that?

23   A    I think Mr. Miske had a -- had a reputation as someone who

24   you didn't want to mess with.

25   Q    So did you feel that these various boards were not wanting

1   to get involved, for lack of a better word?

2   A    It wasn't the boards.  It was the person who would have --

3   who I reached out to to see if they would -- I wanted to have a

4   moderated meeting.  I thought that if we met things might not

5   go as smoothly as I wanted, and I thought it would be best to

6   have a third party kind of moderate our meeting.  And that's

7   what I attempted to do, but nobody would -- nobody would agree

8   to host that meeting.

9   Q    So what did you decide to do at that point, after you've

10  exhausted all those other options?

11  A    Well, I was talking to a police officer who had responded

12  to one of these incidents and I asked him what to do, and he

13  actually knew Mr. Miske and -- or knew of him.  And he said,

14  listen, the best way to do this is to meet with him directly

15  and see if you can sort things out.

16  Q    Is that what you attempted to do?

17  A    Yes.

18  Q    How did you go about doing that?

19  A    I -- I called Mr. Miske and asked him if we could set up a

20  meeting.

21  Q    Did he agree to meet?

22  A    Yes.

23  Q    Where was that meeting set up for?

24  A    Starbucks in Pearl City.

25  Q    Was there any particular reason you chose that location?

```
1   A     I believed I was going to get ambushed at the meeting and
2   I had set that up because I intended to switch locations to
3   Anna Miller's next door as soon as we met to provide a level of
4   safety.
5   Q     Were there any other precautions that you took prior to
6   meeting with Mr. Miske?
7   A     Yes.
8   Q     What were those?
9   A     I was armed.
10  Q     With a gun?
11  A     Yes.
12  Q     More than one?
13  A     Yes.
14  Q     What kinds of weapons did you have with you that day?
15  A     In my truck I had a Remington 870 Marine Magnum with an
16  extended magazine with bear shot, and on me I had a Sig 220
17  semi-auto.
18  Q     So you carried one of them with you, and one was in your
19  truck?
20  A     Yes.
21  Q     Did you have the necessary permits to have those weapons?
22  A     No.
23  Q     Why did you have those weapons without the permit?
24  A     I believed I was going to be ambushed.  And if I was, I
25  would have been able to defend myself with lethal force.
```

1    Q    Were you prepared to do that that day?

2    A    Yes.

3    Q    Were you visibly armed?

4    A    No.

5    Q    So did Mr. Miske arrive at the initial intended meeting

6    spot, the Starbucks?

7    A    Yes.

8    Q    What did you do?

9    A    I asked him -- I had arrived a few hours earlier just to

10   see if I could see anyone else coming in, and I didn't.  And

11   when I met with him, I went over, I think right at the entry of

12   Starbucks, and I said:  Listen, I'm really hungry.  Would you

13   mind if we go next door to Anna Miller's?  They have a good

14   breakfast.  And he agreed and we went next door.

15   Q    So you went inside the restaurant?

16   A    Yes.  Yeah.

17   Q    And you sat at a table?

18   A    We sat down.

19   Q    What happened with the meeting?

20   A    Initially, it was a little bit confrontational.  And, you

21   know, I basically -- I forget the exact words that I used but

22   expressed that, you know, this -- this was it.  We were not

23   going to meet like this again.  We had to have this nonsense

24   stop or there'd be consequences.  And once we both came to

25   terms with that, we actually sat down and had a pleasant, you

1   know, breakfast.

2   Q    So did you tell Mr. Miske specifically what those

3   consequences would be?

4   A    The message I tried to get across was if you mess with my

5   me, my family, or my business, I'll kill you.

6   Q    What was Mr. Miske's reaction to that?

7   A    Almost amused, I would say, and polite.

8   Q    Did you ever discuss specifically the topic of him -- you

9   believing that he was slitting your tents?

10  A    We did.  We -- I think we both knew he was doing it, but

11  he did not admit to it.

12  Q    How did the meeting end?

13  A    Shook hands and I think Mike said:  Okay, that's it.

14  We'll let it go.  And shook hands and walked away as two

15  business people after end of a deal and never had a problem.

16  Q    The tent slitting stopped?

17  A    Yes.

18  Q    Did you ever have any problems with Mr. Miske after that

19  point?

20  A    No.

21  Q    So this was fairly early in the -- I guess the -- the

22  infancy of your -- your company; is that true?

23  A    Yes, I think it was six, seven years in.  May -- I don't

24  know, four to six years in, something like that.

25  Q    So you indicated earlier that your company continued to

1  grow, and it was a profitable -- profitable company, correct?

2  A    Yes.

3  Q    Did you ever hire any employees that had previously worked

4  at Kama'aina Termite and Pest Control?

5  A    Yes.

6  Q    Any idea of the number?  Is it a handful, more than one?

7  Was it a frequent occasion?

8  A    Quite a few.  And especially in the tent fumigation

9  industry in Hawaii, a lot of employees would cycle through all

10  the different companies.  Tent fumigation is brutally physical

11  work.  The tents weigh over 200 pounds and when they're wet,

12  more.  And so guys would work hard every day.  And once you

13  start a tent fumigation, you can't stop until it's done.

14      So if the wind came up, you would have to just work into

15  the night if you had to.  And so, you know, guys would get

16  burnt out.  They would show up late for work the next day.  If

17  that happened two or three times, they'd get let go.  And

18  they'll just go straight across to the next pest control

19  company and go and work for them.  And the same thing would

20  happen there, and they would come back again.  It was just the

21  way it was.

22  Q    Okay.  It sounds like then you had employees that left

23  your company and went to work for Kama'aina as well?

24  A    In some cases, multiple times.

25  Q    Okay.  All right.

1      So did you notice any trends from the people that had

2  worked previously at Kama'aina when they came to your company,

3  as far as their knowledge of the fumigation business?

4  A     Essentially that they were the same people that cycled

5  through.

6  Q     Okay.  What about their skill level or knowledge as to

7  the -- the ins and outs of fumigating a residence, for example?

8  A     I would say they were -- you know, there were different

9  degrees.  You had, you know, drivers, like a CDL driver.  You

10  have a certified applicator and then you have a laborer.  I'd

11  say the labors were all pretty much in the same category.  They

12  were tough experienced guys who knew how to put a tent on a

13  structure, but didn't necessarily understand anything about the

14  science behind what they were doing.

15  Q     Okay.

16  A     They were laborers.

17  Q     All right.  Now, you mentioned earlier that your company

18  had done a number of large jobs.  The Navy contract I think was

19  one you had mentioned.

20      Were you familiar with a job that was possibly, I guess,

21  up for bid, that was a large condominium complex called the

22  Keola Lai condominium complex?

23  A     Yes.

24  Q     Did you -- was your company interested in bidding and

25  possibly doing that job?

 1   A    Yes.

 2   Q    Is this a condominium, a high-rise condominium in downtown

 3   Honolulu?

 4   A    Yeah, hundreds of units, if I remember correctly.

 5   Q    So what would have been the treatment options for a

 6   structure like that, a high-rise condominium?

 7   A    I think we -- it was drywood termites.  And I believe we

 8   came up with three options.  One was a borate treatment, which

 9   is basically a localized spot treatment where you would

10   inspect, drill, and inject.  The other one was a heat treatment

11   and -- which was priced at about the same price as a

12   tape-and-seal fumigation treatment.

13   Q    Okay.  Were you interested in bidding for that job?

14   A    Yes.

15   Q    Did you attempt to make a bid for that job?

16   A    Yes, but they wouldn't receive our proposal.

17   Q    And when you say "they," who are you referring to?

18   A    This was a construction company, I forget the name of it,

19   that was, I think, taking the bids.

20   Q    Does the name Nordic PCL --

21   A    That's it.

22   Q    -- ring a bell?

23   A    Yeah.  Right.

24   Q    Had you actually run numbers as far as what you were going

25   to propose to bid on that job?

1    A    Yes, we did.

2    Q    So what were the numbers or the bids that you were

3    prepared to present for that job?

4    A    I think the drywood termite spot treatment might have been

5    150, 100 and -- something like that per unit.

6    Q    Okay.

7    A    This is based on large volume.  I think there were 300

8    units, if I'm not mistaken.

9    Q    Okay.

10   A    And I think the tape-and-seal fumigation and heat

11   treatment were priced right around the same -- around 650 to

12   750, somewhere in that price range, per unit.

13   Q    Okay.  So $650 to $750 per individual unit or residence?

14   A    Yes.  How fumigation is priced is based on cubic volume.

15   So, like, you would measure the length, the height, and the

16   width of this room to get the cubic volume.  So let's say an

17   average house was -- is a 3-bedroom, 4-bedroom house on Oahu is

18   about 40,000 cubic feet, let's say.

19   Q    Okay.

20   A    So one of those units was -- was tiny, you know, less than

21   10,000 cubic feet as an example.

22        So it was obviously less expensive than fumigating a house

23   because it's much smaller, and so that's why it was cheaper.

24   Q    Okay.  So on the more expensive option was the tape and

25   seal?  Is that how -- what I understand?

1   A    Yes.

2   Q    So at that price, 650, 700 dollars a unit, that would be

3   approximately a quarter-million-dollar contract?

4   A    That's right, yes.

5   Q    So are you aware that the Keola Lai condo paid Kama'aina

6   Termite over $4 million to do that same work?

7   A    That's what I heard.

8   Q    What was your initial reaction when you learned that?

9   A    Disbelief.

10  Q    Would that be over, what, 16 times more than what your

11  company was prepared to do the job for?

12  A    Yeah, it's pretty standard.  There's -- there's -- all of

13  us had similar rate cards, which is how we priced our work.

14  Like I say, fumigation is based on cubic footage.  So you take

15  the cubic volume.  All of us measure it up.  We all got the

16  same cubic volume.  And then you just apply a price to that.

17  And so using that example I gave of an average house, that was

18  that much smaller, therefore the cost was less.  Like an

19  average house might cost $2,000 in those days.  And so, you

20  know, 750 was a reasonable amount to charge.  That would be

21  like the industry rate to do something like that.

22  Q    Okay.  Mr. Botha, do you recall in approximately 2015 the

23  FBI approaching you and asking if you were willing to provide

24  information to them at various times at their request?

25  A    Yes.

1    Q     Did you agree to do that?

2    A     Yes.

3    Q     And were you technically -- technically enlisted as a

4    confidential source of information at that time?

5    A     Yes.

6    Q     Did you meet with the FBI on a number of occasions over

7    the next few years?

8    A     Yes.

9    Q     Was it simply providing information or did you do any sort

10    of kind of proactive assistance?

11    A     No.  Most of it was just they were asking questions

12    regards to information about the industry, most specifically.

13    Q     And that's the pest control industry?

14    A     Yes.

15    Q     Okay.  So during that time, by the time we get to 2015,

16    '16, you're -- this is just before you're about to sell your

17    company, correct?

18    A     Yes.

19    Q     You'd been here working in Hawaii in this industry for

20    about 20 years at that point?

21    A     Over 20 years.

22    Q     You served on these various boards, correct?

23    A     Yes.

24    Q     So did you have a good understanding or good feel for as

25    to the -- the quality of the various pest control companies

1   that were working in the state?

2   A    Yes.

3   Q    How would you -- what was your analysis or review of

4   Kama'aina's reputation as a pest control company?

5            MR. KENNEDY:  Objection, speculation.  And this would

6   be in the lanes of expert testimony, Your Honor.

7            THE COURT:  Overruled.

8            Go ahead.

9   BY MR. INCIONG:

10  Q    You can answer.

11  A    Kama'aina was unbelievably good at marketing.  They came

12  from out of nowhere and built a really big company very

13  quickly.

14       And so they appeared to -- to be -- I think they were

15  probably the fastest-growing company at that time.  And so they

16  were very fast-growing.  But they didn't really have a good

17  reputation for doing things the way others that had been in the

18  industry a long time might have done them.

19       So they had a reputation for being -- doing shoddy work,

20  to be honest.

21  Q    Now, you had mentioned that there were employees kind of

22  coming and going back and forth between your company and

23  Kama'aina, as well as others.

24       But I want to ask you about one in particular.

25       Did you know an individual by the name of David Melton?

```
 1   A     Yes.

 2   Q     Was he employed by you?

 3   A     Yes.

 4   Q     What was his position when he was working for Sandwich

 5   Isle?

 6   A     He was a service manager, I believe.  I think he was a

 7   termite service manager or a pest control service manager.  I

 8   can't remember which.

 9   Q     Did he end up leaving your company?

10   A     Yes.

11   Q     Why did he leave?

12   A     He -- he was a -- he was a great guy.  He's one of these

13   guys that always wants to please and never wants to look bad.

14   But sometimes he would make up stories so that he wouldn't look

15   bad.  And we -- we had some -- something happened, and I just

16   said:  Look, Dave, this isn't going to work out.  You've got to

17   be straight with me when I ask you a question.  And that was

18   it.

19   Q     So you fired him?

20   A     Yes.

21   Q     Did he leave then and end up working at Kama'aina Termite

22   and Pest Control?

23   A     Yes.

24   Q     Now, you mentioned that Kama'aina was really good at

25   marketing.
```

1   A    Excellent.

2   Q    I'd like to show you Defense Exhibit 5000-248.

3        MR. INCIONG:  Which has been previously admitted from

4   their original exhibit list, Your Honor.

5        THE COURT:  Go ahead.

6   BY MR. INCIONG:

7   Q    Mr. Botha, do you see --

8        MR. INCIONG:  Could we publish that for the jury,

9   please?

10       THE COURT:  Yes.  Go ahead.

11  BY MR. INCIONG:

12  Q    So Mr. Botha, do you see the front page of -- this is a

13  2020 calendar that Kama'aina produced.  It's been previously

14  admitted into evidence.

15  A    Yes.

16  Q    Do you see that there in front of you?

17  A    Yes, I do.

18  Q    Are these the red and black tents that you described

19  earlier, that Kama'aina used to distinguish them from other

20  companies?

21  A    Yes.

22  Q    Okay.

23       MR. INCIONG:  Could we turn to page 3 of the exhibit,

24  please.

25  BY MR. INCIONG:

1  Q   Do you recognize this, Mr. Botha, as the Shangri La Estate

2  on -- here on Oahu?

3  A   Honestly, I'm not sure where it is, but it's a beautiful

4  picture.

5  Q   Okay.  All right.  Well, let me move on to another one

6  that you may recognize.

7          MR. INCIONG:  Could we turn to page 5, please.

8  BY MR. INCIONG:

9  Q   Do you recognize this as the Blaisdell Concert Hall?

10  A   Honestly, I'm not sure the name of the building, but it's

11  -- looks kind of familiar.

12  Q   I think the --

13          MR. INCIONG:  Can we scroll down on that?  Is it

14  possible?  There.

15  BY MR. INCIONG:

16  Q   Can you see the --

17  A   Oh, I see it there.  Yeah.

18  Q   The caption there?  Okay.

19          MR. INCIONG:  Could we next have page 11, please.

20  BY MR. INCIONG:

21  Q   Do you see that shot of St. Louis School?

22  A   Yes.

23  Q   So would you consider all these to be large projects?

24  A   Yes.

25          MR. INCIONG:  Could we show Mr. Botha and the jury

1    page 15 next, please.

2    BY MR. INCIONG:

3    Q    Do you see that shot of Poincania -- Poinciana Manor in

4    Kailua?

5    A    Yes.

6    Q    Does that look to be a large structure as well?

7    A    Yes, it does.

8    Q    Now, are these jobs that Sandwich Isle would have been

9    capable of doing?

10   A    Capable?  Yes.

11   Q    Did you have interest in doing any of these particular

12   jobs?

13   A    You know, the -- not particularly.  And the reason for

14   that is it's very hard to have an efficacious fumigation on a

15   structure of that cubic volume.  The larger the structure is,

16   the more difficult it is to reach a state of equilibrium which

17   is necessary to kill the insect.  And so when you have a job

18   that that's big, there's a great deal of complexity.  And so

19   what we probably would have done is either switched it to our

20   heat -- heat -- localized heat treatment or the borate spot

21   treatment.

22   Q    Okay.

23   A    Or, you know, fumigate it in sections.

24   Q    So when you see these pictures, like I've just scrolled

25   through with you, of the black and red tents on these

1   structures, is there any way that you can make any accurate

2   assessment of whether this -- any of these jobs were completed

3   accurately, just by the pictures of the tenting?

4   A    Well, I'll say very impressive pictures because it

5   demonstrates their ability to put basically tarpaulins, which

6   looked like circus tents, on a structure, okay?  So that --

7   that is not a fumigation, though.  A fumigation is the entire

8   process of enclosing the structure within a gas tarpaulin,

9   which they've apparently done here.  Then the next part of it

10  is -- the science behind it is where you have to calculate the

11  dosage, have the required dosage over the required exposure

12  period, you know, make sure that you've got equilibrium and

13  then go through the process of untenting -- monitoring and

14  untenting.  So this is -- this is one of multiple steps in a

15  fumigation.

16       So to look at this and say, well, that was a successful

17  fumigation, that's only part of the story.  It's like a

18  wrapping outside a candy bar or something.  But it is very

19  impressive-looking for sure.

20  Q    Okay.

21            MR. INCIONG:  Could we next show the witness Defense

22  Exhibit 5000-268, which has been previously admitted from their

23  original exhibit list as well?

24            THE COURT:  Mr. Inciong, how much longer do you have

25  with this witness?  It sounds like a fair amount.

```
 1              MR. INCIONG:  Not a whole lot, but it's more than
 2    probably five minutes, Your Honor.  If you want --
 3              THE COURT:  Okay.
 4              MR. INCIONG:  -- to take the break, that's fine.
 5              THE COURT:  Yes.  Why don't we take a break.  And,
 6    yes, you may show Exhibit 5000-268 to the witness upon our
 7    return.
 8              As we go to break, we are at just about 12:15, so
 9    we're getting a little bit late in the trial day to delay.
10              I will remind our jurors to refrain from discussing
11    the substance of this case with anyone, including each other,
12    until I advise you otherwise.  Do not access any media or other
13    accounts of this case that may be out there.  And finally,
14    please do not conduct any independent investigation into the
15    facts, circumstances, or persons involved.
16              We'll try to resume right around 12:30.
17              COURTROOM MANAGER:  All rise for the jury.
18              (The jury was excused at 12:13 p.m).
19              (The proceedings recessed at 12:13 p.m. until
20    12:34 p.m.)
21              (Open court in the presence of the jury.)
22              THE COURT:  All right.  Back from our second break.
23              And Mr. Inciong, you were about to show Mr. Botha an
24    exhibit that had been admitted previously?
25              MR. INCIONG:  Yes, Your Honor, Defense
```

1    Exhibit 5000-268.

2              THE COURT:  Okay.  Go ahead.

3              MR. INCIONG:  Thank you.

4    BY MR. INCIONG:

5    Q    Mr. Botha, do you see the exhibit in front of you on the

6    screen there?

7    A    Yes.

8    Q    During the time that you were -- owned and operated

9    Sandwich Isle Pest Solutions did you become familiar with the

10   Hawaii's Best Awards?

11   A    Yes.  We were once or twice the best.

12   Q    Okay.  Is that basically a customer survey that ranks, you

13   know, various businesses and then a final total or tally is put

14   out by the Star-Advertiser listing the best in the various

15   fields?

16   A    Yes.  Typically your customers would vote.

17   Q    Sandwich Isles received that on at least one occasion, you

18   said?

19   A    I think there might have just been one.  There were a

20   couple of different ones, but I know we were Hawaii's Best at

21   one point.

22   Q    Okay.  All right.

23             MR. INCIONG:  Could we show Mr. Botha and the jury

24   next Government's Exhibit 1-843A, which has been previously

25   admitted?

1          THE COURT:  Yes.  Go ahead.

2    BY MR. INCIONG:

3    Q    Do you see the photo shown this Exhibit 1-843A, Mr. Botha?

4    A    It looks like a room full of customers filling out the

5    nominations for the Hawaii's Best 2018.

6    Q    Did you ever gather your employees and direct them to fill

7    out Hawaii's Best ballots in hope of winning that award for

8    your company?

9    A    No.

10   Q    So let me ask you a few questions going back to --

11          MR. INCIONG:  You can take that down for now.  Thank

12   you.

13   BY MR. INCIONG:

14   Q    Going back to the tent-slitting incidents.

15          Did you have to alter or add any sort of extra precautions

16   after those incidents in order to protect your assets and the

17   safety of others?

18   A    Yes.

19   Q    What did you have to do?

20   A    We would get our own employees who might be short on hours

21   and ask them to stand as security guard at our own fumigations.

22   And they would stay for the duration, typically 22 to 24 hours.

23   Q    Was that an additional expense then that was incurred as

24   part of your operations?

25   A    Yes.

1  Q    Did that cut into the already very low profit margin on

2  the tent fumigation side?

3  A    Yeah, if you think about that average job we talked about

4  earlier, 40,000 cubic feet, 2,000-dollar price for a tent

5  fumigation, now you take an employee who's making maybe $15 an

6  hour times 20 hours.  That's $300.  And you got a 7 percent

7  profit margin is which is, what is that, $140?  You're in the

8  red.

9  Q    Okay.  Now, you had mentioned one time when you were

10 testifying in regard to the process of the fumigation process,

11 with who's involved and the different requirements that there

12 would be, and I think you mentioned at one point a licensed

13 applicator.

14     Could you describe to the jury what this is and what is

15 required in a tent fumigation job?

16 A    For restricted-use materials, such as chloropicrin or

17 Vikane gas, which are -- have a higher -- a very high hazard,

18 the Department of Agriculture or the EPA requires a certified

19 applicator be the applicator of that specific material, because

20 they have to calculate it and -- and apply it.

21     And the Department of Agriculture in Hawaii would certify

22 applicators as certified applicators once they had gone through

23 the application process and had sufficient experience.

24 Q    Okay.  And you also mentioned, I believe, CDLs.  Is that

25 commercial driver's licenses?

1   A    Yes.  To transport hazardous materials like the ones we're

2   talking about, chloropicrin and Vikane gas, you would have to

3   have a commercial driver's license with a HAZMAT endorsement.

4   Q    Did you become aware of any instances where employees,

5   fumigation employees that you had employed, who were not

6   licensed applicators or who did not have commercial driver's

7   licenses, left and began working at other companies, where they

8   were acting in those capacities?

9   A    Yes.

10  Q    Did that include Kama'aina?

11  A    Yes.

12  Q    Would there ever be any instance where it would be

13  appropriate not to use chloropicrin in the fumigation process?

14  A    In structural fumigation, it is required.  Using the exact

15  same active ingredient in a chamber fumigation, which we did in

16  our coffee berry borer treatment center as an example, where to

17  secure chamber you do not need to use chloropicrin because it's

18  a commodity.  It's a food commodity.  It's not actually a -- a

19  household.

20  Q    Okay.  But for a residence or -- were any --

21  A    Any type of structural fumigation with the Vikane label

22  requires that you use warning agents, and chloropicrin was

23  the -- was the warning agent that was required.

24  Q    And maybe this is obvious, but what is the -- what is the

25  problem if chloropicrin is not used in those situations?

1    A    Sulfuryl fluoride in its various label names is the exact
2    same gas, but it is odorless, colorless and has -- has no
3    antidote.  So if someone were to encounter it and there was not
4    a warning agent, you would not know that you were in the
5    vicinity of that gas.  And you may breathe in a lethal dose,
6    and there is no antidote.
7    Q    Mr. Botha, did you previously testify before the grand
8    jury in regard to this matter?
9    A    Yes.
10   Q    Do you recall that being in -- on November of 2018?
11   A    I can't remember the exact date, but sounds right.
12   Q    Do you recall being under oath on that day?
13   A    Yes.
14   Q    And do you recall being under -- testifying under the
15   penalty of perjury as well?
16   A    Yes.
17   Q    Did you testify truthfully on that occasion?
18   A    Yes.
19   Q    Have you testified consistently today with your testimony
20   before the grand jury?
21   A    Yes.
22         MR. INCIONG:  I have no further questions, Your
23   Honor.
24         THE COURT:  Mr. Kennedy.
25   ///

```
 1                          CROSS-EXAMINATION

 2  BY MR. KENNEDY:

 3  Q    We've reached the afternoon, so good afternoon, sir.

 4  A    Good afternoon.

 5  Q    I want to take you to October of 2016, okay?

 6       So in October of 2016, I take it that to kind of complete

 7  the cycle, three years after you arrived in Hawaii, you were

 8  working as the regional technical specialist, right?

 9  A    No.  When I arrived, I was a regional technical

10  specialist.  That's how I came here.

11  Q    I'm sorry?

12  A    That was my job description --

13  Q    Yeah.

14  A    -- when I was sent to Hawaii --

15  Q    Yeah.  Yes.

16  A    -- that's correct.

17  Q    When you arrived here back at the beginning of your time

18  period in Hawaii, you were the regional technical specialist,

19  correct?

20  A    That's -- that's right.  But it was not 2016.

21  Q    I know.  I'm cycling through, getting you --

22  A    Oh, I see.

23  Q    -- to 2016.  So stepping back.  When you arrived here,

24  which I believe was somewhere around 1994?

25  A    Somewhere around there, yes.
```

1   Q    Okay.  You were the regional technical specialist, right?

2   A    That's correct.

3   Q    For Terminix, right?

4   A    That's correct.

5   Q    And Terminix at that time was the largest pest control

6   business in the world, you said?

7   A    Yes.

8   Q    All right.  And you had worked for them in other

9   locations, right?

10  A    Yes.

11  Q    All right.  And then you worked in that capacity for about

12  three years, right?

13  A    Yes.

14  Q    And so you saw the individuals who Terminix hired over the

15  years, right?

16  A    Whilst during that three-year period, yes.

17  Q    And prior to that, right?

18  A    What was the question?  I -- I saw them?

19  Q    Yes.

20  A    Is that what you said?

21  Q    You saw them, right?

22  A    Observed them, yes.

23  Q    Yes.  Okay.

24  A    Yes.

25  Q    All right.  And so after that three-year period working

1   for Terminix your plan was to start your own business, right?

2   A    Yes.

3   Q    Okay.  And that was Sandwich Isles Pest Solutions, right?

4   A    Initially, it was Sandwich Isle Termite and Pest Control,

5   which was way too long, so we shortened it to Sandwich Isle

6   Pest Solutions.

7   Q    Okay.  Which you in both of those names had for about 20

8   years, right?

9   A    Yes.

10   Q    And then you sold it back to Terminix International,

11   right?

12   A    Yes.

13   Q    In October of 2016, right?

14   A    Around about that date.  I can't remember exactly what

15   date it closed, but yes.

16   Q    All right.  And right about that date, right?

17   A    Yes.

18   Q    Okay.  So then that was the end of your time with

19   Sandwich, right?

20   A    With Sandwich Isle, yes.

21   Q    Okay.  So during the last year and a half before that, you

22   were running Sandwich Isles Pest Control, right?

23   A    That's correct.

24   Q    You had competitors, right?

25   A    Yes.

1   Q    And those competitors involved Terminix, right?

2   A    Yes.

3   Q    Competitors involved Kama'aina Termite and Pest Control,

4   correct?

5   A    Yes.

6   Q    And the government asked you some questions about this,

7   but while you were a competitor you became an FBI confidential

8   source, right?

9   A    Yes.

10  Q    And that happened in about May of 2015, correct?

11  A    I think so.

12  Q    And so during those months of -- in the last 18 months

13  before you sold your company, you were competing against

14  businesses, but you were also working for the FBI, right?

15  A    I wouldn't characterize it that way.  They asked me some

16  questions about the industry in general.  That was their main

17  line of the questions.

18  Q    Well, sir, didn't you make consensually recorded telephone

19  calls?

20  A    Yes.

21  Q    On their behalf?

22  A    Yes.

23  Q    Calling up people that didn't know they were being

24  recorded?

25  A    I'm not sure if that's the case.

1    Q    Well, you didn't tell them that you were calling from the

2    FBI office or with the FBI listening, right?

3    A    Refresh my memory as to who those people were.

4    Q    Didn't you make three calls to David Melton in, say, I

5    believe it would be June of 2015?

6    A    Could be.  I do remember talking to him.

7    Q    Leaving messages, right?

8    A    I don't recall.

9    Q    Do you remember talking to him at length in July of 2015,

10   in a recorded conversation for the FBI?

11   A    I remember talking to David Melton, yes, sir.

12   Q    And you spoke with him again in September 2015, correct?

13   A    Not sure on the dates, but I did talk to him.  And I'm not

14   sure which ones were recorded or not recorded.

15   Q    Okay.  And so at that point you were competing against

16   Kama'aina Termite and Pest Control, but you were working with

17   the FBI against Kama'aina Termite and Pest Control and Mike

18   Miske specifically, weren't you?

19   A    That's what you're alleging.  That's not how I felt about

20   it.  But, you know, basically the way I looked at it was I was

21   just providing information primarily about the pest control

22   industry because of my background in the industry.

23   Q    Oh, I understand providing information about the pest

24   control industry is very different than having a recorded

25   conversation with someone when they don't know they're being

1    recorded for the FBI.  You would agree with me, right?

2    A    Sure.

3    Q    Okay.  So you provided information to the FBI in May of

4    2015, right?

5    A    I'm not sure on the dates.

6    Q    June of 2015?

7    A    I'm not sure on the date.

8    Q    July of 2015?

9    A    Not sure on the date on those.

10   Q    August of 2015?

11   A    Possibly.  I mean, I -- it's a long time ago.  I don't

12   know the dates on those.  I'd have to see records of that, I

13   guess, if you wanted me to verify the date.

14   Q    September of 2015?

15   A    Same answer.

16   Q    March of 2016?

17   A    Same answer.

18   Q    June of 2016?

19   A    Yeah, sure.  Show me the records, and I'll be able to

20   verify it.

21   Q    Okay.  Sometimes we have to ask the questions first.

22             MR. KENNEDY:  For May of 2015, can we pull up

23   Exhibit 9033-008.  which I believe is in the original exhibit

24   list, Your Honor.

25             THE COURT:  Go ahead.

1   BY MR. KENNEDY:

2   Q    Sir, do you recognize that you were given a source ID

3   number instead of a name?

4   A    Oh, I see that.

5   Q    And so just take a moment and review the information.  I'm

6   not going to ask you the substance of it, but whether it

7   confirms the questions that I just asked you.

8   A    It -- it looks familiar.  I recall this.

9   Q    All right.  So this appears to be May of 2015, correct?

10  A    Yes.

11  Q    All right.  So you're providing information in May of

12  2015, correct?

13  A    Yes.

14  Q    All right.  If we move to 9033-011 --

15           MR. KENNEDY:  Which is also in the original exhibit

16  list, Your Honor.

17           THE COURT:  Go ahead.

18  BY MR. KENNEDY:

19  Q    Take a moment and take a look at this.

20           And, sir, it sometimes is a little small, so we can blow

21  up the date of contact there.  And I'll clear that away.

22           Does that orient you to the date, sir?

23  A    Sorry.  What was your question?

24  Q    Does it orient you to the date?

25  A    Yes, I see the date, 6/24/2015.

1    Q    Okay.  Let me take -- if we can pull that back out.

2         So as early as June of 2015 you're making phone calls for

3    the FBI in this investigation to a Mr. David Melton, who you

4    talked about earlier today, correct?

5    A    Yes, that's correct.

6    Q    All right.  So I had asked you if you provided information

7    to the FBI in May of 2015 and June of 2015.  It appears that is

8    correct?

9    A    Yes.

10   Q    All right.

11        Moving on to Exhibit 9033-018, which is also in the

12   original exhibit list.

13        Take a moment and -- I'm not going to ask you about the

14   substance of this, but if you want any part of it blown up, I

15   can do that.  But just read it to yourself and let me know when

16   you're -- have completed that.

17   A    (Complies.)

18        I've completed reading it.

19   Q    All right.  And let's -- I don't know if it has a second

20   page.  I think it may.  If you want to take a look at that, and

21   just let me know when you've completed that as well.

22   A    Yeah.  I've kind of speed read through it.  That's --

23   Q    All right.

24   A    Yeah.

25   Q    We can take it down now.

1      So this is now July of 2015, correct?

2   A   Yes.

3   Q   And this is a recorded phone call on behalf of the FBI

4   that you made to Mr. Melton, right?

5   A   Yes.

6   Q   All right.  So in addition to just providing information,

7   you're actively participating in the investigation, correct?

8   A   Viewed that way, yes.

9   Q   At this same time you're bidding against Kama'aina Termite

10  and Pest Control, correct?  For jobs?

11  A   Yes, along with a hundred other companies.

12  Q   Right.  And so if we move on to Exhibit 9033-016 --

13      MR. KENNEDY:  Which is also in the original exhibit

14  list, Your Honor.

15  BY MR. KENNEDY:

16  Q   Let me know when you're --

17  A   Completed.

18  Q   -- done.

19      All right.  We can take that down.

20      I had asked you about August of 2015.  You were providing

21  information in August of 2015 as well?

22  A   Yes.

23  Q   And once again, this is at the same time you're bidding

24  against Kama'aina Termite and Pest Control for jobs, correct?

25  A   Not personally, but the company was, yes.

1   Q    Your company was?

2   A    Yeah.

3   Q    And you're acting -- you owned the company, right?

4   A    That's correct.

5   Q    I believe you said at about, you know, sometime in 2016

6   you sold the company, right?

7   A    Yes.

8   Q    You sold it for over $13 million, right?

9   A    Yes.

10  Q    So you're acting on behalf of your company and you're also

11  working for the FBI in the summer of 2015, May, June, July, and

12  August, correct?

13  A    Yes.

14  Q    All right.  Now, moving to September of 2015, the next

15  month, if we take a look at Exhibit 9033-027 --

16       MR. KENNEDY:  Which I believe is also in the original

17  exhibit list, Your Honor.

18  BY MR. KENNEDY:

19  Q    And let me know when you're finished with that, sir.

20  A    (Reviews document.)

21       I'm completed reading it.

22  Q    All right.  And let's see if it has a second page.  I'm

23  not certain.  Does not appear to.

24       So in September of 2015 you're continuing to make recorded

25  phone calls on behalf of the FBI to Mr. Melton, correct?

1   A    It appears.  Honestly, it's hard to understand what this

2   form means.  But it looks like if that's the numeric name they

3   gave me and David Melton had a conversation.  So --

4   Q    If we just blow this up.

5   A    Okay.

6   Q    Consensual monitoring, right?

7        You understood that you were making a phone call to an

8   individual for the FBI, and that individual had no idea that he

9   was speaking to the FBI?

10  A    But -- okay, that's what that means.

11  Q    Correct?

12       Because they're recording and listening, and you are

13  participating in the investigation, correct?

14  A    Yes.

15            MR. KENNEDY:  We can take that down.

16  BY MR. KENNEDY:

17  Q    So that continued into the next year.  I asked you about

18  March of 2016, if we pull up 9033-022 to refresh your

19  recollection.

20       Take a moment and read that, sir, just to yourself.

21  A    (Complies.)

22       Completed.

23  Q    All right.  Were you able to complete that or do you need

24  it back up, sir?  It looked like it went dark here.

25  A    Oh, no, that's fine.

1    Q    Okay.

2    A    Completed.

3    Q    So in March of 2016, in the same year you're selling the

4    company, you're continuing in your role as participating in the

5    investigation, right?

6    A    Yes.

7    Q    And we move to Exhibit 9033-020.

8         It's another example of you participating in the

9    investigation, correct?

10   A    Yes.

11   Q    All right.  And just to finish it up, if we move to

12   9033-024, if we jump from -- just take a look and read that,

13   and let me know when you're done.

14   A    (Complies.)

15        I am completed.

16   Q    All right.  So now this is into --

17            MR. KENNEDY:  And we can take that down.

18   BY MR. KENNEDY:

19   Q    This is now into June of 2016, correct?

20   A    Yes.

21   Q    And you're still participating in the investigation,

22   right?

23   A    Yes.

24   Q    So you're active in the investigation, correct?

25   A    Yes, I suppose so.  The --

1   Q    Well --

2   A    Yeah.

3   Q    I mean it's one thing --

4   A    Yeah.

5   Q    -- to just give information over.  It's another thing to

6   actively participate with the FBI against a competitor, you

7   would agree, correct?

8   A    Yes.

9   Q    All right.  And so in that you were making recorded

10  telephone calls to a former employee, right?  Of yours?

11  A    Are we talking about Melton?

12  Q    Yes.

13  A    Yes.

14  Q    All right.  And I think you gave some testimony that he

15  had worked for Sandwich Pest Control, correct?

16  A    Sandwich Isle, yes.

17  Q    Sandwich Isle Pest Control, correct?

18  A    Yes.

19  Q    And he had worked at Kama'aina Termite and Pest Control as

20  well, correct?

21  A    He had worked at a number of companies, yes.

22  Q    Right.  All right.  And so in those telephone calls the

23  man you were recording for the FBI, David Melton, was someone

24  that you knew, right?

25  A    Yes.

1  Q    All right.  So in March of 2015 you told the FBI that you

2  fired Dave Melton, right?

3  A    I can't remember the date, but, yes, I do remember that.

4  Q    For being a pathological liar, right?

5  A    It might have been a little bit strongly worded, but yes.

6  Q    And those were your words, right?

7  A    Like I said, probably a little bit strongly worded.  And

8  the reason I say that, if you want me to explain, I will.

9  Q    Well, I understand that you, like many companies, had GPS

10  on your vehicles, right?

11  A    Yes.

12  Q    And so the GPS could track what employees are doing,

13  right?

14  A    Right.

15  Q    And you talked about having upwards of 112 employees,

16  right?

17  A    Yes.

18  Q    And to run the company, you need to know where they're

19  going, getting the jobs done, right?

20  A    Yes.

21  Q    Because if calls are coming in about where's my truck,

22  what's happening here, this is one way to know that things are

23  being done right, correct?

24  A    That's correct.

25  Q    And many companies do that, correct?

 1   A      Correct.

 2   Q      And you yourself implemented that, correct?

 3   A      Yes.

 4   Q      All right.  And so on one occasion you had GPS on

 5   Mr. Melton, right?

 6   A      Yes.

 7   Q      You could see that he wasn't where he was supposed to be,

 8   right?

 9   A      Yes.

10   Q      And so that can happen, right?

11   A      It did happen.

12   Q      And so you bring him in and you say why weren't you there,

13   right?

14   A      Yes.

15   Q      And he told you he was, right?

16   A      Yes.

17   Q      And you knew he wasn't 'cause you had GPS, right?

18   A      Yes.

19   Q      So you called him on it, right?

20   A      Yes.

21   Q      You showed it to him, correct?

22   A      Yes.

23   Q      And so then you fired him, right?

24   A      Yes.

25   Q      Okay.  For doing that, right?

 1  A    Yes.

 2  Q    Okay.  So I want to go from that to the recorded calls for

 3  the FBI.

 4       Now, as your role as an FBI confidential source, in July

 5  and September 2015, you were pretending to float a business

 6  opportunity to Mr. Melton who you had fired, weren't you?

 7  A    You're going to have to explain more on that.  I don't

 8  remember that.

 9  Q    Don't you remember that you had relocated?  You were

10  relocating to Montana?

11  A    I -- of course, I remember.  I relocated.

12  Q    And you told him that you were going to start a

13  Montana-based pest control business?

14  A    That's correct.

15  Q    And that you had already applied for that business?

16  A    And had started it and --

17  Q    And started it?

18  A    And started it, yeah.

19  Q    And that you were seeking to employ him again in some

20  capacity if he was interested?

21  A    He would have been a great candidate for that, yes.

22  Q    And so you were doing this in a role for the FBI so that

23  he would talk with you, right?

24  A    I would have hired him.

25  Q    Because --

1   A    For our pest control company.  He's -- he was a good guy.

2   He just -- sometimes he would not tell the truth because he was

3   one of these guys who really wanted to make you happy.  He

4   never wanted to do anything that would upset you.  He didn't

5   like confrontation.  But in terms of experience, he was a

6   really experienced guy.

7   Q    But you never did hire him, right?

8   A    I didn't hire him, no.

9   Q    And so you had fired him once before, correct?

10  A    Yes.

11  Q    You were playing a role get him to talk to you, right?

12  A    In that phone call, I was trying to get him to talk to me,

13  yes.

14  Q    Right.  Because the call wasn't to hire him for the

15  Montana business.  The call was to -- on behalf of the FBI, you

16  were working at their direction, correct?

17  A    No, that's not correct.  If I had told him there was job

18  opportunity, it was because there was a job opportunity.  And

19  whether he took it or whether -- I didn't hire him is a

20  different story altogether.

21  Q    I thought you retired in 2016.

22  A    You thought I retired?

23  Q    Yes.  Did you?

24  A    I'm -- I'm still working.  I have multiple businesses.

25  Q    Are you working in the pest industry or are you working in

1   real estate?

2   A    I'm working in multiple industries.

3   Q    All right.

4   A    So I continued to consult with Terminix after 2016.

5   Q    Okay.

6   A    I continued to be active in that National Pest Management

7   Association after that.

8   Q    Let me ask you this.  If you're consulting with Terminix,

9   would you have hired Dave Melton to assist you in consulting?

10  A    It was not my position at Terminix as a consultant to hire

11  other people.  My job was direct them on -- on governmental

12  affairs things.

13  Q    Weren't you talking about essentially franchising this

14  business throughout the western states?

15  A    Which business?

16  Q    The one that you were starting in Montana when you were

17  speaking with Mr. Melton, you were going to move around the

18  western states.  And he kept saying he was interested in that

19  and continued to talk with you on behalf of the FBI?

20  A    Yes.  We -- we -- when I started Big Sky Pest Solutions,

21  the idea was to build another business to sell and to build a

22  regionally -- regional size business.  So that was the initial

23  intention with that.

24  Q    All right.  And so during this last 18 months or so of

25  your working and owning Sandwich Isle Pest Control, you were

```
 1    working for the FBI and also competing against Kama'aina

 2    Termite and Pest Control in bids and in projects, correct?

 3    A    Yes.

 4    Q    All right.  Now --

 5         You've described to the jury about the Costco incident,

 6    correct?

 7    A    Yes.

 8    Q    All right.  And so as I understand it, there was a

 9    confrontation inside.  You took it outside, right?

10    A    No.  That's incorrect.

11    Q    Mr. Miske approached you, asked you to take it outside,

12    and you did?

13    A    There was not a -- much of a confrontation inside so much

14    as Mike asked me to go outside and step outside.

15    Q    Okay.

16    A    So I didn't take it outside.  Mike said:  Let's go

17    outside.

18    Q    Okay.

19    A    Which is what we did.

20    Q    He said let's go outside, and you did, right?

21    A    Yes.

22    Q    Then it devolved into an argument between the two of you,

23    right?

24    A    Yes.

25    Q    You at some point said it may become a fight, right?
```

1  A    When I walked out, Mike was in front of me, and he started

2  stretching and warming up as if to get in -- to start a fight.

3  Q    Okay.

4  A    So that's how it started.

5  Q    All right.  And then you're arguing outside, right?

6  A    Yes.

7  Q    Passerbys [verbatim] see it, right?

8  A    Yes.

9  Q    Security comes over, right?

10  A    Yes.

11  Q    If we could take everybody there, a couple of people are

12  pointing fingers at each other and arguing, right?

13  A    Yes.

14  Q    Eventually, someone calls the police, correct?

15  A    Yes.

16  Q    The police show up, right?

17  A    Yes.

18  Q    You disperse, the two of you, right?

19  A    We both went back into Costco.  I believe Mike came into

20  Costco with me and we continued shopping.

21  Q    Okay.  You both went back into the Costco and that event

22  was over, right?

23  A    Yes.

24  Q    Okay.  Now, I want to jump forward from there to the --

25  you described to the jury an incident that happened in Kailua

1   in April of 2004, right?

2   A    Yes.  The fumigation we're talking about?

3   Q    Yes.

4   A    Yeah.

5   Q    Okay.  So just -- we're going back a long time.  So the

6   Costco incident was in December of 2003, right?

7   A    Yes.  Christmas Eve.

8   Q    Now almost 21 years ago, right?

9   A    Yes.

10   Q    Okay.  And so we're fast forwarding about -- I guess we'd

11   say five months or so to April of 2004?

12   A    Sure.

13   Q    Right?  Okay.

14       Now, you described a tent slashing, right?

15   A    Yes.

16   Q    All right.  And in that tent slashing, you went to the

17   scene, correct?

18   A    Yes.

19   Q    We saw the cutout of the tent, right?

20   A    Yes.

21   Q    Okay.  Were you aware that there was a Budweiser can that

22   was collected in terms of evidence by the police there?

23   A    Yes.  I asked them to collect it.

24   Q    Okay.  'Cause they were looking at suspects that might

25   have done this, correct?

1   A    Yes.

2   Q    All right.  And I believe at that point you decided to

3   then call Mr. Miske, if I understand your testimony, correct?

4   A    Incorrect.

5        MR. INCIONG:  Objection, misstates his testimony.

6   A    That's not correct.

7   BY MR. KENNEDY:

8   Q    I believe you testified in front of the grand jury, and

9   you said that you confronted Mr. Miske about the April 14th,

10  2004 incident at 7713 -- I believe it's Mokapu Road in Kailua,

11  right?  Do you recall that?

12  A    Are you -- are you saying did I call him at the location?

13  Is that what you're saying?

14  Q    No, no, no.  After that event, very shortly after that,

15  you decided to call him because that was, as you described, the

16  last straw?

17  A    I don't remember exactly when that call was.  Are you

18  talking about when we met at Starbucks?

19  Q    Yes.

20  A    I don't remember the date or time period that passed from

21  the time that Kailua incident happened to the time that we met.

22  Q    Okay.  I believe you said it was --

23  A    It was after.

24  Q    I believe you said it was about six to seven years after

25  you started the company that that event happened, right?  When

1   you were asked this morning?

2   A    Which event are we talking about?

3   Q    The call in relation to the fumigation.  Correct?

4           MR. INCIONG:  Objection, vague.

5           THE COURT:  I am completely confused.

6   BY MR. KENNEDY:

7   Q    You started the business in 1997, right?

8   A    Right.

9   Q    Seven years later, we'd be in 2004, correct?

10  A    Yes.

11  Q    You testified in front of the grand jury, I believe, that

12  that incident at Makapuu [verbatim] Road in Kailua was the last

13  straw, right?

14  A    I believe that's what I said.

15  Q    And that that triggered you to call Mr. Miske, correct?

16  A    Yes, but not -- not the next day or anything like that.

17  What -- there was a point at which time I decided we need to --

18  we need to get this figured this out.

19  Q    Okay.

20  A    Because it's -- because someone nearly died.

21  Q    All right.  And so I believe you testified about the

22  meeting that happened I believe sometime shortly thereafter,

23  right?  In 2004, right?

24  A    Like I said, I'm not sure of the date thereafter, but,

25  yes, it happened afterwards.

1   Q    Okay.  It didn't happen years later, sir, right?

2   A    I don't remember that, how many days --

3   Q    You don't remember?

4   A    -- weeks, or months went by between that --

5   Q    Well --

6   A    Do you have a date?  I mean, what was the date?

7   Q    Sir, I'm just relying upon your -- your testimony.  I

8   believe you said that that was the last straw, so you decided

9   to call shortly thereafter.  I'm not saying at the scene.  I'm

10  not saying the next day.  I'm saying right in that time period.

11  Is that a fair statement?

12           MR. INCIONG:  Objection, misstates his testimony.

13           THE COURT:  Go ahead.  You can answer.  Overruled.

14  A    I don't know the date, how many days passed from that

15  incident before I called Mike.

16  BY MR. KENNEDY:

17  Q    A week?

18  A    I just said I don't know.

19  Q    A month?

20  A    I can't remember.

21       I don't remember the exact -- exact amounts of time that

22  went by.

23  Q    Okay.  So you called, right?  You called Mr. Miske, right?

24  A    Yes.

25  Q    You asked to meet, right?

1  A   Yes.

2  Q   He agreed to meet?

3  A   Yes.

4  Q   You set it up, you said, for Starbucks, right?

5  A   Yes.

6  Q   And you came with weapons, right?

7  A   Yes.

8  Q   You described the weapons that you had in your vehicle,

9  correct?

10  A   Yes.

11  Q   And you said that you didn't have a permit for any of

12  those weapons, right?

13  A   They're all registered firearms.  They're registered to my

14  name.  It's not that they were unregistered.  In those days you

15  couldn't get a concealed permit in Hawaii.  I have one now.

16  Q   All right.  I understand.

17      So on your person was a concealed firearm, right?

18  A   Correct.

19  Q   For that meeting, right?

20  A   Yes.

21  Q   And you brought it to the meeting, right?

22  A   Yes.

23  Q   You said you were there several hours early, right?

24  A   Yes.

25  Q   You watched Mr. Miske came alone, right?

1   A      Yes.

2   Q      Came into Starbucks, yes?

3   A      I can't remember if we walked into the door or directly

4   outside where we met, but, yes, at Starbucks.

5   Q      Said you were hungry, so you went over to the breakfast

6   spot Anna Miller's for breakfast, right?

7   A      Yes.

8   Q      All right.  Not only were you -- not only were you

9   carrying a concealed weapon, but you had done something special

10  with at least one ammunition that you had in that firearm,

11  correct?

12  A      I had marked it.

13  Q      You had marked it, and you wrote:  Mike Miske slug for a

14  thug, right?

15  A      On the one side is "Mike Miske" and on the other side is

16  "a slug for a thug."

17  Q      So you actually wrote it down on that, correct?  On the

18  bullet casing.

19  A      That's correct.

20  Q      That you carried in there to the restaurant.

21  A      No.  That was on a -- it was a -- it was a bear slug in

22  the 12-gauge shotgun.

23  Q      Ah.

24  A      Which was in the back seat of my truck.

25  Q      All right.  So you put it into one of your other weapons,

1    right?

2    A    I had two weapons.

3    Q    Right.  And the one you brought in there was loaded,

4    wasn't it?

5    A    It -- it had a magazine in it, but it had nothing in the

6    chamber.

7    Q    So you brought a gun with you that had nothing in the

8    magazine?

9    A    No.  I said nothing in the chamber.

10   Q    Ah.  Nothing in the chamber.  It -- the magazine was

11   loaded, but you hadn't chambered a bullet yet?

12   A    That's correct.

13   Q    All right.  Now, you mentioned that the -- now, did you

14   prepare a police report for that incident at Mokapu?

15   A    The fumigation?

16   Q    Yes.

17   A    Yes.  There was a police report.

18   Q    All right.  And so in that particular one, that was in

19   2004, correct?

20   A    Yes.

21   Q    All right.  And you mentioned something about your tents

22   had been slashed between the date in December of 2003 and that

23   April 2004, correct?

24   A    Yes.

25   Q    There's no police report that you ever filed prior to that

1   April date, correct?

2   A    I can't remember.

3   Q    Not one time did you file any police report about any

4   slashed tent between December 24th, 2003, and April 14th of

5   2004, correct?

6   A    That may be the case but we -- we didn't call the police

7   on most of the slashings, and the reason was because they had

8   told us they were not able to help us with that.

9   Q    They had told you they wouldn't help you --

10  A    They said that they couldn't do anything about it.

11  Q    -- before you even called them?

12  A    No, we, had --

13  Q    Sir --

14  A    Like I said, we --

15  Q    Sir, there's no question pending right now.  But let me

16  ask you this.

17          THE COURT:  You asked him a question.

18  BY MR. KENNEDY:

19  Q    If a tent --

20          THE COURT:  You asked him a question, counsel.

21          MR. KENNEDY:  All right.

22          THE COURT:  If you don't want an answer, then move on

23  to another question.  But don't say you didn't ask a question.

24          MR. KENNEDY:  All right.  I will ask you this

25  question.  I'll move on to this question.

1          THE WITNESS:  So should I answer the question you

2     asked?

3          MR. KENNEDY:  Go ahead.

4     A    So beginning in 1997, when we started fumigation, we did

5     experience a couple of burglaries, and exact same thing

6     happened.  We would call the police, and most of the times

7     people are gone, there's nothing they could do about it.  So we

8     had had a -- anyone in the fumigation industry at that -- in

9     that duration of time had had experiences where their tents had

10    been vandalized in some way or another.  So we had had

11    experiences with -- with burglaries and, you know, that type of

12    thing, that we had [indiscernible].

13         So it might not have been after December 24th and before

14    April, but we had had a history of working with police over the

15    years.  And we recognized that they could not do much to help

16    us once the perpetrator had left the place.

17    BY MR. KENNEDY:

18    Q    All right.  So at that time period, you said, you made the

19    call, correct?  To Mr. Miske, right?

20    A    Are we talking about setting up the --

21    Q    Yeah.

22    A    -- meeting at Starbucks?

23    Q    Yes.

24    A    Yes.

25    Q    And when you made that call, other than the April 14th,

1   2014, the police had never been called to anything regarding

2   any slashed tent between the time of the Costco incident and

3   your meeting with Mr. Miske?

4   A    I'd have to check the -- to see what records you have, but

5   there were multiple police reports if I remember correctly.

6   Q    All right.

7            MR. KENNEDY:  If we could pull up 9033-043, which I

8   believe is in the 20th supplemental.  Just for the witness.

9   BY MR. KENNEDY:

10  Q    Now, do you see that there are a number of calls regarding

11  Sandwich Isles?

12  A    Yes, I see that.

13  Q    All right.

14  A    Okay.

15  Q    All right.  All right.  And if we pull back, and if we

16  just flip through and take a look at the document, sir.

17  A    (Reviews document.)

18  Q    And just let me know when you would like the page to flip

19  after you get a sense of -- to refresh your recollection.

20  A    Oh, go ahead, please.

21  Q    All right.

22  A    You can move to the next --

23  Q    If we move to the next page, please.

24  A    (Reviews document.)  Go ahead.

25  Q    And then move to the next page.

1   A      (Reviews document.)  Okay.  Go ahead.

2   Q      And then move to the next page, please.

3   A      (Reviews document.)  Go ahead.

4   Q      And then the next page, please.

5   A      (Reviews document.)  Okay.

6   Q      And move to the next page, please.

7   A      (Reviews document.)  Go ahead.

8   Q      And then the next page.

9   A      (Reviews document.)

10         Just a little bit confused on this one.  There's two dates

11  on this.  The top says 3/29/2019, and the top of the second

12  paragraph says April 22nd, 2010.

13  Q      I believe the 3/29/2019 date would be the date that

14  they're compiling, the FBI.

15  A      Oh, I see.

16  Q      The times that police reports were filed in relation to

17  your company.

18  A      Gotcha.  Okay.  Go ahead, please.  (Reviews document.)

19         Go ahead.  (Reviews document.)

20         Could we go back to the page before this one?  I might

21  have missed something.

22  Q      We can.

23  A      Thanks.

24         (Reviews document.)

25         So this one is a burglary, where they opened the seam and

1    found someone inside, heard the noise from within the house and

2    believed someone may have entered the home to steal things.

3    Q    If we'd move to the next page.

4    A    Okay.

5    Q    If you've had enough time on that page.

6    A    Yes.

7         (Reviews document.)

8         So it appears that someone broke in, went inside and

9    then --

10             THE COURT:  Yes, sir, there's no question pending.

11   Just read the page.

12             THE WITNESS:  Okay.

13             THE COURT:  And move on to the next page, and

14   Mr. Kennedy can ask his question.

15             THE WITNESS:  Sure.  Go ahead.

16             MR. KENNEDY:  Can we move on to the next page?

17             THE WITNESS:  (Reviews document.)  Okay.  Completed.

18   BY MR. KENNEDY:

19   Q    And move on to the next page.

20   A    (Reviews document.)  Go ahead.

21   Q    All right.  And move on to the final page.

22   A    (Reviews document.)  Sure.  Go ahead.

23   Q    Now, let's move back to the first page of 9033-043.

24        Now, if we take that down, are you -- I want to ask you

25   some questions about it.

1    A    Sure.

2    Q    The first police report on behalf of your company is that

3    April 14th, 2004 incident that you described, correct?

4            MR. INCIONG:  Objection, foundation.  This is not his

5    report.  There's no foundation that this is a complete report

6    of all the HPD reports compiled.

7            THE COURT:  The objection's overruled.  You may

8    answer the question.

9    A    Based --

10   BY MR. KENNEDY:

11   Q    The first report in terms of notifying the police is that

12   April 14th, 2004 incident in Kailua on Makapuu [verbatim],

13   correct?

14   A    Based upon what you have showed, yes.

15   Q    All right.

16   A    On -- on --

17   Q    The next one is two years later, in 2006, correct?

18   A    I think it was.  Sorry.  I didn't -- I didn't memorize the

19   date.

20   Q    All right.

21   A    Yeah.

22   Q    If we pull up 9033-043, and just take a look at the first

23   page.

24   A    Okay.

25   Q    No -- the next HPD report involving your company is in

1   2006, correct?

2   A    Can you point out on here where -- where you're seeing

3   that?

4   Q    Yes.  If we go back to the first page.

5   A    Okay.

6   Q    And I'll try to blow that up, sir.

7   A    Okay.

8   Q    And let me get rid of that.

9        Do you see this report (indicates)?

10  A    Yes.

11  Q    The next one is two years later, in 2006, correct?

12  A    Sorry.  I just don't see the dates.  Where are you seeing

13  the dates?

14  Q    Well, right there in terms of the year, sir.

15  A    Oh, I see.  Okay.  I thought that was a serial number or

16  something.  Yeah.

17  Q    Okay.  So do you see that the date is 06, which would

18  correspond to 2006?

19           MR. INCIONG:  Objection, lack of foundation.

20  Hearsay.

21           THE COURT:  Sustained.

22  BY MR. KENNEDY:

23  Q    If we move through the document, if we pull back up, let's

24  go inside the document.  If we keep moving, keep moving, keep

25  moving.

 1      And do you see, we'll start with down here at -- I'll blow

 2   that up.

 3      Regarding this particular.  And then let's pull back and

 4   move to the next page.  And just read that to yourself, and

 5   I'll ask you some questions about it.

 6   A   (Complies.)

 7      Okay.  I've completed reading it.

 8           MR. KENNEDY:  All right.  So we can take that down.

 9   BY MR. KENNEDY:

10   Q   2006 is the next police report, correct?

11           MR. INCIONG:  Objection, lack of foundation, hearsay.

12           THE COURT:  Sustained.

13   BY MR. KENNEDY:

14   Q   It involved a tent slashing in 2006 --

15           MR. INCIONG:  Same objection.

16   Q   -- correct?

17   A   Based on what you showed me.

18   BY MR. KENNEDY:

19   Q   An employee of your company called and made a police

20   report about it, correct?

21           MR. INCIONG:  Objection, hearsay.

22           THE COURT:  We're at 1:25, and we're going to adjourn

23   for the day.

24           As we go to break, I'll remind our jurors to refrain

25   from accessing any media or other accounts of this case that

1   may be out there.  Please do not conduct any independent

2   investigation into the facts, circumstances, or persons

3   involved, and also, do not discuss the substance of this case

4   with anyone, including each other.

5          We will start tomorrow at 8:30.  The lawyers shall

6   remain.

7          COURTROOM MANAGER:  All rise for the jury.

8          (The jury was excused at 1:26 p.m.)

9          THE COURT:  Mr. Botha, you may step down.

10                                          (Witness excused.)

11         (Open court out of the presence of the jury.)

12         THE COURT:  You may be seated.

13         I'd like a status report on where we are in this

14  case.  There is a colossal amount of wasted time.  Repeatedly

15  asked-and-answered questions comprise the vast majority of

16  cross-examination material.  Sometimes the government objects;

17  sometimes not.

18         I understand that context sometimes needs to be

19  provided, but there is just a massive amount of repetition,

20  testimony that has already been offered that the jury has to

21  hear two, three, four, or five times.  It's getting

22  aggravating.  I think the jury is likely getting aggravated if

23  they are at least half of -- half as aggravated as I am.

24         This case is going to take an enormous amount of

25  time.  We've all known that from the beginning.  But part of

1    the reason it's taking as long as it is, and my sense of it, is

2    that we are making modest progress.   Part of the very reason is

3    because of the questioning of the lawyers.

4              And frankly, I'm getting disgusted by both sides.   I

5    can't take it anymore.   Get out of here.

6              COURTROOM MANAGER:   All rise.

7              (Whereupon, at 1:28 p.m., the proceedings adjourned.)

8              (End of partial transcript.)

9                              *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    COURT REPORTER CERTIFICATE

 2           I, Ann B. Matsumoto, Official Court Reporter, United

 3     States District Court, District of Hawaii, do hereby certify

 4     that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5     complete, true, and correct transcript of the stenographically

 6     recorded proceedings held in the above-entitled matter and that

 7     the transcript page format is in conformance with the

 8     regulations of the Judicial Conference of the United States.

 9           DATED at Honolulu, Hawaii, June 30, 2024.

10

11

12
                        /s/ Ann B. Matsumoto
13                      ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25