```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,     )  CR. NO. 19-00099-DKW-KJM
                                   )
 5               Plaintiff,        )  Honolulu, Hawaii
                                   )
 6        vs.                      )  March 6, 2024
                                   )
 7   MICHAEL J. MISKE, JR.,        )  JURY TRIAL - DAY 33
                                   )
 8               Defendant.        )  (CONTINUED TESTIMONY
     _____)  OF GOVERNMENT'S WITNESS
 9                                    MICHAEL BOTHA)

10

               PARTIAL TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE DERRICK K. WATSON
            CHIEF UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:        MARK A. INCIONG, AUSA
                                MICHAEL DAVID NAMMAR, AUSA
15                              WILLIAM KEAUPUNI AKINA, AUSA
                                Office of the United States Attorney
16                              Prince Kuhio Federal Building
                                300 Ala Moana Boulevard, Suite 6100
17                              Honolulu, Hawaii 96850

18   For the Defendant:        LYNN E. PANAGAKOS, ESQ.
                               841 Bishop Street, Suite 2201
19                             Honolulu, Hawaii 96813

20                             MICHAEL JEROME KENNEDY, ESQ.
                               Law Offices of Michael Jerome
21                             Kennedy, PLLC
                               333 Flint Street
22                             Reno, Nevada 89501

23   Official Court            ANN B. MATSUMOTO, RPR
     Reporter:                 United States District Court
24                             300 Ala Moana Boulevard, Room C-338
                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1                        I N D E X

2  WITNESS:                                    PAGE NO.

3  FOR THE GOVERNMENT:

4   MICHAEL BOTHA (CONTINUED EXAMINATION)

5    RESUMED CROSS EXAMINATION BY MR. KENNEDY        4

6    REDIRECT EXAMINATION BY MR. INCIONG            35

7    RECROSS-EXAMINATION BY MR. KENNEDY             44

8

9                      E X H I B I T S

10  Exhibit 5500-100 received in evidence            24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, MARCH 6, 2024                    8:36 A.M. O'CLOCK
 2                              *  *  *  *  *
 3            (Start of partial transcript:)
 4            (Open court in the presence of the jury.)
 5            COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,
 6   United States of America versus Michael J. Miske, Junior.
 7            This case has been called for jury trial, Day 33.
 8            Counsel, please make your appearances for the record.
 9            MR. INCIONG:  Good morning, Your Honor.  Mark
10   Inciong, Michael Nammar, and KeAupuni Akina for the United
11   States, along with Special Agent Tom Palmer and Kari Sherman.
12            THE COURT:  Good morning.
13            MR. KENNEDY:  Good morning, Your Honor.
14            THE COURT:  Good morning.
15            MR. KENNEDY:  Michael Kennedy with Lynn Panagakos,
16   Michael Miske, and Ashley King.
17            THE COURT:  Good morning to your group as well,
18   Mr. Kennedy.
19            Everyone may be seated.
20            MR. KENNEDY:  Good morning to you.
21            THE COURT:  Good morning to the 16 persons on our
22   jury.
23            Mr. Botha's on the witness stand.
24            Good morning, to you, sir.  I will remind you before
25   you begin your testimony, Mr. Botha, we will not re-swear you,
```

1    but you do remain subject to the same oath that you took at the

2    inception of your testimony.  Do you understand that?

3              THE WITNESS:  I understand.

4              THE COURT:  All right.  Mr. Kennedy, you may resume

5    when you're ready.

6              MR. KENNEDY:  Thank you, sir.

7         MICHAEL BOTHA, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

8                     RESUMED CROSS-EXAMINATION

9    BY MR. KENNEDY:

10   Q    Sir, yesterday you testified that Kama'aina Termite and

11   Pest Control was one of the fastest growing companies.  Do you

12   recall that?

13   A    Yes.

14   Q    And that Kama'aina Termite had secured the realtor market,

15   do you recall that as well?

16   A    Yes.

17   Q    Which is one of the reasons that -- I think you said that

18   Kama'aina Termite had taken the market by storm in that I

19   realtor market, correct?

20   A    I don't remember saying "by storm," but I can tell you the

21   reason why I think it happened.

22   Q    All right.  So let me try to explain that a little bit in

23   some questioning because I know that you were involved --

24   A    Sure.

25   Q    -- with that market too, correct?

1  A    Yes.

2  Q    All right.  Unless a property is purchased in cash, every

3  real estate transaction requires a termite inspection report,

4  right?

5  A    Most do.  I think it's on the realtor -- whatever the

6  document is that they use.

7  Q    All right.  And a termite inspection report is sometimes

8  called a TIR, and then it has a PC-9 form, right?  That goes

9  along with it?

10 A    That's correct.

11 Q    All right.  And it's identifying if the property has

12 termites, right?

13 A    Yes.

14 Q    So it's similar to whether it's a clean or a dirty bill of

15 health, right?

16 A    It identifies whether there's a presence or absence of

17 termites.  That's it.

18 Q    All right.  The service is commonly requested by a lender

19 in the loan process, right?

20 A    Yes.

21 Q    The bank or lender doesn't want to give a loan on the

22 property unless there is a determination that there's termites

23 or not termites, correct?

24 A    If there are termites, they may want to have it treated

25 before they -- the transaction proceeds.

1  Q    So they don't want to give a loan on a property if it's

2  infested with termites, right?

3  A    And untreated.

4  Q    So the buyer chooses in most cases the termite inspector,

5  correct?

6           MR. INCIONG:  Objection, beyond the scope.

7           MR. KENNEDY:  I believe he gave testimony about the

8  realtor market yesterday.

9           THE COURT:  The buyer chooses in most cases --

10          MR. KENNEDY:  The termite inspector.

11          THE COURT:  How would -- how would Mr. Botha, the

12  owner of a company, know what most buyers choose to do?

13          MR. KENNEDY:  Because he's in the same line of

14  business, Your Honor, and he did termite inspections.

15          THE COURT:  The objection -- not that objection, but

16  that's an improper question.  Move on.

17          MR. KENNEDY:  All right.

18  BY MR. KENNEDY:

19  Q    And so in that process the funds eventually go into an

20  escrow account, correct?

21  A    Usually.

22  Q    All right.  And the termite company is paid upon closing,

23  right?

24  A    Usually.

25  Q    All right.  So an inspector can inform -- can perform

1    multiple termite inspections in a day, correct?

2    A    Yes.

3    Q    And the task involves a complete visual inspection of the

4    property, right?

5    A    That's part of it.

6    Q    And then you would look in attics, crawl spaces inside and

7    outside the property, right?

8    A    Visually inspectable areas only.

9    Q    All right.  And then you can use an instrument to knock on

10   the wood, right?

11   A    Yes.

12   Q    And a Termatrac mobile X-ray device can help you see

13   what's inside the wood, right?

14   A    No, it doesn't help you see what's inside the wood, but it

15   detects the sound of termites moving inside wood.

16   Q    So by sound, you can determine what you can't see?

17            MR. INCIONG:  Objection, beyond the scope.

18            THE COURT:  I don't know where this is going.  The

19   nuances of how to conduct a termite inspection is relevant to

20   this case how?

21   BY MR. KENNEDY:

22   Q    Now, in terms of those nuances, that area is extremely

23   profitable because the costs are low, correct?

24   A    What area are we talking about, inspection or --

25   Q    Inspection and that process that we're talking about in

1   terms of the realtor market.

2   A    In those days a typical inspection for a three-bedroom,

3   two-bathroom house might cost between 220 to 350 dollars an

4   hour depending on the expertise of the inspector.  It was

5   typically a one-man job.  You might be able to do two small

6   houses in a day, maybe three.

7   Q    All right.  And so in terms of the market, Kama'aina

8   Termite had gotten close to two-thirds of the market at that

9   point, right?

10  A    I don't know that for a fact.

11  Q    Okay.  But you knew that they had -- I believe your

12  testimony was they had cornered that market, correct?

13  A    Kama'aina had a incentive program for realtors.  So you

14  asked about who schedules the inspection?

15  Q    Yes.

16  A    The realtors make the recommendations to the owners on

17  which companies to go with, which vendors, not just pest

18  control.  Kama'aina had an incentive program whereby if you

19  were a realtor and you promoted their company, you would get

20  some kind of kickback on the back end.  I think they had trips

21  to Vegas.  They had some sort of point system or some type of

22  card system, which was unethical and illegal according to the

23  realtor, Board of REALTORS as I understood it.

24  Q    Did you recall that Kama'aina Termite and Pest Control was

25  part of that board?

1   A    Part of which board?

2   Q    They -- they joined the Board of REALTORS?

3   A    So were they on -- is that the association or is that the

4   regular board?

5   Q    The association.  And they put on conferences and they had

6   that market all the way up until the time they were closed?

7   A    Anyone could attend any of those meetings.  All of us were

8   probably members of them.

9   Q    And so that's an area of profit that has very low cost,

10  correct?

11  A    Not necessarily.  There's a high -- the highest degree of

12  risk and liability in the pest management industry stemmed from

13  termite inspection report.

14  Q    If you do --

15  A    So --

16  Q    -- the reports correct, in terms of the cost, then there's

17  no product cost, correct?

18  A    There's no product cost.  Materials and supplies on a pest

19  control job were 3.5 percent.  So that's neither here nor

20  there.  The biggest cost in a termite inspection report was the

21  potential liability.

22  Q    Correct.

23  A    And that's where most of the losses came from in any pest

24  control company, or termite and pest control company.

25  Q    And if you didn't have those losses, then it was

1    profitable, correct?

2    A    It -- it was profitable to the degree that you paid off

3    your expenses, you know, depending on all your expenses, but no

4    more profitable than any other sector of pest management.

5    Q    In your business?

6    A    In general.  I was -- one of the things on the National

7    Pest Management Association, I was on the wood destroying

8    insect committee, which was the committee that oversaw termite

9    inspection reports across the country.  We helped design the

10   forms for it.

11   Q    But you don't know in terms of the market for Kama'aina

12   Termite and Pest Control what their profits were, do you?

13   A    No, I don't know what their profits were.

14   Q    All right.  Let's move on.

15        The King Kamehameha IV job.  You and your company had a

16   contract for that pest management control?

17   A    General pest control and rodent control.

18   Q    Which is one of the areas that you talked about yesterday

19   with the jury, right?

20   A    Yes.

21   Q    The general pest control.

22        So the King Kamehameha IV had a bed bug problem, correct?

23   A    Yes.

24   Q    All right.  And it came to a point where they wanted in --

25   bids to do a fumigation of the entire premises, right?

1    A    That's correct.

2    Q    All right.  So that was around 2008.

3    A    I don't remember the date, but it sounds right.

4    Q    Okay.  You were one of the companies that -- that bid that

5    job, correct?

6    A    We -- yes, we had -- we had indicated an interest in

7    bidding the job.

8    Q    Okay.  The company that won the bid was Kama'aina Termite

9    and Pest Control, correct?

10   A    No, it was Terminix.

11   Q    Sir, would you agree with me that the regional manager for

12   Terminix of Hawaii in 2008 would have a better idea than you do

13   whether they won that contract?

14   A    I would think so.

15   Q    All right.  You believe they did, correct?

16   A    That was what we heard, yes.

17   Q    And if the jury heard --

18   A    And I think that's what the -- I think that's what the

19   hotel manager told us.

20   Q    And if the jury heard from that individual, they would

21   know what Terminix's -- whether they won the contract or not,

22   correct?

23   A    I would think so --

24   Q    All right.

25   A    -- yes.

1   Q    So at that time that was one of the largest fumigation

2   jobs in the state, right?

3   A    I'm not sure if you're talking about the largest.  It was

4   a large job, no doubt.

5   Q    And Kama'aina Termite and Pest Control had done big jobs

6   before that, correct?

7   A    Yes.

8   Q    And one of its advantages was it had a telescoping boom

9   lift truck, correct?

10  A    Everyone rented those things.

11  Q    If you had it, you didn't have to pay for the expense for

12  renting it for days, right?

13  A    Those things cost over a quarter of a million dollars.

14  It's cheaper to rent them.

15  Q    And if you're able to obtain one at ten percent of the

16  cost, that could give you a competitive advantage, right?

17  A    I can't see how that could be a competitive advantage.

18  You'd use it for maybe a few hours, and that'd be it.  I don't

19  know how you would see that as a competitive advantage with the

20  cost of purchasing and maintenance.

21  Q    If you're using it on other large jobs, which allows you

22  to get to high places, then it could be put to use in many

23  structures, correct?

24  A    When you consider the cost of maintenance, CDL driver, you

25  have to have all kind of endorsements on your CDL driver's

 1   license to have that, I would imagine the cost would be cost

 2   prohibitive.

 3   Q    Did you own one?

 4   A    No, but we did rent them a lot.

 5   Q    All right.  Now, so that was a big job that Kama'aina

 6   Termite did, correct?

 7   A    Yes.

 8   Q    All right.  Let's move on to Kealoa [verbatim] Lai.

 9        You testified about that fumigation yesterday, right?

10   A    Yes.

11   Q    It's a 44-story luxury condominium, right?

12   A    I can't remember how many floors it was.  I think it was

13   300 units.  That's what I remember.

14   Q    300, 350 units, which are homes of individuals in a luxury

15   condominium, right?

16   A    Right.

17   Q    Tent fumigation was impossible, right?

18   A    Not possible from a technical point of view.

19   Q    Right.  To try to cover the entire 42 stories, 44 stories

20   with a tent, with wind and all of that is most likely an

21   impossible task --

22   A    Yes.

23   Q    -- right?

24   A    Correct.

25   Q    All right.  And so they had drywood termites in the

1   cabinets, right?

2   A    Yes.

3   Q    And the cabinets were installed and the homeowners moved

4   in, and this had gone on as a problem for about two years,

5   correct?

6   A    I can't remember the exact background on it, on the

7   problem.

8   Q    Okay.  Well, you do know if it had gone on for two years

9   the colonies can grow, right?

10  A    Of course.

11  Q    The termites can move around from unit to unit, right?

12  A    I'm a certified associate entomologist.  Yes.

13  Q    And you know better than most that that can happen.

14       And in that situation, there is usually insurance for the

15  construction company, right?

16  A    Yes.

17  Q    There's a warranty period, right?

18  A    Sure.

19  Q    And if the warranty period is about to expire, the

20  homeowners then get stuck for the cost of getting rid of

21  termites in their home that they put down their good hard

22  money, right?

23  A    In years -- in your scenario, that seems likely.

24  Q    Okay.  At that point, were you aware that homeowners, many

25  of them were threatening litigation when you made your bid?

1   A   I had heard something about that.

2   Q   That there was all kind of lawyers involved and folks that

3   were threatening the construction company, the insurance

4   company on what was happening inside this building, correct?

5   A   I don't know the details of that.

6   Q   All right.  And the cabinets that had been in the units,

7   they'd done spot-type treatment for a period of time and it

8   wasn't working.  Were you aware of that?

9   A   No.

10  Q   All right.  Removing and replacing the cabinets was

11  estimated to cost 20 to 24 million dollars.  Were you aware of

12  that?

13  A   No.

14  Q   If the problem was not solved within the two-year period,

15  the insurer, Zurich, was off the hook, and the homeowners were

16  on the hook.  Were you aware of that?

17  A   No.

18  Q   All right.  So Nordic Construction Company, who built the

19  condominium, hired an entomologist by the name of Jim Geshell.

20  Do you know him?

21  A   Yes.

22  Q   All right.  The AOAO, the homeowners association, hired

23  its own entomologist, Julian Yates from the University of

24  Hawaii.  You're aware of him, right?

25  A   Yes.

1  Q    He sat on boards with you, correct?

2  A    Yes.

3  Q    And so were you aware that Mr. Yates' opinion was that

4  fumigation was the only method available to solve this problem?

5  A    I was not aware of that.

6  Q    Okay.  And so you agree that the bigger the job, the

7  bigger the risk as to whether the result is killing the

8  termites, correct?

9  A    The bigger job -- the bigger the job, the more complex it

10  is, the harder it is to achieve a state of equilibrium for the

11  exposure period that -- that you need for that specific period.

12  So is that -- is that what you mean?

13  Q    Yes.  Because if you're dealing with, say, 44 floors, you

14  have to have that on each floor to make the kill, no matter

15  where the termites are at, correct?

16  A    Correct.

17  Q    All right.  So, now, Kama'aina Termite was hired to

18  eradicate the termites.  They won the bid, right?

19  A    That's what I heard, yes.

20  Q    Okay.  Were you aware that Rene Borja from Cardinal

21  Fumigation was hired by them to be onsite to use remote data

22  access units?

23  A    Yes.  We used those --

24  Q    All right.

25  A    -- and Rene [inaudible] --

1    Q    And so to help the jury, those units had to be on each

2    floor to make certain that equilibrium was working on each

3    floor, because if you don't kill all the termites, they're

4    still there, they can swarm, and the problem is still going on,

5    correct?

6    A    It's a gas analyzing instrument that gives you real time

7    data.  That's what -- that's what that is.

8    Q    All right.  Were you aware that two Dow scientists from

9    the mainland were there, Dr. Joe DeMark and Dr. Bob Williams?

10   A    I did not know that.

11   Q    All right.  And they were Vikane experts on the spot to

12   help with that equilibrium problem that you're discussing,

13   right?

14            MR. INCIONG:  Objection.  He just said he wasn't

15   aware of that.

16            THE COURT:  The objection's sustained.

17   BY MR. KENNEDY:

18   Q    Are you -- do you know an individual by the name of Roman

19   Dycus?

20   A    Yes.

21   Q    He was there as well.  Were you aware of that?

22   A    I wasn't aware of that.

23   Q    Okay.

24   A    I know who he is.

25   Q    To staff that kind of job there was at least -- there were

1   more than 40 Kama'aina staff members onsite, correct?

2           MR. INCIONG:  Objection.  He's testifying.

3   A    Oh, I don't know.

4   BY MR. KENNEDY:

5   Q    To do that kind of job you'd want a center mobile office,

6   right?  To coordinate, right?

7   A    You would -- anytime you have a monitored fumigation you

8   have a location where you set up your analyzing devices and run

9   your tubes to it.  So if that's what you're talking about, yes.

10  Q    Safety meetings to make certain everybody's on the same

11  page, right?

12  A    That's one of the things you would do.

13  Q    And so rather than cover the outside, you're taping and

14  sealing on the inside so that the gas, the Vikane, the killing

15  agent, is able to kill the termites and not leave, correct?

16  A    Yes.

17  Q    So your -- the sealing is plastic sheeting on all the

18  interior --

19          MR. INCIONG:  Objection.

20  BY MR. KENNEDY:

21  Q    -- windows?

22          MR. INCIONG:  Relevance.

23          THE COURT:  Overruled.  Go ahead.

24  BY MR. KENNEDY:

25  Q    Correct?

1   A    I -- I wasn't there.  I didn't see it.

2   Q    Okay.  But in your experience, you're trying to make

3   certain that you create a seal on all areas so the Vikane

4   remains in a 44-story building, correct?

5   A    Yes.  You would try to seal the gas.

6   Q    All right.  And the aeration process of the building is

7   something you can do with fumigation, correct?

8   A    Yes.

9   Q    So on a 44-story building, you would want professionals

10  who are rappeling down and opening the windows as they come

11  down to make certain it works --

12          MR. INCIONG:  Objection.

13  Q    -- correctly?

14          MR. INCIONG:  Relevance.

15  Q    Correct?

16          THE COURT:  Overruled.  Go ahead if you know.

17  A    I think that's a crazy idea.

18  BY MR. KENNEDY:

19  Q    If it worked, sometimes when you're doing something that

20  no one else has done, you have to come up with ideas that are

21  outside the box, correct?

22          MR. INCIONG:  Objection, calls for speculation.

23          THE COURT:  Sustained.

24  BY MR. KENNEDY:

25  Q    So the result was the termites were eradicated, correct?

 1              MR. INCIONG:  Objection, lack of foundation.

 2              THE COURT:  You may answer, if you know.

 3   A    Not that I'm aware of.

 4   BY MR. KENNEDY:

 5   Q    Okay.  So what we did here is have a 20 to 24 million

 6   dollar problem that was solved --

 7              MR. INCIONG:  Objection.

 8   Q    -- for 25 cents on the dollar?

 9              MR. INCIONG:  Facts not in evidence.

10              THE COURT:  Sustained.

11   A    How do you know it was solved?

12   BY MR. KENNEDY:

13   Q    Because there was a warranty, the bugs --

14              THE COURT:  Ask another question, please.

15              MR. KENNEDY:  All right.

16   BY MR. KENNEDY:

17   Q    You mentioned that Kama'aina Termite was good with

18   marketing, correct?

19   A    Yes.

20   Q    If the --

21              MR. INCIONG:  Objection, asked and answered.

22              THE COURT:  Go ahead.

23   BY MR. KENNEDY:

24   Q    If the termites were eradicated, that's also performance,

25   correct?

1    A    How would you determine that termites were eradicated?

2    Q    Were you aware that the individuals involved set up areas

3    inside to make certain that the termites were killed as part of

4    the -- as part of this, to put in live termites and contain

5    them to see if they were eradicated on various floors to make

6    certain the job was done, correct?

7    A    Only from what you've told me.

8    Q    All right.  And then afterwards, if there are no further

9    complaints over the years, then the termites appear to be

10   eradicated if no one's complaining about their homes, correct?

11   A    In that scenario, it appears so.

12   Q    All right.  So now, you testified yesterday that you were

13   familiar to this, about this job, and you had made an offer,

14   correct?

15   A    Yes.

16   Q    All right.

17        MR. KENNEDY:  If we could pull up 5500-100, which is

18   in the 20th supplement, Your Honor.  Just for the witness.

19        THE COURT:  It's in which supplement?

20        MR. KENNEDY:  The 20th, I believe, Your Honor.

21        THE COURT:  No.  It's not in the 20th supplement.

22        MR. KENNEDY:  5500-100?

23        THE COURT:  No.

24        MR. KENNEDY:  Let me go grab my notebook and look,

25   Your Honor.

 1              MS. PANAGAKOS:  It's on the --

 2              MR. KENNEDY:  (Confers off the record.)

 3              Oh, it's in the original.  I'm sorry, Your Honor.  My

 4    apologies.

 5              THE COURT:  5500, dash, what?

 6              MR. KENNEDY:  100, Your Honor.  That's on me.  I

 7    apologize.  I thought we had added it in the 20th.

 8              THE COURT:  Okay.  I've got it now.  Thank you.

 9              MR. KENNEDY:  You're welcome.  My apologies again.

10    BY MR. KENNEDY:

11    Q    Sir, do you recognize -- and I can blow up any part --

12    what has just been marked for identification as 5500-100?

13              And just take some time to review it.  And then let me

14    know when you're ready.

15    A    (Complies.)

16              I've read it.  Thank you.

17    Q    All right.  Sir, do you recognize -- who is Victoria -- is

18    it Fickle?  Or Fick-lee [phonetic]?

19    A    Victoria Fickle was an entomologist who worked for us --

20    Q    Okay.  And when you say --

21              (Simultaneous speaking.)

22    A    -- Enviropure heat and K-9 scent detection divisions.

23    BY MR. KENNEDY:

24    Q    All right.  And so when you said "us," she was at Sandwich

25    Isle Pest Solutions, correct?

1    A    Yes.

2    Q    And what has been marked as 5500-100 is a communication

3    regarding your offer as to the solution to the project manager

4    for the Kealoa [verbatim] Lai, correct?

5    A    There was -- this -- this refers to a offer to provide

6    Enviropure heat as an alternative but does not include -- I

7    think we had also had a spot treatment option and a fumigation

8    option, tape and seal fumigation.

9    Q    Okay.  So in terms of this particular document, you're

10   familiar with it, and you were on the "cc" with the individual

11   who worked with you at your company, right?

12   A    I'm familiar to the extent that I've just reviewed it

13   right now.

14   Q    All right.  Were you involved in this process?  It looked

15   like you were "cc"'d on both --

16   A    Yes.

17   Q    -- the original communication by your employee and the

18   answer by Mr. Crago.

19   A    Yes.

20   Q    All right.

21           MR. KENNEDY:  At this time, Your Honor, I'd move

22   5500-100 into evidence.

23           THE COURT:  Any objection?

24           MR. INCIONG:  Objection, hearsay.

25           THE COURT:  Okay.  Overruled.

1           The document is admitted.  That's 5500-100.

2           (Exhibit 5500-100 received in evidence.)

3           MR. KENNEDY:  May we publish, Your Honor?

4           THE COURT:  Yes, you may.

5           MR. KENNEDY:  All right.  Now, if we just blow up the

6   bottom portion so that it's a little larger to see.  We may

7   have to switch to --

8           Is that on our table?  Okay.  All right.

9   BY MR. KENNEDY:

10  Q    Okay.  So there's referencing a conversation that you had

11  that day regarding heat to treat the termites, correct?  Which

12  is what you just testified to?

13  A    Yes.

14  Q    And you're explaining how that would work, right?

15  A    This is Victoria, Victoria's email, not mine.

16  Q    I assume that this is a follow-up on a conversation that

17  you had where you were explaining the heat treatment on the

18  termites in the units, correct?

19  A    This is Victoria following up with -- with Rick.

20  Q    All right.

21  A    And giving him more information about heat and giving

22  her -- giving him her contact info.

23  Q    All right.  And so the gist of this is you're going to

24  treat one unit at a time, and you said that it could be done in

25  a -- you could have an entire unit completed during the day,

1    correct?

2    A    No, well, there's more to it than that.  If you read the

3    whole email, it says there would not -- be no need to treat

4    units without termite infestations.  So as opposed to tent

5    fumigation, there is no residue left from fumigation.  So if

6    you tent a building like this and there's 50 units that don't

7    have termites, there's no residue left in there that'll kill

8    future termites.  It's just wasted money.

9          So this over here was basically inspect each unit.  Units

10   that did not have termites would not get treated, therefore not

11   charged, and it would only focus on the units that needed to be

12   treated.

13   Q    At that time did you understand how many units had

14   termites?

15   A    No.  According to this email, Victoria had not inspected

16   it.

17   Q    Okay.

18          MR. KENNEDY:  We can take that portion blown up down.

19   BY MR. KENNEDY:

20   Q    Then the response that you received is on the top portion.

21   And let me get rid of --

22          Do you see that the decision was made after consultation

23   with several experts on the West Coast and in Hawaii?

24   A    Yes.

25   Q    And that the conclusion was that fumigation was the only

1    100 percent effective solution?

2    A    That was their recommendation, yes.  I see that.

3    Q    And that was followed in this case, correct?

4    A    Yes.  It sounds like --

5    Q    All right.

6    A    -- it was fumigated.

7         MR. KENNEDY:  All right.  We can take that down.

8    BY MR. KENNEDY:

9    Q    Now, yesterday we had a conversation in terms of testimony

10   regarding some tent slashing, so I want to ask you just some

11   pointed questions about that now.  Okay?

12   A    Sure.

13   Q    Now, in 2006, were you aware that your business had a tent

14   slashed?  The damage was about a hundred dollars, and the

15   police were called?

16   A    Yes, I think, if I'm not mistaken, Keone Madali had

17   reported that, something like that.

18   Q    Correct.  And so in that situation, the police were

19   called, pictures were taken, and evidence was documented,

20   right?

21   A    I would imagine so.

22   Q    Okay.

23   A    Yeah.

24   Q    And I believe we looked yesterday.  And in 2009, a similar

25   situation occurred.  The damage was a little greater.  I

1   believe it was about $1700.  Once again, the police were

2   called, photos were taken, and documentation was made, correct?

3   A    Yes.  There were many incidents.

4   Q    And in those instances, you testified yesterday about the

5   risk of when perhaps a tent is slashed, correct?

6   A    Yes.

7   Q    Because you have the warning agent, chloropicrin, right?

8   A    Yes.

9   Q    And you have the killing agent, Vikane, right?

10  A    Yes.  They're both killing agents.

11  Q    And so if there's a release of that, that may cause a

12  danger, correct?

13  A    Yes.

14  Q    So that's the reason to document it and take pictures,

15  correct?

16  A    Yes, but it was not always documented.  You know,

17  sometimes the guys would get to -- no one would report a

18  slashed tent.  The guys would get there to start untenting;

19  they would see it was slashed.  They would call and, you know,

20  figure out if they're going to reshoot it or not.

21       Like I had mentioned yesterday, we didn't call the -- the

22  police on most occasions because there was nothing they could

23  really do.  It was wasting their time.

24  Q    But you called it when the damage was only a hundred

25  dollars in 2006.

1    A      Sometimes we called; them sometimes we didn't.  The point

2    I'm trying to make is we weren't consistent with calling them.

3    You know, I thought about it last night after your questions

4    yesterday.  And I estimated there must have been 24 to 30,

5    around about that many incidents of tents being slashed.  I

6    think you brought up four or five times where the police had a

7    record of having responded.  So there were many, many times

8    that that did not happen, where we did not call the police.

9    Q      Even if you don't call the police, you can take a picture

10   of it and document what happened, right?

11   A      Not necessarily.  I mean, there was no real reason to take

12   a picture and document it.  If the guy called and said, hey, a

13   tent's slashed, we would say, okay, what can you do?  Would it

14   be better to seal it up and shoot it again or take it down and

15   start from scratch?  And so those were decisions that weren't

16   necessarily made by myself.  They were made by the fumigation

17   management team.

18   Q      All right.  So in those cases where the police aren't

19   called, pictures aren't taken, you can just seal it up and go

20   forward without any risk, right?

21   A      You would make a determination as to what the best course

22   of action is, take the whole thing off and start again or just

23   repair it.  If the people were okay with staying out another

24   night, shoot more gas in, they'll stay out another night and

25   come and untent it the next day.  So there were multiple people

1    involved in that decision-making process.

2    Q    So sometimes the solution is just to fix it, go forward,

3    and the slashed tent doesn't get in the way, correct?

4    A    As your example with the real estate transaction,

5    typically it's a vacant house.  In that case, no one's in it;

6    just seal it up, reshoot it again, and we're done.  If there's

7    a tenant waiting around outside, saying, hey, I want to get

8    back in the house, then at that point, you know, you have to

9    talk to them and see if you can negotiate, keep it on for

10   another night or taking it off and rescheduling the whole

11   thing.  So each one was unique.

12   Q    And you're aware from your work in terms of the

13   association that all termite and pest control companies have

14   this problem from time to time where vandalism happens,

15   correct?

16   A    No.  There were only a few tent fumigation companies that

17   practiced tent fumigation that had this type of problem.  The

18   vast majority of pest control companies did not do tent

19   fumigation.

20   Q    And of the ones that did tent fumigation, they had that

21   problem, right?

22   A    The primary problem was burglaries, where people would not

23   necessarily cut the tents; it was usually opening the seams on

24   the windward side, opening the seams on the leeward side,

25   allowing the air to blow the gas out.  So we believe there

1   was -- and there was people arrested.  It was a group of

2   out-of-work tent fumigators who understood the process.  In

3   those cases there were burglaries, not necessarily just -- they

4   weren't trying to slash the tents.  They were trying to be as

5   inconspicuous as possible so they could get in, steal stuff,

6   and get out.

7   Q    Understood.  And so sometimes those burglaries can be in

8   process, and that's one of the ways in which vandalism occurs,

9   right?

10  A    Yes.

11  Q    All right.  Now, were you aware that Mr. Miske served on

12  the Hawaii Pest Control Association as a director?

13  A    I was not aware.

14  Q    All right.  Now, you're aware that at a certain point

15  Mr. Miske gained his RME that we talked about yesterday?

16  A    I believe so.

17  Q    All right.  You had talked about a period -- are you

18  familiar with the name Andrew Pangan?  I believe it's spelled

19  P-A-N-G-A-N.

20  A    I -- I have heard the name.  I'm not sure I know exactly

21  who it is.

22  Q    So back in that time period where Harry Kansaki came in

23  and was a dual RME, do you remember Mr. Pangan making an

24  application?

25  A    I remember the name.  I just don't know who he is, though.

1   Sorry.

2   Q    All right.  If you don't remember it, then I can't ask you

3   any questions about that.  So I understand that.

4        In talking to the FBI you have described Kama'aina Termite

5   as a crumb operation.

6   A    I don't even know what a crumb operation is.  I have no

7   idea what you're taking about.

8   Q    Were those your words?

9   A    No.  I don't even know -- What do you mean, a crumb

10  operation?  I don't -- I don't know what that means.

11  Q    That's why I was asking you, because I believed those were

12  your words.  If we could pull up --

13  A    Those were not my words.

14  Q    It's -- it's not under sworn testimony.  It's an agent who

15  wrote it up.  So if that wasn't the words you used, then we'll

16  move on.

17  A    Put it up if you want.  I'll take a look at it.

18  Q    If you don't recall it, it's okay, sir.

19  A    Okay.

20  Q    They may have written it down, and you may not have used

21  those words.

22       But let's move to 5000-248, which is in evidence.  We

23  looked at it yesterday.

24            MR. KENNEDY:  I believe that's in the original

25  exhibit list as well, Your Honor.

```
 1              THE COURT:  Okay.  Go ahead.

 2              MR. KENNEDY:  And may we publish?

 3              THE COURT:  Yes, you may.

 4              MR. KENNEDY:  Now, if we just move through the

 5    calendar.  If we go back.

 6    BY MR. KENNEDY:

 7    Q    Were you aware that the Doris Duke Estate Shangri La

 8    fumigation was one that was done by Kama'aina Termite and Pest

 9    Control?

10    A    No, I mean, I'm just reading what's on the -- on the

11    picture.

12    Q    Okay.

13    A    Sure.

14              MR. KENNEDY:  Can we move through.

15    BY MR. KENNEDY:

16    Q    You were aware that the Blaisdell was done in 2007 by

17    Kama'aina Termite and Pest Control?

18    A    Yes.

19    Q    All right.  Let's move through.

20         Queen Emma Summer Palace, were you aware that they did

21    tent fumigation there in 2019?

22    A    I wasn't aware, but I can see the picture.

23    Q    All right.  St. Louis High School, were you aware of that

24    fumigation?

25    A    Not aware of it, but I did see -- can see the picture.
```

1   Q     All right.  You were aware of this one, so we'll move on.

2   A     Yep.

3   Q     You were asked a question about that yesterday.  Were you

4   aware of it back when that was fumigated by Kama'aina Termite

5   and Pest Control in 2010, right around the same time period

6   they were doing Kealoa [verbatim] Lai?

7   A     I wasn't aware of it.

8   Q     All right.

9   A     To be honest, I didn't -- we didn't -- Mike and I were not

10  close friends.  We didn't really keep tabs of each other's

11  businesses.

12  Q     All right.  Let's move through.

13        I believe you said that you were aware of the Waikiki

14  Shell?

15  A     Yes.

16  Q     All right.  Let's move through.  Let's move through.

17        Were you aware that they also did several churches?

18  A     I think I drove past and saw one one time.  Yep.

19  Q     All right.  Let's move through.

20        Were you aware that they had a mobile fumigation chamber?

21  A     Yes, I've heard that.

22  Q     And so that could be used -- if you didn't need to

23  fumigate the entire structure, you could fumigate individual

24  pieces of wood, bring it to a location, so the chamber could go

25  to someone's home and there'd be no tenting, correct?

1   A   Yes.

2   Q   And so here we are at Iolani Palace in terms of work done

3   there.

4         MR. KENNEDY:  Let's move through.

5         Now, we can take that down.

6   BY MR. KENNEDY:

7   Q   Every company needs marketing, correct?

8   A   Every company is unique and has its own form of marketing,

9   yes.

10  Q   Right.  But marketing alone doesn't get you clients if the

11  work is not done right, correct?

12  A   Marketing gets you clients.

13  Q   So a client like -- were you aware that the -- in terms of

14  the work done, Polynesian Cultural Center, are you aware of

15  that location?

16  A   No.

17  Q   Are you aware that Kama'aina Termite and Pest Control

18  started work there in 2010 through 2013, all the way up to

19  2020?

20        MR. INCIONG:  Objection.

21  A   What type of work --

22        THE COURT:  Sustained.

23        MR. INCIONG:  He answered no.

24        MR. KENNEDY:  In terms of fumigation.

25        THE COURT:  The objection was sustained.

1   BY MR. KENNEDY:

2   Q    You would agree that repeat business is an example of a

3   customer who is satisfied with the business that was done,

4   correct?

5   A    Yes.  And in tent fumigation you very rarely got repeat

6   business.  Because if you did an effective job, typically it

7   was five to seven years before they would need tent fumigation

8   again, assuming termites swarmed the very next year.

9   Q    So if the place has 30 to 40 different structures in it, a

10  period of 2010 to 2013 to 2020 would make sense in that

11  timetable, correct?

12  A    Sure.

13          MR. KENNEDY:  Nothing further.

14          THE COURT:  Mr. Inciong, go ahead.

15          MR. INCIONG:  Thank you, Your Honor.

16                         REDIRECT EXAMINATION

17  BY MR. INCIONG:

18  Q    Mr. Botha, good morning.

19  A    Good morning.

20  Q    When did you start thinking about selling your company,

21  Sandwich Isle Pest Solutions?

22  A    When I first built the company, I had it -- my initial

23  goal was to build a company that I could one day sell it to one

24  of the big three companies and cash out.  And so from Day 1 I

25  started building a business that I would be able to sell in the

1  future.

2  Q    Okay.  When did you begin talking seriously with Terminix

3  about the possibility of them buying your company?

4  A    They approached us in -- around about 2010, and so had

5  Steritech, Orkin.  There was another company on the West Coast,

6  Sprague.  And so there were a few different companies

7  interested in buying our company, and at that point we started

8  focusing on the big three because we knew they would provide

9  the highest -- the highest value.

10  Q    Okay.  By 2015 had you narrowed it down from the three to

11  just Terminix or were you still talking to --

12  A    No, we were -- we had three companies that were looking at

13  us.

14  Q    And when did it become clear to you that Terminix was the

15  company you wanted to sell to?

16  A    It came down to a bid between Rentokil, Terminix, and

17  Orkin and all of them -- we ended up working with a broker.

18  And all of them submitted proposals, and we went with Terminix.

19  They were not the highest bidder but they had offered a really

20  good position for me post-sale, and so decided to go with --

21  with Terminix.

22  Q    That decision was made then in 2016?

23  A    Yes.

24  Q    Now, we talked about yesterday, and a little bit today,

25  about you acting as a confidential source of information for

1  the FBI, correct?

2  A    Yes.

3  Q    And you did that for almost exactly a year, May 2015 to

4  early June of 2016.  Does that sound right?

5  A    Yes.

6  Q    Okay.  Now, did the FBI approach you about that, or did

7  you approach the FBI?

8  A    No.  One day someone knocked on the door at my office and

9  two guys walked in and -- and asked to take a closed-door

10  meeting with me, and that's how it started.

11  Q    Okay.  Did you agree to provide information to them?

12  A    Yes.

13  Q    Why did you agree to assist the FBI?

14  A    I'm a law-abiding guy.  I like to do things right.  And

15  the way they laid out their case to me and, you know, I just

16  felt the right thing to do was to help them to whatever -- in

17  whatever capacity I could.

18  Q    Was any part of your decision in order to gain any sort of

19  business or competitive advantage with your -- your company?

20  A    No, of course not.  There was more work than any of us

21  could handle.

22  Q    Now, you mentioned in 2014 there was -- there were some

23  serious concerns as to whether fumigation would even be allowed

24  to continue because of some of the risks?

25  A    Yes, as a matter of fact, Terminix stopped doing

1    fumigation.  So the largest companies stopped doing fumigation

2    because of the risks.

3    Q    So what about your company?  Did you alter any of your

4    business focus because of that?

5    A    We did.  We went from running four crews down to running

6    one crew.

7    Q    Approximately what percentage of your business then was

8    doing fumigations after 2014?

9    A    I would say probably 10, 15 percent maybe.

10   Q    So from your presence in the industry, sitting on the

11   boards and so forth, were you aware of the percentage of

12   business that fumigations comprised at Kama'aina?

13   A    I thought it was the majority of their business, maybe

14   80 percent.

15   Q    So were you competing on any real significant level that

16   would affect your business with Kama'aina for that fumigation

17   business you were doing?

18   A    No.  We -- and we had a different -- a different market.

19   We went after homeowners.  They were very strong in the realtor

20   market.  And so there were really two different markets that we

21   were in in the fumigation business.

22   Q    Did I -- I believe you indicated that Terminix was your

23   primary competitor?

24   A    Yes.

25   Q    Now, so you made two or three of these recorded phone

1  calls to David Melton as part of your agreement with the FBI,

2  right?

3  A    Yes.

4  Q    Okay.  Were you ever directed by the FBI to make calls or

5  attempt to make calls to anybody else other than David Melton?

6  A    Not -- no, I don't recall that.

7  Q    Did they ever ask you to make calls to Mr. Miske directly?

8  A    No.

9  Q    Did you ever wear a wire and meet with anybody in person?

10  A    No.  It's not -- nothing like that.

11  Q    So there was a -- did your assistance consist of a handful

12  of phone calls that were made over a year's period of time, and

13  nothing more?

14  A    I think we had one or two meetings and -- and phone calls

15  and that was it.  Most of the time when I spoke to them it was

16  asking me questions about the industry.  The way they kind of

17  started was they -- they wanted to have someone who had

18  experience in the industry so that they could understand the

19  industry.  That was the primary reason why I thought that I had

20  any value to them.

21  Q    Okay.  At the time that you were making these calls to

22  David Melton, was David Melton even living in Hawaii at that

23  time?

24  A    No.  He -- I believe he was living in Salt Lake City,

25  which is not far from where I operate in Montana, in Utah.

1   Q    Was Mr. Melton even working in the pest control business

2   anymore when you were having these conversations?

3   A    No.  I don't believe he was.

4   Q    From your conversations with Mr. Melton, had he even

5   spoken ever with Mr. Miske after he had left Hawaii?

6   A    Not that I'm aware of.

7   Q    Now, the conversations you had with Mr. Melton about this

8   potential business opportunity on the Mon -- in Montana and

9   other places, was that a legitimate business proposal at the

10  time?

11  A    Yes.  You know, Melton was a -- I had known him for many

12  years.  He was a good guy.  And he was a very experienced guy.

13  He was a very good salesman too.  And he had his flaws.  I

14  mean, the guy would not like to upset you so he wouldn't give

15  you a straight answer sometimes, and that -- that annoyed me

16  and which ultimately resulted in us separating, or separating

17  his employment from us, Sandwich Isle.  But I would have hired

18  him back in a second to work with us in Montana.  And he was --

19  he was considering coming because it's only a four-hour drive

20  from where he was living at the time.

21  Q    Okay.  So let me talk to you about the meeting at Anna

22  Miller, originally for Starbucks, then shifted to Anna

23  Miller's.

24       So why did you come to that meeting armed?

25  A    Everyone knew of Mike's reputation.  Mike was a tough guy.

1    And there were -- there were rumors about how he had -- he had

2    a team of guys that would beat up people that -- that got in

3    the way.

4          MR. KENNEDY:  Objection on the answer about rumors,

5    Your Honor.

6          THE COURT:  Overruled.  Go ahead.

7    A    And so I was -- I didn't want to get anyone else involved.

8    I didn't want to bring support with me and have them involved

9    in what I was going through.  So I decided to handle things in

10   my own way.

11        And I expected that I would get ambushed.  I thought that

12   I would get ambushed at the -- at the site; and if that

13   happened, I was prepared to defend myself.  And I didn't want

14   to get anyone else involved in the deal.  No one knew about

15   this meeting.  And so I went on my own and went with the

16   ability to defend myself.

17   BY MR. INCIONG:

18   Q    So wasn't one of the things that Mr. Miske said to you at

19   the Costco altercation something to the effect of:  You don't

20   know what I'm about, or you don't know who I am, or something

21   along those lines?

22   A    Yes.

23   Q    So did you take it upon yourself to learn what he was

24   about?

25   A    Yes.

1    Q    Is that when you learned about this reputation you just

2    testified to?

3    A    Yes.  I mean, Hawaii's a small place.  A lot of our

4    employees work together.  Mike had quite a reputation.  And

5    there were a lot of people outside the industry who I spoke to,

6    from police officers to -- to tough guys themselves, and asked

7    them all about -- you know, just to try and learn about who I

8    was dealing with.  And my conclusion was Mike legitimately was

9    a tough guy and that there was reason to -- to take

10   precautions.

11   Q    Did his comment that we do differently -- do things

12   differently here in Hawaii at the Costco, did that lead you in

13   part to come armed to that meeting?

14   A    No, I -- I took it that Mike had a way of handling

15   problems his unique way.  And I knew I was dealing with someone

16   who was a tough guy and who probably would ambush me.

17   Q    Have you ever felt the need to go to a business-related

18   meeting, any of -- dealing with any of your competitors,

19   anything like that, and -- and go to that meeting armed?

20   A    No.

21   Q    Have you ever felt that need before or after this

22   incident?

23   A    I have a concealed carry permit.  I -- I was in three

24   knife attacks growing up.  And I've always been very conscious

25   of being able to defend myself and prefer to be armed when I'm

1    doing that.  And so I do have a concealed carry permit which

2    I -- which I use and I carry in Montana.  But no, I don't -- I

3    don't, have never felt the need from a safety point of view

4    going to any business meeting.

5    Q    Other than this one?

6    A    Yes.

7    Q    Did you show or gesture in any way to Mr. Miske to

8    indicate that you had a gun?

9    A    No.  I had it appendix carry in my pants.

10   Q    So you didn't tell him you had -- had the gun?

11   A    No.  No.

12   Q    At the timing of -- or at the time of this meeting, you

13   referenced you thought there had been 24 to 30 of these tent

14   slitting incidents from post the Costco altercation, correct?

15   A    Yes.  And I -- I believe it was over a period of years,

16   not days, weeks or months, that that happened.

17   Q    After the meeting did things change in that regard, the

18   tent slitting?

19   A    Yes.  When the -- I believe that might have been the last

20   time Mike and I ever met.  And we actually had a good

21   conversation as businessmen at the end of the meeting at Anna

22   Miller's, and I'd never -- I don't remember having another

23   altercation with Mike.

24   Q    Okay.  And you went on your way and your company was

25   successful for many years after that?

1   A    Yes.

2            MR. INCIONG:  Nothing further, Your Honor.

3            THE COURT:  Mr. Kennedy, anything else?

4                       RECROSS-EXAMINATION

5   BY MR. KENNEDY:

6   Q    Sir, in terms of that meeting that you just discussed, did

7   you -- were you asked about -- and I'm referring to the meeting

8   where -- the incident in 2004 when there was an asthmatic girl.

9   Okay?

10            MR. INCIONG:  Objection, beyond the scope.

11            THE COURT:  I'm not sure I understand the question.

12            MR. KENNEDY:  I'm just referring him to some

13   testimony that you -- given previously regarding that incident

14   and its relationship to the meeting, okay?

15            MR. INCIONG:  Objection, beyond the scope.

16            MR. KENNEDY:  I thought we were just talking about

17   the meeting.

18   BY MR. KENNEDY:

19   Q    Did you -- did you give sworn testimony that says:  Okay,

20   and for that particular incident was the police called?  Yes.

21            And then the question was:  If you recall?  Okay.

22            That was the -- to -- to be honest, that was the final

23   straw.  That was when I realized that someone could kill -- get

24   killed doing this if we don't -- we had to do something because

25   this was getting to be out of control.

1      And question:  And it was after that that you arranged for

2  the sitdown?  Yes.  With Mr. Miske?

3      Do you recall giving that testimony?

4  A    Yes.  But in the context that you're putting that, it's

5  not correct.  The -- the timeline -- the timeline was I said

6  yes, I think this is the last straw, 'cause I realized this was

7  getting really dangerous now.

8      It was at that point that I started the calling around in

9  the industry.  In fact, I was thinking this through last night.

10  The National Pest Management has an annual convention usually

11  in October or November every year.  And I remember at least two

12  of those where I spoke to people to ask their advice on what --

13  how -- how would you handle this, has this happened to you,

14  what are the types of things I could do.

15      And so I know there was a period of time that -- that went

16  by, most likely over two years or -- or more, after that that

17  Mike and I met.

18      So I took action to try and find solutions to the problem

19  after that.  That was where I realized I had to do something.

20  Q    So the other day when you testified, you said it was about

21  six to seven years after you started the business, correct?

22            MR. INCIONG:  Objection, vague.

23            THE COURT:  Sustained.

24  BY MR. KENNEDY:

25  Q    Started the business in 1997, correct?

```
 1   A      Correct.

 2   Q      You testified yesterday that that meeting was about six to

 3   seven years after you started the business?

 4   A      The meeting at Anna Miller's?

 5   Q      Pardon?

 6   A      The meeting at Anna Miller's?

 7   Q      No.  The meeting with -- yes.  I apologize.  I wasn't

 8   listening.

 9   A      Yeah.  You know, honestly, I was guessing at the time.  I

10   really don't know the date of that meeting.

11   Q      All right.  Now, in terms of that meeting, Mike showed up

12   by himself, sat down.  You had breakfast, and that was it.  And

13   you left, correct?

14   A      That's correct.

15              MR. KENNEDY:  Nothing further, Your Honor.

16              THE COURT:  Mr. Botha, you may step down.

17              THE WITNESS:  Thank you.

18              THE COURT:  Thank you, sir.

19                                              (Witness excused.)

20              (Whereupon, at 1:28 p.m., the proceedings adjourned.)

21              (End of partial transcript.)

22                           *  *  *  *  *

23

24

25
```

1                    COURT REPORTER CERTIFICATE

2          I, Ann B. Matsumoto, Official Court Reporter, United

3   States District Court, District of Hawaii, do hereby certify

4   that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5   complete, true, and correct transcript of the stenographically

6   recorded proceedings held in the above-entitled matter and that

7   the transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, June 30, 2024.

10

11

12
                              _/s/ Ann B. Matsumoto_____
13                            ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25