1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3

4   UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                   )
5               Plaintiff,         )  Honolulu, Hawaii
                                   )
6        vs.                       )  March 6, 2024
                                   )
7   MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 33
                                   )
8               Defendant.         )  (TESTIMONY OF JOHN S. PERELL)
    ───────────────────────────────)
9

10

                    PARTIAL TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE DERRICK K. WATSON
                CHIEF UNITED STATES DISTRICT COURT JUDGE
12
    APPEARANCES:
13
    For the Government:        MARK A. INCIONG, AUSA
14                             MICHAEL DAVID NAMMAR, AUSA
                               WILLIAM KEAUPUNI AKINA, AUSA
15                             Office of the United States Attorney
                               Prince Kuhio Federal Building
16                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
17
    For the Defendant:         LYNN E. PANAGAKOS, ESQ.
18                             841 Bishop Street, Suite 2201
                               Honolulu, Hawaii 96813
19
                               MICHAEL JEROME KENNEDY, ESQ.
20                             Law Offices of Michael Jerome
                               Kennedy, PLLC
21                             333 Flint Street
                               Reno, Nevada 89501
22
    Official Court             ANN B. MATSUMOTO, RPR
23  Reporter:                  United States District Court
                               300 Ala Moana Boulevard, Room C-338
24                             Honolulu, Hawaii 96850

25  Proceedings recorded by machine shorthand, transcript produced
    with computer-aided transcription (CAT).

 1                    I N D E X

 2   <u>WITNESS</u>:                              <u>PAGE NO.</u>

 3   <u>FOR THE GOVERNMENT</u>:

 4    JOHN PERELL, JUNIOR

 5     DIRECT EXAMINATION BY MR. INCIONG            3

 6     CROSS-EXAMINATION BY MR. KENNEDY            24

 7     REDIRECT EXAMINATION BY MR. INCIONG        30

 8

 9                   E X H I B I T S

10   Exhibit 9-1234A received in evidence        11

11   Exhibit 9-1235 received in evidence         13

12   Exhibit 9-1233 received in evidence         17

13   Exhibit 9128-2 received in evidence         24

14   Exhibit 9128-6 received in evidence         26

15

16

17

18

19

20

21

22

23

24

25

```
1   WEDNESDAY, MARCH 6, 2024                    11:11 A.M. O'CLOCK
2                              * * * * *
3              (Start of partial transcript:)
4              THE COURT:  Mr. Inciong, your next witness, please.
5              MR. INCIONG:  Thank you, Your Honor.
6              United States calls John Perell, Junior.
7              COURTROOM MANAGER:  Please raise your right hand.
8              JOHN S. PERELL, GOVERNMENT'S WITNESS, SWORN.
9              THE WITNESS:  I do.
10             COURTROOM MANAGER:  Thank you.  You may be seated.
11             Please state your full name, spelling your last name
12   for the record.
13             THE WITNESS:  My name is John S. Perell, P-E-R-E-L-L.
14                          DIRECT EXAMINATION
15   BY MR. INCIONG:
16   Q    Good morning, Mr. Perell.  How old are you, sir?
17   A    73.
18   Q    Have you previously been a resident of the state of
19   Hawaii?
20   A    Yes, I have.
21   Q    About how long in total did you live here?
22   A    Oh, off and on, probably over 30 years.
23   Q    Did you raise a family here?
24   A    I did.  Ah-huh.
25   Q    And children here?
```

1   A   Ah-huh.

2   Q   While you were here, were you a boating enthusiast?

3   A   Yes.

4   Q   Fishing enthusiast?

5   A   Yes.

6   Q   Did you own fishing boats or other watercraft while you

7   lived here?

8   A   I had several, yes.

9   Q   What kinds of boats did you own?

10  A   Well, fishing boats, the -- I had a Cabo 40, which is a

11  fishing boat, if you will.  And then I -- I had a Boston

12  Whaler, 37-footer.

13  Q   Do you recall approximately the year that you acquired the

14  Boston Whaler?

15  A   2014.

16  Q   Okay.  Was that a boat that you were able to buy here in

17  Hawaii, or did you have to have it shipped from somewhere else?

18  A   I had it shipped from Florida.  Manufacturers are there.

19  Q   Okay.  Did you name that boat?

20  A   I named it the PAINKILLER.  I named it that after a drink

21  down in the Bahamas.  At Sophie's Hole they have a -- a very

22  popular rum drink there called the Painkiller.

23  Q   So that was the story behind the name?

24  A   Mm-hmm.

25  Q   Okay.  How long did you own that boat for?

1   A     A couple of years.

2   Q     Was there a particular reason why you decided to sell that

3   boat, the PAINKILLER?

4   A     I needed to move off the island.  I -- my wife was

5   diagnosed with a terminal disease and we decided to get closer

6   to our grandkids.

7   Q     I see.  What year was that, approximately?

8   A     2016, I believe.

9   Q     So you owned the boat for about two years.

10         When you owned that boat, was there a particular place you

11   were keeping it or mooring it?

12   A     I had a -- a condominium in Makani Kai Marina and I -- I

13   traded slips with a fellow because I had a -- the boat was

14   larger than the slip that I owned.

15   Q     Okay.  So Makani Kai Marina, that's located in Kaneohe on

16   the windward side?

17   A     Yes, mm-hmm.

18   Q     Did those properties come with a particular boat slip

19   attached to it?

20   A     Yes, they do.

21   Q     So that was the boat slip you were using to -- or at least

22   the one you swapped out to --

23   A     Yes.

24   Q     Okay.  Did you go about privately selling the PAINKILLER,

25   or did you enlist any help with that?

```
 1   A     No, I -- I brought in Windward Boats.  Joe Adams owns
 2   that, and so I asked him to sell it for me.  And he had a
 3   salesman that was involved.
 4   Q     All right.  Windward Boats is a company located in Kailua?
 5   A     Correct, ah-huh.
 6   Q     Did you have any potential buyers show interest in buying
 7   the PAINKILLER?
 8   A     I was -- yeah, I was kind of busy with my wife and so I
 9   just kind of let them do their thing.
10   Q     Okay.  Did you ask -- or I'm sorry -- did you receive any
11   requests from interested buyers to take test rides or test
12   drives in the boat?
13   A     Well, I think -- I think the guy's name was Jim Horton,
14   and he was a salesperson, and he brought Mike and -- into the
15   picture for me and said that he was interested in purchasing
16   the boat.
17   Q     Okay.  So you referenced Mike as a potential buyer.  Did
18   you know Mike's last name at the time?
19   A     I didn't know Mike at all.  It was just he was brought to
20   me because of the -- the sale of the boat.
21   Q     Did you later learn of his last name?
22   A     I did when we -- when he purchased, ah-huh.
23   Q     Okay.  What was his last name?
24   A     Miske, yeah.
25   Q     Did you actually take Mr. Miske on a test ride or test
```

1   drive of the boat at any time?

2   A    Yeah, we did.  He and his wife at one point.  I think she

3   came along as well.  So we were -- you know, you buy a boat,

4   you've got to test it.  You know.

5   Q    Was there anything remarkable about that interaction when

6   you test drove the boat with him?

7   A    No.  Nothing.

8   Q    Okay.  Was a deal ever reached between you and Mr. Miske

9   to --

10  A    Yes, ah-huh.

11  Q    So what was the final agreement for the sale of the boat?

12  A    Well, $425,000 was the price.  I wanted 450 and the bank

13  would only loan so much, so then he gave me a promissory note,

14  or I gave him a promissory note for $25,000.

15  Q    Okay.  To make up the difference?

16  A    Ah-huh.  Being the bank would only loan so much, mm-hmm.

17  Q    Do you recall the purchase price that you had bought the

18  Boston Whaler for two years earlier?

19  A    Six hundred and something.  I don't know.  It was around

20  there.

21  Q    So that's a quite -- quite a bit less than you purchased

22  for it.  Was that in line with the depreciation, or were there

23  other reasons?

24  A    Well, my -- I was leaving the islands as quickly as I

25  could.  I sold all my houses.  I had a place in Molokai.  I had

1    a place in Kaneohe Bay.  And I had a place in Lanikai.  And so

2    I knew that I had to leave the islands, so I had everything for

3    sale.  And I was willing to take a loss in order to make it

4    happen quickly because of her condition.

5              MR. INCIONG:  Okay.  Could we show the witness and

6    the jury, Your Honor, Exhibit 1-551, which has been previously

7    admitted from our original exhibit list?

8              THE COURT:  Yes.  Go ahead.

9              MR. INCIONG:  Thank you.

10   BY MR. INCIONG:

11   Q    Mr. Perell, do you see that photo that has just popped up

12   on the monitor in front of you?

13   A    Mm-hmm, yes.

14   Q    Do you recognize that?

15   A    Ah-huh.  That's the boat.

16   Q    Is it a distinctive boat for any reason?

17   A    Well, it's a Boston -- 37-foot Boston Whaler set up for

18   fishing.  It also has the canvas that -- that I had on board

19   and that's the -- the PAINKILLER.

20   Q    Okay.

21   A    Mm-hmm.

22   Q    Did you use this boat for fishing?

23   A    Yes, ah-huh.

24   Q    Was it outfitted for fishing?

25   A    Yes.

1  Q    Was any of the fishing equipment or tackle part of the

2  deal for the sale to Mr. Miske?

3  A    Well, it was -- he wanted that and I really didn't want to

4  let it go, but I said, well, okay, we'll do it and then we'll

5  do a promissory note for the $25,000.  That kind of made me

6  feel a little bit better about letting the fishing tackle go.

7  Q    Okay.

8  A    And so that's how we kind of struck up the deal.

9  Q    I see.

10         MR. INCIONG:  Could we show the witness only, please,

11  Exhibit 9-1234 from the government's original exhibit list,

12  please?

13         THE COURT:  From which list, Mr. Inciong?

14         MR. INCIONG:  I'm sorry, Your Honor.  It's the eighth

15  supplemental exhibit list.

16         THE COURT:  Go ahead.

17  BY MR. INCIONG:

18  Q    Mr. Perell, do you recognize what's shown in this

19  particular exhibit?

20  A    A little correspondence here, yes.

21         MR. INCIONG:  Okay.  Could we go to the next page and

22  show Mr. Perell that?

23  BY MR. INCIONG:

24  Q    Do you recognize that?

25  A    Yes.

1   Q    Okay.  And then to the third page, could you look at that,

2   please?  Do you recognize that?

3   A    Yes.

4   Q    So do these three pages comprise a series of emails that

5   you forwarded to the FBI in this case?

6   A    Ah-huh.

7   Q    Were these -- who are these correspondences between,

8   yourself and who else?

9   A    Well, Joe Adams is, you know, the owner of Windward Boats,

10  and so Joe was involved.

11  Q    So were these email exchanges between just -- between you

12  and Mr. Adams just before the boat was purchased?

13  A    Yeah.

14  Q    Okay.  In regard to the second page, if we could go to

15  that, please.  Is this a photo of the check that you received

16  for payment of the -- for the PAINKILLER?

17  A    Yes.

18       MR. INCIONG:  Your Honor, I would move to admit

19  Exhibit dash -- 9-1234.  We've separately marked page 2 as

20  Exhibit 9-1234A, and I believe really that's the only relevant

21  part that needs to go to the jury.  So I would move to admit

22  that page specifically.

23       THE COURT:  Any objection to 9-1234A?

24       MR. KENNEDY:  Is that the -- is that the second page?

25       MR. INCIONG:  It is.

1          MR. KENNEDY:  Could I see which one it is?

2          MR. INCIONG:  It is the second page.  Yes.

3          MR. KENNEDY:  No objection, Your Honor.

4          THE COURT:  Without objection, 9-1234A is admitted.

5          (Exhibit 9-1234A received in evidence.)

6          THE COURT:  Is that on some list?

7          MR. INCIONG:  Your Honor, we just marked it this

8    morning.  We will add it to the list this afternoon.

9          THE COURT:  All right.  Thank you.

10         MR. INCIONG:  Thank you.

11         Could we publish that at this time, Your Honor?

12         THE COURT:  I'm sorry, yes.

13   BY MR. INCIONG:

14   Q    So Mr. Perell, is this a copy or a photo, I should say, of

15   the cashier's check that you received for payment of the

16   PAINKILLER?

17   A    Yes.

18   Q    And it looks like the J is cut off, but do you see your

19   name there?

20   A    Yes.  It was -- that's a copy of the check, ah-huh.

21   Q    And the amount is correct, the $425,000?

22   A    That's correct, yes.

23   Q    All right.  Now, you mentioned that there was a promissory

24   note that you entered into with Mr. Miske for the remaining

25   $25,000, correct?

1    A     That's correct, ah-huh.

2           MR. INCIONG:  Could we show the witness only

3    Exhibit 9-1235 at this time?

4           THE COURT:  Go ahead.

5           MR. INCIONG:  Thank you, Your Honor.

6    BY MR. INCIONG:

7    Q     Do you see 9-1235 on the screen, Mr. Perell?

8    A     Mm-hmm.  Yes, I do.

9           MR. INCIONG:  And could we just go page by page for

10   the witness, please?  There's four pages total.  Just have him

11   take a look at that.

12   BY MR. INCIONG:

13   Q     Did you have a chance to review this document as well

14   prior to coming to court today?

15   A     Yes, I did.

16   Q     Is this a copy of the unsecured promissory note that you

17   reached with Mr. Miske?

18   A     It is.

19   Q     Now, is this particular copy signed or executed?

20   A     It's not.

21   Q     Did you have a signed or executed copy at one time?

22   A     Yes.

23   Q     Okay.  Did you retain that?

24   A     I did not.

25   Q     Other than the signatures not being on this page, does

1   this otherwise accurately show the terms?

2   A    Yes.

3            MR. INCIONG:  Your Honor, I would move to admit

4   Exhibit 9-1235 at this time.

5            THE COURT:  Any objection?

6            MR. KENNEDY:  I would object since it's unsigned, but

7   we have the testimony, Your Honor.

8            THE COURT:  All right.  The objection's overruled.

9   The exhibit shall be received and admitted.  That's 9-1235.

10           (Exhibit 9-1235 received in evidence.)

11           THE COURT:  And you may publish.

12           MR. INCIONG:  Thank you, Your Honor.

13           If we could start with page 1 of that document, and

14  if we could just highlight the top half or so.  Thank you.

15  BY MR. INCIONG:

16  Q    So you had this particular promissory note drawn up; is

17  that true?

18  A    Yes.

19  Q    And the borrower is listed as Kama'aina Holdings at 940

20  Queen Street, Suite B?

21  A    Yes.

22  Q    And you are listed there as the lender with a -- looks

23  like your Molokai address at the time?

24  A    Correct.

25  Q    Okay.  So what were the general terms of this promissory

1    note, sir?

2    A    Well, if you go back, then I can read it to you, but --

3    Q    Oh, I'm sorry.  I'm sorry, yes.

4    A    Basically --

5         MR. INCIONG:  If you could highlight the bottom half

6    for the witness.

7    A    Yeah.  You know, basically, let's see, the amount owed

8    under the promissory note will be repaid in 24 equal payments

9    at 1,096.78 made every month.  The first payment will be due on

10   July 1st.  All payments shall be first applied to interest and

11   the balance to be principal.

12   BY MR. INCIONG:

13   Q    Did you receive full payment from Mr. Miske in accordance

14   with this promissory note?

15   A    I never received any payment at all.

16   Q    Not a dime?

17   A    Nothing.

18   Q    Did you make any attempts to try and have Mr. Miske pay

19   you pursuant to this agreement?

20   A    I did.  But I was unable to reach Mr. Miske.

21   Q    Okay.  What attempts did you make to try and reach him?

22   A    I called on the phone.  I would check with his office, try

23   to get somebody at his office.  And they had said, well, he'd

24   call back, but nobody ever got back to me.  And I was very busy

25   with my wife, so I didn't make a big deal about it and I just

```
 1   kind of let it go.

 2   Q    Did you resign yourself to the fact that you were not ever

 3   going to receive this money?

 4   A    Yes.

 5   Q    So let me have you then fast forward a few years to 2019.

 6             MR. INCIONG:  You can take that down now.  Thank you.

 7   BY MR. INCIONG:

 8   Q    Did you receive information that the PAINKILLER was up for

 9   sale?

10   A    Yes.

11   Q    How did you find out about that?

12   A    One of my friends just sent me a -- like an email or

13   something.  All of this has been a long time for me, so it's --

14   Q    Sure.

15   A    Somebody sent me a message saying that the boat was for

16   sale.  So I thought, well, I might as well give it another go

17   and see before he sells it, you know, tell him that I -- I

18   could lien the -- I could lien the boat if I -- if I wanted to.

19   But, you know, I was hopeful that he would come around and just

20   take care of his debt.

21   Q    How did you make that initial contact with Mr. Miske, or

22   attempt to?

23   A    I don't know if I called him or I sent him an email.  But

24   I got through to him and I was pleasantly surprised that I got

25   through.  You know, I let him know that I'd like to get paid.
```

1    Q    Okay.  Let me see if we can refresh your recollection.

2              MR. INCIONG:  Could we show the witness

3    Exhibit 9-1233?  And this is from the government's eighth

4    supplemental exhibit list.

5              THE COURT:  Yes, go ahead.

6    BY MR. INCIONG:

7    Q    So Mr. Perell, this is a two-page document.

8              MR. INCIONG:  If we could show the second page as

9    well.

10   BY MR. INCIONG:

11   Q    Have you seen this document before?

12   A    Yes.

13   Q    Did you review this prior to coming to court today?

14   A    Yes.

15   Q    In fact, were these additional emails that you recently

16   forwarded to the FBI?

17   A    Yes.

18   Q    Does this refresh your memory as to how you made contact

19   with Mr. Miske?

20   A    It does.  It's -- you know, at their request I went back

21   to emails and looked things up to see what I had --

22   correspondence I had had.

23   Q    Okay.  Does this two-page document accurately reflect the

24   email communications you had with Mr. Miske in September of

25   2019?

1    A    Yes.

2              MR. INCIONG:  Your Honor, I would move to admit

3    9-1233.

4              THE COURT:  Any objection?

5              MR. KENNEDY:  No objection.

6              THE COURT:  Without objection, 9-1233 is admitted.

7              (Exhibit 9-1233 received in evidence.)

8              THE COURT:  You may publish.

9              MR. INCIONG:  Thank you, Your Honor.

10             So if we could start on page 2 and highlight that

11   section.  Yes.

12   BY MR. INCIONG:

13   Q    So Mr. Perell, was this the initial attempt you made to

14   reach out to Mr. Miske after you learned that the PAINKILLER

15   was back up for sale?

16   A    Yes.

17   Q    And it looks like you were actually responding to a

18   Craigslist ad or listing for the boat.  Is that true?

19   A    I had seen that the boat was for sale.  Someone told me

20   about it.  It was on Craigslist.  I looked it up and then I

21   decided that I'd follow up with this letter.

22   Q    Okay.  So those are your words then, where it says:  Looks

23   like you are selling the PAINKILLER?

24   A    Yes.

25   Q    "You never finished paying me for the boat and you owe me

1    $25,000"?

2    A    Yes.

3    Q    "Please contact me to avoid a lien on this property"?

4    A    Yes.

5    Q    So what did you mean by that?

6    A    Well, whenever somebody doesn't pay you back and it's --

7    they owe you money and we had a promissory note saying that he

8    owed me the money, for him -- for him it could block his sale

9    of the boat.

10   Q    Okay.

11   A    Is the way I was looking at it.

12   Q    All right.  Then you go on to say:  I will accept the

13   fishing tackle as payment if you contact me within 48 hours?

14   A    Yeah, it was a -- idea was that I would at least hear back

15   from him.

16   Q    "Otherwise you are forcing me to take further action"?

17   A    Right.

18   Q    "Further action," are you referencing the lien again

19   there?

20   A    Yes.

21   Q    All right.  And then you signed it with your name, and

22   that was the email address that he could reach you at?

23   A    Correct.

24   Q    So then it sounds like you received a response?

25   A    I did.

1   Q    Okay.

2        MR. INCIONG:  So could we go to page 1, to the bottom

3   third of that, please.

4   BY MR. INCIONG:

5   Q    Is this the response that you received from that email, or

6   to that email?

7   A    Yes.

8   Q    And from the top there, do you see the email address,

9   mike@kamaaina.com?

10  A    I do.

11  Q    That's where the message was sent from?

12  A    Mm-hmm.

13  Q    So this answer was -- stated:  John, I'm not sure what

14  you're considering fishing tackle as payment, but I really

15  don't appreciate any type of threats.

16       Did you feel like you were threatening Mr. Miske?

17  A    Well, no, I just was doing business.

18  Q    Okay.  It says:  If you want to take me to court, I'm more

19  than happy.  I have attorneys coming out of my ass.  Let's go.

20  Exclamation point, exclamation point, exclamation point.

21       Do you recall that?

22  A    Yes.

23  Q    What was your reaction when you saw that?

24  A    Well, I -- that's his response.

25  Q    He went on to say:  The boat had so many undisclosed

```
 1   problems.  It was hung up for months in dry dock, problems with
 2   the engines that the Mercury reps couldn't figure out.
 3        Were there any problems with that boat, mechanical,
 4   otherwise, that you concealed when you were selling the boat?
 5   A    Not at all, no.  I sold it in good order.
 6   Q    Did you keep that boat in top condition when you owned --
 7   A    I felt I did.  Yes.
 8   Q    It says -- the email goes on to say:  I will counter.  So
 9   you and I will countersue for all of the repairs that I've done
10   immediately following the purchase of the boat and all my
11   attorney's fees.
12        Were you interested in pursuing that?
13   A    No, I -- you know, I'm trying to deal with my wife and
14   problems that I have myself.  I don't want to get involved with
15   any big situation where I'm in a lawsuit.
16   Q    So your wife's medical issues were still continuing during
17   this time?
18   A    Still continuing at this time, mm-hmm.
19   Q    And looks like then the next offer was:  Or you're more
20   than welcome to buy the boat back less $25,000 if you feel
21   that's fair.
22        Were you interested in resolving it that way?
23   A    I wasn't living in Hawaii at this time.  I had moved to be
24   closer to the grandkids.  So, no, I was not interested.
25   Q    All right.  So did you respond to this email?
```

1   A    I did.

2        MR. INCIONG:  Okay.  Could we go up to the middle

3   portion of page 1 of that exhibit, please.

4   BY MR. INCIONG:

5   Q    And all of these email exchanges occurred on the same day,

6   September 20th, 2019?

7   A    Yes.

8   Q    So was this your response that's shown there?

9   A    Yes.

10  Q    Could you read that aloud, please?

11  A    Mike, I understand your position and sorry for -- sorry

12  you had problems.  This is the first I've heard of any.  When I

13  sold you the boat, you gave me a promissory note and never made

14  any payments.  I contacted your office and you never replied.

15  I thought you would honor your word and now years later you

16  excuse yourself with attorneys.  Mike, either you honor your

17  word or you don't.  I will not participate in an argument as

18  when we last spoke we had a friendly relationship.  It's up to

19  you.  I was asking for what we agreed to and thought by

20  offering an easy solution by giving my rods and reels back

21  would be fair.  If you think I am being unfair, it's your

22  decision.  I don't intend to create a lien.  But at least I got

23  to hear from you finally.  You know what is the right thing to

24  do.  It's up to you.  Thanks for contacting me.  I wish you all

25  the best.  John Perell.

1   Q    So in your entire life have you ever sued anybody?

2   A    Never.  No.

3   Q    You were just trying to resolve this?

4   A    Exactly.  Mm-hmm.

5   Q    Did Mr. Miske respond to this current email we have on the

6  screen right now?

7   A    No.

8   Q    Well, let me -- if we go up to the top, the top third --

9  and let's see if we can refresh your memory.  The top third of

10  the document.

11      Do you see that, Mr. Perell?

12   A    I do.

13   Q    Do you recall now whether you received a response to that

14  email you just read?

15   A    I see it here, yeah.  Ah-huh.

16   Q    Okay.  So Mr. Miske responded to you that same day still,

17  correct?

18   A    Ah-huh.

19   Q    And he says to you:  That's the point, John.  We had

20  friendly communications and then I get this threatening email

21  from you first thing in the morning.  I don't appreciate it.  I

22  don't think any man would.

23      Did you intend the email to be threatening, sir?

24   A    A little bit.  I wanted to, you know, make my point that I

25  hadn't heard from him in a couple of years and I would like to

1  be -- I would like to get paid.

2  Q    Okay.  That was your goal?

3  A    And then I -- and then I could lien.

4  Q    Okay.  So the email concludes by saying:  Furthermore, it

5  was brought to my attention by the management at Windward Boats

6  and Mercury customer service that you were aware of these

7  problems and never disclosed them.

8       Is that true?

9  A    No.

10  Q    Did you have any further communication from Mr. Miske

11  after that email?

12  A    No.

13  Q    Did you receive a penny towards the $25,000 that he owed

14  you?

15  A    No.

16  Q    Have you -- up until the point you were subpoenaed for

17  this case had you moved on and thought this was in your past?

18  A    Yeah.  I mean, I threw paperwork away, basically.  I had

19  to -- when the FBI contacted me, I had to look in old emails to

20  find this information.

21  Q    So the signed promissory note, for example, you just

22  chucked that because you were --

23  A    No, I threw it away.  I don't need to look at loans that

24  people owe me that I didn't get paid back, so I let it go.

25       MR. INCIONG:  Thank you so much, Mr. Perell.

```
 1              THE WITNESS:  Mm-hmm.

 2              MR. INCIONG:  No further questions.

 3              THE COURT:  Cross.

 4                        CROSS-EXAMINATION

 5  BY MR. KENNEDY:

 6  Q    Sir, I'd like to show you Exhibit 9128-002.

 7              MR. KENNEDY:  I believe it's in the original exhibit

 8  list, Your Honor.

 9              THE COURT:  Okay.  Go ahead.

10  BY MR. KENNEDY:

11  Q    Sir, do you recognize what's been marked as

12  Exhibit 9128-002 for identification?

13  A    Yes.  That's my signature.  Ah-huh.

14  Q    All right.  Is this the bill of sale for the Boston Whaler

15  that you named the PAINKILLER?

16  A    Yes, it is.

17  Q    All right.

18              MR. KENNEDY:  At this time, Your Honor, I would

19  move -- make a motion to admit 9128-002.

20              THE COURT:  Any objection?

21              MR. INCIONG:  No objection.

22              THE COURT:  Without objection, that exhibit is

23  admitted, 9128-2.

24              (Exhibit 9128-2 received in evidence.)

25              THE COURT:  You may publish.
```

1  BY MR. KENNEDY:

2  Q    So now, the bill of sale between you and Mr. Miske was for

3  $425,000, correct?

4  A    Yes.

5  Q    All right.  And the government exhibit was a bit cut off.

6  If we could -- let's see if I could find it.

7        MR. KENNEDY:  If we could just move to 9128-006, that

8  I believe is in the sixth supplemental, Your Honor.  But let me

9  check.

10        THE COURT:  I have it.  Go ahead.

11        MR. KENNEDY:  All right.

12  BY MR. KENNEDY:

13  Q    Do you recognize that as a copy of the check that we were

14  looking at just a few moments ago?

15  A    Yes.

16  Q    Which we can see the entire check?

17  A    Yes.

18  Q    It looked like the other one was sort of cut off on the

19  name of the --

20  A    Right.

21  Q    So would this be the -- did you receive the amount of

22  420 --

23  A    It looks like the right check, ah-huh.

24  Q    Okay.

25  A    Yes.

1          MR. KENNEDY:  At this time, Your Honor, I'd move

2    9128-006 into evidence.

3          THE COURT:  Mr. Inciong, any objection?

4          MR. INCIONG:  No objection.

5          THE COURT:  Without objection, 9128-6 is admitted.

6          (Exhibit 9128-6 received in evidence.)

7          THE COURT:  You may publish.

8    BY MR. KENNEDY:

9    Q    All right.  It looks like, sir, the amount of $425,000 was

10   provided on that check on -- at least the check was cut on

11   June 11th of 2016?

12   A    Yes.

13   Q    And it appears that it was then deposited in the Bank of

14   Hawaii in your account.

15   A    That's correct.

16   Q    Okay.  Now, if we can take that down.

17        Sometime ago in, it looks like, 2017, do you remember

18   speaking with a Heidi Turner from the -- from the FBI?

19   A    No, I don't remember.  But --

20   Q    Okay.

21   A    -- if I did, I did.

22        MR. KENNEDY:  All right.  If we can just pull up for

23   the witness 9128-001, which would be in the original exhibit

24   list, Your Honor.

25        THE COURT:  Yes.  Go ahead.

1       MR. KENNEDY:  I'll just wait until you've obtained

2   it, Your Honor, so you can -- it's 9128-001.

3       THE COURT:  Go ahead.

4       MR. KENNEDY:  All right.

5   BY MR. KENNEDY:

6   Q    Sir, in taking a look at that, does that help you recall

7   a -- at least a telephone interview with an FBI special agent

8   by the name of Heidi Turner?

9   A    (Reviews document.)

10       (Inaudible.)

11       THE WITNESS:  Excuse me?

12       MR. KENNEDY:  I think she just asked you if you could

13   repeat it for the record 'cause she didn't hear you.

14       THE WITNESS:  It looks accurate to me.  Yes.

15   BY MR. KENNEDY:

16   Q    Okay.  All right.  So you do recall speaking with FBI

17   Special Agent --

18   A    I don't recall, but obviously it looks like -- it looks

19   accurate to me, ah-huh.

20   Q    Okay.  Sir, I just want to direct your attention to --

21       MR. KENNEDY:  If we would go to page 2 of that

22   document.  And then I will -- if we just blow that, those two

23   paragraphs up.

24   BY MR. KENNEDY:

25   Q    And then just read that to yourself, sir.  And then I'll

1    ask you some questions about it.

2    A    (Reviews document.)  Okay.  I read it.

3    Q    All right.

4         MR. KENNEDY:  And then if we just take that down.

5    BY MR. KENNEDY:

6    Q    Do you recall telling Special Agent Turner that the

7    purchase price would be $425,000 in total?

8    A    I don't recall even talking to the agent, but it's written

9    here, so I understand that it's written.  I don't remember

10   really -- I don't really remember that conversation.

11   Q    Okay.  And do you recall telling her that the boat itself

12   would be $400,000?

13        MR. INCIONG:  Objection.  The witness just said he

14   doesn't even recall the conversation.

15        THE COURT:  The objection is sustained.  I think he

16   said it twice.

17        MR. KENNEDY:  All right.

18   BY MR. KENNEDY:

19   Q    So in terms of that conversation, you don't recall any --

20        MR. INCIONG:  Objection, asked and answered.

21   BY MR. KENNEDY:

22   Q    -- of the specifics of those two paragraphs that I asked?

23   A    I do not.

24   Q    Okay.  With respect to a second conversation with Special

25   Agent Heidi Turner, do you recall speaking with her again after

1   she interviewed in March of 2017?

2   A    I don't remember talking to her.

3   Q    All right.  Let me just pull it up for you to see if it

4   refreshes your recollection at all.

5          MR. KENNEDY:  9128-004 is in the original exhibit

6   list, Your Honor.  If we could just pull it up for the witness.

7          THE COURT:  I'm not sure I understand the question.

8   Does he recall a second conversation?  What was the first one?

9          MR. KENNEDY:  Well, it appears, at least from the

10  FBI 302, that Special Agent Turner, Heidi Turner, wrote a

11  report saying that she spoke with him.  And Mr. Perell just

12  doesn't remember at this time, but he said it looked accurate.

13         THE COURT:  You need to rephrase the question because

14  I don't think he ever said that he remembered speaking with

15  Agent Turner.  I think, in fact, he said he did not recall it

16  twice.

17  BY MR. KENNEDY:

18  Q    All right.  Let's just pull up 9128-004.

19         And I'll ask you to take a look at it and see if you

20  recall speaking with a Special Agent Heidi Turner on, it

21  appears to be, March 30th of 2017, sir.  And then after you've

22  read it, just let me know if that refreshes your recollection.

23  A    (Reviews document.)

24         I remember telling them that there was a GPS system,

25  somebody.  But I don't remember who it was.  It must have been

 1   this person.

 2   Q    All right.

 3        MR. KENNEDY:  And we can take that down.

 4   A    At least they have that -- they have that detail that --

 5   that the boat had a GPS.

 6   BY MR. KENNEDY:

 7   Q    All right.  We can take that down, sir.  And just let me

 8   ask you some questions about the boat.

 9        Did you have problems with the GPS device malfunctioning

10   on your Boston Whaler the PAINKILLER?

11   A    No.

12   Q    All right.  And did you have any problems with the depth

13   sounder that would assist in fishing malfunctioning?

14   A    No.

15   Q    All right.

16        MR. KENNEDY:  No further questions.

17        THE COURT:  All right, Mr. Inciong.

18        MR. INCIONG:  Briefly, Your Honor.

19        If we could pull up 9-1233 again for the witness and

20   the jury.

21        THE COURT:  Yes.  Go ahead.

22        MR. INCIONG:  Thank you.

23                      REDIRECT EXAMINATION

24   BY MR. INCIONG:

25   Q    So Mr. Perell, this two-page document, this -- these were

1  the emails that you exchanged with Mr. Miske back in 2019 on

2  September 28th, correct?

3  A    Yes.

4  Q    Anywhere in the responses that you received from Mr. Miske

5  that day, did he ever deny owing you the $25,000?

6  A    No.

7  Q    Did it appear to you that he was trying to justify not

8  paying by saying there were these problems with the boat's

9  engines and whatnot?

10 A    Well, I -- you know, I'm -- I -- I'd be putting words in

11 his mouth.

12 Q    Okay.

13 A    So that's not right.

14 Q    Were there any problems with any of the engines or any of

15 the other systems with that boat?

16 A    Not to my knowledge.  I -- you know that people say:

17 B-O-A-T is "break out another thousand."  Boats seem to break

18 down and it's just part of the nature of boats.  And anybody

19 who is aware of boating understands that terminology.

20 Q    But aside from that, was there anything that you

21 concealed --

22 A    No.

23 Q    -- from -- during the --

24 A    No.  The boat was in great shape.

25          THE COURT:  Let him finish the question, please.

1               MR. INCIONG:  I have no further questions.

2          Thank you, Your Honor.

3               THE COURT:  Anything else?

4               MR. KENNEDY:  Nothing further, Your Honor.

5               THE COURT:  All right, Mr. Perell, you may step down.

6   Thank you, sir.

7                                             (Witness excused.)

8          (End of partial transcript.)

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    COURT REPORTER CERTIFICATE

 2            I, Ann B. Matsumoto, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5    complete, true, and correct transcript of the stenographically

 6    recorded proceedings held in the above-entitled matter and that

 7    the transcript page format is in conformance with the

 8    regulations of the Judicial Conference of the United States.

 9            DATED at Honolulu, Hawaii, June 30, 2024.

10

11

12
                         */s/ Ann B. Matsumoto*
13                       ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25