```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
 5             Plaintiff,           )  Honolulu, Hawaii
                                    )
 6        vs.                       )  March 12, 2024
                                    )
 7   MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 36
                                    )
 8             Defendant.           ) (CONTINUED TESTIMONY OF
     _____)  GOVERNMENT'S WITNESS
 9                                      CHLOE CHANG)

10
                     PARTIAL TRANSCRIPT OF PROCEEDINGS
11             BEFORE THE HONORABLE DERRICK K. WATSON
                CHIEF UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
     For the Government:         MARK A. INCIONG, AUSA
14                               MICHAEL DAVID NAMMAR, AUSA
                                 WILLIAM KEAUPUNI AKINA, AUSA
15                               Office of the United States Attorney
                                 Prince Kuhio Federal Building
16                               300 Ala Moana Boulevard, Suite 6100
                                 Honolulu, Hawaii 96850
17
     For the Defendant:          LYNN E. PANAGAKOS, ESQ.
18                               841 Bishop Street, Suite 2201
                                 Honolulu, Hawaii 96813
19
                                 MICHAEL JEROME KENNEDY, ESQ.
20                               Law Offices of Michael Jerome
                                 Kennedy, PLLC
21                               333 Flint Street
                                 Reno, Nevada 89501
22
     Official Court              ANN B. MATSUMOTO, RPR
23   Reporter:                   United States District Court
                                 300 Ala Moana Boulevard, Room C-338
24                               Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1                    I N D E X

2    <u>WITNESS:</u>                                    <u>PAGE NO.</u>

3    <u>FOR THE GOVERNMENT</u>:

4     CHLOE CHANG (CONTINUED EXAMINATION)

5     RESUMED DIRECT EXAMINATION BY MR. AKINA        4

6     CROSS-EXAMINATION BY MR. KENNEDY              20

7     REDIRECT EXAMINATION BY MR. AKINA             30

8     RECROSS-EXAMINATION BY MR.KENNEDY             31

9

10                   E X H I B I T S

11    None.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TUESDAY, MARCH 12, 2024                    8:33 A.M. O'CLOCK
 2                          *  *  *  *  *
 3             (Start of partial transcript:)
 4             (Open court in the presence of the jury.)
 5             COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,
 6   United States of America versus Michael J. Miske, Junior.
 7             This case has been called for jury trial, Day 36.
 8             Counsel, please make your appearances for the record.
 9             MR. INCIONG:  Good morning, Your Honor.  Mark
10   Inciong, Michael Nammar, and KeAupuni Akina for the United
11   States.  Also present with us is FBI Special Agent Tom Palmer
12   and Kari Sherman.  Good morning.
13             THE COURT:  Good morning.
14             MR. KENNEDY:  Good morning, Your Honor.  Michael
15   Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and
16   Josh Barry.  Good morning to you all.
17             THE COURT:  Good morning.  Good morning to the 16
18   persons on our jury.  You may be seated, by the way.  Excuse
19   me.
20             Ms. Chang, good morning.
21             Ms. Chang was, as you may recall, on the stand in the
22   midst of Mr. Akina's direct examination when we adjourned
23   yesterday.
24             So Mr. Akina, you may resume that now.
25             There was also an objection based on hearsay, past
```

1   narrative that was made at the end of the session yesterday.

2   Having now taken a look at that objection and the transcript

3   from yesterday afternoon, the objection's overruled.

4           You may ask the same question, you may start fresh,

5   whatever is easiest for you, Mr. Akina.

6           MR. AKINA:  Thank you, Your Honor.

7       CHLOE CHANG, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

8                    RESUMED DIRECT EXAMINATION

9   BY MR. AKINA:

10  Q    I'm going to take a step back from where we left off

11  yesterday, Ms. Chang.

12  A    Okay.

13          MR. AKINA:  And forgive me, Your Honor.  You might

14  have advised the witness of this but --

15          THE COURT:  I will.  I will.

16          Ms. Chang, we're not going to re-swear you.  But you

17  do remain subject to the same oath that you took at the

18  inception of your testimony yesterday.  Do you understand that?

19          THE WITNESS:  I understand.

20          THE COURT:  Thanks for the reminder.

21  BY MR. AKINA:

22  Q    To -- having to pick up John Stancil from Maunalua Bay,

23  the days prior to that, you remember I asked you some questions

24  about leading up to that, and John Stancil, he seemed to be

25  stressed and he was talking about how his brother was trying to

```
 1    get him to do something that he didn't want to do?  Do you
 2    remember that?
 3    A    Yes.
 4    Q    Were you aware of any text message communications at that
 5    point in time between John Stancil and the defendant, Michael
 6    Miske?
 7    A    Yes.
 8    Q    How were you aware of that?
 9    A    I saw it.
10    Q    Okay.  And what did you -- whose phone were you looking
11    at?
12    A    John's.
13    Q    And was that in private, or were you watching him text?
14    A    No, I was like right there with him.
15    Q    You were right next to him?
16    A    Mm-hmm.
17    Q    Okay.  And what did you see?
18    A    I just saw text messages between him and his brother and
19    it said, "Don't sleep on it."
20    Q    Who sent that message?
21    A    His brother.  It was under "Bro."
22    Q    Okay.  So Michael Miske texted John Stancil "Don't sleep
23    on it"?
24    A    Mm-hmm.
25    Q    Is that a "yes"?
```

1   A    Yes.

2   Q    And so, now, picking up where we left off yesterday, after

3   the stays at the hotels you said that John Stancil was now

4   staying -- he didn't go home.  He went to stay at his brother's

5   place?

6   A    Correct.

7   Q    And about how long did he stay there?

8   A    I want to say a duration of a few days.

9   Q    Few days?

10  A    Mm-hmm.

11  Q    And during that few-day period while John Stancil was

12  staying at Michael Miske's -- one of his homes, did you discuss

13  with John Stancil, you know, what was going on?

14  A    Yes.

15  Q    And prior to that conversation, had you been reading or

16  watching the news?

17  A    Yes.

18  Q    And what had you gathered from that?

19  A    That he was there for that.

20  Q    What do you mean by that?

21  A    That he was at that tattoo shop when that incident

22  occurred.

23  Q    And at this point in time, was it important for you to

24  know from John Stancil what was going on?

25  A    Yes.

 1  Q    Especially because he had been asking you for help in the

 2  last few days?

 3  A    Yes.

 4  Q    And fair to say that you would have -- you wouldn't have

 5  left it alone if he didn't give you a satisfactory answer?

 6  A    No.  I was already, like, bugging him.

 7  Q    Okay.  And was it possible that you could have asked other

 8  people to figure out what was going on if he didn't talk to you

 9  about it?

10  A    Yeah.

11  Q    Okay.  So given that, what did John Stancil explain to

12  you?

13          MR. KENNEDY:  Renewed objection on hearsay, Your

14  Honor.

15          THE COURT:  Overruled.  Go ahead.

16  A    He explained to me that he was there at the tattoo shop

17  and that he didn't do anything wrong.  He just was filming with

18  his phone is what he said.  And then things got messed up and

19  his friend got stabbed.

20  BY MR. AKINA:

21  Q    Did he say who his friend was?

22  A    Yes.

23  Q    Who was that?

24  A    Days.

25  Q    And did he mention anything else about what happened

```
 1   inside the tattoo shop?

 2   A    He just said that the man assaulted him, and then the guy

 3   stabbed him and they ran out.

 4   Q    And when you say "the man assaulted him," what does that

 5   mean?

 6   A    That Days assaulted a man.

 7   Q    At the tattoo shop?

 8   A    Yeah.

 9   Q    And then?

10   A    And he said that the -- Days got stabbed.  And then he

11   said that they tried to leave and he died, or was bleeding out.

12   Q    Dayson was?

13   A    Yeah.

14   Q    You said "Days."  Is that a nickname for Dayson?

15   A    I just know him by that name --

16   Q    By Days?

17   A    -- by what -- what John told me, yeah.

18   Q    And, okay, so it sounds like John told you that he didn't

19   get physically involved?

20   A    He just said he was holding a -- like a phone to record

21   it, an incident.

22   Q    Did he tell you why he was recording?

23   A    Yeah.  He said he was recording for his brother.

24   Q    Michael Miske?

25   A    Yes.
```

1   Q    You mentioned yesterday that at some point you were told
2   that 911 was called?
3   A    Yes.
4   Q    Was it around this time when your -- when did you learn
5   about that?
6   A    John told me that he tried to call for help from the boy
7   with his mother's cell phone.  I think he had his mom call.
8   Q    Okay.  And his mother is Maydeen Stancil?
9   A    Yes.
10  Q    So after you learned about this, John Stancil's -- that he
11  was there for this stabbing, did you call the police?
12  A    No.
13  Q    Did you report this to the authorities?
14  A    No.
15  Q    Why not?
16  A    I didn't really want to believe it, and I honestly just
17  acted like he didn't even tell me anything.  I just shut myself
18  off to it.
19       I was kind of scared.  I didn't want to be, like, involved
20  in any of that.  And once he had told me what happened, it
21  started to all make sense, like why he needed me to take him to
22  a hotel and whatnot.
23  Q    Were you afraid of retaliation at all if you reported
24  this?
25  A    A little bit, yeah.

1  Q    Retaliation from who?

2  A    Him or his brother.  Like, I just felt like these weren't

3  people you want to piss off.

4  Q    And was that based on anything you had observed in the

5  past or just this specific instance?

6  A    Things that I've heard.

7  Q    About who specifically?

8  A    His brother.

9  Q    Okay.  And what did you hear about Michael Miske's

10 reputation?

11 A    That he's --

12       MR. KENNEDY:  Objection, hearsay, Your Honor.

13       THE COURT:  Overruled.  Go ahead.

14 A    That he's dangerous.

15 BY MR. AKINA:

16 Q    While you were living with John Stancil, did you ever see

17 him with a mask?

18 A    Yes.

19 Q    Where?

20 A    At home.

21 Q    Can you describe the mask that you've seen?

22 A    It was black with a skull on it.

23 Q    What color is the skull?

24 A    White.

25       MR. AKINA:  Can we publish Exhibit 1-324, please,

1   already in evidence?

2              THE COURT:  Yes, you may.

3              Publish, please.

4   BY MR. AKINA:

5   Q    Does this look like the mask that you've seen John Stancil

6   with?

7   A    Yes.

8              MR. AKINA:  Could we publish Exhibit 1-299, already

9   in evidence?

10             THE COURT:  Go ahead.

11             MR. AKINA:  If we could zoom in on the address,

12  please.

13  BY MR. AKINA:

14  Q    You see it says:  John Stancil, 41-714 Inoaole Street,

15  Waimanalo, Hawaii?

16  A    Yes.

17  Q    Do you recognize that address?

18  A    Yes.

19  Q    What is that address?

20  A    His mother's residence.

21  Q    Is that the same one that you stayed with him for some

22  period of time?

23  A    Yes.

24             MR. AKINA:  If we could show -- publish

25  Exhibit 1-301, please, already in evidence?

1              THE COURT:  Yes.

2              MR. AKINA:  And zoom in on this top portion of the

3    ticket.

4    BY MR. AKINA:

5    Q    Can you make out "John Stancil"?

6    A    Yes.

7    Q    And the same address, 41-714 Inoaole Street?

8    A    Mm-hmm, yes.

9              MR. AKINA:  Can we publish 1-306, already in

10   evidence?

11             THE COURT:  Go ahead.

12   BY MR. AKINA:

13   Q    Same thing:  Is that John Stancil's name with his address?

14   A    Yes.

15   Q    And this is -- appears to be an envelope?

16   A    Yes.

17             MR. AKINA:  Can we publish Exhibit 1-319, already in

18   evidence?

19             THE COURT:  Go ahead.

20   BY MR. AKINA:

21   Q    This appears to be a T-shirt with the word "Leverage HNL"

22   on it.  Are you familiar with this type of shirt or this brand?

23   A    Yes.

24   Q    How are you familiar with it?

25   A    This was John's T-shirt company.

```
1   Q    So you've seen T-shirts like this before in relation to
2   John Stancil?
3   A    Yes.
4   Q    You testified that after you picked up John Stancil from
5   Maunalua Bay you never saw his phone again.  Do you know if he
6   ever got a new phone?
7   A    Yes.
8   Q    How do you know that?
9   A    Because I got it for him.
10  Q    About how long after you picked him up from Maunalua Bay
11  did you get a new phone for John Stancil?
12  A    Within probably 72 hours.
13  Q    Did he get a new phone number when he got a new phone?
14  A    Yes.
15  Q    Have you ever driven a white Mercedes?
16  A    Yes.
17  Q    What type of Mercedes was that?
18  A    A C300.
19  Q    Where did you get that Mercedes?
20  A    I purchased it from Mike.
21  Q    In 2020, when you were still together with John Stancil,
22  did you have that vehicle?
23  A    Yes.
24  Q    Would you ever let John Stancil use your white Mercedes?
25  A    Yes.
```

```
 1   Q    Do you know someone named Sara Tufele?

 2   A    Yes.

 3   Q    Who is she?

 4   A    Wayne Miller's spouse.

 5   Q    And do you know her by a different name?

 6   A    Maile.

 7   Q    Maile?

 8        Did you know her during the time that you were together

 9   with John Stancil?

10   A    Yes.

11   Q    And during that time how would you describe your

12   relationship with Ms. Tufele?

13   A    We got pretty close.

14   Q    Do you recall a time where Wayne Miller got arrested?

15   A    Yes.

16   Q    Does around August of 2018 sound about right?

17   A    Yes.

18   Q    And at that time was Ms. Tufele still together with Wayne

19   Miller?

20   A    Yeah, for a little bit.

21   Q    Did Michael Miske ever talk about Wayne Miller possibly

22   cooperating with the government after that point?

23   A    I know it was a concern, yeah.

24   Q    How do you know it was a concern?

25   A    Because he did talk about it.
```

1   Q     And do you recall anything else from that?

2   A     No.  I just remember we went to a Outback dinner, and she

3   came to meet all of us, and he was talking to her about it.

4   Q     So --

5   A     And she was like assuring him that he was -- Wayne was not

6   saying anything about him at all.  It was different charges and

7   whatnot.  I don't remember, like, word for word.  It was a

8   really long time ago.

9   Q     So this Outback's -- what type of place is that?

10  A     It's a restaurant.

11  Q     And where was that?

12  A     In Waipio Gentry.

13  Q     And so just to be clear, you said "he."  You're referring

14  to Michael Miske?

15  A     Yeah.

16  Q     And he was questioning Ms. Tufele?

17  A     Yeah.

18  Q     And what did Ms. Tufele explain at that dinner?

19  A     She was saying like he has nothing -- Mike has nothing to

20  worry about and that Wayne would never betray him.  And like

21  nothing that's going on with Wayne had anything to do with him.

22  Q     After that dinner, going forward in time, did Ms. Tufele

23  stop hanging out as much with you and John Stancil and Michael

24  Miske?

25  A     Yeah.

1    Q    Based on your observations of the defendant and John

2    Stancil and the rest of their family members, did you observe

3    any ways that Michael Miske tried to use familial ties to exert

4    control or influence over others?

5              MR. KENNEDY:  Objection, compound, Your Honor.

6              THE COURT:  Overruled.  Go ahead.

7              THE WITNESS:  Can you repeat the question?

8              MR. AKINA:  I'll simplify it.

9              THE COURT:  Go ahead.

10   BY MR. AKINA:

11   Q    Based on your observations of the defendant and how he

12   interacted with other family members, did you ever see any way

13   that he used his family ties to get what he wanted?

14   A    No.  I think that his family treated him like he's really

15   important, you know, and I think that it was just a choice on

16   their part.  Like, John was super loyal to his brother, you

17   know, and whatnot.

18   Q    And would Michael Miske ever ask family members to do

19   things?

20   A    Yeah.

21   Q    What would happen when Michael Miske did not get his way?

22   A    He definitely has a temper.  He would get angry, you know.

23   Q    Have you ever been threatened by Michael Miske?

24   A    Yes.

25   Q    Can you explain that, what happened, to the jury?

1    A    I was pregnant, I want to say about six months along.  And

2    his girlfriend Andi was going to make a -- she wanted to make a

3    party for my daughter at the bay, and she baked all these

4    cupcakes and cakes, and she made it really, really special.

5    And she told me while she was planning it, like, hey, you know,

6    Mike's got a lot on his plate, you know, don't mention it to

7    him.  So I was like, oh, okay, you know, he's a busy guy.

8         And then we had the party for my daughter, and I guess she

9    wasn't allowed to do that.  So he was super upset that she

10   stayed up all night baking cakes and cupcakes for my daughter's

11   party.  And he was just upset that we went behind his back and

12   did something without his approval at the bay.

13        And at that time, he was furious.  He was yelling at her,

14   and then he called me and he told me:  Do you want me to come

15   and fucking smash you right now?  While I'm six months

16   pregnant, over the phone.  And he was also -- he was on

17   speaker, so he was also yelling at his brother and -- yeah.

18   That was the time that he did threaten me, once.  And after

19   that, me and Mike didn't talk for a period of months.  In fact,

20   we didn't talk until my son was born and he came to the

21   hospital.

22   Q    And is that typical of how Michael Miske would try to

23   control that particular girlfriend?

24   A    Yeah.

25   Q    Would Michael Miske -- would you characterize him as being

1    able to manipulate family ties to his advantage?

2    A    Definitely.

3    Q    What do you -- can you explain what that means?

4    A    Like make his brother feel like if he doesn't do what he

5    says then he won't talk to him, he's not loyal, maybe he'll

6    take his job away.  You know what I mean?

7         And I feel like John felt like his back was against the

8    wall a lot of the time when his -- when it came to his brother.

9    He's expressed that to me numerous times, where he doesn't want

10   to do something or his brother needs something.  But it's when

11   his brother says do something, it's:  Oh, I have to go.  I have

12   to do this.  I have to go to the bay.  I have to pick up this.

13   I cannot be late.

14   Q    To you, did it appear that John Stancil was trying to stay

15   in Michael Miske's good graces?

16   A    Of course.

17   Q    There are other family members you mentioned.  Kaulana

18   Freitas?

19   A    Yeah.

20   Q    Did you ever see anything similar like that at play

21   between him and Michael Miske?

22   A    Yeah.

23   Q    Can you describe -- describe that?

24   A    I can't really describe, like, a certain time.  I just

25   would see the interaction.  You know, it -- that's just how it

```
 1   was.  Whenever he needed something, the boys would listen.

 2   Q    Are you thinking of anyone else besides John Stancil and

 3   Kaulana Freitas when you say "the boys"?

 4   A    No.

 5   Q    Just those two?

 6   A    Mm-hmm.

 7   Q    Do you know someone named Michael Char?

 8   A    Yes.

 9   Q    Are you aware of a time that Michael Char got robbed near

10   Maunalua Bay?

11   A    Yes, I'm aware.

12   Q    Did you ever talk to Kaulana Freitas about that?

13   A    Not just Kaulana Freitas.  I was talking to both him and

14   John.

15   Q    They were both present during --

16   A    Mm-hmm.

17   Q    -- this?  Okay.

18        And during this conversation where Kaulana Freitas was

19   present, what did you learn?

20   A    That apparently they set Mike Char up to be robbed.

21   Q    Near Maunalua Bay?

22   A    Yes.  And that his brother was upset about it.

23   Q    Michael Miske was upset --

24   A    Yeah.

25   Q    -- about it?
```

```
 1   A    But this did not happen while I was with John.  This is
 2   like a past tense story that they were like talking about when
 3   I was around.
 4   Q    You learned about it after the fact?
 5   A    Yeah.
 6              MR. AKINA:  (Confers off the record.)
 7   BY MR. AKINA:
 8   Q    Did you want to testify today and yesterday?
 9   A    Did I want to?
10   Q    Yes.
11   A    No.
12   Q    Is it fair to say that this is a time period in your life
13   that you've been trying to forget about?
14   A    Definitely.
15              MR. AKINA:  Thank you.
16              No other questions at this time.
17              THE COURT:  Mr. Kennedy.
18                        CROSS-EXAMINATION
19   BY MR. KENNEDY:
20   Q    You met Mike Miske pretty early on in your relationship
21   with John Stancil, correct?
22   A    Correct.
23   Q    And that started in around September of 2017?
24   A    I met John in September, and then we started dating in
25   October.
```

```
1   Q     All right.  And during that time, at the bay near Hawaii

2   Kai, every Friday Mike Miske and others would gather there,

3   correct?

4   A     Correct.

5   Q     And you became part of that, correct?

6   A     Yes.

7   Q     And they would have a cookout, right?

8   A     Yeah.

9   Q     They would ride jet skis, right?

10  A     Correct.

11  Q     In honor of Mike's deceased son, Caleb Miske?

12  A     Correct.

13  Q     They would lay flowers in the water there?

14  A     Yes.

15  Q     In his honor, right?

16  A     Yes.

17  Q     And you've described Mike Miske to the FBI as John

18  Stancil's older brother, right?

19  A     Yes.

20  Q     And a businessman, right?

21  A     He's a businessman, yes.

22  Q     And he had a number of businesses that he was involved

23  with, right?

24  A     Yes.

25  Q     Now, you met John Stancil, as you said, in September and
```

```
 1   began dating him in October 2017?

 2   A    Yes.

 3   Q    And he introduced himself to you, that he owned the

 4   clothing line Leverage, right?

 5   A    Yes.

 6   Q    Okay.  And at that point you had started dating John

 7   Stancil after your former boyfriend and you ended your

 8   relationship, right?

 9   A    No.

10   Q    Sometime after that, I guess?

11   A    What do you mean, like, I ended my former relationship?

12   Q    Well, I understood that you said that your former

13   boyfriend was arrested by the FBI when you talked to the FBI?

14   A    Yes.

15   Q    And that you said that at that point you began --

16   A    Yeah, I was --

17   Q    -- with John Stancil?

18   A    I was talking to them both.

19   Q    Okay.

20   A    Mm-hmm.

21   Q    All right.

22   A    Still as a friend with my ex.  And I was dating John and

23   romantically involved and invested in him.

24   Q    Okay.  Now, you told the jury yesterday about the fact

25   that Mike Miske assisted John Stancil to obtain a job, right?
```

 1   A      Yes.

 2   Q      Working for the movie company, right?

 3   A      Yes.

 4   Q      And that allowed John to have employment, correct?

 5   A      Correct.

 6   Q      And from time to time you said that you reached out to

 7   Mike about relationship issues, right?

 8   A      Yes.

 9   Q      So when John was off doing something, you oftentimes would

10   call Mike, right?

11   A      Yes.  That was later on in the relationship, not early on.

12   Q      And so when John Stancil was off and he wasn't showing up

13   for work or doing other things in the relationship, you would

14   reach out to Mike, right?

15   A      Yes.

16   Q      And then Mike would try to bring him back to, hey, you got

17   to go to the job, you got to be good in your relationship --

18   A      Correct.

19   Q      -- you got to be good with your son, those sorts of

20   things, correct?

21   A      Yes, he was very much like that, yes.

22   Q      And so in that way he was very much like a big brother

23   trying to get John to understand that he's an adult now and he

24   has adult responsibilities, right?

25   A      He definitely was the only person that could keep his

1    brother in line.

2    Q    Okay.  Now, I believe in terms of assistance, the

3    government's asked you some questions, and Mr. Miske's never

4    assisted John with obtaining an attorney, right?

5    A    What is that?

6    Q    Didn't you tell the FBI that Mr. Miske's never assisted

7    John Stancil in --

8    A    Yeah, initially --

9    Q    -- obtaining an attorney?

10   A    Initially, when I was still in the picture, no, he did

11   not.

12   Q    And you told them that he never really assisted him with

13   money, right?

14   A    No, he did not.

15   Q    And that Mr. Miske only lived in his Kailua house, right?

16   A    That I was aware of, yes.

17   Q    Which you had been to a few times, right?

18   A    That Miske lived in his Kailua house?

19   Q    Correct.

20   A    Yes.

21   Q    And that you had been there a few times, right?

22   A    Yes.

23   Q    All right.  And you'd only been to the place at Lumahai

24   once, right?

25   A    No, I've been there like I think a couple of times, yeah.

1    My son's birthday party was there.  And I want to say I've been

2    there before for like a family, like, little get-together.

3    Q    Okay.  And so your son's first birthday party, Mike had it

4    at the house, right?

5    A    Yes.

6    Q    And so that everyone could come, correct?

7    A    Yes.

8    Q    Okay.  Now, the first time you spoke with the FBI was

9    right after Thanksgiving last year, correct?

10   A    I don't recall exactly when.

11   Q    Would it help to pull up a document that might show the

12   date that you spoke to them?

13   A    Okay.

14   Q    All right.

15        MR. KENNEDY:  If we could just pull up 9427-023,

16   which I believe is in the 22nd supplemental, Your Honor, just

17   for the witness.

18        THE COURT:  Go ahead.

19        MR. KENNEDY:  And it should come up on the screen.

20   9427-023, I think, is it?

21   BY MR. KENNEDY:

22   Q    And if we just take a moment and take a look, and then I

23   was just going to ask you about the date.

24   A    12/15.  Yeah, that seems about right.

25   Q    All right.

1          MR. KENNEDY:  We can take that down.

2    BY MR. KENNEDY:

3    Q    So it was just right after Thanksgiving last year on

4    the --

5    A    Yeah.

6    Q    On the 28th that you spoke with them, right?

7    A    Yes.

8    Q    Okay.  And you met with two FBI agents, right?

9    A    Yes.

10   Q    And there were two members of the prosecution team there,

11   correct?

12   A    I believe so, yes.

13   Q    Okay.  And you said -- you were asked some questions about

14   whether you wanted to be here a few moments ago, right?

15   A    Yes.

16   Q    And so this was an opportunity now, many years later, to

17   talk to the prosecution, right?

18   A    An opportunity, no.

19   Q    Well, they asked you to come in, right?

20   A    Yes, because I thought if I came in and I spoke to them I

21   wouldn't have to come on to court for the January 8th that I

22   got on my subpoena.

23   Q    All right.  So you received a subpoena, right?

24   A    Mm-hmm.

25   Q    So you came in to speak with them, right?

```
 1   A      Mm-hmm.

 2   Q      And they asked you a number of questions over a period of

 3   time, right?

 4   A      Correct.

 5   Q      And you answered their questions, right?

 6   A      Yes.

 7   Q      And you answered them completely, right?

 8   A      I answered them truthfully.

 9   Q      Truthfully, right?

10   A      Yes.

11   Q      Didn't leave anything out?

12   A      That I can remember, no.

13   Q      Okay.  And so you told them on that day that you know John

14   Stancil, right?

15   A      Yes.

16   Q      And you regret knowing him every day, right?

17   A      I mean, yeah, pretty much.

18   Q      And so that was your mindset on that day when you spoke

19   with them, right?

20   A      Yes.

21   Q      Okay.  Now, before the trial began you also told them that

22   John Stancil did not tell you that Mike Miske instructed him to

23   conduct the assault at the tattoo shop.  Do you recall that?

24   A      I don't recall that.  But then again, all of these

25   questions and everything, I started to gain back my memory of
```

1    everything that's happened.

2    Q    Well, sure.  So on November of last year Mike Miske did

3    not instruct John Stancil to conduct an assault at the tattoo

4    shop, and that's what you told them then, correct?

5    A    I don't recall.

6    Q    All right.  And today you've told 'em something different,

7    correct?

8            MR. AKINA:  Objection, facts not in evidence.

9            THE COURT:  Sustained.

10   A    I'm pretty sure I told them --

11           THE COURT:  The objection was sustained.  There's no

12   question pending.

13           THE WITNESS:  Oh, okay.

14           MR. KENNEDY:  Let's take a look at 9427-023, just for

15   the witness.  It's also -- and if we move to page 3.

16   BY MR. KENNEDY:

17   Q    And I'd like you to read the first full paragraph that I

18   will blow up for you there as soon as I take away the --

19   A    Stancil did not discuss any other --

20           THE COURT:  When he said "read," ma'am, he meant read

21   to yourself.

22           THE WITNESS:  Oh, to myself.

23           MR. KENNEDY:  I apologize.

24           THE WITNESS:  I'm sorry.

25           MR. KENNEDY:  That was my fault.

```
 1              THE WITNESS:  Okay.  No problem.
 2    BY MR. KENNEDY:
 3    Q    Just read it to yourself.
 4    A    (Complies.)
 5    Q    And when you're finished, just let me know.
 6    A    I'm finished.
 7              MR. KENNEDY:  Okay.  Let me take that down.
 8    BY MR. KENNEDY:
 9    Q    So you told them on that day that John Stancil did not
10    tell you that Mike Miske had instructed him to conduct the
11    assault at the tattoo shop, correct?
12              MR. AKINA:  Objection, mischaracterizing the context
13    of the report.
14              THE COURT:  Overruled.  Go ahead.
15    A    So --
16    BY MR. KENNEDY:
17    Q    The question is, yes or no, you told them on November 28th
18    that John Stancil did not tell you that Mike Miske had
19    instructed him to conduct the assault --
20    A    I don't recall saying that.
21    Q    -- at the tattoo shop?
22    A    I recall telling them what I just told you today.
23    Q    All right.
24    A    That there was the text message that I found.
25    Q    Oh, I understand that.  And the text message was "Don't
```

1    sleep on it," right?  That was it?

2    A    Mm-hmm.

3    Q    Okay.

4         So now you simply just don't recall it, correct?

5    A    On the November meeting?

6    Q    Yes.

7    A    Yes.

8    Q    So you used your credit card for a few days at the three

9    Marriott hotels that you testified about, correct?

10   A    Correct.

11   Q    All right.  And I believe also you told the FBI that a few

12   days before John Stancil was arrested you prayed that he would

13   be taken out of your life, right?

14   A    I did.

15             MR. KENNEDY:  I have nothing further.

16             THE COURT:  Mr. Akina, redirect.

17                      REDIRECT EXAMINATION

18   BY MR. AKINA:

19   Q    At the time that you were aware of that text message from

20   Michael Miske to John Stancil, saying "Don't sleep on it," fair

21   to say John Stancil was stressed out around that time period?

22   A    Yeah.

23   Q    And at that point in time, this is before anything

24   happened at the tattoo shop, right?

25   A    Yeah.

1    Q    And at that point in time, around the time of the text

2    message, did John Stancil mention to you that Michael Miske was

3    telling him to do an assault?

4    A    Not he would -- he just told me that he wants -- always

5    wants him to do some stupid shit that he doesn't really want to

6    do.

7    Q    Right --

8    A    And I said:  why do you do it?  And he said, you know:  He

9    makes me feel like -- like I owe him.

10   Q    So at that point in time, at the time of the text message,

11   you weren't aware of anything --

12   A    No.

13   Q    -- about an assault?

14        It was only after the fact --

15   A    After.

16   Q    -- when John Stancil was staying at Michael Miske's place?

17   A    Yes.

18             MR. AKINA:  No other questions.  Thank you.

19             THE COURT:  Mr. Kennedy, anything else?

20                       RECROSS-EXAMINATION

21   BY MR. KENNEDY:

22   Q    Stupid things like showing up for work and taking his

23   responsibility as an adult, correct?

24             MR. AKINA:  Objection to the form of the question.

25   Outside the scope.

1    A    I don't understand what you're saying.

2         THE COURT:  Overruled.  Go ahead.

3    BY MR. KENNEDY:

4    Q    You said that John Stancil said his brother was always

5    asking him to do stupid things, right?

6    A    Correct.

7    Q    And you would call Mr. Miske when he was doing those

8    stupid things, and as a big brother he'd get him back in line,

9    correct?

10   A    Yeah.  He was doing -- I think it was different things

11   that he was referring to, but, yes.

12   Q    With respect to the -- were you aware that Andi was also

13   taking care of the granddaughter at that time --

14        MR. AKINA:  Objection, outside the scope.

15   Q    -- when he stayed out all night?

16        THE COURT:  Sustained.

17        THE WITNESS:  Was I aware of what?

18        THE COURT:  The objection was sustained.

19        MR. KENNEDY:  It was sustained.  So nothing further,

20   Your Honor.

21        THE COURT:  Ms. Chang, you may step down.  Thank you.

22        THE WITNESS:  Thank you.  Do I go out --

23        THE COURT:  Yes.  Go out the way you came in.

24                                      (Witness excused.)
          (End of partial transcript.)
25                      * * * * *

1                     COURT REPORTER CERTIFICATE

2              I, Ann B. Matsumoto, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5     complete, true, and correct transcript of the stenographically

6     recorded proceedings held in the above-entitled matter and that

7     the transcript page format is in conformance with the

8     regulations of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, June 22, 2024.

10

11

12
                          _/s/ Ann B. Matsumoto_____
13                        ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25