```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
 5              Plaintiff,          )  Honolulu, Hawaii
                                    )
 6        vs.                       )  March 12, 2024
                                    )
 7   MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 36
                                    )
 8              Defendant.          )  (TESTIMONY OF GOVERNMENT'S
     _____)  WITNESS ALFREDO CABAEL,
 9                                     JUNIOR)

10

11                PARTIAL TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DERRICK K. WATSON
12           CHIEF UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Government:       MARK A. INCIONG, AUSA
                               MICHAEL DAVID NAMMAR, AUSA
15                             WILLIAM KEAUPUNI AKINA, AUSA
                               Office of the United States Attorney
16                             Prince Kuhio Federal Building
                               300 Ala Moana Boulevard, Suite 6100
17                             Honolulu, Hawaii 96850

18   For the Defendant:        LYNN E. PANAGAKOS, ESQ.
                               841 Bishop Street, Suite 2201
19                             Honolulu, Hawaii 96813

20                             MICHAEL JEROME KENNEDY, ESQ.
                               Law Offices of Michael Jerome
21                             Kennedy, PLLC
                               333 Flint Street
22                             Reno, Nevada 89501

23   Official Court           ANN B. MATSUMOTO, RPR
     Reporter:                United States District Court
24                            300 Ala Moana Boulevard, Room C-338
                              Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

```
 1                   I N D E X

 2   WITNESS:                                 PAGE NO.

 3   FOR THE GOVERNMENT:

 4   ALFREDO CABAEL, JUNIOR

 5     DIRECT EXAMINATION BY MR. NAMMAR            3

 6

 7                   E X H I B I T S

 8   Exhibits 9-50 and 9-51 received in           41
     evidence
 9
     Exhibit 1-60 received in evidence            43
10
     Exhibit 1-656 received in evidence           55
11
     Exhibit 9-310 received in evidence           57
12
     Exhibit 9-71 received in evidence            59
13
     Exhibit 9-73 received in evidence            63
14
     Exhibits 9-82 and 9-85 received in           70
15   evidence

16   Exhibit 9-57 received in evidence            73

17   Exhibits 9-58, 9-59, and 9-61               87
     received in evidence
18
     Exhibit 9-63 received in evidence            89
19
     Exhibit 9-9 received in evidence             91
20
     Exhibits 9-21, 9-23, and 9-33               93
21   received in evidence

22   Exhibits 9-524 and 9-527 received           97
     in evidence
23
     Exhibit 9-135 received in evidence          103
24
     Exhibit 9-136 received in evidence          105
25
     Exhibit 9-134 received in evidence          107
```

```
 1   TUESDAY, MARCH 12, 2024                    10:35 A.M. O'CLOCK
 2                              *  *  *  *  *
 3               (Start of partial transcript:)
 4               (Open court in the presence of the jury.)
 5               THE COURT:  All right.  Back from our morning break.
 6               Mr. Nammar, the government may call its next witness.
 7               MR. NAMMAR:  The United States calls Alfredo Cabael.
 8               COURTROOM MANAGER:  Please raise your right hand.
 9               ALFREDO CABAEL, JUNIOR, GOVERNMENT'S WITNESS, SWORN.
10               THE WITNESS:  I do.
11               COURTROOM MANAGER:  Thank you.  You may be seated.
12               Please state your full name, spelling your last name
13   for the record.
14               THE WITNESS:  My name is Alfredo Cabael, Junior.
15   Last name is spelled C-A-B-A-E-L.
16                          DIRECT EXAMINATION
17   BY MR. NAMMAR:
18   Q    Good morning, Mr. Cabael.  Can you tell the jury how old
19   you are?
20   A    I am 51 years old.
21   Q    Can you pull the mic just a little closer to you when you
22   talk?
23   A    I am 51 years old.
24   Q    And where, what part of the country do you currently live
25   in?
```

1    A    I currently live in Salt Lake City, Utah.

2    Q    What are you doing for work right now in Salt Lake City,

3    Utah?

4    A    I work for FedEx Ground, and I work for a grocery store

5    chain there in Utah.

6    Q    What are you doing for the grocery store?

7    A    I work for a freight crew, overnight freight crew.

8    Q    Do you help unload freight in that job?

9    A    I help unload freight and stock shelves in the grocery

10   store.

11   Q    How many nights a week is that?

12   A    Two nights a week.

13   Q    You said you also work for FedEx?

14   A    Correct.  I work for FedEx Ground.

15   Q    And what's your title there?

16   A    I'm a area manager for FedEx Ground.

17   Q    What do you do as the area manager?

18   A    I manage other managers in FedEx Ground to make sure -- to

19   ensure that they're doing their job.

20   Q    How long have you been working for FedEx?

21   A    I've been working for FedEx from 2019.  So say roughly

22   five years almost.

23   Q    Did you work your way up to area manager?

24   A    I did.

25   Q    How many promotions have you had during that time?

1    A     In the last four and a half years I'd say maybe about five

2    promotions.

3    Q     How long have you lived in Utah?

4    A     I moved to Utah in August of 2015.  So maybe nine years,

5    going nine years right now.

6    Q     What other jobs have you had in Utah since August of 2015?

7    A     I'd say four jobs in total.

8    Q     What were those?

9    A     When I first got to Utah, I landed a position for a

10   property management company, Utah Nonprofit Housing.

11   Q     Were you doing -- what kind of work were you doing for the

12   non-profit?

13   A     I started off as being an on-call person.  After meeting

14   me when I first got a unit there, they kind of felt some trust

15   with me to where they offered me a live-for-free place if I

16   stay on call from 7:00 p.m. to 7:00 a.m.  And then from there,

17   they kind of took me in to manage some of the properties there

18   in Utah.

19   Q     What other jobs have you had in Utah besides FedEx and the

20   stocking job?

21   A     At the same time I was at Utah Nonprofit Housing job, I

22   also worked for Salt Lake County Parks and Rec.  I coached

23   baseball, soccer, flag football for -- for youth and also was a

24   league custodian for that, that county job there.

25   Q     Did you also work briefly selling fire protection

1    products?

2    A    That was a brief, maybe about a three-, four-month thing

3    in between the Salt Lake County and FedEx.

4    Q    Prior to living in Utah, what did you do for work?

5    A    I worked for Kama'aina Termite and Pest Control.

6    Q    How many total years did you work there?

7    A    I'd say maybe between 12 -- somewheres between 12 and 13

8    years.

9    Q    Where did you grow up?

10   A    I grew up in a small town, the North Shore, Kahuku for

11   most of my life, and then Laie prior to moving to Honolulu.

12   Q    Around how old were you when you moved to Honolulu?

13   A    Jeez, I think I was maybe 32.

14   Q    Okay.  Would you describe yourself as a model student at

15   Kahuku and Laie?

16   A    I wouldn't say I was a model student in their eyes, but I

17   went to school.

18   Q    Okay.

19   A    But my dad just believe I -- work was more important than

20   education.

21   Q    What did your dad do for work?

22   A    He was the owner of a electrical company.  And being the

23   oldest out of nine, he had me working with his electrical

24   company from a very young age.

25   Q    How old were you when you started working?

```
 1   A    I started working with him when I was nine, but went

 2   full-time with him when I was 12.  So school was out of the

 3   picture at that point.

 4   Q    Did your work include driving as a 12-year-old?

 5   A    That did include driving from Kahuku to Ala Moana

 6   regularly with my dad's -- with my dad's electrical company at

 7   a very young age, around 10 to 12.

 8   Q    Did you graduate from high school?

 9   A    No, I didn't.  I got my GED.

10   Q    In Laie, were you making some bad choices in middle school

11   and high school?

12   A    I did.  I hung around with probably not the best choice of

13   people growing up.

14   Q    And were you influenced by a crowd of boys that were older

15   than you?

16   A    I -- I tend to hang around with people that were older

17   than me.

18   Q    Okay.  And were you committing some minor crime during

19   that period?

20   A    I did.

21   Q    When you were 16, did you discover a drug?

22   A    I did.

23   Q    What drug?

24   A    Crystal meth.

25   Q    And what happened when you discovered crystal meth at 16?
```

1  A    It started off small and very quickly it became a -- a

2  habit I couldn't control.  I used it on a daily basis, probably

3  more than most would.

4  Q    Were you able to hold down a job when you were using

5  crystal meth?

6  A    I did.  I held down a job for a long period of time while

7  using crystal meth.

8  Q    What were you doing around that time when you were using

9  crystal meth around the age of 16 for work?

10  A    I would just work off and on, like I said, my dad's thing.

11  Soon after that, I started working for a property management

12  company out in Laie.  It's a church-owned company out there in

13  Laie.

14  Q    What were you doing for the property management company?

15  A    First, I started cutting grass.  Then I started taking

16  care of properties.  Doing major repairs, right?  And then I

17  became a licensed wastewater operator there.

18  Q    Okay.  Did you eventually work for a seafood company?

19  A    I did.  I worked for a seafood company out at Kahuku

20  Point.  We grew ogo, seaweed.

21  Q    And were you clean at that point when you worked for the

22  seafood company?

23  A    For a short period of time.

24  Q    Okay.  Did things happen when a friend of yours died?

25  A    A very close friend of mine passed away while at that job.

1    And I lost it, went back to what I did before that.

2    Q    Which was what?

3    A    Crystal meth.

4    Q    Did you seek help for your addiction at that time?

5    A    I did.  At that time it would have been my second --

6    second drug treatment program.  I went -- I went for help, and

7    that drug treatment program turned me down, basically turned me

8    down.  Because that was the same one I went to, the one I

9    trusted.  And I pled with them.  I needed help.  'Cause by that

10   time -- by that time, the second time around with crystal meth,

11   it was worse than the first.  And I seeked help and I begged

12   them for help, and they put me in detox for about two weeks and

13   they gave me the help I needed.

14   Q    Where was that drug treatment?

15   A    It was up in -- up on the pali.  There was a Salvation

16   Army kind of run the operation up there.

17   Q    And did it work for you?

18   A    It did.  It did work for me, yes.

19   Q    Were you eventually discharged from Salvation Army on the

20   pali?

21   A    I was discharged, and I was -- you know, since I was there

22   on my own -- my own will, I had a choice of going back to Laie,

23   where I probably would run to drugs again, or I'd go to a clean

24   and sober house.  But I chose the clean and sober house.

25   Q    Where was the clean and sober house?

1   A    Clean and sober house was out in Kailua, Enchanted Lakes
2   area.
3   Q    And when you were at the clean and sober house, did you
4   look for -- seek out work?
5   A    I did.  There was a group of men that I lived with that
6   worked for a security company for movie productions and, I
7   guess, concerts and all that.
8   Q    Did you hear about a job opportunity with a person named
9   Mike?
10  A    Yes, I did.  While working on the security job on a movie
11  set I was approached by someone that I lived with.  He was kind
12  of like the head of the house.  And he said that there was an
13  opportunity with Michael Miske detailing cars.
14  Q    Did you know Michael Miske at that time?
15  A    I did not.
16  Q    Was this around 2003?
17  A    Correct.  Around 2002, 2003, yes.
18  Q    And did you soon thereafter meet with Mr. Miske?
19  A    I did.
20  Q    Where did you meet with him?
21  A    It was for a brief discussion, I think on a movie set.
22  Just kind of told me what it'd be, what would -- I would be
23  doing for him.
24  Q    Why was Michael Miske on a movie set?
25  A    At that time he worked for the movies.

1    Q    Do you know what he did for the movies?

2    A    I think he worked for a department called transportation.

3    Q    Do you know what transportation did?

4    A    They transported crew and actors and -- or whoever was

5    involved with the movies to where they needed to be.

6    Q    So you talked to Mr. Miske about the detailing position?

7    A    I did.

8    Q    Were you offered the job?

9    A    I was.

10   Q    And where did you report to work?

11   A    I reported to work on Queen Street, where the termite

12   company was based out of.  It's a warehouse over there.

13   Q    And what kind of work did you do initially for Mr. Miske?

14   A    It was detailing cars that came off car lots.  I believe

15   the cars came off of boats before they went to car lots, and we

16   had to remove plastic, protective coverings on the car and get

17   them detailed to be in the car lot.

18   Q    How long did you do detailing work for Mr. Miske?

19   A    I'd say maybe six to -- six months to maybe a year or

20   somewheres around there.

21   Q    Did you work your way up to different jobs?

22   A    I did.  Michael needed help in the pest termite side, so I

23   started working with a ground termite technician.

24   Q    Can you tell the jury what ground termite technician, what

25   that means?

1   A     Basically what we do is we pump chemicals into the ground

2   to prevent ground termites from eating up the structure.  And

3   there's different things that we do for that.  We either drill

4   concrete that is along the side of the house, and we put the

5   chemical into these holes and we patch them.  Or if these

6   houses stood on posts, we would crawl under the crawl space and

7   trench around these post blocks and apply chemical there.

8   Q     Is that different than fumigation?

9   A     It is different than fumigation.

10  Q     Tell the jury why it's different.

11  A     Ground termite treatment, we use -- we apply a liquid

12  chemical.  The fumigation, we apply a gas, a fumigant.

13  Q     And in a fumigation, do you usually cover the house?

14  A     Fumigations, we usually cover the house.  We can chamber

15  fume.  Like we have a trailer that we'll fumigate things in,

16  like pieces of furniture or whatever.  But most times it will

17  be covering of a house with a tent, tarps.

18  Q     So you started out doing ground termite help?

19  A     I started off with Michael Miske doing ground termite.

20  Q     Who is training you?

21  A     He had a gentleman named Raymond Kaulana who was the

22  ground technician for that company.

23  Q     And what did Raymond teach you to do?

24  A     He taught me what it -- what it took to do a ground

25  termite treatment, and that's the patching and drilling of

```
 1    holes, patching the holes and pumping the equipment -- the
 2    chemical, applying the chemical.
 3    Q    How long did you help Raymond?
 4    A    I'd say probably maybe six months.  Maybe longer.
 5    Q    After that six months or a little longer -- well, let me
 6    back up.
 7         With Raymond were you only doing -- helping him with
 8    ground termite treatment or were you doing other things at the
 9    end of the day?
10    A    Well, we -- we would do ground termite treatments, and
11    there's sometimes you might do inspections on homes, termite
12    inspections.  And then there's times we will go and help
13    fumigators uncover houses or cover the houses, work with
14    fumigation teams over there.
15    Q    Did you relapse around this time period?
16    A    I did.  My early stage with Kama'aina, my then wife wanted
17    a divorce.  And in the process of that, I kind of fell apart,
18    and, of course, I went right back to crystal meth.
19    Q    And what happened during your relapse?  Did you talk to
20    Michael Miske about it?
21    A    During that relapse I -- I left the clean -- 'cause all --
22    all this time I was still living at the clean and sober house,
23    right?  And when I relapsed, I couldn't face the people at the
24    clean and sober house because of my relapse.
25         So I decided to leave that clean and sober house.  I was
```

1   living in my car for a period of time.  I was homeless but

2   still working with Michael Miske.

3   Q    And did he eventually give you an ultimatum related to

4   drugs?

5   A    First, Michael invited me to live with him, and I did live

6   with him.  And during the time -- time that I was living with

7   him, I continued to do drugs.  And he -- and he noticed that.

8        And when I was living with -- living with Michael, he --

9   he gave me an ultimatum, yes.

10  Q    And were you able to kick your habit with Mr. Miske's

11  help?

12  A    I did.  I went cold turkey.  It wasn't easy but I -- I

13  eventually got clean cold turkey after our discussion with

14  Michael.

15  Q    And then were you able to get back on your feet, so to

16  speak?

17  A    Yes.

18  Q    And go back to work?

19  A    Correct.  I was still working.  But this time I was

20  working sober.

21  Q    And were you able to find your own place to live?

22  A    I did.

23  Q    Did you feel indebted to Mr. Miske for his help to you on

24  that?

25  A    I did.

1   Q    So you said you were helping Raymond out with ground

2   termite treatment.  Did you eventually start doing that on your

3   own?

4   A    I did.  They -- they trusted me on doing the ground

5   termite treatment alone while Michael Mis -- not Michael, but

6   Raymond Kaulana went out to do more termite inspections.

7   Q    Approximately how long was that that you started doing the

8   ground termite treatment on your own that you had been working

9   at Kama'aina?

10  A    I'd say little over six months, close to a year that I was

11  on my own.

12  Q    Okay.  Did you have a license to do that?

13  A    No, I did not.

14  Q    Did you ever have a license to apply ground termite

15  products?

16  A    No, I did not.

17  Q    What does that involve, applying ground termite?

18  A    We create this mixture, this slurry of chemical in a tank,

19  usually a hundred gallon tank, depending on how big the -- the

20  structure was and how much chemical they needed for that

21  structure.

22       And then we would either drill holes in concrete slabs

23  surrounding the structure or would trench around the structure,

24  depending on where the soil was, where the -- where the

25  structure sat.

```
 1          And then we would apply the chemical.  We will cover up
 2     that chemical either with concrete patches or with the soil.
 3     Q     Did you feel you were qualified to do that work on your
 4     own at that point?
 5     A     Well, I -- I felt like I -- I knew how to do it.  I was
 6     doing it the right way.
 7     Q     Okay.  Were you having to study up while you were doing
 8     those applications to see if you were doing it right?
 9     A     Well, there's -- there has been times when I was
10     approached with certain situations, certain houses, you know,
11     that -- that I needed advice on.  So, of course, I'd ask
12     questions, ask questions about the kind of chemicals and -- and
13     what to tell customers, because they had questions too.  And I
14     didn't want to give them the wrong answers, so I would inquire.
15     Q     Did you work your way up from the ground termite
16     applicator to a different job?
17     A     I did.  I started somewhat being like a office manager
18     kind of deal, kind of managing the fumigation team and the
19     ground termite treatment team.
20     Q     And what did you do in that role as the office manager?
21     A     I would make sure that the ground termite schedule was set
22     up to where they could do their jobs, you know, we had enough
23     chemical for the job; and that went for the same with the
24     fumigation crew, making sure we had staffing and -- and the
25     workers available for the jobs coming up for the week.
```

1   Q    What does a fumigation crew mean?

2   A    Excuse me?

3   Q    What's a fumigation crew?

4   A    Fumigation crew are the crews that go out and cover these

5   structures with these tents and then apply the liquid or the

6   gas, the fumigant.

7   Q    What's the fumigant they apply called?

8   A    Vikane.

9   Q    When you started, how many fumigation crews did Kama'aina

10  have?

11  A    I'd say we probably had one or two.

12  Q    And did that grow over time?

13  A    It did.  Over some years they became to be three, four,

14  then five.

15  Q    Were there -- when you left, how many fumigation crews

16  were there?

17  A    We had four working crews, and we also had another truck.

18  So five trucks.

19  Q    Were there -- in your 12 or 13 years, were there many

20  times where there were issues with lack of fumigators who were

21  certified?

22  A    Yes.

23  Q    Tell us about that.

24  A    Well, you have -- you have your certified fumigators who

25  apply the chemical, the -- the Vikane, the fumigant.  And then

1   you also have the CDL-certified fumigators who are -- who are

2   authorized to drive the vehicles with the fumigant, with the

3   hazardous gas on it.

4        To find CDL-certified fumigators was pretty difficult and

5   also fumigant applicators too, licensed ones.

6   Q    So if you had five crews, were there many times where you

7   only had one or two certified CDL applicators?

8   A    Correct.  One or two, yes.

9   Q    Okay.  And would you have a problem with keeping some of

10  those employees at the company?

11  A    Well, it was a challenge to keep these employees because

12  competition always wants these CDL-certified applicators

13  because it's not easy to come by these guys.

14  Q    Was there a lot of switching around from one company to

15  the next?

16  A    There was, yes.

17  Q    Was there a time when out of your four or five crews you

18  only had one certified crew?

19  A    Yes.

20  Q    Department of Ag, were they the regulators who would

21  regulate fumigations?

22  A    Yes, they are.

23  Q    Would you get -- in the regular practice, would you get

24  advance warning if they were going to show up to --

25  A    We would.  Yes.

1   Q    And when the regulators would show up, would you regularly

2   interact with the regulators, the Department of Ag folks?

3   A    I would, yes.

4   Q    And was it your regular practice to conceal the fact that

5   you had unlicensed crews running around town?

6   A    I did.  Yes.

7   Q    What would you do to conceal that fact from the

8   regulators?

9   A    So knowing that they were coming by to pay us a visit, we

10  would make their schedule of fumigations for these trucks that

11  was CDL-certified applicants on these trucks.  And the other

12  trucks who didn't have them, we would not give them the

13  schedule.

14  Q    So you'd give them the schedule of the crews that

15  looked -- were on the up and up and properly licensed?

16  A    Correct.

17  Q    But on the -- for the fumigation crews that weren't, you

18  would not provide them with that information on purpose?

19  A    Yes.

20  Q    Were there ever instances where you would have to hide

21  Vikane that was being transported in some of the Kama'aina's

22  trucks?

23  A    Yes.  The trucks that we didn't have CDL-certified

24  applicators, we would hide these cylinders of Vikane under

25  fumigation tents in the back of the truck so nobody knows.  So

1    they'll think that we're not carrying any chemical on that

2    truck.

3    Q    Was that a regular practice at Kama'aina when you were

4    there?

5    A    It was.

6    Q    When you say CDL, what does that stand for?

7    A    A commercial licensed driver.

8    Q    Okay.  You have to be a certified applicator for the

9    chemicals, but you also need to have a certified driver's

10   license to drive the chemicals?

11   A    Yes, because it's haz -- it's hazard, the chemicals, yeah,

12   on the highway.

13   Q    When you were at Kama'aina, Vikane, you mentioned that

14   product.  That was the gas that was used in fumigations?

15   A    Correct.

16   Q    Was that stored properly per the label when you were at

17   Kama'aina?

18   A    Not always.

19   Q    Where was it stored improperly?

20   A    We would store this chemical in the warehouse under the

21   stairs with no ventilation.

22   Q    And when regulators would show up on one of their

23   announced visits, what, if anything, would you do with the

24   Vikane?

25   A    I will move them out back and put them under a chain,

1    secure them against the wall out back where we had open air.

2    Q    Why would you move them out there?

3    A    Because if there's any release of gas or any accidental

4    release of gas, it would be out in the open air and not in the

5    warehouse.

6    Q    And that's consistent with what the label requires?

7    A    Yes.

8    Q    And you couldn't leave them in the warehouse because that

9    wasn't consistent with what the label requires?

10   A    Yes.

11   Q    Did you move them outside based on the instructions of

12   anyone?

13   A    Yes, I did.

14   Q    Who gave you those instructions?

15   A    Michael Miske.

16         MR. NAMMAR:  Your Honor, can we publish 1-776, which

17   is from the original list and I believe in evidence?

18         THE COURT:  Yes.  Go ahead.

19   BY MR. NAMMAR:

20   Q    Mr. Cabael, 1-776, the jury can see it.

21        What are we looking at here?

22   A    We're looking at the front of the warehouse.

23   Q    Okay.

24   A    Kama'aina Termite's warehouse.

25   Q    Did you have an office in this warehouse?

```
 1   A     I did.

 2   Q     Can you circle that with the touch screen?

 3   A     (Complies.)

 4   Q     And so for the record, you've circled the bottom right?

 5   A     Correct.

 6   Q     Did Mr. Miske, did he have an office?

 7   A     He did.

 8   Q     Where was that?

 9   A     (Indicates.)

10         MR. NAMMAR:  For the record, you've circled the

11   window in the bottom left.

12         Can we publish, Your Honor, 1-803?

13         THE COURT:  Go ahead.

14         MR. NAMMAR:  Sorry, can we publish 1-833?

15         THE COURT:  Yes.

16   BY MR. NAMMAR:

17   Q     Is this a diagram of the office?

18   A     Yes.

19   Q     Which office was yours, this diagram?

20   A     Office C.

21   Q     And which office was Mr. Miske's?

22   A     Office A.

23   Q     Where was the Vikane stored not pursuant to the label when

24   you were at Kama'aina?

25   A     Pest -- Pest Storage E, right under the stairs, on the
```

1   side where Office C is.

2   Q    Is it right here (indicates)?

3   A    Yes.

4   Q    Was that a closet or was it an open area?

5   A    That was a closet under the stairs.

6        MR. NAMMAR:  Can we publish 1-786, Your Honor?

7        THE COURT:  Go ahead.

8   BY MR. NAMMAR:

9   Q    What is shown here, Mr. Cabael?

10  A    That's the area under the stairs that you just circled

11  earlier, where we store Vikane.

12  Q    Okay.  And this is the area that you would move it out,

13  correct?

14  A    Yes.

15  Q    When the regulators showed up?

16  A    Correct.

17  Q    There's a fan that's in the top there, that I've just

18  circled.  Was that fan there when you worked at Kama'aina?

19  A    No, it was not.

20       MR. NAMMAR:  Can we show 1-787?

21       Your Honor, can we publish that one?

22       THE COURT:  Yes.  Go ahead.

23  BY MR. NAMMAR:

24  Q    Do you recognize this, Mr. Cabael?

25  A    Yes.

1   Q    What is this?

2   A    That is the area under the stairs.

3   Q    Okay.  And is this the only ventilation that it had when

4   you worked here, that little vent --

5   A    Yeah.

6   Q    -- (inaudible).

7   A    I can't recall if that's the vent, but it was similar to

8   that, yes.

9   Q    Okay.  This particular tank, it has no cap on it.  Do you

10  see that?

11  A    Yes.

12  Q    Is that pursuant to label?

13  A    No.

14  Q    Why not?

15  A    It's supposed to be covered to protect.  If it falls,

16  it -- that valve is protected.

17  Q    This warehouse, would you ever have an issue with water

18  getting into the warehouse?

19  A    Yes.

20  Q    Tell us about that.

21  A    Well, the -- the back half of the warehouse, there was

22  a -- when I was there, there was an opening there with just

23  kind of like a -- a wire that would block it.  And rain will

24  get in through -- through to that area with the wind blowing

25  in.  And then immediately under the stairs, like with that same

```
 1    square area where the fan is and stuff, there was just like a
 2    vent there.  So rain would get into there too.
 3    Q    Okay.
 4    A    And certain areas of that wall.
 5              MR. NAMMAR:  Your Honor, can we publish 1-785?
 6              THE COURT:  Go ahead.
 7    BY MR. NAMMAR:
 8    Q    Do you recognize this room that's shown in 1-785?
 9    A    I think that might be that storage area near my office.
10    Q    Okay.  Did that area exist at that time, when you were
11    there?
12    A    When I was there, that was a plumbing storage area.
13    Q    Okay.  So this area wasn't used for chemicals?
14    A    No.
15    Q    Would you ever see water seep into this particular area?
16    A    I can't -- I can't say I did.
17    Q    Okay.
18              MR. NAMMAR:  If we can go back to 1-786.
19    BY MR. NAMMAR:
20    Q    What chemical is stored in Room E?
21    A    Vikane.
22    Q    And do you see that name anywhere on the label?
23    A    To the cylinder right here (indicates).
24              MR. NAMMAR:  Okay.  We can take that down.
25    BY MR. NAMMAR:
```

```
 1   Q    Was there ever a time, Mr. Cabael, that you did anything
 2   with Sandwich Isle's tents?
 3   A    Yes.
 4   Q    What did you do to Sandwich Isle's tents?
 5   A    I sliced their tents.
 6   Q    Why did you do that?
 7   A    So they would fail in fumigation.
 8   Q    And what kind of slice did you make?
 9   A    Slices in the shape of S.
10   Q    Did anyone tell you to do that?
11   A    Yes, Michael Miske.
12   Q    Were you commonly driving around town around this time
13   period?
14   A    Yes, I have.
15   Q    And were you --
16   A    I was.
17   Q    Were you trying to recruit other individuals in the pest
18   control business?
19   A    I did.
20   Q    And as a result of that, did you sometimes talk to
21   Sandwich Isle's folks?
22   A    Yes, I did.
23   Q    And did you hear on some of those occasions that some of
24   the employees would say that Sandwich Isles was talking poorly
25   about Kama'aina Termite and Pest Control?
```

1  A    I can't recall that right now.

2  Q    Okay.  Why did Mr. Miske ask you to slash Sandwich Isle's

3  tents?

4           MR. KENNEDY:  Objection.  It's speculation, Your

5  Honor.

6           THE COURT:  Sustained.

7  BY MR. NAMMAR:

8  Q    Did you talk with Mr. Miske about Sandwich Isle?

9  A    I did.

10  Q    What did he tell you?

11  A    He told me about an incident when Botha came by his

12  office.

13  Q    And what did he tell you about that incident?

14  A    That Mr. Botha came by and threatened him.

15  Q    Okay.  And then is it after that that you had a

16  conversation with Mr. Miske about Sandwich Isle?

17  A    Yes.

18  Q    Okay.  And is it after that that Mr. Miske asked you to

19  slash one of their tents?

20  A    I believe it is, yes.

21  Q    How could you pick out which tent to slash?

22  A    Sandwich Isle operated with just a solid blue tent.

23  Q    Okay.  So was each pest -- did each pest control company

24  have its own unique coloring?

25  A    They did.

1    Q    And you could identify Sandwich Isle's as -- as a blue

2    tent?

3    A    Yes.

4    Q    Did you feel like this would put you in a better position

5    with Mr. Miske?

6    A    Yes.

7    Q    Tell us about that.

8    A    Well, from the start of the relationship with Miske, he

9    helped me out a great deal with my personal life.  And I felt

10   at some point I -- you know, somehow I owed him.  And over

11   time, with that, I -- I kind of felt like by doing things I --

12   I would gain his trust and just have a stronger relationship

13   with him.

14   Q    When you slashed the tent, was that early on in your time

15   with Kama'aina Termite and Pest Control?

16   A    Yes.

17   Q    Where was the -- where was the tent that you slashed?

18   What part of the island?

19   A    I believe it was in the Mililani area.

20   Q    And you said you did it with an S.  Why did you use an S,

21   S form to slash it?

22   A    Because Michael Miske told me it would be harder to

23   repair.

24   Q    Had you repaired -- had you re-sewed tents before?

25   A    I did.  Yes.

1  Q    And did you think that an S would be harder to repair?

2  A    Yes.

3  Q    Why did you think that?

4  A    Because the equipment they use to sew a tent isn't -- you

5  can't just move the equipment.  You have to move the tent

6  through the equipment.  And to move the tent in a straight line

7  rather than an S is much more easier to repair.

8  Q    What did you use to slash the Sandwich Isle's tent?

9  A    A razor blade.

10  Q    How is it you recall remembering using a razor blade?

11  A    Because it kept falling out of my hand.  It was a tiny

12  razor blade, a one-sided razor blade.

13  Q    When you slashed the tent, was the house being fumigated

14  at the time?

15  A    It was.

16  Q    So to your knowledge, it had fumigant in it?

17  A    It did.

18  Q    After you slashed the tent, did you report what you did

19  back to Miske after the fact?

20  A    I can't recall at what point I did, but, yes, I did.

21  Q    Do you recall what his reaction was when you told him you

22  had slashed the Sandwich Isle's tent?

23  A    Just laughed.

24  Q    He laughed?

25  A    Yes.

1   Q    Do you recall Mr. Miske talking to you about a trip to
2   China?
3   A    I do.
4   Q    Was this after you had been working at Kama'aina for a
5   period of time?
6   A    Yes.
7   Q    Is this in around 2008 time frame?
8   A    I believe so, yes.
9   Q    Okay.  What did Mr. Miske -- well, what was the state of
10  Kama'aina at that time, 2008?
11  A    Kama'aina had grown from being a one-, two-truck operation
12  to I believe at that time we had bought our fourth truck by
13  then.
14  Q    So business was going well?
15  A    Business was going very well.
16  Q    Okay.  And what did Mr. Miske tell you about his trip to
17  China?
18  A    I didn't know much about the trip to China until after he
19  got back.  He told me that he went to China to I guess broker a
20  deal for fireworks.
21  Q    To broker a deal with fireworks?
22  A    Yes.
23  Q    Did he tell you anything about taking money with him?
24  A    He did talk to me about taking a large sum of money.  I
25  can't recall exactly how much it was.

1    Q    Did he tell you anything about being blindfolded?

2    A    He did.

3    Q    What did he tell you?

4    A    That when they took him up to the location to meet these

5    people he was blindfolded.

6    Q    Did he say who he was meeting?

7    A    No, he did not.

8    Q    But he told you the purpose of the trip was for fireworks?

9    A    Yes.

10   Q    Who did he go with?  Did he tell you that?

11   A    He went with Auntie Jeanie, another gentleman named

12   Michael, and Denny.

13   Q    Okay.  Who is Denny?

14   A    Denny is his brother-in-law or cousin-in-law.

15   Q    Do you know his last name?

16   A    Denny Freitas.

17   Q    What does Denny do for work?

18   A    Denny's a plumber.

19   Q    And Auntie Jeanie, what does she do for work?

20   A    I believe she was in real estate.  I'm not sure if she was

21   a broker, but she was in real estate.

22   Q    Michael -- you said he went with another person?

23   A    Yes.  Michael Torres, I think.

24   Q    What did Michael Torres do?

25   A    He -- he was a photographer.

1  Q    Was he in any way related to Jeanie?

2  A    I believe that was his mom.

3  Q    Okay.  So after Miske came -- comes back from China, he

4  tells you about this trip.  He says the perfect -- purpose is

5  for fireworks?

6  A    Correct.

7  Q    Did you have to at some point meet him at a bunker?

8  A    I did.

9  Q    Where was that bunker located?

10  A    It is in Waipio.

11  Q    Okay.  And what happens at the Waipio bunker?

12  A    We met there.  I -- I can't recall if I was there first or

13  what, but we met there, and there was a container there full of

14  fireworks.

15  Q    What kind of container are we talking about?

16  A    It was a 53-foot shipping container.

17  Q    Okay.  So pretty big?

18  A    Yeah, it's pretty big.

19  Q    What is the container on?

20  A    Excuse me?

21  Q    Is it on a truck or is it on the ground?

22  A    Oh, no, container just standing there --

23  Q    Okay.

24  A    -- free, just with no attachment to a truck or anything.

25  Q    What did you have to do with the container?

1    A    We had to empty out the contents and put into the -- the

2    storage bunker.

3    Q    Okay.  And who did you do that with?

4    A    There were a bunch of people there.  I can't recall who

5    all was there.  But I believe it was Richard MacGuyer and Mike.

6    The rest, I can't recall.

7    Q    What was in the container?

8    A    Fireworks.

9    Q    How could you tell it was fireworks in the container?

10   A    Well, they had -- they had these explosive diamonds on it.

11   At first I -- I wasn't able to look at them.  It was just

12   wrapped up in -- it was cardboard boxes, so I did not look at

13   them.  But I knew they were explosives, yeah.

14   Q    You said bunker.  Could you describe what that was?

15   A    The bunker in Waikele or Waipio is bunkers from wartime,

16   the Pearl Harbor war.  I guess they stored ammunition there for

17   the ships.  The bunkers go on about 200-plus feet deep and

18   pretty dark, not -- not lit up too well.  But, yeah, about

19   200-foot-deep bunkers.

20   Q    And that's where you placed the fireworks into?

21   A    Yes.

22   Q    For storage?

23   A    Yes.

24   Q    You mentioned Richard was there?

25   A    Correct, Richard.

1   Q    Who is Richard?

2   A    Richard is Michael's cousin.

3   Q    Do you know his last name?

4   A    Richard MacGuyer.

5   Q    Do you know why Richard was there?

6   A    At that point I didn't, no.

7   Q    Did you later learn why Richard was there?

8   A    I did.

9   Q    Why was Richard there?

10  A    He was the face of the company for the fireworks show that

11  we were going to be having there.

12  Q    Okay.  What do you mean by that, the face of the company?

13  A    We had a company that was supposed to be putting on

14  fireworks shows for weddings, parties, for like Fourth of July

15  kind of things.

16       And he -- he was the one that kind of ran that.

17  Q    So Richard --

18  A    Richard MacGuyer.

19  Q    -- was the one who ran the company?

20  A    Correct.

21  Q    Was the -- have you heard of the term "front"?

22  A    Yes.

23  Q    Did the company appear to you to be more of a front to

24  disguise something else?

25  A    Later, yes.

1    Q     What was it -- in your mind, what did it appear to be a

2    front to disguise?

3    A     We were going to do legit shows with these fireworks, but

4    instead we were selling them illegally on the street.

5    Q     And did you help with that?

6    A     I did.

7    Q     How did you help?

8    A     After -- after we put these guys in the bunker, I don't

9    know at what point that was, but towards the Thanksgiving time,

10   prior to Thanksgiving of that year I was instructed on what --

11   what we were going to be doing with these fireworks and what I

12   needed to do.

13   Q     Who instructed you that?

14   A     Michael Miske.

15   Q     And what were you supposed to do?

16   A     Get in touch with these individuals that would be

17   purchasing these -- purchasing these fireworks and schedule to

18   do deliveries for these individuals.

19   Q     Was there a typical season?  Well, did you do this for

20   multiple years?

21   A     I did for two seasons, two years.

22   Q     And tell us what two seasons mean.  What makes up a

23   season?

24   A     So the season starts the day after Thanksgiving up until

25   New Year's Day.  It is a season for fireworks.

1    Q    And is there still some sales that happen after New Year's

2    Eve?

3    A    After New Year's Eve?

4    Q    Yeah.

5    A    No, we do -- we do a little bit after New Year's Eve.

6    Q    But the height of it is when?

7    A    I'm sorry?

8    Q    The height of the sales is when?

9    A    After Thanksgiving to New Year's Eve.

10   Q    Okay.  And what would you do during that time period?

11   A    I would rent vehicles and pick up these fireworks and

12   deliver them.

13   Q    What kind of vehicles would you rent?

14   A    I would rent cube trucks, box trucks.

15   Q    Can you tell the jury -- can you describe for the jury

16   what a box truck is?

17   A    A box truck is simply a van with a huge cube on the back,

18   where you can roll the door up and roll the door down.  And

19   it's about 15 feet long by about 10 feet high, and about 10

20   feet wide.

21   Q    Is it similar to what U-Haul rents?

22   A    Kind of similar to what U-Haul rents.

23   Q    Where were you renting these box trucks for?

24   A    I was renting these box truck from a company named United

25   Rental.

1   Q     Where was that company?

2   A     They were based out of Mapunapuna.

3   Q     Were you also at times using your personal truck to del --

4   A     I did.

5   Q     What kind of truck was that?

6   A     Toyota Tacoma.

7   Q     So he did it for two seasons.  How many total containers

8   do you think Mr. Miske brought in during those two seasons?

9   A     I'd say four to six containers.

10  Q     And are these four to six containers that were the same

11  size that you had described?

12  A     Correct, 53-foot containers.

13  Q     For the first season, how many containers do you think

14  Mr. Miske brought in?

15  A     I think it was two.

16  Q     And did you help unload both of those containers?

17  A     I did.

18  Q     Second season, how many containers do you think you helped

19  unload?

20  A     Three, maybe four.

21  Q     Did you know -- you said you were delivering these to the

22  people in the community.  Did you know what you were doing was

23  against the law?

24  A     I did.

25  Q     Did you use any special phones in furtherance of this?

1    A     I did.

2    Q     What kind of phones?

3    A     It's what you call burner phones, cheap phones you buy

4    from like Walmart or Walgreens, whatever, something they can

5    dispose of.

6    Q     How many burner phones did you have per season?

7    A     At one point I had eight.

8    Q     You had eight different phones?

9    A     Yes.

10   Q     Why'd you have so many?

11   A     So I can talk to one individual on one phone and not mix

12   the calls up with other individuals I might be dealing with.

13   Q     Did anybody give you instructions to use that many phones?

14   A     Yes.

15   Q     Who did?

16   A     Mr. -- Mr. Miske.

17   Q     Did you understand it would help you avoid detection from

18   law enforcement?

19   A     Correct.

20   Q     So what would you do with the box truck?

21   A     What do you mean?

22   Q     Where would you -- where would you take it; where would

23   you pick up the product; where would you take it to?

24   A     I would -- I would pick the box truck up from the rental

25   company, from United Rental, and I would take it to Waipio or

```
 1   Waikele, whatever you want to call it where the bunkers are.
 2        And I would look at an order that I would get from these
 3   individuals, and I would pull the product of what they wanted
 4   and load these trucks and do deliveries with the truck and then
 5   return the truck.
 6   Q    Okay.  And when you used the truck, would you do anything
 7   with the license plate?
 8   A    I would put a paper plate on it so they couldn't track the
 9   truck, the vehicle.
10   Q    Whose idea was that?
11   A    Michael Miske's.
12   Q    Where did you get the paper plate from?
13   A    From Michael.
14   Q    And what information did it have on it?
15   A    It would have a date, just -- it's what you get on new
16   cars, just a date on there, handwritten on the -- on the piece
17   of paper.
18   Q    And was any of that information true?
19   A    No.
20   Q    It was false information?
21   A    Yes.
22   Q    And would you use that in addition when you used your
23   personal vehicle to pick up fireworks?
24   A    I did.  Yes.
25   Q    And was that also at Mr. Miske's direction?
```

```
 1   A    Correct.

 2   Q    Did you have a fake identification that you used in

 3   furtherance of the fireworks deliveries?

 4   A    I did.

 5   Q    Whose idea was that?

 6   A    That was Mr. Miske's idea.

 7   Q    And what was the purpose of having the fake ID?

 8   A    To gain access into the bunkers undetected on my own name.

 9   Q    Okay.  Who would you have to gain access from?

10   A    I'm sorry?

11   Q    Where -- who would you have to show that ID to?

12   A    At the top of the hill there was a guard shack that would

13   be manned, not all the time, but they would require an ID when

14   I go into that, that property.

15   Q    And did you use that ID on occasion to disguise who you

16   were?

17   A    I did.

18   Q    Where was that -- where did you obtain that ID from?

19   A    From a coworker from Kama'aina Termite, David Melton.

20   Q    And how did he obtain it, if you know?

21   A    I can't say how he obtained it.  My understanding was he

22   made it for me.

23   Q    Okay.  Did you give him the information to put on it?

24   A    I did.

25   Q    Where did you get that information?
```

1  A    I just made it up.

2  Q    Okay.

3        MR. NAMMAR:  Your Honor, can we show the witness only

4  Exhibit 9-50 and 51?

5        If you can go back to 9-50.

6        THE COURT:  Go ahead.

7        MR. NAMMAR:  And zoom in.

8  BY MR. NAMMAR:

9  Q    Mr. Cabael, do you recognize what's shown in 9, dash, 50

10  and 51?

11  A    Yes.  My fake ID.

12  Q    Is this the one that Mr. Melton made you?

13  A    Correct.

14        MR. NAMMAR:  Your Honor, I move to admit 9-50 and

15  9-51.

16        THE COURT:  Any objection?

17        MR. KENNEDY:  No objection.

18        THE COURT:  Without objection, those two exhibits are

19  admitted.  That's 9, dash, 50 and 51.

20        (Exhibits 9-50 and 9-51 received in evidence.)

21        THE COURT:  You may publish.

22        MR. NAMMAR:  Thank you.

23        If we could just zoom in on the bottom one.

24  BY MR. NAMMAR:

25  Q    So 9-50 is on the screen.  It's not the best picture, but

1    you recognize this as the one that Mr. Melton made for you?

2    A    Correct.

3    Q    And the name on it, is that James Kealoha?

4    A    Yes, James Kealoha.

5    Q    Did you -- you said you just made up that name?

6    A    I just made it up at his house when I went and requested

7    this card.

8    Q    Do you remember what kind of ID this was?

9    A    It was a state employee ID.

10   Q    Was it for the Department of Education for the State of

11   Hawaii?

12   A    I can't recall what department it was, but it's for the

13   State of Hawaii.

14   Q    Okay.

15        MR. NAMMAR:  If you could zoom out.  And now go to

16   the next one.  Next, 9-51.  And zoom in on the top lower -- the

17   lower one, yeah.

18   BY MR. NAMMAR:

19   Q    Did it also require a Social Security number?

20   A    It did.

21   Q    And how did you come up with that Social Security number?

22   A    I just thought it up, made it up.

23   Q    Did anybody else have one of these IDs?

24   A    I believe Michael did.

25   Q    Do you know why he had one of these IDs?

1  A   Same purpose, I -- I would assume, I think.

2  Q   Do you know who made the ID for Mr. Miske?

3  A   David Melton.

4          MR. NAMMAR:  Your Honor, can we show the witness only

5  1-60?

6  BY MR. NAMMAR:

7  Q   Mr. Cabael, do you recognize the individual that's shown

8  in 1-60?

9  A   Yes.

10 Q   Who is it?

11 A   That is David Melton.

12         MR. NAMMAR:  Your Honor, I move to admit 1-60.

13         THE COURT:  Any objection?

14         MR. KENNEDY:  No objection.

15         THE COURT:  1-60 is admitted without objection.

16         (Exhibit 1-60 received in evidence.)

17         THE COURT:  You may publish.

18 BY MR. NAMMAR:

19 Q   Okay, Mr. Cabael, the jury can see 1-60.  Who is this?

20 A   This is David Melton.

21 Q   And how did you know David Melton?

22 A   I knew him through Kama'aina Termite.

23 Q   What did he do for Kama'aina Termite?

24 A   He was a salesman and termite inspector for Kama'aina

25 Termite.

1          MR. NAMMAR:  If you could zoom out -- excuse me.  You

2   can take that down.

3   BY MR. NAMMAR:

4   Q    How much were you -- how much did you receive for your

5   help with Mr. Miske and the fireworks?

6   A    $25,000 cash.

7   Q    And is that per season?

8   A    That was the first season.

9   Q    Did you get any money for the second season?

10  A    No.  Second season was a screwup.  I -- I don't think I

11  got anything for the second season.

12  Q    That 25,000 you got for the first season, did you report

13  that to the IRS?

14  A    I did not.

15  Q    You mentioned that there was a wedding company that was a

16  front?

17  A    Yes.

18  Q    Did the fact that it was a front, did it have anything to

19  do with the Honolulu Fire Department?

20  A    Yes.

21  Q    And would Mr. MacGuyer make certain representations that

22  you were aware of to the Honolulu Fire Department?

23  A    He did.

24  Q    What kind of representations?

25  A    Was saying that we lit up this much product for a show,

1    but we did not.

2    Q    Okay.  Would you actually hold some shows for the wedding

3    company?

4    A    I think we did one or two.

5    Q    Okay.  Do you recall a show at Kualoa Ranch?

6    A    I do.

7    Q    Tell us about that show.

8    A    I don't know much about who we were doing it for, but I

9    know we did pop some fireworks, some aerials for that -- for

10   that one particular event.  And we did fill up a box truck of

11   product and used probably a portion of it and not all of it.

12   Q    Did you represent differently to the Honolulu Fire

13   Department?

14   A    I believe Richard did.  I don't know what he represented,

15   what he told them, though.

16   Q    Okay.  But you believe he inflated, based on what you had

17   heard, the amount used in that show?

18   A    Yes.

19         MR. KENNEDY:  Objection on speculation, Your Honor,

20   based on the last answer.

21         THE COURT:  Sustained.

22   BY MR. NAMMAR:

23   Q    Had you had discussions or had discussions been in front

24   of you about Richard's role with the Honolulu Fire Department

25   in regard to shows?

1   A    Yes.

2   Q    What were those discussions?

3   A    That --

4            MR. KENNEDY:  Objection on hearsay, Your Honor.

5            MR. NAMMAR:  Co-conspirator statement.

6            THE COURT:  No.  Overruled.  Go ahead.

7   BY MR. NAMMAR:

8   Q    You can answer.

9   A    Oh.  That there were some instances where he said we did

10  like 20 -- we popped off 20 product and there was like 150-plus

11  product in the truck.

12  Q    Okay.  And so this is Richard describing representations

13  made to the Honolulu Fire Department?

14  A    Correct.

15  Q    About shows?

16  A    Yes.

17  Q    Okay.  And the purpose of that was what?

18  A    To justify the -- the amount of firework if they did an

19  inspection was missing.

20  Q    Okay.  And why was fireworks missing?

21  A    Because they were sold on the street.

22  Q    And you were helping with that?

23  A    Correct.

24  Q    Okay.  Is there a show that you recall at a water park?

25  A    There was a show at the water park, correct.

1   Q    Tell us what happened at that show.

2   A    That show was I think for a graduation.  And we did some

3   preparations for the show, but we had a firework go off in the

4   wrong way that caused a major fire over there at the show.

5   Q    Where was the show?

6   A    At the water park up in Makakilo.

7   Q    What caught fire?

8   A    First the grass caught fire and then plastic fluming that

9   was in the area caught fire.

10  Q    Who responded to put out the fire?

11  A    We tried to put it ourselves, but we couldn't.  So the

12  Honolulu Fire Department had to come and put them out with foam

13  because that -- the type of material that was burning was not

14  going out with water.

15  Q    What kind of material was that?

16  A    The fiberglass material, plastic.

17  Q    Was it the type of material that water slides are made out

18  of?

19  A    Exactly.  Yes, correct.

20  Q    Did you have a pretty good idea of where the majority of

21  the fireworks were going that were in the bunker?

22  A    I do.

23  Q    Where would the majority have been going?

24  A    They sold illegally on the street.

25  Q    Do you know a person by the name of Russell Moscato?

```
 1   A    I do.

 2   Q    Was he doing anything with the fireworks?

 3   A    He did some at the -- the last season, the second season.

 4   Q    Who is Russell Moscato?

 5   A    Russell Moscato's an associate of ours.

 6   Q    Who was calling the shots, as far as you could tell, with

 7   the fireworks company and the distribution?

 8   A    The only person I really would communicate anything with

 9   was Michael.

10   Q    And would you get direction with regard to the fireworks

11   from Mr. Miske?

12   A    Yes, I would.

13   Q    I want to talk to you now about some of the customers that

14   you dealt with.

15   A    Okay.

16   Q    Do you recall a person named Sam?

17   A    I do.

18   Q    Who was that person?

19   A    He was a associate I believe through the nightclub that we

20   purchased, Oceans 808.

21   Q    Okay.  When you say "the nightclub that we purchased," who

22   purchased the nightclub?

23   A    Michael Miske purchased.

24   Q    What was the nightclub called?

25   A    The M Nightclub.
```

1   Q    And what did you understand that Sam's relationship was to
2   that nightclub?
3   A    I believe he was the owner of the Oceans 808 nightclub.
4   Q    Okay.  This is before it was acquired by Michael Miske?
5   A    Correct.
6   Q    Okay.  Did you sell fireworks to Sam?
7   A    I did.
8   Q    Multiple times?
9   A    On occasion, yes, a few occasions.
10  Q    Okay.  Would you use a box truck to do that?
11  A    I would.
12  Q    Would you fill up the entire box truck on occasion?
13  A    I would.
14  Q    What is the large -- would you also receive cash from Sam?
15  A    I did.
16  Q    What's the largest amount of cash on one occasion that you
17  recall receiving from Sam?
18  A    I can't -- I can't recall exactly, but it was somewheres
19  around 75,000.
20  Q    Somewhere around 75,000?
21  A    Yes.
22  Q    For the other deliveries to Sam, would you also receive
23  cash?
24  A    I would.
25  Q    In excess of $10,000?

 1    A    Correct.

 2    Q    Do you know somebody by the name of Kalani Nuuanu?

 3    A    I do.

 4    Q    Tell us about him.

 5    A    He was also an associate of ours.

 6    Q    Okay.

 7    A    He owned a -- yeah.

 8    Q    Go ahead.

 9    A    He owned a business kind of catering to parties.

10    Q    Was he someone that you would deliver fireworks to as

11    well?

12    A    On a few occasions.

13    Q    Did Miske give you any instructions in the second season

14    about Kalani?

15    A    Yes.

16    Q    What did he tell you?

17    A    That Kalani is not to know of any deliveries I'm doing.

18    Q    Okay.  What did you think the reason was for that?

19              MR. KENNEDY:  Objection, speculation, Your Honor.

20              MR. NAMMAR:  "You."  What did you?

21              THE COURT:  Overruled.  Go ahead.

22    BY MR. NAMMAR:

23    Q    What did you think the reason was for that?

24    A    My -- my belief was that Kalani had a part with it and

25    Michael didn't want him to know that we were selling the

```
 1   products and not paying him the part.

 2   Q    So you thought that at one point Kalani and Mr. Miske were

 3   partners in the fireworks business?

 4   A    On the second season, yes.

 5   Q    Did you deal with a customer named Howie?

 6   A    I did.

 7   Q    And did you make multiple shipments, deliveries to Howie?

 8   A    I did.

 9   Q    Using a box truck?

10   A    Yes.

11   Q    What's the largest amount of cash that you recall

12   receiving from Howie after delivering fireworks?

13   A    One time was over a hundred thousand dollars.

14   Q    In cash?

15   A    In cash.

16   Q    How was that hundred thousand dollars packaged?

17   A    It was wrapped up in plastic and sealed in plastic.

18   Q    Like vacuum sealed?

19   A    Vacuum sealed in plastic, correct.

20   Q    Was it in any sort of bundles?

21   A    If you was to lift it up, it would be just all bundles

22   stacked up on each other in one big seal, plastic.

23   Q    The box truck, when you delivered it to Howie, how full

24   was it?

25   A    I would say it was full to the door.  From the floor to
```

```
 1   the ceiling to the door.

 2   Q    Did you have to have people help you unload all the

 3   fireworks?

 4   A    Yes, I did.

 5   Q    Do you recall a customer named Sumo?

 6   A    I do.

 7   Q    What do you recall about Sumo?

 8   A    Sumo was just like anybody else.  I did deliver to him on

 9   a few occasions up in -- in Pearl City.

10   Q    What about a customer named James?

11   A    James was more of a smaller customer, but I did deliver

12   to -- to him too.

13   Q    What about a customer named Kalei Santos?

14   A    Kalei also was a small -- small customer.  Not much, but I

15   did deliver him too with like my Tacoma truck.

16   Q    And when you say small customer?

17   A    It wasn't like a box truck worth of fireworks.  It was

18   like a Toyota bed of mine.

19   Q    Okay.  And would you also receive cash from these smaller

20   customers?

21   A    I did.

22   Q    And then what would you do with the cash after you

23   received it?

24   A    I'll get it to Michael as soon as possible because I don't

25   want to be carrying around that -- that large sum of cash with
```

1    me.

2    Q    Do you recall a customer named Jubahl?

3    A    I do.

4    Q    Tell us about Jubahl.

5    A    Jubahl was a person who owned a auto rim shop.

6    Q    Did you deliver fireworks on occasion to Jubahl?

7    A    Small delivery.

8    Q    Do you recall having a conversation about Jubahl with

9    Michael Miske and law enforcement?

10   A    I do.

11   Q    Let me strike that.  Let me rephrase that.

12        Do you recall having a conversation with Michael Miske

13   about Jubahl?

14   A    I do.

15   Q    What did Michael Miske tell you?

16   A    That Jubahl got caught with somebody's product, with some

17   fireworks that might be his product.

18   Q    That might be Michael Miske's product?

19   A    Correct.  For Michael Miske's product, yes.

20   Q    Did you believe based on the quantity that you were

21   delivering to these customers whether they were end users or

22   whether they were distributing to other folks?

23   A    They were selling to other people.

24   Q    What makes you say that?

25   A    Because the quantities that -- that they were getting.

```
1    Q    Okay.

2              MR. NAMMAR:  Your Honor, can we publish 1-49, which I

3    believe is in?

4              THE COURT:  Yes.

5              MR. NAMMAR:  1-49.  Four-nine.

6    BY MR. NAMMAR:

7    Q    Do you recognize this individual, Mr. Cabael?

8    A    That is myself, Alfredo.

9    Q    And is that how you appeared when you were looking at --

10   working at Kama'aina?

11   A    Yes.

12             MR. NAMMAR:  Can we publish 1-36, which is in?

13             THE COURT:  Go ahead.

14   BY MR. NAMMAR:

15   Q    Who is shown here?

16   A    That is Russell Moscato.

17   Q    And you said Mr. Moscato helped during the second season

18   of fireworks?

19   A    Yes.

20             MR. NAMMAR:  Can we show the witness only 1-656 from

21   the original list?

22             THE COURT:  Go ahead.

23   BY MR. NAMMAR:

24   Q    Mr. Cabael, do you recognize this individual?

25   A    That is Richard MacGuyer.
```

1   Q    He's the person who you said was the face of the

2   fireworks --

3   A    Yes.

4   Q    -- company?

5           MR. NAMMAR:  Your Honor, I move to admit 1-656.

6           THE COURT:  Any objection?

7           MR. KENNEDY:  No objection.

8           THE COURT:  1-656 is admitted without objection.

9           (Exhibit 1-656 received in evidence.)

10          THE COURT:  You may publish.

11  BY MR. NAMMAR:

12  Q    Mr. Cabael, the picture's up on the screen.  Who are we

13  looking at here?

14  A    That is Richard MacGuyer.

15  Q    How -- what, if anything, was his relationship with

16  Mr. Miske, if you know?

17  A    That was Michael's cousin.

18  Q    Okay.  And he was, as you told us, the face of the

19  fireworks company?

20  A    Correct.

21  Q    Would he be the one who would deal with the regulators?

22  A    Yes.

23          MR. NAMMAR:  Your Honor, can we publish 1-1100, which

24  is from our seventh supplement?

25          THE COURT:  Go ahead.

1                    MR. NAMMAR:  Can we go to page 5?

2    BY MR. NAMMAR:

3    Q    Do you recognize the logo shown on page 5?

4    A    Yes, I do.

5    Q    What is it?

6    A    That is a name of the company that was a front, Grand

7    Finale.

8    Q    The one that you said didn't do too many shows?

9    A    Yes, correct.

10                   MR. NAMMAR:  Can we go to page 6.

11   BY MR. NAMMAR:

12   Q    Do you recognize this flyer on page 6?

13   A    I do.

14   Q    What is it?

15   A    That is also a part of that Grand Finale.  I think it's a

16   brochure.

17   Q    Okay.  And so the shows that you recall were a show at

18   Kualoa Ranch, a show at a water park where the slides caught

19   fire.  Do you remember any other shows?

20   A    We did Fourth of July shows out in Hawaii Kai.

21   Q    Okay.  Other than that, the majority of the fireworks went

22   on the black market?

23   A    Correct.

24   Q    Do you know who the -- do you know what phone number that

25   is on the bottom left?

1  A    I can't recall whose phone -- whose phone number that is.

2  Q    Okay.

3         MR. NAMMAR:  Can we show the witness only 9-310 from

4  our original list?

5         THE COURT:  Go ahead.

6  BY MR. NAMMAR:

7  Q    Mr. Cabael, do you recognize the person shown in 9-310?

8  A    That is Jubahl.

9  Q    One of the customers that you delivered fireworks to?

10  A    Correct.

11  Q    And the same one that Mr. Miske talked to you about the

12  seizure?

13  A    Correct.

14         MR. NAMMAR:  Your Honor, I move to admit 9-310.

15         THE COURT:  Any objection?

16         MR. KENNEDY:  No objection.

17         THE COURT:  Without objection, 9-310 is admitted.

18         (Exhibit 9-310 received in evidence.)

19         THE COURT:  You may publish.

20         MR. NAMMAR:  Thank you.

21  BY MR. NAMMAR:

22  Q    Mr. Cabael, is this Jubahl?

23  A    Yes, Jubahl.

24  Q    What was his -- besides fireworks, what was his business?

25  A    He did rims and tires, custom rims and tires shop.

1   Q    And where do you recall it being located?

2   A    Last location I believe was off of Waiakamilo --

3   Q    Okay.

4   A    -- Kalihi.

5            MR. NAMMAR:  Can we show the witness only 9-71, which

6   is from our original list?

7            THE COURT:  Go ahead.

8   BY MR. NAMMAR:

9   Q    Mr. Cabael, do you recognize what is depicted here?

10  A    Yes.  That's a three-inch shell.

11  Q    And is that one of the types of fireworks that you would

12  commonly deliver to your customers?

13  A    Yes.

14  Q    And this has a date of October 2010.  Was that around the

15  time that you were involved in the fireworks distribution?

16  A    I believe so, yes.

17           MR. NAMMAR:  Your Honor, I move to admit 9-71.

18           THE COURT:  Any objection?

19           MR. KENNEDY:  Objection, Your Honor.  Lack of

20  foundation.

21           THE COURT:  Sustained.

22  BY MR. NAMMAR:

23  Q    How can you tell you were selling this exact type of

24  shell?

25           MR. KENNEDY:  Objection, leading.

1           THE COURT:  Overruled.  Go ahead.

2    BY MR. NAMMAR:

3    Q    How can you tell you were selling this exact type of

4    shell?

5    A    Well, that's not the exact shell.  I can't say, but that

6    type is because I had to separate 'em.  Customers will ask for

7    different styles, and I'll have to look through what the styles

8    were and separate them, and that's what they looked like.

9    Q    And the writing, "dragon egg," was that one of the shells

10   you would sell?

11   A    Correct.

12   Q    Okay.  And the three-inch, is that one of the sizes that

13   you would sell?

14   A    The three-inch was a common size, yes.

15   Q    Okay.  And on the bottom of this it says "Made in China."

16   What was your understanding of where the fireworks were coming

17   from that you sold?

18   A    China.

19           MR. NAMMAR:  Your Honor, I move to admit 9-71.

20           MR. KENNEDY:  Same objection, Your Honor.

21           THE COURT:  Objection's overruled.

22           This exhibit's admitted.  That's 9-71.

23           (Exhibit 9-71 received in evidence.)

24           MR. NAMMAR:  May we publish it?

25           THE COURT:  Yes, you may.

1          MR. NAMMAR:  If we could zoom in on the three-inch

2    part.

3    BY MR. NAMMAR:

4    Q    This is described as a three-inch dragon egg.  Can you

5    tell the jury what that means?

6    A    That is a three-inch shell, and the style would be a

7    dragon egg.  You have different styles of display when it blows

8    in the sky.

9    Q    Okay.

10         MR. NAMMAR:  Can we zoom out.

11   BY MR. NAMMAR:

12   Q    And what is a shell?  What does it do?

13   A    Well, you would put 'em in a tube, a secure tube.  And for

14   different sized shells, three inches, four inches, five inches,

15   and six, they all require different size of tube, width and

16   length.  And you would place them in a tube, light the fuse,

17   and it would just -- it would -- it would light up and fly up

18   to the sky.  Depending on what size it was, it would probably

19   be 300, 400, 500, 600 feet.

20   Q    And did you have any responsibility as far as the tubes

21   go?

22   A    I did.

23   Q    What did you have to do?

24   A    I had to purchase these tubes and have them sealed and

25   prepared for shows.

1   Q     Okay.

2   A     Seal the bottom of the tubes.

3   Q     And this isn't in color.  But if we could see it in color,

4   what paper -- what color would this be?

5   A     Everything that we handled was in brown paper.

6   Q     Okay.  Is there a warning label on this shell?

7   A     I can't say if there is a warning label on the shell.  But

8   what it says there, yes.

9   Q     Do you --

10   A     I can't say if they were on every shell.

11   Q     Okay.  But do you recall seeing at least on some of the

12   shells warning labels?

13   A     Correct.

14          MR. NAMMAR:  Can we zoom in on this one.

15   BY MR. NAMMAR:

16   Q     Okay.  It says extremely dangerous, something about

17   display operators only.  Do you see that?

18   A     Yes.

19   Q     Would you have the help of a display operator when you

20   would do the shows that you did?

21   A     We would.

22   Q     Okay.  And who was the display operator that would help

23   you, if you recall?

24   A     I can't remember their names now.

25   Q     Okay.  And then on the bottom it says:  Made in China,

1    1.30 fireworks.  Do you see that?

2    A    I do.

3    Q    Do you know what the 1.30 references?

4    A    I think that's the -- the diamond, like what -- what the

5    warning sign would be on the box.

6    Q    Okay.

7              MR. NAMMAR:  Can we show the witness only 9-73?

8              THE COURT:  Go ahead.

9    BY MR. NAMMAR:

10   Q    Mr. Cabael, what is shown here?

11   A    Different styles of fireworks.

12   Q    And are these the types of fireworks that you were

13   distributing to customers?

14   A    Some are.

15   Q    Which ones are?

16   A    Should I circle them?

17   Q    Sure.

18   A    (Indicates.)

19   Q    Are these just examples of the -- some of the types of

20   fireworks that you were distributing?

21   A    Yes.

22             MR. NAMMAR:  Your Honor, I move to admit 9-73.

23             THE COURT:  Any objection?

24             MR. KENNEDY:  No objection.

25             THE COURT:  Without objection, 9-73 then is admitted.

1          (Exhibit 9-73 received in evidence.)

2          THE COURT:  You may publish.

3          MR. NAMMAR:  Thank you.

4    BY MR. NAMMAR:

5    Q    Okay.  So let's start -- you've circled -- well, tell the

6    jury what we're looking at that you recognize from this

7    document.

8    A    We had different types of fireworks, and the top -- top

9    ones that I circled are called cakes.  They come in different

10   sizes, different counts.  And then the bottom one I circled is

11   shells.

12   Q    Okay.  How do the cakes work?

13   A    The cakes are all one piece, and you light one fuse and

14   they -- they would just -- like I said, you have a hundred

15   count.  You have multiple counts and multiple sizes, three

16   inches, four inches or whatever it was.

17   Q    Okay.  When you say a hundred count, would that mean that

18   the cake would shoot out a hundred different things?

19   A    Hundred different displays, yes.

20   Q    Okay.  And what's shown in the bottom right that you

21   circled?

22   A    That are shells that were ind -- packed -- sold

23   individually or by case.

24          MR. NAMMAR:  If you could zoom in on that.

25   BY MR. NAMMAR:

1   Q     And are the shells what you talked about going into the

2   tubes?

3   A     Yes.

4   Q     And then they're shot off?

5   A     Yes, correct.

6   Q     Okay.  So in this exhibit there are some numbers, 3-inch,

7   4-inch, 5-inch, 6-inch, 7-inch, 8-inch, 10-inch, 12-inch.  Do

8   you see that?

9   A     I do.

10  Q     Are those just different types of shells?

11  A     Different sizes, yes.

12  Q     Okay.  Which sizes would you sell?

13  A     The three to the six.

14  Q     Okay.  Now, if we can zoom out.

15        Based on your work distributing these for Mr. Miske, did

16  you know what the going rate was for particular fireworks?

17  A     I remember some, yes.

18  Q     Okay.  Tell us -- let's start with cakes.  Do you remember

19  what the cakes sold for?

20  A     Cakes would sell from between 200 to 400, maybe even more,

21  per piece.

22  Q     Per cake?

23  A     Per cake.

24  Q     So in other words, when you say "per cake," and I'm

25  circling one in the top left, you mean what I just circled, one

1   item would be --

2   A    One item, yes.  Depend on the size again and the count.

3   Q    And what would that go for?

4   A    Between 150 to -- it could go up to like 300, 400 dollars

5   a cake.

6   Q    Okay.  And the shells that are in the bottom, what would

7   those go for?

8   A    It depends.  It depends how much you bought.  If you

9   bought more, then it'll be cheaper per shell.

10  Q    Okay.  Give us an idea of the pricing for shells.

11  A    The six-inch shells, I think they -- if I remember

12  correctly, they came in a case of four, and they would be about

13  12 to 16 hundred dollars per case on the six-inch.  And again,

14  it's if -- how much -- depends how much you buy.

15  Q    So for four six-inch shells, it would cost you $1600?

16  A    12 to 16 hundred, yes.

17  Q    Okay.  What about for the smaller shells?

18  A    Smaller shells, I can't recall how much they had per case,

19  but most cases would be about 12 to 16 hundred dollars per

20  case, if not more.

21  Q    Beside the cakes and the shells, were you also selling

22  firecrackers?

23  A    Second season we had firecrackers, yes.

24  Q    Can you tell the jury what firecrackers are?

25  A    Firecrackers are a thread full of fireworks or

1   firecrackers that make loud noise, the common firecracker that

2   we use back home.  And there's 5,000 rolls or more.

3   Q    So there's 5,000 pops in a roll?

4   A    Yes.

5   Q    Or more?

6   A    Or more.

7   Q    Were you delivering those as well to customers?

8   A    We did.  It wasn't as popular as -- as these aerial

9   fireworks, though.

10  Q    Did you end up having some issues that you became aware of

11  with the firecrackers?

12  A    Yes.

13  Q    Okay.  And what do you recall the issues were that you

14  were having with the firecrackers?

15  A    We have accountability for the ones missing.

16  Q    The ones missing, what do you mean by that?

17  A    That were no longer in storage.

18  Q    Okay.  So --

19  A    That were supposed to have been sold --

20  Q    Well --

21  A    -- legally.

22  Q    What did you guys do about the lack of any record for

23  those?

24  A    When it came to fireworks, you need a permit to buy

25  fireworks.  So we would get these permits and falsify these

1   permits and write people's names on them and turn these permits

2   in.

3   Q    Who did you turn the permits in to?

4   A    I can't say who they were, but I -- I did not turn them

5   in.  I don't know who they turned in to.  Fire marshals, I

6   guess.

7   Q    Do you know who was responsible for turning them in?

8   A    Richard MacGuyer.

9   Q    And how many forms are we talking about?

10  A    Excuse me?

11  Q    How many forms did you do this on?

12  A    300-plus forms.  It was more than 300 forms that we

13  forged.

14  Q    Whose idea was that?

15  A    Michael's idea.

16  Q    Where was it done?

17  A    In Michael's office.

18  Q    And who was present in the office?

19  A    Me, Michael, Andi -- Andi and Andrea and my ex-wife --

20  ex-girlfriend.

21  Q    Who was your ex-girlfriend?

22  A    Nalani Epstein.

23  Q    And you said Andi was in there?

24  A    Andi was in there, yes.

25  Q    Who is Andi?

```
 1   A     Andi was Mike's girlfriend.
 2   Q     Can you describe the forms that you were filling out?
 3   A     It -- the forms were carbon copy forms.  I think there
 4   were three forms in one.  And you have to provide a name and an
 5   address and a phone number on these forms.
 6   Q     Where would you get that information?
 7   A     We spent time in the office digging these names up from
 8   phone books.
 9   Q     So you would come across somebody's name in the phone
10   book, and then you would put it on the form?
11   A     We would come across the name in the phone book, write the
12   individual's name on the form, and the address, and sign it,
13   forge a signature on there for that individual.
14   Q     Did the form also require an age?
15   A     It did.
16   Q     How were you able to put somebody's age on the form?
17   A     Just a guess.
18   Q     Just a guess?
19   A     Just a guess.
20   Q     And these forms, were they for fireworks or firecrackers?
21   A     The firecrackers.
22   Q     Okay.  Those are the ones you described that are in rolls
23   of 5,000 or more?
24   A     Yes.
25   Q     Do you recall anything coming up about a safe at Richard's
```

1    house?

2    A    Yes, I do.

3    Q    Tell us about that.

4    A    So there are some documents that the fire marshal

5    requested or required of Richard for this -- this -- this

6    company, fireworks show.  We couldn't produce that paperwork,

7    so he staged a break-in in his house and said that the paper

8    was stolen in his safe.

9    Q    And how did you come to hear about this?

10   A    Hearing Michael and Richard them talk about it in his

11   office.

12   Q    They were talking about it in front of you?

13   A    Yes.

14   Q    And the purpose of the break-in was so you could -- so

15   that Richard could tell the fire marshal:  We don't have these

16   forms, they were stolen?

17   A    Correct.

18   Q    So there -- in reality there was no break-in?

19   A    To my understanding, it was a staged break-in, no

20   break-in.

21   Q    And the firecracker permits that you talked about, how

22   many forms do you require filling out?

23   A    It was over 300 forms.

24   Q    Okay.

25              MR. NAMMAR:  Can we show the witness only 9-82 and

1    9-85?  Can we go to the second page of 9-82.

2              THE COURT:  Go ahead.

3              MR. NAMMAR:  And then if we can go to 9-85.  Second

4    page.

5    BY MR. NAMMAR:

6    Q    You recognize these two forms that I just showed you, 9-82

7    and 9-85?

8    A    I do.

9    Q    Do these look like the kind of form that you filled out

10   and put the false information in?

11   A    It is the form that we filled out.

12             MR. NAMMAR:  Your Honor, I move to admit 9-82 and

13   9-85.

14             THE COURT:  Any objection?

15             MR. KENNEDY:  No objection.

16             THE COURT:  Without objection, those two exhibits are

17   admitted, 9-82 and 9-85.

18             (Exhibits 9-82 and 9-85 received in evidence.)

19             THE COURT:  You may publish.

20             MR. NAMMAR:  If we can start with 9-82.  Zoom in on

21   the top.  Okay.

22   BY MR. NAMMAR:

23   Q    So on the top left it says:  Honolulu Fire Department

24   permit to use/purchase fireworks.  Do you see that?

25   A    Yes.

1   Q    And then, is there a particular cultural purpose of permit

2   checked on this one?

3   A    New Year's Eve.

4   Q    Did you -- do you recall filling these forms out in

5   advance of New Year's Eve?

6   A    Yes.

7   Q    And it lists a name, John Bryan.  Do you see that and an

8   address?

9   A    I do.

10  Q    Where would this information have come from?

11  A    From the phone book.

12  Q    And to the right of that it lists an age.  And as I

13  understand you were talking about earlier, that would have been

14  a guess?

15  A    Guess, correct.

16  Q    Okay.

17          MR. NAMMAR:  If you can zoom out.  And then zoom in

18  on the signature block.  The one above that.  Thank you.

19  BY MR. NAMMAR:

20  Q    And this required a signature as well.  And as I

21  understand your testimony, you were saying you would forge

22  these?

23  A    We would forge those, yes.

24  Q    And you didn't have the people's permission when you were

25  doing this; in other words, Mr. Bryan wasn't approving of this

1    practice?

2    A    Mr. Bryan did not know what we were doing.

3         MR. NAMMAR:  You can go to the next one, 9-85.  Go to

4    the second page.  Zoom in.

5    BY MR. NAMMAR:

6    Q    Is this another example of one of the permits you would

7    fill out?

8    A    Yes, correct.

9    Q    And this one's in the name of Alford Ortiz.  Do you see

10   that?

11   A    Yes.

12        MR. NAMMAR:  You could zoom out.  And then this one

13   has a -- on the signature, if you could go all the way across.

14   That's good.

15   BY MR. NAMMAR:

16   Q    This has a -- next to the signature date it lists a date

17   of -- it looks like December 2009.  Is this around the time

18   period that you recall filling these out?

19   A    I can't say right now, no.

20   Q    Okay.

21        MR. NAMMAR:  Can we show the witness only 9-57 from

22   the original list?

23   BY MR. NAMMAR:

24   Q    Do you recognize this photo?

25   A    This is a store located on the windward side.

1   Q    Is this an accurate --

2   A    Kahaluu.

3   Q    -- picture of the Hygienic Store?

4   A    Yes.

5            MR. NAMMAR:  Your Honor, I move to admit 9-57.

6            THE COURT:  Any objection?

7            MR. KENNEDY:  No objection.

8            THE COURT:  Without objection, 9-57 is admitted.  And

9   when you -- you may publish.

10           (Exhibit 9-57 received in evidence.)

11           THE COURT:  When you're done asking questions about

12  this particular exhibit, Mr. Nammar, let's go ahead and take

13  our second break of the day.

14           MR. NAMMAR:  Okay.

15           The -- if we can publish?

16           THE COURT:  Yes.

17           MR. NAMMAR:  The jury can see 9-57.

18  BY MR. NAMMAR:

19  Q    Mr. Cabael, what does this show?

20  A    The Hygienic Store in Kahaluu.

21  Q    And what part of the island is that on?

22  A    It's on the windward side, near Kaneohe.

23  Q    Were you ever, as part of the fireworks business with

24  Mr. Miske and Richard MacGuyer, were you ever selling

25  firecrackers at this store, to your knowledge?

```
 1   A     Not -- no.

 2             MR. NAMMAR:  We can take a break, Your Honor.

 3             THE COURT:  All right.  As we go to break, I'll

 4   remind our jurors to refrain from discussing the substance of

 5   this case with anyone, including each other, until I advise you

 6   otherwise.  Please also refrain from accessing any media or

 7   other accounts of this case.  And finally, do not conduct any

 8   independent investigation into the facts, circumstances, or

 9   persons involved.

10             We'll see you in about 15 minutes.

11             COURTROOM MANAGER:  All rise for the jury.

12             (The jury was excused at 12:03 p.m.)

13             (The proceedings recessed at 12:04 p.m. until

14   12:33 p.m.)

15             (Open court in the presence of the jury.)

16             THE COURT:  All right.  Back from our second break of

17   the trial day.

18             Mr. Nammar, you may resume your direct of Mr. Cabael.

19             MR. NAMMAR:  Thank you.

20   BY MR. NAMMAR:

21   Q     Mr. Cabael, you told us about some issues that you all

22   were having with the Honolulu Fire Department and the

23   fireworks, correct?

24   A     Correct.

25   Q     Did you also have some issues with an agency called ATF?
```

1    A    Yes, we did.

2    Q    What is ATF?

3    A    ATF?

4    Q    Do you understand it's a federal agency?

5    A    Oh, yes.

6    Q    Okay.  And what do you understand that the issues -- well,

7    how did you first hear about ATF?

8    A    I was at the bunker ready to load a cube truck, and there

9    was an employee that worked there driving by with a golf cart.

10   And he informed me that ATF was on that site of our bunker

11   earlier that day.

12   Q    And when you heard that information about ATF, what did

13   you do?

14   A    Stopped everything I was doing and did not continue to

15   load this truck.

16   Q    And did you go back and have a conversation with Michael

17   Miske?

18   A    I did.

19   Q    Okay.  Tell us about that.

20   A    I can't recall how the conversation went, but I did inform

21   him of what I was told at the bunker.

22   Q    And were you all concerned about the ATF?

23   A    We were.

24   Q    Why?

25   A    Because there's things that was missing from the bunker.

1   And if they're there, they'll want to go into the bunker and

2   possibly find out what's going on with our fireworks.

3   Q    With your inventory?

4   A    With our inventory.

5   Q    Why did you have inventory issues?

6   A    Because we had sold a lot of it on the black market.

7   Q    Did Mr. Miske come up with a plan?

8   A    He did.

9   Q    And did he tell you about the plan?

10  A    He did.

11  Q    What did he tell you?

12  A    I was instructed to -- to do -- to stage a break-in on the

13  bunker.

14  Q    Mr. Miske asked you to do that?

15  A    He did.

16  Q    Did he tell you how do it?

17  A    He did.

18  Q    And what was the plan?  How were you going to accomplish

19  the staged break-in?

20  A    Break the locks and make it look like somebody broke into

21  a bunker and stole fireworks.

22  Q    Okay.  Did you agree to do that?

23  A    I did.

24  Q    Was this in the first season or the second season?

25  A    This was the second season.

1    Q    And in furtherance of that plan, did you take steps to go
2    do it?
3    A    I did.
4    Q    Okay.  Tell us what you did.
5    A    I planned a day, a time to go out there to the bunker.
6    Q    How were you dressed?
7    A    I was dressed all in black.
8    Q    And what time of the day or night did you go out there?
9    A    This was like 9:00, 10:00 p.m.
10   Q    Okay.  And what happened when you got there?
11   A    There was loud people there.  Not that I could see, but I
12   could hear.  And it looked to me like they were filming a movie
13   down there.
14   Q    Okay.  Did that concern you?
15   A    It did.
16   Q    Did you go through with a staged break-in?
17   A    No, I did not.
18   Q    Why not?
19   A    I was afraid to be seen by these people from the movies,
20   being that I know some of them.  And I didn't want nobody to
21   see me down there, because if I stage a break-in they probably
22   would have known it was me.
23   Q    Okay.  Did you report that back to Mr. Miske?
24   A    I did.
25   Q    What was his reaction?

1    A    I can't recall his reaction, but I can remember the way I

2    felt, like I let him down.

3    Q    Did you feel like that hurt your standing with Mr. Miske?

4    A    It did.

5    Q    Why?

6    A    Because I -- I'm known to get things done, and that in

7    itself kind of made me feel like I was a failure to him, that I

8    couldn't accomplish what we needed to accomplish, that was

9    needed to be done, to protect us.

10   Q    Did someone else go through with the staged break-in?

11   A    Yes.

12   Q    And after someone else did it, did Miske give you grief

13   about not doing it?

14   A    He did.

15   Q    What did he tell you?

16   A    He made me feel like I was a pussy.  He probably said it

17   in those words.  And I sorry for saying that, but he made me

18   feel like I was incapable of doing what I needed to do to

19   protect us.

20   Q    Who did the staged break-in?

21   A    Russell Moscato.

22   Q    How'd you find out about it?

23   A    He told me.

24   Q    Russell told you?

25   A    Russell told me.

1  Q    What did he tell you?

2  A    He told me he got -- actually, he got hurt and I asked him

3  about it, and he told me why he got hurt and what he was doing

4  when he got hurt.

5  Q    What did he tell you he was doing?

6  A    Staging a break-in.

7  Q    At the bunker?

8  A    At the bunker, yes.

9  Q    And how did he get hurt?

10  A    He fell, hit his shin on a -- on some boulders and gashed

11  his shin open.

12  Q    Did Mr. Moscato ever talk to you about the term "rats"?

13  A    He did.

14  Q    What did he tell you about that?

15  A    He said he doesn't like rats and we kill rats.

16  Q    And --

17  A    We hurt rats.  Sorry.

18  Q    What did you take that to mean, rats?

19  A    Someone who speaks to law enforcement.

20  Q    At some point did you talk to Miske about the fact that

21  this staged break-in had occurred?

22  A    I'm sorry.  Repeat the question.

23  Q    Did you talk to Mr. Miske about the fact that this staged

24  breakup [verbatim] had occurred?

25  A    Yes.

1   Q    Where did the fireworks end up?

2   A    I'm not sure at what point fireworks were taken out, but

3   fireworks were removed from the bunker and ended up at a

4   property owned by Russell Moscato.

5   Q    Where was that property?

6   A    In Ewa Beach.

7   Q    And what were they contained in?

8   A    A container, shipping container.

9   Q    Did you still pick up fireworks from that property in Ewa

10  Beach and deliver them to customers after the fact?

11  A    I did.

12  Q    Did the ATF find out about the staged break-in?

13  A    They did.

14  Q    How did they find out about the break-in?

15  A    I -- I'm not exactly clear how they found out about the

16  break-in, but they did find out about the break-in and

17  contacted me.

18  Q    Okay.  Who contacted you?

19  A    Agent from the ATF.

20  Q    And were you contacted over the phone initially?

21  A    They did call me on the phone, yes.

22  Q    And after you had phone contact with an ATF agent about

23  the bunker, did you report that to Mr. Miske?

24  A    Immediately.

25  Q    Okay.  Did you guys discuss a plan of how to respond to

1    the agent?

2    A    Well, I was directed to respond to the agent, to meet the

3    agent where he wanted to meet but not to tell him anything that

4    he didn't need to know.

5    Q    Who gave you those instructions?

6    A    Michael Miske.

7    Q    And did you follow through with those instructions and

8    meet with the federal agent?

9    A    I did, and I met him on the fishing pier near -- near

10   Nico's in Honolulu.

11   Q    Is that Pier 38?

12   A    I think so, yes.

13   Q    When you met with the agent, were you truthful?

14   A    Not entirely.

15   Q    Did you not tell him about your fireworks selling

16   operation?

17   A    I did not.

18   Q    Did you indicate anything about being at the bunker four

19   months ago?

20   A    There was talk about that with the agent, yes.

21   Q    Was that true?

22   A    Can you -- can you -- can you ask me that question again?

23   Q    Yeah.  Did you tell the agent that the last time you were

24   at the bunker was four months ago?

25   A    Yes.

1  Q    Was that true?

2  A    No.

3  Q    Why didn't you tell the agent the truth about that?

4  A    Because then it would just raise more questions and I

5  wasn't ready to answer these questions.  I was prepared to be

6  untruthful to him.

7  Q    And did you tell the agent that the last time you were at

8  the bunker you were doing housekeeping duties?

9  A    Yes, I did.

10 Q    Was that true?

11 A    No.

12 Q    Did you tell the agent that you along with Mr. Miske were

13 selling the fireworks on the black market?

14 A    No, I did not.

15 Q    Why wouldn't you tell him that?

16 A    Because I would get in trouble for it and probably -- and

17 definitely Michael Miske would get in trouble for it too.

18 Q    At some point in your meeting with the agent did you

19 request an attorney?

20 A    I did.

21 Q    Did you and Mr. Miske have an attorney in mind when you

22 did that?

23 A    I think we -- I -- I think we did, yes.

24 Q    Who was that attorney at the time?

25 A    We were talking to a Michael Ostendorp.

1   Q     Was he advising you on the fireworks business?

2   A     Well, he was advising me and Mike about certain things

3   that we should say and do on the fireworks business, yes.

4   Q     Have you heard of a person named Uncle Buzz?

5   A     I did.  Yes.

6   Q     Who is Uncle Buzz?

7   A     He had some -- some relationship with the fire department.

8   Q     Do you know if he used to work there?

9   A     I do.

10  Q     Did he used to work there?

11  A     He used to work for the fire department, yes.

12  Q     When you were in the fireworks business, were -- do you

13  recall meetings with you, Uncle Buzz, and Michael Miske?

14  A     Probably on one or two occasions, yes.

15  Q     What was the purpose of those meetings?

16  A     I can't say because I wasn't directly involved in the

17  meeting, but I know I was there.  But I did not listen on the

18  conversation.  But I just have to say it was about fireworks.

19  Q     Would you ever deliver fish to Uncle Buzz?

20  A     I did on one or two occasions, yes.

21  Q     What was that about, the fish?

22  A     I -- I delivered fish to a lot of people.  I can't say why

23  I delivered to him.  I figure I'd deliver it to him as a

24  friend.

25  Q     And where was the fish from?

1   A    From our fishing vessel RACHEL.

2   Q    Whose fishing vessel was it?

3   A    Michael Miske's.

4   Q    And who directed you to deliver fish to Uncle Buzz?

5   A    Michael Miske.

6   Q    Was a guy by the name of Sudee Dahl also somebody you

7   delivered fish to?

8   A    Yes, on occasion.

9   Q    Did you believe he had any relationship to the fireworks

10  business?

11  A    I did.

12  Q    Why did you think that?

13  A    Because his name was brought up in conversations when we

14  spoke about fireworks.

15  Q    How much money do you believe the fireworks sales

16  generated in the two seasons that you guys were in operation?

17  A    I'd say close to $2 million.

18  Q    What do you base the $2 million on?

19  A    By the amount of fireworks that I did deliver.  I just did

20  the math and by the amount of money that I got.  I -- like I

21  got money from some people but not everyone.  So I based my

22  numbers off what I had given out.

23  Q    Were you dealing in quite a number of cash transactions

24  during the fireworks sales time?

25  A    I did a lot of trash -- cash transactions, yes.

1    MR. NAMMAR:  Your Honor, may we publish 1-830, which

2    is in evidence?

3    THE COURT:  I didn't catch that number.  One, dash,

4    what?

5    MR. NAMMAR:  I'm sorry.  1-830.

6    THE COURT:  Go ahead.

7    BY MR. NAMMAR:

8    Q    Mr. Cabael, 1-830 is on the screen.  Do you recognize it?

9    A    Yes.  That is used to count money.

10   Q    Did you use a device like this related to the fireworks

11   business?

12   A    Yes, we did.

13   Q    What did you use it for?

14   A    To count the money I received from the people I delivered

15   to.

16   Q    And how does it work, this device?

17   A    You put a stack of bills in the -- in the counter, and it

18   counts it and spits it back out in a different area of the

19   counter, I believe on the bottom.

20   Q    And then what would you do with the money after you had

21   counted it with the money counter?

22   A    I would package them in a big envelope.

23   Q    And put them where?

24   A    I'm not sure exactly where it would go, but it would be

25   given to Michael Miske.

1    Q    Where was this money counter kept when you were in the

2    fireworks business?

3    A    In Michael's office.

4              MR. NAMMAR:  Can we show the witness only

5    Exhibit 9-58, 59, 61, and 62?

6              THE COURT:  Go ahead.

7    BY MR. NAMMAR:

8    Q    Start with five-eight.  I'm going to scroll through these,

9    Mr. Cabael, and then I'll ask you some questions afterwards.

10   A    Okay.

11             MR. NAMMAR:  9-59, 9-61, and 9-62.

12   BY MR. NAMMAR:

13   Q    Did you recognize those four pictures?

14   A    I do.

15   Q    What do they show?

16   A    They show the bunker that we stored the fireworks in.

17   Q    Are they accurate pictures of the bunker where you guys

18   stored the fireworks?

19   A    It is.

20             MR. NAMMAR:  Your Honor, I move to admit 9-58, 9-59,

21   9-61, and 9-62.

22             THE COURT:  Any objection?

23             THE WITNESS:  9-62 is a totally different bunker,

24   though, just so you know.

25   BY MR. NAMMAR:

1   Q    What is 9-62 of?

2   A    A bunker that's probably down the way from ours.

3   Q    Is this hillside adjacent to where your bunker is?

4   A    Yes, it is.

5        MR. NAMMAR:  Your Honor, I move to admit 9-58, 9-59,

6   9-61, and 9-62.

7        THE COURT:  Mr. Kennedy, any objection?

8        MR. KENNEDY:  No objection to 58, 59, and 61.  But as

9   to 62, objection, Your Honor, just on relevance.

10       THE COURT:  What is the relevance of the --

11       MR. NAMMAR:  Shows the hillside in the area where the

12  bunker is.

13       THE COURT:  9-58 and 59, 9-61 are each admitted

14  without objection.

15       (Exhibits 9-58, 9-59, and 9-61 received in evidence.)

16       THE COURT:  9-62 needs additional foundation.

17       MR. NAMMAR:  All right.  Can we publish 9-58.

18  BY MR. NAMMAR:

19  Q    The jury can see 9-58.

20       What are we looking at here?

21  A    That is the bunker that we stored the fireworks in.

22  Q    And the name of it is what?

23  A    USS Pennsylvania.

24       MR. NAMMAR:  9-59, if we can publish.

25  BY MR. NAMMAR:

1  Q    What is shown here?

2  A    That is the same bunker, USS Pennsylvania, that we stored

3  the fireworks in.

4  Q    The box truck that you mentioned, where would you pull

5  that up?

6  A    I'll pull the box truck in our -- back it up to that, to

7  that -- that docking area where the yellow board is, reverse it

8  up to that, towards the door.

9           MR. NAMMAR:  Can we publish 9-61?

10 BY MR. NAMMAR:

11 Q    What is shown here?

12 A    That is where the locks are placed.  We would typically

13 have at least that one lock up on the top, in that cover plate,

14 so the lock isn't exposed to be broken into.

15 Q    Okay.  When you say "cover plate," do you mean this plate

16 at the top (indicates)?

17 A    Yes.

18 Q    How does a lock get inserted into that?

19 A    Just like that lock in middle, that you see right there in

20 the open, they have connecting holes just like that where you

21 put a lock in, but under that plate to prevent people from

22 breaking a lock.

23 Q    Okay.  So it's like a hood vent around the lock to prevent

24 people from breaking it?

25 A    Correct.

```
 1              MR. NAMMAR:  Can we show the witness only 9-63?

 2    BY MR. NAMMAR:

 3    Q    Do you recognize what's shown here at 9-63?

 4    A    Yes.

 5    Q    What's shown here?

 6    A    The bunker.  I believe it was before.

 7    Q    And is it an accurate overhead picture of the area around

 8    the bunker?

 9    A    Yes, it is.

10              MR. NAMMAR:  And I move to admit 9-63.

11              THE COURT:  Any objection?

12              MR. KENNEDY:  No objection.

13              THE COURT:  9-63 is admitted without objection.

14              (Exhibit 9-63 received in evidence.)

15              THE COURT:  You may publish.

16              MR. NAMMAR:  If we could zoom in on this exhibit,

17    entire one.

18    BY MR. NAMMAR:

19    Q    Where is the bunker located that you would store the

20    fireworks in this photo?

21    A    I would have to say it was bunker B4.

22    Q    Okay.  And do you see in the bottom right where it says

23    office building?

24    A    Yes.

25    Q    Is that where you would have to check in when you came to
```

1   the bunker?

2   A    I did not have to physically go to the office building.

3   There was a gate to the right of that, right here (indicates),

4   that's kind of out of the picture, that you would punch in a

5   code.

6   Q    Is that sometimes where the guard shack would be?

7   A    The guard shack is further up the hill.

8   Q    Okay.  Can you put an X?  Is the guard shack anywhere in

9   this picture?

10  A    No, it's not.

11  Q    Okay.  And when you accessed the bunker, where do you

12  enter in through?

13       In other words, this complex, where do you have to drive

14  by first?

15  A    The guard shack that was on -- that's at the top of the

16  hill, that's not in this picture.

17  Q    Okay.  And do you have to pass the guard shack to enter

18  into the bunker area?

19  A    Yes.

20          MR. NAMMAR:  Can we now show the witness only 9-8 and

21  9-9?  Can we go to 9-9?

22  BY MR. NAMMAR:

23  Q    Do you recognize these two photos in 9-8 and 9-8?

24  A    I do.

25          THE COURT:  9-8 has been admitted.

1          MR. NAMMAR:  Oh, apologies.

2          THE COURT:  But not 9-9.

3          9-8 has been admitted.  9-9 has not.

4   BY MR. NAMMAR:

5   Q    Do you recognize what's shown in 9-9?

6   A    I do.

7   Q    What is that?

8   A    The top picture is the gate that I was talking about

9   earlier, where I circled.  And the bottom picture is the

10  picture of the bunker.

11         MR. NAMMAR:  Your Honor, I move to admit 9-9.

12         THE COURT:  Any objection?

13         MR. KENNEDY:  No objection.

14         THE COURT:  9-9 is admitted without objection.

15         (Exhibit 9-9 received in evidence.)

16         THE COURT:  You can publish.

17         MR. NAMMAR:  Can I also publish 9-8?

18         THE COURT:  Yes.

19         MR. NAMMAR:  Can you zoom in on both of those?

20  BY MR. NAMMAR:

21  Q    What is shown in 9-8?

22  A    That is the office in the previous picture, and to the

23  right of the top picture is where the gate is.

24  Q    Okay.

25         MR. NAMMAR:  Can you publish 9-9 now?

1    BY MR. NAMMAR:

2    Q    What is shown in the top photo?

3    A    That is the gate I just talked about, with the office to

4    the left of that gate.

5    Q    Okay.  And this is where you'd enter, and then up the road

6    you'd encounter the guard shack?

7    A    No.  The guard shack is before this gate.

8    Q    Okay.

9    A    On the hill in the back of me.

10   Q    Okay.

11            MR. NAMMAR:  Can you show the lower photo.

12   BY MR. NAMMAR:

13   Q    What is shown here?

14   A    That is the bunker that we stored the fireworks in.

15   Q    Do you --

16   A    Looks like -- looks like Richard MacGuyer's car.

17   Q    You recalled that Richard MacGuyer drove a similar car?

18   A    Exactly, yes, that car.

19   Q    What kind of car is that?

20   A    Mustang.

21            MR. NAMMAR:  Can we show the witness only 9-21, 9-24,

22   and 9-33?

23   BY MR. NAMMAR:

24   Q    Do you recognize these three pictures?

25   A    I do.

1    Q    What do they appear to be to you?

2    A    That's the pictures of the cases of shells that we stored

3    in the bunker.

4    Q    And did you recognize the other two photos as items that

5    you had stored in the bunker?

6    A    Yes, I do.

7              MR. NAMMAR:  Your Honor, I move to admit 9-21, 9-24,

8    and 9-33.

9              THE COURT:  Any objection to any of these three

10   exhibits?

11             MR. KENNEDY:  No objection, Your Honor.

12             THE COURT:  Without objection, those three exhibits

13   then are admitted.  That's 9-21, dash-24, and dash-33.

14             (Exhibits 9-21, 9-23, and 9-33 received in evidence.)

15             THE COURT:  You may publish.

16             MR. NAMMAR:  If we can zoom in on the bottom on 9-33.

17   BY MR. NAMMAR:

18   Q    It's hard to see, but can you make out what kind of box

19   this is?

20   A    A box of three-inch shells and looks like the quantity of

21   that box.

22   Q    Okay.  And were these the shells that you mentioned

23   earlier that were placed in the tubes and then fired?

24   A    Correct.

25   Q    These are some of the items that you were selling on the

1    black market?

2    A    Yes.

3              MR. NAMMAR:  Can we show 9-24?

4              Publish that one, 9-24.  Zoom in on the lower photo.

5    BY MR. NAMMAR:

6    Q    Do you recognize what is shown here?

7    A    That's the tubes that we used for displays for actual

8    shows for the shells.

9    Q    Those are the tubes you said you were tasked with getting?

10   A    Yes.

11   Q    And where did you obtain those from?

12   A    From our manufacturer somewhere in Mapunapuna.

13             MR. NAMMAR:  And can we show 9-21 now?

14             Zoom in on the top photo.

15   BY MR. NAMMAR:

16   Q    What is shown here?

17   A    Cases of shells.  I can't say what size, but it looks like

18   four inches.

19   Q    Do you see the diamond logo that's on some of those?

20   A    Yes.

21   Q    What are the numbers that appear there?

22   A    1.3, I think.

23   Q    Do you remember seeing a lot of that type of diamond logo

24   on some of the boxes?

25   A    I believe they were put on every box.

1          MR. NAMMAR:  Okay.  You can take those down.

2    BY MR. NAMMAR:

3    Q    You mentioned briefly that you understood that Sudee was

4    a -- was associated with the fireworks business; is that right?

5    A    Yes.

6    Q    And you told us that he was one of the people that you

7    gave fish to at Miske's direction?

8    A    Correct.

9    Q    Who were some of the other folks that you gave fish to at

10   Miske's direction?

11   A    Hmm.  I gave that to a Nate Lum.  I gave some to some

12   other gentleman up in Palolo.  I forgot his name.  James, I

13   think.  And I can't think of any more right now.

14   Q    Okay.  Turning your attention to 2011, do you recall KTPC,

15   or Kama'aina Termite and Pest Control, fumigating Sudee's

16   house?

17   A    Yes, I do.

18   Q    Where is Sudee's house located?

19   A    In Hawaii Kai.

20   Q    How do you know that that fumigation happened?

21   A    I was there for the start of the fumigation.

22   Q    And then after the fumigation, did you speak with Mike

23   about that particular fumigation, Michael Miske?

24   A    Right now, I can't recall.

25   Q    Okay.  Do you recall having conversation with anyone about

1    regulators showing up to that job on Sudee's house?

2    A    I could -- I can recall regulators showing up, but I -- I

3    can't recall who I spoke to about that.

4    Q    Okay.  Was that house fumigated?

5    A    It was.

6    Q    And during that fumigation, do you recall anything about a

7    photo shoot taking place?

8    A    I did hear that, yes.

9    Q    Was that true?

10   A    No.

11   Q    Why was that not true?

12   A    Because you wouldn't have to keep a tent on the house

13   overnight for a photo shoot.  A tent on a house overnight for a

14   photo shoot.

15             MR. NAMMAR:  Can we show the witness --

16   BY MR. NAMMAR:

17   Q    Did you ever speak with Mr. Miske about the photo shoot

18   part?

19   A    I can't recall, no.

20             MR. NAMMAR:  Can we show the witness only 9-527 and

21   9-524?

22   BY MR. NAMMAR:

23   Q    Mr. Cabael, do you recognize those two photos?

24   A    I do.

25   Q    What are they of?

1   A    They're of Mr. Sudee Dahl's house.

2           MR. NAMMAR:  Your Honor, I move to admit 9-527 and

3   9-524.

4           THE COURT:  Any objection?

5           MR. KENNEDY:  No objection.

6           THE COURT:  Those two exhibits then are admitted

7   without objection.  That's 9-524 and dash-527.

8           (Exhibits 9-524 and 9-527 received in evidence.)

9           THE COURT:  You may publish.

10          MR. NAMMAR:  May we publish?

11          THE COURT:  Yes.

12  BY MR. NAMMAR:

13  Q    9-524 is up on the screen.

14        What are we looking at here?

15  A    That's a fumigator truck in front of the -- in front of

16  Sudee Dahl's house getting prepped for a fumigation or uncover.

17  I can't tell at that moment what it is.

18  Q    Okay.  And this is the fumigation that you said you were

19  on at least initially?

20  A    Yes.

21          MR. NAMMAR:  If we can publish 9-527 now.

22  BY MR. NAMMAR:

23  Q    What is shown here?

24  A    That's -- looks like Sudee Dahl's house in Hawaii Kai.

25          MR. NAMMAR:  Take that down.

 1   BY MR. NAMMAR:

 2   Q    Do you recall a federal audit occurring when you worked at

 3   Kama'aina Termite and Pest Control?

 4   A    I do.

 5   Q    What was the subject of the audit?

 6   A    I believe that subject of the audit was to find out if

 7   they were paying a -- our employees cash.

 8   Q    Were employees at the time of the audit being paid in cash

 9   partially?

10   A    They were.

11   Q    How were they being paid in cash?

12   A    Anything that was over 40 hours was paid in cash.

13   Q    So overtime was paid in cash?

14   A    Correct.

15   Q    Have you heard of straight time?

16   A    Yes, I have.

17   Q    And so was the overtime, when paid in cash, was it just

18   paid at the regular hourly rate?

19   A    It was paid at the regular hour -- hourly rate.

20   Q    Or straight time?

21   A    Straight time, yes.

22   Q    Was it ever paid in cash at time and a half?

23   A    No.

24   Q    Why did Kama'aina Termite and Pest Control pay their

25   overtime in straight cash?

1   A    To avoid having --

2        MR. KENNEDY:  Objection.

3   A    -- to provide certain benefits.

4        THE COURT:  I'm sorry.  I didn't hear the objection.

5        MR. KENNEDY:  Objection, speculation.

6   BY MR. NAMMAR:

7   Q    If you know.

8        THE COURT:  Sustained.

9   BY MR. NAMMAR:

10  Q    Do you know why -- do you know why, Mr. Cabael, overtime

11  was paid in cash, straight cash, straight time?

12  A    It was paid in cash to avoid paying or providing benefits

13  to employees.

14  Q    What benefits?

15  A    Medical insurance.

16  Q    Who told you that?

17  A    Michael.

18  Q    Michael Miske?

19  A    Yes.

20  Q    So to avoid paying medical insurance they paid overtime to

21  certain employees in straight cash?

22  A    Correct.

23  Q    And they didn't pay time and a half?

24  A    Yes.

25  Q    What were the types of employees that received overtime in

1   cash at the time of the audit?

2   A     Employees that worked out in the field.

3   Q     Can you give us examples of some of those employees?

4   A     Pest control technicians, fumigant -- fumigation

5   technicians, and ground termite technicians.

6   Q     What does a pest control technician do?

7   A     They spray for pest control for pests or they install bait

8   stations for certain pests.

9   Q     And you've talked about fumigation.  Was it very common

10  for fumigators -- fumigation crews to work more than 40 hours a

11  week?

12  A     Yes, it was.

13  Q     Why was that?

14  A     Because we would start early and would end late, and we

15  would work a six-day operation.

16  Q     Did you get some advance warning from Mr. Miske before the

17  audit -- auditor showed up at work?

18  A     I don't know how much of an advance warning, but we did,

19  yes.

20  Q     Okay.  What did Mr. Miske tell you about the auditor

21  coming to work?

22  A     That he was going to be inquiring about overtime and cash

23  payments.

24  Q     Did he give instructions?

25  A     He did instruct me to make sure the fumigators and all

1   employees knew what to say.

2   Q    Okay.  And what were those instructions?

3        What did you interpret him to mean by "knew what to say"?

4   A    To assure that these employees do not mention they get

5   paid cash.

6   Q    Okay.  And did you take steps in furtherance of that --

7   A    I did.

8   Q    -- direction?  What did you do?

9   A    I did speak to employees.  I can't recall if it was a

10  group setting or individually, but I did inform them that they

11  were not to say they get paid in cash.

12  Q    And did you yourself, did you yourself lie to the auditor?

13  A    I did.

14  Q    Why did you lie?

15  A    Because I did work more than 40 hours and I was getting

16  paid in cash.

17  Q    And it was in part -- did you in part lie based on the

18  directions you got from Mr. Miske?

19  A    I did.

20  Q    Do you remember the auditor coming to the workplace?

21  A    I do.

22  Q    Can you describe what he looks like?

23  A    He was a pretty tall Asian man.

24  Q    Do you remember anything about a chair when he came?

25  A    He did sit on a chair.  And these chairs are known to

1    break, and his broke and fell down.

2    Q    Okay.  And then were you interviewed personally?

3    A    I was.

4    Q    Were you asked about -- did you write out a statement?

5    A    I don't recall writing the statement, but I recall signing

6    one.

7    Q    Okay.  And in that statement, is that statement -- was

8    that statement signed by you?

9    A    It was.

10   Q    And in that statement, does it represent that you never

11   worked over 40 hours a week?

12   A    It did.

13   Q    And that wasn't truthful?

14   A    That was not truthful, no.

15            MR. NAMMAR:  Your Honor, can we show the witness only

16   9-135?

17            THE COURT:  Go ahead.

18            MR. NAMMAR:  Can you go to the second page.

19   BY MR. NAMMAR:

20   Q    Mr. Cabael, do you recognize this statement?

21   A    I do.

22   Q    What is it?

23   A    It is a statement that was written out in my interview

24   with this person from Labor.

25   Q    And is that your signature on the second page?

 1  A    That is my signature, yes.

 2            MR. NAMMAR:  Your Honor, I move to admit 9-135.

 3            THE COURT:  Any objection?

 4            MR. KENNEDY:  No objection, Your Honor.

 5            THE COURT:  9-135 is admitted without objection.

 6            (Exhibit 9-135 received in evidence.)

 7            THE COURT:  You may publish.

 8            MR. NAMMAR:  Can we zoom in on the top part.

 9  BY MR. NAMMAR:

10  Q    So at the top right it says United States Department of

11  Labor.  Do you see that?

12  A    I do.

13  Q    Wage and Hour Division?

14  A    Yes.

15  Q    Is that who you recall meeting with during the audit?

16  A    Yes, I do.

17  Q    And it's dated March 24th, 2010.  Is that around the time

18  period that you recall the auditor showing up?

19  A    Yes.

20  Q    And is that your information and address that's printed on

21  this portion of the form?

22  A    That is, yes.

23  Q    You lived at Rycroft, on Rycroft Street at the time?

24  A    Correct.

25  Q    And was your position at the time field supervisor, as

1   indicated here?

2   A     Yes, I was.

3   Q     And had you worked for Kama'aina since around 2003, as

4   indicated?

5   A     Yes.

6   Q     Okay.

7              MR. NAMMAR:  We can zoom out.  And zoom in on the

8   last line only.

9   BY MR. NAMMAR:

10  Q     And in the last line does it say:  I do not think I work

11  more than 40.  Do you see that?

12  A     I do.

13  Q     Is that true?

14  A     That is -- that is not true.

15  Q     And did you write that based on the instructions you got

16  from Mr. Miske about overtime?

17  A     Yes.

18  Q     And then does it go on to say:  I cannot say that I -- and

19  we go to the second page -- work more than 40.0 a week in my

20  job, since I do not log my hours for actual work?  Was that

21  statement true?

22  A     No.

23  Q     Why did you lie to the auditor?

24  A     To keep the same story as everybody else, to protect

25  myself.

1  Q    And is that your signature that appears at the bottom of

2  the form?

3  A    Yes.

4  Q    Did the auditor interview other employees as well?

5  A    He did.

6           MR. NAMMAR:  Can we show the witness only 9-136?

7           THE COURT:  Go ahead.

8  BY MR. NAMMAR:

9  Q    Whose -- who does this statement purport to be from?

10  A    Same as -- from the top it says Arthur Lake.

11  Q    Who was that?

12  A    He was an employee at Kama'aina.

13  Q    And what did he do there?

14  A    He did just about anything, ground termite treatment and

15  fumigation.

16  Q    And was he one of the folks that would have received the

17  instruction through you from Michael Miske to lie about

18  overtime?

19  A    Yes.

20           MR. NAMMAR:  Your Honor, I move to admit 9-136.  It's

21  also accompanied by a cert. on the last page.

22           THE COURT:  Any objection?

23           MR. KENNEDY:  No objection.

24           THE COURT:  9-136 is admitted without objection.

25           (Exhibit 9-136 received in evidence.)

1          MR. NAMMAR:  Can we publish?

2          THE COURT:  Yes.

3   BY MR. NAMMAR:

4   Q    Okay.  The jury can see it.

5        At the top it lists Arthur Lake.  He lists his occupation

6   as fumigation.  Is that what you understood he did, at least in

7   part?

8   A    Yes.

9   Q    Okay.  And I think you've told us before that fumigators

10  work -- typically work more than 40 hours a week; is that

11  right?

12  A    They did, yes.

13  Q    Okay.

14         MR. NAMMAR:  If you could zoom out and zoom in on

15  like the last four lines.

16  BY MR. NAMMAR:

17  Q    Does it read:  If I am close to 40 hours, I would be

18  rotated off and the hours/jobs would be given to other workers?

19       Do you see that?

20  A    I do.

21  Q    Was there any system like that where you would rotate

22  fumigators off?

23  A    No.

24  Q    That never occurred?

25  A    Never did.

1  Q    And where it goes on to say, "I never worked over 40 hours

2  in a workweek," do you see that?

3  A    Yes.

4  Q    Do you believe that was true?

5  A    No.

6          MR. NAMMAR:  Can we show the witness only 9-134?

7          THE COURT:  Yes.

8          MR. NAMMAR:  And can we go to page 2.

9  BY MR. NAMMAR:

10  Q    Do you recognize a number of the employees listed on this

11  page?

12  A    I do recognize the employees on this page, yes.

13  Q    And were some of them working directly under you during

14  this time period, April 2009?

15  A    Yes.

16          MR. NAMMAR:  Your Honor, I move to admit 9-134.  It

17  is also accompanied by a certification on the last page.

18          THE COURT:  Mr. Kennedy, any objection?

19          MR. KENNEDY:  No objection.

20          THE COURT:  9-134 is admitted then without objection.

21          (Exhibit 9-134 received in evidence.)

22          THE COURT:  You may publish.

23          MR. NAMMAR:  If we can go to the last page.

24  BY MR. NAMMAR:

25  Q    Is this a certification of records from the United States

1   Department of Labor, as indicated on the last page?

2   A    That's what I'm seeing here, yes.

3          MR. NAMMAR:  Okay.  And now if we can go to the first

4   page.

5   BY MR. NAMMAR:

6   Q    And it lists Profile Workweek, April 2009.  Do you see

7   that?

8   A    Yes.

9   Q    Go to the second page.  And it lists a number of

10  employees.  Do you recognize these as employees of Kama'aina

11  Termite and Pest Control?

12  A    Yes.

13  Q    And were you working and supervising some of the

14  fumigation folks in or around this time, April of 2009?

15  A    Yes.

16  Q    Okay.  I want to start and ask you about a few of the

17  folks here.  Alfredo Cabael, it lists that you're on salary.

18  Was that your understanding at the time, that you were on

19  salary?

20  A    No.

21  Q    What was your understanding about your pay at the time?

22  A    I can't recall exactly, but I was getting paid a check and

23  a cash payment.

24  Q    What do you mean by that?

25  A    I can't say if it was a 40-hour check or if it was cut up

```
 1   in -- in pieces or what, but it was a check.  And I can't
 2   recall what the total was and I would get a $300 cash.
 3   Q    Who would give you the cash?
 4   A    Michael.
 5   Q    And did that practice go on for a long time?
 6   A    It did.
 7   Q    For how long?
 8   A    I believe up until I left Kama'aina in '15, 2015.
 9   Q    So you would get a check, but you would also get cash?
10   A    Correct.
11   Q    And who would the cash come from?
12   A    Michael.
13   Q    Okay.  If we could go to Arthur Lake now.
14        Is this the salesperson for the statement that we just
15   looked at?
16   A    It is.
17   Q    He's a fumigator, right?
18   A    Yes.
19   Q    Do you believe the 40 hours to be accurate?
20   A    No.
21            MR. NAMMAR:  If we could zoom --
22   BY MR. NAMMAR:
23   Q    You believe he works more than that?
24   A    I believe he did, yes.
25            MR. NAMMAR:  If we could zoom out.
```

1    BY MR. NAMMAR:

2    Q    Brian Neves, do you see he's listed as 27.75 hours?

3    A    Mm-hmm.  Yes.

4    Q    What did he do for work?

5    A    He was a fumigator also.

6    Q    Do you believe that the 27 hours is accurate?

7    A    No.

8    Q    If we go down to number 11, 12, and 13, who are these

9    folks?

10   A    They were fumigators.

11   Q    Each one of them?

12   A    Correct, each one of 'em.

13   Q    Do you believe those hours to be accurate?

14   A    No.

15   Q    Jason Smith, in particular, tell us about him.

16   A    Jason Smith was one of the CDL-certified fumigators that

17   needed to be on jobs at all times driving the truck.

18   Q    Did he almost always work over 40 hours?

19   A    Almost always did, yes.

20          MR. NAMMAR:  Can you zoom out.

21   BY MR. NAMMAR:

22   Q    Kevin Buck, do you see that?

23   A    Yes.

24   Q    What did he do?

25   A    Kevin Buck did both fumigation and ground termite.  I'm

```
 1   not sure if he was doing ground termite at this time, but he
 2   was one ground termite technician and fumigator.
 3   Q    Do you believe the 25.75 hours to be accurate?
 4   A    No.
 5              MR. NAMMAR:  Can zoom out.
 6   BY MR. NAMMAR:
 7   Q    Nainoa Demello, who is that?
 8   A    Nainoa Demello was also a fumigator.
 9   Q    Do you believe the 40 hours to be accurate?
10   A    No.
11   Q    You can go to Perry Kea.  What did Perry do?
12   A    Perry was also a fumigator.
13   Q    Do you believe the 33 hours to be accurate?
14   A    No.
15   Q    Zooming out, Raymond, who was that?
16   A    He was the termite inspector.
17   Q    Is this the person that initially gave you some
18   instruction on ground termite application?
19   A    He is.
20   Q    Do you believe that the 40 hours to be accurate?
21   A    No.
22   Q    You believe he works more than that?
23   A    Yes, he did.
24   Q    Below that is Ronald Preslar.  What did he do?
25   A    He also worked in fumigation and ground termite.
```

1   Q    And do you believe that the 28 hours is accurate?

2   A    No.

3            MR. NAMMAR:  Could zoom out.

4   BY MR. NAMMAR:

5   Q    Stacy Burnam?

6   A    Also a fumigator.

7   Q    Do you believe the 28 hours to be accurate?

8   A    No.

9   Q    Do you believe he worked more than that?

10  A    Yes.

11  Q    And then Wayne Shigematsu?

12  A    Also a fumigator.

13  Q    Do you believe the 33 hours to be accurate?

14  A    No.

15  Q    You believed he worked more than that?

16  A    Yes.

17           MR. NAMMAR:  You could zoom out.  And zoom in on 10.

18  BY MR. NAMMAR:

19  Q    Hansen Apo, who is that?

20  A    He was an employee that would work maybe a week or two

21  every now and then.  He -- I believe he worked on fumigation

22  that time.

23  Q    Did you know whether he was close with Mr. Miske or not?

24  A    I believe he was.

25  Q    How would you describe his work ethic?

1   A    I don't think he had any work ethic.

2   Q    How would you describe his reliability as an employee from
3   your perspective?

4   A    He was not reliable.

5   Q    What makes you say that?

6   A    He -- he would just randomly work.  I don't know when he
7   came in, when he didn't.

8             MR. NAMMAR:  If you can zoom out.

9   BY MR. NAMMAR:

10  Q    So these folks, many of them that we went through as
11  fumigators, that you told us were fumigators, would these have
12  been the people that you talked to before the auditor showed up
13  from the Department of Labor?

14  A    Yes.

15  Q    And these fumigators, you mentioned they were paid in
16  overtime.  Would you ever see them being paid?

17  A    I have.

18  Q    How would you see them being paid?

19  A    They will get cash in envelopes --

20  Q    Okay.

21  A    -- handed to 'em.

22  Q    Where would they get that cash from?

23  A    From either Michael or Andi in Michael Miske's office.

24  Q    Okay.  Would you sometimes see them waiting for their cash
25  on Fridays?

1    A    Yes.

2    Q    Tell us about that.

3    A    There's times that we come in and nobody's there to

4    distribute the cash, and they would have to wait for that.  And

5    they'll just hang out in front of the shop.

6    Q    You mentioned Andi.  What would she do in relation to

7    hours and pay?

8    A    She was the person that -- that took care of that, kept

9    track of hours and made sure that they got their checks.

10   Q    Okay.  If these records that are in front of us were given

11   to the Department of Labor, based on your experience at

12   Kama'aina for 13 years, who do you think would have drafted the

13   records?

14   A    I would say Andi --

15        MR. KENNEDY:  Speculation.

16   A    -- would be the one to handle this.

17        MR. NAMMAR:  Sorry.  I didn't hear the ruling, Your

18   Honor.

19        THE COURT:  Ruling on what?

20        MR. NAMMAR:  Oh, there was an objection.

21        THE COURT:  Well, I didn't hear the objection.

22        MR. NAMMAR:  Oh, okay.

23        MR. KENNEDY:  Objection, speculation, Your Honor.

24        THE COURT:  To what question?  Based on your

25   experience --

1            MR. KENNEDY:  Based on the -- yes.

2            THE COURT:  -- who do you think would have drafted

3    the records?

4            MR. KENNEDY:  Yes.

5            THE COURT:  That's the question that you objected to?

6            MR. KENNEDY:  Yes.

7            THE COURT:  All right, because there was no -- not

8    only did I not hear it, but apparently the court reporter did

9    not either.  The objection is overruled.

10   BY MR. NAMMAR:

11   Q    So who do you think would have drafted these records,

12   Mr. Cabael?

13   A    It would have been Andi.

14   Q    And why do you think that?

15   A    'Cause she handled the -- the hours and the -- the pay for

16   the employees.

17   Q    When regulators were involved, based on your time and

18   working with Michael Miske, is that something he usually was

19   kept apprised of?

20   A    Yes.

21   Q    And when you were involved with regulators, like the

22   Department of Labor here, would you keep Mr. Miske apprised of

23   your interaction with regulators?

24   A    Yes, I would.

25   Q    Whose business was it?

1   A     It was Michael Miske's business.

2           MR. NAMMAR:  Your Honor, can we publish 1-67?

3   BY MR. NAMMAR:

4   Q     Do you recognize the person shown here?

5           THE COURT:  Go ahead.

6   A     That is Andi.

7   BY MR. NAMMAR:

8   Q     The person that was in charge of bookkeeping at Kama'aina?

9   A     Actually, she was in charge of all the administration

10  work.

11          MR. NAMMAR:  You can take that down.

12  BY MR. NAMMAR:

13  Q     The overtime pay in cash, did it stop after the audit?

14  A     No.

15  Q     Did it continue?

16  A     Yes, it did.

17  Q     For how long?

18  A     I can't say if it's -- if it continued all the way to

19  2015, but it did.

20         I can't say for how long.

21  Q     Okay.

22          THE COURT:  Just a couple of more minutes.

23          MR. NAMMAR:  Yeah, you know, I'm kind of at a good

24  transition spot, Your Honor.

25          THE COURT:  All right.

1          May I see counsel at sidebar briefly, please?

2          (Sidebar on the record.)

3          THE COURT:  Mr. Kennedy and Ms. Panagakos, there have

4    been a couple of times in response to witness questions that

5    your client has audibly responded, and I'm not sure that you're

6    aware a couple times I could hear it.  Likely the jury can hear

7    it, so I just want you to be aware of it.  That's all I wanted

8    to tell you.

9          MR. KENNEDY:  Thank you.

10          THE COURT:  All right.

11          (End of sidebar.)

12          THE COURT:  All right.  We'll go to break for the

13    trial day then.  As we recess until tomorrow at 8:30 I will

14    remind our jurors to refrain from discussing the substance of

15    this case with anyone, including each other, until I advise you

16    otherwise; to refrain from accessing any media or other

17    accounts of this case that may be out there.  And finally,

18    please do not conduct any independent investigation into the

19    facts, circumstance, or persons involved.

20          We will begin tomorrow at 8:30.  There is a schedule

21    change that I wanted you to be aware of.  I previously had let

22    you know that I had a conflict on Monday, April 8th, and that

23    we would need to go dark because of that conflict with another

24    criminal case that I was handling.  That conflict has been

25    resolved, and we do not need to go dark on that day.  It's one

1    day that I think we can recoup from the many days that we have

2    missed for unforeseen circumstances.  So please put that day

3    back on your schedule.  Again, that's Monday, April 8th.  So we

4    will see you tomorrow morning at 8:30.

5              COURTROOM MANAGER:  All rise for the jury.

6              (The jury was excused at 1:28 p.m.)

7              (Whereupon, at 1:29 p.m., the proceedings adjourned.)

8              (End of partial transcript.)

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT REPORTER CERTIFICATE

 2          I, Ann B. Matsumoto, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5   complete, true, and correct transcript of the stenographically

 6   recorded proceedings held in the above-entitled matter and that

 7   the transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9          DATED at Honolulu, Hawaii, June 22, 2024.

10

11

12                          /s/ Ann B. Matsumoto
13                          ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25
```