1               IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3

4     UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                     )
5                   Plaintiff,       )  Honolulu, Hawaii
                                     )
6          vs.                       )  March 13, 2024
                                     )
7     MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 37
                                     )
8                   Defendant.       )
      _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DERRICK K. WATSON
11          CHIEF UNITED STATES DISTRICT COURT JUDGE

12    APPEARANCES:

13    For the Government:        MARK A. INCIONG, AUSA
                                 MICHAEL DAVID NAMMAR, AUSA
14                               WILLIAM KEAUPUNI AKINA, AUSA
                                 Office of the United States Attorney
15                               Prince Kuhio Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
16                               Honolulu, Hawaii 96850

17    For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                 841 Bishop Street, Suite 2201
18                               Honolulu, Hawaii 96813

19                               MICHAEL JEROME KENNEDY, ESQ.
                                 Law Offices of Michael Jerome
20                               Kennedy, PLLC
                                 333 Flint Street
21                               Reno, Nevada 89501

22
      Official Court            ANN B. MATSUMOTO, RPR
23    Reporter:                 United States District Court
                                300 Ala Moana Boulevard, Room C-338
24                              Honolulu, Hawaii 96850

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).

1                    I N D E X

2    WITNESS:                                    PAGE NO.

3    FOR THE GOVERNMENT:

4      ALFREDO CABAEL, JUNIOR (CONTINUED EXAMINATION)

5       RESUMED DIRECT EXAMINATION BY MR. NAMMAR        5

6

7                   E X H I B I T S

8    Exhibit 9-1237 received in evidence              14

9    Exhibit 4-126 received in evidence               16

10   Exhibit 6-67 received in evidence                33

11   Exhibit 9-113 received in evidence               40

12   Exhibits 9-47 through 9-49 and 9-52              51
     received in evidence
13
     Exhibit 9-1236 received in evidence              67
14
     Exhibit 1-977A received in evidence              72
15
     Exhibit 1-882 received in evidence               87
16
     Exhibit 9-99 received in evidence               106
17
     Exhibit 9-281 received in evidence              109
18
     Exhibit 9-106 received in evidence              111
19
     Exhibit 9-108 received in evidence              116
20
     Exhibit 9-126 received in evidence              119
21
     Exhibit 9-300 received in evidence              129
22
     Exhibits 9-303, 9-306, and 9-307               132
23   received in evidence

24   Exhibit 9-301 received in evidence              132

25   Exhibit 9-295 received in evidence              138

1                 E X H I B I T S (Continued)

2                                                         PAGE NO.

3    Exhibit 9-609 received in evidence                    144

4    Exhibit 9-610 received in evidence                    148

5    Exhibit 9-612 received in evidence                    150

6    Exhibit 9-40 received in evidence                     156

7    Exhibit 9-294 received in evidence                    167

8    Exhibit 5000-84 received in evidence                  174

9    Exhibits 9-521 and 9-522 received                     183
     in evidence
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  WEDNESDAY, MARCH 13, 2024                    8:34 A.M. O'CLOCK
 2              (Open court in the presence of the jury.)
 3              COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,
 4  United States of America versus Michael J. Miske, Junior.
 5              This case has been called for jury trial, Day 37.
 6              Counsel, please make your appearances for the record.
 7              MR. INCIONG:  Good morning, Your Honor.  Mark
 8  Inciong, Michael Nammar, and KeAupuni Akina for the United
 9  States, along with Kari Sherman and FBI Special Agent Thomas
10  Palmer.
11              THE COURT:  Good morning.
12              MR. KENNEDY:  Good morning, Your Honor.  Michael
13  Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and
14  Josh Barry.  Good morning to you all.
15              THE COURT:  Good morning.  You may be seated.
16              Good morning to the 16 persons on our jury.
17              Mr. Cabael, good morning to you, sir.  I will remind
18  you, although we will not re-swear you, you do remain subject
19  to the same oath that you started your testimony with
20  yesterday.  Do you understand that?
21              THE WITNESS:  I do.
22              THE COURT:  Okay.  Mr. Nammar, you may resume when
23  you're ready.
24              MR. NAMMAR:  Thank you.
25  ///
```

```
 1              ALFREDO CABAEL, JUNIOR, GOVERNMENT'S WITNESS,
 2                          PREVIOUSLY SWORN
 3              MR. NAMMAR:  Your Honor, may we publish 9-134, that
 4   was one of the exhibits we left off with yesterday?
 5              THE COURT:  Go ahead.
 6              MR. NAMMAR:  Thank you.
 7              Can we go to page 2.  Can you zoom in on the first
 8   line.  Thank you.
 9                     RESUMED DIRECT EXAMINATION
10   BY MR. NAMMAR:
11   Q    Mr. Cabael, do you recognize the name here, Adrian Lono?
12   A    I do.
13   Q    What did Mr. Lono do for Kama'aina Termite and Pest
14   Control?
15   A    He was a fumigator.
16   Q    Okay.  And was he in the tranche of employees that you say
17   would regularly work over 40 hours?
18   A    Yes.
19   Q    Okay.  It looks like he has zero hours listed here.  Do
20   you know if he was not working that week in 2009?
21   A    I can't say if he was working that week.
22   Q    But for the weeks that he was regularly working, was he
23   working more than 40 hours?
24   A    He was.
25   Q    Was he also one of the fumigators that would receive cash
```

1    payments in overtime?

2    A    He was.

3    Q    And was he one of the fumigators that you would see

4    receiving those same cash payments in overtime?

5    A    Yes.

6              MR. NAMMAR:  You can take that down.

7    BY MR. NAMMAR:

8    Q    Yesterday we talked briefly about a fumigation upon Sudee

9    Dahl's house in Hawaii Kai.  Do you remember that?

10   A    Yes.

11             (The proceedings recessed at 8:37 a.m. until

12   9:01 a.m.)

13             (Open court in the presence of the jury.)

14             THE COURT:  All right.  We're back from our unplanned

15   break.  Hopefully we've gotten rid of the menehunes in our

16   system and we're ready to go.

17             So Mr. Nammar, you may try again.

18             MR. NAMMAR:  Thank you.

19   BY MR. NAMMAR:

20   Q    Mr. Cabael, we were talking about Sudee Dahl before we

21   broke, and you reminded us that you had talked yesterday about

22   a fumigation of his house in Hawaii Kai?

23   A    Correct.

24   Q    Did Mr. Dahl have a nickname that you were aware of?

25   A    The Korean.

1   Q     And would Mr. Miske sometimes refer to Mr. Dahl as The

2   Korean?

3   A     Yes.

4   Q     Okay.  I want to switch gears now and ask you, turn your

5   attention to 2011.  In that year do you recall driving out to

6   Sand Island with Mr. Miske and some other individuals?

7   A     Yes.

8   Q     Why did you go out to Sand Island?

9   A     Well, Sand Island, to take a guy out there.

10  Q     Okay.  Were you -- how did you get out to Sand Island?

11  A     We drove out in a Escalade.

12  Q     What color was the Escalade?

13  A     It was a black Escalade.

14  Q     And were you driving that car?

15  A     I was.

16  Q     Before getting to Sand Island, did you get instructions

17  from Michael Miske to pick him up?

18  A     I did.

19  Q     And where did you go pick him up?

20  A     I parked on Ala Moana Boulevard and picked him up from the

21  M Nightclub.

22  Q     Okay.  And when you picked up Mr. Miske, were -- before

23  you picked him up, were you alone in the Escalade?

24  A     Yes.

25  Q     And where did you pick up Mr. Miske?

```
 1   A    On Ala Moana Boulevard at the M Nightclub.

 2   Q    Okay.  And who else was with Mr. Miske when you picked him

 3   up?

 4   A    Andrew Kim and a young man I never met before.

 5   Q    Okay.  How would you describe Andrew Kim's build?

 6   A    He -- he was -- he's still pretty -- pretty tall.  He was

 7   pretty big.

 8   Q    Okay.  What about the young man that you never -- you said

 9   you never met before, how would you describe build?

10   A    He was a shorter guy, maybe about my height, if not

11   shorter.  And he was one thin guy, young.

12   Q    Okay.  Was he -- how would you describe his ethnicity?

13   A    I'd say he was Caucasian.

14   Q    What did you know about -- come to know about what that

15   individual, the Caucasian male, did for work?

16   A    I later found out that he was a bartender, I believe, at

17   the M Nightclub.

18   Q    Okay.  Did you know anything about whether he was a

19   holdover from Oceans 808?

20   A    That is my understanding, yes.

21   Q    So where do you drive, initially, to?

22   A    We drove directly to Sand Island Access Road.

23   Q    And how did you know to drive to Sand Island Access Road?

24   A    I was instructed by Mike Miske where to go.

25   Q    Did you know what was going to happen at the time on Sand
```

1    Island?

2    A     I kind of got an idea.

3    Q     When did you kind of get an idea?

4    A     When we -- driving down Sand Island Access Road at -- I

5    have no business there.

6    Q     What time of day was this?

7    A     That's got to have been maybe 11:00 o'clock at night,

8    maybe later.

9    Q     And where did you go on Sand Island Access Road?

10   A     We went to a dark, somewhat secluded area.  There were

11   structures around, but it's someplace I've never been before.

12   But it's kind of dark, wet, near the ocean.

13   Q     What happened when you got to that secluded area near the

14   ocean where it was dark?

15   A     Everybody got out the car, including myself.

16   Q     And is there any conversation at that point between

17   Mr. Miske and the white smaller male?

18   A     There was some conversation about stolen money.

19   Q     What do you recall?  Who was saying things about stolen

20   money?

21   A     Michael was talking to the young man about him stealing

22   money.

23   Q     And was the young man responding?

24   A     I -- I can't recall if he -- I -- I know he was

25   responding, but I can't recall what he was saying.

1    Q    Okay.  What do you recall happening next?

2    A    We were there for maybe a minute and then Andrew Kim

3    punched him in his face.

4    Q    And then what happened?

5    A    And he continued to hit him, continued to hit him in his

6    body, in his head.

7    Q    And this is Andrew Kim punching the white male?

8    A    Correct.

9    Q    The bartender?

10   A    Yes.

11   Q    What happens with the white male?  Does he stay up or does

12   he fall down?

13   A    He fell down.

14   Q    And what happens when he falls down?

15   A    I believe he tried to get back up.

16   Q    Was the white male fighting back at all?

17   A    No.

18   Q    Does Mr. Kim, Andrew Kim, continue to beat the white male?

19   A    Yes, he did.

20   Q    And what area of his body is the white male being hit on?

21   A    His head and his -- and his sides.

22   Q    Was he being hit on his eyes, in his eye area?

23   A    I believe that was the first hit.

24   Q    Was the white male fighting back?

25   A    No, not at all.

```
 1    Q    Did you join in at some point?

 2    A    I did.

 3    Q    What did you do?

 4    A    I hit him once in the body.

 5    Q    How long did this assault go on for?

 6    A    I'd say maybe a minute.

 7    Q    Was Mr. Miske doing any of the hitting of the white male?

 8    A    Not that I can recall, no.

 9    Q    Do you recall why the assault stopped?

10    A    I think he had enough.

11    Q    Who had enough?

12    A    The young man had enough.  He was just beat up too much.

13    Q    Did you notice whether he had any dirt on him after the

14    assault?

15    A    He was -- he was a little dirty.  He was bloody.

16    Q    Could you tell whether the white male was injured?

17    A    I could, yes.

18    Q    How could you tell?

19    A    His face was bleeding.

20    Q    Do you recall Miske saying anything to the white male

21    after the assault had stopped?

22    A    He did say things to a white male, but I can't recall

23    exactly what they were.

24    Q    Do you recall the subject of what those things were?

25    A    About money.
```

1   Q    Do you recall anything happening with a cell phone?

2   A    I recall Miske asking for the cell phone and then grabbed

3   the cell phone from the young man, threw it in the ocean.

4   Q    Miske threw it in the ocean?

5   A    Yes.

6   Q    Do you recall whether the white male was ordered to get on

7   his knees at any point?

8   A    I do not recall that.

9       He was on his knees last I remember.

10  Q    When you left?

11  A    When he grabbed the cell phone from him.

12  Q    Do you recall whether Miske was at any point yelling at

13  the white male?

14  A    Yeah, he continued to yell at him until we got into the

15  car.

16  Q    And then you eventually left?

17  A    Yes, we did.

18  Q    Why did you jump in and help with this assault?

19  A    I just felt that was my job.

20  Q    Did you feel it was expected of you?

21  A    I did.

22  Q    Was this after you had failed to do the staged break-in at

23  the bunker?

24  A    I can't believe if it was after, but that's just how I

25  felt.  I had -- about what I had to do.

1   Q     Did you feel it would help your standing with Mr. Miske if
2   you joined?
3   A     It did.
4   Q     Did you feel it would help you reinforce that you were a
5   part of his trusted circle?
6   A     Reinforced I was loyal to him.
7   Q     Did you believe it would help you in the future with
8   Mr. Miske?
9   A     I did.
10          MR. NAMMAR:  Your Honor, can we publish 1-22, which
11  is in evidence?
12          THE COURT:  Go ahead.
13  BY MR. NAMMAR:
14  Q     Do you recognize this road, Mr. Cabael?
15  A     That was the entrance to Sand Island Access Road, yes.
16  Q     Is it the road that you traveled down to go to the assault
17  spot?
18  A     Yes.
19          MR. NAMMAR:  May we publish 4-122, which is from our
20  original list and in evidence?
21          THE COURT:  Yes.  Go ahead.
22          MR. NAMMAR:  Thank you.
23  BY MR. NAMMAR:
24  Q     Mr. Cabael, 4-122 is up on the screen.  Do you recognize
25  this business, La Mariana?

```
 1   A     I do.

 2   Q     Was the assault spot near this business?

 3   A     Yes, it was.

 4         MR. NAMMAR:  Can we show the witness only 9-1237,

 5   which is from our ninth supplemental list?

 6         THE COURT:  Go ahead.

 7   BY MR. NAMMAR:

 8   Q     Do you recognize what's shown in 9-1237, Mr. Cabael?

 9   A     I do.

10   Q     What is shown there?

11   A     Looks like a property for -- for a boat ramp or something.

12   Q     Is this the area near where the assault occurred?

13   A     I believe it is, yes.

14   Q     Does it look a little bit different now, in 2024, when

15   this photo was taken?

16   A     Yes, it does.

17         MR. NAMMAR:  Your Honor, I move to admit 9-1237.

18         THE COURT:  Any objection?

19         MR. KENNEDY:  No objection.

20         THE COURT:  9-1237 is admitted without objection.

21         (Exhibit 9-1237 received in evidence.)

22         THE COURT:  You may publish.

23         MR. NAMMAR:  Thank you.

24   BY MR. NAMMAR:

25   Q     Mr. Cabael, the jury can see 9-1237.
```

1       Can you tell them what we're looking at here?

2   A   It looks likes a -- a yacht club or something -- some --

3   some sort around there.

4   Q   Okay.  Where did the assault occur?

5   A   If my memory is correct, it was somewhere right around

6   this area here (indicates).

7   Q   And were those trees and bushes there when -- back when

8   the assault occurred?

9   A   I don't believe so.

10  Q   How about that white gate?

11  A   I can't -- no, the white gate was not there.

12  Q   Okay.  Do you recall that -- seeing this area look

13  familiar over here on the right (indicates)?

14  A   Yes.

15  Q   Is this area near the ocean?

16  A   That is the ocean.

17  Q   Right there to the right?

18  A   Right past that fence, yes.

19          MR. NAMMAR:  May we show the witness only 4-126,

20  which is from our third supplemental list?

21          THE COURT:  Yes.  Go ahead.

22  BY MR. NAMMAR:

23  Q   Mr. Cabael, do you recognize 4-126?

24  A   I do.

25  Q   What is this a picture of?

1   A    That's a picture of the front of the M Nightclub, looking

2   at Ala Moana Boulevard.

3            MR. NAMMAR:  Your Honor, I'd move to admit 4-126.

4            THE COURT:  Any objection?

5            MR. KENNEDY:  No objection.

6            THE COURT:  4-126 is admitted without objection.

7            (Exhibit 4-126 received in evidence.)

8            THE COURT:  You may publish.

9   BY MR. NAMMAR:

10  Q    Mr. Cabael, the jury can see this photo.

11       What are we looking at here?

12  A    This is a view from the front of the M Nightclub, looking

13  at Ala Moana Boulevard.

14  Q    Does this show the general area where you picked up

15  Mr. Miske before -- and the white male before the assault?

16  A    Yes.

17  Q    Can you put an X on the screen of where you think that

18  area is?

19  A    (Complies.)

20           MR. NAMMAR:  Your Honor, may we publish 4-60 from our

21  original list, which I believe is evidence?

22           THE COURT:  Go ahead.

23  BY MR. NAMMAR:

24  Q    Mr. Cabael, do you recognize this map?

25  A    I do.

1    Q     Can you see the area on this map where you picked up

2    Mr. Miske and the white male and Andrew Kim before the assault?

3    A     I do.

4    Q     Can you put an X on that spot?

5    A     (Complies.)

6          MR. NAMMAR:  May we publish 4-2, which is from our

7    original list, Your Honor?

8          THE COURT:  You may.

9          MR. NAMMAR:  Can you zoom in on this area

10   (indicates).

11   BY MR. NAMMAR:

12   Q    Mr. Cabael, do you recognize this as a map of the Sand

13   Island area?

14   A     Yes.

15   Q     Can you put an X on the spot where you believe the assault

16   of the white male occurred?

17   A     (Complies.)

18          MR. NAMMAR:  And for the record, that's near the

19   Kihei boat harbor.

20          Your Honor, may we publish 1-45 from our original

21   list, which is in evidence?

22          THE COURT:  Yes.

23   BY MR. NAMMAR:

24   Q     Mr. Cabael, who's shown in 1-45?

25   A     That is Andrew Kim.

1   Q    Is this the individual that did most of the beating of the

2   white male on Sand Island?

3   A    Yes.

4           MR. NAMMAR:  May we publish 1-37?

5           THE COURT:  Yes.

6   BY MR. NAMMAR:

7   Q    Do you recognize the person shown in 1-37?

8   A    Yes, I do.

9   Q    Who is that?

10   A    That is Michael Miske.

11   Q    Do you see Mr. Miske in the courtroom?

12   A    I do.

13   Q    Can you point him out and describe an article of clothing

14   he's wearing?

15   A    He's standing -- sitting right behind you with a gray

16   suit.

17           MR. NAMMAR:  May the record reflect that the witness

18   has identified the defendant.

19           THE COURT:  Yes.  The record should reflect the

20   witness Mr. Cabael's identification of the defendant,

21   Mr. Miske.

22           MR. NAMMAR:  May we publish 1-897 from the original

23   list, which is in evidence?

24           THE COURT:  Go ahead.

25   BY MR. NAMMAR:

1   Q    Mr. Cabael, 1-897 is on the screen.  Who is this person?

2   A    His name is Hansen.

3   Q    He's the person that you talked about yesterday who didn't

4   have a stellar work ethic?

5   A    Correct.

6   Q    Do you recall him being at the Sand Island assault of the

7   white male?

8   A    I cannot recall him being there.

9   Q    You cannot recall.  So he may have been there, he may not

10  have been there?

11  A    He may have been there, may not have been there.

12       MR. NAMMAR:  May we publish 1-546 from the original

13  list, which is in evidence?

14       THE COURT:  Go ahead.

15       MR. NAMMAR:  Can we zoom in on all these people.

16  BY MR. NAMMAR:

17  Q    Do you recognize the individuals in this photo,

18  Mr. Cabael?

19  A    I do.

20  Q    And can you go from left to right, starting on the top

21  row?

22  A    That would be John Stancil, Andrew Kim, Caleb, Michael

23  Miske, I believe Josiah, Russell, myself, Hansen, and Jason.

24  Q    Jason, do you know his last name?

25  A    Jason Yokoyama.

```
1    Q    And Russell?

2    A    Moscato.

3    Q    And Hansen, did you know his last name?

4    A    I do not know his last name right now.

5    Q    Okay.  And is this a good shot of the build of Andrew Kim?

6    A    Yes.

7    Q    And if you could circle Andrew Kim in this picture.

8    A    (Complies.)

9    Q    Josiah Akau, can you circle that person?

10   A    (Complies.)

11   Q    What did that person do for work, if you know?

12   A    I believe he worked for a fire department.

13   Q    And Jason, can you circle that person?

14   A    (Complies.)

15   Q    What did he do for work, if you know?

16   A    He was the face of the M Nightclub.

17   Q    Did he start out his career working at Kama'aina Termite

18   and Pest Control?

19   A    He started off as assistant, I believe, to Michael.

20   Q    And Russell, can you circle Russell?

21   A    (Complies.)

22   Q    Is he the person that you said assisted in the second

23   season of the fireworks?

24   A    Correct.

25   Q    Is he the person that you told us actually went through
```

1    with the staged break-in at the bunker?

2    A    Yes.

3    Q    Does Russell have a nickname?

4    A    I can't recall if he did.

5    Q    After the Sand Island assault did Miske ever say anything

6    about contacting -- not to contact the police?

7    A    No.

8    Q    Is that something that Mr. Miske would have to tell you?

9    A    He would never have to tell me that.

10   Q    Why not?

11   A    Because he trusted that I'd be loyal enough not to do

12  that.

13   Q    Did you question Mr. Miske before or after the assault as

14  to why it was going to go down or why it went down?

15   A    I never questioned anything he did.

16   Q    Why would you never question Mr. Miske?

17   A    It just came with -- with me being me.  I never questioned

18  him.  I didn't think I had to.

19   Q    Would you question him when he told you to do certain

20  things?

21   A    No.

22   Q    Even if they were illegal?

23   A    Yes.

24   Q    In your time at Kama'aina, did you also hear of another

25  assault of a Terminix employee?

 1   A    I did.

 2   Q    Who did you hear that from?

 3        MR. KENNEDY:  Objection, hearsay, Your Honor, and

 4   past -- past narrative.

 5        THE COURT:  Overruled.  Go ahead.

 6   BY MR. NAMMAR:

 7   Q    Who did you hear that from?

 8   A    I heard that talk through Russell Moscato.

 9   Q    This is the person that we just looked at on the picture?

10   A    Correct.

11   Q    This is the same person that you said staged the break-in?

12   A    Correct.

13   Q    What did Russell tell you about the assault of the

14   Terminix employee?

15        MR. KENNEDY:  Same objection, Your Honor.

16        THE COURT:  Same ruling.  Go ahead.

17   BY MR. NAMMAR:

18   Q    You can answer.

19   A    I'm not sure how the conversation came about or why it

20   even came about, but he just talked about a salesman from

21   another company that got beat up for talking about Kama'aina

22   Termite in a bad way.

23   Q    Did Russell say where the assault took place?

24   A    Up in Kalihi somewhere, in 'Alewa.

25   Q    Did he ever laugh about it when he was talking to you?

1    A    Yes.

2    Q    Did hearing about the assault of the Terminix employee

3    that was talking bad about Kama'aina surprise you?

4    A    No.

5    Q    Why not?

6    A    'Cause we did what we had to do to make -- make ourselves

7    successful, whether it be illegal or not.

8    Q    Did it appear to you when you were working at Kama'aina

9    that Mr. Miske cared about his business reputation?

10   A    Very much.

11   Q    What makes you say that?

12   A    He had -- he had a handle on everything that went -- went

13   on there, and he instructed us to make sure that things got

14   done and taken care of to be successful.

15   Q    And when he would hear that people were talking poorly

16   about your company, would he act?

17   A    Yes.

18   Q    I want to switch gears now and stay on 2011.  Around that

19   time period did you disperse chloropicrin in two nightclubs?

20   A    I did.

21   Q    What were the nightclubs that you personally dispersed

22   chloropicrin in?

23   A    SoHo and Pearl.

24   Q    Did someone ask you to do that?

25   A    Michael Miske, yes.

1   Q    How did that initially come about with Mr. Miske asking

2   you to do it?

3   A    I -- I can't recall exactly how it came about.

4   Q    Tell us about the initial discussion with Mr. Miske.

5   A    "I want to shut that club down."

6   Q    Which club was talked about first?

7   A    Pearl.

8   Q    And Mr. Miske said to you he wanted to shut the club down?

9   A    Correct.

10  Q    Was -- if you know, was Pearl a competitor of any -- of

11  Mr. Miske's club M Nightclub?

12  A    It was.

13  Q    Was there a follow-up conversation after this initial

14  conversation with Mr. Miske about Pearl, doing Pearl nightclub

15  and how you would accomplish it?

16  A    I can't recall if he had a conversation about that, but I

17  kind of created my own idea of how I was going to do it.

18  Q    Did you tell him -- did you tell Mr. Miske about your

19  idea?

20  A    I did.

21  Q    What did you tell him about your idea?

22  A    I was going to enter a club with a syringe full of this

23  teargas chloropicrin and disperse them in the nightclub.

24  Q    And what was Mr. Miske's response?

25  A    I can't recall exactly what his response was.

1  Q   What was the goal of dispersing the chloropicrin in the

2  Pearl nightclub?

3  A   Make it very uncomfortable for the people in the nightclub

4  and make them leave that place.

5  Q   And go where?

6  A   The M.

7  Q   So the first one you did was Pearl, you said?

8  A   Correct, Pearl.

9  Q   Where is that nightclub?

10 A   It was in Ala Moana Shopping Center.

11 Q   And what preparations did you do before dispersing the

12 chloropicrin in Pearl?

13 A   You mean before going to Pearl or at Pearl?

14 Q   Before Pearl.

15 A   I gathered what I needed, and that was a syringe.  It was

16 a pretty large syringe.  Maybe carried about a third of the

17 bottle of chloropicrin with me in that syringe.

18 Q   Where --

19 A   And there was a needle on that syringe.

20 Q   Where did you get the syringe?

21 A   I can't recall exactly where I got the syringe from.  I

22 believe in somewhere in the shop.

23 Q   What was the syringe used for?

24 A   I -- I'm not sure.

25 Q   I mean in the commercial context, was it used in pest

1   control?

2   A   I -- I don't think it was used in pest control.  I can't

3   say right now.

4   Q   Okay.  But you got it from the shop?

5   A   I did.

6   Q   And how many ounces, if you know, does a chloropicrin

7   bottle hold?

8   A   I think the chloropicrin bottle is about 15 ounces, if not

9   more.

10  Q   And how much of that bottle did you put in the syringe?

11  A   Maybe about five to seven ounces.

12  Q   And how did you hide that syringe once it was filled with

13  chloropicrin?

14  A   I hid it between my body and my pants.

15  Q   Okay.  Did you go to the Pearl nightclub alone?

16  A   I did.

17  Q   What kind of night was this?

18  A   It was a busy night.  It was a weekend.

19  Q   Were there a lot of people in the club?

20  A   Lot of people, mostly standing room.

21  Q   Was it more than a hundred, you would say?

22  A   I'd say somewheres around that, yes.

23  Q   Okay.  And what happened when you initially got to the

24  club?

25  A   I had been in there once before.  I didn't really know the

1    layout of the club.  So I just kind of walked around, bought me

2    a drink so I don't look suspicious, and just walked the club

3    and to kind of see where I would possibly disperse this gas at,

4    or this liquid, and my exit route.

5    Q    Were you nervous?

6    A    Very nervous.

7    Q    Had you worked with this chemical before in pest control?

8    A    Many times, yes.

9    Q    Were you aware that it could harm individuals?

10    A    I was aware that it was very harmful, yes.

11    Q    Why did you go through with it?

12    A    To prove myself.

13    Q    To who?

14    A    To Michael.

15    Q    How did you disperse the chemical?

16    A    When I was in there, I put the syringe in my pocket, stuck

17    the needle through my -- my fabric of my pocket and walked

18    throughout the -- throughout the club and just squeezed out of

19    that syringe, spraying it all over the place.

20    Q    Did you disperse the entire amount in the syringe?

21    A    I did.

22    Q    Did you stick around to see what happened after you

23    released it?

24    A    I did not.  I was afraid.

25    Q    You left right away?

```
 1   A     I did.

 2   Q     Where did you go?

 3   A     Straight to the shop.

 4   Q     And what did you do with the syringe at the shop?

 5   A     Disposed in the dumpster at the shop.

 6   Q     At some point after doing this, did you report back to

 7   Mike what you had done?

 8   A     I did.  I can't recall exactly at what point I did, but I

 9   did.

10   Q     What was his reaction?

11   A     We both laughed at it.

12   Q     You laughed at it?

13   A     Yes.

14         MR. NAMMAR:  Can we publish 6-46, Your Honor, which

15   is from our original list and in evidence?

16         THE COURT:  Go ahead.

17   BY MR. NAMMAR:

18   Q     You said that the Pearl nightclub was located at the Ala

19   Moana mall?

20   A     Yes.

21   Q     What area of the mall was it located?

22   A     There was an upper level, above the open parking lot,

23   above the parking structure.  And it was right around here

24   (indicates).

25   Q     It was on the mauka side?
```

```
 1    A     On the mauka side of Ala Moana, yes.

 2          MR. NAMMAR:  Okay.  We can take that down.

 3    BY MR. NAMMAR:

 4    Q     You said you also did another club, a nightclub?

 5    A     I did.

 6    Q     Which club was that?

 7    A     It was a SoHo nightclub in Chinatown.

 8    Q     How much time elapsed between when you did Pearl and when

 9    you did SoHo?

10    A     I can't tell for sure.  It was a couple weeks maybe to a

11    month.

12    Q     Had you ever heard of the SoHo nightclub before?

13    A     Never did.

14    Q     Whose idea was it to do the SoHo nightclub?

15    A     It was also Mike's idea.

16    Q     Did Mr. Miske also instruct you to release chloropicrin in

17    that nightclub?

18    A     Yes.

19    Q     Did you make the same preparations that you did with the

20    Pearl nightclub?

21    A     I did.

22    Q     Did you get a similar syringe?

23    A     Similar syringe, yes.

24    Q     And did you also fill that syringe up with about five

25    ounces of chloropicrin?
```

```
 1   A     Yes.

 2   Q     Did you take anyone with you that night?

 3   A     I took my now ex-girlfriend.

 4   Q     Who was that?

 5   A     Nalani Epstein.

 6   Q     Why did you take someone with you?

 7   A     Because I'd never been there before and I just didn't want

 8   to feel out of place, feel like I went there for a purpose and

 9   that's to enjoy the night with someone.

10   Q     You thought it would help you avoid detection by bringing

11   your ex-girlfriend?

12   A     Yes.

13   Q     Can you describe the SoHo club?

14   A     This is a -- very dark.  It wasn't nothing like Pearl.  It

15   was one level, just looks like all concrete.  And I think it

16   was a little smaller than the Pearl.

17   Q     What area of town was it in?

18   A     It was in Chinatown.

19   Q     Did you do it on a busy night as well?

20   A     I did.

21   Q     When you went in, was this club also packed?

22   A     It was.

23   Q     How many people would you say were in there?

24   A     Maybe the same amount as Pearl, if not little less.

25   Q     So more than a hundred?
```

1   A     Somewheres around there, yes.

2   Q     What happened when you initially got into SoHo?

3   A     First thing I did was walk -- walk my girlfriend to the

4   bar, get a drink for her and I.

5   Q     And did you scope -- then after that did you scope out the

6   club for a while?

7   A     I did.  The bar was on the opposite side of the entrance,

8   so I scoped it from there, figured out how I was going to get

9   out.

10  Q     Did you tell your girlfriend that you were going to do

11  this?

12  A     She has no idea that I did that.  Till today.

13  Q     How did you hide it from her?

14  A     Same thing, I hid it in my pants.  And when nobody's

15  looking, I put it in my pocket and did the same thing and had

16  that needle stick out of my pants.

17  Q     Was it dark or light in this club?

18  A     It was very dark.

19  Q     Was it loud?

20  A     Very loud.

21  Q     With what?

22  A     Loud music.

23  Q     And did you end up dispersing the chemical with the

24  syringe like you had done at Pearl?

25  A     Yes, on the dance floor in the middle -- in the middle of

1    the crowd on the dance floor I did.

2    Q    Did you disperse the entire amount?

3    A    I did.

4    Q    Did you stick around to see what happened or did you leave

5    right away?

6    A    I left right away.

7    Q    And did you leave with your girlfriend at the time?

8    A    Yes.

9    Q    What did you all do after dispersing the chloropicrin?

10   A    Went back to the shop, I believe.

11   Q    And what did you do with the syringe at the shop?

12   A    I threw it in the dumpster.

13   Q    Did your girlfriend ever suspect you after it was done?

14   A    No.  I never told her about it.  She never knew about it.

15   Q    Did you tell Mr. Miske like you had told him after you did

16   Pearl?

17   A    I did.

18   Q    What was his reaction?

19   A    The same thing as the last one.

20   Q    You laughed about it?

21   A    We did.

22         MR. NAMMAR:  Can we show the witness only 6-67?

23   BY MR. NAMMAR:

24   Q    Mr. Cabael, do you recognize this map as of the Chinatown

25   area?

1   A    Yes.

2   Q    Can you see the approximate area where you believe SoHo

3   club was on this map?

4   A    I would have to guess it was right around here

5   (indicates).

6           MR. NAMMAR:  Your Honor, I move to admit 6-67 at this

7   time.

8           THE COURT:  Any objection?

9           MR. KENNEDY:  No objection.

10          THE COURT:  6-67 is admitted then without objection..

11          (Exhibit 6-67 received in evidence.)

12          THE COURT:  You may publish.

13  BY MR. NAMMAR:

14  Q    Okay.  6-67 is up on the screen.  And you circled an area

15  on the bottom near -- between Pauahi Street and Hotel Street;

16  is that correct?

17  A    Correct.

18  Q    That's where you believe SoHo was in the vicinity of?

19  A    I believe so, yes.

20          MR. NAMMAR:  Okay.  You can take that down.

21          May we publish 9-489 at this time, Your Honor, which

22  is from the original list?

23          THE COURT:  Go ahead.

24  BY MR. NAMMAR:

25  Q    9-489 is up on the screen, Mr. Cabael.  Is this what the

1    outside of a chloropicrin box resembles?

2    A    Yes, it is.

3    Q    And you said you're familiar with just how dangerous it

4    was.  Do you recall seeing the skull and crossbones symbol

5    regularly when you were working at Kama'aina?

6    A    Yes.

7    Q    Was that known to you and everybody else who worked at

8    Kama'aina?

9    A    Yes, it is.

10              MR. NAMMAR:  Can we go to page 2.

11   BY MR. NAMMAR:

12   Q    Were you also aware from looking at the label that it also

13   had the same danger, poison, and skull and crossbones signal?

14   A    Yes.

15   Q    And have you yourself felt the effects when working at

16   Kama'aina Termite and Pest Control of just how powerful that

17   chemical could be?

18   A    Yes, I have.

19   Q    What effects have you felt?

20   A    Eyes burning, coughing, you can't breathe.

21   Q    Did you know this chemical that you dispersed in the

22   nightclubs could be fatal if inhaled by humans?

23   A    I did.

24   Q    But you did it anyways?

25   A    Yes, I did.

1  Q    Are you proud of what you did?

2  A    No, I'm not.

3  Q    And as you testified earlier, was this to show your

4  loyalty to Mr. Miske?

5  A    It was.

6  Q    Did you tell the FBI initially about this?

7  A    I did not.

8  Q    Why not?

9  A    I was afraid.

10  Q    Did you eventually, though, tell the FBI about dispersing

11  the chloropicrin in the two different nightclubs?

12  A    First chance I did, I did let them know about it.

13         MR. NAMMAR:  Your Honor, may we publish 1-43 from the

14  original list?

15         THE COURT:  Go ahead.

16  BY MR. NAMMAR:

17  Q    Mr. Cabael, do you recognize who is in this photo?

18  A    Wayne Miller.

19  Q    And who was Mr. Miller?

20  A    Mr. Miller was a -- a real close associate, a friend of

21  mine.

22  Q    Do you know whether he went way back with Mr. Miske?

23  A    Long before I met Mr. Miske, yes.

24  Q    Where is Mr. Miller from?

25  A    I'm sorry?

```
 1   Q    What part of the island is he from?

 2   A    I believe he's from Waimanalo.

 3   Q    Is that also where you believe Mr. Miske is from?

 4   A    Correct.

 5   Q    Do you recall a time when Mr. Miske -- Mr. Miller was

 6   released from prison?

 7   A    I do.

 8   Q    And what was he released from prison for?

 9   A    I -- I think it had something to do with a bank.

10   Q    Had you met Mr. Miller before he was imprisoned for the

11   bank offense?

12   A    I can't -- I can't say.  I can't recall that right now.

13   Q    Okay.  Did you come in contact with Mr. Miller, though,

14   after he was released from prison?

15   A    Yes.

16   Q    At the time, was Mr. Miller staying in a halfway house?

17   A    He was.

18   Q    And would you call over to that halfway house to get

19   Mr. Miske out?

20   A    I would.

21   Q    Excuse me, to get Mr. Miller out?

22   A    I would call for Mr. Wayne Miller, yes.

23   Q    Who directed you to do that?

24   A    Michael.

25   Q    Did you do that multiple times?
```

1  A     Multiple occasions, yes.

2  Q     Did Mr. Miller work for Kama'aina Termite and Pest

3  Control?

4  A     He -- he -- he worked with me a couple of times, yes.

5  Q     Just a couple of times?

6  A     Yes.

7  Q     And after that, was he really -- would you consider him an

8  employee after that?

9  A     I would not.

10  Q     The term -- when he worked for you, the term

11  "babysitting," would that refer to him?

12  A     Yeah.  Yes.

13  Q     Why do you say that?

14  A     Because it wasn't a scheduled thing.  It's not like I

15  planned on him being with me.  It's just he was just thrown in

16  the truck with me and just kind of hung out with me.

17  Q     Was he helping at all?

18  A     He would help sometimes, yes.

19  Q     Okay.  But after those initial times, would you not

20  consider him an employee at Kama'aina Termite and Pest Control?

21  A     Yes.  I would not.

22  Q     Would you see him at work often, though?

23  A     He would be at the shop often.

24  Q     What would he be doing at the shop?

25  A     He would be in the office talking with Mike or just paying

1   a visit for a little bit, and he'd go somewhere else.  I don't

2   know where he'd go.

3   Q    When he was in the office with Mike, did you feel

4   comfortable hanging around the two of them?

5   A    I did not.

6   Q    Why not?

7   A    Because they -- they have a relationship, like I said,

8   before I knew Mike and I didn't want to get in between their

9   discussions or whatever they were doing.

10  Q    So would you leave the office when they were in the office

11  together?

12  A    I would.

13  Q    Would you see other people like Mr. Miller hanging out at

14  the shop a lot despite the fact that they weren't working

15  there?

16  A    I would see people hanging out at the shop, yes.

17  Q    Who were some of the other folks that you saw at the shop

18  that were not working there?

19  A    Andrew Kim, Russell Moscato.  A few more I can't think of

20  right now.

21  Q    Was John Stancil one of those people?

22  A    John Stancil was an occasional one there, yes.

23  Q    How about Cody Stancil?

24  A    Oh, Cody was there too, yes.

25  Q    In the time that you were working for Kama'aina, did it

```
 1    seem like Mr. Miske had a habit of recruiting fumigators from
 2    halfway houses?
 3    A    I -- I wouldn't say recruiting fumigators.  I think it was
 4    more so getting friends over to -- to Kama'aina's office, yes.
 5              MR. NAMMAR:  Can we show the witness only 9-113 from
 6    our original list and go to page 39?
 7              THE COURT:  Go ahead.
 8    BY MR. NAMMAR:
 9    Q    Is that your name that appears at the bottom there?
10    A    That is.
11    Q    Is this a letter for TWIC waiver application for Wayne
12    Miller?
13    A    It is.
14    Q    Is that the way you sign your name?
15    A    That does not look like my signature, no.
16    Q    It describes you in this letter as the lead foreman of
17    Kama'aina Termite and Pest Control.  Was that your role?
18    A    Yes.
19    Q    And was that your role around July of 2015, which is the
20    date of this letter?
21    A    Yes.
22              MR. NAMMAR:  Your Honor, I'd move to admit in its
23    entirety 9-113.  On the first page it's -- it contains a 803(6)
24    and 902(11) cert.
25              THE COURT:  Any objection?
```

 1             MR. KENNEDY:  Your Honor, could I just see the

 2   document first?

 3             THE COURT:  Yes.

 4             MR. KENNEDY:  (Reviews document.)

 5             Then if I could just see the first page, starting at

 6   39?  Thank you so much.  (Reviews document.)

 7             No objection, Your Honor.

 8             THE COURT:  Without objection, 9-113 is admitted

 9   then.

10             (Exhibit 9-113 received in evidence.)

11             THE COURT:  You may publish.

12             MR. NAMMAR:  Thank you.

13             If we could bring up page 39.  You can zoom in on the

14   whole letter.

15   BY MR. NAMMAR:

16   Q    Is that your name that appears there at the bottom?

17   A    It is.

18   Q    And is that how you sign your signature?

19   A    That is not my signature.

20   Q    Do you believe you did not sign this document?

21   A    Yes.

22   Q    Have you reviewed this document prior to coming to court

23   today?

24   A    I did.

25   Q    Do you believe the information on here is false?

1    A    I believe it is.

2    Q    Okay.  Let's start with the date.  Around this time

3    period, were you still -- July 2015 -- still working at

4    Kama'aina Termite and Pest Control?

5    A    Yes.

6    Q    And was one of your responsibilities that you were in

7    charge of the fumigate -- fumigation crew and some of the pest

8    control folks?

9    A    Correct.

10   Q    It says TWIC waiver application of Wayne Miller.  Do you

11   know what a TWIC waiver is?

12   A    It's a document you need to access any -- anything on the

13   ocean, piers, the military bases or anything that has to do

14   with the ocean.

15   Q    Do you know who gives you a TWIC waiver?

16   A    I -- I can't recall exactly where I need to go get that

17   from right now.

18   Q    Is it someone with the United States government?

19   A    It is.

20   Q    And in the first line it says:  My name is Alfredo Cabael,

21   lead foreman of Kama'aina Termite and Pest Control.  Is that

22   accurate?

23   A    Yes.

24   Q    It says -- then it goes on to say that:  I have supervised

25   Wayne K. Miller since May 2013 in his position as a ground

1   termite specialist.  Is that accurate?

2   A    No.

3   Q    Did Mr. Miller ever work as a ground termite specialist?

4   A    Maybe on one or two occasions with me.

5   Q    But other than that, no?

6   A    No.

7   Q    And then it goes on to say that:  Mr. Miller's work ethic

8   has proved valuable to our company and we recently promoted him

9   to an on-duty supervisor.  Is that true?

10  A    No.

11  Q    He was never an on-duty supervisor?

12  A    No.

13  Q    And at this time, 2015, was Mr. Miller even working for

14  Kama'aina Termite and Pest Control?

15  A    No.

16  Q    Do you know who wrote this letter?

17  A    I do not know who wrote that letter.

18  Q    Did you give anybody permission to sign your name?

19  A    No.

20         MR. NAMMAR:  Your Honor, can we publish 9-112, which

21  is from our original list and in evidence?

22         THE COURT:  Yes, you may.

23  BY MR. NAMMAR:

24  Q    9-112 is on the screen.  On the top part it's a little bit

25  cut off, but does this say United States Probation Office, and

1    does it list a time period of July 2015?

2    A    It does.

3    Q    Is that the same time period for the letter that we just

4    looked at?

5    A    It is.

6    Q    Okay.

7         MR. NAMMAR:  If you could zoom out now.  And if you

8    could zoom in on this box, right here (indicates).

9         And -- well, actually, I'm sorry, let's zoom out real

10   quick.

11   BY MR. NAMMAR:

12   Q    Is the name associated with this monthly supervision

13   report Wayne Miller?

14   A    It is.

15   Q    Okay.  And does it list the probation officer there as

16   Tsukayama?

17   A    It does.

18   Q    Okay.  And if we could zoom out and now go to that same

19   box.

20        And does this monthly supervision report list the name of

21   immediate supervisor as Alfredo Cabael?

22   A    It does.

23   Q    That's you, right?

24   A    That is me.

25   Q    And it represents here that in 2015, July, that Mr. Miller

1    had a shift position, was working full-time.  Is that accurate?

2    A    No.

3    Q    And he was -- you were not supervising Mr. Miller during

4    this period?

5    A    No, I was not.

6              MR. NAMMAR:  Your Honor, can we publish 9-110 --

7              THE COURT:  Yes.

8              MR. NAMMAR:  -- which is in evidence?

9              THE COURT:  Yes.

10   BY MR. NAMMAR:

11   Q    Is this a paycheck for Mr. Miller?

12   A    It does.

13   Q    And if we look at the bottom left of the paycheck, does it

14   list a period of June 28, 2015 to 7 -- to July 11th, 2015?

15   A    It does.

16   Q    And this is the same period we've been talking about,

17   correct?

18   A    Correct.

19   Q    Mr. Miller was not working as an employee for Kama'aina

20   Termite at this time?

21   A    He was not.

22   Q    And you were not supervising him?

23   A    No.

24             MR. NAMMAR:  Can we publish 9-111?

25             THE COURT:  Go ahead.

```
 1   BY MR. NAMMAR:

 2   Q    And this is another paycheck for Mr. Miller from Kama'aina

 3   Termite and Pest Control?

 4   A    Yes.

 5   Q    And does it list a pay period of July 12, 2015 to

 6   July 25th, 2015?

 7   A    It does.

 8   Q    Were you still working in Kama'aina Termite and Pest

 9   Control then?

10   A    I was.

11   Q    Was Mr. Miller not working for Kama'aina Termite and Pest

12   Control on this date?

13   A    He was not.

14        MR. NAMMAR:  Okay.  We can take that down now.

15   BY MR. NAMMAR:

16   Q    I want to switch gears and ask you about a time in

17   August 2013 where your Tacoma was searched by law enforcement.

18   Do you remember that?

19   A    I do.

20   Q    What were you -- where were you when your Tacoma was

21   searched by law enforcement?

22   A    I was on a pier where the fish auction is.

23   Q    And why were you on the pier where the fish auction was?

24   A    To meet our fishing vessel RACHEL.

25   Q    And what was the purpose of meeting the fishing vessel
```

1    RACHEL?

2    A    To get a dog that we had shipped in from California off

3    the boat.

4    Q    Who asked you to pick up a dog?

5    A    Mr. Miske.

6    Q    And what happened?

7    A    When I got to the dock I got surrounded by law

8    enforcement, multiple branches of the law enforcement.

9    Q    And do you recall them having a K-9?

10   A    I do.

11   Q    Did the law enforcement search your car?

12   A    They did.

13   Q    Did you tell them anything about a warrant?

14   A    I did.

15   Q    What did you tell them?

16   A    I told them they needed a warrant to search my vehicle.

17   Q    Did they listen to you?

18   A    They did not.

19   Q    And did you see some of the items they recovered from your

20   vehicle?

21   A    I did.

22   Q    What were some of the items they recovered from your

23   vehicle?

24   A    Some steroids, a bag that I was told was Ecstasy and a

25   photo ID and a gun.

```
 1   Q    Okay.  Did you have a tool -- what color was that Tacoma?

 2   A    It was a white Tacoma.

 3   Q    And did you have a toolbox in the bed of that Tacoma?

 4   A    I did.

 5   Q    Were some of the items taken from that toolbox?

 6   A    The gun was, yes.

 7   Q    Was there a particular item in the toolbox that you were

 8   very concerned about?

 9   A    A ledger.

10   Q    Was that item taken?

11   A    It was not.

12   Q    Okay.  Let's walk through some of the items you said were

13   taken.

14        Let's start with the steroids.  Were you -- were those

15   yours?

16   A    It was mine.

17   Q    Were you using steroids at the time?

18   A    I was.

19   Q    Who did you obtain those steroids from?

20   A    I got them from Bruce Perry.

21   Q    Did you obtain steroids from anyone else when you were

22   using them?

23   A    I got some steroids from Andrew Kim.

24   Q    And you mentioned also you had an ID taken?

25   A    I did.
```

 1   Q     Which ID was that?

 2   A     That was that fake ID for James Kealoha that we showed

 3   earlier.

 4   Q     That was the one that we talked about yesterday?

 5   A     Yes.

 6   Q     That you would use to access the bunkers?

 7   A     Correct.

 8   Q     And you said it was in the name of James Kealoha and it

 9   was a State of Hawaii ID?

10   A     Correct.

11   Q     You also said some Ecstasy was taken?

12   A     Some kind of drug, yes.

13   Q     Is Ecstasy also referred to as MDMA?

14   A     Correct.

15   Q     Where did you get the MDMA, or Ecstasy, from?

16   A     I got it from Michael.

17   Q     How many pills was that?

18   A     That's got to be over 60.

19   Q     Over 60 Ecstasy pills?

20   A     Yes.

21   Q     Why did Mr. Miske give it to you, if you know?

22   A     He just told me to hold onto it.

23   Q     How long before the seizure did he tell you to hold onto

24   it?

25   A     Some time.  Maybe a month, little longer.

```
 1   Q    Have you ever used Ecstasy?

 2   A    I did.

 3   Q    When you used it, how many pills did you take?

 4   A    One.

 5   Q    So this amount that he gave you, 60 pills, that was more

 6   than a person would take in one sitting, I take it?

 7   A    Correct.

 8   Q    And the gun that was seized, could you describe the gun?

 9   A    It was all black.  It had clips in the case.  I can't

10   recall exactly what caliber gun it was.

11   Q    Okay.  When you say it was in a case, what do you mean by

12   that?

13   A    It was in a gun case, a small, little case, kind of with

14   some indentures in the case and foam to hold the pieces

15   together there.

16   Q    And where did you get that gun from?

17   A    I got it from Mr. Miske.

18   Q    Where did that take place?

19   A    He gave me that in his office.

20   Q    Do you know where he obtained that gun from?

21   A    I was told it was his cousin's, Richard MacGuyer's.

22   Q    And did you know why, or was there any discussion as to

23   why Mr. Miske had Richard MacGuyer's gun?

24   A    He did not tell me directly why he had the gun, but I just

25   assumed it was for another reason that happened in the past.
```

1  Q    Did you think it was in any way related to the safe theft

2  that was reported at Richard's house?

3  A    Yes, the staged break-in at his house.

4  Q    Is that around the time that you believe you received the

5  gun from Mr. Miske?

6  A    Sometime after the staged break-in is when I received it,

7  yes.

8  Q    Okay.  And what did Mr. Miske -- what were his

9  instructions?

10 A    To just hold onto it.

11 Q    How long had you been holding onto it by the time you got

12 it?

13 A    I'd say maybe a month.

14 Q    You said you were using steroids.  Did that in any way

15 affect your ability to remember?

16 A    No.

17         MR. NAMMAR:  Can we show the witness 9-47 and 9-48 --

18 9-48, 9-49 and 9-52, which are from our original list?

19         THE COURT:  Go ahead.

20         MR. NAMMAR:  Let's start with 9-47.

21         Let's go to 9-48, 9-49, and 9-52.

22 BY MR. NAMMAR:

23 Q    Do you recognize these photos, Mr. Cabael?

24 A    I do.

25 Q    Are some of these hard to see?

```
 1   A     Yes.

 2   Q     Nonetheless, do you recognize them all as items that were

 3   taken from you, from law -- from law enforcement?

 4   A     Yes, I do.

 5   Q     At the pier in 2013?

 6   A     Yes.

 7              MR. NAMMAR:  Your Honor, I move to admit 9-47, 9-48,

 8   9-49, and 9-52.

 9              THE COURT:  Any objection?

10              MR. KENNEDY:  No objection.

11              THE COURT:  Without objection, those four exhibits

12   then are admitted.  That's 9, dash, 47 through 49, and 9-52.

13              (Exhibits 9-47 through 9-49 and Exhibit 9-52 received

14   in evidence.)

15              THE COURT:  You may publish.

16              MR. NAMMAR:  We can start with 9-47, if you could

17   zoom in.

18   BY MR. NAMMAR:

19   Q     It's tough to see, I know, but what can you make out in

20   this photo, Mr. Cabael?

21   A     That's the case.  And I -- I got to say the gun is

22   probably in the case because all I can see is the clips outside

23   of the case.

24   Q     Okay.  Do you recall the gun having multiple clips that

25   are shown here?
```

1   A    Yes.

2   Q    Can you circle the clips?

3   A    (Complies.)

4   Q    And can you circle the case?

5   A    (Complies.)

6   Q    Where do you recall this gun case being stored?

7   A    In my toolbox in the back of my truck.

8            MR. NAMMAR:  Can we publish 9-52?  And zoom in.

9   BY MR. NAMMAR:

10  Q    Hard to see again, but what do you believe we're looking

11  at here?

12  A    The clips.

13  Q    These are the clips that were with the gun?

14  A    Correct.

15  Q    This is the gun and the clips that you got from Mr. Miske?

16  A    Yes.

17           MR. NAMMAR:  May we publish 9-48?  And if we could

18  zoom in on all the items.

19  BY MR. NAMMAR:

20  Q    What are we looking at here, Mr. Cabael?

21  A    That bag of drugs and the needles and syringes that I used

22  for steroids.

23  Q    Okay.  Are these the syringes that you used for steroids

24  (indicates)?

25  A    Yes.

1   Q    And can you circle the bag of MDMA, or Ecstasy, that you

2   got from Mr. Miske?

3   A    (Complies.)

4   Q    And this was the MDMA that he asked you to hold onto?

5   A    Correct.

6            MR. NAMMAR:  Can we publish 9-49?

7   BY MR. NAMMAR:

8   Q    What is this, Mr. Cabael?

9   A    That's the vials of steroids I had in my vehicle.

10  Q    These are the steroids you said you got from Bruce Perry,

11  and you said you also got some from Andrew Kim?

12  A    Correct.

13           MR. NAMMAR:  Your Honor, may we publish 9-50, which

14  was admitted yesterday?

15           THE COURT:  Yes.

16           MR. NAMMAR:  If you could zoom in on the bottom

17  photo.

18  BY MR. NAMMAR:

19  Q    Mr. Cabael, is this -- what is this?

20  A    That is the ID that was taken from my vehicle on that day

21  of the -- when they searched my vehicle that night.

22  Q    This is the ID that was in the name of James Kealoha?

23  A    Yes.

24           MR. NAMMAR:  All right.  We can take that down.

25  BY MR. NAMMAR:

1   Q    So you said you -- you said these items were taken, but

2   you told us that there was another item that you were worried

3   about that was not seized; is that right?

4   A    Yes.

5   Q    What was that item?

6   A    The item was a ledger.

7   Q    Okay.  And after this encounter with law enforcement, did

8   you immediately report it to Mr. Miske?

9   A    I did.

10  Q    And what happened after you reported it to Mr. Miske?

11  A    He wanted to meet immediately.

12  Q    Where did you guys meet?

13  A    I can't recall exactly where it was, but it was in a

14  parking structure somewhere downtown -- downtown.

15  Q    Who was at that meeting?

16  A    Just myself and Michael.

17  Q    And what do you recall taking place at that meeting?

18  A    I can't recall if I was there before him or if he was

19  there before me, but I immediately went in back of my truck and

20  took the ledger out of the toolbox.

21  Q    And did you give Mr. Miske the ledger?

22  A    I did.

23  Q    Is this a memorable time as far as your reaction -- as far

24  as your interactions with Mr. Miske goes?

25  A    I'm sorry.  Repeat the question.

1    Q    Yeah.  Is this a -- is this a meeting that you remember

2    well?

3    A    Yes.

4    Q    Why is it that you remember it well?

5    A    Because that's the first time he's ever been that mad at

6    me.

7    Q    Were you concerned that you may be assaulted by Mr. Miske?

8    A    I was.

9    Q    What was Mr. Miske saying to you?

10   A    I don't know if I can say it on -- on record, but there

11   was a lot of swear words and --

12   Q    You can say it on record.

13   A    He said I'm a fucking dumbass, why the fuck are you

14   carrying this fucking shit around with you, I'm going to

15   fucking get put away for this, this shit will take me down.

16   Q    What was he talking about?

17   A    About the ledger.

18   Q    What did he do with the ledger in front of you?

19   A    He ripped it up.

20   Q    Ripped it up right in front of you?

21   A    Tore it up in pieces, yes.

22   Q    This is after he said it would take him down?

23   A    Yes.

24   Q    What was in that ledger?

25   A    Ledger was full with all cash payments to people.

1    Q    Is that something you would be in charge of?

2    A    Yes.

3    Q    Who were you making cash payments to?

4    A    Multiple people, mainly contractors.

5    Q    Where were you making these cash payments?

6    A    I'm sorry?

7    Q    Who were you making -- what -- what contractors were you

8    paying?

9    A    Just a lot of different contractors.  It's mainly

10   contractors up at the project up in Hawaii Kai.

11   Q    What project was that?

12   A    6 Lumahai Street.

13   Q    Can you describe it for the jury, that project?

14   A    It's a project.  It's a piece of property Mike purchased

15   and we were building a pretty large house on it.

16   Q    Were you heavily involved in that construction?

17   A    From Day 1.

18   Q    And was one of your jobs to regularly pay the people that

19   were working on that job?

20   A    Yes.

21   Q    Would you pay those people in cash?

22   A    Yes.

23   Q    And was that one of the things that you wrote down in the

24   ledger, those cash payments?

25   A    Yes.

1    Q    Did that make up the bulk of what was in the ledger that
2    Mr. Miske ripped up?
3    A    It did.
4    Q    And approximately how much money was accounted for in that
5    ledger, in cash payments?
6    A    Well over a million -- well over a million dollars' worth
7    of payments out.
8    Q    Why were you writing that stuff down?
9    A    Just to keep track from all the records in case he had
10   questioned me about a certain payment.
11   Q    In case who had questions?
12   A    In the case he questioned me or I -- or I had to refer
13   back to a certain time.
14   Q    This is Mr. Miske?
15   A    Yes.
16   Q    Did you change the way that you handled these cash
17   payments after this date?
18   A    It did.
19   Q    What did you change?
20   A    I wouldn't write it down in a ledger anymore, at least in
21   one like that.  I would type it in my phone and immediately
22   erase it.
23   Q    So there wouldn't be a paper trail?
24   A    Correct.
25   Q    What was being built at -- in Hawaii Kai?

1   A     I believe it to be Michael's personal residence.

2   Q     And where was it located?

3   A     On a dead-end street up on Hawaii Kai, Lumahai Street.

4   Q     How many years did you work on helping build that?

5   A     I would say it was a -- more than a year, probably two or

6   three.

7   Q     Did you start in or around 2011 or '12?

8   A     I believe it was 2012.

9   Q     And did you continue all the way until you left in

10  August 2015?

11  A     Yes, I did.

12  Q     And would you handle the cash payments to the workers on

13  that property during that time?

14  A     That property and other properties too.

15  Q     How many workers are we talking about on the Lumahai

16  property?

17  A     It would range from six to maybe nine, sometimes ten or

18  eleven.  Depends on what they were doing on the property at

19  that time.

20  Q     Per week?

21  A     Per week.

22  Q     What were you doing on this job site?

23  A     Acting kind of like a site superintendent.  What I kind of

24  did was coordinate the contractors, coordinate the material

25  being delivered for these contractors on certain stages of the

1   project.

2   Q    Would you ever have a hand in buying the materials?

3   A    Everything.

4   Q    And making sure that the materials showed up to the job

5   site?

6   A    Every day.

7   Q    How many hours a day were you working there?

8   A    On that property?

9   Q    Yes.

10  A    No, it -- I -- I had other tasks too.  I wasn't only

11  tasked at that property, but I got to say that was about --

12  bulk of my time a day was five -- five, six hours there.

13  Q    So you were also working at Kama'aina Termite and Pest

14  Control, but you were working on this Lumahai project at the

15  same time?

16  A    I was working on multiple things at the same time.

17  Q    What percentage of your time would you say you spent on

18  6 Lumahai?

19  A    I'd say 25 to 50 percent of my time.

20  Q    And did you ever keep track of the hours that you were

21  working on Miske's personal residence?

22  A    Never did.

23  Q    Were you -- how were you getting paid for your time at

24  6 Lumahai?

25  A    I was getting paid through Kama'aina Termite.

1  Q    And that was via check, and you mentioned some cash?

2  A    Correct, check and cash.

3  Q    Did you ever give your hours for any of that time to any

4  of Mr. Miske's staff or his accountant?

5  A    No.

6  Q    You said you thought it was his personal residence.  Why

7  did you think that?

8  A    Well, because he was so involved, and at one point he

9  actually told me where my room would be.

10 Q    He told you where your room would be?

11 A    Yeah.

12 Q    Did he talk about who was going to inhabit the other rooms

13 in the Lumahai house?

14 A    No.  He talked about where he -- his room was going to be.

15 Q    Would he mention girlfriends at any point?

16 A    Well, we joked around.  We were joking around about what

17 girlfriend would live with him on that property.

18 Q    Was living in the house a perk that Mr. Miske would dangle

19 over your head, so to speak?

20 A    I'd say yes.

21 Q    Would he also dangle business opportunities over your

22 head?

23 A    Yes, he did.

24 Q    What kind of business opportunities?

25 A    Well, he -- he promised me a part ownership or some part

```
 1   of a company that he owned.  He owned multiple companies.

 2   Q    Now, this work on Lumahai, where would you get the cash

 3   payments -- where would you get the cash to make the payments

 4   to the workers?

 5   A    I would get it from Michael.

 6   Q    And what day of the week would you get it?

 7   A    I would get it either on Thursday or Friday.

 8   Q    And where would you obtain it?

 9   A    I would get the cash in his office.

10   Q    How did you know what amount of cash to get from

11   Mr. Miske?

12   A    I would speak to the contractors, see how much people they

13   had working.  They would kind of give me an idea of who was

14   working, how much hours they worked a day, and I would just

15   take their word for it.

16   Q    What did the average crew member make per week?

17   A    I'd say the highest ones would probably be about 1200, a

18   little more a week, and there was some that was about 900 a

19   week.

20   Q    And when you got the money from Mr. Miske, where would you

21   see him obtain it from?

22   A    From his desk.

23   Q    Where in his desk?

24   A    Either from a desk drawer or from some place behind his

25   off -- behind his desk in the corner.
```

 1            MR. NAMMAR:  May we publish 1-778, which is from our

 2    original list, and I believe in?

 3            THE COURT:  Go ahead.

 4    BY MR. NAMMAR:

 5    Q    What are we looking at here, Mr. Cabael?

 6    A    This is his office.

 7    Q    Okay.  And is this -- the area where the couches are, is

 8    this the area that you would sometimes hang out with Mr. Miske

 9    and others?

10    A    Yes.

11    Q    Is this the area where you'd sometimes overhear Mr. Miske

12    talking with others about legal and illegal subjects?

13    A    Correct.

14            MR. NAMMAR:  May we publish 1-777?

15            THE COURT:  Go ahead.

16    BY MR. NAMMAR:

17    Q    Can you see -- what are we looking at here, Mr. Cabael?

18    A    This is a view of Michael's desk.

19    Q    Can you see the area where Mr. Miske would obtain cash

20    when he would give it to you for the Lumahai workers?

21    A    Yes.

22    Q    Can you circle the areas that you recall?

23    A    (Complies.)

24    Q    The place that you circled on the right, did it look like

25    that, as you recall, when you were obtaining cash from

```
 1    Mr. Miske?

 2    A    I thought there was a drawer there, but he would always

 3    have cash in the back of that desk between the wall and his

 4    desk.

 5    Q    And the other area you circled was the bottom drawer on

 6    the left-hand side?

 7    A    Correct.

 8              MR. NAMMAR:  Can we publish 1-779?

 9              THE COURT:  Go ahead.

10    BY MR. NAMMAR:

11    Q    What are we looking at here?

12    A    That's another view of Michael's office and his desk.

13    Q    Do you recognize what's on the wall that I just circled?

14    A    Looks like a dry erase board.

15    Q    Would Mr. Miske ever write messages to you on that board?

16    A    He would.

17    Q    Would he erase them after he wrote them?

18    A    Yes.

19    Q    Did you know where the money was coming from, all that

20    cash you were paying the workers?

21    A    I had an idea, yes.

22    Q    Where did it come from?

23    A    The nightclub.

24    Q    Why did you think that?

25    A    Because when I'm in the office Jason Yokoyama would drop
```

```
 1   off big envelopes of cash.

 2   Q    How often would that happen?

 3   A    I'd say maybe once a week, after the weekend.

 4   Q    And what did Jason do with respect to the nightclub?

 5   A    He managed the nightclub.

 6   Q    What kind of envelopes are we talking?

 7   A    Large orange or yellow manila envelopes.

 8   Q    Like the paper size?

 9   A    The paper size, yes.

10   Q    Okay.  And after Mr. Yokoyama would deliver those

11   envelopes, would you on occasion have to go into that same

12   envelope to get cash out?

13   A    There has been times that I went into the envelopes to get

14   cash out, yes.

15   Q    Why would you have to do that?

16   A    Because maybe Michael wasn't around to get it, and I had

17   to pay these guys.

18   Q    And how much cash, when you went in the envelope, how much

19   cash would you observe?

20   A    I would say five to ten thousand.

21   Q    And the denominations that you were obtaining from

22   Mr. Miske to pay the workers, were those indicative of money

23   from the nightclub?

24   A    They're most -- mostly in 20s, yes.

25   Q    And did that also make you think that the money was coming
```

1    from the nightclub?

2    A    Correct.

3    Q    In addition to seeing Jason make deliveries, did Jason in

4    your presence also talk to Mike Miske about how things were

5    going at the nightclub?

6    A    He would.

7    Q    And was this at the same time or around the same time he

8    would make cash deliveries?

9    A    Correct.

10   Q    What would Jason say?

11   A    Ah, he'd just say if it was a slow weekend or what they

12   plan on doing this coming weekend or whatever it'd be about the

13   club.

14   Q    These weekly drop-offs that you would make to the workers,

15   do you have an idea of approximately how much money in total

16   those drop-offs were?

17   A    How much money in total, or are you talking about a week

18   or the entire project?

19   Q    Per week.

20   A    Well, in the beginning it was much more bigger than it was

21   towards the end.  I'd say it would probably be upwards of above

22   10,000.

23   Q    Per week?

24   A    Per week.

25   Q    What was the crew doing usually when you would show up to

1   pay the crew?

2   A   They would be hanging outside along the side of the road

3   by the cars, waiting to get paid, drinking beer.

4   Q   Did you recently find some notes in your house in Utah

5   that related to these payments?

6   A   I did.

7   Q   And did you provide those notes recently to the FBI?

8   A   I did.

9        MR. NAMMAR:  Your Honor, may we show the witness only

10  9-1236?  And can we scan through these.

11  BY MR. NAMMAR:

12  Q   Do you recognize this notebook and these notes,

13  Mr. Cabael?

14  A   I do.

15  Q   Are these notes that you took to keep track of the tasks

16  and the payments on the property at 6 Lumahai that you were

17  building, help building -- helped build for Mr. Miske?

18  A   Yes.

19  Q   Are these accurate copies of your notes?

20  A   Yes.

21        MR. NAMMAR:  Your Honor, I move to admit 9-1236.

22        THE COURT:  Any objection, counsel?

23        MR. KENNEDY:  Still reviewing them, Your Honor.

24        THE COURT:  Yes.  Go ahead.

25        MR. KENNEDY:  (Reviews documents.)

```
 1                No objection.

 2                THE COURT:  Without objection, 9-1236 is admitted.

 3                (Exhibit 9-1236 received in evidence.)

 4                THE COURT:  You may publish.

 5                MR. NAMMAR:  Thank you.

 6                Can we start with the first page.

 7   BY MR. NAMMAR:

 8   Q    What is shown on the first page of 9-1236?

 9   A    There is a notebook.

10   Q    And these are the -- this is the notebook that you

11   recently provided to the FBI?

12   A    Correct.

13                MR. NAMMAR:  Can we go to page 3.  And can we zoom in

14   right here (indicates).  I'm sorry.  Zoom out.

15                Can we zoom in on all of this (indicates), including

16   that.  Yeah.

17   BY MR. NAMMAR:

18   Q    Okay.  The date that's associated with this is 9/21.  Is

19   that -- did I read that right?  Or 9/14?  Sorry.

20   A    9/14 to 9/20.

21   Q    Okay.  What are we looking at here?

22   A    Individuals that would work on the project and what they

23   got paid and how much hours they were working for that week.

24   Q    And which project is this?

25   A    This is for 6 Lumahai.
```

1  Q    Do you recognize some of the names on here?

2  A    I do.

3  Q    Can you tell us who those individuals are?

4  A    Well, Woody was the -- like the lead on the job.  And

5  Jason was kind of like the second person in charge when Woody's

6  not there.

7  Q    Okay.

8  A    And the rest were just regular laborers.

9  Q    What does the -- what do these numbers mean, 30 -- next to

10 Jason it says 34, and then it says one, three, six, zero?

11 A    I believe that's the hours he -- he worked, and that's the

12 pay that for -- he got for that week.

13 Q    Okay.  And at the bottom, is that the total for the week?

14 A    That is.

15 Q    And these would all be cash payments that you made to the

16 workers on that week?

17 A    Correct.

18 Q    And the cash you would get from Miske, and then you would

19 pay to the workers?

20 A    Yes.

21         MR. NAMMAR:  If we can go to page 3.  Maybe that was

22 the same.

23         Page 5.  And zoom in on this (indicates).

24 BY MR. NAMMAR:

25 Q    What is shown here, Mr. Cabael?

1   A     Same thing.  Individuals, the hours, and the weekly pay.

2   Q     And was one of these again Woody?

3   A     Correct.

4   Q     And Jason?

5   A     Yes.

6   Q     And this is the total off here to the right?

7   A     Yes, it is.

8   Q     So that would have been 6524 for the week?

9   A     Yes.

10          MR. NAMMAR:  Can we go to page 11.  And zoom in on

11   this (indicates).

12   BY MR. NAMMAR:

13   Q     What is shown here, Mr. Cabael?

14   A     The same thing.  The -- the people working, performing the

15   work, their hours and the -- and the total pay for the week.

16   Q     So again, Woody, who you said was the lead?

17   A     Mm-hmm, yes.

18   Q     Jason was the assistant lead?

19   A     Yes.

20   Q     And the total is 7932?

21   A     Correct.

22          MR. NAMMAR:  Can we go to page 16.  And can we zoom

23   in on this note (indicates).

24   BY MR. NAMMAR:

25   Q     Were you keeping notes to try to remember some of the

 1   tasks that you needed to complete and the tasks you had

 2   completed?

 3   A     Yes.

 4   Q     Is the date associated with this note November 6, 2012?

 5   A     Yes.

 6   Q     And based on seeing that, do you believe that cash

 7   payments that we had just looked at are from that same year,

 8   2012?

 9   A     I do.

10   Q     We looked at a lot of payments for Woody.  How many years

11   do you think you were paying Woody and his guys?

12   A     Like I would say, when I left in 2015, most of the rough

13   work was done on the excavation, so I can't say it was to that

14   date, but it was about maybe two, two and a half years,

15   somewheres around there.

16   Q     Okay.  This first note says:  Met with Tony and Denny to

17   discuss manhole lift and lateral connect.  Do you see that?

18   A     Yes.

19   Q     Did I read that right?

20   A     Correct.

21   Q     Who is Denny?

22   A     Denny is Mike's cousin-in-law who owns a -- or who did own

23   a plumbing company.

24   Q     And was that plumbing company affiliated at all with

25   Kama'aina Termite?

1    A    It was Kama'aina Plumbing, yes.

2    Q    Okay.  And was Denny helping out at all on the Lumahai

3    project?

4    A    He did, but not as a -- he worked with a different company

5    at that point.

6    Q    What company was Denny working for at this point?

7    A    He was working with his cousin, Scott's Plumbing, on the

8    project.

9              MR. NAMMAR:  We can take that down and show the

10   witness only 1-977A, which is from our -- I think it's the

11   ninth supplement, or most recent one.

12             THE COURT:  Go ahead.

13             MR. NAMMAR:  And if we can toggle through these for

14   the witness.  There's quite a few of them.

15             THE WITNESS:  (Reviews document.)

16   BY MR. NAMMAR:

17   Q    Mr. Cabael, do you recognize these 63 pages that we just

18   went through?

19   A    Yes.

20   Q    Are these a number of photos that you personally took?

21   A    I did.

22   Q    Are these of -- majority of them of the Lumahai project?

23   A    Correct.

24   Q    Are some of them of the M Nightclub?

25   A    I -- I would believe so, yes.

1   Q    And was a couple of 'em from fumigation projects that you

2   were working on at Kama'aina Termite and Pest Control?

3   A    Yes.

4   Q    Are these photos all accurate?

5   A    Yes, they are.

6           MR. NAMMAR:  Your Honor, I move to admit 1-977A.

7           THE COURT:  Any objection, counsel?

8           MR. KENNEDY:  No objection.

9           THE COURT:  Without objection, 1-977, alpha, is

10  admitted then.

11          (Exhibit 1-977A received in evidence.)

12          THE COURT:  You may publish.

13          MR. NAMMAR:  Thank you.

14          If we could start with page 1 and zoom in on that

15  photo.

16  BY MR. NAMMAR:

17  Q    Do you recognize this photo, Mr. Cabael?

18  A    Yes, I do.

19  Q    What's going on here?

20  A    That is a picture of me sitting in an excavator at the

21  start of the project.

22  Q    This is 6 Lumahai?

23  A    Yes, it is.

24          MR. NAMMAR:  And if we zoom out, and look at the date

25  acquired on the metadata.

```
 1    BY MR. NAMMAR:

 2    Q    Does it list a date of 2012?

 3    A    It does.

 4    Q    And --

 5              MR. NAMMAR:  Yeah, that's good.

 6    BY MR. NAMMAR:

 7    Q    Do you believe that this was around the summer of 2012, to

 8    the best of your recollection?

 9    A    Yes.

10              MR. NAMMAR:  If we can go to page 2, and zoom in on

11    that.

12    BY MR. NAMMAR:

13    Q    What is shown here?

14    A    Building retaining walls for the project on Lumahai.

15    Q    Do you recognize who these -- any of these workers are?

16    A    I do.

17    Q    Who are they?

18    A    Jason is in the green shirt and Kalani in the orange.

19    Q    So this is Jason right here (indicates)?

20    A    Yes.

21    Q    What is this structure that's right here on the top right

22    that I circled?

23    A    That was our office we operated out of.

24    Q    Is that an area that you would work out of it sometime?

25    A    Yes.
```

```
1                    MR. NAMMAR:  If we can go to page 7.

2    BY MR. NAMMAR:

3    Q    What are we looking at here?

4    A    This looks like when they were building the retaining wall

5    on the ocean side of the property.

6    Q    Do you recognize some of the workers here?

7    A    I do.

8    Q    Who are they?

9    A    Jason again in the green, Woody in the gray, and looks

10   like Kalani in the red.

11   Q    Is Woody one of the people you said was the lead foremen?

12   A    Yes, he was.

13   Q    And Jason was second in charge?

14   A    Jason was, yes.

15   Q    And those were some of the individuals you would

16   frequently pay in cash every week?

17   A    Ups to about nine people, sometimes more.

18                    MR. NAMMAR:  Can we go to page 15.

19   BY MR. NAMMAR:

20   Q    What are we looking at on page 15?

21   A    That looks like the retaining wall again, foundation --

22   I'm sorry -- for a retaining wall.

23   Q    Do you recognize the folks in this photo?

24   A    Again, that's Jason in the green on the left and Woody

25   holding the concrete pump hose.  And the one on the right, I
```

1    can't recall his name.

2    Q    Was there a lot of site work that needed to be done for

3    this construction?

4    A    A lot, yes.

5    Q    Why was that?

6    A    It's just because the house was -- the property was kind

7    of like on a cliff, and it was a sloping terrain, so there was

8    a lot of foundation work that had to be built.

9    Q    Was it sloping right to the ocean?

10   A    Towards the ocean, yes.

11         MR. NAMMAR:  If we can show page 19.

12   BY MR. NAMMAR:

13   Q    Do you recognize who's shown in this photo?

14   A    The young man to the left, he -- he was a Kama'aina

15   Termite and Pest Control employee.  But I forgot his name.

16        And then you have, I think, a nephew of Sudee Dahl.  And

17   then you got Jason in the green on the back.

18   Q    Is this a -- the nephew of Sudee Dahl right here --

19   A    Yes.

20   Q    -- in the white?  Is he one of the ones you would pay in

21   cash?

22   A    Correct.

23   Q    And the person on the left, you say, was a Kama'aina

24   Termite employee?

25   A    Yes.

1   Q     Did Kama'aina Termite employees sometimes work on the

2   Lumahai construction?

3   A     They would.

4   Q     And when would they work on the construction?

5   A     When we had special projects or we -- we needed some extra

6   help there besides Woody's guys, if they didn't have enough

7   people there.

8   Q     Were you ever keeping track of any of the Kama'aina

9   Termite and Pest Control workers' hours?

10  A     I believe I did, but I can't recall how I did that.

11  Q     Okay.

12         MR. NAMMAR:  If we can go to page 21.

13  BY MR. NAMMAR:

14  Q     Do you recognize what's shown here?

15  A     Looks like a container with storage for the fishing boat.

16  Q     What makes you say it's for the fishing boat?

17  A     Because that float's there and looks like that's a fishing

18  line rows on the -- on the left side of the container.

19  Q     Is it in this area right here (indicates)?

20  A     Yes.

21  Q     Do you know where this photo is taken?

22  A     I can't say for sure.  I would have to say it's in the

23  Matson yard in Campbell Industrial Park.

24  Q     And this truck that's shown there, is that your truck?

25  A     That is my truck.

1    Q    That's the white Tacoma you described was seized --

2    searched by law enforcement?

3    A    Yes.

4    Q    Do you see the toolbox where the ledger was?

5    A    Yes.

6    Q    Can you circle that?

7    A    (Complies.)

8         MR. NAMMAR:  Can we show page 25.

9    BY MR. NAMMAR:

10   Q    Do you recognize this photo?

11   A    That's a photo of the fumigation at Polynesian Cultural

12   Center.

13   Q    Were you working on that fumigation?

14   A    I did.

15   Q    And what did that fumigation involve?

16   A    We had tented individual villages and their huts for

17   termites.

18   Q    Where is this on the island?

19   A    That is in Laie towards the North Shore of Oahu.

20   Q    Were you tenting multiple -- fumigating multiple huts?

21   A    Yes.  We would fumigate maybe four, five a night.

22   Q    Okay.

23        MR. NAMMAR:  Can we go to page 27.

24   BY MR. NAMMAR:

25   Q    What is shown here?

1   A    That is the retaining wall for the pool.

2   Q    You recognize the person shown in this photo?

3   A    He was an employee for the pool people.

4          MR. NAMMAR:  Can we go to page 29.

5   BY MR. NAMMAR:

6   Q    What is shown here?

7   A    Again, the same -- the same wall for the pool.

8   Q    Do you recognize the individuals shown here?

9   A    Yes.

10  Q    Who are they?

11  A    I stand corrected.  The first picture is also of Woody's

12  guy, along with this one here.  Looks like Sudee's nephew.

13  Q    Which one is Sudee's nephew?

14  A    The one on the left.

15  Q    That one that I just circled?

16  A    Yes.

17          MR. NAMMAR:  We can go to page 35.  You could zoom in

18  on those -- yep, those individuals.

19  BY MR. NAMMAR:

20  Q    Where is this photo taken?

21  A    That is taken at the top of the property of 6 Lumahai.

22  Q    And do you recognize the folks shown in this photo?

23  A    I do.

24  Q    Who are they?

25  A    The man in the orange is the contractor for the swimming

```
 1   pool, Walter.  And then you got Michael in the middle, and then
 2   you got Ozzy on the right.
 3   Q    Okay.  What did -- you said Walter did the swimming pool?
 4   A    He did.
 5   Q    Would you also pay him in cash?
 6   A    Yes.
 7   Q    And his crew in cash?
 8   A    Correct.
 9   Q    And in the black and the board shorts, is that Michael
10   Miske?
11   A    Yes.
12   Q    And then on the right, in the black shirt with the shades
13   on his head, who is that?
14   A    That is Ozzy from Ozzy Construction.
15   Q    What did Ozzy's Construction do, if anything, on this job?
16   A    I'm not sure if they were the licensed person on the job,
17   licensed contractor, but he had a -- he had something to do
18   with the -- the project.  But I don't exactly know exactly what
19   it was.
20   Q    Do you recall paying any of his guys on the job?
21   A    I can't say.  No.
22            MR. NAMMAR:  Can we go to page 37.  Zoom in.
23   BY MR. NAMMAR:
24   Q    And what is shown here?
25   A    That's the list of contractors or people that had to do
```

 1    with the project.

 2    Q    Where was this board?

 3    A    That was in that trailer that sat at the top of the

 4    property.

 5    Q    Okay.  So Alfredo at the bottom, that's you, right?

 6    A    Correct.

 7    Q    Mike Miske and the number associated with him, is that

 8    542-3900?

 9    A    Yes.

10    Q    And then Kama'aina Plumbing is Denny.  Do you see that?

11    A    Yes.

12    Q    And that's the Denny you talked about before?

13    A    Correct.

14    Q    And then Woody's Concrete is Woody.  That's the one you

15    frequently made payments to?

16    A    Correct.

17    Q    And then under GC it has Ozzy.  Who's that?

18    A    That is a person in the picture we just see.

19    Q    Okay.

20              MR. NAMMAR:  Can we show page 39.

21    BY MR. NAMMAR:

22    Q    What is shown here?

23    A    That is the rough work for the swimming pool.

24    Q    And who's the person in the glasses on the right with the

25    ponytail?

1    A    That is Walter.

2         MR. NAMMAR:  Can we go to page 41.

3    BY MR. NAMMAR:

4    Q    What is shown here?

5    A    That is some of the Kama'aina Termite employees who

6    fumigate.

7    Q    Is this a couple of the fumigation crews?

8    A    That is.

9    Q    Can you tell us from left to right the folks that you

10   remember?

11   A    Pepe.  The short one, I forgot his name.  And then you got

12   Kai standing behind the short guy.  And then you got Nainoa.

13   Darnell.  Next one, I forgot his name.  And then you got Brian,

14   who's kneeling down there.  And then I'd like to say the guy in

15   the white shirt is Thurston.  I forget if that was his name,

16   but Thurston.  And then Daniel, I believe.  And I think that

17   big one's name was Kaulana.  And then Hana and Hugh Manalo.

18   Q    Can you circle Hugh Manalo?

19   A    (Complies.)

20   Q    Can you also circle Nainoa?

21   A    (Complies.)

22        MR. NAMMAR:  Can we go to page 52.

23   BY MR. NAMMAR:

24   Q    Did you take this photo, Mr. Cabael?

25   A    I did.

1   Q     What is this of?

2   A     That looks to be a frame for the Volkswagen bug we were

3   building.

4   Q     Was Miske restoring a number of classic cars when you

5   worked for him?

6   A     Yes, he was.

7   Q     And for some of that restoration work, would you also make

8   cash payments to the people who were restoring the cars?

9   A     I did.

10         MR. NAMMAR:  Can we go to page 58.  Can you zoom in

11   on this.

12   BY MR. NAMMAR:

13   Q     Did you also take this photo?

14   A     I did.

15   Q     What is this of?

16   A     That is one of the bars at M Nightclub.

17   Q     And the metadata associated with this is from 2012.  Do

18   you recall seeing a second old-school register behind the bar

19   at this time period?

20   A     I do not.

21         MR. NAMMAR:  Take that down.  We can take that down.

22         THE COURT:  If you're done with this exhibit, I think

23   now would be time for a break.

24         MR. NAMMAR:  I am, Your Honor.

25         THE COURT:  Okay.  As we go to break, I'll remind our

1    jurors to please refrain from discussing the substance of this

2    case with anyone, including each other, until I advise you

3    otherwise.  Refrain also from accessing any media or other

4    accounts of this case that may be out there.  And finally,

5    please do not conduct any independent investigation into the

6    facts, circumstances, or persons involved.

7               COURTROOM MANAGER:  All rise for the jury.

8               (The jury was excused at 10:37 a.m.)

9               (The proceedings recessed at 10:37 a.m. until

10   11:00 a.m.)

11              (Open court in the presence of the jury.)

12              THE COURT:  All right.  Back from our morning break,

13   the first break of the day.

14              Mr. Nammar, you may continue with your examination.

15              MR. NAMMAR:  Thank you, Your Honor.

16   BY MR. NAMMAR:

17   Q    Mr. Cabael, we've talked a little bit about the nightclub.

18   In the beginning, when the nightclub was getting set up, were

19   you helping with that as far as the remodel goes?

20   A    I was.

21   Q    How were you helping?

22   A    Like any other project, I was kind of handling the

23   contractors and making sure they needed -- they got what they

24   needed to get the job done.

25   Q    And was it similar to the assistance you were giving on

```
 1   6 Lumahai?

 2   A     Correct.

 3   Q     Were you also paying some of those contractors in cash?

 4   A     Yes, I was.

 5   Q     Do you remember any of those contractors?

 6   A     I do, but I don't remember the names exactly.

 7   Q     Okay.  After the nightclub got set up, were you around the

 8   nightclub a lot?

 9   A     I was.

10   Q     Would you on occasion help out with events at the

11   nightclub?

12   A     I did.

13   Q     What kind of events?

14   A     We would do events like fashion shows, Cinco de Mayo,

15   different ones.

16   Q     And besides helping out and working at the nightclub, were

17   you just hanging out at the nightclub after hours quite a bit?

18   A     Not so much the nightclub, but the bar outside of the

19   nightclub called the Row Bar.

20   Q     Okay.  Can you describe that bar?

21   A     It's a outside bar where a lot of people gather for like

22   happy hour and watch sports on TVs over there and drink.

23   Q     Could you eat food there as well?

24   A     Yes, you could.

25   Q     Would you go there almost every night?
```

1    A    Just about, yes.

2    Q    And was one of the perks that you enjoyed being in Miske's

3    trusted circle was that you could drink there for free?

4    A    Drink and eat, yes.

5    Q    And you could also eat for free?

6    A    Correct.

7    Q    Now, do you -- from your time at the M Nightclub, do you

8    recall seeing multiple sets of security?

9    A    I did.

10   Q    Was one set associated with Mr. Miske's crew, so to speak?

11   A    Yes.

12   Q    Who were the people they were associated -- the security

13   that was associated with Mr. Miske?

14   A    I'd say a guy named Mike B and Andrew Kim.

15   Q    And what made you believe that Andrew Kim and Mike B were

16   associated with Miske's security?

17   A    'Cause they always just wore black like the security that

18   was staffed there.

19   Q    Did they look like they were at the club to socialize, or

20   did they look like they were at the club to serve as a

21   security?

22   A    Well, maybe a little of both.

23   Q    Were they dressed identical to the security crew?

24   A    Identical, yes.

25   Q    Would you see them oftentimes interacting with the actual

1   security at the club?

2   A    I would.

3   Q    Did you see -- did you ever see this second set of

4   security assault anyone at the nightclub?

5   A    I'm sorry.  Repeat that.

6   Q    Did you see Andrew Kim assault anybody at the nightclub?

7   A    Right now, I can't remember, no.

8   Q    Okay.  Is there a time where you saw someone with security

9   assault someone in the nightclub or outside the nightclub?

10  A    I did.

11  Q    Tell us about that.

12  A    I was at the Row Bar.  I don't know what happened, but

13  they were chasing a guy out of the nightclub and he got hit a

14  few times as he was trying to exit the nightclub, or exit the

15  property towards the parking structure.

16  Q    Who was doing the hitting?

17  A    I can't say for sure who it was, but it was a nightclub --

18  it was a security.

19  Q    So you saw someone tying to leave the area and someone

20  from the nightclub that was with security staff assaulting that

21  individual?

22  A    Yes.

23       MR. NAMMAR:  Your Honor, could we show the witness

24  only 1-882?  From the original list.

25       THE COURT:  Go ahead.

1    BY MR. NAMMAR:

2    Q    Mr. Cabael, do you recognize this photo?

3    A    That's the Row Bar.

4    Q    And is that where you would often eat and drink for free?

5    A    Yes.

6              MR. NAMMAR:  I move to admit 1-882.

7              THE COURT:  Any objection?

8              MR. KENNEDY:  No objection.

9              THE COURT:  1-882 is admitted without objection.

10             (Exhibit 1-882 received in evidence.)

11             THE COURT:  You may publish.

12   BY MR. NAMMAR:

13   Q    Mr. Cabael, this is up on the screen.  Is this where you

14   would frequent almost every night to eat and drink for free?

15   A    Yes.

16   Q    This is one of the perks that you enjoyed as being in

17   Miske's trusted circle?

18   A    Correct.

19   Q    Is this the same area where you saw the security

20   individual with M Nightclub assault a patron?

21   A    Yes.

22             MR. NAMMAR:  May we publish 1-44, from the original

23   list?

24             THE COURT:  Go ahead.

25             MR. NAMMAR:  1-44 is up on the screen.

1  BY MR. NAMMAR:

2  Q    Do you recognize this photo, Mr. Cabael?

3  A    I do.

4  Q    Who is this?

5  A    That's Mike B.

6  Q    Is this one of the individuals you said was associated

7  with Miske's set of security at the nightclub?

8  A    Correct.

9           MR. NAMMAR:  We can take that down.

10  BY MR. NAMMAR:

11  Q    Did you know who the owner on paper was of the nightclub?

12  A    Jason Yokoyama.

13  Q    Okay.  In reality, though, who did you believe the owner

14  of the nightclub to be?

15  A    Mr. Michael Miske.

16  Q    Why did you think that?

17  A    Because he -- he ordered everything or -- or he made the

18  calls for that, that nightclub.

19  Q    So as far as making the calls, when there were these

20  special events that he would help out with, was Mr. Miske

21  making the calls?

22  A    Yes.

23  Q    When the bar was being renovated at the beginning, was

24  Mr. Miske making the calls?

25  A    Yes.

1    Q    Was Mr. Yokoyama even involved in that renovation in the

2    beginning?

3    A    No.

4    Q    What was Jason doing at the club?

5    A    During the construction phrase or after?

6    Q    When it was open, after.

7    A    He'd -- he'd walk around.  He'd be there speaking to

8    guests.

9            MR. NAMMAR:  Can we publish 1-39?

10           THE COURT:  Go ahead.

11   BY MR. NAMMAR:

12   Q    Do you recognize who this is?

13   A    That's Jason Yokoyama.

14   Q    He's the owner on paper of the club?

15   A    Correct.

16   Q    And the person that would interact with the customers?

17   A    Yes.

18           MR. NAMMAR:  You can take that down.

19   BY MR. NAMMAR:

20   Q    Do you recall hearing about an assault of an NFL football

21   player?

22   A    I did.

23   Q    Who did you hear that from?

24   A    I heard it --

25           MR. KENNEDY:  Objection, hearsay, Your Honor.

 1                    THE COURT:  Sustained.

 2    BY MR. NAMMAR:

 3    Q    Were you in Miske's presence when you heard about it?

 4    A    I was.

 5    Q    Okay.  What did Mr. Miske tell you?

 6    A    Well, he was telling others about it.

 7                    MR. KENNEDY:  Objection, past narrative, Your Honor.

 8                    THE COURT:  I'm sorry.  I didn't hear the objection.

 9                    MR. KENNEDY:  It's a past narrative.  No relevance.

10                    THE COURT:  Overruled.  Go ahead.

11    A    He was talking to people about it in front of me.

12    BY MR. NAMMAR:

13    Q    Who was he talking to in front of you?

14    A    I can't recall who was in that conversation.

15    Q    What was Miske saying about the football player who was

16    assaulted?

17    A    About -- about a scuffle they had at the nightclub and

18    about him hitting a guy over the head with a bottle.

19    Q    Did he say who that NFL football player was?

20    A    He did name him.  He did name the player, but I can't

21    recall his name right now.

22    Q    Did you later see about that or hear that that story made

23    national news?

24    A    I heard it made the news, yes.

25    Q    Did that help, in your opinion, to bolster Miske's

1    reputation?

2    A    I believe it did, yes.

3    Q    Do you know who Johnathan Fraser was?

4    A    I do know Johnathan, yes.

5    Q    Had you met him before?

6    A    On couple occasions.

7    Q    Would you see Mr. Fraser ever around the shop?

8    A    Not too often, but he was there sometimes.

9    Q    What did you know about Mr. Fraser at the time before you

10   had left to Utah, at the time you were working at Kama'aina

11   Termite and Pest Control?

12   A    He was a close friend to Michael's son Caleb.

13   Q    And is that when you would see Mr. Fraser, was around

14   Caleb Miske?

15   A    Yes.

16   Q    Did you ever have a conversation with Mr. Miske about a

17   watch that was missing?

18   A    I did.

19   Q    Tell us about that.

20   A    We got called.  There was a bunch of us that gathered

21   together to locate this individual named John because he had

22   supposedly stole a watch from Michael Miske's office.

23   Q    Did Mr. Miske tell you that?

24   A    Yes.

25   Q    And what did Mr. Miske task you with doing?

1   A   Looking for this young man to get the watch back.

2   Q   And what did you do in furtherance of that direction?

3   A   Drove around town, went to places that we would think he'd

4   be at to locate this young man.

5   Q   Who were you driving around town with?

6   A   I was -- he -- I was in my truck with Caleb Miske.

7   Q   And what was the plan if you saw Johnathan Fraser?

8   A   The plan was to get the watch back.

9   Q   Who else was -- if you recall, who else was driving around

10  town looking for Johnathan Fraser to get the watch back?

11  A   Michael's brother Jonathan [verbatim] and Kaulana.  I

12  believe Russell Moscato was looking for him, and a couple

13  individuals I've never met before.

14  Q   Were you ever in Mr. Miske's presence when he was yelling

15  at Caleb about the watch?

16  A   I was in the presence, yes.

17  Q   What do you recall?

18  A   I -- I can't recall word for word what he was saying, but

19  I know he was very upset.

20  Q   Where do you recall going the day that you were looking

21  for the watch and looking for Johnathan Fraser?

22  A   We went throughout Kalihi.  We went throughout downtown.

23  We also went as far as to go to Kaneohe, at the district park

24  in Kaneohe.

25  Q   When you were at the district park in Kaneohe, did you see

1    Fraser there?

2    A    I did not.

3    Q    Were you informed that Fraser was assaulted by anybody?

4    A    Later I -- I can't say it was that night or -- or the next

5    day, but I did find out or heard that he got assaulted, yes.

6    Q    Who did you hear that from?

7    A    I believe I heard that from Russell.

8    Q    This is Russell Moscato?

9    A    Yes.

10   Q    Do you recall if Russell Moscato gave you any details?

11   A    No.

12   Q    Was Mr. Moscato part of the crew that was work -- looking

13   for Johnathan Fraser and the watch?

14   A    He was.

15   Q    At some point when you were looking for Johnathan Fraser

16   and the watch, do you recall giving -- being given directions

17   to go to Starbucks?

18   A    I don't -- I don't recall at what point I was told to go

19   to Starbucks, but we ended up at Starbucks on Ward.

20   Q    And who gave you those directions?

21   A    Michael.

22   Q    Who was at the Starbucks when you got there?

23   A    I remember me, Caleb, Michael, and I think Michael's

24   brother.

25   Q    What do you recall happening at the Starbucks?

1    A    I don't exactly remember what happened.  I stayed kind of

2    distanced away from Starbucks.

3    Q    Where were you?

4    A    Near my car.

5    Q    And when you say Michael's brother, who do you mean?

6    A    His older brother, young -- oldest half-brother.

7    Q    John Stancil or Cody Stancil?

8    A    I'm sorry?

9    Q    John Stancil or Cody Stancil?

10   A    John.

11   Q    Do you recall what took place at the Starbucks?

12   A    I believe that they got the watch back.

13   Q    Do you know how Mr. Miske got the watch back?

14   A    I don't recall how that happened.  Like I said, I stayed

15   by my vehicle.

16   Q    Did you ever see the police, a police officer show up?

17   A    I may have.

18   Q    Is Miske the type of person that easily forgets things

19   like this?

20   A    No.

21   Q    Is he the type of person that will hold a grudge?

22   A    Yes.

23            MR. NAMMAR:  Can we publish 1-58?

24            THE COURT:  Go ahead.

25   BY MR. NAMMAR:

```
 1   Q     Who is this?

 2   A     John Stancil.

 3   Q     Was he part of the crew that was looking for the watch

 4   that day?

 5   A     Yes.

 6   Q     Do you know what his tattoo says on his neck?

 7   A     I believe that tattoo says "Take Care."

 8   Q     "Take Care"?

 9   A     Yes.

10           MR. NAMMAR:  Can we publish 1-57?

11           THE COURT:  Go ahead.

12   BY MR. NAMMAR:

13   Q     Who is this?

14   A     That is Mike's nephew, Kaulana.

15   Q     Was he part of the crew that was looking for the watch

16   that day?

17   A     Yes, he was.

18           MR. NAMMAR:  Can we publish 1-52?

19           THE COURT:  Yes.

20   BY MR. NAMMAR:

21   Q     Who is this?

22   A     That is Michael's son, Caleb.

23   Q     He was helping look for the watch with you?

24   A     He was with me.

25           MR. NAMMAR:  Can we publish 1-36?
```

```
 1                THE COURT:  Yes.  Go ahead.
 2   BY MR. NAMMAR:
 3   Q    Who is this?
 4   A    That is Russell Moscato.
 5   Q    Is this who you heard that -- from that Fraser was
 6   assaulted on the day that you guys were looking for the watch?
 7   A    I'm not sure if he got assaulted on that day we looked for
 8   a watch, but I -- that's who told me about the assault.
 9   Q    Okay.
10                MR. NAMMAR:  Take that down.
11   BY MR. NAMMAR:
12   Q    I'm going to switch gears now and ask you about a
13   generator.  Have you ever been involved in stealing a
14   generator?
15   A    I was.
16   Q    How did that come up?
17   A    We were driving around town, and we ended up at the movie
18   set for Hawaii Five-O.  And Michael taunted me on stealing a
19   generator from that set.
20   Q    Michael Miske?
21   A    Yes.
22   Q    He taunted you?
23   A    Yeah, he dared me to steal it to see if I could do it.
24   Q    Did you steal it to prove to him you could do it?
25   A    I did.
```

1  Q     What kind of generator are we talking about?

2  A     It was a very large generator on four wheels.  It's a

3  generator that they use to power up sets when they film movie

4  productions.

5  Q     Did you know it to be expensive?

6  A     I know it to be very expensive, yes.

7  Q     Who else was with you when you were taunted by Mr. Miske?

8  A     Right now, I cannot recall who was in the car.  I think it

9  was Russell Moscato, but I can't say for sure right now.

10  Q     Okay.  How did you do it?

11  A     How did I do it?

12  Q     Yep.

13  A     I got dropped off there by my ex-girlfriend in my truck,

14  and I went to one of the movie production flatbed trucks that

15  would haul something as big as this.  And I found a key in the

16  visor.  I hitched up that trailer and drove it off the lot.

17  Q     What did you drive it off the lot in?

18  A     A movie production truck, flatbed, a stake bed.

19  Q     Where did you leave the movie production truck?

20  A     After delivering the generator to my house, I drove it

21  back and parked it in the same spot that I took it from.

22  Q     So you took the generator with a flatbed truck from the

23  movies to steal it?

24  A     Yes.

25  Q     And then you drove that same truck back to the set?

 1   A   Yes.

 2   Q   And then what did you do with the generator?

 3   A   I had it in my house.  I -- I didn't know what to do with

 4   it.  Like I said, I didn't really plan on it.  It was just to

 5   kind of show something, that I could do something like that.

 6   And it parked at my house for maybe about three days.

 7   Q   Did you try to disguise the generator when it was outside

 8   your house?

 9   A   I did.

10   Q   How did you do that?

11   A   I wrapped up in multiple tarps and -- real tightly, and

12   spray painted it with some kind of construction spray paint,

13   make it like it's for a construction site.

14   Q   Where was your house at the time?

15   A   Up in -- it was up in -- near Palolo.

16   Q   And when you -- after you stole it and the generator, what

17   you described as expensive, is sitting in front of your house,

18   do you contact anyone?

19   A   I did mention to Mike that I had the generator, yes.

20   Q   What was his reaction?

21   A   He kind of laughed at me, didn't think I could do it.

22   Q   And did you discuss with him or anyone else what you were

23   going to do with the generator?

24   A   I did discuss with him.

25   Q   What did you guys discuss?  What was the plan?

1    A    Possibly storing it in Waimanalo.

2    Q    Where were you going to store it?

3    A    On a farm in Waimanalo.

4    Q    Whose farm was that?

5    A    I do not know.

6    Q    Okay.  Did you end up taking the generator over to that

7    farm in Waimanalo?

8    A    I did.

9    Q    Did Mr. Miske tell you to do that?

10   A    Yes.

11   Q    Where was the farm in Waimanalo?

12   A    I can't exactly remember, but it's near the mountains.

13   Q    What happened when you dropped off the generator at a farm

14   in Waimanalo?

15   A    I dropped the generator off, then I -- and, well, what I

16   remember is I just dropped it off and left it there, and they

17   did whatever they did with it.

18   Q    Okay.  And what do you recall happening with the generator

19   after that?

20   A    I heard a story about a person named Doug Westbrook who

21   was the asset recovery for people.  I guess he tracked it down

22   to Waimanalo on that property via GPS.

23   Q    Who did you hear that from?

24   A    I heard it through Michael and a few other people.

25   Q    What is Doug Westbrook's reputation?

1  A    Doug Westbrook is a pretty strong guy.  He's got a lot of

2  influence in Waianae.

3  Q    Did you ever -- did it ever come back to you through

4  Mr. Westbrook?

5  A    No.  Never did.

6  Q    And you were never prosecuted for it?

7  A    Never was.

8  Q    And you did this to prove to Mr. Miske that you could do

9  things like this?

10 A    Correct.

11 Q    This was around what time period?

12 A    This was after I couldn't prove my -- my -- my ability to

13 do things after the staged break-in at Waikele.

14 Q    At the bunker?

15 A    Yes.

16 Q    So you heard of a building called Keola Lai?

17 A    I have.

18 Q    Did you work on that job?

19 A    I did.

20 Q    Was this when you were with Kama'aina Termite and Pest

21 Control?

22 A    Yes.

23 Q    What was the problem that that building was experiencing?

24 A    Drywood termite infestations in the cabinets.

25 Q    Eventually was the entire -- did you assist fumigating the

1    entire building?

2    A    I did.

3    Q    What part of town is this in?

4    A    I'm sorry?

5    Q    What part of town is this building in?

6    A    It is on Queen Street, just maybe a -- a few blocks away

7    from our shop.

8    Q    Okay.

9    A    Kama'aina Termite shop.

10   Q    Is it in Kakaako?

11   A    Yes.

12   Q    So before the fumigation of the entire building, do you

13   recall doing some work on a number of cabinets?

14   A    Yes.

15   Q    What kind of work were you doing on the cabinets in that

16   building?

17   A    The contractor for that property would dismantle the

18   cabinets from the -- each unit and bring it to our shop and

19   we'll fumigate it.

20   Q    Okay.  And are these the -- do you recall whether these

21   were the upper or lower cabinets?

22   A    They were all the upper cabinets.

23   Q    Okay.  And where were they fumigated, these upper

24   cabinets?

25   A    They were fumigated in our warehouse.

1    Q    How would you do that?

2    A    We would lay a piece of tarp down that we used to fumigate

3    houses with.  We will place the cabinets on this tarp and will

4    wrap them and pin them shut and shoot gas into them.

5    Q    Inside the shop?

6    A    Inside the shop, yes.

7    Q    Did you use chloropicrin when you did that?

8    A    No, we did not.

9    Q    So you would just wrap up the cabinets inside a building

10   and shoot Vikane gas?

11   A    Correct.

12   Q    Did Mr. Miske know you were doing that?

13   A    Yes.

14   Q    Was that in accordance with the Vikane label?

15   A    No.

16   Q    Did you feel that was dangerous?

17   A    It was dangerous.

18   Q    Was the -- after -- did you do multiple sets of cabinets

19   this way?

20   A    We must have been doing cabinets for well over six months,

21   maybe even a year.

22   Q    Did Kama'aina have a trailer that it could use for chamber

23   fumigations like this?

24   A    We did.

25   Q    Why weren't you using that trailer?

1   A     We believed the cabinets wouldn't fit in that trailer.

2   Q     So you elected to do it inside the shop?

3   A     Correct.

4   Q     Was the -- did the -- did Kama'aina eventually obtain the

5   contract for the entire building?

6   A     We did.

7   Q     Do you know whether that was put out for a bid?

8   A     To my knowledge, it was not.

9   Q     Were you tasked with getting certain materials in

10  preparation of the job?

11  A     Yes.

12  Q     What were you tasked with getting?

13  A     This was a very large project, so I was tasked at getting

14  everything to do a chamber seal from the inside, which was

15  plastic sheeting that painters would use, they called Visqueen,

16  painters tape by the pallets, and fans for -- to circulate

17  the -- the gas in the building.

18  Q     What does a chamber job mean?

19  A     Well, a chamber usually just seals some -- some piece of

20  some part of the structure and fumigate whatever's in that

21  structure by -- and we call that chamber seal, by sealing that

22  one structure off.

23  Q     So that was what the plastic sheeting was for, and the

24  painters tape?

25  A     Yes.

1   Q   Have you heard of a thing called an SCBA?

2   A   Yes.

3   Q   Can you tell the jury what that is?

4   A   SCBA is what fire -- firefighters use on their back.  It

5   has a -- like a scuba tank on it and a full face mask to help

6   them breathe in situations where they're affected by gas or

7   fumes.

8   Q   Where did you obtain those from?

9   A   Well, we had some -- some of our own but not enough for

10  the project, so we got some from Safety Systems Hawaii.

11  Q   So you had some of your own at the time?

12  A   Yes.

13  Q   About how many?

14  A   I'd say about six.

15  Q   And you had to get a number of other SCBAs for the Keola

16  Lai job?

17  A   Correct.

18  Q   Where did you obtain those from?

19  A   Safety Systems Hawaii.

20  Q   And is that located in Honolulu?

21  A   Yes, it is.

22  Q   Were those rented or purchased?

23  A   Rented.

24  Q   Were you tasked with picking up the rentals?

25  A   I was.

1   Q    Why were they rented?

2   A    Because we needed a large amount of 'em and there was no

3   use for us to purchase them because we didn't need that much

4   for our -- our -- our use here at Termite.

5   Q    And did you go to Safety Systems to coordinate the rental?

6   A    I did.

7   Q    Do you recall who you met with there?

8   A    I don't recall the gentleman's name now.

9   Q    What did he look like?

10  A    I can't say for sure what he looked like.

11  Q    Okay.

12          MR. NAMMAR:  Can we show the witness only, 9-99 from

13  the original list?  I don't know if we can rotate that -- yeah.

14  Thanks.

15  BY MR. NAMMAR:

16  Q    Is this a Safety Systems invoice?

17  A    That is.

18  Q    And is the job title that's mentioned here the Keola Lai

19  job?

20  A    Yes, it is.

21  Q    And does it say ordered by, in the body, Alfredo Cabael?

22  You see that (indicates)?

23  A    Yes, I do.

24  Q    Is this the -- do you believe this is the invoice

25  associated with the rental of the SCBA units for the Keola Lai

1  job?

2  A    Yes.

3         MR. NAMMAR:  Your Honor, I move to admit 9-99.

4         THE COURT:  Any objection?

5         MR. KENNEDY:  No objection.

6         THE COURT:  9-99 is admitted then without objection.

7         (Exhibit 9-99 received in evidence.)

8         THE COURT:  You may publish.

9  BY MR. NAMMAR:

10  Q    Okay.  The jury can see it.

11        Is this a -- Safety Systems Hawaii, that's where you

12  picked up the rental from?

13  A    Yes, it is.

14  Q    And the invoice date is in October 2010.  Is that when you

15  recall, around the time period when the Keola Lai job was?

16  A    I believe so, yes.

17  Q    And the person listed here is Alfredo Cabael.  Is that

18  you?

19  A    That is me.

20  Q    Okay.  And it lists a 25 miscellaneous rental, and

21  underneath that it says SCBA with 60-minute bottle and mask.

22  What is that?

23  A    What part are we looking at again?

24  Q    The handwritten part that says SCBA with 60-minute bottle

25  and mask.  What is that?

1   A    Oh, that's -- that's a -- that's a full set.  That is a --

2   the air tank with the mask.

3   Q    Okay.

4            MR. NAMMAR:  And if we could zoom out.

5   BY MR. NAMMAR:

6   Q    And then underneath that it says:  Cylinder 4500 psi.

7   What is that?

8   A    That is -- it's individual cylinder without the mask.

9   Q    Okay.  And the quantity there is 40.  Do you see that?

10  A    Yes, I do.

11  Q    And below that it says:  15 quantity 60-minute SCBA.  Do

12  you see that?

13  A    Yes.

14  Q    Is this about the quantity that you recall picking up?

15  A    Yes.

16  Q    And the total rental amount is listed as 13,790.  Do you

17  see that?

18  A    I do.

19  Q    It also mentions elsewhere -- if you could zoom out -- at

20  the -- an amount on a PO as $27,000.  Do you see that?

21  A    I do.

22  Q    Do you recall that the rental cost somewhere in that

23  neighborhood, between 13 or 27 thousand?

24  A    I do.

25           MR. NAMMAR:  Can we show now, the witness only,

1   9-281?

2           And can we go to page 4.  Can we zoom in on that.

3   BY MR. NAMMAR:

4   Q    Is this another -- purport to be another Safety Systems

5   invoice?

6   A    It is.

7   Q    And does it say on the top right:  Ordered by Alfredo

8   Cabael?

9   A    It does.

10  Q    And does it list a similar quantity of SCBAs in the body?

11  A    It does.

12  Q    And then the total, does it list the total amount as

13  $168,000?

14  A    It does.

15  Q    And is the customer associated with it Kama'aina Termite,

16  on the top left?

17  A    Yes.

18           MR. NAMMAR:  Your Honor, I move to admit this

19  exhibit.  It's accompanied on page 1 by a declaration from

20  Nordic Construction that complies with 803(6) and 902(11).

21           THE COURT:  Any objection?

22           MR. KENNEDY:  Your Honor, may I ask a question or two

23  of the witness on foundation?

24           THE COURT:  Yes.

25           MR. KENNEDY:  Sir, if we could move to the second

 1   page, or the -- the document with the figures.  I don't have it

 2   in front of me.

 3            Is this invoice dated September 13th, 2010?

 4            THE WITNESS:  September 13, 2010?  It says the time

 5   needed, but the date is September 5th.

 6            MR. KENNEDY:  All right.  And the actual fumigation

 7   was in September and completed by September 20th of 2010?

 8            THE WITNESS:  I can't say for sure the date, exactly,

 9   for now.

10            MR. KENNEDY:  The earlier document that we just

11   looked at was in October of 2010?

12            THE WITNESS:  I can't say.

13            MR. KENNEDY:  Thank you.

14            Those are the only questions I have, Your Honor.

15            No objection.

16            THE COURT:  Okay.  Without objection, 9-281 then is

17   admitted.

18            (Exhibit 9-281 received in evidence.)

19            THE COURT:  You can publish.

20   BY MR. NAMMAR:

21   Q    The jury can see this.

22            Is this another Safety Systems invoice?

23   A    Yes.

24   Q    And this one is also for SCBAs --

25   A    It is.

1    Q    -- in the body?  Do you see that?

2    A    Yes.

3    Q    And it lists you as "ordered by."  Do you see that?

4    A    I see that, yes.

5    Q    And the amount listed on the bottom, the total amount is

6    $168,000.  Do you see that?

7    A    I do.

8    Q    Do you recall ever seeing an invoice of anything close to

9    $168,000?

10   A    No.

11   Q    And you recall, as I believe you talked about earlier,

12   that this was for a rental; is that right?

13   A    Correct.

14   Q    Not a purchase; is that right?

15   A    Yes.

16   Q    Does $168,000 for these SCBA rentals, does that seem

17   way -- way incorrect to you?

18   A    It does.

19   Q    Is that something that you would have chatted with

20   Mr. Miske about if you got an invoice for that much for a

21   rental?

22   A    I'm sure he would not be happy with that price if we were

23   renting it.

24   Q    And after the job, were you tasked -- after the Keola Lai

25   job, were you tasked with returning the SCBAs?

1    A    I was.

2    Q    Did you return every single one of them that was rented to

3    S -- to Safety Systems Hawaii?

4    A    I -- I believe we did.  Yes.

5              MR. NAMMAR:  Can we show the witness only

6    Exhibit 9-106?

7    BY MR. NAMMAR:

8    Q    Do you recognize this photo?

9    A    I do.

10   Q    What's shown here?

11   A    That is all the Vikane cylinders we used to fumigate the

12   Keola Lai.

13   Q    Do you recognize the people in this photo?

14   A    I do.

15             MR. NAMMAR:  Your Honor, I move to admit 9-106.

16             THE COURT:  Any objection?

17             MR. KENNEDY:  No objection, Your Honor.

18             THE COURT:  9-106 is admitted then.

19             (Exhibit 9-106 received in evidence.)

20             THE COURT:  You may publish.

21   BY MR. NAMMAR:

22   Q    The jury can see it.

23        What are we looking at here, Mr. Cabael?

24   A    That is all the Vikane cylinders staged to be ready to be

25   shot into the building of Keola Lai.

1  Q    And is this on the loading zone, in a loading zone area,

2  as indicated in this photo of Keola Lai?

3  A    Correct.

4  Q    Who are the people in this photo?

5  A    The person in the white shirt is me, myself, Alfredo, and

6  the person in the red is Hugh Manalo.

7  Q    And what is on your back?

8  A    The SCBA.

9  Q    And are these some of the SCBAs that were rented from

10  Safety Systems Hawaii?

11  A    Correct.

12  Q    Was one of your tasks during -- you can take that down.

13        Was one of your tasks during this fumigation to seal up

14  each particular condo unit?

15  A    That was our plan, was to seal every single unit

16  individually.

17  Q    And was that with the sheathing [verbatim] and the

18  painters tape you mentioned?

19  A    Yes.

20  Q    Were you able to seal up every unit?

21  A    We were not.

22  Q    Why not?

23  A    One, it's time-consuming to do it.  We would not hit our

24  target date of return the building to the customer.  And two,

25  we had a difficult -- difficult time sealing on certain parts

1   of the building because of the wind.

2   Q   Who made the call not to seal up all the units?

3   A   Michael Miske.

4   Q   Were you having issues with the regulators that you recall

5   on that particular job?

6   A   I think we had some issues, yes.

7   Q   Was this regulators with the Department of Agriculture?

8   A   Yes.

9   Q   Did Miske give you any direction with regard to those

10   particular regulators?

11   A   Yes.

12   Q   What direction did you get from Mr. Miske?

13   A   I was instructed to take the regulators to certain parts

14   of the building so they can't see certain things being done or

15   not being done.

16   Q   And were these certain parts of the building where things

17   looked correct?

18   A   Yes.

19   Q   Give us an example of what looked correct where you took

20   them to.

21   A   Staging of pic pans, the places where lines were set up

22   and fans were directing airflow.

23   Q   Were there other places in the building where things

24   didn't look correct?

25   A   Yes.

1   Q    And would you not, at Miske's direction, take the

2   inspectors to that area?

3   A    Yes.

4   Q    What is a pic pan?

5   A    A pic pan is where you introduce the chloropicrin.

6   Q    Did you all use chloropicrin on this particular job?

7   A    Not the entire building, no.

8   Q    Where did you use chloropicrin?

9   A    I can't say we used it.  But if we did, it would be on the

10  first floor.

11  Q    And to your recollection, it wasn't used on any of the

12  other floors in Keola Lai?

13  A    No.

14  Q    Who made that call?

15  A    Michael Miske.

16  Q    And why was the decision, if you know, made not to use

17  chloropicrin on all the other floors at Keola Lai?

18  A    Being able to clear the building in time for the tenants

19  to get back in.

20  Q    Was there some time restraints that you were experiencing

21  at the time?

22  A    Yes.

23  Q    What were the time restraints that you were experiencing?

24  A    The retention time, the amount of time that's needed for

25  the gas to be introduced and to do its thing to kill the

1    termites.

2    Q    And based on those time retentions, was the decision made

3    not to use chloropicrin?

4    A    Yes.

5    Q    Was that inconsistent with the label?

6    A    Yes.

7    Q    And when you took the inspectors around, did Miske tell

8    you to take them to places where things looked like they were

9    set up correctly, as far as chloropicrin goes?

10   A    Correct.

11   Q    When you were going to various places in the building,

12   would you present yourself to others as if chloropicrin was

13   present through the use of an SCBA?

14   A    Yes.

15   Q    What happened, though, when you got up to particular

16   floors where there was no chloropicrin?

17   A    We would remove the SCBA.

18   Q    Have you heard of the term "Hollywood"?

19   A    Yes.

20   Q    What is that?

21   A    It's faking what we're trying to do right.

22   Q    Is that what you were doing in part on the Keola Lai job?

23   A    Yes.

24          MR. NAMMAR:  Can we show the witness only 9-108?

25          THE COURT:  Yes.  Go ahead.

```
 1              MR. NAMMAR:  Can we go to the second page.

 2   BY MR. NAMMAR:

 3   Q    Do you recognize what's shown here, Mr. Cabael?

 4   A    I do.

 5   Q    What is this?

 6   A    That is a bonus check for that job on Keola Lai.

 7              MR. NAMMAR:  Your Honor, I'd move to admit 9-108.

 8              THE COURT:  Any objection?

 9              MR. KENNEDY:  No objection.

10              THE COURT:  9-108 is admitted.

11              (Exhibit 9-108 received in evidence.)

12   BY MR. NAMMAR:

13   Q    Is this the bonus check that you received from Mr. Miske

14   for your work on this job?

15   A    Yes.

16   Q    And this was in addition to your pay?

17   A    Correct.

18   Q    Did you know what the contract price was for this job?

19   A    I believe it to be about 3 million.

20              MR. NAMMAR:  We can take that down.

21              Can we show the witness only 9-126?

22              THE COURT:  Go ahead.

23   BY MR. NAMMAR:

24   Q    Do you recognize the photo that's shown here, Mr. Cabael?

25   A    That is Lumahai Street, 6 Lumahai.
```

1    Q    And the address that's listed here is 6 Lumahai.  Is that

2    an address that you're familiar with?

3    A    Yes.

4    Q    This is the area that you said you were responsible for

5    construction on, right?

6    A    Correct.

7    Q    And the date is listed as July 3rd, 2015.  Were you still

8    working at Kama'aina Termite and Pest Control at this time?

9    A    I was.

10   Q    Still helping out with the 6 Lumahai project this time?

11   A    Somewhat.

12   Q    The -- if we go to page 4.

13        The description of the work here, site work and concrete

14   work, is that some of the work that you were familiar with from

15   your time at 6 Lumahai?

16   A    Yes.

17             MR. NAMMAR:  Your Honor, I move to admit at this time

18   9-126.  It's accompanied by a declaration that complies with

19   803(6) and 902(11) on the last page.

20             THE COURT:  Any objection?

21             MR. KENNEDY:  Your Honor, I would object since he

22   doesn't have any personal knowledge with respect to this

23   company and this document.

24             MR. NAMMAR:  He's going to talk about the work on

25   this particular invoice, Your Honor.

1           THE COURT:  All right.  Then there's more foundation

2     that's necessary.  For now, the objection's sustained.

3           MR. NAMMAR:  Okay.

4     BY MR. NAMMAR:

5     Q    So, Mr. Cabael, if you look at the last page of this

6     exhibit, what is the date associate -- the second to last page.

7     It's purportedly signed here in July of 2015; is that right?

8     A    That's what it shows there, yes.

9     Q    Okay.  And this is a proposal for work on the Lumahai

10    project.  Do you see that?  On the first page?

11    A    The first page, yes.

12    Q    Okay.  And then on page 4, does it list a number of items

13    of work to be done on this particular property?

14    A    It does.

15    Q    Okay.  So site work, does it list a number of things that

16    are needed to be done on site work?

17    A    It does.

18    Q    And then were you responsible for overseeing a lot of

19    these things?

20    A    I was.

21    Q    And at that point in time, July 2015, were pretty much

22    most of these things already complete?

23    A    They were all complete.

24    Q    So do you believe the information that's set forth here

25    under "site work" is false?

1   A    If that's what they're proposing to do, it was done

2   already.

3   Q    Okay.

4        MR. NAMMAR:  If we could zoom in under "concrete."

5   BY MR. NAMMAR:

6   Q    And are you also familiar with the work that's being

7   proposed to be bid on here for concrete work?

8   A    I do.

9   Q    You see that?  Was that work all done as of July 2015?

10  A    It was.

11       MR. NAMMAR:  Your Honor, I move to admit this exhibit

12  at this time.  It comes with a certificate of service --

13  certificate of authenticity, and it's clearly relevant.

14       THE COURT:  Any objection?

15       MR. KENNEDY:  Yes, Your Honor.  The objection is lack

16  of personal knowledge as to the additional work that we just

17  went over, that continued all the way and to close to 2019.

18       MR. NAMMAR:  He says it's false, and it's accompanied

19  by a certification that complies with 902(11) and 803(6).

20       THE COURT:  The objection is overruled.  You may

21  publish.  The exhibit is admitted.  That's 9-126.

22       (Exhibit 9-126 received in evidence.)

23  BY MR. NAMMAR:

24  Q    Okay.  Let's go to the first page.

25       Can you tell the jury what the picture is of here?

1    A    That picture, of 6 Lumahai and all the finished

2    foundation.

3    Q    Okay.  Were you present when the job was in this state?

4    A    Yes, I was.

5    Q    And the project that's listed here is the Miske project,

6    6 Lumahai Street.  Do you see that?

7    A    I do.

8    Q    And the date that's associated with this proposal is

9    July 3rd, 2015.  You see that?

10   A    I see that, yes.

11   Q    The company on the top is Makana Pacific Development.

12   Have you ever heard of that company?

13   A    I never did, no.

14   Q    Did that company ever show up, anyone from that company,

15   to your knowledge, ever show up at the job site when you were

16   working there?

17   A    Never.

18   Q    Go to the last page, second to last page.

19        And here it's purported to be signed by Michael Miske.

20   You know who that is, right?

21   A    I do.

22   Q    With a date of July 3rd, 2016, and a John Lauro.  Do you

23   see that?

24   A    I do.

25   Q    Have you ever heard of John Lauro?

1    A    No.

2         MR. NAMMAR:  If we go to the second page.  Sorry, the

3    third page.  And under completion dates, can you highlight

4    that?

5    BY MR. NAMMAR:

6    Q    So in this proposal it lists -- it states that:

7    Contractor agrees to commence work on or about to be determined

8    and is expected to complete it within 30 months.  Do you see

9    that?

10   A    I do.

11   Q    So this proposal is stating that the work that's about to

12   be listed has not been done yet.  That's the -- it's a

13   proposal, correct?

14   A    It is a proposal, yes.

15        MR. NAMMAR:  Can you go to page 4.  And if we could

16   zoom in and across, on site work.

17   BY MR. NAMMAR:

18   Q    Were you heavily involved in site work at 6 Lumahai?

19   A    I was.

20   Q    And were you making frequent cash payments for site work?

21   A    I -- I did.

22   Q    And were you making frequent cash payments for the site

23   work that's listed here?

24   A    I did.

25   Q    And at this point in time, July of 2015, was that site

1    work completed?

2    A    It was.

3    Q    So when this proposal proposes to bid 1-point -- amount --

4    allocate 1.7 million for that site work, do you believe that

5    work was already completed?

6    A    That work was complete.

7    Q    So for this particular part of the proposal, do you

8    believe that's false?

9    A    Yes.

10   Q    And if we go down to "concrete," it allocates $2.5 million

11   to concrete.  Do you see it?

12   A    Yes.

13   Q    And it talks about concrete formwork, concrete footings,

14   CMU retaining walls, cast-in-place concrete.  Do you see that?

15   A    I do.

16   Q    Were you overseeing all that work at your time on Lumahai?

17   A    I did.

18   Q    And was all that completed as of July 2015?

19   A    Yes.

20   Q    Did that work cost anywhere near 2.5 million?

21   A    No.

22   Q    If we go down to rough/finish carpentry, do you see that

23   it lists $1.3 million in rough/finish carpentry?

24   A    Yes.

25   Q    Was that work also completed as of July 2015, for the most

1    part?

2    A    It was not complete.

3    Q    Was a lot of it already done?

4    A    A lot was done.

5    Q    Was the structural -- structural metal framing already

6    complete?

7    A    Yes.

8    Q    And the rough frame and carpentry already complete?

9    A    Yes.

10   Q    If we can go to page 6.

11        Under swimming pool, do you see that?

12   A    Yes.

13   Q    This proposal purports to charge $400,000 for a swimming

14   pool.  Do you see that?

15   A    I do.

16   Q    Were you in charge of working with Walter, who we'd

17   already seen before, on the swimming pool?

18   A    Yes.

19   Q    Was it already done as of 2015, for the most part?

20   A    For the most part, yes.

21   Q    So the concrete work and the formwork was already in

22   place?

23   A    Yes.

24        MR. NAMMAR:  Can we take that down and now publish

25   9-580?  It's from the first list, Your Honor.

1            THE COURT:  Yes.  Go ahead.

2            MR. NAMMAR:  And can you show the second page.

3   BY MR. NAMMAR:

4   Q    Mr. Cabael, do you recognize these two pages of 9-580?

5   A    I do.

6   Q    And what's shown there?

7   A    Looks like a poke truck.

8   Q    At some point did you work on a truck that looks similar

9   to this?

10  A    I did.

11  Q    What did the truck look like when you worked on it?

12  A    It didn't look like that.

13  Q    Did it have that wrap and the graphics on it?

14  A    No.

15  Q    What state was it in when you were working on it?

16  A    It was bare.  The only thing that I remember having in

17  there was appliances that we ordered that was not set in its

18  place yet.  And we were still cutting holes in the -- the side

19  of the truck.

20  Q    Okay.  If we can go back to the first page.

21       When you say "cutting holes," what do you mean by that?

22  A    That holes for the -- for that display case of the

23  refrigerator or some -- well, whatever that is, and the one

24  towards the back.

25  Q    Okay.  So when you were -- was this near the end of your

1    time at Kama'aina Termite and Pest Control?

2    A    When I left it, we -- we just started cutting the doors

3    open, cutting the holes on that, that wall, and I -- and I

4    left.

5    Q    And what did you understand this truck was going to be

6    used for?

7    A    It was going to be -- I -- I can't recall if it was for a

8    poke truck.  I -- I don't know.

9    Q    Who was giving you the direction for work on this truck?

10   A    Michael was.

11   Q    Who was -- were you purchasing items for this truck?

12   A    I was.

13   Q    Who was giving you the funds to purchase those items?

14   A    Michael was.

15   Q    Do you know if Michael had any other partners in this

16   truck?

17   A    I did not.

18   Q    And by "Michael," you mean Michael Miske?

19   A    Correct.

20              MR. NAMMAR:  You could take that down.

21   BY MR. NAMMAR:

22   Q    Have you heard of a chemical called Termidor?

23   A    Yes.

24   Q    What is that?

25   A    Termidor is a chemical we use to apply for ground

1    termites.

2    Q    And does it have a good reputation as far as chemicals for

3    ground termite treatment?

4    A    Well, at that time when I was here doing ground termites,

5    it was the best.

6    Q    Did it have a long warranty associated with it?

7    A    It did.

8    Q    Besides being the best, was it the most expensive?

9    A    It was.

10   Q    During your time at Kama'aina Termite and Pest Control,

11   would you buy stolen chemicals from anyone?

12   A    We did.

13   Q    Who did you buy them from?

14   A    A competitor's employee.

15   Q    Do you remember that employee's name?

16   A    His name was Rob.

17   Q    How would you describe Rob?

18   A    He was a short -- little short, stocky Filipino guy.

19   Q    And how often would you get these -- would you be in

20   charge of getting the chemicals from Rob?

21   A    I would be.

22   Q    How often would you meet with Rob?

23   A    Maybe once a week, every other week.  It depends how --

24   how available it was for -- for him to get it for me.

25   Q    What kind of chemicals would you get from Rob?

1    A    I'll get anything to do with ground termites.  Either it'd

2    be Termidor or something for pretreatment before construction.

3    Q    Who would direct you to meet with Rob?

4    A    Michael.

5    Q    How would you pay Rob?

6    A    In cash.

7    Q    Who would give you that cash?

8    A    Michael did.

9    Q    Why did you believe that Rob was selling you stolen

10   chemicals?

11   A    Well, he told me.  And -- and then he also worked for

12   another ground termite company, pest control company.

13   Q    And were the chemicals that you usually purchased, did

14   they usually come from a distributor?

15   A    Yes.

16   Q    Okay.  So Termidor, you said it was expensive.  Would

17   you and others at Kama'aina routinely lie to customers about

18   the use of Termidor?

19   A    We would.

20   Q    What would you lie about?

21   A    Well, first, there -- we sold Termidor, but we would --

22   we'll use something that's cheaper, cheaper form.

23   Q    Was this a routine practice at Kama'aina Termite and Pest

24   Control?

25   A    Yes, it was.

1    Q    And what was the reason behind lying about the use of

2    Termidor and selling it but using something cheaper?

3    A    Save money.

4    Q    Was Mike aware of this practice?

5    A    He was.

6    Q    When a customer paid, how would they pay for treatment

7    usually?

8    A    Either check or credit card.  Sometimes cash payments.

9    Q    And the check, would that sometimes frequently -- strike

10   that.

11        The check, how would it be submitted to the business?

12   A    It would be collected by the salesman, or I think the

13   customer would mail it in to the company.

14   Q    The cheaper version of Termidor, how would you describe

15   it?

16   A    Termidor is a brown powder.  The cheaper one was a white

17   powder in a blue bag and not a silver bag like Termidor.

18             MR. NAMMAR:  Can we show the witness only 9-300?

19   BY MR. NAMMAR:

20   Q    Mr. Cabael, do you recognize this as a Kama'aina Termite

21   proposal?

22   A    I do.

23   Q    And is this a standard proposal that was used in the time

24   period of 2015?

25   A    Yes, it is.

1   Q    What was the purpose of the proposal?

2   A    To let the customer know what we're selling 'em.

3           MR. NAMMAR:  Your Honor, I move to admit 9-300.

4           THE COURT:  Any objection?

5           MR. KENNEDY:  No objection.

6           THE COURT:  9-300 is admitted then without objection.

7           (Exhibit 9-300 received in evidence.)

8           THE COURT:  You may publish.

9           MR. NAMMAR:  Can we zoom in on the top half.

10  BY MR. NAMMAR:

11  Q    So this is a proposal.  It lists Kama'aina Termite and

12  Pest Control at the top.  Do you see that?

13  A    I do.

14  Q    And it has the license number is 824.  Do you see that?

15       Is that the one?

16  A    I do.  Yes.

17  Q    And there's some handwritten notes on here that says:

18  Paid GT by credit card.  Do you see that?

19  A    I do.

20  Q    You used the same credit card for fumigation?

21  A    I -- I see that, yes.

22  Q    So would customers frequently pay with a credit card?

23  A    Yes, they do.

24  Q    Sometimes they'd pay by check?

25  A    Yes.

1    Q    Sometimes would they pay by cash?

2    A    Yes.

3    Q    Okay.  And so for this particular proposal, it's got a

4    couple of things on it, right?

5    A    Yes.

6    Q    Tent fumigation, can you remind the jury what that is?

7    A    Tent fumigation is when we cover your house with a tent

8    and we introduce Vikane as the gas to kill the termites and

9    chloropicrin as an indicator that there's Vikane in there, and

10   a deterrent.

11   Q    And there are a couple of different boxes checked.  Vikane

12   is checked and chloropicrin is checked.  Do you see that?

13   A    Yes.

14   Q    So the customer would think that both of those were going

15   to be used in the fumigation; is that correct?

16   A    Correct.

17   Q    And then underground termite service, it lists a chemical

18   there that's handwritten in.  Do see that on the bottom right?

19   A    I do.

20   Q    What is listed?

21   A    Termidor.

22   Q    Is this the way the proposals would frequently look where

23   you would sell Termidor to the customer?

24   A    Yes.

25   Q    But then use a cheaper substitute?

```
 1   A    Yes, sir.
 2             MR. NAMMAR:  Can we show the witness only 9-301?
 3   BY MR. NAMMAR:
 4   Q    Is this another proposal for the 2015 time frame?
 5   A    Yes, it is.
 6   Q    Does it also sell Termidor?
 7   A    It does.
 8             MR. NAMMAR:  Can we show the witness only 9-303?
 9   BY MR. NAMMAR:
10   Q    Is this another proposal from the 2015 time frame?
11   A    It is.
12   Q    And does it also sell Termidor?
13   A    It does.
14             MR. NAMMAR:  Can we show the witness only 9-306?
15   BY MR. NAMMAR:
16   Q    Is this another proposal, this one from 2013?
17   A    Yes.
18   Q    Does it also sell Termidor?
19   A    It does.
20             MR. NAMMAR:  Can we show the witness only 9-307?
21   BY MR. NAMMAR:
22   Q    Is this another proposal from the 2013 time frame?
23   A    It is.
24   Q    And does it also sell Termidor?
25   A    Yes, it does.
```

1          MR. NAMMAR:  Your Honor, I move to admit 9-303,

2    9-306, and 9-307.

3          THE COURT:  Any objection to those three exhibits?

4          MR. KENNEDY:  No objection.

5          THE COURT:  Without objection, those three exhibits

6    then are admitted.  That's 9-303, 306, and 307.

7          (Exhibits 9-303, 9-306, and 9-307 received in

8    evidence.)

9          MR. NAMMAR:  And I forgot 9-301, Your Honor.

10         THE COURT:  Nine, dash, what?

11         MR. NAMMAR:  301.

12         THE COURT:  Any objection to that?

13         MR. KENNEDY:  No objection, Your Honor.

14         THE COURT:  9-301 then is admitted without objection.

15         (Exhibit 9-301 received in evidence.)

16         THE COURT:  You may publish.

17         MR. NAMMAR:  We can start with 9-301.

18    BY MR. NAMMAR:

19    Q    Is this another proposal?

20    A    Yes, it is.

21    Q    And this is from the 2015 time frame?

22    A    That's what it shows there, yes.

23    Q    And there's a handwritten note here that says paid by CC.

24    Do you see that?

25    A    I do.

1   Q    Do you understand that to be "credit card"?

2   A    Correct.

3   Q    And this is another one where the fumigation is sold.  Do

4   you see that?

5   A    I see that, yes.

6   Q    And Vikane and chloropicrin, both of those boxes are

7   checked?

8   A    Correct.

9   Q    And if you go down to ground termite, Termidor is also

10   checked?

11   A    Yes.

12   Q    Do you see that?

13         MR. NAMMAR:  Can we publish 9-303?

14   BY MR. NAMMAR:

15   Q    Is this another proposal from the 2015 time frame?

16   A    That's what it shows, yes.

17   Q    And if you zoom out.

18        Does this one, under ground termite, also sell Termidor?

19   A    It does.

20         MR. NAMMAR:  Can we publish 9-306?

21   BY MR. NAMMAR:

22   Q    Is this from the 2013 time frame?

23   A    Yes.  2013, yes.

24   Q    And does this one also sell Termidor, under ground termite

25   treatment?

1    A    It does.

2    Q    Okay.

3         MR. NAMMAR:  If you could zoom out.  And if we could

4    zoom in on the top where the logo is.

5    BY MR. NAMMAR:

6    Q    So this is the license number, PCO 824.  Do you see that?

7    A    I do.

8    Q    And if you zoom out.

9         At the bottom is it signed by somebody that you recognize?

10   A    The salesman --

11   Q    Yes.

12   A    -- Elton?

13   Q    Yes.

14   A    Yes.

15   Q    Was he a salesman?

16   A    He was.

17   Q    So he would have been the one that sold this job?

18   A    Yes, he would have.

19   Q    So this contract was signed by Elton Santos.  Do you see

20   that?

21   A    Yes.

22        MR. NAMMAR:  If we can go back up to the license

23   number now.

24   BY MR. NAMMAR:

25   Q    So in 2013, the license number was affixed to this

1   proposal.  Was it affixed to every proposal that you recall

2   seeing?

3   A    Yes.

4   Q    Standard practice, right?

5   A    I'm sorry?

6   Q    That was standard practice, right?

7   A    Correct.

8   Q    So you would represent to the customer that you were

9   licensed, right?

10  A    Yes.

11  Q    Harry Kansaki, who was that?

12  A    He was the licensed person for Kama'aina Termite.

13  Q    Was he ever around?

14  A    No.

15  Q    What did Harry Kansaki do for work?

16  A    He had another termite company.

17  Q    What was the name of that company?

18  A    Oahu Termite.

19  Q    So was he ever supervising any of Kama'aina Termite's

20  jobs?

21  A    We would do fumigations for Harry, and he would be on his

22  jobs.

23  Q    Okay.  How would that work?

24  A    Harry had a ground termite company and pest control.  He

25  did not have a fumigation company.  So in turn, Kama'aina would

1    do his fumigations.

2    Q    Okay.

3    A    And he would prep his own customers, and he would ensure

4    that we did a job prop -- correctly on his customers' houses.

5    Q    Okay.  But when Kama'aina sold a job like this, was Harry

6    ever around?

7    A    No.

8    Q    Was Harry ever signing contracts?

9    A    No.

10   Q    Was Harry ever supervising any work?

11   A    No.

12   Q    And was this for the entire time you were at Kama'aina

13   Termite and Pest Control?

14   A    Yes.

15   Q    Did you ever see Harry in the office?

16   A    No.

17   Q    How did you come to learn that Harry was the licensee?

18   A    Some -- sometime during our -- my employment there we

19   talked about him.

20   Q    Did you talk to Mr. Miske about how Harry was a licensee?

21   A    Yes.

22   Q    What did he tell you?

23   A    The story was that they met at a bar and they got to know

24   each other, and Harry became his own license holder for his

25   company.

1   Q    Have you heard of the term RME?

2   A    Yes.

3   Q    Did you think Harry was -- from what you knew, Harry was

4   the principal RME for the time you worked at Kama'aina Termite

5   and Pest Control?

6   A    Yes.

7             MR. NAMMAR:  Can we show the -- or publish 9-307?

8   BY MR. NAMMAR:

9   Q    Is this another proposal from 2013?

10  A    Yes, it is.

11  Q    And does this one also sell ground termite treatment?

12  A    Yes.

13  Q    And does it list again that you're selling Termidor?

14  A    It does.

15  Q    Even though the routine practice was not to apply it?

16  A    Yes.

17            MR. NAMMAR:  Can we show the witness only 9-295?  And

18  can we scroll through it.

19  BY MR. NAMMAR:

20  Q    Mr. Cabael, have you looked at this brochure prior to

21  testifying here today?

22  A    I am familiar with that brochure, yes.

23  Q    And did you recognize it from your time working at

24  Kama'aina Termite and Pest Control?

25  A    I do.

1   Q    Is it a brochure that was commonly given to customers?

2   A    Yes.

3           MR. NAMMAR:  Your Honor, I move to admit 9-295.

4           THE COURT:  Any objection?

5           MR. KENNEDY:  No objection.

6           THE COURT:  9-295 is admitted without objection.

7           (Exhibit 9-295 received in evidence.)

8           THE COURT:  You may publish.

9           MR. NAMMAR:  Thank you.

10          If we can start with the first page.

11  BY MR. NAMMAR:

12  Q    Is this a brochure that you would -- the salesmen would

13  commonly leave with customers?

14  A    It is.

15          MR. NAMMAR:  We can go to page 2.

16  BY MR. NAMMAR:

17  Q    Is this a job you're familiar with?

18  A    That is the Waikiki Shell.  Yes.

19  Q    Did you work on that job?

20  A    I did.

21  Q    You can --

22          MR. NAMMAR:  If we can go to the next page.  And the

23  next page.  The next page.  The next page.  And the next page.

24  The next page.

25  BY MR. NAMMAR:

1  Q    Did this brochure feature Termidor?

2  A    It does.

3  Q    Did it feature any of the cheaper substitutes?

4  A    It does not.

5  Q    Is this another example of presenting material to a

6  customer that was misleading?

7  A    It is.

8         MR. NAMMAR:  Can we go to the next page.  Can we go

9  to the next page.  And the next page.

10         If we can go to the next page.

11 BY MR. NAMMAR:

12 Q    Do you recognize the device that's shown here in this

13 brochure (indicates)?

14 A    Yes, I do.

15 Q    What is that thing -- what is that device called?

16 A    That is called an RDA.

17 Q    When's the only time you've ever seen Kama'aina use that

18 on a job?

19 A    That was for the Keola Lai job.

20 Q    Did you ever in all your time at Kama'aina see an RDA used

21 on any other jobs?

22 A    No.

23 Q    And if we look at the words of the brochures, it says --

24 it talks about the fumigation process.  Do you see that?

25 A    Yes.

1    Q    And it says:  Secondary locks are utilized to secure the

2    homes.  Was that always done?

3    A    No.

4    Q    Why not?

5    A    'Cause we would -- would not have enough.

6    Q    Would you tell Mike about that?

7    A    Yes.

8    Q    What would he tell you?

9    A    I can't recall what he would say.

10   Q    Okay.  But you would let Mr. Miske know that you didn't

11   have enough of these secondary locks?

12   A    Yes.

13   Q    And so would there be numerous times where homes were

14   fumigated without the secondary locks?

15   A    Yes.

16   Q    And did the label require the use of secondary locks?

17   A    It does.

18   Q    It goes on to say, in the second part, that:  Inside a

19   remote data access system is set in place to monitor the

20   interior, ensure that the correct level of fumigant is

21   maintained throughout the entire process.

22        Was that true?  Would you normally use that in

23   fumigations?

24   A    No.

25             MR. NAMMAR:  If we can go to page 14.

1   BY MR. NAMMAR:

2   Q    Do you recognize what is shown here?

3   A    Our chamber -- chamber trailer for fumigation.

4   Q    Is this where you can fumigate furniture?

5   A    Yes, it is.

6   Q    Is this the device that you said you couldn't fit the

7   cabinets in at Keola Lai?

8   A    Yes.

9   Q    Who's featured in this picture?

10  A    Myself to the left and Jason Yokoyama to the right.

11          MR. NAMMAR:  If you go to page 18.  And zoom in on

12  the bottom left picture.

13  BY MR. NAMMAR:

14  Q    Who's featured in this picture?

15  A    That is Richard MacGuyer to the left and Kris Aviero to

16  the right.

17  Q    What did Kris do?

18  A    He also is a salesman for Kama'aina.

19  Q    What did Richard do?

20  A    Salesman for Kama'aina.

21  Q    Was Richard the same person that you said was Miske's

22  cousin?

23  A    Correct.

24  Q    And also the front of the fireworks business?

25  A    Yes.

1          MR. NAMMAR:  If we can go to page 21.  And zoom in on

2     the concierge program part.  Yeah.

3     BY MR. NAMMAR:

4     Q     Do you recognize the person in the photo in the black

5     shirt and the shades?

6     A     That is David Melton.

7     Q     Is he the person that you told us made that fake State of

8     Hawaii ID for you in the name of James Kealoha?

9     A     He is.

10    Q     And in this part of the brochure it talks about an

11    exclusive concierge service for realtors.  Do you see that?

12    A     I do.

13    Q     Was that a big part of the fumigation business for

14    Kama'aina Termite and Pest Control?

15    A     It was.

16    Q     And did you get specific instructions from Mr. Miske as

17    far as the use of chloropicrin on concierge homes for realtors?

18    A     I did.

19    Q     What instructions did you get?

20    A     We were to stage properties with nice plants around the

21    house to prepare to sell the property that was staged with all

22    these beautiful plants.  And we were not to use chloropicrin

23    because they'd burn these plants and they'd damage the foliage

24    before they sell the house.

25    Q     So Mr. Miske told you not to use chloropicrin on all the

1    realtor properties?

2    A    Yes.

3    Q    Because it would damage the plants?

4    A    Correct.

5    Q    He knew that wasn't safe?

6    A    It was not safe.

7    Q    Why wasn't it safe?

8    A    Chloropicrin is, one, a deterrent in case there's anything

9    under the tent before we introduce the gas that kill people, or

10   kill animals, and it's also an indicator gas to let you know

11   that you still have Vikane in the -- in the structure.

12            MR. NAMMAR:  Can we go to page 22.

13   BY MR. NAMMAR:

14   Q    What is this?

15   A    That looks like a business card for Sean Chaves.

16   Q    What did he do?

17   A    He also was a salesman.

18   Q    And on the bottom left it's a little bit cut off, but is

19   that the license number for Kama'aina Termite and Pest Control?

20   A    It is.

21   Q    So if a customer got this brochure or got Sean's card, the

22   customer would believe that Kama'aina was licensed?

23   A    Correct.

24   Q    And you told us about who the license holder was, right?

25   A    Yes.

1    Q    Who was that?

2    A    Harry Kansaki.

3    Q    A guy that was never around?

4    A    Yes.

5         MR. NAMMAR:  Can we show the witness only 9-609 from

6    the first list?

7         THE COURT:  Go ahead.

8    BY MR. NAMMAR:

9    Q    Mr. Cabael, do you recognize this as a Kama'aina Termite

10   and Pest Control contract and proposal?

11   A    I do.

12   Q    And is this an invoice for a job that you worked on?

13   A    It is.

14   Q    What job was that?

15   A    Hawaii Kai Peninsula.

16   Q    And does this particular invoice bill about a hundred

17   thousand dollars for Termidor treatment?

18   A    Correct.

19        MR. NAMMAR:  Your Honor, I move to admit 9-609.

20        THE COURT:  Any objection?

21        MR. KENNEDY:  No objection.

22        THE COURT:  9609 -- 9, dash, 609 is admitted without

23   objection.

24        (Exhibit 9-609 received in evidence.)

25        THE COURT:  You may publish.  And this is the last

 1    area of questioning before we take a break.

 2              MR. NAMMAR:  Your Honor, I think we can take a break

 3    right now because I'm going to go on this topic for a while.

 4              THE COURT:  Okay.

 5              All right.  As we go to break then, your second of

 6    the trial day, I'll remind our jurors to refrain from

 7    discussing the substance of this case with anyone, including

 8    each other, until I advise you otherwise.  Do not access any

 9    media or other accounts of this case that may be out there.

10    And finally, do not conduct any independent investigation.

11              I understand that there is an administrative issue

12    that has been brought to my attention with respect to the jury.

13    I am looking into it, and I hope to get an answer for all of

14    you in the very near future.  I do not have any patience at all

15    for this kind of hiccup in the processing.  And so if I don't

16    get an answer in the next hour, I will be meeting with the

17    people who are responsible.  And so hopefully no later than

18    tomorrow morning when you return at 8:30 I will be able to

19    update you on where that stands.  Okay.

20              Thank you for bringing it to my attention.  And in

21    the future if there are any other administrative-type issues

22    that you are grappling with, please bring it -- without

23    hesitation, please bring it to Ms. Kimura's attention, and I

24    promise you we will get right on it.  Okay.

25              COURTROOM MANAGER:  All rise for the jury.

```
 1                  (The jury was excused at 12:16 p.m. until 12:38 p.m.)

 2                  (Open court in the presence of the jury.)

 3                  THE COURT:  All right.  Mr. Nammar, you may continue

 4      with your direct of Mr. Cabael.

 5                  MR. NAMMAR:  Thank you.

 6                  Can we publish 9-609?  And zoom in on the -- just the

 7      top box.

 8      BY MR. NAMMAR:

 9      Q    So this is a proposal for the Hawaii Kai Peninsula on

10      Lunalilo Home Road?

11      A    Correct.

12      Q    Do you recall working -- being one of the people who

13      worked on this project?

14      A    At the beginning, yes.

15      Q    Okay.  And it was treated around 2010.  Does that jibe

16      with your recollection?

17      A    Correct.  Yes.

18                  MR. NAMMAR:  If we could zoom out.  And zoom in under

19      this box (indicates), the entire box.

20      BY MR. NAMMAR:

21      Q    So this is -- the contract was for ground treatment

22      service.  Do you see that?

23      A    Yes.

24      Q    And what was sold here was Termidor.  Do you see that?

25      A    Yes, I do.
```

1   Q    And the price was about a hundred thousand dollars?

2   A    Yes.

3   Q    Was a cheaper substitute used on this particular job?

4   A    Yes, it was.

5   Q    And did you yourself apply a cheaper substitute on this

6   job?

7   A    Yes, I did.

8   Q    But what was sold here to the customer is Termidor, right?

9   A    Yes, it was.

10  Q    Not Prevail or some other --

11  A    No.

12  Q    -- chemical?

13          MR. NAMMAR:  If you zoom out and go to the bottom.

14  BY MR. NAMMAR:

15  Q    Do you recognize these signatures at the bottom by

16  anybody?

17  A    Looks like David Melton.

18  Q    Who is David Melton?

19  A    David Melton was one of the salesmen with Kama'aina

20  Termite.

21          MR. NAMMAR:  If we could zoom out.

22  BY MR. NAMMAR:

23  Q    Was Prevail a cheaper alternative to Termidor?

24  A    I don't recall using Prevail for any ground termite.  I

25  think Prevail was more so of a -- a treatment before you pour

1    concrete.

2    Q     Okay.

3              MR. NAMMAR:  If we could show the witness only 9-610?

4              THE COURT:  Go ahead.

5    BY MR. NAMMAR:

6    Q     Is this document for the same property?

7    A     It is.

8    Q     And this is the same property where you've told us

9    Termidor was not applied?

10   A     Yes.

11   Q     Who is Kris Aviero?

12   A     Kris Aviero is also a salesman.

13   Q     If we go to page 3, does this document also mention that

14   Termidor was applied at the particular property?

15   A     It does say that, yes.

16             MR. NAMMAR:  Your Honor, I move to admit

17   Exhibit 9-610.

18             THE COURT:  Any objection?

19             MR. KENNEDY:  No objection.

20             THE COURT:  9-610 is admitted then.

21             (Exhibit 9-610 received in evidence.)

22             THE COURT:  You may publish.

23             MR. NAMMAR:  We can go to page 1.

24   BY MR. NAMMAR:

25   Q     Is this the warranty for the work that was done, as

1   indicated here, at the Hawaii Kai Peninsula condo?

2   A    That's what it states there, yes.

3   Q    And is this Kris Aviero at the bottom?  What did he do

4   again?

5   A    He was a salesman for Kama'aina Termite.

6   Q    Okay.  And on page 3, does this warranty document indicate

7   that certain areas were treated?

8   A    Yes.  The exterior -- exterior perimeter of the property,

9   yes.  The -- the buildings.

10  Q    Does it indicate it was Termidor?

11  A    With Termidor, yes.

12  Q    And, in fact, Termidor was not used on this job?

13  A    No, it was not.

14          MR. NAMMAR:  If you could zoom out.

15  BY MR. NAMMAR:

16  Q    And it mentions the office, exercise room, pool hall,

17  cottages, villas, and colonies.  Which one -- which of these do

18  you recall working on?

19  A    I recall working on the office area, that first section

20  there, some of the colony and some of the villas.

21  Q    And this was a property in Hawaii Kai?

22  A    Correct.

23          MR. NAMMAR:  If we could now show the witness only

24  Exhibit 9-612.  And go to page 7 -- 17.

25  BY MR. NAMMAR:

1   Q    Is this a log of work that was purportedly performed at

2   this same project?

3   A    That is.  Yes.

4   Q    And does it indicate that Termidor was applied?

5   A    It does.

6   Q    And do you recognize the handwriting here?

7   A    That is my handwriting there.

8   Q    And does it list you as "treated by" in that box

9   (indicates)?

10  A    It does.

11  Q    Is this a log -- what was the purpose of this log?

12  A    We would fill that out every day we did a application, for

13  any job we did application for, explaining what time you

14  started, what time you finished, what you did, and what -- how

15  much chemical used.

16  Q    And this is for that same project that we mentioned?

17  A    Yes, it is.

18           MR. NAMMAR:  Your Honor, I move to admit 9-612.

19           THE COURT:  Any objection to this exhibit?

20           MR. KENNEDY:  No objection.

21           THE COURT:  9-612 then is admitted without objection.

22           (Exhibit 9-612 received in evidence.)

23           THE COURT:  You may publish.

24  BY MR. NAMMAR:

25  Q    Starting on page 17, this is that same project, the

1   Colony, Hawaii Kai Peninsula.  Do you see that?

2   A    I do.

3   Q    And the date listed here is June 2010.  Do you see that?

4   A    I do.

5   Q    And it lists ground termite specifications.  Do you see

6   that?

7   A    Yes.

8   Q    At the top?  And it lists -- and the hand -- what does it

9   say in the handwritten part?

10  A    It says the date of the treatment, what time we did the

11  treatment, what we treated, and the amount of chemical and who

12  did the treatment.

13  Q    Okay.  And what is listed here?

14  A    We did on the 15th of June, 8:00 in the morning to 1:00

15  p.m., the exterior perimeter -- perimeter of that one property,

16  or that one building that might be labeled on top.  400 gallons

17  of Termidor was used.  And it was applied by myself and Art.

18  Q    And was -- the 400 gallons of Termidor, was that accurate?

19  A    No.

20  Q    Why would you keep false -- why would you notate false

21  information like this?

22  A    Because that's what we sold.

23  Q    So if the customer or regulator ever were to see this

24  document, it would show Termidor, when in reality you applied

25  something else?

1   A     Yes.

2   Q     Were you ever licensed to do ground termite treatment

3   work?

4   A     Not that I'm aware of, no.

5   Q     And if we go to page 15.

6         Is this for the same project?

7   A     That is.

8   Q     And are you also listed in -- in this particular box as

9   being one of the people who treated Colony Building 8?

10  A     Yes.

11  Q     And does this also list 250 gallons of Termidor?

12  A     250 gallons, that's what it says there, yes.

13  Q     But in reality, a cheaper substitute was applied?

14  A     Correct.

15        MR. NAMMAR:  You can take that down.

16  BY MR. NAMMAR:

17  Q     Were all of the -- all of the technicians doing -- and

18  salespeople doing this similar practice at Kama'aina Termite

19  and Pest Control, where they would sell Termidor but apply a

20  cheaper substitute?

21  A     I would speak for the technicians.  I can't speak for all

22  the salesmen.

23  Q     Okay.  What were the technicians doing?

24        MR. KENNEDY:  Objection on lack of firsthand

25  knowledge.

1           THE COURT:  Sustained.

2   BY MR. NAMMAR:

3   Q    Were you supervising the technicians?

4   A    I was.

5   Q    And based on that supervision, do you know what the

6   technicians were applying?

7   A    We were applying a chemical called Premise.

8   Q    And that was a cheaper substitute than Termidor?

9   A    It was.

10  Q    Was Miske aware of this practice?

11  A    He was.

12  Q    Did Miske direct this practice?

13  A    Yes.

14  Q    When would you use Termidor?  When, if ever, would you use

15  Termidor?

16  A    We would apply Termidor to properties or -- or structures

17  that had live infestations because we did not want to have to

18  come back.  We want to make sure it's done right.

19  Q    What does live infestations mean?

20  A    You would have ground termite infested in a house.  Most

21  times they'll have a nest somewhere in the attic, somewhere in

22  the wall, somewhere under the house.  And we would make sure

23  that we used Termidor to treat those areas of infestation of

24  live ground termites.

25  Q    Because you didn't want to come back?

1   A    Because I want to make sure the job was done right and not

2   get called back by the customer.

3   Q    Who made the call?

4   A    Michael.

5   Q    And who made the call to use the cheaper substitute on it?

6   A    Michael did.

7   Q    Michael did?

8   A    Yes.

9   Q    Did making that call to use the cheaper substitute mean

10  more profit for Michael?

11  A    Yes.

12  Q    Do you recall a time where you actually were caught by a

13  customer?

14  A    I was.

15  Q    Tell us about that.

16  A    We would keep empty Termidor bags in the truck, and we

17  would have our full bags of the cheaper substance.  And I was

18  putting the cheaper substance in the Termidor bag to show like

19  I was putting Termidor into a tank to mix it, and he caught me

20  putting the cheaper substance in the Termidor bag.

21  Q    Where was this?

22  A    In Kailua.

23  Q    Was that a common practice that technicians would do on

24  ground termite jobs?

25  A    That was.  But we wouldn't do it on the job site anymore.

1    We would do it before we left the shop.

2    Q     And was Miske aware of that practice?

3    A     He was.

4    Q     Did he direct that practice?

5    A     He did.

6    Q     I want to circle back to something we talked about before.

7              MR. NAMMAR:  Can we show the witness only 9-40?

8    BY MR. NAMMAR:

9    Q     Do you recognize this photo?

10   A     That is the Keola Lai.

11             MR. NAMMAR:  Your Honor, I move to admit 9-40.

12             THE COURT:  Is it a one-page document?

13             MR. NAMMAR:  I think it is.

14             Is it?  Yes.

15             It's from the original.

16             THE COURT:  I'm sorry?

17             MR. NAMMAR:  It's from the original, Your Honor.

18             THE COURT:  Yeah, that's what I'm looking at.  The

19   original says photos, plural.  That's why I'm asking.

20             MR. NAMMAR:  I'm sorry.  I think it's one page.

21             THE COURT:  It's a one-page document.

22             Any objection?

23             MR. KENNEDY:  No objection.

24             THE COURT:  Without objection, that one-page

25   Exhibit 9-40 is admitted.

 1              (Exhibit 9-40 received in evidence.)

 2              THE COURT:  You may publish.

 3    BY MR. NAMMAR:

 4    Q    Mr. Cabael, the jury can see it.

 5         What are we looking at here?

 6    A    That is the structure that we fumigated, Keola Lai.

 7    Q    And this is the one where you said you did a chamber

 8    fumigation; is that right?

 9    A    Correct.

10    Q    Because you couldn't put a tarp over the building?

11    A    We could not cover the building from the outside, correct.

12    Q    And so the plan was to seal each unit?

13    A    Yes.

14    Q    But you told us you had time constraints, right?

15    A    We did.

16    Q    And Mr. Miske made the call not to seal all the units?

17    A    Yes.

18    Q    Whose -- which units did you seal?

19    A    I -- I believe we sealed -- we started sealing from the

20    top down.  I can't say exactly where we finished, where we

21    stopped at.

22    Q    Okay.  What percentage of the units would you say you

23    sealed?

24    A    Maybe about 40 to 50 percent was sealed.

25    Q    And the rest were unsealed?

1   A     Yes.

2   Q     And you mentioned Miske also made the call to not use

3   chloropicrin; is that right?

4   A     Correct.

5   Q     And you mentioned, though, that you would do what was

6   called a Hollywood, right?

7   A     Yes.

8   Q     Would that make it appear to regulators if they were

9   observing that there was chloropicrin in the building?

10  A     I'm sorry?

11  Q     Would that make it appear to regulators that were watching

12  that there was chloropicrin in the building?

13  A     Yes.

14  Q     How so?

15  A     Staging chloropicrin pans in areas of the building.

16  Q     And when you entered the building, would it -- would you

17  suit up in an SCBA as if there was chloropicrin in there?

18  A     We did.

19  Q     In reality, though, there wasn't?

20  A     There was none.

21  Q     Would you then take off your SCBA when you were out of

22  sight?

23  A     We did.

24  Q     Because there was no chloropicrin in the building?

25  A     Yes.

```
 1              MR. NAMMAR:  You can take that down.

 2   BY MR. NAMMAR:

 3   Q    You mentioned -- you talked about the assault that you

 4   observed by a security guard, an M security guard at the

 5   nightclub, outside the nightclub?

 6   A    Yes.

 7   Q    Who was doing the assaulting that you observed?

 8   A    I can't recall right now.

 9   Q    Was it someone associated with the M Nightclub security?

10   A    Yes.

11   Q    They were doing the actual assault -- the actual assault?

12   A    Yes.

13              MR. NAMMAR:  So if we can pull up 9, dash -- publish

14   9-300, Your Honor, which was just submitted?

15              THE COURT:  Yes.  Go ahead.

16   BY MR. NAMMAR:

17   Q    You were shown a number of these proposals.  We talked

18   about the Termidor part, but -- if you could zoom in on tent

19   fumigation.

20        Was it also the normal course of practice that when

21   fumigations were sold both of these boxes would be checked?

22   A    Yes.

23   Q    In other words, to the customer it looked like both Vikane

24   and chloropicrin were going to be used.  Was that always done?

25   A    Yes.
```

1  Q    What happened in reality?

2          MR. KENNEDY:  Objection on lack of personal

3  knowledge.

4          THE COURT:  Overruled.  Go ahead.

5          MR. KENNEDY:  He would not be able to say since he

6  was not there when the gas was shot.

7          THE COURT:  Go ahead.

8  BY MR. NAMMAR:

9  Q    You can answer.

10 A    So we'll -- we'll go ahead and prepare the structure for

11 fumigation.  We would introduce Vikane, but we -- but we will

12 not "chloropic" the house.

13 Q    How many -- what percentage of jobs would you not use

14 chloropicrin on?

15 A    I'd say a great percentage, over 50 percent.

16 Q    Over 50 percent?

17 A    Yes.

18 Q    How do you know that?

19 A    Because I was on -- in charge of the fumigators.

20 Q    You were giving the instructions?

21 A    Yes.

22 Q    And who were those instructions coming from?

23 A    Michael.

24 Q    He would tell you not to use chloropicrin?

25 A    Yes.

1    Q    Why would he tell you not to use chloropicrin?

2    A    Again, we -- we had a lot of jobs that we had on the

3    books, and we had to get customers a reasonable -- reasonable

4    amount of time.  And with chloropicrin you could not do that.

5    Q    Why not?

6    A    Because the customers will get into the house and their

7    eyes will burn.

8    Q    So the cust -- the chloropicrin would linger?

9    A    The chloropicrin is an indicator gas telling you got

10   Vikane in there, and it would linger, yes.

11   Q    So if a customer came back into a house that had

12   chloropicrin in, they would notice it?

13   A    They would.

14   Q    And you had certain time constraints that you wanted to

15   meet?

16   A    Yes.

17   Q    And so to make those time constraints, Mr. Miske directed

18   you to not use chloropicrin?

19   A    Correct.

20   Q    Why did you have time constraints?

21   A    Because after you uncover a house it takes six hours for

22   it to properly aerate.

23   Q    And by not using chloropicrin, could you whittle down that

24   time?

25   A    Yes.

1   Q   Were fumigators constantly working overtime?

2   A   They were.

3   Q   Were they working late into the night?

4   A   Yes.

5   Q   Sometimes?

6   A   Yes.

7   Q   And did it always almost seem like the fumigation crews

8   were overbooked?

9   A   Yes.

10  Q   Why were they overbooked?

11  A   They just was good.  We had a lot of jobs.

12  Q   And the more jobs, the more money?

13  A   Yes.

14  Q   Were you also on a number of jobs not using enough

15  chloropicrin?

16  A   Yes.

17  Q   So when you used it, you wouldn't use the right amount?

18  A   Correct.

19  Q   Why not?

20  A   So we can get the customers in at a decent time.

21  Q   So the chloropicrin wouldn't linger as long?

22  A   Yes.

23  Q   Did you -- because of this practice when you were at

24  Kama'aina -- did this go on the entire time you were in

25  Kama'aina, to your knowledge?

1   A      Pretty much so, yes.

2   Q      Because of this practice, did you end up observing a lot

3   of chloropicrin sitting around in random places?

4   A      We had -- we had a large stockpile of chloropicrin, yes.

5   Q      Where was it stockpiled?

6   A      In the shop, in a storage warehouse, in a bunker, in

7   containers.

8   Q      Is that the bunker that you talked about with the

9   fireworks?

10  A      No.  We had a different bunker that we stored

11  miscellaneous stuff in it.  Not fireworks.

12  Q      Was it the same -- in the same area as where the fireworks

13  bunker was?

14  A      Same area, yes.

15  Q      You said in a storage container?

16  A      And we had some in a storage container too, yes.

17  Q      Where was that?

18  A      That was in Campbell Industrial Park.

19  Q      And was it also stockpiled in the office?

20  A      It was stockpiled in the warehouse, Kama'aina's warehouse,

21  yes.

22  Q      At some point did it spill and leak in the office?

23  A      We -- we've had some -- some exposure of chloropicrin in

24  the shop, yes.

25  Q      Who sold you the chloropicrin?

1   A     The people that sold us the Vikane, Univar.

2   Q     Did Univar question you at one point about the fact that

3   you weren't buying any more chloropicrin?

4   A     They did.

5   Q     Who questioned you?

6   A     Kurt Nosal.

7   Q     What did you tell Kurt?

8   A     We had enough.

9   Q     And did you tell Mike about that conversation?

10  A     Mike was involved in that conversation, yes.

11  Q     Do you know what Michael's response was?

12  A     I can't recall what his response was, no.

13  Q     Do you recall an occasion where you had so much

14  chloropicrin that the distributor actually bought some back

15  from you?

16  A     Yes.

17  Q     What do you recall about that?

18  A     They -- they -- they bought a bunch of cases.  I can't say

19  exact -- exactly how much they did, but they took some off our

20  hands.

21  Q     Was Mr. Miske aware that the distributor bought

22  chloropicrin back from you?

23  A     He was.

24  Q     How did he know?

25  A     'Cause he's the one that made the -- had the discussion

1   with Kurt Nosal.

2   Q    So by not using chloropicrin or not using enough of the

3   chloropicrin, you could return the residence to the customer

4   quicker?

5   A    Correct.

6   Q    Did you feel that was a dangerous practice?

7   A    I did.

8   Q    Why did you think that?

9   A    Now, we had a couple instances where people ended up in

10  the hospital.

11  Q    Who ended up in the hospital?

12  A    The customers.

13  Q    How did you find that out?

14  A    They called the company and said that their family member

15  was in the hospital.

16  Q    Vikane?

17  A    From Vikane, correct.

18  Q    You know Vikane?

19  A    I do.

20  Q    You know that chemical, right?

21  A    Yes.

22  Q    That's what's supposed to be paired with chloropicrin,

23  right?

24  A    Correct.

25  Q    Do you understand that Vikane is odorless?

1   A    It is.

2   Q    And you can't see it?

3   A    Yes.

4   Q    So if a customer came into a house with Vikane without

5   chloropicrin, they would have no idea?

6   A    They would not know.

7   Q    Did you understand that the label had certain requirements

8   that when you used Vikane --

9   A    It does.

10  Q    -- you had to use chloropicrin?

11  A    Yes.

12  Q    But you guys weren't following that?

13  A    We were not.

14  Q    And when it came time to sell a job like the invoice that

15  we looked at, you would regularly inform the customer in the

16  proposal that chlor -- both chloropicrin and Vikane were going

17  to be used --

18  A    Correct.

19  Q    -- is that right?

20          MR. NAMMAR:  Your Honor, can we publish 1977A, which

21  is the photos we admitted earlier today from the ninth supp.,

22  page 43?

23          THE COURT:  Go ahead.

24  BY MR. NAMMAR:

25  Q    Would you also use -- not use -- if you could zoom in on

1   that.

2       Would you also not use chloropicrin on commercial jobs?

3   A   Yes.

4   Q   Commercial jobs that you were in charge of?

5   A   Correct.

6   Q   What is this job?

7   A   That is a job, a picture of a fumigation in Polynesian

8   Cultural Center.

9   Q   And I believe you talked about this earlier.  Was this of

10  multiple structures?

11  A   It was.

12  Q   What kind of structures?

13  A   It was like huts, like grass huts from different villages

14  in the Pacific, Fiji, Samoa, Tonga, Hawaii.

15  Q   And is this one of those huts?

16  A   It is.

17  Q   And did you not use chloropicrin on this hut and the other

18  huts on this job?

19  A   We did not.

20  Q   Was that under Mr. Miske's direction?

21  A   Yes.

22          MR. NAMMAR:  Can we show the witness only 9-294?

23  BY MR. NAMMAR:

24  Q   Is this a proposal for that same job for the picture we

25  just looked at?

1  A    Yes, it is.

2  Q    And 2012, was that around the time when you remember doing

3  this job?

4  A    Yes.

5  Q    And if we go to page 6, does it list a number of

6  buildings?

7  A    It is.

8  Q    Are those the jobs that you recall fumigating?

9  A    Yes.

10         MR. NAMMAR:  Your Honor, I move to admit this

11  proposal, 9-294.

12         THE COURT:  Any objection?

13         MR. KENNEDY:  No objection.

14         THE COURT:  9-294 is admitted then.

15         (Exhibit 9-294 received in evidence.)

16         THE COURT:  You may publish.

17         MR. NAMMAR:  Can we go to page 1.

18  BY MR. NAMMAR:

19  Q    So this is a proposal for the Polynesian Cultural Center.

20  It's dated February 17th, 2012.  Do you see that?

21  A    I do.

22  Q    Okay.  And it lists a number of people.  Who is Andi

23  Kaneakua?

24  A    She was -- she was a person that did a lot of admin work

25  for Kama'aina Termite.  I'd say -- well, that just says they're

1    general manager.

2    Q    And David Melton?

3    A    And David Melton was a sales -- sales rep.

4         MR. NAMMAR:  If we go to page 3.  And if we could --

5    BY MR. NAMMAR:

6    Q    This part's describing the tent fumigation, right?

7    A    Correct.

8    Q    And on the second paragraph it says that tarps are used in

9    most cases and that before the fumigation apply -- is applied

10   chloropicrin, a warning agent, is introduced into the covered

11   building.  Do you see that?

12   A    Yes.

13   Q    And then it says:  In the event that a pet or person may

14   still be in the structure, they would quickly find their way of

15   escape, as it is not tolerable.  Do you see that?

16   A    I do.

17   Q    Is that the purpose of chloropicrin?

18   A    That is one of the purposes of chloropicrin, yes.

19   Q    And as I understand your testimony, you were often not

20   using chloropicrin at all during jobs?

21   A    Correct.

22   Q    Or not using enough?

23   A    Correct.

24   Q    And on this particular job, you're telling the customer

25   you're going to use it, but in reality, it was not used; is

1    that right?

2    A    Correct.

3         MR. NAMMAR:  If we can go to page 5.  And go

4    underneath to materials.

5    BY MR. NAMMAR:

6    Q    And you're also telling the customer here that the control

7    materials are used in strict accordance with applicable

8    regulations and product labeling requirement.  Do you see that?

9    A    I do.

10   Q    And that was often not followed, what the label required,

11   right?

12   A    Correct.

13   Q    The label required the use of chloropicrin, for example;

14   is that right?

15   A    Yes, it did.

16        MR. NAMMAR:  If we go to page 9.

17   BY MR. NAMMAR:

18   Q    And on this job you were also selling Termidor.  Do you

19   see that?

20   A    I do.

21   Q    Was Termidor used on this on the property, or was a

22   cheaper substitute used?

23   A    I can't recall if we used Termidor on that, on that

24   particular job there.

25   Q    Okay.  But the general practice was that you would usually

1   sell Termidor but use a cheaper substitute; is that right?

2   A    Correct.

3   Q    And when you had active, live infestation, you would use

4   Termidor; is that right?

5   A    That is correct.

6   Q    If we go to page 11, is the cost of the fumigation shown

7   here?

8   A    No.  That looks like for ground termite treatment.

9   Q    Okay.  So the fumigation would have been in addition to

10  this; is that right?

11  A    That's what it looks like.

12  Q    Okay.

13            MR. NAMMAR:  Your Honor, can we publish nine, two --

14  9-295, which is --

15            THE COURT:  Yes.

16            MR. NAMMAR:  Was admitted earlier today?

17            THE COURT:  Yes.

18            MR. NAMMAR:  Can we go to page 3.  Page 2, sorry.

19  BY MR. NAMMAR:

20  Q    Mr. Cabael, do you recall working on the Waikiki Shell

21  that's shown here?

22  A    I do.

23  Q    Is that a job that you'd like to forget?

24  A    Yes, very much.

25  Q    Why is that?

1   A   Because I had to crawl under the stage and grab a bunch of

2   dead cats.

3   Q   What's the purpose of chloropicrin?

4   A   To evacuate anything that's live under the tent.

5   Q   And that would include animals, right?

6   A   Correct.

7   Q   And after this job, did you discover there was a number of

8   dead cats in the Shell?

9   A   Yes.

10   Q   And did you have to go get those cats out?

11   A   Yes.

12   Q   How many cats are we talking about?

13   A   Over 50 cats.

14   Q   Do you believe chloropicrin was used on this job?

15   A   No.

16   Q   Did you have to come back to the Shell because it -- the

17   fumigation didn't work?

18   A   We did.

19   Q   How many times?

20   A   I recalled being back there once.

21   Q   Why did you have to come back?

22   A   While they were doing their renovations after the

23   fumigation they found live termites in the roof.

24   Q   And what did you -- how did you treat it when you came

25   back?

1   A   We spot-treated with Termidor.

2   Q   What does that mean?

3   A   We treat the immediate area of activity.

4           MR. NAMMAR:  You can take that down.

5   BY MR. NAMMAR:

6   Q   Poinciana Manor, do you recall working on that job?

7   A   I do.

8   Q   What job was that?

9   A   It was a huge project in Kailua.

10  Q   Was chloropicrin used on that job?

11  A   I can't recall if we did that on that job.

12  Q   Do you believe it was, based on what you recall about the

13  size of the structure?

14          MR. KENNEDY:  Objection on previous answer, lack of

15  firsthand knowledge.  He can't recall.

16          THE COURT:  More foundation is necessary.  I don't

17  recall what his testimony was about this particular job.

18          MR. NAMMAR:  Sure.

19  BY MR. NAMMAR:

20  Q   You said you don't recall.  Do you think it was likely

21  that it wasn't used?

22          MR. KENNEDY:  Objection and the form of the question,

23  Your Honor.

24          THE COURT:  Sustained.

25  BY MR. NAMMAR:

1  Q    What kind of structure was Poinciana Manor?

2  A    Poinciana Manor was a very complicated structure to

3  fumigate.

4  Q    What was complicated about it?

5  A    The way the -- the -- the way the units were set up and

6  the way the roofs are designed, and it was just -- it was just

7  a nightmare.

8  Q    And is there anything about the setup of that structure

9  that makes you think chloropicrin was not used?

10  A    Yes.

11  Q    What?

12         MR. KENNEDY:  Objection on speculation, Your Honor.

13         MR. NAMMAR:  He can answer what.

14         MR. KENNEDY:  Think it might?

15         THE COURT:  The objection is sustained.

16  BY MR. NAMMAR:

17  Q    As we've been talking about the setup of Poinciana Manor,

18  do you now recall whether chloropicrin was used or not?

19         MR. KENNEDY:  Objection, asked and answered.

20         THE COURT:  He can answer that.  Go ahead.

21  A    I can't say.  The likelihood of chloropicrin being used on

22  a job is --

23         MR. KENNEDY:  Objection to the answer.

24         THE COURT:  Sustained.  The witness's response will

25  be stricken and not considered by the jury for any purpose.

 1              MR. NAMMAR:  Can we show the witness only 5000, dash,

 2    84?

 3    BY MR. NAMMAR:

 4    Q    Do you recognize this photo?

 5    A    That is a church that we did in Kalihi.

 6    Q    Was chloropicrin used on this --

 7    A    No.

 8    Q    -- structure?  What was that?

 9    A    No.

10              MR. NAMMAR:  Your Honor, I move to admit 5000-84.

11              THE COURT:  What list is this from?

12              MR. NAMMAR:  This is from the defense list, first

13    list.

14              THE COURT:  The original list?

15              MR. NAMMAR:  I think so.

16              MR. KENNEDY:  It is, Your Honor.

17              THE COURT:  Any objection?

18              MR. KENNEDY:  No objection.

19              THE COURT:  Without objection, 5000-84 is admitted.

20              (Exhibit 5000-84 received in evidence.)

21              THE COURT:  You may publish.

22    BY MR. NAMMAR:

23    Q    Mr. Cabael, did you work on this job?

24    A    I did.

25    Q    And where is this job?

1   A    This is in Kalihi.

2   Q    Do you recognize the business that's right here

3   (indicates), in the left?

4   A    I would like to say that's the fish store.

5   Q    The fish market?

6   A    Yes.  I forget what the name is, though.

7   Q    And chloropicrin, you recalled that chloropicrin was not

8   used on this building?

9   A    Correct.

10  Q    Why was it not used?

11  A    There was just -- we -- we covered that thing up until --

12  it was real late at night that we got that thing sealed and

13  covered up, and we had time restraints on the job, too.

14          MR. NAMMAR:  You can take that down.

15  BY MR. NAMMAR:

16  Q    Did you also work on a job of the Pagoda Hotel?

17  A    We did.

18  Q    Where was that?

19  A    I did.  That is in downtown.

20  Q    Honolulu?

21  A    Downtown Honolulu, yes.

22  Q    Was chloropicrin used on that job?

23  A    No, it was not.

24  Q    Why not?

25  A    Because of the fish and the plants that surround that

1    property.

2    Q    Star of the Sea, did you work on that job?

3    A    I did.

4    Q    Was chloropicrin used on that job?

5    A    No, it was not.

6    Q    What is the Star of the Sea?

7    A    It's a preschool.  It's a school there.  In Hawaii Kai, I

8    think.  Or somewhere down before Hawaii Kai.

9    Q    Was Mr. Miske -- did he seem very concerned with how quick

10   projects were finished?

11   A    Yes, he would.

12   Q    Would he ever instruct you to cut corners?

13   A    We would.

14   Q    Is the lack of using chloropicrin one of those examples?

15   A    It is.

16   Q    Would you have concerns about not using chloropicrin?

17   A    There's times I did, yes.

18   Q    And would your concerns be amplified when you got some

19   calls that customers went to the hospital?

20   A    Correct.

21   Q    What is a Spectros?

22   A    A Spectros is a piece of equipment used to test a house

23   for any Vikane in the air.

24   Q    How does it work?

25   A    It would have to be calibrated by the factory.  And then

1    you would turn it on and you would walk through the house

2    and -- different location in the house and it would suck air

3    into the machine and take its reading to see if there's any

4    present Vikane.

5    Q    What's the purpose of using a Spectros?

6    A    A Spectros was used to make sure that the house is clear

7    for the customers to return into.

8    Q    In the 13 years that you were working at Kama'aina, did

9    the Spectros hardly ever work?

10   A    Yes.

11   Q    Why was that?

12   A    Well, because it -- it needed calibrations regularly.  It

13   was a very expensive piece of equipments.

14   Q    And was it often not calibrated?

15   A    Yes.

16   Q    Did it often not work?

17   A    Yes.

18   Q    Did you not have enough of them either for five crews?

19   A    We had one.

20   Q    And would you tell Mr. Miske about the problems with the

21   Spectros?

22   A    I would.

23   Q    What would he tell you?

24   A    I can't recall what he said, but it would not get fixed.

25   Q    Is this something that's required to do pursuant to the

1    label on the Vikane?

2    A    It is.

3    Q    So were you one of the people that was responsible for

4    telling the customer the house was clear?

5    A    I was.

6    Q    And would you routinely do that with a broken Spectros?

7    A    I did.

8    Q    How would you do that?

9    A    The Spectros makes a noise when you turn it on, and it

10   gives the impression that it's actually doing its job.  And I

11   would walk through the house, go into certain areas and make

12   like I was testing the air quality, and then walk out and say

13   the house was good to go.

14   Q    But in reality, the device wasn't working?

15   A    Yes.

16   Q    Would you call that practice the Hollywood?

17   A    Exactly.

18   Q    Would you do that hundreds of times?

19   A    Yes.

20   Q    And so you would tell the customer that their house was

21   safe when in reality you didn't know?

22   A    I did not know.

23   Q    Did Miske, Mr. Miske, know about this practice?

24   A    He did.

25   Q    Was this routine?

1   A    This was routine, yes.

2   Q    And we've talked about it a little bit, but did the label

3   also require clamshell locks?

4   A    It does.

5   Q    Those are the secondary locks?

6   A    It is.

7   Q    And were there many times where the fumigation crews

8   didn't have enough?

9   A    Correct.

10  Q    And would you be -- would you tell Mr. Miske about that?

11  A    It's been brought up once or twice, a few times, yes.

12  Q    And would he be slow in getting additional clamshell

13  locks?

14  A    We were too busy enough.  We were too busy, and we

15  wouldn't get enough -- in quick enough for our jobs.

16  Q    What are scales used for in fumigation?

17  A    Scales are the -- are used to weigh the cylinder.  And as

18  you disperse the gas, it lets you know how much weight is being

19  left from that cylinder and tells you how much gas you expelled

20  into the house.

21  Q    And is that the way that a fumigator can tell how much gas

22  is being shot into a house?

23  A    That is the only way.

24  Q    Did you have an issue with the fumigators not having

25  enough scales?

1    A    We had issues with fumigators breaking the scales and not

2    have enough, yes.

3    Q    So they would be broken and they would be shooting gas

4    without scales?

5    A    Correct.

6    Q    Did that routinely happen?

7    A    Yes.

8    Q    You talked a little bit yesterday about the lack of

9    licensed crews for fumigation.  You recall that?

10   A    Yes, I do.

11   Q    You said sometimes there was one out of four, sometimes

12   there was two or three out of five.  Do you recall that?

13   A    Yes, I do.

14   Q    Would you do anything, you and other folks at Kama'aina do

15   anything related to the paperwork associated with fumigation to

16   conceal the fact that you didn't have enough licensed

17   fumigators?

18   A    We would.

19   Q    What would you do?

20   A    Say if I'm driving a truck and I'm not certified to apply

21   the gas or send a certified driver, I'll come back to the shop

22   and I'll put the folder on the side.  And the person who is

23   certified will come in that folder and sign his name and put

24   how much gas he put in there and everything else that was

25   required by the state.

1   Q    So was a log kept of every fumigation?

2   A    There was a log for every fumigation, yes.

3   Q    And would Kama'aina, would they ensure that a licensed

4   person was put on that log?

5   A    Correct.

6   Q    Even though in reality you didn't have enough?

7   A    Yes.

8   Q    Even though in reality the licensed person may not have

9   been the actual applicator on the job?

10  A    Yes.

11  Q    Would folks at Kama'aina sometimes forge license

12  applicators' signatures on fumigation logs?

13  A    I can't say for sure if that's happened.

14  Q    Would the fumigation logs record the amount of Vikane and

15  the amount of chloropicrin that was purportedly used on the

16  fumigation?

17  A    Yes.

18  Q    Would those amounts be accurate?

19  A    No.

20  Q    Why not?

21  A    Because there's times that we don't use the amount of

22  chloropicrin for the job and we'll just doctor the amount

23  that's required for the job.

24  Q    And so if a regulator were to get ahold of that fumigation

25  log, it would appear as though chloropicrin was used when in

```
 1   reality on many jobs it wasn't?

 2   A    Correct.

 3   Q    And the purpose of doing this was in case you were audited

 4   by the Department of Ag?

 5   A    Yes.

 6   Q    Did Miske know about this practice?

 7   A    He did.

 8   Q    Did he direct it?

 9   A    He did.

10   Q    Was Andi Kaneakua involved in this practice?

11   A    She was.

12   Q    How so?

13   A    She would be the one filing the files, the paperwork.

14            MR. NAMMAR:  Can we show the witness only 9-522?

15            And can we also show the witness 9-533?

16            Sorry.  Can we go back to 9-522.

17            Can we also show the witness 9-521?

18   BY MR. NAMMAR:

19   Q    Are these two examples of fumigation logs?

20   A    They are.

21   Q    And are these for jobs when you were at Kama'aina Termite

22   and Pest Control?

23   A    Yes.

24   Q    And is the certified applicator for both of these jobs

25   Jason Smith?
```

1   A     It is.  It is written there for Jason Smith, yes.

2   Q     And have you compared the signature on both of these

3   particular exhibits?

4   A     I did.

5   Q     Do they -- do they look nothing similar?

6   A     They do not look similar, no.

7           MR. NAMMAR:  Your Honor, I move to admit 9-522 and

8   9-521.

9           THE COURT:  Any objection?

10          MR. KENNEDY:  No objection.

11          THE COURT:  Those two exhibits shall be admitted then

12  without objection.

13          (Exhibits 9-521 and 9-522 received in evidence.)

14          THE COURT:  You may publish.

15  BY MR. NAMMAR:

16  Q     We have 95, dash, 21 up here [sic].

17        Do you know if Jason Smith is still alive?

18  A     I recently found out he had passed away.

19  Q     Okay.  So what are we looking at here?

20  A     We're looking at a form that is filled out for every job,

21  what we pumped in for chemicals, what we put in for a pic, the

22  size of the job and the address and the date.

23  Q     Okay.

24  A     And the applicator.

25  Q     And what is the address for this particular job?

1   A     The address is 94-414 Hokuili Street.

2   Q     And who is the applicator that's listed on the far right?

3   A     Jason Smith.

4   Q     Is he one of the guys that you understood was licensed?

5   A     Yes.

6   Q     Is that his license number under his name?

7   A     That is a number there.  I don't know if that's his

8   license number.

9   Q     Okay.  And does it list an amount of Vikane and an amount

10  of chloropicrin?

11  A     Yes.

12  Q     And was it routine practice at Kama'aina to always

13  indicate they used chloropicrin --

14  A     Yes.

15  Q     -- even if in reality you did not?

16  A     Correct.  Yes.

17  Q     And as you said, on about 50 percent of the jobs you did

18  not; is that right?

19  A     Somewheres around 50 percent, correct.

20  Q     Okay.

21          MR. NAMMAR:  You can zoom out.  And if we could zoom

22  in on the signature.

23  BY MR. NAMMAR:

24  Q     Do you see that?

25  A     Yes.

1   Q    That's purportedly Jason Smith's signature?

2   A    Correct.

3             MR. NAMMAR:  And if we can go now to 5, dash, 22 --

4   5, dash, 21, sorry.  Or 5, dash [sic], 22.  Yep.

5             If you could zoom in on that signature.

6   BY MR. NAMMAR:

7   Q    Does that look anything like the exhibit that we just

8   looked at, the signature?

9   A    No.

10  Q    And if we zoom out, does it list Jason in the top right?

11  A    Yes.

12  Q    And is this a form for a different fumigation around

13  that -- or of the Kaneohe -- in Kaneohe (indiscernible) -- at

14  the yacht club?  Do you see that?

15  A    I do.

16  Q    Does this also indicate the amount of Vikane and

17  chloropicrin used?

18  A    It does.

19  Q    How are those calculations made, the Vikane and

20  chloropicrin?

21  A    We have a computer that we punch numbers in that would

22  tell you how much gas you need according to the seal, the

23  exposure time, the wind speed, the condition of the tarps,

24  multiple things.

25  Q    Was that an app on your cell phone at the time you worked

1   at Kama'aina?

2   A    I can't recall if I had the app on my phone, if it was

3   around that time when I was here.

4   Q    Okay.  At some point did you have like a handheld

5   computer?

6   A    We did.

7   Q    And would you use that handheld computer to figure out how

8   much Vikane and how much chloropicrin to use?

9   A    Yes.

10   Q    Was there a shortage of those computers?

11   A    Yes.  There was two.

12   Q    And was -- how many crews were there?

13   A    Three, four, five.

14   Q    Would that sometimes be an issue as far as getting the

15   fumigation crews the right amount of gas to use?

16   A    It did.

17   Q    Why was that an issue?

18   A    Because not everyone had a computer, and I wanted to know

19   how much gas to put in, so I was tasked to do that at times.

20   Q    Okay.  And would -- sometimes would the fumigators not be

21   able to get ahold of you to get the right amount?

22   A    Yes.

23   Q    And they would not have a computer?

24   A    They would not.

25   Q    So what would they do in that situation?

1   A    With their experience, they would just kind of guestimate

2   the amount of gas that they have to put in for amount of time

3   that they have to uncover it.  To keep it covered.

4          MR. NAMMAR:  We can take that down.

5   BY MR. NAMMAR:

6   Q    Did the company ever take cash for pest control services

7   or fumigation?

8   A    They did.

9   Q    And what -- would the customer get any kind of break for

10  that?

11  A    That was kind of the selling point from a salesman to the

12  customer.

13  Q    What would --

14  A    That they wouldn't have to pay taxes on it.

15  Q    What taxes would they not have to pay?

16  A    The excise tax.

17  Q    And so who would get the cash?

18  A    The cash would go to either Andi or Michael.

19  Q    And who would -- who would take the cash from the

20  customer?

21  A    It's most times it would be the salesman.

22  Q    Would you see the salesman then deliver the cash to Andi

23  or Michael Miske?

24  A    I've seen it on cert -- on a few times, yes.

25  Q    We talked a little bit about Harry Kansaki, right?

1   A    Mm-hmm.  Yes.

2   Q    You told us he was the RME that was never around?

3   A    Correct.

4   Q    The only times he was ever around was when he was working

5   on his own company's jobs where you would do a fumigation; is

6   that right?

7   A    Yes.

8   Q    Denny Freitas, who is that?

9   A    Repeat the name again.

10  Q    Denny Freitas.

11  A    Denny Freitas was a cousin-in-law of Michael.

12  Q    Okay.  Was he associated with any of Miske's companies?

13  A    I -- I know he was the owner of the Kama'aina Plumbing.

14  Q    Okay.  Did you know whether he was the RME?

15  A    I do not know.

16  Q    Was there a point in time where you no longer started to

17  see Denny around the office?

18  A    Yes.

19  Q    When was that?

20  A    Maybe the last few years before I left.

21  Q    Okay.  Did you see anybody else that appeared to take

22  Denny's place?

23  A    I -- I can't recall who his name was, but there was

24  somebody else in that office.

25  Q    Where did Denny go to work, if you know?

1   A     He -- he went out to work with his cousin who owned -- who

2   owned his own plumbing company too.

3             MR. NAMMAR:  Can we show the witness only 1-50?

4             THE COURT:  We're at 1:30.

5             MR. NAMMAR:  It's a good time to stop, Your Honor.

6             THE COURT:  As we go to break for the trial day then,

7   I'll remind our jurors to refrain from accessing any media or

8   other accounts of this case, to refrain from conducting any

9   independent investigation.  And then finally, please do not

10  have any discussions with anyone, including each other,

11  regarding the substance of this case until I advise you that it

12  is acceptable to do so.

13            All right.  So we'll see you tomorrow morning at

14  8:30.  There is additional information.  I told you we would

15  get it within the hour.  There is additional information

16  regarding your administrative issue that Ms. Kimura can share

17  with you in the anteroom, okay, before you leave.

18            COURTROOM MANAGER:  All rise for the jury.

19            (The jury was excused at 1:31 p.m.)

20            (Open court out of the presence of the jury.)

21            THE COURT:  All right.  Any time estimate for

22  Mr. Cabael?  Because the witness list that you guys provided is

23  substantially off.

24            MR. NAMMAR:  Yeah, it is.  I don't have that much

25  more.  I don't have that much more left, Your Honor.  Probably

1   like an hour.

2                THE COURT:  An hour, okay.

3                All right.  See you tomorrow.

4                (Whereupon, at 1:32 p.m., the proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER CERTIFICATE

2          I, Ann B. Matsumoto, Official Court Reporter, United

3     States District Court, District of Hawaii, do hereby certify

4     that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5     complete, true, and correct transcript of the stenographically

6     recorded proceedings held in the above-entitled matter and that

7     the transcript page format is in conformance with the

8     regulations of the Judicial Conference of the United States.

9          DATED at Honolulu, Hawaii, June 24, 2024.

10

11

12
                          /s/ Ann B. Matsumoto
13                        ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25