```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
 5              Plaintiff,          )  Honolulu, Hawaii
                                    )
 6        vs.                       )  March 14, 2024
                                    )
 7   MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 38
                                    )
 8              Defendant.          )
     ───────────────────────────────)
 9

10                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE DERRICK K. WATSON
11         CHIEF UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Government:       MARK A. INCIONG, AUSA
                               MICHAEL DAVID NAMMAR, AUSA
14                             WILLIAM KEAUPUNI AKINA, AUSA
                               Office of the United States Attorney
15                             Prince Kuhio Federal Building
                               300 Ala Moana Boulevard, Suite 6100
16                             Honolulu, Hawaii 96850

17   For the Defendant:        LYNN E. PANAGAKOS, ESQ.
                               841 Bishop Street, Suite 2201
18                             Honolulu, Hawaii 96813

19                             MICHAEL JEROME KENNEDY, ESQ.
                               Law Offices of Michael Jerome
20                             Kennedy, PLLC
                               333 Flint Street
21                             Reno, Nevada 89501

22
     Official Court           ANN B. MATSUMOTO, RPR
23   Reporter:                United States District Court
                               300 Ala Moana Boulevard, Room C-338
24                             Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

```
 1                    I N D E X

 2   WITNESS:                                    PAGE NO.

 3   FOR THE GOVERNMENT:

 4    ALFREDO CABAEL, JUNIOR (CONTINUED EXAMINATION)

 5     RESUMED DIRECT EXAMINATION BY MR. NAMMAR        5

 6     CROSS-EXAMINATION BY MR. KENNEDY          42, 152

 7     REDIRECT EXAMINATION BY MR. NAMMAR           182

 8

 9                    E X H I B I T S

10   Exhibit 1-50 received in evidence                5

11   Exhibit 9-1238 received in evidence             31

12   Exhibit 9429-102 received in evidence           80

13   Exhibit 9249-103 received in evidence           82

14   Exhibit 9429-104 received in evidence           83

15   Exhibit 9429-105 received in evidence           84

16   Exhibit 9429-106 received in evidence           85

17   Exhibit 9429-107 received in evidence           87

18   Exhibit 9429-108 received in evidence           88

19   Exhibit 9429-109 received in evidence           90

20   Exhibit 9429-56 received in evidence            91

21   Exhibit 9429-57 received in evidence            92

22   Exhibit 9429-60 received in evidence            94

23   Exhibit 9429-61 received in evidence            94

24   Exhibits 9429-2 through 9429-14 and             99
     9429-16 through 9429-19 received in evidence
25
```

1                    E X H I B I T S (Continued)

2                                                              PAGE NO.

3      Exhibits 9429-20 through 9429-25                          107
       received in evidence
4
       Exhibit 9429-26 received in evidence                     109
5
       Exhibits 9429-27 through 9429-47                          112
6      received in evidence

7      Exhibit 9429-53 received in evidence                     115

8      Exhibits 9429-49 through 9429-52                          116
       received in evidence
9
       Exhibit 9429-48 received in evidence                     117
10
       Exhibit 9429-115 received in evidence                    125
11
       Exhibit 9429-116 received in evidence                    129
12
       Exhibits 5000-005 through 5000-012                        134
13     received in evidence

14     Exhibits 5000-19 through 5000-35                          139
       received in evidence
15
       Exhibits 5000-70 through 5000-83                          146
16     received in evidence

17     Exhibits 5000-84 through 5000-86                          148
       received in evidence
18
       Exhibit 9429-121 received in evidence                    161
19
       Exhibit 9429-120 received in evidence                    171
20

21

22

23

24

25

```
 1   THURSDAY, MARCH 14, 2024                    8:42 A.M. O'CLOCK
 2              (Open court in the presence of the jury.)
 3              COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,
 4   United States of America versus Michael J. Miske, Junior.
 5              This case has been called for jury trial, Day 38.
 6              Counsel, please make your appearances for the record.
 7              MR. INCIONG:  Good morning, Your Honor.  Mark
 8   Inciong, Michael Nammar, and KeAupuni Akina for the United
 9   States.  Present again with us are Special Agent Thomas Palmer
10   and Kari Sherman.
11              THE COURT:  Good morning.
12              MR. KENNEDY:  Good morning, Your Honor.  Michael
13   Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and
14   Josh Barry.  And good morning to you all.
15              THE COURT:  Good morning to your group as well.  You
16   may be seated.
17              Good morning to our 16 jurors.
18              Good morning to Mr. Cabael.
19              Mr. Cabael, as I reminded you yesterday morning, I'll
20   do so again, we are not going to take the time to re-swear you,
21   but you do remain subject to the same oath that you took two
22   days ago now.  Do you understand that, sir?
23              THE WITNESS:  I do.
24              THE COURT:  All right.  Mr. Nammar, you may continue
25   with your examination.
```

```
 1              MR. NAMMAR:  Thank you.

 2              ALFREDO CABAEL, JUNIOR, GOVERNMENT'S WITNESS

 3                          PREVIOUSLY SWORN.

 4              MR. NAMMAR:  Can we show the witness only 1-50, which

 5    is not in evidence?  It's from our original list.

 6              THE COURT:  Yes, go ahead.

 7              MR. NAMMAR:  Thank you.

 8                    RESUMED DIRECT EXAMINATION

 9    BY MR. NAMMAR:

10    Q    Mr. Cabael, do you recognize this photo?

11    A    I do.

12    Q    Who is this?

13    A    Josiah.

14              MR. NAMMAR:  Your Honor, I move to admit 1-50.

15              THE COURT:  Any objection, counsel?

16              MR. KENNEDY:  No objection.

17              THE COURT:  Without objection, 1-50 is admitted.

18              (Exhibit 1-50 received in evidence.)

19              THE COURT:  You may publish.

20    BY MR. NAMMAR:

21    Q    Mr. Cabael, 1-50 is on the screen.

22         Who are we looking at here?

23    A    Josiah.

24    Q    What do you understand that Josiah does for work?

25    A    He works for the fire department.
```

1   Q    Were you aware of him having any job at Kama'aina Termite

2   and Pest Control?

3   A    No.

4   Q    Did you ever see Mr. -- excuse me.

5        Did you ever see Josiah around when you were working, in

6   the 13 years at Kama'aina Termite and Pest Control, in the

7   office?

8   A    He may have popped in once or twice.

9   Q    But he was not there on a regular basis?

10  A    No.

11  Q    Do you know what Josiah's relationship -- relation -- do

12  you know -- strike that.

13       Do you know if Josiah's related to Mr. Miske?

14  A    I believe he is.

15  Q    How so?

16  A    I can't say right now.

17  Q    Okay.

18            MR. NAMMAR:  We can take that down.

19  BY MR. NAMMAR:

20  Q    Does the name Vernon Clarke sound familiar?

21  A    Yes.

22  Q    Who is that?

23  A    He's an auto body -- he does repair work on automobiles.

24  Q    Was he doing any work for Mr. Miske that you were aware

25  of?

1   A     He's worked with Mr. Miske for a number of years, yes.

2   Q     On what kinds of vehicles?

3   A     Some of our work vehicles and some of -- maybe some

4   vehicles he had bought just to refinish.

5   Q     Were those refinishing vehicles classic cars?

6   A     I would say they were.

7   Q     Were you ever involved in paying Mr. Clarke for his work?

8   A     I have.

9   Q     And how was Mr. Clarke paid?

10  A     There's been times he was paid in check and times he was

11  paid in cash.

12  Q     And when you paid him in cash, where would you get that

13  cash from?

14  A     From Mr. Miske.

15  Q     If you were to put a percentage on the cash payments and

16  the check payments, what would those be?

17  A     I'd say a greater percentage cash and maybe, I'd say, 20,

18  25 percent checks, if that.

19  Q     In your time at Kama'aina Termite and Pest Control, did

20  you become aware of whether Mr. Miske was involved in any

21  concert promotions?

22  A     I can't say with assurety, but, yes, he -- he was involved

23  in a couple, as I sat in the office.

24  Q     So as you sat in the office you heard discussions about a

25  couple concerts?

1   A   I did.

2   Q   What kind of concerts are we talking about?

3   A   There was a few in the Blaisdell and -- and a few at the

4   nightclub.

5   Q   Do you remember any of the talent as far as the Blaisdell

6   goes?

7   A   I can't say the name off the top of my head, but I know

8   one of them was a female for a Valentine's Day concert in the

9   Blaisdell.

10   Q   And do you know what Mr. Miske's specific involvement was

11   in the Valentine's Day concert at the Blaisdell?

12   A   I can't say I know his specific involvement, no.

13   Q   Do you know an individual named Nate Lum?

14   A   I do know Nate Lum, yes.

15   Q   Who is Nate Lum?

16   A   He works for the stevedore union.

17   Q   And did you understand that he had supervisory duties over

18   there?

19   A   I do.

20   Q   What does the stevedores union do?

21   A   Stevedores, they work on the shipping dock for like

22   Matson, and they unload container ships and load them up on

23   trucks to be delivered to the people out in the community.

24   Q   If you know, is that a sought-after job in the community,

25   working for the stevedores?

```
 1   A     It is.

 2   Q     Why is it a sought-after job?

 3   A     It's a good-paying job.

 4   Q     Do you know whether Mr. Miske assisted in getting his

 5   friends jobs at the stevedores?

 6   A     I do.

 7   Q     Who did he assist?

 8   A     He's assisted Andrew Kim, his brother John, and Russell

 9   Moscato.

10   Q     Did he do that in part through Nate Lum?

11   A     He did.

12   Q     Do you know whether there was a fee associated with

13   helping out in placing people at the stevedores?

14   A     There was a fee.

15   Q     And who charged that fee?

16   A     Michael Miske.

17   Q     How do you know he charged that fee?

18   A     Because I was tasked to collect the fees from one -- one

19   of the individuals.

20   Q     Who were you tasked to collect a fee from?

21   A     Andrew Kim.

22   Q     And who tasked you to go collect the fee from Andrew Kim?

23   A     Michael.

24   Q     Michael Miske?

25   A     Yes.
```

1  Q    And what did you do in furtherance of that task?

2  A    What did I do?

3  Q    Yes.

4  A    I tried to collect it, but I -- I was never successful at

5  collecting anything from him.

6  Q    When you tried to collect it, would Mr. Kim ever complain

7  to you?

8  A    He did once or twice, yes.

9  Q    What would he complain about?

10  A    That he doesn't understand why he has to pay a fee and the

11  others didn't.

12  Q    And who did you understand him mean -- to be referring to

13  when he said the others didn't?

14  A    He did say Russell and Jonathan.

15  Q    Did you help -- when Andrew Kim was attempting to get a

16  job at the stevedores, did you help him with any

17  certifications?

18  A    I did.

19  Q    What kind of certification?

20  A    Off-road forklift certification.

21  Q    How did you help him with that?

22  A    I went and got the certifications made up for him from the

23  people that certified the operators.

24  Q    Who told you to do that?

25  A    Michael.

1   Q   Did you get any money from Mr. Miske to do that?

2   A   I did not.

3   Q   Did you have to pay anybody any money to get --

4   A   I did have to pay people to -- to do the certification

5   done, yes.

6   Q   How much -- how much money did you have to pay people to

7   get the certification done?

8   A   It was $150 per individual.

9   Q   Who did you get the $150 from?

10  A   From Michael.

11  Q   Did you do that -- was this certification true and

12  accurate or was it false?

13  A   It was false.

14  Q   How was it false?

15  A   There's -- they never took the certification.  The

16  individual at that certification company just gave me documents

17  for the individual and I paid them cash.

18  Q   Did you do it for anyone else at Miske's direction besides

19  Andrew Kim?

20  A   I did.

21  Q   Who?

22  A   Russell and John.

23  Q   And who would you -- who specifically would you get these

24  certifications from?

25  A   I can't recall the company's name, but it was a female in

1   an office.

2   Q    Can you describe the female?

3   A    She was a younger, maybe mid 20s, 30-year-old Filipina

4   gal.

5   Q    And what would you give the Filipino girl in exchange for

6   the false certifications?

7   A    I would just pay her the 150 in cash for each one.

8   Q    And then she would make up the certifications?

9   A    Yes, she would.

10  Q    Did you yourself get a fake certification from the same

11  individual?

12  A    I did.

13  Q    Why did you get the certification?

14  A    When I started off I needed to be certified for a

15  government job on Hickam to operate a man lift.

16  Q    And did you have time constraints?

17  A    I did.  They were booked on the scheduling of the classes,

18  and I told them I needed it today, so she gave me a doctored-up

19  certification.

20  Q    And did you relay that back to Michael Miske?

21  A    I did.

22  Q    Was that false certification then submitted to the federal

23  government to obtain --

24  A    It also was a false certification, correct.

25  Q    And was that false certification submitted to the federal

```
 1    government to show you were certified?

 2    A    It was.

 3    Q    When in reality you were not?

 4    A    Correct.

 5    Q    Did you end up performing work on that job?

 6    A    I did.

 7    Q    Was Mr. Miske aware that you had obtained a false

 8    certification on that particular job and submitted it to the

 9    federal government?

10    A    He was.

11            MR. NAMMAR:  Your Honor, can we publish 9-113, which

12    was admitted I think yesterday?

13            THE COURT:  Go ahead.

14            MR. NAMMAR:  And go to page 30.

15            Actually, can we start with 39.

16    BY MR. NAMMAR:

17    Q    Is this the TWIC waiver application letter that we looked

18    at a couple days ago?

19    A    It looks like it, yes.

20    Q    And this is the one you said you did not sign?

21    A    Yes, correct.

22    Q    And this was for Wayne Miller, correct?

23    A    It is for Wayne Miller, yes.

24            MR. NAMMAR:  Can we go to page 30 now, this same

25    exhibit.  Zoom in.
```

 1  BY MR. NAMMAR:

 2  Q    Do you recognize what's shown on page 30?

 3  A    It's that certification.

 4  Q    Are these almost identical to the certifications that you

 5  would obtain, the fake ones that you just talked about?

 6  A    It is.

 7  Q    And do you recall now that it's from the same company,

 8  Safety First?

 9  A    It is.

10  Q    And do you recall whether you got one of these fake

11  certifications for Wayne Miller?

12  A    I -- I can't recall if I did get one for him.

13  Q    But looking at this you could tell it's the exact same

14  certification?

15  A    It is the same one, yes.

16       MR. NAMMAR:  And if we could go to page 31 now.

17  BY MR. NAMMAR:

18  Q    Do you recognize this?

19  A    I do.

20  Q    What is this?

21  A    It's a certificate of completion for that certification.

22  Q    And is this what you'd also get from the -- the Filipino

23  girl when you'd pay her the money for the false certification?

24  A    Yes.

25  Q    Were you made aware of an issue with Andrew Kim and a

```
 1   forklift at work?

 2   A    I was.

 3   Q    What were you -- what -- what happened?

 4   A    He was tasked to operate the forklift and he didn't know

 5   how to operate it.

 6   Q    And this was when he got a job at the stevedores?

 7   A    Yes.

 8   Q    Andrew Kim, did he ever work at Kama'aina Termite and Pest

 9   Control?

10   A    He did a few times, maybe -- maybe within a month period

11   maybe.

12   Q    What would he do there?

13   A    He would -- he would be in the truck with me and he would

14   assist me with ground termite treatment.

15   Q    Nate Lum, the one you said had a supervisory position at

16   the stevedores, would he ever assist Mr. Miske in shipping

17   items for free?

18        MR. KENNEDY:  Objection on speculation, Your Honor.

19   BY MR. NAMMAR:

20   Q    If you know.

21        THE COURT:  Overruled.  Go ahead.

22   A    I know he would ship items for Michael Miske.  And I

23   believe it was for free, but I don't know what the arrangements

24   were aside of whatever I spoke to Nate Lum about.

25   BY MR. NAMMAR:
```

1   Q    Why did you believe it was for free?

2   A    Because I never exchanged any cash with Nate Lum, or any

3   payment.

4   Q    What were some of the items that Mr. Lum helped Mr. Miske

5   ship?

6   A    Some steel framing for a couple of projects and a couple

7   of vehicles.

8   Q    What kind of vehicles?

9   A    I believe they were two Jeeps; a Ford, a Ford truck, and a

10  Porsche.

11  Q    And were you involved in coordinating with Mr. Lum the

12  shipment of these items?

13  A    Yes, I was.

14  Q    Were you specifically involved in coordinating the

15  shipment of the two Jeeps that you just referenced?

16  A    I was, yes.

17  Q    Did that require a lot of back and forth with Mr. Lum and

18  Mr. Miske about coordinating the shipment of those Jeeps?

19  A    There was a lot of coordination, lot of communication,

20  yes.

21  Q    Were those -- both of those Jeeps for Mr. Miske, or did

22  you understand that one of the Jeeps went to someone else?

23  A    Both Jeeps came in.  And I don't know which one went to

24  one, but I know one was for Wayne Miller.

25  Q    And who was the other one for?

1   A     Mr. Miske.

2   Q     Would you ever use burner phones when you would

3   communicate with Nate Lum?

4   A     I have.

5   Q     And would you ever contact Nate Lum and set up meetings

6   with Mr. Miske at Mr. Miske's direction?

7   A     I did.

8   Q     Would you act as a middleman to set up those meetings?

9   A     I did.

10   Q     And would you use a burner phone to do that?

11   A     Yes, I did.

12   Q     Did you know why you were acting as a middleman to set up

13   meetings between Mr. Miske and Mr. Lum?

14   A     No.  I -- I would just say that it was just business that

15   they had to talk about and it probably wasn't legal.

16   Q     Do you know why Mr. Lum wouldn't contact Mr. Miske

17   directly to set up those meetings?

18   A     No, I don't.

19   Q     When you would -- you mentioned yesterday or two days ago

20   that you would provide fish from the fishing boat to some

21   individuals at Miske's direction.  Would you ever give any fish

22   to Mr. Lum?

23   A     I have.

24   Q     And would Mr. Miske direct you to do that?

25   A     Yes.

1          MR. NAMMAR:  Your Honor, can we publish 1-655, which

2     is in evidence, from our original list?

3          THE COURT:  Go ahead.

4          MR. NAMMAR:  Thank you.

5     BY MR. NAMMAR:

6     Q    Mr. Cabael, do you recognize this individual?

7     A    I do.

8     Q    Who is this?

9     A    That's Mr. Teramoto, Ryan Teramoto.

10    Q    How did you know Ryan Teramoto?

11    A    He worked with me at Kama'aina Termite.

12    Q    Did Mr. Teramoto eventually go off on his own?

13    A    He did.

14    Q    What was the name of his company?

15    A    I believe it's Certified Pest Control.

16    Q    Was Mr. Teramoto, if you know, close with Mr. Miske?

17    A    He was.

18    Q    What did Mr. Teramoto do at Kama'aina Termite and Pest

19    Control?

20    A    He did -- he was a sales representative.

21    Q    Were you aware that Miske had a falling out with

22    Mr. Teramoto at some point?

23    A    I did hear about some, yes.

24    Q    And what -- did you know what the falling out was over?

25         MR. KENNEDY:  Objection on hearsay, Your Honor.

```
 1                 THE COURT:  Sustained.

 2   BY MR. NAMMAR:

 3   Q    Did you talk to Mr. Miske directly about the falling out

 4   with Mr. Teramoto?

 5   A    I don't recall, no.

 6   Q    Did your ex-girlfriend at some point go to work for

 7   Mr. Teramoto?

 8   A    She did.

 9   Q    What was she doing for Mr. Teramoto?

10   A    She handled his scheduling and booking appointments.

11   Q    Did Mr. Miske ever task you to do anything with

12   Mr. Teramoto's business through your ex-girlfriend who worked

13   for Mr. Teramoto?

14   A    He did ask me to see if she'd be willing to get the

15   customer base from Mr. Teramoto.

16   Q    The customer?

17   A    Their information.

18   Q    The customer -- his -- that's Mr. Teramoto's list of

19   customer -- customers?

20   A    Yes.

21   Q    And in furtherance of that direction, did you ask your

22   ex-girlfriend?

23   A    I did.

24   Q    And what was her response?

25   A    She refused to -- to hear that.  She didn't do nothing
```

```
 1   about it.

 2   Q     Who was your ex-girlfriend?

 3   A     Her name was Nalani Epstein.

 4   Q     Do you know a person named Kalei Santos?

 5   A     I do.

 6   Q     Is that one of the persons that you mentioned you had

 7   delivered fireworks to at Miske's direction?

 8   A     I did.

 9   Q     What did Mr. Santos do for work?

10   A     I believe he worked for the movies.

11   Q     Did you know a person named Mark Lapena?

12   A     I do.

13   Q     What did Mr. Lapena do for work?

14   A     He detailed Kama'aina's vehicles and some personal

15   vehicles of Mike's.

16   Q     And do you -- where did he work out of?

17   A     He worked out of Kama'aina Termite shop.

18   Q     Did he report there on a daily basis?

19   A     He did.

20   Q     And do you recall seeing him there for a number of years

21   when you worked at Kama'aina Termite and Pest Control?

22   A     Yes.

23   Q     Do you know how he was paid?

24   A     He'd be paid in cash.

25   Q     Do you know whether Miske is friends with any prison
```

1    guards?

2    A    I do.

3    Q    Which person?

4    A    I believe one of them is Scott.  I don't know his last

5    name.

6    Q    Do you know where Scott worked?

7    A    When I first met him he worked for a beer company,

8    delivered alcohol, and then he worked at OCCC, I believe.

9    Q    And would you on occasion see Scott come by Kama'aina

10   Termite and Pest Control?

11   A    Every now and then.  Not too often.  But I've seen him

12   there a few times.

13   Q    And who would the prison guard Scott meet with when he

14   came to Kama'aina Termite and Pest Control?

15   A    Mike.

16   Q    Would that be in Mike's office?

17   A    Yes.

18   Q    We've talked some about John Stancil.  Who was John

19   Stancil?

20   A    That is Mike's younger half-brother.

21   Q    What did he do for work?

22   A    Hmm.  He worked at Kama'aina some -- off and on.  He

23   worked for the movies off and on, and he worked for the

24   stevedore union.

25   Q    Did Mr. Stancil ever tell you that he assaulted people for

```
 1   Mr. Miske?

 2   A    He shared some stories at times.

 3   Q    He told you that?

 4   A    He did.

 5   Q    Do you know a Tori Clegg?

 6   A    I'm sorry?

 7   Q    Do you know a person named Tori Clegg?

 8   A    I -- I know a Tori.  I'm not sure of their last name.

 9   Q    What do you know about Tori?

10   A    A female, Tori.

11   Q    Do you know if she has any connection to Mr. Miske?

12   A    They did have a relationship for a number of years.

13   Q    And what did Tori do for work, if you know?

14   A    No, she works somewhere in the medical field.  I can't say

15   for sure.  I need to say maybe the dentist.

16   Q    Do you know a person named Angela Varnadore?

17   A    I do know her.

18   Q    What, if anything, was her connection to Mr. Miske?

19   A    She worked at the M Nightclub and I think they had a short

20   relationship.

21   Q    What did Ms. Varnadore do for the M Nightclub?

22   A    I believe she was in marketing.

23   Q    Did Mr. Miske ever appear to be paranoid that people were

24   listening to his conversations around you?

25   A    He has.
```

1   Q    And what would he do in those times when you saw him

2   appear to be paranoid?

3   A    That depends on where we were at.  In the office we would

4   play the music loud and have conversations.  And then there's

5   times we will go to the beach and ride jet skis and have

6   conversations.

7   Q    Would he ever write messages on his office in the

8   whiteboard and then erase them?

9   A    He did a few times.

10  Q    Would he do those -- when he wrote those messages, were

11  those about legal things or illegal things?

12  A    I'd say a little of both.

13  Q    Were you aware that Mr. Miske was telling others that you

14  had murdered someone?

15  A    That was told to me.

16  Q    Who told that to you?

17  A    Michael.

18  Q    Did he say it was one murder, or did he say it was

19  multiple?

20  A    No, he said I -- I went to jail for a triple homicide.

21  Q    And who would he say he would tell that to?

22  A    He told that to people in the film industry.

23  Q    Was that true?

24  A    Absolutely not.

25  Q    Would you be tasked by Mr. Miske with collecting money

 1   from people in the film industry?

 2   A    I would.

 3   Q    And how would those people treat you when you collected

 4   money from them?

 5   A    Well, they -- they kind of treated me with respect.

 6   Q    Did they ever mention the triple homicide to you?

 7   A    No.

 8   Q    Do you believe that Miske saying that to others helped his

 9   reputation?

10   A    It probably helped his and mine.

11   Q    Were you one of Mr. Miske's trusted associates?

12   A    I was.

13   Q    Who were some of the other people that you believe were

14   Miske's trusted associates?

15   A    I'd say Jason Yokoyama was one, myself, Wayne Miller.

16   Q    What about Andrew Kim?

17   A    I'd say Andrew Kim probably was one, too, yes.

18   Q    What about John Stancil?

19   A    Yes, John too.

20   Q    Would you do legal work for Mr. Miske?

21   A    Legal work?

22   Q    Legal.

23   A    I did lot of legal work, yes.

24   Q    Did you do illegal work for Mr. Miske?

25   A    I did.

1  Q    Was loyalty important to Mr. Miske as far as you could

2  tell?

3  A    Loyalty is very important.

4  Q    Because you were part of Mr. Miske's trusted circle, were

5  certain things expected of you?

6  A    Yes.

7  Q    Were you expected to lie to get things done?

8  A    I was.

9  Q    Were you expected to lie to customers at the pest control?

10 A    I was.

11 Q    Were you expected to lie to regulators?

12 A    I was.

13 Q    Were you expected to lie to law enforcement?

14 A    I was expected to lie to a lot of people.

15 Q    Were you expected not to cooperate with law enforcement?

16 A    I was.

17 Q    Were you expected to help with crime when Mr. Miske asked?

18 A    I was, yes.

19 Q    Were you expected not to question Mr. Miske?

20 A    Yes.

21 Q    And because of all this, did you get some perks from

22 Mr. Miske?

23 A    I did.

24 Q    Did you get money?

25 A    I did.

1  Q    Would he let you borrow money on occasion when you needed

2  it?

3  A    He would.

4  Q    Would he pay you in cash?

5  A    Yes, he would.

6  Q    Did he pay you for the fireworks?

7  A    He did.

8  Q    Was that in cash?

9  A    It was.

10  Q    Would he let you drink and eat for free at the Row Bar for

11  years?

12  A    He did.

13  Q    What was Mr. Miske's reputation?

14  A    Mr. Miske was a very smart businessman, and he was also

15  very manipulative and influential to a lot of people.

16  Q    When you did not commit crime as Mr. Miske's ask, would it

17  hurt your status with Mr. Miske?

18  A    I believe it did.

19  Q    Was an example of that the staged bunker theft?

20  A    Correct.

21  Q    And when Mr. Miske asked you to do illegal things, would

22  you do them to stay in his good graces?

23  A    I would.

24  Q    And would you do them to ensure that Miske and his

25  companies remained powerful and profitable?

```
 1   A    I did, yes.

 2   Q    Did you have protection from Mr. Miske?

 3   A    I did.

 4   Q    Did you have protection from him if you were robbed?

 5        MR. KENNEDY:  Objection --

 6   A    Yes.

 7        MR. KENNEDY:  -- on speculation, Your Honor.

 8        THE COURT:  Overruled.  Go ahead.

 9   A    Repeat the question.

10   BY MR. NAMMAR:

11   Q    Did you have protection from Mr. Miske if you were robbed?

12   A    Yes.

13   Q    Did you have protection from Mr. Miske if you were

14   assaulted?

15   A    Yes.

16   Q    Did you believe you had protection from Mr. Miske if you

17   were prosecuted?

18   A    I did.

19   Q    Regarding prosecuted, did Mr. Miske ever talk to you about

20   having lawyers retained for you?

21   A    Yes.

22   Q    Who did he say was a lawyer that was retained for you?

23   A    I can't recall his name.  I believe his first name was

24   Alan.

25   Q    Was there any question in your mind who the leader was of
```

1    the trusted circle that surrounded Miske?

2    A    There was no question.

3    Q    Who was the leader?

4    A    Mr. Miske.

5    Q    Towards the end of your time at Kama'aina Termite and Pest

6    Control, did you develop a problem with cocaine?

7    A    I did.

8    Q    Before that problem began, did you start to get user

9    amounts from co -- of cocaine from anyone?

10   A    I did.

11   Q    Who was that from?

12   A    John Stancil.

13   Q    And was that on a routine basis?

14   A    Usually just on the weekend.

15   Q    How long did that go on for?

16   A    I'd say for a few months.

17   Q    And what kind of quantities are we talking about, or

18   dollar amounts?

19   A    Fifty dollars, a hundred dollars.

20   Q    So Mr. Stancil would sell $50 or $100 of cocaine to you at

21   a time for several months?

22   A    Yes.

23   Q    Sometimes would Mr. Stancil give it to you for free?

24   A    He would.

25   Q    Did you start to receive larger quantities from anyone

1   else?

2   A      I did.

3   Q      Who did you receive the larger quantities from?

4   A      From Wayne Miller.

5   Q      What kind of quantities are we talking about?

6   A      Ounces.

7   Q      And what would you do with the ounces of cocaine?

8   A      I would sell 'em and use 'em.

9   Q      Did you feel like you had protection from Mr. Miske when

10  you were selling those ounces of cocaine?

11  A      He did not know when I was doing that.

12  Q      But did you still feel like you had protection from him

13  even though he did not know?

14  A      I did.

15          MR. KENNEDY:  Objection to the question, Your Honor.

16          THE COURT:  Overruled.  He's already answered.  The

17  objection was overruled in any event.

18          MR. NAMMAR:  Sorry.  I didn't hear the answer.

19          THE WITNESS:  "I did."

20  BY MR. NAMMAR:

21  Q      The time that you were obtaining cocaine from Mr. Miller,

22  were you using excess amounts?

23  A      I was.

24  Q      Is that a time in your life you want to forget?

25  A      Yes.

1  Q    Even though you were using excess amounts, did the use of
2  cocaine affect your memory?
3  A    No.
4  Q    And around the same time where you were using too much
5  cocaine, did you take unauthorized withdrawals from a company
6  credit card?
7  A    I did.
8  Q    How long did that go on for?
9  A    A period of a few months.
10 Q    Did you do that without Mr. Miske's permission?
11 A    I did.
12 Q    And did you know that was wrong?
13 A    I did.
14 Q    At some point after you had taken these unauthorized
15 withdrawals, did Mr. Miske summons [verbatim] you to Sand
16 Island?
17 A    He did.  Yes.
18 Q    Were you concerned when he told you to come to Sand
19 Island?
20 A    I was very concerned.
21 Q    Why were you concerned?
22 A    I know what happens to people that steal money from him.
23 Q    Did you know what happened to people who steal money from
24 him?
25 A    I did.

```
 1   Q    Did you go to Sand Island?

 2   A    I did go.

 3   Q    And where did you go?

 4   A    Down near boat ramp in Sand Island.

 5            MR. NAMMAR:  Your Honor, can we show the witness only

 6   9-1238, which is from our ninth supp.?

 7            THE COURT:  Go ahead.

 8   BY MR. NAMMAR:

 9   Q    Do you recognize this photo?

10   A    I do.

11   Q    What is it of?

12   A    It's of the spot where we met on Sand Island.

13   Q    Where Mr. Miske summonsed [verbatim] you to?

14   A    Yes.

15   Q    After you were stealing money?

16   A    Correct.

17            MR. NAMMAR:  Your Honor, I move to admit 9-1238.

18            THE COURT:  Any objection?

19            MR. KENNEDY:  No objection.

20            THE COURT:  Without objection, 9-1238 is admitted.

21            (Exhibit 9-1238 received in evidence.)

22            THE COURT:  You may publish.

23   BY MR. NAMMAR:

24   Q    Mr. Cabael, the jury can see it.

25        What are we looking at here?
```

```
 1  A    This is the area of Sand Island Access Road where people
 2  jet ski and let boats out.
 3  Q    And is this where you went when Mr. Miske summonsed
 4  [verbatim] you?
 5  A    It is.
 6  Q    Where did you specifically go?
 7  A    Right to that picnic table in that picture.
 8           MR. NAMMAR:  Can you zoom in on that picnic table,
 9  Ms. Sherman?
10  BY MR. NAMMAR:
11  Q    Is it the picnic table that we're looking at here?
12  A    It is.
13  Q    Who was at the picnic table when you showed up?
14  A    I believe it was me, Michael, Russell, and Wayne Miller.
15  Q    Russell Moscato?
16  A    Yes.
17  Q    Were you concerned when you saw Russell Moscato and Wayne
18  Miller?
19  A    I was very concerned.
20  Q    What happened?  Did you think you -- what did you think
21  was going to happen to you?
22  A    I thought everything I was doing with Wayne Miller was --
23  was let out about my cocaine use, and I thought I was going to
24  get my ass beat by Russell Moscato.
25  Q    What happened during the meeting?
```

1   A     Mr. Miske gave me an opportunity to come and be honest
2   about what I was doing.
3   Q     And were you honest with him?
4   A     I was.
5   Q     What did you tell him?
6   A     I told him that I was stealing money from him.
7   Q     And what was his response?
8   A     He wasn't too happy, but he wasn't as upset as I've seen
9   him before.
10  Q     Did he say anything about you coming clean?
11  A     Yes.  Told me -- he asked me why -- why didn't I ask him
12  for money and told me don't ever do that again.
13  Q     Did he say anything about what would have happened if you
14  weren't truthful with him?
15  A     I can't recall right now if he did.
16  Q     Were you fired after this incident?
17  A     No, I wasn't.
18  Q     Did you keep your job --
19  A     I did.
20  Q     -- at Kama'aina Termite and Pest Control?
21  A     I did.
22  Q     Around this time, did you get cut off at the Row Bar?
23  A     Somewheres around that time.  I cannot exactly say when
24  after that point, but, yes, I did.
25  Q     Around this time, was a person named Matt Fabry hired?

1   A    I can't say if that was around that time, but, yes, Matt

2   Fabry was hired.

3   Q    Tell us about Matt Fabry.

4   A    He was a representative for Terminix, and he was hired to

5   basically do what I did at Terminix for termite control -- pest

6   control company.

7   Q    And did that frustrate you?

8   A    That really hurt.

9   Q    Did you understand that Mr. Fabry was making much more

10   money than you?

11   A    He was, yes.

12   Q    Was your cocaine habit tough for you to kick, even though

13   you had had this meeting with Mr. Miske?

14   A    It was.

15   Q    What did you decide to do?

16   A    What did I decide to do?

17   Q    Yes.

18   A    After this meeting?

19   Q    Yes.

20   A    I continued to use and hide it from him, hide it from

21   everybody else around me.

22   Q    Did you eventually make the decision to leave Hawaii?

23   A    I did.

24   Q    Why?

25   A    Because I didn't see no more -- no future for me here with

 1   Kama'aina Termite and the rest of the company, and I really

 2   needed to clean my act up.  I felt like I was just spiraling

 3   down to someplace I didn't want to be.

 4   Q    Did you take any steps to leave?  Did you contact anyone?

 5   A    I did contact him, Michael.

 6   Q    How did that go?

 7   A    He wasn't happy.  He was shocked, but he wasn't happy that

 8   I made that -- that choice to leave.

 9   Q    Where did you move to?

10   A    I moved to Utah.

11   Q    When you told Mr. Miske that you were leaving, did he yell

12   at you?

13   A    Some way, yes.

14   Q    What did he yell at you about?

15   A    He wasn't happy that I was leaving.  He wasn't happy the

16   way I was leaving.

17   Q    Why did you move to Utah?

18   A    I felt like I wasn't going to get anywhere with -- with

19   Kama'aina Termite.  I felt like I was not going to advance or

20   get better in the position I was at, with the kind of condition

21   I was at with my drug use, so I had to leave.

22   Q    And who did you go to stay with in Utah when you first

23   arrived?

24   A    My youngest brother that I never met before or never

25   really knew.

```
 1   Q    And was that in August of 2015?

 2   A    That was.

 3   Q    Several years after you moved away to Utah, did you end up

 4   coming back to Hawaii?

 5   A    I did.

 6   Q    Was that for a vacation?

 7   A    Yes, and it was to try and get Nalani back in my life

 8   after what I did to her when I left.

 9   Q    Around what time of year did you come?

10   A    I'd say it was somewhere around early 2017, somewheres

11   around there, like towards Christmastime maybe, of 2016.  I'm

12   not sure.

13   Q    Did you meet with any people that were associated with

14   Kama'aina Termite and Pest Control when you came back?

15   A    I did.

16   Q    Did you meet with Richard?

17   A    That was the first person I seen.

18   Q    And did you -- at some point when you were back, did you

19   learn about Johnathan Fraser?

20   A    I did.

21   Q    Is that the first you had heard of his disappearance?

22   A    That was the first time, yes.

23   Q    How did you feel when you heard about that?

24   A    I was afraid.  I felt sick to my stomach about how

25   everything was going on over here in Hawaii.
```

1   Q     Did you reach out to Miske?

2   A     I believe he might have reached out to me.

3   Q     And did you end up meeting up with him on this?

4   A     I did.

5   Q     Where did you meet up with him?

6   A     I met him at the shop.

7   Q     And when you went to the shop, did you see a lot of new

8   faces?

9   A     Everybody was new at the shop.  I did not recognize

10  anybody there.

11  Q     How did the meeting go at the shop with Mr. Miske?

12  A     It was brief.  It was welcoming.  I felt good to see him.

13  I missed the guy.  And it was very short.

14  Q     Did you make plans to meet later on?

15  A     We did.

16  Q     What were the plans?

17  A     Go meet at the beach park in Hawaii Kai to go ride some

18  jet skis like we used to before I left.

19          MR. NAMMAR:  Your Honor, can we publish 1-1023, which

20  is from our original list, I believe, and in evidence?

21          THE COURT:  Yes.  Go ahead.

22          MR. NAMMAR:  Thank you.

23  BY MR. NAMMAR:

24  Q     Mr. Cabael, do you recognize what -- the area that's shown

25  here on 1-1023?

1    A     I do.

2    Q     What is it?

3    A     That's where we took the jet skis out and rode the jet

4    skis at in Hawaii Kai.

5    Q     And is that where you went on this particular trip during

6    the holidays back to Hawaii?

7    A     Yes.

8    Q     What -- who was there when you got there?

9    A     At first it was just myself and Mr. Miske.

10   Q     And did you have a -- at some point have a conversation,

11   not at this beach park but on the jet skis?

12   A     Yes.

13   Q     Whose idea was that?

14   A     I -- I'd say it was both me and Mike's idea to go out and

15   ride.

16   Q     Okay.  And where did you go?  How far out did you go?

17   A     Beyond the breaks.  I can't say exactly how far that is,

18   but it's pretty far out there.

19   Q     Okay.  And when you got far out, did you have a

20   conversation with Mr. Miske?

21   A     I did.

22   Q     What time of day was this at the time?

23   A     It was getting dark.

24   Q     And did you know why you were having that conversation out

25   on jet skis?

```
 1   A    Yes.

 2   Q    Why?

 3   A    Now, when -- when you go ride jet skis, it's kind of hard

 4   to wear a wire, so that's kind of what we've always talked

 5   about.  It's kind of hard to have any microphone on you if

 6   you're wet and riding jet skis.

 7   Q    What did you talk about out on the water on the jet skis

 8   with Mr. Miske?

 9   A    We talked about the FBI seizing his boat and the

10   accusations made to him, made about him, about murder of John

11   Fraser and about FBI agents talking to other people.

12   Q    Did he ask you if the FBI had talked to you?

13   A    He may have.

14   Q    Did he tell you at any point not to talk to the FBI?

15   A    He did.

16   Q    Did he say anything about Russell Moscato?

17   A    Well, he told me that Russell was afraid that I've already

18   been in contact with FBI.

19   Q    Was that true?

20   A    No.

21   Q    Did Miske say he was a suspect in the Fraser

22   disappearance?

23   A    He did.

24   Q    Did you personally know -- do you personally know whether

25   Mr. Miske was involved in the Fraser disappearance?
```

 1   A    You're asking if I personally know?

 2   Q    Yes.

 3   A    I do not personally know.

 4   Q    Were you involved in it in any way?

 5   A    No.

 6   Q    Following that trip, did you -- well, did you go back to

 7   Utah after that trip?

 8   A    I do.

 9   Q    And in late 2018, were you approached by some FBI agents?

10   A    I was.

11   Q    And did you have a brief meeting with those agents in late

12   2018?

13   A    I did.

14   Q    And then did you come back to Hawaii to speak with those

15   agents a number of times?

16   A    I came back once to speak to them, yes.

17   Q    And when you came back to speak with the agents, did you

18   meet with them on multiple days?

19   A    I did.

20   Q    And at the outset of your meeting with the agents, did you

21   sign what's called a proffer letter?

22   A    I did.

23   Q    Do you understand that the letter essentially entails that

24   what you say can't be used against you?  Do you understand

25   that?

```
 1   A     I do.

 2   Q     So long as you tell the truth, though, is that your

 3   understanding?

 4   A     Yes.

 5   Q     Do you understand that the letter gives you no protections

 6   if you lie?

 7   A     I understand that, yes.

 8   Q     Do you understand you're under that same letter as you

 9   testify here today?

10   A     I do.

11   Q     After signing that letter, did you agree to cooperate with

12   the FBI?

13   A     I did.

14   Q     Did you testify in the grand jury?

15   A     I did.

16   Q     And following the grand jury, have you continued to meet

17   with agents?

18   A     On a couple occasions, yes.

19   Q     Have you been charged with any federal offenses related to

20   this investigation?

21   A     As of right now, no.

22   Q     Have any promises been made to you about charges?

23   A     No promises was made that I'd be free from any charges.

24           MR. NAMMAR:  (Confers off the record.)

25           Nothing further, Your Honor.
```

 1              THE COURT:  Mr. Kennedy.  Mr. Kennedy, when you're

 2  ready.

 3                        CROSS-EXAMINATION

 4  BY MR. KENNEDY:

 5  Q    Sir, I'm going to start where we ended up.  On

 6  January 14th of 2019, you entered into a proffer agreement with

 7  the government, correct?

 8  A    I'm sorry.  I can barely hear you.

 9  Q    On January 14th of 2019, you entered into a proffer

10  agreement with the government.

11  A    I can't say if that was the date.

12              MR. KENNEDY:  Can we pull up 9429-001, just for the

13  witness?  And I believe it's in the 22nd supp. exhibit list,

14  Your Honor.

15              THE COURT:  Yes.  Go ahead.

16  BY MR. KENNEDY:

17  Q    Sir, take a look at the first page.  Just read it to

18  yourself and let me know when you are finished.

19  A    (Reviews document.)  Okay.

20  Q    Move to the second page.

21  A    (Reviews document.)  Okay.

22  Q    Move to the third page.

23  A    (Reviews document.)  Okay.

24  Q    Move to the fourth page.

25  A    (Reviews document.)  Okay.

```
 1   Q    And move to the last page.

 2   A    (Reviews document.)  All right.

 3   Q    Is that your proffer agreement?

 4   A    Yes, it is.

 5   Q    Is that your signature on there?

 6   A    It is.

 7   Q    Is it January 14th of 2019?

 8   A    Correct.

 9   Q    So for the last three days you've been testifying about

10   things that you did, right?  Is that correct?

11   A    I'm sorry.  Is that a question?

12   Q    Yes.

13   A    Okay.  What's your question again?

14   Q    For the last three days you've been testifying about

15   things that you did.

16   A    Correct.

17   Q    Not one of those things can be used against you, correct?

18   A    Not -- not true.

19   Q    Unless the government deems what you say untruthful,

20   correct?

21   A    Correct.

22   Q    Nothing that you've said can be used against you at trial

23   should charges be filed and a trial is held, correct?

24   A    Not -- not in my understanding.

25   Q    Because it's a proffer agreement, so it's protected.  So
```

 1   they can't use one thing that you've said against you, correct?

 2   A    Not my -- not in my understanding.

 3   Q    Unless they deem you to be untruthful.

 4   A    Correct.

 5   Q    Not the jury, but the government, correct?

 6   A    Are your questions about the jury charging me or the

 7   government?

 8   Q    No.  Who decides.  Only the government decides in terms of

 9   charges against you, correct?

10   A    I believe so, yes.

11   Q    So no charges have been filed to date, correct?

12   A    As I know, yes.

13   Q    We're in 2024, right?

14   A    Yes.

15   Q    You first talked to 'em in 2019, right?

16   A    No.  I started a proffer letter 2019, but I talked to them

17   in Utah before that proffer letter was signed.

18   Q    You first talked to them in December of 2018, right?

19   A    I -- I would -- I would have to say it was around there,

20   yes.

21   Q    And at that time you said you'd be -- they handed you a

22   subpoena, right?

23   A    No, not at that time.

24   Q    To come to --

25   A    They didn't have the subpoena in the van when I met them

 1   if that's what you're trying to say.

 2   Q    Right.  Because they'd been surveilling you, right?

 3   A    I don't know if they were surveilling me.  I can't say

 4   that.

 5   Q    And --

 6   A    They never told me they were surveilling me.

 7   Q    And so they -- two FBI agents met you, right?

 8   A    Mm-hmm.

 9   Q    And before you sat down and spoke with them, you signed

10   this proffer letter, correct?

11   A    No.  No, no.  I was at work at my job --

12   Q    Right.

13   A    -- before I spoke to them.

14   Q    Right.  And you didn't tell them one thing that you told

15   the jury over these three days in that December meeting, did

16   you?

17   A    I did.

18   Q    It was only when you signed the proffer agreement that you

19   sat down.

20   A    No.  I -- I -- I told them some of what I knew in that van

21   when I met them in Utah --

22   Q    All right.

23   A    -- before the proffer letter.

24   Q    I see.  All right.  And despite that, not any charges have

25   been filed against you, have they?

1    A    As far as I know right now, yes.

2    Q    Well, you would know if there were, wouldn't you?

3    A    I don't know.  I don't know how law works.  This is my

4    first time in this -- in this kind of situation here.

5    Q    All right.

6    A    So I can't say with assurety that I know how things

7    operate.

8    Q    And it's the prosecution who will decide whether charges

9    will ever be filed against you, correct?

10   A    Not my understanding.

11   Q    It's not your understanding that the prosecution is who

12   charges?

13   A    Well, I know they charge, but I don't know if somebody

14   else in the community might see me and file something against

15   me that maybe I did to them during the years.  I don't know.

16   Q    I'm just talking about your proffer agreement.  You

17   know --

18   A    Okay.  So we're talking about just the proffer agreement,

19   then yes.

20   Q    Okay.  And when you appeared in front of the grand jury,

21   it was explained to you that essentially what the proffer

22   agreement means is the government can't be -- use what you say

23   against -- to increase your sentence.  And they asked you if

24   that was your understanding, and you said yes, right?

25   A    I don't know.

1   Q    Let's pull up -- you appeared in front of the grand jury

2   on January 16th of 2019, sir?

3   A    I'd say it was probably that date, yes.

4   Q    All right.

5        MR. KENNEDY:  Let's pull up Exhibit 7306 just for the

6   witness.

7        If we move to the -- does this -- move to the sixth

8   page.  And if we --

9   BY MR. KENNEDY:

10  Q    I draw your attention to lines 1 through 17.  Just read

11  that to yourself, sir.  And then I'm going to ask you some

12  questions about it.

13  A    (Reviews document.)  Okay.

14       MR. KENNEDY:  All right.  We can take that down.

15  BY MR. KENNEDY:

16  Q    You were asked:  And before the interview began, did you

17  sign what's called a proffer letter?  And you said:  Yes, I

18  did.

19  A    Yes, I did.

20  Q    Then you were asked:  And that proffer letter essentially

21  said what you tell the agents and what you tell the government

22  can't be used to increase your sentence.  Is that your

23  understanding?  "Yes."

24       That was your answer, correct?

25  A    I -- I ca -- say that, yeah.

```
1   Q     And so there is no sentence.  There's not even a charge
2   now, right?
3   A     At the moment.
4   Q     All right.
5   A     Yeah.
6   Q     So I want to talk to you about what you've done here in
7   March, okay?
8         You arrived here at least sometime before March 2nd of
9   this year, correct?
10  A     I'll have to check my itinerary, but I -- I would think
11  so.  Maybe, yeah.  I don't exactly know when I landed here in
12  Hawaii.
13  Q     All right.  So on March 2nd of this year you sat down and
14  you met with agents of the FBI or the IRS, or both, and a
15  member of the prosecution team for about four hours, right?
16  A     Maybe.  I can't say --
17  Q     Well --
18  A     -- exactly how long it was.
19  Q     All right.
20        MR. KENNEDY:  Let's pull up 9429-097, which is in the
21  23rd supplemental.
22  BY MR. KENNEDY:
23  Q     See if that refreshes your recollection of what happened
24  on March 2nd of this year.
25        THE COURT:  Okay.  Go ahead.
```

     1              MR. KENNEDY:  Thank you, Your Honor.

     2              9429-097.  If I misspoke, I apologize.

     3    BY MR. KENNEDY:

     4    Q    Sir, I want to just direct your attention to the first

     5    page.  Just read down to the first paragraph and then about

     6    halfway down.

     7    A    (Reviews document.)

     8    Q    And let me know when you're finished.

     9    A    (Reviews document.)  Okay.

    10    Q    All right.

    11              MR. KENNEDY:  We can take that down for now.

    12    BY MR. KENNEDY:

    13    Q    So on March 2nd of this year you met with the two IRS

    14    criminal special agents, correct?

    15    A    Yes.

    16    Q    One FBI special agent, correct?

    17    A    Yes.

    18    Q    A member of the prosecution team, correct?

    19    A    Yes.

    20    Q    Between about 1:07 to 5:48 in the afternoon, correct?

    21    A    Yeah, I guess.  Was sometime in the afternoon, yeah.

    22    Q    So a little more than four hours to get ready for this,

    23    correct?

    24    A    Yes.

    25    Q    The very next day, on March 3rd of 2024, you met with law

1    enforcement officers again, correct?

2    A    On what day does March 3rd fall on, if you can remind me?

3    Was that a weekend, or was that a weekday?

4    Q    It would be the day after March 2nd.

5    A    I'm sorry?

6    Q    It would be the day after March 2nd.

7    A    Okay.  Is that a weekday or weekend?

8    Q    As I sit here right now, let me think.  Tomorrow is the

9    15th.  We'd go back to --

10             THE COURT:  March 3rd was a Sunday --

11   BY MR. KENNEDY:

12   Q    On a Sunday.

13             THE COURT:  -- if that'll help.

14             THE WITNESS:  March 3rd was a Sunday?

15             MR. KENNEDY:  Right.

16   BY MR. KENNEDY:

17   Q    Do you recall meeting with them -- so March 2nd was a

18   Saturday.  You met with them for over four hours, right?

19   A    Correct.

20   Q    March 3rd, you met with them again on Sunday, correct?

21   A    I did.

22   Q    And that was roughly about three hours, right?

23   A    I'd say it was some time, yes.

24             MR. KENNEDY:  If we pull up 9429-097.  If we move

25   through the document.

```
 1              THE WITNESS:  So is that the 2nd or 3rd?  'Cause
 2    you're talking about the 3rd.  This should be the 2nd.
 3              MR. KENNEDY:  If we keep moving through the document.
 4    All right.
 5              THE WITNESS:  That's the 3rd?
 6    BY MR. KENNEDY:
 7    Q    If we're looking at what is paragraph 25, sir --
 8    A    Okay.
 9    Q    -- and let's just --
10              MR. KENNEDY:  If we can blow that up for the witness.
11    BY MR. KENNEDY:
12    Q    Let me know when you're finished.
13    A    Okay.  It shows that I was there on the 3rd.
14    Q    All right.
15              MR. KENNEDY:  We can take that down.
16    BY MR. KENNEDY:
17    Q    So on the Sunday again, another meeting of about three
18    hours to get ready for this, correct?
19    A    Yes.
20    Q    Took Monday off, but on Tuesday another meeting for a --
21    two more hours, March 5th?
22    A    Okay.
23    Q    March 6, another meeting the next day, on Wednesday, for
24    about two and a half more hours?
25    A    Okay.
```

1   Q    March 7th, another meeting for more than two hours, the

2   next day?

3   A    Okay.

4   Q    And then we get to Friday the 8th, and another meeting

5   over two and a half hours, correct?

6   A    Okay.

7   Q    So that's what you've been doing since you've been here,

8   since March 2nd, correct?

9   A    I've been pretty busy, yes.

10  Q    All right.  Now, the other day you gave us some testimony

11  about 2011 and some chemical releases that you say you did,

12  correct?

13  A    You say yesterday that I talked about chemical releases is

14  what you're saying, yesterday?

15  Q    Yes.

16  A    Yes.

17  Q    All right.  Second one, at the SoHo, right?

18  A    Yes.

19  Q    First one, you say, at Pearl, correct?

20  A    Yes.

21  Q    All right.  In January of 2019 you didn't say anything

22  about that to the FBI, correct?

23  A    Yes.

24  Q    In the grand jury you didn't say anything about it,

25  correct?

```
 1   A    Yes.

 2   Q    It wasn't until 2023 the first time you said anything

 3   about it, right?

 4   A    Correct.

 5   Q    And when you told 'em about it then, you said you did it

 6   at the Modern Hotel, correct?

 7   A    I may have.

 8   Q    And that the Modern Hotel, was it -- and it was inside a

 9   nightclub there, correct?

10   A    I may have.

11   Q    Nothing about the SoHo, right?

12   A    I'm not sure.

13   Q    Okay.  So the Modern Hotel is over by Ala Moana, right?

14   A    I think so, yes.

15   Q    And Chinatown is where SoHo is, right?

16   A    Yes.

17   Q    So all of a sudden, what you told 'em about in 2023 for

18   the first time since 2019 now becomes the SoHo in front of the

19   ladies and gentlemen of the jury here, correct?

20   A    Yes.

21   Q    Now, you said that there were five ounces in a syringe,

22   correct?

23   A    I said about.  I -- like I say, I'm not too sure how much

24   it was in there.

25   Q    Five ounces, huh?
```

```
 1          And that the syringe, was it in your right pocket or your
 2    left pocket?
 3    A    My left pocket.
 4    Q    Your left pocket.
 5          Okay, you're right-handed or you're left-handed?
 6    A    I'm left-handed.
 7    Q    All right.  So you've got a syringe, right?
 8    A    Hm.
 9    Q    You've got a needle, right?
10    A    Yes.
11    Q    There's a cap on the needle, right?
12    A    Yes.
13    Q    You're walking around with the needle in your left pocket,
14    right?
15    A    Correct.
16    Q    You then say that you're -- you used both hands to get the
17    cap off, sir?
18    A    I can't recall if it even had a cap on there.
19    Q    Oh, so you're walking around with a needle in your left
20    pocket, and you don't know whether there's a cap?
21    A    Yeah, the needle was not a sharp needle.  It was just a
22    piece of metal.
23    Q    Oh.  It's just a piece of metal in your -- it wasn't
24    sharp, right?
25    A    No.
```

1    Q    But it was sharp enough so that you never took it out is

2    what you told the ladies and gentlemen of the jury, right?

3    A    Yes.

4    Q    And that somehow this non-sharp needle then went through

5    your pants, right?

6    A    Yes.

7    Q    With five ounces of chloropicrin, right?

8    A    Somewheres around five ounces, yes.

9    Q    And you put all of the chloropicrin on the -- on the floor

10   at these nightclubs, right?

11   A    Not in one spot.

12   Q    Moving around, right?

13   A    Moving around pretty quick, yes.

14   Q    Okay.  And so you never took it out, right?

15        Did this all with one hand?

16   A    Yeah.

17   Q    You pulled it back with one hand and then pressed it in

18   with one hand?

19   A    What are you talking about, put it back?  It was fully

20   extended before I even squished it in.

21   Q    So you're walking all the way over there fully extended,

22   without a cap, right?

23   A    I didn't have to pull it back.  I'm not -- I'm not sure if

24   I'm getting your thing here.

25   Q    Okay.  So did the government play you a 911 call from the

1    event that you say happened at the Pearl?

2    A    I -- I've never heard a 911 call from the Pearl.

3    Q    Did the government call -- play a 911 call from what

4    happened at the SoHo?

5    A    I never heard of a 911 call from SoHo.

6    Q    Which only became the SoHo at trial when you told them in

7    2023 it was at the hotel, The Modern?

8              MR. NAMMAR:  Objection, misstates the testimony.

9              THE COURT:  Overruled.  Go ahead.

10             THE WITNESS:  I'm sorry?

11   BY MR. KENNEDY:

12   Q    They play a -- a 911 call from the Modern Hotel with the

13   Addiction nightclub that you told 'em about in 2023?

14   A    You're asking me if I heard that one?  If I heard the 911

15   call?

16   Q    Did they play you a --

17   A    No.

18   Q    -- 911 --

19   A    No, they did not.

20   Q    Did they play you a 911 call from the SoHo that you told

21   the jury about yesterday, that you had never told anyone else

22   about before?

23   A    I've never heard a 911 call for any location or any 911

24   call from anyone.

25   Q    Any police reports that they showed you from five ounces

1    of chloropicrin on the ground at a nightclub, they --

2    A    No.

3    Q    -- show you those?

4    A    I have not seen a police report for anything about

5    chloropicrin in any nightclub.

6    Q    When you're putting chloropicrin in a pic pan, you never

7    put five ounces in there, do you?

8    A    I -- I sometimes put ten.  It depends on the size of the

9    structure.

10   Q    You put ten in there?

11   A    I can't say it's only one or three or five or six.  I

12   can't say for sure how much I can put in a pan.

13   Q    And not one person has the government ever told you

14   reacted to any of these events that you say happened, correct?

15   A    I can't hear a word you're saying right now.

16   Q    Not one person has been brought to you who ever had a

17   reaction to these events that you say happened, that there's no

18   police report, no 911 call and nothing in the record --

19   A    No --

20   Q    -- supporting it --

21   A    -- person and no call, nothing.

22   Q    -- either than what you say?

23   A    No person, no call or nothing.

24        THE COURT:  Mr. Cabael, if you would let counsel

25   finish his question.

```
 1              THE WITNESS:  I thought he was finished.  I'm sorry.
 2              THE COURT:  Well, you've done it multiple times.  I'm
 3    just letting you know.
 4              THE WITNESS:  Okay.
 5              THE COURT:  Please let him finish his question before
 6    you begin your answer, or we're going to get a very messy
 7    record from the court reporter.
 8              THE WITNESS:  You got it.
 9              THE COURT:  Thank you.
10              THE WITNESS:  Sorry, Your Honor.
11              THE COURT:  Thank you.  Appreciate it.
12    BY MR. KENNEDY:
13    Q    I'm going to shift gears here, sir.
14         I want to talk about Kama'aina Termite and Pest Control
15    and what it's known for, okay?
16    A    Okay.
17    Q    A lot of fumigation jobs that Kama'aina Termite and Pest
18    Control did came from other pest control companies, correct?
19    A    Can you -- can you repeat that question, please?
20    Q    Sure.
21         A lot of fumigation jobs that Kama'aina Termite and Pest
22    Control did came from other pest control companies?
23    A    We had some.  I can't say -- I can't put a number if it
24    was a lot.  We've done -- we've done jobs for other companies,
25    correct.
```

1  Q    Those were your words in front of the grand jury in 2019,
2  correct?

3  A    That we did jobs for other companies?

4  Q    A lot of fumigation jobs that Kama'aina Termite and Pest
5  Control did came from other pest control companies?

6  A    Well, I -- I can't remember exactly what for or what I
7  said on there about that jobs.

8  Q    When those companies could not meet the demands of the
9  job, they reached out to you?

10 A    They did.

11 Q    They would have you do the jobs, right?

12 A    Kama'aina Termite, yes.

13 Q    One of the companies that did was Diversified Termex,
14 correct?

15 A    Correct.

16 Q    Jobs when it was too windy and jobs that were too
17 difficult, right?

18 A    Yes.

19 Q    So Kama'aina Termite and Pest Control has always been
20 known to do the most difficult jobs in this state?

21 A    Yes, they were, and I was very proud of that.

22 Q    Jobs that no other company could do, right?

23 A    Yes.

24 Q    Kama'aina Termite and Pest Control and Mike Miske would
25 take those jobs on, correct?

1   A    Correct.

2   Q    Let's talk about Kealoa [verbatim] Lai, the fumigation in

3   September of 2010, okay?

4   A    Okay.

5   Q    Kealoa [verbatim] Lai is a 44-story luxury condominium,

6   correct?

7   A    It is a large building.  I can't exactly remember how --

8   how much floors there were, but, yes, somewheres around

9   40-something.

10  Q    There were more than 350 homes inside there that people

11  own, correct?

12  A    There's a lot of homes, yes.

13  Q    It's located just not very far from here, over on Queen

14  Street, correct?

15  A    Correct.

16  Q    The building was built in around 2008, when you were

17  working at Kama'aina Termite and Pest Control, correct?

18  A    I can't say what year, but it was a fairly new building

19  when we did fumigate it, yes.

20  Q    The cabinets were infested with drywood termites, right?

21  A    That was my understanding, correct.

22  Q    After the cabinets had been installed in all of these

23  individuals' homes, right?

24  A    Yes.

25  Q    As you know from your experience, as the homeowners moved

1    in, the colonies began to grow, causing major termite damage,

2    right?

3    A    Well, they're causing damages.  I don't know what the

4    extens -- how extensive it was, but there were termites there,

5    yes.

6    Q    They were swarming, and flying termites, within the

7    occupied units, right?

8    A    I never heard that before.

9    Q    Throughout the entire building, right?

10   A    I -- that's news to me.

11   Q    The active termite activity happened within a two-year

12   warranty period for the construction of that business, correct?

13   A    I -- I don't know.

14   Q    Homeowners were threatening lawsuits.  You knew that,

15   right?

16   A    I don't know.  I -- I've never heard of lawsuits, no.

17   Q    You had spot-treated the cabinets inside the chamber

18   fumigation, correct?

19   A    I have not spot-treated 'em.  I had nothing to do with

20   that.  I don't know.

21   Q    As needed.  But the problems persisted, right?

22   A    The problem did persist.

23   Q    And you were aware that removing and replacing the

24   cabinets in total would cost 20 to 24 million dollars?

25   A    I did not know that.

1  Q     You knew it would be a lot of money, though, didn't you,

2  from your experience?

3  A     My -- my understanding, it would be near impossible --

4  Q     Near impossible --

5  A     -- to remove the lower ones with the granite countertops

6  is my understanding.

7  Q     All right.  So it was nearly impossible.

8        So what happened then was Nordic Construction hired its

9  own entomologist.  You knew that, right?

10  A     I do not know that.

11  Q     The homeowners association, AOAO, hired its own

12  entomologist, Julian Yates, who was there during the

13  fumigation.  Correct?

14  A     I don't know.  I did not know Julian Yates was -- worked

15  for the association.

16  Q     All right.  You saw him there during it, right?

17  A     I heard the name, but I forget who Julian Yates looks

18  like.

19  Q     All right.  And it was his opinion -- you said it was

20  impossible.  The only way you could solve this problem was to

21  do a fumigation, right?

22  A     I -- I can't say I heard that from their mouth.  I don't

23  know anything about their conversations.

24  Q     No.  What I'm saying is you said it was impossible, right?

25  A     Well, it was -- it would have been -- just been a very

```
 1   difficult job to break all these granite countertops to
 2   replace, to remove these cabinets on the bottom is what my
 3   misunderstanding was.
 4   Q    And you couldn't put a tent around a 40-plus story
 5   building, right?
 6   A    You probably could, but it's -- we didn't have tents that
 7   big.
 8   Q    Too much wind?
 9   A    Too much wind.
10   Q    Not enough tents?
11   A    It'd probably be too heavy.  Probably -- there's a lot of
12   work to go with that.
13   Q    'Cause walking around with those tents on your shoulders,
14   those can be over 200 pounds, right?
15   A    Yeah.
16   Q    So you got to get 'em up 40 stories somehow, right?
17   A    That's -- that's rough, yes.
18   Q    All right.  So then there was an individual by the name of
19   Rene Borja from Cardinal Fumigation was hired by Mike Miske.
20   Do you recall that?
21   A    Rene, yes.
22   Q    For onsite Vikane monitoring using the RDAs that you
23   talked about, right?
24   A    Yes.
25   Q    And there would be remote data access devices on each
```

1  floor, right?

2  A    I can't say on each floor.  I can't recall exactly how

3  much he had.

4  Q    And so he was a specialist, because this was an extremely

5  difficult job, right?

6  A    There was multiple specialists, yes.

7  Q    And, in fact, Dow Agro sent two research scientists who

8  specialized in this area?  Mike Miske brought 'em, right?

9  A    I -- I believe there were two scientists, yes.

10  Q    And Roman Dycus was there as well, right?  From Dow?

11  A    Roman was there as well.

12  Q    So there were three of those experts there as well,

13  correct?

14  A    Yes.

15  Q    All right.

16       Now, you were on the job from the start to the finish,

17  right?

18  A    I was.

19  Q    And the preparation for this job took at least two months

20  of your time and others' time, correct?

21  A    I can't say two months, but I can say it took a long time.

22  Q    All right.  And prior to the fumigation you talked about

23  having to price out and obtain the Visqueen, the plastic that

24  was used inside to create a chamber; is that correct?

25  A    Yes.

1   Q    The painters tape, right?

2   A    Yes.

3   Q    And there were approximately 300 fans that you had to get

4   to place inside the building, correct?

5   A    There was a lot of fans, yes.

6   Q    And so the job itself, setting aside the preparation, went

7   on for three weeks, right?

8   A    You're saying aside of the prep?  You're saying from

9   putting the Visqueen up?

10  Q    Yeah.

11  A    I'd say it took a while, yes.

12  Q    Okay.  Now, if we move to --

13        MR. KENNEDY:  I'd like to pull up 5500, dash, 077,

14  which was in the original exhibit list, Your Honor.

15        Just for the witness.

16        THE COURT:  Go ahead.  I've got it.

17  BY MR. KENNEDY:

18  Q    Sir, take a look at the first page.  And then let's scroll

19  through the pages that make up 5500-077.

20        Sir, you're familiar with the proposal that was entered

21  into?

22  A    Somewhat, yes.

23  Q    All right.  This was eventually accepted and the job that

24  you did, correct?

25  A    I -- I'll have to say looks like it.  I -- I -- I see no

1    signature.  I don't know if it was signed by the people who

2    accepted the job.

3    Q    All right.

4              MR. KENNEDY:  Your Honor, at this time I'd move

5    5500-077 into evidence.

6              MR. NAMMAR:  Objection, no foundation.

7              THE COURT:  Sustained.

8              MR. KENNEDY:  All right.

9    BY MR. KENNEDY:

10   Q    Well, let me ask you about some features of it.

11        We can take that down, okay?

12        Were you aware that there were weekly seminars for the

13   homeowners for about six weeks?

14   A    I'm not aware of that, no.

15   Q    Were you aware that there was 24-hour phone service set up

16   for information regarding the treatment process?

17   A    I'm not aware of that, no.

18   Q    Were you aware that there was a secure website to log onto

19   for the homeowners who had questions?

20   A    I'm not aware of that, no.

21   Q    All right.  Were you aware that the relocation was going

22   to be for a six-day duration to do this job?

23   A    Again, I'm not aware of that.  My -- my whole thing was

24   staying with the job and not dealing with the customers.

25   Q    All right.  Were you aware that each unit was videotaped

1   to show the pretreatment?

2   A    I did not know that.

3   Q    And representatives from Nordic and the insurance company

4   could be present while all of that work was being done?

5   A    They had some people there, but they weren't present every

6   day, and they weren't present on every floor.  And they weren't

7   by me at all when I was doing the job.

8   Q    All right.

9   A    So I can't --

10  Q    Were you aware that Honolulu Police Department officers

11  were there to direct traffic and provide support during this

12  six-day period?

13  A    I -- I know I seen a few police officers, but I don't know

14  for the intent of the -- if they were there for the entire job

15  or not.

16  Q    Were you aware that they were there at the main entrance

17  and patrolled all areas while this was happening so that the

18  homeowners could be comforted that while they were away their

19  homes would be safe?

20  A    That's the -- that's probably the only time I seen the

21  police officers was when they were exiting the building.

22  Q    Were you aware that Darvin D. Leis Company was doing the

23  air conditioning units and would replace those units?

24  A    I have -- I have no idea.

25  Q    All right.  You were aware that Vikane would be used,

1   right?

2   A    I am, yes.

3   Q    All right.  And from your experience, making certain that

4   the Vikane would not only work on the first floor but on every

5   floor was a difficult proposition, wasn't it?

6   A    It was my job to make sure Vikane got where it had to go.

7   Q    Okay.  All right.

8   A    It was difficult.

9   Q    Were you aware that there was a five-year warranty for

10  spot treatment after the job was done?

11  A    If there was anything that I might have just read, maybe I

12  missed it, but I was not aware of that.

13  Q    Were you aware that furniture that was purchased for one

14  year could come in and get fumigated so that this problem

15  wouldn't happen again?

16  A    No.

17  Q    And were you aware that the warranty was part of the deal?

18  A    Again, like I said, my whole thing was operations.  I did

19  not deal with paperwork or warranties or customers.

20  Q    And specto [verbatim] meters and RDAs were provided for

21  this job, correct?

22  A    Correct.

23  Q    All right.  So this wasn't your average fumigation of just

24  a house, correct?

25  A    It was not.

1   Q    All right.  More than 40 Kama'aina Termite staff were

2   onsite, correct?

3   A    There was a lot of us, yes.

4   Q    They installed a command center there during this entire

5   time, correct?

6   A    They did, yes.

7   Q    They had safety meetings among the staff and the

8   subcontractors, right?

9   A    We did.

10   Q    There was 24-hour professional security, right?

11   A    That, I remember.  Yes.

12   Q    And, in fact, as early as 2010 Mr. Miske made it

13   available, on any home that was being fumigated, they had a

14   security service that could be there to make certain nothing

15   happened to that home during a fumigation, correct?

16   A    For a short period of time, yes.

17   Q    And you said that was one of the smartest ideas that you

18   heard?

19   A    That was.

20   Q    And you testified about doing a chamber like inside the

21   structure as opposed to a tent, correct?

22   A    We're talking about Keola Lai, right?

23   Q    Yes.

24   A    Yes.

25   Q    All right.  Now, you had to have the RDAs monitor the

1   Vikane levels on each floor, right?

2   A    Again, I -- I can't say they were monitoring every floor.

3   I know we did have them there, but I can't say if it was on

4   every single floor.

5   Q    And that's what Mr. Dycus was doing, right?

6   A    I -- I can't say it was Mr. Dycus.  I thought it was

7   scientists doing that.

8   Q    All right.  From Cardinal?

9   A    The scientists from Dow.

10  Q    And the gas lines transported the Vikane gas, right?

11  A    Yes.  We had a lot of gas lines, correct.

12  Q    And running the gas lines through there took more than a

13  week, didn't it?

14  A    It took a long time, yes.

15  Q    And you had professional window folks to assist in the

16  aeration process of the building, right?

17  A    Yes, to crack windows open and help aeration, yes.

18  Q    And they were little -- literally rappeling down the

19  windows to open them to make this job work, correct?

20  A    To get the aeration started, yes.

21  Q    In scuba, coming down rappeling, right?

22  A    I -- I can't say if they were using the -- the SCBAs or

23  not.  But, yes, they -- they rappeled from the roof.

24  Q    All right.

25  A    Got to get to the roof somehow.  I forget how they did

1    that.

2    Q    So for this job Mike Miske sought out the best experts to

3    get the job done right, didn't he?

4    A    He did.

5    Q    And this was an extremely complicated fumigation to target

6    the dosage that was needed to kill all these termites, correct?

7    A    It was a difficult job, yes.

8    Q    Okay.  There were 38 remote data access devices placed on

9    every floor, correct?

10   A    I -- I can't say there were 38 placed on every floor, but

11   there's probably 38 in total.

12   Q    It was measuring in four different locations, right?  On

13   each floor?

14   A    I can't say, no.

15   Q    They had to calculate the dosage on each floor to get the

16   required dosage to eradicate the drywood termites?  Correct?

17   A    Yes.

18   Q    There was an introduction hose that was used, right?  To

19   deliver the gas?

20   A    A very large hose for each floor, yes.

21   Q    And then each one of those hoses split off into three

22   different hoses to deliver the gas, correct?

23   A    They did stuff in different hoses, yes.

24   Q    And each terminating at a fan on each floor hallway to

25   distribute the gas, right?

1    A    Correct.

2    Q    One in the center on each floor and one halfway towards

3    the exits to make this work, right?

4    A    I -- I can't -- I can't say if I recall exactly how the --

5    the -- the layout was, but there was a lot of fans in a lot of

6    areas, yes.

7    Q    Now, when it was done, there was a complete eradication of

8    the termites, right?

9    A    I can't say if it was complete.  I still don't even know

10   if it was a successful fumigation.

11   Q    Well, did you know that there were blind petri dishes

12   placed in there unbeknownst to the company to see if the job

13   was done right, and it showed proof that it was, by Mr. Yates?

14   A    I remember petri dishes being set up, but it was -- it was

15   known where they were.

16   Q    And there was also destructive testing where they tore out

17   some of the cabinets to make certain that it was done right.

18   Are you aware of that?

19   A    I'm not aware of that, no.

20   Q    And that based on that data, within days the fumigation

21   had eradicated all the termites in the building, one of the

22   largest jobs ever done anywhere?

23   A    In the world.

24   Q    In the world --

25   A    Yes.

1   Q    -- correct?

2        Now, yesterday you told each juror sitting over there,

3   while you were under oath, that no chloropicrin was used in the

4   Kealoa [verbatim] Lai fumigation.

5   A    I don't think I said "no."  I think I said we had put it

6   in certain areas but not the entire building.

7   Q    You didn't say no?

8   A    I -- I can't recall.

9   Q    Because you know that two days after entering into your

10  proffer agreement with the government, as part of your ongoing

11  proffer agreement on January 16th at 2019, you told the two FBI

12  special agents and a member of the prosecution team that for

13  the Kealoa [verbatim] Lai fumigation Miske used chloropicrin on

14  a few levels of the building but not the entire building.

15  That's exactly what you told 'em in 2019, correct?

16  A    I -- I can't -- I can't say for sure to you that that's

17  correct.

18  Q    All right.  And then when you were in front of the grand

19  jury, you were asked that question as well?

20  A    I can't say.

21  Q    Okay.  Was pic -- chloropicrin used during that job?  And

22  your answer was:  In a few locations but not the entire

23  building.  Correct?

24  A    I -- I can't say if that's correct or not.

25  Q    Would you like to take a look at Exhibit 7360?

1   A    Sure.

2          MR. NAMMAR:  Your Honor, this misstates his testimony

3   from yesterday that chloropicrin was used on at least one

4   floor.

5          THE COURT:  I think he just said that, right?

6          MR. NAMMAR:  So there's no reason to impeach him with

7   his grand jury testimony then.

8          MR. KENNEDY:  That's counsel's memory.

9   BY MR. KENNEDY:

10  Q    Didn't you say that none was used?

11         THE COURT:  Well, it's also my memory.  It's also the

12  witness's memory.

13         MR. KENNEDY:  All right.

14         THE COURT:  He just testified to.

15  BY MR. KENNEDY:

16  Q    So you agree that chloropicrin was used, correct?

17  A    Used on what job?

18  Q    Kealoa [verbatim] Lai.

19  A    My recollection, it was used on one or a couple of floors,

20  but it wasn't used on the entire prop -- entire building as it

21  should have been.

22  Q    Well, were you aware that there was an agreement reached

23  that it would only be introduced on a few floors?  Do you

24  recall that?

25  A    I do not.

1    Q     Okay.  So you weren't aware of that, were you?

2    A     For someone who's supposed to be applying it and making

3    sure a job gets done, I would think I would be aware of that.

4    Q     All right.  And so Jason Smith prepared the chloropicrin

5    containers.  He had 59 measuring cups, right?

6    A     I can't say.  No, I don't know.

7    Q     60-plus trays, right?

8    A     I don't know.

9    Q     Photos were taken of that event, right?

10   A     Possibly.

11   Q     They were -- fans were positioned at each of the condo

12   entrance, right?

13   A     I don't know.

14   Q     And the chloropicrin was placed in trays, right?

15   A     Trays are for chloropicrin.  But if they were placed in

16   trays, no.  Not -- not on all floors.

17   Q     Now, it'd be very difficult to enter this building from

18   the 44th, all of those floors, correct?

19   A     What's your question again?

20   Q     Well, unlike a one-story, you can't just jump into the

21   44th floor, right?

22   A     Well, we use a -- a exterior lift for us to get to the top

23   floor.

24   Q     I understand.  But the chloropicrin is a warning agent,

25   right?

1   A      Chloropicrin is a indicator agent to let you know you got

2   Vikane present.

3   Q      Right.

4   A      And it also does warn, also does deter people.

5   Q      Right.

6   A      Yes.

7   Q      And so it's meant to keep people out, right?

8   A      I -- I can't say that's what the label says.

9   Q      Because the first thing you do is clear the area before

10  you ever introduce chloropicrin and Vikane, correct?

11  A      That -- that -- that is what you are to do, but you

12  introduce chloropicrin to add -- to assist in that process

13  before you shoot Vikane.

14  Q      Right, in case --

15  A      In case you missed a cat --

16  Q      -- something has been missed?

17  A      -- or a dog or something, yes.

18  Q      And in most instances, it's to deter from -- someone from

19  going in.  And if they do, they would immediately move out

20  because of the chloropicrin, correct?

21  A      That -- that's -- that's kind of the idea, but that's not

22  the label.

23  Q      All right.  Because the Vikane is odorless, so no one

24  would know it was there, correct?

25  A      That is why -- that's why chloropicrin is used on every --

1    so it should be used on every floor because it's an indicator

2    gas that you have Vikane on each floor.

3    Q    All right.

4    A    It's not to deter people from going on each floor.

5    Q    And are you aware that the Department of Agricultural

6    [verbatim] person onsite, Glenn Sahara, agreed that it should

7    be only introduced on a limited number of floors?

8             MR. NAMMAR:  Objection, asked and answered.  And

9    there's no good-faith basis to ask this question.

10            THE COURT:  Overruled.  Go ahead.

11            THE WITNESS:  I'm sorry?  You want me to answer the

12   question?

13            THE COURT:  Yes, please.

14            THE WITNESS:  Okay.  Can you please repeat the

15   question?

16            MR. KENNEDY:  I can.

17   BY MR. KENNEDY:

18   Q    Were you aware that the Department of Agricultural

19   [verbatim] person onsite, Glenn Sahara, reached an agreement

20   that chloropicrin should only be introduced on a limited number

21   of floors?

22   A    I am not aware of that, and that is not the law.  The

23   label is the law and you follow the label.

24   Q    All right.  Now, there's an issue regarding -- were you

25   aware -- let me show you Government Exhibit 9-095.

1          MR. KENNEDY:  Which is in, I believe, the original

2     exhibit list from the government.

3          THE COURT:  Okay.  Go ahead.  I've got it.

4          MR. KENNEDY:  We can pull that up.  If we move to the

5     second page.

6     BY MR. KENNEDY:

7     Q    Take some time and let me know when you're finished with

8     this.

9     A    (Reviews document.)  Okay.

10         It doesn't say anything there.  It's just a blank message

11    email.

12    Q    And move to the second page.

13    A    Again, this -- this is nothing.  It's just an empty email.

14    Q    All right.  And move -- let's take a look at Government

15    Exhibit 9-96 in relation to this.  And I want to see if this

16    refreshes your recollection about --

17         MR. KENNEDY:  Move to the second page.  And now to

18    the third page.  All right.  And move to the next page.

19    A    (Reviews document.)

20    BY MR. KENNEDY:

21    Q    Have you finished that, sir?

22    A    I'm not sure what I'm reading.  What is this?

23         MR. KENNEDY:  All right.  We can take that down.

24    BY MR. KENNEDY:

25    Q    Were you aware that a subcontractor to Kama'aina Termite

 1    and Pest Control was dealing with the air filters, both

 2    removing them and replacing them?

 3              MR. NAMMAR:  Objection to beyond the scope.

 4              THE COURT:  Overruled.  Go ahead.

 5    A    I have no idea.  I've never heard of that.

 6    BY MR. KENNEDY:

 7    Q    All right.  Were you aware that Kama'aina Termite and Pest

 8    Control paid them the money to replace those air filters?

 9    A    I'm not aware of that, nor did I see anybody replacing

10    filters that -- nor did I meet anybody.  So I -- I have no idea

11    about anything about air filters.

12    Q    Is it possible, because it was a subcontractor, that it

13    wasn't in your work and that's why you don't know?

14    A    To an extent, yes, but I would have to be the one to

15    authorize people to have access to the property, to clear the

16    property, to let them go into a unit to do air filters changes.

17    Unless they did it there to -- after the fact, I don't know.

18    Q    All right.  And so the best you can say is you don't know?

19    A    Exactly.  That's why I said I don't know.

20    Q    All right.

21              MR. KENNEDY:  Now, if we can pull up 9429-102, which

22    is in the 24th supplemental exhibit, Your Honor.

23              THE COURT:  Go ahead.

24              MR. KENNEDY:  9429-102, please.  If I misspoke, I

25    apologize.

1    BY MR. KENNEDY:

2    Q    Sir, do you recognize what's depicted in this photograph

3    which has been marked 9429-102?

4    A    Looks like the first day of the project.

5    Q    All right.

6         MR. KENNEDY:  At this time, Your Honor, I'd move

7    9429-102 into evidence.

8         THE COURT:  Any objection?

9         MR. NAMMAR:  No objection.

10         THE COURT:  Without objection, that exhibit is

11    admitted then and may be published.  That's 9429-102.

12         (Exhibit 9429-102 received in evidence.)

13    BY MR. KENNEDY:

14    Q    Now, this is the -- you said the first day of the project,

15    right?

16    A    First day of setting up the project, yes.

17    Q    All right.  And so we've got this gentleman here.  Do you

18    recognize him, sir?

19    A    Which one exactly?  You're talking about a tall white guy

20    that's bald?

21    Q    Yes, who I just put a circle around.

22    A    (Inaudible) like five people, so I'm going to guess that

23    is Dave Melton.

24    Q    All right.  And who is Dave Melton?

25    A    Dave Melton was a sales rep for Kama'aina.

1   Q    All right.  And I'm going to put a circle around here

2   (indicates).  Do you recognize that individual?

3   A    That is Mr. Miske.

4   Q    All right.  And do you see yourself in this photograph,

5   sir?

6   A    I don't know.  Looks like that might be me out in the

7   back.  I can't say for sure.

8   Q    Okay.  This represents the number of folks that were there

9   on the project from Kama'aina Termite and Pest Control?

10  A    That -- that was a bunch of them, yeah, but not all of 'em

11  stayed.  We still have fumigations in the community --

12  Q    Okay.

13  A    -- that we take care of.

14  Q    All right.  Let's move on to 9429-103.

15       MR. KENNEDY:  Which is also in the 24th supplement,

16  Your Honor.

17       THE COURT:  Yes.  Go ahead.

18  BY MR. KENNEDY:

19  Q    Sir, do you recognize what's shown in 9429-103?

20  A    I do.

21  Q    What is it?

22  A    That's the lines that introduce the gases, the fumigant to

23  each floor.

24       MR. KENNEDY:  At this time, Your Honor, I'd move

25  9429-103 into evidence.

1          THE COURT:  Any objection?

2          MR. NAMMAR:  No objection.

3          MR. KENNEDY:  May we publish?

4          THE COURT:  That objection -- that exhibit is

5    admitted then, without objection.  And, yes, you may publish.

6    9249-103.

7          (Exhibit 9249-103 received in evidence.)

8    BY MR. KENNEDY:

9    Q    So, now, you were mentioning that you had a hose that then

10   connected into three different connector hoses on each floor,

11   right?

12   A    It connected to multiple hoses on each floor.  I can't say

13   if it was three or more, but yes.

14   Q    All right.  And so you were running them up the stairwell,

15   all the way up to deliver the Vikane?

16   A    Yes.

17   Q    All right.

18          MR. KENNEDY:  Let's move on to 9429-104.

19   BY MR. KENNEDY:

20   Q    Do you recognize what's shown in 9429-104?

21   A    I do.

22   Q    What is it?

23   A    That looks like one of the window cleaners going down to

24   possibly open windows for us.

25          MR. KENNEDY:  All right.  At this time I'd offer

1  9429-104 into evidence.

2         THE COURT:  Any objection?

3         MR. NAMMAR:  No objection.

4         MR. KENNEDY:  May we publish?

5         THE COURT:  Yes.  You may publish.  That exhibit is

6  admitted, 9429-104.

7         (Exhibit 9429-104 received in evidence.)

8  BY MR. KENNEDY:

9  Q    Now, you mentioned this is one of the folks.  This is

10  during the beginning of the aeration problem?

11  A    The aeration process, yes.

12  Q    And so the individual is swearing a scuba, that you talked

13  about yesterday?

14  A    The SCBA, correct.

15  Q    Because they're opening up the windows, and so this would

16  be the first time that the Vikane and chloropicrin would be

17  released, correct?

18  A    Correct.

19  Q    And so once the Vikane gets out in the air, it eventually

20  disperses, right?

21  A    It does.

22  Q    But there's a period of time, and usually on a home

23  fumigation and others there's a six-hour period by law until

24  someone can re-enter, correct?

25  A    That is correct.

1   Q    So that the aeration is complete before anyone comes in,

2   correct?

3   A    Yes.

4   Q    All right.

5           MR. KENNEDY:  Let's move on to 9429-105.

6   BY MR. KENNEDY:

7   Q    What is shown here, sir?

8   A    That is SCBAs with a full mask and spare tanks.

9           MR. NAMMAR:  At this time I'd move 9429-105 into

10  evidence.

11          THE COURT:  Any objection?

12          MR. NAMMAR:  No objection.

13          MR. KENNEDY:  May we publish?  Oh, I'm sorry, Your

14  Honor.

15          THE COURT:  That's okay.  Yes, you may publish.

16          That exhibit is admitted, 9429-105.

17          (Exhibit 9429-105 received in evidence.)

18  BY MR. KENNEDY:

19  Q    So these are the scubas that are being used throughout?

20  A    That is some of them, yes.

21  Q    All right.  Let's move on to 9429-106.

22          You recognize the individuals in this photograph?

23  A    I recognize a couple of them, yes.

24  Q    All right.  Is this during the process at Kealoa

25  [verbatim] Lai?

 1   A    This looks like the start of the process.

 2   Q    All right.

 3            MR. KENNEDY:  At this time I would move 9429-106.

 4            THE COURT:  Any objection?

 5            MR. NAMMAR:  No objection.

 6            THE COURT:  9429-106 is admitted then.

 7            (Exhibit 9429-106 received in evidence.)

 8            THE COURT:  And you may publish.

 9            MR. KENNEDY:  All right.

10   BY MR. KENNEDY:

11   Q    Sir, who do you recognize in this photograph?

12   A    I recognize Mr. Miske's back facing me.

13   Q    Okay.

14   A    I believe that's Roman Dycus to the left.

15   Q    And would this individual right here (indicates) be Roman

16   Dycus?

17   A    I mean to the right.  I'm sorry --

18   Q    To the right?

19   A    -- to the right of Michael.

20   Q    So this is Roman Dycus?

21   A    Yes, that's Roman Dycus.

22   Q    Okay.

23   A    And I can't say for sure, but that may be Kurt Nosal to

24   the left.

25   Q    All right.

1   A    In the white shirt.

2   Q    And do you recognize these gentlemen as the Dow

3   scientists?

4   A    The Dow scientists, correct.

5   Q    All right.  And so throughout the process there was a

6   coordination among the scientists.  And you talked about Kurt

7   Nosal.  I think you mentioned him yesterday.  Who's Kurt Nosal?

8   A    Kurt Nosal was one individual, along with Roman Dycus,

9   that worked for Dow -- for Univar.

10  Q    All right.  And Univar supplies Vikane, right?

11  A    Univar supplies the chemicals to the pest control company,

12  correct.

13  Q    Which they receive from Douglas Products, right?

14  A    I'm sorry.  Repeat that?

15  Q    Which they -- they distribute from Douglas Products,

16  right?

17  A    They -- I'm sorry.  The last part?

18  Q    Douglas Products, the manufacturer.

19  A    Yes.  I -- I'm sorry.  You got to repeat that question.

20  Q    Kurt Nosal from Univar distributes Vikane and

21  chloropicrin, correct?

22  A    Yes.

23  Q    Which is manufactured by Douglas Products, right?

24  A    I -- I'm not sure who they're manufactured by.

25  Q    All right.  Let's move on to 9429-107.

1       What's shown here, sir?

2   A   That's a RDA unit.

3   Q   All right.

4           MR. KENNEDY:  At this time I'd move 9429-107 into

5   evidence.

6           THE COURT:  Any objection?

7           MR. NAMMAR:  No objection.

8           THE COURT:  9429-107 is admitted without objection.

9           (Exhibit 9429-107 received in evidence.)

10          THE COURT:  And you may publish.

11          MR. KENNEDY:  Thank you, Your Honor.

12  BY MR. KENNEDY:

13  Q   This device is, in laymen's terms, measuring the Vikane

14  connected to whatever floor this device is measuring, correct?

15  A   Yes, measuring the Vikane, the content of the Vikane in

16  the air on whatever floor it's on.

17  Q   Because there's a calculation that needs to be made of the

18  amount of Vikane for a period of time to eradicate or kill the

19  termites, right?

20  A   Yes.  It's mainly to just make sure that we -- we're not

21  losing gas; and if we are, we got to pump more gas on a certain

22  floor.  That's what it's doing.

23  Q   All right.

24  A   That's what we used it for at that job.

25  Q   And each floor has a different amount of gas that is

1   needed in a job that is this complex, correct?

2   A    I can't say if each floor had a different amount.  I -- I

3   got to say probably each floor had the same, but the amount of

4   time that we took to pump the gas to each floor I think was

5   different.

6   Q    All right.

7   A    Because of height.

8         MR. KENNEDY:  Let's take a look at 9429-108.

9   BY MR. KENNEDY:

10  Q    Do you recognize this photograph?

11  A    I do recognize this photograph, yes.

12  Q    What is it?

13  A    It's a photograph of a -- some of the people that were on

14  the project.

15  Q    All right.

16        MR. KENNEDY:  At this time, Your Honor, I would offer

17  to admit 9429-108.

18        THE COURT:  Any objection?

19        MR. NAMMAR:  No objection.

20        THE COURT:  9429-108 is admitted without objection.

21        (Exhibit 9429-108 received in evidence.)

22        THE COURT:  You may publish.

23  BY MR. KENNEDY:

24  Q    Do you recognize yourself in this photograph, sir?

25  A    That is me with the white shirt in the middle with the

1  mask on my face.

2  Q    All right.  Who else do you recognize in the photograph?

3  A    I got to say I recognize maybe about 95 percent of

4  everybody there.

5  Q    All right.  How about this gentleman right next to you?

6  A    That is Hugh Manalo.

7  Q    And was Hugh Manalo one of the licensed folks who worked

8  for Kama'aina Termite and Pest Control who was licensed to

9  shoot the gas?

10  A    He was.

11  Q    All right.  And do you see Mr. Miske as well?

12  A    He is to the left side of the screen.

13  Q    All right.  Do you see Caleb there?

14  A    I do see Caleb on the far right side the screen, right.

15  Q    All right.  And do you see Kurt Nosal?

16  A    Kurt Nosal is just to the right of Caleb.

17  Q    All right.

18  A    In the white shirt.

19  Q    And you recognize this gentleman down here (indicates)?

20  A    I think he was a Department of Ag inspector or some --

21  Q    Did you spend any time speaking with Mr. Yates from the

22  University of Hawaii, the entomologist who was hired?

23  A    Again, I don't think I can recall who Mr. Yates is or what

24  he looks like.

25  Q    All right.

1           MR. KENNEDY:  Let's move on to 9429-109.

2    BY MR. KENNEDY:

3    Q    What are we seeing here, sir?

4    A    That is inside of our operations center that was located

5    in the loading zone.

6    Q    All right.

7    A    In the trailer.

8           MR. KENNEDY:  At this time I'd offer 9429-109 into

9    evidence.

10          THE COURT:  Any objection?

11          MR. NAMMAR:  No objection.

12          THE COURT:  Without objection, 9429-109 is admitted.

13          (Exhibit 9429-109 received in evidence.)

14          THE COURT:  You may publish.

15   BY MR. KENNEDY:

16   Q    And so this was the operations center where folks are

17   manning it.  It looks like a large-scale monitor here

18   (indicates).  We got someone on a -- looks like a walkie-talkie

19   here, coordinating what's happening during the six days,

20   correct?

21   A    Yeah.

22   Q    Now, the gas that was shot remained in this building for

23   four to five days to eradicate these termites, correct?

24   A    I can't say how long it was in there.

25   Q    It was a number of days.  Do you recall that?

1   A    It -- it was more than one that I recall.  I can't say how

2   much days, though.

3   Q    All right.

4        MR. KENNEDY:  Let's move on to 9429-056.

5   BY MR. KENNEDY:

6   Q    Do you recognize who is shown in 9429-056?

7   A    I do.

8   Q    Who is shown?

9   A    Ryan Teramoto and Roger.

10  Q    All right.

11        MR. KENNEDY:  At this time I would offer 9429-056 to

12  admit into evidence, Your Honor.

13        THE COURT:  Any objection?

14        MR. NAMMAR:  No objection.

15        THE COURT:  9429-56 then is admitted without

16  objection.

17        (Exhibit 9429-56 received in evidence.)

18        THE COURT:  You may publish.

19        And counsel, we're almost at 10:30, so if you would

20  give some thought to when we can break for the first time

21  today.

22        MR. KENNEDY:  Your Honor, there are three more after

23  this.  Does the Court want to break now or complete these

24  three?

25        THE COURT:  Let's try to get through these three and

1    then we'll take a break.  Thank you.

2              MR. KENNEDY:  All right.  May we publish?

3              THE COURT:  Yes.

4    BY MR. KENNEDY:

5    Q    Now, is this Mr. Teramoto here?

6    A    That is.

7    Q    And this is Roger here?

8    A    That is.

9    Q    Okay.  And behind them is chloropicrin, correct?

10   A    That is chloropicrin, yes.

11   Q    All right.

12             MR. KENNEDY:  Let's move on to 9429-057.

13   BY MR. KENNEDY:

14   Q    Do you recognize who's shown in this photograph, sir?

15   A    I do.

16   Q    All right.  Is this at the Kealoa [verbatim] Lai

17   fumigation?

18   A    It is.

19             MR. KENNEDY:  At this time I'd move 9429-057 to admit

20   into evidence, Your Honor.

21             THE COURT:  Any objection?

22             MR. NAMMAR:  No objection.

23             THE COURT:  That exhibit then is admitted without

24   objection and may be published.  That's 9429-57.

25             (Exhibit 9429-57 received in evidence.)

1  BY MR. KENNEDY:

2  Q    All right.  Now, I know that is there (indicates) -- is

3  you, sir.  Who's to your immediate left?

4  A    Jason Smith.

5  Q    All right.  And who's to your -- Mr. Smith's immediate

6  left?

7  A    Hugh Manalo.

8  Q    All right.  So both of these gentlemen were among the

9  folks who were licensed to shoot Vikane for Kama'aina Termite

10  and Pest Control, correct?

11  A    I believe they were.

12  Q    All right.  And then who is this gentlemen here, sir?

13  A    He actually worked for Nordic.

14  Q    All right.  And Nordic was the construction company that

15  hired you to do this project that built the condominium,

16  correct?

17  A    Yeah, he was the one that tore the cabinets out and was

18  bringing it to a shop to get fumigated.

19  Q    All right.

20       MR. KENNEDY:  Let's move on to 9429-060.

21  BY MR. KENNEDY:

22  Q    What is shown here, sir?

23  A    That's -- looks like Alfredo Cabael.

24  Q    All right.

25       MR. KENNEDY:  At this time I'd move 9429-060 into

1    evidence.

2              THE COURT:  Any objection?

3              MR. NAMMAR:  No objection.

4              THE COURT:  9429-60 then is admitted without

5    objection, and you may publish.

6              (Exhibit 9429-60 received in evidence.)

7    BY MR. KENNEDY:

8    Q    And this was just you while you're working on the project

9    that a photograph was taken, correct?

10   A    Yes.

11   Q    And if we finish up this 9249-061.

12        Is this another meeting that happens among many meetings

13   during the time that you were in this process?

14   A    Oh, I can't say if that's the same meeting that day or

15   that's another day.  I can't say, but it look like a meeting,

16   yes.

17   Q    All right.

18             MR. KENNEDY:  At this time I would move 9429-061 into

19   evidence.

20             THE COURT:  Any objection?

21             MR. NAMMAR:  No objection.

22             MR. KENNEDY:  And may we publish?

23             THE COURT:  You may.

24             That exhibit is admitted, 9429-61.

25             (Exhibit 9429-61 received in evidence.)

1   BY MR. KENNEDY:

2   Q    And, sir, do you recognize this individual over here in

3   the blue?

4   A    I do not.

5   Q    All right.  If you don't recognize him, I won't ask any

6   questions.

7            MR. KENNEDY:  This is a good time, Your Honor.

8            THE COURT:  All right.  As we go to break for the

9   first time this trial day, I'll remind our jurors to please

10  refrain from discussing the substance of this case with anyone,

11  including each other, until I advise you otherwise.  Do not

12  also access any media or other accounts of this case that may

13  be out there.  And finally, please do not conduct any

14  independent investigation into the facts, circumstances, or

15  persons involved.

16           So let's take about a 15- or 20-minute break, and we

17  will resume with the cross of Mr. Cabael at that time.

18           COURTROOM MANAGER:  All rise for the jury.

19           (The jury was excused at 10:31 a.m.)

20           (The proceedings recessed at 10:32 a.m. until

21  10:56 a.m.)

22           (Open court in the presence of the jury.)

23           THE COURT:  All right.  Back from our first break of

24  the trial day.  Mr. Kennedy, you may resume your cross when

25  you're ready.

1                MR. KENNEDY:  Thank you, Your Honor.

2    BY MR. KENNEDY:

3    Q    Sir, you testified yesterday about how you were involved

4    with the purchases of Vikane and chloropicrin for Kama'aina

5    Termite and Pest Control.

6    A    Yes.

7    Q    All right.  So I want to show you some documents.

8         Univar was the seller to you, correct?

9    A    That is correct.

10   Q    All right.

11               MR. KENNEDY:  So if we can pull up just for the

12   witness to go through these.

13               It's in the 23rd supplemental exhibit, and we'll

14   start with 9429-002, Your Honor.  And then in this set we're

15   going to go through 9429-019.

16               THE COURT:  Okay.  Go ahead.

17               MR. KENNEDY:  If we can show the witness 9429-002.

18   BY MR. KENNEDY:

19   Q    Sir, do you recognize what's been marked as 9429-002?

20   A    (Reviews document.)  I do recognize this, yes.

21   Q    All right.  And if I can blow up just this area so it's a

22   little larger for you, sir.  Let me get rid of that.

23        Do you see that Mr. Miske, yourself, and a Sheryl Garcia

24   are on the invoice?

25   A    I see that, yes.

1   Q    Okay.  And if we pull back from it.

2        You would be receiving both Vikane and chloropicrin from

3   Univar, correct?

4   A    That's what it shows here, correct.

5   Q    All right.  So let's just move through these as a group,

6   and then I'll go back and ask you some questions about it

7   specifically, okay?

8   A    Okay.

9   Q    So if we can move to 9429-003.

10       And let me know when you're done just taking a look at

11  9429-00 --

12  A    Okay.

13  Q    Let's move on to 9429-004.

14  A    All right.

15  Q    9429-005.

16  A    Okay.

17  Q    9429-006.

18  A    Okay.

19  Q    9429-007.

20  A    All right.

21  Q    9429-008.

22  A    Okay.

23  Q    9429-009.

24  A    Okay.

25  Q    9429-010.

```
 1   A    Okay.

 2   Q    9429-011.

 3   A    Okay.

 4   Q    9429-012.

 5   A    All right.

 6   Q    9429-013.

 7   A    Okay.

 8   Q    9429-014.

 9   A    Okay.

10   Q    9429-016.

11   A    Okay.

12   Q    9429-017.

13            THE COURT:  In case it matters to you, counsel, you

14   skipped 015.

15            MR. KENNEDY:  I did, Your Honor, just because it was

16   a duplicate, so I pulled it out.

17            THE COURT:  All right.

18   A    Okay.

19   BY MR. KENNEDY:

20   Q    9429-018.

21   A    Okay.

22   Q    And 9429-019.

23   A    All right.

24   Q    Sir, are these all invoices regarding purchases from

25   Univar of Vikane and chloropicrin between January of 2011 and
```

1   April of 2011?

2   A    Looks like it, yes.

3        MR. KENNEDY:  All right.  At this time I would move

4   9429-002 all the way through 9429-014, and then pick up at

5   9429-016 through 9429-019.

6        THE COURT:  Any objection?

7        MR. KENNEDY:  No objection.

8        THE COURT:  Without objection those 17 exhibits are

9   each admitted.  That's 9429-2 through 9429-14 and 9429-16

10  through 9429-19.

11       (Exhibits 9429-2 through 9429-14 and Exhibits 9429-16

12  through 9429-19 received in evidence.)

13       MR. KENNEDY:  And may we publish at this time, Your

14  Honor?

15       THE COURT:  You may.

16       MR. KENNEDY:  All right.  So let's pull up 9429-002.

17  BY MR. KENNEDY:

18  Q    So, now, these are invoices, right?

19  A    That's what it looks like, yes.

20  Q    From Univar to Kama'aina Termite and Pest Control,

21  correct?

22  A    Yes.

23  Q    Purchasing Vikar [verbatim], yes?

24  A    Purchasing -- I'm sorry?

25  Q    Vikane.  I misspoke.

1    A    Vikane, correct.

2    Q    And chloropicrin?

3    A    Yes.

4    Q    And some assorted other items as well, correct?

5    A    Correct.

6    Q    All right.  Now, do you -- in terms of the purchases for

7    Kama'aina Termite and Pest Control, the company was doing a lot

8    of fumigation work on Hawaii, correct?

9    A    We were doing a lot, correct.

10   Q    And so with respect to these purchases, did you notice

11   that there is no charge for Vikane or chloropicrin?

12   A    Yeah.

13   Q    All right.  And so if we move through this, because of the

14   volume that you were doing, there was a deal reached that

15   chloropicrin was being sold for free to Kama'aina Termite and

16   Pest Control, correct?

17   A    I can't say if it was being sold for free.  Looks like

18   everything was free.

19   Q    In -- including Vikane as well, right?

20   A    Yeah.

21   Q    So with respect to chloropicrin, it was at no cost on this

22   invoice, correct?

23   A    On that invoice, correct.

24   Q    And the Vikane is at no cost, right?

25   A    Correct.

1   Q    All right.  So let's move back and take a look.  This

2   is -- it's a kind of a small form.  So if we can blow up that

3   area, and let me get rid of my --

4        So this invoice is on the 5th of January 2011, when you

5   were working at Kama'aina Termite and Pest Control, correct?

6   A    Correct.

7   Q    And the ship date is on January 5th of the -- 2011,

8   correct?

9   A    Yes.

10  Q    All right.

11            MR. KENNEDY:  If we could move away from that.  Let's

12  move to 9429-003.

13  BY MR. KENNEDY:

14  Q    Do you see that once again, on the next week, January 12th

15  of 2011, both chloropicrin and Vikane is being provided free of

16  charge from Univar?

17  A    That's what it seems, yes.

18  Q    So there's no cost savings at all in terms of

19  chloropicrin, correct?

20  A    I can't say.  I can't say if they saved money or got

21  charged on another invoice or what the deal was.

22  Q    Well, if we move forward, 9429-004.  We've now moved up to

23  January 24th of 2011.

24       Do you see once again there's no charge for chloropicrin

25  or Vikane?

1   A     For anything, yes.

2   Q     Okay.  That takes us through the month of January of 2011.

3   Let's move to 9429-005.

4         See, once again, the Vikane and the chloropicrin is being

5   provided at no cost, along with other items, correct?

6   A     That's what it seems like, correct.

7   Q     All right.  Let's move to 9429-006.

8         That's February 8th of 2011, correct?

9   A     Yes.  It says that, yes.

10  Q     Once -- once again, both Vikane and chloropicrin is being

11  provided at no cost by Univar?

12         MR. NAMMAR:  Objection to counsel testifying.

13  There's no foundation for this.

14         THE COURT:  Overruled.  Go ahead.

15  A     Seems like it.

16  BY MR. KENNEDY:

17  Q     All right.  Let's move to 9429-007.

18         Now, we've looked at February 3rd, February 8th.  Now

19  we're at February 16th of 2011.  Do you see that once again

20  Vikane, chloropicrin, no cost?

21  A     For anything.

22  Q     Okay.  Let's move on to 9429-008.

23         Do you see that that is on February 22nd of 2011?

24  A     Yes.

25  Q     Once again, no charges for Vikane, chloropicrin, correct?

1   A   Or anything.

2   Q   Or anything.

3       So we've moved through the month of February.  There's no

4   cost to the chloropicrin that you're receiving, correct?

5   A   What it shows here, yes.

6   Q   All right.  Let's move on to 9429-009.

7       See this is a March 2nd of 2011?

8   A   Okay.

9   Q   Once again, no charges, right?

10  A   No charges for anything.

11  Q   9429-010, March 7th, once again, no charges, Vikane,

12  chloropicrin, and other items?

13  A   Yes, for nothing.

14  Q   9429-011, on March 14th, 2011, do you see that?

15  A   I see that.

16  Q   No charge for Vikane, chloropicrin, or any other item?

17  A   Yes.  Correct.

18  Q   All right.  9429-012, on March 23rd.  Once again, no cost

19  for Vikane, chloropicrin, or other items?

20  A   Correct.

21  Q   So there's no cost savings at all on this chloropicrin

22  that you're receiving.  You're getting it at no cost, correct?

23  A   For chloropicrin, Vikane, and everything.  That's

24  pretty -- that's a pretty good deal, not charging for Vikane.

25  Q   All right.  9429-013, March 28th of 2011.

1   A   Okay.

2   Q   Do you see that once again there's no charge for Vikane,

3   chloropicrin, or other items, correct?

4   A   Yeah.

5   Q   Moving on to 9429-014, April 1st, 2011, no cost, correct?

6   A   No cost for all the same stuff, yeah.

7   Q   9429-016, now we're on April 8th.  Still no cost, Vikane,

8   chloropicrin, or the other items?

9   A   Yeah.

10  Q   9429-017, April 15th, at 2011, no cost for Vikane,

11  chloropicrin, or the other items?

12  A   Correct.

13  Q   9429-018, April 21st, 2011, no cost for Vikane,

14  chloropicrin, and the other items, correct?

15  A   Correct.

16  Q   9429-019, this is April 26th of 2011.  No cost for Vikane,

17  chloropicrin, or the other items, correct?

18  A   For nothing, yeah.

19  Q   All right.  So if we go back to Kealoa [verbatim] Lai,

20  that was in September of 2010, right?

21  A   I -- I don't know what exact date it was, but, yeah, okay.

22  Q   There was a lot of Vikane that was used at that 44-story

23  building, correct?

24  A   There was a lot, yes.

25  Q   The next month, Poinciana in Kailua, you said, was a big

1    job as well, correct?

2    A    It was a very big job, yes.

3    Q    That was in October of 2010.  Once again, a lot of Vikane

4    was needed for that job, correct?

5    A    Yes.

6    Q    So after those large jobs, the chloropicrin and the Vikane

7    was provided at no cost due to the volume that you were

8    receiving, correct?

9    A    I can't say if it was at no cost.

10   Q    All right.

11   A    It shows it here, but the Vikane isn't free either.  So

12   there's another something somewhere to be paid for something.

13   Q    Well, let's take a look.  Let's move to -- I want to show

14   you another group of documents, which we'll pick up on May 2nd

15   of 2011.

16           MR. KENNEDY:  So if -- this is just for the witness,

17   9429-020.  And I'm going to move through these, Your Honor,

18   through the time period of 9429-047, which is also in the 23rd

19   supplemental exhibit.

20           THE COURT:  Yes.  Go ahead.

21   BY MR. KENNEDY:

22   Q    All right.  Sir, just I'm going to move through these, if

23   you -- just let me know when we can switch to the next

24   document.

25   A    (Reviews document.)  Okay.

1  Q    All right.  9429-021.

2  A    Okay.

3  Q    9429-022.

4  A    Okay.

5  Q    9429-023.

6  A    Okay.

7  Q    949 -- 9429-024.

8  A    Okay.

9  Q    9429-025.

10  A    Okay.

11        MR. KENNEDY:  All right.  At this time, Your Honor,

12  I'd move 9429-020, 9429-025 into evidence.

13  BY MR. KENNEDY:

14  Q    These are invoices, sir, from Univar for Vikane,

15  chloropicrin, and other items, correct?

16  A    Same items over and over, but I know we purchased more

17  than that.  But whatevers, yes, same items, correct.

18        THE COURT:  Just those two exhibits or did you mean

19  020 to through 025?

20        MR. KENNEDY:  Through 025, Your Honor.

21        THE COURT:  So those six exhibits?

22        MR. KENNEDY:  Yes, at this time.

23        THE COURT:  Any objection?

24        MR. NAMMAR:  There's no foundation.

25        THE COURT:  Objection's overruled.  9429-20 through

1    9429-25 is admitted -- are admitted, excuse me, and you may

2    publish.

3                (Exhibits 9429-20 through 9429-25 received in

4    evidence.)

5                MR. KENNEDY:  All right.

6                If we go to 9429-020 and publish.

7    BY MR. KENNEDY:

8    Q    Do you see, sir, that now you're paying for --

9                MR. KENNEDY:  If we can blow up just that area there

10   (indicates).  And let me get rid of that for the jury.

11   BY MR. KENNEDY:

12   Q    The Vikane is now being charged (indicates)?

13   A    I see that, yes.

14   Q    All right.  But the chloropicrin is waived (indicates).

15   No charge for the chloropicrin, correct?

16   A    The one you lined is not for chloropicrin.  That's return

17   of the sender.  But the one below that is chloropicrin, yes.

18   Q    All right.  And so it's a zero charge?

19   A    That's what it looks like, yes.

20   Q    And the other items are still being provided at no cost?

21   A    Correct.

22   Q    So the chloropicrin is no cost on this for May 2nd of

23   2011?

24   A    Yes.

25   Q    So there's no cost savings at all on chloropicrin,

1   correct?

2   A     On that invoice.

3   Q     All right.  If I move away from that, if we move to

4   9429-021.

5         Now we're at May 16th of 2011.

6   A     Okay.

7   Q     And is there -- in terms of clearing -- once again, if we

8   just blow up this area (indicates).

9         Vikane is being charged out, but no charge for

10  chloropicrin, correct?

11  A     Correct.

12  Q     And you're receiving quantities ordered, quantities

13  shipped, billing unit, but not -- at no cost?

14  A     Yep.

15  Q     All right.

16        MR. KENNEDY:  Let's move on to 9429-022.

17  BY MR. KENNEDY:

18  Q     This is now May 23rd, correct?

19  A     It is.

20  Q     Same Vikane being charged, chloropicrin quantity that you

21  ordered being provided for free?

22  A     With everything else, yes.

23  Q     9429-023.  This is now June 1st of 2011.

24        Same situation.  Vikane being charged, chloropicrin for

25  free?

1   A      Correct.

2   Q      9429-024.  Paying for Vikane, chloropicrin for free?

3   A      Correct.

4   Q      And 9429-025.  Once again, is Vikane being charged,

5   chloropicrin and the other items for free?

6   A      Correct.

7   Q      All right.

8           MR. KENNEDY:  Now, if we move to 9429-026 and just

9   show the witness these, let's move through the remainder of

10  these.

11  BY MR. KENNEDY:

12  Q      And just let me know when you're ready.

13  A      I'm ready.

14  Q      All right.  There's 9429-026, another order on June 23rd?

15  A      Yes.

16  Q      Of 2011?

17  A      Correct.

18           MR. KENNEDY:  All right.  At this time I'd move

19  9429-026 into evidence, Your Honor.

20           THE COURT:  Okay.  Any objection?

21           MR. NAMMAR:  No objection.

22           THE COURT:  This one exhibit is admitted then without

23  objection, 9429-26.

24           (Exhibit 9429-26 received in evidence.)

25           MR. KENNEDY:  Okay.

1          THE COURT:  You may publish.

2          MR. KENNEDY:  Thank you, Your Honor.

3    BY MR. KENNEDY:

4    Q    So this one is a little different in that what is being

5    ordered here -- if we blow that up -- is a chloropicrin pan

6    with pad?

7    A    Correct.

8    Q    Can you explain what a chloropicrin pan -- pan with pad

9    is, sir, to the jury?

10   A    It is where you would pour the chloropicrin, the amount

11   required to put, you pour that into that pan and pad, and you

12   place that strategically in the house or in the structure.

13   Q    All right.  Now, if we clear that.

14        And I want to show you a series of exhibits.  That one

15   will begin with 9426-026, which we just looked at.

16        Then on that same date, let's look at 9429-027.  And just

17   let me know when you're ready to move on, sir.

18   A    Okay.

19   Q    9429-028.

20   A    Okay.

21   Q    9429-029.

22   A    Okay.

23   Q    9429-030.

24   A    Okay.

25   Q    9429-031.

```
 1   A    Okay.

 2   Q    9429-032.

 3   A    Yeah.

 4   Q    9429-033?

 5   A    Yeah.

 6   Q    9429-034.

 7   A    Yep.

 8   Q    9429-035.

 9   A    Try go back to 034.

10   Q    Sure.

11   A    Okay.  Three-five now.

12   Q    9429-035.

13   A    Yes.

14   Q    9429-036.

15   A    Go ahead.

16   Q    9429-037.

17   A    Okay.

18   Q    9429-038.

19   A    Okay.

20   Q    9429-039.

21   A    Okay.

22   Q    9429-040.

23   A    Okay.

24   Q    9429-041.

25   A    Okay.
```

```
 1   Q     9429-042.

 2   A     Okay.

 3   Q     9429-043.

 4   A     All right.

 5   Q     9429-044.

 6   A     Okay.

 7   Q     9429-045.

 8   A     Okay.

 9   Q     9429-046.

10   A     Okay.

11   Q     And 9429-047.

12   A     Okay.

13   Q     All right.

14         MR. KENNEDY:  At this time, Your Honor, I would move

15   9429-027 through 9429-047.

16         THE COURT:  Any objection?

17         MR. NAMMAR:  They're not relevant.

18         THE COURT:  Objection's overruled.  Those 21 exhibits

19   shall each be received and admitted.  That's 9429, dash, 27

20   through 47.

21         (Exhibits 9429-27 through 9429-47 received in

22   evidence.)

23         THE COURT:  You may publish.

24         MR. KENNEDY:  All right.  If we've got 9429-027 up,

25   we're now at June 23rd of 2011.  And if we blow up this area
```

1   for the jury (indicates).

2   BY MR. KENNEDY:

3   Q    At that point we're continuing to pay for the Vikane, but

4   the chloropicrin is still being provided free of charge?

5   A    Okay.

6   Q    So there's no cost to it, to Kama'aina Termite and Pest

7   Control?

8   A    Okay.

9   Q    All right.  Now, if we move through 9428, June 30th, same

10  situation:  Vikane charged, chloropicrin no cost?

11  A    Correct.

12  Q    9429, beginning July 11, 2011, Vikane charged, no charge

13  for chloropicrin, correct?

14  A    Correct.

15  Q    9429-030, July 18, 2011, Vikane is charged, no cost for

16  chloropicrin?

17  A    Correct.

18  Q    9429-031, July 29th, Vikane charged $14,100; chloropicrin

19  free, zero.

20  A    Okay.

21  Q    No cost at all for that month as well.

22       All right.  Let's move on to August, 9429-032.  Vikane

23  charged $14,100.  Chloropicrin is provided at no cost, correct?

24  A    Correct.

25  Q    9429-033, August 15th, same situation:  Vikane charged

1   $14,100; chloropicrin and other items, no cost?

2   A    Correct.

3   Q    9429-034, August 19th, same situation:  Vikane charged, no

4   charge for chloropicrin?

5   A    Correct.

6   Q    Now moving on to 9429-035.  Vikane charged, no cost for

7   chloropicrin in the entire month of August of 2011, correct?

8   A    Correct.

9   Q    Moving on to September, 9429-036, 9429-037, 9429-038, and

10  9429-039, that entire month, Vikane charged, no cost for

11  chloropicrin?

12  A    Correct.

13  Q    Let's move on to 9429-040, 9429-041, 9429-042.

14  October 7th, the 18th, and the 26th, Vikane is being charged,

15  no charge for chloropicrin, right?

16  A    Correct.

17  Q    So you're getting chloropicrin at no charge.  There's no

18  cost savings at all.  It's not costing a dime to use, correct?

19  A    Correct.

20  Q    9429-043, November 10th, Vikane being charged,

21  chloropicrin for free.

22       9429-044, November 17th, Vikane charged, no charge for

23  chloropicrin.

24       9429-045, December 2nd, 2011, 9429-046 and 9429-047, the

25  2nd, the 12th, and the 21st of December, correct?

1    A    Correct.

2    Q    So in 2011, the entire year, chloropicrin is being

3    provided with no cost, and there's no cost at all, correct?

4    A    Yeah.

5    Q    Let's move to 9429-053, in 2014 again.

6         Now there is a charge for chloropicrin, correct?

7    A    Seems like it, correct.

8    Q    All right.

9         MR. KENNEDY:  At this time I'd move 9429-053 into

10   evidence.

11        MR. NAMMAR:  No foundation.

12        THE COURT:  The objection is overruled.  Go ahead.

13        This exhibit is admitted, 9429-53.

14        (Exhibit 9429-53 received in evidence.)

15        THE COURT:  You may publish.

16   BY MR. KENNEDY:

17   Q    And this is now, in 2014, after a year of receiving

18   because of the volume of Vikane chloropicrin for free to use at

19   no cost, correct?

20   A    This is a year after?

21   Q    This would be in 2014, correct?

22   A    2011 to 2014, right?

23   Q    Yeah.  So at this point, now, you're being billed for

24   chloropicrin at this point.

25   A    Maybe 2012 or '13 too.  I can't say.

1   Q    Okay.  Let's take a look at 9429-052.

2            MR. KENNEDY:  Just for the witness.

3   A    Okay.  So no charge.

4   BY MR. KENNEDY:

5   Q    9429-051 and 9429-049.

6   A    Okay.

7   Q    Are those invoices from Univar to Kama'aina Termite and

8   Pest Control?

9   A    Yes.

10           MR. KENNEDY:  At this time I'd move 9429-049,

11  9429-051, and 9429-052 into evidence.

12           THE COURT:  Any objection?

13           MR. NAMMAR:  No objection.

14           THE COURT:  Those three exhibits then are admitted

15  without objection, 9429-49, dash-51, and dash-52.

16           (Exhibits 9429-49 through 9429-52 received in

17  evidence.)

18           MR. KENNEDY:  So if we pull up 9429-049 for the jury.

19           In 2013, this looks like July 3rd of -- let me blow

20  this up and so I can see it.

21           MS. KING:  That's 48.

22           MR. KENNEDY:  Oh, it's 48?

23           Your Honor, at this time, since they've pulled it up,

24  I would just show 9429-048 to the witness.

25           THE COURT:  Yes.  Go ahead.

1   BY MR. KENNEDY:

2   Q    Is that a February 2nd, 2012 invoice?

3   A    It is.

4   Q    All right.

5            MR. KENNEDY:  At this time I'd move 9429-048 into

6   evidence.

7            THE COURT:  All right.  Any objection?

8            MR. NAMMAR:  No objection.

9            MR. KENNEDY:  All right.  If we can publish that?

10           THE COURT:  Yes, you may.

11           That exhibit is admitted, 9429-48.

12           (Exhibit 9429-48 received in evidence.)

13           THE COURT:  You may publish.

14           MR. KENNEDY:  All right.

15  BY MR. KENNEDY:

16  Q    So now, after the year --

17           MR. KENNEDY:  If we blow up this invoice and so we

18  can see it.

19  BY MR. KENNEDY:

20  Q    The chloropicrin measuring cup and the chloropicrin pan

21  with pad that we talked about, those are being charged, right?

22  A    Yes.

23  Q    All right.  If we move to 9429-049 --

24           MS. PANAGAKOS:  (Confers off the record.)

25           MR. KENNEDY:  I'm sorry?

1          MS. PANAGAKOS:  49 is a duplicate.

2          MR. KENNEDY:  Oh.

3          Let's move to 9429-051.  All right.

4   BY MR. KENNEDY:

5   Q    Are we now in January 17th of 2013?

6   A    We are.

7   Q    Okay.  And in this document, this is an example of in 2013

8   when the volume of Vikane, being charged for it, but once again

9   in 2013 the chloropicrin is being provided at no cost, correct?

10  A    Correct.

11  Q    All right.  Let's move to 9429-052.  We're still in

12  January.  Same situation:  Vikane being charged, chloropicrin

13  being provided at no cost?

14  A    Correct.

15  Q    All right.  So during this time period there were -- at

16  least all of 2011 and examples in 2013, and I believe also '14,

17  where Vikane is being charged, but chloropicrin is being

18  provided at no cost, right?

19  A    Yeah, for the ones you showed, correct.

20  Q    And so there is absolutely zero cost savings with respect

21  to chloropicrin during that time because it's being provided

22  for free, correct?

23  A    Yeah, correct.

24  Q    All right.  Now, let's move on to something different.

25  The other day when you were testifying, you talked about

1    payments by check and payments by cash, correct?

2    A    For what?

3    Q    In terms of your work at Kama'aina Termite and Pest

4    Control, for one, correct?

5    A    For my work.

6    Q    And also you mentioned that you were doing many other

7    things.  You were involved with the Lumahai project that was

8    dirt and -- and the initial construction, correct?

9    A    Yes.

10   Q    You were also involved with Mr. Miske's fishing vessel,

11   the RACHEL, correct?

12   A    Correct.

13   Q    You were asked some questions about when he purchased the

14   nightclub that had been Oceans 808, and then it became The

15   Standard and then the M, correct?

16   A    We didn't talk about The Standard, but yes.

17   Q    All right.

18   A    We talked about the purchase of the nightclub.

19   Q    And so there were other areas that you are assisting

20   Mr. Miske in other than Kama'aina Termite and Pest Control,

21   correct?

22   A    And more areas than you mentioned just now too.

23   Q    All right.  So let's take a look at what was admitted the

24   other day, Exhibit 9-134.

25              MR. KENNEDY:  Which I believe was in the government's

1   original list, Your Honor.

2            THE COURT:  Go ahead.

3            MR. KENNEDY:  Okay.

4   BY MR. KENNEDY:

5   Q    So this was an example in --

6            MR. KENNEDY:  And could we publish 9-134?

7            THE COURT:  Yes.

8   BY MR. KENNEDY:

9   Q    Now, you talked about overtime and this idea that folks

10  couldn't work overtime unless -- that would affect medical

11  insurance.  Do you recall that?

12  A    Yes.

13  Q    Okay.  So this was a week of -- it looks like April 12th,

14  2009 to April 18th of 2009.  And we looked at that the other

15  day, correct?

16  A    I can't say if it was this one particular, but we looked

17  at something.

18  Q    All right.  Let's move to the second page.  This is

19  probably a little easier to remember.  There were a number of

20  hours listed here, right?

21  A    Correct.

22  Q    And you're on salary, correct?

23  A    Correct.

24  Q    And others are on salary, and other people are on hours?

25  A    As it says on this list, correct.

1   Q    All right.  So, now, what we didn't look at was the third

2   through the sixth page.  So let's take a look at that.

3       Do you see here for this first individual (indicates) that

4   withholdings are being made for medical (indicates)?

5   A    I -- I would think so.  I don't know what -- what "med"

6   means, if that's medical or something else.

7   Q    All right.  And do you see that everyone on this list,

8   looks like there's Social Security withholdings, there's

9   medical withholdings, and there's other withholdings coming out

10  of the check?

11  A    Yeah.

12  Q    All right.  So, now, if we -- let's take a look.  You're

13  on salary, right?  (Indicates.)

14  A    Mm-hmm.

15  Q    So let's just take a look at that.

16      On yours, you're getting paid $700, right?

17  A    Correct.

18  Q    And so that's $700 by check, right?

19  A    Check and cash.

20  Q    Well, you have a $700 here.  There's withholding amounts

21  here, correct?

22  A    There is an amount there, yes.

23  Q    All right.  And then there's a net that you're being paid,

24  right?

25  A    Correct.

1   Q     And that net is coming from a check, is it not?

2   A     Well, that 700, yes.

3   Q     And so your rate of pay, your salary was 700, right?

4   A     I -- I would have to say yes.

5   Q     And that was a check with withholdings, that then you'd

6   get a check for $593.39?

7   A     After -- after the withholdings, yes.

8   Q     All right.  Do you see also you're provided something for

9   med; which for $10.15 the employer is also providing a

10  contribution to provide medical insurance, correct?

11  A     I never had medical insurance at Kama'aina.

12  Q     You're getting a withholding there, correct?

13  A     It looks like every single employee's have different

14  amounts there.  So if you have a medical business or provider,

15  I think it would somewhat be similar, not random numbers there.

16  Q     Okay.

17  A     One dollar out of our -- one person, that's -- that's real

18  cheap medical insurance if you ask me.

19  Q     Well, it's your contribution.  The employer has to

20  provide, did you understand that, additional contribution?

21  A     I don't understand how payroll works, but I can tell you

22  right now I did not have medical insurance.

23         MR. KENNEDY:  All right.  Let's clear that.

24  BY MR. KENNEDY:

25  Q     And if you'll look on the names that are on this page,

1   there's a "med" listed for each individual on the exhibit that

2   was introduced, 9, dash, 131, and I believe we're still on

3   page 3, correct?

4   A    I'm not sure what page you are, but, yeah, I see -- I see

5   names there, the same names.  Maybe a different date.  I don't

6   know.  I didn't recognize the dates.

7   Q    It's really -- it's really small in the -- so let's just

8   move to the next page.

9        You recognize the names of the folks over there as --

10  A    No, not those different names.

11  Q    -- folks that you work with?

12  A    Yes.  I do recognize them.

13  Q    All right.  And you see each individual in their payroll

14  has at least a "med" entry on the Government Exhibit 9-134?

15  A    I do see that.

16  Q    All right.  Let's move to the next page.

17       Do you recognize the names of the folks on the next page,

18  which would be the -- I believe it's the fifth?

19  A    I do recognize them, yes.

20  Q    All right.  And each individual has something listed in

21  terms of med?

22  A    Each one, yes.

23  Q    Okay.  And let's just move to the last page.

24       And once again, each individual has an entry for med with

25  "SS" that I -- I would assume that would be Social Security.

1    Is that your understanding?

2    A    I -- like I said, I don't know how payroll works or how

3    paychecks are -- how -- how to tell what these initials or

4    whatever it is is.

5    Q    Okay.  All right.  Well, we'll take that down.

6         Now, we saw that there was a $700 figure for you and a net

7    amount of 593.  Do you recall that?

8    A    I -- I recall that, yes.

9    Q    Okay.  So let's take a look at Exhibit 9429.

10        MR. KENNEDY:  Just for the witness.

11   BY MR. KENNEDY:

12   Q    Were you working at -- and that, what we were looking at,

13   was in 2019, before, correct?

14   A    I believe so, yes.

15   Q    All right.

16        MR. KENNEDY:  So let's pull up just for the witness

17   9429-115.

18   A    Wait.  Sorry.  It was 2009.  Not 2019, right?

19   BY MR. KENNEDY:

20   Q    2009, yes.

21   A    Okay.

22   Q    If I said 2019, that's my mistake, sir.

23   A    Yeah, I'm sorry.  2009.

24   Q    Oh, yes.

25        MR. KENNEDY:  So moving to 9429-115, which is in the

1    24th supplemental, Your Honor.

2              THE COURT:  Okay.  Go ahead.

3    BY MR. KENNEDY:

4    Q    Sir, there is about 44 pages here, so I'm just going to

5    flip through them with you.

6    A    Okay.

7    Q    And just let me know when you're ready to flip through the

8    pages, and then we'll get --

9    A    You can just go ahead and flip through them.

10   Q    Okay.  And just --

11   A    (Reviews document.)

12   Q    Sir, now that we're back on the first page, did you

13   recognize what has been marked as 9429-115?

14   A    I do.

15   Q    Are those checks that were provided to you in the year of

16   2010?

17   A    Correct.

18              MR. KENNEDY:  All right.  At this time, Your Honor, I

19   would move to admit 9429-115.

20              THE COURT:  Any objection?

21              MR. NAMMAR:  No objection.

22              THE COURT:  That exhibit then is admitted, 9429-115.

23              (Exhibit 9429-115 received in evidence.)

24              THE COURT:  You may publish.

25   BY MR. KENNEDY:

1    Q    All right, sir, if we could publish that.

2         If we start, it looks like the first entry is on

3    January 15th of 2010.

4    A    Yes.

5    Q    All right.  This is a pay period of January 3rd of 2010 to

6    January 9th of 2010, correct?

7    A    Correct.

8    Q    The amount is 591.42 and it's by a check?

9    A    Yes.

10   Q    And you were at that time, I believe you said, were making

11   700, right around that figure?

12   A    That's what it showed, yes.

13   Q    And so once the withholdings are out, you're receiving a

14   check, correct?

15   A    Yes.

16   Q    All right.  Let's move on to the next page.

17        This would be for the next pay period, correct?

18   A    That's what this shows, yes.

19   Q    591.42, correct?

20   A    Correct.

21   Q    By check?

22   A    Yes.

23   Q    Move to the next pay period.

24        591, dash, 42 by check, right?

25   A    Correct.

1  Q    Next pay period, 591, dash, 42 by check, right?

2  A    Yes.

3  Q    Next pay period, 591, dash, 42 -- point-42 by check?

4  A    Yes.

5  Q    From your $700 salary, correct?

6       591.42 by check?

7  A    Mm-hmm, yes.

8  Q    Moving on to the next pay period, March 28th through

9  April 3rd, 591.42 by check?

10 A    Yes.

11 Q    Next pay period, 591, dash -- point-42 by check, right?

12 A    Yes.

13 Q    Next pay period, 591.42 by check?

14 A    Yes.

15 Q    And as we flip through.

16 A    (Reviews documents.)

17 Q    We've moved from May of 2010 all the way to December of

18 2010, the pay period 12/12/2010 to looks like 12/18/2010.  And

19 every one of those was a check for -- in the amount of 591 and

20 some change, correct?

21 A    Yes.

22 Q    And so that was the payment for the $700 that you

23 received, correct?

24 A    Correct.

25 Q    All right.  Now, I understand these other things that you

1   were doing for Mr. Miske, you also got cash for his personal

2   business, correct?

3               MR. NAMMAR:  Misstates the testimony.

4               THE COURT:  Overruled.  Go ahead.  You can answer.

5               THE WITNESS:  What's the question?

6   BY MR. KENNEDY:

7   Q    I understand that you were paid cash for some of the

8   things you were doing for his personal business?

9   A    It was never a separation of me working at a club, me

10  working at the boat, me working at Termite, me working on any

11  projects in particular.  It was one check for one job and cash

12  for my job.

13  Q    And so from Kama'aina Termite and Pest Control, we've just

14  seen checks covering your salary for the entire year, correct?

15  A    Yes, you did.

16  Q    All right.

17              MR. KENNEDY:  Let's move on to 9429-116.  Let's flip

18  through.

19  BY MR. KENNEDY:

20  Q    Is this beginning with the pay period beginning in 2011?

21  A    Yes.

22  Q    All right.

23  A    (Reviews documents.)

24  Q    Do you recognize 9429-116 as Kama'aina Termite and Pest

25  Control checks to you for your salary in 2011?

 1   A     For January 2011, yes.

 2              MR. KENNEDY:  All right.  At this time I'd move

 3   9429-116 into evidence, Your Honor.

 4              THE COURT:  Any objection?

 5              MR. NAMMAR:  No objection.

 6              THE COURT:  9429-116 then is admitted without

 7   objection.

 8              (Exhibit 9429-116 received in evidence.)

 9              THE COURT:  May publish.

10   BY MR. KENNEDY:

11   Q     Now, sir, during this time period the pay is 599.59 for

12   this check, correct?

13   A     Correct.

14   Q     And as we flipped through these, each one represents

15   payments on your salary during the year of 2011 by check?

16   A     Yes.  (Reviews documents.)

17        It changed right there.  What is that, every two weeks

18   now?

19   Q     It looks like, if we look at the pay period, 9/25 to

20   October 8th.  I believe you're correct.

21        And so now there is a larger figure, 1199 and some change,

22   correct?

23   A     Correct.

24   Q     And that's just the only thing that's happened is you're

25   still receiving a check, but it's a two-week pay period?

1  A    Okay.

2  Q    All right.

3  A    (Reviews documents.)

4       Is that a month?  What was that?

5       What was that check for?

6  Q    It looks like a pay period from time to time with --

7  A    From 11/16 to 11/16?

8  Q    Correct.  Would you have received -- it looks like it was

9  deposited in the First Hawaiian Bank.

10      From time to time I believe you said that with Kealoa

11  [verbatim] Lai you got a bonus or extra monies for that job,

12  right?

13 A    Was that during Keola Lai?

14 Q    No.  I was -- just asked the question, during that time

15 period, did you receive extra monies because of the

16 complications of that job and your performance on the job?

17 A    I -- I can't say exactly what I was doing on the week of

18 11/16/2011.

19 Q    That's why I'm asking you about your testimony yesterday.

20 I believe you said that you were paid additional amounts.

21 A    Well, I -- I did get -- I'm sorry for cutting you off,

22 sir.  I did get a bonus check for Keola Lai, yes.

23 Q    Okay.  So it could be that this is a time period that

24 we're -- in 2011 where you could have gotten a bonus check as

25 well, correct?

1  A    I can't say.  I don't remember.

2  Q    Okay.  It's a long time ago.

3  A    It was.

4  Q    The main thing is you got a check, right?  Not cash,

5  correct?

6  A    Yes.

7  Q    All right.

8         MR. KENNEDY:  Let's take a look at 9429-101, just for

9  the witness.  And if we can spin it so that --

10  BY MR. KENNEDY:

11  Q    Are you familiar with this type of document in relation to

12  folks who are receiving medical care, in terms of medical

13  insurance through Kama'aina Termite and Pest Control?

14  A    I've never seen that before, no.

15  Q    Okay.  Let's move on to then 9429-100.

16       Do you recognize 9429-100?

17  A    No.

18  Q    You see it is a member enrollment form?  You don't

19  recognize it at all?

20  A    No.

21  Q    All right.  Let's move on.  Okay.

22       Now, you talked about the Waikiki Shell fumigation

23  yesterday, correct?

24  A    We did.

25  Q    You worked on the Waikiki Shell fumigation, correct?

1    A    I did.

2    Q    There was a licensed applicator on the job, right?

3    A    I believe so, yes.

4    Q    Jason Smith, correct?

5    A    I can't say if Jason Smith was there, but Jason Smith was

6    a licensed applicator.

7    Q    And I believe that you've given sworn testimony that you

8    don't know if chloropicrin was used on the job when you

9    testified in front of the grand jury in 2019; is that correct?

10   A    You're talking about the Shell?

11   Q    Yes.

12   A    I don't think I -- I don't think I said that.  I'm not

13   sure.

14   Q    All right.  Let's take a look at 7306, pages 59 and 60.

15        And move to page 59, starting at line 18.  Just read to

16   yourself from line 18 down through line 25.  And then let me

17   know when you're finished there and we'll move to page 60.

18   A    (Reviews document.)  Okay.

19   Q    All right.  If we move to page 60, then just to line 2.

20        Were you able to see the -- the question that was on line

21   59 and I believe it was on -- excuse me -- page 59 and line 25?

22   A    Yes.

23   Q    Okay.  So in 2019, when these events were fresher in your

24   mind than today, you testified under oath that you don't know

25   if chloropicrin was used on that job, correct?

1   A    Correct.

2   Q    Nowhere in your grand jury testimony did you testify about

3   50 dead cats, correct?

4   A    No.

5   Q    All right.

6        MR. KENNEDY:  Let's take a look at some exhibits,

7   5000-005, just for the witness.

8        Which is in the original exhibit list, Your Honor.

9        THE COURT:  Go ahead.

10  BY MR. KENNEDY:

11  Q    Do you recognize what is shown as 5000-005?

12  A    I'm sorry.  Was that a question?

13  Q    It is.

14  A    I'm sorry.  Repeat your question, please.

15  Q    Yes.  Do you recognize what's shown in 5000 --

16  A    Yes.

17  Q    -- dash, 005?

18  A    Waikiki Shell, yes.

19  Q    All right.

20       MR. KENNEDY:  Let's move to 5000-006, 5000-007,

21  5000-008, 5000-009, 5000-010, 5000-011, and 5000-012.

22  BY MR. KENNEDY:

23  Q    Do you recognize those photographs?

24  A    I do.

25  Q    Were they of the fumigation at the Waikiki Shell in 2007?

1  A     Yes.

2         MR. KENNEDY:  At this time, Your Honor, I'd move

3  5000-005 through 5000-012.

4         THE COURT:  Any issue from the government?

5         MR. NAMMAR:  No.  No objection.

6         THE COURT:  All right.  Those exhibits then are

7  admitted without objection.  That's 5000-005 through 5000-012.

8         (Exhibits 5000-005 through 5000-012 received in

9  evidence.)

10        THE COURT:  You may publish.

11        MR. KENNEDY:  All right.

12  BY MR. KENNEDY:

13  Q     5000-005 is showing the Shell as it has been tented,

14  correct?

15  A     Yes.

16  Q     Moving on to -- and those -- the trucks that are there are

17  Kama'aina Termite and Pest Control check -- trucks?

18  A     It is.

19  Q     All right.  Moving on to 5000-006, what's shown here is

20  the beginnings of the tenting of the Shell, correct?

21  A     It is.

22  Q     Kama'aina Termite and Pest Control owned this boon

23  [verbatim] truck, correct?

24  A     I'm sorry?

25  Q     The boom truck that you can see here, that was something

1   that Kama'aina Termite and Pest Control used, correct?

2   A    Yes, we rented it.

3   Q    And then eventually you had your own, correct?

4   A    Not while I was in Kama'aina Termite, no.

5   Q    All right.  So at this time it was rented?

6   A    Yes.

7   Q    That's your testimony?  All right.

8        That allows someone to be able to get up to heights,

9   correct?

10  A    Correct.

11  Q    Let's move on to 5000-007, 5000-008.

12       So this is in -- partially and when the structure is being

13  tented, correct?

14  A    It is.

15  Q    All right.  So prior to that, people go inside, make

16  certain it's clear, correct?

17  A    By this point they will make sure that there's no food and

18  stuff in there, everything's packaged and prepped correctly.

19  We won't check to confirm that there's nobody in there yet.

20  Q    Well, you wouldn't go in and make --

21       (Simultaneous speaking.)

22  A    People probably could go in there next two hours.

23  BY MR. KENNEDY:

24  Q    All right.  So you've been on the job, right?

25  A    Right.

1   Q    First thing you do is go in and see the facility, right?

2   A    I'm sorry.  Do what?

3   Q    Well, I mean, the Shell knows it's being tented that day,

4   correct?

5   A    Yes.

6   Q    There's no one inside, right?

7   A    There shouldn't be, no.

8   Q    No.  So -- but you go in and make certain before you start

9   tenting, right?

10  A    Multiple times during the process, yes.

11  Q    Okay.  And so now we're working to get the tents on,

12  correct?

13  A    We are.

14  Q    And the tents are heavy, right?

15  A    They are very heavy, yes.

16  Q    How much do they weigh, sir?

17  A    It depends on the size and on if they're wet or dry.

18  Q    All right.  And as you're moving along, do you have to do

19  things with the seams to make certain that the wind doesn't

20  affect them?

21  A    You have to pin them, yes.

22  Q    Okay.  Let's move on to 5000-009.

23       Is this an example, in 5000-009, of what you're describing

24  in terms of pinning?

25  A    Correct.

1  Q    And what are you using to pin?

2  A    Heavy-duty pins.

3  Q    So just like if you're sewing something, you want to make

4  certain that that doesn't allow any escape of chemical, that

5  it's pinned so that the Vikane to kill the pest that is inside

6  remains inside, correct?  Until it's uncovered?

7  A    Well, the main thing is to join multiple tents together.

8  That's the main purpose of pinning them.

9  Q    Let's move to 5000-010.

10      And this is a closeup of using the boom to pin?

11  A    Correct.

12  Q    5000-011.

13      Now, this individual has something right here (indicates).

14  Can you describe to the jury what that is, sir?

15  A    That's a lanyard.

16  Q    Okay.  What's its purpose?

17  A    It connects to a safety line --

18  Q    Okay.

19  A    -- just in case you trip or you fall.

20  Q    Okay.  So it makes certain that if there's a -- there's a

21  fall, harm doesn't come to this individual, correct?

22  A    Correct.

23  Q    All right.  5000-012.

24      And that's an example of the finished tenting before it's

25  uncovered, correct?

1   A     There's still a lot more work, but, yeah, that's the

2   example of the front of the Shell being finished, yes.

3   Q     And then you would have to also complete the back side,

4   correct?

5   A     The -- yes.  The entire structure had to be fumigated,

6   yes, covered.

7   Q     All right.  Now, let's move on to the Polynesian Cultural

8   Center.

9         Were you aware that Mr. Miske back in 2003 first worked at

10  the Polynesian Cultural Center with Kama'aina Termite and Pest

11  Control?

12  A     I -- I -- I did know that they did some fumigation for

13  Polynesian Cultural Center, yes.

14  Q     Okay.  So, now, these particular photographs that we're

15  going to look at, I believe they came from exhibits that you

16  provided to the government on some flash drives, correct?

17  A     I'm not sure.

18  Q     Okay.  Let's take a look at them.

19        Before we do, the Polynesian Cultural Center is open to

20  tourists and natives, correct?

21  A     Correct.

22  Q     It has a number of different structures, right?

23  A     Correct.

24  Q     Of different shapes and different things that when you're

25  tenting you have to do it in a way that comports to the

1    structure, correct?

2    A    Correct.

3    Q    All right.

4         MR. KENNEDY:  So let's take a look at 5000-019.

5    Let's go to 5000-020, 5000-021.

6         The original exhibit list, Your Honor.  I apologize.

7         THE COURT:  I've got it.  Thank you.

8         MR. KENNEDY:  5000-022, 5000-023, 5000-024, 5000-025,

9    5000-026, 5000-027, 5000-028, 5000-029, 5000-030, 5000-031,

10   5000-032, 5000-033, and 5000-34, and 5000-035.

11   BY MR. KENNEDY:

12   Q    Do you recognize all of those exhibits, 5000-019 through

13   5000-035?

14   A    I do.

15   Q    Were these taken by you?

16   A    I -- I would have to say yes.

17   Q    Okay.

18        MR. KENNEDY:  At this time I would move to admit

19   5000-019 through 5000-035.

20        THE COURT:  Any objection?

21        MR. NAMMAR:  No objection.

22        THE COURT:  Without objection, 5000-19 through

23   5000-35 are each admitted.

24        (Exhibits 5000-19 through 5000-35 received in

25   evidence.)

1          THE COURT:  You may publish.

2          MR. KENNEDY:  All right.

3    BY MR. KENNEDY:

4    Q    Now, the first thing that you can see that's different is

5    that it looks like it's night, right?

6    A    It's nighttime, correct.

7    Q    Okay.  So the way this job worked was the park was closed

8    over the weekend, beginning on, say, a Saturday through a

9    Monday; and you were doing the work from the evenings to the

10   next Monday when it would open up, correct?

11   A    Yeah, I can't say for sure how long it was under the tent.

12   Q    All right.  We can see it's nighttime, and this is when

13   you're doing the work and no one is there, right?

14   A    Correct.

15   Q    Okay.

16          MR. KENNEDY:  So if we move through, 5000-19, then

17   let's move to 5000-20.

18   BY MR. KENNEDY:

19   Q    All right.  In this job you were using ladders to do the

20   tenting, correct?

21   A    Yes.

22   Q    All right.

23          MR. KENNEDY:  Let's move to 5000-21, 22, 23, 24, 25.

24   BY MR. KENNEDY:

25   Q    And so each of these buildings presents a different

1    challenge in terms of tenting and the things that you have to

2    do, correct?

3    A    Yes.

4         MR. KENNEDY:  5000-26, 27, 28, 29, 30, 31, 32, 33,

5    34, and 35.

6    BY MR. KENNEDY:

7    Q    All right.  With respect to that job, you're doing it over

8    the weekend.  And each part, as you move through the park,

9    you're tenting, then uncovering after a six-hour period,

10   correct?

11   A    I don't understand the question, six-hour period.  What

12   does that have to do with it?

13   Q    With respect to the uncovering once it's tented, the

14   fumigation is applied, you uncover it, by law there's a

15   six-hour period --

16   A    Correct.

17   Q    -- before anyone can enter it, right?

18   A    Correct.

19   Q    At this facility they've closed it down so that no one is

20   entering during the time that you're doing the work, correct?

21   A    Yes.

22   Q    All right.  And this was in the 2012 -- 2012 period at

23   Polynesian Cultural Center, correct?

24   A    Somewheres around there, yes.

25   Q    And this was a repeat that -- from the job that was done

1   back in 2013 by Kama'aina Termite and Pest Control, correct?

2   A    I --

3           MR. NAMMAR:  Objection.

4   A    I know they did some work in there.  I can't say --

5           THE COURT:  Objection is sustained.

6   A    -- exactly what they did.

7           THE COURT:  The objection is sustained.  The

8   witness's response will be struck.

9           Counsel, I think you mixed up the dates.

10          MR. KENNEDY:  I'm sorry.

11  BY MR. KENNEDY:

12  Q    I believe you were aware of the 2003 earlier job, correct?

13  A    I did hear of it.  I don't know what they did for them,

14  though.

15  Q    Okay.  And this would have been in 2012, correct?

16  A    Yes.

17  Q    Okay.

18          MR. KENNEDY:  And if I did, I apologize, Your Honor.

19          THE COURT:  Yes.

20  BY MR. KENNEDY:

21  Q    Now, you also gave some testimony about the King

22  Kamehameha IV Hotel fumigation?

23  A    What about that?

24          MR. NAMMAR:  Objection, beyond the scope.  Misstates

25  his testimony.

1           MR. KENNEDY:  All right.

2   BY MR. KENNEDY:

3   Q    Did you work on the King Kamehameha IV Hotel fumigation?

4           MR. NAMMAR:  Objection, beyond the scope.

5           THE COURT:  Overruled.  Go ahead.  You can answer

6   that question.

7   A    I did work on the King Kamehameha, King Kam Hotel.

8   BY MR. KENNEDY:

9   Q    Okay.  It was also a very big job, right?

10  A    It was a very large job, yes.

11  Q    The licensed applicator was Hugh Manalo, right?

12  A    I believe he was.

13  Q    You left with your crew on a plane back to Honolulu,

14  right?

15  A    I left with -- with some of the crew, yes.

16  Q    Prior to shooting the gas, right?

17          MR. NAMMAR:  Objection, beyond the scope.

18          THE COURT:  Sustained.

19  BY MR. KENNEDY:

20  Q    So with respect to that project, you can't say whether

21  chloropicrin was used or not because you left prior to the

22  introduction of the gas, correct?

23  A    I can't say.

24  Q    Okay.  And that's consistent with your testimony back in

25  2019 to the grand jury, correct?

1   A    I -- I can't say if it is consistent.

2   Q    All right.  Let's take a look at 5000-060 through

3   5000-067.

4          MR. KENNEDY:  And that would be in the original

5   exhibit list as well, Your Honor.

6          THE COURT:  All right.  Thank you.

7   BY MR. KENNEDY:

8   Q    Sir, you were looking at 5000-060.  If we go to 5000-61.

9          MR. NAMMAR:  Objection to beyond the scope.

10          THE COURT:  This is sustained.  I don't think he was

11   asked about this particular project, was he?

12          MR. NAMMAR:  He was not.

13          MR. KENNEDY:  He was not, but if he can recognize it

14   now, we can introduce these exhibits and move on, Your Honor.

15          THE COURT:  The objection was beyond the scope.

16          MR. KENNEDY:  All right.

17          THE COURT:  And it appears that it is.

18          MR. KENNEDY:  Okay.  Then we'll move on to -- all

19   right.

20   BY MR. KENNEDY:

21   Q    You gave some testimony about the Poinciana fumigation in

22   Kailua yesterday, correct?

23   A    I did.

24   Q    All right.  Let's take a look at a series of exhibits and

25   see if you recognize those.

1          MR. KENNEDY:  They're in the original exhibit list,

2     Your Honor, beginning at 5000-070 through 5000-083.

3          THE COURT:  All right.  Go ahead.

4     BY MR. KENNEDY:

5     Q    All right.  Work through these, sir:  5000-070, 5000-071,

6     5000-072, 5000-073, 5000-074, 5000-075, 5000-076, 5000-077,

7     5000-078, 5000-079, 5000-080, 5000-081, 5000-082, and 5000-083.

8          Do you recognize the exhibits that have been marked as

9     5000-70 through 5000-083?

10    A    I do.

11         MR. KENNEDY:  At this time, Your Honor, I'd move to

12    introduce and admit into evidence 5000-070 through 5000-083.

13    BY MR. KENNEDY:

14    Q    Do you recognize those as the Poinciana fumigation in

15    2010, sir?

16    A    I'm looking at the same picture.  Which ones are you

17    talking about?

18    Q    The total of them, sir, that we just went through.

19    A    All of them?

20    Q    Yes.

21    A    Yes.

22    Q    Okay.

23    A    Sorry.

24         THE COURT:  Any objection?

25    BY MR. KENNEDY:

1   Q    No problem.

2              THE COURT:  Any objection, counsel?

3              MR. NAMMAR:  No.

4              THE COURT:  All right.  Without objection, those 14

5   exhibits shall each be admitted, and you may publish.  That's

6   5000, dash, 70 through 5000, dash, 83.

7              (Exhibits 5000-70 through 5000-83 received in

8   evidence.)

9   BY MR. KENNEDY:

10  Q    All right.  You had mentioned that that was a complicated

11  job, correct?

12  A    It was a very complicated job.

13  Q    Okay.  Let's move through them.  Let's move to 5000-71.

14       We see a number of folks on the roof area.

15            MR. KENNEDY:  If we could blow that up.  All right.

16  BY MR. KENNEDY:

17  Q    Can you explain to the jury what the -- the blue item is

18  that they can see on the top of the roof?

19  A    We call that water snakes.  We basically fill them up with

20  water to weight certain areas of the tent down.

21  Q    Okay.  Let's move on to 500-072, 5000-073, 5000-074,

22  5000-075.

23       With the one we just saw, was that a closeup of the

24  clamping that you were discussing earlier in terms of making

25  certain that the tents come together?

1    A    Yes.

2    Q    All right.  Let's move on to 5000-075, 76, 77, 78, 79, 80,

3    81.

4         And we're looking at a long shot in Kailua, of where this

5    is in the Kailua area, correct?

6    A    Correct.

7    Q    Over by the Enchanted Lake, okay.

8         All right.  And let's look at 5000-082.

9         Do you recognize the individuals in 5000-082?

10   A    I do.

11   Q    Is this Kris?

12   A    That is Kris.

13   Q    All right.  And his last name, sir?

14   A    Kris Aviero.

15   Q    All right.  Did you know him to be the sales rep on this

16   particular facility?

17   A    I -- I don't recall if he was a sales rep for that

18   facility -- for that project.

19   Q    Yeah.  Do you recognize this individual?

20   A    That is Michael Torres.

21   Q    Okay.  All right.

22        And if we move to 5000-083.  Okay.

23        You mentioned yesterday the Kaumakapili fumigation in 2013

24   that you were involved with?

25   A    I can't remember the name, if that's -- if that's the one

1    that I was involved in.

2    Q    Okay.

3    A    I don't know if that's the year.

4    Q    Well, let's take a look at 5000-084, 5000-085, and

5    5000-086.

6            MR. KENNEDY:  Which is in the original exhibit list

7    as well, Your Honor.

8    BY MR. KENNEDY:

9    Q    Is that the one that you were involved with, sir?

10   A    Yes.

11   Q    Okay.  This was a fumigation of this church, correct?

12   A    That is.

13   Q    All right.

14           MR. KENNEDY:  I would move 5000-084 through 5000-086

15   into evidence, Your Honor.

16           THE COURT:  Any objection?

17           MR. NAMMAR:  No objection.

18           THE COURT:  Those three exhibits then are admitted

19   without objection, 5000-84, 85, and 86.  And you may publish.

20           (Exhibits 5000-84 through 5000-86 received in

21   evidence.)

22           THE COURT:  And when you're done asking questions

23   about this particular job, then we will take our second break

24   of the trial day.

25           MR. KENNEDY:  All right.  Let's just move through the

1   5000-084 -- publish it -- 5000-085, and 5000-086.

2   BY MR. KENNEDY:

3   Q    One of the jobs that -- do you recall this being in 2013,

4   sir?

5   A    Again, I -- I can't recall the exact time it was done.

6                MR. KENNEDY:  Okay.  All right.

7                No further questions, Your Honor.  We can take our

8   break right now.

9                THE COURT:  All right.  Thank you.

10               As we go to break, I'll remind our jurors once again

11  to please refrain from discussing the substance of this case

12  with anyone, including each other, until advised otherwise.

13  Please also refrain from conducting any independent

14  investigation.  And then, finally, please also do not access

15  any media or other accounts of this case that may be out there.

16  Thank you.

17               COURTROOM MANAGER:  All rise for the jury.

18               (The jury was excused at 12:15 p.m.)

19               (The proceedings recessed at 12:16 p.m. until

20  12:38 p.m.)

21               (Open court out of the presence of the jury.)

22               COURTROOM MANAGER:  This Honorable Court is now in

23  session.

24               THE COURT:  So there are two issues that I wanted to

25  addresses with the lawyers before we bring the jury back in.

1    One of them is a housekeeping matter.  During the last session,

2    Mr. Kennedy, you offered 9429-49; and then that exhibit, it

3    turns out not to exist because it is a duplicate of what I

4    believe is an admitted exhibit, admitted elsewhere.

5             MR. KENNEDY:  I agree, yes.

6             THE COURT:  So I just want it for the record, we're

7    not going to be sending 9429-49 back to the jury because of

8    that.  Any issue with that?

9             MR. KENNEDY:  No issue, Your Honor.

10            MR. NAMMAR:  No issue.

11            THE COURT:  Okay.

12            MR. KENNEDY:  I caught the other one.  So I didn't

13   catch that one.

14            THE COURT:  All right.  And then the second issue

15   is -- is this.  Yesterday I alluded to an administrative issue

16   that we -- that was brought to my attention only yesterday and

17   that we have, I believe, resolved.  The issue has to do with

18   reimbursement for juror expenses as well as for the per diem.

19   We are unfortunately substantially delayed in that.  That was

20   unbeknownst to me because of an administrative issue that was

21   not of the jurors' doing.

22            We have addressed it administratively, but I would

23   like to address the jury ex parte.  I'm asking for your

24   permission to do that.  I don't know that I need your

25   permission to do that on a ministerial issue like this, but I

1    thought it advisable to at least make you aware.  I do not

2    think, for example, that anything I address with them would

3    impact the ultimate verdict when we get there for either side.

4           But I wanted to make you aware.  If you have any

5    reservations or concerns about me doing it, I basically want to

6    just apologize directly to the jury.  I don't think we need to

7    do it in open court.  Some of them have been embarrassed from

8    what I've been told, for having to bring this up in the first

9    place, and I think if I addressed it in open court, it would

10   only add to that embarrassment and perhaps reluctance to bring

11   up any future administrative issue that might come up.  And I

12   do not want them to hesitate should that occur.

13          So if you have any reservations, if you want some

14   time to confer with your colleagues, I certainly want to give

15   you that opportunity.  But that -- that's my intent.  It's

16   going to be a five-minute-or-less talk.  I intend to do it

17   right after the trial day concludes today.  Because there's a

18   little bit of -- unfortunately, a little bit of some bad

19   feelings, I think -- not between any of the parties or the

20   lawyers, but between our administrative staff and the jurors --

21   that I want to assure -- give them some assurances about.

22          MR. INCIONG:  No concerns whatsoever from the

23   government, Your Honor.

24          THE COURT:  All right.

25          MR. KENNEDY:  Agree, Your Honor.

```
 1              THE COURT:  All right.  I appreciate that from both
 2    sides.  It's just something that I'm personally embarrassed
 3    about.  You know, we try to handle our jury with kid gloves and
 4    do everything we can because we know, especially in a case of
 5    this length, how much inconvenience, among other things, we put
 6    them through.  The compensation that we offer isn't -- isn't
 7    close to what their income is outside of court.  And so when
 8    these kinds of -- these kinds of snags arise, it -- it is --
 9    it's frustrating to all of us.  So I appreciate it.  I promise
10    you I will keep it as plain vanilla as I can, and the main
11    thing I just want to -- on behalf of the court I want to
12    apologize to them.  I appreciate that.
13              Let's bring them in.
14              (Open court in the presence of the jury.)
15              THE COURT:  All right.  Our jurors are now back from
16    the second break of the trial day, as are the lawyers and the
17    parties.
18              Mr. Kennedy, you pay resume your cross of Mr. Cabael.
19                    RESUMED CROSS-EXAMINATION
20    BY MR. KENNEDY:
21    Q    Sir, if we could take a look at Exhibit 9-134 again, which
22    is in evidence.
23              MR. KENNEDY:  And if we move to the -- let's see.
24    What would be a good example.  If we move to what would be
25    page 4.  Sometimes these forms are difficult to understand.
```

1   But what I draw your attention to, I think you've --

2           If we blow up this individual here (indicates) for

3   the jury.

4   BY MR. KENNEDY:

5   Q   Do you see the indication there for health insurance?

6   A   I do.

7   Q   Okay.  So it appears that it was available if you took

8   care of it, and that was something that was offered.  And your

9   testimony was that you didn't have it while you were there; is

10  that correct?

11          MR. NAMMAR:  Objection, no foundation.  Speculation.

12          THE COURT:  Sustained.

13          MR. KENNEDY:  All right.

14          Okay, let's move on.  All right.

15  BY MR. KENNEDY:

16  Q   Now, the Neal S. Blaisdell I think was the last one that

17  you gave some testimony about yesterday.  I just want to go

18  over some of that.  You worked on that project as well?

19  A   I did.

20  Q   All right.  And if we take a look at -- I believe, again,

21  Hugh Manalo was the licensed applicator for that job?

22  A   I said he was.

23  Q   And once again, that was a -- would be described as a huge

24  job, right?

25  A   A very big job, yes.

1    Q    And I think that maybe Vikane was shot with about 50

2    different hoses for that job, in different locations, correct?

3    A    I can't say how many hoses.

4    Q    Okay.  Would it help to take a look at your grand jury

5    testimony for --

6         MR. NAMMAR:  I'm going to object to beyond the scope.

7    I don't believe this was talked about yesterday.

8         THE COURT:  Yeah.  I didn't think it had been either.

9         MR. KENNEDY:  I thought it had.  But if it had not,

10   we'll move on.

11   BY MR. KENNEDY:

12   Q    You worked on that project, correct?

13   A    I did.

14   Q    All right.  If you can take a look at 5000-1002 to

15   5000-107.

16        MR. KENNEDY:  And it's in the original exhibit list,

17   Your Honor.

18        THE COURT:  I've got it.

19        MR. KENNEDY:  And let's just move through these.

20        MR. NAMMAR:  I'm going to object to beyond the scope.

21        THE COURT:  Yeah.  The objection's sustained.

22        MR. KENNEDY:  All right.  Okay.

23   BY MR. KENNEDY:

24   Q    Well, let's move on then to -- you gave --

25        I want to ask you some questions about the -- the typical

1    day in terms of on jobs that you did, okay?

2         Now, would a typical day in terms of the fumigation begin

3    in the morning around 8:00 o'clock with uncovers?

4    A    It depended, yes.

5    Q    And so then the uncovers would be removing the tents,

6    right?

7    A    Correct.

8    Q    And then there's a six-hour time period till 2:00 o'clock

9    before entry can be done by law, right?

10   A    Correct.

11   Q    And so once those tents are uncovered, then you're moving

12   on in the afternoon to -- if there are additional fumigations,

13   correct?

14   A    Correct.

15   Q    And so then those fumigations are done, afternoon,

16   completed whenever they're completed, and then the next day,

17   uncovered at 8:00, correct?

18   A    Sometimes, yes.

19   Q    And then that would be the typical day, as you've

20   described, right?

21   A    Yes.  It depends on the scheduling, on the areas, and the

22   locations of certain fumigations, yes.

23   Q    And each day is different because it depends on who shows

24   up for work, right?

25   A    Correct.

1    Q    Whether you have enough folks for each crew, right?

2    A    Correct.

3    Q    So it's a daily balancing, right?

4    A    It was a -- yes.

5    Q    Okay.  And so in terms of the time savings, that's your

6    typical day.  You're -- by law, once you uncover, it's a

7    six-hour period, right?

8    A    The moment you break the seal, correct.

9    Q    All right.  Okay.  So let's -- that would be how it will

10   work in terms of no time saving.

11        I'd like to talk to you a little bit about and ask you

12   some questions about Termidor.  You gave some testimony

13   yesterday about that as well, okay?

14   A    Yes.

15   Q    All right.  Termidor was something that was also purchased

16   from Univar, correct?

17   A    Correct.

18   Q    All right.  And so you were also involved with that

19   particular purchasing as well, right?

20   A    On occasion, yes.

21   Q    All right.  Well, let's take a look at what's just been

22   marked for identification as 9429-121.

23            MR. KENNEDY:  And that's in the 25th supplement, Your

24   Honor.

25            THE COURT:  All right.  Thank you.

1  BY MR. KENNEDY:

2  Q    And, now, looking at the first page, sir, it looks like,

3  once again, in terms of the individuals -- if we could blow

4  that portion up -- it -- Michael Miske is on the document as

5  well?

6  A    He is.

7  Q    You were on it as well?

8  A    I am.

9  Q    And a Ms. Sheryl Garcia, correct?

10  A    Correct.

11  Q    And those are the three individuals that we saw on earlier

12  invoices that related to chloropicrin and Vikane?

13  A    Correct.

14  Q    Okay.  And Vikane, okay.

15       So let's go through these documents and, first page, just

16  let me -- let me know when you want me to flip the page.

17  A    Go ahead.

18       Go ahead.

19       Go ahead.

20       Go ahead.

21       All right.

22       Go ahead.

23       Go ahead.

24       Yeah.

25       Go ahead.

1        Okay.

2        Go ahead.

3        Okay.

4        Okay.

5        Go ahead.

6        Okay.

7        Okay.

8        Okay.

9        Go ahead.

10       Okay.

11       Okay.

12       Okay.

13       Next.

14       Okay.

15       Go ahead.

16       Next.

17       Okay.

18       Okay.

19       Next.

20       Go ahead.

21       Okay.

22       Okay.

23       All right.

24       Next.

25       Next.

1          Next.

2          Okay.

3          Next.

4          Okay.

5          Next.

6          Next.

7          Okay.

8          Next.

9          Okay.

10         Next.

11         Next.

12         Next.

13         Next.

14         Next.

15         Okay.

16         Next.

17         Next.

18         Next.

19         Next.

20         Next.

21         Next.

22         Next.

23         Next.

24         Next.

25         Next.

1        Next.

2        Next.

3        Next.

4        Next.

5        Next.

6        Next.

7        Next.

8        Next.

9        Next.

10        Next.

11        Next.

12        Next.

13        Next.

14        Next.

15        Next.

16        Next.

17        Next.

18        Next.

19        Next.

20        Next.

21        Next.

22        Next.

23            MR. KENNEDY:  We're at the end.

24    BY MR. KENNEDY:

25    Q    Do you recognize what has been marked as 9429-121?

1   A     What was your question, now?

2   Q     Do you recognize what's been marked as 9429-121 as

3   Termidor purchases by Kama'aina Termite and Pest Control from

4   Univar?

5   A     I do.

6   Q     All right.

7          MR. KENNEDY:  At this time, Your Honor, I would move

8   to admit 9429-121.

9          THE COURT:  Any objection?

10         MR. NAMMAR:  No objection.

11         THE COURT:  Without objection, this exhibit is

12  admitted, 9429-121.

13         (Exhibit 9429-121 received in evidence.)

14         THE COURT:  You may publish.

15         MR. KENNEDY:  May we publish?

16         THE COURT:  Yes.

17         MR. KENNEDY:  All right.

18  BY MR. KENNEDY:

19  Q     So this document consists of 83 different invoices that

20  begin in, looks like, 2011, and Termidor is being purchased

21  from Univar, correct?

22  A     Different -- Termidor is for different uses, yes.

23  Q     So we've got it at -- as we move through the exhibit, the

24  first one is -- if we go to 9421-121 on the first page, there's

25  a Termidor purchase, correct?

1   A    That is for spot treatments, correct.

2   Q    All right.

3   A    Not for ground treatment.

4   Q    Okay.  And so we are purchasing Termidor products here

5   throughout these pages, correct?

6   A    Not all for ground termite treatment, correct.

7   Q    Not all.  But throughout here we have for ground termites,

8   correct?

9   A    There's a few, yes.

10  Q    And for other applications of Termidor, correct?

11  A    Yeah, for spot treatments.

12  Q    For spot treatments, right?

13  A    Yes.

14  Q    And spot treatments are inside and outside, correct?

15  A    For a little -- little tiny jobs --

16  Q    Okay.

17  A    -- inside of the house and a crack in the wall or

18  something.

19  Q    And there's also purchases of Termidor in here for ground

20  treatment as well, correct?

21  A    There are a few, yes.

22  Q    All right.  And with respect to Termidor, you were also

23  purchasing it, you said, from an individual by the name of Rob,

24  correct?

25  A    Correct.

1  Q    And were you aware that that was surplus Termidor from a

2  company that was selling it because they had contracts where

3  they -- if they didn't use it all they could resale?

4  A    No.

5  Q    All right.  And so you were obtaining Termidor from

6  someone who had surplus Termidor?

7         MR. NAMMAR:  Objection, misstates the testimony.

8         THE COURT:  Sustained.

9  BY MR. KENNEDY:

10 Q    All right.  You weren't aware of that, correct?

11 A    I was aware it was stolen, not surplus.

12 Q    You weren't aware that it was surplus?

13        MR. NAMMAR:  Objection.

14 A    I was aware that it was stolen.

15        MR. NAMMAR:  Objection, asked and answered.

16        MR. KENNEDY:  Okay.  All right.

17 BY MR. KENNEDY:

18 Q    Now, with respect to the PCO number 824, do you recall

19 being asked about that yesterday?

20 A    I did.

21 Q    All right.  And you mentioned that that was for Harry,

22 correct?  Kanasaki, right?

23 A    Harry Kansaki, correct.

24 Q    All right.  Are you aware that PCO 824 belongs to the

25 company Kama'aina Termite and Pest Control?

1    A    I did not.

2    Q    All right.  Were you aware that Michael Miske also was an

3    RME, a responsible managing employee?

4    A    Later on in about 2014 or '15.

5    Q    Are you aware that that began in 2008?

6    A    I'm not aware of that.

7    Q    And it continued until 2016?

8    A    I am not aware of that.

9    Q    And it began again in 2017 and went to 2018?

10   A    My understanding was that PCO number belonged to Oahu

11   Termite.

12   Q    Okay.  That was your understanding?

13   A    Correct.

14   Q    All right.  Your understanding is it didn't belong to the

15   company; it belonged to an individual?

16   A    It belonged to the individual that was owning a company.

17   Q    Do you -- with respect to Terminix and other groups,

18   you're aware that there are sometimes multiple RMEs for a

19   fumigation and pest control company?

20   A    I did not know that --

21   Q    Okay.

22   A    -- that that was possible, no.

23   Q    All right.  Were you aware, you mentioned -- and we'll get

24   to that period -- but Matt Fabry or Fabry.  Do you recall that

25   testimony earlier today?

1  A    He came from Terminix, yes.

2  Q    Came from Terminix?

3  A    Yes.

4  Q    You mentioned that he came at a time period when you were

5  leaving?

6  A    He came around a year before I left, somewheres around

7  there.

8  Q    And were you aware that he was also an RME?

9  A    Not of Kama'aina Termite.

10 Q    You're not aware that he was one of the responsible

11 managing employees?

12 A    Not -- not of Kama'aina Termite.  I was not.

13 Q    So you weren't aware that companies can have multiple

14 ones, like Terminix and other companies?

15       MR. NAMMAR:  Objection, asked and answered.

16       THE COURT:  Sustained.

17       MR. KENNEDY:  All right.

18 BY MR. KENNEDY:

19 Q    Now, you mentioned that with respect to licensing -- do

20 you recall that you indicated to -- see if I can find that.

21       You indicated that you had a 7A license, to the FBI?

22       MR. NAMMAR:  Objection, beyond the scope.

23       THE COURT:  A what?  7A, is that what you said?

24       MR. KENNEDY:  Yes.  In --

25 BY MR. KENNEDY:

1  Q    Did you give some testimony about the fact, in terms of

2  whether you could -- well, let me -- let me ask you this

3  directly.

4       You were able to apply restricted chemicals, correct?

5  A    Different licenses allow you to do different jobs.  And I

6  had a 7A, which I later learned this past week that I did have,

7  which I did not know I had.

8  Q    Okay.  And so you gave --

9  A    That was for fumigation.

10 Q    All right.  So you gave some testimony about that.  That's

11 why I want to follow up with it.

12      The license that you learned that you did have allows you

13 to apply restricted chemicals in fumigation, correct?

14 A    Only fumigation, correct.

15 Q    And so that would include Vikane, right?

16 A    That would include Vikane.

17 Q    That would also include chloropicrin, correct?

18 A    Correct.

19 Q    And did you tell the folks that you believed that you

20 could also conduct ground -- in terms of ground services under

21 that license, did you tell them that back in 2023?

22           MR. NAMMAR:  Objection.  Misstates the testimony.

23 Beyond the scope.

24           THE COURT:  I think it's beyond the scope.

25 BY MR. KENNEDY:

1   Q    Well, I believe you gave some testimony about the fact

2   that you said you knew you didn't have a license, right?

3   A    That I did not have a license, yes.

4   Q    Okay.  Then in 2023, you told the FBI that you believed

5   you did have a license that covered that contact, correct?

6           MR. NAMMAR:  Objection, beyond the scope.

7           THE COURT:  Overruled.  Go ahead.

8   A    I found out a week ago that I had a 7A license, which was

9   only for fumigation.  Not for ground termite treatment that I

10  was tasked to do.

11  BY MR. KENNEDY:

12  Q    Correct.

13       I'm asking about you told the FBI back in 2023 that at the

14  time you believed that license covered you for ground

15  termination services.  Do you recall that?

16  A    I don't recall that.

17          MR. KENNEDY:  All right.  If we could take a look at

18  9175-031, just for the witness.

19          And I believe, Your Honor, that one would be in

20  the -- I believe it's in the original exhibit list, Your Honor.

21          THE COURT:  I've got it.

22          MR. KENNEDY:  And if we could move to page 14 of in

23  this document.

24  BY MR. KENNEDY:

25  Q    And just read the last paragraph, sir, and I'll ask you

1    some questions about it.

2    A    (Reviews document.)  Okay.

3    Q    All right.  Did you tell the FBI in 2023 that you believed

4    that license allowed you to conduct ground termite services?

5    A    I was not aware what a 7A license covered at that time.

6    Q    And that's why I'm just asking you about your belief at

7    that time.  Did you tell them that in 2023?

8    A    That's what it says there.  But I -- I could have been

9    wrong.

10   Q    Okay.

11   A    I -- I don't know if I said that or not.

12   Q    All right.  But you did have a license that allowed you to

13   conduct fumigation, correct?

14   A    I did have a license that I found out last week that I had

15   one.

16   Q    All right.  And so during that time period you were

17   licensed to do that, correct?

18         MR. NAMMAR:  Objection, asked and answered three or

19   four times.

20         THE COURT:  Sustained.

21         MR. KENNEDY:  All right.

22   BY MR. KENNEDY:

23   Q    Now, I want to talk to you about you -- switch gears here.

24   And you had mentioned that with respect to the Encore

25   Nightclub, or it started out as The Standard, that Jason

1    Yokoyama was sort of the front person.  Do you recall that

2    testimony?

3    A    I do.

4    Q    All right.  Now --

5            MR. KENNEDY:  I believe in evidence is Exhibit 4-112.

6            THE COURT:  Yes.

7            MR. KENNEDY:  So if we could publish that.  I'm

8    sorry, four, dash, one, one, twelve.  That was my error and I

9    believe that is in evidence as well.

10           THE COURT:  Yes.  4, dash, 112 is in evidence.

11           MR. KENNEDY:  All right.  If we could publish that.

12   BY MR. KENNEDY:

13   Q    Do you recognize Mr. Miske here?

14   A    I do.

15   Q    All right.  And did you -- did you attend this event?

16   A    Well, I'm not in the picture, and I can't say if I did or

17   not.

18   Q    Okay.  All right.  With respect to the -- were you aware

19   that the -- The Standard was the first name before it became

20   the M?

21   A    I am.

22   Q    All right.

23           MR. KENNEDY:  So if we take a look at 9429-120, which

24   is not in evidence.

25           And that would be I believe in the 25th, Your Honor.

1           THE COURT:  Yes.  Go ahead.

2   BY MR. KENNEDY:

3   Q    Do you see both Mr. Miske and Mr. Yokoyama in that

4   photograph?

5   A    I do.

6   Q    All right.  And you had some -- you testified about some

7   work at the M that you did in terms of some of the work for

8   Mr. Miske, correct?

9   A    Can you repeat that question, please?

10  Q    Yeah.  You were involved with some of the construction

11  that was going on when it moved from Oceans 808 to The Standard

12  and then the M, correct?

13  A    I was in -- I was involved from the first -- the first

14  thing that happened there to the finish.

15  Q    Okay.  All right.  So if we take a look at 9429 and just

16  work through these four photographs.

17  A    (Reviews documents.)

18  Q    All right.  Do you recognize those as photographs similar

19  to the one that has been admitted, 4-112, involving the opening

20  of the Standard and the blessing?

21  A    I do.

22          MR. KENNEDY:  All right.  At this time, Your Honor, I

23  move 9429-120 into evidence.

24          MR. NAMMAR:  Objection, relevance.

25          THE COURT:  The objection's overruled.

1          The exhibit will come into evidence, 9429-120.

2          (Exhibit 9429-120 received in evidence.)

3          THE COURT:  You may publish.

4    BY MR. KENNEDY:

5    Q    So if we flip through those four photographs, you see both

6    Mr. Miske and Mr. Yokoyama, correct?

7    A    I do.

8    Q    All right.  Now, you indicated in your testimony that it

9    was -- Mr. Yokoyama was the front.  Do you recall that?

10   A    He was a face is what I said.

11   Q    Okay.  Were you aware that they originally started the

12   business as a LLC?

13   A    I don't.

14   Q    And were you aware that Mr. Yokoyama was the manager of

15   the LLC?

16   A    No, I don't.

17   Q    Were you aware that in terms of paper -- because I think

18   you said on paper Mr. Yokoyama was.  Were you aware that

19   Mr. Miske was on paper a hundred percent shareholder and

20   claimed it on his taxes?

21   A    I am not aware of that, no.

22   Q    Are you aware of any piece of paper that indicated that?

23   A    I am not aware of any piece of paper.

24   Q    Okay.  So in terms of it just being on paper, when you

25   gave that testimony, you're not aware of any paper that does

1    that, correct?

2    A    I am not aware of any paper.

3    Q    Okay.

4        And to say that folks weren't aware that Mr. Miske was

5    involved with the M would be like hiding in plain sight,

6    wouldn't it?

7    A    I never said -- did say he had no involvement with the M.

8    Q    All right.  Now, some of the other things that Mr. Miske

9    was involved with in terms of business also included buying and

10   remodeling and then selling houses, correct?

11   A    Correct.

12   Q    And so there were a number of those that you were involved

13   with, correct?

14            MR. NAMMAR:  Objection to beyond the scope.

15            THE COURT:  That's sustained.

16   BY MR. KENNEDY:

17   Q    And for your efforts -- the question would be, for your

18   efforts involved with those personal dealings Mr. Miske had,

19   those were part of cash that you received for those efforts,

20   correct?

21   A    I did not receive any cash for any one project, no.

22   Q    You're indicating that -- we looked at some documents

23   where you were getting paid by check at Kama'aina, correct?

24   A    Those are documents showing the checks, but I also got

25   paid cash for my paycheck.

1  Q    And you're attributing that to your paycheck, but you're

2  also working in many, many areas that you described to them

3  yesterday for Mr. Miske, correct?

4  A    Yes.

5  Q    All right.  One of those areas was the fishing vessel the

6  RACHEL, correct?

7  A    Correct.

8  Q    And you were involved with paying the crew, right?

9  A    I was involved with paying the crew, correct.

10 Q    Alejandro Bureno was the captain from 2010 to 2015?

11 A    He was the captain, yes.

12 Q    All right.  And the crew members were primarily from

13 Indonesia, so they didn't have permission to get off the boat;

14 you remember that, right?

15         MR. NAMMAR:  Objection to beyond the scope.

16         THE COURT:  Overruled.  Go ahead.

17 A    They were from all around the world.  They weren't only

18 from Indonesia.  But, yes, they were not American citizens.

19 BY MR. KENNEDY:

20 Q    So checks were cut.  Cash was taken.  And then they were

21 paid in cash, correct?

22 A    They were paid in cash, correct.

23 Q    All right.  Now, you mentioned a time period where in the

24 beginning of your relationship with Mr. Miske you had some

25 serious drug issues that were happening back in the 2003, 2002

1   time period, right?

2   A    Correct.

3   Q    And Mr. Miske's response was to bring you into his home,

4   right?

5   A    Yes.

6   Q    And I think you testified that at a certain point he gave

7   you an ultimatum, right?

8   A    He did.

9   Q    And that you were just going to have to stop using, right?

10  A    Correct.

11  Q    Kind of tough message, but eventually then your life came

12  back together, correct?

13  A    For a time, yes.

14  Q    All right.  And then through the time period that we've

15  been talking about, from 2003 up until 2013, there were periods

16  where drug use raised its head again, correct?

17  A    I wouldn't say between 2003 and 2015 or whatever date

18  you're talking about.  I was clean between then.

19  Q    Okay.  And I believe in 2013 is the time period where the

20  cocaine use began, correct?

21  A    I can't say exactly what year, but it was toward my ending

22  of my relationship there at Kama'aina.

23  Q    Was it around the 2013 time period, sir?

24          MR. NAMMAR:  Objection, asked and answered.

25          THE COURT:  Sustained.

1    BY MR. KENNEDY:

2    Q    And I think you said -- well, let me ask you these

3    questions.

4         For about a year you were kind of just using, right?

5    A    Yes.

6    Q    And then eventually Wayne Miller is someone that we -- you

7    mentioned earlier, correct?

8    A    Correct.

9    Q    And you started getting ounce quantities from Wayne

10   Miller, right?

11   A    Yes.

12   Q    And so he was dealing, and you were then receiving them

13   and selling 'em and working underneath him, correct?

14   A    I don't know what you mean by working under him.

15   Q    Well, he was supplying you with drugs, right?

16   A    He was.

17   Q    You were selling the drugs, right?

18   A    Somewhat, yes.

19   Q    And using some of it, right?

20   A    Correct.

21   Q    And so at that time Wayne Miller and you -- and this was

22   10 or 12 or more times you were getting these quantities and

23   then selling.  So now you're sort of in the drug business, not

24   just as a user but a seller, correct?

25   A    You could say that.

1    Q    All right.  And this was kind of cascading in that time

2    period in 2015, right?

3    A    It was going down real fast.

4    Q    And as it was going down real fast -- we looked at the

5    TWIC application for Mr. Miller.  Do you recall that?

6    A    We did.

7    Q    And that was in July of 2015, correct?

8    A    I'm not sure what year that was.

9              MR. KENNEDY:  Let's pull up -- I believe they're all

10   in evidence, Exhibit 9-113.

11             THE COURT:  Yes.  Go ahead.

12             MR. KENNEDY:  And if we kind of move through.

13             All right.  And I believe -- and then if we move to

14   page 39.

15   BY MR. KENNEDY:

16   Q    All right.  You said that you didn't recognize your

17   signature here, correct?

18   A    Correct.

19   Q    All right.  This is during the worst time for you, in July

20   of 2015, correct?

21   A    Correct.

22   Q    And at this time Wayne Miller is someone who is selling

23   drugs to you, and you're also supplying drugs to others with

24   him as being the supplier, correct?

25   A    Correct.

1   Q     All right.  And this is right in this July 2nd of 2015

2   time period, correct?

3   A     Yes.

4   Q     All right.  Now, you gave some testimony about the fact

5   that Mr. Miske had presented some business opportunities to

6   you, correct?

7   A     That was like earlier in the -- it was kind of the mid --

8   mid during the relationship.

9   Q     And that you at some point believed that you should become

10  a partner, right?

11  A     Correct.

12  Q     And you were -- at the time period when Matt Fabry was

13  brought in, this was during the time where you were going

14  downhill with the drug issues, not only by using but selling,

15  correct?

16  A     I -- I can't say for around same time, but that -- that

17  was part of my -- my kind of falling out is when Matt came.

18  Q     Okay.  And so Wayne Miller at this time is a drug dealer,

19  right?

20  A     I can't say if Wayne Miller was a drug dealer when Matt

21  came because I -- again, I don't remember what year

22  specifically that Matt came to Kama'aina.

23  Q     All right.

24  A     I can't say if it was '14, '15, '13.  I don't know.

25  Q     All right.  And so at least Wayne Miller was your dealer,

1    right?

2    A     He was.

3    Q     And not only were you using, but you were selling for him

4    in that illegal business, right?

5              MR. NAMMAR:  Objection, asked and answered.

6              THE COURT:  Sustained.

7    BY MR. KENNEDY:

8    Q     Now, Mr. Miske had Kama'aina Termite and Pest Control,

9    correct?

10   A     He did.

11   Q     And other businesses, right?

12   A     Yes.

13   Q     And so at a point in time you described an incident where

14   you started stealing, right?

15   A     Correct.

16   Q     And so you went out to Sand Island, right?

17   A     Yes.

18   Q     And he asked you to be honest with you --

19   A     I was --

20   Q     -- to him.

21   A     -- yes.

22   Q     And you were, correct?

23   A     Yes.

24   Q     And not one thing happened, did it?

25         Got back in the car.  You drove back.  You kept your job,

1   right?

2   A    I did.

3   Q    And you continued to use, you said, right?

4   A    I -- I continued to use and operate like a normal citizen.

5   Q    And you continued to sell drugs after that, as well?

6   A    Correct.

7   Q    And so at a certain point in time, in August of 2015, you

8   left?

9   A    I did.

10  Q    And Mr. Miske told you that if you ever get your act back

11  together you could come back --

12          MR. NAMMAR:  Objection, hearsay as to what Mr. Miske

13  said.

14  Q    -- and call?

15          THE COURT:  Overruled.  Go ahead.

16  BY MR. KENNEDY:

17  Q    The door was left open to you, right?

18  A    I -- I can't say I recall that conversation, but -- yeah.

19  Q    And when you came back and visited with him, you came back

20  and asked him for money, right?

21  A    I did not -- I -- I don't recall asking for money when I

22  came back.  I asked him for money sometime when I was in Utah.

23  Q    Because you needed to hire an attorney for a matter,

24  correct?

25  A    Yes.

1   Q    And you asked him for it, right?

2   A    I did.

3   Q    And even after you had stolen from him, he provided money

4   to you for that, correct?

5   A    He paid the attorney, yes.

6   Q    And so you had started a pest control company in Utah?

7   A    I did.

8   Q    And at a certain point that ran into problems, right?

9          MR. NAMMAR:  Objection, beyond the scope.

10         THE COURT:  Overruled.  Go ahead.

11  A    My company was actually very successful.  I held many

12  large accounts there.  What hurt my company was COVID.  Nobody

13  could pay their bill.

14  BY MR. KENNEDY:

15  Q    And so at that point you moved on to other --

16  A    No, I was working at FedEx Ground while I had my company.

17  Q    All right.  Now, during the time period that you worked

18  there was a period of time where you were being garnished,

19  right?

20  A    You're talking about working in -- in Kama'aina?

21  Q    Yes.

22  A    There was a period of time, yes.

23  Q    And I believe that, you know, you owed something around

24  $35,000 for a wrecked car that you didn't have insurance for,

25  that you had rented from I believe it was Avis, right?

1    A    It -- it was a large amount, but I don't think it was

2    35,000, but it was pretty big, yes.

3    Q    And did you tell the IRS when you were here in just this

4    month, in March, that you haven't paid any taxes since that

5    time?

6    A    When I did my d/b/a, because they was garnishing me, I had

7    not paid my taxes, no.

8    Q    Since that time?

9    A    Since I did my d/b/a.

10   Q    Okay.

11   A    At Kama'aina.

12   Q    All right.  Now, I want to circle back at the -- we talked

13   about the SoHo, correct?

14   A    The SoHo nightclub, yes.

15   Q    Yeah.  And I believe you gave testimony that your

16   girlfriend was at the bar, right?

17   A    She was with me in the club, yes.

18   Q    And you said that you released five ounces of chloropicrin

19   at that club, right?

20   A    More or less, yes.

21   Q    And so she was inside, right?

22   A    She was with me, yes.

23   Q    But you also gave testimony that she didn't know that

24   happened, right?

25   A    She did not know.

1    Q      Even though she was inside the club?

2    A      Correct.

3    Q      Five ounces of chloropicrin, correct?

4            MR. NAMMAR:  Objection, asked and answered.

5            THE COURT:  Sustained.

6            MR. KENNEDY:  Nothing further.

7            THE COURT:  Mr. Nammar, you don't have too much time,

8    but you might as well get started.

9            MR. NAMMAR:  Can we publish 9 -- I think it's 9-134.

10           THE COURT:  Go ahead.

11           MR. NAMMAR:  And go to page, I think, 3.  Actually --

12   yeah.

13                         REDIRECT EXAMINATION

14   BY MR. NAMMAR:

15   Q      So you were asked some questions about this particular

16   document.  Do you remember that, Mr. Cabael?

17   A      I do.

18   Q      And you were asked questions about the M-E-D withholding

19   (indicates)?

20   A      I was.

21   Q      Do you know that that holding refers to Medicare

22   withholdings that are taken by the government?

23   A      I believe that's on my paystub currently from FedEx, yes.

24   Q      And do you see how on the one right below it for Stacy

25   Burnam, health insurance is itemized?  Do you see that?

1    A    I see that, yes.

2    Q    And as I understand your testimony on direct, was that

3    what you believed the reason was for paying overtime in cash

4    was to avoid paying health insurance; is that right?

5    A    Correct.

6    Q    And you yourself never had health insurance when you

7    worked for Kama'aina Termite and Pest Control?

8    A    Every time I went to the doctor I paid cash, correct.

9    Q    You were asked a lot of questions about Keola Lai.  You

10   remember that job, right?

11   A    I do.

12   Q    Were you aware that the EPA fined Kama'aina Termite and

13   Pest Control over that job?

14   A    I'm not aware of that, no.

15   Q    You said that the label was the law.  What does that mean?

16   A    That what the label says is what you need to do.

17   Q    And does the label on Vikane -- is that what you're

18   referring to, the label on Vikane?

19   A    The label on Vikane and the label on chloropicrin, yes.

20   Q    And so you -- that is the law and you have to follow it;

21   is that correct?

22   A    Yes.

23   Q    Did you understand that the label on Vikane required that

24   chloropicrin be used in conjunction whenever Vikane was used?

25   A    Correct.

1  Q    And as I understand your testimony, in the Keola Lai

2  building chloropicrin was used just on a couple floors; is that

3  right?

4  A    Yes.

5  Q    And then for the entire rest of the 40-story building, no

6  chloropicrin was used?

7  A    No.

8  Q    Were you aware that the Department of Ag was onsite at

9  Keola Lai?

10 A    I was.

11 Q    Were you aware that the inspector with the Department of

12 Ag instructed Mr. Miske that he had to use chloropicrin in the

13 entire building?

14 A    There's no doubt about that.  That's the law.

15 Q    Were you aware that the inspector told Mr. Miske that he

16 could -- that the company could use just one pic pan for some

17 of the floors, but it had to use chloropicrin on all floors?

18        MR. KENNEDY:  Objection.  Misstates the report of

19 Glenn Sahara.

20        THE COURT:  Overruled.  Go ahead.

21 A    I was aware that we had to place one pic pan on every

22 floor.

23 BY MR. NAMMAR:

24 Q    You were asked some questions about Harry Kansaki.  Did

25 you understand him to be the principal RME?

1   A     For Kama'aina Termite, correct.

2   Q     And do you understand that under the regulatory laws

3   there's only one principal RME for a company?

4   A     Yes.

5   Q     And did you understand -- or did you ever see -- for the

6   Keola Lai job, did you ever see Harry Kansaki at that job?

7   A     Not at all.

8   Q     You were shown a number of Univar invoices.  A lot of 'em

9   had no charge for Vikane and no charge for chloropicrin.  Do

10  you remember that?

11  A     I do.

12  Q     Do you personally know that the company wasn't being

13  charged for Vikane?

14  A     I do not.

15  Q     Are you just reading what's on the invoices?

16  A     I'm just seeing -- this is the first time seeing these

17  invoices.

18  Q     And you were shown a number of invoices that there were no

19  charge -- there was no charge for chloropicrin.  Do you recall

20  that?

21  A     These invoices today, yes.

22  Q     Was that one of the reasons why you had chloropicrin

23  piling up in various places in the office, in the containers,

24  is because you received chloropicrin free of charge from

25  Univar?

1    A     No.

2    Q     You were asked about cost savings with chloropicrin.  Do

3    you recall that?

4    A     I was.

5    Q     It wasn't about the -- and you testified on direct at

6    length about how the company didn't, for the majority of the

7    jobs, use chloropicrin; is that right?

8    A     Yes.

9    Q     It wasn't about cost savings, though, was it?

10          It wasn't to save money on chloropicrin; it was to turn

11    over the houses to the customers quicker, right?

12    A     Yes.

13    Q     Could you explain why you didn't use chloropicrin again to

14    the jury?

15    A     Because if you're not allowed the entirety of six hours to

16    clear a house and you let somebody in in two or three hours

17    after you uncover it, chloropicrin will be present and they

18    wouldn't know that there's still gas in the house.

19    Q     Because the chloropicrin lingers longer -- it lingers

20    sometimes; is that right?

21    A     It's -- it's a gas just like Vikane.  So it's going to be

22    in there as -- as present as Vikane is.

23    Q     And the customer could come in and smell it, and they

24    wouldn't be able to re-enter the house; is that right?

25    A     They would feel it.  It would burn their eye and then make

1  them cough.

2  Q    And so by not using it, you could turn over the houses

3  quicker; is that right?

4  A    Yes, because they would think that the house is clear of

5  any gas.

6  Q    And Mr. Miske was aware of that practice?

7  A    He was.

8  Q    And you were asked a number of questions about your pay,

9  and you were shown maybe like 50 different paychecks?

10  A    Correct.

11  Q    For the entire time that you were working at Kama'aina

12  Termite and Pest Control, did you get a check and also paid in

13  cash by Mr. Miske?

14  A    For a majority of the time, I can't say exactly what year

15  I started, but yes.

16  Q    You were paid a check?

17  A    Paid a check and paid cash for a majority of my time

18  there.

19  Q    Did you also -- did you always receive that cash from

20  Mr. Miske?

21  A    I did.

22  Q    And for some of the weeks, were you exclusively working on

23  Kama'aina Termite and Pest Control projects?

24  A    I don't understand the question.

25  Q    Sure.  For -- say, for example, around the Keola Lai time.

1   That was a pretty big project, as I understand it, correct?

2   A    It was.

3   Q    And for like those weeks around that job, were you only

4   working on the Keola Lai project as opposed to various other

5   projects?

6   A    Maybe majority of my time was there, but I still had

7   responsibilities outside of that project.

8   Q    Did Mr. Miske when he handed your pay ever say this is for

9   your help on Lumahai, this cash, or this cash is for your help

10  on that?

11  A    Never.  I got one -- one same pay -- pay amount every week

12  regardless of what I did, where I was, or who I have

13  supervised.

14  Q    You were asked about the Waikiki Shell project.  Do you

15  recall that?

16  A    Yes.

17  Q    And you were asked whether you testified before the grand

18  jury about the dead cats.  Do you recall that?

19  A    Yes.

20       Wait.  Yeah, rephrase the question.

21  Q    Sure.

22  A    Or try the question again.

23  Q    Defense asked you questions about your grand jury

24  testimony, and regarding the Shell.  Do you recall that?

25  A    They did.

1   Q     And they made the point that you didn't tell the grand

2   jury about the dead cats.  Do you remember that?

3   A     Yes.

4   Q     But -- and you've been interviewed a number of times by

5   the FBI, right?

6   A     A few times, yes.

7   Q     And in at least one of those interviews you've told the

8   FBI agents about the dead cats underneath the Waikiki Shell?

9   A     I did.

10           THE COURT:  Mr. Nammar, we're a few minutes past

11  1:30.  Unless you've just got a few more minutes on redirect,

12  then we'll probably need to take a break.

13           MR. NAMMAR:  We can break, Your Honor.

14           THE COURT:  Okay.

15           As we go to break for the trial day then, I'll remind

16  our jurors to please refrain from discussing the substance of

17  this case with anyone, including one another, until I advise

18  you otherwise; to also refrain from accessing any media or

19  other accounts of this case that may be out there.  And

20  finally, please do not conduct any independent investigation

21  into the facts, circumstances, or persons involved.

22           So we will see you tomorrow morning at 8:30.  It's

23  our last day before a break that I think we all maybe deserve a

24  little bit.  So just one more day to power through.  We'll see

25  you then.

1          COURTROOM MANAGER:  All rise for the jury.

2          (The jury was excused at 1:33 p.m.)

3          (Whereupon, at 1:34 p.m., the proceedings adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT REPORTER CERTIFICATE

2            I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9            DATED at Honolulu, Hawaii, June 24, 2024.

10

11

12
                        _/s/ Ann B. Matsumoto_____
13                      ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25