1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF HAWAII

3

4 UNITED STATES OF AMERICA,  ) CR. NO. 19-00099-DKW-KJM
            )
5     Plaintiff,   ) Honolulu, Hawaii
            )
6  vs.       ) March 15, 2024
            )
7 MICHAEL J. MISKE, JR.,   ) JURY TRIAL - DAY 39
            )
8     Defendant.   ) (CONTINUED TESTIMONY OF
 _____) GOVERNMENT'S WITNESS ALFREDO
9             CABAEL, JUNIOR)

10

      PARTIAL TRANSCRIPT OF PROCEEDINGS
11   BEFORE THE HONORABLE DERRICK K. WATSON
   CHIEF UNITED STATES DISTRICT COURT JUDGE
12
 APPEARANCES:
13
 For the Government:   MARK A. INCIONG, AUSA
14         MICHAEL DAVID NAMMAR, AUSA
          WILLIAM KEAUPUNI AKINA, AUSA
15         Office of the United States Attorney
          Prince Kuhio Federal Building
16         300 Ala Moana Boulevard, Suite 6100
          Honolulu, Hawaii 96850
17
 For the Defendant:   LYNN E. PANAGAKOS, ESQ.
18         841 Bishop Street, Suite 2201
          Honolulu, Hawaii 96813
19
         MICHAEL JEROME KENNEDY, ESQ.
20         Law Offices of Michael Jerome
          Kennedy, PLLC
21         333 Flint Street
          Reno, Nevada 89501
22
 Official Court     ANN B. MATSUMOTO, RPR
23 Reporter:      United States District Court
          300 Ala Moana Boulevard, Room C-338
24         Honolulu, Hawaii 96850

25 Proceedings recorded by machine shorthand, transcript produced
 with computer-aided transcription (CAT).

```
 1                        I N D E X

 2   WITNESS:                                    PAGE NO.

 3   FOR THE GOVERNMENT:

 4    ALFREDO CABAEL, JUNIOR (CONTINUED EXAMINATION)

 5     RESUMED REDIRECT EXAMINATION BY MR. NAMMAR        4

 6     RECROSS-EXAMINATION BY MR. KENNEDY              16

 7

 8                       E X H I B I T S

 9    None.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   FRIDAY, MARCH 15, 2024                    8:37 A.M. O'CLOCK

 2                          *  *  *  *  *

 3              (Start of partial transcript:)

 4              (Open court in the presence of the jury.)

 5              COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,

 6   United States of America versus Michael J. Miske, Junior.

 7              This case has been called for jury trial, Day 39.

 8              Counsel, please make your appearances for the record.

 9              MR. INCIONG:  Good morning, Your Honor.  Mark

10   Inciong, Michael Nammar, and KeAupuni Akina for the United

11   States.  Also present are Kari Sherman and FBI Special Agent

12   Thomas Palmer.

13              THE COURT:  Good morning.

14              MR. INCIONG:  Good morning.

15              MR. KENNEDY:  Good morning, your Honor.  Michael

16   Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and

17   Josh Barry.  Good morning to you all.

18              THE COURT:  Good morning.

19              Good morning to the 16 persons on our jury.

20              Mr. Cabael, good morning.  I will remind you, as I

21   have the days prior, that you remain subject to the same oath

22   that you took at the inception of your testimony.  Do you

23   understand that?

24              THE WITNESS:  I do.

25              THE COURT:  And they call today or days like today
```

1    getaway day in the baseball world, for any of you baseball

2    fans, so we will do our very best to end on time so that you

3    all can head off to where you need to.  We're not going to send

4    anything out specifically to your employer.  So if you don't

5    want to tell them that you don't have jury duty next week,

6    that's entirely up to you.  I'll leave that to your conscience.

7              Mr. Nammar, you may begin.

8              MR. NAMMAR:  Thank you, Your Honor.

9            ALFREDO CABAEL, JUNIOR, GOVERNMENT'S WITNESS,

10                        PREVIOUSLY SWORN.

11               RESUMED REDIRECT EXAMINATION

12   BY MR. NAMMAR:

13   Q    Good morning, Mr. Cabael.

14   A    Good morning.

15   Q    Yesterday we talked a little bit about how the -- on the

16   Vikane cans or cylinders there's a label?

17   A    There is.

18   Q    And that the label is the law, correct?

19   A    Correct.

20   Q    And you were asked by defense counsel a couple of times

21   about the six-hour aeration period.  Do you recall that?

22   A    I do.

23   Q    That the tent had to be taken off and the windows had to

24   be opened up and the air -- and house had to be aerated for six

25   hours?

```
 1   A     Yes.

 2   Q     But what the label says about aeration is that six hours

 3   is the minimum amount of time; is that right?

 4   A     I can't -- I can't say if that -- that says that on the

 5   label, no.

 6   Q     Would it help refresh your memory to look at the actual

 7   label?

 8   A     It would.

 9         MR. NAMMAR:  Your Honor, can we show the witness only

10   Exhibit 9-491?  And go to page 43.

11         THE COURT:  Got it.

12         MR. NAMMAR:  43.

13         I'm sorry.  That's the wrong exhibit.  Can we show

14   the witness only Exhibit 9-487?  And go to page 43.

15   BY MR. NAMMAR:

16   Q     And if you could read at the top there to yourself the

17   steps 1, 2, and 3.

18   A     (Reviews document.)

19         I see that, yes.

20   Q     Okay.

21         MR. NAMMAR:  You can take that down.

22   BY MR. NAMMAR:

23   Q     So the label sets forth that the minimum amount of time is

24   six hours; is that right?

25   A     It does.
```

1   Q    And the label also has a number of additional steps that

2   have to be followed besides this minimum amount of time; is

3   that right?

4   A    It does.

5   Q    For example, the label says you have to use chloropicrin;

6   is that right?

7   A    It does.

8   Q    And that's something that you've told the jury Kama'aina

9   was not doing on the majority of the jobs?

10  A    Correct.

11  Q    Something that Kama'aina would lie to its customers about

12  on proposals?

13  A    Yes.

14  Q    And you told us that the reason chloropicrin wasn't used

15  is because it would linger in the house after aeration?

16  A    It would.

17  Q    Meaning that you couldn't return the home as quickly as

18  Kama'aina wanted to the customer?

19  A    Yes.

20  Q    And move on to the next house?

21  A    Yes.

22  Q    And on aeration, the label also instructs that after a

23  minimum of six hours a device has to be used to test the

24  quality of the air to make sure it's safe; is that right?

25  A    That is correct.

1  Q    And one of the approved devices is a Spectros, which you

2  talked about, right?

3  A    Yes.

4  Q    And only then, when you used the Spectros, can the

5  applicator determine that the house is safe to be reoccupied;

6  is that right?

7  A    That is correct.

8  Q    And that is something that you told us, the use of a

9  Spectros was not routinely done; is that right?

10 A    That is correct.

11 Q    That is something that you told us about, how the Spectros

12 wasn't properly calibrated, or broken; is that right?

13 A    Yes.

14 Q    Something that you told us that you lied to customers

15 about hundreds of times?

16 A    That is correct.

17 Q    A practice that you told us that Michael Miske was aware

18 of as well?

19 A    That is correct.

20 Q    Now, you were also asked about your license; do you recall

21 that?

22 A    I was, yes.

23 Q    And you told the jury that you recently discovered that

24 you were licensed to do fumigation; is that right?

25 A    Yes.

1   Q    And that was only for a five-year period when you were

2   working at Kama'aina; is that right?

3   A    I can't say the extent or how long the license is good

4   for.

5   Q    Do you believe it was good for the entire time that you

6   were working at Kama'aina?

7   A    No.   There's a -- there's a limited time frame on -- on

8   when you got to renew your license.

9   Q    And that license applied to fumigations, right?

10  A    That one particular license, yes, to fumigations.

11  Q    But on fumigations, that was not -- you weren't present at

12  the majority of the fumigations, correct?

13  A    I was not.

14  Q    You were the supervisor of the fumigation crews, right?

15  A    I was.

16  Q    So it was the fumigation crews that were actually assigned

17  to do the particular fumigations?

18  A    Yes.

19  Q    And as you told us in these last couple days, there was an

20  issue with the number of licensed fumigators at Kama'aina

21  Termite and Pest Control?

22  A    There was.

23  Q    And when we talk about the label, the label is the law;

24  the Vikane label requires a licensed person to apply the gas

25  onsite during fumigation?

```
 1   A    That is correct.

 2   Q    And separate and apart from fumigations, you've also

 3   talked a good deal about ground termite treatments.  Do you

 4   remember that?

 5   A    Yes.

 6   Q    And you also told us that with respect to ground termite

 7   treatments you were never licensed to do that?

 8   A    I was not.

 9   Q    And you've also talked about pest control.  You were never

10   licensed with the state to do pest control?

11   A    I was not.

12   Q    You were shown a number of pictures from a number of

13   different jobs by defense counsel.  Do you recall that?

14   A    I do.

15            MR. NAMMAR:  If we could publish 5000-21.

16   BY MR. NAMMAR:

17   Q    You recall being showed this picture?

18   A    I do.

19   Q    This was the Polynesian Cultural Center?

20   A    That is correct.

21   Q    You said you did a number of different buildings on this

22   job site?

23   A    We did.

24   Q    And you talked to defense counsel about that, right?

25   A    Yes.
```

1    Q    Chloropicrin wasn't used on this entire job, was it?

2    A    It was not.

3              MR. NAMMAR:  Can we publish 5000-86?

4              THE COURT:  Go ahead.

5    BY MR. NAMMAR:

6    Q    This is another job you were shown pictures of by defense

7    counsel, right?

8    A    That is correct.

9    Q    This is a church that you told us was in Kalihi?

10   A    Yes.

11   Q    In the middle of a neighborhood?

12   A    Yes, it is.

13   Q    And that chloropicrin was not used on this job as well?

14   A    No.

15   Q    And the use of chloropicrin, you told us, concerned you?

16   That the lack of use, sorry.  Not using it concerned you, you

17   told us?

18   A    It did.

19   Q    And in conjunction with a Spectros device which wasn't

20   working, that was something that also concerned you?

21   A    It did.

22   Q    Because people could get sick?

23   A    That is correct.

24   Q    And in fact you did learn that people got sick?

25   A    I did.

1  Q     And that people went to the hospital?

2  A     Yes.

3            MR. NAMMAR:  Your Honor, can we publish 9-612?

4  BY MR. NAMMAR:

5  Q     This is -- we talked a fair amount about Termidor.  Do you

6  remember that?

7            THE COURT:  Go ahead.

8            MR. NAMMAR:  Thank you, Your Honor.

9  BY MR. NAMMAR:

10 Q     We talked a fair amount about Termidor jobs.  Do you

11 remember that?

12 A     Yes.

13 Q     And you told the jury that the regular practice at

14 Kama'aina is that you would sell Termidor but apply a cheaper

15 substitute?

16 A     That is correct.

17 Q     And you recalled this particular commercial job at Hawaii

18 Kai Peninsula where you -- the practice was followed of selling

19 Termidor but applying a cheaper substitute?

20 A     That is correct.

21 Q     And you told us about how when it came to keeping a log of

22 that particular job the folks on the job site at Kama'aina,

23 they would write in Termidor, but in reality they were using a

24 cheaper substitute?

25 A     Yes.

```
1   Q    And you -- as an example, you talked about this particular

2   log.  Do you remember that?

3   A    I did.

4   Q    Now, on this particular job --

5            MR. NAMMAR:  If we can scroll through the pages, and

6   focus on the amount of chemical used.  If we can keep

7   scrolling.  Keep scrolling.  Keep scrolling.  Keep scrolling.

8   Keep scrolling.  Keep scrolling.  Keep scrolling.  Keep

9   scrolling.

10  BY MR. NAMMAR:

11  Q    On this particular job there were thousands of gallons of

12  product used; is that right?

13  A    It appears to be thousands of gallons, yes.

14  Q    And you told us that you were applying thousands of

15  gallons of a cheaper substitute on this job?

16  A    That is correct.

17  Q    And you told us that when it came to Termidor you would

18  only use Termidor at Kama'aina when you had active

19  infestations; is that right?

20  A    That is correct.

21  Q    Now, defense counsel showed you a number of records for

22  purchases of Termidor from Univar.  Do you remember that?

23  A    I do.

24  Q    But those records, they didn't show anywhere near enough

25  Termidor for the amount of jobs you were selling as Termidor;
```

1   is that right?

2   A    That is correct.

3   Q    Nowhere close, right?

4   A    That is correct.

5   Q    Because, for example, this one job that we're looking at

6   here on Hawaii Kai Peninsula, that job entailed thousands of

7   gallons of Termidor?

8   A    That is correct.

9   Q    And that was just one job?

10  A    One job, yes.

11  Q    And the company was routinely selling Termidor on almost

12  all of its ground termite projects?

13  A    That is correct.

14  Q    Both to homeowners?

15  A    Yes.

16  Q    And also to commercial jobs like this one at the Hawaii

17  Kai Peninsula?

18  A    That is correct.

19  Q    Now, you were asked about the chloropicrin attacks at the

20  nightclubs that you talked about?

21  A    Yes.

22  Q    The ones you told us that Mr. Miske ordered you to do.

23  You remember that?

24  A    That is correct, yes.

25  Q    And when you were initially interviewed in the -- when you

1   were interviewed by the FBI last summer, do you remember that?

2   A    Yes.

3   Q    That was in Utah, right?

4   A    That was.

5   Q    You told them about those attacks, did you not?

6   A    I did.

7   Q    And initially you told them that you dumped chloropicrin

8   in the Pearl nightclub, correct?

9   A    I did.

10  Q    And that you initially told them that the second club you

11  believe you dumped it in was the Mod -- in the Modern Hotel.

12  Do you remember that?

13  A    I did.

14  Q    Then you went home, right?

15  A    Yes.

16  Q    The next day, you came back?

17  A    Yes.

18  Q    The very next day, and you talked to the FBI.  Do you

19  remember that?

20  A    I did.

21  Q    And that next day you told them that the second club was

22  in fact SoHo; is that right?

23  A    That is correct.

24  Q    So the very next day you corrected yourself and you said

25  it wasn't the Modern, it was the SoHo?

```
 1   A     Yes.

 2   Q     And all of this took place last summer, in 2023?

 3   A     That is right.

 4   Q     So it's not as if the first time you're talking about the

 5   SoHo club was during this trial?

 6   A     No.

 7   Q     Now, you were also asked, with respect to the chloropicrin

 8   attacks, about the lack of police reports or 911 calls.  Do you

 9   remember that?

10   A     Yes.

11   Q     Did the FBI or anyone from the government ever show you a

12   police report for the assault of the bartender on Sand Island?

13   A     No.

14   Q     Did the FBI or anyone with the government ever play a 911

15   call related to the assault of the bartender on Sand Island?

16   A     No.

17   Q     You were asked by defense counsel about your proffer

18   letter.  Do you understand that you could be charged with

19   crimes in the future?

20   A     I am.

21   Q     You understand that?

22   A     I do.

23   Q     And that those charges could include the crimes that

24   you've testified to here today?

25   A     Yes, it does.
```

1   Q    What is your understanding of what will happen if you

2   don't tell the truth here today?

3   A    I could suffer the consequence of going to prison.

4   Q    Do you understand that you could be prosecuted for lying?

5   A    I do.

6   Q    What is the most important thing that you have to remember

7   about your testimony here today?

8   A    To be truthful and be honest.

9   Q    Have you been truthful during your testimony?

10  A    I have.

11          MR. NAMMAR:  Nothing further, Your Honor.

12          THE COURT:  Mr. Kennedy, anything further for

13  Mr. Cabael?

14          MR. KENNEDY:  I do, Your Honor.

15          THE COURT:  All right.

16                      RECROSS-EXAMINATION

17  BY MR. KENNEDY:

18  Q    Sir, I want to talk with you about some specific questions

19  that counsel just asked you either yesterday or today on

20  redirect, okay?

21  A    Yes.

22  Q    You were clear in front of the grand jury that as far as

23  your pay it was always $700, and it was either $400 on a check

24  or $300 cash or, the reverse, $300 on a check or $400, correct?

25  A    I did.

1   Q    And you testified to that to this jury as well, correct?

2   A    I don't think I mentioned dollar amounts to this jury, no.

3   I'm not sure.

4   Q    And we saw the checks that were cut with a 700-dollar

5   figure for $593 or more per week covering that $700, correct?

6   A    Correct.

7   Q    All right.  Sir, I want to show you, if I can, just to see

8   if some question -- we had some questions about medical

9   insurance.  And so if you could just take a look at 9429-127.

10           MR. KENNEDY:  Which I believe is on the 26th

11   supplemental, Your Honor.

12           THE COURT:  Okay.  Go ahead.

13   BY MR. KENNEDY:

14   Q    And, sir, just take a look at the first page.  And when

15   you reviewed it, seen what it is, I'll ask you to take a look

16   at the second page.

17   A    (Reviews document.)

18           I don't know what I'm looking at.

19   Q    All right.

20           MR. KENNEDY:  Can we go to the second page?

21   BY MR. KENNEDY:

22   Q    And then take a look at the names on here with regard to

23   this particular document.

24   A    (Reviews document.)  Okay.

25   Q    All right.

```
1            MR. KENNEDY:  We can bring that down.

2   BY MR. KENNEDY:

3   Q    Does that refresh your recollection that you had

4   healthcare insurance from UHA, at least in 2014, of which

5   Kama'aina Termite and Pest Control was paying some amount and

6   maybe the entire amount for you, and what you were paying at

7   the medical office was a copay?

8   A    No.  Not to my understanding.  I never did receive a

9   medical card nor did I ever know that I had insurance.

10  Q    Okay.  So they may have just paid it for you and you

11  weren't aware of it, correct?

12  A    Maybe.

13  Q    Okay.  All right.  Now, yesterday there was some

14  questioning about the Kealoa [verbatim] Lai fumigation and the

15  EPA.  Do you recall that?

16  A    I do.

17  Q    All right.  And the job itself was over a $4 million job.

18  Are you aware that the fine from the EPA was $15,000, that's

19  all?

20  A    Can you repeat that question, please?

21  Q    Yes.  You were asked some questions about a fine from the

22  EPA.  Do you recall that?

23  A    Fines from the EPA?

24  Q    With respect to that job, a civil settlement, a fine.  I

25  believe the question was posed to you about the EPA fine, and
```

1    you answered it yesterday.

2         The question that I have is:  Are you aware that the fine

3    for that over $4 million job was $15,000 from --

4    A    Okay.  I believe my answer yesterday was I was not aware

5    of an EPA fine.

6    Q    Okay.

7    A    So that would tell -- that would answer your second

8    question, is I do not know how much that fine would be.

9    Q    Okay.  Were you aware that in the 42-story home

10   condominium trash comes down through a system where you can

11   drop it down similar to what you do with mail and certain

12   businesses?  So the person on the 40th floor doesn't have to

13   walk all the way down to the dumpster.  You are aware of that,

14   correct?

15   A    They may have.  I can't recall.

16   Q    Okay.  Were you aware when you were doing the job that

17   folks had dropped all the trash down to the floor and that it

18   was in the area where the collection of the garbage is?

19   A    I would think that if they had a drop for a chute for

20   trash it would go into the dumpster where the collection would

21   be.

22   Q    All right.  And if that wasn't taken out, were you

23   aware --

24              MR. NAMMAR:  Objection.  This is beyond the scope.

25              THE COURT:  I'm not sure where this is going.

1          MR. KENNEDY:  As to his firsthand knowledge of within

2     the building, where the items were related to the $15,000 fine.

3          MR. NAMMAR:  This is beyond the scope.

4          THE COURT:  This is beyond the scope.  The

5     objection's sustained.

6          MR. KENNEDY:  All right.

7     BY MR. KENNEDY:

8     Q    I take it that as part of the job, folks were supposed to

9     drop their trash down to the trash --

10         MR. NAMMAR:  Objection, beyond the scope.

11         THE COURT:  I thought we just went through this.

12         MR. KENNEDY:  All right.

13    BY MR. KENNEDY:

14    Q    Now, with respect to Spectros --

15         MR. KENNEDY:  Could we put up 9429-122, which I

16    believe is also -- it is not yet in evidence.  I think it's on

17    the -- I believe it's the 25th, but let me check, Your Honor.

18         THE COURT:  Yes.  I have it.

19         MR. KENNEDY:  Thank you.

20    BY MR. KENNEDY:

21    Q    Do you recognize this document?

22         Well, let me ask you this.  You were aware that these

23    items that measure the gas inside after the period of time, the

24    minimum of six hours, which is followed, are you aware that

25    they routinely have maintenance?

1   A    They are required to be maintained and calibrated on a

2   regular basis, yes.

3   Q    All right.  And were you -- in looking at what is

4   9429-122, were you familiar with maintenance being provided to

5   those units for Kama'aina Termite and Pest Control?

6   A    I can't recall this one particular time for this

7   maintenance, but my understanding is it was supposed to be done

8   two times a year, at least.

9   Q    All right.  And this is one example of when it was done on

10  July 3rd of 2012, when you were working, correct?

11  A    Correct.

12        MR. KENNEDY:  At this time I'd move 9429-122 into

13  evidence.

14        MR. NAMMAR:  There's no foundation for this.  He says

15  he doesn't recall this particular one.

16        THE COURT:  Sustained.

17  BY MR. KENNEDY:

18  Q    Sir, are you aware of the fact that -- I would not think

19  you would recall specifically this particular item, but you

20  were aware that they needed to be calibrated, correct?

21  A    I'm aware that they all needed to be calibrated.

22  Q    And calibration is done by an outside company, correct?

23  A    It has to be shipped out --

24  Q    All right.

25  A    -- and shipped back to you, yes.

1   Q     All right.  And EB and S Solutions was one of the

2   companies that would do that, correct?

3   A     I have no idea.  I thought it was all in California.

4   Q     All right.  Are you aware that calibration was done on the

5   Spectros units?

6   A     No.

7   Q     All right.  This would be something that would have come

8   within your area?

9   A     Yes.

10  Q     So would you look at the invoices to make certain that

11  they were?

12  A     No.

13  Q     Okay.  Well, let me ask you this.  You just testified that

14  at the majority of the fumigations you weren't there when the

15  gas was shot, correct?

16  A     I wouldn't say majority.  I'd say a good portion of 'em,

17  yes.

18  Q     And you weren't there when they were uncovered because you

19  were supervising, right?

20  A     Correct.

21  Q     And other members were actually uncovering and using the

22  instruments when you weren't there, correct?

23  A     We had one instrument and that was tasked for me to do.

24  We hadn't -- we did not have five instruments.  We had that one

25  instrument.

1   Q     That's your testimony.  I understand it.

2         If we look at 9429-126 --

3         MR. KENNEDY:  And at this time, Your Honor, I'd move

4   9429-122.

5         MR. NAMMAR:  There is no foundation.  He says he

6   doesn't recognize the company.

7         THE COURT:  The objection's sustained.

8         MR. KENNEDY:  All right.

9         THE COURT:  126 is what you want us to look at now?

10        MR. KENNEDY:  Yes.  Please.

11        THE COURT:  All right.

12        MR. KENNEDY:  We can take that.

13  BY MR. KENNEDY:

14  Q     Do you recognize this as a -- did you understand that

15  Univar was involved with supplying Spectros?

16  A     My understanding was by Cardinal from California.

17  Q     All right.  Are you familiar with what is shown in

18  9429-126?

19  A     No, because that looks like it was done after I left to

20  Utah.

21  Q     Okay.  Do you remember on November 16th of 2019, with

22  respect to the Kaka -- the church that you discuss,

23  Kaumakapili, that you didn't remember whether chloropicrin was

24  used on the job?  Do you remember telling them that in 2019?

25  A     I do not.

1    Q    All right.  Now, you've testified about folks that

2    supposedly went to the hospital.  Has the government ever

3    showed you a hospital report of anybody that went?

4    A    I'm sorry?

5    Q    Has the government ever showed you a hospital report of

6    anyone who went to the hospital?

7    A    No.  I -- I was the one that got the personal phone call

8    from the customers.  I never got shown any documents from the

9    federal government.

10   Q    Okay.  And so did you look into it?

11   A    I'm sorry?

12   Q    Did you look into it?

13   A    What do you mean by look into it?  When I came back in

14   2019?

15   Q    No, when you got the call.

16   A    It was discussed.  Because matters in that -- in that --

17   that type of situation, I'm not going to make the call on my

18   own.  This is not my company.  This is not my company at risk.

19   Q    Okay.

20   A    So I will refer any questions or anything to the owner.

21   Q    All right.  And so what may have happened is that was

22   looked into, and you don't know what the result --

23   A    If --

24   Q    -- of that was?

25   A    If it was looked into --

1          MR. KENNEDY:  Sir, sir --

2          THE WITNESS:  Oh, I'm sorry.

3          MR. KENNEDY:  I'm still asking the question, sir.

4          THE WITNESS:  I'm sorry.

5  BY MR. KENNEDY:

6  Q   So you referred it to someone, correct?

7  A   I did.

8  Q   And then you are not aware of what happened after that,

9  correct?

10  A   I am not aware of what happened after that.

11  Q   Okay.  Now, you mentioned that with respect to -- you're

12  aware that there -- here it was a CDL 7A hazmat truck for

13  Kama'aina Termite and Pest Control, correct?

14          MR. NAMMAR:  Objection, beyond the scope.

15          MR. KENNEDY:  I believe he testified in this area,

16  Your Honor, on redirect.

17          THE COURT:  Well, I'm not sure what this area is yet,

18  so I'll allow that.  Go ahead and see where this heads.

19  BY MR. KENNEDY:

20  Q   And so the truck could move from house to house to shoot

21  the gas after other trucks prepped and get the place ready,

22  correct?

23  A   That has happened on some occasion.  Again, this is a

24  pretty large island.  So it was upon availability on some

25  occasion, yes.

1  Q    And that is what you do with scheduling to make certain

2  that on the -- a particular day you schedule the ones to make

3  certain that that occurs, correct?  And that's what scheduling

4  that --

5  A    Again, on occasion I'd say if we had 20 jobs today, maybe

6  two of them was shot by that one truck.

7  Q    Now, you mentioned that Mr. Miske -- I think your words

8  were -- was a smart businessman, correct?

9  A    He was a smart --

10        MR. NAMMAR:  This is beyond the scope.

11 BY MR. KENNEDY:

12 Q    And with respect to your testimony --

13        THE COURT:  Overruled.  Go ahead.  Go ahead.

14 BY MR. KENNEDY:

15 Q    It's smart business to do the job right, correct?

16 A    I'm sorry.  You got to repeat that question, please.

17 Q    Sure.  It's smart business to do the job right, correct?

18 A    I'd say it would be smart business to do the job right,

19 yes.

20 Q    Are you aware that the Polynesian Cultural Center was a

21 client for almost 20 years?

22 A    Well, we've -- my understanding is they fumigated once and

23 then we fumigated again.  I don't think we had business with

24 them in between that time.

25 Q    So you're not aware of whether there was business in 2020

```
 1   because you were in Salt Lake, correct?

 2   A    Well, if they had business in 2020, I would not know

 3   'cause I was in Salt Lake.

 4           MR. KENNEDY:  All right.  I have nothing further,

 5   Your Honor.  Thank you.

 6           THE COURT:  Mr. Cabael, you may step down.  Thank

 7   you, sir.

 8           THE WITNESS:  Thank you.

 9                                       (Witness excused.)

10           (End of partial transcript.)

11                       *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    COURT REPORTER CERTIFICATE

2           I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9           DATED at Honolulu, Hawaii, June 24, 2024.

10

11

12
                         */s/ Ann B. Matsumoto*
13                       ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25