1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF HAWAII

3

4    UNITED STATES OF AMERICA,      )  CR. NO. 19-00099-DKW-KJM
                                    )
5                Plaintiff,         )  Honolulu, Hawaii
                                    )
6         vs.                       )  March 6, 2024
                                    )
7    MICHAEL J. MISKE, JR.,         )  JURY TRIAL - DAY 33
                                    )
8                Defendant.         )  (TESTIMONY OF
     _____)  TIMOTHY W. GOODRICH)
9

10

                    PARTIAL TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE DERRICK K. WATSON
               CHIEF UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
     For the Government:        MARK A. INCIONG, AUSA
14                              MICHAEL DAVID NAMMAR, AUSA
                                WILLIAM KEAUPUNI AKINA, AUSA
15                              Office of the United States Attorney
                                Prince Kuhio Federal Building
16                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
17
     For the Defendant:        LYNN E. PANAGAKOS, ESQ.
18                              841 Bishop Street, Suite 2201
                                Honolulu, Hawaii 96813
19
                                MICHAEL JEROME KENNEDY, ESQ.
20                              Law Offices of Michael Jerome
                                Kennedy, PLLC
21                              333 Flint Street
                                Reno, Nevada 89501
22
     Official Court            ANN B. MATSUMOTO, RPR
23   Reporter:                 United States District Court
                                300 Ala Moana Boulevard, Room C-338
24                              Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).

1                        I N D E X

2    WITNESS:                                    PAGE NO.

3    FOR THE GOVERNMENT:

4     TIMOTHY W. GOODRICH

5      DIRECT EXAMINATION BY MR. AKINA                3

6      CROSS-EXAMINATION BY MR. KENNEDY              49

7

8                       E X H I B I T S

9    Exhibit 1-219 received in evidence              5

10   Exhibit 1-220 received in evidence             23

11   Exhibit 1-228 received in evidence             24

12   Exhibits 1-224, 1-225, 1-231, and 1-233       27
13   received in evidence

     Exhibit 1-226 received in evidence             30
14
     Exhibits 1-246 and 1-247 received in evidence  32
15
     Exhibit 1-267 received in evidence             34
16
     Exhibits 1-237 and 1-238 received in evidence  40
17
     Exhibit 1-1098 received in evidence            43
18

19

20

21

22

23

24

25

```
 1   WEDNESDAY, MARCH 6, 2024                    11:46 A.M. O'CLOCK

 2                              *  *  *  *  *

 3              (Start of partial transcript:)

 4              THE COURT:  Mr. Akina.

 5              MR. AKINA:  The government calls Timothy Goodrich.

 6              COURTROOM MANAGER:  Please stand and raise your hand.

 7              TIMOTHY W. GOODRICH, GOVERNMENT'S WITNESS, SWORN.

 8              THE WITNESS:  Yes, I do.

 9              COURTROOM MANAGER:  Thank you.  You may be seated.

10              Please state your full name, spelling your last name

11   for the record.

12              THE WITNESS:  My full name is Timothy Wayne Goodrich.

13   Last name is spelled G-O-O-D-R-I-C-H.

14                          DIRECT EXAMINATION

15   BY MR. AKINA:

16   Q    Good morning, Mr. Goodrich.

17   A    Good morning.

18   Q    What do you do for work?

19   A    I'm a tattoo artist.

20   Q    And about how long have you been in the -- that industry?

21   A    28 years now.

22   Q    What did you do prior to becoming a tattoo artist?

23   A    I was a -- enlisted in the Marine Corps.

24   Q    How long did you serve in the Marine Corps?

25   A    Eight years.
```

1   Q    And that was an honorable discharge?

2   A    A general discharge.

3   Q    Now, during your time in the tattoo industry, have you

4   owned any tattoo businesses?

5   A    I have.  I had multiple businesses.

6   Q    One of those called Aloha Tattoo?

7   A    Yes.

8   Q    Where was Aloha Tattoo located?

9   A    Aloha Tattoo is located at 318 Kuulei Road in Kailua.

10        MR. AKINA:  And for those of us not from the islands,

11   could we publish Exhibit 1-15C, which is from the government's

12   first supplemental list already in evidence?

13        THE COURT:  Go ahead.

14   BY MR. AKINA:

15   Q    Can you just circle where Kailua is on this map?

16   A    Kailua (indicates), just below Marine Corps Base Hawaii.

17        MR. AKINA:  And can we show the witness only

18   Exhibit 1-219 from the original list.

19   BY MR. AKINA:

20   Q    Do you recognize what this map shows?

21   A    Yes.  It's a overhead view of the street that my business

22   is on.

23   Q    Is this a neighborhood in Kailua?

24   A    Yes, it is.

25        MR. AKINA:  At this time I'd offer Exhibit 1-219 into

1  evidence.

2             THE COURT:  Any objection?

3             MR. KENNEDY:  No objections.

4             THE COURT:  Without objection, 1-2019 -- 219, excuse

5  me, one, dash, two, one, nine, is admitted.

6             (Exhibit 1-219 received in evidence.)

7             THE COURT:  You may publish.

8  BY MR. AKINA:

9  Q    And just zooming in on the red dot, is that where Aloha

10  Tattoo is located?

11  A    Yes, it is.

12             MR. AKINA:  We could zoom out.  We can take this down

13  for now.

14  BY MR. AKINA:

15  Q    Are you familiar with an individual named William Whitney?

16  A    Yes, I am.

17  Q    Do you know him by a different name?

18  A    He goes by Billy.

19  Q    And how do you -- how did you first meet him?

20  A    I gave him his first job in the tattoo business.  I hired

21  him on as a tattoo artist.

22  Q    And after several years of working together, did the two

23  of you part ways?

24  A    Yes, we did.

25  Q    And at the time that -- after you parted ways, what did

```
1   Billy Whitney do for work?

2   A     He -- he opened up a competing tattoo business.

3   Q     So the two of you became competitors?

4   A     Yes.

5   Q     And without going into too much detail, how's the

6   relationship between the two of you?

7   A     Pretty volatile.  It was -- it was not a good

8   relationship.

9   Q     Were there online feuds between the two of you?

10  A     Yes.

11  Q     Did it ever -- were there ever the potential to get -- or

12  the offer -- did it ever come up that maybe we should possibly

13  fight?

14  A     Later on down the road.  There had been instances where I

15  would be out in Honolulu and, you know, there were a couple of

16  altercations, not with him but with his friends that were

17  acting on his behalf.  And then later on --

18  Q     And at some point did Billy Whitney try to impersonate

19  you?

20  A     Yes.

21  Q     And did that involve sending a -- sending an email to a

22  potential witness in an unrelated case from this one?

23  A     Yes.  Like I said, there was an altercation where I was a

24  defendant in an assault case.  It was a -- I was, you know,

25  pleading self-defense, and when we were in jury selection I
```

1    learned that somebody sent an email to the material witness as

2    if it were coming from me, threatening him if he testified

3    against me.

4    Q    And ultimately -- one, had you sent an email to any

5    witness?

6    A    I did not.

7    Q    And two, did you hire people to investigate that?

8    A    I hired Goodenow Associates to do a forensic tracing of

9    the IP address.  They got it traced back to the actual computer

10   that the email was authored at at the FedEx Kinkos on

11   University.  And they got Billy Whitney on camera typing the

12   email.

13   Q    And was that information shared with law enforcement?

14   A    Yes, because I was charged again with terroristic

15   threatening and a TRO violation.  So I had another court date.

16   Q    Okay.  And after that information was turned over, what

17   happened to those specific charges?

18   A    They were all dismissed.

19   Q    And was Billy Whitney arrested for anything?

20   A    Billy Whitney was indicted by the Attorney General's

21   office for identity theft.

22   Q    With -- do you know -- so fair to say after that, that

23   didn't help your relationship with Billy Whitney?

24   A    No.

25   Q    Do you know an individual named Michael Buntenbah?

1   A     Yes, I'm familiar with him.

2   Q     How do you know of him?

3   A     I just -- I've tattooed him in the past.

4   Q     And --

5   A     My tattoo shop.

6   Q     And do you know if he has any relation to Billy Whitney?

7   A     He and Billy had gone into business together to open a

8   clothing store in Kaneohe.

9   Q     Do you know if Michael Buntenbah did any other type of

10  work?

11  A     I had learned that he was working security for the M

12  Nightclub.

13  Q     And what's your understanding of who owned the M

14  Nightclub?

15  A     Just all I know is what I hear out on --

16  Q     I won't ask you to testify to that then.

17  A     Okay.

18  Q     I'll show you Exhibit 1-44, which is already in evidence.

19        MR. AKINA:  Permission to publish, Your Honor?

20        THE COURT:  Yes.  Go ahead.

21  BY MR. AKINA:

22  Q     Do you recognize this individual?

23  A     Yes.  That's -- that's Mike Buntenbah.

24        MR. AKINA:  We can take that down.

25  BY MR. AKINA:

1    Q     I'm going to direct your attention to November 21st of

2    2017.  This is a few days before Thanksgiving.

3          Did you have any interactions with Billy Whitney on that

4    day?

5    A     Yes, I did.

6    Q     And can you describe what took place briefly?

7    A     We were working out at the 24-Hour Fitness in Kaneohe.

8    Q     Let me stop you there.  When you say "we," who's we?

9    A     Oh, I was with my -- my personal trainer, Stan A.O.

10   [phonetic].

11   Q     So not working out with Billy Whitney?

12   A     No.  I was working with my personal trainer Stan, and

13   about halfway through our back workout when Billy came up the

14   stairs, and he sought me and he -- he approached.  And he was

15   calling me a rat because he got in trouble for the email that

16   he sent.  And he tried talking to my friend, and we just told

17   him, you know, we're training.

18   Q     You referenced an email that he sent.  Is that the --

19   A     The one where he impersonated me and that he got in

20   trouble for.

21   Q     And so how did that interaction go at the gym?

22   A     We had -- we had some loud words in the gym in front of

23   everybody.  You know, I had told him, you know, if you're still

24   mad, you know, let's -- let's take care of it.  And then he

25   left.

1    I went home and my friend Stan had called me and told me:

2    Yeah, he's calling people up.  I said, What do you mean?

3    He says, Oh, he called -- called my friend Sheldon.  He

4    goes:  You know him.  He's got a room where he instructs

5    jujitsu at the gym that we normally train at, the Iron Hawaiian

6    Fitness.

7    I said, Okay, well, I don't want to risk a street fight

8    where I can get in trouble.  So ask him if he wants to schedule

9    a fight in that gym and we can just go at it in a controlled

10    environment, get it off our chests and go our separate ways.

11    Squash it already.

12    Q    And to your understanding, was that offer to squash it at

13    a gym relayed to Billy Whitney?

14    A    Yes.  That was --

15    Q    And to your knowledge, was that offer ever taken up?

16    A    The guy that we asked to relay the message to that owned

17    that portion of the gym, his name was Sheldon, he had relayed

18    the message to Billy.  And then when he came back to us, while

19    we were training, he said he doesn't want to do it.

20    Q    A couple days later after that, did you have a customer by

21    the name of Kayla come into your shop?

22    A    I did.

23    Q    And what -- did she have a tattoo done?

24    A    Yeah.  I believe I tattooed a cursive name on her -- on

25    her hip.

1   Q    And whose name was that?

2   A    She wanted the name "Jake" tattooed on her hip.

3   Q    A few days later after that, November 27th of 2017, do you

4   remember that day?

5   A    Yes, I do.

6   Q    Were you working that day?

7   A    Yes, I was.

8   Q    And about what time did you get to work?

9   A    I think I got to work somewhere between two and three

10  o'clock that day.  It was -- it was, you know, a few years

11  back, so I believe it was between 2:00 and 3:00 p.m.  Probably

12  closer to 2:00.

13  Q    And was this at Aloha Tattoo?

14  A    Yes.

15  Q    And at that time, what was your clientele like?

16  A    I had a group of young ladies and a gentleman, they were

17  all in the Air Force.  I believe they were Security Forces.

18  Q    And those people were inside your shop?

19  A    They were in the shop.

20  Q    Okay.  And did you have people working there as well?

21  A    Yes.  I had one of my -- it was just myself and one other

22  tattooer working, and then we had our desk counter girl.

23  Q    What were the names of the people who were working?

24  A    The tattoo artist's name was Isaiah Carbonell, and then

25  the desk girl that day Yesenia, and I just have her maiden last

1    name, Almazo.

2    Q    That -- at some point that afternoon was your family there

3    at the shop?

4    A    Yes.  All of my kids go to school across the street at

5    Kailua Elementary, or they did at the time.  And my -- my

6    youngest daughter, Isabella, had gotten out of school and her

7    and her friends walked over to the shop.  I put her up on

8    the -- one of the high tables to do her homework.  And then my

9    wife showed up and my wife was sitting with her.  And I think

10   they were there until right around five o'clock.

11   Q    And at some point did your wife and your child leave?

12   A    Yes.  It was right around 5:00 she took -- took my

13   daughter home to feed her and get her bathed.

14   Q    Okay.  So after your wife and your child leave, what do

15   you recall happening next?

16   A    Another young lady came into the tattoo shop.  She wanted

17   to get a bumblebee tattooed.  So I was sitting at my desk

18   working on a -- a drawing for her.

19        While I was doing that, another guy came in, and he wanted

20   a -- you know, he kind of changed the atmosphere in the shop.

21   He came in and he was nervous, rocking back and forth.  And

22   every other word was an F-bomb, you know, F-this, F-that.  He

23   wanted to get a tattoo fixed.  So I got up to go check out what

24   he wanted.  And he was showing me some work on his arm that

25   needed a lot of help, and right about the time I was focusing

1    on one of the tattoos on his arm, the door creeped open and

2    that's when the second guy came in.

3    Q    Stay with the first guy who came in.  Do you recall how he

4    addressed you when he came in?

5    A    He came in asking for me by name.

6    Q    So did you know who he was?

7    A    Never seen him before.  Didn't know who he was.

8    Q    But he knew your name?

9    A    He knew my name.

10   Q    And you said it changed the atmosphere.  Can you describe

11   that?

12   A    He was high.  He was high on something.  It was making him

13   fidgety and he was a little sweaty.

14   Q    And do you recall any tattoos that he had that stand out

15   to you?

16   A    There was one that I want to say looked like a really bad

17   koi fish on the arm and some really bad lettering.  They looked

18   like they were done like at someone's house.

19   Q    And he rolled up the sleeve of his arm and showed you what

20   he wanted?

21   A    No.  He took his hat off.  He was wearing a hat.  He took

22   the hat off and put it on the jewelry case, and then he took

23   his sweater off.  He had a sweatshirt on.  He took that off to

24   show me the tattoos.

25   Q    And then you mentioned a second person came into the shop.

1   A      Second person came into the shop.

2   Q      Can you describe that person?

3   A      When I did look up at him, because one of the girls that

4   was at the table said, "That guy's wearing a mask," I leaned

5   over to see who was wearing a mask in my shop.  Because this is

6   2017.  Wearing masks in the business was not a common thing

7   back then.

8          When I saw the mask, you know, my stomach dropped and then

9   I got hit from side.  I saw white lights and then someone

10  started punching me.

11  Q      Who -- who as punching you?

12  A      The guy that was asking me about looking at his tattoo.

13  Q      So that first guy?

14  A      First guy.

15  Q      The first guy, did he have a mask on?

16  A      No, he didn't.

17  Q      So the second person who came on, with the mask, how was

18  he size-wise?

19  A      He was bigger than the first guy.  I want to say over

20  six-foot.  He -- estimate he was probably in the neighborhood

21  of 270 pounds.  He was -- he was built big but he wasn't

22  ripped.  You know, he was just a really big-framed guy.

23  Q      And was he bigger than the first guy?

24  A      Yeah, he -- he looked like he was bigger than the first

25  guy.

1   Q    And was the first guy, how was he size-wise compared to

2   you?

3   A    He was about as big as I am.  I'm bigger now than I was

4   back then.  But he was about my size now, but he was taller

5   than me.  I would -- I would give him close to six-foot as well

6   because I was looking up at him when I was, you know, initially

7   talking to him.

8   Q    That second guy, what was he doing with his hands?

9   A    He had something in his -- he was wearing gloves.  He had

10  a mask on.  He had a hood up.  He had gloves on.  And I

11  couldn't tell -- I thought he had a gun.

12  Q    Where did you see that gun?

13  A    Well, I thought I saw something in the -- the pocket of

14  his hoodie, and he was doing something.  You know, like I said,

15  as soon as I looked up and saw the mask, I got hit from the

16  side.

17  Q    And so that is the first guy who came in, without a mask,

18  he hits you?

19  A    Correct.

20  Q    What happens next?

21  A    He keeps punching me.  I -- I grabbed onto his shirt and

22  was trying to push myself off and he wasn't -- wasn't letting

23  go of me.  He had me in a clinch and he kept punching and

24  punching, and then we started to scuffle into the doorway into

25  the next part of the shop.

1      And I remember -- worried about the other guy.  'Cause

2   like I said, I thought he had a gun.  And he started to move.

3   I could see him -- you know, I'm kind of behind the guy that

4   I'm scuffling with -- just a little bit because he had my head

5   down.  And then that's when I -- I ended up pulling my

6   pocketknife out and I swung for my life.

7   Q    Who did you swing at?

8   A    The guy that was punching me and holding me.

9   Q    That was the first guy?

10  A    Yeah.

11  Q    Did you -- were you -- did you stab him?

12  A    Yeah.  I got him a couple of times.

13  Q    Did that stop the attack?

14  A    It did.

15  Q    And then what happens?  What did -- how did he react, that

16  first guy?

17  A    I guess once he realized that he -- he had got stabbed, he

18  was hanging onto me for a second.  He turned around and he --

19  you know, he started to run through the room and he was yelling

20  at the other guy that I had a knife.  I followed him out.  You

21  know, I stopped.  Once he -- you know, once he let go of me, I

22  stopped.  I followed him out, and they got into a car that had

23  been parked in front of the shop for a few hours.

24  Q    Who left the shop first of those two guys?

25  A    The guy with the mask and the gloves was -- he was trying

```
 1   to get out the door the wrong way.  You know, the -- there's

 2   a -- it's written on the door to pull, and he was pushing.  And

 3   he almost took the door off before he open -- pulled it open.

 4   And he ran out and then the -- the other guy flew out after

 5   him.

 6   Q    Now, at any point did that second male who was wearing the

 7   mask, did he join in with the attack?

 8   A    No.  He didn't.

 9   Q    And do you know what he was doing during the attack?

10   A    I -- I heard a rumor that he was --

11   Q    I won't ask you --

12   A    Okay.

13   Q    -- to talk about rumors.

14        What did you think was happening in that moment after you

15   got punched and the second --

16   A    I thought I was getting robbed.  I thought I was getting

17   robbed in my tattoo shop.

18   Q    And you told us that you pulled out a knife.  You swung

19   for your life.  Was there anyone else in the shop that you were

20   concerned about?

21   A    Yes, there -- there were many girls in the shop, and then

22   one of my artists who he's not a big guy.  So I was

23   definitely -- definitely in fear for my life and -- and the

24   lives of others in my shop.

25   Q    Fair to see that -- fair to say that these two individuals
```

1  who came in, the one who attacked you and the second male with

2  the mask, that they were larger and bigger than anyone else in

3  the shop?

4  A    Oh, yes, they were.

5  Q    So you followed these two men out of your store.  Did you

6  do anything after that?

7  A    I did.  I saw the -- the guy with the mask ran around to

8  the driver's side of the car and he was trying to get the door

9  open.  I believe somebody opened the back door, the -- the rear

10 passenger door where the guy that I stabbed dove into the back

11 seat.  And I went over and I popped the tires on both passenger

12 tires.

13 Q    Was that the same knife you used earlier?

14 A    Same knife.

15 Q    Why did you do that?

16 A    I wanted to disable the vehicle so they couldn't get away

17 because 500 feet across the street is a HPD substation.

18 Q    That's the Kailua police station?

19 A    Kailua police department, yes.

20 Q    Where did -- what type of vehicle did they get into?

21 A    It -- it looked likes an older, maybe early 2000s Toyota

22 Camry.

23 Q    Do you remember the color?

24 A    Yeah, it was a -- like a goldish -- goldish bronze.

25 Q    Did you stab anyone while they were running away from you?

1   A    I did not.

2   Q    And after these two men jumped into the vehicle, what --

3   where did they go from there?

4   A    Well, they -- they took off.  I didn't see how far they

5   got because I turned around to run back in the shop.  But, you

6   know, what I saw was they were heading town-bound on the -- the

7   pali.

8   Q    So where was this vehicle in relation to your storefront?

9   A    Parked right in front.  When I arrived to work that day,

10  it was parked out front.  I took notice of the car because my

11  body piercer has the same -- you know, same year range, same

12  color car but hers had stickers all over the windows.  This car

13  had blacked-out windows.

14  Q    Did you notice if there was anyone else inside that

15  vehicle?

16  A    I -- I saw somebody in the front passenger seat leaning

17  back looking, trying to look.  And then there was somebody, it

18  looked like, in the back seat as well.  Like I said, I think

19  that's who opened the door to let the other guy in.

20  Q    After the attackers fled in their car, what did you do?

21  A    I turned around.  I went back inside the shop.  I had

22  asked if someone called 911.  They had 911 on the phone

23  already.  And I was yelling back to them, you know, what kind

24  of car it was and which way they were headed, and I just made

25  sure everybody was all right.  And then I called my attorney.

1    Q    You -- so you spoke with your attorney?

2    A    I did.

3    Q    I'm not going to ask you what you talked about.  But did

4    you stay at your shop until police arrived?

5    A    I did.

6    Q    And did you speak to police that day?

7    A    Yes, I did.

8    Q    Were you arrested that day?

9    A    About right around 9:45, I was arrested that night.

10   Q    And were you ever released?

11   A    Yes.  They released me the next day.

12   Q    The next day.  Were you ever prosecuted?

13   A    No.

14   Q    Never prosecuted in relation to this incident?

15   A    No, not to this incident.

16   Q    Did you delay in notifying authorities about what took

17   place at the shop?

18   A    No.

19   Q    What was one of the reasons why you told people to call

20   911?

21   A    Because I thought a robbery just happened in my shop and I

22   know somebody just got stabbed and they're going to -- you

23   know, they're going to be probably showing up at an emergency

24   room shortly.

25   Q    Did you later learn what happened to that person that you

1   stabbed?

2   A    I did, later that night.

3   Q    What did you learn?

4   A    I -- I'd heard it in a conversation between two of the

5   police officers.  They said -- I heard one of them referred to

6   it as he coded.  And I asked him, I said, "What does that

7   mean?"  He goes, "He's dead."

8   Q    How did you feel after learning that?

9   A    Horrible.

10  Q    Do you wish that that scenario played out in a different

11  way?

12  A    Yeah.  I wish it never happened.

13  Q    Did you have surveillance cameras in the shop that day?

14  A    I have a surveillance camera system, but it takes

15  batteries that run out really fast and I did not change the

16  batteries the night before.

17  Q    So were your surveillance -- was your surveillance system

18  working?

19  A    It wasn't working.  It didn't -- those cameras didn't

20  catch anything.

21  Q    Did you change that afterwards?

22  A    What I ended up doing was I -- I bought new battery

23  chargers and I bought more batteries.  Because I'm still using

24  the same system, but they've upgraded the batteries in the

25  charging system.  And I just bought a lot more off Amazon, and

1    I just make it part of the regular routine to check those

2    cameras.  And I get notifications on my phone if one of 'em's

3    going low, where I didn't have that before.

4              MR. AKINA:  Can we publish Exhibit 1-219?  It's

5    already in evidence.

6              THE COURT:  Go ahead.

7    BY MR. AKINA:

8    Q    Okay.  Can you circle where that police station is that

9    you're talking about?

10   A    (Complies.)

11   Q    So if you were to exit your store and turn left, that

12   would take you to the police station?

13   A    Correct.

14   Q    And there's a fire station right next to it --

15   A    Yes.

16   Q    -- is that right?

17        Which direction did the attackers flee?

18   A    You want me to draw it on here?

19   Q    Sure.

20   A    Okay.  They left this way (indicates).

21   Q    So they went the opposite direction?

22   A    The opposite direction.

23   Q    And is that the direction that their car was facing?

24   A    Yes.

25              MR. AKINA:  Could we show the witness Exhibit 1-220?

1    This is from the original list.

2              THE COURT:  Go ahead.

3    BY MR. AKINA:

4    Q    And do you recognize this?

5    A    Yes.

6    Q    What is this?

7    A    That's the tattoo shop with the old paint job.

8    Q    Is this a picture from that -- that same day?

9    A    Yes.

10             MR. AKINA:  I'd offer Exhibit 1-220 into evidence.

11             THE COURT:  Any objection?

12             MR. KENNEDY:  No objection.

13             THE COURT:  Without objection, 1-220 is admitted.

14             (Exhibit 1-220 received in evidence.)

15             THE COURT:  You may publish.

16   BY MR. AKINA:

17   Q    So this is your shop from that day?

18   A    Yes, it is.

19   Q    And if we focus on the sidewalk and doorway -- the

20   sidewalk in front of the doorway and doorway as well.

21   A    Okay.

22   Q    Is this -- is there -- is this the door that was used

23   to -- the operational door?

24   A    Yes, it is.

25   Q    And is this the door that the attackers came in through?

```
 1    A     Yes.  The other door is dead-bolted shut and we -- we
 2    don't use it.  I don't -- I don't even keep the key for it.
 3    Q     There's some red splotches on the sidewalk.  What is that?
 4    A     That's blood from the first guy that got stabbed.
 5              MR. AKINA:  You can zoom out of this.
 6              We go -- can we show the witness Exhibit 1-228?
 7    BY MR. AKINA:
 8    Q     Do you recognize this?
 9    A     Yes.
10    Q     Okay.  What is this diagram of?
11    A     That looks like a -- a topical diagram of the -- the
12    inside of my tattoo shop.
13    Q     Is it --
14    A     And the street out front.
15    Q     Is it a fair and accurate representation of the shop that
16    day?
17    A     I'd say so.  Looks -- looks pretty accurate.
18              MR. AKINA:  I offer 1-228 into evidence.
19              THE COURT:  Any objection, counsel?
20              MR. KENNEDY:  No objection.
21              THE COURT:  No objection.  1-228 is admitted.
22              (Exhibit 1-228 received in evidence.)
23              THE COURT:  You may publish.
24              MR. AKINA:  We can focus on just the drawn portion.
25    BY MR. AKINA:
```

1   Q    Now, this isn't to scale, right?

2   A    Right.  It's -- yeah.

3   Q    And it looks like there's two large rooms for your shop;

4   is that correct?

5   A    Correct.

6   Q    One on the right and one on the left?

7   A    Yes.

8   Q    And that picture we were looking at with the door that

9   works, is that the one on the left or the right?

10  A    The one on the right.

11  Q    Right here where this arrow is; is that right?

12  A    Yes.

13  Q    And could you circle where you were at the time that you

14  were attacked?

15  A    I was in this area right here (indicates).

16  Q    Kind of where that filled-in black circle is?

17  A    Yeah.  I -- I remembered being a bit more right here

18  (indicates), kind of behind the counter.

19  Q    You mentioned that you had one of your workers who was a

20  little smaller, he was in the other room?

21  A    Yes.

22  Q    Is that this area?

23  A    This area right here, that you just circled, was where

24  Isaiah Carbonell was -- was tattooing.

25  Q    And then, you see these other black boxes in the right

1    room?  I'll underline them.

2    A    Yes, I do.

3    Q    What would that represent?

4    A    Okay.  The one right here -- I'm going to circle it

5    (indicates) -- I believe that was Yesenia, the girl that works

6    for me, the desk girl.  And she was in the back cleaning

7    something.

8        Then the table that's closest to the glass counter, right

9    here (indicates), that's where the group of the -- the Air

10   Force -- the Air Force girls were sitting at that tall table

11   waiting for Isaiah to finish tattooing their friend.

12   Q    And this one closest to the doorway at the bottom?

13   A    The one closest to the doorway, and it was the girl that I

14   was drawing the -- the bumblebee for, and I believe that was

15   her in the photo that you showed me in the -- the front of the

16   shop.  She was still sitting in the -- still sitting at the

17   table.

18   Q    And then what does this black -- that circle with the

19   cross going through it represent?

20   A    This one right here?  I'm going to say that's guy number 2

21   with the mask on, when he came in the shop.

22   Q    That's approximately where he was?

23   A    Yeah.

24   Q    And then these Bs that are circled by the doorway, what

25   does that represent?

1   A     I think the Bs are where the blood, when you showed me the

2   pictures of the blood.

3   Q     So there's some blood on the sidewalk.  And does that mean

4   there's blood on the inside of the stairs?

5   A     There was blood on the inside of the floor they had to

6   clean it up and -- and blood on the sidewalk out front.

7             MR. AKINA:  Can we show the witness Exhibit 1-224,

8   then 1-225 -- and 1-225, 1-231, and 1-233.

9   BY MR. AKINA:

10  Q     Are these all photographs of the interior of Aloha Tattoo,

11  various portions of it from that day?

12  A     Yes, they are.

13            MR. AKINA:  At this time I'd offer 1-224, 1-225,

14  1-231, and 1-233 into evidence.

15            THE COURT:  Any objection?

16            MR. KENNEDY:  No objection, Your Honor.

17            THE COURT:  Without objection, those four exhibits

18  are each admitted, 1, dash, 224, 225, 231, and 233.

19            (Exhibits 1-224, 1-225, 1-231, and 1-233 received in

20  evidence.)

21            THE COURT:  You may publish.

22            And Mr. Akina, we're at 12:20.  So unless you've just

23  got a few more minutes with Mr. Goodrich after you get through

24  these photos, I suggest we take a break.

25            MR. AKINA:  Okay.  Your Honor.

```
 1              Could we publish 1-224?
 2              THE COURT:  Go ahead.
 3    BY MR. AKINA:
 4    Q    Is this that blood that you're referring to?
 5    A    Yes, it is.
 6    Q    Going to 1-225.
 7         Is this that front door that was working on that day?
 8    A    Yes.
 9    Q    And you mentioned that there was -- it said "pull" on it?
10    A    Yes.
11    Q    Do you see that here?
12    A    We had to write it on the door because everybody kept
13    trying to push to get out.
14    Q    And then going to 1-231.
15         Is this a picture of that room that you were in when you
16    were attacked?
17    A    Yes, it is.
18    Q    And then we're going to focus on this area on the bottom
19    right-hand corner.
20              MR. AKINA:  Could we go to 1-233?
21    BY MR. AKINA:
22    Q    Does that show what I had circled previously in the other
23    exhibit?
24    A    Yes.
25    Q    And what is -- what is this on the counter underneath --
```

1   A     It's the old DVR system from the -- the previous cameras

2   we were using that no longer worked.

3   Q     So this surveillance system was not in use?

4   A     Correct.

5           MR. AKINA:  This is a good point to stop, Your Honor.

6           THE COURT:  All right.  Let's go ahead and take our

7   second and final break of the trial day.

8           As we do so, I'll remind our jurors to please refrain

9   from discussing the substance of this case with everyone,

10  including each other, until I advise you otherwise.  Please

11  refrain from accessing any media or other accounts of this case

12  that may be out there.  And finally, do not conduct any

13  independent investigation into the facts, circumstances, or

14  persons involved.

15          COURTROOM MANAGER:  All rise for the jury.

16          (The jury was excused at 12:20 p.m.)

17          (The proceedings recessed at 12:21 p.m. until

18  12:39 p.m.)

19          (Open court in the presence of the jury.)

20          THE COURT:  All right.  Back from our second and

21  final break of the trial day.

22          Mr. Akina, you may resume your examination of

23  Mr. Goodrich when you're ready.

24          MR. AKINA:  Thank you, Your Honor.

25  BY MR. AKINA:

1    Q    The knife that you had that day, what did you do with it

2    after you went back into the -- into your shop?

3    A    I -- I went and set it inside the toolbox on the inside of

4    the room next door.

5    Q    And then once police arrived, what did you do?

6    A    I took 'em to the knife and opened the drawer for 'em.

7    Q    Try pulling the microphone --

8    A    I -- I showed him where the knife was so that he can

9    photograph it.

10   Q    So the police could take it as evidence?

11   A    Yes.

12        MR. AKINA:  Could we show you Exhibit 1-226, not in

13   evidence.

14   BY MR. AKINA:

15   Q    What is this a picture of?

16   A    That's my pocketknife, Spyderco.

17   Q    And in this picture, where is the pocketknife located?

18   A    That's the desk drawer that I put it in.

19        MR. AKINA:  I'd offer 1-226 into evidence.

20        THE COURT:  Any objection?

21        MR. KENNEDY:  No objection.

22        THE COURT:  Without objection, 1-226 is admitted.

23        (Exhibit 1-226 received in evidence.)

24        THE COURT:  You may publish.

25   BY MR. AKINA:

1  Q    So this is the pocketknife that you had?

2  A    That's correct.

3  Q    And the blade is approximately how long?

4  A    I believe it's three inches.  It's -- it's a standard

5  legal pocketknife.

6  Q    It's not a large knife?

7  A    No.

8  Q    And you said this is in the drawer of the toolbox that you

9  placed it in?

10 A    Yes.  We use rolling tool chests as our tattoo stations,

11 kind of like a desk.  And it was the very top drawer.

12         MR. AKINA:  We can take this down.

13 BY MR. AKINA:

14 Q    Thinking back to the incident about a week prior to the

15 attack at your shop, and you had the run-in with Billy Whitney

16 at the gym, do you recall anything that Billy Whitney said to

17 you towards the end of the conversation?

18 A    Yes.  You know, we were bantering back and forth, and

19 he -- he lost his temper.  And he told me:  I'm going to start

20 everything right back up again.

21 Q    And did you take that to be a reference to the rivalry

22 between the two of you?

23 A    Yes.

24 Q    You described a older Camry as the vehicle that the

25 attackers fled in.

1            MR. AKINA:  Could we show the witness Exhibits 1-247,

2    which is on the first list, and 1-246?

3            THE COURT:  Yes.  Go ahead.

4    BY MR. AKINA:

5    Q    Do you recognize these pictures?

6    A    Yes.  That's the vehicle that was parked in front of my

7    shop that they -- they left in.

8    Q    And going back to 1-247, does it show the tires that

9    were -- that you slashed?

10   A    Yes.

11           MR. AKINA:  I'd offer 1-246 and 1-247 into evidence.

12           THE COURT:  Any objection, counsel?

13           MR. KENNEDY:  No objection.

14           THE COURT:  Those two exhibits then are admitted

15   without objection.  That's 1-246 and 247.

16           (Exhibits 1-246 and 1-247 received in evidence.)

17           MR. AKINA:  Can we start with 1-247 to publish?

18           THE COURT:  Go ahead.

19   BY MR. AKINA:

20   Q    So this that tan/gold Camry that you described?

21   A    Yes, it is.

22   Q    And if we could focus on the front passenger side tire.

23   A    Okay.

24   Q    Does this show that it's deflated?

25   A    Yes.

1   Q    If we focus on the rear passenger tire.

2        Does that also show that it's deflated?

3   A    Yes, it does.

4   Q    And those are the two tires you remember stabbing or

5   slashing with your knife?

6   A    Yes.

7             MR. AKINA:   Could we show Exhibit -- publish

8   Exhibit 1-296, which is already in evidence?

9             THE COURT:   Yes.   Go ahead.

10  BY MR. AKINA:

11  Q    Does this appear to be the same vehicle?

12  A    That's the same car.

13  Q    Did you later learn the name of the person who attacked

14  you in the store?

15  A    I did.

16  Q    What name is that?

17  A    Dayson Kaae.

18  Q    This is the person who did not have the mask, correct?

19  A    Correct.

20            MR. AKINA:   Can we show the witness only

21  Exhibit 1-267.

22  BY MR. AKINA:

23  Q    Do you recognize this individual?

24  A    Yes.

25  Q    And who is that?

```
 1   A    That's -- that's Dayson.

 2   Q    Is that as you recall him from that day?

 3   A    I only saw him briefly that day, but --

 4   Q    But you recognize him?

 5   A    That's -- that's him.

 6             MR. AKINA:  I'd offer this into evidence, Your Honor.

 7             THE COURT:  Any objection, counsel?

 8             MR. KENNEDY:  No objection.

 9             THE COURT:  1-267 is admitted without objection.

10             You may publish.

11             (Exhibit 1-267 received in evidence.)

12   BY MR. AKINA:

13   Q    And focusing on his neck area, do you see those tribal

14   tattoos on the left half of his neck?

15   A    I -- I do.

16   Q    Okay.

17             MR. AKINA:  We can take this down.

18   BY MR. AKINA:

19   Q    I want to show you Exhibit 1-73, which is already in

20   evidence.  Do you recognize this individual?

21   A    That looks like the same guy.

22   Q    Dayson Kaae?

23             THE COURT:  You may publish.

24             Sorry, counsel, the exhibit was not up on the screen.

25             MR. AKINA:  Thank you, Your Honor.
```

1  BY MR. AKINA:

2  Q    You were saying this looks like Dayson Kaae?

3  A    Yeah, looks like the same guy.

4          MR. AKINA:  We can take this down.

5  BY MR. AKINA:

6  Q    Following the attack at your tattoo shop, several months

7  later, January 18 of 2018, did you see -- well, let me back up.

8          After the attack at your tattoo shop, do you become aware

9  of an individual named Jake Smith?

10  A   Yes, I became aware of him.  I didn't know him before

11  that.

12  Q    And was that just from people that you knew were talking

13  to you?

14  A   Everybody was telling me that Jake Smith was there and

15  that was him.

16  Q    And had you seen videos and done Internet research for

17  yourself a little bit?

18  A   Somebody showed me a couple of video clips, one of him

19  training at a gym, training with focus mitts, doing punch

20  combos and kicks.  And then there was another video of him

21  walking up to fight somebody.  Looked like it was at nighttime.

22  And he was walking up and squared off with another guy and

23  kicked him in the head and knocked the guy out.

24  Q    I want to show you Exhibit 1-41, already in evidence.

25          MR. AKINA:  Permission to publish?

1              THE COURT:  Yes.  Go ahead.

2    BY MR. AKINA:

3    Q    Do you recognize this individual?

4    A    That's a picture I was shown of Jake Smith, and that's the

5    guy from the videos.

6    Q    Okay.  So on January 18, 2018, several month -- a few

7    months after the attack at your shop, did you see this

8    individual again?

9    A    Yes.  He -- he was at my house.

10   Q    And tell us how you ended up saw -- seeing him.

11   A    You want me to tell you the -- the whole story of what

12   happened that morning?

13   Q    Well, let's start with -- were you at home initially?

14   I'll start there.

15   A    I was drive -- dropping my wife off at work.

16   Q    Okay.

17   A    She's a registered nurse at Kaiser.  So I was coming back

18   from Moanalua.  And I had just come out of the second tunnel,

19   heading towards the windward side, when -- I can't remember if

20   it was my son or my daughter called my phone and told me

21   someone was trying to get into the house.

22        So while I was driving, I went onto my phone.  Like I

23   said, I had beefed up my security cameras.  I put Arlo cameras

24   on every inch of my property at home and I can watch them in

25   real time.  And there was two guys trying to get into my front

1    door.

2         So I floored it to get home.  And I was still watching the

3    video, talking to my kids on speakerphone, and I told my

4    daughter to take the kids into her bedroom and lock the door

5    and try to watch where they're going because they had moved to

6    the left of my front door.  They started to go on the side of

7    my house to the rear, and they were trying to get into the --

8    trying to get into the -- the rear slider.

9         At that point, I have an alarm option on the app, and I

10   hit the alarm and it scared 'em.  So they went jumping over

11   backyards to the right of my house, started jumping over --

12   jumping over the fences.  But once they got over the first

13   fence, I couldn't see where they went.

14        But I had got into Kailua, still talking to the kids, and

15   I said I'm going to drive around the neighborhood to see if I

16   can see anyone who shouldn't be there.  Early morning, quiet

17   neighborhood.  And I didn't see anybody, so I told them I'm

18   pulling up in front of the house.  And all my kids came running

19   outside chattering, telling me what was happening and, you

20   know, told me, you know, one of the guys had tattoos, had a

21   hoodie on.  And then one of my -- my son pointed and he said:

22   That's him.

23        And I looked to my left down Akele Street towards Akipohi,

24   and there was a guy walking up the street with his shirt off,

25   heavily tattooed, with a cigarette in his mouth.  And he had

1    approached me telling me that he's looking for the guy that was

2    with him, that stole something from his girlfriend.  He was

3    giving me some story.

4    Q    Let me stop you there.

5    A    Okay.

6    Q    Who was saying that?  You were saying that or he was

7    saying that?

8    A    He was saying that.

9    Q    Okay.  So this guy that your -- your son had pointed out

10   to you?

11   A    Right.

12   Q    Okay.  So you're talking to him, and this is -- is this

13   near your home?

14   A    Yes.  It's -- I was right in between my house and my

15   neighbor's house at this point, standing in the middle of the

16   street.

17   Q    And this individual that you're speaking with, tell us the

18   rest of that conversation.

19   A    Okay.  He -- I recognized him.  His name is Giovanni.  And

20   I know that he has a sister.  And just since the incident

21   happened at my shop and I'm hearing stories from everybody,

22   they're telling me that Giovanni's sister was dating Jake

23   Smith.  So, you know, I thought it was pretty strange.  This

24   guy's at my house trying to get in my front door, with that

25   connection.  And I punched him.

1    Q    You punched him?

2    A    I punched him, yeah.

3    Q    Did he -- before he punched you [sic], did he tell you

4    that he was one of the people that was trying to get into your

5    house?

6    A    Yeah, he's -- he told me that he was trying to chase the

7    other guy that stole something from his girlfriend.  But on my

8    cameras I had him trying to open my door.

9                MR. AKINA:  Can we show --

10   BY MR. AKINA:

11   Q    And that individual, that's not Jake Smith, right?

12   A    No.

13               MR. AKINA:  Now, can we show the witness

14   Exhibit 1-237 from the original list?

15               THE COURT:  Go ahead.

16   BY MR. AKINA:

17   Q    Is this a screen shot from your home surveillance system?

18   A    Yes, it is.

19   Q    And that's the person who -- Giovanni Poland you're

20   talking about?

21   A    Yes.  He's standing in my driveway right in front of my

22   front door camera.

23               MR. AKINA:  And then can we show the witness 1-238.

24   BY MR. AKINA:

25   Q    Is this that same person?

 1    A    Yes.

 2    Q    Taken from their Instagram?

 3    A    Yes, it is.

 4             MR. AKINA:  Offer 1-237 and 1-238 into evidence.

 5             THE COURT:  Any objection, counsel?

 6             MR. KENNEDY:  No objection.

 7             THE COURT:  Without objections, those two exhibits

 8    are admitted, 1, dash, 237 and 238.  You may publish.

 9             (Exhibits 1-237 and 1-238 received in evidence.)

10             MR. AKINA:  Can we publish 237 first?

11    BY MR. AKINA:

12    Q    So this is the screen shot from your home surveillance

13    system?

14    A    Correct.  That's the camera right in front of my front

15    door, in my driveway.

16    Q    And going to 1-238.  Is this that same person?

17    A    Yes, it is.

18    Q    And do you see how this person's left eye is a little blue

19    or black?

20    A    Yes.

21    Q    I'll circle it (indicates).

22         Is that where you punched him?

23    A    I believe so.  Yeah.

24    Q    Now, after this interaction, you punch him, how does --

25    where does Jake Smith show up?

1  A    After I punched him, he, you know, fell down on his -- on

2  his butt.  And he was trying to get back up, and then I heard a

3  car start up two doors down from my house and it was a -- a

4  small silver car.  And it started up and started to pull out

5  and drove.  Wasn't in a hurry, but just drove right past us.  I

6  guess that was the car that had brought him there.  And that's

7  when I saw Jake.  First time I remember seeing Jake, you know,

8  where I could identify him, that was him driving the car.

9  Q    And where was Jake in that car?

10  A    He was driving.

11  Q    And if we could go back to 1-237 real quick.

12       This person, Giovanni Poland, what does that look like to

13  you in his right hand?

14  A    It looks like a cell phone.

15  Q    Does he appear to be chasing anyone?

16  A    No.

17  Q    Okay.  So that was January 18, 2018?

18  A    That's correct.

19  Q    On April 10th of 2018, or about that time, by then were

20  you aware of who -- of an individual named Michael Miske?

21  A    Yes.

22  Q    And did you see that person at any point?

23  A    Yeah.  I was -- I had just dropped one of my kids off at

24  school.  I was driving home with my wife.  And I was driving,

25  taking a right-hand turn off of Keolu Drive onto Akipohi Street

1   to get into my neighborhood, and then there's one more brief

2   right turn.  And I was driving slow and I noticed a -- a

3   brand-new black Suburban.  I think it was -- no, it was a GMC

4   Sierra with dealership plates on it.

5         And I pointed the guy out to my wife.  And I was turning

6   the corner slow, and he turned around and he was holding a

7   remote control.  And I looked up and there was a drone trying

8   to stabilize up in the air.  And this is about four houses down

9   from my house on my street.

10  Q     And to your knowledge, did Michael Miske live on your

11  street?

12  A     No.

13  Q     What did you do after you saw this?

14  A     I ran home and dropped my wife off.  And I jumped in the

15  car and I shot back over there to try to film him.  And I got

16  the truck, but he had ducked out of sight.

17  Q     So the video that you took, does it show Michael Miske?

18  A     It doesn't show him.  But I -- I ended up filing a police

19  report that day that he was on my street.  Not the drone.

20              MR. AKINA:  I want to show the witness Exhibit 1-1098

21  from the government's fourth supplemental.

22              THE COURT:  Go ahead.

23              MR. AKINA:  If we could play -- there shouldn't be

24  any audio, if we could just play this for the witness.

25              (Video played.)

 1   BY MR. AKINA:

 2   Q    Is this that video you took from that day?

 3   A    Yes, it is.

 4            MR. AKINA:  I'd offer Exhibit 1-1098 into evidence.

 5            THE COURT:  Any objection, counsel?

 6            MR. KENNEDY:  No objection.

 7            THE COURT:  Without objection, 1-1098 is admitted.

 8            (Exhibit 1-1098 received in evidence.)

 9            THE COURT:  You may publish.

10            MR. AKINA:  Okay.  If we could play that for the

11   jury, please.

12            (Video played.)

13            MR. AKINA:  Can we pause it right here, at five -- go

14   back to five seconds.  Yes, that's good.

15   BY MR. AKINA:

16   Q    And so you said that this was a black GMC Sierra?

17   A    Yes.

18   Q    And that's what -- is that what you see here in the video?

19   A    Yes, it is.  And what you can't see in the bed of the

20   truck, because now the tailgate's up, was a -- a black Pelican

21   case, probably about three-foot by four-foot.  I guess that's

22   what some people put the high expensive drones in.  But there

23   was a Pelican case in the back.  And that's what actually got

24   my attention, was Pelican case with the tailgate down.  And

25   then I saw Michael Miske turn around and looked right at me and

1    he was holding the -- the remote control for the drone.

2    Q    Had you met Michael Miske prior to that day?

3    A    Very briefly.  Maybe couple years prior to that.

4    Q    Tell us about that.

5    A    My step-daughter, she's older, she worked at his nightclub

6    as a cocktail waitress.  She was dating -- she was dating his

7    younger cousin, named Kaulana Freitas.  So Kaulana was at my

8    house a lot.  I would just run into him when I'm coming in and

9    out of work.  And he would -- you know, he would spend the

10   night there from time to time.

11        And I guess one morning, you know, I was up early getting

12   kids ready for school, and somebody was banging on my front

13   door.  So I answered the front door and it was -- it was Mike

14   Miske.  And he was looking for Kaulana.  I suppose was late for

15   work.  He was -- it wasn't anything bad.  He just -- he's like:

16   Is Kaulana here?  I said, I'll go see if I can get him.

17        And as I was going down the hallway, he was already

18   running past me, apologizing, "I'm so sorry, Uncle."  And he --

19   he was a little flustered.  He started to run out to the car

20   without his shoes.  You know, the relationship I got from there

21   was more of a uncle-nephew relationship because of the age

22   difference, and he was yelling at him:  Go get your shoes.

23        He ran back and grabbed his shoes and -- I was having my

24   morning coffee, laughing at him.

25   Q    At Kaulana Freitas?

1   A     Yeah, Kaulana.  He was getting scoldings when he was

2   getting in the car.

3   Q     No negative interaction with Michael Miske --

4   A     No.

5   Q     -- on that day?

6   A     No.  No negative between him or I.

7   Q     Looking around the courtroom, do you see Michael Miske?

8   A     I do.

9   Q     Can you identify him by something he's wearing?

10  A     Raising his hand, wearing a black sports coat.

11          MR. AKINA:  Let the record reflect the witness has

12  identified the defendant.

13          THE COURT:  Yes.  The record should reflect the

14  witness Mr. Goodrich's identification of the defendant,

15  Mr. Miske.

16  BY MR. AKINA:

17  Q     You described -- going back to the attack at your shop,

18  you described the second masked male, and you said that he had

19  black gloves on; is that correct?

20  A     Yes.

21          MR. AKINA:  Can we show the witness --

22  BY MR. AKINA:

23  Q     Well, can you describe what that mask looked like?

24  A     It was one of those thin -- thin masks made out of like

25  rash guard material.  And it had a print of a skull on the face

1   below the -- you know, from the cheeks on down.

2          MR. AKINA:  Can we show the witness Exhibit 1-324,

3   which is already in evidence?

4          THE COURT:  Yes.  Go ahead.

5          MR. AKINA:  Permission to publish?

6          THE COURT:  Yes.

7   BY MR. AKINA:

8   Q    Is this what the mask looked like?

9   A    That's what it looked like, yes.

10         MR. AKINA:  And can we also publish 1-321, already in

11   evidence?

12         THE COURT:  Yes.

13   BY MR. AKINA:

14   Q    This is what the gloves looked like?

15   A    Yes.

16   Q    Now, after that run-in with Michael Miske in your

17   neighborhood with the -- with the drone, at some point later

18   did you meet with law enforcement?

19   A    I did, that day.  That morning I went down to the Kailua

20   substation to file a police report.

21   Q    And I'm not talking about that day.  I'm talking about

22   later on did you talk to law enforcement about this attack at

23   your shop?

24   A    Oh, yes, I did.

25   Q    And during conversations with law enforcement, who did

1    you -- did you identify an individual who you believed at that

2    time to have been the person wearing the mask?

3    A    I did.  I had been pretty heavily influenced by everybody

4    telling me what they knew, you know, what they thought they

5    knew.  And everybody had been telling me that it was Jake

6    Smith.  I saw a bit of the -- the face, because that mask was

7    slightly pulled down when he was getting back in the car, but I

8    still can't -- I can't really say for sure that it was him.  At

9    the time I thought it was him.  But as time went by and I'm

10   looking at more photos, I saw the video, the video footage, you

11   know, the way he moved, I was really unsure.

12   Q    And --

13   A    I didn't think that was him.

14   Q    And at that time did you also identify for law enforcement

15   who you believed then to be one of the passengers in that

16   getaway car?

17   A    Yeah.  I couldn't see really good.  But I thought I saw --

18   I thought I saw John Stancil in the passenger seat, leaning

19   back.  Was the -- the rear passenger door was open, but there

20   was just a small sliver.  And I was again told that he was

21   -- you know, he was one of the guys in the car.

22        So, you know, at that time I thought that was him.

23   Q    And you even -- did you also write out on some photographs

24   of Jake Smith and John Stancil essentially indicating that

25   belief?

1  A    I -- I did.  Because at that time I thought that's who it

2  was.

3  Q    And then after that, still in 2018, did you testify before

4  the grand jury?

5  A    Yes, I did.

6  Q    And before the grand jury, did you also testify that your

7  belief was that it was Jake Smith wearing the mask and John

8  Stancil in the car?

9  A    I did testify to that, yes.

10  Q    At the time when you were speaking with investigators and

11  when you testified before the grand jury, was that your honest

12  belief at that time?

13  A    It -- it was.  It's -- you know, like I said, it was a

14  long time ago.  I've learned new information since then and

15  it -- you know, it just didn't make any sense.  I was

16  definitely -- you know, definitely unsure later on.  But I -- I

17  wouldn't be able to say for sure that was who was in the

18  passenger seat and who had the mask on now.  But at the time I

19  thought it was.

20  Q    So it sounds like as you sit there today, you're not so

21  sure.

22  A    Yeah, I wouldn't be able to testify to that today.

23  Q    Okay.  And can you explain a little bit to the jury, you

24  know, what happened that brought you from saying that you

25  thought they were to now you're not so sure?

```
1   A    I --

2            MR. KENNEDY:  Objection, hearsay, Your Honor.

3            THE COURT:  Overruled.  Go ahead.

4   A    Okay.  I -- I had been shown a lot of photos of these guys

5   from social media.  The look would change from time to time,

6   but the -- the part that made me really unsure was when I was

7   watching the video of Jake Smith walking up to the fight and

8   saw him fighting, the way he moved and his build was different

9   from the guy that was in my shop that day.

10       I had a run-in, not really a run-in, but I had come across

11  John Stancil a little ways back, maybe 2018.  Like I said, it's

12  unsure, but I saw him at the Kahala Mall.  I had my kids at the

13  Candy Care.  So when he turned, he was about a hundred feet

14  from me, he turned and realized I was standing there.  He

15  turned around and beat feet.  He took off around the corner.

16  And he was -- it was eerily similar to the guy that was in my

17  shop wearing a mask.  Same build, moved exact same way.  So I

18  couldn't be sure that that was Jake Smith in my shop.

19            MR. AKINA:  Nothing further at this time.

20            THE COURT:  Cross-examination.

21                       CROSS-EXAMINATION

22  BY MR. KENNEDY:

23  Q    Sir, I want to take you back to the time period, I think

24  it was the day before.  You mentioned that there was a female

25  that came to your shop, correct?
```

```
 1   A    Couple of days before.

 2   Q    Couple of days before.

 3        And she requested a specific tattoo, right?

 4   A    Yes.

 5   Q    And what was that again?

 6   A    She wanted a cursive name.

 7   Q    And what was that name?

 8   A    Jake.

 9   Q    Okay.  And so I take it at that time, did you -- did you

10   or someone in your shop do that tattoo?

11   A    I did the tattoo.

12   Q    Okay.  So you did that.  And at the time, I guess, did the

13   name Jake mean anything to you?

14   A    No, it did not.

15   Q    Okay.  So then, moving forward, you described to the jury

16   what happened inside your shop when the first individual came

17   in, correct?

18   A    Correct.

19   Q    All right.  And other than the tribal tattoo, I take it

20   that he had to take his sweatshirt off, or he decided to take

21   his sweatshirt off, right?

22   A    Yes.  He wanted to show me a tattoo on his forearm that he

23   wanted fixed.

24   Q    All right.  And did you see any other tattoos on him that

25   you could recognize?
```

1   A     Very hazy memory about what was on his arm.  I just

2   remember no -- you know, thinking that he needed a -- a small

3   miracle to fix his arm.

4   Q     All right.  Okay.

5         So then at that point then you described to the jury the

6   events that happened, you grabbing the knife and having to

7   defend yourself.  So I want to -- want to move forward a little

8   bit here.

9         I take it that you said that later that evening you were

10  arrested?

11  A     Correct.

12  Q     And then you were able to kind of work through your -- I

13  believe you may have called your attorney, correct?

14  A     Yes, I did.

15  Q     And then your attorney was able to work with you to get

16  your side of the story out?

17  A     I hadn't given a statement at that point.

18  Q     Okay.  You hadn't given a statement yet, correct?

19  A     Correct.

20  Q     All right.  And so eventually, as I understood the

21  questioning, that that case against you, which was, if I

22  recall, it was a second degree murder case, was dismissed,

23  right?

24  A     From what I understood, was I was arrested for second

25  degree murder while they investigated, and then they decided --

1   I was told the prosecutor wasn't going to move forward.

2   Q    Okay.  Thank you for clarifying that.  You were under

3   arrest for that, but then there was a decision made not to move

4   forward, correct?

5   A    Correct.

6   Q    And you were working with your lawyer at that time to make

7   that happen, correct?

8   A    I don't know how much he had involved in that, but I know

9   that when I was just being detained while they're investigating

10  they had told me that I was being released.

11  Q    Okay.  Okay.

12  A    With no charge.

13  Q    Now, at a certain point you mentioned this incident at

14  your house when you were -- I guess, were you coming back on

15  the pali that day?

16  A    No.  I was coming down the -- well, I ended up on the Pali

17  Highway, but I was coming back from the H-3.

18  Q    Okay.  Understood.

19       And so then eventually you were able to see the

20  surveillance footage that the jury just saw, correct?

21  A    Was --

22  Q    The surveillance at your home.

23  A    The -- the -- yeah.  The -- the footage of the person at

24  my house?

25  Q    Right.

```
 1   A     Correct.

 2   Q     And then they got to see the person that when he told you

 3   a story you gave him a punch.

 4   A     It happened a little bit faster.  My kids were pretty

 5   upset and pointed at the guy coming up the street at me.

 6   Q     Okay.  And then you described this vehicle going by slowly

 7   where you were able to see Jake Smith, right?

 8   A     Right.  He -- he wasn't wearing a mask.

 9   Q     Okay.  And so he wasn't wearing a mask at that time, so

10   you were able to see him clearly, correct?

11   A     So I got a really good shot of him, yes.

12   Q     Okay.  Then I understand that at a certain point the jury

13   just looked at two photographs.  One was of the mask and one

14   was of some gloves, correct?

15   A     Correct.

16   Q     And those were shown to you during this investigation,

17   right?

18   A     Yes.

19   Q     And so on those photographs you actually wrote out

20   something on the photographs, correct?

21   A     I believe so.

22   Q     And that you positively identified the mask as being worn

23   by Jake Smith, correct?

24   A     That's what my belief was at the time, yes.

25   Q     Okay.  And you wrote that out on the -- on the actual
```

1    photograph, right?

2    A    Yes.

3    Q    And then they showed you a photograph that had the one in

4    there with the two gloves that they just saw.

5    A    Yes.

6    Q    And you wrote out those were the gloves that Jake Smith

7    was wearing on that attack day, correct?

8    A    Yes, I wrote that.

9    Q    All right.  And so at -- the government also brought up

10   that you were before the grand jury, correct?

11   A    Yes.

12   Q    And you were under oath, right?

13   A    I was.

14   Q    And you gave testimony, correct?

15   A    To the best of my knowledge, yes.

16   Q    And the testimony was that Jake Smith was the person who

17   entered the tattoo shop that day that had the mask, correct?

18   A    Yes.  That's what I -- that's what I said in the grand

19   jury.

20   Q    All right.  Now, moving forward, did you come to learn

21   that Jake Smith was cooperating with the government?

22   A    A couple of years.  Might have -- might have been a year

23   or two later I -- I heard something about it.

24   Q    Okay.  And that at that point he now had a agreement with

25   the government to testify for them in this trial, correct?

1            MR. AKINA:  Objection, goes beyond the scope.

2    A    I don't -- I don't know what he did.

3            THE COURT:  Overruled.  Go ahead.

4            MR. KENNEDY:  All right.

5    BY MR. KENNEDY:

6    Q    And so at that point you said that you've seen some more

7    video, correct?  I think you -- you mentioned some video of

8    Jake Smith fighting?

9    A    I believe I saw the video footage prior to learning that

10   he -- he had been arrested.

11   Q    Okay.  So the video that you mentioned was prior to your

12   identification in front of him in the grand jury, correct?

13   A    No.

14   Q    Afterwards?

15   A    It was afterwards.

16   Q    Okay.  That's what I was getting at.

17   A    Yeah.

18   Q    So you saw some footage of him, right?

19   A    Correct.

20   Q    And so at this point you just don't feel sure to give the

21   same testimony that you gave to the grand jury, correct?

22   A    I can't be sure that that was him.

23   Q    I understand.

24        Your -- you want to be certain, right?

25   A    I'd like to be.

1  Q    So there still remains that -- that it most certainly

2  could have been him, correct?

3  A    I don't know.  I -- I couldn't tell you.

4  Q    So at this point you just don't know?

5  A    I'm -- I can't be sure.  I -- you know, I don't want to

6  testify to it --

7  Q    Understood.

8  A    -- and be wrong.

9  Q    That's why -- I'm sorry.  Go ahead, sir.

10 A    I don't want to be wrong.

11 Q    Right.  And that's why I said it could have been, because

12 I'm not trying to say that you can positively identify.

13      That could be the case, correct?

14 A    Well, like I said, to the best of my -- my knowledge, I

15 don't think that was him.

16 Q    Okay.  So now, all of a sudden, you don't think it's him?

17 A    That's not all of a sudden.  It -- I came to that -- I

18 came to that feeling prior to him getting arrested.  I remember

19 feeling that way before.  You know, I -- I didn't really even

20 know who to contact or, you know, to say anything about it to.

21 'Cause I think that shortly after that we ended up in the --

22 you know, all of the -- I guess a lot of events were coming up

23 with the pandemic.  So -- you know.

24 Q    Okay.  So the pandemic.  You're aware that Mr. Smith was

25 arrested back on August 14th of 2018, correct?

```
 1   A    I -- I don't know when he was arrested.

 2   Q    And that he's been in custody since that time?

 3   A    I -- I heard that he was -- he was locked up in the

 4   federal detention center.

 5   Q    Okay.  So you --

 6   A    But I didn't know what date, you know.

 7   Q    So this -- the idea that you're unsure came during the

 8   pandemic?

 9   A    It came -- well, it came actually before he was locked up.

10   And then I just went on with my life.  I figured that whatever,

11   you know, whatever was going on with him was going to come out.

12   Q    All right.

13   A    You know?

14   Q    And so whatever's coming on with him, I guess you're

15   unsure who the second person was, correct?

16   A    Correct.

17   Q    All right.  Now, on the -- are you aware that -- you

18   talked about the one time you met Mr. Miske was when he came

19   over looking for Kaulana.

20   A    That's the one time that I actually had a very brief

21   interaction with him.

22   Q    All right.  Are you aware that he buys and sells houses as

23   part of his business?

24   A    No, I'm not.

25   Q    And that sometimes that's called flipping properties?
```

1    A    I'm -- I'm not aware of what he was doing.

2    Q    Okay.  So you saw him; he had a drone; he was in your

3    neighborhood.  And you reported it, right?

4    A    Correct.

5    Q    And you're not sure whether he was using the drone in

6    terms of houses that are available for sale?

7    A    Never heard of anything like that before.

8    Q    It's a way to be able to take a look at the property?

9           MR. AKINA:  Objection, speculation.  He also

10   testified he's never heard of anything like that.

11          THE COURT:  Overruled.  Go ahead.

12   A    I've never heard of anything like that.  I usually thought

13   that if you wanted to look at a property you would go with a

14   real estate agent or a broker.

15   BY MR. KENNEDY:

16   Q    You can.  But also you can use technology in these days,

17   correct?

18   A    Fly a drone over your house?

19   Q    That's one way, yes.

20   A    Okay.

21   Q    And in terms of you had no idea what he was using the

22   drone for, that's a fair statement, correct?

23   A    I assumed he was flying it over my home.

24   Q    Well, I know you assume that, but you didn't know,

25   correct?

```
 1   A    I didn't know.

 2   Q    Right.  And so you made that assumption, right?

 3   A    Correct.

 4   Q    All right.  And you want to be certain, right?

 5   A    I'd like to be.

 6   Q    So you would be unsure, right?  Because this would be an

 7   assumption?

 8   A    I'm going to go with the assumption that he was on my

 9   street trying to operate a drone to surveil my house.

10   Q    That's -- you're going to go with an assumption?

11   A    Well, if -- if I told you that he was on the end of the

12   street flying it over the corner house to try to buy it, I'd be

13   making an assumption as well.

14   Q    All right.  Fair enough.

15            MR. KENNEDY:  I have no further questions, Your

16   Honor.

17            THE COURT:  Redirect?

18            MR. AKINA:  No redirect, Your Honor.

19            THE COURT:  Mr. Goodrich, you may step down, sir.

20                                      (Witness excused.)

21            (End of partial transcript.)

22                         * * * * *

23

24

25
```

1                    COURT REPORTER CERTIFICATE

2              I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, June 30, 2024.

10

11

12
                              /s/ Ann B. Matsumoto
13                            ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25