```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3

 4   UNITED STATES OF AMERICA,    )  CR. NO. 19-00099-DKW-KJM
                                  )
 5               Plaintiff,       )  Honolulu, Hawaii
                                  )
 6       vs.                      )  April 29, 2024
                                  )
 7   MICHAEL J. MISKE, JR.,       )  FURTHER JURY TRIAL - DAY 59
                                  )
 8               Defendant.       )  (CONTINUED TESTIMONY OF
     _____ )  GOVERNMENT'S WITNESS CARRIE
 9                                   FRASER)

10             PARTIAL TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE DERRICK K. WATSON
11          CHIEF UNITED STATES DISTRICT COURT JUDGE

12   APPEARANCES:

13   For the Government:        MARK A. INCIONG, AUSA
                                MICHAEL DAVID NAMMAR, AUSA
14                              AISLINN AFFINITO, AUSA
                                Office of the United States Attorney
15                              Prince Kuhio Federal Building
                                300 Ala Moana Boulevard, Suite 6100
16                              Honolulu, Hawaii 96850

17   For the Defendant:         LYNN E. PANAGAKOS, ESQ.
                                841 Bishop Street, Suite 2201
18                              Honolulu, Hawaii 96813

19                              MICHAEL JEROME KENNEDY, ESQ.
                                Law Offices of Michael Jerome
20                              Kennedy, PLLC
                                333 Flint Street
21                              Reno, Nevada 89501

22
     Official Court            ANN B. MATSUMOTO, RPR
23   Reporter:                 United States District Court
                               300 Ala Moana Boulevard, Room C-338
24                             Honolulu, Hawaii 96850

25   Proceedings recorded by machine shorthand, transcript produced
     with computer-aided transcription (CAT).
```

1                          I N D E X

2   WITNESS:                                      PAGE NO.

3   FOR THE GOVERNMENT:

4    CARRIE FRASER (CONTINUED EXAMINATION)

5     CROSS-EXAMINATION BY MR. KENNEDY               4

6     REDIRECT EXAMINATION BY MR. INCIONG           30

7     RECROSS-EXAMINATION BY MR. KENNEDY            33

8

9                        E X H I B I T S

10   Exhibit 9168-046B received in evidence         23

11   Exhibit 9168-046D received in evidence         25

12   Exhibit9168-046E received in evidence          26

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    MONDAY, APRIL 29, 2024                    9:01 O'CLOCK A.M.

 2                          *  *  *  *  *

 3              (Start of partial transcript:)

 4              (Open court in the presence of the jury.)

 5              COURTROOM MANAGER:  Criminal Number 19-00099-DKW-KJM,

 6    United States of America versus Michael J. Miske, Junior.

 7              This case has been called for jury trial, Day 59.

 8              Counsel, please make your appearances for the record.

 9              MR. INCIONG:  Good morning, Your Honor.  Mark

10    Inciong, Michael Nammar, and Aislinn Affinito for the United

11    States.  KeAupuni Akina is under the weather today, but Special

12    Agent Tom Palmer and Kari Sherman are present.  Good morning.

13              THE COURT:  Good morning.

14              MR. KENNEDY:  Good morning, Your Honor.  Michael

15    Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and

16    Josh Barry.  And good morning to each of you.

17              THE DEFENDANT:  Good morning.

18              THE COURT:  Good morning.  You may all be seated.

19              Good morning to our 16-person jury.  Start of a new

20    week.  Thank you again for being on time.  I know getting

21    through security this morning might have been a little bit more

22    of a challenge than it has been on a typical day.  So thank you

23    for doing that as efficiently as you apparently have done.

24              Ms. Fraser is back on the stand.

25              Good morning.  I will remind you that you remain
```

1    subject to the same oath that you took on Friday, I believe,

2    when you started your testimony.  But we're not going to take

3    the time to re-swear you again, okay?  All right.

4           Mr. Kennedy has beat me to it.  He's ready to go.

5    And so you may resume when you're ready.

6           CARRIE FRASER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.

7                        CROSS-EXAMINATION ^

8    BY MR. KENNEDY:

9    Q    Good morning, Ms. Fraser.

10   A    Good morning.

11   Q    On July 31st, a detective from the Honolulu Police

12   Department came out and interviewed you, correct?

13   A    Not me.

14   Q    You -- didn't you speak with a detective on that day?

15   A    I spoke to him on a phone, yes.

16   Q    Oh, on the phone?

17   A    Correct.

18   Q    Okay.  Thank you for clarifying.  You spoke to him on the

19   phone.

20          And among the things that you told the detective on that

21   day is you did not want Ashley Wong or your son, Mr. Fraser, to

22   hang out with Mike Miske because of a lawsuit against Caleb

23   Miske and his insurance company to cover medical expenses.  Do

24   you recall telling him that?

25   A    No.

1  Q    So the medical expenses at that time were approximately a

2  million dollars, correct?

3  A    Correct.

4  Q    And in order to recover those, which arose from

5  Johnathan's treatment, you were contemplating a lawsuit against

6  Caleb Miske's estate, correct?

7  A    Correct.

8  Q    And that Johnathan, your son, did not have any medical

9  insurance, correct?

10 A    No, he had, through the state.

11 Q    And due to that pending lawsuit that was contemplated but

12 wasn't filed and due to the claim that was made against the

13 insurance company for Caleb's estate, Johnathan was told to

14 stay away, correct?

15 A    Correct.

16 Q    And that was the reason why Johnathan -- the accident was

17 obviously, as you know better than me, November 17th of 2015,

18 correct?

19 A    Correct.

20 Q    And you said last week that he was able to come home for

21 Christmas, right?

22 A    Correct.

23 Q    And I believe he may even have gotten out on Christmas Eve

24 to make that?

25 A    Around there.

1   Q    And so this was all happening between the December time

2   period up until March and April of 2016, correct?

3   A    Correct.

4   Q    All right.  Now, in April of 2016, Mike Miske showed up at

5   the Fraser house, right?

6   A    Yes.  That's what my husband had told me, but I was at

7   work at that time, so I can't say.

8   Q    All right.  And you understood that he told the family

9   members that it was the hospital's fault for Caleb's death?

10  A    Could you repeat that?

11  Q    Yes.  You understood is what he communicated was that it

12  was the hospital's fault --

13  A    Who --

14  Q    -- for Caleb's death.

15  A    Who communicated that?

16  Q    Mr. Miske, to the family.

17  A    To the family?

18  Q    Yes.

19  A    I can't say.

20  Q    Okay.  And part of --

21          MR. KENNEDY:  If we could just -- let's see.

22          If we could just pull up 7100-002 for the witness

23  only, Your Honor?

24          THE COURT:  Okay.  And this is in your original?

25          MR. KENNEDY:  Yes, Your Honor, it is.

1          THE COURT:  Okay.  Go ahead.

2          MR. KENNEDY:  And if we just move to the 22nd page

3    in.  And if we can, just for the witness -- let's see, I'm just

4    drawing a circle because it's fairly small type.  If we could

5    just blow up that area, please.

6    BY MR. KENNEDY:

7    Q    Do you recall telling the officer during that interview

8    that Mr. Miske told 'em -- told the family that it was the

9    hospital's fault?

10   A    That was my husband.

11   Q    No, I understand that, but I'm talking about the statement

12   that you gave to the officer over the telephone -- if we clear

13   this out and back up.

14          I believe it was a statement that you made, correct?

15   A    See, I spoke to the detective only regarding his missing.

16   I wasn't involved in it till after when they had called me in

17   to go and -- and do a statement, and that's months, months

18   after.

19   Q    Correct.  This would have been on the 31st of 2016, the

20   day -- actually, it looks like it was at -- just beginning the

21   evening hours on the 31st?

22   A    Correct.  'Cause it was me and my husband and my -- my

23   sister-in-law was there.

24   Q    And so you gave a statement to the officer that was

25   looking into it, who was a detective, Mr. Chang, correct?

1   A    I believe so.

2   Q    Okay.  And that's when you said that it was your

3   understanding that Mr. Miske had showed up, told the family

4   that it was the hospital's fault?

5          MR. INCIONG:  Objection.  Misstates the testimony.

6   She said twice she had not.

7          THE COURT:  Sustained.

8          MR. KENNEDY:  Okay.  All right.

9          We can clear that.

10  BY MR. KENNEDY:

11  Q    Now, during that time period when the accident occurred

12  you were at the scene, right?

13  A    Correct.

14  Q    After the accident had happened, correct?

15  A    Correct.

16  Q    And there was a company truck and a truck that was

17  involved in the accident, correct?

18  A    I see the truck.

19  Q    All right.  And were you aware that Mr. Miske blamed the

20  company truck that turned on the yellow, made a left turn for

21  the accident --

22  A    No.

23  Q    -- and sued them?

24  A    No.

25  Q    All right.  Now, in terms of -- did the -- did you or your

1    husband, or anyone in the Fraser family, sue the company truck?

2    A    No, we did not.

3    Q    All right.

4         Now, you were shown -- you gave some testimony last week

5    about at the hospital Mr. Miske showing you a photograph.  Do

6    you recall that?

7    A    Yes.

8    Q    And it had bruising on Caleb Miske's --

9    A    Correct.

10   Q    -- chest, correct?

11        And it was -- and he also had said that the doctors had

12   told him that the bruising indicated to them that he had been a

13   passenger, right?

14   A    Correct.

15        MR. KENNEDY:  If we can pull up what's been admitted,

16   9168-147?

17   BY MR. KENNEDY:

18   Q    Let me ask you if this is the photograph that you saw.

19        MR. KENNEDY:  And it was in the 40th supplemental,

20   Your Honor.

21        THE COURT:  Yes, go ahead.

22   BY MR. KENNEDY:

23   Q    Is this --

24   A    No.

25   Q    All right.

1  A    That is not the photograph that I saw.

2  Q    Okay.  And then let me just show you a photograph that has

3  not yet been admitted --

4        MR. KENNEDY:  Just for the witness, 9168-154 in the

5  42nd supplement.

6  A    No.

7  BY MR. KENNEDY:

8  Q    Was this the photograph that you saw?

9  A    No.

10  Q    Okay.  All right.

11        MR. KENNEDY:  We can take that down if that's not the

12  one that you saw.

13  BY MR. KENNEDY:

14  Q    Now, last Friday you talked about time period when

15  Mr. Fraser was in the seventh to the ninth grade and would run

16  away, correct?

17  A    Correct.

18  Q    So I think you said it -- it happened multiple times on

19  consecutive weekends --

20  A    Weekends.

21  Q    -- right?

22        And he would run away because he wanted to stay out late,

23  right?

24  A    Correct.

25  Q    Wanted to party, right?

 1   A    Have fun with his friends, the girls.

 2   Q    And he would return on Monday, right?

 3   A    Sunday.

 4   Q    Sunday night.  And most of the time he would voluntarily

 5   return, right?

 6   A    Correct.

 7   Q    And sometimes the police would bring him, correct?

 8   A    They'll pick him up before then, correct.

 9   Q    So you started going to school on Friday to prevent this,

10   right?

11   A    Correct.  Well, I picked him up every day, so --

12   Q    Okay.  A little bit earlier, to prevent it, I guess?

13   A    Correct.

14   Q    And he started leaving on Thursdays then, right?

15   A    Correct.

16   Q    And so each time, and you'd call 911?

17   A    Mm-hmm.

18   Q    And that's how the police would get involved, right?

19   A    Correct.

20   Q    All right.  And this was around about 20 times, right?

21   A    Correct.

22   Q    Okay.  And so eventually he went over to stay with his

23   biological mom, right?

24   A    Correct.

25   Q    And you had been raising him since he was, I think you

1   said, one year's old, right?

2   A    Around -- so one and a half is when I first met John.

3   Q    Okay.

4   A    The mom had him.  They brought him to my in-laws, which I

5   was living with my in-laws at that time, took care of him for a

6   little bit.

7        He went back to his mom and then he came back to us before

8   kindergarten started.

9   Q    And so kindergarten up to that point.

10       And I take it that when he went over to stay with her,

11  that was about two months and then he returned, right?

12  A    Around three months.

13  Q    Okay.  Something about the fact that she couldn't handle

14  him anymore?

15  A    I don't know the conversation.  That was between my

16  husband and her.

17  Q    Fair enough.

18       He came back and then he was with you, right?

19  A    Correct.

20  Q    And so at 18, he left home, right?

21  A    Correct.

22  Q    And so there -- in terms of you -- you I believe have said

23  that Johnathan decided to move out of the grandparents' and

24  your home after Mike Miske's apology; is that correct?

25  A    Correct.

1   Q     All right.  Now, I want to ask you about -- you gave some

2   testimony about Mr. Stancil at the hospital?

3   A     Mm-hmm.

4   Q     Do you recall that?

5         And so something about him putting on gloves?

6   A     Correct.

7   Q     All right.  Now, between November and December of 2015

8   when Johnathan was there, were you there the day that Ashley

9   Wong got 86'd from the hospital?

10  A     We just -- we -- my nephew was staying there.  We went

11  home to take a shower, and then we got a phone call and we head

12  right back to the -- to the hospital.

13  Q     So were you aware that Johnathan was refusing to have

14  surgery unless she brought marijuana to him?

15  A     I did not hear about that.

16  Q     And that she then brought it into the hospital and they

17  smoked together?

18              MR. INCIONG:  Objection, beyond the scope.

19  A     I -- I did not hear about that.

20              THE COURT:  Overruled.  Go ahead.

21  A     They only just told me that she was 86'd out of the

22  hospital.

23  BY MR. KENNEDY:

24  Q     Okay.  So that, you know, she was 86'd for some action,

25  right?

 1   A   Correct.

 2   Q   Okay.  Now, you mentioned that with respect to Mr. Stancil

 3   that you notified the nurse, correct?

 4   A   Correct.

 5   Q   Mr. Stancil was never 86'd from the hospital right?

 6   A   No, not that I know of.

 7   Q   There was no report ever made, right?

 8   A   I don't know if the nurse report it, but I reported to the

 9   nurse that had happened.

10   Q   And when you spoke with the detective on July 31st, you

11   never mentioned that in 2016, correct?

12   A   No, we mentioned everything that had happened.

13   Q   You mentioned that specific incident?

14   A   We mentioned everything that had happened.

15   Q   On July 31st?

16   A   I'm not sure what day it was, but we spoke to a lot of

17   detectives.

18   Q   Well, the first time you mentioned it was in 2023 when you

19   spoke to the FBI, correct?

20   A   No, it was bay -- way before then.

21   Q   All right.

22   A   When we first started talking to the detectives.

23        MR. KENNEDY:  Let's see.  Going back to 7102 --

24   7100-002, if we could pull that up.

25        And then if we go back to the 22nd page.

```
 1   BY MR. KENNEDY:

 2   Q    And just read that to yourself and let me know when you're

 3   finished, and I'll ask you some follow-up questions.

 4   A    (Reviews document.)

 5        I'm done.

 6   Q    All right.

 7             MR. KENNEDY:  So we can take that down.

 8   BY MR. KENNEDY:

 9   Q    So on the 31st of July, 2016, you did not tell them about

10   Mr. Stancil and that incident, correct?

11   A    Not --

12             MR. INCIONG:  Objection.  This is not a transcript

13   nor is it her report.

14             THE COURT:  Overruled.  You can answer.

15   A    I don't recall, but like I said, we've been talking to a

16   lot of detectives and I've mentioned a lot of times.  Every

17   incident that happened, they asked us to call, we called, we

18   let them know.

19   Q    All right.  And I take it --

20             MR. KENNEDY:  If we can pull up 9471-003 for the

21   witness.  Which is not in evidence, Your Honor.

22             THE COURT:  Go ahead.

23             MR. KENNEDY:  And it would be in the -- I believe

24   it's in the forty --

25             THE COURT:  It's in the 43rd.
```

```
 1              MR. KENNEDY:  Forty-third, yes.  Thank you, Your
 2    Honor.
 3    BY MR. KENNEDY:
 4    Q    You spoke to the FBI on, it looks like down at the
 5    bottom -- it's hard to see.
 6              MR. KENNEDY:  If we could just blow that up.
 7    BY MR. KENNEDY:
 8    Q    On September 5th of 2023?
 9    A    I don't recall.
10    Q    Looks like it was --
11    A    Like I say, we spoke to a lot of detectives.
12    Q    Well, I'm talking about the -- the FBI.  It looks like it
13    was on the other side of this building, you actually met with
14    them here?
15    A    On the other side of this building?
16              MR. KENNEDY:  If we can pull it -- pull it down and
17    back up.
18    BY MR. KENNEDY:
19    Q    It looks like it was -- unlike the telephone call, it was
20    a -- an interview at the prosecutor's office, correct?
21    A    Mm-hmm.
22    Q    All right.  And so that was in September of --
23    A    Last year.
24    Q    -- 2023?  Last year?
25         And that's the first time that you mentioned the incident
```

```
 1   regarding Mr. Stancil?

 2              MR. INCIONG:  Objection, misstates the evidence,

 3   asked and answered.

 4              THE COURT:  Mr. Kennedy, I'm not sure that you

 5   finished your question, and I think the end of your question is

 6   an important factor.  So can you ask it?

 7   BY MR. KENNEDY:

 8   Q    That was the first time that you spoke to the FBI about

 9   Mr. Stancil?

10   A    The FBI, yes.

11   Q    And with respect to, you mentioned detectives, we have a

12   interview from Detective Chang.  Who else have you spoken to?

13   A    Terrence Chu.

14   Q    I'm sorry?

15   A    Terrence Chu.  We talked to Terrence Chu.  There was

16   other -- where we had to go and meet them close by Restaurant

17   Row.  I'm not too sure I remember their name, but it was more

18   so my husband and myself.  So there was a few of 'em that we

19   have met.

20   Q    Okay.  All right.  And Mr. Chu would be a federal agent,

21   correct?

22   A    Mm-hmm.

23   Q    All right.

24        And you say that you've given an interview to him?

25   A    They asked questions, yes, and we answered them.
```

1    Q    Okay.  All right.

2         Now, there was a period of time after you -- last Friday

3    you talked about a period of time where you said that Jacob

4    Smith was outside of your workplace; is that correct?

5    A    Correct.

6    Q    And I believe you said that was just a couple of weeks

7    after Mr. Fraser went missing, correct?

8    A    Like a month.

9    Q    Okay.  Within that month?

10   A    Within that --

11   Q    Okay.  Were you aware that Mr. Smith was in custody

12   beginning on August 3rd for that month?

13   A    No.

14   Q    And then he wasn't released until later?

15   A    He was there.

16   Q    All right.  There's no police report that you filed

17   against Mr. Smith, correct?

18   A    No.

19   Q    All right.

20   A    I called -- like -- like, we were informed that we need to

21   call and let them know if there was suspicious behavior,

22   activities that was happening.

23        So we called and we let them know.

24   Q    All right.  But no police report was ever --

25   A    No.

1   Q    All right.  Now, you also mentioned something about

2   Mr. Stancil as well.

3   A    Mm-hmm.

4   Q    And there was no police report filed against him, correct?

5   A    No.

6   Q    Now, in 2019 there was an incident involving Norm Akau,

7   right?

8   A    Correct.

9   Q    And Norm Akau was at odds with Lindsey Kinney at that

10  time, correct?

11  A    Correct.

12  Q    And you and your husband were close with Lindsey Kinney,

13  correct?

14          MR. INCIONG:  Objection, beyond the scope.

15          THE COURT:  Was this gone into?

16          MR. KENNEDY:  Just the fact that when that occurred

17  she filed a police report, Your Honor, and filled out a

18  statement.

19          MR. INCIONG:  She did not testify to that on direct.

20          THE COURT:  Yes, this is beyond the scope.  The

21  objection's sustained.

22          MR. KENNEDY:  Okay.

23  BY MR. KENNEDY:

24  Q    Now, were you aware that your husband saw Mr. Fraser in a

25  heated argument outside the vape shop just a couple of days

1   before he went missing?

2   A    No.

3   Q    Now, in the June of 2016 time period Mr. Fraser,

4   Johnathan, told you that if you guys were in his body and you

5   guys had his brain you would understand why he snaps?

6            MR. INCIONG:  Objection, beyond the scope.

7            THE COURT:  I'm sorry.  I don't think I ruled, and

8   the witness already testified.

9            Is that where it's ending?

10           MR. KENNEDY:  No.  I'm going to go through that, Your

11  Honor, those questions.

12           I'm at that place of a cross-examination, then I was

13  going to ask the questions orally first.

14           THE COURT:  All right.  Go ahead.

15           MR. KENNEDY:  All right.

16  BY MR. KENNEDY:

17  Q    Well, because of his street bike accident and then the

18  second car accident, he couldn't control himself?

19           MR. INCIONG:  Objection, relevance.

20           THE COURT:  Overruled.  Go ahead.

21  BY MR. KENNEDY:

22  Q    He tries to take a deep breath, but he just gets mad.

23  A    I never seen that.

24  Q    And then when he gets mad, he stays mad for a long time?

25  A    No.

1   Q    And you indicated to him that he should see a therapist,
2   right?
3   A    Therapist for things that he was going through.
4   Q    And he told you that he never did, right?
5   A    Excuse me?
6   Q    He told you that he had never seen that therapist to deal
7   with this control madness?
8   A    No, 'cause it wasn't for control madness.  He never had
9   madness.
10  Q    Okay.
11            MR. KENNEDY:  Your Honor, at this time I would move
12  to play Exhibit 9168-046B.
13            THE COURT:  Yes, you may.  The objection's overruled.
14            Do you have a headset near you?
15            THE WITNESS:  This one?
16            THE COURT:  Yes.
17            (Recording played.)
18            THE COURT:  Is there a tech problem?
19            MR. KENNEDY:  Looks like, but if we can take a recess
20  to see what the problem is, and then hopefully get it figured
21  out.
22            THE COURT:  Is there a -- it's only 9:30.  Is there
23  additional line -- we've only been going 30 minutes, not even
24  30 minutes.
25            MR. KENNEDY:  You know, this is the portion that I

1    was going to do next, Your Honor.  And then it's pretty much

2    done.

3                 COURTROOM MANAGER:  (Confers off the record.)

4                 THE COURT:  Does your crew know whether the problem

5    is internal or whether it's part of the court?

6                 MR. KENNEDY:  I'm not sure.

7                 THE COURT:  Okay.

8                 MR. KENNEDY:  Since I'm standing up here and they're

9    over there.

10                (Pause in proceedings.)

11                THE COURT:  All right.  We've called our IT to lend

12   some assistance.  I just hate to take a break only not even 30

13   minutes into the trial day.

14                MR. KENNEDY:  Me as well.

15                THE COURT:  All right.  They are on their way,

16   hopefully.

17                (Pause in proceedings.)

18                MR. KENNEDY:  Your Honor, I could move to admit it.

19   It appears that it could be played out loud.  It seems like

20   maybe the problem is in the headphones.

21                THE COURT:  Okay.  This is 46B, right?

22                MR. KENNEDY:  Yes.  This is 9168-046B.

23                And, Your Honor, 57, line 8, through 58, line 25.

24                COURTROOM MANAGER:  It's okay now, Judge.

25                THE COURT:  Thank you.

 1                    (Recording played.)

 2                    THE COURT:  Mr. Kennedy, I'm not sure if you're

 3      waiting on me or I'm waiting on you.

 4                    MR. KENNEDY:  We thought you were doing -- I would

 5      move to admit it at this time so the jury can hear it.

 6                    THE COURT:  All right.  Any objection?

 7                    MR. INCIONG:  Yes.  The witness is required to be

 8      given an opportunity to respond.

 9                    THE COURT:  That's why I thought we were going

10      through the foundational questions here, to determine whether

11      this should be admitted for the reasons we talked about.

12                    And defense position, Mr. Kennedy, is that the

13      foundation, I gather, has already been established?

14                    MR. KENNEDY:  It is, Your Honor.  That's why I asked

15      those questions, to lay the foundation before --

16                    THE COURT:  I'm looking back.  I'm looking back at

17      the record, because we had a substantial delay there with the

18      tech assistance.

19                    MR. KENNEDY:  Yes.

20                    THE COURT:  And I now agree.  The objection's

21      overruled.

22                    (Exhibit 9168-046B received in evidence.)

23                    THE COURT:  You may play it.

24                    (Recording played.)

25      BY MR. KENNEDY:

1  Q    The male voice is Johnathan Fraser?

2  A    Yes.

3  Q    And the other voice is yours, correct?

4  A    Correct.

5  Q    During this time period in June of 2016, you expressed to

6  Johnathan that everybody used to say he's a loving, caring

7  person, then all of a sudden, "You're just that person like you

8  don't care who they are, you just disrespect them and in a way

9  that you shouldn't be," correct?

10 A    Correct.

11 Q    And then you expressed to him:  What the fuck did we do to

12 this boy that gets so mad, correct?

13 A    Mm-hmm.

14 Q    I really don't know.  All we did was try to raise you --

15 you being Mr. Fraser, correct?  To be a good guy to do the

16 right things, right?

17 A    Correct.

18 Q    And you told him:  It's just like you went the opposite of

19 the way we were fucking trying to teach you, correct?

20 A    Not swearing.

21       MR. KENNEDY:  If we could pull up 9168-046D, as in

22 "dog," Your Honor.

23       It's at page 4201 to 4207 of the transcript, in the

24 43rd supplemental, Your Honor.

25       THE COURT:  Yes.  Go ahead.

1            You move for its admission?

2            MR. KENNEDY:  I move for its admission, Your Honor.

3            THE COURT:  And the Court grants that over the

4  government's objection.

5            (Exhibit 9168-046D received in evidence.)

6            THE COURT:  Go ahead and play it.

7            MR. KENNEDY:  All right.  If we could play D, as in

8  "dog."

9            (Recording played.)

10  BY MR. KENNEDY:

11  Q    You told him:  I'll say hi.  But as much as I want that

12  relationship I used to have with you before -- and that's with

13  Mr. Fraser, Johnathan -- I cannot have it with you anymore.  Me

14  and you used to be really close, but we cannot be really close

15  anymore.  Correct?

16  A    I -- like I said, I -- it's been a while.  I probably did.

17  Q    Well, probably?

18            MR. KENNEDY:  Your Honor, I would move --

19            MR. INCIONG:  Objection.

20            MR. KENNEDY:  -- 9168-046E.  And if not, play it at

21  least first to refresh her recollection.

22            And that was page 40, dash -- line 21 to 41, dash,

23  03, Your Honor.

24            THE COURT:  I've got it.  And the objection was?

25            MR. INCIONG:  Not inconsistent, no foundation,

 1   relevance.

 2            THE COURT:  All of those objections are overruled.

 3            The Exhibit 9168-46E is admitted.

 4            (Exhibit 9168-46E received in evidence.)

 5            THE COURT:  You may play it.

 6            (Recording played.)

 7   BY MR. KENNEDY:

 8   Q    Johnathan Fraser, Mr. Fraser, told you that he was getting

 9   kicked out.  He's -- I'm not leaving.  The last time you were

10   here, you guys just left is what you told him.

11            He told you that there are three times that he had gotten

12   kicked out of this damn house.  And he said:  I got told to

13   leave many times.  And you said:  Because you guys -- meaning

14   Ashley Wong and Johnathan Fraser -- couldn't follow the rules.

15            And he told you:  When I'm told to leave, I leave.

16   Correct?

17   A    Correct.

18   Q    Then you expressed to him:  There's been drama after drama

19   after drama.  For a while we never had drama, Johnnie.  And he

20   told you:  That's why I don't move fucking back here.  That's

21   why I didn't want to come back here.  It seems like when I come

22   here, there's drama.  Correct?

23   A    Correct.

24   Q    And that he told you:  Well, I never really come back here

25   in the first place, so you never have to worry about getting

1    kicked out of my damn house over that.

2         And then he said:  There are times that I could have been

3    there this whole time saving up money.

4         And you said:  Saving up money doing what, Johnnie?  I

5    mean this wasn't working.

6         And he said:  No fuck, selling drugs or something, right?

7    A    I believe so, yes.

8    Q    You've seen him when he snaps, and when he snaps he says

9    things in a rage, like mother fucker, beat it, fuck you, fuck

10   you, we go leave, I leave, I don't want to leave -- live with

11   that fucker in this first place.  I will get the truck fist

12   [verbatim] and I'm gone.  Half truths.  Correct?

13   A    Correct.

14        MR. KENNEDY:  Your Honor, at this time I would ask

15   that 9168-048B be admitted for state of mind.

16        THE COURT:  Any objection?

17        MR. INCIONG:  Objection, not inconsistent.  The

18   witness just answered "correct," 403.

19        THE COURT:  The objection's sustained.

20   BY MR. KENNEDY:

21   Q    And so when that happens, you can hear it in his voice.

22   He's screaming, right?

23   A    Mm-hmm.

24   Q    He's hitting his head against the wall sometimes, correct?

25   A    I never -- not the wall, but I hear him screaming.

1  Q    In that case he was smashing a door, correct?

2  A    Slapping the doors.

3  Q    People are running after him:  Stop, stop, stop.  And he's

4  screaming.

5  A    Correct.

6  Q    And that's what happens when he loses control, correct?

7  A    Correct.

8  Q    And when he's disrespecting others, that happens when he's

9  losing control, correct?

10  A    Correct.

11  Q    And when he's disrespecting others and losing control, the

12  first time he got kicked out, when he was 18, he got in a

13  fight, right?

14  A    No, the --

15  Q    And he was asked to leave?

16  A    No, the first time that he left was when Ashley couldn't

17  move in.  And he left.

18  Q    Wasn't it a time where someone came over to fight with

19  Johnathan and a girlfriend came over and fought and the --

20  Ashley and Johnathan both fought each of them?

21            MR. INCIONG:  Objection, relevance, beyond the scope.

22            THE COURT:  Sustained.

23  BY MR. KENNEDY:

24  Q    You and Ashley Wong communicated by text message, correct?

25  A    Correct.

```
1    Q    And on August 6 she told you that she was going to be
2    looking tomorrow, of 2016, for Johnathan, correct?
3    A    Correct.
4    Q    And she said:  Our focus isn't on Mike anymore.  I don't
5    feel like he did it.  Do you recall that?
6    A    I -- I don't recall that.
7              MR. KENNEDY:  If we can take a look at 9471-006.
8              In the 43rd --
9              THE COURT:  Forty-third?  Yes.
10             MR. KENNEDY:  Forty-third supplemental, Your Honor.
11             THE COURT:  Go ahead.
12   BY MR. KENNEDY:
13   Q    Do you recognize the phone number that ends in 2126?
14   A    Yes.
15   Q    That was the phone associated with the iPhone 6 that both
16   Johnathan Fraser, Mr. Fraser, and Ashley Wong, Ms. Wong, used,
17   correct?
18   A    Correct.
19   Q    And you -- you recognize 6944?
20   A    Correct.
21   Q    And that would be your number, correct?
22   A    Correct.
23   Q    And just read the description to yourself, and I'll ask
24   you --
25   A    (Reviews document.)
```

1            MR. KENNEDY:  We can take that down.

2    BY MR. KENNEDY:

3    Q    So Ashley Wong texted you and said:  We're going to be

4    looking tomorrow.  Correct?

5    A    Correct.

6    Q    Our focus isn't on Mike anymore.  Correct?

7    A    Correct.

8    Q    I don't feel like he did it.  Correct?

9    A    Correct.

10            MR. KENNEDY:  Nothing further.

11            THE COURT:  Redirect when you're ready, Mr. Inciong.

12                      REDIRECT EXAMINATION

13    BY MR. INCIONG:

14    Q    Good morning, Mrs. Fraser.

15    A    Good morning.

16    Q    You told Johnathan and Ashley to stay away from Mr. Miske,

17    correct?

18    A    Correct.

19    Q    Was the lawsuit that was pending at the time the only

20    reason you told them that?

21    A    No.

22    Q    Was it also because of the history between Mr. Miske and

23    Johnathan regarding the whole accident and him blaming

24    Johnathan for the crash?

25    A    Yes.

1   Q    Was it also that you were aware there had been threats to

2   Johnathan?

3   A    Yes.

4   Q    Was it also because you picked Johnathan up from when he'd

5   been beaten up over the watch, that he had said Mr. Miske was

6   responsible?

7   A    Yes.

8   Q    The lawsuit, was that ever filed?

9   A    No.

10  Q    Did you ever file against anyone in relation to that

11  accident?

12  A    No.

13  Q    Do you have any doubt in your mind that you saw

14  Mr. Stancil put the latex gloves on in the nurse station and

15  try to go into Johnathan's room at Queen's Hospital?

16  A    No doubt.  I know.

17  Q    Did you tell somebody in law enforcement that -- soon

18  thereafter that had happened?

19  A    Yes.

20  Q    Now, these audio clips that we heard, that was one day in

21  time, correct?

22  A    Mm-hmm.

23  Q    Did you have ups and downs in your relationship with

24  Johnathan?

25  A    Yes, after the accident.

1   Q    Like any other people that you have relationships with?

2   A    Mm-hmm.

3   Q    Were there many days where you didn't have these sorts

4   conversations?

5   A    Say that again?

6   Q    Were there many days that you had other conversations,

7   productive conversations?

8   A    Yes.

9   Q    Were these isolated incidents where Johnathan was unable

10   to control his temper?

11   A    Correct.

12   Q    Now, in the text message that Ashley Wong sent you on

13   August 6th of 2016, she also told you that she thought

14   Johnathan was alive at that date, didn't she?

15   A    Yes, she did.

16   Q    And were you aware that the next day Delia had kicked her

17   out of the Keokea house?

18   A    Yes.  She called me.  Ashley had called me to let me know

19   that.  'Cause she had Nala, which was their dog.  And she

20   didn't know where she could put Nala that time, but she told me

21   that she was -- she was kicked out and she had to wait down the

22   street.

23   Q    So she found out about that after she sent you this text

24   that you were asked --

25   A    Yes.

```
 1   Q     -- about?
 2               MR. INCIONG:  Nothing further, Your Honor.
 3               THE COURT:  Any recross?
 4                           RECROSS-EXAMINATION
 5   BY MR. KENNEDY:
 6   Q     You just testified that Johnathan would have ups and
 7   downs, correct?
 8   A     Yes.
 9   Q     Were you aware that he was not taking any of his
10   medication?
11   A     No.
12               MR. INCIONG:  Objection, beyond the scope.
13               THE COURT:  Overruled.  Go ahead.
14   BY MR. KENNEDY:
15   Q     Were you aware that he was self-medicating with marijuana
16   heavily instead of taking his medication?
17   A     I was aware that he was taking his medication.  He was --
18   'cause I always made sure.  I would ask him:  Did you take your
19   medication?  And he'd be like, yes, I did.
20   Q     Okay.  So he told you that he was taking his medication,
21   correct?
22   A     Correct.
23   Q     And you're not aware whether he was taking it, correct?
24   A     Correct.
25   Q     Because he was living elsewhere, right?
```

 1   A    He was living with us for the beginning part when he was

 2   taking his medication.

 3   Q    Right.

 4   A    But after that I -- I can't say if he was or he wasn't.

 5   Q    Okay.  And so that would have been during that time period

 6   Ashley was with him, correct?

 7   A    Correct.

 8   Q    All right.

 9        Now, the government just asked you about the lawsuit,

10   right?

11   A    Say that again?

12   Q    The government just asked you some questions about whether

13   you filed a lawsuit, right?

14   A    Correct.

15   Q    So what happened, though, was you didn't seek monies from

16   the driver, Jared Ishiki, and his insurance policy, correct?

17   A    We didn't follow through with the lawsuit with anybody.

18   Q    You followed through with the insurance company with Caleb

19   Miske, though?

20   A    They had sent us a letter just stating that they had paid

21   only 10,000 to -- towards Johnathan's medical bills.  That was

22   the only thing we received.

23   Q    I understand that.  What I'm saying is the party that you

24   sought the monies from was Caleb Miske's estate, correct?

25   A    To my understanding, yes.

```
 1   Q     All right.  And not the driver of the truck, correct?

 2   A     No.

 3   Q     Okay.  You were aware that doctors told Mr. Miske about

 4   what appeared to them to be bruising indicative of just being a

 5   passenger, correct?

 6            MR. INCIONG:  Objection, beyond the scope.

 7            THE COURT:  Sustained.

 8   BY MR. KENNEDY:

 9   Q     And so --

10            MR. INCIONG:  Objection.

11            MR. KENNEDY:  I haven't even finished the question.

12            MR. INCIONG:  You don't need to.

13            THE COURT:  Go ahead.

14   BY MR. KENNEDY:

15   Q     Mr. Miske never threatened Johnathan.

16            MR. INCIONG:  Objection, beyond the scope.

17            THE COURT:  Is that the end of your question?

18            MR. KENNEDY:  Yes.

19            THE COURT:  The objection's sustained.

20   BY MR. KENNEDY:

21   Q     These ups and downs led to Johnathan being kicked out of

22   the house, correct?

23   A     Nope.  It was an argument between my mother-in-law and

24   Ashley Wong.

25   Q     Mr. Fraser just said, in his own words, that he was being
```

1    kicked out.  Did you hear that?

2    A    Yes.

3            MR. KENNEDY:  Nothing further.

4            THE COURT:  Ms. Fraser, you may step down.  Thank

5    you.

6                                        (Witness excused.)

7            (End of partial transcript.)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER CERTIFICATE

 2          I, Ann B. Matsumoto, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

 5   complete, true, and correct transcript of the stenographically

 6   recorded proceedings held in the above-entitled matter and that

 7   the transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9          DATED at Honolulu, Hawaii, July 8, 2024.

10

11

12
                          /s/ Ann B. Matsumoto
13                        ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25
```