1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

    UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                                )
                Plaintiff,       )      Honolulu, Hawaii
5                                )
           vs.                   )      May 16, 2024
6                                )
    MICHAEL J. MISKE, JR.,       )      TESTIMONY OF HUNTER WILSON
7                                )
                Defendant.       )
8    _____)

9

               PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 72)
10             BEFORE THE HONORABLE DERRICK K. WATSON,
               CHIEF UNITED STATES DISTRICT COURT JUDGE
11

    APPEARANCES:
12

    For the Plaintiff:          MARK INCIONG, ESQ.
13                              MICHAEL DAVID NAMMAR, ESQ
                                WILLIAM KE AUPUNI AKINA, ESQ.
14                              AISLINN AFFINITO, ESQ.
                                Office of the United States Attorney
15                              PJKK Federal Building
                                300 Ala Moana Boulevard, Suite 6100
16                              Honolulu, Hawaii  96850

17  For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                841 Bishop St., Ste 2201
18                              Honolulu, HI 96813

19                              MICHAEL JEROME KENNEDY, ESQ.
                                Law Offices of Michael Jerome
20                              Kennedy, PLLC
                                333 Flint Street
21                              Reno, NV 89501

22  Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                United States District Court
23                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
24

     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

```
1                      I N D E X

2  GOVERNMENT WITNESS:                          PAGE NO.

3
     HUNTER WILSON
4
          DIRECT EXAMINATION BY MR. INCIONG          3
5         CROSS-EXAMINATION BY MR. KENNEDY          55
          REDIRECT EXAMINATION BY MR. INCIONG       81
6         RECROSS-EXAMINATION BY MR. KENNEDY        83

7  EXHIBITS:                                    PAGE NO.

8    Exhibit 1-761 was received in evidence          9
     Exhibit 1-762 was received in evidence         10
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | May 16, 2024                                    11:38 a.m. |
| | 2 | --oo0oo-- |
| 11:38AM | 3 | MR. INCIONG:  Thank you, Your Honor.  The United |
| 11:38AM | 4 | States calls Hunter Wilson. |
| 11:39AM | 5 | THE CLERK:  Please raise your right hand. |
| 11:39AM | 6 | HUNTER WILSON, |
| 11:39AM | 7 | called as a witness, having been first duly sworn, was examined |
| 11:39AM | 8 | and testified as follows: |
| 11:39AM | 9 | THE CLERK:  Please be seated. |
| 11:39AM | 10 | Please state your full name, spelling your last name |
| 11:39AM | 11 | for the record. |
| 11:39AM | 12 | THE WITNESS:  My name is Hunter Wilson.  W-I-L-S-O-N. |
| 11:39AM | 13 | DIRECT EXAMINATION |
| 11:39AM | 14 | BY MR. INCIONG: |
| 11:39AM | 15 | Q    Good morning -- or, yes, still morning.  Good morning, |
| 11:39AM | 16 | Mr. Wilson.  How old are you, sir? |
| 11:39AM | 17 | A    Twenty-eight. |
| 11:39AM | 18 | Q    Where did you grow up? |
| 11:39AM | 19 | A    Ka'a'awa on the east side of Oahu. |
| 11:39AM | 20 | Q    Did you spend all your childhood here on Oahu? |
| 11:40AM | 21 | A    Yes. |
| 11:40AM | 22 | Q    Do you have any siblings? |
| 11:40AM | 23 | A    Yes. |
| 11:40AM | 24 | Q    How many? |
| 11:40AM | 25 | A    Five sisters, one brother. |

| 11:40AM | 1  | Q | Where are you in the order? |
| 11:40AM | 2  | A | Second oldest. |
| 11:40AM | 3  | Q | Where did you go to high school? |
| 11:40AM | 4  | A | Kahuku and Castle. |
| 11:40AM | 5  | Q | Did you graduate from one of those schools? |
| 11:40AM | 6  | A | Yes, Kahuku. |
| 11:40AM | 7  | Q | What year was that? |
| 11:40AM | 8  | A | 2013. |
| 11:40AM | 9  | Q | After high school, what were you doing? |
| 11:40AM | 10 | A | Selling drugs. |
| 11:40AM | 11 | Q | What kind of drugs were you selling? |
| 11:40AM | 12 | A | Crystal meth. |
| 11:40AM | 13 | Q | How did you get involved in that? |
| 11:40AM | 14 | A | Using drugs. |
| 11:40AM | 15 | Q | Were you using crystal meth yourself at the time? |
| 11:40AM | 16 | A | Yes. |
| 11:40AM | 17 | Q | How old were you when you started using crystal meth? |
| 11:40AM | 18 | A | Sixteen. |
| 11:40AM | 19 | Q | Were you a regular user? |
| 11:40AM | 20 | A | Yeah. |
| 11:40AM | 21 | Q | Would you say you were addicted? |
| 11:40AM | 22 | A | Yeah. |
| 11:40AM | 23 | Q | Why did you choose to start selling drugs instead of just |
| 11:41AM | 24 |   | using them? |
| 11:41AM | 25 | A | Support my habit and to make money. |

11:41AM   1   Q    It's an expensive habit?

11:41AM   2   A    Yeah.

11:41AM   3   Q    How much were you spending a day to support your habit,

11:41AM   4   would you say?

11:41AM   5   A    Like two, $300 a day.

11:41AM   6   Q    Were you selling any other drugs other than crystal

11:41AM   7   methamphetamine?

11:41AM   8   A    Marijuana.

11:41AM   9   Q    What kinds of amounts as far as quantity were you selling

11:41AM   10   of those drugs when you first started?

11:41AM   11   A    A few ounces.

11:41AM   12   Q    Did that increase over time?

11:41AM   13   A    Yes.

11:41AM   14   Q    Who were you getting your drugs from?

11:41AM   15   A    Jake Smith.

11:41AM   16   Q    How did you know Jake Smith?

11:41AM   17   A    I grew up with him.

11:41AM   18   Q    Is he someone you went to school with?

11:41AM   19   A    Yeah, hung around with.

11:41AM   20   Q    Was Jake about the same age as you or was there an age

11:42AM   21   difference?

11:42AM   22   A    Couple years older.

11:42AM   23   Q    Would you consider Jake to be your main supplier?

11:42AM   24   A    Yes.

11:42AM   25   Q    I'll ask you little bit more about Jake Smith in a minute,

| | | |
|---|---|---|
| 11:42AM | 1 | but I want to direct you to May 4th of 2018.  So this would be |
| 11:42AM | 2 | about five years after you graduated from high school? |
| 11:42AM | 3 | A    Yes. |
| 11:42AM | 4 | Q    Had you been selling drugs consistently during that |
| 11:42AM | 5 | five-year period? |
| 11:42AM | 6 | A    Yeah, off and on. |
| 11:42AM | 7 | Q    Okay.  On May 4th of 2018, were you arrested by the |
| 11:42AM | 8 | Honolulu Police Department? |
| 11:42AM | 9 | A    Pulled over. |
| 11:42AM | 10 | Q    Okay.  Where were you pulled over? |
| 11:42AM | 11 | A    Castle High School -- across Castle High School in |
| 11:42AM | 12 | Kaneohe. |
| 11:42AM | 13 | Q    Where were you headed to at that time? |
| 11:42AM | 14 | A    Meet some -- meet somebody to drop off drugs. |
| 11:42AM | 15 | Q    Who was that somebody? |
| 11:43AM | 16 | A    Tim Taboada. |
| 11:43AM | 17 | Q    Was that a customer of yours? |
| 11:43AM | 18 | A    Yeah. |
| 11:43AM | 19 | Q    Was he also a friend? |
| 11:43AM | 20 | A    Yeah. |
| 11:43AM | 21 | Q    Did you have drugs in your vehicle that you were going to |
| 11:43AM | 22 | take to Mr. Taboada? |
| 11:43AM | 23 | A    Yes. |
| 11:43AM | 24 | Q    What kind of drugs? |
| 11:43AM | 25 | A    Crystal meth. |

| | | | |
|---|---|---|---|
| 11:43AM | 1 | Q | What quantity? |
| 11:43AM | 2 | A | Two pounds. |
| 11:43AM | 3 | Q | Where had you gotten those drugs from? |
| 11:43AM | 4 | A | Took it from -- broke into Eddie Wong's car and took it |
| 11:43AM | 5 | | from his car. |
| 11:43AM | 6 | Q | Who is Eddie Wong? |
| 11:43AM | 7 | A | Somebody else I used to get drugs from. |
| 11:43AM | 8 | Q | You found out he had these drugs in his -- his car? |
| 11:43AM | 9 | A | Yes. |
| 11:43AM | 10 | Q | And you basically stole them from him? |
| 11:43AM | 11 | A | Yes. |
| 11:43AM | 12 | Q | Without his permission? |
| 11:43AM | 13 | A | Yes. |
| 11:43AM | 14 | Q | Had you just obtained those drugs that same day when you |
| 11:43AM | 15 | | were taking them to Mr. Taboada? |
| 11:43AM | 16 | A | Yes. |
| 11:43AM | 17 | Q | So when you were pulled over by the police, where was that |
| 11:43AM | 18 | | exactly? |
| 11:43AM | 19 | A | In the trunk. |
| 11:44AM | 20 | Q | Let me clarify the question.  Where were you pulled over? |
| 11:44AM | 21 | A | Oh, Castle -- across Castle High School. |
| 11:44AM | 22 | Q | Is that on Kaneohe Bay Drive? |
| 11:44AM | 23 | A | Yes. |
| 11:44AM | 24 | Q | Did you think you were in trouble at that point? |
| 11:44AM | 25 | A | Yeah. |

| | | | |
|---|---|---|---|
| 11:44AM | 1 | Q | Did the police ask you to get out of the car? |
| 11:44AM | 2 | A | Yes. |
| 11:44AM | 3 | Q | Did they search your car? |
| 11:44AM | 4 | A | Yes. |
| 11:44AM | 5 | Q | Did they find the drugs? |
| 11:44AM | 6 | A | Yes. |
| 11:44AM | 7 | Q | Where were the drugs? |
| 11:44AM | 8 | A | In the trunk. |
| 11:44AM | 9 | Q | And you knew the quantity as well? |
| 11:44AM | 10 | A | Yeah. |
| 11:44AM | 11 | | MR. INCIONG:  Your Honor, could we show the witness |
| 11:44AM | 12 | | only Exhibit 1-761 at this time from our original list? |
| 11:44AM | 13 | | THE COURT:  Yes. |
| 11:44AM | 14 | | BY MR. INCIONG: |
| 11:44AM | 15 | Q | Mr. Wilson, do you see the photo that's marked as |
| 11:44AM | 16 | | Exhibit 1-761? |
| 11:44AM | 17 | A | Yes. |
| 11:44AM | 18 | Q | Do you recognize what's shown there? |
| 11:44AM | 19 | A | Yes. |
| 11:44AM | 20 | Q | How do you recognize that? |
| 11:44AM | 21 | A | That was the drugs that was in the car. |
| 11:45AM | 22 | Q | Does that show how they appeared and what those drugs were |
| 11:45AM | 23 | | contained in the day you were pulled over by Honolulu Police |
| 11:45AM | 24 | | Department on May 4th of 2018? |
| 11:45AM | 25 | A | Yes. |

11:45AM    1          MR. INCIONG:  I would move to admit 1-761.

11:45AM    2          THE COURT:  Any objection?

11:45AM    3          MR. KENNEDY:  No objection.

11:45AM    4          THE COURT:  1-761 is admitted, and you may publish.

11:45AM    5           (Exhibit 1-761 was received in evidence.)

11:45AM    6          MR. INCIONG:  Thank you, Your Honor.

11:45AM    7   BY MR. INCIONG:

11:45AM    8   Q    So this is the two pounds ever crystal methamphetamine,

11:45AM    9   Mr. Wilson?

11:45AM   10   A    Yes.

11:45AM   11   Q    Was that some sort of bag that those were contained in?

11:45AM   12   A    Yeah.

11:45AM   13   Q    Is that what the drugs were held in when you took them

11:45AM   14   from Eddie Wong's car?

11:45AM   15   A    Yes.

11:45AM   16          MR. INCIONG:  Could we show Mr. Wilson only

11:45AM   17   Exhibit 1-762, please?

11:45AM   18          THE COURT:  Yes.

11:45AM   19   BY MR. INCIONG:

11:45AM   20   Q    Mr. Wilson, do you recognize what's shown in this picture?

11:45AM   21   A    Yes.

11:45AM   22   Q    Do you recognize those as being the -- some of the bags of

11:45AM   23   the methamphetamine that were contained in that larger canvas

11:45AM   24   bag?

11:45AM   25   A    Yes.

| | | |
|---|---|---|
| 11:45AM | 1 | MR. INCIONG:  Your Honor, I would move to admit 1-762. |
| 11:45AM | 2 | THE COURT:  Any objection? |
| 11:45AM | 3 | MR. KENNEDY:  No objection. |
| 11:45AM | 4 | THE COURT:  1-762 is admitted as well.  You may |
| 11:46AM | 5 | publish. |
| 11:46AM | 6 | (Exhibit 1-762 was received in evidence.) |
| 11:46AM | 7 | MR. INCIONG:  Thank you. |
| 11:46AM | 8 | BY MR. INCIONG: |
| 11:46AM | 9 | Q   Mr. Wilson, do you recognize what's shown there? |
| 11:46AM | 10 | A   Yes. |
| 11:46AM | 11 | Q   Those are the bags of methamphetamine that you took from |
| 11:46AM | 12 | Eddie Wong? |
| 11:46AM | 13 | A   Yes. |
| 11:46AM | 14 | Q   Now, that amount of methamphetamine, two pounds, was -- |
| 11:46AM | 15 | was it common or unusual for you to be in possession of that |
| 11:46AM | 16 | amount? |
| 11:46AM | 17 | A   Common. |
| 11:46AM | 18 | Q   You said you were going to take these drugs to |
| 11:46AM | 19 | Mr. Taboada? |
| 11:46AM | 20 | A   Yes. |
| 11:46AM | 21 | Q   Were you going to sell them to him? |
| 11:46AM | 22 | A   Yes. |
| 11:46AM | 23 | Q   Did you have a price in mind? |
| 11:46AM | 24 | A   Yeah. |
| 11:46AM | 25 | Q   How much were you going to sell these drugs for? |

| | | |
|---|---|---|
| 11:46AM | 1 | A    Eight grand each pound. |
| 11:46AM | 2 | Q    Was that the price -- normal price you would give |
| 11:46AM | 3 | Mr. Taboada or did it change because you had stolen these? |
| 11:46AM | 4 | A    Changed because I stole it. |
| 11:46AM | 5 | Q    What was the normal price you would have charged if you |
| 11:46AM | 6 | had -- had to buy these drugs? |
| 11:46AM | 7 | A    Ten to 12. |
| 11:46AM | 8 | MR. INCIONG:  Could we publish, please, Exhibit 2-16, |
| 11:47AM | 9 | previously admitted from our original list? |
| 11:47AM | 10 | THE COURT:  Go ahead. |
| 11:47AM | 11 | MR. INCIONG:  And can we focus in on the area around |
| 11:47AM | 12 | the red dot.  The lower quarter, a little bit more.  There. |
| 11:47AM | 13 | Thank you. |
| 11:47AM | 14 | BY MR. INCIONG: |
| 11:47AM | 15 | Q    Mr. Wilson, can you tell on this map from looking at this |
| 11:47AM | 16 | map approximately where you were pulled over by Honolulu police |
| 11:47AM | 17 | that day? |
| 11:47AM | 18 | A    Yes. |
| 11:47AM | 19 | Q    Could you -- using your finger, could you just make a |
| 11:47AM | 20 | circle or draw an X as to where the traffic stop was? |
| 11:47AM | 21 | A    (Witness complies.) |
| 11:47AM | 22 | Q    So you've marked just to the left of what shows Bay View |
| 11:47AM | 23 | Mini-Putt and Zipline? |
| 11:47AM | 24 | A    Yes. |
| 11:47AM | 25 | Q    And to the left of that, do you see the little -- the cap |

| | | |
|---|---|---|
| 11:47AM | 1 | and the little pin there? |
| 11:47AM | 2 | A    Yes. |
| 11:47AM | 3 | Q    Is that where Castle High School is? |
| 11:47AM | 4 | A    Yes. |
| 11:47AM | 5 | MR. INCIONG:  Your Honor, at this time I would like to |
| 11:47AM | 6 | read into the record part of a stipulation that the parties |
| 11:48AM | 7 | have reached.  This is from Document Number 1490, ECF Number |
| 11:48AM | 8 | 1490, filed May 14th of this year.  And it's the last paragraph |
| 11:48AM | 9 | and the one sentence after that on page 2. |
| 11:48AM | 10 | I have a copy if Your Honor needs. |
| 11:48AM | 11 | THE COURT:  All right.  I have a copy in front of me. |
| 11:48AM | 12 | MR. INCIONG:  "It is hereby stipulated and agreed by |
| 11:48AM | 13 | the undersigned parties that the substance seized on May 4th, |
| 11:48AM | 14 | 2018, by the Federal Bureau of Investigation, pursuant to a |
| 11:48AM | 15 | traffic stop in the vicinity of Castle High School, Kaneohe, |
| 11:48AM | 16 | Hawaii, from a vehicle bearing Hawaii license plate number |
| 11:48AM | 17 | TDC660, is pure or actual methamphetamine, a Schedule II |
| 11:48AM | 18 | controlled substance, with a net weight of approximately |
| 11:48AM | 19 | 966 grams.  The above quantity of methamphetamine is a |
| 11:49AM | 20 | distributable amount." |
| 11:49AM | 21 | THE COURT:  And as I've advised the jury before, this |
| 11:49AM | 22 | statement that Mr. Inciong just read is a statement that the |
| 11:49AM | 23 | parties have stipulated to.  "Stipulated" means they have |
| 11:49AM | 24 | reached an agreement on.  No further proof is necessary to |
| 11:49AM | 25 | prove the facts that Mr. Inciong just read into the record. |

| | | |
|---|---|---|
| 11:49AM | 1 | These facts are to be treated by you as having been |
| 11:49AM | 2 | conclusively approved. |
| 11:49AM | 3 | And once again, you will receive a specific jury |
| 11:49AM | 4 | instructions to the same effect at the time -- at the |
| 11:49AM | 5 | appropriate time later in this case, but I want to let you know |
| 11:49AM | 6 | what the meaning of a "stipulation" is now. |
| 11:49AM | 7 | MR. INCIONG:  Thank you, Your Honor. |
| 11:49AM | 8 | May we show the witness only Exhibit 1-55, please, |
| 11:49AM | 9 | from our original list? |
| 11:50AM | 10 | THE COURT:  1-55 has been admitted. |
| 11:50AM | 11 | MR. INCIONG:  Okay.  Thank you, Your Honor.  I just |
| 11:50AM | 12 | wanted to confirm.  If we could publish then that at this time? |
| 11:50AM | 13 | THE COURT:  Yes. |
| 11:50AM | 14 | BY MR. INCIONG: |
| 11:50AM | 15 | Q    Mr. Hunter, do you recognize the individual shown in 1-55? |
| 11:50AM | 16 | A    Yes. |
| 11:50AM | 17 | Q    Who is that? |
| 11:50AM | 18 | A    Tim Taboada. |
| 11:50AM | 19 | Q    This is the person that you were going to sell these |
| 11:50AM | 20 | approximately two pounds of methamphetamine to? |
| 11:50AM | 21 | A    Yes. |
| 11:50AM | 22 | Q    Now, you told us a minute ago that he was a friend of |
| 11:50AM | 23 | yours as well, correct? |
| 11:50AM | 24 | A    Yes. |
| 11:50AM | 25 | Q    Had you been engaged in drug distribution with him for |

| | | |
|---|---|---|
| 11:50AM | 1 | some time prior to this stop? |
| 11:50AM | 2 | A    Yes. |
| 11:50AM | 3 | Q    You were supplying him in this instance, but did he ever |
| 11:50AM | 4 | supply you on other occasions? |
| 11:50AM | 5 | A    Yeah. |
| 11:50AM | 6 | Q    Did you kind of work together in that way? |
| 11:50AM | 7 | A    Yeah.  Yes. |
| 11:50AM | 8 | Q    So after these drugs were found in your -- the trunk of |
| 11:50AM | 9 | your car, what happened to you at that time? |
| 11:50AM | 10 | A    They let me go. |
| 11:50AM | 11 | Q    Did that surprise you? |
| 11:50AM | 12 | A    Yes. |
| 11:50AM | 13 | Q    What did you think was the explanation for that at that |
| 11:51AM | 14 | time? |
| 11:51AM | 15 | A    They wanted to keep it and just let me go.  I got ripped |
| 11:51AM | 16 | off, so I thought. |
| 11:51AM | 17 | Q    So you thought the police had ripped you off? |
| 11:51AM | 18 | A    Yeah. |
| 11:51AM | 19 | Q    Was this a marked patrol unit or undercover police that |
| 11:51AM | 20 | stopped you? |
| 11:51AM | 21 | A    Both. |
| 11:51AM | 22 | Q    Both.  Okay.  There was both, a marked unit and |
| 11:51AM | 23 | plainclothes? |
| 11:51AM | 24 | A    Yes. |
| 11:51AM | 25 | Q    Did you in fact call a number of people immediately after |

| | | |
|---|---|---|
| 11:51AM | 1 | and explain your -- what you thought had just happened? |
| 11:51AM | 2 | A    Yes. |
| 11:51AM | 3 | Q    Meaning you thought you had been ripped off by the police? |
| 11:51AM | 4 | A    Yes. |
| 11:51AM | 5 | Q    Did you think it was any particular section or unit of the |
| 11:51AM | 6 | Honolulu police? |
| 11:51AM | 7 | A    CRU. |
| 11:51AM | 8 | Q    That's known as CRU sometimes? |
| 11:51AM | 9 | A    Yes. |
| 11:51AM | 10 | Q    Do you understand that means Crime Reduction Unit? |
| 11:51AM | 11 | A    Yes. |
| 11:51AM | 12 | Q    Why did you believe the CRU unit had ripped you off? |
| 11:51AM | 13 | A    At that time there was many stories that was going around |
| 11:51AM | 14 | that they were doing that. |
| 11:52AM | 15 | Q    After that had happened to you, did that alter your -- |
| 11:52AM | 16 | your drug distribution activity? |
| 11:52AM | 17 | A    Yeah. |
| 11:52AM | 18 | Q    Did you stop completely or did you just change your -- |
| 11:52AM | 19 | your habits? |
| 11:52AM | 20 | A    Changed my habits. |
| 11:52AM | 21 | Q    How did you -- what did you change? |
| 11:52AM | 22 | A    Stopped selling crystal meth. |
| 11:52AM | 23 | Q    You switched to a different drug? |
| 11:52AM | 24 | A    Yes. |
| 11:52AM | 25 | Q    Which drug? |

| | | | |
|---|---|---|---|
| 11:52AM | 1 | A | Coke and weed. |
| 11:52AM | 2 | Q | Why did you switch? |
| 11:52AM | 3 | A | I felt it was too risky selling ice. |
| 11:52AM | 4 | Q | Did you later learn that you had been intercepted in a |
| 11:52AM | 5 | | conversation with Tim Taboada? |
| 11:52AM | 6 | A | Yes. |
| 11:52AM | 7 | Q | And that that's what had led to you being stopped by |
| 11:52AM | 8 | | Castle High School? |
| 11:52AM | 9 | A | Yes. |
| 11:52AM | 10 | Q | When did you find out about that? |
| 11:52AM | 11 | A | When I was at -- when I was at FDC. |
| 11:52AM | 12 | Q | Okay.  Let me fast-forward then and have you focus on July |
| 11:53AM | 13 | | of 2020.  Do you recall being arrested in July of 2020? |
| 11:53AM | 14 | A | Yes. |
| 11:53AM | 15 | Q | Where were you arrested at that time? |
| 11:53AM | 16 | A | Salt Lake. |
| 11:53AM | 17 | Q | Do you recall the date? |
| 11:53AM | 18 | A | No. |
| 11:53AM | 19 | Q | Did you know why you were being arrested at that time? |
| 11:53AM | 20 | A | No. |
| 11:53AM | 21 | Q | Did you connect it in any way to the -- the May 2018 |
| 11:53AM | 22 | | traffic stop -- |
| 11:53AM | 23 | A | No. |
| 11:53AM | 24 | Q | -- at that time?  Okay. |
| 11:53AM | 25 | | When did you kind of put that together? |

| | | | |
|---|---|---|---|
| 11:53AM | 1 | A | When I seen it in my discovery. |
| 11:53AM | 2 | Q | So did you see that you been charged in an indictment? |
| 11:53AM | 3 | A | Yes. |
| 11:53AM | 4 | Q | What charges did you see you were charged with in that |
| 11:53AM | 5 | | indictment? |
| 11:53AM | 6 | A | Conspiracy to distribute, racketeering, gun charges. |
| 11:53AM | 7 | Q | Okay.  Were you appointed an attorney at the time? |
| 11:53AM | 8 | A | Yes. |
| 11:53AM | 9 | Q | What was the name of your attorney that you were |
| 11:54AM | 10 | | appointed? |
| 11:54AM | 11 | A | Andrew Kennedy. |
| 11:54AM | 12 | Q | Does Mr. Kennedy represent you to this day? |
| 11:54AM | 13 | A | Yes. |
| 11:54AM | 14 | Q | Did you meet with Mr. Kennedy shortly after you were |
| 11:54AM | 15 | | arrested and discuss your case? |
| 11:54AM | 16 | A | Yes. |
| 11:54AM | 17 | Q | Did you decide as to how you wanted to proceed? |
| 11:54AM | 18 | A | Yes. |
| 11:54AM | 19 | Q | What did you decide to do at that point? |
| 11:54AM | 20 | A | Plead guilty. |
| 11:54AM | 21 | Q | Even before you pled guilty, did you discuss with |
| 11:54AM | 22 | | Mr. Kennedy the option of whether you wanted to cooperate with |
| 11:54AM | 23 | | the government or not? |
| 11:54AM | 24 | A | Yes. |
| 11:54AM | 25 | Q | What did you decide? |

11:54AM   1   A    Cooperate.

11:54AM   2   Q    Did you decide to do that very quickly after you were

11:54AM   3   arrested?

11:54AM   4   A    Yes.

11:54AM   5   Q    Do you recall entering into what's called a proffer

11:54AM   6   agreement with the government?

11:54AM   7   A    Yes.

11:54AM   8         MR. INCIONG:  Could we show the witness only

11:54AM   9   Exhibit 1-474 from our original list, just for identification

11:54AM  10   purposes?

11:55AM  11         THE COURT:  Go ahead.

11:55AM  12   BY MR. INCIONG:

11:55AM  13   Q    Mr. Wilson, do you see the first page of the document

11:55AM  14   that's been marked 1-474?

11:55AM  15   A    Yes.

11:55AM  16   Q    Is that the proffer letter or proffer agreement that you

11:55AM  17   entered into?

11:55AM  18   A    Yes, I did.

11:55AM  19   Q    Do you see the date on there?

11:55AM  20   A    Yes.

11:55AM  21   Q    Does that represent the accurate date when you entered

11:55AM  22   into that agreement?

11:55AM  23   A    Yes.

11:55AM  24   Q    What date was that?

11:55AM  25   A    July 20th, 2020.

11:55AM   1           MR. INCIONG:  If we could just go to the second and

11:55AM   2   third page, and then the final page.

11:55AM   3   BY MR. INCIONG:

11:55AM   4   Q    Is that your signature on that document?

11:55AM   5   A    Yes.

11:55AM   6   Q    And does that bear the same date, July 20th of 2020?

11:55AM   7   A    Yes.

11:55AM   8   Q    What did you understand the terms of that proffer

11:55AM   9   agreement to be?

11:55AM   10  A    I need to cooperate and tell the truth.

11:55AM   11  Q    Were you also required to meet with government agents when

11:55AM   12  you were requested?

11:55AM   13  A    Yes.

11:55AM   14  Q    Did this --

11:56AM   15          MR. INCIONG:  You can take that down.

11:56AM   16  BY MR. INCIONG:

11:56AM   17  Q    Did this proffer agreement offer you any benefits or

11:56AM   18  protection?

11:56AM   19  A    Anything I knew or bring forth can't be used against me.

11:56AM   20  Q    Did you meet with agents for the first time that very same

11:56AM   21  day on July 20th of 2020?

11:56AM   22  A    Yes.

11:56AM   23  Q    Did you meet with them another two times, in September and

11:56AM   24  October of that year?

11:56AM   25  A    Yes.

| | | | |
|---|---|---|---|
| 11:56AM | 1 | Q | Did you tell the agents everything that you knew about the |
| 11:56AM | 2 | | charges against you during those meetings? |
| 11:56AM | 3 | A | Yes. |
| 11:56AM | 4 | Q | Were you completely truthful with the agents? |
| 11:56AM | 5 | A | Yes. |
| 11:56AM | 6 | Q | Now, shortly after your arrest did you -- you through your |
| 11:56AM | 7 | | attorney ask the court to be released on bail? |
| 11:56AM | 8 | A | Yes. |
| 11:56AM | 9 | Q | Were you granted release? |
| 11:56AM | 10 | A | Yes. |
| 11:56AM | 11 | Q | Where were you released to? |
| 11:56AM | 12 | A | MOCA House. |
| 11:56AM | 13 | Q | What is the MOCA House? |
| 11:56AM | 14 | A | Halfway house. |
| 11:56AM | 15 | Q | Were you under what's called pretrial supervision during |
| 11:56AM | 16 | | that time? |
| 11:56AM | 17 | A | Yes. |
| 11:56AM | 18 | Q | Were there some conditions that you had to follow? |
| 11:57AM | 19 | A | Yes. |
| 11:57AM | 20 | Q | Was a curfew one of those? |
| 11:57AM | 21 | A | Yes. |
| 11:57AM | 22 | Q | What time was your curfew at the MOCA House? |
| 11:57AM | 23 | A | 11:00 p.m. |
| 11:57AM | 24 | Q | Did you have drug testing urinalysis tests you were |
| 11:57AM | 25 | | required to submit to? |

| | | | |
|---|---|---|---|
| 11:57AM | 1 | A | Yes. |
| 11:57AM | 2 | Q | Did you have to wear any sort of ankle monitor or a GPS |
| 11:57AM | 3 | | monitor? |
| 11:57AM | 4 | A | Yes. |
| 11:57AM | 5 | Q | Were you required to be employed or at least seek |
| 11:57AM | 6 | | employment during that time? |
| 11:57AM | 7 | A | Yes. |
| 11:57AM | 8 | Q | Did you do all of those things? |
| 11:57AM | 9 | A | Yes. |
| 11:57AM | 10 | Q | How long did you stay at the MOCA House? |
| 11:57AM | 11 | A | I would say five months. |
| 11:57AM | 12 | Q | Where did you go from the MOCA House? |
| 11:57AM | 13 | A | Big Island family house. |
| 11:57AM | 14 | Q | Is there a reason why you left the MOCA House? |
| 11:57AM | 15 | A | Yes. |
| 11:57AM | 16 | Q | Explain to the jury why. |
| 11:57AM | 17 | A | One night when I was sleeping, my roommate woke my up, |
| 11:57AM | 18 | | somebody shot into the MOCA House, into the unit. |
| 11:58AM | 19 | Q | Did that bullet come into the room you were in? |
| 11:58AM | 20 | A | The living room. |
| 11:58AM | 21 | Q | Did you actually -- could you actually see where that |
| 11:58AM | 22 | | bullet had become lodged? |
| 11:58AM | 23 | A | Yes. |
| 11:58AM | 24 | Q | Where -- where did it become lodged? |
| 11:58AM | 25 | A | The ceiling. |

| | | | |
|---|---|---|---|
| 11:58AM | 1 | Q | Did you call the police? |
| 11:58AM | 2 | A | Yes. |
| 11:58AM | 3 | Q | Did the police respond? |
| 11:58AM | 4 | A | Yes. |
| 11:58AM | 5 | Q | Were they ever able to identify who had fired the shot? |
| 11:58AM | 6 | A | No. |
| 11:58AM | 7 | Q | Did that whole situation frighten you? |
| 11:58AM | 8 | A | Yeah. |
| 11:58AM | 9 | Q | Why? |
| 11:58AM | 10 | A | Because my life's in danger. |
| 11:58AM | 11 | Q | Were other of your codefendants released at the same time |
| 11:58AM | 12 | | you were? |
| 11:58AM | 13 | A | No, they were released before me. |
| 11:58AM | 14 | Q | Did that worry you as to what -- |
| 11:58AM | 15 | A | No, after me. |
| 11:58AM | 16 | Q | Okay.  Did the fact that you were released and others |
| 11:58AM | 17 | | weren't concern you? |
| 11:58AM | 18 | A | Yes. |
| 11:58AM | 19 | Q | Why? |
| 11:58AM | 20 | A | Because I was the first one to cooperate. |
| 11:58AM | 21 | Q | Were you worried other -- other codefendants might have |
| 11:58AM | 22 | | known that or thought that at least? |
| 11:58AM | 23 | A | Yes. |
| 11:58AM | 24 | Q | So did you ask to be relocated for safety reasons? |
| 11:59AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 11:59AM | 1 | Q | So that's when you went to the Big Island? |
| 11:59AM | 2 | A | Yes. |
| 11:59AM | 3 | Q | So did your conditions of pretrial release still remain |
| 11:59AM | 4 | | even though you were no longer at the halfway house? |
| 11:59AM | 5 | A | Yes. |
| 11:59AM | 6 | Q | So you were required to still wear a GPS ankle monitor? |
| 11:59AM | 7 | A | Yes. |
| 11:59AM | 8 | Q | How often were the drug tests that you were required to |
| 11:59AM | 9 | | submit to? |
| 11:59AM | 10 | A | Every week. |
| 11:59AM | 11 | Q | Did you find employment? |
| 11:59AM | 12 | A | Yes. |
| 11:59AM | 13 | Q | What kind of employment were you doing? |
| 11:59AM | 14 | A | Construction. |
| 11:59AM | 15 | Q | Are you still on supervised release -- |
| 11:59AM | 16 | A | Yes. |
| 11:59AM | 17 | Q | -- or pretrial release? |
| 11:59AM | 18 | A | Yes, I am. |
| 11:59AM | 19 | Q | So how long now have you been on these pretrial release |
| 11:59AM | 20 | | conditions? |
| 11:59AM | 21 | A | Next -- July makes four years. |
| 11:59AM | 22 | Q | For four years you've been wearing an ankle monitor? |
| 11:59AM | 23 | A | Yes. |
| 11:59AM | 24 | Q | Four years you've been submitting to drug tests? |
| 11:59AM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 11:59AM | 1 | Q | Weekly drug tests? |
| 11:59AM | 2 | A | Yes. |
| 11:59AM | 3 | Q | Have you violated any of your pretrial conditions during |
| 11:59AM | 4 | | those almost four years now? |
| 11:59AM | 5 | A | No. |
| 11:59AM | 6 | Q | Did your curfew change when you left the MOCA House? |
| 12:00PM | 7 | A | Yes. |
| 12:00PM | 8 | Q | What did it change to? |
| 12:00PM | 9 | A | 11:00 p.m. to 8:30 p.m. |
| 12:00PM | 10 | Q | Have you ever been late for a curfew? |
| 12:00PM | 11 | A | No. |
| 12:00PM | 12 | Q | So no violations of any sort for those almost now four |
| 12:00PM | 13 | | years? |
| 12:00PM | 14 | A | Yes. |
| 12:00PM | 15 | Q | Now, going back to the charges against you, did -- you |
| 12:00PM | 16 | | were consulting with your attorney about the case against you? |
| 12:00PM | 17 | A | Yes. |
| 12:00PM | 18 | Q | Did you get a chance to review your discovery with him? |
| 12:00PM | 19 | A | Yes. |
| 12:00PM | 20 | Q | And after doing that, is that when you decided to plead |
| 12:00PM | 21 | | guilty? |
| 12:00PM | 22 | A | Yes. |
| 12:00PM | 23 | Q | Why did you decide to plead guilty? |
| 12:00PM | 24 | A | Because I was guilty. |
| 12:00PM | 25 | Q | Did you enter into a plea agreement with the United States |

12:00PM   1   in order to resolve your case?

12:00PM   2   A     Yes.

12:00PM   3               MR. INCIONG:  Your Honor, could we show the witness

12:00PM   4   only Exhibit 1-473, please?

12:00PM   5               THE COURT:  Yes.

12:00PM   6               MR. INCIONG:  From our original list.

12:00PM   7               THE COURT:  Go ahead.

12:00PM   8   BY MR. INCIONG:

12:00PM   9   Q     Mr. Wilson, do you see the -- at least the first page of

12:00PM   10  this document?

12:00PM   11  A     Yes.

12:00PM   12  Q     Do you recognize that as being the memorandum of --

12:01PM   13  memorandum of plea agreement that you entered into with the

12:01PM   14  United States?

12:01PM   15  A     Yes.

12:01PM   16  Q     Do you see the date in the upper right-hand corner where

12:01PM   17  there's a stamp there?

12:01PM   18  A     Yes.

12:01PM   19  Q     Does that date look accurate to you as to when you entered

12:01PM   20  that guilty plea?

12:01PM   21  A     Yes.

12:01PM   22  Q     When did you enter your guilty plea?

12:01PM   23  A     May 6, 2021.

12:01PM   24  Q     So you were arrested in July of 2020, so that was just a

12:01PM   25  little bit less than a year after you were arrested?

12:01PM   1   A    Yes.

12:01PM   2          MR. INCIONG:  And then could we just go to the final

12:01PM   3   page of that document, please?

12:01PM   4   BY MR. INCIONG:

12:01PM   5   Q    Is that your signature, Mr. Wilson, on the -- on the last

12:01PM   6   page?

12:01PM   7   A    Yes.

12:01PM   8   Q    Is that below your attorney's signature, just above you on

12:01PM   9   the bottom there as well?

12:01PM   10  A    Yes.

12:01PM   11         MR. INCIONG:  Okay, we can take that down.

12:01PM   12  BY MR. INCIONG:

12:01PM   13  Q    So what were the -- let's start with just the very basic

12:01PM   14  terms of the plea agreement.  What did you agree to plead

12:01PM   15  guilty to?

12:01PM   16  A    Conspiracy and racketeering.

12:02PM   17  Q    What was the conspiracy charge, conspiracy to do what?

12:02PM   18  A    Distribute crystal meth.

12:02PM   19  Q    So was Count 1 of the indictment against you the

12:02PM   20  racketeering conspiracy count?

12:02PM   21  A    Yes.

12:02PM   22  Q    Was Count 16 the conspiracy to distribute drugs, crystal

12:02PM   23  meth in this case?

12:02PM   24  A    Yes.

12:02PM   25  Q    Were there a number of case -- or number of counts, I

12:02PM   1   should say, that the government agreed to dismiss as part of

12:02PM   2   your plea agreement?

12:02PM   3   A     Yes.

12:02PM   4   Q     Were those Counts 17, 20 and 21?

12:02PM   5   A     Yes.

12:02PM   6   Q     What did you understand those counts to be?

12:02PM   7   A     Gun charges.

12:02PM   8   Q     Was there also a -- one of those a armed robbery charge?

12:02PM   9   A     Yes.

12:02PM   10  Q     Now, in regard to the racketeering conspiracy charge,

12:02PM   11  Count 1, did you -- were you aware of what the statutory

12:02PM   12  maximum penalty for that charge was?

12:02PM   13  A     Yes.

12:02PM   14  Q     What was that?

12:02PM   15  A     Minimum, ten; max, life.

12:02PM   16  Q     Okay.  Is that the -- what you understand to be the drug

12:03PM   17  charge or the racketeering charge?

12:03PM   18  A     Oh, that's the drug charge.

12:03PM   19  Q     Okay.  So mandatory minimum, ten years; max, life for the

12:03PM   20  drug charge?

12:03PM   21  A     Yes.

12:03PM   22  Q     And for the racketeering charge, did you understand that

12:03PM   23  to be a statutory maximum of 20 years?

12:03PM   24  A     Yes.

12:03PM   25  Q     Did you understand that the drug -- I'm sorry, that the

12:03PM   1   gun counts, two of them, that were dismissed against you, that

12:03PM   2   each of those would have carried a five-year consecutive

12:03PM   3   sentence?

12:03PM   4   A   Yes.

12:03PM   5   Q   Those were dismissed, correct?

12:03PM   6   A   Yes.

12:03PM   7   Q   Did you understand that the robbery charge dismissed

12:03PM   8   against you had a 20-year maximum?

12:03PM   9   A   Yes.

12:03PM  10   Q   Let me ask you a few questions about the racketeering

12:03PM  11   conspiracy charge that you pled guilty to, Count 1.  So what do

12:03PM  12   you understand racketeering conspiracy to be?

12:03PM  13   A   A group of people get together, commit crimes to make

12:03PM  14   money.

12:03PM  15   Q   Is that what you did?

12:03PM  16   A   Yes.

12:03PM  17   Q   You understand for that charge that the agreement is the

12:04PM  18   crime?

12:04PM  19   A   Yes.

12:04PM  20   Q   But you did more than just agree, correct?

12:04PM  21   A   Yes.

12:04PM  22   Q   In your plea agreement did you specifically admit to being

12:04PM  23   a member of the Miske Enterprise?

12:04PM  24   A   Yes.

12:04PM  25   Q   What was the approximate time frame that you were a member

12:04PM   1   of the Miske Enterprise, Mr. Wilson?

12:04PM   2   A    2016 to '18.

12:04PM   3   Q    Who did you conspire with as part of being a member of

12:04PM   4   Miske Enterprise?

12:04PM   5   A    Jake Smith.

12:04PM   6   Q    So you brought his name up a little bit earlier.

12:04PM   7         MR. INCIONG:  Could we publish, please, Your Honor,

12:04PM   8   Exhibit 1-41 admitted from our original list?

12:04PM   9         THE COURT:  Yes, you may.

12:04PM  10   BY MR. INCIONG:

12:04PM  11   Q    Is that Jake Smith, Hunter?

12:04PM  12   A    Yes.

12:04PM  13   Q    And this is someone that you said you've known -- you knew

12:04PM  14   growing up on the east side --

12:04PM  15   A    Yes.

12:04PM  16   Q    -- Kaneohe?

12:05PM  17         Are you -- do you consider him a friend of yours?

12:05PM  18   A    Not now.

12:05PM  19   Q    Okay.  So let's go back to high school time, and from, I

12:05PM  20   guess, the time you graduated from high school until 2018, that

12:05PM  21   five-year period, let's start there.  Were you friends with

12:05PM  22   Jake during that period?

12:05PM  23   A    Yes.

12:05PM  24   Q    Best friends, just casual acquaintances, somewhere in

12:05PM  25   between?

| | | | |
|---|---|---|---|
| 12:05PM | 1 | A | Best friends. |
| 12:05PM | 2 | Q | What kinds of things did you and Jake do together? |
| 12:05PM | 3 | A | Do drugs, sell drugs, rob people. |
| 12:05PM | 4 | Q | Was Jake -- pardon me? |
| 12:05PM | 5 | A | Rob people. |
| 12:05PM | 6 | Q | Was Jake the one that kind of introduced you to drug |
| 12:05PM | 7 | | sales? |
| 12:05PM | 8 | A | Yes. |
| 12:05PM | 9 | Q | You described him as -- as being best friends.  Did you |
| 12:05PM | 10 | | have a complicated relationship with Jake? |
| 12:05PM | 11 | A | Yes. |
| 12:05PM | 12 | Q | How would you describe your relationship with Jake Smith? |
| 12:05PM | 13 | A | Like a love-hate relationship. |
| 12:05PM | 14 | Q | And what do you mean by that? |
| 12:05PM | 15 | A | We fight, make up, fight again, argue, come friends again. |
| 12:06PM | 16 | Q | Did Jake have a reputation -- well, let's start with |
| 12:06PM | 17 | | Kaneohe, the east side? |
| 12:06PM | 18 | A | Yes. |
| 12:06PM | 19 | Q | What was his reputation? |
| 12:06PM | 20 | A | Scary.  He could fight. |
| 12:06PM | 21 | Q | When you say "scary," what do you mean by that? |
| 12:06PM | 22 | A | Violent. |
| 12:06PM | 23 | Q | So people were scared of him? |
| 12:06PM | 24 | A | Yes. |
| 12:06PM | 25 | Q | Did Jake have some special talents or skills that led to |

| | | |
|---|---|---|
| 12:06PM | 1 | that? |
| 12:06PM | 2 | A    Kickboxing. |
| 12:06PM | 3 | Q    Tell us about his kickboxing. |
| 12:06PM | 4 | A    He was great at it.  He was good.  He went all over the |
| 12:06PM | 5 | world. |
| 12:06PM | 6 | Q    Did his father own a kick -- kickboxing studio? |
| 12:06PM | 7 | A    Yes. |
| 12:06PM | 8 | Q    In Kaneohe? |
| 12:06PM | 9 | A    Yes. |
| 12:06PM | 10 | Q    Was Jake trained from a very young boy in that -- in that |
| 12:06PM | 11 | sport? |
| 12:06PM | 12 | A    Yes. |
| 12:06PM | 13 | Q    And he became an elite kickboxer, correct? |
| 12:07PM | 14 | A    Yes. |
| 12:07PM | 15 | Q    Did Jake enjoy the fight in your experience? |
| 12:07PM | 16 | A    Yes. |
| 12:07PM | 17 | Q    Did he enjoy beating people up? |
| 12:07PM | 18 | A    Yeah. |
| 12:07PM | 19 | Q    Did you see him do that on a number of occasions? |
| 12:07PM | 20 | A    Yes. |
| 12:07PM | 21 | Q    Was that his reputation that you were aware of during the |
| 12:07PM | 22 | time you were in high school and in the years after high |
| 12:07PM | 23 | school? |
| 12:07PM | 24 | A    Yes. |
| 12:07PM | 25 | Q    Do you know Lance Bermudez? |

| | | | |
|---|---|---|---|
| 12:07PM | 1 | A | Yes. |
| 12:07PM | 2 | Q | How do -- how do you know Lance Bermudez? |
| 12:07PM | 3 | A | From Jake. |
| 12:07PM | 4 | | MR. INCIONG:  Could we publish, Your Honor, |
| 12:07PM | 5 | | Exhibit 1-34 from our original exhibit list? |
| 12:07PM | 6 | | THE COURT:  You may. |
| 12:07PM | 7 | | BY MR. INCIONG: |
| 12:07PM | 8 | Q | Do you recognize this photo, Hunter? |
| 12:07PM | 9 | A | Yes. |
| 12:07PM | 10 | Q | Who is that? |
| 12:07PM | 11 | A | Lance. |
| 12:07PM | 12 | Q | So you met Lance through Jake? |
| 12:07PM | 13 | A | Yes. |
| 12:07PM | 14 | Q | Do you recall was this after high school, still in high |
| 12:07PM | 15 | | school? |
| 12:07PM | 16 | A | After. |
| 12:07PM | 17 | Q | You were selling drugs with Jake already at this point? |
| 12:07PM | 18 | A | Yes. |
| 12:08PM | 19 | Q | Did you agree with Lance Bermudez to commit various acts |
| 12:08PM | 20 | | in furtherance of the Miske Enterprise? |
| 12:08PM | 21 | A | Yes. |
| 12:08PM | 22 | Q | What kinds of things did you agree to do with -- with |
| 12:08PM | 23 | | Lance? |
| 12:08PM | 24 | A | I facilitated a robbery for him. |
| 12:08PM | 25 | Q | Do you know or did you know at the time you were post-high |

| | | |
|---|---|---|
| 12:08PM | 1 | school hanging out with Jake selling drugs, did you come to |
| 12:08PM | 2 | know someone by the name of Mike Miske? |
| 12:08PM | 3 | A    No. |
| 12:08PM | 4 | Q    Did you ever hear the name Mike Miske? |
| 12:08PM | 5 | A    Heard it. |
| 12:08PM | 6 | Q    Did you ever actually meet Mike Miske? |
| 12:08PM | 7 | A    No. |
| 12:08PM | 8 | Q    So how did you hear or come to know of Mike Miske? |
| 12:08PM | 9 | A    Jake. |
| 12:08PM | 10 | Q    How did -- how did Jake let you know about Mike Miske? |
| 12:08PM | 11 | MR. KENNEDY:  Objection on hearsay, Your Honor. |
| 12:08PM | 12 | THE COURT:  Overruled.  Go ahead. |
| 12:08PM | 13 | BY MR. INCIONG: |
| 12:08PM | 14 | Q    How did Jake -- how did Jake first bring Mike Miske to |
| 12:08PM | 15 | your attention? |
| 12:08PM | 16 | A    Talking, bragging about it, money, going to the M. |
| 12:09PM | 17 | Q    Bragging about it? |
| 12:09PM | 18 | A    Yeah. |
| 12:09PM | 19 | Q    So bragging about what exactly? |
| 12:09PM | 20 | A    Beating people up for money. |
| 12:09PM | 21 | Q    And he told you he was beating people up for money for |
| 12:09PM | 22 | Mr. Miske? |
| 12:09PM | 23 | A    Yes. |
| 12:09PM | 24 | Q    Did you ever -- were you ever present when Jake Smith was |
| 12:09PM | 25 | involved in any telephone conversations with Mr. Miske? |

12:09PM    1    A    No.

12:09PM    2    Q    Were you aware of him having conversations with Mr. Miske?

12:09PM    3    A    Yes.

12:09PM    4    Q    How did you become aware of that?  How did you know?

12:09PM    5         MR. KENNEDY:  Objection on hearsay, Your Honor.

12:09PM    6         THE COURT:  That question, overruled.

12:09PM    7         THE WITNESS:  He would say, Oh, I gotta go see Bro.

12:09PM    8    That's it.

12:09PM    9    BY MR. INCIONG:

12:09PM   10    Q    Okay.  How did you know "Bro" meant Mr. Miske?

12:09PM   11    A    Because that's what he would call him.

12:09PM   12    Q    Now, you mentioned the M Nightclub.

12:10PM   13    A    Yeah.

12:10PM   14    Q    Jake would tell you he would go to the M Nightclub?

12:10PM   15    A    Yeah.

12:10PM   16    Q    Were you ever invited to go to the M Nightclub?

12:10PM   17    A    Yeah, but I didn't go.

12:10PM   18    Q    Why not?

12:10PM   19    A    I didn't want to.

12:10PM   20    Q    Any particular reason?

12:10PM   21    A    Yeah, I tried to stay out of the mix.

12:10PM   22    Q    Did Jake ever tell you any specific instances or examples

12:10PM   23    where he would beat somebody up for Mr. Miske?

12:10PM   24         MR. KENNEDY:  Objection.  Hearsay, past.

12:10PM   25         MR. INCIONG:  Coconspirator statement.

| | | |
|---|---|---|
| 12:10PM | 1 | THE COURT:  Sustained. |
| 12:10PM | 2 | MR. KENNEDY:  Past narrative. |
| 12:10PM | 3 | BY MR. INCIONG: |
| 12:10PM | 4 | Q   Were you present when Jake would receive any phone calls |
| 12:10PM | 5 | on any occasion from Mr. Miske? |
| 12:10PM | 6 | MR. KENNEDY:  Objection.  Asked and answered. |
| 12:10PM | 7 | THE COURT:  Sustained. |
| 12:10PM | 8 | BY MR. INCIONG: |
| 12:10PM | 9 | Q   When you were hanging out with Jake, Jake Smith, did you |
| 12:10PM | 10 | ever assist him in any robberies? |
| 12:11PM | 11 | A   Yes. |
| 12:11PM | 12 | Q   How did you assist Jake with any robberies? |
| 12:11PM | 13 | A   I told him what door to enter into a house so he could rob |
| 12:11PM | 14 | somebody. |
| 12:11PM | 15 | Q   Who was that person? |
| 12:11PM | 16 | A   Brandon Ota. |
| 12:11PM | 17 | Q   How did you know Brandon Ota? |
| 12:11PM | 18 | A   Selling drugs. |
| 12:11PM | 19 | Q   Why did you alert Jake to him as a possible robbery |
| 12:11PM | 20 | target? |
| 12:11PM | 21 | A   Because he has been asking me for a while for somebody to |
| 12:11PM | 22 | rob, so I gave him Brandon Ota. |
| 12:11PM | 23 | Q   What did you believe that Brandon Ota may have that would |
| 12:11PM | 24 | be a possible target for a robbery? |
| 12:11PM | 25 | A   Money, marijuana, Xanax. |

| 12:11PM | 1  | Q | Did you tell anybody else besides Jake about this? |
| 12:11PM | 2  | A | Lance. |
| 12:11PM | 3  | Q | Lance Bermudez? |
| 12:11PM | 4  | A | Yeah. |
| 12:11PM | 5  | Q | Did this robbery happen? |
| 12:11PM | 6  | A | Yes. |
| 12:12PM | 7  | Q | Did you participate in the robbery? |
| 12:12PM | 8  | A | No. |
| 12:12PM | 9  | Q | Why not? |
| 12:12PM | 10 | A | I mean, yeah, I guess I did because I told them where to |
| 12:12PM | 11 |   | go and how to get in there. |
| 12:12PM | 12 | Q | Okay.  Well, as far as did you physically go to the |
| 12:12PM | 13 |   | location and participate in the robbery? |
| 12:12PM | 14 | A | No. |
| 12:12PM | 15 | Q | You provide the information as to where to go? |
| 12:12PM | 16 | A | Yes. |
| 12:12PM | 17 | Q | Was there specific information that you gave as to how to |
| 12:12PM | 18 |   | get into the house? |
| 12:12PM | 19 | A | Yes. |
| 12:12PM | 20 | Q | How did you know about that? |
| 12:12PM | 21 | A | I've been to the house many times. |
| 12:12PM | 22 | Q | Did you have a conversation with Jake after they went to |
| 12:12PM | 23 |   | Brandon Ota's house? |
| 12:12PM | 24 | A | Yes. |
| 12:12PM | 25 | Q | Was Jake happy about what had happened there? |

| | | | |
|---|---|---|---|
| 12:12PM | 1 | A | Yeah. |
| 12:12PM | 2 | Q | How did he describe what had happened? |
| 12:12PM | 3 | A | He didn't describe to me in details what happened.  He |
| 12:12PM | 4 | | just said he took Brandon Ota's stuff, and that was that. |
| 12:12PM | 5 | Q | Now, you said Mr. Smith's reputation was known to be a |
| 12:13PM | 6 | | fighter and he -- he was scary.  Did he have that reputation |
| 12:13PM | 7 | | before he started working for Mr. Miske? |
| 12:13PM | 8 | A | Yeah. |
| 12:13PM | 9 | Q | After he started working for Mr. Miske, did you see any |
| 12:13PM | 10 | | changes in Jake? |
| 12:13PM | 11 | A | Yeah. |
| 12:13PM | 12 | Q | Describe what those were. |
| 12:13PM | 13 | A | Wanting guns more.  Acting more untouchable. |
| 12:13PM | 14 | Q | Acting more untouchable? |
| 12:13PM | 15 | A | Yeah. |
| 12:13PM | 16 | Q | Did you attribute that to him being connected to |
| 12:13PM | 17 | | Mr. Miske? |
| 12:13PM | 18 | A | Yes. |
| 12:13PM | 19 | Q | Were you aware of whether Lance Bermudez was connected to |
| 12:13PM | 20 | | Mr. Miske? |
| 12:13PM | 21 | A | No. |
| 12:14PM | 22 | Q | So let me ask you -- you've talked a little bit who you |
| 12:14PM | 23 | | had agreed with, but let me ask you a little bit more specific |
| 12:14PM | 24 | | about what you did to make you guilty as you pled guilty in |
| 12:14PM | 25 | | this case. |

12:14PM    1              Did you in your plea agreement admit to personally

12:14PM    2    committing two different racketeering acts?

12:14PM    3    A    Yes.

12:14PM    4    Q    Was one of those trafficking or distributing controlled

12:14PM    5    substances?

12:14PM    6    A    Yes.

12:14PM    7    Q    Was the other the robbery of Brandon Ota that you just

12:14PM    8    described?

12:14PM    9    A    Yes.

12:14PM   10    Q    Did you understand that by committing those two different

12:14PM   11    racketeering acts you had committed a pattern of racketeering

12:14PM   12    acts?

12:14PM   13    A    Yes.

12:14PM   14    Q    We talked about Jake Smith.  We talked about Lance

12:14PM   15    Bermudez.

12:14PM   16              Timothy Taboada, he was also involved in your drug

12:15PM   17    distribution, correct?

12:15PM   18    A    Yes.

12:15PM   19    Q    In about 2016, had you just moved back from the Big Island

12:15PM   20    back to Oahu?

12:15PM   21    A    Yes.

12:15PM   22    Q    Do you recall moving with Brandon Ota at that time?

12:15PM   23    A    Yes.

12:15PM   24    Q    Were you selling any particular drug at that -- at that

12:15PM   25    period?

| | | | |
|---|---|---|---|
| 12:15PM | 1 | A | Weed. |
| 12:15PM | 2 | Q | Weed meaning marijuana? |
| 12:15PM | 3 | A | Yeah. |
| 12:15PM | 4 | Q | Did you need permission from anybody at that time to sell |
| 12:15PM | 5 | | marijuana? |
| 12:15PM | 6 | A | Jake. |
| 12:15PM | 7 | Q | Why did you need permission from Jake to sell marijuana at |
| 12:15PM | 8 | | that time? |
| 12:15PM | 9 | A | I did and before he robs me. |
| 12:15PM | 10 | Q | So what did you have to do to get permission? |
| 12:15PM | 11 | A | Pay him money every week. |
| 12:15PM | 12 | Q | How much money did you have to pay every week? |
| 12:15PM | 13 | A | To give him like 500 to $1,000 a week. |
| 12:15PM | 14 | Q | So did you consider that to be -- or was that called tax |
| 12:16PM | 15 | | sometimes? |
| 12:16PM | 16 | A | Yes. |
| 12:16PM | 17 | Q | So Jake was taxing -- taxing you? |
| 12:16PM | 18 | A | Yeah. |
| 12:16PM | 19 | Q | Was he taxing other people? |
| 12:16PM | 20 | A | Yes. |
| 12:16PM | 21 | Q | How long did that last? |
| 12:16PM | 22 | A | Until I started selling his drugs. |
| 12:16PM | 23 | Q | Pardon me? |
| 12:16PM | 24 | A | Until I started selling Jake's drugs. |
| 12:16PM | 25 | Q | So you were selling drugs for him? |

| | | | |
|---|---|---|---|
| 12:16PM | 1 | A | Yeah. |
| 12:16PM | 2 | Q | What kind of drugs were you selling for him? |
| 12:16PM | 3 | A | Crystal meth. |
| 12:16PM | 4 | Q | Did that start in about 2017? |
| 12:16PM | 5 | A | Yeah. |
| 12:16PM | 6 | Q | Was there a period -- a short period of time where you had |
| 12:16PM | 7 | | moved to Los Angeles? |
| 12:16PM | 8 | A | Yeah. |
| 12:16PM | 9 | Q | And then did you move back here to Oahu? |
| 12:16PM | 10 | A | Yes. |
| 12:16PM | 11 | Q | Where were you living at that point when you moved back |
| 12:16PM | 12 | | from LA? |
| 12:16PM | 13 | A | North Shore. |
| 12:16PM | 14 | Q | That's when you started selling crystal meth for Jake? |
| 12:16PM | 15 | A | Yes. |
| 12:16PM | 16 | Q | Did you know who Jake Smith's supplier was at that time? |
| 12:16PM | 17 | A | No. |
| 12:16PM | 18 | Q | Did you feel protected since Jake was your source of |
| 12:16PM | 19 | | supply? |
| 12:16PM | 20 | A | Yes. |
| 12:16PM | 21 | Q | Why? |
| 12:16PM | 22 | A | Because nobody is going to rob me. |
| 12:17PM | 23 | Q | And you -- you knew that because Jake had beat other |
| 12:17PM | 24 | | people up, right? |
| 12:17PM | 25 | A | Yes. |

| | | | |
|---|---|---|---|
| 12:17PM | 1 | Q | Did Jake beat you up before? |
| 12:17PM | 2 | A | Yes. |
| 12:17PM | 3 | Q | Why did Jake beat you up? |
| 12:17PM | 4 | A | Because I stole drugs from him and money to support my |
| 12:17PM | 5 | | habit. |
| 12:17PM | 6 | Q | Were you injured as a result of that assault? |
| 12:17PM | 7 | A | Yes. |
| 12:17PM | 8 | Q | What injury did you sustain? |
| 12:17PM | 9 | A | Broke my collarbone. |
| 12:17PM | 10 | Q | That went along with Jake's reputation on -- on the |
| 12:17PM | 11 | | island? |
| 12:17PM | 12 | A | Yes. |
| 12:17PM | 13 | Q | Did you ever carry a firearm while you were dealing drugs? |
| 12:17PM | 14 | A | No. |
| 12:17PM | 15 | Q | Why not? |
| 12:17PM | 16 | A | Didn't feel the need to. |
| 12:17PM | 17 | Q | Felt like you were protected by Jake? |
| 12:17PM | 18 | A | Yes. |
| 12:17PM | 19 | Q | So when Jake started working for Mr. Miske beating people |
| 12:17PM | 20 | | up, was he still supplying you drugs at that time? |
| 12:17PM | 21 | A | Yes. |
| 12:17PM | 22 | Q | Did you feel like your protection changed at that point? |
| 12:18PM | 23 | A | Yeah. |
| 12:18PM | 24 | Q | In what way? |
| 12:18PM | 25 | A | I had -- nobody was going to try to rob me or do anything |

12:18PM   1   to me.

12:18PM   2   Q    Because you were protected by Jake?

12:18PM   3   A    Yeah.

12:18PM   4   Q    And Jake was protected by Miske?

12:18PM   5   A    Yes.

12:18PM   6           MR. KENNEDY:  Objection to the form of the question,

12:18PM   7   Your Honor.

12:18PM   8           THE COURT:  Overruled.  Go ahead.

12:18PM   9   BY MR. INCIONG:

12:18PM  10   Q    So what amounts of methamphetamine were you selling for

12:18PM  11   Jake during that time?

12:18PM  12   A    He will give me anywhere from a half pound to a pound at a

12:18PM  13   time.

12:18PM  14   Q    Were you selling a lot of that to Tim Taboada during that

12:18PM  15   period?

12:18PM  16   A    Yes.

12:18PM  17   Q    About how much crystal methamphetamine would you say you

12:18PM  18   sold total to Tim Taboada during that period?

12:18PM  19   A    Seven pounds.

12:18PM  20   Q    Was Mr. Taboada also one of Jake's customers?

12:18PM  21   A    Yes.

12:18PM  22   Q    Did he find out you were selling his drugs to his own

12:19PM  23   customer?

12:19PM  24   A    Yes.

12:19PM  25   Q    How did he feel about that?

| | | | |
|---|---|---|---|
| 12:19PM | 1 | A | Upset. |
| 12:19PM | 2 | Q | Is that when he broke your collarbone? |
| 12:19PM | 3 | A | No, that was the time before when I took the money. |
| 12:19PM | 4 | Q | Okay.  So what happened this time when he found out you |
| 12:19PM | 5 | | were selling to Mr. Taboada? |
| 12:19PM | 6 | A | He slapped me around for a little bit, kicked me out. |
| 12:19PM | 7 | Q | Did you have a falling out with -- with Jake? |
| 12:19PM | 8 | A | Yeah. |
| 12:19PM | 9 | Q | Did you continue to sell methamphetamine? |
| 12:19PM | 10 | A | Yes. |
| 12:19PM | 11 | Q | Were you still selling to Tim Taboada? |
| 12:19PM | 12 | A | Yes. |
| 12:19PM | 13 | Q | Now, you said that you had stolen those two pounds that |
| 12:19PM | 14 | | you were in possession of when you were stopped by the police |
| 12:19PM | 15 | | in May of 2018 by Castle High School, you had stolen that from |
| 12:19PM | 16 | | Eddie Wong.  Had you ever supplied Eddie Wong before that? |
| 12:19PM | 17 | A | No. |
| 12:19PM | 18 | Q | Had he supplied you previous to that? |
| 12:19PM | 19 | A | Yes. |
| 12:19PM | 20 | Q | Now, the robbery that you talked about with Brandon Ota, |
| 12:20PM | 21 | | do you recall that being in approximately August of 2016? |
| 12:20PM | 22 | A | Yes. |
| 12:20PM | 23 | Q | Where were you living at that time? |
| 12:20PM | 24 | A | Kalihi. |
| 12:20PM | 25 | Q | Were you living with Jake Smith? |

12:20PM   1   A   Yes.

12:20PM   2   Q   Was that a residence on Kalihi Street?

12:20PM   3   A   Yes.

12:20PM   4   Q   Now, you said that Jake had been asking you for targets,

12:20PM   5   robbery targets.

12:20PM   6   A   Yes.

12:20PM   7   Q   Were you aware of whether Jake was conducting other

12:20PM   8   robberies during this time?

12:20PM   9   A   Yeah, I was aware.

12:20PM   10   Q   Were you aware that he was robbing other drug dealers?

12:20PM   11   A   Yes.

12:20PM   12   Q   Were you aware that he was robbing game rooms?

12:20PM   13   A   Yes.

12:20PM   14   Q   Did he ever tell you about any specific game rooms that he

12:20PM   15   had robbed?

12:20PM   16   A   One in Mapunapuna.

12:20PM   17   Q   Did he give you any details about that?

12:20PM   18   A   Yeah, he just tied couple of people up, and took the money

12:20PM   19   and left.

12:20PM   20   Q   Now, after Jake started working for Mr. Miske, was he

12:21PM   21   doing more robberies?

12:21PM   22   A   Same amount.

12:21PM   23   Q   Was he taking more risks?

12:21PM   24   A   Same risks.

12:21PM   25   Q   Was Lance Bermudez part of some of those robberies with --

| | | |
|---|---|---|
| 12:21PM | 1 | with Mr. Smith? |
| 12:21PM | 2 | A    Yes. |
| 12:21PM | 3 | Q    What was Lance Bermudez's reputation? |
| 12:21PM | 4 | A    He likes to shoot at people, shoot people. |
| 12:21PM | 5 | Q    Did you know anything about his reputation regarding cars |
| 12:21PM | 6 | in particular? |
| 12:21PM | 7 | A    Yeah, steal cars. |
| 12:21PM | 8 | Q    Was he known to be good at stealing cars? |
| 12:21PM | 9 | A    Yes. |
| 12:21PM | 10 | Q    Was there another person that was involved besides Jake |
| 12:21PM | 11 | and Lance Bermudez with the Brandon Ota robbery? |
| 12:22PM | 12 | A    Yeah. |
| 12:22PM | 13 | Q    Who was that? |
| 12:22PM | 14 | A    Turtle, they called him.  Last name Salas.  James I think |
| 12:22PM | 15 | is his first name. |
| 12:22PM | 16 | Q    Did you know Mr. Salas or Turtle? |
| 12:22PM | 17 | A    I met him couple times. |
| 12:22PM | 18 | Q    Did Jake Smith ever talk to you about Turtle Salas? |
| 12:22PM | 19 | A    Yes. |
| 12:22PM | 20 | Q    What did he say about Mr. Salas? |
| 12:22PM | 21 | A    At first he introduced him as his friend, and after Jake's |
| 12:22PM | 22 | house got robbed, that was not Jake's friend no more.  Jake |
| 12:22PM | 23 | found out Turtle robbed his house and he was upset. |
| 12:22PM | 24 | Q    Okay.  Did anything more than that happen? |
| 12:22PM | 25 | A    Yeah.  He ended up getting beat up in prison. |

| | | | |
|---|---|---|---|
| 12:22PM | 1 | Q | Mr. Salas ended up getting beat up in prison? |
| 12:22PM | 2 | A | Yeah. |
| 12:22PM | 3 | Q | Was Mr. Smith held in that same prison at that time? |
| 12:23PM | 4 | A | I'm not sure.  I think it was only -- he had friends in |
| 12:23PM | 5 | | there. |
| 12:23PM | 6 | Q | Who provided this information to you? |
| 12:23PM | 7 | A | Jake. |
| 12:23PM | 8 | Q | So was he involved in the assault himself, or no? |
| 12:23PM | 9 | A | No, not that I'm aware of. |
| 12:23PM | 10 | | MR. INCIONG:  Could we publish Exhibit 1-32, please, |
| 12:23PM | 11 | | that's been previously admitted from our original list? |
| 12:23PM | 12 | | THE COURT:  Go ahead. |
| 12:23PM | 13 | | BY MR. INCIONG: |
| 12:23PM | 14 | Q | Do you know this individual, Mr. Wilson? |
| 12:23PM | 15 | A | Yes. |
| 12:23PM | 16 | Q | Who is that? |
| 12:23PM | 17 | A | John Fraser. |
| 12:23PM | 18 | Q | How did you know John Fraser? |
| 12:23PM | 19 | A | We went to Castle together. |
| 12:23PM | 20 | Q | Castle High School? |
| 12:23PM | 21 | A | Yes. |
| 12:23PM | 22 | Q | Were you friends, acquaintances? |
| 12:23PM | 23 | A | Acquaintances. |
| 12:23PM | 24 | Q | Okay.  Going back to October of 2015, did you become aware |
| 12:24PM | 25 | | that he was involved in a serious car accident? |

| | | | |
|---|---|---|---|
| 12:24PM | 1 | A | Yes. |
| 12:24PM | 2 | Q | How did you learn about that? |
| 12:24PM | 3 | A | We were at Windward city when that happened. |
| 12:24PM | 4 | Q | Windward City Shopping Center? |
| 12:24PM | 5 | A | Yes. |
| 12:24PM | 6 | Q | So when it happened meaning the accident? |
| 12:24PM | 7 | A | Yes. |

12:24PM    8          MR. INCIONG:  Could we go back to Exhibit 2-16,

12:24PM    9    please, previously admitted from our original list?

12:24PM   10          THE COURT:  Yes, go ahead.

12:24PM   11          MR. INCIONG:  And if we can center in on that lower

12:24PM   12    right-hand corner.

12:24PM   13    BY MR. INCIONG:

12:24PM   14    Q    So this is the -- near the same area where you were pulled

12:24PM   15    over by the police in May of 2018?

12:24PM   16    A    Yes.

12:24PM   17    Q    So Windward City Shopping Center is there where the red

12:24PM   18    dot is?

12:24PM   19    A    Yes.

12:24PM   20    Q    Did the -- what were you doing at Windward City Shopping

12:24PM   21    Center that day?

12:24PM   22    A    Drinking in the parking lot that night.

12:24PM   23    Q    How did you become aware of the accident?

12:24PM   24    A    We were by McDonald's and the accident was right across

12:24PM   25    the street.

| | | | |
|---|---|---|---|
| 12:24PM | 1 | Q | Did you see or hear it? |
| 12:24PM | 2 | A | Yeah, we heard it first.  Nobody seen it. |
| 12:25PM | 3 | Q | What did you do? |
| 12:25PM | 4 | A | And then we seen it after we heard it. |
| 12:25PM | 5 | Q | Okay.  So did you go -- have to go closer to see it or |
| 12:25PM | 6 | | could you see it from where you were? |
| 12:25PM | 7 | A | We ran across the street. |
| 12:25PM | 8 | Q | What did you see when you got there? |
| 12:25PM | 9 | A | The car was totalled. |
| 12:25PM | 10 | | MR. INCIONG:  Could we publish, please, Exhibit 2-164, |
| 12:25PM | 11 | | previously admitted from our 15th supplemental list? |
| 12:25PM | 12 | | THE COURT:  Go ahead. |
| 12:25PM | 13 | | BY MR. INCIONG: |
| 12:25PM | 14 | Q | Mr. Wilson, do you recognize what's shown in the photo |
| 12:25PM | 15 | | marked 2-164? |
| 12:25PM | 16 | A | Yes. |
| 12:25PM | 17 | Q | What is shown there? |
| 12:25PM | 18 | A | The car that was in the accident. |
| 12:25PM | 19 | Q | Was there more than one vehicle involved? |
| 12:25PM | 20 | A | Yes. |
| 12:25PM | 21 | Q | Now, when you got there, were there any first responders, |
| 12:25PM | 22 | | police or anything yet? |
| 12:25PM | 23 | A | No. |
| 12:25PM | 24 | Q | So this photo has some -- you can see the police car in |
| 12:25PM | 25 | | the back, correct? |

| | | | |
|---|---|---|---|
| 12:25PM | 1 | A | Yes. |
| 12:25PM | 2 | Q | And you see it looks like a fireman or a policeman with |
| 12:26PM | 3 | | a -- some sort of equipment in the front.  Were those -- were |
| 12:26PM | 4 | | those there when you arrived? |
| 12:26PM | 5 | A | No. |
| 12:26PM | 6 | Q | Where did you go when you first arrived? |
| 12:26PM | 7 | A | We ran kind of by where that bucket and the bumper is from |
| 12:26PM | 8 | | across the street. |
| 12:26PM | 9 | Q | So this is the angle that you came up on to the -- the |
| 12:26PM | 10 | | accident scene? |
| 12:26PM | 11 | A | Yes. |
| 12:26PM | 12 | Q | But when -- did you go right up to the vehicle that's |
| 12:26PM | 13 | | shown there that's in -- what's left of the vehicle, I guess? |
| 12:26PM | 14 | A | No.  Somebody else, I forget who it was, was there, but |
| 12:26PM | 15 | | somebody else ran up close and said, Jonathan Fraser was in the |
| 12:26PM | 16 | | car. |
| 12:26PM | 17 | Q | You knew Jonathan Fraser? |
| 12:26PM | 18 | A | Yes. |
| 12:26PM | 19 | Q | Were you in a position to see whether in fact it was him |
| 12:26PM | 20 | | or not? |
| 12:26PM | 21 | A | I didn't have a clear view. |
| 12:26PM | 22 | Q | Okay.  Did you see from where you were where the person |
| 12:26PM | 23 | | that you thought might be Jonathan Fraser was in the car? |
| 12:26PM | 24 | A | The passenger seat. |
| 12:26PM | 25 | Q | You didn't get any closer than that? |

| | | | |
|---|---|---|---|
| 12:27PM | 1 | A | No. |
| 12:27PM | 2 | Q | Did you talk to Jake Smith about what you had seen at that |
| 12:27PM | 3 | | accident scene? |
| 12:27PM | 4 | A | Yeah. |
| 12:27PM | 5 | Q | Did he tell you anything about that? |
| 12:27PM | 6 | A | "Don't talk to the cops." |
| 12:27PM | 7 | Q | Why did he say that? |
| 12:27PM | 8 | A | At the time I'm not sure. |
| 12:27PM | 9 | Q | Did Jake tell you anything about Jonathan Fraser in |
| 12:27PM | 10 | | relation to Michael Miske? |
| 12:27PM | 11 | A | No. |
| 12:27PM | 12 | Q | Did he tell you anything about a watch? |
| 12:27PM | 13 | A | Yes, later. |
| 12:27PM | 14 | Q | Okay.  How much later are we talking about? |
| 12:27PM | 15 | A | Like maybe a month or so into when I started living in |
| 12:27PM | 16 | | Kalihi. |
| 12:27PM | 17 | Q | Okay.  What did he tell you about this watch? |
| 12:27PM | 18 | | MR. KENNEDY:  Objection.  Hearsay within hearsay, Your |
| 12:27PM | 19 | | Honor. |
| 12:27PM | 20 | | THE COURT:  Sustained. |
| 12:27PM | 21 | | It's at 12:30.  We're going to go ahead and take our |
| 12:27PM | 22 | | second break of the trial day at this point.  We are getting |
| 12:27PM | 23 | | very late in the day. |
| 12:27PM | 24 | | As we do so, I'll remind our jurors to please refrain |
| 12:27PM | 25 | | from discussing the substance of this case with anyone, |

12:27PM   1   including each another; to refrain from accessing any media or

12:27PM   2   other accounts of this case that may be out there; and finally,

12:27PM   3   please do not conduct your own investigation into anything

12:28PM   4   relating to this case.

12:28PM   5              (Proceedings were recessed at 12:28 p.m. to 12:52

12:52PM   6   p.m.)

12:52PM   7              THE COURT:  All right.  We have about 40 minutes left

12:52PM   8   in the trial day.

12:52PM   9              Mr. Inciong, you may resume the direct examination of

12:53PM   10  Mr. Wilson.

12:53PM   11             MR. INCIONG:  Thank you, Your Honor.

12:53PM   12  BY MR. INCIONG:

12:53PM   13  Q   Mr. Wilson, earlier I had asked you about whether you had

12:53PM   14  ever -- ever gone to the M Nightclub or met Mr. Miske, and I

12:53PM   15  believe you had said that you -- you wanted to stay out of the

12:53PM   16  mix.  Is that your answer?

12:53PM   17  A   Yes.

12:53PM   18  Q   Could you explain to the jury what you meant by that?

12:53PM   19  A   There's too much people at the M, and that was never

12:53PM   20  really my scene to go to clubs.  I was into doing drugs and

12:53PM   21  selling drugs.

12:53PM   22  Q   Okay.  You also mentioned that you were living at one

12:53PM   23  point with Jake Smith at a house in Kalihi.

12:53PM   24  A   Yes.

12:53PM   25  Q   Do you recall that being in the summer of 2016?

12:53PM   1   A    Yes.

12:53PM   2   Q    Do you recall being present there when Jake Smith, Lance

12:53PM   3   Bermudez and James Salas were having a conversation regarding

12:53PM   4   Jonathan Fraser?

12:53PM   5   A    Yes.

12:53PM   6   Q    What was the nature of that conversation?

12:53PM   7        MR. KENNEDY:  Objection.  Hearsay.  Could we approach?

12:54PM   8        THE COURT:  No, you don't need to approach.  It's

12:54PM   9   sustained.

12:54PM   10       MR. INCIONG:  Present -- or coconspirator statement,

12:54PM   11  Your Honor.

12:54PM   12  BY MR. INCIONG:

12:54PM   13  Q    Do you know Lindsey Kinney?

12:54PM   14  A    Yes.

12:54PM   15       MR. INCIONG:  Could we publish Exhibit 1-62, please,

12:54PM   16  previously admitted from our original list?

12:54PM   17       THE COURT:  Yes.

12:54PM   18  BY MR. INCIONG:

12:54PM   19  Q    Do you recognize this person?

12:54PM   20  A    Yes.

12:54PM   21  Q    How do you know Lindsey Kinney?

12:54PM   22  A    He is from Kahaluu.  I've smoked weed with him, drank with

12:54PM   23  him before.

12:54PM   24  Q    Did Jake Smith discuss with you ever an accident with --

12:54PM   25  with Lindsey Kinney at Kualoa Ranch?

12:54PM   1   A    Briefly.

12:54PM   2   Q    What did he say?

12:54PM   3        MR. KENNEDY:  Objection.  Hearsay.

12:54PM   4        THE COURT:  Sustained.

12:54PM   5   BY MR. INCIONG:

12:54PM   6   Q    Have you ever been in any sort of gang, Mr. Hunter --

12:54PM   7   Mr. Wilson?

12:54PM   8   A    No.

12:54PM   9   Q    Are you aware or have you ever heard of the USO gang?

12:54PM  10   A    I heard.

12:54PM  11   Q    Have you ever been affiliated with that gang?

12:55PM  12   A    No.

12:55PM  13   Q    Have you heard of the Nakipi Motorcycle Club?

12:55PM  14   A    Yes.

12:55PM  15   Q    Have you ever been a member affiliated with that gang?

12:55PM  16   A    No.

12:55PM  17   Q    Have you ever heard the La Familia gang?

12:55PM  18   A    Yes.

12:55PM  19   Q    Have you ever been a member affiliated with that gang?

12:55PM  20   A    No.

12:55PM  21   Q    Have you heard of the North Shore Boys?

12:55PM  22   A    Yes.

12:55PM  23   Q    Have you ever been a member or been affiliated with that

12:55PM  24   gang?

12:55PM  25   A    No.

12:55PM   1   Q   Were any of the crimes you committed in furtherance of the

12:55PM   2   Miske Enterprise in relation to any of those gangs I just

12:55PM   3   mentioned?

12:55PM   4   A   No.

12:55PM   5   Q   In your plea agreement, did you -- did it contain what's

12:55PM   6   called a cooperation provision or cooperation agreement?

12:55PM   7   A   Yes.

12:55PM   8   Q   What was your understanding as to what that required?

12:55PM   9   A   Cooperate with the feds to tell the truth about a

12:55PM  10   situation, the situation.

12:55PM  11   Q   Are you testifying today voluntarily?

12:56PM  12   A   Yeah, I voluntary to testify today.

12:56PM  13   Q   Has anyone coerced you in order to get you to testify

12:56PM  14   today?

12:56PM  15   A   No.

12:56PM  16   Q   Have you been promised any sort of benefit in order to

12:56PM  17   testify?

12:56PM  18   A   No.

12:56PM  19   Q   Have you been promised any sort of reduced sentence?

12:56PM  20   A   No.

12:56PM  21   Q   Are you hoping to gain a reduced sentence in this case?

12:56PM  22   A   Yes.

12:56PM  23   Q   Has that been guaranteed to you in any way?

12:56PM  24   A   No.

12:56PM  25   Q   What is your understanding of how and who will determine

12:56PM  1   whether in fact you do get a reduced sentence?

12:56PM  2   A   It's all up to the judge when I get sentenced.

12:56PM  3   Q   Have you prepared yourself for the possibility that you

12:56PM  4   may have to serve prison time in this case?

12:56PM  5   A   Yes.

12:56PM  6   Q   Do you have a plan for when you get out of prison?

12:56PM  7   A   Yes.

12:56PM  8   Q   Have you done research as to possible programs you might

12:56PM  9   be able to take advantage while you're in prison?

12:56PM  10   A   Yes.

12:56PM  11   Q   What kind of programs have you look into?

12:56PM  12   A   Welding and HVAC.

12:57PM  13   Q   Prior to getting in trouble, did you have any professional

12:57PM  14   licenses that you had obtained?

12:57PM  15   A   Real estate.

12:57PM  16   Q   Is that something you are still interested in as well when

12:57PM  17   you get out?

12:57PM  18   A   Maybe.

12:57PM  19       MR. INCIONG:  Nothing further, Your Honor.

12:57PM  20       THE COURT:  Cross-examination.

12:57PM  21                   CROSS-EXAMINATION

12:57PM  22   BY MR. KENNEDY:

12:57PM  23   Q   Good afternoon, sir.

12:57PM  24   A   Good afternoon.

12:57PM  25   Q   When did you graduate from Castle High?

| | | | |
|---|---|---|---|
| 12:57PM | 1 | A | I graduated from Kahuku. |
| 12:57PM | 2 | Q | Oh, did you.  When did you graduate from high school then? |
| 12:57PM | 3 | A | 2013. |
| 12:57PM | 4 | Q | Okay.  So you said in 2013, what you started to do was |
| 12:57PM | 5 | | sell drugs and do drugs, correct? |
| 12:57PM | 6 | A | I was doing drugs when I was still in high school. |
| 12:57PM | 7 | Q | All right.  So you started at 16.  Did you start selling |
| 12:57PM | 8 | | drugs at 16 as well? |
| 12:57PM | 9 | A | Weed. |
| 12:58PM | 10 | Q | All right.  Now, I'm going to ask you some questions about |
| 12:58PM | 11 | | that, and you understand that the government has given you |
| 12:58PM | 12 | | what's called a proffer agreement, correct? |
| 12:58PM | 13 | A | Yes. |
| 12:58PM | 14 | Q | So everything that you told them back in 2020 and the |
| 12:58PM | 15 | | things you're testifying about now can't be used against you to |
| 12:58PM | 16 | | increase your sentence, right? |
| 12:58PM | 17 | A | Yes. |
| 12:58PM | 18 | Q | Okay.  So I'm going to ask you some questions about that |
| 12:58PM | 19 | | then.  So you began selling weed in high school, right? |
| 12:58PM | 20 | A | Yes. |
| 12:58PM | 21 | Q | And then you moved towards selling ice, right? |
| 12:58PM | 22 | A | Yes. |
| 12:58PM | 23 | Q | Methamphetamine, correct? |
| 12:58PM | 24 | A | Yes. |
| 12:58PM | 25 | Q | All right.  And so you mentioned that Jake Smith was |

12:58PM   1   someone that you went to high school with.

12:58PM   2   A    I didn't go to high school with him.  I hung around him in

12:58PM   3   high school.

12:58PM   4   Q    You hung around with him in high school.  Okay.

12:58PM   5        All right.  And so when you got with Jake Smith, you

12:58PM   6   said the things that the two of you did was do drugs, sell

12:58PM   7   drugs, and rob people, correct?

12:58PM   8   A    Yes.

12:58PM   9   Q    All right.  Now, in terms of quantity, let me ask you a

12:59PM   10  little bit about that.  Now, in 2016 you moved back to Oahu

12:59PM   11  from the Big Island, correct?

12:59PM   12  A    Yes.

12:59PM   13  Q    All right.  So when did you go to the Big Island?

12:59PM   14  A    2014.  Late 2014.

12:59PM   15  Q    Okay.  So between that time in 2013 and 2016, you had been

12:59PM   16  selling drugs during that time, correct?

12:59PM   17  A    Yeah, before I moved to Big Island.

12:59PM   18  Q    So before you moved to the Big Island, you were selling

12:59PM   19  drugs, correct?

12:59PM   20  A    Yes.

12:59PM   21  Q    You moved over there in 2014, correct?

12:59PM   22  A    Yes.

12:59PM   23  Q    You sold drugs over there as well?

12:59PM   24  A    No.

12:59PM   25  Q    You moved back in 2016, correct?

| | | | |
|---|---|---|---|
| 12:59PM | 1 | A | Yes. |
| 12:59PM | 2 | Q | And you moved in with a friend, right? |
| 12:59PM | 3 | A | Yes. |
| 01:00PM | 4 | Q | Brandon Ota, right? |
| 01:00PM | 5 | A | Yes. |
| 01:00PM | 6 | Q | And was the other person Tyson? |
| 01:00PM | 7 | A | Yes. |
| 01:00PM | 8 | Q | And what was Tyson's last name? |
| 01:00PM | 9 | A | Nobriga. |

01:00PM   10   Q   Nobriga.  And so this is the same Brandon Ota that you
01:00PM   11   ended up getting charged with robbing him and what you said was
01:00PM   12   a gun charge, right?

01:00PM   13   A   Yes.

01:00PM   14   Q   Okay.  So at that time you were selling marijuana in the
01:00PM   15   Kaneohe area, right?

01:00PM   16   A   Yes.

01:00PM   17   Q   And during that time Jake Smith, you were -- you said that
01:00PM   18   you were paying him during that time $500 to maybe $1,000 a
01:00PM   19   week --

01:00PM   20   A   Yes.

01:00PM   21   Q   -- for the privilege to sell marijuana in Kaneohe,
01:00PM   22   correct?

01:00PM   23   A   Yes.

01:00PM   24   Q   And others were paying him similar amounts to be able to
01:00PM   25   sell in Kaneohe, correct?

01:00PM    1    A    Yes.

01:00PM    2    Q    Because Jake Smith was the person who was himself getting

01:00PM    3    that money and controlling that market, right?

01:00PM    4    A    Yes.

01:00PM    5    Q    And that's one of the ways Jake Smith was making his money

01:01PM    6    in 2016, correct?

01:01PM    7    A    Yes.

01:01PM    8    Q    All right.  And so that continued for a time, and so with

01:01PM    9    respect to that, you were paying him in a month's time maybe

01:01PM   10    2,000 or $4,000 a month, right?

01:01PM   11    A    Yes.

01:01PM   12    Q    And so that was money that you had to take out of the

01:01PM   13    money that you were profiting from your drug sales, right?

01:01PM   14    A    Yes.

01:01PM   15    Q    And I believe you said that during that time you had about

01:01PM   16    a 200 to $300 a day habit, correct?

01:01PM   17    A    Yes.

01:01PM   18    Q    And so I don't want to step it out too far, but is it fair

01:01PM   19    to say that that would be at least five days out of a seven-day

01:01PM   20    week you'd have to pay that amount?

01:01PM   21    A    Close to it, yeah.

01:01PM   22    Q    Okay.  So somewhere between 1,000 and $1500 just for your

01:01PM   23    habit, right?

01:01PM   24    A    Yes.

01:02PM   25    Q    Okay.  Now, you continued in 2016, and eventually with

| | | |
|---|---|---|
| 01:02PM | 1 | Brandon Ota and Tyson, you mentioned you were familiar with |
| 01:02PM | 2 | that house, right? |
| 01:02PM | 3 | A    Yes. |
| 01:02PM | 4 | Q    You were familiar with the house because you had lived |
| 01:02PM | 5 | there, right? |
| 01:02PM | 6 | A    For a little bit, yes. |
| 01:02PM | 7 | Q    And eventually you got kicked out of that house, correct? |
| 01:02PM | 8 | A    I didn't get kick out.  I left. |
| 01:02PM | 9 | Q    Eventually you left, correct? |
| 01:02PM | 10 | A    Yes. |
| 01:02PM | 11 | Q    And at that time you left and you moved in with Jason |
| 01:02PM | 12 | (verbatim) Smith at the Kalihi house, right? |
| 01:02PM | 13 | A    Jake Smith. |
| 01:02PM | 14 | Q    Jake Smith. |
| 01:02PM | 15 | A    Yes. |
| 01:02PM | 16 | Q    Thank you for correcting me. |
| 01:02PM | 17 | So that was the time period where one of the charges |
| 01:02PM | 18 | and another charge comes, that's the time period where you gave |
| 01:02PM | 19 | the information to Jake on where Brandon Ota, your friend, kept |
| 01:02PM | 20 | his drugs, right? |
| 01:02PM | 21 | A    Yes. |
| 01:02PM | 22 | Q    How to get into the house, right? |
| 01:02PM | 23 | A    Yes. |
| 01:02PM | 24 | Q    Where a chain would be to rob? |
| 01:02PM | 25 | A    No. |

01:03PM   1    Q    All right.  And so Brandon Ota -- were you on the phone
01:03PM   2    while they were doing it, if Brandon Ota recognized your voice?
01:03PM   3    A    I was not on the phone with them.
01:03PM   4    Q    You were not on the phone.
01:03PM   5    A    No, they called me before they went in.
01:03PM   6    Q    Okay.  So right before they went in, you were on the phone
01:03PM   7    with them?
01:03PM   8    A    Yes.
01:03PM   9    Q    Telling them how to get in, correct?
01:03PM   10   A    Yes.
01:03PM   11   Q    So it wasn't that you just told them about it and they
01:03PM   12   went and did it, you were active with them while they were
01:03PM   13   doing it, right?
01:03PM   14   A    No.
01:03PM   15   Q    You were on phone with them telling them how to get in,
01:03PM   16   right?
01:03PM   17   A    Yeah, when they were in the car.
01:03PM   18   Q    All right.  So you knew because you were living with them
01:03PM   19   that they left armed, right?
01:03PM   20   A    I wasn't there, so I wouldn't know if they were armed.
01:03PM   21   Q    And that's why you were charged with an armed robbery,
01:03PM   22   right?
01:03PM   23   A    No, because I was -- I didn't know they were armed at the
01:03PM   24   time.
01:03PM   25   Q    Well, I -- I heard that you were charged with a federal

01:03PM    1    armed robbery --

01:03PM    2    A    Yes.

01:03PM    3    Q    -- what's called a Hobbs robbery.

01:03PM    4    A    Yes.

01:03PM    5    Q    And that's one of the rob -- that's one of the charges

01:04PM    6    that was dismissed, right?

01:04PM    7    A    Yes.

01:04PM    8    Q    And you have counsel, Mr. Andrew Kennedy, and he explained

01:04PM    9    to you I'm sure that that could be up to 20 years, right?

01:04PM   10    A    Yes.

01:04PM   11    Q    Okay.  And you knew that you had participated by helping

01:04PM   12    three people go in and rob your friend, right?

01:04PM   13    A    Yes.

01:04PM   14    Q    Okay.  And you don't know whether they brought in

01:04PM   15    semiautomatic, fully automatic, what type of weaponry, correct?

01:04PM   16    A    Yes, I --

01:04PM   17    Q    When you got the discovery, did you ever see a picture of

01:04PM   18    Brandon Ota, what he looked like after that robbery?

01:04PM   19    A    No.

01:04PM   20    Q    All right.  Now, I also know that with respect to that

01:04PM   21    robbery you said that you had a couple of gun charges, right?

01:04PM   22    A    Yes.

01:04PM   23    Q    So one of the gun charges with that robbery is using or

01:04PM   24    carrying a firearm during in relation to a crime of violence,

01:05PM   25    correct?

01:05PM    1    A    Yes.

01:05PM    2    Q    That robbery, right?  And so Mr. Inciong asked you a

01:05PM    3    question, but are you aware -- I'm sure Mr. Andrew Kennedy told

01:05PM    4    you that if you're brandishing, showing the gun, striking

01:05PM    5    someone with a gun, that's seven years consecutive to any other

01:05PM    6    time you do mandatory, correct?

01:05PM    7    A    Yes.

01:05PM    8    Q    And so that seven years, the judge has no authority to

01:05PM    9    reduce that for that charge.  It has to be consecutive,

01:05PM   10    correct?

01:05PM   11    A    Yes.

01:05PM   12    Q    All right.  Now, in addition to the -- you had a second

01:05PM   13    gun charge as well, right?

01:05PM   14    A    Yes.

01:05PM   15    Q    And that related to the drug distribution that you were

01:05PM   16    doing, correct?

01:05PM   17    A    Yes.

01:05PM   18    Q    And that one was another five years consecutive, correct?

01:05PM   19    A    Yes.

01:05PM   20    Q    So that's 22 -- that's 12 years, seven plus five, that you

01:05PM   21    knew going into this you'd have to do after you spoke with your

01:05PM   22    lawyer, right?

01:05PM   23    A    Yes.

01:05PM   24    Q    Okay.  Now -- so each one of those three charges have been

01:06PM   25    dismissed in terms of your plea agreement, right?

| | | | |
|---|---|---|---|
| 01:06PM | 1 | A | Yes. |
| 01:06PM | 2 | Q | So for that you don't have to do those 12 additional |
| 01:06PM | 3 | | years, right? |
| 01:06PM | 4 | A | Yes. |
| 01:06PM | 5 | Q | And whatever you would have to do for the robbery, right? |
| 01:06PM | 6 | A | Yes. |
| 01:06PM | 7 | Q | Okay.  Now, the drug charge that you pled to you said |
| 01:06PM | 8 | | carries a minimum of ten years, right? |
| 01:06PM | 9 | A | Yes. |
| 01:06PM | 10 | Q | And a maximum of life, right? |
| 01:06PM | 11 | A | Yes. |
| 01:06PM | 12 | Q | And it can -- can include any drug activity during the |
| 01:06PM | 13 | | time of the charge, right? |
| 01:06PM | 14 | A | Yes. |
| 01:06PM | 15 | Q | And so you've talked about getting out of high school and |
| 01:06PM | 16 | | basically doing drugs and selling drugs, right? |
| 01:06PM | 17 | A | Yes. |
| 01:06PM | 18 | Q | And you talked about it in terms of pound quantities of |
| 01:06PM | 19 | | ice, correct? |
| 01:06PM | 20 | A | Yes. |
| 01:06PM | 21 | Q | Over a period of many years, right? |
| 01:06PM | 22 | A | Yes. |
| 01:06PM | 23 | Q | Okay.  Now, when you were arrested, how old were you, sir? |
| 01:07PM | 24 | A | Twenty-four. |
| 01:07PM | 25 | Q | Twenty-four.  So at that time, trying to make it real, if |

01:07PM   1   you were -- had 12 years consecutive and a mandatory minimum of
01:07PM   2   ten years, you were looking at 22 years as a 24-year-old,
01:07PM   3   right?
01:07PM   4   A     Yes.
01:07PM   5   Q     All right.  Now, you entered into a proffer agreement and
01:07PM   6   agreed to cooperate, correct?
01:07PM   7   A     Yes.
01:07PM   8   Q     All right.  And you were asked if you're here voluntarily,
01:07PM   9   right?
01:07PM  10   A     Yes.
01:07PM  11   Q     You are here because if you refuse, you violate your plea
01:07PM  12   agreement, right?
01:07PM  13   A     Yes.
01:07PM  14   Q     And so that's one of the requirements to have an ability
01:07PM  15   to get a sentence below ten years, right?
01:07PM  16   A     Yes.
01:07PM  17   Q     And so you are out of custody right now, correct?
01:07PM  18   A     Yes.
01:07PM  19   Q     And so how long were you at the Federal Detention Center?
01:07PM  20   A     I would say like couple of weeks.
01:08PM  21   Q     Couple of weeks.  You can ask never to go back into
01:08PM  22   custody, can't you, under your agreement?
01:08PM  23   A     No.
01:08PM  24   Q     You can't do that?  There's no floor on your sentence, is
01:08PM  25   there, sir?

01:08PM   1              MR. INCIONG:  Objection.  Misstates the facts.

01:08PM   2              THE COURT:  Sustained.

01:08PM   3    BY MR. KENNEDY:

01:08PM   4    Q    With respect to your agreement, it does at this point,

01:08PM   5    however, if the government makes a motion to the Court that you

01:08PM   6    have provided substantial assistance, then the Court has the

01:08PM   7    ability to sentence you to less than ten years, correct?

01:08PM   8    A    Yes.

01:08PM   9    Q    And there is no other floor below that.  You can ask for

01:08PM   10   whatever you and your lawyer decide, and the judge will make

01:08PM   11   the final decision, correct?

01:08PM   12   A    Yes.

01:08PM   13   Q    All right.  Now, you were asked a little bit about --

01:08PM   14   well, let me just ask you up front.  You never met Michael

01:09PM   15   Miske, correct?

01:09PM   16   A    No.

01:09PM   17   Q    Never spoken with him, correct?

01:09PM   18   A    No.

01:09PM   19   Q    First time you've ever been in the same room with him?

01:09PM   20   A    Yes.

01:09PM   21   Q    All right.  Now, with Jake Smith, you were asked some

01:09PM   22   questions about some of your dealings with him.  And so -- one

01:09PM   23   of those questions was about a game room in Mapunapuna.  Do you

01:09PM   24   recall that?

01:09PM   25   A    Yes.

01:09PM   1   Q   And so from that robbery, Jake Smith you said went in,

01:09PM   2   tied some people up and got money, right?

01:09PM   3   A   Yes.

01:09PM   4   Q   $60,000 from that, right?

01:09PM   5   A   Yes.

01:09PM   6   Q   And so that's how Jake Smith made his money by taxing

01:09PM   7   people, correct?

01:09PM   8   A   Yes.

01:09PM   9   Q   By robbing people, correct?

01:09PM   10  A   Yes.

01:09PM   11  Q   By robbing game rooms, right?

01:10PM   12  A   Yes.

01:10PM   13  Q   And by selling drugs, right?

01:10PM   14  A   Yes.

01:10PM   15  Q   And so one of the areas that you were asked about was Jake

01:10PM   16  Smith was supplying you as your major supplier, right?

01:10PM   17  A   Yes.

01:10PM   18  Q   And he was supplying pound quantities of ice to you to

01:10PM   19  sell, right?

01:10PM   20  A   Yes.

01:10PM   21  Q   And he was selling pound quantities himself, right?

01:10PM   22  A   Yes.

01:10PM   23  Q   And you were selling pound quantities yourself, right?

01:10PM   24  A   I was -- yeah.

01:10PM   25  Q   And -- and both of you were selling to Tim Taboada at the

01:10PM   1   same time, right?

01:10PM   2   A    Yes.

01:10PM   3   Q    And you said that Jake Smith then slapped you around,

01:10PM   4   correct?

01:10PM   5   A    Yes.

01:10PM   6   Q    Because Jake Smith decided what you could do and not do

01:10PM   7   with your drug dealing, correct?

01:10PM   8   A    Yes.

01:10PM   9   Q    And so whether it was pay him money or who was going to be

01:10PM  10   the person you can sell to, that was Jake Smith telling you,

01:10PM  11   right?

01:10PM  12   A    Yes.

01:10PM  13   Q    And there were others that Jake Smith was doing the same

01:11PM  14   thing with, correct?

01:11PM  15   A    Yes.

01:11PM  16   Q    All right.  Now, you were asked some questions about

01:11PM  17   gangs.  You were asked were you aware of USO.  Do you recall

01:11PM  18   that?

01:11PM  19   A    Yes.

01:11PM  20   Q    And you said you were aware of them, but you were never a

01:11PM  21   member, right?

01:11PM  22   A    Yes.

01:11PM  23   Q    You were asked about Nakipi Motorcycle gang, correct?

01:11PM  24   A    Yes.

01:11PM  25   Q    And you said you were aware of them, but you weren't a

| | | |
|---|---|---|
| 01:11PM | 1 | member, right? |
| 01:11PM | 2 | A    Yes. |
| 01:11PM | 3 | Q    So you -- you were aware of them, so you knew that Lindsey |
| 01:11PM | 4 | Kinney was part of the Nakipi Motorcycle gang, correct? |
| 01:11PM | 5 | A    Yes. |
| 01:11PM | 6 | Q    You knew that Norman Akau was, correct? |
| 01:11PM | 7 | A    Yes. |
| 01:11PM | 8 | Q    And you knew that Zeph Salas was, correct? |
| 01:11PM | 9 | A    Yes. |
| 01:11PM | 10 | Q    All right.  You just weren't part of that, right? |
| 01:11PM | 11 | A    Yes. |
| 01:11PM | 12 | Q    All right.  You were asked about La Familia, correct? |
| 01:11PM | 13 | A    Yes. |
| 01:11PM | 14 | Q    And you said you were aware of it, but you weren't a part |
| 01:11PM | 15 | of it, right? |
| 01:11PM | 16 | A    Yes. |
| 01:11PM | 17 | Q    But you knew Jake Smith was, right? |
| 01:11PM | 18 | A    Yes. |
| 01:11PM | 19 | Q    And you knew Turtle was, right? |
| 01:11PM | 20 | A    No. |
| 01:11PM | 21 | Q    And you knew that when you were asked a question about |
| 01:12PM | 22 | James Salas and -- and Jacob Smith, correct? |
| 01:12PM | 23 | A    Yes. |
| 01:12PM | 24 | Q    And you said something about Jake Smith being upset that |
| 01:12PM | 25 | James Salas had robbed his house, right? |

01:12PM   1   A   Yes.

01:12PM   2   Q   And this would have been a period of time where Jake was

01:12PM   3   in custody?

01:12PM   4   A   Yes.

01:12PM   5   Q   And so during that time you said that Mr. Smith, Jake

01:12PM   6   Smith was upset, right?

01:12PM   7   A   Yes.

01:12PM   8   Q   And that you -- you mentioned something about James Salas

01:12PM   9   being roughed up or beat up?

01:12PM  10   A   Yes.

01:12PM  11   Q   What you told the government is that Jake Smith put a hit

01:12PM  12   on James Salas, and La Familia killed him in custody, didn't

01:12PM  13   you?

01:12PM  14   A   Yeah.

01:12PM  15   Q   Now, you were asked about the North Shore Boys.

01:12PM  16   A   Yes.

01:12PM  17   Q   You -- when you left Oahu, you moved over to the Big

01:12PM  18   Island for a bit, and then you came back in 2017; is that

01:13PM  19   right?

01:13PM  20   A   '16.

01:13PM  21   Q   Okay.  Was it around the 2017 time period when you were up

01:13PM  22   at the -- the North Shore?

01:13PM  23   A   Yes.

01:13PM  24   Q   Okay.  And so you became familiar with the North Shore

01:13PM  25   Boys up there, correct?

01:13PM    1    A    Yes.

01:13PM    2    Q    In particular, Keli'i Young, correct?

01:13PM    3    A    Yes.

01:13PM    4    Q    Who otherwise sometimes goes by Keli'i Foster, right?

01:13PM    5    A    Yes.

01:13PM    6    Q    And they were selling drugs, right?

01:13PM    7    A    Yes.

01:13PM    8    Q    And Keli'i Young controlled up there who got to sell

01:13PM    9    drugs, right?

01:13PM   10    A    Yes.

01:13PM   11    Q    And you went with him on numerous occasions where he

01:13PM   12    picked up drugs of pound quantities, correct?

01:13PM   13    A    Yes.

01:13PM   14    Q    When he was supplying you during that time, correct?

01:13PM   15    A    Here and there, yes.

01:13PM   16    Q    Here and there, right.  And so La Familia is something

01:13PM   17    that's real in prison and on the outside, isn't it?

01:13PM   18    A    Mostly just prison.

01:13PM   19    Q    Mostly just prison.  But folks go in, they go out, they

01:14PM   20    stay La Familia, don't they?

01:14PM   21    A    Yes.

01:14PM   22    Q    The North Shore Boys is real in that area in terms of the

01:14PM   23    drug trade, correct?

01:14PM   24    A    Yes.

01:14PM   25    Q    And the North Shore Boys are the ones that are providing

01:14PM   1   protection, correct?

01:14PM   2   A   To who?

01:14PM   3   Q   So themselves in their drug trade, correct?

01:14PM   4   A   Yes.

01:14PM   5   Q   La Familia, Mr. Smith was providing his own protection in

01:14PM   6   his drug trade, correct?

01:14PM   7   A   Yes.

01:14PM   8   Q   With his fists, yes?

01:14PM   9   A   Yes.

01:14PM   10   Q   With his kicks, yes?

01:14PM   11   A   Yes.

01:14PM   12   Q   And with his guns, right?

01:14PM   13   A   I didn't see him shoot nobody, but --

01:14PM   14   Q   You didn't see him shoot nobody, but you saw him with

01:14PM   15   guns, right?

01:14PM   16   A   Yeah.

01:14PM   17   Q   All right.  So he and his La Familia members, that was

01:14PM   18   their protection, correct?

01:14PM   19   A   Okay.

01:14PM   20   Q   Now, there was a period of time that you and Jake Smith

01:15PM   21   broke off in terms of your collective drug dealing, correct?

01:15PM   22   A   Yes.

01:15PM   23   Q   And so you continued to sell drugs during that time

01:15PM   24   period, correct?

01:15PM   25   A   Yes.

01:15PM   1   Q   Right up until the time you were arrested, right?

01:15PM   2   A   No.

01:15PM   3   Q   Up to -- when did you stop?

01:15PM   4   A   Stopped selling crystal meth in 2018.

01:15PM   5   Q   Okay.  Stopped selling crystal meth in 2018.  And let me

01:15PM   6   ask you some questions about that.

01:15PM   7       So you were in the Kaneohe area, right?

01:15PM   8   A   Yes.

01:15PM   9   Q   You were right by Castle High School, correct?

01:15PM   10  A   Yes.

01:15PM   11  Q   And you got pulled over by a marked unit, right?

01:15PM   12  A   Yes.

01:15PM   13  Q   And an unmarked police car, right?

01:15PM   14  A   Yes.

01:15PM   15  Q   Police officers came over to you, and eventually they got

01:15PM   16  in and searched in the trunk, right?

01:15PM   17  A   Yes.

01:15PM   18  Q   And you had two pounds of crystal meth that you had stolen

01:15PM   19  from Eddie Wong, right?

01:15PM   20  A   Yes.

01:15PM   21  Q   Eddie Wong was another supplier of you, right?

01:15PM   22  A   Yes.

01:15PM   23  Q   You saw him put a backpack into his car, right?

01:15PM   24  A   Yes.

01:15PM   25  Q   And so when he wasn't looking, you stole the backpack, you

01:15PM   1   had the two pounds, right?

01:16PM   2   A    Yes.

01:16PM   3   Q    And you were going to sell to Timmy Taboada, right?

01:16PM   4   A    Yes.

01:16PM   5   Q    And you were going to give him a discount, rather than --

01:16PM   6   I think it was ten to $12,000 per pound, right?

01:16PM   7   A    Yes.

01:16PM   8   Q    Either twenty to 24,000, right?

01:16PM   9   A    Yes.

01:16PM   10   Q    You were going to sell it to him for 8,000, so you'd only

01:16PM   11   walk away with 16,000, right?

01:16PM   12   A    Yes.

01:16PM   13   Q    Okay.  And all of sudden, the CRU members take the drugs,

01:16PM   14   right?

01:16PM   15   A    Yes.

01:16PM   16   Q    And you thought you were getting robbed, right?

01:16PM   17   A    Yes.

01:16PM   18   Q    And so the government mentioned when they questioned you

01:16PM   19   that you made a number of phone calls after that, and you were

01:16PM   20   really surprised, right?

01:16PM   21   A    Yes.

01:16PM   22   Q    It was like this weird thing happened, I got pulled over,

01:16PM   23   they pulled out two pounds, and I didn't go to jail, right?

01:16PM   24   A    Yes.

01:16PM   25   Q    Only later did you find out that they had a wiretap on

| | | |
|---|---|---|
| 01:16PM | 1 | you, correct? |
| 01:16PM | 2 | A    Yes. |
| 01:16PM | 3 | Q    And that they had been wiretapping Jake Smith, correct? |
| 01:16PM | 4 | A    Yes. |
| 01:16PM | 5 | Q    Wiretapping Tim Taboada, correct? |
| 01:16PM | 6 | A    Yes. |
| 01:16PM | 7 | Q    Wiretapping you, right? |
| 01:17PM | 8 | A    Yes. |
| 01:17PM | 9 | Q    And you were aware that Jake Smith also got drugs from an |
| 01:17PM | 10 | individual that you knew as Nico, right? |
| 01:17PM | 11 | A    Yes. |
| 01:17PM | 12 | Q    Did you know Nico's last name? |
| 01:17PM | 13 | A    No. |
| 01:17PM | 14 | Q    Okay.  So were you aware when you -- after you were |
| 01:17PM | 15 | arrested that those were all the folks that you were targets of |
| 01:17PM | 16 | these wiretaps, right? |
| 01:17PM | 17 | A    Yes. |
| 01:17PM | 18 | Q    So they knew you were going to Tim Taboada's house when |
| 01:17PM | 19 | they pulled you over because they were listening to your calls, |
| 01:17PM | 20 | right? |
| 01:17PM | 21 | A    Yes. |
| 01:17PM | 22 | Q    And you found that out later, right? |
| 01:17PM | 23 | A    Yes. |
| 01:17PM | 24 | Q    When you got your discovery, did you see they never had a |
| 01:17PM | 25 | wiretap on Mr. Miske, did they? |

| | | | |
|---|---|---|---|
| 01:17PM | 1 | A | No.  I didn't see that. |
| 01:17PM | 2 | Q | You've never talked to him on the phone, correct? |
| 01:17PM | 3 | A | No. |
| 01:17PM | 4 | Q | You've never texted him on the phone? |
| 01:17PM | 5 | A | No. |
| 01:17PM | 6 | Q | And as you said, this is the first time you've ever been |
| 01:17PM | 7 | | in the same room with him? |
| 01:17PM | 8 | A | Yes. |
| 01:17PM | 9 | Q | You were asked some questions about what Mr. Smith may |
| 01:18PM | 10 | | have told you after you went to the accident scene back in |
| 01:18PM | 11 | | November of 2015 where someone that you knew from Castle High |
| 01:18PM | 12 | | School, Jonathan Fraser, was involved.  Do you recall that? |
| 01:18PM | 13 | A | Yes. |
| 01:18PM | 14 | Q | All right.  And so what Mr. Smith told you was not to |
| 01:18PM | 15 | | cooperate because the Frasure family wanted to sue Mr. Miske |
| 01:18PM | 16 | | for the accident. |
| 01:18PM | 17 | A | Along those lines, yes. |
| 01:18PM | 18 | Q | That's what you told the government -- |
| 01:18PM | 19 | A | Right. |
| 01:18PM | 20 | Q | -- and that's what Mr. Smith told you, correct? |
| 01:18PM | 21 | A | Yes. |
| 01:18PM | 22 | Q | Now, we talked about Mr. Smith selling drugs for a long |
| 01:19PM | 23 | | period of time, correct? |
| 01:19PM | 24 | A | Yes. |
| 01:19PM | 25 | Q | So the entire time you knew him, he was selling drugs, |

| | | |
|---|---|---|
| 01:19PM | 1 | right? |
| 01:19PM | 2 | A    Not the entire time.  Not when we were in intermediate. |
| 01:19PM | 3 | Q    Intermediate, no, but by the time you're in high school, |
| 01:19PM | 4 | yes? |
| 01:19PM | 5 | A    Yeah, late high school. |
| 01:19PM | 6 | Q    Okay.  Late high school, all the way up. |
| 01:19PM | 7 |      And we're talking about him selling pound quantities |
| 01:19PM | 8 | during the time you get out of high school, right? |
| 01:19PM | 9 | A    Yes. |
| 01:19PM | 10 | Q    And so the prices that you referred to, 10,000, $12,000 |
| 01:19PM | 11 | per pound is what's being sold, right? |
| 01:19PM | 12 | A    Yes. |
| 01:19PM | 13 | Q    And so you've seen Jake Smith with a large amount of cash, |
| 01:19PM | 14 | haven't you? |
| 01:19PM | 15 | A    Yeah. |
| 01:19PM | 16 | Q    And the robberies, you talked about the one at the game |
| 01:19PM | 17 | room that netted him 60,000, right? |
| 01:19PM | 18 | A    Yes. |
| 01:19PM | 19 | Q    And you knew he had robbed other game rooms, right? |
| 01:20PM | 20 | A    Yes. |
| 01:20PM | 21 | Q    So that's how Mr. Smith made his money, correct? |
| 01:20PM | 22 | A    Yes. |
| 01:20PM | 23 | Q    All right.  So Mr. Smith, Jake Smith was making thousands |
| 01:20PM | 24 | and thousands of dollars in the drug trade, correct? |
| 01:20PM | 25 | A    Yes. |

01:20PM   1   Q   And Mr. Smith was keeping that money for himself, wasn't
01:20PM   2   he?
01:20PM   3   A   He was spending it.
01:20PM   4   Q   He was keeping it and spending it on himself, right?
01:20PM   5   A   Yeah.
01:20PM   6   Q   You, when you were in the drug trade during that time, you
01:20PM   7   were keeping it, spending it on yourself, and while you were an
01:20PM   8   addict, spending it on your addiction, right?
01:20PM   9   A   Yes.
01:20PM  10   Q   All right.  Now, with respect to the charges that you pled
01:21PM  11   guilty to, you pled guilty to a charge that carries a minimum
01:21PM  12   of ten years to life, right?
01:21PM  13   A   Yes.
01:21PM  14   Q   And that's the conspiracy to distribute drugs, correct?
01:21PM  15   A   Yes.
01:21PM  16   Q   The government insisted you plead to the racketeering
01:21PM  17   charge, didn't it?
01:21PM  18         MR. INCIONG:  Objection.
01:21PM  19         THE COURT:  Sustained.
01:21PM  20   BY MR. KENNEDY:
01:21PM  21   Q   You didn't decide what the offer was, did you?
01:21PM  22   A   I knew what I was pleading to.
01:21PM  23   Q   Yeah, you knew what you were plead guilty to, correct?
01:21PM  24   A   Yes.
01:21PM  25   Q   All right.  Now, you pled to those two charges after you

01:21PM   1   had made a proffer where you had laid out from 2013 to 2018

01:21PM   2   your total of amount of sales for meth, correct?

01:22PM   3   A    Yes.

01:22PM   4   Q    During that time also the large amounts of marijuana that

01:22PM   5   you had also sold, correct?

01:22PM   6   A    Yes.

01:22PM   7   Q    And so by entering the proffer, if you told them

01:22PM   8   everything about that, then they couldn't use that against you

01:22PM   9   ever, correct?

01:22PM   10   A    Yes.

01:22PM   11   Q    And if you cooperate, and the government decides to make

01:22PM   12   the motion for substantial assistance, then you wouldn't be

01:22PM   13   looking at the minimum of ten years, correct?

01:22PM   14   A    I would hope not.

01:22PM   15   Q    And you would be in a position where you could have a

01:22PM   16   different life than you had up until the time you were 24,

01:22PM   17   correct?

01:22PM   18   A    Yes.

01:22PM   19   Q    If you paid the penalty for all that life by going away,

01:22PM   20   you might not have a life outside of prison, correct?

01:22PM   21   A    Correct.

01:22PM   22   Q    And you certainly don't want that life, do you?

01:23PM   23   A    Nobody would.

01:23PM   24   Q    Okay.  The government asked you about work.  What Jake

01:23PM   25   Smith said was simply that he would beat some people up for

| | | |
|---|---|---|
| 01:23PM | 1 | Mr. Miske.  That was it, correct? |
| 01:23PM | 2 | A    Yes. |
| 01:23PM | 3 | Q    That was the sum total, and if he testified that he got |
| 01:23PM | 4 | $5,500 from that, Jake Smith made more money on a single drug |
| 01:23PM | 5 | transaction than that in a day, didn't he? |
| 01:23PM | 6 | A    Not really, because he had to pay for the drugs. |
| 01:23PM | 7 | Q    About a week? |
| 01:23PM | 8 | A    Yeah. |
| 01:23PM | 9 | Q    And he certainly got 60,000 out of robbing a game room, |
| 01:23PM | 10 | right? |
| 01:23PM | 11 | A    Not all 60,000 himself. |
| 01:23PM | 12 | Q    No, he had to split it with the person he did it with, so |
| 01:23PM | 13 | he got 30, right? |
| 01:23PM | 14 | A    Maybe even less. |
| 01:23PM | 15 | Q    He got more than 5,500, didn't he? |
| 01:23PM | 16 | A    Yeah. |
| 01:23PM | 17 | Q    So what Jake Smith was doing was selling drugs, robbing |
| 01:24PM | 18 | people and taxing people, and giving orders as a La Familia |
| 01:24PM | 19 | member, correct? |
| 01:24PM | 20 | MR. INCIONG:  Objection.  Asked and answered, |
| 01:24PM | 21 | argumentative. |
| 01:24PM | 22 | THE COURT:  Sustained. |
| 01:24PM | 23 | MR. KENNEDY:  Nothing further. |
| 01:24PM | 24 | THE COURT:  Redirect. |
| | 25 | |

01:24PM    1                            REDIRECT EXAMINATION

01:24PM    2    BY MR. INCIONG:

01:24PM    3    Q    Mr. Wilson, what is the main requirement of both your

01:24PM    4    cooperation agreement and your proffer agreement?

01:24PM    5    A    Tell the truth.

01:24PM    6    Q    Have you told the truth here today?

01:24PM    7    A    Yes.

01:24PM    8    Q    Did you testify consistently with the information you

01:24PM    9    provided to the FBI and the proffer meetings that you had with

01:24PM   10    them?

01:24PM   11    A    Yes.

01:24PM   12    Q    What would happen if you were untruthful during your

01:24PM   13    testimony at this trial?

01:24PM   14    A    It would violate my plea agreement.

01:24PM   15    Q    And there would be no shot for you to get a reduced

01:24PM   16    sentence?

01:24PM   17    A    Yes.

01:24PM   18    Q    That's what you're hoping for, right?

01:24PM   19    A    Yes.

01:24PM   20    Q    Has that been promised to you in any way?

01:24PM   21    A    No.

01:24PM   22    Q    Did you plead guilty voluntarily in this case?

01:24PM   23    A    Yes.

01:24PM   24    Q    Did you understand all of the charges and consequences as

01:24PM   25    explained to your attorney?

| | | | |
|---|---|---|---|
| 01:24PM | 1 | A | Yes. |
| 01:25PM | 2 | Q | You admitted to being part of the Miske Enterprise? |
| 01:25PM | 3 | A | Yes. |
| 01:25PM | 4 | Q | Even though you actually had never met Mr. Miske, correct? |
| 01:25PM | 5 | A | Yes. |
| 01:25PM | 6 | Q | Now, you were asked about Jake make -- making money |
| 01:25PM | 7 | | robbing people.  That's true, right? |
| 01:25PM | 8 | A | Yes. |
| 01:25PM | 9 | Q | He also made money selling drugs, correct? |
| 01:25PM | 10 | A | Yes. |
| 01:25PM | 11 | Q | He also made money beating people up for Mike Miske, |
| 01:25PM | 12 | | right? |
| 01:25PM | 13 | A | Yes. |
| 01:25PM | 14 | Q | Who was protecting you when you were doing your drug |
| 01:25PM | 15 | | dealing? |
| 01:25PM | 16 | A | Jake. |
| 01:25PM | 17 | Q | Who was protecting Jake? |
| 01:25PM | 18 | | MR. KENNEDY:  Speculation, Your Honor. |
| 01:25PM | 19 | | THE COURT:  Overruled.  Go ahead. |
| 01:25PM | 20 | | THE WITNESS:  Jake himself and Miske. |
| 01:25PM | 21 | | BY MR. INCIONG: |
| 01:25PM | 22 | Q | Do you feel protected by Miske as well because of that? |
| 01:25PM | 23 | A | Somewhat, yes. |
| 01:25PM | 24 | Q | Even though you had never met him? |
| 01:25PM | 25 | A | Yes. |

01:25PM    1            MR. INCIONG:  Nothing further.

01:25PM    2            THE COURT:  Mr. Kennedy, anything else?

01:25PM    3                     RECROSS-EXAMINATION

01:25PM    4    BY MR. KENNEDY:

01:25PM    5    Q    During that period of your life, Jake Smith protected you,

01:26PM    6    right?

01:26PM    7    A    Yes.

01:26PM    8    Q    He also broke your collarbone, right?

01:26PM    9    A    Yes.

01:26PM   10    Q    So Jake Smith, you said you had a love-hate relationship

01:26PM   11    with him, correct?

01:26PM   12    A    Yes.

01:26PM   13    Q    And it was Jake Smith who you dealt drugs with, correct?

01:26PM   14    A    Yes.

01:26PM   15    Q    Did drugs with, right?

01:26PM   16    A    Yes.

01:26PM   17    Q    And robbed people, correct?

01:26PM   18    A    Yes.

01:26PM   19            MR. KENNEDY:  Nothing further.

01:26PM   20            THE COURT:  Mr. Wilson, you may step down.  Thank you.

01:26PM   21            We have just a few minutes.  By chance, anyone on your

01:26PM   22    list that we might be able to use the time for?

01:26PM   23            MR. AKINA:  No, I think it might be better to wait.

01:26PM   24            THE COURT:  All right.  We will go ahead and adjourn

01:26PM   25    just a few minutes early for the trial day.

01:26PM   1              As we go to break, I will remind our jurors to refrain

01:26PM   2      from discussing the substance of this case with anyone,

01:26PM   3      including each another, until I advise otherwise; to refrain

01:26PM   4      from accessing any media or other accounts of this case that

01:26PM   5      may be out there; and finally, please do not conduct your own

01:27PM   6      investigation into anything relating to this case.

01:27PM   7              We'll see you tomorrow morning at 8:30, getaway day.

01:27PM   8              (Proceedings were concluded at 1:27 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, July 6, 2024.

11

12

13                                /s/ Gloria T. Bediamol

14                                GLORIA T. BEDIAMOL.

15                                RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```