1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

   UNITED STATES OF AMERICA,    )      CRIMINAL NO. 19-00099-DKW
4                               )
              Plaintiff,        )      Honolulu, Hawaii
5                               )
         vs.                    )      July 1, 2024
6                               )
   MICHAEL J. MISKE, JR.,       )      STATUS CONFERENCE
7                               )
              Defendant.        )
8    _____ )

9

10              PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 96)
                BEFORE THE HONORABLE DERRICK K. WATSON,
                CHIEF UNITED STATES DISTRICT COURT JUDGE
11

   APPEARANCES:
12

   For the Plaintiff:          MARK INCIONG, ESQ.
13                             MICHAEL DAVID NAMMAR, ESQ
                               WILLIAM KE AUPUNI AKINA, ESQ.
14                             AISLINN AFFINITO, ESQ.
                               Office of the United States Attorney
15                             PJKK Federal Building
                               300 Ala Moana Boulevard, Suite 6100
16                             Honolulu, Hawaii  96850

17  For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                               841 Bishop St., Ste 2201
18                             Honolulu, HI 96813

19                             MICHAEL JEROME KENNEDY, ESQ.
                               Law Offices of Michael Jerome
20                             Kennedy, PLLC
                               333 Flint Street
21                             Reno, NV 89501

22  Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24

     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

1    July 1, 2024                                    8:31 a.m.

2            (Open court out of the presence of the jury.)

3            THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

4    States of America versus Michael J. Miske, Jr.

08:31AM    5            This case has been called for a status conference.

6            Counsel, your appearances please for the record.

7            MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

8    Michael Nammar and Aislinn Affinito for the United States.

9    Also present are Special Agent Thomas Palmer and Kari Sherman.

08:31AM   10            THE COURT:  Good morning.

11            MR. KENNEDY:  Good morning, Your Honor.  Michael

12    Kennedy with Lynn Panagakos, Michael Miske, Ashley King and

13    Josh Barry.

14            THE COURT:  Good morning.  You may all be seated.

08:31AM   15            Before we bring the jury in, there are a few

16    evidentiary issues that some of which came up over the weekend,

17    I gather, and others we had touched upon before we adjourned

18    last week.  And so, in no particular order, there is a

19    stipulation that the parties appear to have reached with

08:32AM   20    respect to Ms. Plaza.  And I gather that stipulation then would

21    obviate the need for her testimony and bringing her in from I

22    believe the east coast somewhere.  So you let me know then when

23    the parties wish to read this stipulation into the record.

24            One thing I did note that the stipulation refers to,

08:32AM   25    Item 108, parens, 1.  I'm not sure if the jury is going to know

1    what that refers to.  I don't know if you wish some greater

2    specificity to be added to that description.  If you want to

3    leave it the same, that's fine by me.  But that's one thing I

4    noted in going through that stipulation this morning.

08:32AM    5         Second item is the anticipated testimony of

6    Mr. Carson.  There are a number of additional pieces that came

7    in over the weekend with respect to that.  The government

8    provided the email that I think Mr. Inciong described late last

9    week, that in addition to that there was, I don't know what to

08:33AM    10   call it, a memo, a two-paged memo that also came in via the

11   same transmission from the government with respect to

12   Mr. Carson.  There was also a couple of transcripts that the

13   government submitted:  one from Mr. Carson's interview by the

14   OIG, another from a Nevada Federal Court proceeding in the

08:33AM    15   later half of 2022, I think it was, where a similar issue arose

16   before Chief Judge Du.

17        And then, in addition to that, there was a memorandum

18   that the defense submitted, I believe early this morning,

19   responding to the potential cross-examination of Mr. Carson.

08:34AM    20   So I've read all of that, and if I'm missing something that I

21   did not just describe, please point that out to me.  It may

22   have been an omission on my part; on the other hand, it may be

23   something that we have not seen.

24        So who wants to address Mr. Carson first?

08:34AM    25        MR. INCIONG:  I can, Your Honor.

1                    THE COURT:  Go ahead.

2                    MR. INCIONG:  First of all, as I indicated last week,

3          I believe all of the information that Your Honor has referenced

4          should be fodder for cross-examination of Mr. Carson, should he

08:34AM   5          testify pursuant to Rule 608(b).  I would also add, based on

6          some of the new information that we received and provided, that

7          it seems clear that Mr. Carson also would have a bias against

8          the FBI based on the circumstances of his departure.  And that

9          would be another reason that should be available for

08:35AM  10          cross-examination to the United States.

11                    There are now I believe two separate pieces --

12          separate but related pieces.  First, there was the mortgage

13          fraud allegation issue; but then, based on the testimony that

14          was provided in the District of Nevada trial, it appears to me

08:35AM  15          that Mr. Carson perjured himself in that trial, after you look

16          at the transcript of the OIG interview, where he was told

17          literally from the outset, from the very opening moments of

18          that interview that he was officially under investigation for

19          allegations of mortgage fraud.  So we believe those are all

08:35AM  20          fodder for cross-examination.

21                    The other issue that we are concerned about is, should

22          Mr. Carson testify on direct and then on cross-examination he

23          would invoke the Fifth Amendment when asked about any of these

24          issues.  From my understanding, the proper procedure at that

08:36AM  25          point would be that all of his testimony would have to be

1  struck if he does not agree to answer any questions and invokes

2  the Fifth from that point on.

3      The government would be highly prejudiced at that

4  point because he would have already testified on direct, and we

08:36AM  5  would not have had the opportunity to cross-examine him.  So I

6  believe that if he is going to be called, before he testifies,

7  that there should be an inquiry on the record before the Court

8  as to whether or not he does intend or not to take the Fifth.

9  And if he does, then he should be precluded from testifying

08:36AM  10  entirely.

11      THE COURT:  With Mr. Carson on the stand, you mean?

12      MR. INCIONG:  Well, prior to him testifying; but, yes,

13  him under oath being inquired by the Court whether or not he

14  intends to invoke the Fifth to any of these questions.  And if

08:37AM  15  he indicates yes, then he should be not allowed to testify at

16  all.

17      THE COURT:  To your knowledge, does he have counsel?

18      MR. INCIONG:  That's a good question, Your Honor.  He

19  was represented by an attorney affiliated --

08:37AM  20      THE COURT:  Mr. Burger.

21      MR. INCIONG:  Mr. Burger with the Federal Law

22  Enforcement Officers Association, that was sometime ago.  I

23  believe that was part of membership in that association.

24  Whether Mr. Carson is still a member and would be entitled to

08:37AM  25  that representation, I don't know.  But I think that's another

1    issue.  He should have counsel, if he does not.

2           THE COURT:  Who wants to address this from the

3    defense?  In particular, while you decide whether Mr. Kennedy

4    or Ms. Panagakos wishes to respond, the memorandum that was

08:37AM    5    filed does not address the last concern that Mr. Inciong just

6    expressed, which is to say Mr. Carson's testimony before Judge

7    Du in the Munoz proceeding in Nevada Federal Court.

8           So the memorandum does deal with -- or attempts to

9    deal with the statements made by Mr. Carson prior to that, and

08:38AM    10   in particular what the two-paged email and the two-paged

11   memorandum from the FBI, whether that amounts to something that

12   Mr. Carson ought to face cross-examination under oath by the

13   U.S. Attorney here.  But it does not address the most recent

14   statements that were provided by the government in that Nevada

08:39AM    15   proceeding.

16          So that would be something I'm interested in

17   particular in hearing from the defense on, since I do not have

18   your insight into that issue.

19          MS. PANAGAKOS:  Your Honor, as to the Nevada

08:39AM    20   proceeding, so what we submitted in our response I think is a

21   basis to believe that when he retired he was not under

22   investigation any longer.  The interview with OIG was over a

23   month earlier, and the FBI's determination not only of

24   retirement in good standing but also that he qualified for

08:39AM    25   the -- met the criteria for the qualified law enforcement

1    officer.  As I read the procedures, you wouldn't get that

2    qualification if you were still under investigation or if there

3    was any derogatory information.

4         So when he's asked in the Munoz trial whether he was

08:40AM    5    under administrative investigation when he retired, he could

6    honestly say no.  I mean, he could have believed that he wasn't

7    because --

8         THE COURT:  But he also said, "I wasn't investigated,"

9    did he not?  Without qualification --

08:40AM    10        MS. PANAGAKOS:  Let me get to that.

11        THE COURT:  And that was without qualification to my

12    reading as to the time.

13        MS. PANAGAKOS:  When I asked if you were investigated

14    for providing -- it wasn't investigated, they wanted an

08:40AM    15    explanation.

16        THE COURT:  I'm not certain how he could say "it

17    wasn't investigated."  It's quite clear that it was, regardless

18    of what you may think or interpret.  Regarding the findings

19    that subsequently ensued, one can hardly say that I was not

08:41AM    20    investigated.

21        MS. PANAGAKOS:  It appears that, yes, he was.  This

22    statement was five years later given -- I mean, the way the

23    transcript reads was he was caught off guard, this was out of

24    left field.  There was interplay between -- in these questions,

08:41AM    25    there's a number of places -- "So you're saying it's not

```
     1    true" -- I mean, if you look at the whole line of questioning.

     2    "There was an FBI administrative inquiry" is in one question.

     3         Another question:  "So you're saying it's not true

     4    that the Office of Professional Responsibility at the FBI said

08:41AM  5    something?"

     6         Then on redirect by the defense lawyer, she asks

     7    about -- "The government asked you about an investigation of

     8    you by the Office of Professional Responsibility."

     9         And so there is the interplay between that because

08:41AM 10    there was, to his knowledge, no investigation by the Office of

    11    Professional Responsibility.  The FBI Office of Professional

    12    Responsibility is something different than DOJ or OIG, two

    13    different things.

    14         Given the ambiguity in the questions, he may have been

08:42AM 15    directing it to that.  Right after this, it wasn't

    16    investigated, they wanted an explanation.

    17         And then the next question:  "It sounds like you're

    18    not aware of the FBI's finding."  So again, it's back to the

    19    FBI OPR.  I mean, that could be what he is saying, I don't

08:42AM 20    know.  But clearly that one part that says, "I wasn't

    21    investigated," yeah, that was inaccurate five years after the

    22    fact with ambiguous questions.

    23         MR. KENNEDY:  Your Honor, as to the second part of

    24    your question, I'll address that.  It is my understanding that

08:42AM 25    he is still represented by that same lawyer; that he's been in
```

          1    contact with the lawyer.  However, I don't know that the lawyer

          2    has the materials that the Court has at present, because they

          3    were not provided to him under the understanding that it's in

          4    this litigation.  It may be part of the protective order, and

08:43AM   5    the protective order would allow somebody to show it to them,

          6    but he's on the east coast.

          7         So I would ask -- and the other part of it is the

          8    transcript that came yesterday, I think, is 212 pages, so be

          9    able to review it.  So if the Court is inclined, perhaps we

08:43AM  10    could move him over to tomorrow, if the Court is -- since they

         11    have been filed, maybe we could get the materials to his

         12    lawyer, in terms of the government's second part question as to

         13    whether he would take the Fifth, because I see the 608 issue

         14    very differently since you can ask the questions.  But

08:43AM  15    extrinsic evidence is usually, in almost every case, not

         16    allowed.

         17         The other question is something that since he does

         18    have counsel, I think his counsel would need to review it and

         19    give him advice separate and apart from Mr. Miske's counsel.

08:44AM  20    And it seems like, with the addition of 212 pages, that

         21    counsel -- I don't think they have any of those documents.

         22    It's my understanding that most of the documents that they have

         23    received have been blacked out over the years, and so I don't

         24    think they have any of those at this point to be able to give

08:44AM  25    that advice.

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | THE COURT:  All right.  So, Mr. Inciong, did you have              |
|        | 2  | anything further?                                                  |
|        | 3  | MR. INCIONG:  No, Your Honor.                                      |
|        | 4  | THE COURT:  All right.  The Court is going to allow                |
| 08:44AM| 5  | the government to cross-examine Mr. Carson with the                |
|        | 6  | materials -- really, all of the materials that have been given    |
|        | 7  | and shown to me, not limited to Mr. Carson's under-oath           |
|        | 8  | statements before the Nevada Federal Court.  All of his           |
|        | 9  | comments, quite frankly, raise questions in my mind with regard   |
| 08:45AM| 10 | to his truthfulness, not only in regards to his mortgage loan     |
|        | 11 | applications, but in regards to the interview by the OIG as       |
|        | 12 | well as his under-oath statement in federal court, all question   |
|        | 13 | his veracity.  And whether or not he would plead the Fifth is     |
|        | 14 | obviously a personal choice that he would have to make with the   |
| 08:45AM| 15 | advice of counsel.                                                 |
|        | 16 | And, quite clearly, counsel here need to provide                   |
|        | 17 | Mr. Berger with the materials that I was provided with over the   |
|        | 18 | weekend, and Mr. Carson can thereafter make an intelligent        |
|        | 19 | decision on what he wishes to do.  And it's also possible that    |
| 08:45AM| 20 | Mr. Berger no longer represents Mr. Carson, and they will have    |
|        | 21 | to tell us that of course if that is the situation.               |
|        | 22 | But it does appear to me that there is a serious issue            |
|        | 23 | in terms of many things, but including perjury and his comments   |
|        | 24 | in Judge Du's court perhaps are the most alarming to me.  But     |
| 08:46AM| 25 | it's not the only thing that I think the government has fodder    |

 1    to cross-examine him about.

 2         So I trust that you will all address that with

 3    Mr. Carson and his legal team, if he has one lined up.  And if

 4    he wishes to proceed and the defense wishes to proceed with his

08:46AM   5    testimony, you may do so tomorrow.

 6         The next issue I have concerns some -- two different

 7    motions that the defense filed over the weekend: one, I think,

 8    Ms. Panagakos foreshadowed and gave us notice about and the

 9    other not.  So let me take up the one that I was expecting, and

08:47AM  10    I didn't see it until this morning, which is Docket 1626, and

11    it relates to the motion to admit from the Defense Exhibits

12    9011-82 alpha and 9550-2 alpha and/or to call one witness,

13    Mr. Goldberg, who appears to be what the defense calls a

14    retired U.S. Coast Guard investigative service special agent.

08:47AM  15         So who wishes to be heard with regard to this?

16    Ms. Panagakos, I gather this is your motion, but I don't know

17    if you had everything -- or said everything you wish to say in

18    your written papers in which case I'll ask the government for a

19    response.

08:48AM  20         MS. PANAGAKOS:  Yes, Your Honor.  I just want to ask

21    that we be permitted to introduce these documents under Federal

22    Rule of Evidence 803(8).  And Mr. Goldberg is here, his

23    testimony will be very limited.

24         THE COURT:  So he is available to testify today if

08:48AM  25    permitted?

1          MS. PANAGAKOS:  Available to testify, yes.  And just

2     given the balancing of the constitutional rights at stake, I

3     know we should have provided notice sooner, we are doing the

4     best we can, and I would just ask the Court to decide that

08:48AM  5     preclusion is too severe a sanction under the circumstances.

6          THE COURT:  All right.  If there is an agreement, and

7     I'm not suggesting that there is, because I have no further

8     information beyond what we've talked about in court on I think

9     it was Friday, but I've lost track of the days at this point.

08:49AM 10     Fridays seem to blend into Saturdays, and Saturdays into

11     Sundays, and so forth.  If 9011-82A and 9550-2A, if there was

12     an agreement, those I know are limited excerpts of other

13     exhibits that are lengthier.  If there were an agreement from

14     the government to admit those two documents, then we would not

08:49AM 15     need to hear from Mr. Goldberg, or would there still be a

16     reason to?

17          MR. KENNEDY:  Your Honor, there would still be a

18     reason to because Mr. Goldberg was, and once again I apologize

19     for the omission, I think it's like with Mr. Chung, AC, we

08:49AM 20     assumed that he was on the list.  But he was part of the search

21     team for the Boston Whaler for I think three or four days; so

22     he has firsthand knowledge of the boat itself.

23          And then he also was involved with seeing the boat in

24     its mooring, and then so he's seen it firsthand, so the

08:50AM 25     testimony would be very brief.  It would be some photographs of

1   a craft that he is familiar with, the -- he was tasked in the

2   investigation as a special agent to view to see with the

3   satellite imagery whether it was moored on the 27th and the

4   30th -- we're only introducing it on the 30th -- and then he is

08:50AM   5   using the same document -- excuse me, the same source of that

6   which is the other exhibit.

7           So he does have a little more firsthand knowledge of

8   identifying the craft itself.

9           THE COURT:  From the government's side, Mr. Inciong,

08:51AM   10   is that you again?

11          MR. INCIONG:  Yes, Your Honor.

12          THE COURT:  All right.

13          MR. INCIONG:  Your Honor, we may well be willing to

14   stipulate to it, but we just haven't had enough time.  This

08:51AM   15   came in at five this morning or something.  I skimmed it, but I

16   certainly have not read it carefully.

17          My initial reactions would be that in order for this

18   to come in as a public record, there would have to be findings

19   that are made.  And in the report that is marked as 9550-002A,

08:51AM   20   all it says is that a boat matching the description of

21   Painkiller is in its mooring.  It doesn't positively identify

22   the boat.  I mean, there could be a thousand boats that match

23   the description.  So I don't think that qualifies as a finding.

24          Secondly, I would say there is also marginal, if any,

08:51AM   25   relevance of this evidence.  We have not produced any evidence

1    or made any argument that the Painkiller was in any way

2    involved in the kidnapping or murder of Mr. Frasure, other than

3    Wayne Miller saying that was an option that he had presented

4    per Mr. Miske's request.

08:52AM    5    THE COURT:  That's exactly what I was wondering

6    myself.  No one had made that an issue previously when the

7    admissibility of at least one of these two documents came up.

8    I wasn't sure why it mattered, given that the government wasn't

9    contending that the Painkiller had anything to do with

08:52AM    10   Mr. Frasure's disappearance.

11   MR. INCIONG:  So I don't see this as critical to the

12   defense at all for those reasons.  I mean, clearly we would be

13   concerned for other reasons about preclusion of something that

14   was, but I don't think it's even a close call.  We are willing

08:52AM    15   to take a look and look further and may be willing to stipulate

16   to it, but I'm just not prepared to give that answer definitely

17   right now.

18   THE COURT:  Okay.  From the defense, anything else?

19   MR. KENNEDY:  Well, Your Honor, the questions came up

08:53AM    20   with respect to Mr. Miller's credibility.  And I don't think

21   it's much of a jump for the jury to think that if the

22   government took the time that they did on the Painkiller to

23   suggest that -- I mean, at this point, the government has

24   produced nothing as far as what chain of events, in terms of a

08:53AM    25   story, were associated with the kidnapping or the alleged

1    murder that they are putting forth.

2         So it is critical in a reasonable doubt situation with

3    the instruction, not only from Mr. Miller but to indicate that

4    this boat was in its mooring at that time.  Mr. Goldberg has

08:54AM    5    personal knowledge of the craft itself, and so it takes away

6    something that jurors may decide.

7         Whether the government argues it in closing or not,

8    it's up to them.  But I think it is critical to the particular

9    case because it's the absence of a story.  Thank you.

08:54AM    10       THE COURT:  Well, see, that's the irony behind it

11    perhaps is that from the defense side to say that this is such

12    critical testimony, but then you didn't put this guy on your

13    witness list, nor did you put the other four people that you

14    identified late last week on your witness list.  I don't know

08:54AM    15    how you -- I don't know how you justify critical witnesses, in

16    your words, being left entirely off your witness list for

17    months.

18         In fact, to this day, your witness lists have never

19    been amended, never been supplemented.  These people do not

08:54AM    20    appear on any witness list from the defense or the government

21    as of July 1, 2024.  But these are critical witnesses.  I don't

22    get it.

23        MR. KENNEDY:  We made a mistake with that, Your Honor,

24    in terms of his -- when there's close to a thousand witnesses,

08:55AM    25    just like the ninth witness -- when the government called Mr.

08:55AM

08:55AM

08:56AM

08:56AM

08:56AM

1    Chung.  You know, they assumed they had it on the list and they

2    made a mistake and he was called.  We assumed Mr. Goldberg was

3    on the list, due to the fact that he was part of the search and

4    also was involved in this, and we were incorrect.  And then

5    when we sought to introduce this document earlier through

6    Mr. Knorr, then the reason for Mr. Goldberg would be there.

7         Obviously, Your Honor, we've done pretty well up to

8    this point, but we made a mistake with him, and I acknowledge

9    that.

10        THE COURT:  Well, I don't think it was limited to him,

11   because none of the five people that you offered on Friday to

12   sponsor these exhibits that you are seeking to admit,

13   Mr. Goldberg, Mr. Hall, Mr. Horton, Mr. Roster, Mr. Lopez, none

14   of them were on the witness list.  It wasn't just an omission

15   of one, an oversight of one.

16        In any event, the government has indicated they are

17   willing to read the defense brief that I myself only read

18   probably around 7:30 this morning before court, a little

19   closer, and to see if there is some path forward in terms of an

20   agreement possibly in terms of a stipulation along the lines of

21   Ms. Plaza that would obviate the need for additional testimony

22   from Mr. Goldberg.

23        So I'll leave it to you all, once we are out of court

24   here today, to see if such an agreement can be reached.

25   Mr. Goldberg should be available to testify tomorrow

1    potentially, if an agreement cannot be reached and the Court

2    were to rule to allow him to testify.  So I will put that one

3    in abeyance pending further discussions between yourselves as

4    to whether such an agreement can be reached.

08:57AM    5    The last and final motion that I at least am aware of

6    is another one filed by the defense.  I did not see it again

7    until early this morning.  I think it was filed sometime either

8    very late last night or early this morning.  It is on the

9    docket at 1627.  And it is the defense motion to admit

08:57AM    10    Exhibit 7100-2G or to allow the testimony of Ms. Gloria Sua who

11    was one of the witnesses that I excluded late last week because

12    of untimely disclosure.

13    So, Ms. Panagakos or Mr. Kennedy, do you wish to be

14    heard further on this particular request before hearing from

08:58AM    15    the government?

16    MS. PANAGAKOS:  Your Honor, this is the same.  Ms. Sua

17    was in the -- it's 338-paged HPD missing person report, and I

18    thought all these material officers from that were on the list.

19    As of now, she is the only one I can see who is missing.  And

08:58AM    20    then when we provided notice last week, I guess I thought that

21    was -- by providing notice to the Court and the government,

22    that that was effectively supplementing the list.

23    So in terms of it not appearing on a list as of

24    July 1st, I would think -- in my mind, it was on a list on

08:58AM    25    June 27th when I sent it.  But in this instance, if the

08:59AM

```
 1    government would stipulate to this single-paged exhibit, it is
 2    an either/or situation.  So if the government would stipulate,
 3    then we don't need her testimony.  And I do think it's a
 4    finding -- it's a finding of she did the fingerprint
 5    comparisons and identified Frasure's fingerprint on two
 6    different locations which are very important to the defense.
 7         So maybe the government can consider whether or not to
 8    stipulate and that would alleviate the need for her testimony.
 9         THE COURT:  So just to be clear, and I don't know if
10    the government has had a chance to do more than skim this, but
11    my understanding is that similar to the Coast Guard and Navy
12    reports that we just talked about in the previous motion, this
13    one the defense is offering also as an excerpt of a larger
14    report; so you created a specific exhibit, that exhibit being
15    7100-2G, that excerpt is, from what I read, a one-paged
16    excerpt --
17         MS. PANAGAKOS:  Yes.
18         THE COURT:  -- that contains Ms. Sua's determination
19    that Mr. Frasure's fingerprints were found on two different
20    items, two different locations:  one being on a vape pen in the
21    vehicle, the Frasure abandoned vehicle that was found on Summer
22    Street approximately a week after he disappeared; and the
23    second item being on a door handle in his Hawaii Kai apartment.
24         MS. PANAGAKOS:  Yes.
25         THE COURT:  That's essentially what you are looking
```

1    for.

2              MS. PANAGAKOS:  Yes, Your Honor.

3              THE COURT:  And that if the government were to

4    stipulate to that one-paged report from -- that is an excerpt

09:00AM    5    from a larger HPD report, then Ms. Sua's testimony would not be

6    needed?

7              MS. PANAGAKOS:  Yes, Your Honor.  That's correct.

8              THE COURT:  Okay.  And the rationale is largely the

9    same as what we heard from the defense with regard to the Coast

09:00AM   10    Guard and Navy one, it's 803(8) is my recollection.

11              MS. PANAGAKOS:  Yes, Your Honor.

12              THE COURT:  Okay.  From the government's side.

13              MR. INCIONG:  Thank you, Your Honor.  Similar

14    situation.  Again, we haven't been able to really read

09:01AM   15    carefully the motion, would be willing potentially to

16    stipulate, however, there is one critical distinction that we

17    would absolutely not stipulate to, and there are numerous

18    references.

19              I think there are three different points in the motion

09:01AM   20    where it references that the vape pen was found in Frasure's

21    vehicle.  There is no evidence of that in this trial.  In fact,

22    just the opposite.  Ashley Wong testified, identified the vape

23    pen, which is Exhibit 2-46, said that was the pen that was left

24    at the Keokea condo.  The report itself says simply, quote,

09:01AM   25    from, quote, below the mouth piece of the cartridge, end quote.

1         So there is no evidence whatsoever that this was

2    recovered from the vehicle.  So that would not be included in

3    any stipulation.

4         THE COURT:  And don't assume that I think it was.  I'm

09:01AM   5    just telling you what the motion said.

6         MR. INCIONG:  Understood.

7         THE COURT:  The motion says that the vape pen, on

8    which Mr. Frasure's print was found, the vape pen was located

9    in his abandoned vehicle.  That's what the docket 1627, which

09:02AM  10    is the defense brief, says.  I did not go back and verify

11    whether any of the facts represented in the motion were true or

12    not.

13         MR. INCIONG:  Understood.

14         THE COURT:  All right.  So with -- Mr. Kennedy, go

09:02AM  15    ahead.

16         MR. KENNEDY:  Your Honor, with respect to that, I

17    think if -- here we are again with that particular issue.  When

18    you look at that particular vape pen, there were two.  There

19    was one at Keokea and then there was one in the car.  And it

09:02AM  20    was, you have to -- I mean, unfortunately in this case nobody

21    like said, this item came from this area and it had this

22    fingerprint in the final report.

23         So you have to go back to inside that one report, who

24    is the person who had the fingerprint card, where -- which

09:02AM  25    person did that search of that area, and connect up the dots.

1    So that's why sometimes it's difficult without a little bit of

2    testimony.  In this case, we could do that with the documents

3    and we don't need her testimony.  So it doesn't change that.

4              THE COURT:  I was going to say she might not be the

09:03AM   5    right person to say where the vape pen was found.

6              MR. KENNEDY:  She would not be.

7              THE COURT:  All right.  Well, then I'll treat her as

8    the same.  The one thing I did not hear was, is Ms. Sua here

9    today, and is she available potentially tomorrow?

09:03AM   10             MS. PANAGAKOS:  She is available today and we will

11   confirm of her availability tomorrow.

12             THE COURT:  Okay.  Then we will put this one in the

13   same bucket as the defense motion 1626.  I'll leave it to you

14   all to see if you can work out this -- I won't even call it a

09:03AM   15   disagreement necessarily at this point, but I'll leave it to

16   you to work out this issue.  If it's possible, then you let me

17   know, just like 1626.  If it's not possible, you also let me

18   know, and if I have to rule in terms of whether Ms. Sua will be

19   permitted to take the stand and/or whether the Court will admit

09:04AM   20   this exhibit without her testimony, I will do so.

21             MS. PANAGAKOS:  Thank you, Your Honor.

22             THE COURT:  Anything else in terms of -- we have to

23   check on our jury.  One thing I neglected to say is there was a

24   flight delay with regard to one of the flights for our

09:04AM   25   interisland jurors, and so they were -- we were still waiting

1    on them to touch down, and I don't know if they have since.

2    And I also don't know if they have since arrived on premises.

3              All right, Ms. Sharpe is saying no.  So we might have

4    to wait until they arrive.

09:04AM    5              MR. KENNEDY:  We will go check and see of availability

6    for tomorrow for those witnesses.

7              THE COURT:  Okay.  Anything else before we bring the

8    jury in?  I'll leave the bench and come back when they are

9    ready to go.

09:04AM   10              MR. INCIONG:  No, Your Honor.

11              THE COURT:  We will see you in an a little bit.

12              (Proceedings were recessed at 9:04 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2            I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10            DATED at Honolulu, Hawaii, July 17, 2024.

11

12

13                                 /s/ Gloria T. Bediamol

14                                 GLORIA T. BEDIAMOL.

15                                 RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```