<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
     UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
 4                                 )
                Plaintiff,         )    Honolulu, Hawaii
 5                                 )
           vs.                     )    April 8, 2024
 6                                 )
     MICHAEL J. MISKE, JR.,        )    TESTIMONY OF NORMAN AKAU
 7                                 )
                Defendant.         )
 8   _____)

 9
                 PARTIAL TRANSCRIPT OF JURY TRIAL (DAY 45)
10               BEFORE THE HONORABLE DERRICK K. WATSON,
                 CHIEF UNITED STATES DISTRICT COURT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:           MARK INCIONG, ESQ.
13                                MICHAEL DAVID NAMMAR, ESQ
                                  WILLIAM KE AUPUNI AKINA, ESQ.
14                                AISLINN AFFINITO, ESQ.
                                  Office of the United States Attorney
15                                PJKK Federal Building
                                  300 Ala Moana Boulevard, Suite 6100
16                                Honolulu, Hawaii  96850

17   For the Defendant:           LYNN E. PANAGAKOS, ESQ.
                                  841 Bishop St., Ste 2201
18                                Honolulu, HI 96813

19                                MICHAEL JEROME KENNEDY, ESQ.
                                  Law Offices of Michael Jerome
20                                Kennedy, PLLC
                                  333 Flint Street
21                                Reno, NV 89501

22   Official Court Reporter:     Gloria T. Bediamol, RPR RMR CRR FCRR
                                  United States District Court
23                                300 Ala Moana Boulevard
                                  Honolulu, Hawaii 96850
24
       Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
</pre>

1                    I N D E X

2    GOVERNMENT WITNESS:                              PAGE NO.

3
     NORMAN AKAU
4
          DIRECT EXAMINATION BY MR. INCIONG              3
5        CROSS-EXAMINATION BY MR. KENNEDY              101
         REDIRECT EXAMINATION BY MR. INCIONG           139
6        RECROSS EXAMINATION BY MR. KENNEDY            145

7
     EXHIBITS:                                        PAGE NO.
8
     Exhibit 1-35 was received in evidence             40
9    Exhibit 1-13 was received in evidence             54
     Exhibit 1-27 was received in evidence             56
10   Exhibit 1-47 was received in evidence             62
     Exhibit 8-2 was received in evidence              74
11   Exhibit 8-8 was received in evidence              76
     Exhibit 8-9 was received in evidence              77
12   Exhibit 8-6 was received in evidence              80
     Exhibit 1-698 was received in evidence            92
13   Exhibit 1-668 was received in evidence            96
     Exhibit 1-673 was received in evidence            98
14

15

16

17

18

19

20

21

22

23

24

25

```
 1    April 8, 2024                              9:12 a.m.
 2                        --oo0oo--
 3              MR. INCIONG:  Thank you, Your Honor.  The United
 4    States calls Norman Akau.
 5              THE CLERK:  Please raise your right hand.
 6                        NORMAN AKAU,
 7    called as a witness, having been first duly sworn, was examined
 8    and testified as follows:
 9              THE CLERK:  Please state your full name, spelling your
10    last name for the record.
11              THE WITNESS:  Norman Akau, A-K-A-U.
12                        DIRECT EXAMINATION
13    BY MR. INCIONG:
14    Q    Good morning, Mr. Akau.
15    A    Good morning.
16    Q    How old are you, sir?
17    A    Fifty-one.
18    Q    Are you currently incarcerated?
19    A    Yes.
20    Q    How long have you been incarcerated?
21    A    Three years, nine months.
22    Q    Where are you being held currently?
23    A    FDC Honolulu.
24    Q    Why are you incarcerated at the FDC Honolulu?
25    A    I was indicted for numerous federal charges.
```

09:20AM (lines 5, 10, 15, 20, 25)

| | | |
|---|---|---|
| | 1 | Q    Did you enter a guilty plea to any of those charges? |
| | 2 | A    Yes, I did. |
| | 3 | Q    What did you plead guilty to? |
| | 4 | A    Racketeering conspiracy. |
| 09:21AM | 5 | Q    Did you enter that guilty plea pursuant to a plea |
| | 6 | agreement? |
| | 7 | A    Yes, I did. |
| | 8 | Q    Do you recall the date that you were arrested on those |
| | 9 | charges, sir?  Approximately. |
| 09:21AM | 10 | A    2020. |
| | 11 | Q    The racketeering conspiracy charge that you pled guilty |
| | 12 | to, is that a felony? |
| | 13 | A    Yes, it is. |
| | 14 | Q    Are you aware of what the maximum statutory penalty is for |
| 09:21AM | 15 | that crime? |
| | 16 | A    Twenty years. |
| | 17 | Q    Were there a number of counts that were dismissed as part |
| | 18 | of your plea agreement? |
| | 19 | A    Yes, there was. |
| 09:21AM | 20 | Q    Do you recall what various crimes or counts those were? |
| | 21 | A    Two 924(c) charges, Hobbs Act Robbery, and a conspiracy to |
| | 22 | distribute drugs. |
| | 23 | Q    Okay.  The 924(c) charges you're referencing, are those |
| | 24 | gun charges? |
| 09:22AM | 25 | A    Yes. |

```
        1   Q     Was one of those using a gun in relation to a drug
        2   trafficking crime?
        3   A     Yes.
        4   Q     Was the other using a firearm in relation to a crime of
09:22AM 5   violence?
        6   A     Yes.
        7   Q     Are you aware of what the statutory penalties for those
        8   two charges were?
        9   A     For the two gun charges?
09:22AM 10  Q     Yes.
        11  A     Mandatory five years, consecutive terms.
        12  Q     You mentioned a drug conspiracy charge as well.  Were you
        13  aware of what the maximum you would have been facing for that?
        14  A     Yes.
09:22AM 15  Q     What was that?
        16  A     Twenty years.
        17  Q     For the drug charge?
        18  A     Excuse me, ten years.  Ten years to life.
        19  Q     So life maximum?
09:22AM 20  A     Yes.
        21  Q     And the ten years that you referenced, is that a mandatory
        22  minimum that would have been applicable?
        23  A     Mandatory minimum ten.
        24        THE COURT:  Mr. Akau, would you pull the microphone a
09:22AM 25  little bit closer to you so we can hear you a little better?
```

1          THE WITNESS:  Okay.

2          THE COURT:  Thank you, sir.

3          MR. INCIONG:  Thank you, Mr. Akau.

4          Thank you, Your Honor.

5    BY MR. INCIONG:

6    Q    And the other count you referenced was a Hobbs Act Robbery

7    charge, correct?

8    A    Yes.

9    Q    Was there also an agreement from the government in your

09:23AM  10    plea agreement not to charge you with any instances of murder

11    or murder for hire that you had made known to the government?

12    A    Yes.

13    Q    Was the plea agreement fashioned to include a -- the

14    contemplation of acceptance of responsibility for your guilty

09:23AM  15    plea?

16    A    Yes, it was.

17    Q    Did you have an attorney to consult with you throughout

18    the process when you were entering your guilty plea?

19    A    Yes, I did.

09:23AM  20    Q    Are you currently still represented to this day?

21    A    Yes.

22    Q    Did you have discussions with your attorney as to what was

23    the possible guideline range or sentence that you would be

24    facing for your guilty plea to racketeering conspiracy?

09:23AM  25    A    Yes, I did.

```
       1   Q    What is that guideline range?

       2   A    Ten years to 14 years.

       3   Q    Did your attorney explain to you that that is an estimate

       4   basically?

09:24AM 5  A    Yes, it is.

       6   Q    Do you understand that only the sentencing judge will be

       7   the final determiner of your sentence in this case?

       8   A    Yes.

       9   Q    Are you testifying today freely and voluntarily, sir?

09:24AM 10 A    Yes, I am.

       11  Q    Has anyone done anything to attempt to coerce you in any

       12  way in order to get you to testify in this case?

       13  A    No.

       14  Q    What are you hoping to gain from testifying in this trial?

09:24AM 15 A    Leniency in sentencing.

       16  Q    Have you been promised a reduced sentence?

       17  A    No.

       18  Q    Have you been guaranteed a reduced sentence?

       19  A    No.

09:24AM 20 Q    Have you been promised anything at all in return for your

       21  testimony?

       22  A    No.

       23  Q    What is your understanding as to the process which will

       24  determine whether in fact you do receive a reduced sentence in

09:24AM 25 this case?
```

1    A    That I testify truthfully, and come to any and all

2    hearings that the government asks me to show up for.

3    Q    Who is, in your understanding, the final decision maker as

4    to whether in fact you do receive a reduced sentence?

09:25AM    5    A    Judge Watson.

6    Q    Now, I want to talk to you about your plea agreement in a

7    little bit more detail.  You indicated that you pled guilty to

8    RICO conspiracy, correct?

9    A    Yes.

09:25AM    10    Q    Did you understand that as being an agreement to violate

11    the racketeering laws of the United States?

12    A    Yes.

13    Q    In your plea agreement did you admit to being a member of

14    the Miske Enterprise?

09:25AM    15    A    Yes, I did.

16    Q    Did you agree with at least one other enterprise member to

17    violate the racketeering laws of the United States?

18    A    Yes.

19    Q    What approximate time frame were you an associate or a

09:25AM    20    member of the Miske Enterprise, sir?

21    A    2016 to 2018.

22    Q    Who were other members that you conspired or agreed with

23    as part of your agreement to violate the racketeering laws of

24    the United States?

09:26AM    25    A    Wayne Miller, Jake Smith, Harry Kauhi, Lance Bermudez.

1    Q    Okay.  Now, you indicated that you agreed and admitted to

2    being a member of the Miske Enterprise.  Do you know someone by

3    the name of Mike Miske?

4    A    Yes, I do.

09:26AM    5    Q    How did you know Mike Miske?

6    A    We worked in the movies together.

7    Q    When you say you worked in the movies, what do you mean

8    exactly by that?

9    A    We worked in the Hawaii film industry.

09:26AM    10    Q    Were you a union member that worked in that industry?

11    A    Yes, I am.

12    Q    That's where you met Mr. Miske?

13    A    That's where I know of him.

14    Q    Okay.  Do you see the person that you know as Mike Miske

09:27AM    15    in the courtroom today?

16    A    Yes.

17    Q    Could you indicate where he's seated and what he's wearing

18    for the record, please.

19    A    He's seated to the left in a suit.

09:27AM    20    Q    Could you state the color of the suit, please?

21    A    A beige or gray.

22         MR. INCIONG:  Your Honor, may the record reflect that

23    Mr. Akau has identified the defendant?

24         THE COURT:  Yes, the record should reflect the witness

09:27AM    25    Mr. Akau's identification of the defendant Mr. Miske.

```
 1   BY MR. INCIONG:
 2   Q    Now, Mr. Akau, did you have to admit to certain things in
 3   your plea agreement that made you guilty of violating the -- or
 4   I'm sorry, I should say agreeing to violate the racketeering
 5   laws of the United States?
 6   A    Yes.
 7   Q    In fact, did you admit to personally committing a number
 8   of racketeering acts?
 9   A    Yes.
10   Q    Do you recall which racketeering acts that you admitted to
11   in your plea agreement?
12   A    Hobbs Act robbery, guns, murder for hire.
13   Q    Did you also admit to drug trafficking?
14   A    Yes.
15   Q    Did you also admit to attempted murder?
16   A    Yes.
17   Q    Did you agree with at least one other member of the Miske
18   Enterprise to commit each and every one of those racketeering
19   acts?
20   A    Yes.
21   Q    Now, you mentioned some of these individuals already.  I
22   want to start by asking you about Wayne Miller.
23        MR. INCIONG:  Could we publish, Your Honor,
24   Exhibit 1-43 previously admitted from our original list?
25        THE COURT:  Go ahead.
```

09:27AM  5
09:27AM  10
09:28AM  15
09:28AM  20
09:28AM  25

```
         1   BY MR. INCIONG:

         2   Q    Mr. Akau, do you see Exhibit 1-43?

         3   A    Yes.

         4   Q    Do you recognize who that is?

09:28AM  5   A    Yes.

         6   Q    Who is that?

         7   A    Wayne Miller.

         8   Q    How did you know Wayne Miller?

         9   A    He's my cousin.

09:28AM  10  Q    Did you know Wayne Miller your whole life or meet him

         11  later in life?

         12  A    I met him later in life.

         13  Q    Where did you meet him?

         14  A    On a movie set.

09:29AM  15  Q    This is again the employment you had with the union?

         16  A    Yes.

         17  Q    When you met Mr. Miller, did you realize you were related

         18  to him at that time?

         19  A    Yeah, when we met, it was for that reason.

09:29AM  20  Q    But you had never actually met him in person until that

         21  point?

         22  A    Yes.

         23  Q    After you met with Mr. Miller, what kind of relationship

         24  did you form, if any, with him?

09:29AM  25  A    He would come over a lot to my house.
```

           1   Q    When you say "a lot," how frequently are we talking about?

           2   A    Two times a week.

           3   Q    Did you become close with him?

           4   A    Yes.

09:29AM    5   Q    Which racketeering acts that you mentioned did you agree

           6   to commit with Wayne Miller?

           7   A    Murder for hire.

           8   Q    We'll talk about that in a moment.

           9        Let me next go on to Jake Smith.

09:29AM   10        MR. INCIONG:  If I could show the jury and the

          11   witness, Your Honor, Exhibit 1-41 previously admitted from our

          12   first list?

          13        THE COURT:  Go ahead.

          14   BY MR. INCIONG:

09:30AM   15   Q    Do you know this person, sir?

          16   A    Yes.

          17   Q    Who do you know that to be?

          18   A    Jake Smith.

          19   Q    How do you know Jake Smith?

09:30AM   20   A    We trained for his -- I trained for his father.

          21   Q    When you say you trained for his father, trained for what?

          22   A    Taekwondo.

          23   Q    Is his father a -- did he operate a Taekwondo studio?

          24   A    Yes.

09:30AM   25   Q    Approximately how old were you when you met Jake Smith?

```
         1   A      Forty-something.

         2   Q      So you met him later in life as well?

         3   A      Yes.

         4   Q      Which racketeering acts did you agree to commit with Jake

09:30AM  5   Smith?

         6   A      Hobbs Act robbery and drug charges.

         7          MR. INCIONG:  Your Honor, I'm next going to ask if we

         8   could publish 1-61 previously admitted from our initial exhibit

         9   list?

09:31AM  10         THE COURT:  Go ahead.

         11         MR. INCIONG:  And, Your Honor, may I utilize the face

         12  board at this time --

         13         THE COURT:  You may.

         14         MR. INCIONG:  -- to display?

09:31AM  15         THE COURT:  Yes.

         16         MR. INCIONG:  Thank you.

         17  BY MR. INCIONG:

         18  Q      Mr. Akau, do you recognize the person shown in

         19  Exhibit 1-61?

09:31AM  20  A      Yes, I do.

         21  Q      Who is that?

         22  A      Harry Kauhi.

         23  Q      How did you know Harry Kauhi?

         24  A      We worked in the movies together.

09:31AM  25  Q      How did you -- so did you meet him later in life as well?
```

```
          1   A    Yes.

          2   Q    Which racketeering acts did you commit with -- or agree to

          3   commit with Harry Kauhi?

          4   A    Drugs and robbery.

09:32AM   5        MR. INCIONG:  Could we show the witness and the jury

          6   Exhibit 1-34 admitted from our original list?

          7        THE COURT:  Yes.

          8   BY MR. INCIONG:

          9   Q    Who do you recognize that as, sir?

09:32AM  10   A    Lance Bermudez.

         11   Q    How did you know Lance Bermudez?

         12   A    From robbery.

         13   Q    And was that one of the racketeering acts that you agreed

         14   to commit as mentioned in your plea agreement?

09:32AM  15   A    Yes.

         16        MR. INCIONG:  Finally, could we show the witness and

         17   the jury Exhibit 1-58 previously admitted from our original

         18   list?

         19        THE COURT:  You may.

09:33AM  20   BY MR. INCIONG:

         21   Q    Do you recognize the person in Exhibit 1-58, Mr. Akau?

         22   A    Yes.

         23   Q    How do you know that person?

         24   A    I worked in the movies with him.

09:33AM  25   Q    Did you meet him again later in life around the same time
```

```
 1   period as these other folks?

 2   A    Yes.

 3   Q    Which racketeering acts did you agree to commit with

 4   Mr. Stancil?

 5   A    None.

 6   Q    And I know you have identified him in court already.

 7        MR. INCIONG:  But could we show the witness and

 8   publish to the jury Exhibit 1-37, please?

 9        THE COURT:  Yes.

10   BY MR. INCIONG:

11   Q    Who do you recognize in that photo, sir?

12   A    Mike Miske.

13   Q    Okay.  Mr. Akau, I want to ask you a few questions as to

14   your personal background.  What part of the island did you grow

15   up on?

16   A    Kaneohe.

17   Q    Did you live on Oahu your whole life?

18   A    Yes.

19   Q    What high school did you attend?

20   A    Castle High School.

21   Q    Did you graduate?

22   A    Yes.

23   Q    What year did you graduate?

24   A    Twelfth grade.

25   Q    What year did you graduate?
```

1    A    Oh, 1990.

2    Q    After you graduated from high school, you mentioned you

3    became employed with the union in the movie industry.  About

4    how old were you when you joined that industry?

09:34AM    5    A    Maybe 33.

6    Q    Or the year, whichever is easier for you to remember.  Do

7    you recall what year you started?

8    A    Maybe 2009, 2010.

9    Q    Okay.  And just so we know specifically, which union are

09:34AM    10    we talking about?

11    A    IATSE 665.

12    Q    What union -- what kind of service are we --

13    A    We provide the building and operations of filming.

14    Q    So are these for sets and things of that nature?

09:35AM    15    A    Yes.

16    Q    These are movies that are filmed here on the island --

17    A    Yes.

18    Q    -- or in the state?

19        What kinds of things did you do for the -- the union?

09:35AM    20    A    I did AC, and I did rigging grips.

21    Q    When you say "AC," what do you mean by that?

22    A    Provide air conditioning for the sets.

23    Q    Did you start in what's known as the greens department?

24    A    Yes.

09:35AM    25    Q    What is the greens department?

1    A    We dressed the set with greens, with plants.

2    Q    Then you mentioned you had done some rigging work.

3    A    Yes.

4    Q    Could you explain to the jury what does that mean?

09:35AM    5    A    Basically we attach fixtures to machines for filming,

6    bouncing of light.

7    Q    Did you ever work as a grip or in gripping?

8    A    Yes.

9    Q    What does that mean?

09:36AM    10    A    It means bringing light to the set without means of

11    electricity.

12    Q    You also mentioned AC, air conditioning.  Was that part of

13    the union or was that your own kind of side business that you

14    started?

09:36AM    15    A    Both.

16    Q    Explain that to the jury if you would.

17    A    So basically what it was is I provided AC units that I put

18    on trailers, and drove it to the sets and chilled the sets so

19    the actors wouldn't get hot in between takes.

09:36AM    20    Q    So when you say "both," it was a side business --

21    A    It was -- it was my personal business as well as a union

22    job.

23    Q    I got you.  Okay.

24         Do you have a family, Mr. Akau?

09:36AM    25    A    Yes.

```
 1   Q    How long have you been married or with your significant

 2   other?

 3   A    Since 2005.

 4   Q    Do you have children?

 5   A    Yes.

 6   Q    How many children do you have?

 7   A    Two.

 8   Q    Now, Mr. Akau, before you entered your guilty plea and you

 9   were arrested on these charges, were you in trouble with the

10   law previously?

11   A    Yes.

12   Q    In fact, you have three felony convictions from the early

13   1990s?

14   A    Yes.

15   Q    Were those all arising out of the same incident?

16   A    Yes, it was.

17   Q    What were the three convictions that you have?

18   A    First degree assault, robbery, and prohibited firearms.

19   Q    Those are all felonies, correct?

20   A    Yes.

21   Q    Did you plead guilty for those charges or did you go to

22   trial?

23   A    I pled guilty.

24   Q    Why did you plead guilty?

25   A    Because they gave me a deal.
```

09:36AM   5
09:37AM   10
09:37AM   15
09:37AM   20
09:37AM   25

```
        1   Q    What was the sentence you received as part of that deal?

        2   A    Twenty years.  All three charges would run under the

        3   20-year term.

        4   Q    So meaning concurrently?

09:37AM 5   A    Concurrent.

        6   Q    Was the assault charge actually a ten-year sentence?

        7   A    Yes.

        8   Q    The robbery charge a 20-year sentence?

        9   A    Yes.

09:38AM 10  Q    And was the gun charge a five-year sentence?

        11  A    Five-year mandatory.

        12  Q    And those all ran concurrently, so the 20-year was the

        13  longest?

        14  A    Yes.

09:38AM 15  Q    How much actual time did you serve in prison out of that

        16  20-year sentence?

        17  A    Ten years -- ten years out of the 20.

        18  Q    What happened to the remaining ten years?

        19  A    I was on parole.

09:38AM 20  Q    Were you ever found to be in violation of your parole

        21  during those ten years?

        22  A    No.

        23  Q    So tell the jury if you would in a nutshell what happened.

        24  What were the circumstances that led to you being convicted of

09:38AM 25  those three crimes?
```

```
 1   A     I was -- I was in a robbery, and in the process of the

 2   robbery we had a struggle for the gun, the gun went off, and

 3   the victim was shot, and -- and I turned myself in.

 4   Q     So you are the prohibited possessor, the weapon charge,

 5   that was referenced to the gun that you used in the shooting?

 6   A     Yes.

 7   Q     What kind of gun was that?

 8   A     A sawed-off shotgun.

 9   Q     Is that why it was considered a prohibited weapon?

10   A     Yes.

11   Q     Where did you do your prison sentence, serve your prison

12   sentence?

13   A     All in the continental United States or on the Mainland.

14   Q     So none of that was served in any Hawaii facility?

15   A     About a year.

16   Q     Okay.  Now, when you were in prison, did you join any

17   prison gang?

18   A     Yes.

19   Q     What prison gang did you join?

20   A     USO Family.

21   Q     What does USO stand for?

22   A     Brother.

23   Q     That's USO in the Samoan language --

24   A     Yes.

25   Q     -- is brother?
```

09:38AM (line 5)
09:39AM (line 10)
09:39AM (line 15)
09:39AM (line 20)
09:39AM (line 25)

```
        1   A     Yes.

        2   Q     When did you join the USO Family gang?  How far into your

        3   prison term?

        4   A     About eight -- six to eight years.

09:39AM  5   Q     Why did -- well, let me make sure I'm clear on that.  Is

        6   that the length of time you were in or when --

        7   A     When I joined.

        8   Q     So you were eight years into -- six to eight years into

        9   your prison term when you joined?

09:40AM 10   A     Yes.

       11   Q     Gotcha, okay.  Why did you join that gang?

       12   A     To protect Hawaii inmates against other Mainland inmates.

       13   Q     While you were part of the USO Family in custody, did you

       14   commit any crimes on behalf of the USO Family?

09:40AM 15   A     Yes.

       16   Q     What kinds of crimes did you commit?

       17   A     Assaults.

       18   Q     On other inmates?

       19   A     Yes.

09:40AM 20   Q     When you were released from prison on parole, did you

       21   remain a member of the USO Family?

       22   A     Yes.

       23   Q     Why?

       24   A     Just is what it was.

09:40AM 25   Q     Once you were released from prison, did you commit any
```

```
      1   crimes in furtherance or on behalf of the USO Family?
      2   A    Yes.
      3   Q    What types of crimes?
      4   A    Assault.
09:41AM  5   Q    Are you familiar with the motor vehicle gang called the
      6   Nakipi gang?
      7   A    Yes.
      8   Q    How are you familiar with Nakipi?
      9   A    One of the founders.
09:41AM 10   Q    Who was the founder -- who was the founder of Nakipi?
     11   A    Myself and Zeph Salas.
     12   Q    Who is Zeph Salas?
     13   A    One of my friends who passed away.
     14   Q    Was he also a coworker of yours in the movie industry?
09:41AM 15   A    Yes.
     16   Q    At any point did you become in charge or become president
     17   of the Nakipi gang?
     18   A    Yes.
     19   Q    Approximately when did you join the Nakipi gang?
09:41AM 20   A    Probably 2015.
     21   Q    So when the Nakipi gang was originated, originally formed,
     22   what was the purpose or intent of Nakipi at that time?
     23   A    Hawaiian culture club.
     24   Q    It was a motorcycle club as well?
09:42AM 25   A    Yes.
```

```
        1   Q    Did that ever change over time?

        2   A    Yes, it did.

        3   Q    What did the Nakipi Motorcycle Club morph into?

        4   A    Turned into a motorcycle gang.

09:42AM  5   Q    And would it be accurate to call it an outlaw motorcycle

        6   gang?

        7   A    Yes.

        8   Q    Did you commit crimes on behalf of a Nakipi Motorcycle

        9   Club at any point?

09:42AM  10  A    Yes.

        11  Q    What kinds of crimes?

        12  A    Assaults, stabbing, shootings.

        13  Q    Were you ever arrested for any of those things?

        14  A    No.

09:42AM  15  Q    You mentioned shootings.  When you were convicted back in

        16  the early '90s of the robbery, the assault and the prohibited

        17  weapon charges, did you understand that you were a convicted

        18  felon at that point?

        19  A    Yes.

09:42AM  20  Q    Did you understand that it was illegal for you to possess

        21  firearms from that point on?

        22  A    Yes.

        23  Q    Did you possess firearms nonetheless?

        24  A    Yes.

09:43AM  25  Q    Did your membership in the Nakipi Motorcycle gang and the
```

```
         1   USO Family ever overlap?

         2   A    Yes.

         3   Q    At any point did you leave either of those groups?

         4   A    I left both of -- both groups.

09:43AM  5   Q    Was that at the same time or at different times?

         6   A    Pretty much the same time.

         7   Q    When was that?

         8   A    2019.

         9   Q    Why did you leave the USO Family and the Nakipi Motorcycle

09:43AM  10  Club?

         11  A    Two parts.  One, a close friend passed away, and the other

         12  was just time to change my life.

         13  Q    Is leaving a group like the USO Family or the Nakipi

         14  Motorcycle Club a simple matter?

09:44AM  15  A    No.

         16  Q    What went into that?

         17  A    Just doing it.

         18  Q    Were there consequences that you thought you might suffer

         19  as a result of that?

09:44AM  20  A    Yes.

         21  Q    Did you suffer any of those?

         22  A    No.

         23  Q    And when you say it was time to change your life, what

         24  were you doing as far as work at that time?

09:44AM  25  A    Movies, AC, grip.
```

1    Q    Had you started this kind of side AC business already at

2    that point?

3    A    Yes.

4    Q    Did you want to focus on that?

09:44AM    5    A    I focused on building the business.

6    Q    What was going on with your family at that time?

7    A    A lot of bills.  The wife was in school, and so I paid all

8    the bills.

9    Q    Now, were any of the racketeering acts that you -- we've

09:44AM    10    talked about briefly so far that you admitted to committing as

11    part of the Miske Enterprise, were any of those done in

12    furtherance of the USO Family?

13    A    No.

14    Q    Were any of those done in furtherance of the Nakipi

09:45AM    15    Motorcycle Club?

16    A    No.

17    Q    Did any of those have anything to do with either of those

18    groups?

19    A    No.

09:45AM    20    Q    What is your current status with the USO Family?

21    A    I'm not a member of the USO Family.

22    Q    What is your current status with the Nakipi Motorcycle

23    Club?

24    A    I'm not a member.

09:45AM    25    Q    Being a member of those two groups in the past, is it

1   difficult for you to be here testifying in a courtroom today?

2   A    Yes.

3   Q    Could you explain to the jury why that is?

4   A    I live my life by a set of rules and standards, and

09:45AM   5   testifying in court is something that we would never do or I

6   would never do.

7   Q    And you're referencing when you were a member of these two

8   clubs?

9   A    Yes.

09:45AM   10   Q    And now you're doing something you would have never done

11   in the past.

12   A    Yes.

13   Q    You indicated when you pled guilty to the three crimes in

14   the early '90s, you did so because you took a deal.

09:46AM   15   A    Yes.

16   Q    Did you wish to accept responsibility in that case?

17   A    Yes.

18   Q    Is that part of why you're pleading guilty in this case?

19   A    I'm pleading guilty, yeah, to accept my responsibility for

09:46AM   20   my part in all of this.

21   Q    When you were arrested on these charges, was it a surprise

22   to you?

23   A    Yes.

24   Q    After you learned of the charges, were you ready to accept

09:46AM   25   responsibility immediately?

```
        1  A    No.

        2  Q    Why not?

        3  A    Because I never done anything with Mike Miske, so to me I

        4  wanted to fight the RICO charge.

09:47AM 5  Q    When you were initially arrested in this case, were you

        6  detained or -- meaning held without bond?

        7  A    Yes.

        8  Q    Had you been held under those -- under that status ever

        9  since?

09:47AM 10 A    Yes.

       11  Q    When you were initially in custody then after your arrest,

       12  did you have any communications with Mr. Miske?

       13  A    Once, yeah.

       14  Q    Describe to the jury how that happened.

09:47AM 15 A    We were in seg together, the holding unit.

       16  Q    When you say "seg," that's segregation?

       17  A    Yes.

       18  Q    That's a special holding area at the FDC Honolulu?

       19  A    Yes.

09:47AM 20 Q    Is that basically solitary confinement?

       21  A    Yes, it was.

       22  Q    You're in a cell by yourself without any other cellmate?

       23  A    Yes.

       24  Q    Are there a number of cells that are -- that hold people

09:47AM 25 that are in that particular position at that time?
```

```
          1   A     Yeah.

          2   Q     Was Mr. Miske held in that same area with you during that

          3   time?

          4   A     Yes.

09:48AM   5   Q     How did you communicate with Mr. Miske?

          6   A     I sent -- I sent him a letter.

          7   Q     How did you send him a letter?

          8   A     I slid a book out and had him -- passed the book to him.

          9   Q     So ordinarily you're not allowed to send letters --

09:48AM  10   A     No.

         11   Q     -- to other inmates, correct?

         12   A     Yes.

         13   Q     So you basically had to sneak this letter in a book to

         14   him?

09:48AM  15   A     Yes.

         16   Q     Why did you write the letter to Mr. Miske?

         17   A     To let him know how much I was involved in the case

         18   monetary with my lawyers.

         19   Q     Why did you want him to know that?

09:48AM  20   A     Just to let him know how far into the case I was with

         21   money.  My family tapped out of their money, so I sent the

         22   letter.

         23   Q     So how much had you -- how much did you tell Mr. Miske you

         24   had invested?

09:48AM  25   A     About 250,000.
```

1    Q    What were you hoping to get in response from Mr. Miske?

2    A    I don't know.  I don't know what I was expecting.

3    Q    Did you receive any communication back from Mr. Miske?

4    A    Yes.

09:49AM    5    Q    What did that communication consist of?

6    A    He told me how much he was involved -- I mean, how much

7    money he had spent, and told me to hang in there.

8    Q    How much money did he say he had spent?

9    A    Over 2 million.

09:49AM    10          MR. KENNEDY:  Objection, Your Honor.

11          THE COURT:  Sustained.

12    BY MR. INCIONG:

13    Q    After that did you have any further communication with

14    Mr. Miske?

09:49AM    15    A    I seen him one time in visit.

16    Q    So a few thoughts.  When you were originally arrested, you

17    had -- you had no affiliation with Mr. Miske, then what made

18    you plead guilty in this case?

19    A    My lawyers sent me the RICO primer.

09:49AM    20    Q    The RICO is the -- that's the racketeering law?

21    A    Yes.

22    Q    Does the primer explain the racketeering conspiracy law?

23    A    It did.

24    Q    Did you have consultations with your attorney --

09:50AM    25    A    Yes.

|          |    |   |                                                             |
|----------|----|---|-------------------------------------------------------------|
|          | 1  | Q | -- about the racketeering law?                              |
|          | 2  | A | Yes.                                                        |
|          | 3  | Q | Many consultations?                                         |
|          | 4  | A | Many.                                                       |
| 09:50AM  | 5  | Q | Long consultations?                                         |
|          | 6  | A | Yes.                                                        |
|          | 7  | Q | At some point did you believe that you understood how the   |
|          | 8  |   | RICO law worked?                                            |
|          | 9  | A | Yes, I did.                                                 |
| 09:50AM  | 10 | Q | Did that change your mind?                                  |
|          | 11 | A | Yes, it did.                                                |
|          | 12 | Q | Why?                                                        |
|          | 13 | A | Because it explained to me that even if I don't know who    |
|          | 14 |   | he is or in my thought process I did nothing with him, because |
| 09:50AM  | 15 |   | I did something with one member that I was guilty.          |
|          | 16 | Q | So you understood then that after those consultations with  |
|          | 17 |   | your attorney that you only need to agree with one other    |
|          | 18 |   | enterprise member to violate the racketeering laws to be guilty |
|          | 19 |   | of a RICO conspiracy?                                       |
| 09:50AM  | 20 | A | Yes.                                                        |
|          | 21 | Q | Did you understand that the agreement is the crime?         |
|          | 22 | A | Yes.                                                        |
|          | 23 | Q | But you admitted that you had actually done certain         |
|          | 24 |   | specific things as well, so it is more than just an agreement, |
| 09:51AM  | 25 |   | correct?                                                    |

```
         1  A      Correct.

         2          THE COURT:  Mr. Inciong, I apologize for interrupting.

         3  There was a question a few -- about a minute ago directed to

         4  Mr. Akau as to what Mr. Miske had told him about how much

09:51AM  5  Mr. Miske had spent on this case.

         6          The objection from Mr. Kennedy was sustained.  Despite

         7  that objection, it appears that Mr. Akau did answer the

         8  question, and the response was taken down on the record.  I did

         9  not hear it.  I don't know if the jurors did.  If you did, that

09:51AM 10  response should be stricken and not considered by the jury for

        11  any purpose.

        12          Mr. Inciong, I apologize for interrupting.  You may

        13  continue.

        14          MR. INCIONG:  No apology needed.  Thank you, Your

09:51AM 15  Honor.

        16  BY MR. INCIONG:

        17  Q    So let's go back and talk to you about your cousin Wayne

        18  Miller for a second, okay?  You said you met him on a movie

        19  set, correct?

09:51AM 20  A    Yes.

        21  Q    Do you recall what movie you were working on at that time?

        22  A    He was working on King Kong.

        23  Q    Okay.  You became close with Mr. Miller?

        24  A    Yes.

09:52AM 25  Q    Did Mr. Miller ever bring up Michael Miske to you?
```

1    A    He told me that that was his best friend.

2    Q    Did you have conversations with Mr. Miller about Mike

3    Miske and Mr. Miller's relationship with him?

4    A    Not really.

09:52AM    5    Q    Did you find or learn at any point that there was a strain

6    in their relationship?

7    A    Yes.

8    Q    How did you find out about that?

9    A    Miller told me that they weren't on good terms.

09:52AM    10    Q    Did Mr. Miller indicate whether or not he cared whether

11    they remained on good terms or not?

12    A    Yeah, he wanted to be on good terms.

13    Q    Why?

14    A    Because he said that was his best friend.

09:52AM    15    Q    Did Mr. Miller approach you and ask -- inquire with you

16    whether you would be interested in abducting and possibly

17    killing another individual?

18    A    Yes.

19    Q    How did that come about?

09:53AM    20    A    He told me that the only way he feels that he could fix

21    his friendship is to do something for Mike.

22    Q    And that's his friendship with Mike Miske?

23    A    Yes.

24    Q    So what did Mr. Miller propose to do to try and repair

09:53AM    25    that relationship?

```
 1   A    He wanted to --
 2             MR. KENNEDY:  Objection, hearsay.
 3             THE COURT:  Overruled.  Go ahead.
 4             THE WITNESS:  He wanted to abduct Jonathan Fraser.
09:53AM  5   BY MR. INCIONG:
 6   Q    Did you know who the name -- did that name mean anything
 7   to you at that time?
 8   A    No.
 9   Q    What did Mr. Miller ask you to do regarding Jonathan
09:53AM  10  Fraser?
11   A    Abduct him.
12   Q    Did he indicate whether there was any specific place he
13   wanted you to take him?
14   A    He would let me know.  He just wanted me to take him to
09:54AM  15  the North Shore.
16   Q    Was it simply to abduct Mr. Frasure or was there anything
17   more that he proposed to you?
18   A    He proposed, if I was willing, to shoot him.
19   Q    Meaning kill him?
09:54AM  20  A    Yeah.
21   Q    Did Mr. Miller offer you anything if you would agree to do
22   that?
23   A    50,000.
24   Q    Did you believe that this was an offer coming from
09:54AM  25  Mr. Miller himself or being relayed on behalf of someone else?
```

                        MR. KENNEDY:  Objection on his belief, Your Honor.

                        THE COURT:  Overruled.  Go ahead.

                        THE WITNESS:  From himself.

    BY MR. INCIONG:

09:54AM  5    Q    Did you give Mr. Miller an answer immediately?

    6    A    No.

    7    Q    Did you ask him for time to think about it?

    8    A    Yeah, I told him let me think about this.

    9    Q    Did you consult with anybody about whether you should do

09:54AM  10   this?

    11   A    Yeah, I consulted Lindsey Kinney.

    12   Q    Who is Lindsey Kinney?

    13   A    Someone that used to work with me in the movies.

    14   Q    Was Lindsey Kinney a friend of yours as well?

09:55AM  15   A    At that time.

    16   Q    Was Lindsey Kinney a member of either the USO Family or

    17   the Nakipi group that you had mentioned before?

    18   A    Nakipi.

    19   Q    Why did you consult with Mr. Kinney?

09:55AM  20   A    Just got his advice.

    21   Q    Did you relay the name Jonathan Fraser to Mr. Kinney?

    22   A    Yes.

    23   Q    Was Mr. Kinney aware who Jonathan Fraser was?

    24   A    He was.

09:55AM  25   Q    Did you learn there was a connection between Jonathan

        1    Fraser and Michael Miske at any point?

        2    A    Not at that time.

        3    Q    At any point?

        4    A    Yeah.

09:55AM  5    Q    What did -- when did you learn that?

        6    A    I learned it later when I started asking questions.

        7    Q    What was the connection that you learned?

        8    A    That --

        9         MR. KENNEDY:  Objection.  Hearsay, Your Honor.

09:56AM  10        THE COURT:  Overruled.  Go ahead.

        11        THE WITNESS:  That he was a friend of his son's.

        12   BY MR. INCIONG:

        13   Q    A friend of Mr. Miske's son?

        14   A    Yes.

09:56AM  15   Q    When you spoke with Lindsey Kinney about whether or not to

        16   accept this offer, what did you decide?

        17   A    Decided not to do it.

        18   Q    Why?

        19   A    Just it's not my nature.  I wasn't going to do it.

09:56AM  20   Q    Was there anything in particular about Jonathan Fraser

        21   that led you to make that decision?

        22   A    Lindsey Kinney said he wouldn't do it because he was a

        23   kid, but like I said, I didn't know who he was.

        24   Q    Now, you mentioned that at the time Lindsey Kinney and

09:56AM  25   yourself were both Nakipi members, correct?

1    A    Yes.

2    Q    Did this decision or whether yes or no have anything to do

3    with Nakipi?

4    A    No.

09:56AM    5    Q    Were you asking Lindsey Kinney simply as your friend

6    separate from --

7    A    Yes.

8    Q    Now, you said Mr. Miller had said he would want you to

9    take Mr. Frasure to the North Shore.

09:57AM    10    A    Right.

11    Q    Was there any other individual mentioned that would step

12    in at that point to you?

13    A    Not at the time.

14    Q    Was there later?

09:57AM    15    A    No.

16    Q    Did you relay your decision to Mr. Miller?

17    A    Yes.

18    Q    What was his response when you told him that, no, you

19    would not do it?

09:57AM    20    A    He was all right.

21    Q    After you had told Mr. Miller no, did you later learn that

22    Jonathan Fraser had disappeared?

23    A    Yes.

24    Q    Were you involved in any way with Mr. Frasure's

09:57AM    25    disappearance?

```
        1    A    No.

        2    Q    Do you have any information as to how Mr. Frasure

        3    disappeared?

        4    A    I do not.

09:57AM 5    Q    After you declined the offered contract from Mr. Miller in

        6    regard to Jonathan Fraser, was there another contract that he

        7    offered to you fairly quickly after that?

        8    A    Yes.

        9    Q    Tell the jury about that.

09:58AM 10   A    He asked me if I could help him follow a union member for

        11   the longshoremen.

        12   Q    Did Mr. Miller identify who that person was?

        13   A    Yes.

        14   Q    What was that person's name?

09:58AM 15   A    Elgin.

        16   Q    Did you know this person?

        17   A    No.

        18   Q    Did you know his position at the union?

        19   A    I think he was the hiring agent.

09:58AM 20   Q    And was this the same union that you worked with at the

        21   movies or was this a separate union?

        22   A    Separate union.

        23   Q    Was this the stevedores union?

        24   A    Yes.

09:58AM 25   Q    What was the offer made in regard to whether you would
```

1    assist with Mr. Calles -- with Elgin?

2    A    He told me he would give me the same money, 50,000, or a

3    job in the stevedores.

4    Q    So there were two options for this one?

09:59AM    5    A    Yes.

6    Q    $50,000 or a job in the stevedores?

7    A    Yes.

8    Q    From your friendship with Mr. Miller, did you believe he

9    had any pull or a way to guarantee you a job in the stevedores?

09:59AM    10    A    I wasn't sure if he did or he didn't.

11    Q    So I asked you previously whether you believed the Frasure

12    offer was Miller's own or he was doing it on behalf of someone

13    else.  Same question in regard to Elgin, did you believe this

14    was Miller's thing?

09:59AM    15    A    Yes, I did.

16    Q    Why did you believe that?

17    A    Because I asked him if it had anything to do with Mike,

18    and he told me no.

19    Q    Why did you specifically ask him if it had anything to do

09:59AM    20    with Mike Miske?

21    A    Because I kind of stay in my own lane.  After the Frasure

22    situation, I didn't want to get involved with anything.

23    Q    So you trusted Mr. Miller's word on that?

24    A    Yes.

10:00AM    25    Q    Were there any meetings that happened after that that led

1    you to believe what he had told you?

2    A    Yes.

3    Q    Who did you meet with that seemed to indicate he was being

4    honest with you about that?

10:00AM    5    A    I met with Nate Lum.

6    Q    Who is Nate Lum?

7    A    The former hiring agent for stevedores.

8    Q    Was it your understanding that Elgin was the person that

9    had replaced Nate Lum?

10:00AM    10    A    Yes.

11         MR. INCIONG:  Your Honor, could we show the witness

12    Exhibit 1-35 for the witness only from our first exhibit list?

13         THE COURT:  You may.

14    BY MR. INCIONG:

10:00AM    15    Q    Mr. Akau, do you recognize the individual shown in

16    Exhibit 1-35?

17    A    Yes.

18    Q    Who do you recognize that person as?

19    A    Nate Lum.

10:00AM    20    Q    Is this the person that you met with along with Wayne

21    Miller after he offered you the Elgin contract?

22    A    Yes.

23         MR. INCIONG:  Your Honor, I would move to admit 1-35

24    at this time.

10:01AM    25         THE COURT:  Any objection?

1          MR. KENNEDY:  No objection.

2          THE COURT:  1-35 is admitted without objection, and

3    you may publish.

4               (Exhibit 1-35 was received in evidence.)

10:01AM    5          MR. INCIONG:  Thank you, Your Honor.

6    BY MR. INCIONG:

7    Q    So before you had your meeting with Wayne Miller and

8    Mr. Lum, what was exactly the request that Wayne Miller made of

9    you for the $50,000?

10:01AM   10    A    He wanted me to help him follow Elgin.

11    Q    And do anything more than that?

12    A    And when we caught up to him, he wanted me to beat him up.

13    Q    After meeting with Mr. Miller and Nate Lum, did you agree

14    to accept that contract?

10:01AM   15    A    I did.

16    Q    And which -- which form of payment did you want, the job

17    or the money?

18    A    The money.

19    Q    Why did you want the money?

10:01AM   20    A    I had bills.

21    Q    Did the contract to beat Elgin up change at any point?

22    A    Yes, it did.

23    Q    How did it change?

24    A    We had a hard time following him, so eventually he got

10:02AM   25    irritated and he told me that he wanted me to shoot him.

|       |    |   |                                                                    |
|-------|----|---|--------------------------------------------------------------------|
|       | 1  | Q | And kill him?                                                      |
|       | 2  | A | Yes.                                                               |
|       | 3  | Q | Did you agree to do that?                                          |
|       | 4  | A | Yes, I did.                                                        |
| 10:02AM | 5 | Q | So when you say you were following this Elgin, were you            |
|       | 6  |   | following him by yourself?                                         |
|       | 7  | A | No.                                                                |
|       | 8  | Q | Who did you follow him with?                                       |
|       | 9  | A | Wayne Miller.                                                      |
| 10:02AM | 10 | Q | Were you following Elgin in person or were you using any          |
|       | 11 |   | sort of technology to do it as well?                              |
|       | 12 | A | Tracking devices.                                                 |
|       | 13 | Q | Who provided these tracking devices?                             |
|       | 14 | A | Wayne Miller.                                                     |
| 10:02AM | 15 | Q | Did Mr. Miller indicate whether he had ever been following      |
|       | 16 |   | Elgin before you became involved?                                |
|       | 17 | A | Yes.  He told me he was following him for a while now.          |
|       | 18 | Q | How did you find out that Mr. Miller had been using these       |
|       | 19 |   | tracking devices?                                                |
| 10:02AM | 20 | A | He told me.                                                       |
|       | 21 | Q | Did he ever show you any of those tracking devices?             |
|       | 22 | A | Yeah, I think he showed me one of them.                         |
|       | 23 | Q | What did that tracking device look like?                         |
|       | 24 | A | Like a magnetic half egg.                                        |
| 10:03AM | 25 | Q | Was there a term that Wayne Miller used to refer to the         |

```
        1   tracking devices?

        2   A    Just eggs.

        3   Q    Was that because of the shape or the appearance?

        4   A    Yes.

10:03AM 5   Q    So how did these eggs or tracking devices work?

        6   A    They magnetically stuck to anything metal, and I think it

        7   sends messages to the phone.

        8   Q    Was there an application that then you could actually

        9   track it using a cell phone?

10:03AM 10  A    I'm assuming.  I've never used it.  He was using it.

        11  Q    You never used it yourself.

        12  A    No.

        13  Q    Did you see Wayne Miller using it?

        14  A    Yes.

10:03AM 15  Q    But he relayed the information to you?

        16  A    Yes.

        17  Q    So after you started assisting Mr. Miller, for

        18  approximately how long did you follow this --

        19  A    Three weeks.

10:04AM 20  Q    Do you recall any specific areas where you repeatedly

        21  would follow Elgin to?

        22  A    Hawaii Kai to Kalihi.

        23  Q    Were you aware of where he lived?

        24  A    Yes.

10:04AM 25  Q    Where was that?
```

|         |    |   |                                                            |
|---------|----|---|------------------------------------------------------------|
|         | 1  | A | Downtown Honolulu.                                          |
|         | 2  | Q | Were you aware of any places that he frequented for lunch  |
|         | 3  |   | or to eat?                                                 |
|         | 4  | A | Yes.                                                       |
| 10:04AM | 5  | Q | Where were -- where was that?                              |
|         | 6  | A | Penny's on Sand Island.                                    |
|         | 7  | Q | Was it just yourself and Wayne Miller or were there others |
|         | 8  |   | involved in this?                                          |
|         | 9  | A | Harry Kauhi.                                               |
| 10:04AM | 10 | Q | How was Harry Kauhi involved?                              |
|         | 11 | A | He was the driver.                                         |
|         | 12 | Q | He would drive when you were following the subject around? |
|         | 13 | A | Yes.                                                       |
|         | 14 | Q | Do you recall the type of vehicle that this Elgin drove?   |
| 10:04AM | 15 | A | A black Tahoe.                                             |
|         | 16 | Q | Is that the vehicle that you would always see him in when  |
|         | 17 |   | you followed him?                                          |
|         | 18 | A | Yes.                                                       |
|         | 19 | Q | To your knowledge, was Jake Smith ever involved in this?   |
| 10:05AM | 20 | A | Yes.                                                       |
|         | 21 | Q | How was Jake Smith involved?                               |
|         | 22 | A | He was with Miller before I got on.  He was the one        |
|         | 23 |   | helping Miller.                                            |
|         | 24 | Q | Once you came on, was Jake involved at that point?         |
| 10:05AM | 25 | A | No.                                                        |

1    Q    Did you replace Jake in a sort of way?

2    A    I guess so.

3           MR. INCIONG:  Could we show the witness and publish,

4    please, Exhibit 1-1079 from the government's first supplemental

10:05AM    5    witness -- or I'm sorry, exhibit list?

6           THE COURT:  Go ahead.

7    BY MR. INCIONG:

8    Q    Do you recognize the individual in 1-1079, Mr. Akau?

9    A    Yes.

10:05AM    10    Q    Who is that?

11    A    Ali'i.

12    Q    Do you know Ali'i's actual name?

13    A    Just I know him as Ali'i.

14    Q    Does Justin Wilcox sound familiar?

10:06AM    15    A    Yeah.

16    Q    Was Ali'i or Justin Wilcox involved in following Elgin?

17    A    I think his part was putting the egg on the cars.

18    Q    How did you find out about that?

19    A    One day Miller asked us to watch Elgin's apartment because

10:06AM    20    the egg died, and he was waiting for Ali'i to change the egg

21    out.

22    Q    Did you know it was Ali'i who was waiting -- who was --

23    A    No.

24    Q    So were you surprised by that?

10:06AM    25    A    Very surprised.

```
         1   Q    Why?

         2   A    I thought Ali'i was a straight person.

         3   Q    Were you surprised at all as far as that Wayne Miller was

         4   involving someone else?

10:06AM  5   A    Yes.

         6   Q    Why did that surprise you?

         7   A    I just felt there's too many people getting involved.

         8   Q    In your dealings with Wayne Miller, did you find that to

         9   be common or uncommon that he would not tell you about certain

10:07AM  10  parts?

         11  A    It was becoming very common.

         12  Q    So you mentioned that on this one particular day Ali'i was

         13  involved in changing out the tracker at Elgin's residence,

         14  correct?

10:07AM  15  A    Yes.

         16  Q    Was there another day where all of you were present,

         17  meaning yourself, Wayne Miller, Harry Kauhi and Ali'i, near

         18  this Penny's restaurant that you've described?

         19  A    Not Ali'i, but everyone else.

10:07AM  20  Q    Okay.  What was happening on that day?

         21  A    That was the day we followed him to Penny's to -- to

         22  finish the job.

         23  Q    So when you say "finish the job," what do you mean?

         24  A    That's the day he wanted me to shoot him.

10:08AM  25  Q    Who is "he"?
```

        1    A    Wayne Miller.

        2    Q    At that point had you been able to establish kind of a

        3    pattern of activity that this union official would follow?

        4    A    It was hard to follow.

10:08AM 5    Q    So is that part of the reason why that was the day it was

        6    chosen to end it?

        7    A    Yes.

        8    Q    Before we talk about that, I'd like to show you

        9    Exhibit 5-36.

10:08AM 10        MR. INCIONG:  This is from our original exhibit list,

        11   Your Honor, that was previously admitted, I believe.

        12        THE COURT:  I don't have that exhibit as having been

        13   admitted.

        14        MR. INCIONG:  Okay.  Thank you.  I'll come back to

10:08AM 15   that then.

        16   BY MR. INCIONG:

        17   Q    So, Mr. Akau, what -- who were you with as you went to

        18   Penny's on the day that you were just describing?

        19   A    Wayne Miller and Harry Kauhi.

10:09AM 20   Q    Were you all in the same vehicle?

        21   A    No.  Me and Harry was.

        22   Q    Who was driving the vehicle you were in?

        23   A    Harry.

        24   Q    Were you armed?

10:09AM 25   A    I had a gun in the backpack.

|       |    |   |                                                              |
|-------|----|---|--------------------------------------------------------------|
|       | 1  | Q | Wayne Miller was in a separate vehicle, correct?             |
|       | 2  | A | Yes.                                                         |
|       | 3  | Q | All right.  So do all three of you arrive at Penny's?        |
|       | 4  | A | Yes.                                                         |
| 10:09AM | 5 | Q | What do you see once you arrive at Penny's?                 |
|       | 6  | A | I seen Elgin coming out of Penny's with a lot of plate      |
|       | 7  |   | lunches.                                                     |
|       | 8  | Q | Where were you positioned at that time?                     |
|       | 9  | A | In front of Subway.                                         |
| 10:09AM | 10 | Q | That's near by the Penny's?                               |
|       | 11 | A | Yes.                                                         |
|       | 12 | Q | What were you about to do?                                  |
|       | 13 | A | I was waiting for Miller to give me the order to shoot.    |
|       | 14 | Q | Did he give you that order?                                |
| 10:09AM | 15 | A | No.                                                        |
|       | 16 | Q | What order did you get, if any?                            |
|       | 17 | A | Cancel.                                                     |
|       | 18 | Q | Did you know why?                                          |
|       | 19 | A | He said he couldn't get the tracker off the vehicle.      |
| 10:10AM | 20 | Q | So nothing happened then.                                 |
|       | 21 | A | No.                                                         |
|       | 22 | Q | Did you continue to follow and assist with trying to track |
|       | 23 |   | Elgin after that day?                                       |
|       | 24 | A | No.                                                         |
| 10:10AM | 25 | Q | Why?                                                       |

```
        1   A     It was just too much wishy-washy out of Wayne Miller.

        2   Q     Now, on some of the times that you did commit -- or

        3   conduct, I should say, surveillance prior to that day, were you

        4   ever encountered by the police?

10:10AM 5   A     Yes.

        6   Q     Tell the jury about that.

        7   A     So the time that we were watching his apartment and

        8   waiting for the egg to get switched out, a policeman pulled

        9   behind us and pulled us over.

10:10AM 10  Q     Why were you pulled over?

        11  A     For sitting out in front of an empty parking lot in the

        12  middle of the night.

        13  Q     So the officer thought you looked suspicious?

        14  A     Yes.

10:11AM 15  Q     So what explanation did you provide to the officer?

        16  A     I didn't.  Harry spoke to him.

        17  Q     Were you allowed to go at that point?

        18  A     Yes.

        19  Q     Did that have -- that incident have an impact on you or

10:11AM 20  Mr. Kauhi?

        21  A     Yeah.

        22  Q     How so?

        23  A     Harry didn't want to complete anything else.  He was done.

        24  Q     Now, you mentioned that the target drove a specific

10:11AM 25  vehicle.
```

```
 1   A    Yes.

 2   Q    What was the make and type of that vehicle again?

 3   A    A black Tahoe or GMC.

 4        MR. INCIONG:  Your Honor, I would like to show -- play

 5   for the jury and Mr. Akau Exhibit 1-009B, as in bravo, from the

 6   second supplemental exhibit list previously admitted.

 7        THE COURT:  Dash 9 bravo, is that what you said?

 8        MR. INCIONG:  Yes.

 9        THE COURT:  Okay.  Go ahead.

10        (Video was played.)

11   BY MR. INCIONG:

12   Q    Mr. Akau, first of all, did you recognize the voice that

13   you heard on that video?

14   A    Yes.

15   Q    Whose voice was that?

16   A    Wayne Miller.

17   Q    Did you see a vehicle that was the focus -- seemed to be

18   the focus of that video?

19   A    Yes.

20   Q    Was that consistent with the vehicle that you were

21   following in regard to Elgin?

22   A    Yes.

23        MR. INCIONG:  Could we show and publish for the jury

24   also Exhibit 1-15, which has been previously admitted from our

25   first exhibit list, Your Honor?
```

10:11AM

10:12AM

10:13AM

10:13AM

10:13AM

```
       1              THE COURT:  Go ahead.

       2    BY MR. INCIONG:

       3    Q    Mr. Akau, do you recognize what's shown in this photo?

       4    A    Yes.

10:13AM 5    Q    How do you recognize that?

       6    A    That's Elgin's place.

       7    Q    Is this one of the locations that you conducted

       8    surveillance with Wayne Miller and/or Harry Kauhi when you were

       9    following Elgin?

10:14AM 10   A    Yes.

       11             MR. INCIONG:  Could we go to 1-16 next, Your Honor --

       12             THE COURT:  Yes.

       13             MR. INCIONG:  -- also admitted from our original list?

       14             THE COURT:  Go ahead.

10:14AM 15   BY MR. INCIONG:

       16   Q    Mr. Akau, do you know what's shown here?

       17   A    Yes.

       18   Q    What is that?

       19   A    That's the ramp that went up to his parking structure.

10:14AM 20   Q    And that's the parking structure into Elgin's residence?

       21   A    Yes.

       22             MR. INCIONG:  Your Honor, could we show 1-17, also

       23   from the original list admitted previously?

       24             THE COURT:  Yes.

10:14AM 25   BY MR. INCIONG:
```

```
       1   Q     Is this just another view of that same ramp, Mr. Akau?

       2   A     Yes.

       3         MR. INCIONG:  Your Honor, could we go to 1-18, please?

       4         THE COURT:  Yes.

10:14AM  5   BY MR. INCIONG:

       6   Q     What is shown here, Mr. Akau?

       7   A     That's in the same area.

       8   Q     Is this -- do you recognize this as being the street

       9   that's kind of on the backside of the condo complex?

10:15AM 10   A     Yes.

      11   Q     Was there an entry or exit on that street that you were

      12   watching as well?

      13   A     Yeah, that's further up.

      14         MR. INCIONG:  Could we show for the witness only,

10:15AM 15   please, because I don't believe it's been admitted yet,

      16   Exhibit 1-19 from our original list?

      17         THE COURT:  Yes, you may.

      18   BY MR. INCIONG:

      19   Q     Mr. Akau, do you recognize this photo?

10:15AM 20   A     I don't.

      21   Q     All right.

      22         MR. INCIONG:  Let's move on then to Exhibit 1-20,

      23   which has been previously admitted from our original list.

      24         THE COURT:  Go ahead.

10:15AM 25   BY MR. INCIONG:
```

```
        1   Q    Mr. Akau, do you recognize the view shown here?

        2   A    Yes.

        3   Q    Is this looking out of that entryway toward Queen Emma

        4   Street?

10:15AM 5   A    Yes, it is.

        6        MR. INCIONG:  Could we publish 1-21 from our original

        7   exhibit list previously admitted?

        8        THE COURT:  Yes.

        9   BY MR. INCIONG:

10:16AM 10  Q    Mr. Akau, do you recognize this?

        11  A    No.

        12       MR. INCIONG:  Could we go to Exhibit 1-21A, as in

        13  alpha, from our first supplemental list?

        14       THE COURT:  Go ahead.

10:16AM 15  BY MR. INCIONG:

        16  Q    Mr. Akau, do you recognize this view, this photo?

        17  A    No.

        18  Q    So the Penny's that you described, the Penny's restaurant,

        19  what part of the island or city is that located?

10:16AM 20  A    Sand Island.

        21       MR. INCIONG:  Could we show Mr. Akau Exhibit 1-12,

        22  please, which is previously admitted from our original list?

        23       THE COURT:  Go ahead.

        24  BY MR. INCIONG:

10:16AM 25  Q    Mr. Akau, do you see this map showing part of Honolulu?
```

```
           1    A     Yes.

           2    Q     Does this also show Sand Island?

           3    A     Yes.

           4    Q     That's where you followed Mr. -- or Elgin on the day that
10:17AM    5    you were prepared to shoot and kill him on behalf of Wayne

           6    Miller's offer?

           7    A     Yes.

           8          MR. INCIONG:  Could we show the witness only

           9    Exhibit 1-13 from our first supplemental list?
10:17AM   10          THE COURT:  Okay, go ahead.

          11    BY MR. INCIONG:

          12    Q     Mr. Akau, is this just a different view of that same area?

          13    A     Yes.

          14    Q     Does it also show Sand Island?
10:17AM   15    A     Yes.

          16    Q     Could you just draw a circle around the -- what you know

          17    to be as the Sand Island area.

          18          You can use your finger on the touch screen.

          19    A     (Witness complies.)
10:18AM   20          MR. INCIONG:  Your Honor, I move to admit 1-13 at this

          21    time.

          22          THE COURT:  Any objection?

          23          MR. KENNEDY:  No objection.

          24          THE COURT:  1-13 is admitted then without objection.
10:18AM   25    You may publish.
```

```
                1            (Exhibit 1-13 was received in evidence.)

                2            MR. INCIONG:  Thank you, Your Honor.

                3    BY MR. INCIONG:

                4    Q    So, Mr. Akau, that red circle, that's the mark you just

10:18AM         5    placed to show Sand Island on this map?

                6    A    Yes.

                7            MR. INCIONG:  Could we go to Exhibit 1-22 and publish

                8    that, previously admitted from our original list, Your Honor?

                9            THE COURT:  Go ahead.

10:18AM        10    BY MR. INCIONG:

               11    Q    Do you recognize 1-22, Mr. Akau?

               12    A    Yes.

               13    Q    What does that show?

               14    A    Sand Island Access Road.

10:18AM        15    Q    Is that the road that you took to get to Penny's?

               16    A    Yes.

               17            MR. INCIONG:  Could we show Mr. Akau 1-23, please,

               18    previously admitted from our original list?

               19            THE COURT:  Yes.

10:18AM        20    BY MR. INCIONG:

               21    Q    What is shown in this shot, Mr. Akau?

               22    A    Penny's.

               23    Q    Is that kind of on the -- the left side with the

               24    purplish --

10:18AM        25    A    Yes.
```

```
 1   Q     -- part of the roof there?  All right.

 2         MR. INCIONG:  Could we go to 1-24, previously

 3   admitted, Your Honor?

 4         THE COURT:  Yes.

 5   BY MR. INCIONG:

 6   Q     Do you recognize this as a shot of Penny's diner across

 7   Sand Island Access Road?

 8   A     Yes.

 9         MR. INCIONG:  Could we go to 1-25 next, please, Your

10   Honor, previously admitted?

11         THE COURT:  Yes.

12   BY MR. INCIONG:

13   Q     This is just another view there, Mr. Akau?

14   A     Yes.

15   Q     Is this where you saw Mr. Calles -- Elgin Calles walk out

16   of the restaurant with the plate lunches?

17   A     Yes.

18         MR. INCIONG:  Could we go to 1-26 next, please,

19   previously admitted?

20         THE COURT:  Yes.

21   BY MR. INCIONG:

22   Q     Is that just a closer view of that entrance, sir?

23   A     Yes.

24         MR. INCIONG:  Could we show for the witness only,

25   because I don't believe it's admitted yet, Your Honor,
```

10:19AM (lines 5, 9/10, 15, 20, 25)

```
     1   Exhibit 1-27?

     2             THE COURT:  Yes, you may.  Could you clear the screen

     3   as well, please.

     4             MR. INCIONG:  Thank you.

10:19AM  5             THE COURT:  Thank you.

     6   BY MR. INCIONG:

     7   Q    Do you recognize that view, Mr. Akau?

     8   A    Yes.

     9   Q    Does that accurately show the front entry area of Penny's

10:20AM 10   on Sand Island Access Road?

    11   A    It does.

    12             MR. INCIONG:  Your Honor, I would move admit 1-27.

    13             THE COURT:  Any objection?

    14             MR. KENNEDY:  No objection.

10:20AM 15             THE COURT:  1-27 is admitted without objection.  You

    16   may publish.

    17             (Exhibit 1-27 was received in evidence.)

    18             MR. INCIONG:  Thank you, Your Honor.

    19   BY MR. INCIONG:

10:20AM 20   Q    So this is just another view of the front of that drive-in

    21   or Penny's Drive In?

    22   A    Yes.

    23   Q    So in relation to this, looking at this point shot, where

    24   were you located when you were waiting to get the -- the signal

10:20AM 25   or the call from Wayne Miller?
```

```
 1   A    Behind the white truck.

 2        MR. INCIONG:  So let's go to Exhibit 1-28 if we could,

 3   previously admitted, Your Honor?

 4        THE COURT:  Go ahead.

 5   BY MR. INCIONG:

 6   Q    Does that give a better indication, Mr. Akau --

 7   A    Yes.

 8   Q    -- of where you were?

 9   A    We were right in front of Rendezvous.

10   Q    So Rendezvous, that's the business on the far right side

11   of that photo?

12   A    Yes.

13   Q    You were there in a vehicle?

14   A    Yes, we were.

15   Q    Who provided that vehicle, by the way?

16   A    Wayne Miller.

17   Q    And Wayne Miller was in his own separate vehicle, though,

18   correct?

19   A    Yes.

20   Q    Did Wayne Miller provide vehicles to you on other

21   occasions?

22   A    That's the only time I got a vehicle from him.

23        MR. INCIONG:  Finally, could we go to 1-29 previously

24   admitted from our original list?

25        THE COURT:  Go ahead.
```

10:20AM   5

10:21AM  10

10:21AM  15

10:21AM  20

10:21AM  25

BY MR. INCIONG:

Q    Is this the area just to the right as you're looking at the front of Penny's Drive In?

A    Yes.

10:21AM    Q    So this is a little bit to the left, I guess, of where you were located in front of the -- the business called Rendezvous?

A    Yes.

Q    What kind of weapon did you have with you that day that you were prepared to use if needed?

10:22AM    A    A .22 caliber.

Q    Did you have any plans as to what you were going to do with the vehicle Mr. Miller had given you if in fact you had carried out the murder?

A    No.

10:22AM    Q    Was your involvement or your acceptance of this contract to initially assault and then kill Elgin in any way connected to the USO Family?

A    No.

Q    Was it in any way connected to the Nakipi Motorcycle Club?

10:22AM    A    No.

Q    Were you already disassociated from those groups at this time?

A    Yes.

Q    You indicated one of the racketeering acts that you

10:22AM    committed, as you admitted to in your plea agreement, was a

         1    Hobbs Act robbery, correct?

         2    A    Correct.

         3    Q    Was that specifically in regard to the robbery of a

         4    suspected drug dealer?

10:23AM  5    A    Yes.

         6    Q    Do you recall that drug dealer's name?

         7    A    Nicholas Carignan.

         8    Q    How did that proposed robbery come about?

         9         THE COURT:  Mr. Inciong, if could I interrupt you, it

10:23AM  10   seems like we've transitioned to a new event, and we're about

         11   an hour and 45 minutes into the trial day.  So if you wouldn't

         12   mind.

         13        All right.  Let's go ahead and take our first break of

         14   the trial day or in fact the trial week at this point then.  As

10:23AM  15   we go to break, I'll remind our jurors to refrain from

         16   accessing any media or other accounts of this account; to

         17   refrain from conducting any independent investigation into the

         18   facts, circumstances or persons involved; and finally, please

         19   do not discuss the substance of this case with anyone,

10:23AM  20   including each other, until I advise you otherwise.

         21        (Proceedings were recessed at 10:23 a.m. to 10:53

         22   a.m.)

         23        THE COURT:  All right.  Back from our first break of

         24   the trial day.

10:53AM  25        Mr. Akau is back on the stand.

                 1          And, Mr. Inciong, you may resume your direct when

                 2    you're ready.

                 3          MR. INCIONG:  Thank you, Your Honor.

                 4    BY MR. INCIONG:

10:53AM          5    Q    Mr. Akau, before we go forward, I just want to clarify the

                 6    chronology and the timeline of something you testified to

                 7    earlier.

                 8          Am I correct to understand you said you left Nakipi

                 9    and the USO Family in 2018 or '19?

10:53AM         10    A    Yes.

                11    Q    So when you were conducting the surveillance on Elgin and

                12    the Penny's incident that you just talked about, was that prior

                13    to 2018 or 2019?

                14    A    Yes.

10:54AM         15    Q    So at that point you were still involved with either USO

                16    or Nakipi?

                17    A    I don't think so.  I was involved with them already at

                18    that point.

                19    Q    Okay.  All right.  So let me go on to the subject that we

10:54AM         20    had just left off with, which was the robbery of Nico Carignan.

                21    Was that one of the racketeering acts that you admitted to in

                22    your plea agreement?

                23    A    Yes.

                24    Q    Tell the jury how the robbery came about of Rico -- of

10:54AM         25    Nico Carignan.

```
         1   A    One of my friends came to my house and told me that Ashlin

         2   Akau just robbed Nico Carignan for one pound of

         3   methamphetamine, and that she set up a 5-pound deal, and the

         4   1 pound was to test the product, and if it was good, then there

10:55AM  5   would be 4 pounds to follow.

         6   Q    How did you know -- well, did you know Ashlin Akau?

         7   A    I met her a few times.

         8   Q    You share the same last name as her?

         9   A    Yes.

10:55AM  10  Q    Are you related?

         11  A    I believe we are.

         12       MR. INCIONG:  Could we show Mr. Akau only Exhibit 1-47

         13  from our original exhibit list, please?

         14       THE COURT:  Go ahead.

10:55AM  15  BY MR. INCIONG:

         16  Q    Mr. Akau, do you recognize the individual in 1-47?

         17  A    Yes.

         18  Q    Who is that?

         19  A    Ashlin.

10:55AM  20  Q    Ashlin Akau?

         21  A    Yes.

         22  Q    Is this the person that you just referenced in your

         23  testimony?

         24  A    Yes.

10:55AM  25       MR. INCIONG:  Your Honor, I would move to admit 1-47.
```

```
              1              THE COURT:  Any objection?

              2              MR. KENNEDY:  No objection.

              3              THE COURT:  1-47 is admitted without objection.  You

              4    may publish.

10:55AM       5              (Exhibit 1-47 was received in evidence.)

              6              MR. INCIONG:  Thank you, Your Honor.

              7    BY MR. INCIONG:

              8    Q    So after you received that information, the friend that

              9    you referenced, who is that?

10:56AM      10    A    Kurt Kipapa.

             11    Q    Had in fact Ms. Akau obtained the 1 pound as -- as had

             12    been planned?

             13    A    Yes.

             14    Q    So did you decide to go forward with trying to obtain the

10:56AM      15    additional methamphetamine you believed Mr. Carignan had?

             16    A    Yes.  So -- you want me to finish?

             17    Q    Yes, please.

             18    A    Okay.  So what happened was at that time he asked me if I

             19    wanted to go with them to where Ashlin was with Nico.  She was

10:56AM      20    setting him up at The Shack Kailua.

             21              Then once we pulled into the parking lot, that's when

             22    I met with Harry Kauhi.  Harry just showed up out of the blue.

             23    He wasn't planned.  So once everything went into order, she was

             24    texting Kurt and letting him know the progress of what was

10:56AM      25    happening with Nico, and then we followed them to Kalihi.
```

|       |     |   |                                                              |
|-------|-----|---|--------------------------------------------------------------|
|       | 1   | Q | Okay. Let me ask you a few questions before you go on.       |
|       | 2   |   | So you said that Harry Kauhi showed up just unexpectedly.    |
|       | 3   | A | Yes.                                                         |
|       | 4   | Q | Did you have any conversations with Harry at that time?      |
| 10:57AM | 5 | A | Yes. He asked me what I was doing there.                    |
|       | 6   | Q | Did you tell him?                                            |
|       | 7   | A | Yeah, I told him.                                            |
|       | 8   | Q | Based on that conversation, did Harry become involved in    |
|       | 9   |   | this?                                                        |
| 10:57AM | 10 | A | Yeah, Harry got involved at that moment.                   |
|       | 11  | Q | What was Harry's role going to be in this?                   |
|       | 12  | A | He was the driver.                                          |
|       | 13  | Q | So did you have a plan as far as how you were going to       |
|       | 14  |   | carry out this robbery?                                      |
| 10:57AM | 15 | A | Yeah, we were going to follow them to Kalihi, in which      |
|       | 16  |   | Jake Smith was supposed to stop them and remove the 4 pounds |
|       | 17  |   | from Ashlin.                                                 |
|       | 18  | Q | So when you say "follow them to Kalihi," you're talking      |
|       | 19  |   | about Nico Carignan and Ashlin Akau?                         |
| 10:57AM | 20 | A | Yes.                                                        |
|       | 21  | Q | All right. So we just heard Jake Smith's name for the       |
|       | 22  |   | first time in relation to this. How was Jake involved?      |
|       | 23  | A | He was supposed to do the robbery for the 4 pounds.         |
|       | 24  | Q | Did Jake have any relationship with Ashlin Akau at that      |
| 10:58AM | 25 |   | time?                                                        |

```
         1  A    I think they were starting to see each other.

         2  Q    Was anybody going to assist Jake with this robbery?

         3  A    Lance Bermudez.

         4  Q    Did you meet with Lance Bermudez and Jake Smith at The

10:58AM  5  Shack Kailua?

         6  A    No.

         7  Q    You were going to meet them somewhere else?

         8  A    They were supposed to do the robbery.  We were just to

         9  watch.

10:58AM 10  Q    So when you say "watch," you're following them in a car?

        11  A    Yes.

        12  Q    Are you in the car with Mr. Kauhi?

        13  A    Yes, I am.

        14  Q    Is Kurt Kipapa also in the car?

10:58AM 15  A    Yes.

        16  Q    Who was driving that car?

        17  A    Harry was driving.

        18  Q    So you followed the car containing Mr. Carignan and Ashlin

        19  Akau to Kalihi?

10:58AM 20  A    Yes.

        21  Q    At that point had you made contact or seen Jake Smith or

        22  Lance Bermudez?

        23  A    No.

        24  Q    What did you do at that point?

10:59AM 25  A    So she was texting us asking us asking where Jake was, and
```

```
        1   we didn't have the answer either, but when Kurt called Jake,

        2   they said they were on their way, they were late.

        3   Q    Just to be clear, "she" is Ashlin Akau?

        4   A    Yes.

10:59AM 5   Q    She is texting?

        6   A    She is texting --

        7   Q    From the car that --

        8   A    -- from her vehicle to the vehicle we was in, because Jake

        9   them, they was supposed to rob Nico.  They didn't show up.

10:59AM 10  Q    Did you get information relayed as to whether they were in

        11  fact --

        12  A    They were en route.

        13  Q    Okay.  My question was going to be in regard to drugs in

        14  the vehicle containing --

10:59AM 15  A    She told us the drugs were in a blue Walmart bag in the

        16  trunk.

        17  Q    The vehicle she was in?

        18  A    Yes.

        19  Q    With Nico Carignan?

10:59AM 20  A    Yes.

        21  Q    All right.  So you get to Kalihi.  How closely are you

        22  following the vehicle?

        23  A    Two cars behind her.

        24  Q    At that point Jake Smith and Lance Bermudez still have not

11:00AM 25  shown up?
```

```
        1  A    They didn't show up, and she's texting us letting us know
        2  that they were about to leave and what should she do.
        3  Q    They were about to leave where?
        4  A    From picking up the drugs from the apartment.
11:00AM 5  Q    I see.  So did you have information that they had picked
        6  up the drugs?
        7  A    Yes.  She told us it was confirmed, it's in the blue
        8  Walmart bag in the trunk.
        9  Q    And were they moving in the vehicle at that point?
11:00AM 10 A    They were driving up the hill.
        11 Q    What did you do?
        12 A    We blocked -- we blocked their vehicle, and I jumped out.
        13 Q    So when you say you blocked, describe exactly what
        14 happened.
11:00AM 15 A    So they were pulling up on the street, and Harry blocks
        16 the vehicle, and I open my backpack, I pull out a badge and a
        17 walkie talkie, and I jumped out of the car and then proceed to
        18 tell him to put his hands up.
        19 Q    So are you impersonating a police officer at that point?
11:01AM 20 A    Yes.
        21 Q    And when you say you pulled a badge out of your
        22 backpack --
        23 A    Yes.
        24 Q    -- what kind of badge is this?
11:01AM 25 A    A prop badge from the movies.
```

|       |    |   |                                                              |
|-------|----|---|--------------------------------------------------------------|
|       | 1  | Q | So this is a badge you had obtained from your work on the    |
|       | 2  |   | movie sets?                                                  |
|       | 3  | A | Yes.                                                         |
|       | 4  | Q | Does it look like a real badge?                             |
| 11:01AM | 5  | A | Yes.                                                       |
|       | 6  | Q | Did you have anything else to try and pose as being a       |
|       | 7  |   | police officer at that time?                                |
|       | 8  | A | Just the walkie talkie.                                     |
|       | 9  | Q | How did you -- how were you displaying the badge?           |
| 11:01AM | 10 | A | I had it around my neck.                                   |
|       | 11 | Q | Were you armed?                                             |
|       | 12 | A | In the car I had my backpack with two guns in there.        |
|       | 13 | Q | What kinds of guns did you have in the backpack?            |
|       | 14 | A | A .38 revolver and a .22.                                   |
| 11:01AM | 15 | Q | Was the .22 equipped with any special equipment?           |
|       | 16 | A | Yes, it had a silencer on it.                               |
|       | 17 | Q | Did those remain in the backpack when you got out?          |
|       | 18 | A | Yes, it remained in the backpack.                           |
|       | 19 | Q | What time of day was this?                                  |
| 11:02AM | 20 | A | The middle of the day.                                     |
|       | 21 | Q | So broad daylight?                                          |
|       | 22 | A | Yes.                                                        |
|       | 23 | Q | And Harry Kauhi blocks the other vehicle?                  |
|       | 24 | A | Yes.                                                        |
| 11:02AM | 25 | Q | What street was this on?                                   |

1    A    I don't know the name of the street.

2    Q    Was it a busy street?

3    A    Yeah, a busy street.

4    Q    I'll show you a few pictures in a moment, but tell us what

11:02AM  5    happened at that point.

6    A    So I am yelling to him to put his hands up, and so he puts

7    his hands up.  He's yelling to me that he wants his lawyer, and

8    then --

9    Q    This is Nico Carignan?

11:02AM  10    A    Nico.

11    Q    Okay.

12    A    And then he rolls the window down a little bit, allowing

13    me to take his two phones from his hand and put it on the roof

14    of the car.  And then I tell him get out of the car.  He opens

11:02AM  15    the door, he goes to the pole.  I told him to keep your hands

16    on the pole.  And I tell Ashlin to open the trunk.

17    Q    So you were trying to portray this and conduct this as a

18    police stop.

19    A    Yes.

11:02AM  20    Q    And Mr. Carignan believed that?

21    A    Yes.

22    Q    Did Ashley open the trunk as you instructed?

23    A    He was telling her not to open the trunk.  She -- I needed

24    a warrant.  And so I guess she finally opens the trunk, and by

11:03AM  25    that time I come around the back of the car, and Lance shows up

| | | |
|---|---|---|
| | 1 | with Jake. |
| | 2 | Q    What sort of vehicle did they show up in? |
| | 3 | A    A BMW. |
| | 4 | Q    Who was driving? |
| 11:03AM | 5 | A    Lance. |
| | 6 | Q    Did you know Lance Bermudez at that time? |
| | 7 | A    No. |
| | 8 | Q    Did you know Jake Smith at that time? |
| | 9 | A    Yes. |
| 11:03AM | 10 | Q    Were either of them armed that you could see? |
| | 11 | A    Lance was armed. |
| | 12 | Q    What did you see Lance do? |
| | 13 | A    Point the gun at Ashlin. |
| | 14 | Q    Did he get out of his car? |
| 11:03AM | 15 | A    Who? |
| | 16 | Q    Lance. |
| | 17 | A    Yes. |
| | 18 | Q    Was Lance masked? |
| | 19 | A    Yes. |
| 11:03AM | 20 | Q    Was Jake Smith masked? |
| | 21 | A    Jake was still in the BMW.  They came with another person. |
| | 22 | I don't know who it was, he was masked. |
| | 23 | Q    Could you see whether Jake was wearing a mask or not while |
| | 24 | he remained in the car? |
| 11:04AM | 25 | A    No, I couldn't tell. |

```
    1   Q   What about Harry Kauhi, was he masked?

    2   A   No.

    3   Q   Was he armed?

    4   A   I'm not sure.

11:04AM 5   Q   Kurt Kipapa, was he masked?

    6   A   No.

    7   Q   Okay.  So Jake -- or I'm sorry, Lance gets out, he points

    8   the gun at Ashlin.

    9   A   Yes.

11:04AM 10  Q   Is this still part of the ruse that this was a police

    11  stop?

    12  A   I don't know what the plan was.  Like I said, we weren't

    13  supposed to rob him.  Lance was supposed to with Jake.

    14  Q   So what did you do after Lance and Jake arrive then as far

11:04AM 15  as your involvement?

    16  A   I grabbed the bag, went back to the vehicle, gave the

    17  drugs to Kurt.  And we left.

    18  Q   So what bag are you talking about?

    19  A   The Walmart bag with the 4 pounds.

11:04AM 20  Q   This was in the trunk?

    21  A   Yes.

    22  Q   So you gave that to Kurt Kipapa in the vehicle you arrived

    23  in?

    24  A   Yes.

11:04AM 25  Q   Did you leave then?
```

```
         1    A    Yes.

         2    Q    Quickly?

         3    A    Yes.

         4    Q    Whose car did you leave in?

11:05AM  5    A    With Lance.  I jumped in with Lance.

         6    Q    So there are four people in that car, including yourself?

         7    A    Yes.

         8    Q    Did you ever learn the identities of everybody that was in

         9    that car?

11:05AM  10   A    Everybody but the passenger.

         11   Q    That person never took their mask off?

         12   A    No.

         13   Q    So where did you go from there?

         14   A    We -- they dropped me off at -- in Waimanalo at the tow

11:05AM  15   yard where Kurt was.

         16   Q    Why?

         17   A    Because the drugs was being divided at the tow yard.

         18   Q    Is that -- is that a residence or what do you mean?

         19   A    I guess it's a business, a tow yard in Waimanalo.

11:05AM  20   Q    Who was there when the drugs were divided up?

         21   A    Kurt Kipapa.

         22   Q    Anyone else?

         23   A    Jonah Sniffen.

         24   Q    So how much weights of drugs did you end up taking from

11:05AM  25   the -- from the trunk?
```

|         |    |   |                                                    |
|---------|----|---|----------------------------------------------------|
|         | 1  | A | Four pounds.                                       |
|         | 2  | Q | How was the division going to be?                  |
|         | 3  | A | Eight ounces a person.                             |
|         | 4  | Q | Who decided that?                                  |
| 11:06AM | 5  | A | We all kind of mutually did, that it would be evenly |
|         | 6  |   | divided.                                           |
|         | 7  | Q | So basically everybody who was there got an equal share? |
|         | 8  | A | Yes.                                               |
|         | 9  | Q | All right.  Where did you go from there?           |
| 11:06AM | 10 | A | I went to the Waimanalo gym.                       |
|         | 11 | Q | What was the purpose of going there?               |
|         | 12 | A | Meeting up with everybody.                         |
|         | 13 | Q | Who was there when you met up there?               |
|         | 14 | A | Everybody from the robbery.                        |
| 11:06AM | 15 | Q | So Harry Kauhi?                                    |
|         | 16 | A | Yes.                                               |
|         | 17 | Q | Kurt Kipapa?                                       |
|         | 18 | A | Yes.                                               |
|         | 19 | Q | Ashlin Akau?                                       |
| 11:06AM | 20 | A | Yes.                                               |
|         | 21 | Q | Jake Smith?                                        |
|         | 22 | A | Yes.                                               |
|         | 23 | Q | Lance Bermudez?                                    |
|         | 24 | A | Yes.                                               |
| 11:06AM | 25 | Q | Was John Stancil there?                            |

```
 1    A    Yes, he was there.

 2    Q    Did he get a share of the drugs?

 3    A    No, not to my knowledge.

 4    Q    What did you intend to do with the -- with your share of

 5    the drugs?

 6    A    I traded my share of drugs.

 7    Q    For?

 8    A    Cocaine.

 9              MR. INCIONG:  Could we show the witness only

10    Exhibit 8-2, not admitted yet, Your Honor, from our original

11    exhibit list?

12              THE COURT:  Go ahead.

13    BY MR. INCIONG:

14    Q    Mr. Akau, do you see this map of part of Honolulu marked

15    as Exhibit 8-2?

16    A    Yes.

17    Q    Do you see the red pin that's marked on there as well?

18    A    Yes.

19    Q    Does that show the approximate area where the robbery of

20    Nico Carignan occurred?

21    A    Yes -- yeah, it is.

22    Q    Does this overhead or map accurately show that portion of

23    the city of Honolulu?

24    A    Yes.

25              MR. INCIONG:  Your Honor, I would move to admit
```

11:06AM (line 5)
11:07AM (line 10)
11:07AM (line 15)
11:07AM (line 20)
11:07AM (line 25)

```
 1   Exhibit 8-2.

 2              THE COURT:  Any objection?

 3              MR. KENNEDY:  No objection.

 4              THE COURT:  8-2 is admitted without objection.  You

 5   may publish it.

 6                   (Exhibit 8-2 was received in evidence.)

 7              MR. INCIONG:  Thank you, Your Honor.

 8   BY MR. INCIONG:

 9   Q    So, Mr. Akau, the red dot there, is that shown on North

10   School Street where the robbery occurred approximately?

11   A    Yes.

12   Q    Is there a business or convenience store that was nearby

13   that you recall?

14   A    Yeah, right next to it.

15   Q    What was the name of that?

16   A    21 Mart.

17              MR. INCIONG:  Could we show the witness and the jury

18   Exhibit 8-1 previously admitted from our original list, Your

19   Honor?

20              THE COURT:  Yes.

21   BY MR. INCIONG:

22   Q    Mr. Akau, is this just a little bit tighter, closer-up

23   view of that same area you were talking about?

24   A    It is.

25   Q    Does this show the 21 Mart just to the left of the red pin
```

11:07AM (line 5)
11:08AM (line 10)
11:08AM (line 15)
11:08AM (line 20)
11:08AM (line 25)

1    on School Street there?

2    A    Yes.

3    Q    Is this about where the robbery occurred?

4    A    Yes.

11:08AM    5        MR. INCIONG:  Could we show both the jury and Mr. Akau

6    Exhibit 8-7 previously admitted from our original list, please?

7        THE COURT:  Yes.

8    BY MR. INCIONG:

9    Q    Mr. Akau, do you recognize what's shown in this photo?

11:08AM   10    A    Yes, I do.

11    Q    Is that the area where the robbery of Nico Carignan

12    occurred?

13    A    Yes.

14    Q    And that's the 21 Mart just to the -- on the right side of

11:09AM   15    that photo?

16    A    Yes.

17        MR. INCIONG:  Your Honor, it's not showing up, I'm

18    sorry, on the -- for the jury.

19        THE COURT:  Oh.

11:09AM   20        MR. INCIONG:  There we go.  Thank you.

21    BY MR. INCIONG:

22    Q    So again, this is the 21 Mart you referenced on the

23    right-hand side?

24    A    Yes.

11:09AM   25    Q    And that's School Street where the robbery occurred?

1    A    Yes.

2            MR. INCIONG:  Could we show the witness two exhibits

3    that have not yet been admitted, Exhibit 8-8 and 8-9, starting

4    with 8-8?

11:09AM    5            THE COURT:  Go ahead.

6    BY MR. INCIONG:

7    Q    Mr. Akau, do you recognize this shot?

8    A    Yes.

9    Q    Is this just a view looking the other way of the photo you

11:09AM    10    just described?

11    A    Yes.

12    Q    Is this the area where the robbery of Nico Carignan

13    occurred?

14    A    Yes, it is.

11:10AM    15            MR. INCIONG:  Your Honor, I would move to admit 8-8.

16            THE COURT:  Any objection?

17            MR. KENNEDY:  No objection.

18            THE COURT:  8-8 is admitted.  You may publish.

19            (Exhibit 8-8 was received in evidence.)

11:10AM    20            MR. INCIONG:  Thank you.

21            Before we publish that, could we go to 8-9 for the

22    witness only.

23            THE COURT:  Yes.

24    BY MR. INCIONG:

11:10AM    25    Q    Mr. Akau, is this just a little bit different angle of

```
        1   that same view looking from the 21 Mart from the previous

        2   photo?

        3   A    Yes.

        4   Q    Does this accurately show the area where the robbery

11:10AM  5   occurred of Nico Carignan?

        6   A    Yes.

        7        MR. INCIONG:  Your Honor, I would move to admit 8-9.

        8        THE COURT:  Any objection?

        9        MR. KENNEDY:  No objection.

11:10AM 10        THE COURT:  8-9 is admitted.  You may publish.

       11        (Exhibit 8-9 was received in evidence.)

       12        MR. INCIONG:  So if we could start with 8-8, please.

       13   BY MR. INCIONG:

       14   Q    So this is a view looking down School Street from the

11:10AM 15   21 Mart; is that correct?

       16   A    Yes.

       17   Q    And could you use an X or mark approximately where your

       18   vehicle blocked Nico Carignan's vehicle.

       19   A    (Witness complies.)

11:10AM 20   Q    Okay, so you've made an X on the --

       21   A    Ashlin's vehicle.

       22   Q    Okay.

       23   A    Our vehicle.

       24   Q    Okay.  So the X is Mr. Carignan's vehicle.  The straight

11:11AM 25   line is your vehicle.
```

                1    A    Yes.

                2    Q    So what direction was Mr. Carignan's vehicle traveling?

                3    A    (Witness indicating.)

                4    Q    Okay.  So you've drawn an arrow toward -- down toward the

11:11AM         5    bottom of that photograph?

                6    A    That's how we blocked him.

                7         MR. INCIONG:  Okay.  Could we clear that, please, and

                8    then show -- publish 8-9?

                9    BY MR. INCIONG:

11:11AM        10    Q    Is this just a little bit different view of that same

               11    location?

               12    A    Yes.

               13    Q    Okay.  Now, when you met up at the District Park in

               14    Waimanalo, you mentioned that everyone that was involved was --

11:11AM        15    was there, correct?

               16    A    Yes.

               17    Q    Did that include Lance Bermudez?

               18    A    Yes.

               19         MR. INCIONG:  Could we show the witness only

11:12AM        20    Exhibit 8-5, please, from our original list?

               21         THE COURT:  Yes, it's admitted.

               22         MR. INCIONG:  Oh, it's been admitted.  Okay, thank

               23    you.  We can publish that then.

               24    BY MR. INCIONG:

11:12AM        25    Q    Mr. Akau, do you recognize what's shown here?

```
          1   A    Yes.

          2   Q    What is that?

          3   A    This is a park, the District Park.

          4   Q    Waimanalo District Park?

11:12AM   5   A    Yes.

          6   Q    That's where the group met after the robbery was completed

          7   and the drugs had been divided?

          8   A    Yes.

          9        MR. INCIONG:  Could we show 8-6 then, which I believe

11:12AM  10   has been admitted from our original list?

         11        THE COURT:  That's the one that I do not have.

         12        MR. INCIONG:  Okay.  I have them mixed up.  Thank you.

         13        For the witness only then 8-6, please?

         14        THE COURT:  Go ahead.

11:12AM  15   BY MR. INCIONG:

         16   Q    Mr. Akau, do you recognize what's shown there?

         17   A    Yes.

         18   Q    Is that another view of the Waimanalo District Park?

         19   A    Yes.

11:12AM  20   Q    And does that include the gym near where you met that day?

         21   A    Yes.

         22        MR. INCIONG:  Your Honor, I would move to admit 8-6 at

         23   this time.

         24        THE COURT:  Any objection?

11:13AM  25        MR. KENNEDY:  No objection.
```

```
             1              THE COURT:  8-6 then is admitted without objection.

             2    You may publish.

             3                   (Exhibit 8-6 was received in evidence.)

             4              MR. INCIONG:  Thank you, Your Honor.

11:13AM      5    BY MR. INCIONG:

             6    Q    So at this meeting yourself was there, correct?

             7    A    Yes.

             8    Q    Jake Smith was there?

             9    A    Yes.

11:13AM     10    Q    Lance Bermudez was there?

            11    A    Yes.

            12    Q    Harry Kauhi was there?

            13    A    Yes.

            14    Q    Ashlin Akau was there?

11:13AM     15    A    Yes.

            16    Q    Kurt Kipapa was there?

            17    A    Yes.

            18    Q    Were any of those people members of the USO Family?

            19    A    No.

11:13AM     20    Q    Were any of those people members of the Nakipi Motorcycle

            21    Club gang?

            22    A    Yes.

            23    Q    Was Kurt Kipapa that person?

            24    A    Yes.

11:13AM     25    Q    Anyone else?
```

```
        1   A    No.

        2   Q    Did this robbery have anything to do with Nakipi

        3   Motorcycle gang?

        4   A    No.

11:13AM  5   Q    Was the robbery done to further or have any connection

        6   with the USO Family?

        7   A    No.

        8   Q    You mentioned that one of the guns you had in your

        9   backpack that day was equipped with a silencer, right?

11:13AM 10   A    Yes.

       11   Q    Did you demonstrate that silencer to other members of the

       12   group at the Waimanalo -- Waimanalo District Park?

       13   A    To one person.

       14   Q    Who was that?

11:14AM 15   A    Lance.

       16   Q    Why?

       17   A    Because he was talking a lot.

       18   Q    So what -- how did you demonstrate to Mr. Bermudez?

       19   A    I was shooting at the ground by his feet.

11:14AM 20   Q    Was the silencer working?

       21   A    Yes.

       22   Q    So there was very little sound being made?

       23   A    Yes.

       24   Q    What happened to that silencer?

11:14AM 25   A    I destroyed it.
```

```
         1   Q    Why did you destroy it?

         2   A    I destroyed a lot of stuff once I knew the indictments was

         3   coming.

         4   Q    Okay.  So did you have occasion to make your own

11:14AM  5   silencers?

         6   A    Yes.

         7   Q    Had you made other silencers other than -- well, let me

         8   ask you this first:  Had you made that one yourself that day?

         9   A    Yes.

11:14AM  10  Q    You had made others in addition to that?

         11  A    Yes.

         12  Q    Do you ever recall giving or trading a gun equipped with a

         13  silencer to Wayne Miller?

         14  A    No -- oh, wait.  Yes, I did, yeah.

11:15AM  15  Q    Do you recall what kind of gun that was?

         16  A    A MAC-10.

         17  Q    And what makes you recall that incident?

         18  A    Because I had to custom make the silencer.

         19  Q    What kind of gun is a MAC-10?

11:15AM  20  A    It's a full automatic machine gun.

         21  Q    So that required a special silencer?

         22  A    Yes.

         23  Q    You made that?

         24  A    Yes.

11:15AM  25  Q    Did you make that at Wayne Miller's request or had you
```

1   already made that?

2   A    I already made that.

3   Q    How did Wayne Miller become aware you had this gun?

4   A    We were talking about it.

11:15AM   5   Q    Did you trade guns frequently with Wayne Miller?

6   A    Yes.

7   Q    When Wayne Miller found out about this particular gun, the

8   MAC-10, fully automatic with the silencer, did he want that

9   gun?

11:15AM   10   A    Yes.

11   Q    Did he indicate why he wanted it?

12   A    Yeah.  He kind -- he kind of talked a lot.  He was

13   dropping names that he wanted it to buy for Mike.

14   Q    Who did he -- who did he mean by Mike?

11:16AM   15   A    Mike Miske.

16   Q    So he wanted that gun to give to Mike Miske?

17   A    He wanted a discount, and he used Mike's name to get a

18   discount on the gun.

19   Q    Did you end up giving that gun to Wayne Miller?

11:16AM   20   A    I sold it to Wayne Miller.

21   Q    Now, you said you -- you believed that Ashlin Akau is

22   related to you, correct?

23   A    Yes.

24   Q    And she had you believe at least the beginning of a

11:16AM   25   relationship with Jake Smith at that time?

1   A     Excuse me?

2   Q     She was beginning a relationship with Jake Smith around

3   that time?

4   A     Yes.

11:16AM   5   Q     Also right around in that same time frame, did Jake Smith

6   ever ask you to rent a car for him?

7   A     Yes.

8   Q     Did you agree to do that?

9   A     No.

11:17AM   10   Q     Why?

11   A     He was untrustworthy.

12   Q     Why did Jake want a car or want to rent a car?

13   A     He said he wanted a car to drive around, a clean car.

14   Q     What do you mean by "a clean car"?

11:17AM   15   A     A car that is with paperwork.

16   Q     Meaning that didn't have his name attached to it?

17   A     No.  Just a car that had insurance, was clean.  He didn't

18   have a vehicle at the time.

19   Q     I see.  So did you offer any alternatives to Mr. Smith

11:17AM   20   after you told him you would not rent it?

21   A     Yeah, I told him I would ask Ashlin to get him the car.

22   Q     Why did you suggest that Ashlin rent the car?

23   A     Because they were sleeping together.

24   Q     Did you assist in any way with Ashlin obtaining the car

11:17AM   25   for Jake Smith?

```
 1   A   I called her and asked her if she can get him a car.

 2   Q   Did she agree to do that?

 3   A   Yes.

 4   Q   Was this a car that was purchased or rented?

 5   A   Rented.

 6   Q   Did you accompany Ashlin Akau to --

 7   A   I met her there at the rental place, yeah.

 8   Q   Do you recall what kind of car she ended up renting for

 9   Jake?

10   A   A Chrysler 300.

11   Q   Did you ever see that car again?

12   A   No.

13   Q   Now, you mentioned before that you had a coworker, a

14   friend and a fellow Nakipi member by the name of Lindsey

15   Kinney, correct?

16   A   Yeah.

17   Q   Describe your relationship with Lindsey Kinney.

18   A   When, now or before?

19   Q   Well, kind of take us through the time span.

20   A   When I first met him, he was a little strange, but still

21   kind of I liked him.  He was very amusing.

22   Q   Okay.  So you guys became friends?

23   A   Yeah.

24   Q   Did that friendship fall apart at some point?

25   A   Yes.
```

11:17AM

11:18AM

11:18AM

11:18AM

11:18AM

          1    Q    What led to that?

          2    A    He started to sell drugs.

          3    Q    Did you become aware of any dispute between Lindsey Kinney

          4    and Mike Miske?

11:19AM   5    A    Yes.

          6    Q    How did you become aware of that?

          7    A    Lindsey was harassing him.

          8    Q    Harassing Mr. Miske?

          9    A    On social media.

11:19AM  10    Q    About what?

         11    A    About a bill that Jake Smith owed him.

         12    Q    A bill that Jake Smith owed Lindsey Kinney?

         13    A    Yeah.

         14    Q    Did you know what that bill was for?

11:19AM  15    A    Drugs.

         16    Q    So why would Lindsey Kinney harass Mike Miske over a bill

         17    that Jake Smith owed him?

         18    A    I don't know.

         19         MR. KENNEDY:  Objection.  Speculation, Your Honor.

11:19AM  20         THE WITNESS:  I have no clue.

         21         THE COURT:  Sustained.

         22    BY MR. INCIONG:

         23    Q    Was there a connection between Miske and Jake that you

         24    were aware of?

11:19AM  25    A    No.

1   Q   So how did you become involved, if at all?

2   A   I introduced Lindsey to Jake.

3   Q   For what purpose?

4   A   We were at the bar and Lindsey pulled up, and Jake was

11:20AM  5   with me and I just introduced them.

6   Q   From that point on, did you know that Jake and Lindsey

7   started dealing drugs together?

8   A   Yes.

9   Q   And is that where this drug debt came from?

11:20AM 10   A   Yes.

11   Q   So did Mr. Miske ever seek out your help with this issue

12   with the drug debt?

13   A   We were at work one day, and someone told me that Mike

14   wanted to talk to me or Lindsey.  So I went to his vehicle, he

11:20AM 15   came out, and it was the first time I ever met him.  And he

16   basically asked if Lindsey was working.  I said, No, he's

17   supposed to be in but he's late.

18        And he mentioned that he doesn't have no interest

19   meeting anybody for any reasons.  He doesn't associate with

11:20AM 20   Jake.  He doesn't associate with Lindsey or myself, for that

21   matter.  All he asked was that we leave his name out of our

22   business.

23   Q   Okay.  So you said this was at work.  So where were you at

24   work?

11:21AM 25   A   Close to Ala Moana, an empty lot.

```
       1   Q    That was the first time you actually met Mr. Miske in

       2   person?

       3   A    Yes.

       4   Q    So why was he coming to you?

11:21AM 5  A    Because Lindsey worked for me.

       6   Q    This was at the movies?

       7   A    Yes.

       8   Q    So what did you do?

       9   A    I was the supervisor for the rigging grips.

11:21AM 10 Q    So after you had the meeting with Mr. Miske, did you speak

       11  with Lindsey Kinney?

       12  A    I did.

       13  Q    What came out of that conversation?

       14  A    I asked him to stop harassing Mike, and he returned by

11:21AM 15 saying, If he doesn't want to meet me, then I'll make him meet

       16  me.

       17  Q    Mr. Kinney said that?

       18  A    Yes.

       19  Q    Did you have another meeting with Mr. Miske following

11:21AM 20 that?

       21  A    So when we left that job site, everybody was sent to

       22  Kualoa to work, and I went to Diamond Head to pick up

       23  equipment.

       24  Q    Okay.  So what happened there?

11:22AM 25 A    I received a phone call.  I didn't recognize the number.
```

1    And then when I answered the phone, he told me it was Mike.

2    And I said, Hey, what's up?  And he goes, Well, where -- where

3    you at right now?  And I told him Diamond Head.  And he says,

4    Can you meet me for a couple of minutes?  So I told him, Okay.

11:22AM   5        So we met down from the Diamond Head studio, at which

6    time he asked me if I had a chance to speak to Lindsey, and I

7    told him I did and that I can't control Lindsey, and that

8    Lindsey told me that he was going to keep trying to reach Mike

9    to meet with him, even after I told him to leave Mike alone

11:22AM   10   because Mike doesn't want to associate with, you know, us.

11   Q    Okay.  So what was Mr. Miske's response, if anything?

12   A    So he told me -- no, so I told him that I'm pretty much

13   going to end up firing him.  He was, I'm into helping people,

14   so if you're going to fire him, I'll give him a job or I'll

11:23AM   15   give him 20 grand, whatever it's going to take.  Just tell him

16   to leave my business out of his mouth because I don't get

17   involved with what you guys do.

18   Q    So this was in regard to the social media posting?

19   A    Social media.

11:23AM   20   Q    Did you relay that information to Mr. Kinney?

21   A    I did.

22   Q    Where did you go from that meeting with Mr. Miske?

23   A    I told him I would talk to him again.  I'm headed to

24   Kualoa right now, because that's where we're all at, and when I

11:23AM   25   got there I told Zeph what happened.

```
 1   Q    That's Zeph Salas?

 2   A    Yes.

 3   Q    That's your co-worker?

 4   A    Yes.

 5   Q    And fellow Nakipi member?

 6   A    Yep.

 7   Q    So what was decided?

 8   A    Zeph went and talked to him and told him to leave Mike

 9   alone, stop doing that, stop texting him.

10   Q    This was Lindsey?

11   A    Yeah, he talked to Lindsey.

12   Q    Okay.  All right.  Was that relayed to Mr. Kinney?

13   A    Yes.

14   Q    Did you have a meeting later with Jake Smith?

15   A    Yes.  So after he told Lindsey that, he came by me and

16   showed me a message that someone sent him with Lindsey

17   basically saying, You met with these two donkeys, but you never

18   meet me.  And that was in reference to he sent the message on

19   Instagram or on social media.

20   Q    Okay.  So let me just make sure I understand who was

21   saying what here.  So when you said he sent a message, who --

22   A    Lindsey sent the message on social media.  Then someone

23   screenshot the message and sent it to Zeph.

24   Q    I see.  So after that did you meet with anybody else

25   involved?
```

11:23AM (line 5)
11:24AM (line 10)
11:24AM (line 15)
11:24AM (line 20)
11:25AM (line 25)

```
     1   A    No.  Then Zeph told me to call Jake, and we headed to pick

     2   up lunch for the crew.

     3   Q    Why did you want to meet with Jake?

     4   A    Because Jake is the source of all that -- that whole

11:25AM  5   problems.  So if he couldn't get Lindsey to stop, he was going

     6   to tell Jake.

     7   Q    Okay.  So where did this meeting take place with Jake?

     8   A    Temple Valley Shopping Center.

     9   Q    Who was there?

11:25AM 10   A    Jake, Harry, me, and Zeph.

    11   Q    Harry is Harry Kauhi?

    12   A    Yes.

    13   Q    Did he arrive with Jake Smith?

    14   A    Yes.

11:25AM 15        MR. INCIONG:  Could we show the witness Exhibit 1-698

    16   from our original list?

    17        THE COURT:  Go ahead.

    18   BY MR. INCIONG:

    19   Q    Mr. Akau, do you see Exhibit 1-698?  Do you see that

11:25AM 20   exhibit?

    21   A    Yes.

    22   Q    Does that map show the Temple Valley Shopping mall you

    23   met?

    24   A    Yes.

11:26AM 25        MR. INCIONG:  Your Honor, I would move to admit 1-698.
```

```
             1              THE COURT:  Any objection?

             2              MR. KENNEDY:  No objection.

             3              THE COURT:  1-698 is admitted without object.  You may

             4     publish it.

11:26AM      5              (Exhibit 1-698 was received in evidence.)

             6     BY MR. INCIONG:

             7     Q    So, Mr. Akau, could you place an X approximately where the

             8     Temple Valley Shopping Center is where the meeting was held

             9     between you, Zeph Salas, Jake Smith, and Harry Kauhi.

11:26AM     10     A    (Witness complies.)

            11              THE COURT:  Could you maybe blow this up a little bit,

            12     Counsel?

            13              MR. INCIONG:  Sure.

            14              THE COURT:  Thank you.

11:26AM     15              MR. INCIONG:  Thank you.

            16     BY MR. INCIONG:

            17     Q    If you see -- do you see the McDonald's logo there, is it

            18     in that area approximately?

            19     A    Around this area.

11:26AM     20     Q    Okay.  So you said you came there from the worksite at

            21     Kualoa Ranch.

            22     A    Yes.

            23     Q    Approximately how far away driving time is the worksite?

            24     A    Maybe 15 minutes each way.

11:27AM     25     Q    So you go there to pick up lunch and to meet with Jake
```

1      Smith and Harry Kauhi.

2      A      Yeah.

3      Q      So what was discussed at the meeting with Jake Smith and

4      Harry Kauhi?

11:27AM    5      A      Zeph was basically telling Jake all this is his fault, and

6      that because of everything, he wants him to go take care of it,

7      go handle it.

8      Q      What did you understand that to mean?

9      A      Either give him cracks or whatever it took.

11:27AM    10     Q      So beat him up?

11     A      Yeah.

12     Q      What was Jake's response to that?

13     A      He said, okay, he was going to take care of it.

14     Q      Where did you go from there?

11:27AM    15     A      We went back to Kualoa.

16     Q      When you got back to Kualoa, did you ever see Mike Miske

17     there?

18     A      About an hour later.

19     Q      Describe what you saw.

11:27AM    20     A      So I'm working on the Gradall, and then I turn and I see

21     Mike and Zeph talking.  So I jumped off the equipment, went

22     over there, and he basically told me, No worry, I tried my best

23     to stay out of this, and now the guy is even slandering my

24     family, my son, everything.

11:28AM    25             And I kind of understood he was upset.  So he said, At

            1    this point I just like fight this guy already, just get it out

            2    of the way.  And I said, You sure you want to fight with him?

            3    And he said, Yeah.  So I said, Okay.

            4         So Zeph told me, Go call Lindsey.  So I called

11:28AM     5    Lindsey, and when I called him, he was walking to us.  And Zeph

            6    told him, Are you still texting Mike after I told you to stop?

            7    And he said, Oh, yeah.  So Zeph told him, Okay, then you going

            8    to go and fight him then.

            9         So I told Lindsey, Give me your chain, give me your

11:28AM    10    gun.  I gave both of it to Mike -- I mean, not to Mike but to

           11    Zeph.  And I walked to my car, and then when I was coming back

           12    from my car, I seen Lindsey running yelling, "Gun! Gun!"

           13    Q    Did you hear anything at that time?

           14    A    I heard one shot.

11:29AM    15    Q    What did you see, if anything?

           16    A    I seen Jake shoot in the air.

           17    Q    So when did you first see Jake Smith at the worksite?

           18    A    That was the first time I saw him.

           19    Q    Was he on foot, in a car?  What did you see?

11:29AM    20    A    He was on foot.

           21    Q    Did you see how he had arrived?

           22    A    No.

           23    Q    Where did you see him fire the gun?

           24    A    Towards us, towards the air.

11:29AM    25    Q    Was that in the direction of Lindsey Kinney?

| | | |
|---|---|---|
| | 1 | A    Yeah, Lindsey was running towards me. |
| | 2 | Q    Where was Mike Miske during this time? |
| | 3 | A    Right where he was when I first left him. |
| | 4 | Q    Was there anyone with Jake Smith that you saw? |
| 11:29AM | 5 | A    Not at first.  Then I seen somebody with a mask running |
| | 6 | after Lindsey. |
| | 7 | Q    Could you tell who that person was? |
| | 8 | A    No. |
| | 9 | Q    What happened then? |
| 11:30AM | 10 | A    Lindsey ran past me, ran in the bushes.  As soon as he got |
| | 11 | in the bushes, he made another video. |
| | 12 | Q    Okay.  What did Jake -- what was Jake Smith doing during |
| | 13 | this time? |
| | 14 | A    I didn't see him at that time.  I was too busy |
| 11:30AM | 15 | concentrating on Lindsey. |
| | 16 | Q    Did you see where Mike Miske went? |
| | 17 | A    No. |
| | 18 | Q    Did you see where the unknown masked man went? |
| | 19 | A    No. |
| 11:30AM | 20 | MR. INCIONG:  Could we show Exhibit 1-668 to the jury |
| | 21 | and Mr. Akau, which has been previously admitted from our |
| | 22 | original list? |
| | 23 | THE COURT:  Do you have that as an admitted exhibit, |
| | 24 | Counsel? |
| 11:30AM | 25 | MR. KENNEDY:  Let me look. |

1           MR. INCIONG:  My mistake, Your Honor.  If we could

2    just show it to the witness then.

3    BY MR. INCIONG:

4    Q    Mr. Akau, do you recognize what's shown in 1-668?

11:30AM  5    A    Yes.

6    Q    Is this the base camp that you've referenced a couple of

7    times?

8    A    Yes.

9    Q    What is this base camp used for?

11:31AM  10   A    Crew.  This is where the crew has all the equipment.

11   Q    This is used to basically stage for movie productions at

12   Kualoa Ranch?

13   A    Yes.

14   Q    There are a number of different locations and vehicles

11:31AM  15   that are referenced in this.  Does this accurately show, even

16   though maybe not he precisely to scale, that base camp area on

17   the date in question that you were just describing?

18   A    Yes.

19          MR. INCIONG:  Your Honor, I would move to admit 1-668.

11:31AM  20          THE COURT:  Any objection?

21          MR. KENNEDY:  No objection.

22          THE COURT:  1-668 is admitted.  You may publish.

23          (Exhibit 1-668 was received in evidence.)

24   BY MR. INCIONG:

11:31AM  25   Q    Mr. Akau, could you describe, first of all, where you were

1   when you first noticed that Mike Miske had arrived and was

2   talking to Mr. Salas?

3   A    I was here (indicating).

4   Q    So you made a red dot right in between the two 40-foot

11:32AM   5   indications in between -- looks like -- are those trailers, the

6   white?

7   A    Yes.

8   Q    Okay.  And where was -- where did you see Mr. Miske

9   talking with Zeph Salas?

11:32AM   10        So that's just I'm going to say to the north as far as

11  this picture goes by a jeep and a Lexus.  Is that correct?

12  A    Yes.

13  Q    Did you see the vehicle that Mr. Miske arrived in?

14  A    No.

11:32AM   15  Q    And where was -- where did you first see Jake Smith when

16  you saw him at that spot?

17  A    Right here (indicating).

18  Q    So you marked just behind the jeep and just to the -- I

19  guess also an area of the F-150?

11:32AM   20  A    So this marking here just shows certain vehicles, but this

21  whole area was loaded with cars.

22  Q    Okay.  All right.  So there were other cars there at that

23  location.

24  A    A lot of cars.

11:33AM   25        MR. INCIONG:  Could we show the witness only

```
     1   Exhibit 1-673 at this time?

     2   BY MR. INCIONG:

     3   Q    So I believe a few minutes ago you said you were around

     4   the Gradall --

11:33AM  5   A    Yes.

     6   Q    -- when you saw Mr. Miske.  What is a Gradall?

     7   A    This machine right here (indicating).

     8   Q    And does that accurately show the Gradall as it appeared

     9   on the day we were talking about?

11:33AM 10   A    That's -- yeah, that's the one I was on.

    11   Q    And is this the area we were just looking at in that

    12   overhead diagram as well?

    13   A    Yes.

    14        MR. INCIONG:  Your Honor, I would move to admit 1-673.

11:33AM 15        THE COURT:  673 is admitted, so you may publish.

    16        (Exhibit 1-673 was received in evidence.)

    17   BY MR. INCIONG:

    18   Q    So, Mr. Akau, you've circled in red the Gradall that you

    19   were on.  That was the piece of equipment you were on, correct?

11:34AM 20   A    Yes.

    21   Q    There's a yellow circle that's on there as well.  What

    22   does that show?

    23   A    That's my rigging grip truck.

    24   Q    And is this the area where the confrontation occurred?

11:34AM 25   A    Yes.
```

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | MR. INCIONG:  Could we show the witness and publish, I     |
|       | 2  | believe it's been admitted also, 1-674 at this time?       |
|       | 3  | THE COURT:  You may.                                        |
|       | 4  | BY MR. INCIONG:                                             |
| 11:34AM | 5  | Q    What is shown here, Mr. Akau?                        |
|       | 6  | A    That's the backside of the bush line where Lindsey them |
|       | 7  | was cutting wood.                                           |
|       | 8  | Q    Okay.  Is that where he ran back into after you heard him |
|       | 9  | yell "Gun"?                                                 |
| 11:34AM | 10 | A    Yes.                                                 |
|       | 11 | Q    Were you involved or brought into anything else in regard |
|       | 12 | to this dispute after that incident occurred?              |
|       | 13 | A    No.                                                   |
|       | 14 | Q    A few days after the incident, did you meet up with Jake |
| 11:35AM | 15 | Smith?                                                    |
|       | 16 | A    Yes.                                                  |
|       | 17 | Q    Why did you meet up with Jake Smith at that time?     |
|       | 18 | A    He called and asked if I could clean one of his guns. |
|       | 19 | Q    Is that something he did from time to time?           |
| 11:35AM | 20 | A    Yes.                                                 |
|       | 21 | Q    That was -- that wasn't unusual?                      |
|       | 22 | A    No.                                                   |
|       | 23 | Q    Did you agree to do that?                             |
|       | 24 | A    Yes.                                                  |
| 11:35AM | 25 | Q    Where did this meeting take place?                   |

```
       1   A    At my house.

       2   Q    When you started to clean the gun, did you notice anything

       3   familiar about that weapon?

       4   A    Yeah, it was spray painted black.  Then I started cleaning

11:35AM 5   the gun, and as the paint was coming off, I noticed it was one

       6   of my old guns.

       7   Q    How did you recognize it as one of your guns?

       8   A    It's a unique brand.

       9   Q    Do you recall the brand?

11:36AM 10  A    Astra.

       11  Q    Do you recall the caliber.

       12  A    .40 caliber.

       13  Q    How did that gun get from at one point you owning it to

       14  Jake having it?

11:36AM 15  A    I traded it with Wayne Miller.

       16  Q    You testified previously that was something you did

       17  regularly with Wayne?

       18  A    Yes.

       19  Q    Did you know Wayne had given it to Jake Smith?

11:36AM 20  A    No.

       21  Q    Did Jake tell you what he had used that gun for?

       22  A    He said that's the gun he used to shoot at Kualoa.

       23  Q    Do you recall the caliber of that gun.

       24  A    .40 caliber.

11:36AM 25          MR. INCIONG:  Just one moment, Your Honor.
```

|      |    |   |                                                           |
|------|----|---|-----------------------------------------------------------|
|      | 1  |   | Okay.  Your Honor, I have nothing further.  Thank you.   |
|      | 2  |   | THE COURT:  Cross-examination.                           |
|      | 3  |   | CROSS-EXAMINATION                                        |
|      | 4  |   | BY MR. KENNEDY:                                          |
| 11:37AM | 5 | Q | Good morning, sir.                                     |
|      | 6  | A | Good morning.                                            |
|      | 7  | Q | Let's start where we ended off.  You saw Jake Smith with a |
|      | 8  |   | pistol at the ranch at Kualoa, correct?                 |
|      | 9  | A | Correct.                                                 |
| 11:38AM | 10 | Q | And you saw him shoot up into the air, right?         |
|      | 11 | A | Yeah.                                                    |
|      | 12 | Q | One shot?                                                |
|      | 13 | A | One shot.                                                |
|      | 14 | Q | And you heard one shot?                                  |
| 11:38AM | 15 | A | One shot.                                               |
|      | 16 | Q | And one shot up in the air?                              |
|      | 17 | A | Yes.                                                     |
|      | 18 | Q | All right.  Now, just prior to that, you and Mike Miske  |
|      | 19 |   | had spoken and Mike Miske told you that he wanted to scrap with |
| 11:38AM | 20 |   | Kinney up and up, right?                              |
|      | 21 | A | Yes.                                                     |
|      | 22 | Q | Because what was happening is on social media Lindsey   |
|      | 23 |   | Kinney was doing the equivalent of bombing Mike Miske, correct? |
|      | 24 | A | Correct.                                                 |
| 11:38AM | 25 | Q | Saying things like, You killed your son, right?      |

|   |   |   |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | How are you enjoying your loss? |
| 3 | A | Correct. |
| 4 | Q | And just bombing him on social media? |
| 11:38AM 5 | A | Correct. |
| 6 | Q | And so you said you understood why he was a little upset. |
| 7 | A | Yes. |
| 8 | Q | Because he had come to you previously, and this was the |
| 9 |   | first time you had ever met him, right? |
| 11:39AM 10 | A | Yes. |
| 11 | Q | And he said he had nothing to do with any of this, right? |
| 12 | A | Yes. |
| 13 | Q | And this guy is now starting to bomb him on social media, |
| 14 |   | right? |
| 11:39AM 15 | A | Correct. |
| 16 | Q | And he asked you, Hey, can you get this guy to stop? |
| 17 | A | Yes. |
| 18 | Q | And so you went about that, right? |
| 19 | A | Yes. |
| 11:39AM 20 | Q | You spoke with Lindsey Kinney. |
| 21 | A | Yes. |
| 22 | Q | And Lindsey Kinney said, Well, I'll make him meet me. |
| 23 | A | Yes. |
| 24 | Q | So then it just got worse, didn't it? |
| 11:39AM 25 | A | Yes. |

|       | 1  | Q | All right.  And now Lindsey Kinney was someone that you |

```
        1   Q   All right.  And now Lindsey Kinney was someone that you

        2   said was a little strange but made you laugh in the beginning,

        3   right?

        4   A   Right.

11:39AM 5   Q   And you covered a little bit of the work you had -- you

        6   were working for the movie union, right?

        7   A   Yes.

        8   Q   You also had your own business, correct?

        9   A   Yes.

11:40AM 10  Q   It was an air conditioning business, right?

        11  A   Yes.

        12  Q   You had partners, right?

        13  A   Yes.

        14  Q   And Lindsey Kinney was a minor participant in that, right?

11:40AM 15  A   Yes.

        16  Q   Maybe he had invested like $5,000.

        17  A   Correct.

        18  Q   But he was making money along with your other more

        19  substantial partner too?

11:40AM 20  A   Yes.

        21  Q   So he worked for you in your business, right?

        22  A   Yes.

        23  Q   And he was underneath you at the movies, right?

        24  A   Yes.

11:40AM 25  Q   Now, at that time you had started to distance yourself
```

```
         1   from Lindsey Kinney, correct?

         2   A    Yes.

         3   Q    Now, you also knew him because you and Zeph Salas had

         4   started Nakipi Motorcycle?

11:40AM  5   A    Yes.

         6   Q    And at that time Zeph Salas, was he the president in the

         7   beginning?

         8   A    Founder.

         9   Q    I'm sorry?

11:40AM 10   A    Founder.

        11   Q    Father?

        12   A    Founder.

        13   Q    Were you the president?

        14   A    I was the president.

11:41AM 15   Q    Okay.  And Lindsey Kinney was what's referred to as a

        16   sergeant of arms, right?

        17   A    Yes.

        18   Q    All right.  And so you also had connection with him

        19   through Nakipi, correct?

11:41AM 20   A    Correct.

        21   Q    All right.  And so what was happening is Lindsey Kinney

        22   had a connection with a Mexican cartel member, right?

        23   A    Yes.

        24   Q    And he was bringing in a lot of methamphetamine, right?

11:41AM 25   A    Yes.
```

|       |    |   |                                                              |
|-------|----|---|--------------------------------------------------------------|
|       | 1  | Q | And he was selling a lot of methamphetamine, right?          |
|       | 2  | A | Yes.                                                         |
|       | 3  | Q | And you didn't particularly want to be involved with that,   |
|       | 4  |   | right?                                                       |
| 11:41AM | 5  | A | Correct.                                                   |
|       | 6  | Q | And he was selling to Wayne Miller, among others?            |
|       | 7  | A | Yes.                                                         |
|       | 8  | Q | He was selling to Jake Smith?                                |
|       | 9  | A | Yes.                                                         |
| 11:41AM | 10 | Q | He may have been from time to time providing some to Harry |
|       | 11 |   | Kauhi?                                                       |
|       | 12 | A | Yes.                                                         |
|       | 13 | Q | And he was providing from time to time to Zeph Salas.        |
|       | 14 | A | Yes.                                                         |
| 11:41AM | 15 | Q | And so you were in the position that you wanted to         |
|       | 16 |   | distance yourself from his drug trafficking organization.    |
|       | 17 | A | Correct.                                                     |
|       | 18 | Q | That involved those people, correct?                        |
|       | 19 | A | Yes.                                                         |
| 11:42AM | 20 | Q | Now, we'll jump around a little bit, but I understood that |
|       | 21 |   | when you were involved with the robbery of Nico Carignan, you |
|       | 22 |   | received an 8-ounce share of meth, right?                    |
|       | 23 | A | Yes.                                                         |
|       | 24 | Q | And you traded that for cocaine, right?                      |
| 11:42AM | 25 | A | Yes.                                                         |

|       |    |   |                                                                   |
|-------|----|---|-------------------------------------------------------------------|
|       | 1  | Q | Because you didn't want to be involved with crystal meth.         |
|       | 2  | A | Correct.                                                          |
|       | 3  | Q | Ice?                                                              |
|       | 4  | A | Yes.                                                             |
| 11:42AM | 5 | Q | And that's what Lindsey Kinney was doing.                        |
|       | 6  | A | Yes.                                                             |
|       | 7  | Q | All right.  So you spoke with him to make him stop, right?       |
|       | 8  | A | Yes.                                                             |
|       | 9  | Q | And then shortly thereafter it increased, and Mike Miske         |
| 11:42AM | 10 | | reached out to you again.                                        |
|       | 11 | A | Yes.                                                             |
|       | 12 | Q | And said, It's getting worse.  Is that right?                   |
|       | 13 | A | You're correct.                                                 |
|       | 14 | Q | All right.  So those two meetings were right around             |
| 11:43AM | 15 | | May 22nd, May 23rd of 2017.                                      |
|       | 16 | A | Correct.                                                         |
|       | 17 | Q | All right.  Eventually then you're headed from downtown         |
|       | 18 | | over -- over to the east side, right?                            |
|       | 19 | A | Yes.                                                             |
| 11:43AM | 20 | Q | And you end up at the lunch spot L&L?                            |
|       | 21 | A | Yes.                                                             |
|       | 22 | Q | And that's when Zeph has reached out to Jake Smith, right?      |
|       | 23 | A | Correct.                                                         |
|       | 24 | Q | And so at that point that meeting occurs with Zeph Salas?       |
| 11:43AM | 25 | A | Correct.                                                         |

|        | 1  | Q   | Yourself? |
|--------|----|-----|-----------|
|        | 2  | A   | Correct. |
|        | 3  | Q   | Harry Kauhi? |
|        | 4  | A   | Yes. |
| 11:43AM | 5  | Q   | And then Jake Smith arrives? |

1    Q    Yourself?

2    A    Correct.

3    Q    Harry Kauhi?

4    A    Yes.

11:43AM    5    Q    And then Jake Smith arrives?

6    A    Yes.

7    Q    All right.  And now at that time, were Jake and Harry

8    interested in becoming Nakipi members?

9    A    I cannot answer that.  I don't know.

11:43AM    10    Q    Okay.  They hadn't expressed that to you yet.

11    A    Yes, they hadn't expressed that.

12    Q    So at that point it's 2017, so Zeph Salas is still USO

13    Family, correct?

14    A    Correct.

11:44AM    15    Q    You yourself I believe said 2018 or 2019 you're still USO

16    Family, correct?

17    A    Correct.

18    Q    And Jake Smith had been USO Family as well, correct?

19    A    Correct.

11:44AM    20    Q    And so when the -- Zeph Salas was speaking to Jake Smith

21    when he said to handle Lindsey, right?

22    A    Yes.

23    Q    He was giving him an order, right?

24    A    Correct.

11:44AM    25    Q    And Jake accepted that order as a USO Family member.

```
         1   A    Yes.

         2   Q    Now, when we go back to the Kualoa, when we were back at

         3   the ranch, Mike had come up and said, I want to fight him up

         4   and up.  So then you approached Lindsey Kinney, correct?

11:45AM  5   A    Yes.

         6   Q    And you went to find him, right?

         7   A    Correct.

         8   Q    And you told him that Mike Miske wanted to fight him up

         9   and up --

11:45AM 10   A    Yes.

        11   Q    -- for the social media bombing that he was doing.

        12   A    Correct.

        13   Q    It had gotten to the point where it was going to be man to

        14   man, both of them agreed to fight.

11:45AM 15   A    Correct.

        16   Q    He had had enough?

        17   A    Yes.

        18   Q    All right.  So Lindsey Kinney is at the worksite, right?

        19   A    Yes.

11:45AM 20   Q    He has a chain, right?

        21   A    Yeah.

        22   Q    And he has a concealed firearm on him, correct?

        23   A    Correct.

        24   Q    And so he gives those to you?

11:45AM 25   A    Yes.
```

1    Q    And do you provide those to Zeph Salas?

2    A    Correct.

3    Q    All right.  Now, at that point Mr. Miske and Mr. Kinney

4    were in the process of scrapping, the two of them, correct?

11:45AM    5    A    Correct.

6    Q    And that's when at a certain point Jake Smith fires a shot

7    in the air.

8    A    Yes.

9    Q    And that's when the entire thing ends, right?

11:46AM    10    A    Yes.

11    Q    And I believe you said it was a .40 caliber --

12    A    Correct.

13    Q    -- Astra?

14    A    Yes.

11:46AM    15    Q    That you recognized a couple days later.

16    A    Yes.

17    Q    And Jake told you that was the gun that he shot up in the

18    air.

19    A    Correct.

11:46AM    20    Q    Ending the whole thing.

21    A    Ending it.

22    Q    Because Jake was supposed to handle it with Lindsey

23    Kinney, correct?

24    A    Correct.

11:46AM    25    Q    He had gotten the order from Zeph Salas, correct?

1    A    Correct.

2    Q    He stopped anything from happening that day with that

3    shot, right?

4    A    Correct.

11:46AM    5    Q    Lindsey then ran back into the bushes, right?

6    A    Yes.

7    Q    Went back on social media and just started doing more.

8    A    Yes.

9    Q    Which he kept doing even after that, right?

11:46AM    10    A    Correct.

11    Q    Everybody left the area, right?

12    A    Yes.

13    Q    And that event was over.

14    A    Yes.

11:46AM    15    Q    All right.  Now, with respect to Lindsey Kinney when Zeph

16    Salas was talking to him -- excuse me, with respect to Lindsey

17    Kinney when Zeph Salas was talking to Jake Smith, both USO

18    Family, at that point Mr. Kinney had left the protection of USO

19    and Nakipi, correct?

11:47AM    20    A    Correct.

21    Q    Now, the crew at the worksite that day I believe were

22    fired, right?

23    A    All of the crew was fired, myself included.

24    Q    And most of the crew was hired back, right?

11:47AM    25    A    Yes.

```
 1   Q    All right.  And so the one person that was not hired back

 2   was Lindsey Kinney.

 3   A    Correct.

 4   Q    And part of this was you mentioned Lindsey Kinney had

 5   fronted meth to Jake Smith, right?

 6   A    Yes.

 7   Q    And Jake Smith was selling meth, right?

 8   A    Yes.

 9   Q    And Jake Smith hadn't paid him, right?

10   A    Correct.

11   Q    Just like Lindsey Kinney had fronted meth to Wayne Miller,

12   right?

13   A    Correct.

14   Q    Harry Kauhi, right?

15   A    Yes.

16   Q    And Zeph Salas, right?

17   A    Yes.

18   Q    And those were the folks that were involved with this drug

19   sale network, right?

20   A    Correct.

21   Q    And they were the ones who were doing it, right?

22   A    Yes.

23   Q    And Lindsey Kinney was part of that.

24   A    Yes.

25   Q    All right.  And I believe after this incident, you never
```

1    had another conversation with Michael Miske following that,

2    correct?

3    A    Never.

4    Q    Because I believe you said earlier today that with respect

11:49AM    5    to Mike, you never did anything with him.

6    A    Never.

7    Q    And so that was the first time you had ever even met him

8    in person?

9    A    Correct.

11:49AM    10    Q    All right.  Now, with respect to Elgin Calles, it was

11    Wayne Miller who claimed he had the contract, right?

12    A    Correct.

13    Q    And it didn't have anything to do with Mike Miske.

14    A    Correct.

11:49AM    15    Q    And Wayne was the one, Wayne Miller offered you either

16    $50,000 or a job at the docks, right?

17    A    Yes.

18    Q    And Wayne Miller had been involved with, as we pointed

19    out, Lindsey Kinney, right?

11:50AM    20    A    Correct.

21    Q    In large drug transactions, right?

22    A    Correct.

23    Q    And were you aware that he was also involved with others

24    through your conversations with Wayne Miller?

11:50AM    25    A    Yes.

```
         1   Q    He was involved with an individual by the name of Gursh.
         2   Do you know him?
         3   A    I don't know him.
         4   Q    Wayne Kahale?
11:50AM  5   A    Yeah, I don't know who that is.
         6   Q    And Ali'i you mentioned.
         7   A    Right.
         8   Q    Did he also involve -- say that he was involved with him
         9   as well?
11:50AM 10   A    In drugs?
        11   Q    Yes.
        12   A    He didn't mention that.
        13   Q    So he kept that part from you.
        14   A    Yes.
11:50AM 15   Q    All right.  So now, you mentioned you had bills to pay,
        16   right?
        17   A    Yes.
        18   Q    So you decided to agree to Wayne's contract originally to
        19   beat up Elgin Calles.
11:50AM 20   A    Yes.
        21   Q    For Wayne Miller.
        22   A    Yes.
        23   Q    Nothing to do with Mike Miske.
        24   A    Nothing.
11:50AM 25   Q    So all your information came from Wayne Miller, right?
```

```
        1   A    Correct.

        2   Q    All right.  Now, you mentioned that there was a couple of

        3   meetings with Wayne Miller, right?

        4   A    Yes.

11:51AM  5   Q    And I believe the first one was at the Saigon Passion?

        6   A    Yes.

        7   Q    Here in Honolulu, right?

        8   A    Yes.

        9   Q    All right.  So at that meeting was yourself, right?

11:51AM 10   A    Yes.

       11   Q    Wayne Miller?

       12   A    Yes.

       13   Q    And Nate Lum?

       14   A    And also Zeph Salas.

11:51AM 15   Q    And Zeph Salas.

       16   A    Yes.

       17   Q    All right.  And at that meeting Wayne Miller was telling

       18   you that Nate Lum was involved with a union, right?

       19   A    Correct.

11:51AM 20   Q    And your understanding from Wayne Miller is that he was a

       21   point of person for hiring, right?

       22   A    Yes.

       23   Q    Okay.  And so this would be with the stevedores?

       24   A    Correct.

11:52AM 25   Q    All right.  And so there are various companies down there,
```

1    Pasha, Matson.

2    A    Mm-hmm.

3    Q    Correct?

4    A    Correct.

11:52AM    5    Q    All right.  And so those individual companies end up

6    hiring people, right?

7    A    Correct.

8    Q    And then some of those workers or maybe all of them, I'm

9    not certain, become union members, right?

11:52AM    10    A    Correct.

11    Q    All right.  And so you understood that the companies

12    themselves would end up doing the hiring, right?

13    A    Correct.

14    Q    All right.  Now, at this first meeting with Zeph Salas,

11:52AM    15    yourself, Nate Lum, and Wayne Miller, there was simply a

16    conversation, right?

17    A    Yes.

18    Q    Nobody said anything about beating anyone up, right?

19    A    Yes, correct.

11:52AM    20    Q    And no one said anything about a murder.

21    A    No.

22    Q    It was simply a luncheon that was held with the four of

23    you.

24    A    Yes.

11:53AM    25    Q    All right.  Which Wayne Miller set up, right?

|      |    |                                                              |
| ---- | -- | ------------------------------------------------------------ |
| 1    | A  | Yes.                                                         |
| 2    | Q  | Wayne Miller was the one who got Nate Lum there, right?     |
| 3    | A  | Correct.                                                    |
| 4    | Q  | Wayne Miller was the one who got yourself there?           |

11:53AM 5    A    Correct.

6    Q    And Wayne Miller was the person who got Zeph Salas there?

7    A    Correct.

8    Q    Now, there was a second meeting at a different club,

9    right?

11:53AM 10    A    Correct.

11    Q    And at that club, was that the time that Wayne Miller --

12    well, first off, was it just yourself and Wayne Miller at that

13    second meeting?

14    A    No, Zeph again.

11:53AM 15    Q    All right.  So it was yourself, Zeph, and Wayne Miller.

16    A    Yes.

17    Q    All right.  At that meeting was there a discussion about

18    moving from beating up this person that Wayne Miller wanted

19    beat up, Elgin Calles, to a murder?

11:53AM 20    A    No.

21    Q    Okay.  So prior to -- so that meeting occurred.  Now, I

22    understand that you and Harry Kauhi only surveilled Mr. Calles

23    one time at his condominium; is that correct?

24    A    Correct.

11:54AM 25    Q    All right.  And that was the time where it was in the

```
            1   evening, right?

            2   A    Yes.

            3   Q    It was dark, right?

            4   A    Yes.

11:54AM     5   Q    There's a church parking lot nearby?

            6   A    Yes.

            7   Q    You were parked there, right?

            8   A    Yes.

            9   Q    And while you were surveilling, a -- was it a marked HPD

11:54AM    10   unit?

           11   A    Yes, it was an HPD unit.

           12   Q    All right.  They came into the parking lot, right?

           13   A    Mm-hmm.  Correct.

           14   Q    And Harry was driving, right?

11:54AM    15   A    Yes.

           16   Q    Away from there when the HPD unit came into the parking

           17   lot?

           18   A    Correct.

           19   Q    And then they stopped you.

11:54AM    20   A    Yes.

           21   Q    Harry talked with the officer.

           22   A    Yes.

           23   Q    And then you left.

           24   A    Yep.

11:54AM    25   Q    No citation.
```

```
 1   A    No citation.

 2   Q    All right.  And that was the one time that you had

 3   surveilled Elgin Calles at his condominium, correct?

 4   A    Correct.

 5   Q    Now, you understood that Wayne Miller had been surveilling

 6   him, correct?

 7   A    Yes.

 8   Q    And Wayne Miller had these -- had a -- what you referred

 9   to as an egg, right?

10   A    Correct.

11   Q    A GPS device, right?

12   A    Yes.

13   Q    Which he had on his phone and app.

14   A    Yes.

15   Q    Which would provide him location information.

16   A    Yes.

17   Q    From that egg, correct?

18   A    Correct.

19   Q    All right.  And you said that from time to time the device

20   needed to be recharged or changed out the charge?

21   A    Correct.

22   Q    And that Wayne Miller took care of that, right?

23   A    Yes.

24   Q    And that was also Ali'i who was involved with that as well

25   with Wayne?
```

1    A    Correct.

2    Q    All right.  And so you had understood that Wayne Miller

3    had spent maybe three, maybe four months surveilling this

4    individual prior to you even getting involved, right?

11:56AM    5    A    Correct.

6    Q    And it was Wayne Miller who was putting the GPS tracking

7    devices on the vehicle that Elgin Calles drove.

8    A    Yeah, I think it was him.

9    Q    Okay.  Now, eventually at some point you mentioned that at

11:56AM   10    the time where Harry, you said -- I'm trying to remember.  Bear

11    with me, sir, for a second.

12         You said Harry didn't want to complete anything, he

13    was done.  Do you recall that?

14    A    Yes.

11:56AM   15    Q    Now, was that in relation to when you were at the church

16    parking lot or later?

17    A    Church.

18    Q    Okay.  So when we moved to Penny's Drive In --

19    A    Yes.

11:57AM   20    Q    -- I understand Harry is driving, right?

21    A    Yes.

22    Q    And you're with Harry, right?

23    A    Yes.

24    Q    In a vehicle that Mr. Wayne Miller acquired for you.

11:57AM   25    A    Correct.

1    Q    All right.  And Wayne Miller is there in a separate

2    vehicle, right?

3    A    Yes.

4    Q    All right.  And we've seen some photographs, and the jury

11:57AM    5    has seen it.  So the Penny's Drive In, is this during the

6    middle of the day?

7    A    It is.

8    Q    So it's light out, right?

9    A    Yes.

11:57AM    10    Q    It's a fairly busy restaurant, I would take it.

11    A    Yes.

12    Q    Is it around the lunch hour?

13    A    It is.

14    Q    Okay.  And I take it they probably have a pretty good

11:57AM    15    lunch hour there.

16    A    Yep.

17    Q    In the photograph we saw there were a lot of cars right

18    near the entrance, right?

19    A    Correct.

11:57AM    20    Q    And you were over by where that photograph showed the

21    white pickup, right?

22    A    Could be -- yeah, right behind that.

23    Q    Okay.  And so at this point it's no longer beat him up,

24    right?

11:58AM    25    A    Right.

1   Q    At this point Wayne Miller has said to you, I want him

2   shot?

3   A    Yes.

4   Q    I want him killed?

11:58AM   5   A    Yes.

6   Q    Premeditated, right?

7   A    Yes.

8   Q    All right.  And so you mentioned that at Nico Carignan's

9   robbery you had a backpack.

11:58AM   10   A    Yes.

11   Q    And inside that backpack, I believe you said on that day

12   you had a .38?

13   A    Yes.

14   Q    And you had a .22.

11:58AM   15   A    Yes.

16   Q    And that .22 was the one that had the silencer, right?

17   A    Correct.

18   Q    All right.  And that day you didn't take out either one of

19   those two weapons, right?

11:58AM   20   A    Correct.

21   Q    But you had them with you and you possessed them, right?

22   A    Yes.

23   Q    Including the one that had the silencer.

24   A    Yes.

11:58AM   25   Q    All right.  Now, moving back to Penny's Drive In, I

```
         1   believe you said you had the .22 with you that day as well.

         2   A    Correct.

         3   Q    In the backpack, right?

         4   A    Correct.

11:59AM  5   Q    And on that day, had the plan that Wayne Miller put

         6   together gone forward, the .22 would have been pulled out of

         7   the backpack, right?

         8   A    Yes.

         9   Q    It had the silencer on it, correct?

11:59AM  10  A    Correct.

         11  Q    It's in the middle of the day, so you don't want to shoot

         12  off a gun and make a lot of noise, right?

         13  A    Correct.

         14  Q    So this .22 with the silencer was what you were going to

11:59AM  15  use to shoot and kill Mr. Calles, correct?

         16  A    Correct.

         17  Q    All right.  And then at some point I understand that you

         18  may have been communicating by walkie talkies?

         19  A    Correct.

11:59AM  20  Q    Mr. Miller then says, Stand down, or something along those

         21  lines, right?

         22  A    Yes.

         23  Q    And so you don't take the gun out of the backpack with the

         24  silencer, right?

11:59AM  25  A    Correct.
```

1   Q    And then Elgin Calles leaves, right?

2   A    Yes.

3   Q    And then you find out afterwards that Wayne Miller had his

4   GPS device still on Elgin Calles's car.

12:00PM   5   A    Yes.

6   Q    And he didn't want his device found --

7   A    Right.

8   Q    -- after someone is shot and killed.

9   A    Right.

12:00PM   10   Q    Now, with respect to some questions about silencers, I

11   believe you just talked about a -- that maybe you had milled --

12   would that be the correct term, some of those silencers?

13   A    Yes.

14   Q    All right.  And that maybe there were like four or five

12:01PM   15   that you had gotten involved with, right?

16   A    Yes.

17   Q    That you were pretty handy with it, and you had sold three

18   of these with silencers and guns to Lindsey Kinney at some

19   point.

12:01PM   20   A    Yes.

21   Q    All right.  And that Wayne Miller wanted the MAC-10,

22   right?

23   A    Correct.

24   Q    And he dropped Mike Miske's name, right?

12:01PM   25   A    Correct.

| | | |
|---|---|---|
| | 1 | Q    Thinking he could get a discount. |
| | 2 | A    Correct. |
| | 3 | Q    But he's the one who wanted it, right? |
| | 4 | A    Yes. |
| 12:01PM | 5 | Q    All right.  Now, with respect to Wayne Miller, I think -- |
| | 6 | was it the King Kong movie that he was -- |
| | 7 | A    Correct. |
| | 8 | Q    Okay.  So it was the King Kong movie where you had met |
| | 9 | him, right? |
| 12:01PM | 10 | A    Yes. |
| | 11 | Q    And he was working -- he had just started working at the |
| | 12 | movies, right? |
| | 13 | A    Correct. |
| | 14 | Q    And so then you thought -- you had sought him out because |
| 12:01PM | 15 | you knew you were cousins, right? |
| | 16 | A    Yes. |
| | 17 | Q    But you had never met him. |
| | 18 | A    Correct. |
| | 19 | Q    And then I think you said that for a period of time he was |
| 12:02PM | 20 | coming over to your house quite a bit. |
| | 21 | A    Yes. |
| | 22 | Q    And maybe at least two times a week -- |
| | 23 | A    Right. |
| | 24 | Q    -- I think you said earlier this morning. |
| 12:02PM | 25 |        All right.  Now, you were aware that Mr. Miller, in |

1    addition to selling drugs, had an oxy problem, right?

2    A    Correct.

3    Q    And he was taking a lot of oxycodone, right?

4    A    Yes.

12:02PM    5    Q    And he was addicted to them, right?

6         MR. INCIONG:  Objection.  Beyond the scope.

7         THE COURT:  Overruled.  Go ahead.

8    By MR. KENNEDY:

9    Q    And that Mr. Wayne Miller, you understood kept his

12:02PM   10   firearms at his mom's house, right?

11   A    Correct.

12   Q    That he had a place where he stashed his firearms there,

13   right?

14   A    Yes.

12:02PM   15   Q    Okay.  Now, you mentioned that Wayne Miller approached you

16   about a -- a kidnapping, correct?

17   A    Correct.

18   Q    To just take someone, right?

19   A    Correct.

12:03PM   20   Q    And I believe the first time you talked with the ATF, you

21   said that you simply just brushed it off, right?

22   A    Correct.

23   Q    Didn't think much of it, right?

24   A    Correct.

12:03PM   25   Q    You mentioned -- and that was what Miller told you, and

1   you didn't give it any thought, right?

2   A    Correct.

3   Q    And now when you were speaking with the ATF, and we'll

4   just cover this, the first time you had an interview with them,

12:03PM    5   you had a proffer agreement, right?

6   A    Correct.

7   Q    And so that proffer agreement said that, you know, with

8   respect to what you were saying, it couldn't be used against

9   you, right?

12:03PM    10   A    Yes.

11   Q    All right.  And then eventually you spoke with the FBI

12   later, maybe three years later, and you had a second proffer

13   agreement with them as well.

14   A    Yes.

12:03PM    15   Q    All right.  Now -- and I guess with respect to that Miller

16   offer, you didn't even give it any thought, did you?  You just

17   brushed it off.

18   A    Which one, Frasure?

19   Q    Yeah.

12:04PM    20   A    Yeah.

21   Q    And I think you said before that you understood that Wayne

22   Miller and Mike Miske -- I think your term you used was

23   "strained," right?

24   A    Yes.

12:04PM    25   Q    That they weren't at all together, right?

```
          1   A    Correct.

          2   Q    And Miller thought of him as his best friend, right?

          3   A    Yes.

          4   Q    And he was seeking somehow to get back with him, right?

12:04PM   5   A    Right.

          6   Q    And doing this other stuff, right, like Elgin Calles?

          7   A    Correct.

          8   Q    And what he offered you, right?

          9   A    Yes.

12:04PM  10   Q    Dealing drugs.

         11        Now, you know Jake Smith because you know his father

         12   well, right?

         13   A    Correct.

         14   Q    His father was someone that you trained with in -- was it

12:04PM  15   Taekwondo?

         16   A    Correct.

         17   Q    And so you knew Bob Smith well.

         18   A    Yes.

         19   Q    And you knew Jake Smith from that, right?

12:05PM  20   A    Yes.

         21   Q    All right.  And that Jake Smith, I think, was family,

         22   right?

         23   A    Yes.

         24   Q    Because of your relationship with Bob.

12:05PM  25   A    Yes.
```

```
         1   Q    All right.  And Lindsey Kinney, we discussed in terms of

         2   those ties that were originally friendship and then business,

         3   right?

         4   A    Correct.

12:05PM  5   Q    And eventually you said his -- your relationship with him

         6   was strained, right?

         7   A    Correct.

         8   Q    And it all revolved around what you had asked him to do,

         9   and he didn't do it, right?

12:05PM 10   A    Correct.

        11   Q    And then all of a sudden he decides to, I guess, go to the

        12   ATF, right?

        13   A    Yes.

        14   Q    Starts recording phone calls from you?

12:05PM 15   A    Yes.

        16   Q    Wears wires on you?

        17   A    Yes.

        18   Q    Before he gets into his own trouble, right?

        19   A    Yeah.

12:05PM 20   Q    And then there's nowhere for him to go at that point,

        21   right?

        22   A    Correct.

        23   Q    All right.  Now, when you were with Nakipi, I believe at

        24   one time you were involved in a -- in a shooting, correct?

12:06PM 25   A    Correct.
```

|        | 1  | Q | And the members were leaving a club, right? |
|--------|----|---|---------------------------------------------|

             1    Q    And the members were leaving a club, right?

             2    A    Correct.

             3    Q    And the motorcycles were on the road?

             4    A    Yes.

12:06PM      5    Q    Headed towards H3, right?

             6    A    Right.

             7    Q    A vehicle almost hit one of your members, right?

             8    A    Yes.

             9    Q    And you ended up shooting a .38 into the rear driver's

12:06PM     10    side of that vehicle?

            11    A    Yes.

            12    Q    All right.  And Lindsey Kinney was the person that at that

            13    point the vehicle almost hit, right?

            14    A    Correct.

12:07PM     15    Q    Later, though, when he was the sergeant of arms, Zeph

            16    Salas barred him from the club because he wouldn't stop

            17    harassing Mike Miske.

            18    A    Yes.

            19    Q    For no reason at all.

12:07PM     20    A    Correct.

            21    Q    And harassing him about the death of his son.

            22    A    Yes.

            23    Q    Now, were you aware that Wayne Miller was an informant for

            24    the FBI when he was doing everything involving Elgin Calles?

12:07PM     25    A    I was not aware.

```
        1    Q    Now, at the Nico Carignan robbery, I understand that it

        2    essentially came about between Ashlin Akau and Kurt Kipapa,

        3    right?

        4    A    Correct.

12:08PM 5    Q    Okay.  So Ashlin had been able to procure -- what was it,

        6    was it 1 pound?

        7    A    Yes.

        8    Q    Of meth?

        9    A    Correct.

12:08PM 10   Q    From Nico Carignan?

        11   A    Yes.

        12   Q    And Nico Carignan was a drug dealer, right?

        13   A    Right.

        14   Q    And so the plan was that -- put together by Kurt Kipapa,

12:08PM 15   right?

        16   A    Yes.

        17   Q    And then eventually the -- you and others joined, right?

        18   A    Correct.

        19   Q    All right.  And Jake Smith joined, right?

12:08PM 20   A    Correct.

        21   Q    And Lance Bermudez joined?

        22   A    Correct.

        23   Q    All right.  And you dressed in -- were impersonating a

        24   police officer that day.

12:08PM 25   A    Yes.
```

```
        1    Q    All right.  And he asked for his lawyer, right?

        2    A    Correct.

        3    Q    And then it was you who grabbed the blue Walmart bag?

        4    A    Correct.

12:09PM 5    Q    Filled with, I guess, at least 4 pounds of meth, right?

        6    A    Yes.

        7    Q    And those were split up 8 ounces apiece?

        8    A    Yes.

        9    Q    Between Kurt Kipapa?

12:09PM 10   A    Yes.

        11   Q    Lance Bermudez?

        12   A    Correct.

        13   Q    Jake Smith?

        14   A    Yeah.

12:09PM 15   Q    Ashlin Akau?

        16   A    Yeah.

        17   Q    Yourself?

        18   A    Yes.

        19   Q    And Harry Kauhi?

12:09PM 20   A    Yes.

        21   Q    All right.  And Harry Kauhi was also someone involved in

        22   the drug meth trade.

        23   A    Yes.

        24   Q    All right.  Now, with respect to your proffer agreement,

12:09PM 25   we talked about those two, eventually you decided to enter a
```

```
     1   plea of guilty, correct?

     2   A    Yes.

     3   Q    And so you had five charges, right?

     4   A    Yes.

12:10PM   5   Q    Okay.  One of those charges was carrying or using or

     6   possessing a firearm during a relation to a crime of violence,

     7   right?

     8   A    Yes.

     9   Q    The Hobbs Act robbery.

12:10PM  10   A    Correct.

    11   Q    And so for that particular crime you mentioned that the --

    12   it would be not more than -- it would be a consecutive

    13   sentence, right?

    14   A    Yes.

12:10PM  15   Q    So that means it doesn't run with any other sentence, it

    16   adds to it, right?

    17   A    Yes.

    18   Q    Okay.  And I think you mentioned five years, correct?

    19   A    Yes.

12:10PM  20   Q    But on that day you had two firearms which you possessed

    21   in your backpack, correct?

    22   A    Correct.

    23   Q    And one of those was the .22 caliber with the silencer,

    24   correct?

12:10PM  25   A    Correct.
```

```
      1   Q    And did your lawyer explain to you that that would be not

      2   less than 25 years or 30 years if a firearm is equipped with a

      3   silencer?

      4   A    Yes.

12:11PM   5   Q    Okay.  So you knew for just that robbery, the Hobbs

      6   robbery, the silencer would give you 30 years, right?

      7   A    Correct.

      8   Q    And you said you were 51 today, right?

      9   A    Yes.

12:11PM  10   Q    And the Hobbs Act robbery could be up to 20 years, right?

     11   A    Yes.

     12   Q    The judge would decide where within that 20 years your

     13   sentence would be?

     14   A    Yeah.

12:11PM  15   Q    But what the judge had to do was give the 30 years

     16   consecutive to that, right?

     17   A    Yes.

     18   Q    Okay.  Now, the other firearm charge was carrying or using

     19   a firearm or possessing it during in relation to drug

12:11PM  20   trafficking crime, correct?

     21   A    Correct.

     22   Q    And that was five years, right?

     23   A    Yes.

     24   Q    And that was consecutive, right?

12:11PM  25   A    Yep.
```

|       | 1  | Q    So that would be 30 plus 5 before we even get to the drug |
|       | 2  | charge or the robbery charge, right? |
|       | 3  | A    Yes. |
|       | 4  | Q    And the drug charge itself I believe was brought out, that |
| 12:12PM | 5 | was not less than ten years, correct? |
|       | 6  | A    Correct. |
|       | 7  | Q    So it would be at least 30 plus 5 plus 10.  We're now at |
|       | 8  | 45 years, right? |
|       | 9  | A    Correct. |
| 12:12PM | 10 | Q    And it could go up to life. |
|       | 11 | A    Yes. |
|       | 12 | Q    All right.  So now, the racketeering conspiracy charge -- |
|       | 13 | so each one of these four charges that we just talked about are |
|       | 14 | being dismissed under your plea agreement, correct? |
| 12:12PM | 15 | A    Correct. |
|       | 16 | Q    So you don't have to do any of those 45 years plus. |
|       | 17 | A    Correct. |
|       | 18 | Q    All right.  So now the conspiracy charge is not more than |
|       | 19 | 20 years, right? |
| 12:12PM | 20 | A    Yes. |
|       | 21 | Q    All right.  So it's capped at 20 years, right? |
|       | 22 | A    Correct. |
|       | 23 | Q    Can't get more than that, right? |
|       | 24 | A    Cannot. |
| 12:13PM | 25 | Q    And it doesn't have a floor, right? |

1    A    No floor.

2    Q    You can ask for any sentence underneath 20, right?

3    A    Yes.

4    Q    In fact, you could ask for a sentence of time served,

12:13PM  5    right?

6    A    Yes.

7    Q    And part of the substantial assistance that is part of the

8    plea agreement is the prosecution alone will make the decision

9    whether you provided substantial assistance, correct?

12:13PM  10    A    Correct.

11    Q    And that's the benefit even below getting rid of the

12    45 years consec, correct?

13    A    Correct.

14    Q    All right.  They can make that motion to the Court, right?

12:13PM  15    A    Yes.

16    Q    Or they can say no, right?

17    A    Yep.

18    Q    That motion rests entirely with them, right?

19    A    Yes.

12:14PM  20    Q    And you have no remedy if they don't, right?

21    A    Yes.

22    Q    And so without this plea agreement, your sentence might

23    have been the remainder of your life.

24    A    Correct.

12:14PM  25            MR. KENNEDY:  I'd like to show the witness alone

|        | 1  | 9001-017, which is not yet in evidence, but I believe it's part |

```
        1   9001-017, which is not yet in evidence, but I believe it's part

        2   of the 32nd supplemental, Your Honor.

        3          THE COURT:  Go ahead.

        4          MR. KENNEDY:  Oh, I'm sorry.  I apologize.

12:14PM 5          THE COURT:  I don't have an exhibit that's shown.

        6          MR. KENNEDY:  9001-017.

        7          THE COURT:  You said the right exhibit.

        8          MR. KENNEDY:  Oh, I did?

        9          THE COURT:  You did.

12:15PM 10         MR. KENNEDY:  Oh, okay.

        11         THE COURT:  So what was depicted was the --

        12         MR. KENNEDY:  I'd rather it be my mistake.

        13  BY MR. KENNEDY:

        14  Q    Sir, do you recognize what's shown in 9001-017?

12:15PM 15  A    Yes.

        16  Q    Do you recognize the individuals in it?

        17  A    Yes.

        18  Q    Are you part of it?

        19  A    Yes.

12:15PM 20  Q    All right.  Are these members of Nakipi Motorcycle Club?

        21  A    Everyone but the one in the middle.

        22  Q    Okay.  And the other individual who is part of Nakipi, who

        23  might that be?

        24  A    Steve Silva.

12:15PM 25  Q    All right.
```

1              MR. KENNEDY:  At this time, Your Honor, I move to

2      admit 9001-017.

3              THE COURT:  Any objection?

4              MR. INCIONG:  Objection.  Relevance, 403.

12:16PM    5              THE COURT:  Sustained.

6              MR. KENNEDY:  All right.  If we move on to 9001-018.

7              THE COURT:  Go ahead.

8      BY MR. KENNEDY:

9      Q      Do you recognize the individuals in 9001-018?

12:16PM   10      A      Yes.

11      Q      Is -- we've heard about Mr. Kurt Kipapa.  Is he shown in

12      9001-018?

13      A      Yes.

14      Q      All right.  And which individual in the photograph would

12:16PM   15      be Mr. Kipapa?

16      A      Second to the left.

17              MR. KENNEDY:  Then at this time, Your Honor, I would

18      move 9001-018 into evidence.

19              THE COURT:  Any objection?

12:16PM   20              MR. INCIONG:  Objection.  Relevance, 403.

21              THE COURT:  Same ruling, sustained.

22              MR. KENNEDY:  All right.

23      BY MR. KENNEDY:

24      Q      Sir, do you recall a time around November 17th of 2016,

12:17PM   25      where Jake Smith and Lance Bermudez were at odds with each

1    other?

2    A    No.

3    Q    All right.  Sir, I think you told the jury that with

4    respect to Mike Miske, you never did anything with Mike Miske;

12:18PM    5    is that correct?

6    A    Correct.

7              MR. KENNEDY:  I have nothing further.  Thank you.

8              THE COURT:  Mr. Inciong, it's 20 minutes after noon.

9    If you've got just a few minutes on redirect, then we can try

12:18PM   10    to get through it now.  If you've got more than just a few

11    minutes, I know you may not be able to tell exactly, then maybe

12    we should take our break.

13              MR. INCIONG:  We're going to be more than just a few

14    minutes, Your Honor.

12:18PM   15              THE COURT:  Okay.  Then why don't we go ahead and take

16    our second break of the trial day at this point before

17    redirect.

18              As we go to break, I'll remind our jurors to refrain

19    from discussing the substance of this case with anyone,

20    including each another, until I advise otherwise; also refrain

21    from accessing any media or other accounts of this case that

22    may be out there; and finally, please do not conduct any

23    independent investigation of your own into the facts,

24    circumstances or persons involved.

12:19PM   25              (Proceedings were recessed at 12:19 p.m. to 12:48

1    p.m.)

2           THE COURT:  Okay.  Back from our second break of the

3    trial day.  We were just about to start with the government's

4    redirect of Mr. Akau.

12:48PM    5           Mr. Inciong, you may do that when you're ready.

6           MR. INCIONG:  Thank you, Your Honor.

7                       REDIRECT EXAMINATION

8    BY MR. INCIONG:

9    Q    Mr. Akau, there was a cooperation agreement in your plea

12:48PM   10    agreement, correct?

11    A    Correct.

12    Q    What did that cooperation agreement require of you?

13    A    That I make any and all -- besides telling the truth, make

14    all appointments that you guys set forth for me.

12:49PM   15    Q    Did you understand the primary responsibility of that?

16    A    Tell the truth.

17    Q    Now, before you entered your plea agreement you entered

18    into a proffer agreement, correct?

19    A    Correct.

12:49PM   20    Q    Was that just about three months prior to entering your

21    guilty plea?

22    A    Correct.

23    Q    What were the main essential provisions of that proffer

24    agreement, as you understood?

12:49PM   25    A    Same thing, tell the truth.

1    Q    Did the proffer agreement, however, offer you some

2    protections that were not included in the cooperation agreement

3    in your plea agreement?

4    A    Yes.

12:49PM    5    Q    What was that?

6    A    That I would be protected from anything I said with --

7    pertaining to the murder for hire.

8    Q    So despite that, did you agree to waive that protection

9    and admit to some of those --

12:50PM    10    A    Yes.

11    Q    -- in your plea agreement?

12    A    I waived it.

13    Q    Why did you agree to do that?

14    A    Because I was going to -- regardless of how it was coming

12:50PM    15    out already, I figured I'm just going to be truthful.

16    Q    In regards to the 5K process, the reduced sentence, that's

17    why you're testifying when it comes down to it, right?

18    A    Yes.

19    Q    And in the end, who makes the final decision as to whether

12:50PM    20    you get a reduced sentence?

21    A    Judge Watson.

22    Q    Now, you were asked about potential sentences you could

23    have been facing, correct?

24    A    Correct.

12:50PM    25    Q    Now, are you testifying truthfully or are you testifying

1   because you're saying what you think the government wants to

2   hear?

3   A     No, I'm testifying truthfully.  Because if I wasn't going

4   to -- if I wanted a big deal, I would have just made up a bunch

12:50PM   5   of lies to get the best deal possible.

6   Q     Couldn't you have easily accused Mr. Miske of a bunch of

7   things that you had no direct knowledge of?

8   A     Correct, but the truth is I didn't do anything with him,

9   so I wanted that be to known.

12:51PM   10   Q     And when you learned the racketeering conspiracy law and

11   you consulted with your attorney, you found out that you don't

12   even need to know who the other enterprise members are, right?

13   A     Correct.

14         MR. KENNEDY:  Your Honor, I object on law.  The Court

12:51PM   15   will instruct on the law.

16         THE COURT:  I'm going to sustain that.  It's also been

17   asked and answered.

18   BY MR. INCIONG:

19   Q     When you've been pending trial in this case, have you had

12:51PM   20   any contact or communication with Harry Kauhi?

21   A     No.

22   Q     Have you had any contact or communication with Jake Smith?

23   A     No.

24   Q     Have you had any contact or communication with Lance

12:51PM   25   Bermudez?

```
         1    A    No.

         2    Q    Have you had any contact or communication with Wayne

         3    Miller?

         4    A    No.

12:51PM  5    Q    And when Mr. Miske said something to the effect of you

         6    at -- just prior to the shooting at Kualoa ranch, that he had

         7    nothing to do with this, do you recall that?  Do you recall

         8    that statement you testified about?

         9    A    That --

12:52PM  10   Q    Mr. Miske was -- when he was talking to you about Jake

         11   Smith and Lindsey Kinney --

         12   A    Correct.

         13   Q    -- he said something to the effect of, I had nothing to do

         14   with this.

12:52PM  15   A    Yes.

         16   Q    That was in regard to their drug debt dispute, wasn't it?

         17   A    That was in everything.  He just told me that, Whenever my

         18   name was ever brought up, there's an incidence where my sister

         19   was beat up.  And he could have easily not done anything to

12:52PM  20   make the matter right, but he was respectable in that matter,

         21   that he stayed in his lane.  And for that matter, yeah, when he

         22   said that he had nothing to do with it, I understood him to

         23   mean that he had nothing to do with anything that those guys

         24   were involved with, including myself.

12:52PM  25   Q    Okay.  Well, there were multiple issues going on at Kualoa
```

```
          1   Ranch that day, right?

          2   A    Yes.

          3   Q    It was not just one thing, correct?

          4   A    Correct.

12:53PM   5   Q    You were not privy to any meetings or discussions that

          6   Mr. Miske and Jake had prior to the shooting, correct?

          7   A    No.

          8   Q   Or after?

          9   A    No.

12:53PM  10   Q    For you, the reason you accepted these contracts, I'll

         11   call them, was monetary, right?

         12   A    Monetary.

         13   Q    You were trying to enrich yourself?

         14   A    I was trying to take care of my family.

12:53PM  15   Q    The MAC-10 with the silencer that you gave to Wayne

         16   Miller --

         17   A    Yes.

         18   Q    -- you said that he dropped Mr. Miske's name --

         19   A    Yes.

12:53PM  20   Q    -- hoping to get a better deal, correct?

         21   A    Correct.

         22   Q    But he also told you he was going to give that to

         23   Mr. Miske, right?

         24   A    Yes.

12:53PM  25   Q    The very first job that Wayne Miller offered you was the
```

1    abduction and murder of Jonathan Fraser, correct?

2    A    Correct.

3    Q    After you turned that down, didn't Jonathan Fraser go

4    missing shortly after that?

12:53PM    5    A    Yes.

6    Q    And then shortly after you refused that contract is when

7    Mr. Miller offered you the Elgin Calles job, right?

8    A    Correct.

9    Q    Didn't you specifically ask Wayne Miller at that time, Is

12:54PM    10    Miske involved in this?

11    A    Yes.

12    Q    Didn't you ask that because you knew he had been involved

13    in the Frasure contract?

14         MR. KENNEDY:  Objection.

12:54PM    15         THE WITNESS:  No.  I -- I don't know if he was

16    involved with Frasure.  I told you that I'm only going to speak

17    the truth, so I don't know that.

18    BY MR. INCIONG:

19    Q    Why did you ask then if Miske was involved in the Elgin

12:54PM    20    Calles?

21    A    Why did I ask if he was involved?

22    Q    Yeah.

23    A    Because Frasure went missing, and I -- at that point I

24    tried to distance myself from anybody that had anything to do

12:54PM    25    with that.

```
 1   Q    Fair enough.  Thank you.

 2             MR. INCIONG:  No further questions, Your Honor.

 3             THE COURT:  Anything on recross?

 4                           RECROSS EXAMINATION

 5   BY MR. KENNEDY:

 6   Q    Sir, the government asked you a question, and you said

 7   you're here to speak the truth, right?

 8   A    Yes.

 9   Q    And you have done so, correct?

10   A    Yes.

11   Q    And originally I understood that Wayne Miller brought up

12   this thing involving a kidnapping, right?

13   A    Yes.

14   Q    And that you brushed it off.

15   A    Yes.

16   Q    Didn't give it another thought.

17   A    Correct.

18   Q    All right.  And then with respect to Mr. Miske on the day

19   at the ranch, he was there to scrap, right?

20   A    Yes.

21   Q    Other than that, you've had absolutely nothing to do with

22   Mr. Miske, right?

23   A    Correct.

24   Q    And you had met him either that day or the day before,

25   right?
```

1  A   Yes.

2  Q   And spent no time with him after that, right?

3  A   Correct.

4  Q   And what you said was, in response to the government's

12:55PM  5  question is, These folks are always throwing out Mr. Miske's

6  name, right?

7  A   Yes.

8  Q   With Wayne Miller, you distanced yourself from him, right?

9  A   Yes.

12:55PM  10  Q   You saw what he was about, didn't you?

11  A   Correct.

12        MR. KENNEDY:  Nothing further.

13        THE COURT:  Mr. Akau, you may step down.  Thank you,

14  sir.

12:56PM  15        THE WITNESS:  Thank you.

16                    --oo0oo--

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2          I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10          DATED at Honolulu, Hawaii, August 2, 2024.

11

12

13                                /s/ Gloria T. Bediamol

14                                GLORIA T. BEDIAMOL.

15                                RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```