08:32AM

```
  1                 IN THE UNITED STATES DISTRICT COURT

  2                    FOR THE DISTRICT OF HAWAII

  3
       UNITED STATES OF AMERICA,    )    CRIMINAL NO. 19-00099-DKW
  4                                 )
                  Plaintiff,        )    Honolulu, Hawaii
  5                                 )
            vs.                     )    July 22, 2024
  6                                 )
       MICHAEL J. MISKE, JR.,       )
  7                                 )
                  Defendant.        )
  8    _____ )

  9
                     TRANSCRIPT OF JURY TRIAL (DAY 104)
 10            BEFORE THE HONORABLE DERRICK K. WATSON,
             CHIEF UNITED STATES DISTRICT COURT JUDGE
 11
       APPEARANCES:
 12
       For the Plaintiff:          MARK INCIONG, ESQ.
 13                                MICHAEL DAVID NAMMAR, ESQ
                                   WILLIAM KE AUPUNI AKINA, ESQ.
 14                                AISLINN AFFINITO, ESQ.
                                   Office of the United States Attorney
 15                                PJKK Federal Building
                                   300 Ala Moana Boulevard, Suite 6100
 16                                Honolulu, Hawaii  96850

 17    For the Defendant:          LYNN E. PANAGAKOS, ESQ.
                                   841 Bishop St., Ste 2201
 18                                Honolulu, HI 96813

 19                                MICHAEL JEROME KENNEDY, ESQ.
                                   Law Offices of Michael Jerome
 20                                Kennedy, PLLC
                                   333 Flint Street
 21                                Reno, NV 89501

 22    Official Court Reporter:    Gloria T. Bediamol, RPR RMR CRR FCRR
                                   United States District Court
 23                                300 Ala Moana Boulevard
                                   Honolulu, Hawaii 96850
 24
        Proceedings recorded by machine shorthand, transcript produced
 25    with computer-aided transcription (CAT).
```

1                          I N D E X

2    GOVERNMENT WITNESSES:                              PAGE NO.

3      CRYSTAL YOUNG

4          DIRECT EXAMINATION BY MS. AFFINITO              30

5      GREGORY TURNER

6          DIRECT EXAMINATION BY MR. AKINA                 43

7    EXHIBITS:                                          PAGE NO.

8      Exhibit 11-3 was received in evidence              32
       Exhibit 11-11 was received in evidence             35
9      Exhibit 11-8 was received in evidence              36
       Exhibit 11-20 was received in evidence             40
10     Exhibit 11-6 was received in evidence              46
       Exhibit 11-9 was received in evidence              48
11     Exhibit 11-25 was received in evidence             51
       Exhibit 11-22 was received in evidence             54
12     Exhibit 11-34 was received in evidence             56
       Exhibit 11-19 was received in evidence             58
13     Exhibit 11-28 was received in evidence             62
       Exhibit 11-51 was received in evidence             67
14     Exhibit 11-54 was received in evidence             69
       Exhibit 11-36 was received in evidence             70
15     Exhibit 11-41 was received in evidence             73
       Exhibit 11-53 was received in evidence             75
16     Exhibit 11-55 was received in evidence             77
       Exhibit 11-56 was received in evidence             79
17     Exhibit 11-59 was received in evidence             80
       Exhibit 11-60 was received in evidence             82
18     Exhibit 11-67 was received in evidence             86
       Exhibit 9-1199 was received in evidence            88
19     Exhibit 11-72 was received in evidence             91
       Exhibit 11-71 was received in evidence             92
20     Exhibits 11-73 through 11-79 were received in      97
       evidence
21     Exhibits 11-80 through 11-82 and 11-84 through     102
       11-89 were received in evidence
22     Exhibit 11-63 was received in evidence             107
       Exhibit 11-91 was received in evidence             112
23

24

25

1   July 22, 2024                                    8:41 a.m.

2          (Open court out of the presence of the jury.)

08:41AM   3          THE CLERK:  Criminal Number 19-00099-DKW-KJM, United

08:41AM   4   States of America versus Michael J. Miske, Jr.

08:41AM   5          This case has been called for jury trial, Phase 2,

08:41AM   6   Day 104.

08:41AM   7          Counsel, please make your appearances for the record.

08:42AM   8          MR. INCIONG:  Good morning, Your Honor.  Mark Inciong,

08:42AM   9   KeAupuni Akina, Aislinn Affinito, and Michael Nammar for the

08:42AM   10   United States.  Today we have our paralegal Collin Vickers with

08:42AM   11   us as well as FBI Special Agent Tom Palmer.

08:42AM   12          THE COURT:  Good morning.

08:42AM   13          MR. KENNEDY:  Good morning, Your Honor.  Michael

08:42AM   14   Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and

08:42AM   15   Josh Barry.

08:42AM   16          THE COURT:  Good morning.  You may be seated.

08:42AM   17          Before we bring the jury in, there are a few issues to

08:42AM   18   review regarding matters that were brought to my attention over

08:42AM   19   this past weekend.

08:42AM   20          In no particular order, there is the issue of what the

08:42AM   21   defense refers to as the government's late production of

08:42AM   22   forfeiture trial exhibits.  That is not only the introduction

08:42AM   23   of the issue, it is the end of the issue as far as I'm aware.

08:42AM   24          So does someone wish to elaborate on this?

08:42AM   25          MS. PANAGAKOS:  Your Honor, we received 99 new

08:42AM  1    exhibits late last night -- I mean, well, 8:20 last night, and

08:43AM  2    that the government intends to use for the forfeiture hearing.

08:43AM  3    And we just haven't had sufficient time to review and make use

08:43AM  4    of them.  I mean, I haven't even been able to print them out

08:43AM  5    and select what I would use for cross-examination.  You know, I

08:43AM  6    just completely -- not enough time to prepare to use them.

08:43AM  7    So --

08:43AM  8           THE COURT:  Are these 99 exhibits that have -- that

08:43AM  9    are not in --

08:43AM  10          MS. PANAGAKOS:  Correct.

08:43AM  11          THE COURT:  -- the 10,000 binders I have behind me?

08:43AM  12          MS. PANAGAKOS:  Correct.

08:43AM  13          THE COURT:  These are brand new exhibits that you had

08:43AM  14   not previously been notified as having been exhibits.

08:43AM  15          MS. PANAGAKOS:  Correct.  We got five summary charts

08:43AM  16   on Saturday, which are included within the 99.  So five on

08:43AM  17   Saturday and the rest of the 99 last night, yeah.

08:43AM  18          THE COURT:  All right.  Who wants to address this for

08:43AM  19   the government?

08:43AM  20          MR. INCIONG:  Your Honor, we filed them as soon as we

08:43AM  21   could.  It was not a case of, you know, waiting until --

08:43AM  22   obviously we didn't have a verdict until Thursday afternoon,

08:44AM  23   and we were working on it over the weekend and deciding what we

08:44AM  24   needed and what we didn't need, trying to be as efficient as

08:44AM  25   possible.

08:44AM  1          I would point out during the defense case we never got

08:44AM  2    an exhibit list before 10:00 p.m. on any day.  In many cases it

08:44AM  3    was 1:00 or 2:00 in the morning, and that was -- so, I mean,

08:44AM  4    this is kind of the way it's been in this case.

08:44AM  5          MS. PANAGAKOS:  Your Honor, may I respond to that?

08:44AM  6          THE COURT:  Yes, of course.

08:44AM  7          MS. PANAGAKOS:  Our exhibit lists that were filed the

08:44AM  8    night before were impeachment exhibits to cross-examine

08:44AM  9    witnesses, not --

08:44AM  10         MR. INCIONG:  I'm talking about the defense case.

08:44AM  11         MS. PANAGAKOS:  And we did have -- you know, the one

08:44AM  12   time that's analogous is with the Ken Hines summaries, and the

08:44AM  13   government was given extra time to go over them.

08:44AM  14         And that's all I'm asking.  I mean, I wouldn't object

08:44AM  15   to the direct testimony today, but if we could just -- I guess

08:44AM  16   my proposal would be to have Mr. Hines, who is here, be able to

08:44AM  17   sit in on today's hearing and have the direct testimony today,

08:44AM  18   and let me cross the IRS people tomorrow.

08:45AM  19         THE COURT:  How many of these 99 exhibits did the

08:45AM  20   government intend to offer through the witnesses that are

08:45AM  21   identified for today?  All of them?

08:45AM  22         MR. INCIONG:  I would estimate half, Your Honor.

08:45AM  23         MS. PANAGAKOS:  Your Honor, I would just also point

08:45AM  24   out that some of them weren't even in the discovery from -- you

08:45AM  25   know, that's how new they are.

08:45AM   1          THE COURT:  Okay.  So the government -- so,
08:45AM   2    Ms. Panagakos, as I understand her objection, isn't saying that
08:45AM   3    these exhibits should be excluded.  It's just that she needs
08:45AM   4    more time to prepare.  So given the disclosure at 8:18 last
08:45AM   5    night, it doesn't seem unreasonable of a request to me.
08:45AM   6          So the government has a choice.  You can wait until
08:46AM   7    tomorrow's proceedings and utilize the witnesses that are --
08:46AM   8    that you intend to introduce these -- one or more of these 99
08:46AM   9    exhibits or you can present them on direct, as Ms. Panagakos
08:46AM   10   has offered that they don't have an objection to that.  But if
08:46AM   11   their direct is done today, the cross-examination would be
08:46AM   12   reserved until tomorrow to give her another day or another
08:46AM   13   evening to review these documents.  It doesn't matter to me
08:46AM   14   what -- what the government chooses to do.
08:46AM   15         Okay.  So that's the first issue.
08:46AM   16         The second one is relating to the use of hearsay.
08:46AM   17   Does anyone -- I've read the two briefs on this subject.  Does
08:46AM   18   anyone wish to be heard further?  Otherwise, I'm prepared to
08:46AM   19   rule.
08:46AM   20         MR. AKINA:  Yes, Your Honor.
08:46AM   21         THE COURT:  Mr. Akina.
08:47AM   22         MR. AKINA:  A couple of responses to the defense's
08:47AM   23   objection.  This is clearly -- we're clearly now past the
08:47AM   24   conviction stage, past the guilt stage.  This is the forfeiture
08:47AM   25   stage.  It's under sentencing.  So that's how it's structured

08:47AM  1  under the rules.  That's what every case I've seen has

08:47AM  2  indicated, Supreme Court down to this district.

08:47AM  3         There is -- just because the trier of fact has

08:47AM  4  changed, judge versus jury, that doesn't change the burden of

08:47AM  5  proof.  It doesn't change standard of proof either.  This is

08:47AM  6  part of sentencing.  That's why we have preponderance of the

08:47AM  7  evidence standard.  That's what the committee notes, the 32.2

08:47AM  8  notes.  That's the same reason why admissible -- hearsay is

08:47AM  9  admissible in this type of proceeding.  There's a different set

08:47AM  10  of rules now.  The rules are now it must be relevant and

08:47AM  11  reliable.

08:47AM  12         The distinction the defense tries to draw, I don't

08:48AM  13  really see it.  The distinction between a judge making the

08:48AM  14  decision versus a jury making the decision, that's going to be

08:48AM  15  the same decision that they have to come to the conclusion of.

08:48AM  16  What's the nexus?  Rule 32.2 lays out -- besides that, lays out

08:48AM  17  the same procedure.

08:48AM  18         So for those reasons -- I would also note we didn't

08:48AM  19  identify anything specific.  We did indicate -- included some

08:48AM  20  case law about coconspirator statements at the time we were

08:48AM  21  considering maybe doing that.  We don't plan on introducing

08:48AM  22  coconspirator statements at this phase of the trial as well,

08:48AM  23  but nonetheless, I don't think that changes the standard.

08:48AM  24         THE COURT:  Okay.  Ms. Panagakos or Mr. Kennedy.

08:48AM  25         MS. PANAGAKOS:  Yes, Your Honor.  You know, Mr. Akina

08:48AM  1    says he doesn't see a difference between judge and jury.

08:48AM  2    There's obviously a big one.  Rule 32.2 does not talk about

08:48AM  3    admissibility of hearsay when it's before the jury.  You know,

08:49AM  4    there will be a different time, at sentencing or maybe before

08:49AM  5    sentencing, when the court issues a preliminary order of

08:49AM  6    forfeiture.  That's not this proceeding.  That's what 32.2, the

08:49AM  7    first section on what the court can consider.

08:49AM  8         I mean it's very clear.  The language of the rule says

08:49AM  9    what the court can consider.  And that's at a different stage,

08:49AM  10   which is sentencing.  This is Phase 2 of a jury trial.  They

08:49AM  11   didn't cite a single case where hearsay was admissible to a

08:49AM  12   jury of where the sentencing standard as to what evidence can

08:49AM  13   be considered is what applies to a jury, they didn't set a

08:49AM  14   single case which says that.

08:49AM  15        You know, I would note that there is the circuit split

08:49AM  16   on the standard of proof.  You know, that may be resolved by

08:49AM  17   the Supreme Court some day.  You know, we have our objection

08:49AM  18   preserved on that.  But, you know, that also goes to why it

08:49AM  19   should be the Rules of Evidence should apply.

08:49AM  20        And now they're saying they didn't -- I'm sorry, Your

08:49AM  21   Honor.

08:49AM  22        THE COURT:  No, go ahead.

08:49AM  23        MS. PANAGAKOS:  Now they're saying they don't intend

08:50AM  24   to introduce coconspirator statements.  Well, what hearsay do

08:50AM  25   they introduce?  I mean, there at least has to be -- if Your

08:50AM    1    Honor is going to apply the sentencing due process standard,

08:50AM    2    which we object to for the reasons we cited, you know, there at

08:50AM    3    least has to be some showing of reliability and some extrinsic

08:50AM    4    evidence we could cross on, and we don't even know what that

08:50AM    5    is.  So we'd at least need to know that in advance.  Thank you,

08:50AM    6    Your Honor.

08:50AM    7            THE COURT:  All right.  So in addressing this issue --

08:50AM    8    and for the record, the relevant briefs are at Docket 1724 and

08:50AM    9    1726 -- the government cites a number of cases.  In my mind,

08:50AM   10    the two principle ones are the Davila and Haleamau cases.  Both

08:50AM   11    of those cases involve the determination that hearsay is

08:50AM   12    permitted in forfeiture proceedings before the court.

08:51AM   13            The defense quarrels with those two citations, but of

08:51AM   14    course offers none of its own relating to the use of hearsay in

08:51AM   15    any kind of proceedings.  The defendant tries to distinguish

08:51AM   16    the government -- all of the government's cases, including

08:51AM   17    Haleamau and Davila, but does not offer any authority of its

08:51AM   18    own, except for one.  The one exception is Federal Rule of

08:51AM   19    Evidence 1101.  And there that citation is for the proposition

08:51AM   20    that the Federal Rules of Evidence apply and do not apply in

08:51AM   21    certain circumstances.

08:51AM   22            And the enumerated proceedings that 1101 says the

08:51AM   23    Rules of Evidence do not apply, according to the defense, is

08:51AM   24    forfeiture.  It does not say -- does not provide an exception

08:52AM   25    for the Rules of Evidence in forfeiture proceedings.  And while

08:52AM  1    that is objectively true, 1101(d)(3) says that the rules do not

08:52AM  2    apply in sentencing proceedings.  Forfeiture is part of

08:52AM  3    sentencing.  The government has made that assertion, and

08:52AM  4    there's been no argument or citation to the contrary by the

08:52AM  5    defense.  That is a material issue.

08:52AM  6              But like Mr. Akina, I do not see there being a

08:52AM  7    material difference, a substantive difference in who the fact

08:52AM  8    finder is.  So where these courts have said that hearsay is

08:52AM  9    permitted in forfeiture proceedings before the court, I see no

08:52AM  10   difference -- no reason to rule otherwise when those same

08:53AM  11   proceedings come before the jury.

08:53AM  12             Now, that doesn't mean that all hearsay is permitted,

08:53AM  13   and I don't think either side, including the government, is

08:53AM  14   suggesting otherwise.  There must be some indicia of

08:53AM  15   reliability, and the fact that it's hearsay is perhaps right

08:53AM  16   away some indicia of unreliability.  But so long as that

08:53AM  17   standard is met, what the government refers to as both

08:53AM  18   procedural or substantive reliability, I see no reason why that

08:53AM  19   could not be as a matter of law allowed for consideration by

08:53AM  20   the -- by the jury.

08:53AM  21             I can't provide more specifics because I've been given

08:53AM  22   no more specifics in terms of what hearsay the government sees

08:53AM  23   as coming down the pipe over the next couple of days.  So we

08:53AM  24   will have to reserve until that occurs.

08:53AM  25             The last issue that was briefed over the weekend

08:54AM 1   relates to the defense motion that is styled to preclude the

08:54AM 2   government from arguing forfeiture theories which are

08:54AM 3   inadequate as a matter of law.  The relevant briefs are at 1725

08:54AM 4   and I'm not sure what the government's opposition was docketed

08:54AM 5   at, perhaps at 1727, but I'm not certain of that.

08:54AM 6           MR. KENNEDY:  Your Honor, just so the record is clear,

08:54AM 7   I believe it's at 1728.

08:54AM 8           THE COURT:  All right.  Thank you.  My version that I

08:54AM 9   have in front of me is an undocketed copy that I think we got

08:54AM 10  via email.

08:54AM 11          All right.  Who wishes to be heard on this?  It seems

08:54AM 12  like the defense ought to go first, it's their motion.

08:54AM 13          MS. PANAGAKOS:  Thank you, Your Honor.  You know,

08:54AM 14  during jury instructions we objected to the RME fraud

08:54AM 15  instruction, folded into the wire fraud instruction, which the

08:54AM 16  Court sustained that objection.  And now we're -- now it's --

08:55AM 17          THE COURT:  I sustained the objection to including --

08:55AM 18  including specific language regarding RME fraud in the jury

08:55AM 19  instructions, but I did not sustain the objection with respect

08:55AM 20  to whether the government can proceed with RME fraud as a

08:55AM 21  theory.  And in fact, I don't think the government did abstain

08:55AM 22  or abdicate that theory in -- in what remained of the

08:55AM 23  proceedings, including closings thereafter.

08:55AM 24          MS. PANAGAKOS:  Right, Your Honor, and that, you know,

08:55AM 25  we made a general Rule 29 motion as to Count 1, but there was

08:55AM  1  no substantive wire fraud count charging the RME fraud theory.

08:55AM  2  So there was no, you know, procedural vehicle to move to

08:55AM  3  dismiss a count pursuant to Rule 29.

08:55AM  4       So now that we're at the forfeiture phase, and in

08:55AM  5  looking at Special Agent Turner's affidavit, and he's on the

08:56AM  6  witness list, it looks like from my reading of the affidavit

08:56AM  7  that legally inadequate theory was presented.  The theory being

08:56AM  8  that we're arguing is inadequate is that -- you know, that the

08:56AM  9  license is not -- they did not obtain property by making a

08:56AM  10 false statement to the DCCA.

08:56AM  11      Now, if there are other false statements made to

08:56AM  12 customers, that's a different issue.  But simply saying, you

08:56AM  13 know, PCO -- I have license PCO 24, that we're arguing is not a

08:56AM  14 false statement.

08:56AM  15      And so that's the only argument is that narrow

08:56AM  16 argument that we're trying to preclude -- Forfeiture Verdict

08:56AM  17 Number 3 asks whether or not, you know, these items are

08:56AM  18 proceeds of racketeering activity.  And so we're seeking to

08:56AM  19 preclude the argument that they're proceeds of wire fraud based

08:56AM  20 on the issuance of the license pursuant to the false statement.

08:57AM  21 If there's a particular statement made to a customer that the

08:57AM  22 government contends is false, that's a different issue.

08:57AM  23      But many of these customers were told nothing about

08:57AM  24 licensing.  I mean, they are -- you know, it's the distinction

08:57AM  25 between -- you know, you hold yourself out as licensed, which

08:57AM  1    they are, each of these entities have a license.  It's -- you

08:57AM  2    know, in holding yourself out as licensing -- as licensed,

08:57AM  3    you're not saying, I'm complying with every rule about

08:57AM  4    principal RMEs, and my principal RME is on site, and this means

08:57AM  5    my contract is signed by the person who is authorized to sign

08:57AM  6    it.  All of those representations are not folded into a simple

08:57AM  7    representation that I'm licensed.

08:57AM  8         You know, so -- and if Mr. Miske signed a contract

08:57AM  9    instead of Mr. Kansaki, that's not a false statement.  So

08:57AM  10   that's the argument we're trying to preclude.

08:57AM  11        THE COURT:  But as much as we know about the jury's

08:57AM  12   verdict on Count 1, as a subissue within Count 1, the jury was

08:58AM  13   asked to make findings with regard to the number of acts, if

08:58AM  14   any, on various types of racketeering activity.  Wire fraud

08:58AM  15   being one of those.  And in response to that query and that

08:58AM  16   responsibility by the jury, they elected a finding of two or

08:58AM  17   more acts of wire fraud.

08:58AM  18        Now, we don't know what kind of wire fraud.  There

08:58AM  19   were a number of different events that the government cited as

08:58AM  20   the basis, but that is as much as we know.  And now you're

08:58AM  21   saying that we should tell the jury they can't consider RME

08:58AM  22   fraud as one of the types of wire fraud that can connect

08:58AM  23   Mr. Miske's conduct to the various types of property at issue

08:58AM  24   here?

08:58AM  25        MS. PANAGAKOS:  No.  I'm not saying the jury should be

| | | |
|---|---|---|
| 08:58AM | 1 | instructed.  I'm saying the government should limit its |
| 08:58AM | 2 | instructions to false statements made to customers.  I'm not |
| 08:59AM | 3 | saying that, you know, because they obtained the license |
| 08:59AM | 4 | through alleged false statements, that means the customers were |
| 08:59AM | 5 | defrauded.  That the argument should be, you know, limited to, |
| 08:59AM | 6 | tailored to what false statements were made to customers. |
| 08:59AM | 7 | THE COURT:  Okay.  Mr. Inciong, did you want to |
| 08:59AM | 8 | respond, or Mr. Akina? |
| 08:59AM | 9 | MR. INCIONG:  Ms. Affinito will. |
| 08:59AM | 10 | THE COURT:  Ms. Affinito, okay. |
| 08:59AM | 11 | MS. AFFINITO:  Thank you, Your Honor.  So the purpose |
| 08:59AM | 12 | of the forfeiture portion of this trial is to determine whether |
| 08:59AM | 13 | property has a sufficient nexus to the crime of conviction, |
| 08:59AM | 14 | which is racketeering conspiracy.  It's not any sort of |
| 08:59AM | 15 | underlying substantive charges or even specific racketeering |
| 08:59AM | 16 | acts.  It's the general racketeering conspiracy. |
| 08:59AM | 17 | And the jury may consider any relevant conduct or |
| 08:59AM | 18 | evidence that establishes that nexus.  Indeed, before the jury |
| 08:59AM | 19 | is the entirety of evidence that was presented at trial, which |
| 08:59AM | 20 | includes uncharged conduct that served as enterprise proof, as |
| 09:00AM | 21 | well as lawful conduct that might have served as evidence of |
| 09:00AM | 22 | the conspiracy, as well as all of the evidence surrounding the |
| 09:00AM | 23 | RME fraud.  They've already heard all of this evidence, and |
| 09:00AM | 24 | they're permitted to consider it in determining whether there |
| 09:00AM | 25 | is a sufficient nexus. |

09:00AM   1          The government is not limited to specific legal
09:00AM   2    theories which the jury is not going to be deciding the
09:00AM   3    sufficiency is of at this stage.  And again, it doesn't make
09:00AM   4    sense to preclude them from hearing additional evidence or
09:00AM   5    argument on RME fraud when they've already considered it and
09:00AM   6    potentially convicted the defendant on it.
09:00AM   7          The RME fraud was presented as a racketeering act, and
09:00AM   8    we maintain that the way it was presented, it was a different
09:00AM   9    and legally sufficient theory.  It's based on obtaining
09:00AM   10   money -- not property, not licenses -- it was based on
09:00AM   11   obtaining money from customers by making misrepresentations to
09:01AM   12   them.  Those misrepresentation happen to be whether the
09:01AM   13   companies are properly licensed.
09:01AM   14          But in any event, the government is not limited to
09:01AM   15   racketeering acts to establish the necessary nexus between
09:01AM   16   forfeitable property and the racketeering conspiracy.  It can
09:01AM   17   rely on conduct like, for example, the separate DCCA fraud not
09:01AM   18   presented by the government as wire fraud if it helps establish
09:01AM   19   that nexus.  Thank you.
09:01AM   20          THE COURT:  Anything else with respect to this motion,
09:01AM   21   not just the RME fraud issue?
09:01AM   22          MS. PANAGAKOS:  Your Honor, just one of the points we
09:01AM   23   made in our motion is that, you know, we're trying to prevent
09:01AM   24   an end run around Cleveland.  And Cleveland, obviously the
09:01AM   25   defendants used the license to then conduct their business.

09:01AM   1    And that's, you know, the distinction between -- you can't -- I
09:01AM   2    mean, you can't just get end run around the case by saying you
09:01AM   3    can't then use your license.  If it's separate false
09:01AM   4    statements, that's a different story, but the use of a license
09:01AM   5    is not in itself a false statement.  The representation that
09:01AM   6    you now have the license is not a false statement.  That's what
09:02AM   7    we're trying to preclude.  Thank you, Your Honor.
09:02AM   8              THE COURT:  Anything else?
09:02AM   9              MS. AFFINITO:  No, Your Honor.
09:02AM  10              THE COURT:  Motion is denied.
09:02AM  11              Openings.  Both sides wish to enter an opening
09:02AM  12    argument on Phase 2?  I assume that to be the case, but maybe I
09:02AM  13    shouldn't.
09:02AM  14              MR. INCIONG:  Yes.
09:02AM  15              THE COURT:  All right.  I assume they're also
09:02AM  16    relatively brief?
09:02AM  17              MR. INCIONG:  Yes, very.
09:02AM  18              THE COURT:  All right.  And the defense wishes to make
09:02AM  19    an opening as well?
09:02AM  20              MS. PANAGAKOS:  Yes, Your Honor.
09:02AM  21              And before we start, can -- would it be all right if
09:02AM  22    Ken Hines sits in this portion of the trial?
09:02AM  23              THE COURT:  Who's -- who's Ken Hines?
09:02AM  24              MS. PANAGAKOS:  Oh, Ken Hines is the -- our witness.
09:02AM  25    He testified at the trial, and --

09:02AM 1          THE COURT:  We had hundreds of witnesses.  I'm sorry,
09:02AM 2   I don't recall who Ken Hines is.
09:02AM 3          MS. PANAGAKOS:  Right.  He testified as our expert
09:02AM 4   with regard to summaries of tax returns and how much tax was
09:02AM 5   reported, the former IRS agent.  And I'm just asking for an
09:02AM 6   exception to the exclusionary rule for this portion of the
09:03AM 7   proceedings, especially in light of the late production of the
09:03AM 8   exhibits, he will be able to help me get ready tonight.
09:03AM 9          THE COURT:  Any issue along that?
09:03AM 10          MR. INCIONG:  No, Your Honor.
09:03AM 11          THE COURT:  Mr. Inciong is saying the government has
09:03AM 12   no problem.
09:03AM 13          MS. PANAGAKOS:  Thank you.
09:03AM 14          MR. KENNEDY:  I'll go let him know, Your Honor.
09:03AM 15          THE COURT:  All right.  Let's get the jury in then.
09:03AM 16          And I don't know if we have communicated this yet, but
09:03AM 17   we were able to, as I said we would try to do, secure the
09:03AM 18   presence for the balance of Phase 2 of two alternate jurors.
09:03AM 19   We went down the list, and we only had to go down the list of
09:03AM 20   two -- positions 1 and 2 to secure the two that we needed.  So
09:03AM 21   the alternates that you'll see walk in in just a couple of
09:03AM 22   minutes here are Alternates 1 and 2 from Phase 1.
09:03AM 23          Alternates 3 and 4, by the way, have been instructed
09:04AM 24   with the same admonitions that we previously set in the event
09:04AM 25   that we need them.  We have not discharged either one of them

09:04AM    1    yet.

09:04AM    2            MR. AKINA:  Your Honor, as to the option that you gave

09:04AM    3    the government on whether to call witnesses today or

09:04AM    4    tomorrow --

09:04AM    5            THE COURT:  Yes.

09:04AM    6            MR. AKINA:  -- we have two witnesses planned for

09:04AM    7    today, and I expect that the estimate we gave the Court is

09:04AM    8    going to be shorter.  It's possible that we could wrap it up in

09:04AM    9    less than a day.  Our preference would be to wait till tomorrow

09:04AM    10   to start their direct examination.  We can go forward with

09:04AM    11   openings today.  We leave that up to Your Honor's discretion,

09:04AM    12   but that what we would elect to do.

09:04AM    13           THE COURT:  Just openings?

09:04AM    14           MR. AKINA:  I think personally it would make sense to

09:04AM    15   do it all at the same time, but I'll leave that up to Your

09:04AM    16   Honor.

09:04AM    17           THE COURT:  What do you mean?  You mean delay openings

09:04AM    18   till tomorrow?

09:04AM    19           MR. AKINA:  Correct.  And I'm not asking for that, but

09:05AM    20   I'm just --

09:05AM    21           THE COURT:  So what would we accomplish today?

09:05AM    22   Nothing?

09:05AM    23           MR. AKINA:  That's what we would accomplish.

09:05AM    24           THE COURT:  All right.  Then you don't have the

09:05AM    25   option.  Those witnesses will be presented today.

| | | |
|---|---|---|
| 09:07AM | 1 | (Open court in the presence of the jury.) |
| 09:07AM | 2 | THE CLERK:  Criminal Number 19-00099-DKW-KJM, United |
| 09:07AM | 3 | States of America versus Michael J. Miske, Jr. |
| 09:07AM | 4 | This case has been called for jury trial, Phase 2, |
| 09:07AM | 5 | Day 104. |
| 09:07AM | 6 | Counsel, please make your appearances for the record. |
| 09:07AM | 7 | MR. INCIONG:  Good morning, Your Honor.  Mark Inciong, |
| 09:07AM | 8 | KeAupuni Akina, Aislinn Affinito, and Michael Nammar for the |
| 09:07AM | 9 | United States.  Today we have our paralegal Collin Vickers |
| 09:07AM | 10 | joining us for the first time, and FBI Special Agent Tom Palmer |
| 09:07AM | 11 | is present as well.  Good morning. |
| 09:07AM | 12 | THE COURT:  Good morning. |
| 09:07AM | 13 | MR. KENNEDY:  Good morning, Your Honor.  Michael |
| 09:07AM | 14 | Kennedy with Lynn Panagakos, Michael Miske, Ashley King, and |
| 09:07AM | 15 | Josh Barry. |
| 09:07AM | 16 | Good morning to each of you. |
| 09:07AM | 17 | THE COURT:  Good morning.  You may be seated. |
| 09:07AM | 18 | Good morning to our 14-member Phase 2 jury.  I hope |
| 09:07AM | 19 | everyone was able to get a little bit of rest over the -- what |
| 09:07AM | 20 | was a three-day break from this trial at least. |
| 09:08AM | 21 | The inception of Phase 2 will begin as the beginning |
| 09:08AM | 22 | of Phase 1 began, which is to say the prosecution and the |
| 09:08AM | 23 | defense will have an opportunity to address you first through |
| 09:08AM | 24 | what is known as an opening statement. |
| 09:08AM | 25 | As you now undoubtedly know, an opening statement is |

09:08AM  1   an outline of what each party intends to prove and is offered

09:08AM  2   to help you follow the evidence that is to come over the next

09:08AM  3   two or three days.  What counsel say to you in an opening

09:08AM  4   statement is not itself evidence.  That does not mean, however,

09:08AM  5   that you should not pay careful attention to what the lawyers

09:08AM  6   say, because you should.  An opening statement may help you to

09:08AM  7   better understand and follow the evidence.

09:08AM  8        And we'll start with the government.

09:09AM  9        Ms. Affinito.

09:09AM  10       MS. AFFINITO:  So good morning and welcome back.

09:09AM  11   We're here to discuss the forfeiture of Michael Miske's assets

09:09AM  12   due to their nexus to his criminal racketeering enterprise.

09:09AM  13   You've already found Mr. Miske guilty of conspiring to engage

09:09AM  14   in racketeering activity.  You've already determined that he

09:09AM  15   agreed to commit a multitude of racketeering acts.  That is the

09:09AM  16   starting point.

09:09AM  17       So you're going to hear that under our laws there are

09:09AM  18   three buckets of property that are forfeitable.  Any interests

09:09AM  19   the defendant acquired or maintained as part of a conspiracy is

09:09AM  20   forfeitable.  Mr. Miske's entire interests in the enterprise,

09:10AM  21   even if you think part of that enterprise was not tainted by

09:10AM  22   racketeering activity, is forfeitable as is any of the property

09:10AM  23   that was used to promote or further the affairs of the

09:10AM  24   enterprise, and finally, any property constituting proceeds of

09:10AM  25   racketeering activity or derived from those proceeds, whether

09:10AM   1    directly or indirectly, is forfeitable.  All of it.

09:10AM   2         Now, sometimes it can be tricky to disentangle what

09:10AM   3    are racketeering proceeds or what someone's interests in an

09:10AM   4    enterprise is or how to trace those proceeds back.  Sometimes.

09:10AM   5         But not here.  You've heard six months' worth of

09:10AM   6    evidence establishing that Michael Miske's businesses operated

09:10AM   7    to promote and further his criminal enterprise and his

09:10AM   8    racketeering activity.  The Miske Enterprise encompassed his

09:10AM   9    entire family of businesses which was built upon fraud upon

09:10AM   10   fraud upon fraud, and through which he engaged in a seemingly

09:11AM   11   endless stream of racketeering activity.

09:11AM   12        Fraudulent RME licenses to get these companies up and

09:11AM   13   running, to maintain their operation, and to deceive customers

09:11AM   14   about their qualifications.  Like Kama'aina Termite getting its

09:11AM   15   initial license back in 2000 by lying to the DCCA that Harry

09:11AM   16   Kansaki was going to serve as the principal RME and was a 51

09:11AM   17   percent owner.  Forging signatures left and right on contracts,

09:11AM   18   on permits, on license applications, on documents to obtain

09:11AM   19   pesticides, underreporting income from Mr. Miske's businesses

09:11AM   20   on his tax returns, and then using that unreported income to

09:11AM   21   fund his extravagant lifestyle, using his house at 6 Lumahai,

09:11AM   22   which was instructed by his own companies as collateral for the

09:11AM   23   bank fraud that he committed, structuring financial

09:11AM   24   transactions for his fishing operation to avoid CTRs and the

09:11AM   25   scrutiny of law enforcement, and using Kama'aina company

09:12AM    1    employees and resources to commit obstruction of justice

09:12AM    2    against this very court.

09:12AM    3        Michael Miske's companies operated criminally to

09:12AM    4    promote and further the affairs of his racketeering enterprise,

09:12AM    5    and everything he acquired, everything his companies generated

09:12AM    6    through racketeering activity were derived from the proceeds of

09:12AM    7    it.

09:12AM    8        And on top of the evidence you've already seen and

09:12AM    9    heard, you're going to see additional evidence of how

09:12AM    10    particular assets are tied and traced back to the Miske

09:12AM    11    Enterprise.  How Michael Miske acquired and maintained bank

09:12AM    12    accounts and real estate and other assets through his

09:12AM    13    racketeering activity.  You'll see how he used some of the

09:12AM    14    assets themselves to promote and further the affairs of his

09:12AM    15    enterprise like his bank accounts, and you'll see additional

09:12AM    16    evidence of how he used the racketeering proceeds to purchase

09:12AM    17    assets like real estate, luxury vehicles, boats, and artwork.

09:12AM    18        You're also going to get additional jury instructions

09:13AM    19    from the Court later, but for this forfeiture phase you're

09:13AM    20    going to consider the evidence under a completely different

09:13AM    21    standard than before, and it's a much lower burden of proof.

09:13AM    22    As you'll hear, you're not being asked to decide anything

09:13AM    23    beyond a reasonable doubt.  The applicable burden of proof here

09:13AM    24    is a much lower standard called preponderance of the evidence,

09:13AM    25    and it basically means more probably true than not.

09:13AM   1          So the United States is seeking to forfeit Mr. Miske's

09:13AM   2     real estate assets, boats, cars, artwork, and money from his

09:13AM   3     personal and business bank accounts.  And at the end of this

09:13AM   4     much shorter trial, we will ask that you find all of these

09:13AM   5     assets forfeitable as property that Mr. Miske acquired and

09:13AM   6     maintained through racketeering activity, that was used to

09:13AM   7     promote and further the affairs of the enterprise, and that

09:13AM   8     constitutes or was derived from proceeds of his racketeering

09:14AM   9     activity.  Thank you.

09:14AM   10         THE COURT:  Mr. Kennedy or Ms. Panagakos for the

09:14AM   11    defense, please.

09:14AM   12         MS. PANAGAKOS:  Good morning, ladies and gentlemen.

09:14AM   13    Among the instructions you'll be given is to -- that you'll be

09:14AM   14    told that the previous instructions that you were provided last

09:14AM   15    week continue to govern, and one of those instructions -- well,

09:14AM   16    those instructions concerning racketeer -- racketeering

09:14AM   17    activity continue to govern.

09:14AM   18         Like Ms. Affinito said, there are three buckets

09:14AM   19    whether an interest was acquired -- whether an asset was

09:14AM   20    acquired or maintained in violation of Count 1, whether it's

09:14AM   21    proceeds of Count 1.  And the proceeds you'll see in the

09:14AM   22    special verdict form, you're going to be asked whether it's

09:14AM   23    proceeds of racketeering activity.  And that's why I bring your

09:15AM   24    attention to remembering that instruction.

09:15AM   25         And then when you look at the assets, there's a number

09:15AM    1    of assets, like Ms. Affinito said, and a number of them are

09:15AM    2    tied to the four and a half million dollars that Kama'aina

09:15AM    3    Termite and Pest Control earned on the Keola La'i condominium

09:15AM    4    job.

09:15AM    5         Now, with regard to licensing, there was no evidence

09:15AM    6    presented to you as to what Mr. Harry Kansaki's ownership was

09:15AM    7    in the company in 2000.  The earliest tax returns where

09:15AM    8    Mr. Miske reported a hundred percent ownership I believe were

09:15AM    9    in 2009 or 2010.  Mr. Hughford Manolo said that Mr. Kansaki was

09:15AM    10   in fact the RME in the earlier years, and he was present and

09:15AM    11   supervised and worked directly with Mr. Manolo.  So we don't

09:15AM    12   know.  It's not accurate -- there is no evidence to support the

09:15AM    13   assertion that the license was obtained by fraud to begin with.

09:16AM    14        Now, with regard to the Nordic Construction job, at

09:16AM    15   that time Mr. Miske was the owner of Kama'aina Termite.  He

09:16AM    16   reported that to the IRS, and he had his own pest control

09:16AM    17   operator's license and he was an RME of Kama'aina Termite and

09:16AM    18   Pest Control.  He held himself out as the president and person

09:16AM    19   in charge of Kama'aina Termite in all his dealings with Nordic

09:16AM    20   Construction.  They were never deceived about the existence of

09:16AM    21   some other person.  He was the person that they thought was in

09:16AM    22   charge, and he was in fact in charge and he was licensed to be

09:16AM    23   in charge.

09:16AM    24        They were not -- if you'll recall Instruction 42,

09:16AM    25   which talks about whether or not Nordic Construction was

09:16AM  1    defrauded, which goes to whether or not its proceeds of

09:16AM  2    racketeering activity, they were never deceived about the

09:16AM  3    nature of their bargain.  That was in the instruction.  In

09:16AM  4    order to be wire fraud, in order to be proceeds of that

09:16AM  5    racketeering activity, Nordic Construction would've had to have

09:16AM  6    been deceived about the essential nature of the bargain.  They

09:17AM  7    weren't.  They bargained to -- for the service of Kama'aina

09:17AM  8    Termite, a company they knew to be managed by Mr. Miske, and

09:17AM  9    they got a successful fumigation job.

09:17AM  10          So what was purchased with money from that job that

09:17AM  11   you'll be asked to render forfeiture verdict on, one is the

09:17AM  12   Rachel, the commercial fishing boat.  That boat operated

09:17AM  13   lawfully.  You heard from Frank Crivello about the lawful

09:17AM  14   fishing activities that that boat derived its income from.

09:17AM  15   There was an issue as to how workers were paid, but that -- the

09:17AM  16   payment to workers is not -- those were monies out.  Those

09:17AM  17   weren't proceeds in, and it didn't -- it wasn't relevant to how

09:17AM  18   the Rachel was acquired or maintained in the ownership of the

09:17AM  19   Kama'aina family of businesses.  They didn't keep it free

09:18AM  20   structuring, and they didn't use proceeds of any illegal act to

09:18AM  21   keep it.  They purchased it outright.  Kama'aina Holdings was

09:18AM  22   the entity that purchased it outright for 900-something

09:18AM  23   thousand dollars with money from the Nordic job.

09:18AM  24          So we're asking you to find that Nordic money

09:18AM  25   untainted because that job was a success.  That company got the

09:18AM   1    benefit of its bargain.  They were not deceived.  There was

09:18AM   2    never an intent to cheat Nordic.  And that's how the Rachel was

09:18AM   3    purchased.

09:18AM   4           And then the Rachel engaged in fishing -- commercial

09:18AM   5    fishing activity for many years, and then that derived income

09:18AM   6    that was fully reported on the tax returns.  And then with that

09:18AM   7    money the Boston Whaler was purchased, the Painkiller.  And

09:18AM   8    that was purchased in 2016.  There is no nexus between that

09:18AM   9    boat and the alleged -- and the structuring.  The structuring

09:18AM   10   that was presented to you took place from 2012 to 2014.  This

09:18AM   11   boat, the Painkiller, was purchased in 2016 with a down payment

09:19AM   12   from fishing revenues alone, and alone that was repaid with

09:19AM   13   fishing revenues, lawful money.

09:19AM   14          A third asset that was purchased with the Nordic

09:19AM   15   Construction money is a residence on Paokano Loop in Kailua.

09:19AM   16   That was purchased with Nordic Construction money, and then

09:19AM   17   it -- it paid for itself largely with rental income, rental

09:19AM   18   income from that property.

09:19AM   19          So that is one bucket of assets that we would ask you

09:19AM   20   to find not subject to forfeiture for those reasons, and for

09:19AM   21   additional reasons as the evidence is presented and during

09:19AM   22   closing.

09:19AM   23          There's another bucket of assets which is the bank

09:19AM   24   accounts.  Those bank accounts -- there were bank accounts that

09:19AM   25   were -- funds from bank accounts were seized in July 2020.  So

09:19AM   1    the money in those bank accounts were from, you know, the time

09:19AM   2    period prior to 2020.  There are two Kama'aina Termite and Pest

09:19AM   3    Control accounts, there's an O'ahu Termite and Pest management

09:20AM   4    account, a plumbing account and a personal account.

09:20AM   5         So the Kama'aina Termite and Pest Control accounts

09:20AM   6    were generated -- and the revenues -- I believe the evidence is

09:20AM   7    going to show that the money in the Kama'aina Termite bank

09:20AM   8    accounts were revenues earned from fumigation and pest control

09:20AM   9    jobs, nothing else.

09:20AM   10        And at that time period Delia Fabro-Miske was the RME.

09:20AM   11   There's been no evidence that she -- that there were any false

09:20AM   12   statements made to anyone with regard to the -- her license.

09:20AM   13   The company held itself out as licensed.  It was licensed with

09:20AM   14   PCO824 from the beginning to the end.

09:20AM   15        And so those revenues we'd ask you to find to be

09:20AM   16   lawfully earned, not acquired or maintained in violation of

09:20AM   17   RICO and not the proceeds of any racketeering activity.

09:20AM   18        Oahu Termite and Pest Management, that covers a time

09:20AM   19   period when Michael Worden was the RME.  Now, he admits he was

09:21AM   20   the RME until -- and he moved away at a certain period of time,

09:21AM   21   and he didn't remove himself as the RME.  So the time period

09:21AM   22   governing the funds in that account are when Michael Worden was

09:21AM   23   the RME.  He testified he was, and whether or not he was in

09:21AM   24   compliance with the rules regarding the RME when he moved away,

09:21AM   25   there were no statements made to customers who paid O'ahu

09:21AM  1  Termite for its services with regard to that.  So there was no
09:21AM  2  intent to cheat Oahu Termite and Pest Management customers.
09:21AM  3  They paid for services that were rendered, and that money is
09:21AM  4  not acquired or maintained in violation of the RICO statute,
09:21AM  5  the Count 1 -- in violation of Count 1.
09:21AM  6      And then there's Mr. Miske's personal account which
09:21AM  7  has money, that I think will be presented as a commingled
09:21AM  8  account, so there will be money that is simply untainted by any
09:21AM  9  argument.  There will be money that comes from Kama'aina
09:22AM  10  Holdings, which is fishing revenues, which the fishing activity
09:22AM  11  was lawful, and then money from the Kama'aina Termite
09:22AM  12  fumigations.
09:22AM  13      One big job that relates to these -- the Kama'aina
09:22AM  14  Termite money and an asset purchased with it, one asset is the
09:22AM  15  Ferrari.  The Ferrari was purchased with funds from the
09:22AM  16  Maunakea job.  The Maunakea contract was signed by Delia, the
09:22AM  17  RME.  The job was performed.  There were issues that couldn't
09:22AM  18  be resolved because of the charges in this case, but there was
09:22AM  19  no fraud.  The Maunakea -- there was no fraud, there was no
09:22AM  20  deception of Maunakea.  Kama'aina Termite, a licensed company,
09:22AM  21  bid the job, got the job, performed the work to the best of its
09:22AM  22  ability, and couldn't finish with its warranty work because of
09:22AM  23  this case.  But that's where the Ferrari comes from.
09:22AM  24      There are other vehicles.  There's a red Volkswagen.
09:22AM  25  You saw pictures of a young Mr. Miske with his girlfriend Andi

09:22AM    1    at the time and a young Caleb.  That vehicle was purchased

09:23AM    2    sometime in the '90s before any evidence of tainted funds at

09:23AM    3    all.  The green Volkswagen, which was turned into a tribute

09:23AM    4    car, the 1951 green Volkswagen, and it was originally red, but,

09:23AM    5    anyway, it was purchased in 2009, again before any of the

09:23AM    6    evidence of the monies in this case.

09:23AM    7         So the collective vehicles, that was a personal hobby.

09:23AM    8    I'm not talking about the Hawaii Partners vehicles.  I'm

09:23AM    9    talking about collector -- the Volkswagens, the ones you saw

09:23AM   10    pictures of, those are personal collector vehicles that were

09:23AM   11    purchased with personal funds outside of the affairs of the

09:23AM   12    RICO conspiracy.

09:23AM   13         And then there's gifts which have no connection to any

09:23AM   14    taint at all.  You heard from the artist Slick as to gifts that

09:23AM   15    he supplied, and they're seeking to forfeit those as well, and

09:23AM   16    we'd ask you to, you know, find that those are not subject to

09:23AM   17    forfeiture because they're untainted gifts.  And there are

09:24AM   18    other artworks which are gifts as well.  Thank you.

09:24AM   19         THE COURT:  The exclusionary rule continues to apply

09:24AM   20    to this Phase 2, with the exception of Mr. Hines with the

09:24AM   21    government's consent.

09:24AM   22         Is the government prepared for as its first witness?

09:24AM   23         MS. AFFINITO:  Yes, Your Honor.  The government calls

09:24AM   24    Crystal Young.

09:24AM   25         THE CLERK:  Please raise your right hand.

| | | |
|---|---|---|
| 09:24AM | 1 | CRYSTAL YOUNG, |
| 09:24AM | 2 | called as a witness, having been first duly sworn, was examined |
| 09:24AM | 3 | and testified as follows: |
| 09:24AM | 4 | THE CLERK:  Please state your name, spelling your last |
| 09:25AM | 5 | name for the record. |
| 09:25AM | 6 | THE WITNESS:  Crystal Young, Y-O-U-N-G. |
| 09:25AM | 7 | DIRECT EXAMINATION |
| 09:25AM | 8 | BY MS. AFFINITO: |
| 09:25AM | 9 | Q    Good morning. |
| 09:25AM | 10 | A    Good morning. |
| 09:25AM | 11 | Q    Ms. Young, would you please remind the jury what you do. |
| 09:25AM | 12 | A    I'm a revenue agent with the Internal Revenue Service. |
| 09:25AM | 13 | Q    And you work out of the LA field office? |
| 09:25AM | 14 | A    Yes. |
| 09:25AM | 15 | Q    And you previously testified at trial about your review of |
| 09:25AM | 16 | accounting and tax records; is that correct? |
| 09:25AM | 17 | A    Yes. |
| 09:25AM | 18 | Q    So I want to direct your attention to the work that |
| 09:25AM | 19 | Kama'aina Termite did for the Keola La'i job.  Are you familiar |
| 09:25AM | 20 | with the payments that Kama'aina Termite received in connection |
| 09:25AM | 21 | with this work? |
| 09:25AM | 22 | A    Yes. |
| 09:25AM | 23 | Q    And how were those payments received? |
| 09:25AM | 24 | A    A couple of the payments were directly deposited -- or put |
| 09:25AM | 25 | into the bank account of Kama'aina Termite, and then three |

09:25AM   1   payments were also put into the Title Guaranty escrow account.

09:26AM   2   Q    Okay.  And what happened to the three payments that were

09:26AM   3   put in the escrow account?

09:26AM   4   A    They were eventually disbursed.

09:26AM   5   Q    Okay.  And I guess, was there any activity before they

09:26AM   6   were disbursed?

09:26AM   7   A    Yes, they were put into an interest-bearing bank account

09:26AM   8   for the -- on behalf of Kama'aina Termite.

09:26AM   9   Q    Okay.  And then did you review records of the Keola La'i

09:26AM  10   escrow account, other bank account records and accounting

09:26AM  11   records, to determine where the payments were ultimately

09:26AM  12   disbursed?

09:26AM  13   A    Yes.

09:26AM  14   Q    And did you prepare a summary of those records focusing on

09:26AM  15   transactions that you determined to be relevant to this

09:26AM  16   forfeiture proceeding?

09:26AM  17   A    Yes.

09:26AM  18        MS. AFFINITO:  I'd like to show the witness only

09:26AM  19   Government's Exhibit 11-3 from the -- I believe it's the 47th

09:26AM  20   supplement.

09:26AM  21        THE COURT:  Go ahead.

09:28AM  22        MS. AFFINITO:  Looks like we're having a problem.  We

09:28AM  23   can use the ELMO.

09:28AM  24   BY MS. AFFINITO:

09:28AM  25   Q    All right.  So can you see the document that I've placed

09:29AM   1   under the ELMO?

09:29AM   2   A    Yes.

09:29AM   3   Q    Okay.  Is this a copy of the summary that you've prepared?

09:29AM   4   A    Yes.

09:29AM   5   Q    Okay.  And does it show how payments were received from

09:29AM   6   the Keola La'i job into the escrow account?

09:29AM   7   A    Yes.

09:29AM   8   Q    And then does it show the accounts and destinations into

09:29AM   9   which those payments were ultimately disbursed?

09:29AM  10   A    Yes.

09:29AM  11        MS. AFFINITO:  Your Honor, we would move to admit and

09:29AM  12   publish Exhibit 11-3.

09:29AM  13        THE COURT:  Any objection?

09:29AM  14        MS. PANAGAKOS:  No objection, Your Honor.

09:29AM  15        THE COURT:  11-3 is admitted then without objection.

09:29AM  16   You may publish it.

09:29AM  17        (Exhibit 11-3 was received in evidence.)

09:29AM  18   BY MS. AFFINITO:

09:29AM  19   Q    So there are a number of columns here.  Could you walk the

09:29AM  20   jury through what these columns show?

09:29AM  21   A    Yes.  The first column is the date, and that's the date

09:29AM  22   the transaction was initiated.  Payer or payee, that's either

09:29AM  23   who the money is coming from or going to.  Receipts, what was

09:30AM  24   deposited into the escrow account.  Disbursements, what were

09:30AM  25   paid out of the escrow account.  And then the last column is

09:30AM  1   disbursement destinations, so where the money eventually

09:30AM  2   landed.

09:30AM  3   Q    Okay.  Now, does this show all of the transactions that

09:30AM  4   were in the escrow account?

09:30AM  5   A    No.

09:30AM  6   Q    Okay.  And so which ones are not shown here?

09:30AM  7   A    It's not showing the money that's transferred to the

09:30AM  8   interest-bearing bank account and then back.  And it's not

09:30AM  9   showing a handful of transactions.  There is a fee to the

09:30AM 10   escrow company, there is a payment out to Kama'aina Rolloff,

09:30AM 11   and then a payment made to a title company on behalf of

09:30AM 12   Mr. Dahl.

09:30AM 13   Q    Okay.  So here, the first three rows show payments into

09:30AM 14   the escrow count by Nordic PCL, correct?

09:30AM 15   A    Correct.

09:30AM 16   Q    So those were payments for the Keola La'i job; is that

09:31AM 17   right?

09:31AM 18   A    That's right.

09:31AM 19   Q    Okay.  And the remaining entries here then show where

09:31AM 20   those payments from the escrow account went; is that correct?

09:31AM 21   A    Correct.

09:31AM 22   Q    Okay.  So did some of the money from the Keola La'i job go

09:31AM 23   into Mike Miske's personal bank accounts?

09:31AM 24   A    Yes.

09:31AM 25   Q    And approximately how much?

| | | | |
|---|---|---|---|
| 09:31AM | 1 | A | A little -- a little over 470,000. |
| 09:31AM | 2 | Q | Okay.  And did some of the money go into various Leverage |
| 09:31AM | 3 | | bank accounts? |
| 09:31AM | 4 | A | Yes. |
| 09:31AM | 5 | Q | And how much? |
| 09:31AM | 6 | A | 1,050,000. |
| 09:31AM | 7 | Q | Okay.  And then did some of it go into Kama'aina Termite |
| 09:31AM | 8 | | and Pest Control's bank accounts? |
| 09:31AM | 9 | A | Yes. |
| 09:31AM | 10 | Q | And how much was that? |
| 09:31AM | 11 | A | 300,000. |
| 09:31AM | 12 | Q | Okay.  So I don't know if I'll be able to zoom in on this, |
| 09:31AM | 13 | | but do you see on -- here on February 24th, 2011, there's a |
| 09:32AM | 14 | | $150,000 disbursement to Pacific Rim Bank, correct? |
| 09:32AM | 15 | A | Correct. |
| 09:32AM | 16 | Q | And what is that payment for? |
| 09:32AM | 17 | A | That's a payment on the Pacific Rim loan for the land at |
| 09:32AM | 18 | | 6 Lumahai. |
| 09:32AM | 19 | | MS. AFFINITO:  Okay.  I'd like to now show the witness |
| 09:32AM | 20 | | only Exhibit 11-11 from the 47th supplement. |
| 09:32AM | 21 | | THE COURT:  Go ahead. |
| 09:32AM | 22 | | BY MS. AFFINITO: |
| 09:32AM | 23 | Q | Can you see that? |
| 09:32AM | 24 | A | Yes. |
| 09:32AM | 25 | Q | Okay.  So is this a copy of the $150,000 check out of the |

09:32AM  1   Keola La'i escrow account that was disbursed to Pacific Rim

09:32AM  2   Bank?

09:32AM  3   A     Yes.

09:32AM  4   Q     And this is you said in connection with a Pacific Rim Bank

09:32AM  5   loan for the land at 6 Lumahai, correct?

09:33AM  6   A     Correct.

09:33AM  7          MS. AFFINITO:  Your Honor, I would move to admit and

09:33AM  8   publish Exhibit 11-11.  There's a certification at 11-7.

09:33AM  9          THE COURT:  Any objection?

09:33AM  10         MS. PANAGAKOS:  No objection.

09:33AM  11         THE COURT:  11-11 is admitted then.  You may publish.

09:33AM  12         (Exhibit 11-11 was received in evidence.)

09:33AM  13  BY MS. AFFINITO:

09:33AM  14  Q     So if we look, I guess, first at the top portion here,

09:33AM  15  this shows this was a loan payment by Michael Miske to Pacific

09:33AM  16  Rim Bank, correct?

09:33AM  17  A     Correct.

09:33AM  18  Q     And then you can see the disbursement in this check, this

09:33AM  19  is the $150,000 check below there, correct?

09:33AM  20  A     Correct.

09:33AM  21  Q     Okay.  And so I don't know if it's easy to see here, but

09:33AM  22  the date on this check is February 24th, 2011, correct?

09:33AM  23  A     Correct.

09:33AM  24  Q     And so that corresponds with -- it matches the escrow

09:33AM  25  account date, correct?

09:33AM   1   A    Correct.

09:33AM   2   Q    Okay.  So on the check here, right below it there's a

09:33AM   3   different date, March 7th, 2011.  What does that mean?

09:34AM   4   A    That's the date that Pacific Rim would have processed it.

09:34AM   5   There is very effectually lag time between when a check is

09:34AM   6   written to when it finally gets cashed or processed.

09:34AM   7        MS. AFFINITO:  I'd like to now show the witness only

09:34AM   8   Exhibit 11-8 from the 47th supplement.

09:34AM   9        THE COURT:  Yes, go ahead.

09:34AM  10   BY MS. AFFINITO:

09:34AM  11   Q    Okay.  So is this a copy of a history of loan payments by

09:34AM  12   Michael Miske on the -- to Pacific Rim Bank on that loan for

09:34AM  13   the land at 6 Lumahai?

09:34AM  14   A    Yes.

09:34AM  15        MS. AFFINITO:  Your Honor, I would move to admit and

09:34AM  16   publish Exhibit 11-8.  There's a certification at 11-7.

09:34AM  17        THE COURT:  Any objection?

09:34AM  18        MS. PANAGAKOS:  No objection.

09:35AM  19        THE COURT:  11-8 is admitted then.  You may publish.

09:35AM  20        (Exhibit 11-8 was received in evidence.)

09:35AM  21   Q    So if we first look at the top portion here, so this

09:35AM  22   identifies Michael J. Miske, Jr., correct?

09:35AM  23   A    Correct.

09:35AM  24   Q    And this document, it says it's a loan history record,

09:35AM  25   correct?

09:35AM    1    A    Correct.

09:35AM    2    Q    Related to Pacific Rim Bank?

09:35AM    3    A    Correct.

09:35AM    4    Q    And this loan, it says it's for a first mortgage, vacant

09:35AM    5    land at 6 Lumahai Street; is that correct?

09:35AM    6    A    Correct.

09:35AM    7    Q    Okay.  And then if we look at the bottom here, is this

09:35AM    8    dated March 7th, and there's an amount here $150,000, does this

09:35AM    9    correspond to the $150,000 payment out of the Keola La'i escrow

09:35AM    10   account?

09:35AM    11   A    Yes.

09:35AM    12   Q    Okay.  And so here they're using the processing date as

09:36AM    13   opposed to the initiation date, correct?

09:36AM    14   A    Correct.

09:36AM    15   Q    Okay.  So this $150,000 payment on the loan for the land

09:36AM    16   at 6 Lumahai was ultimately sourced from Kama'aina Termite and

09:36AM    17   Pest Control, correct?

09:36AM    18   A    Correct.

09:36AM    19   Q    Okay.  So it was -- specifically, it came from money that

09:36AM    20   Kama'aina Termite received for the Keola La'i job, correct?

09:36AM    21   A    Correct.

09:36AM    22   Q    Okay.  And based on your review of the loan documents and

09:36AM    23   accounting and tax records, did Mr. Miske identify any uses for

09:36AM    24   the 6 Lumahai land aside from building the property on it?

09:36AM    25   A    Yes.  In the mun (sic) documents it stated that he would

09:36AM   1   be using it for rental storage of equipment, specifically for

09:36AM   2   Kama'aina Plumbing and Kama'aina Termite.

09:36AM   3   Q    Okay.  And I can show you again --

09:36AM   4        MS. AFFINITO:  Publish Exhibit 11-3, which is already

09:37AM   5   admitted.

09:37AM   6        THE COURT:  Yes.

09:37AM   7   BY MS. AFFINITO:

09:37AM   8   Q    So this is that summary we were just looking at that you

09:37AM   9   made.  So you testified earlier that over a million dollars of

09:37AM   10  the money that you earned from the Keola La'i job went to the

09:37AM   11  Leverage accounts; is that correct?

09:37AM   12  A    That's correct.

09:37AM   13  Q    And so the first payment here into a Leverage account is

09:37AM   14  this on February 28th, 2011, correct?

09:37AM   15  A    Correct.

09:37AM   16  Q    It goes to Leverage Entertainment LLC, correct?

09:37AM   17  A    Correct.

09:37AM   18  Q    And it's for $350,000, correct?

09:37AM   19  A    Correct.

09:37AM   20  Q    And then between October and December of 2011, an

09:37AM   21  additional $700,000 of the Keola La'i money gets disbursed to

09:37AM   22  Leverage accounts; is that correct?

09:37AM   23  A    Correct.

09:37AM   24  Q    And do you know what that money was for?

09:37AM   25  A    That was the first year of Leverage, it's to operate and

09:38AM    1    start the business.

09:38AM    2    Q    Okay.  So this money is going into Leverage around the

09:38AM    3    time that it's starting up; is that correct?

09:38AM    4    A    Correct.

09:38AM    5    Q    Okay.  And 2011 was the Leverage's first year of

09:38AM    6    operation.  Is that what you were testifying to?

09:38AM    7    A    Yes, that's correct.

09:38AM    8    Q    Okay.  And so were these -- these were contributions to

09:38AM    9    Leverage; is that right?

09:38AM    10    A    That's right.

09:38AM    11    Q    And if we look here on September 27th, 2011, there is a

09:38AM    12    $556,252.87 disbursement to Title Guaranty Escrow Services; is

09:38AM    13    that right?

09:38AM    14    A    Yes.

09:38AM    15    Q    So is this the same escrow company who's holding the

09:38AM    16    entire escrow account?

09:38AM    17    A    Same company, yes.

09:38AM    18    Q    Okay.  This disbursement goes to the escrow company,

09:38AM    19    correct?

09:38AM    20    A    Yes.

09:38AM    21    Q    Okay.  So did it actually go to a different office within

09:39AM    22    the escrow company?

09:39AM    23    A    Yes.

09:39AM    24    Q    Okay.  And did you review records to determine what that

09:39AM    25    disbursement was used for?

09:39AM    1    A    Yes.

09:39AM    2    Q    And what was it used for?

09:39AM    3    A    It was the purchase of Paokano Loop property.

09:39AM    4         MS. AFFINITO:  If I could show the witness only

09:39AM    5    Exhibit 11-20 from the 47th supplement.

09:39AM    6         THE COURT:  Yes, go ahead.

09:39AM    7    BY MS. AFFINITO:

09:39AM    8    Q    So can you see this document before you?

09:39AM    9    A    Yes.

09:39AM   10    Q    Okay.  So is this a copy of the final buyer statement for

09:39AM   11    a property purchased by Michael Miske at 614 Paokano Loop?

09:39AM   12    A    Yes.

09:39AM   13    Q    And does this show a roughly $556,000 disbursement from

09:39AM   14    that Keola La'i escrow account?

09:39AM   15    A    Yes.

09:39AM   16         MS. AFFINITO:  Your Honor, I'd move to admit and

09:40AM   17    publish Exhibit 11-20.  There's a certification at 11-16.

09:40AM   18         THE COURT:  Any objection to 11-20?

09:40AM   19         MS. PANAGAKOS:  No objection, Your Honor.

09:40AM   20         THE COURT:  That exhibit is then admitted without

09:40AM   21    objection.  You may publish it.

09:40AM   22         (Exhibit 11-20 was received in evidence.)

09:40AM   23    BY MS. AFFINITO:

09:40AM   24    Q    So if we zoom in here and look at the top.  So this is --

09:40AM   25    this is the final buyer's statements for the property at 614

09:40AM  1    Paokano Loop in Kailua, Hawaii; is that right?

09:40AM  2    A    Yes.

09:40AM  3    Q    And it identifies Michael Miske on this document, correct?

09:40AM  4    A    Correct.

09:40AM  5    Q    And then again, that same Title Guaranty Escrow Services

09:40AM  6    company, correct?

09:40AM  7    A    Correct.

09:40AM  8    Q    And if we look a little further down, do you see the

09:40AM  9    deposit of $556,252.87?

09:41AM  10   A    Yes.

09:41AM  11   Q    And so that's the exact same amount down to the cent that

09:41AM  12   was disbursed from the Keola La'i escrow account, correct?

09:41AM  13   A    Correct.

09:41AM  14   Q    And then we see that here, and you see that number down

09:41AM  15   here again as well.

09:41AM  16   A    Correct.

09:41AM  17   Q    Okay.  And here it says "TGES Main Office."  Is that the

09:41AM  18   escrow company?

09:41AM  19   A    Yes.

09:41AM  20   Q    Okay.  And so it has this roughly $556,000 payment, again

09:41AM  21   dated September 27th, 2011; is that right?

09:41AM  22   A    That's right.

09:41AM  23   Q    And so that's the same date that's identified on the

09:41AM  24   escrow account; is that right?

09:41AM  25   A    Correct.

| | | |
|---|---|---|
| 09:41AM | 1 | Q    Okay.  So the payment for the purchase of the Paokano Loop |
| 09:41AM | 2 | property was ultimately sourced from monies that Kama'aina |
| 09:41AM | 3 | Termite received; is that right? |
| 09:41AM | 4 | A    Correct. |
| 09:41AM | 5 | Q    And specifically, this money came from money that |
| 09:41AM | 6 | Kama'aina Termite received for the Keola job -- Keola La'i job; |
| 09:41AM | 7 | is that correct? |
| 09:41AM | 8 | A    That's correct. |
| 09:42AM | 9 | MS. AFFINITO:  Nothing further. |
| 09:42AM | 10 | THE COURT: Ms. Panagakos. |
| 09:42AM | 11 | MS. PANAGAKOS:  No, Judge. |
| 09:42AM | 12 | THE COURT:  All right.  Ms. Young, you may step down |
| 09:42AM | 13 | subject to cross-examination at a later date. |
| 09:42AM | 14 | THE WITNESS:  Thank you. |
| 09:42AM | 15 | THE COURT:  Next witness. |
| 09:42AM | 16 | MR. AKINA:  The government calls Greg Turner. |
| 09:43AM | 17 | THE CLERK:  Please raise your right hand. |
| 09:43AM | 18 | GREGORY TURNER, |
| 09:43AM | 19 | called as a witness, having been first duly sworn, was examined |
| 09:43AM | 20 | and testified as follows: |
| 09:43AM | 21 | THE CLERK:  Please state your full name, spelling your |
| 09:43AM | 22 | last name for the record. |
| 09:43AM | 23 | THE WITNESS:  My name is Gregory Turner, T-U-R-N-E-R. |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 09:43AM | 1 | DIRECT EXAMINATION |
| 09:43AM | 2 | BY MR. AKINA: |
| 09:43AM | 3 | Q    Good morning, Agent Turner. |
| 09:43AM | 4 | A    Good morning. |
| 09:43AM | 5 | Q    Welcome back. |
| 09:43AM | 6 | Remind the jury, how long have you been with the FBI? |
| 09:43AM | 7 | A    I joined the FBI in July of 2010, graduated the academy |
| 09:43AM | 8 | in -- I'm sorry, it's coming up on ten years.  That's where the |
| 09:43AM | 9 | ten years came from.  So, yeah, I joined the bureau in July of |
| 09:43AM | 10 | 2014, I graduated the academy, and got up here to Honolulu in |
| 09:43AM | 11 | December of 2014. |
| 09:43AM | 12 | Q    And what do you do for the FBI? |
| 09:43AM | 13 | A    I am a special agent assigned to the white collar crime |
| 09:43AM | 14 | squad.  We investigate financial crimes, public corruption, and |
| 09:43AM | 15 | then also the evidence response team, senior team leader. |
| 09:44AM | 16 | Q    And in this case did you assist in the seizure of certain |
| 09:44AM | 17 | properties related to Michael Miske? |
| 09:44AM | 18 | A    I did. |
| 09:44AM | 19 | Q    And around what year did most of those -- or did those |
| 09:44AM | 20 | seizures take place? |
| 09:44AM | 21 | A    July of 2020. |
| 09:44AM | 22 | Q    Did you also look at financial documents related to some |
| 09:44AM | 23 | of those properties? |
| 09:44AM | 24 | A    I did. |
| 09:44AM | 25 | Q    I want to ask you some questions about 6 Lumahai. |

09:44AM    1                MR. AKINA:  If we could pull up Exhibit 9-1374,

09:44AM    2    already in evidence in the government's 40th list.

09:44AM    3                THE COURT:  Go ahead.

09:44AM    4    BY MR. AKINA:

09:44AM    5    Q    Going to page 2.  And if we focus on just the top portion

09:45AM    6    of the document.  You see here this is a loan amount for

09:45AM    7    6 Lumahai Street?

09:45AM    8    A    That's correct.

09:45AM    9    Q    And what's the amount?

09:45AM    10   A    1,175,000.

09:45AM    11   Q    And what was this for?

09:45AM    12   A    This was a loan that was applied for and granted in 2010

09:45AM    13   to help purchase what was then a vacant lot at 6 Lumahai.

09:45AM    14   Q    So this was an additional funding source to purchase that

09:45AM    15   land?

09:45AM    16   A    That's correct.

09:45AM    17   Q    And if we zoom out of here, let me just focus on the

09:45AM    18   primary applicant.  Who's -- above, yeah, who's listed there?

09:45AM    19   A    Michael Miske.

09:45AM    20               MR. AKINA:  We can take this down.

09:45AM    21   BY MR. AKINA:

09:45AM    22   Q    Did you look at mortgage payments made on this loan for

09:45AM    23   6 Lumahai?

09:46AM    24   A    I did.

09:46AM    25   Q    And where did those payments come from, the money for

09:46AM   1   those payments?

09:46AM   2   A    The source of the payments for both the principal and

09:46AM   3   interest came from Kama'aina Termite and Pest Control, and then

09:46AM   4   earlier on there was some interest-only payments that came out

09:46AM   5   of Mr. Miske's personal bank account.

09:46AM   6   Q    Did you create a summary of those mortgage payments --

09:46AM   7   A    I did.

09:46AM   8   Q    -- from 2010 to 2018?

09:46AM   9   A    Sorry.  Yes, I did.

09:46AM  10        MR. AKINA:  And if we could show the witness

09:46AM  11   Exhibit 11-6 from the 47th supplemental list.

09:46AM  12        THE COURT:  Yes, go ahead.

09:46AM  13   BY MR. AKINA:

09:46AM  14   Q    And is this that summary that you generated?

09:46AM  15   A    It is.

09:46AM  16   Q    And what does it show?

09:46AM  17   A    It shows -- yeah, payments that were made on that loan

09:46AM  18   over the -- over the life of the loan.

09:46AM  19   Q    It shows the accounts it came from and the amounts as

09:46AM  20   well?

09:46AM  21   A    Yeah, correct.  It's an Excel spreadsheet, and, yeah, you

09:47AM  22   have the actual bank account with the last three digits of the

09:47AM  23   bank account number, and then the owner, whether that's

09:47AM  24   Kama'aina Termite or Mr. Miske's personal account.

09:47AM  25        MR. AKINA:  I offer Exhibit 11-6 into evidence.

| | | |
|---|---|---|
| 09:47AM | 1 | THE COURT:  Any objection? |
| 09:47AM | 2 | MR. KENNEDY:  No objection. |
| 09:47AM | 3 | THE COURT:  11-6 is admitted then.  You may publish. |
| 09:47AM | 4 | (Exhibit 11-6 was received in evidence.) |
| 09:47AM | 5 | MR. AKINA:  If we could focus on the top, the heading |
| 09:47AM | 6 | of the column headers. |
| 09:47AM | 7 | BY MR. AKINA: |
| 09:47AM | 8 | Q    If you could just walk the jury through what this means. |
| 09:47AM | 9 | A    Yeah, so starting on the left, the account, that's going |
| 09:47AM | 10 | to be the source bank account.  So for example, FHB, First |
| 09:47AM | 11 | Hawaiian Bank, the bank account ending in 379 or 376.  The |
| 09:47AM | 12 | owner of the account is either going to be Kama'aina Termite or |
| 09:47AM | 13 | Mike Miske personal, so MM personal.  The date can be the date |
| 09:47AM | 14 | of the payment.  The description from the banking records. |
| 09:48AM | 15 | Check -- check Number/ACH, so some of the payments were checks, |
| 09:48AM | 16 | some of them were electronic payments, which is what ACH is, |
| 09:48AM | 17 | and then the payment amount. |
| 09:48AM | 18 | MR. AKINA:  If we can zoom out of this. |
| 09:48AM | 19 | BY MR. AKINA: |
| 09:48AM | 20 | Q    And so staying on this page 1, looking at the Payment |
| 09:48AM | 21 | column on the far right, that's roughly $12,000 payments |
| 09:48AM | 22 | followed by five or -- four to $6,000 payments, are those the |
| 09:48AM | 23 | principal and interest payments you were talking about earlier? |
| 09:48AM | 24 | A    Yes. |
| 09:48AM | 25 | Q    And looking on the second column from the left, are those |

09:48AM   1    payments coming out of Kama'aina Termite and Pest Control

09:48AM   2    accounts as well as Michael Miske's personal accounts?

09:48AM   3    A    Yes.

09:48AM   4    Q    And which one was paying for which?

09:48AM   5    A    Early on the Mike Miske personal accounts were basically

09:48AM   6    covering the interest only, and the principal payments were the

09:49AM   7    Kama'aina Termite payments.

09:49AM   8    Q    If we go to page 3 of the document, does that change as

09:49AM   9    far as money coming out of Michael Miske's personal account?

09:49AM   10   A    Yes.  So, you know, at some point, approximately June of

09:49AM   11   2013, the payments out of Mr. Miske's personal account stopped,

09:49AM   12   and the remaining payments for the life of the loan come out of

09:49AM   13   the Kama'aina Termite account.

09:49AM   14   Q    If we go to page 7, which should be the last page.  You

09:49AM   15   said this goes up to 2018.  Here we see First Foundation

09:49AM   16   instead of Pacific Rim Bank.  Does that mean that the -- the

09:49AM   17   loan -- whoever held the loan changed?

09:49AM   18   A    Yes, correct.  So First Foundation bought out Pacific Rim

09:49AM   19   in 2015.  So the same loan but the payee changed obviously at

09:50AM   20   that time.

09:50AM   21   Q    And so monthly, approximately how much in payments was

09:50AM   22   Kama'aina -- was coming out of the Kama'aina Termite and Pest

09:50AM   23   Control accounts?

09:50AM   24   A    Towards the end, you know, on this last page,

09:50AM   25   September 17th through March of '18, approximately -- not

09:50AM  1    approximately -- exactly $15,000.

09:50AM  2           MR. AKINA:  If we could show the witness Exhibit 11-9

09:50AM  3    from the 47th list.

09:50AM  4           THE COURT:  Go ahead.

09:50AM  5    BY MR. AKINA:

09:50AM  6    Q    Is this an example of a check face of one of those

09:50AM  7    payments that were being made -- or two of those payments that

09:50AM  8    were being made over time?

09:50AM  9    A    Yes, one of them.

09:50AM  10   Q    If we could go to the second page to the second example.

09:50AM  11   A    Yeah, correct.  Yes.

09:50AM  12          MR. AKINA:  I would offer Exhibit 11-9 into evidence.

09:50AM  13   The certification is at 11-7.

09:50AM  14          THE COURT:  Any objection?

09:50AM  15          MR. KENNEDY:  No objection.

09:50AM  16          THE COURT:  11-9 is admitted.  You may publish.

09:51AM  17          (Exhibit 11-9 was received in evidence.)

09:51AM  18   Q    Let me focus on the bottom -- third from the bottom --

09:51AM  19   third to the bottom, sorry, that check.

09:51AM  20          So just by way of example, is this a check from

09:51AM  21   Kama'aina Termite and Pest Control to Pacific Rim Bank?

09:51AM  22   A    Yes.

09:51AM  23   Q    And it's in the amount of $12,000?

09:51AM  24   A    Yes.

09:51AM  25   Q    And then looking in the memo line, what is written there?

09:51AM    1    A    "Lease 6 Lumahai."

09:51AM    2    Q    Are you aware that there was also supposed to be a lease

09:51AM    3    arrangement where the land was being leased to Kama'aina

09:51AM    4    Termite and Pest Control for storage?

09:51AM    5    A    Yes.

09:51AM    6    Q    And does this correspond to a line item on the chart that

09:51AM    7    you created?

09:51AM    8    A    This check payment does, yes.

09:51AM    9         MR. AKINA:  Now, we can take this exhibit down.

09:51AM    10    BY MR. AKINA:

09:51AM    11    Q    So based on your review of records, was 6 Lumahai obtained

09:52AM    12    and acquired through using proceeds from Kama'aina Termite and

09:52AM    13    Pest Control?

09:52AM    14    A    The loan that was used to partially -- or, yeah, the loan

09:52AM    15    was used to partially acquire the property and, yes, Kama'aina

09:52AM    16    money and Mike Miske's personal account paid down that loan

09:52AM    17    over time.

09:52AM    18    Q    I'm going to ask you about 559 Kumukahi Place.  What type

09:52AM    19    of building is that?

09:52AM    20    A    It's a residence in Hawaii Kai.

09:52AM    21    Q    And was that property sold in the amount of $611,123.60

09:52AM    22    approximately?

09:52AM    23    A    Yes, that was the net proceeds after the accompanying

09:52AM    24    mortgage was paid off, but -- yeah.

09:52AM    25    Q    And who owned that property prior to the sale?

| | | | |
|---|---|---|---|
| 09:53AM | 1 | A | Michael Miske. |
| 09:53AM | 2 | Q | And do you remember approximately when he acquired that |
| 09:53AM | 3 | | property? |
| 09:53AM | 4 | A | It was at the very end of 2019. |
| 09:53AM | 5 | Q | And to acquire that property initially, were any |
| 09:53AM | 6 | | associates of Michael Miske's used? |
| 09:53AM | 7 | A | Yes. |
| 09:53AM | 8 | Q | Who? |
| 09:53AM | 9 | A | Kaulana Freitas. |
| 09:53AM | 10 | Q | And how was he used? |
| 09:53AM | 11 | A | The -- the home was purchased at a foreclosure auction, |
| 09:53AM | 12 | | and Kaulana Freitas used money from Mike Miske's accounts to |
| 09:53AM | 13 | | actually go to the auction and bid on the house. |
| 09:53AM | 14 | | MR. AKINA:  If we could show the witness only |
| 09:53AM | 15 | | Exhibit 11-25 from the 47th list. |
| 09:53AM | 16 | | THE COURT:  Go ahead. |
| 09:53AM | 17 | | BY MR. AKINA: |
| 09:53AM | 18 | Q | What is this document we are looking at? |
| 09:53AM | 19 | A | It's a letter from Kaulana Freitas just acknowledging his |
| 09:54AM | 20 | | role in initially, you know, acting as the buyer for Mr. Miske. |
| 09:54AM | 21 | Q | And is it signed by Michael Miske? |
| 09:54AM | 22 | A | It is. |
| 09:54AM | 23 | Q | And is it signed by Kaulana Freitas? |
| 09:54AM | 24 | A | It is. |
| 09:54AM | 25 | | MR. AKINA:  I would offer 11-25 into evidence.  There |

09:54AM  1  is a certification at 11-21.

09:54AM  2          THE COURT:  Any objection?

09:54AM  3          MR. KENNEDY:  No objection.

09:54AM  4          THE COURT:  11-25 is admitted.  You may publish.

09:54AM  5          (Exhibit 11-25 was received in evidence.)

09:54AM  6  Q    And the very top, you see this is on Kama'aina Termite and

09:54AM  7  Pest Control letterhead?

09:54AM  8  A    Yes.

09:54AM  9  Q    And if we focus on the first paragraph, is this what

09:54AM  10  you're describing about Kaulana Freitas being the bidder at the

09:54AM  11  auction?

09:54AM  12  A    Yes.

09:54AM  13  Q    And then if we go to the second paragraph.  Is this an

09:54AM  14  explanation that Kaulana Freitas is then designating Michael

09:55AM  15  Miske to be the buyer of the property?

09:55AM  16  A    Yes.

09:55AM  17  Q    And was -- were payments -- did payments go through

09:55AM  18  Kaulana Freitas for this property as well?

09:55AM  19  A    Yes.  So Mr. Miske had four cashier's checks withdrawn

09:55AM  20  from his account, and those cashier's checks were given to

09:55AM  21  Kaulana Freitas.  They were written out to him actually, to

09:55AM  22  Kaulana Freitas, again for the purpose of going to the auction

09:55AM  23  and bidding on the house.

09:55AM  24  Q    And was that money ultimately applied to the purchase of

09:55AM  25  the home?

| | | | |
|---|---|---|---|
| 09:55AM | 1 | A | It was. |
| 09:55AM | 2 | Q | About how much was that in total? |
| 09:55AM | 3 | A | 140,000. |
| 09:55AM | 4 | Q | Did money go through any other associates of Michael |
| 09:56AM | 5 | | Miske's? |
| 09:56AM | 6 | A | Yes. |
| 09:56AM | 7 | Q | Who? |
| 09:56AM | 8 | A | So basically three buckets of money that were used to |
| 09:56AM | 9 | | purchase Kumukahi.  One was the cashier's checks from Kaulana |
| 09:56AM | 10 | | Freitas for $140,000.  There was an additional $250,000 down |
| 09:56AM | 11 | | payment that came from a checking account, and the signatory on |
| 09:56AM | 12 | | that was Delia Fabro-Miske, and it was a joint account with her |
| 09:56AM | 13 | | and a minor child. |
| 09:56AM | 14 | Q | And were you able to trace money going from both Kaulana |
| 09:56AM | 15 | | Freitas's account and Delia Fabro-Miske's accounts back to |
| 09:56AM | 16 | | Michael Miske's personal account? |
| 09:56AM | 17 | A | The cashier's checks used by Kaulana Freitas and the money |
| 09:56AM | 18 | | from the joint account of Delia Fabro-Miske and her minor |
| 09:56AM | 19 | | child, yes, were traced into the escrow account to buy the |
| 09:56AM | 20 | | house. |
| 09:56AM | 21 | Q | And did those monies go out at different points in time |
| 09:56AM | 22 | | from his accounts? |
| 09:56AM | 23 | A | Yes. |
| 09:57AM | 24 | Q | About how much time elapsed? |
| 09:57AM | 25 | A | Approximately a year. |

09:57AM   1   Q    Which one went out first?

09:57AM   2   A    So the checks came out, you know, at the foreclosure

09:57AM   3   auction, and because it was a foreclosure, I think the escrow,

09:57AM   4   the closing of the property took a lot longer than a normal

09:57AM   5   closing.  So, yeah, the checks happened, and then maybe a year

09:57AM   6   later the $250,000 came into the escrow account.

09:57AM   7   Q    So the checks from Kaulana Freitas, those came out first?

09:57AM   8   A    Yes.

09:57AM   9   Q    And for those checks, were you able to trace where that

09:57AM  10   came from from Mr. Miske's account?

09:57AM  11   A    Yes.

09:57AM  12   Q    Where did that come from?

09:57AM  13   A    So that was sourced from -- okay, in 2018, Mr. Miske got a

09:57AM  14   refinanced loan from Bank of Hawaii and took some cash out from

09:57AM  15   that refinance loan.  And so the -- some of the funds that were

09:58AM  16   used from that refinanced loan were used to get the cashier's

09:58AM  17   checks that Kaulana Freitas used to buy the house.

09:58AM  18   Q    So proceeds from the Bank of Hawaii loan at 6 Lumahai,

09:58AM  19   where 6 Lumahai was the collateral, those proceeds were used in

09:58AM  20   part to purchase Kumukahi Place?

09:58AM  21   A    That's correct.

09:58AM  22   Q    Did you --

09:58AM  23        MR. AKINA:  Can we show the witness Exhibit 11-22 from

09:58AM  24   the 47th list?

09:58AM  25        THE COURT:  Go ahead.

| | | |
|---|---|---|
| 09:58AM | 1 | BY MR. AKINA: |
| 09:58AM | 2 | Q    And what is this document? |
| 09:58AM | 3 | A    This is a settlement statement.  So, yeah, when the house |
| 09:58AM | 4 | closed, it's just kind of an accounting basically of the money |
| 09:58AM | 5 | in and out, and who owes what to document the purchase of the |
| 09:58AM | 6 | property. |
| 09:58AM | 7 | Q    Does it also document those deposits -- those payments |
| 09:58AM | 8 | that you just described? |
| 09:58AM | 9 | A    It does. |
| 09:58AM | 10 | MR. AKINA:  I'd offer Exhibit 11-22 into evidence. |
| 09:59AM | 11 | There's a certification at 11-21. |
| 09:59AM | 12 | THE COURT:  Any objection to 11-22? |
| 09:59AM | 13 | MR. KENNEDY:  No objection. |
| 09:59AM | 14 | THE COURT:  That exhibit then is admitted.  You may |
| 09:59AM | 15 | publish it. |
| 09:59AM | 16 | (Exhibit 11-22 was received in evidence.) |
| 09:59AM | 17 | Q    If we could focus on the third box from the top.  So this |
| 09:59AM | 18 | is the settlement statement for that Kumukahi Place; is that |
| 09:59AM | 19 | correct? |
| 09:59AM | 20 | A    Yes. |
| 09:59AM | 21 | Q    And who's listed as the buyer on this? |
| 09:59AM | 22 | A    Michael John Miske, Jr., and Delia Miske. |
| 09:59AM | 23 | Q    And you said it was purchased around towards the end of |
| 09:59AM | 24 | 2019, December 31st, 2019, to be exact? |
| 09:59AM | 25 | A    Yes. |

09:59AM  1    Q    If we can zoom out of this.

09:59AM  2         If we focus on the first portion of that last box

09:59AM  3    under "Financial."  It shows the sale price was 1.4 million for

10:00AM  4    the home?

10:00AM  5    A    That's correct.

10:00AM  6    Q    And then there are two deposits here.  Are these the two

10:00AM  7    deposits you were talking about?

10:00AM  8    A    Yes.

10:00AM  9    Q    Okay.  So the $140,000 that came through the Law Office of

10:00AM  10   James Dandar, was that the Kaulana Freitas checks?

10:00AM  11   A    Yes.

10:00AM  12   Q    And the 250,000 you talked about, it says Michael Miske

10:00AM  13   here, but it came through Delia Fabro-Miske's account?

10:00AM  14   A    That's correct.

10:00AM  15   Q    Were you able to sort of chart out the different accounts

10:00AM  16   and the flow of the funds?

10:00AM  17   A    I was.

10:00AM  18        MR. AKINA:  If we could show the witness Exhibit 11-34

10:00AM  19   from the 47th list.

10:00AM  20        THE COURT:  Go ahead.

10:00AM  21   BY MR. AKINA:

10:00AM  22   Q    Is this that chart, the flow of the funds that you

10:00AM  23   created?

10:00AM  24   A    It is.

10:00AM  25        MR. AKINA:  I'd offer Exhibit 11-34 into evidence.

| | | |
|---|---|---|
| 10:00AM | 1 | THE COURT:  Any objection? |
| 10:01AM | 2 | MR. KENNEDY:  No objection. |
| 10:01AM | 3 | THE COURT:  11-34 is admitted.  You may publish it. |
| 10:01AM | 4 | (Exhibit 11-34 was received in evidence.) |
| 10:01AM | 5 | Q    Okay.  So the -- you said there were three buckets of |
| 10:01AM | 6 | payments, is that -- that's depicted here? |
| 10:01AM | 7 | A    Yes. |
| 10:01AM | 8 | Q    Under the Escrow column, the $140,000, $250,000, and over |
| 10:01AM | 9 | 1 million? |
| 10:01AM | 10 | A    Right. |
| 10:01AM | 11 | Q    So this top row that starts on the left, "From BOH refi 6 |
| 10:01AM | 12 | Lumahai," which -- which person did these go through? |
| 10:01AM | 13 | A    So, yeah, looking at the right column, right, so the |
| 10:01AM | 14 | $140,000 was sourced left to right.  So the top chunk of money |
| 10:01AM | 15 | is the chunk of money that Kaulana Freitas was involved in. |
| 10:01AM | 16 | Q    And so just working through, can you explain to the jury |
| 10:01AM | 17 | the path that the money took? |
| 10:01AM | 18 | A    Yeah, so if you start in the top left, you have the Bank |
| 10:02AM | 19 | of Hawaii refinance loan.  Some of those proceeds went into -- |
| 10:02AM | 20 | I'm sorry, all of those proceeds went into Mr. Miske's Bank of |
| 10:02AM | 21 | Hawaii account ending in 729, and then some of those proceeds |
| 10:02AM | 22 | were used to purchase the cashier's checks that totaled |
| 10:02AM | 23 | $140,000 that were written out to Kaulana Freitas. |
| 10:02AM | 24 | And then Kaulana Freitas goes to the foreclosure |
| 10:02AM | 25 | auction and has to put 10 percent down, right.  10 percent of |

10:02AM  1  1.4 million is 140,000, and so that's the first -- that top

10:02AM  2  row.

10:02AM  3          MR. AKINA:  And if we can show Exhibit 11-19 to the

10:02AM  4  witness.

10:02AM  5          THE COURT:  Yes, go ahead.

10:02AM  6  BY MR. AKINA:

10:02AM  7  Q    What are we looking at here?

10:02AM  8  A    So this is a -- kind of a subset or a portion of a

10:03AM  9  previous exhibit, but, yeah, it's -- it shows the Bank of

10:03AM  10  Hawaii refinance loan money coming into Mr. Miske's personal

10:03AM  11  account, and then the disbursements that were made subsequent

10:03AM  12  to that.

10:03AM  13  Q    So this would show the money coming in, and then also the

10:03AM  14  money going out from that chart?

10:03AM  15  A    Yes.

10:03AM  16  Q    And is this a summary of the underlying documents --

10:03AM  17  A    It is.

10:03AM  18  Q    -- for that loan?

10:03AM  19  A    It is.

10:03AM  20          MR. AKINA:  I would offer Exhibit 11-19 into evidence.

10:03AM  21          THE COURT:  Any objection to 11-19?

10:03AM  22          MR. KENNEDY:  Your Honor, no objection, but the -- I

10:03AM  23  would ask that the last entry that's not paged, the last entry

10:03AM  24  on the last page just be blackened out.

10:03AM  25          THE COURT:  Any objection to that?

| | | |
|---|---|---|
| 10:04AM | 1 | MR. AKINA:  No objection to that. |
| 10:04AM | 2 | THE COURT:  This is one of the entries dated |
| 10:04AM | 3 | July 24th, 2018? |
| 10:04AM | 4 | MR. AKINA:  I believe it's a July 26, 2018 entry. |
| 10:04AM | 5 | THE COURT:  I see.  I was missing one page. |
| 10:04AM | 6 | All right.  Without objection then, 11-19 is admitted |
| 10:04AM | 7 | with the caveat that the final entry -- I was looking for a |
| 10:04AM | 8 | page number.  It doesn't look like this document has page |
| 10:04AM | 9 | numbers, but the final entry dated July 26, 2018, will be |
| 10:04AM | 10 | admitted -- will be deleted -- excuse me -- redacted before it |
| 10:04AM | 11 | goes back to the jury. |
| 10:04AM | 12 | (Exhibit 11-19 was received in evidence.) |
| 10:04AM | 13 | MR. KENNEDY:  And, Your Honor, since I'm looking at it |
| 10:04AM | 14 | on my computer, it looks like it totals 15 pages in total. |
| 10:05AM | 15 | THE COURT:  Okay, thank you. |
| 10:05AM | 16 | MR. KENNEDY:  You're welcome. |
| 10:05AM | 17 | THE COURT:  It appears on the final page. |
| 10:05AM | 18 | MR. AKINA:  Permission to publish? |
| 10:05AM | 19 | THE COURT:  Yes. |
| 10:05AM | 20 | BY MR. AKINA: |
| 10:05AM | 21 | Q    Okay.  So this is a summary of Michael Miske's personal |
| 10:05AM | 22 | accounts at the time? |
| 10:05AM | 23 | A    That's correct. |
| 10:05AM | 24 | Q    And if we focus on the top left corner with the gray |
| 10:05AM | 25 | boxes, and this was at which bank? |

10:05AM   1   A    Bank of Hawaii.

10:05AM   2   Q    And if we go -- zoom out of this.

10:05AM   3        On the far right column, what is that?  If we zoom on

10:05AM   4   that header beginning "Non-loan funds."

10:05AM   5   A    Right, so Mr. Miske had some money in his bank account

10:05AM   6   prior to the loan proceeds coming in.  So prior to the loan

10:06AM   7   proceeds, he had $231,278.89 in that account.  So this heading

10:06AM   8   in this column shows the money that was in the account, yeah,

10:06AM   9   prior to those loan proceeds coming in.

10:06AM  10        MR. AKINA:  And so if we zoom out of here, if we focus

10:06AM  11   on the balance and just the first row underneath balance in the

10:06AM  12   middle of the page.  Just the first two rows.

10:06AM  13   BY MR. AKINA:

10:06AM  14   Q    Okay.  This is what you're talking about, how it starts at

10:06AM  15   $231,000 approximately?

10:06AM  16   A    Correct.

10:06AM  17   Q    And then the next number, this is the balance,

10:06AM  18   2.1 million; is that correct?

10:06AM  19   A    Right, yeah, that's essentially the balance before the

10:06AM  20   loan proceeds come in, the loan proceeds come in, and then your

10:06AM  21   new balance in that bank account is 2.1 million roughly.

10:07AM  22   Q    Okay.  If we zoom out, that highlighted box with

10:07AM  23   1.9 million, that's the loan proceeds, right?

10:07AM  24   A    Right.

10:07AM  25   Q    That's the refi on -- the refinance on the 6 Lumahai home?

10:07AM   1   A     Yes.

10:07AM   2   Q     And so this column on the far right, is this just a

10:07AM   3   running tally of how the pre- -- the money that was in the

10:07AM   4   account before the loan hit the account, did you just kind of

10:07AM   5   keep an eye on that to assume that that money would be used

10:07AM   6   first?

10:07AM   7   A     Yeah, so those right two columns are -- yeah, basically

10:07AM   8   the beginning funds in that account, and then you'll see the

10:07AM   9   loan funds.  And so as you work down the page, the transactions

10:07AM  10   happen, the money that was in the account, I subtracted it

10:07AM  11   first, and, you know, after you hit, let's say, 231,000 and

10:08AM  12   expenditures, you get into the loan money.

10:08AM  13          So, yeah, the two right columns just track that, you

10:08AM  14   know, is it the beginning money or is it the money that came in

10:08AM  15   with the loan proceeds.

10:08AM  16   Q     And so this is a way for you to keep track of whether

10:08AM  17   those four checks going to Kaulana Freitas were actually coming

10:08AM  18   from the loan proceeds?

10:08AM  19   A     Yes.

10:08AM  20   Q     If we go to the second page.  You highlighted some of the

10:08AM  21   cells.  Is that where -- does that signify where the

10:08AM  22   preexisting money was used up, and then now you're switching

10:08AM  23   over to the loan proceeds that are being used?

10:08AM  24   A     That's correct, yes.  And that's shown in the two -- in

10:08AM  25   the two right-hand columns as well.

10:08AM  1            MR. AKINA:  If we go to page 8.  And focusing on these
10:08AM  2    top six withdrawals going down to -- from May 16, 2018, just
10:09AM  3    going the first four, five columns -- first five columns.  Just
10:09AM  4    the first five columns.
10:09AM  5    BY MR. AKINA:
10:09AM  6    Q    So May 16, 2018, there are a number of checks going out,
10:09AM  7    and here we see four check numbers; is that correct?
10:09AM  8    A    Yes.
10:09AM  9    Q    And the amounts for those four check numbers, 20,000,
10:09AM  10   50,000, 50,000, and 20,000; is that correct?
10:09AM  11   A    Yes.
10:09AM  12   Q    That's -- is that the $140,000 worth of checks going out
10:09AM  13   to Kaulana Freitas?
10:09AM  14   A    Right.
10:09AM  15            MR. AKINA:  And if we zoom out of here, and zoom to
10:10AM  16   the next five columns for that same period, to the right.
10:10AM  17   BY MR. AKINA:
10:10AM  18   Q    And here it shows that they were checks made out for
10:10AM  19   Kaulana Freitas?
10:10AM  20   A    Correct.
10:10AM  21            MR. AKINA:  If we could show the witness Exhibit 11-28
10:10AM  22   from the 47th list.
10:10AM  23            THE COURT:  Go ahead.
10:10AM  24            MR. AKINA:  And if we just scroll through.
10:10AM  25   BY MR. AKINA:

10:10AM  1  Q    And as we're scrolling through, can you tell us what these

10:10AM  2  are?

10:10AM  3  A    Yes, so these are -- once the checks were deposited, this

10:10AM  4  is what this is.  So some of the copies of the checks after

10:11AM  5  they had been transacted, and then some related financial

10:11AM  6  information.

10:11AM  7  Q    And so are these copies of those cashier's checks?

10:11AM  8  A    Yes.

10:11AM  9  Q    And going back to the first page, is that a deposit slip

10:11AM  10  for those four checks combined to that law office of James

10:11AM  11  Dandar?

10:11AM  12  A    Yes.

10:11AM  13       MR. AKINA:  I'd offer Exhibit 11-28 into evidence.

10:11AM  14  There's a certification at 11-26.

10:11AM  15       THE COURT:  Any objection?

10:11AM  16       MR. KENNEDY:  No objection.

10:11AM  17       THE COURT:  11-28 is admitted.  You may publish.

10:11AM  18       (Exhibit 11-28 was received in evidence.)

10:11AM  19  Q    And if we go to the third page, this is one of those

10:11AM  20  checks that we were just looking at?

10:11AM  21  A    It is.

10:11AM  22  Q    $20,000 to Kaulana Freitas on May 18, 2018?

10:11AM  23  A    Right.

10:11AM  24  Q    And it's -- going down to the fourth page, is this the

10:11AM  25  back of that check?

10:11AM   1   A    It is.

10:11AM   2   Q    And it was deposited at Hawaii National Bank?

10:12AM   3   A    Yep.

10:12AM   4        MR. AKINA:  And then if we could zoom in down here,

10:12AM   5   the sequence number.

10:12AM   6   BY MR. AKINA:

10:12AM   7   Q    Do the back of each of the checks in this document have a

10:12AM   8   sequence number?

10:12AM   9   A    They do.

10:12AM   10  Q    And are they sequential, meaning one after another after

10:12AM   11  another?

10:12AM   12  A    Yes.

10:12AM   13  Q    And with the deposit slip --

10:12AM   14       MR. AKINA:  We can zoom out of that, and going back to

10:12AM   15  the first page.  And now the second page.

10:12AM   16  BY MR. AKINA:

10:12AM   17  Q    Is the second page the back of that deposit slip?

10:12AM   18  A    It is.

10:12AM   19  Q    And that's for the four checks?

10:12AM   20  A    Yes.

10:12AM   21  Q    And this sequence number also at Hawaii National Bank, is

10:12AM   22  that the beginning of that series of numbers?

10:12AM   23  A    It is.

10:12AM   24  Q    All done on the same day?

10:12AM   25  A    Yes.

10:12AM   1   Q    So what does that mean?

10:12AM   2   A    Basically that the deposit slip was transacted at the same

10:12AM   3   time as the -- as the checks.  Same transaction.

10:13AM   4          MR. AKINA:  We can take this down.

10:13AM   5          If we could go back to Exhibit 11-34 already in

10:13AM   6   evidence.

10:13AM   7          THE COURT:  Go ahead.

10:13AM   8   BY MR. AKINA:

10:13AM   9   Q    Okay.  So did you do -- so that was Kaulana Freitas on the

10:13AM   10  top row, and then Delia Fabro-Miske, is she in that middle row

10:13AM   11  for $250,000?

10:13AM   12  A    Yes.

10:13AM   13  Q    And similarly, were you able to look at documents that

10:13AM   14  sort of showed the flow of funds for this one?

10:13AM   15  A    I was.

10:13AM   16  Q    And the difference is this one didn't go back to the

10:13AM   17  Lumahai refinance, right?

10:13AM   18  A    Yeah, that's correct.

10:14AM   19  Q    It came out of Michael Miske's personal account?

10:14AM   20  A    Yes.

10:14AM   21  Q    And so can you walk the jury through just the path that it

10:14AM   22  took.

10:14AM   23  A    Yes.  So, yeah, looking at that kind of second horizontal

10:14AM   24  row, you have money in Mr. Miske's personal account, $200,000,

10:14AM   25  it goes to an account at Bank of Hawaii in the name of Delia

10:14AM   1   Fabro-Miske and her minor child.

10:14AM   2          That account gets closed and moved over to Hawaiian

10:14AM   3   Financial Federal Credit Union.  And so you have $200,000 for

10:14AM   4   Michael Miske that goes into the first Delia account.  The

10:14AM   5   entire balance in that account moves over to Hawaiian Financial

10:14AM   6   Federal Credit Union.  So, you know, 200 of the $268,000 total

10:14AM   7   was attributable to Mr. Miske.

10:14AM   8          And then in that last account, the Hawaiian Financial

10:15AM   9   account, $200,000 from Mr. Miske is added to $50,000 that is

10:15AM  10   otherwise in that account to go to the escrow account to buy

10:15AM  11   the house.

10:15AM  12   Q    And I'm not going to walk you through the underlying

10:15AM  13   documents, but this chart you put the yellow box on the top

10:15AM  14   left, the 6 Lumahai refinance, right?

10:15AM  15   A    Right.

10:15AM  16   Q    And does this chart show just how money flowed from that

10:15AM  17   refinance to the purchase of Kumukahi Place?

10:15AM  18   A    Yes.

10:15AM  19          MR. AKINA:  We can take this exhibit down.

10:15AM  20   BY MR. AKINA:

10:15AM  21   Q    I'm going to ask you about the Painkiller.  Are you

10:15AM  22   familiar with generally what that is?

10:15AM  23   A    Yes.

10:15AM  24   Q    What was that?

10:15AM  25   A    That's a Boston Whaler 370 Outrage pleasure craft.  Yeah,

10:15AM   1   the boat name is Painkiller.

10:15AM   2   Q    And how did this relate to Miske's businesses?

10:16AM   3   A    The boat was purchased in the summer of 2016, and the

10:16AM   4   funds for that came from two different loans that were taken

10:16AM   5   out on behalf of one of Mr. Miske's companies, Kama'aina

10:16AM   6   Holdings.

10:16AM   7           MR. AKINA:  So if we can show the witness

10:16AM   8   Exhibit 9128-002 from the defense original list.

10:16AM   9           THE COURT:  Go ahead.

10:16AM  10           MR. AKINA:  And permission to publish?

10:16AM  11           THE COURT:  Yes.

10:16AM  12   BY MR. AKINA:

10:16AM  13   Q    You see this, this is a bill of sale for the Painkiller?

10:16AM  14   A    Yes.

10:17AM  15           MR. AKINA:  And if we zoom in on the top quarter of

10:17AM  16   the document.

10:17AM  17   BY MR. AKINA:

10:17AM  18   Q    Sold for $425,000?

10:17AM  19   A    Correct.

10:17AM  20           MR. AKINA:  If we zoom out of this and zoom in on the

10:17AM  21   portion right underneath that.

10:17AM  22   BY MR. AKINA:

10:17AM  23   Q    The buyer was Hawai'i Partners LLC, right?

10:17AM  24   A    Yes.  That was taken out in the name of Kama'aina

10:17AM  25   Holdings, but the boat was registered in the name of Hawai'i

```
10:17AM    1    Partners.
10:17AM    2              MR. AKINA:  And if we could zoom in on the bottom
10:17AM    3    portion of this page where it starts "The undersigned buyer
10:17AM    4    accepts."
10:17AM    5    BY MR. AKINA:
10:17AM    6    Q    You see that it's signed on behalf of Hawai'i Partners
10:17AM    7    LLC?
10:17AM    8    A    Yes.
10:17AM    9              MR. AKINA:  If we could show the witness 11-51 from
10:17AM   10    the 47th supplement.
10:17AM   11    BY MR. AKINA:
10:18AM   12    Q    Is this a check for that payment $425,000?
10:18AM   13    A    It is.
10:18AM   14              MR. AKINA:  I would offer 11-51 into evidence.
10:18AM   15    There's a certification at 11-35.
10:18AM   16              THE COURT:  Any objection to 11-51?
10:18AM   17              MR. KENNEDY:  No objection.
10:18AM   18              THE COURT:  Without objection, that exhibit is
10:18AM   19    admitted.  You may publish.
10:18AM   20              (Exhibit 11-51 was received in evidence.)
10:18AM   21              MR. AKINA:  And focusing on the top the face of the
10:18AM   22    check.
10:18AM   23    BY MR. AKINA:
10:18AM   24    Q    Who is this check being -- who's making this check out?
10:18AM   25    A    So it's a, yeah, Central Pacific Bank -- official bank
```

10:18AM    1    check.

10:18AM    2    Q    And who -- which account is it coming from?

10:18AM    3    A    It is -- the source of funds comes from, yeah, Kama'aina

10:19AM    4    Holdings.

10:19AM    5    Q    So this is what you were saying earlier was paid for

10:19AM    6    through Kama'aina Holdings but registered under Hawai'i

10:19AM    7    Partners?

10:19AM    8    A    Yeah, correct.

10:19AM    9         MR. AKINA:  We can take this down.

10:19AM    10   BY MR. AKINA:

10:19AM    11   Q    You mentioned that this was paid for using two credit

10:19AM    12   applications.  Were those business loans?

10:19AM    13   A    Yes.

10:19AM    14   Q    And did you chart out the path from those loans to this

10:19AM    15   check that we're looking at?

10:19AM    16   A    I did.

10:19AM    17        MR. AKINA:  Could we show the witness 11-54 from the

10:19AM    18   47th supplement?

10:19AM    19        THE COURT:  Yes.

10:19AM    20   BY MR. AKINA:

10:19AM    21   Q    Is this that chart just showing -- showing where the money

10:19AM    22   came from?

10:19AM    23   A    It is.

10:19AM    24        MR. AKINA:  I'd offer 11-54 into evidence.

10:19AM    25        THE COURT:  Any objection?

10:19AM   1              MR. KENNEDY:  No objection.

10:19AM   2              THE COURT:  11-54 is admitted.  You may publish.

10:20AM   3              (Exhibit 11-54 was received in evidence.)

10:20AM   4   Q    Okay.  There are two yellow boxes.  What do those

10:20AM   5   represent?

10:20AM   6   A    Those represent the two loans that were taken out.

10:20AM   7   Q    And money from those two loans, they ended up in this blue

10:20AM   8   box in the middle, Michael Miske's personal account?

10:20AM   9   A    That's correct.

10:20AM  10   Q    And then out of that account, is that where that check

10:20AM  11   that we just looked at came from?

10:20AM  12   A    Yes.  One of the loans went through the Kama'aina Holdings

10:20AM  13   business account, and then the other loan was deposited

10:20AM  14   directly into Mr. Miske's account, and then, yeah, correct, the

10:20AM  15   $425,000 check came out of the personal account.

10:20AM  16   Q    Okay.  So I'm going to ask you questions about this first

10:20AM  17   one on the left, that first yellow box, the loan ending in 957.

10:20AM  18              MR. AKINA:  If I can show you Exhibit 11-36 from the

10:20AM  19   47th supplement.

10:20AM  20              THE COURT:  Go ahead.

10:20AM  21   BY MR. AKINA:

10:20AM  22   Q    Is this the credit application for that loan ending in 957

10:21AM  23   that we were talking about?

10:21AM  24   A    Yes.

10:21AM  25              MR. AKINA:  I'd offer Exhibit 11-36 into evidence.

10:21AM   1   There's a certification at 11-35.

10:21AM   2              THE COURT:  Any objection?

10:21AM   3              MR. KENNEDY:  I'm just going to review it briefly,

10:21AM   4   Your Honor.

10:21AM   5              THE COURT:  Yes, go ahead.

10:21AM   6              MR. KENNEDY:  No objection.

10:21AM   7              THE COURT:  11-36 is admitted.  You may publish it.

10:21AM   8              (Exhibit 11-36 was received in evidence.)

10:21AM   9   BY MR. AKINA:

10:21AM  10   Q    So what was the amounts of the two credit applications

10:21AM  11   that went -- that were the source of the funds for the

10:21AM  12   Painkiller?

10:21AM  13   A    So both of them were $250,000.

10:21AM  14   Q    So if we focus on this top box under "Credit Request

10:22AM  15   Information," is that amount reflected here, $250,000?

10:22AM  16   A    It is.

10:22AM  17   Q    And under "Use of Funds," there had to be something

10:22AM  18   checked.  What was checked for the use of funds?

10:22AM  19   A    "Purchase equipment."

10:22AM  20   Q    And do you see here this notice, can you read that out,

10:22AM  21   please?

10:22AM  22   A    Yes.  "This credit application is for business purposes

10:22AM  23   only.  Credit for personal, family, and/or household purposes

10:22AM  24   is prohibited under business credit lines/loans."

10:22AM  25   Q    Is that pretty typical for a business loan, it's got to be

10:22AM   1    for a business purpose?

10:22AM   2    A    Yes.

10:22AM   3             MR. AKINA:  And if we go -- zoom out of here and focus

10:22AM   4    towards the middle under the "Applicant Information."

10:22AM   5    BY MR. AKINA:

10:23AM   6    Q    Okay.  Who is the applicant here?

10:23AM   7    A    Kama'aina Holdings.

10:23AM   8    Q    And then there's an email address.  Whose email address is

10:23AM   9    that?

10:23AM   10   A    Yeah, mike@kama'aina.com.

10:23AM   11            MR. AKINA:  If we go to page 3 of the document,

10:23AM   12   focusing on this middle box on left.

10:23AM   13   BY MR. AKINA:

10:23AM   14   Q    Who is the guarantor?

10:23AM   15   A    Michael Miske, Jr.

10:23AM   16   Q    And if we focus on the box to the right -- on the right

10:23AM   17   side of the page of that, is there another guarantor listed for

10:23AM   18   Kama'aina Termite and Pest Control?

10:23AM   19   A    Yes.

10:23AM   20            MR. AKINA:  If we go to page 4 of the document.  If we

10:23AM   21   can focus on that first signature in the middle and the name

10:23AM   22   next to it.

10:23AM   23   BY MR. AKINA:

10:24AM   24   Q    Is this signed by Michael Miske?

10:24AM   25   A    Yes.

| | | |
|---|---|---|
| 10:24AM | 1 | MR. AKINA:  And there's a bunch of language above |
| 10:24AM | 2 | that.  I want to focus on the first paragraph towards the third |
| 10:24AM | 3 | to the last line where it starts with number 5. |
| 10:24AM | 4 | BY MR. AKINA: |
| 10:24AM | 5 | Q    It's a little hard to make out, but number 5, is that |
| 10:24AM | 6 | essentially the same language from that notice on the first |
| 10:24AM | 7 | page? |
| 10:24AM | 8 | A    It is. |
| 10:24AM | 9 | Q    About this has to be for business purposes and not for |
| 10:24AM | 10 | personal, family or household purposes? |
| 10:24AM | 11 | A    Yes. |
| 10:24AM | 12 | Q    And I'm going to show you -- ask you about the second |
| 10:24AM | 13 | loan. |
| 10:24AM | 14 | MR. AKINA:  If we could show the witness Exhibit 11-41 |
| 10:24AM | 15 | from the 47th list. |
| 10:24AM | 16 | THE COURT:  Yes, go ahead. |
| 10:24AM | 17 | BY MR. AKINA: |
| 10:24AM | 18 | Q    This is that second loan ending 956, the application for |
| 10:25AM | 19 | it? |
| 10:25AM | 20 | A    Yes. |
| 10:25AM | 21 | Q    Also for $250,000? |
| 10:25AM | 22 | A    Right. |
| 10:25AM | 23 | MR. AKINA:  And I would offer 11-41 into evidence. |
| 10:25AM | 24 | There's a certification at 11-35. |
| 10:25AM | 25 | THE COURT:  Any objection? |

| | | |
|---|---|---|
| 10:25AM | 1 | MR. KENNEDY:  Just give me a moment to review it, Your |
| 10:25AM | 2 | Honor. |
| 10:25AM | 3 | THE COURT:  Of course. |
| 10:25AM | 4 | MR. KENNEDY:  No objection. |
| 10:25AM | 5 | THE COURT:  11-41 is admitted you.  You may publish |
| 10:25AM | 6 | it. |
| 10:25AM | 7 | (Exhibit 11-41 was received in evidence.) |
| 10:25AM | 8 | BY MR. AKINA: |
| 10:25AM | 9 | Q    Are a lot of the terms in this application similar to the |
| 10:25AM | 10 | terms in the first application we looked at? |
| 10:25AM | 11 | A    Similar, yeah.  The amount is the same, $250,000.  This is |
| 10:25AM | 12 | a line of credit and not a term loan, but yes. |
| 10:25AM | 13 | Q    And so focusing on the top box again.  Same amount, |
| 10:25AM | 14 | $250,000, right? |
| 10:25AM | 15 | A    Right. |
| 10:25AM | 16 | Q    And like you said, line of credit.  This time what option |
| 10:26AM | 17 | was checked for the use of the funds? |
| 10:26AM | 18 | A    "Other business purpose and working capital" was typed in. |
| 10:26AM | 19 | Q    And then is that same notice about person -- about |
| 10:26AM | 20 | business purposes only here? |
| 10:26AM | 21 | A    Yes. |
| 10:26AM | 22 | MR. AKINA:  And zooming out of this, focusing on the |
| 10:26AM | 23 | applicant information. |
| 10:26AM | 24 | BY MR. AKINA: |
| 10:26AM | 25 | Q    Is that the same applicant information as the other one? |

| | | |
|---|---|---|
| 10:26AM | 1 | A    It is, yeah.  Kama'aina Holdings with an associated email |
| 10:26AM | 2 | address of mike@kama'aina.com. |
| 10:26AM | 3 | Q    And if we go to page 3, is Michael Miske and Kama'aina |
| 10:26AM | 4 | Termite and Pest Control also the guarantor on this loan? |
| 10:26AM | 5 | A    Yes. |
| 10:26AM | 6 | Q    And if we go to page 4, is this also signed by Michael |
| 10:26AM | 7 | Miske? |
| 10:26AM | 8 | A    Yes. |
| 10:26AM | 9 | Q    And if we focus on that first paragraph above it, does it |
| 10:27AM | 10 | have that similar language about business purposes only? |
| 10:27AM | 11 | A    Yes, it does. |
| 10:27AM | 12 | Q    And on the far right, the date for the signature, this is |
| 10:27AM | 13 | May 2016; is that right? |
| 10:27AM | 14 | A    Right. |
| 10:27AM | 15 | Q    Is that the same date as the other loan? |
| 10:27AM | 16 | A    Yes. |
| 10:27AM | 17 | MR. AKINA:  If we could show the witness Exhibit 11-53 |
| 10:27AM | 18 | from the 47th list. |
| 10:27AM | 19 | THE COURT:  Yes. |
| 10:27AM | 20 | BY MR. AKINA: |
| 10:27AM | 21 | Q    Are these text messages between Trisha Castro and Michael |
| 10:27AM | 22 | Miske? |
| 10:27AM | 23 | A    They are. |
| 10:27AM | 24 | MR. AKINA:  I'd offer Exhibit 11-53 into evidence. |
| 10:27AM | 25 | There is a certification at 9-1313 from the government's 29th |

10:27AM   1    list.

10:27AM   2              THE COURT:  Any objection?

10:27AM   3              MR. KENNEDY:  Just a moment to review them, Your

10:27AM   4    Honor.

10:28AM   5              No objection.

10:28AM   6              THE COURT:  11-53 is admitted.  You may publish.

10:28AM   7              (Exhibit 11-53 was received in evidence.)

10:28AM   8              MR. AKINA:  Focusing towards the middle of the page,

10:28AM   9    starting 2016, October 5th, at 23:26.  So lower than where the

10:29AM   10   mouse is right now.  Okay.  Right there.  And go down -- yeah,

10:29AM   11   that's good.

10:29AM   12   BY MR. AKINA:

10:29AM   13   Q    Okay.  You see this text from Trisha Castro on

10:29AM   14   October 5th, 2016:  "Do you own Painkiller personally or

10:29AM   15   Holdings?"

10:29AM   16   A    Yes.

10:29AM   17   Q    And Holdings would be Kama'aina Holdings?

10:29AM   18   A    I assume so, yeah.

10:29AM   19              MR. AKINA:  And if we zoom out of here.  If we could

10:29AM   20   focus on the next couple of lines of text starting at 23:26

10:29AM   21   hours.  And further down.

10:29AM   22   BY MR. AKINA:

10:29AM   23   Q    Right here, what is the response?

10:29AM   24   A    Personally.

10:29AM   25              MR. AKINA:  We can zoom out.

10:29AM   1    BY MR. AKINA:

10:29AM   2    Q    Is that consistent with what was on the loan applications?

10:30AM   3    A    No.

10:30AM   4         MR. AKINA:  Okay.  We can take this down.

10:30AM   5    BY MR. AKINA:

10:30AM   6    Q    I'm going to ask you about another boat, the Rachel.  Is

10:30AM   7    that a fishing vessel?

10:30AM   8    A    It is.

10:30AM   9    Q    And was that vessel also sold pursuant -- was that sold?

10:30AM  10    A    Yes, the vessel was sold.

10:30AM  11    Q    And was that for approximately $676,000 -- $676,785.56 --

10:30AM  12         THE COURT REPORTER:  Could you say that again?

10:30AM  13    BY MR. AKINA:

10:30AM  14    Q    $676,785.56.

10:30AM  15    A    Yes.

10:30AM  16    Q    Was there anything accompanying the -- the Rachel as well?

10:30AM  17    A    Yes.  So there's a fishing permit that's associated with

10:30AM  18    the vessel or that was at the time.

10:30AM  19    Q    Is that a longline limited entry permit?

10:31AM  20    A    Yes.

10:31AM  21    Q    And generally, what does that let you do?

10:31AM  22    A    It allows for, you know, fishing certain species in

10:31AM  23    certain areas, and then this permit specifically allowed for

10:31AM  24    tuna fishing in parts of the Pacific.

10:31AM  25    Q    And is that required to fish around Hawaii?

| | | |
|---|---|---|
| 10:31AM | 1 | A    It's required to at least do, yeah, certain fishing |
| 10:31AM | 2 | activities.  Not exactly sure what. |
| 10:31AM | 3 | Q    Not all fishing activities but certain fishing activities. |
| 10:31AM | 4 | A    Right. |
| 10:31AM | 5 | MR. AKINA:  If we could show the witness Exhibit 11-55 |
| 10:31AM | 6 | from the 47th supplemental. |
| 10:31AM | 7 | THE COURT:  Yes. |
| 10:31AM | 8 | BY MR. AKINA: |
| 10:31AM | 9 | Q    Is this a buy-sell agreement for the Rachel and that entry |
| 10:31AM | 10 | permit? |
| 10:31AM | 11 | A    It is. |
| 10:31AM | 12 | Q    And if we go to the last page, page 3, is it signed by |
| 10:31AM | 13 | Michael Miske? |
| 10:31AM | 14 | A    It is. |
| 10:31AM | 15 | MR. AKINA:  And I'd offer Exhibit 11-55 into evidence. |
| 10:32AM | 16 | There is a certification at 1-1050 from the original list. |
| 10:32AM | 17 | THE COURT:  Any objection? |
| 10:32AM | 18 | MR. KENNEDY:  No objection. |
| 10:32AM | 19 | THE COURT:  11-55 then is admitted.  You may publish |
| 10:32AM | 20 | it. |
| 10:32AM | 21 | (Exhibit 11-55 was received in evidence.) |
| 10:32AM | 22 | MR. AKINA:  If we can focus here on the two |
| 10:32AM | 23 | signatures.  This is the last page. |
| 10:32AM | 24 | BY MR. AKINA: |
| 10:32AM | 25 | Q    Is the bottom, that's Mike Miske? |

10:32AM  1   A    Correct.

10:32AM  2   Q    On behalf of Kama'aina Holdings?

10:32AM  3   A    Yes.

10:32AM  4   Q    And the date here for the top signature is December 2nd,

10:32AM  5   2010?

10:32AM  6   A    That's correct.

10:32AM  7        MR. AKINA:  If we could go to the first page, and

10:32AM  8   focusing on the top portion, including the first three

10:32AM  9   paragraphs.

10:32AM  10  BY MR. AKINA:

10:32AM  11  Q    Who is this agreement between?  Who are the parties?

10:32AM  12  A    So the agreement is between Kama'aina Holdings, who is

10:33AM  13  buying the Rachel and the fishing permit, and Pelagic Fisheries

10:33AM  14  is the seller through an escrow agent that was associated with

10:33AM  15  this.  But, yeah, that's the buyer and seller, and the -- yes.

10:33AM  16  Q    And there are two dollar amounts listed here.  Can you

10:33AM  17  explain what those are for?

10:33AM  18  A    Correct.  Yeah, so the total purchase price was $900,000,

10:33AM  19  and in this paragraph they just kind of break out, you know, at

10:33AM  20  least on paper, how much is attributable to the boat versus how

10:33AM  21  much is attributable to the fishing license.

10:33AM  22  Q    And was it 800,000 for the boat and 100,000 for the

10:33AM  23  Hawaiian limited entry longline permit?

10:33AM  24  A    Yes.

10:33AM  25       MR. AKINA:  If we can show the witness Exhibit 11-56

10:33AM  1    from the 47th supplement.

10:33AM  2              THE COURT:  Go ahead.

10:33AM  3    BY MR. AKINA:

10:33AM  4    Q    And what is this?

10:34AM  5    A    This is the bill of sale documenting the transaction.

10:34AM  6    Q    Between those two parties again?

10:34AM  7    A    Yeah, between Pelagic Fisheries as the seller and

10:34AM  8    Kama'aina Holdings as the buyer.

10:34AM  9              MR. AKINA:  I'd offer Exhibit 11-56 into evidence.

10:34AM  10             THE COURT:  Any objection to that?

10:34AM  11             MR. KENNEDY:  No objection.

10:34AM  12             THE COURT:  11-56 is admitted without objection.  You

10:34AM  13   may publish it.

10:34AM  14             (Exhibit 11-56 was received in evidence.)

10:34AM  15             MR. AKINA:  And focusing on top portions, one -- boxes

10:34AM  16   1, 2, 3 and 4.

10:34AM  17   BY MR. AKINA:

10:34AM  18   Q    This lists the parties from that previous buy-sell

10:34AM  19   agreement?

10:34AM  20   A    That's correct.

10:34AM  21             MR. AKINA:  We can take this down.

10:34AM  22   BY MR. AKINA:

10:34AM  23   Q    Okay.  And how was the -- where did the money come from

10:34AM  24   for the Rachel?

10:34AM  25   A    The operations, you have Kama'aina Termite and Pest

10:35AM    1    Control.

10:35AM    2    Q    And were you able to trace that to a specific type of job

10:35AM    3    at Kama'aina Termite and Pest Control?

10:35AM    4    A    Yes.

10:35AM    5    Q    Which job?

10:35AM    6    A    It was the job at the Keola La'i building.

10:35AM    7    Q    And were you able to chart out that path of funds?

10:35AM    8    A    I was.

10:35AM    9         MR. AKINA:  Could we show the witness Exhibit 11-59

10:35AM    10   from the 47th list?

10:35AM    11        THE COURT:  Yes.

10:35AM    12   BY MR. AKINA:

10:35AM    13   Q    Is this that path of funds that you charted out?

10:35AM    14   A    It is.

10:35AM    15        MR. AKINA:  I'd offer 11-59 into evidence.

10:35AM    16        THE COURT:  Any objection?

10:35AM    17        MR. KENNEDY:  No objection.

10:35AM    18        THE COURT:  11-59 is admitted.  You may publish.

10:35AM    19        (Exhibit 11-59 was received in evidence.)

10:35AM    20   Q    Can you walk the jury through the path of funds for the

10:35AM    21   Rachel and the longline permit?

10:35AM    22   A    Yes.  So starting at the top left, that's income from the

10:35AM    23   Keola La'i building job, which -- and Nordic PCL was the

10:36AM    24   company.  So Nordic PCL for the Keola La'i job wrote two

10:36AM    25   checks.  The checks went into the Kama'aina Termite business

| 10:36AM | 1 | account, and then $950,000 of that money went to Kama'aina |
| 10:36AM | 2 | Holdings, and then approximately $900,000 of that money went to |
| 10:36AM | 3 | buy the -- the Rachel and the permit. |
| 10:36AM | 4 | Q   So the Rachel and the permit were obtained using proceeds |
| 10:36AM | 5 | from -- using Kama'aina Termite and Pest Control proceeds |
| 10:36AM | 6 | specifically from that Keola La'i job? |
| 10:36AM | 7 | A   That's correct. |
| 10:36AM | 8 | Q   Was any money from -- was there money spent also to |
| 10:36AM | 9 | maintain the Rachel? |
| 10:36AM | 10 | A   Yes. |
| 10:36AM | 11 | Q   And where did that come from? |
| 10:37AM | 12 | A   So in 2018, there was a good bit of refurbishment, repair, |
| 10:37AM | 13 | etcetera, work done.  And the money that was -- part of the |
| 10:37AM | 14 | money that was used to do that work came from the refinance |
| 10:37AM | 15 | from the Bank of Hawaii loan from the 6 Lumahai property. |
| 10:37AM | 16 | Q   That's the same refinance you were talking about earlier? |
| 10:37AM | 17 | A   That's correct. |
| 10:37AM | 18 | Q   And were you able to chart out the path for the funds for |
| 10:37AM | 19 | that as well? |
| 10:37AM | 20 | A   Yes. |
| 10:37AM | 21 | MR. AKINA:  And could we show the witness |
| 10:37AM | 22 | Exhibit 11-60? |
| 10:37AM | 23 | THE COURT:  Yes, go ahead. |
| 10:37AM | 24 | BY MR. AKINA: |
| 10:37AM | 25 | Q   And is this that path of funds that you charted out? |

10:37AM    1    A    It is.

10:37AM    2            MR. AKINA:  I'd offer Exhibit 11-60 into evidence.

10:37AM    3            THE COURT:  Any objection?

10:37AM    4            MR. KENNEDY:  No objection.

10:37AM    5            THE COURT:  11-60 is admitted.  You may publish.

10:37AM    6            (Exhibit 11-60 was received in evidence.)

10:38AM    7    BY MR. AKINA:

10:38AM    8    Q    So based on the documents you reviewed, did money come

10:38AM    9    from that refinance?  I think earlier you testified that that

10:38AM    10   whole 1.9 million went into Michael Miske's personal accounts?

10:38AM    11   A    That's correct.

10:38AM    12   Q    And then there's a $25,000 payment that goes out in May of

10:38AM    13   2018?

10:38AM    14   A    Yes, there's a $25,000 transfer to Kama'aina Holdings, and

10:38AM    15   then that $25,000 was used in various ways for maintenance on

10:38AM    16   the Rachel.

10:38AM    17   Q    And there's some language in quotes here, "Shipyard

10:38AM    18   payment, dry dock 2018."  Did that come from the documents you

10:38AM    19   were reviewing?

10:38AM    20   A    Yes.

10:38AM    21   Q    So that was -- what was that?

10:38AM    22   A    That would have been a notation on the documents that we

10:38AM    23   got from the bank.

10:38AM    24   Q    I'm going to ask you --

10:39AM    25            MR. AKINA:  If we can show and publish Exhibit 11-19,

10:39AM   1   which is already in evidence.

10:39AM   2            THE COURT:  Yes, go ahead.

10:39AM   3   BY MR. AKINA:

10:39AM   4   Q    This is the summary chart that you created of Michael

10:39AM   5   Miske's personal accounts showing when that refinance loan hit

10:39AM   6   the account?

10:39AM   7   A    Yeah, correct.

10:39AM   8            MR. AKINA:  And if we go to page 9 of the document.

10:39AM   9   And focusing on May 25th, 2018.  There is a check -- let's do

10:39AM  10   the first left half of the page first.

10:39AM  11   BY MR. AKINA:

10:39AM  12   Q    This one, May 25th, 2018, Check Number 296 for $25,000, is

10:40AM  13   that what was depicted in that chart?

10:40AM  14   A    Yes.  The bottom line, yeah.

10:40AM  15   Q    And if we focus on the rest of the row to the right of it,

10:40AM  16   it was made out to Kama'aina Holdings with the notation for

10:40AM  17   "Shipyard payment, dry dock"?

10:40AM  18   A    That's correct.

10:40AM  19            MR. AKINA:  We can take this down.

10:40AM  20   BY MR. AKINA:

10:40AM  21   Q    Was there a Ferrari that was seized from 6 Lumahai?

10:40AM  22   A    There was.

10:40AM  23   Q    Specifically a Ferrari Berlinetta?

10:40AM  24   A    Yes.

10:40AM  25            MR. AKINA:  Could we show and publish Exhibit 9-1194,

| 10:40AM | 1 | from the third supplement already in evidence? |
| 10:41AM | 2 | THE COURT:  I don't have it. |
| 10:41AM | 3 | MR. AKINA:  9-1194 from the third supplement? |
| 10:41AM | 4 | THE COURT:  Yes.  Okay, go ahead. |
| 10:41AM | 5 | BY MR. AKINA: |
| 10:41AM | 6 | Q    This is a picture of that Ferrari? |
| 10:41AM | 7 | A    It is. |
| 10:41AM | 8 | MR. AKINA:  And if we can now publish Exhibit 9-1197 |
| 10:41AM | 9 | from the third supplement. |
| 10:42AM | 10 | And going to page 5 of the document. |
| 10:42AM | 11 | BY MR. AKINA: |
| 10:42AM | 12 | Q    Do you see, if we focus on top left corner, the buyer in |
| 10:42AM | 13 | the name of Hawai'i Partners; is that correct? |
| 10:42AM | 14 | A    That's correct, yes. |
| 10:42AM | 15 | MR. AKINA:  And zooming out of this, right below that |
| 10:42AM | 16 | under the description of the vehicle, the year, make and model. |
| 10:42AM | 17 | BY MR. AKINA: |
| 10:42AM | 18 | Q    What was the year, make and model? |
| 10:42AM | 19 | A    2017 Ferrari F12berlinetta. |
| 10:42AM | 20 | MR. AKINA:  And then if we could focus on the VIN, |
| 10:42AM | 21 | which is right below that to the right. |
| 10:42AM | 22 | BY MR. AKINA: |
| 10:42AM | 23 | Q    The VIN number, is it ZFF74UFA5H0223173? |
| 10:43AM | 24 | A    Yes. |
| 10:43AM | 25 | Q    And above that there's a date of May 30th, 2020, to be |

10:43AM  1    delivered; is that correct?

10:43AM  2    A    Yes.

10:43AM  3    Q    And below that, what was the purchase price?

10:43AM  4    A    Yeah, a little over two -- well, almost 218.  $217,866.52.

10:43AM  5    Q    And how was this Ferrari paid for?

10:43AM  6    A    It came -- yeah, the source of the money was Kama'aina

10:43AM  7    Termite bank account.

10:43AM  8    Q    And were you able to trace that to a specific job?

10:43AM  9    A    Yes.

10:43AM  10   Q    Which job?

10:43AM  11   A    It was a job on the Big Island related to the Maunakea --

10:43AM  12   Maunakea LLC.

10:43AM  13        MR. AKINA:  If we could show the witness Exhibit 11-67

10:44AM  14   from the 47th supplemental.

10:44AM  15        THE COURT:  Go ahead.

10:44AM  16   BY MR. AKINA:

10:44AM  17   Q    What are we looking at here?

10:44AM  18   A    Yeah, so a portion of the previous -- previous exhibit

10:44AM  19   related to, you know, bank accounts, and so this is a portion

10:44AM  20   of the Kama'aina Termite and Pest Control bank account for

10:44AM  21   April, May and June of 2020.

10:44AM  22   Q    So did you put it into a -- an Excel spreadsheet showing

10:44AM  23   all the activity in that period after April 2020?

10:44AM  24   A    Yes.

10:44AM  25   Q    And does that cover payments from the Maunakea job?

| 10:44AM | 1 | A | Yes. |

10:44AM   1   A    Yes.

10:44AM   2   Q    And does it cover a payment for the Ferrari?

10:44AM   3   A    Yes.

10:45AM   4        MR. AKINA:  I would offer Exhibit 11-67 into evidence.

10:45AM   5        THE COURT:  Any objection?

10:45AM   6        MR. KENNEDY:  No objection.

10:45AM   7        THE COURT:  11-67 is admitted.  You may publish.

10:45AM   8        (Exhibit 11-67 was received in evidence.)

10:45AM   9        MR. AKINA:  And if we could focus on the top left-hand

10:45AM   10   corner between the gray boxes.

10:45AM   11   BY MR. AKINA:

10:45AM   12   Q    This is a summary of account activity for Kama'aina

10:45AM   13   Termite and Pest Control?

10:45AM   14   A    Yes, one of the Kama'aina Termite and Pest Control

10:45AM   15   accounts.  This is the business savings account.

10:45AM   16        MR. AKINA:  And if we zoom out of here.  Focusing on

10:45AM   17   the balance in the middle of the page from the top line.  And

10:45AM   18   the -- yeah.

10:45AM   19   BY MR. AKINA:

10:45AM   20   Q    Okay.  So the top line where this starts is April 2020.

10:46AM   21   What does this represent, this starting balance?

10:46AM   22   A    So, yeah, this is the balance that's in the account as of

10:46AM   23   April 1st before any of the money from the Maunakea job gets

10:46AM   24   transferred into the -- into the account.

10:46AM   25   Q    So there's approximately $151,000 prior to the Maunakea

10:46AM  1  job payments.

10:46AM  2  A    Correct.

10:46AM  3          MR. AKINA:  If we could zoom out of that.  If we focus

10:46AM  4  on the next couple of payments, the Additions column all the

10:46AM  5  way to the Source Description for the rest of April.

10:46AM  6  BY MR. AKINA:

10:46AM  7  Q    Okay.  And then you see three customer deposits being made

10:46AM  8  in April of varying amounts?

10:46AM  9  A    Right.

10:46AM  10  Q    What are those?

10:46AM  11  A    Yeah, again, those are funds from the Maunakea LLC related

10:47AM  12  to the -- the job on Big Island.  So these are payments on

10:47AM  13  that -- for that service.

10:47AM  14          MR. AKINA:  And if we zoom out.

10:47AM  15  BY MR. AKINA:

10:47AM  16  Q    And then there's another deposit, May 5th, 2020.  Is that

10:47AM  17  a fourth payment for that Maunakea job as well?

10:47AM  18  A    Yes.

10:47AM  19  Q    Now, if we zoom out of here, going down to June 1st, 2020,

10:47AM  20  do you see a withdrawal for $217,000?

10:47AM  21  A    Yes.

10:47AM  22  Q    Where did that go to?

10:47AM  23  A    So that money went into the Hawai'i Partners bank account.

10:47AM  24  Q    And ultimately where did it go?

10:47AM  25  A    To purchase the Ferrari.

10:47AM   1   Q    And as of June 1st, 2020, was there -- was there a

10:47AM   2   significant amount of money coming in besides the Maunakea job?

10:48AM   3   A    No.

10:48AM   4   Q    And but for that Maunakea job money, would the starting

10:48AM   5   balance of $151,000 have been enough to cover that $217,000

10:48AM   6   payment?

10:48AM   7   A    No.

10:48AM   8         MR. AKINA:  If we could show the witness

10:48AM   9   Exhibit 11-1199 from the third supplement.

10:48AM   10        THE COURT:  Go ahead.

10:48AM   11  BY MR. AKINA:

10:48AM   12  Q    What are we looking at here?

10:48AM   13  A    So, yeah, documentation, a check from the Bank of Hawaii

10:48AM   14  for the payment on the -- for the Ferrari.

10:48AM   15        MR. AKINA:  I'd offer Exhibit 9-1199 into evidence.

10:48AM   16        THE COURT:  Any objection to that?

10:48AM   17        MR. KENNEDY:  No objection.

10:48AM   18        THE COURT:  9-1199 is admitted then without objection.

10:48AM   19  You may publish.

10:48AM   20         (Exhibit 9-1199 was received in evidence.)

10:49AM   21        MR. AKINA:  If we can focus in on the check itself.

10:49AM   22  BY MR. AKINA:

10:49AM   23  Q    And -- and what's the date?

10:49AM   24  A    May 30th, 2020.

10:49AM   25  Q    And I said check, but this is a receipt for that check; is

| 10:49AM | 1 | that correct? |
| 10:49AM | 2 | A    Yes.  Yeah, it's -- yeah, a Bank of Hawaii documentation |
| 10:49AM | 3 | for the -- for the payment, yeah. |
| 10:49AM | 4 | Q    Okay.  And the purchaser is Hawai'i Partners? |
| 10:49AM | 5 | A    That's correct. |
| 10:49AM | 6 | Q    And this is paid out to Ferrari Hawaii? |
| 10:49AM | 7 | A    Yes. |
| 10:49AM | 8 | Q    Now, so based on the documents reviewed, was the Ferrari |
| 10:49AM | 9 | purchased with proceeds from Kama'aina Termite and Pest |
| 10:49AM | 10 | Control, specifically the Maunakea job? |
| 10:49AM | 11 | A    Yes. |
| 10:49AM | 12 | MR. AKINA:  You can take this exhibit down. |
| 10:49AM | 13 | If we could go back to Exhibit 11-67. |
| 10:49AM | 14 | THE COURT:  Go ahead. |
| 10:49AM | 15 | MR. AKINA:  I want to focus on this -- on the top |
| 10:49AM | 16 | portions, the April and May additions and subtractions -- |
| 10:50AM | 17 | sorry, from April to May 5th. |
| 10:50AM | 18 | Could you do additions and subtractions? |
| 10:50AM | 19 | BY MR. AKINA: |
| 10:50AM | 20 | Q    So these top three numbers, previously you testified that |
| 10:50AM | 21 | came from the Maunakea job? |
| 10:50AM | 22 | A    Right. |
| 10:50AM | 23 | Q    And then this subsequent number, $669,000 approximately, |
| 10:50AM | 24 | that was a fourth payment from the Maunakea job? |
| 10:50AM | 25 | A    Right. |

10:50AM  1   Q    And then on May 5th, 2020, there's a subtraction of

10:50AM  2   approximately $1.1 million.  What do the parentheses represent

10:50AM  3   around that number?

10:50AM  4   A    Just the parentheses -- parentheses just show that it's

10:50AM  5   negative.  It's a withdrawal, a subtraction.

10:50AM  6   Q    So this is money going out of the Kama'aina Termite and

10:51AM  7   Pest Control accounts?

10:51AM  8   A    Yes.

10:51AM  9   Q    And does this amount, specifically $1,162,826.76, is that

10:51AM  10  the sum of the first two payments from the Maunakea job?

10:51AM  11  A    It is.

10:51AM  12  Q    And what was -- was this a cash withdrawal or a check, or

10:51AM  13  what was this, this $1.1 million --

10:51AM  14  A    It was a -- yeah, it was a withdrawal, and it was -- it's

10:51AM  15  an official bank check.

10:51AM  16       MR. AKINA:  If we could show Exhibit 11-72.

10:51AM  17       THE COURT:  Okay.

10:51AM  18  BY MR. AKINA:

10:51AM  19  Q    Is this a copy of that cashier's check for that amount

10:51AM  20  coming out of Kama'aina Termite and Pest Control's account?

10:51AM  21  A    Yes, it is.

10:52AM  22       MR. AKINA:  I'd offer Exhibit 11-72 into evidence.

10:52AM  23       THE COURT:  Any objection?

10:52AM  24       MR. KENNEDY:  No objection.

10:52AM  25       THE COURT:  11-72 is admitted.  You may publish.

10:52AM   1              (Exhibit 11-72 was received in evidence.)

10:52AM   2              MR. AKINA:  If we could focus on the cashier's check.

10:52AM   3    BY MR. AKINA:

10:52AM   4    Q    So you see that this -- so this corresponds to that line

10:52AM   5    item on the chart that we were just looking at?

10:52AM   6    A    It does.

10:52AM   7    Q    And the date is May 5th, 2020, on this cashier's check?

10:52AM   8    A    Right.

10:52AM   9    Q    And who is it made out to?

10:52AM   10   A    Kama'aina Termite and Pest Control.

10:52AM   11   Q    Do you know who drew this cashier's check out of the

10:52AM   12   account?

10:52AM   13   A    Yeah, based on the -- the documents from the bank, yeah,

10:52AM   14   Delia Fabro-Miske.

10:53AM   15              MR. AKINA:  And if we zoom out of here.  If I could

10:53AM   16   show the witness Exhibit 11-71 from the 47th supplement.

10:53AM   17              THE COURT:  Yes.

10:53AM   18              MR. AKINA:  If we go to the second page.

10:53AM   19   BY MR. AKINA:

10:53AM   20   Q    And what are we looking at here?

10:53AM   21   A    Yeah, so documentation again from Bank of Hawaii related

10:53AM   22   to that withdrawal and the corresponding cashier's check.

10:53AM   23              MR. AKINA:  If we go back to the first page.

10:53AM   24              I offer Exhibit 11-71 into evidence.  There's a

10:53AM   25   certification at 9-1334.

| | | |
|---|---|---|
| 10:53AM | 1 | THE COURT:  Any objection? |
| 10:53AM | 2 | MR. KENNEDY:  No objection. |
| 10:53AM | 3 | THE COURT:  11-71 is admitted.  You may publish. |
| 10:53AM | 4 | (Exhibit 11-71 was received in evidence.) |
| 10:53AM | 5 | MR. AKINA:  And so this is from Bank of Hawaii, and if |
| 10:53AM | 6 | we could focus on the first -- the withdrawal -- the face of |
| 10:53AM | 7 | that withdrawal slip.  The entire -- the entire slip. |
| 10:53AM | 8 | BY MR. AKINA: |
| 10:54AM | 9 | Q    And what does this show? |
| 10:54AM | 10 | A    So, yeah, this is the withdrawal slip documentation, yeah, |
| 10:54AM | 11 | that would have been prepared at the time the check was issued |
| 10:54AM | 12 | in May, and the signature appears to be Delia Fabro's. |
| 10:54AM | 13 | Q    And this is the same dollar amount? |
| 10:54AM | 14 | A    Yes. |
| 10:54AM | 15 | Q    And the same date, May 5th, 2020? |
| 10:54AM | 16 | A    Right. |
| 10:54AM | 17 | Q    So fair to say that this cashier's check in a little bit |
| 10:54AM | 18 | over $1.1 million, that's money that came from the Maunakea |
| 10:54AM | 19 | job? |
| 10:54AM | 20 | A    Yes. |
| 10:54AM | 21 | MR. AKINA:  We can take this down. |
| 10:54AM | 22 | BY MR. AKINA: |
| 10:54AM | 23 | Q    And in addition to the Ferrari, were other vehicles |
| 10:54AM | 24 | seized? |
| 10:54AM | 25 | A    Yes. |

10:54AM  1    Q    And that was pursuant to court order?

10:55AM  2    A    They were seized, yeah, as evidence when the search

10:55AM  3    warrant happened.

10:55AM  4    Q    And what types of other vehicles were seized?

10:55AM  5    A    There were four Volkswagens and a Ford Bronco.

10:55AM  6              THE COURT:  Mr. Akina, if you're going to move -- if

10:55AM  7    you're in the position of moving past the Ferrari, this might

10:55AM  8    be a good time to take a break.

10:55AM  9              MR. AKINA:  Sounds good, Your Honor.

10:55AM  10             THE COURT:  Okay.  We'll go ahead and take our break.

10:55AM  11   It's nearly 11:00.

10:55AM  12             As we go to break, I remind our jurors to please

10:55AM  13   refrain from discussing the substance of this case with anyone,

10:55AM  14   including each other until I advise you otherwise; to also

10:55AM  15   refrain from accessing any media or other accounts of this case

10:55AM  16   that may be out there; and do not conduct your own

10:55AM  17   investigation into anything relating to this case.

10:55AM  18             We'll take a short break, and a reminder that we will

10:55AM  19   be taking a full lunch break somewhere around the noon hour,

10:55AM  20   maybe a little later, given when we're breaking now.

10:55AM  21             (Proceedings were recessed at 10:55 a.m. to 11:26

11:24AM  22   a.m.)

11:26AM  23             THE COURT:  All right.  Mr. Akina, you may resume when

11:26AM  24   you're ready.

11:26AM  25             MR. AKINA:  Could we publish Exhibit 11-28 that was

11:26AM    1    admitted earlier this morning?

11:26AM    2            THE COURT:  Yes, you may.

11:26AM    3    BY MR. AKINA:

11:26AM    4    Q    So going back to the Kumukahi residence, you had testified

11:26AM    5    earlier this morning that money had gone from -- from the Keola

11:26AM    6    La'i job to Michael Miske to -- sorry, to the Lumahai refinance

11:26AM    7    all the way through Mr. Miske to Kaulana Freitas; is that

11:26AM    8    correct?

11:26AM    9    A    Right.

11:26AM    10   Q    And then money -- those checks went from Kaulana Freitas

11:27AM    11   to an attorney, James Dandar?

11:27AM    12   A    Right, yeah.

11:27AM    13   Q    And did you -- are you aware of who James Dandar was in

11:27AM    14   relation to this foreclosure sale?

11:27AM    15   A    Yeah, so it was purchased at foreclosure, right, and so

11:27AM    16   the person running the foreclosure auction -- this is an escrow

11:27AM    17   account basically.  So, yeah, the law offices of James Dandar

11:27AM    18   is essentially just an escrow or trust account to hold those

11:27AM    19   funds while the purchase process continues.

11:27AM    20           MR. AKINA:  And if we could show the witness

11:27AM    21   Exhibit 11-24 from the 47th supplement.

11:27AM    22           Just going to the second page, focusing on that first

11:27AM    23   paragraph 1 at the bottom.

11:27AM    24   BY MR. AKINA:

11:27AM    25   Q    And is it your understanding that James Dandar, he was

11:28AM    1    appointed by a state court to oversee the sale of that

11:28AM    2    property?

11:28AM    3    A    Yes.

11:28AM    4        MR. AKINA:  We can take this down.

11:28AM    5    BY MR. AKINA:

11:28AM    6    Q    So before the break you testified that there were several

11:28AM    7    vehicles in addition to the Ferrari.  And of those four

11:28AM    8    Volkswagens and the Ford Bronco that you mentioned, who -- what

11:28AM    9    entity were they held in?  Who was the registered owner?

11:28AM    10   A    The registered owner was Hawai'i Partners LLC.

11:28AM    11   Q    For each of those vehicles?

11:28AM    12   A    Right.

11:28AM    13   Q    And those were seized in July of 2020?

11:28AM    14   A    Yes.

11:28AM    15       MR. AKINA:  Can we show and publish Exhibit 9-1232

11:29AM    16   from the third supplement.

11:29AM    17       THE COURT:  Yes, go ahead.

11:29AM    18   BY MR. AKINA:

11:29AM    19   Q    Is this a picture of three of those Volkswagens?

11:29AM    20   A    It is.

11:29AM    21       MR. AKINA:  And if we can show -- if we can publish

11:29AM    22   Exhibit 9-1219 from the third supplement, also in evidence.

11:29AM    23       THE CORT:  Go ahead.

11:29AM    24   BY MR. AKINA:

11:29AM    25   Q    Is this the fourth Volkswagen?

| | | |
|---|---|---|
| 11:29AM | 1 | A    It is, yeah.  The back of the Volkswagen van. |
| 11:29AM | 2 | MR. AKINA:  And then if we can publish Exhibit 9-1230 |
| 11:30AM | 3 | from the third supplement. |
| 11:30AM | 4 | BY MR. AKINA: |
| 11:30AM | 5 | Q    Is this the Ford Bronco you mentioned? |
| 11:30AM | 6 | A    It is. |
| 11:30AM | 7 | MR. AKINA:  Now, can we show the witness |
| 11:30AM | 8 | Exhibit 11-73? |
| 11:30AM | 9 | THE COURT:  Go ahead. |
| 11:30AM | 10 | MR. AKINA:  And 11-74. |
| 11:30AM | 11 | THE COURT:  Yes. |
| 11:30AM | 12 | MR. AKINA:  11-75. |
| 11:30AM | 13 | THE COURT:  Yes. |
| 11:30AM | 14 | MR. AKINA:  11-76. |
| 11:30AM | 15 | THE COURT:  Yes. |
| 11:30AM | 16 | MR. AKINA:  11-77. |
| 11:30AM | 17 | THE COURT:  Yes. |
| 11:30AM | 18 | MR. AKINA:  11-78. |
| 11:30AM | 19 | THE COURT:  Go ahead. |
| 11:30AM | 20 | MR. AKINA:  And 11-79. |
| 11:30AM | 21 | THE COURT:  Yes. |
| 11:30AM | 22 | BY MR. AKINA: |
| 11:31AM | 23 | Q    Are these all DMV records with certifications relating to |
| 11:31AM | 24 | those vehicles that I just showed pictures of? |
| 11:31AM | 25 | A    Yes.  Yeah, registration and ownership documentation |

11:31AM   1   maintained by the City and County, yeah.

11:31AM   2   Q    And they have -- they each have a seal attesting to it

11:31AM   3   being correct and accurate?

11:31AM   4   A    Yes.

11:31AM   5        MR. AKINA:  I'd offer Exhibits 11-73 through 11-79

11:31AM   6   into evidence.

11:31AM   7        THE COURT:  Any objection?

11:31AM   8        MR. KENNEDY:  No objection.

11:31AM   9        THE COURT:  11-73 through 11-79 then are each admitted

11:31AM  10   without objection.  You may publish.

11:31AM  11   (Exhibits 11-73 through 11-79 were received in evidence.)

11:31AM  12        MR. AKINA:  If we could start with 11-73.

11:31AM  13   BY MR. AKINA:

11:31AM  14   Q    And is this one of the Volkswagen Bugs?

11:31AM  15   A    Yes.

11:31AM  16   Q    And specifically, this is the 1951 Volkswagen.  What's the

11:31AM  17   VIN number here, if we could focus on that portion?

11:32AM  18   A    10234188.

11:32AM  19   Q    And what was the license number for that?

11:32AM  20   A    SYB865.

11:32AM  21        MR. AKINA:  And if we zoom out of that.

11:32AM  22   BY MR. AKINA:

11:32AM  23   Q    And it's registered to Hawai'i Partners, correct?

11:32AM  24   A    Yes.

11:32AM  25   Q    And what's the issuance date on this?

| | | | |
|---|---|---|---|
| 11:32AM | 1 | A | It's 8/26/2016, so August of 2016. |
| 11:32AM | 2 | | MR. AKINA:  If we can go to Exhibit 11-74.  And |
| 11:32AM | 3 | | focusing on these top boxes showing the vehicle information. |
| 11:32AM | 4 | | All the way to the date. |
| 11:32AM | 5 | | BY MR. AKINA: |
| 11:32AM | 6 | Q | And this is for another Volkswagen Bug, 1956 model? |
| 11:32AM | 7 | A | Correct. |
| 11:32AM | 8 | Q | And what's the license number? |
| 11:33AM | 9 | A | 56VDUB. |
| 11:33AM | 10 | Q | And the VIN number? |
| 11:33AM | 11 | A | 109382821. |
| 11:33AM | 12 | Q | What date was this registration issued? |
| 11:33AM | 13 | A | 8/29/2016. |
| 11:33AM | 14 | Q | And zooming out, does it show Hawai'i Partners as the |
| 11:33AM | 15 | | registered owner? |
| 11:33AM | 16 | A | Yes. |
| 11:33AM | 17 | Q | If we could go to 11-76, is this for another one of the |
| 11:33AM | 18 | | Volkswagen Bugs? |
| 11:33AM | 19 | A | Yes. |
| 11:33AM | 20 | Q | And zooming in on that box with the vehicle information, |
| 11:33AM | 21 | | this is a 1957 model? |
| 11:33AM | 22 | A | Yes. |
| 11:33AM | 23 | Q | And what's the license number? |
| 11:33AM | 24 | A | EBYGRL. |
| 11:33AM | 25 | Q | And the VIN? |

| | | | |
|---|---|---|---|
| 11:33AM | 1 | A | 1529889. |
| 11:33AM | 2 | Q | And what date is this registration issued? |
| 11:33AM | 3 | A | 7/14/27 (verbatim). |
| 11:34AM | 4 | Q | And it's held in the name of Hawai'i Partners? |
| 11:34AM | 5 | A | Yes. |
| 11:34AM | 6 | Q | If we go to 11-75, and you see this notice of transfer in |
| 11:34AM | 7 | | the top right corner for that same vehicle, EBYGRL? |
| 11:34AM | 8 | A | Yes. |
| 11:34AM | 9 | Q | The date here, it's an earlier date of January 2015? |
| 11:34AM | 10 | A | Yes. |
| 11:34AM | 11 | Q | And so previously, who was the prior owner before Hawai'i |
| 11:34AM | 12 | | Partners? |
| 11:34AM | 13 | A | Kaulana Freitas. |
| 11:34AM | 14 | | MR. AKINA: If we could publish Exhibit 11-78. Zoom |
| 11:34AM | 15 | | in on vehicle information. |
| 11:34AM | 16 | | BY MR. AKINA: |
| 11:34AM | 17 | Q | Is this for the Volkswagen van? |
| 11:34AM | 18 | A | Yes. |
| 11:34AM | 19 | Q | And this is a 1961 model? |
| 11:34AM | 20 | A | Yes. |
| 11:34AM | 21 | Q | And what is the license number? |
| 11:34AM | 22 | A | SYB762. |
| 11:35AM | 23 | Q | And the VIN? |
| 11:35AM | 24 | A | 685167. |
| 11:35AM | 25 | Q | And what date was this registration issued? |

11:35AM   1   A      7/17/2017.

11:35AM   2   Q      And zooming out, it's also held in Hawai'i Partners' name?

11:35AM   3   A      Yes.

11:35AM   4          MR. AKINA:  And can we publish Exhibit 11-77.

11:35AM   5          THE COURT:  Go ahead.

11:35AM   6   BY MR. AKINA:

11:35AM   7   Q      Focusing on the vehicle information, is this that same

11:35AM   8   vehicle license plate SYB762?

11:35AM   9   A      Yes.

11:35AM   10  Q      So still for the Volkswagen van?

11:35AM   11  A      Right.

11:35AM   12  Q      And it's an older date here now, August of 2016; is that

11:35AM   13  right?

11:35AM   14  A      Yes, August 23rd, 2016.

11:35AM   15  Q      And if we zoom out, who was the previous owner?

11:35AM   16  A      Delia Ann M. Fabro.

11:36AM   17         MR. AKINA:  If we could publish Exhibit 11-79.

11:36AM   18         THE COURT:  Yes.

11:36AM   19  BY MR. AKINA:

11:36AM   20  Q      Focusing on vehicle information, this one is made by Ford,

11:36AM   21  so this is for the Ford Bronco?

11:36AM   22  A      That's correct.

11:36AM   23  Q      And what's the -- a 1970 model?

11:36AM   24  A      Yes.

11:36AM   25  Q      And what is the license number?

11:36AM   1   A     TTY105.

11:36AM   2   Q     And the VIN?

11:36AM   3   A     U15GLG85573.

11:36AM   4   Q     What is the issuance date for this registration?

11:36AM   5   A     5/20/2019.

11:36AM   6   Q     And zooming out, is it held in the name of Hawai'i

11:36AM   7   Partners?

11:36AM   8   A     Yes.

11:36AM   9   Q     So the registration dates that we looked over, that ranges

11:36AM  10   from 2016 to 2019; is that correct?

11:36AM  11   A     That's correct.

11:36AM  12   Q     And based on -- and is it your understanding that that's

11:37AM  13   the time frame where Michael Miske's companies were in

11:37AM  14   operation?

11:37AM  15   A     Yes.

11:37AM  16   Q     So each of these would be considered property of Hawai'i

11:37AM  17   Partners?

11:37AM  18   A     Yes, according to the registration, yeah.

11:37AM  19   Q     It's registered in Hawai'i Partners' name.

11:37AM  20   A     Yes.

11:37AM  21         MR. AKINA:  And we can take this down.

11:37AM  22   BY MR. AKINA:

11:37AM  23   Q     Was artwork, including paintings and sculptures, also

11:37AM  24   found at the 6 Lumahai residence?

11:37AM  25   A     Yes.

| | | |
|---|---|---|
| 11:37AM | 1 | Q    And that was also in July of 2020? |
| 11:37AM | 2 | A    Yes. |
| 11:37AM | 3 | MR. AKINA:  If I can show the witness a series of |
| 11:37AM | 4 | exhibits from the 47th supplemental list, starting with 11-80? |
| 11:37AM | 5 | THE COURT:  Go ahead. |
| 11:37AM | 6 | MR. AKINA:  And 11-81.  11-82.  11-84.  11-85.  11-86. |
| 11:38AM | 7 | 11-87.  11-88.  And 11-89. |
| 11:38AM | 8 | BY MR. AKINA: |
| 11:38AM | 9 | Q    Are these pictures of artwork and paintings and sculptures |
| 11:38AM | 10 | that were at the 6 Lumahai residence? |
| 11:38AM | 11 | A    Yes. |
| 11:38AM | 12 | MR. AKINA:  I'd offer Exhibits 11-80 through 11-82 and |
| 11:38AM | 13 | 11-84 through 11-89 into evidence. |
| 11:38AM | 14 | THE COURT REPORTER:  Can you say that again?  11 dash? |
| 11:38AM | 15 | MR. AKINA:  11-80 through 11-82 and 11-84 through |
| 11:38AM | 16 | 11-89 into evidence. |
| 11:38AM | 17 | THE COURT:  Any objection to those nine exhibits? |
| 11:38AM | 18 | MR. KENNEDY:  No objection. |
| 11:38AM | 19 | THE COURT:  Without objection, those nine exhibits are |
| 11:38AM | 20 | each admitted.  That's 11-80 through 11-82 and 11-84 through |
| 11:39AM | 21 | 11-89.  You may publish. |
| 11:38AM | 22 | (Exhibits 11-80 through 11-82 and 11-84 through 11-89 were |
| 11:38AM | 23 | received in evidence.) |
| 11:39AM | 24 | MR. AKINA:  If we could start with 11-80. |
| 11:39AM | 25 | BY MR. AKINA: |

11:39AM   1   Q     Is this painting Ludavico & Ludovio by an artist named

11:39AM   2   Retna?

11:39AM   3   A     Yes.

11:39AM   4              MR. AKINA:  Can we go to 11-81.

11:39AM   5   BY MR. AKINA:

11:39AM   6   Q     Is this a painting Watermark by artist Retna?

11:39AM   7   A     Yes.

11:39AM   8              MR. AKINA:  Can we go to 11-82.

11:39AM   9   BY MR. AKINA:

11:39AM  10   Q     Is this a painting Forever Young by Retna?

11:39AM  11   A     Yes.

11:39AM  12              MR. AKINA:  Can we go to the second page of the

11:39AM  13   document.  And focusing in on -- on the back of the painting

11:39AM  14   itself.

11:39AM  15   BY MR. AKINA:

11:39AM  16   Q     Can you make out the words "Forever" in the top left box?

11:39AM  17   A     Yes.

11:39AM  18   Q     And the top middle box, does that appear to be the word

11:40AM  19   "Young"?

11:40AM  20   A     It appears to be, yeah.

11:40AM  21              MR. AKINA:  If we can publish Exhibit 9-1349 from the

11:40AM  22   36 supplemental list, already in evidence.

11:40AM  23              THE COURT:  Go ahead.

11:40AM  24              MR. AKINA:  Go to page 8.

11:40AM  25   BY MR. AKINA:

11:40AM    1    Q    Does this --

11:40AM    2            MR. AKINA:  And if we can zoom in on the top left

11:40AM    3    corner with the invoice to and information below it as well.

11:40AM    4    BY MR. AKINA:

11:40AM    5    Q    Does this appear to be an invoice to Michael Miske dated

11:40AM    6    April 19, 2019, for Forever Young by Retna?

11:40AM    7    A    Yes.

11:40AM    8            MR. AKINA:  And zooming out, if we can focus on the

11:40AM    9    purchase price.

11:40AM    10   BY MR. AKINA:

11:41AM    11   Q    What was the price here?

11:41AM    12   A    $195,000.

11:41AM    13           MR. AKINA:  If we can publish Exhibit 11-84.

11:41AM    14   BY MR. AKINA:

11:41AM    15   Q    Is this the painting Sangre Oscura by the artist Retna?

11:41AM    16   A    Yes.

11:41AM    17           MR. AKINA:  If we can go to Exhibit 11-85.

11:41AM    18   BY MR. AKINA:

11:41AM    19   Q    Is this painting Graffiti Does It by OG Slick?

11:41AM    20   A    Yes.

11:41AM    21           MR. AKINA:  If we go to 11-87.

11:41AM    22   BY MR. AKINA:

11:41AM    23   Q    Is this a sculpture Uzi Does It by OG Slick?

11:41AM    24   A    Yes.

11:41AM    25           MR. AKINA:  If we can now publish 11-86.

11:41AM    1    BY MR. AKINA:

11:41AM    2    Q    Is this a sculpture titled Slick Skull also by OG Slick?

11:41AM    3    A    Yes.

11:41AM    4    Q    And what does that --

11:42AM    5              MR. AKINA:  If we can focus on that document in front

11:42AM    6    of the skull.

11:42AM    7    BY MR. AKINA:

11:42AM    8    Q    What is that?

11:42AM    9    A    It's a certificate of authenticity.

11:42AM   10              MR. AKINA:  Can we zoom out?  If we could publish

11:42AM   11    Exhibit 11-88.

11:42AM   12    BY MR. AKINA:

11:42AM   13    Q    Is this a painting Speaking in Tongues by an artist Defer,

11:42AM   14    also Alex Kizu?

11:42AM   15    A    Yes.

11:42AM   16              MR. AKINA:  And if we could publish Exhibit 11-89.

11:42AM   17    BY MR. AKINA:

11:42AM   18    Q    Is this a painting by the same artist titled Spiritual

11:42AM   19    Language?

11:42AM   20    A    It is.

11:42AM   21    Q    And is that -- were you able to look previously at that

11:42AM   22    blue tape on the top?

11:42AM   23    A    Yes.

11:42AM   24    Q    And what was written there?

11:42AM   25    A    The name of the painting.

```
11:42AM   1              MR. AKINA:  We can take this down.

11:42AM   2    BY MR. AKINA:

11:43AM   3    Q    Were there several bank accounts that were also found?

11:43AM   4    A    Yes, there were several bank accounts that were seized in

11:43AM   5    July of 2020.

11:43AM   6    Q    And what were those bank accounts?

11:43AM   7    A    Mostly business bank accounts associated with the

11:43AM   8    Kama'aina family of companies, and then there was one personal

11:43AM   9    bank account of Mr. Miske's.

11:43AM  10    Q    And so let's focus on the personal one first.  Is that a

11:43AM  11    Hawaii Central Federal Credit Union account ending 075?

11:43AM  12    A    I know it's a Hawaii Central, yes.

11:43AM  13    Q    Did you schedule out activity for that account from

11:43AM  14    August 2019 to approximately July 2020?

11:43AM  15    A    Yes.

11:43AM  16    Q    And that would show money coming in, money coming out of

11:43AM  17    the account?

11:43AM  18    A    Right.

11:43AM  19              MR. AKINA:  Could we show the witness Exhibit 11-63.

11:44AM  20              THE COURT:  Go ahead.

11:44AM  21    BY MR. AKINA:

11:44AM  22    Q    And is this that schedule that you created?

11:44AM  23    A    It is.

11:44AM  24    Q    And here you listed the account number as ending in 075?

11:44AM  25    A    Right.
```

11:44AM   1              MR. AKINA:  I'd offer Exhibit 11-63 into evidence.

11:44AM   2              THE COURT:  Any objection?

11:44AM   3              MR. KENNEDY:  Give me a moment to just go through the

11:44AM   4      pages, Your Honor.

11:44AM   5              THE COURT:  Yes.

11:44AM   6              MR. KENNEDY:  Thank you.

11:44AM   7              MR. AKINA:  If we could scroll through the pages.

11:44AM   8              MR. KENNEDY:  No objection.  Thank you.

11:44AM   9              THE COURT:  11-63 then is admitted without objection.

11:44AM   10     You may publish it.

11:44AM   11             (Exhibit 11-63 was received in evidence.)

11:44AM   12             MR. AKINA:  If we could go back to the first page, and

11:44AM   13     just focusing on the top with the information on the accounts.

11:45AM   14     Along with the titles.

11:45AM   15     BY MR. AKINA:

11:45AM   16     Q    Okay.  So this is Michael Miske's personal account.  At

11:45AM   17     some point in time were there other people added on as

11:45AM   18     signatories?

11:45AM   19     A    Yes.

11:45AM   20     Q    Who were those people?

11:45AM   21     A    Delia Ann Fabro-Miske and Maydeen Stancil.

11:45AM   22     Q    And the date there is October 2020.  Is that after the

11:45AM   23     seizure took place?

11:45AM   24     A    Correct.

11:45AM   25     Q    And the activity that's shown here, that's for the time

| | | |
|---|---|---|
| 11:45AM | 1 | period going up to July 17, 2020? |
| 11:45AM | 2 | A    Yes. |
| 11:45AM | 3 | MR. AKINA:  If we can zoom out. |
| 11:45AM | 4 | BY MR. AKINA: |
| 11:45AM | 5 | Q    Okay.  There are some red highlighted cells here.  What |
| 11:45AM | 6 | are those -- what do those represent? |
| 11:45AM | 7 | A    The highlights are just noting deposits that were made |
| 11:46AM | 8 | into the account from the Kama'aina family of companies. |
| 11:46AM | 9 | Q    Did that include Kama'aina Termite and Pest Control? |
| 11:46AM | 10 | A    Yes. |
| 11:46AM | 11 | MR. AKINA:  And for this first red cell, if we could |
| 11:46AM | 12 | focus on that as well as the balance and name portion to the |
| 11:46AM | 13 | right. |
| 11:46AM | 14 | BY MR. AKINA: |
| 11:46AM | 15 | Q    So this was almost $4,000 deposited? |
| 11:46AM | 16 | A    Right. |
| 11:46AM | 17 | Q    And if we zoom out, what was the date for that |
| 11:46AM | 18 | transaction? |
| 11:46AM | 19 | A    August 26, 2019. |
| 11:46AM | 20 | Q    And there's a memo to the right of it.  What is that memo? |
| 11:46AM | 21 | A    The memo says "Payroll." |
| 11:46AM | 22 | Q    So was that one of the categories of money that was coming |
| 11:46AM | 23 | in from the Kama'aina family of companies? |
| 11:46AM | 24 | A    Yes. |
| 11:46AM | 25 | MR. AKINA:  And looking at the very bottom of this |

| | | |
|---|---|---|
| 11:46AM | 1 | first page, that red highlight, if we could focus on that |
| 11:46AM | 2 | information to the -- all the way to the far right.  Yeah. |
| 11:46AM | 3 | BY MR. AKINA: |
| 11:46AM | 4 | Q    This is another type of inflow of money? |
| 11:47AM | 5 | A    Right, yeah, and the -- the account there, yeah, I would |
| 11:47AM | 6 | group the inflow as roughly into two categories, one in, you |
| 11:47AM | 7 | know, payroll or maybe normal, you know, regularly scheduled, |
| 11:47AM | 8 | let's say, additions.  And then you have these larger |
| 11:47AM | 9 | shareholder distributions.  So this is one of the shareholder |
| 11:47AM | 10 | distributions from Kama'aina Holdings. |
| 11:47AM | 11 | Q    And if we go to the second page, we see additional |
| 11:47AM | 12 | highlights.  And if we go to the third page, additional |
| 11:47AM | 13 | highlights.  Are those additional monies coming in from those |
| 11:47AM | 14 | companies? |
| 11:47AM | 15 | A    Yes. |
| 11:47AM | 16 | Q    And so on this third page on October 2nd of 2019 -- |
| 11:47AM | 17 | MR. AKINA:  Can we focus on those top two red |
| 11:47AM | 18 | highlights going to the far right? |
| 11:47AM | 19 | BY MR. AKINA: |
| 11:47AM | 20 | Q    The bottom one for $3,700, is that also from another |
| 11:47AM | 21 | company, Kama'aina Plumbing and Renovations? |
| 11:47AM | 22 | A    Yes. |
| 11:48AM | 23 | MR. AKINA:  And then if we go to page 8. |
| 11:48AM | 24 | BY MR. AKINA: |
| 11:48AM | 25 | Q    We skipped a few pages, but are there regular inflows of |

11:48AM   1   money?

11:48AM   2   A    Yes.

11:48AM   3   Q    And is that consistent with payroll, also approximately

11:48AM   4   every two weeks?

11:48AM   5   A    Yes.

11:48AM   6        MR. AKINA:  And we're on this final page of the

11:48AM   7   document -- or, no, we're not.  We are on the eighth page of

11:48AM   8   the document, and looking at these three red cells, and if we

11:48AM   9   could zoom in all the way to the right.

11:48AM  10   BY MR. AKINA:

11:48AM  11   Q    This is January 2020.  What are the amounts here?

11:48AM  12   A    $40,000 from Kama'aina Holdings, 50,000 from Kama'aina

11:48AM  13   Termite and Pest Control, and $5,299.43 from Kama'aina Termite.

11:48AM  14   Q    Over the period that you scheduled out here from

11:49AM  15   August 20, 2019, to July 17, 2020, about how much money came in

11:49AM  16   from Kama'aina companies?

11:49AM  17   A    This is over $200,000.

11:49AM  18        MR. AKINA:  And if we go to the last page of the

11:49AM  19   document.  Looking at that line item, July 17, 2020.  The one

11:49AM  20   below that.

11:49AM  21   BY MR. AKINA:

11:49AM  22   Q    This one is to -- is this money coming in or going out?

11:49AM  23   A    So this is money going out of the account.

11:49AM  24   Q    Can you explain what this transaction shows?

11:49AM  25   A    Yes.  So we served a seizure warrant for -- for this bank

11:49AM   1   account on Hawaii Central Federal Credit Union, and just the

11:50AM   2   logistics and process of that is when a seizure warrant is

11:50AM   3   served, the check is made out to the United States Marshals

11:50AM   4   Service to go into an escrow or holding account.

11:50AM   5          So what you're seeing here is that check coming out to

11:50AM   6   go to the Marshals Service for the balance of the account at

11:50AM   7   that time.

11:50AM   8   Q    Okay.  So you said balance of the account.  That means all

11:50AM   9   the money that was in there as of that date?

11:50AM  10   A    Yeah, correct.

11:50AM  11   Q    And what was the amount?

11:50AM  12   A    $81,656.56.

11:50AM  13   Q    Okay.  So fair to say that this account contained proceeds

11:50AM  14   from Kama'aina Termite and Pest Control and other companies

11:50AM  15   from the Kama'aina family of companies?

11:50AM  16   A    Yes.

11:50AM  17          MR. AKINA:  We can take this down.

11:50AM  18   BY MR. AKINA:

11:50AM  19   Q    You testified that there were other business bank accounts

11:50AM  20   that were also seized.

11:50AM  21   A    That's correct.

11:50AM  22   Q    Did you schedule out just showing the accounts, the

11:51AM  23   account numbers and the amounts taken or seized?

11:51AM  24   A    I did, yeah.

11:51AM  25   Q    And that was pursuant to a court order?

| 11:51AM | 1 | A    Yes, the -- yeah, pursuant to the -- yeah, the seizure |
| 11:51AM | 2 | warrant. |
| 11:51AM | 3 | MR. AKINA:  If we could show the witness Exhibit 11-91 |
| 11:51AM | 4 | from the 47th supplement. |
| 11:51AM | 5 | THE COURT:  Go ahead. |
| 11:51AM | 6 | BY MR. AKINA: |
| 11:51AM | 7 | Q    Does this table show those business bank accounts and the |
| 11:51AM | 8 | personal Hawaii Central Federal Credit Union account that we |
| 11:51AM | 9 | just looked at? |
| 11:51AM | 10 | A    Yes, it does. |
| 11:51AM | 11 | MR. AKINA:  I'd offer Exhibit 11-91 into evidence. |
| 11:51AM | 12 | THE COURT:  Any objection? |
| 11:51AM | 13 | MR. KENNEDY:  No objection. |
| 11:51AM | 14 | THE COURT:  11-91 is admitted.  You may publish it. |
| 11:51AM | 15 | (Exhibit 11-91 was received in evidence.) |
| 11:51AM | 16 | MR. AKINA:  Can we focus on the table? |
| 11:51AM | 17 | BY MR. AKINA: |
| 11:51AM | 18 | Q    And so in total, there were two accounts from Kama'aina |
| 11:52AM | 19 | Termite and Pest Control and two from Oahu Termite and Pest |
| 11:52AM | 20 | Management? |
| 11:52AM | 21 | A    Yeah, that's correct.  Yeah, like a regular maybe checking |
| 11:52AM | 22 | or operating account, and then a savings account for each. |
| 11:52AM | 23 | Q    And then one from Kama'aina Plumbing and Renovations? |
| 11:52AM | 24 | A    Yes. |
| 11:52AM | 25 | Q    And so this shows the seized balance.  That's the balances |

11:52AM    1    that were in the accounts when they were seized?

11:52AM    2    A    That's correct.

11:52AM    3    Q    So for the Bank of Hawaii account ending 602 for Kama'aina

11:52AM    4    Termite and Pest Control, how much was in that?

11:52AM    5    A    $1,063,427.35.

11:52AM    6    Q    And for the Bank of Hawaii account ending 415 for the

11:52AM    7    Kama'aina Termite and Pest Control account, how much was in

11:52AM    8    that?

11:52AM    9    A    $300,372.85.

11:53AM    10    Q    And for the account -- Bank of Hawaii account ending 414

11:53AM    11    for Oahu Termite and Pest Management, how much was in that?

11:53AM    12    A    $206,725.80.

11:53AM    13    Q    And for the Bank of Hawaii account ending 218 for O'ahu

11:53AM    14    Termite and Pest Management, how much was in that?

11:53AM    15    A    $170,105.72.

11:53AM    16    Q    And for the Bank of Hawaii account ending in 220 for

11:53AM    17    Kama'aina Plumbing and Renovations, how much was in that?

11:53AM    18    A    $22,710.48.

11:53AM    19    Q    And you said that these are business operating, savings or

11:53AM    20    checking accounts?

11:53AM    21    A    Yes.

11:53AM    22    Q    So it would contain proceeds from profits that the company

11:53AM    23    has made?

11:53AM    24    A    Yes.

11:53AM    25    Q    It would contain money that could be used for -- to pay

| | | |
|---|---|---|
| 11:53AM | 1 | for expenses? |
| 11:53AM | 2 | A     Yes. |
| 11:53AM | 3 | Q     Money that could be used to be paid for -- to continue the |
| 11:53AM | 4 | operations of those companies? |
| 11:54AM | 5 | A     Yes. |
| 11:54AM | 6 | MR. AKINA:  No further questions at this time. |
| 11:54AM | 7 | THE COURT:  Mr. Kennedy, you reserve cross until |
| 11:54AM | 8 | tomorrow? |
| 11:54AM | 9 | MR. KENNEDY:  Yes. |
| 11:54AM | 10 | THE COURT:  All right. |
| 11:54AM | 11 | MR. AKINA:  Your Honor, may -- |
| 11:54AM | 12 | THE COURT:  You may step down.  Thank you, sir. |
| 11:54AM | 13 | MR. AKINA:  May we approach, Your Honor? |
| 11:54AM | 14 | THE COURT:  Yes. |
| 11:54AM | 15 | (Sidebar on the record:) |
| 11:54AM | 16 | MR. AKINA:  So that's all the witnesses that we have. |
| 11:55AM | 17 | We would be -- if cross-examination had happened, we would be |
| 11:55AM | 18 | prepared to rest.  We don't have -- we don't plan on calling |
| 11:55AM | 19 | additional witnesses unless something unforeseen happens on |
| 11:55AM | 20 | cross-examination. |
| 11:55AM | 21 | THE COURT:  Okay. |
| 11:55AM | 22 | MR. AKINA:  So that's what we have.  That's the |
| 11:55AM | 23 | state of -- |
| 11:55AM | 24 | THE COURT:  So right now then, that means we will be |
| 11:55AM | 25 | finished for today -- |

11:55AM   1              MR. AKINA:  Correct.

11:55AM   2              THE COURT:  -- and that the two crosses will be

11:55AM   3    tomorrow.

11:55AM   4              MR. AKINA:  Correct.

11:55AM   5              THE COURT:  Okay.  And then tomorrow, assuming no

11:55AM   6    other witnesses are prompted by the cross, the defense has

11:55AM   7    Mr. Hines, I assume.

11:55AM   8              MS. PANAGAKOS:  We do.

11:55AM   9              THE COURT:  And then anyone else that you intend to

11:55AM  10    call at this point?

11:55AM  11              MS. PANAGAKOS:  Possibly Mr. Miske.

11:55AM  12              THE COURT:  Possibly Mr. Miske, okay.

11:55AM  13              Okay.  So it's possible that the jury could have this

11:55AM  14    tomorrow.

11:55AM  15              MS. PANAGAKOS:  Yes.

11:55AM  16              THE COURT:  Okay.  All right.  We're just about at

11:55AM  17    noon, so we're going to soon take a lunch break, but I guess it

11:55AM  18    will be a break for the day at this point.

11:55AM  19              Anything else?

11:55AM  20              MR. KENNEDY:  Nothing from us.

11:55AM  21              MR. AKINA:  Not from the government.

11:55AM  22              THE COURT:  Thank you.

11:55AM  23              MR. AKINA:  Oh, sorry, we do have one thing.  There

11:56AM  24    was one item that we intentionally left out of the artwork.

11:56AM  25    It's a painting --

11:56AM    1              THE COURT:  Brian Flores?

11:56AM    2              MR. AKINA:  Yes, that's the one that the government is

11:56AM    3    going to concede.  So we'd just ask that it be taken off the

11:56AM    4    verdict form that goes to the jury.

11:56AM    5              THE COURT:  Okay.  I was going to tell you this at the

11:56AM    6    end of the day today, but we just published the verdict form

11:56AM    7    and the jury instructions from the last discussion we had

11:56AM    8    because there were no changes from the last discussion.  So I

11:56AM    9    think --

11:56AM    10             MR. KENNEDY:  Maybe we can just do a stipulation to

11:56AM    11   say that one is no longer --

11:56AM    12             THE COURT:  Well, we can go in and -- I mean, the jury

11:56AM    13   doesn't have it yet, so we can go ahead and modify the -- there

11:56AM    14   would be no changes to the instructions.  It would just be the

11:56AM    15   verdict form just to remove that.

11:56AM    16             MR. AKINA:  Just to remove that.

11:56AM    17             THE COURT:  I think we can accomplish that.

11:56AM    18             MR. AKINA:  I believe that you listed out in the jury

11:56AM    19   instructions as well.

11:56AM    20             MR. KENNEDY:  In Instruction 1.

11:56AM    21             THE COURT:  Ah, okay.  So we'll edit that in both

11:56AM    22   cases, and then publish new ones later today.

11:57AM    23             MR. AKINA:  Thank you.

11:57AM    24             MS. PANAGAKOS:  Your Honor, I'm not positive about

11:57AM    25   Mr. Hines.  That will depend on the cross.

| | | |
|---|---|---|
| 11:57AM | 1 | THE COURT:  Sure.  Sure.  Thank you. |
| 11:57AM | 2 | (End of sidebar.) |
| 11:57AM | 3 | THE COURT:  All right.  So it is just about noon, and |
| 11:57AM | 4 | although I thought we would be taking a lunch break right |
| 11:57AM | 5 | around this point, we're actually going to be taking a break |
| 11:57AM | 6 | for the trial day.  We will resume tomorrow morning at 8:30 for |
| 11:57AM | 7 | the cross-examinations of the two witnesses that took the stand |
| 11:57AM | 8 | earlier -- earlier this morning. |
| 11:57AM | 9 | Okay.  So as we go to break, I'll remind our jury to |
| 11:57AM | 10 | please once again refrain from discussing the substance of this |
| 11:57AM | 11 | case with anyone, including each over, although you obviously |
| 11:57AM | 12 | did deliberate on Phase 1.  At this point until deliberations |
| 11:57AM | 13 | begin on Phase 2, no discussions amongst one another regarding |
| 11:58AM | 14 | the substance of this case.  Also do not discuss -- do not |
| 11:58AM | 15 | access, rather, any media or other accounts of this case that |
| 11:58AM | 16 | may be out there, and do not conduct your own investigation |
| 11:58AM | 17 | into anything relating to this case. |
| 11:58AM | 18 | So we'll see you tomorrow morning at 8:30. |
| 11:58AM | 19 | (Proceedings were concluded at 11:58 a.m.) |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1                    COURT REPORTER'S CERTIFICATE

 2           I, Gloria T. Bediamol, Official Court Reporter, United

 3    States District Court, District of Hawaii, do hereby certify

 4    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5    true, and correct transcript from the stenographically reported

 6    proceedings held in the above-entitled matter and that the

 7    transcript page format is in conformance with the regulations

 8    of the Judicial Conference of the United States.

 9

10           DATED at Honolulu, Hawaii, January 16, 2025.

11

12

13                               /s/ Gloria T. Bediamol

14                               GLORIA T. BEDIAMOL.

15                               RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```