# EXHIBIT A

KENNETH M. SORENSON
Acting United States Attorney
District of Hawaii

SYDNEY SPECTOR #11232
AISLINN K. AFFINITO
CRAIG S. NOLAN
Assistant U.S. Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
Email:   Sydney.Spector@usdoj.gov
           Aislinn.Affinito@usdoj.gov
           Craig.Nolan@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    vs.<br><br>REAL PROPERTY LOCATED AT 6 LUMAHAI STREET IN PORTLOCK, HAWAII, TOGETHER WITH ALL APPURTENANCES AND IMPROVEMENTS; AND<br><br>REAL PROPERTY LOCATED AT 614 PAOKANO LOOP, IN KAILUA, HAWAII, TOGETHER WITH ALL APPURTENANCES AND IMPROVEMENTS; AND | Civil No.<br><br>COMPLAINT FOR FORFEITURE; EXHIBITS "A" and "B"; VERIFICATION OF GREGORY L. TURNER |

$611,123.60, CONSTITUTING PROCEEDS OF THE SALE OF THE REAL PROPERTY LOCATED AT 559 KUMUKAHI PLACE, HAWAII KAI, HAWAII, TAX MAP KEY 390520260000; AND

THE "PAINKILLER", 2014 37.5-FOOT BOSTON WHALER PLEASURE CRAFT, HULL NO. BWCE1942D414, REGISTRATION NO. HA-9849-H, HELD IN THE NAME OF HAWAII PARTNERS LLC; AND

HAWAII LONGLINE LIMITED ENTRY PERMIT, ISSUED TO THE FISHING VESSEL "RACHEL", VESSEL NUMBER 1050716, HELD IN THE NAME OF KAMAAINA HOLDINGS LLC; AND

$676,785.56, CONSTITUTING PROCEEDS OF THE SALE OF THE "RACHEL", A TUNA LONGLINE FISHING VESSEL, U.S. REGISTRATION NUMBER 1050716, REGISTERD TO KAMAAINA HOLDINGS LLC; AND

2017 FERRARI F12 BERLINETTA, VIN: ZFF74UFA5H0223173, HELD IN THE NAME OF HAWAII PARTNERS LLC; AND

$81,656.56 IN FUNDS, SEIZED FROM HAWAII CENTRAL FEDERAL CREDIT UNION,

2

ACOUNT #XXXXX075, HELD IN
THE NAME OF MICHAEL J.
MISKE; AND

$300,372.85 IN FUNDS, SEIZED
FROM BANK OF HAWAII,
ACCOUNT #XXXXX415, HELD IN
THE NAME OF KAMAAINA
TERMITE AND PEST CONTROL,
INC.; AND

$1,063,427.35 IN FUNDS, SEIZED
FROM BANK OF HAWAII,
ACCOUNT #XXXXXXX602, HELD
IN THE NAME OF KAMAAINA
TERMITE AND PEST CONTROL,
INC.; AND

$206,725.80 IN FUNDS, SEIZED
FROM BANK OF HAWAII,
ACCOUNT #XXXXX414, HELD IN
THE NAME OF OAHU TERMITE
AND PEST MANAGEMENT LLC,
DBA OAHU TERMITE AND PEST
CONTROL LLC; AND

$170,105.72 IN FUNDS, SEIZED
FROM BANK OF HAWAII,
ACCOUNT #XXXXXXX218, HELD
IN THE NAME OF OAHU
TERMITE AND PEST
MANAGEMENT LLC, DBA OAHU
TERMITE AND PEST CONTROL
LLC; AND

$22,710.48 IN FUNDS, SEIZED
FROM BANK OF HAWAII,
ACCOUNT #XXXXX220, HELD IN
THE NAME OF KAMAAINA

3

PLUMBING AND RENOVATIONS
LLC; AND

BANK OF HAWAII CASHIER'S
CHECK NO. 429111, IN THE
AMOUNT OF $1,162,826.76,
PAYABLE TO KAMAAINA
TERMITE AND PEST CONTROL;
AND

1951 VOLKSWAGEN, VIN:
10234188, HAWAII LICENSE
PLATE: SYB865, REGISTERED
OWNER: HAWAII PARTNERS
LLC; AND

1956 VOLKSWAGEN, VIN:
109382821, HAWAII LICENSE
PLATE: 56VDUB, REGISTERED
OWNER: HAWAII PARTNERS
LLC; AND

1957 VOLKSWAGEN, VIN:
1529889, HAWAII LICENSE
PLATE: BBYGRL, REGISTERED
OWNER: HAWAII PARTENRS
LLC; AND

1961 VOLKSWAGEN VAN, VIN:
685167, HAWAII LICENSE PLATE:
SYB762, REGISTERED OWNER:
HAWAII PARTNERS LLC; AND

1970 FORD BRONCO, VIN:
U15GLG85573, HAWAII LICENSE
PLATE: TTY105, REGISTERED
OWNER: HAWAII PARTNERS,
LLC; AND

PAINTING ENTITLED,
"LUDAVICO & LUDOVICO" BY
RETNA; AND

PAINTING ENTITLED,
"WATERMARK" BY RETNA; AND

PAINTING ENTITLED, "FOREVER
YOUNG" BY RETNA; AND

PAINTING ENTITLED, "SANGRE
OSCURA" BY RETNA; AND

SCULPTURE ENTITLED, "SLICK
SKULL" BY OG SLICK; AND

SCULPTURE ENTITLED, "UZI
DOES IT" BY OG SLICK; AND

PAINTING ENTITLED,
"SPEAKING IN TONGUES" BY
ALEX "DEFER" KIZU; AND

PAINTING ENTITLED,
"SPIRITUAL LANGUAGE" BY
ALEX "DEFER" KIZU,

Defendants *in Rem*.

## **COMPLAINT FOR FORFEITURE**

Plaintiff United States of America, by its undersigned attorneys, brings this

Complaint for Forfeiture and alleges as follows in accordance with Rule G(2) of

the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions, Federal Rules of Civil Procedure (hereinafter the "Supplemental Rules"):

## NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit and condemn to the use and benefit of the United States the above-captioned property (the "Defendant Properties"), pursuant to: 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a violation of any offense constituting a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), including racketeering activity in violation of 18 U.S.C. § 1961, which includes wire fraud, fraud in connection with identification documents, financial institution fraud, and a conspiracy to commit such offenses; and/or pursuant to 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in money laundering or a money laundering conspiracy in violation of 18 U.S.C. § 1956 or a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property.

2.      For its claims against the Defendant Properties, the United States alleges as follows upon information and belief.

## THE DEFENDANTS *IN REM*

3.      The Defendant Properties include all right, title, and interest including all leasehold interests in the real property located at 6 Lumahai Street, Portlock, Hawaii 96825, and designated as Tax Map Key 390130330000, together with all appurtenances and improvements and any and all rental income derived from such

real property as of July 19, 2020 (the "Defendant Portlock Property").  The

Defendant Portlock Property is more fully described in Exhibit "A," which is

attached hereto and incorporated by reference.

      a.    The Defendant Portlock Property is titled in the name of

           Michael J. Miske, Jr., Trustee under the Michael J. Miske, Jr.

           Revocable Living Trust dated August 6, 2008.

    4.    The Defendant Properties include all right, title, and interest including

all leasehold interests in the real property located at 614 Paokano Loop, Kailua,

Hawaii 96734, and designated as Tax Map Key 420470470000, together with all

appurtenances and improvements (the "Defendant Kailua Property").  The Kailua

Property is more fully described in Exhibit "B," which is attached hereto and

incorporated by reference.

      a.    The Defendant Kailua Property is titled in the name of Michael

           J. Miske, Jr., Trustee under the Michael J. Miske, Jr. Revocable

           Living Trust dated August 6, 2008.

    5.    The Defendant Properties also include $611,123.60, constituting

proceeds of the sale of the real property located at 559 Kumukahi Place, Honolulu,

Hawaii, 96825, Tax Map Key 390520260000.

6.    The Defendant Properties include The "Painkiller," a 2014 37.5-foot Boston Whaler Pleasure Craft, Hull No. BWCE1942D414, Registration No. HA-9849-H, held in the name of Hawaii Partners LLC.

7.    The Defendant Properties include Hawaii Longline Limited Entry Permit issued to the fishing vessel "Rachel", Vessel Number 1050716, held in the name of Kamaaina Holdings LLC.

8.    The Defendant Properties include $676,785.56 constituting proceeds of the sale of the "Rachel," a Tuna Longline Fishing Vessel, U.S. Registration Number 1050716, registered to Kamaaina Holdings LLC.

9.    The Defendant Properties include a 2017 Ferrari F12 Berlinetta, VIN ZFF74UFA5H0223173, held in the name of Hawaii Partners LLC (the "Defendant Ferrari").

10.    The Defendant Properties include $81,656.56 in funds seized from Hawaii Central Federal Credit Union, Account #XXXXX075, held in the name of Michael J. Miske.

11.    The Defendant Properties include $300,372.85 in funds seized from Bank of Hawaii, Account #XXXXX415, held in the name of Kamaaina Termite and Pest Control, Inc.

8

12.     The Defendant Properties include $1,063,427.35 in funds seized from Bank of Hawaii, Account #XXXXXXX602, held in the name of Kamaaina Termite and Pest Control, Inc. (the "KTPC Savings Account").

13.     The Defendant Properties include $206,725.80 in funds seized from Bank of Hawaii, Account#XXXXX414, held in the name of Oahu Termite and Pest Management LLC, dba Oahu Termite and Pest Control LLC.

14.     The Defendant Properties include $170,105.72 in funds seized from Bank of Hawaii, Account#XXXXXXX218, held in the name of Oahu Termite and Pest Management LLC, dba Oahu Termite and Pest Control LLC.

15.     The Defendant Properties include $22,710.48 in funds seized from Bank of Hawaii, Account#XXXXX220, held in the name of Kamaaina Plumbing and Renovations LLC.

16.     The Defendant Properties include a Bank of Hawaii Cashier's Check, No. 429111 in the amount of $1,162,826.76, payable to Kamaaina Termite and Pest Control.

17.     The Defendant Properties include a 1951 Volkswagen, VIN 10234188, Hawaii License Plate: SYB865, Registered Owner: Hawaii Partners LLC.

18.     The Defendant Properties include a 1956 Volkswagen, VIN 109382821, Hawaii License Plate: 56VDUB, Registered Owner: Hawaii Partners LLC.

19.     The Defendant Properties include a 1957 Volkswagen, VIN: 1529889, Hawaii License Plate: BBYGRL, Registered Owner: Hawaii Partners LLC.

20.     The Defendant Properties include a 1961 Volkswagen Van, VIN: 685167, Hawaii License Plate: SYB762, Registered Owner: Hawaii Partners LLC.

21.     The Defendant Properties include a 1970 Ford Bronco, VIN: U15GLG85573, Hawaii License Plate: TTY105, Registered Owner: Hawaii Partners LLC.

22.     The Defendant Properties include a Painting entitled "Ludavico & Ludovico" by RETNA.[1]

23.     The Defendant Properties include a Painting entitled "Watermark" by RETNA.

24.     The Defendant Properties include a Painting entitled "Forever Young" by RETNA.

25.     The Defendant Properties include a Painting entitled "Sangre Oscura" by RETNA.

---

[1]     The original criminal forfeiture filings contained a scrivener's error identifying this property as "Ludavico & Ludovio" by RETNA.  The correct title is Ludavico & Ludovico."

26.     The Defendant Properties include a Sculpture entitled "Slick Skull" by OG Slick.

27.     The Defendant Properties include a Sculpture entitled "Uzi Does It" by OG Slick.

28.     The Defendant Properties include a Painting entitled "Speaking in Tongues" by Alex "DEFER" Kizu.

29.     The Defendant Properties include a Painting entitled "Spiritual Language" by Alex "DEFER" Kizu.

30.     The Defendant Properties are now, and during the pendency of this action, will be in the jurisdiction of this Court.

## JURISDICTION AND VENUE

31.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Properties.  This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

32.     This Court has *in rem* jurisdiction over the Defendant Properties under 28 U.S.C. § 1355(b)(1).

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred in this District

and pursuant to 28 U.S.C. § 1395 because the Defendant Properties are located in this District.

## BASIS FOR FORFEITURE

34.     The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense.  Pursuant to 18 U.S.C. § 1956(c)(7), racketeering activity in violation of 18 U.S.C. § 1961(1) is specified unlawful activity within the meaning of 18 U.S.C. § 981(a)(1)(C).  Here, such racketeering activity includes, but is not limited to, wire fraud in violation of 18 U.S.C. § 1343, fraud in connection with identification documents in violation of 18 U.S.C. § 1028, and financial institution fraud in violation of 18 U.S.C. § 1344.

35.     The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property, real or personal, involved in money laundering or a money laundering conspiracy in violation of 18 U.S.C. § 1956 or a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property.

## OVERVIEW OF THE RELATED CRIMINAL PROSECUTION

36.     On June 18, 2020, a federal grand jury sitting in the District of Hawaii returned a superseding indictment against Michael J. Miske, Jr. ("MISKE") charging, among other things, racketeering conspiracy in connection with his direction of a criminal organization (the "Miske Enterprise").  *See* Superseding Indictment, *United States v. Miske, et al.*, No. 1:19-cr-00099 (D. Haw. June 18, 2020) (ECF No. 3, the "Superseding Indictment").  In Count 1 of the Superseding Indictment, MISKE and nine of his codefendants were charged with, from at least in or about the late 1990s to the present, willfully and knowingly conspiring with each other to violate the racketeering laws of the United States, namely, 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the "Miske Enterprise" through a pattern of racketeering activity, as that term is defined in Title 18 U.S.C. §§ 1961(1) and 1961(5).

37.     The Superseding Indictment alleged the "Miske Enterprise" operated principally under the direction of MISKE, who used his power over members and associates of the Miske Enterprise, his reputation for violence in the community, and the various corporate entities under his control to enrich the members and associates of the Miske Enterprise and to protect their criminal activities.  The Superseding Indictment charged that the pattern of racketeering activity included acts involving murder, arson, robbery, trafficking of controlled substances, wire

13

fraud, fraud and related activity in connection with identification documents, financial institution fraud, money laundering, engaging in monetary transactions in property derived from specified unlawful activity, obstruction of justice, and many others.

38.    The Superseding Indictment contained 21 other counts charging MISKE and others with murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, murder-for-hire conspiracy resulting in death, kidnapping using a facility of interstate commerce resulting in death, conspiracy to commit kidnapping using a facility of interstate commerce, murder-for-hire conspiracy, assault and attempted murder in aid of racketeering, carrying and using a firearm during and in relation to a crime of violence, conspiracy to commit assault in aid of racketeering, conspiracy to use a chemical weapon, use of a chemical weapon, conspiracy to distribute and possess with intent to distribute cocaine, conspiracy to distribute and possess with intent to distribute controlled substances, and financial institution fraud.

39.    The Superseding Indictment included five forfeiture notices, and it specifically listed the Defendant Portlock Property, the Defendant Kailua Property, and the real property located at 559 Kumukahi Place in Honolulu as subject to forfeiture.  Notices of pendency of action were recorded as to those properties.

MISKE and others were arrested on or about July 15, 2020, when the Superseding Indictment was unsealed.

40.     Pursuant to federal seizure warrants executed on July 15, 2020, the government seized the defendant properties identified in paragraphs 10 through 15 above (funds seized from various bank accounts), the Hawaii Longline Entry Permit for the fishing vessel "Rachel" (the property identified in paragraph 7 above), and the Defendant Ferrari (the property identified in paragraph 9 above).

41.     MISKE was indicted in a Second Superseding Indictment on July 15, 2021, and in a Third Superseding Indictment on December 8, 2022.  *See* Second Superseding Indictment, *United States v. Miske, et al.*, No. 1:19-cr-00099 (D. Haw. July 15, 2021) (ECF No. 272); Third Superseding Indictment, *United States v. Miske, et al.*, No. 1:19-cr-00099 (D. Haw. Dec. 8, 2022) (ECF No. 673).  Each successive superseding indictment reiterated the five forfeiture notices contained in the June 18, 2020 Superseding Indictment.

42.     On December 4, 2023, the government filed a Bill of Particulars for Forfeiture of Property identifying all Defendant Properties as subject to criminal forfeiture, as well as another painting entitled "Graffiti Does It" by OG Slick.  *See* Bill of Particulars, *United States v. Miske, et al.*, No. 1:19-cr-00099 (D. Haw. Dec. 4, 2023) (ECF No. 1182).

43.     MISKE's criminal trial began on January 8, 2024, and on July 18,

2024, a federal jury convicted MISKE of racketeering conspiracy, murder in aid of

racketeering, conspiracy to commit murder in aid of racketeering, kidnapping

using a facility of interstate commerce resulting in death, two counts of conspiracy

to commit kidnapping using a facility of interstate commerce, conspiracy to

commit murder for hire, conspiracy to commit assault in aid of racketeering,

conspiracy to use a chemical weapon, two counts of use of a chemical weapon, and

two counts of obstruction of justice.  *See* Special Verdict Form, *United States v.*

*Miske, et al.*, No. 1:19-cr-00099 (D. Haw. July 18, 2024) (ECF No. 1717).  In

connection with the charged racketeering conspiracy, the jury found that MISKE

had committed racketeering acts that included wire fraud, financial institution

fraud, and identity theft, as well as murder, kidnapping, robbery, use of a chemical

weapon, travelling in or using interstate commerce facilities in aid of specified

unlawful activity, Hobbs Act robbery or extortion, structuring of financial

transactions, obstruction of justice, and tampering with a witness, victim, or

informant.  *Id*.

44.     Following the guilty verdict, the jury was retained to determine

forfeiture.  On July 22, 2024, a criminal forfeiture trial began as to the specific

property identified in the December 4, 2023 Bill of Particulars.  On July 24, 2024,

a federal jury found, in relevant part, all Defendant Properties forfeitable as

property constituting or derived from proceeds that MISKE obtained directly or indirectly from racketeering activity in violation of 18 U.S.C. § 1962. *See* Special Verdict Form for Forfeiture, *United States v. Miske, et al.*, No. 1:19-cr-00099 (D. Haw. July 24, 2024) (ECF No. 1739).

45. The Court set MISKE's sentencing for January 30, 2025, but on or about December 1, 2024, MISKE died while in custody at the Bureau of Prisons.

46. The United States now brings this civil forfeiture action as to the Defendant Properties.

## ENTITIES AND INDIVIDUALS
## INVOLVED IN THE UNLAWFUL ACTIVITY

47. The relevant entities, each of which is identified in the Third Superseding Indictment as among the corporate entities that were part of the Miske Enterprise and used to promote the ends of the Miske Enterprise, are:

a. **Kamaaina Termite and Pest Control Inc. ("KTPC")**, which was incorporated in the State of Hawaii on June 13, 2000, with MISKE and another individual listed as the original two directors. KTPC provided some termite and pest control services, but also served as a headquarters for the planning of criminal activities, the laundering of illicit proceeds, and the fraudulent "employment" of individuals whose "work" consisted of engaging in acts of violence or fraud on behalf of the Miske Enterprise, including financial institution fraud and a fraud scheme relating to representations about proper licensing.

17

MISKE was at all relevant times the de facto owner of KTPC, although at different times the names of other persons were used to conceal or obscure MISKE's control of KTPC and to obtain or maintain required licensure. As a pest control business, KTPC was subject to state regulation and oversight. According to documents submitted to Hawaii's Department of Commerce and Consumer Affairs ("DCCA"), KTPC's Principal Responsible Managing Employee ("Principal RME") was Delia-Anne Mele Fabro-Miske[2] as of June 30, 2020. KTPC continued its operations through at least July 15, 2020.

  b.  **Oahu Termite and Pest Management LLC, DBA Oahu Termite and Pest Control, Inc. ("Oahu Termite")**, which was acquired by MISKE from Harry Kansaki in or about December 2016, according to records submitted to the DCCA by Delia-Anne Mele Fabro-Miske. Like KTPC, Oahu Termite provided termite and pest control services, and it was subject to state regulation and oversight. According to documents submitted to the DCCA, its Principal RME as of June 30, 2020 was Michael J. Worden.

  c.  **Kamaaina Plumbing and Renovations LLC ("Kamaaina Plumbing")**, which was owned and run by MISKE. The address of record for

---

[2]   Delia-Anne Mele Fabro-Miske went by different names at various times, including, among others, Delia-Anne Mele Miske, Delia-Anne Mele Fabro-Miske, Delia-Anne Fabro, and Delia-Anne Fabro-Miske. This Complaint will refer to her as "Fabro-Miske" for clarity.

Kamaaina Plumbing was the same as KTPC. According to its website, Kamaaina Plumbing was a full-service plumbing and remodeling contractor that provided services for both residential and commercial customers. Documents submitted to the DCCA listed Edward Freitas, Jr., a.k.a. "Denny" Freitas, as the Principal RME as of September 30, 2020.

        d. **Hawaii Partners, LLC ("Hawaii Partners")**, which was the recorded owner of Defendant Properties Boston Whaler called "Painkiller," 2017 Ferrari F12 Berlinetta, 1951 Volkswagen, 1956 Volkswagen, 1957 Volkswagen, 1961 Volkswagen Van, and 1970 Ford Bronco. Hawaii Partners was formed on January 7, 2011, as a member-managed limited liability corporation (LLC) with one member, Jason Yokoyama. On January 1, 2015, MISKE was also shown as a member, and on November 3, 2016, an amendment was filed indicating Delia-Anne Mele Fabro-Miske was the sole member. Hawaii Partners did not issue W-2s to any of its employees, who instead were paid by and received W-2s from KTPC. Hawaii Partners was in the used-car business and continued operations until at least on or about June 2020.

        e. **Kamaaina Holdings LLC ("Kamaaina Holdings")**, which was originally funded with proceeds of the wire fraud and fraud in connection with identification documents. It owned and operated a longline fishing vessel called the "Rachel," and funds from its bank account were used to make loan payments

19

for the Boston Whaler called the "Painkiller." Kamaaina Holdings continued operations until at least October 1, 2020.

f.     **Kamaaina Energy LLC (formerly Kamaaina Solar Solutions) ("Kamaaina Energy")**, which was a solar power business owned and operated by MISKE, which began operations in or around 2013 and continued operations until on or around November 4, 2019. According to documents submitted to the DCCA, Kamaaina Energy's Principal RME from on or about May 24, 2013 through on or about September 28, 2019, was Kerry Kitteringham, who was also purportedly a 51% owner of the company according to documents submitted to the DCCA.

g.     **Makana Pacific Development LLC ("Makana Pacific")**, which was a construction company that MISKE used to, among other things, construct the Defendant Portlock Property. Makana Pacific operated from in or about 2017 through in or about May 2019. According to documents submitted to the DCCA, Makana Pacific's Principal RME was Derek Higa from on or about July 19, 2017 through on or about May 17, 2019.

(collectively, the "Miske Companies").

48.     The individual participants in the criminal conduct constituting the bases for forfeiture pled herein include, among others:

20

a. **Michael J. Miske, Jr. ("MISKE")**, who ran KTPC, Oahu Termite, and the other businesses identified above.  He was the head of the racketeering enterprise identified in the Third Superseding Indictment as the Miske Enterprise, and he was the lead defendant in the Third Superseding Indictment.  He was never identified in documents submitted to the DCCA as Principal RME of KTPC, and he was not identified in documents submitted to the DCCA as a subordinate RME of KTPC since July 23, 2018.  MISKE was not identified in documents submitted to Hawaii's DCCA as the Principal RME of Oahu Termite since November 20, 2018.  MISKE was never identified in documents submitted to the DCCA as an RME, subordinate or principal, of Kamaaina Plumbing, Kamaaina Energy, or Makana Pacific.  On July 18, 2024, a federal jury convicted MISKE of thirteen counts charged in the Third Superseding Indictment, including racketeering conspiracy.

b. **Delia-Anne Mele Fabro-Miske ("Fabro-Miske")**, who is MISKE's daughter-in-law and a named defendant in the Third Superseding Indictment.  According to documents submitted to the DCCA, she was the Principal RME for KTPC from January 28, 2019 until June 30, 2020, and she was the Principal RME for Oahu Termite from November 20, 2018 until January 28, 2019.  According to documents Fabro-Miske submitted to the DCCA, she was the President, Vice President, Secretary, Treasury, Director, and registered agent for

21

both KTPC and Oahu Termite and had been since January 26, 2017. She was the sole member of Hawaii Partners as of November 3, 2016, the sole member of Kamaaina Holdings as of February 7, 2017, and one of two members of Kamaaina Energy as of October 31, 2016. On January 12, 2024, Fabro-Miske pled guilty to Count 1 and Count 20 of the Third Superseding Indictment, charging racketeering conspiracy and financial institution fraud, respectively.

        c.    **Tricia Castro ("Castro")**, who was MISKE's tax accountant from in or around 2009 until in or around January 2019. On June 28, 2021, Castro pled guilty to conspiring with MISKE to defraud the United States and to commit financial institution fraud.

        d.    **Harry Kansaki ("Kansaki")**, who was the designated Principal RME for KTPC from on or around October 26, 2000 to August 11, 2015. Kansaki served as KTPC's first Principal RME when the company was initially licensed by the DCCA in 2000, and it is through his PCO license that KTPC operated. Kansaki was purportedly a 51% owner of KTPC according to documents submitted to the DCCA.

        e.    **Tia Paoa ("Paoa")**, who began working at KTPC in or around 2014. Paoa later served as the officer manager for Makana Pacific from in or around 2017 to 2018 and as Project Manager for Kamaaina Energy from in or around 2014 to 2019.

f. **Denny Freitas ("Freitas")**, who formed Kamaaina Plumbing with MISKE in or around 2005. According to documents submitted to the DCCA, Freitas was the designated Principal RME for Kamaaina Plumbing from on or around August 4, 2005 to September 30, 2020. According to federal tax records, Freitas had no ownership interest in Kamaaina Plumbing after 2013.

g. **Preston Kimoto ("Kimoto")**, who served as a salesperson for KTPC, where he worked from in or around 2015 to July 2020. Kimoto also worked at other Miske Companies, including as a salesperson for Oahu Termite and for Hawaii Partners.

## STATUTORY AND REGULATORY BACKGROUND

*Pest Control Businesses*

49. Termite and pest control businesses, such as KTPC and Oahu Termite, are regulated in the State of Hawaii. Their pest control operators and field representatives, their managers, and the businesses are required to hold valid licenses to operate. Haw. Rev. Stat. § 460J-6; Haw. Admin. R. § 16-94-4; Haw. Admin. R. § 16-94-5.

50. Hawaii's Pest Control Board, a regulatory board that is part of the Professional and Vocational Licensing (PVL) Division of the DCCA, is a regulatory agency responsible for licensing and overseeing termite and pest control businesses in Hawaii.

23

51.     The applicable statute, Haw. Rev. Stat. § 460J-8, and the applicable

regulations require termite and pest control businesses to assign a Responsible

Managing Employee ("RME").  The RME is the individual responsible for the

direct management of the pest control business of the licensee.  Haw. Admin. R.

§ 16-94-3.

52.     An RME must be a bona fide employee principally employed by the

licensee and cannot serve as an RME for more than one pest control operator,

unless:

      a.     There is a common ownership of at least fifty-one percent of

the equity of each firm for which the individual acts as RME;

      b.     Each additional firm for which the individual acts as RME is a

subsidiary of or joint venture with the first; or

      c.     There is a direct family relationship between the RME and the

officers of each additional firm for which an individual acts as RME; or

      d.     There is a direct family relationship between the officers,

directors, members, managers, and partners of all pest control operators for which

the individual acts as the RME; and

      e.     The Pest Control Board is satisfied that it is in the public

interest and that such individual is competent, able, and qualified to be an RME for

more than one firm.  Haw. Admin. R. § 16-94-25.001.

24

53.    Pest control operators must designate a "Principal RME" who is primarily responsible for the direct management of the pest control business.  The Principal RME must also be in a position to secure full compliance with the pest control laws and rules of the Pest Control Board; be familiar with all contracts the firm enters into; be familiar with all projects the firm undertakes; and see that detailed records are kept on those projects.  Haw. Admin. R. §§ 16-94-25(a)(2), (a)(3), (a)(4).

54.    RMEs are required to be licensed for, and have specific experience in, the relevant branch(es) of pest control the business performs (e.g., fumigation, general pest control, or termite control).  Haw. Admin. R. § 16-94-17.  Such licenses are called Pest Control Operator ("PCO") licenses.  RMEs must also be certified by the State Department of Agriculture as commercial applicators in the relevant branch(es) of pest control.  *Id.*

55.    The Principal RME must assume the direct management of the pest control business that employs him or her.  "Direct management" means "the direct supervision of the pest control project undertaken by the licensee, the control of technical and administrative decisions, personnel management, the review of pest control contracts, and enforcing compliance with all laws and rules affecting the pest control business."  Haw. Admin. R. § 16-94-3.

25

56.     It is the RME whose PCO license qualifies a pest control entity for licensing, Haw. Admin. R. § 16-94-16, and the Principal RME is the RME through whom the business license is maintained.  Haw. Admin. R. § 16-94-3.

57.     The regulations also provide that persons engaged in the business of pest control must have insurance covering all branches of its pest control work and must have a current copy of a certificate of general liability insurance on file with the Pest Control Board.  Haw. Admin. R. § 16-94-49.

### *Construction Businesses*

58.     The State of Hawaii also regulates construction contractors, plumbers, and electricians.  The Contractor License Board (CLB) is the regulatory agency responsible for licensing and overseeing contracting businesses in Hawaii.

59.     Kamaaina Plumbing operated and was licensed both as a general building contractor and as a plumbing company, and its operations were therefore governed by both Title 16, Chapter 77 (construction contractors), and Title 16, Chapter 80 (electricians and plumbers), of the Hawaii Administrative Code.

60.      Kamaaina Energy operated and was licensed as an electrical contractor, and its operations were therefore governed by Title 16, Chapter 80 (electricians and plumbers).

61.     Makana Pacific operated and was licensed as a general building contractor, and its operations were therefore governed by Title 16, Chapter 77 (construction contractors).

62.     As in the pest control industry, the contracting business of a contracting entity must be under the direct management of a Principal RME.  Haw. Admin. R. § 16-77-70.  An RME must be a bona fide employee of the contracting entity that maintains a current contractor's license, and it is the RME who qualifies the contracting entity for a contractor's license in the licensed qualifications held by the individual.  Haw. Admin. R. § 16-77-3.  The Principal RME is primarily responsible for the direct management of the business of the contracting entity. Haw. Admin. R. § 16-77-71.

63.     An individual may be an RME for more than one contracting entity only if:

        a.     There is a common ownership of at least fifty-one per cent of the equity of each contracting entity for which the individual acts as the RME;

        b.     A contracting entity is a subsidiary of or joint venture with another contracting entity;

        c.     There is a direct family relationship between the RME and the officers, directors, members, managers, or partners of the other contracting entities for which the individual acts as the RME; or

27

d.      There is a direct family relationship between the officers, directors, members, managers, and partners of all contracting entities for which the individual acts as the RME; and

e.      The board is satisfied that it is in the public's interest and that the individual is competent, able, and qualified to be an RME for more than one contracting entity.  Haw. Admin. R. § 16-77-72.

### *Pertinent Crimes*

64.      Under 18 U.S.C. § 1343, it is a felony, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," to "transmit[] or cause to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ."

65.      The elements of the offense set forth in 18 U.S.C. § 1343 are:

a.      First, the defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts;

28

b. Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c. Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

d. Fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme. [Ninth Circuit Model Criminal Jury Instructions § 15.35.]

66. Under 18 U.S.C. § 1028(a)(7), it is a felony to "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person with intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law" where interstate or foreign commerce is affected or the mails are used. It is also a felony to attempt or conspire to do so. 18 U.S.C. § 1028(f). The term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name, social security number, . . . or identification number." 18 U.S.C. § 1028(d)(7).

67. The elements of the offense set forth in 18 U.S.C. § 1028(a)(7), as applicable here, are:

29

a. The defendant knowingly transferred, possessed, or used a means of identification of another person;

b. The defendant did so without lawful authority;

c. The defendant intended to commit, in this particular case, an act in violation of Hawaii Revised Statutes § 710-1016.3 and/or Hawaii Revised Statutes § 708-853; and

d. The transfer, possession, or use of the means of identification of another person was in or affected commerce between one state and another state, or in the course of the possession or use, the means of identification was transported in the mail. [Ninth Circuit Model Criminal Jury Instructions § 15.7.]

68. Under 18 U.S.C. § 1344, it is a felony to "knowingly execute[], or attempt[] to execute, a scheme or artifice" "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

69. The elements of the offense set forth in 18 U.S.C. § 1344(1) are:

a. The defendant knowingly executed or attempted to execute a scheme to defraud a financial institution of something of value;

30

b.  That the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.  The defendant did so with the intent to defraud the financial institution; and

d.  The financial institution was insured by the Federal Deposit Insurance Corporation (or otherwise fits the definition in 18 U.S.C. § 20).  [Ninth Circuit Model Criminal Jury Instructions § 15.36.]

70.  The elements of the offense set forth in 18 U.S.C. § 1344(2) are:

a.  The defendant knowingly carried out a scheme or plan to obtain money or property from, in this particular case, the Bank of Hawaii, by making false statements or promises;

b.  The defendant knew that the statements or promises were false;

c.  The statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;

d.  In this particular case, Bank of Hawaii was federally chartered or insured.  [Ninth Circuit Model Criminal Jury Instructions § 15.39.]

31

71.     Under 18 U.S.C. § 1956(a)(1)(B)(i), it is a felony, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [to] conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," and "knowing that the transaction is designed in whole or in part," "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  18 U.S.C. § 1956(a)(1)(B)(i).

72.     The elements of the offense set forth in 18 U.S.C. § 1956(a)(1)(B)(i) are:

> a.     The defendant conducted or intended to conduct a financial transaction involving property that represented the proceeds of prior, separate criminal activity;
>
> b.     The defendant knew that the property represented the proceeds of some form of unlawful activity; and
>
> c.     The defendant knew, in this particular case, that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.
>
> [Ninth Circuit Model Criminal Jury Instructions § 18.4.]

73.     Under 18 U.S.C. § 1957(a), it is a felony to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a

value greater than $10,000 and is derived from specified unlawful activity" where the offense "takes place in the United States or in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. §§ 1957(a), (d).

74.    The elements of the offense set forth in 18 U.S.C. § 1957 are:

    a.    The defendant knowingly engaged or attempted to engage in a monetary transaction;

    b.    The defendant knew the transaction involved criminally derived property;

    c.    The property had a value greater than $10,000;

    d.    The property was, in fact, derived from specified unlawful activity; and

    e.    The transaction occurred in the United States or special maritime and territorial jurisdiction of the United States. [Ninth Circuit Model Criminal Jury Instructions § 18.7.]

75.    Under 18 U.S.C. § 1956(h), it is a felony to "conspire[] to commit any offense defined in this section [1956] or section 1957."

76.    The elements of the offense set forth in 18 U.S.C. § 1956(h) are:

    a.    There was an agreement to commit money laundering;

    b.    The defendant knew the objective of the agreement; and

    c.      The defendant joined the agreement with the intent to further its

unlawful purpose.  [Ninth Circuit Model Criminal Jury

Instructions § 18.7A.]

## **THE WIRE FRAUD**

77.    From a period beginning by at least October 20, 2000, and continuing

through at least July 15, 2020, MISKE and others, known and unknown, engaged

in a scheme to defraud individuals and entities in Hawaii in connection with the

operation of the Miske Companies.  The scheme involved the use of forged

signatures, stolen identities, and false or fraudulent representations concerning the

qualifications of proposed RMEs to obtain and maintain required licenses from the

State of Hawaii Department of Commerce and Consumer Affairs ("DCCA"), and

the use of those licenses to fraudulently market the Miske Companies to

individuals and entities as authorized and qualified to provide pest control,

construction, and other services, in violation of 18 U.S.C. § 1343 and 18 U.S.C. §

1028(a).  The operations of the Miske Companies were permeated with fraud from

inception, and these companies would have been unable to conduct their operations

but for the wire fraud scheme.

78.    MISKE, the Miske Enterprise, and the Miske Companies engaged in a

continuing course of wire fraud through at least in or about July 2020, with KTPC

and other Miske Companies continuing to do business while operating under fraudulently obtained and maintained licenses.

### *Pest Control Companies – KTPC and Oahu Termite*

79.     From at least 2004 to September 12, 2019, MISKE reported to the IRS that he, MISKE, held 100% of the stock—that is, he was the sole owner—of KTPC.  Furthermore, since at least 2004, MISKE conducted the actual, direct management of KTPC's pest control business within the meaning of section 16-94-3 of the Hawaii Administrative Code.

80.     MISKE engaged in a pattern of listing individuals as the Principal Responsible Managing Employees (RMEs) of his businesses when in fact they were not operating in that role, not qualified, or both.  Customers who retained the services of KTPC, insurers providing insurance to KTPC, the DCCA (including its respective licensing boards), and the general public all relied upon the representations that a legitimate Principal RME was properly overseeing the operations of KTPC.

81.     On August 16, 2000, MISKE and the other original director of KTPC, Andrew Pangan, submitted a request to the Pest Control Board to license KTPC as a pest control business and to designate Pangan as KTPC's RME.  On October 3, 2000, the Pest Control Board rejected the application due to Pangan's lack of experience as a commercial applicator.

82.     On October 20, 2000, the Pest Control Board received a new request from MISKE to license KTPC as a pest control business and to designate Harry Kansaki ("Kansaki") as KTPC's RME.  As part of this request, a letter signed by Kansaki was submitted to the Pest Control Board that stated that Kansaki was 51% owner of KTPC.  In addition, corporate minutes from a stockholders' meeting were submitted to the Pest Control Board stating that Kansaki was 51% owner of KTPC, Pangan was 25% owner of KTPC, and MISKE was 24% owner of KTPC.  These stockholders' meeting minutes were signed by Kansaki, MISKE, and Pangan. Another set of meeting minutes submitted to the Pest Control Board stated that Kansaki, MISKE, and Pangan were directors of KTPC.

83.     Kansaki was actually the owner and RME for Oahu Termite and Pest Control, and he had been since 1975.  Kansaki was not an owner of KTPC. MISKE, however, falsely identified Kansaki as a 51% owner of KTPC in order to satisfy the DCCA regulation that prevented individuals from serving as RMEs for multiple companies unless there was at least 51% common ownership between the companies.

84.     In October 2000, as part of KTPC's application, the Pest Control Board also received a "Zoning Certification Form" from KTPC indicating that it was submitted by Kansaki, as the RME/PCO of KTPC, using Kansaki's PCO number, #77.

36

85.     On October 26, 2000, the Pest Control Board issued KTPC a unique
PCO number, #824; authorized KTPC to operate as a pest control business in
Hawaii; and designated Kansaki as KTPC's Principal RME.

86.     On December 5, 2005, Kansaki submitted a "Field Representatives
Confirmation of Employment" and three documents entitled "Certification of
Training & Field Experience for a Pest Control Field Representative Application"
for fumigation (BR-1), general pest (BR-2), and termite (BR-3) for MISKE.
Kansaki submitted all four documents as the RME and PCO of KTPC using
KTPC's unique PCO #824.  On July 1, 2006, the Pest Control Board issued
MISKE a unique Pest Control Field Representative number, #1069.

87.     On October 19, 2007, the Pest Control Board received an "Entity
Resolution" and an "Application for License Pest Control Operator" signed by
Kansaki.  This resolution designated MISKE as an RME of KTPC.  Kansaki signed
both documents as an RME of KTPC and as an Officer, Partner, Manager, or
Member using KTPC's unique PCO #824.  On April 30, 2008, the Pest Control
Board issued MISKE a unique PCO #1157 and designated him an RME for KTPC.

88.     On April 10, 2008, the Pest Control Board sent KTPC a letter
requesting payment of KTPC's license renewal fee and a resubmission of the
Principal RME certification for KTPC.  On April 20, 2008, Kansaki signed and

submitted to the Pest Control Board the certification that he was the Principal RME of KTPC using both KTPC's unique PCO #824 and Kansaki's unique PCO #77.

89.     The Pest Control Board designated Kansaki Principal RME of KTPC from October 26, 2000 to June 30, 2004 and again as Principal RME of KTPC from July 15, 2004, to August 11, 2015.[3]  During that entire period, including at the time of the December 5, 2005, October 19, 2007, and April 10, 2008 submissions to the Pest Control Board, Kansaki was not eligible to be KTPC's RME.  Kansaki was the owner and RME of Oahu Termite and Pest Control; he was not principally employed by KTPC; no one had common ownership of at least 51% of the equity of both Oahu Termite and Pest Control and KTPC; and Kansaki was not otherwise qualified to be RME of KTPC.  *See* Haw. Admin. R. § 16-94-25.001.

90.     From October 2000 to August 2015, KTPC's unique PCO #824 fraudulently operated under Kansaki's unique PCO #77.

91.     From August 2015 through January 2016, Carlton Agena was KTPC's Principal RME.  Matthew Fabry ("Fabry") became KTPC's Principal RME in July 2016, and he continued to be listed as KTPC's RME until December 2017, despite leaving Hawaii in July 2016.  Michael Worden took over as Principal RME from

---

[3]     According to DCCA records, Kansaki failed to renew his license, so his tenure as KTPC's Principal RME ended, effective June 30, 2004.  Kansaki restored his license and was reinstated as KTPC's Principal RME, effective July 15, 2004.

Case 1:25-cv-00999-DKW-RDM Document 84-1 Filed 04/22/25 Page 23 of 99 PageID.2575
Case 1:25-cv-00999-DKW-RDM Document 1 Filed 04/22/25 Page 40 of 100
PageID.25736

July 2018 through January 2019, when Fabro-Miske became the Principal RME.

Until at least June 30, 2020, Fabro-Miske was listed as KTPC's Principal RME.

92.     Fabro-Miske took steps to fraudulently obtain her PCO certification as
well as her Pest Control Field Representative (PCFR) license, which is needed
prior to applying for the higher-level PCO.

93.     On December 7, 2017, as part of Fabro-Miske's PCFR application,
Worden signed a Field Representative Confirmation of Employment certification
that contained his unique PCO number.  In the application, Worden falsely
certified that Fabro-Miske had been trained.  Fabro-Miske's PCFR certification
package also included job logs that falsely certified that Fabro-Miske worked on
25 fumigation jobs from December 8, 2016 through December 21, 2016.

94.     Worden, in fact, could not verify that Fabro-Miske was trained or that
Fabro-Miske ever showed up to the worksites.  Moreover, Fabro-Miske showed up
to work only two or three days a week.

95.     In response to an earlier PCFR application submitted by Fabro-Miske
to the Pest Control Board, and in response to work experience Fabro-Miske
claimed she had completed, the Executive Officer of the Pest Control Board stated
in a letter to Fabro-Miske that the Pest Control Board "noted that those lists [of
work experience] are exact copies of lists provided by other PCFR applicants."

96.     From July 2015 to April 2018, the period described in Fabro-Miske's PCFR application, Fabro-Miske was never scheduled to perform any fumigation jobs and Fabro-Miske never went out in the field in that time period, but instead did office work.

97.     Fabro-Miske was a supervisor in the office, not out in the field, from early 2017 through August 2018 at KTPC and Oahu Termite.

98.     On April 27, 2017, after receiving the false certifications and false job logs in Fabro-Miske's application, the Pest Control Board issued Fabro-Miske PCFR #1559.

99.     Having fraudulently obtained a PCFR number, Fabro-Miske, in coordination with MISKE, then made efforts to obtain a PCO through fraud.  In March 2018, Fabro-Miske submitted a PCO application to the Pest Control Board. In connection with that application, on March 1, 2018, Worden submitted to the Pest Control Board an Experience Certification that falsely certified, among other things, that Fabro-Miske "showed proficiency in all aspects of the required field for branches 1 and 2 of the pest control services."  In fact, Worden could not verify that Fabro-Miske was trained or that Fabro-Miske ever showed up to the worksites. Nonetheless, as part of Fabro-Miske's PCO certification package, Fabro-Miske submitted job logs in March 2018 that falsely certified that Fabro-Miske worked on 100 fumigation jobs from December 9, 2016 through January 26, 2017.

40

100.    As an example of fraudulent representations Fabro-Miske made in her PCO application, Fabro-Miske falsely asserted that she was "an applicator actively involved in the treatment and application of the chemicals" for four separate structure, or "tent," fumigation jobs on December 9, 2016.  These four jobs were located in Kailua, Kaneohe, Haleiwa, and Honolulu, Hawaii.  On January 2, 2017, Fabro-Miske falsely asserted that she was an applicator at six different jobs, three in Honolulu and one each in Wahiawa, Mililani, and Kahuku.  In fact, Fabro-Miske was not an applicator for any of these jobs.

101.    In her ongoing PCO application in 2018, Fabro-Miske made additional false representations in updated Experience Certifications submitted to the Pest Control Board in July 2018.  For example, Fabro-Miske falsely asserted that she was an applicator of Vikane for structure fumigation jobs at a stated series of seven locations between December 9, 2016 and December 14, 2016.  Later, in her PCO application, Fabro-Miske again listed the same seven locations, but the dates were different—December 1, 2016 to December 3, 2016.  At least one set of representations was false.

102.    As noted above, from July 2015 through April 2017, Fabro-Miske never went out in the field, but instead did office work.

103.    On June 28, 2018, after receiving these false experience certifications and job logs, the Pest Control Board issued Fabro-Miske PCO #1583.

41

104.   On November 20, 2018, the Pest Control Board stamped "received" on a handwritten letter from Fabro-Miske that stated that as of November 20, 2018, Fabro-Miske would be applying to the Pest Control Board to be the dual RME for both Oahu Termite and KTPC.  On November 20, 2018, the Pest Control Board received a letter from KTPC dated November 5, 2018, that was signed by Miske that stated in part, "This letter serves to verify that Delia-Anne Mele Miske [i.e., Fabro-Miske] has 51% ownership of Kamaaina Termite and Pest Control Inc. (PCO-824)."  On November 20, 2018, the Pest Control Board received another letter from Oahu Termite also dated November 5, 2018, that was signed by Fabro-Miske that stated in part, "This letter serves to verify that Delia-Anne Mele Miske [i.e., Fabro-Miske] has 51% ownership of Oahu Termite and Pest Management LLC (PCO-1565)."  A review of MISKE's, Fabro-Miske's, and KTPC's 2018 individual and corporate tax returns, however, showed that Fabro-Miske was not a 51% owner of either Oahu Termite or KTPC.  For tax period 2018, under penalty of perjury, MISKE reported 100% ownership of both Oahu Termite and KTPC to the IRS.  Given that MISKE owned 100% of these companies, Fabro-Miske was not qualified to be RME of both Oahu Termite and KTPC.  *See* Hawaii Admin. Rules § 16-94-25(1).

105.   Accordingly, from November 2018 to January 2019, Oahu Termite's unique PCO #1565 fraudulently operated under Fabro-Miske's unique PCO #1583.

In addition, from January 2019 to at least on or around June 30, 2020, KTPC's unique PCO #824 fraudulently operated under Fabro-Miske's unique PCO #1583.

106.   Worden was designated as the Principal RME for Oahu Termite effective January 28, 2019, and he remained so designated through at least June 30, 2020.  This designation was based on an undated letter Fabro-Miske sent to the DCCA that was stamped as received on March 1, 2019.  In fact, Worden did not perform work for Oahu Termite.  He was neither a 51% owner of Oahu Termite nor primarily employed by Oahu Termite.  Further, Worden moved to the mainland on July 26, 2019, and began working full-time for a completely separate, unrelated national pest control company.  Because he could not and did not handle the direct management of the pest control business of Oahu Termite as required by the applicable statute and rules, he could not and did not fulfill the required role of RME for Oahu Termite.  *See* Haw. Rev. Stat. § 460J-8; Haw. Admin. R. § 16-94-3. Accordingly, Oahu Termite had no valid RME and was operating illegally.

107.   KTPC and Oahu Termite obtained much of the equipment needed to operate their pest control businesses in Hawaii, and all of the pesticides needed to operate those businesses from other states.  Their pest control businesses, and their possession and use of the means of identification they fraudulently used to obtain and retain licenses to conduct such pest control businesses, were accordingly in and affecting interstate commerce within the meaning of 18 U.S.C. § 1028(c)(3).

43

The companies also routinely communicated with pesticide vendors via interstate telephone calls and emails, which constituted interstate wires.

108.  Hawaii regulations require that "[a]ll company-operated service vehicles shall be properly identified with the company's name and pest control operator's license number."  Haw. Admin. R. § 16-94-85.  KTPC's vehicles and Oahu Termite's vehicles were, in fact, identified with the respective business's name and unique PCO number.  Additionally, KTPC's license number was affixed to every proposal as a representation to its customers that they were licensed.

109.  According to the DCCA, the Pest Control Board relies on the documents submitted by applicants like KTPC and Oahu Termite, as well as the honesty and trustworthiness of the applicants, in evaluating its licensing applications.

110.  According to the DCCA, KTPC would have been out of compliance with the board's rules and regulations governing licensing of pest control operators if Kansaki were not actually a 51% owner of KTPC.

111.  According to the DCCA, KTPC and Oahu Termite would have been out of compliance with the board's rules and regulations if their RMEs no longer worked for their companies or lived outside the state, as with Fabry and Worden, and the companies' licenses could have been suspended or revoked by the board.

112.    In the absence of the above-described false material representations, KTPC would not have been licensed by the DCCA, neither KTPC nor Oahu Termite could have operated, customers would not have hired and paid KTPC and Oahu Termite, and insurers would not have issued policies insuring KTPC and Oahu Termite.

113.    Throughout the course of their operations and in furtherance of the wire fraud scheme, MISKE, Fabro-Miske, Kansaki, Kimoto, and others associated with KTPC and Oahu Termite, known and unknown, routinely caused interstate wires to be transmitted as a result of credit card payments from customers, check deposits from customers, interstate telephone calls, interstate text messages, facsimiles, wire transfers, Automated Clearing House ("ACH") payments, and email communications within the companies and with vendors and customers.

*Materiality*

114.    During the periods October 26, 2000 to August 11, 2015, August 2016 to June 2017, and at least January 2019 through at least July 15, 2020, KTPC's representations to others, including its customers, that it had a legitimate RME, that it was properly licensed, or that it was operating lawfully, were false. During the period from at least January 2019 through at least July 15, 2020, Oahu Termite's representations to others, including its customers, that it had a legitimate RME, that it was properly licensed, or that it was operating lawfully, were false.

45

115.   MISKE was well-aware that a pest control business required an RME to operate legally.

116.   Kimoto, one of the salespeople for KTPC and Oahu Termite, also was aware that pest control businesses required an RME to operate legally.  In order to obtain business for KTPC and Oahu Termite, Kimoto repeatedly made misrepresentations to customers that the pest control companies had a legitimate RME, were properly licensed, and were operating lawfully.

117.   According to customers of KTPC and Oahu Termite, they would not have hired KTPC or Oahu Termite had they known the companies had obtained or maintained their licenses through fraud, that the companies were not in compliance with the applicable rules and regulations regarding licensure, or that the companies were operating illegally in some way.

118.   For example, when Nordic PCL Construction, Inc. ("Nordic PCL") made the decision in 2010 to hire KTPC to perform the major condominium fumigation project, the company performed due diligence before that decision was made.  At the time, KTPC was operating under Kansaki as purported Principal RME, after having obtained KTPC's PCO license through fraud.

119.   Nordic PCL learned that KTPC had handled large jobs before and that it had valid insurance certificates, and they were pleased to find out that someone other than MISKE was listed as the Principal RME for KTPC.  According to

46

Nordic PCL, the company believed KTPC was properly licensed and would not have hired KTPC for the 2010 fumigation project had it known KTPC obtained its license through fraud, that KTPC's Principal RME was not supervising the pest control projects, or that KTPC was out of compliance with the laws and regulations regarding RMEs.

120.   Nordic PCL hired and paid KTPC based on these false representations, and in November 2010, KTPC deposited two checks from Nordic PCL into a KTPC bank account.  Additionally, MISKE caused Nordic PCL to initiate three wire transfers to a KTPC escrow account held with First Hawaiian Bank ("FHB").  The escrow company, Title Guaranty Escrow Services, Inc., transferred the proceeds from the wire transfers to the FHB escrow account via check, which cleared via interstate wires.

121.   Between 2010 and 2012, MISKE transferred the proceeds from the escrow account via checks, which cleared via interstate wires, including:  a $150,000 check to Pacific Rim Bank, to pay down the loan MISKE took out to purchase the land for the Defendant Portlock Property; and eight checks totaling $1,050,000 to accounts held at Central Pacific Bank associated with Leverage, Inc. and Leverage Entertainment LLC, to fund the creation of MISKE's nightclub business; and a check for $100,000 to MISKE's account at Central Pacific Bank.

122. Similarly, the Mauna Kea Beach Hotel ("Mauna Kea") hired KTPC in 2020 to perform a major hotel resort fumigation project, after performing diligence on the company and learning that KTPC had handled large jobs before, including hotels.

123. Fabro-Miske was listed on KTPC's proposal materials as the "Project Manager" for the Mauna Kea fumigation project, and she signed the contract between the companies as Vice President of KTPC.

124. Mauna Kea paid KTPC $2,501,569.68 in four installments in April and May 2020 for a fumigation that took place in May 2020. Each of the four payments was made by check from Mauna Kea's account at First Hawaiian Bank to KTPC's Bank of Hawaii Account #XXXXXXX602. Each of these checks cleared via interstate wires.

125. The fumigation was ultimately unsuccessful, and the hotel remained infested with termites post-fumigation. KTPC was unresponsive when Mauna Kea began reaching out in May or June 2020 to address the continued infestation, including under the contracted service warranty.

126. According to the Mauna Kea, it would not have hired KTPC had it known that KTPC was not properly supervised or managed in accordance with the law, that KTPC had obtained or maintained its license through fraud, or that the

person responsible for direct management of the entire company (Fabro-Miske) had obtained or maintained her license through fraud.

***Kamaaina Plumbing***

127.   Similar to the Pest Control Board, the Contractor License Board (CLB), also a part of the State of Hawaii's DCCA, requires that businesses engaged in the construction and plumbing contracting business be directly managed by a properly licensed RME.  The applicable rules, like the rules for pest control businesses, require that, among other conditions, an RME must be a bona fide employee of the business entity it is associated with, familiar with all contracts that the firm enters into, familiar with all projects the firm carries out, and in a position to secure full compliance with the laws governing contractors.

128.   According to DCCA's records, Kamaaina Plumbing and Home Renovations's Principal RME was Edward D. Freitas, Jr. ("Freitas"), while its alternative RME was another individual, Josiah Akau ("Akau").  Though both Freitas and Akau had active RME licenses, neither of them was legally allowed to function as Kamaaina Plumbing's RME.  Neither Freitas nor Akau were principally employed by, or had any ownership in, Kamaaina Plumbing.  Further, that was true since at least 2015.

129.   MISKE and Freitas formed the predecessor company of Kamaaina Plumbing together in approximately 2005.  From 2005, that company operated

under Freitas's RME license.  In 2014, Freitas left the business, was no longer a supervisor or employee, and was paid out any and all remaining ownership interest.  Applicable regulations required the company to remove Freitas as an RME at this point and designate a new RME, but that did not happen.

130.    According to records obtained from MISKE's accountant at the time, Tricia Castro, the last ownership payout made to Freitas was on January 17, 2014. On separate accounting records, a note indicates that Freitas "left the partnership in 2014 and no new partner was found to replace him."  Consistent with Freitas's divestiture, starting with the 2014 tax year, MISKE had Castro report the income and expenses for Kamaaina Plumbing as a sole proprietor on MISKE's Schedule C on his personal income tax returns, instead of on a partnership return as MISKE had done in prior years.

131.    Freitas's tax filings dating back to at least tax year 2017 showed no income from Kamaaina Plumbing.  In fact, Freitas's information showed that he owned a separate, sole-proprietorship plumbing company during at least part of that time.

132.    In October 2018, when Freitas's RME license was due to be renewed, a "Renewal Application" was submitted to the DCCA seeking renewal of Freitas's position as the RME for Kamaaina Plumbing utilizing Freitas's unique license number CT-26157.  The form noted that the signatory was certifying "that the

statements contained in this application are true and correct" and that "misrepresentation is grounds for . . . revocation of license." This "Renewal Application" was purportedly signed by Freitas on October 31, 2018. If Freitas did, in fact, sign the document, his certification was false because he was no longer employed, nor had any ownership interest in, Kamaaina Plumbing. If Freitas did not sign the form, the form was fraudulently signed as Freitas and submitted it to the DCCA.

133.   Around the time of Freitas's departure, MISKE arranged to have Akau added as an RME. Akau was unaware he was listed as Kamaaina Plumbing's RME. Akau never worked as an employee for, nor received pay from, Kamaaina Plumbing. Akau was not aware of a document submitted to DCCA designating him as Kamaaina Plumbing's RME. Akau was a full-time firefighter, and he held an active contracting license and was listed since June 6, 2011 as the Principal RME for Diversified Contractor Services LLC. Akau had no affiliation with Kamaaina Plumbing and in no way acted as its RME.

134.   MISKE also caused to be submitted to the DCCA a purported Operating Agreement for Kamaaina Plumbing, dated July 15, 2014, which identified Akau as a 51% owner of Kamaaina Plumbing and included Akau's purported signature. The Agreement identified MISKE as the 49% owner of

Kamaaina Plumbing and included MISKE's signature. In fact, Akau was never an owner of Kamaaina Plumbing.

135. Because neither Freitas nor Akau, the two RMEs listed for Kamaaina Plumbing, was serving in that role since at least 2015, Kamaaina Plumbing was operating illegally. Kamaaina Plumbing, however, continued to make false representations to customers that Kamaaina Plumbing was properly licensed and supervised while soliciting sales from customers.

136. Throughout the course of Kamaaina Plumbing's operations and in furtherance of the wire fraud scheme, MISKE, Freitas, and others associated with Kamaaina Plumbing, known and unknown, routinely caused interstate wires to be transmitted in the forms of credit card payments from customers, check deposits from customers, interstate telephone calls, facsimiles, wire transfers, Automated Clearing House ("ACH") payments, and email communications within the companies and with vendors and customers.

137. According to customers of Kamaaina Plumbing, they would not have hired Kamaaina Plumbing had they known that the company had obtained or maintained its license through fraud, that the company was not in compliance with the applicable rules and regulations regarding licensure, or that it was operating illegally in some way.

### Kamaaina Energy

138.   One of MISKE's businesses was a solar energy company called Kamaaina Energy, LLC (formerly Kamaaina Solar Solutions), which was licensed with the DCCA as an electrical contractor.  The Contractor License Board (CLB), which is part of the DCCA, requires that businesses engaged in the electrical contracting business be directly managed by a properly licensed RME.

139.   As part of Kamaaina Energy's (then known as Kamaaina Solar Solutions) licensing application, MISKE submitted or caused to be submitted to the DCCA documentation identifying an individual named Kerry Kitteringham as Kamaaina Energy's Principal RME.  MISKE selected Kitteringham because he wanted his solar company to operate under the license that Kitteringham possessed.  On May 24, 2013, a letter was submitted to the DCCA, which represented that Kitteringham was the RME for a company called Austech and that he wished to be a dual RME for Kamaaina Energy as well.  The letter represented to the DCCA that Kitteringham was at least a 51% owner of Kamaaina Energy (with MISKE a 49% owner), and it bore a signature that purported to be that of Kitteringham.

140.   In fact, Kitteringham did not write or sign the letter submitted to the DCCA identifying him as a 51% owner of Kamaaina Energy, and Kitteringham was not an owner of Kamaaina Energy.  Indeed, in that same time period—in

53

Individual Form 1040s that MISKE's accountant Tricia Castro prepared and that MISKE signed—MISKE represented himself to be the sole owner of Kamaaina Energy. The signature on the letter submitted to the DCCA was a forgery. Kitteringham was only briefly an independent contractor for Kamaaina Energy and was not involved in many projects that Kamaaina Energy performed using his licenses.

141. The documents submitted to the DCCA identified Kitteringham as the Principal RME for Kamaaina Energy from May 24, 2013 until September 28, 2019.

142. Kamaaina Energy's employees – including the general manager for the company, and Tia Paoa, who served as project manager – were aware that Kitteringham was not supervising Kamaaina Energy or performing the functions of RME. Kamaaina Energy, however, made false representations to customers that Kamaaina Energy was properly licensed and supervised while soliciting sales from customers.

143. Throughout the course of their operations and in furtherance of the wire fraud scheme, MISKE, Tia Paoa, and others associated with Kamaaina Energy, known and unknown, routinely caused interstate wires to be transmitted in the forms of credit card payments from customers, check deposits from customers, interstate telephone calls, facsimiles, wire transfers, Automated Clearing House

("ACH") payments, and email communications within the companies and with vendors and customers.

144.   According to customers of Kamaaina Energy, they would not have hired Kamaaina Energy had they known that the company had obtained or maintained its license through fraud, that the company was not in compliance with the applicable rules and regulations regarding licensure, or that it was operating illegally in some way.

***Makana Pacific***

145.   MISKE's construction company, Makana Pacific Development, LLC ("Makana Pacific"), similarly was part of the wire fraud scheme.  Makana Pacific had a general contracting license from the DCCA and was subject to the DCCA's RME licensing requirements.

146.   In or about 2017, MISKE and an individual named John Lauro (who worked at Makana Pacific) recruited Derek Higa to serve as the Principal RME for Makana Pacific in order to allow the company to use Higa's general engineering license.  Higa agreed to be the Principal RME for Makana Pacific.  Fabro-Miske subsequently signed and submitted an application to the DCCA to have Higa listed as the Principal RME, citing Higa's general engineering license.  That submission represented that Higa would be required to assume the direct management of the contracting entity he was employed by, Makana Pacific.  According to Higa, he did

not do any of that for Makana Pacific, but instead was merely an RME "on paper" and not involved in the day-to-day aspects of the business. In fact, Lauro supervised the projects, even though Lauro did not have a general engineering license and thus could not be the Principal RME.

147. The documents submitted to the DCCA identified Higa as the Principal RME for Makana Pacific from July 19, 2017 until May 17, 2019.

148. Makana Pacific's employees – including John Lauro, who supervised the construction projects despite being unable to serve as an RME, and Tia Paoa, who served as office manager – were aware that Higa was not supervising Makana Pacific or performing the functions of RME. Makana Pacific, however, made false representations to customers that Makana Pacific was properly licensed and supervised while soliciting construction projects from customers.

149. Throughout the course of their operations and in furtherance of the wire fraud scheme, MISKE, Fabro-Miske, Higa, Paoa, and others associated with Makana Pacific, known and unknown, routinely caused interstate wires to be transmitted in the forms of credit card payments from customers, check deposits from customers, interstate telephone calls, facsimiles, wire transfers, Automated Clearing House ("ACH") payments, and email communications within the companies and with vendors and customers.

150.   According to customers of Makana Pacific, they would not have hired Makana Pacific had they known that the company had obtained or maintained its license through fraud, that the company was not in compliance with the applicable rules and regulations regarding licensure, or that it was operating illegally in some way.

*Conspiracy*

151.   As described above in paragraphs 77-150, from on or about October 20, 2000 through at least on or about July 15, 2020, MISKE, Fabro-Miske, Freitas, Higa, Paoa, Castro, Kansaki, Kimoto, and others, known, and unknown, conspired, confederated, and agreed with each other to knowingly and willfully devise a scheme and artifice to defraud, that is, with the intent to deceive and cheat, and to obtain money by means of false and fraudulent pretenses, representations, and promises, as well as by the omission of material facts, well knowing at the time that such pretenses, representations, and promises, would be and were false when made, which scheme was furthered by the use of interstate wire communications.

152.   MISKE and his coconspirators agreed to submit false information and documentation to the DCCA for the purpose of obtaining and maintaining the licenses for KTPC, Oahu Termite, Kamaaina Plumbing, Kamaaina Energy, and Makana Pacific.  In order to obtain customers' business, MISKE and his

coconspirators then made fraudulent misrepresentations about the licensing, supervision, and lawfulness of MISKE's companies.

***Wires Traveling In Commerce and In Furtherance of Wire Fraud Conspiracy***

153.   Throughout the course of the multi-decades-long wire fraud conspiracy, numerous interstate wires were transmitted in furtherance of the scheme and conspiracy in the form of credit card payments from customers, check deposits from customers, interstate telephone calls, interstate text messages, facsimiles, wire transfers, Automated Clearing House ("ACH") payments, and email communications within the companies and with vendors and customers.  The Miske Companies operated based on fraudulently obtained and maintained licenses until at least July 15, 2020, and they continued to receive payments and send electronic communications during their operations as a result of such operation.

154.   For example, in April 2020, KTPC contracted to provide pest control services to the Mauna Kea Beach Hotel.  In connection with these services, the Mauna Kea Beach Hotel's parent company, Hapuna Beach Prince Hotel, made four payments by check to KTPC:  on April 6, 2020, in the amount of $558,376.74; on April 21, 2020, in the amount of $604,450.02; on May 1, 2020, in the amount of $669,371.46; and on May 4, 2020, in the amount of $669,371.46.  Each of these payments was deposited into KTPC's Bank of Hawaii Account #XXXXXXX602.  These check deposits cleared via interstate wires.

155.   On June 8, 2020, an email from the Gmail account of KTPC sales representative Sean Chaves was sent to KTPC employee Moana White's KTPC email account in connection with an effort to fix prices between KTPC and Oahu Termite.  This communication represents an interstate wire because the email traveled through servers on the U.S. mainland.

156.   On June 29, 2020, a customer cashier's check from a First Hawaiian Bank account in the amount of $50,000 was received into KTPC's Bank of Hawaii Account #XXXXXXX602.  This check deposit was via interstate wires.

157.   Between January 23, 2020 and June 30, 2020, at least 184 batch deposits of customer checks were received into KTPC's Bank of Hawaii Account #XXXXX415, from customers paying for jobs KTPC should not have performed because it did not meet the DCCA requirements to operate as a pest control business.  These check deposits cleared via interstate wires.  Additional activity included four outgoing interstate wires and 37 outgoing transfers to KTPC's payroll processing vendor.  These transactions constituted interstate wire transfers because they were cleared through the Federal Reserve Bank on the U.S. mainland.

### Proceeds of Wire Fraud Conspiracy

158.   The Miske Companies were used by MISKE, in coordination and agreement with others, as vehicles to commit the fraud scheme described above, which ultimately touched and tainted everything within the companies.  The Miske

Companies obtained and maintained their licenses through fraud and could not have begun or continued operations but for the RME fraud. The fraud was pervasive, beginning at KTPC's inception and continuing throughout the duration of KTPC's operations, as well as during the operations of the Miske Companies. None of the Miske Companies' proceeds would have generated but for the wire fraud scheme. Any proceeds generated during the infrequent brief periods of compliance with the RME requirements were therefore derived indirectly from the wire fraud scheme. Because the Miske Companies' entire operations were permeated with fraud, all proceeds generated from October 2000 through July 15, 2020 are subject to forfeiture.

159. Throughout the course of the wire fraud scheme, MISKE, Fabro-Miske, Castro, and others known and unknown, attempted to conceal or disguise the nature, source, ownership, and control of the proceeds of the scheme, and the connection of these proceeds to the scheme, including by: putting personal and business bank accounts in the names of other individuals, including other Miske Enterprise members; identifying other individuals as the owners and/or managers of companies, including individuals who, in fact, held no ownership interests and had no managerial responsibilities; and laundering the illicit proceeds of the Miske Enterprise's criminal activities through the Miske Companies and monetary transactions. The proceeds of MISKE's wire fraud scheme included the profits

from the Miske Companies, which were used directly and indirectly to purchase or fund, or otherwise comprise, the Defendant Properties.

160.   Based on an examination of banking and financial records, the **Defendant Portlock Property** was paid for, in part, with proceeds from KTPC. Specifically, the property was paid for with proceeds from the 2010 Nordic PCL condominium fumigation project, when KTPC was operating without a lawful Principal RME.  Nordic PCL ledgers from August and September 2010 show that Nordic PCL paid KTPC a total of $4,598,747 for pest control services, as follows:

| Date | Amount |
|---|---|
| August 13, 2010 | $1,091,385.25 |
| September 13, 2010 | $233,277.00 |
| September 14, 2010 | $1,274,084.75 |
| September 17, 2010 | $1,000,000.00 |
| September 28, 2010 | $1,000,000.00 |

161.   The last three payments to KTPC from Nordic PCL, on September 14, 17, and 28, were wired into an escrow account in November 2010, and $150,000 from that escrow account was transferred to Pacific Rim Bank on February 24, 2011, to pay down the loan MISKE took out to purchase the land for the Defendant Portlock Property.

162.   In constructing the house on the lot of the Defendant Portlock Property, MISKE used workers and resources from KTPC, Kamaaina Plumbing, Kamaaina Energy, and Makana Pacific.  In connection with loan application

61

documents submitted to a financial services company called Finance Factors,

MISKE submitted a signed letter dated August 7, 2018 in which he represented to

Finance Factors that he "Self-funded the build of my Lumahai property. As

income was received through my business, I would pay for goods and services."

163.   Because KTPC, as discussed above, was operating illegally, the

Defendant Portlock Property constitutes proceeds of wire fraud, fraud in

connection with identification documents, and conspiracy to commit wire fraud

and fraud in connection with identification documents.

164.   Based on an examination of banking and financial records, the

**Defendant Kailua Property** was purchased with proceeds from KTPC.

Specifically, $556,252.87 of KTPC's proceeds from the Nordic PCL project were

disbursed from the established escrow account to Title Guaranty Escrow Services

on September 27, 2011, to purchase the Defendant Kailua Property. Because

KTPC, as discussed above, was operating illegally, the Defendant Kailua Property

constitutes proceeds of wire fraud, fraud in connection with identification

documents, and conspiracy to commit wire fraud and fraud in connection with

identification documents.

165.   Based on an examination of banking and financial records, the

**$611,123.60 constituting proceeds of the sale of the real property located at**

**559 Kumukahi Place, Honolulu** is proceeds of a property that was paid for, in

part, with proceeds from KTPC. MISKE obtained a mortgage loan to fund a portion of the purchase. Three payments on this mortgage loan, totaling $20,485.47, were made between January 23, 2020, and June 30, 2020. The mortgage loan payments were made from MISKE's HCFCU Account #XXXXX075, and two of these payments were traced to deposits from KTPC and Kamaaina Plumbing. Because KTPC, as discussed above, was operating illegally, the sale proceeds from the Kumukahi Place property constitute proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

166. Based on an examination of United States Department of Commerce, National Oceanic and Atmospheric Administration (NOAA) records, as well as financial and bank records, the **Hawaii Longline Limited Entry Permit issued to the fishing vessel "Rachel,"** which was held in the name of Kamaaina Holdings, LLC, and the **$676,785.56 constituting proceeds of the sale of the "Rachel,"** which before its sale was registered to Kamaaina Holdings, pertain to a fishing vessel that was purchased with proceeds from KTPC. Specifically, the fishing vessel was purchased with proceeds from the 2010 Nordic PCL condominium fumigation project, when KTPC was operating without a lawful Principal RME.

167. A review of KTPC's First Hawaiian Bank ("FHB") account with an account number ending in x9376 ("FHB account x9376") showed that on

November 3, 2010, Nordic PCL check #18578461 for $1,091,358.25 and Nordic PCL check #1858472 for $233,277 were deposited into KTPC FHB account x9376. Prior to these deposits, the balance in KTPC's FHB account x9376 was $333,279.53. Because KTPC, as discussed above, was operating illegally, these funds – and the eventual sale proceeds from the fishing vessel "Rachel" – constitute proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

168. On December 9, 2010, $950,000 was transferred from KTPC's FHB account x9376 to an FHB account held in the name of another corporate entity MISKE controlled, Kamaaina Holdings LLC, with an account number ending in 6836 ("FHB account x6836"). An analysis of KTPC's FHB account showed that as of December 9, 2010, KTPC's FHB account x9376 had a balance of $1,210,683.70, which consisted solely of funds derived from Nordic PCL deposits.

169. On December 13, 2010, $900,521 of the $950,000 deposited into Kamaaina Holdings LLC FHB account x6836 on December 9, 2010, was sent by wire transfer to Kim Marine Documentations Inc.

170. A review of the "Buy-Sell Agreement" for the fishing vessel "Rachel," a tuna longline oceangoing fishing vessel bearing United States registration number 1050716 (the "fishing vessel Rachel"), showed that on

64

December 2, 2010, MISKE agreed to transfer $900,000 to Kim Marine Documentation Inc., $800,000 to purchase the Subject Vessel and $100,000 for the purchase of a Hawaii limited entry longline permit.

171.   NOAA, National Marine Fisheries Service, most recently issued a Hawaii longline limited entry permit (the "Longline Limited Entry Permit") for the fishing vessel Rachel, Vessel Number 1050716, on January 7, 2020.  That permit's current effective date is March 4, 2020, and its current expiration date is March 3, 2021.  The permit must be renewed annually and still can be renewed for a small fee.

172.   Accordingly, the Hawaii Longline Limited Entry Permit was acquired with the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

173.   Based on an examination of banking and financial records, MISKE purchased the "**Painkiller**" in 2016 in the name of Hawaii Partners LLC.  MISKE paid for the Painkiller with a check for $425,000, which was funded through a term loan and a line of credit extended by Central Pacific Bank (CPB) to Kamaaina Holdings but paid to MISKE's personal checking account at CPB.  The payments to repay these two loans were made from fraud proceeds held in the Kamaaina Holdings bank account, which was first at CPB until it was moved to Bank of

Hawaii in November 2016. Specifically, as described above, MISKE purchased the fishing vessel Rachel with KTPC proceeds from the fumigation of the Nordic PCL condominium project. The funds in the Kamaaina Holdings bank accounts, at both CPB and then Bank of Hawaii, were substantially all derived from revenue traceable to the commercial fishing activities of the fishing vessel Rachel, and therefore, as discussed above, were derived from property that constituted the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

174.    The Painkiller was purchased on June 14, 2016, with loan proceeds obtained by MISKE on June 10, 2016. Although MISKE initially borrowed $500,000, split between two loans, to purchase the Painkiller, $50,000 was not used and was paid back to CPB immediately. Thus, the two loans used to purchase the Painkiller, at their inception, totaled $450,000 combined. As of June 30, 2020, approximately $401,000, or 89%, of that balance had been paid off.

175.    Of the approximate $401,000 of principal that had been paid off as of June 30, 2020, approximately $372,000, or 93%, was traced to Kamaaina Holdings bank accounts at CPB and Bank of Hawaii. During the time period of this $371,000 principal paydown, proceeds generated from the fishing vessel Rachel and deposited into the Kamaaina Holdings bank account totaled just over

$4,000,000. Approximately $3,500,000 of this total was earned from seafood sales to United Fishing Agency, a fish market in Honolulu, Hawaii, while the remainder came from two other fish wholesalers (Catalina Offshore Products in San Diego, California, and Hawaiian Fresh Seafood).

176. The funds deposited into the Kamaaina Holdings bank accounts that were not sourced from the fishing vessel Rachel primarily consisted of transfers and capital contributions made during the period from April 2018 to October 2018. During most of this time, the fishing vessel Rachel was in drydock undergoing renovations. The vast majority of these transfers and capital contributions went to repairs and other expenses during this time period, and only a small amount went to loan payments. Specifically, income during this "drydock" period from sources other than fishing totaled approximately $391,000. Non-loan expenses during the same period totaled approximately $371,000. Loan payments of approximately $68,000 made during this time period were mostly paid with money generated prior to the drydock repairs.

177. Accordingly, the Painkiller was acquired with the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

178. Based on an examination of banking records for KTPC and Hawaii Partners, and other relevant documents, MISKE purchased the **2017 Ferrari F12**

**Berlinetta** through Hawaii Partners on or about May 30, 2020, for $219,900, with $217,000 of those funds originating from proceeds of KTPC, held in KTPC's Bank of Hawaii Savings Account, #XXXXXXX602. The funds were transferred from KTPC's account to a Hawaii Partners Bank of Hawaii account, #XXXXX963. Hawaii Partners then issued a cashier's check to Ferrari Hawaii dated May 30, 2020, in the amount of $217,000. The balance in the Hawaii Partners account immediately prior to the $217,000 transfer from the KTPC Savings Account was approximately $1,326.54. Accordingly, at least $215,673.46 of the funds used to purchase the Ferrari were traceable to proceeds of a fraud scheme. Because KTPC, as discussed above, was operating illegally, the 2017 Ferrari F12 Berlinetta constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

179. Based on an examination of the records of the **Hawaii Central Federal Credit Union ("HCFCU") Account #XXXXX075**, the deposits into that account were proceeds of KTPC. MISKE maintained a banking relationship with HCFCU, a financial institution insured by the National Credit Union Association, an independent agency of the United States government. At HCFCU, MISKE maintained two accounts under his member number (88087), a "regular share" account with suffix -000, and a "share draft checking" account with suffix -075.

The two accounts functioned like a savings account and a checking account, respectively. The "regular share" account was initially funded on March 6, 2019, with a deposit of $200. Since this initial funding, the only activity has been an immaterial amount of interest earned and a deposit of $5,004.94 made on August 20, 2019, from an unknown source.

180. The "share draft checking" account, the "HCFCU Account," was initially funded on August 20, 2019, with a check deposit of $79,215.77 that cleared via interstate wires. Since that initial deposit, twenty-six deposits were made into the HCFCU Account from the KTPC Operating account (23), Kamaaina Holdings account (2), and Kamaaina Plumbing account (1). These twenty-six deposits totaled $288,931.91. As described below, these deposits, which were funded by the operations of Kamaaina Holdings, Kamaaina Plumbing, and KTPC, represented the proceeds of wire fraud and fraud in connection with identification documents.

181. Specifically, the two shareholder distributions from Kamaaina Holdings were each traced to funds received from United Fishing Agency, Ltd., which is a seafood wholesaler in the business of purchasing fish from commercial fishing vessels. These proceeds are derived from funds traceable to (a) wire fraud, (b) fraud in connection with identification documents, and (c) conspiracy to commit wire fraud and fraud in connection with identification documents.

69

182.  The sole deposit from the Kamaaina Plumbing account was for the purchase of a 2008 Honda Accord.

183.  The twenty-three deposits into the HCFCU Account from the KTPC Operating account discussed above were described as either "Shareholder Distribution[s]" or direct deposit payroll funds.  Four of the "Shareholder Distribution[s]" were described in the source KTPC Operating account as "Electronic Bill Pay" transactions.

184.  As of July 13, 2020 , the date these funds were initially seized, the total balance in the HCFCU Account was $81,656.56.  All of these funds constituted the proceeds of wire fraud and fraud in connection with identification documents.  Accordingly, the entire $81,656.56 balance in the HCFCU Account is subject to forfeiture as proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

185.  Based on an examination of the records of the **KTPC Bank of Hawaii Operating Account, #XXXXX415**, for the period from January 1, 2019, to June 30, 2020, substantially all of the deposits into that account are proceeds of KTPC.  These include at least 184 batch check deposits, totaling $2,229,159.51, made on or after January 23, 2020.  All of these check deposits cleared through interstate wires.  Because KTPC, as discussed above, was operating illegally, the

70

contents of the KTPC Operating Account were the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

186. Based on an examination of the records of the **KTPC Bank of Hawaii Savings Account, #XXXXXXX602**, for the period from January 1, 2019, to June 30, 2020, substantially all of the deposits into the account are either funds obtained from the 2020 Mauna Kea job or transfers from the KTPC Operating Account. These incoming KTPC transfers include five deposits totaling $175,000 made on or after January 21, 2020. Proceeds from the Mauna Kea job, described at paragraphs 122-126 and 154, deposited into this account included at least three deposits in April and May of 2020 totaling $1,832,198.22, each of which cleared through interstate wires. Accordingly, the contents of the KTPC Savings Account are subject to forfeiture as proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

187. Based on an examination of the records of the **Oahu Termite Bank of Hawaii Operating Account, #XXXXXXX414**, for the period from January 1, 2019, to June 30, 2020, substantially all of the deposits into that account are proceeds of Oahu Termite. These include at least 76 batch check deposits, totaling $140,618.35, made on or after January 23, 2020. All of these check deposits

cleared through interstate wires.  Because Oahu Termite, as discussed above, was operating illegally, the contents of the Oahu Termite Operating Account are subject to forfeiture as the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

188.   Based on an examination of the records of the **Oahu Termite Bank of Hawaii Savings Account, #XXXXXXX218**, for the period from January 1, 2019, to June 30, 2020, substantially all of the deposits into that account are proceeds of Oahu Termite.  These transfers include at least three deposits totaling $50,000 made on or after January 21, 2020.  Because Oahu Termite, as discussed above, was operating illegally, the contents of the Oahu Termite Operating Account are subject to forfeiture as the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

189.   Based on an examination of the records of the **Bank of Hawaii Plumbing Account, #XXXXX220**, for the period from January 1, 2019, to June 30, 2020, substantially all of the deposits into that account are proceeds of Kamaaina Plumbing.  These include at least 14 batch check deposits, totaling $80,602.54 made on or after January 23, 2020.  All of these check deposits cleared through interstate wires.  Because Kamaaina Plumbing, as discussed above, was

72

operating illegally, the contents of the Plumbing Account are subject to forfeiture as the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

190.   Based on an examination of the records of KTPC's Bank of Hawaii Savings Account #XXXXXXX602, the **Bank of Hawaii Cashier's Check No. 429111 in the amount of $1,162,826.76** was withdrawn from proceeds of KTPC. Specifically, the cashier's check constitutes proceeds of the KTPC's 2020 Mauna Kea job, described at paragraphs 122-126 and 154.  On May 5, 2020, KTPC withdrew $1,162,826.76 from KTPC's Bank of Hawaii Savings Account #XXXXXXX602, in the form of Cashier's Check No. 429111.  Because KTPC, as discussed above, was operating illegally, the contents of the KTPC Savings Account were the proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.  Accordingly, the cashier's check, which is derived of funds from the KTPC Savings Account, constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

191.   Based on an examination of DMV records, MISKE purchased the **1951 Volkswagen** and registered it to Hawaii Partners on August 26, 2016.

Because MISKE's income was derived from the proceeds of the fraud scheme and the operations of Hawaii Partners were funded through KTPC, on information and belief, the 1951 Volkswagen constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

192.   Based on an examination of DMV records, MISKE purchased the **1956 Volkswagen** and registered it to Hawaii Partners on August 29, 2016. Because MISKE's income was derived from the proceeds of the fraud scheme and the operations of Hawaii Partners were funded through KTPC, on information and belief, the 1956 Volkswagen constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

193.   Based on an examination of DMV records, MISKE purchased the **1957 Volkswagen** and registered it to Hawaii Partners on July 14, 2017.  Because MISKE's income was derived from the proceeds of the fraud scheme and the operations of Hawaii Partners were funded through KTPC, on information and belief, the 1957 Volkswagen constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

194.  Based on an examination of DMV records, MISKE purchased the **1961 Volkswagen Van** and registered it to Hawaii Partners on July 17, 2017. Because MISKE's income was derived from the proceeds of the fraud scheme and the operations of Hawaii Partners were funded through KTPC, on information and belief, the 1961 Volkswagen Van constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

195.  Based on an examination of DMV records, MISKE purchased the **1970 Ford Bronco** and registered it to Hawaii Partners on May 20, 2019.  Because MISKE's income was derived from the proceeds of the fraud scheme and the operations of Hawaii Partners were funded through KTPC, on information and belief, the 1970 Ford Bronco constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

196.  Based on an examination of public records, MISKE purchased the **painting entitled "Ludavico & Ludovico" by RETNA** on or after 2018.  Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Ludavico & Ludovico" by RETNA constitutes proceeds of wire fraud, fraud in connection with identification

documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

197.　Based on an examination of public records, MISKE purchased the **painting entitled "Watermark" by RETNA** on or after 2011.  Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Watermark" by RETNA constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

198.　Based on an examination of insurance records, MISKE purchased the **painting entitled "Forever Young" by RETNA** for $195,000 on or about April 22, 2019.  Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Forever Young" by RETNA constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

199.　Based on an examination of public records, MISKE purchased the **painting entitled "Sangre Oscura" by RETNA** on or after 2011.  Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Sangre Oscura" by RETNA constitutes proceeds of wire fraud, fraud in connection with identification

documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

200.    Based on an examination of public records, MISKE purchased the **painting entitled "Slick Skull" by OG Slick** on or after 2017. Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Slick Skull" by OG Slick constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

201.    Based on an examination of insurance records, MISKE purchased the **sculpture entitled "Uzi Does It" by OG Slick** on or after 2015. Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the sculpture entitled "Uzi Does It" by OG Slick constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

202.    Based on an examination of public records, MISKE purchased the **painting entitled "Speaking in Tongues" by Alex "DEFER" Kizu** on or after 2014. Because MISKE's income was derived from the proceeds of the fraud scheme, on information and belief, the painting entitled "Speaking in Tongues" by Alex "DEFER" Kizu constitutes proceeds of wire fraud, fraud in connection with

identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

203.   Based on an examination of public records, MISKE purchased the **painting entitled "Spiritual Language" by Alex "DEFER" Kizu** on or after 2023.  Because MISKE's income was derived from the proceeds of his wire fraud scheme, on information and belief, the painting entitled "Spiritual Language" by Alex "DEFER" Kizu constitutes proceeds of wire fraud, fraud in connection with identification documents, and conspiracy to commit wire fraud and fraud in connection with identification documents.

## FINANCIAL INSTITUTION FRAUD SCHEME

204.   MISKE also engaged in a financial institution fraud scheme to obtain a cash-out refinance loan and conspiracy to do the same.  In 2018, MISKE applied for and obtained a $2 million loan from the Bank of Hawaii for which the Defendant Portlock Property served as collateral.

205.   Bank of Hawaii based its approval of MISKE's loan in part upon an appraisal for the Defendant Portlock Property that MISKE submitted with the loan application.  The appraisal attached a fraudulent General Service Agreement for the construction of the Defendant Portlock Property, which MISKE provided to the appraiser.

206.   The General Service Agreement was both backdated to July 3, 2015 (before Makana Pacific came into existence in or about 2017) and included a forged signature of John Lauro, the contractor for the Defendant Portlock Property.

207.   Bank of Hawaii relied upon the appraisal and the false information submitted by MISKE as assurance MISKE could repay the loan.  According to Bank of Hawaii, the bank would not have approved the loan had it known the General Service Agreement was fraudulent.

208.   Upon information and belief, loan payments continued to be made on this loan from the KTPC Bank of Hawaii Operating Account #XXXXX415 through at least August 1, 2019.

209.   On information and belief, MISKE continued to submit, or cause to be submitted, loan repayments on the Bank of Hawaii loan from MISKE's personal account HCFCU Account #XXXXX075 through at least July 2020.

210.   Law enforcement first learned of the financial institution fraud on or around March 2023, when John Lauro, an employee of Makana Pacific, was interviewed by law enforcement.  Lauro reviewed the General Service Agreement and confirmed that he did not recognize the contract, that the signature purporting to be Lauro's was not his, and that Lauro was not working at Makana Pacific as of the date the contract was signed.  Tia Paoa, the officer manager for Makana Pacific, understood the document was for a mortgage, but she wrote up the

fraudulent Makana Pacific General Service Agreement and forged Lauro's
signature at MISKE's direction.

### Proceeds of Financial Institution Fraud Scheme

211.    Based on an examination of banking and financial records, the
**$611,123.60, constituting proceeds of the sale of the real property located at
559 Kumukahi Place, Honolulu**, are proceeds of the 2018 financial institution
fraud.  On May 18, 2018, MISKE, through Kaulana Freitas, used $140,000 of the
Bank of Hawaii loan proceeds to help purchase the real property located at 559
Kumukahi Place, Honolulu.  The initial $140,000 deposit on the property was paid
for with proceeds of the fraudulent Bank of Hawaii loan, the proceeds of which
were transferred to MISKE's personal Bank of Hawaii account (x729), from which
four cashier's checks were purchased to comprise the initial $140,000 deposit on
the property on May 18, 2018.  Because the 2018 Bank of Hawaii loan was
procured through fraud, the real property sale proceeds are subject to forfeiture as
the proceeds of bank fraud.

212.    Based on an examination of banking and financial records, the
**$676,785.56 constituting proceeds of the sale of the "Rachel"** pertain to a
fishing vessel that was maintained with proceeds of the 2018 financial institution
fraud.  On March 23, 2018, MISKE transferred the $1,909,115 in loan proceeds
from Bank of Hawaii to his personal Bank of Hawaii account x729.  On May 25,

2018, MISKE transferred $25,000 of these proceeds to Kamaaina Holdings Bank of Hawaii business account x274 for a drydock shipyard payment for the fishing vessel Rachel.  Because the 2018 Bank of Hawaii loan was procured through fraud, the sale proceeds of the fishing vessel Rachel are the subject to forfeiture as the proceeds of financial institution fraud.

## MONEY LAUNDERING CONSPIRACY

213.   Starting by at least 2010, and continuing through at least May 2024, MISKE, Delia Fabro-Miske, Tricia Castro, and others known and unknown, engaged in a money laundering conspiracy to (1) conceal the source of funds from unlawful wire and financial institution fraud activity, and (2) engage in monetary transactions of $10,000 or more using the proceeds of unlawful activity, including wire and financial institution fraud.

### *Concealment of Unlawful Proceeds*

214.   Starting by at least 2010, and continuing through at least May 2024, MISKE, Delia Fabro-Miske, Tricia Castro, and others known and unknown, agreed to conceal and disguise the nature, source, ownership, and control of the proceeds of MISKE's wire fraud and financial institution fraud schemes, and the connection of these proceeds to the underlying schemes.  MISKE and each of his coconspirators knew that their objective was to conceal and disguise the nature,

source, ownership, and control of the proceeds of MISKE's schemes and joined in the agreement to further this unlawful purpose.

215.   As described in paragraphs 77-203, MISKE engaged in an ongoing conspiracy to conceal and disguise the nature, source, ownership, and control of the proceeds of the above-described wire fraud scheme by identifying other individuals as the owners and/or managers of his companies, including individuals who, in reality, held no ownership interests and had no actual managerial responsibilities.

216.   For example, Fabro-Miske was the designated Principal RME of KTPC from January 28, 2019 through at least June 30, 2020; Edward Freitas was the designated Principal RME of Kamaʻaina Plumbing through at least September 30, 2020; and Michael Worden was the designated Principal RME of Oahu Termite through at least June 30, 2020.  In fact, none of these people was performing the duties and responsibilities of Principal RME for these companies in 2020.

217.   Additionally, in response to learning of developments in the grand jury investigation into MISKE, MISKE and others conspired to conceal and disguise the nature, source, ownership, and control of the proceeds of his wire fraud and financial institution fraud schemes by putting personal and business bank

accounts in the names of other individuals, including other Miske Enterprise
members.

218.   On October 28, 2016, MISKE sent text messages to his accountant,
Tricia Castro, informing her that MISKE needed to change banks due to the U.S.
Attorney's Office's grand jury investigation.  During this text message exchange,
MISKE stated, among other things, the following: (a) "They are gonna need docs.
Taylor will draft an email with everything he needs."; (b) "I am going to take my
name off the DCCA."; (c) "And not to be a signer on accounts."; (d) "Only Delia
[Fabro-Miske]."; (e) "The reason [Central Pacific Bank] kicked us out is just fkn
bulshit and I don't want to have to go thru it again."; (f) "So I'll stay on payroll and
hold shares b[ut] my name won't be attached."; (g) "Time to go dark."; and (h) "I
believe it's the Feds and their subpoenas just trying to make my life hard."
Through these text messages, MISKE made clear to Castro that he was aware of
the U.S. Attorney's Office's grand jury investigation and that he intended to
conceal his ownership of companies, accounts, and revenues in order to conceal
the fraud proceeds from the government and evade the investigation.

219.   MISKE and his coconspirators then carried out this plan to "go dark."
On October 31, 2016, Fabro-Miske submitted documents to the DCCA that
removed MISKE from the state records and stated that Fabro-Miske was now the
only member of KTPC, acting in the capacity of President, Vice-President,

Secretary, Treasurer, and Director of the corporation. At the same time, Fabro-Miske ensured that her pay was so low that she was entitled to Social Security benefits. Likewise, although, on June 1, 2016, an individual named Allen Lau submitted recertification documents to the DCCA stating that MISKE was the sole member of Kamaaina Plumbing, on October 31, 2016, documents were submitted to the DCCA that removed MISKE from the state records and further stated that Fabro-Miske and Lau were now the only members of that plumbing company. On May 22, 2017, Fabro-Miske submitted documents to the DCCA that stated, in part, that she was the sole member of Kamaaina Plumbing, even though the company was reported to the IRS as a sole proprietorship owned and operated by MISKE on MISKE's individual taxes for tax years 2015 to 2018.

220. There were more efforts to conceal MISKE's ownership of the Miske Companies. On November 3, 2016, documents were submitted to the DCCA that stated Fabro-Miske was the only member of Hawaii Partners, and on November 18, 2016, Fabro-Miske opened up a Bank of Hawaii business account for the company, purporting to be its sole member. On October 31, 2016, Fabro-Miske submitted documents to the DCCA that removed MISKE as a member of Kamaaina Energy and made Fabro-Miske and Kerry Kitteringham the sole members. On November 19, 2016, Fabro-Miske opened a Bank of Hawaii business account for Kamaaina Holdings as its sole member. And on February 7,

2017, Robert Clarke submitted documents to the DCCA stating that the company

was a single member corporation with Fabro-Miske as its sole member.

221.   As described at paragraph 224(e), in an effort to conceal and disguise

the nature, source, ownership, and control of the proceeds of MISKE's wire fraud

scheme, Fabro-Miske was ultimately made a signatory on all of the defendant

business bank accounts sought in forfeiture here, and MISKE was not a signatory

on any of these defendant business bank accounts as of 2020.

222.   All of this conduct, as MISKE admitted in explicit terms to Castro,

was designed to conceal his ownership over his companies, even as he continued to

maintain de facto ownership of them and continued to make use of their resources

for his own ends.

223.   MISKE and others also repeatedly transferred proceeds of the wire

fraud scheme among different accounts with no apparent business purpose, a

practice known as "layering" that makes it difficult to trace funds to their true

source.  For example, MISKE attempted to conceal and disguise the nature, source,

ownership, and control of the fraud proceeds from the 2010 Nordic PCL job by

using an intermediary escrow account to layer the transactions before they were

disbursed to: Pacific Rim Bank to pay for the Defendant Portlock Property;

Leverage's bank accounts to fund MISKE's nightclub business; another escrow

account to purchase the Defendant Kailua Property; KTPC business accounts; and

MISKE's personal bank accounts.  Additionally, as further described at paragraph

224(d), MISKE engaged in a layered transaction when purchasing the 2017 Ferrari

F12 Berlinetta, routing wire fraud proceeds first through Hawaii Partners's bank

account, rather than paying the dealership directly with the original source of

funds.

224.   MISKE and his coconspirators engaged in transactions as part of their

conspiracy to conceal the source of funds from the unlawful wire and financial

institution fraud schemes, and the property involved in such transactions is

forfeitable.

a.     As described in paragraphs 160-163, MISKE paid for the

**Defendant Portlock Property**, in part, with proceeds of the wire fraud scheme.  In

doing so, MISKE attempted to conceal the nature and source of these criminal

proceeds and attenuate them from their criminal source by using an intermediary

escrow account and investing them in real property.  Further, as discussed above in

paragraphs 204-212, MISKE used false documents related to the Defendant

Portlock Property to obtain a $2 million cash-out refinance loan from the Bank of

Hawaii, further attenuating the criminal proceeds from their criminal source.  Upon

information and belief, loan payments continued to be made on this loan from the

KTPC Bank of Hawaii Operating Account XXXXX415 through at least August 1,

2019.  On information and belief, MISKE continued to cause payments on the

fraudulent bank loan to be made from MISKE's personal Hawaii Central Federal Credit Union ("HCFCU") Account #XXXXX075 through at least July 2020.

b.     As described in paragraph 164, MISKE paid for the **Defendant Kailua Property**, in part, with proceeds of the wire fraud scheme.  In doing so, MISKE attempted to conceal the nature and source of these criminal proceeds and attenuate them from their criminal source by using an intermediary escrow account and investing them in real property.

c.     As described in paragraphs 165 and 211, MISKE purchased the **real property located at 559 Kumukahi Place, Honolulu**, using, among other things, proceeds of the 2018 financial institution fraud scheme and proceeds of the wire fraud scheme.  To conceal the nature, source, ownership, and control of the proceeds, MISKE routed these proceeds through a convoluted series of transactions.  To pay the initial deposit on the property, MISKE used $140,000 from the fraudulent 2018 Bank of Hawaii cash-out refinance, which he transferred to his personal Bank of Hawaii account (x729), from which four cashier's checks were purchased.  A member of the Miske Enterprise, Kaulana Freitas, used these cashier's checks at a foreclosure auction to purchase the property.  MISKE subsequently transferred $200,000 from his personal Bank of Hawaii account (x729) to a Bank of Hawaii account held in the name of Fabro-Miske and her minor child (x902).  MISKE and Fabro-Miske had $286,979 transferred from this

account to a Hawaiian Financial Federal Credit Union ("HFFCU") account also held in the name of Fabro-Miske and her minor child (x469). MISKE then used $250,000 from the HFFCU account x469 to help purchase the real property located at 559 Kumukahi Place, Honolulu.

       d.    In purchasing the **2017 Ferrari F12 Berlinetta**, MISKE engaged in a layered transaction, transferring proceeds of the wire fraud among different accounts with no apparent business purpose to obscure the source of the funds. Rather than paying the dealership directly with the original source of funds, MISKE had these funds first routed through another entity's bank account. The money used to purchase the 2017 Ferrari F12 Berlinetta was originally proceeds of the fraudulent 2020 Mauna Kea job, which were deposited into KTPC's Bank of Hawaii Savings Account, #XXXXXXX602. MISKE had $217,000 of these funds routed from KTPC's Bank of Hawaii Savings Account, #XXXXXXX602, to a Hawaii Partners Bank of Hawaii account, #XXXXX963. Hawaii Partners then issued a cashier's check to Ferrari Hawaii to purchase the vehicle.

       e.    Despite MISKE being the de facto owner of all of the Miske Companies, as of 2020, MISKE was not a signatory on any of the defendant business bank accounts sought in forfeiture here: **KTPC Bank of Hawaii Operating Account, #XXXXX415**; **KTPC Bank of Hawaii Savings Account, #XXXXXXX602**; **Oahu Termite Bank of Hawaii Operating Account,**

**#XXXXXXX414**; **Oahu Termite Bank of Hawaii Savings Account,**

**#XXXXXXX218**; and **Bank of Hawaii Plumbing Account, #XXXXX220**.  Each

of these accounts, identified in the table below, engaged in numerous financial

transactions involving wire fraud proceeds, including the receipt of customer

payments and subsequent transactions involving these payments.

| Defendant Bank Account | Signatory(ies) |
|---|---|
| KTPC Bank of Hawaii Operating Account, #XXXXX415 | Delia Anne Fabro Sheena Diaz |
| KTPC Bank of Hawaii Savings Account, #XXXXXXX602 | Delia Fabro |
| Oahu Termite Bank of Hawaii Operating Account, #XXXXXXX414 | Delia Fabro Miske Sheena Diaz |
| Oahu Termite Bank of Hawaii Savings Account, #XXXXXXX218 | Delia Fabro Miske |
| Bank of Hawaii Plumbing Account, #XXXXX220 | Delia Fabro Allen Lau Sheena Diaz |

      f.    In or around May 5, 2020, Fabro-Miske caused Bank of Hawaii

to issue **Bank of Hawaii Cashier's Check No. 429111 in the amount of**

**$1,162,826.76** from the KTPC Savings Account made payable to KTPC.  At the

time, MISKE, Fabro-Miske and their coconspirators were well-aware that they and

their fraudulently-run businesses, including KTPC, were under federal

investigation, and they had the cashier's check issued to conceal and disguise the

nature, location, source, ownership, and control of the proceeds.  By having the

cashier's check issued, MISKE, Fabro-Miske, and their coconspirators moved

fraudulent KTPC proceeds into a form that was more easily transportable and physically concealable, thus assisting them in concealing and hiding the location of these fraud proceeds.

g.     As described in paragraphs 166-172, the **Hawaii Longline Limited Entry Permit issued to the fishing vessel "Rachel"** was held in the name of Kamaaina Holdings, LLC, and **the $676,785.56 constituting proceeds of the sale of the "Rachel,"** are derived from the sale of a vessel that was registered to Kamaaina Holdings. The permit and the Rachel were paid for using KTPC proceeds that were routed through a Kamaaina Holdings account as a way to concealing or disguising the nature, location, source, ownership, or control of the proceeds of MISKE's wire fraud scheme.

h.     MISKE also engaged in financial transactions involving the transfer of title to vehicles and vessels for the purpose of concealing or disguising the nature, location, source, ownership, or control of the proceeds of MISKE's wire fraud scheme.  MISKE purchased vehicles and a vessel with wire fraud proceeds and attempted to conceal and disguise the true nature, location, source, ownership, or control of those proceeds by transferring title to the vehicles and vessel to Hawaii Partners and registering these assets to Hawaii Partners.

i.     Title to the "**Painkiller**," which was purchased with fraudulent KTPC proceeds as described in paragraphs 173-177, was transferred to

Hawaii Partners on or about June 14, 2016, and held as an asset of Hawaii Partners.

      ii.      Title to the **2017 Ferrari F12 Berlinetta**, which was purchased with fraudulent KTPC proceeds as described in paragraph 178, was transferred to Hawaii Partners on or about May 30, 2020, and held as an asset of Hawaii Partners.

      iii.      Title to the **1951 Volkswagen**, which was purchased with wire fraud proceeds as described in paragraph 191, was transferred to Hawaii Partners on or about August 26, 2016, and held as an asset of Hawaii Partners.

      iv.      Title to the **1956 Volkswagen**, which was purchased with wire fraud proceeds as described in paragraph 192, was transferred to Hawaii Partners on or about August 29, 2016, and held as an asset of Hawaii Partners.

      v.      Title to the **1957 Volkswagen**, which was purchased with wire fraud proceeds as described in paragraph 193, was transferred to Hawaii Partners on or about July 14, 2017, and held as an asset of Hawaii Partners.

      vi.      Title to the **1961 Volkswagen Van**, which was purchased with wire fraud proceeds as described in paragraph 194, was transferred to Hawaii Partners on or about July 17, 2017, and held as an asset of Hawaii Partners.

vii.    Title to the **1970 Ford Bronco**, which was purchased

with wire fraud proceeds as described in paragraph 195, was transferred to Hawaii

Partners on or about May 20, 2019, and held as an asset of Hawaii Partners.

225.    Accordingly, the above properties identified in Paragraph 224, are

forfeitable as property involved in a conspiracy to launder money, in violation of

18 U.S.C. § 1956(h).

*Money Laundering Transactions in Violation of 18 U.S.C. § 1957*

226.    Additionally, starting in at least 2010 and continuing through at least

May 2024, MISKE, Delia Fabro-Miske and others known and unknown, agreed to

and did engage in monetary transactions involving proceeds of the wire fraud

scheme and the financial institution fraud scheme in violation of 18 U.S.C. §§

1957 and 1956(h).  MISKE, Fabro-Miske, and their coconspirators knew that their

objective was to engage in transactions with criminally derived property and joined

in the agreement to further this unlawful purpose.

227.    The following are examples of transactions executed in violation of 18

U.S.C. § 1957 and in furtherance of the conspiracy in violation of 18 U.S.C.

§ 1956(h):

| Date | Transaction | Source of Funds |
|------|-------------|-----------------|
| 5/30/2020 | Hawaii Partners LLC's purchase of the Defendant Ferrari | $217,000 of the funds in the Hawaii Partners account used to purchase the Defendant Ferrari were proceeds of wire fraud that originated from the KTPC Savings Account (specifically, funds received from performing the job at Mauna Kea Beach Hotel, based on material misrepresentations). |
| 5/5/2020 | Fabro-Miske's withdrawal of the $1,162,826.76 Cashier's Check from KTPC Savings Account | The entirety, or almost the entirety, of the KTPC Savings Account #XXXXXXX602 from which it was withdrawn constituted proceeds of the wire fraud scheme (specifically, funds received from performing the job at Mauna Kea Beach Hotel, based on material misrepresentations). |
| 4/1/2020 | $50,000 wire transfer from KTPC Savings Account #XXXXXXX602 | The $50,000 wire transfer from KTPC Savings Account #XXXXXXX602 to MISKE's First Hawaiian Bank account, which constituted proceeds of the wire fraud scheme (KTPC proceeds). |
| 3/23/2020 | $50,000 wire transfer from KTPC Savings Account #XXXXXXX602 | The $50,000 wire transfer from KTPC Savings Account #XXXXXXX602 to MISKE's First Hawaiian Bank account, which constituted proceeds of the wire fraud scheme (KTPC proceeds). |
| 9/3/2019 – 7/3/2020 | Defendant Portlock Property mortgage/loan payments over $10K | Twelve payments between $13,862.31 and $12,312.83, totaling $160,189.80, made from MISKE's HCFCU account 7075. These funds constituted proceeds of the wire fraud scheme. |

| Date | Transaction | Source of Funds |
|---|---|---|
| 5/18/2018 | MISKE's withdrawal of four cashier's checks used to pay for the real property at 559 Kumukahi Pl. | Four cashier's checks between $20,000 and $50,000 each, totaling $140,000, withdrawn from MISKE's personal Bank of Hawaii account x729, were proceeds of the financial institution fraud scheme (specifically, funds derived from the 2018 fraud upon Bank of Hawaii). |
| 5/1/2018 – 8/1/2019 | Defendant Portlock Property mortgage/loan payments over $10K | Sixteen payments between $13,113.78 and $15,062.31, totaling $224,814.60, made from KTPC's Bank of Hawaii account x4415. These funds constituted proceeds of the wire fraud scheme. |
| 9/27/2011 | Purchase of Defendant Kailua Property | The $556,252.87 disbursed from KTPC escrow account established for the Nordic PCL job to Title Guaranty Escrow Services, which was used to purchase the Defendant Kailua Property, were proceeds of the wire fraud scheme (specifically, funds derived from Nordic PCL deposits). |
| 7/5/2011 – 10/17/2011 | Transfer of KTPC business income from KTPC escrow account into KTPC FHB bank account | Two transactions of $200,000 and $100,000, of funds transferred from the KTPC escrow account established for the Nordic PCL job to KTPC's FHB account x9376, which constituted wire fraud scheme proceeds (specifically funds derived from Nordic PCL deposits). |
| 4/27/2011 – 6/20/2012 | Transfer of KTPC business income from KTPC escrow account into MISKE's personal bank accounts | Four transactions issued from the KTPC escrow account between $100,000 and $200,000, totaling $470,523.48, of funds transferred into MISKE's personal FHB account x7379 and CPB account x8274, which constituted wire fraud proceeds (specifically, funds derived from Nordic PCL deposits). |

| Date | Transaction | Source of Funds |
|------|-------------|-----------------|
| 2/24/2011 – 12/15/2011 | Payments from KTPC escrow account to Leverage accounts | Eight transactions issued from the KTPC escrow account between $100,000 and $350,000, totaling $1,050,000, and transferred into Leverage CPB accounts x1374 and x2575, which constituted wire fraud proceeds (specifically, funds derived from Nordic PCL deposits). |
| 2/24/2011 | Purchase of the Defendant Portlock Property | The $150,000 transferred from the KTPC escrow account to Pacific Rim Bank to pay down the loan that MISKE took out to purchase the land for the Defendant Portlock Property was proceeds of the wire fraud scheme (specifically, funds derived from Nordic PCL deposits). |
| 12/13/2010 | Purchase of the fishing vessel "Rachel" and the Hawaii Longline Limited Entry Permit | The $900,521 sent from Kamaaina Holding LLC FHB account x6836 to Kim Marine Documentations Inc. to purchase the fishing vessel "Rachel" and Permit were proceeds of the wire fraud scheme (specifically, funds derived from Nordic PCL deposits). |
| 12/9/2010 | Purchase of the fishing vessel "Rachel" and the Hawaii Longline Limited Entry Permit | The $950,000 transferred from KTPC's FHB account x9376 to Kamaaina Holdings LLC's FHB account x6836, and later transferred Kim Marine Documentations Inc. to purchase the fishing vessel "Rachel" and Permit, were proceeds of the wire fraud scheme (specifically, funds derived from Nordic PCL deposits). |
| 5/7/2010 – 8/13/2012 | Defendant Portlock Property mortgage/loan payments over $10K | Twenty-eight payments of $12,000 each, totaling $336,000, made from KTPC's FHB account x9376. These funds constituted proceeds of the wire fraud scheme. |

228. The above properties are forfeitable as property involved in a violation of 18 U.S.C. § 1956(h), as property involved in a conspiracy to engage in monetary transactions in violation of 18 U.S.C. § 1957, and are also forfeitable as property involved in a transaction in violation of 18 U.S.C. § 1957.

## SUMMARY OF FORFEITABILITY

229. As set forth above, pursuant to 18 U.S.C. § 981(a)(1)(C), all of the Defendant Properties are forfeitable as property constituting, or derived from, proceeds traceable to the wire fraud scheme alleged above, in violation of 18 U.S.C. § 1343, fraud in connection with identification documents, in violation of 18 U.S.C. § 1028, and/or a conspiracy to commit one or both such offenses.

230. Additionally, pursuant to 18 U.S.C. § 981(a)(1)(C), the following Defendant Properties are forfeitable as property constituting, or derived from, proceeds traceable to the financial institution fraud scheme alleged above, in violation of 18 U.S.C. § 1344, and/or a conspiracy to commit such offenses:

    a.    $611,123.60 constituting proceeds of the sale of 559 Kumukahi; and

    b.    $676,785.56 constituting proceeds of the sale of the fishing vessel "Rachel."

231. Additionally, pursuant to 18 U.S.C. § 981(a)(1)(A), the following Defendant Properties are forfeitable, as property involved in a conspiracy to

96

launder money in violation of 18 U.S.C. § 1956(h), or property traceable to such

property:

  a.    Defendant Portlock Property;

  b.    Defendant Kailua Property;

  c.    Real property located at 559 Kumukahi Place, Honolulu;

  d.    2017 Ferrari F12 Berlinetta;

  e.    KTPC Bank of Hawaii Operating Account, #XXXXX415;

  f.    KTPC Bank of Hawaii Savings Account, #XXXXXXX602;

  g.    Oahu Termite Bank of Hawaii Operating Account,
        #XXXXXXX414;

  h.    Oahu Termite Bank of Hawaii Savings Account,
        #XXXXXXX218;

  i.    Bank of Hawaii Plumbing Account, #XXXXX220;

  j.    Bank of Hawaii Cashier's Check No. 429111 in the amount of
        $1,162,826.76;

  k.    Hawaii Longline Limited Entry Permit issued to the fishing
        vessel "Rachel";

  l.    The $676,785.56 constituting proceeds of the sale of the
        "Rachel";

  m.    The "Painkiller";

n.  1951 Volkswagen;

o.  1956 Volkswagen;

p.  1957 Volkswagen;

q.  1961 Volkswagen Van; and

r.  1970 Ford Bronco.

232.  Additionally, pursuant to 18 U.S.C. § 981(a)(1)(A), the following Defendant Properties are forfeitable, as property involved in money laundering in violation of 18 U.S.C. § 1957, or property traceable to such property:

a.  The Defendant Bank of Hawaii Cashier's Check No. 429111 in the amount of $1,162,826.76;

b.  $611,123.60, constituting proceeds of the sale of the real property located at 559 Kumukahi Place, Honolulu;

c.  The Defendant Ferrari; and

d.  The Defendant Portlock Property.

WHEREFORE, the United States prays that:

1.  Notice of this action be given to all persons who reasonably appear to be potential claimants of interests in the Defendant Properties;

2.  The Defendant Properties shall be forfeited and condemned to the United States of America;

3.  Plaintiff be awarded its costs and disbursements in this action; and

4.      The Court award such other and further relief as this Court deems just

and proper.

DATED:  January 22, 2025, at Honolulu, Hawaii.

KENNETH M. SORENSON
Acting United States Attorney
District of Hawaii


By      */s/ Aislinn Affinito*
SYDNEY SPECTOR
AISLINN K. AFFINITO
CRAIG S. NOLAN
Assistant U.S. Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA